1  DAVID A. GILL (State Bar No. 032145)
   *DGill@DGDK.com*
2  JOHN J. BINGHAM, JR. (State Bar No. 075842)
   *JBingham@DGDK.com*
3  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *JTedford@DGDK.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
5  Los Angeles, California 90067-2904
   Telephone:  (310) 277-0077
6  Facsimile:  (310) 277-5735

7  Proposed Attorneys for Meruelo Maddux Properties, Inc.,
   and affiliated Debtors and Debtors-in-Possession

8                    **UNITED STATES BANKRUPTCY COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10                   **SAN FERNANDO VALLEY DIVISION**

11

12  In re                                    )  Case No. 1:09-bk-13356-KT
                                             )
13  MERUELO MADDUX PROPERTIES, INC., et      )  Chapter 11
    al.[1]                                    )
14                                           )  (Joint Administration Requested)
              Debtor and Debtor-in-Possession. )
15                                           )  **DECLARATION OF RICHARD**
                                             )  **MERUELO IN SUPPORT OF FIRST**
16  _____ )  **DAY MOTIONS, INCLUDING BUT NOT**
                                             )  **LIMITED TO EMERGENCY MOTION**
17  ☑   Affects all Debtors                  )  **FOR ORDER DIRECTING THE JOINT**
                                             )  **ADMINISTRATION OF RELATED**
18  ☐   Affects the following Debtor(s):     )  **CASES**
                                             )
19                                           )  *[No hearing required with respect to the*
                                             )  *motion for joint administration.]*
20                                           )
                                             )  Date:    March 30, 2009
21                                           )  Time:    2:30 p.m.
                                             )  Place:   Courtroom 301
22                                           )           21041 Burbank Blvd.
                                             )           Woodland Hills, California
23                                           )
24  _____ )

25

26  _____

27      [1] Concurrently herewith, MMPI and 53 of its subsidiaries have filed motions for orders directing the joint administration of their chapter 11 cases (the "Joint Administration Motion"). In anticipation that the Joint Administration Motion will be granted, and consistent with the relief requested therein, the within motion is being filed only in MMPI's case. The debtors and debtors-in-possession and their respective tax identification numbers are identified in the *Notice Identifying Jointly Administered Debtors* to be filed with the Court in this case.
28

                                   1

1    I, Richard Meruelo, declare and state as follows:

2    1.    I am the Chief Executive Officer and Chairman of the Board of Directors of

3    Meruelo Maddux Properties, Inc., a Delaware corporation ("MMPI").

4    2.    On the date of filing of this declaration, MMPI has filed a voluntary petition for

5    relief under Chapter 11 of Title 11 of the United States Code (the "Code").

6    3.    As further described below, MMPI is the parent company of approximately 69

7    affiliated entities. Fifty-three of the affiliated entities (collectively with MMPI, the "Debtors")

8    have also filed voluntary petitions for relief under Chapter 11 of the Code. Attached as Exhibit "1"

9    hereto and incorporated herein by reference is a schedule listing the related entities which have

10    filed petitions for relief. I am a designated officer of each of the affiliated entities and am

11    authorized to give this declaration. I am over the age of 18 years and competent to give this

12    declaration.

13    4.    As a result of my being Chief Executive Officer of MMPI and a designated officer

14    of each of the affiliated entities and my review of relevant documents, I am familiar with the

15    Debtors' day-to-day operations, business affairs, and books and records, and the manner in which

16    they are prepared. Except as otherwise noted, all facts set forth in this declaration are based on my

17    personal knowledge, my discussions with other members of the Debtors' senior management team,

18    my review of relevant documents, or my opinion, based on, among other things, my experience and

19    knowledge of the Debtors' operations and financial conditions.

20    5.    This declaration is made in support of the following motions which have been or

21    will be filed today by the Debtors (collectively the "First-Day Motions"):

22        a.    *Emergency Motion for Order Directing the Joint Administration of Related*

23    *Cases* (the "Joint Administration Motion");

24        b.    *Emergency Motion for Order Limiting Scope of Notice* (the "Limited Notice

25    Motion");

26        c.    *Emergency Motion for Order (1) Approving Continued Use of Cash*

27    *Management System, (2) Approving Lending and Borrowing between Debtors on an Unsecured*

28    ///

334663.09 [XP]    25162

1   *Basis, (3) Authorizing the Debtors' Use of Prepetition Bank Accounts, and (4) Dispensing with the*

2   *Requirements of 11 U.S.C. § 345(b)* (the "Cash Management Motion");

3           d.      *Emergency Motion for Order Authorizing the Use of Cash Collateral on an*

4   *Interim Basis Pending a Final Hearing* (the "Cash Collateral Motion");

5           e.      *Emergency Motion for Order Authorizing Debtors to Pay Outstanding*

6   *Prepetition Wages and Salaries, and Honor All Other Prepetition Employee Benefits* (the

7   "Employee Payroll and Benefits Motion");

8           f.      *Emergency Motion for Order Establishing Procedures for (A) Determining*

9   *Requests for Assurance of Payment to Utility Companies and (B) Modifying the Amount of*

10  *Assurance of Payment that a Utility Demands as Adequate* (the "Utilities Motion");

11          g.      *Emergency Motion for Order Authorizing the Debtors to Employ and*

12  *Compensate Certain Professionals and Service Providers Utilized by the Debtors in the Ordinary*

13  *Course of Business Pursuant to 11 U.S.C. §§ 105(a), 327, 328 and 330* (the "Ordinary Course

14  Professionals Motion"); and

15          h.      *Emergency Motion for Order Extending Time for Debtors to File Schedules*

16  *and Statements of Financial Affairs* (the "Extension Motion").

17          6.      I am experienced in the development, ownership and operation of real estate assets.

18  Attached as Exhibit "2" hereto and incorporated herein is my personal resume summarizing my

19  education, employment history, and expertise.  The matters stated therein are true and correct.

20

21  **Corporate Structure**

22          7.      MMPI was incorporated in 2006 under the laws of the State of Delaware, and is

23  registered with the California Secretary of State to do business in the State of California.

24  Approximately 51.3% of MMPI's stock is privately owned by entities affiliated with John Maddux

25  or me.  The other 48.7% of MMPI's stock is publicly owned and traded on the NASDAQ stock

26  exchange.  MMPI is structured as a taxable corporation under Subchapter C of the Internal

27  Revenue Code.

28  *///*

-3-

334663.09 [XP]    25162

8.    MMPI was formed to acquire substantially all of the interests and assets of, and to succeed to the business of, its predecessor, Meruelo Maddux Properties. That business consisted of a combination of entities whose controlling interest was owned by me and non-controlling interest was owned by John Maddux. MMPI's predecessor was an owner, developer and acquirer of industrial, commercial and residential properties.

9.    MMPI and a subsidiary operating partnership, Meruelo Maddux Properties, L.P. ("MMPLP"), were formed on or about July 5, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's common stock. The formation transaction and the IPO were designed to allow MMPI to acquire and continue the operations of its predecessor entities, pay down existing mortgage debt, pay off a mezzanine loan facility from the State of California Public Employees' Retirement System ("CalPERS"), provide capital for future acquisitions, fund future development costs, and establish a capital reserve for general corporate purposes. Between January 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000 shares of common stock at $10.00 per share. MMPI raised approximately $425.7 million, after underwriting discounts but before expenses related to the IPO. A substantial portion of the proceeds was used to pay off the debt owed to CalPERS. On December 31, 2008, there were approximately 88.1 million shares of common stock outstanding.

10.    MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP, which we refer to internally as the "Operating Partnership." The remaining 0.4% limited partnership units are owned by certain members of MMPI's management team who obtained their interests through a Long-Term Incentive Plan ("LTIP") available to certain personnel as part of their compensation packages.

11.    MMPLP owns 100% of the common stock of Meruelo Maddux Construction, Inc. ("MM Construction"), 99% of the membership units in Meruelo Maddux Management, LLC ("MM Management"), and 99% of the membership units in Funes Architecture, LLC ("Funes"). The remaining membership units in MM Management and Funes are owned by MM Construction.

12.    MMPLP also owns 100% of the membership units in MMP Ventures, LLC ("MMP Ventures"). MMP Ventures, in turn, owns 100% of the stock or membership units in a number of

-4-

1  subsidiary corporations and limited liability companies.  We sometimes refer to these subsidiaries

2  as the "property-level entities" because they are the entities which hold title to the various real

3  properties and real estate projects developed and operated by MMPI through MMPLP.

4      13.    For ease of reference, a chart reflecting the Company's corporate structure is

5  attached as Exhibit "3" hereto.  The corporate structure utilized by the Company is not uncommon

6  in the real estate development industry.

7      14.    As mentioned above, a list of related entities which have filed for bankruptcy relief

8  is attached as Exhibit "1" hereto.  There are a number of related entities that have not filed at this

9  time for relief under the Code because, in our business judgment, we have determined that it is not

10  in the best interests of MMPI and the affiliates that such entities file for relief.  A list of MMPI's

11  subsidiaries which have *not* filed for bankruptcy is attached as Exhibit "4" hereto.

12

13  **The Company's Business**

14      15.    MMPI, together with MMPLP and its affiliates and related entities (sometimes

15  collectively referred to herein as the "Company"), is a self-managed, full-service real estate

16  company that develops, redevelops and owns industrial, commercial and multi-unit residential real

17  properties primarily located in downtown Los Angeles and other areas in southern California.  The

18  Company focuses on unique properties that it believes have an alternate, more profitable use

19  achievable through major renovation, redevelopment or development.  The Company's projects are

20  predominantly located in a densely populated urban, multi-ethnic environment and involve

21  numerous local entitlement, property assemblage and physical challenges.

22      16.    The Company's upper-level management team consists of the following:  I am the

23  Chairman and Chief Executive Officer; John Charles Maddux is our President and Chief Operating

24  Officer; Lynn Beckemeyer is our Executive Vice President – Development; Andrew Murray is our

25  Chief Financial Officer; Fred Skaggs is our Chief Accounting Officer; Todd Nielsen is our General

26  Counsel and corporate Secretary; and Miguel Enrique Echemendia is our Chief Administrative

27  Officer.  I believe that our management team is a very experienced and highly talented group, with

28  ///

-5-

1  experience across a broad spectrum of specialties in the field of real estate development, including
2  but not limited to accounting, finance, management and sales.

3      17.     The Company is committed to responsible property investing that has economic,
4  environmental and social benefits.  Its development activities include major urban infill projects
5  (those in which land in a built-up area is used as part of a community redevelopment or growth
6  management program) that are expected to meet the demands of urban communities and utilize or
7  upgrade existing infrastructure.  The Company is known as a "smart" developer, and many of its
8  projects are designed to locate businesses, customers and employees close to one another and to
9  existing public transit systems.  The Company is also known as an "incubator" of new businesses,
10  actively seeking development projects in empowerment zones.  The Company is very familiar with
11  the social, cultural, business and political issues of land development in Southern California, and
12  especially the Los Angeles area.

13      18.     The Company has a construction arm (MM Construction), a property management
14  arm (MM Management), an architectural arm (Funes), and an operating arm (MMPLP), which
15  entities provide accounting, legal, land use, development and other administrative services for all of
16  the Debtors.  Overall, the Company currently has approximately 100 employees, and its bi-weekly
17  payroll is approximately $300,000.

18      19.     Both before and after MMPI's formation, the Company's businesses have been
19  operated on a consolidated basis.  Among other things, the Company files consolidated financial
20  statements and other reports with the Securities and Exchange Commission (the "SEC") and
21  consolidated tax returns.  This consolidated reporting is a manifestation of the synergy and
22  economic efficiencies gained through the Company's corporate structure as outlined herein.
23  Although I understand that our corporate structure theoretically could be viewed as involving
24  ownership by some property-level entities of separate "single asset real estate" parcels or projects
25  under sections 101(51B) and 362(d)(3) of the Code, we feel strongly that because the Company is
26  much more than its individual parts, such property-level entity Debtors should be treated as part of
27  a consolidated multi-business entity rather than single asset real estate entities.  I anticipate that the
28  Debtors may file a motion for a determination that the property-level entity Debtors are not "single

-6-

1  asset real estate" debtors under the Code or, alternatively, for an extension of six to nine months of

2  the time for such Debtors to comply with the requirements of section 362(d)(3) of the Code, to

3  allow the Debtors time to present a joint or consolidated plan of reorganization to the Court and

4  creditors.

5       20.     Further evidencing the consolidated nature of the Company, the indirect overhead

6  expenses for administrative services provided by certain parts of the Company are allocated to the

7  other parts of the Company based on an equitable formula. Direct costs of property management,

8  construction, architectural services, or other services are charged directly to the property-level

9  entity that receives the benefit of such services. As discussed in greater detail below, with a few

10 exceptions, revenues received from the operation of the Company's properties are swept daily into

11 a general operating account, and the Company's debts are paid from such account. Although such

12 accounting procedures are followed internally, I believe that, generally, investors, creditors and

13 others view or believe that the Company is a consolidated entity.

14      21.     As of December 31, 2008, the Company owned, leased with rights to purchase

15 and/or held rights to acquire interests in 28 rental projects and 19 development projects (one of

16 which was subject to a lease with an option to purchase, which lease and option were terminated in

17 the first quarter of 2009). Properties and projects the Company currently owns or is developing

18 include the following:

19      a.     The Company owns a 20.12-acre site along Alameda Street which houses

20 garment manufacturer American Apparel, believed to be operating the largest garment factory in

21 the United States and one of the largest private employers in the city of Los Angeles. The site also

22 houses the Company's headquarters, located at 761 Terminal Street, Building One, Second Floor,

23 in Los Angeles, California.

24      b.     The Company owns real property on South Hill Street on which is located

25 The Union Lofts apartments. The building is a 12-story former landmark bank building which was

26 redeveloped by the Company for approximately 92 loft-style apartments ranging in size from 700

27 to 1,900 square feet. The building has approximately 10,000 square feet of restaurant and retail

28 space at street level.

-7-

1      c.      The Company is developing a 35-story residential apartment complex with

2   6,800 square feet of ground floor retail space at 717 West Ninth Street in Los Angeles, a few

3   blocks northeast of the Staples Center.  When finished, the building will be downtown Los

4   Angeles' tallest residential skyscraper.  The property is owned by Meruelo Maddux – 845 S.

5   Flower Street, LLC, an entity that at this time has not filed for relief under the Code.

6      22.      With approximately 80 acres of land, I believe that the Company is the largest non-

7   government land owner in downtown Los Angeles.

8

9   **Summary of the Debtors' Assets and Liabilities**

10     23.      Collectively, the Debtors currently own approximately 52 real properties and real

11   estate projects.  These real properties and projects may be categorized as follows:

12     a.      The Debtors own 26 real properties and real estate projects that generate

13   income through operations and are encumbered by consensual liens.  A schedule of the properties

14   identifying, among other things, the Debtor which owns each respective property, the property

15   address, the property value, the name of the secured creditor holding the consensual lien against the

16   property, and the amount owed to such creditor as of March 25, 2009, is attached as Exhibit "5"

17   hereto.  As Exhibit "5" reflects, the aggregate value of these properties is approximately $432.1

18   million, and the aggregate debt secured by the properties is approximately $253.7 million.

19     b.      The Debtors own 4 real properties and real estate projects that do not

20   generate income through operations and are encumbered by consensual liens.  These properties are

21   also identified in Exhibit "5" hereto.  As the exhibit reflects, the aggregate value of these properties

22   is approximately $50.3 million, and the aggregate debt secured by the properties is approximately

23   $26.3 million.

24     c.      The Debtors own 22 real properties and real estate projects that are not

25   encumbered by consensual liens, 10 of which generate income from operations.  A schedule of the

26   properties identifying, among other things, the Debtor which owns each respective property, the

27   property address, the property book value and fair market value, and the amount generated from the

28   ///

-8-

1  property monthly is attached as Exhibit "7" hereto.  As Exhibit "7" reflects, the aggregate value of

2  these properties is approximately $104.3 million.

3         24.    The Debtors have liability insurance in place with respect to all of the Debtors'

4  properties.  In addition, for those properties that have been improved, the Debtors have all risk

5  coverage in place.  The Debtors are current in the payment of their insurance premiums.

6         25.    Our assessment of the property values identified in Exhibits "5" and "7" is based

7  upon our long-standing expertise as developers and sellers of real property in the Los Angeles area

8  generally and downtown Los Angeles in particular, and numerous discussions we have had over

9  the past few months with other developers, lenders, real estate brokers and appraisers.  I believe

10  that the value of the Debtors' properties are as set forth in Exhibits "5" and "7" hereto.

11         26.    There is currently outstanding real property taxes secured by each of the properties

12  owned by the Debtors.  A schedule of real property taxes owed against the Debtors' properties is

13  attached as Exhibit "6" hereto.

14         27.    Exhibits "5" through "7" hereto were prepared under my supervision.  They were

15  prepared based upon a review by the Company's senior management, especially Andrew Murray,

16  our Chief Financial Officer, and Fred Skaggs, our Chief Accounting Officer, of the Company's

17  files and records, including accounting data for each of the affected Debtors.  To the best of my

18  knowledge and belief, all of the information contained in such exhibits is true and accurate.

19         28.    In light of the information reflected in Exhibits "5" through "7", I believe that the

20  aggregate fair market value of the Debtors' real properties is approximately $587.0 million, and the

21  aggregate liens against such real properties, including real property taxes, is approximately $284.0

22  million.  By extension, I and others members of the Company's management team believe that the

23  value of the Debtors' properties exceeds the liens and charges against such properties by more than

24  $300 million.

25         29.    Exhibit "7" includes real property located at 1319 West 7th Street in Los Angeles,

26  with a stated value of $20 million.  That property is currently the subject of litigation between the

27  entity that has title to the property, Alameda Produce Market, LLC, and the Metropolitan Transit

28  Authority ("MTA"), which initiated eminent domain proceedings.  We believe that the MTA did

1  not properly pursue such proceedings and the Company has a claim against the MTA for the value

2  of the Company's lost use of the property during the four years that the property has been subject

3  of litigation.  In the event that the MTA is ever successful in taking the property, the Company will

4  have a claim against the MTA for the fair value thereof, which value the Company asserts is not

5  less than $20 million.

6        30.  In addition to the secured debt described above, there exists claims by employees

7  which I understand may be entitled to priority under the Code.  As discussed below, the Debtors

8  have paid their employees' wages and salaries through March 27, 2009.  As a result, I believe that

9  any wages and salaries owed to current employees are minimal.  However, it is my understanding

10  that employees are also entitled to claims for accrued but unpaid vacation and sick leave pay.  I am

11  informed and believe that the aggregate amount of accrued vacation pay owed to current employees

12  is approximately $243,899, and the aggregate amount of accrued sick pay owed to current

13  employees is approximately $110,946.

14        31.  The Debtors also owe debts which I understand are classified as general unsecured

15  debts under the Code.  As of March 24, 2009, the aggregate amount of unsecured debt owed by the

16  Debtors to trade creditors, attorneys and other professionals, utility companies, insurance and title

17  companies, and similarly situated creditors was approximately $8.73 million.  This figure does not

18  include Debtors' liability arising from a Debtor's guarantee of another Debtor's secured debt.  This

19  figure also does not include inter-company debt, a schedule of which is attached as Exhibit "8"

20  hereto.  This schedule was prepared under my supervision, and is based upon a review by the

21  Company's senior management, especially Fred Skaggs, our Chief Accounting Officer, of the

22  Company's files and records, including accounting data for each of the affected Debtors.  To the

23  best of my knowledge and belief, all of the information contained in such exhibits is true and

24  accurate.

25        32.  In light of the foregoing, I and others members of the Company's management team

26  believe that the value of the Debtors' real estate assets is substantially in excess of the debt secured

27  by such real estate, as well as the claims of unsecured creditors.

28  ///

**Events Leading to the Debtors' Bankruptcy Filing**

33.     The Company's primary objective is to maximize return on investment through development and redevelopment activities, which activities require significant amounts of capital. The Company experiences significant, recurring cash shortfalls from (a) operating activities, (b) recurring investment activities such as carrying costs for interest payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing rental properties. The Company needs to generate additional cash of approximately $28.0 million annually to fund such shortfalls.

34.     The current economic recession and associated disruption in the debt and equity capital markets have been extremely challenging for the Company. However, during 2008, the Company took significant steps in an effort to improve its financial position. Among other things, the Company sold three rental projects and three development projects, for an aggregate sales price of approximately $110.6 million. The Company also completed nine acquisitions or conversions of development projects to rental projects, resulting in the availability of 949,905 net rental square footage. However, the Company's efforts could not overcome the collapse of credit markets and the American banking system that took place in the fall of 2008. On or about October 1, 2008, the Company suspended development of twelve construction projects.

35.     The Company requires approximately $1.8 million in cash monthly to satisfy principal and interest payments on 26 out of 30 of the Company's loans that total $266.0 million. However, a number of the Company's loans have come due or will be coming due soon. Among other things, the Company has been unable to extend or refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or March 1, 2009, including two secured by the property housing the Company's corporate headquarters, and one which is secured by the Union Lofts project. In total, the Company has twelve loans that are set to mature during 2009 with an aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization on other long-terms loans.

36.     Two lenders have filed lawsuits seeking, among other things, the appointment of a receiver. On or about March 4, 2009, California Bank & Trust filed a complaint against 788 South

-11-

1  Alameda, LLC, and MMPI for, among other things, judicial foreclosure and the appointment of a

2  receiver. A hearing on California Bank & Trust's motion for appointment of a receiver has been

3  set for April 2, 2009. 788 South Alameda, LLC, is one of the Debtors that has filed a Chapter 11

4  petition. California Bank & Trust's counsel will be notified of the filing prior to the hearing.

5       37.    In addition, on or about March 17, 2009, Chinatrust Bank filed a complaint against

6  Merco Group – 3185 E. Washington Boulevard, LLC, for, among other things, judicial foreclosure

7  and the appointment of a receiver. A hearing on Chinatrust Bank's motion for appointment of a

8  receiver was scheduled for March 27, 2009. Merco Group – 3185 E. Washington Boulevard, LLC,

9  filed its Chapter 11 petition prior to the hearing on that motion, and Chinatrust Bank's counsel was

10 notified of the filing prior to the hearing thereon.

11       38.    During the past several months, the Company has tirelessly investigated borrowing

12 additional capital in order to continue to fund its development projects and, if necessary, operating

13 expenses. However, the Company has not been able to borrow or refinance at conventional or

14 otherwise acceptable rates, in large part, in my view, due to the deterioration of the credit markets

15 that appears to have affected all banks and other lenders. Lenders are frequently lending at lower

16 loan-to-value ratios, are taking longer to make lending decisions and are generally applying more

17 stringent underwriting standards. Over the last few months, a number of lenders have demanded

18 exorbitant fees as consideration for their consent to extend the terms of their loans, with each

19 lender seemingly seeking to outdo the other with respect to the fees and other concessions sought

20 by such lenders. However, given that the Company has an approximately $28.0 million annual

21 shortfall in its combined operating and development activities, and because of the turmoil in the

22 credit markets especially for development financing, the Company must obtain significant loan

23 concessions from its lenders to survive.

24       39.    The existence of open credit markets is not only important because the Company

25 needs to finance acquisitions and developments in the ordinary course of its business, but also

26 because part of the Company's business model involves the sale of the developed or redeveloped

27 properties to third party purchasers. Absent an open credit market, purchasers of our products are

28 finding it difficult to obtain financing to purchase our products. No such markets appear to exist at

334663.09 [XP]      25162

1 | the present time. However, the Company's management team and I anticipate that credit markets

2 | will improve in the near future in light of, among other things, the hundreds of billions of dollars

3 | being infused into the banking systems by the federal government, thus returning the Company's

4 | operations to its traditional business models.

5 |      40.     Due to the Company's inability to obtain additional capital, and the unwillingness of

6 | current lenders to extend the terms of maturing loans on acceptable terms, the Debtors are seeking

7 | relief under Chapter 11 of the Code to reorganize their financial affairs and prevent the piecemeal

8 | dismemberment of their business to the detriment of their creditors.

9 |

10 | **General Strategy for Reorganization of the Debtors' Financial Affairs**

11 |      41.     Through these Chapter 11 cases, the Company anticipates it will seek various forms

12 | of relief from the Court in addition to the relief being sought in their First Day Motions. Among

13 | other things, the Debtors may seek: (a) a determination that the Debtors are not single asset real

14 | estate entities as that term is defined under section 101(51B) of the Code, or, in the alternative, that

15 | cause exists to extend the time for them to comply with section 362(d)(3) of the Code;

16 | (b) substantive consolidation of the Debtors' respective assets and liabilities, either through a

17 | motion or a plan of reorganization; (c) authorization to reject such executory contracts that the

18 | Debtors find in their business judgment burdensome or otherwise subject to rejection under section

19 | 365 of the Code; (d) approval of the marketing and sale of a number of properties, including

20 | pending sales, during the administration of the Chapter 11 case; and (e) the promulgation of a joint

21 | or consolidated disclosure statement and a feasible joint or consolidated plan of reorganization

22 | which will provide for a restructuring of the Debtors' secured debt, thus preserving substantial

23 | recoveries to unsecured creditors.

24 |      42.     The Company's management team and I believe that there is sufficient value in the

25 | Company's assets to satisfy all legitimate claims of secured and unsecured creditors if the Debtors

26 | are allowed to continue to operate their business, including the marketing and sale and the ongoing

27 | development of their real properties, and restructure the Debtors' secured debt to incorporate fair

28 | market terms.

**Additional Facts Relating to the Joint Administration Motion**

43.     Generally, the Debtors operate as a consolidated entity.  Among other things, the Debtors file consolidated financial statements with the Securities and Exchange Commission and employ a cash management system in which all of the Debtors' income is pooled together in order to pay the Debtors' collective expenses.  MMPI, as the ultimate parent company, controls all of the other Debtors' operations and accounts.

44.     It is my understanding that the term "affiliate" is defined in the Code to mean, among other things, an entity that directly or indirectly owns, controls, or holds with power to vote, twenty percent or more of the outstanding voting securities of the debtor, subject to certain exceptions which I understand are not relevant in this case.  I believe that MMPI is an "affiliate" of each of the other Debtors, by virtue of the fact that MMPI, directly or through its subsidiaries, owns or controls 100% of each of the other Debtors.

45.     It is my understanding that, absent "joint administration" of the Cases, the Debtors will sometimes be required to file substantially the exact same pleading in each of the Cases when seeking certain forms of relief.  This will require the Debtors to incur substantial and unnecessary legal fees and expenses since papers and pleadings will have to be duplicated and adapted to each Case, and then filed on the docket for each Case.  In order to ease the administrative burden and cost on the Debtors, as well as on the Court, creditors, and other parties in interest, the Debtors are requesting that Cases be jointly administered.

46.     The first chapter 11 petition filed by the Debtors was filed on March 26, 2009, by Meruelo Maddux Properties – 12385 San Fernando Road, LLC ("MMP San Fernando Road").  MMP San Fernando Road owns 5.50 acres of undeveloped real property located at 12385 San Fernando Road, Sylmar, California, which I understand to be located within the San Fernando Valley Division of the Central District of California.  The Company's current plan with respect to that property is the development of an urban village with 245 residential units with 9,000 square feet of retail space and 9,000 square feet of office space.

47.     Because the Debtors generally operated as or in the nature of a single entity, and because MMPI is a publicly traded company, I believe that creditors and others that do business

-14-

1  with the Debtors are much more familiar with the name Meruelo Maddux Properties, Inc. or MMPI

2  than Meruelo Maddux Properties – 12385 San Fernando Road, LLC.  As a result, if the Court

3  grants the Debtors' request for joint administration of the Cases, the Debtors are requesting that

4  MMPI's case be the "lead" case.

5

6  **Additional Facts Relating to the Motion to Limit Notice**

7          48.     As of the date of the filing of this declaration, the Debtors are continuing to gather

8  information needed in order to prepare the Debtors' schedules, statements of financial affairs, and

9  other documents required by the Court and the Office of the United States Trustee.  Accordingly, I

10 am unable to testify as to exactly how many creditors will appear in the Debtors' schedules, but I

11 do provide below my estimate of the various creditor constituencies as listed or to be listed in the

12 mailing matrixes and lists of creditors filed in the Debtors' cases.  Because MMPI is a publicly

13 traded company, the identity of security interest holders can vary from day to day.

14         49.     As detailed above, a number of the Debtors own real properties which are

15 encumbered.  As of today, the Debtors collectively owe money to approximately sixteen lenders

16 whose debts are secured by liens against real properties, as identified in Exhibit "5" hereto.  This

17 figure does not include entities such as the Counties of Los Angeles and San Bernardino that have

18 liens or charges against the Debtors' real properties as a result of unpaid real property taxes, as

19 identified in Exhibit "6" hereto.

20         50.     As of today, and as discussed further below, the Debtors currently employ

21 approximately 100 employees.  Prior to the filing of the Cases, the Debtors paid all employees their

22 estimated wages and salaries through March 27, 2009.  Thus, I believe that few, if any, employees

23 were owed wages and salaries as of the time of filing.  However, all of the employees have, in the

24 ordinary course of their employment, accrued vacation and sick leave pay.  It is my understanding

25 that, at least to a point, claims that may be asserted by the employees are entitled to priority over

26 general unsecured claims.  As a result, I anticipate that employees will need to be identified in the

27 applicable Debtors' schedules and appear on the consolidated master mailing matrix to be filed in

28 MMPI's case.

-15-

334663.09 [XP]    25162

1    51.    As of today, the Debtors currently owe debts which I understand are characterized in

2    the bankruptcy context as "general unsecured" debts to approximately 88 trade creditors, attorneys

3    and other professionals, utility companies, insurance and title companies, and similarly situated

4    creditors.  A number of these entities are creditors of more than one of the Debtors.  I believe that

5    most of the Debtors have less than twenty general unsecured creditors whose claims are not

6    disputed.  There may also be contingent liabilities owed to the hundreds of entities that are tenants

7    under leases of the real properties owned by the Debtors.

8    52.    It is my understanding that, in the absence of the appointment of an Official

9    Committee of Unsecured Creditors, certain pleadings filed with the Court generally must be served

10    in each case on the creditors holding the twenty largest general unsecured claims against the estate.

11    However, because of the number of creditors that hold claims against one Debtor but not others, I

12    understand that, in the aggregate, there are a lot more than twenty entities who will appear on the

13    lists of the top twenty general unsecured creditors in the Debtors' cases.

14    53.    As a result, and in conjunction with the Debtors' motion for joint administration, the

15    Debtors are requesting that whenever applicable bankruptcy rules might require service on the top

16    twenty general unsecured creditors, parties instead be required to serve a consolidated list of the top

17    twenty-five general unsecured creditors of the Debtors' estates.  A schedule of the top twenty-five

18    general unsecured creditors which has been prepared by the Company's counsel based upon the

19    Company's accounts payable register as of March 26, 2009, is attached as Exhibit "9" hereto.  This

20    list includes 25 of 88 (28.4%) third-party general unsecured creditors; in terms of dollars, the

21    entities identified in Exhibit "9" constitute approximately $8.4 million of the $8.7 million (96.1%)

22    of general unsecured claims.

23    54.    As discussed above, shares of MMPI are publicly traded on NASDAQ.  As a result,

24    the identity of MMPI's shareholders, and the amount of shares owned by each shareholder, change

25    frequently.  I am advised that it will likely take approximately five or more business days to obtain

26    names and addresses of the persons and entities that owned shares in MMPI as of the date MMPI

27    files its petition.  I estimate that, as of today, MMPI has approximately 1,000 shareholders.

28    ///

-16-

1    55.    It is my understanding that a number of notices are required to be served on all

2  creditors and parties in interest, and certain other notices are required to be served as well on all

3  equity security holders.  It is also my understanding that the duplication and postage costs of

4  serving such notices during the course of the Debtors' cases will be very high if the Debtors are

5  required to serve all creditors and equity security holders, even if only by regular first class mail.

6  Accordingly, the Company is requesting that the Court limit the entities on which certain notices

7  must be served in the manner set forth in the Motion to Limit Notice.

8

9  **Additional Facts Relating to the Cash Management Motion**

10    56.    At my direction, MMPI's accounting department has prepared a chart of all bank

11  accounts held in the Debtors' names and comprising the Debtors' consolidated cash management

12  and disbursement system (the "Cash Management System").  A true and correct copy of the

13  schedule of accounts is attached as Exhibit "10" hereto.  Among other things, the schedule

14  identifies the Debtor in whose name each account is held, the bank at which the account is placed,

15  and the cash balance as of March 26, 2009.  Some of the Debtors' accounts are checking accounts,

16  some are investment accounts, and some are reserve accounts for the benefit of specific lenders.

17    57.    In the ordinary course of business, MMPLP maintains a concentration account (the

18  "Concentration Account") into which is swept or deposited all receipts received by the Debtors,

19  from whatever source.  Currently electronically tied to the Concentration Account is the operating

20  bank account for every other Debtor and non-debtor affiliate.  From the Concentration Account,

21  each day funds are transferred to the operating account of each affiliated entity when needed to

22  fund payment on checks issued by that entity.

23    58.    For purposes of clarification, the procedure described in the foregoing paragraph

24  does not apply to receipts and the payment of expenses of Meruelo Maddux – 845 S. Flower Street,

25  LLC ("MM 845 South Flower").  That entity is the owner of the property on which is being built a

26  35-story residential apartment complex at 717 West Ninth Street in Los Angeles.  MM 845 South

27  Flower has sufficient available reserves and/or funding from the construction lender to pay the

28  costs of construction through the completion of the project, and has not yet filed for bankruptcy.

-17-

334663.09 [XP]    25162

59.    MMPLP and several other Debtors also maintain payroll accounts. Employees receive payroll checks drawn against, or receive funds transferred from, the payroll account held in the name of the Debtor for which such person is an employee. The Company utilizes ADP as its payroll service provider, which remits, among other things, funds withheld from employees' paychecks to appropriate governmental agencies. From MMPI's operating account, funds are transferred to the payroll account of each affiliated entity when needed to fund that entity's payroll.

60.    Transfers made to and from the Concentration Account are accounted for on the Debtors' books through "to/from" entries between MMPLP and the relevant Debtor. Direct costs incurred by one Debtor on behalf of another are charged by MMPLP against the Debtor receiving the benefit. Indirect costs of administration are allocated on an equitable basis among the Debtors benefiting therefrom. The balances of the to/from accounts are updated at about the time of each transaction, and change almost daily. Current balances are reflected in Exhibit "8" hereto.

61.    An example of the manner in which the Cash Management System operates is as follows. If a Debtor owning rental property is paid rent by one of its tenants, the rent payment is deposited or transferred into the Concentration Account and applied against the inter-company balance, if any, owed or owing by that particular Debtor to MMPLP. The funds would then be available for use by the other Debtors. Creditors of the landlord Debtor would be paid in the ordinary course. In that regard, payment would be made by the transfer of funds from the Concentration Account to the landlord Debtor's operating account.

62.    MMPLP also maintains a number of investment accounts. When funds are not immediately needed to pay the Company's operating and payroll obligations, the funds may be transferred into one or more investment accounts to earn short-term interest. During 2008, the Company earned approximately $839,000 in interest income, mostly from the interest earned on deposits in its interest-bearing investment accounts.

63.    It is my understanding that the accounting protocols utilized in the Cash Management System are within the structures of Generally Accepted Accounting Principles, and are similar to cash management systems commonly employed by corporate enterprises comparable to the Company in economic scope. The Cash Management System was established in

-18-

334663.09 [XP]    25162

1    consultation with the Company's accountants, Ernst & Young, LLP.  The Cash Management

2    System utilizes complex computer software, as well as the Company's experienced accounting

3    staff to maintain and operate the same.

4         64.    An integral part of the Cash Management System is the Company's use of its bank

5    accounts to effectively and efficiently collect, transfer and disburse funds as needed in the ordinary

6    course of the Company's business operations, while maximizing the ability to earn interest on its

7    deposits.  I believe that the Cash Management System provides significant benefits to the

8    Company, including the ability to (a) closely track, and thus control, all corporate funds, (b) ensure

9    cash availability, (c) earn interest income on money not immediately needed to pay the Company's

10   obligations, and (d) reduce administrative expenses by facilitating the movement of funds and the

11   development of timely and accurate account balance and presentment information.

12        65.    I believe that a disruption in the Cash Management System could cause delays in the

13   collection and disbursement of funds, impeding the Debtors' ability to carry out normal business

14   operations and resulting in a loss of income.  I also believe that a disruption could impair the

15   implementation of the Debtors' restructuring strategy.  I further believe that the Cash Management

16   System allows the Company to closely manage its cash flow needs, and includes the accounting

17   controls necessary to allow the Debtors and others to trace funds through the system and ensure

18   that all transactions are adequately documented and readily ascertainable.

19        66.    I do not believe that the Debtors' creditors will be prejudiced by their continuation

20   of the Cash Management System.  Excluding inter-company balances and contingent claims on

21   guarantees, the balance of the Debtors' unsecured debt is believed to be approximately $8.73

22   million, which is far less than the approximately $104.5 million of unencumbered real estate that is

23   owned by the Debtors.  Accordingly, I believe that the value of the Debtors' free and clear assets

24   alone exceeds the Debtors' unsecured debt, and therefore the use of income from one Debtor to pay

25   the debts of another will not impair or diminish the claim of any unsecured creditor.

26        67.    It is my understanding that the U.S. Trustee generally requires that Chapter 11

27   debtors close existing bank accounts and establish new "debtor-in-possession" accounts at certain

28   approved depositories, including accounts for taxes and cash collateral.  I believe that the closing of

-19-

1    all of the Debtors' accounts would disrupt the Debtors' business operations and require the Debtors

2    to devote a substantial amount of time and effort to the closing and opening of such accounts at a

3    critical stage of the Debtors' restructuring effort. As a result, the Debtors are requesting authority

4    to maintain their current Cash Management System and maintain their usage of existing bank

5    accounts.

6        68.    In order to ensure that no payments are made postpetition on debts incurred by the

7    Debtors prepetition, the Company intends to, among other things, work closely with the Debtors'

8    banks participating in the Cash Management System to ensure that any checks issued prepetition

9    are not honored without approval of the Court. In addition, as part of its reorganization planning,

10   the Debtors ceased writing checks, except for payroll, on or about March 25, 2009, in an effort to

11   reduce the number of checks not presented for payment prior to today. The aggregate amount of

12   checks outstanding is approximately $544,000. In light of the procedures that will be followed by

13   the Debtors, provided that the banks act according to the Debtors' requests, I do not believe that

14   prepetition debts will inadvertently be paid.

15       69.    As reflected in Exhibit "10" hereto, as of March 26, 2009, the Company had on

16   deposit cash in the total approximate amount of $61.9 million, of which approximately $3.3 million

17   constituted unreserved, free and clear funds. I do not believe that there has been any significant or

18   meaningful change in such balances from March 26, 2009, through today. Some of the Debtors'

19   accounts currently have, and typically have, over $250,000 on deposit, and the balance of funds in

20   the Concentration Account generally exceeds $250,000.

21       70.    It is my understanding that section 345 of the Code contains provisions regarding

22   deposits and investments maintained by a debtor-in-possession. Among other things, I understand

23   that, unless the court orders otherwise, with respect to a deposit or investment that is insured or

24   guaranteed by the United States or an agency thereof, a debtor must require from an entity with

25   which such money is deposited or invested a bond in favor of the United States, secured by the

26   undertaking of certain corporate sureties, subject to certain conditions. The Debtors are requesting

27   that they be excused from compliance with section 345 because, among other things, the deposit

28   ///

-20-

1 | accounts held at depositories listed in Exhibit "10" that are not approved by the U.S. Trustee are

2 | special use accounts that generally have relatively small balances.

3

4 | **Additional Facts Relating to the Cash Collateral Motion**

5 |     71.    As discussed above, the Cash Management System provides for the deposit of all

6 | receipts, regardless of which Debtor entity or property generated the monies, into a concentration

7 | account in the name of MMPLP, the operating partnership. The expenses of all entities related to

8 | MMPI are then paid from the concentration account.

9 |     72.    It is my understanding that, now that Chapter 11 cases have been filed by MMPI and

10 | 53 subsidiaries, and in light of the significant number of real properties owned by the Debtors that

11 | are subject to consensual liens of lenders, there are provisions of the Code that must be fulfilled by

12 | the Debtors prior to using rents, issues and profits from such real properties. Particularly, it is my

13 | understanding that the Debtors generally must obtain the consent of secured creditors holding liens

14 | against such properties, or obtain Bankruptcy Court approval of the use of cash collateral. Due to

15 | the large number of secured creditors, and our constant efforts over the past few weeks to obtain a

16 | resolution of the Company's financial difficulties without the necessity of filing for bankruptcy

17 | relief, we have had insufficient time or opportunity to obtain such consents, nor could we risk

18 | public disclosure of an impending bankruptcy in light of the fact that the Company is publicly

19 | traded on the NASDAQ stock exchange.

20 |     73.    The Debtors cannot operate without the use of cash collateral. The Company's Cash

21 | Management System and pooling of revenues in one concentration account for the payment of all

22 | expenses is the business model that the Debtors have utilized for years. If cash collateral from

23 | those properties that generate income in excess of the normal operating expenses is not available

24 | for the use by other Debtors for their normal and customary needs, valuable assets may be lost to

25 | the detriment of the Debtors' estates and creditors.

26 |     74.    Attached collectively as Exhibit "11" hereto are operating projections for the

27 | months of April through December 2009 for the Debtors. These projections of cash receipts and

28 | disbursements were prepared under my supervision and control and were prepared based upon a

334663.09 [XP]    25162

1  review by the Company's senior management, especially Andrew Murray, our Chief Financial

2  Officer, and Fred Skaggs, our Chief Accounting Officer, of the Company's files and records,

3  including accounting data for each of the affected Debtors. To the best of my knowledge and

4  belief, all of the information contained in such exhibits is true and accurate.

5        75.    As reflected in Exhibits "5" through "7" and "11" hereto:

6            a.      the Company projects that it will generate total receipts of approximately

7  $18.7 million and make disbursements, excluding interest, totaling approximately $28.1 million

8  from April through December 2009;

9            b.      the Company projects that there will be sufficient income generated by the

10  Debtors' income producing properties to pay normal and customary costs of upkeep, maintenance

11  and operations (exclusive of debt service and real property taxes) for each of the property-level

12  entities, and also to fund similar expenses for the non-income producing Debtors;

13            c.      the monthly debt service on the debt secured by the Debtors' real property

14  totals approximately $1.95 million; and

15            d.      the Company projects that the amount of real property taxes that will become

16  due and payable April 1, 2009, and December 31, 2009, exclusive of non-payment penalties and

17  related charges, will total approximately $6.6 million, unless reduced through the sale of properties

18  or payment of taxes.

19        76.    As noted above, the Debtors own 22 real properties and real estate projects that are

20  not encumbered by consensual liens. As reflected in Exhibit "7" hereto, the aggregate value of

21  these properties is estimated to be approximately $104.5 million

22        77.    The Company currently is in the process of selling five properties owned by the

23  Debtors, and has opened escrows in connection with such potential sales. A list of the properties

24  currently in escrow is attached as Exhibit "12" hereto. The sale price for each of the properties is

25  comparable to the value ascribed to such property in Exhibit "7" hereto. The Company projects

26  that the net sale proceeds that would be generated from the sales of these five properties will be

27  approximately $27.5 million.

28  ///

78.    The Debtors contend that the use of cash collateral to pay for the ordinary costs and expenses of preserving, maintaining and operating the properties subject to lenders' liens, in and of itself, constitutes adequate protection of secured creditors' interests in the properties subject to their liens. Notwithstanding, in order to provide "adequate protection" to secured creditors with respect to any postpetition diminution in the value of their cash collateral, the Debtors are proposing that those creditors holding liens against income producing properties be granted the following:

    a.  a replacement lien on their collateral: and

    b.  a charge or lien against the Debtors' unencumbered properties.

79.    I believe that the estimated current values of the Debtors' properties as set forth in Exhibits "5" and "7" hereto are reasonable and reflect the fair value of such properties in the current market. I also believe property values should remain relatively constant over the ensuing months, and at some time towards the end of the year will increase slightly as the credit markets loosen.

80.    The Debtors currently anticipate the filing of either a consolidated or joint plan of reorganization for all of the Debtors within four to six months. I believe that a key component to the plan(s) will be the restructuring of the Debtors' secured debt, which restructuring will allow the Debtors to meet their cash flow needs. We are hopeful that consensual agreements can be reached with lenders, but if we are unable to reach such agreements we believe that the law will allow the Debtors to confirm a plan or plans over the lenders' objections to the treatment of their claims. In that regard, we believe that the terms of certain existing secured loans are above market and that the evidence will establish the Debtors' entitlement to lower interest rates and extensions of the terms of such loans for a period of between seven to ten years.

## Additional Facts Relating to the Employee Payroll and Benefits Motion

81.    Collectively, the Debtors currently employ approximately 100 employees who receive wages and salaries on a bi-weekly basis. The Debtors' next routine payroll period will end on April 3, 2009, which ordinarily would cover the period from March 21, 2009, through April 3, 2009. Payroll for this period would normally be disbursed on April 10, 2009. However, in an

-23-

1 attempt to reduce the adverse effects of the Debtors' bankruptcy filing on their employees, the

2 Debtors prepared a special payroll and disbursed funds to their employees for wages and salaries

3 earned through March 27, 2009.

4    82.    It is my understanding that the term "insider" is defined in the Code to mean, with

5 respect to a debtor which is a corporation, (a) a director of the debtor, (b) an officer of the debtor,

6 (c) a person in control of the debtor, (d) a partnership in which the debtor is a general partner, (e) a

7 general partner of the debtor, or (f) a relative of a general partner, director, officer, or person in

8 control of the debtor.  It is also my understanding that, with respect to a debtor which is a

9 partnership, the term "insider" is defined to mean, among other things, a person in control of the

10 debtor.

11    83.    In the event that any of the Debtors' employees have not been paid the full amount

12 of wages and salaries earned by them prior to today (the "Prepetition Earnings"), the Debtors are

13 requesting authority to pay the Prepetition Earnings as part of their next routine payroll.  Since the

14 Debtors sought to pay all employees their wages and salaries earned through March 27, 2009, I

15 believe that any balance owed (which may result from, for example, an employee having earned

16 overtime pay during the last few days) is very small.

17    84.    The Debtors' request for authority to pay Prepetition Earnings to employees relates

18 only to employees who are currently employed by the Debtors.  If an employee voluntarily quit or

19 has been terminated, the Debtors are not seeking authority to pay such employee.

20    85.    The Debtors' employees perform a variety of functions which are integral to the

21 Debtors' operations, including management, design, marketing, sales, technical services, and other

22 tasks.  Over the past few months, the Company has pared its work force to what I believe may be

23 the minimum needed to maintain operations and prepare the Company for future growth.  I do not

24 believe that there will be significant reductions in the Company's work force in the near future.

25    86.    In addition to regular wages and salaries, the Debtors offer their employees certain

26 benefits.  Benefits offered by the Debtors to all or some of their employees consist of vacation and

27 sick leave pay, as well as contributions for medical and life insurance benefits (collectively the

28 "Employee Benefits").

-24-

334663.09 [XP]    25162

87. All of the Debtors' full-time employees are entitled to accrue vacation and sick leave pay. Generally, from the time that an employee's entitlement to accrue vacation or sick leave pay vests, the employee earns either two or three weeks of vacation leave pay per year, and forty hours of sick leave pay per year.

88. In the ordinary course of business, the Debtors do not allow employees to cash out accrued vacation or sick leave pay, except in the case of an employee's termination. I believe that, as of today, with only four exceptions, the amount of each employee's accrued vacation and sick leave pay is less than $10,950. The four employees whose accrued vacation and sick leave pay exceeds $10,950 are John Maddux, Fred Skaggs, Lynn Beckemeyer, and Marcial Garcia, the Company's controller.

89. For certain employees, the Company contributes toward the premiums for basic medical insurance (the "Medical Plan") under policies provided and operated by Anthem Blue Cross. The Company contributes toward the premiums for approximately 55 employees, with the specific amounts varying depending upon the type of coverage. The amount paid by the Debtors per employee per month ranges from $179.07 to $210.81. The aggregate amount paid by the Debtors for all of their employees per month is approximately $10,000. I believe that, as of today, medical insurance premiums are current.

90. For all employees, the Company provides life insurance under policies provided and operated by Anthem Blue Cross. The Debtors pay between $2.17 and $4.82 per employee per month for the employees' life insurance coverage. The aggregate amount paid by the Debtors per month is approximately $280. I believe that, as of today, life insurance premiums are current.

91. I believe that the continued provision of coverage to employees under the Medical Plan is a vital component of the Employee Benefits. I also believe that the continued provision of life insurance coverage to employees is an important component. As a result, I believe that it is important that the Debtors continue providing such benefits and make any necessary payments with respect to any amounts incurred prior to today, and continue providing coverage under the Medical Plan and pay life insurance premiums in the ordinary course of business.

///

334663.09 [XP]      25162

92.     I believe that, except to the extent that employees' vacation and sick leave pay has been earned and not yet been paid to the employees in the ordinary course, the Debtors are current on all of their obligations relating to the Employee Benefits.

93.     I believe that the Debtors' employees' skills, and their knowledge and understanding of the Debtors' operations, are essential to an effective reorganization of the Debtors' business.

94.     I also believe that it is important that the Debtors pay employees' outstanding wages and salaries, if any, and honor all of the Employee Benefits, in order to avoid an interruption in the Debtors' business. If the Debtors do not do so, there is a risk of unmanageable turnover of the Debtors' work force, and I believe that employees' morale will very likely decline drastically due to, among other things, the economic burdens faced by employees in these current tough economic times. I believe that many of the Debtors' employees live paycheck to paycheck, and would suffer harm if they were to not receive payment for the work they performed prior to today.

**Additional Facts Relating to the Utilities Motion**

95.     In the ordinary course of business, the Debtors currently use electric, natural gas, heat, water, sewer, telecommunications, and other services of the same general type or nature originated and provided by approximately nineteen utility companies (collectively the "Utility Companies"). A spreadsheet identifying the Utility Companies and, among other things, the average amounts invoiced by each of the Utility Companies on a monthly basis, and the deposits previously afforded to the Utility Companies by the Debtors, is attached as Exhibit "13" hereto. The spreadsheet has been prepared from the Debtors' records with the assistance of the Debtors' counsel, and I believe the information contained therein to be accurate.

96.     I understand that the Debtors' filing of their Chapter 11 petitions occurred during the middle of the billing cycles for many, if not all, of the Utility Companies. As a result, as of today, there are likely outstanding prepetition amounts owed to the Utility Companies.

97.     I believe that if the utility services to the Debtors' properties and projects are disrupted, even for a brief period of time, the Debtors will not be able to operate. I also believe that an interruption in the Debtors' business will have a devastating effect on the Debtors' relationships

-26-

1 with tenants, employees, contractors, vendors and other persons with whom the Debtors conduct

2 business. I further believe that such a disruption could severely impact the Debtors' cash flow and

3 ability to reorganize.

4       98.     Based upon the Debtors' cash flow projections, including those identified Exhibit

5 "11" hereto, I anticipate that the Debtors will have adequate cash to meet all of its necessary

6 postpetition operating expenses on a current basis, including payments to the Utility Companies.

7 However, it is my understanding that section 366 of the Code requires debtors to provide

8 "assurance of payment" to the Utility Companies in the form of a deposit or other enumerated form

9 of assurance. Accordingly, the Debtors are proposing to deliver to each Utility Company a deposit

10 in the amount identified in Exhibit "13" hereto within 45 days of the Court's entry of an order

11 granting the Debtors' motion relating to the form, timing and amount of assurance of payment to be

12 provided.

13

14 **Additional Facts Relating to the Ordinary Course Professionals Motion**

15       99.     In the ordinary course of the Debtors' operation and development of properties and

16 development projects, the Debtors utilize the services of various attorneys, accountants, and similar

17 professionals (the "Ordinary Course Professionals"). Attached as Exhibit "14" hereto is a list of

18 Ordinary Course Professionals currently used from time to time by the Debtors in connection with

19 their business.

20       100.    In addition to the Ordinary Course Professionals identified in Exhibit "14" hereto,

21 the Debtors utilize the legal services of DLA Piper as their securities counsel, and Ernst & Young

22 as their accountants and financial advisors. The Debtors anticipate that DLA Piper and Ernst &

23 Young will continue to provide services to the Debtors in connection with certain aspects of the

24 Debtors' administration of their chapter 11 cases. In contrast, the Ordinary Course Professionals

25 represent the Debtors outside of the bankruptcy context and in support of the Debtor's day-to-day

26 operations and project development.

27       101.    Also in the ordinary course of business, the Debtors employ various professional

28 service providers, such as public relations and communications consultants, architects, engineers,

1  title companies, surveyors, real estate closing professionals, real estate brokers, environmental

2  consultants, design consultants, information technology consultants, life/safety consultants,

3  property managers, marketing and business consultants, and other similar service providers

4  (collectively the "Service Providers"). Although some Service Providers have professional degrees

5  and certifications, I believe that their services rendered postpetition will relate to the Debtors' day-

6  to-day operations and project developments, and not to the Debtors' administration of their chapter

7  11 cases.

8      102.    I believe that the Debtors' business operations depend on, among other things, the

9  Debtors' ability to retain and pay for the services of the Ordinary Course Professionals and Service

10 Providers. I also believe that notwithstanding their significant value to the Debtors' estates, the

11 amounts that will be owed each month to the Ordinary Course Professionals and Service Providers

12 will be relatively small.

13     103.    It is my understanding that the typical bankruptcy process of employing

14 professionals, and the process by which professionals seek approval of compensation, is very costly

15 to the estate. Because the amounts paid to the Ordinary Course Professionals are relatively small

16 and because the services to be rendered to the Ordinary Course Professionals relate to the Debtors'

17 day-to-day operations and not to services rendered in connection with the administration of the

18 Chapter 11 cases, the Debtors are requesting that the Court adopt the streamlined procedure for the

19 retention and payment of Ordinary Course Professionals, as detailed in the Ordinary Course

20 Professionals Motion.

21     104.    In conjunction with this request, the Debtors are requesting authority to pay the

22 Ordinary Course Professionals for their services each month, in the ordinary course of business, up

23 to the amounts identified in the "Monthly Cap" column of Exhibit "14" hereto. The figures in the

24 Monthly Cap column have been determined based on (a) amounts that the Debtors have recently

25 paid to the Ordinary Course Professionals, and (b) estimates of the amount of services that will

26 need to be rendered by each Ordinary Course Professional in the foreseeable future. I believe that

27 the amounts identified in the Monthly Cap column are fair and reasonable, based on such factors.

28 ////

-28-

1  **Additional Facts Relating to the Motion to Extend the Time to File Schedules**

2      105.    It is my understanding that the Court's local rules provide that, within fifteen days

3  after a debtor files a Chapter 11 petition, the debtor must file a variety of schedules, a statement of

4  financial affairs, and various other documents (collectively the "Schedules") with the Court.  The

5  Debtors' senior management team tried to gather much of the information needed to prepare the

6  Schedules prior to today, but for a number of reason the Debtors were unable to prepare the

7  Schedules for filing at the same time as their voluntary petitions for relief.

8      106.    Among other things, the Debtors have continued operating in the ordinary course of

9  business.  As a result, the identity of the Debtors' creditors changes daily, making it difficult if not

10  impossible for the Debtors to prepare in advance schedules of debts owing as of today.  Further, the

11  Debtors' reduced staff has been required to devote substantial time during the past few weeks not

12  only to the operation of the business, but also to the filing of the Company's 10-K report with the

13  SEC and working on certain tasks in an effort to avoid the necessity of filing for bankruptcy.  In

14  that regard, in an effort to avoid the need for bankruptcy, the Debtors attempted to negotiate with

15  certain potential lenders in the hope of obtaining financing for ongoing operations, but where not

16  able to secure such financing.  Employees needed for day to day operations and SEC compliance

17  issues have not been available to assist senior management in the preparation of the Schedules.

18      107.    On or about February 10, 2009, the Debtors retained Danning, Gill, Diamond &

19  Kollitz, LLP, to advise the Debtors with regard to a possible chapter 11 filing.  Since that time,

20  certain of the Debtors' senior management team have communicated with and provided counsel

21  with information requested by counsel to provide such advice.  Also, management has focused on

22  providing information and preparing budgets and spreadsheets that would be needed by counsel in

23  support of the various motions filed by the Debtors today and in support of which this declaration

24  is being filed.  Management's need to focus on such important, time-sensitive matters is another

25  reason that the Debtors are unable to prepare and file their Schedules today.

26      108.    It is my understanding that the Office of the United States Trustee (the "U.S.

27  Trustee") requires that debtors filing Chapter 11 petitions for relief submit numerous reports and

28  information to the U.S. Trustee within seven days after filing for bankruptcy.  Because of the

334663.09 [XP]    25162

1    number of Debtors that have filed petitions, and the number of real properties collectively owned

2    by the Debtors, I anticipate that a significant amount of work will need to be done by the Debtors'

3    management and other personnel in connection with the preparation of the "7-Day Package" to the

4    U.S. Trustee.

5        109.    In light of the foregoing, the need of the Debtors to comply with various laws and

6    regulations applicable to publicly held companies, other complications that will inevitably arise as

7    a result of the Debtors' bankruptcy filings, and the need for the Debtors to continue operating in the

8    ordinary course of business, I do not believe that the Debtors will be able to complete and file their

9    Schedules by mid-April 2009. I believe that the Debtors may need at least thirty additional days to

10   do so.

11

12       I declare under penalty of perjury under the laws of the United States of America that the

13   foregoing is true and correct.

14       Executed on March 27, 2009, at Los Angeles, California.

15

16                                                          _____
                                                            RICHARD MERUELO
17

18

19

20

21

22

23

24

25

26

27

28

-30-

334663.09 [XP]    25162

# SCHEDULE OF ENTITIES FILING CHAPTER 11 PETITIONS FOR RELIEF

# EXHIBIT 1

Meruelo Maddux Properties, Inc.
Schedule of Entities Filing Chapter 11 Petitions for Relief

| | Entity | State | Tax ID No. |
|---|---|---|---|
| 1 | Meruelo Maddux Properties, Inc. | DE | 20-5398955 |
| 2 | Meruelo Maddux Properties, L.P. | DE | 20-8363288 |
| 3 | Meruelo Maddux Construction, Inc. | CA | 20-4418296 |
| 4 | Meruelo Maddux Management, Inc. | DE | 20-8376794 |
| 5 | MMP Ventures, LLC | DE | 20-8375912 |
| 6 | 2640 Washington Boulevard, LLC | CA | 13-4285894 |
| 7 | 788 South Alameda, LLC | CA | 65-1187504 |
| 8 | 905 8th Street, LLC | CA | 51-0484641 |
| 9 | 9901 Alameda, LLC | CA | 20-2788976 |
| 10 | Alameda Produce Market, LLC | DE | 26-0817525 |
| 11 | Merco Group -- 1211 E. Washington Boulevard, LLC | DE | 20-2349858 |
| 12 | Merco Group -- 1308 S. Orchard, LLC | DE | 20-5528320 |
| 13 | Merco Group -- 146 E. Front Street, LLC | CA | 34-2027340 |
| 14 | Merco Group -- 1500 Griffith Avenue, LLC | DE | 20-2349769 |
| 15 | Merco Group -- 2001-2021 West Mission Boulevard, LLC | CA | 54-2153255 |
| 16 | Merco Group -- 2040 Camfield Avenue, LLC | DE | 20-8769703 |
| 17 | Merco Group -- 2529 Santa Fe Avenue, LLC | DE | 20-2922650 |
| 18 | Merco Group -- 3185 E. Washington Boulevard, LLC | DE | 20-2349897 |
| 19 | Merco Group -- 425 West 11th Street, LLC | CA | 73-1719261 |
| 20 | Merco Group -- 4th Street Center, LLC | DE | 20-2861016 |
| 21 | Merco Group -- 5707 S. Alameda, LLC | CA | 11-3739830 |
| 22 | Merco Group -- 620 Gladys Avenue, LLC | DE | 20-2350017 |
| 23 | Merco Group -- 801 E. 7th Street, LLC | DE | 20-2448810 |
| 24 | Merco Group -- Ceres Street Produce, LLC | DE | 20-2349984 |
| 25 | Merco Group -- Little J, LLC | CA | 16-1712322 |
| 26 | Merco Group -- Overland Terminal, LLC | CA | 45-0539908 |
| 27 | Merco Group -- Southpark, LLC | CA | 73-1704237 |
| 28 | Merco Group, LLC | CA | 36-4547803 |
| 29 | Meruelo Baldwin Park, LLC | CA | 77-0627079 |
| 30 | Meruelo Farms, LLC | CA | 27-0114275 |
| 31 | Meruelo Maddux -- 1000 E. Cesar Chavez, LLC | DE | 20-2984283 |
| 32 | Meruelo Maddux -- 230 W. Avenue 26, LLC | DE | 20-2922700 |
| 33 | Meruelo Maddux -- 2415 E. Washington Blvd., LLC | DE | 20-2922662 |
| 34 | Meruelo Maddux -- 336 W. 11th Street, LLC | DE | 20-2936510 |
| 35 | Meruelo Maddux -- 3rd & Omar Street, LLC | DE | 20-2788868 |
| 36 | Meruelo Maddux -- 420 Boyd Street, LLC | DE | 26-0374178 |
| 37 | Meruelo Maddux -- 500 Mateo Street, LLC | DE | 20-2788930 |
| 38 | Meruelo Maddux -- 5500 Flotilla Street, LLC | DE | 26-0712538 |
| 39 | Meruelo Maddux -- 555 Central Avenue, LLC | DE | 20-2986157 |
| 40 | Meruelo Maddux -- 817-825 S. Hill Street, LLC | DE | 20-3405983 |
| 41 | Meruelo Maddux -- 915-949 S. Hill Street, LLC | DE | 20-2922657 |
| 42 | Meruelo Maddux -- Mission Boulevard, LLC | DE | 26-2370514 |
| 43 | Meruelo Maddux Properties -- 1009 North Citrus Avenue, Covina | DE | 20-2465270 |
| 44 | Meruelo Maddux Properties -- 1060 N. Vignes, LLC | CA | 71-0974577 |
| 45 | Meruelo Maddux Properties -- 12385 San Fernando Road, LLC | DE | 20-2350144 |
| 46 | Meruelo Maddux Properties -- 1919 Vineburn Street, LLC | DE | 20-2433903 |
| 47 | Meruelo Maddux Properties -- 2131 Humboldt Street, LLC | DE | 20-2465281 |
| 48 | Meruelo Maddux Properties -- 2951 Lenwood Road, LLC | DE | 20-2350096 |
| 49 | Meruelo Maddux Properties -- 306-330 N. Avenue 21, LLC | DE | 20-2642537 |
| 50 | Meruelo Maddux Properties -- 760 S. Hill Street, LLC | DE | 20-2465227 |
| 51 | Meruelo Wall Street, LLC | CA | 35-2223764 |
| 52 | National Cold Storage, LLC | DE | None |
| 53 | Santa Fe & Washington Market, LLC | DE | 95-4742615 |
| 54 | Santa Fe Commerce Center, Inc. | CA | 26-2388733 |
| 55 | Wall Street Market, LLC | CA | 27-0091290 |

EXHIBIT 1

# RESUME OF
# RICHARD MERUELO

# EXHIBIT 2

# EXHIBIT 2

Richard Meruelo is the Chief Executive Officer and Chairman of the Board of Directors of Meruelo Maddux Properties, Inc. ("MMPI"). Mr. Meruelo graduated from the University of Southern California in 1986 with a Bachelors of Science degree in Business Administration, with an emphasis in Finance and Real Estate.

Mr. Meruelo served as chairman of MMPI's predecessor business from 1987 until MMPI was formed in 2006. During that time, Mr. Meruelo led the strategic planning for the business while managing project acquisitions, purchase negotiations and related financings totaling nearly $1.2 billion. Also, Mr. Meruelo was responsible for maintaining the business' relationships with its major lenders, as well as state and local governmental bodies that had land-use jurisdiction over the business' projects. Mr. Meruelo has served as MMPI's CEO and Chairman since its formation in 2006.

Mr. Meruelo currently serves as a board member for various associations dedicated toward revitalizing downtown Los Angeles, including the Central City Association, the Central City East Association and the Los Angeles Central Industrial Redevelopment Project.

335582.01 [XP] 25162

# CORPORATE STRUCTURE DIAGRAM

# EXHIBIT 3



# SCHEDULE OF ENTITIES NOT FILING CHAPTER 11 PETITIONS FOR RELIEF

# EXHIBIT 4