ORIGINAL

Donald L. Gaffney (Admitted Pro Hac Vice)
SNELL & WILMER L.L.P.
One Arizona Center
400 E. Van Buren
Phoenix, AZ 85004-2202
Phone:        (602) 382-6254
Facsimile:    (602) 382-6070
E-Mail:       dgaffney@swlaw.com

Eric S. Pezold (#255657)
Jasmin Yang (#255254)
SNELL & WILMER L.L.P.
600 Anton Blvd, Suite 1400
Costa Mesa, CA 92626
Phone:        (714) 427-7000
Facsimile:    (714) 427-7799
              epezold@swlaw.com
              jyang@swlaw.com

Attorneys for Bank of America, N.A.

FILED

APR 2 1 2009

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In Re:<br><br>MERUELO MADDUX PROPERTIES, INC., et al.,<br><br>Debtors-in-Possession.<br><br>☒ Affects All Debtors | Case No.: 1:09-bk-13356-KT<br>Jointly Administered<br>Chapter 11<br><br>**DECLARATION OF CAROL SETTLES IN SUPPORT OF BANK OF AMERICA, N.A.'S OPPOSITION TO DEBTOR'S MOTIONS: (1) TO USE CASH COLLATERAL; AND (2) TO APPROVE CASH MANAGEMENT SYSTEM**<br><br>Date:  May 1, 2009<br>Time:  9:30 a.m.<br>Place:  Courtroom 301<br>         21041 Burbank Blvd.<br>         Woodland Hills, CA<br><br>Judge:  Honorable Kathleen Thompson |

Carol Settles hereby makes this Declaration in support of Bank of America, N.A.'s ("BofA's") Opposition to Debtors' Motions: (1) To Use Cash Collateral; and (2) To Approve Cash Management Systems and states as follows:

9943341

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1.     I am a Senior Vice President and Senior Client Manager of BofA with personal knowledge of the facts set forth herein an am authorized by BofA to make this declaration.

2.     Two of the Debtors in the above-referenced case, Merco Group – Southpark, LLC ("Southpark LLC") and Meruelo Maddux Properties – 760 S. Hill Street, LLC (760 S. Hill LLC) are borrowers under loans with BofA.  The loans to Southpark, LLC and 760 S. Hill LLC are separate loans secured by separate collateral.  In connection with these loans, Southpark, LLC and 760 S. Hill LLC, executed several documents with BofA memorializing the loan transactions.

**Southpark, LLC Loan**

3.     On August 4, 2004, BofA and Lancam Properties, LLC, Tranmar Properties, LLC, and Tranrich, LLC (Lancam Properties LLC, Tranmar Properties, LLC, and Tranrich, LLC are hereinafter collectively referred to as the "Southpark Predecessors") entered into a "Term Loan Agreement" (the "Southpark Loan Agreement") wherein BofA agreed to lend the Southpark Predecessors the principal amount of $19,000,000.  A true and correct copy of the Southpark Loan Agreement is attached hereto as Exhibit 1.  Southpark, LLC is noted in the Southpark Loan Agreement as the lessee under a ground lease with the Southpark Predecessors.

4.     To evidence the Southpark Loan Agreement, the Southpark Predecessors executed that certain "Promissory Note" (the "Southpark Note") dated August 4, 2004 wherein the Southpark Predecessors agreed to pay BofA the principal amount of $19,000,000 and interest thereon pursuant to a monthly schedule.  A true and correct copy of the Southpark Note is attached hereto as Exhibit 2.

5.     The Southpark Predecessors' obligations under the Southpark Loan Agreement and Southpark Promissory Note are secured by that certain "Deed of Trust, Assignment, Security Agreement and Fixture Filing" (the "Southpark Deed of Trust") dated August 4, 2004, wherein the Southpark Predecessors granted BofA a lien and security interest on, among other things, certain real property (hereinafter referred to as the "Southpark Property") and certain personal property, and an assignment of leases and rents.  The Southpark Deed of Trust was recorded with the Los Angeles County Recorder's Office at Instrument No. 04-2025758 on August 6, 2004.  A true and correct copy of the Southpark Deed of Trust is attached hereto as Exhibit 3.

1    6.    The Southpark Predecessors' obligations under the Southpark Loan Agreement are

2    further secured by that certain "Guaranty" (the "Namvar Southpark Guaranty") dated August 4,

3    2004 executed by Ezri Namvar and that certain "Guaranty" (the "Meruelo Southpark Guaranty")

4    dated August 4, 2004 executed by Richard Meruelo in his individual capacity and in his capacity

5    as trustee of the Richard Meruelo Living Trust u/t/d/ September 15, 1989, wherein Mr. Namvar

6    and Mr. Meruelo guaranteed the obligations of the Southpark Predecessors to BofA under the

7    Southpark Loan Agreement and Southpark Note.  True and correct copies of the Namvar

8    Southpark Guaranty and the Meruelo Southpark Guaranty are attached hereto as Exhibits 4 and 5,

9    respectively.

10    7.    On September 21, 2005, the Southpark Predecessors, Southpark, and BofA entered

11    into that certain "Modification and Assignment and Assumption Agreement" (the "Southpark

12    Modification and Assignment Agreement") wherein Southpark assumed all of the Southpark

13    Predecessors' obligations under the Southpark Loan Agreement, Southpark Note, and Southpark

14    Deed of Trust.  As part of the Southpark Modification and Assignment Agreement, BofA released

15    the Southpark Predecessors from their obligations under the Southpark Loan Agreement and

16    Southpark Note and released Mr. Namvar from his obligations under the Namvar Southpark

17    Guaranty.  Additionally, pursuant to the Southpark Modification and Assignment Agreement,

18    Southpark and BofA agreed to increase the principal balance of the Southpark Note from

19    $19,000,000 to $25,000,000, and agreed to extend the maturity date of the Southpark Note from

20    August 1, 2006 to September 14, 2007.  A true and correct copy of the Southpark Modification

21    and Assignment Agreement is attached hereto as Exhibit 6.  The Southpark Loan Agreement,

22    Southpark Note, Namvar Southpark Guaranty, Meruelo Southpark Guaranty, and the Southpark

23    Modification and Assignment Agreement are hereinafter collectively referred to as the

24    "Southpark Loan Documents."

25    8.    In conjunction with the Southpark Modification and Assignment Agreement, on

26    September 21, 2005, BofA and Southpark entered into a "Memorandum of Modification of Deed

27    of Trust" setting forth the assignment and assumption set forth in the Southpark Modification and

28    Assignment and memorializing the substitution of Southpark for the Southpark Predecessors

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1   under the Southpark Loan Documents. The Memorandum of Modification of Deed of Trust was

2   recorded with the Los Angeles County Recorder's Office on October 4, 2005 at Instrument No.

3   052387913. A true and correct copy of the Memorandum of Modification of Deed of Trust is

4   attached hereto as Exhibit 7.

5         9.     Pursuant to a "Consent Agreement and Amendment to Loan Agreement" dated

6   May 8, 2007, Meruelo Maddux Properties, Inc. ("MMPI") assumed the guaranty obligations

7   under the Meruelo Southpark Guaranty. A true and correct copy of the "Southpark Consent

8   Agreement" is attached hereto as Exhibit 8.

9         10.    On September 19, 2007, Southpark LLC and BofA entered into that certain

10  "Modification Agreement" (the "Southpark Modification Agreement") wherein they agreed to

11  extend the maturity date of the Southpark Loan Agreement and Southpark Note from September

12  14, 2007 to November 14, 2007. A true and correct copy of the Southpark Modification

13  Agreement is attached hereto as Exhibit 9.

14        11.    Between September 19, 2007 and July 18, 2009, Southpark and BofA entered into

15  various agreements wherein, among other things, they modified the Southpark Loan Documents

16  to reflect extended maturity dates for the Southpark Loan Agreement and Southpark Note.

17        12.    On July 18, 2008, Southpark LLC and BofA entered into that certain "Seventh

18  Modification Agreement" (the "Southpark Seventh Modification Agreement") wherein they

19  agreed, among other things, to extend the maturity date of the Southpark Note from July 14, 2008

20  to July 14, 2009 and to reduce the principal amount owed under the Southpark Loan Agreement

21  and Southpark Note from $25,000,000 to $20,000,000. A true and correct copy of the Southpark

22  Seventh Modification Agreement is attached hereto as Exhibit 10.

23        13.    As of March 27, 2009 (the "Petition Date"), Southpark LLC's indebtedness to

24  BofA under the Southpark Loan Documents was no less than $20,270,938.55[1], with interest and

25  attorneys' fees continuing to accrue.

26

---

27  [1]    BofA was still in the process of calculating this amount when it received notice that the Court's
    ECF system unexpectedly went down. In order to ensure that this Opposition was filed on a timely basis,
28  BofA may not have fully completed its calculation. As such, BofA fully reserves the right to amend this
    figure.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

**760 Hill Street, LLC Loan**

14.     On January 27, 2006, BofA and 760 S. Hill LLC entered into a "Construction Loan Agreement" (the "760 S. Hill Loan Agreement") wherein BofA agreed to lend 760 S. Hill LLC the principal amount of $28,720,000. A true and correct copy of the 760 S. Hill Loan Agreement is attached hereto as Exhibit 11.

15.     To evidence the 760 S. Hill Loan Agreement, 760 S. Hill LLC executed that certain "Promissory Note" (the "760 S. Hill Note") dated January 27, 2006 wherein 760 S. Hill LLC agreed to pay BofA the principal amount of $28,720,000 and interest thereon pursuant to a monthly schedule. A true and correct copy of the 760 S. Hill Note is attached hereto as Exhibit 12.

16.     760 S. Hill LLC's obligations under the 760 S. Hill Loan Agreement and 760 S. Hill Note are secured by that certain "Construction Deed of Trust, Assignment, Security Agreement, and Fixture Filing" (the "760 S. Hill Deed of Trust") dated January 27, 2006, wherein 760 S. Hill granted BofA a lien and security interest on, among other things, certain real property (hereinafter referred to as the "760 S. Hill Property") and certain personal property, and an assignment of leases and rents. The 760 S. Hill Deed of Trust was recorded with the Los Angeles County Recorder's Office at Instrument No. 06-0214046 on January 30, 2006. A true and correct copy of the 760 S. Hill Deed of Trust is attached hereto as Exhibit 13.

17.     760 S. Hill LLC's obligations under the 760 S. Hill Loan Agreement are further secured by that certain "Guaranty" (the "760 S. Hill Guaranty") executed by Richard Meruelo in his individual capacity and in his capacity as trustee of the Richard Meruelo Living Trust u/t/d/ September 15, 1989 wherein Mr. Meruelo guaranteed the obligations of 760 S. Hill to BofA under the 760 S. Hill Loan Agreement and 760 S. Hill Note. A true and correct copy of the 760 S. Hill Guaranty is attached hereto as Exhibit 14. The 760 S. Hill Loan Agreement, 760 S. Hill Note, and the 760 S. Hill Guaranty are collectively referred to herein as the "760 S. Hill Loan Documents."

18.     On May 8, 2007, BofA, 760 S. Hill LLC, Mr. Meruelo and MMPI entered into that certain "Consent Agreement and Amendment to Loan Agreement" (760 S. Hill Consent

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

Agreement") wherein, among other things, they agreed to substitute MMPI for Mr. Meruelo as the guarantor in the 760 S. Hill Guaranty. A true and correct copy of the 760 S. Hill Consent Agreement is attached hereto as Exhibit 15.

19. On September 19, 2007, BofA and 760 S. Hill LLC entered into that certain Modification Agreement (the 760 S. Hill Modification Agreement") wherein they agreed to extend the maturity date of the Note from March 1, 2008 to March 1, 2009. A true and correct copy of the 760 S. Hill Modification Agreement is attached hereto as Exhibit 16. Pursuant to the 760 S. Hill Modification Agreement, 760 S. Hill LLC agreed to deposit $6,400,000 in a bank account selected by BofA as further security for the obligations under the 760 S. Hill Loan Documents.

20. As of the Petition Date, 760 S. Hill LLC's indebtedness to BofA under the 760 S. Hill Loan Documents was no less than $29,552,057.08[2], with interest and attorneys' fees continuing to accrue.

21. I am informed and believe that various mechanics' liens, totaling not less than $480,830.66 encumber the 760 S. Hill Property.

I declare under penalty of perjury that the foregoing is true and correct.

DATED this 20th day of April, 2009.


/s/ Carol Settles
Carol Settles

---

[2] BofA was still in the process of calculating this amount when it received notice that the Court's ECF system unexpectedly went down. In order to ensure that this Opposition was filed on a timely basis, BofA may not have fully completed its calculation. As such, BofA fully reserves the right to amend this figure.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000



# TERM LOAN AGREEMENT

by and between

**LANCAM PROPERTIES, LLC,**
a Delaware limited liability company

and

**TRANMAR PROPERTIES, LLC,**
a Delaware limited liability company

and

**TRANRICH, LLC,**
a Delaware limited liability company,

collectively, as Borrower,

and

**BANK OF AMERICA, N.A.,**
a national banking association,

as Lender,

with respect to

Transamerica Land

Los Angeles, California

14243.5

# TABLE OF CONTENTS

Page

Term Loan Agreement ............................................................................................................ 1

Article I Definitions. ............................................................................................................ 1

      Section 1.1     Defined Terms. .................................................................................... 5

Article II The Loan ............................................................................................................ 5

      Section 2.1     The Loan ............................................................................................ 5
      Section 2.2     Purpose. ............................................................................................. 5
      Section 2.3     Draw Requests. .................................................................................. 5
      Section 2.5     Liability of Lender. ........................................................................... 6

Article III Representations and Warranties. ...................................................................... 6

      Section 3.1     Organization, Power and Authority of Borrower; Loan Documents .... 6
      Section 3.2     Other Documents; Laws ...................................................................... 7
      Section 3.3     Taxes. ................................................................................................ 7
      Section 3.4     Legal Actions. ................................................................................... 7
      Section 3.5     Nature of Loan. ................................................................................. 7
      Section 3.6     Trade Names. ..................................................................................... 7
      Section 3.7     Financial Statements. ......................................................................... 7
      Section 3.8     ERISA and Prohibited Transactions. .................................................. 7
      Section 3.9     Compliance with Zoning and Other Requirements. ............................ 8
      Section 3.10    Certificate of Occupancy. .................................................................. 8
      Section 3.11    Utilities. ............................................................................................ 8
      Section 3.12    Access; Roads .................................................................................... 8
      Section 3.13    Other Liens. ...................................................................................... 8
      Section 3.14    No Material Adverse Change .............................................................. 8
      Section 3.15    Defaults ............................................................................................. 8

Article IV Affirmative Covenants and Agreements ........................................................... 8

      Section 4.1     Compliance with Laws ...................................................................... 8
      Section 4.2     Inspections; Cooperation .................................................................... 9
      Section 4.3     Payment and Performance of Contractual Obligations ........................ 9
      Section 4.4     Correction of Structural Defects. ....................................................... 9
      Section 4.5     Insurance ........................................................................................... 10
      Section 4.6     Adjustment of Condemnation and Insurance Claims .......................... 11
      Section 4.7     Utilization of Net Proceeds. .............................................................. 11
      Section 4.8     Management. ..................................................................................... 11
      Section 4.9     Books and Records; Financial Statements; Tax Returns. .................... 12
      Section 4.10    Estoppel Certificates. ........................................................................ 12
      Section 4.11    Taxes ................................................................................................

14243.5

Section 4.12    Lender's Rights to Pay and Perform.................................................................... 12
Section 4.13    Reimbursement; Interest............................................................................... 13
Section 4.14    Notification by Borrower.............................................................................. 13
Section 4.15    Indemnification by Borrower......................................................................... 13
Section 4.16    Fees and Expenses..................................................................................... 13
Section 4.17    Appraisals............................................................................................. 13
Section 4.18    Leasing and Tenant Matters.......................................................................... 14
Section 4.19    Principal Depository................................................................................. 14
Section 4.20    Swap Contracts........................................................................................ 14
Section 4.21    Tenancy-in-Common Agreement........................................................................... 15

Article V Negative Covenants. ........................................................................................ 15

Section 5.1    Conditional Sales...................................................................................... 15
Section 5.2    Alterations to Improvements............................................................................ 15
Section 5.3    Single Purpose Entity Entity........................................................................... 15

Article VI Events of Default. ........................................................................................ 15

Section 6.1    Payment Default........................................................................................ 15
Section 6.2    Default Under Other Loan Documents..................................................................... 15
Section 6.3    Accuracy of Information; Representations and Warranties. ................................................ 16
Section 6.4    Deposits............................................................................................... 16
Section 6.5    Insurance Obligations.................................................................................. 16
Section 6.6    Other Obligations...................................................................................... 16
Section 6.7    Damage to Improvements................................................................................. 16
Section 6.8    Lapse of Permits or Approvals. ........................................................................ 16
Section 6.9    Mechanic's Lien........................................................................................ 16
Section 6.10   Bankruptcy............................................................................................. 16
Section 6.11   Appointment of Receiver, Trustee, Liquidator. ........................................................ 17
Section 6.12   Judgment............................................................................................... 17
Section 6.13   Dissolution; Change in Business Status. ............................................................... 17
Section 6.14   Default Under Other Indebtedness. ..................................................................... 17
Section 6.15   Death; Disability. .................................................................................... 17
Section 6.16   Change in Controlling Interest......................................................................... 17
Section 6.17   Material Adverse Change................................................................................ 18
Section 6.18   Default Under Ground Lease, Option Agreement or Tenancy-in-Common Agreement............................. 18

Article VII Remedies on Default. ..................................................................................... 18

Section 7.1    Remedies on Default. .................................................................................. 18
Section 7.2    No Release or Waiver; Remedies Cumulative and Concurrent................................................ 18

Article VIII Miscellaneous. .......................................................................................... 19

Section 8.1    Further Assurances; Authorization to File Documents. .................................................. 19
Section 8.2    No Warranty by Lender. ................................................................................ 19
Section 8.3    Standard of Conduct of Lender.......................................................................... 19
Section 8.4    No Partnership......................................................................................... 19

14243.5

.................................... 19
Section 8.5    Severability.................................................. 20
Section 8.6    Notices. ...................................................... 20
Section 8.7    Permitted Successors and Assigns; Disclosure of Information. ........... 21
Section 8.8    Modification; Waiver. ......................................... 21
Section 8.9    Third Parties; Benefit. ......................................... 21
Section 8.10   Rules of Construction............................................ 21
Section 8.11   Counterparts. .................................................. 21
Section 8.12   Publicity........................................................ 22
Section 8.13   Governing Law................................................. 22
Section 8.14   Time of Essence. ............................................... 22
Section 8.15   Electronic Transmission of Data.................................. 22
Section 8.16   Dispute Resolution.............................................. 24
Section 8.17   Forum........................................................... 24
Section 8.18   **WAIVER OF JURY TRIAL.**................................... 24
Section 8.19   Entire Agreement................................................ 25
Section 8.20   Partial Release Provisions........................................ 25
Section 8.21   Transfer of Property to Merco Group..............................

14243.5

## Term Loan Agreement

This Term Loan Agreement (this "Agreement") is made as of the 4th day of August, 2004, by and between LANCAM PROPERTIES, LLC, a Delaware limited liability company, TRANMAR PROPERTIES, LLC, a Delaware limited liability company, and TRANRICH, LLC, a Delaware limited liability company (collectively or individually, as applicable, "Borrower"), and BANK OF AMERICA, N.A., a national banking association ("Lender").

### Recitals

Borrower has applied to Lender for a loan to finance certain acquisition and predevelopment costs related to certain real property in which Borrower has acquired or is acquiring a fee simple interest. Lender has agreed to make the loan on the terms and conditions set forth in this Agreement and in the other documents evidencing and securing the loan.

Now, therefore, in consideration of the premises, and in further consideration of the mutual covenants and agreements herein set forth, the parties covenant and agree as follows:

### Agreements

### Article I
### Definitions.

Section 1.1    Defined Terms.

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms and to all genders:

"Authorized Signer" means any signer of this Agreement, acting alone, or any other representative of Borrower duly designated and authorized by any Authorized Signer to sign draw requests in a writing addressed to Lender, which writing may include a draw request in the form attached hereto as Schedule 2.

"Banking Day" means any day that is not a Saturday, Sunday or banking holiday in the State.

"Budget" means the breakdown of costs attached hereto as Schedule 1, as the same may be revised from time to time with the written approval of Lender.

"Casualty" means any act or occurrence of any kind or nature that results in damage, loss or destruction to the Property.

"Claim" means any liability, suit, action, claim, demand, loss, expense, penalty, fine, judgment or other cost of any kind or nature whatsoever, including fees, costs and expenses of attorneys, consultants, contractors and experts.

"Code" means the Internal Revenue Code of 1986, as amended.

"Condemnation" means any taking of title to, use of, or any other interest in the Property under the exercise of the power of condemnation or eminent domain, whether temporarily or permanently, by any Governmental Authority or by any other Person acting under or for the benefit of a Governmental Authority.

"Condemnation Awards" means any and all judgments, awards of damages (including severance and consequential damages), payments, proceeds, settlements, amounts paid for a taking in lieu of Condemnation, or other

compensation heretofore or hereafter made, including interest thereon, and the right to receive the same, as a result of, or in connection with, any Condemnation or threatened Condemnation.

"Default" means an event or circumstance that, with the giving of Notice or lapse of time, or both, would constitute an Event of Default under the provisions of this Agreement.

"Development Site" means any one (1) of the three (3) development sites described on Schedule 4 attached hereto.

"Dispute" means any controversy, claim or dispute between or among the parties to this Agreement, including any such controversy, claim or dispute arising out of or relating to (a) this Agreement, (b) any other Loan Document, (c) any related agreements or instruments, or (d) the transaction contemplated herein or therein (including any claim based on or arising from an alleged personal injury or business tort).

"Environmental Agreement" means the Environmental Indemnification and Release Agreement of even date herewith by and between Borrower and Lender pertaining to the Property, as the same may from time to time be extended, amended, restated or otherwise modified. The Environmental Agreement is unsecured.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Event of Default" means any event or circumstance specified in Article VI and the continuance of such event or circumstance beyond the applicable grace and/or cure periods therefor, if any, set forth in Article VI.

"Expenses" means all fees, charges, costs and expenses of any nature whatsoever incurred at any time and from time to time (whether before or after an Event of Default) by Lender in making, funding, administering or modifying the Loan, in negotiating or entering into any "workout" of the Loan, or in exercising or enforcing any rights, powers and remedies provided in the Mortgage or any of the other Loan Documents, including attorneys' fees, court costs, receiver's fees, management fees and costs incurred in the repair, maintenance and operation of, or taking possession of, or selling, the Property.

"Governmental Authority" means any governmental or quasi-governmental entity, including any court, department, commission, board, bureau, agency, administration, service, district or other instrumentality of any governmental entity.

"Ground Lease" means the Lease Agreement of even date herewith by and between Borrower, as ground lessor, and Merco Group, as ground lessee, under the terms of which Merco Group ground leased the Property, in its entirety, from Borrower for a term of thirty (30) years or more, together with a memorandum of such Lease Agreement relating thereto to be recorded in the Official Records of Los Angeles County, California.

"Guarantor" means, individually or collectively, any Person(s) that may concurrently or in the future guaranty the obligations of Borrower hereunder and under the other Loan Documents and its, his, her or their respective heirs, personal representatives, successors and assigns.

"Guaranty" means one or more Guaranty Agreement(s) of even date herewith executed by a Guarantor for the benefit of Lender with respect to the Loan, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Improvements" means all on-site and off-site improvements to the Land, together with all fixtures, tenant improvements and appurtenances now or later to be located on the Land and/or in such improvements.

14243.5
PAGE 2

"Insurance Proceeds" means the insurance claims under and the proceeds of any and all policies of insurance covering the Property, or any part thereof, including all returned and unearned premiums with respect to any insurance relating to such Property, in each case whether now or hereafter existing or arising.

"JAMS" means JAMS LLC, a Delaware limited liability company, or any successor thereof.

"Land" means the land described in and encumbered by the Mortgage.

"Laws" means all federal, state and local laws, statutes, rules, ordinances, regulations, codes, licenses, authorizations, decisions, injunctions, interpretations, orders or decrees of any court or other Governmental Authority having jurisdiction as may be in effect from time to time.

"Leases" means all leases, license agreements and other occupancy or use agreements (whether oral or written), now or hereafter existing, which cover or relate to the Property or any part thereof (including, without limitation, the Ground Lease), together with all options therefor, amendments thereto and renewals, modifications and guaranties thereof, including any cash or security deposited under the Leases to secure performance by the tenants of their obligations under the Leases, whether such cash or security is to be held until the expiration of the terms of the Leases or applied to one or more of the installments of rent coming due thereunder.

"Loan" means the loan from Lender to Borrower, the repayment obligations in connection with which are evidenced by the Note.

"Loan Amount" means Nineteen Million and No/100 Dollars ($19,000,000).

"Loan Documents" means this Agreement, the Note, the Mortgage, the Environmental Agreement, the Guaranty, the Subordination Agreement, any Swap Contract, and any and all other documents which Borrower, any Guarantor or any other party or parties have executed and delivered, or may hereafter execute and deliver, to evidence, secure or guarantee the Obligations, or any part thereof, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Merco Group" means Merco Group - Southpark, LLC, a California limited liability company.

"Mortgage" means the Deed of Trust, Assignment, Security Agreement and Fixture Filing of even date herewith given by Borrower to Lender to secure the Obligations, except for Obligations arising out of the Environmental Agreement, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Net Proceeds," when used with respect to any Condemnation Awards or Insurance Proceeds, means the gross proceeds from any Condemnation or Casualty remaining after payment of all expenses, including attorneys' fees, incurred in the collection of such gross proceeds.

"Note" means the Promissory Note of even date herewith, in an amount equal to the Loan Amount, made by Borrower to the order of Lender, as the same may from time to time be extended, amended, restated, supplemented or otherwise modified.

"Notice" means a notice, request, consent, demand or other communication given in accordance with the provisions of Section 8.6 of this Agreement.

"Obligations" means all present and future debts, obligations and liabilities of Borrower to Lender arising pursuant to, or on account of, the provisions of this Agreement, the Note or any of the other Loan Documents, including the obligations: (a) to pay all principal, interest, late charges, prepayment premiums (if any) and other amounts due at any tie under the Note; (b) to pay all Expenses, indemnification payments, fees and other amounts due at any time under the

Mortgage or any of the other Loan Documents, together with interest thereon as provided in the Mortgage or such Loan Document; (c) to pay and perform all obligations of Borrower under any Swap Contract; and (d) to perform, observe and comply with all the terms, covenants and conditions, expressed or implied, which Borrower is required to perform, observe or comply with pursuant to the terms of the Mortgage or any of the other Loan Documents.  Notwithstanding any language contained in the Loan Documents, the Obligations of Borrower to pay and perform under the Environmental Agreement are unsecured.

"Option Agreement" means the Option Agreement of even date herewith by and between Borrower, as optioner, and Merco Group, as optionee, under the terms of which Merco Group is granted the right to acquire the Property, in its entirety, from Borrower by exercising its option to do so any time between August 4, 2005 and July 4, 2006, together with a memorandum of such Option Agreement relating thereto to be recorded in the Official Records of Los Angeles County, California.

"Person" means an individual, a corporation, a partnership, a joint venture, a limited liability company, a trust, an unincorporated association, any Governmental Authority or any other entity.

"Property" means the real and personal property conveyed and encumbered by the Mortgage.

"Purchase Agreement" means the Purchase and Sale Agreement and Escrow Instructions to be entered into by and between Borrower, as seller, and Merco Group, as buyer, with respect to the Option Agreement.

"Rents" means all of the rents, royalties, issues, profits, revenues, earnings, income and other benefits of the Property or any part thereof, or arising from the use or enjoyment of the Property or any part thereof, including all such amounts paid under or arising from any of the Leases and all fees, charges, accounts or other payments for the use or occupancy of rooms or other public facilities within the Property or any part thereof.

"State" means the State of California.

"Subordination Agreement" means the Subordination Agreement of even date herewith by and among Borrower, Merco Group and Lender, under the terms of which the Ground Lease, the Option Agreement and the Purchase Agreement are expressly and unconditionally subordinated to the lien or charge of the Mortgage and the other Loan Documents, as applicable.

"Survey" means a map or plat of survey of the Land which conforms with the "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys" jointly established and adopted by ALTA, ACSM and NSPS in 1999, and pursuant to Accuracy Standards as adopted by ALTA, ACSM and NSPS and in effect on the date when the Survey is certified to Lender, which certification shall be in form and substance satisfactory to Lender.

"Swap Contract" means any agreement, whether or not in writing, relating to any transaction that is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap or option, bond, note or bill option, interest rate option, forward foreign exchange transaction, interest cap, collar or floor transaction, currency swap, cross-currency rate swap, swap option, currency option or any other similar transaction (including any option to enter into the foregoing) or any combination of the foregoing, and, unless the context otherwise clearly requires, any form of master agreement published by the International Swaps and Derivatives Association, Inc., or any other master agreement, entered into between Lender (or its affiliate) or another financial institution acceptable to Lender in its sole discretion and Borrower (or its affiliate) in connection with the Loan, together with any related schedules and confirmations, as amended, supplemented, superseded or replaced from time to time, relating to or governing any or all of the foregoing.

"Taxes" means all taxes and assessments whether general or special, ordinary or extraordinary, or foreseen or unforeseen, which at any time may be assessed, levied, confirmed or imposed by any Governmental Authority or any

communities facilities or other private district on Borrower or on any of its properties or assets or any part thereof or in respect of any of its franchises, businesses, income or profits.

"Tenancy-in-Common Agreement" means the Tenancy-in-Common Agreement of even date herewith by and between Lancam Properties, LLC, a Delaware limited liability company, Tranmar Properties, LLC, a Delaware limited liability company, and Tranrich, LLC, a Delaware limited liability company, with respect to their ownership of the fee interest in the Property as tenants-in-common.

Article II
The Loan.

Section 2.1     The Loan.

Borrower agrees to borrow the Loan from Lender, and Lender agrees to lend the Loan to Borrower, subject to the terms and conditions herein set forth.  Interest shall accrue and be payable in arrears.  The Loan is not a revolving loan; amounts repaid may not be re-borrowed.

Section 2.2     Purpose.

The Loan shall be advanced by Lender in accordance with the terms of this Agreement to pay those expenses related to the Loan and the Property that are described in the Budget, but not, in the aggregate with respect to any line item set forth in the Budget, in excess of the amount of the Loan to be disbursed for such line item, as set forth in the Budget.  Borrower will receive each advance in trust for the purpose of paying only those costs for which the advance is made and will utilize the funds advanced for no other purpose.  With the prior approval of Lender, any cost savings, actual or estimated, affecting any approved line item within the Budget, other than the interest reserve, may be reallocated by Borrower to any other line item within the Budget.  Each disbursement from a contingency reserve, if any, shall be subject to approval by Lender as to the amount and purpose for which such disbursement will be used.

Section 2.3  Draw Requests.

Advances shall be made not more frequently than monthly based on draw requests signed by an Authorized Signer in the form attached hereto as Schedule 2 or in another form approved by Lender.  Each draw request shall be supported by such information and documentation (such as paid receipts, invoices, statements of accounts, lien releases, etc.) as Lender may require to assure that amounts requested are to be used to reimburse Borrower for costs previously paid by Borrower or to pay costs incurred by Borrower that are to be paid from proceeds of the Loan, as set forth in the Budget.

Section 2.4     Additional Terms Regarding Advances.

Advances of the Loan shall also be subject to the terms and conditions set forth in Schedule 3.

Section 2.5     Liability of Lender.

Lender shall in no event be responsible or liable to any Person other than Borrower for the disbursement of or failure to disburse the Loan proceeds or any part thereof and no contractor, subcontractor, laborer or material supplier shall have any right or claim against Lender under this Agreement or the other Loan Documents.

Section 2.6     Conditions to Closing.

Prior to the closing of this transaction, Borrower will deliver, or will cause Merco Group to deliver, as applicable, the following documents and other items, executed and acknowledged as appropriate, all in form and substance

14243.5
PAGE 5

satisfactory to Lender: (a) this Agreement; (b) the Note; (c) the Mortgage; (d) the Environmental Agreement; (e) the Guaranty(ies); (f) the Subordination Agreement; (g) an ALTA title insurance policy issued by Land America Lawyers Title ("Title Insurer") insuring Lender that the Mortgage constitutes a valid and enforceable lien on the Property subject and subordinate only to such liens or other matters as Lender has approved in writing; (h) evidence of the casualty and other insurance coverage required under this Agreement; (i) evidence of Borrower's, Merco Group's and each Guarantor's due formation and good standing, as well as due authorization and execution of the Loan Documents and the Environmental Agreement, as applicable; (j) copies the Ground Lease, the Option Agreement and the Tenancy-in-Common Agreement; (k) a certification from each Guarantor that such Guarantor is in compliance with the financial covenants set forth in its respective Guaranty; and (l) such other documents, property information and other assurances as Lender may require.

> Section 2.7    Disbursement Procedures.

Lender shall disburse the initial advance of Loan proceeds to an escrow established with Land America Title Company, 251 South Lake Avenue, Fourth Floor, Pasadena, California 91101 (Attn: Marleny Martin) via wire transfer ("Escrow Agent"), in the amount of $15,320,559.16, as requested in the initial draw request submitted by Borrower to Lender and approved by Lender, less Lender's Loan fee ($190,000), Lender's appraisal fee and the cost of the flood certification obtained by Lender with respect to the Property. Borrower shall pay all closing costs incurred in connection with the funding of the Loan, including, without limitation, title insurance fees, escrow charges and recording costs and shall reimburse Lender for all costs and fees incurred in connection therewith, including, without limitation, the fees and costs of Lender's outside counsel (which fees and costs shall be paid through escrow), and such other fees and expenses incurred by Lender.

Article III
Representations and Warranties.

Borrower represents and warrants to Lender that:

> Section 3.1    Organization, Power and Authority of Borrower; Loan Documents.

Each Borrower (a) is a limited liability company duly formed, existing and in good standing under the laws of the state in which it is formed and is duly qualified to do business and in good standing in the state in which the Land is located (if different from the state of its formation) and in any other state where the nature of Borrower's business or property requires it to be qualified to do business, and (b) has the power, authority and legal right to own its property and carry on the business now being conducted by it and to engage in the transactions contemplated by the Loan Documents. The Loan Documents to which Borrower is a party have been duly executed and delivered by Borrower, and the execution and delivery of, and the carrying out of the transactions contemplated by, such Loan Documents, and the performance and observance of the terms and conditions thereof, have been duly authorized by all necessary organizational action by and on behalf of Borrower. The Loan Documents to which Borrower is a party constitute the valid and legally binding obligations of Borrower and are fully enforceable against Borrower in accordance with their respective terms, except to the extent that such enforceability may be limited by laws generally affecting the enforcement of creditors' rights.

> Section 3.2    Other Documents; Laws.

The execution and performance of the Loan Documents to which Borrower is a party and the consummation of the transactions contemplated thereby will not conflict with, result in any breach of, or constitute a default under, the organizational documents of Borrower, or any contract, agreement, document or other instrument to which Borrower is a party or by which Borrower or any of its properties may be bound or affected, and such actions do not and will not violate or contravene any Law to which Borrower is subject.

14243.5
PAGE 6

Section 3.3    Taxes.

Borrower has filed all federal, state, county and municipal Tax returns required to have been filed by Borrower and has paid all Taxes which have become due pursuant to such returns or pursuant to any Tax assessments received by Borrower.

Section 3.4    Legal Actions.

There are no Claims or investigations by or before any court or Governmental Authority, pending, or to the best of Borrower's knowledge and belief, threatened against or affecting Borrower, Borrower's business or the Property. Borrower is not in default with respect to any order, writ, injunction, decree or demand of any court or any Governmental Authority affecting Borrower or the Property.

Section 3.5    Nature of Loan.

Borrower is a business or commercial organization. The Loan is being obtained solely for business or investment purposes, and will not be used for personal, family, household or agricultural purposes.

Section 3.6    Trade Names.

Borrower conducts its business solely under the name set forth in the Preamble to this Agreement and makes use of no trade names in connection therewith, unless such trade names have been previously disclosed to Lender in writing.

Section 3.7    Financial Statements.

The financial statements heretofore delivered by Borrower and each Guarantor to Lender are true and correct in all respects, have been prepared in accordance with sound accounting principles consistently applied, and fairly present the respective financial conditions of the subjects thereof as of the respective dates thereof.

Section 3.8    ERISA and Prohibited Transactions.

As of the date hereof and throughout the term of the Loan: (a) Borrower is not and will not be (i) an "employee benefit plan," as defined in Section 3(3) of ERISA, (ii) a "governmental plan" within the meaning of Section 3(32) of ERISA, or (iii) a "plan" within the meaning of Section 4975(e) of the Code; (b) the assets of Borrower do not and will not constitute "plan assets" within the meaning of the United States Department of Labor Regulations set forth in Section 2510.3-101 of Title 29 of the Code of Federal Regulations; (c) transactions by or with Borrower are not and will not be subject to state statutes applicable to Borrower regulating investments of fiduciaries with respect to governmental plans; and (d) Borrower will not engage in any transaction that would cause any Obligation or any action taken or to be taken hereunder (or the exercise by Lender of any of its rights under the Mortgage or any of the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA or Section 4975 of the Code. Borrower agrees to deliver to Lender such certifications or other evidence of compliance with the provisions of this Section as Lender may from time to time request.

Section 3.9    Compliance with Zoning and Other Requirements.

The use of the Property complies with applicable zoning ordinances, regulations and restrictive covenants affecting the Land. All use and other requirements of any Governmental Authority having jurisdiction over the Property have been satisfied. No violation of any Law exists with respect to the Property. The Improvements are constructed entirely on the Land and do not encroach upon any easement or right-of-way, or upon the land of others. The Improvements comply with all applicable building restriction lines and set-backs, however established, and are in strict

14243.5
PAGE 7

compliance with all applicable use or other restrictions and the provisions of all applicable prior agreements, declarations, covenants and all applicable zoning and subdivision ordinances and regulations.

Section 3.10    Certificate of Occupancy.

All certificates of occupancy and other permits necessary or required in connection with the use and occupancy of the Improvements have been validly issued.

Section 3.11    Utilities.

All utility services necessary for the operation of the Improvements including telephone service, cable television, water supply, storm and sanitary sewer facilities, natural gas and electric facilities, including cabling for telephonic and data communication, and the capacity to send and receive wireless communication have been fully installed or, subject to customary rates and charges, are available to the Property.

Section 3.12    Access; Roads.

All roads and other access necessary for the operation of the Improvements and full utilization thereof for their intended purposes have been completed and have been dedicated to public use and accepted by such Governmental Authority.

Section 3.13    Other Liens.

Borrower has made no contract or arrangement of any kind the performance of which by the other party thereto would give rise to a lien on the Property.

Section 3.14    No Material Adverse Change.

No material adverse change has occurred in the financial conditions reflected in the financial statements of Borrower or any Guarantor since the respective dates of such statements, and no material additional liabilities have been incurred by Borrower since the dates of such statements other than the borrowings contemplated herein or as approved in writing by Lender.

Section 3.15    Defaults.

There is no Default or Event of Default under any of the Loan Documents, and there is no default or event of default under any material contract, agreement or other document related to the construction or operation of the Improvements.

Article IV
Affirmative Covenants and Agreements.

Section 4.1    Compliance with Laws.

The Improvements shall be maintained and operated in accordance with all applicable (whether present or future) Laws.

Section 4.2    Inspections; Cooperation.

Borrower shall permit representatives of Lender to enter upon the Land, to inspect the Improvements, to examine all records and books of account maintained by or on behalf of Borrower relating thereto and to discuss the affairs,

14243.5
PAGE 8

finances and accounts pertaining to the Loan and the Improvements with representatives of Borrower.  Borrower shall at all times cooperate with the representatives of Lender in connection with or in aid of the performance of Lender's functions under this Agreement.  Except in the event of an emergency, Lender shall give Borrower at least twenty-four hours' notice by telephone in each instance before entering upon the Land and/or exercising any other rights granted in this Section.

Section 4.3      Payment and Performance of Contractual Obligations.

Borrower shall perform in a timely manner all of its obligations under any and all other contracts and agreements related to the operation, maintenance or alteration of the Improvements.  Within thirty (30) days after the filing of any mechanic's lien or other lien or encumbrance against the Property, Borrower will promptly discharge the same by payment or filing a bond or otherwise as permitted by Law.  So long as Lender's security has been protected by the filing of a bond or otherwise in a manner satisfactory to Lender in its sole and absolute discretion, Borrower shall have the right to contest in good faith any claim, lien or encumbrance, provided that Borrower does so diligently and without prejudice to Lender.

Section 4.4      Correction of Structural Defects.

Promptly following any demand by Lender, Borrower shall correct or cause the correction of any structural defects in the Improvements.

Section 4.5      Insurance.

Borrower shall maintain, or shall cause Merco Group under the terms of the Ground Lease to maintain, the following insurance at its sole cost and expense:

(a)      Insurance against Casualty to the Property under a policy or policies covering such risks as are presently included in "special form" (also known as "all risk") coverage, including such risks as are ordinarily insured against by similar businesses, but in any event including fire, lightning, windstorm, hail, explosion, riot, riot attending a strike, civil commotion, damage from aircraft, smoke, vandalism, malicious mischief and acts of terrorism.  Such insurance shall name Lender as mortgagee and loss payee.  Unless otherwise agreed in writing by Lender, such insurance shall be for the full insurable value of the Property on a replacement cost basis, with a deductible amount, if any, satisfactory to Lender.  No policy of insurance shall be written such that the proceeds thereof will produce less than the minimum coverage required by this Section by reason of co-insurance provisions or otherwise.  The term "full insurable value" means one hundred percent (100%) of the actual replacement cost of the Property, including tenant improvements (excluding foundation and excavation costs and costs of underground flues, pipes, drains and other uninsurable items).

(b)      Comprehensive (also known as commercial) general liability insurance on an "occurrence" basis against claims for "personal injury" liability and liability for death, bodily injury and damage to property, products and completed operations, in limits satisfactory to Lender with respect to any one occurrence and the aggregate of all occurrences during any given annual policy period.  Such insurance shall name Lender as an additional insured.

(c)      Workers' compensation insurance for all employees of Borrower in such amount as is required by Law and including employer's liability insurance, if required by Lender.

(d)      During any period of construction of tenant improvements, Borrower shall maintain, or cause others to maintain, such insurance as may be required by Lender of the type customarily carried in the case of similar construction for one hundred percent (100%) of the full replacement cost of materials stored at or upon the Property.  During any period of other construction upon the Property, Borrower shall maintain, or cause others to maintain, builder's risk insurance (non-reporting form) of the type customarily carried in the case of similar construction for one hundred percent (100%) of the full replacement cost of work in place and materials stored at or upon the Property.

14243.5
PAGE 9

(e)    If at any time any portion of any structure on the Property is insurable against Casualty by flood and is located in a Special Flood Hazard Area under the Flood Disaster Protection Act of 1973, as amended, a flood insurance policy in form and amount acceptable to Lender but in no amount less than the amount sufficient to meet the requirements of applicable Law as such requirements may from time to time be in effect.

(f)    Loss of rental value insurance or business interruption insurance in an amount equal to twelve (12) months of the projected gross income of the Property and an extended period of indemnity endorsement providing an additional twelve (12) months' loss of rental value or business interruption insurance after the Property has been restored or until the projected gross income returns to the level that existed prior to the loss, whichever is first to occur.

(g)    Such other and further insurance as may be required from time to time by Lender in order to comply with regular requirements and practices of Lender in similar transactions including, if required by Lender, boiler and machinery insurance, pollution liability insurance, wind insurance and earthquake insurance, so long as any such insurance is generally available at commercially reasonable premiums as determined by Lender from time to time.

Each policy of insurance (i) shall be issued by one or more insurance companies each of which must have an A.M. Best Company financial and performance rating of A-IX or better and are qualified or authorized by the Laws of the State to assume the risks covered by such policy, (ii) with respect to the insurance described under the preceding Subsections (a), (d), (e) and (f), shall have attached thereto standard non-contributing, non-reporting mortgagee clauses in favor of and entitling Lender without contribution to collect any and all proceeds payable under such insurance, either as sole payee or as joint payee with Borrower, (iii) shall provide that such policy shall not be canceled or modified for nonpayment of premiums without at least ten (10) days prior written notice to Lender, or for any other reason without at least thirty (30) days prior written notice to Lender, and (iv) shall provide that any loss otherwise payable thereunder shall be payable notwithstanding any act or negligence of Borrower which might, absent such agreement, result in a forfeiture of all or a part of such insurance payment. Borrower shall promptly pay all premiums when due on such insurance and, not less than ten (10) days prior to the expiration dates of each such policy, Borrower will deliver to Lender acceptable evidence of insurance, such as a renewal policy or policies marked "premium paid" or other evidence satisfactory to Lender reflecting that all required insurance is current and in force. Borrower will immediately give Notice to Lender of any cancellation of, or change in, any insurance policy. Lender shall not, because of accepting, rejecting, approving or obtaining insurance, incur any liability for (A) the existence, nonexistence, form or legal sufficiency thereof, (B) the solvency of any insurer, or (C) the payment of losses. Borrower may satisfy any insurance requirement hereunder by providing one or more "blanket" insurance policies, subject to Lender's approval in each instance as to limits, coverages, forms, deductibles, inception and expiration dates, and cancellation provisions.

Section 4.6    Adjustment of Condemnation and Insurance Claims.

Borrower shall give prompt Notice to Lender of any Casualty or any Condemnation or threatened Condemnation. Lender is authorized, at its sole and absolute option, to commence, appear in and prosecute, in its own or Borrower's name, any action or proceeding relating to any Condemnation or Casualty, and to make proof of loss for and to settle or compromise any Claim in connection therewith. In such case, Lender shall have the right to receive all Condemnation Awards and Insurance Proceeds, and may deduct therefrom any payment all of its Expenses. However, so long as no Event of Default has occurred and Borrower is diligently pursuing its rights and remedies with respect to a Claim, Lender will obtain Borrower's written consent (which consent shall not be unreasonably withheld or delayed) before making proof of loss for or settling or compromising such Claim. Borrower agrees to diligently assert its rights and remedies with respect to each Claim and to promptly pursue the settlement and compromise of each Claim subject to Lender's approval, which approval shall not be unreasonably withheld or delayed. If, prior to the receipt by Lender of any Condemnation Award or Insurance Proceeds, the Property shall have been sold pursuant to the provisions of the Mortgage, Lender shall have the right to receive such funds (a) to the extent of any deficiency found to be due upon such sale with interest thereon (whether or not a deficiency judgment on the Mortgage shall have been sought or recovered or denied), and (b) to the extent necessary to reimburse Lender for its Expenses. If any Condemnation Awards or Insurance Proceeds are paid to

Borrower, Borrower shall receive the same in trust for Lender. Within ten (10) days after Borrower's receipt of any Condemnation Awards or Insurance Proceeds, Borrower shall deliver such awards or proceeds to Lender in the form in which they were received, together with any endorsements or documents that may be necessary to effectively negotiate or transfer the same to Lender. Borrower agrees to execute and deliver from time to time, upon the request of Lender, such further instruments or documents as may be requested by Lender to confirm the grant and assignment to Lender of any Condemnation Awards or Insurance Proceeds.

Section 4.7    <u>Utilization of Net Proceeds.</u>

(a)    Net Proceeds must be utilized either for payment of the Obligations or for the restoration of the Property. Net Proceeds may be utilized for the restoration of the Property only if no Default shall exist and only if in the reasonable judgment of Lender (i) there has been no material adverse change in the financial viability of the construction or operation of the Improvements, (ii) the Net Proceeds, together with other funds deposited with Lender for that purpose, are sufficient to pay the cost of the restoration pursuant to a budget and plans and specifications approved by Lender, and (iii) the restoration can be completed prior to the final maturity of the Loan and prior to the date required by any Lease. Otherwise, Net Proceeds shall be utilized for payment of the Obligations.

(b)    If Net Proceeds are to be utilized for the restoration of the Property, the Net Proceeds, together with any other funds deposited with Lender for that purpose, must be deposited in an interest-bearing account with Lender. Lender may, at its option, require Borrower to deposit funds in the event of a deficiency in the funds available to complete restoration as herein contemplated. Lender shall have the exclusive right to manage and control all funds in such account, but Lender shall have no fiduciary duty with respect to such funds. Advances of the deposited funds will be subject to such terms and conditions, including without limitation, retainage and lien waivers as Lender shall reasonably require. Any account fees and charges may be deducted from the balance, if any, in such account. Borrower grants to Lender a security interest in such account and all such deposited funds hereafter deposited to such account, and any proceeds thereof, as security for the Obligations. Such security interest shall be governed by the Uniform Commercial Code of the State, and Lender shall have available to it all of the rights and remedies available to a secured party thereunder. Such account may be established and held in such name or names as Lender shall deem appropriate, including in the name of Lender. Borrower hereby constitutes and appoints Lender and any officer or agent of Lender its true and lawful attorneys-in-fact with full power of substitution to open such account and to do any and every act that Borrower might do on its own behalf to fulfill the terms of this <u>Section 4.7</u>. To the extent permitted by Law, Borrower hereby ratifies all that said attorneys shall lawfully do or cause to be done by virtue hereof. It is understood and agreed that this power of attorney, which shall be deemed to be a power coupled with an interest, cannot be revoked.

Section 4.8    <u>Management.</u>

Borrower at all times shall provide for the competent and responsible management and operation of the Property. Any management contract or contracts affecting the Property must be approved in writing by Lender prior to the execution of the same.

Section 4.9    <u>Books and Records; Financial Statements; Tax Returns.</u>

Borrower will keep and maintain full and accurate books and records administered in accordance with sound accounting principles, consistently applied, showing in detail the earnings and expenses of the Property and the operation thereof. Borrower will keep and maintain its books and records, including recorded data of any kind and regardless of the medium of recording, at the address of Borrower set forth in <u>Section 8.6</u>. Borrower shall permit Lender, or any Person authorized by Lender, to inspect and examine such books and records (regardless of where maintained) and all supporting vouchers and data and to make copies and extracts therefrom at all reasonable times and as often as may be requested by Lender. Borrower will furnish or cause to be furnished to Lender annual financial statements, including balance sheets and income statements, for Borrower, each Guarantor (other than Ezri Namvar and the Namvar Family Trust u/d/t dated December 5, 1994 (the "Excluded Guarantors")) and the Property, within one hundred twenty (120) days after each fiscal

year end for the respective reporting party. In addition, Borrower will furnish or cause to be furnished to Lender, (i) with reasonable promptness, such interim financial statements of Borrower, each Guarantor (other than the Excluded Guarantors) and the Property, together with such additional information, reports or statements in connection therewith, as Lender may from time to time request, and (ii) within thirty (30) days of their filing (but in no event later than October 25 of any calendar year), copies of all filed federal and state income tax returns for Borrower and each Guarantor (other than the Excluded Guarantors). All financial statements must be in form and detail acceptable to Lender and must be certified as to accuracy by Borrower or the respective Guarantor, as the case may be. All financial statements must be in form and detail acceptable to Lender, must be certified as to accuracy by Borrower or the respective Guarantor, as the case may be. Borrower shall provide, upon Lender's request, convenient facilities for the audit and verification of any such statement. All certifications and signatures on behalf of corporations, partnerships, limited liability companies and other entities shall be by a representative of the reporting party satisfactory to Lender. All financial statements for individuals shall be on Lender's then-current personal financial statement form or in another form satisfactory to Lender.

Section 4.10    Estoppel Certificates.

Within ten (10) days after any request by Lender or a proposed assignee or purchaser of the Loan or any interest therein, Borrower shall certify in writing to Lender, or to such proposed assignee or purchaser, the then unpaid balance of the Loan and whether Borrower claims any right of defense or setoff to the payment or performance of any of the Obligations, and if Borrower claims any such right of defense or setoff, Borrower shall give a detailed written description of such claimed right.

Section 4.11    Taxes.

Borrower shall pay and discharge all Taxes prior to the date on which penalties are attached thereto unless and to the extent only that such Taxes are contested in accordance with the terms of the Mortgage.

Section 4.12    Lender's Rights to Pay and Perform.

If, after any required notice, Borrower fails to promptly pay or perform any of the Obligations within any applicable grace or cure periods, Lender, without Notice to or demand upon Borrower, and without waiving or releasing any Obligation or Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Borrower. Lender may enter upon the Property for that purpose and take all action thereon as Lender considers necessary or appropriate. Without limiting the generality of the foregoing, Lender may, following the occurrence of an Event of Default, make advances directly to any supplier of materials or services with respect to the Property, including any contractor, as Lender shall deem necessary or appropriate. The execution hereof by Borrower shall, and hereby does, constitute an irrevocable authorization to make any such payment. No further direction or authorization from Borrower shall be necessary to warrant such payment. Each payment shall be secured by the Mortgages, shall be payable upon demand and shall accrue interest at the rate of interest then applicable to the Loan under the terms of the Note from the date of such notice until paid.

Section 4.13    Reimbursement; Interest.

If Lender shall incur any Expenses or pay any Claims by reason of the Loan or the rights and remedies provided under the Loan Documents (regardless of whether or not any of the Loan Documents expressly provide for an indemnification by Borrower against such Claims), Lender's payment of such Expenses and Claims shall constitute advances to Borrower which shall be paid by Borrower to Lender on demand, together with interest thereon from the date incurred until paid in full at the rate of interest then applicable to the Loan under the terms of the Note. Each advance arising out of the Environmental Agreement shall be unsecured. All other advances shall be secured by the Mortgage and the other Loan Documents as fully as if made to Borrower, regardless of the disposition thereof by the party or parties to whom such advance is made. Notwithstanding the foregoing, however, in any action or proceeding to foreclose the

14243.5
PAGE 12

Mortgage or to recover or collect the Obligations, the provisions of Law governing the recovery of costs, disbursements and allowances shall prevail unaffected by this Section.

Section 4.14    Notification by Borrower.

Borrower will promptly give Notice to Lender of the occurrence of any Default or Event of Default hereunder or under any of the other Loan Documents.

Section 4.15    Indemnification by Borrower.

Borrower agrees to indemnify Lender and to hold Lender harmless from and against, and to defend Lender by counsel approved by Lender against, any and all Claims directly or indirectly arising out of or resulting from any transaction, act, omission, event or circumstance in any way connected with the Property or the Loan, including any Claim arising out of or resulting from (a) construction of any Improvements, including any defective workmanship or materials; (b) any failure by Borrower to comply with the requirements of any Laws or to comply with any agreement that applies or pertains to the Property, including any agreement with a broker or "finder" in connection with the Loan or other financing of the Property; (c) any failure by Borrower to observe and perform any of the obligations imposed upon the landlord under the Leases; (d) any other Default or Event of Default hereunder or under any of the other Loan Documents; or (e) any assertion or allegation that Lender is liable for any act or omission of Borrower or any other Person in connection with the ownership, development, financing, leasing, operation or sale of the Property; provided, however, that Borrower shall not be obligated to indemnify Lender with respect to any Claim arising solely from the gross negligence or willful misconduct of Lender. The agreements and indemnifications contained in this Section shall apply to Claims arising both before and after the repayment of the Loan and shall survive the repayment of the Loan, any foreclosure or deed, assignment or conveyance in lieu thereof and any other action by Lender to enforce the rights and remedies of Lender hereunder or under the other Loan Documents.

Section 4.16    Fees and Expenses.

Borrower shall pay all fees, charges, costs and expenses required to satisfy the conditions of the Loan Documents. Without limitation of the foregoing, Borrower will pay, when due, and if paid by Lender will reimburse Lender on demand for, all fees and expenses of the title insurer, environmental engineers, appraisers, surveyors and Lender's counsel in connection with the closing, administration, modification or any "workout" of the Loan, or the enforcement of Lender's rights and remedies under any of the Loan Documents.

Section 4.17    Appraisals.

Lender may obtain from time to time an appraisal of all or any part of the Property, prepared in accordance with written instructions from Lender, from a third-party appraiser satisfactory to, and engaged directly by, Lender. The cost of one such appraisal obtained by Lender in each calendar year and the cost of each such appraisal obtained by Lender following the occurrence of an Event of Default shall be borne by Borrower and shall be paid by Borrower on demand.

Section 4.18    Leasing and Tenant Matters.

(a)    Representations and Warranties of Borrower Regarding Leases.

Borrower represents and warrants that Borrower has delivered to Lender a true and correct copy of all Leases, and any guaranty(ies) thereof, affecting any part of the Property and/or the Improvements, together with an accurate and complete rent roll for the Property, that no such Lease or guaranty (other than the Option Agreement with respect to the Ground Lease) contains any option or right of first refusal to purchase all or any portion of the Property or any present or future interest therein, and that all such Leases (other than the Ground Lease) may be terminated by

14243.5
PAGE 13

Borrower without cause upon not more than ninety (90) days' prior notice and without the payment of any type of termination fee.

(b)     Covenants of Borrower Regarding Leases and Rents.

Borrower covenants that Borrower (i) will observe and perform all of the obligations imposed upon the landlord in the Leases and will not do or permit to be done anything to impair the security thereof; (ii) will use its best efforts to enforce or secure, or cause to be enforced or secured, the performance of each and every obligation and undertaking of the respective tenants under the Leases and will appear in and defend, at Borrower's sole cost and expense, any action or proceeding arising under, or in any manner connected with, such Leases; (iii) will not collect any of the Rents in advance of the time when the same become due under the terms of the Leases; (iv) will not discount any future accruing Rents; (v) without the prior written consent of Lender, will not execute any assignment of the Leases or the Rents; (vi) will not modify any of the terms under any of the Leases, or add or modify any option or right of first refusal to purchase all or any portion of the Property or any present or future interest therein, or surrender, cancel or terminate any Lease, without the prior written consent of Lender (which consent may be granted or withheld in Lender's sole discretion); and (vii) will execute and deliver, at the request of Lender, all such assignments of the Leases and Rents in favor of Lender as Lender may from time to time require.

(c)     Leasing Approval.

Borrower shall not enter into any Lease with respect to the Property or the Improvements unless approved by Lender in its sole and absolute discretion prior to execution.  Borrower shall provide to Lender a correct and complete copy of each Lease, including any exhibits, and any guaranty(ies) thereof, prior to execution.  Borrower shall pay all reasonable costs incurred by Lender in reviewing and approving Leases and any guaranties thereof, and also in negotiating subordination agreements and subordination, nondisturbance and attornment agreements with tenants, including reasonable attorneys' fees and costs.

(d)     Delivery of Leasing Information and Documents.

From time to time upon Lender's request, Borrower shall promptly deliver to Lender (i) complete executed originals of each Lease, including any exhibits thereto and any guaranty(ies) thereof, (ii) a complete rent roll of the Property in such detail as Lender may require, together with such operating statements and leasing schedules and reports as Lender may require, (iii) any and all financial statements of the tenants, subtenants and any lease guarantors to the extent available to Borrower, (iv) such other information regarding tenants and prospective tenants and other leasing information as Lender may request, and (v) such estoppel certificates, subordination agreements and/or subordination, nondisturbance and attornment agreements executed by such tenants, subtenants and guarantors, if any, in such forms as Lender may require.

Section 4.19    Intentionally Deleted.

Section 4.20    Intentionally Deleted.

Section 4.21    Tenancy-in-Common Agreement.

Each Borrower (i) will observe and perform all obligations imposed upon it under the Tenancy-in-Common Agreement, (ii) will not modify any of the terms of the Tenancy-in-Common Agreement or surrender, cancel or terminate the Tenancy-in-Common Agreement, and (iii) will not permit any assignment or other transfer of any tenant-in-common interest in the Property, without the prior written consent of Lender (which consent may be granted or withheld in

14243.5
PAGE 14

Lender's sole discretion).

Article V
Negative Covenants.

Section 5.1      Conditional Sales.

Borrower shall not incorporate in the Improvements any property acquired under a conditional sales contract or lease or as to which the vendor retains title or a security interest, without the prior written consent of Lender.

Section 5.2      Alterations to Improvements.

Borrower shall not make or permit any alterations to the Improvements without the prior written consent of Lender and under such reasonable conditions as Lender may establish.

Section 5.3      Single Purpose Entity Entity.

Borrower (a) shall not own or acquire any real or personal property other than the Property and personal property related to the operation and maintenance of the Property, (b) shall not operate any business other than the management and operation of the Property, (c) shall not incur, assume or otherwise become liable for any indebtedness or other liability, whether direct or contingent, other than trade debt directly related to the operation and/or maintenance of the Property, and (d) shall not maintain its assets in a way which is difficult to segregate and identify.

Article VI
Events of Default.

The occurrence or happening, from time to time, of any one or more of the following shall constitute an Event of Default under this Agreement:

Section 6.1      Payment Default.

Borrower fails to pay any Obligation under this Agreement when due, whether on the scheduled due date or upon acceleration, maturity or otherwise.

Section 6.2      Default Under Other Loan Documents.

An Event of Default (as defined therein) occurs under the Note or the Mortgage, or Borrower or any Guarantor fails to promptly pay, perform, observe or comply with any term, obligation or agreement contained in any of the other Loan Documents (within any applicable grace or cure period).

Section 6.3      Accuracy of Information; Representations and Warranties.

Any information contained in any financial statement, schedule, report or any other document delivered by Borrower, Merco Group, any Guarantor or any other Person to Lender in connection with the Loan proves at any time not to be in all respects true and accurate, or Borrower, Merco Group, any Guarantor or any other Person shall have failed to state any material fact or any fact necessary to make such information not misleading, or any representation or warranty contained in this Agreement or in any other Loan Document or other document, certificate or opinion delivered to Lender in connection with the Loan, proves at any time to be incorrect or misleading in any material respect either on the date when made or on the date when reaffirmed pursuant to the terms of this Agreement.

14243.5
PAGE 15

Section 6.4      <u>Deposits</u>.

Borrower fails to deposit funds with Lender, in the amount requested by Lender, pursuant to the provisions of <u>Section 4.7</u>, within ten (10) days from the effective date of a Notice from Lender requesting such deposit, or Borrower fails to deliver to Lender any Condemnation Awards or Insurance Proceeds within ten (10) days after Borrower's receipt thereof.

Section 6.5      <u>Insurance Obligations</u>.

Borrower fails to promptly perform or comply with any of the covenants contained in the Loan Documents with respect to maintaining insurance, including the covenants contained in <u>Section 4.5</u>.

Section 6.6      <u>Other Obligations</u>.

Borrower fails to promptly perform or comply with any of the Obligations set forth in this Agreement (other than those expressly described in other Sections of this <u>Article VI</u>), and such failure continues uncured for a period of thirty (30) days after Notice from Lender to Borrower, unless (a) such failure, by its nature, is not capable of being cured within such period, and (b) within such period, Borrower commences to cure such failure and thereafter diligently prosecutes the cure thereof, and (c) Borrower causes such failure to be cured no later than ninety (90) days after the date of such Notice from Lender.

Section 6.7      <u>Damage to Improvements</u>.

Unless otherwise approved by Lender in its sole discretion, the Improvements are substantially damaged or destroyed by fire or other casualty and Lender determines that the Improvements cannot be restored and completed in accordance with the terms and provisions of this Agreement and the Mortgage.

Section 6.8      <u>Lapse of Permits or Approvals</u>.

Any permit, license, certificate or approval that Borrower is required to obtain with respect to the construction, operation, development, leasing or maintenance of the Improvements or the Property lapses or ceases to be in full force and effect.

Section 6.9      <u>Mechanic's Lien</u>.

A lien for the performance of work or the supply of materials filed against the Property, or any stop notice served on Borrower remains unsatisfied or unbonded for a period of thirty (30) days after the date of filing or service.

Section 6.10      <u>Bankruptcy</u>.

Borrower, Merco Group or any Guarantor files a bankruptcy petition or makes a general assignment for the benefit of creditors, or a bankruptcy petition is filed against Borrower, Merco Group or any Guarantor and such involuntary bankruptcy petition continues undismissed for a period of sixty (60) days after the filing thereof.

Section 6.11      <u>Appointment of Receiver, Trustee, Liquidator</u>.

Borrower, Merco Group or any Guarantor applies for or consents in writing to the appointment of a receiver, trustee or liquidator of Borrower, Merco Group or any Guarantor, the Property, or all or substantially all of the other assets of Borrower, Merco Group or any Guarantor, or an order, judgment or decree is entered by any court of competent jurisdiction on the application of a creditor appointing a receiver, trustee or liquidator of Borrower, Merco Group or any Guarantor, the Property, or all or substantially all of the other assets of Borrower, Merco Group or any Guarantor.

Section 6.12    Judgment.

A final nonappealable judgment for the payment of money involving more than $50,000 is entered against Borrower or Merco Group or for the payment of money involving more than $250,000 is entered against any Guarantor, and Borrower, Merco Group or such Guarantor fails to discharge the same, or causes it to be discharged or bonded off to Lender's satisfaction, within thirty (30) days from the date of the entry of such judgment.

Section 6.13    Dissolution; Change in Business Status.

Unless the written consent of Lender is previously obtained, all or substantially all of the business assets of Borrower, Merco Group or any Guarantor are sold, Borrower, Merco Group or any Guarantor is dissolved, or there occurs any change in the form of business entity through which Borrower, Merco Group or any Guarantor presently conducts its business or any merger or consolidation involving Borrower, Merco Group or any Guarantor.

Section 6.14    Default Under Other Indebtedness.

Borrower, Merco Group or any Guarantor fails to pay any indebtedness owed by Borrower, Merco Group or such Guarantor to Lender when and as due and payable (whether by acceleration or otherwise).

Section 6.15    Death; Disability.

(a) Ezri Namvar dies or becomes incapacitated, unless within (90) days after such death or incapacity a substitute President of Namco Financial, Inc., the sole Manager of Lacy 20 LLC, a California limited liability company, which is the sole member of Lancam Properties, LLC, a Delaware limited liability company, acceptable to Lender, in its sole and absolute discretion, agrees to assume and perform the obligations of such sole Manager in connection with the Loan and the Property. In determining whether or not to approve any Person as a substitute President of Namco Financial, Inc., Lender may consider, among other things, the net worth a relevant business experience of such Person.

(b) Richard Meruelo dies or becomes incapacitated, unless within ninety (90) days after such death or incapacity a substitute member of Merco Group, acceptable to Lender, in its sole and absolute discretion, agrees to assume and perform the obligations of such member in connection with the Loan, the Ground Lease, the Option Agreement and the Property. In determining whether or not to approve any Person as a substitute member of Merco Group, Lender may consider, among other things, the net worth and relevant business experience of such Person.

Section 6.16    Change in Controlling Interest.

Without the prior written consent of Lender (which consent may be conditioned, among other matters, on the issuance of a satisfactory endorsement to the title insurance policy insuring Lender's interest under the Mortgage), (i) Ezri Namvar ceases to own, either directly or indirectly, at least fifty-one percent (51%) of the ownership interests in Namco Financial, Inc., the sole Manager of Lacy 20 LLC, a California limited liability company, which is the sole member of Lancam Properties, LLC, a Delaware limited liability company, or fails to be the sole trustee of the Namvar Family Trust u/d/t dated December 5, 1994; or (ii) Richard Meruelo ceases to own, either directly or indirectly, at least ninety-nine percent (99%) of the ownership interests in Merco Group or fails to be the sole trustee of the Richard Meruelo Living Trust u/d/t dated September 15, 1989.

Section 6.17    Material Adverse Change.

In the reasonable opinion of Lender, the prospect of payment or performance of all or any part of the Obligations has been impaired because of a material adverse change in the financial condition, results of operations, business or properties of Borrower, Merco Group, any Guarantor or any other Person liable for the payment or performance of any of the Obligations.

Section 6.18    Default Under Ground Lease, Option Agreement or Tenancy-in-Common Agreement.

Any default by Borrower or Merco Group, as applicable, occurs under the Ground Lease, the Option Agreement , the Purchase Agreement or the Tenancy-in-Common Agreement and any applicable grace or cure period has expired, or a transfer is made of any tenant-in-common interest under the Tenancy-in-Common Agreement.

Article VII
Remedies on Default.

Section 7.1    Remedies on Default.

Upon the happening of any Event of Default, Lender shall have the right, in addition to any other rights or remedies available to Lender under the Mortgage or any of the other Loan Documents or under applicable Law, to exercise any one or more of the following rights and remedies:

(a)    Lender may accelerate all of Borrower's Obligations under the Loan Documents whereupon such Obligations shall become immediately due and payable, without notice of default, acceleration or intention to accelerate, presentment or demand for payment, protest or notice of nonpayment or dishonor, or notices or demands of any kind or character (all of which are hereby waived by Borrower).

(b)    Lender may apply to any court of competent jurisdiction for, and obtain appointment of, a receiver for the Property.

(c)    Lender may set off the amounts due Lender under the Loan Documents against any and all accounts, credits, money, securities or other property of Borrower now or hereafter on deposit with, held by or in the possession of Lender to the credit or for the account of Borrower, without notice to or the consent of Borrower.

Section 7.2    No Release or Waiver; Remedies Cumulative and Concurrent.

Borrower shall not be relieved of any Obligation by reason of the failure of Lender to comply with any request of Borrower or of any other Person to take action to foreclose on the Property under the Mortgage or otherwise to enforce any provision of the Loan Documents, or by reason of the release, regardless of consideration, of all or any part of the Property. No delay or omission of Lender to exercise any right, power or remedy accruing upon the happening of an Event of Default shall impair any such right, power or remedy or shall be construed to be a waiver of any such Event of Default or any acquiescence therein. No delay or omission on the part of Lender to exercise any option for acceleration of the maturity of the Obligations, or for foreclosure of the Mortgage following any Event of Default as aforesaid, or any other option granted to Lender hereunder in any one or more instances, or the acceptance by Lender of any partial payment on account of the Obligations shall constitute a waiver of any such Event of Default and each such option shall remain continuously in full force and effect. No remedy herein conferred upon or reserved to Lender is intended to be exclusive of any other remedies provided for in the Loan Documents, and each and every such remedy shall be cumulative, and shall be in addition to every other remedy given hereunder, or under the Loan Documents, or now or hereafter existing at Law or in equity or by statute. Every right, power and remedy given by the Loan Documents to Lender shall be concurrent and may be pursued separately, successively or together against Borrower, the Property, or any part thereof, and every right, power and remedy given by the Loan Documents may be exercised from time to time as often as may be deemed expedient by Lender.

Article VIII
Miscellaneous.

Section 8.1      Further Assurances; Authorization to File Documents.

At any time, and from time to time, upon request by Lender, Borrower will, at Borrower's expense, (a) correct any defect, error or omission which may be discovered in the form or content of any of the Loan Documents, and (b) make, execute, deliver and record, or cause to be made, executed, delivered and recorded, any and all further instruments, certificates and other documents as may, in the opinion of Lender, be necessary or desirable in order to complete, perfect or continue and preserve the lien of the Mortgage. Upon any failure by Borrower to do so, Lender may make, execute and record any and all such instruments, certificates and other documents for and in the name of Borrower, all at the sole expense of Borrower, and Borrower hereby appoints Lender the agent and attorney-in-fact of Borrower to do so, this appointment being coupled with an interest and being irrevocable. Without limitation of the foregoing, Borrower irrevocably authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements deemed necessary or desirable by Borrower to establish or maintain the validity, perfection and priority of the security interests granted in the Mortgage, and Borrower ratifies any such filings made by Lender prior to the date hereof.

Section 8.2      No Warranty by Lender.

By accepting or approving anything required to be observed, performed or fulfilled by Borrower or to be given to Lender pursuant to this Agreement, including any certificate, Survey, receipt, appraisal or insurance policy, Lender shall not be deemed to have warranted or represented the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof and any such acceptance or approval thereof shall not be or constitute any warranty or representation with respect thereto by Lender.

Section 8.3      Standard of Conduct of Lender.

Nothing contained in this Agreement or any other Loan Document shall limit the right of Lender to exercise its business judgment or to act, in the context of the granting or withholding of any consent under this Agreement or any other Loan Document, in a subjective manner, whether or not objectively reasonable under the circumstances, so long as Lender's exercise of its business judgment or action is made or undertaken in good faith. Borrower and Lender intend by the foregoing to set forth and affirm their entire understanding with respect to the standard pursuant to which Lender's duties and obligations are to be judged and the parameters within which Lender's discretion may be exercised hereunder and under the other Loan Documents. As used herein, "good faith" means honesty in fact in the conduct and transaction concerned.

Section 8.4      No Partnership.

Nothing contained in this Agreement shall be construed in a manner to create any relationship between Borrower and Lender other than the relationship of borrower and lender and Borrower and Lender shall not be considered partners or co-venturers for any purpose on account of this Agreement.

Section 8.5      Severability.

In the event any one or more of the provisions of this Agreement or any of the other Loan Documents shall for any reason be held to be invalid, illegal or unenforceable, in whole or in part or in any other respect, or in the event any one or more of the provisions of any of the Loan Documents operates or would prospectively operate to invalidate this Agreement or any of the other Loan Documents, then and in either of those events, at the option of Lender, such provision or provisions only shall be deemed null and void and shall not affect the validity of the remaining Obligations, and the

remaining provisions of the Loan Documents shall remain operative and in full force and effect and shall in no way be affected, prejudiced or disturbed thereby.

Section 8.6    Notices.

All Notices required or which any party desires to give hereunder or under any other Loan Document shall be in writing and, unless otherwise specifically provided in such other Loan Document, shall be furnished if delivered by personal delivery, by nationally recognized overnight courier service or by certified United States mail, postage prepaid, addressed to the party to whom directed at the applicable address set forth below (unless changed by similar notice in writing given by the particular party whose address is to be changed) or by facsimile. Any Notice shall be deemed to have been given either at the time of personal delivery or, in the case of courier or mail, as of the date of first attempted delivery at the address and in the manner provided herein, or, in the case of facsimile, upon receipt; provided that service of a Notice required by any applicable statute shall be considered complete when the requirements of that statute are met. Notwithstanding the foregoing, no notice of change of address shall be effective except upon actual receipt. This Section shall not be construed in any way to affect or impair any waiver of notice or demand provided in this Agreement or in any other Loan Document or to require giving of notice or demand to or upon any Person in any situation or for any reason.

The address and fax number of Borrower are:

c/o Lacy 20 LLC
12121 Wilshire Boulevard, Suite 1400
Los Angeles, California 90025
Attention: Ezri Namvar
Fax Number: (___) ____-____

The address and fax number of Lender are:

Bank of America, N.A.

333 South Hope Street
Commercial Real Estate Banking, 11th Floor
Mailcode: CA9-193-11-07
Los Angeles, California 90071
Attention: Philip D. Ratnoff
Fax Number: (213) 621-4832

Section 8.7    Permitted Successors and Assigns; Disclosure of Information.

(a)    Each and every one of the covenants, terms, provisions and conditions of this Agreement and the Loan Documents shall apply to, bind and inure to the benefit of Borrower, its successors and those assigns of Borrower consented to in writing by Lender, and shall apply to, bind and inure to the benefit of Lender and the endorsees, transferees, successors and assigns of Lender, and all Persons claiming under or through any of them.

(b)    Borrower agrees not to transfer, assign, pledge or hypothecate any right or interest in this Agreement, or any of the other benefits of this Agreement, without the prior written consent of Lender, which consent may be withheld by Lender in its sole and absolute discretion. Any such transfer, assignment, pledge or hypothecation made or attempted by Borrower without the prior written consent of Lender shall be void and of no effect. No consent by Lender to an assignment shall be deemed to be a waiver of the requirement of prior written consent by Lender with respect to each and every further assignment and as a condition precedent to the effectiveness of such assignment.

14243.5
PAGE 20