1  RICHARD K. DIAMOND (State Bar No. 070634)
   *RDiamond@DGDK.com*
2  JOHN J. BINGHAM, JR. (State Bar No. 075842)
   *JBingham@DGDK.com*
3  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *JTedford@DGDK.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
5  Los Angeles, California 90067-2904
   Telephone: (310) 277-0077
6  Facsimile: (310) 277-5735

7  Attorneys for Meruelo Maddux Properties, Inc., and
   affiliated Debtors and Debtors-in-Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **SAN FERNANDO VALLEY DIVISION**

11  In re                                    ) Case No. 1:09-bk-13356-KT
                                              )
12  MERUELO MADDUX PROPERTIES, INC., et       ) Chapter 11 (Jointly Administered)
    al.[1]                                    )
13                                            ) **DEBTORS' OPPOSITION TO**
         Debtors and Debtors-in-Possession.  ) **PNL POMONA, LP'S MOTION FOR**
14                                            ) **RELIEF FROM THE AUTOMATIC STAY**
                                              ) **UNDER 11 U.S.C. SECTION 362 (REAL**
15  _____ ) **PROPERTY); AND MEMORANDUM OF**
                                              ) **POINTS AND AUTHORITIES,**
16  ☐   Affects all Debtors                   ) **DECLARATIONS OF RICHARD**
                                              ) **MERUELO AND JOHN N. TEDFORD, IV,**
17  ☑   Affects the following Debtor(s):      ) **AND REQUEST FOR JUDICIAL NOTICE**
                                              ) **IN SUPPORT THEREOF**
18                                            )
    Merco Group – 2001-2021 West Mission      )
19  Boulevard, LLC (1:09-bk-13403-KT)         ) Date:      July 16, 2009
                                              ) Time:      9:30 a.m.
20                                            ) Place:     Courtroom 301
                                              )            21041 Burbank Blvd.
21  _____ )            Woodland Hills, California

22

23

24  _____
           [1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated
25  entities. The affiliated case numbers are as follows: 1:09-bk-13358-KT; 1:09-bk-13359-KT; 1:09-bk-13360-
    KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-13365-KT; 1:09-
26  bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-bk-13371-KT; 1:09-bk-13373-
    KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT; 1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-
27  bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13386-
    KT; 1:09-bk-13387-KT; 1:09-bk-13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13391-KT; 1:09-bk-13392-KT; 1:09-
    bk-13393-KT; 1:09-bk-13394-KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-
28  KT; 1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-KT; 1:09-
    bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.

# **TABLE OF CONTENTS**

I.   STATEMENT OF FACTS ........................................................................... 3

     A.   BANKRUPTCY BACKGROUND ..................................................... 3

     B.   DEBTORS' OVERALL BUSINESS MODEL AND
          APPROACH ................................................................................... 3

     C.   DEBTORS' ORGANIZATION AND OPERATIONS ........................... 5

     D.   MERCO GROUP – 2001-2021 WEST MISSION BOULEVARD,
          LLC ................................................................................................ 6

     E.   PNL'S FILING OF AN ACTION WITH THE SUPERIOR COURT
          IN VIOLATION OF THE AUTOMATIC STAY ................................. 8

II.  ARGUMENT ........................................................................................... 10

     A.   PNL IS NOT ENTITLED TO RELIEF FROM STAY UNDER
          SECTION 362(d)(2) ...................................................................... 10

          1.   THE DEBTOR HAS EQUITY IN THE PROPERTY ............................. 10

          2.   THE PROPERTY IS NECESSARY TO AN EFFECTIVE
               REORGANIZATION ............................................................. 11

     B.   PNL IS NOT ENTITLED TO RELIEF FROM STAY
          UNDER SECTION 362(d)(4) ................................................. 12

III. CONCLUSION ....................................................................................... 15

i

339653.05 [XP]      25195

1

# **TABLE OF AUTHORITIES**

2

3

**Cases**

4

*In re Abdul Muhaimin*
     343 B.R. 159 (Bankr. D. Md. 2006) ........................................................................13, 14

5

6

*In re Hwang*
     396 B.R. 757 (Bankr. C.D. Cal. 2008) ...............................................................................7

7

*In re Schwartz*
     954 F.2d 569 (9th Cir. 1992) ..............................................................................................9

8

9

**Statutes**

10

11 U.S.C. § 362(d)(2) ........................................................................................2, 10, 11, 15

11

11 U.S.C. § 362(d)(4) .................................................................................................passim

12

11 U.S.C. § 362(g) ..........................................................................................................10

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

339653.05 [XP]    25195

1    Meruelo Maddux Properties, Inc. ("MMPI"), and 53 of MMPI's direct and indirect

2    subsidiaries (collectively "Debtors"), including Merco Group – 2001-2021 West Mission

3    Boulevard, LLC ("MG"), hereby oppose PNL Pomona, LP's ("PNL") *Motion for Relief from the*

4    *Automatic Stay Under 11 U.S.C. § 362 (Real Property)* ("Motion").[2]  The Motion seeks relief from

5    the automatic stay provided by Section 362(a) of the Bankruptcy Code on the following bases:[3]

6    1.    Section 362(d)(2), which provides for relief from a stay of an act against property

7    when the debtor has no equity in the property and the property is not necessary to an effective

8    reorganization. The Motion is not well-founded because that there is over $6.4 million in equity in

9    the property at issue.  In fact, PNL's evidence indicates that MG has over $1.43 million in equity in

10    the property.  In addition, the property is necessary to an effective reorganization in terms of,

11    among other things, the Debtors' overall reorganization plan.

12    2.    Section 362(d)(4), which provides a secured creditor relief from a stay of an act

13    against real property if the court finds that the bankruptcy filing was part of a scheme to delay,

14    hinder, and defraud creditors that involved the transfer of the property without consent of the

15    creditor or court approval.  There is absolutely no evidence of a scheme to delay, hinder and

16    defraud creditors or that any transfer of the property was made for such a purpose.  Further, in

17    October 2008, PNL actually consented in writing to the transfer of the property to MG.

18    ///

19    ///

20    ///

21    ///

22    _____

23    [2] The Motion does not identify the Debtor against which PNL particularly seeks relief.  The property to which PNL refers in the Motion is owned by MG.

24    [3] The local rules require parties seeking relief from stay to use the court-mandated F4001-1
25    series of form motions.  *See* LBR 4001-1(b)(1) ("The failure to use the mandatory forms may result in denial of the motion or imposition of sanctions.").  PNL utilized only the first two pages of the required form (the notice of the motion), but not the motion or declaration.  Thus, PNL does not
26    include the pages of the form on which it would normally check boxes identifying the grounds for relief sought.  However, on pages 6-7 of the portion of its papers printed on lined pleading papers,
27    PNL indicates that its motion is brought under Bankruptcy Code Sections 362(d)(2) and (d)(4).

28

339653.05 [XP]    25195

I.

STATEMENT OF FACTS

A.   BANKRUPTCY BACKGROUND

On March 26 and 27, 2009,[4] MMPI and 53 of its direct and indirect subsidiaries filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Bankruptcy Code ("Bankruptcy Code"). Included among the entities filing voluntary petitions was Merco Group – 2001-2021 West Mission Boulevard, LLC. Pursuant to the Bankruptcy Court's ruling on March 30, 2009, MG's bankruptcy case (case no. 1:09-bk-13403-KT) and those of the other affiliated entities are being jointly administered under case no. 1:09-bk-13356-KT. Debtors continue to operate their business affairs as debtors-in-possession pursuant to the authority granted under Sections 1107 and 1108 of the Bankruptcy Code.

B.   DEBTORS' OVERALL BUSINESS MODEL AND APPROACH[5]

MMPI, together with Meruelo Maddux Properties, LP ("MMPLP") and its affiliates and related entities (sometimes collectively referred to herein as the "Company") develops, redevelops and owns industrial, commercial and multi-unit residential properties in downtown Los Angeles and other urban markets in southern California. MMPI was formed in 2006, and one of the reasons for forming MMPI was to hold an initial public offering of stock in order to generate cash to pay off the then-existing debt to the California Public Employees' Retirement System (aka "CalPERS")

---

[4] For purposes of this opposition, March 27, 2009, is referred to as the "Petition Date."

[5] In addition to the declaration appended hereto, this opposition is supported by the Declaration of Richard Meruelo filed with the Court on March 27, 2009 (*docket entry no. 10*), and the Supplemental Declaration of Richard Meruelo and the Declaration of Fred Skaggs filed with the Court on April 21, 2009 (*docket entry no. 95*). The declarations were sizeable, particularly with the exhibits. In connection with a prior matter before the Court, it was suggested by a non-Debtor party that, to conserve the environment, the Debtors should not be required to re-file and serve the declarations in connection with each matter where the Debtors rely upon the declarations in support of their description of the Debtors' background and operations. The Debtors therefore request that the Court take judicial notice of the filing of those declarations and treat the declarations as if they were filed anew in support of this opposition. The Debtors will make copies of the declarations available on request by electronic mail or regular mail, as appropriate.

3

339653.05 [XP]      25195

1  and raise funds the Company could use to continue growing through the development of real

2  properties. When MMPI was formed, the Company owned, leased with rights to purchase, and had

3  rights to buy approximately 52 development, redevelopment and stabilized projects.

4      Like its predecessor business, MMPI's focus is on non-stabilized properties and commercial

5  land which have alternate, more profitable uses that are achievable through redevelopment or major

6  renovation and ground-up development. The Company's properties are used for diverse purposes,

7  and include food industry, wholesale markets, small tenant industrial, residential high rise and

8  mixed-use "urban village" properties. The vast majority of the properties are situated in downtown

9  Los Angeles. The Company is believed to be the largest non-governmental land owner in

10  downtown Los Angeles, owing or controlling approximately 80 acres of land in downtown Los

11  Angeles at the time that MMPI was formed.

12      The Company focuses on urban in-fill development and on finding different, more

13  profitable uses for existing urban properties. The Company looks for properties that have value

14  intrinsic to the property itself, such as the property's location, whether there is an end user of the

15  property on the horizon who might want to purchase the property, how well the property will fit in

16  with the growth patterns of the area and community in which it is situated, and other factors.

17      The Company's business model anticipates the need for time to develop properties and

18  requires the infusion of funds to pay the costs of such development, including the carrying costs.

19  To help defray costs during development, properties may be utilized as parking lots or other uses,

20  not because such use generates substantial income but because the land itself is extremely valuable

21  since it can be developed at an appropriate time in the future, and the parking lot revenue provides

22  some interim revenue. Many of the Company's properties have been developed to the point where

23  entitlements have been obtained thus increasing the value substantially, but development has been

24  deferred pending an improvement in the credit markets. In summary, the Company's business

25  model contemplates and is based upon the purchase, development and resale of properties, pursuant

26  to which, the Company turns over such properties in a relatively short period of time, such as a few

27  years instead of decades, and uses the profit from such properties to fund operations of MMPI and

28  all of its other affiliates and the purchase and development of other properties.

4

## C.    DEBTORS' ORGANIZATION AND OPERATIONS

Although Debtors and their non-Debtor affiliates consist of a parent company and various levels of subsidiaries, including limited liability companies and other entities which hold title to properties, the Company has been, before and after its formation as a public company, and presently continues to be, effectively operated as a single enterprise. With limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and the subsidiaries. Some entities generate revenues in excess of operational expenses and debt service, but some do not. The reason that the Company purchases, and then keeps, properties that are cash flow negative is because the Company believes that those properties will, in time, generate a positive return and the enterprise will be significantly more valuable as a result.

Before and after the IPO, the Debtors commingled funds. The cash management system implemented before the IPO provides for funds to flow to and from a cash concentration account ("Concentration Account") maintained by MMPLP. The Concentration Account is linked to the operating bank accounts of each of the Debtors and non-Debtor affiliates, which bank accounts are maintained as zero balance accounts.[6] When needed to fund payment on checks issued by a particular affiliate, funds are transferred from the Concentration Account to the operating account of that affiliate. Excess funds, if any, are invested in interest bearing accounts.

As a public company, MMPI is required to file various reports with the Securities and Exchange Commission ("SEC"), including among others, quarterly reports as well as an annual audited report. These reports are prepared on a consolidated basis. Although the Debtors' SEC filings do provide information relating to individual subsidiaries, the filings generally discuss the business as a consolidated enterprise.

///

///

///

---

[6] Since the filing of Debtors' Chapter 11 petitions, the Concentration Account has been un-linked from the accounts of non-Debtor entities.

339653.05 [XP]    25195

1    D.    MERCO GROUP – 2001-2021 WEST MISSION BOULEVARD, LLC

2    One of the Debtors is Merco Group – 2001-2021 West Mission Boulevard, LLC.  MG owns

3    certain real property located at 1875 W. Mission Blvd., Pomona, California.[7]  Land owned by MG

4    is adjacent to the property owned by another Debtor, Meruelo Maddux – Mission Boulevard, LLC

5    ("MM Mission").

6    The Property against which PNL has a lien[8] previously was owned by Homero Meruelo and

7    Belinda Meruelo, Trustees of The Meruelo Living Trust U.D.T. dated November 11, 1988 (the

8    "Meruelo Trust").  In March 1999, the Meruelo Trust borrowed $9.8 million (the "Loan") from

9    Redwood Trust, Inc. ("Redwood Trust") secured by a deed of trust on the Property.[9]  In 2003, the

10    Meruelo Trust transferred its interest in the Property to an entity called Meruelo Pomona, LLC

11    ("Meruelo Pomona").[10]  In April 2005, Redwood Trust effectively assigned 40% of its beneficial

12    interest in the deed of trust to PNL.[11]  About the same time, PNL assigned its beneficial interest

13    under the deed of trust, as well as its interests in the underlying loan documents, to Bank Midwest,

14    N.A. ("Bank Midwest") to secure a debt that was incurred by PNL to Bank Midwest.[12]  It is

15    unclear whether PNL presently has an interest in the Property, or whether it acts on behalf of

16    ///

17

18    [7] The property against which allegedly constitutes PNL's collateral is referred to hereinafter as the "Property."  *See* note 8, *infra*.

19    [8] As discussed below, whether PNL presently has a lien against the Property is unknown, since PNL assigned its beneficial interest under the relevant deed of trust in 2005.  As a result, it is
20    unclear whether PNL has standing to seek relief from stay.  For purposes of this opposition, rather than refer to PNL as having an "alleged lien" or "purported lien," reference will be made to the lien
21    as if it were, in fact, PNL's lien.  Nothing herein constitutes an admission by Debtors that PNL is in fact the current holder of a beneficial interest in the deed of trust encumbering the Property.
22

23    [9] A copy of the deed of trust is attached as Exhibit "2" to the Request for Judicial Notice.

24    [10] *See* Exhibit "3" to the Declaration of John N. Tedford, IV.  Meruelo Pomona is not one of MMPI's subsidiaries.

25    [11] A copy of the Assignment of Deed of Trust and Other Loan Documents is attached as
26    Exhibit "4" to the Request for Judicial Notice.

27    [12] A copy of the Assignment of Beneficial Interest in Deed of Trust/Mortgage and Collateral Documents is attached as Exhibit "5" to the Request for Judicial Notice.

28

339653.05 [XP]    25195

1  parties that do have an interest in the Property but are not identified as the real party or parties in

2  interest in the Motion.[13]

3      In July 2007, MG purchased the Property from Meruelo Pomona.[14]  Debtors believe that the

4  present value of the Property is not less than $15 million.[15]

5      Debtors contemplated that the properties owned by MG and MM Mission together could be

6  developed as part of a large 54-acre mixed use development that would be known as Pomona Park

7  Village.  Preliminary plans called for 2,300 units of townhouses, attached units and low and mid-

8  rise apartment buildings, together with commercial space for shops and restaurants over several

9  blocks.

10      In October 2008, PNL and Owens Mortgage Investment Fund, L.P. ("Owens"), which held

11  the other 60% beneficial interest in the deed of trust, entered into a Reinstatement Agreement with

12  MG, Meruelo Pomona, and the Meruelo Trust.  The Reinstatement Agreement provided that PNL

13  and Owens would be paid $500,000 plus certain other fees and costs.  Further, the Reinstatement

14  Agreement specifically provided as follows:

15      Upon receipt of the payment as set forth herein, [PNL and
Owens] will release the Notice of Default on the Property and
16  otherwise terminate the foreclosure proceedings pursuant thereto and
reinstate the Loan obligation as though no default had occurred, and
17  *[PNL and Owens] shall be deemed to have consented to the transfer
of the Mortgaged Property to Merco Group – 2001-2021 West
18  Mission Boulevard, LLC.*[16]

19  ///

20  ///

21  ///

22

23  [13] By the same token, it is unclear whether PNL actually has standing to seek relief from the
automatic stay.  *See In re Hwang*, 396 B.R. 757 (Bankr. C.D. Cal. 2008).
24

25  [14] *See* Exhibit "3" to the Declaration of John N. Tedford, IV.

26  [15] PNL mentions the fact that a fire recently occurred at the Property.  Debtors do not
believe that the fire materially affected the value of the Property.

27  [16] Emphasis added.

28

7

1  E.    PNL'S FILING OF AN ACTION WITH THE SUPERIOR COURT IN VIOLATION OF

2         THE AUTOMATIC STAY

3         On March 27, 2009, MMPI and MG, among others, filed their Chapter 11 petitions for

4  relief.  That same day, a number of so-called "first day motions" were filed with the Court and

5  served by Federal Express on, among others, parties holding secured claims against the Debtors.

6  The first day motions were sent by Federal Express to PNL to the attention of Scott Kocurek in

7  Dallas, Texas.[17]  According to Federal Express, the package was signed for on March 30, 2009, at

8  10:15 a.m., by "P. Levtan."[18]

9         Also on March 27, 2009, telephone calls were made to various creditors advising them that

10 Chapter 11 petitions and first day motions had been filed and that a hearing on the first day motions

11 would be held the following Monday, on March 30, 2009.[19]  As stated in the Declaration of John N.

12 Tedford, IV, filed with the Court on March 30, 2009 (*docket entry no. 17*):

13              During the afternoon of March 27, 2009, I called Scott
               Kocurek of PNL Pomona, L.P., and left him a voice mail advising
14             him, among other things, that MMPI and certain of its affiliates had
               filed for bankruptcy, and that the Debtors were filing a number of
15             motions which would be heard by the Court on March 30, 2009, at
               2:30 p.m.  Subsequently, Scott requested that I e-mail him copies of
16             the Debtors' papers, which he would forward to counsel.  I e-mailed
               him copies of the papers during the evening on March 28, 2009.
17             Thereafter, I received a notification that his server had rejected my e-
               mail due to the size of the attachments.  On March 29, 2009, I re-sent
18             my e-mail to him in multiple parts.[20]

19             Notwithstanding the fact that notice of the Debtors' bankruptcy cases had been given to

20 PNL on March 27, 2009, PNL filed a verified complaint against MG in the Los Angeles Superior

21 _____

22        [17] See Exhibit "7" to the Request for Judicial Notice (declaration of Valerie Radocay
   regarding service of first day pleadings).
23

24        [18] *See* Exhibit "8" to the Declaration of John N. Tedford, IV.

25        [19] See Exhibit "9" to the Request for Judicial Notice (declaration of John N. Tedford, IV,
   regarding telephonic notice given of the hearing on the first day motions).

26        [20] On March 31, 2009, Debtors' counsel received notifications that the individual e-mails
   also did not go through.  Nevertheless, by that time, hard copies of the first day motions had been
27 delivered by Federal Express.

28

                                              8

339653.05 [XP]    25195

1  Court on April 16, 2009.[21]  The verification was signed by Mr. Kocurek on April 9, 2009 – over

2  one week after he was notified telephonically that the Debtors had filed for bankruptcy.  The filing

3  of the complaint was a clear violation of the automatic stay and is void *ab initio* under Ninth

4  Circuit law.  *See In re Schwartz*, 954 F.2d 569, 571 (9th Cir. 1992).

5  On May 19, 2009, Debtors' counsel received a telephone call from PNL's counsel during

6  which they discussed, among other things, PNL's intent to file a motion for relief from stay.

7  On June 9, 2009, PNL's counsel executed the motion for relief from stay which has been

8  filed with this Court.  The next day, on June 10, 2009, PNL attempted to serve its Superior Court

9  complaint on MG by dropping off a copy of the complaint, summons and related documents with

10  Debtors' receptionist.  Debtors do not believe that service was properly effectuated under state law,

11  but, in any event, the attempt to serve MG with the complaint, summons and related documents

12  was another clear and willful violation of the automatic stay by PNL which, under Ninth Circuit

13  law, is void and ineffective.

14  On June 15, 2009, Debtors' counsel sent a letter to PNL's counsel by e-mail and regular

15  mail demanding, among other things, that PNL immediately take all steps to reverse its willful

16  violations of the automatic stay, including but not limited to dismissing the complaint.[22]  The Los

17  Angeles Superior Court's publicly available case summary indicates that PNL has failed to take

18  any steps whatsoever to remedy their improper actions.[23]  Unfortunately, Debtors may be forced to

19  expend time and effort, and incur legal fees, to compel PNL to comply with the Bankruptcy Code.

20  If such legal actions are necessary, Debtors intend to seek an award of sanctions against PNL due

21  to its clear and willful violations of the automatic stay.

22  ///

23  ///

24

25  [21] *See* Exhibit "10" to the Declaration of John N. Tedford, IV.

26  [22] A copy of the letter is attached as Exhibit "11" to the Declaration of John N. Tedford, IV.

27  [23] A printout from the Superior Court's case summary is attached as Exhibit "12" to the
Declaration of John N. Tedford, IV.

28

339653.05 [XP]    25195

II.

ARGUMENT

A.  PNL IS NOT ENTITLED TO RELIEF FROM STAY UNDER SECTION 362(d)(2)

The first section under which PNL seeks relief, Section 362(d)(2) of the Bankruptcy Code, provides that the Court must grant some form of relief from the automatic stay

> with respect to a stay of an act against [estate] property. . . if –
> (A)  the debtor does not have an equity in such property; and
> (B)  such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).  A party seeking relief from stay has the burden of proving the debtor's lack of equity in the property.  11 U.S.C. § 362(g).

1.    THE DEBTOR HAS EQUITY IN THE PROPERTY

Debtors estimate that the Property has a value of not less than $15 million.[24]  Debtors' estimate is based upon the opinion of Richard Meruelo, who this Court previously determined to be qualified to testify as an expert in connection with such valuation matters.

For its part, PNL provides only the declaration of Scott Kocurek, the Senior Vice President and Asset Manager for PNL.  PNL offers no basis for Mr. Kocurek's ability to opine as to the value of the Property other than his familiarity with the Property.  There is no testimony offered to show that Mr. Kocurek is qualified as an expert on valuation issues.  Therefore, Mr. Kocurek's testimony does not constitute expert testimony and must be given little, if any, weight.

Moreover, Mr. Kocurek's own declaration testimony fails to show that there is no equity in the Property.  In paragraph 10 of the declaration, Mr. Kocurek states that as of February 11, 2009, the amount owed to PNL was approximately $8.57 million.  As to value, in paragraph 21 Mr. Kocurek states that it is his "strong opinion" that the Property is "likely" less than $10 million, and that there is "significant concern" that the Property would not sell for as much as the amount of the

///

_____

[24] *See* Declaration of Richard Meruelo.

10

339653.05 [XP]     25195

1  debt. This testimony clearly is insufficient to satisfy PNL's burden to prove that the Property lacks

2  equity.

3      Instead of offering meaningful evidence in support of its position, PNL erroneously claims

4  that "[t]o date, the Meruelos have never received any offers, inquiries or other communications of

5  interest regarding the purchase of the Property and/or Warehouse at any time in the period herein

6  described."[25] To the contrary, MG has, in fact, had discussions with more than one potential

7  purchaser of the Property, and such discussions are part of the basis for Mr. Meruelo's expert

8  opinion that the Property is worth not less than $15 million.

9      In sum, Debtors have offered Mr. Meruelo's expert testimony that the Property is estimated

10 to have a value of not less than $15 million. PNL does not offer any expert testimony or other form

11 of meaningful evidence to rebut Mr. Meruelo's valuation testimony. The testimony PNL does

12 submit utterly fails to show that MG does not have equity in the Property. Accordingly, PNL has

13 failed to carry its burden under Section 362(d)(2) of establishing that MG lacks equity in the

14 Property. The failure by PNL to fulfill its burden of proof is reason enough to deny its request for

15 relief under Section 362(d)(2).

16

17      2.    THE PROPERTY IS NECESSARY TO AN EFFECTIVE REORGANIZATION

18      The Property is necessary to an effective reorganization. As was argued and briefed in

19 detail in connection with Debtors' "SARE" motion, and as the Court determined in connection with

20 its granting of that motion, Debtors' operations are integrated and operated as a single consolidated

21 entity. As Debtors have consistently stated, they believe that their only reasonable prospects for

22 reorganization in these cases involve a joint plan of reorganization dealing with all of Debtors'

23

24    [25] Notwithstanding this allegation in the Motion, Mr. Kocurek's declaration is not so clear.
Mr. Kocurek acknowledged in paragraph 16 of his declaration that Debtors had received offers, and
25 purports to know that Debtors' discussions have not "developed into anything of substantial import
or progress." There obviously is no foundation in the declaration to show that Mr. Kocurek knows
26 of all discussions that have taken place between Debtors and potential purchasers. There is not
even testimony by Mr. Kocurek mirroring the allegation in the motion that no potential purchaser
27 offered $15 million or a similar amount for the Property.

28

339653.05 [XP]    25195

1  operations. Debtors firmly believe that a series of piecemeal plans dealing with individual Debtors

2  are not feasible and do not offer the best chance of successful reorganization and also do not offer

3  the best opportunity to maximize distributions to creditors.

4        The Property is part of the pool of assets with value beyond that of the secured claims

5  therein and, as with almost all of Debtors' properties, are expected to serve an important role in

6  Debtors' reorganization. Reorganization in these Chapter 11 cases is not simply a matter of a

7  single creditor and a single piece of property. All of the properties owned by the various Debtors

8  will be examined for how to most efficiently and profitably use Debtors' assets in reorganizing.

9  Accordingly, even if the Court somehow concludes that PNL has carried its burden of showing that

10  MG has no equity in the Property, the Property is in fact necessary to an effective reorganization.

11        The Property also is necessary to an effective reorganization because Debtors may

12  determine that their best use for the Property is to develop the Property together with neighboring

13  parcels, as was originally contemplated in connection with the 54-acre mixed use development that

14  would be known as Pomona Park Village. Even if Debtors ultimately determine that the Property

15  will be sold instead of redeveloped by Debtors, the ability to bundle the Property with other parcels

16  owned by Debtors affords Debtors the greatest flexibility and ability to obtain the highest and best

17  price for their assets.

18

19  **B.  PNL IS NOT ENTITLED TO RELIEF FROM STAY UNDER SECTION 362(d)(4)**

20        Section 362(d)(4) of the Bankruptcy Code provides that the Court must grant relief

21  with respect to a stay of an act against real property under subsection (a) . . . if the court finds that the filing of the petition was part of a scheme to delay, hinder, and

22  defraud creditors that involved either –

    (A) transfer of all or part ownership of, or other interest in, such real property

23  without the consent of the secured creditor or court approval; or

    (B) multiple bankruptcy filings affecting such real property.

24

25  PNL does not (and cannot) allege that there have been multiple bankruptcy filings affecting the

26  Property. Therefore, PNL is entitled to relief only if the Court finds that three elements have been

27  satisfied: (i) the current bankruptcy filing was part of a scheme; (ii) the object of the scheme was to

28  delay, hinder and defraud; and (iii) the scheme involved either the transfer of property without the

12

339653.05 [XP]    25195

1  creditor's consent or court approval or multiple bankruptcy filings. *See In re Abdul Muhaimin*, 343

2  B.R. 159, 167-68 (Bankr. D. Md. 2006).

3       Any suggestion that Debtors' bankruptcy filings was part of a "scheme" to "delay, hinder

4  and defraud" is frivolous. As Mr. Meruelo's prior declarations show and as the Court is fully

5  aware from having thus far heard 3-1/2 days of argument and testimony on cash collateral issues,

6  Debtors' Chapter 11 filings are the result of the collapse in the credit markets which has

7  temporarily precluded Debtors from obtaining the financing on which they rely in the ordinary

8  course of their business. The fact that Debtors filed for bankruptcy a few days prior to the date on

9  which PNL's loan came due is coincidence.[26]

10      PNL's baseless claim that MG's bankruptcy was timed to prejudice PNL is contradicted by,

11  among other things, the fact that PNL does not appear to recognize the date on which MG filed its

12  Chapter 11 petition. PNL claims that its note "matured on April 1, 2009 and the instant bankruptcy

13  followed."[27] PNL's witness, Mr. Kocurek, also testified in his declaration that MG filed its petition

14  "[s]everal weeks after the April 1, 2009 maturity of the Note,"[28] notwithstanding that Mr. Kocurek

15  was notified on March 27, 2009, that the petition had been filed. Thus, even the scheme that PNL

16  apparently alleges to exist – *i.e.*, waiting until the note matured and then filing for bankruptcy – is

17  not supported by its evidence.

18      PNL also significantly misreads the Bankruptcy Code when it claims that "[b]ased on the

19  history of this matter, the timing of the filing and the previous attempts to avoid satisfaction of the

20  obligations owed to PNL Pomona, the sole purpose of this filing was clearly to delay *or* hinder

21  PNL Pomona's foreclosure."[29] Actually, Section 362(d)(4) requires that the debtor have engaged

22  in a scheme to "delay, hinder *and* defraud." *See* 11 U.S.C. § 362(d)(4) (emphasis added). "Use of

23  _____

24  [26] As the Court may recall, other creditors have also claimed to be the reason for Debtors'
    filing on March 26 and 27, 2009.

25      [27] Motion, page 4, lines 20-21.

26      [28] Kocurek declaration, paragraph 13.

27      [29] Motion, page 7 (emphasis added).

28

13

339653.05 [XP]    25195

1    the word 'and' [in § 362(d)(4)] differs from other Bankruptcy Code sections which afford relief

2    upon a showing that actions were intended '...to hinder, delay, *or* defraud' a creditor." *Muhaimin*,

3    343 B.R. at 167.  The use of the word "and" instead of "or" was deliberate.  *Id.* at 167.  Even if

4    PNL has shown that there was some "scheme" involved in MG's Chapter 11 filing, PNL has utterly

5    failed to show that there was any scheme employed to delay, hinder and defraud anybody.  To the

6    contrary, the Debtors and MG are only seeking the lawful protections afforded by the Bankruptcy

7    Code in an effort to reorganize and restructure their operations.

8         Further, any suggestion that the transfer of the Property to MG was part of some scheme

9    relating to MG's bankruptcy filing is also frivolous.  "The transfer [of the Property] or the multiple

10   filings must somehow be connected with or included in the scheme to delay, hinder and defraud

11   creditors."  *Muhaimin*, 343 B.R. at 168.  PNL complains that in early 2008 it "learned that the

12   Meruelos had transferred their interest in the property to another Meruelo entity without notice" to

13   PNL.  However, PNL does not appear to recognize that Homero and Belinda Meruelo, the persons

14   to whom PNL refers as "the Meruelos," were not even the record title holders of the Property at the

15   time that PNL purchased its interest in the loan.[30]  As discussed above, the Property was transferred

16   by the Meruelo Trust to Meruelo Pomona in 2003.  It was not until two years later that PNL even

17   purchased its 40% interest in the loan.

18        Belying any suggestion that MG's acquisition of the Property was made in contemplation of

19   MG's March 27, 2009, Chapter 11 filing is that PNL itself learned of the transfer one full year prior

20   to the Petition Date.  PNL fails to explain how the transfer of the property to MG, which actually

21   took place in July 2007, had anything to do with any alleged scheme involving MG's bankruptcy

22   filing.  In truth, MG acquired the Property to effect the assemblage of parcels for the purpose of

23   development, since the Company already owned the adjacent parcels.

24        PNL also conveniently ignores the fact that it has affirmatively consented in writing to the

25   transfer of the Property to MG.  In particular, the October 2008 Reinstatement Agreement, a copy

26

27   [30] PNL also claims that Homero and Belinda Meruelo are or were officers of MMPI.  This is untrue.  Neither of them have ever been officers of MMPI.

28

14

1  of which is attached as Exhibit "1" to Mr. Meruelo's declaration appended hereto, provided in

2  relevant part as follows:

> Upon receipt of the payment [of $500,000 plus certain fees and costs] as set forth
> herein, [PNL and Owens] will release the Notice of Default on the Property and
> otherwise terminate the foreclosure proceedings pursuant thereto and reinstate the
> Loan obligation as though no default had occurred, and *[PNL and Owens] shall be
> deemed to have consented to the transfer of the Mortgaged Property to Merco
> Group – 2001-2021 West Mission Boulevard, LLC.*[31]

7  Subsequently, the payment referred to in the Reinstatement Agreement was made and the notice of

8  default was rescinded.  Therefore, under the terms of the Reinstatement Agreement, PNL is deemed

9  to have actually consented to the transfer that it now claims, without any factual basis, to have been

10  part of a scheme to delay, hinder and defraud PNL.

11       In sum, MG's bankruptcy filing was not part of some nefarious scheme.  The case was not

12  filed in order to delay, hinder and defraud PNL or any other creditor.  The transfer of the Property

13  to MG was not made in contemplation of bankruptcy.  No multiple bankruptcies have been filed

14  affecting the Property.  Accordingly, none of the elements of Section 362(d)(4) are present.

16                                        III.

17                                    CONCLUSION

18       PNL has completely failed to satisfy its burden of demonstrating that MG has no equity in

19  the Property.  To the contrary, PNL's evidence indicates that MG *does* have equity in the Property.

20  Further, the Property is necessary to MG's reorganization.  Accordingly, PNL's request for relief

21  under Section 362(d)(2) should be denied.  So too, should PNL's request for relief under Section

22  362(d)(4).  PNL offers no evidence of any scheme to delay, hinder and defraud creditors and the

23  transfer of which it complains was, among other things, actually consented to by PNL as part of the

24  ///

25  ///

27  [31] Reinstatement Agreement, Section 1.01 (emphasis added).

339653.05 [XP]     25195

1  Reinstatement Agreement.  For the reasons set forth herein, Debtors respectfully request that the

2  Motion be denied in its entirety.

3

4  Dated:  July 2, 2009                              DANNING, GILL, DIAMOND & KOLLITZ, LLP

5

6                                          By:    _____

7                                                John N Tedford, IV
                                                Attorneys for Meruelo Maddux Properties,
8                                                Inc., and affiliated Debtors and Debtors-in-
                                                Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

## DECLARATION OF RICHARD MERUELO

I, Richard Meruelo, declare and state as follows:

1.    I am the Chief Executive Officer and Chairman of the Board of Directors of Meruelo Maddux Properties, Inc., a Delaware corporation ("MMPI"), and the designated officer of MMPI's fifty-three affiliates that are debtors in these Chapter 11 cases pending before the United States Bankruptcy Court for the Central District of California, San Fernando Valley Division (collectively, "Debtors"). I am over the age of 18 years and competent to give this declaration.

2.    As a result of my being Chief Executive Officer of MMPI and a designated officer of each of its affiliated entities (sometimes collectively referred to as the "Company"), and my review of relevant documents, I am familiar with Debtors' day-to-day operations, business affairs, and books and records, and the manner in which they are prepared. Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of Debtors' senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of Debtors' operations and financial conditions.

3.    One of the Debtors is Merco Group – 2001-2021 West Mission Boulevard, LLC ("MG"). MG owns certain real property located at 1875 W. Mission Blvd., Pomona, California, part of which is encumbered by a deed of trust under which an entity called Redwood Trust, Inc. ("Redwood Trust"), was originally named as the beneficiary. The property encumbered by that deed of trust is referred to herein as the "Property."

4.    There are a number of factors which I consider when estimating the value of real property, and the weight I give to one factor versus another will depend on, among other things, the current condition and use of the property, and the use for which the property is best suited.

5.    One factor I may consider is the replacement cost of the property, which generally looks to how much a buyer would pay for an otherwise equivalent substitute property. With respect to Debtors' properties, including the Property, I am familiar with the prices for which the properties were purchased, I am familiar with the prices for which similar properties are being sold

17

339653.05 [XP]    25195

1 (particularly since the Company is often the one selling the properties), I am familiar with the

2 structures on Debtors' properties, and I have a significant amount of experience in the development

3 of properties and therefore can estimate the expense that would be incurred if someone had to

4 rebuild the structures.

5      6.     Another factor I may consider relates to sale comparisons, which generally looks to

6 the prices for which comparable properties, adjusted for differences in location and such, are being

7 sold. Such values are often estimated in terms of price per square foot of land and price per square

8 foot of building. Again, I am familiar with the prices for which similar properties are being sold,

9 both in total and on a square footage basis, especially in the downtown Los Angeles market, often

10 because the Company has sold the comparable properties. In fact, over the years I have observed

11 that lender appraisals, when identifying comparable sales, often are relying on sales of properties

12 sold by the Company.

13      7.     Another factor I may consider looks to the ability of the property to produce income,

14 typically in the form of rents. Present value may be estimated based on an evaluation of the

15 anticipated future income stream from the property, and then a capitalization rate is applied in order

16 to estimate the present value of the property.

17      8.     In the performance of my duties as Chairman and Chief Executive Officer of MMPI,

18 I regularly speak with real estate professionals, brokers and others familiar with the downtown Los

19 Angeles real estate market and other markets in which the Company owns real property in order to,

20 among other things, expand my knowledge of the markets, evaluate properties available for sale

21 that the Company may wish to purchase, and keep apprised of trends in values and the capital

22 markets. I incorporate the information obtained by me during the course of these discussions when

23 I estimate the values of Debtors' properties.

24      9.     Also, MMPI's management team has met periodically during recent years,

25 particularly in 2008 and 2009, to discuss, among other things, real estate trends, growth patterns,

26 market conditions, and particular properties and the factors that contribute to their value. These

27 meetings have been conducted in order to, among other things, evaluate the prices to pay for the

28 purchase of properties not presently owned by the Company, and prices for which the Company's

18

1  properties may be sold.  During these meetings, we discuss, among other things, space needs by

2  tenants or end users, the condition and location of the properties, access to the properties and traffic

3  patterns, the income stream, if any, generated by the property, growth patterns, community and

4  area trends, comparable sales, expressions of interest by third parties in purchasing the Company's

5  properties, and statements or expressions of value by commercial real estate brokers.

6       10.     I believe that the present value of the Property is not less than $15 million.  My

7  estimate of value is based, in part, upon discussions that MG has had with more than one potential

8  purchaser of the Property.

9       11.     I am aware of the fire that recently occurred at the Property.  Debtors do retain a

10  security company to monitor the Property.  CalTrans recently removed fencing on one side of the

11  Property in connection with roadwork, which I believe may have exposed the Property to vagrants,

12  but in any event was not due to any neglect by Debtors.  Damage caused by the fire is covered by

13  insurance, and any damage does not materially alter the value of the Property because development

14  of the Property already will require demolition of the building in which the fire occurred.

15      12.     The Company contemplated that the properties owned by MG and another Debtor,

16  Meruelo Maddux – Mission Boulevard, LLC ("MM Mission"), together could be developed as part

17  of a large 54-acre mixed use development that would be known as Pomona Park Village.

18  Preliminary plans called for 2,300 units of townhouses, attached units and low and mid-rise

19  apartment buildings, together with commercial space for shops and restaurants over several blocks.

20  A true and correct copy of certain marketing materials available on MMPI's website relating to

21  Pomona Park Village are attached as Exhibit "6" hereto.

22      13.     Attached as Exhibit "1" hereto is a true and correct copy of the Reinstatement

23  Agreement dated October 24, 2008, between MG, among others, and PNL, among others.  MG

24  made the payment referred to in Section 1.01 of the Reinstatement Agreement.

25      14.     I believe that the Property is necessary to Debtors' effective reorganization for a

26  number of reasons.  In addition to reasons identified by Debtors in connection with their motion for

27  authority to use cash collateral and their motion for a determination that they are not subject to

28  "single asset real estate" provisions of the Bankruptcy Code, the Property is necessary to an

19

339653.05 [XP]     25195

1  effective reorganization because Debtors may determine that their best use for the Property is to

2  develop the Property together with neighboring parcels, as was originally contemplated.  Even if

3  Debtors ultimately determine that the Property will be sold instead of redeveloped by Debtors, the

4  option to bundle the Property with other parcels owned by Debtors affords Debtors the greatest

5  flexibility to maximize the value of their assets for the benefit of the estate.

6        15.    The filing by MG of a Chapter 11 petition for relief is not part of any scheme to

7  delay, hinder and defraud any creditor or other party in interest, and the transfer of the Property to

8  MG was not done in contemplation of any such scheme.  To the contrary, Debtors' filings are the

9  result of a collapse in the credit markets which has temporarily precluded Debtors from obtaining

10  the financing on which they rely in the ordinary course of their business.  Also, the Property was

11  acquired by MG to effect the assemblage of parcels for the purpose of development, since the

12  Company already owned the adjacent property.

14       I declare under penalty of perjury under that the laws of the United States of America that

15  the foregoing is true and correct.

16       Executed at _____ on July ___, 2009.

18                     SIGNATURE TO FOLLOW _____
                              RICHARD MERUELO

20

339653.05 [XP]    25195

## DECLARATION OF JOHN N. TEDFORD, IV

I, John N. Tedford, IV, declare and state as follows:

1.     I am an attorney at law duly licensed to practice before all of the courts of the State of California and am a member of the Bar of this Court.  I am the principal of a professional corporation which is a partner in the law firm of Danning, Gill, Diamond & Kollitz, LLP, general bankruptcy counsel for Meruelo Maddux Properties, Inc., and fifty-three of its direct and indirect subsidiaries (collectively, "Debtors") which each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on or about March 26 and 27, 2009, including Merco Group – 2001-2021 West Mission Boulevard, LLC ("MG").

2.     I have personal knowledge of the facts stated herein, and if called as a witness, I could and would competently testify thereto

3.     Attached as Exhibit "3" hereto are true and correct copies of results returned by Westlaw with regard to a search I conducted for real property transactions relating to 1875 West Mission Boulevard, Pomona, California.

4.     On March 27, 2009, Debtors filed a number of so-called "first day motions."  Paper copies of the first day motions were served by Federal Express on a number of parties, including PNL Pomona, LP ("PNL"), to the attention of Mr. Scott Kocurek.  A true and correct copy of the Federal Express proof of delivery with regard to the package sent to PNL is attached as Exhibit "8" hereto.

5.     On May 19, 2009, I received a telephone call from PNL's attorney, Cara Hagan.  During our telephone discussion, Ms. Hagan and I discussed, among other things, PNL's intent to file a motion for relief from stay.

6.     Attached as Exhibit "10" hereto is a true and correct copy of a complaint, without the exhibits thereto, which I understand may have been dropped off with Debtors' receptionist on June 10, 2009.  On June 15, 2009, I sent a letter to Ms. Hagan regarding the attempted service of the complaint and related documents.  A true and correct copy of my letter to Ms. Hagan is attached as Exhibit "11" hereto.

1      7.    I have reviewed the Los Angeles Superior Court's case summary for the case filed

2  by PNL against Debtors after March 27, 2009.  A true and correct copy of the case summary is

3  attached as Exhibit "12" hereto.  In my experience, if PNL had filed a notice or request for

4  voluntary dismissal of the action, the fact that such a notice or request had been filed would be

5  reflected on the Superior Court's case summary.

6

7      I declare under penalty of perjury under the laws of the United States of America that the

8  foregoing is true and correct.

9      Executed on July 2, 2009, at Los Angeles, California.

10

11                       JOHN N. TEDFORD, IV

22

**<u>REQUEST FOR JUDICIAL NOTICE</u>**

In support of Debtors' Opposition to PNL Pomona, LP's Motion for Relief from the Automatic Stay Under 11 U.S.C. Section 362 (Real Property), Meruelo Maddux Properties, Inc. ("MMPI"), and the fifty-three of MMPI's affiliated entities who also are debtors in Chapter 11 proceedings pending before the Court (collectively "Debtors"), including Merco Group – 2001-2021 West Mission Boulevard, LLC ("MG"), request that the Court take judicial notice of the following:

1.      On March 26 and 27, 2009 (the latter referred to hereinafter as "Petition Date"), Debtors filed voluntary petitions for relief under Chapter 11, Title 11 of the United States Code ("Bankruptcy Code").  One Debtor is Merco Group – 2001-2021 West Mission Boulevard, LLC.

2.      On March 27, 2009, Debtors filed the Declaration of Richard Meruelo in Support of First Day Motions, Including But Not Limited to Emergency Motion for Order Directing the Joint Administration of Related Cases ("Meruelo Declaration").  *Docket Entry No. 10.*

3.      On or about March 30, 2009, Debtors filed the Declaration of Valerie G. Radocay regarding service of certain emergency motions and related pleadings.  A true and correct copy of the declaration is attached as Exhibit "7" hereto.

4.      On or about March 30, 2009, Debtors filed the Declaration of John N. Tedford, IV, regarding telephonic notice of the hearing on certain emergency motions.  A true and correct copy of the declaration is attached as Exhibit "9" hereto.

5.      On April 7, 2009, the Court entered an order in the MMPI case directing the joint administration of the fifty-four cases under case no. 1:09-bk-13356-KT.  *Docket Entry No. 30.*

6.      On April 21, 2009, Debtors filed the Supplemental Declaration of Richard Meruelo and Declaration of Fred Skaggs in Support of Motions for Authority to Use Cash Collateral and Maintain Cash Management System ("Supplemental Declaration").  *Docket Entry No. 31.*

7.      On or about April 2, 1999, a deed of trust (the "Deed of Trust") was recorded in favor of Redwood Trust, Inc. ("Redwood Trust"), against certain property that was at that time owned by Homero Meruelo and Belinda Meruelo, Trustees of The Meruelo Living Trust U.D.T.

1    dated November 11, 1988 (the "Meruelo Trust").  A true and correct copy of the Deed of Trust is

2    attached as Exhibit "2" hereto.

3        8.      On or about April 15, 2005, Redwood Trust assigned 40% of its beneficial interest

4    in the Deed of Trust to PNL Pomona, LP ("PNL").  A true and correct copy of the Assignment of

5    Deed of Trust and Other Loan Documents is attached as Exhibit "4" hereto.

6        9.      On or about April 21, 2005, PNL assigned its 40% beneficial interest in the Deed of

7    Trust, as well as its interests in the underlying loan documents, to Bank Midwest, N.A., to secure a

8    debt incurred by PNL to Bank Midwest.  A true and correct copy of the Assignment of Beneficial

9    Interest in Deed of Trust/Mortgage and Collateral Documents is attached as Exhibit "5" hereto.

10

11   Dated: July 2, 2009                          DANNING, GILL, DIAMOND & KOLLITZ, LLP

12

13                                    By:  _____
                                          John N Tedford, IV
14                                        Attorneys for Meruelo Maddux Properties,
                                          Inc., and affiliated Debtors and Debtors-in-
15                                        Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

                                        24