1 | RICHARD K. DIAMOND (State Bar No. 070634)
*RDiamond@DGDK.com*
2 | JOHN J. BINGHAM, JR. (State Bar No. 075842)
*JBingham@DGDK.com*
3 | JOHN N. TEDFORD, IV (State Bar No. 205537)
*JTedford@DGDK.com*
4 | DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
5 | Los Angeles, California 90067-2904
Telephone: (310) 277-0077
6 | Facsimile: (310) 277-5735

7 | Attorneys for Meruelo Maddux Properties, Inc., and
affiliated Debtors and Debtors-in-Possession

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **SAN FERNANDO VALLEY DIVISION**

11 | In re                                  ) Case No. 1:09-bk-13356-KT
                                          )
12 | MERUELO MADDUX PROPERTIES, INC., et   ) Chapter 11 (Jointly Administered)
al.[1]                                     )
13 |                                        ) **DEBTOR'S OPPOSITION TO UNITED**
                                          ) **COMMERCIAL BANK'S MOTION FOR**
14 |        Debtors and Debtors-in-Possession. ) **RELIEF FROM THE AUTOMATIC**
                                          ) **STAY (2640 E. WASHINGTON); AND**
15 |                                        ) **DECLARATION OF RICHARD**
                                          ) **MERUELO IN SUPPORT THEREOF**
16 | ☐   Affects all Debtors              )
                                          ) [Separate declaration of Michael F. Waldron,
17 | ☑   Affects the following Debtor(s): ) MAI, filed concurrently herewith]
                                          )
18 | 2640 Washington Boulevard, LLC        ) Date:    August 13, 2009
(1:09-bk-13397-KT)                         ) Time:    9:30 a.m.
19 |                                        ) Place:   Courtroom 301
                                          )          21041 Burbank Blvd.
20 |                                        )          Woodland Hills, California
                                          )
21 |                                        )
                                          )
22 | _____  )

23 |

24 |

25 | [1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities. The affiliated case numbers are as follows: 1:09-bk-13338-KT; 1:09-bk-13358-KT; 1:09-bk-13359-KT; 1:09-bk-13360-KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-13365-KT; 1:09-bk-13366-KT; 1:09-bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-bk-13371-KT; 1:09-bk-13372-KT; 1:09-bk-13373-KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT; 1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13385-KT; 1:09-bk-13386-KT; 1:09-bk-13387-KT; 1:09-bk-13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13391-KT; 1:09-bk-13392-KT; 1:09-bk-13393-KT; 1:09-bk-13394-KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-KT; 1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-KT; 1:09-bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.

26 |

27 |

28 |

# TABLE OF CONTENTS

I.  STATEMENT OF FACTS ................................................................. 1

    A.  BANKRUPTCY BACKGROUND ........................................................ 1

    B.  THE DEBTORS' OVERALL BUSINESS MODEL AND APPROACH ........................................................................... 2

    C.  THE DEBTORS' COLLECTIVE ORGANIZATION AND OPERATIONS .......................................................................... 3

    D.  BRIEF DESCRIPTION OF 2640 WASHINGTON'S BUSINESS AND PROPERTY ..................................................................... 4

II.  UCB IS NOT ENTITLED TO RELIEF FROM STAY ...................................... 7

    A.  UCB'S INTEREST IN THE PROPERTY IS ADEQUATELY PROTECTED ............................................................................ 8

        1.  UCB'S INTEREST IN THE PROPERTY IS PROTECTED BY AN ADEQUATE EQUITY CUSHION AND RELIEF THAT MAY BE AFFORDED TO UCB IN CONNECTION WITH THE DEBTORS' CASH COLLATERAL MOTION ..................... 8

        2.  THERE IS NO EVIDENCE TO SUPPORT UCB'S CLAIM THAT THE FAIR MARKET VALUE OF THE PROPERTY IS DECLINING ................................................................... 11

    B.  2640 WASHINGTON HAS EQUITY IN THE PROPERTY AND THE PROPERTY IS NECESSARY FOR AN EFFECTIVE REORGANIZATION ....................................................................... 11

        1.  2640 WASHINGTON HAS EQUITY IN THE PROPERTY ................. 12

            a.  The Hirose Appraisal ................................................. 12

            b.  Valuation of the Property Using the Cost Approach .................... 13

            c.  Valuation of the Property Using the Sales Comparison Approach ........................................................... 15

            d.  Valuation of the Property Using the Income Capitalization Approach .............................................. 15

            e.  The Real Property Tax Appeal Submitted to the County ................................................................. 19

            f.  If Relief Sought under § 362(d)(2) is not Denied, the Court Should Set a Final Evidentiary Hearing ............................ 20

i

2.     THE PROPERTY IS NECESSARY FOR AN EFFECTIVE REORGANIZATION ................................................................................. 20

C.     THE 10-DAY STAY DESCRIBED BY FEDERAL RULE OF BANKRUPTCY PROCEDURE 4001(a)(3) SHOULD NOT BE WAIVED ........................................................................................................... 24

III.     CONCLUSION ............................................................................................................. 25

ii

# **TABLE OF AUTHORITIES**

**Cases**

*In re Mellor*
    734 F.2d 1396 (9th Cir. 1984) ............................................................................8

**Statutes**

11 U.S.C. § 362(d)(1) ...................................................................................7, 12

11 U.S.C. § 362(d)(2) ...................................................................7, 12, 20, 24

11 U.S.C. § 362(e)(1) .........................................................................................10

11 U.S.C. § 362(g)..............................................................................................12

**Rules**

Fed. R. Bankr. P. 4001(a)(3)..........................................................................24

iii

1    2640 Washington Boulevard, LLC ("2640 Washington"), opposes the *Motion for Relief*

2    *from the Automatic Stay under 11 U.S.C. § 362* (the "Motion") filed by United Commercial Bank

3    ("UCB"), with respect to real property owned by 2640 Washington and commonly known as 2640

4    East Washington Boulevard, Los Angeles, California (the "Property").[2]  For the reasons stated

5    herein, 2640 Washington requests that the Motion be denied in its entirety at this time, or in the

6    alternative that the Court set an evidentiary hearing at which time the Court may hear testimony

7    regarding the value of the Property.

8

9                                          I.

10                          STATEMENT OF FACTS

11   A.      BANKRUPTCY BACKGROUND

12           On March 26 and 27, 2009 (the "Petition Date"), Meruelo Maddux Properties, Inc.

13   ("MMPI"), and 53 of MMPI's direct and indirect subsidiaries (collectively the "Debtors") filed

14   voluntary petitions under Chapter 11, Title 11 of the United States Bankruptcy Code (the "Code").

15   Pursuant to the Court's ruling on March 30, 2009, the 54 cases are being jointly administered under

16   MMPI's case number, 1:09-bk-13356-KT.  The Debtors are operating their business affairs

17   pursuant to the authority granted under sections 1107 and 1108 of the Code.

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24

25           [2] At the request of the Debtors' counsel, so that counsel could devote adequate time to the
     preparation of this opposition as well as other matters pending in this case, UCB graciously agreed
26   to consent to an extension of time for 2640 Washington to file and serve this opposition, to 12:00
     noon on July 31, 2009.  2640 Washington appreciates UCB's cooperation, and does not object to
27   any similar extension for the benefit of UCB in connection with the filing of its reply brief.

28

                                          1

B.     THE DEBTORS' OVERALL BUSINESS MODEL AND APPROACH[3]

MMPI, together with Meruelo Maddux Properties, LP ("MMPLP") and its affiliates and related entities (sometimes collectively referred to herein as the "Company") develops, redevelops and owns industrial, commercial and multi-unit residential properties in downtown Los Angeles and other urban markets in southern California. MMPI was formed in 2006, and one of the reasons for forming MMPI was to hold an initial public offering of stock in order to generate cash to pay off the then-existing debt to the California Public Employees' Retirement System (aka "CalPERS") and raise funds the Company could use to continue growing through the development of real properties. When MMPI was formed, the Company owned, leased with rights to purchase, and had rights to buy approximately 52 development, redevelopment and stabilized projects.

Like its predecessor business, MMPI's focus is on non-stabilized properties and commercial and industrial land which have alternate, more profitable uses that are achievable through redevelopment or major renovation and ground-up development. The Company's properties are used for diverse purposes, and include food industry, wholesale markets, small tenant industrial, residential high rise and mixed-use "urban village" properties. The vast majority of the properties are situated in downtown Los Angeles. The Company is believed to be the largest non-governmental land owner in downtown Los Angeles, owning or controlling approximately 80 acres of land in downtown Los Angeles at the time that MMPI was formed.

The Company focuses on urban in-fill development and on finding different, more profitable uses for existing urban properties. The Company looks for properties that have value

---

[3] In addition to the declaration appended hereto, this opposition is supported by the Declaration of Richard Meruelo filed with the Court on March 27, 2009 (*docket entry no. 10*), and the Supplemental Declaration of Richard Meruelo and the Declaration of Fred Skaggs filed with the Court on April 21, 2009 (*docket entry no. 95*). The declarations were sizeable, particularly with the exhibits. In connection with a prior matter before the Court, it was suggested by a non-Debtor party that, to conserve the environment, the Debtors should not be required to re-file and serve the declarations in connection with each matter where the Debtors rely upon the declarations in support of their description of the Debtors' background and operations. 2640 Washington therefore requests that the Court take judicial notice of the filing of those declarations and treat the declarations as if they were filed anew in support of this opposition. 2640 Washington will make copies of the declarations available on request by electronic mail or regular mail, as appropriate.

2

intrinsic to the property itself, such as the property's location, whether there is an end user of the property on the horizon who might want to purchase the property, how well the property will fit in with the growth patterns of the area and community in which it is situated, and other factors.

The Company's business model anticipates the need for time to develop properties and requires the infusion of funds to pay the costs of such development, including the carrying costs. To help defray costs during development, properties may be utilized as parking lots or other uses, not because such use generates substantial income but because the land itself is extremely valuable since it can be developed at an appropriate time in the future, and the parking lot revenue provides some interim revenue. Many of the Company's properties have been developed to the point where entitlements have been obtained thus increasing the value substantially, but development has been deferred pending an improvement in the credit markets. In summary, the Company's business model contemplates and is based upon the purchase, development and resale of properties, pursuant to which, the Company turns over such properties in a relatively short period of time, such as a few years instead of decades, and uses the profit from such properties to fund operations of MMPI and all of its other affiliates and the purchase and development of other properties.

C.    THE DEBTORS' COLLECTIVE ORGANIZATION AND OPERATIONS

Although the Debtors and their non-Debtor affiliates consist of a parent company and various levels of subsidiaries, including limited liability companies and other entities which hold title to properties, the Company has been, before and after its formation as a public company, and presently continues to be, effectively operated as a single enterprise. With limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and the subsidiaries. Some entities generate revenues in excess of operational expenses and debt service, but some do not. The reason that the Company purchases, and then keeps, properties that are cash flow negative is because the Company believes that those properties will, in time, generate a positive return and the enterprise will be significantly more valuable as a result.

Before and after the IPO, the Debtors commingled funds. The cash management system implemented before the IPO provides for funds to flow to and from a cash concentration account

3

1 ("Concentration Account") maintained by MMPLP. The Concentration Account is linked to the

2 operating bank accounts of each of the Debtors and non-Debtor affiliates, which bank accounts are

3 maintained as zero balance accounts.[4] When needed to fund payment on checks issued by a

4 particular affiliate, funds are transferred from the Concentration Account to the operating account

5 of that affiliate. Excess funds, if any, are invested in interest bearing accounts.

6      As a public company, MMPI is required to file various reports with the Securities and

7 Exchange Commission ("SEC"), including among others, quarterly reports as well as an annual

8 audited report. These reports are prepared on a consolidated basis. Although the Debtors' SEC

9 filings do provide information relating to individual subsidiaries, the filings generally discuss the

10 business as a consolidated enterprise.

11

12 D.     BRIEF DESCRIPTION OF 2640 WASHINGTON'S BUSINESS AND PROPERTY

13      One of the Debtors is 2640 Washington, which owns one parcel of real property located in

14 downtown Los Angeles. The Property consists of 2.71 acres of land south of Interstate 10, east of

15 Santa Fe Avenue, and adjacent to the Los Angeles River.

16      The Property has been a part of the Company's business plan for a number of years. Over

17 six years ago, Alameda Produce Market, Inc., the predecessor to Alameda Produce Market, LLC

18 ("Alameda Produce"), which is a Debtor in these proceedings, entered into a lease with the then-

19 current owner with an option to purchase. In or before August 2004, pursuant to a "build-to-suit"

20 agreement with Dynamic Builders, Inc. ("Dynamic Builders"), Alameda Produce assigned its

21 purchase option to Dynamic Builders. Dynamic Builders is a company that provides extensive

22 turnkey construction services, and handles the design, entitlement, and construction of properties

23 that a client owns or Dynamic Builders purchases for the purpose of developing the property and

24 selling the fully developed property to its client. In August 2004, Dynamic Builders purchased the

25 Property and developed the Property pursuant to the Company's development plans. In March

26 _____

27    [4] Since the filing of Debtors' Chapter 11 petitions, the Concentration Account has been un-
linked from the accounts of non-Debtor entities.

28

4

1  2007, after the Property was developed, and still pursuant to the Company's original agreement
2  with Dynamic Builders, the Property was sold by Dynamic Builders to 2640 Washington for the
3  approximate sum of $8,556,000. The purchase price was funded by, among other things, funds
4  received by the Company through its IPO.

5        The Company owns a number of properties in downtown Los Angeles which are currently
6  utilized as produce markets. The largest of the produce markets is known as the "Seventh Street
7  Produce Market," located next to the Company's corporate headquarters near the corner of Seventh
8  Street and Alameda Street, approximately 1.5 miles south of the Roybal Federal Building, and is
9  believed to be the second largest produce terminal market in California. Another is a property
10  owned by the Company located in the same area, at 788 South Alameda Street. Those properties
11  are located in the heart of Los Angeles' produce markets, and the Seventh Street Produce Market is
12  one of the major hubs and transfer points for produce distribution, with fresh produce brought from
13  various sources and then distributed to markets, restaurants and institutional food services. The
14  Company currently leases units at the Seventh Street Produce Market for an average of
15  approximately $4.00 per square foot per month and currently leases units at 788 S. Alameda for an
16  average of approximately $3.40 per square foot per month on a modified gross basis.

17        The development of the Property was conducted to build on synergies that the Company has
18  developed and harvested over the years. For example, when the Company purchased the Seventh
19  Street Produce Market, the Company invested approximately $10.4 million to renovate the property
20  by modernizing and expanding the facility and improving internal traffic flow. During the process,
21  the Company relocated large produce tenants to other produce buildings owned by the Company,
22  and the space they vacated was leased to a larger number of smaller tenants at higher rental rates.

23        Unlike the Seventh Street Produce Market and 788 S. Alameda, the Property is not located
24  in downtown Los Angeles' traditional produce market sector. After Dynamic Builders transferred
25  the Property to 2640 Washington, the Property was placed into service in or about April 2007.

26        As developed, the Property contains a 31,876 rentable square foot produce distribution
27  facility with 33 produce distribution units. When the Property was placed into service, the
28  Company recognized that lease prices per square foot initially needed to be lower than lease prices

5

1  at the Seventh Street Produce Market and 788 S. Alameda since the Property was not in a location

2  known to be a core produce market district. The Company's intent from the inception of the

3  project has been to offer available spaces at the Property to existing tenants at other produce market

4  properties who would prefer newer facilities and lower lease rates, and to grow the Property into an

5  established produce market. As noted in the appraisal submitted by UCB in support of the Motion,

6           [W]e spoke with several of the subject tenants who indicated that
           they had relocated to the [Property] from older produce buildings
7           located in the core produce district of Downtown Los Angeles. They
           had relocated to the [Property] due in large part to the fact that the
8           landlords at the existing older produce buildings in the core produce
           district were not taking care of the health code related issues that
9           were being raised by the City of Los Angeles. The tenants indicated
           that they had been paying for some of the required health code
10          repairs but it was proving to be fairly costly as well as a distraction to
           the operation of their produce business. As a result, they were
11          motivated to look for alternative locations.[5]

12  It is noteworthy that the Company specifically targeted and secured an on site manager with over

13  35 years of experience with the Los Angeles County Health Department, with expertise in produce

14  market activities. This unique skill-set enhances the property's overall financial viability, safety

15  and security.

16          Over time, as the produce market becomes more established, the Property will command

17  higher lease rates, thereby increasing the value of the Property to, among others, an end user who

18  wants to purchase the Property in connection with its business. As also noted in the appraisal

19  submitted by UCB,

20          In the local neighborhood, and south in the city of Vernon, there is a
           high concentration of refrigerated warehouse facilities and food
21          processing facilities. The subject's location southeast of Downtown
           Los Angeles, in an area with lower land prices, will allow for
22          development of produce units that will be offered at lower rental
           rates than in the core Downtown Los Angles [sic] produce district.[6]
23

24  ///

25  _____

26          [5] Hirose Appraisal, page 108. Page references to the Hirose Appraisal are to the Bates
    stamped page numbers in the lower right hand corner of the exhibit.

27          [6] Hirose Appraisal, page 82.

28

                                                    6

1  Persons interviewed by the appraisers told them "that the [Property] should benefit from the
2  demand for space by produce tenants that can find it challenging to find space of 500 to 1,500
3  square feet in size."[7]  At the end of 2007, the Property commanded rates in the range of $1.59 to
4  $1.85 per square foot per month, and was 56% occupied.  Presently, the Company leases units for
5  approximately $1.26 to $2.04 per square foot per month and receives additional rent for parking.
6  Since the Petition Date, the average monthly parking revenues received by the Company has
7  totaled $4,800 per month.  The current average rent for the entire facility is approximately $1.75
8  per square foot per month, excluding the additional income received from other sources.  The
9  Company presently markets space at $1.85 to $2.00 per square foot per month, depending upon
10 size.  All of the Property's 33 units are currently occupied.

11        The Company believes that its development of the Property has been successful, and that
12 the Company is succeeding in establishing the Property as a viable and successful produce market.
13 The Property is appreciating in value as it continues to be established as an alternative wholesale
14 produce market and narrows the earnings differential with the 788 S. Alameda and Seventh Street
15 Produce Market.  The Company believes that the Property will continue to appreciate in value and
16 will ultimately be sold by the Company for a price exceeding its development and carrying costs,
17 and that the proceeds from the sale will be used by the Company to acquire and/or develop new
18 properties in conjunction with its overall business plan.  The Property's strategic location is viewed
19 as a price point alternative with newer cold storage facilities becoming present in the vicinity.

20

21                                           II.

22                      UCB IS NOT ENTITLED TO RELIEF FROM STAY

23        On or about July 16, 2009, UCB filed a motion for relief from the automatic stay,

24 requesting such relief under § 362(d)(1) and (d)(2) of the Code.  For the reasons discussed herein,

25 the Motion should be denied in its entirety.  In the alternative, if the Court determines at this stage

26

27        [7] Hirose Appraisal, page 108.

28

                                            7

1  that an evidentiary hearing is required, 2640 Washington requests that the date for an evidentiary

2  hearing be set at which time live testimony may be presented the Court regarding valuation of the

3  Property.

4

5  A.    UCB'S INTEREST IN THE PROPERTY IS ADEQUATELY PROTECTED

6       UCB seeks relief from stay on the alleged basis that its interest in the Property is not

7  adequately protected.  According to the Motion, UCB's interest is not protected by an adequate

8  equity cushion and the "fair market value of the Property is declining and payments are not being

9  made to [UCB] sufficient to protect [UCB's] interest against that decline."[8]

10

11       1.    UCB'S INTEREST IN THE PROPERTY IS PROTECTED BY AN ADEQUATE

12             EQUITY CUSHION AND RELIEF THAT MAY BE AFFORDED TO UCB IN

13             CONNECTION WITH THE DEBTORS' CASH COLLATERAL MOTION

14       An evaluation of a secured creditor's equity cushion begins with the value of the creditor's

15  collateral.  *See In re Mellor*, 734 F.2d 1396 (9th Cir. 1984).  In support of the Debtors' motion for

16  authority to use cash collateral, the Debtors submitted the declaration of Richard Meruelo, who the

17  Court has determined to be an expert on valuation issues, regarding, among other things, estimated

18  values of the Debtors' properties.  With respect to the Property, Mr. Meruelo testified as follows:

19             44.    **2640 Washington Boulevard, LLC**, owns
                approximately 2.7 acres of land in Los Angeles.  The property is
20             improved with a recently completed, 31,876 net rentable square foot
                building which is a modern produce center.  The property was
21             purchased in 2007 for $8.6 million.  I am informed and believe that a
                lender appraisal by CB Richard Ellis appraised the property at $10.0
22             million as of December 2007.  I estimate that the value of the
                property is not less than **$7,172,100**, which equates to approximately
23             $61.21 per land square foot.[9]

24  ///

25

26       [8] Motion, ¶¶ 3(a)(1)(a) and 3(a)(1)(b).

27       [9] Emphasis in original.

28

                                    8

1    As the Court is aware, the Debtors have argued in connection with their motion for

2    authority to use cash collateral that, in evaluating a secured creditor's equity cushion, the Court

3    should apply a non-default rate of interest (8.0%) and estimated costs of sale of 2.2%, which is the

4    actual average percentage costs of sale incurred by the Company for all of its sales during the last

5    year. Employing this approach, as of July 31, 2009, UCB's interest in the Property is protected by

6    an equity cushion of approximately 6.3%, which amounts to an 11-month equity cushion.[10] If the

7    Court calculates the equity cushion using the default interest rate (10%) and estimated costs of sale

8    of 5.0%, as of July 31, 2009, UCB's equity cushion is approximately 2.7%, or approximately 3.7

9    months.

10    As the Court is also aware, UCB and a number of other secured creditors generally have

11    opposed the Debtors' cash collateral motion, and the Debtors' related cash management motion, to

12    the extent that the Debtors are seeking to use their cash collateral for a use other than the payment

13    of expenses directly attributable to their respective collateral. In connection therewith, the Debtors

14    have proposed that after all testimony has been taken and argument has been presented as to value

15    and other issues raised by creditors, and after the Court has determined which of the creditors must

16    be afforded adequate protection in addition to the equity in their collateral, the Debtors will propose

17    and/or the Court will require specific forms of additional adequate protection to be given. Indeed,

18    in the Debtors' supplemental cash collateral brief, the Debtors stated as follows:

19            If, based upon the evidence, the Court does not agree that adequate
              protection is sufficient based upon the equity cushion of the Cash
20            Collateral Creditor's collateral alone, as additional adequate
              protection, the Debtors will grant a lien or charge against one or more
21            of their Unencumbered Properties, the identity of which
              Unencumbered Properties is to be determined at hearing.[11]
22

23
     _____

24    [10] This calculation includes the late charge and cost figures identified by UCB in the
     Motion. It also includes real property taxes in an amount of $193,210. In the Motion, UCB alleges
25    that the real property taxes are $239,138, but that amount is inconsistent with the amount of taxes
     owed, as evidenced by the County tax collector's website.

26    [11] *See Debtors' Supplemental Brief in Support of Their Emergency Motion for an Order*
     *Authorizing the Use of Cash Collateral and Approving Cash Management Procedures,* page 3, line
27    20 through page 4, line 2.

28

                                                    9

1  In other words, there is already a proceeding pending before this Court where, at the conclusion of
2  the proceeding, the Court may determine that UCB should be afforded a lien against one or more
3  unencumbered properties or some other form of adequate protection. Indeed, the Court noted that
4  any additional adequate protection could be tailored to the circumstances; the Court may order that
5  some creditors be afforded liens against unencumbered properties, that the Debtors make monthly
6  payments in some amount that the Court deems appropriate, that the Debtors pay the real property
7  taxes presently encumbering a creditor's collateral, or some other or combination of forms of relief.
8  UCB is participating in the cash collateral proceeding, and at the end of that proceeding UCB will
9  be afforded any additional adequate protection the Court determines is necessary and appropriate to
10  protect UCB's interest in the Property as a result of the Debtors' use of cash collateral.

11        UCB's effort to circumvent the cash collateral proceeding and obtain relief from stay prior
12  to a final adjudication of that matter must be rejected. If the Court concludes that the equity in the
13  Property is insufficient to adequately protect UCB's interests, the Debtors can then offer or the
14  Court can then determine what form(s) of adequate protection *would* be sufficient for both cash
15  collateral and stay relief purposes. In light of the availability for such relief, cause does not exist
16  for the granting of the relief sought by UCB in the Motion.

17        In light of the foregoing, 2640 Washington requests that the Court deem the hearing on
18  August 13, 2009, a preliminary hearing and set a final hearing on the Motion, subject to further
19  extensions, so that the final hearing trails the pending cash collateral proceedings,[12] and order that
20  the automatic stay will continue in effect pending conclusion of the final hearing. *See* 11 U.S.C.
21  § 362(e)(1). In the meantime, UCB's interest in the Property will continue to be protected by 2640
22  Washington's continued use, operation and maintenance of the Property.

23  ///

24  ///

25

---

26  [12] The Court has indicated that it hopes that trial in the cash collateral proceeding will be
27  concluded by the end of August 2009. The Court has set aside August 3, August 12, August 19,
   and August 26, 2009, for such hearings.

28

341010.02 [XP]    25195

1      2.      THERE IS NO EVIDENCE TO SUPPORT UCB'S CLAIM THAT THE FAIR

2             MARKET VALUE OF THE PROPERTY IS DECLINING

3          As support for its claim that it is not adequately protected, UCB also claims that "[t]he fair

4 market value of the Property is declining and payments are not being made to Movant sufficient to

5 protect Movant's interest against that decline."[13] UCB's evidence consists solely of the conclusory

6 declaration testimony of Richard Swartz, UCB's "Vice President & Credit Risk Management," that

7 UCB's claim is "based on/due to economic conditions and credit market conditions."[14] Mr.

8 Swartz' declaration establishes only that he is a custodian of UCB's books and records, and there is

9 no testimony whatsoever to show that he is qualified to testify regarding the value of the Property,

10 including that the Property is declining in value. Mr. Swartz appears only to assume that because

11 economic and credit markets are struggling, the value of the Property must be declining. This

12 testimony is woefully inadequate to support UCB's claim that the value of 2640 Washington's

13 Property in particular is declining in value. To the contrary, the value of the Property is increasing

14 because of 2640 Washington's continuing operations and success in leasing the Property's produce

15 bays and establishment of the Property as a thriving alternative to more expensive produce market

16 space near the Seventh Street Produce Market.

17

18 B.     2640 WASHINGTON HAS EQUITY IN THE PROPERTY AND THE PROPERTY IS

19        NECESSARY FOR AN EFFECTIVE REORGANIZATION

20          UCB also seeks relief from stay on the alleged basis that 2640 Washington has no equity in

21 the Property and the Property is not necessary for an effective reorganization."[15] Neither is correct.

22 ///

23 ///

24

25      [13] Motion, ¶ 3(a)(1)(b).

26      [14] Declaration of Richard Swartz, ¶ 11. An evidentiary objection to this statement made by Mr. Swartz in his declaration is filed concurrently herewith.

27      [15] Motion, ¶¶ 3(a)(1)(a) and 3(a)(1)(b).

28

341010.02 [XP]   25195

1        1.    2640 WASHINGTON HAS EQUITY IN THE PROPERTY

2        A party seeking relief from stay has the burden of proving the debtor's lack of equity in the

3    property. 11 U.S.C. § 362(g). In attempting to fulfill this burden, UCB submits the Declaration of

4    Don Hirose and Mr. Hirose's appraisal report dated May 15, 2009 (the "Hirose Appraisal"). The

5    Debtors are in the process of retaining an appraiser in order to fully evaluate the Hirose Appraisal,

6    and anticipate that a full analysis and counter-appraisal will be available in six to eight weeks. In

7    the meantime, the Debtors' appraiser, Michael F. Waldron, MAI, of Waldron & Associates, Inc.,

8    has offered a number of preliminary observations and criticisms which call the methodology and

9    conclusions in the Hirose Appraisal into question. If the Court determines that it needs to make

10   findings regarding the value of the Property, whether for § 362(d)(1) or (d)(2), 2640 Washington

11   requests that the Court set a final evidentiary hearing in this matter approximately two months in

12   the future, in order to allow Mr. Waldron sufficient time to complete his analysis and appraisal,

13   UCB sufficient time to review the appraisal, depose Mr. Waldron, and prepare for an evidentiary

14   hearing.

15

16              a.    The Hirose Appraisal[16]

17       The Hirose Appraisal indicated that the Property consists of 33 produce distribution units

18   and that 82.2% of the Property was occupied.[17] It is noteworthy that the Property is now entirely

19   leased up, well in advance of the November 1, 2009, date by which the Hirose Appraisal estimated

20   that the Property would be stabilized.[18] In any event, the Hirose Appraisal stated that the estimated

21   _____

22       [16] According to Mr. Hirose's declaration, he and another appraiser at CBRE conducted the
     inspection. Declaration of Don Hirose, MAI, ¶ 3. At his deposition, Mr. Hirose was asked whether
23   he had inspected the premises and Mr. Hirose stated that he had. However, the "Certification of the
     Appraisal" signed by Mr. Hirose expressly stated that he had not made a personal inspection of the
24   Property. Hirose Appraisal, page 49, no. 11. Subject to subsequent discovery to the contrary, 2640
     Washington believes that it is the certification that is incorrect, and thus assumes for purposes of
25   this opposition that Mr. Hirose conducted a full inspection of the Property on April 20, 2009.

26       [17] Hirose Appraisal, page 46.

27       [18] See Hirose Appraisal, page 47.

28
                                              12

1    value of the Property, fully stabilized, would be $4.19 million.[19]   In reaching this conclusion, the

2    Hirose Appraisal, among other things, applied an inappropriately high capitalization rate, identified

3    purportedly comparable sales which are not sufficiently comparable to the Property and in one case

4    was not even a sale, miscalculated the effect of "external obsolescence" of the Property's building,

5    and noticeably reached a number of conclusions that tended toward UCB's favor.  In other words,

6    notwithstanding the boilerplate statement in the Hirose Appraisal that the appraiser's "engagement

7    in this assignment was not contingent upon developing or reporting predetermined results,"[20] the

8    appraisal is noticeably skewed in favor of UCB.

9

10                  b.      Valuation of the Property Using the Cost Approach

11          The Hirose Appraisal evaluated the Property's value utilizing three different approaches.

12   One approach was the "cost approach," which the Hirose Appeal described as follows:

13                  The cost approach is based upon the proposition that the informed
                    purchaser would pay no more for the subject than the cost to produce
14                  a substitute property with equivalent utility.  This approach is
                    particularly applicable when the property being appraised involves
15                  relatively new improvements that represent the highest and best use
                    of the land, or when it is improved with relatively unique or
16                  specialized improvements for which there exist few sales or leases of
                    comparable properties.[21]
17

18   As discussed above, the development of the Property with a modern produce market building was

19   completed only a few years ago.  The land was purchased by Dynamic Builders for approximately

20   $2.5 million, or $21.19 per land square foot.[22]  Dynamic Builders built the produce market pursuant

21   ///

22   ///

23   _____

24        [19] Hirose Appraisal, page 47.  In the Motion, UCB relies upon a slightly lesser value given
     by the Hirose Appraisal on an "as is" basis on April 20, 2009, $4.15 million.

25        [20] Hirose Appraisal, page 49, no. 4.

26        [21] Hirose Appraisal, page 127.

27        [22] Hirose Appraisal, page 58.

28

                                                      13

1    to the Company's design, and 2640 Washington purchased the Property in 2007 for $8,556,000.[23]

2    The Hirose Appraisal indicated that the Property is being used for its highest and best use.[24]  Even

3    then, the Hirose Appraisal claimed that the Property's value utilizing the cost approach was only

4    $4.19 million.[25]

5        The Hirose Appraisal reached this figure by starting with an estimated building cost of

6    $5,091,000 and adding $763,650 for a component referred to as "entrepreneurial profit," resulting

7    in a "replacement cost new" of $5,854,650.  However, the Hirose Appraisal reduced this amount by

8    an astounding $5,095,310 for a component referred to as "external obsolescence," and after adding

9    in another reduction the Hirose Appraisal concluded that the depreciated replacement cost of the

10   Property's three year-old building was a mere $642,247.  This figure was added to the stated land

11   value of $3,550,000 and rounded down, resulting in the Hirose Appraisal's conclusion that the cost

12   value of the Property, stabilized, was only $4.19 million.

13       Among other things, the Hirose Appraisal erred in calculating external obsolescence.  As

14   noted in the boilerplate language on page 77, land value is not impacted by this factor, and thus

15   only the value of improvements are subject to a reduction for that factor.  However, on the next

16   page, the Hirose Appraisal indicated that its calculation was based on a factor referred to as the

17   "Cost Feasible NOI" which "is based on the depreciated cost of the improvements *plus land*

18   *value*."[26]  Based on that figure, the Hirose Appraisal arrived at a $420,363 figure referred to as

19   "NOI Differential," applied an overall capitalization rate of 8.25%, and thus concluded that the

20   external obsolescence was $5,095,310, or *89.0%* of the replacement cost of the improvements.

21   Had more appropriate figures been used, even with an overall capitalization rate of 8.25% into

22   ///

23   _____

24   [23] The Hirose Appraisal states that the purchase price was 9,164,000.  See Hirose Appraisal, page 58.  The price was actually $8,556,000.

25   [24] Hirose Appraisal, page 126.

26   [25] Hirose Appraisal, page 56.

27   [26] Hirose Appraisal, page 135 (emphasis added).

28

14

1  perpetuity, the replacement cost, and thus the estimated value utilizing the cost approach, would
2  have been significantly higher.

3        Even the Hirose Appraisal's estimate of land value – $3,550,000, or $30.00 per land square
4  foot, was low.  The Hirose Appraisal identified five comparable land sales (or, in two cases, sales
5  that were in escrow) in which the prices per land square foot were $28.50, $35.29, $40.16, $47.58,
6  and $49.97.  The Hirose Appraisal recognized that the lowest priced of these was an off-market
7  transaction and was not widely exposed to the market.  In the end, however, the Hirose Appraisal,
8  with no rational justification, picked a land square foot value noticeably lower than the other
9  properties identified as being comparable to the Property.

10
11              c.      Valuation of the Property Using the Sales Comparison Approach
12        The second approach was the "sales comparison approach," in which the Hirose Appraisal
13  looked at one sale each in Commerce and the City of Industry, two sales in Downey, and a listing
14  in Los Angeles.  2640 Washington's appraiser, Mr. Waldron, will investigate these sales and other
15  sales which may serve as superior comparable sales, but believes that finding comparable sales are
16  difficult because the Property is unique and comparable sales for the Property are hard to come by.
17  In any event, in Mr. Waldron's view, very little weight should be given to the listing agreement that
18  the Hirose Appraisal listed as its first comparable or to either of the sales which did not involve
19  cold storage buildings.  Those that do involve cold storage sales were allocated prices in a bulk sale
20  transaction.  In light of the uniqueness of the Property and other factors relevant to a cost approach,
21  Mr. Waldron's preliminary conclusion is that, in the absence of a sufficient number of comparable
22  sales, appraisers should rely more heavily upon the cost approach and not a sale comparison
23  approach when appraising the Property.

24
25              d.      Valuation of the Property Using the Income Capitalization Approach
26        The final approach was the "income capitalization approach," which the Hirose Appeal
27  described as follows:
28  ///

                                                 15

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.[27]

In evaluating market lease rates, the Hirose Appraisal looked to six properties, including one that is owned by the Company, 788 S. Alameda. The lowest lease rate identified in the Hirose Appraisal was $1.75 per square foot for a 2,400 square foot area in a 30 year old facility in Los Angeles. The Hirose Appraisal did not consider the Seventh Street Produce Market which commands lease rates of $4.00 per square foot.

The Hirose Appraisal noted that 2640 Washington has leased units to tenants recently at rates of $1.59 to $1.85 per square foot (with lower rates generally provided to tenants to lease more than one unit). However, it failed to recognize that the lease rates were purposely low to attract tenants and establish the Property as a thriving produce market, and it also erroneously stated that no leases contained rental escalations.[28] The month-to-month leases utilized by 2640 Washington will permit it to increase rents for new tenants when and to the extent appropriate, and has done so.

Even at $1.85 per month, stabilized, and 31,876 rentable square feet, the Property would generate rents of $707,647 per year for the building. In addition, 2640 Washington's parking income has averaged $4,800 per month since the Petition Date, which equates to $57,600 per year. As noted in the Hirose Appraisal, a vacancy loss factor of 5% could be applied, resulting in a net for valuation purposes of $726,984, a figure which is significantly higher than the effective gross income listed in the Hirose Appraisal.

Ultimately the income capitalization approach requires that the appraiser determine the net operating income of the Property. The Hirose Appraisal contains a number of pages of expense

---

[27] Hirose Appraisal, page 127.

[28] Leases for 27 of the 33 units provide for an annual 5.0% increase in rent, and leases for 4 of the other 6 units provide for an annual 3.0% increase in rent.

16

estimates, ultimately estimating operating expenses to be $309,165. However, at this preliminary stage in his investigation, Mr. Waldron believes that a reasonable estimate for operating expenses assuming market level rents would hover around 40% of income. At market rates, the resulting estimated net operating income would be in excess of $450,000.

Regardless of the net operating income figure, the most significant factor in determining value under the income capitalization approach is the capitalization rate, as indicated as follows:

| Cap Rate: | N.O.I. of $468,896[29] | N.O.I. of $450,000 | N.O.I. of $417,819[30] |
|---|---|---|---|
| 3.50% | $13,397,029 | $12,857,143 | $11,937,686 |
| 4.00% | $11,722,400 | $11,250,000 | $10,445,475 |
| 4.50% | $10,419,911 | $10,000,000 | $9,284,867 |
| 5.00% | $9,377,920 | $9,000,000 | $8,356,380 |
| 5.50% | $8,525,382 | $8,181,818 | $7,596,709 |
| 6.00% | $7,814,933 | $7,500,000 | $6,963,650 |
| 6.50% | $7,213,785 | $6,923,077 | $6,427,985 |
| 7.00% | $6,698,514 | $6,428,571 | $5,968,843 |
| 7.50% | $6,251,947 | $6,000,000 | $5,570,920 |
| 8.00% | $5,861,200 | $5,625,000 | $5,222,738 |
| 8.25% | $5,683,588 | $5,454,545 | $5,064,473 |

As this chart demonstrates, an appraiser utilizing an income capitalization approach can skew the estimated value of a property by using a high overall capitalization rate. Based on his experience over the years, Mr. Meruelo does not believe that buyers of industrial properties in downtown Los Angeles typically give much emphasis to capitalization rates when evaluating properties. To the extent that capitalization rates are relevant, it is noteworthy that the last five sales of properties located in downtown Los Angeles closed by the Debtors and sellers related in some way to the Debtors or Mr. Meruelo evidence an average capitalization rate of 3.65%.

Page 108 of the Hirose Appraisal discussed a report which identified expected capitalization rates for December 2009. Expected rates for hotels exceeded 8.0%, but the rates for all of the other

---

[29] This is $2.00 per square foot per month, multiplied by 31,876 rentable square feet, multiplied by 12 months, plus $57,600 for annualized parking income, multiplied by 95% (the 5% deduction for vacancy), then multiplied by 60% (to account for estimated operating costs of 40%).

[30] This is the net income for valuation purposes identified on the prior page, 726,984, less the estimated operating costs utilized in the Hirose Appraisal, $309,165.

17

341010.02 [XP]    25195

industries referred to ranged from 6.43% to 7.83%. The rate identified for "Warehouse/Industrial" properties was 7.26%. Another chart of rates was included on page 109 to show recent trends in capitalization rates, but noticeably only one of the six comparables exceeded 8.0% and three of the six were less than 7.0%. On page 110 the Hirose Appraisal identified capitalization rates for five sales analyzed in the sales comparison approach. One of the rates was 8.25%, but all of the others ranged from 7.0% to 7.74%. On page 111 of the Hirose Appraisal, four recent sales of cold storage facilities were examined, and they had capitalization rates of 7.50%, 7.68%, 7.87% and 8.26% (the first and last of which were actually listings, not sales). Notwithstanding the fact that most of the rates identified in the Hirose Appraisal were less than 8.0%, and despite the "favorable investment attributes" of the Property identified on page 112, the Hirose Appraisal somehow concluded that a capitalization rate of 8.25% was appropriate. Applying that rate to the other calculations contained in the Hirose Appraisal, UCB's appraisers concluded that the Property had a value of $4,190,000.

Mr. Waldron, having reviewed the Hirose Appraisal and based on his knowledge of the real estate market in downtown Los Angeles, believes that an appropriate capitalization rate for the Property is significantly less than 8.25%. Some reasons for Mr. Waldron's belief were identified in the Hirose Appraisal:

> 1) the limited supply of directly comparable produce distribution space offering units in the size range from 500 to 1,500 square feet; 2) the recent and high quality of construction of the subject property; 3) the challenges being faced by owners/operators of older produce facilities in the Downtown Los Angeles area with regard to health code violations; and 4) the growing concentration of industrial buildings along Washington Boulevard in the vicinity of the [Property] with cold storage space.[31]

In addition, as noted in Mr. Waldron's declaration, appraisers must consider a variety of factors when selecting a capitalization rate and one factor that should be considered by an appraiser is the quality of current management. 2640 Washington's on site manager, who is on location at least twice per day, is an ex-health department employee with over 30 years experience and who is

---

[31] Hirose Appraisal, page 112.

1  skilled and knowledgeable with regard to compliance and other health code related issues that have
2  recently dogged other produce markets in Los Angeles. Mr. Waldron believes that the on site
3  manager would add significant value and should be considered in selecting a capitalization rate.
4  Further, Mr. Waldron does not believe that the Hirose Appraisal gives due regard to the difference
5  between the types of tenants who have leased space at the Washington Produce Market. Mr.
6  Waldron's initial investigation indicates that 2640 Washington's tenants are more likely to have
7  established customer bases than some tenants at the core downtown produce markets, and therefore
8  decrease the risk of vacancy and, in turn, decrease the appropriate capitalization rate.

9

10              e.      The Real Property Tax Appeal Submitted to the County

11          UCB alleges that 2640 Washington has filed a tax appeal in which it valued the Property at
12  $5,491,578, with the suggestion that the Company may believe that to be the value of the Property.
13  In doing so, UCB ignores the trial testimony of Richard Meruelo and Fred Skaggs regarding the
14  appeals. On May 1, 2009, Mr. Meruelo testified that the Debtors had hired a law firm to deal with
15  property taxes and assessments, and retained an outside service that works on a contingency fee.[32]
16  The firm submitted property tax appeals for substantially all of the Debtors' properties.[33] When
17  asked whether the Debtors were appealing because it was the Debtors' belief that the properties
18  were assessed at too high a number, Mr. Meruelo testified that that was not the case, and that in his
19  view the entity that filed the appeals on the Debtors' behalf picked low numbers "because that's the
20  only way they get paid."[34] Mr. Skaggs also testified that the forms were prepared by the Debtors'
21  consultant and there was a simple, generic formula used to plug in values.[35] The consultant was

22

23          [32] Transcript, May 1, 2009, 161:6-9.

24          [33] Transcript, May 1, 2009, 161:12-15.

25          [34] Transcript, May 1, 2009, 161:18-162:19.

26          [35] Transcript, May 4, 2009, 169:19-24. Mr. Skaggs testified that it was his understanding
27  that the consultant multiplied land value by 60% and improvements by 65% in reaching the values
    identified in the appeals.

28

                                                19

retained by the Debtors shortly before the appeals were prepared, the consultant did not review the properties prior to preparing the appeals, and the Debtors filed the appeals in order to preserve their right to any refund.[36] Simply, the Debtors have never admitted that values used by the consultants in the property tax appeals are accurate and reflect the actual value of the Properties, and UCB has offered no evidence whatsoever to support that figure.[37]

        f.      <u>If Relief Sought under § 362(d)(2) is not Denied, the Court Should Set a</u>
                    <u>Final Evidentiary Hearing</u>

      A creditor seeking relief from stay under § 362(d)(2) bears the burden of proving that the debtor lacks equity in the property. As the above discussion makes clear, there are serious issues with the Hirose Appraisal that need to be addressed before the Court can accept UCB's allegation that the value of the Property is only $4.19 million. 2640 Washington's appraiser requires time to fully review the Hirose Appraisal, including the various assumptions and statements therein, make his own investigation of comparable properties and leases, and reach his own conclusions that may be presented to the Court. Accordingly, if the Court does not deny UCB's request for relief under § 362(d)(2) because the Property is necessary for an effective reorganization, the Court should set this matter for a full evidentiary hearing and order that pending resolution of that hearing the stay will remain in effect.

      2.      <u>THE PROPERTY IS NECESSARY FOR AN EFFECTIVE REORGANIZATION</u>

      The Property is also necessary to an effective reorganization. As was argued and briefed in detail with regard to the Debtors' SARE motion, and as the Court found, the Debtors' operations

---

[36] Transcript, May 4, 2009, 170:12-19; Transcript, May 6, 2009, 28:8-17.

[37] The Debtors have completed their review of the tax appeals that were filed by the consultant in which the Debtors determined, on a property by property basis, whether the appeals should be revised or withdrawn. The Debtors have directed the consultant to withdraw or modify various appeals. The Debtors determined that the appeal filed with regard to the Property will be reduced such that the value alleged in the appeal will equal the value stated by Mr. Meruelo in his declarations filed with this Court.

20

1  are integrated and operate as a single consolidated entity. As the Debtors have consistently stated,

2  they believe that their only reasonable prospects for reorganization in these cases involve a joint

3  plan of reorganization dealing with all of the Debtors' operations. The Debtors firmly believe that

4  a series of piecemeal plans dealing with individual Debtors are not feasible and do not offer the

5  best chance of successful reorganization and also do not offer the best opportunity to maximize

6  distributions to creditors.

7       The Property is part of the enterprise's assets with value beyond that of the secured claims

8  therein and, as with almost all of the Debtors' properties, are expected to serve an important role in

9  the Debtors' reorganization. Reorganization in these Chapter 11 cases is not simply a matter of a

10  single creditor and a single piece of property. All of the properties owned by the various Debtors

11  will be examined for how to most efficiently and profitably use the Debtors' assets in reorganizing.

12  As Mr. Meruelo has testified in support of the Debtors' cash collateral motion:

13           17.     MMPI does not utilize the same business model as
          typical real estate investment companies, many of which utilize real
14        estate investment trusts ("REITs"), and I understand that our business
          plan is distinctive among publicly traded companies. Many public
15        real estate companies focus on properties with stable occupancies at
          market rents or properties with stable occupancies at below-market
16        rents that may benefit from more efficient management or minor
          renovations. In contrast, we focus on urban in-fill development and
17        on finding different, more profitable uses for existing urban
          properties. We look for properties that have value intrinsic to the
18        property itself, such as the property's location, whether there is an
          end user of the property on the horizon who might want to purchase
19        the property, how well the property will fit in with the growth patters
          of the area and community in which it is situated, and other factors.
20        Such properties may have substantial vacancies, unstable
          occupancies, or require major renovations for a new use. MMPI's
21        business requires local and other special knowledge to identify viable
          alternative uses for urban property, and presents higher potential
22        returns than the returns that the property owner might otherwise
          derive.
23           18.     Even at the time of the IPO, we knew that many of the
          Company's development projects were still several years away from
24        commencing. We also knew that before many of our projects would
          generate substantial revenues, the Company would be required to
25        incur substantial costs. In the meantime, for some properties, we
          continued to lease all or portions of the properties in order to, among
26        other things, help defray the costs of holding the property and/or
          other expenses incurred by the Company. Similarly, we continued to
27        operate some of the properties as parking lots, not because the
          parking lots were generating substantial income but because the land
28        itself is extremely valuable since it can be developed at an

21

appropriate time in the future, and the parking lot revenue provided some interim revenue. Some of these properties already have entitlements for development.

19.    I am aware that some secured creditors, having reviewed exhibits previously filed with the Court showing the amount of monthly revenues from operations and monthly debt service, have questioned why the Company would hold onto a property that does not generate sufficient rent to pay for operating that property and paying the monthly debt service. I believe that asking the question, in and of itself, reflects a fundamental misunderstanding of the Company's basic business approach. Although the Company consists of a parent company and various levels of subsidiaries . . . the Company is effectively operated as a single enterprise. With limited exceptions, revenues for each of the entities are commingled, and the commingled funds are used to pay the expenses of MMPI and the subsidiaries. Accordingly, there are some entities which generate revenues in excess of operational expenses and debt service, but there are some that do not. The reason that we purchase, and then keep, properties that are cash flow negative is because we believe that those properties will, in time, generate a positive return. While this may be a foreign concept to real estate investment companies that focus only on present income streams, it is the Company's basic business model. I believe that the model has served the Company very well.[38]

Consistent with evidence submitted by the Debtors in this case, the Court found that the Debtors have complex, consolidated and inter-related business operations, and that "there is a historical synergy in the whole enterprise that benefits the holdings of each individual debtor and that effective reorganization in these chapter 11 cases requires a unified approach in developing a plan or plans to present for confirmation."[39] Notwithstanding, UCB alleges that cause exists to grant relief from stay because 2640 Washington allegedly does not have the requisite cash flow that would be required to file a confirmable plan of reorganization. UCB simply ignores the Court's prior findings, as well as the statements made and evidence that has been provided to the Court by the Debtors.

As discussed above, the Company's purchase and development of the Property has been part of the Company's business plan for a number of years. The Company has completed its lease-

---

[38] Supplemental declaration of Richard Meruelo (*docket entry no. 95*), ¶¶ 17-19.

[39] *Memorandum on Debtors' Motion for Order Determining that the Debtors Are Not Subject to Provisions Applicable to Entities with Single Asset Real Estate* (*docket entry no. 310*), pages 5-6.

22

1  up of the Property and can focus on maintaining those aspects of the Property that give it an edge

2  over older core downtown produce market districts.  Maintaining the Property allows the Company

3  to continue to take advantage of synergies, such as by directing some of its tenants at the Seventh

4  Street Produce Market or 788 S. Alameda property to the Property if it in the parties' best interests

5  to do so.  Moreover, the Company believes that continued operations of the Property will allow the

6  Company to ultimately sell the Property at a higher price, recouping the Company's investment in

7  the Property, and providing additional funds for the Company to invest in new opportunities in the

8  future.

9       In arguing that the Property is not necessary for an effective reorganization, UCB chooses

10  to ignore substantially all of the evidence that the Court has received in the form of declarations

11  and live testimony submitted in connection with the cash collateral and cash management motions.

12  UCB makes sweeping generalizations, such as when UCB claims that the "cash flow necessary for

13  [the Debtors'] operations comes from 'financing activities' and not operations."  However, as the

14  Court is aware, a number of the Debtors' properties are operating properties, some of the Debtors

15  are cash flow positive and others are not, and the Debtors' business approach includes the sale of

16  developed properties in order to fund the ongoing development and operations of the Company.

17  UCB also claims that its Exhibit "8" (Exhibit "8h" to Mr. Skaggs' declaration filed on or about

18  April 20, 2009) shows that 2640 Washington has "a cash deficit of $433,602" and that "[t]here is

19  no possible proposal which this Debtor can make which will increase revenues to the point that it

20  can pay its debt service."  However, as noted above, rental income and parking income have been

21  higher than the amounts that were identified in the Debtors' monthly reforecast summaries, and

22  will continue to increase now that the Property is fully leased up and the Company can focus on

23  establishing the Property's place as a productive alternative to other produce markets in the core

24  produce market areas downtown.  UCB also sidesteps the fact that the reforecast summary includes

25  a direct corporate property management expense of $121,032 through December 31, 2009, which is

26  actually an allocation of MMPI's expenses.  UCB also disregards the possibility that the Debtors

27  may restructure its loan through a Chapter 11 plan with the effect of reducing monthly payments

28  made to UCB.  Further, though UCB attempts to minimize it, the fact is that the Property *is* part of

23

1 | ///

2 a portfolio of properties owned by an enterprise which has multiple and varies resources, which

3 increases the ability of Company to reorganize.

4        As the Court is aware, the Debtors have retained FTI Consulting to assist the Debtors in

5 preparing a plan of reorganization. Although it is still in the early development phase, the Debtors

6 anticipate they will propose a joint or consolidated Chapter 11 plan that provides for, among other

7 things, the retention of the Property by the Company. 2640 Washington believes that the Property

8 will continue to thrive and be a successful produce market over the years and generate rents, either

9 for the Company in the short term or an ultimate buyer of the Property for years to come, and is an

10 important part of its portfolio.[40]

11

12 C.    THE 10-DAY STAY DESCRIBED BY FEDERAL RULE OF BANKRUPTCY

13      PROCEDURE 4001(a)(3) SHOULD NOT BE WAIVED

14        Federal Rule of Bankruptcy Procedure 4001(a)(3) provides, "An order granting a motion

15 for relief from an automatic stay . . . is stayed until the expiration of 10 days after the entry of the

16 order, unless the court orders otherwise." UCB requests that the Court waive this 10-day stay,[41]

17 but offers no justification for its request. Therefore, even if the Court grants the Motion generally,

18 the Court should not waive the 10-day stay provided for the benefit of debtors and other parties in

19 interest under Rule 4001(a)(3).

20

21

22

23

24
_____

25 [40] Of course, if the Court were to adopt the perspective urged by some creditors that each Debtor should be viewed on its own and not part of an enterprise, relief under § 362(d)(2) clearly would be inappropriate because the Property is 2640 Washington's only asset. It is axiomatic that

26 the Property would therefore be necessary for an effective reorganization of 2640 Washington.

27 [41] Motion, page 4.

28

341010.02 [XP]   25195

III.

CONCLUSION

Cause does not exist to grant UCB relief from the automatic stay. UCB's interest in the Property is adequately protected and even if UCB's interest in the Property was not adequately protected by its equity cushion, adequate protection will be provided to UCB by the Debtors in connection with the pending cash collateral motion. Contrary to UCB's conclusory statement, the value of the Property is not declining. The Property has value and also is necessary to an effective reorganization of the Debtors. For these and other reasons stated herein, UCB's Motion should be denied in its entirety.

Dated: July 21, 2009

DANNING, GILL, DIAMOND & KOLLITZ, LLP

By: _____
John N Tedford, IV
Attorneys for Meruelo Maddux Properties, Inc., and affiliated Debtors and Debtors-in-Possession

25

# DECLARATION OF RICHARD MERUELO

I, Richard Meruelo, declare and state as follows:

1.     I am the Chief Executive Officer of Meruelo Maddux Properties, Inc., a public company ("MMPI"), and the designated officer of the 53 affiliates (collectively the "Debtors") that are debtors in these Chapter 11 cases pending before the United States Bankruptcy Court for the Central District of California. I am over the age of 18 years and competent to give this declaration. The matters stated herein are true and correct and based upon my personal knowledge except as to such matters stated on information and belief which matters I believe to be true.

2.     Certain of the facts set forth in this declaration are based upon the business records of MMPI and its subsidiaries (sometimes referred to collectively as the "Company"). Documents and papers which comprise the Company's business records are maintained by persons whose duty it is to keep such records accurately and correctly. The records were created by the Company's employees at or near the time of each transaction or occurrence by making a written record of such transaction or occurrence at or shortly after the time thereof.

3.     One of the Debtors is 2640 Washington Boulevard, LLC ("2640 Washington"). 2640 Washington owns a parcel of real property located in downtown Los Angeles, which is commonly known as 2640 E. Washington Blvd., Los Angeles, California (the "Property"). The Property consists of 2.71 acres of land south of Interstate 10, east of Santa Fe Avenue, and adjacent to the Los Angeles River.

4.     The Property has been a part of the Company's business plan for a number of years, even before MMPI was formed and went public. If I recall correctly it was over six years ago that Alameda Produce Market, Inc., the predecessor to Alameda Produce Market, LLC ("Alameda Produce"), entered into a lease with the then-current owner with an option to purchase. Pursuant to a "build-to-suit" agreement with Dynamic Builders, Inc. ("Dynamic Builders"), Alameda Produce assigned its purchase option to Dynamic Builders. Dynamic Builders is a company that provides extensive turnkey construction services, and handles the design, entitlement, and construction of properties that a client owns or Dynamic Builders purchases for the purpose of developing the

341010.02 [XP]    25195

1 | property and selling the fully developed property to its client.  Dynamic Builders purchased the
2 | Property and developed the Property pursuant to the Company's development plans.  In early 2007,
3 | after the Property was developed by Dynamic Builders, and pursuant to our original agreement
4 | with Dynamic Builders, the Property was sold by Dynamic Builders to 2640 Washington for the
5 | approximate sum of $8,556,000.  The purchase price was funded by, among other things, funds
6 | received by the Company through its IPO.

7 |      5.      The Company owns a number of properties in downtown Los Angeles which are
8 | currently utilized as produce markets.  The largest of the produce markets is known as the "Seventh
9 | Street Produce Market," located next to the Company's corporate headquarters near the corner of
10 | Seventh Street and Alameda Street, approximately 1.5 miles south of the Roybal Federal Building.
11 | It is my understanding that the Seventh Street Produce Market is the second largest produce
12 | terminal market in California.  Another is a property owned by the Company located in the same
13 | area, at 788 South Alameda Street ("788 S. Alameda").  Those properties are located in the heart of
14 | Los Angeles' produce markets.  Seventh Street Produce Market is one of the major hubs and
15 | transfer points for produce distribution, with fresh produce brought from various sources and then
16 | distributed to markets, restaurants and institutional food services.  The Company currently leases
17 | units at the Seventh Street Produce Market for an average of approximately $4.00 per square foot
18 | per month and currently leases units at 788 S. Alameda for an average of approximately $3.40 per
19 | square foot per month on a modified gross basis.

20 |      6.      The development of the Property owned by 2640 Washington was conducted to
21 | build on synergies that the Company has developed and harvested over the years.  For example,
22 | when the Company purchased the Seventh Street Produce Market, the Company invested
23 | approximately $10.4 million to renovate that property by modernizing and expanding the facility
24 | and improving internal traffic flow.  During that process, the Company relocated large produce
25 | tenants to other produce buildings owned by the Company, and the space they vacated was leased
26 | to a larger number of smaller tenants at higher rental rates.  Unlike the Seventh Street Produce
27 | Market and 788 S. Alameda, the Property is not located in downtown Los Angeles' traditional
28 | produce market sector.  This has allowed the Company to offer its tenants at the Seventh Street

27

1 | Produce Market and 788 S. Alameda, as well as other entities, a lower cost alternative to space in
2 | the core downtown produce district.

3 |        7.     I believe that recently, in connection with an evidentiary hearing relating to the
4 | Debtors' motion for authority to use cash collateral, I testified that the Property was placed into
5 | service about twelve to sixteen months ago. Since then, I asked the Company's management team
6 | to research when the first units at the Property were leased. Based on information provided to me
7 | by them, I believe that the first units at the Property were available for lease in or about April 2007.

8 |        8.     As developed, the Property is improved with a 31,876 rentable square foot produce
9 | distribution facility with 33 produce distribution units. When the Property was placed into service,
10 | we recognized that lease prices per square foot initially needed to be lower than lease prices at the
11 | Seventh Street Produce Market and 788 S. Alameda since the Property was south of Interstate 10
12 | and not in a location known to be a core produce market district.

13 |        9.     Our intent from the inception of the project has been to offer available spaces at the
14 | Property to existing tenants at other produce market properties who would prefer newer facilities
15 | and lower lease rates, and to grow the Property into an established produce market. I believe that
16 | the project has been very successful. As of today, there are no vacancies at the Property.

17 |       10.    The area around the Property is beginning to develop into an area which is very
18 | conducive to produce market and related businesses. Among other things, cold storage facilities
19 | and food processing facilities have been established in the area. Over time, as the produce market
20 | becomes more established, I believe that the Property will command higher lease rates. This will,
21 | among other things, increase the value of the Property to, among others, an end user who wants to
22 | purchase the Property in connection with its business.

23 |       11.    There are numerous other aspects of the Property which I believe will allow it to
24 | thrive as a produce market. The building is only about three to four years old, compared to some of
25 | the buildings at other produce markets which are decades old. The units range from 500 to 1,500
26 | square feet of rentable space, which many produce sellers find desirable because they do not need
27 | to pay for larger spaces that they do not need. If they need more space, they are able to rent units
28 | next to one another if available, and a few of our tenants have done so. Washington Boulevard is a

341010.02 [XP]   25195

1   wide and easily accessible street. There is adequate parking available for the produce tenants, as

2   well as adequate space for the produce sellers' customers to access the produce bays. A true and

3   correct copy of an ALTA/ACSM land title survey is attached as Exhibit "1" hereto.

4           12.     Our on site manager for the Property is Steve London. We specifically targeted Mr.

5   London because, among other things, he has substantial experience with the Los Angeles County

6   Health Department and has expertise in produce market activities. Because of our ownership and

7   experience with produce markets, we know that it is very important to have someone responsible

8   for overseeing the Property who is familiar with the many health and safety regulations that apply

9   to produce markets. I believe that having Mr. London overseeing such matters at the Property adds

10  significant value to the project. I also believe that he makes our tenants comfortable that we are

11  doing everything we can to ensure that the Property remains up to code and that business at the

12  Property will not be unnecessarily interrupted.

13          13.     At the end of 2007, the Property commanded rates in the range of $1.59 to $1.85 per

14  square foot per month, and was 56% occupied. As of today, under the terms of the leases that are

15  in place, we are leasing units for approximately $1.26 to $2.04 per square foot per month, and the

16  average rent for the entire facility is approximately $1.75 per square foot per month, which does

17  not include additional income received from other sources. We are presently marketing space at

18  $1.85 to $2.00 per square foot per month, depending upon size.

19          14.     We also receive additional rent for parking. I am informed and believe that, since

20  the Petition Date, the actual average monthly parking revenue received by 2640 Washington is

21  $4,800 per month.

22          15.     I believe that our development of the Property has been very successful, and we are

23  succeeding in our goal of establishing the Property as a viable and successful produce market. I

24  believe that the Property is appreciating in value as it continues to be established as an alternative

25  wholesale produce market and narrows the earnings differential with produce markets located in

26  the core produce market section of downtown, such as the 788 S. Alameda and Seventh Street

27  Produce Market. I believe that the Property will continue to appreciate in value and will ultimately

28  be sold by the Company for a price exceeding its development and carrying costs. Consistent with

1 our business approach, the proceeds from the sale will be used by the Company to acquire and/or

2 develop new properties in conjunction with its overall business plan.

3     16. The Company has investigated its actual costs of sale on sales of real property by

4 the Company during the past year. Based thereon, I believe that the Company's actual average

5 costs of sale has been 2.2% of the gross sale price.

6     17. I understand that the appraiser retained by United Commercial Bank ("UCB"), in

7 preparing his appraisal of the Property, utilized the three different valuation approaches typically

8 utilized by real estate appraisers. One of these approaches is sometimes referred to as the "income

9 capitalization approach." Under that approach, an appraiser generally arrives at an estimated net

10 income per year, and then divides the estimated net income by a capitalization rate. The product of

11 that calculation is the appraised value. As a result, the higher the capitalization rate, the lower the

12 appraised value.

13     18. In my experience, buyers of industrial properties in downtown Los Angeles do not

14 typically place much emphasis on capitalization rates when determining the value of the properties

15 they are purchasing. To emphasize this, I asked our management team to provide an analysis of

16 effective capitalization rates on the five most recent sales by the Debtors, or entities related to me

17 or the Debtors, of income-generating properties in downtown Los Angeles. As shown by their

18 report, the highest effective capitalization rate was 5.08%, and the average effective capitalization

19 rate was 3.65%:

| Sale | Property | Price | Annual NOI | Cap Rate | Comments |
|------|----------|-------|------------|----------|----------|
| 9/08 | 1800 Wash. | $14,200,000 | $350,000 | 2.46% | 12 month actuals ended 6/30/08 |
| 11/08 | 801 E. 7th | $9,500,000 | $220,000 | 2.32% | Actual rents for 12 months ended 9/30/08 less $0 of OpEx |
| 11/08 | Overland Terminal | $19,702,000 | $1,000,000 | 5.08% | Assumes highest rent levels (2007) with normalized expenses |
| 4/09 | 500 Mateo | $1,900,000 | $76,000 | 4.00% | 2008 actuals |
| 7/09 | Alameda/ Olympic/ McGarry | $11,850,000 | $438,000 | 3.70% | 6 months actuals ended 6/30/09 annualized |

28 ///

30