Curtis C. Jung, Esq. (State Bar No. 130657)
Monica H. Lin, Esq. (State Bar No. 237343)
JUNG & YUEN, LLP
888 South Figueroa Street, Suite 720
Los Angeles, California 90017
(213) 689-8880 - Tel
(213) 689-8887 - Fax
curtis@jyllp.com

Elmer Dean Martin III, Esq. (SBN 75517)
22632 Golden Springs Dr., Suite 190
Diamond Bar, CA 91765
elmer@bankruptcytax.net
(909) 861-6700 - Tel.
(909) 860-3801 – Fax

Counsel For United Commercial Bank

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA – SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>Meruelo Maddux Properties,<br><br>Inc., et al,<br><br>                Debtor.<br>Affects 2640 Washington Boulevard,<br>LLC, a California LLC<br>Case No. 1:09-bk-13397-KT | CASE NO. 1:09-bk-13356-KT<br>Chapter 11<br><br>United Commercial Bank's Brief for October 19, 2009 Cash Collateral Argument<br><br>Hearing Date: October 19, 2009<br>Time: 9:00 a.m.<br>Place: Courtroom 301<br>21041 Burbank Blvd.<br>Woodland Hills, CA |

United Commercial Bank hereby submits its perspective of the facts and law for purposes of the hearing on the motion of 2640 Washington Boulevard, LLC, a California LLC for use of cash collateral scheduled for hearing October 19, 2009.

References to the record are hypertext linked as allowed by United States Bankruptcy Court Manual §3-5(e). Hypertext links are designated in blue

underlining.  Right clicking on the link and choosing open in new window brings up the referenced material in a window separate from the brief.

## Factual Contentions

### UCB's Claim and Burn Rate

The amount of UCB's claim and the components of its claim were developed in its motion for relief from stay which was resolved by the order allowing it to file its notice of default and for payment of the current year's taxes. A copy of the declaration used in that motion is attached as Exhibit 1.  This resolution affects the amount of property taxes utilized in the motion but otherwise constitutes the amounts at issue here.  The claim is computed using the default rate of interest which is 2% over original rate.  The claim computed as $6,669,917 as of July 31, 2009 would be reduced for purposes of this proceeding by the approximate amount of $10,000 for property tax which will be paid in December 2009.  Through October 2009 an additional amount of $50,344 per month would be added for three months making the present secured claim the amount of $6,669,917 minus $10,000 plus $151,032 for a total of $6,810,949.

### Debtor's Contention of Value

The Debtor contends that the property should be valued at $7,172,100.  The Debtor's determination of value is attached at Exhibit 2 which includes the page from Richard Meruelo's Supplemental Declaration which determined the value and Exhibit 5 from Richard Meruelo's First Day Motion declaration which listed the valuation of all of the MMPI related properties.  The present claim in the amount of $6,810,949 plus cost of sale at 5.5% of $7,172,100 ($394,466) equals $7,205,415.  This indicates that even at the value contended by the Debtor there presently is no equity in the property to protect cash collateral use.  Accordingly for purposes of these proceedings UCB stipulates to the value contended by Debtor.

## UCB's Contention of Value

UCB contended that the property value is $4,130,000 as of November 1, 2009 according to the appraisal it offered which was admitted into evidence. A portion of the appraisal is attached as Exhibit 3. The transcript of the August hearings during which the appraisal value of the property was contested is attached as Exhibit 4.

## Use of Cash

Attached as Exhibit 5 is a summary of the cash reporting filed by the Debtor through August 2009 together with the Debtor's relevant report pages which are summarized. According to these reports the Debtor has been diverting to its affiliates an average of $61,917.26 a month in revenues for the last five months ending on August 31, 2009. The diversion over a 12 month period, which is what the Debtor estimates it will take to obtain a determination of whether it can confirm a plan, would be $619,170, or roughly 10% of its loan principal balance. UCB has an assignment of rents and accordingly claims a security interest in such revenues as indicated in its initial filing in these hearings a copy of which is attached to one of UCB's original filings for the May 1, 2009 hearing which is number 76 on the docket. As indicated the resolution of the motion for relief from stay would reduce the diversion by approximately $9,390 a month for property taxes so from the $619,170 a reduction of 9 times $9,390 would leave $534,660 or approximately 9% of the unpaid principal balance.

If the value contended by the Debtor were adopted then the cash collateral not protected by the Debtor's equity would be $7,172,100 less UCB's present claim and cost of sale as computed above which is $7,205,415 for a negative amount of $33,315. Diversion of $61,917.26 monthly as computed above less $9,390 for property taxes results in a monthly diversion of $52,527 for the

projected period of November 1, 2009 through March 31, 2010 or $262,635 plus the negative present equity of $33,315 for a total of $295,950.

Accordingly, based on the Debtor's operating report cash receipts and disbursement reports and the Debtor's contention of value, UCB is entitled to protection of a minimum amount of $295,950. If the Court determines that the value is less than $7,172,100 then the adequate protection amount would be increased commensurately, presumably up to the $534,660 amount computed above at a minimum. The words "at a minimum" should be emphasized because the Court's prior comments on the subject of cash collateral adequate protection indicate that the amount should be larger as discussed in the following discussion of applicable law.

## Contentions of Law

### What Interest of UCB is Entitled to Adequate Protection under Section 363

The parties in this proceeding have applied traditional approaches to computation of adequate protection under Title 11 U.S.C. §363. In a hearing involving two of the lenders in this group of cases, the Court made pronouncements regarding computation of equity cushion, use of default interest rate, and costs of sale. In truth, there should have been a prior determination that the intercompany borrowing which occurs in this case when cash collateral is used is authorized under Title 11 U.S.C. §364. The prior proceedings conflated the determination from a determination first under section 364 followed by a determination under section 363 to a determination as if UCB were in effect making the loan. Technical propriety is then further abbreviated by having neither the Debtor nor the borrower of the cash collateral provide adequate protection through the use of property owned by neither the Debtor nor the borrower, after overlooking the fact that most of the debtors in the overall case don't need bankruptcy protection and in reality suffer as a result of being in a bankruptcy case.

| In re | (SHORT TITLE) | CHAPTER: 11 |
|---|---|---|
| Meruelo Maddux Properties, Inc., et al., | Debtor(s). | CASE NO.: 1:09-bk-13356-KT |

## REAL PROPERTY DECLARATION
### (MOVANT: _____ United Commercial Bank _____ )

I, _Richard Swartz_____, declare as follows:
          *(Print Name of Declarant)*

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the real property that is the subject of this Motion ("Property") because *(specify)*:

    ☐ I am the Movant and owner of the Property.

    ☐ I manage the Property as the authorized agent for the Movant.

    ☒ I am employed by Movant as *(state title and capacity)*: Vice President & Credit Risk Management

    ☐ Other *(specify)*:

2. I am one of the custodians of the books, records and files of Movant that pertain to loans and extensions of credit given to Debtor(s) concerning the Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the Court if required.

3. a. The address of the Property that is the subject of this Motion is:

      *Street Address:* 2640 East Washington Boulevard
      *Apartment/Suite No.:*
      *City, State, Zip Code:* Los Angeles, CA 90023

   b. The legal description or document recording number (including county of recording) set forth in Movant's Deed of Trust is attached as Exhibit _1_____.

      ☐ See attached page.

4. Type of property *(check all applicable boxes)*:

   a. ☐ Debtor's(s') principal residence    b. ☐ Other single family residence

   c. ☐ Multi-unit residential          d. ☒ Commercial

   e. ☐ Industrial                 f. ☐ Vacant land

   g. ☐ Other *(specify)*:

*(Continued on next page)*

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*January 2009*           **F 4001-1M.RP**

Exhibit 1 Page 000012

| In re                                             (SHORT TITLE) | CHAPTER: 11 |
|---|---|
| Meruelo Maddux Properties, Inc., et al.,                              Debtor(s). | CASE NO.: 1:09-bk-13356-KT |

5. Nature of Debtor's(s') interest in the Property:

   a. ☒ Sole owner

   b. ☐ Co-owner(s) *(specify)*:

   c. ☐ Lien holder *(specify)*:

   d. ☐ Other *(specify)*:

   e. ☐ Debtor(s)   ☐ did   ☐ did not   list the Property in the Schedules filed in this case.

   f. ☐ Debtor(s) acquired the interest in the Property by   ☐ grant deed   ☐ quitclaim deed   ☐ trust deed

       The deed was recorded on:

6. Amount of Movant's claim with respect to the Property:

| | | PREPETITION | POSTPETITION | TOTAL |
|---|---|---|---|---|
| a. | Principal: | $ 6,066,072.72 | $ 0.00 | $ 6,066,072.72 |
| b. | Accrued Interest: | $ 127,387.52 | $ 212,312.55 | $ 339,700.07 |
| c. | Late Charges | $ 4,794.72 | $ 9,589.44 | $ 14,384.16 |
| d. | Costs (Attorney's Fees, Other Costs): | $ 0.00 | $ 10,622.00 | $ 10,622.00 |
| e. | Advances (Property Taxes, Insurance): | $ 127,428.00 | $ 111,710.00 | $ 239,138.00 * |
| f. | TOTAL CLAIM as of 7/31/09 : | $ 6,325,682.96 | $ 344,233.99 | $ 6,669,916.95 |

   h. ☐ Loan is all due and payable because it matured on *(specify date)*:

                                          **\* Subject to Pending Hearing**

7. Movant holds a   ☒ deed of trust   ☐ judgment lien   ☒ other *(specify)* Assignment of Rents
   that encumbers the Property.

   a. A true and correct copy of the document as recorded is attached as Exhibit  1 & 2  .

   b. A true and correct copy of the promissory note or other document that evidences the Movant's claim is attached as
   Exhibit  3  .

   c. ☐ A true and correct copy of the assignment(s) transferring the beneficial interest under the note and deed of trust to Movant
   is attached as Exhibit _____ .

8. Status of Movant's claim relating to the Property *(fill in all applicable information requested below)*:

   a. Current interest rate: WSJP + 0.50%.   Floor Rate @ 8.00% plus 2% default rate from 2-5-09

   b. Contractual maturity date: 12/5/12

   c. Amount of current monthly payment: $ 47,947.12

   d. Number of PREPETITION payments that have come due and were not made:  2  . Total amount: $ 95,894.24

   e. Number of POSTPETITION payments that have come due and were not made:  4  . Total amount: $ 191,788.00

   f. Date of POSTPETITION default:

   g. Last payment received on the following date:  1/15/09

   h. Notice of default recorded on the following date:

   i. Notice of sale recorded on the following date:

   j. Foreclosure sale originally scheduled for the following date:

   k. Foreclosure sale currently scheduled for the following date:

   l. Foreclosure sale already held on the following date:

   m. Trustee's deed on sale already recorded on the following date:

   n. Future payments due by time of anticipated hearing date *(if applicable)*:
   An additional payment of $ 47,947.12  will come due on  8/5/09 , and on the  5th  day of
   each month thereafter. If the payment is not received by the  20th  day of the month, a late charge of $ 2,397.36  will
   be charged to the loan.

9. Attached hereto as Exhibit  4  is a true and correct copy of a POSTPETITION statement of account that accurately reflects the
   dates and amounts of all charges assessed to and payments made by the Debtor(s) since the petition date.

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                                          **F 4001-1M.RP**

Exhibit 1 Page 000013

| In re                                      (SHORT TITLE) | CHAPTER: 11 |
|---|---|
| Meruelo Maddux Properties, Inc., et al.,                          Debtor(s). | CASE NO.: 1:09-bk-13356-KT |

10. ☒  *(Chapter 7 and 11 cases only):* The fair market value of the entire Property is $ 4,150,000.00 _____, established by:

   a. ☒ Appraiser's declaration with appraisal attached herewith as Exhibit _5_____ .

   b. ☐ A real estate broker or other expert's declaration regarding value attached as Exhibit _____ .

   c. ☒ A true and correct copy of relevant portion(s) of Debtor's(s') Schedules attached as Exhibit _6_____ .

   d. ☒ Other *(specify):* Application for changed assessment of property taxes attached to Exhibit 7

11. ☒  The fair market value of the Property is declining based on/due to: economic conditions and credit market conditions
_____

12. ☐  **Calculation of equity in Property:**

   a. Based upon ☐ preliminary title report ☐ Debtor's(s') admissions in the schedules filed in this case, the Property is subject to the following deed(s) of trust or lien(s) in the amounts specified securing the debt against the Property:

| | Name of Holder | Amount as Scheduled by Debtor(s) (if any) | Amount Known to Declarant and Source |
|---|---|---|---|
| 1st Deed of Trust: | United Commercial Bank | $6,066,072.00 | $6,430,778.95 |
| 2nd Deed of Trust: | | | |
| 3rd Deed of Trust: | | | |
| Judgment Liens: | | | |
| Taxes: | | | $239,138.00 |
| Other: | | | |
| **TOTAL DEBT:  $** | | | **6,669,916.95** |

   b. Evidence establishing the existence of the above deed(s) of trust and lien(s) is attached as Exhibit _6 & 8____ , and consists of:

      ☐ Preliminary title report

      ☒ Relevant portions of Debtor's(s') Schedules as filed in this case

      ☒ Other *(specify):* Declaration of Richard Meruelo

   c. Subtracting the deed(s) of trust and other lien(s) set forth above from the value of the Property as set forth in Paragraph 10 above, the Debtor's(s') equity in the Property is $ 0.00 _____ (§ 362(d)(2)(A)).

   d. The value of the "equity cushion" in the Property exceeding Movant's debt and any lien(s) senior to Movant is $0.00 _____ (§ 362(d)(1)).

   e. Estimated costs of sale: $ 228,250.00 _____ (Estimate based upon 5.5 ____ % of estimated gross sales price) or $394,466 based on price of $7,172,100

13. ☐  *(Chapter 12 and 13 cases only)* Chapter 12 or 13 case status information:

   a. 341(a) Meeting currently scheduled for (or concluded on) the following date:
      Confirmation hearing currently scheduled for (or concluded on) the following date:
      Plan confirmed on the following date *(if applicable):*

   b. Postpetition/preconfirmation payments due BUT REMAINING UNPAID since the filing of the case:

| *(Number of)* | payment(s) due at $ | each | = | $ |
|---|---|---|---|---|
| *(Number of)* _____ | payment(s) due at $ _____ | each | = | $ _____ |
| *(Number of)* _____ | payment(s) due at $ _____ | each | = | $ _____ |
| *(Number of)* _____ | late charge(s) at $ _____ | each | = | $ _____ |
| *(Number of)* _____ | late charge(s) at $ _____ | each | = | $ _____ |

*(Continued on next page)*

*January 2009*                                                                                          **F 4001-1M.RP**

Exhibit 1 Page 000014

| In re | (SHORT TITLE) | CHAPTER: 11 |
|---|---|---|
| Meruelo Maddux Properties, Inc., et al., | Debtor(s). | CASE NO.: 1:09-bk-13356-KT |

c.  Postpetition/preconfirmation advances or other charges due but unpaid:      $_____
    (See attachment for details of type and amount.)

         **TOTAL POSTPETITION/PRECONFIRMATION DELINQUENCY:**   $_____

d.  Postconfirmation payments due BUT REMAINING UNPAID since plan confirmation *(if applicable)*:

     *(Number of)* _____ payment(s) due at $_____ each  =  $_____
     *(Number of)* _____ payment(s) due at $_____ each  =  $_____
     *(Number of)* _____ late charge(s) at   $_____ each  =  $_____
     *(Number of)* _____ late charge(s) at   $_____ each  =  $_____

e.  Postconfirmation advances or other charges due but unpaid:      $_____
    (See attachment for details of type and amount.)

         **TOTAL POSTCONFIRMATION DELINQUENCY:**    $_____

f.  ☐ The claim is provided for in the Chapter 12 or 13 Plan. Plan payment history is attached as Exhibit _____.

g.  ☐ See attached Declaration(s) of Chapter 12 or 13 Trustee regarding receipt of payments under the plan *(attach Court Form F 4001-1M.13)*.

14. ☐ Movant has not been provided with evidence that the Property is currently insured, as required under the terms of the loan.

15. ☐ The court determined that the Property qualifies as single asset real estate on _____. More than 90 days have passed since the filing of the petition, more than 30 days have passed since the court determined that the Property qualifies as single asset real estate, the Debtor(s) has/have not filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time  or the Debtor(s) has/have not commenced monthly payments to Movant as required by 11 U.S.C. § 362(d)(3).

16. ☐ See attached continuation page for facts establishing that the bankruptcy case was filed in bad faith to delay, hinder or defraud Movant.

17 ☐ The filing of the petition was part of a scheme to delay, hinder and defraud creditors that involved:

a.  ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval.  See attached continuation page for facts establishing the scheme.

b.  ☐ Multiple bankruptcy filings affecting the Property.  The multiple bankruptcy filings include the following cases:
    1.  Case Name:
       Case Number:               Chapter:
       Date Filed:                 Date Dismissed:           Date Discharged:
       Relief from stay re this property   ☐ was     ☐ was not  granted.
    2.  Case Name:
       Case Number:               Chapter:
       Date Filed:                 Date Dismissed:           Date Discharged:
       Relief from stay re this property   ☐ was     ☐ was not  granted.
    3.  ☐ See attached continuation page for more information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, and defraud creditors.

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*January 2009*    F 4001-1M.RP

Exhibit 1 Page 000015

| In re                (SHORT TITLE)<br>2640 Washington Boulevard, LLC, a California LLC | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NO.: 1:09-bk-13397-KT |

18. ☐ Movant seeks annulment of the automatic stay so that the filing of the bankruptcy petition does not affect any and all of the enforcement actions set forth in paragraph 8 above that were taken after the filing of the bankruptcy petition in this case.

    a. ☐ These actions were taken by Movant without knowledge of the bankruptcy filing, and Movant would have been entitled to relief from stay to proceed with these actions.

    b. ☐ Although Movant knew about the bankruptcy filing, Movant had previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting this Property as set forth in paragraph 17(b) above.

    c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on July 14 , 2009 , at Pasadena, California *(city, state)*.


Richard Swartz
*Print Declarant's Name*

*Signature of Declarant*

This form is mandatory by Order of the United States Bankruptcy Court for the Central District of California.

*January 2009*                **F 4001-1M.RP**

Exhibit 1 Page 000016

1   is home to a large number of small businesses in the fresh produce distribution business. I am
2   informed and believe that a lender appraisal by CB Richard Ellis as of October 2006 appraised
3   Seventh Street Produce Market at $49.0 million. I believe that a conservative estimate of the value
4   of the Seventh Street Produce Market is not less than **$38.8 million**, which equates to the same $80
5   per land square foot figure used with respect to Alameda Square.

6       42.     **788 South Alameda, LLC,** owns approximately 2.2 acres of land across from
7   Alameda Square. The property is improved with a 33,984 net rentable square foot building, and is
8   a recently constructed modern produce market that is home to numerous small businesses. The
9   property was developed at a cost of approximately $8.6 million. I estimate that the value of the
10  property is not less than **$9,333,333**. This value equates to approximately $96.52 per land square
11  foot. The value may be derived in part from the $80 per land square foot value given with respect
12  to the Alameda Square property and applying a 7.5% cap rate assumed on 2008 normalized net
13  operating income and the new condition of the building and improvements. I am informed and
14  believe that a lender appraisal by CB Richard Ellis as of September 2007 appraised the property at
15  $13.7 million.

16      43.     **905 8th Street, LLC,** owns approximately 0.9 acres of land in downtown Los
17  Angeles. The property is improved with a 28,200 net rentable square foot single or multi-tenant
18  industrial building. The property was purchased in 2003 for $2.5 million. I estimate that the value
19  of the property is not less than **$3.0 million**, which equates to approximately $73.42 per land
20  square foot. This value is based on, among other things, expressions of interest we have received
21  with regard to the property. It is currently listed for sale at an asking price of $3.5 million.

22      44.     **2640 Washington Boulevard, LLC,** owns approximately 2.7 acres of land in Los
23  Angeles. The property is improved with a recently completed, 31,876 net rentable square foot
24  building which is a modern produce center. The property was purchased in 2007 for $8.6 million.
25  I am informed and believe that a lender appraisal by CB Richard Ellis appraised the property at
26  $10.0 million as of December 2007. I estimate that the value of the property is not less than
27  **$7,172,100**, which equates to approximately $61.21 per land square foot.
28  ///

-16-

Exhibit 2 Page 000017

# MERUELO MADDUX PROPERTIES, INC.
## SCHEDULE OF ENTITIES, PROPERTIES, SECURED CREDITORS, DEBTS AND VALUES
### (March 25, 2009)

**PROPERTIES GENERATING CASH COLLATERAL**

| Owner Debtor | Property Address | Secured Creditor | Secured Debt as of 3/25/09 | Property Value | Reserves or Deposits | Monthly Revenue | Ratio Debt/FMV | 2/09 Debt Service |
|---|---|---|---|---|---|---|---|---|
| Alameda Produce Market, LLC | 761 Terminal, 1312 E. 7th St., 1215 E. 7th. St. - Los Angeles | Cathay Bank | $58,664,655 | $109,679,285 | N/A | $586,833 | 53% | $542,057 |
| 788 South Alameda, LLC | 788 South Alameda, Los Angeles | California Bank & Trust | $7,153,799 | $9,333,333 | N/A | $97,833 | 77% | $44,905 |
| 905 8th Street, LLC | 905 8th Street, Los Angeles | The Stafford Group | $1,950,000 | $3,000,000 | N/A | $11,700 | 66% | $12,188 |
| 2640 Washington Boulevard, LLC | 2640 E. Washington Blvd, Los Angeles | United Commercial Bank | $6,066,073 | $7,172,100 | N/A | $53,750 | 85% | $47,947 |
| Merco Group - 1500 Griffith Avenue, LLC | 1510 Griffith & 833 E. 15th., Los Angeles | Y & F Murakami | $3,000,000 | $3,000,000 | | $14,839 | 100% | $16,110 |
| Merco Group - 1500 Griffith Avenue, LLC | 1500 E. Griffith and 4th Street Center, Los Angeles | East West Bank | $6,396,500 | $8,800,000 | N/A | $23,450 | 73% | $29,850 |
| Merco Group - 4th Street Center, LLC | 405-411 S. Hewitt St., 900, 926, 910 E. 4th St., Los Angeles | East West Bank | incl above | $3,679,000 | N/A | $8,000 | incl above | |
| Merco Group - 425 West 11th Street, LLC | Desmond Building, 425 W. 11th St., 1051 S. Grand St, Los Angeles | East West Bank | $5,340,000 | $12,200,000 | N/A | $7,500 | 44% | $17,652 |
| Merco Group - 620 Gladys Avenue, LLC | 609, 637,647 Ceres, 614, 616, 618 Gladys, 838 E. 6th St., - Los Angeles | East West Bank | $5,380,688 | $8,758,575 | N/A | $45,750 | 61% | $40,965 |
| Merco Group - 2529 Santa Fe Avenue, LLC | Santa Fe Plaza, 2529 Santa Fe Ave., Vernon, CA | East West Bank | $3,134,825 | $3,772,200 | N/A | $6,400 | 83% | $22,383 |
| Merco Group - 3185 E. Washington Boulevard, LLC | Washington Cold Storage, 3185 E. Washington Blvd., Los Angeles | Chinatrust Bank | $9,541,565 | $11,800,000 | N/A | $90,000 | 81% | $64,134 |
| Merco Group, LLC | Southern California Institute of Architecture, 960 E. 3rd St., Los Angeles | East West Bank | $10,108,209 | $15,700,000 | N/A | $102,383 | 64% | $80,109 |
| Merco Group - Little J, LLC | 1117-1119 S. Olive St., Los Angeles | East West Bank | addtl collateral | $4,548,225 | N/A | $40,302 | N/A | N/A |
| Merco Group, LLC | Sky Arc, 950 E. 3rd St., Los Angeles | East West Bank | $17,000,000 | $29,000,000 | $2,017,992 | $13,100 | 59% | $109,083 |
| Merco Group - Southpark, LLC | South Park Towers | Bank Of America | $20,000,000 | $57,250,000 | N/A | $50,500 | 35% | $81,667 |
| Meruelo Farms, LLC | 210-234 Center St., 815 E. Temple, 740 Jackson St., Los Angeles | Imperial Capital Bank | $6,978,349 | $9,567,360 | N/A | $25,000 | 73% | $53,389 |
| Meruelo Farms, LLC | 233 Center St., 720 E. Temple, 718-736 Jackson St., Los Angeles | Pacific Commerce Bank | $3,350,000 | $4,155,000 | N/A | $20,000 | 81% | $8,468 |
| Meruelo Maddux - 3rd & Omar Street, LLC | 450-470 E. 3rd. St., 308-310 Omar St., 307 S. Crocker St., Los Angeles | East West Bank | $2,559,658 | $3,000,000 | N/A | $10,017 | 85% | $16,840 |

Exhibit 2 Page 000018

335636   25162

EXHIBIT 5

## PROPERTIES GENERATING CASH COLLATERAL (CONTINUED)

| Owner Debtor | Property Address | Secured Creditor | Secured Debt as of 3/25/09 | Property Value | Reserves or Deposits | Monthly Revenue | Ratio Debt/ FMV | 2/09 Debt Service |
|---|---|---|---|---|---|---|---|---|
| Meruelo Maddux - 420 Boyd Street, LLC | 400-428 Boyd St., Los Angeles | East West Bank | $5,950,000 | $6,375,000 | N/A | $37,000 | 93% | $34,662 |
| Meruelo Maddux - 500 Mateo Street, LLC | 500 Mateo St., Los Angeles | Western Mixers | $445,000 | $1,900,000 | N/A | $10,167 | 23% | $17,596 |
| Meruelo Maddux - 915-949 S. Hill Street, LLC | Ullman Tower One, 915-949 Hill St., Los Angeles | Imperial Capital Bank | $9,063,875 | $12,540,000 | N/A | $30,000 | 72% | $56,049 |
| Meruelo Maddux Properties - 760 S. Hill Street, LLC | 760 S. Hill Street, Los Angeles | Bank of America | $28,108,094 | $29,200,000 | $6,624,324 | $171,667 | 96% | $71,680 |
| Meruelo Maddux Properties - 1919 Vineburn Street, LLC | 1919 Vineburn Street, Los Angeles | Imperial Capital Bank | $5,468,543 | $8,564,150 | N/A | $51,617 | 64% | $43,811 |
| Meruelo Maddux Properties - 2131 Humboldt Street, LLC | 2131 Humboldt St., Los Angeles | V & A Chamilian | $7,000,000 | $10,512,500 | N/A | $12,000 | 67% | $37,917 |
| Meruelo Wall Street, LLC | 419 E. 9th Street, Los Angeles | United Commercial Bank | $20,850,859 | $35,352,900 | $508,532 | $203,333 | 59% | $126,248 |
| Santa Fe Commerce Center, Inc. | 2445-2535 E. 12th St, Los Angeles | Capmark Finance, Inc. | $10,170,904 | $23,250,000 | $598,721 | $142,167 | 44% | $98,408 |
| | | | $253,681,596 | $432,109,608 | $9,749,569 | $1,865,308 | | $1,674,118 |

## PROPERTIES NOT GENERATING CASH COLLATERAL

| Owner Debtor | Property Address | Secured Creditor | Secured Debt as of 3/25/09 | addtl collateral | Property Value | Reserves or Deposits | Monthly Revenue | Ratio Debt/ FMV | 2/09 Debt Service |
|---|---|---|---|---|---|---|---|---|---|
| Meruelo Maddux - 336 W. 11th Street, LLC | 336 W. 11th St., 1105 S. Olive St., Los Angeles | East West Bank | | $8,983,643 | $10,000,000 | N/A | $0 | 90% | $81,538 |
| Meruelo Maddux Properties - 2951 Lenwood Road, LLC | 2951 Lenwood Road, Barstow, California | FDIC | | | $5,386,150 | N/A | $0 | N/A | N/A |
| Meruelo Maddux - Mission Boulevard, LLC | Crown Commerce Center, 2001-2031 W. Mission Blvd, Pomona, Cal | Kennedy Funding, Inc. | | $8,800,000 | $20,000,000 | $440,000 | $0 | 44% | $88,000 |
| Merco Group - 2001-2021 West Mission Boulevard, LLC | 1875 W. Mission, Pomona, CA - Pomona East | PNL | | $8,462,940 | $15,000,000 | $154,721 | $0 | 56% | $102,388 |
| | | | | $26,246,583 | $50,386,150 | $594,721 | | | $271,926 |
| | | | $279,928,179 | | $482,495,758 | $10,344,290 | | | $1,946,044 |



355 South Grand Avenue, 12th Floor
Los Angeles, CA, 90071

T (213) 613-3176
F (213) 613-3131

www.cbre.com

May 3, 2009


Mr. Curtis C. Jung, Esq.
Counsel for United Commercial Bank C/O
**JUNG & YUEN, LLP**
888 S. Figueroa Street, Suite 720
Los Angeles, California  90017


RE:     Appraisal of **WASHINGTON PRODUCE CENTER**
        2640 E. Washington Boulevard
        Los Angeles, Los Angeles County, California  90023
        CBRE File No 09-251LA-0403


Dear Mr. Jung:

At your request and authorization, CB Richard Ellis (CBRE) has prepared an appraisal of the market value of the referenced property.  Our analysis is presented in the following Summary Appraisal Report.

The subject is a 31,876-square-foot produce distribution facility located at 2640 E. Washington Boulevard in the city of Los Angeles, California. The improvements were constructed in 2006, and are situated on a 2.71-acre site. The subject building consists of 33 produce distribution units, in which approximately 25 percent of the space is ambient dry storage area and the remaining 75 percent of the space is refrigerated cooler space. Currently, the property is 85.2% leased on a multi-tenant basis, and is considered to be in good overall condition. The subject is more fully described, legally and physically, within the enclosed report.

The subject is not stabilized.  Therefore, we have provided the following estimates of value: 1) the "as is" value as of the date of our inspection; and 2) the "as stabilized" value as of the estimated date of stabilized occupancy.

Based on the analysis contained in the following report, the market value of the subject is concluded as follows:

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000020

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value Conclusion** |
| As Is | Leased Fee Interest | April 20, 2009 | $4,090,000 |
| As Stabilized | Leased Fee Interest | November 1, 2009 | $4,130,000 |
| Compiled by CBRE | | | |

Data, information, and calculations leading to the value conclusion are incorporated in the report following this letter. The report, in its entirety, including all assumptions and limiting conditions, is an integral part of, and inseparable from, this letter.

Substantial volatility in the capital markets has increased uncertainty in the real property marketplace. It is difficult to predict what may happen in the capital markets going forward. As a result, it is difficult to predict what may happen to real property values over time. Our valuation of the subject property considered the best information that was available at the time of our analysis. Due to on-going volatility in the marketplace, users of this appraisal should consider the current market uncertainty when determining the level of confidence they choose to place on these analyses and conclusions. Users are reminded that the appraisal conclusions in this report are effective as of the stated date(s) of valuation.

The following appraisal sets forth the most pertinent data gathered, the techniques employed, and the reasoning leading to the opinion of value. The analyses, opinions and conclusions were developed based on, and this report has been prepared in conformance with, our interpretation of the guidelines and recommendations set forth in the Uniform Standards of Professional Appraisal Practice (USPAP), the requirements of the Code of Professional Ethics and Standards of Professional Appraisal Practice of the Appraisal Institute, the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA) and Title XI Regulations.

The report is for the sole use of the client; however, client may provide only complete, final copies of the appraisal report in its entirety (but not component parts) to third parties who shall review such reports in connection with loan underwriting or securitization efforts. Appraiser is not required to explain or testify as to appraisal results other than to respond to the client for routine and customary questions. Please note that our consent to allow an appraisal report prepared by CBRE or portions of such report, to become part of or be referenced in any public offering, the granting of such consent will be at our sole discretion and, if given, will be on condition that we will be provided with an Indemnification Agreement and/or Non-Reliance letter, in a form and content satisfactory to us, by a party satisfactory to us. We do consent to your submission of the reports to rating agencies, loan participants or your auditors in its entirety (but not component parts) without the need to provide us with an Indemnification Agreement and/or Non-Reliance letter.

CBRE hereby expressly granted to Client the right to copy this report and distribute it to other parties in the transaction for which this report has been prepared, including employees of Client, other lenders in the transaction, and the borrower, if any. It has been a pleasure to assist you in this assignment. If you have any questions concerning the analysis, or if CBRE can be of further service, please contact us.



Mr. Curtis C. Jung, Esq.
May 3, 2009
Page 3


Respectfully submitted,

**CBRE - VALUATION & ADVISORY SERVICES**


David L. Isola
Senior Appraiser
CA State Certification No. AG025497

Phone:   213_613-3391
Fax:        213_613_3131
Email:     david.isola@cbre.com

Don T. Hirose, MAI
Vice President
CA State Certification No. AG008876

Phone:   213_613-3602
Fax:        213_613_3131
Email:     don.hirose@cbre.com



© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000022

## SUMMARY OF SALIENT FACTS

| | |
|---|---|
| **Property Name** | Washington Produce Center |
| **Location** | 2640 E. Washington Boulevard, Los Angeles, Los Angeles County, California  90023 |
| **Assessor's Parcel Number** | 5168-017-012 |
| **Highest and Best Use** | |
| As Vacant | Hold for future industrial development |
| As Improved | Industrial |
| **Property Rights Appraised** | Leased Fee Interest |
| **Land Area** | 2.71 AC        118,203 SF |
| **Improvements** | |
| Property Type | Industrial        (Cooler Storage) |
| Number of Buildings | 1 |
| Number of Stories | 1 |
| Gross Building Area | 33,860 SF        (With common restrooms) |
| Rentable Building Area | 31,876 SF        (W/out common restrooms) |
| Clear Height | 12'-13.75' |
| Percent Office | 0.0% |
| Percent Ambient (Dry) Storage | 25.0% |
| Percent Cold Storage | 75.0% |
| *Percent Cooler Area* | 75.0% |
| *Percent Freezer Area* | 0.0% |
| Year Built | 2006 |
| Condition | Good |
| **Major Tenants** | |
| **Estimated Exposure Time** | 12 Months |
| **Financial Indicators** | |
| Current Occupancy | 85.2% |
| Stabilized Occupancy | 96.0% |
| Stabilized Credit Loss | 1.0% |
| Estimated Lease-up Period | 6 Months |
| Overall Capitalization Rate | 8.25% |

| **Pro Forma Operating Data** | *Total* | *Per SF* |
|---|---|---|
| Effective Gross Income | $648,711 | $20.35 |
| Operating Expenses | $308,149 | $9.67 |
| Expense Ratio | 47.50% | |
| Net Operating Income | $340,563 | $10.68 |

Exhibit 3 Page 000023

© 2009 CB Richard Ellis, Inc.

| VALUATION | | Total | Per SF |
|---|---|---|---|
| Land Value | | $3,550,000 | $30.03 |
| **Market Value As Is On** | **April 20, 2009** | | |
| Cost Approach | | $4,090,000 | $128.31 |
| Sales Comparison Approach | | $4,110,000 | $128.94 |
| Income Capitalization Approach | | $4,090,000 | $128.31 |
| **Market Value As Stabilized On** | **November 1, 2009** | | |
| Cost Approach | | $4,130,000 | $129.56 |
| Sales Comparison Approach | | $4,140,000 | $129.88 |
| Income Capitalization Approach | | $4,130,000 | $129.56 |

| CONCLUDED MARKET VALUE | | | |
|---|---|---|---|
| **Appraisal Premise** | **Interest Appraised** | **Date of Value** | **Value** |
| As Is | Leased Fee Interest | April 20, 2009 | $4,090,000 |
| As Stabilized | Leased Fee Interest | November 1, 2009 | $4,130,000 |

Compiled by CBRE

## EXTRAORDINARY ASSUMPTIONS & HYPOTHETICAL CONDITIONS

None noted.

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000024

## IMPROVEMENTS LAYOUT



Exhibit 3 Page 000025

© 2009 CB Richard Ellis, Inc.

## IMPROVEMENTS ANALYSIS

The following chart depicts a summary of the improvements.

| IMPROVEMENTS SUMMARY AND ANALYSIS | | |
|---|---|---|
| Property Type | Industrial | (Cooler Storage) |
| Number of Buildings | 1 | |
| Number of Stories | 1 | |
| Gross Building Area | 33,860 SF | |
| Rentable Building Area | 31,876 SF | |
|   Office Area | 0 SF | (0.0% of Total) |
|   Ambient (Dry) Storage | 7,969 SF | (25.0% of Total) |
|   Unfinished Mezzanine (not included with GBA) | 0 SF | |
|   Cold Storage Area | 23,907 SF | (75.0% of Total) |
|     *Cooler Area* | *23,907 SF* | *(75.0% of Total)* |
|     *Freezer Area* | *0 SF* | *(0.0% of Total)* |
| Clear Height | 12'-13.75' | |
| Loading Area | | |
|   Grade Level Overhead Doors | 33 | |
|   Dock High Overhead Doors | 0 | |
| Site Coverage | 27.0% | |
| Land-to-Building Ratio | 3.71 : 1 | |
| Parking Improvements | Open | |
| Total Spaces: | 154 | |
| Parking Ratio (per 1,000 SF GBA ) | 4.83 | |
| Year Built | 2006 | |
| Actual Age | 3 Years | |
| Effective Age | 1 Years | |
| Total Economic Life | 50 Years | |
| Age/Life Depreciation | 2.0% | |
| Functional Utility | Typical | |

| Building Number | Improvement Type | % Cold Storage | Size (SF) | % Office | Clear Height | Year Built / Renovated |
|---|---|---|---|---|---|---|
| Building 1 | Concrete block/Produce Distributi | 75% | 31,876 | 0.0% | 12'-13.75' | 2006 |

Source: Various sources compiled by CBRE

Building plans and specifications were provided in conjunction with this appraisal and were prepared by Funes Architecture and dated April 27, 2005. The following is a description of the subject improvements and basic construction features derived from these plans and CBRE's inspection.

The subject property consists of one produce distribution building of 31,876 rentable square feet, and two common (shared) restroom buildings, each of which is approximately 992 square feet in size. The total gross building area for the subject is therefore 33,860 square feet. However, we have estimated the value for the property based upon the rentable building area of 31,876 square feet as this is the rentable building area as shown in the rent roll provided by subject ownership.

## BUILDING DESIGN / LAYOUT

The subject building has a curvilinear shape that is adjacent to the west and south boundary of the subject site, which is curvilinear along the western and southern boundary. The building contains 33

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000026

rectangular shaped units, each approximately 944 square feet in size, with one unit (Unit #1) being larger at 1,668 square feet in size. Approximately 75 percent of each unit is cooler storage space, and the remaining 25 percent is ambient or dry storage area.

## YEAR BUILT

The subject was built in 2006.

## CONSTRUCTION COMPONENTS

The construction components and interior finish of the building is summarized as follows:

| | |
|---|---|
| Foundation: | The foundation consists of a continuous concrete slab reinforced with steel rebar. The foundation structure and condition does not appear to be a limiting factor with regard to potential industrial uses. |
| Exterior Walls: | The exterior wall structure is concrete block with wood framing and steel reinforcing. Warehouse entrances are metal panel doors set in steel frames. |
| Roof Cover: | The building has a flat roof of plywood, with a rolled composition cover. |
| Interior Finish: | As required by the Department of Health, the walls and ceilings of the refrigerated space is 100 percent acrylic. The floor is concrete and has a sub-floor draining system. The refrigerated area is separated from the ambient storage area by a rubber membrane. The dry storage area provides painted acrylic walls, concrete floors, and exposed wood roof. All of the units have fluorescent lighting, electrical outlets and phone hook-ups. |
| Refrigeration Systems: | The cooler area of each unit is cooled by a Freon refrigeration system. |
| Electrical: | Each unit is separately metered and has electrical outlets and telephone jacks. |
| Clear Height | The interior clear heights of each unit range from 12 feet to 13.75 feet. |
| Loading Doors: | Each unit has one ground level loading door. |

Exhibit 3 Page 000027

© 2009 CB Richard Ellis, Inc.

# APPRAISAL METHODOLOGY

In appraisal practice, an approach to value is included or omitted based on its applicability to the property type being valued and the quality and quantity of information available.

## COST APPROACH

The cost approach is based upon the proposition that the informed purchaser would pay no more for the subject than the cost to produce a substitute property with equivalent utility. This approach is particularly applicable when the property being appraised involves relatively new improvements that represent the highest and best use of the land, or when it is improved with relatively unique or specialized improvements for which there exist few sales or leases of comparable properties.

## SALES COMPARISON APPROACH

The sales comparison approach utilizes sales of comparable properties, adjusted for differences, to indicate a value for the subject. Valuation is typically accomplished using physical units of comparison such as price per square foot, price per unit, price per floor, etc., or economic units of comparison such as gross rent multiplier. Adjustments are applied to the physical units of comparison derived from the comparable sale. The unit of comparison chosen for the subject is then used to yield a total value. Economic units of comparison are not adjusted, but rather analyzed as to relevant differences, with the final estimate derived based on the general comparisons.

## INCOME CAPITALIZATION APPROACH

The income capitalization approach reflects the subject's income-producing capabilities. This approach is based on the assumption that value is created by the expectation of benefits to be derived in the future. Specifically estimated is the amount an investor would be willing to pay to receive an income stream plus reversion value from a property over a period of time. The two common valuation techniques associated with the income capitalization approach are direct capitalization and the discounted cash flow (DCF) analysis.

## METHODOLOGY APPLICABLE TO THE SUBJECT

In valuing the subject, all three approaches are applicable and have been utilized. In addition, the replacement cost has been utilized within the analysis of insurable value.

Exhibit 3 Page 000028

© 2009 CB Richard Ellis, Inc.

### *MVS Conclusion*

The concluded direct and indirect building cost estimate obtained via the MVS cost guide is illustrated as follows:

| MARSHALL VALUATION SERVICE COST SCHEDULE | | | |
|---|---|---|---|
| Primary Building Type: | Industrial | Height per Story: | 13'-14.75' |
| Effective Age: | 1 YRS | Number of Buildings: | 1 |
| Quality/Condition: | Good | Gross Building Area: | 31,876 SF |
| Exterior Wall: | Concrete block | Net Rentable Area: | 31,876 SF |
| Number of Stories: | 1 | Average Floor Area: | 31,876 SF |

| | |
|---|---|
| MVS Sec/Page/Class | 14/24/C |
| **Building Component** | Total Building |
| **Component Sq. Ft.** | 31,876 SF |
| **Base Square Foot Cost** | $93.08 |
| | |
| **Square Foot Refinements** | |
| Heating and Cooling | $6.90 |
| Doors | $0.15 |
| Common Area Restrooms | $10.00 |
| Other | $0.00 |
| Subtotal | $110.13 |
| | |
| **Height and Size Refinements** | |
| Number of Stories Multiplier | 1.00 |
| Height per Story Multiplier | 1.00 |
| Floor Area Multiplier | 0.95 |
| Subtotal | $104.62 |
| | |
| **Cost Multipliers** | |
| Current Cost Multiplier | 1.04 |
| Local Multiplier | 1.21 |
| **Final Square Foot Cost** | **$131.66** |
| **Base Component Cost** | **$4,196,737** |

| | | |
|---|---|---|
| **Base Building Cost** | *(via Marshall Valuation Service cost data)* | $4,196,737 |
| **Additions** | | |
| Signage, Landscaping & Misc. Site Improvements (not included above) | | $431,635 |
| Other | | $0 |
| **Direct Building Cost** | | $4,628,372 |
| | | |
| **Indirect Costs** | 10.0% of Direct Building Cost | $462,837 |
| **Direct and Indirect Building Cost** | | $5,091,209 |
| **Rounded** | | $5,091,000 |

Compiled by CBRE

## ENTREPRENEURIAL PROFIT

Entrepreneurial profit represents the return to the developer, and is separate from contractor's overhead and profit. This line item, which is a subjective figure, tends to range from 10% to 20% of

Exhibit 3 Page 000029

© 2009 CB Richard Ellis, Inc.

total direct and indirect costs for this property type, based on discussions with developers active in this market.

## ACCRUED DEPRECIATION

There are essentially three sources of accrued depreciation:

1. physical deterioration, both curable and incurable;
2. functional obsolescence, both curable and incurable; and
3. external obsolescence.

### Physical Deterioration

The subject's physical condition was detailed in the improvements analysis. Curable deterioration affecting the improvements results from deferred maintenance and, if applicable, was previously discussed. With regard to incurable deterioration, the subject improvements are considered to have deteriorated due to normal wear and tear associated with natural aging. The following chart provides a summary of the remaining economic life.

| ECONOMIC AGE AND LIFE | |
| --- | --- |
| Actual Age | 3 Years |
| Effective Age | 1 Years |
| MVS Expected Life | 50 Years |
| Remaining Economic Life | 49 Years |
| Accrued Physical Incurable Depreciation | 2.0% |
| Compiled by CBRE | |

### Functional Obsolescence

Based on a review of the design and layout of the improvements, no forms of curable functional obsolescence were noted. Because replacement cost considers the construction of the subject improvements utilizing modern materials and current standards, design and layout, functional incurable obsolescence normally is not applicable.

### External Obsolescence

External obsolescence is estimated by the capitalization of income loss. As the subject produces income, the income loss caused by the external obsolescence can be capitalized into an estimate of the loss in total property value. As the land value is not impacted, the entire amount is attributed to the improvements. For the purpose of this approach, the external obsolescence affecting the subject from weakening market conditions has been analyzed, and is calculated in the following table:

Exhibit 3 Page 000030

© 2009 CB Richard Ellis, Inc.

| EXTERNAL OBSOLESCENCE | |
| --- | --- |
| Cost Feasible NOI: | $766,223 |
| Pro-Forma Stabilized NOI: | $340,563 |
| NOI Differential: | $425,661 |
| Capitalized at: | 8.25% |
| External Obsolescence: | ($5,159,527) |
| Compiled by CBRE | |

The cost feasible NOI is based on the depreciated cost of the improvements plus land value, multiplied by current rates of return supported in the appraisal. The pro forma stabilized NOI is taken from the direct capitalization schedule and supported by the assumptions in the appraisal report.

## COST APPROACH CONCLUSION

The value estimate is calculated as follows.

| COST APPROACH CONCLUSION | | | |
| --- | --- | --- | --- |
| Primary Building Type: | Industrial | Height per Story: | 13'-14.75' |
| Effective Age: | 1 YRS | Number of Buildings: | 1 |
| Quality/Condition: | Good | Gross Building Area: | 31,876 SF |
| Exterior Wall: | Concrete block | Net Rentable Area: | 31,876 SF |
| Number of Stories: | 1 | Average Floor Area: | 31,876 SF |
| | | | |
| **Direct and Indirect Building Cost** | | | $5,091,000 |
| | | | |
| **Entrepreneurial Profit** | 15.0% of Total Building Cost | | $763,650 |
| | | | |
| **Replacement Cost New** | | | $5,854,650 |
| | | | |
| **Accrued Depreciation** | | | |
| Unfinished Shell Space | | $0 | |
| Incurable Physical Deterioration | 2.0% of Replacement Cost New less Curable Physical Deterioration | ($117,093) | |
| Functional Obsolescence | | $0 | |
| External Obsolescence | | ($5,159,527) | |
| Total Accrued Depreciation | 90.1% of Replacement Cost New | | ($5,276,620) |
| **Depreciated Replacement Cost** | | | $578,030 |
| | | | |
| **Land Value** | | | $3,550,000 |
| **Stabilized Value Indication** | | | $4,128,030 |
| **Rounded** | | | $4,130,000 |
| **Curable Physical Deterioration** | | | $0 |
| **Lease-Up Discount** | | | ($37,000) |
| **As Is Value Indication** | | | $4,091,030 |
| **Rounded** | | | $4,090,000 |
| **Value Per SF** | | | $128.31 |
| Compiled by CBRE | | | |

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000031

insurance, common area utilities, trash removal, administrative and general, repairs and maintenance, security, and management fee. The recent leases have each been month-to-month in terms of length. None of the leases included any free rent or a tenant improvement allowance.

## MARKET RENT ESTIMATE

The most recently executed leases within the subject have typically been consistent with trends exhibited in the competitive market and by the rent comparables. The following charts summarize the concluded market leasing parameters for the subject.

### *Base Rental Rate*

The estimate of base rental rates is shown in the following chart.

| BASE RENTAL RATES | |
| --- | --- |
| Category | All Units |
| Subject's Quoted Terms | $1.95 |
| Rent Comparable Data | $1.75-$3.75 |
| **CBRE Estimate** | **$1.85** |
| Compiled by CBRE | |

### *Reimbursements*

The estimate of reimbursements is shown in the following chart.

| REIMBURSEMENTS | |
| --- | --- |
| Category | All Units |
| Subject's Quoted Terms | Gross |
| Rent Comparable Data | Gross / NNN |
| **CBRE Estimate** | **Gross** |
| Compiled by CBRE | |

### *Lease Term*

The estimate of lease terms is shown in the following chart.

Exhibit 3 Page 000032

© 2009 CB Richard Ellis, Inc.

## MARKET RENT CONCLUSIONS

The following chart depicts the market rent conclusions for the subject:

| MARKET RENT CONCLUSIONS | |
| --- | --- |
| Category | All Units |
| GBA (SF) | 31,876 |
| Percent of Total SF | 100.0% |
| Market Rent ($/SF/Mon.) | $1.85 |
| Market Rent ($/SF/Yr.) | $22.20 |
| Concessions | None |
| Reimbursements | Gross |
| Rental Escalation | None |
| Tenant Improvements (New Tenants) | None |
| Tenant Improvements (Renewals) | None |
| Average Lease Term | 1 YRS |
| Compiled by CBRE | |

Exhibit 3 Page 000033

© 2009 CB Richard Ellis, Inc.

**RENT ROLL ANALYSIS**

The subject's rent roll is illustrated as follows:

| Suite No. | Tenant | Lease Start | Lease Expiration | Term (Mos.) | Size (GBA) SF | % Total | Contract Rental Rate $/SF/Mon. | $/SF/Yr. | $/Yr. |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |
| 1 | R.T. Herbs | Feb-08 | M-t-M | --- | 1,668 | 5.2% | $1.26 | $15.11 | $25,200 |
| 2, 3 | CF Produce | Jun-08 | M-t-M | --- | 1,888 | 5.9% | $1.59 | $19.07 | $36,000 |
| 4-6 | Universal Select | Jan-08 | M-t-M | --- | 2,832 | 8.9% | $1.84 | $22.02 | $62,370 |
| 8 | Saiya Produce | Oct-08 | M-t-M | --- | 944 | 3.0% | $1.85 | $22.25 | $21,000 |
| 9 | Richard Alcosta | Feb-09 | M-t-M | --- | 944 | 3.0% | $1.85 | $22.25 | $21,000 |
| 11 | Jose Luis Florex | Feb-08 | M-t-M | --- | 944 | 3.0% | $1.95 | $23.36 | $22,050 |
| 12 | FJ Produce | Feb-08 | M-t-M | --- | 944 | 3.0% | $1.95 | $23.36 | $22,050 |
| 13 | New tenant | May-09 | M-t-M | --- | 944 | 3.0% | $1.85 | $22.25 | $21,000 |
| 15 | M.J.E. Produce | Jul-08 | M-t-M | --- | 944 | 3.0% | $1.85 | $22.25 | $21,000 |
| 17 | ZamZam Trading | Dec-07 | M-t-M | --- | 944 | 3.0% | $1.95 | $23.36 | $22,050 |
| 18 | O.B. Produce | Aug-08 | M-t-M | --- | 944 | 3.0% | $1.75 | $20.97 | $19,800 |
| 19 | A & A Produce | Jan-09 | M-t-M | --- | 944 | 3.0% | $1.85 | $22.25 | $21,000 |
| 20 | Cordoba Produce | Nov-07 | M-t-M | --- | 944 | 3.0% | $1.95 | $23.36 | $22,050 |
| 21 | T.S. Kai Enterpr. | Aug-08 | M-t-M | --- | 944 | 3.0% | $1.85 | $22.25 | $21,000 |
| 23 | Barajas Produce | Nov-07 | M-t-M | --- | 944 | 3.0% | $1.95 | $23.36 | $22,050 |
| 24 | Arturo's Sodas | Aug-07 | M-t-M | --- | 944 | 3.0% | $1.95 | $23.36 | $22,050 |
| 25-28 | Green Valley | Jan-09 | M-t-M | --- | 3,776 | 11.8% | $1.59 | $19.07 | $72,000 |
| 29 | Evergreen Valley | Jan-09 | M-t-M | --- | 944 | 3.0% | $1.59 | $19.07 | $18,000 |
| 30-31 | Green Valley | Jan-09 | M-t-M | --- | 1,888 | 5.9% | $1.59 | $19.07 | $36,000 |
| 32-33 | Bryan's Distributor | May-09 | M-t-M | --- | 1,888 | 5.9% | $1.75 | $20.97 | $39,660 |
| Occupied Subtotals | | | | | 27,156 | 85.2% | $1.74 | $20.89 | $567,270 |
| 7 | Vacant | --- | | --- | 944 | 3.0% | $1.85 | $22.20 | $20,957 |
| 10 | Vacant | --- | | --- | 944 | 3.0% | $1.85 | $22.20 | $20,957 |
| 14 | Vacant | --- | | --- | 944 | 3.0% | $1.85 | $22.20 | $20,957 |
| 16 | Vacant | --- | | --- | 944 | 3.0% | $1.85 | $22.20 | $20,957 |
| 22 | Vacant | --- | | --- | 944 | 3.0% | $1.85 | $22.20 | $20,957 |
| Property Totals - Contract Rent | | | | | 31,876 | 100.0% | $1.76 | $21.08 | $672,054 |
| Property Totals - Market Rent | | | | | 31,876 | 100.0% | $1.85 | $22.20 | $707,647 |
| Compiled by CBRE | | | | | | | | | |

The subject property is presently 85.2% percent leased on a multi-tenant basis. All of the existing subject leases are on a month-to-month basis. The tenants are paying rents in the range of $1.26 to $1.95 per square foot per month, gross, with all but one of the tenants paying rents in a tighter range from $1.59 to $1.95 per square foot per month.

The gross lease structure means that the tenant is separately metered for utilities to their unit (or units) but does not reimburse the landlord for any other operating expenses including real estate taxes,

Exhibit 3 Page 000034

© 2009 CB Richard Ellis, Inc.

property insurance, common area utilities, trash removal, administrative and general, repairs and maintenance, security, and management fee.

The estimated market rent for the subject is modestly higher than the in-place contract rent, where the total contract rent includes the in-place base rents from the existing tenants plus the vacant space modeled at the concluded market rent. Therefore we have utilized the contract rent in the pro forma net operating income for the direct capitalization analysis. However, the slightly below market nature of the contract rent has been considered in our selection of an appropriate overall capitalization rate for the subject in the direct capitalization analysis.

### *Anticipated Changes/Rollover to Rent Roll*

The property manager reported that there are two new leases out for signature that are expected to commence as of May 1, 2009, which are summarized as follows: 1) Bryan's Distributor intends to lease Units 32 and 33, or a total of 1,888 square feet, at a monthly rent of $1.75 per square foot, gross; on a month-to-month basis; and 2) an unnamed tenant intends to lease Unit 13, consisting of 944 square feet, at a monthly rent of $1.85 per square foot, gross, on a month-to-month basis. We were informed by the property manager that there are no significant anticipated changes to the rent roll due to tenant defaults and/or non-renewals.

## POTENTIAL RENTAL INCOME CONCLUSION

Within this analysis, potential rental income is estimated based upon the forward looking rental income over the next twelve months. This method of calculating rental income is most prevalent in the local market and is consistent with the method used to derive overall capitalization rates from the comparable sales data.

In estimating the subject's pro forma operating data, the 2008 operating statement and the 2009 budget have been analyzed. The following table presents the available operating data history for the subject.

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000035

| OPERATING HISTORY | | | | |
|---|---|---|---|---|
| Year-Occupancy | 2008 | 74.0% | 2009 Budget | 95.0% |
| | Total | $/SF | Total | $/SF |
| **Income** | | | | |
| Rental Income | $492,666 | $15.46 | $634,662 | $19.91 |
| Parking Income | 4,650 | 0.15 | 10,800 | 0.34 |
| Bad Debt Expense | (52,791) | (1.66) | (95,199) | (2.99) |
| Effective Gross Income | $444,525 | $13.95 | $550,263 | $17.26 |
| **Expenses** | | | | |
| Real Estate Taxes | $107,610 | $3.38 | $111,708 | $3.50 |
| Property Insurance | 6,331 | 0.20 | 5,805 | 0.18 |
| Building Maintenance | 30,105 | 0.94 | 80,400 | 2.52 |
| Utilities | 10,639 | 0.33 | 27,660 | 0.87 |
| Trash | 58,500 | 1.84 | 3,000 | 0.09 |
| Security | 170,251 | 5.34 | 143,424 | 4.50 |
| Administrative & General | 13,744 | 0.43 | 16,491 | 0.52 |
| Management Fee | - | - | 46,380 | 1.46 |
| Reserves for Replacement | - | - | - | - |
| Operating Expenses | $397,180 | $12.46 | $434,868 | $13.64 |
| **Net Operating Income** | **$47,345** | **$1.49** | **$115,395** | **$3.62** |

Source: Operating statements

## VACANCY/COLLECTION LOSS

The subject's estimated stabilized occupancy rate was previously discussed in the market analysis. We have estimated a stabilized vacancy factor of 5.00 percent. This has been modeled as a 1.00 percent credit/collection loss plus a 4.00 percent vacancy factor, for a total vacancy/collection loss of 5.00 percent.

## PARKING INCOME

The base rent for each of the tenant leases includes two parking spaces per unit. Several of the subject tenants pay additional rental for car parking spaces and/or truck parking spaces at the property. The subject's parking income is detailed as follows:

| PARKING INCOME | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $4,650 | $0.15 |
| 2009 Budget | $10,800 | $0.34 |
| **CBRE Estimate** | **$10,800** | **$0.34** |

Compiled by CBRE

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000036

## EXPENSE REIMBURSEMENTS

The subject's leases are typically based on a gross basis whereby the tenant pays directly for electricity charges to the unit, but does not reimburses the owner for any operating expenses. We have estimated a market rent that is based on a similar gross lease. As a result, none of the operating expenses that are run through the property are reimbursed by the tenants.

## EFFECTIVE GROSS INCOME

The subject's effective gross income is detailed as follows:

| EFFECTIVE GROSS INCOME | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $444,525 | $13.95 |
| 2009 Budget | $550,263 | $17.26 |
| **CBRE Estimate** | **$648,711** | **$20.35** |
| Compiled by CBRE | | |

Our pro forma estimate is significantly higher than the 2009 budgeted amount due to the fact that we have not included the bad debt provision of $95,199 that is shown in the 2009 budget. If we deduct this bad debt amount from the pro forma effective gross income, the adjusted amount is $553,572, which is similar to the 2009 budgeted effective gross income.

## OPERATING EXPENSE ANALYSIS

### *Expense Comparables*

The following chart summarizes expenses obtained from comparable properties.

Exhibit 3 Page 000037

© 2009 CB Richard Ellis, Inc.

| EXPENSE COMPARABLES | | | |
|---|---|---|---|
| Comparable Number | 1 | 2 | 3 |
| Location | Los Angeles | Carson | Los Angeles |
| GBA (SF) | 32,000 | 152,572 | 290,620 |
| Expense Year | 2008 | 2007 | 2008 Budget |
| | | | |
| Expenses | $/SF | $/SF | $/SF |
| | | | |
| Real Estate Taxes | $0.85 | $1.54 | $2.87 |
| Property Insurance | 0.18 | 0.73 | 0.47 |
| Building Maintenance | 1.07 | 0.40 | 1.87 |
| Utilities | 0.35 | 2.64 | 1.46 |
| Trash | 1.68 | 0.27 | 0.22 |
| Security | 2.91 | 0.67 | 0.41 |
| Administrative & General | 1.53 | 0.55 | 0.04 |
| Management Fee | 1.35 | - | 0.10 |
| (as a % of EGI) | 4.2% | - | - |
| Reserves for Replacement | - | - | - |
| Operating Expenses | $9.91 | $6.80 | $7.34 |
| Operating Expense Ratio | 31.1% | - | - |

Source: operating statements

The following subsections represent the analysis for the pro forma estimate of each category of the subject's stabilized expenses.

### *Real Estate Taxes*

The real estate taxes for the subject were previously discussed. The subject's expense is detailed as follows:

| REAL ESTATE TAXES | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $107,610 | $3.38 |
| 2009 Budget | $111,708 | $3.50 |
| Expense Comparable 1 | N/A | $0.85 |
| Expense Comparable 2 | N/A | $1.54 |
| Expense Comparable 3 | N/A | $2.87 |
| **CBRE Estimate** | **$55,881** | **$1.75** |
| Compiled by CBRE | | |

Our estimate is based on the assumed sale of the property at the stabilized value indication provided by the direct capitalization analysis, which is consistent with California's Proposition 13 statute.

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000038

### Property Insurance

Property insurance expenses typically include fire and extended coverage and owner's liability coverage. The subject's expense is detailed as follows:

| PROPERTY INSURANCE | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $6,331 | $0.20 |
| 2009 Budget | $5,805 | $0.18 |
| Expense Comparable 1 | N/A | $0.18 |
| Expense Comparable 2 | N/A | $0.73 |
| Expense Comparable 3 | N/A | $0.47 |
| **CBRE Estimate** | **$6,375** | **$0.20** |
| Compiled by CBRE | | |

Our estimate is similar to the subject's recent historical and budgeted figures, and is toward the low end of the range provided by the expense comparable data. The relatively high property insurance expenses for Expense Comparable Two and Expense Comparable Three are due in part to the significant amount of freezer space at each of these properties.

### Building Maintenance

Building maintenance expenses typically include repairs and maintenance of the building, common area facilities, landscaping, and parking lot. The subject's expense is detailed as follows:

| BUILDING MAINTENANCE | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $30,105 | $0.94 |
| 2009 Budget | $80,400 | $2.52 |
| Expense Comparable 1 | N/A | $1.07 |
| Expense Comparable 2 | N/A | $0.40 |
| Expense Comparable 3 | N/A | $1.87 |
| **CBRE Estimate** | **$36,657** | **$1.15** |
| Compiled by CBRE | | |

Our estimate is bracketed by the subject's recent historical and budgeted figures, and is toward the middle of the range provided by the expense comparable data.

Exhibit 3 Page 000039

© 2009 CB Richard Ellis, Inc.

### Utilities

Utilities expense typically includes common area utilities, consisting primarily of electrical charges for exterior lighting and water used for the washing down of the parking lot/yard area. The subject's expense is detailed as follows:

| UTILITIES | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $10,639 | $0.33 |
| 2009 Budget | $27,660 | $0.87 |
| Expense Comparable 1 | N/A | $0.35 |
| Expense Comparable 2 | N/A | $2.64 |
| Expense Comparable 3 | N/A | $1.46 |
| **CBRE Estimate** | **$15,938** | **$0.50** |
| Compiled by CBRE | | |

Our estimate is bracketed by the subject's recent historical and budgeted figures, and is toward the low end of the range provided by the expense comparable data. The expenses for Expense Comparable Two and Expense Comparable Three are relatively higher as they include freezer usage.

### Trash

Trash expense typically includes costs related to the removal of trash from the yard area and parking lot by third-party service providers. The subject's expense is detailed as follows:

| TRASH | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $58,500 | $1.84 |
| 2009 Budget | $3,000 | $0.09 |
| Expense Comparable 1 | N/A | $1.68 |
| Expense Comparable 2 | N/A | $0.27 |
| Expense Comparable 3 | N/A | $0.22 |
| **CBRE Estimate** | **$39,845** | **$1.25** |
| Compiled by CBRE | | |

Our estimate is bracketed by the subject's recent historical and budgeted figures, and is toward the upper end of the range provided by the expense comparable data.

Exhibit 3 Page 000040

© 2009 CB Richard Ellis, Inc.

### Security

Security expense typically includes all costs related to the security of a property, including manned security patrols, video camera monitoring, and/or secure gated entry. The subject's expense is detailed as follows:

| SECURITY | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $170,251 | $5.34 |
| 2009 Budget | $143,424 | $4.50 |
| Expense Comparable 1 | N/A | $2.91 |
| Expense Comparable 2 | N/A | $0.67 |
| Expense Comparable 3 | N/A | $0.41 |
| **CBRE Estimate** | **$111,566** | **$3.50** |
| Compiled by CBRE | | |

Based on information provided by subject ownership, and the on-duty security person at the time of our inspection, the security service consists of one man per 8-hour shift, with three such shifts per day. The property provides security 24 hours per day, and seven days per week. The hourly rate for the security person is $12.00, which amounts to $104,832 per year in security personnel salary. The budgeted security expense of $143,424 appears to include worker's compensation insurance and other similar costs.

The subject's budgeted security expense of $4.50 per square foot for 2009 is relatively high in comparison to the expense comparable data, which range from $0.41 to $2.91 per square foot. This discrepancy is due in large part to the fact that many produce facilities do not provide onsite security on Saturday or Sunday. Instead, for other properties, the weekend security is handled by way of security cameras mounted at the property, which are monitored in an off-site location, and/or via drive-by security patrols.

We have modeled the pro forma security expense for the subject at $3.50 per square foot, which is based on three 8-hour shifts per day, consisting of one security person each shift at an hourly rate of $12.50, for five days per week and 52 weeks per year, plus a drive-by security patrol on the weekends.

### Administrative & General

General and administrative expenses typically include all payroll and payroll related items for all directly-employed administrative personnel such as building managers, secretaries, and bookkeepers. Leasing personnel are not included nor are the salaries or fees for off-site management firm personnel and services. This expense category also typically includes administrative expenses such as legal costs

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000041

pertaining to the operation of the building, telephone, supplies, furniture, temporary help, etc.  The subject's expense is detailed as follows:

| ADMINISTRATIVE & GENERAL | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $13,744 | $0.43 |
| 2009 Budget | $16,491 | $0.52 |
| Expense Comparable 1 | N/A | $1.53 |
| Expense Comparable 2 | N/A | $0.55 |
| Expense Comparable 3 | N/A | $0.04 |
| **CBRE Estimate** | **$15,938** | **$0.50** |
| Compiled by CBRE | | |

Our estimate is bracketed by the subject's recent historical and budgeted figures, and is toward the middle of the range provided by the expense comparable data.

### Management Fee

Management expenses are typically negotiated as a percentage of collected revenues (i.e., effective gross income). The subject's expense is detailed as follows:

| MANAGEMENT FEE | | |
|---|---|---|
| Year | Total | % EGI |
| 2008 | $0 | 0.0% |
| 2009 Budget | $46,380 | 8.4% |
| **CBRE Estimate** | **$25,948** | **4.0%** |
| Compiled by CBRE | | |

Professional management fees in the local market range from 3.0% to 5.0% for comparable properties. The 2009 budgeted management fee for the subject is 8.4 percent of effective gross income. Given the subject's size and the competitiveness of the local market area, we believe an appropriate management expense for the subject would be towards the middle of the range.

### Reserves for Replacement

Reserves for replacement are typically not included as an expense line item in calculating net operating income. Therefore we have not included reserves for replacement in the modeled pro forma.

## OPERATING EXPENSE CONCLUSION

The subject's expense is detailed as follows:

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000042

| OPERATING EXPENSES | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $397,180 | $12.46 |
| 2009 Budget | $434,868 | $13.64 |
| Expense Comparable 1 | N/A | $9.91 |
| Expense Comparable 2 | N/A | $6.80 |
| Expense Comparable 3 | N/A | $7.34 |
| **CBRE Estimate** | **$308,149** | **$9.67** |
| Compiled by CBRE | | |

The subject's per square foot operating expense pro forma is significantly lower than the 2009 budgeted figure and is higher than the upper end of the range provided by the expense comparable data.

The primary reason for the discrepancy between the subject's expense pro forma and the 2009 budgeted figure is due primarily to the modeled real estate taxes, which are based upon the assumed sale of the property at the stabilized value indication provided by the direct capitalization analysis. Whereas the 2009 budget includes real estate taxes of $3.50 per square foot, the modeled pro forma real estate taxes are at $1.75 per square foot.

Expense Comparable One represents the most similar of the expense comparables. It shows a total operating expense of $9.91 per square foot, or 2.6 percent higher than the subject's pro forma operating expense of $9.67 per square foot. Expense Comparable Two and Expense Comparable Three have substantial freezer space and are larger in size than the subject, and therefore are less comparable.

## NET OPERATING INCOME CONCLUSION

The subject's net operating income is detailed as follows:

| NET OPERATING INCOME | | |
|---|---|---|
| Year | Total | $/SF |
| 2008 | $47,345 | $1.49 |
| 2009 Budget | $115,395 | $3.62 |
| **CBRE Estimate** | **$340,563** | **$10.68** |
| Compiled by CBRE | | |

Our pro forma estimate is substantially higher than the 2009 budgeted amount and reflects: 1) the fact that we have not included the significant bad debt expense that was shown in the 2009 budget; 2) the lower pro forma real estate taxes as compared to the budgeted real estate taxes; and 3) the lower pro forma security expense as compared to the budgeted security expense.

Exhibit 3 Page 000043

© 2009 CB Richard Ellis, Inc.

## *Capitalization Rate Conclusion*

The following chart summarizes the OAR conclusions.

| OVERALL CAPITALIZATION RATE - CONCLUSION | |
|---|---|
| Source | Indicated OAR |
| **CBRE Estimate** | 8.25% |
| Compiled by: CBRE | |

In concluding an overall capitalization rate for the subject, primary reliance has been placed upon the data obtained from the comparable sales, the OAR sales, and interviews with active market participants. This data tends to provide the most accurate depiction of both buyer's and seller's expectations within the market and the ranges indicated are relatively tight. Further secondary support for our conclusion is noted via the Korpacz Real Estate Investor Survey. Considering the data presented, the concluded overall capitalization rate appears to be well supported in the local market.

## *Lease-up Discount*

The following chart summarizes the estimated lease-up costs related to the lease-up of the currently available subject units. The lease-up costs have been subtracted from the "stabilized" value indication provided by the direct capitalization analysis to arrive at the "as is" estimate of value.

Exhibit 3 Page 000044

© 2009 CB Richard Ellis, Inc.

## RECONCILIATION OF VALUE

The value indications from the approaches to value are summarized as follows:

| SUMMARY OF VALUE CONCLUSIONS | | |
|---|---|---|
| | As Is on April 20, 2009 | As Stabilized on November 1, 2009 |
| Cost Approach | $4,090,000 | $4,130,000 |
| Sales Comparison Approach | $4,110,000 | $4,140,000 |
| Income Capitalization Approach | $4,090,000 | $4,130,000 |
| Reconciled Value | $4,090,000 | $4,130,000 |
| Compiled by CBRE | | |

The cost approach typically gives a reliable value indication when there is strong support for the replacement cost estimate and when there is minimal depreciation.  Considering the limited amount of physical and/or functional depreciation present in the property, the reliability of the cost approach is considered to be good.  Therefore, the cost approach is considered equally applicable to the subject.

In the sales comparison approach, the subject is compared to similar properties that have been sold recently or for which listing prices or offers are known.  The sales used in this analysis are considered to be generally comparable to the subject, and the required adjustments were based on reasonable rationale.  In addition, market participants are currently analyzing purchase prices on investment properties as they relate to available substitutes in the market.  Therefore, the sales comparison approach is considered to provide a reliable value indication, but has been given secondary emphasis in the final value reconciliation.

The income capitalization approach is applicable to the subject since it is an income producing property leased in the open market.  Market participants are primarily analyzing properties based on their income generating capability.  Therefore, the income capitalization approach is considered a reasonable and substantiated value indicator and has been given primary emphasis in the final value estimate.

Based on the foregoing, the market value of the subject has been concluded as follows:

| MARKET VALUE CONCLUSION | | | |
|---|---|---|---|
| Appraisal Premise | Interest Appraised | Date of Value | Value Conclusion |
| As Is | Leased Fee Interest | April 20, 2009 | $4,090,000 |
| As Stabilized | Leased Fee Interest | November 1, 2009 | $4,130,000 |
| Compiled by CBRE | | | |

Exhibit 3 Page 000045

© 2009 CB Richard Ellis, Inc.

**RENT ROLL**
**2640 E Washington Produce**
**April 2, 2009**

| Unit | Name | Square Ft. | CAM Charges | Rent | Price per SF | Start Date | End Date |
|------|------|-----------|-------------|------|-------------|-----------|----------|
| 1 | R.T. Herbs | 1,668 | Gross | 2,100.00 | 1.26 | 2/1/2008 | m-to-m |
| 2 | CF Produce | 944 | Gross | 1,650.00 | 1.75 | 5/1/2008 | m-to-m |
| 3 | CF Produce | 944 | Gross | 1,650.00 | 1.75 | 5/1/2008 | m-to-m |
| 4 | Universal Select Produce | 944 | Gross | 1,758.75 | 1.86 | 10/1/2007 | m-to-m |
| 5 | Universal Select Produce | 944 | Gross | 1,758.75 | 1.86 | 10/1/2007 | m-to-m |
| 6 | Vacant | 944 | Gross | 0.00 | 0.00 | | |
| 7 | Vacant | 944 | Gross | 0.00 | 0.00 | | |
| 8 | Saiya Products | 944 | Gross | 1,750.00 | 1.85 | 10/1/2008 | m-to-m |
| 9 | Richard Acosta | 944 | Gross | 1,750.00 | 1.85 | 2/1/2009 | m-to-m |
| 10 | Vacant | 944 | Gross | 0.00 | 0.00 | | |
| 11 | Jose Luis Flores | 944 | Gross | 1,837.50 | 1.95 | 1/13/2008 | m-to-m |
| 12 | FJ Produce | 944 | Gross | 1,837.50 | 1.95 | 1/13/2008 | m-to-m |
| 13 | Vacant | 944 | Gross | 0.00 | 0.00 | | |
| 14 | Vacant | 944 | Gross | 0.00 | 0.00 | | |
| 15 | MJE Produce | 944 | Gross | 1,750.00 | 1.85 | 7/1/2008 | m-to-m |
| 16 | Vacant | 944 | Gross | 0.00 | 0.00 | | |
| 17 | Zam Zam Trading | 944 | Gross | 1,837.50 | 1.95 | 11/1/2007 | m-to-m |
| 18 | OB Produce | 944 | Gross | 1,837.50 | 1.95 | 10/1/2008 | m-to-m |
| 19 | A & A Produce | 944 | Gross | 1,750.00 | 1.85 | 10/1/2008 | m-to-m |
| 20 | Richard Cordoba | 944 | Gross | 1,837.50 | 1.95 | 10/1/2007 | m-to-m |
| 21 | T.S Kai Enterprises | 944 | Gross | 1,750.00 | 1.85 | 8/1/2006 | m-to-m |
| 22 | Vacant | 944 | Gross | 0.00 | 0.00 | | |
| 23 | Barajas Produce | 944 | Gross | 1,837.50 | 1.95 | 11/1/2007 | m-to-m |
| 24 | Arturo Elizondo | 944 | Gross | 1,837.50 | 1.95 | 7/1/2007 | m-to-m |
| 25 | Green Valley Vegetables | 944 | Gross | 1,500.00 | 1.59 | 1/1/2008 | m-to-m |
| 26 | Green Valley Vegetables | 944 | Gross | 1,500.00 | 1.59 | 1/1/2008 | m-to-m |
| 27 | Green Valley Vegetables | 944 | Gross | 1,500.00 | 1.59 | 1/1/2008 | m-to-m |
| 28 | Green Valley Vegetables | 944 | Gross | 1,500.00 | 1.59 | 1/1/2008 | m-to-m |
| 29 | Evergreen Valley Distributors | 944 | Gross | 1,500.00 | 1.59 | 1/1/2009 | m-to-m |
| 30 | Green Valley Vegetables | 944 | Gross | 1,500.00 | 1.59 | 1/1/2008 | m-to-m |
| 31 | Green Valley Vegetables | 944 | Gross | 1,500.00 | 1.59 | 1/1/2008 | m-to-m |
| 32 | Bryan's Distributor * | 944 | Gross | 1,650.00 | 0.00 | 5/1/2009 | m-to-m |
| 33 | Bryan's Distributor * | 944 | Gross | 1,650.00 | 1.75 | 5/1/2009 | m-to-m |
| | **Total:** | 31,876 | | $ 44,330.00 | | | |

\* New leases commencing on 5/1/09

© 2009 CB Richard Ellis, Inc.

Exhibit 3 Page 000046

Prepared For:
Prepared By:
Property ID: 11(2640)
Property RSF: 31,876
Cost Center(s) RSF: 31,876

Software: Kardin Budget System
Version: 27.08
File: 11FOR09.RFC
Date: 3/25/2009
Page: 1 of 1

# Meruelo Maddux Properties, Inc.

## Washington Produce Market (2640 E Washington)
## 2009 Monthly Reforecast Summary

| | Jan-09 | Feb-09 | Mar-09 | Apr-09 | May-09 | Jun-09 | Jul-09 | Aug-09 | Sep-09 | Oct-09 | Nov-09 | Dec-09 | Total | $/RSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | Reforecast | | |
| **Income** | | | | | | | | | | | | | | |
| Rental Income | 40,576 | 42,076 | 43,576 | 49,576 | 51,326 | 53,076 | 59,076 | 59,076 | 59,076 | 59,076 | 59,076 | 59,076 | 634,662 | 19.91 |
| Parking Income | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 900 | 10,800 | 0.34 |
| Total Income | 41,476 | 42,976 | 44,476 | 50,476 | 52,226 | 53,976 | 59,976 | 59,976 | 59,976 | 59,976 | 59,976 | 59,976 | 645,462 | 20.25 |
| **Operating Expenses - Unrecoverable** | | | | | | | | | | | | | | |
| Management Fees | 3,895 | 3,895 | 3,865 | 3,865 | 3,865 | 3,865 | 3,865 | 3,865 | 3,865 | 3,865 | 3,865 | 3,865 | 46,380 | 1.46 |
| General Building | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 | 0.09 |
| Repair and Maintenance | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 6,700 | 80,400 | 2.52 |
| Security | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 11,952 | 143,424 | 4.50 |
| Utilities | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 2,305 | 27,660 | 0.87 |
| Property Tax | 0 | 0 | 0 | 55,302 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 56,406 | 111,708 | 3.50 |
| Insurance | 480 | 480 | 480 | 485 | 485 | 485 | 485 | 485 | 485 | 485 | 485 | 485 | 5,805 | 0.18 |
| Bad Debt | 6,098 | 6,311 | 6,536 | 7,436 | 7,699 | 7,991 | 8,861 | 8,861 | 8,861 | 8,861 | 8,861 | 8,861 | 85,199 | 2.80 |
| Professional Fees | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,000 | 0.09 |
| Income Tax | 0 | 0 | 0 | 3,300 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,300 | 0.10 |
| Administrative | 877 | 1,384 | 700 | 1,010 | 700 | 700 | 1,010 | 700 | 700 | 1,010 | 700 | 700 | 10,191 | 0.32 |
| Total Operating Expenses - Unrecoverable | 32,768 | 33,497 | 33,038 | 92,855 | 34,209 | 34,498 | 35,678 | 35,388 | 35,388 | 35,878 | 35,388 | 91,774 | 630,067 | 16.63 |
| Net Operating Income | 8,711 | 9,479 | 11,438 | -42,379 | 18,020 | 19,508 | 35,076 | 24,608 | 24,608 | 24,298 | 24,608 | -31,798 | 115,385 | 3.62 |
| **Debt Service** | | | | | | | | | | | | | | |
| Interest | 41,794 | 37,712 | 41,685 | 40,295 | 41,686 | 40,202 | 41,469 | 41,444 | 40,064 | 41,346 | 39,067 | 41,245 | 488,829 | 15.34 |
| Total Debt Service | 41,794 | 37,712 | 41,685 | 40,295 | 41,686 | 40,202 | 41,469 | 41,444 | 40,064 | 41,346 | 39,067 | 41,245 | 488,829 | 15.34 |
| Cash Flow after Debt Service | -33,083 | -28,233 | -30,247 | -82,674 | -23,666 | -20,694 | -17,191 | -16,836 | -15,456 | -17,048 | -15,359 | -73,043 | -373,434 | -11.72 |

EXHIBIT 11-h

Exhibit 3 Page 000047

© 2009 CB Richard Ellis, Inc.

**Operating Income Statement**
**2640 E Washington Blvd, LLC (2640)**
**January 1, 2008 - December 31, 2008**

|  | Period to Date | % |
|---|---|---|
| **INCOME** | | |
| Rent Income | 492,666.17 | 99.06% |
| Parking Income | 4,650.00 | 0.94% |
| TOTAL INCOME | 497,316.17 | 100.00% |
| | | |
| **PROPERTY OPERATING EXPENSES** | | |
| Administrative | 13,743.72 | 2.76% |
| Bad Debt Expense | 44,655.00 | 8.98% |
| General Building | 58,500.00 (1) | 11.76% |
| Janitorial | 580.12 | 0.12% |
| Late Fee Expense | 8,136.13 | 1.64% |
| Property Insurance | 6,330.78 | 1.27% |
| Property Taxes | 107,610.05 | 21.64% |
| Repairs and Maintenance | 29,524.55 | 5.94% |
| Security | 170,250.63 | 34.23% |
| Utilities | 10,639.43 | 2.14% |
| TOTAL EXPENSES | 449,970.41 (2) | 90.48% |
| | | |
| NET INCOME | 47,345.76 | 9.52% |

(1) Excludes Direct Corporate Management Expense

(2) Does not include depreciation, amortization and debt service

Exhibit 3 Page 000048

© 2009 CB Richard Ellis, Inc.

1 our company has appraised in the -- and one of my associates

2 has appraised the Seventh Street Produce Market in Alameda

3 Square.

4          MR. MARTIN:  Do you want to voir dire?

5          MR. BINGHAM:  I have no voir dire, your Honor.

6 BY MR. MARTIN:

7 Q    Okay.  Mr. Hirose, what principles and methods did you

8 apply -- well, first of all, let's back up here a second.

9 Would you identify Exhibit 24, please?

10 A    Exhibit 24 in front of me is an appraisal.  It says

11 "Washington Produce Center, Summary Appraisal Report"

12 prepared for Mr. Curtis Jung, Esquire, counsel for United

13 Commercial Bank.

14 Q    Did you prepare Exhibit 24?

15 A    Yes.

16 Q    Did you sign Exhibit 24?

17 A    Yes.

18 Q    And what is Exhibit 24?

19 A    Exhibit 24 is an appraisal that I completed on the

20 subject property.

21 Q    What is the subject property?

22 A    The subject property is 2640 East Washington Boulevard,

23 which is a multi-tenant produce distribution center.

24 Q    In conducting this appraisal, what principles and

25 methods, procedures and standards did you apply?

1 A    In terms of procedures, the appraisal procedures are

2 noted in our appraisal methodology section.  First we

3 identified the property.  And by identifying the property,

4 we relied on building plans and rent roles and property

5 surveys.

6    We conducted a physical inspection of the property, and

7 that physical inspection of the property was conducted on

8 April 20th.  My associate, David Isola (phonetic), and I

9 toured the property that day and were met with a

10 representative of MMPI, Joquin Medrano, and we physically

11 walked the property and interviewed the tenants, each of the

12 available tenants in the property also.

13    We -- during our property inspection, we had a copy of

14 a rent role, and in the rent role or looking at the rent

15 role, we asked the individual tenants that were available to

16 verify if they were paying the rent listed in the rent role,

17 and everything checked out.

18 Q    Is a copy of that attached to your appraisal?

19 A    We -- the rent role is in our appraisal files.  We have

20 a reconstructed rent role in the income capitalization

21 approach based upon updating the rent role that was given to

22 us by MMPI.

23 Q    I direct your attention to Addendum E, operating data.

24 Is that what you're referring to?

25 A    That is correct.  That's the original rent role that we

1 had.

2 Q    And that's the rent role as of April 2nd, 2009?

3 A    That is correct.

4 Q    Okay.  Now, you also have other documents attached as

5 -- to Addendum E.  What are those documents?

6 A    We have -- after the rent role, we have -- it's listed

7 as Exhibit 11h here which is the Washington Produce Center

8 2009 monthly reforecast summary which essentially is an

9 operating summary for the property, and then thereafter

10 there is an operating statement reflecting operations for

11 2008.

12 Q    And this is the -- these are -- this is the operating

13 income upon which you relied and your appraisal?

14 A    What we did is basically we looked at this operating

15 income, and we made adjustments to it based upon where we

16 thought market rent should be on the vacant spaces, and also

17 we took a look at the specific expense categories in the

18 property to see if those expenses were out of line with

19 where we thought appropriate expense rates would be.

20 Q    What income rate did you use?

21 A    Mr. Martin, can you -- when you say --

22 Q    What monthly average income rate did you use in

23 computing the income for your appraisal?

24 A    In terms of are you talking about market rent?

25 Q    No.  The rent -- well, the rent that you utilized in

1  determining your value.

2  A    Well, if you refer to page 95 in the appraisal, we have

3  a rent role analysis, and the rent role analysis indicates

4  the occupied income or the occupied tenants in place, and

5  they were averaging $1.76 per square foot per month, and

6  then there were vacant units, and we applied a market rent

7  estimate of $1.85 a square foot per month on the vacant

8  units.  The total rent that we utilized in our income

9  capitalization approach which is shown on page 114 was

10  $678,000 or 2129 on an annual basis.

11  Q    So the -- the market rent that you applied to the

12  unoccupied -- first of all, what percentage was unoccupied

13  at the time that you did your appraisal?

14  A    At the time we did our appraisal, the property was 82.2

15  percent leased.

16  Q    So you applied your $1.85 per square foot to the 18

17  percent or so that was unoccupied in arriving at your

18  projected income?

19  A    That is correct.

20  Q    Okay.  Let's back up a second and I'll come back to

21  that.  My actual question before was what principal methods,

22  procedures did you apply.  Could you describe the appraisal

23  procedures that you as an appraiser are required to follow

24  in making an appraisal?

25  A    Yes.  Well, first off, in terms of -- in starting the

1 appraisal again, it's an identification of the property, and

2 part of that identification is giving an overview of the

3 general area of where this property is located, on a Los

4 Angeles County basis and then closer in on a neighborhood

5 basis.

6 We also -- what we also discussed was a -- starting on

7 page 26 is a market analysis of where the industrial market

8 was and the conditions of the industrial market as of the

9 date of our -- date of the appraisal. And in this section

10 investment market conditions are discussed, and there are

11 projections on -- in terms of from our Total Wheaton

12 Research Group on where they think general industrial rents

13 are headed, and it was noted that in 2009 and 2010 and 2011

14 and 2012 that rents were headed down, and this is for

15 general industrial rents, and I would not categorize that --

16 and when I say general industrial rents, that's non-cold

17 storage food processing.

18 Then within this market analysis, a discussion over the

19 produce industry is made and we conclude to a overall

20 vacancy rate that would be representative of the property

21 based upon where we saw the industrial market at that time.

22 And, moving along in the appraisal process, we describe

23 the subject site in the site description section beginning

24 on page 52 of the report. Going over the site features,

25 this property is a 2.71 acre site. It's kind of pie shaped.

1  The building is located to the back of the property.

2  Starting on page 57 the improvements are discussed.  The net

3  rentable area is 31,876 square feet.  The property is broken

4  up into 33 produce distribution units.  Each unit has a

5  ground level door.  Then the unit has a cooler -- cold

6  storage area.  It has acrylic walls that can be washable and

7  cleaned, and there's drains from the cold storage area where

8  water runoff can go into.

9         The -- there are bathrooms that are situated in the

10  yard area.  There is security on site, and, you know, there

11  are gates in front of the property along Washington

12  Boulevard.

13         Continuing on in our analysis, we describe the zoning

14  on the property, which is M3.1.  We go over the property

15  taxes starting on page 65, and then starting on page 67, we

16  go over the highest and best use of the property, and in the

17  highest and best use, we determined that the existing use is

18  the highest and best use at this point in time.  However, as

19  vacant today in this marketplace, this development would not

20  be constructed, and the reason it wouldn't be constructed is

21  due to the current conditions in the marketplace, lack of

22  financing, and the increase in overall rates in the

23  marketplace where it's caused severe declines in real

24  estate.

25  Q    I think, again, I'd like to go back to where I started.

1  I wanted to finish the section on the articulation of what

2  principles, methods, and standards that you applied, and

3  then we will apply those principles, methods, and standards

4  to the data which you've started to summarize.

5      And I'm referring to, for instance, appraisal

6  standards, FIRREA, statutory standards, regulatory

7  standards.

8  A    Okay.  Now I understand.

9  Q    Could you describe what -- the origin of the rules

10 under which you operate?

11 A    Well, the rules that appraisers operate, and especially

12 when we're doing appraisals for banks, we first have to

13 appraise according to the financial -- called FIRREA,

14 Financial Institute Reform Recovery and Enforcement Act of

15 1989.  Also we are required to follow the Uniform Standards

16 of Professional Appraisal Practice which is called USPAP.

17 Within the appraisal industry, there is a designation called

18 the Member of the Appraisal Institute, and the Appraisal

19 Institute has real estate guidelines, professional

20 guidelines on ethics and standards that an appraiser has to

21 follow.  And basically, these regulations are -- were put in

22 place to provide or to guide an appraiser to be a score

23 keeper, to not advocate the position on a property for a

24 property owner or for a lender.

25 Q    Also what do these standards, principles, and methods

1   say about what factors you should use in appraising a

2   property?

3   A    The standards basically say that -- you know, when you

4   appraise a property, that you would employ techniques that

5   would be most applicable to that in terms of valuation

6   techniques, and when you look at a property such as this,

7   you're going to have to ask yourself, well, typically

8   there's three approaches to value, and which methods of

9   valuation would an appraiser employ.

10       And so in this instance --

11  Q    But would you just summarize those factors and then

12  we'll apply them to the Debtor.

13  A    Okay.  When you say summarize the factors, in terms of

14  the actual appraisal methodologies?

15  Q    Yeah, costs, sales.

16  A    Okay.  Summarize those?

17  Q    Right.

18  A    Okay.  Well, typically in the appraisal report, when

19  you open it up, the first approach is the cost approach, and

20  that's the replacement cost of the property less

21  depreciation plus the land value, and that is applicable

22  when you have a -- typically applicable when you have a

23  relatively new property that's been put into service and

24  when there's relatively minimal depreciation.

25       The -- I would say the second approach is called the

1 sales comparison approach.  Sales comparison approach

2 basically is you're looking at sales in the marketplace of

3 comparable properties, and in residential housing it's

4 typically you look at, you know, houses that sold right next

5 to one another.  For larger properties like this that are

6 specialized, you typically have to have a wider range of

7 area that you have to take a look at, and there's a wider

8 property type to look at.

9      This property, 2640 Washington Boulevard, is unique in

10 that it's a newer multi-tenant produce distribution product.

11 To have 33 units divided into a rentable area of 31,876

12 square feet is -- it's a new product that's been built in

13 the marketplace.

14 Q    And are there other factors?

15 A    Yes.  The income capitalization approach is a approach

16 where an appraiser looks at the income producing potential

17 of a property, and in the case of 2640 Washington, this is

18 an income producing property and one in which an appraiser

19 would examine the income stream in place and look at the

20 potential for the property if it has vacant units to lease

21 up those vacant units and to obtain market rent on the

22 vacant space.  Also in this approach, an appraiser has to do

23 a thorough examination of the operating expenses in place to

24 see if those expenses are high or low, and the appraiser is

25 going to have to take a look at all the data that's out

1  there from the operator and reconstruct an operating

2  statement for the property.

3      And as part of the valuation of -- in this approach,

4  one of the key things is selecting the -- what is called the

5  overall capitalization rate or cap rate to value that income

6  stream, and that's typically based on looking at investment

7  sales in the marketplace that have occurred, and those

8  investment sales are typically where you have leases in

9  place, where the buyer of the property is buying it based

10 upon the income producing potential of that property.

11 Q    I think you've summarized the principles and methods

12 very well.

13 A    There's one -- Mr. Martin, there's one other thing.

14 Q    Yes.

15 A    Is that we have all these appraisal procedures here,

16 and so --

17      MR. BINGHAM:  Objection, your Honor.  There's no

18 question pending.  The witness is volunteering information.

19      THE COURT:  Sustained.

20      MR. MARTIN:  I think he's completing the answer to

21 the question I interrupted him.  The original question was

22 would you describe the principles, methods, and procedures

23 that you utilized in making an appraisal.  I thought he was

24 done.  Apparently he wasn't.  He can continue.

25      THE COURT:  You can ask if it's part of his

1  answer.

2  BY MR. MARTIN:

3  Q    Okay.  Do you have anything further to add with regard

4  to what principles, methods, and procedures you employed in

5  your appraisal?

6  A    Yes, I do, and this is -- it's good to come up with

7  values for a cost approach, a sales comparison approach, and

8  an income capitalization approach, but you have to look at

9  all three of those approaches at the end when you complete

10 these approaches and come up with a reconciled value for the

11 property.  You just can't do three approaches and let it

12 stand there.  There's a reconciliation process that needs to

13 be completed in order to come up with the final value for

14 the property.

15 Q    Okay.  Let's -- you started getting into cap rate.  So

16 let's talk about that.  Would you -- first question is in

17 determining cap rate, do you distinguish in using

18 comparables between whether the comparables were -- involved

19 owner users or owner investors?

20 A    A distinction is made between owner users and

21 investors.  In the appraisal report that I completed, we

22 looked at investment sales of properties in the marketplace

23 here true investors, buyers of real estate bought the

24 property based upon the income producing potential of that

25 particular property.

1   There are some situations where I've seen in
2  documentation where you might have an owner user who's
3  leasing the property buy it and then an appraiser will go
4  out and say, well, he was leasing it for this and all of a
5  sudden he bought it and that's a cap rate.  Well, to me
6  that's not an investment sale.  That's an owner user
7  purchase because that property owner is buying it for his
8  own use, and he's applying it not for the income producing
9  potential of the property, he's buying it for his own use.
10 He didn't rely upon that income.
11 Q    Are you aware of any sales by the -- any of the Debtors
12 to investor owners?
13 A    I don't understand your question.  You're saying --
14 Q    Are you aware of any sales that any of the Debtors have
15 conducted recently of properties to buyers who were owner
16 investors?
17 A    Owner -- Mr. Martin, I'm getting --
18 Q    Owner investor rather than owner user.
19 A    Okay.  Well, I'm getting confused with your language
20 here.
21 Q    Okay.
22 A    Because an investor to me is an investor.  An owner is
23 an owner.  So could you -- I want to be clear on what you're
24 saying here.
25 Q    Okay.  An owner investor is a person who buys it to

1 rent it out to somebody else. An owner user is someone who

2 buys it to use himself, conduct his business out of it.

3 A    Understood. Okay. So you're asking me am I aware of

4 any sales of property that MMPI has done to -- or that has

5 sold to an investor?

6 Q    Yes.

7 A    Recently, within this year, no, but I am familiar with

8 the property that they sold on San Fernando Road, the FedEx

9 facility.

10 Q    What was the cap rate on that transaction?

11 A    The FedEx facility was a sale that occurred in I want

12 to say August 2008. It was about 120,000 square feet, and

13 the property sale price was $35,000,000, a little bit under

14 $300 a square foot. The cap rate that we have in our

15 database is 7.9 percent. The property was marketed by

16 Kushman and Wakefield, a competitor of CB Richard Ellis.

17 Q    Is that 7.9 percent typical for the cap rate for

18 property -- industrial property which is sold to a person

19 for investment as distinguished from use?

20 A    At that point in time, I would say that cap rate was an

21 -- or that cap rate was appropriate for an investor. Now,

22 you have to examine that sale because you have a lease with

23 FedEx. It had about 6.8 years remaining on its term. FedEx

24 is a credit tenant. There was also above market rent in

25 place.

1    So the investor who bought it, you know, evaluated all

2 that and looked at returns on other investments and thought

3 it was appropriate and proceeded.

4 Q    Could you describe your procedure in applying your cost

5 factor in this appraisal?

6 A    You are referring to the cost approach, Mr. Martin?

7 Q    Yes.

8 A    Starting on page 75, the first portion of the cost

9 approach is to look at the placement cost of the subject

10 property, and what we did is we looked at the -- we utilized

11 the Marshal Valuation Service, and on page 76 is a chart

12 which represents the replacement cost of the subject

13 property before entrepreneurial profit.

14    Page 78 there is a cost approach conclusion that lists

15 direct and indirect building costs, and then we have

16 entrepreneurial profit of 15 percent, for a total

17 replacement cost new of $5,854,650.  And as part of the cost

18 approach we then analyze the depreciation on the property.

19 There is -- since this property was built in 2006, there is

20 some physical deterioration, relatively minor.  However,

21 this property is being affected by factors outside of it,

22 and what it is called is called external obsolescence, and

23 the external obsolescence affecting this property right now

24 is essentially the current -- is caused -- is caused by the

25 current non-availability of funds for real estate

1 transactions, and this whole external obsolescence

2 calculation is indicating that today this property would not

3 be built in this marketplace because the current rents for

4 this property and based upon the existing income in place on

5 this property are not enough to justify it being built

6 because the construction costs that would -- that would be

7 incurred to do this would be too high.

8     Now, in calculating external obsolescence here, we did

9 a simplified approach in which we looked at the replacement

10 cost new and we applied -- we figured out a cost feasible

11 NOI, and that calculation is shown above this chart here.

12     Now, there are various appraisal methodologies in this

13 marketplace where you can break out different components and

14 figure out a rate of return on the land and a rate of return

15 on the building and come up with an external obsolescence

16 value this way. This is a simplified methodology. This

17 external obsolescence calculation that you see here is

18 happening in a majority of the real estate appraisals that

19 I'm completing right now for major financial institutions,

20 and they -- it pertains to properties typically that have

21 been built within I would say the last two to three years.

22 These properties were built at the height of the real estate

23 market, when values were peaking.

24 Q   The term "external obsolescence" is -- well, first of

25 all, could you go through at the top of page 78 and explain

1  to the Court how you apply the cap rate and what you apply

2  it to and how you arrived at your cap rate value?

3  A    Okay.  Are you referring to on page 78 here or the cap

4  rate and the income capitalization approach, Mr. Martin?

5  Q    Actually, I'm sorry.  I misspoke, because you have a

6  cap rate at the top of 78.

7      Would you explain what the concept, external

8  obsolescence, is?  Is it in any way related to market value?

9  A    Yes, it is, because it -- another way of looking at

10 external obsolescence here is if we did not include this

11 calculation here and we only subtracted out the replacement

12 cost less curable physical deterioration, the -- the

13 depreciated replacement cost new before the addition of land

14 value would have been $5,737,557.  Adding the land value of

15 $3,550, the value would have been $9,287,557.

16 Q    Where do those figures appear?

17 A    I just manually calculated, but what this -- what this

18 is showing right now in this marketplace right now is that

19 you're not going to get $9,287,557 in this marketplace based

20 upon what we calculated in the income capitalization

21 approach.

22     In the income capitalization approach, this property is

23 only generating rent an enough net operating income to

24 support a value on a stabilized basis of $4,190,000 -- or

25 yeah, $4,190,000.

Q    Again, going back to this term "external obsolescence,"
because that sounds very technical, does it essentially mean
that in this marketplace properties are being sold at less
than cost?

A    Yes, it does.

Q    Do you have any recent examples of such sales?

A    Our company was just involved in the sale of two
properties.  These transactions recently closed in June
15th, 2009.  They were listed in January 2009.  The first
property is called the Garfield Business Center.  It's
located in the City of Commerce.  It's 554,299 square feet.
The property sold -- the seller was Prudential.  The buyer
was Westcore.  The sale price was $30,000,000 or $55.02 per
square foot.

      Prudential in July 2006 had originally acquired this
property for around $56,000,000.  If you look at the change
in price, that's a 46 percent decrease in value from their
acquisition price.  When Prudential bought this, this was
part of a portfolio real estate transaction.

      In conjunction with this sale, Prudential also sold a
two-building complex in Buena Park which was a cold storage
facility.  One had a produce distributor in it.  It consists
of two buildings built in 1968 and 1993.  Total square
footage was approximately 224,600 square feet.  Prudential
sold this property to Westcore.  Sale price was $17,320,000,

1  $77 per square foot approximately.

2      Now, taking a look at these transactions, I think it's

3  important to look at that these properties were investment

4  properties.  They were bought by a sophisticated all cash

5  buyer.  The properties were marketed by CBRE, and each

6  property had 10 or 11 offers to purchase.  The first

7  property, the Garfield Business Center, had a first year

8  going in cap rate of 9.61 percent.  The second property, the

9  Buena Park Commerce Center, which was -- had cold storage

10 units in it, had a first year overall rate of 13.31 percent.

11     I've reviewed a bid list for each property indicating

12 where the offers came from that were competing for these

13 properties, and they are local and national real estate

14 investors, and to give you an example of the bidding

15 process, the Garfield Business Center in particular had 11

16 offers.  The 11 offers range from about $27 million or $27.3

17 million to $31.4 million.  The overall rates range from

18 about 10 percent to 11.5 percent.

19     The Buena Park Commerce Center had about the same

20 number of bidders, and the offers ranged from $16,850,000 to

21 $18,000,000.  The final buyer -- the property went into

22 escrow at $18,000,000, and the final price was $17,320,000.

23 There was some types of issues with the mechanical --

24 mechanical problems with the refrigeration, and that was a

25 price reduction.

1    But the going in cap rates that investors were looking

2   at for this purchase were in the range of 13 to 14.7

3   percent.

4   Q    Did you continue the discount from cost for the Buena

5   Park produce distribution building?

6   A    No.  In terms of when you say discount from cost, from

7   the replacement cost?

8   Q    Well, for the first one you indicated that Prudential

9   sold for a discount from its cost.  Did you compute a

10  similar comparison for Buena Park?

11  A    Mr. Martin, we're in the process of trying to verify

12  that.  That property was also acquired by Prudential in and

13  around 2006 as part of the Overton Moore purchase of a

14  number of properties, and I'm trying to find that out.  I do

15  not have that at this point in time.

16  Q    All right.  Would you -- would you explain to the Court

17  how the cap rate analysis -- how you determined value and

18  cap rate?  What is -- what do you do with the cap rate and

19  what do you apply it to and how do you arrive at a value?

20  A    Okay.  Well, first off, in terms of our -- the analysis

21  that was completed in this appraisal report, we first -- the

22  best way to -- or the -- to determine a cap rate is based

23  upon market sales in the competitive marketplace.  So

24  starting in our sales comparison approach on page 80, we

25  list five properties here, one of which is a listing, and

1 the first property is called the Quantum Foods property, and

2 at the time of our -- at the time of the appraisal, the

3 property was listed at a cap rate of 7.74, and the cap rate

4 is essentially the net operating income over the sales

5 price.  So when we see that 7.74 percent overall rate here,

6 that's based upon the listing price of $12,950,000.  If you

7 look at the sales in this chart, we have four sales of

8 properties that sold to investors.  Sale one is a multi-

9 tenant industrial park in Downey.  It is not a cold storage

10 multi-tenant property.

11     One of the difficulties that we had in appraising this

12 property is that there were no sales of multi-tenant cold

13 storage properties in small units the size of the subject

14 property that were cooler units.  However, if you look at

15 sale number three, 6100 Sheila is a 1958, 72,236 square foot

16 industrial property.  That was a multi-tenant property, had

17 cold storage in it but not -- it was predominantly freezer

18 units.  I have personally appraised that property on

19 numerous times.  That property was part of a portfolio

20 acquisition by Guardian Life Insurance.

21     Sale four is a single-tenant industrial building that

22 has freezer space in it.  It's located in the City of

23 Industry.  It has about approximately 60 percent cold

24 storage space, 28 foot clear height.  That sale occurred in

25 December 2008, and the indicated overall rate was 7.61

1  percent.

2      In sale five is another smaller multi-tenant property.

3  It's non-cold storage, does not have produce distribution

4  units in it, and the overall rate on that sale was seven

5  percent.  That sale occurred in July 2008 when market

6  conditions were better.

7      Now, someone's going to ask why did we use non --

8  buildings that didn't have cold storage space.  The reason

9  is that there was just a limited amount of sales.  It's

10  important in this kind of analysis to use what's out there,

11  and using the Downey sales, which were multi-tenant

12  properties with smaller, multi-tenant space gives an

13  indication of where investors would pay for smaller type

14  properties.

15      Now, in addition to these sales, there were two

16  additional overall rate sales that we looked at in the

17  marketplace that are found on page -- or I stand corrected.

18  We have a survey of additional overall rate sales in the

19  marketplace starting on page 111.

20      We have two listings of properties, one on Valley

21  Boulevard, an older property, multi-tenant, and that's at an

22  overall rate of --

23  Q    Excuse me.  I'm looking at page 111, and I don't see --

24  I don't see a listing.

25  A    I have it.  The document that I have shows OAR sales

1  chart.

2  Q    No, it's not 111.

3  A    Okay.  Well, all right, 110 then.  The first property

4  is located on Valley Boulevard.  It's multi-tenant property.

5  It's a listing rate of 8.26 percent.  The second property is

6  a listing that has some cold storage space in it.  The

7  overall rate -- it's a listing overall rate of 7.5 percent.

8  2650 East Long Beach Avenue in Los Angeles is a cold storage

9  property that CBRE sold.  It has both cooler space and

10 freezer spacer in it.  It was bought by an entity of Lowe

11 Development at 7.68.  This transaction had been under

12 contract in the summer of 2008, and the transaction closed

13 right when the market was collapsing, and then 130 South

14 Myers Street is a 51,100 square foot produce facility,

15 produce distribution.  Price per square foot was $170.25 per

16 square foot.  This was a short term lease back.

17 Q    Okay.  Cranking all this data into your analysis, what

18 did you arrive at as the cap rate for 2640 Washington?

19 A    Eight point two five percent.

20 Q    And in computing the value arithmetically, what did you

21 do with that 8.25 percent in order to compute your appraised

22 value?

23 A    Okay.  Mr. Martin, I don't understand your question.

24 Can you say what -- what do you mean by what did I do?

25 Q    From the standpoint of arithmetic, what did you

1  multiply or divide in order to arrive at your value using

2  the 8.25 percent?

3  A    On page 114, what was done was the net operating income

4  of $340,063, was divided into the capitalization rate of

5  8.25 percent.  And that resulted in a value of $4,130,000 on

6  a stabilized basis.

7  Q    In arriving at your cap rate, did you use as

8  comparables any properties that were sold to owner users or

9  owner manufacturer type of buyers?

10  A    No.

11  Q    Why not?

12  A    Those are not applicable.

13  Q    Could you explain why they're not?

14  A    The reason is is that this is an income-producing

15  property.  It's my judgment that the buyer of this property

16  would buy the property based upon its income producing

17  potential.  This is not -- this property is not suitable for

18  an owner user.  It's demised into 33 produce distribution

19  units with tenants running it.

20       I have also discussed this with active industrial

21  brokers in the marketplace and actually the contractor of

22  the project, and I asked the contractor of the project would

23  this property be suitable for an owner user to occupy, and

24  he said it was most likely not feasible.

25  Q    Do you have pictures in your appraisal of 2640

1  Washington so the Court could get a visual impact what it

2  looks like?

3  A    Yes, I do, and I prepared exhibits which I had in my

4  box, but if you go to the original page ii in the appraisal,

5  there is an aerial photograph showing the subject property.

6  Page iii shows the front of the building on the first

7  photograph, and then there is a picture going -- or taken

8  westward showing the individual produce units.

9       The next page on four shows the interior of the unit as

10 you enter it from the ground level loading door, and then

11 the second photograph shows the cooler unit.

12      The remaining photographs show the signage along

13 Washington Boulevard, one of the common area restrooms, and

14 then the last page of photographs indicate the street views

15 in front of the subject property.

16 Q    Do you have a -- do you have a map in here that shows

17 how the units are split up?

18 A    Yes, I do.

19 Q    Overhead?

20 A    On page 57 of the appraisal report, there is a

21 improvement layout, and the improvement layout indicates how

22 the property is demised.  And looking at that improvement

23 layout, because of the number of units and the

24 configuration, it would be highly unlikely that an owner

25 user would purchase this property.

1  Q    Let's go back to Exhibit 23 in your maps of appraisals,
2  and the indication on the maps where 2640 East Washington
3  Boulevard is located.  Where is the main produce market for
4  Los Angeles on these maps?
5  A    Okay.  Going back to Exhibit 23 -- and this would be
6  page 10 -- if you look at this exhibit, you'll see the
7  subject property at the lower end of the map south of the 5
8  and 10 Freeways.  The main terminal markets are located
9  along Alameda and Seventh and Olympic.  There are two main
10 terminal markets.  You have the L.A. Wholesale Market, and
11 you have the Seventh Street Produce Market.  And around
12 Alameda and varying locations there are supporting, you
13 know, smaller produce distribution developments, but the
14 L.A. Wholesale Mart which was built in 1986 and the Seventh
15 Street Produce Market are the dominant terminal markets for
16 produce in Los Angeles.
17      The Wholesale Mart was built in 1986, about 528,000
18 square feet, has 22 foot clear height.  It's -- in
19 comparison to the Seventh Street Market, it's modern, has
20 more truck maneuvering space.  The Seventh Street Produce
21 Market is much older, built in 1917, has about 150,000, 280
22 square feet of space right now, and when you look at these
23 marts, you know, they're achieving much higher rent than the
24 subject property.  The Seventh Street Produce Market has
25 rents going up to four dollars a square foot on a gross

1  basis.

2      One interesting -- what's really interesting is across

3  from the L.A. Wholesale Mart, there's a very similar

4  property to our subject property.  It's called 788 Alameda

5  Street, and it is also was owned and developed by MMPI.

6      The unique thing about this produce market or the

7  terminal market areas is that there are synergies for --

8  that occur when you have all these produce distributors

9  located there.  If you go there in the morning, early in the

10 morning, like around 4:00 or 3:00 o'clock in the morning,

11 when the produce market opens, there is a flurry of activity

12 in between each one of those markets.  I saw in a recent

13 inspection of that -- of those properties hand carts and

14 forklifts moving from the L.A. Wholesale Market which is on

15 -- on the west side of Alameda to the 788 Alameda property.

16 And the reason for this is that a produce operator might

17 only have certain kinds of produce like tomatoes or lettuce,

18 but he needs onions, and the onions are located across the

19 street.  So he'll send his forklift or his hand truck guy

20 across the street to get that produce to bring it over.  And

21 that's what the advantage of this -- of the terminal mart

22 locations has over 2640 Washington, and because of that

23 there is a distinct rental differential that is being

24 achieved in the terminal markets versus 2640 Washington.

25 Q    Okay.  So based on your experience in the data that

1  you've collected and apply in your principles and procedures

2  to the data, what is your opinion as to the value of 2640

3  East Washington Boulevard, Los Angeles?

4  A     Mr. Martin, the opinion of value, our assignment was to

5  appraise the property on an as-is basis and on an as-

6  stabilized basis.  So on an as-is basis, as of April 20th,

7  2009, the date of our property inspection, the -- our

8  opinion or my opinion of value was $4,090,000.  We -- an

9  estimate was made to value the property on a stabilized

10 basis assuming that the property was to be leased up because

11 there was vacant space.  We estimated an approximate six-

12 month lease up period, and we came up with a value assuming

13 a stabilized occupancy of $4,130,000.

14 Q     And, once again, for that lease up of the unoccupied

15 approximately 20 percent at the time of your appraisal, what

16 monthly income per square foot figure did you use?

17 A     Are you referring to the market rent that we applied to

18 that?

19 Q     Yes.

20 A     It's $1.85 a square foot.

21          MR. MARTIN:  That's all I have for direct.

22          THE COURT:  Let's take a break before we -- 15

23 minutes.

24          MR. GEHER:  Your Honor, can I ask you a question?

25 My client's appraiser is here also.  Just noticing the

1  time --

2         THE COURT:  I don't think we'll get to him.

3         MR. MARTIN:  I don't think we'll get to him.

4         MR. GEHER:  So if he goes home, there's no

5  problem?

6         MR. MARTIN:  No problem.

7      (Proceedings recessed briefly.)

8                    CROSS EXAMINATION

9  BY MR. BINGHAM:

10 Q    Good afternoon, Mr. Hirose.  My name is John Bingham.

11 I represent Meruelo Maddux Properties, Inc. and its 53

12 affiliate entities.  How are you?

13 A    Fine for right now.

14 Q    It's good to see you again.  You indicated you

15 performed your appraisal in or about April of this year?

16 A    That is correct.

17 Q    And your appraisal was prepared at the rest of Mr.

18 Elmer and Mr. Jung or their law firms?

19 A    It was prepared at the request of Curtis Jung, Esquire,

20 counsel.

21 Q    It wasn't a FIRREA appraisal, it wasn't an appraisal

22 under one of those other acronyms?

23 A    No.  It was prepared under FIRREA standards.

24 Q    Under those standards?

25 A    Yes.

1  Q    At Mr. Jung's request?

2  A    Yes.

3  Q    Would you turn to page VII in your appraisal, and we'll

4  follow the pagination that appears in your appraisal.  And I

5  just wanted to go over some of the salient facts.  I think

6  maybe some of them items may have gone over them a little

7  quickly.

8        I see we have land area of 118,203 square feet?

9  A    Correct.

10  Q    I see you have an estimated exposure time of about 12

11  -- or not about -- of 12 months.  Will you describe what 12

12  months means in that context?

13  A    Essentially that's in terms of our exposure time.  If

14  you turn to page four, this is a time in which we would look

15  at a reasonable time frame that can be -- the property would

16  be put on the market and a sale can happen in a reasonable

17  time -- time frame.  That would have to be exposed in the

18  market for at least 12 months.

19  Q    And I believe we also have as of April a current

20  occupancy rate of 85.2 percent?

21  A    I thought it was 82 percent.

22  Q    That's not what appears at your VII page.  If it's some

23  other number, please feel free to correct me.

24  A    Eighty-five point one nine.

25  Q    In other words, rounded up to 85.2 as it appears at

1 page VII of your appraisal?

2 A    That is correct.

3 Q    Now, I also notice on VII of your appraisal the

4 building is listed as a property type industrial (cooler

5 storage), is that correct?

6 A    Where are you referring to that on this --

7 Q    It's about one-third of the way down on the page under

8 improvements, the heading "Improvements."

9 A    That is correct.

10 Q    And then I see further down, about halfway down the

11 page, you further define the improvements or refine the

12 improvements by saying the percent of cold storage is 75

13 percent, is that correct?

14 A    That is correct.

15 Q    And the ambient storage is 25 percent?

16 A    That's correct.

17 Q    But there's no cold storage, freezer storage?

18 A    There's no freezer storage, that is correct.

19 Q    Is there a difference in business operations between

20 cold storage and a produce market?

21 A    Mr. Bingham, I don't understand your question.  Can you

22 elaborate on that?

23 Q    Is a cold storage facility operated differently from a

24 facility that sells, markets, and distributes produce?

25 A    First, I would define what cold storage is, because

1  cold storage is a generic term.  It can mean freezer space.

2  It could mean cooler space.  It could mean a combination of

3  both of them together.

4  Q    Would you please define it then for me, what is cold

5  storage?

6  A    Okay.  Well --

7  Q    As applies to the appraisal industry.

8  A    Okay.  Cold storage, as I define it, is refrigerated

9  space, and within cold storage you have freezer space, and

10 you have cooler space.  You have ambient space.  You have

11 certain types of properties that cater to cooler storage

12 like produce which typically cannot be put in freezers

13 because you can't have fresh produce that way.  You have

14 other properties that are strictly freezer facilities where

15 they will store things like ice cream, meats, frozen foods.

16      So it's -- it's a wide variety.  You know, cold storage

17 can be used for different kinds of product types.  You name

18 it.  So in your questioning, what I need to know is are you

19 referring strictly to produce meaning vegetables, onions,

20 things like that.  Are you talking about commodities that

21 need to be frozen.

22 Q    Is the frozen storage business operated differently

23 than the produce storage business?

24 A    I would say yes.

25 Q    And is the ambient storage business of food stuffs

1  operated different than the cooler storage business or the

2  produce storage business, cool storage business?

3  A    Okay.  If I understand what you're asking me is you're

4  asking me, Mr. Bingham, is the ambient storage business run

5  differently from the cooler storage business or the freezer

6  business.  Is that correct?

7  Q    Yes.

8  A    Okay.  To me that's a loaded question because when you

9  have cold storage facilities, they have ambient space also.

10 So, for example, if you were to go to the Washington Food

11 Center down the road on Washington Boulevard, that property

12 has a mix of freezer.  It has a mix of cooler, and it has a

13 mix of ambient storage space, and when you say it's operated

14 differently, well, those kinds of tenants that are in there

15 do operate differently from a produce guy.  If he's got

16 freezer space in there, he's going to be storing, you know,

17 steaks, he's going to be storing ice cream, things like

18 that.

19      The produce guy in 2640 Washington will strictly be

20 storing produce.

21 Q    Let us turn to -- I heard you testify earlier about the

22 three methodologies, and one of the methodologies you

23 discussed I believe was the cost approach, and in that

24 regard I believe you start -- your cost approach starts with

25 an analysis and an assessment of value of the land value.

1  And in that regard, could you please advise as to the land

2  value that you found or assessed for the property?

3  A    I concluded a land value of $30 per square foot for the

4  subject property, and that's shown on page 74 of the

5  appraisal.

6  Q    And in that regard, would you describe briefly the

7  methodology you used to reach that land value?

8  A    The methodology that was used is called a sales

9  comparison approach, and in a sales comparison approach,

10 what an appraiser does is he goes out into the marketplace

11 and he looks for listings of land, any land that might be

12 under contract or under negotiation and actual -- he would

13 also search for actual sales that have transpired in the

14 marketplace.

15     One of the most important things right now in this kind

16 of a market is that when you're looking at these

17 transactions, that you look at the date of sale and when

18 those land sales were negotiated, because if you're looking

19 at transactions that occurred in 2007 and 2008, there's been

20 severe declines in land value since then.

21 Q    And do you know what the average of all the five

22 comparable land sales was as far as per square foot?

23 A    On page 74, I state that the sales comparables range

24 from a low of $28.50 to $49.97, with an average unadjusted

25 pricing indication of $40.30 a square foot.

1  Q   So the $40.30 unadjusted average you discounted down to

2  $30 a square foot -- or adjusted downward?

3  A   I would say the correct word is adjusted downward.

4  Q   But I see here land sale one, two, and three -- and

5  correct me if I'm wrong, aren't land sale one, two, and

6  three comparables to close in 2009 or have closed in 2009?

7  A   Land sale number one and land sale number two were

8  under contract as of the date of the appraisal.  Land sale

9  number three was an official close.

10       MR. MARTIN:  Could you give the page number,

11  please?

12       MR. BINGHAM:  I'm still at page 72 through 74.

13       THE WITNESS:  Seventy-one being the sales

14  comparison chart or the land sales chart, and then the

15  remaining pages would be their valuation section.

16  BY MR. BINGHAM:

17  Q   But at least three of the five sales are 2009

18  transactions -- or comparables for 2009 transactions?

19  A   Yeah.  One is an actual sale and land sales one and two

20  were under contract.

21  Q   Then why isn't a land value of around $37 a more

22  accurate reflection of land value?

23  A   Mr. Bingham, it's based upon my professional appraisal

24  experience and the adjustment process that is shown in this

25  appraisal.  That's why I concluded the $30 per square foot

1  value.

2      If you look at land sale number one -- and this is a

3  transaction that has actually closed since that date because

4  our value at -- when we did this appraisal was as of April

5  20th, 2009 -- 4037 Bandini Boulevard.  It's a 2.69 acre

6  parcel.  It's located in Vernon in proximity to the subject

7  property.  It was a transaction that was under contract and

8  was bought by a user, and essentially they're going to be

9  building an office building on that, and it's across the

10 street from one of their existing facilities.

11     That in terms of comparable data is the most recent

12 transaction in the marketplace, and if you look at the sales

13 in 2007, those sales were at the peak of the marketplace.

14 You understand when you examine these sales, when you look

15 at sale number two, sale number two was an escrow.  It was

16 listed for sale in 2008 and an asking price of $65 per

17 square foot.  It had a closing of June 2009, but that

18 purchase price was negotiated at a time when market

19 conditions were superior than they are right now when we did

20 the appraisal.

21     Also, you have to look at the location of these

22 comparables.  Land sale two, if you look at the chart or the

23 map on page 71, is located north of the 10 Freeway, in an

24 area where there are higher land values.

25 Q    After concluding that the land value was $3,550,000,

1  what was the second step in doing your cost approach?

2  A    The second step in the cost approach was to come up

3  with a replacement cost analysis of the property.  That is

4  shown on page 76, which I previously described.

5      We are -- a Marshal Evaluation Service cost guideline

6  was utilized.  We estimated based upon that service the

7  replacement cost of the subject property.  Essentially if

8  you, again, move to page 78, there is a cost approach

9  conclusion which takes the cost that was generated on page

10  76, the $5,091,000 dollars.  That's the replacement cost

11  that it would cost to build this today or as of the date of

12  our appraisal.  And on page 78, to that we add

13  entrepreneurial profit, and we come in at a replacement cost

14  here of $5,854,650.

15  Q    So if you added the land value to the replacement cost,

16  the total cost approach before you took depreciation would

17  be $9,287,557, if I'm not -- if I'm correct, and I think

18  that's the number that you threw out during the prior

19  examination, is that correct?

20  A    I'm going to count that right now.  I just want to make

21  sure that --

22  Q    Sure.

23  A    You would add the $5,854,650 plus the $3,550,000.

24  Q    And you subtract the two percent replacement cost of

25  depreciation?

1  A     Physical deterioration.

2  Q     Yeah.

3  A     I come up with $9,287,557.

4  Q     Okay.  And the two percent, I take it, is that a

5  straight line depreciation?

6  A     Yeah, it's age life.

7  Q     And that's a 50-year depreciation?

8  A     We're using a --

9  Q     Or deterioration I guess is the correct term.

10  A     Yeah, it's based on age life.

11  Q     And that's straight line?

12  A     Right.

13  Q     Are there other standards used in other types of

14  buildings?

15  A     You know, you can use different kinds -- you can base

16  depreciation based upon extracting it from the marketplace

17  if you wanted to also.  There's also the Marshal Evaluation

18  Service, which has a depreciation guideline, which is

19  different.

20  Q     Now, at page 77, you discuss and you testified as to

21  other factors that went into your cost approach valuation,

22  is that correct?

23  A     What are you referring to?

24  Q     I simply asked a question.  At page 77 you discuss and

25  you testified as to other factors, but I'll withdraw that.

1  Can you -- we went through really quickly -- and I
2  appreciate that from Mr. Martin, but I think it would help
3  all of us if maybe we take it a little slower this time and
4  walk through external obsolescence, because I think that's
5  very important, and at least I had a little difficulty
6  following you.

7  So let's start with your explanation of external
8  obsolescence again.

9  A    Well, basically, I think the reason why everyone's
10 getting excited about external obsolescence right now is I
11 call it a denial of current fact.  Currently right now, the
12 economic forces have caused real estate prices and values to
13 fall, and this is factors outside the specific property
14 itself, mainly caused by the economy.  And in the analysis
15 of the subject property, external obsolescence is calculated
16 on a very simplified basis, and essentially, the external
17 obsolescence is calculated by first calculating the cost
18 feasible NOI, which is shown on page 78.

19 Q    Let's stop there, because I have a couple of questions
20 before we get to the number crunching.

21 First off, let's go back to page 77, and as I
22 understand the terms you used, first you used current, and
23 then I think in your prior testimony I heard the words
24 "credit markets" and things like that.  I had the impression
25 that the situation we're facing right now is a temporary

occurrence.  Is that correct?  Is this external obsolescence
temporary or permanent?

A    This external obsolescence could be both.  It could be
temporary.  The market could turn or it could be permanent.

Q    Are you telling me that your appraisal is predicated on
a permanent condition in the credit market, that they will
never change, that the market will never change?

A    What I'm saying, Mr. Bingham, is that when we -- when I
did this appraisal in terms of calculating this external
obsolescence, I did a simplified methodology which is
something that has been reviewed by banks and financial
institutions where I calculated the cost feasible NOI and
compared it to the pro forma stabilized NOI, and the
remaining net operating income is really the income that
you're not going to be able to achieve in this particular
market.

Q    Let's go back a minute.  You're jumping way ahead of
where I am.  I'm not as quick and fast as you are.  I would
like to first understand can external obsolescence, under
the guidelines of appraisers, be a temporary condition?

A    It can be a temporary condition.

Q    And I take it external obsolescence can also be a
permanent condition?

A    It can be a permanent condition also.

Q    In your appraisal or appraisal report, with regard to

1  this appraisal, how did you treat it?

2  A    If you look at the way that we treat it, we're

3  capitalizing that NOI differential into perpetuity.

4  Q    In other words, you treated it as a permanent

5  condition, as if -- let me strike that.

6      In other words, you treated it as a permanent

7  condition?

8  A    In this analysis, if you were to look at the

9  methodology that we did, this condition that we have right

10 now in this external obsolescence is based upon this

11 capitalization at 8.25 percent.  Now, when you say it's a

12 permanent condition, things can change in this marketplace.

13 Just quickly as the market collapsed in -- in October of --

14 or September of this year, things could get better and

15 conditions can increase.  If we were to do this calculation

16 and rents increased in the marketplace, then this external

17 obsolescence calculation would actually be lower, and things

18 would improve.

19     But the purpose of this external obsolescence

20 calculation is everyone's getting excited about this.  This

21 property is an income-producing property, and when investors

22 look at this property, they're going to be basing it upon

23 the income-producing ability of this property based upon

24 current investment rates in the marketplace.

25     So this cost approach is just used as a check against

eflto
7171

default

1  A     In this analysis, based upon the factors that are in

2  there, based upon current market rents, what this does, it

3  capitalizes that income stream and comes up with an external

4  obsolescence that's representative of this current

5  marketplace since the credit markets have fallen apart.

6  Q     Into perpetuity?

7  A     I would say that -- you're putting words into my mouth.

8  Q     I don't mean to.  I'm just asking the question.  You

9  can say yes or no.

10 A     I think it's going to be misleading if I say yes or no

11 here, Mr. Bingham, because the purpose of this cost

12 approach, again, is a check against the sales -- the income

13 capitalization approach.  And I'm going to say it over and

14 over again.  This property is going to be bought by an

15 investor based upon the income capitalization approach,

16 based upon its current income stream.  This approach that

17 we're using here on external obsolescence, I've had

18 thousands of review appraisers at various major banks and

19 financial institutions and REETS look at this calculation,

20 and they go, "Okay.  I understand it.  Our property is

21 taking it in the shorts right now.  Let's get over it and

22 move on.  Don, let's go to your income capitalization

23 approach, and let's concentrate on the income because this

24 is the income-producing property."

25 Q     I'm sorry to interrupt you, but you're going beyond the

scope of my question. That is all anecdotal. So let me --
let me get back to the questions. Let us go back to some
principles as I understand them -- and certainly you're the
expert. I'm just -- I'm just the attorney. Let's go back
to some principles of appraisal methodology in science and
art so that I can understand this.

In the application of your profession, you used three
principle approaches so you have testified, a cost approach,
a comparable sale approach or methodology, and an income
capitalization methodology. We are now -- and the reason
for that -- and I recall your testimony to be is that all
three approaches have some relevance to the investor or the
user of your report, is that correct?

A   They have some relevance.

Q   And at the end of the day -- and it's a very important
part. In fact, you -- I guess I interrupted your counsel at
that point in time and you wanted to make sure your answer
was understood correctly, and your counsel reasked the
question and you answered the question. You wanted to make
sure everyone knew at the end of the day you reconciled
those three approaches, and the three values you came from
those three approaches to come up with a reconciled value.
So those three approaches must have some value to every
investor and every person using your report, is that
correct?

1 A    I would say that when an investor looks at a property,

2 he's going to look at the valuation approaches, and I would

3 say nine times out of 10, if it's an income-producing

4 property, he's going to say, "Hey, I'm going to concentrate

5 on the income capitalization approach."  If he's a current

6 buyer right now, he's going to say "I want to try and buy

7 this property at below replacement cost."

8       So, you know, he's going to be looking at this thing

9 called external obsolescence, and he's going to say, "Hey,

10 if I can get this thing below replacement costs," I want to

11 buy it because it's a deal.

12 Q    Yeah.  And every investor will look at the appraisal,

13 and he'll -- he'll want to make sure that the appraisal has

14 various approaches and they're done correctly, is that

15 correct?

16 A    As I understand it, they will look at it, and they'll

17 critique it and they'll analyze it and get back to us if

18 they think we're incorrect in certain sections.

19 Q    Okay.  Let's go back to the maxims of appraisal law or

20 appraisal profession.  I take it that real property has two

21 components, most real properties.  Real property that has

22 improvements has two components, land and buildings, is that

23 correct?

24 A    That is correct.

25 Q    And, typically, those two components have various risk

1  factors, is that correct?

2  A    That is correct.

3  Q    And you recognize those various risk factors in doing

4  slightly different things when you value property vis-a-vis

5  the land and vis-a-vis the buildings, is that correct?

6  A    That is correct.

7  Q    Okay.  And, in fact, you recognize it at page 77 when

8  you describe external obsolescence, and let me quote from

9  your report.

10             "As the land value is not impacted, the

11             entire amount" -- and I assume from my

12             reading that entire paragraph you mean

13             the obsolescence component -- "is

14             attributed to the improvements."

15       Have I read that sentence correctly?

16  A    That's what it says in our appraisal.

17  Q    Do you agree with that statement?

18  A    I think what you're trying -- this is -- in our

19  appraisal, in the utilization of this external obsolescence

20  calculation, there is a methodology where appraisers will

21  factor in different rates of return on land and building to

22  come up with the external obsolescence calculation.

23  However, in current -- based upon the current Appraisal of

24  Real Estate 13th Edition, it does say in the Appraisal of

25  Real Estate that you can use an overall capitalization rate

1  to calculate the income loss, and this is -- in the 13th

2  edition it says:

3           "External obsolescence estimated by

4           capitalization of income loss.  When a

5           property produces income, the income

6           loss caused by the external obsolescence

7           can be capitalized into an estimate of

8           the loss in total property value."

9      This is what I did here.  This is part of my procedure.

10 Now, you know, back when -- back in the '80s, the Appraisal

11 Institute in their eighth edition came up with the

12 methodology where you're supposed to extract out a land

13 component rate and a building component rate, but when you

14 do that, it's more subjectivity, Mr. Bingham.  It's more

15 pulling numbers from the sky.  So it's like at that point,

16 you know, when you look at that, this is a simplified

17 methodology, a simplified methodology to come up with

18 external obsolescence, and this is an income producing

19 property.  It's an income producing property that an

20 investor would purchase based upon its income producing

21 potential.

22 Q    Again, then, is your statement then inaccurate at page

23 77 as you apply your approach to external obsolescence at

24 page 78?

25 A    Can you ask that question again?

1  Q    I'll withdraw the question, and I'll restate it.  How

2  do you reconcile the following, "As the land value is not

3  impacted, the entire amount is attributed to the

4  improvements" with your last response?  And I'll simplify

5  it.  Applying the external obsolescence doctrine or protocol

6  or procedure or methodology as you have calculated and

7  applied it in this appraisal and as calculated at page 78

8  and everywhere else in this appraisal, is the land value

9  impacted?

10 A    Well, in the analysis of our comps, we came up with a

11 market value on the land.

12           MR. BINGHAM:  Move to strike, your Honor, as

13 unresponsive.

14           THE COURT:  Would you like to have the question

15 restated?

16           THE WITNESS:  Yes.

17 BY MR. BINGHAM:

18 Q    What did you mean at page 77 when you stated "As the

19 land value is not impacted, the entire amount is attributed

20 to the improvements?"

21 A    In terms of that statement right there, it's that

22 depreciation will be -- will be applied to the improvements,

23 and in -- in our analysis on the external obsolescence --

24 and this is what I'm trying to get across and I don't think

25 you're understanding is that this is a simplified appraisal

approach, okay.  We're applying the 8.25 percent also to the

land, okay.  And then other appraisers will do an extraction

method where they figure out the rate of return on the land,

the rate of return on the building, and they'll come up with

different returns on each component, and someone will say,

okay, the rate of return on the land would be 10 percent,

the rate of return on the land would be around 6.75 percent,

but when you blend everything in together, it averages out

to like an 8.25 or something like that factor that would be

applied to external obsolescence.

It's an averaging process.  So if you -- the reason why

I didn't do it the other way is that it leads to more

subjectivity and more room for error.  This is a simplified

method that's been accepted by major financial institutions.

The financial institutions I think are represented by

lawyers here, and, you know, we're talking about, you know,

people who have major loans on properties that see this.

Q    Let's go on a minute.  Let's go to the bottom of page

78 and test what you have just said.  What do you show at

the bottom of page 78 as the rounded cost value or cost

approach to this property after you apply the external

obsolescence approach or methodology?

A    Are you -- okay.  There's two -- you're talking about

the reconciliation on page 78 at the bottom, is that

correct, Mr. Bingham?

1  Q    That's right, to the right of the rounded.

2  A    Okay.  We have two values there.  The first value is

3  called the stabilized value, and that value assumes the

4  property is fully leased.  It's $4,130,000.  And then we

5  have an as is value of $4,090,000.

6  Q    And so let's stick with the stabilized value of

7  $4,130,000.  And then you'd previously found that the land

8  value was -- was $3,550,000.  Is that correct?

9  A    That is correct.

10 Q    So your ultimate conclusion is that the cost of

11 improvements that -- which you recognized to rebuild or

12 replace in excess of $5,000,000, was approximately $600,000

13 attributable to the costs of improvements, is that correct?

14 A    That is the resulting value after you -- what you're

15 saying is if you take -- I want to stand clear on this or

16 make everyone clear on this.  If you take the $4,130,000,

17 which is the stabilized value, minus the $3,550,000, is that

18 the correct -- is that what you're getting at, Mr. Bingham?

19 Q    Yes, it is.

20 A    Okay.  If you take the $4,130,000 and the land value of

21 $3,550,000 -- let me calculate this.  The resulting value or

22 -- attributed to the building improvements is $580,000.  Is

23 that what you're --

24 Q    That's what I was getting at, yes.  Thank you.

25 A    Yes.  Okay.

1  Q    I -- you know, I concur with that.

2  A    Okay.

3  Q    And you don't find that to be a rather astonishing

4  number?

5  A    No, I don't, and here's the reason why.  In my earlier

6  testimony --

7  Q    I didn't ask you for your reason why.  I asked you if

8  you found it to be an astonishing number.

9  A    Initially --

10 Q    Let's go on.  You indicated -- you read earlier to me

11 from the book at the witness stand, and that was the

12 Appraisal of Real Estate 13th Edition?

13 A    Yes.

14 Q    And what page were you reading from?

15 A    Page 444.

16 Q    You know, we have the same librarian.  I have the same

17 page in front of me.  Would you read from the bottom of that

18 same paragraph, the first paragraph under "External

19 Obsolescence Estimated by Capitalization of Income Loss,"

20 the sentence that begins with "The income loss is not

21 anticipated."

22 A    Okay.  Okay.  You're referring to the last paragraph.

23 Okay.

24           "If the over-supply were" --

25 Q    No, no, no.  No, not the bottom paragraph to that page.

1 Two paragraphs up, the last sentence of the first paragraph

2 of that section.

3 A    It says:

4           "If the income loss is not anticipated

5           to be permanent, it can be estimated

6           using a discounted cash flow analysis."

7 Q    And you didn't use that approach here?

8 A    Yes, I did not use it.

9 Q    Okay.  Let's go back to -- let's get into the numbers

10 now.  We've hit the high points that you believe the current

11 credit crisis won't last forever, and you've used that

12 approach, and you've created a simplified model that is

13 accepted apparently through your anecdotal statements by the

14 world.  What is --

15 A    Mr. --

16 Q    What is a cost feasible NOI?

17           MR. MARTIN:  I'd move those statements which are

18 not supported by evidence and speculative, argumentative be

19 stricken.

20           MR. BINGHAM:  I withdraw them.

21           THE COURT:  Thank you.

22 BY MR. BINGHAM:

23 Q    Cost feasible and NOI, what do you mean by that?

24 A    Mr. Bingham, you -- in your questioning before or your

25 lead up to the question, you stated that -- that I had an

1 opinion that the credit crisis would last forever.  I didn't

2 say that.

3 Q    What did you say?

4 A    I didn't say that.

5 Q    What did you say?

6 A    You're putting words into my mouth.

7 Q    Then what did you say?

8 A    You know, I don't -- I didn't make --

9         THE COURT:  I'm going to --

10         MR. BINGHAM:  I apologize.

11         THE COURT:  I think both of you have editorialized

12 enough.  Ask a question.

13         MR. BINGHAM:  Okay.

14         THE COURT:  Mr. Martin, if you've got something

15 that you want to ask on redirect, you can.

16         MR. BINGHAM:  Yes, your Honor.  I will act

17 accordingly.

18 BY MR. BINGHAM:

19 Q    What is cost feasible NOI, Mr. Hirose?

20 A    Cost feasible NOI is shown on page 78, and it's based

21 upon a return on the replacement costs new.

22 Q    Would you please explain what you -- I see the

23 definition under the chart or the columns there, but where

24 does that term come from?

25 A    Cost feasible NOI?

1  Q     Yes.

2  A     It's something that -- the term, it's something that is

3  developed based upon our interpretation of what would be the

4  feasible NOI that would make this property, how should I put

5  it, operating in the marketplace without external

6  obsolescence.

7  Q     Do you mean income feasible NOI?  Does it have to do

8  with income?

9  A     Basically, what we're doing right there with the cost

10 feasible NOI is that we're applying our capitalization rate

11 of 8.25 to the replacement cost new plus the -- less the

12 physical depreciation.

13 Q     Do you mean achievable market rent?

14 A     That in terms of it's applied to the actual cost.

15 Q     Okay.  Now, as I understand it, under your simplified

16 external obsolescence protocol, you haven't bothered to

17 segregate or apply different risk factors to the

18 obsolescence of the land, which there shouldn't be any, and

19 the improvements, is that correct?

20 A     According to this methodology -- and, again, it's

21 misleading -- I believe I'm being misled right here -- is

22 that this is a simplified methodology in which we use one

23 rate applied versus having two rates and averaging them out.

24 Q     Would -- what's a capitalization rate?

25 A     The capitalization rate is the net operating income

1  over the sales price.

2  Q    That's one capitalization rate?

3  A    Right.

4  Q    There can be other methods of converting income to

5  value, can't there?

6  A    There could be.

7  Q    But that's the standard one everybody uses?

8  A    Right.

9  Q    Okay.  So we got that.  That's the capitalization rate.

10 Is there -- you describe the capitalized at 8.25 further

11 down in that paragraph as the rate of return.  You mean

12 capitalized -- capitalization rate?

13 A    That's correct.

14 Q    Okay.  I just want to make sure we're there.  Okay.  So

15 we used an 8.25 capitalization rate for both the building

16 and the land in this external obsolescence -- simplified

17 external obsolescence methodology.  That's correct?

18 A    That is correct.

19 Q    Okay.  Is that how you would do it typically if you

20 were valuing land and valuing the building separately?

21 A    As far as valuing the building and land separately, I'd

22 do something different, and this analysis right here, again,

23 it's a simplified appraisal.

24 Q    Did somebody ask you to do a simplified appraisal?

25 A    I employed the proper appraisal methodologies that I

1 thought were required for this appraisal, and also I

2 utilized the methodologies that a layman could look at this

3 appraisal and utilize it without having to look at a lot of

4 other factors that would cause more errors in an appraisal.

5 And, again, you know, the appraisal of real estate textbooks

6 says that you can capitalize income loss by utilizing a

7 capitalization rate.  The old appraisal technique said, you

8 know, you're supposed to break it out.  I didn't do it.  And

9 I want to emphasize that this is an income producing

10 property, that an investor would place the most weight on

11 the income capitalization approach, and the external

12 obsolescence calculation here is, again, a simplified

13 methodology, and you would look at the cost approach, but

14 basically someone is going to take a hard look at the income

15 that this property is producing, its expenses, and the rates

16 of return or cap rates in the marketplace, the value of this

17 property.  This is an investor property.

18 Q    If you worked backwards, did you calculate what your

19 feasible market rate would be if you looked at your cost

20 feasible NOI?

21 A    What do you mean by that?  I don't understand your

22 question.

23 Q    Well, your cost feasible NOI is $766,223 annually.

24 A    That's two dollars a square foot.

25 Q    That's not quite the number I had, but I had $2.93 a

1  square foot, but we can work through that later.

2  A    Well, what I did was at 766,223 divided by 31,876.

3  That's a rent on an annual basis of $24 divided by 12.

4  That's two dollars a square foot.

5  Q    Well, you add back in the operating expenses and come

6  up with the effective gross income.  You take out the

7  vacancy and credit loss.  You come up with the potential

8  gross income.  You divide by 12, less the parking income,

9  and you come up with the monthly gross income of $93,343,

10  and that's $2.93 a square foot.

11  A    Where are you calculating this from?

12  Q    A chart I prepared, and I'm happy to share it with you.

13  A    Yeah, please.

14        MR. MARTIN:  Could I have a copy also?

15        MR. BINGHAM:  Of course.  May I approach the

16  witness, your Honor?

17        THE COURT:  Yes.

18  BY MR. BINGHAM:

19  Q    I'd like to -- before we get into the imputed rent --

20  and I'm sorry to start with that.  I got sort of sidetracked

21  -- let's finish up with the external obsolescence

22  calculation.  We had the cost feasible NOI, and as I

23  understand it, would you explain that, state again what you

24  mean by that?  I know how you calculated it, but what is it

25  supposed to represent?  You're very clear on where -- how

1  it's calculated here in the paragraph immediately below it,

2  but what is it supposed to represent?

3  A    The cost feasible NOI represents the net operating

4  income that would be required to operate this property on a

5  stabilized basis that would indicate a positive value for

6  the property.  The -- what you're -- what I see here on this

7  chart that you have, you're taking --

8  Q    We'll get to the chart.

9  A    Okay.

10 Q    I really appreciate it.

11 A    Okay.

12 Q    We're almost there.  And the reason we're doing this --

13 and I know you're a very experienced witness, and --

14 A    This is the second time I'm up here.

15 Q    Today.

16 A    No.  This is the second time I've testified in court.

17 Q    Oh, really?

18 A    Yes.

19 Q    You come across as so experienced.

20        THE COURT:  Can I stop you both for a moment?

21        MR. BINGHAM:  Yes.

22        THE COURT:  Go back --

23        MR. BINGHAM:  That's fine.

24        THE COURT:  -- and say -- tell me again that cost

25 feasible NOI represents the NOI that would be required on a

1  stabilized basis to what?

2         THE WITNESS:  Cost feasible NOI is -- is what

3  would be required by an investor to -- or a developer of a

4  property to develop the property and operate it such that

5  he's going to make a profit on the property.

6         THE COURT:  Okay.  So if he bought the land, built

7  the improvements, and wanted to operate in the black, this

8  is the NOI he'd have to have?

9         THE WITNESS:  This is the NOI that he's going to

10 have to have a positive income coming to the property.

11        THE COURT:  Okay.  Is that different from what I

12 just said?

13        THE WITNESS:  No.

14        THE COURT:  Okay.

15 BY MR. BINGHAM:

16 Q    And to take the Court through the analysis, Mr. Hirose,

17 and then next you have the pro forma stabilized NOI which is

18 from your page 110 I believe, 110?

19        THE COURT:  I'm sorry.  Did you refer us to page

20 110?

21        MR. BINGHAM:  Yes.

22        THE COURT:  Thank you.

23 BY MR. BINGHAM:

24 Q    Wrong page, 114, which is his direct capitalization

25 summary where he goes through the costs and an income and

1  cost analysis, is that correct, Mr. Hirose?

2  A    Yeah, the -- I have page 114.  It's the direct --

3  Q    Yes, 114.  I corrected myself, 114.

4  A    Right.

5  Q    And then we have the NOI differential, and you -- I

6  always get this confused.  You multiply the differential

7  against the 8.25 capitalization rate, and that comes up with

8  your external obsolescence factor.

9           MR. MARTIN:  Is that a question?

10          MR. BINGHAM:  Yes.

11          THE WITNESS:  I didn't understand that.  Are you

12  asking me a question, Mr. Bingham?

13  BY MR. BINGHAM:

14  Q    Yes, so that it's in the record.

15  A    Okay.  Could you go over that again?

16  Q    Yes.  I'll --

17  A    I don't understand your --

18  Q    The question is, as you state in -- you multiply the

19  capitalization rate against the NOI differential, and that

20  -- the product is your external obsolescence factor.

21  A    Okay.  You're referring -- you're going back to page --

22  I just want to make sure I under --

23  Q    Seventy-eight.

24  A    -- 78?

25  Q    Yeah.  I was just pointing out for the Court's --

1 A    Yeah.  What you're saying is I -- I'm not multiplying.
2 I'm dividing the NOI differential by the 8.25 percent.
3 Q    Right.  Okay.  Dividing.  Pardon me.  I appreciate the
4 correction.  And that comes up with the external
5 obsolescence factor.  And, as we've already pointed out, we
6 computed the cost feasible NOI which is in effect the market
7 rents that need to be charged at stabilized occupancy to
8 reach a feasible net operating income by the capitalization
9 rate against the land value and the replacement cost new
10 less the incurable physical deterioration to arrive at the
11 cost feasible NOI, is that correct?
12 A    Could you break that down, because there are some
13 things in there, Mr. Bingham, that I thought could be wrong
14 but I want to make --
15 Q    No, that's fair enough.  I confused myself.  If we take
16 -- to derive the costs feasible NOI, we take the depreciated
17 cost of the improvements plus land value, which we've
18 already walked through.
19 A    Uh-huh.
20 Q    And, you know, which is the total of the $9,000,000
21 plus less the incurable physical deterioration, plus the
22 land value multiplied by your capitalization rate.  That
23 gave us the $766,223?
24 A    That is correct.
25 Q    Okay.  Now, you mentioned earlier on direct that you

1 are now using this external obsolescence and the simplified

2 mode with many of your I take it appraisal clients, is that

3 correct?

4 A    That is correct.

5 Q    Anybody else in the office using it?

6 A    Yes.

7 Q    Everyone using it?

8 A    Where the property is -- some people in the office will

9 in their reconciliation not have this external obsolescence

10 calculation and will just show the number that we calculated

11 before, which would be the replacement cost new of

12 $5,854,650, and adding in the land value and then comparing

13 that to the final valuation of the property and will state

14 in their report, "Well, the difference in value between the

15 cost approach and the concluded value for the property is

16 external obsolescence."  So some people in our office

17 utilize that.

18 Q    Now, let's go back to your -- the spreadsheet or the

19 little work chart I handed you.  Could you -- is that in

20 front of you now, sir?

21 A    This is --

22 Q    Yes.

23 A    Yes.

24 Q    My little calculation of the -- what you call the cost

25 feasible NOI.

1 A    Correct.

2 Q    Does that seem an appropriate methodology?  Have I done

3 it right?

4 A    Okay.  Are you asking --

5 Q    I'm asking you if you were to compute the market rent

6 to achieve your cost feasible NOI, would it be approximately

7 $2.93 cents per square foot?

8 A    Let me take a look at this, Mr. Bingham, if you would

9 allow me.

10 Q    I will certainly give you the time, and you have your

11 calculator there.  And I've tried to identify the pages

12 where the source numbers are derived from.

13    (Pause.)

14 A    Mr. Bingham, can you explain to me -- I'm -- you take

15 the cost -- the NOI, the cost feasible NOI that I have on

16 page 78 of $766,223.

17 Q    Yes.

18 A    Okay.  And then, as I understand it, you're taking the

19 operating expenses that I calculated on page 114 --

20 Q    Correct.

21 A    And you add those two together, is that correct?

22 Q    Yes.

23 A    Okay.  So when I do that and I check my calculator --

24 Q    I should have subtracted them?

25 A    No.  Okay.  So you're coming in at $1,074,372.  What

1 I'd like to know is then the next factor, where it says

2 "Vacancy and credit loss" --

3 Q    Uh-huh.

4 A    -- when you go -- are you saying dividing that by .95

5 there, is that what you're trying to do?

6 Q    No.  What I'm doing is I'm adding back in five percent

7 to bring it up to potential --

8 A    Okay.  So you're adding it?

9 Q    -- full income, yes.

10 A    Well, I'm getting a different number than you here on

11 potential gross income, getting like $1,128,096.  So I don't

12 know how you did that, but it's --

13 Q    Let's take your number.

14 A    It's close.

15 Q    It's close.  Let's take your number.

16 A    Okay.  Then, if I understand what you're doing right

17 here is you're taking that potential gross income, dividing

18 it by 12, is that correct?

19 Q    Yes.

20 A    Okay.  And I'm getting $94,007.55.  Is that correct?

21 Q    Correct.

22 A    Per month, okay.  So then you're getting a monthly

23 gross income of $94,000 -- well, I calculate $94,007.55.

24 Okay.  And then from page 114, you're taking the parking

25 income that I calculated of $10,800.  You're dividing that

1  by 12, is that correct?

2  Q    That's correct.

3  A    Okay.  Okay.  I get $900.

4  Q    Yes.

5  A    And then it says monthly gross from rental units.  Then

6  what I'm seeing here is that you're going to -- you're

7  adding that number of $900 to the $93,343, is that correct?

8  I mean, you're adding that to the --

9  Q    Well, less parking income.

10  A    Less parking income, okay.  Okay.  So then you're

11  coming up with -- what I'm coming up with is monthly gross

12  from rental units only $93,107.55.  Is that correct?

13  Q    Yes, that's correct.

14  A    Okay.  And then you're -- what you're doing here is

15  that you're coming up with -- you're dividing the square

16  footage of $31,876 into the square footage of the property,

17  and you're coming up with $2.93 a square foot as your market

18  rent.

19  Q    As the cost feasible, for want of a better term, NOI

20  market rent.

21  A    Yeah, I understand that.

22         MR. BINGHAM:  Okay.

23         THE COURT:  It's 10 to 5:00.  I think all hope of

24  finishing to night has flown.

25         MR. BINGHAM:  Pardon?

1          MR. TEDFORD:  One more housekeeping item since

2     we're on housekeeping issues.  You have a number of relief

3     from stay motions on calendar for tomorrow.  The one for UCB

4     I think is on calendar for 9:00 o'clock.  The other ones,

5     whether they're being continued or not, some of them I

6     understand the Court is going to approve the stipulation and

7     continue a couple of those hearings, but those are set at

8     10:45.

9          Can we do the same thing that we have in the past

10    with respect to UCB, where it will just get called at 10:45?

11          THE COURT:  Yes.

12          MR. TEDFORD:  Thank you, your Honor.  Mr. Rallis

13    reminds me it's technically scheduled for 9:30 and not 9:00

14    o'clock, but we'll have it called at 10:45.  Thank you.

15          MR. BINGHAM:  With the housekeeping items -- John

16    Bingham of Danning, Gill, Diamond and Kollitz, appearing on

17    behalf of Meruelo Maddux Properties, Inc. and 53 related

18    affiliate Debtors.

19          With the housekeeping matters having been handled,

20    if we could call Mr. Hirose back to the stand.

21          THE COURT:  Yes.

22        DON HIROSE - DEBTOR'S WITNESS - PREVIOUSLY SWORN

23              REDIRECT EXAMINATION  (RESUMED)

24    BY MR. BINGHAM:

25    Q    Good morning, Mr. Hirose.

1  A     Good morning.

2           MR. BINGHAM:  May I approach the witness, your

3  Honor?

4           THE COURT:  Yes.

5           MR. BINGHAM:  Do you have one for the Court?

6           MR. MARTIN:  Yes.  May I approach, your Honor?

7           THE COURT:  Yes, please.

8           MR. MARTIN:  Do you want this marked next in

9  order, 25?

10          MR. BINGHAM:  Yes, I do.  Thank you.

11 BY MR. BINGHAM:

12 Q     Mr. Martin, counsel for UCB, has handed you a writing,

13 is that correct, Mr. Hirose?

14 A     If you're referring to this appraisal, yes.

15 Q     And are you familiar with that appraisal?

16 A     Yes.

17 Q     And that is an appraisal prepared for Rebecca Leung,

18 senior loan coordinator, United Commercial Bank?

19 A     That is correct.

20 Q     And that is an appraisal for the subject property, 2640

21 East Washington Boulevard?

22 A     That is correct.

23 Q     And that is an appraisal that appears to be dated based

24 upon page two of the writing April 7, 2007?

25 A     That is correct.

1  Q    And the fourth page down there appears a signature

2  under the letter -- under the -- over the typewritten name

3  of Don T. Hirosi, MAI.  Is that your signature?

4  A    That is correct.  Are you talking on page three, Mr.

5  Bingham?

6  Q    Yes, page three.

7  A    Okay.

8  Q    Fourth page down.

9  A    Where it says "Respectively submitted, CBR evaluation?"

10 I just want to make sure we're on the same page.

11 Q    Yes, we are.

12 A    On the cover letter.

13 Q    Is that your signature?

14 A    That is correct.

15 Q    And at the page number page two, there is a market

16 value conclusion table.  Do you see that?

17 A    Are you referring to the cover letter again, Mr.

18 Bingham?

19 Q    Yes, I am.  And the cover letter at page two, is there

20 a market value conclusion table?

21 A    Yes.

22 Q    And is there a market value conclusion expressed in

23 that table?

24 A    There are two value conclusions.

25 Q    And those value conclusions are your value conclusions

1 as of that date?

2 A    As of the dates that are indicated in the table, yes.

3 Q    And would you state those dates and those value

4 conclusions for the Court?

5 A    As is fee simple value March 29, 2007, $9,500,000.

6 Second value is a prospective stabilized value, fee simple

7 estate, December 31, 2007, $10,000,000.

8 Q    Did you do a cost approach valuation in this appraisal

9 report that is attached to your cover letter?

10 A    In the appraisal report, the cost approach was included

11 in the document.

12 Q    Did you include an external obsolescence adjustment?

13 A    No.

14 Q    I'll just go back to your current appraisal.  Did you

15 do an income capitalization methodology in valuing 2640, the

16 subject property, and your current appraisal?

17 A    Yes.

18 Q    And does that -- your discussion of the income

19 capitalization rate start at about page 108 of your current

20 appraisal?

21 A    Mr. Bingham, can you clarify that?  Are you asking when

22 the income capitalization approach starts in the current

23 appraisal?

24 Q    Let me withdraw that question.  Could you briefly

25 describe the factors as you understand them that go into the

1  assessment or estimation of cap rates, capitalization rates?

2  A    Could you break that down?  I don't understand.  You

3  mean how I selected the overall capitalization rate?

4  Q    Yes.

5  A    Okay.  Well, in this appraisal, what we did is we

6  relied on actual transactions in the marketplace, also

7  interviews with brokers in the marketplace who sell

8  investment properties.  Beginning on page -- and this is the

9  current appraisal -- on 105, we talk about the direct

10 capitalization approach, and we go over market conditions

11 right now in the credit markets and how that's affecting

12 real estate, and we show on page 108 some Southern

13 California market transactions and their change in overall

14 pricing, and then on page 109, we have, you know, five

15 comparable sales that we utilize in our analysis in the

16 sales comparison approach, and those sales had our overall

17 rates in place, and I must point out that comparable number

18 one at 7.74 percent is a listing overall rate.  It is not an

19 actual closed sale.  The remaining comparables, which would

20 be two through five, had overall rates ranging from 7.2 to

21 8.25 percent.

22      In addition, we have some additional overall rate

23 sales shown on page 110 indicating overall rates of seven

24 and a half to 8.25.  And, again, the first two overall rates

25 are listings.  There was at the time when we did the

1  appraisal not that many transactions occurring.

2  Then we took a look at investor surveys in the

3  marketplace, and the Core Paz Survey on page 111 is a

4  national survey of where overall capitalization rates were

5  based upon surveys of institutional real estate owners.

6  Then we also talk to market participants in the

7  marketplace, and they rendered their opinion on overall

8  rates in the marketplace.  And, frankly, at that point in

9  time, I did talk to one of our top food facilities brokers

10  and described the property to him, and he said, "Don, I

11  think based upon the current marketplace and the lack of

12  sales and where this property is situated," he says, "I

13  think you should be like a 10 percent overall rate."  But at

14  that point in time in the marketplace, based upon the actual

15  sales that I saw, where the listings were, you know, I

16  thought -- or not thought, but I concluded an 8.25 percent.

17  I thought at that point in time that the brokers in the

18  marketplace were being extremely negative.

19  Q    Why didn't the guy who recommended the 10 percent cap

20  rate sign the appraisal?

21  A    Because he's a broker.

22  Q    Oh, he's a broker.  Tell me this, the cap rates in

23  these surveys, do they reflect current market conditions?

24  A    The --

25  MR. MARTIN:  That's vague because is he asking as

1  of the time of the appraisal or as of today?

2       MR. BINGHAM:  I'm asking as of the time that he

3  gathered the information, as of the time of this survey.

4       THE WITNESS:  If I understand you right, Mr.

5  Bingham, what you're asking me is as of the date that I

6  completed this appraisal, did the investor surveys reflect

7  current market conditions.  Is that the correct question

8  that you're asking me?  I want to make sure I understand

9  your question.

10 BY MR. BINGHAM:

11 Q    Yes.

12 A    Okay.  This is something, you know, the investor

13 surveys that we have in the marketplace, which is the Core

14 Paz survey, and our company also does investor surveys, you

15 have to understand that Core Paz, when they do their survey,

16 they send out letters of interview questions to

17 institutional events, investors across the United States,

18 okay.

19      When we did this survey, we were using the first

20 quarter 2009 Core Paz survey.  There is a lag time when they

21 publish it.  So they could have been collecting that

22 information.  And, you know, as of the current date that we

23 did the appraisal, that was the best available data from

24 Core Paz.

25      Now, one of the things that when you look at these

1  surveys, the surveys are done on a national basis.  When it

2  says warehouse property generally speaking, the warehouse

3  properties are institutionally owned, big box warehouse

4  distribution facilities, non-cold storage.  So typically

5  overall rates for properties like that which are cookie

6  cutter properties which are readily traded in the

7  marketplace are typically lower than properties that have

8  cold storage properties and -- or cold storage improvements

9  and tenants that have I would say not substantial credit.

10 Q    Let's go to page 108.  Would you turn to page 108,

11 please, Mr. Hirose.  At the top of page 108 there's a chart.

12 As I understand reading your page 108, the source is

13 emerging trends in real estate-209 ULI

14 PricewaterhouseCoopers.  Have ai read that correctly?

15 A    That is correct.

16 Q    And under warehouse industrial, they show expected cap

17 rate December '09 7.83 percent.  Have I read that correctly?

18 A    Okay.  I'm looking at the chart here, and Mr. Bingham

19 -- okay.  I see warehouse industrial.  It says expected cap

20 rate 7.26 percent.  Is that correct?

21 Q    I misspoke, 7.26 percent.

22 A    That is correct.

23 Q    Okay.  And what does this chart reflect as you

24 understand it, from PricewaterhouseCoopers?

25 A    Again, it's actual surveys in the marketplace of

1 institutional type investors.

2 Q    So the institutional investors, in responding to

3 surveys from PricewaterhouseCoopers, indicated that

4 warehouse industrial property they expected a cap rate by

5 the end of December '09 of about 7.26 percent when they

6 prepared that survey of the group?

7 A    That's what's indicated in the table here.

8 Q    Okay.  Thank you.  And that is one of the resources you

9 look to in evaluating cap rates for this property?

10 A    Mr. Bingham, I would say it is an ancillary or

11 secondary source.  Typically, the best indication of where

12 overall capitalization rates are are extracted from the

13 market, and when I say market, those are actual sales that

14 are current in the marketplace locally in Southern

15 California.

16     So, you know, I would say that we look at it.  We put

17 it in the report.  It gives the feel where, you know,

18 institutional players are in terms of their investment

19 returns, and these surveys constantly change.  If you were

20 to look at the current investor surveys are out there, Core

21 Paz has their new survey.  CB Richard Ellis has just

22 completed a national investor survey, and the CB Richard

23 Ellis national investor survey indicates a higher

24 expectation for cap rates or where cap rates are right now

25 than what's showing in this chart as of the second quarter

1 2009.

2 Q    Let's turn to page 111.

3          THE COURT:  Mr. Hirose, if you could move the

4 microphone away from your mouth a little bit.  We're getting

5 a little echo feedback.  Don't go so close to it.  Thank

6 you.

7 BY MR. BINGHAM:

8 Q    Let's turn to page 111.  At page 111 you have a second

9 published investor survey, and that's one, as I understand,

10 called the Core Paz real estate investor survey, and that

11 reflects the survey, as I understand it, of the first

12 quarter of 2009, is that correct?

13 A    That is correct, Mr. Bingham.

14 Q    And that one shows for national data for warehouses a

15 range of five to 9.5 percent, is that correct?

16 A    That is correct.

17 Q    And an average of 7.13 percent?

18 A    Yes.

19 Q    And that, again, I take it your answers with regard to

20 the Pricewaterhouse survey would hold true with regard to

21 this survey as well?

22 A    Mr. Bingham, you have to understand that

23 PricewaterhouseCoopers publishes the Core Paz real estate

24 investor survey.  So they're the same company.  This survey

25 is, you know, put out on a quarterly basis.  So these

1  numbers that you see here are, you know, what's stated in

2  that survey. And, again, I just want to qualify the number

3  -- or the average that you see that's an average based upon

4  their survey participants. However, when we -- when I

5  appraised this property, you know, I based my selection on

6  the overall rate based upon sales in the marketplace and

7  broker interviews.

8  Q    And the sales in the marketplace, are you referring to

9  the sales at page 109?

10  A    That is correct.

11  Q    And I see the sales in the marketplace. We have one at

12  8.25 and three at 7.61 or less and two at seven to 7.20, is

13  that correct?

14  A    Referring to the chart, that is correct.

15  Q    And in your view, these were reflective of the

16  marketplace at the time the sales were done?

17  A    Those are sales that happened in the marketplace and in

18  looking at them, that's how I extracted my conclusion of the

19  overall rate of 8.25 percent. And, again, I want to restate

20  that number one is a current listing. That's not an actual

21  transaction.

22  Q    Let's look at sale number two, for example, or can --

23  sale number two at -- and is this the one that's identified

24  at page 110? This is a listing.

25  A    Okay. I'm getting a little bit confused here.

1  Q    Can you provide me -- and let's go back to 109.

2  A    One zero nine?

3  Q    Can you identify the detail from your comparable

4  capitalization rate at -- at sale number two?

5  A    Mr. Bingham, what do you mean by detail?  Can you

6  explain?

7  Q    That appears at page 108, is that correct?  You would

8  compare both sale number two -- the detail appears at page

9  108.

10 A    Well, in the copy that I have here -- you're talking

11 about -- I have page 109, and there's a chart of overall

12 rate sales.

13 Q    Yes.

14 A    And sale number two is an 8.25 percent overall rate,

15 and if you go back to page 80, there's another chart here in

16 the sales comparison approach.  It says 8.25 percent, and if

17 you go back to page 82, there's a paragraph description

18 talking about sale number two.  And if you go back to our

19 addenda, which is addenda C, improved sale data sheets,

20 there is a data sheet with a picture of the comparable,

21 12401 Wood Drift Avenue, indicated in the addendum of the

22 report.

23 Q    Okay.  Let's go to page 80 and look at comparable sale

24 number two, and that is a sale with an overall rate of 8.25,

25 is that correct?

1 A     That is correct.

2 Q     And I see here that this is the sale of a property in

3 Downey?

4 A     That is correct.

5 Q     And that is not downtown L.A.?

6 A     That is correct.

7 Q     And it's not a "storage facility," is it?

8 A     That is correct.

9 Q     And it's not a produce market?

10 A     It is a multi-tenant industrial property, and it is not

11 a produce market.

12 Q     And, if I understand correctly, its NOI per square foot

13 was 8.33 -- $8.33, is that correct?

14         MR. MARTIN:  Did you mean NOI or --

15         MR. BINGHAM:  NOI.

16         MR. MARTIN:  NOI?

17         MR. BINGHAM:  Was $8.33 per square foot.

18         MR. MARTIN:  Oh, okay.

19         THE WITNESS:  Net operating income $8.33.

20 BY MR. BINGHAM:

21 Q     And that is less by $2.35 a square foot from the

22 subject property?

23 A     Okay.  Now you're comparing $8.33 to what now?  I

24 don't --

25 Q     The net operating income from the subject property.

1 A    Okay.  If we go to the subject property -- I just want

2 to make sure that --

3 Q    That's at page 114 I think.

4 A    Okay.

5 Q    I see $10.68 per square foot for the subject property.

6 A    That is correct.

7 Q    Okay.  So it's -- it's $2.35 less per square foot, and

8 it has less land serving the building I believe, because it

9 says it's a ratio of 2.07 to one as compared to 3.7 to one,

10 is that correct?

11 A    That is correct.

12 Q    And it's only 85 percent occupied as compared to 95

13 percent occupied to the subject property.  Am I correct?

14 A    At the time of sale it was 85 percent occupied, but the

15 overall rate is based upon pro forma income.

16 Q    Well, with all these factors built in, isn't this a

17 much inferior property to the subject property?

18 A    In terms of comparing it to the subject property, in

19 our analysis, if you look at -- in our sales comparison

20 approach -- because we're doing two things here.  In a sales

21 comparison approach, we're comparing the subject property to

22 other properties in the marketplace on a per square foot

23 basis, and we are in agreement that it is an inferior

24 property.  This one sold for $101 a square foot.  We're

25 concluding on a price per square foot of $130 a square foot,

1  and that assumes, you know, the subject property that this

2  does not have cold storage in it, that it's not located near

3  downtown L.A., and it has -- and it's an older property.

4      Now, why did we use this sale?  The reason we used this

5  sale, it was an investment sale that occurred at the time

6  that we were doing the appraisal.  It also had multi-tenant

7  occupancy like the subject property.

8  Q    But you're also using it as an example as one of your

9  comparable cap rate.

10 A    And I think it's a good example of a comparable cap

11 rate because when you look at the property, it's stabilized.

12 It was based upon what current investors were paying in the

13 marketplace based upon a stabilized asset.  And in light of

14 the fact too that, you know, brokers in the marketplace were

15 telling us at that point in time from our food facilities

16 group that, you know, darn, you should be at a 10 cap rate

17 based upon current credit market conditions and lack of

18 sales in the marketplace.  You know, our 8.25 percent gave

19 the property the benefit of the doubt.

20 Q    So, in other words, the primary consideration utilized

21 by you in fixing the cap rate was input from brokers?

22 A    Mr. Bingham, I don't fix a cap rate.  What I do is I

23 look at the data that's out there, whether it's listing a

24 sale -- I look at trends in the marketplace.  I talk, and I

25 interview brokers.  I hear the sentiment from them.  I look

at investor surveys, and after I look at all that, then I
say, okay, what am I going to do. I'm going to place most
weight on sales in the marketplace. The most recent sales
that happened in the marketplace I'm going to put greater
weight. I'm going to take a look at what the brokers are
saying. At the time that we did this appraisal, the brokers
were extremely negative in the marketplace. Transactions
were not happening. They were saying 10 percent to me. I
said, "Well, wait a second. Look at all these other sales."

And I think you've pointed out in your examination of
me, "Well, hey, there's lower cap rates in the marketplace."
Well, we considered that. Well, we've considered that, you
know, there was a seven percent that happened in Downey, a
-- a 7.61 percent that happened in the City of Industry, a
7.2 in the City of Commerce.

But if we examine each one of those overall rates and
we take a look at what happens, first, if you start from the
end, number five, multi-tenant building in Downey, July
2008, height of the marketplace, overall capitalization
rates at that point in time were substantially lower. You
know, if you look at sale number two, look what happens
approximately I want to say six to seven months later. You
have a cap rate that goes up to 8.25 percent. So there was
an increase in the cap rate due to negative market
conditions.

1    Sale number four, the 710 Everson Drive facility, which
2  is the state fish building, closed in December 2008.  At
3  that point in time, you know, that transaction was -- had
4  been -- was being negotiated I would say sometime -- had
5  been -- that pricing and the cap rate and the financial
6  analysis of that property had been negotiated several months
7  earlier.  And when we did our appraisal as of April 2009,
8  market conditions shifted and had gotten more negative.
9    If we look at sale number three, which is a 72,236
10  square foot multi-tenant freezer facility, and I've
11  appraised this property I want to say three, four, five
12  times before, you know, this property was part of a
13  portfolio acquisition by Guardian Life Insurance.  But,
14  again, you know, that property -- the financials on that
15  property in talking to the, you know, acquisitions manager
16  on the property, you know, those financial -- the
17  underwriting to acquire that property was done back in I
18  want to say, you know, October, you know, several months
19  earlier than the closing date.  And since then, when we did
20  our appraisal, we found that market conditions were
21  deteriorating.  That's why I did not go to a overall rate
22  below eight percent.
23  Q    You relied in large part upon information provided by
24  brokers that indicated to you from your -- as you have
25  stated, the cap rate should be 10 percent?

1  A    At that point in time, brokers were saying, oh, cap

2  rates should be 10 percent, but if I looked up the

3  transactions that actually closed during that time, I didn't

4  see 10 percent.  So that's why I didn't use it.  That's why

5  I'm called a score keeper.  I call it like I see it.

6       A lot of times when you have brokers in the

7  marketplace, they're interested in making a deal.  So,

8  naturally, they're going to be more pessimistic, and if they

9  think they could generate a sale at 10 percent versus a sale

10 at an eight percent cap rate or 8.25 percent, they're going

11 to try and go for it, but I have to make that call.  I have

12 no vested interest in the property, and I had no vested

13 interest in --  you know, when a broker's trying to sell a

14 property, he has a vested interest.  He's going to be making

15 a commission on it.

16 Q    Let's return to your direct capitalization analysis in

17 your current appraisal at page 114.  Would you please turn

18 to page 114, and I note that your operating expenses, about

19 halfway down the page are reflected or is reflected at

20 $308,149, is that correct?

21 A    That is correct.

22 Q    And as I understand the methodology utilized in doing a

23 direct capitalization summary, the greater the differential

24 between net rental income -- or the greater the net

25 operating income, generally -- well, let me restate that.

1    Taking the calculations at page 114, if the net

2  operating income were to go up and everything else would

3  remain the same, including the capitalization rate, but if

4  everything else stayed the same other than net operating

5  income, the valuation would go up, is that correct?

6  A    That is correct.

7  Q    And if net operating income stayed the same but

8  operating expenses went down and everything else stayed the

9  same, the valuation would go up, is that correct?

10  A    That is correct.

11  Q    Let us return to what we have marked for identification

12  as Exhibit 25, and turn to your appraisal of two years ago

13  and look at -- to page 91.  And I see at page 91 the same

14  sort of methodology utilized in your current appraisal, and

15  there is a schedule there called direct capitalization

16  summary.  Do you recognize that schedule?

17  A    If -- okay.  Page 91, direct capitalization summary,

18  and this is on the appraisal that we completed as of April

19  7, 2007 with dates of value March 29, 2007 and December 31,

20  2007, that is correct.

21  Q    And what -- and about halfway down there's a line item

22  called operating expenses?

23  A    That is correct.

24  Q    And what is the amount stated for the total annual

25  operating expenses on that line item?

1 A    Six ninety-one.

2 Q    That's the dollar item per square foot per year?

3 A    That is correct.

4 Q    And the total amount for the entire year?

5 A    The total operating expense?

6 Q    Yes.

7 A    At that point in time, we projected $233,850.

8 Q    And currently you have an operating expense of $308,149

9 in your current appraisal?

10 A    That is correct.

11 Q    If an investor believes or a buyer believes that the

12 condition of a property will improve, does he expect to pay

13 a higher or lower capitalization rate?

14 A    If an -- okay.  If I understand -- I want to make sure

15 I understand your question, Mr. Bingham.  So you have an

16 investor, and he anticipates that the -- are you saying the

17 property's going to improve or what's going to improve about

18 the property?

19 Q    The NOI will improve.

20 A    Okay.  Meaning that they're going to get higher rents

21 in place, is that correct?

22 Q    That's correct.  That's one factor that would improve a

23 property but I'll just make that as the assumption.

24 A    Okay.  I would say on a general basis then an investor

25 is going to look at it and say, okay, it's got some upside

1  potential and based upon where the current credit markets

2  and where transactions are in that marketplace, he's going

3  to make his call where an overall rate would be for the

4  subject property.

5      And, again, I want to phrase that it depends upon the

6  situation that's happening in the economy at that point in

7  time where that investor is going to select his

8  capitalization rate.

9  Q    Let's make it as simple as possible.  If an investor or

10  buyer believes the financial condition of the property will

11  improve in the future, either by an increase in the rents, a

12  decrease in the costs, an improvement in market conditions,

13  will the investor expect the capitalization rate to go -- to

14  be lower or higher?

15  A    Again, that's a pretty generalized question or, with

16  all -- all kinds of different factors.  Again, I would have

17  to state that you have to take that question in the context

18  of what's going on with the current economy.  I would say,

19  you know, on a general basis -- and there could be

20  exceptions to it -- I would say that an investor, if he

21  thinks that things are going to improve with the property in

22  terms of the rents are going to go up and maybe the expenses

23  go down and the property's going to improve, you know, he

24  might go for a lower overall rate.

25  Q    Are there buyers -- are there marketplace players who

1 purchase properties for cash?

2 A    That's correct.

3 Q    Are there marketplace players who purchase properties

4 for their own use?

5 A    There are marketplace players who would purchase

6 properties for their own use.

7 Q    Are there marketplace players who have alternative

8 sources of financing rather than traditional sources?

9 A    I would say yes.

10 Q    Have those markets been considered in your appraisal?

11 A    At that point in time when we did the appraisal, we

12 were basing it on current transactions in the marketplace.

13 We did consider that there were -- that there are other

14 buyers in the marketplace also.

15 Q    Did you have conversations with such people?

16 A    Generally speaking, in terms of what we did, Mr.

17 Bingham, is we looked at the sales that we saw in the

18 marketplace at that point in time.  If you look at that

19 Guardian Life Insurance deal, you know, that's an all cash

20 deal by a major financial institution.  They had money in

21 place ready to buy this, and those are, you know, two

22 properties that we had in our sales comparison approach.

23          MR. BINGHAM:  I have nothing further, and I move

24 to introduce Exhibit 25 into evidence, your Honor.

25          MR. MARTIN:  No objection.

1    THE COURT:  It's admitted.

2    MR. MARTIN:  May I approach, your Honor?

3    THE COURT:  Yes.

4    MR. MARTIN:  I just handed the Court and the clerk

5 a document I'd like marked for identification as Exhibit 26.

6 It's a compilation prepared by Mr. Bingham, and there was a

7 lot of discussion during the cross examination about it.  So

8 I'd like it marked for identification.  I intend to refer to

9 it during the redirect.

10                    RECROSS EXAMINATION

11 BY MR. MARTIN:

12 Q    Mr. Hirose, would you turn to page two of your letter

13 which is part of Exhibit 24.  What are the dates for which

14 you determined value of the subject property as indicated by

15 page two?

16 A    April -- the as is value, April 20th, 2009, and the

17 stabilized -- as stabilized value was November 1, 2009.

18 Q    Now, you indicated during the cross examination that

19 you referred to a number of surveys, the KORPAC survey and

20 some other surveys, and you indicated there was a lag time

21 on these surveys.  Has anything happened during the four

22 months since your appraisal date which would either confirm

23 or invalidate the -- the conclusions that you reached with

24 regard to value?

25 A    Mr. Martin, there has been additional surveys that have

1 been completed by or been published by

2 PricewaterhouseCoopers or the KORPAC Real Estate Investors

3 Survey.  As of now as we speak, the second quarter 2009

4 survey is now available to the public, and the title of that

5 document says -- or the highlighted title say "Investors

6 expect further value declines."

7 Q    Do you have additional copies of that?

8 A    Yes, I do.  I believe I gave them to you.

9 Q    Which one is this?

10 A    Right there.

11          MR. MARTIN:  May I approach, your Honor?

12          THE COURT:  Yes.

13          MR. MARTIN:  We have this marked as Exhibit 26 --

14          MR. BINGHAM:  Objection, your Honor.

15          MR. MARTIN:  -- for identification.

16          THE COURT:  27.

17          MR. MARTIN:  27.

18 BY MR. MARTIN:

19 Q    What does that study indicate, Mr. Hirose?

20 A    The study indicates, if you were to turn to page three,

21 that the overall rates for properties have been increasing

22 since the first quarter of 2009.  If you were look at the

23 warehouse -- national warehouse average for the second

24 quarter 2009, that average jumped up to 7.93 or 80 basis

25 points.

1     One of the interesting things I think about this survey

2 or the publication is that if you turn to page eight,

3 there's a long discussion about real estate value cycles,

4 and there are charts on page nine that indicate that -- that

5 most of the real estate stock in the United States is in a

6 recessionary situation, and according to the data that

7 they've compiled together, the -- PriceWaterhouseCoopers is

8 projecting that the majority of the commercial real estate

9 stock of real estate will start to recover in 2012.

10     Additionally, our firm has published the 2009 National

11 Investors Survey.  It just came out, and some of the

12 highlights of this survey -- and, again --

13          MR. MARTIN:  Hold on a second.  Could we have that

14 marked for identification also so we know what we're talking

15 about?  And this will be what, 28?

16          THE COURT:  28.

17 BY MR. MARTIN:

18 Q    Okay.  Go on with your description of Exhibit 28.

19 A    The CBRE National Investors Survey was compiled and

20 produced by our valuation and advisory services group

21 throughout the United States, and essentially, it indicates

22 that overall rates have increased since the first quarter of

23 2009.

24 Q    Excuse me, Mr. Hirose.  You keep referring to rates.

25 Are you referring to cap rates or something else?

1  A    Cap rates.

2  Q    Okay.

3  A    In particular, here there is on page six a market

4  overview of what's been happening since early 2007.  You

5  know, in early 2007, we were riding a very high marketplace.

6  We had low debt service.  We were proceeding that rental

7  rate increases were going to happen in all property classes,

8  and there was strong investment demand.

9      Well, since then this is --

10       MR. BINGHAM:  Objection, your Honor.  If he wants

11  to testify as to the current survey in the current amount,

12  the current rate, then that -- that I cannot object to, but

13  if he's going to go over the history of the rates, I think

14  we're going beyond the scope of the redirect.

15       MR. MARTIN:  Well, I think that history is a guide

16  to the present and the future in terms of the projections

17  which are taking place.  Mr. Meruelo has testified that

18  things are going to improve.  I think in determining when

19  things are going to improve, it's important to determine how

20  long things have been bad, and so I think he's entitled to

21  go into the history of what it is as a guide to the future.

22       THE COURT:  Objection overruled.  You can answer.

23       THE WITNESS:  Well, basically, what this survey

24  indicates -- and if you turn to page 11, which covers the

25  industrial market, second paragraph, it says:

1    "Industrial availability rates continue

2    to increase across the country as

3    companies confronted the ongoing

4    challenges of the global recession and

5    sought to reduce costs as quickly as

6    possible.  The lower value of the U.S.

7    dollar will not likely impact experts

8    and local demand for goods remains weak.

9    Rental rates are expected to continue to

10   decrease while construction grinds to a

11   halt."

12   Now, this is -- industrial cap rates increased

13   from 7.4 percent in 2007 to 8.7 percent in 2009.  The

14   biggest increases were business parks, with increases from

15   last year ranging from 176 basis points to 205 basis points.

16   Okay.  Again, this is a national survey.  It crosses the

17   entire United States.  It deals with industrial properties.

18   Our -- you know, when I did the valuation of the subject

19   property, the survey was not in place.  I concluded as of

20   the date of value an 8.25 percent capitalization rate.  In

21   retrospect, looking at this survey right now which covers,

22   you know, current market conditions, I think it provides

23   further evidence or validates where I was on my overall

24   rate.

25   In my previous testimony, I referred to

1  institutional sales that recently occurred in July of this

2  year, and one was the Garfield Business Center, which was a

3  multi-tenant business park.  The overall cap rate -- and,

4  again, I don't have it right in front of me -- I think was

5  around 9.3 percent, and the Buena Park Commerce Center,

6  which is a cold storage property with some cold storage

7  tenants in Buena Park, modern construction.  That cap rate

8  was over 13 percent.

9          So, again, you know, when you look at things that

10 have happened since then and you ask, well, is my 8.25

11 percent overall rate, was it reasonable at that time, it was

12 reasonable at that time, and I thought -- and in retrospect,

13 you know, we gave the property the benefit of the doubt.

14 BY MR. MARTIN:

15 Q    There's a chart on page 12 of Exhibit 28 in the upper

16 right-hand corner.  Does that chart indicate what you're

17 talking about with regard to investor cap rate trend?

18 A    Yes, it does.  If you look at page 12, you'll see that

19 back in 2001, you know, overall capitalization rates, the

20 average was between 10 and 10.5, and then if you look at

21 this chart, you'll see starting in 2007 -- and I think

22 that's about -- that overall rates started their march

23 upward.  In the current marketplace, you know, this is

24 what's happening.

25 Q    Would you turn to Exhibit 26 again.  That's the -- Mr.

1 Bingham's worksheet.

2 A    Mr. Martin, are you referring to this sheet?

3 Q    Yes.  That's Exhibit 26.  During the direct examination

4 and the cross examination, there was a lot of talk of

5 external obsolescence.  Can you relate that concept to

6 Exhibit 26?

7 A    Well -- and, again, I don't know what Mr. Bingham was

8 trying to do here, but basically what this exhibit indicates

9 is based upon the replacement costs of the subject property,

10 I think I said it was like about $9.2 million without

11 external obsolescence, that this $2.93 per square foot

12 number is the feasible market rent that's required for that

13 replacement cost number.

14 Q    And how do you get from that to determination of what

15 your factor should be for external obsolescence?

16 A    Well, you know, you can do it on a simplified basis

17 right here by taking the $2.93 a square foot minus the $1.76

18 that the property was generating.  If you return to our

19 income capitalization approach, rent role analysis on page

20 95 of the current report, the subject property was averaging

21 $1.76 a square foot.  Assuming income in place plus the --

22 plus the market rent of $1.85 a square foot on the vacant

23 space.

24      So if you take the $2.93 cost feasible rent minus, you

25 know, the $1.76, you get a rent differential of about $1.17

1  a square foot.  So you're losing -- you're not achieving,
2  you know, $1.17 gross, times $31,876.  That's times 12 --
3  well, let's see here.  You're losing about $447,539 on an
4  annual basis.

5      If we were to use our cap rate, apply that, divide that
6  external obsolescence number comes out to about $5.4
7  million, which is pretty damn close to what we calculated in
8  the cost approach.

9      But one of the things is in -- that you got to
10  understand here is that this $2.93 a square foot rent is a
11  -- a rent that assumes that you can achieve the replacement
12  cost value.  One of the things that I think is very
13  important is that you have to look at the distinction here
14  of where the current market rents are for the subject
15  property and where this cost feasible rent of $2.93 a square
16  foot is.  That's just a projection out into the future.

17      When we did -- when we did our market rent survey, we
18  looked at rents that were occurring in the marketplace.  On
19  page 86 -- you know, most of our comparables -- most of the
20  comparable properties were located above the 10 Freeway,
21  near the produce terminals, the L.A. Wholesale Mart and the
22  Seventh Street Terminal Mart, and those comparables would be
23  comparables one, two, four, five, and six.

24      And I would say that these comparables, especially 788
25  Alameda and comparable number two are the core produce

market -- are located in the core produce market area, and
the best way that I can describe it is is that when you're
close to the L.A. Wholesale market or the Seventh Street
Produce Market, there are synergies to being there, and all
the produce tenants want to be there because they can pick
up produce from various other vendors in the marketplace to
supply their customers.

At the subject property you cannot do that, and because
of that, there is a distinct rental differential.  So when
you look at the rents in place here in our comparables,
number one, 788 Alameda, which is an MMPI property, it's
located right across from the L.A. Wholesale Mart in Alameda
Square, and the users there can -- or the tenants in that
product can go take their forklifts and hand trucks across
the street, bring produce over from those larger marts and
service their customers.  You can't do that with the subject
property.

So if you look at the rents that are being generated at
788 or 350 and 375, that's the reason why they're getting
those rents.

Okay.  Let's go back to this cost feasible rent of
$2.93 a square foot.  Well, this $2.93 a square foot is,
again, I -- it's a projection based upon the replacement
cost, and you have to ask yourself is -- if the rents are
going to -- you know, there's always going to be a rental

1 differential between the comparables that are located near

2 the L.A. Wholesale Produce Market and the Seventh Street

3 Produce Market because that's the Beverly Hills of the

4 produce industry.  When you go down to the subject property,

5 2640 Washington, the property was only getting, you know,

6 $1.75 to $1.85 a square foot, and that is a situation where

7 there's going to be -- you know, based upon the analysis

8 that I see in the marketplace, there's a permanent

9 locational difference in the rents that you're going to be

10 able to achieve for 2640 and the rents which are going to be

11 achieved for the produce markets in Los Angeles.

12 Q    Are you saying that for rents to go up at 2640, they

13 have to go up at 788 Alameda?  Is that what you're saying?

14 A    Excuse me, Mr. Martin.  I didn't understand your

15 question.

16 Q    Are you saying that for rents to go up at 2640, they

17 have to go up at 788 Alameda?

18 A    I still kind of don't understand what you're saying.

19 Q    Okay.  Well, you indicated that there was a rental

20 difference between the two locations attributable to their

21 locations, and you indicated that that differential was

22 permanent.  Now, if you have a permanent differential and

23 you have a change in the rent at one location, does that

24 indicate that there has to be a change in the other

25 location?

1 A    That means that the rent's going to have to go up in

2 the other location also.

3 Q    So are you saying that for the rents to go up at 2640

4 Washington they have to go up at 788 Alameda?

5 A    That's what would have to happen.

6 Q    And for how long have the rents at 788 Alameda been

7 where they are now?

8 A    Again, I don't have, you know, all my -- well, I have

9 my appraisals from the last three other times that I've

10 appraised 2640 Washington Boulevard, but they've always

11 seemed to be in that three to 350 range.

12 Q    Okay.  If you could turn to I believe it was Exhibit

13 25.  Is that the prior exhibit, 25?

14 A    Are you referring to the prior appraisal?

15 Q    Yeah, your 2007 appraisal of the subject property,

16 Exhibit 25.  You were asked a number of questions about

17 that.

18 A    Yes.

19 Q    Okay.  What was -- what was the difference between the

20 data that you relied on between your 2007 appraisal of the

21 subject property and your 2009 appraisal?

22 A    Mr. Martin, can you -- okay.  You said what is the

23 difference.  Can you elaborate on that?

24 Q    What is the difference with regard to the information

25 that you had with regard to the subject property regarding

1  expenses and income?  What are the differences between those

2  data between 2007 and 2009?

3  A     Okay.  In 2007, when the property was appraised -- if

4  you look on page -- and, again, this is -- I'm referring to

5  the Washington Produce Center appraisal prepared for Rebecca

6  Leung, United Commercial Bank, and the date is April 7,

7  2007.  If you turn to page 3(iii), which shows a picture of

8  the property, when I appraised it at that point in time, the

9  property was totally vacant.  There were no signed leases in

10 place.  There was no operating history available, meaning

11 that there was no income and expense statements, operating

12 statements to rely upon for generating -- there were no

13 income and expense statements available similar to what I

14 had when I did the current appraisal.  However, at that

15 point in time, we did have some operating statements for

16 comparable properties.  And that's shown on page 84.

17 Q     Did you rely on any information that you received from

18 the owner?

19 A     At that point in time, we had -- from the owner we had

20 rent statements.  If you look on page 788, we had, you know,

21 comparable rental data on a similar produce facility, 788

22 Alameda at $3.50 a square foot, and we had I believe at that

23 point in time some statements from some other produce

24 tenants in some of their other operations.

25     We did have -- when we were doing this appraisal, on

page 81 of the appraisal there were two leases that were being negotiated at that point in time. One was with a produce tenant called Equestia, and we were told at that point in time that they were going to be leasing eight units of space totaling 7,680 square feet and that their initial rent was going to be around $2.25 a square foot modified gross.

And then there was another tenant, A and F Produce, who was going to occupy three units totaling 2,880 square feet. And at that point in time, the rental rate that -- based upon the information that we were getting from the ownership, they indicated $2.25 a square foot, not by gross.

Q    And you reviewed the information and the rent roles in -- for your April 2009 appraisal. Were either of those leases included in the information you had at that time?

A    Based upon the review of the rent role, we didn't -- or I did not see these tenants in the rent role.

Q    In computing the expenses for your April 20, 2009 value, did you accept the figures which were given to you for operational costs from the owner or for purposes of your appraisal, did you modify them?

A    In coming up with our -- the expense -- the operating expenses for the subject property, we were given operating statements for the subject property. If you refer to addendum E of our current appraisal -- and, again, I want to

1  state that that appraisal was as of -- the date of the

2  report was May 3rd, 2009, and the date of values were April

3  20th, 2009 and November 1, 2009.  But we had operating data

4  consisting of the rent role, a 2009 monthly reforecast

5  summary and a 2008 operating statement, and these are all in

6  addenda E.

7       So one of the things that we did is we took a look at

8  those operating statements, and we had to make a judgment

9  call as to, okay, do we go with exactly the numbers that are

10 shown in the operating statements or if we see some

11 variations where we think that the operating expenses are

12 too high or too low, we'll make adjustments.

13      Starting on page 99, we show operating expense

14 comparables of similar cold storage properties.  I want to

15 point out that number one, 32,000 square feet is 788

16 Alameda, which is pretty comparable to the subject property.

17 We at first estimate real estate taxes and taxes are based

18 upon the stabilized value with the current tax rate applied

19 to it.

20      If you look at our property insurance calculation or

21 estimate on page 100, the 2008 actual was showing .20 cents

22 a square foot.  The budget was .18 cents.  We concluded at

23 .20 cents.  Building maintenance, if you look at that, the

24 -- the next category, the actual expense in 2008 was .94

25 cents.  In 2009, the ownership had budgeted $2.52 a square

foot based upon the expense comparables that we saw in the marketplace. They had expenses ranging from .40 cents to $1.87.

We thought that the 2009 budgeted expense of $2.52 a square foot was too high. So we came in at an estimate of $1.15. If you go to the next category of utilities, the 2008 indicated utility expense was .33 cents. The budgeted expense for 2009 was .87 cents. Our expense comparable data ranged from .35 cents to $2.64 a square foot. I want to say that expense comparables two and three had more freezer space in their larger, more institutional cold storage facilities, and freezer space has higher operational costs in terms of using electricity. So we placed less weight on that.

We concluded a utilities cost of .50 cents a square foot. Again, we were below the 2009 budget. Trash was budgeted -- or the actual trash amount expense was $1.84 a square foot in 2008. The budget in 2009 was nine cents a square foot. When we looked at the expense comparable one, which was 788 Alameda, it was indicating a trash budget of $1.68 a square foot, and then the two expense comparables two and three had substantially lower expenses at .22 cents and .27 cents.

We made a judgment call at $1.25, which is higher than the budget, but it was lower than the actual 2008 expense

1 amount for trash.  In our opinion, that was reasonable.
2 Q    And in your page three of addendum E is the 2008
3 operating statement which indicates expenses of $449,970.
4 In your appraisal you arrive at a figure of $308,000.  Can
5 you just describe the reason for the difference between the
6 actual 2008 which you actually used in your appraisal, which
7 was substantially lower?
8 A    That is correct, and I just want to go over a couple of
9 key things here.  One of the extremely high numbers in
10 operating expenses for this property was the security
11 expense.  And if you look on page 102, the 2008 security
12 expense was $5.34 a square foot.  Now, that security expense
13 was budgeted to be $4.50 a square foot in 2009 by the
14 subject ownership.
15       Well, the security expense for the subject property
16 when we took a look at it assumed that there's a 24 hour --
17 there was 24-hour security on the property, on-site guards.
18 Because this was a -- a remote location away from the
19 produce market, we though that the security expense could be
20 lowered by having a drive-by security service versus an on-
21 site security service.  So, because of that, we came up with
22 a $3.50 a square foot security expense for the subject
23 property, which is substantially lower than the security
24 expenses for 2008 and 2009.
25       Again, you know, that's based upon -- we're assuming

1 that the management of the subject property was being done

2 by a professional manager and that they would do all that

3 they could to reduce their operational costs.

4 Another instance also is on the administrative and

5 general expenses. Mr. Martin, you know, we were shown that

6 in 2008 those expenses were .43 and .52 cents a square foot,

7 budgeted at .52. In 2009 we came slightly lower. The

8 management fee for the subject property in 2009 was budgeted

9 at 8.4 percent. We -- we made a call and we said the

10 management fee would be lower at four percent.

11 You know, in each case, when we looked at these

12 categories, we were trying to determine reasonable operating

13 expenses for the subject property, and where we saw things

14 that were out of line or too excessive, we made the call.

15 Q So did I hear you just say, to sum up, that in your

16 view, professional management would have -- if the property

17 had been properly professionally managed, the actual cost

18 would be $308,000 operated instead of 449 --

19 MR. BINGHAM: Objection, your Honor. Leading the

20 witness.

21 THE COURT: Sustained.

22 BY MR. MARTIN:

23 Q What -- in your opinion, what would the proper cost

24 factor be for the operation of this property if the property

25 were properly managed?

1 A    We were using a four percent management fee.

2 Q    And what would be the dollar figure?

3 A    Well, in terms of -- well, we had .81 cents a square

4 foot.

5 Q    What would be the aggregate?

6 A    Well, the aggregate -- well, the aggregate total

7 operating expenses that we came up with was $308,149.

8 Q    Okay.

9 A    Or $9.67 a square foot.

10 Q    Okay.  And, according to the actual operating results

11 for 2008, your third page of addendum E indicates the actual

12 cost is $449,970, is that correct?

13 A    Based upon what I see here, that is correct.  Now, one

14 thing I want to point out --

15          MR. BINGHAM:  Objection, your Honor.  There's no

16 question pending.

17          THE COURT:  Maybe we should take a break.  Let's

18 come back at 10 till.

19     (Proceedings recessed briefly.)

20          THE COURT:  Mr. Martin.

21          MR. MARTIN:  No further questions, your Honor.

22                    REDIRECT EXAMINATION

23 BY MR. BINGHAM:

24 Q    Referring to what has been marked for identification

25 Exhibit 27 and 28, we've discussed those also and you

1  referred to them in your prior testimony.  Those are surveys

2  prepared with regard to investors, is that correct?

3  A    That is correct.

4  Q    And I'd direct your attention to Exhibit 27 marked for

5  identification and the heading at page eight is "Real Estate

6  Value Cycles," is that correct?

7  A    You're referring to the second quarter 2009 KORPAC, is

8  that correct?

9  Q    Yes.

10 A    Okay.  Page?

11 Q    Eight.

12 A    Okay.

13 Q    And the heading is "Real Estate Cycles?"

14 A    Uh-huh.

15 Q    And yet you testified I believe the last time you were

16 here that you prepared your external obsolescence predicated

17 upon a permanent change in obsolescence, is that correct?

18 A    Mr. Bingham, I think you're -- not -- you're

19 misconstruing my words.

20 Q    Then what did you testify?

21 A    Are you referring to the testimony today or last week

22 or what specific -- what are you referring to?

23 Q    Let's go over that again.  My understanding is that

24 external obsolescence can be temporary or permanent, is that

25 correct?

1  A    An external obsolescence can be temporary.  It can be

2  permanent.  When I did the external obsolescence calculation

3  as of the date of value, that's a point estimate in value at

4  that point in time, and we're saying as of that date, that's

5  what the external obsolescence was.

6  Q    You calculated it as if it were permanent?

7  A    I calculated the external obsolescence as of that date

8  of value because what I've said in my prior testimony is

9  that if that rent changes the next day or expenses go down,

10  then that external obsolescence changes, okay.  So that

11  means that external obsolescence calculation can change, and

12  that would indicate that -- what you're saying is is it

13  permanent.  In that instance, no, because it diminished.

14  Q    You did not provide a discounted cash flow analysis

15  predicated upon a temporary application of external

16  obsolescence, is that correct?

17  A    That is correct.

18  Q    So you did not treat the event of external obsolescence

19  as if it were a temporary or cyclic event, is that correct?

20  A    I did not do a discounted cash flow analysis.  What I

21  did was I estimated external obsolescence as of the date of

22  value based upon the loss of income, and I applied my

23  capitalization rate, and that's a point estimate of value as

24  of that particular date.

25  Q    If you had done a discounted cash flow analysis, how

1  would you have done it?

2  A     Well, in applying a discounted cash flow analysis, you

3  can -- Mr. Bingham, are you referring to how I would have

4  done it for the subject property in terms of if I did a

5  discounted cash flow analysis?

6  Q     Yes, I am.  Thank you.

7  A     Okay.  Well, what I would -- there's various ways to do

8  it, but essentially, you would project income over the

9  holding period.  Typically it's 10 years, your operating

10 expenses, and then deduct the operating expenses and your

11 net operating income, and then you would also show the cash

12 flow over the 10 years, and you would assume a reversion

13 into the future and discount that back.

14      You know, as a cross-check, you know, we did it

15 subsequent to our valuation a discounted 10-year cash flow

16 analysis based upon current investment parameters, and, you

17 know, we came in at a value stabilized about $4,190,000.

18      Now, what you can do is -- and we didn't do it -- you

19 can figure out the difference in your loss of income, and

20 you can discount that back over a certain period to come out

21 with an external obsolescence calculation.  We chose not to

22 do that because of the complexities involved, because of all

23 the variables.  And, essentially, you are manipulating more

24 factors in calculating external obsolescence than is

25 necessary.  Again, stated in current -- my current and past

1  testimony, that external obsolescence in our appraisal was a

2  simplified appraisal approach, a simplified appraisal

3  approach that has been utilized by -- and reviewed by major

4  financial institutions and REETs are, you know, in this

5  marketplace.  It is used to demonstrate that the market

6  conditions have severely impacted real estate.

7       And, again, the external obsolescence calculation in

8  the cost approach which results in similar value to the

9  income capitalization approach, it is one approach to value.

10 We relied on three approaches to value, applying the --

11 placing the most weight on the income capitalization

12 approach.

13          MR. BINGHAM:  I have nothing further of the

14 witness, your Honor.

15          MR. MARTIN:  One question, your Honor.

16                RECROSS EXAMINATION

17 BY MR. MARTIN:

18 Q    Mr. Hirose, you indicated that you -- if I understood

19 you correctly, you did a discount cash flow analysis.  Did I

20 hear you correctly?

21 A    That is after the fact, but this discounted cash flow

22 analysis was something that we did that would parallel the

23 direct capitalization approach, but we did it on a -- on a

24 basis where we looked at the property and, you know, we

25 decided, okay, if someone did a discounted cash flow

1 analysis and if you had 10 appraisers out there and you

2 asked them to appraise this property and they'd say, wait,

3 would you do a discounted cash flow analysis when you got

4 month-to-month leases in place, most of them will say

5 probably no.

6       This cash flow analysis that I completed -- and, again,

7 this is not incorporated into our original valuation, and

8 the reason why we didn't do it is because there are too many

9 variables in this to go over and to justify any of the

10 appraisal processes.  You can do it as a matter of course,

11 but it's unnecessary in this.

12 Q    What was the result of your discounted cash flow

13 analysis?  What value did you run it on?

14 A    Four million one ninety.  Again, we were just doing it

15 on an ancillary basis, and this is -- you know, we wanted to

16 do a test.

17 Q    Do you have a copy of that document with you here

18 today?  Do you have more than one copy?

19 A    Yes, I have.

20         MR. MARTIN:  Can we have it marked as Exhibit 29?

21         MR. BINGHAM:  Not until I see it.

22         MR. MARTIN:  You'll get a copy.  Is this the only

23 copy you have?

24         THE WITNESS:  Can I have my marked copy, please?

25         MR. MARTIN:  Are those the same?

1         THE WITNESS:  Yeah.

2         MR. MARTIN:  May I approach, your Honor?

3         THE COURT:  You may.

4         MR. MARTIN:  Handing Exhibit 29 for

5 identification.  That's the only question that I have.

6    (Pause.)

7         MR. BINGHAM:  If Mr. Martin intends to introduce

8 this into evidence, I intend to move to strike it in light

9 of the fact -- due to surprise.  This is not within the

10 gambit of the original appraisal, nor is it something that

11 can be responded to in 60 seconds.  It involves further

12 exam, and I don't think it can be handled within this period

13 of time.  Otherwise, I would conclude the examination.

14         MR. MARTIN:  Exhibit 29 is in response to the

15 recross and also cross which raised the issue of the

16 discounted cash flow analysis.  We believe that we don't

17 have to move to put it into evidence.  We will not move to

18 put it into evidence because his testimony is already in

19 evidence.

20         THE COURT:  You may recover your --

21         MR. MARTIN:  Thank you.

22         THE COURT:  -- document and get it from the clerk

23 too, please.

24         MR. MARTIN:  This was marked for identification.

25 I haven't moved to have it in evidence, but I wanted it

1   marked for identification.

2        THE COURT:  It's been so marked.  On these matters

3   not admitted, it won't be reviewed by me or any appellate

4   court because it's not in evidence.

5        MR. BINGHAM:  I would also object -- and I haven't

6   heard it moved into evidence -- Exhibits 27 and 28 on the

7   basis of lack of authentication and the fact that they're

8   hearsay, if it was intended that they be introduced into

9   evidence.  If they were merely intended to be a source for

10  recollection or a matter for his testimony, I have no

11  objection and did not raise an objection to his testifying

12  as to new matter in support of his testimony.

13       MR. MARTIN:  Well, let's start with Exhibits 25

14  and 26.  25 is the appraisal.  26 is Mr. Bingham's schedule.

15  We move for admission of those.

16       MR. BINGHAM:  I have no objection to those.

17       MR. MARTIN:  Okay.  With regard to 27 and 28, the

18  appraisal which has been admitted indicates a value as of

19  November 1st.  The 27 and 28 validate the assumptions which

20  were made in arriving at the value here.  As Mr. Hirose

21  indicated, many of the indicators that he relied on were

22  lagging because the data was from a period prior to the date

23  of the report in which he relied.  For instance, the KORPAC

24  summary which was for the first quarter was actually lagging

25  his April 20 appraisal.  So the second -- the second quarter

1  KORPAC appraisal was actually contemporaneous with his

2  appraisal, and it should be admitted.

3          The other one is CBRE, which indicates information

4  that he relied on in the course of his contacts within CBRE

5  to which he referred.  So this is foundational for his

6  testimony.  We move the admission of 27 and 28.

7          MR. BINGHAM:  I believe the -- both documents,

8  again, to the extent they are being proffered for anything

9  other than as materials normally used by an expert such as

10  Mr. Hirose as an appraiser in the course of the performance

11  of his duties is in our -- inadmissible due to lack of

12  foundation and lack of -- and that they're hearsay and

13  inadmissible on that basis.  They may be admissible --

14  they're simply -- the probative value is outweighed by the

15  lack of support for the general propositions made in these

16  -- these studies.  There's just nobody here from KORPAC to

17  authenticate the nature and the manner in which these

18  studies were conducted, how scientific the studies were, who

19  the investors were who provided the information, how the

20  information was tested, and how accurate that information

21  is.

22          THE COURT:  I agree with you on all those points,

23  but you said that to the extent that they are inadmissible

24  in and of themselves, they're foundational documents for the

25  testimony.  So shouldn't they not be admitted?

1          MR. MARTIN:  I think they should be admitted, and

2  your Honor should also be informed that Mr. Hirose was

3  deposed, and a copy of the first quarter KORPAC survey was

4  acquired by Mr. Bingham in that deposition, and Mr. Hirose

5  was deposed about that.  So all we're doing is updating

6  information on which Mr. Hirose --

7          THE COURT:  He hasn't suggested surprise.  What he

8  has said is -- I guess I need to know what are you going to

9  do with them.  I assume you're never going to want me to

10 look at them again because they're not product.  They're

11 product -- inadmissible product that he can use to form his

12 opinion.  So why would I have them is my question?

13         MR. MARTIN:  Because they validate his opinion.

14         THE COURT:  So you do want me to read them?

15         MR. MARTIN:  Yes.

16         MR. BINGHAM:  Well, I object to the Court reading

17 them.

18         THE COURT:  Objection sustained.  His testimony is

19 on the record.  Whatever you wanted me to know about what

20 was in them he's testified as his opinion, correct?

21 Correct.

22         Next subject.

23         MR. BINGHAM:  Witness may be excused, your Honor,

24 if the Court would so instruct the witness.

25         THE COURT:  Thank you, Mr. Hirose, for coming to

Summary of 2640 Washington and Wall St Cash Receipts and Disbursements from Debtor's Operating Reports

### 2009

| 2640 Washington | March Report # 1 | April Report #2 | May Report # 3 | June Report # 4 | July Report # 5 | August Report # 6 | (2-5) Totals | Average |
|---|---|---|---|---|---|---|---|---|
| Receipts | $ 606.30 | $ 61,092.38 | $ 60,294.46 | $ 64,392.03 | $ 81,209.25 | $ 71,580.38 | $ 266,988.12 | $ 66,747.03 |
| Transfer to other DIP accounts | $ 606.30 | $ 57,792.38 | $ 59,676.96 | $ 54,376.19 | $ 75,823.50 | $ 61,144.00 | $ 247,669.03 | $ 61,917.26 |
| Operating disbursements | $    - | $ 3,300.00 | $ 617.50 | $ 10,015.84 | $ 5,385.75 | $ 10,436.38 | $ 19,319.09 | $ 4,829.77 |

### 2009

| Wall St. | March Report # 1 | April Report #2 | May Report # 3 | June Report # 4 | July Report # 5 | August Report # 6 | (2-5) Totals | Average |
|---|---|---|---|---|---|---|---|---|
| Receipts | $3,724.25 | $188,683.00 | $181,771.74 | $166,486.45 | $212,811.90 | $198,791.06 | $749,753.09 | $187,438.27 |
| Transfer to other DIP accounts | $3,724.25 | $175,885.00 | $171,432.96 | $137,197.95 | $208,348.83 | $198,077.02 | $692,864.74 | $173,216.19 |
| Operating disbursements | $    - | $ 6,798.00 | $ 13,182.22 | $ 25,360.88 | $ 5,292.83 | $ 3,743.04 | $ 50,633.93 | $ 12,658.48 |

Exhibit 5 Page 000162

# I. CASH RECEIPTS AND DISBURSEMENTS

| | | | | | | |
|---|---|---|---|---|---|---|
| Case Number: | 13365 | 13404 | 13397 | 13383 | 13370 | 13373 |
| Month Ending: | 08/31/2009 | 08/31/2009 | 08/31/2009 | 08/31/2009 | 08/31/2009 | 08/31/2009 |
| Account Number: | 0080306665 | 0080594676 | 0080302235 | 0080301518 | 0080302433 | 0080301724 |
| Depository Name & Location | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank |
| | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 |
| | Meruelo Maddux-2415 E. Washington Blvd, LLC | Merco Group-2529 Santa Fe Ave, LLC | 2640 Washington Blvd, LLC | Meruelo Maddux Props-2951 Lenwood Road, LLC | Meruelo Maddux Props-306-330 N. Ave 21, LLC | Merco Group-3185 E. Washington Blvd, LLC |
| 1. Total Prior Receipts | 5,575.00 | 56,277.25 | 267,594.42 | 11,474.53 | 45,232.23 | 438,227.86 |
| 2. LESS: Total Prior Disbursements | 5,575.00 | 56,277.25 | 267,594.42 | 11,474.53 | 45,232.23 | 438,227.86 |
| 3. Beginning Balance | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 750.00 | 0 | 61,144.00 | 0 | 6,150.00 | 30,000.00 |
| A/R - Pre Filing | 0 | 0 | 0 | 0 | 1,000.00 | 0 |
| General Sales | 0 | 0 | 0 | 0 | 0 | 0 |
| Intercompany Receipts | 430.00 | 3,342.76 | 10,436.38 | 2,061.27 | 2,543.35 | 325.00 |
| TOTAL RECEIPTS | 1,180.00 | 3,342.76 | 71,580.38 | 2,061.27 | 9,693.35 | 30,325.00 |
| 5. BALANCE | 1,180.00 | 3,342.76 | 71,580.38 | 2,061.27 | 9,693.35 | 30,325.00 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | 750.00 | 0 | 61,144.00 | 0 | 7,092.45 | 30,000.00 |
| Disbursements | 430.00 | 3,342.76 | 10,436.38 | 2,061.27 | 2,600.90 | 325.00 |
| TOTAL Disbursements | 1,180.00 | 3,342.76 | 71,580.38 | 2,061.27 | 9,693.35 | 30,325.00 |
| 7. Ending Balance | 0 | 0 | 0 | 0 | 0 | 0 |

I. Cash Receipts and Disbursements
Page 5 of 15

Exhibit 5 Page 000163

# I. CASH RECEIPTS AND DISBURSEMENTS

| | 13439 | 13381 | 13401 | 13366 | 13366 | 13363 |
|---|---|---|---|---|---|---|
| Case Number: | | | | | | |
| Month Ending: | 08/31/2009 | 08/31/2009 | 08/31/2009 | 08/31/2009 | 08/31/2009 | 08/31/2009 |
| Account Number: | 0080313711 | 0080301567 | 0080302383 | 0080301807 | 0080364953 | 0080302029 |
| Depository Name & Location | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank |
| | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 |
| | Meruelo Maddux-555 Central Ave, LLC | Merco Group-5707 S. Alameda, LLC | Merco Group-620 Gladys Ave, LLC | Meruelo Wall St, LLC | Meruelo Wall St, LLC | Meruelo Maddux Props-760 S. Hill St, LLC |
| 1. Total Prior Receipts | 0 | 43,320.47 | 134,538.34 | 724,660.94 | 28,816.40 | 104,668.83 |
| 2. LESS: Total Prior Disbursements | 0 | 43,320.47 | 134,538.34 | 724,660.94 | 22,561.98 | 104,668.83 |
| 3. Beginning Balance | 0 | 0 | 0 | 0 | 6,254.42 | 0 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 0 | 8,893.42 | 29,002.28 | 187,665.00 | 0 | 0 |
| A/R - Pre Filing | 0 | 630.18 | 0 | 0 | 0 | 0 |
| General Sales | 0 | 0 | 0 | 0 | 0 | 0 |
| Intercompany Receipts | 325.00 | 393.60 | 325.00 | 3,294.85 | 7,831.21 | 50,749.26 |
| TOTAL RECEIPTS | 325.00 | 9,917.20 | 29,327.28 | 190,959.85 | 7,831.21 | 50,749.26 |
| 5. BALANCE | 325.00 | 9,917.20 | 29,327.28 | 190,959.85 | 14,085.63 | 50,749.26 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts Disbursements | 0 | 9,523.60 | 29,002.28 | 187,216.81 | 10,860.21 | 0 |
| Disbursements | 325.00 | 393.60 | 325.00 | 3,743.04 | 0 | 50,749.26 |
| TOTAL Disbursements | 325.00 | 9,917.20 | 29,327.28 | 190,959.85 | 10,860.21 | 50,749.26 |
| 7. Ending Balance | 0 | 0 | 0 | 0 | 3,225.42 | 0 |

I. Cash Receipts and Disbursements
Page 7 of 15

Exhibit 5 Page 000164

| Date mm/dd/yyyy | Case # | Entity | Payee or DIP account | Internal Vendor Code | Check Number | Acct # | Purpose | Amount Transferred | Amount Disbursed | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | U. S. Trustee Payment Center | v0000615 | 2769 | 008030981 | Q2/2009 731-09-13318 Q2/2009 731-09-13376 | 0.00 | 1,300.00 | 1,300.00 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att34 | 2770 | 004030981 | 06/1009-07/0909 -verified- | 0.00 | 149.57 | 149.57 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att35 | 2771 | 008030981 | 06/1009-07/0909 -verified- | 0.00 | 19.49 | 19.49 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | The Gas Company | gas04 | 2772 | 008030981 | 06/1509-07/1409 -verified- | 0.00 | 26.61 | 26.61 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | Karen Wilson | kwilson | 2774 | v0000619 | Certified return receipt | 0.00 | 11.08 | 11.08 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | Perfect Signs | att10 | 2775 | 008030981 | For lease sign -verified- | 0.00 | 8,011.75 | 8,011.75 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | Menicle Mechanical Inc | menicle | 2776 | 008030981 | 06/1709-07/1609 -verified- bt # 213 626-6992 398 $ | 0.00 | 28.71 | 28.71 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | Menicle Mechanical Inc | menicle | 2777 | 008030981 | Cooler emergency service | 0.00 | 28.71 | 28.71 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | Susan Moody | smoody | 2778 | 008030981 | Purchased parts Repair storage cooler Repair condenser towers | 0.00 | 756.25 | 756.25 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att07 | 2779 | 008030981 | MF Rent 07/2009 and 08/2009 -verified- | 0.00 | 462.37 | 462.37 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att08 | 2780 | 008030981 | 07/0409-08/0309 | 0.00 | 3,456.00 | 3,456.00 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att09 | 2781 | 008030981 | 08/01/09-8/31/09 | 0.00 | 28.75 | 28.75 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att11 | 2782 | 008030981 | 07/0409-08/0309 | 0.00 | 5.85 | 5.85 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att13 | 2783 | 008030981 | 07/1409-08/1209 -verified- | 0.00 | 28.75 | 28.75 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | The Gas Company | gas04 | 2784 | 008030981 | 07/0109-08/0309 -verified- | 0.00 | 27.04 | 27.04 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | A T T | att15 | 2785 | 008030981 | 06/2309-07/2209 -verified- | 0.00 | 28.56 | 28.56 |
| 8/31/2009 | 13318, 13376 | Menudo Farms, LLC | LA Dept of Water & Power | dwp8307 | JE 20441 | 008030981 | A/C # 2-31-440-4169 | 0.00 | 8.31 | 8.31 |
| 8/31/2009 | 13398 | Metro Group-1500 Griffith Ave, LLC | 008093116 | | JE 20274 | 008030100 | Q2/2009 731-09-13398 -verified- | 24,600.00 | 479.20 | 479.20 |
| 8/31/2009 | 13398 | Metro Group-1500 Griffith Ave, LLC | U. S. Trustee Payment Center | v0000615 | 240 | 008030100 | ZBA Funding Transfer | 28,600.00 | 0.00 | 28,600.00 |
| 8/31/2009 | 13403 | Metro Group-2001-2021 West Mission | 008093116 | | JE 20442 | 008030492 | Q2/2009 731-09-13398 | 28,516.69 | 0.00 | 28,516.69 |
| 8/31/2009 | 13403 | Metro Group-2001-2021 West Mission | U. S. Trustee Payment Center | v0000615 | JE 20443 | 008030492 | ZBA Funding Transfer | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13403 | Metro Group-2001-2021 West Mission | Michael Martinez | mike | 542 | 008030100 | Q2/2009 731-09-13403 | 38,289.45 | 0.00 | 38,289.45 |
| 8/31/2009 | 13403 | Metro Group-2001-2021 West Mission | U. S. Trustee Payment Center | v0000615 | 546 | 008030100 | ZBA Funding Transfer | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13403 | Metro Group-2001-2021 West Mission | Kitman Plumbing Co | kitman | 547 | 008030100 | Board up windows -verified- | 0.00 | 210.00 | 210.00 |
| 8/31/2009 | 13313 | Menudo Madina Props-2951 Lynwood | Kitman Plumbing Co | kitman | 313 | 008031518 | Repair plumbing -verified- | 0.00 | 2,441.18 | 2,441.18 |
| 8/31/2009 | 13313 | Menudo Madina Props-2951 Lynwood | U. S. Trustee Payment Center | v0000615 | 315 | 008031518 | Q2/2009 731-09-13313 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13385 | Metro Group-Cerst St Produce, LLC | Southern California Edison | v0000475 | 160 | 008030115 | A/C # 2-31-440-4169 | 0.00 | 1,736.27 | 1,736.27 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | U. S. Trustee Payment Center | v0000615 | 432 | 008031559 | Q2/2009 731-09-13385 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | U. S. Trustee Payment Center | v0000615 | 433 | 008031559 | Q2/2009 731-09-13342 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | D. B. Electric Co | dbelec | 434 | 008031559 | Q2/2009 731-09-13342 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | Michael Martinez | mike | 435 | 008031559 | Repair existing exit signs with emergency lights plus material - | 0.00 | 9,177.20 | 9,177.20 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | Michael Martinez | mike | 436 | 008031559 | Demo floor for plumbers -verified- | 0.00 | 455.00 | 455.00 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | Michael Martinez | mike | JE 20526 | 008031559 | Repair walkway | 0.00 | 151.78 | 151.78 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | LA Dept of Water & Power | dwp8317 | JE 20443 | 008031559 | 06/2409-07/2309 -verified- | 50.00 | 0.00 | 50.00 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | 008093116 | | JE 20558 | 008031559 | ZBA Funding Transfer | 37,780.00 | 0.00 | 37,780.00 |
| 8/31/2009 | 13342 | Metro Group-1211 E. Washington Blvd | 008093116 | | 313 | 008031567 | ZBA Funding Transfer | 0.00 | 50.00 | 50.00 |
| 8/31/2009 | 13381 | Metro Group-5707 S. Alameda, LLC | 008093116 | | 314 | 008031567 | ZBA Funding Transfer | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13381 | Metro Group-5707 S. Alameda, LLC | U. S. Trustee Payment Center | v0000615 | 315 | 008031567 | Q2/2009 731-09-13381 | 0.00 | 55.96 | 55.96 |
| 8/31/2009 | 13381 | Metro Group-5707 S. Alameda, LLC | AT&T | sbc140 | JE 20327 | 008031567 | 333 315314 014 036 Q2/2009-0721/09 -verified- | 0.00 | 12.64 | 12.64 |
| 8/31/2009 | 13381 | Metro Group-5707 S. Alameda, LLC | LA Dept of Water & Power | dwp7186 | JE 20344 | 008031567 | 06/0409-07/0609 -verified- | 1,300.00 | 0.00 | 1,300.00 |
| 8/31/2009 | 13381 | Metro Group-5707 S. Alameda, LLC | 008093116 | | JE 20725 | 008031383 | ZBA Funding Transfer | 6,663.60 | 0.00 | 6,663.60 |
| 8/31/2009 | 13374 | MMH-22185 San Fernando Road, LL | 008093116 | | 290 | 008031383 | ZBA Funding Transfer | 1,560.00 | 0.00 | 1,560.00 |
| 8/31/2009 | 13374 | Menudo Madina Props-1060 N. Vigne | 008093116 | | 308 | 008031658 | ZBA Funding Transfer | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13374 | Menudo Madina Props-1060 N. Vigne | Dave Elevator | dwp5144 | 309 | 008031658 | Svc 3/28/09-6/25/09 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13374 | Menudo Madina Props-1060 N. Vigne | Dave Elevator | dwp5171 | 310 | 008031658 | Svc 3/28/09-6/25/09 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13374 | Menudo Madina Props-1060 N. Vigne | Dave Elevator | dwp5144 | 311 | 008031658 | Svc 6/23/09-7/27/09 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13377 | Menudo Madina Props-1060 N. Vigne | Dave Elevator | dwp5171 | 312 | 008031658 | Svc 6/23/09-7/27/09 | 0.00 | 107.83 | 107.83 |
| 8/31/2009 | 13373 | Metro Group-3185 E. Washington Blvd | U. S. Trustee Payment Center | v0000615 | 251 | 008031724 | Q2/2009 731-09-13377 | 0.00 | 211.11 | 211.11 |
| 8/31/2009 | 13373 | Metro Group-3185 E. Washington Blvd | U. S. Trustee Payment Center | v0000615 | JE 20504 | 008031724 | Q2/2009 731-09-13373 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13374 | Metro Group-3185 E. Washington Blvd | LA Dept of Water & Power | dwp5144 | 591 | 008031807 | Q2/2009 731-09-13374 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13366 | Menudo Wall St, LLC | AT&T | sbcnw | 592 | 008031807 | Svc 6/11/09-7/10/09 | 30,000.00 | 0.00 | 30,000.00 |
| 8/31/2009 | 13366 | Menudo Wall St, LLC | U. S. Trustee Payment Center | v0000615 | 593 | 008031807 | Q2/2009 731-09-13366 | 0.00 | 650.00 | 650.00 |
| 8/31/2009 | 13366 | Menudo Wall St, LLC | Sprint | sprin-nw | 594 | 008031807 | Svc 6/11/09-7/10/09 | 0.00 | 95.61 | 95.61 |
| 8/31/2009 | 13366 | Menudo Wall St, LLC | Unisource Worldwide, Inc. | unisourc | 595 | 008031807 | SVc 6/2009 | 0.00 | 448.19 | 448.19 |
| 8/31/2009 | 13366 | Menudo Wall St, LLC | 008093116 | | 596 | 008031807 | Svc 6/26/09-7/25/09 | 0.00 | 137.17 | 137.17 |
| 8/31/2009 | 13366 | Menudo Wall St, LLC | State Compensation Insurance | natl | JE 20445 | 008031807 | Order Dt. 7/1/09 | 144,516.41 | 0.00 | 144,516.41 |
| 8/31/2009 | 13366 | Menudo Wall St, LLC | 008093116 | | JE 20561 | 008030561 | 5/1/09-8/1/09 | 0.00 | 1,003.13 | 1,003.13 |
| 8/31/2009 | 13364 | Menudo Wall St, LLC | U. S. Trustee Payment Center | v0000615 | JE 20726 | 008031915 | Q2/2009 731-09-13364 | 0.00 | 1,408.94 | 1,408.94 |
| 8/31/2009 | 13364 | Menudo Madina Props-1919 Vineburn | 008093116 | | 197 | 008031915 | ZBA Funding Transfer | 41,700.00 | 144,516.41 | 144,516.41 |
| 8/31/2009 | 13354 | Menudo Madina Props-1919 Vineburn | U. S. Trustee Payment Center | v0000615 | JE 20446 | 008031823 | Q2/2009 731-09-13354 | 1,000.00 | 41,700.00 | 41,700.00 |
| 8/31/2009 | 13354 | Menudo Madina Props-1919 Vineburn | 008093116 | | 707 | 008031823 | ZBA Funding Transfer | 42,210.06 | 1,000.00 | 1,000.00 |
| 8/31/2009 | 13405 | Metro Group-Little J, LLC | U. S. Trustee Payment Center | v0000615 | | | Q2/2009 731-09-13405 | 0.00 | 325.00 | 325.00 |
| | | | | | | | | | 42,210.06 | 42,210.06 |
| | | | | | | | | | 325.00 | 325.00 |

Exhibit 5 Page 000165

| Date mm/dd/yyyy | Case # | Entity | Acct # | Check Number | Internal Vendor Code | Payee or DIP account | Purpose | *Amount Transferred | *Amount Disbursed | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/31/2009 | 13405 | Merco Group-Lena I, LLC | 0080301123 | JE 20562 | | 0080993116 | ZBA Funding Transfer | 7,000.00 | 0.00 | 7,000.00 |
| 8/31/2009 | 13405 | Merco Group-Lena I, LLC | 0080301123 | JE 20727 | | 0080993116 | ZBA Funding Transfer | 25,000.00 | 0.00 | 35,000.00 |
| 8/31/2009 | 13378 | Merco Group-401 E. 7th St, LLC | 0080301930 | 220 | v0000615 | U.S. Trustee Payment Center | Q22009 731-i-09-13378 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13378 | Merco Group-401 E. 7th St, LLC | 0080301930 | JE 20447 | | 0080993116 | ZBA Funding Transfer | 500.00 | 0.00 | 500.00 |
| 8/31/2009 | 13316 | Meruelo Baldwin Park, LLC | 0080301948 | 273 | v0000615 | U.S. Trustee Payment Center | Q22009 731-i-09-13316 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13316 | Meruelo Baldwin Park, LLC | 0080301948 | 275 | v0000016 | Laufer | Parking reimbursement | 0.00 | 15.00 | 15.00 |
| 8/31/2009 | 13316 | Meruelo Baldwin Park, LLC | 0080301948 | 276 | mike | Michael Martinez | Board up doors and windows -verified- | 0.00 | 567.00 | 567.00 |
| 8/31/2009 | 13316 | Meruelo Baldwin Park, LLC | 0080301944 | 277 | v0000016 | Laufer | Parking reimbursement | 0.00 | 9.00 | 9.00 |
| 8/31/2009 | 13316 | Meruelo Baldwin Park, LLC | 0080301944 | 278 | v0000310 | Valley County Water District | 06/03/09-08/11/09 | 0.00 | 14.79 | 14.79 |
| 8/31/2009 | 13316 | Meruelo Baldwin Park, LLC | 0080301948 | JE 20544 | | 0080993116 | ZBA Funding Transfer | 4,600.00 | 0.00 | 4,600.00 |
| 8/31/2009 | 13316 | Meruelo Baldwin Park, LLC | 0080301948 | JE 20728 | | 0080993116 | ZBA Funding Transfer | 2,991.00 | 0.00 | 2,991.00 |
| 8/31/2009 | 13371 | Meruelo Maddux Props-2131 Humbold | 0080301963 | 321 | v0000615 | U.S. Trustee Payment Center | Q22009 731-i-09-13371 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13371 | Meruelo Maddux Props-2131 Humbold | 0080301963 | 322 | mea | MCA Ornamental Iron Works | Fix fence and gate-verified- | 0.00 | 160.00 | 160.00 |
| 8/31/2009 | 13371 | Meruelo Maddux Props-2131 Humbold | 0080301963 | 323 | dvep3994 | LA Dept of Water & Power | 06/19/09-07/21/09 -verified- | 0.00 | 157.58 | 157.58 |
| 8/31/2009 | 13371 | Meruelo Maddux Props-2131 Humbold | 0080301963 | 324 | mike | Michael Martinez | Paint Graffiti - | 0.00 | 537.00 | 537.00 |
| 8/31/2009 | 13371 | Meruelo Maddux Props-2131 Humbold | 0080301963 | JE 20449 | | 0080993116 | ZBA Funding Transfer | 3,000.00 | 0.00 | 3,000.00 |
| 8/31/2009 | 13372 | MMP-1009 North Citrus Ave, LLC | 0080301989 | 333 | v0000615 | U.S. Trustee Payment Center | Q22009 731-i-09-13372 | 4,000.00 | 0.00 | 4,000.00 |
| 8/31/2009 | 13414 | Merco Group-Overland Terminal, LLC | 0080301997 | 334 | swcb | State Water Resources Control Board | Billing Period 7/1/09-6/30/10 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 217 | dvep5508 | LA Dept of Water & Power | Svc 3/28/09-6/29/09 Unit 904 | 0.00 | 36.93 | 36.93 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4221 | v0000278 | Stavis | Svc 3/28/09-6/29/09 Unit 905 | 0.00 | 42.48 | 42.48 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4316 | v0000349 | Steve Solutions, Inc | iClass Start Key Fobs | 0.00 | 440.00 | 440.00 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4317 | v0000492 | Handy Five Systems, LLC | Aug09 Newsletters | 0.00 | 55.40 | 55.40 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4318 | v0000148 | Alliance Residential Company | Working Capital Reserve Funds | 30,143.00 | 0.00 | 30,143.00 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4326 | v0000492 | Time Warner Cable | Keys | 0.00 | 324.49 | 324.49 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4328 | v0000043 | dba Network Communications Inc | Ad Dir. 7/8/09 | 0.00 | 324.49 | 324.49 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4329 | v000194 | Urry | Move out refund | 0.00 | 450.00 | 450.00 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4330 | v0000644 | Staples Business Advantage | b/c @A95985 | 0.00 | 2,091.02 | 2,091.02 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4311 | v0000656 | The Left Exchange, Inc. | Commission, Theresa Vercuraz9707 | 0.00 | 849.05 | 849.05 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4323 | v0000044 | S.C. Frestige Parking, Inc. | Svc 6/2009 | 0.00 | 1,260.00 | 1,260.00 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4334 | v000053 | dba LA/San Fernando Valley Apt Guide | Aug09 Print AD | 0.00 | 4,969.00 | 4,969.00 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4334 | v0000647 | Staples Business Advantage | Order Dir. 7/15/09 | 0.00 | 36.42 | 36.42 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | 4335 | v0000650 | dba For Rent Media Solutions | I/2 Page Ad 8/1/09 | 0.00 | 440.00 | 440.00 |
| 8/31/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, | 0080302029 | JE 20450 | | 0080993116 | ZBA Funding Transfer | 1,491.90 | 0.00 | 1,491.90 |
| 8/31/2009 | 13407 | Merco Group-Southgate, LLC | 0080302193 | 672 | v0000615 | U.S. Trustee Payment Center | Q22009 731-i-09-13407 | 0.00 | 440.00 | 440.00 |
| 8/3/2009 | 13407 | Merco Group-Southgate, LLC | 0080302193 | 673 | edya | Eddy Ayara | Returned item smart | 0.00 | 650.00 | 650.00 |
| 8/31/2009 | 13407 | Merco Group-Southgate, LLC | 0080302193 | 674 | v0000124 | Ameco Parking | Ameco Parking | 0.00 | 64.75 | 64.75 |
| 8/31/2009 | 13407 | Merco Group-Southgate, LLC | 0080302193 | JE 20459 | | 0080993116 | ZBA Funding Transfer | 29,500.00 | 0.00 | 29,500.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 675 | v0000615 | U.S. Trustee Payment Center | Q22009 731-i-09-13397 | 3,100.00 | 0.00 | 5,100.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 676 | dvep8155 | LA Dept of Water & Power | Svc 6/20/09-7/20/09 | 0.00 | 55.36 | 55.36 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 677 | dvep8155 | LA Dept of Water & Power | Svc 6/20/09-7/20/09 | 0.00 | 35.62 | 35.62 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 678 | dvep8800 | LA Dept of Water & Power | ZBA Funding Transfer | 2,500.00 | 0.00 | 834.01 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 20430 | | 0080993116 | ZBA Funding Transfer | 0.00 | 0.00 | 125.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 20730 | | 0080993116 | Q22009 731-v0913397 | 0.00 | 172.00 | 172.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 195 | mike | Michael Martinez | Health dept. repairs @ 2640 Wash. | 0.00 | 416.95 | 416.95 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 197 | dbelet | D. B. Electric Co | Replace transformer at 2460 Washington | 0.00 | 200.00 | 200.00 |

| Date mm/dd/yyyy | Case # | Entity | Acct # | Check Number | Internal Vendor Code | Payee or DIP account | Purpose | *Amount Transferred | *Amount Disbursed | *Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 398 | mike | Michael Martinez | Heath dept. issues at 2640 Washington | 0.00 | 80.00 | 80.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 399 | lac0031 | Treasurer Tax Collector | A/C # 2640-749624 JH, Out node # 10 | 0.00 | 354.00 | 354.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 401 | mike | Micheal Martinez | Health dept permit issues-2640 Wash. | 0.00 | 80.00 | 80.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 403 | d0008507 | Asian Fresh Produce | Move out refund | 0.00 | 6,000.00 | 6,000.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 404 | complete | Complex Thermal Services | Repair to HVAC/condos at 2640 Wash. Repair to HVAC/co | 0.00 | 1,620.59 | 1,620.59 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 405 | kirman | Kirman Plumbing Co | Repair/truant. to restrooms @ 2640 Wash. | 0.00 | 367.34 | 367.34 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE20329 | mike | Micheal Martinez | Health department at 2640 Washington | 0.00 | 60.00 | 60.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE20418 | | 0080099116 | ZBA Funding Transfer | 1,900.00 | 0.00 | 1,900.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE20451 | | 0080099116 | ZBA Funding Transfer | 1,000.00 | 0.00 | 1,000.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE20593 | | 0080099116 | ZBA Funding Transfer | 52,394.00 | 0.00 | 52,394.00 |
| 8/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE20731 | | 0080099116 | ZBA Funding Transfer | 700.00 | 0.00 | 700.00 |
| 8/31/2009 | 13409 | Metro Group-425 West 11th St, LLC | 0080302276 | 314 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13409 | 0.00 | 5,150.00 | 5,150.00 |
| 8/31/2009 | 13409 | Metro Group-425 West 11th St, LLC | 0080302276 | 317 | v0000016 | Volunteer Fire Protection | Replace/Certify Dry Stand Pipes | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13409 | Metro Group-425 West 11th St, LLC | 0080302276 | 318 | linki | Rooter's India | Door Repair West of Bldg | 0.00 | 12,920.00 | 12,920.00 |
| 8/31/2009 | 13409 | Metro Group-425 West 11th St, LLC | 0080302276 | JE20660 | | 0080099116 | ZBA Funding Transfer | 250.00 | 0.00 | 250.00 |
| 8/31/2009 | 13409 | Metro Group-425 West 11th St, LLC | 0080302276 | JE20702 | | 0080099116 | ZBA Funding Transfer | 31.82 | 0.00 | 31.82 |
| 8/31/2009 | 13401 | Metro Group-620 Gladys Ave, LLC | 0080303383 | 315 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13401 | 0.00 | 2,760.85 | 2,760.85 |
| 8/31/2009 | 13401 | Metro Group-620 Gladys Ave, LLC | 0080303383 | JE20452 | | 0080099116 | ZBA Funding Transfer | 5,567.00 | 0.00 | 5,567.00 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 599 | stti7 | U. S. Trustee Payment Center | Q22009 731-09-13370 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 600 | v0000001 | Fred M. Salehski, A Law Corporation | MNP- 306-330 N Avenue 21 vs. CD Fashion | 0.00 | 29,002.28 | 29,002.28 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 603 | dwp2482 | Douglas Industrial Supply Co. | Keys -verified- | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 604 | dwp2931 | Stanley Convergent Security Solutions | 08/2009-102009 Alarm -verified- | 0.00 | 57.22 | 57.22 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 605 | dwp3437 | National Corporate Research, LTD | Delaware Annual ending 03/31/2010 | 0.00 | 250.00 | 250.00 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 606 | dwp3464 | LA Dept of Water & Power | 04/19/09-07/21/09 node rider 03 and 01 -verified- | 0.00 | 31.82 | 31.82 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 607 | dwp3493 | LA Dept of Water & Power | 06/10/09-07/21/09 -verified- | 0.00 | 113.40 | 113.40 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 608 | ncr | LA Dept of Water & Power | 06/10/09-07/21/09 -verified- | 0.00 | 105.00 | 105.00 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 609 | | LA Dept of Water & Power | 06/10/09-07/21/09 -verified- | 0.00 | 286.81 | 286.81 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 610 | stti7 | A T & T (306-330 N Ave 21) | 08/2010 -verified- | 0.00 | 47.69 | 47.69 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 611 | | Commercial Waste Services Inc | 06/10/09-08/09/09 | 0.00 | 212.28 | 212.28 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 612 | | LA Dept of Water & Power | 07/10/09-08/09/09 | 0.00 | 350.45 | 350.45 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | 613 | | A T & T (306-330 N Ave 21) | 06/10/09-08/09/09 | 0.00 | 715.53 | 715.53 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | JE20453 | | 0080099116 | ZBA Funding Transfer | 48.15 | 0.00 | 48.15 |
| 8/31/2009 | 13370 | Metradit Maddux Props-306-330 N Av | 0080302453 | JE20733 | | 0080099116 | ZBA Funding Transfer | 57.55 | 0.00 | 57.55 |
| 8/31/2009 | 13359 | Metradit Maddux-3rd & Omar St, LLC | 0080302458 | 297 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13359 | 0.00 | 5,650.00 | 5,650.00 |
| 8/31/2009 | 13359 | Metradit Maddux-3rd & Omar St, LLC | 0080302458 | 298 | | National Corporate Research, LTD | Delaware Annual ending 03/31/2010 | 0.00 | 1,442.45 | 1,442.45 |
| 8/31/2009 | 13359 | Metradit Maddux-3rd & Omar St, LLC | 0080302458 | 299 | dwp2581 | LA Dept of Water & Power | Svc 6/24/09-7/24/09 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13359 | Metradit Maddux-3rd & Omar St, LLC | 0080302458 | 300 | dwp2937 | LA Dept of Water & Power | Svc 6/24/09-7/24/09 | 0.00 | 105.00 | 105.00 |
| 8/31/2009 | 13359 | Metradit Maddux-3rd & Omar St, LLC | 0080302458 | 301 | dwp3464 | LA Dept of Water & Power | Svc 6/30/09-7/30/09 | 0.00 | 24.63 | 24.63 |
| 8/31/2009 | 13359 | Metradit Maddux-3rd & Omar St, LLC | 0080302458 | JE20454 | dwp3493 | LA Dept of Water & Power | Svc 6/30/09-7/30/09 | 0.00 | 28.63 | 28.63 |
| 8/31/2009 | 13359 | Metradit Maddux-3rd & Omar St, LLC | 0080302458 | JE20734 | | 0080099116 | ZBA Funding Transfer | 42.00 | 0.00 | 42.00 |
| 8/31/2009 | 13361 | Metradit Maddux-300 Mateo St, LLC | 0080302474 | 188 | | 0080099116 | ZBA Funding Transfer | 36.00 | 0.00 | 36.00 |
| 8/31/2009 | 13361 | Metradit Maddux-300 Mateo St, LLC | 0080302474 | 189 | | 0080099116 | ZBA Funding Transfer | 8,300.00 | 0.00 | 8,300.00 |
| 8/31/2009 | 13361 | Metradit Maddux-300 Mateo St, LLC | 0080302474 | 190 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13361 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13406 | Metro Group, LLC | 0080306442 | 249 | lasder | National Corporate Research, LTD | Delaware Annual ending 03/21/2010 | 0.00 | 13.00 | 13.00 |
| 8/31/2009 | 13406 | Metro Group, LLC | 0080306442 | 289 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13406 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13406 | Metro Group, LLC | 0080306442 | JE20735 | | U. S. Trustee Payment Center | Parking reimbursement | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13406 | Metro Group, LLC | 0080306442 | eddy-x | eddy-x | Eddy Juarez | Svc. A/c. automation to BOD | 0.00 | 30.04 | 30.04 |
| 8/31/2009 | 13399 | Metro Group-4th St Center, LLC | 0080306459 | 275 | | 0080099116 | ZBA Funding Transfer | 114,113.00 | 0.00 | 114,113.00 |
| 8/31/2009 | 13399 | Metro Group-4th St Center, LLC | 0080306459 | 276 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13399 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13399 | Metro Group-4th St Center, LLC | 0080306459 | JE20511 | | National Corporate Research, LTD | Annual Svc 4/30/2010 | 0.00 | 105.00 | 105.00 |
| 8/31/2009 | 13365 | Metro Group-2415 E. Washington, LLC | 0080306655 | 158 | | 0080099116 | ZBA Funding Transfer | 1,590.00 | 0.00 | 1,590.00 |
| 8/31/2009 | 13365 | Metro Group-2415 E. Washington, LLC | 0080306655 | 138 | v0000615 | U. S. Trustee Payment Center | Q22009 731-49-13165 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13365 | Metro Group-2415 E. Washington, LLC | 0080306655 | JE20455 | | National Corporate Research, LTD | Annual Svc 4/30/2010 | 0.00 | 185.00 | 185.00 |
| 8/31/2009 | 13362 | Metradit Maddux-315-449 S Hill St, LLC | 0080306855 | 216 | | National Corporate Research, LTD | Annual Svc 4/30/2010 | 0.00 | 750.00 | 750.00 |
| 8/31/2009 | 13362 | Metradit Maddux-315-449 S Hill St, LLC | 0080306855 | 256 | v0000615 | U. S. Trustee Payment Center | Q22009 731-49-13362 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13362 | Metradit Maddux-315-449 S Hill St, LLC | 0080306855 | JE20456 | | U. S. Trustee Payment Center | Annual Svc 4/30/2010 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13362 | Metradit Maddux-315-449 S Hill St, LLC | 0080306857 | JE20457 | | 0080099116 | ZBA Funding Transfer | 30,375.00 | 0.00 | 30,375.00 |
| 8/31/2009 | 13402 | Metradit Maddux-316 W. 11th St, LLC | 0080306871 | 207 | | 0080099116 | ZBA Funding Transfer | 30,000.00 | 0.00 | 30,000.00 |
| 8/31/2009 | 13402 | Metradit Maddux-316 W. 11th St, LLC | 0080307044 | 208 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13402 | 0.00 | 325.00 | 325.00 |
| 8/31/2009 | 13402 | Metradit Maddux-316 W. 11th St, LLC | 0080307044 | 437 | | National Corporate Research, LTD | Annual Svc 4/30/2010 | 0.00 | 105.00 | 105.00 |
| 8/31/2009 | 13393 | Metradit Maddux-1000 E Cesar Chavez, LLC | 0080307044 | 439 | v0000615 | U. S. Trustee Payment Center | Q22009 731-09-13393 | 0.00 | 185.00 | 185.00 |
| 8/31/2009 | 13393 | Metradit Maddux-1000 E Cesar Chavez, LLC | 0080307044 | 448 | s4e140 | AT&T | 323 222-2425 X64 0 06/23/09-07/22/09 -verified- | 0.00 | 55.99 | 55.99 |

I. Disbursements
Page 1 of 15

Exhibit 5 Page 000167

| | 13365 | 13404 | 13397 | 13383 | 13370 | 13373 |
|---|---|---|---|---|---|---|
| Case Number: | | | | | | |
| Month Ending: | 07/31/2009 | 07/31/2009 | 07/31/2009 | 07/31/2009 | 07/31/2009 | 07/31/2009 |
| Account Number: | 0080306665 | 0080994676 | 0080302235 | 0080301518 | 0080302433 | 0080301724 |
| Depository Name & Location | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank |
| | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl |
| | Pasadena, CA 91101 | Pasadena, CA 91101 | Pasadena, CA 91101 | Pasadena, CA 91101 | Pasadena, CA 91101 | Pasadena, CA 91101 |
| | Meruelo Maddux-2415 E. Washington Blvd, LLC | Merco Group-2529 Santa Fe Ave, LLC | 2640 Washington Blvd, LLC | Meruelo Maddux Props-2951 Lenwood Road, LLC | Meruelo Maddux Props-306-330 N. Ave 21, LLC | Merco Group-3185 E. Washington Blvd, LLC |
| 1. Total Prior Receipts | 4,825.00 | 46,203.37 | 186,385.17 | 8,592.13 | 34,255.48 | 308,227.86 |
| 2. LESS: Total Prior Disbursements | 4,825.00 | 46,203.37 | 186,385.17 | 8,592.13 | 34,255.48 | 308,227.86 |
| 3. Beginning Balance | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 750.00 | 6,400.00 | 78,556.50 | | 6,150.00 | 100,000.00 |
| A/R - Pre Filing | 0 | 0 | 0 | 0 | 1,000.00 | 0 |
| General Sales | 0 | 0 | 0 | 0 | 0 | 0 |
| Intercompany Receipts | 0 | 3,673.88 | 2,652.75 | 2,882.40 | 3,826.75 | 30,000.00 |
| TOTAL RECEIPTS | 750.00 | 10,073.88 | 81,209.25 | 2,882.40 | 10,976.75 | 130,000.00 |
| 5. BALANCE | 750.00 | 10,073.88 | 81,209.25 | 2,882.40 | 10,976.75 | 130,000.00 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | 750.00 | 6,400.00 | 75,823.50 | 0 | 7,150.00 | 130,000.00 |
| Disbursements | 0 | 3,673.88 | 5,385.75 | 2,882.40 | 3,826.75 | 0 |
| TOTAL Disbursements | 750.00 | 10,073.88 | 81,209.25 | 2,882.40 | 10,976.75 | 130,000.00 |
| 7. Ending Balance | 0 | 0 | 0 | 0 | 0 | 0 |

Exhibit 5 Page 000168

| | | | | | | |
|---|---|---|---|---|---|---|
| **Case Number:** | 13439 | 13381 | 13401 | 13366 | 13366 | 13363 |
| **Month Ending:** | 07/31/2009 | 07/31/2009 | 07/31/2009 | 07/31/2009 | 07/31/2009 | 07/31/2009 |
| **Account Number:** | 0080313711 | 0080301567 | 0080302383 | 0080301807 | 0080354953 | 0080302029 |
| **Depository Name & Location** | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank |
| | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 |
| | Meruelo Maddux-555 Central Ave, LLC | Merco Group-5707 S. Alameda, LLC | Merco Group-620 Gladys Ave, LLC | Meruelo Wall St, LLC | Meruelo Wall St, LLC | Meruelo Maddux Props-760 S. Hill St, LLC |
| **1. Total Prior Receipts** | 0 | 30,411.22 | 101,071.68 | 519,714.68 | 20,550.76 | 62,595.17 |
| **2. LESS: Total Prior Disbursements** | 0 | 30,411.22 | 101,071.68 | 519,714.68 | 13,466.58 | 62,595.17 |
| **3. Beginning Balance** | 0 | 0 | 0 | 0 | 7,084.18 | 0 |
| **4. Receipts During Current Period** | | | | | | |
| A/R – Post Filing | 0 | 6,626.00 | 33,002.28 | 190,185.00 | 0 | 0 |
| A/R – Pre Filing | 0 | 2,250.00 | 0 | 12,000.00 | 0 | 0 |
| General Sales | 0 | 0 | 0 | 0 | 0 | 40,883.52 |
| Intercompany Receipts | 0 | 4,033.25 | 464.38 | 2,761.26 | 7,865.64 | 1,190.14 |
| TOTAL RECEIPTS | 0 | 12,909.25 | 33,466.66 | 204,946.26 | 7,865.64 | 42,073.66 |
| **5. BALANCE** | 0 | 12,909.25 | 33,466.66 | 204,946.26 | 14,949.82 | 42,073.66 |
| **6. LESS: Disbursements** | | | | | | |
| Transfers to other DIP Accounts | 0 | 8,876.00 | 33,002.28 | 199,653.43 | 8,695.40 | 0 |
| Disbursements | 0 | 4,033.25 | 464.38 | 5,292.83 | 0 | 0 |
| TOTAL Disbursements | 0 | 12,909.25 | 33,466.66 | 204,946.26 | 8,695.40 | 0 |
| **7. Ending Balance** | 0 | 0 | 0 | 0 | 6,254.42 | 42,073.66 |

Exhibit 5 Page 000169

| Date mm/dd/yyyy | Case # | Entity | Acct # | Check Number | Internal Vendor Code | Payee or DIP account | Purpose | *Amount Transferred | **Amount Disbursed | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/31/2009 | 13404 | Metro Group-3259 Santa Fe Ave, LLC | 0080994676 | 332 | v0000318 | Fire Alarms Tie Call | Fire Alarms Tie Call | 0.00 | 175.00 | 175.00 |
| 7/31/2009 | 13404 | Metro Group-3259 Santa Fe Ave, LLC | 0080994676 | JE 19885 | | | ZBA Funding Transfer | 6,400.00 | 0.00 | 6,400.00 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 364 | dwp2640 | LA Dept of Water & Power | A/C # 1-41-93722-02540-00-9001-1-01 A/C # 1-41-93722-02540-00-9001-3-01 | 0.00 | 355.66 | 355.66 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 370 | dzrham-s | John Durham | Janitorial supplies for 2640 Washington Blvd. | 0.00 | 837.51 | 837.51 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 371 | dwp2640 | LA Dept of Water & Power | A/C # 1-41-93722-02540-00-9001-3-01 | 0.00 | 220.62 | 220.62 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 385 | complac-dzrham-s | Complete Thermal Services/John Durham | Repairs to HVAC/cooling units Repairs to coolers/freezers-Washington Prod. | 0.00 | 470.00 | 470.00 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 386 | complac | Complete Thermal Services | Reimbursement for janitorial supplies-2640 Washington Prod. | 0.00 | 761.69 | 761.69 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 387 | complac | Complete Thermal Services | Repairs to HVAC/freezers-Washington Prod. Repairs to HVAC/freezers-Washington Prod. | 0.00 | 1,184.75 | 1,184.75 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 388 | dbelect | D. B. Electric Co | A/C # 1-41-93722-02540-00-9001-1-01 | 0.00 | 210.35 | 210.35 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 389 | orkin | Orkin Pest Control | Repairs to ballasts at 2640 Washington Blvd. | 0.00 | 418.25 | 418.25 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 390 | v0000299 | LA Dept of Water & Power | A/C # 9793327 | 0.00 | 560.00 | 560.00 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | 391 | v0007024 | LA Dept of Water & Power | Service fees 6/2 to 7/2/09 | 0.00 | 266.92 | 266.92 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | JE 19506 | | | ZBA Funding Transfer | 5,511.75 | 0.00 | 5,511.75 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | JE 19537 | | | ZBA Funding Transfer | 64,621.75 | 0.00 | 64,621.75 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | JE 19819 | | | ZBA Funding Transfer | 500.00 | 0.00 | 500.00 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | JE 19854 | | | ZBA Funding Transfer | 2,950.00 | 0.00 | 2,950.00 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | JE 20007 | | | ZBA Funding Transfer | 1,700.00 | 0.00 | 1,700.00 |
| 7/31/2009 | 13397 | 2640 Washington Blvd, LLC | 0010201235 | JE 20227 | | | ZBA Funding Transfer | 500.00 | 0.00 | 500.00 |
| 7/31/2009 | 13383 | Metulo Maddax Props-2591 Lenwood Road, LLC | 0010301518 | 308 | v0000316 | Verizon | A/C # 45-9906-3941235809 | 0.00 | 47.21 | 47.21 |
| 7/31/2009 | 13383 | Metulo Maddax Props-2591 Lenwood Road, LLC | 0010301518 | 309 | v0000317 | Henco Canadian | Landscaping at Barstow property | 0.00 | 600.00 | 600.00 |
| 7/31/2009 | 13383 | Metulo Maddax Props-2591 Lenwood Road, LLC | 0010301518 | 310 | v0000251 | Golden State Water Company | A/C # 818101-4 | 0.00 | 363.18 | 363.18 |
| 7/31/2009 | 13383 | Metulo Maddax Props-2591 Lenwood Road, LLC | 0010301518 | 313 | v0000079 | Southern California Edison | A/C # 2-31-440-4360 | 0.00 | 1,591.70 | 1,591.70 |
| 7/31/2009 | 13383 | Metulo Maddax Props-2591 Lenwood Road, LLC | 0010301518 | 314 | v0000101 | Stamp Solutions, Inc | A/C # 120-6610; alarm monitoring | 0.00 | 135.00 | 135.00 |
| 7/31/2009 | 13381 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 581 | v0000191 | Verizon | Phone # 580-213-3154 | 0.00 | 45.21 | 45.21 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 591 | dwp2834 | LA Dept of Water & Power | Pmt CH 11 initial deposit -Verified- | 0.00 | 123.97 | 123.97 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 592 | dwp2534 | LA Dept of Water & Power | 02/24/09-04/21/09 -verified- | 0.00 | 336.12 | 336.12 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 593 | xmph | Commercial Waste Services Inc | 07/20/09 -verified- | 0.00 | 715.53 | 715.53 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 594 | dwp2537 | LA Dept of Water & Power | 03/24/09-06/19/09 -verified- | 0.00 | 481.73 | 481.73 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 595 | dwp2531 | LA Dept of Water & Power | 05/08/09-06/19/09 -verified- | 0.00 | 421.40 | 421.40 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 596 | att17 | AT&T | 05/04/09-06/09/09 -verified- | 0.00 | 8.29 | 8.29 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 597 | dwp3464 | LA Dept of Water & Power | 01/16/09-04/09/09 -verified- | 0.00 | 79.99 | 79.99 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 598 | att17 | AT&T | Time from -verified- | 0.00 | 37.12 | 37.12 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 601 | v0000498 | Richard McDonald | 06/04/09-07/02/09 employee reimbursement | 0.00 | 1,133.40 | 1,133.40 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | 602 | v000698a | | ZBA Funding Transfer | 410.00 | 410.00 | 410.00 |
| 7/31/2009 | 13370 | Metulo Maddax Props-306-330 N. Ave 21, LLC | 0010302433 | JE 19640 | | | ZBA Funding Transfer | 38.40 | 0.00 | 38.40 |
| 7/31/2009 | 13373 | Metro Group-3185 E. Washington Blvd, LLC | 0010301724 | JE 19978 | | | ZBA Funding Transfer | 5,850.00 | 0.00 | 5,850.00 |
| 7/31/2009 | 13373 | Metro Group-3185 E. Washington Blvd, LLC | 0010301724 | JE 19766 | | | ZBA Funding Transfer | 1,300.00 | 0.00 | 1,300.00 |
| 7/31/2009 | 13373 | Metro Group-3185 E. Washington Blvd, LLC | 0010301724 | JE 19907 | | | ZBA Funding Transfer | 30,000.00 | 0.00 | 30,000.00 |
| 7/31/2009 | 13373 | Metro Group-3185 E. Washington Blvd, LLC | 0010301724 | JE 20024 | | | ZBA Funding Transfer | 30,000.00 | 0.00 | 30,000.00 |
| 7/31/2009 | 13373 | Metro Group-3185 E. Washington Blvd, LLC | 0010301724 | RC 23990 | | | ZBA Funding Transfer | 60,000.00 | 0.00 | 60,000.00 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 364 | dwp1549 | LA Dept of Water & Power | Renewal imp sa | 0.00 | 421.07 | 421.07 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 365 | dwp5902 | LA Dept of Water & Power | Court Ordered Post Bankruptcy Deposit | 0.00 | 36.15 | 36.15 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 366 | dwp5978 | LA Dept of Water & Power | Court Ordered Post Bankruptcy Deposit | 0.00 | 5.30 | 5.30 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 393 | clyla | Public Works | Jan-Mar 2009 Input Fees | 0.00 | 187.95 | 187.95 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 393 | sbc140 | AT&T | Svc Dc 6/209 | 0.00 | 71.00 | 71.00 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 394 | v0000041 | Fred M. Schidrski, A Law Corporation | 420 Boyd, LLC vs Joon Koo | 0.00 | 61.38 | 61.38 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 395 | complac | Complete Thermal Services | Svc Dc 6/209 | 0.00 | 2,335.00 | 2,335.00 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 398 | v0000096a | Traxton | FP627090-627110 installm Pymt | 0.00 | 91.38 | 91.38 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 399 | dept | Dept of Building & Safety | Insp Dec 6 6/09 Young TA Bldg | 0.00 | 1,604.75 | 1,604.75 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 399 | dwp0251 | LA Dept of Water & Power | Svc 5/28/09-6/26/09 | 0.00 | 178.20 | 178.20 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 401 | v0000096 | Traxton | Svc 5/28/09-6/26/09 | 0.00 | 12.74 | 12.74 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 402 | dwp0164 | LA Dept of Water & Power | FP627090-627110 installm Pymt | 0.00 | 192.25 | 192.25 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 403 | v0000165 | AT&T | Svc 6/4/09-7/6/09 | 0.00 | 2,159.00 | 2,159.00 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | 404 | v0000393 | Commercial Waste Services | Svc 5/28/09-6/27/09 | 0.00 | 56.43 | 56.43 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | JE 19656 | | | 972069 Svc | 0.00 | 28.46 | 28.46 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | JE 19884 | | | ZBA Funding Transfer | 25,308.47 | 0.00 | 25,308.47 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | JE 19989 | | | ZBA Funding Transfer | 2,641.03 | 0.00 | 2,641.03 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | JE 20029 | | | ZBA Funding Transfer | 6,434.62 | 0.00 | 6,434.62 |
| 7/31/2009 | 13360 | Metulo Maddax-420 Boyd St, LLC | 0080994650 | JE 2002D | | | ZBA Funding Transfer | 3,070.00 | 0.00 | 3,070.00 |
| 7/31/2009 | 13401 | Metro Group-423 West 11th St, LLC | 0010202276 | 299 | dwp0092 | LA Dept of Water & Power | Court Ordered Post Bankruptcy Deposit | 0.00 | 561.94 | 561.94 |

I. Disbursements
Page 3 of 16

Exhibit 5 Page 000170

| Date mm/dd/yyyy | Case # | Entity | Acct # | Check Number | Internal Vendor Code | Payee or DIP account | Purpose | *Amount Transferred | **Amount Disbursed | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/31/2009 | 13400 | Meruo Group-425 West 11th St, LLC | 0082022276 | 300 | dwp14 | LA Dept of Water & Power | Dept of Building & Safety — Costs Ordered Past Bankruptcy Owner Inspection Fee a/c 2X0021034 & Std Chk Collection Fee ACP2X0021034-d [had check invoice 437394-2] | 0.00 | 0.00 | 13.27 |
| 7/31/2009 | 13400 | Meruo Group-425 West 11th St, LLC | 0082022276 | 310 | dept | Dept of Building & Safety | Proposed eleventh and grand residential development thru 06/30/09 verified | 0.00 | 213.20 | 213.20 |
| 7/31/2009 | 13400 | Meruo Group-425 West 11th St, LLC | 0082022276 | 311 | geo | GeoDesign, Inc. | Svc Dt 6/4/09 | 0.00 | 7,958.00 | 7,958.00 |
| 7/31/2009 | 13400 | Meruo Group-425 West 11th St, LLC | 0082022276 | 312 | v000029 | Orkin Pest Control | Svc 3/24/09-6/03/09 | 0.00 | 99.17 | 99.17 |
| 7/31/2009 | 13400 | Meruo Group-425 West 11th St, LLC | 0082022276 | 313 | dwp1506 | LA Dept of Water & Power | Svc 3/24/09-6/03/09 | 0.00 | 3,101.25 | 3,101.25 |
| 7/31/2009 | 13400 | Meruo Group-425 West 11th St, LLC | 0082022276 | 316 | dwp1271 | LA Dept of Water & Power | ZBA Funding Transfer | 0.00 | 87.62 | 87.62 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | JE19616 | | 0081093116 | ZBA Funding Transfer | 13,067.00 | 0.00 | 13,067.00 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | JE19955 | | 0081093116 | Port CH 11 initial deposit - Verified- | 2,911.68 | 0.00 | 2,911.68 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | 304 | kirman | Kitman Plumbing Co | Repair broken water line -verified- | 0.00 | 1,244.44 | 1,244.44 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | 310 | she140 | 0081093116 | 05/22/09-06/21/09 213 588-5118-9418 0 -verified- | 0.00 | 2,692.98 | 2,692.98 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | 311 | | AT&T | ZBA Funding Transfer | 0.00 | 55.83 | 55.83 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | JE19553 | | 0081093116 | ZBA Funding Transfer | 1,300.00 | 0.00 | 1,300.00 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | JE19629 | | 0081093116 | ZBA Funding Transfer | 3,476.00 | 0.00 | 3,476.00 |
| 7/31/2009 | 13381 | Meruo Group-2707 S. Alameda, LLC | 0082021567 | JE19905 | | 0081093116 | ZBA Funding Transfer | 1,300.00 | 0.00 | 1,300.00 |
| 7/31/2009 | 13401 | Meruo Group-620 Gladys Ave, LLC | 0082022383 | JE19971 | | 0081093116 | 03/26/09-06/03/09 -verified- | 2,200.00 | 0.00 | 2,200.00 |
| 7/31/2009 | 13401 | Meruo Group-620 Gladys Ave, LLC | 0082022383 | 344 | | AT&T | ZBA Funding Transfer | 0.00 | 464.24 | 464.24 |
| 7/31/2009 | 13401 | Meruo Group-620 Gladys Ave, LLC | 0082022383 | JE19639 | | 0081093116 | ZBA Funding Transfer | 31,002.28 | 0.00 | 31,002.28 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | JE19977 | | Data Security | Svc 5/11/09-6/10/09 | 2,000.00 | 0.00 | 2,000.00 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 579 | | c/o Stanley Convergent Security Solution | May09 Svc | 0.00 | 122.53 | 122.53 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 580 | | Unknown Worldwide, Inc. | 04/01/09-06/30/09 | 0.00 | 448.19 | 448.19 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 581 | | Guarantee Pest Control Company | Order Dt 6/2/09 | 0.00 | 126.51 | 126.51 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 582 | | Lee & Lee Structural Engineering Inc | May 2009 Service | 0.00 | 1,116.89 | 1,116.89 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 583 | | Sprint | Remaining Balance Svc 4/30/09 | 0.00 | 90.00 | 90.00 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 584 | | Consolidated Disposal Service | Restart Pest Control @ 801 E Wall St | 0.00 | 1,108.73 | 1,108.73 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 585 | | Guarantee Pest Control Company | Svc 5/26/09-6/25/09 | 0.00 | 600.00 | 600.00 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 516 | | LA Dept of Water & Power | 07/2009 Svc | 0.00 | 136.79 | 136.79 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 517 | | AT&T | 6/2009 Help Svc | 0.00 | 1,107.23 | 1,107.23 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 588 | | 0081093116 | 5/6c-5/24/09-6/24/09 | 0.00 | 90.00 | 90.00 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 589 | | 0081093116 | ZBA Funding Transfer | 0.00 | 225.51 | 225.51 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082021807 | 590 | | 0081093116 | 6/09-7/09 | 0.00 | 110.25 | 110.25 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19344 | | 0081093116 | ZBA Funding Transfer | 819.25 | 0.00 | 819.25 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19418 | | 0081093116 | ZBA Funding Transfer | 0.00 | 126.51 | 126.51 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19419 | | 0081093116 | ZBA Funding Transfer | 0.00 | 1,824.51 | 1,824.51 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19420 | | 0081093116 | ZBA Funding Transfer | 695.30 | 0.00 | 695.30 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19526 | | 0081093116 | ZBA Funding Transfer | 511.00 | 0.00 | 511.00 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19616 | | 0081093116 | ZBA Funding Transfer | 77.14 | 0.00 | 77.14 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19630 | | 0081093116 | ZBA Funding Transfer | 124.49 | 0.00 | 124.49 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082011807 | JE19701 | | 0081093116 | ZBA Funding Transfer | 163,176.27 | 0.00 | 163,176.27 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082011807 | JE19702 | | 0081093116 | ZBA Funding Transfer | 1,824.51 | 0.00 | 1,824.51 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082011807 | JE19703 | | 0081093116 | ZBA Funding Transfer | 722.70 | 0.00 | 722.70 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082011807 | JE19767 | | 0081093116 | ZBA Funding Transfer | 511.00 | 0.00 | 511.00 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19849 | | 0081093116 | ZBA Funding Transfer | 4,502.67 | 0.00 | 4,502.67 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19863 | | 0081093116 | ZBA Funding Transfer | 1,974.49 | 0.00 | 1,974.49 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE19908 | | 0081093116 | ZBA Funding Transfer | 0.00 | 67.14 | 67.14 |
| 7/31/2009 | 13366 | Meruo Wall St, LLC | 0082054953 | JE20014 | | 0081093116 | ZBA Funding Transfer | 30,000.00 | 0.00 | 30,000.00 |
| 7/31/2009 | 13366 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4104 | v000604 | Universal Safety Consultants | Emergency preparations manual required by the LAFD for residential | 819.26 | 947.50 | 947.50 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4112 | dwp3250 | LA Dept of Water & Power | Costs Ordered Past Bankruptcy Deposit | 0.00 | 29.45 | 29.45 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4113 | dwp325mn | LA Dept of Water & Power | Costs Ordered Past Bankruptcy Deposit | 0.00 | 367.81 | 367.81 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4114 | dwp760 | LA Dept of Water & Power | Costs Ordered Past Bankruptcy Deposit | 0.00 | 4,543.77 | 4,543.77 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4208 | v000514 | Deerlane | Cancel Move In failed | 0.00 | 580.00 | 580.00 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4213 | v000318 | Jennie Grant | 421-5102009 Expense Reimbursement | 0.00 | 616.12 | 616.12 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4214 | v000025 | The Gas Company | Svc 5/6-6/4 | 0.00 | 553.86 | 553.86 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4215 | v000073 | Time Warner Cable | Svc 6/23/09-7/22/09 | 0.00 | 162.24 | 162.24 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4216 | v000001 | South Coast Air Quality Mgmt Dist. | 3/09-Jan09 AQMD Fees | 0.00 | 31.23 | 31.23 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4217 | v000044 | Healy Tran-Systems, LLC | Svc 6/23/09 Svc 6/2009 | 0.00 | 69.90 | 69.90 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4218 | v000073 | Mitowa Engineered Systems, Inc. | Digital Communication Module MR2S14+Labor | 0.00 | 903.50 | 903.50 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4219 | v000044 | S.C. Prestige Parking, Inc. | Svc May 2009 Svc-April 2009 | 0.00 | 10,092.80 | 10,092.80 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4220 | v000073 | Kone, Inc. | Maintenance Coverage 6/2009 | 0.00 | 1,260.00 | 1,260.00 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4221 | v000059 | dba Durkin Power Services | Svc Repair Order#0720754Cust#AER260 | 0.00 | 610.99 | 610.99 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4222 | complex | Complex Thermal Services | Svc Dt 6/3/09, 6/3/09 | 0.00 | 1,146.24 | 1,146.24 |
| 7/31/2009 | 13363 | Meruo Maddox Props-760 S. Hill St, LLC | 0082032029 | 4223 | v000643 | dba Network Communications Inc | Ad Dt 6/10/09 | 0.00 | 450.00 | 450.00 |

| | 13365 | 13404 | 13397 | 13383 | 13370 | 13373 |
|---|---|---|---|---|---|---|
| Case Number: | 13365 | 13404 | 13397 | 13383 | 13370 | 13373 |
| Month Ending: | 06/30/2009 | 06/30/2009 | 06/30/2009 | 06/30/2009 | 06/30/2009 | 06/30/2009 |
| Account Number: | 0080306665 | 0080994676 | 0080302235 | 0080301518 | 0080302433 | 0080301724 |
| Depository Name & Location | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank |
| | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 |
| | Meruelo Maddux-2415 E. Washington Blvd, LLC | Merco Group-2529 Santa Fe Ave, LLC | 2540 Washington Blvd, LLC | Meruelo Maddux Props-2551 Lenwood Road), LLC | Meruelo Maddux Props-306-330 N. Ave 21, LLC | Merco Group-3185 E. Washington Blvd, LLC |
| | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession |
| 1. Total Prior Receipts | 3,825.00 | 29,624.55 | 121,993.14 | 3,973.99 | 22,541.76 | 207,125.00 |
| 2. LESS: Total Prior Disbursements | 3,825.00 | 29,624.55 | 121,993.14 | 3,973.99 | 22,541.76 | 207,125.00 |
| 3. Beginning Balance | 0 | 0 | 0 | 0 | 0 | 0 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 750.00 | 6,400.00 | 50,691.25 | 0 | 8,350.00 | 100,000.00 |
| A/R - Pre Filing | 0 | 0 | 5,241.25 | 0 | 1,000.00 | 0 |
| General Sales | 0 | 0 | 0 | 0 | 0 | 852.86 |
| Intercompany Receipts | 250.00 | 250.00 / 10,178.82 | 8,459.53 | 4,618.14 | 2,363.72 | 250.00 |
| TOTAL RECEIPTS | 1,000.00 | 16,578.82 | 64,392.03 | 4,618.14 | 11,713.72 | 101,102.86 |
| 5. BALANCE | 1,000.00 | 16,578.82 | 64,392.03 | 4,618.14 | 11,713.72 | 101,102.86 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | | | | | | |
| Disbursements | 750.00 / 250.00 | 6,348.62 / 10,230.20 | 54,376.19 / 10,015.84 | 0 / 4,618.14 | 10,091.22 / 1,622.50 | 94,852.86 / 6,250.00 |
| TOTAL Disbursements | 1,000.00 | 16,578.82 | 64,392.03 | 4,618.14 | 11,713.72 | 101,102.86 |
| 7. Ending Balance | 0 | 0 | 0 | 0 | 0 | 0 |

Exhibit 5 Page 000172

| | | | | | | |
|---|---|---|---|---|---|---|
| **Case Number:** | 13439 | 13381 | 13401 | 13366 | 13366 | 13363 |
| **Month Ending:** | 06/30/2009 | 06/30/2009 | 06/30/2009 | 06/30/2009 | 06/30/2009 | 06/30/2009 |
| **Account Number:** | 0080313711 | 0080301567 | 0080302383 | 0080301807 | 0080364953 | 0080302029 |
| **Depository Name & Location** | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank |
| | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 | Corporate Headquarters 135 N. Los Robles Ave, 7th Fl Pasadena, CA 91101 |
| | Meruelo Maddux-555 Central Ave, LLC | Merco Group-5707 S. Alameda, LLC | Merco Group-620 Gladys Ave, LLC | Meruelo Wall St, LLC | Meruelo Wall St, LLC | Meruelo Maddux Props-760 S. Hill St, LLC |
| | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession | Debtor-In-Possession |
| 1. Total Prior Receipts | 0 | 21,988.20 | 67,434.14 | 365,015.23 | 9,163.76 | 26,758.53 |
| 2. LESS: Total Prior Disbursements | 0 | 21,988.20 | 67,434.14 | 365,015.23 | 6,007.20 | 26,758.53 |
| 3. Beginning Balance | 0 | 0 | 0 | 0 | 3,156.56 | 0 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 0 | 7,213.60 | 31,492.28 | 145,585.00 | 0 | 0 |
| A/R - Pre Filing | 0 | 750.00 | 0 | 0 | 0 | 0 |
| General Sales | 0 | 0 | 0 | 0 | 0 | 35,359.56 |
| Intercompany Receipts | 0 | 459.42 | 2,145.26 | 9,114.45 | 11,787.00 | 477.08 |
| TOTAL RECEIPTS | 0 | 8,423.02 | 33,637.54 | 154,699.45 | 11,787.00 | 35,836.64 |
| 5. BALANCE | 0 | 8,423.02 | 33,637.54 | 154,699.45 | 14,943.56 | 35,836.64 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | 0 | 6,947.29 | 31,492.28 | 137,197.95 | 0 | 0 |
| Disbursements | 0 | 1,475.73 | 2,145.26 | 17,501.50 | 7,859.38 | 35,836.64 |
| TOTAL Disbursements | 0 | 8,423.02 | 33,637.54 | 154,699.45 | 7,859.38 | 35,836.64 |
| 7. Ending Balance | 0 | 0 | 0 | 0 | 7,084.18 | 35,836.64 |

Exhibit 5 Page 000173

## TOTAL DISBURSEMENTS FROM ALL ACCOUNTS FOR CURRENT PERIOD

| Date mm/dd/yyyy | Case # | Entity | Acct # | Check Number | Payee or DIP account | Purpose | *Amount Transferred | **Amount Disbursed | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 6/30/2009 | 13364 | Menuelo Maddux Props-1919 Vineburn St, LLC | 0080301815 | 196 | Franchise Tax Board | Estimated fee for LLC, yr 2009 -verified- | 0.00 | 900.00 | 900.00 |
| 6/30/2009 | 13364 | Menuelo Maddux Props-1919 Vineburn St, LLC | 0080301815 | JE 18902 | 0080993116 | ZBA Funding Transfer | 42,210.06 | | 42,210.06 |
| 6/30/2009 | 13403 | Merco Group-2001-2021 West Mission Blvd, LLC | 0080301500 | 539 | Franchise Tax Board | SOS1.20041356/10006 Tax yr 12/07 -verified- | 0.00 | 1,068.43 | 1,068.43 |
| 6/30/2009 | 13375 | Merco Group-2040 Camfield Ave, LLC | 0080994643 | 116 | STATE OF DELAWARE | 2008 LLC Tax Notice | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13371 | Menuelo Maddux Props-2131 Humboldt St, LLC | 0080994643 | 117 | U.S. Trustee Payment Center | Q1/09 731-09-13375 | 0.00 | 325.00 | 325.00 |
| 6/30/2009 | 13371 | Menuelo Maddux Props-2131 Humboldt St, LLC | 0080301963 | 310 | STATE OF DELAWARE | 2008 LLC Tax Notice -verified- | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13371 | Menuelo Maddux Props-2131 Humboldt St, LLC | 0080301963 | 311 | American Elevator | Repair elevator -verified- Repair elevator -verified- | 0.00 | 945.00 | 945.00 |
| 6/30/2009 | 13371 | Menuelo Maddux Props-2131 Humboldt St, LLC | 0080301963 | 312 | Richard McDonald | reimbursement – Repairs/Maintenance | 0.00 | 58.28 | 58.28 |
| 6/30/2009 | 13371 | Menuelo Maddux Props-2131 Humboldt St, LLC | 0080301963 | 314 | Kirman Plumbing Co | Plumbing repair-Verified- | 0.00 | 313.00 | 313.00 |
| 6/30/2009 | 13371 | Menuelo Maddux Props-2131 Humboldt St, LLC | 0080301963 | JE 18904 | 0080993116 | ZBA Funding Transfer | 2,941.72 | 0.00 | 2,941.72 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080301963 | JE 19005 | 0080993116 | ZBA Funding Transfer | 4,000.00 | 0.00 | 4,000.00 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 308 | STATE OF DELAWARE | 2008 LLC Tax Notice -verified- | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 309 | Department of Water & Power | 1-57-05720-00246-00-9002-8-01 03/28/09-04/21/09 | 0.00 | 115.47 | 115.47 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 310 | Department of Water & Power | 1-57-05720-00246-00-9001-6-01 03/28/09-04/21/09 -verified- | 0.00 | 15.59 | 15.59 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 311 | Department of Water & Power | 1-57-05720-00242-00-0000-6-01 03/28/09-04/21/09 -verified- | 0.00 | 637.82 | 637.82 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 313 | dba Environmental Fire Protection | Fire alarm technician call -verified- 04/10/09-05/09/09 -verified- 05/10/09-05/22/09 -verified- | 0.00 | 262.50 | 262.50 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 314 | AT&T | 03/28/09-04/21/09 -verified- | 0.00 | 97.45 | 97.45 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 316 | LA Dept of Water & Power | Estimated fee for LLC, yr 2009 -verified- | 0.00 | 86.75 | 86.75 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | 317 | Franchise Tax Board | ZBA Funding Transfer | 0.00 | 900.00 | 900.00 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | JE 18915 | 0080993116 | ZBA Funding Transfer | 4,600.00 | 0.00 | 4,600.00 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | JE 18969 | 0080993116 | ZBA Funding Transfer | 1,300.00 | 0.00 | 1,300.00 |
| 6/30/2009 | 13389 | Menuelo Maddux-230 W. Ave 26, LLC | 0080307051 | JE 19192 | 0080993116 | ZBA Funding Transfer | 2,481.00 | 0.00 | 2,481.00 |
| 6/30/2009 | 13365 | Menuelo Maddux-2415 E. Washington Blvd, LLC | 0080307051 | JE 19227 | 0080993116 | 2008 LLC Tax Notice | 1,728.40 | 0.00 | 1,728.40 |
| 6/30/2009 | 13404 | Menuelo Maddux-2415 E. Washington Blvd, LLC | 0080306665 | 156 | STATE OF DELAWARE | ZBA Funding Transfer | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080306665 | JE 18746 | STATE OF DELAWARE | ZBA Funding Transfer | 750.00 | 0.00 | 750.00 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 336 | Stratex Solutions, Inc. | 2008 LLC Tax Notice | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 337 | dba Environmental Fire Protection | Axis Camera/accessories installation | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 338 | dba Environmental Fire Protection | Svc 5/2009 Fire Alarm 24hr/7day per wk svc agreemt fire system | 0.00 | 6,937.38 | 6,937.38 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 339 | City of Vernon | a/c 3765_Svc 4/8/09-4/27/09 | 0.00 | 262.00 | 262.00 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 340 | Rountree Glass Co | 3D x80 1/4 Clear Tempered Glass Replacement | 0.00 | 239.81 | 239.81 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 341 | Los Arboles Nursery, LLC | Install/Purchase of 48' Tree | 0.00 | 665.00 | 665.00 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 342 | AT&T | 4/10-5/9 #323584050534251 | 0.00 | 1,440.63 | 1,440.63 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | 344 | Dynamic Solutions | Install/Purchase DTV Flat Screen TV w/accessories [electrical] | 0.00 | 51.38 / 384.00 | 384.00 |
| 6/30/2009 | 13404 | Merco Group-2529 Santa Fe Ave, LLC | 0080994676 | JE 19088 | 0080993116 | ZBA Funding Transfer | 6,348.62 | 0.00 | 6,348.62 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 361 | John Durham | Reimbursement - Janitorial Supplies | 0.00 | 744.31 | 744.31 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 363 | Orkin Pest Control | A/C # 9798327; Month of April 2009 | 0.00 | 560.00 | 560.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 365 | Complete Thermal Services | Repairs to coolers | 0.00 | 784.07 | 784.07 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 366 | D. B. Electric Co | Repair transformer | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 367 | State Water Resources Control Board | Facility I.D. # 4 19C327821 | 0.00 | 375.00 | 375.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 368 | Complete Thermal Services | Repairs to coolers/HVAC units | 0.00 | 460.27 | 460.27 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 373 | Kirman Plumbing Co | Gral. maint. to toilets @ 2640 Washington | 0.00 | 152.67 | 152.67 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 374 | Michael Martinez | Replace cove tile @ 2640 Washington | 0.00 | 184.00 | 184.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 375 | Department of Water & Power | A/C # 1-45-89722-02640-00-9001-1-I-01 | 0.00 | 306.99 | 306.99 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 376 | LA Dept of Water & Power | A/C # 1-45-89722-02640-00-0000-1-I-01 | 0.00 | 204.22 | 204.22 |

I. Disbursements

Page 2 of 20

Exhibit 5 Page 000174

| Date mm/dd/yyyy | Case # | Entity | Acct # | Check Number | Payee or DIP account | Purpose | *Amount Transferred | **Amount Disbursed | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 377 | Michael Martinez | Health dept. issues @ 2640 Washington | 0.00 | 258.00 | 258.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 378 | Orkin Pest Control | A/C # 9798527 | 0.00 | 560.00 | 560.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 379 | D. B. Electric Co | Install pull phone lines @ 2640 Washington | 0.00 | 835.00 | 835.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 380 | Kirnan Plumbing Co | Repairs to mainline pipes @ 2640 Washington | 0.00 | 322.82 | 322.82 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 381 | Michael Martinez | Health dept. issues | 0.00 | 120.00 | 120.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 382 | Franchise Tax Board | Estimated fee for LLC, yr 2009 -verified- | 0.00 | 2,500.00 | 2,500.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 383 | LA Dept of Water & Power | Service frm 3/28 to 6/3/09 | 0.00 | 742.36 | 742.36 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | 384 | LA Dept of Water & Power | Service frm 3/28 to 6/3/09 | 0.00 | 656.13 | 656.13 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 18864 | 0080993116 | ZBA Funding Transfer | 1,000.00 | 0.00 | 1,000.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 18908 | 0080993116 | ZBA Funding Transfer | 4,063.69 | 0.00 | 4,063.69 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 18963 | 0080993116 | ZBA Funding Transfer | 18,603.00 | 0.00 | 18,603.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 18983 | 0080993116 | ZBA Funding Transfer | 20,004.50 | 0.00 | 20,004.50 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 19007 | 0080993116 | ZBA Funding Transfer | 9,205.00 | 0.00 | 9,205.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 19074 | 0080993116 | ZBA Funding Transfer | 1,000.00 | 0.00 | 1,000.00 |
| 6/30/2009 | 13397 | 2640 Washington Blvd, LLC | 0080302235 | JE 19273 | 0080993116 | ZBA Funding Transfer | 500.00 | 0.00 | 500.00 |
| 6/30/2009 | 13383 | Menudo Maddux Props-2951 Lenwood Road, LLC | 0080301518 | 302 | Golden State Water Company | A/C # 762677-3 A/C # 762678-1 A/C # 762680-7 | 0.00 | 696.63 | 696.63 |
| 6/30/2009 | 13383 | Menudo Maddux Props-2951 Lenwood Road, LLC | 0080301518 | 303 | STATE OF DELAWARE | File # 3919579 | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13383 | Menudo Maddux Props-2951 Lenwood Road, LLC | 0080301518 | 304 | Joaquin Medrano | Reimbursement to Medrano; Barstow trip | 0.00 | 87.96 | 87.96 |
| 6/30/2009 | 13383 | Menudo Maddux Props-2951 Lenwood Road, LLC | 0080301518 | 305 | Verizon | Phone # 760-255-5534 | 0.00 | 84.01 | 84.01 |
| 6/30/2009 | 13383 | Menudo Maddux Props-2951 Lenwood Road, LLC | 0080301518 | 306 | Southern California Edison | A/C # 2-31-440-4369; 4/23 to 5/22/09 | 0.00 | 1,203.03 | 1,203.03 |
| 6/30/2009 | 13383 | Menudo Maddux Props-2951 Lenwood Road, LLC | 0080301518 | 307 | Golden State Water Company | A/C # 838102-2; 3/27 TO 6/10/09 A/C # 838099-0 | 0.00 | 2,296.51 | 2,296.51 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 582 | STATE OF DELAWARE | 2008 LLC Tax Notice -verified- | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 583 | AT & T (306-330 N Ave 21) | 04/10/09-05/09/09 -verified- | 0.00 | 58.78 | 58.78 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 584 | LA Dept of Water & Power | Closing bill 03/26/09-04/01/09 -verified- | 0.00 | 10.94 | 10.94 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 586 | LA Dept of Water & Power | 03/28/09-04/21/09 -verified- | 0.00 | 26.87 | 26.87 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 587 | LA Dept of Water & Power | 03/28/09-04/21/09 -verified- | 0.00 | 204.78 | 204.78 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 588 | LA Dept of Water & Power | 03/28/09-04/21/09 -verified- | 0.00 | 39.59 | 39.59 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 589 | LA Dept of Water & Power | 03/28/09-04/21/09 -verified- | 0.00 | 169.02 | 169.02 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 590 | LA Dept of Water & Power | 03/28/09-05/20/09 -verified- | 0.00 | 146.99 | 146.99 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | 591 | Commercial Waste Services Inc | 06/20/09 -verified- | 0.00 | 715.53 | 715.53 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | JE 18911 | 0080993116 | ZBA Funding Transfer | 1,500.00 | 0.00 | 1,500.00 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | JE 18945 | 0080993116 | ZBA Funding Transfer | 0.00 | 0.00 | 0.00 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | JE 18965 | 0080993116 | ZBA Funding Transfer | 1,391.22 | 0.00 | 1,391.22 |
| 6/30/2009 | 13370 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | JE 19053 | 0080993116 | ZBA Funding Transfer | 4,200.00 | 0.00 | 4,200.00 |
| 6/30/2009 | 13373 | Menudo Maddux Props-306-330 N. Ave 21, LLC | 0080302433 | RC 25389 | Paala, Inc. | Returned item 00/00158 | 2,200.00 | 0.00 | 2,200.00 |
| 6/30/2009 | 13373 | Merco Group-3185 E. Washington Blvd, LLC | 0080301724 | 186 | STATE OF DELAWARE | 2008 LLC Tax Notice -verified- | 0.00 | 800.00 | 800.00 |
| 6/30/2009 | 13373 | Merco Group-3185 E. Washington Blvd, LLC | 0080301724 | 187 | Franchise Tax Board | Estimated fee for LLC, yr 2009 -verified- | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13373 | Merco Group-3185 E. Washington Blvd, LLC | 0080301724 | JE 18900 | 0080993116 | ZBA Funding Transfer | 6,000.00 | 0.00 | 6,000.00 |
| 6/30/2009 | 13373 | Merco Group-3185 E. Washington Blvd, LLC | 0080301724 | JE 18924 | 0080993116 | ZBA Funding Transfer | 852.86 | 0.00 | 852.86 |
| 6/30/2009 | 13373 | Merco Group-3185 E. Washington Blvd, LLC | 0080301724 | JE 19178 | 0080993116 | ZBA Funding Transfer | 25,000.00 | 0.00 | 25,000.00 |
| 6/30/2009 | 13373 | Merco Group-3185 E. Washington Blvd, LLC | 0080301724 | JE 19247 | 0080993116 | ZBA Funding Transfer | 19,000.00 | 0.00 | 19,000.00 |
| 6/30/2009 | 13373 | Merco Group-3185 E. Washington Blvd, LLC | 0080301724 | JE 19269 | 0080993116 | ZBA Funding Transfer | 25,000.00 | 0.00 | 25,000.00 |
| 6/30/2009 | 13402 | Menudo Maddux-336 W. 11th St, LLC | 0080306871 | 206 | STATE OF DELAWARE | 2008 LLC Tax Notice | 25,000.00 | 0.00 | 25,000.00 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 367 | The Gas Company | Court Ordered Post Bankruptcy Deposit | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 370 | STATE OF DELAWARE | 2008 LLC Tax Notice | 0.00 | 121.00 | 121.00 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 371 | Department of Water & Power | Svc-3/28/09-4/1/09 | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 372 | LA Dept of Water & Power | Svc-3/30-4/28 | 0.00 | 5.00 | 5.00 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 372 | LA Dept of Water & Power | Svc-3/30-4/28 | 0.00 | 826.84 | 826.84 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 374 | LA Dept of Water & Power | Svc-3/30 to 4/28 | 0.00 | 6.37 | 6.37 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 375 | The Gas Company | Svc-4/10-5/11/2009 | 0.00 | 231.53 | 231.53 |
| 6/30/2009 | 13360 | Menudo Maddux-420 Boyd St, LLC | 0080994650 | 375 | The Gas Company | Svc-4/10-5/11/2009 | 0.00 | 83.53 | 83.53 |

I. Disbursements

Exhibit 5 Page 000175

TOTAL DISBURSEMENTS FROM ALL ACCOUNTS FOR CURRENT PERIOD

| Date mm/dd/yyyy | Case # | Entity | Acct # | Check Number | Payee or Dif account | Purpose | *Amount Transferred | **Amount Disbursed | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 6/30/2009 | 13401 | Menco Group-620 Gladys Ave, LLC | 0080302383 | JE 18964 | 0080993116 | ZBA Funding Transfer | 9,390.00 | 0.00 | 9,390.00 |
| 6/30/2009 | 13401 | Menco Group-620 Gladys Ave, LLC | 0080302383 | JE 19274 | 0080993116 | ZBA Funding Transfer | 4,000.00 | 0.00 | 4,000.00 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 555 | Sprint | Court Ordered Post Bankruptcy Deposit | 0.00 | 0.00 | 0.00 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 556 | AT&T | Svc 4/11-5/10/2009 | 0.00 | 71.33 | 71.33 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 557 | AT&T | Svc 4/2009 | 0.00 | 141.22 | 141.22 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 558 | Consolidated Disposal Service | Disposal Svc 4/2009 | 0.00 | 1,121.71 | 1,121.71 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 559 | L.A Dept of Water & Power | Svc 3/30/09 to 4/28/09 | 0.00 | 20.14 | 20.14 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 560 | L.A Dept of Water & Power | Svc 3/30/09-4/28/09 | 0.00 | 984.61 | 984.61 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 561 | L.A Dept of Water & Power | Svc 3/30/09-4/28/09 | 0.00 | 104.31 | 104.31 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 562 | L.A Dept of Water & Power | Svc 3/30/09-4/28/09 | 0.00 | 594.93 | 594.93 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 563 | AT&T | Svc 4/8-5/7/2009 | 0.00 | 110.35 | 110.35 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 564 | Unisource Worldwide, Inc. | Janitorial supplies [order date:5/4/09] | 0.00 | 1,244.81 | 1,244.81 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 565 | Consolidated Disposal Service | Svc 3/28/09-3/31/09 | 0.00 | 134.04 | 134.04 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 566 | Sprint | 4/26 to 5/26 | 0.00 | 136.88 | 136.88 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 567 | Unisource Worldwide, Inc. | Order Dt: 4/2/09 | 0.00 | 110.73 | 110.73 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 568 | Ojani Sadiollan | Svc 4/2009 | 0.00 | 448.19 | 448.19 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 569 | Franchise Tax Board | Expense Reimbursement | 0.00 | 156.18 | 156.18 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 570 | Delta Elevator | Estimated fee for LLC, yr 2009 -verified- | 0.00 | 6,000.00 | 6,000.00 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 571 | Unisource Worldwide, Inc. | 3/28/09-3/31/09 Mar09 Svc | 0.00 | 57.77 | 57.77 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 572 | L.A Dept of Water & Power | Invoice Balance | 0.00 | 1,197.17 | 1,197.17 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 573 | L.A Dept of Water & Power | Svc 3/28/09-5/28/09 | 0.00 | 43.40 | 43.40 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 574 | L.A Dept of Water & Power | 3/28/09-5/28/09 | 0.00 | 2,062.54 | 2,062.54 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 575 | L.A Dept of Water & Power | 3/28/09-5/28/09 | 0.00 | 1,399.46 | 1,399.46 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 576 | c/o Stanley Convergent Security Solution | 7/09-9/09 Monitoring Chrgs | 0.00 | 136.62 | 136.62 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 577 | AT&T | Svc 5/8/09-6/7/09 | 0.00 | 120.35 | 120.35 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | 578 | AT&T | June2009 Svc | 0.00 | 1,104.76 | 1,104.76 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | JE 18901 | 0080993116 | ZBA Funding Transfer | 35,536.37 | 0.00 | 35,536.37 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | JE 18959 | 0080993116 | ZBA Funding Transfer | 57,615.00 | 0.00 | 57,615.00 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | JE 18981 | 0080993116 | ZBA Funding Transfer | 25,000.00 | 0.00 | 25,000.00 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | JE 19004 | 0080993116 | ZBA Funding Transfer | 17,530.10 | 0.00 | 17,530.10 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | JE 19248 | 0080993116 | ZBA Funding Transfer | 1,516.48 | 0.00 | 1,516.48 |
| 6/30/2009 | 13366 | Meruelo Wall St, LLC | 0080301807 | JE 19490 | 0080995116 | Jun 09 pyrl disbursed | 0.00 | 0.00 | 0.00 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080364953 | 4111 | The Gas Company | Svc 4/7/09 Svc acct 168 375 9128 4 | 0.00 | 7,859.38 | 7,859.38 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4115 | The Gas Company | Court Ordered Post Bankruptcy Deposit | 0.00 | 617.85 | 617.85 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4115 | Hart-Leverton | 3/28/09-11/5/09POST | 0.00 | 442.75 | 442.75 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4119 | Douglas Industrial Supply Co. | 9 Privacy Latches | 0.00 | 135.71 | 135.71 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4120 | Orkin Pest Control | a/c 5798158_Svc Date: 4/6/09 A/C # 9798143_Svc Date: 4/6/09 & 4/28/09 Residential a/c 9757450_3/30/09 Fly Treatment | 0.00 | 368.71 | 368.71 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4122 | STATE OF DELAWARE | 2008 LLC Tax Notice | 0.00 | 410.00 | 410.00 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4123 | dba A's Glass & Mirror | Svc 5/1/09 (Door Stops) | 0.00 | 250.00 | 250.00 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4124 | Handy Trac Systems, LLC | A/C # 4464; Monthly online fee 05/2009 A/C # 5004; | 0.00 | 440.00 | 440.00 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4125 | | Monthly fee 5/2009 MaintOffice | 0.00 | 69.90 | 69.90 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4127 | Kanzu Legal Solutions, Inc. | Legal fee 4/2009 [Not to exceed 5,000 mthly cap] | 0.00 | 136.30 | 136.30 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4128 | L.A.-Dept of Water & Power | Svc 4/16/09-4/29/09 | 0.00 | 8.52 | 8.52 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4128 | Department of Water & Power | Svc 3/31/09 TO 4/29/09 #16397602003230090001301 | 0.00 | 5,533.81 | 5,533.81 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4129 | LA Dept of Water & Power | Svc 3/31 TO 4/29 | 0.00 | 58.99 | 58.99 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4129 | LA Dept of Water & Power | Svc 3/31 TO 4/29 | 0.00 | 686.08 | 686.08 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4133 | TrustUnion Rental Screening | ac 4408R0031431 Svc 3/28/09-4/25/09 | 0.00 | 22.59 | 22.59 |
| 6/30/2009 | 13363 | Meruelo Maddux Props-760 S. Hill St, LLC | 0080302029 | 4134 | Time Warner Cable | Svc 5/23/09-6/22/09 #8448 30 038 4698749 | 0.00 | 157.50 | 157.50 |

I. Disbursements
Page 5 of 20

Exhibit 5 Page 000176

Report # 3 May 2009

| Case Number:<br>Month Ending:<br>Account Number:<br>Depository Name & Location | 1-09-bk-13371-KT<br>05/31/2009<br>0080301963<br>East West Bank<br>Meruelo Maddux Properties 2131 Humboldt Street, LLC Debtor in Possession | 1-09-bk-13389-KT<br>05/31/2009<br>0080307051<br>East West Bank<br>Meruelo Maddux 230 W Ave 26, LLC Debtor in Possession | 1-09-bk-13355-KT<br>05/31/2009<br>0080306665<br>East West Bank<br>Meruelo Maddux 2415 E Washington Blvd, LLC Debtor in Possession | 1-09-bk-13365-KT<br>05/31/2009<br>0080358294<br>East West Bank<br>Meruelo Maddux 2415 E Washington Blvd, LLC Debtor in Possession | 1-09-bk-13404-KT<br>05/31/2009<br>0080994676<br>East West Bank<br>MG-2529 Santa Fe Ave, LLC Debtor in Possession | 1-09-bk-13397-KT<br>05/31/2009<br>0080302235<br>East West Bank<br>Merco Group 2640 Washington Blvd, LLC Debtor in Possession |
|---|---|---|---|---|---|---|
| 1. Total Prior Receipts | 25,339.46 | 20,835.95 | 2,750.00 | - | 22,382.57 | 61,698.68 |
| 2. LESS: Total Prior Disbursements | 25,339.46 | 19,935.95 | 2,750.00 | - | 22,382.57 | 61,698.68 |
| 3. Beginning Balance | - | 900.00 | - | - | - | - |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 12,000.00 | 8,137.80 | 40.23 | - | 6,400.00 | -49,418.12 |
| A/R - Pre Filing | 4,020.00 | 8,921.80 | 709.77 | - | - | 6,211.25 |
| General Sales | - | - | - | - | - | 4,666.69 |
| Intercompany Receipts | 419.00 | 110.48 | 325.00 | - | 841.98 | - |
| TOTAL RECEIPTS | 16,419.00 | 17,170.08 | 1,075.00 | - | 7,241.98 | 60,294.46 |
| 5. BALANCE | 16,419.00 | 18,070.08 | 1,075.00 | - | 7,241.98 | 60,294.46 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | | | | | | |
| Disbursements | 15,675.00 | 16,734.60 | 750.00 | - | 6,400.00 | 59,676.96 |
| | 744.00 | 1,335.48 | 325.00 | - | 841.98 | 617.50 |
| TOTAL Disbursements | 16,419.00 | 18,070.08 | 1,075.00 | - | 7,241.98 | 60,294.46 |
| 7. Ending Balance | | | | | | |

Exhibit 5 Page 000177

| | 1-09-bk-13766-KT 05/31/2009 0080301807 East West Bank | 1-09-bk-13366-KT 05/31/2009 0080364953 East West Bank | 1-09-bk-13363-KT 05/31/2009 0080302029 East West Bank | 1-09-bk-13363-KT 05/31/2009 0080358369 East West Bank | 1-09-bk-13395-KT 05/31/2009 0050592701 East West Bank | 1-09-bk-13395-KT 05/31/2009 0080313703 East West Bank |
|---|---|---|---|---|---|---|
| Case Number: Month Ending: Account Number: Depository Name & Location | Meruelo Wall Street, LLC Debtor in Possession | Meruelo Wall Street, LLC Debtor in Possession | Meruelo Maddux Properties 760 South Hill Street, LLC Debtor in Possession | Meruelo Maddux Properties 760 S. Hill Street, LLC Debtor in Possession | 788 South Alameda, LLC Debtor in Possession | 788 South Alameda, LLC Debtor in Possession |
| 1. Total Prior Receipts | 192,407.25 | | 2,593.12 | 86,045.14 | 111,111.67 | 2,245.00 |
| 2. LESS: Total Prior Disbursements | 186,407.25 | | 2,593.12 | 86,045.14 | 105,111.67 | 2,303.00 |
| 3. Beginning Balance | 6,000.00 | | - | | 6,000.00 | 1,458.58 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 136,885.00 | | - | 54,652.71 | 59,008.00 | |
| A/R - Pre Filing | 30,000.00 | | | 16,415.76 | 25,850.00 | - |
| General Sales | - | | 2,843.65 | 32.47 | 1,550.00 | - |
| Intercompany Receipts | 5,722.98 | 9,163.76 | 20,921.76 | 16,713.63 | 1,975.68 | 1,910.00 |
| TOTAL RECEIPTS | 172,607.98 | 9,163.76 | 23,765.41 | 87,814.57 | 88,383.68 | 1,910.00 |
| 5. BALANCE | 178,607.98 | 9,163.76 | 23,765.41 | 87,814.57 | 94,383.68 | 3,368.58 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | 165,425.76 | 6,007.20 | 1,101.52 | | 86,067.00 | |
| Disbursements | 13,182.22 | - | 22,663.89 | 87,814.57 | 8,321.68 | 1,908.93 |
| TOTAL Disbursements | 178,607.98 | 6,007.20 | 23,765.41 | 87,814.57 | 94,383.68 | 1,908.93 |
| 7. Ending Balance | - | 3,156.56 | - | - | - | 1,459.65 |

Exhibit 5 Page 000178

I. CASH RECEIPTS AND DISBURSEMENTS

| Case Number:<br>Month Ending:<br>Account Number:<br>Depository Name & Location | 1:09-bk-13371-KT<br>04/30/2009<br>0080301963<br>East West Bank<br><br>Meruelo Maddux Properties 2131 Humboldt Street, LLC Debtor in Possession | 1:09-bk-13389-KT<br>04/30/2009<br>0080307051<br>East West Bank<br><br>Meruelo Maddux 230 W Ave 26, LLC Debtor in Possession | 1:09-bk-13365-KT<br>04/30/2009<br>0080306665<br>East West Bank<br><br>Meruelo Maddux 2415 E Washington Blvd, LLC Debtor in Possession | 1:09-bk-13365-KT<br>04/30/2009<br>0080358294<br>East West Bank<br><br>Meruelo Maddux 2415 E Washington Blvd, LLC Debtor in Possession | 1:09-bk-13404-KT<br>04/30/2009<br>0080994676<br>East West Bank<br><br>MG-2529 Santa Fe Ave, LLC Debtor in Possession | 1:09-bk-13397-KT<br>04/30/2009<br>0080302235<br>East West Bank<br><br>Merco Group 2540 Washington Blvd, LLC Debtor in Possession |
|---|---|---|---|---|---|---|
| 1. Total Prior Receipts | - | - | - | - | 418.02 | 606.30 |
| 2. LESS: Total Prior Disbursements | - | - | - | - | 418.02 | 606.30 |
| 3. Beginning Balance | - | - | - | - | - | - |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 13,000.00 | 10,520.95 | - | - | 6,400.00 | -44,516.38 |
| A/R - Pre Filing | 11,500.00 | 5,415.00 | 750.00 | - | - | 13,256.00 |
| General Sales | - | - | 1,200.00 | - | 14,764.55 | - |
| Intercompany Receipts | 839.46 | 4,950.00 | 800.00 | - | 800.00 | 3,320.00 |
| TOTAL RECEIPTS | 25,339.46 | 20,885.95 | 2,750.00 | - | 21,964.55 | 61,092.38 |
| 5. BALANCE | 25,339.46 | 20,885.95 | 2,750.00 | - | 21,964.55 | 61,092.38 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | 24,500.00 | 19,164.84 | 1,950.00 | - | 21,164.55 | 57,792.38 |
| Disbursements | 839.46 | 821.11 | 800.00 | - | 800.00 | 3,300.00 |
| TOTAL Disbursements | 25,339.46 | 19,985.95 | 2,750.00 | - | 21,964.55 | 61,092.38 |
| 7. Ending Balance | - | 900.00 | - | - | - | - |

Exhibit 5 Page 000179

| | 1-09-bk-13366-KT 04/30/2009 0380301807 East West Bank Meruelo Wall Street, LLC Debtor in Possession | 1-09-bk-13366-KT 04/30/2009 0380364953 East West Bank Meruelo Wall Street, LLC Debtor in Possession | 1-09-bk-13363-KT 04/30/2009 0380302029 East West Bank Meruelo Maddux Properties 760 South Hill Street, LLC Debtor in Possession | 1-09-bk-13363-KT 04/30/2009 0380358369 East West Bank Meruelo Maddux Properties 760 S. Hill Street, LLC Debtor in Possession | 1-09-bk-13395-KT 04/30/2009 0080992701 East West Bank 788 South Alameda, LLC Debtor in Possession | 1-09-bk-13395-KT 04/30/2009 0380313703 East West Bank 788 South Alameda, LLC Debtor in Possession |
|---|---|---|---|---|---|---|
| Case Number / Month Ending: / Account Number: / Depository Name & Location | | | | | | |
| 1. Total Prior Receipts | 3,724.25 | - | - | 12,220.05 | 12,658.00 | - |
| 2. LESS: Total Prior Disbursements | 3,724.25 | - | - | 12,220.05 | 12,658.00 | - |
| 3. Beginning Balance | - | - | - | - | - | 1,516.58 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 141,085.00 | - | 49,197.82 | - | 33,566.25 | - |
| A/R - Pre Filing | 34,800.00 | - | 15,641.35 | - | 52,883.50 | - |
| General Sales | - | - | 518.50 | - | 680.00 | - |
| Intercompany Receipts | 12,798.00 | - | 8,467.52 | 2,993.12 | 11,403.92 | 2,245.00 |
| TOTAL RECEIPTS | 188,683.00 | - | 73,825.09 | 2,993.12 | 98,453.67 | 2,245.00 |
| 5. BALANCE | 188,683.00 | - | 73,825.09 | 2,993.12 | 98,453.67 | 3,761.58 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | 175,885.00 | - | 73,825.09 | 458.78 | 91,055.12 | 2,303.00 |
| Disbursements | 6,799.00 | - | - | 2,534.34 | 1,398.55 | - |
| TOTAL Disbursements | 182,683.00 | - | 73,825.09 | 2,993.12 | 92,453.67 | 2,303.00 |
| 7. Ending Balance | 6,000.00 | - | - | - | 6,000.00 | 1,458.58 |

Exhibit 5 Page 000180

| | 1:09-bk-13371-KT 03/31/2009 0080301963 East West Bank | 1:09-bk-13389-KT 03/31/2009 0080307051 East West Bank | 1:09-bk-13365-KT 03/31/2009 0080306665 East West Bank | 1:09-bk-13365-KT 03/31/2009 0080358294 East West Bank | 1:09-bk-13404-KT 03/31/2009 0080994676 East West Bank | 1:09-bk-13397-KT 03/31/2009 0080302235 East West Bank |
|---|---|---|---|---|---|---|
| Case Number: Month Ending: Account Number: Depository Name & Location | Meruelo Maddux Properties 2121 Humboldt Street, LLC Debtor in Possession | Meruelo Maddux 230 W Ave 26, LLC Debtor in Possession | Meruelo Maddux 2415 E Washington Blvd, LLC Debtor in Possession | Meruelo Maddux 2415 E Washington Blvd, LLC Debtor in Possession | MG-2529 Santa Fe Ave, LLC Debtor in Possession | Metro Group 2540 Washington Blvd, LLC Debtor in Possession |
| 1. Total Prior Receipts | - | - | - | - | - | - |
| 2. LESS: Total Prior Disbursements | - | - | - | - | - | - |
| 3. Beginning Balance | - | - | - | - | - | - |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | - | - | - | - | - | |
| A/R - Pre Filing | - | - | - | - | - | |
| General Sales | - | - | - | - | - | 100.00 |
| Intercompany Receipts | - | - | - | - | 418.02 | 506.30 |
| TOTAL RECEIPTS | - | - | - | - | 418.02 | 606.30 |
| 5. BALANCE | - | - | - | - | 418.02 | 606.30 |
| 6. LESS: Disbursements | | | | | | |
| Transfers to other DIP Accounts | | | | | | |
| Disbursements | - | - | - | - | 418.02 | 606.30 |
| TOTAL Disbursements | - | - | - | - | 418.02 | 606.30 |
| 7. Ending Balance | - | - | - | - | - | - |

Exhibit 5 Page 000181

| | 1:09-bk-13366-KT | 1:09-bk-13366-KT | 1:09-bk-13363-KT | 1:09-bk-13363-KT | 1:09-bk-13395-KT | 1:09-bk-13395-KT |
|---|---|---|---|---|---|---|
| Case Number: | 03/31/2009 | 03/31/2009 | 03/31/2009 | 03/31/2009 | 03/31/2009 | 03/31/2009 |
| Month Ending: | 0080301807 | 0080364953 | 0080302029 | 0080358369 | 0080992704 | 0080317703 |
| Account Number: | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank | East West Bank |
| Depository Name & Location: | Meruelo Wall Street, LLC Debtor in Possession | Meruelo Wall Street, LLC Debtor in Possession | Meruelo Maddux Properties 760 South Hill Street, LLC Debtor in Possession | Meruelo Maddux Properties 760 S. Hill Street, LLC Debtor in Possession | 788 South Alameda, LLC Debtor in Possession | 788 South Alameda, LLC Debtor in Possession |
| 1. Total Prior Receipts | - | - | - | - | - | - |
| 2. LESS Total Prior Disbursements | - | - | - | - | - | - |
| 3. Beginning Balance | - | - | - | - | - | 1,516.58 |
| 4. Receipts During Current Period | | | | | | |
| A/R - Post Filing | 1,200.00 | - | - | 2,940.87 | - | - |
| A/R - Pre Filing | 2,400.00 | - | - | 9,279.18 | 3,060.00 | - |
| General Sales | | - | - | - | 9,598.00 | - |
| Intercompany Receipts | 124.25 | - | - | - | - | - |
| TOTAL RECEIPTS | 3,724.25 | - | - | 12,220.05 | 12,658.00 | - |
| 5. BALANCE | 3,724.25 | - | - | 12,220.05 | 12,658.00 | 1,516.58 |
| 6. LESS: Disbursements Transfers to other DIP Accounts Disbursements | 3,724.25 | - | - | 12,220.05 | 12,658.00 | - |
| TOTAL Disbursements | 3,724.25 | - | - | 12,220.05 | 12,658.00 | - |
| 7. Ending Balance | - | - | - | - | - | 1,516.58 |

Exhibit 5 Page 000182