1  Donald L. Gaffney (Admitted *Pro Hac Vice*)
   Eric S. Pezold (#255657)
2  Jasmin Yang  (#255254)
   SNELL & WILMER L.L.P.
3  600 Anton Blvd, Suite 1400
   Costa Mesa, CA 92626
4  Phone:     (714) 427-7000
   Facsimile:  (714) 427-7799
5  Email: dgaffney@swlaw.com
            epezold@swlaw.com
6           jyang@swlaw.com

7  Counsel for Bank of America, N.A.

8

9              UNITED STATES BANKRUPTCY COURT

10   CENTRAL DISTRICT OF CALIFORNIA – SAN FERNANDO VALLEY DIVISION

11  In Re:                                    Case No.: 1:09-bk-13356-KT
                                              Jointly Administered
    MERUELO MADDUX PROPERTIES,                Chapter 11
12            INC., et al.,

13  Debtors-in-Possession.                    **BANK OF AMERICA, N.A.'S BENCH
                                              BRIEF IN OPPOSITION TO DEBTORS'**
14                                            **MOTIONS FOR USE OF CASH
                                              COLLATERAL AND MAINTENANCE OF**
15  ■ Affects Meruelo Maddux Properties       **CASH MANAGEMENT SYSTEM
    — 760 S. Hill Street, LLC                 (MERUELO MADDUX PROPERTIES –
                                              760 S. HILL STREET, LLC)**
16
    □ Affects the following Debtor(s)         Date:   October 26, 2009
17                                            Time:   9:00 a.m.
                                              Place:  21041 Burbank Blvd., Courtroom 301
18                                                    Woodland Hills, CA

19         Bank of America, N.A. (the "Bank"), a secured creditor of Meruelo Maddux

20  Properties — 760 Hill Street, LLC ("760 S. Hill Street") and Merco Group — Southpark

21  LLC, and an unsecured creditor of Meruelo Maddux Properties, Inc. ("MMPI"), by and

22  through undersigned counsel, opposes the Debtors'[1] *"Emergency Motion for an Order*

23  *Authorizing the Use of Cash Collateral on an Interim Basis Pending a Final Hearing"*

24  ("Cash Collateral Motion") and the Debtors *"Emergency Motion for Order (1) Approving*

25  *Continued Use of Cash Management System, (2) Approving Lending and Borrowing*

26  ─────────────────────
    [1] On March 26 and March 27, 2009 (the "Petition Date"), MMPI and 53 of its apparently affiliated entities
27  (including Southpark) filed petitions for relief under Title 11 of the United States Code.  As used herein,
    "Debtor" and "Debtors" refer to MMPI and its 53 affiliates that filed bankruptcy petitions on March 26
28  and March 27, 2009.

    10643833

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1  *Between Debtors on An Unsecured Basis, (3) Authorizing the Debtors' Use of Prepetition*

2  *Bank Accounts, and (4) Dispensing with the Requirements of 11 U.S.C. § 345(b)*" ("Cash

3  Management Motion"). The Court should deny the Cash Collateral and Cash

4  Management Motions because: (1) there is no equity in the Union Loft Apartment

5  Building, which is located at 325 West 8th Street, Los Angeles, California (the "Property")

6  and 760 S. Hill Street has failed to carry its burden in demonstrating the Bank is

7  adequately protected; and (2) the intercompany lending contemplated by the Debtors is

8  not permitted under the Bankruptcy Code. In opposition to the Cash Collateral Motion

9  and the Cash Management Motion, Bank states as follows:

10  **I.    BRIEF FACTUAL BACKGROUND**

11

| Value of Property as of Petition Date[2] | $31,600,000 |
| --- | --- |
| Less | |
| Property Taxes[3] | $324,752.13 |
| Amount due to Bank[4] | $30,895,619.62 |
| Costs of Sale[5] | $1,386,000 |
| **Equity Cushion** | **$(1,006,371.75)** |

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

[2] *See* October 8, 2008 appraisal attached to "*Declaration of Michael Abergel*" filed with the Court on April 21, 2009 at docket entry no. 100. In addition to the value of the 760 S. Hill Street Property, for purposes of the adequate protection analysis, the Bank has added $6.4 million of principal pledged by the Debtor in conjunction with a modification agreement that is currently being held in one of the Debtors' restricted accounts. Bank asserts that it is entitled to the interest on the principal. Debtors' disagree. As such, Bank has not included in the interest in the calculation.
[3] *See* March 27, 2009 Property Tax Schedule appended to the "*Declaration of Richard Meruelo*" filed on March 27, 2009 at docket entry no. 10.
[4] 760 S. Hill Street has fully matured. As of the Petition Date, 760 S. Hill Street was indebted to the Bank in the amount of $29,546,828.07, comprising the principal amount of the loan, interest, default interest, late fees, appraisal fees and attorneys' fees. The Bank incorporates by this reference the prepetition calculation of indebtedness from its "*Motion for Relief from Stay*" filed at docket entry no. 370 on July 8, 2009. Since the Petition Date and through October 31, 2009, 760 S. Hill Street will have accrued an additional 219 days worth of default interest and late fees (at a per diem rate of $5,660.66 in interest and $145.09 in late fees) totaling $1,271,458.47. As of July 8, 2009, the Bank's attorneys' fees were estimated at $77,333.08. Since then, the amount of attorneys' fees accrued has increased and is subject to upward adjustment.
[5] Pursuant to the Court's July 6, 2009 ruling, costs of sale of 5.5% will be used in connection with analyzing the Cash Collateral Motion. Notably, the 5.5% has been applied to the $25.2 million value of the building, excluding the $6.4 million in the restricted account.

10643833

1

**II.    THE BANK IS NOT ADEQUATELY PROTECTED BECAUSE THERE IS**

2

**NO EQUITY CUSHION IN THE PROPERTY**

3

    **A.    The Encumbrances on the Property Exceed the Value of the Property**

4

        **By No Less Than $1,006,371.75**

5

    760 S. Hill Street has failed to present any competent evidence demonstrating how

6

the Bank is adequately protected.  Pursuant to Bankruptcy Code § 363(p)(1), 760 S. Hill

7

Street has the burden of proof on the issue of adequate protection.  As demonstrated

8

above, **there is no equity cushion**, much less the 20% equity cushion espoused as

9

adequate by *In re Mellor*, to protect the Bank's interest in the Property.  Even though the

10

Bank's October 8, 2008 appraisal values the Property at $25.2 million, given the

11

precipitous decline in real estate values, of which the Court may take judicial notice, it is

12

likely that the value of the Property has significantly decreased since October 8, 2009.

13

Even using this value indicates that there is no equity cushion to protect the Bank.

14

Moreover, 760 S. Hill Street's continued failure to pay property taxes and debt service or

15

interest payments further decreases the value of the Property with each passing day.[6]

16

    **B.    Richard Meruelo's Valuation of the Property Must Be Disregarded**

17

        **Because It Assumes a Hypothetical 93% Occupancy Level When the**

18

        **Actual  Occupancy Level is Less Than 50%**

19

    Despite 760 S. Hill Street's burden to demonstrate that the Bank is adequately

20

protected in the Property, the sole evidence provided by 760 S. Hill Street concerning the

21

value of the Property is Richard Meruelo's bare statement that the Property is worth no

22

less than $29.2 million.[7]  *See Supplemental Declaration of Richard Meruelo*

23

("Supplemental Declaration"), filed with the Court on April 21, 2009 at docket entry no.

24

95 at ¶ 59.  Mr. Meruelo's assessment of the Property's value is based on "Fannie Mae

25

style stabilized cash flow projections."  Supplemental Declaration, ¶ 59.  Upon cross

26

[6] The per diem interest and late charges on the 760 S. Hill Street loan are approximately $5,805.75.

27

[7] On the other hand, the Bank has filed with the Court an MAI appraisal supported by detailed and lengthy

28

analysis analyzing the different valuation methodologies used and presenting the demographic and comparable data used in arriving at a valuation figure.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

10643833

1    examination, Mr. Meruelo stated that the Fannie Mae cash flow projections contemplate a

2    stabilized occupancy level of approximately 93%.  Transcript of July 15, 2009 hearing,

3    112:4-15.[8]  Mr. Meruelo then testified that the Property was less than 50% occupied.  *Id.*

4    112:16-22.

5         The Fannie Mae projections should not be used in valuing this Property because

6    the Property has a dramatically lower occupancy rate than that contemplated by the

7    Fannie Mae projections.  760 S. Hill Street's most recent rent roll indicates that the

8    building's occupancy rate is approximately 33% (with 33 out of the 92 units leased).[9]  760

9    S. Hill Street's most recent Monthly Operating Report for August 2009 reflects a

10    downward trend in rental revenue compared to previous months and reflects rental income

11    of $75,709.00.[10]  This rental income reflects that the Property is approximately 41%

12    occupied and not even close to the Fannie Mae projection levels.[11]  Aside from the

13    problematic issue of Mr. Meruelo's self interest in valuing the Property at an inflated

14    figure, Mr. Meruelo is not even using appropriate methodology or appropriate

15    assumptions in valuing the Property.

16    **C.    Even if Mr. Meruleo's Valuation is Used, There is Not Still An**

17    **Insufficient Equity Cushion to Protect the Bank's Interest in the**

18    **Property**

19         Mr. Meruelo's valuation should not be used because it is based solely on Mr.

20    Meruelo's self-serving statements and flawed methodology.  However, even assuming for

21    the sake of argument that the Property is worth what Mr. Meruelo contends that it is, the

22    equity cushion in the Property is still not even close to 20% of the value of the property

23    ---

[8] A true and correct copy of the relevant pages from the Transcript of the July 15, 2009 hearing are
24    attached hereto as Exhibit 1 and incorporated herein by this reference.
[9] A true and copy of the rent roll information is attached hereto as Exhibit 2 and incorporated by this
25    reference.
[10] A true and copy of relevant pages of the Debtors' August 2009 Monthly Operating Report is attached
26    hereto as Exhibit 3 and incorporated by this reference.
[11] This figure is arrived at by dividing $75,709.99 (the amount of rental income for August) by the average
27    of the net rental amounts for each leased unit reflected in the Rent Roll (the average net rent is
approximately $1,985.73).  The August 2009 Monthly Operating Report suggests that approximately 38
28    units are leased, constituting approximately 41% of the 92 units.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1  and is insufficient to constitute adequate protection. *In re Mellor*, 734 F.2d 1396 (9th Cir.

2  1984). The chart below establishes that the Property has less than a 10% equity cushion.

3        Value of Property:        $29,200,000 + $6,400,000 = $35,600,000

4                    <u>Less</u>:

5        Property Taxes:        $324,752.13

6        Amount Due to Bank:    $30,895,619.62

7        Costs of Sale:         $1,606,000

8        Equity:              $2,773,628.25 or 9.50%

9        Given that interest and property taxes continue to accrue, equity in the Property

10  diminishes on a daily basis.

11  **III.**    **<u>THE PROPOSED INTERCOMPANY LENDING BETWEEN THE</u>**

12          **<u>DEBTORS IS NOT PERMITTED BY THE BANKRUPTCY CODE</u>**

13      **A.**    **Inter-Debtor Lending Is Not Permitted Under the Bankruptcy Code**

14        As much as the Debtors would like to assume that all of the jointly administered

15  cases have been substantively consolidated and that the Court should treat all the Debtor

16  entities and all the cash collateral generated by the different real properties securing

17  different Debtor loans as one single enterprise, these cases have not been substantively

18  consolidated and the Debtors are not permitted to commingle their cash collateral and use

19  the cash collateral of one Debtor to pay the liabilities of another Debtor. Courts that have

20  specifically addressed the propriety of inter-debtor lending have found that the use of cash

21  collateral from one estate to pay the claims of another estate is not allowed under the

22  Bankruptcy Code. *See In re Las Torres Dvpt. L.L.C.*, 2009 Bankr. LEXIS 2983 at 35

23  (Bankr. S.D. Texas 2009) ("The proposed use of cash collateral from one estate to pay the

24  claims of another estate—in effect, borrowing from Peter to pay Paul—<u>is not allowed</u>

25  <u>under the applicable law</u>") (emphases added).

26        *Las Torres* involves an analogous situation where two jointly administered debtors

27  sought to use the cash collateral generated by one estate to pay the administrative claims

28  of another estate. One of the debtors (La Placita) operated a shopping center that

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anson Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

1  generated $47,000 per month in rental income. *Id* at 4. The other debtor, Las Torres,

2  generated no income and held title to an undeveloped tract of land. *Id.* at 7. Both debtors

3  (La Placita and Las Torres) sought, in their cash collateral motion, to use the income from

4  La Placita to pay for Las Torres's administrative claims, including Las Torres's United

5  States Trustee and attorneys' fees. *Id.* at 8. The Court refused to allow the cash collateral

6  generated by La Placita to pay the expenses of Las Torres. In refusing to allow one debtor

7  to use the cash collateral from the other debtor, the court distinguished between joint

8  administration and substantive consolidation noting that when cases are jointly

9  administered "the Debtors' asset and liabilities are *not* combined." 2009 Bankr. LEXIS at

10  15 (emphasis added). Crucial to the *Las Torres* court's decision was its reasoning that

11  joint administration <u>does not</u> blur the line between separate bankruptcy estates:

> The administrative expenses of one jointly administered debtor
> should not be paid out of the other jointly administered debtor's
> cash collateral because joint administration does 'not affect the
> substantive rights of the claimants or of the respective debtor's
> estates'.
>
> …
>
> Professional services rendered to one debtor (i.e., Las Torres) in a
> jointly administered Chapter 11 case <u>may not be paid using the
> assets of the other joint debtor's (i.e., La Placita's) estate because
> when cases are jointly administered, as opposed to substantively
> consolidated, the assets of each joint debtor are property of separate
> bankruptcy estates and each estate also has different liabilities.</u>

20  2009 Bankr. LEXIS at 31, 32-33 (emphasis added) (internal citations omitted).

21  For the same reasons articulated by *Las Torres*, the 760 S. Hill Street's proposed

22  use of cash collateral is not permitted under the Bankruptcy Code. 760 S. Hill Street's

23  August 2009 Monthly Operating Report indicates that the Property generated $75,709 in

24  income for August, 2009. The Monthly Operating Report also provides that 760 S. Hill

25  Street incurred $43,800 in "Direct Corporate Property Management" expenses that same

26  month. The Debtors have previously testified that the "Direct Corporate Property

27  Management" fee charged by MMPI to the Debtors bears no relation to the actual costs of

28

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

10643833

1    operating a given Debtor's specific property.[12] To the extent that the income from 760 S.

2    Hill Street is used to pay the expenses and claims of any other entity or any other Debtor,

3    whether under the guise of "Direct Corporate Property Management" fees that bear no

4    relation to the costs of operating the Property, or otherwise, this is not permitted under the

5    Bankruptcy Code.

6    **B.    Cash Collateral Generated by 760 S. Hill Street Must Be Used to Pay**

7    **Only Its Expenses**

8    Although the Debtors cite several cases in support of the general proposition that

9    cash collateral can be used where a secured creditor is adequately protected, none of the

10    cases concern situations where the cash collateral from the real property of one debtor

11    entity is used to fund expenses outside that bankruptcy case. In fact, contrary to what the

12    Debtors seek in their Cash Collateral Motion, courts limit the use of cash collateral

13    generated by a certain piece of real property towards the operation of that property and do

14    not permit cash collateral generated by a piece of real property towards the administrative

15    expenses of the bankruptcy case. *In re River Oaks Ltd. P'ship*, 166 B.R. 94, 98 (E.D.

16    Mich. 1994) ("In this Court's opinion, the rental income, constituting cash collateral, may

17    not be used for expenses not related to the operation and maintenance of the building

18    generating the rents, except as may be permitted pursuant to 11 U.S.C. § 506(c)"); *In re*

19    *Plaza Family P'ship*, 95 B.R. 166, 172 (E.D. Cal. 1989).

20    The Court should not permit the Debtors to use the income generated by 760 S.

21    Hill Street for the benefit of any other Debtor because there is no equity in the Property.

22    However, in the event that Court allows such use, to the extent that the Debtors are

23    seeking to assess a "Direct Corporate Property Management" fee against 760 S. Hill

24    Street, the Debtors must show how this fee relates to the expenses and operations of the

25    Property before they may be permitted to use the revenue it generates.

26

27    [12] A true and correct copy of relevant pages from the Transcript of the May 4, 2009 hearing are attached
hereto as Exhibit 4 and incorporated herein by this reference

28

10643833

- 7 -

**C.    760 S. Hill Street's Failure to Segregate Cash Collateral Is In Violation of the Bankruptcy Code**

The Court should deny the Cash Collateral Motion and the Cash Management Motion because the Debtors' proposed use and direction of funds, by which the Debtors seek the use of cash collateral of certain lenders towards the expenses of unrelated Debtors, is impermissible under the Bankruptcy Code.

Section 363(c)(4) states in relevant part that "the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control." Segregating cash collateral serves an essential non-bankruptcy purpose — it allows a secured lender to maintain its perfected security interest in cash proceeds by ensuring that the cash proceeds remain identifiable. *See* UCC § 9-315(a)(2).

According to the Cash Management Motion, the Debtors maintain "a concentration account into which is swept or there is deposited all receipts of the Debtors ... from the Concentration Account, each day funds are transferred to the operating account of each affiliated entity when needed to fund payment on checks issued by that entity". Cash Management Motion, ¶ 19. Furthermore, the Debtors' Chief Accounting Officer, Fred Skaggs, testified that "Money is fudge I believe. It's all going into one pot. To say what this money went to is – why did it go here, why did it go there, it's all going to the same pot, and **it's not easily identifiable**. It's not – it just makes no when it goes into the same pot to identify it after it's in the pot where it's going." Deposition Transcript of Fred Skaggs, 138:20-25; 139:1 (emphasis added).

If the Debtors were allowed to maintain the Concentration Account, by the Debtors' own admission, it would be impossible for the Bank to trace any of the rents and other income generated from the Property for the purposes of maintaining its perfected security interest in those monies. 760 S. Hill Street has cited no basis or authority for effectively stripping the Bank's liens in the rents and other income generated from the Property. The Bank, therefore, respectfully requests that the Court deny the Cash Management Motion.

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

10643833

1

**IV.  CONCLUSION**

2      760 S. Hill Street should not be permitted to use the cash collateral generated by

3 760 S. Hill Street because there is no equity in the Property.  Furthermore, the Court

4 should deny the Cash Collateral Motion and the Cash Management Motion because the

5 Debtors' proposed use of cash collateral across different Debtor estates is not permitted

6 under the Bankruptcy Code.  In the event the Court permits the Debtors to use 760 S. Hill

7 Street's cash collateral, the Bank requests that the Court restrict the use of cash collateral

8 generated by the Property to pay for the expenses and claims that are directly related and

9 traceable to 760 S. Hill Street.  Furthermore, in the event the Court permits the Debtors to

10 use the cash collateral generated by 760 S. Hill Street, the Bank requests that the Court

11 condition such use on the Debtors: (1) monthly payment of amounts due under the 760 S.

12 Hill Street loan; (2) payments of delinquent property taxes and timely maintenance of

13 property tax payments; and (3) a replacement lien on the Debtors' unencumbered property

14 equal to the amount of accrued interest, late fees, and attorneys' fees accrued through the

15 period of permitted cash collateral use (an amount no less than $1,348,7941.55 through

16 October 31, 2009).

17

18 Dated: October 19, 2009.                       SNELL & WILMER, L.L.P.

19

20                                          By:  /s/ Jasmin Yang
                                               Donald L. Gaffney
21                                             Eric S. Pezold
                                               Jasmin Yang
22                                             Counsel for Bank of America, N.A.

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
600 Anton Boulevard, Suite 1400
Costa Mesa, California 92626-7689
(714) 427-7000

10643833

# EXHIBIT 1

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                   --oOo--

4   In Re:                    )  Case No. SV09-13356-KT
                              )
5   MERUELO MADDUX PROPERTIES, )  Woodland Hills, California
    INC., A DE CORP.,         )  Wednesday, July 15, 2009
6                             )  9:00 a.m.
             Debtor.          )
7   _____)

8                             MOTION TO ASSUME LEASE OR
                              EXECUTORY CONTRACT DEBTOR'S
9                             NOTICE OF MOTION AND MOTION
                              FOR AN ORDER EXTENDING THE
10                            TIME DURING WHICH DEBTORS MUST
                              ASSUME OR REJECT
11                            NONRESIDENTIAL REAL PROPERTY
                              LEASES PURSUANT TO 11 U.S.C.
12                            SECTION 365(D)(4)(B)(I)

13                            MOTION TO EXTEND EXCLUSIVITY
                              PERIOD FOR FILING A CHAPTER 11
14                            PLAN AND DISCLOSURE STATEMENT
                              DEBTORS' NOTICE OF MOTION AND
15                            MOTION FOR AN ORDER PURSUANT
                              TO BANKRUPTCY CODE SECTION
16                            1121(D) EXTENDING THE
                              EXCLUSIVE PERIODS DURING WHICH
17                            ONLY THE DEBTORS MAY FILE A
                              PLAN OF REORGANIZATION AND
18                            SOLICIT ACCEPTANCES

19                            DEBTORS' MOTION FOR ORDER
                              ESTABLISHING PROCEDURE FOR
20                            INTERIM COMPENSATION AND
                              REIMBURSEMENT OF EXPENSES FOR
21                            PROFESSIONALS

22                            STATUS CONFERENCE RE: MOTION
                              FOR AN ORDER AUTHORIZING THE
23                            USE OF CASH COLLATERAL ON AN
                              INTERIM BASIS PENDING A FINAL
24                            HEARING

25  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.

*Echo Reporting, Inc.*

10

111

1  A     Fourth quarter.

2  Q     Okay.  How will this group -- how do you anticipate

3  paying this group?  Are they paid from commissions of placed

4  leases or is there a base compensation?

5  A     It's a percentage of gross.

6  Q     Of gross of the project?

7  A     Yes.

8  Q     And do you know what that percentage is?

9  A     It starts off at around $6,000 a month.

10 Q     And is there escalators based upon reaching certain

11 occupancy levels?

12 A     The detail of the contract I haven't read.  John Maddux

13 would be a better person to ask about that.

14 Q     Mr. Maddux is handling those negotiations?

15 A     Yes.

16 Q     All right.  Now, if you look on page 23, you give --

17 you've estimated the value as of April 20th in this

18 declaration on the Union Lofts project at $29.2 million, is

19 that correct?

20 A     Yeah.

21 Q     And was that based upon the occupancy level at the

22 time?

23 A     No.  That was what we refer to as a Fannie Mae style

24 projections.  Fannie Mae has a pretty active apartment

25 financing program, and they have a formula of how they

112

1  project revenues and expenses and what the values, the loan

2  to values they will finance.  So that number came from that

3  type of analysis.

4  Q    Was that -- I hate to be slow, but is that based then

5  upon achieving some higher stabilized rent level that --

6  A    Yes.  They figure out a -- that process is taking the

7  vacancy rate that's been established for an area, regardless

8  of what the vacancy rate of the building is, and they apply

9  that to what they consider is the market rents.  The market

10 rents, market vacancy, and market expenses and -- it's kind

11 of, you know, a one size fits all program.

12 Q    All right.  And what does Fannie Mae use as its

13 stabilized occupancy level for that formal --

14 A    I think it was 93 percent, but I'm not 100 percent sure

15 of that.

16 Q    Okay.  And how much was the occupancy rate at the time

17 you were doing your declaration on Union Lofts?

18 A    Under 50.

19 Q    Under 50 percent?

20 A    Call it 50.

21 Q    About 50 percent?

22 A    Uh-huh.

23 Q    If you had plugged the 50 percent occupancy level into

24 that formula, what would result in its value?

25 A    It doesn't work that way because they'll take the

# EXHIBIT 2

| Unit | Area | From | To | Months | Gross Rent | Net Rent + other |
|---|---|---|---|---|---|---|
| 201 | 1,152 | 6/17/09 | 9/16/10 | 15 | 2,881 | 2,198 |
| 202 | 1,347 | | | | | |
| 203 | 1,243 | | | | | |
| 204 | 1,320 | | | | | |
| 301 | 1,169 | 7/13/09 | 10/12/10 | 15 | 2,848 | 2,563 |
| 302 | 843 | 10/12/08 | 1/11/10 | 15 | 2,402 | 2,162 |
| 303 | 695 | 3/5/09 | 6/4/10 | 15 | 1,816 | 1,725 |
| 304 | 952 | 5/15/08 | 8/14/09 | 15 | 2,697 | 2,477 |
| 305 | 514 | 6/22/09 | 9/21/10 | 15 | 1,114 | 1,177 |
| 306 | 502 | 7/20/09 | 10/19/10 | 15 | 1,250 | 1,130 |
| 307 | 503 | 3/21/09 | 6/20/10 | 15 | 1,338 | 949 |
| 308 | 815 | 11/12/08 | 2/28/10 | 15 | 2,267 | 1,749 |
| 309 | 573 | 3/30/08 | MTM | MTM | 1,374 | 1,374 |
| 310 | 1,295 | | | | | |
| 401 | 1,052 | | | | | |
| 402 | 788 | | | | | |
| 403 | 739 | | | | | |
| 404 | 686 | | | | | |
| 405 | 1,696 | | | | | |
| 406 | 1,103 | 7/23/09 | 10/22/10 | 15 | 3,205 | 2,581 |
| 407 | 773 | | | | | |
| 408 | 1,603 | | | | | |
| 501 | 776 | 3/28/09 | 9/28/09 | 6 | 2,146 | 1,824 |
| 502 | 857 | 2/12/09 | 5/11/10 | 15 | 2,424 | 2,105 |
| 503 | 673 | 7/1/09 | 9/30/10 | 15 | 1,746 | 1,276 |
| 504 | 640 | 2/28/09 | 4/27/10 | 14 | 1,778 | 1,639 |
| 505 | 1,118 | 3/1/09 | 5/31/10 | 15 | 3,248 | 2,931 |
| 506 | 637 | 5/15/09 | 11/14/09 | 6 | 1,600 | 1,518 |
| 507 | 722 | 11/1/08 | 1/31/10 | 15 | 2,043 | 1,837 |
| 508 | 678 | 7/18/08 | 10/17/09 | 15 | 1,922 | 1,730 |
| 509 | 653 | | | | | |
| 510 | 1,040 | | | | | |
| 601 | 876 | 12/6/08 | 3/5/10 | 15 | 3,131 | 2,557 |
| 602 | 857 | | | | | |
| 603 | 673 | 10/4/08 | 1/3/10 | 15 | 2,083 | 1,880 |
| 604 | 640 | 9/22/08 | 12/21/09 | 15 | 1,815 | 1,541 |
| 605 | 1,118 | | | | | |
| 606 | 637 | 6/15/09 | 3/14/10 | 9 | 1,968 | 1,785 |
| 607 | 722 | 9/22/08 | 12/21/09 | 15 | 2,224 | 1,965 |
| 608 | 678 | 10/10/08 | 1/9/10 | 15 | 2,051 | 1,362 |
| 609 | 653 | | | | | |
| 610 | 1,041 | | | | | |
| 701 | 776 | | | | | |
| 702 | 857 | 8/4/09 | 5/3/10 | 9 | 2,689 | 889 |
| 703 | 673 | | | | | |
| 704 | 640 | 7/10/09 | 10/9/10 | 15 | 1,938 | 1,129 |

13

| Unit | Area | From | To | Months | Gross Rent | Net Rent + other |
|------|------|------|-----|--------|------------|------------------|
| 705 | 1,118 | | | | | |
| 706 | 637 | 5/16/09 | 8/22/09 | 3 | 1,968 | 1,573 |
| 707 | 722 | 7/18/09 | 10/17/10 | 15 | 2,224 | 1,821 |
| 708 | 678 | 6/14/09 | 9/13/10 | 15 | 2,091 | 1,677 |
| 709 | 653 | | | | | |
| 710 | 1,040 | | | | | |
| 801 | 776 | | | | | |
| 802 | 857 | | | | | |
| 803 | 673 | | | | | |
| 804 | 640 | | | | | |
| 805 | 1,118 | | | | | |
| 806 | 637 | | | | | |
| 807 | 722 | | | | | |
| 808 | 678 | | | | | |
| 809 | 653 | | | | | |
| 810 | 1,040 | | | | | |
| 901 | 876 | | | | | |
| 902 | 857 | | | | | |
| 903 | 673 | | | | | |
| 904 | 640 | | | | | |
| 905 | 1,118 | | | | | |
| 906 | 637 | | | | | |
| 907 | 722 | | | | | |
| 908 | 678 | | | | | |
| 909 | 653 | | | | | |
| 910 | 1,040 | | | | | |
| 1001 | 776 | | | | | |
| 1002 | 857 | | | | | |
| 1003 | 673 | | | | | |
| 1004 | 640 | | | | | |
| 1005 | 1,118 | | | | | |
| 1006 | 637 | | | | | |
| 1007 | 722 | | | | | |
| 1008 | 678 | | | | | |
| 1009 | 653 | | | | | |
| 1010 | 1,040 | | | | | |
| 1101 | 1,542 | | | | | |
| 1102 | 1,445 | | | | | |
| 1103 | 1,345 | | | | | |
| 1104 | 1,816 | 6/1/09 | 8/31/10 | 15 | 5,948 | 4,675 |
| 1105 | 1,368 | | | | | |
| 1106 | 628 | | | | | |
| 1107 | 716 | | | | | |
| 1108 | 1,593 | | | | | |
| 1109 | 1,573 | 1/26/09 | 4/25/10 | 15 | 5,559 | 4,446 |
| 1110 | 1,256 | 7/15/09 | 10/14/10 | 15 | 3,944 | 3,284 |

14

# EXHIBIT 3

# Meruelo Maddux Properties, Inc. et. al.
## Consolidated Income Statement of Debtors-In-Possession
### For the Month of August

| | Meruelo Farms, LLC 13358 / National Cold Storage, LLC 13376 | 1500 Griffith Avenue, LLC 13398 | 2951 Lenwood Road, LLC 13383 | 2001-2021 West Mission Blvd, LLC 13403 | Meruelo Maddux Mission Blvd, LLC 13369 | 760 Hill Street, LLC 13363 | 3185 Washington Blvd, LLC 13373 |
|---|---|---|---|---|---|---|---|
| **REVENUE** | | | | | | | |
| Rental Income | 28,600 | 37,956 | - | - | - | 75,709 | 100,000 |
| Management Fees | - | - | - | - | - | - | - |
| Other Income | - | - | - | - | - | - | - |
| **TOTAL REVENUE** | 28,600 | 37,956 | - | - | - | 75,709 | 100,000 |
| **OPERATING EXPENSES** | | | | | | | |
| Direct Corporate Property Management | 20,584 | 17,700 | 8,333 | 12,500 | 16,667 | 43,800 | 17,700 |
| Payroll - Insiders | 4,386 | 642 | 501 | 36 | - | - | - |
| Property Administration | - | - | - | - | 313 | 13,169 | 34,718 |
| Cleaning | - | - | - | - | - | 3,455 | - |
| General Building | 1,728 | - | - | - | - | (3,621) | - |
| Insurance | 4,632 | 722 | 3,158 | 9,668 | 4,822 | 3,053 | 789 |
| Repairs and Maintenance | 424 | - | - | 829 | 4,600 | (179) | - |
| Real Property Taxes | 21,949 | 12,931 | 12,264 | 21,543 | 21,655 | 32,035 | 13,283 |
| Security | - | - | 11,083 | - | (179) | - | - |
| Utilities | (49,921) | - | (2,406) | - | 11,209 | 8,726 | - |
| Depreciation and Amortization | 7,055 | 10,473 | 9,053 | - | (455) | 118,871 | 19,484 |
| Stock Compensation | - | - | - | - | 15,071 | - | - |
| General and Administrative | 8,920 | 4,742 | 2,755 | 959 | 1,915 | 3,329 | - |
| Misc Operating Expense | - | - | - | - | - | - | 7,879 |
| **TOTAL OPERATING EXPENSES** | 19,760 | 47,210 | 44,743 | 45,535 | 75,798 | 222,637 | 93,817 |
| **Net Income/(Loss) from Operations** | 8,840 | (9,254) | (44,743) | (45,535) | (75,798) | (146,928) | 6,183 |
| **NON-OPERATING INCOME** | | | | | | | |
| Interest Income | - | - | - | - | - | - | - |
| Gain on Sale of Asset | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | 897 | - |
| **TOTAL NON-OPERATING INCOME** | - | - | - | - | - | 897 | - |
| **NON-OPERATING EXPENSES** | | | | | | | |
| Interest Expense | 59,552 | 50,884 | 53,559 | 77,268 | 117,392 | (234,475) | 56,939 |
| Legal and Professional | 119 | - | - | 957 | 2,500 | (5,488) | - |
| Impairment Loss on Real Estate | - | - | - | - | - | - | - |
| Provision (Benefit) for Income Taxes | - | - | - | - | - | - | 0 |
| Minority Interests | - | - | - | - | - | - | - |
| **TOTAL NON-OPERATING EXPENSES** | 59,671 | 50,884 | 53,559 | 78,225 | 119,892 | (239,964) | 56,939 |
| **NET INCOME/(LOSS)** | (50,831) | (60,138) | (98,301) | (123,760) | (195,690) | 93,933 | (50,756) |

Schedule IX: 1 of 9

15

**EXHIBIT 4**

ORIGINAL

1              UNITED STATES BANKRUPTCY COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                      --oOo--

4   In Re:                    ) Case No. SV09-13356-KT
                              )
5   MERUELO MADDUX PROPERTIES, ) Woodland Hills, California
    INC., A DE CORP,           ) Monday, May 4, 2009
6                              ) 9:30 a.m.
            Debtor.           )
7   _____)

8                              STATUS CONFERENCE IN RE:
                              MOTION FOR ORDER (1) APPROVING
9                              CONTINUED USE OF CASH
                              MANAGEMENT SYSTEM, (2)
10                             APPROVING LENDING AND
                              BORROWING BETWEEN DEBTORS ON
11                             AN UNSECURED BASIS, (3)
                              AUTHORIZING THE DEBTORS USE OF
12                             PREPETITION BANK ACCOUNTS, AND
                              (4) DISPENSING WITH THE
13                             REQUIREMENTS OF 11 U.S.C.
                              SECTION 345(B)
14
                              CHAPTER 11 STATUS CONFERENCE
15

16              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE KATHLEEN THOMPSON
17            UNITED STATES BANKRUPTCY JUDGE

18  APPEARANCES:

19  For the Debtor:           JOHN J. BINGHAM, JR., ESQ.
                              RICHARD DIAMOND, ESQ.
20                             JOHN N. TEDFORD, IV, ESQ.
                              Danning, Gill, Diamond &
21                                 Kollitz, LLP
                              2029 Century Park East
22                             Third Floor
                              Los Angeles, California 90067
23                             (310) 277-0077

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*

16

63

1  up all this direct corporate management and it doesn't

2  surprise you, I imagine, that it's over $7 million; right?

3  A    I thought it was closer to nine.

4  Q    Nine?

5  A    But okay, call it seven.

6  Q    Call it eight, we'll middle it like we've been doing

7  everything else.  So that's $8 million to pay all the G and

8  A and the direct corporate management over the next nine

9  months, including all the bonuses; correct?

10 A    Yes.

11 Q    Now, there are properties here on these Exhibits

12 Eights, and I could point them out but maybe we don't have

13 to do that, but is it your recollection that some of these

14 debtor entities, they don't even generate enough money to

15 pay this direct corporate property management expense;

16 correct?

17 A    Yeah, if they don't produce any revenue, absolutely.

18 Q    Right, so even though it's getting allocated to one

19 debtor, the fact of the matter remains that those other

20 debtors that are cash positive are really paying those --

21 that entity on somebody else's line item also; correct?  Do

22 you understand what I said?

23 A    Yes.

24 Q    Okay.  Is that a correct statement, what I just said?

25 A    Yes.

64

1 Q     So even though it's, quote, "allocated", the fact of

2 the matter is it sort of all comes out of one pot and it

3 really doesn't matter where you allocate it from; right?

4 This is just niceties for the Bankruptcy Court?

5 A     It's total G and A expense.

6        MR. GEHER:  I think I may be done, so if you can

7 just give me a moment to check, I'd appreciate it.

8        THE COURT:  Okay.

9        MR. GEHER:  Because again, your Honor, I'm just

10 limiting it to this direct issue on the management, right,

11 not values and other things like that.

12        THE COURT:  Right.  Values have their own time.

13        MR. GEHER:  Right, so -- for instance, when we got

14 this morning these reductions on the property values, I

15 don't see that as an issue for here because that's really a

16 valuation issue.  I just don't want to be waiving my rights

17 because I do have many questions about these new pieces of

18 paper we got today.

19        THE COURT:  Valuation issue -- the only valuation

20 issue?

21        MR. GEHER:  You sent it to me at 10:00 o'clock

22 last night, you are correct.

23        THE COURT:  Okay.

24        MR. GEHER:  Okay.

25 //

*18*

65

BY MR. GEHER:

Q     And this direct corporate property management, it only correlates to the fair market value as you've determined it; correct?

A     No, I think there's other factors that were involved. Again, I'm going to ask you to ask Fred.

Q     What other factors did you think were involved?

A     I'm not sure.  I will just say that I believe there was other factors involved.

Q     Well, wouldn't you have to know what they were to even think that there were?  Or are you just guessing?

A     The allocation was an accounting function.

Q     What was your involvement with that?  Approving the final result?

A     The final result, yes.

Q     So from step one to the step right before the final result, you had zero involvement in it.

A     I generally knew we were allocating our G and A to all the properties.

Q     Sir, I'm going to read you -- and I believe it's Mr. Skaggs' declaration, and it is, which you have in front of you; correct?

A     Which -- could you give me the Bates stamp number?

Q     I'm sorry, it's 37, page 37.  It's not Bates -- it's way in the front, before all those exhibits, sir.

66

1  A     Page 37.

2  Q     Start on paragraph 18.

3  A     Okay.

4  Q     Paragraph 18, and you could read it and tell me if you

5  don't think it's correct, basically says how you undertook

6  to allocate the corporate overhead and describes what some

7  of those components are; right?

8  A     Yes.

9  Q     And then paragraph 19 reads -- and it's talking about

10  the methodology, right, on how you allocated all this;

11  correct?  Or your company allocated all this.

12  A     Yes.

13  Q     And it says,

14          "The methodology takes into account one,

15          the fair market value of the property,

16          two, the type of property, whether it is

17          a development project or an operating

18          project, and three, if it's an operating

19          project, whether the particular property

20          required additional amounts of time and

21          effort and the management staff to

22          provide services to it."

23  A     Yes.

24  Q     Are you aware of any other factors?

25  A     That's why I said, your question before, was it based

*Echo Reporting, Inc.*

20

67

1  strictly on fair market value and I said no, it was that and

2  other factors.

3  Q    Okay.

4  A    Those are the other factors.

5  Q    Do you know of any others?  That's my question.

6  A    No.

7  Q    Okay.

8  A    Two and three.

9  Q    And generally paragraph 20 says for development

10 projects they're charged one per cent of its fair market

11 value and operating projects are charged 1.8 of its value.

12 You see that, sir; right?

13 A    Yes.

14 Q    On Crown Commerce Center, are you familiar with that?

15 That's my client's collateral.  Are you familiar with that?

16 A    Very well.

17 Q    Oh, good.  Does that property require additional

18 amounts of time and effort of the management to provide

19 services to it as stated in paragraph 19?

20 A    I don't know exactly what the allocation was for that

21 property.

22 Q    Other than 1.8 per cent of its fair market value,

23 because it's an operating project; correct?

24 A    Possibly.

25 Q    And if I were to tell you, and you can check my math,

68

1  that that is exactly the number you got to, would you

2  dispute that or would you like a moment to look and

3  calculate it yourself?

4  A     I agree with you.

5  Q     Okay.  So as to my client's property there's merely a

6  function of 1.8 per cent of its fair market value; correct?

7  A     Yes.

8  Q     It has nothing to do with whether it takes an hour to

9  deal with that property or ten hours a week to deal with

10  that property; correct?

11  A     Yes.

12  Q     And that's a function of basically you got your top

13  number of what all the expenses are and you found a way to

14  back into that number according to this allocation; correct?

15  A     The accounting department came up with a way they

16  believed was a very fair allocation.

17  Q     Do you think it would have been maybe more fair to

18  determine how much time is actually spent on each property?

19  A     That's not the allocation method that was used.

20  Q     You said that's the "fair" and I just asked you another

21  question.  Don't you think it would have been more fair to

22  do it based upon what actual time gets input into the

23  property?

24  A     No.

25  Q     Why not?

69

1  A     Because we think we came up with the appropriate way to

2  allocate it.

3          THE COURT:  Stop.  Fifteen minute recess.

4          THE WITNESS:  Thank you.

5      (Proceedings recessed briefly.)

6          THE COURT:  Okay.

7          MR. GEHER:  Thank you.

8  BY MR. GEHER:

9  Q     Mr. Meruelo, as part of your supplemental and

10 Mr. Skaggs' declaration filed, your supplemental declaration

11 and Mr. Skaggs' declaration, you filed an exhibit that is

12 denominated 13, which starts on page 276.  Let me know when

13 you get there, sir.  Let me know when you get there, sir.

14 A     I'm here.

15 Q     Okay, great.  Have you seen this before?

16 A     Yes.

17 Q     Do you know what it is?

18 A     It's a schedule of bank accounts.

19 Q     And on page 277, kind of at the bottom one-third, it

20 says "total unrestricted cash."  Do you see that, sir?

21 A     I'm sorry, I don't -- where is that at again?

22 Q     Sir, do you see where my finger is?

23 A     Yeah, I got it.

24 Q     Okay, you with me?

25 A     Got it.

| In re:  MERUELO MADDUX PROPERTIES, INC., et al., | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER - 1:09-bk-13356-K |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate a NEF because only orders that have been entered are placed on the CM/ECF docket.

### PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 600 Anton Boulevard, Suite 1400, Costa Mesa, CA  92626  The foregoing documents described as: **BANK OF AMERICA, N.A.'S BENCH BRIEF IN OPPOSITION TO DEBTORS' MOTIONS FOR USE OF CASH COLLATERAL AND MAINTENANCE OF CASH MANAGEMENT SYSTEM (MERUELO MADDUX PROPERTIES – 760 S. HILL STREET, LLC)**

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF") –** Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On **October 19, 2009** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒  Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):   On **October 19, 2009**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope with postage thereon fully prepaid in the United States Mail and/or with an overnight mail service addressed as follows:

The Honorable Kathleen Thompson
United States Bankruptcy Court
Warner Center
21041 Burbank Boulevard, Suite 305
Woodland Hills, CA 91367-6609
(Overnight)

☒ Service information continued on attached page

**III.  SERVED BY FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to Fed. R. Civ. Proc. 5 and/or controlling LBR, on _____ served the following person(s) and/or entity(ies), who consented in writing to such service method, by facsimile transmission and/or email as follows:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| October 19, 2009 | Digna B. Anonas | /s/ Digna B. Anonas |
|---|---|---|

Snell & Wilmer
L.L.P.
LAW OFFICES
350 South Grand Avenue, Suite 2600, Two California Plaza
Los Angeles, California 90071
(213) 929-2500

20699.0150\ANONASD\SWDMS\10646111.
110198124.1

1

## I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")**

- Michael C Abel    mca@dgdk.com
- John J Bingham    jbingham@dgdk.com
- Julia W Brand    jwb@dgdk.com
- Jennifer L Braun    jennifer.l.braun@usdoj.gov
- Martin J Brill    mjb@lnbrb.com
- Howard Camhi    hcamhi@ecjlaw.com
- Ronald R Cohn    rcohn@horganrosen.com
- Michaeline H Correa    mcorrea@jonesday.com
- Brian L Davidoff    bdavidoff@rutterhobbs.com,
  calendar@rutterhobbs.com;jreinglass@rutterhobbs.com
- Aaron De Leest    aed@dgdk.com
- Michael G Fletcher    mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com
- Barry V Freeman    bvf@jmbm.com, bvf@jmbm.com
- Donald L Gaffney    dgaffney@swlaw.com
- Thomas M Geher    tmg@jmbm.com
- Bernard R Given    bgiven@frandzel.com,
  efiling@frandzel.com;shom@frandzel.com;bgiven@frandzel.com
- Barry S Glaser    bglaser@swjlaw.com
- John A Graham    jag@jmbm.com
- Ofer M Grossman    omglaw@gmail.com
- Asa S Hami    ahami@sulmeyerlaw.com
- Brian T Harvey    bharvey@buchalter.com, IFS_filing@buchalter.com
- William W Huckins    whuckins@allenmatkins.com, clynch@allenmatkins.com
- Lance N Jurich    ljurich@loeb.com, kpresson@loeb.com
- Andrew F Kim    kim-a@blankrome.com
- Michael S Kogan    mkogan@ecjlaw.com
- Tamar Kouyoumjian    tkouyoumjian@sulmeyerlaw.com
- Duane Kumagai    dkumagai@rutterhobbs.com, calendar@rutterhobbs.com
- David E Leta    dleta@swlaw.com, wsmart@swlaw.com
- Katherine Lien    katie.lien@sbcglobal.net, katielien@gmail.com
- Steven K Linkon    slinkon@rcolegal.com
- Richard Malatt    rmalatt@gmail.com
- Elmer D Martin    elmermartin@msn.com
- Elissa Miller    emiller@sulmeyerlaw.com
- Iain A W Nasatir    inasatir@pszjlaw.com, jwashington@pszjlaw.com
- Jennifer L Nassiri    jennifer.nassiri@dlapiper.com
- Lawrence Peitzman    lpeitzman@pwkllp.com
- Eric S Pezold    epezold@swlaw.com, dwlewis@swlaw.com
- Michael H Raichelson    mhr@cabkattorney.com
- Dean G Rallis Jr    drallis@sulmeyerlaw.com
- Craig M Rankin    cmr@lnbrb.com
- Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
- Martha E Romero    Romero@mromerolawfirm.com
- Victor A Sahn    vsahn@sulmeyerlaw.com
- Jeffrey S Shinbrot    shinbrot@earthlink.net
- Stephen Shiu    sshiu@swlaw.com
- Daniel H Slate    dslate@buchalter.com, salarcon@buchalter.com;ifs_filing@buchalter.com
- Surjit P Soni    surjit@sonilaw.com, wendy@sonilaw.com
- Tracie L Spies    tracie@haganlaw.org
- James Stang    jstang@pszjlaw.com
- John N Tedford    jtedford@dgdk.com
- James A Timko    jtimko@allenmatkins.com
- Alan G Tippie    atippie@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com

Snell & Wilmer
L.L.P.
LAW OFFICES
350 South Grand Avenue, Suite 2600, Two California Plaza
Los Angeles, California 90071
(213) 929-2500

1   • United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov
    • Jason L Weisberg    jason@gdclawyers.com
2   • Jasmin Yang    jyang@swlaw.com

3   **II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or
    entity served)**:**
4

5   Janis G Abrams
    The Gersh Law Firm Inc
6   15821 Ventura Blvd Ste 515
    Encino, CA 91436

7   David P Beitchman
    16130 Ventura Blvd Ste 570
8   Encino, CA 91436

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Snell & Wilmer
L.L.P.
LAW OFFICES
350 South Grand Avenue, Suite 2600, Two California Plaza
Los Angeles, California 90071
(213) 929-2500

20699.0150\ANONASD\SWDMS\10646111.1