1  RICHARD K. DIAMOND (State Bar No. 070634)
   *RDiamond@DGDK.com*
2  JOHN J. BINGHAM, JR. (State Bar No. 075842)
   *JBingham@DGDK.com*
3  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *JTedford@DGDK.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
5  Los Angeles, California  90067-2904
   Telephone:  (310) 277-0077
6  Facsimile:  (310) 277-5735

7  Attorneys for Meruelo Maddux Properties, Inc., and
   affiliated Debtors and Debtors-in-Possession

8              **UNITED STATES BANKRUPTCY COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10             **SAN FERNANDO VALLEY DIVISION**

11

| | |
|---|---|
| 12  In re | )  Case No. 1:09-bk-13356-KT |
| 13  MERUELO MADDUX PROPERTIES, INC., et al.,[1] | )  Chapter 11 (Jointly Administered) |
| 14 | )  **NOTICE OF MOTION AND MOTION** |
| Debtors and Debtors-in-Possession. | )  **FOR APPROVAL OF SETTLEMENT** |
| 15 | )  **WITH YOSHIAKI AND FUMIKO** |
| | )  **MURAKAMI AND AUTHORIZING** |
| 16 | )  **DEBTOR TO PERFORM** |
| ☐   Affects all Debtors | )  **THEREUNDER; AND MEMORANDUM** |
| 17 | )  **OF POINTS AND AUTHORITIES,** |
| ☑   Affects the following Debtor(s): | )  **DECLARATION OF JOHN C.** |
| 18 | )  **MADDUX, AND REQUEST FOR** |
| Merco Group – 1500 Griffith Avenue, LLC | )  **JUDICIAL NOTICE IN SUPPORT** |
| 19  (1:09-bk-13398-KT) | )  **THEREOF** |
| 20 | )  Date:      December 9, 2009 |
| | )  Time:      9:30 a.m. |
| 21 | )  Place:     Courtroom 301 |
| | )               21041 Burbank Blvd. |
| 22 | )               Woodland Hills, California |

23

24
   [1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by
25  affiliated entities.  The affiliated case numbers are as follows:  1:09-bk-13338-KT; 1:09-bk-13358-KT; 1:09-bk-13359-
   KT; 1:09-bk-13360-KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-
   13365-KT; 1:09-bk-13366-KT; 1:09-bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-
26  bk-13371-KT; 1:09-bk-13372-KT; 1:09-bk-13373-KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT;
   1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-
   KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13385-KT; 1:09-bk-13386-KT; 1:09-bk-13387-KT; 1:09-bk-
27  13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13391-KT; 1:09-bk-13392-KT; 1:09-bk-13393-KT; 1:09-
   bk-13394-KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-KT;
   1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-
28  KT; 1:09-bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.

345255.02 [XP]      25195

1    **PLEASE TAKE NOTICE** that that on December 9, 2009, at 9:30 a.m., or as soon

2    thereafter as the matter may be heard, in Courtroom 301 of the United States Bankruptcy Court

3    located at 21041 Burbank Boulevard, Woodland Hills, California, Merco Group – 1500 Griffith

4    Avenue, LLC ("MG Griffith"), will and does hereby move for an order:  (1) approving MG

5    Griffith's proposed settlement with Yoshiaki Murakami and Fumiko Murakami, as Co-Trustees of

6    the Revocable Trust of Yoshiaki Murakami and Fumiko Murakami U/T/A Dated June 16, 1988,

7    and Yoshiaki Murakami, an individual (collectively "Murakami"); (2) authorizing MG Griffith to

8    use funds referred to in this case as "unrestricted cash" to (a) pay interest at the agreed-upon rate

9    for the period of January through October 2009, (b) make the principal reduction payment, and

10    (c) reimburse certain of Murakami's legal fees, costs and related expenses under the settlement; and

11    (3) authorizing MG Griffith to use cash collateral to pay interest for months subsequent to October

12    2009 and other payment obligations required under the settlement and the relevant Purchase Money

13    Note, as modified by the proposed Loan Reinstatement Agreement.

14         This motion is made on the following grounds:  Prior to March 27, 2009 (the "Petition

15    Date"), MG Griffith purchased certain real property located at 1510 Griffith Avenue, Los Angeles

16    California (the "Property"), from Murakami, among others, for $5 million.  In connection with that

17    purchase, MG Griffith executed a promissory note in favor of Murakami in the principal amount of

18    $3 million (the "Loan").  MG Griffith's obligations under the promissory note are secured by a

19    deed of trust in favor of Murakami against the Property.

20         On the Petition Date, MG Griffith filed a voluntary petition for relief under Chapter 11 of

21    Title 11 of the United States Code with the United States Bankruptcy Court for the Central District

22    of California (the "Bankruptcy Court").  The case number for MG Griffith's case is 1:09-bk-13398-

23    KT.  The case is being jointly administered with Chapter 11 cases filed by certain affiliated debtors

24    and debtors-in-possession (collectively the "Debtors") under the lead case, *In re Meruelo Maddux*

25    *Properties, Inc.*, case number 1:09-bk-13356-KT.  Since the filing of their petitions for relief, the

26    Debtors have and are continuing to operate their business as debtors-in-possession under 11 U.S.C.

27    §§ 1107 and 1108.

28    ///

1    On the Petition Date, the Debtors filed a number of "first day motions" including a motion

2  for authority to use cash collateral (the "Cash Collateral Motion") and a motion for authority to

3  maintain their prepetition cash management system (the "Cash Management Motion").  Relief

4  sought in the Cash Collateral Motion and the Cash Management Motion was granted on an interim

5  basis.  Evidentiary hearings and further proceedings regarding the Debtors' requests for relief on a

6  final basis are ongoing.

7    In the Cash Collateral Motion, MG Griffith is, generally, seeking authority to use rents

8  generated by the Property to pay the expenses of preserving and maintaining the Property, with the

9  excess, if any, being made available to pay expenses of MG Griffith and other Debtors.  Pursuant to

10  the Court's interim cash collateral orders, Murakami was granted a lien on an interim basis against

11  certain real properties owned by certain of the other Debtors as and for adequate protection against

12  any diminution in the value of Murakami's interests in its collateral arising from MG Griffith's use

13  of cash collateral (the "Adequate Protection Lien").  MG Griffith contends that there has not been

14  any diminution in the value of Murakami's interests in his collateral, and therefore contends that

15  Murakami does not have an Adequate Protection Lien on real properties owned by other Debtors.

16    Subject to Court approval, MG Griffith and Murakami have agreed to a settlement of any

17  disputes arising out of or relating to the Cash Collateral Motion, the Cash Management Motion, the

18  Loan, and the treatment of Murakami's claims under a Chapter 11 plan or plans of reorganization

19  (the "Settlement").  The Settlement is memorialized in the Settlement Agreement attached as

20  Exhibit "1" to the Declaration of John C. Maddux.  MG Griffith believes that the Settlement is fair,

21  reasonable and in the best interests of its and other Debtors' estates.  MG Griffith requests that the

22  Court approve the Settlement and authorize the use of "unrestricted cash" and cash collateral to

23  perform MG Griffith's payment obligations under the Settlement.

24    This Motion is based upon this Notice and Motion, the Memorandum of Points and

25  Authorities, Declaration of John C. Maddux and Request for Judicial Notice, the papers and

26  pleadings on file in this case, and such other evidence as may be presented to the Court.

27    **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

28  any party opposing the relief sought by the Motion must file a response in writing with the Clerk of

1  the Court and such response must be served upon the following not less than 14 days prior to the

2  hearing on the motion: (1) the Office of the United States Trustee, ATTN: Jennifer L. Braun, Esq.,

3  21051 Warner Center Lane, Suite 115, Woodland Hills, CA 91367; (2) counsel for MG Griffith,

4  John N. Tedford, IV, Esq., Danning, Gill, Diamond & Kollitz, LLP, 2029 Century Park East, Third

5  Floor, Los Angeles, CA 90067; (3) counsel for the Official Committee of Unsecured Creditors,

6  Dean G. Rallis Jr., Esq., SulmeyerKupetz, 333 S. Hope St., 35th Floor, Los Angeles, CA 90071;

7  and (4) counsel for Murakami, Duane Kumagai, Esq., Rutter Hobbs & Davidoff Incorporated, 1901

8  Avenue of the Stars, Suite 1700, Los Angeles, CA 90067. Any response not timely filed and

9  served may be deemed by the Court to be consent to the granting of the Motion. If you do not have

10 any objection to the Motion, you do not need to take any further action.

11

12 Dated: November 18, 2009            DANNING, GILL, DIAMOND & KOLLITZ, LLP

13

14                                     By:   _____
                                             John N Tedford, IV
15                                           Attorneys for Meruelo Maddux Properties,
                                             Inc., and affiliated Debtors and Debtors-in-
16                                           Possession

17

18

19

20

21

22

23

24

25

26

27

28

4

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

3

I.

4

STATEMENT OF FACTS

5   A.    BANKRUPTCY BACKGROUND

6       On March 26 and 27, 2009 (the "Petition Date"), Meruelo Maddux Properties, Inc.

7   ("MMPI"), and 53 of MMPI's direct and indirect subsidiaries (collectively the "Debtors") filed

8   voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Code"). Pursuant

9   to the Court's ruling on March 30, 2009, the 54 cases are being jointly administered under MMPI's

10  case number, 1:09-bk-13356-KT. The Debtors are operating their business affairs pursuant to the

11  authority granted under §§ 1107 and 1108 of the Code.

12

13  B.    THE DEBTORS' OVERALL BUSINESS MODEL AND APPROACH[2]

14      MMPI, together with Meruelo Maddux Properties, LP ("MMPLP") and its affiliates and

15  related entities (sometimes collectively referred to herein as the "Company") develops, redevelops

16  and owns industrial, commercial and multi-unit residential properties in downtown Los Angeles

17  and other urban markets in southern California. MMPI was formed in 2006, and one of the reasons

18  for forming MMPI was to hold an initial public offering of stock in order to generate cash to pay

19  off the then-existing debt to the California Public Employees' Retirement System (aka "CalPERS")

20  and raise funds the Company could use to continue growing through the development of real

21  _____

22      [2] In addition to the declaration appended hereto, this opposition is supported by the
Declaration of Richard Meruelo filed with the Court on March 27, 2009 (*docket entry no. 10*), and
23  the Supplemental Declaration of Richard Meruelo and the Declaration of Fred Skaggs filed with
the Court on April 21, 2009 (*docket entry no. 95*). The declarations were sizeable, particularly with
24  the exhibits. In connection with a prior matter before the Court, it was suggested by a non-Debtor
party that, to conserve the environment, the Debtors should not be required to re-file and serve the
25  declarations in connection with each matter where the Debtors rely upon the declarations in support
of their description of the Debtors' background and operations. MG Griffith therefore requests that
26  the Court take judicial notice of the filing of those declarations and treat the declarations as if they
were filed anew in support of this opposition. MG Griffith will make copies of the declarations
27  available on request by electronic mail or regular mail, as appropriate.

28

1   properties.  When MMPI was formed, the Company owned, leased with rights to purchase, and had

2   rights to buy approximately 52 development, redevelopment and stabilized projects.

3        Like its predecessor business, MMPI's focus is on non-stabilized properties and commercial

4   and industrial land which have alternate, more profitable uses that are achievable through

5   redevelopment or major renovation and ground-up development.  The Company's properties are

6   used for diverse purposes, and include food industry, wholesale markets, small tenant industrial,

7   residential high rise and mixed-use "urban village" properties.  The vast majority of the properties

8   are situated in downtown Los Angeles.  The Company is believed to be the largest non-

9   governmental land owner in downtown Los Angeles, owning or controlling approximately 80 acres

10  of land in downtown Los Angeles at the time that MMPI was formed.

11       The Company focuses on urban in-fill development and on finding different, more

12  profitable uses for existing urban properties.  The Company looks for properties that have value

13  intrinsic to the property itself, such as the property's location, whether there is an end user of the

14  property on the horizon who might want to purchase the property, how well the property will fit in

15  with the growth patterns of the area and community in which it is situated, and other factors.

16       The Company's business model anticipates the need for time to develop properties and

17  requires the infusion of funds to pay the costs of such development, including the carrying costs.

18  To help defray costs during development, properties may be utilized as parking lots or other uses,

19  not because such use generates substantial income but because the land itself is extremely valuable

20  since it can be developed at an appropriate time in the future, and the parking lot revenue provides

21  some interim revenue.  Many of the Company's properties have been developed to the point where

22  entitlements have been obtained thus increasing the value substantially, but development has been

23  deferred pending an improvement in the credit markets.  In summary, the Company's business

24  model contemplates and is based upon the purchase, development and resale of properties, pursuant

25  to which, the Company turns over such properties in a relatively short period of time, such as a few

26  years instead of decades, and uses the profit from such properties to fund operations of MMPI and

27  all of its other affiliates and the purchase and development of other properties.

28  ///

345255.02 [XP]      25195

C.    THE DEBTORS' COLLECTIVE ORGANIZATION AND OPERATIONS

Although the Debtors and their non-Debtor affiliates consist of a parent company and various levels of subsidiaries, including limited liability companies and other entities which hold title to properties, the Company has been, before and after its formation as a public company, and presently continues to be, effectively operated as a single enterprise. With limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and the subsidiaries. Some entities generate revenues in excess of operational expenses and debt service, but some do not. The reason that the Company purchases, and then keeps, properties that are cash flow negative is because the Company believes that those properties will, in time, generate a positive return and the enterprise will be significantly more valuable as a result.

Before and after the IPO, the Debtors commingled funds. The cash management system implemented before the IPO provides for funds to flow to and from a cash concentration account ("Concentration Account") maintained by MMPLP. The Concentration Account is linked to the operating bank accounts of each of the Debtors and non-Debtor affiliates, which bank accounts are maintained as zero balance accounts.[3] When needed to fund payment on checks issued by a particular affiliate, funds are transferred from the Concentration Account to the operating account of that affiliate. Excess funds, if any, are invested in interest bearing accounts.

As a public company, MMPI is required to file various reports with the Securities and Exchange Commission ("SEC"), including among others, quarterly reports as well as an annual audited report. These reports are prepared on a consolidated basis. Although the Debtors' SEC filings do provide information relating to individual subsidiaries, the filings generally discuss the business as a consolidated enterprise.

///

///

///

---

[3] Since the filing of Debtors' Chapter 11 petitions, the Concentration Account has been un-linked from the accounts of non-Debtor entities.

345255.02 [XP]    25195

1    D.    BRIEF DESCRIPTION OF MG GRIFFITH'S BUSINESS AND PROPERTY

2        One of the Debtors is Merco Group – 1500 Griffith Avenue, LLC ("MG Griffith"), which

3    owns certain parcels of real property consisting of approximately 2.0 acres of land near the corner

4    of Griffith Avenue and East 16th Street in downtown Los Angeles.  Together, the properties have

5    approximately 50,058 square feet of net rentable space located in two buildings located at 1500 and

6    1510 Griffith Avenue.[4]  Richard Meruelo has testified that the aggregate value of the properties is

7    not less than $11.8 million.

8        Three parcels owned by MG Griffith, collectively referred to as 1510 Griffith Avenue (the

9    "Property"), are encumbered by a lien in favor of Yoshiaki Murakami and Fumiko Murakami, as

10    Co-Trustees of the Revocable Trust of Yoshiaki Murakami and Fumiko Murakami U/T/A Dated

11    June 16, 1988, and Yoshiaki Murakami, an individual (collectively "Murakami").  Mr. Meruelo has

12    identified the Property as having a value of not less than $4.9 million.

13        MG Griffith's properties are located in downtown Los Angeles' garment district.  The

14    properties comprise the majority of an entire city block.  The properties have excellent visibility

15    along the Interstate 10 Freeway.  There are multiple MEGATRON billboards on a property next

16    door that each generates over $120,000 per month in signage revenue.

17        Within the garment district, MG Griffith's properties are in a valuable location.  The

18    properties are located in the new, more desirable section of the garment district.  The properties are

19    also across the street from a recently-completed $130 million L.A. Fashion Center building which

20    represents the newest, cutting-edge wholesale garment development in the western United States.

21

22    E.    MURAKAMI'S NOVEMBER 2007 LOAN TO MG GRIFFITH

23        On or about January 26, 2006, MG Griffith purchased the Property from Murakami and

24    certain other entities related to Murakami for the sum of $5 million.  In connection therewith, MG

25    _____

26        [4] Part of MG Griffith Properties, commonly known as 1500 Griffith Avenue, Los Angeles,
     California, is subject to a lien in favor of Legendary Investors Group No. 1, LLC ("Legendary").
27    The parcels subject to Legendary's lien are not at issue in this motion.

28

1  Griffith executed a Purchase Money Note (the "Note") in favor of Murakami relating to a seller

2  carry-back loan made by Murakami to MG Griffith in the principal sum of $3 million (the "Loan").

3  The Loan was secured by a deed of trust against the Property and an assignment of rents (the "Deed

4  of Trust"). Copies of the Note and the Deed of Trust are attached as Exhibits "2" and "3" to the

5  Declaration of John C. Maddux.

6  As evidenced by the Note, interest on the principal owed under the Note accrues at a rate of

7  7.00% per annum.. Therefore, the Note requires monthly payments of interest which, at the rate of

8  7.00% per annum, equates to $17,500 per month. The maturity date of the Note is January 26,

9  2013, at which time all unpaid principal, interest and other charges and fees will be due.

10

11  F.      THE DEBTORS' CASH COLLATERAL AND CASH MANAGEMENT MOTIONS

12  On the Petition Date, the Debtors filed a number of so-called "first day motions," including

13  motions seeking authority to use cash collateral (the "Cash Collateral Motion") and to utilize their

14  existing cash management system (the "Cash Management Motion"). The Cash Collateral Motion

15  and the Cash Management Motion were granted on an interim basis. Various hearings, including

16  evidentiary hearings, have been held with regard to the Debtors' request for such authority on a

17  final basis. Final hearings on the Cash Collateral Motion and the Cash Management Motion were

18  held as to almost all of the "Cash Collateral Creditors" on October 19 and 26, 2009. The orders

19  currently in effect by which the Debtors are authorized to use cash collateral and utilize their cash

20  management system on an interim basis are attached as Exhibits "4" and "5," respectively, to the

21  Request for Judicial Notice.

22  Pursuant to the Court's most recently entered interim cash collateral order:

23          3.      The Debtors are hereby authorized to use the cash
            collateral of the Cash Collateral Creditors to and through the
24          conclusion of the Final Hearing on the Motion, pursuant to the terms
            of the Motion and in the amounts and for the expenses set forth in the
25          budgets attached to the First Day Declaration . . ..

26          4.      After the payment of the expenses of preserving,
            maintaining and operating the Cash Collateral Properties, any excess
27          income may be utilized by any other Debtor to pay its ordinary costs
            and expenses of preserving, maintaining and operating its property
28          and business, subject to the provisions of paragraph 3 above. . . ..

9

5.      Each Cash Collateral Creditor, as to the extent set forth in the Motion, shall be and is granted, parri passu, as and for adequate protection against any diminution in the value of their separate interests in their collateral arising from the use of cash collateral pursuant to this Order, from on and after the petition date, March 27, 2009, a lien or charge against the 24 unencumbered real properties and proceeds thereof identified in Exhibit "7" to the First Day Declaration, and further, each of the Cash Collateral Creditors shall be and is granted a replacement lien upon its respective collateral, all with the same extent, validity, scope and priority as the pre-petition liens held by each such Cash Collateral Creditor until further order of the Court.[5]

In addition, pursuant to the Court's interim cash management order:

13.      The Debtors are authorized, but not directed, to continue the operation of their businesses, to transfer monies from Debtor to Debtor as necessary and appropriate, to continue utilizing their existing Cash Management System to manage their cash, to pay intercompany payables and to extend intercompany credit, in a manner consistent with the Debtors' prepetition practice. ...[6]

Murakami is a "Cash Collateral Creditor" because on the Petition Date the Property generated income in the form of rents and Murakami has a security interest in rents generated by the Property pursuant to the assignment of rents. The Bankruptcy Court has authorized the Debtors to use Murakami's cash collateral on an interim basis in conformance with the terms and conditions of the cash collateral order. As authorized by the cash management order and consistent with the Debtors' prepetition cash management system, rents received by MG Griffith are swept regularly into the concentration account held in the name of MMPLP. When funds are needed to pay MG Griffith's actual and direct expenses, a sufficient amount of funds is transferred from MMPLP to MG Griffith. The funds are then disbursed to MG Griffith's creditors.

///

---

[5] *Third Interim Order Authorizing the Debtors' Use of Cash Collateral on an Interim Basis*, entered on or about May 12, 2009.

[6] *Third Interim Order (1) Approving Continued Use of Cash Management System, (2) Approving Lending and Borrowing between Debtors on an Unsecured Basis, (3) Authorizing the Debtors' Use of Prepetition Bank Accounts, and (4) Dispensing with the Requirements of 11 U.S.C. § 345(b)*, entered on or about May 12, 2009.

345255.02 [XP]     25195

1  To the extent that the Debtors' use of Murakami's cash collateral has resulted in a

2  diminution of value of Murakami's interests in its collateral, Murakami has been afforded, on an

3  interim basis, a lien against the "unencumbered" properties described above.  However, the Debtors

4  believe that Murakami's interest in the Property is and at all relevant times has been fully secured,

5  there has not been any diminution in value of Murakami's interests in its collateral,[7] and therefore

6  Murakami has no Adequate Protection Liens against the Debtors' unencumbered properties.

7

8  G.    THE DEBTORS' JOINT OR CONSOLIDATED PLAN OF REORGANIZATION

9  As the Court is aware, the Debtors are in the process of developing a joint or consolidated

10  Chapter 11 plan of reorganization, and anticipate that the plan will be filed on or before November

11  30, 2009.  As set forth in § 1123(a) of the Code, a Chapter 11 plan must provide "adequate means

12  for the plan's implementation" such as, among other things, "retention by the debtor of all or any

13  part of the property of the estate," "satisfaction or modification of any lien," "curing or waiving of

14  any default," and an "extension of a maturity date or a change in an interest rate or other term of

15  outstanding securities."  11 U.S.C. § 1123(a)(5).  Further, a Chapter 11 plan may "modify the rights

16  of holders of secured claims . . . or of holders of unsecured claims, or leave unaffected the rights of

17  holders of any class of claims."  11 U.S.C. § 1123(b)(5).

18

19  H.    MG GRIFFITH'S PROPOSED SETTLEMENT WITH MURAKAMI

20  Subject to Court approval, MG Griffith and Murakami have agreed to a settlement of any

21  disputes arising out of or relating to the Cash Collateral Motion, the Cash Management Motion, the

22  Loan, and the treatment of Murakami's claims under the Debtors' proposed Chapter 11 plan (the

23  "Settlement").  The Settlement is memorialized in the Settlement Agreement attached as Exhibit

24  "1" to the Declaration of John C. Maddux.  Without limiting the detail in that agreement, the terms

25  of MG Griffith's proposed settlement are as follows:

26

27  [7] Murakami disputes that he has, at all relevant times, been oversecured.

28

11

1.  MG Griffith and Murakami will enter into a separate loan reinstatement agreement providing, among other things, for the following:

    a.  MG Griffith will pay Murakami the sum of $93,750 in satisfaction of all agreed-upon interest and other such amounts accrued through October 31, 2009;[8]

    b.  MG Griffith will pay Murakami the sum of $55,000 as a principal reduction payment under the Note, thereby reducing the outstanding principal balance owed to $2,945,000;

    c.  MG Griffith will pay Murakami the fixed sum of $100,000 in satisfaction of all attorneys' fees, costs, expenses and other amounts Murakami may have incurred and will incur through the date of entry of the Bankruptcy Court's order;

    d.  the maturity date under the Promissory Note and the other Loan Documents will remain January 26, 2013;

    e.  the non-default rate of interest under the Note will be a fixed rate of 3.75% per annum, and the default rate of interest will be a fixed rate of 6.75% per annum.

2.  Murakami will consent to the use of cash collateral for the purposes set forth in the Cash Collateral Motion, for the purpose of making payments provided for in the Settlement and the Loan, as modified, and any other purpose as may be authorized by the Bankruptcy Court.

3.  Murakami will consent to the Debtors' continued use of their existing cash management system and the relief sought in the Cash Management Motion.  Neither MG Griffith nor any other entity will be required to segregate Murakami's cash collateral.

4.  Except with regard to the obligations created under the Settlement and the Loan Documents, as modified by the Loan Reinstatement Agreement, MG Griffith and Murakami will release each other of all known and unknown claims which they had or may have had against the other as of the date of entry of the Bankruptcy Court's order approving the Settlement.

///

---

[8] The amount to be paid ($93,750) is equal to the principal balance of the loan ($3,000,000) multiplied by the agreed-upon interest rate in the Settlement (3.75%), divided by twelve to arrive at a monthly interest amount, and then multiplied by ten to reflect that payment is being made for the interest accrued from January 2009 through October 2009.

1       5.      To the extent that any Adequate Protection Liens have arisen or may arise in favor

2   of Murakami pursuant to the Bankruptcy Court's orders authorizing the use of cash collateral on an

3   interim basis, such liens will be waived, released and discharged.  This would <u>not</u> effect a waiver,

4   release or discharge of any lien afforded to Murakami against the Property, rents generated by the

5   Property, or other assets in which Murakami holds a security interest under the Loan Documents.

6       6.      The treatment afforded to Murakami under any plan proposed by MG Griffith will

7   be consistent with, and MG Griffith will not in any way seek to alter, modify or contradict, the

8   terms of the Settlement.  Murakami's secured claim against MG Griffith would be deemed to be

9   impaired under § 1124 of the Code.  Provided that the proposed plan complies with the Settlement,

10  Murakami will fully support the proposed plan and Murakami will not support or participate in the

11  formulation of any other plan.

12

13                                       II.

14                                    <u>ARGUMENT</u>

15  A.      <u>THE COURT IS AUTHORIZED TO APPROVE THE SETTLEMENT AGREEMENT</u>

16          This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, and

17  Federal Rule of Bankruptcy Procedure 9019.  Federal Rule of Bankruptcy Procedure 9019(a)

18  provides,

19          On motion by the trustee and after a hearing on notice to creditors,
            the debtor . . . and to such other entities as the court may designate,
20          the court may approve a compromise or settlement.

21          The Supreme Court, in *Protective Committee for Independent Stockholders of TMT Trailer*

22  *Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), held that a bankruptcy court, in considering

23  whether to approve a compromise, should inform itself regarding

24          all facts necessary for an intelligent and objective opinion of the
            probabilities of ultimate success should the claim be litigated.
25          Further, the judge should form an educated estimate of the
            complexity, expense, and likely duration of such litigation, the
26          possible difficulties of collecting on any judgment which might be
            obtained, and all other factors relevant to a full and fair assessment of
27          the wisdom of the proposed compromise.

28  ///

                                       13

1    The Ninth Circuit has clarified the inquiry as follows:

> In determining the fairness, reasonableness and adequacy of a
> proposed settlement agreement, the court must consider: (a)
> probability of success in the litigation; (b) the difficulties, if any, to
> be encountered in the matter of collection; (c) the complexity of the
> litigation involved, and the expense, inconvenience and delay
> necessarily attending it; [and] (d) the paramount interest of the
> creditors and a proper deference to their reasonable views in the
> premises.

*In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied*, 479 U.S. 854, 107 S. Ct. 189 (1986).

A trustee or debtor-in-possession has the burden of persuading the Court that the compromise is fair and equitable and should be approved. *Id.* Although "the creditors' objections to a compromise must be afforded due deference, such objections are not controlling, and while the court must preserve the rights of the creditors, it must also weigh certain factors to determine whether the compromise is in the best interest of the bankrupt estate." *Id.* at 1382 (citations omitted).

The bankruptcy court has wide latitude and discretion in evaluating a proposed compromise because the judge is "uniquely situated to consider the equities and reasonableness." *United States v. Alaska National Bank (In re Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982). The Ninth Circuit has further stated:

> A compromise agreement allows the trustee and the creditor to avoid
> the expenses and burdens associated with litigating "sharply
> contested and dubious" claims. [Citation].  The bankruptcy court
> need not conduct an exhaustive investigation into the validity of the
> asserted claim. [Citation].  It is sufficient that, after apprising itself of
> all facts necessary for an intelligent and objective opinion concerning
> the claim's validity, the court determines that either (1) the claim has
> a "substantial foundation" and is not "clearly invalid as a matter of
> law," or (2) the outcome of the claim's litigation is "doubtful."

*Id.* at 1328.  The court is not "to decide the numerous questions of law and fact raised by [objectors] but rather to canvass the issues and see whether the settlement '*falls below the lowest point in the range of reasonableness.*'" *In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr. S.D.N.Y. 1984) (*quoting In re W. T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (emphasis added), *cert. denied*, 464 U.S. 822, 104 S. Ct. 89 (1983)), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985).

14

B.    THE PROPOSED SETTLEMENT IS REASONABLE AND IN THE BEST INTERESTS
OF THE ESTATES

MG Griffith's proposed settlement with Murakami is a fair and reasonable settlement of issues that have arisen or may arise relating to the Cash Collateral Motion, the Cash Management Motion, MG Griffith's default under the loan, and the Debtors' anticipated Chapter 11 plan. There is no dispute that MG Griffith ceased making payments to Murakami in January 2009, and that Murakami has a lien on rents generated by the Property. Murakami may assert that he is entitled to recover interest at the default rate under the Note (10.0% per annum), or at least the non-default rate (7.0%), and various other remedies under the Code. Murakami has objected to the Debtors' use of his cash collateral and may allege that he is entitled to an Adequate Protection Lien under the Court's interim orders authorizing the use of cash collateral.[9] Murakami may also seek to prevent confirmation of a Chapter 11 plan by voting to reject the Debtors' proposed plan. The Debtors believe that the likelihood that the Debtors would successfully oppose such efforts by Murakami is relatively high because, among other things, Murakami is adequately protected by an equity cushion in the Property of as much as approximately 26%, although Murakami disputes the Debtors' position in this regard. Of course, there is always a risk of loss in litigation, and MG Griffith has factored in such risk in determining that, in its business judgment, the Settlement is fair, reasonable, and in the best interests of the estate.

The Debtors believe that the complexity, delay and expense of litigating with Murakami with regard to the above issues also justifies settlement on the agreed-upon terms. The Court has likely noted the significant amount of attorneys' fees being incurred by the Debtors and the Official Committee of Unsecured Creditors, and the even larger amounts asserted by the numerous secured creditors in this case. Some motions that have been filed by the Debtors have been separately opposed by multiple secured creditors, who often repeat each others' arguments both in pleadings and at the podium. Thus far, Murakami has been only a moderately active participant in the

---

[9] Murakami alleges that he is undersecured.

345255.02 [XP]        25195

1  litigation pending before the Court. Murakami opposed the Cash Collateral Motion and filed a

2  notice of joinder in the oppositions of others to the Debtors' "SARE" motion, and its counsel

3  appeared at some of the cash collateral hearings in this case. If the Debtors are required to litigate

4  with Murakami, the Court will need to conduct further evidentiary hearings regarding the value of

5  Murakami's collateral and related issues. MG Griffith believes that the litigation likely will be

6  complex and expensive.

7          Finally, the paramount interests of creditors warrants approval of the Settlement. Under the

8  Settlement, MG Griffith will, among other things, lock in a fixed interest rate that will contribute

9  towards the Debtors' reorganization efforts. The Loan will be brought current by paying interest

10 from January through October 2009 at the new rate set forth in the Settlement (3.75%), which is

11 less than the non-default rate in the Note (7.0%). Murakami's claim for reimbursement of legal

12 fees and related costs will be capped at $100,000, which is less than the total fees and costs which

13 Murakami has incurred. Interest going forward will accrue at the rate of 3.75% per annum. The

14 objections by Murakami to the Debtors' use of cash collateral and utilization of their existing cash

15 management system will be resolved. MG Griffith will also eliminate the possibility of litigation

16 with Murakami regarding the treatment of its claim under a plan. Any Adequate Protection Lien

17 that Murakami may have now or could have in the future will be released. Finally, Murakami will

18 agree to support the Debtors' plan provided that it is consistent with the Settlement, thus increasing

19 the likelihood of confirming a plan of reorganization that enables the Company to emerge from

20 bankruptcy best prepared and able to handle the opportunities and challenges that it will face in the

21 future. In view of the expense of litigation and the significant benefits of reaching agreement with

22 secured creditors with regard to treatment of their claims under a plan, MG Griffith believes that

23 the proposed settlement is in the best interests of the Debtors' estates and their creditors.

24

25 C.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE CASH COLLATERAL

26        TO PERFORM FUTURE PAYMENT OBLIGATIONS UNDER THE SETTLEMENT

27         In connection with the Debtors' motion for approval of a proposed settlement with Pacific

28 Commerce Bank, the Debtors' sought authority to use cash collateral to pay interest that accrued

1  prior to execution of the settlement and the future payments of interest and other payment

2  obligations under that loan, as modified by the settlement. As reflected in the Court's order entered

3  on or about October 22, 2009, the Court authorized the Debtors to use so-called "unrestricted cash"

4  to pay the past-due interest and cash collateral to make future payments of interest.

5      Although MG Griffith believes that it is appropriate to use cash collateral to make payments

6  of interest that accrued from January 2009 through October 2009, MG Griffith is not requesting the

7  authority to do so at this time. Instead, MG Griffith is requesting that the Court's order approving

8  the Settlement provide that unrestricted cash may be used to pay (a) the $93,750 in satisfaction of

9  the agreed-upon interest accrued through October 31, 2009, (b) the $55,000 principal reduction

10  payment, and (c) the $100,000 reimbursement of legal fees, costs and expenses. MG Griffith is

11  also requesting that the Court's order provide that cash collateral may be used to pay interest for

12  months subsequent to October 2009 and other payment obligations required under the Settlement

13  and Loan, as modified by the Loan Reinstatement Agreement, including real property taxes.

14

15  III.

16  CONCLUSION

17      For the foregoing reasons, MG Griffith requests that the Court approve its proposed

18  settlement with Murakami and authorize MG Griffith to perform thereunder as set forth above.

19  MG Griffith also requests such further relief as the Court deems just and proper.

20

21  Dated: November 18, 2009        DANNING, GILL, DIAMOND & KOLLITZ, LLP

22

23  By: _John Tedford IV_____

24          John N Tedford, IV
           Attorneys for Meruelo Maddux Properties,

25          Inc., and affiliated Debtors and Debtors-in-
           Possession

26

27

28

345255.02 [XP]    25195

### DECLARATION OF JOHN C. MADDUX

I, John C. Maddux, declare and state as follows:

1.    I am the President and Chief Operating Officer of Meruelo Maddux Properties, Inc. ("MMPI").

2.    MMPI is the ultimate parent company of approximately 69 affiliated entities, including Merco Group – 1500 Griffith Avenue, LLC ("MG Griffith"). On March 26 and 27, 2009, MMPI, MG Griffith, and fifty-two other of the affiliated entities (collectively the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. I am a designated officer of each of the affiliated entities, including MG Griffith, and am authorized to give this declaration.

3.    As a result of my being Chief Operating Officer of MMPI and a designated officer of MG Griffith and each of the affiliated entities, and my review of relevant documents, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records, and the manner in which they are prepared. Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of the Debtors' operations and financial conditions.

4.    MG Griffith owns multiple parcels of real property near the corner of Griffith Avenue and East 16th Street in downtown Los Angeles. Three parcels owned by MG Griffith, collectively referred to as 1510 Griffith Avenue (the "Property"), are encumbered by a deed of trust in favor of Yoshiaki Murakami and Fumiko Murakami, as Co-Trustees of the Revocable Trust of Yoshiaki Murakami and Fumiko Murakami U/T/A Dated June 16, 1988, and Yoshiaki Murakami, an individual (collectively "Murakami"). The other parcels are encumbered by a deed of trust in favor of Legendary Investors Group No. 1, LLC.

5.    MG Griffith's properties are located in downtown Los Angeles' garment district. The properties comprise the majority of an entire city block. The properties have excellent visibility along the Interstate 10 Freeway. There are multiple MEGATRON billboards on a

345255.02 [XP]    25195

1  property next door to the properties that I am informed and believes each generates over $120,000

2  per month in signage revenue.

3      6.      Within the garment district, MG Griffith's properties are in a valuable location.  The

4  properties are located in the new, more desirable section of the downtown garment district, across

5  the street from a recently-completed $130 million L.A. Fashion Center building which represents

6  the newest, cutting-edge wholesale garment development in the western United States.

7      7.      In or about January 2006, MG Griffith purchased the Property from Murakami and

8  certain other entities related to Murakami for the sum of $5 million.  In connection therewith, MG

9  Griffith executed a Purchase Money Note (the "Note") in favor of Murakami in the principal sum

10  of $3 million (the "Loan").  A true and correct copy of the Note is attached as Exhibit "2" hereto.

11  The Loan was secured by a deed of trust against the Property and an assignment of rents.  A true

12  and correct copy of the Short Form Deed of Trust and Assignment of Rents is attached as Exhibit

13  "3" hereto.

14      8.      The Debtors are developing a Chapter 11 plan of reorganization.  I anticipate that

15  the plan will be filed on or before November 30, 2009.

16      9.      Subject to Bankruptcy Court approval, MG Griffith has agreed to a settlement with

17  Murakami of any disputes arising out of or relating to the Debtors' motion for authority to use cash

18  collateral, the Debtors' motion for authority to utilize their existing cash management system, the

19  Loan, and the treatment of Murakami's claim under the Chapter 11 plan to be proposed by the

20  Debtors (the "Settlement").  A true and correct copy of the proposed settlement agreement is

21  attached as Exhibit "1" hereto.

22      10.     In my business judgment, I believe that the Settlement is in the best interests of MG

23  Griffith and its affiliated debtors-in-possession.  MG Griffith does not dispute that it ceased making

24  payments to Murakami in January 2009, and that Murakami has a lien against the Property and

25  rents generated by the Property.  Under the terms of the Loan, MG Griffith owes past due interest

26  which, if calculated at a rate of 7.0% per annum, totaled $175,000 as of November 1, 2009, not

27  including default interest, late charges, and other fees and costs to which Murakami may be entitled

28  under the Note.  Murakami has objected to the Debtors' use of cash collateral.  Because Murakami

345255.02 [XP]      25195

1    claims that he is undersecured, Murakami also may seek to allege that he is entitled to an Adequate

2    Protection Lien under the Court's interim orders authorizing the use of cash collateral. Murakami

3    has not filed a motion for relief from stay. If Murakami were to continue or commence litigation

4    with MG Griffith and other Debtors over cash collateral, relief from stay, and Chapter 11 plan

5    confirmation issues, I believe that the likelihood that the Debtors would successfully oppose such

6    efforts is relatively high because I understand that, under the Debtors' figures, Murakami has an

7    equity cushion in the Property of as much as approximately 26%. However, I also recognize that

8    there is always a risk of loss in litigation. We have factored in such risk of loss in determining that,

9    in our business judgment, the Settlement is fair, reasonable, and in the best interests of the Debtors.

10        11.    I also believe that the complexity, delay and expense of litigating with Murakami

11    with regard to such issues also justifies settlement on the agreed-upon terms. Thus far, Murakami

12    has been only a moderately active participant in the cash collateral, cash management and other

13    litigation that has been pending before the Bankruptcy Court. I believe that if the Debtors litigate

14    with Murakami, the Court will need to conduct further evidentiary hearings regarding the value of

15    Murakami's collateral and related issues. On November 2, 2009, in connection with our settlement

16    discussions with Murakami, I reviewed monthly billing statements of Murakami's bankruptcy

17    counsel, and I am informed and believe that the aggregate amount of legal fees and related costs

18    incurred by Murakami prior to and after March 27, 2009, is above $100,000. While I believe that

19    some of the fees incurred by Murakami may not properly be charged under the loan and/or may not

20    be allowable under the Bankruptcy Code, litigating with Murakami will cause him to incur more

21    legal fees which he presumably will seek to charge to MG Griffith under the Note. Of course, the

22    Debtors would also be required to incur additional legal fees and related costs. I believe that, for

23    both sides, further litigation likely will be complex and expensive.

24    ///

25    ///

26    ///

27    ///

28    ///

1    12.    For these and other reasons stated in MG Griffith's motion seeking approval of the

2  Settlement, to which this declaration is attached and which I have read, I believe that the Settlement

3  is fair, reasonable and in the best interests of the Debtors and their estates.

4

5    I declare under penalty of perjury under the laws of the United States of America that the

6  foregoing is true and correct.

7    Executed on November 16, 2009, at Los Angeles, California.

8

9

10    _____
                    JOHN C. MADDUX

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

21

**REQUEST FOR JUDICIAL NOTICE**

Merco Group – 1500 Griffith Avenue, LLC ("MG Griffith"), hereby requests that the Court take judicial notice of the following facts:

1.    On March 26 and 27, 2009, Meruelo Maddux Properties, Inc. ("MMPI"), and 53 of MMPI's direct and indirect subsidiaries (collectively the "Debtors") filed voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Code").

2.    Pursuant to a ruling of the Court on March 30, 2009, the 54 cases are being jointly administered under MMPI's case number, 1:09-bk-13356-KT.

3.    The Debtors are operating their business affairs pursuant to the authority granted under §§ 1107 and 1108 of the Code.

4.    On or about May 12, 2009, the Court entered its *Third Interim Order Authorizing the Debtors' Use of Cash Collateral on an Interim Basis*. A true and correct copy of the order is attached as Exhibit "4" hereto.

5.    On or about May 12, 2009, the Court entered its *Third Interim Order (1) Approving Continued Use of Cash Management System, (2) Approving Lending and Borrowing between Debtors on an Unsecured Basis, (3) Authorizing the Debtors' Use of Prepetition Bank Accounts, and (4) Dispensing with the Requirements of 11 U.S.C. § 345(b)*. A true and correct copy of the order is attached as Exhibit "5" hereto.

Dated: November 18, 2009          DANNING, GILL, DIAMOND & KOLLITZ, LLP

By: _____
    John N Tedford, IV
    Attorneys for Meruelo Maddux Properties,
    Inc., and affiliated Debtors and Debtors-in-
    Possession

22

345255.02 [XP]     25195

# EXHIBIT 1

## SETTLEMENT AGREEMENT

Merco Group – 1500 Griffith Avenue, LLC ("MG Griffith"), on the one hand, and Yoshiaki Murakami and Fumiko Murakami, as Co-Trustees of the Revocable Trust of Yoshiaki Murakami and Fumiko Murakami U/T/A Dated June 16, 1988, and Yoshiaki Murakami, an individual (collectively "Murakami"), on the other hand, agree as follows:

## RECITALS

A.      MG Griffith is the maker of the Purchase Money Note dated January 26, 2006 in the original principal amount of $3,000,000 made to the order of Murakami ("Note"). The Note evidences a $3,000,000 seller carry-back loan made by Murakami to MG Griffith (the "Loan"). MG Griffith's obligations under the Note are secured by the Short Form Deed of Trust and Assignment of Rents executed by MG Griffith for the benefit of Murakami and recorded on January 24, 2006 as Instrument No. 06-0164584 in the Official Records of Los Angeles County, California ("Deed of Trust"), which encumbers the property described therein ("Property"). The Note and Deed of Trust are referred to collectively as the "Loan Documents."

B.      On March 27, 2009 (the "Petition Date"), MG Griffith filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), Case No. 1:09-bk-13398-KT. The case is being jointly administered with Chapter 11 cases filed by Meruelo Maddux Properties, Inc. ("MMPI"), and fifty-three of MMPI's direct and indirect subsidiaries, under the lead case, *In re Meruelo Maddux Properties, Inc.*, Case No. 1:09-bk-13356-KT. Since the filing of its petition for relief, MG Griffith has and is continuing to operate its business as debtor-in-possession under 11 U.S.C. §§ 1107 and 1108.

C.      On March 27, 2009, MG Griffith filed a number of "first day motions" including a motion for authority to use cash collateral (the "Cash Collateral Motion") and a motion for authority to maintain its prepetition cash management system (the "Cash Management Motion"). Relief sought in the Cash Collateral Motion and the Cash Management Motion was granted on an interim basis; evidentiary hearings and further proceedings regarding MG Griffith's requests for relief on a final basis are ongoing.

D.      In the Cash Collateral Motion, MG Griffith is, generally, seeking authority to use any rents generated by the Property to pay the expenses of preserving and maintaining the Property, with the excess, if any, being made available to pay expenses of MG Griffith and its affiliated debtors-in-possession (collectively the "Related Debtors"). Pursuant to the Court's interim cash collateral orders, Murakami was granted a lien against real properties owned by certain of the Related Debtors as and for adequate protection against any diminution in the value of Murakami's interests in his collateral arising from MG Griffith's use of cash collateral (the "Adequate Protection Liens"). MG Griffith contends that there has not been any diminution in the value of Murakami's interests in his collateral, and therefore contend that Murakami does not have an Adequate Protection Lien on real properties owned by the Related Debtors.

E.      Murakami disputes MG Griffith's contentions with regard to cash collateral and adequate protection, and has filed papers with the Court accordingly.

1

00023

F.    MG Griffith, on the one hand, and Murakami, on the other hand, hereby memorialize their settlement of any disputes arising out of or relating to the Cash Collateral Motion, the Cash Management Motion, and the Loan Documents, and the treatment of Murakami's claims under a Chapter 11 plan or plans of reorganization, in accordance with the terms and conditions set forth below.

## TERMS AND CONDITIONS

Based on the mutual promises contained herein and for other good and valuable consideration, the receipt of which is acknowledged, the Parties agree as follows:

1.    Recitals Acknowledged.  The foregoing recitals are true and correct to the best of the Parties' knowledge, and are hereby adopted by the Parties.

2.    Bankruptcy Court Approval.  The Parties agree that their obligations under this Settlement Agreement shall become binding only upon entry of an order by the Bankruptcy Court (the "Approval Order") approving the terms of this Settlement Agreement, which MG Griffith shall seek as soon as practicable, and in any event within 14 calendar days following execution of this Settlement Agreement by the Parties.

3.    Reinstatement of the Loan.  MG Griffith and Murakami shall enter into a loan reinstatement agreement substantially conforming to the "Loan Reinstatement and First Amendment to Loan Documents" attached as Exhibit "A" hereto (the "Loan Reinstatement Agreement").

4.    Murakami's Consent to Use of Cash Collateral and the Relief Sought in the Cash Management Motion.  Murakami consents to the use of his cash collateral for the purposes set forth in the Cash Collateral Motion, for the purpose of making payments provided for in this Settlement Agreement and the Loan Documents, as modified by the Loan Reinstatement Agreement, and any other purpose as may be authorized by the Bankruptcy Court.  Murakami further consents to the relief sought in the Cash Management Motion, including but not limited to the transfer of rents received by MG Griffith to commingled accounts held in the name of Meruelo Maddux Properties, L.P.  Neither MG Griffith nor any other entity shall be required to segregate Murakami's cash collateral.

5.    Mutual Release.  Upon entry of the Approval Order, and except with regard to the obligations created under this Settlement Agreement and the Loan Documents, as modified by the Loan Reinstatement Agreement, the Parties agree to release each other as follows:

a.    MG Griffith, on behalf of itself and its estate, shall release Murakami of and from any and all rights, claims, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or causes of action of every nature, character and description, whether known or unknown, suspected or unsuspected, which MG Griffith had or may have had against Murakami as of the date of entry of the Approval Order. This release applies to all of MG Griffith's predecessors, successors and assigns, and to all of its attorneys and agents.  This release also applies to MMPI's direct and indirect subsidiaries, including but not limited to the Related Debtors.

2

   b.    Murakami shall release MG Griffith and MMPI's direct and indirect subsidiaries, including but not limited to the Related Debtors, of and from any and all rights, claims, including but not limited to any claims arising under sections 503 and 507(b) of the Bankruptcy Code, debts, demands, acts, agreements, liabilities, obligations, damages, costs, attorneys' fees, expenses, actions, and/or causes of action of every nature, character and description, whether known or unknown, suspected or unsuspected, which Murakami had or may have had against MG Griffith and MMPI's direct and indirect subsidiaries, including but not limited to the Related Debtors, as of the date of entry of the Approval Order. This release applies to all of Murakami's predecessors, successors and assigns, and to all of his attorneys and agents.

   c.    The Parties expressly agree that they waive and relinquish any and all rights and benefits they may have under Section 1542 of the California Civil Code or any similar law of any other jurisdiction. That section reads as follows:

> SECTION 1542. [GENERAL RELEASE; EXTENT] A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

   6.    Release of Adequate Protection Liens. Murakami waives, releases and discharges any and all Adequate Protection Liens that have arisen or may in the future arise in favor of Murakami pursuant to the Bankruptcy Court's orders authorizing MG Griffith's use of cash collateral on an interim or final basis. For purposes of clarification, nothing herein shall constitute a waiver, release or discharge of any lien afforded to Murakami against the Property, rents generated by the Property, or other assets in which Murakami holds a security interest under the Loan Documents.

   7.    Consent to Treatment Under Chapter 11 Plan.

   a.    The Parties acknowledge that this Settlement Agreement is entered into in contemplation of the proposal and confirmation of a Chapter 11 plan by MG Griffith and its affiliated debtors-in-possession.

   b.    The treatment of Murakami under any plan proposed by MG Griffith shall be consistent with, and MG Griffith shall not in any way seek to alter, modify or contradict, the terms of the Loan Documents, as modified by the Loan Reinstatement Agreement. The entirety of Murakami's claim against MG Griffith's estate shall comprise a single class of secured claims, and that class shall consist solely of Murakami's claim. The class of claims consisting of Murakami's secured claim against MG Griffith's estate shall be deemed to be "impaired" under 11 U.S.C. § 1124. Provided that the plan complies herewith, MG Griffith shall use its best efforts to obtain confirmation of the plan, Murakami will fully support the proposed plan, and Murakami will not support or participate in the formulation of any other plan.

3

c.    .Nothing herein shall be deemed to prohibit the proposal and confirmation of a joint or consolidated plan. In the event that such a plan is proposed, the terms of the plan shall contain provisions complying with section 7(b) of this paragraph.

d.    Nothing herein shall be deemed to require confirmation of a plan as a condition to the effectiveness and enforceability of the Loan Reinstatement Agreement.

8.    <u>Procedure for Seeking Relief from Stay Prior to Plan Effective Date</u>. Notwithstanding anything to the contrary in the Loan Documents, as modified by the Loan Reinstatement Agreement, the following shall apply prior to the effective date of the plan:

a.    If an Event of Default (as defined in the Loan Documents) occurs in which MG Griffith fails to perform an obligation under the Loan Documents, as modified by the Loan Reinstatement Agreement (a "Default"), Murakami shall provide notice of such Default in writing (the "Notice of Default"), and deliver such notice to MG Griffith and MG Griffith's counsel at the addresses identified in this paragraph.

b.    MG Griffith shall have twenty calendar days from the date of delivery of the Notice of Default (the "Cure Period") to cure the Default identified in the Notice of Default. If the Default has not been cured prior to expiration of the Cure Period, Murakami shall be authorized to request entry of an order terminating or modifying the automatic stay in MG Griffith's case, to which request MG Griffith may object only on the grounds set forth below, as follows:

i.    Murakami shall file a *Motion for Relief from the Automatic Stay under 11 U.S.C. § 362* (the "Stay Motion") in accordance with Local Bankruptcy Rule 4001-1, except that the Stay Motion shall be filed and served not later than 14 calendar days before the hearing. MG Griffith shall file and serve any opposition to the Stay Motion not later than seven (7) calendar days before the hearing.

ii.    Subject to the limitations set forth below, in the event of a material Default by MG Griffith, the Parties stipulate and agree to the granting of relief from stay under 11 U.S.C. § 362(d)(1). In such event, the Bankruptcy Court shall terminate or modify the automatic stay as against MG Griffith and MG Griffith's estate, such that Murakami shall be authorized to proceed under applicable nonbankruptcy law to enforce its remedies to foreclose upon and obtain possession of the Collateral (as defined in the Loan Documents).

(a)    The Stay Motion shall be *denied* if MG Griffith establishes that: (a) no Default occurred; (b) the Default identified in the Notice of Default was timely cured; (c) the Default identified in the Notice of Default was not a material default under applicable nonbankruptcy law; or (d) a failure by Murakami to comply with one or more of his duties and obligations to MG Griffith excuses the Default identified in the Notice of Default.

(b)    The Stay Motion shall be *continued for a reasonable time* if the Bankruptcy Court determines that (a) the Notice of Default is based exclusively upon one or more defaults that are not readily curable by MG Griffith within the Cure Period (the "Non-Readily-Curable Defaults"); (b) MG Griffith has commenced reasonable, good faith efforts to cure within the Cure Period; and (c) MG Griffith has at all times continued with such efforts. Examples of possible

4

Non-Readily-Curable Defaults include, but are not limited to, failure to keep the Property in good repair, and failure to comply with laws requiring alterations to the Property, where the necessary repairs or alterations by their nature cannot be completed within the Cure Period. A failure by MG Griffith to comply with its obligation under the Loan Documents, as modified by the Loan Reinstatement Agreement, to pay any sum of money to Murakami, or to maintain or to deliver upon request a certificate of fire insurance, shall not constitute a Non-Readily-Curable Default.

        iii.    · Murakami acknowledges MG Griffith's belief that, pursuant to 11 U.S.C. § 1129(a)(9)(D), MG Griffith may pay real property taxes incurred before the Petition Date and secured by a lien against the Property over a period of years. Notwithstanding anything to the contrary in the Loan Documents, as modified by the Loan Reinstatement Agreement, the payment of such prepetition taxes over time pursuant to a confirmed Chapter 11 plan shall not constitute a material default entitling Murakami to relief from the automatic stay.

        c.    Any Notice of Default to be delivered pursuant to this paragraph shall be served by personal delivery and facsimile as follows:

| | | |
|---|---|---|
| i. | MG Griffith: | Todd W. Nielsen<br>Meruelo Maddux Properties, Inc.<br>761 Terminal Street<br>Building 1, 2nd Floor<br>Los Angeles, CA 90021<br>Facsimile no. (213) 291-2830 |
| ii. | MG Griffith's counsel: | John N. Tedford, IV<br>Danning, Gill, Diamond & Kollitz, LLP<br>2029 Century Park East, Third Floor<br>Los Angeles, CA 90067<br>Facsimile no. (310) 277-5735 |

    9.    <u>Successor and Assigns</u>. This Settlement Agreement is binding upon and shall inure to the benefit of all the Parties hereto, and their respective attorneys, agents, heirs, administrators, predecessors, successors and assigns.

    10.    <u>Governing Law and Jurisdiction</u>. This Settlement Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to choice of law principles of the State of California. The Bankruptcy Court shall retain exclusive jurisdiction to resolve any and all disputes pertaining to this Settlement Agreement, including without limitation the enforcement and interpretation of any of its terms, and the Parties agree to submit to the jurisdiction of the Bankruptcy Court for the purpose of resolving such disputes. Notwithstanding the foregoing, the Loan Documents shall be governed by and construed in accordance with the choice of law provisions contained therein, and jurisdiction over disputes arising under or related to the Loan Documents and not pertaining particularly to the terms of this Settlement Agreement shall be as set forth therein.

    11.    <u>Further Assurances</u>. Each Party to this Settlement Agreement shall execute all instruments and documents and take all actions as may be reasonably required, necessary or convenient to effectuate this Settlement Agreement.

5

12.    <u>Complete Agreement.</u>    This Settlement Agreement and all exhibits attached hereto contain the entire integrated agreement between the Parties with respect to the matters covered herein. No variations, modifications or changes herein or hereof shall be binding upon any Party unless set forth in a writing duly executed by such Party.

13.    <u>Modification.</u>    This Settlement Agreement may be modified only by a writing executed by the Party to this Settlement Agreement against whom enforcement of such modification is sought.

14.    <u>Rules Of Construction.</u>    The Parties, including their counsel, have participated in the preparation of this Settlement Agreement, and this Settlement Agreement is the result of the joint efforts of the Parties. This Settlement Agreement has been accepted and approved as to its final form by all Parties and upon the advice of their respective counsel. Accordingly, any uncertainty or ambiguity existing in this Settlement Agreement shall not be interpreted against any Party as a result of the manner of the preparation of this Settlement Agreement. Each Party to this Settlement Agreement agrees that any statute or rule of construction providing that ambiguities are to be resolved against the drafting Party shall not be employed in the interpretation of this Settlement Agreement and are hereby waived.

15.    <u>Attorneys' Fees and Expenses.</u>    Each Party shall bear its own attorneys' fees, court costs and related expenses incurred by or on behalf of said Party in connection with this Settlement Agreement, provided, however, that should legal action be necessary to enforce the terms of this Settlement Agreement, the party declared to be the prevailing party in such proceedings shall be entitled to recover from the non-prevailing party its reasonable attorneys' fees and costs incurred in enforcing this Settlement Agreement.

[PARAGRAPH 16 AND SIGNATURES ON FOLLOWING PAGE]

341496.06 [XF] 25195

00028

16.   _Counterparts_.   Each Party may sign a facsimile copy of this Settlement Agreement, in counterparts, with the same effect as if each Party had signed an original of the same document.

Dated: November 12, 2009          MERCO GROUP – 1500 GRIFFITH AVENUE, LLC, a
                                   Delaware limited liability company


                                   By: _____

                                   Its: _____


Dated: November 10, 2009          _____
                                   YOSHIAKI MURAKAMI, AS CO-TRUSTEE OF THE
                                   REVOCABLE TRUST OF YOSHIAKI MURAKAMI
                                   AND FUMIKO MURAKAMI U/T/A DATED JUNE 16,
                                   1988


Dated: November 10, 2009          _____
                                   FUMIKO MURAKAMI, AS CO-TRUSTEE OF THE
                                   REVOCABLE TRUST OF YOSHIAKI MURAKAMI
                                   AND FUMIKO MURAKAMI U/T/A DATED JUNE 16,
                                   1988


Dated: November 10, 2009          _____
                                   YOSHIAKI MURAKAMI, an individual

7