### 35.   1308 South Orchard, Los Angeles

The subject property is owned by Merco Group - 1308 S. Orchard, LLC ("MG 1308 S. Orchard") and is unencumbered. The subject property is located west of downtown Los Angeles. It is comprised of approximately 0.3 acres of land.

### 36.   758 Ceres Avenue, Los Angeles (Ceres Street Produce Market)

The subject property is owned by Merco Group - Ceres Street Produce, LLC ("MG Ceres Street Produce") and is unencumbered. The property is located in the industrial district of downtown Los Angeles. It is comprised of approximately 0.4 acres of land.

This property is intended to be developed based upon the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

### 37.   336 West 11th Street, Los Angeles (South Park Towers)

The subject property is owned by Meruelo Maddux - 336 W. 11th Street, LLC ("MM 336 W. 11th Street") and is encumbered by a lien in favor of Legendary. The property is located at the corner of West 11th Street and South Olive Street in the South Park area of downtown Los Angeles. The property is entitled for an 80 unit residential development. It is comprised of approximately 0.7 acres of land being utilized as a parking lot.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 38.   915-949 South Hill Street, Los Angeles (Ullman Tower One)

The subject property is owned by Meruelo Maddux - 915-949 S. Hill Street, LLC ("MM 915-949 S. Hill Street") and is encumbered by a lien in favor of Imperial. The property is located at 915-949 South Hill Street in the South Park area of downtown Los Angeles. It is comprised of approximately 1.5 acres of land being utilized as a commercial parking lot.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

1    **39.    900, 910 and 926 East 4th Street and 405 – 411 S. Hewitt Street, Los**

2    **Angeles**

3    The subject property is owned by Merco Group - 4th Street Center, LLC ("MG 4th Street

4    Center") and is encumbered by a lien in favor of Legendary.  The property is located at the corner

5    of South Hewitt Street and East 4th Street in the Arts District of downtown Los Angeles. It is

6    comprised of approximately 1.3 acres which has been improved with two buildings consisting of

7    approximately 13,430 net rentable square feet.  The improvements have been partly leased. The

8    property is a multi-tenant industrial and distribution space facility.

9    This property is intended to be used by an assortment of small business owners prevalent in

10    downtown Los Angeles whereby the Company looks to support and incubate their businesses.

11    **40.    425 West 11th Street, Los Angeles (Desmond Building)**

12    The subject property is owned by Merco Group - 425 West 11th Street, LLC ("MG 425 W.

13    11th Street") and is encumbered by a lien in favor of Legendary.  The subject property consists of

14    two properties located on 11th Street, a few blocks away from the Staples Center and LA Live in

15    the South Park area of downtown Los Angeles.  The two properties total approximately 0.67 acres

16    which has been improved with a multi-story industrial building known as the "Desmond Building"

17    consisting of approximately 78,500 net rentable square feet.  As of September 30, 2009, the

18    improvements were leased to a tenant occupying approximately 20.0% of the total rentable area.

19    The other property is currently utilized as a parking lot.

20    Both the improved and unimproved parts of this property are intended to be redeveloped

21    based on the Company's focus on supplying residential units to individuals.  This effort is geared

22    towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of

23    residences.

24    **41.    West 11th Street and South Grand Avenue, Los Angeles (South Park**

25    **Towers, TransAmerica Lofts & Olive Street Towers)**

26    The subject property is owned by Merco Group - South Park, LLC ("MG South Park") and

27    is encumbered by a lien in favor of Bank of America.  The property is located in parts of three

28    blocks located at 1150 S. Grand Avenue and various other addresses in downtown Los Angeles.  It

346506.1

1    is comprised of approximately 4.7 acres and a structure with approximately 8,700 net rentable

2    square feet.  The property is currently being utilized as parking lots.

3          This property is an example of how the Company focuses its expertise and downtown

4    knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

5    density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

6                    **42.    705 W. 9th Street, Los Angeles**

7          The subject property is owned by Meruelo Maddux - 845 S. Flower Street, LLC ("MM 845

8    S. Flower") and is encumbered by a lien in favor of Canpartners Realty Holding Company IV LLC

9    ("Canpartners").  Located in the South Park region of downtown Los Angeles, the property totals

10   approximately 0.8 acres of land, on which is located a newly constructed 35-story condominium

11   tower (the "Project").  The building is comprised of 214 luxury residential condominium units

12   totaling 254,300 square feet and a 6,800 square foot commercial unit on the ground floor.  MM 845

13   S. Flower obtained a temporary certificate of occupancy for the Project and anticipates securing a

14   final certificate of occupancy by the end of 2009.

15         The 6,800 square feet of ground floor commercial space is well suited for a restaurant and

16   MM 845 S. Flower is in negotiations with a prominent Los Angeles restaurant operator for a

17   restaurant in this location.

18         The Project has an attractive location at the corner of Ninth and Flower Streets, which is (a)

19   across the street from the newly opened Ralph's supermarket, (b) a few blocks away from the LA

20   Live complex and the Staples Center, (c) on an all residential corner and (d) closer than most other

21   South Park residences to the class A office core of downtown Los Angeles.  The building has

22   resident amenities that start at street level which include (a) a valet entrance area adjacent to the

23   lobby on Ninth Street, (b) two gated entrances that lead to above ground parking providing in

24   excess of one parking space for each one bedroom residence and two parking spaces for each two

25   bedroom residence, and (c) an efficient loading dock area for resident move-ins.

26         There is a seventh floor amenity level located on top of the six story parking facility.  The

27   amenity level clearly separates this building from its residential neighbors with its stunning visuals

28   and common area space.  This level contains (a) a gym that overlooks the pool complete with

346506.1

1    changing rooms and showers, (b) an approximately 70 foot lap pool with infinity features, (c) a

2    Jacuzzi-type whirlpool, (d) a landscaped garden and (e) a club room. The club room amenities

3    include (a) a demonstration kitchen/catering area, (b) a Wii electronic gaming room, (c) a pool

4    table, and (d) several large flat screen TVs.

5         This property represents the culmination of a specific project that has resulted in an iconic

6    residential tower geared towards high density urban in-fill and transit oriented development.

7         **43.    129 West College Street, Los Angeles (Meruelo Chinatown Village)**

8         The subject property is owned by Meruelo Chinatown, LLC ("Chinatown") and is

9    encumbered by a lien in favor of Canpartners securing certain obligations of MM 845 S. Flower to

10   Canpartners. The property was provided as additional collateral to secure substantial completion of

11   the 705 W. 9th Street Project. Chinatown and Canpartners are in a dispute as to whether the lien

12   should be released. The property is located at 129 West College Street in downtown Los Angeles.

13   It is comprised of one property totaling approximately 5.5 acres of land. Interim operating revenue

14   is generated by parking revenues from the film industry.

15        This property is an example of how the Company focuses its expertise and downtown

16   knowledge base on supplying residential units to individuals. This effort is geared towards (a) high

17   density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

18        **44.    Consolidated Operations**

19        The Company's business model and strength is based on the fact that it is a single enterprise

20   with a single management team that manages a portfolio of properties that were assembled and are

21   managed in an efficient and synergistic manner. In addition, the acquisition and development of a

22   relatively large number of properties in a small geographic area allows for great flexibility in the

23   development of such properties. Accordingly, the properties together are more valuable than the

24   properties separately because of this synergistic relationship. For instance, the Company is an

25   incubator for small businesses. Certain properties in the portfolio are conducive to start-up

26   businesses (e.g., smaller tenant spaces, less expensive costs). As those start-up businesses grow, the

27   Company has the flexibility to move them to another property to meet the needs of their growing

28   businesses. This is particularly true with respect to Alameda Square, Seventh Street Produce

346506.1

33

1   Market, 788 Alameda, and 2640 Washington.  Additionally, certain employees of businesses at the

2   larger facilities of Alameda Square or Seventh Street Produce Market learn the business then start

3   their own businesses, often at one of the smaller facilities.  This is also true of the Company's

4   garment tenants.  Urban in-fill development is very different from single-family home-building

5   over large swaths of land.  Urban in-fill development involves many moving parts which may

6   require business relocations amongst various properties.  In the process, the Company is able to

7   improve and update facilities and organize these smaller businesses into a cohesive market that

8   helps improve the business of each.

9          Although the Debtors formally consist of a parent company and various levels of subsidiary

10   Debtors, including the Property Level Debtors, the Company has been, before and after its

11   formation in 2006, and presently continues to be, effectively operated as a single enterprise.  With

12   limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay

13   the expenses of MMPI and the subsidiary Debtors.  Accordingly, there are some Debtors which

14   generate revenues in excess of operating expenses and debt service, but there are some that do not.

15   The Company may purchase and keep properties that are cash flow negative because the Company

16   believes that those properties will, in time, generate a positive return and the enterprise will be

17   significantly more valuable as a result.  The recent unprecedented freezing of credit markets and

18   economic downturn has caused the Company to suspend substantially all of its various development

19   projects.

20          Before and after the IPO, like most larger developers, the Debtors utilized a concentration

21   account for its cash management.  The cash management system provides for funds to flow to and

22   from a cash concentration account maintained by MMPLP.  The concentration account is linked to

23   the operating bank accounts of each of Debtors, which bank accounts are maintained as zero

24   balance accounts.  When needed to fund payment on checks issued by a particular affiliate, funds

25   are transferred from the concentration account to the operating account of that affiliate.  Excess

26   funds, if any, are invested in interest bearing accounts pending their utilization.  The Company

27   rarely disrupts this flow of funds.

28          As a public company, MMPI is required to file various reports with the SEC, including

346506.1

1   among others, quarterly reports as well as annual reports with audited financial statements. These

2   reports are prepared and filed on a consolidated basis. Although the Debtors' SEC filings do

3   provide information relating to individual subsidiaries, the filings generally discuss the business as

4   a consolidated enterprise. This consolidated reporting is a manifestation of the synergy and

5   economic efficiencies gained through the Company's corporate structure. The indirect overhead

6   expenses for administrative services provided by certain Debtors may be allocated to other Debtors.

7   With a few exceptions, revenues received from the operation of the Debtors' properties are swept

8   daily into a general operating account, and the Debtors' obligations are paid from such account.

9       Representatives of the Company frequently spoke with loan officers and representatives of

10   the Company's lenders about the status and operation of the Company and regularly referred the

11   lenders to the Company's SEC filings, and the consolidated financial information contained therein.

12   Those conversations often included a discussion of how events relating to other Property Level

13   Debtors might affect a given borrower (other Property Level Debtor) or the overall operations of

14   the Company. From time to time, lenders would request additional financial information regarding

15   MMPI, MMPLP or one of the Property Level Debtors and were provided with copies of the

16   Company's consolidated financial statement or referred to the Company's public filings with the

17   SEC. The Company firmly believes that all lenders with whom the Company did business were

18   aware of the consolidated nature of the Debtor's business affairs and such awareness was a part of

19   those sophisticated lenders' decision-making process in extending credit to the individual Debtors.

20   In addition, the Company also believes that investors, creditors and others view or believe that the

21   Debtors are a consolidated entity.

22       **C.**    **THE DEBTORS' CURRENT AND ON-GOING BUSINESS STRATEGIES**

23       The Company's business is focused on real estate development and redevelopment. The

24   substantial majority of the Company's properties are not stabilized, i.e., the property is either not a

25   rental property or if a rental property, the property has not reached full occupancy or has not yet

26   been redeveloped to its full income producing level. The Company's strategy has three primary

27   components: investment, value creation and operations. Due to the current economic climate,

28   including the lack of an active credit market, the Company has placed on hold substantially all of its

346506.1

1  development projects.

2       The Company's intent is to continue to build on (i) its market presence, (ii) its relationships

3  with its tenants, (iii) development and operation experiences and (iv) its desire to provide real estate

4  solutions for a variety of urban space users and urban residents.  The Company has always followed

5  a double bottom line approach to its real estate operations that include both a financial return goal

6  and a goal of providing more to the community it serves and the City of Los Angeles through transit

7  oriented development, "green" or LEED development, and the incubation of small businesses that

8  employ large amounts of employees.  For instance, the Company constructed the 705 West Ninth

9  Street 35-story condominium project to meet LEED Silver requirements, and the Company helped

10  incubate American Apparel from a small startup company to an employer with over 5,000

11  employees at what is believed to be the largest garment manufacturing facility in the nation.

12       In particular, the Company will continue and expand on the following:

13            1.    **The Debtors' Investment Strategy**

14       The Company invests in sub-markets that are undergoing demographic, structural or

15  economic changes, where a significant portion of the properties and participants are historically of a

16  non-institutional nature, where the buildings are predominantly obsolete or no longer relevant to the

17  submarket's changing profile, where the Company has established strong working relationships

18  with the city planners, community redevelopment agencies and local political organizations and

19  where the existing transportation networks, particularly public transportation systems, are nearby.

20            2.    **The Debtors' Value Creation Strategies**

21                 (a)    ***Focus on the Property Needs of Specific Industries and
                              Premium Space Users.***

22

23       The Company seeks to achieve rent premiums by meeting the property needs of "premium

24  space users" such as food processing and food distribution companies whose critical business

25  functions depend on the location, zoning, tenant improvements or utilities of the leased space and

26  whose needs frequently coincide with urban environments. The ability to provide premium space

27  users with facilities and services that maximize their operating profits may allow a landlord to

28  minimize leasing risk and charge rents that, net of costs incurred to provide such facilities and

346506.1

1    services, exceed rents that could be obtained from tenants that are relatively indifferent to location

2    or amenities. The Company will continue to identify premium space users in the Company's

3    markets and work to understand and fulfill their evolving requirements.

4                    **(b)    *Focus on Sub-Markets that are Transitioning from Large to
                              Small Tenants.***

5

6        The Company acquires, modernizes and subdivides large, older single-tenant industrial and

7    mixed-use buildings. In many urban markets, large manufacturers and distributors have relocated

8    their businesses, often vacating such buildings for overseas or suburban locations. Taking their

9    place are small emerging businesses and established companies that are de-centralizing their

10   operations. The Company seeks to transform large, single-tenant buildings into workplaces for

11   many small tenants by re-using a large portion of the existing facility and creatively subdividing the

12   space at a relatively low cost. This approach should allow the Company to offer competitively-

13   priced space (as compared to rental rates for new buildings) in convenient urban locations.

14                   **(c)    *Aggregate Small, Synergistic Tenants.***

15       In urban areas, the non-office tenant base includes many small businesses. Grouping similar

16   businesses together creates a marketplace that offers convenience to product buyers and a steadier

17   stream of prospective customers to the businesses. These advantages may increase tenants' business

18   profits and stability and may justify a rental premium compared to stand-alone locations. The

19   Company seeks sub-markets where there is an active, but unorganized, critical mass of similar

20   businesses that could benefit from aggregation. The Company believes this strategy should allow

21   the Company to generate higher rental income from the Company's small tenants.

22                   **(d)    *Focus on Residential Development in Appropriate
                              Locations.***

23       The Company intends to continue to develop urban residential projects on sites the

24   Company owns near transportation infrastructure and demand generators such as office buildings,

25   retail stores, restaurants, and cultural and sports venues.  In the long term, the Company believes

26   demand for residential units in downtown Los Angeles and other urban areas will continue to grow.

27

28

346506.1

1  The Company believes that ultimately their residential projects will offer desirable housing and

2  provide the Company with attractive returns on invested capital.

3            **(e)**     *Coordinate Residential and Industrial Development in Shifting Urban Markets.*

4

5      The Company believes that much of the downtown Los Angeles industrial space is aging or

6  obsolete and not properly serving its industrial users. The Company seeks properties within

7  historically industrial districts that are located in emerging housing sub-markets. As active

8  developers and operators of industrial/distribution space, the Company believes they have greater

9  ability to acquire such opportunities quickly and at lower industrial/distribution pricing than

10  residential-only developers. The Company also seeks the purchase of industrial/distribution

11  properties in areas near downtown but not in emerging residential markets. The Company sees

12  opportunities to better serve industrial users they displace through residential redevelopment by

13  providing them with more suitable space in commercial projects of the Company in such near

14  downtown areas. The Company believes coordinating residential and industrial development in this

15  manner facilitates the Company's land assemblage.

16            **(f)**     *Pursue Opportunities Offered by Governmental Organizations.*

17      In the State of California, the state government, regional agencies and local community

18  redevelopment agencies created under the California Community Redevelopment Law control a

19  large amount of surplus property in urban areas and have substantial land use discretion. These

20  organizations often must dispose of their surplus property in a manner that encourages socially

21  responsible development. The Company believes that such organizations present some of the more

22  compelling opportunities in California urban areas because of the size or location of the parcels

23  they control or because the acquisition terms for such parcels may be more favorable than typical

24  private seller terms. The Company believes their management's advocacy of socially-minded

25  solutions for urban real estate problems gives the Company a competitive advantage to be selected

26  by these government organizations, thereby creating opportunities to acquire properties at attractive

27  values.

28

346506.1

1

          **(g)    *Aggregate Separate Parcels and Acquire Controlling
Locations in Developing Neighborhoods.***

2

3

In the Company's markets, large, contiguous development properties are infrequently for

sale and, when available, sell for prices that often reflect their potential value. The Company seeks

4

to acquire smaller, separate real estate parcels over time with a view toward aggregating those

5

smaller parcels into one property that can accommodate a larger-scale development project. To

6

acquire the individual parcels and reduce the Company's holding costs, the Company sometimes

7

purchases an option contract or signs a long-term purchase agreement that gives the Company the

8

right to acquire the land at a specific price on or before a specified future date. The Company may

9

also acquire a strategically sized or configured parcel in a city block that would be instrumental in

10

any material redevelopment of the block, thereby deterring any substantial competing development

11

and creating an incentive for owners of adjacent parcels to sell.

12

          **3.    The Company's Operating Strategies**

13

          **(a)    *Efficiently Manage the Development and Operation of the
Company's Projects.***

14

15

The Company employs a mixture of project development management and asset

16

management strategies. First, the Company keeps direct control over critical development functions

17

in which they believe they have valuable expertise and that require significant local knowledge,

18

such as identification and acquisition of projects and land use entitlement. Second, because of the

19

widely varying nature of the Company's projects, the Company generally retains expert third-party

20

general contractors to manage the construction of the Company's projects, and the Company

21

employs in-house project managers to supervise the construction management process closely.

22

Third, once a project is complete, the Company manages its operation and leasing activities, or the

23

Company retains third-party sales companies in the case of for-sale projects. The Company will

24

engage third-party leasing agents when they have superior tenant relationships or knowledge of the

25

sub-markets in which the Company's projects are located.

26

          **(b)    *Seek Interim Revenues from Properties.***

27

The public approval process for certain projects may last two years or longer. During the

28

assemblage or approval process, the Company takes steps to permit the Company to generate

346506.1

39

1   interim revenues and allow the Company to terminate leases promptly or relocate tenants when the

2   Company obtains the final assemblage piece or approvals. The Company accomplishes this by

3   converting long-term leases to month-to-month leases and seeking additional interim income from

4   additional sources, such as surface parking or by temporarily licensing space to entertainment

5   companies for on-location filming. In addition, because the Company has a roster of month-to-

6   month tenants who have shown a willingness to relocate at the Company's discretion, the Company

7   has the flexibility to generate interim revenues by relocating tenants from a property commencing

8   redevelopment construction to another property that is not currently being redeveloped.

9                   **(c)**     ***Sell or Recapitalize the Company's Projects to Realize***
                              ***Value.***

10          The Company has engaged in a business strategy whereby it may dispose of or recapitalize

11   some portion of the Company's projects from time to time once they reach what the Company

12   believes to be their maximum near-term value and may redeploy some or all of the Company's

13   equity and profits into other real estate investments that the Company believes have a greater long-

14   term potential for economic appreciation.  In addition, in response to the changing economy and as

15   part of its business strategy to emerge as a reorganized company from Chapter 11, the Company

16   continues to consider multiple scenarios to determine the best use of its real property assets,

17   including but not limited to the sale or refinancing of some portion of its assets to meet its financial

18   obligations under the Plan, to reduce obligations to creditors, to provide capital for its business and

19   to ensure the long-term sustainability of the business.

20   **D.      PREPETITION CAPITAL STRUCTURE OF THE COMPANY**

21          **1.     MMPI**

22          MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue

23   Code.  Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately

24   owned by MMPI's directors and executive officers with Richard Meruelo owning the largest

25   amount of shares (approximately 39,911,378).  The other 47.8% of MMPI's stock is publicly

26   owned and, prior to April 2009, was traded on the NASDAQ stock exchange.  The stock is

27   presently trading on the Over the Counter Bulletin Board.

28

346506.1

### (a)    *MMPI Initial Public Offering*

Prior to MMPI's formation in 2006, its predecessor business' management team was one of only approximately thirteen designated groups participating in the California Urban Real Estate ("C.U.R.E.") program sponsored by the State of California Public Employee's Retirement System ("CalPERS"). CalPERS provided the predecessor business with capital through the C.U.R.E program in the form of a revolving credit facility in the principal amount of approximately $150 million. The CalPERS credit facility was obtained through a single borrower and the funds were disbursed among the entities collectively comprising the predecessor business.

Thereafter, MMPI was formed on or about July 5, 2006, and MMPLP was formed on or about September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's common stock. The formation transaction and the IPO were designed to allow MMPI to acquire and continue the operations of its predecessor entities, pay down existing mortgage debt, pay off the mezzanine loan facility from CalPERS, provide capital for future acquisitions, fund future development costs, and establish a capital reserve for general corporate purposes. Between January 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000 shares of common stock at $10.00 per share. MMPI raised approximately $425.7 million, after underwriting discounts but before expenses related to the IPO. A substantial portion of the proceeds was used to pay off the debt owed to CalPERS. On December 31, 2008, there were approximately 88.1 million shares of common stock outstanding.

### (b)    *MMPI Common Stock*

The authorized capital stock of MMPI consists of up to 200,000,000 shares of common stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred stock, $.01 par value per share. As of November 20, 2009, there are 87,845,789 shares of Common Stock issued and outstanding held by approximately sixty holders of record. Holders of Common Stock have no right to convert their Common Stock into any other securities. The Common Stock has no preemptive or other subscription rights. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are duly authorized, validly issued, fully paid and nonassessable.

346506.1

1

### (c)   *MMPI's Equity Incentive Plan*

2    Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity

3  Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive

4  Plan ("LTIP") Units and other awards as part of its employee compensation packages.  The LTIP

5  units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be

6  converted into MMPLP's common units and consequently become redeemable by the Holder on a

7  one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of such

8  common stock.  MMPI initially reserved 2,277,500 shares of common stock for issuance of awards

9  under the Equity Incentive Plan.  As of June 30, 2009, there remain 1,083,334 shares available from

10  the initial reservation.

11

### 2.   Corporate Structure of the Other Debtors

12    MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP.

13  The remaining 0.4% limited partnership units are owned by certain members of MMPI's

14  management team who obtained their interests through the LTIP available to certain personnel as

15  part of their compensation packages.

16    MMPLP owns 100% of the common stock of MM Construction, 99% of the membership

17  units in MM Management and 99% of the membership units in Funes Architecture, LLC ("Funes").

18  The remaining membership units in MM Management and Funes are owned by MM Construction.

19    MMPLP also owns 100% of the membership units in MMP Ventures.  MMP Ventures, in

20  turn, owns 100% of the stock or membership units in a number of subsidiary corporations and

21  limited liability companies referred to as Property Level Debtors because they are the entities which

22  hold title to the various real properties and real estate projects developed and operated by MMPI

23  through MMPLP.

24

### E.   MATERIAL PROCEEDINGS

25    There are several different circumstances that may create liability for the Company in the

26  future, to the extent they are not discharged under the Plan as more fully discussed in Section VII.J.

27

28

346506.1

1

### 1.    Potential Government Tax Audits

The Company is subject to audit and review by federal and state taxing authorities.  An adverse audit report could result in the Company being assessed additional tax liability.  The Company is not aware of any such pending audits and has filed all of its tax returns.

### 2.    Indemnification Claims

As is necessary and customary in the normal course of business, certain of the Company's contracts contain indemnification provisions that could require the Company to make payments for Claims made against customers or employees of the Company, including management.  Additionally, the Articles and Bylaws of MMPI provide that MMPI shall indemnify its officers and directors to the fullest extent permitted by law.  Pursuant to its contractual and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of its Board of Directors with respect to costs and expenses that may be incurred by them in conjunction with the performance of their employment or role as a member of the Board of Directors.  These indemnification provisions may result in material liability to MMPI or other of the Debtors.  However,  the Company maintains various insurance coverages to reduce the exposure of the Company.

### III.

### EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

Prior to the Petition Date, the Company's primary objective was to maximize return on investment through development and redevelopment activities, which activities require significant amounts of capital.  The Company experienced significant, recurring cash shortfalls from (a) operating activities, (b) recurring investment activities such as carrying costs for interest payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing rental properties.  Shortfalls in operating capital have been funded by the refinance or sale of real property assets, and the use of the proceeds for operating and reinvestment in the purchase of replacement real property assets.

The economic climate and associated disruption in the debt and equity capital markets shortly before the Petition Date were extremely challenging for the Company.  During 2008, the

43

1   Company took significant steps in an effort to improve its financial position.  Among other things,

2   the Company sold three rental projects and three development projects, for an aggregate sales price

3   of approximately $110.6 million.  The Company also completed nine acquisitions or conversions of

4   development projects to rental projects, resulting in the availability of 949,905 net rental square

5   footage.  However, the Company's efforts could not overcome the collapse of credit markets and

6   the American banking system that took place in the fall of 2008.  On or about October 1, 2008, the

7   Company suspended development of twelve construction projects.

8        A number of the Company's loans secured by real property matured prior to the Petition

9   Date or were to mature soon thereafter.  Among other things, the Company was unable to extend or

10  refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or

11  March 1, 2009, including two secured by the property housing the Company's corporate

12  headquarters, and one which is secured by the Union Lofts project owned by MMP 760 S. Hill

13  Street.  In total, the Company had twelve loans that were set to mature during 2009 with an

14  aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization

15  on other long-terms loans.

16       In addition, prior to the Petition Date, two lenders filed lawsuits seeking, among other

17  things, the appointment of a receiver.  On or about March 4, 2009, California Bank & Trust filed a

18  complaint against 788 South Alameda and MMPI for, among other things, judicial foreclosure and

19  the appointment of a receiver.  In addition, on or about March 17, 2009, Chinatrust Bank filed a

20  complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure

21  and the appointment of a receiver.

22       During the year prior to the Petition Date, the Company tirelessly investigated borrowing

23  additional capital in order to continue to fund its development projects and, if necessary, operating

24  expenses.  However, the Company was not able to borrow or refinance at conventional or otherwise

25  acceptable rates, in large part, due to the deterioration of the credit markets that appears to have

26  affected all banks and other lenders.  Lenders were frequently lending at lower loan-to-value ratios,

27  taking longer to make lending decisions and generally applying more stringent underwriting

28  standards.  During the last few months prior to the Petition Date, a number of lenders demanded

346506.1

1    exorbitant fees, principal reduction payments and/or other burdensome terms as consideration for

2    their consent to extend the terms of their loans.  However, given that the Company had an

3    approximately $28.0 million annual shortfall in its combined operating and development activities,

4    and because of the turmoil in the credit markets especially for development financing, the Company

5    needed significant loan concessions from its lenders to survive.

6        The existence of open credit markets has been important to the Company's business strategy

7    of financing acquisitions and development in the ordinary course of its business.  In addition, an

8    open credit market is important to purchasers of the Company's properties.  The Company's

9    management team anticipates that credit markets will improve in the future in light of, among other

10   things, the hundreds of billions of dollars that have been infused into the banking systems by the

11   federal government.

12       Due to the Company's inability to obtain additional capital, and the unwillingness of current

13   lenders to extend the terms of maturing loans on acceptable terms, the fifty-four jointly

14   administered MMPI Debtors sought relief under Chapter 11 of Bankruptcy Code to reorganize their

15   financial affairs and prevent the piecemeal dismemberment of their business to the detriment of

16   their creditors.

17       Thereafter, on or about March 30, 2009, during the construction phase of MM 845 S.

18   Flower's condominium Project, Canpartners declared a default under its Loan Agreement with MM

19   845 S. Flower asserting that the filing of the bankruptcy case by MMPI, the guarantor of MM 845

20   S. Flower's obligations to Canpartners, constituted an event of default.  Canpartners did not identify

21   any event of default other than the filing of MMPI's bankruptcy case.  On July 22, 2009,

22   Canpartners unilaterally imposed additional conditions on its consent to future construction draw

23   payments, which endangered the progress of the 705 W. 9th Street project.  While MM 845 S.

24   Flower and Canpartners engaged in negotiations with respect to the loan, it became clear that both

25   MM 845 S. Flower and Chinatown needed to seek relief under the Chapter 11 of the Bankruptcy

26   Code to protect their assets for creditors, and the bankruptcy estates of the 54 MMPI Debtors.

27

28

346506.1

# IV.

# CHAPTER 11 EVENTS

A.   **ADMINISTRATIVE ORDERS AND MATTERS**

1.   **Introduction**

On March 26 and 27, 2009, MMPI and the MMPI Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a variety of matters.  The Debtors obtained Orders of the Bankruptcy Court, inter alia, (a) authorizing, on an interim basis, the Debtors' use of cash collateral (see below for more detail), (b) authorizing the Debtors to employ and compensate legal and financial advisors, (c) authorizing the Debtors to honor certain obligations to employees and to continue employee benefit plans in effect, (d)  permitting the Debtors, on an interim basis, to continue to utilize their cash management systems, (e) establishing procedures for the Debtors to ensure continued provision of utility services; (f) limiting the scope of notice required; (g) extending the time to file schedules and statement of financial affairs; and (h) directing the joint administration of the Cases of the MMPI Debtors (MM 845 S. Flower and Chinatown are not jointly administered).  Subsequently, the Bankruptcy Court established September 24, 2009, as the last day for creditors and parties in interests to file proofs of Claim and proofs of interest against the MMPI Debtors.  The Debtors filed the required monthly operating reports on a timely basis.  The Debtors were authorized and continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

On September 3, 2009, MM 845 S. Flower and Chinatown filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a variety of matters.  The MM 845 S. Flower Debtors obtained Orders of the Bankruptcy Court, inter alia, (a) authorizing the Debtors' to use of cash collateral (see below for more detail), (b) authorizing the Debtors to employ and compensate legal and financial advisors, (c) establishing procedures for the Debtors to ensure continued provision of utility services; (d)

346506.1

1  limiting the scope of notice required; (e) extending the time to file schedules and statement of

2  financial affairs; and (f) setting a bar date of October 30, 2009 as the last day for creditors and

3  parties in interest to file proofs of Claim and proofs of interest.  The MM 845 S. Flower Debtors'

4  motion for joint administration of the cases with the MMPI Debtors' cases was denied.  The MM

5  845 S. Flower Debtors were authorized and continue to operate their business and manage their

6  properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7             2.       **The MMPI Cash Collateral Motion and Corresponding Orders**

8                           **(a)     *MMPI Debtors' Cash Collateral Motion and Order***

9              By their Motion for Entry of Interim and Final Orders Authorizing Debtors to Use Cash

10  Collateral, (the "MMPI Cash Collateral Motion") the MMPI Debtors sought permission to use the

11  cash collateral of various lenders.  Oppositions were filed by most of the MMPI Debtors' lenders.

12  The Bankruptcy Court entered a series of interim orders authorizing such use and continued to hear

13  testimony and consider evidence concerning the MMPI Debtors' proposed use of cash collateral on

14  a final basis.  These hearings concluded in October 2009.  The Bankruptcy Court ruled in the

15  MMPI Debtors' favor and entered a final order authorizing the use of the cash collateral of the

16  following lenders through March 31, 2009: BofA, CBT, Capmark, Cathay, Chinatrust, Legendary,

17  Stanford, UCB (now succeeded by East West), and Chamlian.  In making that ruling, the

18  Bankruptcy Court determined that the following lenders were entitled to additional adequate

19  protection and are therefore entitled to a replacement lien in one or more of the Debtors'

20  unencumbered real properties:  Capmark, CBT, Chinatrust, Legendary with respect to 425 W. 11th

21  Street; 3rd & Omar Street; 420 Boyd Street, and East West with respect to 2640 Washington.

22                           **(b)     *MM 845 S. Flower Debtors' Cash Collateral Motion and
                                        Order***

23

24              MM 845 S. Flower also filed its Motion for Entry of Interim and Final Orders Authorizing

25  Debtor to Use Cash Collateral (the "845 S. Flower Cash Collateral Motion") seeking permission to

26  use the cash collateral of Canpartners.  Canpartners opposed the requested relief.  By its order

27  entered October 23, 2009, the Bankruptcy Court ruled in favor of MM 845 S. Flower and

28  authorized it to use the cash collateral of Canpartners on a final basis to pay the costs and expenses

346506.1

1  of construction of 845 S. Flower's condominium Project and to pay the first and second installment

2  of the Debtor's 2009-2010 real property taxes.

3  ### 3.    **MMPI Debtors' Single Asset Real Estate ("SARE") Motion**

4  The MMPI Debtors filed a motion seeking an order determining that none of the fifty-four

5  MMPI Debtors are subject to the single asset real estate provisions of Sections 101(51B) and

6  362(d)(3) of the Bankruptcy Code.  Two lenders (BofA and Cathay) filed motions seeking a

7  determination from the Bankruptcy Court that MG South Park, MMP 760 S. Hill Street and

8  Alameda Produce Market are subject to the SARE provisions of the Bankruptcy Code.  The MMPI

9  Committee supported the MMPI Debtors' position.  Fourteen oppositions and joinders in opposition

10  were filed by various lenders.  In June 2009 the Bankruptcy Court ruled in favor of the MMPI

11  Debtors, holding that the MMPI Debtors are not subject to the SARE provisions of the Bankruptcy

12  Code.  BofA has appealed from the Bankruptcy Court's SARE determination. That appeal remains

13  pending before the United States District Court for the Central District of California, but is stayed

14  pending a ruling by the Ninth Circuit Court of Appeals on BofA's petition for authority to appeal

15  directly to that court.

16  ### 4.    **Motions for Relief from Stay**

17  The following motions for relief from stay have been filed by lenders to pursue their

18  state law remedies against various real properties owned by the Debtors:

19  - PNL moved for relief from stay with respect to the real property owned by MG 2001 – 2021

20  W. Mission located in Pomona.  MG 2001 – 2021 W. Mission and PNL are engaged in

21  ongoing settlement discussions and have continued the hearing on PNL's motion from time

22  to time.  The hearing is currently scheduled for January 28, 2010;

23  - BofA moved for relief from stay with respect to real property owned by MMP 760 S. Hill

24  Street and commonly known as 325 West 8th Street and 760 South Hill Street, Los Angeles

25  (the Union Lofts).  The Bankruptcy Court denied the motion subject to the Debtor's

26  provision of certain adequate protection to BofA;

27

28

346506.1

1     • BofA moved for relief from the automatic stay with respect to certain real properties owned

2       by MG South Park located in downtown Los Angeles. The Bankruptcy Court ruled in favor

3       of the Debtors and denied BofA's motion;

4     • UCB moved for relief from the automatic stay with respect to real property owned by 2640

5       Washington Boulevard. Pursuant to an agreement between the Debtors and UCB, the

6       motion was granted for the sole and limited purpose of permitting UCB to record a notice of

7       default with respect to the real property. The Debtor 2640 Washington agreed to pay, out of

8       cash collateral, the first and second installments of real property taxes for the 2009 – 2010

9       fiscal year. UCB's motion was withdrawn in all other respects;

10    • Legendary moved for relief from the automatic stay with respect to real property owned by

11      MM 3rd & Omar Street located in downtown Los Angeles. In the context of the

12      Bankruptcy Court's rulings on the MMPI Cash Collateral Motion, the Debtors offered

13      Legendary a replacement lien in postpetition cash collateral, payment of normal and

14      ordinary expenses to maintain the property and the payment of real property taxes for the

15      2009 – 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide

16      an adequate protection lien in favor of Legendary on one or more of the Debtors'

17      unencumbered properties. In light of the rulings in connection with the MMPI Cash

18      Collateral Motion, the Bankruptcy Court denied Legendary's motion, subject to the

19      provision of such adequate protection;

20    • Legendary moved for relief from the automatic stay with respect to real property owned by

21      both MG 1500 Griffith Avenue and MG 4th Street Center and located in downtown Los

22      Angeles. The Bankruptcy Court denied Legendary's motion;

23    • Legendary moved for relief from the automatic stay with respect to real property owned by

24      Merco Group, commonly known as Sci-Arc, and located in downtown Los Angeles. The

25      Bankruptcy Court denied Legendary's motion;

26    • Legendary moved for relief from the automatic stay with respect to real property owned by

27      MM 420 Boyd Street and located in downtown Los Angeles. In the context of the

28      Bankruptcy Court's rulings on the MMPI Cash Collateral Motion, the Debtors offered

1    Legendary a replacement lien in postpetition cash collateral, payment of normal and

2    ordinary expenses to maintain the property and the payment of real property taxes for the

3    2009 – 2010 fiscal year.  In addition, the Bankruptcy Court required the Debtors to provide

4    an adequate protection lien in favor of Legendary on one or more of the Debtors'

5    unencumbered properties.  In light of the rulings in connection with the MMPI Cash

6    Collateral Motion, the Bankruptcy Court denied Legendary's motion subject to the

7    provision of such adequate protection;

8    • Legendary moved for relief from the automatic stay with respect to real property owned by

9    Merco Group (Sky-Arc) and MG Little J and located in downtown Los Angeles.  The

10    hearing on that motion is scheduled for December 9, 2009;

11    • Legendary moved for relief from the automatic stay with respect to real properties owned by

12    MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles.  The

13    hearing on that motion is scheduled for December 9, 2009;

14    • Legendary moved for relief from the automatic stay with respect to real property owned by

15    MG 425 W. 11th Street and located in downtown Los Angeles.  In the context of the

16    Bankruptcy Court's rulings on the MMPI Cash Collateral Motion, the Debtors offered

17    Legendary a replacement lien in postpetition cash collateral, payment of normal and

18    ordinary expenses to maintain the property and the payment of real property taxes for the

19    2009 – 2010 fiscal year.  In addition, the Bankruptcy Court required the Debtors to provide

20    an adequate protection lien in favor of Legendary on one or more of the Debtors'

21    unencumbered properties.  In light of the rulings in connection with the MMPI Cash

22    Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied

23    Legendary's motion for relief from the automatic stay subject to the provision of such

24    adequate protection;

25    • Vahan and Anoush Chamlian moved for relief from the automatic stay with respect to real

26    property owned by MMP 2131 Humboldt Street near downtown Los Angeles.  The

27    Bankruptcy Court ruled in favor of the Debtors and denied the motion;

28

346506.1

1    • Chinatrust moved for relief from the automatic stay with respect to real property owned by

2       MG 3185 E. Washington Boulevard, among other things.  In the context of the Bankruptcy

3       Court's rulings on the MMPI Cash Collateral Motion, the Debtors offered Chinatrust a

4       replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to

5       maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year.

6       In addition the Bankruptcy Court required the Debtors to provide an adequate protection

7       lien in favor of Chinatrust on one or more of the Debtors' unencumbered properties.  In light

8       of the rulings in connection with the MMPI Cash Collateral Motion, the Bankruptcy Court

9       ruled in favor of the Debtors and denied Chinatrust's motion for relief from the automatic

10      stay subject to the provision of such adequate protection;

11   • The Stanford Group moved for relief from the automatic stay with respect to the real

12      property owned by 908 8th Street located in downtown Los Angeles.  The hearing on that

13      motion is scheduled for December 10, 2009; and

14   • Canpartners moved for relief from the automatic stay with respect to the real property and

15      condominium Project owned by MM 845 S. Flower located in the South Park area of

16      downtown Los Angeles.  By stipulation of the parties, the initial hearing on that motion has

17      been re-set for January 7, 2010.

18          In addition to the motions filed by the Debtors' lenders, a group consisting of three

19   individuals have moved for relief from the automatic stay to seek authority to prosecute a civil

20   action filed by them in Los Angeles Superior Court and to clarify that they have authority to pursue

21   alleged labor Claims against certain current and former employees and board members of MMPI,

22   Alameda Produce Market and 788 South Alameda.  The matter has been continued from time to

23   time as the parties explore settlement.  A continued hearing on that motion is scheduled for

24   December 17, 2009.

25          Also, in addition to the foregoing motions, in April 2004, the Los Angeles County

26   Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of

27   eminent domain, certain property of the Debtors.  In September 2008 the trial court dismissed the

28   action and the MTA appealed.  Thereafter, the Debtors filed their chapter 11 petitions and the

51

1  automatic stay prevented further prosecution of the appeal.  The Debtors and the MTA entered into

2  a stipulation to modify the automatic stay to permit the prosecution and defense of the appeal.  The

3  order approving the stipulation was entered in August 2009.  The matter is still pending.

4  **5.  The Debtors' Compromises With Various Lenders**

5  The Debtors have engaged in extensive settlement discussions with their lenders as to their

6  Claims under Loan Documents and as of the filing of this Disclosure Statement, the Debtors have

7  reached settlements with PCB and Murakami.  The Bankruptcy Court approved the Debtors'

8  compromise with PCB and the essential terms of that settlement are reflected in the Plan,

9  specifically the Plan's treatment of PCB's Class 51A-4 Claim in Section III.B.2 of the Plan.

10  The Debtors' motion to approve their settlement with Murakami is set for hearing on

11  December 9, 2009.  The essential terms of that settlement are reflected in the Plan, specifically the

12  Plan's treatment of Murakami's Class 37A-4 Claim in Section III.B.2 of the Plan.

13  Subject to Bankruptcy Court approval and finalization of documents memorializing their

14  agreement, the Debtors and Imperial have agreed to a settlement of certain claims.  Some of the

15  essential terms of that agreement in principal are reflected in the Plan's treatment of Imperial's

16  Claims in Classes 35A-2, 38A-2 and 51A-2 in Section III.B.2 of the Plan.

17  **6.  Unexpired Leases and Executory Contracts**

18  With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired nonresidential

19  lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is the lessee and

20  Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December 1, 2000, the

21  successor-in-interest to Evelyn Hammond, is the lessor.

22  **7.  Summary of Claims Process, Bar Date and Claims Filed**

23  **(a)  *Schedules and Statements of Financial Affairs***

24  On or before June 12, 2009 the fifty-four jointly administered MMPI Debtors filed with the

25  Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the

26  "Schedules and Statements") as of their March 26, 2009 or March 27, 2009 Petition Date.  On

27  September 30, 2009 MM 845 S. Flower and Chinatown filed with the Bankruptcy Court their

28  Schedules and Statements reflecting their assets, liabilities and financial affairs as of their

346506.1

52

1  September 3, 2009 Petition Date.  Neither the schedules nor the statement of financial affairs of any

2  of the Debtors have been amended.

3      For financial reporting purposes, MMPI prepares consolidated financial statements that are

4  filed with the SEC and that are audited annually.  Unlike these consolidated financial statements,

5  the Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the

6  Debtors' non-audited books and tax records.  This means that audited financial statements and

7  supporting schedules have not been prepared for each Debtor.

8              **(b)**    ***Claims Bar Date***

9      On July 22, 2009, the Bankruptcy Court entered an order in the MMPI case (the "MMPI Bar

10  Date Order") establishing the general deadline for filing proofs of Claim against the 54 jointly

11  administered MMPI Debtors (the "MMPI Bar Date").  The deadline established by the Bankruptcy

12  Court was September 24, 2009.  On September 16, 2009, the Bankruptcy Court entered orders in

13  the MM 845 S. Flower case and the Chinatown case (the "Flower Bar Date Order" and the

14  "Chinatown Bar Date Order," respectively) establishing the general deadline for filing proofs of

15  Claim against MM 845 S. Flower (the "Flower Bar Date" and the "Chinatown Bar Date,"

16  respectively).  The deadline established by the Bankruptcy Court was October 30, 2009 for both the

17  MM 845 S. Flower and the Chinatown cases.

18      The MMPI, Flower and Chinatown Bar Dates established the deadline for Claims, including

19  Claims of governmental units, but excluding certain other Claims, including Claims based on the

20  rejection of executory contracts and unexpired leases as to which the bar date is the later of: (1) the

21  applicable Bar Date; or (2) the first business day that is at least thirty (30) calendar days after (a) the

22  mailing of notice of the entry of the order first approving the rejection of such contract or lease, (b)

23  the mailing of notice of the entry of an order or judgment avoiding a transfer, or (c) the date any

24  relevant tax Claim first arises.  The Debtors provided notice of the MMPI, Flower and Chinatown

25  Bar Dates by mailing a notice of such Bar Dates.

26              **(c)**    ***Proofs of Claim and Other Claims***

27      According to the Debtors' records, a total of 404 Claims were filed against the Debtors

28  asserting Claims in the total face amount of approximately $1,079,772,213.  The Claims scheduled

346506.1

1  by the Debtors and Claims filed by claimants in each Class is summarized in Exhibits "H.2" to

2  "H.8" attached hereto.  The amounts listed on those exhibits represent the current state of the

3  Debtors' computation of the Claims filed and scheduled, and do not reflect amounts which have

4  been paid to date or which the Debtors have otherwise resolved through deposit or stipulation.

5  Numerous Claims were asserted by various alleged creditors in unliquidated amounts, i.e.

6  Claims that did not contain a specific dollar amount.  The Debtors believe that certain Claims that

7  have been asserted are without merit and intend to object to all such Claims.  Other significant

8  categories of disputed Claims include certain taxing authorities that are requesting payments far in

9  excess of those the Debtors believe to be owed to such authorities.

10  **(d)    The Debtors' Stipulation with the OCC Regarding Unsecured
Claims**

11

12  The Debtors entered into a stipulation with the OCC by which they agreed that to the extent

13  any party files a proof of Claim in any of the MMPI Debtors' Chapter 11 Cases prior to the MMPI

14  Bar Date, such proof of Claim shall be deemed to have been timely filed in the proper Debtor's

15  Chapter 11 Case and against the proper Debtor regardless of the name of the particular Debtor or

16  case number identified in the proof of Claim.  The Bankruptcy Court approved that stipulation.

17  Capmark has appealed from the order approving the stipulation and that appeal remains pending

18  before the District Court for the Central District of California.

**8.    Other Administrative Matters**

19  Early in the cases, the Debtors met with and were interviewed by the staff attorney and other

20  representative of the Office of the United States Trustee (the "US Trustee").  During the Cases, the

21  Debtors have complied with certain requirements promulgated by that office with respect to the

22  filing of monthly operating and cash reports.  In May and June, 2009 the MMPI Debtors appeared

23  at the Section 341(a) meeting of creditors - known as the initial creditor meeting - in the cases of

24  the fifty-four jointly administered MMPI Debtors to answer questions of creditors and parties in

25  interest.  On October 2, 2009 MM 845 S. Flower and Chinatown appeared at the Section 341(a)

26  meeting of creditors conducted in their cases.  The US Trustee conducted each of the Section 341(a)

27  meetings.

28

346506.1

1    On April 22, 2009 the US Trustee appointed the Committee of Unsecured Creditors in the

2    MMPI cases. Shortly thereafter, the Debtors met with the MMPI Committee to discuss the

3    Debtors' business and proposed Chapter 11 Plan. The Debtors and the MMPI Committee have

4    been in close communication throughout these cases.

5    Various professionals have been retained and employed in the Chapter 11 Cases and will be

6    paid pursuant to the terms of the Plan. Danning, Gill, Diamond & Kollitz, LLP has been employed

7    as general reorganization counsel for all of the Debtors in the Chapter 11 Cases. The following

8    professionals also have been employed by the MMPI Debtors: FTI Consulting, Inc., as financial

9    advisors ("FTI"), Ernst & Young as independent auditors and tax advisors, DLA Piper LLP (US) as

10   special securities and litigation counsel, and Waldron & Associates, Inc. as real estate appraiser.

11   SulmeyerKupetz, APC was employed as general counsel by the MMPI Committee in the MMPI

12   Debtors' cases. Cushman & Wakefield of California, Inc. has been employed as real estate

13   appraiser by MM 845 S. Flower. In addition, certain real estate brokers have been or will be

14   employed in the Chapter 11 Cases to market and sell certain properties but will be paid out of the

15   proceeds of the sale of the properties as opposed to through the Plan.

16   **B.      REAL ESTATE SALES SINCE COMMENCEMENT OF CASE**

17   Since the commencement of the cases, the Debtors, have formulated and implemented a

18   strategy with respect to the Debtors' real estate assets. As part of this strategy, the Debtors have

19   considered multiple scenarios in the categorization and use of their real estate assets providing for a

20   balance between creditor payment and the creation of an enterprise with the greatest chance of

21   long-term sustainability and success. The Debtors determined that certain assets should be sold to

22   reduce the immediate obligations to creditors, to provide capital for the business and to ensure the

23   long-term sustainability of the business.

24   The following properties have been sold, pursuant to orders entered by the Bankruptcy

25   Court, since the Petition Date:

26   • 5500 Flotilla Street, Los Angeles, previously owned by Debtor Meruelo Maddux – 5500

27   Flotilla Street, LLC ("MM 5500 Flotilla Street") to Camfield Partners, LLC for $210,000;

28

346506.1

55

1     •  146 East Front Street, Covina, previously owned by Debtor Merco Group – 146 East Front

2          Street, LLC ("MG 146 E. Front Street") to Vartan and Dzovig Koroghlian for $1,114,450;

3     •  2040 Camfield Avenue, Commerce, previously owned by Debtor Merco Group – 2040

4          Camfield Avenue, LLC ("MG 2040 Camfield Avenue") to Camfield Partners, LLC for

5          $4,790,000; and

6     •  500 Mateo Street, Los Angeles, previously owned by Debtor  Meruelo Maddux – 500 Mateo

7          Street, LLC ("MM 500 Mateo Street") to Mydland Enterprises, LLC for $1,900,000.

8     **C.    MM 845 S. FLOWER'S PENDING SALE MOTION**

9     In addition to the consummated real estate sales discussed above, on November 18, 2009,

10   MM 845 S. Flower filed a motion by which  it seeks  authorization from the Bankruptcy Court to

11   engage in a sale program (the "Flower Sale Motion") to sell individual condominium units in MM

12   845 S. Flower's 35-story luxury residential condominium  project (the "Project").  In the Flower

13   Sale Motion, MM 845 S. Flower seeks authorization to conduct a one-day sale event of

14   approximately 48 of the 214 condominium units, comprising six floors of the Project (the "Initial

15   Sale Event").  Following the Initial Sale Event, MM 845 S. Flower will engage in a conventional

16   sales program for approximately forty-eight additional units through June 30, 2010, unless extended

17   as requested in the motion.  MM 845 S. Flower has sought permission to retain Kennedy Wilson

18   Auction Group, Inc. to be the broker for the sales and conduct the auction and has sought

19   authorization to provide seller financing to third party purchasers of the condominium units up to an

20   aggregate amount of financing of $20 million.  In addition, Chinatown has also filed a motion to

21   provide a priming lien on its real property as security for a bond to be obtained by MM 845 S.

22   Flower to facilitate issuance of the White Report for the Property.  If the Flower Sale Motion is

23   approved, the Debtors believe that by June 30, 2010, approximately 45% of the units

24   (approximately ninety-six or so) in the Project will be sold.  The Debtors believe that, at that point,

25   if it is in the best interests of the MM 845 S. Flower estate, it will have the ability to continue to sell

26   condominium units and that such sales activity will provide MM 845 S. Flower with multiple

27   options for paying creditors and to repay in full the debt to Canpartners (the "Canpartners Debt") in

28

346506.1

1 │ accordance with the Plan, including by potentially refinancing the remaining balance of the

2 │ Canpartners Debt.   The Flower Sale Motion is set for hearing on December 17, 2009.

3 │ **D.    THE CHINATOWN ADVERSARY PROCEEDING**

4 │ On October 19, 2009, Canpartners filed complaints for declaratory relief against Chinatown

5 │ (adv. no. 1:09-ap-01437-KT) and 845 S. Flower (adv. no. 1:09-ap-01435-KT), seeking declaratory

6 │ judgments as to the validity and extent of Canpartners' lien on Chinatown's real property.

7 │ Canpartners alleged that a deed of trust provides that Chinatown's real property secures payment of

8 │ 845 S. Flower's indebtedness to Canpartners.  Canpartners further alleged that 845 S. Flower has

9 │ defaulted under said deed of trust.  Canpartners requests that the Bankruptcy Court enter an order:

10 │ declaring that Canpartners' lien on Chinatown's real property secures 845 S. Flower's indebtedness

11 │ in full; that the lien shall survive issuance of an acceptable temporary certificate of occupancy (as

12 │ defined in the operative loan documents) on the project at 845 S. Flower; and that Canpartners is

13 │ not required to release its lien due to multiple events of default.  On November 19, 2009, the

14 │ Bankruptcy Court entered its Order approving the parties' stipulation to consolidate the two

15 │ adversaries, deeming the complaint filed in 845 S. Flower's case as the sole operative complaint

16 │ (the "Chinatown Adversary").   The Debtors made demand on Canpartners that it release its liens on

17 │ the basis that 845 S. Flower has obtained an Acceptable Temporary Certificate of Occupancy and

18 │ therefore dispute Canpartners' allegations, including but not limited to, allegations regarding 845 S.

19 │ Flower's default and the extent of Canpartners' interest in Chinatown's real property.  Pursuant to

20 │ the Bankruptcy Court's November 19, 2009 Order, the Debtors' response deadline was extended to

21 │ December 7, 2009.

22 │ **V.**

23 │ **SUMMARY OF THE PLAN**

24 │ **A.    GENERAL PROVISIONS FOR TREATMENT OF CLAIMS AND**

25 │ **INTERESTS**

26 │ **1.    Unclassified Claims (Applicable to all of the Debtors)**

27 │ Certain types of Claims are not placed into voting Classes; instead they are unclassified.

28 │ They are not considered impaired and they do not vote on the Plan because they are automatically

346506.1

57

1  entitled to a specific treatment provided for them in the Bankruptcy Code. As such, the Debtors

2  have not placed the following Claims in a Class. The treatment of these Claims is provided below.

(a)    <strong>Administrative Claims</strong>

4      Administrative Claims are Claims for costs or expenses of administering the Debtors'

5  Chapter 11 Cases which are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy

6  Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a

7  particular claimant agrees to a different treatment. The following chart lists the Debtors' Section

8  507(a)(2) Administrative Claims arising from the employment of professionals and the costs and

9  the statutory fees of the Bankruptcy Court and the Office of the United States Trustee and their

10  treatment under this Plan.

| NAME | ESTIMATED AMOUNT OWED | TREATMENT |
|---|---|---|
| DANNING, GILL, DIAMOND & KOLLITZ, LLP – Reorganization Counsel to the Debtors | To Be Determined | See below. |
| SULMEYERKUPETZ – Counsel to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases of the MMPI Debtors | To Be Determined | See below. |
| FTI CONSULTING – Financial Advisors to the MMPI Debtors | To Be Determined | See below. |
| ERNST & YOUNG LLP – Independent Auditors and Tax Advisors to the MMPI Debtors | To Be Determined | See below. |
| DLA PIPER – Special Counsel to the MMPI Debtors | To Be Determined | See below. |
| Clerk's Office Fees | To Be Determined | Paid in full on the Effective Date |
| Office of the United States Trustee Fees | To Be Determined | Paid in full on the Effective Date |
| TOTAL | | |

<strong>A.    General</strong>

    Subject to the bar date provisions herein and additional requirements for professionals and

certain other entities set forth below, the surviving Reorganized Debtor shall pay to each Holder of

an Allowed Administrative Claim, on account of its Administrative Claim and in full satisfaction

thereof, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date or

as soon as practicable thereafter, unless the Holder agrees or shall have agreed to other treatment of

such Claim. Payment on an Administrative Claim which arose in the ordinary course of each

346506.1

1   Debtor's business, including Ordinary Course Professionals, will be made when such payment

2   would have become due in the ordinary course of each Debtor's business or under the terms of the

3   Claim in the absence of the Chapter 11 Cases.

4                    **B.**    **Payment of Statutory Fees**

5        On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930, as

6   determined by the Bankruptcy Court at the hearing on Confirmation, shall be paid in Cash equal to

7   the amount of such Administrative Claim.

8                    **C.**    **Bar Date for Administrative Claims**

9                         *(a)*    *General Provisions*

10       Except as provided below for (i) non-tax liabilities incurred in the ordinary course of

11   business by each Debtor and (ii) Postpetition Tax Claims, requests for payment of Administrative

12   Claims must be Filed and served on counsel for the Reorganized Debtor no later than forty-five (45)

13   days after the Effective Date, or such later date, if any, as the Bankruptcy Court shall order upon

14   application made prior to the end of such 45-day period.  Holders of Administrative Claims

15   (including, without limitation, professionals requesting compensation or reimbursement of expenses

16   and the Holders of any Claims for federal, state or local taxes) that are required to File a request for

17   payment of such Claims and that do not File such requests by the applicable bar date shall be

18   forever barred from asserting such Claims against any of the Debtors or the Reorganized Debtor or

19   any of their respective properties.

20                         *(b)*    *Professionals*

21       All professionals or other Persons requesting compensation or reimbursement of expenses

22   pursuant to any of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for

23   services rendered on or before the Effective Date (including, inter alia, any compensation requested

24   by any professional or any other Person for making a substantial contribution in the Reorganization

25   Case) shall File and serve on the Reorganized Debtor and the Creditors' Committee an application

26   for final allowance of compensation and reimbursement of expenses no later than (i) forty-five (45)

27   days after the Effective Date, or (ii) such later date as the Bankruptcy Court shall order upon

28   application made prior to the end of such 45-day period.  Objections to applications of professionals

346506.1

59

1   for compensation or reimbursement of expenses must be Filed and served on Reorganized Debtor,

2   the Creditors' Committee and the professionals to whose application the objections are addressed

3   on or before (i) fourteen days after such application is Filed and served or (ii) such later date as the

4   Bankruptcy Court shall order or upon agreement between the Reorganized Debtor and the affected

5   professional.

6       Any professional fees and reimbursements of expenses incurred by the Reorganized Debtor

7   subsequent to the Effective Date may be paid by the Reorganized Debtor without application to or

8   Order of the Bankruptcy Court.

9                   *(c)*      **Ordinary Course Liabilities**

10      Holders of Administrative Claims based on liabilities incurred post-petition in the ordinary

11   course of the Debtors' businesses, including Ordinary Course Professionals, (other than Claims of

12   governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required

13   to File any request for payment of such Claims.  Such Administrative Claims shall be assumed and

14   paid by such Reorganized Debtor pursuant to the terms and conditions of the particular transaction

15   giving rise to such Administrative Claim, without any further action by the Holders of such Claims.

16                   *(d)*    **Tax Claims**

17      All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise

18   been previously established, must be Filed on or before the later of (i) forty-five (45) days

19   following the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes

20   for such tax year or period with the applicable governmental unit.  Any Holder of any Postpetition

21   Tax Claim that is required to File a request for payment of such taxes and that does not File such a

22   Claim by the applicable bar date shall be forever barred from asserting any such Postpetition Tax

23   Claim against any of the Debtors or Reorganized Debtor, or any of their respective properties,

24   whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the

25   Effective Date.  The Debtors are paying all Postpetition Tax Claims as they come due; however,

26   certain taxing authorities conduct audits which may result in a postpetition tax liability of which the

27   Debtors are currently unaware.

28

346506.1

1

             (b)     **Priority Tax Claims**

2

      Priority Tax Claims are certain unsecured income, employment and other taxes described by

3

Bankruptcy Code Section 507(a)(8).  The Bankruptcy Code requires that each holder of such a

4

507(a)(8) priority Tax Claim receive the present value of such Claim in deferred cash payments,

5

over a period not exceeding five years after the Petition Date.  The following chart lists the Debtors'

6

Section 507(a)(8) priority Tax Claims and their treatment under this Plan.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **1.    Meruelo Maddux Properties Inc.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **Name** – IRS<br>**Type of tax** – income | $0.00 | See below. |
| **Name** – State Board of Equalization<br>**Type of tax** –  Hazardous Substance Tax | $62,220 | See below. |
| **2.    Meruelo Maddux Properties L.P.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **4.    Meruelo Maddux Construction, Inc.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **10.    Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **11.    Meruelo Maddux – 230 W. Avenue 26 LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **12.    Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **13.    Meruelo Maddux – 817-825 S. Hill Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **14.    Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **15.    Meruelo Maddux Properties – 1060 N. Vignes LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |

346506.1