industrial building consisting of approximately 424,309 net rentable square feet.  As of September 30, 2009, the improvements were not leased.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of Pomona space users.

**29.    Santa Fe Commerce Center – 2445, 2460 and 2535 East 12th Street, Los Angeles**

The subject property is owned by Santa Fe Commerce Center, Inc. ("Santa Fe Commerce Center") and is encumbered by a lien in favor of Capmark Finance, Inc., special servicer for Wells Fargo Bank, N.A., successor by consolidation to Wells Fargo Bank Minnesota, N.A. as Trustee for the Registered Certificate holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates 2002-C1 ("Capmark").  The property is located at 2445, 2460 and 2535 East 12th Street in the Southeast Industrial District of downtown Los Angeles.  It is comprised of one property totaling approximately 6.8 acres which has been improved with a three building industrial complex consisting of approximately 244,501 net rentable square feet.  As of September 30, 2009, the improvements were leased to six tenants occupying approximately 100% of the total rentable area.  The largest tenant occupies 35.7% of the total area.  The property is currently being utilized as a multi-tenant industrial space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

**30.    1009 North Citrus Avenue, Covina (Citrus Gardens)**

The subject property is owned by Meruelo Maddux Properties - 1009 North Citrus Avenue, Covina, LLC ("MMP 1009 N. Citrus Avenue") and is unencumbered.  The property is located at 1009 North Citrus Avenue in Covina, California.  It is comprised of approximately 2.5 acres of land which has been entitled for 52 residential units.  The property is currently vacant.

-41-

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 31.    817-825 South Hill Street, Los Angeles (Ullman Tower Two)

The subject property is owned by Meruelo Maddux-817-825 S. Hill Street, LLC ("MM 817-825 S. Hill Street") and is unencumbered. The property is located at 817-825 South Hill Street in the Historic Core/ Jewelry district of downtown Los Angeles. It is comprised of one property totaling approximately 1.0 acres of land being utilized as a commercial parking lot facility.

While currently being utilized as a parking facility, this property is an example of how the Company focuses its expertise and knowledge base on supplying future residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 32.    1060 North Vignes, Los Angeles (Vignes Village)

The subject property is owned by Meruelo Maddux Properties-1060 N. Vignes, LLC ("MMP 1060 N. Vignes") and is unencumbered. The property is located near the corner of North Vignes Street and North Main Street near Chinatown in downtown Los Angeles. It is comprised of one property totaling approximately 4.0 acres of land, which is currently unoccupied. Interim operating revenue is typically generated from parking revenues from film production parking.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 33.    12361 and 12385 San Fernando Road, Sylmar (San Fernando Court)

The subject property is owned by Meruelo Maddux Properties - 12385 San Fernando Road, LLC ("MMP 12385 San Fernando Road") and is unencumbered. The property is located at 12361 and 12385 San Fernando Road in Sylmar, California. It is comprised of approximately 5.5 acres of land entitled for approximately 247 residential housing units, along with retail and office space.

347973.01 [XP]    25195

This property is an example of how the Company focuses its expertise and knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 34.    801 East 7th Street, Los Angeles

Merco Group – 801 E. 7th Street, LLC owns a parking lot located at 648 S. Stamford Avenue in downtown Los Angeles that occupies approximately 0.13 acres and is unencumbered. It generates no income currently.

### 35.    1308 South Orchard, Los Angeles

The subject property is owned by Merco Group - 1308 S. Orchard, LLC ("MG 1308 S. Orchard") and is unencumbered. The subject property is located west of downtown Los Angeles. It is comprised of approximately 0.3 acres of land.

### 36.    758 Ceres Avenue, Los Angeles (Ceres Street Produce Market)

The subject property is owned by Merco Group - Ceres Street Produce, LLC ("MG Ceres Street Produce") and is unencumbered. The property is located in the industrial district of downtown Los Angeles. It is comprised of approximately 0.4 acres of land. This property is intended to be developed based upon the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

### 37.    336 West 11th Street, Los Angeles (South Park Towers)

The subject property is owned by Meruelo Maddux - 336 W. 11th Street, LLC ("MM 336 W. 11th Street") and is encumbered by a lien in favor of Legendary. The property is located at the corner of West 11th Street and South Olive Street in the South Park area of downtown Los Angeles. The property is entitled for an 80 unit residential development. It is comprised of approximately 0.7 acres of land being utilized as a parking lot.

347973.01 [XP]    25195

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 38.   915-949 South Hill Street, Los Angeles (Ullman Tower One)

The subject property is owned by Meruelo Maddux - 915-949 S. Hill Street, LLC ("MM 915-949 S. Hill Street") and is encumbered by a lien in favor of Imperial. The property is located at 915-949 South Hill Street in the South Park area of downtown Los Angeles. It is comprised of approximately 1.5 acres of land being utilized as a commercial parking lot.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 39.   900, 910 and 926 East 4th Street and 405 – 411 S. Hewitt Street, Los Angeles

The subject property is owned by Merco Group - 4th Street Center, LLC ("MG 4th Street Center") and is encumbered by a lien in favor of Legendary. The property is located at the corner of South Hewitt Street and East 4th Street in the Arts District of downtown Los Angeles. It is comprised of approximately 1.3 acres which has been improved with two buildings consisting of approximately 13,430 net rentable square feet. The improvements have been partly leased. The property is a multi-tenant industrial and distribution space facility.

This property is intended to be used by an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

### 40.   425 West 11th Street, Los Angeles (Desmond Building)

The subject property is owned by Merco Group - 425 West 11th Street, LLC ("MG 425 W. 11th Street") and is encumbered by a lien in favor of Legendary. The subject property consists of two properties located on 11th Street, a few blocks away from the Staples Center and LA Live in the South Park area of downtown Los Angeles. The two properties total approximately 0.67 acres

which has been improved with a multi-story industrial building known as the "Desmond Building" consisting of approximately 78,500 net rentable square feet.  As of September 30, 2009, the improvements were leased to a tenant occupying approximately 20.0% of the total rentable area. The other property is currently utilized as a parking lot.

Both the improved and unimproved parts of this property are intended to be redeveloped based on the Company's focus on supplying residential units to individuals.  This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**41.** **West 11th Street and South Grand Avenue, Los Angeles (South Park Towers, TransAmerica Lofts & Olive Street Towers)**

The subject property is owned by Merco Group - South Park, LLC ("MG South Park") and is encumbered by a lien in favor of Bank of America.  The property is located in parts of three blocks located at 1150 S. Grand Avenue and various other addresses in downtown Los Angeles.  It is comprised of approximately 4.7 acres and a structure with approximately 8,700 net rentable square feet.  The property is currently being utilized as parking lots.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**42.    705 W. 9th Street, Los Angeles**

The subject property is owned by Meruelo Maddux - 845 S. Flower Street, LLC ("MM 845 S. Flower") and is encumbered by a lien in favor of Canpartners Realty Holding Company IV LLC ("Canpartners").  Located in the South Park region of downtown Los Angeles, the property totals approximately 0.8 acres of land, on which is located a newly constructed 35-story condominium tower (the "Project").  The building is comprised of 214 luxury residential condominium units totaling 254,300 square feet and a 6,800 square foot commercial unit on the ground floor.  MM 845 S. Flower obtained a temporary certificate of occupancy for the Project and anticipates securing a final certificate

-45-

of occupancy by the end of 2009.

The 6,800 square feet of ground floor commercial space is well suited for a restaurant and MM 845 S. Flower is in negotiations with a prominent Los Angeles restaurant operator for a restaurant in this location.

The Project has an attractive location at the corner of Ninth and Flower Streets, which is (a) across the street from the newly opened Ralph's supermarket, (b) a few blocks away from the LA Live complex and the Staples Center, (c) on an all residential corner and (d) closer than most other South Park residences to the class A office core of downtown Los Angeles. The building has resident amenities that start at street level which include (a) a valet entrance area adjacent to the lobby on Ninth Street, (b) two gated entrances that lead to above ground parking providing in excess of one parking space for each one bedroom residence and two parking spaces for each two bedroom residence, and (c) an efficient loading dock area for resident move-ins.

There is a seventh floor amenity level located on top of the six story parking facility. The amenity level clearly separates this building from its residential neighbors with its stunning visuals and common area space. This level contains (a) a gym that overlooks the pool complete with changing rooms and showers, (b) an approximately 70 foot lap pool with infinity features, (c) a Jacuzzi-type whirlpool, (d) a landscaped garden and (e) a club room. The club room amenities include (a) a demonstration kitchen/catering area, (b) a Wii electronic gaming room, (c) a pool table, and (d) several large flat screen TVs.

This property represents the culmination of a specific project that has resulted in an iconic residential tower geared towards high density urban in-fill and transit oriented development.

**43.    129 West College Street, Los Angeles  (Meruelo Chinatown Village)**

The subject property is owned by Meruelo Chinatown, LLC ("Chinatown") and is encumbered by a lien in favor of Canpartners securing certain obligations of MM 845 S. Flower to Canpartners. The property was provided as additional collateral to secure substantial completion of the 705 W. 9th Street Project. Chinatown and Canpartners are in a dispute as to whether the lien should be released.

-46-

347973.01 [XP]    25195

The property is located at 129 West College Street in downtown Los Angeles. It is comprised of one property totaling approximately 5.5 acres of land. Interim operating revenue is generated by parking revenues from the film industry.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high-density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 42.    44. Consolidated Operations

The Company's business model and strength is based on the fact that it is a single enterprise with a single management team that manages a portfolio of properties that were assembled and are managed in an efficient and synergistic manner. In addition, the acquisition and development of a relatively large number of properties in a small geographic area allows for great flexibility in the development of such properties. Accordingly, the properties together are more valuable than the properties separately because of this synergistic relationship. For instance, the Company is an incubator for small businesses. Certain properties in the portfolio are conducive to start-up businesses (e.g., smaller tenant spaces, less expensive costs). As those start-up businesses grow, the Company has the flexibility to move them to another property to meet the needs of their growing businesses. This is particularly true with respect to Alameda Square, Seventh Street Produce Market, 788 Alameda, and 2640 Washington. Additionally, certain employees of businesses at the larger facilities of Alameda Square or Seventh Street Produce Market learn the business then start their own businesses, often at one of the smaller facilities. This is also true of the Company's garment tenants. Urban in-fill development is very different from single-family home-building over large swaths of land. Urban in-fill development involves many moving parts which may require business relocations amongst various properties. In the process, the Company is able to improve and update facilities and organize these smaller businesses into a cohesive market that helps improve the business of each.

347973.01 [XP]    25195

Although the Debtors formally consist of a parent company and various levels of subsidiary Debtors, including the Property Level Debtors, the Company has been, before and after its formation in 2006, and presently continues to be, effectively operated as a single enterprise.  With limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and the subsidiary Debtors.  Accordingly, there are some Debtors which generate revenues in excess of operating expenses and debt service, but there are some that do not. The Company may purchase and keep properties that are cash flow negative because the Company believes that those properties will, in time, generate a positive return and the enterprise will be significantly more valuable as a result.  The recent unprecedented freezing of credit markets and economic downturn has caused the Company to suspend substantially all of its various development projects.

Before and after the IPO, like most larger developers, the Debtors utilized a concentration account for its cash management.  The cash management system provides for funds to flow to and from a cash concentration account maintained by MMPLP.  The concentration account is linked to the operating bank accounts of each of Debtors, which bank accounts are maintained as zero balance accounts.  When needed to fund payment on checks issued by a particular affiliate, funds are transferred from the concentration account to the operating account of that affiliate.  Excess funds, if any, are invested in interest bearing accounts pending their utilization.  The Company rarely disrupts this flow of funds.

As a public company, MMPI is has been required to file various reports with the SEC, including among others, quarterly reports as well as annual reports with audited financial statements.  These reports are have been prepared and filed on a consolidated basis.  Although the Debtors' SEC filings do provide information relating to individual subsidiaries, the filings generally discuss the business as a consolidated enterprise.  This consolidated reporting is a manifestation of the synergy and economic efficiencies gained through the Company's corporate structure.  The indirect overhead expenses for administrative services provided by certain Debtors may be

-48-

347973.01 [XP]    25195

allocated to other Debtors.  With a few exceptions, revenues received from the operation of the Debtors' properties are swept daily into a general operating account, and the Debtors' obligations are paid from such account.

~~Representatives of the Company frequently spoke with loan officers and representatives of the Company's lenders about the status and operation of the Company and regularly referred the lenders to the Company's SEC filings, and the consolidated financial information contained therein.  Those conversations often included a discussion of how events relating to other Property Level Debtors might affect a given borrower (other Property Level Debtor) or the overall operations of the Company.  From time to time, lenders would request additional financial information regarding MMPI, MMPLP or one of the Property Level Debtors and were provided with copies of the Company's consolidated financial statement or referred to the Company's public filings with the SEC.  The Company firmly believes that all lenders with whom the Company did business were aware of the consolidated nature of the Debtor's business affairs and such awareness was a part of those sophisticated lenders' decision-making process in extending credit to the individual Debtors.  In addition, the Company also believes that investors, creditors and others view or believe that the Debtors are a consolidated entity.~~

## C.    THE DEBTORS' CURRENT AND ON-GOING BUSINESS STRATEGIES

The Company's business is focused on real estate development and redevelopment. The substantial majority of the Company's properties are not stabilized, i.e., the property is either not a rental property or if a rental property, the property has not reached full occupancy or has not yet been redeveloped to its full income producing level.  The Company's strategy has three primary components: investment, value creation and operations.  Due to the current economic climate, including the lack of an active credit market, the Company has placed on hold substantially all of its development projects.

The Company's intent is to continue to build on (i) its market presence, (ii) its relationships with its tenants, (iii) development and operation experiences and (iv) its desire to provide real estate solutions for a variety of urban space users and urban residents.  The Company has always followed

347973.01 [XP]    25195

a double bottom line approach to its real estate operations that include both a financial return goal and a goal of providing more to the community it serves and the City of Los Angeles through transit oriented development, "green" or LEED development, and the incubation of small businesses that employ large amounts of employees. For instance, the Company constructed the 705 West Ninth Street 35-story condominium project to meet LEED Silver requirements, and the Company helped incubate American Apparel from a small startup company to an employer with over 5,000 employees at what is believed to be the largest garment manufacturing facility in the nation.

In particular, the Company will continue and expand on the following:

1.    **The Debtors' Investment Strategy**

The Company invests in sub-markets that are undergoing demographic, structural or economic changes, where a significant portion of the properties and participants are historically of a non-institutional nature, where the buildings are predominantly obsolete or no longer relevant to the submarket's changing profile, where the Company has established strong working relationships with the city planners, community redevelopment agencies and local political organizations and where the existing transportation networks, particularly public transportation systems, are nearby.

2.    **The Debtors' Value Creation Strategies**

a.    (a) *Focus on the Property Needs of Specific Industries and Premium Space Users*.

The Company seeks to achieve rent premiums by meeting the property needs of "premium space users" such as food processing and food distribution companies whose critical business functions depend on the location, zoning, tenant improvements or utilities of the leased space and whose needs frequently coincide with urban environments. The ability to provide premium space users with facilities and services that maximize their operating profits may allow a landlord to minimize leasing risk and charge rents that, net of costs incurred to provide such facilities and services, exceed rents that could be obtained from tenants that are relatively indifferent to location

-50-

347973.01 [XP]    25195

or amenities. The Company will continue to identify premium space users in the Company's markets and work to understand and fulfill their evolving requirements.

### b.    (b) *Focus on Sub-Markets that are Transitioning from Large to Small Tenants.*

The Company acquires, modernizes and subdivides large, older single-tenant industrial and mixed-use buildings. In many urban markets, large manufacturers and distributors have relocated their businesses, often vacating such buildings for overseas or suburban locations. Taking their place are small emerging businesses and established companies that are de-centralizing their operations. The Company seeks to transform large, single-tenant buildings into workplaces for many small tenants by re-using a large portion of the existing facility and creatively subdividing the space at a relatively low cost. This approach should allow the Company to offer competitively-priced space (as compared to rental rates for new buildings) in convenient urban locations.

### c.    (c) *Aggregate Small, Synergistic Tenants.*

In urban areas, the non-office tenant base includes many small businesses. Grouping similar businesses together creates a marketplace that offers convenience to product buyers and a steadier stream of prospective customers to the businesses. These advantages may increase tenants' business profits and stability and may justify a rental premium compared to stand-alone locations. The Company seeks sub-markets where there is an active, but unorganized, critical mass of similar businesses that could benefit from aggregation. The Company believes this strategy should allow the Company to generate higher rental income from the Company's small tenants.

### d.    (d) *Focus on Residential Development in Appropriate Locations.*

The Company intends to continue to develop urban residential projects on sites the Company owns near transportation infrastructure and demand generators such as office buildings, retail stores, restaurants, and cultural and sports venues.  In the long term, the Company believes demand for residential units in downtown Los Angeles and other urban areas will continue to grow.

The Company believes that ultimately their residential projects will offer desirable housing and provide the Company with attractive returns on invested capital.

### e.    (e) *Coordinate Residential and Industrial Development in Shifting Urban Markets*.

The Company believes that much of the downtown Los Angeles industrial space is aging or obsolete and not properly serving its industrial users.  The Company seeks properties within historically industrial districts that are located in emerging housing sub-markets. As active developers and operators of industrial/distribution space, the Company believes they have greater ability to acquire such opportunities quickly and at lower industrial/distribution pricing than residential-only developers. The Company also seeks the purchase of industrial/distribution properties in areas near downtown but not in emerging residential markets. The Company sees opportunities to better serve industrial users they displace through residential redevelopment by providing them with more suitable space in commercial projects of the Company in such near downtown areas. The Company believes coordinating residential and industrial development in this manner facilitates the Company's land assemblage.

### f.    (f) *Pursue Opportunities Offered by Governmental Organizations.*

In the State of California, the state government, regional agencies and local community redevelopment agencies created under the California Community Redevelopment Law control a large amount of surplus property in urban areas and have substantial land use discretion. These organizations often must dispose of their surplus property in a manner that encourages socially responsible development. The Company believes that such organizations present some of the more compelling opportunities in California urban areas because of the size or location of the parcels they control or because the acquisition terms for such parcels may be more favorable than typical private seller terms. The Company believes their management's advocacy of socially-minded solutions for urban real estate problems gives the Company a competitive advantage to be selected

347973.01 [XP]    25195

by these government organizations, thereby creating opportunities to acquire properties at attractive values.

g.    (g)  *Aggregate Separate Parcels and Acquire Controlling Locations in Developing Neighborhoods.*

In the Company's markets, large, contiguous development properties are infrequently for sale and, when available, sell for prices that often reflect their potential value. The Company seeks to acquire smaller, separate real estate parcels over time with a view toward aggregating those smaller parcels into one property that can accommodate a larger-scale development project. To acquire the individual parcels and reduce the Company's holding costs, the Company sometimes purchases an option contract or signs a long-term purchase agreement that gives the Company the right to acquire the land at a specific price on or before a specified future date. The Company may also acquire a strategically sized or configured parcel in a city block that would be instrumental in any material redevelopment of the block, thereby deterring any substantial competing development and creating an incentive for owners of adjacent parcels to sell.

3.    **The Company's Operating Strategies**

a.    (a)  *Efficiently Manage the Development and Operation of the Company's Projects*.

The Company employs a mixture of project development management and asset management strategies. First, the Company keeps direct control over critical development functions in which they believe they have valuable expertise and that require significant local knowledge, such as identification and acquisition of projects and land use entitlement. Second, because of the widely varying nature of the Company's projects, the Company generally retains expert third-party general contractors to manage the construction of the Company's projects, and the Company employs in-house project managers to supervise the construction management process closely. Third, once a project is complete, the Company manages its operation and leasing activities, or the Company retains third-party sales companies in the case of for-sale projects. The Company will

engage third-party leasing agents when they have superior tenant relationships or knowledge of the sub-markets in which the Company's projects are located.

### b.    (b) *Seek Interim Revenues from Properties.*

The public approval process for certain projects may last two years or longer. During the assemblage or approval process, the Company takes steps to permit the Company to generate interim revenues and allow the Company to terminate leases promptly or relocate tenants when the Company obtains the final assemblage piece or approvals. The Company accomplishes this by converting long-term leases to month-to-month leases and seeking additional interim income from additional sources, such as surface parking or by temporarily licensing space to entertainment companies for on-location filming. In addition, because the Company has a roster of month-to-month tenants who have shown a willingness to relocate at the Company's discretion, the Company has the flexibility to generate interim revenues by relocating tenants from a property commencing redevelopment construction to another property that is not currently being redeveloped.

### c.    (c) *Sell or Recapitalize the Company's Projects to Realize Value.*

The Company has engaged in a business strategy whereby it may dispose of or recapitalize some portion of the Company's projects from time to time once they reach what the Company believes to be their maximum near-term value and may redeploy some or all of the Company's equity and profits into other real estate investments that the Company believes have a greater long-term potential for economic appreciation.  In addition, in response to the changing economy and as part of its business strategy to emerge as a reorganized company from Chapter 11, the Company continues to consider multiple scenarios to determine the best use of its real property assets, including but not limited to the sale or refinancing of some portion of its assets to meet its financial obligations under the Plan, to reduce obligations to creditors, to provide capital for its business and to ensure the long-term sustainability of the business.

### D.   PREPETITION CAPITAL STRUCTURE OF THE COMPANY

#### 1.   MMPI

MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue Code.  Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately owned by MMPI's directors and executive officers with Richard Meruelo owning the largest amount of shares (approximately 39,911,378).  The other 47.8% of MMPI's stock is publicly owned and, prior to April 2009, was traded on the NASDAQ stock exchange.  The stock is presently trading on the Over the Counter Bulletin Board.

##### *a.*   (a)  *MMPI Initial Public Offering*

Prior to MMPI's formation in 2006, its predecessor business' management team was one of only approximately thirteen designated groups participating in the California Urban Real Estate ("C.U.R.E.") program sponsored by the State of California Public Employee's Retirement System ("CalPERS").  CalPERS provided the predecessor business with capital through the C.U.R.E program in the form of a revolving credit facility in the principal amount of approximately $150 million.  The CalPERS credit facility was obtained through a single borrower and the funds were disbursed among the entities collectively comprising the predecessor business.

Thereafter, MMPI was formed on or about July 5, 2006, and MMPLP was formed on or about September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's common stock.  The formation transaction and the IPO were designed to allow MMPI to acquire and continue the operations of its predecessor entities, pay down existing mortgage debt, pay off the mezzanine loan facility from CalPERS, provide capital for future acquisitions, fund future development costs, and establish a capital reserve for general corporate purposes.  Between January 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000 shares of common stock at $10.00 per share.  MMPI raised approximately $425.7 million, after underwriting discounts but before expenses related to the IPO.  A substantial portion of the

347973.01 [XP]   25195

proceeds was used to pay off the debt owed to CalPERS.  On December 31, 2008, there were approximately 88.1 million shares of common stock outstanding.

### b.    (b) MMPI Common Stock

The authorized capital stock of MMPI  consists of up to 200,000,000 shares of common stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred stock, $.01 par value per share.  As of November 20, 2009, there are 87,845,789 shares of Common Stock issued and outstanding held by approximately sixty holders of record.  Holders of Common Stock have no right to convert their Common Stock into any other securities.  The Common Stock has no preemptive or other subscription rights.  There are no redemption or sinking fund provisions applicable to the Common Stock.  All outstanding shares of Common Stock are duly authorized, validly issued, fully paid and nonassessable.

### c.    (c) MMPI's Equity Incentive Plan

Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive Plan ("LTIP") Units and other awards as part of its employee compensation packages.  The LTIP units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be converted into MMPLP's common units and consequently become redeemable by the Holder on a one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of such common stock.  MMPI initially reserved 2,277,500 shares of common stock for issuance of awards under the Equity Incentive Plan.  As of June 30, 2009, there remain 1,083,334 shares available from the initial reservation.

### 2.    Corporate Structure of the Other Debtors

MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP.  The remaining 0.4% limited partnership units are owned by certain members of MMPI's management team who obtained their interests through the LTIP available to certain personnel as part of their compensation packages.

-56-

347973.01 [XP]    25195

MMPLP owns 100% of the common stock of MM Construction, 99% of the membership units in MM Management and 99% of the membership units in Funes Architecture, LLC ("Funes"). The remaining membership units in MM Management and Funes are owned by MM Construction.

MMPLP also owns 100% of the membership units in MMP Ventures. MMP Ventures, in turn, owns 100% of the stock or membership units in a number of subsidiary corporations and limited liability companies referred to as Property Level Debtors because they are the entities which hold title to the various real properties and real estate projects developed and operated by MMPI through MMPLP.

### E.    MATERIAL PROCEEDINGS

There are several different circumstances that may create liability for the Company in the future, to the extent they are not discharged under the Plan as more fully discussed in Section VII.J.

#### 1.    Potential Government Tax Audits

The Company is subject to audit and review by federal and state taxing authorities. An adverse audit report could result in the Company being assessed additional tax liability. The Company is not aware of any such pending audits and has filed all of its tax returns.

#### 2.    Indemnification Claims

As is necessary and customary in the normal course of business, certain of the Company's contracts contain indemnification provisions that could require the Company to make payments for Claims made against customers or employees of the Company, including management. Additionally, the Articles and Bylaws of MMPI provide that MMPI shall indemnify its officers and directors to the fullest extent permitted by law. Pursuant to its contractual and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of its Board of Directors with respect to costs and expenses that may be incurred by them in conjunction with the performance of their employment or role as a member of the Board of Directors. These indemnification provisions may result in material liability to MMPI or other of the Debtors.

However, the Company maintains various insurance coverages to reduce the exposure of the Company.

**III.**

III.

**EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

Prior to the Petition Date, the Company's primary objective was to maximize return on investment through development and redevelopment activities, which activities require significant amounts of capital. The Company experienced significant, recurring cash shortfalls from (a) operating activities, (b) recurring investment activities such as carrying costs for interest payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing rental properties. Shortfalls in operating capital have been funded by the refinance or sale of real property assets, and the use of the proceeds for operating and reinvestment in the purchase of replacement real property assets.

The economic climate and associated disruption in the debt and equity capital markets shortly before the Petition Date were extremely challenging for the Company. During 2008, the Company took significant steps in an effort to improve its financial position. Among other things, the Company sold three rental projects and three development projects, for an aggregate sales price of approximately $110.6 million. The Company also completed nine acquisitions or conversions of development projects to rental projects, resulting in the availability of 949,905 net rental square footage. However, the Company's efforts could not overcome the collapse of credit markets and the American banking system that took place in the fall of 2008. On or about October 1, 2008, the Company suspended development of twelve construction projects.

A number of the Company's loans secured by real property matured prior to the Petition Date or were to mature soon thereafter. Among other things, the Company was unable to extend or refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or March 1, 2009, including two secured by the property housing the Company's corporate

347973.01 [XP]   25195

headquarters, and one which is secured by the Union Lofts project owned by MMP 760 S. Hill Street.  In total, the Company had twelve loans that were set to mature during 2009 with an aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization on other long-terms loans.

In addition, prior to the Petition Date, two lenders filed lawsuits seeking, among other things, the appointment of a receiver.  On or about March 4, 2009, California Bank & Trust filed a complaint against 788 South Alameda and MMPI for, among other things, judicial foreclosure and the appointment of a receiver.  In addition, on or about March 17, 2009, Chinatrust Bank filed a complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure and the appointment of a receiver.

During the year prior to the Petition Date, the Company tirelessly investigated borrowing additional capital in order to continue to fund its development projects and, if necessary, operating expenses.  However, the Company was not able to borrow or refinance at conventional or otherwise acceptable rates, in large part, due to the deterioration of the credit markets that appears to have affected all banks and other lenders.  Lenders were frequently lending at lower loan-to-value ratios, taking longer to make lending decisions and generally applying more stringent underwriting standards.  During the last few months prior to the Petition Date, a number of lenders demanded exorbitant fees, principal reduction payments and/or other burdensome terms as consideration for their consent to extend the terms of their loans.  However, given that the Company had an approximately $28.0 million annual shortfall in its combined operating and development activities, and because of the turmoil in the credit markets especially for development financing, the Company needed significant loan concessions from its lenders to survive.

The existence of open credit markets has been important to the Company's business strategy of financing acquisitions and development in the ordinary course of its business.  In addition, an open credit market is important to purchasers of the Company's properties.  The Company's management team anticipates that credit markets will improve in the future in light of, among other

347973.01 [XP]   25195

things, the hundreds of billions of dollars that have been infused into the banking systems by the federal government.

Due to the Company's inability to obtain additional capital, and the unwillingness of current lenders to extend the terms of maturing loans on acceptable terms, the fifty-four jointly administered MMPI Debtors sought relief under Chapter 11 of Bankruptcy Code to reorganize their financial affairs and prevent the piecemeal dismemberment of their business to the detriment of their creditors.

Thereafter, on or about March 30, 2009, during the construction phase of MM 845 S. Flower's condominium Project, Canpartners declared a default under its Loan Agreement with MM 845 S. Flower asserting that the filing of the bankruptcy case by MMPI, the guarantor of MM 845 S. Flower's obligations to Canpartners, constituted an event of default.  Canpartners did not identify any event of default other than the filing of MMPI's bankruptcy case.  On July 22, 2009, Canpartners unilaterally imposed additional conditions on its consent to future construction draw payments, which endangered the progress of the 705 W. 9th Street project.  While MM 845 S. Flower and Canpartners engaged in negotiations with respect to the loan, it became clear that both MM 845 S. Flower and Chinatown needed to seek relief under the Chapter 11 of the Bankruptcy Code to protect their assets for creditors, and the bankruptcy estates of the 54 MMPI Debtors.

**IV.**

~~IV.~~

**CHAPTER 11 EVENTS**

A.    **ADMINISTRATIVE ORDERS AND MATTERS**

1.    **Introduction**

On March 26 and 27, 2009, ~~MMPI and~~ the ~~MMPI~~ Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a variety of matters.  The Debtors obtained Orders of the Bankruptcy Court, inter alia,

~~-60-~~

347973.01 [XP]    25195

(a) authorizing, on an interim basis, the Debtors' use of cash collateral (see below for more detail), (b) authorizing the Debtors to employ and compensate legal and financial advisors, (c) authorizing the Debtors to honor certain obligations to employees and to continue employee benefit plans in effect, (d)  permitting the Debtors, on an interim basis, to continue to utilize their cash management systems, (e) establishing procedures for the Debtors to ensure continued provision of utility services; (f) limiting the scope of notice required; (g) extending the time to file schedules and statement of financial affairs; and (h) directing the joint administration of the Cases of the ~~MMPI~~ Debtors ~~(MM 845 S. Flower and Chinatown are not jointly administered).~~  Subsequently, the Bankruptcy Court established September 24, 2009, as the last day for creditors and parties in interests to file proofs of Claim and proofs of interest against the ~~MMPI~~ Debtors.  The Debtors filed the required monthly operating reports on a timely basis.  The Debtors were authorized and continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

~~On September 3, 2009, MM 845 S. Flower and Chinatown filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a variety of matters.  The MM 845 S. Flower Debtors obtained Orders of the Bankruptcy Court, inter alia, (a) authorizing the Debtors' to use of cash collateral (see below for more detail), (b) authorizing the Debtors to employ and compensate legal and financial advisors, (c) establishing procedures for the Debtors to ensure continued provision of utility services; (d) limiting the scope of notice required; (e) extending the time to file schedules and statement of financial affairs; and (f) setting a bar date of October 30, 2009 as the last day for creditors and parties in interest to file proofs of Claim and proofs of interest.  The MM 845 S. Flower Debtors' motion for joint administration of the cases with the MMPI Debtors' cases was denied.  The MM 845 S. Flower Debtors were authorized and~~ continue to operate their ~~business and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.~~

~~-61-~~

347973.01 [XP]    25195

## 2.    The ~~MMPI~~ Cash Collateral Motion and Corresponding Orders

### _a._    ~~(a)~~ *MMPI Debtors' Cash Collateral Motion and Order*

By their Motion for Entry of Interim and Final Orders Authorizing Debtors to Use Cash Collateral, (the "~~MMPI~~ Cash Collateral Motion") the ~~MMPI~~ Debtors sought permission to use the cash collateral of various lenders.  Oppositions were filed by most of the ~~MMPI~~ Debtors' lenders.  The Bankruptcy Court entered a series of interim orders authorizing such use and continued to hear testimony and consider evidence concerning the ~~MMPI~~ Debtors' proposed use of cash collateral on a final basis.  These hearings concluded in October 2009.  The Bankruptcy Court ruled in the ~~MMPI~~ Debtors' favor and entered a final order authorizing the use of the cash collateral of the following lenders through March 31, ~~2009~~2010: BofA, CBT, Capmark, Cathay, Chinatrust, Legendary, Stanford, UCB (now succeeded by East West), and Chamlian.  In making that ruling, the Bankruptcy Court determined that the following lenders were entitled to additional adequate protection and are therefore entitled to a replacement lien in one or more of the Debtors' unencumbered real properties:  Capmark, CBT, Chinatrust, Legendary with respect to 425 W. 11th Street; 3rd & Omar Street; 420 Boyd Street, and East West with respect to 2640 Washington.

### ~~(b)~~    ~~*MM 845 S. Flower Debtors'*~~

As a result of the ~~Cash Collateral~~ *Motion and Order*

~~MM 845 S. Flower also~~determinations made by the Bankruptcy Court, the Debtors filed ~~its Motion for Entry of Interim and Final Orders Authorizing Debtor to Use Cash Collateral (the "845 S. Flower Cash Collateral Motion")~~a motion seeking ~~permission to~~ to designate certain properties that would serve as adequate protection for the Debtors' use ~~the~~ of cash collateral ~~of Canpartners.  Canpartners opposed the requested relief.~~.  ~~By its order entered October 23, 2009, the Bankruptcy Court ruled~~The Debtors sought authority to limit the continuing adequate protection lien to certain identified properties in ~~favor~~place of ~~MM 845 S. Flower and authorized it to use the cash collateral~~a blanket lien on all of ~~Canpartners on a final basis to pay~~ the ~~costs and expenses~~Debtors' unencumbered properties.  The matter has been continued pending the completion of ~~construction~~an

appraisal of 845 S. Flower's condominium Project and to pay the first and second installment one of the Debtor's 2009-2010 real property taxes. properties the Debtors propose to include as part of the pool of assets to serve as continuing adequate protection.

The Debtors also filed a motion seeking authority to use a portion of certain insurance proceeds resulting from fire damage to one of the Debtors properties which currently secures certain obligations of the Debtors to PNL Pomona. The Debtors propose to use a portion of the insurance proceeds to demolish the remaining structure on the property in order to be able to market and sell the property as vacant land. The matter is currently pending.

### 3. MMPI The Debtors' Single Asset Real Estate ("SARE") Motion

The MMPI Debtors filed a motion seeking an order determining that none of the fifty-four MMPI Debtors are subject to the single asset real estate provisions of Sections 101(51B) and 362(d)(3) of the Bankruptcy Code. Two lenders (BofA and Cathay) filed motions seeking a determination from the Bankruptcy Court that MG South Park, MMP 760 S. Hill Street and Alameda Produce Market are subject to the SARE provisions of the Bankruptcy Code. The MMPI Creditors Committee supported the MMPI Debtors' position. Fourteen oppositions and joinders in opposition were filed by various lenders. In June 2009 the Bankruptcy Court ruled in favor of the MMPI Debtors, holding that the MMPI Debtors are not subject to the SARE provisions of the Bankruptcy Code. BofA has appealed from the Bankruptcy Court's SARE determination. That appeal remains pending before the United States District Court for the Central District of California, but is stayed pending a ruling by the Ninth Circuit Court of Appeals on BofA's petition for authority to appeal directly to that court.

### 4. Motions for Relief from Stay

The following motions for relief from stay have been filed by lenders to pursue their state law remedies against various real properties owned by the Debtors:

- PNL moved for relief from stay with respect to the real property owned by MG 2001 – 2021 W. Mission located in Pomona. MG 2001 – 2021 W. Mission and PNL are engaged in

347973.01 [XP]    25195

ongoing settlement discussions and have continued the hearing on PNL's motion from time to time. The ~~hearing is currently scheduled for January 28, 2010~~<u>Bankruptcy Court ruled in favor of the Debtors and denied PNL's Motion</u>;

- BofA moved for relief from stay with respect to real property owned by MMP 760 S. Hill Street and commonly known as 325 West 8th Street and 760 South Hill Street, Los Angeles (the Union Lofts). The Bankruptcy Court denied the motion subject to the Debtor's provision of certain adequate protection to BofA;

- BofA moved for relief from the automatic stay with respect to certain real properties owned by MG South Park located in downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied BofA's motion;

- UCB moved for relief from the automatic stay with respect to real property owned by 2640 Washington Boulevard. Pursuant to an agreement between the Debtors and UCB, the motion was granted for the sole and limited purpose of permitting UCB to record a notice of default with respect to the real property. The Debtor 2640 Washington agreed to pay, out of cash collateral, the first and second installments of real property taxes for the 2009 – 2010 fiscal year. UCB's motion was withdrawn in all other respects;

- Legendary moved for relief from the automatic stay with respect to real property owned by MM 3rd & Omar Street located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the ~~MMPI~~ Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the ~~MMPI~~ Cash Collateral Motion, the Bankruptcy Court denied Legendary's motion, subject to the provision of such adequate protection;

- Legendary moved for relief from the automatic stay with respect to real property owned by both MG 1500 Griffith Avenue and MG 4th Street Center and located in downtown Los Angeles.  The Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion;

- Legendary moved for relief from the automatic stay with respect to real property owned by Merco Group, commonly known as Sci-Arc, and located in downtown Los Angeles.  The Bankruptcy Court denied Legendary's motion;

- Legendary moved for relief from the automatic stay with respect to real property owned by MM 420 Boyd Street and located in downtown Los Angeles.  In the context of the Bankruptcy Court's rulings on the ~~MMPI~~ Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year.  In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties.  In light of the rulings in connection with the ~~MMPI~~ Cash Collateral Motion, the Bankruptcy Court denied Legendary's motion subject to the provision of such adequate protection;

- Legendary moved for relief from the automatic stay with respect to real property owned by Merco Group (Sky-Arc) and MG Little J and located in downtown Los Angeles.  The ~~hearing on that motion is scheduled for December 9, 2009~~ matter has been submitted to the Court.  An order has not yet been issued;

- Legendary moved for relief from the automatic stay with respect to real properties owned by MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles.  The ~~hearing on that motion is scheduled for December 9, 2009~~ matter has been submitted to the Court.  An order has not yet been issued;

- Legendary moved for relief from the automatic stay with respect to real property owned by MG 425 W. 11th Street and located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the ~~MMPI~~ Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the ~~MMPI~~ Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion for relief from the automatic stay subject to the provision of such adequate protection;

- Vahan and Anoush Chamlian moved for relief from the automatic stay with respect to real property owned by MMP 2131 Humboldt Street near downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied the Chamlians' motion;

- Chinatrust moved for relief from the automatic stay with respect to real property owned by MG 3185 E. Washington Boulevard, among other things. In the context of the Bankruptcy Court's rulings on the ~~MMPI~~ Cash Collateral Motion, the Debtors offered Chinatrust a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Chinatrust on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the ~~MMPI~~ Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Chinatrust's motion for relief from the automatic stay subject to the provision of such adequate protection;

• The Stanford Group moved for relief from the automatic stay with respect to the real property owned by 908 8th Street located in downtown Los Angeles. The hearing on that motion is scheduled for ~~December 10, 2009~~February 24, 2010; and

~~Canpartners moved for relief from the automatic stay with respect to the real property and condominium Project owned by MM 845 S. Flower located in the South Park area of downtown Los Angeles. By stipulation of the parties, the initial hearing on that motion has been re-set for January 7, 2010.~~

In addition to the motions filed by the Debtors' lenders, a group consisting of three individuals have moved for relief from the automatic stay to seek authority to prosecute a civil action filed by them in Los Angeles Superior Court and to clarify that they have authority to pursue alleged labor Claims against certain current and former employees and board members of MMPI, Alameda Produce Market and 788 South Alameda. The matter has been continued from time to time as the parties explore settlement. A continued hearing on that motion is scheduled for December 17, 2009.

Also, in addition to the foregoing motions, in April 2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of eminent domain, certain property of the Debtors. In September 2008 the trial court dismissed the action and the MTA appealed. Thereafter, the Debtors filed their chapter 11 petitions and the automatic stay prevented further prosecution of the appeal. The Debtors and the MTA entered into a stipulation to modify the automatic stay to permit the prosecution and defense of the appeal. The order approving the stipulation was entered in August 2009. The matter is still pending.

Also, in a similar action, in February 2010, the City of Pomona filed a motion for relief from the automatic stay in order to allow an action in a non-bankruptcy forum to proceed. Specifically, the City of Pomona drafted a complaint seeking to acquire, through its power of eminent domain, certain property of the Debtors. The Debtors anticipate that the parties will be

able to reach an agreement that may permit a modification of the automatic stay in order to allow the eminent domain litigation to proceed.  The matter is still pending.

The Debtors filed a motion to determining the amounts owed to the County of Los Angeles on account of real property taxes.  The dispute involves the proper amount of taxes owed to the County and the appropriate rates of interest as well as whether certain other claimed amounts are properly included in the claim.  The hearing on the motion is set for February 24, 2010 and the matter is still pending.

**5.    The Debtors' Compromises With Various Lenders**

The Debtors have engaged in extensive settlement discussions with their lenders as to their Claims under Loan Documents and as of the filing of this Disclosure Statement, the Debtors have reached settlements with PCB, Imperial and Murakami.  The Bankruptcy Court approved the Debtors' compromise with PCB and the essential terms of that settlement are reflected in the Plan, specifically the Plan's treatment of PCB's Class 51A-4 Claim in Section III.B.2 of the Plan.

The ~~Debtors' motion to approve their~~Bankruptcy Court approved the settlement with ~~Murakami is set for hearing on December 9, 2009.~~the Marakamis.  The essential terms of that settlement are reflected in the Plan, specifically the Plan's treatment of Murakami's Class 37A-4 Claim in Section III.B.2 of the Plan.

~~Subject to Bankruptcy Court approval and finalization of documents memorializing their agreement, the~~The Debtors ~~and Imperial have agreed~~motion to ~~a~~approve their settlement ~~of certain claims~~with Imperial was heard on February 24, 2010 and was granted.  ~~Some of the~~The essential terms of that ~~agreement in principal~~settlement are reflected in the Plan, specifically, the Plan's treatment of Imperial's Claims in Classes 35A-2, 38A-2 and 51A-2 in Section III.~~B~~C.~~2~~ of the Plan.

**6.    Unexpired Leases and Executory Contracts**

With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired nonresidential lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is

the lessee and Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December 1, 2000, the successor-in-interest to Evelyn Hammond, is the lessor.

### 7.    Summary of Claims Process, Bar Date and Claims Filed

#### a.    (a) *Schedules and Statements of Financial Affairs*

On or before June 12, 2009 the fifty-four jointly administered ~~MMPI~~ Debtors filed with the Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the "Schedules and Statements") as of their March 26, 2009 or March 27, ~~2009 Petition Date.   On September 30, 2009 MM 845 S. Flower and Chinatown filed with the Bankruptcy Court their Schedules and Statements reflecting their assets, liabilities and financial affairs as of their September 3,~~ 2009 Petition Date.  Neither the schedules nor the statement of financial affairs of any of the Debtors have been amended.

For financial reporting purposes, MMPI prepares consolidated financial statements that are filed with the SEC and that are audited annually.  Unlike these consolidated financial statements, the Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the Debtors' non-audited books and tax records.  This means that audited financial statements and supporting schedules have not been prepared for each Debtor.

#### b.    (b) *Claims Bar Date*

On July 22, 2009, the Bankruptcy Court entered an order in the ~~MMPI~~ case (the "MMPI Bar Date Order") establishing the general deadline for filing proofs of Claim against the 54 jointly administered ~~MMPI~~ Debtors (the "~~MMPI~~ Bar Date").  The deadline established by the Bankruptcy Court was September 24, 2009.  ~~On September 16, 2009, the Bankruptcy Court entered orders in the MM 845 S. Flower case and the Chinatown case (the "Flower Bar Date Order" and the "Chinatown Bar Date Order," respectively) establishing the general deadline for filing proofs of Claim against MM 845 S. Flower (the "Flower Bar Date" and the "Chinatown Bar Date," respectively).  The deadline established by the Bankruptcy Court was October 30, 2009 for both the MM 845 S. Flower and the Chinatown cases.~~

~~-69-~~

347973.01 [XP]    25195

The ~~MMPI, Flower and Chinatown~~ Bar ~~Dates~~Date established the deadline for Claims, including Claims of governmental units, but excluding certain other Claims, including Claims based on the rejection of executory contracts and unexpired leases as to which the bar date is the later of: (1) the applicable Bar Date; or (2) the first business day that is at least thirty (30) calendar days after (a) the mailing of notice of the entry of the order first approving the rejection of such contract or lease, (b) the mailing of notice of the entry of an order or judgment avoiding a transfer, or (c) the date any relevant tax Claim first arises.  The Debtors provided notice of the ~~MMPI, Flower and Chinatown~~ Bar ~~Dates~~Date by mailing a notice of such Bar ~~Dates~~Date.

### c.        (c) *Proofs of Claim and Other Claims*

According to the Debtors' records, a total of ~~404~~415 Claims were filed against the Debtors asserting Claims in the total face amount of approximately $~~1,079,772,213.~~927,761,559.23.  The Claims scheduled by the Debtors and Claims filed by claimants in each Class is summarized in Exhibits "H.2" to "H.8" attached hereto.  The amounts listed on those exhibits represent the current state of the Debtors' computation of the Claims filed and scheduled, and do not reflect amounts which have been paid to date or which the Debtors have otherwise resolved through deposit or stipulation.

Numerous Claims were asserted by various alleged creditors in unliquidated amounts, i.e. Claims that did not contain a specific dollar amount.  The Debtors believe that certain Claims that have been asserted are without merit and intend to object to all such Claims.  Other significant categories of disputed Claims include certain taxing authorities that are requesting payments far in excess of those the Debtors believe to be owed to such authorities.

The Debtors filed a motion to determining the amounts owed to the County of Los Angeles on account of real property taxes.  The dispute involves the proper amount of taxes owed to the County and the appropriate rates of interest as well as whether certain other claimed amounts are properly included in the claim.  The hearing on the motion is set for February 24, 2010 and the matter is still pending.

### d. ~~(d)~~ *The Debtors' Stipulation with the OCC Regarding Unsecured Claims*

The Debtors entered into a stipulation with the OCC by which they agreed that to the extent any party files a proof of Claim in any of the ~~MMPI~~ Debtors' Chapter 11 Cases prior to the ~~MMPI~~ Bar Date, such proof of Claim shall be deemed to have been timely filed in the proper Debtor's Chapter 11 Case and against the proper Debtor regardless of the name of the particular Debtor or case number identified in the proof of Claim.  The Bankruptcy Court approved that stipulation. Capmark has appealed from the order approving the stipulation and that appeal remains pending before the District Court for the Central District of California.

### 8.    Other Administrative Matters

Early in the cases, the Debtors met with and were interviewed by the staff attorney and other representative of the Office of the United States Trustee (the "US Trustee").  During the Cases, the Debtors have complied with certain requirements promulgated by that office with respect to the filing of monthly operating and cash reports.  In May and June, 2009 the ~~MMPI~~ Debtors appeared at the Section 341(a) meeting of creditors - known as the initial creditor meeting - in the cases of the fifty-four jointly administered ~~MMPI~~ Debtors to answer questions of creditors and parties in interest. ~~On October 2, 2009 MM 845 S. Flower and Chinatown appeared at the Section 341(a) meeting of creditors conducted in their cases~~.  The US Trustee conducted each of the Section 341(a) meetings.

On April 22, 2009 the US Trustee appointed the Committee of Unsecured Creditors in the ~~MMPI~~ cases.  Shortly thereafter, the Debtors met with the ~~MMPI~~ Committee to discuss the Debtors' business and proposed Chapter 11 Plan.  The Debtors and the ~~MMPI~~ Committee have been in close communication throughout these cases.

Various professionals have been retained and employed in the Chapter 11 Cases and will be paid pursuant to the terms of the Plan.  Danning, Gill, Diamond & Kollitz, LLP has been employed as general reorganization counsel for all of the Debtors in the Chapter 11 Cases.  The following

professionals also have been employed by the ~~MMPI~~ Debtors: FTI Consulting, Inc., as financial advisors ("FTI"), Ernst & Young as independent auditors and tax advisors, DLA Piper LLP (US) as special securities and litigation counsel, and Waldron & Associates, Inc. as real estate appraiser. SulmeyerKupetz, APC was employed as general counsel by the ~~MMPI~~ Committee in the ~~MMPI~~ Debtors' cases. ~~Cushman & Wakefield of California, Inc. has been employed as real estate appraiser by MM 845 S. Flower.~~ In addition, certain real estate brokers have been or will be employed in the Chapter 11 Cases to market and sell certain properties but will be paid out of the proceeds of the sale of the properties as opposed to through the Plan. <u>In accordance with the Bankruptcy Court's order, the Debtors submitted supplemental declarations from certain brokers in connection with representing the Debtors in connection with specific properties to be listed for sale. Specifically, the Debtors have retained (i) Lee & Associates – Commerce Inc., regarding the listing of 1919 Vineburn Street, Los Angeles, CA; (ii) The Bradco Companies regarding the listing of 2951 Lenwood Road, Barstow, CA; and (iii) DAUM Commercial Real Estate Services regarding the listing of (a) 905 E. 8th Street, Los Angeles, CA, (b) 308-310 Omar Street and 452, 464 and 470 E. 3rd Street, Los Angeles, CA, and (c) 400-428 Boyd Street, Los Angeles, CA.</u>

<u>The Bankruptcy Court granted the Debtors' motion to extend the time during which only the Debtors may file a plan of reorganization and solicit acceptances thereof through March 22, 2010. The Debtors have previously filed a plan of reorganization and disclosure statement, which disclosure statement was considered by the Court on January 20, 2010. The Bankruptcy Court declined to approve the original disclosure statement but scheduled a continued hearing for March 19, 2010, at which time the present amended disclosure statement will be considered.</u>

**B.    REAL ESTATE SALES <u>AND LISTINGS</u> SINCE COMMENCEMENT OF CASE**

Since the commencement of the cases, the Debtors, have formulated and implemented a strategy with respect to the Debtors' real estate assets. As part of this strategy, the Debtors have considered multiple scenarios in the categorization and use of their real estate assets providing for a

balance between creditor payment and the creation of an enterprise with the greatest chance of long-term sustainability and success.  The Debtors determined that certain assets should be sold to reduce the immediate obligations to creditors, to provide capital for the business and to ensure the long-term sustainability of the business.

The following properties have been sold, pursuant to orders entered by the Bankruptcy Court, since the Petition Date:

• 5500 Flotilla Street, Los Angeles, previously owned by Debtor Meruelo Maddux – 5500 Flotilla Street, LLC ("MM 5500 Flotilla Street") to Camfield Partners, LLC for $210,000;

• 146 East Front Street, Covina, previously owned by Debtor Merco Group – 146 East Front Street, LLC ("MG 146 E. Front Street") to Vartan and Dzovig Koroghlian for $1,114,450;

• 2040 Camfield Avenue, Commerce, previously owned by Debtor Merco Group – 2040 Camfield Avenue, LLC ("MG 2040 Camfield Avenue") to Camfield Partners, LLC for $4,790,000; and

• 500 Mateo Street, Los Angeles, previously owned by Debtor  Meruelo Maddux – 500 Mateo Street, LLC ("MM 500 Mateo Street") to Mydland Enterprises, LLC for $1,900,000.

C.    MM 845 S. FLOWER'S PENDING SALE MOTION

In addition to the consummated real estate sales discussed above, on November 18, 2009, MM 845 S. Flower filed a motion by which  it seeks  authorization from the Bankruptcy Court to engage in a, the Debtors have recently listed the following properties for sale program (the "Flower Sale Motion") to sell individual condominium units in MM 845 S. Flower's 35-story luxury residential condominium  project  (the "Project").  In the Flower Sale Motion, MM 845 S. Flower seeks authorization to conduct a one-day sale event of approximately 48 of the 214 condominium units, comprising six floors of the Project (the "Initial Sale Event").  Following the Initial Sale Event, MM 845 S. Flower will engage in a conventional sales program for approximately forty-eight additional units through June 30, 2010, unless extended as requested in the motion.  MM 845

S. Flower has sought permission to retain Kennedy Wilson Auction Group, Inc. to be the broker for the sales and conduct the auction:

- 1919 Vineburn Street, Los Angeles, CA

- 2951 Lenwood Road, Barstow, CA

- 905 E. 8th Street, Los Angeles, CA

- 308-310 Omar Street and 452, 464 and has sought authorization to provide seller financing to third party purchasers of the condominium units up to an aggregate amount of financing of $20 million.  In addition, Chinatown has also filed a motion to provide a priming lien on its real property as security for a bond to be obtained by MM 845 S. Flower to facilitate issuance of the White Report for the Property.  If the Flower Sale Motion is approved, the Debtors believe that by June 30, 2010, approximately 45% of the units (approximately ninety six or so) in the Project will be sold.  The Debtors believe that 470 E. Third Street, at that point Los Angeles, if it is in the best interests of the MM 845 S. Flower estate, it will have the ability to continue to sell condominium units and that such sales activity will provide MM 845 S. Flower with multiple options for paying creditors and to repay in full the debt to Canpartners (the "Canpartners Debt") in accordance with the Plan, including by potentially refinancing the remaining balance of the Canpartners Debt.   The Flower Sale Motion is set for hearing on December 17, 2009.

**D.    THE CHINATOWN ADVERSARY PROCEEDING**

On October 19, 2009, Canpartners filed complaints for declaratory relief against Chinatown (adv. no. 1:09-ap-01437-KT) and 845 S. Flower (adv. no. 1:09-ap-01435-KT), seeking declaratory judgments as to the validity and extent of Canpartners' lien on Chinatown's real property.  Canpartners alleged that a deed of trust provides that Chinatown's real property secures payment of 845 S. Flower's indebtedness to Canpartners.  Canpartners further alleged that 845 S. Flower has defaulted under said deed of trust.  Canpartners requests that the Bankruptcy Court enter an order:

347973.01 [XP]    25195

~~declaring that Canpartners' lien on Chinatown's real property secures 845 S. Flower's indebtedness in full; that the lien shall survive issuance of an acceptable temporary certificate of occupancy (as defined in the operative loan documents) on the project at 845 S. Flower; and that Canpartners is not required to release its lien due to multiple events of default.  On November 19, 2009, the Bankruptcy Court entered its Order approving the parties' stipulation to consolidate the two adversaries, deeming the complaint filed in 845 S. Flower's case as the sole operative complaint (the "Chinatown Adversary"). The Debtors made demand on Canpartners that it release its liens on the basis that 845 S. Flower has obtained an Acceptable Temporary Certificate of Occupancy and therefore dispute Canpartners' allegations, including but not limited to, allegations regarding 845 S. Flower's default and the extent of Canpartners' interest in Chinatown's real property.  Pursuant to the Bankruptcy Court's November 19, 2009 Order, the Debtors' response deadline was extended to December 7, 2009.~~CA

- 400-428 Boyd Street, Los Angeles, CA.

## V.

~~V.~~

## SUMMARY OF THE PLAN

~~A.    GENERAL PROVISIONS FOR TREATMENT OF CLAIMS AND INTERESTS~~

The Plan provides for the treatment and payment of Claims against the bankruptcy estates of each of the Debtors.  It also provides for the payment of unclassified claims, such as administrative expense claims and priority tax claims against each Debtor.  Claims or Interests are classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and are classified in another Class or Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Class or Classes.

### 1.    Common Class Treatments for Classified Claims

The following are Common Class Treatments for the following classes of Claims and Interests: (i) Secured Tax Claims, (ii) Secured Lender Claims, (iii) Other Priority Claims, (iv) Unsecured Tenant Security Deposit Claims, (v) Convenience Class Claims, (vi) General Unsecured

Claims, (vii) Intercompany Claims, and (viii) Equity Interests. The Classes of Claims and Interests for each Debtor will either receive the Common Treatment or a treatment specific to a particular Class. The Plan for each Class will specify whether such class will receive the common treatment set forth herein or another treatment.

In addition to the specific treatment detailed below, the Debtors expressly reserve the right to abandon any of their real properties pursuant to Section 554 of the Bankruptcy Code prior to the Confirmation Date. The Debtors also expressly reserve the right, at any time during the term of the Plan, to refinance the obligations secured by any of their real properties and satisfy the full amount of the Allowed Secured Claims against such real property(ies) from the proceeds of such refinancing. The Debtors also reserve the right subject to Court Approval to sell any of their properties prior to the Effective Date and Reinstate the obligations with respect thereto and pay any such Claims in full under the Plan at the Effective Date.

### a.    Common Secured Tax Claim Treatment

The Holder shall receive deferred cash payments equal to the Allowed amount of the Claims with interest at the rate of 3.25 percent per annum, or at a rate otherwise established by the Court, accruing on the total prepetition amount owing. Holders of Allowed Secured Tax Claims shall receive deferred cash payments, payable in fifteen (15) equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date, with the last payment payable by no later than March 26, 2014. In the event a Disputed Secured Tax Claim becomes an Allowed Secured Tax Claim: the first payment will be due and payable on the later of the next Quarterly Distribution Date or 30 days after the end of the calendar quarter in which the Disputed Priority Tax Claim becomes an Allowed Secured Tax Claim, which payment shall include payments that would have been due on prior Quarterly Payment Dates before the Disputed Priority Tax Claim became an Allowed Priority Tax Claim.

347973.01 [XP]    25195

The Reorganized Debtor shall have the right to pay the Allowed Secured Tax Claim, or any remaining balance of such Claim, or any portion of such Claim, at any time on or after the Effective Date, without premium or penalty of any kind.

### b.    Common Secured Lender Claim Treatment

The Holder shall receive deferred Cash payments over a period of either (i) five years from the Effective Date if the Holder votes to accept the Plan or (ii) seven years from the Effective Date if the Holder votes to reject the Plan (the "Maturity Date"), in an aggregate amount equal to the amount of the Allowed Secured Claim, plus interest from the Effective Date on the unpaid portion of the Allowed Secured Claim, at the rate prescribed below.  Payments shall be made in the amount of the monthly accruing interest, with the principal balance and any unpaid interest due and payable at the Maturity Date.  The monthly installments of interest shall be payable on or before the fifteenth (15th) day of each month, with the first installment due on or before the fifteenth (15th) day of the first full month following  the latest of: (a) the Effective Date, (b) 30 days after the end of the calendar quarter in which an Order allowing such Claim becomes a Final Order, and (c) such other time or times as may be agreed to by the Holder of the Claim and the Reorganized Debtor.  Each installment shall be in the amount equal to interest on the Allowed Claim at the rate of 4.0% per annum or as otherwise established by the Court.

The terms and conditions of the agreements or instruments between the Holder and the Debtor shall be restructured and amended as of the Effective Date pursuant to a Loan Modification Agreement which shall be filed with the Court five days prior to the Disclosure Statement hearing, which agreement shall include, among other things, the following modifications:  1) the period within which the Debtor is to perform any  non-monetary obligation under such agreement is extended to the Maturity Date; 2) any provision in such agreement  providing for the assessment of interest at a rate greater than that provided above or any prepayment penalty or late fees shall be of no force and effect.  Except as provided in this section and the Loan Modification Agreement, and notwithstanding section 1141(c) or any other provision of the Bankruptcy Code, all valid,

347973.01 [XP]    25195

enforceable and perfected prepetition liens of the Holder in its Collateral shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such Holder and/or applicable law until the Holder's Allowed Secured Claim is satisfied pursuant to this Plan; provided however, that the Holder shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtor is in compliance with this Plan. Any lien or interest granted to the Holder by the Court as adequate protection shall be released and extinguished.

### *c.*    **Common Other Priority Claim Treatment**

This Class includes Other Priority Claims for an amount entitled to priority under Sections 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, and does not include any Administrative Claim or Tax Claim. These unsecured Other Priority Claims are for unsecured Claims for accrued employee compensation earned within 180 days prior to the Petition Date, to the extent of $10,950 per employee

The Bankruptcy Code requires that each Holder of a Priority Claim receive Cash on the Effective Date equal to the amount of the Holder's Allowed Claim. However, a Class of Priority Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claims.

Unless otherwise agreed to by the parties, each Holder of an Allowed Other Priority Claim will receive an initial payment equal to 50% of the Holder's Allowed Claim and a second payment for the balance of the Holder's Allowed Claim one year after the Effective Date with interest at the rate of 1.0% per annum. To the extent such claim includes accrued vacation pay such vacation pay shall not be disbursed in cash but the vacation time shall be reinstated and the holder shall be authorized to use such vacation time following the Effective Date. The initial payment shall occur on or before the later of (i) the Effective Date or (ii) 30 days after the end of the calendar quarter in which the Disputed Claim becomes an Allowed Claim and (iii) the date that such Claim would be

-78-

347973.01 [XP]    25195

paid in accordance with any terms and conditions of any agreements or understandings relating thereto between the applicable Debtor and the Holder of such Claim.

### d.   Common Tenant Security Deposits Treatment

The Allowed Claims of the Holders shall be reinstated as of the Effective Date of the Plan.

### e.   Common Convenience Class Claim Treatment

Convenience Classes of General Unsecured Claims against each Debtor includes those Claims the amount of which are equal to or less than $500.  The Holders of such Claims shall receive a single Cash payment equal to the full Allowed amount of the Claim, payable on the later of (i) the Effective Date or as soon as practicable thereafter or (ii) 30 days after the end of the calendar quarter in which the Disputed Claim becomes an Allowed Claim or (iii) 30 days after the contingent claim becomes non-contingent.  No payments shall be made to Holders of contingent Claims until such Claims become non-contingent.

The Holder of any Claim in any Impaired "C" Class may elect to reduce the Allowed amount of its Claim to $500 and be treated as a member of the Convenience Class.

### f.   Common Unsecured Claim Treatment

The Holders of Allowed General Unsecured Claims shall receive deferred cash payments equal to 100% of the Allowed amount of the Claim plus interest at the rate of one percent per annum, payable in twenty (20) equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date.  Any Holder shall have the right to elect an alternate treatment for such claim which election must be made at the time such Holder votes on the Plan.  Under the alternate treatment, the Holder shall receive payment of 50% of its Allowed Claim within 30 days after the Effective Date in full satisfaction of its Claim.

In the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the first quarterly payment will be due and payable on the later of the next Quarterly Distribution Date or 30 days after date the Disputed Claim becomes an Allowed Claim, and the first payment shall include

347973.01 [XP]   25195

payment for any quarter for which payment had not been made before the Disputed Claim became an Allowed Claim.

### g.   Common Unsecured Guaranty Claim Treatment

Claims in this Class consist of Guaranty Claims on obligations for which another one of the Debtors is the principal obligor (referred to generally in this section as the "Principal Obligor") and for which the principal obligation is provided for under this Plan or under the plan filed by MM 845 S. Flower and Chinatown.

As of the Effective Date, all provisions of all guaranties giving rise to such Guaranty Claims shall be canceled and extinguished, including any and all waivers of suretyship rights and defenses under California Civil Code § 2856, and all Claims arising under such guaranties shall be released except as provided in this Plan. Guaranty Claims shall be deemed contingent as of the Effective Date and shall be deemed to be guarantees of the amended obligations of the respective Principal Obligors under the Plan. The Holder of a Guaranty Claim in this Class shall not receive any distribution on account of its Guaranty Claim; unless and until the Principal Obligor defaults under the terms of this Plan (e.g., by failing to make a payment of interest and failing to timely cure such default under the surviving terms of the applicable promissory note). In that event, the Holder of a Guaranty Claim shall be required to proceed, whether by judicial or non-judicial foreclosure, against all real property securing the debt owed by the Principal Obligor to the Holder before seeking payment on account of its Guaranty Claim. If the Holder forecloses on such real property collateral, the amount of the Holder's Guaranty Claim shall be equal to (1) the amount owed by the Principal Obligor at the time of default, less the price for which the real property collateral was sold at the foreclosure sale (including by credit bid) or the fair market value of such property at the time of the foreclosure sale, whichever is greater. If the price for which the real property collateral was sold at the foreclosure sale is greater than the amount owed by the Principal Obligor as of the date of default, the amount of the Holder's Guaranty Claim shall be zero and any excess amounts will be distributed to the Debtor in accordance with applicable law.

-80-

347973.01 [XP]   25195

If the price for which the real property collateral was sold at the foreclosure sale is less than the amount owed by the Principal Obligor as of the date of default, the Holder's resulting Guaranty Claim shall be deemed non-contingent.  Within thirty (30) days after the foreclosure sale, the Holder shall file a motion with the Bankruptcy Court on regular notice to the Debtors seeking entry of an order determining the amount of the Holder's Guaranty Claim as provided herein.  Upon the entry of that order, the Holder's Guaranty Claim shall receive the same treatment as afforded to Claims (i.e., the Holder shall receive deferred cash payments equal to 100% of the Allowed amount of the Claim with interest, payable in equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date).  In the event that the order is entered after the first Quarterly Distribution Date, the initial payment shall be due and payable on the later of the next Quarterly Distribution Date or thirty (30) days after the date on which the order is entered.

The foregoing treatment shall not apply with regard to guaranties executed by MMPI or other Debtors for the benefit of PCB, Imperial, or other Holders of Guaranty Claims where, pursuant to settlements approved by the Bankruptcy Court, the guaranties have been confirmed or otherwise continued.  With respect to those guaranties, the treatment of the Holder's Guaranty Claim shall be consistent in all regards with the Bankruptcy Court-approved settlement.

### *h.* **Common Intercompany Claim Treatment**

The Holders shall retain such Claims and all rights, interests, and obligations related thereto but, notwithstanding, the Debtors consent to the treatment afforded and distributions to be made under this Plan to Holders in each class of Allowed Claims.

### *i.* **Common Equity Interest Treatment**

The Holders of the Equity Interests in the Debtors Equity Interests in this Class shall retain their Equity Interests in the Debtor.

### **2.** **Summary of Classified Claims and Treatment**

The following are Common Class Treatments for the following classes of Claims and

The categories of Claims and Interests listed in the chart below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to this Plan.  The amounts listed for each Class in the chart below represent the Debtors' estimate of the amount of the Allowable Claims as of the Petition Date asserted in each Class and contain a brief summary description of the treatment of each class.  This is a summary for information only and does not specify the full terms of the treatment for each class.  Such full description is set forth in Article III of the Plan.  The terms of the Plan control over the summary descriptions set forth herein.  In addition, the Debtors expressly reserve all of their rights to object to the amount, character and enforceability of any Claim, whether or not listed in the chart below.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 1. | Meruelo Maddux Properties, Inc.[3] | | |
| 1A | Secured Claim of Oliver, Sandifer - $436,901 | Impaired. | Paid in full.  Interest accrues on unpaid amount at 3.50%.  10% of claim paid on Effective Date. 10% paid on each subsequent anniversary of Effective Date until litigation that is basis for attorney lien is resolved, with remaining amounts paid from litigation recoveries. |
| 1B | Priority Wage Claims - $46,362 | Impaired. | Paid in full.  50% of claim paid on Effective Date and 50% of claim plus interest at 1% per annum paid on 1st anniversary of Effective Date. |
| 1C-1 | General Unsecured Claims – Convenience Class - $1,274 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 1C-2 | Unsecured Guaranty Claims - $194,698,171 | Impaired. | Guaranties deemed contingent as of Effective Date and deemed to guaranty amended obligation of Principal Obligor under Plan.  Guarantor enjoined from enforcement until default by |

[3] The Debtors are listed in the order of the Service Level Debtors and then the Property Level Debtors.

-82-

347973.01 [XP]   25195