If within 20 days after the giving of any notice pursuant to the preceding paragraph above for such extended time as in all the circumstances the Board of Directors shall consider reasonable) such notice is not complied with to the satisfaction of the Board of Directors, the Directors may arrange for the Company to redeem those Prohibited Shares at the lesser of the proposed transfer price or their book value according to United States generally accepted accounting principles.  With regards to the foregoing, the Directors may take such other steps as they think fit to effect the redemption of the Prohibited Shares by the Corporation.

Any notice given pursuant to the preceding paragraphs may relate to more than one share shall in any event specify the share or shares to which it relates.  For the purposes of this section in the case of shares of Common Stock held by any holder in uncertificated form, the Board of Directors may, to enable the shares to be identified and dealt with in accordance with the provisions of this section, require the operator of the relevant system to convert the shares into certificated form.

The Board of Directors shall not be required to give any reasons for any decision, determination or declaration taken or made in accordance with this section.

The Board of Directors may resolve at any time to suspend the powers conferred on it by this section indefinitely or for such period as it may in its absolute discretion determine.

Securities Laws.  In addition to the transfer restrictions set forth above, none of the shares of Common Stock of any of the stockholders may be transferred (whether by sale, gift, assignment, divestment or other disposition) unless such transfer shall be made pursuant to an effective registration statement under the Securities Act of 1933, as amended, and any applicable state securities laws, or an exemption from such registration, and prior to any transfer exempt from registration, the stockholder proposing to transfer shares shall give the Corporation notice describing the manner and circumstances of the proposed transfer (copies of which the Corporation shall furnish to each other stockholder following receipt thereof by the Corporation).  The Board of Directors may require that the

125

1    stockholder proposing the transfer deliver contemporaneously with such transfer an opinion

2    of counsel addressed to the Corporation and its stockholders, in form and substance

3    satisfactory to the Corporation that the transfer complies with all applicable federal and

4    state securities laws.

5    　　　Right of First Refusal.  In addition to the provisions set forth above, no stockholder

6    may sell, gift, assign, divest or otherwise dispose of ("Transfer"), directly or indirectly, any

7    shares of Common Stock except in compliance with the provisions hereof.

8    　　　If at any time a stockholder proposes to Transfer all or any part of his interest in the

9    Corporation, such stockholder (the "Offeror") shall first make a written offer to sell such

10    interest to the Corporation on the same terms and conditions on which the Offeror proposes

11    to transfer the shares.  Such offer shall state the name of the proposed transferee and all the

12    terms and conditions of the proposed transfer, including the price to the proposed

13    transferee, and shall be accompanied by a copy of the offer, if any, from the proposed

14    transferee and all related information either provided by the transferee or accumulated by

15    the Offeror.

16    　　　The Corporation shall have the right for a period of 30 days after receipt of the offer

17    from the Offeror, to elect to purchase the shares offered.  To exercise its right to purchase,

18    the Corporation shall give written notice to the Offeror, which notice shall be deemed to be

19    given on the date of mailing by certified or registered mail or, if the notice is not mailed,

20    upon personal delivery to the Offeror.  Upon exercise of the rights to purchase, the purchase

21    shall be closed and payment made within thirty (30) days after exercise, on the same terms

22    as applicable to the offer received by the Offeror from the proposed transferee.

23    　　　If the Corporation does not elect to purchase the shares offered in accordance with

24    the provisions of the preceding paragraph, the Offeror may Transfer all of the offered shares

25    to the proposed transferee named in the offer.  In all cases, the proposed transferee shall

26    agree in writing to deliver an opinion of counsel addressed to the Corporation and its

27    stockholders, in form and substance satisfactory to the Corporation, that the transfer

28    complies with all applicable federal and state securities laws, said opinion to be delivered

126

1  contemporaneously with the transfer.  If the transfer is not made within 30 days after the

2  expiration of the 30-day period a new offer shall be made to the Corporation and the

3  provisions of this section shall again apply.

4       Permitted Transfers.  Notwithstanding any other provisions of this section, a

5  Transfer to any one or more lineal descendants (whether by blood relation or by adoption),

6  or irrevocable trusts established for the sole benefit of such descendants (such descendants

7  and trusts being hereinafter collectively referred to as "Permitted Transferees"), shall be

8  permitted without first offering the interest to the Corporation.  Stockholders holding in the

9  aggregate a majority of the total voting power may adopt any one or more resolutions for

10  the purpose of extending or modifying the types of family members which qualify as a

11  Permitted Transferee; provided, that no such resolution shall retrospectively impair any

12  transfer that has been effected prior to the adoption of such resolution.

13  --    New Equity Legend. Each Eligible Investor who receives shares of New Equity

14  agrees to the imprinting of a legend on any certificate or other instrument representing shares of

15  New Equity in substantially the following form:

16  THE NUMBER OF SHAREHOLDERS OF COMMON STOCK OF THE

17  CORPORATION SHALL NOT EXCEED BY ANY MEANS TWO HUNDRED AND

18  FIFTY(250), THE SALE, TRANSFER, GIFT, ASSIGN, DEVISE OR DISPOSITION OF SHARE

19  OF COMMON STOCK OF THE CORPORATION BY ANY SHAREHOLDER IN VIOLATION

20  OF THE PRECEDING SENTENCE SHALL BE NULL AND VOID.  INVESTORS SHOULD

21  REVIEW THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF

22  MERUELO MADDUX PROPERTIES, INC.  CAREFULLY WHEN CONSIDERING

23  WHETHER TO INVEST IN THE CORPORATION.

24  THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND

25  EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN

26  RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES

27  ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND STATE SECURITIES LAWS

28  AND MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE

351389.04 [XP]    25195

1    REGISTRATION STAETMENT UNDER THE SECURITIES ACT AND STATE SECURITIES

2    LAWS OR PURSUANT TO AN AVAILABLE EXEMPTION FROM OR IN A TRANSACTION

3    NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT

4    AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED

5    BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUC EFFECT, THE

6    SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY.

7         THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN

8    RESTRICTIONS UPON TRANSFER AND A RIGHT OF FIRST REFUSAL OPTION IN

9    FAVOR OF MERUELO MADDUX PROPERTIES, INC. OR ITS ASSIGNEE IS SET FORTH IN

10   THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF MERUELO

11   MADDUX PROPERTIES, INC., A COPY OF WHICH IS ON FILE AT THE PRINCIPAL

12   OFFICE OF MERUELO MADDUX PROPERTIES, INC.

13                    b.    **Payment of Purchase Price**

14         After the Subscription Election Deadline (identified below), MMPI will give notice to each

15   Eligible Investor (and any permitted transferee thereof) entitled and obligated to subscribe for

16   shares of New Equity, advising such Eligible Investor of:

17         --    the number of whole shares of New Equity that such Eligible Investor is bound to

18   purchase pursuant to the Private Placement, and the aggregate purchase price thereof;

19         --    the date or time after the notice by which a wire transfer of such purchase price must

20   be received by Reorganized MMPI; and

21         --    wire transfer instructions for wiring such purchase price to Reorganized MMPI or

22   another Person designated by MMPI.

23                    c.    **Risk of Delivery**

24         The risk of delivery of all documents and payments is on the holder of New Equity, not the

25   Debtors, or Reorganized MMPI.

26

27

28

351389.04 [XP]    25195

1                 **d.**      **Private Placement Conditioned Upon Confirmation And**

2                 **Effective Date**

3        All New Equity is subject to and conditioned upon the confirmation of the Plan and the

4 occurrence of the Effective Date. If this Plan is not confirmed or the Effective Date does not occur

5 each Eligible Investor submitting a purchase price payment with respect to shares of New Equity

6 will be refunded all of the subscription price, without interest, by _____, 2010.

7        Certificates for the applicable shares of New Equity purchased pursuant to the Private

8 Placement will be mailed no later than 30 days after the Effective Date to the Initial Investors and

9 the Eligible Investors subscribing for shares of New Equity.

10                **e.**      **Subscription Election Deadline**

11       ALL NEW EQUITY MUST BE SUBSCRIBED BEFORE THE SUBSCRIPTION

12 ELECTION DEADLINE, WHICH IS 5:00 P.M., PACIFIC TIME, ON _____, 2010.

13      **H.**      **Certificate of Incorporation and Bylaws; Cancellation Of MMPI Securities,**

14            **LTIP Units and Related Agreements**

15               **a.**      **Cancellation Of MMPI Securities, LTIP Units and Related**

16                 **Agreements**

17        At the Effective Date, (i) the MMPI Existing Common Stock and the LTIP Units; all

18 warrants, options or other rights for the purchase or other acquisition from any Debtor of any

19 MMPI Existing Common Stock or LTIP Units; all securities convertible into or redeemable or

20 exchangeable for any MMPI Existing Common Stock or LTIP Units; and all warrants, rights or

21 options for the purchase or other acquisition from any Debtor of any MMPI Existing Common

22 Stock or LTIP Units or any such warrants, options, other rights or securities, and any interest or

23 participation in any of the foregoing and any other ownership or profit interest or participation in

24 MMPI or MMPLP (to the extent not held directly or indirectly by MMPI) will be cancelled and

25 extinguished, and (ii) the obligations of, Claims against, and/or Interests in MMPI under, relating

26 or pertaining to any agreements (including without limitation, registration rights agreements,

27 merger, contribution and similar agreements and voting, shareholders and similar agreements),

28 indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar

129

1 documents governing the MMPI Existing Common Stock and any other instrument or document

2 evidencing or creating ownership interest in MMPI (including without limitation, provisions of the

3 agreement of limited partnership of MMPLP and award agreements relating to the LTIP Units) will

4 be released and discharged.

5            b.     **Amended and Restated Certificate of Incorporation and**

6                  **Bylaws**

7       On and after the Effective Date, pursuant to and by virtue of this Plan, the certificate

8 of incorporation of the Reorganized MMPI will be amended and restated in the form attached

9 hereto as Exhibit K until thereafter changed or amended as provided therein or by applicable law,

10 and the amended and restated bylaws in the form attached hereto as Exhibit L will be the bylaws of

11 Reorganized MMPI until thereafter changed or amended as provided therein or by applicable law.

12     **I.**     **Issuance of New Equity Interests**

13       Upon entry of the Confirmation Order, the shares of New Equity shall be issued to the

14 Eligible Investors validity subscribing for New Equity and the Initial Investors,  in accordance with

15 the Private Placement, which issuance will then represent all of the issued and outstanding equity

16 interests in MMPI.  Nothing herein shall prevent Reorganized MMPI from adopting a new name.

17 All of the shares of New Equity issued pursuant to the Plan shall be duly authorized, validly issued,

18 fully paid and non-assessable.

19     **J.**     **Merger of MMPLP and MMPI**

20       Upon the terms and subject to the conditions set forth in the agreement and plan of merger

21 (the "Merger Agreement"), the form of which is attached hereto as Exhibit M, MMPLP shall be

22 merged with and into MMPI one day after the Effective Date if not earlier accomplished (the

23 "Merger").  Following the Merger, the separate corporate existence of MMPLP shall cease, and

24 MMPI shall continue as the surviving company and shall succeed to and assume all the rights and

25 obligations of MMPLP.

26       If not earlier accomplished, as promptly as practicable but at least one day after the

27 Effective Date, the parties shall file with the Secretary of State of the State of Delaware a certificate

28 of merger (the "Certificate of Merger") executed and acknowledged by the parties in accordance

351389.04 [XP]    25195

1  with the relevant provisions of the DGCL and the RULPA and, as promptly as practicable on or

2  after the Effective Date, the parties to the Merger shall make all other filings or recordings required

3  by the Court and under the DGCL and the RULPA.  If not earlier accomplished, the Merger shall

4  become effective one day after the Effective Date and the filing of the Certificate of Merger with

5  the Secretary of State of the State of Delaware, or at such later date and time as MMPI and

6  MMPLP shall agree and shall specify in the Certificate of Merger.

7      Once the Merger becomes effective, all the property, rights, privileges, powers and

8  franchises of MMPLP shall vest in MMPI, and all debts, liabilities and duties of MMPLP shall

9  become the debts, liabilities and duties of MMPI.

10      **K.      Retained Claims And Defenses And Reservation Of Rights**

11          **a.      No Waiver and Retention of Claims and Defenses**

12              Unless otherwise expressly set forth in the Plan or the Confirmation Order, pursuant

13  to Section 1123(b)(3)(B), all Retained Claims and Defenses of any kind or nature whatsoever

14  against third parties arising before the Effective Date and belonging to the Debtor or the Estate

15  shall become property of the Reorganized Debtor.  Such Retained Claims and Defenses shall

16  include, without limitation:

17              All claims and defenses pursuant to applicable non-bankruptcy law and Sections

18  502, 506, 524 and 553 of the Bankruptcy Code against any Creditor regarding the amount of such

19  Holder's Allowed Claim (whether prepetition or postpetition), to enforce the discharge of any

20  Secured Creditors' Claims;

21              All claims and defenses pursuant to applicable non-bankruptcy law and Sections

22  502, 506, 510, 524, 542 and 553 of the Bankruptcy Code including, without limitation, claims and

23  defenses based on any Creditors' assertion of unreasonable professionals' fees, costs, charges and

24  penalties (whether disguised as interest, or otherwise); and

25              All claims and defenses related to the recovery of professionals' fees and expenses

26  by the Debtor or Reorganized Debtor from Creditors.

27              From and after the Effective Date, the Reorganized Debtor is authorized to assert the

28  Retained Claims and Defenses including, but not limited to, for purposes of objection to the

351389.04 [XP]     25195

1  allowance of any Claim.  Nothing contained in the Plan or the Confirmation Order shall be deemed

2  to be a waiver or the relinquishment of any of the Debtor's rights with respect to the Retained

3  Claims and Defenses and Reorganized Debtor shall be entitled to assert the Retained Rights and

4  Defenses as fully as if the Chapter 11 Case had not been commenced.

5            b.    **Retention of Avoidance Actions**

6       Unless otherwise expressly set forth in the Plan or the Confirmation Order, from and after

7  the Effective Date, the Reorganized Debtor shall have the right to prosecute any and all avoidance

8  actions, recovery causes of action and objections to Claims under Sections 105, 502, 506, 510, 542

9  through 551 and 553 of the Bankruptcy Code that belong to the Debtors or to the Estates,

10  including, without limitation, all avoidance actions related to the transfers listed on Exhibit "I"

11  attached hereto, as well as potential avoidance actions against Legendary and East West Bank

12  relating to the withdrawals by East West Bank of $2 million from an account held at East West

13  Bank a few days before the Debtors' bankruptcy and against Legendary, based on the post petition

14  recording of documents purporting to re-establish a previously reconveyed Lien against assets of

15  Debtors, and against PNL for certain involuntary, unauthorized postpetition transfers of funds

16  belonging to MG 2001-2021 W. Mission.

17       With regard to actions that may be asserted by the Debtors under section 547 of the Code,

18  the Debtors note that in order to avoid a preferential transfer a debtor must show that the recipient

19  received more as a result of the transfer than the recipient would receive in a hypothetical Chapter 7

20  case.  Provided that the Debtors' proposed plans are confirmed, general unsecured creditors'

21  Allowed Claims will be paid in full.  As a result, with regard to transfers made during the relevant

22  90-day or 1-year preference periods to general unsecured creditors, the Reorganized Debtor is

23  unlikely to seek the avoidance of such transfers.  If the plan is not confirmed, the risk that an

24  avoidance action may be filed to recover a transfer made during the relevant period may increase.

25  A list of all of the transfers by the Debtor during the 90-day and 1-year periods is attached as

26  Exhibit "I."

27

28

351389.04 [XP]    25195

c.    **Unknown Retained Claims and Defenses / No Preclusion**

Unless otherwise expressly set forth in the Plan or the Confirmation Order, the reservation of rights and Retained Claims and Defenses set forth above shall include, without limitation, any Retained Claims and Defenses of which the Debtor may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist including, without limitation, claims based on theories of construction defect, breach of warranty, negligence, indemnification and contribution.  Therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to the Reorganized Debtor with respect to the Retained Claims and Defenses upon or after the Confirmation of the Plan based on the Plan, the Disclosure Statement or the Confirmation Order.

**L.    NON-BANKRUPTCY LITIGATION**

The Debtors are engaged in litigation proceedings for which relief from stay has been granted.  While the Debtors do not consider any such litigation to be material, there are two eminent domain actions that may result in cash awards being paid to the respective Debtors.  In 2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed an eminent domain action against Alameda Produce Market seeking to take the 1339 E. 7th Street Real Property.  Shortly thereafter, the MTA obtained an order for possession of such property and have remained in possession ever since.  After lengthy proceedings, the trial court dismissed the action and ordered the MTA to return possession of the property to Alameda Produce Market.  The MTA appealed the ruling and the matter is pending before the appellate court.  If the trial court ruling is affirmed and not further appealed, the MTA will be required to return possession of the property to Alameda Produce Market, and Alameda Produce Market may, among other things, be entitled to damages and/or compensation as a result of the MTA's use of the property.  A reversal of the trial court's ruling could result in a remand to the trial court for a hearing on the valuation of the property.  In the event the MTA is permitted to proceed with the taking of the property, the MTA would be required to pay just compensation in connection with such taking.

133

351389.04 [XP]    25195

1          **M.    OBJECTIONS TO CLAIMS**

2          Except as otherwise provided in the Plan, objections to Claims, including without limitation

3  Administrative Claims (other than objections to Administrative Claims of Professionals), shall be

4  Filed and served upon the Holder of such Claim or Administrative Claim no later than the later of:

5  (a) one hundred eighty (180) days after the Effective Date, (b) one hundred eighty (180) days after

6  a proof of Claim or request for payment of such Claim is Filed, and (c) a deadline set by the

7  Bankruptcy Court after the extension of the one hundred eighty (180)-day deadline; such extension

8  may be granted on an ex parte basis without notice or hearing.  After the Confirmation Date, only

9  the Reorganized Debtor will have the authority to File objections, settle, compromise, withdraw or

10  litigate to judgment objections to Claims and Interests.  From and after the Confirmation Date,

11  Reorganized Debtor may settle or compromise any Disputed Claim or Disputed Interest without

12  approval of the Bankruptcy Court.

13          The Debtors will file objections to any claim which was scheduled as disputed, contingent

14  or unliquidated and for which no timely proof of claim was filed.  The following list is not

15  illustrative, but not exhaustive, and the Debtors expressly reserve the right to object to any claim or

16  interest whether or not identified below.

17          Berkadia has filed alleged and duplicative unsecured claims for "money had and received,

18  money lent, unjust enrichment, and interference with contract" for $1,443,668.40 (the "Berkadia

19  Unsecured Claim") against 53 of the 54 Debtors.  Santa Fe Commerce Center is the only Debtor

20  against whom Berkadia did not file an unsecured claim.  The Debtors will be filing formal

21  objections to the Berkadia Unsecured Claims asserted in the 53 Chapter 11 Cases as there is no

22  basis for any of the 53 Berkadia Unsecured Claims.

23          The FTB filed an $800 priority unsecured tax claim against 21 of the Debtors for corporate

24  tax fees.  The Debtors believe these tax obligations were satisfied prior to the Petition Date and, if

25  the Debtors cannot resolve the issue consensually with the FTB, the Debtors will object to the

26  FTB's claims.

27          The County of Los Angeles filed proofs of secured claims and alleged administrative claims

28  against all of the Debtors that own real property, and one Debtor that does not, with regard to real

1    property taxes owed.  With regard to the base amount of such real property taxes, any disputes are

2    being pursued pursuant to applicable state and local law in the form of tax assessment appeals.

3    Pursuant to the Debtors' settlement with the County, the Debtors' rights with regard to such appeals

4    are preserved.  In the event that the Debtors' settlement with the County is not approved, the

5    Debtors may object to portions of the County's claims on various grounds.

6           **1.**    <u>MMPI</u>

7       **Grand Avenue Lofts Homeowners Association (POC no. 43)**:  Grand Avenue Lofts

8    Homeowners Association ("Grand Ave HOA") filed a secured claim against MMPI for $270,000

9    based on agreements between Grand Ave HOA's predecessor in interest and certain Property Level

10   Debtors.  MMPI was not a party to those agreements and MMPI did not pledge any assets in

11   connection with those agreements.  Therefore, if the Debtors cannot resolve the issue consensually

12   with Grand Ave HOA, the Debtors will object to this claim.

13       **Aviles Security Patrol (POC no. 19)**:  Aviles Security Patrol ("Aviles") filed a priority

14   status unsecured claim for $32,530 against MMPI.  The Debtors believe there is no basis for the

15   asserted priority status of this claim and, if the Debtors cannot resolve the issue consensually with

16   Aviles, the Debtors will object to the priority of this claim and ask the Court to allow the claim

17   only as a general unsecured claim.  As noted above, this claim is also one of the claims which the

18   Debtors seek to reassign from MMPI to the Debtors for whom Aviles provided security services:

19   2640 Washington, 788 S. Alameda, Alameda Produce Market, MG 2529 Santa Fe, MG Southpark,

20   MM 1000 E. Cesar Chavez, MM 2415 E. Washington Boulevard, MMP 760 S. Hill Street,

21   MMPLP, Meruelo Wall Street and Santa Fe Commerce Center pursuant to the Debtors'

22   Reassignment Motion.  To the extent the Reassignment Motion results in eleven claims each for

23   $32,500 being deemed filed against eleven Debtors, the Debtors will seek disallowance of the

24   amounts in excess of those actually owed by each obligor-Debtor.

25       **Guaranty Claims of CBT, Kennedy, Legendary, UCB**:  Kennedy and UCB each filed a

26   secured guaranty claim against MMPI and Legendary filed seven different secured claims against

27   MMPI.  While MMPI has guaranteed the obligations of certain Property Level Debtors, none of

28   those guaranties is secured and the Debtors will object to the guaranty claims of any lender who

135

1  asserts it holds a secured guaranty. Because MMPI's guaranty claims are unsecured, the Debtors

2  do not believe there is any basis for the lenders to include, among other things, postpetition interest,

3  postpetition attorney's fees or any postpetition charges in their unsecured guaranty claims. CBT,

4  Kennedy, Legendary and UCB appear to include postpetition amounts in their guaranty claims and

5  the Debtors will object to those amounts. To the extent any amounts claimed by lenders against the

6  Property Level Debtors are disallowed, the Debtors will seek to disallow the same amounts from

7  the lenders' guaranty claims against MMPI.

8       **CIM Urban RE Fund GP II (POC no. 60)**: CIM Urban RE Fund GP II ("CIM") filed a

9  secured claim for an unliquidated amount against MMPI based on agreements between CIM's

10  predecessor in interest and certain Property Level Debtors. MMPI was not a party to those

11  agreements and MMPI did not pledge any assets in connection with those agreements. Therefore,

12  if the Debtors cannot resolve the issue consensually with CIM, the Debtors will object to this claim.

13       **Geodesign (POC no. 71)**: Geodesign filed an unsecured claim for $21,715 against MMPI.

14  The Debtors believe the claim is owed by a non-debtor affiliate, not MMPI. If the Debtors cannot

15  resolve the issue consensually with Geodesign, the Debtors will object to this claim.

16       **Tirso Del Junco (POC no. 77)**: Dr. Tirso Del Junco filed an unsecured claim for $268,260

17  against MMPI. There is no basis for any of the amounts claimed by Dr. Del Junco and, to the

18  extent any obligation is owed to Dr. Del Junco, it is owed by a non-debtor affiliate and not MMPI.

19       **Shareholders' Equity Interests Filed as Claims (POC nos. 1-8, 10-12, 14)**: Various

20  shareholders of MMPI filed proofs of claims asserting what appear to be equity interests in MMPI.

21  The Debtors will object to the claims and seek to have them allowed as equity interests.

22       **Late Filed Claims:** Sprint Nextel filed an unsecured claim for $210,687 on March 8, 2010.

23  RoofCorp filed an unsecured claim for $25,000 on November 4, 2009. As the Bar Date in the

24  Chapter 11 Cases was September 24, 2009, the Debtors will object to these claims as late-filed.

25       **2.**    **MMPLP**

26       **US Bancorp Business Equipment Finance Group (MMPI POC no. 57)**: US Bancorp

27  Business Equipment Finance Group ("US Bancorp") filed a secured claim against MMPI for

28  $8,682 related to an equipment lease for a copier. Pursuant to the Debtors' Reassignment Motion,

1  the Debtors believe the claim should be deemed filed against MMPLP. The Debtors, however,

2  believe the claim is an unsecured claim and if the Debtors are unable to resolve the issue

3  consensually with US Bancorp, the Debtors will object to the secured status of this claim.

4         **3.**    **MM Management**

5      **American Home Assurance (POC no. 3):** American Home Assurance Company and

6  various other insurance companies filed a single unsecured claim for an unknown amount against

7  MM Management. The Debtors do not believe that any amount is owing to these companies by

8  any of the Debtors and will object to this claim.

9         **4.**    **MG – Overland Terminal**

10     **Mayer Hoffman McCann P.C. / CBIZ MHM, LLC (POC nos. 1 & 2):** Mayer Hoffman

11 McCann P.C. and CBIZ MHM, LLC each filed unsecured proofs of claim for $42,228 which

12 appear to be duplicate claims for a single debt. The Debtors believe only one, but not both, of the

13 claims should be allowed. If the Debtors are unable to resolve the issue consensually with the two

14 creditors, the Debtors will object to one of these claims as duplicative of the other claim.

15     **Late Filed Claims**: Capital One Bank filed an unsecured claim for $1,308 against MG

16 Overland Terminal on December 10, 2009. The claim also appears to have been intended to be

17 filed against an unrelated debtor in an unrelated case. The Los Angeles Department of Water and

18 Power ("DWP") filed an unsecured claim for $9,646 on January 15, 2010. As the Bar Date in the

19 Chapter 11 Cases was September 24, 2009, the Debtors will object to these claims as late-filed and

20 will object to the Capital One Bank claim as not being an obligation of any of the MMPI Debtors.

21        **5.**    **National Cold Storage**

22     **SYM PAC International (POC no. 10):** SYM PAC International, Inc. filed an unsecured

23 claim for $150,994 against National Cold Storage on November 9, 2009 for alleged damages

24 related to the cold storage of swordfish. The debtors will object as there is no merit to this claim

25 and as it was not timely filed.

26        **6.**    **MMP 306 – 330 N. Avenue 21**

27     **City of Los Angeles (POC no. 8):** The City of Los Angeles filed a priority unsecured tax

28 claim for $151,232 for business taxes. The Debtors believe that the entire amount claimed is not

351389.04 [XP]    25195

1   entitled to priority as a portion of the taxes claimed were assessed more than one year before the

2   Petition Date.  If the Debtors are unable to resolve the issue consensually with the City of Los

3   Angeles, the Debtors will object to the priority status asserted for the entirety of the claim and they

4   will also object to the amount of the claim.

5       **Lexis Nexis:**  Lexis Nexis filed two unsecured proofs of claims for $1,548 and $801 on

6   March 11, 2010 and November 2, 2009 respectively and the Debtors will also object to these

7   untimely claims.

8           **7.    MMP 1060 N. Vignes**

9       **State Board of Equalization (MMPI POC no. 82):**  The SBE filed a priority unsecured

10  tax claim for $61,915 related to a hazardous substance tax.  The claim relates to stockpiled soil on,

11  and contaminated earth affecting, unimproved real property commonly described as 1060 N.

12  Vignes St., Los Angeles, California owned by MMP – 1060 N. Vignes, LLC.  Pursuant to the

13  Debtors' Reassignment Motion, the Debtors believe the claim should be deemed filed against

14  MMP 1060 N. Vignes.  The Debtors also dispute that this claim is entitled to priority status as a tax

15  claim or otherwise.  If the Debtors are unable to resolve the issue consensually with the SBE, the

16  Debtors will object to the priority status of this claim.

17          **8.    MMP 12385 San Fernando Road**

18      **American Home Assurance (POC no. 4):**  American Home Assurance Company and

19  various other insurance companies filed a single unsecured claim for an unknown amount against

20  MMP 12385 San Fernando Road.  The Debtors do not believe that any amount is owing to these

21  companies by any of the Debtors and will object to this claim.

22          **9.    MG 1211 E. Washington Boulevard**

23      **Blake Sign Co. (POC no. 5):**  Blake Sign Company ("Blake") filed an unsecured claim for

24  $1,948 and asserted priority status for $148 of this amount.  The Debtors believe there is no basis

25  for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the

26  issue consensually with Blake, the Debtors will object to the $148 priority portion of this claim and

27  ask the Court to allow the claim only as a general unsecured claim for $1,948.

28

351389.04 [XP]    25195

### 10.    MG – Ceres Street Produce

**Blake Sign Co. (POC no. 2):**  Blake Sign Company ("Blake") filed an unsecured claim for $1,407 and asserted priority status for $107 of this amount.  The Debtors believe there is no basis for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue consensually with Blake, the Debtors will object to the $107 priority portion of this claim and ask the Court to allow the claim only as a general unsecured claim for $1,407.

### 11.    MM 3rd & Omar Street

**Legendary (POC no. 4):**  The Debtors will object to the amount of Legendary's proof of claim against MM 3rd & Omar, as well as the associated guaranty claims asserted against MMPI and MMPLP, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

### 12.    MM 336 W. 11th Street

**Legendary:**  Although Legendary did not file a proof of claim against MM 336 W. 11th Street, this Debtor pledged its real property in favor of Legendary to secure the obligations of MG 620 Gladys.  MM 336 W. 11th Street will be a co-movant with respect to any objections to the Legendary claim filed by MG 620 Gladys.

**CIM Urban RE Fund GP II (POC no. 6) and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (POC no. 5):**  CIM Urban RE Fund GP II ("CIM") and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP each filed a secured claim for an unliquidated amount against MM 336 W. 11th Street based on agreements entered into by MM 336 W. 11th Street, MG Little J and MG Southpark.  The Debtors will object to this claim.

**Grand Avenue Lofts Homeowners Association (POC no. 43):**  Grand Avenue Lofts Homeowners Association ("Grand Ave HOA") filed a secured claim against MMPI for $270,000 based on agreements between Grand Ave HOA's predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors will object to this claim.

### 13.    MM 420 Boyd

**Legendary (POC no. 6):**  The Debtors will object to the amount of Legendary's proof of claim against MM 420 Boyd, as well as the associated guaranty claims asserted against MMPI and

1  MMPLP, to the extent Legendary seeks amounts which are not allowable under state law,

2  bankruptcy law or both.

3          **14.    MMP 760 S. Hill Street**

4          **BofA**: The Debtors will object to the amount of BofA's proof of claim against MMP 760 S.

5  Hill Street, as well as the associated guaranty claim asserted against MMPI, to the extent BofA

6  seeks amounts which are not allowable under state law, bankruptcy law or both.

7          **Asha Abdella (MMPI POC no. 18)**: Asha Abdella filed an unsecured claim for $250,000

8  against MMPI asserting damages for alleged discrimination in housing and employment.  Pursuant

9  to the Debtors' Reassignment Motion, the Debtors believe the claim should be deemed filed against

10  MMP 760 S. Hill Street.  The Debtors also believe there is no basis for Ms. Abdella's claim and

11  will file an objection to the claim.

12          **Fast Taco #3 (MMPI POC no. 32)**:  Fast Taco #3 filed an unsecured claim for $300,000

13  against MMPI asserting damages for an alleged breach of a lease termination agreement.  Pursuant

14  to the Debtors' Reassignment Motion, the Debtors believe the claim should be deemed filed against

15  MMP 760 S. Hill Street.  The Debtors will object to this claim.

16          **Otis Elevator (MMPI POC no. 24)**:  Otis Elevator ("Otis") filed an unsecured claim for

17  $16,611 for repair services related to an elevator in the Union Lofts.  Pursuant to the Debtors'

18  Reassignment Motion, the Debtors believe the claim should be deemed filed against MMP 760 S.

19  Hill Street.  The Debtors also believe that any sums owed to Otis were paid in full prior to the

20  Petition Date.  If the Debtors cannot resolve the issue consensually with Otis, they will object to

21  this claim.

22          **The Union Restaurant & Lounge (POC no. 3)**:  The Union Restaurant & Lounge

23  ("Union Restaurant") filed an unsecured claim against MMP 760 S. Hill Street for damages in the

24  amount of $247,606 based on alleged breach of lease and defamation.  The Debtors believe there is

25  no basis for Union Restaurant's claim and will file an objection to the claim.

26

27

28

### 15.   788 S. Alameda

**CBT:** The Debtors will object to the amount of CBT's proof of claim against 788 S. Alameda, as well as the associated guaranty claim asserted against MMPI, to the extent CBT seeks amounts which are not allowable under state law, bankruptcy law or both.

**Hugo Rodriguez, Natividad Gonzales, Jose Barreto, Roman Rodriguez (POC nos. 2-4, 6):** Hugo Rodriguez, Natividad Gonzales, Jose Barreto and Roman Rodriguez (collectively, the "Rodriguez Plaintiffs") filed unsecured claims against 788 S. Alameda for $251,084, $233,554, $233,554 and $238386, respectively, for damages based on alleged wage and hour violations. Each of the Rodriguez Plaintiffs asserts priority status for their claims. The Debtors do not believe there is any basis for the claims asserted by the Rodriguez Plaintiffs and further do not believe there is a basis for priority status for any of the amounts asserted and will file objections to these claims. The Debtor anticipates that liquidation of the alleged claims will take place in the Superior Court.

### 16.   Alameda Produce Market

**Hugo Rodriguez, Natividad Gonzales, Jose Barreto, Roman Rodriguez (POC nos. 8-10,12):** The Rodriguez Plaintiffs filed unsecured claims against Alameda Produce Market for $251,084, $233,554, $233,554 and $238,386, respectively, for damages based on alleged wage and hour violations. Each of the Rodriguez Plaintiffs asserts priority status for their claims. The Debtors do not believe there is any basis for the claims asserted by the Rodriguez Plaintiffs and further do not believe there is a basis for priority status for any of the amounts asserted and will file objections to these claims.

**County of Los Angeles, Metropolitan Transportation Authority (POC no. 14):** The County of Los Angles Metropolitan Transportation Authority ("MTA") filed an unsecured claim against Alameda Produce Market for $8,500,000 related to the pending eminent domain litigation between Alameda Produce Market and MTA. The Debtors believe that they are owed damages in an amount in excess of $8.5 million.

### 17.   MG 1500 Griffith Avenue

**Legendary (POC no. 3):** The Debtors will object to the amount of Legendary's proof of claim against MG 1500 Griffith and MG 4th Street Center, as well as the associated guaranty claim

141

1 asserted against MMPI, to the extent Legendary seeks amounts which are not allowable under state

2 law, bankruptcy law or both.

3         **18.**    **MMP 2131 Humboldt Street**

4      **Chamlian (POC no. 3):**  The Debtors will object to the amount of the Chamlians' proof of

5 claim against MMP 2131 Humboldt Street to the extent they seek amounts which are not allowable

6 under state law, bankruptcy law or both.

7      **Blake Sign Co. (POC no. 5):**  Blake Sign Company ("Blake") filed an unsecured claim for

8 $975 and asserted priority status for $80 of this amount.  The Debtors believe there is no basis for

9 the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue

10 consensually with Blake, the Debtors will object to the $80 priority portion of this claim and ask

11 the Court to allow the claim only as a general unsecured claim for $975.

12         **19.**    **2640 Washington Blvd.**

13      **UCB (POC no. 5):**  The Debtors will object to the amount of UCB's proof of claim against

14 2640 Washington Blvd as well as the associated guaranty claims asserted against MMPI, to the

15 extent it seeks amounts which are not allowable under state law, bankruptcy law or both.

16         **20.**    **MG 3185 E. Washington Boulevard**

17      **Chinatrust (POC no. 3):**  The Debtors will object to the amount of Chinatrust's proof of

18 claim against MG 3185 E. Washington Boulevard to the extent it seeks amounts which are not

19 allowable under state law, bankruptcy law or both.

20         **21.**    **MG 4th Street Center**

21      **Legendary (POC no. 11):**  The Debtors will object to the amount of Legendary's proof of

22 claim against MG 4th Street Center and against MG 1500 Griffith, as well as the associated

23 guaranty claims asserted against MMPI, to the extent Legendary seeks amounts which are not

24 allowable under state law, bankruptcy law or both.

25         **22.**    **MG 425 W. 11th Street**

26      **Legendary (POC no. 5):**  The Debtors will object to the amount of Legendary's proof of

27 claim against MG 425 W. 11th Street, as well as the associated guaranty claim asserted against

28

351389.04 [XP]    25195

1   MMPI, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy

2   law or both.

3       **Blake Sign Co. (POC no. 2):** Blake Sign Company ("Blake") filed an unsecured claim for

4   $1,300 and asserted priority status for $107 of this amount. The Debtors believe there is no basis

5   for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the

6   issue consensually with Blake, the Debtors will object to the $107 priority portion of this claim and

7   ask the Court to allow the claim only as a general unsecured claim for $1300.

8          **23.**   <u>**MG 620 Gladys Avenue**</u>

9       **Legendary (POC no. 5):** The Debtors will object to the amount of Legendary's proof of

10   claim against MG 620 Gladys Avenue and against MM 336 W. 11th Street, as well as the associated

11   guaranty claims asserted against MMPI and MMPLP, to the extent Legendary seeks amounts

12   which are not allowable under state law, bankruptcy law or both.

13          **24.**   <u>**MG 2001-2021 W. Mission Boulevard**</u>

14       **PNL:** Although PNL failed to file a proof of claim against MG 2001-2021 W. Mission

15   Boulevard, the Debtors will object to the amounts in any claim PNL asserts to the extent PNL seeks

16   amounts which are not allowable under state law, bankruptcy law or both.

17          **25.**   <u>**MG Little J**</u>

18       **Legendary:** Although Legendary did not file a proof of claim against MG Little J, this

19   Debtor pledged its real property in favor of Legendary to secure some of the obligations of Merco

20   Group. MG Little J will be a co-movant with respect to any objections to the Legendary claim

21   filed by Merco Group.

22       **CIM Urban RE Fund GP II (POC no. 6) and Grand Avenue Lofts, LLC / Grand**

23   **Avenue Lofts LP (POC no. 4):** CIM and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP

24   each filed a secured claim for an unliquidated amount against MG Little J based on agreements

25   entered into by MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors dispute that

26   any of these creditors hold a claim secured by any of the assets of Little J. The Debtors will object

27   to this claim.

28

351389.04 [XP]    25195

1  **Grand Avenue Lofts Homeowners Association (POC no. 3)**:  Grand Ave HOA filed a

2  secured claim against MG Little J for $270,000 based on agreements between Grand Ave HOA's

3  predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark.  The Debtors

4  dispute that Grand Ave HOA's claim is secured by any of the assets of Little J.  The Debtors will

5  object to this claim.

6            **26.**    **MG Southpark**

7  **BofA (POC no. 8)**:  The Debtors will object to the amount of BofA's proof of claim against

8  MG Southpark, as well as the associated guaranty claim asserted against MMPI, to the extent BofA

9  seeks amounts which are not allowable under state law, bankruptcy law or both.

10  **CIM Urban RE Fund GP II (POC no. 13) and Grand Avenue Lofts, LLC / Grand**

11  **Avenue Lofts LP (POC no. 7)**:  CIM and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP

12  each filed a secured claim for an unliquidated amount against MG Southpark based on agreements

13  entered into by MM 336 W. 11th Street, MG Little J and MG Southpark.  The Debtors dispute that

14  any of these creditors hold a claim secured by any of the assets of MG Southpark.  The Debtors

15  will object to this claim.

16  **Grand Avenue Lofts Homeowners Association (POC no. 6)**:  Grand Ave HOA filed a

17  secured claim against MG Southpark for $270,000 based on agreements between Grand Ave

18  HOA's predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark.  The

19  Debtors dispute that Grand Ave HOA's claim is secured by any of the assets of MG Southpark.

20  The Debtors will object to this claim.

21  **EDI Architecture (POC no. 9; MMPI POC no. 26)**:  EDI Architecture ("EDI") filed

22  unsecured claim for $567,524 against MG Southpark.  The Debtors dispute the amounts asserted by

23  EDI.

24            **27.**    **Merco Group**

25  **Legendary (POC no. 5)**:  The Debtors will object to the amount of Legendary's proof of

26  claim against Merco Group, as well as the associated guaranty claims asserted against MMPI and

27  MMPLP, to the extent Legendary seeks amounts which are not allowable under state law,

28  bankruptcy law or both.  In addition, the Debtors may object to Legendary's asserted secured status

1  with respect to the Sky-Arc Real Property as Legendary's predecessor in interest recorded a full

2  reconveyance of its deed of trust on the Sky-Arc Real Property in 2007.

3  **American Home Assurance (POC no. 6):**  American Home Assurance Company and

4  various other insurance companies filed a single unsecured claim for an unknown amount against

5  Merco Group.  The Debtors do not believe that any amount is owing to these companies by any of

6  the Debtors and will object to this claim.

7  **EDI (MMPI POC nos. 26, 72):**  EDI filed unsecured claims against MMPI for $129,570

8  and $140,881.  Pursuant to the Debtors' Reassignment Motion, the Debtors believe the claim

9  should be deemed filed against Merco Group.  The Debtors dispute the amounts asserted by EDI.

10  ## 28.  Meruelo Farms

11  **Woodland Farms (POC no. 9):**  Woodland Farms filed an unsecured claim against

12  Meruelo Farms for $1,991,537 and asserts administrative priority for $1,412,913 based on alleged

13  damages and an alleged breach of a prepetition lease with Meruelo Farms.  The Debtors dispute the

14  amount claimed by Woodland Farms and also dispute that any sums which may be owing to

15  Woodland Farms are entitled to administrative priority.  The Debtors will object to this claim.

16  ## 29.  Meruelo Wall Street

17  **UCB:**  The Debtors will object to the amount of UCB's proof of claim against Meruelo

18  Wall Street to the extent UCB seeks amounts which are not allowable under state law, bankruptcy

19  law or both.

20  ## 30.  MM Mission Boulevard

21  **Kennedy:**  The Debtors will object to the amount of Kennedy's proof of claim against MM

22  Mission Boulevard to the extent Kennedy seeks amounts which are not allowable under state law,

23  bankruptcy law or both.

24  ## 31.  Santa Fe Commerce Center

25  **Berkadia:**  The Debtors will object to the amount of Berkadia's proof of claim against

26  Santa Fe Commerce Center to the extent Berkadia seeks amounts which are not allowable under

27  state law, bankruptcy law or both.

28

351389.04 [XP]    25195

N.    DISBURSING AGENT

The Chief Accounting Officer of MMPI (currently Fred Skaggs) shall act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond, and shall receive no additional compensation for his duties as Disbursing Agent.

O.    DISCHARGE OF THE DEBTORS AND INJUNCTION

1.    Discharge

Except as otherwise provided in the Plan, the Confirmation Order or Section 1141(d)(6) of the Bankruptcy Code: (i) on the Effective Date, each Debtor shall be deemed discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Confirmation Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is allowed pursuant to Section 502 of the Bankruptcy Code or (C) the Holder of a Claim or Interest based on such debt or Interest has accepted the Plan; and (ii) all Persons shall be precluded from asserting against each Reorganized Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date.  Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Debtor, as provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Debtor at any time obtained to the extent that it relates to a Claim discharged.

2.    Injunction

All Persons that have held, currently hold or may hold a Claim or other debt or liability or an Interest or other right of an equity security Holder, are permanently enjoined from taking any of the following actions on account of any such Claims, debts or liabilities or terminated Interests or

146

1  rights discharged pursuant to Section I.1. immediately above: (a) commencing or continuing in any

2  manner any action or other proceeding against any of the Debtors and the Creditors' Committee,

3  and professional persons retained by the Debtors, the Creditors' Committee, and each of their

4  respective affiliates, current or former officers, directors, agents, employees and representatives; (b)

5  enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order

6  against any of the Debtors, the Creditors' Committee and professional persons retained by any of

7  the Debtors and Creditors' Committee and each of their respective affiliates, current or former

8  officer, directors, agents, employees and representatives; (c) creating, perfecting or enforcing any

9  lien or encumbrance against any of the Debtors, the Creditors' Committee, and professional

10  persons retained by any of the Debtors and the Creditors' Committee and each of their respective

11  affiliates, current or former officers, directors, agents, employees and representatives; (d) asserting

12  a setoff, right of subrogation or recoupment of any kind against any obligation due to any of the

13  Debtors, the Creditors' Committee and professional persons retained by any of the Debtors and the

14  Creditors' Committee and each of their respective affiliates, current or former officers, directors,

15  agents, employees and representatives; and (e) commencing or continuing any action, in any

16  manner, in any place that does not comply with or is inconsistent with the provisions of the Plan;

17  provided however, the injunction provided herein does not apply to and shall not enjoin or

18  otherwise prevent action against the Debtors' current or former officers, directors, or employees

19  that is not a Discharged Claim under Section I.1. immediately above.

20      Any Person injured by any willful violation of such injunction shall recover actual damages,

21  including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive

22  damages, from the willful violator.

23      **P.        TEMPORARY ENFORCEMENT INJUNCTION**

24      *MMPI, MMPLP, John Maddux, Belinda Meruelo, The Meruelo Living Trust, Richard*

25  *Meruelo, and the Richard Meruelo Living Trust (collectively, the "Guarantors") have*

26  *guaranteed certain obligations of some of the Debtors, as well as MM 845 S. Flower,  which*

27  *obligations are afforded treatment under either this Plan (in the case of obligations of the*

28  *Debtors) or under the Flower Plan (in the case of obligations of MM 845 S. Flower). In addition,*

147

1  *MMP Ventures pledged its equity interests in both MM 845 S. Flower and Chinatown in favor of*

2  *Canpartners as additional collateral to secure certain obligations of MM 845 S. Flower to*

3  *Canpartners which are afforded treatment under the Flower Plan; MG Little J pledged the 1119*

4  *S. Olive Street Real Property as additional collateral to secure certain obligations of Merco*

5  *Group to Legendary which are afforded treatment under this Plan and MM 336 W. 11th Street*

6  *pledged the 336 W. 11th Street Real Property as additional collateral to secure certain obligations*

7  *of MG 620 Gladys to Legendary which are afforded treatment under this Plan (collectively,*

8  *MMP Ventures, MG Little J and MM 336 W. 11th Street, the "Pledgors").*

9  *The Confirmation Order shall act as a temporary injunction (the "Temporary*

10  *Enforcement Injunction") to stay and restrain the taking of any of the following actions against*

11  *the Guarantors and the Pledgors in their capacity as guarantors or pledgors, or against property*

12  *in which the Guarantors or Pledgors hold an interest, on account of any judgments, claims or*

13  *causes of action that arise out of relate to Claims against the Debtors or the Debtors' Estates or*

14  *MM 845 S. Flower or the MM 845 S. Flower Estate, and which judgments, claims or causes of*

15  *action if asserted or enforced against the Guarantors or Pledgors may give rise to a claim of*

16  *indemnity or contribution against the Debtor-obligor or MM 845 S. Flower (an "Enjoined*

17  *Claim"):*

18  *(a)    commencing or continuing in any manner any such Enjoined Claim against the*

19  *Guarantors or Pledgors;*

20  *(b)    enforcing, attaching, collecting or recovering in any manner any judgment,*

21  *award, decree, or order on account of an Enjoined Claim; and/or*

22  *(c)    creating, perfecting or enforcing any lien or encumbrance on account of an*

23  *Enjoined Claim.*

24  *With respect to an Enjoined Claim related to an obligation afforded treatment under this*

25  *Plan, the Temporary Enforcement Injunction shall continue in effect until the earliest of the*

26  *following:*

27

28

148

351389.04 [XP]    25195

1    *(d)    all of the payments required to be made under this Plan have been paid, and all*

2    *Allowed Claims have been fully satisfied pursuant to the terms of this Plan, at which time the*

3    *Temporary Enforcement Injunction shall be terminated;*

4    *(e)    the Chapter 11 Cases are dismissed or converted to cases under Chapter 7; or*

5    *(f)    the entry of an order by the Court terminating the Enforcement Injunction on*

6    *account of the Debtor-obligor having defaulted under this Plan, and having failed to cure such*

7    *default within fifteen (15) Business Days from the date of default.*

8    *With respect to an Enjoined Claim related to an obligation afforded treatment under the*

9    *Flower Plan, the Temporary Enforcement Injunction shall continue in effect until the earliest of*

10    *the following:*

11    *(a)*    all of the payments required to be made to Canpartners under the Flower Plan have

12    been paid, and all Allowed Claims of Canpartners have been fully satisfied pursuant to the terms of

13    the Flower Plan, at which time the Temporary Enforcement Injunction shall be terminated;

14    *(b)    the Chapter 11 Cases are dismissed or converted to cases under Chapter 7; or*

15    *(c)    the entry of an order by the Court terminating the Enforcement Injunction on*

16    *account of MM 845 S. Flower having defaulted under the Flower Plan, and having failed to*

17    *cure such default within fifteen (15) Business Days from the date of default.*

18    **Q.    NO LIABILITY FOR SOLICITATION OR PARTICIPATION**

19    As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or

20    rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

21    offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the

22    Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation

23    of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of

24    the Plan or the offer, issuance, sale, or purchase of securities.

25    **R.    LIMITATION OF LIABILITY**

26    Neither (a) any Reorganized Debtor or any of their respective postpetition employees,

27    officers, directors, agents, representatives, affiliates, attorneys or any other professional persons

28    employed by any of them, nor (b) the Creditors' Committee or any of their respective postpetition

149

351389.04 [XP]    25195

1  members, agents, employees, directors, officers representatives, attorneys or other professional

2  advisors, in each case, shall have any responsibility, or have or incur any liability, to any Person

3  whatsoever, under any theory of liability (except for any Claim based upon willful misconduct or

4  gross negligence), for any act taken or omission made in good faith directly related to formulating,

5  implementing, confirming, or consummating the Plan, the Disclosure Statement, or any contract,

6  instrument, release, or other agreement or document created in connection with the Plan, provided

7  that nothing in this paragraph shall limit the liability of any Person for breach of any express

8  obligation it has under the terms of this Plan or under any post-petition agreement or other post-

9  petition document entered into by such Person or in accordance with the terms of this Plan or for

10  any breach of a duty of care owed to any other Person occurring after the Effective Date.

11  **S.      CERTIFICATE OF INCORPORATION AND CERTIFICATES OF**

12  **ORGANIZATION**

13  On the Effective Date, the Reorganized Debtor, or each of them if there is more than one,

14  shall adopt amended certificates pursuant to applicable non-bankruptcy law and Section

15  1123(a)(5)(I) of the Bankruptcy Code.  Each amended certificate will, among other provisions

16  prohibit the issuance of nonvoting equity securities to the extent required by Section 1123(a)(6) of

17  the Bankruptcy Code and will become effective upon the occurrence of the Effective Date, and

18  shall include such other provisions as determined by the Reorganized Debtors including the

19  elimination of single purpose entity provisions.

20  **T.      OTHER DOCUMENTS AND ACTIONS**

21  The Debtors and the Reorganized Debtor may, and shall, execute such documents and take

22  such other actions as are necessary to effectuate the transactions provided for in the Plan.

23  **U.      CORPORATE ACTION**

24  The adoption of the amended certificates of incorporation, certificates of organization, or

25  certificate of limited partnership, as the case may be, and all other matters under the Plan involving

26  the corporate structure of the Reorganized Debtor, shall be deemed to have occurred and be

27  effective on and after the Effective Date without any requirement of further action by the

28  stockholders, directors, managers, members, or limited partners, as the case may be, of each

351389.04 [XP]    25195

Debtor. Without limiting the foregoing, upon entry of the Confirmation Order by the Clerk, the filing by any of the Reorganized Debtor of the amended certificates shall be authorized and approved in all respects, including amendments to eliminate any special purpose entity provisions. On the Effective Date or as soon thereafter as is practicable, pursuant to applicable law, the bylaws, operating agreements, or partnership agreement, as the case may be, of each Debtor shall be the bylaws, operating agreements or partnership agreement of such Reorganized Debtor.

### V.    RETIREE BENEFITS

The Debtors do not have any present obligations to pay retiree benefits within the meaning of Section 1129(a)(13).

### W.    THE CREDITORS' COMMITTEE

The Creditors' Committee shall be dissolved 180 days after the Effective Date and the members of such committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases. The professionals retained by such committee and the members thereof shall not be entitled to compensation or reimbursement of expenses incurred for services rendered after the Effective Date (except with regard to seeking allowance of fees incurred prior to the Effective Date).

### VIII.

### MANAGEMENT OF REORGANIZED DEBTORS

### A.    BOARD OF DIRECTORS AND MANAGEMENT OF THE REORGANIZED DEBTORS

#### 1.    Board of Directors

The initial members of the Board of Directors of the Reorganized Debtor shall consist of Directors serving immediately prior to the Effective Date, subject to modification prior to the Confirmation Hearing. These members are: Richard Meruelo, John Charles Maddux, Lynn Beckemeyer, John B. Hansen, Philip S. Payne, Richard Garcia Polanco, and Anthony A. Williams. Each of the members of such initial Board of Directors shall serve in accordance with the Reorganized Debtor Certificate of Incorporation and Bylaws, as the same may be amended from

351389.04 [XP]    25195

1  time to time.  If the Reorganized Debtor decides to become a limited liability company, there will

2  be no board of directors.

3  ## 2.    Officers & Biographies

4  Richard Meruelo (Chief Executive Officer), John Charles Maddux (President and Chief

5  Operating Officer), Lynn Beckemeyer (Executive Vice President for Development), Fred Skaggs

6  (Chief Accounting Officer),  Andrew Murray (Chief Financial Officer), Todd Nielsen (General

7  Counsel and Corporate Secretary) and Miguel Enrique Echemendia (Chief Administrative Officer)

8  will continue in their current capacities as officers of the Reorganized Debtors.

9  ### a.    *Richard Meruelo*

10  Mr. Meruelo serves as the Company's Chief Executive Officer and Chairman of MMPI's

11  Board of Directors. Mr. Meruelo has served as chairman of the Company's predecessor business

12  since 1987. During that time, Mr. Meruelo led the strategic planning for the business while

13  managing project acquisitions, purchase negotiations and related financings totaling nearly $1.2

14  billion. In addition, Mr. Meruelo was responsible for maintaining the predecessor business'

15  relationships with CalPERS and local and state governmental bodies that had land-use jurisdiction

16  over the contributed projects. Mr. Meruelo earned his degree in business administration from the

17  University of Southern California, with an emphasis in finance and real estate. Mr. Meruelo

18  currently serves as a board member for the Central City East Association and the Los Angeles

19  Central Industrial Redevelopment Project.

20  ### b.    *John Charles Maddux*

21  Mr. Maddux serves as the Company's President and Chief Operating Officer and as a

22  member of MMPI's Board of Directors. Mr. Maddux has served as president of the Company's

23  predecessor business since 2005. Before joining the predecessor business, Mr. Maddux served as a

24  founder and shareholder of the law firm of Nevers, Palazzo, Maddux & Packard, PLC from 1998 to

25  2005, and practiced law with the firm of O'Melveny & Myers, LLP from 1986 to 1996, where he

26  was a member of the real estate practice group. While at each firm, Mr. Maddux served as the

27  Company's predecessor's outside legal counsel. Mr. Maddux earned his bachelor's degree in

28  business management—finance from Brigham Young University's Marriott School of

351389.04 [XP]    25195

1  Management and his J.D. from Brigham Young University's J. Reuben Clark Law School. His

2  affiliations include the Urban Land Institute, the Building Industry Association, the International

3  Conference of Shopping Centers, the Los Angeles County Bar Association and the California Bar

4  Association, Real Property Section.

5                              c.    ***Andrew Murray***

6      Andrew Murray serves as the Company's Chief Financial Officer.  He oversees the

7  Company's financial reporting, capital markets activities and investor relations.  Mr. Murray joined

8  the Company on May 23, 2008.  Before joining the Company, Mr. Murray had twenty years of

9  experience in financial institutions and real estate investment banking with such firms as Salomon

10  Brothers, Ryan Beck & Co., Sutro & Co., and Friedman, Billings, Ramsey, which is now FBR

11  Capital Markets.  Mr. Murray graduated from the Wharton School of Business in 1989.

12                              d.    ***Lynn Beckemeyer***

13      Mr. Beckemeyer serves as the Company's Executive Vice President for Development and

14  as a member of the Company's Board of Directors. He oversees work relating to planning, design,

15  architecture and entitlement work as well as construction activity. Mr. Beckemeyer has served as

16  the senior vice president of development and construction of the Company's predecessor business

17  since April 2006. Before joining the predecessor business, Mr. Beckemeyer served in various real

18  estate development and management positions with The Walt Disney Company for seven years

19  before becoming vice president of worldwide corporate operations and real estate for Walt Disney

20  from 2001 to 2006. Prior to that, Mr. Beckemeyer managed the development, design and

21  construction of urban projects in the Washington, DC metropolitan area and Dallas, Texas, from

22  1983 to 1994, with 21 International and The Limited, Inc. Mr. Beckemeyer serves as a director of

23  Avalon Entertainment, a private company. A registered architect, Mr. Beckemeyer earned a degree

24  in architecture and construction science at Kansas State University and studied real estate

25  development at Harvard University Graduate School of Design. Mr. Beckemeyer's professional

26  affiliations include the American Institute of Architects, the National Council of Architectural

27  Registration Boards, the National Association of Home Builders and the Urban Land Institute.

28

351389.04 [XP]    25195

1             e.     ***Fred Skaggs***

2        Mr. Skaggs serves as the Company's Chief Accounting Officer.  He is responsible for all

3 accounting activities.  Mr. Skaggs joined the Company's predecessor business as treasurer in

4 September 2005.  Before joining the predecessor business, he served as chief financial officer for

5 Bright Development, a private residential and multifamily developer, where he guided the

6 company's financial and operational performance from 2004 to 2005.  Prior to that, Mr. Skaggs

7 served as the chief financial officer and controller for Shuwa Investments Corporation, a

8 commercial real estate company with $3.2 billion in assets, from 1987 to 2004.  Mr. Skaggs also

9 served as senior internal auditor and chief corporate accountant for the Masco Corporation from

10 1981 to 1987 and with Price Waterhouse from 1979 to 1981.  A certified licensed public

11 accountant, Mr. Skaggs earned his degree in accounting from Brigham Young University's

12 Marriott School of Management with minors in English and Spanish.

13             f.     ***Miguel Echemendia***

14        Mr. Echemendia serves as the company's Chief Administrative Officer.  He is responsible

15 for all property management, leasing activities, property specific financing and other general

16 administrative functions.  Mr. Echemendia served as chief operating officer of the predecessor

17 business since July 2000, and has been responsible for strategic planning, acquisitions, finance and

18 management.

19             g.     ***Todd Nielsen***

20        Mr. Nielsen serves as the Company's General Counsel and Corporate Secretary.  He is

21 responsible for all legal issues relating to compliance with SEC regulations, as well as overseeing

22 real estate transactions and other legal matters. Mr. Nielsen has served as the general counsel of the

23 Company's predecessor business since March 2005.  Before joining the predecessor business, Mr.

24 Nielsen served as the predecessor's outside legal counsel with the law firm of Nevers, Palazzo,

25 Maddux & Packard.  Prior to that, Mr. Nielsen practiced law privately including with Brobeck,

26 Phleger & Harrison.  Mr. Nielsen's private practice experience included representation of

27 developers, investors, corporate users and lenders in connection with the acquisition, financing,

28 development, construction, sale and leasing of retail, office, industrial, hotel, and residential

projects.  Mr. Nielsen graduated magna cum laude in 1995 from Brigham Young University's J. Reuben Clark Law School, and thereafter served as a law clerk to the Hon. Howard M. Kirshbaum of the Colorado Supreme Court.

### B.    COMPENSATION OF MMPI EXECUTIVE OFFICERS

The following table sets forth the compensation paid by MMPI to each of their current executive officers, for services rendered in their respective capacities in 2009.

| Name | Capacity in Which Served | Compensation |
|---|---|---|
| Richard Meruelo | Chief Executive Officer | $470,350 |
| John Maddux | President and Chief Operating Office | $472,880 |
| Todd Nielsen | General Counsel and Corporate Secretary | $278,483 |
| Miguel Echemendia | Chief Administrative Officer | $278,483 |
| Fred Skaggs | Chief Accounting Officer | $278,115 |
| Lynn Beckemeyer | Executive Vice President for Development | $278,279 |
| Andrew Murray | Chief Financial Officer | $279,630 |

John Maddux and Richard Meruelo will continue to receive their car allowances.  The officers will receive reimbursement of expenses pursuant to customary company procedures. Historically, in 2007 and 2008, the Debtors' officers have received cash bonuses.  For 2007 and 2008 the Debtors' officers received cash bonuses pursuant to the terms of their employment agreements as follows:

| Name | Annual Bonus Amount |
|---|---|
| Richard Meruelo | $225,000 |
| John Charles Maddux | $225,000 |
| Todd Nielsen | $68,750 |

351389.04 [XP]    25195

| Andrew Murray | $68,750[9] |
| Miguel Enrique Echemendea | $68,750 |
| Fred Skaggs | $68,750 |
| Lynn Beckemeyer | $68,750 |

The Debtors did not pay bonuses to the officers in 2009.  The Debtors may pay bonuses to the officers during the Plan term as determined by the Board of Directors.

## IX.

## CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

A.    **SOLICITATION OF VOTES**

In accordance with Sections 1126 and 1129 of the Bankruptcy Code, the following Classes of Claims are impaired, and the Holders of Allowed Claims in each of these Classes are entitled to vote to accept or reject the Plan of this Debtor or Debtors against whom they have a claim:

• Classes 10A, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1, 28A-1, 38A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of Secured Tax Claims against the Debtors);

• Classes 21A-2, 28A-2, 29A-2, 29A-3, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 37A-2, 37A-3, 37A-4, 38A-2, 39A-2, 40A-2, 41A-2, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors);

• Classes 1B, 5B, 32B, 33B, and 36B (consisting of the Priority Unsecured Benefits Claims of present and former employees); and

---

[9]    2008 only

156

1    •    Classes 1C-3, 2C-3, 3C, 4C-2, 5C-2, 6C, 7C, 8C-2, 9C-2, 10C-2, 11C-3, 12C-3,

2    13C-2, 14C-3, 15C-2, 16C-2, 17C, 18C-2, 19C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3,

3    27C-3, 28C-3, 29C-2, 30C-3, 31C-2, 32C, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3,

4    40C-3, 41C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3,

5    53C,  and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor); and

6        The Class of Interests of MMPI, Class 1E, is being cancelled and extinguished, and the

7    Holders of such Interests will not receive distributions under the Plan.  As a result, Holders of

8    Interests in Class 1E are deemed to reject the Plan.  The Class of Interests of MMPLP, Class 2E

9    will not retain or receive any property on account of their Interests as a result of the merger of

10    MMPLP and MMPI immediately following the Effective Date.

11        The following Classes of the Plan are unimpaired.  As a result, Holders of Claims and

12    Interests in those Classes are conclusively presumed to have accepted the Plan and the solicitation

13    of acceptances with respect to such Classes is not required under Section 1126(f) of the Bankruptcy

14    Code:

15    •    Classes 11C-1, 12C-1, 14C-1, 15C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1,

16    32C-1, 33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 43C-3, 44C-3, 46C-1, 48C-3,

17    49C-3, 52C-1 and 54C-1 consisting of the unsecured Claims for security deposits of the Debtors'

18    tenants);

19    •    Classes 3E through 54E (consisting of the Interests of MMPLP, MMP Ventures,

20    MM Construction and MM Management, and the Property Level Debtors).

21        As to the Classes of Claims entitled to vote on a Plan, the Bankruptcy Code defines

22    acceptance of a Plan by a Class of creditors as acceptance by Holders of at least two-thirds in dollar

23    amount and more than one-half in number of the Claims of that Class that have timely voted to

24    accept or reject a Plan.  A vote may be disregarded if the Bankruptcy Court determines, after notice

25    and a hearing, that acceptance or rejection was not solicited or procured in good faith or in

26    accordance with the provisions of the Bankruptcy Code.

27        Any creditor in an impaired Class: (i) whose Claim has been listed by the Debtors in the

28    Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as

351389.04 [XP]    25195

1  disputed, contingent or unliquidated) or (ii) who filed a proof of Claim on or before the Bar Date or

2  any proof of Claim filed within any other applicable period of limitations or with leave of the

3  Bankruptcy Court, which Claim is not the subject of an objection or request for estimation, is

4  entitled to vote on the Plan.

5  **B.      THE CONFIRMATION HEARING**

6  The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation

7  hearing.  The Confirmation Hearing in respect of the Plan has been scheduled for [_____ __],

8  2010, commencing at [__:__ _.m.] Los Angeles Time, before, the Honorable Kathleen Thompson

9  of the United States Bankruptcy Court, Courtroom 301, 21041 Burbank Blvd., Woodland Hills,

10  California 91367.  The Confirmation Hearing may be adjourned from time to time by the

11  Bankruptcy Court without further notice except for an announcement of the adjourned date made at

12  the Confirmation Hearing.  The Plan may be modified by the Debtors pursuant to Section 1127 of

13  the Bankruptcy Code prior to, during or as a result of that hearing, without further notice to parties

14  in interest.

15  Any objection to confirmation must be made in writing and specify in detail the name and

16  address of the objector, all grounds for the objection and the amount of the Claim or number of

17  shares of stock held by the objector.  Any such objection must be filed with the Bankruptcy Court

18  and served so that it is received by the Bankruptcy Court, the Committee and the Debtors on or

19  before _____ __, 2010 at __:__ _.m. Los Angeles Time.  Objections to confirmation of the Plan

20  are governed by Bankruptcy Rule 9014.

21  **C.      CONFIRMATION**

22  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the

23  requirements of Section 1129 of the Bankruptcy Code are met.  Among the requirements for

24  confirmation of a Plan are that the Plan is (i) accepted by all impaired Classes of Claims and

25  Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is

26  "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of creditors and

27  stockholders that are impaired under the Plan.

28  .

351389.04 [XP]     25195