### 1.    Acceptance

The Classes identified above in Section IX.A are impaired and are entitled to vote to accept or reject the Plan.

The Debtors reserve the right to amend the Plan in accordance with the terms of the Plan or seek nonconsensual confirmation of the Plan under Section 1129(b) of the Bankruptcy Code or both with respect to any Class of Claims that is entitled to vote to accept or reject the Plan, if such Class rejects the Plan.

### 2.    Unfair Discrimination and the Fair and Equitable Tests

Section 1129(b) of the Bankruptcy Code provides that a Plan can be confirmed even if it has not been accepted by all impaired Classes as long as at least one impaired Class of Claims has accepted it.  The Bankruptcy Court may confirm the Plan as to one or more Debtors at the request of such Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes in the case of such Debtors as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.   A Plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting Class if the value of the cash and/or securities to be distributed to the nonaccepting Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the nonaccepting Class or is otherwise permitted under the circumstances.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

• Secured Creditors.  Either: (i) each impaired secured creditor retains its liens securing its secured Claim and receives on account of its secured Claim deferred cash payments having a present value equal to the amount of its allowed secured Claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

159

351389.04 [XP]    25195

1      •      Unsecured Creditors.  Either: (i) each impaired unsecured creditor receives or

2   retains under the Plan property of a value equal to the amount of its allowed Claim; or (ii) the

3   Holders of Claims and interests that are junior to the Claims of the dissenting Class will not receive

4   any property under the Plan.

5      •      Interests.  Either: (i) each holder of an Interests will receive or retain under the Plan

6   property of a value equal to the greater of the fixed liquidation preference to which such holder is

7   entitled, or the fixed redemption price to which such holder is entitled or the value of the interest;

8   or (ii) the holder of an interest that is junior to the nonaccepting Class will not receive or retain any

9   property under the Plan.

10          **3.      Feasibility**

11          To confirm the Plan, the Bankruptcy Code must find that confirmation of the Plan is not

12  likely to be followed by liquidation or the need for further financial reorganization of the Debtors.

13  This requirement is imposed by Section 1129(a) of the Bankruptcy Code and is referred to as the

14  "feasibility" requirement.

15          There are at least two important aspects of a feasibility analysis.  The first aspect considers

16  whether the Debtors will have enough cash on hand on the Effective Date of the Plan to pay all the

17  Claims and expenses which are entitled to be paid on such date.

18          The other aspect of feasibility considers whether the Reorganized Debtors will have enough

19  cash over the life of the Plan to make the required Plan payments.  For purposes of determining

20  whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet

21  their obligations under the Plan.  As part of this analysis, the Debtors have prepared projections of

22  their financial performance for seven years following the Effective Date through December 31,

23  2017 (the "Projection Period").  These projections, and the assumptions on which they are based,

24  are included in the Debtors' Projected Financial Information, annexed hereto as Exhibit "E" and

25  provide a projected Consolidated Statement of Cash Flow for the Debtors on a monthly basis for

26  the first two years of the Projection Period and on an annual basis for each of the seven years of the

27  Projection Period.  The Projections also provide a projected Cash Flow for each of the Operating

28  Debtors on a monthly basis for the first two years of the Projection Period and on an annual basis

160

1  for each of the seven years of the Projection Period.  Exhibit E also contains a statement of the

2  results of actual operating revenues and expenses for the period April 1, 2009 through March 31,

3  2010.

4       The pro forma financial information and the projections are based on the assumption that

5  the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective

6  Date under the Plan will occur on or about September 30, 2010.   Based upon the Debtors'

7  Projected Financial Information, the Debtors believe that they will be able to make all payments

8  required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be

9  followed by liquidation or the need for further reorganization.  The Projections show that the

10  Debtors will have sufficient funds to meet this Effective Date payment obligations.  The Plan calls

11  for the repayment of the secured claims within 5 years after the Effective Date if the relevant

12  Secured Creditor votes in favor of the Plan and within 7 years after the Effective Date if the

13  relevant Secured Creditor votes against the Plan.  The Secured Claims of the Debtors will be repaid

14  during this time period either from the refinancing of the secured Debt post-Effective Date or the

15  sale of the Collateral for such Debt.  Upon the sale of such Collateral, the proceeds will be used to

16  pay the costs of sale and any secured claim that is secured by the Collateral to be sold.  Excess

17  proceeds would be unencumbered funds available for the Reorganized Debtors use in the operation

18  of their businesses or for the payment of claims as determined by the Reorganized Debtors' in the

19  sound exercise of their business judgment.

20       The Debtors have prepared their financial projections, with the assistance of their advisors

21  based upon certain assumptions that they believe to be reasonable under the circumstances.  Those

22  assumptions considered to be significant are described in Exhibit "E" hereto.   The financial

23  projections have not been examined or compiled by independent accountants.  The Debtors make

24  no representation as to the accuracy of the projections or their ability to achieve the projected

25  results.  Many of the assumptions on which the projections are based are subject to significant

26  uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and

27  circumstances may affect the actual financial results.  Therefore, the actual results achieved

28  throughout the Projection Period may vary from the projected results and the variations may be

1  material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to

2  examine carefully all of the assumptions on which the financial projections are based in connection

3  with their evaluation of the Plan.

4  **4.    Best Interests Test**

5       Even if a plan is accepted by each Class of Holders of Claims and interests, the Bankruptcy

6  Code requires a bankruptcy court to determine that the plan is in the "best interests" of all Holders

7  of Claims and Interests that are impaired by the plan and that have not accepted the Plan. The "best

8  interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy

9  Court to find either that: (i) all members of an impaired Class of Claims or interests have accepted

10  the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of

11  property of a value, as of the effective date of the plan, that is not less than the amount that such

12  holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. Once

13  the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority

14  claimants, it must determine the probable distribution to general unsecured creditors and equity

15  security holders from the remaining available proceeds in liquidation. If such probable distribution

16  has a value greater than the distributions to be received by such creditors and equity security

17  holders under a debtor's plan, then such plan is not in the best interests of creditors and equity

18  security holders.

19       To determine what Holders of Claims and Interests in each impaired Class would receive if

20  the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar

21  amount that would be generated from the liquidation of the Debtors' assets and properties in the

22  context of a Chapter 7 liquidation case. The Cash amount that would be available for satisfaction

23  of Claims and Interests would consist of the proceeds resulting from the disposition of the

24  unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by

25  the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be

26  reduced by the costs and expenses of liquidation and by such additional administrative and priority

27  Claims that might result from the termination of the Debtors' business and the use of Chapter 7 for

28  the purposes of liquidation.

1    The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a

2  trustee in bankruptcy, as well as those fees that might be payable to attorneys and other

3  professionals that such a trustee might engage.  In addition, other Claims that might arise in a

4  liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses

5  incurred by the Debtors during the Cases, such as compensation for attorneys, financial advisors

6  and accountants, would be paid in full from the liquidation proceeds before the balance of those

7  proceeds would be made available to pay general unsecured Claims.  Moreover, the costs of

8  liquidation in these cases could be greater due to the fact that there is no guarantee that only one

9  trustee would be appointed for each of the 54 related cases.  If more than one trustee is appointed,

10  the costs of liquidation will be increased as each such trustee will retain its own professionals to

11  assist it with the case.

12    To determine if the Plan is in the best interests of each impaired Class, the present value of

13  the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and

14  properties, after subtracting the amounts attributable to the foregoing Claims, must be compared

15  with the present value of the property offered to such Classes of Claims under the Plan.

16    After considering the effects that a Chapter 7 liquidation would have on the ultimate

17  proceeds available for distribution to creditors in the Chapter 11 Cases, including: (i) the increased

18  costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in

19  bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a Chapter

20  7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale"

21  atmosphere that would prevail; and (iii) the substantial increases in Claims that would be satisfied

22  on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined

23  that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is

24  not less than the recovery such holder would receive pursuant to the liquidation of the Debtors

25  under Chapter 7.

26    The Liquidation Analysis for each of the Property Level Debtors, MMPI and MMPLP, is

27  attached hereto as Exhibit "G."  The information set forth in Exhibit G provides a summary of the

28  liquidation values of each of such Debtors' assets, assuming a Chapter 7 liquidation in which a

1  trustee appointed by the Bankruptcy Court would liquidate the assets of the Estates. Reference

2  should be made to the Liquidation Analysis for a complete discussion and presentation of the

3  Liquidation Analysis. Underlying the Liquidation Analysis are a number of estimates and

4  assumptions that, although developed and considered reasonable by the Debtors' management, are

5  inherently subject to significant economic and competitive uncertainties and contingencies beyond

6  the control of the Debtors and their management. The Liquidation Analysis also is based on

7  assumptions with regard to liquidation decisions that are subject to change. Accordingly, the

8  values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation.

9  The Chapter 7 liquidation period is assumed to be a period of several years, primarily allowing for

10  the sale of the real property assets of the Debtors.

11  **D.    CONSUMMATION**

12      The Plan will be consummated on the Effective Date. The Effective Date of the Plan will

13  occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan,

14  as set forth in the Plan, have been satisfied or waived by the Debtors pursuant to the terms of the

15  Plan. For a more detailed discussion of the conditions precedent to the Plan and the consequences

16  of the failure to meet such conditions, see Article X of this Disclosure Statement. The Plan is to be

17  implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

18  **X.**

19  **CONFIRMATION DATE CONDITIONS**

20  **A.    CONDITIONS TO CONFIRMATION**

21      The conditions to Confirmation shall be the following:

22      (1)    The satisfaction of the requirements of Section 1129 of the Bankruptcy Code;

23      (2)    The Confirmation Order shall (i) be acceptable in form and substance to the Debtors

24  (in the Debtors' sole and absolute discretion) and (ii) expressly authorize and direct the Debtors to

25  perform the actions that are conditions to the effectiveness of the Plan; and

26      (3)    Each of the events and actions required by the Plan to occur or to be taken prior to

27  Confirmation shall have occurred or have been taken, or the Debtors or the party whose obligations

28

164

are conditioned by such occurrences and/or actions, as applicable, shall have waived such occurrences or actions.

### B.    WAIVER OF CONDITIONS

The Debtors may waive any or all of the other conditions set forth in the Plan without leave of or order of the Bankruptcy Court and without any formal action.  The Debtors reserve the right to amend or revoke the Plan.  Although this Plan is styled as a joint Plan, the Debtors reserve the right to proceed with Confirmation under this Plan for one Debtor, or a combination of Debtors, and not the others.

### C.    EFFECT OF FAILURE OF CONDITIONS

In the event that the Effective Date does not occur, upon notification submitted by the Debtors to the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### D.    VACATUR OF CONFIRMATION ORDER

If an order denying confirmation of the Plan is entered, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors; (c) prejudice in any manner any right, remedy or Claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

165

351389.04 [XP]    25195

# XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date to the full extent permitted by law, including, without limitation, jurisdiction to:

(a)    Allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan;

(b)    Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending before the Effective Date;

(c)    Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which the any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

(d)    Ensure that distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Plan;

(e)    Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors, Reorganized Debtor or the Chapter 11 Cases that may be pending on the Effective Date;

(f)    Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;

(g)    Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan and the

351389.04 [XP]    25195

1  Confirmation Order, or any entity's rights arising under or obligations incurred in connection with

2  the Plan or the Confirmation Order;

3       (h)    Subject to any restrictions on modifications provided in any contract, instrument,

4  release, indenture or other agreement or document created in connection with the Plan, modify the

5  Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code or modify

6  the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or

7  other agreement or document created in connection with the Plan, the Disclosure Statement or the

8  Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any

9  Bankruptcy Court Order, the Plan, the Disclosure Statement, the Confirmation Order or any

10  contract, instrument, release, indenture or other agreement or document created in connection with

11  the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary

12  or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

13       (i)    Issue injunctions, enter and implement other Orders or take such other actions as

14  may be necessary or appropriate to restrain interference by any entity with consummation,

15  implementation or enforcement of the Plan or the Confirmation Order;

16       (j)    Enter and implement such Orders as are necessary or appropriate if the

17  Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

18       (k)    Determine any other matters that may arise in connection with or relating to the

19  Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release,

20  indenture or other agreement or document created in connection with the Plan, the Disclosure

21  Statement or the Confirmation Order, except as otherwise provided in the Plan; and

22       (l)    Enter an Order concluding the Chapter 11 Cases.

23       The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy

24  Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is

25  otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including

26  without limitation the matters set forth in this Article, this Article shall have no effect upon and

27  shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent

28  jurisdiction with respect to such matter.

351389.04 [XP]    25195

## XII.

## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER

## THE PLAN AND TREATMENT OF DISPUTED, CONTINGENT

## AND UNLIQUIDATED CLAIMS AND INTERESTS

### A.    VOTING OF CLAIMS AND INTERESTS

Each Holder of an Allowed Claim or an Allowed Interest in an Impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Plan as provided in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### B.    METHOD OF DISTRIBUTIONS UNDER THE PLAN

#### 1.    Distributions Under the Plan

The Chief Accounting Officer of MMPI, currently Fred Skaggs, will serve as Disbursing Agent.  The Disbursing Agent will make all distributions of cash and securities required to be distributed under the applicable provisions of the Plan.  The Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan.  The Disbursing Agent will serve without bond, and the Disbursing Agent will not receive additional compensation for distribution services rendered pursuant to the Plan.

Cash payments made pursuant to the Plan will be in U.S. dollars by checks drawn on a bank selected by the Reorganized Debtor, or by wire transfer from a bank, at the option of Reorganized Debtor.  Cash payments of $1,000,000 or more to be made pursuant to the Plan will, to the extent requested in writing no later than five days after the Confirmation Date, be made by wire transfer from a bank.  Cash payments to foreign creditors, if any, may be made, at the option of the Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

2.    **Timing and Methods of Distribution**

a.    ***Compliance with Tax Requirements***

In connection with the Plan, to the extent applicable, the Disbursing Agent must comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan: (i) each Holder of an Allowed Claim or Interest that is to receive a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution; and (ii) no distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations. Any Cash to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to the Plan.

b.    ***Pro Rata Distributions***

When the Plan provides for Pro Rata distribution, the property to be distributed under the Plan shall be divided Pro Rata among the Holders of Allowed Claims or Allowed Interests of the relevant Class.

c.    ***Distributions***

Distributions under the Plan shall be made by the Disbursing Agent to the Holders of Allowed Administrative Claims and Allowed Claims at the addresses set forth on the Schedules, unless such addresses are superseded by addresses listed on proofs of Claim or transfers of Claims filed pursuant to Bankruptcy Rule 3001, or at the last known address of such Holders if the Debtors or Reorganized Debtor has been notified in writing of a change of address.

351389.04 [XP]    25195

**C.     UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS**

Any Person that is entitled to receive a cash distribution under the Plan but that fails to cash a check within 90 days of its issuance shall be entitled to receive a reissued check from the Reorganized Debtor for the amount of the original check, without any interest, if such person requests the Disbursing Agent to reissue such check and provides the Disbursing Agent with such documentation as the Disbursing Agent requests to verify that such Person is entitled to such check, prior to the first anniversary of the Effective Date.  If a Person fails to cash a check within 90 days of its issuance and fails to request reissuance of such check prior to the first anniversary of the date on which the check is issued, such Person shall not be entitled to receive any further distribution under this Plan.  If the distribution to any Holder of an Allowed Claim or Allowed Interest is returned to a Disbursing Agent as undeliverable, no further distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified in writing of such Holder's then-current address.  Undeliverable distributions will remain in the possession of the Disbursing Agent pursuant to the Plan until such time as a distribution becomes deliverable.  Undeliverable cash will be held in trust in segregated bank accounts in the name of the Disbursing Agent for the benefit of the potential claimants of such funds, and will be accounted for separately.  The Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtor's investment and deposit guidelines.  Any distribution which is not claimed within thirteen months of the Effective Date shall be deemed property of the Reorganized Debtor.

**D.     DISPUTED CLAIMS AND ESTIMATIONS**

**1.     Treatment of Disputed Claims**

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of any Claim or Interest until such Claim or Interest becomes an Allowed Claim or Allowed Interest.  The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, irrespective of whether the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Claim at any time during litigation concerning any

170

1  objection to the Claim, including during the pendency of any appeal relating to any such objection.

2  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will

3  constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as

4  determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on

5  such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to

6  any ultimate payment on account of such Claim.  All of these Claims objection, estimation and

7  resolution procedures are cumulative and not necessarily exclusive of one another.  In addition to

8  seeking estimation of Claims as provided in the Plan, the Reorganized Debtor may resolve or

9  adjudicate certain Disputed Claims of Holders in Unimpaired Classes in the manner in which the

10  amount of such Claim and the rights of the Holder of such Claim would have been resolved or

11  adjudicated if the Reorganization Cases had not been commenced, subject to any applicable

12  discharge and limitations on amounts of Claims and remedies available under bankruptcy law.

13  Claims may be subsequently compromised, settled, withdrawn or resolved by the Reorganized

14  Debtor.

15          **2.          Distribution on Account of Disputed Claims Once They Are Allowed**

16          On the later of the next Quarterly Distribution Date or thirty days after the date a Disputed

17  Claim becomes an Allowed Claim, the Disbursing Agent will commence making distributions on

18  account of any Disputed Claim or Disputed Interest that has become an Allowed Claim or Allowed

19  Interest during the preceding calendar quarter.  Such distributions will be made pursuant to the

20  provisions of the Plan governing the applicable Class.  Holders of Disputed Claims or Disputed

21  Interests that are ultimately allowed will also be entitled to receive, on the basis of the amount

22  ultimately allowed, matured and payable interest, if any, at the rate provided for the Class to which

23  such Claim belongs.

24          **3.          Allowance of Claims Subject to Bankruptcy Code Section 502(d)**

25          Allowance of Claims shall be in all respects subject to the provisions of Section 502(d) of

26  the Bankruptcy Code.

27

28

**E.     SETOFFS**

Except with respect to Claims of the Debtors and Reorganized Debtor released pursuant to the Plan or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Reorganized Debtor may, pursuant to Section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the Claims, rights and causes of action of any nature that the Reorganized Debtor may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by Reorganized Debtor of any such Claims, rights and causes of action that the Debtors and the Reorganized Debtor may possess against such Holder.

**XIII.**

**CERTAIN RISK FACTORS TO BE CONSIDERED**

**HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**A.     CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

**1.     Risk of Non-Confirmation of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

172

## 2.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in Article V of the Plan have not occurred or been waived by the Debtors within one hundred and twenty (120) days after the Confirmation Date, the Confirmation Order shall be vacated, in which event no distributions under the Plan would be made, the Debtors and all Holders of Claims and Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

## B.    RISKS TO RECOVERY BY HOLDERS OF CLAIMS

### 1.    Ability to Service Debt

The Reorganized Debtor's ability to make scheduled payments of principal, to pay the interest on, to refinance its indebtedness will depend on future performance.  Future performance is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Reorganized Debtor's control.  While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flow described in the financial projections attached as Exhibit E hereto, the Debtors believe that cash flow from operations, available cash, debt refinancings and sales and the Debtors' ability to sell assets as necessary to fund its operations, of assets will be adequate to fund the Plan and meet their future liquidity needs.

### 2.    Risks of Asset Disposition Delays

The Plan relies, in part, on generating proceeds from real estate sales to pay Claims in the event operating revenues are insufficient.  In the event that sales are delayed due to economic or other constraints, payments may be correspondingly delayed.

### 3.    Risks Related to Dependence on Key Personnel

The Debtors success depends to a significant extent on the continued services of their senior management and other members of management.  The Debtors' senior management has extensive

351389.04 [XP]    25195

1  expertise in the real estate industry.  The Debtors could be adversely affected if one or more

2  members of its current management were unwilling or unable to continue in their employment.

3  **4.    Projected Financial Information**

4  The financial projections included as Exhibit E hereto are dependent upon the successful

5  implementation of the Plan and the validity of the other assumptions contained therein.  These

6  projections reflect numerous assumptions, including confirmation and consummation of the Plan in

7  accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry

8  performance, general business and economic conditions and other matters, many of which are

9  beyond the control of the Reorganized Debtor.  In addition, unanticipated events and circumstances

10  occurring subsequent to the preparation of the projections may affect the actual financial results of

11  the Reorganized Debtors.  Although the Debtors believe that the projections are reasonably

12  attainable, variations between the actual financial results and those projected may occur and may be

13  material.

14  **5.    Failure to Obtain Equity Investment of $10 Million.**

15  The Plan is dependent in part on the Debtors' ability to obtain an equity investment of

16  $10,000,000 from one or more Eligible Investors.  There is a risk that the Debtors will not be able

17  to raise the full amount of the projected $10,000,000 equity investment.  The Debtors believe that

18  this risk is not substantial in light of the fact that the Initial Investors have agreed to purchase all of

19  the New Equity Interests in the event such interests are not fully subscribed by other Eligible

20  Investors.

21  **6.    Failure to Confirm One or More of the Debtors' Chapter 11 Plans.**

22  This Plan is a joint Plan for 54 related debtor entities.  The Debtors are seeking

23  confirmation of the Plan separately for each of the 54 related Chapter 11 Cases.  It is possible that

24  the Debtors will not be able to achieve confirmation in one or more of the 54 Chapter 11 Cases.

25  Nevertheless, the Debtors believe that they have a strong likelihood of confirming their Cases.  In

26  the event one or more Debtors' cases are not confirmed, the affected Debtors will re-evaluate their

27  options in light of their inability to confirm the plan, which options would include without

28

174

1   limitation, an alternative plan of reorganization, conversion of the case to a chapter 7 case or

2   dismissal of the case.

3        The Debtors believe that their inability to achieve confirmation for one or more of the

4   Chapter 11 Cases will not have a material impact on the Debtors' ability to implement the Plan for

5   the remaining Debtors and make the payments required under the Plan. The Debtors believe that

6   they have sufficient equity in their properties and sufficient unencumbered assets to monetize

7   additional assets as needed to meet the cash flow needs of the enterprise in the event one or more of

8   the Debtors' cases is not confirmed. As an example, the Debtors assert that even in the unlikely

9   event that the cases of each of the eleven Debtors with positive cash flow (i.e., in excess of their

10   respective expenses) were not confirmed, the Debtors would still be able to implement the Plan

11   with respect to the remaining Debtors. The loss of the revenue from the income producing Debtors

12   would result in a shortfall of approximately $4.2 million per year, or approximately $29.4 million

13   over the term of the Plan. In that event, the Debtors would be required to monetize additional

14   assets, reduce costs, refinance debt and increase revenues more quickly to meet their cash flow

15   needs. The Debtors will have sufficient cash on hand following confirmation from, at minimum,

16   the purchase of the New Equity Interests and the remaining proceeds from the sale of MM 845 S.

17   Flower's Project to fund operations while assets are sold, costs are reduced, refinancing is

18   completed and revenues are increased. In addition, the Debtors have sufficient equity in all of their

19   assets in the aggregate to monetize assets and retain substantial value for the enterprise. The

20   Debtors' real property has total equity of approximately $283 million before taking into account the

21   equity of Meruelo Chinatown, which has been valued at $16 million. There is sufficient equity to

22   sell assets to deal with this shortfall and maintain a viable enterprise.

23        Further, the Debtor' Plan is likely to succeed, and the loss of one or more Debtor's cases will

24   not materially affect that success in light of the fact that the Debtors have significant value in their

25   substantial unencumbered assets which would be available to address cash flow needs in the event

26   one or more Debtors cases is not confirmed. Finally, if one or more non-cash flow producing

27   Debtors are among those that are not confirmed, the failure to achieve confirmation for those

28

175

1  Debtors may well have a neutral or non-detrimental effect on the feasibility of the Plan and the

2  Debtors' ability to make payments thereunder.

3                                                    XIV.

4              **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

5          A summary description of certain United States federal income tax consequences of the

6  Plan is provided below.  This description is for informational purposes only and, due to a lack of

7  definitive judicial or administrative authority or interpretation, substantial uncertainties exist with

8  respect to various tax consequences of the Plan as discussed herein.  Only the principal United

9  States federal income tax consequences of the Plan to the Debtors and to holders of Claims who are

10  entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been

11  sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations

12  of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or

13  obtained with respect to any tax consequences of the Plan, and the discussion below is not binding

14  upon the IRS or such other authorities.  No representations are being made regarding the particular

15  tax consequences of the confirmation and consummation of the Plan to the Debtors or any holders

16  of Claims.  No assurance can be given that the IRS would not assert, or that a court would not

17  sustain, a different position from any discussed herein.

18          The discussion of United States federal income tax consequences below is based on the

19  Internal Revenue Code of 1986, as amended (the "Tax Code") Treasury Regulations, judicial

20  authorities, published positions of the IRS and other applicable authorities, all as in effect on the

21  date of this document and all of which are subject to change or differing interpretations (possibly

22  with retroactive effect).

23          The following discussion does not address foreign, state or local tax consequences of the

24  Plan, nor does it purport to address the United States federal income tax consequences of the Plan

25  to special classes of taxpayers (e.g., persons who are related to the Debtors within the meaning of

26  the Tax Code, banks and certain other financial institutions, insurance companies, tax-exempt

27  organizations, governmental entities, persons that are, or hold their Claims through, pass-through

28  entities, persons whose functional currency is not the United States dollar, foreign persons, dealers

                                                    176

1 in securities or foreign currency, employees, holders of LTIP Units persons who received their

2 Claims pursuant to the exercise of an employee stock option or otherwise as compensation and

3 persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are

4 part of a straddle, constructive sale or conversion transaction).  Furthermore, the following

5 discussion does not address United States federal taxes other than income taxes.

6       Each holder is strongly urged to consult its own tax advisor regarding the United States

7 federal, state, and local and any foreign tax consequences of the transactions described herein and

8 in the Plan.

9       IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH

10 REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS

11 SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO

12 BE USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF

13 AVOIDING PENALTIES UNDER THE TAX CODE. ANY TAX ADVICE CONTAINED IN

14 THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE

15 PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY

16 THE SUMMARY EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE

17 TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX

18 ADVISER.

19     **A.**    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

20         **TO THE DEBTORS**

21     **1.**    **Net Operating Losses**

22       The Debtors currently have significant net operating loss ("NOL") carryforwards for federal

23 income tax purposes and expect to incur a substantial additional NOL during their current taxable

24 year.  The amount of such NOL carryforwards remains subject to adjustment by the IRS.  As

25 discussed below, the amount of the Debtors' NOL carryforwards, and possibly certain other tax

26 attributes, will be reduced, and the subsequent utilization of such NOL carryforwards and other tax

27 attributes may be restricted upon the implementation of the Plan.

28

351389.04 [XP]    25195

### 2.    Cancellation of Debt

In general, the Tax Code allows a debtor in a bankruptcy case to exclude from income any cancellation of indebtedness income ("CODI") that is realized, but the debtor must reduce certain of its tax attributes - such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets by the amount of the CODI that is excluded from income.  CODI is that amount by which the adjusted issue price (including accrued but unpaid interest) of the indebtedness satisfied exceeds the cash and fair market value of the other property issued therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled debt would have given rise to a tax deduction).  To the extent the amount of excluded CODI exceeds the tax attributes available for reduction, the remaining CODI is simply forgiven.  Any reduction in tax attributes does not effectively occur until the first day of the taxable year following the year the CODI occurs.  If advantageous, a debtor could elect to reduce the basis of depreciable property prior to any reduction in its loss carryforwards.

As a result of the implementation of the Plan, the Debtors expect to realize CODI in an amount that is less than its current year NOL and NOL carryforwards.  Recent legislation allows certain taxpayers that recognize CODI in 2009 or 2010 to elect to include the CODI in taxable income ratably over the five (5) year period beginning in the fourth or fifth tax year, depending on whether the CODI is recognized in 2009 or 2010 (a "CODI Deferral Election").  The deferral ends if the taxpayers liquidates or sells substantially all of its assets.  If this election is available to a debtor in bankruptcy, the debtor may elect to include the CODI in taxable income on a deferred basis rather than excluding the CODI from taxable income and reducing its tax attributes by the amount of the CODI in the year the CODI arises.  The Debtors do not currently expect to make the CODI Deferral Election.

### 3.    Limitation on NOL Carryforwards and Other Tax Attributes

Following the implementation of the Plan, any NOLs and carryforwards and possibly certain other tax attributes of the Debtors, allocable to periods prior to the Effective Date, may be subject to the limitations imposed by Section 382 of the Tax Code.

351389.04 [XP]    25195

1    Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and

2   the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed

3   below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in

4   general, subject to an annual limitation.  Such limitation also may apply to certain losses or

5   deductions, which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the

6   ownership change that are subsequently recognized.  It is possible that the issuance of stock

7   pursuant to the Plan may result in an ownership change of the Debtors.  In addition, Section

8   382(g)(4)(D) provides, in effect, that if a fifty percent (50%) or greater shareholder of a loss

9   corporation claims a Section 165(g) worthless stock loss and retains his stock at the end of the year

10  of worthlessness, the Debtors will be treated as having undergone an ownership change.

11          **4.      General Section 382 Limitation**

12          In general, the amount of the annual limitation to which a corporation would be subject

13  would be equal to the product of (i) the fair market value of the stock of the corporation

14  immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-

15  term tax-exempt rate" in effect for the month in which the ownership change occurs (4.03% for

16  ownership changes occurring in May 2010).

17          Any unused limitation may be carried forward, thereby increasing the annual limitation in

18  the subsequent taxable year.  However, if the corporation does not continue its historic business or

19  use a significant portion of its assets in a new business for two (2) years after the ownership

20  change, the annual limitation resulting from the ownership change is zero.  The limitation on the

21  use of pre-change losses following an ownership change is in addition to any reduction of tax

22  attributes in connection with the realization of CODI.

23          The Debtors do not expect to experience a Section 382 ownership change in connection

24  with the private offering if all of the current shareholders of MMPI purchase New Equity Interests

25  on a pro-rata basis or if Richard Meruelo and John Maddux purchase New Equity Interests in an

26  amount at least equal to their existing pro-rata share.  However, if a fifty percent (50%) or greater

27  shareholder of the Debtor claims a worthless stock loss pursuant to Section 165(g) with respect to

28

179

1   its MMPI Existing Common Stock and retains its stock at the end of the year of worthlessness, then

2   a Section 382 ownership change would occur pursuant to Section 382(g)(4)(D).

3         **5.**    **Special Bankruptcy Exception**

4         There are two exceptions to the general loss limitation rule under Section 382 of the Tax

5   Code.  The first exception generally applies where the stockholders and/or qualified creditors of the

6   debtor retain or receive at least fifty percent (50%) of the vote and value of the stock of the

7   reorganized debtor pursuant to a confirmed bankruptcy plan (the "382(1)(5) Exception").  Under

8   this exception, a debtor's pre-change losses are not limited on an annual basis, but are required to

9   be reduced by the amount of any interest deductions claimed during the three (3) taxable years

10  preceding the date of the reorganization, and during the part of the taxable year prior to and

11  including the reorganization, in respect of the debt converted into stock in the reorganization.

12  Moreover, if this exception applies, any further ownership change of the debtor within a two-year

13  period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent

14  ownership change against future taxable income.

15        If the 382(1)(5) Exception is not applicable to a debtor in bankruptcy (either because the

16  debtor company does not qualify for it or a debtor company elects not to utilize it), the second

17  exception to the general Section 382 rule (the 382(1)(6) Exception") will generally apply.  When

18  the 382(1)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change"

19  generally is permitted to determine the fair market value of its stock after taking into account the

20  increase in value resulting from any surrender or cancellation of creditor's Claims in the

21  bankruptcy.  This differs from the ordinary rule that requires the fair market value of a

22  corporation's equity to be determined before the events giving rise to the ownership change.

23        **6.**    **Merger of MMPLP into MMPI**

24        Pursuant to the Plan, MMPLP will merge into MMPI and, accordingly, will distribute its

25  assets to MMPI in complete liquidation.  In general, a distribution in liquidation of a partner's

26  interests is tax-free to both the partner and the partnership unless Section 737 or 751(b) applies.

27  Section 737 requires a partner to recognize gain (but not loss) upon the partnership's distribution of

28  property to such partner (other than property previously contributed to the partnership by such

1  partner) within seven (7) years of the date on which such partner contributed appreciated property

2  to such partnership.  Section 751(b) generally provides that to the extent that a partner receives a

3  distribution from a partnership (i) Section 751 property (unrealized receivables and inventory items

4  which have appreciated substantially in value) in exchange for relinquishing all or part of its

5  interest in the partnership's non-Section 751 property, or (ii) non-Section 751 property in exchange

6  for relinquishing all or part of its interest in the partnership's Section 751 property, the transaction

7  is recharacterized.  The transaction is treated as (1) a deemed distribution to the partner of an

8  interest in the relinquished property followed by (2) a deemed taxable exchange between the

9  partner and the partnership of the relinquished property in exchange for an interest in the property

10 actually distributed by the partnership to the distributee partner.

11        Section 731(b) provides that no gain or loss is recognized by a partnership on a distribution

12 of property to a partner.  Section 731(a) provides for (1) the nonrecognition of gain to the partner

13 except to the extent an amount of money is distributed in excess of the partner's tax basis in their

14 partnership interests, and (2) the nonrecognition of loss unless the distribution consists solely of

15 money, unrealized receivables, and inventory.  Any gain or loss recognized by the partner is

16 generally treated as gain or loss from the sale or exchange of a capital asset (subject to the

17 exceptions above).  Section 732(b) provides that the basis of any distributed property is equal to the

18 partner's tax basis in their partnership interest immediately prior to the distribution, reduced by any

19 cash received.  The Debtors do not expect to recognize any gain or loss in connection with the

20 liquidation of MMPLP.

21        **7.    Consequences of the Sale and/or Refinance of Assets of the Debtors**

22        Pursuant to the Plan, the Reorganized Debtors will sell some of their assets and refinance

23 other assets as necessary during the term of the Plan to meet their operational needs and payment

24 obligations under the Plan.  The sale of real property may cause the Debtors to recognize gain or

25 loss.  The gain or loss is measured by the difference between the amount realized (the amount paid

26 by the purchaser) and the adjusted tax basis the Debtors have in the property sold.  The amount

27 realized from a sale of real property generally includes the amount of liabilities from which the

28 transferor is discharged as a result of the sale.  For purposes of this rule, the sale of real property

1  that secures a nonrecourse liability discharges the transferor from the liability, and the sale of real

2  property that secures a recourse liability discharges the transferor from the liability if another

3  person agrees to pay the liability (whether or not the transferor is in fact released from the liability).

4       Gain or loss recognized from the sale of real property may be characterized as either capital

5  or ordinary.  Generally, capital gains and losses are gains or losses from the sale or exchange of a

6  capital asset.  A capital asset is any property held by a taxpayer, whether or not connected with a

7  trade or business, but does not include property held by a taxpayer, whether or not connected with a

8  trade or business, but does not include property of a kind which would properly be included in the

9  inventory of the taxpayer if on hand at the close of the taxable year, or property which is held

10  primarily for sale to customers in the ordinary course of its trade or business, or property, used in

11  the taxpayer's trade or business, of a character which is subject to the allowance for depreciation, or

12  real property used in the taxpayer's trade or business.

13       Pursuant to Section 1245, a taxpayer who disposes of Section 1245 property must treat as

14  ordinary income the amount of depreciation recapture computed with respect to that property.

15  Section 1245 property includes limited types of real property which have been depreciable.

16  Depreciation recapture with respect to Section 1245 property is computed by subtracting its

17  adjusted tax basis from the lower of its recomputed basis (adjusted tax basis increased by previous

18  depreciation deductions allowed) or amount realized.  Pursuant to Section 1250, a taxpayer who

19  disposes of Section 1250 property must treat as ordinary income the amount of depreciation

20  recapture computed with respect to that property.  Section 1250 property is any real property which

21  has been depreciable and that is not Section 1245 property.  Generally, for Section 1250 property

22  for which depreciation deductions are computed using the straight-line method for tax purposes,

23  there is no Section 1250 depreciation recapture.

24       Pursuant to Section 1231, Section 1231 gains and losses are treated as capital gains and

25  losses if the Section 1231 gains for the taxable year exceed the Section 1231 losses for that year.  A

26  Section 1231 gain or loss is any recognized gain or loss from a Section 1231 transaction.  A sale or

27  exchange of property used in a trade or business is a Section 1231 transaction.  Real property is

28  considered to be used in a trade or business if it is held for more than one year and is not property

182

1    of a kind which would properly be includible in the inventory of the taxpayer if on hand at the

2    close of the taxable year or property held by the taxpayer primarily for sale to customers in the

3    ordinary course of its trade or business.

4    Generally, for tax purposes, a refinancing transaction by itself produces no income or

5    deductions as it involves the tax-free receipt of loan proceeds and the nondeductible repayment of a

6    prior loan, assuming the old debt is satisfied in full.

7    **B.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS**

8    **1.    Consequences to Holders of Allowed General Unsecured Claims**

9    Pursuant to the Plan, a holder of an Allowed General Unsecured Claim will receive

10   payment in full in cash over approximately five (5) years plus interest at the rate of one percent

11   (1.0%) per annum (herein referred to as the "Deferred Payment Obligation"). A holder of an

12   Allowed General Unsecured Claim will have the option to elect to receive fifty (50%) percent of

13   their claims thirty (30) days after the Effective Date in full satisfaction of the claim. For federal

14   income tax purposes, the Deferred Payment Obligation should be treated (and, the following

15   discussion assumes, would be treated) in a similar fashion to the receipt of an actual note

16   amortizable over five (5) years.

17   In general, a holder of an Allowed General Unsecured Claim will recognize gain or loss in

18   an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of

19   its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax

20   basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the

21   treatment of any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued

22   Interest" below. The amount realized by a holder will equal the "issue price" of the Deferred

23   Payment Obligation received by such holder. Such issue price should be equal to the stated

24   principal amount of the Deferred Payment Obligation. Each holder of a General Unsecured Claim

25   is urged to consult its tax advisor regarding the specific tax consequences to such holder of the

26   receipt of the Deferred Payment Obligation, including the possible application of (and ability to

27   elect out of) the "installment method" or reporting any gain that might otherwise be recognized by

28   the holder upon such receipt. The amount realized by holders of Allowed General Unsecured

183

1 Claims who elect to receive fifty (50%) percent of their claims in cash thirty (30) days after the

2 Effective Date should be equal to the amount of cash received.

3       Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim, the

4 character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income

5 or loss will be determined by a number of factors, including the tax status of the holder, whether

6 the Claim constitutes a capital asset in the hands of the holder and how long it has been held,

7 whether the Claim was acquired at a market discount and whether and to what extent the holder

8 had previously claimed a bad debt deduction.

9       **2.     Consequences to Holders of Allowed Secured Claims**

10       Pursuant to the Plan, a holder of an Allowed Secured Claim will receive payment in full in

11 cash over approximately seven (7) years, or over five (5) years if such holder votes in favor of the

12 Plan (collectively herein referred to as the "Secured Deferred Payment Obligation"). In either case,

13 the holder will also receive interest at the rate of four percent (4%) per annum. For federal income

14 tax purposes, the Secured Deferred Payment Obligation should be treated (and the following

15 discussion assumes, would be treated) in a similar fashion to the receipt of an actual note

16 amortizable over seven (7) years or five (5) years in the case of holders who vote in favor of the

17 Plan.

18       In general, a holder of an Allowed Secured Claim will recognize gain or loss in an amount

19 equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim

20 (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its

21 Claim (other than any Claim for accrued but unpaid interest). For a discussion of the treatment of

22 any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued Interest"

23 below. The amount realized by a holder will equal the "issue price" of the Secured Deferred

24 Payment Obligation received by such holder. Such issue price should be equal to the stated

25 principal amount of the Secured Deferred Payment Obligation. Each holder of a Secured Claim is

26 urged to consult its tax advisor regarding the specific tax consequences to such holder of the receipt

27 of the Secured Deferred Payment Obligation, including the possible application of (and the ability

28

351389.04 [XP]    25195

1   to elect out of) the "installment method" of reporting any gain that might otherwise be recognized

2   by the holder upon such receipt.

3       Where gain or loss is recognized by a holder of an Allowed Secured Claim, the character of

4   such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will

5   be determined by a number of factors, including the tax status of the holder, whether the Claim

6   constitutes a capital asset in the hands of the holder and how long it has been held, whether the

7   Claim was acquired at a market discount and whether and to what extent the holder had previously

8   claimed a bad debt deduction.

9       **C.    CONSEQUENCES OF THE PRIVATE OFFERING**

10      MMPI will not recognize gain or loss on the receipt of money or other property in exchange

11  for the issuance of its stock pursuant to Section 1032. In addition, MMPI shareholders will not

12  recognize gain or loss upon the receipt of New Equity Interests in exchange for cash in the private

13  offering. The tax basis in the New Equity Interests acquired in the private offering will equal the

14  sum of the purchase price paid for the New Equity Interests. The holding period for the New

15  Equity Interests acquired through the private offering should begin on the date the New Equity

16  Interests are received.

17      Any MMPI shareholders claiming a worthless stock loss on their MMPI Existing Common

18  Stock pursuant to Section 165(g) will generally have a capital loss. Additionally, there is a risk that

19  the wash sale rule of Section 1091(a) may apply to disallow such loss. The wash sale rule of

20  Section 1091(a) provides that if a loss has been sustained from the sale or other disposition of

21  shares of stock or securities and within a period beginning thirty (30) days before the date of such

22  sale or disposition and ending thirty (30) days after such date, the taxpayer acquired or has entered

23  into a contract or option to acquire, substantially identical stock or securities, then no deduction is

24  allowed under Section 165. It is unclear as to whether the wash sale rule would apply based on the

25  facts and circumstances surrounding the Plan. Each shareholder of MMPI is urged to consult its

26  tax advisor with respect to the specific tax consequences of the private offering and any related

27  share issuance to such shareholder.

28

351389.04 [XP]    25195

1    **D.      DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST**

2           Pursuant to the Plan, all distributions in respect of an Allowed Claim will be allocated first

3    to any portion of such Claim for accrued interest, with any excess allocated to the principal amount

4    of such Claim to the extent thereof, and then to all other amounts.  However, there is no assurance

5    that the IRS will respect such allocation for federal income tax purposes.

6           In general, to the extent that any amount received by a holder of a debt (whether paid in

7    cash or treated for tax purposes as paid with a note) is received in satisfaction of accrued interest

8    during its holding period, such amount will be taxable to the holder as interest income (if not

9    previously included in the holder's gross income).  Conversely, a holder generally recognizes a

10   deductible loss to the extent any accrued interest claimed was previously included in its gross

11   income and is not paid in full.  Each holder of a Claim is urged to consult its tax advisor regarding

12   the allocation of consideration and the deductibility of unpaid interest for tax purposes.

13   **E.      INFORMATION REPORTING AND BACKUP WITHHOLDING**

14          Certain payments, including payments in respect of accrued interest or OID, are generally

15   subject to information reporting by the payer to the IRS.  Moreover, such reportable payments are

16   subject to backup withholding in certain circumstances.  Under the Tax Code's backup withholding

17   rules, a holder of Claims may be subject to backup withholding at the applicable rate with respect

18   to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain

19   exempt categories (which generally includes corporations) and, when required, demonstrates this

20   fact or (b) provides a correct United States taxpayer identification and certifies under penalty of

21   perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the

22   holder is not subject to backup withholding because of a failure to report all dividend and interest

23   income.

24   **F.      IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**

25          THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF

26   CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE

27   FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE

28   DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.

351389.04 [XP]    25195

1   THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY

2   DEPENDING ON A TAXPAYER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY,

3   HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE STRONGLY URGED TO

4   CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE,

5   LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF

6   THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING

7   REQUIREMENTS.

8                                            **XV.**

9                               **MISCELLANEOUS PROVISIONS**

10          **A.     EXEMPTION FROM TRANSFER TAXES**

11          Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of

12  notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other

13  security interest, the making or assignment or any lease or sublease, or the making or delivery of

14  any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan,

15  including, without limitation, any agreements of consolidation, deeds, bills of sale or assignments

16  executed in connection with any of the transactions contemplated under the Plan shall not be

17  subject to any stamp, real estate transfer, mortgage recording, license transfer or other similar tax.

18  For the avoidance of doubt, the transactions contemplated under the Plan include, among other

19  things, the transactions and transfers contemplated in Section III of the Plan under, in furtherance

20  of, or in connection with the consolidation provided for therein including, without limitation, the

21  transfer of the Debtors' right, title and interest in property of the Estates to the Reorganized Debtor.

22          **B.     PAYMENT OF STATUTORY FEES**

23          All fees payable on or before the Effective Date pursuant to Section 1930 of Title 28 of the

24  United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be

25  paid on or before the Effective Date.

26          **C.     MODIFICATION OR WITHDRAWAL OF THE PLAN**

27          The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend, modify

28  (subject to Court approval), or withdraw the Plan prior to the entry of the Confirmation Order.

187

351389.04 [XP]    25195

1    After the entry of the Confirmation Order, the Debtors may amend or modify the Plan, or remedy

2    any defect or omission or reconcile any inconsistency in the Plan in such a manner as may be

3    necessary to carry out the purpose and intent of the Plan.

4        **D.    GOVERNING LAW**

5        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy

6    Code and Bankruptcy Rules), the laws of the State of California (without reference to the conflicts

7    of laws provisions thereof) shall govern the construction and implementation of the Plan and any

8    agreements, documents and instruments executed in connection with the Plan.

9        **E.    FILING OR EXECUTION OF ADDITIONAL DOCUMENTS**

10       On or before the Effective Date, the Reorganized Debtor shall file with the Bankruptcy

11   Court or execute, as appropriate, such agreements and other documents as may be necessary or

12   appropriate to effectuate and further evidence the terms and conditions of the Plan.

13       **F.    WITHHOLDING AND REPORTING REQUIREMENTS**

14       In connection with the Plan and all instruments issued in connection therewith and

15   distributions thereon, the Reorganized Debtor shall comply with all withholding and reporting

16   requirements imposed by any federal, state, local or foreign taxing authority and all distributions

17   there under shall be subject to any such withholding and reporting requirements.

18       **G.    WAIVER OF RULE 7062 OF THE FEDERAL RULES OF BANKRUPTCY**

19           **PROCEDURE**

20       The Debtors may request that the Confirmation Order include (a) a finding the Rule 62(a)

21   of the Federal Rules of Civil Procedure, made applicable by Rule 7062 of the Federal Rules of

22   Bankruptcy Procedure, shall not apply to the Confirmation Order, and (b) authorization for the

23   Debtors to consummate the Plan immediately after the entry of the Confirmation Order.

24       **H.    HEADINGS**

25       Headings used in the Plan are for convenience and reference only and shall not constitute a

26   Part of the Plan for any purpose.

27

28

351389.04 [XP]    25195

### I.    EXHIBITS AND SCHEDULES

All Exhibits and Schedules to the Plan and Disclosure Statement are incorporated into and constitute a part of the Plan as if set forth herein.

### J.    NOTICES

All notices, requests and demand hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by U.S. Mail or email addressed as follows:

| REORGANIZED DEBTOR | COUNSEL TO THE DEBTORS AND REORGANIZED DEBTOR |
|---|---|
| Todd Nielsen, Esq.<br>General Counsel<br>MERUELO MADDUX PROPERTIES, INC.<br>761 Terminal Street<br>Building 1, 2nd Floor<br>Los Angeles, California 90021<br>Tnielsen@meruelomaddux.com | John J. Bingham, Jr. , Esq.<br>John N. Tedford, IV , Esq.<br>Julia W. Brand, Esq.<br>DANNING, GILL, DIAMOND & KOLLITZ, LLP<br>2029 Century Park East, Third Floor<br>Los Angeles, California 90067-2904<br>E-Mail:<br>JBingham@dgdk.com<br>JTedford@dgdk.com<br>JBrand@dgdk.com |

### K.    CONFLICT

The terms of this Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in the Disclosure Statement.

### L.    SUCCESSORS AND ASSIGNS

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, trustee, administrator, successor or assign of such Person.

### M.    SATURDAY, SUNDAY OR LEGAL HOLIDAY

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

189

351389.04 [XP]    25195

**N.    POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS OR INTERESTS**

Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all Instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

**O.    SEVERABILITY OF PLAN PROVISIONS**

If, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests provided for herein or the conditions to the Effective Date is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination, and shall provide, that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**P.    BALLOTING**

Each Holder of Allowed Claim or an Allowed Interest entitled to vote on the Plan will receive a ballot.  The ballot will contain two boxes, one indicating acceptance of the Plan and the other indicating rejection of the Plan.  Holders of Allowed Claims or Allowed Interests who elect to vote on the Plan must mark one or the other box pursuant to the instructions contained on the ballot.  Any executed Ballot that does not indicate acceptance or rejection of the Plan will be deemed to constitute an acceptance of the Plan.

351389.04 [XP]    25195

## Q.    NO ADMISSIONS OR WAIVER OF OBJECTIONS

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by any Debtor with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claims classification.  The Debtors are not bound by any statements herein or in the Disclosure Statement as judicial admissions.

## R.    SURVIVAL OF SETTLEMENTS

All Bankruptcy Court-approved settlements shall survive consummation of the Plan, except to the extent that any provision of any such settlement is inconsistent with the Plan, in which case the provisions of the Plan shall supersede such inconsistent provision of such settlement. Notwithstanding the foregoing, the settlement documents approved by the Bankruptcy Court regarding Imperial, Murakami and PCB, and any other settlement agreement approved prior to the Effective Date that specifically provides that the Plan shall not modify the terms of such settlement, shall supersede any inconsistent Plan provisions.

## XVI.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
## OF THE PLAN

The Debtors believe that the Plan affords Holders of Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders.  If the Plan is not confirmed, however, the theoretical alternatives include: (a) an alternative plan or plans of reorganization; or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

## A.    ALTERNATIVE PLANS OF REORGANIZATION

If the Plan is not confirmed, the Debtors, or after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization Plan, any other party in interest in the Chapter 11 Cases, could propose a different Plan or Plans.  Such Plans might involve either a reorganization and continuation of the Debtors' business, or a liquidation of their assets or a combination of both.

351389.04 [XP]    25195