1 | JOHN J. BINGHAM, JR. (State Bar No. 075842)
JBingham@DGDK.com
2 | JOHN N. TEDFORD, IV (State Bar No. 205537)
JTedford@DGDK.com
3 | DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
4 | Los Angeles, California 90067-2904
Telephone: (310) 277-0077
5 | Facsimile: (310) 277-5735

6 | Attorneys for Meruelo Maddux Properties, Inc., and
affiliated Debtors and Debtors-in-Possession

7

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **SAN FERNANDO VALLEY DIVISION**

11

12 | In re

13 | MERUELO MADDUX PROPERTIES, INC., et al.,[1]

14 | Debtors and Debtors-in-Possession.

15

16 | ☐ Affects all Debtors

17 | ☑ Affects the following Debtor(s):

18 | Meruelo Maddux Properties, Inc.
19 | (1:09-bk-13356-KT)

20 | Alameda Produce Market, LLC
(1:09-bk-13394-KT)

21

22

23

Case No. 1:09-bk-13356-KT

Chapter 11 (Jointly Administered)

**NOTICE OF MOTION AND MOTION FOR APPROVAL OF SETTLEMENTS WITH CATHAY BANK AND AUTHORIZING DEBTOR TO PERFORM THEREUNDER; AND MEMORANDUM OF POINTS AND AUTHORITIES, DECLARATION OF RICHARD MERUELO, AND REQUEST FOR JUDICIAL NOTICE IN SUPPORT THEREOF**

[Supplemental Request for Judicial Notice also filed concurrently herewith]

Date:    June 7, 2010
Time:    9:30 a.m.
Place:   Courtroom 301
         21041 Burbank Blvd.
         Woodland Hills, California

---

[1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities. The affiliated case numbers are as follows: 1:09-bk-13338-KT; 1:09-bk-13358-KT; 1:09-bk-13359-KT; 1:09-bk-13360-KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-13365-KT; 1:09-bk-13366-KT; 1:09-bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-bk-13371-KT; 1:09-bk-13372-KT; 1:09-bk-13373-KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT; 1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13385-KT; 1:09-bk-13386-KT; 1:09-bk-13387-KT; 1:09-bk-13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13391-KT; 1:09-bk-13392-KT; 1:09-bk-13393-KT; 1:09-bk-13394-KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-KT; 1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-KT; 1:09-bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.

1    **PLEASE TAKE NOTICE** that on June 7, 2010, at 9:30 a.m., or as soon thereafter as the

2    matter may be heard, in Courtroom 301 of the United States Bankruptcy Court located at 21041

3    Burbank Boulevard, Woodland Hills, California, Meruelo Maddux Properties, Inc. ("MMPI"), and

4    Alameda Produce Market, LLC ("Alameda Produce" and, together with MMPI, the "Settling

5    Debtors"), will and do hereby move for an order approving the Settling Debtors' proposed

6    settlements with Cathay Bank ("Cathay"), including but not limited to terms providing for the

7    termination of the automatic stay in Alameda Produce's case for any defaults of obligations for the

8    payment of money to Cathay that are not cured within a 30-day cure period as more particularly

9    provided in the settlement agreements attached as Exhibit "1" and "2" to the Declaration of Richard

10    Meruelo appended hereto, and authorizing the Settling Debtors to use cash collateral to make

11    payments provided for under the settlements.

12    This motion is made on the following grounds:  Prior to March 27, 2009 (the "Petition

13    Date"), Alameda Produce[2] obtained a loan in the principal amount of $53 million from Cathay

14    evidenced by, among other things, a promissory note secured by a first-priority deed of trust

15    against certain parcels of real property owned on the Petition Date by Alameda Produce

16    (collectively the "Property").  Also prior to the Petition Date, Alameda Produce obtained a loan in

17    the principal amount of $10 million from Cathay evidenced by, among other things, a promissory

18    note secured by a second-priority deed of trust against the same Property.  After the Petition Date,

19    Cathay frequently opposed the motions filed by the Debtors in this case, including motions for

20    authority to use cash collateral and enter into settlements, alleged that it had an interest in a portion

21    of funds on hand known in this case as the "unrestricted cash," and objected to approval of the

22    Debtors' proposed disclosure statement.

23    Subject to Court approval, the Settling Debtors and Cathay have agreed to settlements of

24    any and all disputes arising out of or relating to, among other things, the Debtors' motions for

25    authority to use cash collateral and for authority to utilize their cash management system, Cathay's

26    _____

27    [2] Some references to "Alameda Produce" include Alameda Produce Market, Inc., a
California corporation, the predecessor-in-interest to Alameda Produce Market, LLC.

28

2

1    loans to Alameda Produce, and the treatment of Cathay's various claims under a Chapter 11 plan.

2    The settlements are memorialized in the settlement agreements attached as Exhibits "1" and "2" to

3    the Declaration of Richard Meruelo.  The Settling Debtors believe that the settlements are fair,

4    reasonable and in the best interests of their and other Debtors' estates.  The Settling Debtors

5    request that the Court approve the settlements and authorize the Debtors to use cash collateral to

6    perform the payment obligations under the settlements.

7        This Motion is based upon this Notice and Motion, the Memorandum of Points and

8    Authorities, Declaration of Richard Meruelo and the Request for Judicial Notice appended hereto,

9    the Supplemental Request for Judicial Notice filed concurrently herewith,[3] the papers and

10    pleadings on file in this case, and such other evidence as may be presented to the Court.

11    **PLEASE TAKE FURTHER NOTICE** that pursuant to Local Bankruptcy Rule 9013-1(f),

12    any party opposing the relief sought by the Motion must file a response in writing with the Clerk of

13    the Court and such response must be served upon the following not less than 14 days prior to the

14    hearing on the motion:  (1) the Office of the United States Trustee, ATTN: Jennifer L. Braun, Esq.,

15    21051 Warner Center Lane, Suite 115, Woodland Hills, CA  91367; (2) counsel for the Settling

16    Debtors, John N. Tedford, IV, Esq., Danning, Gill, Diamond & Kollitz, LLP, 2029 Century Park

17    East, Third Floor, Los Angeles, CA  90067; (3) counsel for the Official Committee of Unsecured

18    Creditors, Dean G. Rallis Jr., Esq., SulmeyerKupetz, 333 S. Hope St., 35th Floor, Los Angeles, CA

19    90071; and (4) counsel for Cathay, Michael G. Fletcher, Frandzel Robins Bloom & Csato, L.C.,

20    6500 Wilshire Blvd., 17th Floor, Los Angeles, CA  90048.  Any response not timely filed and

21    ///

22    ///

23    ///

24    ///

25    ///

26

27    [3] The Supplemental Request for Judicial Notice contains copies of the two proofs of claims filed by Cathay in Alameda Produce's bankruptcy case.

28

1  served may be deemed by the Court to be consent to the granting of the Motion.  If you do not have

2  any objection to the Motion, you do not need to take any further action.

3

4  Dated: May 12, 2010                    DANNING, GILL, DIAMOND & KOLLITZ, LLP

5

6                                        By:  _John Tedford IV_____

7                                             John N Tedford, IV
                                             Attorneys for Meruelo Maddux Properties,
8                                             Inc., and affiliated Debtors and Debtors-in-
                                             Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3                                          I.

4                              STATEMENT OF FACTS

5   A.      BANKRUPTCY BACKGROUND

6         On March 26 and 27, 2009 (the "Petition Date"), Meruelo Maddux Properties, Inc.

7   ("MMPI"), and 53 of MMPI's direct and indirect subsidiaries (collectively the "Debtors") filed

8   voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Code").  Pursuant

9   to the Court's ruling on March 30, 2009, the 54 cases are being jointly administered under MMPI's

10  case number, 1:09-bk-13356-KT.  The Debtors are operating their business affairs pursuant to the

11  authority granted under §§ 1107 and 1108 of the Code.

12

13  B.      THE DEBTORS' OVERALL BUSINESS MODEL AND APPROACH[4]

14        MMPI, together with Meruelo Maddux Properties, LP ("MMPLP") and its affiliates and

15  related entities (sometimes collectively referred to herein as the "Company") develops, redevelops

16  and owns industrial, commercial and multi-unit residential properties in downtown Los Angeles

17  and other urban markets in southern California.  MMPI was formed in 2006, and one of the reasons

18  for forming MMPI was to hold an initial public offering of stock in order to generate cash to pay

19  off the then-existing debt to the California Public Employees' Retirement System (aka "CalPERS")

20  and raise funds the Company could use to continue growing through the development of real

21  _____

22        [4] In addition to the declaration appended hereto, this opposition is supported by the

23  Declaration of Richard Meruelo filed with the Court on March 27, 2009 (*docket entry no. 10*), and
    the Supplemental Declaration of Richard Meruelo and the Declaration of Fred Skaggs filed with

24  the Court on April 21, 2009 (*docket entry no. 95*).  The declarations were sizeable, particularly with
    the exhibits.  In connection with a prior matter before the Court, it was suggested by a non-Debtor

25  party that, to conserve the environment, the Debtors should not be required to re-file and serve the
    declarations in connection with each matter where the Debtors rely upon the declarations in support

26  of their description of the Debtors' background and operations.  The Debtors therefore request that
    the Court take judicial notice of the filing of those declarations and treat the declarations as if they

27  were filed anew in support of this opposition.  The Debtors will make copies of the declarations
    available on request by electronic mail or regular mail, as appropriate.

28

353619.04 [XP]    25195

1  properties. When MMPI was formed, the Company owned, leased with rights to purchase, and had

2  rights to buy approximately 52 development, redevelopment and stabilized projects.

3        Like its predecessor business, MMPI's focus is on non-stabilized properties and commercial

4  and industrial land which have alternate, more profitable uses that are achievable through

5  redevelopment or major renovation and ground-up development.  The Company's properties are

6  used for diverse purposes, and include food industry, wholesale markets, small tenant industrial,

7  residential high rise and mixed-use "urban village" properties.  The vast majority of the properties

8  are situated in downtown Los Angeles.  The Company is believed to be the largest non-

9  governmental land owner in downtown Los Angeles, owning or controlling approximately 80 acres

10  of land in downtown Los Angeles at the time that MMPI was formed.

11        The Company focuses on urban in-fill development and on finding different, more

12  profitable uses for existing urban properties.  The Company looks for properties that have value

13  intrinsic to the property itself, such as the property's location, whether there is an end user of the

14  property on the horizon who might want to purchase the property, how well the property will fit in

15  with the growth patterns of the area and community in which it is situated, and other factors.

16        The Company's business model anticipates the need for time to develop properties and

17  requires the infusion of funds to pay the costs of such development, including the carrying costs.

18  To help defray costs during development, properties may be utilized as parking lots or other uses,

19  not because such use generates substantial income but because the land itself is extremely valuable

20  since it can be developed at an appropriate time in the future, and the parking lot revenue provides

21  some interim revenue.  Many of the Company's properties have been developed to the point where

22  entitlements have been obtained thus increasing the value substantially, but development has been

23  deferred pending an improvement in the credit markets.  In summary, the Company's business

24  model contemplates and is based upon the purchase, development and resale of properties, pursuant

25  to which, the Company turns over such properties in a relatively short period of time, such as a few

26  years instead of decades, and uses the profit from such properties to fund operations of MMPI and

27  all of its other affiliates and the purchase and development of other properties.

28  ///

6

353619.04 [XP]     25195

1  C.    THE DEBTORS' COLLECTIVE ORGANIZATION AND OPERATIONS

2         Although the Debtors and their non-Debtor affiliates consist of a parent company and

3  various levels of subsidiaries, including limited liability companies and other entities which hold

4  title to properties, the Company has been, before and after its formation as a public company, and

5  presently continues to be, effectively operated as a single enterprise.  Revenues of the entities are

6  commingled, and the funds are used to pay the expenses of MMPI and the subsidiaries.  Some

7  entities generate revenues in excess of operational expenses and debt service, but some do not.  The

8  reason that the Company purchases, and then keeps, properties that are cash flow negative is

9  because the Company believes that those properties will, in time, generate a positive return and the

10 enterprise will be significantly more valuable as a result.

11        Before and after the IPO, the Debtors commingled funds.  The cash management system

12 implemented before the IPO provides for funds to flow to and from a cash concentration account

13 ("Concentration Account") maintained by MMPLP.  The Concentration Account is linked to the

14 operating bank accounts of each of the Debtors and non-Debtor affiliates, which bank accounts are

15 maintained as zero balance accounts.  When needed to fund payment on checks issued by a

16 particular affiliate, funds are transferred from the Concentration Account to the operating account

17 of that affiliate.  Excess funds, if any, are invested in interest bearing accounts.

18        MMPI has filed various reports with the Securities and Exchange Commission ("SEC"),

19 including among others, quarterly reports as well as annual audited reports.  These reports have

20 been prepared on a consolidated basis.  The filings have been made with respect to the business as

21 a consolidated enterprise.

22

23 D.    BRIEF DESCRIPTION OF ALAMEDA PRODUCE MARKET, LLC'S BUSINESS AND

24        PROPERTY

25        One of the Debtors is Alameda Produce Market, LLC ("Alameda Produce"), which owns

26 two separate encumbered properties or projects and two separate unencumbered properties totaling

27 approximately 34.7 acres of land located at the corner of East 7th Street and South Alameda Street

28 in downtown Los Angeles.  Each is described generally below.

7

1    First, Alameda Produce owns an industrial complex referred to as "Alameda Square,"

2  which is encumbered by liens in favor of Cathay.[5]  In or about 1997, Rykoff Sexton Company, a

3  national institutional food distributor, relocated out of downtown Los Angeles.  The 1.4 million

4  square foot facility consisted of four multi-story buildings that had been built in or about 1923.

5  Alameda Produce acquired the property in or about April 1998 and modernized the buildings at a

6  total cost of approximately $18.5 million.  Presently, Alameda Square is home to American

7  Apparel, one of downtown Los Angeles' largest employers.  The Company's corporate

8  headquarters is also located in one of the buildings at Alameda Square.

9    Second, Alameda Produce owns a 122,120 square foot produce market referred to as the

10  "Seventh Street Produce Market,"[6] which is also encumbered by liens in favor of Cathay.  The

11  Seventh Street Produce Market is a produce wholesale terminal market adjacent to Alameda

12  Square, and was acquired by Alameda Produce in or about April 1999.  Prior to the Company's

13  IPO, Alameda Produce invested over $10 million to renovate the property and, during that process,

14  relocated large produce tenants to other produce buildings owned by the Company.  Currently, the

15  Seventh Street Produce Market is home to a large number of small businesses in the fresh produce

16  distribution business.

17    Third, Alameda Produce owns a property consisting of 0.7 acres of land located at 1215

18  East 7th Street,[7] which is not subject to Cathay's liens.  Use of the property is currently being

19  donated to Central City East Association, which is a downtown business association, for purposes

20  of Association parking and storage and the providing of Association services to the community.

21    Fourth, Alameda Produce owns a property consisting of 2.6 acres of land located at 1339

22  East 7th Street,[8] which is also not subject to Cathay's liens.  This property is sometimes referred to

23  _____

24    [5]  Assessor's Parcel Numbers 5146-009-004 and 5146-009-005.

25    [6]  Assessor's Parcel Number 5146-009-003.

26    [7]  Assessor's Parcel Number 5417-034-015.

27    [8]  Assessor's Parcel Numbers 5147-035-900, 5147-035-901, 5147-035-902, 5147-035-903, and 5147-035-904.

28

353619.04 [XP]    25195

1   as the "MTA Property" because it is currently the subject of eminent domain proceedings initiated

2   by the Metropolitan Transportation Authority (the "MTA").

3

4   E.    CATHAY BANK'S LOANS TO ALAMEDA PRODUCE

5          In or about November 2005, Alameda Produce entered into a Loan Agreement and executed

6   a Promissory Note in favor of Cathay in the principal amount of $53 million secured by, among

7   other things, a Deed of Trust, Assignment of Rents and Fixture Filing recorded on November 16,

8   2005 (the "Senior Loan"). A copy of the $53 million Promissory Note and related documents were

9   attached to one of Cathay's proofs of claim filed in Alameda Produce's case, which proof of claim

10  was assigned claim number 16 by the Clerk of the Court, and a copy of which is attached as Exhibit

11  "3" to the separately filed Request for Judicial Notice.

12         As evidenced by the Promissory Note for the Senior Loan, interest on the principal owed

13  under the Promissory Note accrues at a fixed non-default rate of 6.75% per annum (approximately

14  $274,588 per month as of the Petition Date), with a default rate of 11.75% (approximately

15  $477,987 per month as of the Petition Date). The monthly payment is $406,100.60, applied first to

16  interest and other charges and then to the principal balance. Pursuant to subsequent modifications

17  of the Senior Loan, the maturity date of the Promissory Note was February 28, 2009. Alameda

18  Produce's obligations under the Senior Loan originally were guarantied by Richard Meruelo and

19  Mr. Meruelo's parents individually and in their capacities as trustees of a living trust. In 2007, the

20  parties entered into a modification agreement whereby, among other things, Cathay consented to a

21  merger of Alameda Produce Market, LLC, and its predecessor Alameda Produce Market, Inc., a

22  California corporation, released the then-existing guarantors of any liability under their guaranties,

23  and was provided a new guaranty given by MMPI.

24         As of the Petition Date, Cathay was holding a tax reserve of $176,255.15 pursuant to the

25  Senior Loan documents (the "Tax Reserve Account"). As reflected in pleadings previously filed

26  with the Court, a dispute exists regarding Cathay's obligation to turn over the funds in the Tax

27  Reserve Account to Alameda Produce.

28  ///

353619.04 [XP]    25195

1    In or about October 2006, Alameda Produce executed another Promissory Note in favor of

2  Cathay in the principal amount of $10 million secured by, among other things, a Deed of Trust,

3  Assignment of Rents and Fixture Filing recorded on October 17, 2006 (the "Junior Loan"). A copy

4  of the $10 million Promissory Note and related documents also were attached to Cathay's second

5  proof of claim, which proof of claim was assigned claim number 17 by the Clerk of the Court. As

6  evidenced by the Promissory Note for the Junior Loan, interest on the principal owed under the

7  Promissory Note accrues at a fixed non-default rate of 8.00% per annum (approximately $65,660

8  per month as of the Petition Date), with a default rate of 13.00% (approximately $106,697 per

9  month as of the Petition Date). Interest payments are due each month, in arrears. Pursuant to

10 subsequent modifications of the Junior Loan, the maturity date of the Promissory Note also was

11 February 28, 2009. Because the Junior Loan was made prior to MMPI's formation, Alameda

12 Produce's obligations under the Junior Loan originally were guarantied by Richard Meruelo. In

13 2007, the parties entered into a modification agreement whereby, among other things, Cathay

14 consented to the merger of Alameda Produce Market, LLC, and Alameda Produce Market, Inc.,

15 released Mr. Meruelo of any liability under his guaranty, and was provided a new guaranty given

16 by MMPI.

17

18 F.    THE DEBTORS' CASH COLLATERAL AND CASH MANAGEMENT MOTIONS

19     On the Petition Date, the Debtors filed a number of so-called "first day motions," including

20 motions seeking authority to use cash collateral and to utilize their existing cash management

21 system (sometimes referred to together with subsequent motions seeking similar relief as the "Cash

22 Collateral Motion" and the "Cash Management Motion"). The Cash Collateral Motion and the

23 Cash Management Motion were granted on an interim basis. Cathay, among others, opposed the

24 Debtors' motions. Various hearings, including evidentiary hearings, were held with regard to the

25 Debtors' requests for relief on a final basis. Among other things, Cathay challenged the Debtors'

26 valuation of its real property collateral (collectively the "Property") and submitted two appraisals.

27 Cathay conducted cross-examination of Richard Meruelo regarding his valuation of the Property

28 and the Debtors cross-examined Cathay's appraiser regarding his valuations. On or about January

10

1  13, 2010, the Court entered its order granting the Cash Collateral Motion and Cash Management

2  Motion on a final basis through March 31, 2010; as to Cathay, the Court determined that Cathay

3  was entitled to the base level of adequate protection proposed by the Debtors.  On March 31, 2010,

4  on motion of the Debtors, the Court entered its order extending the Debtors' authority to use cash

5  collateral and utilize their cash management system through June 30, 2010.  That order also

6  provides that in connection with such use Cathay is afforded the base level of adequate protection

7  proposed by the Debtors.

8

9  G.        THE DEBTORS' JOINT OR CONSOLIDATED PLAN OF REORGANIZATION

10             As the Court is aware, the Debtors have filed a joint Chapter 11 plan of reorganization

11  which has been, and will continue to be, the subject of significant litigation by secured creditors.

12  The Debtors' second amended disclosure statement and second amended plan were filed on or

13  about May 1, 2010.  As set forth in § 1123(a) of the Code, a Chapter 11 plan must provide

14  "adequate means for the plan's implementation" such as, among other things, "retention by the

15  debtor of all or any part of the property of the estate," "satisfaction or modification of any lien,"

16  "curing or waiving of any default," and an "extension of a maturity date or a change in an interest

17  rate or other term of outstanding securities."  11 U.S.C. § 1123(a)(5).  Further, a Chapter 11 plan

18  may "modify the rights of holders of secured claims . . . or of holders of unsecured claims, or leave

19  unaffected the rights of holders of any class of claims."  11 U.S.C. § 1123(b)(5).  Cathay objected

20  to the Debtors' request for approval of an earlier version of the Debtors' disclosure statement.  The

21  second amended disclosure statement identifies the treatment of Cathay's claims consistent with

22  the settlements of which the Debtors' now seek approval.

23

24  H.        THE SETTLING DEBTORS' PROPOSED SETTLEMENTS WITH CATHAY

25             Subject to Court approval, Alameda Produce and MMPI (the "Settling Debtors") have

26  agreed to settlements of all disputes arising out of or relating to the Cash Collateral Motion, the

27  Cash Management Motion, the two loans, and the treatment of Cathay's claims under the Debtors'

28  proposed Chapter 11 plan (the "Settlements").  The settlement relating to the Senior Loan is

1  memorialized in the Settlement Agreement attached as Exhibit "1" to the Declaration of Richard

2  Meruelo, and the settlement relating to the Junior Loan is memorialized in the Settlement

3  Agreement attached as Exhibit "2" to Mr. Meruelo's declaration.

4      Without limiting or altering the terms the detail in the settlement agreement attached as

5  Exhibit "1" to Mr. Meruelo's declaration,[9] the terms of the Settling Debtors' proposed settlement as

6  to the Senior Loan are summarized as follows:

7      1.      The Settling Parties and Cathay will enter into a separate Third Modification and

8  Extension Agreement (the "Third Modification") providing, among other things, for the following:

9          a.      as of the date on which the Court enters its order approving the settlement

10  (the "Approval Date"), the principal balance of the Senior Loan will be $48,815,711.37 (the

11  principal balance as of December 31, 2008), plus interest thereon at a rate of 4.0% per annum from

12  January 1, 2009, through the Approval Date, plus attorneys' fees and costs as discussed below;

13          b.      the maturity date under the Promissory Note will be extended to the date that

14  is 4 years after the Approval Date;

15          c.      the non-default interest rate under the Promissory Note will be a fixed rate of

16  4.0% for the first year, 4.5% for the second year, and 5.0% thereafter until the maturity date, except

17  that the default rate of interest will be a fixed rate of 8.0% per annum;

18          d.      Alameda Produce will make monthly payments of interest only, in arrears, at

19  a rate of 4.0% per annum throughout the extended term, and any interest that accrues in excess of

20  that amount will be deferred and will be payable at the extended maturity date;

21          e.      of the $176,255.15 in the Tax Reserve Account, $113,000 will be disbursed

22  to Cathay as partial reimbursement of its attorneys' fees and costs incurred in connection with the

23  Senior Loan, and the remaining $63,255.15 will be disbursed to Alameda Produce;

24          f.      Cathay will waive its claim for reimbursement of $150,000 of its attorneys'

25  fees and costs, and any remaining attorneys' fees and costs incurred by Cathay and chargeable

26  _____

27  [9] In the event that there is any discrepancy between the terms set forth in the settlement
documents and the terms described below, the terms in the settlement documents will control.

28

1  under the Senior Loan documents, less the $113,000 to be disbursed from the Tax Reserve

2  Account, will be added to the loan balance to be paid when the Senior Loan is paid in full or upon

3  the maturity date, and no interest will accrue on such amounts;

4           g.    Alameda Produce will not be required to comply with provisions in the

5  Senior Loan documents relating to debt service coverage ratios and prepayment fees; and

6           h.    MMPI will execute a reaffirmation of its guaranty as provided in the Third

7  Modification.

8          2.    Cathay will consent to the use of cash collateral for the purposes set forth in the

9  Cash Collateral Motion, for the purpose of making payments provided for in the settlement and the

10  Senior Loan, as modified, and any other purpose as may be authorized by the Court.

11          3.    Cathay will consent to the Debtors' continued use of their existing cash management

12  system and the relief sought in the Cash Management Motion. Neither Alameda Produce nor any

13  other entity will be required to segregate Alameda Produce's cash collateral.

14          4.    Except with regard to the obligations created under the settlement and the Senior

15  Loan documents, as modified by the Third Modification, and similar settlement documents related

16  to the Junior Loan, Alameda Produce and Cathay will release each other of all known and unknown

17  claims which they had or may have had against the other as of the date of the agreement.

18          5.    To the extent that any adequate protection liens have arisen or may arise in favor of

19  Cathay pursuant to the Court's orders authorizing the use of cash collateral, such liens will be

20  waived, released and discharged. This would *not* effect a waiver, release or discharge of any lien

21  afforded to Cathay against the Property, rents generated by the Property, or other assets in which

22  Cathay holds a security interest under the Senior Loan documents.

23          6.    The treatment afforded to Cathay under any plan proposed by the Settling Debtors

24  will be consistent with, and the Settling Debtors will not in any way seek to alter, modify or

25  contradict, the terms of the settlement. Provided that the plan complies with the settlement, Cathay

26  will fully support the proposed plan and Cathay will not support or participate in the formulation of

27  any other plan.

28  ///

353619.04 [XP]    25195

1      7.     As of the Approval Date, relief from stay will be granted in favor of Cathay to

2  exercise its remedies against Alameda Produce and property of Alameda Produce's estate in the

3  event of a default in any obligation for the payment of money to Cathay that is not cured within a

4  30-day cure period as more particularly provided in the settlement agreement. With regard to any

5  other defaults susceptible to being cured but not cured within the 30-day cure period, Cathay may

6  seek relief from stay by filing a motion on 14 days' notice.

7       Without limiting the detail or altering the terms in the settlement agreement attached as

8  Exhibit "2" to Mr. Meruelo's declaration,[10] the terms of the Settling Debtors' proposed settlement

9  as to the Junior Loan are summarized as follows:

10     1.     The Settling Debtors and Cathay will enter into a separate Sixth Modification and

11  Extension Agreement (the "Sixth Modification") providing, among other things, for the following:

12        a.     as of the Approval Date, the principal balance of the Junior Loan will be

13  $9,848,139.32 (the balance as of December 31, 2008), plus interest thereon at a rate of 4.0% per

14  annum from January 1, 2009, through the Approval Date, plus attorneys' fees and costs as

15  discussed below;

16        b.     the maturity date under the Promissory Note will be extended to the date that

17  is 4 years after the Approval Date;

18        c.     the non-default interest rate under the Promissory Note will be a fixed rate of

19  4.0% for the first year, 4.5% for the second year, and 5.0% thereafter until the maturity date, except

20  that the default rate of interest will be a fixed rate of 8.0% per annum;

21        d.     Alameda Produce will make monthly payments of interest only, in arrears, at

22  a rate of 4.0% per annum throughout the extended term, and any interest that accrues in excess of

23  that amount will be deferred and will be payable at the extended maturity date;

24  ///

25  ///

26

27  [10] In the event that there is any discrepancy between the terms set forth in the settlement documents and the terms described below, the terms in the settlement documents will control.

28

14

1      e.     Cathay's attorneys' fees and costs in the amount of $2,412.46 will be added

2 to the loan balance to be paid when the Junior Loan is paid in full or upon the maturity date, and no

3 interest will accrue on such amounts; and

4      f.     MMPI will execute a reaffirmation of its guaranty as provided in the Sixth

5 Modification.

6      2.     Cathay will consent to the use of cash collateral for the purposes set forth in the

7 Cash Collateral Motion, for the purpose of making payments provided for in the settlement and the

8 Junior Loan, as modified, and any other purpose as may be authorized by the Court.

9      3.     Cathay will consent to the Debtors' continued use of their existing cash management

10 system and the relief sought in the Cash Management Motion.  Neither Alameda Produce nor any

11 other entity will be required to segregate Alameda Produce's cash collateral.

12      4.     Except with regard to the obligations created under the settlement and the Junior

13 Loan documents, as modified by the Sixth Modification, and similar settlement documents related

14 to the Senior Loan, Alameda Produce and Cathay will release each other of all known and

15 unknown claims which they had or may have had against the other as of the date of the agreement.

16      5.     To the extent that any adequate protection liens have arisen or may arise in favor of

17 Cathay pursuant to the Court's orders authorizing the use of cash collateral, such liens will be

18 waived, released and discharged.  This would *not* effect a waiver, release or discharge of any lien

19 afforded to Cathay against the Property, rents generated by the Property, or other assets in which

20 Cathay holds a security interest under the Junior Loan documents.

21      6.     The treatment afforded to Cathay under any plan proposed by the Settling Debtors

22 will be consistent with, and the Settling Debtors will not in any way seek to alter, modify or

23 contradict, the terms of the settlement.  Provided that the plan complies with the settlement, Cathay

24 will fully support the proposed plan and Cathay will not support or participate in the formulation of

25 any other plan.

26      7.     As of the Approval Date, relief from stay will be granted in favor of Cathay to

27 exercise its remedies against Alameda Produce and property of Alameda Produce's estate in the

28 event of a default in any obligation for the payment of money to Cathay that is not cured within a

353619.04 [XP]    25195

1  30-day cure period as more particularly provided in the settlement agreement.  With regard to any

2  other defaults susceptible to being cured but not cured within the 30-day cure period, Cathay may

3  seek relief from stay by filing a motion on 14 days' notice.

4

5                                          II.

6                                      ARGUMENT

7  A.      THE COURT IS AUTHORIZED TO APPROVE THE SETTLEMENT AGREEMENTS

8          This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, and

9  Federal Rule of Bankruptcy Procedure 9019.  Federal Rule of Bankruptcy Procedure 9019(a)

10 provides,

11              On motion by the trustee and after a hearing on notice to creditors,
                the debtor . . . and to such other entities as the court may designate,
12              the court may approve a compromise or settlement.

13         The Supreme Court, in *Protective Committee for Independent Stockholders of TMT Trailer*

14 *Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), held that a bankruptcy court, in considering

15 whether to approve a compromise, should inform itself regarding

16              all facts necessary for an intelligent and objective opinion of the
                probabilities of ultimate success should the claim be litigated.
17              Further, the judge should form an educated estimate of the
                complexity, expense, and likely duration of such litigation, the
18              possible difficulties of collecting on any judgment which might be
                obtained, and all other factors relevant to a full and fair assessment of
19              the wisdom of the proposed compromise.

20         The Ninth Circuit has clarified the inquiry as follows:

21              In determining the fairness, reasonableness and adequacy of a
                proposed settlement agreement, the court must consider:  (a)
22              probability of success in the litigation; (b) the difficulties, if any, to
                be encountered in the matter of collection; (c) the complexity of the
23              litigation involved, and the expense, inconvenience and delay
                necessarily attending it; [and] (d) the paramount interest of the
24              creditors and a proper deference to their reasonable views in the
                premises.
25

26 *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied*, 479 U.S. 854, 107 S. Ct.

27 189 (1986).

28 ///

                                          16

1      A trustee or debtor-in-possession has the burden of persuading the Court that the

2   compromise is fair and equitable and should be approved.  *Id.*  Although "the creditors' objections

3   to a compromise must be afforded due deference, such objections are not controlling, and while the

4   court must preserve the rights of the creditors, it must also weigh certain factors to determine

5   whether the compromise is in the best interest of the bankrupt estate." *Id.* at 1382 (citations

6   omitted).

7      The bankruptcy court has wide latitude and discretion in evaluating a proposed compromise

8   because the judge is "uniquely situated to consider the equities and reasonableness." *United States*

9   *v. Alaska National Bank (In re Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982).

10  The Ninth Circuit has further stated:

11          A compromise agreement allows the trustee and the creditor to avoid
            the expenses and burdens associated with litigating "sharply
12          contested and dubious" claims. [Citation]. The bankruptcy court
            need not conduct an exhaustive investigation into the validity of the
13          asserted claim. [Citation]. It is sufficient that, after apprising itself of
            all facts necessary for an intelligent and objective opinion concerning
14          the claim's validity, the court determines that either (1) the claim has
            a "substantial foundation" and is not "clearly invalid as a matter of
15          law," or (2) the outcome of the claim's litigation is "doubtful."

16  *Id.* at 1328. The court is not "to decide the numerous questions of law and fact raised by

17  [objectors] but rather to canvass the issues and see whether the settlement '*falls below the lowest*

18  *point in the range of reasonableness.*'" *In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr.

19  S.D.N.Y. 1984) (*quoting In re W. T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (emphasis

20  added), *cert. denied*, 464 U.S. 822, 104 S. Ct. 89 (1983)), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985).

21

22  B.   THE PROPOSED SETTLEMENTS ARE REASONABLE AND IN THE BEST

23       INTERESTS OF THE ESTATES

24      The Settling Debtors' proposed settlements with Cathay are fair and reasonable settlements

25  of issues that have arisen or may arise relating to, among other things, the Cash Collateral Motion,

26  the Cash Management Motion, Alameda Produce's default under the loans, and the Debtors'

27  Chapter 11 plan. There is no dispute that Alameda Produce ceased making payments to Cathay in

28  January 2009. Non-default interest on the principal balance due with regard to the Senior Loan is

353619.04 [XP]     25195

1  6.75% and non-default interest on the principal balance due with regard to the Junior Loan is

2  8.00%, and Cathay may assert that it is entitled to recover such interest and exercise various other

3  remedies under the Code.  Cathay previously objected to the Debtors' use of its cash collateral and

4  may allege in the future that it is entitled to additional adequate protection for such future use.

5  Cathay may also seek to prevent confirmation of a Chapter 11 plan by voting to reject the Settling

6  Debtors' proposed plan.  The Settling Debtors believe that the likelihood that the Settling Debtors

7  would successfully oppose such efforts by Cathay is relatively high because, among other things,

8  the Settling Debtors believe that Cathay is adequately protected by a significant equity cushion in

9  the Property.  Of course, there is always a risk of loss in litigation, and the Settling Debtors have

10  factored in such risk in determining that, in its business judgment, the settlements are fair,

11  reasonable, and in the best interests of their estates.

12      The only known dispute between the Settling Debtors and Cathay involving the potential

13  for a recovery in favor of the Settling Debtors relates to the tax escrow funds.  If Alameda Produce

14  were required to seek turnover of the funds by Cathay, the likelihood of collection would be high.

15      The Settling Debtors believe that the complexity, delay and expense of litigating with

16  Cathay with regard to the above issues also justifies settlement on the agreed-upon terms.  The

17  Court has noted the significant amount of attorneys' fees being incurred by the Debtors and the

18  Official Committee of Unsecured Creditors, and the even larger amounts asserted by the numerous

19  secured creditors in this case.  Some motions that have been filed by the Debtors have been

20  separately opposed by multiple secured creditors, who often repeat each others' arguments both in

21  pleadings and at the podium.  Until settlement negotiations progressed to the point where it would

22  be counterproductive for the parties to continue litigating, Cathay was a very active participant in

23  the litigation pending before the Court.  Among other things, Cathay opposed the Cash Collateral

24  Motion and the Cash Management Motion, claimed that a significant amount of funds referred to as

25  "unrestricted cash" belonged to Cathay, opposed the Debtors' motion for a determination that the

26  Debtors are not subject to the single asset real estate provisions of the Code, filed its own motion

27  for a determination that Alameda Produce was subject to such provisions, challenged the Debtors'

28  valuation of Cathay's real property collateral, objected to the Debtors' request for an extension of

1    exclusivity, opposed a motion by a few of the Debtors to sell real property, objected to the payment

2    of professional fees from cash collateral, objected to approval of the Debtors' disclosure statement,

3    did not agree to turn over the funds in the tax escrow account to pay taxes coming due during the

4    2009-2010 fiscal year, and appeared at a significant number of hearings before the Court.  Absent

5    settlement, Cathay likely would litigate over similar matters in the future.  If required to litigate

6    with Cathay regarding pending and future matters, the Settling Debtors believe that some of the

7    litigation between it and Cathay likely will be complex and expensive.

8           Finally, the interests of creditors warrants approval of the Settlements.  Under the

9    Settlements, Alameda Produce will, among other things, lock in fixed interest rates that will

10   contribute towards the Debtors' reorganization efforts.  Past-due interest will be added to the

11   principal balance of the loans at the new rate set forth in the Settlements (4.0%), which is less than

12   the current interest rates under the loans (6.75% for the Senior Loan and 8.00% for the Junior

13   Loan).  Monthly payments to Cathay will be reduced from approximately $471,760 per month to

14   approximately $207,409 per month.[11]  Cathay will waive $150,000 of its attorneys' fees and costs

15   which may otherwise be chargeable under the relevant loan documents, and except for $113,000

16   which will be paid to Cathay from the tax escrow funds, any remaining attorneys' fees and costs

17   will be added to the loans, payable at maturity, and no interest thereon will accrue between now

18   and the maturity date.  Any objections by Cathay to the Debtors' use of cash collateral and

19   utilization of their existing cash management system will be resolved.  The Settling Debtors will

20   also eliminate the possibility of litigation with Cathay regarding the treatment of its claim under a

21   plan.  Finally, Cathay will agree to support the Debtors' plan provided that it is consistent with the

22   Settlements, thus increasing the likelihood of confirming a plan of reorganization that enables the

23   Company to emerge from bankruptcy best prepared and able to handle the opportunities and

24   challenges that it will face in the future.  In view of the expense of litigation and the significant

25   _____

26   [11] This approximate figure is estimated based on, among other things, an Approval Date of
     June 30, 2010.  The actual amount of monthly payments to be made will be calculated by Cathay
27   and the Debtors after the Approval Date.

28

353619.04 [XP]    25195

1  benefits of reaching agreement with secured creditors with regard to treatment of their claims under

2  a plan, the Settling Creditors believe that the proposed Settlements are in the best interests of the

3  Debtors' estates and their creditors.

4

5  C.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE CASH COLLATERAL

6         TO PERFORM PAYMENT OBLIGATIONS UNDER THE SETTLEMENTS

7         The Settling Debtors' settlements with Cathay add past-due interest (at the modified rate of

8  interest) to the balance due under the loans, payable at maturity, and so the use of cash collateral is

9  not at issue with respect to such amounts.  As the Court has previously ordered with respect to

10 other settlements, the Settling Debtors request that the Court's order provide that cash collateral

11 may be used to pay future payment obligations required under the Settlement and the loans, as

12 modified, including real property taxes.

13

14                                III.

15                            CONCLUSION

16        For the foregoing reasons, the Settling Debtors request that the Court approve its proposed

17 Settlements with Cathay, including but not limited to terms providing for the termination of the

18 automatic stay in Alameda Produce's case for any defaults of obligations for the payment of money

19 to Cathay that are not cured within a 30-day cure period as more particularly provided in the

20 settlement agreements, and authorize the Settling Debtors to perform thereunder as set forth above.

21 The Settling Debtors also requests such further relief as the Court deems just and proper.

22

23 Dated: May 12, 2010                  DANNING, GILL, DIAMOND & KOLLITZ, LLP

24

25                                By:  _____

26                                     John N Tedford, IV
                                       Attorneys for Meruelo Maddux Properties,
27                                     Inc., and affiliated Debtors and Debtors-in-
                                       Possession

28

                                         20

# **DECLARATION OF RICHARD MERUELO**

I, Richard Meruelo, declare and state as follows:

1.     I am the Chief Executive Officer of Meruelo Maddux Properties, Inc. ("MMPI").

2.     MMPI is the parent company of a number of subsidiaries, including Alameda Produce Market, LLC ("Alameda Produce"). On March 26 and 27, 2009, MMPI, Alameda Produce, and fifty-two other of MMPI's subsidiaries (collectively the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. I am a designated officer of each of the affiliated entities, including Alameda Produce, and am authorized to give this declaration.

3.     As a result of my being the Chief Executive Officer of MMPI and a designated officer of Alameda Produce and each of the affiliated entities, and my review of relevant documents, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records, and the manner in which they are prepared. Except as otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of the Debtors' operations and financial conditions.

4.     Alameda Produce owns two separate encumbered properties or projects and two separate unencumbered properties totaling approximately 34.7 acres of land located at the corner of East 7th Street and South Alameda Street in downtown Los Angeles.

5.     First, Alameda Produce owns an industrial complex referred to as "Alameda Square," which is encumbered by liens in favor of Cathay Bank ("Cathay"). In or about 1997, Rykoff Sexton Company, a national institutional food distributor, relocated out of downtown Los Angeles. The 1.4 million square foot facility consisted of four multi-story buildings that had been built in or about 1923. Alameda Produce acquired the property in April 1998 and modernized the buildings at a total cost of approximately $18.5 million. Alameda Square is home to American Apparel, which I understand is one of downtown Los Angeles' largest employers. MMPI's corporate headquarters is also located in one of the buildings at Alameda Square.

353619.04 [XP]    25195

1    6.    Second, Alameda Produce owns a 122,120 square foot produce market referred to as

2 the "Seventh Street Produce Market," which is also encumbered by liens in favor of Cathay. The

3 Seventh Street Produce Market is a produce wholesale terminal market adjacent to Alameda

4 Square, and was acquired by Alameda Produce in April 1999. Prior to MMPI's initial public

5 offering, Alameda Produce invested over $10 million to renovate the property and, during that

6 process, relocated large produce tenants to other produce buildings owned by the Company. The

7 Seventh Street Produce Market is home to a large number of small businesses in the fresh produce

8 distribution business.

9    7.    Third, Alameda Produce owns a property consisting of 0.7 acres of land located at

10 1215 East 7th Street, which is unencumbered. Use of the property is currently being donated to

11 Central City East Association, which is a downtown business association, for purposes of

12 Association parking and storage and the providing of Association services to the community.

13    8.    Fourth, Alameda Produce owns a property consisting of 2.6 acres of land located at

14 1339 East 7th Street, which is also not subject to Cathay's liens. For ease of reference, we refer to

15 this property sometimes as the "MTA Property" because it is currently the subject of eminent

16 domain proceedings initiated by the Metropolitan Transportation Authority.

17    9.    Alameda Produce obtained a loan in the principal amount of $53 million from

18 Cathay secured by, among other things, a deed of trust against Alameda Square and the Seventh

19 Street Produce Market (collectively the "Property"). The loan originally was guarantied by myself

20 and my parents individually and in their capacities as trustees of a living trust. After MMPI was

21 formed, the Company entered into modification agreements with a number of lenders in which the

22 then-existing guarantors were released and MMPI, as the borrower's parent company, became the

23 new guarantor of the loan. Consistent with this approach, Cathay consented to a merger of

24 Alameda Produce Market, LLC, and its predecessor Alameda Produce Market, Inc., released the

25 then-existing guarantors of any liability under their guaranties, and was provided a new guaranty

26 given by MMPI.

27    10.    Subsequently, Alameda Produce obtained another loan in the principal amount of

28 $10 million from Cathay secured by, among other things, a junior-priority deed of trust against the

22

1  Property. The loan originally was guarantied by myself. As with the senior loan, Cathay later

2  released me of any liability under the guaranty and was provided a new guaranty given by MMPI.

3        11.    Subject to Bankruptcy Court approval, Alameda Produce and MMPI (collectively

4  the "Settling Debtors") have agreed to settlements with Cathay of any and all disputes arising out

5  of or relating to, among other things, the Cash Collateral Motion, the Cash Management Motion,

6  the two loans, and the treatment of Cathay's claims under the Debtors' proposed Chapter 11 plan.

7  A true and correct copy of the proposed settlement agreement relating to the $53 million loan is

8  attached as Exhibit "1" hereto. A true and correct copy of the proposed settlement agreement

9  relating to the $10 million loan is attached as Exhibit "2" hereto.

10        12.    In my business judgment, I believe that the settlements are in the best interests of

11  Alameda Produce and its affiliated debtors-in-possession. Alameda Produce ceased making

12  payments to Cathay in January 2009, and Cathay may seek to assert that it is entitled to recover

13  interest since January 2009 at the default interest rates set forth in its loan documents. Cathay

14  previously objected to the Debtors' use of cash collateral, and may seek to allege in the future that

15  it is entitled to additional adequate protection for such future use. Cathay may also seek to prevent

16  confirmation of a Chapter 11 plan by voting to reject the Settling Debtors' proposed plan. While I

17  believe that the likelihood that the Settling Debtors would successfully oppose such efforts by

18  Cathay is relatively high, I also recognize that there is always a risk of loss in litigation. I have

19  factored in such risk of loss in determining that, in my business judgment, the settlements are fair,

20  reasonable, and in the best interests of the Settling Debtors and their estates.

21        13.    To the best of my knowledge, the only known dispute between the Settling Debtors

22  and Cathay involving the potential for a recovery in favor of the Settling Debtors relates to funds

23  previously paid by Alameda Produce to Cathay and held by Cathay in a tax reserve. The amount of

24  the funds being held by Cathay is approximately $176,255.15. A dispute exists regarding Cathay's

25  obligation to turn over the funds to Alameda Produce. If Alameda Produce were required to seek

26  turnover of the funds by Cathay, I believe that the likelihood of collection would be high.

27        14.    I also believe that the complexity, delay and expense of litigating with Cathay with

28  regard to such issues also justifies settlement on the agreed-upon terms. Until the settlement

353619.04 [XP]    25195

1  negotiations progressed to the point where it would be counterproductive for the parties to continue

2  litigating, Cathay was a very active participant in the litigation pending before the Court.  If the

3  settlements are not approved, I believe that Cathay will reinitiate litigation with the Debtors.  If

4  required to litigate with Cathay regarding pending and future matters, the Debtors will be required

5  to incur additional legal fees and related costs.  I believe that, for both sides, some of the further

6  litigation likely will be complex and expensive.

7      15.    For these and other reasons stated in the Settling Debtors' motion seeking approval

8  of the settlements, I believe that the settlements are fair, reasonable and in the best interests of the

9  Debtors and their estates.

10

11      I declare under penalty of perjury under the laws of the United States of America that the

12  foregoing is true and correct.

13      Executed on May 12, 2010, at Los Angeles, California.

14

15

16                        RICHARD MERUELO

17

18

19

20

21

22

23

24

25

26

27

28

24

353619.04 [XP]    25195

1

**REQUEST FOR JUDICIAL NOTICE**

2

3        Meruelo Maddux Properties, Inc. ("MMPI"), and Alameda Produce Market, LLC

4   ("Alameda Produce"), hereby request that the Court take judicial notice of the following facts:

5        1.        On March 26 and 27, 2009 (the "Petition Date"), MMPI and 53 of MMPI's direct

6   and indirect subsidiaries (collectively the "Debtors") filed voluntary petitions for relief under

7   Chapter 11 of Title 11 of the United States Code (the "Code").

8        2.        Pursuant to a ruling of the Court on March 30, 2009, the 54 cases are being jointly

9   administered under MMPI's case number, 1:09-bk-13356-KT.

10       3.        The Debtors are operating their business affairs pursuant to the authority granted

11   under §§ 1107 and 1108 of the Code.

12       4.        On the Petition Date, the Debtors filed a number of so-called "first day motions,"

13   including motions for authority to use cash collateral and to utilize their existing cash management

14   system (sometimes referred to together with subsequent motions seeking similar relief as the "Cash

15   Collateral Motion" and the "Cash Management Motion"). The first-day Cash Collateral Motion

16   and Cash Management Motion were granted on an interim basis.

17       5.        On or about April 21, 2009, Cathay Bank ("Cathay") filed its opposition to the Cash

18   Collateral Motion and the Cash Management Motion. In connection therewith, Cathay alleged that

19   a certain amount of funds known in this case as "unrestricted cash" belonged to Cathay and did not

20   constitute property of the Debtors' estates. Various hearings, including evidentiary hearings, were

21   held with regard to the Debtors' requests for relief on a final basis. Among other things, Cathay

22   challenged the Debtors' valuation of its real property collateral (collectively the "Property") and

23   submitted two appraisals. The Debtors cross-examined Cathay's appraiser, and Cathay cross-

24   examined the Debtors' expert witness, Richard Meruelo, regarding his valuation of the Property.

25   Final arguments with regard to Cathay's cash collateral were held on or about October 19, 2009.

26   On or about January 13, 2010, the Court entered its *Order Authorizing the Debtors' Use of Cash*

27   *Collateral on a Final Basis and Approving the Debtors' Use of Its Cash Management System.* As

28   ///

353619.04 [XP]     25195

1    to Cathay, the Court determined that Cathay was entitled to the base level of adequate protection

2    proposed by the Debtors.

3        6.      On or about April 28, 2009, the Debtors filed a motion for a determination that the

4    Debtors are not subject to the "single asset real estate" provisions in the Bankruptcy Code.  Also on

5    or about April 28, 2009, Cathay filed a motion for a determination that Alameda Produce is subject

6    to such provisions.  On or about May 7, 2009, Cathay filed an opposition to the Debtors' motion.

7    Ultimately, the Debtors' motion was granted and Cathay's motion was denied.

8        7.      On or about June 24, 2009, the Debtors filed a motion for an order extending,

9    among other things, the exclusive period in which the Debtors could file a proposed plan.  Cathay

10   filed an opposition to the Debtors' motion, which motion was ultimately granted in part.

11       8.      In late July or early August 2009, Cathay stipulated with the County of Los Angeles

12   Tax Collector (the "County") regarding the disbursement of tax reserve funds held by Cathay in the

13   amount of $176,255.15.  The County filed a motion for approval of the stipulation.  The Debtors

14   opposed the motion, and Cathay filed a reply to the Debtors' opposition.  Ultimately, the motion

15   was denied and the proposed stipulation was not approved.

16       9.      On or about September 2, 2009, the Debtors filed a motion for approval of a

17   proposed settlement with United Commercial Bank.  On or about September 17, 2009, Cathay filed

18   a notice of joinder in another secured creditor's opposition to the motion.  Ultimately, most of the

19   relief sought in the motion, including approval of the settlement, was granted.

20       10.     On or about September 4, 2009, the Debtors filed a motion for authority to sell

21   properties owned by two of the Debtors free and clear of liens.  On or about September 10, 2009,

22   Cathay filed a limited opposition to the motion.  The motion ultimately was granted.

23       11.     On or about November 24, 2009, Cathay filed objections to fee applications that

24   had been filed with the Court.  Ultimately, Cathay's objections were overruled and, for the most

25   part, the fees sought by the relevant professionals were approved on an interim basis.

26       12.     On or about December 4, 2009, the Debtors filed a proposed disclosure statement.

27   On or about January 6, 2010, Cathay filed an objection to the Debtors' disclosure statement.  On or

28   ///

353619.04 [XP]    25195

1    about May 1, 2010, the Debtors filed a second amended disclosure statement and second amended

2    plan.  A hearing on approval of the disclosure statement is set for June 14, 2010.

3          13.    On or about March 31, 2010, the Court entered its *Order Granting Debtors' Motion*

4    *for Order Extending Authority for the Use of Cash Collateral and to Maintain Cash Management*

5    *System through June 30, 2010.*  The order provided that in connection with such use Cathay is

6    afforded the base level of adequate protection proposed by the Debtors.

7

8    Dated:  May 12, 2010                          DANNING, GILL, DIAMOND & KOLLITZ, LLP

9

10                                          By: _____

11                                          John N Tedford, IV
                                            Attorneys for Meruelo Maddux Properties,
                                            Inc., and affiliated Debtors and Debtors-in-
12                                          Possession

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          27