1    This property is an example of the Company's (a) significant expertise and presence and (b)

2    focus on providing tailored solutions for a variety of space needs of the many small businesses in

3    the food and produce distribution industry in downtown Los Angeles.

4    **23.    2001 - 2021 West Mission Boulevard, Pomona**

5    The subject property is owned by Meruelo Maddux - Mission Boulevard, LLC ("MM

6    Mission Boulevard") and is encumbered by a lien in favor of Kennedy Funding, Inc. ("Kennedy").

7    The property is located adjacent to 1875 West Mission Boulevard in Pomona, California. It is

8    comprised of one property totaling approximately 14.7 acres which has been improved with a

9    three-story, single-tenant, office building consisting of approximately 242,042 net rentable square

10    feet. As of March 31, 2010, the improvements were not leased.

11    This property represents a large scale redevelopment site that could be redeveloped in a

12    variety of ways to satisfy the developing needs of Los Angeles space users.

13    **24.    1124 South Olive, 1117-1119 South Olive and 218 W. 11th Street, Los**

14    **Angeles**

15    The subject property is owned by Merco Group-Little J, LLC ("MG Little J"). It is

16    comprised of three separate properties, located on both sides of the 1100 block of South Olive

17    Street in the South Park area of downtown Los Angeles. The western portion, which is

18    encumbered by a lien in favor of Legendary, is improved with a building occupied by a restaurant

19    tenant consisting of approximately 11,829 net rentable square feet. The remaining two properties,

20    which are unimproved and unencumbered, are currently being utilized as parking lots. As of

21    March 31, 2010, the improvements were leased to a restaurant occupying 100% of the total

22    rentable area.

23    As a compliment to the commercial real estate activities of MMPI, the Company also

24    focuses its expertise and downtown knowledge base on supplying residential units to individuals.

25    This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable

26    development of for rent or for sale product. This property is intended to be redeveloped for such

27    uses.

28

1

### 25.    950 and 960 E. 3rd Street, Los Angeles

2    The subject property is owned by Merco Group, LLC ("MG") and is encumbered by two

3    liens in favor of Legendary, each on separate parcels.[3]  The two properties are located at the corner

4    of East 3rd Street and South Santa Fe Avenue in the Arts District of downtown Los Angeles.  It is

5    comprised of two separate properties totaling approximately 10.5 acres of which one has been

6    improved with a building occupied by the Southern California Institute of Architecture ("Sci-Arc")

7    consisting of approximately 81,741 net rentable square feet.  The second property consists of

8    unimproved land which is entitled for 635 residential units and a portion of which is currently

9    being partially utilized as parking lot for Sci-Arc student parking.  As of March 31, 2010,  the

10    building was leased to Sci-Arc occupying approximately 100% of the total rentable area.  Sci-Arc

11    exercised its option to extend its lease.  The Debtor and Sci-Arc have entered into an agreement for

12    the purchase by Sci-Arc of the property where the building is located and the parking lot.

13    As a compliment to the commercial real estate activities of MMPI, the Company also

14    focuses its expertise and downtown knowledge base on supplying residential units to individuals.

15    This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable

16    development of for rent or for sale product.  This land portion of this property is intended to be

17    redeveloped for such uses.

18

### 26.    815 East Temple Street, 210 Center Street and 729 East Temple Street,

19    Los Angeles (Center Village)

20    The subject property is owned by Meruelo Farms, LLC ("Meruelo Farms") and is

21    encumbered by liens in favor of Imperial (on 815 East Temple Street) and Pacific Commerce Bank

22    ("PCB"), on 729 East Temple Street.  The property is comprised of multiple properties totaling

23    approximately 5.3 acres of which 815 East Temple Street has been improved by a cold storage and

24    processing facility and 729 East Temple Street has been improved by industrial buildings.  The

25    subject properties consist of approximately 176,628 net rentable square feet.  The unimproved

26

27    [3] The Debtors reserve the right to assert that Legendary's lien is void or voidable.

28

28

353400.03 [XP]    25195

1  portions of the properties are currently being held as parking lots.  As of March 31, 2010, the

2  improvements at 815 East Temple Street were partly leased to a food processing tenant occupying

3  approximately 14% of the total rentable area.

4  815 East Temple is an example of the Company's (a) significant expertise and presence and

5  (b) focus on providing tailored solutions for a variety of space needs of the many small businesses

6  in the food and produce distribution industry in downtown Los Angeles.  729 East Temple is

7  intended to be a home to a large assortment of small business owners prevalent in downtown Los

8  Angeles whereby the Company looks to support and incubate their businesses.

9  **27.    833 Wall Street (Wall Street Market), Los Angeles**

10  The subject property is owned by Meruelo Wall Street, LLC ("Meruelo Wall Street") and is

11  encumbered by a lien in favor of East West as successor to UCB.  The property is located at the

12  intersection of East 9th Street and Wall Street in the Garment District of downtown Los Angeles.

13  It is comprised of one property totaling approximately 2.1 acres which has been improved with a

14  multi-tenant building consisting of approximately 98,245 net rentable square feet and rooftop

15  parking.  As of March 31, 2010, the improvements were leased to fifty-five tenants occupying

16  approximately 94% of the total rentable area. All of the tenants are on month to month tenancies.

17  The average occupancy for month to month tenants is 45 months.  The property is currently being

18  utilized as a garment wholesale and retail and office space facility.

19  This property is an example of how MMPI services the multitude of business owners and

20  their numerous employees who are involved in the (a) design, (b) production and (c) distribution

21  sectors of the garment industry in downtown Los Angeles.

22  **28.    1875 West Mission Boulevard, Pomona**

23  The subject property is owned by Merco Group – 2001 – 2021 West Mission Boulevard,

24  LLC ("MG 2001 – 2021 West Mission Boulevard") a part of which is encumbered by a lien in

25

26

27

28

29

353400.03 [XP]    25195

favor of PNL Pomona.[4]  The property is located at 1875 West Mission Boulevard in Pomona, CA. It is comprised of two properties totaling approximately 27.7 acres on which is presently located an industrial building consisting of approximately 424,309 net rentable square feet.  As of March 31, 2010, the improvements were not leased.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of Pomona space users.

### 29.    Santa Fe Commerce Center – 2445, 2460 and 2535 East 12th Street, Los Angeles

The subject property is owned by Santa Fe Commerce Center, Inc. ("Santa Fe Commerce Center") and is encumbered by a lien in favor of Wells Fargo Bank, N.A., successor by consolidation to Wells Fargo Bank Minnesota, National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 2002-C1 ("Wells Fargo").  In this case, Wells Fargo has acted by and through Berkadia Commercial Mortgage, Inc., its Special Servicer, and is referred to hereinafter as "Berkadia."

The property is located at 2445, 2460 and 2535 East 12th Street in the Southeast Industrial District of downtown Los Angeles.  It is comprised of one property totaling approximately 6.8 acres which has been improved with a three building industrial complex consisting of approximately 244,501 net rentable square feet.  As of March 31, 2010, the improvements were leased to seven tenants occupying approximately 82% of the total rentable area.  Three of the tenants, occupying 40% of the rented space, are on month to month tenancies.  The average occupancy for month to month tenants is 86 months. The largest tenant occupies 35.7% of the total area.  The property is currently being utilized as a multi-tenant industrial space facility.

---

[4] For purposes of clarification, readers should note that the real property located at 2001-2021 W. Mission Boulevard is not owned by MG 2001-2021 West Mission Boulevard but is instead owned by MM Mission Boulevard, LLC.

30

1    This property is an example of how MMPI services the multitude of business owners and

2   their numerous employees who are involved in the (a) design, (b) production and (c) distribution

3   sectors of the garment industry in downtown Los Angeles.

4              **30.    1009 North Citrus Avenue, Covina (Citrus Gardens)**

5      The subject property is owned by Meruelo Maddux Properties - 1009 North Citrus Avenue,

6   Covina, LLC ("MMP 1009 N. Citrus Avenue") and is unencumbered.  The property is located at

7   1009 North Citrus Avenue in Covina, California.  It is comprised of approximately 2.5 acres of

8   land which has been entitled for 52 residential units.  The property is currently vacant.

9      This property is an example of how the Company focuses its expertise and downtown

10  knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

11  density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

12             **31.    817-825 South Hill Street, Los Angeles (Ullman Tower Two)**

13     The subject property is owned by Meruelo Maddux-817-825 S. Hill Street, LLC ("MM

14  817-825 S. Hill Street") and is unencumbered. The property is located at 817-825 South Hill Street

15  in the Historic Core/ Jewelry district of downtown Los Angeles.  It is comprised of one property

16  totaling approximately 1.0 acres of land being utilized as a commercial parking lot facility.

17     While currently being utilized as a parking facility, this property is an example of how the

18  Company focuses its expertise and knowledge base on supplying future residential units to

19  individuals.  This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or

20  (c) affordable development of residences.

21             **32.    1060 North Vignes, Los Angeles (Vignes Village)**

22     The subject property is owned by Meruelo Maddux Properties-1060 N. Vignes, LLC

23  ("MMP 1060 N. Vignes") and is unencumbered.  The property is located near the corner of North

24  Vignes Street and North Main Street near Chinatown in downtown Los Angeles.  It is comprised of

25  one property totaling approximately 4.0 acres of land, which is currently unoccupied.  Interim

26  operating revenue is typically generated from parking revenues from film production parking.

27

28

31

1    This property is an example of how the Company focuses its expertise and downtown

2 knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

3 density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

4    **33.    12361 and 12385 San Fernando Road, Sylmar (San Fernando Court)**

5    The subject property is owned by Meruelo Maddux Properties - 12385 San Fernando Road,

6 LLC ("MMP 12385 San Fernando Road") and is unencumbered.  The property is located at 12361

7 and 12385 San Fernando Road in Sylmar, California.  It is comprised of approximately 5.5 acres of

8 land entitled for approximately 247 residential housing units, along with retail and office space.

9    This property is an example of how the Company focuses its expertise and knowledge base

10 on supplying residential units to individuals.  This effort is geared towards (a) high density urban

11 in-fill, (b) transit oriented and/or (c) affordable development of residences.

12    **34.    801 East 7th Street, Los Angeles**

13    Merco Group – 801 E. 7th Street, LLC owns a parking lot located at 648 S. Stamford

14 Avenue in downtown Los Angeles that occupies approximately 0.13 acres and is unencumbered.  It

15 generates no income currently.

16    **35.    1308 South Orchard, Los Angeles**

17    The subject property is owned by Merco Group - 1308 S. Orchard, LLC ("MG 1308 S.

18 Orchard") and is unencumbered. The subject property is located west of downtown Los Angeles.  It

19 is comprised of approximately 0.3 acres of land.

20    **36.    758 Ceres Avenue, Los Angeles (Ceres Street Produce Market)**

21    The subject property is owned by Merco Group - Ceres Street Produce, LLC ("MG Ceres

22 Street Produce") and is unencumbered.  The property is located in the industrial district of

23 downtown Los Angeles.  It is comprised of approximately 0.4 acres of land.

24 This property is intended to be developed based upon the Company's (a) significant expertise and

25 presence and (b) focus on providing tailored solutions for a variety of space needs of the many

26 small businesses in the food and produce distribution industry in downtown Los Angeles.

27

28

32

353400.03 [XP]    25195

1                   **37.    336 West 11th Street, Los Angeles (South Park Towers)**

2         The subject property is owned by Meruelo Maddux - 336 W. 11th Street, LLC ("MM 336

3 W. 11th Street") and is encumbered by a lien in favor of Legendary. The property is located at the

4 corner of West 11th Street and South Olive Street in the South Park area of downtown Los

5 Angeles. The property is entitled for an 80 unit residential development. It is comprised of

6 approximately 0.7 acres of land being utilized as a parking lot.

7         This property is an example of how the Company focuses its expertise and downtown

8 knowledge base on supplying residential units to individuals. This effort is geared towards (a) high

9 density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

10                 **38.    915-949 South Hill Street, Los Angeles (Ullman Tower One)**

11         The subject property is owned by Meruelo Maddux - 915-949 S. Hill Street, LLC ("MM

12 915-949 S. Hill Street") and is encumbered by a lien in favor of Imperial. The property is located

13 at 915-949 South Hill Street in the South Park area of downtown Los Angeles. It is comprised of

14 approximately 1.5 acres of land being utilized as a commercial parking lot.

15         This property is an example of how the Company focuses its expertise and downtown

16 knowledge base on supplying residential units to individuals. This effort is geared towards (a) high

17 density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

18              **39.    900, 910 and 926 East 4th Street and 405 – 411 S. Hewitt Street, Los**

19                       **Angeles**

20         The subject property is owned by Merco Group - 4th Street Center, LLC ("MG 4th Street

21 Center") and is encumbered by a lien in favor of Legendary. The property is located at the corner

22 of South Hewitt Street and East 4th Street in the Arts District of downtown Los Angeles. It is

23 comprised of approximately 1.3 acres which has been improved with two buildings consisting of

24 approximately 13,430 net rentable square feet. As of March 31, 2010, the improvements were

25 leased to one tenant occupying 53% of the net rentable area. The lease is subject to renewal in

26 2011. The property is a multi-tenant industrial and distribution space facility.

27         This property is intended to be used by an assortment of small business owners prevalent in

28 downtown Los Angeles whereby the Company looks to support and incubate their businesses.

353400.03 [XP]    25195

1

**40.    425 West 11th Street, Los Angeles (Desmond Building)**

2      The subject property is owned by Merco Group - 425 West 11th Street, LLC ("MG 425 W.

3  11th Street") and is encumbered by a lien in favor of Legendary.  The subject property consists of

4  two properties located on 11th Street, a few blocks away from the Staples Center and LA Live in

5  the South Park area of downtown Los Angeles.  The two properties total approximately 0.67 acres

6  which has been improved with a multi-story industrial building known as the "Desmond Building"

7  consisting of approximately 78,500 net rentable square feet.  As of March 31, 2010, the

8  improvements were leased to a tenant occupying approximately 20.0% of the total rentable area.

9  The tenant is on a month to month tenancy with the average occupancy of 48 months.  The other

10  property is currently utilized as a parking lot.

11      Both the improved and unimproved parts of this property are intended to be redeveloped

12  based on the Company's focus on supplying residential units to individuals.  This effort is geared

13  towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of

14  residences.

15

**41.    West 11th Street and South Grand Avenue, Los Angeles (Southpark**

16

**Towers, TransAmerica Lofts & Olive Street Towers)**

17      The subject properties are owned by Merco Group -- Southpark, LLC ("MG Southpark"),

18  and are encumbered by a lien in favor of Bank of America.  The properties are approximately three

19  to four blocks east of the Staples Center and the L.A. Live complex.  One property is located along

20  Pico Boulevard between Olive Street and Hill Street, and consists of four adjacent parcels, part of

21  which is improved with a three-story parking structure and an adjoining one-story brick industrial

22  building.  One and one-half blocks northeast of the first property is another property located at the

23  intersection of 11th Street and South Olive Street, consisting of one parcel.  One full major street

24  west of the first two properties is the third property, located along South Grand Avenue and

25  reaching to the corner of 12th Street and South Olive Street, consisting of three parcels.  Pending

26  development or sale, the properties are leased to Prestige Parking and utilized as parking lots.

27

28

34

1    This property is an example of how the Company focuses its expertise and downtown

2 knowledge base on supplying residential units to individuals. This effort is geared towards (a) high

3 density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

4    **C.    Consolidated Operations**

5    The Company's business model and strength is based on the fact that it is a single enterprise

6 with a single management team that manages a portfolio of properties that were assembled and are

7 managed in an efficient and synergistic manner. In addition, the acquisition and development of a

8 relatively large number of properties in a small geographic area allows for great flexibility in the

9 development of such properties. Accordingly, the properties together are more valuable than the

10 properties separately because of this synergistic relationship. For instance, the Company is an

11 incubator for small businesses. Certain properties in the portfolio are conducive to start-up

12 businesses (e.g., smaller tenant spaces, less expensive costs). As those start-up businesses grow,

13 the Company has the flexibility to move them to another property to meet the needs of their

14 growing businesses. This is particularly true with respect to Alameda Square, Seventh Street

15 Produce Market, 788 Alameda, and 2640 Washington. Additionally, certain employees of

16 businesses at the larger facilities of Alameda Square or Seventh Street Produce Market learn the

17 business then start their own businesses, often at one of the smaller facilities. This is also true of

18 the Company's garment tenants. Urban in-fill development is very different from single-family

19 home-building over large swaths of land. Urban in-fill development involves many moving parts

20 which may require business relocations amongst various properties. In the process, the Company is

21 able to improve and update facilities and organize these smaller businesses into a cohesive market

22 that helps improve the business of each.

23    Although the Debtors formally consist of a parent company and various levels of subsidiary

24 Debtors, including the Property Level Debtors, the Company has been, before and after its

25 formation in 2006, and presently continues to be, effectively operated as a single enterprise. With

26 limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay

27 the expenses of MMPI and the subsidiary Debtors. Accordingly, there are some Debtors which

28 generate revenues in excess of operating expenses and debt service, but there are some that do not.

353400.03 [XP]    25195

1   The Company may purchase and keep properties that are cash flow negative because the Company

2   believes that those properties will, in time, generate a positive return and the enterprise will be

3   significantly more valuable as a result.  The recent unprecedented freezing of credit markets and

4   economic downturn caused the Company to suspend substantially all of its various development

5   projects.

6          Before and after the IPO, like most larger developers, the Debtors utilized a concentration

7   account for its cash management.  The cash management system provides for funds to flow to and

8   from a cash concentration account maintained by MMPLP.  The concentration account is linked to

9   the operating bank accounts of each of Debtors, which bank accounts are maintained as zero

10  balance accounts.  When needed to fund payment on checks issued by a particular affiliate, funds

11  are transferred from the concentration account to the operating account of that affiliate.  Excess

12  funds, if any, are invested in interest bearing accounts pending their utilization.  The Company

13  rarely disrupts this flow of funds.

14         As a public company, MMPI has been required to file various reports with the SEC,

15  including among others, quarterly reports as well as annual reports with audited financial

16  statements.  These reports have been prepared and filed on a consolidated basis.  Although the

17  Debtors' SEC filings do provide information relating to individual subsidiaries, the filings

18  generally discuss the business as a consolidated enterprise.  This consolidated reporting is a

19  manifestation of the synergy and economic efficiencies gained through the Company's corporate

20  structure.  The indirect overhead expenses for administrative services provided by certain Debtors

21  may be allocated to other Debtors.  With a few exceptions, revenues received from the operation of

22  the Debtors' properties are swept daily into a general operating account, and the Debtors'

23  obligations are paid from such account.

24         **D.    THE DEBTORS' CURRENT AND ON-GOING BUSINESS STRATEGIES**

25         The Company's business is focused on real estate development and redevelopment.  The

26  substantial majority of the Company's properties are not stabilized, i.e., the property is either not a

27  rental property or if a rental property, the property has not reached full occupancy or has not yet

28  been redeveloped to its full income producing level.  The Company's strategy has three primary

36

1  components: investment, value creation and operations. Due to the current economic climate,

2  including the lack of an active credit market, the Company has placed on hold substantially all of

3  its development projects.

4         The Company's intent is to continue to build on (i) its market presence, (ii) its relationships

5  with its tenants, (iii) development and operation experiences and (iv) its desire to provide real

6  estate solutions for a variety of urban space users and urban residents. The Company has always

7  followed a double bottom line approach to its real estate operations that include both a financial

8  return goal and a goal of providing more to the community it serves and the City of Los Angeles

9  through transit oriented development, "green" or LEED development, and the incubation of small

10  businesses that employ large amounts of employees. For instance, the Company helped incubate

11  American Apparel from a small startup company to an employer with over 5,000 employees at

12  what is believed to be the largest garment manufacturing facility in the nation.

13         In particular, the Company will continue and expand on the following:

14         **1.**      **The Debtors' Investment Strategy**

15         The Company invests in sub-markets that are undergoing demographic, structural or

16  economic changes, where a significant portion of the properties and participants are historically of

17  a non-institutional nature, where the buildings are predominantly obsolete or no longer relevant to

18  the submarket's changing profile, where the Company has established strong working relationships

19  with the city planners, community redevelopment agencies and local political organizations and

20  where the existing transportation networks, particularly public transportation systems, are nearby.

21         **2.**      **The Debtors' Value Creation Strategies**

22              a.      ***Focus on the Property Needs of Specific Industries and Premium***

23                   ***Space Users.***

24         The Company seeks to achieve rent premiums by meeting the property needs of "premium

25  space users" such as food processing and food distribution companies whose critical business

26  functions depend on the location, zoning, tenant improvements or utilities of the leased space and

27  whose needs frequently coincide with urban environments. The ability to provide premium space

28  users with facilities and services that maximize their operating profits may allow a landlord to

37

1  minimize leasing risk and charge rents that, net of costs incurred to provide such facilities and

2  services, exceed rents that could be obtained from tenants that are relatively indifferent to location

3  or amenities. The Company will continue to identify premium space users in the Company's

4  markets and work to understand and fulfill their evolving requirements.

5         b.        ***Focus on Sub-Markets that are Transitioning from Large to Small***

6                   ***Tenants.***

7         The Company acquires, modernizes and subdivides large, older single-tenant industrial and

8  mixed-use buildings. In many urban markets, large manufacturers and distributors have relocated

9  their businesses, often vacating such buildings for overseas or suburban locations. Taking their

10 place are small emerging businesses and established companies that are de-centralizing their

11 operations. The Company seeks to transform large, single-tenant buildings into workplaces for

12 many small tenants by re-using a large portion of the existing facility and creatively subdividing

13 the space at a relatively low cost. This approach should allow the Company to offer competitively-

14 priced space (as compared to rental rates for new buildings) in convenient urban locations.

15         c.        ***Aggregate Small, Synergistic Tenants.***

16        In urban areas, the non-office tenant base includes many small businesses. Grouping similar

17 businesses together creates a marketplace that offers convenience to product buyers and a steadier

18 stream of prospective customers to the businesses. These advantages may increase tenants'

19 business profits and stability and may justify a rental premium compared to stand-alone locations.

20 The Company seeks sub-markets where there is an active, but unorganized, critical mass of similar

21         businesses that could benefit from aggregation. The Company believes this strategy should

22 allow the Company to generate higher rental income from the Company's small tenants.

23         d.        ***Focus on Residential Development in Appropriate Locations.***

24        The Company intends to continue to develop urban residential projects on sites the

25 Company owns near transportation infrastructure and demand generators such as office buildings,

26 retail stores, restaurants, and cultural and sports venues.  In the long term, the Company believes

27 demand for residential units in downtown Los Angeles and other urban areas will continue to grow.

28

38

1    The Company believes that ultimately their residential projects will offer desirable housing

2  and provide the Company with attractive returns on invested capital.

3    e.    ***Coordinate Residential and Industrial Development in Shifting***

4    ***Urban Markets.***

5    The Company believes that much of the downtown Los Angeles industrial space is aging or

6  obsolete and not properly serving its industrial users.  The Company seeks properties within

7  historically industrial districts that are located in emerging housing sub-markets. As active

8  developers and operators of industrial/distribution space, the Company believes they have greater

9  ability to acquire such opportunities quickly and at lower industrial/distribution pricing than

10  residential-only developers. The Company also seeks the purchase of industrial/distribution

11  properties in areas near downtown but not in emerging residential markets. The Company sees

12  opportunities to better serve industrial users they displace through residential redevelopment by

13  providing them with more suitable space in commercial projects of the Company in such near

14  downtown areas. The Company believes coordinating residential and industrial development in this

15  manner facilitates the Company's land assemblage.

16    f.    ***Pursue Opportunities Offered by Governmental Organizations.***

17    In the State of California, the state government, regional agencies and local community

18  redevelopment agencies created under the California Community Redevelopment Law control a

19  large amount of surplus property in urban areas and have substantial land use discretion. These

20  organizations often must dispose of their surplus property in a manner that encourages socially

21  responsible development. The Company believes that such organizations present some of the more

22  compelling opportunities in California urban areas because of the size or location of the parcels

23  they control or because the acquisition terms for such parcels may be more favorable than typical

24  private seller terms. The Company believes their management's advocacy of socially-minded

25  solutions for urban real estate problems gives the Company a competitive advantage to be selected

26  by these government organizations, thereby creating opportunities to acquire properties at attractive

27  values.

28

353400.03 [XP]    25195

g.    *Aggregate Separate Parcels and Acquire Controlling Locations in Developing Neighborhoods.*

In the Company's markets, large, contiguous development properties are infrequently for sale and, when available, sell for prices that often reflect their potential value. The Company seeks to acquire smaller, separate real estate parcels over time with a view toward aggregating those smaller parcels into one property that can accommodate a larger-scale development project. To acquire the individual parcels and reduce the Company's holding costs, the Company sometimes purchases an option contract or signs a long-term purchase agreement that gives the Company the right to acquire the land at a specific price on or before a specified future date. The Company may also acquire a strategically sized or configured parcel in a city block that would be instrumental in any material redevelopment of the block, thereby deterring any substantial competing development and creating an incentive for owners of adjacent parcels to sell.

3.    **The Company's Operating Strategies**

a.    *Efficiently Manage the Development and Operation of the Company's Projects.*

The Company employs a mixture of project development management and asset management strategies. First, the Company keeps direct control over critical development functions in which they believe they have valuable expertise and that require significant local knowledge, such as identification and acquisition of projects and land use entitlement. Second, because of the widely varying nature of the Company's projects, the Company generally retains expert third-party general contractors to manage the construction of the Company's projects, and the Company employs in-house project managers to supervise the construction management process closely. Third, once a project is complete, the Company manages its operation and leasing activities, or the Company retains third-party sales companies in the case of for-sale projects. The Company will engage third-party leasing agents when they have superior tenant relationships or knowledge of the sub-markets in which the Company's projects are located.

40

353400.03 [XP]    25195

1               b.       ***Seek Interim Revenues from Properties.***

2            The public approval process for certain projects may last two years or longer. During the

3       assemblage or approval process, the Company takes steps to permit the Company to generate

4       interim revenues and allow the Company to terminate leases promptly or relocate tenants when the

5       Company obtains the final assemblage piece or approvals. The Company accomplishes this by

6       converting long-term leases to month-to-month leases and seeking additional interim income from

7       additional sources, such as surface parking or by temporarily licensing space to entertainment

8       companies for on-location filming. In addition, because the Company has a roster of month-to-

9       month tenants who have shown a willingness to relocate at the Company's discretion, the Company

10      has the flexibility to generate interim revenues by relocating tenants from a property commencing

11      redevelopment construction to another property that is not currently being redeveloped.

12              c.       ***Sell or Recapitalize the Company's Projects to Realize Value.***

13           The Company has engaged in a business strategy whereby it may dispose of or recapitalize

14      some portion of the Company's projects from time to time once they reach what the Company

15      believes to be their maximum near-term value and may redeploy some or all of the Company's

16      equity and profits into other real estate investments that the Company believes have a greater long-

17      term potential for economic appreciation.  In addition, in response to the changing economy and as

18      part of its business strategy to emerge as a reorganized company from Chapter 11, the Company

19      continues to consider multiple scenarios to determine the best use of its real property assets,

20      including but not limited to the sale or refinancing of some portion of its assets to meet its financial

21      obligations under the Plan, to reduce obligations to creditors, to provide capital for its business and

22      to ensure the long-term sustainability of the business.

23      **E.      PREPETITION CAPITAL STRUCTURE OF THE COMPANY**

24           **1.      MMPI**

25           MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue

26      Code.  Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately

27      owned by MMPI's directors and executive officers with Richard Meruelo owning the largest

28      amount of shares (approximately 39,911,378).  The other 47.8% of MMPI's stock is publicly

1  owned and, prior to April 2009, was traded on the NASDAQ stock exchange. The stock is

2  presently trading on the Over the Counter Bulletin Board.

3                a.    ***MMPI Initial Public Offering***

4        Prior to MMPI's formation in 2006, its predecessor business' management team was one of

5  only approximately thirteen designated groups participating in the California Urban Real Estate

6  ("C.U.R.E.") program sponsored by the State of California Public Employee's Retirement System

7  ("CalPERS"). CalPERS provided the predecessor business with capital through the C.U.R.E

8  program in the form of a revolving credit facility in the principal amount of approximately $150

9  million. The CalPERS credit facility was obtained through a single borrower and the funds were

10 disbursed among the entities collectively comprising the predecessor business.

11       Thereafter, MMPI was formed on or about July 5, 2006, and MMPLP was formed on or

12 about September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's

13 common stock. The formation transaction and the IPO were designed to allow MMPI to acquire

14 and continue the operations of its predecessor entities, pay down existing mortgage debt, pay off

15 the mezzanine loan facility from CalPERS, provide capital for future acquisitions, fund future

16 development costs, and establish a capital reserve for general corporate purposes. Between January

17 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000

18 shares of common stock at $10.00 per share. MMPI raised approximately $425.7 million, after

19 underwriting discounts but before expenses related to the IPO. A substantial portion of the

20 proceeds was used to pay off the debt owed to CalPERS. On December 31, 2008, there were

21 approximately 88.1 million shares of common stock outstanding.

22               b.    ***MMPI Common Stock***

23       The authorized capital stock of MMPI consists of up to 200,000,000 shares of common

24 stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred

25 stock, $.01 par value per share. As of April 23, 2010, there are 87,845,789 shares of Common

26 Stock issued and outstanding held by approximately sixty holders of record. Holders of Common

27 Stock have no right to convert their Common Stock into any other securities. The Common Stock

28 has no preemptive or other subscription rights. There are no redemption or sinking fund provisions

1  applicable to the Common Stock. All outstanding shares of Common Stock are duly authorized,

2  validly issued, fully paid and nonassessable.

3            c.      *MMPI's Equity Incentive Plan*

4          Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity

5  Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive

6  Plan ("LTIP") Units and other awards as part of its employee compensation packages. The LTIP

7  units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be

8  converted into MMPLP's common units and consequently become redeemable by the Holder on a

9  one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of

10  such common stock. MMPI initially reserved 2,277,500 shares of common stock for issuance of

11  awards under the Equity Incentive Plan. As of June 30, 2009, there remain 1,083,334 shares

12  available from the initial reservation.

13            2.      **Corporate Structure of the Other Debtors**

14          MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP.

15  The remaining 0.4% limited partnership units are owned by certain members of MMPI's

16  management team who obtained their interests through the LTIP available to certain personnel as

17  part of their compensation packages.

18          MMPLP owns 100% of the common stock of Meruelo Maddux Construction, Inc. ("MM

19  Construction"), 99% of the membership units in Meruelo Maddux Management, LLC ("MM

20  Management") and 99% of the membership units in Funes Architecture, LLC ("Funes"). The

21  remaining membership units in MM Management and Funes are owned by MM Construction.

22          MMPLP also owns 100% of the membership units in MMP Ventures, LLC ("MMP

23  Ventures"). MMP Ventures, in turn, owns 100% of the stock or membership units in a number of

24  subsidiary corporations and limited liability companies referred to as Property Level Debtors

25  because they are the entities which hold title to the various real properties and real estate projects

26  developed and operated by MMPI through MMPLP.

27

28

43

## F.    MATERIAL PROCEEDINGS

There are several different circumstances that may create liability for the Company in the future, to the extent they are not discharged under the Plan as more fully discussed in Section VII.J.

### 1.    Potential Government Tax Audits

The Company is subject to audit and review by federal and state taxing authorities.  An adverse audit report could result in the Company being assessed additional tax liability.  The Company is not aware of any such pending audits and has filed all of its tax returns.

### 2.    Indemnification Claims

As is necessary and customary in the normal course of business, certain of the Company's contracts contain indemnification provisions that could require the Company to make payments for Claims made against customers or employees of the Company, including management. Additionally, the Articles and Bylaws of MMPI provide that MMPI shall indemnify its officers and directors to the fullest extent permitted by law.  Pursuant to its contractual and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of its Board of Directors with respect to costs and expenses that may be incurred by them in conjunction with the performance of their employment or role as a member of the Board of Directors.  These indemnification provisions may result in material liability to MMPI or other of the Debtors. However,  the Company maintains various insurance coverages to reduce the exposure of the Company.

## III.

## EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

Prior to the Petition Date, the Company's primary objective was to maximize return on investment through development and redevelopment activities, which activities require significant amounts of capital.  The Company experienced significant, recurring cash shortfalls from (a) operating activities, (b) recurring investment activities such as carrying costs for interest payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing rental properties.  Shortfalls in operating capital have been funded by the refinance or sale of real

353400.03 [XP]    25195

1  property assets, and the use of the proceeds for operating and reinvestment in the purchase of

2  replacement real property assets.

3       The economic climate and associated disruption in the debt and equity capital markets

4  shortly before the Petition Date were extremely challenging for the Company.  During 2008, the

5  Company took significant steps in an effort to improve its financial position.  Among other things,

6  the Company sold three rental projects and three development projects, for an aggregate sales price

7  of approximately $110.6 million.  The Company also completed nine acquisitions or conversions of

8  development projects to rental projects, resulting in the availability of 949,905 net rental square

9  footage.  However, the Company's efforts could not overcome the collapse of credit markets and

10  the American banking system that took place in the fall of 2008.  On or about October 1, 2008, the

11  Company suspended development of twelve construction projects.

12       A number of the Company's loans secured by real property matured prior to the Petition

13  Date or were to mature soon thereafter.  Among other things, the Company was unable to extend or

14  refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or

15  March 1, 2009, including two secured by the property housing the Company's corporate

16  headquarters, and one which is secured by the Union Lofts project owned by MMP 760 S. Hill

17  Street.  In total, the Company had twelve loans that were set to mature during 2009 with an

18  aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization

19  on other long-terms loans.

20       In addition, prior to the Petition Date, two lenders filed lawsuits seeking, among other

21  things, the appointment of a receiver.  On or about March 4, 2009, California Bank & Trust filed a

22  complaint against 788 South Alameda and MMPI for, among other things, judicial foreclosure and

23  the appointment of a receiver.  In addition, on or about March 17, 2009, Chinatrust Bank filed a

24  complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure

25  and the appointment of a receiver.

26       During the year prior to the Petition Date, the Company tirelessly investigated borrowing

27  additional capital in order to continue to fund its development projects and, if necessary, operating

28  expenses.  However, the Company was not able to borrow or refinance at conventional or

45

353400.03 [XP]    25195

1    otherwise acceptable rates, in large part, due to the deterioration of the credit markets that appears

2    to have affected all banks and other lenders.  Lenders were frequently lending at lower loan-to-

3    value ratios, taking longer to make lending decisions and generally applying more stringent

4    underwriting standards.  During the last few months prior to the Petition Date, a number of lenders

5    demanded exorbitant fees, principal reduction payments and/or other burdensome terms as

6    consideration for their consent to extend the terms of their loans.  However, given that the

7    Company had an approximately $28.0 million annual shortfall in its combined operating and

8    development activities, and because of the turmoil in the credit markets especially for development

9    financing, the Company needed significant loan concessions from its lenders to survive.

10          The existence of open credit markets has been important to the Company's business

11    strategy of financing acquisitions and development in the ordinary course of its business.  In

12    addition, an open credit market is important to purchasers of the Company's properties.  The

13    Company's management team anticipates that credit markets will improve in the future in light of,

14    among other things, the hundreds of billions of dollars that have been infused into the banking

15    systems by the federal government.

16          Due to the Company's inability to obtain additional capital, and the unwillingness of current

17    lenders to extend the terms of maturing loans on acceptable terms, the fifty-four jointly

18    administered MMPI Debtors sought relief under Chapter 11 of Bankruptcy Code to reorganize their

19    financial affairs and prevent the piecemeal dismemberment of their business to the detriment of

20    their creditors.

21                                      **IV.**

22                            **CHAPTER 11 EVENTS**

23    **A.      ADMINISTRATIVE ORDERS AND MATTERS**

24          **1.      Introduction**

25          On March 26 and 27, 2009, the Debtors filed their voluntary petitions for relief under

26    Chapter 11 of the Bankruptcy Code.  Shortly after the commencement of the Chapter 11 Cases, the

27    Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a

28    variety of matters.  The Debtors obtained Orders of the Bankruptcy Court, inter alia, (a)

46

1   authorizing, on an interim basis, the Debtors' use of cash collateral (see below for more detail), (b)

2   authorizing the Debtors to employ and compensate legal and financial advisors, (c) authorizing the

3   Debtors to honor certain obligations to employees and to continue employee benefit plans in effect,

4   (d) permitting the Debtors, on an interim basis, to continue to utilize their cash management

5   systems, (e) establishing procedures for the Debtors to ensure continued provision of utility

6   services; (f) limiting the scope of notice required; (g) extending the time to file schedules and

7   statement of financial affairs; and (h) directing the joint administration of the Cases of the Debtors.

8   Subsequently, the Bankruptcy Court established September 24, 2009, as the last day for creditors

9   and parties in interests to file proofs of Claim and proofs of interest against the Debtors. The

10   Debtors filed the required monthly operating reports on a timely basis. The Debtors were

11   authorized and continue to operate their business and manage their properties as debtors in

12   possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

13        **2.**     **The Cash Collateral Motions and Corresponding Orders**

14           a.    ***MMPI Debtors' Cash Collateral Motions and Orders***

15        By their first Motion for Entry of Interim and Final Orders Authorizing Debtors to Use

16   Cash Collateral, (the "Cash Collateral Motion") the Debtors sought permission to use the cash

17   collateral of various lenders. Oppositions were filed by most of the Debtors' lenders. The

18   Bankruptcy Court entered a series of interim orders authorizing such use and continued to hear

19   testimony and consider evidence concerning the Debtors' proposed use of cash collateral on a final

20   basis. These hearings concluded in October 2009. The Bankruptcy Court ruled in the Debtors'

21   favor and entered a final order authorizing the use of the cash collateral of the following lenders

22   through March 31, 2010: BofA, CBT, Berkadia, Cathay, Chinatrust, Legendary, Stanford, UCB

23   (now succeeded by East West), and Chamlian. In making that ruling, the Bankruptcy Court

24   determined that the following lenders were entitled to additional adequate protection and are

25   therefore entitled to an adequate protection lien in one or more of the Debtors' unencumbered real

26   properties: Berkadia, CBT, Chinatrust, Legendary with respect to 425 W. 11th Street; 3rd & Omar

27   Street, and 420 Boyd Street, and East West with respect to 2640 Washington.

28

353400.03 [XP]    25195

1    As a result of the Cash Collateral determinations made by the Bankruptcy Court, the

2  Debtors filed a motion seeking to designate certain properties that would serve as adequate

3  protection for the Debtors' use of cash collateral.  The Debtors sought authority to limit the

4  continuing adequate protection lien to certain identified properties in place of a blanket lien on all

5  of the Debtors' unencumbered properties.  The matter has been continued pending the completion

6  of an appraisal of one of the properties the Debtors propose to include as part of the pool of assets

7  to serve as continuing adequate protection.

8    The Debtors also filed a motion seeking authority to use a portion of certain insurance

9  proceeds resulting from fire damage to one of the Debtors properties which currently secures

10  certain obligations of the Debtors to PNL Pomona.  The Court authorized the Debtors to use a

11  portion of the insurance proceeds to demolish the remaining structure on the property in order to be

12  able to market and sell the property as vacant land.

13    On March 8, 2010, the Debtors filed their Motion for Order Extending Authority for the

14  Use of Cash Collateral and to Maintain Cash Management System Through June 30, 2010.  A

15  hearing on the motion was held on March 29, 2010.  On March 31, 2010, the Court entered its

16  Order Granting Debtors' Motion for Order Extending Authority for the Use of Cash Collateral and

17  to Maintain Cash Management System Through June 30, 2010, on the terms provided in the Order.

18    **3.    The Debtors' Single Asset Real Estate ("SARE") Motion**

19    The Debtors filed a motion seeking an order determining that none of the fifty-four Debtors

20  are subject to the single asset real estate provisions of Sections 101(51B) and 362(d)(3) of the

21  Bankruptcy Code.  Two lenders (BofA and Cathay) filed motions seeking a determination from the

22  Bankruptcy Court that MG Southpark, MMP 760 S. Hill Street and Alameda Produce Market are

23  subject to the SARE provisions of the Bankruptcy Code.  The Creditors Committee supported the

24  Debtors' position.  Approximately, fourteen oppositions and joinders in opposition were filed by

25  various lenders.  In June 2009 the Bankruptcy Court ruled in favor of the Debtors, holding that the

26  Debtors are not subject to the SARE provisions of the Bankruptcy Code.  BofA has appealed from

27  the Bankruptcy Court's SARE determination. That appeal remains pending before the United

28  States District Court for the Central District of California.

353400.03 [XP]    25195

### 4.    Motions for Relief from Stay

The following motions for relief from stay have been filed by lenders to pursue their state law remedies against various real properties owned by the Debtors:

- PNL moved for relief from stay with respect to the real property owned by MG 2001 – 2021 W. Mission located in Pomona. The Bankruptcy Court ruled in favor of the Debtors and denied PNL's Motion. PNL has recently filed a second motion for relief from stay which will be heard in June 2010;

- BofA moved for relief from stay with respect to real property owned by MMP 760 S. Hill Street and commonly known as 325 West 8th Street and 760 South Hill Street, Los Angeles (the Union Lofts). The Bankruptcy Court denied the motion subject to the Debtor's provision of certain adequate protection to BofA;

- BofA moved for relief from the automatic stay with respect to certain real properties owned by MG Southpark located in downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied BofA's motion;

- UCB moved for relief from the automatic stay with respect to real property owned by 2640 Washington Boulevard. Pursuant to an agreement between the Debtors and UCB, the motion was granted for the sole and limited purpose of permitting UCB to record a notice of default with respect to the real property. The Debtor 2640 Washington agreed to pay, out of cash collateral, the first and second installments of real property taxes for the 2009 – 2010 fiscal year. UCB's motion was withdrawn in all other respects;

- Legendary moved for relief from the automatic stay with respect to real property owned by MM 3rd & Omar Street located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash Collateral Motion, the

49

1   Bankruptcy Court denied Legendary's motion, subject to the provision of such adequate

2   protection;

3   • Legendary moved for relief from the automatic stay with respect to real property owned by

4   both MG 1500 Griffith Avenue and MG 4th Street Center and located in downtown Los

5   Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied Legendary's

6   motion;

7   • Legendary moved for relief from the automatic stay with respect to real property owned by

8   Merco Group, commonly known as Sci-Arc, and located in downtown Los Angeles. The

9   Bankruptcy Court denied Legendary's motion;

10   • Legendary moved for relief from the automatic stay with respect to real property owned by

11   MM 420 Boyd Street and located in downtown Los Angeles. In the context of the

12   Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a

13   replacement lien in postpetition cash collateral, payment of normal and ordinary expenses

14   to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal

15   year. In addition, the Bankruptcy Court required the Debtors to provide an adequate

16   protection lien in favor of Legendary on one or more of the Debtors' unencumbered

17   properties. In light of the rulings in connection with the Cash Collateral Motion, the

18   Bankruptcy Court denied Legendary's motion subject to the provision of such adequate

19   protection;

20   • Legendary moved for relief from the automatic stay with respect to real property owned by

21   Merco Group (Sky-Arc) and MG Little J and located in downtown Los Angeles. The

22   matter has been submitted to the Court. An order has not yet been issued;

23   • Legendary moved for relief from the automatic stay with respect to real properties owned

24   by MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles.

25   The matter has been submitted to the Court. An order has not yet been issued;

26   • Legendary moved for relief from the automatic stay with respect to real property owned by

27   MG 425 W. 11th Street and located in downtown Los Angeles. In the context of the

28   Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a

1   replacement lien in postpetition cash collateral, payment of normal and ordinary expenses

2   to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal

3   year.  In addition, the Bankruptcy Court required the Debtors to provide an adequate

4   protection lien in favor of Legendary on one or more of the Debtors' unencumbered

5   properties.  In light of the rulings in connection with the Cash Collateral Motion, the

6   Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion for relief

7   from the automatic stay subject to the provision of such adequate protection;

8   • Vahan and Anoush Chamlian moved for relief from the automatic stay with respect to real

9   property owned by MMP 2131 Humboldt Street near downtown Los Angeles.  The

10   Bankruptcy Court ruled in favor of the Debtors and denied the Chamlians' motion;

11   • Chinatrust moved for relief from the automatic stay with respect to real property owned by

12   MG 3185 E. Washington Boulevard, among other things.  In the context of the Bankruptcy

13   Court's rulings on the Cash Collateral Motion, the Debtors offered Chinatrust a replacement

14   lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain

15   the property and the payment of real property taxes for the 2009 – 2010 fiscal year.  In

16   addition the Bankruptcy Court required the Debtors to provide an adequate protection lien

17   in favor of Chinatrust on one or more of the Debtors' unencumbered properties.  In light of

18   the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court ruled in

19   favor of the Debtors and denied Chinatrust's motion for relief from the automatic stay

20   subject to the provision of such adequate protection;

21   • The Stanford Group moved for relief from the automatic stay with respect to the real

22   property owned by 908 8th Street located in downtown Los Angeles.  The hearing on that

23   motion has been continued from time to time while the parties engage in settlement

24   negotiations.  The parties have reached a settlement on the Claim of Stanford Group, and a

25   motion for approval of the settlement has been filed with the Court.  The settlement resolves

26   the motion for relief from stay.

27   • Legendary filed a second motion for relief from the automatic stay with respect to the real

28   property owned by MM 420 Boyd Street.  The Court denied Legendary's motion.

51

1    • Legendary filed a second motion for relief from the automatic stay with respect to the real

2       property owned by MM 3rd and Omar. The Court denied Legendary's motion.

3    • Vahan and Anoush Chamlian filed a second motion for relief from the automatic stay with

4       respect to real property owned by MMP 2131 Humboldt Street. The motion is set for

5       hearing in June, 2010.

6    • PNL Pomona filed a second motion for relief from the automatic stay with respect to the

7       real property owned by MG 2001-2021 West Mission. The motion is set for hearing in

8       June, 2010.

9       In addition to the motions filed by the Debtors' lenders, a group consisting of three

10 individuals moved for relief from the automatic stay to seek authority to prosecute a civil action

11 filed by them in Los Angeles Superior Court and to clarify that they have authority to pursue

12 alleged labor Claims against certain current and former employees and board members of MMPI,

13 Alameda Produce Market and 788 South Alameda. A hearing on that motion was held on

14 December 17, 2009. The Court entered an order granting the motion as to Debtors Alameda

15 Produce and 788 S. Alameda but ordered that the movants could not pursue such litigation until

16 June 30, 2010. The motion was denied as to MMPI.

17       Also, in addition to the foregoing motions, in April 2004, the Los Angeles County

18 Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of

19 eminent domain, certain property of the Debtors. In September 2008 the trial court dismissed the

20 action and the MTA appealed. Thereafter, the Debtors filed their chapter 11 petitions and the

21 automatic stay prevented further prosecution of the appeal. The Debtors and the MTA entered into

22 a stipulation to modify the automatic stay to permit the prosecution and defense of the appeal. The

23 order approving the stipulation was entered in August 2009. The matter is still pending.

24       Also, in a similar action, in February 2010, the City of Pomona filed a motion for relief

25 from the automatic stay in order to allow an eminent domain action in a non-bankruptcy forum to

26 proceed. The Debtors did not oppose the relief sought and the motion was granted.

27       The Debtors filed a motion to determine the amounts owed to the County of Los Angeles on

28 account of real property taxes. The dispute involved the proper amount of taxes owed to the

1  County and the appropriate rates of interest as well as whether certain other claimed amounts are

2  properly included in the claim.  The motion was resolved through the Debtors' settlement with the

3  County described in Section 6 below.

### 5.    The Debtors' Compromises With Various Lenders

5  The Debtors have engaged in extensive settlement discussions with their lenders as to their

6  Claims under Loan Documents and as of the filing of this Disclosure Statement, the Debtors have

7  reached settlements with PCB, Imperial, Murakami, Cathay Bank and the Stanford Group.  The

8  Bankruptcy Court approved the Debtors' compromise with PCB and the essential terms of that

9  settlement are reflected in the Plan, specifically the Plan's treatment of PCB's Class 51A-4 Claim

10  in Section III.C.2 of the Plan.

11  The Bankruptcy Court approved the settlement with Murikami.  The essential terms of that

12  settlement are reflected in the Plan, specifically the Plan's treatment of Murakami's Class 37A-4

13  Claim in Section III.B.2 of the Plan.

14  The Debtors motion to approve their settlement with Imperial was heard on February 24,

15  2010 and was granted.  The essential terms of that settlement are reflected in the Plan, specifically,

16  the Plan's treatment of Imperial's Claims in Classes 35A-2, 38A-2 and 51A-2 in Section III.C. of

17  the Plan.

18  The Debtors have reached an agreement in principal with Cathay Bank for the settlement of

19  Cathay Bank's claims.  The parties are in the process of documenting that settlement and will file a

20  motion for approval with the Bankruptcy Court. The essential terms of that settlement are reflected

21  in the Plan, specifically the Plan's treatment of Cathay Bank's Class 36A-2 and 36A-3 in Section

22  III.C.2 of the Plan.

23  The Debtors have reached an agreement with The Stanford Group, L.P. for the settlement of

24  The Stanford Group, L.P.'s claims.  The Debtors have filed a motion for approval of the settlement

25  with the Bankruptcy Court.  The Motion is set for hearing on April 30, 2010.  The essential terms

26  of that settlement are reflected in the Plan, specifically the Plan's treatment of the Stanford Group,

27  L.P.'s Class 34A-2 in Section III.C.2. of the Plan.

28

353400.03 [XP]    25195

1

### 6.    The Debtor's Settlement with the County of Los Angeles

2      The Debtors have engaged in extensive settlement discussions with the County of Los

3  Angeles as to its Claims and as of the filing of this Disclosure Statement, the Debtors have reached

4  a settlement with the County of Los Angeles.  The Debtors filed a motion to approve their

5  settlement with the County.  That Motion was heard on April 9, 2010.  The Court continued the

6  hearing on approval of the settlement to June 11, 2010.  The essential terms of that settlement are

7  reflected in the Plan, specifically the Plan's treatment of the Claims of the County as set forth in the

8  Common Secured Tax Claim section of the Plan at Section III.b.2.a. of the Plan.

9

### 7.    Unexpired Leases and Executory Contracts

10      With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired

11  nonresidential lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is

12  the lessee and Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December

13  1, 2000, the successor-in-interest to Evelyn Hammond, is the lessor.

14

### 8.    Summary of Claims Process, Bar Date and Claims Filed

15

####      a.    *Schedules and Statements of Financial Affairs*

16      On or before June 12, 2009 the fifty-four jointly administered Debtors filed with the

17  Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the

18  "Schedules and Statements") as of their March 26, 2009 or March 27, 2009 Petition Date.  The

19  Debtors will shortly file amendments to the schedules.

20      For financial reporting purposes, MMPI prepares consolidated financial statements that are

21  filed with the SEC and that are audited annually.  Unlike these consolidated financial statements,

22  the Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the

23  Debtors' non-audited books and tax records.  This means that audited financial statements and

24  supporting schedules have not been prepared for each Debtor.

25

####      b.    *Claims Bar Date*

26      On July 22, 2009, the Bankruptcy Court entered an order in the case (the "MMPI Bar Date

27  Order") establishing the general deadline for filing proofs of Claim against the 54 jointly

28

54

1  administered Debtors (the "Bar Date").  The deadline established by the Bankruptcy Court was

2  September 24, 2009.

3        The Bar Date established the deadline for Claims, including Claims of governmental units,

4  but excluding certain other Claims, including Claims based on the rejection of executory contracts

5  and unexpired leases as to which the bar date is the later of: (1) the applicable Bar Date; or (2) the

6  first business day that is at least thirty (30) calendar days after (a) the mailing of notice of the entry

7  of the order first approving the rejection of such contract or lease, (b) the mailing of notice of the

8  entry of an order or judgment avoiding a transfer, or (c) the date any relevant tax Claim first arises.

9  The Debtors provided notice of the Bar Date by mailing a notice of such Bar Date.

10                c.    ***Proofs of Claim and Other Claims***

11        According to the Debtors' records, a total of 415 Claims were filed against the Debtors

12  asserting Claims in the total face amount of approximately $927,761,559.23.  The Claims

13  scheduled by the Debtors and Claims filed by claimants in each Class is summarized in Exhibits

14  "H.2" to "H.8" attached hereto.  The amounts listed on those exhibits represent the current state of

15  the Debtors' computation of the Claims filed and scheduled, and do not reflect amounts which have

16  been paid to date or which the Debtors have otherwise resolved through deposit or stipulation.

17        Numerous Claims were asserted by various alleged creditors in unliquidated amounts, i.e.

18  Claims that did not contain a specific dollar amount.  The Debtors believe that certain Claims that

19  have been asserted are without merit and intend to object to all such Claims.  Other significant

20  categories of disputed Claims include certain taxing authorities that are requesting payments far in

21  excess of those the Debtors believe to be owed to such authorities.

22        The Debtors filed a motion to determining the amounts owed to the County of Los Angeles

23  on account of real property taxes.  The dispute involves the proper amount of taxes owed to the

24  County and the appropriate rates of interest as well as whether certain other claimed amounts are

25  properly included in the claim.  The parties reached a settlement of their disputes and the Debtors'

26  Motion for approval of the settlement is pending.

27

28

353400.03 [XP]    25195

1           d.      **The Debtors' Stipulation with the OCC Regarding Unsecured**

2                 **Claims**

3        The Debtors entered into a stipulation with the OCC by which they agreed that to the extent

4 any party files a proof of Claim in any of the Debtors' Chapter 11 Cases prior to the Bar Date, such

5 proof of Claim shall be deemed to have been timely filed in the proper Debtor's Chapter 11 Case

6 and against the proper Debtor regardless of the name of the particular Debtor or case number

7 identified in the proof of Claim. The Stipulation was intended to address the possible confusion

8 among creditors holding claims against one or more of the Debtors where the claimant was not sure

9 of the specific Debtor against whom the claim was held because of the Debtors' consolidated

10 business operations. The Stipulation provided among other things, that claims that were timely

11 filed would be deemed to have been filed against the proper Debtor regardless of the whether

12 Debtor and/or case number were properly identified in the proof of claim. The Bankruptcy Court

13 approved that stipulation. Berkadia has appealed from the order approving the stipulation and that

14 appeal remains pending before the District Court for the Central District of California.

15           e.      **Motion to Deem Claims Filed Against the Wrong Debtor to be**

16                 **Filed Against the Proper Debtor**

17        Pursuant to the terms of the Debtors' Stipulation with the OCC described above, the

18 Debtors have reviewed certain of the proofs of claim filed before the Bar Date in order to identify

19 claims filed in the wrong case or against the wrong Debtor that may properly be reassigned

20 pursuant to the Order approving the Stipulation. Those determinations were based on the

21 documents attached to the proofs of claim, a review of the appropriate Debtor's records and

22 consultation with members of the Debtors' management familiar with the claims and creditors. On

23 or about April 30, 2010, the Debtors filed their motion asking the Court to enforce the terms of the

24 earlier Stipulation and Order and to deem the timely filed claims as having been filed against the

25 proper Debtor, regardless of the Debtor's name and/or case number identified on the proof of

26 claim. A hearing on that motion is set for June 11, 2010.

27

28

56

### 9.    Other Administrative Matters

1

2    Early in the cases, the Debtors met with and were interviewed by the staff attorney and

3 other representative of the Office of the United States Trustee (the "US Trustee").  During the

4 Cases, the Debtors have complied with certain requirements promulgated by that office with

5 respect to the filing of monthly operating and cash reports.  In May and June, 2009 the Debtors

6 appeared at the Section 341(a) meeting of creditors - known as the initial creditor meeting - in the

7 cases of the fifty-four jointly administered Debtors to answer questions of creditors and parties in

8 interest.  The US Trustee conducted each of the Section 341(a) meetings.

9    On April 22, 2009 the US Trustee appointed the Committee of Unsecured Creditors in the

10 cases.  Shortly thereafter, the Debtors met with the Committee to discuss the Debtors' business and

11 proposed Chapter 11 Plan.  The Debtors and the Committee have been in close communication

12 throughout these cases.

13    Various professionals have been retained and employed in the Chapter 11 Cases and will be

14 paid pursuant to the terms of the Plan.  Danning, Gill, Diamond & Kollitz, LLP has been employed

15 as general reorganization counsel for all of the Debtors in the Chapter 11 Cases.  The following

16 professionals also have been employed by the Debtors: FTI Consulting, Inc., as financial advisors

17 ("FTI"), Ernst & Young as independent auditors and tax advisors, DLA Piper LLP (US) as special

18 securities and litigation counsel, and Waldron & Associates, Inc. as real estate appraiser.

19 SulmeyerKupetz, APC was employed as general counsel by the Committee in the Debtors' cases.

20    The Committee has filed an application to retain Kibel Green, Inc., as its financial advisor.

21 The Court granted this application on April 22, 2010.  In addition, certain real estate brokers have

22 been or will be employed in the Chapter 11 Cases to market and sell certain properties but will be

23 paid out of the proceeds of the sale of the properties as opposed to through the Plan.  In accordance

24 with the Bankruptcy Court's order, the Debtors submitted supplemental declarations from certain

25 brokers in connection with representing the Debtors in connection with specific properties to be

26 listed for sale.  Specifically, the Debtors have retained (i) The Bradco Companies regarding the

27 listing of 2951 Lenwood Road, Barstow, CA; (ii) DAUM Commercial Real Estate Services

28 regarding the listing of (a) 905 E. 8th Street, Los Angeles, CA, (b) 308-310 Omar Street and 452,

1  464 and 470 E. 3rd Street, Los Angeles, CA, and (c) 400-428 Boyd Street, Los Angeles, CA; and

2  (iii) Cushman and Wakefield of California, Inc. regarding the listing of (a) 1875 West Mission

3  Boulevard, Pomona, California; and (b) 2001-2021 West Mission Boulevard, Pomona, California.

4       The Bankruptcy Court granted the Debtors' motion to extend the time during which only

5  the Debtors may file a plan of reorganization and solicit acceptances thereof through June 11, 2010,

6  provided that on and after May 18, 2010, the Committee is authorized to file a plan of

7  reorganization. The Debtors filed their original plan of reorganization and disclosure statement,

8  which disclosure statement was considered by the Court on January 20, 2010. The Debtors filed

9  their First Amended Joint Plan of Reorganization and First Amended Joint Disclosure Statement on

10  February 27, 2010. The Court held hearings on approval of the First Amended Disclosure

11  Statement on March 19 and March 31, 2010. The Court set a further disclosure statement hearing

12  for June 14, 2010 at which time this Second Amended Disclosure Statement will be considered.

13      **B.    REAL PROPERTY VALUATION, SALES AND LISTINGS**

14          **1.   <u>Value of Property Level Debtors Real Property Assets</u>**

15       Attached  hereto as Exhibit J is a schedule of real property owned by each of the Property

16  Level Debtors that owns real property. The values are based on the opinion of Richard Meruelo

17  who has substantial experience in valuing real property and particular in the downtown Los

18  Angeles area and has been found by the Court to qualify as an expert on such matters.

19       A brief description regarding each property is set forth in Section II.B hereof.  Generally,

20  the values given are those that Mr. Meruelo believes the Debtors could sell the property over a

21  normal period of time.  Mr. Meruelo believes the real estate market, especially downtown, is

22  improving. There is renewed sale activity occurring, whereas, one year ago there

23  were very few sale transactions. The most recent example is the sale of MM 845 S. Flower's

24  property at 705 W. 9th Street, that solicited several offers from investors. Although he believes the

25  price that it was sold for is less than what Mr. Meruelo would have expected if the Company was

26  not in bankruptcy, the sale price achieved was significantly higher than the value expected by many

27  appraisers.

28

353400.03 [XP]     25195

1    There is also a significant difference in the availability of credit to finance real estate.

2  Today, there are several real estate lenders in the market looking to make loans. Although

3  traditional bank financing is still rare; that is primarily because the banks are still struggling to

4  digest bad loans in their portfolios and not that financing real estate is not an opportunity for

5  lending.   However, the non bank lending sources are slowly returning to the market. The most

6  significant lending source that has been absent from the market during the economic downturn, the

7  CMBS securitization market, has now completed several transactions on a nationwide basis. This is

8  truly exceptional because one year ago the supposed experts said this method of real estate

9  financing was gone forever.

10    In total, Mr. Meruelo has more than 20 years of experience in identifying, acquiring,

11  entitling, financing, developing and redeveloping real estate in downtown Los Angeles.  In

12  connection with these activities, he has read and studied hundreds of appraisal reports prepared by

13  M.A.I. and other appraisers for properties located in downtown Los Angeles.  He has attended

14  numerous seminars concerning real estate development, valuation issues, and similar matters.  He

15  is a member, and in some cases an officer, of a number of local civic groups that track local real

16  estate and commercial business conditions in downtown Los Angeles, including the Central City

17  Association, the Central City East Association and the Los Angeles Central Industrial

18  Redevelopment Project.

19    During the course of this case various secured creditors commissioned appraisals which

20  they submitted to the Court in support of motions for relief from the automatic stay or in opposition

21  to the Debtors' motion for authority to use cash collateral.  Naturally, those creditors who submitted

22  appraisals did so because their appraisals reflected opinions of value that were less than Mr.

23  Meruelo's opinions of value; creditors who may have obtained appraisals that were comparable to

24  or higher than Mr. Meruelo's values did not, of course, submit their appraisals to the Court.  In

25  addition, an appraiser appointed by the Court at the request of one creditor has provided six

26  appraisals, some of which concluded that the values of the property appraised was similar to Mr.

27  Meruelo's valuation, and some of which concluded that the values were measurably lower than Mr.

28  Meruelo's valuation.  The Debtors believe that reasonable minds can differ with regard to the value

59