1  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *JTedford@DGDK.com*
2  JULIA W. BRAND (State Bar No. 121760)
   *JBrand@DGDK.com*
3  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
4  Los Angeles, California 90067-2904
   Telephone: (310) 277-0077
5  Facsimile: (310) 277-5735

6  Attorneys for Meruelo Maddux Properties, Inc., and
   affiliated Debtors and Debtors-in-Possession
7

8               **UNITED STATES BANKRUPTCY COURT**

9               **CENTRAL DISTRICT OF CALIFORNIA**

10              **SAN FERNANDO VALLEY DIVISION**

11 In re                                ) Case No. 1:09-bk-13356-KT
                                         )
12 MERUELO MADDUX PROPERTIES, INC., et   ) Chapter 11 (Jointly Administered)
   al.[1]                                )
13                                       ) **DEBTORS' REPLY IN SUPPORT OF**
           Debtors and Debtors-in-Possession. ) **MOTION FOR ORDER EXTENDING**
14                                       ) **AUTHORITY FOR THE USE OF CASH**
                                         ) **COLLATERAL AND TO MAINTAIN**
15                                       ) **CASH MANAGEMENT SYSTEM**
                                         ) **THROUGH SEPTEMBER 30, 2010; AND**
16 ☑  Affects all Debtors                ) **DECLARATIONS OF RICHARD**
                                         ) **MERUELO AND JOHN N. TEDFORD,**
17 ☐  Affects the following Debtor(s):   ) **IV, AND REQUEST FOR JUDICIAL**
                                         ) **NOTICE IN SUPPORT THEREOF**
18                                       )
                                         ) Date:   June 29, 2010
19                                       ) Time:   10:00 a.m.
                                         ) Place:  Courtroom 301
20                                       )         21041 Burbank Blvd.
                                         )         Woodland Hills, California
21                                       )
                                         )
22

23

24

25    [1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated
   entities. The affiliated case numbers are as follows: 1:09-bk-13338-KT; 1:09-bk-13358-KT; 1:09-bk-13359-KT; 1:09-bk-13360-
26 KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-13365-KT; 1:09-bk-13366-KT; 1:09-
   bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-bk-13371-KT; 1:09-bk-13372-KT; 1:09-bk-13373-
   KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT; 1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-
27 bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13385-KT; 1:09-bk-13386-
   KT; 1:09-bk-13387-KT; 1:09-bk-13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13391-KT; 1:09-bk-13392-KT; 1:09-
   bk-13393-KT; 1:09-bk-13394-KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-
28 KT; 1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-KT; 1:09-
   bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.

                                           1

1    The above-captioned debtors and debtors-in-possession (collectively the "Debtors") hereby

2    reply to (1) *Bank of America N.A.'s Opposition to Debtor's Motion for Order Extending Authority*

3    *for the Use of Cash Collateral and to Maintain Cash Management System through September 30,*

4    *2010* (the "BofA Response") (*docket entry no. 1520*), (2) *Objection of Legendary Investors Group*

5    *No. 1, LLC to Debtors' Motion for Order Extending Authority for the Use of Cash Collateral and*

6    *to Maintain Cash Management System through September 30, 2010* (the "Legendary Opposition")

7    (*docket entry no. 1521*), (3) *California Bank & Trust's Opposition to Debtors' Motion for Order*

8    *Extending Authority for the Use of Cash Collateral and to Maintain Cash Management System*

9    *through September 30, 2010* (the "CB&T Opposition") (*docket entry no. 1523*), and (4) *Chinatrust*

10    *Bank's Opposition to Debtor's Motion to Extend Authority to Use Cash Collateral* (the "Chinatrust

11    Opposition") (*docket entry no. 1525*), as follows:

12        1.    Bank of America ("BofA"), Legendary Investors Group No. 1, LLC ("Legendary"),

13    and Chinatrust Bank ("Chinatrust") oppose the Debtors' motion for an order extending authority

14    for the use of cash collateral and to maintain their cash management system through September 30,

15    2010 (the "Motion"), without regard to the undisputed fact that the Debtors will incur expenses in

16    connection with the operation and maintenance of the opposing parties' collateral.  In light of prior

17    oppositions presented by the parties and the clear benefit that the opposing parties receive from the

18    Debtors' continued operation and maintenance of the properties, the Debtors presume that what the

19    opposing parties actually object to is the Debtors' use of cash collateral generated in excess of such

20    costs.  The Court previously evaluated the form of additional adequate protection to be afforded to

21    the opposing parties, among others, for the use of such cash collateral, and none of the opposing

22    parties makes any effort to show that the Court's prior determinations, carefully made after months

23    of hearings and consideration, are inadequate to protect the opposing parties for the Debtors' use of

24    cash collateral during the next three months.

25        2.    BofA alleges, without providing any evidence, that the Debtors have not shown that

26    BofA is adequately protected "in light of the downward trend in real estate values."  With regard to

27    the Union Lofts apartment project, BofA ignores, for example, the fact that the apartment project is

28    still in the process of being leased up (explaining the anticipated increase the revenues generated by

1  the property through December 2010). As shown by, among other things, the real property

2  appraisal previously filed by BofA in this case (*see docket entry no. 100*), the property will have a

3  higher value when stabilized and, therefore, the Debtors' continued efforts to lease up the property

4  results in an *increase* in the value of BofA's collateral.[2]  BofA also ignores the additional adequate

5  protection that the Court has afforded BofA in connection with the Debtors' use of cash collateral

6  generated by Union Lofts, and the Debtors' intent to pay BofA's allowed secured claim in full,

7  with interest, as part of the Debtors' Chapter 11 plan. BofA further ignores the Debtors' estimate

8  of value for Union Lofts that is identified the Debtors' second amended plan, which results in a

9  calculation of BofA's equity cushion in its real property collateral of approximately 11.5% as of

10  June 29, 2010.[3]  Instead, BofA criticizes the Debtors' revenue projections for the Union Lofts,

11  without explaining how that impacts the analysis to be conducted by the Court.

12       3.    BofA also makes no effort to show that its interests in the properties referred to in

13  this case as the Southpark properties are not adequately protected. Again, BofA ignores the value

14  of the Southpark properties stated in the Debtors' second amended plan, which is the same value

15  that the Debtors have ascribed to those properties throughout this case. BofA's equity cushion at

16  that value exceeds 54%, and even if the Court utilizes the value stated in an appraisal previously

17  ///

18  ///

19  ///

20

21      [2] The appraisal provided an "as is" market value of $25,200,000 as of the September 2008
22  date identified in the appraisal, and a prospective value upon stabilization of $27,100,000.

23      [3] This calculation, which does not include the additional adequate protection lien afforded
to BofA pursuant to the Court's prior orders, is as follows: Value of $30,032,925 plus $6,563,634
24  of cash in the segregated account in which BofA claims a security interest results in a total value of
BofA's claimed collateral of approximately $36.6 million. From this is subtracted $28,108,094 in
25  principal, $2,896,835 of interest if calculated at the default rate from the date on which BofA
claims default interest is owed, $115,873 in late fees if interest is calculated at the default rate,
26  $250,000 in estimated legal fees, some of which may be disputed by the Debtors, $266,488 in
taxes, and approximately $1.5 million in costs of sale calculated at 5% of the real property value.
27  This calculation results in an equity cushion of over $3.45 million, equating to 11.51% and more
than 20 months of interest at the default rate.

28

1    submitted by BofA in this case the equity cushion would be approximately 42%.[4]  BofA simply

2    alleges that real property values are declining, particularly unimproved land, without any evidence

3    or recognition of recent transactions in the Southpark area of downtown Los Angeles, including the

4    sales of condominiums at the Evo condominium project, which is located directly across the street

5    from one of MG Southpark's properties, and the recent sale of the Company's building at 705 West

6    9th Street (aka 845 South Flower Street).

7         4.    For the most part, Legendary opposes the Motion on the same grounds asserted by

8    Legendary in prior oppositions to the Debtors' cash collateral motions, and the Debtors request that

9    the Court again overrule such objections where it has done so previously.[5]  The only new argument

10   made by Legendary relates to real properties owned by Merco Group – 425 West 11th Street, LLC

11   ("MG 425 W. 11th"), consisting of one parcel improved with a building known as the "Desmond

12   Building" and a second parcel currently utilized as a parking lot (collectively the "425 Properties").

13        5.    With regard to the 425 Properties, Legendary argues that it is not adequately

14   protected because the Debtors recently obtained the issuance of a building permit, allegedly "broke

15   ground" on construction, and allegedly terminated parking operations on the site.  Legendary also

16   claims to have not known about the potential development.  However, in opposition to Legendary's

17   motion for relief from stay, Mr. Meruelo stated that "[c]urrent redevelopment plans for the parking

18   lot property are expected to include building a new, ground up, 20-story, 80,000 square foot

19   ///

20   ///

21   --------------------------------------------

22   [4] Value of $57,250,000, less principal of $20,000,000, interest of $2,091,111 if calculated at
     the default rate from the date on which BofA claimed default interest is owed, $83,644 in late fees
23   if interest is calculated at the default rate, $250,000 in estimated legal fees, some of which may be
     disputed by the Debtors, $593,635 in taxes, and approximately $2.86 million in costs of sale
     calculated at 5% of the real property values.  This calculation results in an equity cushion of
24   approximately $31.37 million, equating to 54.8% and more than 259 months of interest at the
     default rate.  Even if the valuation previously urged by BofA is used ($43,300,000), the equity
25   cushion would be approximately 42% and approximately 150 months of interest at the default rate.

26   [5] As noted in the Motion, where the Court has previously ordered the Debtors to provide
     additional adequate protection the Debtors are requesting authority to use cash collateral on the
27   same terms.

28                                    -4-

1  residential project that will compliment existing nearby residential projects."[6] Legendary filed a

2  supplemental declaration of its appraiser suggesting that a development such as that disclosed by

3  Mr. Meruelo would not be approved because of zoning and structural restrictions. An evidentiary

4  hearing on Legendary's motion commenced on October 2, 2009, and the project was mentioned in

5  various contexts.[7] During that evidentiary hearing Legendary's appraiser acknowledged that he

6  was not, in fact, testifying that the planned development was not impossible or prohibited. When

7  Mr. Meruelo was cross-examined by Legendary's counsel he also stated, among other things, that

8  the Company had made an assessment of the cost "to build a building that we've designed that's

9  being processed through the City . . .." Legendary's counsel also questioned Mr. Meruelo about

10  the anticipated costs of the project. Now, however, Legendary appears to have forgotten about Mr.

11  Meruelo's testimony last October. Legendary also completely fails to take into consideration that

12  the property has significantly *increased* in value by virtue of it being entitled. By obtaining the

13  permit, the Company has the ability to proceed with development of the property at an appropriate

14  time in the future.[8]

15        6.        Certain other statements by Legendary in the opposition appear to be speculation,

16  but are not true. For example, Legendary claims that the Debtors have "broken ground" and started

17  construction. This is incorrect, and Legendary's belief may be based on an erroneous statement to

18  that effect in an on-line publication that focuses on real estate developments in downtown Los

19  Angeles. To obtain the permit, MG 425 W. 11th was required to remove the asphalt surface so

20  there could be an investigation of underground shoring and other building components remaining

21

---

22        [6] A copy of Mr. Meruelo's declaration filed with the Court on September 17, 2009, without
23  exhibits, is attached as Exhibit "1" to the Request for Judicial Notice. The quoted language is in
    paragraph 8 of Mr. Meruelo's prior declaration.

24        [7] Pages from the official court transcript for the October 2, 2009, hearing are attached as
25  Exhibit "3" to the Declaration of John N. Tedford, IV.

26        [8] Legendary simply speculates that cash collateral was used to obtain the permit.
    Legendary does not consider that the Debtors have accounts holding funds known in this case as
27  "unrestricted cash" which may be utilized to fund such expenses. Such expenses would not
    therefore appear in a cash collateral budget.

28

355413.01 [XP]      25195

1  from a building previously located on the site.  After the investigation was completed, the property

2  was graded so that it could again be utilized by Prestige Parking, which operates a parking lot on

3  the property.  Based on these events, Legendary alleges that the Debtors started construction and

4  that parking operations have terminated.  In truth, construction has not commenced and parking

5  operations were only temporarily halted.  Prestige Parking continues to use the property today, and

6  MG 425 W. 11th continues to be entitled to revenues relating to such use, just as it did before the

7  asphalt was removed.

8         7.       Chinatrust opposes the Motion on the grounds that the Debtors allegedly have not

9  proposed sufficient unencumbered properties as part of the Replacement Lien Property Pool.  The

10  Debtors disagree, and Chinatrust's argument is already addressed in connection with the Debtors'

11  pending motion for an order designating certain properties as the Replacement Lien Property Pool.

12  Chinatrust also reiterates the argument previously made by it that its additional adequate protection

13  lien should not be extinguished on the effective date of a Chapter 11 plan.  However, as the Debtors

14  have addressed, the purpose of the adequate protection lien is to provide secured creditors adequate

15  protection for the use of cash collateral during the course of this case and provide a source to which

16  the creditor may look in the event that a plan is not confirmed pursuant to which secured creditors

17  will be paid.  In the case of Chinatrust, under the Debtors' proposed plan, monthly interest to which

18  Chinatrust is entitled under § 506 of the Code will be added to the amount of Chinatrust's claim as

19  of the effective date of the plan, and that amount will be paid in full, with interest, as set forth in the

20  plan.  Chinatrust will effectively receive interest after the effective date on postpetition interest, and

21  ultimately will receive deferred cash payments with a present value of at least the allowed amount

22  of Chinatrust's claim.  Chinatrust simply disregards the treatment of its secured claim set forth in

23  the Debtors' plan.

24         8.       For the foregoing reasons and the reasons stated in the Motion, the Debtors request

25  that the Court enter an order extending authority for the Debtors' use of cash collateral through

26  September 30, 2010, on the same terms and conditions as the Court authorized such use through

27  ///

28  ///

355413.01 [XP]    25195

1  June 30, 2010 and authorizing the Debtors' continued use of its integrated cash management

2  system.[9]

3

4  Dated: June 22, 2010                    DANNING, GILL, DIAMOND & KOLLITZ, LLP

5

6                                          By: _____

7                                          John N. Tedford, IV
                                           Attorneys for Meruelo Maddux Properties,
8                                          Inc., and affiliated Debtors and Debtors-in-
                                           Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
   _____

26      [9] CB&T filed a brief opposition incorporating its prior objections to the Debtors' use of
   cash collateral generated by the property located at 788 South Alameda.  Likewise, the Debtors
27  incorporate their prior responses to CB&T's objections.

28

355413.01 [XP]    25195

## DECLARATION OF RICHARD MERUELO

I, Richard Meruelo, declare and state as follows:

1.      I am the Chief Executive Officer of Meruelo Maddux Properties, Inc. ("MMPI").

2.      MMPI is the parent company of a number of subsidiaries, including Merco Group – Southpark, LLC ("MG Southpark"), Meruelo Maddux Properties – 760 S. Hill Street, LLC ("MMP South Hill"), Merco Group – 3185 E. Washington Boulevard, LLC ("MG 3185 E. Washington"), Merco Group – 425 West 11th Street, LLC ("MG 425 W. 11th").  On March 26 and 27, 2009, MMPI and fifty-three of its subsidiaries, including those listed above (collectively the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  I am a designated officer of MMPI and each of the affiliated entities and am authorized to give this declaration.

3.      As a result of my being the Chief Executive Officer of MMPI and a designated officer of each of the affiliated entities, and my review of relevant documents, I am familiar with the Debtors' day-to-day operations, business affairs, and books and records, and the manner in which they are prepared.  Except as may be otherwise noted, all facts set forth in this declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management team, my review of relevant documents, or my opinion, based on, among other things, my experience and knowledge of the Debtors' operations and financial conditions.

4.      MG Southpark owns certain parcels of real property in the South Park area of downtown Los Angeles with various addresses, including 1150 South Grand Avenue.  The parcels owned by MG Southpark, which constitute at least three different properties, are approximately four to six blocks from the Staples Center, and approximately one-half mile south of the project recently sold for by another of MMPI's subsidiaries, Meruelo Maddux – 845 S. Flower Street, LLC, for approximately $110 million.  There has been considerable positive developments in the South Park area, including but not limited to the 845 South Flower project, the Evo condominium project located at 1155 South Grand Avenue, right across the street from one of MG Southpark's properties, and the Concerto Lofts condominium project located at 901 South Flower Street, all of which have benefitted from the Staples Center and the recent development of L.A. Live.

5.       I believe that the value of MG Southpark's properties is not less than $57,250,000. The principal amount owed by MG Southpark to Bank of America ("BofA") on account of a loan secured by MG Southpark's properties is $20 million. Based on prior allegations by BofA in this case, we calculate that BofA would assert that the amount of accrued interest as of June 29, 2010, including default interest, will be approximately $2,091,111, and the amount of late fees as of June 29, 2010, based on the default rate of interest, will be approximately $83,644. I believe that according to public records available from the County of Los Angeles, the prepetition real property taxes and alleged delinquent and redemption penalties thereon total $593,635. Interest at the default rate would accrue at 7.25% per annum, equating to approximately 120,833 per month. In light of the recent developments in the South Park area of downtown, I believe that the value of MG Southpark's properties are stable, if not increasing.

6.       MMP South Hill owns a 92-unit apartment building located in downtown Los Angeles, commonly known as either 760 South Hill Street or 325 West 8th Street, Los Angeles, California ("Union Lofts"). The building was originally built in the 1920s to serve as the corporate headquarters for Union Bank of California. MMP South Hill extensively renovated the building, which has been mapped for use as condominiums. Presently, the units at Union Lofts are being leased as luxury apartments and is in the process of being leased up. As occupancy of the building increases toward a stabilized rate, the value of the property increases. Accordingly, MMP South Hill's efforts to lease up the property results in an increase in the value thereof.

7.       I believe that the value of Union Lofts is not less than $30,032,925. There is also approximately $6,563,634 in a segregated debtor-in-possession account. BofA claims that it has a security interest in the entirety of the funds, although we believe that BofA has a security interest in only exactly $6.4 million of the funds. The principal amount owed by MMP South Hill to BofA on account of a loan secured by Union Lofts and cash is $28,108,094. Based on prior allegations by BofA in this case, we calculate that BofA would assert that the amount of accrued interest as of June 29, 2010, including default interest, will be approximately $2,896,835, and the amount of late fees as of June 29, 2010, based on the default rate of interest, will be approximately $115,873. I

///

-9-

1    believe that according to public records available from the County of Los Angeles, the prepetition

2    real property taxes and alleged delinquent and redemption penalties thereon total $266,488.

3         8.      MG 425 W. 11th owns two properties located on 11th Street between Hope Street

4    and Grand Avenue in the South Park area of downtown Los Angeles, a few blocks from the Staples

5    Center and L.A. Live. One property is improved with a 78,500 square foot, five-story industrial

6    building known as the "Desmond Building." The other is currently utilized as a 13,678 square foot

7    parking lot operated by Prestige Parking.

8         9.      With regard to the parcel utilized as a parking lot, it is my understanding that

9    Legendary Investors Group No. 1, LLC ("Legendary"), alleges that MG 425 W. 11th has obtained

10   the issuance of a building permit, broken ground and commenced construction, and also terminated

11   parking operations at the site. I previously stated that current plans for development of the parking

12   lot property were expected to include the building of a new, ground up, 20-story, 80,000 square

13   foot residential project that would compliment existing nearby residential projects. I also stated in

14   October 2009 that the building was at that time being processed through the City. We began the

15   permitting process in September 2009. As is common, it took a while for the City's inspectors to

16   review various documents and sign off on various permits. At no point was there any guarantee

17   that all approvals would be obtained and/or any permits would be issued. On or about June 10,

18   2010, the City issued its latest permit. By obtaining the permit, the Company has the ability to

19   proceed with development of the property at an appropriate time in the future. In the meantime, by

20   virtue of the property having been entitled, the value of the property has increased.

21        10.     Contrary to Legendary's statements, we have not "broken ground" or commenced

22   construction, and parking operations have not terminated. In order to obtain the permit, MG 425

23   W. 11th was required to remove the asphalt surface so there could be an investigation of

24   underground shoring and other building components remaining from a building that was previously

25   located on the site. After the investigation was completed, the property was graded so that it could

26   again be utilized by Prestige Parking. Parking operations were only temporarily halted. Prestige

27   Parking currently is operating the parking lot just as it was before we removed the asphalt surface.

28   Recent photographs of the property, with parked cars, are attached as Exhibit "4" hereto. Expenses

-10-

1  such as those relating to the approval process that were not included in prior cash collateral budgets

2  were paid for with funds known in this case as unrestricted cash.

3

4       I declare under penalty of perjury under the laws of the United States of America that the

5  foregoing is true and correct.

6       Executed on June ___, 2010, at Los Angeles, California.

7

8                                        _SIGNATURE TO FOLLOW_

9                                        RICHARD MERUELO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

355413.01 [XP]    25195

1

## DECLARATION OF JOHN N. TEDFORD, IV

2

3    I, John N. Tedford, IV, declare and state as follows:

4    1.    I am an attorney, duly licensed and entitled to practice before courts of the State of

5 California, and I am a member in good standing of the Bar of this Court. I am a principal of a

6 professional corporation that is a partner of the law firm of Danning, Gill, Diamond & Kollitz,

7 LLP, attorneys for Meruelo Maddux Properties, Inc., and its affiliated debtors and debtors-in-

8 possession in this case.

9    2.    I have personal knowledge of the facts in this declaration. If called as a witness, I

10 could testify competently to these facts.

11    3.    Attached as Exhibit "3" hereto are true and correct copies of pages i through iv, 21,

12 81 through 83, 152, 163 through 167, and 201 of the official Court transcript for the hearing held

13 on October 2, 2009, in connection with the motion by Legendary Investors Group No. 1, LLC, for

14 relief from the automatic stay with respect to certain real properties owned by debtor Merco Group

15 – 425 W. 11th Street, LLC.

16

17    I declare under penalty of perjury under the laws of the United States of America that the

18 foregoing is true and correct.

19    Executed on June 22, 2010, at Los Angeles, California.

20

21

22                JOHN N. TEDFORD, IV

23

24

25

26

27

28

-12-

355413.01 [XP]     25195

## REQUEST FOR JUDICIAL NOTICE

The above-captioned debtors and debtors-in-possession (collectively the "Debtors") hereby request that the Court take judicial notice of the following facts:

1.    On or about September 17, 2009, the Debtors filed the *Debtor's Opposition to Legendary Investors Group No. 1, LLC's Motion for Relief from the Automatic Stay (425 West 11th Street)* (docket entry no 627).  A true and correct copy of the caption page and the Declaration of Richard Meruelo appended to the opposition, without exhibits, is attached as Exhibit "1" hereto.

2.    On or about September 25, 2009, Legendary Investors Group No. 1, LLC, filed the *Supplemental Declaration of Steve C. Kerhart in Support of Legendary Investors Group No. 1, LLC's Motion for Relief from the Automatic Stay (425 West 11th Street)* (docket entry no 689).  A true and correct copy of the declaration is attached as Exhibit "2" hereto.

Dated: June 22, 2010                    DANNING, GILL, DIAMOND & KOLLITZ, LLP


By: _____
John N. Tedford, IV
Attorneys for Meruelo Maddux Properties,
Inc., and affiliated Debtors and Debtors-in-
Possession

-13-

355413.01 [XP]    25195

# EXHIBIT 1

1 | RICHARD K. DIAMOND (State Bar No. 070634)
  | *RDiamond@DGDK.com*
2 | JOHN J. BINGHAM, JR. (State Bar No. 075842)
  | *JBingham@DGDK.com*
3 | JOHN N. TEDFORD, IV (State Bar No. 205537)
  | *JTedford@DGDK.com*
4 | DANNING, GILL, DIAMOND & KOLLITZ, LLP
  | 2029 Century Park East, Third Floor
5 | Los Angeles, California 90067-2904
  | Telephone:  (310) 277-0077
6 | Facsimile:  (310) 277-5735

7 | Attorneys for Meruelo Maddux Properties, Inc., and
  | affiliated Debtors and Debtors-in-Possession

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | **SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| 11  In re | ) Case No. 1:09-bk-13356-KT |
| 12  MERUELO MADDUX PROPERTIES, INC., et al.[1] | ) Chapter 11 |
| 13 | ) (Jointly Administered) |
|     Debtors and Debtors-in-Possession. | ) |
| 14 | ) **DEBTOR'S OPPOSITION TO** |
| 15 | ) **LEGENDARY INVESTORS GROUP NO.** |
|     | ) **1, LLC'S MOTION FOR RELIEF FROM** |
| 16  ☐   Affects all Debtors | ) **THE AUTOMATIC STAY (425 WEST** |
|     | ) **11TH STREET); AND DECLARATIONS** |
| 17  ☑   Affects the following Debtor(s): | ) **OF RICHARD MERUELO AND JOHN** |
|     | ) **N. TEDFORD, IV, AND REQUEST FOR** |
| 18  Merco Group – 425 West 11th Street, LLC | ) **JUDICIAL NOTICE IN SUPPORT** |
|     (1:09-bk-13373-KT) | ) **THEREOF** |
| 19 | ) |
|     | ) Date:       October 1, 2009 |
| 20 | ) Time:       11:00 a.m. |
|     | ) Place:      Courtroom 301 |
| 21 | )             21041 Burbank Blvd. |
|     | )             Woodland Hills, California |
| 22 | ) |
| 23 | |

24

25 | [1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities.  The affiliated case numbers are as follows:  1:09-bk-13358-KT; 1:09-bk-13359-KT; 1:09-bk-13360-KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-13365-KT; 1:09-bk-13366-KT; 1:09-bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-bk-13371-KT; 1:09-bk-13372-KT; 1:09-bk-13373-KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT; 1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13385-KT; 1:09-bk-13386-KT; 1:09-bk-13387-KT; 1:09-bk-13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13391-KT; 1:09-bk-13392-KT; 1:09-bk-13393-KT; 1:09-bk-13394-KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-KT; 1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-KT; 1:09-bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.

342936.05 [XP]      25195

15

## DECLARATION OF RICHARD MERUELO

I, Richard Meruelo, declare and state as follows:

1.    I am the Chief Executive Officer of Meruelo Maddux Properties, Inc., a public company ("MMPI"), and the designated officer of the 53 affiliates (collectively the "Debtors") that are debtors in these Chapter 11 cases being jointly administered and pending before the United States Bankruptcy Court for the Central District of California.  I am over the age of 18 years and competent to give this declaration.  The matters stated herein are true and correct and based upon my personal knowledge except as to such matters stated on information and belief which matters I believe to be true.

2.    Certain of the facts set forth in this declaration are based upon the business records of MMPI and its subsidiaries (sometimes referred to collectively as the "Company").  Documents and papers which comprise the Company's business records are maintained by persons whose duty it is to keep such records accurately and correctly.  The records were created by the Company's employees at or near the time of each transaction or occurrence by making a written record of such transaction or occurrence at or shortly after the time thereof.

3.    One of the Debtors is Merco Group – 425 West 11th Street, LLC ("425 West 11th").  425 West 11th owns two properties (collectively referred to herein as the "Property") located on 11th Street between Hope Street and Grand Avenue in the Southpark neighborhood of downtown Los Angeles, a few blocks east of the Staples Center and L.A. Live.  One of the properties is currently utilized as a 13,678 square foot parking lot and is leased out to a parking lot operator.  The second property is improved with a 78,500 square foot, five-story industrial building (the "Desmond Building") situated on 15,682 square feet of land.

4.    An aerial photograph of the Property and a parcel map is attached as Exhibit "1" hereto.  The Property is outlined with heavy black lines.

5.    The Property has significant development potential.  It may be redeveloped for a variety of uses, including office, hotel or residential units.  The Property is in an all-residential neighborhood.  To the south, the Property faces major residential projects known as Elleven and

26

1   Luma, which are successful, fully sold out condominium communities. To the west, the Property

2   faces another major project, Met Lofts, which is a recently constructed, fully-leased up, 275-unit

3   apartment community. The Southpark area is an established and desirable residential area that has

4   benefited greatly from both the Staples Center and the recently opened L.A. Live. The prime

5   location of the Property as well as recent developments provide various potential redevelopment

6   possibilities.

7       6.      The Property was purchased by the Company in 2005 for $12,200,000. I estimate

8   that the value of the Property currently is no less than $12.2 million.

9       7.      From April through August of 2008, the Company received unsolicited offers for

10  the Property from two third parties. In April 2008, the Company received offers in the amounts of

11  $14.5 and $17 million. In August 2008, the Company received another offer from one of those

12  parties for $15 million. I believe that the willingness of parties to offer at least $14.5 million and

13  up to $17 million for the Property in mid-2008 reflects that my $12.2 million estimated value of the

14  Property is accurate.

15      8.      I expect that the Property will be redeveloped from its current interim use to a more

16  valuable and denser use. Current development plans for the parking lot property are expected to

17  include building a new, ground up, 20-story, 80,000 square foot residential project that will

18  compliment existing nearby residential projects. Redevelopment plans for the Desmond Building

19  are expected to include the conversion of the building into a boutique hotel and restaurant space

20  that will take advantage of the Property's proximity to L.A. Live and the newly expanded Los

21  Angeles Convention Center. This redevelopment plan will also add to the growing base of lifestyle

22  amenities that Southpark is now known for.

23      9.      I also expect that the overall development of the Property will be coordinated and

24  derive positive economic synergies with other nearby contiguous or linked properties owned by the

25  Company, such as the properties owned by Meruelo Maddux – 336 W. 11th Street, LLC, Merco

26  Group – Southpark, LLC, and Merco Group – Little J, LLC. These four entities' properties create

27  a contiguous grouping of several key parcels and blocks of valuable, mostly residential land in the

28  most attractive Southpark district of downtown Los Angeles.

27

1     10.    It is my understanding that Legendary Investors Group No. 1, LLC ("Legendary"),

2 has submitted to the Court an appraisal of the Property prepared by Continental Realty Advisors

3 (the "CRA Appraisal"). I have reviewed that appraisal and am familiar with its contents. I believe

4 that the CRA Appraisal is flawed in a number of respects.

5     11.    CRA also appraised the Property in early 2008 for East West Bank. A true and

6 correct copy of the appraisal report which was provided to the Company by East West Bank is

7 attached as Exhibit "2" hereto.

8     12.    Among other things, I do not believe that the CRA Appraisal adequately accounts

9 for the Property's location as compared to the location of comparables referred to and relied upon

10 in the CRA Appraisal. One of the comparables is on the outskirts of the Southpark area, but none

11 of the other comparables are in the Southpark district. I recognize that the nature of the downtown

12 market makes the accurate use of comparables difficult, but when comparing the Property to other

13 properties outside of Southpark, the CRA Appraisal should have contained upward adjustments in

14 favor of the Property in order to reflect the highly desirable location of the Property.

15     13.    In determining the effects of changes in market conditions on the Property's value,

16 relying upon a database which reflects sales within a 20-mile radius of the Property is inadequate.

17 Doing so results in drastically dissimilar properties that are located in very different locations being

18 compiled into an overall generate rate of decline. I do not believe that a downward adjustment of

19 17% annualized should be applied to each of the comparable sales. Among other reasons, I do not

20 believe that doing so accurately reflects the market in downtown Los Angeles. I am informed and

21 believe that, after renovations, one of the comparables identified in the CRA Appraisal, located at

22 213 West Pico and 1301 Olive, is currently listed for sale for $219 per square foot. However, the

23 CRA Appraisal appears to identify that property as having an adjusted value of only $140.35 per

24 square foot. It does not appear that the CRA Appraisal takes into account the current listing price

25 of that property.

26     14.    I believe that the CRA Appraisal does not take into account certain comparable sales

27 which, if considered, could have resulted in a higher estimate of value. We have recently sold two

28 larger properties in inferior locations to the Property. One of the properties, a 136,000 square foot

28

1 | building located at 801 E 7th Street, was sold for $70 per building square foot. The other, a

2 | 109,000 square foot building located at 1800 Washington, was sold for $131 per building square

3 | foot. I am also aware of a pending sale of a 73,000 square foot building known as the "Modernica"

4 | located next to the L.A. River in the industrial heart of downtown Los Angeles, an where the

5 | property is being sold for over $100 per building square foot. I believe that those properties are

6 | inferior to the Desmond Building, and would have reflected favorably on the Desmond Building

7 | had they been considered as comparables by CRA.

8 | 15.    In my experience, buyers of industrial properties in downtown Los Angeles do not

9 | typically place much emphasis on capitalization rates when determining the value of the properties

10 | they are purchasing. Buyers of such properties in downtown Los Angeles tend to be end users, and

11 | do not buy the properties for the purpose of holding them and collecting rents. To emphasize this, I

12 | provided the Court with an analysis of effective capitalization rates on the five most recent sales by

13 | the Debtors, or entities related to me or the Debtors, of income-generating properties in downtown

14 | Los Angeles. The highest effective capitalization rate was 5.08%, and the average effective

15 | capitalization rate was 3.65%. The point is that using capitalization rates to determine values of

16 | properties like the Property in downtown Los Angeles is generally not appropriate, since buyers are

17 | not relying on capitalization rates when they buy properties.

18 | 16.    Attached as Exhibit "3" hereto are true and correct copies of loan statements dated

19 | January 16, 2009, February 13, 2009, March 16, 2009, and April 15, 2009, which were received by

20 | 425 West 11th from East West Bank with respect to the loan secured by the Property.

21 | 17.    The Debtors have retained FTI Consulting to assist the Debtors in preparing a plan

22 | of reorganization. Although it is still being developed, I anticipate that our Chapter 11 plan will

23 | provide for the retention of the Property by the Company. I consider the Property to be an

24 | important and valuable contributor to the Company's operations and reorganization.

25 | 18.    It is my understanding that, in the motions filed by Legendary for relief from the

26 | automatic stay, Legendary calculates costs of sale by multiplying the properties' value or alleged

27 | value by 7.5%. I believe that calculating costs of sale as being 7.5% of each properties' value is

28 | highly inappropriate and not reflected of costs of sale actually paid by sellers of properties in the

29

1   downtown market. Within the last few months, the Company investigated its actual costs of sale

2   on sales of real property by the Company during the past year. Based thereon, I believe that the

3   Company's actual average costs of sale has been 2.2% of the gross sale price. I believe that if 425

4   West 11th were to consummate a sale of the Property, the costs of sale would be significantly less

5   than 7.5% of the gross sale price.

6        19.     I am informed and believe that Surjit P. Soni is the managing member of an entity

7   called Legendary Developments, LLC, as well as Legendary. I am also informed and believe that

8   Mr. Soni may be affiliated with certain other entities which contain the word "Legendary" in their

9   names and which have been formed within the last year or so. Through many entities owned and

10   controlled by me and entities with which I am affiliated, I have been in the business of purchasing,

11   selling and developing properties in downtown Los Angeles for over twenty years. I very

12   frequently speak with owners of property located in downtown Los Angeles, real estate brokers

13   involved in the sale and lease of properties in downtown Los Angeles, and real estate appraisers

14   who specialize in the appraisal of properties in downtown Los Angeles. In these discussions, we

15   frequently discuss residential, commercial and industrial properties being sold and leased, and the

16   participants involved in those transactions. Until Legendary purchased seven of East West Bank's

17   notes, I do not believe that I had ever heard of Legendary or Mr. Soni.

18        20.     I am informed and believe that Mr. Soni has testified that, in his opinion, the value

19   of the Property is declining. For a variety of reasons, including those discussed above, I believe

20   that Mr. Soni is incorrect. Properties in the Southpark submarket are continuing to increase in

21   value as the area's redevelopment continues its momentum. Southpark continues to benefit from

22   new amenities as a result of the recent opening of the adjacent $2.5 billion L.A. Live project.

23   L.A. Live includes approximately 12 new restaurants, an ESPN Zone, several new nightclubs, Club

24   Nokia, approximately 1,000 new hotel rooms in both a JW Marriott and a Ritz Carlton hotel, 224

25   luxury Ritz Carlton residences in a $950 million combined 54-story structure, and a flagship Regal

26   Cinemas multiplex movie theatre. Reportedly, approximately $300 million of the Ritz Carlton

27   residences have been pre-sold.

28   ///

30

342936.05 [XP]     25195

21.     In addition, Evo, a 311-unit condominium project, has experienced increased sales volumes and higher pricing since the beginning of 2009.  Moreover, on August 29, 2009, Concerto Lofts, a 77-unit condominium project also in Southpark, sold out 100% of the building for $31 million in a one day marketing program.  These two projects prove that the desire to live downtown is strong and growing.  Ultimately, the success of each and every new project downtown continues to drive the increase in values in downtown.  Even though development has come to a standstill in many parts of the country, downtown continues to see new developments proceed.  In the downtown market, no other submarket downtown comes close to the level of development in Southpark.

22.     Additionally, the RMZ index, a stock market index of 128 publicly traded real estate companies, strongly suggests that real estate markets are on the mend. The index has rebounded by over 70% from its lows reached in March 2009.  There have been over 30 companies that have raised equity from investors beginning in July 2009.  In contrast, I know of no public real estate company that was able to sell new equity to investors since the collapse of Bear Sterns in or about February 2008.  The stock market has historically preceded economic conditions by 6-9 months.  Consequently, the stock market is indicating a recovery in real estate prices between now and the next six months.


I declare under penalty of perjury that the foregoing is true and correct, and if called upon as a witness, I could testify competently to each and every fact stated herein.

Executed on September ___, 2009, at _____.


_____Signature To Follow_____
RICHARD MERUELO

31

342936.05 [XP]    25195

# EXHIBIT 2

1   James I. Stang (CA Bar No. 94435)
2   Iain A. W. Nasatir (CA Bar No. 148977)
    PACHULSKI STANG ZIEHL & JONES LLP
3   10100 Santa Monica Blvd., 11th Floor
    Los Angeles, California  90067-4100
    Telephone: 310/277-6910
4   Facsimile:  310/201-0760
    E-mail: jstang@pszjlaw.com
5           inasatir@pszjlaw.com

6   Counsel for Legendary Investors Group No. 1, LLC

7

8                    UNITED STATES BANKRUPTCY COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10                   SAN FERNANDO VALLEY DIVISION

11  | In re: | Case No. 1:09-bk-13356-KT |

12  MERUELO MADDUX PROPERTIES, INC., et al.,   Chapter 11 (Jointly Administered)

                          Debtors.

13
                                        SUPPLEMENTAL DECLARATION OF
14  ☐ Affects all Debtors              STEVE C. KERHART IN SUPPORT OF
                                        LEGENDARY INVESTORS GROUP
15  ☒ Affects the following Debtor(s):  NO. 1, LLC'S MOTION FOR RELIEF
                                        FROM THE AUTOMATIC STAY (425
16  Merco Group – 425 West 11th Street, LLC   WEST 11TH STREET)
    (1:09-bk-13373-KT)
17                                      Hearing:

18                                      Date:  October 2, 2009
                                        Time:  9:00 a.m.
19                                      Place: 21041 Burbank Boulevard
                                               Courtroom 301
20                                             Woodland Hills, California

21          I, Steve C. Kerhart, declare as follows:

22          1.      I am a partner in the valuation services group of Continental Realty Advisors

23  ("CRA").  If called upon to testify as to the matters set forth herein, I could and would competently

24  testify thereto, as the matters set forth herein are personally known to me to be true or I have gained

25  knowledge of them from CRA's books and records which are kept in the ordinary course of the

26  CRA's business.

27          2.      I make this declaration in support of the *Motion for Relief From Automatic Stay*

28  ("RFS Motion") of Legendary Investors Group No. 1, LLC ("Legendary") pertaining to the above-

                                        1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    referenced debtor (the "Debtor"). Any capitalized term(s) not otherwise defined herein shall have

2    the meaning ascribed to it in the RFS Motion.

3        3.    In connection with preparing CRA's appraisal, my associate asked the Debtor for

4    copies of the offers that the Debtor claims to have received for the purchase of the Property in April

5    2008 and August 2008. The Debtor failed to provide them. In any event, even if such offers were

6    made, whether verbally or in writing, I do not believe that such offers would be determinative as to

7    the Property's current value since they were made over a year ago.

8        4.    When appraising the market value of a property, I generally do not take into account

9    any positive value derived by the owner due to synergies between the subject property and other

10    properties with common ownership, such as Mr. Meruelo states would be the case between 425 West

11    11th Street, 336 West 11th Street, Merco Group – Southpark, and Little J. Any such synergies are

12    only properly taken into account in connection with an in-use valuation, which calculates the net

13    present value of the cash flow that the Property generates for a specific owner under a specific use.

14        5.    The Debtor also contends that the comparables relied upon in the CRA Appraisal are

15    inadequate because the comparable properties are not located close enough to the Property and thus

16    do not have the same value as properties located in the South Park area of downtown Los Angeles.

17    It is in the nature of a comparable analysis to rely on properties that are not exactly the same as the

18    property in question and then to make adjustments that capture on an economic scale the differences

19    between the properties compared. While CRA considered the best data available and applied

20    assumptions and discounts based on their experience and skill in preparing its comparables-based

21    analysis.

22        6.    The Neptune Building is 1 of the 5 comparable transactions considered in the sales

23    comparison approach. I believe that in CRA's current appraisal of the Property, I assigned an

24    effective age to each of the Neptune Building and the Property, respectively, that is appropriate

25    today. The effective age of a property is linked to the property's general condition, maintenance and

26    repair, and the modernity of its components and systems. It is possible for a property's effective age

27    to vary by more than one year in any given chronological year. Additionally, the effective age is

28    only one of several factors taken into account in the adjustments made to the Neptune Building as a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

2

1   comparable in the CRA Appraisal, and the Neptune Building is only 1 of 5 comparables that were

2   considered in arriving at the final valuation of the Property.

3       7.      Mr. Meruelo refers to the following three comparables that were not included in the

4   CRA Appraisal: (i) 801 E. 7th Street, (ii) 1800 Washington, and (iii) the Modernica Building. The

5   E. 7th Street property is much larger than the subject and was excluded from the analysis due to size.

6   Steve Kerhart of CRA states that he has been unable to locate the details of a transaction that Mr.

7   Meruelo references involving property located at 1800 Washington and thus I cannot assess its value

8   as a comparable without additional information. With respect to the Modernica Building, located on

9   E. 7th Place, this is a current listing. The CRA Appraisal includes two other listings that were

10  considered by CRA to be more proximate and similar in terms of size and other factors.

11      8.      The capitalization rate of 7.75% reflects appropriate adjustments to the best

12  comparable data that was available to CRA. I believe that utilizing a 7% or even a 6% capitalization

13  rate would not result in a valuation close to $12,200,000 as proposed by the Debtor.

14      9.      Mr. Meruelo claims that the Debtor would redevelop the parking lot portion of the

15  Property into a 20-story 80,000 square foot residential project. However, my understanding is that

16  the subject parking lot is presently limited by a floor-to-area ratio ("FAR") of 6:1 which would

17  enable a maximum of 1 unit per 200 square feet pursuant to City zoning ordinances. While in some

18  cases, density may be transferred between two properties such that the FAR on one property would

19  be increased while the FAR on another property would be decreased comparatively, it would be

20  speculative to assume that this could be achieved here. It is sometimes the case that tight FAR

21  restrictions where a multi-unit project is desired is handled by building up several stories as the

22  Debtor purports to plan to do here. However, a 20-story building with 80,000 square feet implies

23  floor plates of just 4,000 square feet, which would involve a very narrow building with potentially

24  inadequate foundational support.

25      10.     The Debtor's purported plan to convert the Desmond Building into a boutique hotel

26  and restaurant space also seems problematic. A hotel in the Desmond Building would be a challenge

27  structurally because it would require pillars 20 feet apart on every floor. This should be both a

28  structural and aesthetic concern to a builder.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

3

1     I declare under penalty of perjury under the laws of the State of California that the foregoing

2     is true and correct and that this verification was executed on September 25, 2009, at Los Angeles,

3     California.

4

5                                          /s/ Steve C. Kerhart
                                           Steve C. Kerhart

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

4

# EXHIBIT 3

1           UNITED STATES BANKRUPTCY COURT

2           CENTRAL DISTRICT OF CALIFORNIA

3               --oOo--

4 In Re:                 ) Case No. SV09-13356-KT
                       )
5 MERUELO MADDUX PROPERTIES,    ) Woodland Hills, California
INC., a DE Corp.,         ) Friday, October 2, 2009
6                     ) 9:00 a.m.
       Debtor.          )
7 _____ )

8                       HEARING RE: [535] NOTICE OF
MOTION AND MOTION FOR RELIEF
9                       FROM THE AUTOMATIC STAY WITH
SUPPORTING DECLARATIONS REAL
10                      PROPERTY RE MERCO GROUP, LLC

11                       HEARING RE: [534] NOTICE OF
MOTION AND MOTION FOR RELIEF
12                       FROM THE AUTOMATIC STAY WITH
SUPPORTING DECLARATIONS REAL
13                      PROPERTY RE 1500 GRIFFITH
AVENUE, LLC AND 4TH STREET
14                      CENTER, LLC

15                       HEARING RE: [536] NOTICE OF
MOTION AND MOTION FOR RELIEF
16                      FROM THE AUTOMATIC STAY WITH
SUPPORTING DECLARATIONS REAL
17                      PROPERTY RE: 420 BOYD STREET,
LLC
18

19                       HEARING RE: [533] NOTICE OF
MOTION AND MOTION FOR RELIEF
20                      FROM THE AUTOMATIC STAY WITH
SUPPORTING DECLARATIONS REAL
21                      PROPERTY RE: 3RD AND OMAR
STREET, LLC

22

23

24
Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Echo Reporting, Inc.*

ii

```
 1                          MOTION FOR RELIEF FROM THE
                            AUTOMATIC STAY WITH SUPPORTING
 2                          DECLARATIONS REAL PROPERTY RE:
                            MERCO GROUP - 425 W. 11TH
 3                          STREET, LLC

 4                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE KATHLEEN THOMPSON
 5               UNITED STATES BANKRUPTCY JUDGE

 6  APPEARANCES:

 7  For the Debtor:            JOHN N. TEDFORD, IV, ESQ.
                               Danning, Gill, Diamond &
 8                               Kollitz, LLP
                               2029 Century Park East
 9                             Third Floor
                               Los Angeles, California  90067
10                             (310) 277-0077

11  For Creditors Committee:   DEAN RALLIS, ESQ.
                               TAMAR KOUYOUMIJIAN, ESQ.
12                             Sulmeyer, Kupetz
                               333 South Hope Street
13                             35th Floor
                               Los Angeles, California  90071
14                             (213) 626-2311

15  For Legendary Investors:   IAIN A.W. NASATIR, ESQ.
                               Pachulski, Stang, Ziehl &
16                               Jones, LLP
                               10100 Santa Monica Boulevard
17                             11th Floor
                               Los Angeles, California  90067
18                             (310) 277-6910

19  For United Commercial Bank: ELMER DEAN MARTIN, III, ESQ.
                               22632 Golden Springs Drive
20                             Suite 190
                               Diamond Bar, California 91765
21                             (909) 861-6700

22  Court Recorder:            Emma Gonzalez
                               United States Bankruptcy Court
23                             21041 Burbank Boulevard
                               Woodland Hills, California
24                               91367

25
```

*Echo Reporting, Inc.*



iii

1  Transcriber:                    Shonna D. Mowrer
                                    Echo Reporting, Inc.
2                                   6336 Greenwich Drive, Suite B
                                    San Diego, California  92122
3                                   (858) 453-7590

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

iv

1                    I N D E X

2  WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

3  Steven Kerhart           10      37       107        --

4  Richard Meruelo         127     145        --        --

5  Surjit Soni             173     187        --        --

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

21

1  present value, we'll derive an assessment of value.

2  Q    Now, you used the sales approach and the net income

3  approach, but you did not utilize the developmental

4  approach.

5  A    The developmental model is not relevant in this

6  instance.

7  Q    And why is that?

8  A    The subject property -- the upside of the subject

9  property initially was for redevelopment of a 20-story condo

10 or loft product.  And the downtown real estate market, the

11 residential market is suffering, as are most residential

12 housing markets.  And at this time, the price levels are

13 simply not high enough to justify a developmental model on

14 the subject property.

15 Q    And that's your view specifically with respect to 425

16 West Eleventh?

17 A    Correct.

18 Q    Is that your view generally speaking about developments

19 in downtown --

20 A    Yes, it is.

21 Q    And you didn't use a discounted cash flow analysis

22 either, right?

23 A    No, I did not.

24 Q    Why didn't you?

25 A    The discount cash flow analysis could have been

*Echo Reporting, Inc.*

81

1  A    They're older buildings similar to the subject

2  property.  The whole area encompassed by the map is just a

3  mixture of old -- old and, you know, interspersed newer

4  developments throughout the map boundaries.

5  Q    Any high-rise residential developments anywhere near

6  Comparable Number 4?

7  A    I couldn't tell you that.  I couldn't tell you.

8  Q    Any major entertainment complexes anywhere comparable

9  to Number 4?

10  A    No.

11  Q    And how about Comparable Number 3?

12  A    No.

13  Q    Do you recall your testimony -- let's talk again about

14  the parking lot a little bit.

15  A    Okay.

16  Q    Do you recall your testimony with respect to the

17  Debtor's planned development of that property?

18  A    No, I do not.

19  Q    Do you recall referring to a six-to-one floor-to-area

20  ratio and a --

21  A    Yes, there was something along those lines I recall.

22  Q    Describe that for me.  What is that all about?

23  A    Six to one would be a vertical development at six times

24  the size of the site area, would be the building area.

25  Q    And what's the problem with the Debtor's development in

82

1 that regard?

2 A    In terms of the footprint of the site, it is rather

3 small.  And to go up that many stories, it's extremely

4 expensive.  And it would just -- the width of the floors

5 would probably -- I think it would be just overly dense.

6 But most importantly, it's not economically viable.

7 Q    In your supplemental declaration, you indicate that --

8 do you mind if I read it again?

9 A    Sure.

10 Q    As opposed to --

11 A    Sure.

12 Q    "However, my understanding is that the subject parking

13 lot is presently limited by a floor-to-area ratio of six to

14 one, which would enable a maximum of one unit per 200 square

15 feet pursuant to City zoning ordinances."

16 A    Correct.

17 Q    Can you talk to me about those City zoning ordinances?

18 A    The City -- well, basically, I'm just saying that for

19 every 200 square feet of land area, you get to build one

20 unit.  And the City zoning ordinance, I am not an expert in

21 that area at all.  All I know is the density and the number

22 of units that could be built.

23 Q    And does that -- does that zoning ordinance to which

24 you refer have an impact on your opinion about the layout of

25 the building that would have to be built as part of a

*Echo Reporting, Inc.*

83

1  development?

2  A     No.  The layout of the building was just my assessment

3  based on the size of the parking lot.  And again, my

4  visualization of how dense the property would be if you were

5  to go up multiple stories for a residential development.  I

6  am not an expert in zoning.  I am not an expert in

7  construction.  It's just my personal assessment as to what I

8  think.  It would be a rather dense development.  Again, the

9  key here is the economics of it.

10  Q     So you're not saying it's impossible or prohibited or

11  anything like that?

12  A     No.  No, I'm not saying that.

13  Q     And you're not an architect, so --

14  A     Correct.  I am not.

15  Q     Let's go ahead and for the time being talk about your

16  income approach.

17  A     Okay.

18  Q     On what page does that start in your appraisal?

19  A     The income approach starts at page 69.

20  Q     And you identify a number of comparables with respect

21  to your approach?

22  A     Yes.

23  Q     Are any of them in South Park?

24  A     They're in the South Park region, yes.

25  Q     You make certain adjustments due to the size of the

*Echo Reporting, Inc.*

152

1   close to being finished, like they'll be finished in a

2   couple of months.

3   A      Yes.

4   Q      None of the Debtor properties on the subject of this

5   proceeding are in that situation, are they, sir?

6   A      Yeah.  We have a building at 845 South Flower that we

7   believe will be finished hopefully in a month or so.

8   Q      I'm sorry.  I was being lawyer-technical.  I didn't

9   consider that in proceeding yet because it hasn't been added

10  to this proceeding yet as a pending issue.  Excluding 845

11  South Flower.

12  A      I don't exclude 845 South Flower.  It's a major project

13  for us.

14  Q      I'm sure.

15         Have you seen any evidence of an increased volume of

16  transactions for sale of properties like Desmond which is

17  undeveloped?

18  A      No.

19  Q      If you developed Desmond, have you made an assessment

20  of what the total project cost would be?

21  A      Well, there's two properties.  So we have costs of

22  approximately -- to build a building that we've designed

23  that's being processed through the City of about $18

24  million.

25  Q      Eighteen or 80?

163

1 didn't enter into your calculations in submitting this

2 declaration, did it?

3          MR. TEDFORD:  Can you ask the question again?  I'm

4 sorry.

5          MR. NASATIR:  Sure.

6 BY MR. NASATIR:

7 Q    I said, so this idea of separating the properties

8 between the parking lot and the building structure and

9 selling them separately, that didn't enter into this

10 declaration, did it?

11 A    No.  It says what it says.  It's only one paragraph.

12 Q    My point is, that's a new idea you just came up with.

13 A    Well, I think in paragraph eight, it says that we have

14 plans for the parking lot.

15 Q    Right.  But it's to make it into something else, not to

16 make -- not to sell it as a parking lot.  You're looking

17 at --

18 A    No.  Again, we believe -- we hope to develop the site.

19 Q    In any of your consideration of developing 425 West

20 Eleventh, have you come up with any per-square-foot cost

21 that would be associated with the development?

22 A    We're working with a contractor now to get -- to get

23 those construction costs.

24 Q    So in other words, since you've owned the building in

25 2005, we don't have any -- you haven't yet reached the point

*Echo Reporting, Inc.*

164

1 where you need or can tell anybody what the per-square-foot

2 cost associated with development would be?

3 A    Of the new structure?

4 Q    Of anything that you're planning to do with 425 West

5 Eleventh.

6 A    I just told you, $18 million.

7 Q    You told me that's the cost. You didn't tell me the

8 per-square-foot cost.

9 A    Oh, it's -- we're hoping to achieve approximately $200

10 a foot in hard costs, about $50 a foot in soft costs.

11 Q    How large is the project?

12 A    It's about 80,000 feet.

13 Q    So what's the per-square-foot cost on that? You know

14 I'm mathematically challenged.

15 A    About $16 million in hard costs and between 2 and $3

16 million of soft costs.

17 Q    So what's the per-square-foot cost, then? I need --

18 A    Okay. Well, hard costs are 200 and soft costs are 50.

19 Q    Okay. There you go. See, that's why you're there.

20      So it's $250 per square foot development costs?

21 A    Yes. No. I don't know what your development costs.

22 I'm saying hard and soft costs.

23 Q    Cost to development. Maybe that's --

24 A    No. Because I think -- I think some people refer to

25 development costs to include profit and land and carrying

*Echo Reporting, Inc.*

165

1 and other things.

2 Q    Okay.

3 A    I'm just telling you what the hard cost and the soft

4 cost component is.

5 Q    And I appreciate that clarification.

6      So therefore, to arrive at that hard and soft cost,

7 you're not including the land cost?

8 A    No.

9 Q    What would be the last cost that is predicted on a

10 development of this nature?  As a --

11 A    We already own it.

12 Q    Well, if you had to finance it, there would be costs

13 associated, would there not?

14 A    No.  We already own the property.  We would have to

15 finance whatever expenditures needed to be expended.

16 Q    That's the cost of financing I'm talking about.

17 A    So $18 million.

18 Q    That includes your --

19 A    Well, that could include equity and debt or all debt or

20 all equity or some combination thereof.

21 Q    Something here doesn't make sense to me.  And maybe

22 I'm -- you told me it's going to cost $18 million to develop

23 the property.

24 A    No.

25 Q    Maybe that's where I --

*Echo Reporting, Inc.*

166

1 A    The hard costs and soft costs are around -- we're

2 budgeting that number.

3 Q    So you're saying that in order to -- that includes

4 whatever amount of either financing you would need -- be

5 required, including whatever collateral you'd be required to

6 put up?

7 A    No.

8 Q    Let me put it a different way.  You say you own the

9 land, but it's subject to debt, right?

10 A    Yes.

11 Q    Yeah.  So does that $18 million number include paying

12 off the debt?

13 A    No.

14 Q    Well, if you simply added in the debt on Desmond,

15 that's going to take you, using rough numbers, 5 to $6

16 million in addition, right?

17 A    If we were to pay it off, yes.

18 Q    So you're assuming you're not going to pay it off for

19 the purposes of calculating the cost of developing this

20 property?

21 A    I said we don't have the financial plan finished yet,

22 no.  I can't say that.  It may involve paying off the debt.

23 Q    But that would have to cost you more than the 18 you've

24 just given me.

25 A    It's not -- paying off the debt is not a cost -- in my

*Echo Reporting, Inc.*

167



1  mind, is not a cost.

2  Q    Okay.  You understand, Mr. Meruelo, that Mr. -- let me

3  ask you this.  Do you believe Mr. Kerhart has any bias that

4  he brings to the table in presenting his appraisal?

5  A    I think in many appraisals, not -- I'm not talking

6  about this one specifically -- the client of the appraiser

7  influences what the purpose of the appraisal is and some of

8  the assumptions in relying on it.

9  Q    Has there been any evidence since you've been sitting

10 here that suggested that that type of influence has been

11 apparent?

12 A    I didn't say that.  I just said in many instances, a

13 client ordering an appraisal influences what that appraisal

14 looks like.

15 Q    I heard you.  I'm asking if you think that happened

16 here.

17 A    I don't have a comment on that.

18 Q    You haven't heard any evidence to suggest it has, have

19 you?

20 A    I just don't have an opinion on that.

21 Q    Do you concede that you could be accused of having some

22 interest or bias in presenting your valuation of the value

23 of Desmond?

24 A    Sure.

25 Q    So you bought the property in 2005 at 12 -- what was

201

1  certain mush quality about the number of months it might

2  take to get where you need to go.

3          Other than that, it would seem to me that having

4  corrected the Boyd Street duplication of numbers, I don't

5  think you're in disagreement on what they are, only whether

6  or not it should be default, nondefault.  And I've already,

7  I think, ruled on that.

8          MR. TEDFORD:  Yeah.  I don't remember in

9  particular.  I'd have to go back and check the spreadsheets

10 and stuff.

11         THE COURT:  Right.  Okay.

12     (Proceedings concluded.)

13

14

15

16         I certify that the foregoing is a correct

17 transcript from the electronic sound recording of the

18 proceedings in the above-entitled matter.

19

20 /s/Shonna Mowrer                    11/10/09
   Transcriber                         Date

21

   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

22

23
   /s/L.L. Francisco
24 L.L. Francisco, President
   Echo Reporting, Inc.
25

*Echo Reporting, Inc.*

# EXHIBIT 4