1  CHRISTOPHER E. PRINCE(State Bar No. 183553)
   cprince@lesnickprince.com
2  MATTHEW A. LESNICK (SBN 177594)
   matt@lesnickprince.com
3  Lesnick Prince LLP
   185 Pier Avenue, Suite 103
4  Santa Monica, CA 90405
   Telephone: (213) 291-8984
5  Facsimile:  (310) 396-0963

6  Attorneys for
   Charlestown Capital Advisors, LLC and
7  Hartland Asset Management Corporation

8              UNITED STATES BANKRUPTCY COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10             SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| 11  In re | Case No. 1:09-bk-13356-KT |
| 12  | Chapter 11 |
| 13  MERUELO MADDUX PROPERTIES, INC., et al., | CHARLESTOWN CAPITAL ADVISORS, LLC'S AND HARTLAND ASSET MANAGEMENT CORPORATION'S |
| 14          Debtor. | DISCLOSURE STATEMENT DESCRIBING JOINT PLAN OF REORGANIZATION OF MERUELO MADDUX PROPERTIES, INC., ET AL. |
| 15 | |
| 16 | |
| 17 | |
| 18 | Hearing<br>Date:        TBD |
| 19 | Time:       TBD<br>Place:      Courtroom 301 |
| 20 | 21041 Burbank Blvd.<br>Woodland Hills, CA 91367 |

21

22

23

24

25

26

27

28

THE STATEMENTS CONTAINED IN THE SHAREHOLDER DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THE SHAREHOLDER DISCLOSURE STATEMENT DOES NOT IMPLY THE INFORMATION HAS NOT CHANGED SINCE. HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ THE SHAREHOLDER DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE SHAREHOLDER PLAN, BEFORE VOTING.

THE SHAREHOLDER DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT, AND IT SUMMARIZES THE TERMS OF THE SHAREHOLDER PLAN.  IF THE SHAREHOLDER PLAN AND DISCLOSURE STATEMENT ARE INCONSISTENT, THE SHAREHOLDER PLAN WILL CONTROL. THE SHAREHOLDER DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE SHAREHOLDER PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE SHAREHOLDER PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THE SHAREHOLDER DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE XIII OF THE SHAREHOLDER DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE SHAREHOLDER PLAN.

WHERE THERE ARE SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THE SHAREHOLDER DISCLOSURE STATEMENT, SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND DO NOT SUBSTITUTE FOR THE FULL TEXT

1    OF THE APPLICABLE AGREEMENT.

2         THE SHAREHOLDER PROPONENTS BELIEVE THE SHAREHOLDER PLAN WILL

3    SUCCESSFULLY REORGANIZE THE DEBTORS AND THAT CONFIRMATION OF THE

4    SHAREHOLDER PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR

5    CREDITORS.  THE SHAREHOLDER PROPONENTS URGE IMPAIRED HOLDERS OF

6    CLAIMS OR INTERESTS TO VOTE TO ACCEPT THE SHAREHOLDER PLAN.

7                                              **I.**

8                                    **<u>INTRODUCTION</u>**

9         **A.      OVERVIEW**

10        Charlestown Capital Advisors, LLC and Hartland Asset Management, Inc. (the "Shareholder

11   Proponents") are shareholders of Meruelo Maddux Properties, Inc. ("MMPI").  The Shareholder

12   Proponents submit the Shareholder Disclosure Statement (the "Shareholder Disclosure Statement")

13   to provide Holders of Claims against and Interests in MMPI and/or its 53 related debtor entities

14   (each a "Debtor" and, collectively, the "Debtors" or the "Company") with adequate information

15   regarding the Shareholder Proponents' Joint Plan of Reorganization under Chapter 11 of the

16   Bankruptcy Code, dated July 9, 2010, (as the same may be amended, the "Shareholder Plan"). [1]

17        **The Shareholder Proponents own stock in MMPI, but they are not otherwise affiliated**

18   **with the company.  They do not have access to the Debtors' employees, advisors, attorneys or**

19   **internal documents.  Therefore, the Shareholder Plan and the Shareholder Disclosure**

20   **Statement include information based on the Debtors' statements in publicly available**

21   **documents (such as filings in these bankruptcy cases).  Except as specifically provided, the**

22   **Shareholder Proponents make no representations regarding the accuracy of the Debtors'**

23   **statements.**

24        The Shareholder Plan is a coordinated plan of reorganization and not a consolidated plan of

25   _____

26   [1] Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed
     to them in the Shareholder Plan, a copy of which is attached hereto as Exhibit "A." A term used, but

27   not defined herein or in the Shareholder Plan, but defined in the Bankruptcy Code, has the meaning
     given to that term in the Bankruptcy Code unless the context of the Shareholder Disclosure Statement

28   clearly requires otherwise. References to code sections are references to the Bankruptcy Code, except
     as otherwise stated.

reorganization.  In other words, except as specifically noted, each of the Debtors will remain a separate entity during and after the Shareholder Plan confirmation process, and the debts and liabilities of each debtor entity will remain attributable to that debtor alone.  Accordingly, the Debtors' Claims and Interests are classified on a Debtor-by-Debtor basis, votes will be tabulated on a Debtor-by-Debtor basis, and the Shareholder Plan will be confirmed on a Debtor-by-Debtor basis.

The Shareholder Plan provides for payment of all Claims in full.  If the Shareholder Plan is confirmed and becomes effective, the Reorganized Debtors will pay Allowed General Unsecured Claims the full value of their claim within 30 days of the Effective Date.  Secured Claims will also be paid in full but over time with interest.

The Shareholder Plan provides that the existing common stock of MMPI will be cancelled and new common stock in Reorganized MMPI will be issued.  Non-Insider Holders of MMPI stock will, at their option, receive either (a) $16.00 for each 100 shares of MMPI stock they Hold; or (b) a combination of $10.00 plus 1 share for each 100 shares of MMPI stock they Hold.  Insider Holders of MMPI stock will receive $16.00 for each 100 shares of stock they hold and will not have the option to receive stock in Reorganized MMPI.

New investors will purchase the remaining newly issued common stock in Reorganized MMPI.  The new investors will pay no less than $30 million for the new stock.  MMPLP will be merged into MMPI and MMPLP's equity interests will be cancelled.

Payments under the Shareholder Plan will be funded from the Reorganized Debtors' operations, the infusion of new capital (at least $30 million) on the Effective Date and the sale and/or refinance of certain of the Reorganized Debtors' assets. A detailed description of the Shareholder Plan is set forth in Article V of the Shareholder Disclosure Statement.

Upon entry of an order confirming the Shareholder Plan, the Shareholder Plan will be binding upon all creditors and shareholders regardless of whether an individual creditor or shareholder has voted in favor of the Shareholder Plan.  THE SHAREHOLDER PROPONENTS URGE YOU TO READ THE SHAREHOLDER DISCLOSURE STATEMENT AND THE SHAREHOLDER PLAN CAREFULLY.

**B.    EXHIBITS AND ADDITIONAL INFORMATION**

Attached as Exhibits to the Shareholder Disclosure Statement are copies of the following documents:

- The Shareholder Plan (Exhibit A);

- Order of the Bankruptcy Court dated August __, 2010 (the "Disclosure Statement Order"), among other things, approving the Shareholder Disclosure Statement and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Shareholder Plan (Exhibit B);

- Chart of the Debtors' Corporate Structure: Prepetition List of the Debtors (Exhibit C);

- Loan Modification Agreements (Exhibit D);

- The Debtors' Projected Financial Information (Exhibit E);

- The Debtors' Unexpired Leases and Executory Contracts (Exhibit F);

- The Debtors' Liquidation Analysis (Exhibit G);

- The Claims and Interests of the Debtors (Exhibit H);

  - List of Administrative Expense Claims (Exhibit H. 1)

  - List of Class `B" Priority Unsecured Claims (Exhibit H.2);

  - List of Class "C" General Unsecured Claims — Tenant Security Deposit Claims (Exhibit H.3);

  - List of Class "C" General Unsecured Claims -- Convenience Class (Exhibit H.4);

  - List of Class "C" General Unsecured Claims (Exhibit H.5);

  - List of Class "C" Unsecured Guaranty Claims (Exhibit H.6);

  - List of Class "D" Intercompany Claims (Exhibit H.7);

  - List of Class "E" Interests (Exhibit H.8);

- List of Debtors' Transfers During the 90-Day and One-Year Avoidance Periods (Exhibit I);

1        • Debtors' Property Valuations (Exhibit J);

2        • Amended and Restated Certificate of Incorporation (Exhibit K);

3        • Bylaws of Reorganized MMPI (Exhibit L);

4        • Agreement and Plan of Merger (Exhibit M); and

5        • Addendum of historical financial information.

6        MMPI has filed public reports with the Securities and Exchange Commission ("SEC")

7 which contain additional information about the Company and its historic financial performance. The

8 most recent filings are: 10-K for the year ended December 31, 2008 (filed on March 16, 2009),

9 Amended 10-K for the year ended December 31, 2008 (filed on April 30, 2009), 10-Q for the

10 quarter ended March 31, 2009 (filed on September 9, 2009), 10-Q for the quarter ended June 30,

11 2009 (filed on September 17, 2009) and 10-Q for the quarter ended September 30, 2009 (filed on

12 November 9, 2009). On January 19, 2010, MMPI filed its Certification and Notice of Termination

13 of Registration under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty

14 to File Reports under Section 13 and 15(d) of the Securities Exchange Act of 1934 and accordingly,

15 the Debtor is no longer required to file public reports with the SEC.

16        You may obtain copies of these documents from:

17        • The SEC's website at: *http://www.sec.gov/edgar/searchedgar/companysearch.html*;

18 The Company's website (under "Investor Relations") at:

19 *http://www.meruelomaddux.com/noflash/index.php* or

20        • By requesting them in writing from:

Meruelo Maddux Properties, Inc.
761 Terminal Street
Building 1, 2nd Floor
Los Angeles, CA 90021
Attn: Mr. Todd Nielsen

21

22

23

24        A Ballot for the acceptance or rejection of the Shareholder Plan is also enclosed with the

25 Shareholder Disclosure Statement submitted to the Holders of Claims and Interests that are entitled

26 to vote to accept or reject the Shareholder Plan.

27        On [_____], 2010, after notice and a hearing, the Bankruptcy Court entered the

28

6

Disclosure Statement Order, approving the Shareholder Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Shareholder Plan. APPROVAL OF THE SHAREHOLDER DISCLOSURE STATEMENT DOES NOT MEAN THE BANKRUPTCY COURT HAS RULED ON THE MERITS OF THE SHAREHOLDER PLAN. THE BANKRUPTCY COURT HAS NOT CONFIRMED THE SHAREHOLDER PLAN DESCRIBED IN THE SHAREHOLDER DISCLOSURE STATEMENT, AND THE TERMS OF THE SHAREHOLDER PLAN ARE NOT BINDING ON ANYONE. IF THE BANKRUPTCY COURT CONFIRMS THE SHAREHOLDER PLAN, HOWEVER, THE SHAREHOLDER PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL HOLDERS OF CLAIMS OR INTERESTS IN THOSE CHAPTER 11 CASES WHERE THE PLAN IS CONFIRMED.

The Disclosure Statement Order describes the deadlines, procedures and instructions for voting to accept or reject the Shareholder Plan and for filing objections to confirmation of the Shareholder Plan, and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each Holder of a Claim or Interest entitled to vote on the Shareholder Plan should read the Shareholder Disclosure Statement, the Shareholder Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Shareholder Plan. These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Shareholder Plan may be made except under Bankruptcy Code Section 1125.

## C.      HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE

Only Holders of Allowed Claims or Interests who are impaired and who will receive a distribution under the Shareholder Plan are entitled to vote to accept or reject the Shareholder Plan. Holders of unimpaired Claims or Interests are deemed to accept the Shareholder Plan and are not entitled to vote. Holders of Claims or Interests who receive nothing are deemed to have rejected the Shareholder Plan and are not entitled to vote. For a detailed description of the treatment of Claims

and Interests under the Shareholder Plan, see Article V of the Shareholder Disclosure Statement.

The following Classes of Claims and Interests are impaired, and Holders of Allowed Claims and Interests in those Classes will receive distributions under the Shareholder Plan. As a result, Holders of Claims and Interests in those Classes are entitled to vote to accept or reject the Shareholder Plan:

- Classes 1OA, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1, 28A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 50A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of secured tax Claims against the Debtors);

- Classes 21A-2, 28A-2, 29A-2, 29A-3, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 37A-2, 37A-3, 38A-2, 39A-2, 40A-2, 41A-2, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors against each relevant Debtor);

- Classes 1C-3, 2C-3, 3C, 4C-2, 5C-2, 6C, 7C, 8C-2, 9C-2, IOC-2, 11C-3, 12C-3, 13C-2, 14C-3, 15C-2, 16C-2, 17C, 18C-2, 19C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3, 27C-3, 28C-3, 29C-2, 30C-3, 31C-2, 32C, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3, 40C-3, 41C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3, 53C, and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor); and

- Class 1 E (the Class of Interests of MMPI).

The following Classes of the Shareholder Plan are unimpaired. Holders of Claims and Interests in those Classes are not entitled to vote because they are presumed to have accepted the Shareholder Plan:

- Classes 1B, 5B, 32B, 33B, 36B and 52B, (consisting of the Priority Unsecured Benefits Claims of present and former employees of each relevant Debtor);

- Classes 11C-1, 12C-1, 14C-1, 15C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1, 32C-1, 33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 41C-1, 43C-3, 44C-3, 46C-3, 48C-3, 49C-3, 52C-1 and 54C-1 (consisting of the unsecured Claims for security deposits of

the Debtors' tenants);

- Classes 2D through 7D, 9D-35D, and 37D-53D (consisting of the Intercompany Claims);

- Classes 3E through 54E (consisting of the Interests of MMPLP, MMP Ventures, LLC ("MMP Ventures"), Meruelo Maddux Construction, Inc. ("MM Construction") and Meruelo Maddux Management, LLC ("MM Management")).

The following Class of Interests is being extinguished and, therefore, Holders of Interests in the Class are deemed to reject the Shareholder Plan and are not entitled to vote:

- Class 2E (Interests in MMPLP).

Under the Bankruptcy Code, a Chapter 11 plan of reorganization may be confirmed if each Class of Impaired Claims and Interests votes to accept that plan. Bankruptcy Code Section 1126(c) defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Allowed Claims in that Class who vote. Under Bankruptcy Code Section 1126(d), a Class of Interests accepts a plan if, of those Holders voting, Holders of two-thirds of the Interests (in amount) vote to accept that plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. For a more detailed description of the requirements for confirmation of the Shareholder Plan, see Article IX of the Shareholder Disclosure Statement.

With respect to each Debtor's Chapter 11 Case, a Class of Claims entitled to vote on the Shareholder Plan rejects the Shareholder Plan, the Shareholder Proponents reserve the right to amend the Shareholder Plan or request confirmation of the Shareholder Plan pursuant to Section 1129(b) of the Bankruptcy Code or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of the Shareholder Plan by one or more impaired Classes of Claims or Interests. Under that Section, a Plan may be confirmed by a Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Class. For a more detailed description of the requirements for confirmation of a

nonconsensual Plan, see Article IX of the Shareholder Disclosure Statement.

For each Debtor, in the event at least one Impaired Class of Claims votes to accept the Shareholder Plan (and at least one Impaired Class either votes to reject the Shareholder Plan or is deemed to have rejected the Shareholder Plan), such Debtor shall request the Bankruptcy Court to confirm the Shareholder Plan under the cramdown provisions of Section 1129(b) of the Bankruptcy Code.

### D.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Shareholder Plan, in the Chapter 11 Case in which you have an Allowed Claim, a Ballot is enclosed for the purpose of voting on the Shareholder Plan. If you hold Claims in more than one Class or against more than one Debtor and you are entitled to vote each of such claims, you will receive separate Ballots for each case in which you are entitled to vote and for each separate Class of Claims for which you are entitled to vote. Please vote and return your Ballot(s) to:

[Balloting Agent]

DO NOT RETURN ANY NOTES OR SECURITIES WITH YOUR BALLOT. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE SHAREHOLDER PLAN MUST BE RECEIVED BY NO LATER THAN [_____] P.M., LOS ANGELES TIME, ON [_____], 2010. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE SHAREHOLDER PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE SHAREHOLDER PLAN.

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is scheduled by the relevant Debtor as unliquidated, disputed or contingent and for which no proof of Claim has been filed is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Shareholder Plan.

1        If you are a holder of a Claim entitled to vote on the Shareholder Plan and did not receive a

2   Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the

3   Shareholder Disclosure Statement, the Shareholder Plan or the procedures for voting on the

4   Shareholder Plan, please email the Debtors' counsel at:  cprince@lesnickprince.com

5       **E.**     **CONFIRMATION HEARING**

6        Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on

7   [_____]  2010 commencing at [_____]1 Los Angeles Time, before the

8   Bankruptcy Court, the Honorable Kathleen Thompson, Presiding, Courtroom 301, 21041 Burbank

9   Blvd., Woodland Hills, California 91367. The Bankruptcy Court may adjourn the Confirmation

10  Hearing from time to time without further notice except for the announcement of the adjournment

11  date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

12       Any objection to confirmation must be made in writing and specify in detail the name and

13  address of the objector, all grounds for the objection and the amount of the Claim or number of

14  shares of stock held by the objector. Any such objection must be filed with the Bankruptcy Court

15  and served so that it is received by the Bankruptcy Court, the Official Committee of Unsecured

16  Creditors Appointed (the "Creditors Committee") and the Debtors on or before _____, 2010.

17  Objections to confirmation of the Shareholder Plan are governed by Bankruptcy Rule 9014.

18      **F.**     **NOTICES**

19       All notices, requests and demands hereunder to be effective must be in writing and unless

20  otherwise expressly provided herein, shall be deemed to have been duly given or made when

21  actually delivered by U.S. Mail or email addressed as follows:

22

23

24  SHAREHOLDER PROPONENTS         COUNSEL TO THE SHAREHOLDER PROPONENTS

25                                       **Christopher E. Prince**
                                         **Lesnick Prince LLP**

26                                       185 Pier Avenue, Suite 103
                                         Santa Monica, CA  90405

27                                       direct     213.291.8984
                                         facsimile   310.396.0963

28                                       cprince@lesnickprince.com

## II.

### DEBTORS' BUSINESS AND OPERATIONS PRIOR TO THE FILING

#### A.    CORPORATE HISTORY OF THE DEBTORS

MMPI is the parent company of the fifty-three related Debtor entities that, along with MMPI, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 26 and 27, 2009. A list of each of the Debtors is attached as part of Exhibit "C." MMPI was incorporated in 2006 under the laws of the State of Delaware and is registered with the California Secretary of State to do business in the State of California. Each of the other Debtors was formed under either the laws of the State of Delaware or the laws of the State of California. The Delaware Debtors are registered with the California Secretary of State to do business in the State of California.

#### B.    NATURE OF THE DEBTORS' BUSINESS

MMPI, together with its subsidiary operating partnership, MMPLP, and its affiliates and related entities, is a self-managed, full-service real estate company that develops, redevelops and owns industrial, commercial and multi-unit residential real properties primarily located in downtown Los Angeles and other areas in southern California. The Company focuses on unique properties that it believes have an alternate, more profitable use achievable through major renovation, redevelopment or development. The Company's projects are predominantly located in a densely populated urban, multi-ethnic environment and involve numerous local entitlement, property assemblage and physical challenges.

The Company is committed to responsible property investing that has economic, environmental and social benefits. Its development activities include urban infill projects that are expected to meet the demands of urban communities and that utilize or upgrade existing infrastructure instead of creating new infrastructure. The Company is known as a "smart growth" developer, and many of the Company's projects are designed to locate businesses, customers and employees close to each other and close to existing public transit systems. The Company is also

1  known as an "incubator" of new businesses, actively seeking development projects in empowerment

2  zones. The Company is very familiar with the social, cultural, business and political issues of land

3  development in Southern California, and especially the Los Angeles area.

4          The Company's business model anticipates the need for time to develop properties and

5  requires the infusion of funds to pay the costs of such development, including the carrying costs.

6  Many of the Company's properties have gone through the land use process to the point where

7  entitlements have been obtained thus increasing the value substantially, but development has been

8  deferred pending an improvement in the credit markets. In summary, the Company's business model

9  contemplates and is based upon the purchase, development and resale of properties, pursuant to

10  which the Company turns over such properties in a relatively short period of time, such as a few

11  years instead of decades, and uses the profit from such properties to fund operations of MMPI and

12  all of its other affiliates and the purchase and development of other properties.

13          Currently, the Company owns in excess of forty discrete properties consisting in some cases

14  of a number of parcels, some of which generate income and others of which are in various stages of

15  development. With approximately 80 acres of land, the Company is believed to be the largest non-

16  government land owner in downtown Los Angeles.

17          Properties the Debtors currently own include the following:

18          **1.      210 — 212 and 230 West Avenue 26, Los Angeles**

19          The subject property is owned by Meruelo Maddux-230 W. Avenue 26, LLC ("MM 230 W.

20  Avenue 26") and is unencumbered. The property is located at the corner of Humboldt Street and

21  West Avenue 26 near the Northeast boundary of downtown Los Angeles. It is comprised of one

22  property totaling approximately 1.8 acres of land which has been improved with a group of multi

23  tenant industrial buildings consisting of approximately 67,671 net rentable square feet. As of March

24  31, 2010, the improvements were leased to five tenants occupying approximately 30% of the total

25  rentable area. Two of the tenants, occupying 33% of the rented space are on month to month

26  tenancies. The average occupancy for month to month tenants is 47 months. The largest tenant

27  occupies 6.9% of the total area. The property is currently being utilized as an industrial and

28

1    distribution space facility.

2        This property is an example of how MMPI services the multitude of business owners and

3    their numerous employees who are involved in the (a) design, (b) production and (c) distribution

4    sectors of the garment industry in downtown Los Angeles.

5            **2.    306 — 330 North Avenue 21, Los Angeles**

6        The subject property is owned by Meruelo Maddux Properties-306-330 N. Avenue 21, LLC

7    ("MMP 306-330 N. Avenue 21") and is unencumbered. The property is located near the corner of

8    Humboldt Street and North Avenue 21 near the Northeast boundary of downtown Los Angeles. It is

9    comprised of approximately 1.1 acres which have been improved with industrial buildings

10   consisting of approximately 80,712 net rentable square feet. As of March 31, 2010, the

11   improvements were leased to five tenants occupying approximately 30% of the total rentable area.

12   All of the tenants are on month to month tenancies. The average occupancy for month to month

13   tenants is 34 months. The largest tenant occupies 13.4% of the total area. The property is currently

14   being utilized as an industrial and distribution space facility.

15       This property is an example of how MMPI services the multitude of business owners and

16   their numerous employees who are involved in the (a) design, (b) production and (c) distribution

17   sectors of the garment industry in downtown Los Angeles.

18           **3.    1000 East Cesar Chavez, Los Angeles**

19       The subject property is owned by Meruelo Maddux-1000 E. Cesar Chavez, LLC ("MM

20   1000 E. Cesar Chavez") and is unencumbered. The property is comprised of four separate properties

21   located near the Northeast boundary of downtown Los Angeles. Specifically, properties one and

22   two are located at the corner of East Cesar Chavez Avenue and North Mission Road and properties

23   three and four are located east of the parking lot on East Cesar Chavez Avenue. The subject

24   property is improved with an industrial building, parking lot, and two single-family residences and

25   totals approximately 1.6 acres consisting of approximately 50,373 net rentable square feet. As of

26   March 31, 2010, the improvements were leased to seven tenants occupying approximately 17% of

27   the total rentable area. All of the tenants are on month to month tenancies. The average occupancy

28

for month to month tenants is 39 months. The largest tenant occupies 6.6% of the total area. The non-residential portion of the property is currently being utilized as an industrial and distribution space facility.

This property is home to an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

### 4.    2415 East Washington Boulevard, Los Angeles

The subject property is owned by Meruelo Maddux-2415 E. Washington Blvd., LLC ("MM 2415 E. Washington Boulevard"). As a result of the Debtors' settlement with Imperial Capital Bank, a division of City National Bank, a national banking association ("Imperial") and Bankruptcy Court approval thereof, the property is encumbered by a lien in favor of Imperial. The property is located near the corner of South Santa Fe Avenue and East Washington Boulevard, adjacent to Santa Fe Commerce Center, near the Southeast Industrial part of downtown Los Angeles. It is comprised of one property totaling approximately 0.5 acres which has been improved with an industrial building consisting of approximately 18,500 net rentable square feet. As of March 31, 2010, the improvements were not leased. The property is currently a multi-tenant industrial space facility.

This property is intended to be used by an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

### 5.    1211 East Washington Boulevard, Los Angeles

The subject property is owned by Merco Group-1211 E. Washington Boulevard, LLC ("MG 1211 East Washington Boulevard") and is unencumbered. The property is located at the corner of Washington Boulevard and South Central Avenue just south of the Interstate 10 Freeway in downtown Los Angeles. It is comprised of three properties totaling approximately 2.0 acres which have been improved with a multi-tenant industrial building and a retail plaza consisting of approximately 113,479 net rentable square feet. The third property is a parking lot. As of March 31, 2010, the improvements were leased to seven tenants occupying approximately 73.2% of the total rentable area. Two of the tenants, occupying 46% of the rented space are on month to month tenancies. The average occupancy for month to month tenants is 35 months. The largest tenant

1    occupies 31.6% of the total area. The property is currently being utilized primarily as a garment

2    manufacturing space.

3         This property is an example of how MMPI services the multitude of business owners and

4    their numerous employees who are involved in the (a) design, (b) production and (c) distribution

5    sectors of the garment industry in downtown Los Angeles.

6         **6.    13853, 13822 and 13916 Garvey Avenue, 13904 Corak Street and 3060**

7         **Feather Avenue, Baldwin Park**

8         The subject property is owned by Meruelo Baldwin Park, LLC and is unencumbered. The

9    property is located at the intersection of Francisquito Avenue and the Interstate 10 Freeway in

10    Baldwin Park, California. It is comprised of approximately 6.3 acres of land and improvements

11    containing approximately 3,878 net rentable square feet which include two single-family residences.

12    As of March 31, 2010, the improvements were leased to three tenants occupying approximately

13    100% of the total rentable area. All of the tenants are on month to month tenancies. The average

14    occupancy for month to month tenants is 43 months. The largest tenant occupies 40.3 % of the total

15    building area. The largest component of this property is unimproved land immediately adjacent to

16    the Interstate 10 Freeway.

17         This property is intended to be a retail development as a compliment to the garment,

18    produce, multi-tenant and residential activities of MMPI.

19         **7.    1910 - 1922 Santa Fe Avenue, 2425 East 12th Street and 303 South**

20         **Hewitt, Los Angeles**

21         The subject property is owned by Santa Fe & Washington Market, LLC ("Santa Fe &

22    Washington Market"). The subject property includes three separate properties of which one is

23    located in the Arts District of downtown Los Angeles at 303 South Hewitt Street and two of which

24    are located adjacent to the Santa Fe Commerce Center at 1910-1922 Santa Fe Avenue and 2425

25    East 12th Street in downtown Los Angeles. The property located at 303 South Hewitt Street has

26    been improved with a fifty-four unit apartment building. The two industrial buildings located at

27    1910-1922 Santa Fe Avenue and at 2425 East 12th Street contain approximately 52,040 net rentable

28

square feet in the aggregate. As of March 31, 2010, the improvements were leased to forty-six tenants occupying approximately 80% of the total rentable area. Forty-two of the tenants, occupying 27% of the rented space are on month to month tenancies. The average occupancy for month to month tenants is 47 months. The largest tenant occupies 27.2% of the total area.

Pursuant to a settlement with Imperial, the properties located at 1910-1922 Santa Fe Avenue are encumbered by a lien in favor of Imperial.

The property at 1910-1922 Santa Fe Avenue is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles. The property at 2425 East 12th Street is tenanted by small business owners prevalent in downtown Los Angeles whereby the Company looks to support and be a helping hand in incubating their businesses. The property at 303 S Hewitt is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 8. 5701 and 5707 - 5715 South Alameda Street and 5016 Alba Street, Los Angeles

The subject property is owned by Merco Group - 5707 S. Alameda, LLC ("MG 5707 S. Alameda") and is unencumbered. The property is located in a major trucking thoroughfare immediately south of downtown Los Angeles. It is comprised of two separate properties totaling approximately 1.9 acres of which one property has been improved with a multi-tenant industrial building consisting of approximately 55,729 net rentable square feet. The second property includes an additional non-contiguous land parcel one block away that can be utilized as pallet storage. As of March 31, 2010, the improvements were leased to five tenants occupying approximately 51.0% of the total rentable area. A sixth tenant leases the pallet storage area. Four of the tenants, occupying 96% of the rented space are on month to month tenancies. The average occupancy for month to month tenants is 35 months. The largest tenant occupies 19.9% of the total area. The property is

1  currently being utilized as a multi-tenant industrial space facility.

2  This property is an example of how MMPI services the multitude of business owners and

3  their numerous employees who are involved in the (a) design, (b) production and (c) distribution

4  sectors of the garment industry in downtown Los Angeles.

5  ### 9.    3rd & Omar Street, Los Angeles

6  The subject property is owned by Meruelo Maddux - 3rd & Omar Street, LLC ("MM 3rd &

7  Omar Street") and is encumbered by a lien in favor of Legendary Investors Group No. 1, LLC, as

8  successor to East West Bank ("Legendary"). The property is located at 3rd & Omar Streets near the

9  Little Tokyo area of downtown Los Angeles. It is comprised of two properties totaling

10  approximately 0.5 acres of which one has been improved with a multi-tenant building consisting of

11  approximately 23,298 net rentable square feet and the other is being utilized as a parking lot. As of

12  March 31, 2010, the improvements were leased to one tenant occupying approximately 10.0% of

13  the total rentable area. The tenant is on a month to month tenancy. The average occupancy for

14  month to month tenants is 34 months. The ground floor of this property, where the current tenant is

15  located, is currently being utilized as retail/wholesale storefront facility.

16  This property is intended to be used by an assortment of small business owners prevalent in

17  downtown Los Angeles whereby the Company looks to support and incubate their businesses.

18  ### 10.    420 Boyd Street, Los Angeles

19  The subject property is owned by Meruelo Maddux - 420 Boyd Street, LLC ("MM 420

20  Boyd Street") and is encumbered by a lien in favor of Legendary. The property is located at 420

21  Boyd Street near the Little Tokyo area of downtown Los Angeles. It is comprised of two properties

22  totaling approximately 0.6 acres which have been improved with a multi-tenant building consisting

23  of approximately 47,806 net rentable square feet and a parking lot. As of March 31, 2010, the

24  improvements were leased to eleven tenants occupying approximately 57 % of the total rentable

25  area. Six of the tenants, occupying 67% of the rented space are on month to month tenancies. The

26  average occupancy for month to month tenants is 94 months. The largest tenant occupies 12.6% of

27  the total area. The property is currently being utilized as multi-tenant office space, a restaurant

28

1   facility and a parking lot.

2      This property is intended to be used by an assortment of small business owners prevalent in

3   downtown Los Angeles whereby the Company looks to support and incubate their businesses.

4      **11.    760 South Hill Street, and 325 West 8th Street, Los Angeles (The Union**

5          **Lofts)**

6      The subject property is owned by Meruelo Maddux Properties - 760 South Hill Street, LLC

7   ("MMP 760 S. Hill Street") and is encumbered by a lien in favor of Bank of America, N.A.

8   ("BofA"). The property is located at the corner of West 8th Street and South Hill Street in

9   downtown Los Angeles. It is comprised of one property totaling approximately 0.3 acres which has

10  been improved with a ninety-two unit condominium building currently in lease-up. The building is

11  newly restored and converted former bank headquarters originally built in the 1920s consisting of

12  approximately 94,270 net rentable square feet. Space located on the ground floor is intended for a

13  restaurant tenant. As of March 31, 2010, the improvements are leased to sixty-nine tenants

14  occupying approximately 5.77% of the total rentable area.

15     This property is an example of how the Company focuses its expertise and downtown

16  knowledge base on supplying residential units to individuals. This effort is geared towards (a) high

17  density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

18     **12.    788 South Alameda, Los Angeles**

19     The subject property is owned by 788 South Alameda, LLC ("788 South Alameda") and is

20  encumbered by a lien in favor of California Bank & Trust. The property is located at 788 South

21  Alameda Street across the street from Alameda Square in downtown Los Angeles. It is comprised

22  of one property totaling approximately 2.3 acres which has been improved with a newly constructed

23  modern produce market that is home to numerous small produce tenants consisting of

24  approximately 33,984 net rentable square feet. As of March 31, 2010, the improvements were

25  leased to twenty-four tenants occupying approximately 75% of the total rentable area. All of the

26  tenants are on month to month tenancies. The average occupancy for month to month tenants is 17

27  months. The property is currently being utilized as a small-tenant produce industry space with

28

1    coolers.

2        This property is an example of the Company's (a) significant expertise and presence and (b)

3    focus on providing tailored solutions for a variety of space needs of the many small businesses in

4    the food and produce distribution industry in downtown Los Angeles.

5                    **13.    905 8th Street, Los Angeles**

6        The subject property is owned by 905 8th Street, LLC ("905 8th Street") and is encumbered

7    by a lien in favor of The Stanford Group, L.P. ("Stanford"). The property is located at 905 8th Street

8    in downtown Los Angeles. It is comprised of one property totaling approximately 0.9 acres which

9    has been improved with a multi-tenant industrial building consisting of approximately 28,200 net

10    rentable square feet. As of March 31, 2010, the improvements were leased to seven tenants

11    occupying approximately 23.6 % of the total rentable area. All of the tenants are on month to month

12    tenancies. The average occupancy for month to month tenants is 23 months.

13        This property is an example of the Company's (a) significant expertise and presence and (b)

14    focus on providing tailored solutions for a variety of space needs of the many small businesses in

15    the food and produce distribution industry in downtown Los Angeles.

16                **14.    Alameda Produce Market, Los Angeles (Including Alameda Square and**

17                    **Seventh Street Produce Market)**

18        The subject property is owned by Alameda Produce Market, LLC ("Alameda Produce

19    Market") and includes (a) four industrial buildings totaling 1,585,816 square feet of net rentable

20    area on approximately 20.2 acres that is home to American Apparel ("Alameda Square"), (b) a

21    multi-tenant produce market known as the Seventh Street Produce Market with 122,120 square feet

22    of net rentable area, (c) an unencumbered parking structure located at 1215 East 7th Street whose

23    use has been donated to the Center City East Association to provide aid to homeless people and (d)

24    an unencumbered parking lot located at 1339 East 7th Street that is subject to an eminent domain

25    proceeding with the MTA. The Alameda Square and Seventh Street Produce Market properties are

26    subject to a lien in favor of Cathay Bank ("Cathay").

27        In regards to Alameda Square it is 59.3% occupied with eleven tenants and the largest tenant

28

1    is American Apparel who leases more than 55% of the area.

2         In regards to the Seventh Street Produce Market it is 65.3% leased. A significant portion of

3    the vacant space is unusable currently and is in the process of being approved to be improved so

4    that it can be leased.

5         Alameda Square has been an example of two characteristics of MMPI's overall operations.

6         First, it serves as an example of how MMPI incubates small business owners in the case of

7    American Apparel that now occupies more than 10 times more space than it initially did and

8    employs approximately 5,000 workers daily at Alameda Square. Second, it is an example of how

9    the Company services business owners and their numerous employees who are involved in the (a)

10   design, (b) production and (c) distribution sectors of the garment industry in downtown Los

11   Angeles. Seventh Street Produce Market is an example of the Company's (a) significant expertise

12   and presence and (b) focus on providing tailored solutions for a variety of space needs of the many

13   small businesses in the food and produce distribution industry in downtown Los Angeles. The

14   portion of the property located at 1339 East 7th Street is currently the subject of litigation between

15   Alameda Produce Market and the Metropolitan Transit Authority ("MTA") which initiated eminent

16   domain proceedings. The Company asserted that the MTA did not properly pursue such

17   proceedings and the MTA's case was dismissed. The case has been appealed by the MTA and

18   Alameda Produce Market believes it has claims against the MTA for, among other things, the value

19   of the Company's lost use of the property during the numerous years that the property has been

20   possessed by the MTA. In the event the MTA is successful in taking the property, the Company will

21   have a Claim against the MTA for the fair value thereof, among other things less amounts

22   previously paid to lenders.

23                    **15.    1500 Griffith Avenue, Los Angeles**

24        The subject property is owned by Merco Group - 1500 Griffith Avenue, LLC ("MG 1500

25   Griffith Avenue"). The property is located at the corner of Griffith Avenue and East 16th Street in

26   downtown Los Angeles. It is comprised of two separate properties totaling approximately 2.0 acres

27   which have been improved with two buildings consisting of approximately 50,058 net rentable

28

square feet. One property is encumbered by a lien in favor of Yoshiaki & Fumiko Murakami and the other property is encumbered by a lien in favor of Legendary. As of March 31, 2010, the improvements were leased to three tenants occupying approximately 100% of the total rentable area. One of the tenants, occupying 12% of the rented space is on a month to month tenancy. The average occupancy for month to month tenants is 39 months. One lease is subject to renewal in 2011. The largest tenant occupies 60% of the total area. The property is currently being utilized as a distribution facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

### 16.    1919 Vineburn Street, Los Angeles

The subject property is owned by Meruelo Maddux Properties - 1919 Vineburn Street, LLC ("MMP 1919 Vineburn Street") and is encumbered by a lien in favor of Imperial. The property is located at 1919 Vineburn Street just north of downtown Los Angeles. It is comprised of one property totaling approximately 5.8 acres which has been improved with a single-tenant distribution building consisting of approximately 122,345 net rentable square feet. As of March 31, 2010, the improvements were 100% leased to one tenant. The property is currently being utilized as a single-tenant distribution space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

### 17.    2131 Humboldt Street, Los Angeles

The subject property is owned by Meruelo Maddux Properties - 2131 Humboldt Street, LLC ("MMP 2131 Humboldt Street") and is partially encumbered by a lien in favor of Vahan & Anoush Chamlian ("Chamlian"). The subject property is located at the corner of Interstate 5 Freeway and Humboldt Street near the Northern boundary of downtown Los Angeles. It is comprised of approximately 6.0 acres which has been partially improved with industrial buildings consisting of

approximately 31,319 net rentable square feet. The largest component of this property is unimproved land, which is encumbered and located at 2131 Humboldt Street and contains approximately 214,000 square feet of land with no improvements. This portion of the property is used from time to time for film shoots and associated parking.

The unencumbered portion is located at 336-346 and 350-354 North Avenue 21. It contains approximately 17,415 square feet of land and improvements containing approximately 14,668 square feet of space. As of March 31, 2010, the improvements were leased to one tenant occupying approximately 17% of the total rentable area. The tenant is on a month to month tenancy. The average occupancy for month to month tenants is 44 months. The improved portion of the property is currently being utilized as an industrial and distribution space facility.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of downtown Los Angeles space users both by itself or with other properties located in the same area and owned by other Debtors.

### 18.    2529 Santa Fe Avenue, Vernon (Santa Fe Plaza)

The subject property is owned by Merco Group — 2529 Santa Fe Avenue, LLC ("MG 2529 Santa Fe Avenue") and is encumbered by a lien in favor of 1248 Figueroa Street, LLC ("1248 Figueroa"). The property is located in Vernon, California totaling approximately 1.3 acres which has been improved with a newly constructed retail plaza that opened in 2009' consisting of approximately 16,000 net rentable square feet. As of March 31, 2010, a portion of the improvements were leased to a restaurant occupying approximately 29.4% of the total rentable area with the lease expiring on April 30, 2013. The property is currently in lease up.

This property is an example of the development of urban in-fill property to satisfy the sometimes non-institutional needs of small businesses in downtown Los Angeles.

### 19.    2640 East Washington Boulevard, Los Angeles (Washington Produce Market)

The subject property is owned by 2640 Washington Boulevard, LLC ("2640 Washington Boulevard") and is encumbered by a lien in favor of East West Bank as successor to United

Commercial Bank ("UCB"). The property is located at 2640 East Washington Boulevard just south of downtown Los Angeles. It is comprised of one property totaling approximately 2.8 acres which has been improved with a newly constructed modern produce center consisting of approximately 31,876 net rentable square feet. As of March 31, 2010, the improvements were leased to twenty-eight tenants occupying approximately 88.0% of the total rentable area. Twenty-seven of the tenants, occupying 97% of the rented space, are on month to month tenancies. The average occupancy for month to month tenants is 15 months. The largest tenant occupies 17.8% of the total area. The property is currently being utilized as a small-tenant produce industry space with coolers.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

### 20.    2951 Lenwood Road, Barstow (Barstow Produce Center)

The subject property is owned by Meruelo Maddux Properties - 2951 Lenwood Road, LLC ("MMP 2951 Lenwood Road") and is encumbered by a secured lien in favor of FNBN-CMLCOM I, LLC ("FNBN"). The property is located at the intersection of Lenwood Road and the Interstate 15 Freeway in Barstow, California. It is comprised of several properties totaling 75.0 acres which has been partially improved with three buildings consisting of approximately 261,650 net rentable square feet. The three buildings are comprised of a single-tenant cross dock building, a truck maintenance building, and a newly constructed multi-tenant cold storage building for produce tenants. As of March 31, 2010, the improvements were not leased.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry.

### 21.    3185 East Washington Boulevard, Los Angeles (Washington Cold Storage)

The subject property is owned by Merco Group -- 3185 E. Washington Boulevard, LLC ("MG 3185 E. Washington Boulevard"). The property is commonly known as 3185 East

1    Washington Boulevard in downtown Los Angeles. It is comprised of two parcels. The main, largest

2    parcel is encumbered by a lien in favor of Chinatrust Bank (U.S.A.) ("Chinatrust"), and totals

3    approximately 2.7 acres which has been improved with a cold storage facility consisting of

4    approximately 59,000 net rentable square feet. As of March 31, 2010, the improvements were

5    leased to a tenant occupying 100% of the total rentable area. The property is currently being utilized

6    as a single-tenant cold storage facility. MG 3185 E. Washington Boulevard also owns a small parcel

7    across Washington Boulevard which is unencumbered.

8         This property is an example of the Company's (a) significant expertise and presence and (b)

9    focus on providing tailored solutions for a variety of space needs of the many small businesses in

10   the food and produce distribution industry in downtown Los Angeles.

11        **22.    620, 643 and 644 South Gladys Avenue, 830 - 838 East 6th Street and 647**

12        **- 649 Ceres Avenue, Los Angeles**

13        The subject property is owned by Merco Group-620 Gladys Avenue, LLC ("MG 620 Gladys

14   Avenue") and is partially encumbered by a lien in favor of Legendary. The property generally is

15   located at the corner of South Gladys Avenue and East 6th Street in the Seafood District of

16   downtown Los Angeles. The property has been improved with several buildings housing numerous

17   small businesses and an educational/daycare facility. The encumbered portion of the property is

18   located at 620 S. Gladys Avenue, 830 - 838 East 6th Street and 647 - 649 Ceres Avenue. It contains

19   approximately 107,795 square feet of land and improvements totaling approximately 73,253 square

20   feet of space. It is being primarily used as a multi-tenant seafood/produce distribution facility. The

21   unencumbered portion of the property is located at 643 and 644 S. Gladys Avenue and contains

22   approximately 17,400 square feet of land and improvements containing approximately 16,535

23   square feet of space. It is being used as a multi-tenant distribution space facility. As of March 31,

24   2010, the improvements on the subject property were leased to six tenants occupying approximately

25   78.0% of the total rentable area. Two of the tenants, occupying 46% of the rented space are on

26   month to month tenancies. The average occupancy for month to month tenants is 24 months. The

27   largest tenant occupies 15.7% of the total area.

28

1    This property is an example of the Company's (a) significant expertise and presence and (b)

2    focus on providing tailored solutions for a variety of space needs of the many small businesses in

3    the food and produce distribution industry in downtown Los Angeles.

4    **23.    2001 - 2021 West Mission Boulevard, Pomona**

5    The subject property is owned by Meruelo Maddux - Mission Boulevard, LLC ("MM

6    Mission Boulevard") and is encumbered by a lien in favor of Kennedy Funding, Inc. ("Kennedy").

7    The property is located adjacent to 1875 West Mission Boulevard in Pomona, California. It is

8    comprised of one property totaling approximately 14.7 acres which has been improved with a three-

9    story, single-tenant, office building consisting of approximately 242,042 net rentable square feet. As

10    of March 31, 2010, the improvements were not leased.

11    This property represents a large scale redevelopment site that could be redeveloped in a

12    variety of ways to satisfy the developing needs of Los Angeles space users.

13    **24.    1124 South Olive, 1117-1119 South Olive and 218 W. 11th Street, Los**

14    **Angeles**

15    The subject property is owned by Merco Group-Little J, LLC ("MG Little J"). It is

16    comprised of three separate properties, located on both sides of the 1100 block of South Olive Street

17    in the South Park area of downtown Los Angeles. The western portion, which is encumbered by a

18    lien in favor of Legendary, is improved with a building occupied by a restaurant tenant consisting of

19    approximately 11,829 net rentable square feet. The remaining two properties, which are unimproved

20    and unencumbered, are currently being utilized as parking lots. As of March 31, 2010, the

21    improvements were leased to a restaurant occupying 100% of the total rentable area.

22    As a compliment to the commercial real estate activities of MMPI, the Company also

23    focuses its expertise and downtown knowledge base on supplying residential units to individuals.

24    This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable

25    development of for rent or for sale product. This property is intended to be redeveloped for such

26    uses.

27    **25.    950 and 960 E. 3rd Street, Los Angeles**

28

1    The subject property is owned by Merco Group, LLC ("MG") and is encumbered by two

2   liens in favor of Legendary, each on separate parcels.  The two properties are located at the corner

3   of East 3rd Street and South Santa Fe Avenue in the Arts District of downtown Los Angeles. It is

4   comprised of two separate properties totaling approximately 10.5 acres of which one has been

5   improved with a building occupied by the Southern California Institute of Architecture ("Sci-Arc")

6   consisting of approximately 81,741 net rentable square feet. The second property consists of

7   unimproved land which is entitled for 635 residential units and a portion of which is currently being

8   partially utilized as parking lot for Sci-Arc student parking. As of March 31, 2010, the building was

9   leased to Sci-Arc occupying approximately 100% of the total rentable area. Sci-Arc exercised its

10  option to extend its lease. The Debtor and Sci-Arc have entered into an agreement for the purchase

11  by Sci-Arc of the property where the building is located and the parking lot.

12    As a compliment to the commercial real estate activities of MMPI, the Company also

13  focuses its expertise and downtown knowledge base on supplying residential units to individuals.

14  This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable

15  development of for rent or for sale product. This land portion of this property is intended to be

16  redeveloped for such uses.

17    **26.    815 East Temple Street, 210 Center Street and 729 East Temple Street,**

18    **Los Angeles (Center Village)**

19    The subject property is owned by Meruelo Farms, LLC ("Meruelo Farms") and is

20  encumbered by liens in favor of Imperial (on 815 East Temple Street) and Pacific Commerce Bank

21  ("PCB"), on 729 East Temple Street. The property is comprised of multiple properties totaling

22  approximately 5.3 acres of which 815 East Temple Street has been improved by a cold storage and

23  processing facility and 729 East Temple Street has been improved by industrial buildings. The

24  subject properties consist of approximately 176,628 net rentable square feet. The unimproved

25    As of March 31, 2010, the improvements at 815 East Temple Street were partly leased to a

26  food processing tenant occupying approximately 14% of the total rentable area.  815 East Temple is

27  an example of the Company's (a) significant expertise and presence and (b) focus on providing

28

1    tailored solutions for a variety of space needs of the many small businesses in the food and produce

2    distribution industry in downtown Los Angeles. 729 East Temple is intended to be a home to a large

3    assortment of small business owners prevalent in downtown Los Angeles whereby the Company

4    looks to support and incubate their businesses.

5    **27.    833 Wall Street (Wall Street Market), Los Angeles**

6    The subject property is owned by Meruelo Wall Street, LLC ("Meruelo Wall Street") and is

7    encumbered by a lien in favor of East West as successor to UCB. The property is located at the

8    intersection of East 9th Street and Wall Street in the Garment District of downtown Los Angeles. It

9    is comprised of one property totaling approximately 2.1 acres which has been improved with a

10   multi-tenant building consisting of approximately 98,245 net rentable square feet and rooftop

11   parking. As of March 31, 2010, the improvements were leased to fifty-five tenants occupying

12   approximately 94% of the total rentable area. All of the tenants are on month to month tenancies.

13   The average occupancy for month to month tenants is 45 months. The property is currently being

14   utilized as a garment wholesale and retail and office space facility.

15   This property is an example of how MMPI services the multitude of business owners and

16   their numerous employees who are involved in the (a) design, (b) production and (c) distribution

17   sectors of the garment industry in downtown Los Angeles.

18   **28.    1875 West Mission Boulevard, Pomona**

19   The subject property is owned by Merco Group — 2001 — 2021 West Mission Boulevard,

20   LLC ("MG 2001 — 2021 West Mission Boulevard") a part of which is encumbered by a lien in

21   favor of PNL Pomona.[2]   The property is located at 1875 West Mission Boulevard in Pomona, CA.

22   It is comprised of two properties totaling approximately 27.7 acres on which is presently located an

23   industrial building consisting of approximately 424,309 net rentable square feet. As of March 31,

24   2010, the improvements were not leased.

25

26   _____
[2] For purposes of clarification, readers should note that the real property located at 2001-2021 W.
Mission Boulevard is not owned by MG 2001-2021 West Mission Boulevard but is instead owned by
27   MM Mission Boulevard, LLC.  This property is an example of how MMPI services the multitude of
business owners and their numerous employees who are involved in the (a) design, (b) production and
28   (c) distribution sectors of the garment industry in downtown Los Angeles.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of Pomona space users.

### 29.    Santa Fe Commerce Center — 2445, 2460 and 2535 East 12th Street, Los Angeles

The subject property is owned by Santa Fe Commerce Center, Inc. ("Santa Fe Commerce Center") and is encumbered by a lien in favor of Wells Fargo Bank, N.A., successor by consolidation to Wells Fargo Bank Minnesota, National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 2002-Cl ("Wells Fargo"). In this case, Wells Fargo has acted by and through Berkadia Commercial Mortgage, Inc., its Special Servicer, and is referred to hereinafter as "Berkadia."

The property is located at 2445, 2460 and 2535 East 12th Street in the Southeast Industrial District of downtown Los Angeles. It is comprised of one property totaling approximately 6.8 acres which has been improved with a three building industrial complex consisting of approximately 244,501 net rentable square feet. As of March 31, 2010, the improvements were leased to seven tenants occupying approximately 82% of the total rentable area. Three of the tenants, occupying 40% of the rented space, are on month to month tenancies. The average occupancy for month to month tenants is 86 months. The largest tenant occupies 35.7% of the total area. The property is currently being utilized as a multi-tenant industrial space facility.

### 30.    1009 North Citrus Avenue, Covina (Citrus Gardens)

The subject property is owned by Meruelo Maddux Properties - 1009 North Citrus Avenue, Covina, LLC ("MMP 1009 N. Citrus Avenue") and is unencumbered. The property is located at 1009 North Citrus Avenue in Covina, California. It is comprised of approximately 2.5 acres of land which has been entitled for 52 residential units. The property is currently vacant. This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**31.**      **817-825 South Hill Street, Los Angeles (Ullman Tower Two)**

The subject property is owned by Meruelo Maddux-817-825 S. Hill Street, LLC ("MM 817-825 S. Hill Street") and is unencumbered. The property is located at 817-825 South Hill Street in the Historic Core/ Jewelry district of downtown Los Angeles. It is comprised of one property totaling approximately 1.0 acres of land being utilized as a commercial parking lot facility.

While currently being utilized as a parking facility, this property is an example of how the Company focuses its expertise and knowledge base on supplying future residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**32.**      **1060 North Vignes, Los Angeles (Vignes Village)**

The subject property is owned by Meruelo Maddux Properties-1060 N. Vignes, LLC ("MMP 1060 N. Vignes") and is unencumbered. The property is located near the corner of North Vignes Street and North Main Street near Chinatown in downtown Los Angeles. It is comprised of one property totaling approximately 4.0 acres of land, which is currently unoccupied. Interim operating revenue is typically generated from parking revenues from film production parking.  This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**33.**      **12361 and 12385 San Fernando Road, Sylmar (San Fernando Court)**

The subject property is owned by Meruelo Maddux Properties - 12385 San Fernando Road, LLC ("MMP 12385 San Fernando Road") and is unencumbered. The property is located at 12361 and 12385 San Fernando Road in Sylmar, California. It is comprised of approximately 5.5 acres of land entitled for approximately 247 residential housing units, along with retail and office space.

This property is an example of how the Company focuses its expertise and knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**34.**      **801 East 7th Street, Los Angeles**

1    Merco Group — 801 E. 7th Street, LLC owns a parking lot located at 648 S. Stamford

2    Avenue in downtown Los Angeles that occupies approximately 0.13 acres and is unencumbered. It

3    generates no income currently.

4    **35.    1308 South Orchard, Los Angeles**

5    The subject property is owned by Merco Group - 1308 S. Orchard, LLC ("MG 1308 S.

6    Orchard") and is unencumbered. The subject property is located west of downtown Los Angeles. It

7    is comprised of approximately 0.3 acres of land.

8    **36.    758 Ceres Avenue, Los Angeles (Ceres Street Produce Market)**

9    The subject property is owned by Merco Group - Ceres Street Produce, LLC ("MG Ceres

10    Street Produce") and is unencumbered. The property is located in the industrial district of

11    downtown Los Angeles. It is comprised of approximately 0.4 acres of land.

12    This property is intended to be developed based upon the Company's (a) significant

13    expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of

14    the many small businesses in the food and produce distribution industry in downtown Los Angeles.

15    **37.    336 West 11th Street, Los Angeles (South Park Towers)**

16    The subject property is owned by Meruelo Maddux - 336 W. 11th Street, LLC ("MM 336

17    W. 11th Street") and is encumbered by a lien in favor of Legendary. The property is located at the

18    corner of West 11th Street and South Olive Street in the South Park area of downtown Los Angeles.

19    The property is entitled for an 80 unit residential development. It is comprised of approximately 0.7

20    acres of land being utilized as a parking lot.

21    This property is an example of how the Company focuses its expertise and downtown

22    knowledge base on supplying residential units to individuals. This effort is geared towards (a) high

23    density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

24    **38.    915-949 South Hill Street, Los Angeles (Ullman Tower One)**

25    The subject property is owned by Meruelo Maddux - 915-949 S. Hill Street, LLC ("MM

26    915-949 S. Hill Street") and is encumbered by a lien in favor of Imperial. The property is located at

27    915-949 South Hill Street in the South Park area of downtown Los Angeles. It is comprised of

28

1   approximately 1.5 acres of land being utilized as a commercial parking lot.

2        This property is an example of how the Company focuses its expertise and downtown

3   knowledge base on supplying residential units to individuals. This effort is geared towards (a) high

4   density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

5   **39.    900, 910 and 926 East 4th Street and 405 — 411 S. Hewitt Street, Los**

6   **Angeles**

7        The subject property is owned by Merco Group - 4th Street Center, LLC ("MG 4th Street

8   Center") and is encumbered by a lien in favor of Legendary. The property is located at the corner of

9   South Hewitt Street and East 4th Street in the Arts District of downtown Los Angeles. It is

10  comprised of approximately 1.3 acres which has been improved with two buildings consisting of

11  approximately 13,430 net rentable square feet. As of March 31, 2010, the improvements were

12  leased to one tenant occupying 53% of the net rentable area. The lease is subject to renewal in 2011.

13  The property is a multi-tenant industrial and distribution space facility.

14       This property is intended to be used by an assortment of small business owners prevalent in

15  downtown Los Angeles whereby the Company looks to support and incubate their businesses.

16  **40.    425 West 11th Street, Los Angeles (Desmond Building)**

17       The subject property is owned by Merco Group - 425 West 11th Street, LLC ("MG 425 W.

18  11th Street") and is encumbered by a lien in favor of Legendary. The subject property consists of

19  two properties located on 11th Street, a few blocks away from the Staples Center and LA Live in

20  the South Park area of downtown Los Angeles. The two properties total approximately 0.67 acres

21  which has been improved with a. multi-story industrial building known as the "Desmond Building"

22  consisting of approximately 78,500 net rentable square feet. As of March 31, 2010, the

23  improvements were leased to a tenant occupying approximately 20.0% of the total rentable area.

24  The tenant is on a month to month tenancy with the average occupancy of 48 months. The other

25  property is currently utilized as a parking lot.

26       Both the improved and unimproved parts of this property are intended to be redeveloped

27  based on the Company's focus on supplying residential units to individuals. This effort is geared

28

towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### 41.    West 11th Street and South Grand Avenue, Los Angeles (Southpark Towers, TransAmerica Lofts & Olive Street Towers)

The subject properties are owned by Merco Group -- Southpark, LLC ("MG Southpark"), and are encumbered by a lien in favor of Bank of America. The properties are approximately three to four blocks east of the Staples Center and the L.A. Live complex. One property is located along Pico Boulevard between Olive Street and Hill Street, and consists of four adjacent parcels, part of which is improved with a three-story parking structure and an adjoining one-story brick industrial building. One and one-half blocks northeast of the first property is another property located at the intersection of 11th Street and South Olive Street, consisting of one parcel. One full major street west of the first two properties is the third property, located along South Grand Avenue and reaching to the corner of 12th Street and South Olive Street, consisting of three parcels. Pending development or sale, the properties are leased to Prestige Parking and utilized as parking lots.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

### C.    Consolidated Operations

The Debtors consist of a parent company and various levels of subsidiary Debtors, including the Property Level Debtors.  The Company has been, before and after its formation in 2006, and presently continues to be, operated as a consolidated enterprise. With limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and the subsidiary Debtors.  Accordingly, there are some Debtors which generate revenues in excess of operating expenses and debt service, but there are some that do not.

The Company may purchase and keep properties that are cash flow negative because the Company believes that those properties will, in time, generate a positive return and the enterprise will be significantly more valuable as a result. The recent unprecedented freezing of credit markets

1    and economic downturn caused the Company to suspend substantially all of its various development

2    projects.

3          Before and after the IPO, the Debtors utilized a concentration account for its cash

4    management. The cash management system provides for funds to flow to and from a cash

5    concentration account maintained by MMPLP. The concentration account is linked to the operating

6    bank accounts of each of Debtors, which bank accounts are maintained as zero balance accounts.

7    When needed to fund payment on checks issued by a particular affiliate, funds are transferred from

8    the concentration account to the operating account of that affiliate. Excess funds, if any, are

9    invested in interest bearing accounts pending their utilization. The Company rarely disrupts this

10   flow of funds.

11         As a public company, MMPI has been required to file various reports with the SEC,

12   including among others, quarterly reports as well as annual reports with audited financial

13   statements. These reports have been prepared and filed on a consolidated basis. Although the

14   Debtors' SEC filings do provide information relating to individual subsidiaries, the filings generally

15   discuss the business as a consolidated enterprise. This consolidated reporting is a manifestation of

16   the synergy and economic efficiencies gained through the Company's corporate structure. The

17   indirect overhead expenses for administrative services provided by certain Debtors may be allocated

18   to other Debtors. With a few exceptions, revenues received from the operation of the Debtors'

19   properties are swept daily into a general operating account, and the Debtors' obligations are paid

20   from such account.

21         **D.       THE DEBTORS' CURRENT BUSINESS STRATEGIES**

22         The Company's business is focused on real estate development and redevelopment. The

23   substantial majority of the Company's properties are not stabilized, i.e., the property is either not a

24   rental property or if a rental property, the property has not reached full occupancy or has not yet

25   been redeveloped to its full income producing level. The Company's strategy has three primary

26   components: investment, value creation and operations. Due to the current economic climate,

27   including the lack of an active credit market, the Company has placed on hold substantially all of its

28

1   development projects.

2       **E.**      **PROPOSED BUSINESS STRATEGY FOR THE REORGANIZED DEBTORS**

3       Broadly speaking, the Shareholder Proponents feel that MMPI's mix of assets and core of

4   employees is sound.  MMPI's greatest weaknesses are lack of sound strategic direction from the

5   highest levels of executive management, high vacancy rates (relative to its peers) and, most

6   critically, inadequate capitalization.  Without a change in upper management, improved occupancy

7   at MMPI's income-producing properties, and a significant infusion of cash, the Shareholder

8   Proponents believe MMPI cannot survive as a reorganized company.

9       Accordingly, the Shareholder Plan contemplates removal of Richard Meruelo and John

10   Maddux from their positions with the Company, renewed focus on leasing income-generating

11   properties, and an infusion of not less than $30 million cash on the Effective Date.  These steps,

12   taken together, will permit the Company to fund operating losses in the near term while moving the

13   Company to profitability in the medium term.  Moreover, it will give the Company breathing room

14   to sell assets in a measured fashion without the need for "fire sale" dispositions of property.

15       With a strengthened balance sheet and stabilizing cash flow, the Company will be able to re-

16   start development activities it has currently placed on hold.

17       The Shareholder Proponents anticipate that the Reorganized Debtors will use existing

18   vendors, contractors and other service providers to the extent needed to meet the operational needs

19   of the Company.  Similarly, the Shareholder Proponents anticipate that the Reorganized Debtors

20   will retain many of the Debtors' current employees to maintain continuity of management and

21   operations and to preserve institutional knowledge.

22       **F.**      **PREPETITION CAPITAL STRUCTURE OF THE COMPANY**

23       **1.**      **MMPI**

24       MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue

25   Code. Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately

26   owned by MMPI's directors and executive officers with Richard Meruelo owning the largest amount

27   of shares (approximately 39,911,378). The other 47.8% of MMPI's stock is publicly owned and,

28

prior to April 2009, was traded on the NASDAQ stock exchange. The stock is presently trading on the Over the Counter Bulletin Board.

### a. *MMPI Initial Public Offering*

MMPI was formed on or about July 5, 2006, and MMPLP was formed on or about September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's common stock. The formation transaction and the IPO were designed to allow MMPI to acquire and continue the operations of its predecessor entities, pay down existing mortgage debt, pay off the mezzanine loan facility from Ca1PERS, provide capital for future acquisitions, fund future development costs, and establish a capital reserve for general corporate purposes. Between January 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000 shares of common stock at $10.00 per share. MMPI raised approximately $425.7 million, after underwriting discounts but before expenses related to the IPO. A substantial portion of the proceeds was used to pay off the debt owed to Ca1PERS. On December 31, 2008, there were approximately 88.1 million shares of common stock outstanding.

### b. *MMPI Common Stock*

The authorized capital stock of MMPI consists of up to 200,000,000 shares of common stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred stock, $.01 par value per share. As of April 23, 2010, there are 87,845,789 shares of Common Stock issued and outstanding held by approximately sixty holders of record. Holders of Common Stock have no right to convert their Common Stock into any other securities. The Common Stock has no preemptive or other subscription rights. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are duly authorized, validly issued, fully paid and nonassessable.

### c. *MMPI's Equity Incentive Plan*

Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive Plan ("LTIP") Units and other awards as part of its employee compensation packages. The LTIP

1    units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be

2    converted into MMPLP's common units and consequently become redeemable by the Holder on a

3    one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of such

4    common stock. MMPI initially reserved 2,277,500 shares of common stock for issuance of awards

5    under the Equity Incentive Plan. As of June 30, 2009, there remain 1,083,334 shares available from

6    the initial reservation.

7                    **2.        Corporate Structure of the Other Debtors**

8            MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP. The

9    remaining 0.4% limited partnership units are owned by certain members of MMPI's management

10   team who obtained their interests through the LTIP available to certain personnel as part of their

11   compensation packages.

12           MMPLP owns 100% of the common stock of MM Construction, 99% of the membership

13   units in MM Management and 99% of the membership units in Funes Architecture, LLC ("Funes").

14   The remaining membership units in MM Management and Funes are owned by MM Construction.

15           MMPLP also owns 100% of the membership units in MMP Ventures. MMP Ventures, in

16   turn, owns 100% of the stock or membership units in a number of subsidiary corporations and

17   limited liability companies referred to as Property Level Debtors because they are the entities which

18   hold title to the various real properties and real estate projects developed and operated by MMPI

19   through MMPLP.

20           **G.        MATERIAL PROCEEDINGS**

21           There are several different circumstances that may create liability for the Company in the

22   future, to the extent they are not discharged under the Shareholder Plan as more fully discussed in

23   Section VII.J.

24                    **1.        Potential Government Tax Audits**

25           The Company is subject to audit and review by federal and state taxing authorities. An

26   adverse audit report could result in the Company being assessed additional tax liability. The

27   Company is not aware of any such pending audits and has filed all of its tax returns.

28

2.    **Indemnification Claims**

As is necessary and customary in the normal course of business, certain of the Company's contracts contain indemnification provisions that could require the Company to make payments for Claims made against customers or employees of the Company, including management. Additionally, the Articles and Bylaws of MMPI provide that MMPI shall indemnify its officers and directors to the fullest extent permitted by law. Pursuant to its contractual and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of its Board of Directors with respect to costs and expenses that may be incurred by them in conjunction with the performance of their employment or role as a member of the Board of Directors. These indemnification provisions may result in material liability to MMPI or other of the Debtors. However, the Company maintains various insurance coverages to reduce the exposure of the Company.

**III.**

**EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

Prior to the Petition Date, the Company experienced significant, recurring cash shortfalls from (a) operating activities, (b) recurring investment activities such as carrying costs for interest payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing rental properties. Shortfalls in operating capital have been funded by the refinance or sale of real property assets, and the use of the proceeds for operating and reinvestment in the purchase of replacement real property assets.

The economic climate and associated disruption in the debt and equity capital markets shortly before the Petition Date were extremely challenging for the Company.  On or about October 1, 2008, the Company suspended development of twelve construction projects.

A number of the Company's loans secured by real property matured prior to the Petition Date or were to mature soon thereafter.  Among other things, the Company was unable to extend or refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or March 1, 2009, including two secured by the property housing the Company's corporate

1    headquarters, and one which is secured by the Union Lofts project owned by MMP 760 S. Hill

2    Street.  In total, the Company had twelve loans that were set to mature during 2009 with an

3    aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization

4    on other long-terms loans.

5          In addition, prior to the Petition Date, two lenders filed lawsuits seeking, among other

6    things, the appointment of a receiver. On or about March 4, 2009, California Bank & Trust filed a

7    complaint against 788 South Alameda and MMPI for, among other things, judicial foreclosure and

8    the appointment of a receiver. In addition, on or about March 17, 2009, Chinatrust Bank filed a

9    complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure

10   and the appointment of a receiver.

11         Because the Company's Management did not obtain additional capital to fund operating

12   losses and could not negotiate concessions from its secured lenders sufficient to offset the lack of

13   adequate capital, the fifty-four jointly administered MMPI Debtors sought relief under Chapter 11

14   of Bankruptcy Code.

15                                   **IV.**

16                          **<u>CHAPTER 11 EVENTS</u>**

17   **A.        ADMINISTRATIVE ORDERS AND MATTERS**

18        **1.        Introduction**

19         On March 26 and 27, 2009, the Debtors filed their voluntary petitions for relief under

20   Chapter 11 of the Bankruptcy Code. Shortly after the commencement of the Chapter 11 Cases, the

21   Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a

22   variety of matters. The Debtors obtained Orders of the Bankruptcy Court, inter alia, (a) authorizing,

23   on an interim basis, the Debtors' use of cash collateral (see below for more detail), (b) authorizing

24   the Debtors to employ and compensate legal and financial advisors, (c) authorizing the Debtors to

25   honor certain obligations to employees and to continue employee benefit plans in effect, (d)

26   permitting the Debtors, on an interim basis, to continue to utilize their cash management systems,

27   (e) establishing procedures for the Debtors to ensure continued provision of utility services; (f)

28

1   limiting the scope of notice required; (g) extending the time to file schedules and statement of

2   financial affairs; and (h) directing the joint administration of the Cases of the Debtors.

3   Subsequently, the Bankruptcy Court established September 24, 2009, as the last day for creditors

4   and parties in interests to file proofs of Claim and proofs of interest against the Debtors. The

5   Debtors filed the required monthly operating reports on a timely basis. The Debtors were authorized

6   and continue to operate their business and manage their properties as debtors in possession pursuant

7   to Sections 1107 and 1108 of the Bankruptcy Code.

8   **2.      The Cash Collateral Motions and Corresponding Orders**
          a.      *MMPI Debtors' Cash Collateral Motions and Orders*

9

10   By their first Motion for Entry of Interim and Final Orders Authorizing Debtors to Use Cash

11   Collateral (the "Cash Collateral Motion") the Debtors sought permission to use the cash collateral of

12   various lenders. Oppositions were filed by most of the Debtors' lenders. The Bankruptcy Court

13   entered a series of interim orders authorizing such use and continued to hear testimony and consider

14   evidence concerning the Debtors' proposed use of cash collateral on a final basis. These hearings

15   concluded in October 2009. The Bankruptcy Court ruled in the Debtors' favor and entered a final

16   order authorizing the use of the cash collateral of the following lenders through March 31, 2010:

17   BofA, CBT, Berkadia, Cathay, Chinatrust, Legendary, Stanford, UCB (now succeeded by East

18   West), and Chamlian. In making that ruling, the Bankruptcy Court determined that the following

19   lenders were entitled to additional adequate protection and are therefore entitled to an adequate

20   protection lien in one or more of the Debtors' unencumbered real properties: Berkadia, CBT,

21   Chinatrust, Legendary with respect to 425 W. 11th Street; 3rd & Omar Street, and 420 Boyd Street,

22   and East West with respect to 2640 Washington.

23   As a result of the Cash Collateral determinations made by the Bankruptcy Court, the Debtors

24   filed a motion seeking to designate certain properties that would serve as adequate protection for the

25   Debtors' use of cash collateral. The Debtors sought authority to limit the continuing adequate

26   protection lien to certain identified properties in place of a blanket lien on all of the Debtors'

27   unencumbered properties. The matter has been continued pending the completion of an appraisal of

28

1   one of the properties the Debtors propose to include as part of the pool of assets to serve as

2   continuing adequate protection.

3       The Debtors also filed a motion seeking authority to use a portion of certain insurance

4   proceeds resulting from fire damage to one of the Debtors properties which currently secures certain

5   obligations of the Debtors to PNL Pomona. The Court authorized the Debtors to use a portion of the

6   insurance proceeds to demolish the remaining structure on the property in order to be able to market

7   and sell the property as vacant land.

8       On March 8, 2010, the Debtors filed their Motion for Order Extending Authority for the Use

9   of Cash Collateral and to Maintain Cash Management System Through June 30, 2010. A hearing on

10  the motion was held on March 29, 2010. On March 31, 2010, the Court entered its Order Granting

11  Debtors' Motion for Order Extending Authority for the Use of Cash Collateral and to Maintain Cash

12  Management System Through June 30, 2010, on the terms provided in the Order.

13              **3.    The Debtors' Single Asset Real Estate ("SARE") Motion**

14      The Debtors filed a motion seeking an order determining that none of the fifty-four Debtors

15  are subject to the single asset real estate provisions of Sections 101(51B) and 362(d)(3) of the

16  Bankruptcy Code. Two lenders (BofA and Cathay) filed motions seeking a determination from the

17  Bankruptcy Court that MG Southpark, MMP 760 S. Hill Street and Alameda Produce Market are

18  subject to the SARE provisions of the Bankruptcy Code. The Creditors Committee supported the

19  Debtors' position. Approximately, fourteen oppositions and joinders in opposition were filed by

20  various lenders. In June 2009 the Bankruptcy Court ruled in favor of the Debtors, holding that the

21  Debtors are not subject to the SARE provisions of the Bankruptcy Code. BofA has appealed from

22  the Bankruptcy Court's SARE determination. That appeal remains pending before the United States

23  District Court for the Central District of California.

24              **4.    Motions for Relief from Stay**

25      The following motions for relief from stay have been filed by lenders to pursue their state

26  law remedies against various real properties owned by the Debtors:

27

28

1    • PNL moved for relief from stay with respect to the real property owned by MG 2001

2    —2021 W. Mission located in Pomona. The Bankruptcy Court ruled in favor of the Debtors and

3    denied PNL's Motion. PNL has recently filed a second motion for relief from stay which will be

4    heard in June 2010;

5    • BofA moved for relief from stay with respect to real property owned by MMP 760 S.

6    Hill Street and commonly known as 325 West 8th Street and 760 South Hill Street, Los Angeles

7    (the Union Lofts). The Bankruptcy Court denied the motion subject to the Debtor's provision of

8    certain adequate protection to BofA;

9    • BofA moved for relief from the automatic stay with respect to certain real properties

10   owned by MG Southpark located in downtown Los Angeles. The Bankruptcy Court ruled in favor

11   of the Debtors and denied BofA's motion;

12   • UCB moved for relief from the automatic stay with respect to real property owned

13   by 2640 Washington Boulevard. Pursuant to an agreement between the Debtors and UCB, the

14   motion was granted for the sole and limited purpose of permitting UCB to record a notice c default

15   with respect to the real property. The Debtor 2640 Washington agreed to pay, out c cash collateral,

16   the first and second installments of real property taxes for the 2009 — 2010 fiscal year. UCB's

17   motion was withdrawn in all other respects,

18   • Legendary moved for relief from the automatic stay with respect to real property

19   owned by MM 3rd & Omar Street located in downtown Los Angeles. In the context of the

20   Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a

21   replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to

22   maintain the property and the payment of real property taxes for the 2009 — 2010 fiscal year. In

23   addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor

24   of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in

25   connection with the Cash Collateral Motion, the Bankruptcy Court denied Legendary's motion,

26   subject to the provision of such adequate protection;

27

28

- Legendary moved for relief from the automatic stay with respect to real property owned by both MG 1500 Griffith Avenue and MG 4th Street Center and located in downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion;

- Legendary moved for relief from the automatic stay with respect to real property owned by Merco Group, commonly known as Sci-Arc, and located in downtown Los Angeles. The Bankruptcy Court denied Legendary's motion;

- Legendary moved for relief from the automatic stay with respect to real property owned by MM 420 Boyd Street and located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 — 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court denied Legendary's motion subject to the provision of such adequate protection;

- Legendary moved for relief from the automatic stay with respect to real property owned by Merco Group (Sky-Arc) and MG Little J and located in downtown Los Angeles. The matter has been submitted to the Court. An order has not yet been issued;

- Legendary moved for relief from the automatic stay with respect to real properties owned by MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles. The matter has been submitted to the Court. An order has not yet been issued;

- Legendary moved for relief from the automatic stay with respect to real property owned by MG 425 W. 11th Street and located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 — 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor

1     of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in

2     connection with the Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and

3     denied Legendary's motion for relief from the automatic stay subject to the provision of such

4     adequate protection;

5         •     Vahan and Anoush Chamlian moved for relief from the automatic stay with respect

6     to real property owned by MMP 2131 Humboldt Street near downtown Los Angeles. The

7     Bankruptcy Court ruled in favor of the Debtors and denied the Chamlians' motion;

8         •     Chinatrust moved for relief from the automatic stay with respect to real property

9     owned by MG 3185 E. Washington Boulevard, among other things. In the context of the

10     Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Chinatrust a

11     replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to

12     maintain the property and the payment of real property taxes for the 2009 — 2010 fiscal year. In

13     addition the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor

14     of Chinatrust on one or more of the Debtors' unencumbered properties. In light of the rulings in

15     connection with the Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and

16     denied Chinatrust's motion for relief from the automatic stay subject to the provision of such

17     adequate protection;

18         •     The Stanford Group moved for relief from the automatic stay with respect to the real

19     property owned by 908 8th Street located in downtown Los Angeles. The hearing on that motion

20     has been continued from time to time while the parties engage in settlement negotiations. The

21     parties have reached a settlement on the Claim of Stanford Group, and a motion for approval of the

22     settlement has been filed with the Court. The settlement resolves the motion for relief from stay.

23         •     Legendary filed a second motion for relief from the automatic stay with respect to

24     the real property owned by MM 420 Boyd Street. The Court denied Legendary's motion.

25         •     Legendary filed a second motion for relief from the automatic stay with respect to

26     the real property owned by MM 3rd and Omar. The Court denied Legendary's motion.

27

28

• Vahan and Anoush Chamlian filed a second motion for relief from the automatic stay with respect to real property owned by MMP 2131 Humboldt Street. The motion is set for hearing in June, 2010.

• PNL Pomona filed a second motion for relief from the automatic stay with respect to the real property owned by MG 2001-2021 West Mission. The motion is set for hearing in June, 2010.

In addition to the motions filed by the Debtors' lenders, a group consisting of three individuals moved for relief from the automatic stay to seek authority to prosecute a civil action filed by them in Los Angeles Superior Court and to clarify that they have authority to pursue alleged labor Claims against certain current and former employees and board members of MMPI, Alameda Produce Market and 788 South Alameda. A hearing on that motion was held on December 17, 2009. The Court entered an order granting the motion as to Debtors Alameda Produce and 788 S. Alameda but ordered that the movants could not pursue such litigation until June 30, 2010. The motion was denied as to MMPI.

Also, in addition to the foregoing motions, in April 2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of eminent domain, certain property of the Debtors. In September 2008 the trial court dismissed the action and the MTA appealed. Thereafter, the Debtors filed their chapter 11 petitions and the automatic stay prevented further prosecution of the appeal. The Debtors and the MTA entered into a stipulation to modify the automatic stay to permit the prosecution and defense of the appeal. The order approving the stipulation was entered in August 2009. The matter is still pending.

Also, in a similar action, in February 2010, the City of Pomona filed a motion for relief from the automatic stay in order to allow an eminent domain action in a non-bankruptcy forum to proceed. The Debtors did not oppose the relief sought and the motion was granted.

The Debtors filed a motion to determine the amounts owed to the County of Los Angeles on account of real property taxes. The dispute involved the proper amount of taxes owed to the County and the appropriate rates of interest as well as whether certain other claimed amounts are properly

1    included in the claim.

2    **5.        The Debtors' Compromises With Various Lenders**

3    The Debtors have reached settlements with PCB, Imperial, Murakami, Cathay Bank and the

4    Stanford Group. The Bankruptcy Court approved the Debtors' compromise with PCB and the

5    essential terms of that settlement are reflected in the Shareholder Plan, specifically the Shareholder

6    Plan's treatment of PCB's Class 51A-4 Claim in Section III.C.2 of the Shareholder Plan.

7    The Bankruptcy Court approved the settlement with Murikami. The essential terms of that

8    settlement are reflected in the Shareholder Plan, specifically the Shareholder Plan's treatment of

9    Murakami's Class 37A-4 Claim in Section III.B.2 of the Shareholder Plan.

10    The Debtors motion to approve their settlement with Imperial was heard on February 24,

11    2010 and was granted. The essential terms of that settlement are reflected in the Shareholder Plan,

12    specifically, the Shareholder Plan's treatment of Imperial's Claims in Classes 35A-2, 38A-2 and

13    51A-2 in Section III.C. of the Shareholder Plan.

14    The Debtors have reached an agreement in principal with Cathay Bank for the settlement of

15    Cathay Bank's claims. The parties are in the process of documenting that settlement and will file a

16    motion for approval with the Bankruptcy Court. The essential terms of that settlement are reflected

17    in the Shareholder Plan, specifically the Shareholder Plan's treatment of Cathay Bank's Class 36A-2

18    and 36A-3 in Section III.C.2 of the Shareholder Plan.

19    The Debtors have reached an agreement with The Stanford Group, L.P. for the settlement of

20    The Stanford Group, L.P.'s claims. The Debtors have filed a motion for approval of the settlement

21    with the Bankruptcy Court. The Motion is set for hearing on April 30, 2010. The essential terms of

22    that settlement are reflected in the Shareholder Plan, specifically the Shareholder Plan's treatment of

23    the Stanford Group, L.P.'s Class 34A-2 in Section III.C.2. of the Shareholder Plan.

24    **6.        Unexpired Leases and Executory Contracts**

25    With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired nonresidential

26    lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is the lessee and

27    Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December 1, 2000, the

28

successor-in-interest to Evelyn Hammond, is the lessor.

### 7. Summary of Claims Process, Bar Date and Claims Filed
#### a. *Schedules and Statements of Financial Affairs*

On or before June 12, 2009 the fifty-four jointly administered Debtors filed with the Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the "Schedules and Statements") as of their March 26, 2009 or March 27, 2009 Petition Date. The Debtors will shortly file amendments to the schedules.

For financial reporting purposes, MMPI prepares consolidated financial statements that are filed with the SEC and that are audited annually. Unlike these consolidated financial statements, the Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the Debtors' non-audited books and tax records. This means that audited financial statements and supporting schedules have not been prepared for each Debtor.

#### b. *Claims Bar Date*

On July 22, 2009, the Bankruptcy Court entered an order in the case (the "MMPI Bar Date Order") establishing the general deadline for filing proofs of Claim against the 54 jointly administered Debtors (the "Bar Date"). The deadline established by the Bankruptcy Court was September 24, 2009.

The Bar Date established the deadline for Claims, including Claims of governmental units, but excluding certain other Claims, including Claims based on the rejection of executory contracts and unexpired leases as to which the bar date is the later of: (1) the applicable Bar Date; or (2) the first business day that is at least thirty (30) calendar days after (a) the mailing of notice of the entry of the order first approving the rejection of such contract or lease, (b) the mailing of notice of the entry of an order or judgment avoiding a transfer, or (c) the date any relevant tax Claim first arises. The Debtors provided notice of the Bar Date by mailing a notice of such Bar Date.

#### c. *Proofs of Claim and Other Claims*

According to the Debtors' records, a total of 415 Claims were filed against the Debtors asserting Claims in the total face amount of approximately $927,761,559.23. The Claims scheduled

1    by the Debtors and Claims filed by claimants in each Class is summarized in Exhibits "H.2" to

2    "H.8" attached hereto. The amounts listed on those exhibits represent the current state of the

3    Debtors' computation of the Claims filed and scheduled, and do not reflect amounts which have

4    been paid to date or which the Debtors have otherwise resolved through deposit or stipulation.

5    Numerous Claims were asserted by various alleged creditors in unliquidated amounts, i.e.,

6    Claims that did not contain a specific dollar amount. The Debtors believe that certain Claims that

7    have been asserted are without merit and intend to object to all such Claims. Other significant

8    categories of disputed Claims include certain taxing authorities that are requesting payments far in

9    excess of those the Debtors believe to be owed to such authorities.

10    The Debtors filed a motion to determining the amounts owed to the County of Los Angeles

11    on account of real property taxes. The dispute involves the proper amount of taxes owed to the

12    County and the appropriate rates of interest as well as whether certain other claimed amounts are

13    properly included in the claim. The parties reached a settlement of their disputes and the Debtors'

14    Motion for approval of the settlement is pending.

d.    ***The Debtors' Stipulation with the OCC Regarding Unsecured
Claims***

15

16

17    The Debtors entered into a stipulation with the OCC by which they agreed that to the extent

18    any party files a proof of Claim in any of the Debtors' Chapter 11 Cases prior to the Bar Date, such

19    proof of Claim shall be deemed to have been timely filed in the proper Debtor's Chapter 11 Case

20    and against the proper Debtor regardless of the name of the particular Debtor or case number

21    identified in the proof of Claim. The Stipulation was intended to address the possible confusion

22    among creditors holding claims against one or more of the Debtors where the claimant was not sure

23    of the specific Debtor against whom the claim was held because of the Debtors' consolidated

24    business operations. The Stipulation provided among other things, that claims that were timely filed

25    would be deemed to have been filed against the proper Debtor regardless of the whether Debtor

26    and/or case number were properly identified in the proof of claim. The Bankruptcy Court approved

27    that stipulation. Berkadia has appealed from the order approving the stipulation and that appeal

28    remains pending before the District Court for the Central District of California.

e. ***Motion to Deem Claims Filed Against the Wrong Debtor to be Filed Against the Proper Debtor***

Pursuant to the terms of the Debtors' Stipulation with the OCC described above, the Debtors have reviewed certain of the proofs of claim filed before the Bar Date in order to identify claims filed in the wrong case or against the wrong Debtor that may properly be reassigned pursuant to the Order approving the Stipulation. Those determinations were based on the documents attached to the proofs of claim, a review of the appropriate Debtor's records and consultation with members of the Debtors' management familiar with the claims and creditors. On or about April 30, 2010, the Debtors filed their motion asking the Court to enforce the terms of the earlier Stipulation and Order and to deem the timely filed claims as having been filed against the proper Debtor, regardless of the Debtor's name and/or case number identified on the proof of claim. A hearing on that motion is set for June 11, 2010.

**8.    Other Administrative Matters**

Early in the cases, the Debtors met with and were interviewed by the staff attorney and other representative of the Office of the United States Trustee (the "US Trustee"). During the Cases, the Debtors have complied with certain requirements promulgated by that office with respect to the filing of monthly operating and cash reports. In May and June, 2009 the Debtors appeared at the Section 341(a) meeting of creditors - known as the initial creditor meeting - in the cases of the fifty-four jointly administered Debtors to answer questions of creditors and parties in interest. The US Trustee conducted each of the Section 341(a) meetings.

On April 22, 2009 the US Trustee appointed the Committee of Unsecured Creditors in the cases.

Various professionals have been retained and employed in the Chapter 11 Cases and will be paid pursuant to the terms of the Shareholder Plan. Danning, Gill, Diamond & Kollitz, LLP has been employed as general reorganization counsel for all of the Debtors in the Chapter 11 Cases. The following professionals also have been employed by the Debtors: FTI Consulting, Inc., as financial advisors ("FTI"), Ernst & Young as independent auditors and tax advisors, DLA Piper LLP (US) as special securities and litigation counsel, and Waldron & Associates, Inc. as real estate appraiser.

1    SulmeyerKupetz, APC was employed as general counsel by the Committee, Kibel Green, Inc., was

2    retained as the Committee's financial advisor.

3        In addition, certain real estate brokers have been or will be employed in the Chapter 11

4    Cases to market and sell certain properties but will be paid out of the proceeds of the sale of the

5    properties as opposed to through the Shareholder Plan. In accordance with the Bankruptcy Court's

6    order, the Debtors submitted supplemental declarations from certain brokers in connection with

7    representing the Debtors in connection with specific properties to be listed for sale. Specifically, the

8    Debtors have retained (i) The Bradco Companies regarding the listing of 2951 Lenwood Road,

9    Barstow, CA; (ii) DAUM Commercial Real Estate Services regarding the listing of (a) 905 E. 8th

10    Street, Los Angeles, CA, (b) 308-310 Omar Street and 452, 464 and 470 E. 3rd Street, Los Angeles,

11    CA, and (c) 400-428 Boyd Street, Los Angeles, CA; and (iii) Cushman and Wakefield of California,

12    Inc. regarding the listing of (a) 1875 West Mission Boulevard, Pomona, California; and (b) 2001-

13    2021 West Mission Boulevard, Pomona, California.

14       **B.**      **REAL PROPERTY VALUATION, SALES AND LISTINGS**

15          **1.**      **Value of Property Level Debtors Real Property Assets**

16        Attached hereto as Exhibit J is a schedule of real property owned by each of the Property

17    Level Debtors that owns real property. **The real property values in Exhibit J are based on the**

18    **opinion of Richard Meruelo, not the Shareholder Proponents. Mr. Meruelo is not a**

19    **professional appraiser and his valuations are higher than all other known valuations of the**

20    **same properties. To date, actual sale prices obtained during the Debtors' bankruptcy cases**

21    **have been lower than Mr. Meruelo's estimates.**

22        A brief description regarding each property is set forth in Section II.B

23          **2.**      **Sales and Listings Since the Commencement of the Chapter 11 Cases**

24        Since becoming a public company the Company has, among other things: successfully

25    completed approximately nine acquisitions or conversions of development projects to rental

26    projects; successfully completed, acquired, or placed in service four parcels attached to current

27    rental projects; and successfully completed the sale of three rental projects and three development

28

projects. In 2008, the Company sold more property in downtown Los Angeles than any other

landowner. With regard to the six properties that were sold:

    a.    on or about March 31, 2008, the Company sold a development project located at

9901 Alameda in south Los Angeles for approximately $31.2 million;

    b.    in a two-step sale culminating in or about August 2008, the Company sold a rental

project located at 2000 San Fernando Road just north of downtown Los Angeles for

approximately $35 million;

    c.    on or about September 12, 2008, the Company sold a rental project located at 1800

E. Washington Blvd. in downtown Los Angeles for approximately $14.2 million;

    d.    on or about November 7, 2008, the Company sold a development project located at

816 Stanford in downtown Los Angeles for approximately $1.0 million.

    e.    on or about November 14, 2008, the Company sold a rental project referred to as the

"Overland Terminal" in downtown Los Angeles for approximately $19.7 million; and

    f.    on or about November 21, 2008, the Company sold a development project located at

801 E. 7th Street in downtown Los Angeles for approximately $9.5 million.

    The following properties have been sold, pursuant to orders entered by the Bankruptcy

Court, since the Petition Date:

-     5500 Flotilla Street, Los Angeles, previously owned by Debtor Meruelo Maddux —
-     5500 Flotilla Street, LLC ("MM 5500 Flotilla Street") to Camfield Partners, LLC for $210,000;
-     2040 Camfield Avenue, Commerce, previously owned by Debtor Merco Group —
-     2040 Camfield Avenue, LLC ("MG 2040 Camfield Avenue") to Camfield Partners, LLC for $4,790,000;
-     146 East Front Street, Covina, previously owned by Debtor Merco Group — 146 East
-     Front Street, LLC ("MG 146 E. Front Street") to Vartan and Dzovig Koroghlian for $1,114,450; and

1       •       500 Mateo Street, Los Angeles, previously owned by Debtor Meruelo Maddux —

2       •       500 Mateo Street, LLC ("MM 500 Mateo Street") to Mydland Enterprises, LLC for

3       $1,900,000.

4               •       In addition, the Debtors have recently listed the following properties for sale:

5               •       2951 Lenwood Road, Barstow, CA

6               •       905 E. 8th Street, Los Angeles, CA

7               •       308-310 Omar Street and 452, 464 and 470 E. Third Street, Los Angeles, CA

8                       • 400-428 Boyd Street, Los Angeles, CA

9               •       1875 West Mission Boulevard, Pomona, CA

10              •       2001-2021 West Mission Boulevard, Pomona, CA.

11      Finally, on April 26, 2010, MM 845 Flower closed the sale of its 34 story luxury residential

12      tower for a purchase price of $109,500,000.

13      **C.      Events in the Related Chapter 11 Cases MM 845 S. Flower and Chinatown.**

14      On September 3, 2009, MM 845 S. Flower and Chinatown each filed voluntary petitions for

15      relief under chapter 11 of the Bankruptcy Code. While MM 845 S. Flower and Chinatown are

16      affiliates of the MMPI Debtors, these cases are not jointly administered with the cases of the MMPI

17      Debtors.

18      MM 845 S. Flower owned a 34-story residential tower located at 705 W. 9th Street in the

19      South Park region of downtown Los Angeles (the "Project"). The building is comprised of 214

20      luxury residential units totaling approximately 254,300 square feet and an approximately 6,800

21      square foot commercial unit on the ground floor. This building is a first class iconic structure in

22      downtown Los Angeles. Viewed from the street, this curtain wall building is clad with various

23      shades of green glass and has numerous distinctive and attractive architectural features which

24      include external balconies on all four corners of the building, a seventh floor amenity deck with a

25      landscaped garden area and a premium extended balcony and viewing deck located on the ninth

26      floor.

27      Chinatown owns approximately 5.5 acres of unimproved land at 129 West College Street in

28

downtown Los Angeles ("Chinatown Property"). The Chinatown Property has significant development potential and the current development plan for the property is for a mixed residential and retail use. The Chinatown Property is now unencumbered. The Chinatown Property was appraised at $17,600,000 as of March 2008 based upon about $80 per land square foot.

Prior to September 3, 2009 (the "Flower Petition Date"), and on or about July 31, 2008, MM 845 Flower executed a promissory note (the "Note") in the original principal amount of $84,000,000 in favor of Canpartners Realty Holding Company IV, LLC ("Canyon") in connection with a Loan Agreement dated as of July 31, 2008 (the "Loan Agreement") pursuant to which Canyon made a construction loan of $84,000,000 to MM 845 Flower (the "Loan"). MM 845 Flower's obligations under the Note were secured by a construction deed of trust (the "845 Flower Deed of Trust") in favor of Canyon against the Project. MM 845 Flower also granted Canyon a security interest in various deposit accounts of 845 Flower (the "Accounts Pledge"). In addition, Chinatown granted Canyon a deed of trust (the "Chinatown Deed of Trust") against Chinatown's real property located at 129 West College Street, Los Angeles, California (the "Chinatown Property"). Meruelo Maddux Properties, Inc., ("MMPI") executed both completion and repayment guaranties in favor of Canyon (the "MMPI Guaranties") and MMP Ventures pledged its membership interests in 845 Flower and Chinatown to Canyon (the "Pledge Agreementss")[3].

1.    **Important Events in MM 845 S. Flower and Chinatown cases**

At the time the cases were filed, the construction of MM 845 S. Flower Project was close to completion. After commencement of the 845 S. Flower case, MM 845 S. Flower completed construction of the Project, completed the process of entitling the Project as condominiums and developed a program for selling individual condominium units (the "Sale Program"). MM 845 S. Flower filed a motion for authority to engage in the Sale Program. Canyon opposed the motion on among other grounds that the Debtor could not sell units free and clear of its loan. After extensive briefing and several hearings, the Court denied the motion without prejudice to the Debtor pursuing

---

[3] The Loan Agreement, the Note, the Deed of Trust, the Accounts Pledge, the MMPI Guaranties, the Chinatown Deed of Trust, the Pledge Agreements and all other documents and instruments evidencing or securing the Loan, are referred to collectively herein as the "Loan Documents"

the Sale program as part of its Chapter 11 Plan.

On November 12, 2009, Canyon filed a Motion for Relief from the Automatic Stay (the "RFS Motion") in the MM 845 S. Flower case seeking relief from the automatic stay to permit it to foreclose on its Deed of Trust against the Project. Canyon asserted that it was entitled to relief from the stay because the Debtor does not have any equity in the Project and according to Canyon, the Debtor cannot cram down a plan on Canyon over its objection. MM 845 S. Flower vigorously disputed each of Canyon's contentions. The initial hearing on the RFS Motion was held on January 8, 2010. After additional briefing and a further hearing on February 5, 2010, the Court continued the RFS Motion to March 12, 2010 for an evidentiary hearing regarding the value of the Project and testimony by the appraisers retained by Canyon and MM 845 S. Flower. That evidentiary hearing has been continued to June 7, 2010 but will be taken off calendar due to the settlement discussed below.

In addition, on October 19, 2009, Canyon filed an adversary proceeding against MM 845 S. Flower and Chinatown in their respective cases, asserting and seeking a declaration, among other things, that Canyon was not required to release its lien on the Chinatown Property or its security interest in MMP Ventures' membership interests in Chinatown (the "Chinatown Adversary Proceeding") MM 845 Flower and Chinatown answered and counterclaimed, contending, among other things, that Canyon is required to release its liens on the Chinatown Property and its security interest in the MMP Ventures membership interests in Chinatown. On November 19, 2009, the Bankruptcy Court entered its Order approving the parties' stipulation to consolidate the two adversary proceedings, deeming the complaint filed in 845 Flower's case (1:09-ap-01435-KT) as the sole operative complaint.

On February 16, 2010 the parties filed cross-motions for summary judgment (Chinatown Adversary Proceeding docket nos. 13 19) which were initially set for hearing on March 12, 2010. Those hearings have been continued several times and are currently set for hearing on June 7, 2010 but will be taken off calendar due to the settlement discussed below.

### 2. Sale of the Project and Settlement with Canyon

1    On April 13, 2010, MM 845 S. Flower filed a motion for authority to sell the Project to

2    Watermarke Properties, Inc., a California corporation, or its assignee (the "Buyer") for a purchase

3    price of $110,000,000 cash pursuant to the Purchase Agreement, subject to a $500,000 purchase

4    price credit to the Buyer as described below. The hearing on the Motion was held on April 19, 2010.

5    The Court approved the sale by its order entered on April 19, 2010.

6    On April 12, 2010, MM 845 S. Flower, Chinatown, MMPI and MMP Ventures entered into

7    a settlement with Canyon (the "Canyon Settlement Agreement"). Pursuant to the settlement, Canyon

8    agreed to accept $86,521,389 from escrow at closing in satisfaction of its Lien and has agreed to the

9    release of its Lien on the Project, on MM 845 S. Flower's bank accounts and other personal property

10    and on the real property owned by the related debtor Meruelo Chinatown, LLC. The sale closed on

11    April 26, 2010 and Canyon received payment of the settlement amount on that date.

12    The Canyon Settlement Agreement resolves all disputes arising out of or relating to

13    Canyon's claims against the Debtors or arising out of or related to the Loan Documents, the RFS

14    Motion, and the Chinatown Adversary Proceeding.

15    In addition, certain creditors have asserted, or may assert, mechanics liens against the

16    Project (the "Mechanics Lien Creditors"). The sale of the Project combined with the funds in MM

17    845 S. Flower's construction reserve accounts (which was $7,139,319 as of April 9, 2010) provides

18    more than enough proceeds for payment of all amounts determined to be owing to the Mechanics

19    Lien Creditors. MM 845 S. Flower has objections to certain of these claims and reserves all rights

20    and defenses thereto. As of the date hereof, the aggregate amount owing to the Mechanics' Lien

21    Creditors was between $4,179,157 and $8,733,944. As such claims are resolved, the Mechanics'

22    Lien Claims will be paid from the Remaining Claims Fund as provided below.

23    At closing, MM 845 S. Flower established the Remaining Claims Fund as a segregated

24    account at City National Bank to hold funds for payment of the unpaid or disputed Mechanics' Lien

25    Claims and unsecured claims against the Debtor's estate (the "Remaining Claims") as provided in

26    the Canyon Settlement Agreement. The Remaining Claims Fund was funded in an amount not to

27    exceed $10,636,268, comprised of the maximum amount of all unpaid or disputed Mechanics Lien

28

Claims, $100,000 for payment of unsecured claims, and $1,500,000 as provided in the Canyon Settlement Agreement. The Remaining Claims Fund was funded with the remaining funds from the Debtor's construction reserve accounts plus proceeds of the Sale sufficient to fully fund the account. The Liens of all creditors of MM 845 S. Flower asserting Liens against the Project, including but not limited to Canyon (pursuant to the Canyon Settlement Agreement) and the Mechanics Lien Creditors, attached to the Remaining Claims Fund. The Canyon Settlement Agreement also provided for the payment of Canyon's third party fees and expenses arising out of the Remaining Claims from the Remaining Claims Fund. As a result of receipt of the Settlement Amount, all of Canyon's liens, rights and interest in and to any of the Debtors' assets have been fully released, reconveyed, terminated and discharged, including, without limitation, full reconveyances of the Flower Deed of Trust, the Chinatown Deed of Trust, terminations of any UCC financing statements and account control agreements, releases of any guaranties, assignments and pledges, including MMP Ventures' membership interests in 845 Flower and Chinatown, the MMPI Guaranties and the Accounts Pledge and Pledge Agreements.

As a result of the settlement, the Chinatown Adversary Proceeding will be dismissed and Canyon will withdraw its RFS Motion. The sale will provide approximately $20 million in sale proceeds to the estate and, after payment of administrative expenses, such funds will be available to pay intercompany claims. The impact of successful resolution of these cases is that the remaining proceeds from the sale of this Project will be available to the MMPI Debtors at the Effective Date rather than one or more years later. Further, the Chinatown Property is no longer encumbered and will be available to the Company as an unencumbered property.

**V.**

**<u>SUMMARY OF THE SHAREHOLDER PLAN</u>**

The Shareholder Plan provides for the treatment and payment of Claims and Interests in each of the Debtors' bankruptcy cases. It also provides for the payment of unclassified claims, such as administrative expense claims and priority tax claims against each Debtor. Claims or Interests are classified in a particular Class only to the extent that the Claim or Interest qualifies within the

description of that Class, and are classified in another Class or Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Class or Classes.

### 1.    Common Class Treatments for Classified Claims

The following are Common Class Treatments for the following classes of Claims and Interests: (i) Secured Tax Claims, (ii) Secured Lender Claims, (iii) Other Priority Claims, (iv) Unsecured Tenant Security Deposit Claims, (v) General Unsecured Claims, (vi) Intercompany Claims, and (vii) Equity Interests. The Classes of Claims and Interests for each Debtor will either receive the Common Treatment or a treatment specific to a particular Class. For each Class and for each Debtor, the Shareholder Plan will specify whether such class will receive the common treatment set forth herein or another treatment.

In addition to the specific treatment detailed below, the Debtors expressly reserve the right to abandon any of their real properties pursuant to Section 554 of the Bankruptcy Code prior to the Confirmation Date. The Debtors also expressly reserve the right, at any time during the term of the Shareholder Plan, to refinance the obligations secured by any of their real properties and satisfy the full amount of the Allowed Secured Claims against such real property(ies) from the proceeds of such refinancing. The Debtors also reserve the right subject to Court Approval to sell any of their properties prior to the Effective Date and Reinstate the obligations with respect thereto and pay any such Claims in full under the Shareholder Plan at the Effective Date. The Debtors also reserve the right to make full or partial payment of the Debt at any time on or following the Effective Date.

#### a.    *Common Los Angeles Tax Claim Treatment*

Los Angeles Tax Claims shall be Reinstated.

#### b.    *Common Secured Lender Claim Treatment*

The Holder shall receive deferred Cash payments over a period of five years from the Effective Date in an amount equal to the amount of the Allowed Secured Claim plus interest from the Effective Date on the unpaid portion of the Allowed Secured Claim at the rate prescribed below.

Payments shall be made in the amount of the monthly accruing interest with the principal balance and any unpaid interest due and payable four years after the Effective Date. The monthly installments of interest shall be payable on or before the fifteenth (15th) day of each month, with the first installment due on or before the fifteenth (15th) day of the month following the month in which the Effective Date occurs.  The first six installments, however, will be paid together on the date that the first installment is due.

Each installment shall be in the amount equal to interest on the Allowed Secured Claim at the rate of 4.5% per annum or as otherwise established by the Bankruptcy Court, provided, however, that in the event such Claim is not an Allowed Secured Claim at the Effective Date then interest shall be payable on the undisputed portion of such Claim until the Claim is allowed pursuant to a Final Order of the Bankruptcy Court. Once the Claim is an Allowed Secured Claim pursuant to a Final Order, then on the next interest payment date, the Holder shall receive a payment equal to the unpaid interest due and owing on the disputed portion of the Claim from the Effective Date.

The terms and conditions of the agreements or instruments between the Holder and the Debtor shall be restructured and amended as of the Effective Date pursuant to Loan Modification Agreement, the form of which is attached to the Disclosure Statement as Exhibit D.  The Holder and Reorganized Debtor shall, within a reasonable period of time after the Effective Date (or after a Final Order of the Bankruptcy Court allowing the Claim) complete the Loan Modification Agreement consistent with the terms of this Shareholder Plan, and execute and deliver the same to be effective as of the Effective Date.  If there shall be found any error in the Loan Modification Agreement such that it was not completed consistent with the terms of this Shareholder Plan, the Holder and the Reorganized Debtor shall correct and re-execute the Loan Modification Agreement to be consistent with the Shareholder Plan.  Except as provided in this section and the Loan Modification Agreement, and notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all valid, enforceable and perfected prepetition liens of the Holder in its Collateral shall survive the Effective Date and continue in accordance with the contractual terms of

the underlying agreements with such Holder and/or applicable law until the Holder's Allowed Secured Claim is satisfied pursuant to the Shareholder Plan; provided however, that the Holder shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtor is in compliance with the Shareholder Plan. Any lien or interest granted to the Holder by the Bankruptcy Court as adequate protection shall be released and extinguished upon confirmation.

c.      <b><i>Common Other Priority Claim Treatment</i></b>

This Class includes Other Priority Claims for an amount entitled to priority under Sections 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, and does not include any Administrative Claim or Tax Claim. These unsecured Other Priority Claims are for unsecured Claims for accrued employee compensation earned within 180 days prior to the Petition Date, to the extent of $10,950 per employee.

Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim remains employed with the Reorganized Debtors after the Effective Date.  If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date.

d.      <b><i>Common Tenant Security Deposits Treatment</i></b>

The Allowed Claims of the Holders shall be Reinstated as of the Effective Date of the Shareholder Plan.

e.      <b><i>Common Unsecured Claim Treatment</i></b>

The Holders of Allowed General Unsecured Claims shall receive a cash payment equal to the full amount of their Allowed Claim on or before 30 days after the Effective Date.  In the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the payment will be due 30

days after the date the Disputed Claim becomes an Allowed Claim.  Creditors who have agreed to other treatments in court-approved settlements shall receive the treatments provided in those settlements notwithstanding the Allowance of some or all of their Claims as General Unsecured Claims.

f.      ***Common Unsecured Guaranty Claim Treatment***

Claims in this Class consist of Guaranty Claims on obligations for which another one of the Debtors is the principal obligor and for which the principal obligation is provided for under this Shareholder Plan or under the plan filed by MM 845 S. Flower and Chinatown.

Five years after the Effective Date, the Holder of an Allowed Guaranty Claim in this Class shall receive the full amount of its Claim plus interest at 3% per annum (or such other interest rate as the Bankruptcy Court shall determine is necessary for the Shareholder Plan to comply with Bankruptcy Code Section 1129(b)(2)).  The amount of the Allowed Guaranty Claim shall reflect payments made on the underlying obligation and/or recoveries based on disposal of the collateral. If, for example, the underlying obligation is satisfied, the amount of the Holder's Guaranty Claim shall be zero.  Similarly, if the Collateral securing the underlying obligation is sold at a foreclosure sale for more than the amount owed by the Principal Obligor, the Holder's Guaranty Claim shall also be zero.

g.      ***Common Treatment for Guaranty Claims held by Settling Guaranty Creditors***

The foregoing treatment shall not supersede treatment specified in Bankruptcy Court-approved settlements.  Holders of Guaranty Claims who have agreed to a different treatment in Bankruptcy Court-approved settlement will receive that treatment.

h.      ***Common Intercompany Claim Treatment***

The Holders shall retain such Claims and all rights, interests, and obligations related thereto but, notwithstanding, the Holders consent to the treatment afforded and distributions to be made under this Shareholder Plan to Holders in each class of Allowed Claims.

1

### i.    *Common Equity Interest Treatment*

2

3    The Holders of the Equity Interests in these Classes shall retain their Equity Interests in the

4    Debtor.

5    ### 2.    Summary of Classified Claims and Treatment

6    The categories of Claims and Interests listed in the chart below classify Claims (except for

7    Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting,

8    confirmation and distribution pursuant to this Shareholder Plan. The amounts listed for each Class

9    in the chart below represent the Debtors' estimate of the amount of the Allowable Claims asserted in

10    each Class and contain a brief summary description of the treatment of each class. This is a

11    summary for information only and does not specify the full terms of the treatment for each class.

12    Such full description is set forth in Article III of the Shareholder Plan. The terms of the Shareholder

13    Plan control over the summary descriptions set forth herein. In addition, the Debtors expressly

14    reserve all of their rights to object to the amount, character and enforceability of any Claim, whether

15    or not listed in the chart below.

16

17

18

19

20

21

22

23

24

25

26

27

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 1. | Meruelo Maddux Properties, Inc.[4] | | |
| 1A | Secured Claim of Oliver, Sandifer - $436,901 | Unimpaired. | The Class 1A Claim is unimpaired and the Holder is not entitled to vote on the Shareholder Plan.  On the Effective Date, the Holder's claim shall be reinstated and the Holder shall retain its attorney's lien, if any. |
| 1B | Priority Benefits Claims - $46,362 | Unimpaired. | Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim remains |

28

---

[4]    The Debtors are listed in the order of the Service Level Debtors and then the Property Level Debtors.

| Class | Description of Class | Impaired/ Unimpaired | |
|-------|---------------------|----------------------|---|
| | | | employed with the Reorganized Debtors after the Effective Date. If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date. |
| 1C-1 | Unsecured Insider Claims | Impaired. | The Holders shall receive the Common General Unsecured Claim Treatment on account of their Allowed Claims except that their distribution will be held by the Reorganized MMPI in reserve for the earlier of (1) five years after the Effective Date; (2) the resolution of any Insider Litigation against that Holder; or (3) upon such earlier time as the Reorganized Debtor decides, in its sole and absolute discretion is appropriate. Interest will accrue, at an annual rate to be determined by the Bankruptcy Court, on the Allowed amount of the Claims until the distribution is released to the Holder. |
| 1C-2A | Unsecured Guaranty Claims - $102,245,154 | Impaired. | Common Unsecured Guaranty Claim Treatment: Five years after the Effective Date, the Holder of an Allowed Guaranty Claim in this Class shall receive the full amount of its Claim plus interest at 3% per annum (or such other interest rate as the Bankruptcy Court shall determine is necessary for the Shareholder Plan to comply with Bankruptcy Code Section 1129(b)(2)). The amount of the Allowed Guaranty Claim shall |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | | | reflect payments made on the underlying obligation and/or recoveries based on disposal of the collateral. |
| 1C-2B | Unsecured Guaranty Claims - $92,453,017 | Impaired. | Holder's Guaranty Claim shall be consistent in all regards with the Bankruptcy Court-approved settlement. |
| 1C-3 | General Unsecured Claims - $7,668,891 | Impaired. | Common Unsecured Guaranty Claim Treatment: The Holders of Allowed General Unsecured Claims shall receive a cash payment equal to the full amount of their Allowed Claim on or before 30 days after the Effective Date.  In the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the payment will be due 30 days after the date the Disputed Claim becomes an Allowed Claim. |
| 1 E | Equity Interests | Impaired. | Holders of MMPI Existing Common Stock shall receive $10.00 and 1 share of Reorganized MMPI Stock for each 100 shares of MMPI Existing Common Stock they hold.  At the Holder's option, the Holder may elect to receive $16.00 for every 100 shares of Existing Common Stock they hold.  Holders of less than 100 shares will receive $.16 per share. |
| 1F | Insider Equity Interests | Impaired. | Holders of Insider Equity Interests in the Debtor will receive $.16 per share for each share of MMPI Existing Common Stock they hold.  The distribution to Holders of Insider Equity Interests shall be held in reserve for the earlier of (1) five years after the Effective Date; (2) the resolution of any Insider Litigation against |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | | | that Holder; or (3) upon such earlier time as the Reorganized MMPI decides, in its sole and absolute discretion is appropriate. |
| **2.** | **Meruelo Maddux Properties, Inc.** | | |
| 2C-2 | Unsecured Guaranty Claims - $41,001,926 | Impaired. | Common Unsecured Guaranty Claim Treatment |
| 2C-3 | General Unsecured Claims - $1,869,638[5] | Impaired. | Common Unsecured Claim Treatment. |
| 2D | Intercompany Claims - $452,881,601 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto |
| 2E | Equity Interests of MMPI (99.6%) and Holders of LTIP Units (0.4%) | Impaired. | LTIP units cancelled. MMPLP merged into MMPI |
| **3.** | **MMP Ventures LLC** | | |
| 3C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment. |
| 3D | Intercompany Claims - $2,509 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 3E | Equity Interests of MMPLP (100%) | Unimpaired. | Holders retain their interests. |
| **4.** | **Meruelo Maddux Construction, Inc.** | | |
| 4C | General Unsecured Claims - $652 | Unimpaired. | Paid in full at Effective Date. |
| 4D | Intercompany Claims - $10,588 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 4E | Equity Interests of Meruelo Maddux Construction, Inc. | Unimpaired. | Holders retain their interests. |
| **5.** | **Meruelo Maddux Management LLC** | | |
| 5B | Priority Benefits Claims - $151,247 | Unimpaired. | |
| 5C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment. |

---

[5] Berkadia has filed alleged and duplicative unsecured claims for "money had and received, money lent, unjust enrichment, and interference with contract" for $1,443,668.40 (the `Berkadia Unsecured Claim") against 53 of the 54 Debtors. The Debtors will be filing formal objections to the Berkadia Unsecured Claims asserted in the 53 Chapter 11 Cases at the appropriate time. In the table below, the classes of "General Unsecured Claims" for the 53 Debtors separately list the amount of general unsecured claims asserted by claimants, exclusive of the disputed Berkadia Unsecured Claim. Notwithstanding the foregoing, the claim is included in the Class 2C-3.

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 5D | Intercompany Claims - $4,296,137 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 5E | Equity Interests of MMPLP (99%) and MMCI (1%) | Unimpaired. | Holders retain their interests |
| **6.** | **Meruelo Maddux – 555 Central Avenue LLC** | | |
| 6C | General Unsecured Claims - $10,102 | Impaired. | Common Unsecured Claim Treatment. |
| 6D | Intercompany Claims - $1,999,388 | Unimpaired. | Creditors retain their claims and all rights, interests an obligations related thereto. |
| 6E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **7.** | **Merco Group – Overland Terminal LLC** | | |
| 7C | General Unsecured Claims - $132,750 | Impaired. | Common Unsecured Claim Treatment. |
| 7D | Intercompany Claims - $1,093,202 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 7E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **8.** | **National Cold Storage LLC** | | |
| 8C | General Unsecured Claims — $4,545 | Impaired. | Common Unsecured Claim Treatment. |
| 8E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **9.** | **Wall Street Market LLC** | | |
| 9C | General Unsecured Claims - $2,092 | Impaired. | Common Unsecured Claim Treatment |
| 9D | Intercompany Claims - $3,536,086 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 9E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **10.** | **Meruelo Maddux Properties – 1009 N. Citrux Avenue, Covina, LLC** | | |
| 10A | Los Angeles County Secured Tax Claim - $118,420 | Unimpaired. | Common Los Angeles Tax Claim Treatment.  See Plans or full description of treatment. |
| 10C | General Unsecured Claims - $15,357 | Impaired. | Common Unsecured Claim Treatment. |
| 10D | Intercompany Claims - $6,630,774 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 10E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **11.** | **Meruelo Maddux – 230 W. Avenue 26 LLC** | | |
| 11A | Los Angeles County Secured Tax Claim - $163,484 | Unimpaired. | Common Los Angeles Tax Claim Treatment. See Plan for full description of treatment |
| 11C-1 | Unsecured Claims — Tenant Security Deposits - $24,610 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 11C-2 | General Unsecured Claims - $3,952 | Impaired. | Common Unsecured Claim Treatment. |
| 11D | Intercompany Claims - $6,414,500 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 11E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **12.** | **Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | |
| 12A | Los Angeles County Secured Tax Claim - $111,937 | Unimpaired. | Common Los Angeles Tax Claim Treatment. See Plan for full description of treatment. |
| 12C-1 | Unsecured Claims — Tenant Security Deposits - $8,025 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 12C-2 | General Unsecured Claims - $14,882 | Impaired. | Common Unsecured Claim Treatment. |
| 12D | Intercompany Claims - $3,569,603 | Unimpaired. | Creditors retain their claims and all rights, interests and obli2:ations related thereto. |
| 12E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **13.** | **Meruelo Maddux – 817-825 S. Hill Street LLC** | | |
| 13A | Los Angeles County Secured Tax Claim — $350,917 | Unimpaired. | Common Los Angeles Tax Claim Treatment. See Plan for full |
| 13C | General Unsecured Claims - $1,583 | Impaired. | Common Unsecured Claim Treatment. |
| 13D | Intercompany Claims - $16,377,573 | Unimpaired. | Creditors retain their claims and all rights, interests and obli2:ations related thereto. |
| 13E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **14.** | **Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| 14A | Los Angeles County Secured | Impaired. | Common Los Angeles Tax |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | Tax Claim - $167,582 | | Claim Treatment. |
| 14C-1 | Unsecured Claims — Tenant Security Deposits - $3,100 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 14C-2 | General Unsecured Claims - $10,930 | Impaired. | Common Unsecured Claim Treatment. |
| 14D | 14D  Intercompany Claims - $6,804,902 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 14E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **15.** | **Meruelo Maddux Properties – 1060 N. Vignes LLC** | | |
| 15A | Los Angeles County Secured Tax Claim - $115,121 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 15C | General Unsecured Claims - $71,044 | Impaired. | Common Unsecured Claim Treatment. |
| 15D | Intercompany Claims - $6,549,824 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 15E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **16.** | **Meruelo Maddux – 2415 E. Washington Boulevard LLC** | | |
| 16A | Los Angeles County Secured Tax Claim - $50,897 | Impaired. | Creditor receives Common Secured Tax Claim- Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 16C | General Unsecured Claims - $4,780 | Impaired. | Common Unsecured Claim Treatment. |
| 16D | Intercompany Claims - $2,220,879 | Unimpaired. | Creditors retain their claims and all rights interests and obligations related thereto. |
| 16E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **17.** | **Meruelo Maddux – 5500 Flotilla Street LLC** | | |
| 17C | General Unsecured Claims - $652 | Unimpaired. | Paid in full at Effective Date. |
| 17D | Intercompany Claims - $611,663 | Unimpaired. | Creditors retain their claims and all rights interests and obligations related thereto. |
| 17E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **18.** | **Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 18A | Los Angeles County Secured Tax Claim - $211,338 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 18C | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 18D | Intercompany Claims - $8,997,401 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 18E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **19.** | **Merco Group – 146 E. Front Street LLC** | | |
| 19C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment. |
| 19D | Intercompany Claims - $2,243,787 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 19E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **20.** | **Merco Group – 801 E. 7th Street LLC** | | |
| 20A | Los Angeles County Secured Tax Claim - $14,177 | Unimpaired. | Common Los Angeles Tax Claim Treatment.. |
| 20C | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 20D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 20E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **21.** | **Merco Group – 1211 E. Washington Boulevard LLC** | | |
| 21A-1 | Los Angeles County Secured Tax Claim - $245,814 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 21A-2 | RoofCorp of CA, Inc. - $37,500 | Impaired. | Paid in full with 50% of claim paid on Effective Date and 50% of Claim, plus interest from the Effective Date at 3.5% on the 1 st anniversary of the Effective Date. |
| 21C-1 | Unsecured Claims — Tenant Security Deposits - $42,357 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 21C-2 | General Unsecured Claims - $31,231 | Impaired. | Common Unsecured Claim Treatment. |
| 21D | Intercompany Claims - | Unimpaired. | Creditors retain their |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | $9,122,302 | | claims and all rights, interests and obligations related thereto.. |
| 21E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holder retains their interests. |
| **22.** | **Merco Group – 1380 S. Orchard LLC** | | |
| 22A | Los Angeles County Secured Tax Claim - $36,714 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 22C | General Unsecured Claims - $4,322 | Impaired. | Common Unsecured Claim Treatment. |
| 22D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 22E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **23.** | **Merco Group – 2040 Camfield Avenue LLC** | | |
| 23C | General Unsecured Claims - $652 | Unimpaired. | Paid in full on the Effective Date. |
| 23D | Intercompany Claims - $5,163,790 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 23E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **24.** | **Merco Group – Ceres Street Produce LLC** | | |
| 24A | Los Angeles County Secured Tax Claim - $65,342 | Unimpaired | Common Los Angeles Tax Claim Treatment. |
| 24C | General Unsecured Claims - $2,059 | Impaired. | Common Unsecured Claim Treatment. |
| 24D | Intercompany Claims - $2,772,264 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 24E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **25.** | **Meruelo Baldwin Park LLC** | | |
| 25A | Los Angeles County Secured | Impaired | Common Los Angeles Tax |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | Tax Claim - $201,681 | | Claim Treatment. |
| 25C-1 | Unsecured Claims — Tenant Security Deposits - $3,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 25C-2 | General Unsecured Claims - $4,082 | Unimpaired. | Common Unsecured Claim Treatment. |
| 25D | Intercompany Claims - $8,847,699 | Unimpaired. | Creditors retain their claims and all claims, interests and obligations related thereto.. |
| 25E | Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **26.** | **Santa Fe & Washington Market LLC** | | |
| 26A | Los Angeles County Secured Tax Claim - $45,481 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 26C-1 | Unsecured Claims — Tenant Security Deposits - $27,900 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 26C-2 | General Unsecured Claims - $4,591 | Impaired. | Common Unsecured Claim Treatment. |
| 26D | Intercompany Claims - $4,879,642 | Unimpaired. | Creditors retain their claims and  all rights, interests and obligations related thereto.. |
| 26E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **27.** | **Merco Group – 5707 S. Alameda LLC** | | |
| 27A | Los Angeles County Secured Tax Claim re $112,423 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 27C-1 | Unsecured Claims — Tenant Security Deposits - $5,794 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 27C-2 | General Unsecured Claims - $16,673 | Impaired. | Common Unsecured Claim Treatment. |
| 27D | Intercompany Claims - $4,859,886 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 27E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **28.** | **Meruelo Maddux – 3rd and Omar Street LLC** | | |
| 28A-1 | Los Angeles County Secured Tax Claim - $125,813 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 28A-2 | Legendary Secured Claim - $2,559,658 | Impaired. | Common Secured Lender Treatment. . |
| 28C-1 | Unsecured Claims — Tenant Security Deposits - $2,600 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 28C-2 | General Unsecured Claims - $2,772 | Impaired. | Common Unsecured Claim Treatment. |
| 28D | Intercompany Claims - $3,416,741 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 28E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 29. | Meruelo Maddux – 336 W. 11th Street LLC | | |
| 29A-1 | Los Angeles County Secured Tax Claim - $199,416 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 29A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligations of 620 Gladys Avenue, LLC (see Class 46A-2 below). | Impaired. | Common Secured Lender Treatment. |
| 29A-3 | Grand Avenue Lofts, HOA Secured Claim - $270,000 | Impaired. | Claim is disputed. To the extent allowed, Creditor receives Common Secured Lender Treatment. |
| 29A-4 | Grand Avenue Lofts, LLC / CIM Urban RE Fund GP II, LLC Secured Claim - 0 | Impaired. | Same as 29A-3 immediately above. |
| 29C | General Unsecured Claims - $43,857 | Impaired. | Common Unsecured Claim Treatment. |
| 29D | Intercompany Claims - $10,554,921 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 29E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 30. | Meruelo Maddux – 420 Boyd Street LLC | | |
| 30A-1 | Los Angeles County Secured Tax Claim - $272,651 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 30A-2 | Legendary Secured Claim - $5,950,000 | Impaired. | Common Secured Lender Treatment. |
| 30C-1 | Unsecured Claims — Tenant Security Deposits - $21,463 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 30C-2 | General Unsecured Claims - $31,296 | Impaired. | Common Unsecured Claim Treatment. |
| 30D | Intercompany Claims - $2,607,940 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 30E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 31. | Meruelo Maddux – 500 Mateo Street LLC | | |

| Class | Description of Class | Impaired/Unimpaired | |
|---|---|---|---|
| 31C | General Unsecured Claims - $1,657 | Impaired. | Common Unsecured Claim Treatment. |
| 31D | Intercompany Claims - $1,968,955 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 31E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **32.** | **Meruelo Maddux Properties – 760 S. Hill Street LLC** | | |
| 32A-1 | Los Angeles County Secured Tax Claim - $256,063 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 32A-2 | Bank of America Secured Claim - $28,108,094 | Impaired. | Common Secured Lender Treatment. |
| 32B | Priority Benefits Claims - $14,223 | Unimpaired. | |
| 32C-1 | Unsecured Claims — Tenant Security Deposits $39,061 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 32C-2 | General Unsecured Claims - $460,061 | Impaired. | Common Unsecured Claim Treatment. |
| 32D | Intercompany Claims - $25,543,339 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 32E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **33.** | **788 S. Alameda LLC** | | |
| 33A-1 | Los Angeles County Secured Tax Claim - $95,225 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 33A-2 | California Bank & Trust Secured Claim - $7,153,799 | Impaired. | Common Secured Lender Treatment. |
| 33B | Priority Benefits Claims - $1,382 | Unimpaired. | |
| 33C-1 | Unsecured Claims — Tenant Security Deposits - $85,000 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 33C-2 | General Unsecured Claims - $61,022 | Impaired. | Common Unsecured Claim Treatment. |
| 33D | Intercompany Claims - $1,485,597 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 33E | Equity Interests of MMP Ventures (100%) | Unimpaired | Holders retain their interests. |
| **34.** | **905 8th Street LLC** | | |
| 34A-1 | Los Angeles County Secured Tax Claim - $87,293 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 34A-2 | The Stanford Group LP | Impaired. | |

72

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | Secured Claim - $1,950,000 | | |
| 34C-1 | Unsecured Claims — Tenant Security Deposits - $3,525 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 34C-2 | General Unsecured Claims - $12,849 | Impaired. | Common Unsecured Claim Treatment. |
| 34D | Intercompany Claims - $2,814,172 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 34E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **35.** | **Meruelo Maddux – 914-949 S. Hill Street LLC** | | |
| 35A-1 | Los Angeles County Secured Tax Claim - $307,986 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 35A-2 | Imperial Capital Bank Secured Claim - $9,007,827 | Impaired. | |
| 35C-1 | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 35C-2 | Tenant Security Deposits - $30,000 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 35D | Intercompany Claims - $17,716,678 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 35E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **36.** | **Alameda Produce Market LLC** | | |
| 36A-1-a | Los Angeles County Secured Tax Claim re Alameda Produce Market Encumbered Real Property - $421,457 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 36A-1-b | Los Angeles County Secured Tax Claim re Alameda Produce Market Unencumbered Real Property - $37,263 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 36A-2 | Cathay Bank Secured Claim - $48,815,711 | Impaired. | |
| 36A-3 | Cathay Bank Secured Claim - $9,848,944 | Impaired. | |
| 36B | Priority Benefits Claims - $23,169 | Unimpaired. | |
| 36C-1 | Unsecured Claims — Tenant Security Deposits - $301,019 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 36C-2 | General Unsecured Claims - | Impaired. | Common Unsecured Claim |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | $581,888 | | Treatment. |
| 36E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **37.** | **Merco Group – 1500 Griffith Avenue LLC** | | |
| 37A-1-a | Los Angeles County Secured Tax Claim re 1500 Griffith - $109,864 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 37A-1-b | Los Angeles County Secured Tax Claim re 1510 Griffith Avenue - $78,830 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 37A-2 | Legendary Secured Claim - $6,396,500 — joint and several obligation with 4th Street Center, LLC, and also secured by the 4th Street Center Real Property (see Class 44A-2 below). | Impaired. | Common Secured Lender Treatment. |
| 37A-3 | Murakami Secured Claim - $2,945,000 | Impaired. | Common Secured Lender Treatment. |
| 37C-1 | Unsecured Claims — Tenant Security Deposits - $58,830 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 37C-2 | General Unsecured Claims - $2,452 | Impaired. | Common Unsecured Claim Treatment. |
| 37D | Intercompany Claims - $5,508,367 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 37E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **38.** | **Meruelo Maddux Properties – 1919 Vineburn Street LLC** | | |
| 38A-1 | Los Angeles County Secured Tax Claim - $138,067 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 38A-2 | Imperial Capital Bank Secured Claim - $5,468,543 | Impaired. | |
| 38C-1 | Unsecured Claims     Tenant Security Deposits - $42,210 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 38C-2 | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 38D | Intercompany Claims - $3,035,648 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 38E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **39.** | **Meruelo Maddux Properties – 2131 Humboldt Street LLC** | | |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 39A-1-a | Los Angeles County Secured Tax Claim Against 2131 Humboldt Encumbered Real Property - $263,168 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 39A-1-b | Los Angeles County Secured Tax Claim Against 2131 Humboldt Unencumbered Real Property - $145,353 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 39A-2 | Chamlian Secured Claim - $7,000,000 | Impaired. | Common Secured Lender Treatment. |
| 39C-1 | Unsecured Claims — Tenant Security Deposits - $10,500 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 39C-2 | General Unsecured Claims - $3,631 | Impaired. | Common Unsecured Claim Treatment. |
| 39D | Intercompany Claims - $13,680,208 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 39E | Equity Interests of MMP Ventures (100%) | Unimpaired | Holders retain their interests. |
| **40.** | **Merco Group – 2529 Santa Fe Avenue LLC** | | |
| 40A-1 | Los Angeles County Secured Tax Claim - $126,578 | Unmpaired. | Common Los Angeles Tax Claim Treatment. |
| 40A-2 | 1248 S. Figueroa Secured Claim - $3,134,825 | Impaired. | Common Secured Lender Treatment. |
| 40C-1 | Unsecured Claims — Tenant Security Deposits - $15,000 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 40C-2 | General Unsecured Claims - $25,049 | Impaired. | Common Unsecured Claim Treatment. |
| 40D | Intercompany Claims - $3,703,446 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 40E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **41.** | **2640 Washington Boulevard LLC** | | |
| 41A-1 | Los Angeles County Secured Tax Claim - $212,108 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 41A-2 | East West Bank as successor to UCB Secured Claim - $6,066,073 | Impaired. | Common Secured Lender Treatment. |
| 41C-1 | Unsecured Claims — Tenant Security Deposits - $52,150 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 41C-2 | General Unsecured Claims - $19,358 | Impaired. | Common Unsecured Claim Treatment. |
| 41D | Intercompany Claims - | Unimpaired. | Creditors retain their |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | $3,920,800 | | claims and all rights, interests and obligations related thereto. |
| 41E | Equity Interests of MMP Ventures (100%) | Unimpaired. | |
| **42.** | **Meruelo Maddux Properties – 2941 Lenwood Road LLC** | | |
| 42A-1 | FNBN Secured Claim - $8,983,643 | Impaired. | Common Secured Lender Treatment. |
| 42C | General Unsecured Claims - $6,281,773 | Impaired. | Common Unsecured Claim Treatment. |
| 42D | Intercompany Claims - $6,279,821 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 42E | Equity Interests of MMP Ventures (100%) | Unimpaired | Holders retain their interests. |
| **43.** | **Merco Group – 3185 E. Washington Boulevard LLC** | | |
| 43A-1-a | Los Angeles County Secured Tax Claim re 3185 E. Washington Boulevard Encumbered Real Property - $191,130 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 43A-1-b | Los Angeles County Secured Tax Claim re 3185 E. Washington Boulevard Unencumbered Real Property- $969 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 43A-2 | Chinatrust Secured Claim - $9,541,565 | Impaired. | |
| 43C-1 | General Unsecured Claims - $1,702 | Impaired. | Common Unsecured Claim Treatment. |
| 43C-2 | Unsecured Claims — Tenant Security Deposits $250,000 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 43D | Intercompany Claims - $1,938,813 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 43E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **44.** | **Merco Group – 4th Street Center LLC** | | |
| 44A-1 | Los Angeles County Secured Tax Claim - $96,705 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 44A-2 | Legendary Secured Claim - joint and several obligation with 1500 Griffith Avenue, and also secured by 1500 Griffith Avenue (see Class | Impaired. | Common Secured Lender Treatment. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | 37A-2 above). | | |
| 44C-1 | General Unsecured Claims - $17,652 | Impaired. | Common Unsecured Claim Treatment. |
| 44C-2 | General Unsecured Claims — Tenant Security Deposits - $4,500 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 44D | Intercompany Claims - $6,840,375 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 44E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **45.** | **Merco Group – 425 W. 11th Street LLC** | | |
| 45A-1 | Los Angeles County Secured Tax Claim - $332,662 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 45A-2 | Legendary Secured Claims - $5,340,000 | Impaired. | Common Secured Lender Treatment. |
| 45C | General Unsecured Claims - $4,266 | Impaired. | Common Unsecured Claim Treatment. |
| 45D | Intercompany Claims - $11,737,757 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 45E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **46.** | **Merco Group – 620 Gladys Avenue LLC** | | |
| 46A-1-a | Los Angeles County Secured Tax Claim re 620 S. Gladys Avenue Encumbered Real Property - $311,811 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 46A-1-b | Los Angeles County Secured Tax Claim re 620 S. Gladys Avenue Unencumbered Real Property - $113,033 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 46A-2 | Legendary Secured Claim re 620 S. Gladys Avenue - $5,380,688 which is also secured by the MM 336 W. 11th Street Real Property (see Class 29A-4 above). | Impaired. | Common Secured Lender Treatment. |
| 46C | General Unsecured Claims - $1,501 | Impaired. | Common Unsecured Claim Treatment. |
| 46D | Intercompany Claims - $9,788,629 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 46E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **47.** | **Merco Group – 2001-2021 W. Mission Boulevard LLC** | | |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 47A-1 | Los Angeles County Secured Tax Claim - $105,146 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 47A-2 | PNL Pomona LP Secured Claim — to be determined | Impaired. | Common Secured Lender Treatment. |
| 47C | General Unsecured Claims - $5,402 | Impaired. | Common Unsecured Claim Treatment. |
| 47D | Intercompany Claims - $12,948,409 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 47E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **48.** | **Merco Group – Little J LLC** | | |
| 48A-1-a | Los Angeles County Secured Tax Claim re 1119 S. Olive Street - $52,446 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 48A-1-b | Los Angeles County Secured Tax Claim re 1124 S. Olive Street - $64,262 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 48A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligation for payment under a loan made to Merco Group which is also secured by the Sky-Arc Real Property (see Class 50A-2 below). | Impaired. | Common Secured Lender Treatment. |
| 48C-2 | General Unsecured Claims - $2,252 | Impaired. | Common Unsecured Claim Treatment. |
| 48C-3 | Tenant Security Deposit Claims - $7,000 | | Creditors' legal equitable and contractual rights are Reinstated. |
| 48D | Intercompany Claims - $8,299,295 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 48D | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **49.** | **Merco Group – Southpark LLC** | | |
| 49A-1 | Los Angeles County Secured Tax Claim - $570,318 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 49A-2 | Bank of America Secured Claim - $20,000,000 | Impaired. | Common Secured Lender Treatment. |
| 49C-1 | General Unsecured Claims - $1,308,981 | Impaired. | Common Unsecured Claim Treatment. |
| 49C-2 | Tenant Security Deposit Claims - $31,000 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 49D | Intercompany Claims - $37,919,096 | Unimpaired. | Creditors retain their claims and all rights, |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | | | interests and obligations related thereto. |
| 49E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **50.** | **Merco Group LLC** | | |
| 50A-1 | Los Angeles County Secured Tax Claim $380,214 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 50A-2 | Legendary Secured Claim re Sky-Arc Real Property - $15,000,000 which is also secured by the Little J Real Property (see Class 48A-2 above) | Impaired. | Common Secured Lender Treatment. |
| 50A-3 | Legendary Secured Claim re Sci-Arc Real Property - $10,108,209 | Impaired. | Common Secured Lender Treatment. |
| 50C | General Unsecured Claims - $271,104 | Impaired. | Common Unsecured Claim Treatment. |
| 50D | Intercompany Claims - $16,604,526 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 50E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **51.** | **Meruelo Farms LLC** | | |
| 51A-1-a | Los Angeles County Secured Tax Claim re 815 E. Temple Street - $94,319 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 51A-1-b | Los Angeles County Secured Tax Claim re 729 E. Temple Street - $208,977 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 51A-2 | Imperial Capital Bank Secured Claim - $6,978,349 | Impaired. | |
| 51A-3 | Pacific Commerce Secured Claim - $3,350,000 | Impaired. | Common Secured Lender Treatment. |
| 51C | General Unsecured Claims - $187,099 | Impaired. | Common Unsecured Claim Treatment. |
| 51D | Intercompany Claims - $9,138,503 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 51E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **52.** | **Meruelo Wall Street LLC** | | |
| 52A-1 | Los Angeles County Secured Tax Claim - $423,210 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 52A-2 | East West Bank as successor to UCB Secured Claim - $20,850,859 | Impaired. | Common Secured Lender Treatment. |
| 52B | Priority Benefits Claims - $9,542 | Impaired. | |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 52C-1 | Unsecured Claims — Tenant Security Deposits - $297,650 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 52C-2 | General Unsecured Claims - $16,640 | Impaired. | Common Unsecured Claim Treatment. |
| 52D | Intercompany Claims - $3,133,131 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 52E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **53.** | **Meruelo Maddux – Mission Boulevard LLC** | | |
| 53A-1 | Los Angeles County Secured Tax Claim - $290,497 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 53A-2 | Kennedy Funding, Inc. Secured Claim - $8,800,000 | Impaired. | Common Secured Lender Treatment. |
| 53C | General Unsecured Claims - $15,539 | Impaired. | Common Unsecured Claim Treatment. |
| 53D | Intercompany Claims - $20,054,067 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 53E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **54.** | **Santa Fe Commerce Center, Inc.** | | |
| 54A-1 | Los Angeles County Secured Tax Claim - $99,452 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 54A-2 | Berkadia Secured Claim - $10,170,904 | Impaired. | Common Secured Lender Treatment. |
| 54A-3 | RoofCorp of CA, Inc. Secured Claim - $111,377 | Impaired. | Common Secured Lender Treatment. |
| 54C-1 | Unsecured Claims — Tenant Security Deposits -$79,667 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 54C-2 | General Unsecured Claims - $16,059 | Impaired. | Common Unsecured Claim Treatment. |
| 54E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

**B.      Treatment for Unclassified Claims**

   **1.      Unclassified Claims (Applicable to all of the Debtors)**

Certain types of claims are not placed into voting classes; instead they are unclassified.

They are not considered impaired and they do not vote on the Shareholder Plan because they

are automatically entitled to a specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class. The treatment of these claims is provided below.

### a.    *Administrative Claims*

Administrative Claims are claims for costs or expenses of administering the Debtors' Chapter 11 Cases which are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Shareholder Plan, unless a particular claimant agrees to a different treatment. Section 507(a)(2) Administrative Claims include, but are not limited to, claims arising from the employment of professionals and the costs and the statutory fees of the Bankruptcy Court and the Office of the United States Trustee.

### (1)    General

Subject to the bar date provisions herein and additional requirements for professionals and certain other entities set forth below, the surviving Reorganized Debtor shall pay to each Holder of an Allowed Administrative Claim, on account of its Administrative Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date or as soon as practicable thereafter, unless the Holder agrees or shall have agreed to other treatment of such Claim. Payment on an Administrative Claim which arose in the ordinary course of each Debtor's business, including Ordinary Course Professionals, will be made when such payment would have become due in the ordinary course of each Debtor's business or under the terms of the Claim in the absence of the Chapter 11 Cases.

### (2)    Payment of Statutory Fees

On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the hearing on Confirmation, shall be paid in Cash equal to the amount of such Administrative Claim.

### (3)    Bar Date for Administrative Claims

### (a)    *General Provisions*

Except as provided below for (i) non-tax liabilities incurred in the ordinary course of

business by each Debtor and (ii) Postpetition Tax Claims, requests for payment of Administrative

Claims must be Filed and served on counsel for the Reorganized Debtor no later than forty-five (45)

days after the Effective Date, or such later date, if any, as the Court shall order upon application

made prior to the end of such 45-day period. Holders of Administrative Claims (including, without

limitation, professionals requesting compensation or reimbursement of expenses and the Holders of

any Claims for federal, state or local taxes) that are required to File a request for payment of such

Claims and that do not File such requests by the applicable bar date shall be forever barred from

asserting such Claims against any of the Debtors or the Reorganized Debtor or any of their

respective properties.

### *(b)      Professionals*

All professionals or other Persons requesting compensation or reimbursement of expenses

pursuant to any of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for

services rendered on or before the Effective Date (including, inter alia, any compensation requested

by any professional or any other Person for making a substantial contribution in the Reorganization

Case) shall File and serve on the Reorganized Debtor and the Creditors' Committee an application

for final allowance of compensation and reimbursement of expenses no later than (i) forty-five (45)

days after the Effective Date, or (ii) such later date as the Court shall order upon application made

prior to the end of such 45-day period. Objections to applications of professionals for compensation

or reimbursement of expenses must be Filed and served on Reorganized Debtor, the Creditors'

Committee and the professionals to whose application the objections are addressed on or before (i)

fourteen days after such application is Filed and served or (ii) such later date as the Court shall

order or upon agreement between the Reorganized Debtor and the affected professional.

Any professional fees and reimbursements of expenses incurred by the Reorganized Debtor

subsequent to the Effective Date may be paid by the Reorganized Debtor without application to or

Order of the Court.

### *(c)      Ordinary Course Liabilities*

Holders of Administrative Claims based on liabilities incurred post-petition in the ordinary

course of the Debtors' businesses, including Ordinary Course Professionals, (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to File any request for payment of such Claims. Such Administrative Claims shall be assumed and paid by such Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claim, without any further action by the Holders of such Claims.

### *(d)* *Tax Claims*

All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) forty-five (45) days following the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any Postpetition Tax Claim that is required to File a request for payment of such taxes and that does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Postpetition Tax Claim against any of the Debtors or Reorganized Debtor, or any of their respective properties, whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date. The Debtors are paying all Postpetition Tax Claims as they come due; however, certain taxing authorities conduct audits which may result in a postpetition tax liability of which the Debtors are currently unaware.

### b.      Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code Section 507(a)(8). The Bankruptcy Code requires that each holder of such a 507(a)(8) priority Tax Claim receive the present value of such claim in deferred cash payments, over a period not exceeding five years after the Petition Date. The following chart lists the Debtors' Section 507(a)(8) priority Tax Claims and their treatment under this Shareholder Plan.

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **1.  Meruelo Maddux Properties, Inc.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **Name** – State of Delaware<br>**Type of tax** –  Franchise | $125,138.00 | See below. |
| **Name** – State Board of Equalization<br>**Type of tax** –  Hazardous Substance Tax | $61,916 | See below |

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **2.  Meruelo Maddux Properties, L.P.** | | |
| Name – Franchise Tax Board<br>Type of tax – Income | $0.00 | See below. |
| **4.  Meruelo Maddux Construction, Inc.** | | |
| Name – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **10.  Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina** | | |
| Name – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **11.  Meruelo Maddux – 230 W. Avenue 26 LLC** | | |
| Name: Franchise Tax Board<br>**Type of tax** –  Income | $0.00 | See below. |
| **12.  Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | |
| Name – City of Los Angles<br>**Type of tax** – Business<br>Name – Franchise Tax Board<br>**Type of tax** – Income | $151,232<br><br>$0.00 | See below. |
| **13.  .  Meruelo Maddux  - 817-825 S. Hill Street L** | | |
| Name – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **14. .  Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| Name - Franchise Tax Board<br>**Type of tax** – Income | 0.00 | See below. |
| **15.. Meruelo Maddux  Properties – 1060 N. Vignes LLC** | | |
| Name – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **17.  Meruelo Maddux  - 5500 Flotilla Street LLC** | | |
| Name - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **18.  Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |
| Name - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **20.  Merco Group – 801 E. 7th StreetLLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **21.  Merco Group – 1211 E. Washington Boulevard LLC** | | |
|  | | |
| **28.  Meruelo Maddux 3rd and Omar Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **29.  Meruelo Maddux - 336 W. 11th Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **30.  Meruelo Maddux  -  500 Mateo Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **35.  Meruelo Maddux  -  915-949 S. Hill Street** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **39.  Meruelo Maddux  -  2131 Humboldt Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **42.  Meruelo Maddux  -  2951 Lenwood Road LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **52.  Meruelo Wall Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **TOTAL** | **$340,475.00** | |

Except as otherwise provided below, or as otherwise agreed to by Reorganized Debtor and the applicable taxing agency, Reorganized Debtor shall pay to each Holder of an Allowed Priority Tax Claim allowed in an amount greater than $800, deferred Cash payments, over a period not exceeding five years from the Petition Date, of an aggregate amount equal to the amount of such Allowed Priority Tax Claim, with interest at the rate of 4.0% per annum accruing from the Petition Date of such Allowed Priority Tax Claim (without penalty of any kind).

Holders of Allowed Priority Tax Claims shall receive deferred cash payments, payable in fifteen (15) equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date. In the event a Disputed Priority Tax.

Claim becomes an Allowed Priority Tax Claim, the first payment will be due and payable on the later of the next Quarterly Distribution Date or 30 days after the end of the calendar quarter in which the Disputed Priority Tax Claim becomes an Allowed Priority Tax Claim, and the first payment shall include payment for amounts that would have been owing in quarters prior to the

---

[6] The Franchise Tax Board has filed claims for franchise taxes for the 2009 year corporate tax fee of $800 in the Debtors' cases scheduled above.  Debtors' records indicate that all such taxes have been paid and, accordingly, the above schedule shows the amount of the such FTB claims to be zero but if it is determined that the FTB has Allowable Claims, the treatment is as provided above.

1   allowance of the Disputed Priority Tax Claim. Each installment shall include interest on the unpaid

2   portion of such Allowed Priority Tax Claim, without penalty of any kind, at rate of 4.0% per

3   annum. In the event an Allowed Priority Tax Claim is in the amount of $800 or less, the

4   Reorganized Debtor shall pay such claim in full on the latest of (a) the Effective Date, (b) 30 days

5   after the end of the calendar quarter in which an Order allowing such priority Tax Claim becomes a

6   Final Order, and (c) such other time or times as may be agreed to by the Holder of such Tax Claim

7   and the Reorganized Debtor, with interest at the rate of 4.0% per annum accruing from the Petition

8   Date.

9       Notwithstanding the above treatment, the Reorganized Debtors may pay Priority Tax Claims

10   in full at any time after the Effective Date.

11                         **VI.**

12      **<u>TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>**

13       The Shareholder Plan constitutes a motion to assume or reject all executory contracts and

14   nonresidential real property leases, except for those executory contracts and nonresidential real

15   property leases that have already been assumed or rejected pursuant to an earlier Order of the

16   Bankruptcy Court or that are the subject of a motion for such an Order pending as of the

17   Confirmation Hearing. Prior to the Shareholder Proponents, the Shareholder Proponents will file a

18   schedule of all real property leases and executory contracts to be rejected; any contract or lease not

19   on that schedule shall be deemed assumed by the applicable Debtor as of the Effective Date.  Prior

20   to the date of hearing on the Shareholder Proponents Disclosure Statement, the Shareholder

21   Proponents will file a schedule of all real property leases and executory contracts to be assumed

22   listing the cure amount, if any, under such unexpired lease or executory contract. Unless the non-

23   Debtor party to any such executory contract or unexpired lease to be assumed files and serves on

24   Shareholder Proponents' counsel an objection to the cure amount specified on that schedule on or

25   before the last date established by the Bankruptcy Court to file and serve objections to confirmation

26   of the Shareholder Plan, such cure amount shall be forever binding on such non-debtor party to said

27   executory contract or unexpired lease.

28

Except as otherwise agreed by the parties to an executory contract or unexpired lease, each Reorganized Debtor will cure any and all undisputed defaults within thirty days of the Effective Date under any executory contract or unexpired lease assumed pursuant to the Shareholder Plan and to which it is a party, in accordance with Section 365 of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty days of the entry of a Final Order determining the amount, if any, of such Debtor's or Reorganized Debtor's liability with respect thereto, or as may be agreed otherwise by the parties. The Confirmation Order shall state that all pre-petition contracts and unexpired leases that are listed on the schedule described herein are deemed assumed under the Shareholder Plan.

Any Claim for damages arising from the rejection of an executory contract or unexpired lease must be Filed and served on counsel for the Reorganized Debtors within thirty (30) days after the order of the Bankruptcy Court approving such rejection becomes a Final Order or be (i) forever barred and unenforceable against any Debtor, its Estate, the Reorganized Debtor and their respective property, and (ii) barred from receiving any distribution under the Shareholder Plan. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as a Class "C" General Unsecured Claim against the respective Debtor who is a party to such executory contract or unexpired lease.

Any election of rights by a lessee under Section 365(h)(1) of the Bankruptcy Code must be Filed and served on counsel for the Debtors within thirty (30) days after the order of the Bankruptcy Court approving such rejection becomes a Final Order or lessee shall be deemed to have waived any and all of its rights under Section 365(h)(1).

## VII.

## MEANS FOR IMPLEMENTATION OF THE SHAREHOLDER PLAN

### A.    OVERVIEW OF PLAN IMPLEMENTATION

Except as otherwise provided in the Shareholder Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Shareholder Plan will be obtained from the Reorganized Debtors' cash balances existing on the Effective Date, from cash

generated by the Reorganized Debtors' business post-Effective Date, from the sale or refinancing of assets of the Reorganized Debtors, from the sale of the New Equity Interests described below, and from any other lawful source.

**B.      VESTING OF ASSETS**

Except as otherwise provided in any provision of the Shareholder Plan, on the Effective Date, all legal and equitable interests of the Debtors in property of their respective estates shall be vested in such Reorganized Debtors, free and clear of all Claims, Liens, encumbrances and Interests except to the extent and only as is expressly provided for otherwise in Article III.0 of the Shareholder Plan.

**C.      SALE OR REFINANCE OF CERTAIN OF THE ASSETS OF CERTAIN DEBTORS**

As of the Effective Date, the Reorganized Debtors will continue to operate their businesses. In order to meet their operational needs and payment obligations under the Shareholder Plan, the Reorganized Debtors may sell or refinance some of their assets as necessary during the term of the Shareholder Plan. The Reorganized Debtors will determine which assets will be sold or refinanced based on the then existing needs of the business.  After the payment of the costs of sale and the satisfaction of any Liens fixed by this Shareholder Plan against the asset, the remaining proceeds will be available for the payment of the costs of operating its business and funding the Reorganized Debtors' obligations under this Shareholder Plan.

**D.      EQUITY STRUCTURE FOR REORGANIZED MMPI**

The Shareholder Plan provides for an infusion of New Equity through a private placement (see Section F immediately below for a description of the New Equity infusion).

**E.      PRIVATE PLACEMENT**
         a.    *New Equity*

To fund the Shareholder Plan, MMPI will issue 4,350,000 shares of MMPI common stock ("New Equity").  MMPI Acquisition has committed to purchase the 4.35 million shares at a total purchase price of $30,000,000.  MMPI acquisition will not, however, have the exclusive right to

purchase the New Equity.  The Sale of New Equity will be subject to higher cash offers in accordance with the terms described in Exhibit __ to the Shareholder Plan.  If a higher offer is submitted and accepted, the net proceeds will be distributed to Holders of Existing MMPI Common Stock pro rata.

The foregoing private placement transaction is referred to in this Shareholder Plan as the "Private Placement."  The terms of the Private Placement will meet any and all requirements necessary for the Private Placement to be exempt from registration requirements of the Securities Act and of any equivalent state securities or "blue sky" laws under section 4(2) of the Securities Act in accordance with Rule 506 of Regulation D promulgated thereunder.  Section 4(2) exempts from registration under the Securities Act all "transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(2).

### a.    *Deposit and Payment of Purchase Price*

MMPI Acquisition (or such other party as may submit a higher bid) will transmit the full New Equity purchase price within 30 days of entry of an order confirming this Shareholder Plan. Deposit requirements shall be as described in Exhibit __ to the Shareholder Plan.

### b.    *Private Placement Conditioned Upon Confirmation And Effective Date*

The Private Placement is subject to and conditioned upon the confirmation of the Shareholder Plan.

### a.    *MMPI Acquisition*

The proposed purchaser of shares in the Private Placement is MMPI Acquisition.  The investors in MMPI Acquisition are Charlestown Capital, Hartland Asset Management, Global Asset Capital, and the Perimeter Group.

Charlestown Capital is a private merchant-banking and financial advisory company

1 headquartered in New York. Charlestown Capital has been involved in strategic M & A advisory,

2 restructurings, asset divestitures, partial recapitalizations and other financings across many sectors.

3 As a merchant bank, Charlestown has committed capital to mid-sized enterprises and financially

4 backed managements during financial restructurings.

5  Charlestown Capital was founded by Raj Maheshwari in 2005.  Under Mr. Maheshwari's

6 tenure, Charlestown Capital has been a M & A advisor to Esmark, Inc, a $1.3 billion steel company

7 that was sold to OAO Severstal of Russia in August 2008.  Charlestown Capital continues to be a

8 Mergers & Acquisition advisor to The Bouchard Group, the founders of Esmark, Inc. and to their

9 successor companies.  In addition, Charlestown continues to be involved in many other M & A and

10 financial restructuring initiatives.

11  Global Asset Capital ("GAC") is a Palo Alto, California-based private equity investment

12 firm with interests in venture capital, structured finance, and real estate. Founded in 1997, GAC is

13 currently managing over $350MM focused on venture capital, private equity, and real estate. GAC

14 has a successful track record of building businesses in the telecommunications/media/technology

15 and specialty finance/real estate industries. GAC partners with management teams to build category

16 defining companies that create long-term equity value. GAC's current real estate portfolio comprises

17 over twenty office and development assets in California.  GAC's financial advisor in real estate

18 matters is Deutsche Bank, and its legal advisor is Morrison & Foerster.

19  The Perimeter Group is currently 85 employees located across seven offices globally,

20 including acquisitions, asset management, finance and investor relations professionals.  The

21 Perimeter Group completed a spin-out of Lehman Brothers Real Estate Partners (LBREP) in May,

22 2010.  It manages $3.5 billion of equity with an underlying real estate value of over $18 billion, and

23 its asset base primarily consists of office, hotel, apartment and residential land assets.  The

24 principals of Perimeter average over 25 years of real estate experience and collectively have

25 invested over $15 billion of equity and have originated over $30 billion of first mortgage and

26 mezzanine debt transactions.  Perimeter principals have been involved in several billions of dollars

27 of investment in the Los Angeles metro area including the sale of Arden Realty, acquisition and

28

1    entitlement of 9900 Wilshire Boulevard in Beverly Hills and construction of JW Marriott / Ritz-

2    Carlton hotel and residential tower at LA Live complex located in downtown Los Angeles.  In

3    addition to its investment in MMPI Acquisition, Perimeter Group will support the development and

4    implementation of the Reorganized Debtor's business plan.

5    In addition to the above investors, MMPI Acquisition is advised by the Multi Capital Group.

6    Multi Capital Group is a Real Estate Investment Banking firm, specializing in the full spectrum of

7    real estate financing. This is the case whether it is the acquisition or refinancing of an office

8    building, shopping center, industrial building, mixed-use, multi-family property or health related

9    facility. As a part of The Multi Group of Companies, Multi Capital Group has successfully been

10    involved in excess of $6 billion Dollars of real estate transactions.  Over the last decade, Multi

11    Capital has built an array of complementary financial and advisory services. Today, Multi Capital

12    offers, owners, investors and developers comprehensive debt structures, corporate advisory, and

13    construction consulting services, as well access to a wide variety of investment and financial

14    services.

15
      **F.       Certificate of Incorporation and Bylaws; Cancellation Of MMPI Securities,**
16
      **LTIP Units and Related Agreements**
17
      　　　　　　　　a.        ***Cancellation Of MMPI Securities, LTIP Units and Related***
      　　　　　　　　　　　　　　***Agreements***
18

19    At the Effective Date, (i) the MMPI Existing Common Stock and the LTIP Units; all

20    warrants, options or other rights for the purchase or other acquisition from any Debtor of any MMPI

21    Existing Common Stock or LTIP Units; all securities convertible into or redeemable or

22    exchangeable for any MMPI Existing Common Stock or LTIP Units; and all warrants, rights or

23    options for the purchase or other acquisition from any Debtor of any MMPI Existing Common

24    Stock or LTIP Units or any such warrants, options, other rights or securities, and any interest or

25    participation in any of the foregoing and any other ownership or profit interest or participation in

26    MMPI or MMPLP (to the extent not held directly or indirectly by MMPI) will be cancelled and

27    extinguished, and (ii) the obligations of, Claims against, and/or Interests in MMPI under, relating or

28

1  pertaining to any agreements (including without limitation, registration rights agreements, merger,

2  contribution and similar agreements and voting, shareholders and similar agreements)), indentures,

3  certificates of designation, bylaws, or certificates or articles of incorporation or similar documents

4  governing the MMPI Existing Common Stock and any other instrument or document evidencing or

5  creating ownership interest in MMPI (including without limitation, provisions of the agreement of

6  limited partnership of MMPLP and award agreements relating to the LTIP Units) will be released

7  and discharged.

        b.     ***Amended and Restated Certificate of Incorporation and Bylaws***

8

9  On and after the Effective Date, pursuant to and by virtue of this Shareholder Plan, the

10  certificate of incorporation of the Reorganized MMPI will be amended and restated in the form

11  attached hereto as Exhibit K until thereafter changed or amended as provided therein or by

12  applicable law, and the amended and restated bylaws in the form attached hereto as Exhibit L will

13  be the bylaws of Reorganized MMPI until thereafter changed or amended as provided therein or by

14  applicable law.

15  **G.**    **Issuance of New Equity Interests**

16  Upon entry of the Confirmation Order, the shares of New Equity shall be issued to the

17  Eligible Investors validity subscribing for New Equity and the Initial Investors, in accordance with

18  the Private Placement, which issuance will then represent all of the issued and outstanding equity

19  interests in MMPI. Nothing herein shall prevent Reorganized MMPI from adopting a new name. All

20  of the shares of New Equity issued pursuant to the Shareholder Plan shall be duly authorized,

21  validly issued, fully paid and non-assessable.

22  **H.**    **Merger of MMPLP and MMPI**

23  Upon the terms and subject to the conditions set forth in the agreement and plan of merger

24  (the "Merger Agreement"), the form of which is attached hereto as Exhibit M, MMPLP shall be

25  merged with and into MMPI one day after the Effective Date if not earlier accomplished (the

26  "Merger"). Following the Merger, the separate corporate existence of MMPLP shall cease, and

27  MMPI shall continue as the surviving company and shall succeed to and assume all the rights and

28

1    obligations of MMPLP.

2        If not earlier accomplished, as promptly as practicable but at least one day after the Effective

3    Date, the parties shall file with the Secretary of State of the State of Delaware a certificate of merger

4    (the "Certificate of Merger") executed and acknowledged by the parties in accordance with the

5    relevant provisions of the DGCL and the RULPA and, as promptly as practicable on or after the

6    Effective Date, the parties to the Merger shall make all other filings or recordings required by the

7    Court and under the DGCL and the RULPA. If not earlier accomplished, the Merger shall become

8    effective one day after the Effective Date and the filing of the Certificate of Merger with the

9    Secretary of State of the State of Delaware, or at such later date and time as MMPI and MMPLP

10   shall agree and shall specify in the Certificate of Merger.

11       Once the Merger becomes effective, all the property, rights, privileges, powers and

12   franchises of MMPLP shall vest in MMPI, and all debts, liabilities and duties of MMPLP shall

13   become the debts, liabilities and duties of MMPI.

14   **I.    Retained Claims And Defenses And Reservation Of Rights**
     *a.    No Waiver and Retention of Claims and Defenses*

15

16       Unless otherwise expressly set forth in the Shareholder Plan or the Confirmation Order,

17   pursuant to Section 1123(b)(3)(B), all Retained Claims and Defenses of any kind or nature

18   whatsoever against third parties arising before the Effective Date and belonging to the Debtor or the

19   Estate shall become property of the Reorganized Debtor. Such Retained Claims and Defenses shall

20   include, without limitation:

21

22       •    All claims and defenses pursuant to applicable non-bankruptcy law and Sections

23            502, 506, 524 and 553 of the Bankruptcy Code against any Creditor regarding the

24            amount of such Holder's Allowed Claim (whether prepetition or postpetition), to

25            enforce the discharge of any Secured Creditors' Claims;

26       •    All claims and defenses pursuant to applicable non-bankruptcy law and Sections

27            502, 506, 510, 524, 542 and 553 of the Bankruptcy Code including, without

28

93

1    limitation, claims and defenses based on any Creditors' assertion of unreasonable

2    professionals' fees, costs, charges and penalties (whether disguised as interest, or

3    otherwise); and

4    • All claims and defenses related to the recovery of professionals' fees and expenses by

5    the Debtor or Reorganized Debtor from Creditors.

6    • All claims against the Debtors' Insiders, employees, and/or agents relating to pre-

7    confirmation and/or pre-petition conduct, including without limitation, claims for

8    fraud, breach of fiduciary duty or negligence.

9

10    • All claims and defenses attributable to the filing of personal Chapter 7 or Chapter 11

11    bankruptcy petitions by an Insider who is a natural person, including without

12    limitation, claims or defenses related to the diminution of security for the Company's

13    debts if an Insider obtains a discharge of their personal guaranty obligations.

14

15    From and after the Effective Date, the Reorganized Debtor is authorized to assert the

16    Retained Claims and Defenses including, but not limited to, for purposes of objection to the

17    allowance of any Claim.  Nothing contained in the Shareholder Plan or the Confirmation Order

18    shall be deemed to be a waiver or the relinquishment of any of the Debtor's rights with respect to the

19    Retained Claims and Defenses and Reorganized Debtor shall be entitled to assert the Retained

20    Rights and Defenses as fully as if the Chapter 11 Case had not been commenced.

21    **b.    *Retention of Avoidance Actions***

22    Unless otherwise expressly set forth in the Shareholder Plan or the Confirmation Order,

23    from and after the Effective Date, the Reorganized Debtor shall have the right to prosecute any and

24    all avoidance actions, recovery causes of action and objections to Claims under Sections 105, 502,

25    506, 510, 542 through 551 and 553 of the Bankruptcy Code that belong to the Debtors or to the

26    Estates, including, without limitation, all avoidance actions related to the transfers listed on Exhibit

27    "I" attached hereto, as well as potential avoidance actions against Legendary and East West Bank

28    relating to the withdrawals by East West Bank of $2 million from an account held at East West

94

1  Bank a few days before the Debtors' bankruptcy and against Legendary, based on the post petition

2  recording of documents purporting to re-establish a previously reconveyed Lien against assets of

3  Debtors, and against PNL for certain involuntary, unauthorized postpetition transfers of funds

4  belonging to MG 2001-2021 W. Mission.

5        With regard to actions that may be asserted by the Debtors under section 547 of the Code,

6  the Debtors note that in order to avoid a preferential transfer a debtor must show that the recipient

7  received more as a result of the transfer than the recipient would receive in a hypothetical Chapter 7

8  case. Provided that the Debtors' proposed plans are confirmed, general unsecured creditors' Allowed

9  Claims will be paid in full. As a result, with regard to transfers made during the relevant 90-day or

10  1-year preference periods to general unsecured creditors, the Reorganized Debtor is unlikely to seek

11  the avoidance of such transfers. If the Shareholder Plan is not confirmed, the risk that an avoidance

12  action may be filed to recover a transfer made during the relevant period may increase. A list of all

13  of the transfers by the Debtor during the 90-day and 1-year periods is attached as Exhibit "I."

        c.    ***Unknown Retained Claims and Defenses / No Preclusion***

14

15        Unless otherwise expressly set forth in the Shareholder Plan or the Confirmation Order, the

16  reservation of rights and Retained Claims and Defenses set forth above shall include, without

17  limitation, any Retained Claims and Defenses of which the Debtor may presently be unaware, or

18  which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at

19  this time or facts or circumstances that may change or be different from those the Debtor now

20  believes to exist including, without limitation, claims based on theories of construction defect,

21  breach of warranty, negligence, indemnification and contribution. Therefore, no preclusion doctrine,

22  including, without limitation, the doctrines of res judicata, collateral estoppel, waiver, estoppel

23  (judicial, equitable or otherwise), or laches will apply to the Reorganized Debtor with respect to the

24  Retained Claims and Defenses upon or after the Confirmation of the Shareholder Plan based on the

25  Shareholder Plan, the Disclosure Statement or the Confirmation Order.

26      **J.**      **NON-BANKRUPTCY LITIGATION**

27        The Debtors are engaged in litigation proceedings for which relief from stay has been

28

granted. While the Debtors do not consider any such litigation to be material, there are two eminent

domain actions that may result in cash awards being paid to the respective Debtors. In 2004, the Los

Angeles County Metropolitan Transportation Authority ("MTA") filed an eminent domain action

against Alameda Produce Market seeking to take the 1339 E. 7th Street Real Property. Shortly

thereafter, the MTA obtained an order for possession of such property and have remained in

possession ever since. After lengthy proceedings, the trial court dismissed the action and ordered

the MTA to return possession of the property to Alameda Produce Market. The MTA appealed the

ruling and the matter is pending before the appellate court. If the trial court ruling is affirmed and

not further appealed, the MTA will be required to return possession of the property to Alameda

Produce Market, and Alameda Produce Market may, among other things, be entitled to damages

and/or compensation as a result of the MTA's use of the property. A reversal of the trial court's

ruling could result in a remand to the trial court for a hearing on the valuation of the property. In the

event the MTA is permitted to proceed with the taking of the property, the MTA would be required

to pay just compensation in connection with such taking.

### K.      OBJECTIONS TO CLAIMS

Except as otherwise provided in the Shareholder Plan, objections to Claims, including

without limitation Administrative Claims (other than objections to Administrative Claims of

Professionals), shall be Filed and served upon the Holder of such Claim or Administrative Claim no

later than the later of: (a) one hundred eighty (180) days after the Effective Date, (b) one hundred

eighty (180) days after a proof of Claim or request for payment of such Claim is Filed, and (c) a

deadline set by the Bankruptcy Court after the extension of the one hundred eighty (180)-day

deadline; such extension may be granted on an ex parte basis without notice or hearing. After the

Effective Date, only the Reorganized Debtor will have the authority to File objections, settle,

compromise, withdraw or litigate to judgment objections to Claims and Interests. From and after the

Confirmation Date, Reorganized Debtor may settle or compromise any Disputed Claim or Disputed

Interest without approval of the Bankruptcy Court.  The Reorganized Debtors will file objections to

any claim which was scheduled as disputed, contingent or unliquidated and for which no timely

1    proof of claim was filed.

2

3    **L.    DISBURSING AGENT**

4    The Chief Accounting Officer of Reorganized MMPI shall act as the Disbursing Agent for

5    the purpose of making all distributions provided for under the Shareholder Plan. The Disbursing

6    Agent shall serve without bond, and shall receive no additional compensation for his duties as

7    Disbursing Agent.

8    **M.    DISCHARGE OF THE DEBTORS AND INJUNCTION**

9    **1.    Discharge**

10    Except as otherwise provided in the Shareholder Plan, the Confirmation Order or Section

11    1141 (d)(6) of the Bankruptcy Code: (i) on the Effective Date, each Debtor shall be deemed

12    discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code

13    from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and

14    Interests that arose before the Confirmation Date and all debts of the kind specified in Sections

15    502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of

16    Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the

17    Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is allowed pursuant to

18    Section 502 of the Bankruptcy Code or (C) the Holder of a Claim or Interest based on such debt or

19    Interest has accepted the Shareholder Plan; and (ii) all Persons shall be precluded from asserting

20    against each Reorganized Debtor, its successors, or its assets or properties any other or further

21    Claims or Interests based upon any act or omission, transaction, or other activity of any kind or

22    nature that occurred prior to the Confirmation Date. Except as otherwise provided in the

23    Shareholder Plan or the Confirmation Order, the Confirmation Order shall act as a discharge of any

24    and all Claims against and all debts and liabilities of the Debtor, as provided in Sections 524 and

25    1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Debtor at

26    any time obtained to the extent that it relates to a Claim discharged.

27    **2.    Injunction**

28

All Persons that have held, currently hold or may hold a Claim or other debt or liability or an Interest or other right of an equity security Holder, are permanently enjoined from taking any of the following actions on account of any such Claims, debts or liabilities or terminated Interests or rights discharged pursuant to Section I.1. immediately above: (a) commencing or continuing in any manner any action or other proceeding against any of the Debtors, the Creditors' Committee, or professional persons retained by the Creditors' Committee; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any of the Debtors, the Creditors' Committee or professional persons retained by the Creditors' Committee; (c) creating, perfecting or enforcing any lien or encumbrance against any of the Debtors, the Creditors' Committee, or professional persons retained by the Creditors' Committee; (d) asserting a setoff, right of subrogation or recoupment of any kind against any obligation due to any of the Debtors, the Creditors' Committee or professional persons retained by the Creditors' Committee; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Shareholder Plan.  The injunction described herein does not apply to and shall not enjoin or otherwise prevent the Reorganized Debtor from commencing or continuing any action against the Debtors' current or former officers, directors, or employees for claims arising before or after the commencement of the Debtors' bankruptcy cases.

Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator. No Liability for Solicitation or Participation

As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Shareholder Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Shareholder Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Shareholder Plan or the offer, issuance, sale, or purchase of securities.

**N.      NO LIABILITY FOR SOLICITATION OR PARTICIPATION**

As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Shareholder Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Shareholder Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Shareholder Plan or the offer, issuance, sale, or purchase of securities.

**O.      LIMITATION OF LIABILITY**

Neither (a) the Shareholder Proponents or any of their employees, officers, directors, agents, representatives, affiliates, attorneys or any other professional persons employed by any of them, nor (b) MMPI Acquisition or any of its employees, officers, directors, agents, representatives, affiliates, attorneys or any other professional persons employed by it, nor (c) the Reorganized Debtors or any of its respective members, agents, employees, directors, officers, representatives, attorneys or other professional advisors, nor (d) the Creditors' Committee or any of its respective postpetition members, agents, employees, directors, officers representatives, attorneys or other professional advisors shall have any responsibility, or have or incur any liability, to any Person whatsoever, under any theory of liability (except for any claim based upon willful misconduct or gross negligence), for any act taken or omission made in good faith directly related to formulating, implementing, confirming, or consummating the Shareholder Plan, the Shareholder Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Shareholder Plan, provided that nothing in this paragraph shall limit the liability of any Person for breach of any express obligation it has under the terms of this Shareholder Plan or under any post-petition agreement or other post-petition document entered into by such Person or in accordance with the terms of this Shareholder Plan or for any breach of a duty of care owed to any other Person occurring after the Effective Date.

**P.      CERTIFICATE OF INCORPORATION AND CERTIFICATES OF**

**ORGANIZATION**

On the Effective Date, the Reorganized Debtor, or each of them if there is more than one, shall adopt amended certificates pursuant to applicable non-bankruptcy law and Section 1123(a)(5)(I) of the Bankruptcy Code. Each amended certificate will, among other provisions prohibit the issuance of nonvoting equity securities to the extent required by Section 1123 (a)(6) of the Bankruptcy Code and will become effective upon the occurrence of the Effective Date, and shall include such other provisions as determined by the Reorganized Debtors including the elimination of single purpose entity provisions.

**Q.    OTHER DOCUMENTS AND ACTIONS**

The Debtors and the Reorganized Debtor may, and shall, execute such documents and take such other actions as are necessary to effectuate the transactions provided for in the Shareholder Plan.

**R.    CORPORATE ACTION**

The adoption of the amended certificates of incorporation, certificates of organization, or certificate of limited partnership, as the case may be, and all other matters under the Shareholder Plan involving the corporate structure of the Reorganized Debtor, shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the stockholders, directors, managers, members, or limited partners, as the case may be, of each

Debtor. Without limiting the foregoing, upon entry of the Confirmation Order by the Clerk, the filing by any of the Reorganized Debtor of the amended certificates shall be authorized and approved in all respects, including amendments to eliminate any special purpose entity provisions. On the Effective Date or as soon thereafter as is practicable, pursuant to applicable law, the bylaws, operating agreements, or partnership agreement, as the case may be, of each Debtor shall be the bylaws, operating agreements or partnership agreement of such Reorganized Debtor.

**S.    RETIREE BENEFITS**

The Debtors do not have any present obligations to pay retiree benefits within the meaning

1  of Section 1129(a)(13).

2  **T.    THE CREDITORS' COMMITTEE**

3  The Creditors' Committee shall be dissolved on the Effective Date and the members of such

4  committee shall be released and discharged from all further rights and duties arising from or related

5  to the Chapter 11 Cases. The professionals retained by such committee and the members thereof

6  shall not be entitled to compensation or reimbursement of expenses incurred for services rendered

7  after the Effective Date (except with regard to seeking allowance of fees incurred prior to the

8  Effective Date).

9  **VIII.**

10  **MANAGEMENT OF REORGANIZED DEBTORS**

11  The Reorganized Debtors will retain professional management to manage the Company.

12  The professional management will be existing MMPI employees, new employees, or outside

13  management companies or some combination of them.  The Shareholder Proponents may serve as

14  non-executive members of the Company's board of directors, but they will not hold operational

15  management positions.  The Shareholder Proponents anticipate that the Reorganized Debtors will

16  retain as many of the current employees as practicable for continuity of management and

17  preservation of institutional knowledge.  The Shareholder Proponents do not, however, anticipate a

18  role in the Reorganized Debtors for Richard Meruelo or John Maddux.

19  **IX.**

20  **CONFIRMATION AND CONSUMMATION PROCEDURE**

21  Under the Bankruptcy Code, the following steps must be taken to confirm the Shareholder

22  Plan:

23  **A.    SOLICITATION OF VOTES**

24  In accordance with Sections 1126 and 1129 of the Bankruptcy Code, the following Classes

25  of Claims are impaired, and the Holders of Allowed Claims in each of these Classes are entitled to

26  vote to accept or reject the Shareholder Plan of this Debtor or Debtors against whom they have a

27  claim:

28

- Classes 10A, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1, 28A-1, 38A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of Secured Tax Claims against the Debtors);

- Classes 21A-2, 28A-2, 29A-2, 29A-3, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 37A-2, 37A-3, 37A-4, 38A-2, 39A-2, 40A-2, 41A-2, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors);

- Classes 1B, 5B, 32B, 33B, and 36B (consisting of the Priority Unsecured Benefits Claims of present and former employees); and

- Classes 1C-3, 2C-3, 3C, 4C-2, 5C-2, 6C, 7C, 8C-2, 9C-2, 10C-2, 11C-3, 12C-3, 15C-2, 16C-2, 17C, 18C-2, 19C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3, 29C-2, 30C-3, 31C-2, 32C, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3, 53C, and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor); and

The Class of Interests of MMPI, Class 1E, is being cancelled and extinguished, and the Holders of such Interests will not receive distributions under the Shareholder Plan. As a result, Holders of Interests in Class 1E are deemed to reject the Shareholder Plan. The Class of Interests of MMPLP, Class 2E will not retain or receive any property on account of their Interests as a result of the merger of MMPLP and MMPI immediately following the Effective Date.

The following Classes of the Shareholder Plan are unimpaired. As a result, Holders of Claims and Interests in those Classes are conclusively presumed to have accepted the Shareholder Plan and the solicitation of acceptances with respect to such Classes is not required under Section 1126(f) of the Bankruptcy Code:

- Classes 11C-1, 12C-1, 14C-1, 15C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1, 32C-1, 33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 43C-3, 44C-3, 46C-1, 48C-3,

49C-3, 52C-1 and 54C-1 consisting of the unsecured Claims for security deposits of the Debtors' tenants);

- Classes 3E through 54E (consisting of the Interests of MMPLP, MMP Ventures, MM Construction and MM Management, and the Property Level Debtors).

As to the Classes of Claims entitled to vote on a Plan, the Bankruptcy Code defines acceptance of a Plan by a Class of creditors as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of that Class that have timely voted to accept or reject a Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any creditor in an impaired Class: (i) whose Claim has been listed by the Debtors in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who filed a proof of Claim on or before the Bar Date or any proof of Claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court, which Claim is not the subject of an objection or request for estimation, is entitled to vote on the Shareholder Plan.

**B.      THE CONFIRMATION HEARING**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Shareholder Plan has been scheduled for [

2010, commencing at [_:_ _.m.] Los Angeles Time, before, the Honorable Kathleen Thompson of the United States Bankruptcy Court, Courtroom 301, 21041 Burbank Blvd., Woodland Hills, California 91367. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. The Shareholder Plan may be modified by the Debtors pursuant to Section 1127 of the Bankruptcy Code prior to, during or as a result of that hearing, without further notice to parties in interest.

Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number of shares of stock held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court, the Committee and the Debtors on or before _____ 2010 at _•_ _.m. Los Angeles Time. Objections to confirmation of the Shareholder Plan are governed by Bankruptcy Rule 9014.

## C.    CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Shareholder Plan only if all of the

requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the Shareholder Plan is (i) accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Shareholder Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of creditors and stockholders that are impaired under the Shareholder Plan.

### 1.    Acceptance

The Classes identified above in Section IX.A are impaired and are entitled to vote to accept or reject the Shareholder Plan.

The Debtors reserve the right to amend the Shareholder Plan in accordance with the terms of the Shareholder Plan or seek nonconsensual confirmation of the Shareholder Plan under Section 1129(b) of the Bankruptcy Code or both with respect to any Class of Claims that is entitled to vote to accept or reject the Shareholder Plan, if such Class rejects the Shareholder Plan.

### 2.    Unfair Discrimination and the Fair and Equitable Tests

Section 1129(b) of the Bankruptcy Code provides that a Plan can be confirmed even if it has not been accepted by all impaired Classes as long as at least one impaired Class of Claims has accepted it. The Bankruptcy Court may confirm the Shareholder Plan as to one or more Debtors at the request of such Debtors notwithstanding the Shareholder Plan's rejection (or deemed rejection) by impaired Classes in the case of such Debtors as long as the Shareholder Plan "does not

discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A Plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting Class if the value of the cash and/or securities to be distributed to the nonaccepting Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the nonaccepting Class or is otherwise permitted under the circumstances.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

• <u>Secured Creditors</u>. Either: (i) each impaired secured creditor retains its liens securing its secured Claim and receives on account of its secured Claim deferred cash payments having a present value equal to the amount of its allowed secured Claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

<u>Unsecured Creditors</u>. Either: (i) each impaired unsecured creditor receives or retains under the Shareholder Plan property of a value equal to the amount of its allowed Claim; or (ii) the Holders of Claims and interests that are junior to the Claims of the dissenting Class will not receive any property under the Shareholder Plan.

<u>Interests</u>. Either: (i) each holder of an Interests will receive or retain under the Shareholder Plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the nonaccepting Class will not receive or retain any property under the Shareholder Plan.

### 3.    Feasibility

To confirm the Shareholder Plan, the Bankruptcy Code must find that confirmation of the Shareholder Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Section 1129(a) of the Bankruptcy

1    Code and is referred to as the "feasibility" requirement.

2        There are at least two important aspects of a feasibility analysis. The first aspect considers

3    whether the Reorganized Debtors will have enough cash on hand on the Effective Date of the

4    Shareholder Plan to make the distributions provided under the Shareholder Plan on or near the

5    Effective Date.  The other aspect of feasibility considers whether the Reorganized Debtors will

6    generate enough cash – through operations or asset sales -- to make the future payments

7    contemplated under the Shareholder Plan.  For purposes of determining whether the Shareholder

8    Plan meets the feasibility requirement, the Shareholder Proponents have analyzed the Reorganized

9    Debtors' ability to meet their obligations under the Shareholder Plan. As part of this analysis, the

10   Shareholder Proponents have prepared projections of the Reorganized Debtors' financial

11   performance for seven years following the Effective Date (the "Projection Period"). These

12   projections, and the assumptions on which they are based, are included in the Shareholder

13   Propoenents' Projected Financial Information, annexed hereto as Exhibit "E" and provide a

14   projected Consolidated Statement of Cash Flow for the Reorganized Debtors on a monthly basis for

15   the first two years of the Projection Period and on an annual basis for each of the seven years of the

16   Projection Period. The Projections also provide a projected Cash Flow for each of the Operating

17   Debtors on a monthly basis for the first two years of the Projection Period and on an annual basis

18   for each of the seven years of the Projection Period. Exhibit E also contains a statement of the

19   results of actual operating revenues and expenses for the period April 1, 2009 through March 31,

20   2010.

21       The pro forma financial information and the projections are based on the assumption that the

22   Shareholder Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the

23   Effective Date under the Shareholder Plan will occur on or about December 30, 2010. Based upon

24   the Shareholder Proponents Projected Financial Information, the Shareholder Proponents believe

25   that the Reorganized Debtors will be able to make all payments required pursuant to the

26   Shareholder Plan and, therefore, that confirmation of the Shareholder Plan is not likely to be

27   followed by liquidation or the need for further reorganization. The Projections show that the

28

1    Reorganized Debtors will have sufficient funds to meet their Effective Date payment obligations.

2    The Shareholder Plan calls for the repayment of the secured claims within 5 years after the

3    Effective Date. The Secured Claims of the Debtors will be repaid during this time period either

4    from the refinancing of the secured Debt post-Effective Date or the sale of the Collateral for such

5    Debt.  Upon the sale of such Collateral, the proceeds will be used to pay the costs of sale and any

6    secured claim that is secured by the Collateral to be sold. Excess proceeds would be unencumbered

7    funds available for the Reorganized Debtors use in the operation of their businesses or for the

8    payment of claims as determined by the Reorganized Debtors' in the sound exercise of their

9    business judgment.

10    The Shareholder Proponents have prepared their financial projections with the assistance of

11    their advisors based upon certain assumptions that they believe to be reasonable under the

12    circumstances. Those assumptions considered to be significant are described in Exhibit "E" hereto.

13    The financial projections have not been examined or compiled by independent accountants. The

14    Shareholder Proponents make no representation as to the accuracy of the projections or the

15    Reorganized Debtors' ability to achieve the projected results. Many of the assumptions on which

16    the projections are based are subject to significant uncertainties. Inevitably, some assumptions will

17    not materialize and unanticipated events and circumstances may affect the actual financial results.

18    Therefore, the actual results achieved throughout the Projection Period may vary from the projected

19    results and the variations may be material. All Holders of Claims and Interests that are entitled to

20    vote to accept or reject the Shareholder Plan are urged to examine carefully all of the assumptions

21    on which the financial projections are based in connection with their evaluation of the Shareholder

22    Plan.

23    **4.    Best Interests Test**

24    Even if a plan is accepted by each Class of Holders of Claims and interests, the Bankruptcy

25    Code requires a bankruptcy court to determine that the Shareholder Plan is in the "best interests" of

26    all Holders of Claims and Interests that are impaired by the Shareholder Plan and that have not

27    accepted the Shareholder Plan. The "best interests" test, as set forth in Section 1 129(a)(7) of the

28

1  Bankruptcy Code, requires a Bankruptcy Court to find either that: (i) all members of an impaired

2  Class of Claims or interests have accepted the Shareholder Plan or (ii) the Shareholder Plan will

3  provide a member who has not accepted the Shareholder Plan with a recovery of property of a

4  value, as of the effective date of the Shareholder Plan, that is not less than the amount that such

5  holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. Once

6  the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority

7  claimants, it must determine the probable distribution to general unsecured creditors and equity

8  security holders from the remaining available proceeds in liquidation. If such probable distribution

9  has a value greater than the distributions to be received by such creditors and equity security holders

10  under a debtor's plan, then such plan is not in the best interests of creditors and equity security

11  holders.

12        To determine what Holders of Claims and Interests in each impaired Class would receive if

13  the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar

14  amount that would be generated from the liquidation of the Debtors' assets and properties in the

15  context of a Chapter 7 liquidation case. The Cash amount that would be available for satisfaction of

16  Claims and Interests would consist of the proceeds resulting from the disposition of the

17  unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by

18  the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be

19  reduced by the costs and expenses of liquidation and by such additional administrative and priority

20  Claims that might result from the termination of the Debtors' business and the use of Chapter 7 for

21  the purposes of liquidation.

22        The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee

23  in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that

24  such a trustee might engage. In addition, other Claims that might arise in a liquidation case or result

25  from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during

26  the Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in

27  full from the liquidation proceeds before the balance of those proceeds would be made available to

28

1    pay general unsecured Claims. Moreover, the costs of liquidation in these cases could be greater due

2    to the fact that there is no guarantee that only one trustee would be appointed for each of the 54

3    related cases. If more than one trustee is appointed, the costs of liquidation will be increased as each

4    such trustee will retain its own professionals to assist it with the case.

5        To determine if the Shareholder Plan is in the best interests of each impaired Class, the

6    present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered

7    assets and properties, after subtracting the amounts attributable to the foregoing Claims, must be

8    compared with the present value of the property offered to such Classes of Claims under the

9    Shareholder Plan.

10        After considering the effects that a Chapter 7 liquidation would have on the ultimate

11    proceeds available for distribution to creditors in the Chapter 11 Cases, including: (i) the increased

12    costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in

13    bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a Chapter

14    7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale"

15    atmosphere that would prevail; and (iii) the substantial increases in Claims that would be satisfied

16    on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined

17    that confirmation of the Shareholder Plan will provide each holder of an Allowed Claim with a

18    recovery that is not less than the recovery such holder would receive pursuant to the liquidation of

19    the Debtors under Chapter 7.

20        The Liquidation Analysis for each of the Property Level Debtors, MMPI and MMPLP, is

21    attached hereto as Exhibit "G." The information set forth in Exhibit G provides a summary of the

22    liquidation values of each of such Debtors' assets, assuming a Chapter 7 liquidation in which a

23    trustee appointed by the Bankruptcy Court would liquidate the assets of the Estates. Reference

24    should be made to the Liquidation Analysis for a complete discussion and presentation of the

25    Liquidation Analysis. Underlying the Liquidation Analysis are a number of estimates and

26    assumptions that, although developed and considered reasonable by the Shareholder Proponents, are

27    inherently subject to significant economic and competitive uncertainties and contingencies. The

28

1    Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are

2    subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in

3    fact, to undergo such a liquidation. The Chapter 7 liquidation period is assumed to be a period of

4    several years, primarily allowing for the sale of the real property assets of the Debtors.

5    **D.    CONSUMMATION**

6    The Shareholder Plan will be consummated on the Effective Date. The Effective Date of the

7    Shareholder Plan will occur on the first Business Day on which the conditions precedent to the

8    effectiveness of the Shareholder Plan, as set forth in the Shareholder Plan, have been satisfied or

9    waived by the Shareholder Proponents pursuant to the terms of the Shareholder Plan. For a more

10    detailed discussion of the conditions precedent to the Shareholder Plan and the consequences of the

11    failure to meet such conditions, see Article X of the Shareholder Disclosure Statement. The

12    Shareholder Plan is to be implemented pursuant to its terms, consistent with the provisions of the

13    Bankruptcy Code.

14    **X.**

15    **CONFIRMATION DATE CONDITIONS**

16    **A.    CONDITIONS TO CONFIRMATION The conditions to Confirmation shall be**

17    **the following:**

18    (1)    The satisfaction of the requirements of Section 1129 of the Bankruptcy Code;

19    (2)    The Confirmation Order shall (i) be acceptable in form and substance to the

20    Shareholder Proponents (in their sole and absolute discretion) and (ii) expressly authorize and direct

21    the Debtors to perform the actions that are conditions to the effectiveness of the Shareholder Plan;

22    and

23    (3)    Each of the events and actions required by the Shareholder Plan to occur or to be

24    taken prior to Confirmation shall have occurred or have been taken, or the Shareholder Proponents

25    or the party whose obligations are conditioned by such occurrences and/or actions, as applicable,

26    shall have waived such occurrences or actions.

27    **B.    WAIVER OF CONDITIONS**

28

The Shareholder Proponents may waive any or all of the other conditions set forth in the Shareholder Plan without leave of or order of the Bankruptcy Court and without any formal action. The Shareholder Proponents reserve the right to amend or revoke the Shareholder Plan. Although this Shareholder Plan is styled as a joint Plan, the Shareholder Proponents reserve the right to proceed with Confirmation under this Shareholder Plan for one Debtor, or a combination of Debtors, and not the others.

## C.    EFFECT OF FAILURE OF CONDITIONS

In the event that the Effective Date does not occur, upon notification submitted by the Shareholder Proponents to the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b) no distributions under the Shareholder Plan shall be made, (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Shareholder Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

## D.    VACATUR OF CONFIRMATION ORDER

If an order denying confirmation of the Shareholder Plan is entered, then the Shareholder Plan shall be null and void in all respects, and nothing contained in the Shareholder Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors; (c) prejudice in any manner any right, remedy or Claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

## XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective

Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the

Effective Date to the full extent permitted by law, including, without limitation, jurisdiction to:

(a)    (a)    *Allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Shareholder Plan;*

(b)    *Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Shareholder Plan, for periods ending before the Effective Date;*

(c)    *Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which the any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;*

(d)    *Ensure that distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Shareholder Plan;*

(e)    *Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors, Reorganized Debtor or the Chapter 11 Cases that may be pending on the Effective Date;*

(f)    *Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Shareholder Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection*

*with the Shareholder Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;*

(g) *Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Shareholder Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Shareholder Plan and the Confirmation Order, or any entity's rights arising under or obligations incurred in connection with the Shareholder Plan or the Confirmation Order;*

(h) *Subject to any restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Shareholder Plan, modify the Shareholder Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code or modify -the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Shareholder Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Court Order, the Shareholder Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Shareholder Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Shareholder Plan, to the extent authorized by the Bankruptcy Code;*

(i) *Issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with*

*consummation, implementation or enforcement of the Shareholder Plan or the*

*Confirmation Order;*

*(j)*   *Enter and implement such Orders as are necessary or appropriate if the*

*Confirmation Order is for any reason modified, stayed, reversed, revoked or*

*vacated;*

*(k)*   *Determine any other matters that may arise in connection with or relating to the*

*Shareholder Plan, this Disclosure Statement, the Confirmation Order or any*

*contract, instrument, release, indenture or other agreement or document created in*

*connection with the Shareholder Plan, the Disclosure Statement or the*

*Confirmation Order, except as otherwise e provided in the Shareholder Plan; and*

*Enter an Order concluding the Chapter 11 Cases.*

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction. If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including without limitation the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## XII.

## PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE SHAREHOLDER PLAN AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS

### A.    VOTING OF CLAIMS AND INTERESTS

Each Holder of an Allowed Claim or an Allowed Interest in an Impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Shareholder Plan as provided in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Shareholder Plan, or any other order

1    or orders of the Bankruptcy Court.

2    **B.    METHOD OF DISTRIBUTIONS UNDER THE SHAREHOLDER PLAN**

3    **1.    Distributions Under the Shareholder Plan**

4    The Chief Accounting Officer of Reorganized MMPI will serve as Disbursing Agent. The

5    Disbursing Agent will make all distributions of cash and securities required to be distributed under

6    the applicable provisions of the Shareholder Plan. The Disbursing Agent may employ or contract

7    with other entities to assist in or make the distributions required by the Shareholder Plan. The

8    Disbursing Agent will serve without bond, and the Disbursing Agent will not receive additional

9    compensation for distribution services rendered pursuant to the Shareholder Plan.

10    Cash payments made pursuant to the Shareholder Plan will be in U.S. dollars by checks

11    drawn on a bank selected by the Reorganized Debtor, or by wire transfer from a bank, at the option

12    of Reorganized Debtor. Cash payments of $1,000,000 or more to be made pursuant to the

13    Shareholder Plan will, to the extent requested in writing no later than five days after the

14    Confirmation Date, be made by wire transfer from a bank. Cash payments to foreign creditors, if

15    any, may be made, at the option of the Reorganized Debtor, in such funds and by such means as are

16    necessary or customary in a particular foreign jurisdiction.

17    **2.    Timing and Methods of Distribution**
        a.    ***Compliance with Tax Requirements***

18

19    In connection with the Shareholder Plan, to the extent applicable, the Disbursing Agent must

20    comply with all tax withholding and reporting requirements imposed on it by any governmental

21    unit, and all distributions pursuant to the Shareholder Plan will be subject to such withholding and

22    reporting requirements. The Disbursing Agent will be authorized to take any and all actions that

23    may be necessary or appropriate to comply with such withholding and reporting requirements.

24    Notwithstanding any other provision of the Shareholder Plan: (i) each Holder of an Allowed

25    Claim or Interest that is to receive a distribution of Cash pursuant to the Shareholder Plan will have

26    sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by

27    any governmental unit, including income, withholding and other tax obligations, on account of such

28

distribution; and (ii) no distribution will be made to or on behalf of such Holder pursuant to the

Shareholder Plan unless and until such Holder has made arrangements satisfactory to the Disbursing

Agent for the payment and satisfaction of such tax obligations. Any Cash to be distributed pursuant

to the Shareholder Plan will, pending the implementation of such arrangements, be treated as an

undeliverable distribution pursuant to the Shareholder Plan.

b.      ***Pro Rata Distributions***

When the Shareholder Plan provides for Pro Rata distribution, the property to be distributed

under the Shareholder Plan shall be divided Pro Rata among the Holders of Allowed Claims or

Allowed Interests of the relevant Class.

c.      ***Distributions***

Distributions under the Shareholder Plan shall be made by the Disbursing Agent to the

Holders of Allowed Administrative Claims and Allowed Claims at the addresses set forth on the

Schedules, unless such addresses are superseded by addresses listed on proofs of Claim or transfers

of Claims filed pursuant to Bankruptcy Rule 3001, or at the last known address of such Holders if

the Debtors or Reorganized Debtor has been notified in writing of a change of address.

## C.      UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS

Any Person that is entitled to receive a cash distribution under the Shareholder Plan but that

fails to cash a check within 90 days of its issuance shall be entitled to receive a reissued check from

the Reorganized Debtor for the amount of the original check, without any interest, if such person

requests the Disbursing Agent to reissue such check and provides the Disbursing Agent with such

documentation as the Disbursing Agent requests to verify that such Person is entitled to such check,

prior to the first anniversary of the Effective Date. If a Person fails to cash a check within 90 days of

its issuance and fails to request reissuance of such check prior to the first anniversary of the date on

which the check is issued, such Person shall not be entitled to receive any further distribution under

this Shareholder Plan. If the distribution to any Holder of an Allowed Claim or Allowed Interest is

returned to a Disbursing Agent as undeliverable, no further distributions will be made to such

Holder unless and until the applicable Disbursing Agent is notified in writing of such Holder's then-

current address. Undeliverable distributions will remain in the possession of the Disbursing Agent

pursuant to the Shareholder Plan until such time as a distribution becomes deliverable.

Undeliverable cash will be held in trust in segregated bank accounts in the name of the Disbursing

Agent for the benefit of the potential claimants of such funds, and will be accounted for separately.

The Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with

the Reorganized Debtor's investment and deposit guidelines. Any distribution which is not claimed

within thirteen months of the Effective Date shall be deemed property of the Reorganized Debtor.

### D.    DISPUTED CLAIMS AND ESTIMATIONS

#### 1.    Treatment of Disputed Claims

Notwithstanding any other provisions of the Shareholder Plan, no payments or distributions

will be made on account of any Claim or Interest until such Claim or Interest becomes an Allowed

Claim or Allowed Interest. The Reorganized Debtor may, at any time, request that the Bankruptcy

Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy

Code, irrespective of whether the Reorganized Debtor previously objected to such Claim or whether

the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction

to estimate any contingent or unliquidated Claim at any time during litigation concerning any

objection to the Claim, including during the pendency of any appeal relating to any such objection.

If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will

constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as

determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on

such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to

any ultimate payment on account of such Claim. All of these Claims objection, estimation and

resolution procedures are cumulative and not necessarily exclusive of one another. In addition to

seeking estimation of Claims as provided in the Shareholder Plan, the Reorganized Debtor may

resolve or adjudicate certain Disputed Claims of Holders in Unimpaired Classes in the manner in

which the amount of such Claim and the rights of the Holder of such Claim would have been

resolved or adjudicated if the Reorganization Cases had not been commenced, subject to any

1   applicable discharge and limitations on amounts of Claims and remedies available under bankruptcy

2   law. Claims may be subsequently compromised, settled, withdrawn or resolved by the Reorganized

3   Debtor.

4       **2.**    **Distribution on Account of Disputed Claims Once They Are Allowed**

5   On the later of the next Quarterly Distribution Date or thirty days after the date a Disputed

6   Claim becomes an Allowed Claim, the Disbursing Agent will commence making distributions on

7   account of any Disputed Claim or Disputed Interest that has become an Allowed Claim or Allowed

8   Interest during the preceding calendar quarter. Such distributions will be made pursuant to the

9   provisions of the Shareholder Plan governing the applicable Class. Holders of Disputed Claims or

10  Disputed Interests that are ultimately allowed will also be entitled to receive, on the basis of the

11  amount ultimately allowed, matured and payable interest, if any, at the rate provided for the Class to

12  which such Claim belongs.

13      **3.**    **Allowance of Claims Subject to Bankruptcy Code Section 502(d)**

14  Allowance of Claims shall be in all respects subject to the provisions of Section 502(d) of

15  the Bankruptcy Code.

16  **E.**    **SETOFFS**

17  Except with respect to Claims of the Debtors and Reorganized Debtor released pursuant to

18  the Shareholder Plan or any contract, instrument, release, indenture or other agreement or document

19  created in connection with the Shareholder Plan, the Reorganized Debtor may, pursuant to Section

20  553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim

21  and the distributions to be made pursuant to the Shareholder Plan on account of such Claim (before

22  any distribution is made on account of such Claim), the Claims, rights and causes of action of any

23  nature that the Reorganized Debtor may hold against the Holder of such Allowed Claim; provided,

24  however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder

25  will constitute a waiver or release by Reorganized Debtor of any such Claims, rights and causes of

26  action that the Debtors and the Reorganized Debtor may possess against such Holder.

27                                        **XIII.**

28

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE SHAREHOLDER DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE SHAREHOLDER PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE SHAREHOLDER PLAN AND ITS IMPLEMENTATION.

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

#### 1.    Risk of Non-Confirmation of the Shareholder Plan

Although the Shareholder Proponents believe that the Shareholder Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Shareholder Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

#### 2.    Risk of Non-Occurrence of the Effective Date

Although the Shareholder Proponents believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in Article V of the Shareholder Plan have not occurred or been waived by the Shareholder Proponents within one hundred and twenty (120) days after the Confirmation Date, the Confirmation Order shall be vacated, in which event no distributions under the Shareholder Plan would be made, the Debtors and all Holders of Claims and Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### B.    RISKS TO RECOVERY BY HOLDERS OF CLAIMS

### 1.   Ability to Service Debt

The Reorganized Debtor's ability to make scheduled payments of principal, to pay the interest on, to refinance its indebtedness will depend on future performance. Future performance is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Reorganized Debtor's control. While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flow described in the financial projections attached as Exhibit E hereto, the Shareholder Proponents believe that cash flow from operations, available cash, debt refinancings and sales and the Reorganized Debtors' ability to sell assets as necessary to fund its operations, of assets will be adequate to fund the Shareholder Plan and meet their future liquidity needs.

### 2.   Risks of Asset Disposition Delays

The Shareholder Plan relies, in part, on generating proceeds from real estate sales to pay Claims in the event operating revenues are insufficient. In the event that sales are delayed due to economic or

### 3.   Projected Financial Information

The financial projections included as Exhibit E hereto are dependent upon the successful implementation of the Shareholder Plan and the validity of the other assumptions contained therein. These projections reflect numerous assumptions, including confirmation and consummation of the Shareholder Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtor. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors. Although the Shareholder Proponents believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

### 4.   Failure to Obtain Equity Investment of $30 Million.

The Shareholder Plan is dependent in part on the sale of the New Equity Interests. There is a

risk that the sale will not be consummated. The Shareholder Proponents believe that this risk is

minimal because MMPI acquisition is prepared to purchase the New Equity Interests subject only to

the conditions set for in Exhibit __ to the Shareholder Plan.  The purchase is not subject to a

financing contingency.

### 5. Failure to Confirm One or More of the Debtors' Chapter 11 Plans.

This Shareholder Plan is a joint plan for 54 related debtor entities. The Shareholder

Proponents are seeking confirmation of the Shareholder Plan separately for each of the 54 related

Chapter 11 Cases.  In one or more of the cases, the Shareholder Plan may not be confirmed. If the

Shareholder Plan is not confirmed in one or more of the Debtors' cases, the affected Debtors will

re-evaluate their options, including without limitation, an alternative plan of reorganization,

conversion of the case to chapter 7 or dismissal of the case.

If the Shareholder Plan is confirmed at the parent level (i.e., for MMPI and MMPLP), the

Shareholder Proponents believe that failure to confirm the Shareholder Plan for one or more of the

Property Level Debtors will not prevent implementing of the Shareholder Plan.  If, however, the

Shareholder Plan cannot be confirmed for the majority of Property Level Debtors, implementation

of the Shareholder Plan would be threatened.


### XIV.

### CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE SHAREHOLDER PLAN

A summary description of certain United States federal income tax consequences of the

Shareholder Plan is provided below. This description is for informational purposes only and, due to

a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties

exist with respect to various tax consequences of the Shareholder Plan as discussed herein. Only the

principal United States federal income tax consequences of the Shareholder Plan to the Reorganized

Debtors and to holders of Claims who are entitled to vote to accept or reject the Shareholder Plan

are described below. No opinion of counsel has been sought or obtained with respect to any tax

consequences of the Shareholder Plan. No rulings or determinations of the Internal Revenue Service

1   (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax

2   consequences of the Shareholder Plan, and the discussion below is not binding upon the IRS or such

3   other authorities. No representations are being made regarding the particular tax consequences of

4   the confirmation and consummation of the Shareholder Plan to the Debtors or any holders of

5   Claims. No assurance can be given that the IRS would not assert, or that a court would not sustain, a

6   different position from any discussed herein.

7          The discussion of United States federal income tax consequences below is based on the

8   Internal Revenue Code of 1986, as amended (the "Tax Code") Treasury Regulations, judicial

9   authorities, published positions of the IRS and other applicable authorities, all as in effect on the

10  date of this document and all of which are subject to change or differing interpretations (possibly

11  with retroactive effect).

12         The following discussion does not address foreign, state or local tax consequences of the

13  Shareholder Plan, nor does it purport to address the United States federal income tax consequences

14  of the Shareholder Plan to special classes of taxpayers (e.g., persons who are related to the Debtors

15  within the meaning of the Tax Code, banks and certain other financial institutions, insurance

16  companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims

17  through, pass-through entities, persons whose functional currency is not the United States dollar,

18  foreign persons, dealers in securities or foreign currency, employees, holders of LTIP Units persons

19  who received their Claims pursuant to the exercise of an employee stock option or otherwise as

20  compensation and persons holding Claims that are a hedge against, or that are hedged against,

21  currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore,

22  the following discussion does not address United States federal taxes other than income taxes.

23         Each holder is strongly urged to consult its own tax advisor regarding the United States

24  federal, state, and local and any foreign tax consequences of the transactions described herein and in

25  the Shareholder Plan.

26         IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH

27  REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS

28

1   SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE

2   USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING

3   PENALTIES UNDER THE TAX CODE. ANY TAX ADVICE CONTAINED IN THIS

4   SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE

5   PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY

6   THE SUMMARY EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE

7   TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX

8   ADVISER.

9       **A.     CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

10  **TO THE DEBTORS**

11          **1.     Net Operating Losses**

12          The Debtors currently have significant net operating loss ("NOL") carryforwards for federal

13  income tax purposes and expect to incur a substantial additional NOL during their current taxable

14  year. The amount of such NOL carryforwards remains subject to adjustment by the IRS. The

15  amount of the Debtors' NOL carryforwards, and possibly certain other tax attributes, will be

16  reduced, and the subsequent utilization of such NOL carryforwards and other tax attributes may be

17  restricted upon the implementation of the Shareholder Plan.

18          **2.     Cancellation of Debt**

19          In general, the Tax Code allows a debtor in a bankruptcy case to exclude from income any

20  cancellation of indebtedness income ("CODI") that is realized, but the debtor must reduce certain of

21  its tax attributes - such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets

22  by the amount of the CODI that is excluded from income. CODI is that amount by which the

23  adjusted issue price (including accrued but unpaid interest) of the indebtedness satisfied exceeds the

24  cash and fair market value of the other property issued therefor, subject to certain statutory or

25  judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the

26  cancelled debt would have given rise to a tax deduction). To the extent the amount of excluded

27  CODI exceeds the tax attributes available for reduction, the remaining CODI is simply forgiven.

28

Any reduction in tax attributes does not effectively occur until the first day of the taxable year following the year the CODI occurs. If advantageous, a debtor could elect to reduce the basis of depreciable property prior to any reduction in its loss carryforwards.

### 3.    Limitation on NOL Carryforwards and Other Tax Attributes

Following the implementation of the Shareholder Plan, any NOLs and carryforwards and possibly certain other tax attributes of the Debtors, allocable to periods prior to the Effective Date, may be subject to the limitations imposed by Section 382 of the Tax Code.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions, which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized. It is possible that the issuance of stock pursuant to the Shareholder Plan may result in an ownership change of the Debtors. In addition, Section 382(g)(4)(D) provides, in effect, that if a fifty percent (50%) or greater shareholder of a loss corporation claims a Section 165(g) worthless stock loss and retains his stock at the end of the year of worthlessness, the Debtors will be treated as having undergone an ownership change.

### 4.    Merger of MMPLP into MMPI

Pursuant to the Shareholder Plan, MMPLP will merge into MMPI and, accordingly, will distribute its assets to MMPI in complete liquidation. In general, a distribution in liquidation of a partner's interests is tax-free to both the partner and the partnership unless Section 737 or 751(b) applies. Section 737 requires a partner to recognize. gain (but not loss) upon the partnership's distribution of property to such partner (other than property previously contributed to the partnership by such partner) within seven (7) years of the date on which such partner contributed appreciated property to such partnership. Section 751(b) generally provides that to the extent that a

1    partner receives a distribution from a partnership (i) Section 751 property (unrealized receivables

2    and inventory items which have appreciated substantially in value) in exchange for relinquishing all

3    or part of its interest in the partnership's non-Section 751 property, or (ii) non-Section 751 property

4    in exchange for relinquishing all or part of its interest in the partnership's Section 751 property, the

5    transaction is recharacterized. The transaction is treated as (1) a deemed distribution to the partner

6    of an interest in the relinquished property followed by (2) a deemed taxable exchange between the

7    partner and the partnership of the relinquished property in exchange for an interest in the property

8    actually distributed by the partnership to the distributee partner.

9         Section 731(b) provides that no gain or loss is recognized by a partnership on a distribution

10    of property to a partner. Section 731(a) provides for (1) the nonrecognition of gain to the partner

11    except to the extent an amount of money is distributed in excess of the partner's tax basis in their

12    partnership interests, and (2) the nonrecognition of loss unless the distribution consists solely of

13    money, unrealized receivables, and inventory. Any gain or loss recognized by the partner is

14    generally treated as gain or loss from the sale or exchange of a capital asset (subject to the

15    exceptions above). Section 732(b) provides that the basis of any distributed property is equal to the

16    partner's tax basis in their partnership interest immediately prior to the distribution, reduced by any

17    cash received. The Debtors do not expect to recognize any gain or loss in connection with the

18    liquidation of MMPLP.

19       **5.**     **Consequences of the Sale and/or Refinance of Assets of the Debtors**

20         Pursuant to the Shareholder Plan, the Reorganized Debtors will sell some of their assets and

21    refinance other assets as necessary during the term of the Shareholder Plan to meet their operational

22    needs and payment obligations under the Shareholder Plan. The sale of real property may cause the

23    Debtors to recognize gain or loss. The gain or loss is measured by the difference between the

24    amount realized (the amount paid by the purchaser) and the adjusted tax basis the Debtors have in

25    the property sold. The amount realized from a sale of real property generally includes the amount of

26    liabilities from which the transferor is discharged as a result of the sale. For purposes of this rule,

27    the sale of real property that secures a nonrecourse liability discharges the transferor from the

28

liability, and the sale of real property that secures a recourse liability discharges the transferor from the liability if another person agrees to pay the liability (whether or not the transferor is in fact released from the liability).

Gain or loss recognized from the sale of real property may be characterized as either capital or ordinary. Generally, capital gains and losses are gains or losses from the sale or exchange of a capital asset. A capital asset is any property held by a taxpayer, whether or not connected with a trade or business, but does not include property held by a taxpayer, whether or not connected with a trade or business, but does not include property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property which is held primarily for sale to customers in the ordinary course of its trade or business, or property, used in the taxpayer's trade or business, of a character which is subject to the allowance for depreciation, or real property used in the taxpayer's trade or business.

Pursuant to Section 1245, a taxpayer who disposes of Section 1245 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property. Section 1245 property includes limited types of real property which have been depreciable. Depreciation recapture with respect to Section 1245 property is computed by subtracting its adjusted tax basis from the lower of its recomputed basis (adjusted tax basis increased by previous depreciation deductions allowed) or amount realized. Pursuant to Section 1250, a taxpayer who disposes of Section 1250 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property. Section 1250 property is any real property which has been depreciable and that is not Section 1245 property. Generally, for Section 1250 property for which depreciation deductions are computed using the straight-line method for tax purposes, there is no Section 1250 depreciation recapture.

Pursuant to Section 1231, Section 1231 gains and losses are treated as capital gains and losses if the Section 1231 gains for the taxable year exceed the Section 1231 losses for that year. A Section 1231 gain or loss is any recognized gain or loss from a Section 1231 transaction. A sale or exchange of property used in a trade or business is a Section 1231 transaction. Real property is

1  considered to be used in a trade or business if it is held for more than one year and is not property of

2  a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of

3  the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary

4  course of its trade or business.

5          Generally, for tax purposes, a refinancing transaction by itself produces no income or

6  deductions as it involves the tax-free receipt of loan proceeds and the nondeductible repayment of a

7  prior loan, assuming the old debt is satisfied in full.

8          **B.        CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS**

9          Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim, the

10  character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income

11  or loss will be determined by a number of factors, including the tax status of the holder, whether the

12  Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether

13  the Claim was acquired at a market discount and whether and to what extent the holder had

14  previously claimed a bad debt deduction.

15          **1.        Consequences to Holders of Allowed Secured Claims**

16          Pursuant to the Shareholder Plan, a Holder of an Allowed Secured Claim will receive

17  payment in full in cash over approximately five (5) years (collectively herein referred to as the

18  "Secured Deferred Payment Obligation"). The Holder will also receive interest at the rate of four

19  percent (4%) per annum. For federal income tax purposes, the Secured Deferred Payment

20  Obligation should be treated (and the following discussion assumes, would be treated) in a similar

21  fashion to the receipt of an actual note amortizable over seven (7) years or five (5) years in the case

22  of holders who vote in favor of the Shareholder Plan.

23          In general, a holder of an Allowed Secured Claim will recognize gain or loss in an amount

24  equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim

25  (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its

26  Claim (other than any Claim for accrued but unpaid interest). For a discussion of the treatment of

27  any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued Interest"

28

1    below. The amount realized by a holder will equal the "issue price" of the Secured Deferred

2    Payment Obligation received by such holder. Such issue price should be equal to the stated

3    principal amount of the Secured Deferred Payment Obligation. Each holder of a Secured Claim is

4    urged to consult its tax advisor regarding the specific tax consequences to such holder of the receipt

5    of the Secured Deferred Payment Obligation, including the possible application of (and the ability

6    to elect out of) the "installment method" of reporting any gain that might otherwise be recognized

7    by the holder upon such receipt.

8         Where gain or loss is recognized by a holder of an Allowed Secured Claim, the character of

9    such gain or loss as long-teem or short-term capital gain or loss or as ordinary income or loss will

10   be detelinined by a number of factors, including the tax status of the holder, whether the Claim

11   constitutes a capital asset in the hands of the holder and how long it has been held, whether the

12   Claim was acquired at a market discount and whether and to what extent the holder had previously

13   claimed a bad debt deduction.

14         **C.        DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST**

15         Pursuant to the Shareholder Plan, all distributions in respect of an Allowed Claim will be

16   allocated first to any portion of such Claim for accrued interest, with any excess allocated to the

17   principal amount of such Claim to the extent thereof, and then to all other amounts. However, there

18   is no assurance that the IRS will respect such allocation for federal income tax purposes.

19         In general, to the extent that any amount received by a holder of a debt (whether paid in cash

20   or treated for tax purposes as paid with a note) is received in satisfaction of accrued interest during

21   its holding period, such amount will be taxable to the holder as interest income (if not previously

22   included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss

23   to the extent any accrued interest claimed was previously included in its gross income and is not

24   paid in full. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of

25   consideration and the deductibility of unpaid interest for tax purposes.

26         **D.        INFORMATION REPORTING AND BACKUP WITHHOLDING**

27         Certain payments, including payments in respect of accrued interest or OID, are generally

28

subject to information reporting by the payer to the IRS. Moreover, such reportable payments are subject to backup withholding in certain circumstances. Under the Tax Code's backup withholding rules, a holder of Claims may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Shareholder Plan, unless the holder (a) comes within certain exempt categories (which generally includes corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

### E.    IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE SHAREHOLDER PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A TAXPAYER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE SHAREHOLDER PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

### XV.

### MISCELLANEOUS PROVISIONS

### A.    EXEMPTION FROM TRANSFER TAXES

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Shareholder Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment or any lease or sublease, or the making or delivery

1    of any deed or other instrument of transfer under, in furtherance of, or in connection with the

2    Shareholder Plan, including, without limitation, any agreements of consolidation, deeds, bills of sale

3    or assignments executed in connection with any of the transactions contemplated under the

4    Shareholder Plan shall not be subject to any stamp, real estate transfer, mortgage recording, license

5    transfer or other similar tax. For the avoidance of doubt, the transactions contemplated under the

6    Shareholder Plan include, among other things, the transactions and transfers contemplated in

7    Section III of the Shareholder Plan under, in furtherance of, or in connection with the consolidation

8    provided for therein including, without limitation,' the transfer of the Debtors' right, title and interest

9    in property of the Estates to the Reorganized Debtor.

10        **B.        PAYMENT OF STATUTORY FEES**

11        All fees payable on or before the Effective Date pursuant to Section 1930 of Title 28 of the

12    United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be

13    paid on or before the Effective Date.

14        **C.        MODIFICATION OR WITHDRAWAL OF THE SHAREHOLDER PLAN**

15        The Shareholder Proponents reserve the right, in accordance with the Bankruptcy Code, to

16    amend, modify (subject to Court approval), or withdraw the Shareholder Plan prior to the entry of

17    the Confirmation Order.  After the entry of the Confirmation Order, the Debtors may amend or

18    modify the Shareholder Plan, or remedy any defect or omission or reconcile any inconsistency in

19    the Shareholder Plan in such a manner as may be necessary to carry out the purpose and intent of

20    the Shareholder Plan.

21        **D.        GOVERNING LAW**

22        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code

23    and Bankruptcy Rules), the laws of the State of California (without reference to the conflicts of laws

24    provisions thereof) shall govern the construction and implementation of the Shareholder Plan and

25    any agreements, documents and instruments executed in connection with the Shareholder Plan.

26        **E.        FILING OR EXECUTION OF ADDITIONAL DOCUMENTS**

27        On or before the Effective Date, the Reorganized Debtor shall file with the Bankruptcy

28

1   Court or execute, as appropriate, such agreements and other documents as may be necessary or

2   appropriate to effectuate and further evidence the terms and conditions of the Shareholder Plan.

3        **F.     WITHHOLDING AND REPORTING REQUIREMENTS**

4        In connection with the Shareholder Plan and all instruments issued in connection therewith

5   and distributions thereon, the Reorganized Debtor shall comply with all withholding and reporting

6   requirements imposed by any federal, state, local or foreign taxing authority and all distributions

7   there under shall be subject to any such withholding and reporting requirements.

8        **G.     WAIVER OF RULE 7062 OF THE FEDERAL RULES OF BANKRUPTCY**

9   **PROCEDURE**

10       The Shareholder Proponents may request that the Confirmation Order include (a) a finding

11  the Rule 62(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7062 of the Federal

12  Rules of Bankruptcy Procedure, shall not apply to the Confirmation Order, and (b) authorization for

13  the Debtors to consummate the Shareholder Plan immediately after the entry of the Confirmation

14  Order.

15       **H.     HEADINGS**

16       Headings used in the Shareholder Plan are for convenience and reference only and shall not

17  constitute a Part of the Shareholder Plan for any purpose.

18       **I.     EXHIBITS AND SCHEDULES**

19       All Exhibits and Schedules to the Shareholder Plan and Disclosure Statement are

20  incorporated into and constitute a part of the Shareholder Plan as if set forth herein.

21       **J.     NOTICES**

22       All notices, requests and demand hereunder to be effective shall be in writing and unless

23  otherwise expressly provided herein, shall be deemed to have been duly given or made when

24  actually delivered by U.S. Mail or email addressed as follows:

25

26       **SHAREHOLDER PROPONENTS**     **COUNSEL TO THE SHAREHOLDER PROPONENTS**

27  CHRISTOPHER E. PRINCE
cprince@lesnickprince.com
MATTHEW A. LESNICK

28

matt@lesnickprince.com
Lesnick Prince LLP
185 Pier Avenue, Suite 103
Santa Monica, CA 90405
Facsimile:  (310) 396-0963

**K.    CONFLICT**

The terms of this Shareholder Plan shall govern in the event of any inconsistency with the summaries of the Shareholder Plan set forth in the Disclosure Statement.

**L.    SUCCESSORS AND ASSIGNS**

The rights, benefits and obligations of any Person named or referred to in the Shareholder Plan shall be binding on, and shall inure to the benefit of, any heir, executor, trustee, administrator, successor or assign of such Person.

**M.    SATURDAY, SUNDAY OR LEGAL HOLIDAY**

If any payment or act under the Shareholder Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**N.    POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS OR INTERESTS**

Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all Instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Shareholder Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Shareholder Plan.

**O.    SEVERABILITY OF PLAN PROVISIONS**

If, prior to Confirmation, any term or provision of the Shareholder Plan that does not govern the treatment of Claims or Interests provided for herein or the conditions to the Effective Date is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have

the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Shareholder Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination, and shall provide, that each term and provision of the Shareholder Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### P.    BALLOTING

Each Holder of Allowed Claim or an Allowed Interest entitled to vote on the Shareholder Plan will receive a ballot. The ballot will contain two boxes, one indicating acceptance of the Shareholder Plan and the other indicating rejection of the Shareholder Plan. Holders of Allowed Claims or Allowed Interests who elect to vote on the Shareholder Plan must mark one or the other box pursuant to the instructions contained on the ballot. Any executed Ballot that does not indicate acceptance or rejection of the Shareholder Plan will be deemed to constitute an acceptance of the Shareholder Plan.

### Q.    NO ADMISSIONS OR WAIVER OF OBJECTIONS

Notwithstanding anything herein to the contrary, nothing contained in the Shareholder Plan shall be deemed as an admission by any Shareholder Proponents with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claims classification. The Shareholder Proponents are not bound by any statements herein or in the Disclosure Statement as judicial admissions.

### R.    SURVIVAL OF SETTLEMENTS

All Bankruptcy Court-approved settlements shall survive consummation of the Shareholder Plan, except to the extent that any provision of any such settlement is inconsistent with the Shareholder Plan, in which case the provisions of the Shareholder Plan shall supersede such

1   inconsistent provision of such settlement. Notwithstanding the foregoing, the settlement documents

2   approved by the Bankruptcy Court regarding Imperial, Murakami and PCB, and any other

3   settlement agreement approved prior to the Effective Date that specifically provides that the

4   Shareholder Plan shall not modify the terms of such settlement, shall supersede any inconsistent

5   Plan provisions.

6                                          **XVI.**

7                   **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION**

8                                **OF THE SHAREHOLDER PLAN**

9           The Shareholder Proponents believe that the Shareholder Plan affords Holders of Claims the

10  potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of

11  such Holders. If the Shareholder Plan is not confirmed, however, the theoretical alternatives

12  include: (a) an alternative plan or plans of reorganization; or (b) liquidation of the Debtors under

13  Chapter 7 or Chapter 11 of the Bankruptcy Code.

14          **A.      ALTERNATIVE PLANS OF REORGANIZATION**

15          The Debtors have proposed a competing plan of reorganization.  Their plan contemplates a

16  reorganization and continuation of the Debtors' business.

17          If neither the Debtors' plan, the Shareholder Plan is not confirmed, the Creditors'

18  Committee, or after the expiration of the Debtors' exclusive period in which to propose and solicit a

19  reorganization Plan, any other party in interest in the Chapter 11 Cases, could propose a different

20  Plan or Plans. Such Plans might involve reorganization and continuation of the Debtors' business, or

21  a liquidation of their assets or a combination of both.

22          **B.      LIQUIDATION UNDER CHAPTER 7**

23          If no Plan is confirmed, the Chapter 11 Cases may be converted to individual cases under

24  Chapter 7 of the Bankruptcy Code. Upon conversion, one or more Chapter 7 trustees will be

25  appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the

26  proceeds of the liquidation would be distributed to the respective Holders of Claims against the

27  Debtors. A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of

28

1    Holders of Claims and Interests is set forth in Article IX.C. of the Shareholder Disclosure Statement

2    (Best Interests Test / Liquidity Analysis). The Debtors believe that liquidation under Chapter 7

3    would result in, among other things: (i) decreased distributions to creditors because of additional

4    administrative expenses attendant to the appointment of one or more trustee's and the trustee's

5    employment of attorneys and other professionals; (ii) increased expenses and Claims, some of

6    which would be entitled to priority, which would be generated during the liquidation and from the

7    rejection of leases and other executory contracts in connection with a cessation of the Debtors'

8    operations; and (iii) the failure to realize the greater, going concern value of the Debtors' assets.

9         In the opinion of the Debtors, the recoveries projected to be available in either a Chapter 7

10    liquidation are not likely to afford Holders of Claims as great a realization potential as does the

11    Shareholder Plan.

12                                    **XVII.**

13                        **CONCLUSION AND RECOMMENDATION**

14         The Shareholder Plan provides for an equitable distribution to creditors of the Debtors and

15    preserves the value of the business as a going concern. The Shareholder Proponents believe that

16    confirmation and implementation of the Shareholder Plan is preferable to any of the alternatives

17    described above because it will provide the greatest recoveries to Holders of Claims and Interests.

18    FOR THESE REASONS, THE SHAREHOLDER PROPONENTS URGE YOU TO RETURN

19    YOUR BALLOT ACCEPTING THE SHAREHOLDER PLAN SO THAT THEY WILL BE

20    RECEIVED NO LATER THAN [],LOS ANGELES TIME, ON [ ], 2010.

21    Dated:  July 14, 2010                          LESNICK PRINCE LLP

22

23                                        By: _____/s/ Christopher E. Prince_____

24                                              Christopher E. Prince
                                                   Attorneys for
25                                         Charlestown Capital Advisors, LLC

26

27

28