JOHN N. TEDFORD, IV. (State Bar No. 205537)
*JTedford@DGDK.com*
JULIA W. BRAND (State Bar No. 121760)
*JBrand@DGDK.com*
ENID M. COLSON (State Bar No. 189912)
*EColson@DGDK.com*
DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
Los Angeles, California 90067-2904
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Meruelo Maddux Properties, Inc., and affiliated Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

In re

MERUELO MADDUX PROPERTIES, INC., et al.

Debtors and Debtors-in-Possession.

☑ Affects all Jointly Administered Debtors

☐ Affects the following Debtor(s):

Case No. 1:09-bk-13356-KT

Chapter 11 (Jointly Administered)

**SUBMISSION OF REDLINE OF THIRD AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING THIRD AMENDED JOINT PLAN OF REORGANIZATION OF MERUELO MADDUX PROPERTIES, INC., ET AL. DATED SEPTEMBER 1, 2010**

**<u>Disclosure Statement Hearing</u>**
Date: September 1, 2010
Time: 9:30 a.m.
Ctrm: "301" 21041 Burbank Blvd.
Woodland Hills, CA 91367

**<u>Plan Confirmation Hearing</u>**
Date: November 29, 2010
Time: 9:30 a.m.
Place: Courtroom 301
21041 Burbank Blvd.
Woodland Hills, California

Attached hereto is a redline of the Debtors' *Third Amended Joint Disclosure Statement Describing Third Amended Joint Plan of Reorganization of Meruelo Maddux Properties, Inc., et al., Dated September 1, 2010* (docket no. 1772) compared to the *Modified Second Amended Joint Disclosure Statement Describing Second Amended Joint Plan of Reorganization of Meruelo Maddux Properties, Inc., et al.*, filed on June 10, 2010 (docket no. 1510).

Dated: September 1, 2010

DANNING, GILL, DIAMOND & KOLLITZ, LLP

By: ______________________
ENID M. COLSON
Attorneys for Debtors and Debtors-in-Possession

JOHN J. BINGHAM, JR. (State Bar No. 075842)
*JBingham@DGDK.com*
JOHN N. TEDFORD, IV (State Bar No. 205537)
*JTedford@DGDK.com*
JULIA W. BRAND (State Bar No. 121760)
*JBrand@dgdk.com*
ENID COLSON (State Bar No. 189912)
*EColson@dgdk.com*
DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
Los Angeles, California 90067-2904
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Attorneys for Meruelo Maddux Properties, Inc., and affiliated Debtors and Debtors-in-Possession

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| In re<br><br>MERUELO MADDUX PROPERTIES, INC., et al.,[1]<br><br>Debtors and Debtors-in-Possession.<br><br>☑ Affects all Debtors<br><br>☐ Affects the following Debtor(s):<br><br>☑ Affects all Debtors<br><br>☐ Affects the following Debtor(s): | Case No. 1:09-bk-13356-KT<br><br>Chapter 11 (Jointly Administered)<br><br>**MODIFIED SECONDTHIRD AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING SECONDTHIRD AMENDED JOINT PLAN OF REORGANIZATION OF MERUELO MADDUX PROPERTIES, INC., ET AL.**<br><br>Date: June 2 **DATED SEPTEMBER 1, 2010**<br><br>**Disclosure Statement Hearing**<br>Date: August 6, 2010<br>Time: 9:30 a.m.<br>Place: Courtroom 301<br>21041 Burbank Blvd.<br>Woodland Hills, California<br><br>**Plan Confirmation Hearing**<br>Date: November 29, 2010<br>Time: 9:30 a.m. |

[1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities. The affiliated case numbers are as follows: 1:09-bk-13338-KT; 1:09-bk-13358-KT; 1:09-bk-13359-KT; 1:09-bk-13360-KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-13365-KT; 1:09-bk-13366-KT; 1:09-bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-bk-13371-KT; 1:09-bk-13372-KT; 1:09-bk-13373-KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT; 1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13385-KT; 1:09-bk-13386-KT; 1:09-bk-13387-KT; 1:09-bk-13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13391-KT; 1:09-bk-13392-KT; 1:09-bk-13393-KT; 1:09-bk-13394-KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-KT; 1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-KT; 1:09-bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.

Style Definition: Heading 1,h1,H1: Font: Bold, Underline, Centered, Indent: Left: 0", First line: 0", Tabs: 0.5", List tab + Not at 3.67"
Style Definition: Heading 2,h2,H2: Font: Bold, Indent: Left: 0.5", Tabs: 1", List tab + Not at 1.08"
Style Definition: Heading 3,h3,H3: Font: Bold
Style Definition: Heading 4,h4,H4: Font: Bold, Italic
Style Definition: Heading 5,h5,H5: Font: Bold, Underline
Style Definition: Heading 2 Char,h2 Char,H2 Char: Font: Bold
Style Definition: TOC 1: Do not check spelling or grammar, Indent: Left: 0", First line: 0", Tabs: 6.55", Right,Leader: …
Style Definition: TOC 2: Do not check spelling or grammar, Indent: Left: 0", Tabs: 0.5", Left + 6.55", Right,Leader: … + Not at 4.17"
Style Definition: TOC 3: Do not check spelling or grammar, Indent: Left: 0.5", Tabs: 1", Left + Not at 4.67"
Style Definition: TOC 4: Do not check spelling or grammar, Indent: Left: 1", Tabs: 1.5", Left + Not at 5.17"
Style Definition: TOC 5: Do not check spelling or grammar, Indent: Left: 2", Tabs: 6.55", Right,Leader: … + Not at 5.67"
Style Definition: TOC 6: Indent: Left: 2", Tabs: Not at 6.17"
Style Definition: TOC 7: Indent: Left: 2.5", Tabs: Not at 6.67"
Style Definition: TOC 8: Indent: Left: 3", Tabs: 6.55", Right,Leader: … + Not at 7.17"
Style Definition: TOC 9: Indent: Left: 3.5", Tabs: 6.55", Right,Leader: … + Not at 7.67"
Style Definition: Style Heading 1h1H1 + Centered: Font: Not Bold, Underline
Formatted Table
Formatted: Font: Bold
Formatted: Indent: Left: 0"

) Place: Courtroom 301
) 21041 Burbank Blvd.
Woodland Hills, California

Formatted: Divider

Formatted: Flush Left,fl,Left: 3.38",Right: 0.4",fl + Line spacing: Exactly 24 pt

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF. HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING. THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE XIII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

WHERE THERE ARE SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT, SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS BELIEVE THE PLAN WILL ENABLE THEM TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

THE DEBTORS URGE ALLOWED CLAIM HOLDERS IN CLASSES OF CLAIMS THAT ARE IMPAIRED AND THAT ARE NOT DEEMED TO HAVE REJECTED THE PLAN TO VOTE TO ACCEPT THE PLAN.

~~I.~~

# I.

# INTRODUCTION

Formatted: Heading 1,h1,H1, Left

## A. OVERVIEW

Meruelo Maddux Properties, Inc., (“MMPI”), and its 53 related debtor entities that filed voluntary bankruptcy petitions at the same time as MMPI (each a “Debtor” and, collectively, the “Debtors” or the “Company”) submit this ~~First~~Third Amended Disclosure Statement ("Disclosure Statement') pursuant to Section 1125 of Title 11 of the United States Code (the “Bankruptcy Code”). The purpose of this Disclosure Statement is to provide Holders of Claims against and Interests in the Debtors with adequate information to enable them to make informed judgments about the Debtors’ Joint ~~Second~~Third Amended Plan of Reorganization under Chapter 11 of the Bankruptcy Code, dated ~~June 10~~September 1, 2010, (as the same may be amended, the “Plan”), filed with the United States Bankruptcy Court for the Central District of California – San Fernando Valley Division (the “Bankruptcy Court”) before exercising their right to vote to accept or reject the Plan.[2]

[2] Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan, a copy of which is attached hereto as Exhibit “A.” A term used, but not defined herein or in the Plan, but defined in the Bankruptcy Code, has the meaning given to that term in the Bankruptcy Code unless the context of this Disclosure Statement clearly requires otherwise. References to code sections are references to the Bankruptcy Code, except as otherwise stated.

This Disclosure Statement describes the business background and operating history of the Debtors before the filing of their Chapter 11 Cases. It also summarizes certain significant events that have taken place during the Chapter 11 Cases and describes the terms of the Plan, which divides creditor Claims and the interests of shareholders into Classes and provides for the satisfaction of allowed Claims and interests.

The Plan is a joint Plan and not a consolidated Plan. The Debtors are not seeking substantive consolidation in the Plan. As a result, the Claims and Interests in each of the Debtors have been classified on a Debtor by Debtor basis. Votes will be tabulated and acceptances will be determined on a Debtor by Debtor basis. The Debtors will seek confirmation of the Plan as to each Debtor on an individual basis notwithstanding that the Plan is a joint Plan. The votes of creditors of one Debtor will not affect or be counted toward acceptance of rejection of a plan for any other Debtor. The Debtors reserve the right to proceed with Confirmation under the Plan for one Debtor, or a combination of Debtors, and not others.

The Plan provides for the payment in full of all Claims over time with interest. The Secured Claims will be paid interest only over the term of the Plan and the principal balance will be paid either through the sale of the property securing the claim or the refinance of the secured debt. MMPI shareholders will ~~have the option of electing to receive payment~~ retain their shares in ~~exchange for their shares or in exchange for their existing shares and to receive stock in Reorganized~~ MMPI. MMPLP will be merged into MMPI and MMPLP's equity interests will be cancelled. Payments under the Plan will be funded from the Debtors' operations, ~~an infusion of capital~~existing cash at the Effective Date and the sale and refinance of certain of the Debtors' assets. A detailed description of the Plan is set forth in Article V of this Disclosure Statement.

Upon Bankruptcy Court approval ("Confirmation") of the Plan, the Plan will be binding upon all creditors and shareholders regardless of whether an individual creditor or shareholder has voted in favor of the Plan. THE DEBTORS THEREFORE URGE YOU TO READ THIS DISCLOSURE STATEMENT AND THE PLAN CAREFULLY.

### B. EXHIBITS AND ADDITIONAL INFORMATION

Attached as Exhibits to this Disclosure Statement are copies of the following documents:

- The Plan (Exhibit A);
- Order of the Bankruptcy Court dated [ ], 2010 (the "Disclosure Statement Order")~~, among other things,~~ approving this Disclosure Statement ~~and establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan~~ (Exhibit B);
- Chart of the Debtors' Corporate Structure: Prepetition List of the Debtors (Exhibit C);
- Loan Modification Agreements (Exhibit D);
- The Debtors' Projected Financial Information (Exhibit E);
- The Debtors' Unexpired Leases and Executory Contracts (Exhibit F);
- The Debtors' Liquidation Analysis (Exhibit G);
- The Claims and Interests of the Debtors (Exhibit H);
  - List of Administrative Expense Claims (Exhibit H.1)
  - List of Class "B" Priority Unsecured Claims (Exhibit H.2);
  - List of Class "C" General Unsecured Claims – Tenant Security Deposit Claims (Exhibit H.3);
  - List of Class "C" General Unsecured Claims -- Convenience Class (Exhibit H.4);
  - List of Class "C" General Unsecured Claims (Exhibit H.5);
  - List of Class "C" Unsecured Guaranty Claims (Exhibit H.6);
  - List of Class "D" Intercompany Claims (Exhibit H.7);
  - List of Class "E" Interests (Exhibit H.8);
- List of Debtors' Transfers During the 90-Day and One-Year Avoidance Periods (Exhibit I);
- Debtors' Property Valuations (Exhibit J);
- Amended~~Agreement~~ and ~~Restated Certificate~~Plan of ~~Incorporation~~Merger (Exhibit K);
- ~~Bylaws of Reorganized MMPI (Exhibit L);~~
- ~~Agreement and Plan of Merger (Exhibit M);~~ and

- Addendum of historical financial information.

MMPI has filed public reports with the Securities and Exchange Commission ("SEC") which contain additional information about the Company and its historic financial performance. The most recent filings are: 10-K for the year ended December 31, 2009 (filed on June 21, 2010), 10-K for the year ended December 31, 2008 (filed on March 16, 2009), Amended 10-K for the year ended December 31, 2008 (filed on April 30, 2009), 10-Q for the quarter ended March 31, 2009 (filed on September 9, 2009), 10-Q for the quarter ended June 30, 2009 (filed on September 17, 2009) and 10-Q for the quarter ended September 30, 2009 (filed on November 9, 2009). On January 19, 2010, MMPI filed its Certification and Notice of Termination of Registration under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports under Section 13 and 15(d) of the Securities Exchange Act of 1934 and accordingly, the Debtor is no longer required to file public reports with the SEC.

You may obtain copies of these documents from:

- The SEC's website at: *http://www.sec.gov/edgar/searchedgar/companysearch.html;*
- The Company's website (under "Investor Relations") at: *http://www.meruelomaddux.com/noflash/index.php* or
- Kurtzman Carson Consultant's website at: *[to be inserted]*
- By requesting them in writing from:

Meruelo Maddux Properties, Inc.
761 Terminal Street
Building 1, 2nd Floor
Los Angeles, CA 90021
Attn: Mr. Todd Nielsen

A Ballot for the acceptance or rejection of the Plan is also enclosed with this Disclosure Statement submitted to the Holders of Claims ~~and Interests~~ that are entitled to vote to accept or reject the Plan.

On [______________________], 2010, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order, approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.

APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE BANKRUPTCY COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CHAPTER 11 CASES.

The ~~Disclosure Statement Order, a copy of which is annexed hereto as Exhibit B, sets forth in detail~~Court will enter an order that provides the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and the applicable standards for tabulating Ballots (the "Procedures Order"). In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim or Interest entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the Procedures Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims for voting purposes and the tabulation of votes. No solicitation of votes to accept the Plan may be made except pursuant to Section 1125 of the Bankruptcy Code.

### C. HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only Holders of Allowed Claims or Interests in Classes of Claims or Interests that are impaired and that are not deemed to have rejected the Plan are entitled to vote to accept or reject a proposed Plan. Classes of Claims or Interests in which the Holders of Claims or Interests are unimpaired under a Chapter 11 Plan are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes of Claims or Interests in which the Holders of Claims or Interests will receive no recovery under a Chapter 11 Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. For a detailed description of the treatment of Claims and Interests under the Plan, see Article V of this Disclosure Statement.

The following Classes are impaired and, to the extent Claims ~~or Interests~~ in such Classes are Allowed Claims or Interests, the Holders of such Claims will receive distributions under the Plan. As a result, Holders of Claims ~~or Interests~~ in those Classes are entitled to vote to accept or reject the Plan:

- Classes 10A, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1, 28A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 50A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of secured tax Claims against the Debtors);
- Classes 21A-2, 28A-2, 29A-2, 29A-3, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 37A-2, 37A-3, 38A-2, 39A-2, 40A-2, 41A-2, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors against each relevant Debtor);
- Classes 1C-2A, 1C-2B, 1C-3, 2C-3, 3C, 4C-2, 5C-2, 6C, 7C, 8C-2, 9C-2, 10C-2, 11C-3, 12C-3, 13C-2, 14C-3, 15C-2, 16C-2, 17C, 18C-2, 19C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3, 27C-3, 28C-3, 29C-2, 30C-3, 31C-2, 32C, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3, 40C-3, 41C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3, 53C, and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor)~~; and~~

~~Class 1E, consisting of the Class of Interests of MMPI~~.

Formatted: Indent: First line: 0.5", No bullets or numbering

The Plan provides for the merger of MMPLP into MMPI. The interests of the holders of LTIP units in Class 2E will be cancelled and extinguished at the Effective Date and the remaining interests will be extinguished as a result of the merger of MMPLP and MMPI. As a result Class 2E is deemed to reject the Plan and is not entitled to vote on the Plan.

The following Classes of the Plan are Unimpaired. As a result, Holders of Claims and Interests in those Classes are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan:

- Classes 1B, 5B, 32B, 33B, 36B and 52B, (consisting of the Priority Unsecured Benefits Claims of present and former employees of each relevant Debtor);

- Classes 11C-1, 12C-1, 14C-1, 15C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1, 32C-1, 33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 41C-1, 43C-3, 44C-3, 46C-1, 48C-3, 49C-3, 52C-1 and 54C-1 (consisting of the unsecured Claims for security deposits of the Debtors' tenants);
- Classes 1C-1, 2C-1, 4C-1, 8C-1, 9C-1, 10C-1, 11C-2, 12C-2, 13C-1, 14C-2, 15C-1, 16C-1, 18C-1, 19C-1, 21C-2, 24C-1, 25C-2, 26C-2, 27C-2, 28C-2, 29C-1, 30C-2, 31C-1, 32C-2, 33C-2, 34C-2, 35C-1, 36C-2, 38C-2, 39C-2, 40C-2, 41C-2, 42C-1, 43C-1, 44C-1, 45C-1, 47C-1, 49C-1, 50C-1, 51C-1, 52C-2, and 54C-2 (consisting of the Convenience Claims of each relevant Debtor);
- Classes 2D through 7D, 9D-35D, and 37D-53D (consisting of the Intercompany Claims);
- Classes 1E and 3E through 54E (consisting of the Interests in the Debtors other than MMPI and MMPLP).

As a condition to confirmation for each Debtor's Chapter 11 Case, the Bankruptcy Code requires that each Class of Impaired Claims and Interests vote to accept the Plan, except under certain circumstances. Section 1126(c) of the Bankruptcy Code defines acceptance of a Plan by a Class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of Claims in that Class, but for that purpose counts only those who actually vote to accept or to reject the Plan. Thus, a Class of Claims will have voted to accept its Debtor's Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance. For each Debtor's Chapter 11 Case, under Section 1126(d) of the Bankruptcy Code, a Class of Interests has accepted the Plan if Holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan. Thus, acceptance of a Plan by the Impaired Classes of Claims listed above for each Debtor will occur only if at least two-thirds in dollar amount and a majority in number of the Holders of such Claims in each Class that cast their Ballots vote in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. For a more detailed description of the requirements for confirmation of the Plan, see Article IX of this Disclosure Statement.

With respect to each Debtor's Chapter 11 Case, if a Class of Claims or Interests entitled to vote on the Plan rejects the Plan, the relevant Debtor reserves the right to amend the Plan or request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of the Plan by one or more impaired Classes of Claims or Interests. Under that Section, a Plan may be confirmed by a Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Class. For a more detailed description of the requirements for confirmation of a nonconsensual Plan, see Article IX of this Disclosure Statement.

For each Debtor, in the event at least one Impaired Class of Claims votes to accept the Plan (and at least one Impaired Class either votes to reject the Plan or is deemed to have rejected the Plan), such Debtor shall request the Bankruptcy Court to confirm the Plan under the cramdown provisions of Section 1129(b) of the Bankruptcy Code.

**D. VOTING PROCEDURES**

If you are entitled to vote to accept or reject the Plan, in the Chapter 11 Case in which you have an Allowed Claim or Allowed Interest, a Ballot is enclosed for the purpose of voting on the Plan. If you hold Claims in more than one Class or against more than one Debtor and you are entitled to vote each of such claims or interests, you will receive separate Ballots for each case in which you are entitled to vote and for each separate Class of Claims or Interests for which you are entitled to vote. Please vote and return your Ballot(s) to:

~~DANNING GILL DIAMOND & KOLLITZ LLP~~
~~2029 Century Park East, Third Floor~~
~~Los Angeles, CA 90067~~
~~Attention: Yves Pierre Derae~~

Kurtzman Carson Consultants
*[to be inserted]*

Formatted: Font: Italic

Formatted: Centered, Indent: First line: 0", Line spacing: Exactly 12 pt

DO NOT RETURN ANY NOTES OR SECURITIES WITH YOUR BALLOT. TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN [__________]4:00 P.M., LOS ANGELES TIME, ON [__________ ___]OCTOBER 12, 2010. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is scheduled by the relevant Debtor as unliquidated, disputed or contingent and for which no proof of Claim has been filed is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please email the Debtors' counsel at: mmpi@dgdk.com.

**E. CONFIRMATION HEARING**

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on [__________]November 29, 2010 commencing at [__________]9:30 a.m. Los Angeles Time, before the Bankruptcy Court, the Honorable Kathleen Thompson, Presiding. Courtroom 301, 21041 Burbank Blvd., Woodland Hills, California 91367. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number of shares of stock held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court, the Official Committee of Unsecured

Creditors (the "Creditors Committee") and the Debtors on or before November 4, 2010. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

### F. NOTICES

All notices, requests and demands hereunder to be effective must be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by U.S. Mail or email addressed as follows:

| DEBTORS AND REORGANIZED DEBTORS | COUNSEL TO THE DEBTORS AND REORGANIZED DEBTORS |
|---|---|
| Todd Nielsen, Esq.<br>General Counsel<br>MERUELO MADDUX PROPERTIES, INC.<br>761 Terminal Street<br>Building 1, 2nd Floor<br>Los Angeles, California 90021<br>TNielsen@meruelomaddux.com | John J. Bingham, Jr., Esq.<br>John N. Tedford, IV, Esq.<br>Julia W. Brand, Esq.<br>DANNING, GILL, DIAMOND & KOLLITZ, LLP<br>2029 Century Park East, Third Floor<br>Los Angeles, California 90067-2904<br>Telephone: (310) 277-0077<br>Facsimile: (310) 277-5735<br>E-Mail:<br>JBingham@dgdk.com<br>JTedford@dgdk.com<br>JBrand@dgdk.com |

II.

## II.

## DEBTORS' BUSINESS AND OPERATIONS PRIOR TO THE FILING

### A. CORPORATE HISTORY OF THE DEBTORS

MMPI is the parent company of the fifty-three related Debtor entities that, along with MMPI, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 26 and 27, 2009. A list of each of the Debtors is attached as part of Exhibit "C." MMPI was incorporated in 2006 under the laws of the State of Delaware, and is registered with the California Secretary of State to do business in the State of California. Each of the other Debtors was formed under either the laws of the State of Delaware or the laws of the State of California. The Delaware

Formatted: Left, Indent: Left: 0", Hanging: 0.5"
Formatted Table
Formatted: Left
Formatted: Indent: Left: 0", Hanging: 0.5"
Formatted: Indent: Left: 0.01"
Formatted: Indent: Left: 0", Hanging: 0.5"
Formatted: Left

Debtors are registered with the California Secretary of State to do business in the State of California.

**B. NATURE OF THE DEBTORS' BUSINESS**

MMPI, together with its subsidiary operating partnership, MMPLP, and its affiliates and related entities, is a self-managed, full-service real estate company that develops, redevelops and owns industrial, commercial and multi-unit residential real properties primarily located in downtown Los Angeles and other areas in southern California. The Company focuses on unique properties that it believes have an alternate, more profitable use achievable through major renovation, redevelopment or development. The Company's projects are predominantly located in a densely populated urban, multi-ethnic environment and involve numerous local entitlement, property assemblage and physical challenges.

The Company is committed to responsible property investing that has economic, environmental and social benefits. Its development activities include urban infill projects that are expected to meet the demands of urban communities and that utilize or upgrade existing infrastructure instead of creating new infrastructure. The Company is known as a "smart growth" developer, and many of the Company's projects are designed to locate businesses, customers and employees close to each other and close to existing public transit systems. The Company is also known as an "incubator" of new businesses, actively seeking development projects in empowerment zones. The Company is very familiar with the social, cultural, business and political issues of land development in Southern California, and especially the Los Angeles area.

The Debtors were formed to succeed to certain operations of a predecessor group, whose owners were Richard Meruelo, Maria Meruelo and John Charles Maddux. Through their predecessor business, the Company's principals have been investing in urban real estate since 1972.

The Debtors' current management team is led by Richard Meruelo, who serves as MMPI's Chief Executive Officer and Chairman of MMPI's Board of Directors, and John Charles Maddux, who serves as MMPI's President and Chief Operating Officer and a member of MMPI's Board of Directors. Messrs. Meruelo and Maddux both have more than 20 years experience in identifying,

acquiring, entitling, financing, developing and redeveloping urban real estate. They have worked together since 1987.

The Company does not utilize the same business model as typical real estate investment companies, many of which utilize real estate investment trusts ("REITs"), and the Company's business Plan is distinctive among publicly traded companies. Many public real estate companies focus on properties with stable occupancies at market rents or properties with stable occupancies at below-market rents that may benefit from more efficient management or minor renovations. In contrast, the Company focuses on urban in-fill development and on finding different, more profitable uses for existing urban properties. The Company looks for properties that have value intrinsic to the property itself, such as the property's location, whether there is an end user of the property on the horizon who might want to purchase the property, how well the property will fit in with the growth patterns of the area and community in which it is situated, and other factors. Such properties may have substantial vacancies, unstable occupancies, or require major renovations for a new use. The Company's business requires local and other special knowledge to identify viable alternative uses for urban property, and presents higher potential returns than the returns that the property owner might otherwise derive.

The Company's business model anticipates the need for time to develop properties and requires the infusion of funds to pay the costs of such development, including the carrying costs. To help defray costs during development, properties may be utilized as parking lots or other uses, not because such use generates substantial income but because the land itself is extremely valuable since it can be developed at an appropriate time in the future, and the parking lot revenue provides some interim revenue. Many of the Company's properties have gone through the land use process to the point where entitlements have been obtained thus increasing the value substantially, but development has been deferred pending an improvement in the credit markets. In summary, the Company's business model contemplates and is based upon the purchase, development and resale of properties, pursuant to which the Company turns over such properties in a relatively short period of time, such as a few years instead of decades, and uses the profit from such properties to fund

operations of MMPI and all of its other affiliates and the purchase and development of other properties.

Currently, the Company owns in excess of forty discrete properties consisting in some cases of a number of parcels, some of which generate income and others of which are in various stages of development. With approximately 80 acres of land, the Company is believed to be the largest non-government land owner in downtown Los Angeles.

Properties the Debtors currently own include the following:

### 1. 210 – 212 and 230 West Avenue 26, Los Angeles

The subject property is owned by Meruelo Maddux-230 W. Avenue 26, LLC ("MM 230 W. Avenue 26") and is unencumbered. The property is located at the corner of Humboldt Street and West Avenue 26 near the Northeast boundary of downtown Los Angeles. It is comprised of one property totaling approximately 1.8 acres of land which has been improved with a group of multi-tenant industrial buildings consisting of approximately 67,671 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to ~~five~~four tenants occupying approximately ~~30~~23% of the total rentable area. ~~Two~~Three of the tenants, occupying ~~33~~71% of the rented space are on month to month tenancies. The average occupancy for month to month tenants is ~~47~~34 months. The largest tenant occupies 6.9% of the total area. The property is currently being utilized as an industrial and distribution space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

### 2. 306 – 330 North Avenue 21, Los Angeles

The subject property is owned by Meruelo Maddux Properties-306-330 N. Avenue 21, LLC ("MMP 306-330 N. Avenue 21") and is unencumbered. The property is located near the corner of Humboldt Street and North Avenue 21 near the Northeast boundary of downtown Los Angeles. It is comprised of approximately 1.1 acres which have been improved with industrial buildings consisting of approximately 80,712 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to five tenants occupying approximately 30% of the total rentable area.

All of the tenants are on month to month tenancies. The average occupancy for month to month tenants is ~~34~~37 months. The largest tenant occupies 13.4% of the total area. The property is currently being utilized as an industrial and distribution space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

**3. 1000 East Cesar Chavez, Los Angeles**

The subject property is owned by Meruelo Maddux-1000 E. Cesar Chavez, LLC ("MM 1000 E. Cesar Chavez") and is unencumbered. The property is comprised of four separate properties located near the Northeast boundary of downtown Los Angeles. Specifically, properties one and two are located at the corner of East Cesar Chavez Avenue and North Mission Road and properties three and four are located east of the parking lot on East Cesar Chavez Avenue. The subject property is improved with an industrial building, parking lot, and two single-family residences and totals approximately 1.6 acres consisting of approximately 50,373 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to seven tenants occupying approximately 17% of the total rentable area. All of the tenants are on month to month tenancies. The average occupancy for month to month tenants is ~~39~~42 months. The largest tenant occupies 6.6% of the total area. The non-residential portion of the property is currently being utilized as an industrial and distribution space facility.

This property is home to an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

**4. 2415 East Washington Boulevard, Los Angeles**

The subject property is owned by Meruelo Maddux-2415 E. Washington Blvd., LLC ("MM 2415 E. Washington Boulevard"). As a result of the Debtors' settlement with Imperial Capital Bank, a division of City National Bank, a national banking association ("Imperial") and Bankruptcy Court approval thereof, the property is encumbered by a lien in favor of Imperial. The property is located near the corner of South Santa Fe Avenue and East Washington Boulevard, adjacent to Santa Fe Commerce Center, near the Southeast Industrial part of downtown Los

Angeles. It is comprised of one property totaling approximately 0.5 acres which has been improved with an industrial building consisting of approximately 18,500 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were not leased. The property is currently a multi-tenant industrial space facility.

This property is intended to be used by an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

**5. 1211 East Washington Boulevard, Los Angeles**

The subject property is owned by Merco Group-1211 E. Washington Boulevard, LLC ("MG 1211 East Washington Boulevard") and is unencumbered. The property is located at the corner of Washington Boulevard and South Central Avenue just south of the Interstate 10 Freeway in downtown Los Angeles. It is comprised of three properties totaling approximately 2.0 acres which have been improved with a multi-tenant industrial building and a retail plaza consisting of approximately 113,479 net rentable square feet. The third property is a parking lot. As of ~~March 31~~June 30, 2010, the improvements were leased to seven tenants occupying approximately 73.2% of the total rentable area. Two of the tenants, occupying 46% of the rented space are on month to month tenancies. The average occupancy for month to month tenants is ~~35~~38 months. The largest tenant occupies ~~31.6~~30.8% of the total area. The property is currently being utilized primarily as a garment manufacturing space.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

**6. 13853, 13822 and 13916 Garvey Avenue, 13904 Corak Street and 3060 Feather Avenue, Baldwin Park**

The subject property is owned by Meruelo Baldwin Park, LLC and is unencumbered. The property is located at the intersection of Francisquito Avenue and the Interstate 10 Freeway in Baldwin Park, California. It is comprised of approximately 6.3 acres of land and improvements containing approximately 3,878 net rentable square feet which include two single-family residences. As of ~~March 31~~June 30, 2010, the improvements were leased to three tenants

occupying approximately 100% of the total rentable area. All of the tenants are on month to month tenancies. The average occupancy for month to month tenants is ~~43~~46 months. The largest tenant occupies 40.3 % of the total building area. The largest component of this property is unimproved land immediately adjacent to the Interstate 10 Freeway.

This property is intended to be a retail development as a compliment to the garment, produce, multi-tenant and residential activities of MMPI.

### **7. 1910 - 1922 Santa Fe Avenue, 2425 East 12th Street and 303 South Hewitt, Los Angeles**

The subject property is owned by Santa Fe & Washington Market, LLC ("Santa Fe & Washington Market"). The subject property includes three separate properties of which one is located in the Arts District of downtown Los Angeles at 303 South Hewitt Street and two of which are located adjacent to the Santa Fe Commerce Center at 1910-1922 Santa Fe Avenue and 2425 East 12th Street in downtown Los Angeles. The property located at 303 South Hewitt Street has been improved with a ~~fifty-four~~ forty-eight unit apartment building. The two industrial buildings located at 1910-1922 Santa Fe Avenue and at 2425 East 12th Street contain approximately ~~52,040~~38,490 net rentable square feet in the aggregate. As of ~~March 31~~June 30, 2010, the ~~improvements were~~apartment building was leased to forty-~~six~~one tenants occupying approximately ~~80~~85.2% of the total rentable area~~. Forty-two~~, thirty-nine of ~~the tenants, occupying 27% of the rented space~~which are on month to month tenancies. The average occupancy for month to month tenants is ~~47~~41 months. ~~The largest tenant occupies 27~~As of June 30, 2010, the two industrial buildings are leased to four tenants, occupying approximately 86.2% of the total rentable area. The largest tenant occupies 36.7% of the total area.

Pursuant to a settlement with Imperial, the properties located at 1910-1922 Santa Fe Avenue are encumbered by a lien in favor of Imperial.

The property at 1910-1922 Santa Fe Avenue is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles. The property at 2425 East 12th Street is tenanted by small business owners prevalent in downtown Los

Angeles whereby the Company looks to support and be a helping hand in incubating their businesses. The property at 303 S Hewitt is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**8. 5701 and 5707 - 5715 South Alameda Street and 5016 Alba Street, Los Angeles**

The subject property is owned by Merco Group - 5707 S. Alameda, LLC ("MG 5707 S. Alameda") and is unencumbered. The property is located in a major trucking thoroughfare immediately south of downtown Los Angeles. It is comprised of two separate properties totaling approximately 1.9 acres of which one property has been improved with a multi-tenant industrial building consisting of approximately 55,729 net rentable square feet. The second property includes an additional non-contiguous land parcel one block away that ~~can be~~ is utilized as pallet storage. As of ~~March 31~~June 30, 2010, the improvements were leased to five tenants occupying approximately ~~51.0~~50.5% of the total rentable area. A sixth tenant leases the pallet storage area. ~~Four~~All five of the tenants, ~~occupying 96% of the rented space~~ are on month to month tenancies. The average occupancy for month to month tenants is ~~35~~41 months. The largest tenant occupies ~~19~~21.9% of the total area. The property is currently being utilized as a multi-tenant industrial space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

**9. 3rd & Omar Street, Los Angeles**

The subject property is owned by Meruelo Maddux - 3rd & Omar Street, LLC ("MM 3rd & Omar Street") and is encumbered by a lien in favor of Legendary Investors Group No. 1, LLC, as successor to East West Bank ("Legendary"). The property is located at 3rd & Omar Streets near the Little Tokyo area of downtown Los Angeles. It is comprised of two properties totaling approximately 0.5 acres of which one has been improved with a multi-tenant building consisting of

approximately 23,298 net rentable square feet and the other is being utilized as a parking lot. As of ~~March 31~~June 30, 2010, the improvements were leased to one tenant occupying approximately 10~~.0~~% of the total rentable area. The tenant is on a month to month tenancy. The average occupancy for month to month tenants is ~~34~~37 months. The ground floor of this property, where the current tenant is located, is currently being utilized as retail/wholesale storefront facility.

This property is intended to be used by an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

**10. 420 Boyd Street, Los Angeles**

The subject property is owned by Meruelo Maddux - 420 Boyd Street, LLC ("MM 420 Boyd Street") and is encumbered by a lien in favor of Legendary. The property is located at 420 Boyd Street near the Little Tokyo area of downtown Los Angeles. It is comprised of two properties totaling approximately 0.6 acres which have been improved with a multi-tenant building consisting of approximately 47,806 net rentable square feet and a parking lot. As of ~~March 31~~June 30, 2010, the improvements were leased to ~~eleven~~nine tenants occupying approximately ~~57~~39 % of the total rentable area. ~~Six~~Seven of the tenants, occupying ~~67~~76% of the rented space are on month to month tenancies. The average occupancy for month to month tenants is ~~94~~69 months. The largest tenant occupies 12.6% of the total area. The property is currently being utilized as multi-tenant office space, a restaurant facility and a parking lot.

This property is intended to be used by an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

**11. 760 South Hill Street, and 325 West 8th Street, Los Angeles (The Union Lofts)**

The subject property is owned by Meruelo Maddux Properties - 760 South Hill Street, LLC ("MMP 760 S. Hill Street") and is encumbered by a lien in favor of Bank of America, N.A. ("BofA"). The property is located at the corner of West 8th Street and South Hill Street in downtown Los Angeles. It is comprised of one property totaling approximately 0.3 acres which has been improved with a ninety-two unit condominium building currently in lease-up. The building is newly restored and converted former bank headquarters originally built in the 1920s

consisting of approximately 94,270 net rentable square feet. Space located on the ground floor is intended for a restaurant tenant. As of ~~March 31~~June 30, 2010, the improvements are leased to ~~sixty-nine~~seventy-two tenants occupying approximately ~~5.77~~61% of the total rentable area. The residential component, comprised of 81,609 square feet, is 72.4% occupied. The retail component, comprised of approximately 12,661 square feet, is 0% occupied.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**12. 788 South Alameda, Los Angeles**

The subject property is owned by 788 South Alameda, LLC ("788 South Alameda") and is encumbered by a lien in favor of California Bank & Trust. The property is located at 788 South Alameda Street across the street from Alameda Square in downtown Los Angeles. It is comprised of one property totaling approximately 2.3 acres which has been improved with a newly constructed modern produce market that is home to numerous small produce tenants consisting of approximately 33,984 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to twenty-~~four~~six tenants occupying approximately ~~75~~81% of the total rentable area. All of the tenants are on month to month tenancies. The average occupancy for month to month tenants is 17 months. The property is currently being utilized as a small-tenant produce industry space with coolers.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

**13. 905 8th Street, Los Angeles**

The subject property is owned by 905 8th Street, LLC ("905 8th Street") and is encumbered by a lien in favor of The Stanford Group, L.P. ("Stanford"). The property is located at 905 8th Street in downtown Los Angeles. It is comprised of one property totaling approximately 0.9 acres which has been improved with a multi-tenant industrial building consisting of approximately 28,200 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to

~~seven~~six tenants occupying approximately ~~23.6~~20 % of the total rentable area. All of the tenants are on month to month tenancies. The average occupancy for month to month tenants is ~~23~~29 months.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

**14. Alameda Produce Market, Los Angeles (Including Alameda Square and Seventh Street Produce Market)**

The subject property is owned by Alameda Produce Market, LLC ("Alameda Produce Market") and includes (a) four industrial buildings totaling 1,585,816 square feet of net rentable area on approximately 20.2 acres that is home to American Apparel ("Alameda Square"), (b) a multi-tenant produce market known as the Seventh Street Produce Market with 122,120 square feet of net rentable area, (c) an unencumbered parking structure located at 1215 East 7th Street whose use has been donated to the Center City East Association to provide aid to homeless people and (d) an unencumbered parking lot located at 1339 East 7th Street that is subject to an eminent domain proceeding with the MTA. The Alameda Square and Seventh Street Produce Market properties are subject to a lien in favor of Cathay Bank ("Cathay").

In regards to Alameda Square it is ~~59.3~~60.9% occupied with eleven tenants and the largest tenant is American Apparel who leases ~~more than 55~~53.9% of the area.

In regards to the Seventh Street Produce Market it is ~~65.3~~71.5% leased. A significant portion of the vacant space is unusable currently and is in the process of being approved to be improved so that it can be leased.

Alameda Square has been an example of two characteristics of MMPI's overall operations. First, it serves as an example of how MMPI incubates small business owners in the case of American Apparel that now occupies more than 10 times more space than it initially did and employs approximately 5,000 workers daily at Alameda Square. Second, it is an example of how the Company services business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los

Angeles. Seventh Street Produce Market is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles. The portion of the property located at 1339 East 7th Street is currently the subject of litigation between Alameda Produce Market and the Metropolitan Transit Authority ("MTA") which initiated eminent domain proceedings. The Company asserted that the MTA did not properly pursue such proceedings and the MTA's case was dismissed. The case has been appealed by the MTA and Alameda Produce Market believes it has claims against the MTA for, among other things, the value of the Company's lost use of the property during the numerous years that the property has been possessed by the MTA. In the event the MTA is successful in taking the property, the Company will have a Claim against the MTA for the fair value thereof, among other things less amounts previously paid to lenders.

**15. 1500 Griffith Avenue, Los Angeles**

The subject property is owned by Merco Group - 1500 Griffith Avenue, LLC ("MG 1500 Griffith Avenue"). The property is located at the corner of Griffith Avenue and East 16th Street in downtown Los Angeles. It is comprised of two separate properties totaling approximately 2.0 acres which have been improved with two buildings consisting of approximately 50,058 net rentable square feet. One property is encumbered by a lien in favor of Yoshiaki & Fumiko Murakami and the other property is encumbered by a lien in favor of Legendary. As of ~~March 31~~June 30, 2010, the improvements were leased to three tenants occupying approximately 100% of the total rentable area. One of the tenants, occupying 12% of the rented space is on a month to month tenancy. The average occupancy for month to month tenants is ~~39~~42 months. One lease is subject to renewal in 2011. The largest tenant occupies 60% of the total area. The property is currently being utilized as a distribution facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

**16. 1919 Vineburn Street, Los Angeles**

The subject property is owned by Meruelo Maddux Properties - 1919 Vineburn Street, LLC ("MMP 1919 Vineburn Street") and is encumbered by a lien in favor of Imperial. The property is located at 1919 Vineburn Street just north of downtown Los Angeles. It is comprised of one property totaling approximately 5.8 acres which has been improved with a single-tenant distribution building consisting of approximately 122,345 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were 100% leased to one tenant. The property is currently being utilized as a single-tenant distribution space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

**17. 2131 Humboldt Street, Los Angeles**

The subject property is owned by Meruelo Maddux Properties - 2131 Humboldt Street, LLC ("MMP 2131 Humboldt Street") and is partially encumbered by a lien in favor of Vahan & Anoush Chamlian ("Chamlian"). The subject property is located at the corner of Interstate 5 Freeway and Humboldt Street near the Northern boundary of downtown Los Angeles. It is comprised of approximately 6.0 acres which has been partially improved with industrial buildings consisting of approximately 31,319 net rentable square feet. The largest component of this property is unimproved land, which is encumbered and located at 2131 Humboldt Street and contains approximately ~~214,000~~213,801 square feet of land with no improvements. This portion of the property is used from time to time for film shoots and associated parking.

The unencumbered portion is located at 336-346 and 350-354 North Avenue 21. It contains approximately ~~17,415 square feet of land and improvements containing approximately 14,668~~31,319 square feet of space. As of ~~March 31,~~June 30, 2010, the improvements were leased to one tenant occupying approximately 17% of the total rentable area. The tenant is on a month to month tenancy. The average occupancy for month to month tenants is ~~44~~47 months. The improved portion of the property is currently being utilized as an industrial and distribution space facility.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of downtown Los Angeles space users both by itself or with other properties located in the same area and owned by other Debtors.

**18. 2529 Santa Fe Avenue, Vernon (Santa Fe Plaza)**

The subject property is owned by Merco Group – 2529 Santa Fe Avenue, LLC ("MG 2529 Santa Fe Avenue") and is encumbered by a lien in favor of 1248 Figueroa Street, LLC ("1248 Figueroa"). The property is located in Vernon, California totaling approximately 1.3 acres which has been improved with a newly constructed retail plaza that opened in 2009 consisting of approximately 16,000 net rentable square feet. As of ~~March 31,~~ June 30, 2010, a portion of the improvements were leased to a restaurant occupying approximately 29.4% of the total rentable area with the lease expiring on April 30, 2013. The property is currently in lease up.

This property is an example of the development of urban in-fill property to satisfy the sometimes non-institutional needs of small businesses in downtown Los Angeles.

**19. 2640 East Washington Boulevard, Los Angeles (Washington Produce Market)**

The subject property is owned by 2640 Washington Boulevard, LLC ("2640 Washington Boulevard") and is encumbered by a lien in favor of East West Bank as successor to United Commercial Bank ("UCB"). The property is located at 2640 East Washington Boulevard just south of downtown Los Angeles. It is comprised of one property totaling approximately 2.8 acres which has been improved with a newly constructed modern produce center consisting of approximately 31,876 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to twenty-~~eight~~three tenants occupying approximately ~~88.0~~70.4% of the total rentable area. ~~Twenty-seven of the~~ All tenants~~, occupying 97% of the rented space,~~ are on month to month tenancies. The average occupancy for month to month tenants is ~~15~~20 months. The largest tenant occupies ~~17.~~8.9% of the total area. The property is currently being utilized as a small-tenant produce industry space with coolers.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

**20. 2951 Lenwood Road, Barstow (Barstow Produce Center)**

The subject property is owned by Meruelo Maddux Properties - 2951 Lenwood Road, LLC ("MMP 2951 Lenwood Road") and is encumbered by a secured lien in favor of FNBN-CMLCOM I, LLC ("FNBN"). The property is located at the intersection of Lenwood Road and the Interstate 15 Freeway in Barstow, California. It is comprised of several properties totaling 75.0 acres which has been partially improved with three buildings consisting of approximately 261,~~650~~750 net rentable square feet. The three buildings are comprised of a single-tenant cross dock building, a truck maintenance building, and a newly constructed multi-tenant cold storage building for produce tenants. As of ~~March 31~~June 30, 2010, the improvements were not leased.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry.

**21. 3185 East Washington Boulevard, Los Angeles (Washington Cold Storage)**

The subject property is owned by Merco Group -- 3185 E. Washington Boulevard, LLC ("MG 3185 E. Washington Boulevard"). The property is commonly known as 3185 East Washington Boulevard in downtown Los Angeles. It is comprised of two parcels. The main, largest parcel is encumbered by a lien in favor of Chinatrust Bank (U.S.A.) ("Chinatrust"), and totals approximately 2.7 acres which has been improved with a cold storage facility consisting of approximately 59,000 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to a tenant occupying 100% of the total rentable area. The property is currently being utilized as a single-tenant cold storage facility. MG 3185 E. Washington Boulevard also owns a small parcel across Washington Boulevard which is unencumbered.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

**22. 620, 643 and 644 South Gladys Avenue, 830 - 838 East 6th Street and 647 - 649 Ceres Avenue, Los Angeles**

The subject property is owned by Merco Group-620 Gladys Avenue, LLC ("MG 620 Gladys Avenue") and is partially encumbered by a lien in favor of Legendary. The property generally is located at the corner of South Gladys Avenue and East 6th Street in the Seafood District of downtown Los Angeles. The property has been improved with several buildings housing numerous small businesses and an educational/daycare facility. The encumbered portion of the property is located at 620 S. Gladys Avenue, 830 - 838 East 6th Street and 647 - 649 Ceres Avenue. It contains approximately 107,795 square feet of land and improvements totaling approximately 73,253 square feet of space. It is being primarily used as a multi-tenant seafood/produce distribution facility. The unencumbered portion of the property is located at 643 and 644 S. Gladys Avenue and contains approximately 17,400 square feet of land and improvements containing approximately 16,535 square feet of space. It is being used as a multi-tenant distribution space facility. As of ~~March 31~~June 30, 2010, the improvements on the subject property were leased to six tenants occupying approximately ~~78.0~~63% of the total rentable area. Two of the tenants, occupying 46% of the rented space are on month to month tenancies. The average occupancy for month to month tenants is ~~24~~27 months. The largest tenant occupies ~~15.7~~19.2% of the total area.

This property is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

**23. 2001 - 2021West Mission Boulevard, Pomona**

The subject property is owned by Meruelo Maddux - Mission Boulevard, LLC ("MM Mission Boulevard") and is encumbered by a lien in favor of Kennedy Funding, Inc. ("Kennedy"). The property is located adjacent to 1875 West Mission Boulevard in Pomona, California. It is

comprised of one property totaling approximately 14.7 acres which has been improved with a three-story, single-tenant, office building consisting of approximately 242,042 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were not leased.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of Los Angeles space users.

**24. 1124 South Olive, 1117-1119 South Olive and 218 W. 11th Street, Los Angeles**

The subject property is owned by Merco Group-Little J, LLC ("MG Little J"). It is comprised of three separate properties, located on both sides of the 1100 block of South Olive Street in the South Park area of downtown Los Angeles. The western portion, which is encumbered by a lien in favor of Legendary, is improved with a building occupied by a restaurant tenant consisting of approximately 11,829 net rentable square feet. The remaining two properties, which are unimproved and unencumbered, are currently being utilized as parking lots. As of ~~March 31~~June 30, 2010, the improvements were leased to a restaurant occupying 100% of the total rentable area.

As a compliment to the commercial real estate activities of MMPI, the Company also focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of for rent or for sale product. This property is intended to be redeveloped for such uses.

**25. 950 and 960 E. 3rd Street, Los Angeles**

The subject property is owned by Merco Group, LLC ("MG") and is encumbered by two liens in favor of Legendary, each on separate parcels.[3] The two properties are located at the corner of East 3rd Street and South Santa Fe Avenue in the Arts District of downtown Los Angeles. It is

[3] The Debtors reserve the right to assert that Legendary's lien is void or voidable.

comprised of two separate properties totaling approximately 10.5 acres of which one has been improved with a building occupied by the Southern California Institute of Architecture ("Sci-Arc") consisting of approximately 81,741 net rentable square feet. The second property consists of unimproved land which is entitled for 635 residential units and a portion of which is currently being partially utilized as parking lot for Sci-Arc student parking. As of ~~March 31~~June 30, 2010, the building was leased to Sci-Arc occupying approximately 100% of the total rentable area. Sci-Arc exercised its option to extend its lease. The Debtor and Sci-Arc have entered into an agreement for the purchase by Sci-Arc of the property where the building is located and the parking lot.

As a compliment to the commercial real estate activities of MMPI, the Company also focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of for rent or for sale product. This land portion of this property is intended to be redeveloped for such uses.

**26. 815 East Temple Street, 210 Center Street and 729 East Temple Street, Los Angeles (Center Village)**

The subject property is owned by Meruelo Farms, LLC ("Meruelo Farms") and is encumbered by liens in favor of Imperial (on 815 East Temple Street) and Pacific Commerce Bank ("PCB"), on 729 East Temple Street. The property is comprised of multiple properties totaling approximately 5.3 acres of which 815 East Temple Street has been improved by a cold storage and processing facility and 729 East Temple Street has been improved by industrial buildings. The subject properties consist of approximately 176,628 net rentable square feet. The unimproved portions of the properties are currently being held as parking lots. As of ~~March 31~~June 30, 2010, the improvements at 815 East Temple Street were partly leased to a food processing tenant occupying approximately 14% of the total rentable area.

815 East Temple is an example of the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles. 729 East Temple is

intended to be a home to a large assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

### 27. 833 Wall Street (Wall Street Market), Los Angeles

The subject property is owned by Meruelo Wall Street, LLC ("Meruelo Wall Street") and is encumbered by a lien in favor of East West as successor to UCB. The property is located at the intersection of East 9th Street and Wall Street in the Garment District of downtown Los Angeles. It is comprised of one property totaling approximately 2.1 acres which has been improved with a multi-tenant building consisting of approximately 98,245 net rentable square feet and rooftop parking. As of ~~March 31~~June 30, 2010, the improvements were leased to fifty~~-five~~ tenants occupying approximately ~~94~~92% of the total rentable area. All of the tenants are on month to month tenancies. The average occupancy for month to month tenants is ~~45~~49 months. The property is currently being utilized as a garment wholesale and retail and office space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

### 28. 1875 West Mission Boulevard, Pomona

The subject property is owned by Merco Group – 2001 – 2021 West Mission Boulevard, LLC ("MG 2001 – 2021 West Mission Boulevard") a part of which is encumbered by a lien in favor of PNL Pomona.[4] The property is located at 1875 West Mission Boulevard in Pomona, CA. It is comprised of two properties totaling approximately 27.7 acres on which is presently located an industrial building consisting of approximately 424,309 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were not leased.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of Pomona space users.

---

[4] For purposes of clarification, readers should note that the real property located at 2001-2021 W. Mission Boulevard is not owned by MG 2001-2021 West Mission Boulevard but is instead owned by MM Mission Boulevard, LLC.

**29. Santa Fe Commerce Center – 2445, 2460 and 2535 East 12th Street, Los Angeles**

The subject property is owned by Santa Fe Commerce Center, Inc. ("Santa Fe Commerce Center") and is encumbered by a lien in favor of Wells Fargo Bank, N.A., successor by consolidation to Wells Fargo Bank Minnesota, National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates, Series 2002-C1 ("Wells Fargo"). In this case, Wells Fargo has acted by and through Berkadia Commercial Mortgage, Inc., its Special Servicer, and is referred to hereinafter as "Berkadia."

The property is located at 2445, 2460 and 2535 East 12th Street in the Southeast Industrial District of downtown Los Angeles. It is comprised of one property totaling approximately 6.8 acres which has been improved with a three building industrial complex consisting of approximately 244,501 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to ~~seven~~five tenants occupying approximately 82% of the total rentable area. Three of the tenants, occupying 40% of the rented space, are on month to month tenancies. The average occupancy for month to month tenants is ~~86~~89 months. The largest tenant occupies ~~35.7~~26.9% of the total area. The property is currently being utilized as a multi-tenant industrial space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

**30. 1009 North Citrus Avenue, Covina (Citrus Gardens)**

The subject property is owned by Meruelo Maddux Properties - 1009 North Citrus Avenue, Covina, LLC (“MMP 1009 N. Citrus Avenue”) and is unencumbered. The property is located at 1009 North Citrus Avenue in Covina, California. It is comprised of approximately 2.5 acres of land which has been entitled for 52 residential units. The property is currently vacant.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**31. 817-825 South Hill Street, Los Angeles (Ullman Tower Two)**

The subject property is owned by Meruelo Maddux-817-825 S. Hill Street, LLC ("MM 817-825 S. Hill Street") and is unencumbered. The property is located at 817-825 South Hill Street in the Historic Core/ Jewelry district of downtown Los Angeles. It is comprised of one property totaling approximately 1.0 acres of land being utilized as a commercial parking lot facility.

While currently being utilized as a parking facility, this property is an example of how the Company focuses its expertise and knowledge base on supplying future residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**32. 1060 North Vignes, Los Angeles (Vignes Village)**

The subject property is owned by Meruelo Maddux Properties-1060 N. Vignes, LLC ("MMP 1060 N. Vignes") and is unencumbered. The property is located near the corner of North Vignes Street and North Main Street near Chinatown in downtown Los Angeles. It is comprised of one property totaling approximately 4.0 acres of land, which is currently unoccupied. Interim operating revenue is typically generated from parking revenues from film production parking.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**33. 12361 and 12385 San Fernando Road, Sylmar (San Fernando Court)**

The subject property is owned by Meruelo Maddux Properties - 12385 San Fernando Road, LLC ("MMP 12385 San Fernando Road") and is unencumbered. The property is located at 12361 and 12385 San Fernando Road in Sylmar, California. It is comprised of approximately 5.5 acres of land entitled for approximately 247 residential housing units, along with retail and office space.

This property is an example of how the Company focuses its expertise and knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**34. 801 East 7th Street, Los Angeles**

Merco Group – 801 E. 7th Street, LLC owns a parking lot located at 648 S. Stamford Avenue in downtown Los Angeles that occupies approximately 0.13 acres and is unencumbered. It generates no income currently.

**35. 1308 South Orchard, Los Angeles**

The subject property is owned by Merco Group - 1308 S. Orchard, LLC ("MG 1308 S. Orchard") and is unencumbered. The subject property is located west of downtown Los Angeles. It is comprised of approximately 0.3 acres of land.

**36. 758 Ceres Avenue, Los Angeles (Ceres Street Produce Market)**

The subject property is owned by Merco Group - Ceres Street Produce, LLC ("MG Ceres Street Produce") and is unencumbered. The property is located in the industrial district of downtown Los Angeles. It is comprised of approximately 0.4 acres of land.

This property is intended to be developed based upon the Company's (a) significant expertise and presence and (b) focus on providing tailored solutions for a variety of space needs of the many small businesses in the food and produce distribution industry in downtown Los Angeles.

**37. 336 West 11th Street, Los Angeles (South Park Towers)**

The subject property is owned by Meruelo Maddux - 336 W. 11th Street, LLC ("MM 336 W. 11th Street") and is encumbered by a lien in favor of the County and Legendary. Grand Avenue Lofts Homeowners Association also asserts a lien against the property. CIM Urban RE Fund GP II, LLC and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (collectively, "CIM") asserts that this subject property is encumbered by a covenant running with the land for the benefit of CIM based on language included in the grant deed by which MM 336 W. 11th Street acquired the subject property. CIM asserts that the alleged encumbrance in favor of CIM has priority over any party asserting a lien which arose after the deed was recorded, including the County, Legendary and Grand Avenue Lofts Home Owners Association. The Debtors dispute the validity of the interests asserted by CIM and the Homeowners Association.

The property is located at the corner of West 11th Street and South Olive Street in the South Park area of downtown Los Angeles. The property is entitled for an 80 unit residential development. It is comprised of approximately 0.7 acres of land being utilized as a parking lot.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**38. 915-949 South Hill Street, Los Angeles (Ullman Tower One)**

The subject property is owned by Meruelo Maddux - 915-949 S. Hill Street, LLC ("MM 915-949 S. Hill Street") and is encumbered by a lien in favor of Imperial. The property is located at 915-949 South Hill Street in the South Park area of downtown Los Angeles. It is comprised of approximately 1.5 acres of land being utilized as a commercial parking lot.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**39. 900, 910 and 926 East 4th Street and 405 – 411 S. Hewitt Street, Los Angeles**

The subject property is owned by Merco Group - 4th Street Center, LLC ("MG 4th Street Center") and is encumbered by a lien in favor of Legendary. The property is located at the corner of South Hewitt Street and East 4th Street in the Arts District of downtown Los Angeles. It is comprised of approximately 1.3 acres which has been improved with two buildings consisting of approximately ~~13,430~~14,472 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to one tenant ~~occupying~~, that occupies 53% of the net rentable area. The lease for this tenant is subject to renewal in 2011. The property is a multi-tenant industrial and distribution space facility.

This property is intended to be used by an assortment of small business owners prevalent in downtown Los Angeles whereby the Company looks to support and incubate their businesses.

**40. 425 West 11th Street, Los Angeles (Desmond Building)**

The subject property is owned by Merco Group - 425 West 11th Street, LLC ("MG 425 W. 11th Street") and is encumbered by a lien in favor of Legendary. The subject property consists of two properties located on 11th Street, a few blocks away from the Staples Center and LA Live in the South Park area of downtown Los Angeles. The two properties total approximately 0.67 acres which has been improved with a multi-story industrial building known as the "Desmond Building" consisting of approximately 78,500 net rentable square feet. As of ~~March 31~~June 30, 2010, the improvements were leased to a tenant occupying approximately 20.0% of the total rentable area. The tenant is on a month to month tenancy with the average occupancy of ~~48~~56 months. The other property is currently utilized as a parking lot.

With regard to the property currently utilized as a parking lot, current plans for development include the building of a new, ground up, 20+ story, 80,000 square foot residential project that will compliment existing nearby residential projects. The City of Los Angeles issued initial permits for such project. By obtaining the permit, MG 425 W. 11th Street has the ability to proceed with development of the property at an appropriate time in the future.

Both the improved and unimproved parts of this property are intended to be redeveloped based on the Company's focus on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

**41. West 11th Street and South Grand Avenue, Los Angeles (Southpark Towers, TransAmerica Lofts & Olive Street Towers)**

The subject properties are owned by Merco Group -- Southpark, LLC ("MG Southpark"), and are encumbered by a lien in favor of Bank of America. The properties are approximately three to four blocks east of the Staples Center and the L.A. Live complex. One property is located along Pico Boulevard between Olive Street and Hill Street, and consists of four adjacent parcels, part of which is improved with a three-story parking structure and an adjoining one-story brick industrial building. One and one-half blocks northeast of the first property is another property located at the intersection of 11th Street and South Olive Street, consisting of one parcel. One full major street

west of the first two properties is the third property, located along South Grand Avenue and reaching to the corner of 12th Street and South Olive Street, consisting of three parcels. There is one tenant in the improvements. Pending development or sale, the properties are leased to ~~Prestige Parking~~a parking operator and utilized as parking lots.

This property is an example of how the Company focuses its expertise and downtown knowledge base on supplying residential units to individuals. This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

~~C. Consolidated Operations~~

**C. CONSOLIDATED OPERATIONS**

The Company's business model and strength is based on the fact that it is a single enterprise with a single management team that manages a portfolio of properties that were assembled and are managed in an efficient and synergistic manner. In addition, the acquisition and development of a relatively large number of properties in a small geographic area allows for great flexibility in the development of such properties. Accordingly, the properties together are more valuable than the properties separately because of this synergistic relationship. For instance, the Company is an incubator for small businesses. Certain properties in the portfolio are conducive to start-up businesses (e.g., smaller tenant spaces, less expensive costs). As those start-up businesses grow, the Company has the flexibility to move them to another property to meet the needs of their growing businesses. This is particularly true with respect to Alameda Square, Seventh Street Produce Market, 788 Alameda, and 2640 Washington. Additionally, certain employees of businesses at the larger facilities of Alameda Square or Seventh Street Produce Market learn the business then start their own businesses, often at one of the smaller facilities. This is also true of the Company's garment tenants. Urban in-fill development is very different from single-family home-building over large swaths of land. Urban in-fill development involves many moving parts which may require business relocations amongst various properties. In the process, the Company is able to improve and update facilities and organize these smaller businesses into a cohesive market that helps improve the business of each.

Although the Debtors formally consist of a parent company and various levels of subsidiary Debtors, including the Property Level Debtors, the Company has been, before and after its formation in 2006, and presently continues to be, effectively operated as a single enterprise. With limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and the subsidiary Debtors. Accordingly, there are some Debtors which generate revenues in excess of operating expenses and debt service, but there are some that do not. The Company may purchase and keep properties that are cash flow negative because the Company believes that those properties will, in time, generate a positive return and the enterprise will be significantly more valuable as a result. The recent unprecedented freezing of credit markets and economic downturn caused the Company to suspend substantially all of its various development projects.

Before and after the IPO, like most larger developers, the Debtors utilized a concentration account for its cash management. The cash management system provides for funds to flow to and from a cash concentration account maintained by MMPLP. The concentration account is linked to the operating bank accounts of each of Debtors, which bank accounts are maintained as zero balance accounts. When needed to fund payment on checks issued by a particular affiliate, funds are transferred from the concentration account to the operating account of that affiliate. Excess funds, if any, are invested in interest bearing accounts pending their utilization. The Company rarely disrupts this flow of funds.

As a public company, MMPI has been required to file various reports with the SEC, including among others, quarterly reports as well as annual reports with audited financial statements. These reports have been prepared and filed on a consolidated basis. Although the Debtors' SEC filings do provide information relating to individual subsidiaries, the filings generally discuss the business as a consolidated enterprise. This consolidated reporting is a manifestation of the synergy and economic efficiencies gained through the Company's corporate structure. The indirect overhead expenses for administrative services provided by certain Debtors may be allocated to other Debtors. With a few exceptions, revenues received from the operation of

the Debtors' properties are swept daily into a general operating account, and the Debtors' obligations are paid from such account.

### D. THE DEBTORS' CURRENT AND ON-GOING BUSINESS STRATEGIES

The Company's business is focused on real estate development and redevelopment. The substantial majority of the Company's properties are not stabilized, i.e., the property is either not a rental property or if a rental property, the property has not reached full occupancy or has not yet been redeveloped to its full income producing level. The Company's strategy has three primary components: investment, value creation and operations. Due to the current economic climate, including the lack of an active credit market, the Company has placed on hold substantially all of its development projects.

The Company's intent is to continue to build on (i) its market presence, (ii) its relationships with its tenants, (iii) development and operation experiences and (iv) its desire to provide real estate solutions for a variety of urban space users and urban residents. The Company has always followed a double bottom line approach to its real estate operations that include both a financial return goal and a goal of providing more to the community it serves and the City of Los Angeles through transit oriented development, "green" or LEED development, and the incubation of small businesses that employ large amounts of employees. For instance, the Company helped incubate American Apparel from a small startup company to an employer with over 5,000 employees at what is believed to be the largest garment manufacturing facility in the nation.

In particular, the Company will continue and expand on the following:

#### 1. The Debtors' Investment Strategy

The Company invests in sub-markets that are undergoing demographic, structural or economic changes, where a significant portion of the properties and participants are historically of a non-institutional nature, where the buildings are predominantly obsolete or no longer relevant to the submarket's changing profile, where the Company has established strong working relationships with the city planners, community redevelopment agencies and local political organizations and where the existing transportation networks, particularly public transportation systems, are nearby.

**2. The Debtors' Value Creation Strategies**

***a. Focus on the Property Needs of Specific Industries and Premium Space Users.***

The Company seeks to achieve rent premiums by meeting the property needs of "premium space users" such as food processing and food distribution companies whose critical business functions depend on the location, zoning, tenant improvements or utilities of the leased space and whose needs frequently coincide with urban environments. The ability to provide premium space users with facilities and services that maximize their operating profits may allow a landlord to minimize leasing risk and charge rents that, net of costs incurred to provide such facilities and services, exceed rents that could be obtained from tenants that are relatively indifferent to location or amenities. The Company will continue to identify premium space users in the Company's markets and work to understand and fulfill their evolving requirements.

***b. Focus on Sub-Markets that are Transitioning from Large to Small Tenants.***

The Company acquires, modernizes and subdivides large, older single-tenant industrial and mixed-use buildings. In many urban markets, large manufacturers and distributors have relocated their businesses, often vacating such buildings for overseas or suburban locations. Taking their place are small emerging businesses and established companies that are de-centralizing their operations. The Company seeks to transform large, single-tenant buildings into workplaces for many small tenants by re-using a large portion of the existing facility and creatively subdividing the space at a relatively low cost. This approach should allow the Company to offer competitively-priced space (as compared to rental rates for new buildings) in convenient urban locations.

***c. Aggregate Small, Synergistic Tenants.***

In urban areas, the non-office tenant base includes many small businesses. Grouping similar businesses together creates a marketplace that offers convenience to product buyers and a steadier stream of prospective customers to the businesses. These advantages may increase tenants' business profits and stability and may justify a rental premium compared to stand-alone locations. The Company seeks sub-markets where there is an active, but unorganized, critical mass of similar

Formatted: Indent: First line: 0"

businesses that could benefit from aggregation. The Company believes this strategy should allow the Company to generate higher rental income from the Company's small tenants.

**d. *Focus on Residential Development in Appropriate Locations.***

The Company intends to continue to develop urban residential projects on sites the Company owns near transportation infrastructure and demand generators such as office buildings, retail stores, restaurants, and cultural and sports venues. In the long term, the Company believes demand for residential units in downtown Los Angeles and other urban areas will continue to grow.

The Company believes that ultimately their residential projects will offer desirable housing and provide the Company with attractive returns on invested capital.

**e. *Coordinate Residential and Industrial Development in Shifting Urban Markets.***

The Company believes that much of the downtown Los Angeles industrial space is aging or obsolete and not properly serving its industrial users. The Company seeks properties within historically industrial districts that are located in emerging housing sub-markets. As active developers and operators of industrial/distribution space, the Company believes they have greater ability to acquire such opportunities quickly and at lower industrial/distribution pricing than residential-only developers. The Company also seeks the purchase of industrial/distribution properties in areas near downtown but not in emerging residential markets. The Company sees opportunities to better serve industrial users they displace through residential redevelopment by providing them with more suitable space in commercial projects of the Company in such near downtown areas. The Company believes coordinating residential and industrial development in this manner facilitates the Company's land assemblage.

**f. *Pursue Opportunities Offered by Governmental Organizations.***

In the State of California, the state government, regional agencies and local community redevelopment agencies created under the California Community Redevelopment Law control a large amount of surplus property in urban areas and have substantial land use discretion. These organizations often must dispose of their surplus property in a manner that encourages socially responsible development. The Company believes that such organizations present some of the more

compelling opportunities in California urban areas because of the size or location of the parcels they control or because the acquisition terms for such parcels may be more favorable than typical private seller terms. The Company believes their management's advocacy of socially-minded solutions for urban real estate problems gives the Company a competitive advantage to be selected by these government organizations, thereby creating opportunities to acquire properties at attractive values.

**g. *Aggregate Separate Parcels and Acquire Controlling Locations in Developing Neighborhoods.***

In the Company's markets, large, contiguous development properties are infrequently for sale and, when available, sell for prices that often reflect their potential value. The Company seeks to acquire smaller, separate real estate parcels over time with a view toward aggregating those smaller parcels into one property that can accommodate a larger-scale development project. To acquire the individual parcels and reduce the Company's holding costs, the Company sometimes purchases an option contract or signs a long-term purchase agreement that gives the Company the right to acquire the land at a specific price on or before a specified future date. The Company may also acquire a strategically sized or configured parcel in a city block that would be instrumental in any material redevelopment of the block, thereby deterring any substantial competing development and creating an incentive for owners of adjacent parcels to sell.

**3. The Company's Operating Strategies**

**a. *Efficiently Manage the Development and Operation of the Company's Projects.***

The Company employs a mixture of project development management and asset management strategies. First, the Company keeps direct control over critical development functions in which they believe they have valuable expertise and that require significant local knowledge, such as identification and acquisition of projects and land use entitlement. Second, because of the widely varying nature of the Company's projects, the Company generally retains expert third-party general contractors to manage the construction of the Company's projects, and the Company employs in-house project managers to supervise the construction management process closely.

Third, once a project is complete, the Company manages its operation and leasing activities, or the Company retains third-party sales companies in the case of for-sale projects. The Company will engage third-party leasing agents when they have superior tenant relationships or knowledge of the sub-markets in which the Company's projects are located.

**b.** ***Seek Interim Revenues from Properties.***

The public approval process for certain projects may last two years or longer. During the assemblage or approval process, the Company takes steps to permit the Company to generate interim revenues and allow the Company to terminate leases promptly or relocate tenants when the Company obtains the final assemblage piece or approvals. The Company accomplishes this by converting long-term leases to month-to-month leases and seeking additional interim income from additional sources, such as surface parking or by temporarily licensing space to entertainment companies for on-location filming. In addition, because the Company has a roster of month-to-month tenants who have shown a willingness to relocate at the Company's discretion, the Company has the flexibility to generate interim revenues by relocating tenants from a property commencing redevelopment construction to another property that is not currently being redeveloped.

**c.** ***Sell or Recapitalize the Company's Projects to Realize Value.***

The Company has engaged in a business strategy whereby it may dispose of or recapitalize some portion of the Company's projects from time to time once they reach what the Company believes to be their maximum near-term value and may redeploy some or all of the Company's equity and profits into other real estate investments that the Company believes have a greater long-term potential for economic appreciation. In addition, in response to the changing economy and as part of its business strategy to emerge as a reorganized company from Chapter 11, the Company continues to consider multiple scenarios to determine the best use of its real property assets, including but not limited to the sale or refinancing of some portion of its assets to meet its financial obligations under the Plan, to reduce obligations to creditors, to provide capital for its business and to ensure the long-term sustainability of the business.

### E. PREPETITION CAPITAL STRUCTURE OF THE COMPANY

#### 1. MMPI

MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue Code. Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately owned by MMPI's directors and executive officers with Richard Meruelo owning the largest amount of shares (approximately 39,911,378). The other 47.8% of MMPI's stock is publicly owned and, prior to April 2009, was traded on the NASDAQ stock exchange. The stock is presently trading on the Over the Counter Bulletin Board.

##### a. *MMPI Initial Public Offering*

Prior to MMPI's formation in 2006, its predecessor business' management team was one of only approximately thirteen designated groups participating in the California Urban Real Estate ("C.U.R.E.") program sponsored by the State of California Public Employee's Retirement System ("CalPERS"). CalPERS provided the predecessor business with capital through the C.U.R.E program in the form of a revolving credit facility in the principal amount of approximately $150 million. The CalPERS credit facility was obtained through a single borrower and the funds were disbursed among the entities collectively comprising the predecessor business.

Thereafter, MMPI was formed on or about July 5, 2006, and MMPLP was formed on or about September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's common stock. The formation transaction and the IPO were designed to allow MMPI to acquire and continue the operations of its predecessor entities, pay down existing mortgage debt, pay off the mezzanine loan facility from CalPERS, provide capital for future acquisitions, fund future development costs, and establish a capital reserve for general corporate purposes. Between January 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000 shares of common stock at $10.00 per share. MMPI raised approximately $425.7 million, after underwriting discounts but before expenses related to the IPO. A substantial portion of the proceeds was used to pay off the debt owed to CalPERS. On December 31, 2008, there were approximately 88.1 million shares of common stock outstanding.

#### b. *MMPI Common Stock*

The authorized capital stock of MMPI consists of up to 200,000,000 shares of common stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred stock, $.01 par value per share. As of April 23, 2010, there are 87,845,789 shares of Common Stock issued and outstanding held by approximately sixty holders of record. Holders of Common Stock have no right to convert their Common Stock into any other securities. The Common Stock has no preemptive or other subscription rights. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are duly authorized, validly issued, fully paid and nonassessable.

#### c. *MMPI's Equity Incentive Plan*

Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive Plan ("LTIP") Units and other awards as part of its employee compensation packages. The LTIP units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be converted into MMPLP's common units and consequently become redeemable by the Holder on a one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of such common stock. MMPI initially reserved 2,277,500 shares of common stock for issuance of awards under the Equity Incentive Plan. As of June 30, 2009, there remain 1,083,334 shares available from the initial reservation.

### 2. Corporate Structure of the Other Debtors

MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP. The remaining 0.4% limited partnership units are owned by certain members of MMPI's management team who obtained their interests through the LTIP available to certain personnel as part of their compensation packages.

MMPLP owns 100% of the common stock of Meruelo Maddux Construction, Inc. ("MM Construction"), 99% of the membership units in Meruelo Maddux Management, LLC ("MM Management") and 99% of the membership units in Funes Architecture, LLC ("Funes"). The remaining membership units in MM Management and Funes are owned by MM Construction.

MMPLP also owns 100% of the membership units in MMP Ventures, LLC ("MMP Ventures"). MMP Ventures, in turn, owns 100% of the stock or membership units in a number of subsidiary corporations and limited liability companies referred to as Property Level Debtors because they are the entities which hold title to the various real properties and real estate projects developed and operated by MMPI through MMPLP.

## F. MATERIAL PROCEEDINGS

There are several different circumstances that may create liability for the Company in the future, to the extent they are not discharged under the Plan as more fully discussed in Section VII.J.

### 1. Potential Government Tax Audits

The Company is subject to audit and review by federal and state taxing authorities. An adverse audit report could result in the Company being assessed additional tax liability. The Company is not aware of any such pending audits and has filed all of its tax returns.

### 2. Indemnification Claims

As is necessary and customary in the normal course of business, certain of the Company's contracts contain indemnification provisions that could require the Company to make payments for Claims made against customers or employees of the Company, including management. Additionally, the Articles and Bylaws of MMPI provide that MMPI shall indemnify its officers and directors to the fullest extent permitted by law. Pursuant to its contractual and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of its Board of Directors with respect to costs and expenses that may be incurred by them in conjunction with the performance of their employment or role as a member of the Board of Directors. These indemnification provisions may result in material liability to MMPI or other of the Debtors. However, the Company maintains various insurance coverages to reduce the exposure of the Company. This potential liability is largely the result of guaranty claims against certain officers of the Debtors in connection with loans of some Debtors and litigation against certain of the officers and directors filed by certain former employees of some of the Debtors. For example, there are presently two guaranty claims pending against Mr. Meruelo. Such guarantors have filed claims for indemnification against the Debtors' estates. However each such claim for the underlying debt will

be paid pursuant to the Plan. Thus, the existence of this litigation does not increase the Debtors' potential liability except with respect to a claim by the officer for attorneys fees incurred in connection with the litigation and amounts, if any, the officer is required to pay above and beyond the amount of the borrower Debtor's restructured debt to the lender.

III.

# III.

# EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

Formatted: Heading 1,h1,H1

Prior to the Petition Date, the Company's primary objective was to maximize return on investment through development and redevelopment activities, which activities require significant amounts of capital. The Company experienced significant, recurring cash shortfalls from (a) operating activities, (b) recurring investment activities such as carrying costs for interest payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing rental properties. Shortfalls in operating capital have been funded by the refinance or sale of real property assets, and the use of the proceeds for operating and reinvestment in the purchase of replacement real property assets.

The economic climate and associated disruption in the debt and equity capital markets shortly before the Petition Date were extremely challenging for the Company. During 2008, the Company took significant steps in an effort to improve its financial position. Among other things, the Company sold three rental projects and three development projects, for an aggregate sales price of approximately $110.6 million. The Company also completed nine acquisitions or conversions of development projects to rental projects, resulting in the availability of 949,905 net rental square footage. However, the Company's efforts could not overcome the collapse of credit markets and the American banking system that took place in the fall of 2008. On or about October 1, 2008, the Company suspended development of twelve construction projects.

A number of the Company's loans secured by real property matured prior to the Petition Date or were to mature soon thereafter. Among other things, the Company was unable to extend or refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or March 1, 2009, including two secured by the property housing the Company's corporate

headquarters, and one which is secured by the Union Lofts project owned by MMP 760 S. Hill Street. In total, the Company had twelve loans that were set to mature during 2009 with an aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization on other long-terms loans.

In addition, prior to the Petition Date, two lenders filed lawsuits seeking, among other things, the appointment of a receiver. On or about March 4, 2009, California Bank & Trust filed a complaint against 788 South Alameda and MMPI for, among other things, judicial foreclosure and the appointment of a receiver. In addition, on or about March 17, 2009, Chinatrust Bank filed a complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure and the appointment of a receiver.

During the year prior to the Petition Date, the Company tirelessly investigated borrowing additional capital in order to continue to fund its development projects and, if necessary, operating expenses. However, the Company was not able to borrow or refinance at conventional or otherwise acceptable rates, in large part, due to the deterioration of the credit markets that appears to have affected all banks and other lenders. Lenders were frequently lending at lower loan-to-value ratios, taking longer to make lending decisions and generally applying more stringent underwriting standards. During the last few months prior to the Petition Date, a number of lenders demanded exorbitant fees, principal reduction payments and/or other burdensome terms as consideration for their consent to extend the terms of their loans. However, given that the Company had an approximately $28.0 million annual shortfall in its combined operating and development activities, and because of the turmoil in the credit markets especially for development financing, the Company needed significant loan concessions from its lenders to survive.

The existence of open credit markets has been important to the Company's business strategy of financing acquisitions and development in the ordinary course of its business. In addition, an open credit market is important to purchasers of the Company's properties. The Company's management team anticipates that credit markets will improve in the future in light of, among other things, the hundreds of billions of dollars that have been infused into the banking systems by the federal government.

Due to the Company's inability to obtain additional capital, and the unwillingness of current lenders to extend the terms of maturing loans on acceptable terms, the fifty-four jointly administered MMPI Debtors sought relief under Chapter 11 of Bankruptcy Code to reorganize their financial affairs and prevent the piecemeal dismemberment of their business to the detriment of their creditors.

~~IV.~~

# IV.

# CHAPTER 11 EVENTS

## A. ADMINISTRATIVE ORDERS AND MATTERS

### 1. Introduction

Formatted: Heading 1,h1,H1, Left

Formatted: No underline

On March 26 and 27, 2009, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a variety of matters. The Debtors obtained Orders of the Bankruptcy Court, inter alia, (a) authorizing, on an interim basis, the Debtors' use of cash collateral (see below for more detail), (b) authorizing the Debtors to employ and compensate legal and financial advisors, (c) authorizing the Debtors to honor certain obligations to employees and to continue employee benefit plans in effect, (d) permitting the Debtors, on an interim basis, to continue to utilize their cash management systems, (e) establishing procedures for the Debtors to ensure continued provision of utility services; (f) limiting the scope of notice required; (g) extending the time to file schedules and statement of financial affairs; and (h) directing the joint administration of the Cases of the Debtors. Subsequently, the Bankruptcy Court established September 24, 2009, as the last day for creditors and parties in interests to file proofs of Claim and proofs of interest against the Debtors. The Debtors filed the required monthly operating reports on a timely basis. The Debtors were authorized and continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### 2. The Cash Collateral Motions and Corresponding Orders

~~a. MMPI Debtors' Cash Collateral Motions and Orders~~

By their first Motion for Entry of Interim and Final Orders Authorizing Debtors to Use Cash Collateral, (the "Cash Collateral Motion") the Debtors sought permission to use the cash collateral of various lenders. Oppositions were filed by most of the Debtors' lenders. The Bankruptcy Court entered a series of interim orders authorizing such use and continued to hear testimony and consider evidence concerning the Debtors' proposed use of cash collateral on a final basis. These hearings concluded in October 2009. The Bankruptcy Court ruled in the Debtors' favor and entered a final order authorizing the use of the cash collateral of the following lenders through ~~March 31~~June 30, 2010: BofA, CBT, Berkadia, Cathay, Chinatrust, Legendary, Stanford, UCB (now succeeded by East West), 1248 S. Figueroa and Chamlian. In making that ruling, the Bankruptcy Court determined that the following lenders were entitled to additional adequate protection and are therefore entitled to an adequate protection lien in one or more of the Debtors' unencumbered real properties: Berkadia, CBT, Chinatrust, Legendary with respect to 425 W. 11th Street; 3rd & Omar Street, and 420 Boyd Street, and East West with respect to 2640 Washington. In addition, the Bankruptcy Court determined that BofA was entitled to additional adequate protection with respect to MM 760 S. Hill Street and was entitled to an adequate protection lien on the properties owned by MG Southpark, junior to BofA's existing senior lien against such properties.

As a result of the Cash Collateral determinations made by the Bankruptcy Court, the Debtors filed a motion seeking to designate certain properties that would serve as adequate protection for the Debtors' use of cash collateral. The Debtors sought authority to limit the continuing adequate protection lien to certain identified properties in place of a blanket lien on all of the Debtors' unencumbered properties. The matter has been continued from time to time and remains pending ~~the completion of an appraisal of one of the properties the Debtors propose to include as part of the pool of assets to serve as continuing adequate protection~~.

The Debtors also filed a motion seeking authority to use a portion of certain insurance proceeds resulting from fire damage to one of the Debtors properties which currently secures certain obligations of the Debtors to PNL Pomona. The Court authorized the Debtors to use a portion of the insurance proceeds to demolish the remaining structure on the property in order to be able to market and sell the property as vacant land.

Formatted: Indent: First line: 0"

On March 8, 2010, the Debtors filed their Motion for Order Extending Authority for the Use of Cash Collateral and to Maintain Cash Management System Through June 30, 2010. A hearing on the motion was held on March 29, 2010. On March 31June 30, 2010, the Court entered its Order Granting Debtors' Motion for Order Extending Authority for the Use of Cash Collateral and to Maintain Cash Management System Through June 30, 2010, on the terms provided in the Order. Subsequently, the Debtors filed a motion requesting that their authority to use cash collateral and utilize their cash management system be extended through September 30, 2010. On July 1, 2010, the Court entered an order granting the motion on an interim basis, and the Debtors' request for such approval on a final basis is pending as, among other things, the Bankruptcy Court considers whether the additional adequate protection to be afforded to certain of the secured creditors should include a cash component.

On April 2, 2010, SFCC filed a motion seeking authority to use cash collateral held by Berkadia in certain reserves for the purpose of paying for repairs to the roof of buildings and HVAC equipment located on the property subject to Berkadia's lien. That motion remains pending.

### 3. The Debtors' Single Asset Real Estate ("SARE") Motion

Formatted: Font: Not Bold

The Debtors filed a motion seeking an order determining that none of the fifty-four Debtors are subject to the single asset real estate provisions of Sections 101(51B) and 362(d)(3) of the Bankruptcy Code. Two lenders (BofA and Cathay) filed motions seeking a determination from the Bankruptcy Court that MG Southpark, MMP 760 S. Hill Street and Alameda Produce Market are subject to the SARE provisions of the Bankruptcy Code. The Creditors Committee supported the Debtors' position. Approximately, fourteen oppositions and joinders in opposition were filed by various lenders. In June 2009 the Bankruptcy Court ruled in favor of the Debtors, holding that the

Debtors are not subject to the SARE provisions of the Bankruptcy Code. BofA has appealed from the Bankruptcy Court's SARE determination. ~~That appeal remains pending before~~

On or about June 29, 2010, the United States District Court ~~for the Central District~~ issued its decision on appeal and ruled, among other things, that MG Southpark is not subject to the SARE provisions of ~~California~~the Bankruptcy Code, but that MMP 760 S. Hill Street is subject to such provisions. On July 14, 2010, MMP 760 S. Hill Street appealed the District Court's decision as to MMP 760 S. Hill Street to the United States Court of Appeals for the Ninth Circuit. MMP 760 S. Hill Street does not anticipate that the appeal will be concluded prior to the Effective Date. In the event that the Ninth Circuit were to issue a decision and such decision was not appealed, pursuant to orders of the Bankruptcy Court MMP 760 S. Hill Street would have at least 60 days from the issuance of such final decision, and perhaps longer, to comply with section 362(d)(3) of the Code by commencing periodic payments to Union Lofts in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of BofA's interest in the real estate, or filing "a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time." In any event, it is impossible to know when a final ruling will be issued by the Ninth Circuit.

**4. Motions for Relief from Stay**

The following motions for relief from stay have been filed by lenders to pursue their state law remedies against various real properties owned by the Debtors:

- PNL moved for relief from stay with respect to the real property owned by MG 2001 – 2021 W. Mission located in Pomona. The Bankruptcy Court ruled in favor of the Debtors and denied PNL's Motion. PNL ~~has recently~~subsequently filed a second motion for relief from stay ~~which will be heard in June 2010;~~and an evidentiary hearing on that motion is pending.
- BofA moved for relief from stay with respect to real property owned by MMP 760 S. Hill Street and commonly known as 325 West 8th Street and 760 South Hill Street, Los Angeles (the Union Lofts). The Bankruptcy Court denied the motion subject to the Debtor's provision of certain adequate protection to BofA;

- BofA moved for relief from the automatic stay with respect to certain real properties owned by MG Southpark located in downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied BofA's motion;
- UCB moved for relief from the automatic stay with respect to real property owned by 2640 Washington Boulevard. Pursuant to an agreement between the Debtors and UCB, the motion was granted for the sole and limited purpose of permitting UCB to record a notice of default with respect to the real property. The Debtor 2640 Washington agreed to pay, out of cash collateral, the first and second installments of real property taxes for the 2009 – 2010 fiscal year. UCB's motion was withdrawn in all other respects;
- Legendary moved for relief from the automatic stay with respect to real property owned by MM 3rd & Omar Street located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties and authorized Legendary to record a notice of default with respect to the property. In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court denied Legendary's motion, subject to the provision of such adequate protection;
- Legendary moved for relief from the automatic stay with respect to real property owned by both MG 1500 Griffith Avenue and MG 4th Street Center and located in downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion;
- Legendary moved for relief from the automatic stay with respect to real property owned by Merco Group, commonly known as Sci-Arc, and located in downtown Los Angeles. The Bankruptcy Court denied Legendary's motion;

- Legendary moved for relief from the automatic stay with respect to real property owned by MM 420 Boyd Street and located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties and authorized Legendary to record a notice of default with respect to the property. In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court denied Legendary's motion subject to the provision of such adequate protection;
- Legendary moved for relief from the automatic stay with respect to real property owned by Merco Group (Sky-Arc) and MG Little J and located in downtown Los Angeles. The matter has been submitted to the Court. An order has not yet been issued;
- Legendary moved for relief from the automatic stay with respect to real properties owned by MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles. The matter has been submitted to the Court. An order has not yet been issued;
- Legendary moved for relief from the automatic stay with respect to real property owned by MG 425 W. 11th Street and located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion for relief from the automatic stay subject to the provision of such adequate protection;

- On September 2, 2009, Vahan and Anoush Chamlian moved for relief from the automatic stay with respect to real property owned by MMP 2131 Humboldt Street near downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied the Chamlians' motion;
- Chinatrust moved for relief from the automatic stay with respect to real property owned by MG 3185 E. Washington Boulevard, among other things. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Chinatrust a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year. In addition the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Chinatrust on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Chinatrust's motion for relief from the automatic stay subject to the provision of such adequate protection;
- The Stanford Group moved for relief from the automatic stay with respect to the real property owned by 908 8th Street located in downtown Los Angeles. The ~~hearing on that motion has been continued from time to time while the parties engage in settlement negotiations. The~~ parties have reached a settlement on the Claim of Stanford Group, ~~and~~which was approved by the Court. As a ~~motion for approval~~result of the settlement ~~has been filed with the Court. The settlement resolves,~~ the motion ~~for relief from stay.~~was dismissed.
- Legendary filed a second motion for relief from the automatic stay with respect to the real property owned by MM 420 Boyd Street. The Court denied Legendary's motion.
- Legendary filed a second motion for relief from the automatic stay with respect to the real property owned by MM 3rd and Omar. The Court denied Legendary's motion.
- On April 1, 2010 Vahan and Anoush Chamlian filed a second motion for relief from the automatic stay with respect to real property owned by MMP 2131 Humboldt Street. ~~The motion is set for hearing in June,~~In July 2010~~.~~

- ~~PNL Pomona filed a second motion for relief from~~ , the ~~automatic~~ Bankruptcy Court granted relief from stay ~~with respect to the~~ effective as of December 1, 2010, provided that a sale of Chamlian's real property ~~owned~~collateral may not occur until after March 26, 2011, and absent (a) confirmation of a plan providing for treatment of Chamlian's claim, which treatment will supersede the relief granted by ~~MG 2001-2021 West Mission. The motion is set for hearing in June, 2010.~~ the order, (b) commencement of adequate protection payments to Chamlian at the non-default rate under the note, or (c) further order of the Bankruptcy Court.

In addition to the motions filed by the Debtors' lenders, a group consisting of three individuals moved for relief from the automatic stay to seek authority to prosecute a civil action filed by them in Los Angeles Superior Court and to clarify that they have authority to pursue alleged labor Claims against certain current and former employees and board members of MMPI, Alameda Produce Market and 788 South Alameda. A hearing on that motion was held on December 17, 2009. The Court entered an order granting the motion as to Debtors Alameda Produce and 788 S. Alameda but ordered that the movants could not pursue such litigation until June 30, 2010. The motion was denied as to MMPI.

Also, in addition to the foregoing motions, in April 2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of eminent domain, certain property of the Debtors. In September 2008 the trial court dismissed the action and the MTA appealed. Thereafter, the Debtors filed their chapter 11 petitions and the automatic stay prevented further prosecution of the appeal. The Debtors and the MTA entered into a stipulation to modify the automatic stay to permit the prosecution and defense of the appeal. The order approving the stipulation was entered in August 2009. The matter is still pending.

Also, in a similar action, in February 2010, the City of Pomona filed a motion for relief from the automatic stay in order to allow an eminent domain action in a non-bankruptcy forum to proceed. The Debtors did not oppose the relief sought and the motion was granted.

The Debtors filed a motion to determine the amounts owed to the County of Los Angeles on account of real property taxes. The dispute involved the proper amount of taxes owed to the

County and the appropriate rates of interest as well as whether certain other claimed amounts are properly included in the claim. The motion was resolved through the Debtors' settlement with the County described in Section 6 below.

### 5. The Debtors' Compromises With Various Lenders

The Debtors have engaged in extensive settlement discussions with their lenders as to their Claims under Loan Documents and as of the filing of this Disclosure Statement, the Debtors have reached settlements with PCB, Imperial, Murakami, Cathay Bank ~~and~~ , the Stanford Group and FNBN. The Bankruptcy Court approved the Debtors' compromise with PCB and the essential terms of that settlement are reflected in the Plan, specifically the Plan's treatment of PCB's Class 51A-4 Claim in Section III.C.2 of the Plan.

The Bankruptcy Court approved the settlement with Murikami. The essential terms of that settlement are reflected in the Plan, specifically the Plan's treatment of Murakami's Class 37A-4 Claim in Section III.B.2 of the Plan.

The Debtors motion to approve their settlement with Imperial was heard on February 24, 2010 and was granted. The essential terms of that settlement are reflected in the Plan, specifically, the Plan's treatment of Imperial's Claims in Classes 35A-2, 38A-2 and 51A-2 in Section III.C. of the Plan.

The Debtors have reached an agreement ~~in principal~~ with Cathay Bank for the settlement of Cathay Bank's claims. The ~~parties are in~~ Bankruptcy Court approved the ~~process of documenting that~~ settlement ~~and will file a motion for approval~~ with ~~the Bankruptcy Court.~~Cathay Bank. The essential terms of that settlement are reflected in the Plan, specifically the ~~Plan's~~Plan's treatment of Cathay Bank's claims in Class 36A-2 and 36A-3 in Section III.C.2 of the Plan.

The Debtors have reached an agreement with The Stanford Group, L.P. for the settlement of The Stanford Group, L.P.'s claims. The ~~Debtors have filed a motion for approval of~~Bankruptcy Court approved the settlement with the ~~Bankruptcy Court. The Motion is set for hearing on April 30, 2010~~Stanford Group. The essential terms of that settlement are reflected in the Plan, specifically the Plan's treatment of the Stanford Group, L.P.'s claims in Class 34A-2 in Section III.C.2. of the Plan.

The Debtors have reached an agreement with FNBN for the settlement of FNBN's claims. The Bankruptcy Court approved the settlement with FNBN. The essential terms of that settlement are reflected in the Plan, specifically the Plan's treatment of FNBN's claims in Classes 1-C3, 42A-1 and 42C-2 in Section III.C.2. of the Plan.

**6. The Debtor's Settlement with the County of Los Angeles**

~~The Debtors have engaged in extensive settlement discussions with the County of Los Angeles as to its Claims and as of the filing of this Disclosure Statement, the Debtors have reached a settlement with the County of Los Angeles. The Debtors filed a motion to approve their settlement with the County. That Motion was heard on April 9, 2010. The Court continued the hearing on approval of the settlement to June 11, 2010. The essential terms of that settlement are reflected in the Plan, specifically the Plan's treatment of the Claims of the County as set forth in the Common Secured Tax Claim section of the Plan at Section III.b.2.a. of the Plan.~~

The Debtors have engaged in extensive settlement discussions with the County of Los Angeles ("County") as to its Claims. Except as to two Debtors, MG Southpark and MMP 760 S. Hill Street, the Bankruptcy Court has approved the Debtors' settlement with the County. As to those two Debtors, their motion for approval of their proposed settlement with the County has been severed and has been stayed by the Bankruptcy Court pending the outcome of a certain adversary proceeding filed by the County.

The County's adversary proceeding was filed in response to efforts by Bank of America to, in the Debtors' and the County's view, disregard statements of the Bankruptcy Court with regard to Bank of America's efforts to pay real property taxes prior to the Bankruptcy Court's approval of the Debtors' settlement with the County. The settlement provides that the County will accept payments only from the Debtors through, among other things, the effective date of a plan confirmed by the Court. On April 9, 2010, Bank of America sought to pay the real property taxes by handing two checks to the County's attorney during a hearing on the Debtors' motion for approval of the settlement. The County's attorney declined to accept the payments at that time. The Bankruptcy Court observed that it had witnessed a tender but no acceptance, and continued the hearing to allow for further briefing on the question of whether the Bankruptcy Court could approve the settlement

containing the term by which the County agreed to return such payments. Pending the outcome of the continued hearing, the County's attorney intended to keep the checks in his firm's safe.

Thereafter, Bank of America sought admissions from the County that the monthly accrual of penalties had ceased as of April 9, 2010, notwithstanding that the payment had not been accepted on that date. Ultimately, the County filed a complaint with the Bankruptcy Court for declaratory relief, requesting that the Bankruptcy Court declare, again, that there had not been an acceptance as of April 9, 2010, and requesting authority to deposit the two checks with the Court.

Bank of America filed a motion with the District Court requesting that the District Court exercise original jurisdiction over the adversary proceeding, asserting that the District Court was required by law to "withdraw the reference" of the adversary proceeding. After filing its motion, BofA filed a counterclaim for declaratory relief against the County seeking, among other things, a determination that the County was required to accept the payment from Bank of America on April 9, 2010, and therefore the County's claims against MG Southpark's and MMP 760 S. Hill Street's estates have been satisfied. The Debtors and the County opposed Bank of America's motion for withdrawal of the reference, which was granted.

The District Court has set September 20, 2010, as the date on which the parties' motions for summary judgment may be heard. Bank of America asserts that if a judgment is entered in its favor the County will not have allowed claims in MG Southpark's and MMP 760 S. Hill Street's cases. The Debtors and the County dispute that Bank of America is entitled to any relief in the District Court. The scope and effect, if any, of the District Court's ruling will not be known until it is issued by the District Court, and the effect of any ruling made by the District Court prior to the hearing on confirmation of the Debtors' plan will be determined by the Bankruptcy Court in connection with the Debtors' request for confirmation of its plan in MG Southpark's and MMP 760 S. Hill Street's cases.

### 7. Unexpired Leases and Executory Contracts

With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired nonresidential lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is

the lessee and Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December 1, 2000, the successor-in-interest to Evelyn Hammond, is the lessor.

### 8. Summary of Claims Process, Bar Date and Claims Filed

#### a. *Schedules and Statements of Financial Affairs*

On or before June 12, 2009 the fifty-four jointly administered Debtors filed with the Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the "Schedules and Statements") as of their March 26, 2009 or March 27, 2009 Petition Date. The Debtors ~~will shortly file~~filed amendments to the schedules on August 9, 2010.

For financial reporting purposes, MMPI prepares consolidated financial statements that are filed with the SEC and that are audited annually. Unlike these consolidated financial statements, the Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the Debtors' non-audited books and tax records. This means that audited financial statements and supporting schedules have not been prepared for each Debtor.

#### b. *Claims Bar Date*

On July 22, 2009, the Bankruptcy Court entered an order in the case (the "MMPI Bar Date Order") establishing the general deadline for filing proofs of Claim against the 54 jointly administered Debtors (the "Bar Date"). The deadline established by the Bankruptcy Court was September 24, 2009.

The Bar Date established the deadline for Claims, including Claims of governmental units, but excluding certain other Claims, including Claims based on the rejection of executory contracts and unexpired leases as to which the bar date is the later of: (1) the applicable Bar Date; or (2) the first business day that is at least thirty (30) calendar days after (a) the mailing of notice of the entry of the order first approving the rejection of such contract or lease, (b) the mailing of notice of the entry of an order or judgment avoiding a transfer, or (c) the date any relevant tax Claim first arises. The Debtors provided notice of the Bar Date by mailing a notice of such Bar Date.

#### c. *Proofs of Claim and Other Claims*

According to the Debtors' records, a total of 415 Claims were filed against the Debtors asserting Claims in the total face amount of approximately $927,761,559.23. The Claims

scheduled by the Debtors and Claims filed by claimants in each Class is summarized in Exhibits "H.2" to "H.8" attached hereto. The amounts listed on those exhibits represent the current state of the Debtors' computation of the Claims filed and scheduled, and do not reflect amounts which have been paid to date or which the Debtors have otherwise resolved through deposit or stipulation.

Numerous Claims were asserted by various alleged creditors in unliquidated amounts, i.e. Claims that did not contain a specific dollar amount. The Debtors believe that certain Claims that have been asserted are without merit and intend to object to all such Claims. Other significant categories of disputed Claims include certain taxing authorities that are requesting payments far in excess of those the Debtors believe to be owed to such authorities.

The Debtors filed a motion to determining the amounts owed to the County of Los Angeles on account of real property taxes. The dispute involves the proper amount of taxes owed to the County and the appropriate rates of interest as well as whether certain other claimed amounts are properly included in the claim. The parties reached a settlement of their disputes and the Debtors' Motion for approval of the settlement is pending.

**d.** ***The Debtors' Stipulation with the OCC Regarding Unsecured Claims***

The Debtors entered into a stipulation with the OCC by which they agreed that to the extent any party files a proof of Claim in any of the Debtors' Chapter 11 Cases prior to the Bar Date, such proof of Claim shall be deemed to have been timely filed in the proper Debtor's Chapter 11 Case and against the proper Debtor regardless of the name of the particular Debtor or case number identified in the proof of Claim. The Stipulation was intended to address the possible confusion among creditors holding claims against one or more of the Debtors where the claimant was not sure of the specific Debtor against whom the claim was held because of the Debtors' consolidated business operations. The Stipulation provided among other things, that claims that were timely filed would be deemed to have been filed against the proper Debtor regardless of the whether Debtor and/or case number were properly identified in the proof of claim. The Bankruptcy Court approved that stipulation. Berkadia has appealed from the order approving the stipulation and that appeal remains pending before the District Court for the Central District of California.

#### e. *Motion to Deem Claims Filed Against the Wrong Debtor to be Filed Against the Proper Debtor*

Pursuant to the terms of the Debtors' Stipulation with the OCC described above, the Debtors have reviewed certain of the proofs of claim filed before the Bar Date in order to identify claims filed in the wrong case or against the wrong Debtor that may properly be reassigned pursuant to the Order approving the Stipulation. Those determinations were based on the documents attached to the proofs of claim, a review of the appropriate Debtor's records and consultation with members of the Debtors' management familiar with the claims and creditors. On or about April 30, 2010, the Debtors filed their motion asking the Court to enforce the terms of the earlier Stipulation and Order and to deem the timely filed claims as having been filed against the proper Debtor, regardless of the Debtor's name and/or case number identified on the proof of claim. A hearing on that motion ~~is set~~was held on for June 11, 2010. That motion has been granted with regard to the majority of the relief sought by the Debtors, and a continued hearing on the balance of the relief sought by the Debtors was held on August 6, 2010 at which time the Motion was granted as modified by the Debtors.

### 9. Other Administrative Matters

Early in the cases, the Debtors met with and were interviewed by the staff attorney and other representative of the Office of the United States Trustee (the "US Trustee"). During the Cases, the Debtors have complied with certain requirements promulgated by that office with respect to the filing of monthly operating and cash reports. In May and June, 2009 the Debtors appeared at the Section 341(a) meeting of creditors - known as the initial creditor meeting - in the cases of the fifty-four jointly administered Debtors to answer questions of creditors and parties in interest. The US Trustee conducted each of the Section 341(a) meetings.

On April 22, 2009 the US Trustee appointed the Committee of Unsecured Creditors in the cases. Shortly thereafter, the Debtors met with the Committee to discuss the Debtors' business and proposed Chapter 11 Plan. The Debtors and the Committee have been in close communication throughout these cases.

Various professionals have been retained and employed in the Chapter 11 Cases and will be paid pursuant to the terms of the Plan. Danning, Gill, Diamond & Kollitz, LLP has been employed as general reorganization counsel for all of the Debtors in the Chapter 11 Cases. The following professionals also have been employed by the Debtors: FTI Consulting, Inc., as financial advisors ("FTI"), Ernst & Young as independent auditors and tax advisors, DLA Piper LLP (US) as special securities and litigation counsel, and Waldron & Associates, Inc. as real estate appraiser. SulmeyerKupetz, APC was employed as general counsel by the Committee in the Debtors' cases.

The Committee has filed an application to retain Kibel Green, Inc., as its financial advisor. The Court granted this application on April 22, 2010. In addition, certain real estate brokers have been or will be employed in the Chapter 11 Cases to market and sell certain properties but will be paid out of the proceeds of the sale of the properties as opposed to through the Plan. In accordance with the Bankruptcy Court's order, the Debtors submitted supplemental declarations from certain brokers in connection with representing the Debtors in connection with specific properties to be listed for sale. Specifically, the Debtors have retained (i) The Bradco Companies regarding the listing of 2951 Lenwood Road, Barstow, CA; (ii) DAUM Commercial Real Estate Services regarding the listing of (a) 905 E. 8th Street, Los Angeles, CA, (b) 308-310 Omar Street and 452, 464 and 470 E. 3rd Street, Los Angeles, CA, and (c) 400-428 Boyd Street, Los Angeles, CA; and (iii) Cushman and Wakefield of California, Inc. regarding the listing of (a) 1875 West Mission Boulevard, Pomona, California; and (b) 2001-2021 West Mission Boulevard, Pomona, California.

The Bankruptcy Court granted the Debtors' motion to extend the time during which only the Debtors may file a plan of reorganization and solicit acceptances thereof through ~~June 11~~September 30, 2010, provided that on and after May 18, 2010, the Committee is authorized to file a plan of reorganization and as of June 14, 2010, an equity committee appointed in the case, if any, and Charleston Capital Advisors and the Hartland Asset Management Corporation are authorized to file a plan of reorganization. The Debtors filed their original plan of reorganization and disclosure statement, which disclosure statement was considered by the Court on January 20, 2010. The Debtors filed their First Amended Joint Plan of Reorganization and First Amended Joint Disclosure Statement on February 27, 2010. The Court held hearings on approval of the First

Amended Disclosure Statement on March 19 and March 31June 30, 2010. The Court set a further disclosure statement hearing for June 14, 2010 which was subsequently continued to June 21, 2010 and then July 21, 2010 at which time this Second Amended Disclosure Statement will be considered. On July 19, 2010 and August 2, 2010, the Office of the U.S. Trustee filed a notice with the Court that it had appointed an equity committee, consisting of Taylor International Fund, Ltd., David A. Spinney, Douglas J. McCaslin, Kapil Tayal, Williams & Ribb LLP Profit Sharing Plan, David Ofman and David Pourbaba. The equity committee has filed an application to retain Ron Orr & Professionals, Inc. and Rodiger Law Office as its counsel. The equity committee has filed an application to employ Kibel Green, Inc. as its financial advisor. A hearing on the application to employ Ron Orr & Professionals, Rodiger Law Office and Kibel Green, Inc. will be held on August 26, 2010. The equity committee has also filed an application to employ Jenner & Block as counsel. A hearing on the application to employ Jenner & Block will be held on September 14, 2010.

## B. REAL PROPERTY VALUATION, SALES AND LISTINGS

### 1. Value of Property Level Debtors Real Property Assets

Formatted: No underline

Attached hereto as Exhibit J is a schedule of real property owned by each of the Property Level Debtors that owns real property. The values are based on the opinion of Richard Meruelo who has substantial experience in valuing real property and particular in the downtown Los Angeles area and has been found by the Court to qualify as an expert on such matters.

A brief description regarding each property is set forth in Section II.B hereof. Generally, the values given are those that Mr. Meruelo believes the Debtors could sell the property over a normal period of time. Mr. Meruelo believes the real estate market, especially downtown, is improving. There is renewed sale activity occurring, whereas, one year ago there were very few sale transactions. The most recent example is the sale of MM 845 S. Flower's property at 705 W. 9th Street, that solicited several offers from investors. Although he believes the price that it was sold for is less than what Mr. Meruelo would have expected if the Company was not in bankruptcy, the sale price achieved was significantly higher than the value expected by many appraisers.

There is also a significant difference in the availability of credit to finance real estate. Today, there are several real estate lenders in the market looking to make loans. Although traditional bank financing is still rare; that is primarily because the banks are still struggling to digest bad loans in their portfolios and not that financing real estate is not an opportunity for lending. However, the non bank lending sources are slowly returning to the market. The most significant lending source that has been absent from the market during the economic downturn, the CMBS securitization market, has now completed several transactions on a nationwide basis. This is truly exceptional because one year ago the supposed experts said this method of real estate financing was gone forever.

In total, Mr. Meruelo has more than 20 years of experience in identifying, acquiring, entitling, financing, developing and redeveloping real estate in downtown Los Angeles. In connection with these activities, he has read and studied hundreds of appraisal reports prepared by M.A.I. and other appraisers for properties located in downtown Los Angeles. He has attended numerous seminars concerning real estate development, valuation issues, and similar matters. He is a member, and in some cases an officer, of a number of local civic groups that track local real estate and commercial business conditions in downtown Los Angeles, including the Central City Association, the Central City East Association and the Los Angeles Central Industrial Redevelopment Project.

During the course of this case various secured creditors commissioned appraisals which they submitted to the Court in support of motions for relief from the automatic stay or in opposition to the Debtors' motion for authority to use cash collateral. Naturally, those creditors who submitted appraisals did so because their appraisals reflected opinions of value that were less than Mr. Meruelo's opinions of value; if any creditors ~~who may have~~ obtained appraisals that were comparable to or higher than Mr. Meruelo's values, they did not~~, of course,~~ submit ~~their~~those appraisals to the Court. In addition, an appraiser appointed by the Court at the request of one creditor has provided six appraisals, some of which concluded that the values of the property appraised was similar to Mr. Meruelo's valuation, and some of which concluded that the values

were measurably lower than Mr. Meruelo's valuation. The Debtors believe that reasonable minds can differ with regard to the value of a property, but that appraisals submitted to the Court have not, on the whole, reflected the true values of the relevant properties. In fact, a number of appraisals contained estimates of value that are disproved by prices that potential buyers were at the same time offering to the Debtors.

The Debtors believe that many of the appraisals, including those submitted by the Court-appointed appraiser, contain significant errors. Among other things, some appraisals have treated separate parcels which should be appraised separately as a single economic unit, which results in an artificially low estimate of value. Some appraisals disregard comparable local sales (including some transactions involving subsidiaries of MMPI) in favor of sales in outlying areas where the prices obtained for properties are lower than downtown Los Angeles, and then fail to accurately account for the fact that the property being appraised is in a significantly better locale. Some appraisals fail to recognize that the downtown real estate market has not been as adversely affected by recent market conditions as outlying areas and put too much emphasis on trends in Riverside and similar areas when estimating a rate of decline in properties downtown. Some appraisals fail to recognize that certain areas of downtown, such as the South Park area (near the Staples Center and L.A. Live) and areas in Little Tokyo where significant residential and other development is ongoing, are at least stable if not increasing in value. Also, many of the appraisals of improved properties in downtown failed to recognize that buyers in the downtown market do not utilize capitalization rates (which typically are relied upon by appraisers) in determining the price for which they are willing to purchase property. Appraisers also appear to still be looking to declines in value from 2007 through 2009 when comparing estimated values today to prices for which properties were sold one year ago, even though the Debtors' experience in selling properties over the last few years is to the contrary.

**2. Mr. Meruelo's Expertise in Valuing the Debtors Properties**

There are a number of factors which Mr. Meruelo considers when estimating the value of real property, and the weight he gives to one factor versus another will depend on, among other things, the current condition and use of the property, and the use for which the property is best

suited. One factor he may consider is the replacement cost of the property, which generally looks to how much a buyer would pay for an otherwise equivalent substitute property. With respect to the Debtors' properties, Mr. Meruelo is familiar with the prices for which the properties were purchased, he is familiar with the prices for which similar properties are being sold (particularly since the Company is often the one selling the properties), he is familiar with the structures on the Debtors' properties, and he has a significant amount of experience in the development of properties and therefore can estimate the expense that would be incurred if someone had to rebuild the structures.

Another factor he may consider relates to sale comparisons, which generally looks to the prices for which comparable properties, adjusted for differences in location and such, are being sold. Such values are often estimated in terms of price per square foot of land and price per square foot of building. Again, he is familiar with the prices for which similar properties are being sold, both in total and on a square footage basis, especially in the downtown Los Angeles market, often because the Company has sold the comparable properties. In fact, over the years he has observed that lender appraisals, when identifying comparable sales, often are relying on sales of properties sold by the Company.

Another factor he may consider looks to the ability of the property to produce income, typically in the form of rents. Present value may be estimated based on an evaluation of the anticipated future income stream from the property, and then a capitalization rate is applied in order to estimate the present value of the property. As noted above, in the performance of his duties as Chairman and Chief Executive Officer of MMPI, Mr. Meruelo regularly speaks with real estate professionals, brokers and others familiar with the downtown Los Angeles real estate market and other markets in which the Company owns real property in order to, among other things, expand his knowledge of the markets, evaluate properties available for sale that the Company may wish to purchase, and keep apprised of trends in values and the capital markets. He incorporates the information obtained by him during the course of these discussions when he estimates the values of the Debtors' properties.

Also, MMPI's management team have met periodically during recent years, particularly in 2008 and 2009, to discuss, among other things, real estate trends, growth patterns, market conditions, and particular properties and the factors that contribute to their value. These meetings have been conducted in order to, among other things, evaluate the prices to pay for the purchase of properties not presently owned by the Company, and prices for which the Company's properties may be sold. During these meetings, they discuss, among other things, space needs by tenants or end users, the condition and location of the properties, access to the properties and traffic patterns, the income stream, if any, generated by the property, growth patterns, community and area trends, comparable sales, expressions of interest by third parties in purchasing the Company's properties, and statements or expressions of value by commercial real estate brokers.

**3. Sales and Listings Since the Commencement of the Chapter 11 Cases**

Formatted: No underline

Since becoming a public company the Company has, among other things: successfully completed approximately nine acquisitions or conversions of development projects to rental projects; successfully completed, acquired, or placed in service four parcels attached to current rental projects; and successfully completed the sale of three rental projects and three development projects. In 2008, the Company sold more property in downtown Los Angeles than any other landowner. With regard to the six properties that were sold:

a. on or about March 31, 2008, the Company sold a development project located at 9901 Alameda in south Los Angeles for approximately $31.2 million;

b. in a two-step sale culminating in or about August 2008, the Company sold a rental project located at 2000 San Fernando Road just north of downtown Los Angeles for approximately $35 million;

c. on or about September 12, 2008, the Company sold a rental project located at 1800 E. Washington Blvd. in downtown Los Angeles for approximately $14.2 million;

d. on or about November 7, 2008, the Company sold a development project located at 816 Stanford in downtown Los Angeles for approximately $1.0 million.

e. on or about November 14, 2008, the Company sold a rental project referred to as the "Overland Terminal" in downtown Los Angeles for approximately $19.7 million; and

f. on or about November 21, 2008, the Company sold a development project located at 801 E. 7th Street in downtown Los Angeles for approximately $9.5 million.

The Company is believed to have sold more properties in downtown Los Angeles than anybody else during the last two years. Mr. Meruelo was involved in negotiating each of the above sales and other sales on behalf of the Company. Further, he is the person who ultimately decided the sale price for each of the properties, largely because he is the person at the Company who is the most knowledgeable as to the value of the Company's real estate. That fact that the Company has engaged in so many recent sales and ongoing development activities is one of the reasons the Debtors believe that he is one of the most qualified persons in Los Angeles to testify as to the value of properties in downtown Los Angeles.

Since the commencement of the cases, the Debtors have formulated and implemented a strategy with respect to the Debtors' real estate assets. As part of this strategy, the Debtors have considered multiple scenarios in the categorization and use of their real estate assets providing for a balance between creditor payment and the creation of an enterprise with the greatest chance of long-term sustainability and success. The Debtors determined that certain assets should be sold to reduce the immediate obligations to creditors, to provide capital for the business and to ensure the long-term sustainability of the business.

The following properties have been sold, pursuant to orders entered by the Bankruptcy Court, since the Petition Date:

- 5500 Flotilla Street, Los Angeles, previously owned by Debtor Meruelo Maddux – 5500 Flotilla Street, LLC ("MM 5500 Flotilla Street") to Camfield Partners, LLC for $210,000;
- 2040 Camfield Avenue, Commerce, previously owned by Debtor Merco Group – 2040 Camfield Avenue, LLC ("MG 2040 Camfield Avenue") to Camfield Partners, LLC for $4,790,000;
- 146 East Front Street, Covina, previously owned by Debtor Merco Group – 146 East Front Street, LLC ("MG 146 E. Front Street") to Vartan and Dzovig Koroghlian for $1,114,450; and

- 500 Mateo Street, Los Angeles, previously owned by Debtor Meruelo Maddux – 500 Mateo Street, LLC ("MM 500 Mateo Street") to Mydland Enterprises, LLC for $1,900,000.

In addition, the Debtors have recently listed the following properties for sale:

- 2951 Lenwood Road, Barstow, CA
- 905 E. 8th Street, Los Angeles, CA
- 308-310 Omar Street and 452, 464 and 470 E. Third Street, Los Angeles, CA
- 400-428 Boyd Street, Los Angeles, CA
- 1875 West Mission Boulevard, Pomona, CA
- 2001-2021 West Mission Boulevard, Pomona, CA.

Finally, on April 26, 2010, MM 845 Flower closed the sale of its 34 story luxury residential tower for a purchase price of $109,500,000.

~~C. Events in the Related Chapter 11 Cases MM 845 S. Flower and Chinatown.~~

### C. EVENTS IN THE RELATED CHAPTER 11 CASES MM 845 S. FLOWER AND CHINATOWN

On September 3, 2009, MM 845 S. Flower and Chinatown each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. While MM 845 S. Flower and Chinatown are affiliates of the MMPI Debtors, these cases are not jointly administered with the cases of the MMPI Debtors.

MM 845 S. Flower owned a 34-story residential tower located at 705 W. 9th Street in the South Park region of downtown Los Angeles (the "Project"). The building is comprised of 214 luxury residential units totaling approximately 254,300 square feet and an approximately 6,800 square foot commercial unit on the ground floor. This building is a first class iconic structure in downtown Los Angeles. Viewed from the street, this curtain wall building is clad with various shades of green glass and has numerous distinctive and attractive architectural features which include external balconies on all four corners of the building, a seventh floor amenity deck with a landscaped garden area and a premium extended balcony and viewing deck located on the ninth floor.

Chinatown owns approximately 5.5 acres of unimproved land at 129 West College Street in downtown Los Angeles ("Chinatown Property"). The Chinatown Property has significant development potential and the current development plan for the property is for a mixed residential and retail use. The Chinatown Property is now unencumbered. The Chinatown Property was appraised at $17,600,000 as of March 2008 based upon about $80 per land square foot.

Prior to September 3, 2009 (the "Flower Petition Date"), and on or about July 31, 2008, MM 845 Flower executed a promissory note (the "Note") in the original principal amount of $84,000,000 in favor of Canpartners Realty Holding Company IV, LLC ("Canyon") in connection with a Loan Agreement dated as of July 31, 2008 (the "Loan Agreement") pursuant to which Canyon made a construction loan of $84,000,000 to MM 845 Flower (the "Loan"). MM 845 Flower's obligations under the Note were secured by a construction deed of trust (the "845 Flower Deed of Trust") in favor of Canyon against the Project. MM 845 Flower also granted Canyon a security interest in various deposit accounts of 845 Flower (the "Accounts Pledge"). In addition, Chinatown granted Canyon a deed of trust (the "Chinatown Deed of Trust") against Chinatown's real property located at 129 West College Street, Los Angeles, California (the "Chinatown Property"). MMPI executed both completion and repayment guaranties in favor of Canyon (the "MMPI Guaranties") and MMP Ventures pledged its membership interests in 845 Flower and Chinatown to Canyon (the "Pledge Agreements[5]") .

**1. Important Events in MM 845 S. Flower and Chinatown cases**

At the time the cases were filed, the construction of MM 845 S. Flower Project was close to completion. After commencement of the 845 S. Flower case, MM 845 S. Flower completed construction of the Project, completed the process of entitling the Project as condominiums and developed a program for selling individual condominium units (the "Sale Program"). MM 845 S. Flower filed a motion for authority to engage in the Sale Program. Canyon opposed the motion on

[5] The Loan Agreement, the Note, the Deed of Trust, the Accounts Pledge, the MMPI Guaranties, the Chinatown Deed of Trust, the Pledge Agreements and all other documents and instruments evidencing or securing the Loan, are referred to collectively herein as the "Loan Documents"

among other grounds that the Debtor could not sell units free and clear of its loan. After extensive briefing and several hearings, the Court denied the motion without prejudice to the Debtor pursuing the Sale program as part of its Chapter 11 Plan.

On November 12, 2009, Canyon filed a Motion for Relief from the Automatic Stay (the "RFS Motion") in the MM 845 S. Flower case seeking relief from the automatic stay to permit it to foreclose on its Deed of Trust against the Project. Canyon asserted that it was entitled to relief from the stay because the Debtor does not have any equity in the Project and according to Canyon, the Debtor cannot cram down a plan on Canyon over its objection. MM 845 S. Flower vigorously disputed each of Canyon's contentions. The initial hearing on the RFS Motion was held on January 8, 2010. After additional briefing and a further hearing on February 5, 2010, the Court continued the RFS Motion to March 12, 2010 for an evidentiary hearing regarding the value of the Project and testimony by the appraisers retained by Canyon and MM 845 S. Flower. ~~That evidentiary hearing has been continued to June 7, 2010 but will be taken off calendar~~The RFS Motion was dismissed due to the settlement discussed below.

In addition, on October 19, 2009, Canyon filed an adversary proceeding against MM 845 S. Flower and Chinatown in their respective cases, asserting and seeking a declaration, among other things, that Canyon was not required to release its lien on the Chinatown Property or its security interest in MMP Ventures' membership interests in Chinatown (the "Chinatown Adversary Proceeding") MM 845 Flower and Chinatown answered and counterclaimed, contending, among other things, that Canyon is required to release its liens on the Chinatown Property and its security interest in the MMP Ventures membership interests in Chinatown. On November 19, 2009, the Bankruptcy Court entered its Order approving the parties' stipulation to consolidate the two adversary proceedings, deeming the complaint filed in 845 Flower's case (1:09-ap-01435-KT) as the sole operative complaint.

On February 16, 2010 the parties filed cross-motions for summary judgment (Chinatown Adversary Proceeding docket nos. 13 – 19) which were initially set for hearing on March 12, 2010. Those hearings ~~have been~~were continued several times and ~~are currently set for hearing on June 7,~~

~~2010 but will be taken off calendar~~the motions and the Chinatown Adversary Proceeding were dismissed due to the settlement discussed below.

**2. Sale of the Project and Settlement with Canyon**

On April 13, 2010, MM 845 S. Flower filed a motion for authority to sell the Project to Watermarke Properties, Inc., a California corporation, or its assignee (the "Buyer") for a purchase price of $110,000,000 cash pursuant to the Purchase Agreement, subject to a $500,000 purchase price credit to the Buyer as described below. The hearing on the Motion was held on April 19, 2010. The Court approved the sale by its order entered on April 19, 2010.

On April 12, 2010, MM 845 S. Flower, Chinatown, MMPI and MMP Ventures entered into a settlement with Canyon (the "Canyon Settlement Agreement"). Pursuant to the settlement, Canyon agreed to accept $86,521,389 from escrow at closing in satisfaction of its Lien and has agreed to the release of its Lien on the Project, on MM 845 S. Flower's bank accounts and other personal property and on the real property owned by the related debtor Meruelo Chinatown, LLC. The sale closed on April 26, 2010 and Canyon received payment of the settlement amount on that date.

The Canyon Settlement Agreement resolves all disputes arising out of or relating to Canyon's claims against the Debtors or arising out of or related to the Loan Documents, the RFS Motion, and the Chinatown Adversary Proceeding.

In addition, certain creditors have asserted, or may assert, mechanics liens against the Project (the "Mechanics Lien Creditors"). The sale of the Project combined with the funds in MM 845 S. Flower's construction reserve accounts (which was $7,139,319 as of April 9, 2010) provides more than enough proceeds for payment of all amounts determined to be owing to the Mechanics Lien Creditors. MM 845 S. Flower has objections to certain of these claims and reserves all rights and defenses thereto. As of ~~the date hereof~~April 30, 2010, the aggregate amount owing to the Mechanics' Lien Creditors was between $4,179,157 and $8,733,944. ~~As such claims are~~Since that date, MM 845 S. Flower has resolved~~, the Mechanics' Lien Claims will be~~ many of these claims which have been paid from ~~the~~ Remaining Claims Fund as provided below. MM 845 S. Flower continues to work to resolve the remaining claims.

At closing, MM 845 S. Flower established the Remaining Claims Fund as a segregated account at City National Bank to hold funds for payment of the unpaid or disputed Mechanics' Lien Claims and unsecured claims against the Debtor's estate (the "Remaining Claims") as provided in the Canyon Settlement Agreement. The Remaining Claims Fund was funded in an amount not to exceed $10,636,268, comprised of the maximum amount of all unpaid or disputed Mechanics Lien Claims, $100,000 for payment of unsecured claims, and $1,500,000 as provided in the Canyon Settlement Agreement. The Remaining Claims Fund was funded with the remaining funds from the Debtor's construction reserve accounts plus proceeds of the Sale sufficient to fully fund the account. The Liens of all creditors of MM 845 S. Flower asserting Liens against the Project, including but not limited to Canyon (pursuant to the Canyon Settlement Agreement) and the Mechanics Lien Creditors, attached to the Remaining Claims Fund. The Canyon Settlement Agreement also provided for the payment of Canyon's third party fees and expenses arising out of the Remaining Claims from the Remaining Claims Fund. As a result of receipt of the Settlement Amount, all of Canyon's liens, rights and interest in and to any of the Debtors' assets have been fully released, reconveyed, terminated and discharged, including, without limitation, full reconveyances of the Flower Deed of Trust, the Chinatown Deed of Trust, terminations of any UCC financing statements and account control agreements, releases of any guaranties, assignments and pledges, including MMP Ventures' membership interests in 845 Flower and Chinatown, the MMPI Guaranties and the Accounts Pledge and Pledge Agreements.

As a result of the settlement, the Chinatown Adversary Proceeding ~~will be~~has been dismissed and Canyon ~~will withdraw~~has withdrawn its RFS Motion. The sale will provide approximately $20 million in sale proceeds to the estate and, after payment of administrative expenses, such funds will be available to pay intercompany claims. The impact of successful resolution of these cases is that the remaining proceeds from the sale of this Project will be available to the MMPI Debtors at the Effective Date rather than one or more years later. Further, the Chinatown Property is no longer encumbered and will be available to the Company as an unencumbered property.

V.

On or about July 7, 2010, MM 845 S. Flower filed a motion for authority to make an interim distribution or distributions in the aggregate amount of up to $12 million from free and clear cash in MM 845 S. Flower's estate to MMPLP. That motion was granted.

Formatted: Heading 1,h1,H1, Left

# V.

# SUMMARY OF THE PLAN

The Plan provides for the treatment and payment of Claims against the bankruptcy estates of each of the Debtors. It also provides for the payment of unclassified claims, such as administrative expense claims and priority tax claims against each Debtor. Claims or Interests are classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and are classified in another Class or Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Class or Classes.

1. Common Class Treatments for Classified Claims

## A. COMMON CLASS TREATMENTS FOR CLASSIFIED CLAIMS

The following are Common Class Treatments for the following classes of Claims and Interests: (i) Secured Tax Claims, (ii) Secured Lender Claims, (iii) Other Priority Claims, (iv) Unsecured Tenant Security Deposit Claims, (v) Convenience Class Claims, (vi) General Unsecured Claims, (vii) Intercompany Claims, and (viii) Interests. The Classes of Claims and Interests for each Debtor will either receive the Common Treatment or a treatment specific to a particular Class. For each Class and for each Debtor, the Plan will specify whether such class will receive the common treatment set forth herein or another treatment.

In addition to the specific treatment detailed below, the Debtors expressly reserve the right to abandon any of their real properties pursuant to Section 554 of the Bankruptcy Code prior to the Confirmation Date. The Debtors also expressly reserve the right, at any time during the term of the Plan, to refinance the obligations secured by any of their real properties and satisfy the full amount of the Allowed Secured Claims against such real property(ies) from the proceeds of such refinancing. The Debtors also reserve the right subject to Court Approval to sell any of their properties prior to the Effective Date and Reinstate the obligations with respect thereto and pay any

such Claims in full under the Plan at the Effective Date. The Debtors also reserve the right to make full or partial payment of the Debt at any time on or following the Effective Date.

### 1. Common Secured Tax Claim Treatment

**Formatted:** No underline

**Formatted:** Heading 3,h3,H3, Indent: Left: 0", Tabs: Not at 2.17"

Pursuant to, and subject to Court approval of the Debtors' settlement with the County, the Holder shall receive deferred cash payments equal to the Allowed Secured Tax Claims with interest at the rate of 18.00 percent per annum, on the Allowed Secured Tax Claim until paid in full. Holders of Allowed Secured Tax Claims shall receive deferred cash payments, payable in sixteen (16) equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date. To the extent that the last payment occurs later than March 26, 2013, the County has consented to this Treatment.

The Reorganized Debtor shall have the right to pay the Allowed Secured Tax Claim, or any remaining balance of such Claim, or any portion of such Claim, at any time on or after the Effective Date.

### 2. Common Secured Lender Claim Treatment

**Formatted:** No underline

**Formatted:** Heading 3,h3,H3, Indent: Left: 0", Tabs: Not at 2.17"

The Holder shall receive deferred Cash payments over a period of either (i) five years from the Effective Date if the Holder votes to accept the Plan or (ii) seven years from the Effective Date if the Holder votes to reject the Plan (the "Maturity Date"), in an aggregate amount equal to the amount of the Allowed Secured Claim, plus interest from the Effective Date on the unpaid portion of the Allowed Secured Claim, at the rate prescribed below. Payments shall be made in the amount of the monthly accruing interest, with the principal balance and any unpaid interest due and payable at the Maturity Date. The monthly installments of interest shall be payable on or before the fifteenth (15th) day of each month, with the first installment due on or before the fifteenth (15th) day of the first month following the month the Effective Date occurs. Each installment shall be in the amount equal to interest on the Allowed Claim at the rate of 45.0% per annum or as otherwise established by the Court, provided, however, that in the event such Claim is not an allowed Claim at the Effective Date then interest shall be payable on the undisputed portion of such Claim until the Claim is allowed pursuant to a Final Order of the Bankruptcy Court. Once the Claim is an Allowed Claim pursuant to a Final Order, then on the next interest payment date, the Holder shall

receive a payment equal to the unpaid interest due and owing on the disputed portion of the Claim from the Effective Date.

The terms and conditions of the agreements or instruments between the Holder and the Debtor shall be restructured and amended as of the Effective Date pursuant to a Loan Modification Agreement the form of which is attached hereto as Exhibit D. The Holder and Debtor shall, within a reasonable period of time after the Effective Date (or after a Final Order of the Bankruptcy Court allowing the Claim) complete the Loan Modification Agreement consistent with the terms of this Plan, and execute and deliver the same to be effective as of the Effective Date. If there shall be found any error in the Loan Modification Agreement such that it was not completed consistent with the terms of this Plan, the Holder and the Debtor shall correct and re-execute the Loan Modification Agreement to be consistent with the Plan. Except as provided in this section and the Loan Modification Agreement, and notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all valid, enforceable and perfected prepetition liens of the Holder in its Collateral shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such Holder and/or applicable law until the Holder's Allowed Secured Claim is satisfied pursuant to this Plan; provided however, that the Holder shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtor is in compliance with this Plan. Any lien or interest granted to the Holder by the Court as adequate protection shall be released and extinguished upon confirmation.

### 3. Common Other Priority Claim Treatment

Formatted: No underline

Formatted: Heading 3,h3,H3, Tabs: Not at 2.17"

This Class includes Other Priority Claims for an amount entitled to priority under Sections 507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, and does not include any Administrative Claim or Tax Claim. These unsecured Other Priority Claims are for unsecured Claims for accrued employee compensation earned within 180 days prior to the Petition Date, to the extent of $10,950 per employee

The Bankruptcy Code requires that each Holder of a Priority Claim receive Cash on the Effective Date equal to the amount of the Holder’s Allowed Claim. However, a Class of Priority

Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the allowed amount of such Claims.

Unless otherwise agreed to by the parties, each Holder of an Allowed Other Priority Claim will receive an initial payment equal to 50% of the Holder's Allowed Claim and a second payment for the balance of the Holder's Allowed Claim one year after the Effective Date with interest at the rate of ~~1~~4.0% per annum. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. The initial payment shall occur on or before the later of (i) the Effective Date or (ii) 30 days after the end of the calendar quarter in which the Disputed Claim becomes an Allowed Claim and (iii) the date that such Claim would be paid in accordance with any terms and conditions of any agreements or understandings relating thereto between the applicable Debtor and the Holder of such Claim.

### 4. Common Tenant Security Deposits Treatment

The Allowed Claims of the Holders shall be reinstated as of the Effective Date of the Plan.

### 5. Common Convenience Class Claim Treatment

Convenience Classes of General Unsecured Claims against each Debtor includes those Claims the amount of which are equal to or less than $500. The Holders of such Claims shall receive a single Cash payment equal to the full Allowed amount of the Claim, payable on the later of (i) the Effective Date or as soon as practicable thereafter or (ii) ~~30 days after~~in the ~~end~~case of ~~the calendar quarter in which the~~a Disputed Claim~~ becomes ~~, 30 days after the date an ~~Allowed Claim~~Order allowing such Claim becomes a Final Order, or (iii) 30 days after the contingent claim becomes non-contingent. No payments shall be made to Holders of contingent Claims until such Claims become non-contingent.

The Holder of any Claim in any Impaired "C" Class may elect to reduce the Allowed amount of its Claim to $500 and be treated as a member of the Convenience Class.

**Formatted:** No underline

**Formatted:** Heading 3,h3,H3, Indent: Left: 0", Tabs: Not at 2.17"

**Formatted:** No underline

**Formatted:** Heading 3,h3,H3, Indent: Left: 0", Tabs: Not at 2.17"

### 6. Common Unsecured Claim Treatment

The Holders of Allowed General Unsecured Claims shall receive deferred cash payments equal to 100% of the Allowed amount of the Claim plus interest at the rate of ~~1~~4.0% per annum, payable in twenty (20) equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date. Any Holder shall have the right to elect an alternate treatment for such claim which election must be made at the time such Holder votes on the Plan. Under the alternate treatment, the Holder shall receive payment of 50% of its Allowed Claim within 30 days after the Effective Date in full satisfaction of its Claim.

In the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the first quarterly payment will be due and payable on the later of the next Quarterly Distribution Date or 30 days after the date the Disputed Claim becomes an Allowed Claim, and the first payment shall include payment for any quarter for which payment had not been made before the Disputed Claim became an Allowed Claim.

### 7. Common Unsecured Guaranty Claim Treatment

Claims in this Class consist of Guaranty Claims on obligations for which another one of the Debtors is the principal obligor (referred to generally in this section as the "Principal Obligor") and for which the principal obligation is provided for under this Plan~~ or under the plan filed by MM 845 S. Flower and Chinatown~~.

As of the Effective Date, all provisions of all guaranties giving rise to such Guaranty Claims shall be canceled and extinguished, including any and all waivers of suretyship rights and defenses under California Civil Code § 2856, and all Claims arising under such guaranties shall be released except as provided in this Plan. Guaranty Claims shall be deemed contingent as of the Effective Date and shall be deemed to be guarantees of the amended obligations of the respective Principal Obligors under the Plan. The Holder of a Guaranty Claim in this Class shall not receive any distribution on account of its Guaranty Claim; unless and until the Principal Obligor defaults under the terms of this Plan (e.g., by failing to make a payment of interest and failing to timely cure such default under the surviving terms of the applicable promissory note). In that event, the Holder of a Guaranty Claim shall be required to proceed, whether by judicial or non-judicial foreclosure,

**Formatted:** No underline

**Formatted:** Heading 3,h3,H3, Tabs: Not at 2.17"

**Formatted:** Indent: First line: 0.5"

**Formatted:** No underline

**Formatted:** Heading 3,h3,H3, Tabs: Not at 2.17"

against all real property securing the debt owed by the Principal Obligor to the Holder before seeking payment on account of its Guaranty Claim. If the Holder forecloses on such real property collateral, the amount of the Holder's Guaranty Claim shall be equal to (1) the amount owed by the Principal Obligor at the time of default, less the price for which the real property collateral was sold at the foreclosure sale (including by credit bid) or the fair market value of such property at the time of the foreclosure sale, whichever is greater. If the price for which the real property collateral was sold at the foreclosure sale is greater than the amount owed by the Principal Obligor as of the date of default, the amount of the Holder's Guaranty Claim shall be zero and any excess amounts will be distributed to the relevant principal obligor in accordance with applicable law.

If the price for which the real property collateral was sold at the foreclosure sale is less than the amount owed by the Principal Obligor as of the date of default, the Holder's resulting Guaranty General Unsecured Claim shall be deemed non-contingent. Within thirty (30) days after the foreclosure sale, the Holder shall file a motion with the Bankruptcy Court on regular notice to the Debtors seeking entry of an order determining the amount of the Holder's Guaranty Claim as provided herein. Upon the entry of that order, the Holder's Guaranty Claim shall receive the same treatment as afforded to Claims (i.e., the Holder shall receive deferred cash payments equal to 100% of the Allowed amount of the Claim with interest, payable in equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date). In the event that the order is entered after the first Quarterly Distribution Date, the initial payment shall be due and payable on the later of the next Quarterly Distribution Date or thirty (30) days after the date on which the order is entered.

### 8. Common Treatment for Guaranty Claims held by Settling Guaranty Creditors

Formatted: No underline

Formatted: Heading 3,h3,H3

The foregoing treatment shall not apply with regard to guaranties executed by MMPI or other Debtors for the benefit of Cathay, FNBN, Imperial, PCB, or other Holders of Guaranty Claims where, pursuant to settlements approved by the Bankruptcy Court, the guaranties have been confirmed or otherwise continued. With respect to those guaranties, the treatment of the Holder's Guaranty Claim shall be consistent in all regards with the Bankruptcy Court-approved settlement.

Formatted: No underline

Formatted: Heading 3,h3,H3, Tabs: Not at 2.17"

### 9. Common Intercompany Claim Treatment

The Holders shall retain such Claims and all rights, interests, and obligations related thereto but, notwithstanding, the Holders consent to the treatment afforded and distributions to be made under this Plan to Holders in each class of Allowed Claims.

Formatted: No underline

Formatted: Heading 3,h3,H3, Tabs: Not at 2.17"

### 10. Common Interest Treatment

The Holders of Interests in this Class shall retain their Interests in the Debtor.

~~2. Summary of Classified Claims and Treatment~~

## B. SUMMARY OF CLASSIFIED CLAIMS AND TREATMENT

The categories of Claims and Interests listed in the chart below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to this Plan. The amounts listed for each Class in the chart below represent the Debtors' estimate of the amount of the Allowable Claims asserted in each Class and contain a brief summary description of the treatment of each class. This is a summary for information only and does not specify the full terms of the treatment for each class. Such full description is set forth in Article III of the Plan. The terms of the Plan control over the summary descriptions set forth herein. In addition, the Debtors expressly reserve all of their rights to object to the amount, character and enforceability of any Claim, whether or not listed in the chart below.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 1. Meruelo Maddux Properties, Inc.[6] | | | |
| 1A | Secured Claim of Oliver, Sandifer - $436,901 | Impaired. | Paid in full. Interest accrues on unpaid amount at 3.5~~0~~%. 10% of claim paid on Effective Date. 10% paid on each subsequent anniversary of Effective Date until litigation that is basis for attorney lien is resolved, with remaining amounts paid from litigation recoveries. |

[6] The Debtors are listed in the order of the Service Level Debtors and then the Property Level Debtors.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 1B | Priority Benefits Claims - $46,362 | Unimpaired. | Paid in full. 50% of claim paid on Effective Date and 50% of claim plus interest at 1.04% per annum paid on 1st anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 1C-1 | General Unsecured Claims – Convenience Class - $1,274429 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date, See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 1C-2A | Unsecured Guaranty Claims - $102,245,154 | Impaired. | Guaranties deemed contingent as of Effective Date and deemed to guaranty amended obligation of Principal Obligor under Plan. Guarantor enjoined from enforcement until default by Principal Obligor on payment obligations under Plan are uncured for 15 days. Guarantor must proceed against real property collateral first. Guaranty claim reduced by payments received on principal obligation and the purchase price received at foreclosure sale for collateral or fair market value, whichever is greater. See Common Unsecured Guaranty Claim Treatment and Plan for full description of treatment. |
| 1C-2B | Unsecured Guaranty Claims – Settling Guaranty Creditors - $92,453,017 | Impaired. | The treatment of the Holder's Guaranty Claim shall be consistent in all regards with the Bankruptcy Court-approved settlement. |
| 1C-3 | General Unsecured Claims - $7,658,849093,358 | Impaired. | Paid in full over 5 years with interest at 1%. Creditors have right to elect to reduce30 days after Effective Date or date claim by 50% and receive payment in full of reduced amount 30 Days after Effective Dateis allowed; except that FNBN's unsecured claim will be |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | paid pursuant to the Settlement with FNBN. ~~See Common Unsecured Claim Treatment and Plan for full description of treatment.~~ |
| 1E | Equity Interests | ~~Impaired.~~Unimpaired. | ~~At the election of the Holder, Holder shall receive $.08 for each share of MMPI Existing Common Stock or, alternatively, Holder may elect to contribute [1] cash equal to $.07 for each share of New Equity Interests plus [2] Holder's shares of MMPI Existing Common Stock in exchange for an equal amount of shares of New Equity Interests in Reorganized MMPI. If there will be more than 299 shareholders of Reorganized MMPI, then the Reverse Stock Split will occur.~~Holders retain their Interests. |
| 2. Meruelo Maddux Properties L.P. | | | |
| 2C-1 | General Unsecured Claims – Convenience Class - $2,~~737~~422 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 2C-2 | Unsecured Guaranty Claims - $41,001,926 | Impaired. | Guaranties deemed contingent as of Effective Date and deemed to guaranty amended obligation of Principal Obligor under Plan. Guarantor enjoined from enforcement until default by Principal Obligor on payment obligations under Plan are uncured for 15 days. Guarantor must proceed against real property collateral first. Guaranty claim reduced by payments received on principal obligation and the purchase price received at foreclosure sale for collateral or fair market value, whichever is greater. See Common Unsecured Guaranty Claim Treatment and Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 2C-3 | General Unsecured Claims - $1,869,6382,369,702[7] | Impaired. | Paid in full over 5 years with interest at 1%. Creditors have right to elect to reduce30 days after Effective Date or date claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment.is allowed. |
| 2D | Intercompany Claims - $452,881,601 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 2E | Equity Interests of MMPI (99.6%) and Holders of LTIP Units (0.4%) | Impaired. | LTIP units cancelled. MMPLP merged into MMPI |
| 3. MMP Ventures LLC | | | |
| 3C | General Unsecured Claims - $652 629 | Unimpaired. | Paid in full at Effective Date. |
| 3D | Intercompany Claims - $2,509 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 3E | Equity Interests of MMPLP (100%) | Unimpaired. | Holders retain their interests. |
| 4. Meruelo Maddux Construction, Inc. | | | |
| 4C-1 | General Unsecured Claims – Convenience Class - $672350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 4C-2 | General Unsecured Claims - $652629 | Unimpaired. | Paid in full at Effective Date. |
| 4D | Intercompany Claims - $10,588 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 4E | Equity Interests of MMPLP (100%) | Unimpaired. | Holders retain their interests. |
| 5. Meruelo Maddux Management LLC | | | |

[7] Berkadia has filed alleged and duplicative unsecured claims for "money had and received, money lent, unjust enrichment, and interference with contract" for $1,443,668.40 (the "Berkadia Unsecured Claim") against 53 of the 54 Debtors. The Debtors will be filing formal objections to the Berkadia Unsecured Claims asserted in the 53 Chapter 11 Cases at the appropriate time. In the table below, the classes of "General Unsecured Claims" for the 53 Debtors separately list the amount of general unsecured claims asserted by claimants, exclusive of the disputed Berkadia Unsecured Claim. Notwithstanding the foregoing, the claim is included in the Class 2C-3.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 5B | Priority Benefits Claims - $151,247 | Unimpaired. | Paid in full. 50% paid on Effective date and 50% plus interest at ~~1.~~04% paid on 1st Anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 5C – 1 | General Unsecured Claims – Convenience Class - $24 | Unimpaired. | Claims of $500 or Less Paid in Full on Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 5C - 2 | General Unsecured Claims - $~~652~~629 | Unimpaired. | Paid in full at Effective Date. |
| 5D | Intercompany Claims - $4,296,137 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 5E | Equity Interests of MMPLP (99%) and MMCI (~~1~~4%) | Unimpaired. | Holders retain their interests. |
| 6. Meruelo Maddux – 555 Central Avenue LLC | | | |
| 6C | General Unsecured Claims - $10,~~102~~ 079 | Impaired. | Paid in full over 5 years with interest at ~~1~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 6D | Intercompany Claims - $1,999,388 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 6E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 7. Merco Group – Overland Terminal LLC | | | |
| 7C | General Unsecured Claims - $132,~~750~~ 726 | Impaired. | Paid in full over 5 years with interest at ~~1~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 7D | Intercompany Claims - $1,093,202 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 7E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 8. National Cold Storage LLC | | | |
| 8C-1 | General Unsecured Claims – Convenience Class - $212 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 8C-2 | General Unsecured Claims – $4,545522 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 8E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 9. Wall Street Market LLC | | | |
| 9C-1 | General Unsecured Claims – Convenience Class - $1,118 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 9C-2 | General Unsecured Claims - $2,092029 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 9D | Intercompany Claims - $3,536,086 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 9E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| 10. Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina, LLC | | | |
| 10A | Los Angeles County Secured Tax Claim - $118,420127,403 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 10C-1 | General Unsecured Claims – Convenience Class - $525 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 10C-2 | General Unsecured Claims - $15,~~357~~334 | Impaired. | Paid in full over 5 years with interest at ~~1~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 10D | Intercompany Claims - $6,630,774 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 10E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 11. | Meruelo Maddux – 230 W. Avenue 26 LLC | | |
| 11A | Los Angeles County Secured Tax Claim - $~~163,484~~175,442 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 11C-1 | Unsecured Claims – Tenant Security Deposits - $24,610 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 11C-2 | General Unsecured Claims – Convenience Class - $999 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 11C-3 | General Unsecured Claims - $3,~~952~~ 929 | Impaired. | Paid in full over 5 years with interest at ~~1~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 11D | Intercompany Claims - $6,414,500 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 11E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 12. | Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC | | |
| 12A | Los Angeles County Secured Tax Claim - $~~111,937~~120,124 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | description of treatment. |
| 12C-1 | Unsecured Claims – Tenant Security Deposits - $8,025 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 12C-2 | General Unsecured Claims – Convenience class - $597 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 12C-3 | General Unsecured Claims - $14,88218,858 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 12D | Intercompany Claims - $3,569,603 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 12E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 13. Meruelo Maddux – 817-825 S. Hill Street LLC | | | |
| 13A | Los Angeles County Secured Tax Claim – $350,917379,123 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 13C-1 | General Unsecured Claims – Convenience Class - $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 13C-2 | General Unsecured Claims - $1,583560 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 13D | Intercompany Claims - $16,377,573 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 13E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 14. Meruelo Maddux – 1000 E. Cesar Chavez LLC | | | |
| 14A | Los Angeles County Secured Tax Claim - | Impaired. | Creditor receives Common Secured Tax Claim Treatment |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | $167,582 179,907 | | pursuant to agreement with County. See Plan for full description of treatment. |
| 14C-1 | Unsecured Claims – Tenant Security Deposits - $3,100 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 14C-2 | General Unsecured Claims – Convenience Class - $705 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 14C-3 | General Unsecured Claims - $10,930241 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 14D | Intercompany Claims - $6,804,902 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 14E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 15. Meruelo Maddux Properties – 1060 N. Vignes LLC | | | |
| 15A | Los Angeles County Secured Tax Claim - $115,121123,542 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 15C-1 | General Unsecured Claims – Convenience Class - $597 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 15C-2 | General Unsecured Claims - $71,044021 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 15D | Intercompany Claims - $6,549,824 | Unimpaired | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 15E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 16. Meruelo Maddux – 2415 E. Washington Boulevard LLC | | | |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 16A | Los Angeles County Secured Tax Claim - $~~50,897~~55,606 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 16C-1 | General Unsecured Claims – Convenience Class - $175 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 16C-2 | General Unsecured Claims - $4,~~780~~091 | Impaired. | Paid in full over 5 years with interest at ~~1~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 16D | Intercompany Claims - $2,220,879 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 16E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **17.** | **Meruelo Maddux – 5500 Flotilla Street LLC** | | |
| 17C | General Unsecured Claims - $~~652~~629 | Unimpaired. | Paid in full at Effective Date. |
| 17D | Intercompany Claims - $611,663 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 17E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **18.** | **Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |
| 18A | Los Angeles County Secured Tax Claim - $~~211,338~~226,806 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 18C-1 | General Unsecured Claims – Convenience Class - $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 18C-2 | General Unsecured Claims - $2,~~652~~629 | Impaired. | Paid in full over 5 years with interest at ~~1~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | description of treatment. |
| 18D | Intercompany Claims - $8,997,401 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 18E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 19. Merco Group – 146 E. Front Street LLC | | | |
| 19C-1 | General Unsecured Claims – Convenience Class - $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 19C-2 | General Unsecured Claims - $652 629 | Unimpaired. | Paid in full on the Effective Date |
| 19D | Intercompany Claims - $2,243,787 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 19E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 20. Merco Group – 801 E. 7th Street LLC | | | |
| 20A | Los Angeles County Secured Tax Claim - $14,17715,205 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 20C | General Unsecured Claims - $2,652 629 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 20D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 20E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 21. Merco Group – 1211 E. Washington Boulevard LLC | | | |
| 21A-1 | Los Angeles County Secured Tax Claim - $245,814263,793 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 21A-2 | RoofCorp of CA, Inc. - $37,500 | Impaired. | Paid in full with 50% of claim paid on Effective Date and 50% of Claim, plus interest from the Effective Date at 3.5% on the 1st anniversary of the Effective |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Date. |
| 21C-1 | Unsecured Claims – Tenant Security Deposits - $42,357 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 21C-2 | General Unsecured Claims – Convenience Class - $260 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 21C-3 | General Unsecured Claims - $31,23133,786 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 21D | Intercompany Claims - $9,122,302 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 21E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 22. Merco Group – 1308 S. Orchard LLC | | | |
| 22A | Los Angeles County Secured Tax Claim - $36,71439,500 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 22C | General Unsecured Claims - $4,322 299 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 22D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 22E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 23. Merco Group – 2040 Camfield Avenue LLC | | | |
| 23C | General Unsecured Claims - $652 629 | Unimpaired. | Paid in full on the Effective Date. |
| 23D | Intercompany Claims - $5,163,790 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 23E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 24. Merco Group – Ceres Street Produce LLC | | | |
| 24A | Los Angeles County Secured Tax Claim - $65,34270,090 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 24C-1 | General Unsecured Claims – Convenience Class - $121 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 24C-2 | General Unsecured Claims - $2,059 036 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 24D | Intercompany Claims - $2,772,264 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 24E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 25. Meruelo Baldwin Park LLC | | | |
| 25A | Los Angeles County Secured Tax Claim - $201,681216,638 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 25C-1 | Unsecured Claims – Tenant Security Deposits - $3,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 25C-2 | General Unsecured Claims – Convenience Class - $213 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 25C-3 | General Unsecured Claims - $4,082059 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 25D | Intercompany Claims - $8,847,699 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 25E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 26. Santa Fe & Washington Market LLC | | | |
| 26A | Los Angeles County Secured Tax Claim - $45,48139,305 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 26C-1 | Unsecured Claims – Tenant Security Deposits - $27,900 | Unimpaired. | Creditors legal, equitable and contractual rights are Reinstated. |
| 26C-2 | General Unsecured Claims – Convenience Class - $251 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 26C-3 | General Unsecured Claims - $4,591 568 | Impaired. | Paid in full over 5 years with interest at 1.0%. 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 26D | Intercompany Claims - $4,879,642 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 26E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 27. Merco Group – 5707 S. Alameda LLC | | | |
| 27A | Los Angeles County Secured Tax Claim - $112,423120,619 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 27C-1 | Unsecured Claims – Tenant Security Deposits - $5,794 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 27C-2 | General Unsecured Claims – Convenience Class - $718 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 27C-3 | General Unsecured Claims - $16,673 650 | Impaired. | Paid in full over 5 years with interest at 1.0%. 4%. Creditors have right to elect to reduce claim by 50% and receive |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 27D | Intercompany Claims - $4,859,886 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 27E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 28. | Meruelo Maddux – 3rd and Omar Street LLC | | |
| 28A-1 | Los Angeles County Secured Tax Claim - $~~125,813~~137,523 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 28A-2 | Legendary Secured Claim - $2,559,658 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its Lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 28C-1 | Unsecured Claims – Tenant Security Deposits - $2,600 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 28C-2 | General Unsecured Claims – Convenience Class - $954 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 28C-3 | General Unsecured Claims - $2,~~772~~ 749 | Impaired. | Paid in full over 5 years with interest at ~~1.0%.~~ 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 28D | Intercompany Claims - $3,416,741 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 28E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 29. | Meruelo Maddux – 336 W. 11th Street LLC | | |
| 29A-1 | Los Angeles County Secured Tax Claim - $199,416217,986 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 29A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligations of 620 Gladys Avenue, LLC (see Class 46A-2 below). | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 29A-3 | Grand Avenue Lofts, HOA Secured Claim - $270,000 | Impaired | Claim is disputed. To the extent allowed, Creditor receives monthly payments of interest at 4% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. See Common Secured Lender Treatment and Plan for full description of treatment. To the extent allowed, Creditor receives Common Secured Lender Treatment except that the Holder shall not be required to enter into the Loan Modification Agreement, but the agreements or instruments between the Holder and the Debtor shall be deemed restructured and amended to provide that the periods within which the Debtor is to perform obligations under such agreements shall be extended to the Maturity Date and the period for accrual of damages or the exercise of rights and remedies against the Debtor, including |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | liquidated damages and reversion rights, are tolled through the Maturity Date. |
| 29A-4 | Grand Avenue Lofts, LLC / CIM Urban RE Fund GP II, LLC Secured Claim – 0 | Impaired. | Same as 29A-3 immediately above. |
| 29C-1 | General Unsecured Claims - Convenience Class $400 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 29C-2 | General Unsecured Claims - $43,857834 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 29D | Intercompany Claims - $10,554,921 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 29E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 30. | Meruelo Maddux – 420 Boyd Street LLC | | |
| 30A-1 | Los Angeles County Secured Tax Claim - $272,651298,732 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 30A-2 | Legendary Secured Claim - $5,950,000 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 30C-1 | Unsecured Claims – Tenant Security Deposits - $21,463 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 30C-2 | General Unsecured Claims – Convenience Class - $1,465799 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Claim Treatment and Plan for full description of Treatment. |
| 30C-3 | General Unsecured Claims - $31,~~296~~272 | Impaired. | Paid in full over 5 years with interest at ~~1.~~04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 30D | Intercompany Claims - $2,607,940 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 30E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **31. Meruelo Maddux – 500 Mateo Street LLC** | | | |
| 31C-1 | General Unsecured Claims - Convenience Class $255 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 31C-2 | General Unsecured Claims - $1,~~657~~ 634 | Impaired. | Paid in full over 5 years with interest at ~~1.~~04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 31D | Intercompany Claims - $1,968,955 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 31E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **32. Meruelo Maddux Properties – 760 S. Hill Street LLC** | | | |
| 32A-1 | Los Angeles County Secured Tax Claim - $~~256,063~~281,044 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 32A-2 | Bank of America Secured Claim - $28,108,094 | Impaired. | Creditor receives monthly payments of interest at the "BBA LIBOR Rate" as defined in the Holder's Loan Documents on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | of the 5 or 7 year term. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment, which is modified as to interest rate as provided above and as provided in the Plan and summarized below. Debtor shall have a one-time right to sell the BofA Collateral re MMP 760 S. Hill Street (excepting the funds held on deposit which are part of such collateral) to a third party on the terms provided in the Plan without triggering an acceleration of the debt or a breach or default under Holder's Loan Documents and without triggering any due on sale clause in the Holder's Loan Documents. |
| 32B | Priority Benefits Claims - $14,223 | Unimpaired. | Paid in full. 50% of claim paid on Effective Date and 50% of claim plus interest at 4.0% per annum paid on 1st anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 32C-1 | Unsecured Claims – Tenant Security Deposits $39,061 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 32C-2 | General Unsecured Claims – Convenience Class - $2,~~436~~186 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 32C-3 | General Unsecured Claims - $~~460,061~~ 473,167 | Impaired. | Paid in full over 5 years with interest at ~~1.0~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | description of treatment. |
| 32D | Intercompany Claims - $25,543,339 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 32E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 33. 788 S. Alameda LLC | | | |
| 33A-1 | Los Angeles County Secured Tax Claim - $95,225104,514 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 33A-2 | California Bank & Trust Secured Claim - $7,153,799 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 33B | Priority Benefits Claims - $1,382 | Unimpaired. | Paid in full. 50% of claim paid on Effective Date and 50% of claim plus interest at 4.0% per annum paid on 1st anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 33C-1 | Unsecured Claims – Tenant Security Deposits - $85,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 33C-2 | General Unsecured Claims – Convenience Class - $1,503 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 33C-3 | General Unsecured Claims - $61,02265,876 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 33D | Intercompany Claims - $1,485,597 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 33E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 34. 905 8th Street LLC | | | |
| 34A-1 | Los Angeles County Secured Tax Claim - $87,29395,421 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 34A-2 | The Stanford Group LP Secured Claim - $1,950,000 | Impaired. | Claim paid pursuant to settlement with Creditor. See Section III.C.34 of Plan for full description of the treatment. |
| 34C-1 | Unsecured Claims – Tenant Security Deposits - $3,525 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 34C-2 | General Unsecured Claims - Convenience Class $300 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 34C-3 | General Unsecured Claims - $12,849 13,525 | Impaired. | Paid in full over 5 years with interest at 1.0%. 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 34D | Intercompany Claims - $2,814,172 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 34E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 35. Meruelo Maddux – 915-949 S. Hill Street LLC | | | |
| 35A-1 | Los Angeles County Secured Tax Claim - $307,986338,027 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 35A-2 | Imperial Capital Bank Secured Claim - $9,007,827 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.35.b of Plan for |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | full description of treatment. |
| 35C-1 | General Unsecured Claims – Convenience Class - $674 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 35C-2 | General Unsecured Claims - $2,652 629 | Impaired. | Paid in full over 5 years with interest at 1.0%. 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 35C-3 | Unsecured Claims – Tenant Security Deposits - $30,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 35D | Intercompany Claims - $17,716,678 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 35E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 36. Alameda Produce Market LLC | | | |
| 36A-1-a | Los Angeles County Secured Tax Claim re Alameda Produce Market Encumbered Real Property - $421,457 462,572 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 36A-1-b | Los Angeles County Secured Tax Claim re Alameda Produce Market Unencumbered Real Property - $37,26339,199 | Impaired. | Same as 36A-1-a immediately above. |
| 36A-2 | Cathay Bank Secured Claim - $48,815,711 | Impaired. | Claim paid pursuant to settlement with creditor. See Section III.C.36 of the Plan for full description of treatment. |
| 36A-3 | Cathay Bank Secured Claim - $9,848,139944 | Impaired. | Same as section 36A-2 immediately above. |
| 36B | Priority Benefits Claims - $23,169 | Unimpaired. | Paid in full. 50% of claim paid on Effective Date and 50% of claim plus interest at 4.0% per annum paid on 1st anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | be authorized to use such vacation or sick time following the Effective Date. |
| 36C-1 | Unsecured Claims – Tenant Security Deposits - $301,019 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 36C-2 | General Unsecured Claims – Convenience Class - $1,~~522~~650 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 36C-3 | General Unsecured Claims - $~~581,888~~ 696,776 | Impaired. | Paid in full over 5 years with interest at ~~1.0%.~~ 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 36E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 37. Merco Group – 1500 Griffith Avenue LLC | | | |
| 37A-1-a | Los Angeles County Secured Tax Claim re 1500 Griffith - $~~109,864~~120,576 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 37A-1-b | Los Angeles County Secured Tax Claim re 1510 Griffith Avenue - $~~78,830~~86,516 | Impaired. | Same as 37A-1-a immediately above. |
| 37A-2 | Legendary Secured Claim - $6,396,500 – joint and several obligation with 4th Street Center, LLC, and also secured by the 4th Street Center Real Property (see Class 44A-2 below). | Impaired. | Creditor receives monthly payments of interest at ~~4~~5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 37A-3 | Murakami Secured Claim - $2,945,000 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.37.c of Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 37C-1 | Unsecured Claims – Tenant Security Deposits - $58,830 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 37C-2 | General Unsecured Claims - $2,~~452~~ 429 | Impaired. | Paid in full over 5 years with interest at ~~1.0%.~~ 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 37D | Intercompany Claims - $5,508,367 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 37E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 38. Meruelo Maddux Properties – 1919 Vineburn Street LLC | | | |
| 38A-1 | Los Angeles County Secured Tax Claim - $~~138,067~~151,536 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 38A-2 | Imperial Capital Bank Secured Claim - $5,468,543 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.38.b of Plan for full description of treatment. |
| 38C-1 | Unsecured Claims – Tenant Security Deposits - $42,210 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 38C-2 | General Unsecured Claims - Convenience Class $275 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 38C-3 | General Unsecured Claims - $2,~~652~~ 629 | Impaired. | Paid in full over 5 years with interest at ~~1.0%.~~ 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 38D | Intercompany Claims - $3,035,648 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 38E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 39. Meruelo Maddux Properties – 2131 Humboldt Street LLC | | | |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 39A-1-a | Los Angeles County Secured Tax Claim Against 2131 Humboldt Encumbered Real Property - $263,168 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 39A-1-b | Los Angeles County Secured Tax Claim Against 2131 Humboldt Unencumbered Real Property - $145,353 | Impaired. | Same as 39A-1-b immediately above. |
| 39A-2 | Chamlian Secured Claim - $7,000,000 | Impaired. | Creditor receives monthly payments of interest at ~~4~~5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 39C-1 | Unsecured Claims – Tenant Security Deposits - $10,500 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 39C-2 | General Unsecured Claims – Convenience Class $485 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 39C-3 | General Unsecured Claims - $3,~~631~~608 | Impaired. | Paid in full over 5 years with interest at ~~1.0%.~~ 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 39D | Intercompany Claims - $13,680,208 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 39E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **40. Merco Group – 2529 Santa Fe Avenue LLC** | | | |
| 40A-1 | Los Angeles County Secured Tax Claim - $~~126,578~~138,336 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | County. See Plan for full description of treatment. |
| 40A-2 | 1248 S. Figueroa Secured Claim - $3,134,825 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 40C-1 | Unsecured Claims – Tenant Security Deposits - $15,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 40C-2 | General Unsecured Claims – Convenience Class - $718 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 40C-3 | General Unsecured Claims - $25,049 026 | Impaired. | Paid in full over 5 years with interest at 1.0%. 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 40D | Intercompany Claims - $3,703,446 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 40E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **41. 2640 Washington Boulevard LLC** | | | |
| 41A-1 | Los Angeles County Secured Tax Claim - $212,108231,852 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 41A-2 | East West as successor to UCB Secured Claim - $6,066,073 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 41C-1 | Unsecured Claims – Tenant Security Deposits - $52,150 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 41C-2 | General Unsecured Claims – Convenience Class - $1,262 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 41C-3 | General Unsecured Claims - $~~19,357~~ 23,510 | Impaired. | Paid in full over 5 years with interest at ~~1.0%.~~ 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 41D | Intercompany Claims - $3,920,800 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 41E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 42. Meruelo Maddux Properties – 2951 Lenwood Road LLC | | | |
| 42A-1 | FNBN Secured Claim - $8,983,643 | Impaired. | Claim paid pursuant to settlement with creditor. See Section III.C.42 of the Plan for full description of treatment. |
| 42C-1 | General Unsecured Claims - Convenience Class $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 42C-2 | General Unsecured Claims - $6,~~181,377~~ 281,750 | Impaired. | Paid in full over 5 years with interest at ~~1.0%.~~ 4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date~~; provided however that the unsecured claim of FNBN will be paid pursuant to the terms of the Settlement between FNBN and MMP-2951 Lenwood Road~~. See Common Unsecured Claim Treatment and Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 42D | Intercompany Claims - $6,179,424 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 42E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 43. Merco Group – 3185 E. Washington Boulevard LLC | | | |
| 43A-1-a | Los Angeles County Secured Tax Claim - $192,099Encumbered - $209,776 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 43-A-21-b | ChinatrustLos Angeles County Secured Tax Claim - $9,541,565Unencumbered - $1,063 | Impaired. | Creditor receives monthly payments of interest at 4% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral.Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 43A-2 | Chinatrust Secured Claim - $9,541,565 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 43C-1 | General Unsecured Claims – Convenience Class - $63 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 43C-2 | General Unsecured Claims - $1,702 679 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 43C-3 | Unsecured Claims – Tenant Security Deposits - $250,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 43D | Intercompany Claims - $1,938,813 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 43E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **44.** | **Merco Group – 4th Street Center LLC** | | |
| 44A-1 | Los Angeles County Secured Tax Claim - $~~96,705~~106,132 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 44A-2 | Legendary Secured Claim - joint and several obligation with 1500 Griffith Avenue, and also secured by 1500 Griffith Avenue (see Class 37A-2 above). | Impaired. | Creditor receives monthly payments of interest at ~~4~~5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 44C-1 | General Unsecured Claims – Convenience Class - $407 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 44C-2 | General Unsecured Claims - $17,~~652~~629 | Impaired. | Paid in full over 5 years with interest at ~~1.0~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 44C-3 | Unsecured Claims – Tenant Security Deposits - $4,500 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 44D | Intercompany Claims - $6,840,375 | Unimpaired. | Creditors retain their claims and all rights, interests and |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | obligations related thereto. |
| 44E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 45. Merco Group – 425 W. 11th Street LLC | | | |
| 45A-1 | Los Angeles County Secured Tax Claim - $332,662363,625 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 45A-2 | Legendary Secured Claims - $5,340,000 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Lien on Collateral is extinguished. Creditor receives lien on real property of MMP 1060 N. Vignes. See Plan for full description of treatment. |
| 45C-1 | General Unsecured Claims – Convenience Class - $835 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 45C-2 | General Unsecured Claims - $4,266 243 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 45D | Intercompany Claims - $11,737,757 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 45E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 46. Merco Group – 620 Gladys Avenue LLC | | | |
| 46A-1-a | Los Angeles County Secured Tax Claim re 620 S. Gladys Avenue Encumbered Real Property - $311,811 340,820 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 46A-1-b | Los Angeles County Secured Tax Claim re 620 | Impaired. | Same as 46A-1-a immediately above. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | S. Gladys Avenue Unencumbered Real Property - $~~113,033~~121,492 | | |
| 46A-2 | Legendary Secured Claim re 620 S. Gladys Avenue - $5,380,688 which is also secured by the MM 336 W. 11th Street Real Property (see Class 29A-4 above). | Impaired. | Creditor receives monthly payments of interest at ~~4~~5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 46C-1 | Unsecured Claims – Tenant Security Deposits - $22,682 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 46C-2 | General Unsecured Claims - $1,~~501~~ 478 | Impaired. | Paid in full over 5 years with interest at ~~1.0~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 46D | Intercompany Claims - $9,788,629 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 46E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **47. Merco Group – 2001-2021 W. Mission Boulevard LLC** | | | |
| 47A-1 | Los Angeles County Secured Tax Claim - $~~105,146~~112,819 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 47A-2 | PNL Pomona LP Secured Claim – ~~to be determined~~$8,462,940 | Impaired. | Creditor receives monthly payments of interest at ~~4~~5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | See Common Secured Lender Treatment and Plan for full description of treatment. |
| 47C-1 | General Unsecured Claims – Convenience Class - $899 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 47C-2 | General Unsecured Claims - $5,~~402~~379 | Impaired. | Paid in full over 5 years with interest at ~~1.0~~4%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 47D | Intercompany Claims - $12,948,409 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 47E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 48. Merco Group – Little J LLC | | | |
| 48A-1-a | Los Angeles County Secured Tax Claim re 1119 S. Olive Street - $~~52,446~~57,560 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 48A-1-b | Los Angeles County Secured Tax Claim re 1124 S. Olive Street - $~~64,262~~68,960 | Impaired. | Same as 48A-1-a immediately above. |
| 48A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligation for payment under a loan made to Merco Group (see Class 50A-2 below) which is also secured by the Sky-Arc Real Property (see Class 50A-2 below). | Impaired. | Creditor receives monthly payments of interest at ~~4~~5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 48C-1 | General Unsecured Claims - Convenience Class $400 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 48C-2 | General Unsecured Claims - $2,252229 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 48C-3 | Unsecured Claims – Tenant Security Deposits - $7,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 48D | Intercompany Claims - $8,299,295 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 48E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| | 49. Merco Group – Southpark LLC | | |
| 49A-1 | Los Angeles County Secured Tax Claim - $570,318625,953 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 49A-2 | Bank of America Secured Claim - $20,000,000 | Impaired. | Creditor receives monthly payments of interest at the "Base Rate as defined in Holder's Loan Documents on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 49C-1 | General Unsecured Claims – Convenience Class - $777 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 49C-2 | General Unsecured Claims - $1,308,981 038,368 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 49C-3 | Unsecured Claims – Tenant Security Deposits - $31,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 49D | Intercompany Claims - $37,919,096 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 49E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| | 50. Merco Group LLC | | |
| 50A-1 | Los Angeles County Secured Tax Claim $~~380,214~~415,617 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 50A-2 | Legendary Secured Claim re Sky-Arc Real Property - $15,000,000 which is secured by the Little J Real Property (see Class 48A-2 above) | Impaired. | Depending upon outcome of any adversary proceeding regarding the validity and extent of the Creditor's lien on the Sky Arc Real Property, the Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment.<br><br>To the extent the Debtor sells Parcel D of the Sky-Arc Real Property, the Creditor's alleged lien will be released pursuant to the Plan on that Parcel and a pro-rata share of the purchase price will be segregated with the Creditor's lien to attach to such proceeds to the same extent and with the same validity and priority as such Liens had on Parcel D immediately prior to the sale, pending the outcome of any adversary proceeding. |
| 50A-3 | Legendary Secured Claim re Sci-Arc Real Property - $10,108,209 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment.<br><br>To the extent the Debtor sells the collateral prior to the Effective Date, the Loan will be Reinstated and the Creditor will be paid in full with interest at the non-default contract rate. To the Extent the collateral is sold after the Effective Date, the Creditor's Lien shall be released and the allowed amount of the Creditor's Claim will be paid in full. |
| 50C-1 | General Unsecured Claims - Convenience Class $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 50C-2 | General Unsecured Claims - $271,104 629 | Impaired. | Paid in full over 5 years with interest at 14%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 50D | Intercompany Claims - $16,604,526 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 50E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **51. Meruelo Farms LLC** | | | |
| 51A-1-a | Los Angeles County Secured Tax Claim re 815 E. Temple Street - $94,319103,517 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 51A-1-b | Los Angeles County Secured Tax Claim re 729 E. Temple Street - $208,977228,384 | Impaired. | Same as 51A-1-a immediately above. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 51A-2 | Imperial Capital Bank Secured Claim - $6,978,349 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.51.c of Plan for full description of treatment. |
| 51A-3 | Pacific Commerce Secured Claim - $3,350,000 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.51.d of Plan for full description of treatment. |
| 51C-1 | General Unsecured Claims – Convenience Class - $16592 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 51C-2 | General Unsecured Claims - $187,099076 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 51D | Intercompany Claims - $9,138,503 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 51E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **52. Meruelo Wall Street LLC** | | | |
| 52A-1 | Los Angeles County Secured Tax Claim - $423,210465,046 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 52A-2 | East West as successor to UCB Secured Claim - $20,850,859 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 52B | Priority Benefits Claims-$9,542 | Unimpaired | Paid in full. 50% of claim paid on Effective Date and 50% of claim plus interest at 4.0% per annum paid on 1st anniversary of Effective Date. To the extent |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 52C-1 | Unsecured Claims – Tenant Security Deposits - $297,650 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 52C-2 | General Unsecured Claims – Convenience Class - $1,761 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 52C-3 | General Unsecured Claims - $16,640 20,873 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 52D | Intercompany Claims - $3,133,131 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 52E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 53. Meruelo Maddux – Mission Boulevard LLC | | | |
| 53A-1 | Los Angeles County Secured Tax Claim - $290,497305,815 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 53A-2 | Kennedy Funding, Inc. Secured Claim - $8,800,000 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retaining its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 53C | General Unsecured Claims - $15,539 515 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 53D | Intercompany Claims - $20,054,067 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 53E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| 54. Santa Fe Commerce Center, Inc. | | | |
| 54A-1 | Los Angeles County Secured Tax Claim - $99,452109,152 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 54A-2 | Berkadia Secured Claim - $10,170,904 | Impaired. | Creditor receives monthly payments of interest at 45% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its liens on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 54A-3 | RoofCorp of CA, Inc. Secured Claim - $111,377 | Impaired. | Paid in full with 50% of claim paid on Effective Date and 50% of Claim, plus interest from the Effective Date at 3.5% on the 1st anniversary of the Effective Date. |
| 54C-1 | Unsecured Claims – Tenant Security Deposits -$79,667 | Unimpaired | Creditors' legal, equitable and contractual rights are Reinstated. |
| 54C-2 | General Unsecured Claims – Convenience Class - $755 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 54C-3 | General Unsecured Claims - $16,05915,369 | Impaired. | Paid in full over 5 years with interest at 1.04%. Creditors have right to elect to reduce claim by 50% and receive |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | payment in full of reduced amount 30 Days after Effective Date. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 54E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

Formatted: Normal, Space Before: 0 pt

B. Treatment for Unclassified Claims

## C. TREATMENT FOR UNCLASSIFIED CLAIMS

### 1. Unclassified Claims (Applicable to all of the Debtors)

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to a specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class. The treatment of these claims is provided below.

#### a. *Administrative Claims*

Formatted: Indent: Left: 0", Tabs: Not at 1.5" + 2.17"

Administrative Claims are claims for costs or expenses of administering the Debtors' Chapter 11 Cases which are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment. The following chart lists the Debtors' Section 507(a)(2) Administrative Claims arising from the employment of professionals and the costs and the statutory fees of the Bankruptcy Court and the Office of the United States Trustee and their treatment under this Plan.

Formatted

Formatted Table

| NAME | ESTIMATED[8] AMOUNT | TREATMENT |
|---|---|---|

[8] Stated amounts are estimates based on information available as of April 30, 2010. Any requests must comply with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

| | OWEDESTIMATED AMOUNT OWED[9] | |
|---|---|---|
| DANNING, GILL, DIAMOND & KOLLITZ, LLP – Reorganization Counsel to the Debtors | $600,000$516,800 | See below. |
| SULMEYERKUPETZ – Counsel to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases of the MMPI Debtors | $150,000$158,400 | See below. |
| FTI CONSULTING – Financial Advisors to the MMPI Debtors | $155,723$161,000 | See below. |
| ERNST & YOUNG LLP – Independent Auditors and Tax Advisors to the MMPI Debtors | $250121,000 | See below. |
| DLA PIPER – Special Counsel to the MMPI Debtors | $250,000$19,200 | See below. |
| LEWIS LANDAU | $5,000To Be Determined | See below. |
| KIBEL GREEN, INC. Financial Advisors to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases of the MMPI Debtors | $50,000$52,800 | See below. |
| Clerk's Office FeesKIBEL GREEN, INC. Proposed Financial Advisors to the Official Equity Holders Committee | To Be Determined-. | Paid in full on the Effective Date |
| RON ORR & PROFESSIONALS, INC.; RODIGER LAW OFFICE And JENNER & BLOCK, LLP - Proposed Co-Counsel to the Official Equity Holders Committee | To Be Determined | See below |
| Clerk's Office Fees | To Be Determined | Paid in full on the Effective Date |

(...Continued)

[9] Stated amounts are estimates based on information available as of September 1, 2010. Any requests must comply with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

Formatted

Formatted: Body Double,bd,bd Char Char,Body Double Char Char,bd Char Char Char Char,bd + Left: 1",First line: 0",Right: 1.16",Line spacing: si......,bd + First line: 0",bd Char1,Line spacing: si...,Body Douible Char

Formatted

Formatted: Font: 10 pt

Formatted

Formatted

Formatted: Font: 10 pt

Formatted

Formatted: Font: 10 pt

Formatted

Formatted

Formatted: Font: 11 pt

Formatted: Body Double,bd,bd Char Char,Body Double Char Char,bd Char Char Char Char,bd + Left: 1",First line: 0",Right: 1.16",Line spacing: si......,bd + First line: 0",bd Char1,Line spacing: si...,Body Douible Char

Formatted

Formatted

Formatted

Formatted: Font: 12 pt

Formatted

| Office of the United States Trustee Fees | To Be Determined | Paid in full on the Effective Date |
|---|---|---|
| TOTAL | ~~$1,460,723~~$1,179,200 | |

Formatted

Formatted: Font: 11 pt

Formatted: Normal

Formatted Table

Formatted

Formatted: Indent: Left: 0", Space Before: 12 pt, Tabs: Not at 2.58"

**(1) General**

Subject to the bar date provisions herein and additional requirements for professionals and certain other entities set forth below, the surviving Reorganized Debtor shall pay to each Holder of an Allowed Administrative Claim, on account of its Administrative Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date or as soon as practicable thereafter, unless the Holder agrees or shall have agreed to other treatment of such Claim. Payment on an Administrative Claim which arose in the ordinary course of each Debtor's business, including Ordinary Course Professionals, will be made when such payment would have become due in the ordinary course of each Debtor's business or under the terms of the Claim in the absence of the Chapter 11 Cases.

Formatted: Indent: Left: 0", Tabs: Not at 2.58"

**(2) Payment of Statutory Fees**

On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the hearing on Confirmation, shall be paid in Cash equal to the amount of such Administrative Claim.

Formatted: Indent: Left: 0", Tabs: Not at 2.58"

**(3) Bar Date for Administrative Claims**

***(a) General Provisions***

Except as provided below for (i) non-tax liabilities incurred in the ordinary course of business by each Debtor and (ii) Postpetition Tax Claims, requests for payment of Administrative Claims must be Filed and served on counsel for the Reorganized ~~Debtor~~ Debtors no later than forty-five (45) days after the Effective Date, or such later date, if any, as the Court shall order upon application made prior to the end of such 45-day period. Holders of Administrative Claims (including, without limitation, professionals requesting compensation or reimbursement of expenses and the Holders of any Claims for federal, state or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date

shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized ~~Debtor~~Debtors or any of their respective properties.

***(b) Professionals***

All professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, inter alia, any compensation requested by any professional or any other Person for making a substantial contribution in the Reorganization Case) shall File and serve on the Reorganized Debtor and the Creditors' Committee and the Equity Committee an application for final allowance of compensation and reimbursement of expenses no later than (i) forty-five (45) days after the Effective Date, or (ii) such later date as the Court shall order upon application made prior to the end of such 45-day period. Objections to applications of professionals for compensation or reimbursement of expenses must be Filed and served on Reorganized Debtors, the Creditors' Committee, the Equity Committee and the professionals to whose application the objections are addressed on or before (i) fourteen days after such application is Filed and served or (ii) such later date as the Court shall order or upon agreement between the Reorganized ~~Debtor~~Debtors and the affected professional.

Any professional fees and reimbursements of expenses incurred by the Reorganized Debtor subsequent to the Effective Date may be paid by the Reorganized Debtor without application to or Order of the Court.

***(c) Ordinary Course Liabilities***

Holders of Administrative Claims based on liabilities incurred post-petition in the ordinary course of the Debtors' businesses, including Ordinary Course Professionals, (other than Claims of governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to File any request for payment of such Claims. Such Administrative Claims shall be assumed and paid by such Reorganized Debtor pursuant to the terms and conditions of the particular transaction giving rise to such Administrative Claim, without any further action by the Holders of such Claims.

***(d) Tax Claims***

All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) forty-five (45) days following the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes for such tax year or period with the applicable governmental unit. Any Holder of any Postpetition Tax Claim that is required to File a request for payment of such taxes and that does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Postpetition Tax Claim against any of the Debtors or Reorganized Debtors, or any of their respective properties, whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date. The Debtors are paying all Postpetition Tax Claims as they come due; however, certain taxing authorities conduct audits which may result in a postpetition tax liability of which the Debtors are currently unaware.

**b. *Priority Tax Claims***

Formatted: Indent: Left: 0", Tabs: Not at 1.5" + 2.17"

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code Section 507(a)(8). The ~~Bankruptcy Code requires that each holder of such a 507(a)(8) priority Tax Claim receive the present value of such claim in deferred cash payments, over a period not exceeding five years after the Petition Date. The~~ following chart lists the Debtors' Section 507(a)(8) priority Tax Claims and their treatment under this Plan.

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **1. Meruelo Maddux Properties Inc.** | | |
| **Name –** IRS<br>**Type of tax –** Income | $304 | See below. |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **Name –** State of Delaware<br>**Type of tax –** Franchise | $125,138 | See below. |
| ~~**Name** – State Board of Equalization~~<br>~~**Type of tax** – Hazardous Substance Tax~~ | ~~$61,916~~ | ~~See below.~~ |
| **2. Meruelo Maddux Properties L.P.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **4. Meruelo Maddux Construction, Inc.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **10. Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **11. Meruelo Maddux – 230 W. Avenue 26 LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **12. Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | |
| **Name** – City of Los Angeles<br>**Type of tax** - Business<br>**Name** – Franchise Tax Board<br>**Type of tax** – Income | $151,232<br><br>$0.00 | See below.<br><br>See below. |
| **13. Meruelo Maddux – 817-825 S. Hill Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **14. Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **15. Meruelo Maddux Properties – 1060 N. Vignes LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **Name** – State Board of Equalization<br>**Type of tax** – Hazardous Substance Tax | $61,916 | See below. |
| **17. Meruelo Maddux – 5500 Flotilla Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **18. Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **20. Merco Group – 801 E. 7th Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **21. Merco Group – 1211 E. Washington Boulevard LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **28. Meruelo Maddux – 3rd and Omar Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |

Formatted Table

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **29. Meruelo Maddux – 336 W. 11th Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **30. Meruelo Maddux – 500 Mateo Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **31. Meruelo Maddux Properties – 760 S. Hill Street LLC** | | |
| **Name** – City of Los Angeles<br>**Type of tax** – Business<br>**Name** – Franchise Tax Board<br>**Type of tax** – Income | $1,885<br><br>$0.00 | See below.<br><br>See below. |
| **35. Meruelo Maddux – 915-949 S. Hill Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **39. Meruelo Maddux Properties – 2131 Humboldt Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **42. Meruelo Maddux Properties – 2951 Lenwood Road LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **52. Meruelo Wall Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **TOTAL**[10] | **$340,~~475~~779** | |

~~Except as otherwise provided below, or as otherwise agreed to by Reorganized Debtor and the applicable taxing agency, Reorganized Debtor shall pay to each Holder of an Allowed Priority Tax Claim allowed in an amount greater than $800, deferred Cash payments, over a period not exceeding five years from the Petition Date, of an aggregate amount equal to the amount of such~~

---

[10] The Franchise Tax Board has filed claims for franchise taxes for the 2009 year corporate tax fee of $800 in the Debtors' cases scheduled above. Debtors' records indicate that all such taxes have been paid and, accordingly, the above schedule shows the amount of the such FTB claims to be zero but if it is determined that the FTB has Allowable Claims, the treatment is as provided above.

Allowed Priority Tax Claim, with interest at the rate of 1.0% per annum accruing from the Petition Date of such Allowed Priority Tax Claim (without penalty of any kind).

Holders of Allowed Priority Tax Claims shall receive deferred cash payments, payable in fifteen (15) equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date. In the event a Disputed Priority Tax Claim becomes an Allowed Priority Tax Claim, the first payment will be due and payable on the later of the next Quarterly Distribution Date or 30 days after the end of the calendar quarter in which the Disputed Priority Tax Claim becomes an Allowed Priority Tax Claim, and the first payment shall include payment for amounts that would have been owing in quarters prior to the allowance of the Disputed Priority Tax Claim. Each installment shall include interest on the unpaid portion of such Allowed Priority Tax Claim, without penalty of any kind, at rate of 1.0% per annum. In the event an Allowed Priority Tax Claim is in the amount of $800 or less, the Reorganized Debtor shall pay such claim in full on the latest of (a) the Effective Date, (b) 30 days after the end of the calendar quarter in which an Order allowing such priority Tax Claim becomes a Final Order, and (c) such other time or times as may be agreed to by the Holder of such Tax Claim and the Reorganized Debtor, with interest at the rate of 1.0% per annum accruing from the Petition Date.

VI.

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Except as otherwise agreed to by Reorganized Debtor and the applicable taxing agency, the Reorganized Debtors shall pay such Allowed Priority Tax Claim in full with interest at the rate of 5% per annum accrued from the Petition Date on the latest of (a) 30 days after the Effective Date, and (b) with respect to a Disputed Priority Tax Claim, 30 days after the date an Order allowing such Priority Tax Claim becomes a Final Order.

**VI.**

**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

The Plan constitutes a motion to assume or reject all executory contracts and nonresidential

real property leases, except for those executory contracts and nonresidential real property leases that have already been assumed or rejected pursuant to an earlier Order of the Bankruptcy Court or that are the subject of a motion for such an Order pending as of the Confirmation Hearing. Prior to the Confirmation Hearing, the Debtors will file a schedule of all real property leases and executory contracts to be rejected; any contract or lease not on that schedule shall be deemed assumed by the applicable Debtor as of the Effective Date. Prior to the date of hearing on the Debtors' Disclosure Statement, the Debtors will file a schedule of all real property leases and executory contracts to be assumed listing the cure amount, if any, under such unexpired lease or executory contract. Unless the non-Debtor party to any such executory contract or unexpired lease to be assumed files and serves on Debtors' counsel an objection to the cure amount specified on that schedule on or before the last date established by the Bankruptcy Court to file and serve objections to confirmation of the Plan, such cure amount shall be forever binding on such non-debtor party to said executory contract or unexpired lease.

Except as otherwise agreed by the parties to an executory contract or unexpired lease, each Reorganized Debtor will cure any and all undisputed defaults within thirty days of the Effective Date under any executory contract or unexpired lease assumed pursuant to the Plan and to which it is a party, in accordance with Section 365 of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty days of the entry of a Final Order determining the amount, if any, of such Debtor's or Reorganized Debtor's liability with respect thereto, or as may be agreed otherwise by the parties. The Confirmation Order shall state that all pre-petition contracts and unexpired leases that are listed on the schedule described herein are deemed assumed under the Plan.

Any Claim for damages arising from the rejection of an executory contract or unexpired lease must be Filed and served on counsel for the Debtors within thirty (30) days after the order of the Bankruptcy Court approving such rejection becomes a Final Order or be (i) forever barred and unenforceable against any Debtor, its Estate, the Reorganized Debtor and their respective property, and (ii) barred from receiving any distribution under the Plan. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as a Class "C" General

Unsecured Claim against the respective Debtor who is a party to such executory contract or unexpired lease.

Any election of rights by a lessee under Section 365(h)(1) of the Bankruptcy Code must be Filed and served on counsel for the Debtors within thirty (30) days after the order of the Bankruptcy Court approving such rejection becomes a Final Order or lessee shall be deemed to have waived any and all of its rights under Section 365(h)(1).

VII.

VII.

Formatted: Left

## MEANS FOR IMPLEMENTATION OF THE PLAN

### A. OVERVIEW OF PLAN IMPLEMENTATION

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan will be obtained from the Reorganized Debtors' cash balances existing on the Effective Date and thereafter, from the operations of the Reorganized Debtors' business, the sale or refinancing of assets of the Reorganized Debtors, as deemed necessary and appropriate by the Reorganized Debtors, from the cash to be provided in connection with the issuance of the New Equity Interests described below, and from any other lawful source.

### B. VESTING OF ASSETS

Except as otherwise provided in any provision of the Plan, on the Effective Date, all legal and equitable interests of the Debtors in property of their respective estates shall be vested in such Reorganized Debtors, free and clear of all Claims, Liens, encumbrances and Interests except to the extent and only as is expressly provided for otherwise in Article III.C of the Plan.

### C. SALE OR REFINANCE OF CERTAIN OF THE ASSETS OF CERTAIN DEBTORS

As of the Effective Date, the Reorganized Debtors will continue to operate their businesses. In order to meet their operational needs and payment obligations under the Plan, the Reorganized Debtors will sell some of their assets and refinance other of their assets as necessary during the term of the Plan. The Debtors will determine which assets will be sold or refinanced based on the

~~then existing needs and business plan of the Debtors and the condition of the real estate and credit markets. The Debtors have in the past shown a willingness and ability to sell properties to meet their cashflow needs and they will continue to make such strategic sales as and when they deem it necessary in order to meet their obligations in the future. After the payment of the costs of sale and the satisfaction of any Liens fixed by this Plan against the asset, the remaining proceeds will be available for the payment of the costs of operating its business and funding the Reorganized Debtors' obligations under this Plan.~~

~~D. PERFORMANCE BENCH MARKS~~

~~The Debtors' Financial Projections attached hereto as Exhibit E show that the Debtors will monetize certain of their assets at various times during the seven year term of the Plan. The Debtors have projected asset sales in each year of the Plan. As stated in the Financial Projections, during the first 14 months of the Plan term, the Debtors will have sufficient cash (including cash on hand at the Effective Date and cash flow from the operation of their properties) to fully fund their operations for approximately 18 months without any asset sales during that time. The Debtors propose to sell assets during that time period and have property under contract for sale that is projected to close at or shortly after the Effective Date. In light of the Debtors' available liquid assets to fund operations, the Debtors will project that they will need to meet the following performance benchmarks through the sale and/or refinancing of their secured debt, through cost reductions or increased revenues from operations. To the extent the Debtors exceed the performance benchmark in any one year, this will necessarily reduce the amount needed to meet the performance benchmark for the succeeding year.~~

**C. DEBTORS' BUSINESS POST-CONFIRMATION**

As of the Effective Date, the Reorganized Debtors will continue to operate their businesses. The Debtors future business model and operations will be consistent with its pre-existing business model, adapted to meet the challenges of the new economic climate as more fully discussed below. The Debtors have always operated as an integrated enterprise where the assets are managed to bring the greatest value to the enterprise as a whole. The Company has been, and will continue to

be, a self-managed, full-service real estate company focused on industrial, commercial and residential properties primarily in urban markets. The Company has unique development and management expertise in the types of properties owned by the Debtors. Its development projects often involve unique local entitlement, property assemblage and physical challenges. The Company's operating projects frequently require management expertise not usually found in third-party asset or property management companies. For these reasons, the Company believes that maintaining the current development and management functions of the Company are essential to providing the greatest value to the enterprise. Further, to reduce the cost of operating at the corporate level, the Company intends to maintain itself as a private company as more fully discussed in Section VII.E. below.

Two of the primary adaptations in the business model are being driven by constricted credit markets. First, as credit underwriting has substantially tightened, the Company may be more inclined to dispose of development projects that present longer-term development challenges. Nevertheless, the Company is likely to retain key strategic development projects, and will maintain a development pipeline that we believe will result in the greatest value to the company in the years to come. Second, the Company is more likely to redeploy cash into projects that provide for shorter-term realization of investment, whether through the sale of the asset or through increases in operating revenue. For instance, with respect to projects that were slated for substantial redevelopment, the Company may instead upgrade or rehabilitate existing improvements to provide for more immediate increases in rental income.

The Financial Projections err on the conservative side, and have not assumed any significant improvement in market conditions. Among other things, the Projections show the earnings potential of the Debtors portfolio generally at current occupancy and rent levels. Even given these conservative assumptions, the Financial Projections show that the Company will have the ability to meet its obligations under the Plan. Any future development or leasing activities not forecast in the Financial Projections would be undertaken to bring accretive value to the Company over and above that shown in the Financial Projections.

### D. DEBTORS' PERFORMANCE UNDER THE PLAN

As part of their business plan, the Reorganized Debtors intend to sell some of their assets and refinance other assets during the term of the Plan in order to meet their operational needs and fund their payment obligations under the Plan. The Debtors will determine which assets will be sold or refinanced based on a variety of factors, including the then existing needs of the Debtors, the condition of the real estate and credit markets and opportunities available to the Debtors.

The Debtors' Financial Projections which were prepared with the advice and assistance of the Debtors' financial advisor, show that the Debtors will monetize certain of their assets over the course of the seven year term of the Plan. These Financial Projections provide a model for the sale of certain of their assets over the term of the Plan and are an example of a sales strategy which, when executed, would provide sufficient funding for the Debtors' obligations under the Plan. The Financial Projections provide an example of the Debtors' possible sale strategy and do not represent a commitment by the Debtors to sell any given asset at any particular time. The Debtors may sell a designated asset at a different time than as set forth in the Financial Projections or it may determine that an asset identified for sale should instead be retained by the Debtors. As noted above, the Debtors' decision regarding which assets will ultimately be sold will depend on a variety of factors, including the condition of the real estate and credit markets and opportunities available to the Debtors.

As stated in the Financial Projections, during the first eight months of the Plan, the Debtors will have sufficient cash (including cash on hand at the Effective Date and cash flow from the operation of their properties) to fully fund their operations without any asset sales during that time. Nonetheless, the Debtors intend to sell assets during that time period consistent with their business strategy. The Debtors have entered into contracts with the Southern California Institute for Architecture ("Sci-Arc") for the sale of the Sci-Arc Property and Parcel D of the Sky-Arc Property from Merco Group, LLC. Sci-Arc is the tenant of the Sci-Arc Property. Provided that all due diligence is completed and all contingencies and conditions are met or waived, this sale is projected to close within the first year after the Effective Date.

In light of the Debtors' available liquid assets to fund operations, the Debtors project that they will need to meet the following performance benchmarks through (i) the sale of assets, (ii) refinancing of secured debt (iii) cost reductions or increased revenues from operations and increased leasing activity including increased occupancy and rental rates; and (iv) other business generation activities such as proceeds realized from development projects. To the extent the Debtors exceed a performance benchmark in any one year, this will necessarily reduce the amount needed to meet the performance benchmark for the succeeding year.

| | |
|---|---|
| Year 1 | $7,242,000 |
| Year 2 | $~~14,226~~19,027,000 |
| Year 3 | $19,~~433~~198,000 |
| Year 4 | $18,~~621~~961,000 |
| Year 5 | $~~16,518~~15,791,000 |
| Year 6 | $14,~~313~~680,000 |
| Year 7 | $14,~~454~~916,000 |

~~These amounts represent the projected operating and plan payment shortfalls in those years if there are no assets sales, cost reductions, proceeds from refinancing of debt or increases in operating revenue. These are the minimum amounts required to maintain positive cash balances and make the payments required under the Plan.~~

~~E. NEW EQUITY AND OCCURRENCE OF REVERSE STOCK SPLIT~~

~~The Plan provides that the Holders of Interests in MMPI will have the option to election one of two alternative treatments. Under Option 1, the Holders will receive on account of and in exchange for their Interests cash in the amount of $.08 for each share of MMPI Existing Common Stock held by such Holder. This payment will be made on the Effective Date or as soon as practicable thereafter. Under Option 2, also on the Effective Date, or as soon as practicable thereafter, the Holder, in exchange for the Holder's Interests and after payment by the Holder of $.07 for each share of New Equity Interest, shall receive shares of the New Equity Interests equal to~~

~~the number of MMPI Existing Common Shares that the Holder held as of the Record Date. The New Equity Interests will be issued subject to the restrictions described in Section VII.F. below. Further, under Section 1145 of the Bankruptcy Code, stockholders holding a large amount of shares may be deemed to be underwriters and may not freely retrade their shares.~~

~~The deadline for Holders of Interests to elect Option 1 or Option 2 shall be the date set as the deadline for casting Ballots to accept or reject the Plan (the "Election Deadline"), and the procedures for electing Option 2, including tendering Interests to be exchanged and submitting appropriate payment in immediately available funds for New Equity Interests, shall be as set forth on the Ballot or in the transmittal materials accompanying the Ballot. Holders electing Option 2 will be required to tender their shares and payment for New Equity Interests no later than 20 days after entry of the Confirmation Order. Holders who do not make a proper election as of the Election Deadline, or who fail to timely tender the applicable Interests and appropriate cash payment, will be deemed to have irrevocably elected treatment under Option 1.~~

~~On the Effective Date, Reorganized MMPI will issue shares of New Equity Interests to the Holders of Interests in MMPI electing Option 2 under the Plan who otherwise comply with the requirements for such issuance. If, after the Election Deadline, it is determined that there will be more than 299 stockholders in Reorganized MMPI as a result of the treatment of this Class, then, effective upon the Effective Date, the Reverse Stock Split will occur, without further action by any of the Holders of Interests, upon filing of the appropriate Stock Split Amendment. As a result of the Reverse Stock Split, the number of authorized shares of New Equity Interests will remain unchanged, and the outstanding shares of New Equity Interests after the Reverse Stock Split will be duly authorized, validly issued, fully paid and non-assessable. No fractional shares will be issued in connection with the Reverse Stock Split. Holders of shares of New Equity Interests who otherwise would be entitled to receive fractional shares because they hold a number of shares of New Equity Interests not evenly divisible by the number selected by the Board of Directors for the reverse stock split ratio will be entitled to receive a cash payment calculated by multiplying $.08 and the number of New Equity Interest shares the Holder would otherwise be entitled to receive but~~

for the Reverse Stock Split. Holders will not be entitled to receive interest for the period of time between the effective date of the Reverse Stock Split and the date payment is received.

Richard Meruelo and John Charles Maddux have indicated their intent to elect Option 2 under the treatment for Holders of Interests in MMPI. In the event that Richard Meruelo and John Charles Maddux make such election and timely comply with the requirements for such election, Mr. Meruelo and Mr. Maddux will hold a majority of the shares in Reorganized MMPI. Further, in the event a Reverse Stock Split occurs the percentage ownership interests of any remaining shareholders, including Mr. Meruelo and Mr. Maddux, in Reorganized MMPI will increase.

F. TRANSFER RESTRICTIONS

The following transfer restrictions will be incorporated into the Amended and Restated Certificate of Incorporation and Bylaws of Reorganized MMPI and will be binding on recipients of New Equity Interests and their transferees:

(1) Prohibited Transfers:

Number of Stockholders. THE NUMBER OF STOCKHOLDERS OF THE COMMON STOCK OF THE CORPORATION SHALL NOT EXCEED BY ANY MEANS TWO HUNDRED NINETY-NINE (299). ANY PURPORTED SALE, TRANSFER, GIFT, ASSIGNMENT, DEVISE OR OTHER DISPOSITION OF SHARES OF COMMON STOCK OF THE CORPORATION THAT WOULD VIOLATE THE FOREGOING RESTRICTION OR THAT WOULD REQUIRE THE SHARES OF THE COMMON STOCK OF THE CORPORATION TO BE REGISTERED UNDER THE SECURITIES ACT OF 1934, AS AMENDED, SHALL BE VOID AB INITIO, AND THE INTENDED TRANSFEREE SHALL ACQUIRE NO RIGHTS IN SUCH SHARES.

Restrictions on Transfers. For the purposes of this section:

(a) "Prohibited Shares" means any and all shares of Common Stock purported to be held by a Prohibited Stockholder;

(b) "Prohibited Stockholder" means, with respect to any purported Prohibited Transfer, any person or entity that upon any sale, transfer, gift, assign, devise or other disposition of shares of Common Stock, would own or hold shares of Common Stock in

violation of this section or that would require the shares of Common Stock of the Corporation to be registered under the Securities Act of 1934, as amended (the "Exchange Act").

(c) "Prohibited Transfer" means any sale, transfer, gift, assign, devise or other disposition of shares of Common Stock of the Corporation by any stockholder in violation of this Section or that would require the shares of Common Stock of the Corporation to be registered under the Exchange Act.

Without limiting the effect of this section, if at any time the Board of Directors believe, or have reason to believe, that there purport to be more than 299 stockholders of shares of Common Stock of the Corporation, then the Prohibited Shares may be dealt with in accordance with the following:

Subject to the provisions of this section, the Board of Directors shall, unless any Director has reason to believe otherwise, be entitled to assume without inquiry that shares purported to be held by Prohibited Stockholders if the corporate books of the Corporation show that there are more than 299 stockholders. Upon the Board of Directors' determination of the Board of Directors that a person or entity is considered a Prohibited Stockholder or that a holder purportedly owns or holds Prohibited Shares, the Board of Directors may at any time give notice in writing to the purported holder (or to any one of the purported joint holders) of a Prohibited Share requiring such holder to make a declaration (in such form as the Board of Directors may prescribe) within such reasonable period of time as may be specified in the notice as to the date and place of the acquisition of such shares of Common Stock, and to specify, who the transferor of those shares was. If such holder fails to comply with such notice, the Board of Directors may, in its absolute discretion, treat the transfer of such shares void ab initio and the intended Prohibited Stockholder shall acquire no rights in such shares of Common Stock.

The Board of Directors may give notice in writing to the Prohibited Stockholder (or to any one of the joint holders) of any Prohibited Transfer requiring him or her within 20 days (or such extended time as in all the circumstances the Board of Directors shall

~~consider reasonable) to unwind and/or procure the nullification of the sale, transfer, gift, devise or other disposition of the Prohibited Shares. On and after the date of such notice, the Prohibited Stockholder agrees not to accept/acknowledge notice of or to attend (whether in person or by proxy), to speak and to vote at any meeting of the stockholders, whether on a show of hands or on a poll that would have attached to the share had it not appeared to the Board of Directors to be a Prohibited Stockholder. The Chairman of any such meeting shall be informed by the Board of Directors of any share becoming or being deemed to be a Prohibited Share.~~

~~If within 20 days after the giving of any notice pursuant to the preceding paragraph above for such extended time as in all the circumstances the Board of Directors shall consider reasonable) such notice is not complied with to the satisfaction of the Board of Directors, the Board of Directors may arrange for the Company to redeem those Prohibited Shares at the lesser of the proposed transfer price or their book value according to United States generally accepted accounting principles. With regard to the foregoing, the Board of Directors may take such other steps as it thinks fit to effect the redemption of the Prohibited Shares by the Corporation.~~

~~Any notice given pursuant to the preceding paragraphs may relate to more than one share and shall in any event specify the share or shares to which it relates. For the purposes of this section in the case of shares of Common Stock held by any holder in uncertificated form, the Board of Directors may, to enable the shares to be identified and dealt with in accordance with the provisions of this section, require the operator of the relevant system to convert the shares into certificated form.~~

~~The Board of Directors shall not be required to give any reasons for any decision, determination or declaration taken or made in accordance with this section.~~

~~The Board of Directors may resolve at any time to suspend the powers conferred on it by this section indefinitely or for such period as it may in its absolute discretion determine.~~

Securities Laws. In addition to the transfer restrictions set forth above, none of the shares of Common Stock of any of the stockholders may be transferred (whether by sale, gift, assignment, divestment or other disposition) unless such transfer shall be made pursuant to an effective registration statement under the Securities Act of 1933, as amended, and any applicable state securities laws, or an exemption from such registration, and prior to any transfer exempt from registration, the stockholder proposing to transfer shares shall give the Corporation notice describing the manner and circumstances of the proposed transfer (copies of which the Corporation shall furnish to each other stockholder following receipt thereof by the Corporation). The Board of Directors may require that the stockholder proposing the transfer deliver contemporaneously with such transfer an opinion of counsel addressed to the Corporation and its stockholders, in form and substance satisfactory to the Corporation that the transfer complies with all applicable federal and state securities laws.

Right of First Refusal. In addition to the provisions set forth above, no stockholder may sell, gift, assign, devise or otherwise dispose of ("Transfer"), directly or indirectly, any shares of Common Stock except in compliance with the provisions hereof.

If at any time a stockholder proposes to Transfer all or any part of his interest in the Corporation, such stockholder (the "Offeror") shall first make a written offer to sell such interest to the Corporation on the same terms and conditions on which the Offeror proposes to transfer the shares. Such offer shall state the name of the proposed transferee and all the terms and conditions of the proposed transfer, including the price to the proposed transferee, and shall be accompanied by a copy of the offer, if any, from the proposed transferee and all related information either provided by the transferee or accumulated by the Offeror.

The Corporation shall have the right for a period of 30 days after receipt of the offer from the Offeror to elect to purchase the shares offered. To exercise its right to purchase, the Corporation shall give written notice to the Offeror, which notice shall be deemed to be given on the date of mailing by certified or registered mail or, if the notice is not mailed,

~~upon personal delivery to the Offeror. Upon exercise of the rights to purchase, the purchase shall be closed and payment made within 30 days after exercise, on the same terms as applicable to the offer received by the Offeror from the proposed transferee.~~

~~If the Corporation does not elect to purchase the shares offered in accordance with the provisions of the preceding paragraph, the Offeror may Transfer all of the offered shares to the proposed transferee named in the offer. In all cases, the proposed transferee shall agree in writing to deliver an opinion of counsel addressed to the Corporation and its stockholders, in form and substance satisfactory to the Corporation, that the transfer complies with all applicable federal and state securities laws, said opinion to be delivered contemporaneously with the transfer. If the transfer is not made within 30 days after the expiration of the 30-day period a new offer shall be made to the Corporation and the provisions of this section shall again apply.~~

~~Permitted Transfers. Notwithstanding the right of first refusal provided in this section (but in all cases subject to the provisions under "Prohibited Transfers" above), a Transfer to any one or more lineal descendants (whether by blood relation or by adoption), or irrevocable trusts established for the sole benefit of such descendants (such descendants and trusts being hereinafter collectively referred to as "Permitted Transferees"), shall be permitted without first offering the interest to the Corporation. Stockholders holding in the aggregate a majority of the total voting power may adopt any one or more resolutions for the purpose of extending or modifying the types of family members which qualify as a Permitted Transferee; provided, that no such resolution shall retrospectively impair any transfer that has been effected prior to the adoption of such resolution.~~

~~(2) New Equity Legend. Each Holder who receives shares of New Equity agrees to the imprinting of a legend on any certificate or other instrument representing shares of New Equity in substantially the following form:~~

~~THE NUMBER OF STOCKHOLDERS OF SHARES OF COMMON STOCK OF THE CORPORATION SHALL NOT EXCEED BY ANY MEANS TWO HUNDRED NINETY-NINE (299), THE SALE, TRANSFER, GIFT, ASSIGNMENT, DEVISE OR OTHER DISPOSITION OF~~

SHARES OF COMMON STOCK OF THE CORPORATION BY ANY STOCKHOLDER IN VIOLATION OF THE PRECEDING SENTENCE SHALL BE NULL AND VOID. INVESTORS SHOULD REVIEW THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF MERUELO MADDUX PROPERTIES, INC. CAREFULLY WHEN CONSIDERING WHETHER TO INVEST IN THE CORPORATION.

THIS SECURITY HAS NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION OR THE SECURITIES COMMISSION OF ANY STATE IN RELIANCE UPON AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND STATE SECURITIES LAWS AND MAY NOT BE OFFERED OR SOLD EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT AND STATE SECURITIES LAWS OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS AS EVIDENCED BY A LEGAL OPINION OF COUNSEL TO THE TRANSFEROR TO SUCH EFFECT, THE SUBSTANCE OF WHICH SHALL BE REASONABLY ACCEPTABLE TO THE COMPANY.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS UPON TRANSFER AND A RIGHT OF FIRST REFUSAL OPTION IN FAVOR OF MERUELO MADDUX PROPERTIES, INC. OR ITS ASSIGNEE AS SET FORTH IN THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF MERUELO MADDUX PROPERTIES, INC., A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF MERUELO MADDUX PROPERTIES, INC.

G. Certificate of Incorporation and Bylaws; Cancellation Of LTIP Units and Related Agreements

These amounts represent the projected operating and plan payment shortfalls in those years if there are no assets sales, cost reductions, proceeds from refinancing of debt, increases in operating revenue, including through increased occupancy or rental rates or proceeds generated

from development or other activities. These are the minimum amounts required to maintain positive cash balances and make the payments required under the Plan.

The Debtors believe that, even without significant market improvement, they will be able to satisfy their payment obligations under the Plan because they have sufficient equity in all of their assets in the aggregate to monetize assets and retain substantial value for the enterprise. The Debtors have unencumbered assets which they value at $105.4 million. The value of the unencumbered assets alone almost equals the total cash needs for the entire 7 year term of the Plan. There is sufficient equity to enable the Debtors to sell assets if necessary to fully meet their financial obligations under the Plan. Moreover, the Debtors have demonstrated their ability and willingness to sell property in order to meet their obligations. As discussed at Section IV.C. above, the Debtors sold $110.6 million in property in 2008 and have closed sales of $8.1 million since the commencement of the Chapter 11 Cases. In addition, in the bankruptcy case of related debtor MM 845 S. Flower, the Company closed a sale on April 26, 2010 of a residential tower in downtown Los Angeles for the net sale price of $109.5 million. The Debtors have in the past and will continue in the future to seek strategic sales that will benefit the Company. Based on the Debtors' business plan, the fact that they have substantial equity in their properties and their business expertise, they believe that they will be able to satisfy all payment obligations under the Plan.

## E. CERTIFICATE OF INCORPORATION AND BYLAWS; CANCELLATION OF LTIP UNITS AND RELATED AGREEMENTS

### 1. Cancellation of LTIP Units and Related Agreements

Formatted: Heading 3,h3,H3, Indent: Left: 0", Widow/Orphan control, Tabs: Not at 2.17"

At the Effective Date, ~~the MMPI Existing Common Stock will be treated as provided in Section III.C.1.g of the Plan. In addition,~~ other than the MMPI Existing Common Stock, (i) the LTIP Units; all warrants, options or other rights for the purchase or other acquisition from any Debtor of any MMPI Existing Common Stock or LTIP Units; all securities convertible into or redeemable or exchangeable for any MMPI Existing Common Stock or LTIP Units; and all warrants, rights or options for the purchase or other acquisition from any Debtor of any MMPI Existing Common Stock or LTIP Units or any such warrants, options, other rights or securities, and any interest or participation in any of the foregoing and any other ownership or profit interest or

participation in MMPI or MMPLP (to the extent not held directly or indirectly by MMPI) will be cancelled and extinguished, and (ii) the obligations of, Claims against, and/or Interests in MMPI under, relating or pertaining to any agreements (including without limitation, registration rights agreements, merger, contribution and similar agreements and voting, shareholders and similar agreements), indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the MMPI Existing Common Stock and any other instrument or document evidencing or creating ownership interest in MMPI (including without limitation, provisions of the agreement of limited partnership of MMPLP and award agreements relating to the LTIP Units) will be released and discharged.

**2. Amended and Restated Certificate of Incorporation and Bylaws**

Formatted: Heading 3,h3,H3, Indent: Left: 0", Widow/Orphan control, Tabs: Not at 2.17"

On and after the Effective Date, pursuant to and by virtue of this Plan, the certificate of incorporation of the Reorganized MMPI will be amended ~~and restated in~~to prohibit the ~~form attached hereto until thereafter changed or amended as provided therein or by applicable law, and the amended and restated bylaws in the form attached hereto will be the bylaws~~issuance of ~~Reorganized MMPI until thereafter changed or amended as provided therein or by applicable law, provided that if the Reverse Stock Split is consummated, the amended and restated certificate of incorporation of Reorganized MMPI will include the Stock Split Amendment containing the split ratio determined by the Board of Directors.~~

~~H. Issuance of New Equity Interests~~

~~Upon the occurrence of the Effective Date, the timely exchange of the MMPI Existing Common Stock held by such Holders, the timely payment by the Holders of the Option 2 payment and timely compliance with the other applicable procedures, the shares of New Equity Interests shall be issued to the Holders validly electing to receive such shares in accordance with the Plan and pursuant to section 1145 of the Bankruptcy Code. Upon issuance, the New Equity Interests will then represent all of the issued and outstanding~~non-voting equity ~~interests in MMPI~~securities. Nothing herein shall prevent Reorganized MMPI from adopting a new name. ~~All of the shares of New Equity Interests issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable.~~

Formatted: Space Before: 0 pt

**F. Merger ofMERGER OF MMPLP andAND MMPI**

Upon the terms and subject to the conditions set forth in the agreement and plan of merger (the "Merger Agreement"), the form of which is attached hereto as Exhibit MK, MMPLP shall be merged with and into MMPI one day after the Effective Date if not earlier accomplished (the "Merger"). Following the Merger, the separate corporate existence of MMPLP shall cease, and MMPI shall continue as the surviving company and shall succeed to and assume all the rights and obligations of MMPLP.

If not earlier accomplished, as promptly as practicable but at least one dayon or after the Effective Date, the parties shall file with the Secretary of State of the State of Delaware a certificate of merger (the "Certificate of Merger") executed and acknowledged by the parties in accordance with the relevant provisions of the DGCL and the RULPA and, as promptly as practicable on or after the Effective Date, the parties to the Merger shall make all other filings or recordings required by the Court and under the DGCL and the RULPA. If not earlier accomplished, the Merger shall become effective one day after the Effective Date and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, or at such later date and time as MMPI and MMPLP shall agree and shall specify in the Certificate of Merger.

Once the Merger becomes effective, all the property, rights, privileges, powers and franchises of MMPLP shall vest in MMPI, and all debts, liabilities and duties of MMPLP shall become the debts, liabilities and duties of MMPI.

J. Retained Claims And Defenses And Reservation Of Rights

**G. RETAINED CLAIMS AND DEFENSES AND RESERVATION OF RIGHTS**

Formatted: Heading 3,h3,H3, Indent: Left: 0", Widow/Orphan control

**1. No Waiver and Retention of Claims and Defenses**

Unless otherwise expressly set forth in the Plan or the Confirmation Order, pursuant to Section 1123(b)(3)(B), all Retained Claims and Defenses of any kind or nature whatsoever against third parties arising before the Effective Date and belonging to the Debtor or the Estate shall become property of the Reorganized Debtor. Such Retained Claims and Defenses shall include, without limitation:

Formatted: Indent: First line: 0.5"

All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 524 and 553 of the Bankruptcy Code against any Creditor regarding the amount of such Holder's Allowed Claim (whether prepetition or postpetition), to enforce the discharge of any Secured Creditors' Claims;

All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 510, 524, 542 and 553 of the Bankruptcy Code including, without limitation, claims and defenses based on any Creditors' assertion of unreasonable professionals' fees, costs, charges and penalties (whether disguised as interest, or otherwise); and

All claims and defenses related to the recovery of professionals' fees and expenses by the Debtor or Reorganized Debtor from Creditors.

From and after the Effective Date, the Reorganized Debtor is authorized to assert the Retained Claims and Defenses including, but not limited to, for purposes of objection to the allowance of any Claim. Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any of the Debtor's rights with respect to the Retained Claims and Defenses and Reorganized Debtor shall be entitled to assert the Retained Rights and Defenses as fully as if the Chapter 11 Case had not been commenced.

### 2. Retention of Avoidance Actions

Formatted: Heading 3,h3,H3, Indent: Left: 0"

Unless otherwise expressly set forth in the Plan or the Confirmation Order, from and after the Effective Date, the Reorganized Debtor shall have the right to prosecute any and all avoidance actions, recovery causes of action and objections to Claims under Sections 105, 502, 506, 510, 542 through 551 and 553 of the Bankruptcy Code that belong to the Debtors or to the Estates, including, without limitation, all avoidance actions related to the transfers listed on Exhibit "I" attached hereto, as well as potential avoidance actions against Legendary and East West Bank relating to the withdrawals by East West Bank of $2 million from an account held at East West Bank a few days before the Debtors' bankruptcy and against Legendary, based on the post petition recording of documents purporting to re-establish a previously reconveyed Lien against assets of Debtors, and against PNL for certain involuntary, unauthorized postpetition transfers of funds belonging to MG 2001-2021 W. Mission.

With regard to actions that may be asserted by the Debtors under section 547 of the Code, the Debtors note that in order to avoid a preferential transfer a debtor must show that the recipient received more as a result of the transfer than the recipient would receive in a hypothetical Chapter 7 case. Provided that the Debtors' proposed plans are confirmed, general unsecured creditors' Allowed Claims will be paid in full. As a result, with regard to transfers made during the relevant 90-day or 1-year preference periods to general unsecured creditors, the Reorganized Debtor is unlikely to seek the avoidance of such transfers. If the plan is not confirmed, the risk that an avoidance action may be filed to recover a transfer made during the relevant period may increase. A list of all of the transfers by the Debtor during the 90-day and 1-year periods is attached as Exhibit "I."

### 3. Unknown Retained Claims and Defenses / No Preclusion

Formatted: Heading 3,h3,H3, Indent: Left: 0", Tabs: Not at 1.5"

Unless otherwise expressly set forth in the Plan or the Confirmation Order, the reservation of rights and Retained Claims and Defenses set forth above shall include, without limitation, any Retained Claims and Defenses of which the Debtor may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist including, without limitation, claims based on theories of construction defect, breach of warranty, negligence, indemnification and contribution. Therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to the Reorganized Debtor with respect to the Retained Claims and Defenses upon or after the Confirmation of the Plan based on the Plan, the Disclosure Statement or the Confirmation Order.

## H. NON-BANKRUPTCY LITIGATION

The Debtors are engaged in litigation proceedings for which relief from stay has been granted. While the Debtors do not consider any such litigation to be material, there are two eminent domain actions that may result in cash awards being paid to the respective Debtors. In 2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed an eminent domain action against Alameda Produce Market seeking to take the 1339 E. 7th Street Real

Property. Shortly thereafter, the MTA obtained an order for possession of such property and have remained in possession ever since. After lengthy proceedings, the trial court dismissed the action and ordered the MTA to return possession of the property to Alameda Produce Market. The MTA appealed the ruling and the matter is pending before the appellate court. If the trial court ruling is affirmed and not further appealed, the MTA will be required to return possession of the property to Alameda Produce Market, and Alameda Produce Market may, among other things, be entitled to damages and/or compensation as a result of the MTA's use of the property. A reversal of the trial court's ruling could result in a remand to the trial court for a hearing on the valuation of the property. In the event the MTA is permitted to proceed with the taking of the property, the MTA would be required to pay just compensation in connection with such taking.

Earlier this year MG - 2001-2021 West Mission Blvd. stipulated to relief from the automatic stay to permit the City of Pomona, acting in concert with Cal-Trans ("City") to proceed with an eminent domain action. The action seeks to take a number of small portions of property owned by MG - 2001-2021 West Mission Blvd. in connection with the 71 Expressway/Mission Boulevard Project. MG - 2001-2021 West Mission Blvd. filed its answer and cross complaint for inverse condemnation. The matter was only recently commenced and may take 18-20 months to be resolved.

In addition, in November 2007, the State of California commenced an eminent domain action against Meruelo Baldwin Park in the Los Angeles Superior Court seeking to condemn two small portions of property. The parties reached an agreement which was submitted to the Bankruptcy Court and was approved in early 2010. Generally, the agreement provides that the state will pay MBP approximately $80,000 in exchange for taking a small portion of land in fee absolute and a temporary construction easement in the other small portion. The parties are in the process of finalizing the Agreement and making the above-referenced payment.

Formatted: Normal, Line spacing: Exactly 24 pt, Don't adjust space between Latin and Asian text, Don't adjust space between Asian text and numbers

Formatted: Font: (Default) Arial, 10 pt

## I. OBJECTIONS TO CLAIMS

Except as otherwise provided in the Plan, objections to Claims, including without limitation Administrative Claims (other than objections to Administrative Claims of Professionals), shall be Filed and served upon the Holder of such Claim or Administrative Claim no later than the later of:

(a) one hundred eighty (180) days after the Effective Date, (b) one hundred eighty (180) days after a proof of Claim or request for payment of such Claim is Filed, and (c) a deadline set by the Bankruptcy Court after the extension of the one hundred eighty (180)-day deadline; such extension may be granted on an ex parte basis without notice or hearing. After the Confirmation Date, only the Reorganized Debtor will have the authority to File objections, settle, compromise, withdraw or litigate to judgment objections to Claims and Interests. From and after the Confirmation Date, Reorganized Debtor may settle or compromise any Disputed Claim or Disputed Interest without approval of the Bankruptcy Court. Nothing in this Section VII.L. shall affect the rights of Bank of America with respect to its claims and defenses asserted in connection with the *County of Los Angeles Tax Collector v. Bank of America, et al.*, pending before the United States District Court for the Central District of California, case number 2:10-cv-03536-SVW, in which Bank of America is requesting declaratory relief that, *inter alia*, it has a right to pay real property taxes assessed against Bank of America's real property collateral and that the County tax collector must accept checks handed to the County's counsel on or about April 9, 2010. Bank of America asserts that the County's Liens and tax claims have been released as to those properties. The County disagrees and opposes Bank of America's requests.

The Debtors will file objections to any claim which was scheduled as disputed, contingent or unliquidated and for which no timely proof of claim was filed. The following list is illustrative, but not exhaustive, and the Debtors expressly reserve the right to object to any claim or interest whether or not identified below.

Berkadia has filed alleged and duplicative unsecured claims for “money had and received, money lent, unjust enrichment, and interference with contract” for $1,443,668.40 (the “Berkadia Unsecured Claim”) against 53 of the 54 Debtors. Santa Fe Commerce Center is the only Debtor against whom Berkadia did not file an unsecured claim. The Debtors will be filing formal objections to the Berkadia Unsecured Claims asserted in the 53 Chapter 11 Cases as there is no basis for any of the 53 Berkadia Unsecured Claims.

The FTB filed an $800 priority unsecured tax claim against 21 of the Debtors for corporate tax fees. The Debtors believe these tax obligations were satisfied prior to the Petition Date and, if

the Debtors cannot resolve the issue consensually with the FTB, the Debtors will object to the FTB's claims.

The County of Los Angeles filed proofs of secured claims and alleged administrative claims against all of the Debtors that own real property, and one Debtor that does not, with regard to real property taxes owed. With regard to the base amount of such real property taxes, any disputes are being pursued pursuant to applicable state and local law in the form of tax assessment appeals. Pursuant to the Debtors' settlement with the County, the Debtors' rights with regard to such appeals are preserved. In the event that the Debtors' settlement with the County is not approved, the Debtors may object to portions of the County's claims on various grounds.

**1. MMPI**

**Grand Avenue Lofts Homeowners Association (POC no. 43)**: Grand Avenue Lofts Homeowners Association ("Grand Ave HOA") filed a secured claim against MMPI for $270,000 based on agreements between Grand Ave HOA's predecessor in interest and certain Property Level Debtors. MMPI was not a party to those agreements and MMPI did not pledge any assets in connection with those agreements. Therefore, if the Debtors cannot resolve the issue consensually with Grand Ave HOA, the Debtors will object to this claim.

**Aviles Security Patrol (POC no. 19)**: Aviles Security Patrol ("Aviles") filed a priority status unsecured claim for $32,530 against MMPI. ~~The Debtors believe there is no basis for the asserted priority status of this claim and, if the Debtors cannot resolve the issue consensually with Aviles, the Debtors will object to the priority of this claim and ask the Court to allow the claim only as a general unsecured claim.~~ As noted above, this claim is also one of the claims which ~~the Debtors seek to reassign~~was reassigned from MMPI to the Debtors for whom Aviles provided security services: 2640 Washington, 788 S. Alameda, Alameda Produce Market, MG 2529 Santa Fe, MG Southpark, MM 1000 E. Cesar Chavez, MM 2415 E. Washington Boulevard, MMP 760 S. Hill Street, MMPLP, Meruelo Wall Street and Santa Fe Commerce Center pursuant to the Debtors' Reassignment Motion. To the extent the Reassignment Motion results in eleven claims each for $32,500 being deemed filed against eleven Debtors, the Debtors will seek disallowance of the amounts in excess of those actually owed by each obligor-Debtor. The Debtors believe there is no

basis for the asserted priority status of this claim and, if the Debtors cannot resolve the issue consensually with Aviles, the Debtors will object to the priority of these claims and ask the Court to allow the claim only as a general unsecured claim.

**EDI (MMPI POC nos. 26, 72):** EDI filed unsecured claims against MMPI for $129,570 and $140,881. The Debtors dispute the amounts asserted by EDI.

**Guaranty Claims of CBT, Kennedy, Legendary, UCB**: Kennedy and UCB each filed a secured guaranty claim against MMPI and Legendary filed seven different secured claims against MMPI. While MMPI has guaranteed the obligations of certain Property Level Debtors, none of those guaranties is secured and the Debtors will object to the guaranty claims of any lender who asserts it holds a secured guaranty. Because MMPI's guaranty claims are unsecured, the Debtors do not believe there is any basis for the lenders to include, among other things, postpetition interest, postpetition attorney's fees or any postpetition charges in their unsecured guaranty claims. CBT, Kennedy, Legendary and UCB appear to include postpetition amounts in their guaranty claims and the Debtors will object to those amounts. To the extent any amounts claimed by lenders against the Property Level Debtors are disallowed, the Debtors will seek to disallow the same amounts from the lenders' guaranty claims against MMPI.

**CIM Urban RE Fund GP II (POC no. 60)**: CIM Urban RE Fund GP II ("CIM") filed a secured claim for an unliquidated amount against MMPI based on agreements between CIM's predecessor in interest and certain Property Level Debtors. MMPI was not a party to those agreements and MMPI did not pledge any assets in connection with those agreements. Therefore, if the Debtors cannot resolve the issue consensually with CIM, the Debtors will object to this claim.

**Geodesign (POC no. 71)**: Geodesign filed an unsecured claim for $21,715 against MMPI. The Debtors believe the claim is owed by a non-debtor affiliate, not MMPI. If the Debtors cannot resolve the issue consensually with Geodesign, the Debtors will object to this claim.

~~**Tirso Del Junco (POC no. 77):** Dr. Tirso Del Junco filed an unsecured claim for $268,260 against MMPI. There is no basis for any of the amounts claimed by Dr. Del Junco and, to the extent any obligation is owed to Dr. Del Junco, it is owed by a non-debtor affiliate and not MMPI.~~

**Shareholders' Equity Interests Filed as Claims (POC nos. 1-8, 10-12, 14)**: Various shareholders of MMPI filed proofs of claims asserting what appear to be equity interests in MMPI. The Debtors will object to the claims and seek to have them allowed as equity interests.

**Late Filed Claims:** ~~Sprint Nextel filed an unsecured claim for $210,687 on March 8, 2010.~~ RoofCorp filed an unsecured claim for $25,000 on November 4, 2009. As the Bar Date in the Chapter 11 Cases was September 24, 2009, the Debtors will object to ~~these claims~~ this claim as late-filed.

**2. MMPLP**

**US Bancorp Business Equipment Finance Group (MMPI POC no. 57):** US Bancorp Business Equipment Finance Group ("US Bancorp") filed a secured claim against MMPI for $8,682 related to an equipment lease for a copier. Pursuant to the Debtors' Reassignment Motion, the ~~Debtors believe the~~ claim ~~should be~~ is deemed filed against MMPLP. The Debtors, however, believe the claim is an unsecured claim and if the Debtors are unable to resolve the issue consensually with US Bancorp, the Debtors will object to the secured status of this claim.

**3. MM Management**

**American Home Assurance (POC no. 3):** American Home Assurance Company and various other insurance companies filed a single unsecured claim for an unknown amount against MM Management. The Debtors do not believe that any amount is owing to these companies by any of the Debtors and will object to this claim.

**4. MG – Overland Terminal**

**Mayer Hoffman McCann P.C. / CBIZ MHM, LLC (POC nos. 1 & 2):** Mayer Hoffman McCann P.C. and CBIZ MHM, LLC (now Argo Partners) each filed unsecured proofs of claim for $42,228 which appear to be duplicate claims for a single debt. The Debtors believe only one, but not both, of the claims should be allowed. If the Debtors are unable to resolve the issue consensually with the two creditors, the Debtors will object to one of these claims as duplicative of the other claim.

**Late Filed Claims**: Capital One Bank filed an unsecured claim for $1,308 against MG Overland Terminal on December 10, 2009. The claim also appears to have been intended to be

filed against an unrelated debtor in an unrelated case. The Los Angeles Department of Water and Power ("DWP") filed an unsecured claim for $9,646 on January 15, 2010. As the Bar Date in the Chapter 11 Cases was September 24, 2009, the Debtors will object to these claims as late-filed and will object to the Capital One Bank claim as not being an obligation of any of the MMPI Debtors.

**5. National Cold Storage**

**SYM PAC International (POC no. 10):** SYM PAC International, Inc. filed an unsecured claim for $150,994 against National Cold Storage on November 9, 2009 for alleged damages related to the cold storage of swordfish. The debtors will object as there is no merit to this claim and as it was not timely filed.

**6. MMP 306 – 330 N. Avenue 21**

**City of Los Angeles (POC no. 8):** The City of Los Angeles filed a priority unsecured tax claim for $151,232 for business taxes. The Debtors believe that the entire amount claimed is not entitled to priority as a portion of the taxes claimed were assessed more than one year before the Petition Date. If the Debtors are unable to resolve the issue consensually with the City of Los Angeles, the Debtors will object to the priority status asserted for the entirety of the claim and they will also object to the amount of the claim.

**Lexis Nexis:** Lexis Nexis filed two unsecured proofs of claims for $1,548 and $801 on March 11, 2010 and November 2, 2009 respectively and the Debtors will also object to these untimely claims.

**7. MMP 1060 N. Vignes**

**State Board of Equalization (MMPI POC no. 82):** The SBE filed a priority unsecured tax claim for $61,915 related to a hazardous substance tax. The claim relates to stockpiled soil on, and contaminated earth affecting, unimproved real property commonly described as 1060 N. Vignes St., Los Angeles, California owned by MMP – 1060 N. Vignes, LLC. Pursuant to the Debtors' Reassignment Motion, the ~~Debtors believe the~~ claim ~~should be~~ is deemed filed against MMP 1060 N. Vignes. The Debtors ~~also~~ dispute that this claim is entitled to priority status as a tax claim or otherwise. If the Debtors are unable to resolve the issue consensually with the SBE, the Debtors will object to the priority status of this claim.

**8. MMP 12385 San Fernando Road**

**American Home Assurance (POC no. 4):** American Home Assurance Company and various other insurance companies filed a single unsecured claim for an unknown amount against MMP 12385 San Fernando Road. The Debtors do not believe that any amount is owing to these companies by any of the Debtors and will object to this claim.

**9. MG 1211 E. Washington Boulevard**

**Blake Sign Co. (POC no. 5):** Blake Sign Company ("Blake") filed an unsecured claim for $1,948 and asserted priority status for $148 of this amount. The Debtors believe there is no basis for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue consensually with Blake, the Debtors will object to the $148 priority portion of this claim and ask the Court to allow the claim only as a general unsecured claim for $1,948.

**10. MG – Ceres Street Produce**

**Blake Sign Co. (POC no. 2):** Blake Sign Company ("Blake") filed an unsecured claim for $1,407 and asserted priority status for $107 of this amount. The Debtors believe there is no basis for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue consensually with Blake, the Debtors will object to the $107 priority portion of this claim and ask the Court to allow the claim only as a general unsecured claim for $1,407.

**11. MM 3rd & Omar Street**

**Legendary (POC no. 4):** The Debtors will object to the amount of Legendary's proof of claim against MM 3rd & Omar, as well as the associated guaranty claims asserted against MMPI and MMPLP, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

**12. MM 336 W. 11th Street**

**Legendary**: Although Legendary did not file a proof of claim against MM 336 W. 11th Street, this Debtor pledged its real property in favor of Legendary to secure the obligations of MG 620 Gladys. MM 336 W. 11th Street will be a co-movant with respect to any objections to the Legendary claim filed by MG 620 Gladys.

**CIM Urban RE Fund GP II (POC no. 6) and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (POC no. 5)**: CIM Urban RE Fund GP II ("CIM") and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP each filed a secured claim for an unliquidated amount against MM 336 W. 11th Street based on agreements entered into by MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors will object to this claim.

**Grand Avenue Lofts Homeowners Association (POC no. 43)**: Grand Avenue Lofts Homeowners Association ("Grand Ave HOA") filed a secured claim against MMPI for $270,000 based on agreements between Grand Ave HOA's predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors will object to this claim.

### 13. MM 420 Boyd

**Legendary (POC no. 6):** The Debtors will object to the amount of Legendary's proof of claim against MM 420 Boyd, as well as the associated guaranty claims asserted against MMPI and MMPLP, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

### 14. MMP 760 S. Hill Street

**BofA**: The Debtors will object to the amount of BofA's proof of claim against MMP 760 S. Hill Street, as well as the associated guaranty claim asserted against MMPI, to the extent BofA seeks amounts which are not allowable under state law, bankruptcy law or both.

**Asha Abdella (MMPI POC no. 18):** Asha Abdella filed an unsecured claim for $250,000 against MMPI asserting damages for alleged discrimination in housing and employment. Pursuant to the Debtors' Reassignment Motion, the ~~Debtors believe the~~ claim ~~should be~~ is deemed filed against MMP 760 S. Hill Street and MM Management. The Debtors also believe there is no basis for Ms. Abdella's claim and will file an objection to the claim.

**Fast Taco #3 (MMPI POC no. 32):** Fast Taco #3 filed an unsecured claim for $300,000 against MMPI asserting damages for an alleged breach of a lease termination agreement. Pursuant to the Debtors' Reassignment Motion, the Debtors believe the claim ~~should be~~is deemed filed against MMP 760 S. Hill Street and MG Southpark. The Debtors will object to this claim.

**Otis Elevator (MMPI POC no. 24):** Otis Elevator ("Otis") filed an unsecured claim for $16,611 for repair services related to an elevator in the Union Lofts. ~~Pursuant to the Debtors' Reassignment Motion, the Debtors believe the claim should be deemed filed against MMP 760 S. Hill Street.~~ The Debtors ~~also~~ believe that any sums owed to Otis were paid in full prior to the Petition Date. If the Debtors cannot resolve the issue consensually with Otis, they will object to this claim.

**The Union Restaurant & Lounge (POC no. 3):** The Union Restaurant & Lounge ("Union Restaurant") filed an unsecured claim against MMP 760 S. Hill Street for damages in the amount of $247,606 based on alleged breach of lease and defamation. The Debtors believe there is no basis for Union Restaurant's claim and will file an objection to the claim.

### 15. 788 S. Alameda

**CBT:** The Debtors will object to the amount of CBT's proof of claim against 788 S. Alameda, as well as the associated guaranty claim asserted against MMPI, to the extent CBT seeks amounts which are not allowable under state law, bankruptcy law or both.

**Hugo Rodriguez, Natividad Gonzales, Jose Barreto, Roman Rodriguez (POC nos. 2-4, 6):** Hugo Rodriguez, Natividad Gonzales, Jose Barreto and Roman Rodriguez (collectively, the "Rodriguez Plaintiffs") filed unsecured claims against 788 S. Alameda for $251,084, $233,554, $233,554 and $238386, respectively, for damages based on alleged wage and hour violations. Each of the Rodriguez Plaintiffs asserts priority status for their claims. The Debtors do not believe there is any basis for the claims asserted by the Rodriguez Plaintiffs and further do not believe there is a basis for priority status for any of the amounts asserted and will file objections to these claims. The Debtor anticipates that liquidation of the alleged claims will take place in the Superior Court.

### 16. Alameda Produce Market

**Hugo Rodriguez, Natividad Gonzales, Jose Barreto, Roman Rodriguez (POC nos. 8-10,12):** The Rodriguez Plaintiffs filed unsecured claims against Alameda Produce Market for $251,084, $233,554, $233,554 and $238,386, respectively, for damages based on alleged wage and hour violations. Each of the Rodriguez Plaintiffs asserts priority status for their claims. The Debtors do not believe there is any basis for the claims asserted by the Rodriguez Plaintiffs and

further do not believe there is a basis for priority status for any of the amounts asserted and will file objections to these claims.

**County of Los Angeles, Metropolitan Transportation Authority (POC no. 14):** The County of Los Angles Metropolitan Transportation Authority ("MTA") filed an unsecured claim against Alameda Produce Market for $8,500,000 related to the pending eminent domain litigation between Alameda Produce Market and MTA. The Debtors believe that they are owed damages in an amount in excess of $8.5 million.

**17. MG 1500 Griffith Avenue**

**Legendary (POC no. 3):** The Debtors will object to the amount of Legendary's proof of claim against MG 1500 Griffith and MG 4th Street Center, as well as the associated guaranty claim asserted against MMPI, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

**18. MMP 2131 Humboldt Street**

**Chamlian (POC no. 3):** The Debtors will object to the amount of the Chamlians' proof of claim against MMP 2131 Humboldt Street to the extent they seek amounts which are not allowable under state law, bankruptcy law or both.

**Blake Sign Co. (POC no. 5):** Blake Sign Company ("Blake") filed an unsecured claim for $975 and asserted priority status for $80 of this amount. The Debtors believe there is no basis for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue consensually with Blake, the Debtors will object to the $80 priority portion of this claim and ask the Court to allow the claim only as a general unsecured claim for $975.

**19. 2640 Washington Blvd.**

**UCB (POC no. 5):** The Debtors will object to the amount of UCB's proof of claim against 2640 Washington Blvd as well as the associated guaranty claims asserted against MMPI, to the extent it seeks amounts which are not allowable under state law, bankruptcy law or both.

**20. MG 3185 E. Washington Boulevard**

**Chinatrust (POC no. 3):** The Debtors will object to the amount of Chinatrust's proof of claim against MG 3185 E. Washington Boulevard to the extent it seeks amounts which are not allowable under state law, bankruptcy law or both.

**21. MG 4th Street Center**

**Legendary (POC no. 11):** The Debtors will object to the amount of Legendary's proof of claim against MG 4th Street Center and against MG 1500 Griffith, as well as the associated guaranty claims asserted against MMPI, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

**22. MG 425 W. 11th Street**

**Legendary (POC no. 5):** The Debtors will object to the amount of Legendary's proof of claim against MG 425 W. 11th Street, as well as the associated guaranty claim asserted against MMPI, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

**Blake Sign Co. (POC no. 2):** Blake Sign Company ("Blake") filed an unsecured claim for $1,300 and asserted priority status for $107 of this amount. The Debtors believe there is no basis for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue consensually with Blake, the Debtors will object to the $107 priority portion of this claim and ask the Court to allow the claim only as a general unsecured claim for $1300.

**23. MG 620 Gladys Avenue**

**Legendary (POC no. 5):** The Debtors will object to the amount of Legendary's proof of claim against MG 620 Gladys Avenue and against MM 336 W. 11th Street, as well as the associated guaranty claims asserted against MMPI and MMPLP, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

**24. MG 2001-2021 W. Mission Boulevard**

**PNL:** Although PNL failed to file a proof of claim against MG 2001-2021 W. Mission Boulevard, the Debtors will object to the amounts in any claim PNL asserts to the extent PNL seeks amounts which are not allowable under state law, bankruptcy law or both.

**25. MG Little J**

**Legendary**: Although Legendary did not file a proof of claim against MG Little J, this Debtor pledged its real property in favor of Legendary to secure some of the obligations of Merco Group. MG Little J will be a co-movant with respect to any objections to the Legendary claim filed by Merco Group.

**CIM Urban RE Fund GP II (POC no. 6) and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (POC no. 4)**: CIM and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP each filed a secured claim for an unliquidated amount against MG Little J based on agreements entered into by MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors dispute that any of these creditors hold a claim secured by any of the assets of Little J. The Debtors will object to this claim.

**Grand Avenue Lofts Homeowners Association (POC no. 3)**: Grand Ave HOA filed a secured claim against MG Little J for $270,000 based on agreements between Grand Ave HOA's predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors dispute that Grand Ave HOA's claim is secured by any of the assets of Little J. The Debtors will object to this claim.

**26. MG Southpark**

**BofA (POC no. 8)**: The Debtors will object to the amount of BofA's proof of claim against MG Southpark, as well as the associated guaranty claim asserted against MMPI, to the extent BofA seeks amounts which are not allowable under state law, bankruptcy law or both.

**CIM Urban RE Fund GP II (POC no. 13) and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (POC no. 7)**: CIM and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP each filed a secured claim for an unliquidated amount against MG Southpark based on agreements entered into by MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors dispute that any of these creditors hold a claim secured by any of the assets of MG Southpark. The Debtors will object to this claim.

**Grand Avenue Lofts Homeowners Association (POC no. 6)**: Grand Ave HOA filed a secured claim against MG Southpark for $270,000 based on agreements between Grand Ave

HOA's predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark. The Debtors dispute that Grand Ave HOA's claim is secured by any of the assets of MG Southpark. The Debtors will object to this claim.

**EDI Architecture (POC no. 9; MMPI POC no. 26):** EDI Architecture ("EDI") filed unsecured claim for $567,524 against MG Southpark. The Debtors dispute the amounts asserted by EDI.

**27. Merco Group**

**Legendary (POC no. 5)**: The Debtors will object to the amount of Legendary's proof of claim against Merco Group, as well as the associated guaranty claims asserted against MMPI and MMPLP, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both. In addition, the Debtors may object to Legendary's asserted secured status with respect to the Sky-Arc Real Property as Legendary's predecessor in interest recorded a full reconveyance of its deed of trust on the Sky-Arc Real Property in 2007.

**American Home Assurance (POC no. 6):** American Home Assurance Company and various other insurance companies filed a single unsecured claim for an unknown amount against Merco Group. The Debtors do not believe that any amount is owing to these companies by any of the Debtors and will object to this claim.

~~**EDI (MMPI POC nos. 26, 72):** EDI filed unsecured claims against MMPI for $129,570 and $140,881. Pursuant to the Debtors' Reassignment Motion, the Debtors believe the claim should be deemed filed against Merco Group. The Debtors dispute the amounts asserted by EDI.~~

**28. Meruelo Farms**

**Woodland Farms (POC no. 9):** Woodland Farms filed an unsecured claim against Meruelo Farms for $1,991,537 and asserts administrative priority for $1,412,913 based on alleged damages and an alleged breach of a prepetition lease with Meruelo Farms. The Debtors dispute the amount claimed by Woodland Farms and also dispute that any sums which may be owing to Woodland Farms are entitled to administrative priority. The Debtors will object to this claim.

**29. Meruelo Wall Street**

**UCB:** The Debtors will object to the amount of UCB's proof of claim against Meruelo Wall Street to the extent UCB seeks amounts which are not allowable under state law, bankruptcy law or both.

**30. MM Mission Boulevard**

**Kennedy**: The Debtors will object to the amount of Kennedy's proof of claim against MM Mission Boulevard to the extent Kennedy seeks amounts which are not allowable under state law, bankruptcy law or both.

**31. Santa Fe Commerce Center**

**Berkadia**: The Debtors will object to the amount of Berkadia's proof of claim against Santa Fe Commerce Center to the extent Berkadia seeks amounts which are not allowable under state law, bankruptcy law or both.

## J. DISBURSING AGENT

The Chief Accounting Officer of MMPI (currently Fred Skaggs) shall act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond, and shall receive no additional compensation for his duties as Disbursing Agent.

## K. DISCHARGE OF THE DEBTORS AND INJUNCTION

### 1. Discharge

Except as otherwise provided in the Plan, the Confirmation Order or Section 1141(d)(6) of the Bankruptcy Code: (i) on the Effective Date, each Debtor shall be deemed discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Confirmation Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is allowed pursuant to Section 502 of the Bankruptcy Code or (C) the Holder of a Claim or Interest based on such debt or Interest has

accepted the Plan; and (ii) all Persons shall be precluded from asserting against each Reorganized Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date. Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Debtor, as provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Debtor at any time obtained to the extent that it relates to a Claim discharged.

**2. Injunction**

All Persons that have held, currently hold or may hold a Claim or other debt or liability or an Interest or other right of an equity security Holder, are permanently enjoined from taking any of the following actions on account of any such Claims, debts or liabilities or terminated Interests or rights discharged pursuant to Section ~~I~~K.1. immediately above: (a) commencing or continuing in any manner any action or other proceeding against any of the Debtors and the Creditors' Committee, and professional persons retained by the Debtors, the Creditors' Committee, and each of their respective affiliates, current or former officers, directors, agents, employees and representatives; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against any of the Debtors, the Creditors' Committee and professional persons retained by any of the Debtors and Creditors' Committee and each of their respective affiliates, current or former officer, directors, agents, employees and representatives; (c) creating, perfecting or enforcing any lien or encumbrance against any of the Debtors, the Creditors' Committee, and professional persons retained by any of the Debtors and the Creditors' Committee and each of their respective affiliates, current or former officers, directors, agents, employees and representatives; (d) asserting a setoff, right of subrogation or recoupment of any kind against any obligation due to any of the Debtors, the Creditors' Committee and professional persons retained by any of the Debtors and the Creditors' Committee and each of their respective affiliates, current or former officers, directors, agents, employees and representatives; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with

the provisions of the Plan; provided however, the injunction provided herein does not apply to and shall not enjoin or otherwise prevent action against the Debtors' current or former officers, directors, or employees that is not a Discharged Claim under Section IK.1. immediately above.

Any Person injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages, from the willful violator.

O. TEMPORARY ENFORCEMENT INJUNCTION

***MMPI, MMPLP, John Maddux, Belinda Meruelo, The Meruelo Living Trust, Richard Meruelo, and the Richard Meruelo Living Trust (collectively, the "Guarantors") have guarantied certain obligations of some of the Debtors, which obligations are afforded treatment under either this Plan (in the case of obligations of the Debtors). In addition, MG Little J pledged the 1119 S. Olive Street Real Property as additional collateral to secure certain obligations of Merco Group to Legendary which are afforded treatment under this Plan and MM 336 W. 11th Street pledged the 336 W. 11th Street Real Property as additional collateral to secure certain obligations of MG 620 Gladys to Legendary which are afforded treatment under this Plan (collectively, MMP Ventures, MG Little J and MM 336 W. 11th Street, the "Pledgors").***

***The Confirmation Order shall act as a temporary injunction (the "Temporary Enforcement Injunction") to stay and restrain the taking of any of the following actions against the Guarantors and the Pledgors in their capacity as guarantors or pledgors, or against property in which the Guarantors or Pledgors hold an interest, on account of any judgments, claims or causes of action that arise out of relate to Claims against the Debtors or the Debtors' Estates and which judgments, claims or causes of action if asserted or enforced against the Guarantors or Pledgors may give rise to a claim of indemnity or contribution against the Debtor-obligor (an "Enjoined Claim"):***

***(a) commencing or continuing in any manner any such Enjoined Claim against the Guarantors or Pledgors;***

***(b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree, or order on account of an Enjoined Claim; and/or***

~~(c) creating, perfecting or enforcing any lien or encumbrance on account of an Enjoined Claim.~~

~~With respect to an Enjoined Claim related to an obligation afforded treatment under this Plan, the Temporary Enforcement Injunction shall continue in effect until the earliest of the following:~~

~~(a) all of the payments required to be made under this Plan have been paid, and all Allowed Claims have been fully satisfied pursuant to the terms of this Plan, at which time the Temporary Enforcement Injunction shall be terminated;~~

~~(b) the Chapter 11 Cases are dismissed or converted to cases under Chapter 7; or~~

~~(c) the entry of an order by the Court terminating the Enforcement Injunction on account of the Debtor-obligor having defaulted under this Plan, and having failed to cure such default within fifteen (15) Business Days from the date of default.~~

**L. NO LIABILITY FOR SOLICITATION OR PARTICIPATION**

As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer, issuance, sale, or purchase of securities.

**M. LIMITATION OF LIABILITY**

Neither (a) any Reorganized Debtor or any of their respective postpetition employees, officers, directors, agents, representatives, affiliates, attorneys or any other professional persons employed by any of them, nor (b) the Creditors' Committee or any of their respective postpetition members, agents, employees, directors, officers representatives, attorneys or other professional advisors, in each case, shall have any responsibility, or have or incur any liability, to any Person whatsoever, under any theory of liability (except for any Claim based upon willful misconduct or gross negligence), for any act taken or omission made in good faith directly related to formulating, implementing, confirming, or consummating the Plan, the Disclosure Statement, or any contract,

instrument, release, or other agreement or document created in connection with the Plan, provided that nothing in this paragraph shall limit the liability of any Person for breach of any express obligation it has under the terms of this Plan or under any post-petition agreement or other post-petition document entered into by such Person or in accordance with the terms of this Plan or for any breach of a duty of care owed to any other Person occurring after the Effective Date.

### N. CERTIFICATE OF INCORPORATION AND CERTIFICATES OF ORGANIZATION

On the Effective Date, the Reorganized Debtor, or each of them if there is more than one, shall adopt amended certificates pursuant to applicable non-bankruptcy law and Section 1123(a)(5)(I) of the Bankruptcy Code. Each amended certificate will, among other provisions prohibit the issuance of nonvoting equity securities to the extent required by Section 1123(a)(6) of the Bankruptcy Code and will become effective upon the occurrence of the Effective Date, and shall include such other provisions as determined by the Reorganized Debtors including the elimination of single purpose entity provisions.

### O. OTHER DOCUMENTS AND ACTIONS

The Debtors and the Reorganized Debtor may, and shall, execute such documents and take such other actions as are necessary to effectuate the transactions provided for in the Plan.

### P. CORPORATE ACTION

The adoption of the amended certificates of incorporation, certificates of organization, or certificate of limited partnership, as the case may be, and all other matters under the Plan involving the corporate structure of the Reorganized Debtor, shall be deemed to have occurred and be effective on and after the Effective Date without any requirement of further action by the stockholders, directors, managers, members, or limited partners, as the case may be, of each Debtor. Without limiting the foregoing, upon entry of the Confirmation Order by the Clerk, the filing by any of the Reorganized Debtor of the amended certificates shall be authorized and approved in all respects, including amendments to eliminate any special purpose entity provisions. On the Effective Date or as soon thereafter as is practicable, pursuant to applicable law, the bylaws,

operating agreements, or partnership agreement, as the case may be, of each Debtor shall be the bylaws, operating agreements or partnership agreement of such Reorganized Debtor.

**Q. RETIREE BENEFITS**

The Debtors do not have any present obligations to pay retiree benefits within the meaning of Section 1129(a)(13).

**R. THE CREDITORS' COMMITTEE AND THE EQUITY HOLDERS' COMMITTEE**

The Creditors' Committee and the Equity Committee shall be dissolved ~~180~~60 days after the Effective Date and the members of each such committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases. The professionals retained by each such committee and the members thereof shall not be entitled to compensation or reimbursement of expenses incurred for services rendered after the Effective Date (except with regard to seeking allowance of fees incurred prior to the Effective Date).

~~VIII.~~

**VIII.**

**MANAGEMENT OF REORGANIZED DEBTORS**

Formatted: Left

**A. BOARD OF DIRECTORS AND MANAGEMENT OF THE REORGANIZED DEBTORS**

**1. Board of Directors**

The initial members of the Board of Directors of the Reorganized Debtor shall consist of Directors serving immediately prior to the Effective Date, subject to modification prior to the Confirmation Hearing. These members are: Richard Meruelo, John Charles Maddux, Lynn Beckemeyer, John B. Hansen, Philip S. Payne, Richard Garcia Polanco, and Anthony A. Williams. Each of the members of such initial Board of Directors shall serve in accordance with the Reorganized Debtor Certificate of Incorporation and Bylaws, as the same may be amended from time to time. If the Reorganized Debtor decides to become a limited liability company, there will be no board of directors.

### 2. Officers & Biographies

Richard Meruelo (Chief Executive Officer), John Charles Maddux (President and Chief Operating Officer), Lynn Beckemeyer (Executive Vice President for Development), Fred Skaggs (Chief Accounting Officer), Andrew Murray (Chief Financial Officer), Todd Nielsen (General Counsel and Corporate Secretary) and Miguel E~~nrique~~. Echemendia (Chief Administrative Officer) will continue in their current capacities as officers of the Reorganized Debtors.

#### a. Richard Meruelo

**Formatted:** Font: Not Italic

Mr. Meruelo serves as the Company's Chief Executive Officer and Chairman of MMPI's Board of Directors. Mr. Meruelo has served as chairman of the Company's predecessor business since 1987. During that time, Mr. Meruelo led the strategic planning for the business while managing project acquisitions, purchase negotiations and related financings totaling nearly $1.2 billion. In addition, Mr. Meruelo was responsible for maintaining the predecessor business' relationships with CalPERS and local and state governmental bodies that had land-use jurisdiction over the contributed projects. Mr. Meruelo earned his degree in business administration from the University of Southern California, with an emphasis in finance and real estate. Mr. Meruelo currently serves as a board member for the Central City East Association and the Los Angeles Central Industrial Redevelopment Project.

#### b. John Charles Maddux

**Formatted:** Font: Not Italic

Mr. Maddux serves as the Company's President and Chief Operating Officer and as a member of MMPI's Board of Directors. Mr. Maddux has served as president of the Company's predecessor business since 2005. Before joining the predecessor business, Mr. Maddux served as a founder and shareholder of the law firm of Nevers, Palazzo, Maddux & Packard, PLC from 1998 to 2005, and practiced law with the firm of O'Melveny & Myers, LLP from 1986 to 1996, where he was a member of the real estate practice group. While at each firm, Mr. Maddux served as the Company's predecessor's outside legal counsel. Mr. Maddux earned his bachelor's degree in business management—finance from Brigham Young University's Marriott School of Management and his J.D. from Brigham Young University's J. Reuben Clark Law School. His affiliations include the Urban Land Institute, the Building Industry Association, the International

Conference of Shopping Centers, the Los Angeles County Bar Association and the California Bar Association, Real Property Section.

**c. Andrew Murray**

Formatted: Font: Not Italic

Andrew Murray serves as the Company's Chief Financial Officer. He oversees the Company's financial reporting, capital markets activities and investor relations. Mr. Murray joined the Company on May 23, 2008. Before joining the Company, Mr. Murray had twenty years of experience in financial institutions and real estate investment banking with such firms as Salomon Brothers, Ryan Beck & Co., Sutro & Co., and Friedman, Billings, Ramsey, which is now FBR Capital Markets. Mr. Murray graduated from the Wharton School of Business in 1989.

**d. Lynn Beckemeyer**

Formatted: Font: Not Italic

Mr. Beckemeyer serves as the Company’s Executive Vice President for Development and as a member of the Company’s Board of Directors. He oversees work relating to planning, design, architecture and entitlement work as well as construction activity. Mr. Beckemeyer has served as the senior vice president of development and construction of the Company’s predecessor business since April 2006. Before joining the predecessor business, Mr. Beckemeyer served in various real estate development and management positions with The Walt Disney Company for seven years before becoming vice president of worldwide corporate operations and real estate for Walt Disney from 2001 to 2006. Prior to that, Mr. Beckemeyer managed the development, design and construction of urban projects in the Washington, DC metropolitan area and Dallas, Texas, from 1983 to 1994, with 21 International and The Limited, Inc. Mr. Beckemeyer serves as a director of Avalon Entertainment, a private company. A registered architect, Mr. Beckemeyer earned a degree in architecture and construction science at Kansas State University and studied real estate development at Harvard University Graduate School of Design. Mr. Beckemeyer’s professional affiliations include the American Institute of Architects, the National Council of Architectural Registration Boards, the National Association of Home Builders and the Urban Land Institute.

**e. Fred Skaggs**

Formatted: Font: Not Italic

Mr. Skaggs serves as the Company’s Chief Accounting Officer. He is responsible for all accounting activities. Mr. Skaggs joined the Company’s predecessor business as treasurer in

September 2005. Before joining the predecessor business, he served as chief financial officer for Bright Development, a private residential and multifamily developer, where he guided the company's financial and operational performance from 2004 to 2005. Prior to that, Mr. Skaggs served as the chief financial officer and controller for Shuwa Investments Corporation, a commercial real estate company with $3.2 billion in assets, from 1987 to 2004. Mr. Skaggs also served as senior internal auditor and chief corporate accountant for the Masco Corporation from 1981 to 1987 and with Price Waterhouse from 1979 to 1981. A certified licensed public accountant, Mr. Skaggs earned his degree in accounting from Brigham Young University's Marriott School of Management with minors in English and Spanish.

**f. Miguel E. Echemendia**

Formatted: Font: Not Italic

Formatted: Font: Not Italic

Mr. Echemendia serves as the company's Chief Administrative Officer. He is responsible for all property management, leasing activities, property specific financing and other general administrative functions. Mr. Echemendia served as chief operating officer of the predecessor business since July 2000, and has been responsible for strategic planning, acquisitions, finance and management.

**g. Todd Nielsen**

Formatted: Font: Not Italic

Mr. Nielsen serves as the Company's General Counsel and Corporate Secretary. He is responsible for all legal issues relating to compliance with SEC regulations, as well as overseeing real estate transactions and other legal matters. Mr. Nielsen has served as the general counsel of the Company's predecessor business since March 2005. Before joining the predecessor business, Mr. Nielsen served as the predecessor's outside legal counsel with the law firm of Nevers, Palazzo, Maddux & Packard. Prior to that, Mr. Nielsen practiced law privately including with Brobeck, Phleger & Harrison. Mr. Nielsen's private practice experience included representation of developers, investors, corporate users and lenders in connection with the acquisition, financing, development, construction, sale and leasing of retail, office, industrial, hotel, and residential projects. Mr. Nielsen graduated magna cum laude in 1995 from Brigham Young University's J. Reuben Clark Law School, and thereafter served as a law clerk to the Hon. Howard M. Kirshbaum of the Colorado Supreme Court.

## B. COMPENSATION OF MMPI EXECUTIVE OFFICERS

The following table sets forth the compensation paid by MMPI to each of their current executive officers, for services rendered in their respective capacities in 2009. The executive officers' salaries remained the same in 2010 and will be the same as of the Effective Date.

| Name | Capacity in Which Served | Compensation |
|---|---|---|
| Richard Meruelo | Chief Executive Officer | $470,350 |
| John Maddux | President and Chief Operating Officer | $472,880 |
| Todd Nielsen | General Counsel and Corporate Secretary | $278,483 |
| Miguel E. Echemendia | Chief Administrative Officer | $278,483 |
| Fred Skaggs | Chief Accounting Officer | $278,115 |
| Lynn Beckemeyer | Executive Vice President for Development | $278,279 |
| Andrew Murray | Chief Financial Officer | $279,630 |

Formatted Table

John Maddux and Richard Meruelo will continue to receive their car allowances. The officers will receive reimbursement of expenses pursuant to customary company procedures. Historically, in 2007 and 2008, the Debtors' officers have received cash bonuses. For 2007 and 2008 the Debtors' officers received cash bonuses pursuant to the terms of their employment agreements as follows:

| Name | Annual Bonus Amount |
|---|---|
| Richard Meruelo | $225,000 |
| John Charles Maddux | $225,000 |

**Formatted:** Font: Bold, Underline

**Formatted:** Centered

Formatted Table

| Name | Annual Bonus Amount |
|---|---|
| Todd Nielsen | $68,750 |
| Andrew Murray | $68,750[11] |
| Miguel Enrique Echemendea. Echemendia | $68,750 |
| Fred Skaggs | $68,750 |
| Lynn Beckemeyer | $68,750 |

The Debtors did not pay bonuses to the officers in 2009. The Debtors may pay bonuses to the officers during the Plan term as determined by the Board of Directors, in its discretion. In addition, pursuant to Employment Agreements between the Company and each of Richard Meruelo, John Maddux and Andrew Murray, Richard Meruelo and John Maddux are entitled to receive annual bonuses in a minimum amount equal to 50% of their base compensation and Andrew Murray is entitled to receive a bonus in a minimum amount equal to 25% of his base compensation. Such bonuses are payable on December 31 of each year of their term of employment. Upon assumption of the Employment Agreements, the Debtors will be required to pay the Bonuses due on December 31, 2009, totaling $518,750.

IX.

IX.

## CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

### A. SOLICITATION OF VOTES

In accordance with Sections 1126 and 1129 of the Bankruptcy Code, the following Classes of Claims are impaired, and the Holders of Allowed Claims in each of these Classes are entitled to vote to accept or reject the Plan of this Debtor or Debtors against whom they have a claim:

[11] 2008 only

Formatted: Font: Bold, Underline

Formatted: Centered

Formatted Table

Formatted: Line spacing: Exactly 8 pt

Formatted: Left

- Classes 10A, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1, 28A-1, 38A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of Secured Tax Claims against the Debtors);

- Classes 21A-2, 28A-2, 29A-2, 29A-3, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 37A-2, 37A-3, 37A-4, 38A-2, 39A-2, 40A-2, 41A-2, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors);

- Classes 1B, 5B, 32B, 33B, and 36B (consisting of the Priority Unsecured Benefits Claims of present and former employees); and

- Classes 1C-2A, 1C-2B, 1C-3, 2C-3, 3C, 4C-2, 5C-2, 6C, 7C, 8C-2, 9C-2, 10C-2, 11C-3, 12C-3, 13C-2, 14C-3, 15C-2, 16C-2, 17C, 18C-2, 19C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3, 27C-3, 28C-3, 29C-2, 30C-3, 31C-2, 32C, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3, 40C-3, 41C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3, 53C, and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor); and

- Class 1E, consisting of the Class of Interests of MMPI.

Formatted: Indent: Left: 0", First line: 0.5"

The Plan provides for the merger of MMPLP into MMPI. The interests of the holders of LTIP units in Class 2E will be cancelled and extinguished at the Effective Date and the remaining interests will be extinguished as a result of the merger of MMPLP and MMPI. As a result Class 2E is deemed to reject the Plan and is not entitled to vote on the Plan.

The following Classes of the Plan are unimpaired. As a result, Holders of Claims and Interests in those Classes are conclusively presumed to have accepted the Plan and the solicitation of acceptances with respect to such Classes is not required under Section 1126(f) of the Bankruptcy Code:

- Classes 11C-1, 12C-1, 14C-1, 15C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1, 32C-1, 33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 43C-3, 44C-3, 46C-1, 48C-3,

49C-3, 52C-1 and 54C-1 consisting of the unsecured Claims for security deposits of the Debtors' tenants);

- Classes 1E and 3E through 54E (consisting of the Interests of the Debtors other than MMPI and MMPLP).

As to the Classes of Claims entitled to vote on a Plan, the Bankruptcy Code defines acceptance of a Plan by a Class of creditors as acceptance by Holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of that Class that have timely voted to accept or reject a Plan. A Class of Interests has accepted the Plan if Holders of such Interests holding at least two-thirds in amount actually voting have voted to accept the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any creditor in an impaired Class: (i) whose Claim has been listed by the Debtors in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who filed a proof of Claim on or before the Bar Date or any proof of Claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court, which Claim is not the subject of an objection or request for estimation, is entitled to vote on the Plan.

**B. THE CONFIRMATION HEARING**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. The Confirmation Hearing in respect of the Plan has been scheduled for ~~[_______]~~November 29, 2010, commencing at ~~[__:___~~9:30 a.m.~~]~~., Los Angeles Time, before, the Honorable Kathleen Thompson of the United States Bankruptcy Court, Courtroom 301, 21041 Burbank Blvd., Woodland Hills, California 91367. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. The Plan may be modified by the Debtors

pursuant to Section 1127 of the Bankruptcy Code prior to, during or as a result of that hearing, without further notice to parties in interest.

Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number of shares of stock held by the objector. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court, the Committee and the Debtors on or before November 4, 2010 at 4:00 p.m. Los Angeles Time. Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

**C. CONFIRMATION**

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the Plan is (i) accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of creditors and stockholders that are impaired under the Plan.

**1. Acceptance**

The Classes identified above in Section IX.A are impaired and are entitled to vote to accept or reject the Plan.

The Debtors reserve the right to amend the Plan in accordance with the terms of the Plan or seek nonconsensual confirmation of the Plan under Section 1129(b) of the Bankruptcy Code or both with respect to any Class of Claims or Interests that is entitled to vote to accept or reject the Plan, if such Class rejects the Plan.

**2. Unfair Discrimination and the Fair and Equitable Tests**

Section 1129(b) of the Bankruptcy Code provides that a Plan can be confirmed even if it has not been accepted by all impaired Classes as long as at least one impaired Class of Claims has accepted it. The Bankruptcy Court may confirm the Plan as to one or more Debtors at the request of such Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes in the case of such Debtors as long as the Plan "does not discriminate unfairly" and is "fair and

equitable" as to each impaired Class that has not accepted it. A Plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting Class if the value of the cash and/or securities to be distributed to the nonaccepting Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the nonaccepting Class or is otherwise permitted under the circumstances.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

- Secured Creditors. Either: (i) each impaired secured creditor retains its liens securing its secured Claim and receives on account of its secured Claim deferred cash payments having a present value equal to the amount of its allowed secured Claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.
- Unsecured Creditors. Either: (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed Claim; or (ii) the Holders of Claims and interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.
- Interests. Either: (i) each holder of an Interests will receive or retain under the Plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the nonaccepting Class will not receive or retain any property under the Plan.

### 3. Feasibility

To confirm the Plan, the Bankruptcy Code must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Section 1129(a) of the Bankruptcy Code and is referred to as the "feasibility" requirement.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtors will have enough cash on hand on the Effective Date of the Plan to pay all the Claims and expenses which are entitled to be paid on such date.

The other aspect of feasibility considers whether the Reorganized Debtors will have enough cash over the life of the Plan to make the required Plan payments. For purposes of determining whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of their financial performance for seven years following the Effective Date through December 31, 2017 (the "Projection Period"). These projections, and the assumptions on which they are based, are included in the Debtors' Projected Financial Information, annexed hereto as Exhibit "E" and provide a projected Consolidated Statement of Cash Flow for the Debtors on a monthly basis for the first two years of the Projection Period and on an annual basis for each of the seven years of the Projection Period. The Projections also provide a projected Cash Flow for each of the Operating Debtors on a monthly basis for the first two years of the Projection Period and on an annual basis for each of the seven years of the Projection Period. Exhibit E also contains a statement of the results of actual operating revenues and expenses for the period April 1, 2009 through March 31, 2010.

The pro forma financial information and the projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective Date under the Plan will occur on or ~~about September 30, 2010~~before January 1, 2011. Based upon the Debtors' Projected Financial Information, the Debtors believe that they will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. The Projections show that the Debtors will have sufficient funds to meet this Effective Date payment obligations. The Plan calls for the repayment of the secured claims within 5 years after the Effective Date if the relevant Secured Creditor votes in favor of the Plan and within 7 years after the Effective Date if the relevant Secured Creditor votes against the Plan. The Secured Claims of the Debtors will be repaid during this time period either from the refinancing of the secured Debt post-Effective Date

or the sale of the Collateral for such Debt. Upon the sale of such Collateral, the proceeds will be used to pay the costs of sale and any secured claim that is secured by the Collateral to be sold. Excess proceeds would be unencumbered funds available for the Reorganized Debtors use in the operation of their businesses or for the payment of claims as determined by the Reorganized Debtors' in the sound exercise of their business judgment.

The Debtors have prepared their financial projections, with the assistance of their advisors based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in Exhibit “E” hereto. The financial projections have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the Projection Period may vary from the projected results and the variations may be material. All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

**4. Best Interests Test**

Even if a plan is accepted by each Class of Holders of Claims and Interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the “best interests” of all Holders of Claims and Interests that are impaired by the plan and that have not accepted the Plan. The “best interests” test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that: (i) all members of an impaired Class of Claims or interests have accepted the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity

security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under a debtor's plan, then such plan is not in the best interests of creditors and equity security holders.

To determine what Holders of Claims and Interests in each impaired Class would receive if the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a Chapter 7 liquidation case. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the costs and expenses of liquidation and by such additional administrative and priority Claims that might result from the termination of the Debtors' business and the use of Chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, other Claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during the Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay general unsecured Claims. Moreover, the costs of liquidation in these cases could be greater due to the fact that there is no guarantee that only one trustee would be appointed for each of the 54 related cases. If more than one trustee is appointed, the costs of liquidation will be increased as each such trustee will retain its own professionals to assist it with the case.

To determine if the Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and

properties, after subtracting the amounts attributable to the foregoing Claims, must be compared with the present value of the property offered to such Classes of Claims under the Plan.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including: (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail; and (iii) the substantial increases in Claims that would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than the recovery such holder would receive pursuant to the liquidation of the Debtors under Chapter 7.

The Liquidation Analysis for each of the Property Level Debtors, MMPI and MMPLP, is attached hereto as Exhibit "G." The information set forth in Exhibit G provides a summary of the liquidation values of each of such Debtors' assets, assuming a Chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Estates. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis. Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors' management, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation. The Chapter 7 liquidation period is assumed to be a period of several years, primarily allowing for the sale of the real property assets of the Debtors.

### D. CONSUMMATION

The Plan will be consummated on the Effective Date. The Effective Date of the Plan will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan,

as set forth in the Plan, have been satisfied or waived by the Debtors pursuant to the terms of the Plan. For a more detailed discussion of the conditions precedent to the Plan and the consequences of the failure to meet such conditions, see Article X of this Disclosure Statement. The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

X.

X.

Formatted: Left

## CONFIRMATION DATE CONDITIONS

### A. CONDITIONS TO CONFIRMATION

The conditions to Confirmation shall be the following:

(1) The satisfaction of the requirements of Section 1129 of the Bankruptcy Code;

(2) The Confirmation Order shall (i) be acceptable in form and substance to the Debtors (in the Debtors' sole and absolute discretion) and (ii) expressly authorize and direct the Debtors to perform the actions that are conditions to the effectiveness of the Plan; and

(3) Each of the events and actions required by the Plan to occur or to be taken prior to Confirmation shall have occurred or have been taken, or the Debtors or the party whose obligations are conditioned by such occurrences and/or actions, as applicable, shall have waived such occurrences or actions.

### B. CONDITIONS TO EFFECTIVE DATE

The Plan shall not become effective unless and until it has been confirmed and the following condition has been satisfied in full or waived by the Debtors: the Confirmation Order in a form satisfactory to the Debtors shall have become a Final Order.

### C. WAIVER OF CONDITIONS

The Debtors may waive any or all of the other conditions set forth in the Plan without leave of or order of the Bankruptcy Court and without any formal action. The Debtors reserve the right to amend or revoke the Plan. Although this Plan is styled as a joint Plan, the Debtors reserve the right to proceed with Confirmation under this Plan for one Debtor, or a combination of Debtors, and not the others.

### D. EFFECT OF FAILURE OF CONDITIONS

In the event that the Effective Date does not occur, upon notification submitted by the Debtors to the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b) no distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### E. VACATUR OF CONFIRMATION ORDER

If an order denying confirmation of the Plan is entered, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of any Claim against, or Interest in, the Debtors; (c) prejudice in any manner any right, remedy or Claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

~~XI.~~

## XI.

## RETENTION OF JURISDICTION

Formatted: Left

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date to the full extent permitted by law, including, without limitation, jurisdiction to:

(a) Allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan;

(b) Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending before the Effective Date;

(c) Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which the any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

(d) Ensure that distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Plan;

(e) Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors, Reorganized Debtor or the Chapter 11 Cases that may be pending on the Effective Date;

(f) Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;

(g) Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan and the Confirmation Order, or any entity's rights arising under or obligations incurred in connection with the Plan or the Confirmation Order;

(h) Subject to any restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court Order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with

the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

(i) Issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

(j) Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(k) Determine any other matters that may arise in connection with or relating to the Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided in the Plan; and

(l) Enter an Order concluding the Chapter 11 Cases.

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction. If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including without limitation the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

~~XII.~~

**PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER**

**THE PLAN AND TREATMENT OF DISPUTED, CONTINGENT**

**XII.**

**AND UNLIQUIDATED CLAIMS AND INTERESTS**

**A. VOTING OF CLAIMS AND INTERESTS**

Formatted: Left

Formatted: Font: Not Bold

Formatted: Underline

Each Holder of an Allowed Claim or an Allowed Interest in an Impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Plan as provided in such order as

may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

**B. METHOD OF DISTRIBUTIONS UNDER THE PLAN**

**1. Distributions Under the Plan**

The Chief Accounting Officer of MMPI, currently Fred Skaggs, will serve as Disbursing Agent. The Disbursing Agent will make all distributions of cash and securities required to be distributed under the applicable provisions of the Plan. The Disbursing Agent may employ or contract with other entities to assist in or make the distributions required by the Plan. The Disbursing Agent will serve without bond, and the Disbursing Agent will not receive additional compensation for distribution services rendered pursuant to the Plan.

Cash payments made pursuant to the Plan will be in U.S. dollars by checks drawn on a bank selected by the Reorganized Debtor, or by wire transfer from a bank, at the option of Reorganized Debtor. Cash payments of $1,000,000 or more to be made pursuant to the Plan will, to the extent requested in writing no later than five days after the Confirmation Date, be made by wire transfer from a bank. Cash payments to foreign creditors, if any, may be made, at the option of the Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**2. Timing and Methods of Distribution**

***a. Compliance with Tax Requirements***

In connection with the Plan, to the extent applicable, the Disbursing Agent must comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan: (i) each Holder of an Allowed Claim or Interest that is to receive a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental

unit, including income, withholding and other tax obligations, on account of such distribution; and (ii) no distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations. Any Cash to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to the Plan.

**b. *Pro Rata Distributions***

When the Plan provides for Pro Rata distribution, the property to be distributed under the Plan shall be divided Pro Rata among the Holders of Allowed Claims or Allowed Interests of the relevant Class.

**c. *Distributions***

Distributions under the Plan shall be made by the Disbursing Agent to the Holders of Allowed Administrative Claims, Allowed Claims and Allowed Interests at the addresses set forth on the Schedules, unless such addresses are superseded by addresses listed on proofs of Claim or transfers of Claims filed pursuant to Bankruptcy Rule 3001, or at the last known address of such Holders if the Debtors or Reorganized Debtor has been notified in writing of a change of address.

**C. UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS**

Any Person that is entitled to receive a cash distribution under the Plan but that fails to cash a check within 90 days of its issuance shall be entitled to receive a reissued check from the Reorganized Debtor for the amount of the original check, without any interest, if such person requests the Disbursing Agent to reissue such check and provides the Disbursing Agent with such documentation as the Disbursing Agent requests to verify that such Person is entitled to such check, prior to the first anniversary of the Effective Date. If a Person fails to cash a check within 90 days of its issuance and fails to request reissuance of such check prior to the first anniversary of the date on which the check is issued, such Person shall not be entitled to receive any further distribution under this Plan. If the distribution to any Holder of an Allowed Claim or Allowed Interest is returned to a Disbursing Agent as undeliverable, no further distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified in writing of such Holder's

then-current address. Undeliverable distributions will remain in the possession of the Disbursing Agent pursuant to the Plan until such time as a distribution becomes deliverable. Undeliverable cash will be held in trust in segregated bank accounts in the name of the Disbursing Agent for the benefit of the potential claimants of such funds, and will be accounted for separately. The Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtor's investment and deposit guidelines. Any distribution which is not claimed within thirteen months of the Effective Date shall be deemed property of the Reorganized Debtor.

### D. DISPUTED CLAIMS, DISPUTED INTERESTS AND ESTIMATIONS

#### 1. Treatment of Disputed Claims or Interests

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of any Claim or Interest until such Claim or Interest becomes an Allowed Claim or Allowed Interest. The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, irrespective of whether the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Claim at any time during litigation concerning any objection to the Claim, including during the pendency of any appeal relating to any such objection. If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on account of such Claim. All of these Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another. In addition to seeking estimation of Claims as provided in the Plan, the Reorganized Debtor may resolve or adjudicate certain Disputed Claims of Holders in Unimpaired Classes in the manner in which the amount of such Claim and the rights of the Holder of such Claim would have been resolved or adjudicated if the Reorganization Cases had not been commenced, subject to any applicable discharge and limitations on amounts of Claims and remedies available under bankruptcy law.

Claims may be subsequently compromised, settled, withdrawn or resolved by the Reorganized Debtor.

**2. Distribution on Account of Disputed Claims or Interests Once They Are Allowed**

On the later of the next Quarterly Distribution Date or thirty days after the date a Disputed Claim or Interest becomes an Allowed Claim or Interest, the Disbursing Agent will commence making distributions on account of any Disputed Claim or Disputed Interest that has become an Allowed Claim or Allowed Interest during the preceding calendar quarter. Such distributions will be made pursuant to the provisions of the Plan governing the applicable Class. Holders of Disputed Claims or Disputed Interests that are ultimately allowed will also be entitled to receive, on the basis of the amount ultimately allowed, matured and payable interest, if any, at the rate provided for the Class to which such Claim belongs.

**3. Allowance of Claims Subject to Bankruptcy Code Section 502(d)**

Allowance of Claims shall be in all respects subject to the provisions of Section 502(d) of the Bankruptcy Code.

**E. SETOFFS**

Except with respect to Claims of the Debtors and Reorganized Debtor released pursuant to the Plan or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Reorganized Debtor may, pursuant to Section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim), the Claims, rights and causes of action of any nature that the Reorganized Debtor may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by Reorganized Debtor of any such Claims, rights and causes of action that the Debtors and the Reorganized Debtor may possess against such Holder.

Formatted: Body Double,bd,bd Char Char,Body Double Char Char,bd Char Char Char Char,bd + Left: 1",First line: 0",Right: 1.16",Line spacing: si......,bd + First line: 0",bd Char1,Line spacing: si...,Body Double Char

Formatted: Left

# XIII.

# CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

## A. CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1. Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes.

### 2. Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in Article V of the Plan have not occurred or been waived by the Debtors within one hundred and twenty (120) days after the Confirmation Date, the Confirmation Order shall be vacated, in which event no distributions under the Plan would be made, the Debtors and all Holders of Claims and Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### B. RISKS TO RECOVERY BY HOLDERS OF CLAIMS

#### 1. Ability to Service Debt

The Reorganized Debtor's ability to make scheduled payments of principal, to pay the interest on, to refinance its indebtedness will depend on future performance. Future performance is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Reorganized Debtor's control. While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flow described in the financial projections attached as Exhibit E hereto, the Debtors believe that cash flow from operations, available cash, debt refinancings and sales and the Debtors' ability to sell assets as necessary to fund its operations, of assets will be adequate to fund the Plan and meet their future liquidity needs.

#### 2. Risks of Asset Disposition Delays

The Plan relies, in part, on generating proceeds from real estate sales to pay Claims in the event operating revenues are insufficient. In the event that sales are delayed due to economic or other constraints, payments may be correspondingly delayed.

#### 3. Risks Related to Dependence on Key Personnel

The Debtors success depends to a significant extent on the continued services of their senior management and other members of management. The Debtors' senior management has extensive expertise in the real estate industry. The Debtors could be adversely affected if one or more members of its current management were unwilling or unable to continue in their employment.

#### 4. Projected Financial Information

The financial projections included as Exhibit E hereto are dependent upon the successful implementation of the Plan and the validity of the other assumptions contained therein. These projections reflect numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtor. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of

the Reorganized Debtors. Although the Debtors believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

**5. Failure to Confirm One or More of the Debtors' Chapter 11 Plans.**

This Plan is a joint Plan for 54 related debtor entities. The Debtors are seeking confirmation of the Plan separately for each of the 54 related Chapter 11 Cases. It is possible that the Debtors will not be able to achieve confirmation in one or more of the 54 Chapter 11 Cases. Nevertheless, the Debtors believe that they have a strong likelihood of confirming their Cases. In the event one or more Debtors' Cases are not confirmed, the affected Debtors will re-evaluate their options in light of their inability to confirm the plan, which options would include without limitation, an alternative plan of reorganization, conversion of the case to a chapter 7 case or dismissal of the case.

The Debtors believe that their inability to achieve confirmation for one or more of the Chapter 11 Cases will not have a material impact on the Debtors' ability to implement the Plan for the remaining Debtors and make the payments required under the Plan. The Debtors believe that they have sufficient equity in their properties and sufficient unencumbered assets to monetize additional assets as needed to meet the cash flow needs of the enterprise in the event one or more of the Debtors' cases is not confirmed. As an example, the Debtors assert that even in the unlikely event that the cases of each of the eleven Debtors with positive cash flow (i.e., in excess of their respective expenses) were not confirmed, the Debtors would still be able to implement the Plan with respect to the remaining Debtors. The loss of the revenue from the income producing Debtors would result in a shortfall of approximately $4.2 million per year, or approximately $29.4 million over the term of the Plan. In that event, the Debtors would be required to monetize additional assets, reduce costs, refinance debt and increase revenues more quickly to meet their cash flow needs. The Debtors will have sufficient cash on hand following confirmation from, at minimum, the ~~purchase of the New Equity Interests and the~~ remaining proceeds from the sale of MM 845 S. Flower's Project to fund operations while assets are sold, costs are reduced, refinancing is completed and revenues are increased. Finally, if one or more non-cash flow producing Debtors

are among those that are not confirmed, the failure to achieve confirmation for those Debtors may well have a neutral or non-detrimental effect on the feasibility of the Plan and the Debtors' ability to make payments thereunder.

~~XIV.~~

XIV.

Formatted: Left

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain United States federal income tax consequences of the Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein. Only the principal United States federal income tax consequences of the Plan to the Debtors and to holders of Claims who are entitled to vote to accept or reject the Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan. No rulings or determinations of the Internal Revenue Service (the “IRS”) or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holders of Claims. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the “Tax Code”) Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., persons who are related to the Debtors within the meaning of the Tax Code, banks and certain other financial institutions, insurance companies, tax-exempt

organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees, holders of LTIP Units persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation and persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore, the following discussion does not address United States federal taxes other than income taxes.

Each holder is strongly urged to consult its own tax advisor regarding the United States federal, state, and local and any foreign tax consequences of the transactions described herein and in the Plan.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES UNDER THE TAX CODE. ANY TAX ADVICE CONTAINED IN THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE SUMMARY. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISER.

## A. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES TO THE DEBTORS

### 1. Net Operating Losses

The Debtors currently have significant net operating loss ("NOL") carryforwards for federal income tax purposes and expect to incur a substantial additional NOL during their current taxable year. The amount of such NOL carryforwards remains subject to adjustment by the IRS. As discussed below, the amount of the Debtors' NOL carryforwards, and possibly certain other tax attributes, will be reduced, and the subsequent utilization of such NOL carryforwards and other tax

attributes may be restricted upon the implementation of the Plan. Because almost all of the Debtors are limited liability companies, the NOLs generally may be utilized to reduce income taxes that otherwise would be paid by such Debtors. The only Property Level Debtor that is a Subchapter C corporation is Santa Fe Commerce Center. NOLs that may be offset against gains realized by MMPI and its limited liability company subsidiaries may not be available to offset gains realized by Santa Fe Commerce.

### 2. Cancellation of Debt

In general, the Tax Code allows a debtor in a bankruptcy case to exclude from income any cancellation of indebtedness income ("CODI") that is realized, but the debtor must reduce certain of its tax attributes - such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets by the amount of the CODI that is excluded from income. CODI is that amount by which the adjusted issue price (including accrued but unpaid interest) of the indebtedness satisfied exceeds the cash and fair market value of the other property issued therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent the amount of excluded CODI exceeds the tax attributes available for reduction, the remaining CODI is simply forgiven. Any reduction in tax attributes does not effectively occur until the first day of the taxable year following the year the CODI occurs. If advantageous, a debtor could elect to reduce the basis of depreciable property prior to any reduction in its loss carryforwards.

As a result of the implementation of the Plan, the Debtors expect to realize CODI in an amount that is less than its current year NOL and NOL carryforwards. Recent legislation allows certain taxpayers that recognize CODI in 2009 or 2010 to elect to include the CODI in taxable income ratably over the five (5) year period beginning in the fourth or fifth tax year, depending on whether the CODI is recognized in 2009 or 2010 (a "CODI Deferral Election"). The deferral ends if the taxpayers liquidates or sells substantially all of its assets. If this election is available to a debtor in bankruptcy, the debtor may elect to include the CODI in taxable income on a deferred basis rather than excluding the CODI from taxable income and reducing its tax attributes by the

amount of the CODI in the year the CODI arises. The Debtors do not currently expect to make the CODI Deferral Election.

### 3. Limitation on NOL Carryforwards and Other Tax Attributes

Following the implementation of the Plan, any NOLs and carryforwards and possibly certain other tax attributes of the Debtors, allocable to periods prior to the Effective Date, may be subject to the limitations imposed by Section 382 of the Tax Code.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions, which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized. ~~It is possible that the issuance of stock pursuant to the Plan may result~~Since interests in MMPI are unimpaired, there will not be an ownership change~~ of the Debtors~~.

### 4. General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation would be subject would be equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4~~.01~~% for ownership changes occurring in June 2010).

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. However, if the corporation does not continue its historic business or use a significant portion of its assets in a new business for two (2) years after the ownership change, the annual limitation resulting from the ownership change is zero. The limitation on the use of pre-change losses following an ownership change is in addition to any reduction of tax attributes in connection with the realization of CODI.

~~The Debtors do not expect to experience a Section 382 ownership change in connection with the issuance of New Equity Interests if all of the current shareholders of MMPI receive New~~

~~Equity Interests on a pro rata basis or if Richard Meruelo and John Maddux receive New Equity Interests in an amount at least equal to their existing pro rata share.~~

In addition, Section 382(g)(4)(D) provides, in effect, that if a fifty percent (50%) or greater shareholder of a loss corporation claims a Section 165(g) worthless stock loss and retains his stock at the end of the year of worthlessness, the Debtors will be treated as having undergone an ownership change. The Debtors are not aware that any significant shareholder has claimed or plans to claim a Section 165(g) worthless stock loss that would trigger the application of Section 382(g)(4)(D).

**5. Special Bankruptcy Exception**

If a corporation experiences an ownership change, there are two exceptions to the general loss limitation rule under Section 382 of the Tax Code. The first exception generally applies where the stockholders and/or qualified creditors of the debtor retain or receive at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan (the "382(~~1~~l)(5) Exception"). Under this exception, a debtor's pre-change losses are not limited on an annual basis, but are required to be reduced by the amount of any interest deductions claimed during the three (3) taxable years preceding the date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of the debt converted into stock in the reorganization. Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

If the 382(~~1~~l)(5) Exception is not applicable to a debtor in bankruptcy (either because the debtor company does not qualify for it or a debtor company elects not to utilize it), the second exception to the general Section 382 rule (the 382(~~1~~l)(6) Exception") will generally apply. When the 382(~~1~~l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditor's Claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a corporation's equity to be determined before the events giving rise to the ownership change.

~~In the unlikely event that Richard Meruelo and John Maddux own less than fifty percent (50%) of the New Equity Interests and the Debtors experience an ownership change, it is expected that the Section 382(l)(5) Exception will apply.~~

**6. Merger of MMPLP into MMPI**

Pursuant to the Plan, MMPLP will merge into MMPI and, accordingly, will distribute its assets to MMPI in complete liquidation. In general, a distribution in liquidation of a partner's interests is tax-free to both the partner and the partnership unless Section 737 or 751(b) applies. Section 737 requires a partner to recognize gain (but not loss) upon the partnership's distribution of property to such partner (other than property previously contributed to the partnership by such partner) within seven (7) years of the date on which such partner contributed appreciated property to such partnership. Section 751(b) generally provides that to the extent that a partner receives a distribution from a partnership (i) Section 751 property (unrealized receivables and inventory items which have appreciated substantially in value) in exchange for relinquishing all or part of its interest in the partnership's non-Section 751 property, or (ii) non-Section 751 property in exchange for relinquishing all or part of its interest in the partnership's Section 751 property, the transaction is recharacterized. The transaction is treated as (1) a deemed distribution to the partner of an interest in the relinquished property followed by (2) a deemed taxable exchange between the partner and the partnership of the relinquished property in exchange for an interest in the property actually distributed by the partnership to the distributee partner.

Section 731(b) provides that no gain or loss is recognized by a partnership on a distribution of property to a partner. Section 731(a) provides for (1) the nonrecognition of gain to the partner except to the extent an amount of money is distributed in excess of the partner's tax basis in their partnership interests, and (2) the nonrecognition of loss unless the distribution consists solely of money, unrealized receivables, and inventory. Any gain or loss recognized by the partner is generally treated as gain or loss from the sale or exchange of a capital asset (subject to the exceptions above). Section 732(b) provides that the basis of any distributed property is equal to the partner's tax basis in their partnership interest immediately prior to the distribution, reduced by any

cash received. The Debtors do not expect to recognize any gain or loss in connection with the liquidation of MMPLP.

**7. Consequences of the Sale and/or Refinance of Assets of the Debtors**

Pursuant to the Plan, the Reorganized Debtors will sell some of their assets and refinance other assets as necessary during the term of the Plan to meet their operational needs and payment obligations under the Plan. The sale of real property may cause the Debtors to recognize gain or loss. The gain or loss is measured by the difference between the amount realized (the amount paid by the purchaser) and the adjusted tax basis the Debtors have in the property sold. The amount realized from a sale of real property generally includes the amount of liabilities from which the transferor is discharged as a result of the sale. For purposes of this rule, the sale of real property that secures a nonrecourse liability discharges the transferor from the liability, and the sale of real property that secures a recourse liability discharges the transferor from the liability if another person agrees to pay the liability (whether or not the transferor is in fact released from the liability).

Gain or loss recognized from the sale of real property may be characterized as either capital or ordinary. Generally, capital gains and losses are gains or losses from the sale or exchange of a capital asset. A capital asset is any property held by a taxpayer, whether or not connected with a trade or business, but does not include property held by a taxpayer, whether or not connected with a trade or business, but does not include property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property which is held primarily for sale to customers in the ordinary course of its trade or business, or property, used in the taxpayer's trade or business, of a character which is subject to the allowance for depreciation, or real property used in the taxpayer's trade or business.

Pursuant to Section 1245, a taxpayer who disposes of Section 1245 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property. Section 1245 property includes limited types of real property which have been depreciable. Depreciation recapture with respect to Section 1245 property is computed by subtracting its adjusted tax basis from the lower of its recomputed basis (adjusted tax basis increased by previous depreciation deductions allowed) or amount realized. Pursuant to Section 1250, a taxpayer who

disposes of Section 1250 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property. Section 1250 property is any real property which has been depreciable and that is not Section 1245 property. Generally, for Section 1250 property for which depreciation deductions are computed using the straight-line method for tax purposes, there is no Section 1250 depreciation recapture.

Pursuant to Section 1231, Section 1231 gains and losses are treated as capital gains and losses if the Section 1231 gains for the taxable year exceed the Section 1231 losses for that year. A Section 1231 gain or loss is any recognized gain or loss from a Section 1231 transaction. A sale or exchange of property used in a trade or business is a Section 1231 transaction. Real property is considered to be used in a trade or business if it is held for more than one year and is not property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business.

Generally, for tax purposes, a refinancing transaction by itself produces no income or deductions as it involves the tax-free receipt of loan proceeds and the nondeductible repayment of a prior loan, assuming the old debt is satisfied in full.

## B. CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS

### 1. Consequences to Holders of Allowed General Unsecured Claims

Pursuant to the Plan, a holder of an Allowed General Unsecured Claim (other than an Allowed General Unsecured Claim of MMPI or MMPLP) will receive either payment in full in cash over approximately five (5) years plus interest at the rate of one percent (~~1~~4.0%) per annum (herein referred to as the "Deferred Payment Obligation"). ~~A holder of an Allowed General Unsecured Claim will have the option to elect to receive~~ or, at such holder's election, fifty (50%) percent of their claims thirty (30) days after the Effective Date in full satisfaction of the claim. For federal income tax purposes, the Deferred Payment Obligation should be treated (and, the following discussion assumes, would be treated) in a similar fashion to the receipt of an actual note amortizable over five (5) years.

~~In general, a holder of an Allowed General Unsecured Claim will recognize gain or loss~~ With respect to the Allowed General Unsecured Claims of MMPI and MMPLP, pursuant to the Plan, holders will receive one hundred (100%) of their claims thirty (30) days after the Effective Date in ~~an amount equal~~ full satisfaction of the claim plus interest from the petition date (March 27, 2009) at five percent (5%) per annum until the claim is paid in full.

In general, a holder of an Allowed General Unsecured Claim will recognize gain or loss to the extent there is any difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the treatment of any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued Interest" below. The amount realized by a holder receiving a Deferred Payment Obligation will equal the "issue price" of the Deferred Payment Obligation ~~received by such holder. ~~. Such issue price should be equal to the stated principal amount of the Deferred Payment Obligation. Each holder of a General Unsecured Claim is urged to consult its tax advisor regarding the specific tax consequences to such holder of the receipt of the Deferred Payment Obligation, including the possible application of (and ability to elect out of) the "installment method" ~~or~~of reporting any gain that might otherwise be recognized by the holder upon such receipt. The amount realized by holders of Allowed General Unsecured Claims who elect to receive fifty (50%) percent of their claims in cash thirty (30) days after the Effective Date and by holders of Allowed General Unsecured Claims of MMPI and MMPLP should be equal to the amount of cash received.

Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.

**2. Consequences to Holders of Allowed Secured Claims**

Pursuant to the Plan, a holder of an Allowed Secured Claim will receive payment in full in cash over approximately seven (7) years, or over five (5) years if such holder votes in favor of the Plan (collectively herein referred to as the "Secured Deferred Payment Obligation"). In either case, the holder will also receive interest at the rate of ~~four~~ five percent (~~4~~5%) per annum. For federal income tax purposes, the Secured Deferred Payment Obligation should be treated (and the following discussion assumes, would be treated) in a similar fashion to the receipt of an actual note amortizable over seven (7) years or five (5) years in the case of holders who vote in favor of the Plan.

In general, a holder of an Allowed Secured Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the treatment of any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued Interest" below. The amount realized by a holder will equal the "issue price" of the Secured Deferred Payment Obligation received by such holder. Such issue price should be equal to the stated principal amount of the Secured Deferred Payment Obligation. Each holder of a Secured Claim is urged to consult its tax advisor regarding the specific tax consequences to such holder of the receipt of the Secured Deferred Payment Obligation, including the possible application of (and the ability to elect out of) the "installment method" of reporting any gain that might otherwise be recognized by the holder upon such receipt.

Where gain or loss is recognized by a holder of an Allowed Secured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.

~~C. CONSEQUENCES OF THE ISSUANCE OF NEW EQUITY INTERESTS~~

~~Pursuant to the Plan, shareholders of MMPI Existing Common Stock have the option of electing to receive cash in exchange for their MMPI Existing Common Stock ("Option 1") or electing to receive shares of New Equity Interests in Reorganized MMPI equal to the amount of shares such shareholders had in MMPI, in exchange for their MMPI Existing Common Stock and a cash payment ("Option 2"). In addition, if more than 299 shareholders of MMPI Existing Common Stock have elected Option 2, the Reverse Stock Split will occur, and any shareholder who would otherwise be entitled to a fractional interest will receive cash on account of such fractional interest.~~

~~MMPI will not recognize gain or loss on the receipt of money or other property in exchange for the issuance of its stock pursuant to Section 1032.~~

~~Shareholders receiving cash in redemption of their MMPI Existing Common Stock under Option 1 should generally recognize gain or loss pursuant to Section 1001. The gain or loss is measured by the difference between the amount realized (the amount of cash received) and the adjusted tax basis in the shares redeemed. Such gain or loss will be a long-term capital gain or loss if the holding period for such stock exceeded one year. However, pursuant to Section 302(d), certain shareholders may be required to treat the cash proceeds received as a distribution of property to which Section 301 applies due to the constructive ownership rules of Section 318. Each shareholder of MMPI Existing Common Stock is urged to consult its tax advisor with respect to the specific tax consequences of the redemption and proper tax treatment of the transaction.~~

~~Shareholders receiving New Equity Interests under Option 2 in exchange for MMPI Existing Common Stock and a cash payment should not recognize any gain or loss upon the exchange. Each shareholder's tax basis in the New Equity Interests will be the same as such shareholder's tax basis in the MMPI Existing Common Stock, surrendered in exchange therefor, increased by the amount of the cash payment. The holding period for the New Equity Interests received should include the holding period in the MMPI Existing Common Stock surrendered.~~

~~The Reverse Stock Split should be tax-free to shareholders pursuant to Section 354 and tax-free to MMPI pursuant to Section 1032. However, shareholders receiving cash in lieu of fractional shares under the terms of the Reverse Stock Split should generally treat such cash proceeds as~~

~~received in exchange for the fractional shares resulting in the recognition of gain or loss, but may be required to treat such proceeds as a distribution of property to which Section 301 applies, depending on such shareholder's ownership interest in Reorganized MMPI. Each shareholder receiving cash in lieu of fractional shares is urged to consult its tax advisor with respect to the specific tax consequences of the cash payment made in lieu of fractional shares.~~

**C. DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST**

Pursuant to the Plan, all distributions in respect of an Allowed Claim will be allocated first to any portion of such Claim for accrued interest, with any excess allocated to the principal amount of such Claim to the extent thereof, and then to all other amounts. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

In general, to the extent that any amount received by a holder of a debt (whether paid in cash or treated for tax purposes as paid with a note) is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

**D. INFORMATION REPORTING AND BACKUP WITHHOLDING**

Certain payments, including payments in respect of accrued interest or OID, are generally subject to information reporting by the payer to the IRS. Moreover, such reportable payments are subject to backup withholding in certain circumstances. Under the Tax Code's backup withholding rules, a holder of Claims may be subject to backup withholding at the applicable rate with respect to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain exempt categories (which generally includes corporations) and, when required, demonstrates this fact or (b) provides a correct United States taxpayer identification and certifies under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income.

**E. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A TAXPAYER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE STRONGLY URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING REQUIREMENTS.

~~XV.~~

**XV.**

**MISCELLANEOUS PROVISIONS**

**A. EXEMPTION FROM TRANSFER TAXES**

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment or any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including, without limitation, any agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan shall not be subject to any stamp, real estate transfer, mortgage recording, license transfer or other similar tax. For the avoidance of doubt, the transactions contemplated under the Plan include, among other things, the transactions and transfers contemplated in Section III of the Plan under, in furtherance of, or in connection with the consolidation provided for therein including, without limitation, the transfer of the Debtors' right, title and interest in property of the Estates to the Reorganized Debtor.

Formatted: Left

**B. PAYMENT OF STATUTORY FEES**

All fees payable on or before the Effective Date pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

**C. MODIFICATION OR WITHDRAWAL OF THE PLAN**

The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend, modify (subject to Court approval), or withdraw the Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtors may amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan in such a manner as may be necessary to carry out the purpose and intent of the Plan.

**D. GOVERNING LAW**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan.

**E. FILING OR EXECUTION OF ADDITIONAL DOCUMENTS**

On or before the Effective Date, the Reorganized Debtor shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**F. WITHHOLDING AND REPORTING REQUIREMENTS**

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions there under shall be subject to any such withholding and reporting requirements.

**G. WAIVER OF RULE 7062 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

The Debtors may request that the Confirmation Order include (a) a finding the Rule 62(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7062 of the Federal Rules of

Bankruptcy Procedure, shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after the entry of the Confirmation Order.

### H. HEADINGS

Headings used in the Plan are for convenience and reference only and shall not constitute a Part of the Plan for any purpose.

### I. EXHIBITS AND SCHEDULES

All Exhibits and Schedules to the Plan and Disclosure Statement are incorporated into and constitute a part of the Plan as if set forth herein.

### J. NOTICES

All notices, requests and demand hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by U.S. Mail or email addressed as follows:

| REORGANIZED DEBTOR | COUNSEL TO THE DEBTORS AND REORGANIZED DEBTOR |
|---|---|
| Todd Nielsen, Esq.<br>General Counsel<br>MERUELO MADDUX PROPERTIES, INC.<br>761 Terminal Street<br>Building 1, 2nd Floor<br>Los Angeles, California 90021<br>~~Tnielsen~~TNielsen@meruelomaddux.com | ~~John J. Bingham, Jr. , Esq.~~<br>John N. Tedford, IV , Esq.<br>Julia W. Brand, Esq.<br>DANNING, GILL, DIAMOND & KOLLITZ, LLP<br>2029 Century Park East, Third Floor<br>Los Angeles, California 90067-2904<br>E-Mail:<br>~~JBingham@dgdk.com~~<br>JTedford@dgdk.com<br>JBrand@dgdk.com |

Formatted Table

### K. CONFLICT

The terms of ~~this~~ the Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in ~~the~~ this Disclosure Statement.

### L. SUCCESSORS AND ASSIGNS

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, trustee, administrator, successor or assign of such Person.

**M. SATURDAY, SUNDAY OR LEGAL HOLIDAY**

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**N. POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS OR INTERESTS**

Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all Instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

**O. SEVERABILITY OF PLAN PROVISIONS**

If, prior to Confirmation, any term or provision of the Plan that does not govern the treatment of Claims or Interests provided for herein or the conditions to the Effective Date is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination, and shall provide, that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**P. BALLOTING**

Each Holder of Allowed Claim or an Allowed Interest entitled to vote on the Plan will receive a ballot. The ballot will contain two boxes, one indicating acceptance of the Plan and the other indicating rejection of the Plan. Holders of Allowed Claims or Allowed Interests who elect

to vote on the Plan must mark one or the other box pursuant to the instructions contained on the ballot. Any executed Ballot that does not indicate acceptance or rejection of the Plan will be deemed to constitute an acceptance of the Plan.

**Q. NO ADMISSIONS OR WAIVER OF OBJECTIONS**

Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed as an admission by any Debtor with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claims classification. The Debtors are not bound by any statements herein or in the Disclosure Statement as judicial admissions.

**R. SURVIVAL OF SETTLEMENTS**

All Bankruptcy Court-approved settlements shall survive consummation of the Plan, except to the extent that any provision of any such settlement is inconsistent with the Plan, in which case the provisions of the Plan shall supersede such inconsistent provision of such settlement. Notwithstanding the foregoing, the settlement documents approved by the Bankruptcy Court regarding Imperial, Murakami and PCB, and any other settlement agreement approved prior to the Effective Date that specifically provides that the Plan shall not modify the terms of such settlement, shall supersede any inconsistent Plan provisions.

~~XVI.~~

**ALTERNATIVES TO CONFIRMATION AND CONSUMMATION**

**XVI.**

**OF THE PLAN**

Formatted: Heading 1,h1,H1, Left

The Debtors believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) an alternative plan or plans of reorganization; or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

### A. ALTERNATIVE PLANS OF REORGANIZATION

If the Plan is not confirmed, the Debtors, or after the expiration of the Debtors' exclusive period in which to propose and solicit a reorganization Plan, any other party in interest in the Chapter 11 Cases, could propose a different Plan or Plans. Such Plans might involve either a reorganization and continuation of the Debtors' business, or a liquidation of their assets or a combination of both.

### B. LIQUIDATION UNDER CHAPTER 7

If no Plan is confirmed, the Chapter 11 Cases may be converted to individual cases under Chapter 7 of the Bankruptcy Code. Upon conversion, one or more Chapter 7 trustees will be appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims against the Debtors. A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests is set forth in Article IX.C. of this Disclosure Statement (Best Interests Test / Liquidity Analysis). The Debtors believe that liquidation under Chapter 7 would result in, among other things: (i) decreased distributions to creditors because of additional administrative expenses attendant to the appointment of one or more trustee's and the trustee's employment of attorneys and other professionals; (ii) increased expenses and Claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations; and (iii) the failure to realize the greater, going concern value of the Debtors' assets.

In the opinion of the Debtors, the recoveries projected to be available in either a Chapter 7 liquidation are not likely to afford Holders of Claims as great a realization potential as does the Plan.

~~XVII.~~

## XVII.

## CONCLUSION AND RECOMMENDATION

The Plan provides for an equitable distribution to creditors and shareholders of the Debtors and preserves the value of the business as a going concern. The Debtors believe that confirmation

Formatted: Heading 1,h1,H1, Left

and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to Holders of Claims and Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs. FOR THESE

REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN SO THAT THEY WILL BE RECEIVED NO LATER THAN [ ],4:00 P.M., LOS ANGELES TIME, ON [ ]OCTOBER 12, 2010.

Dated: June September 1, 2010

Respectfully Submitted,

By: /s/ Richard Meruelo

By: Signature to Follow
Richard Meruelo
Chief Executive Officer

COUNSEL FOR NOTICE PURPOSES:
DANNING, GILL, DIAMOND & KOLLITZ, LLP

By:______________________________
Julia W. Brand.
Counsel for Debtors and
Debtors in Possession

| In re: MERUELO MADDUX PROPERTIES, INC. Debtor(s). | CHAPTER: 11<br>CASE NUMBER: 1:09-bk-13356-KT |
|---|---|

NOTE: When using this form to indicate service of a proposed order, DO NOT list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Danning, Gill, Diamond & Kollitz, LLP, 2029 Century Park East, Third Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described **SUBMISSION OF REDLINE OF THIRD AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING THIRD AMENDED JOINT PLAN OF REORGANIZATION OF MERUELO MADDUX PROPERTIES, INC., ET AL. DATED SEPTEMBER 1, 2010** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On September 1, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Michael C Abel, mca@dgdk.com (counsel for Debtors)
Robert Abiri rabiri@abiriszeto.com
Allison R Axenrod allison@claimsrecoveryllc.com
John J Bingham, jbingham@dgdk.com (counsel for Debtors)
Peter Bonfante, peterbonfante@bsalawfirm.com
Julia W Brand, jwb@dgdk.com (counsel for Debtors)
Jennifer L Braun, jennifer.l.braun@usdoj.gov (Office of the U.S. Trustee)
Martin J Brill, mjb@lnbrb.com (counsel for interested party)
George T Busu george.busu@limruger.com
Andrew W Caine acaine@pszyjw.com
Howard Camhi, hcamhi@ecjlaw.com (counsel for Kennedy Funding Inc.)
James E Carlberg jcarlberg@boselaw.com
Gary O Caris gcaris@mckennalong.com, pcoates@mckennalong.com
Sara Chenetz chenetz@blankrome.com
Jacquelyn H Choi jchoi@swjlaw.com
Ronald R Cohn, rcohn@horganrosen.com (counsel for Pacific Commerce Bank)
Enid M. Colson, ecm@dgdk.com (counsel for Debtors)
Michaeline H Correa, mcorrea@jonesday.com (counsel for MTA)
Daniel Denny ddenny@gibsondunn.com
Jeffrey W Dulberg jdulberg@pszjlaw.com
Aaron De Leest, aed@dgdk.com (counsel for Debtors)
Michael G Fletcher, mfletcher@frandzel.com (counsel for Cathay Bank)
Donald L Gaffney, dgaffney@swlaw.com (counsel for Bank of America)

☒ Service information continued on attached page

| In re: MERUELO MADDUX PROPERTIES, INC. Debtor(s). | CHAPTER: 11<br>CASE NUMBER: 1:09-bk-13356-KT |
|---|---|

Thomas M Geher, tmg@jmbm.com (counsel for Capmark Finance Inc.)
Bernard R Given, bgiven@frandzel.com (counsel for Cathay Bank)
Barry S Glaser, bglaser@swjlaw.com (counsel for L.A. County)
Matthew A Gold courts@argopartners.net
Michael I. Gottfried mgottfried@lblawllp.com, aerskine@lgbfirm.com
John A Graham, jag@jmbm.com (counsel for Capmark Finance Inc.)
Ofer M Grossman, omglaw@gmail.com (counsel for Justman Packaging & Display)
Peter J Gurfein pgurfein@lgbfirm.com
Jodie M Grotins jgrotins@mcguirewoods.com
Cara Hagan, carahagan@haganlaw.org
Asa S Hami, ahami@sulmeyerlaw.com (counsel for OCC)
Brian T Harvey, bharvey@buchalter.com (counsel for California Bank & Trust)
David W Hercher dave.hercher@millernash.com
William W Huckins whuckins@allenmatkins.com, clynch@allenmatkins.com
Lance M. Jurich, ljurich@loeb.com (counsel for Canpartners)
Alexandra Kazhokin akazhokin@buchalter.com
William H. Kiekhofer wkiekhofer@mcguirewoods.com (counsel for Esmark)
Andrew F Kim, kim-a@blankrome.com (counsel for Imperial Bank)
Michael S Kogan, mkogan@ecjlaw.com (counsel for Kennedy Funding Inc.)
Tamar Kouyoumjian, tkouyoumjian@sulmeyerlaw.com (counsel for OCC)
Lewis R Landau lew@landaunet.com (Conflicts Counsel to Creditors Committee)
David E Leta, dleta@swlaw.com (counsel for FNBN-CMLCON I LLC)
R. Michael Llewellyn, michael.llewellyn@boe.ca.gov (counsel for California State Bar of Equalization)
Katherine Lien katie.lien@sbcglobal.net, katielien@gmail.com
Steven K Linkon, slinkon@rcolegal.com (counsel for Chinatrust Bank)
Richard Malatt, rmalatt@gmail.com (counsel for interested party)
Elmer D Martin, elmermartin@msn.com (counsel for United Commercial Bank)
Elissa Miller, emiller@sulmeyerlaw.com (counsel for Committee)
Raymond A. Myer; rmyer@myerlawpc.com (counsel for SCS Flooring)
Iain A W Nasatir, inasatir@pszjlaw.com (counsel for East West Bank and Legendary)
Ron Orr & Professionals, Inc: ronorresq@aol.com (Proposed Attorneys for Equity Committee)
Lawrence Peitzman, lpeitzman@pwkllp.com (counsel for interested party)
Eric S Pezold, epezold@swlaw.com (counsel for Bank of America)
Christopher E Prince cprince@lesnickprince.com
Dean G Rallis Jr, drallis@sulmeyerlaw.com (counsel for OCC)
Michael H Raichelson, mhr@cabkattorney.com (counsel for Stanford Group)
Kurt Ramlo, kurt.ramlo@dlapiper.com
Michael B Reynolds, mreynolds@swlaw.com (counsel for FNBN-CMLCON I LLC)
Jeremy V Richards jrichards@pszjlaw.com, bdassa@pszjlaw.com
Martha E Romero, Romero@mromerolawfirm.com (counsel for San Bernardino County)
Victor A Sahn, vsahn@sulmeyerlaw.com (counsel for OCC)
Zev Shechtman, zshechtman@dgdk.com (counsel for Debtors)
Jeffrey S Shinbrot, shinbrot@earthlink.net (counsel for Rodriguez, et al.)
Daniel H Slate, dslate@buchalter.com (counsel for California Bank & Trust)
Surjit P Soni, surj@sonilaw.com (counsel for Legendary)

☒ Service information continued on attached page

| In re: MERUELO MADDUX PROPERTIES, INC. Debtor(s). | CHAPTER: 11<br>CASE NUMBER: 1:09-bk-13356-KT |
|---|---|

James Stang, jstang@pszjlaw.com (counsel for East West Bank and Legendary)
Catherine Steege csteege@jenner.com (counsel for OEC)
Derrick Talerico dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
John N Tedford, jtedford@dgdk.com (counsel for Debtors)
Damon Thayer dthayer@jenner.com
James A Timko jtimko@allenmatkins.com
Alan G Tippie, atippie@sulmeyerlaw.com (counsel for OCC)
United States Trustee (SV), ustpregion16.wh.ecf@usdoj.gov
Rouben Varozian rvarozian@bzlegal.com (counsel for Vahan and Anoush Chamlian)
Jason L Weisberg, jason@gdclawyers.com (counsel for Roofcorp)
William E Winfield wwinfield@nchc.com
Jasmin Yang, jyang@swlaw.com (counsel for Bank of America)

II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served): On, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on September 1, 2010, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Via EMail
Ron Orr & Professionals, Inc: ronorresq@aol.com (Proposed Attorneys for Equity Committee)
Georgiana G. Rodiger: crodiger@rodigerlaw.com (Proposed Attorneys for Equity Committee)

Via Personal Delivery
Hon. Kathleen Thompson, U.S. Bankruptcy Court, 21041 Burbank Blvd, Suite 305, Woodland Hills, CA 91367

U.S. Trustee, Attn: Jennifer Braun, 21051 Warner Center Lane, Suite 115, Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| September 1, 2010 | Cindy M. Cripe | *[signature]* |
|---|---|---|
| Date | Type Name | Signature |

0.0 [XP]