1  Jeremy V. Richards (CA Bar No. 102300)
   Jeffrey W. Dulberg (CA Bar No. 181200)
2  PACHULSKI STANG ZIEHL & JONES LLP
   10100 Santa Monica Blvd., 11th Floor
3  Los Angeles, California  90067-4100
   Telephone: 310/277-6910; Facsimile: 310/201-0760
4  E-mail: jrichards@pszjlaw.com
           jdulberg@pszjlaw.com
5
   Surjit P. Soni (CA Bar No. 127419)
6  THE SONI LAW FIRM
   35 N. Lake Ave., Suite 720
7  Pasadena, California  91101
   Telephone: 626/683-7600; Facsimile: 626/683-1199
8  E-mail: surj@sonilaw.com
9  Counsel for Co-Proponent, Legendary Investors
   Group No. 1, LLC
10

Curtis C. Jung, Esq. (CA Bar No. 130657)
Monica H. Lin, Esq. (CA Bar No. 237343)
JUNG & YUEN, LLP
888 South Figueroa Street, Suite 720
Los Angeles, California  90017
Telephone: 213/689-8880; Facsimile: 213/689-8887
E-mail: curtis@jyllp.com

Elmer Dean Martin III, Esq. (CA Bar No. 75517)
22632 Golden Springs Dr., Suite 190
Diamond Bar, California  91765
Telephone: 909/861-6700; Facsimile: 909/860-3801
E-mail: elmer@bankruptcytax.net

Counsel for Co-Proponent, East West Bank

11              **UNITED STATES BANKRUPTCY COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13              **SAN FERNANDO VALLEY DIVISION**

14

| | |
|---|---|
| 15  In re: | Case No.: 1:09-bk-13356-KT |
| 16  MERUELO MADDUX PROPERTIES, INC., et al., | Chapter 11 |
| 17 | **AMENDED DISCLOSURE STATEMENT FOR LEGENDARY INVESTORS GROUP NO. 1, LLC'S AND EAST WEST BANK'S MODIFIED SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION DATED SEPTEMBER 3, 2010** |
| 18            Debtor |
| 19  ☒ Affects all Debtors |
| 20  ☐ Affects the following Debtor(s): |
| 21 | Disclosure Statement Approval Hearing |
| 22 | Hearing Date:    October 15, 2010 |
| 23 | Time:            10:30 a.m. |
|    | Place:           21041 Burbank Blvd. |
| 24 |                  Courtroom 301 |
|    |                  Woodland Hills, CA |
| 25 | Judge:           Hon. Kathleen Thompson |

26

27

28

**TABLE OF CONTENTS**

I. INTRODUCTION ............................................................................................. 7
II. PLAN PROPONENTS' BACKGROUND AND PROPOSED MANAGEMENT ................ 13
    A.    Legendary ................................................................................. 13
        1.    Surjit P. Soni ................................................................ 16
        2.    Dilip K. Bhavnani ....................................................... 17
    B.    East West Bank ....................................................................... 18
    C.    Asset Management and Property Management ................................ 18
III.    DEBTORS' BACKGROUND; STRUCTURE AND PROPERTIES; CASE
HISTORY ................................................................................................... 19
    A.    Corporate History, Consolidated Operations and Corporate and Capital
        Structures ............................................................................... 20
        1.    Corporate History ........................................................ 20
        2.    Prepetition Corporate and Capital Structure ..................... 20
            (a)    MMPI ........................................................ 20
            (b)    MMPI Initial Public Offering ....................... 20
            (c)    MMPI Existing Common Stock ..................... 21
            (d)    MMPI's Equity Incentive Plan ..................... 21
        3.    Corporate Structure of the Other Debtors ........................ 21
    B.    Description of Properties ............................................................ 22
    C.    Events Leading to Filing ........................................................... 22
    D.    Chapter 11 Events .................................................................... 24
        1.    Administrative Orders And Matters ................................ 24
            (a)    Introduction ............................................... 24
            (b)    The Cash Collateral Motions and Corresponding Orders ... 24
            (c)    The Debtors' Single Asset Real Estate ("SARE") Motion ... 26
            (d)    Motions for Relief from Stay ........................ 27
            (e)    The Debtors' Compromises With Various Lenders And
                    Disputes With Legendary ............................. 31
            (f)    The Debtors' Settlement with the County of Los Angeles ... 31
            (g)    Unexpired Leases and Executory Contracts ... 33
             (h)    Summary of Claims Process, Bar Date and Claims Filed ... 33
            (i)    East West Bank Lawsuit ............................... 34
        2.    The Debtors' Stipulation with the Creditors Committee Regarding
            Unsecured Claims ......................................................... 35
            (a)    Motion to Deem Claims Filed Against the Wrong Debtor to be
                    Filed Against the Proper Debtor ................... 36
            (b)    Other Administrative Matters ....................... 36
        3.    Plan Exclusivity .......................................................... 38
        4.    Real Property Valuation, Sales And Listings ..................... 39
            (a)    Value of Property Level Debtors Real Property Assets ... 39
            (b)    Sales and Listings Since the Commencement of the Chapter 11
                    Cases ........................................................ 39
        5.    Events in the Related Chapter 11 Cases MM 845 S. Flower and
            Chinatown. ................................................................. 41
            (a)    Important Events in MM 845 S. Flower and Chinatown Cases ... 42
            (b)    Sale of the Project and Settlement with Canyon ... 43
    E.    Material Proceedings ................................................................ 45
    F.    Potential Government Tax Audits ................................................ 45
        1.    Indemnification Claims ................................................. 45
        2.    Eminent Domain .......................................................... 46
        3.    Litigation After Lifting of the Automatic Stay .................. 47
IV. SUMMARY OF LEGENDARY/EWB PLAN ....................................................... 47
    A.    Unclassified Claims ................................................................. 48
        1.    Administrative Claims .................................................. 48

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

|  |  |  |  |  |
|---|---|---|---|---|
|  |  | (a) | General | 48 |
|  |  | (b) | Payment of Statutory Fees | 49 |
|  |  | (c) | Bar Date for Administrative Claims | 49 |
|  | 2. | Priority Tax Claims | | 51 |
| B. | Classes of Claims, Treatment, Impairment, Voting Status | | | 52 |
|  | 1. | Common Class Treatments for Classified Claims | | 56 |
|  |  | (a) | Common Secured Tax Claim Treatment | 57 |
|  |  | (b) | Common Secured Lender Claim Treatment | 58 |
|  |  | (c) | Common Other Priority Claim Treatment | 59 |
|  |  | (d) | Common Tenant Security Deposits Treatment | 60 |
|  |  | (e) | Common General Unsecured Claim Treatment | 60 |
|  |  | (f) | Common Unsecured Guaranty Claim Treatment | 61 |
|  |  | (g) | Common Intercompany Claim Treatment | 61 |
|  |  | (h) | Common Equity Interest Treatment | 61 |
| C. | Executory Contracts and Leases | | | 61 |

V. MEANS FOR IMPLEMENTATION OF PLAN ........................................................................ 63

| A. | Debt for Equity Conversion and Cash Infusion | | | 63 |
|---|---|---|---|---|
| B. | Sources and Uses of Cash for Effective Date | | | 63 |
| C. | Business Plan; Feasibility of Ongoing Operations | | | 63 |
| D. | Insider Litigation Trust | | | 66 |
| E. | Equity Ownership in Reorganized MMPI and the Litigation Trust | | | 68 |
|  | 1. | Issuance of New Common Stock | | 68 |
|  | 2. | Interests in the Litigation Trust | | 72 |
|  | 3. | Sales and Transfers of the New Common Stock and Litigation Trust Interests | | 74 |
|  |  | (a) | Restrictions Under Operative Agreements/Documents | 74 |
|  |  | (b) | Restrictions/Exemptions under Applicable Law | 74 |
|  | 4. | Exchange Act Compliance and Related Consequences Thereof | | 76 |
|  | 5. | Certain Transactions by Stockbrokers | | 78 |
|  | 6. | Listing of Reorganized MMPI Stock | | 78 |
|  | 7. | Investment Company Act | | 78 |
|  | 8. | Compliance by the Litigation Trust If Required | | 79 |
|  | 9. | Rights Offering to Holders of MMPI Existing Common Stock. | | 79 |
| F. | Board of Directors and Management of Reorganized MMPI; Compensation; Asset and Property Management | | | 80 |
|  | 1. | Board Composition | | 80 |
|  | 2. | Management | | 81 |
|  | 3. | Compensation | | 81 |
|  | 4. | Asset and Property Management | | 82 |
| G. | Revesting of Assets/Discharge/Limited Plan Releases | | | 83 |
|  | 1. | Vesting of Assets | | 83 |
|  | 2. | Retained Claims and Defenses and Reservation of Rights | | 83 |
|  |  | (a) | No Waiver and Retention of Claims and Defenses | 83 |
|  |  | (b) | Unknown Retained Claims and Defenses / No Preclusion | 85 |
|  | 3. | Discharge of the Debtors and Injunction | | 85 |
|  |  | (a) | Discharge | 85 |
|  |  | (b) | Injunction | 86 |
|  |  | (c) | No Liability for Solicitation or Participation | 86 |
|  |  | (d) | Limitation of Liability | 87 |
| H. | Claims Subject To Objection; Post-Effective Date Claims Objections Process | | | 87 |

VI. CONFIRMATION .................................................................................................................. 88

| A. | Acceptance | | | 88 |
|---|---|---|---|---|
| B. | Unfair Discrimination and the Fair and Equitable Tests | | | 89 |
| C. | Feasibility | | | 90 |
| D. | Best Interests Test | | | 91 |

VII. RISK FACTORS .................................................................................................................. 94

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | A. | Certain Bankruptcy Law Considerations | 94 |
|---|---|---|---|
| | | 1. Risk of Non-Confirmation of the Plan | 94 |
| | | 2. Risk of Non-Occurrence of the Effective Date | 94 |
| | B. | Risks To Recovery By Holders Of Claims | 95 |
| | | 1. Ability to Service Debt | 95 |
| | | 2. Risks of Asset Disposition Delays | 95 |
| | | 3. Projected Financial Information | 96 |
| | | 4. Risks Related to Reorganized MMPI's Common Stock | 96 |
| | | 5. Transfer Restrictions | 97 |
| | | 6. Regulatory Related Requirements | 97 |
| | | 7. Removal of Existing Management | 97 |
| | | 8. Additional Claims Associated with the Plan. | 98 |
| | | 9. Risks Associated with East West Bank Litigation | 98 |
| VIII. | INCOME TAX CONSEQUENCES | | 98 |
| | A. | Certain United States Federal Income Tax Consequences To The Debtors | 100 |
| | | 1. Net Operating Losses | 100 |
| | | 2. Cancellation of Debt | 101 |
| | | 3. Substitution of Debt | 102 |
| | | 4. Limitation on NOL Carryforwards and Other Tax Attributes | 102 |
| | | 5. General Section 382 Limitation | 103 |
| | | 6. Special Bankruptcy Exception | 103 |
| | | 7. Merger of MMPLP into MMPI | 105 |
| | | 8. Consequences of the Sale and/or Refinance of Assets | 106 |
| | B. | Consequences To Holders Of Certain Claims | 107 |
| | | 1. Consequences to Holders of Allowed General Unsecured Claims | 107 |
| | | 2. Consequences to Holders of Allowed Secured Claims | 108 |
| | C. | Consequences Of The Issuance Of New Common Stock | 109 |
| | D. | Distribution In Discharge Of Accrued Interest | 109 |
| | E. | Information Reporting And Backup Withholding | 110 |
| | F. | Importance Of Obtaining Professional Tax Assistance | 110 |
| IX. | COMPARISON OF PLAN TO OTHER PLANS BEFORE THE COURT | | 111 |
| X. | ALTERNATIVES TO PLAN/LIQUIDATION | | 111 |
| | A. | Alternative Plans of Reorganization | 111 |
| | B. | Liquidation Under Chapter 7 | 111 |
| XI. | CONCLUSION AND RECOMMENDATIONS | | 112 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**Exhibits to this Disclosure Statement**

1.    Plan

2.    Definitions & Identification Keys for Debtors' Estates and Secured Claims

3.    Effective Date Sources and Uses of Cash

4.    Financial Projections: Pro Forma Balance Sheets; Income Statements; Cash Flows
   and Assumptions (Including Asset Disposition Schedule)

5.    Liquidation Analysis

6.    Property Descriptions

7.    Property Valuations

8.    Priority Tax Claims

9.    Loan Modification Provisions

10.    Legendary Informational Brochure

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

## IMPORTANT DATES

2

☐ Date by which Ballots must be received: **November 17, 2010, at 4:00 p.m. Pacific Time.**
**Please vote and return your Ballot(s) to:**
3                **Meruelo Maddux Ballot Processing**
**c/o Kurtzman Carson Consultants**
4                **2335 Alaska Avenue**
**El Segundo, California 90245**
5                **Facsimile: (310) 751-1567**
**E-mail: kcc_meruelomaddux@kccllc.com**
6
☐ Date by which: (a) list of dispositive plan confirmation issues in bullet point format must be
7                filed and served: **November 9, 2010**; and (b) opposition briefs, supporting declarations and
expert reports must be filed and served: **December 13, 2010**.
8
☐ Hearing on Confirmation of the Plan: **January 12, 2011, at 9:30 a.m. Pacific Time.**

9

10   **11 U.S.C. § 1125(b) PROHIBITS SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN**
**UNLESS A COPY OF THE PLAN, OR A SUMMARY THEREOF, IS ACCOMPANIED OR PRECEDED BY A**
11   **COPY OF A DISCLOSURE STATEMENT APPROVED BY THE BANKRUPTCY COURT. THIS PROPOSED**
**DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT, AND,**
12   **THEREFORE, THE FILING AND DISSEMINATION OF THIS PROPOSED DISCLOSURE STATEMENT IS**
**NOT INTENDED TO BE, NOR SHOULD IT BE CONSTRUED AS, AN AUTHORIZED SOLICITATION**
13   **PURSUANT TO 11 U.S.C. § 1125 AND RULE 3017 OF THE FEDERAL RULES OF BANKRUPTCY**
**PROCEDURE. NO SUCH SOLICITATION WILL BE MADE EXCEPT AS AUTHORIZED PURSUANT TO**
14   **SUCH LAW AND RULES.**

15                Jeremy V. Richards
Jeffrey W. Dulberg
16                PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 11th Floor
17                Los Angeles, California 90067-4100
Telephone: 310/277-6910
18                Counsel for Co-Proponent, Legendary Investors Group No. 1, LLC

19

20   Dated: October 14, 2010

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2

**I.**

**INTRODUCTION**

3    Legendary Investors Group No. 1, LLC ("Legendary") and East West Bank ("EWB" and

4 collectively with Legendary, the "Proponents"), which are secured creditors of certain of the Debtors

5 and unsecured guaranty creditors of the parent corporation Meruelo Maddux Properties, Inc., a

6 Delaware corporation ("MMPI"), have jointly proposed their modified second amended chapter 11

7 plan of reorganization in the form attached hereto as **Exhibit "1"** (the "Plan") for MMPI and each of

8 its 53 related debtor entities (collectively, the "Debtors").

9    This *Amended Disclosure Statement for Legendary Investors Group No. 1, LLC's and East

10 West Bank's Modified Second Amended Chapter 11 Plan of Reorganization* dated as of September 3,

11 2010 ("Disclosure Statement") provides a summary of the Plan and certain related matters.[1] *This

12 Disclosure Statement has been approved by the Bankruptcy Court and is provided to help you

13 understand the Plan.* This Disclosure Statement sets forth information (a) concerning the Plan and

14 alternatives to the Plan,[2] (b) advising the Holders[3] of Claims and Interests of their rights under the

15 Plan, (c) assisting the Holders of Claims and Interests in making an informed judgment regarding

16 whether they should vote to accept or reject the Plan, and (d) assisting the Bankruptcy Court in

17 determining whether the Plan complies with the provisions of the Bankruptcy Code and should be

18 confirmed.

19    The Plan provides for the reorganization of the Debtors' affairs to create a strong, well-

20 managed and well-financed operation. The Plan's foundation is an $80 million recapitalization via a

21 $5 million cash infusion by Legendary, conversion of approximately $65 million of the Proponents'

22 debt to equity and a $10 million Rights Offering to Holders of MMPI Existing Common Stock as of

23 the Record Date. Such Holders will be offered the right to purchase up to a total of 2,202,500

24    [1] In the event the Plan and Disclosure Statement are inconsistent, the Plan will control.

25    [2] In addition to the Plan described herein, the Debtors proposed a chapter 11 plan described in their *Third Amended Joint
Plan of Reorganization of Meruelo Maddux Properties, Inc. et al. Dated September 1, 2010* [Docket No. 1771] (as
26 amended or modified from time to time, "Debtors' Disclosure Statement"). Equity holders Charlestown Capital
Advisors LLC and Hartland Asset Management Corporation proposed a chapter 11 plan described in their *First Amended
27 Joint Plan of Reorganization of Meruelo Maddux Properties, Inc., et al. Dated September 2, 2010* [Docket No. 1778].

28    [3] The definitions for capitalized terms used in the Proponents' Plan and Disclosure Statement are set forth in Exhibit 2
and shall have the respective meanings set forth therein.

1    additional shares of Reorganized MMPI Common Stock, equal to a 10% stake in Reorganized
2    MMPI.

3          The restructuring proposed by the Plan will greatly reduce the Reorganized Debtors' debt
4    service load permitting them to meet all of their obligations both in the short term and over the life
5    of the Plan. Legendary's cash contribution combined with the proceeds of the Rights Offering and
6    the Debtors' cash from operations will provide more than sufficient funds for the payment of all
7    amounts due on or around the Plan's Effective Date.

8          Except to the extent that the Holder of an Allowed General Unsecured Claim accepts, or has
9    accepted, less favorable treatment, the Holder of an Allowed General Unsecured Claim will receive
10   one of the following treatments:

11         (i) If a Class of Holders of General Unsecured Claims votes to accept the Plan in accordance
12   with Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim
13   in such Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the
14   Effective Date, plus simple interest at 5% per annum for the period from the Petition Date through
15   the date each Allowed Claim is paid; *provided, however*, if a Claim is not Allowed as of the
16   Effective Date but becomes Allowed thereafter interest shall not accrue during the initial 30-day
17   period following the Effective Date but shall resume accruing thereafter.

18         (ii) If a Class of Holders of General Unsecured Claims votes to reject the Plan in accordance
19   with Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim
20   in such Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the
21   Effective Date, plus (x) simple interest at 0.64% (i.e., the Federal Judgment Rate) for the period
22   from the Petition Date through the Effective Date and (y) in the event the Claim is not Allowed as of
23   the Effective Date but becomes Allowed thereafter, simple interest at 5% per annum for the period
24   from the 31st day after the Effective Date through the date the Claim is paid.

25         Holders of General Unsecured Claims could be considered "Impaired" by the Plan; out of an
26   abundance of caution, the Proponents are soliciting votes on the Plan from such Holders. However,
27   the Proponents reserve the right to contend that Holders of General Unsecured Claims are
28   Unimpaired under the Plan and are deemed to have accepted the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52010-001\DOCS_LA:224408.6                                    8

1    Unless they have agreed to alternative treatment with the Debtors pursuant to a Bankruptcy

2    Court-approved settlement, Holders of Secured Claims will receive 5.5% interest-only payments on

3    a quarterly basis, with repayment of all principal on or before the fourth anniversary of the Effective

4    Date. Unless they have agreed to alternative treatment with the Debtors pursuant to a Bankruptcy

5    Court-approved settlement, Holders of Allowed Unsecured Guaranty Claims will have their Allowed

6    Guaranty Claims reinstated but modified with respect to the restructured underlying secured debt.

7    Those secured lenders that have entered into Bankruptcy Court-approved settlements with the

8    Debtors regarding repayment of their Secured Claims shall have those settlements honored in the

9    form approved by the Bankruptcy Court.

10    The Plan divides the Holders of Equity Interests in MMPI into two classes, the Insider

11    Shareholders and all other Holders. As to both classes, the Plan provides for the cancellation of

12    MMPI Existing Common Stock and the issuance of 22,025,000 shares of Reorganized MMPI

13    Common Stock to stakeholders as follows. Holders of MMPI Existing Common Stock, who hold

14    approximately 88.1 million shares in total, shall be issued one share of Reorganized MMPI Common

15    Stock in exchange for each twenty (20) shares of MMPI Existing Common Stock they held on the

16    Record Date (for a total of 4,405,000 shares of Reorganized MMPI Common Stock). Thus, Holders

17    of MMPI Existing Common Stock shall be diluted to an aggregate 20% stake in Reorganized MMPI.

18    In addition, Holders of MMPI Existing Common Stock shall receive one Subscription Right for each

19    20 shares of such MMPI Existing Common Stock held by such Holder as of the Effective Date.

20    Pursuant to the Subscription Right and, in accordance with the terms and conditions of the

21    Subscription Right more fully set forth in section V.E.9 hereof, during the Subscription Period, the

22    Holder of the Subscription Right shall have the right to subscribe for the purchase of a number of

23    Subscription Shares equal to up to 0.95 times the number of shares of Reorganized MMPI Common

24    Stock distributed to such Holder under the Plan, at a purchase price of $4.54 per share; provided,

25    however, that the number of Subscription Shares subject to the foregoing Subscription Rights (also

26    referred to herein as the Rights Offering) will not exceed 2,202,500 shares of Reorganized MMPI

27    Common Stock. In the event that the Rights Offering is oversubscribed, each holder of Subscription

28    Rights that are timely and properly exercised shall receive, pursuant to the exercise of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Subscription Rights, additional shares of Reorganized MMPI Common Stock equal to the total

2    number of Subscription Shares available (i.e. 2,202,500) multiplied by such Holder's Subscription

3    Share Pro Rata Allocation (the number of Reorganized MMPI Common Stock subscribed to by the

4    Holder / number of shares of Reorganized MMPI Common Stock subscribed to by all subscribers).

5    This offering shall comply with all rules necessary to ensure its exemption, under Section 1145 of

6    the Bankruptcy Code, from federal, state and local security registration requirements; alternatively it

7    shall be made available only to the Holders of MMPI Existing Common Stock who are "accredited

8    investors." In any event, the occurrence of the Plan's Effective Date is not conditioned or contingent

9    upon the Rights Offering. As set forth in Section V.E.1 herein, Legendary will backstop the Rights

10   Offering for up to $10 million. This backstop eliminates any concerns regarding the Plan's

11   feasibility in the event the Rights Offering does not occur as the net result to the Reorganized

12   Debtors will be the same.

13       In exchange for converting approximately $65 million of their debt and Legendary's $5

14   million equity contribution, the Proponents shall receive between 15,417,500 and 17,620,000 shares

15   of Reorganized MMPI Common Stock, equal to a stake of between 70% and 80% of Reorganized

16   MMPI, dependent upon the outcome of the Rights Offering described above.

17       Claims held by the Debtors' estates that may be asserted against Insiders (defined herein as

18   Insider Causes of Action) shall be controlled by a Litigation Trustee and the Equity Holders

19   Committee on behalf of present non-Insider MMPI Equity Holders and Reorganized MMPI.

20       The Proponents will seek Confirmation of the Plan in the MMPI case immediately prior to

21   seeking confirmation of the Plan in the remaining Debtors' cases. Confirmation of the Plan in the

22   MMPI case is an express condition to Confirmation of the Plan in each of the other Debtors' cases.

23   In the event the Proponents are unable to confirm the Plan in the MMPI case, the Proponents will not

24   seek to confirm the Plan with respect to the remaining Debtors. The Plan does not substantively

25   consolidate the Debtors' estates. Each of the Debtors will remain a separate entity if the Plan is

26   confirmed in whole or in part, and the debts and liabilities of each Debtor will remain attributable to

27   that Debtor alone. Accordingly, the Plan classifies the Debtors' Claims and Interests on a Debtor-

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  by-Debtor basis, votes will be tabulated on a Debtor-by-Debtor basis, and the Plan will be confirmed
2  on a Debtor-by-Debtor basis.

3      The chart in Section IV.B of this Disclosure Statement shows the categories of Claims and
4  Interests (except for Administrative Claims and Priority Tax Claims which are not classified) by
5  class in each of the Estates[4] for all purposes, including voting, confirmation and distribution pursuant
6  to the Plan.

7      All Holders of Impaired Claims and Interests entitled to vote on the Plan are encouraged to
8  read it and this Disclosure Statement in their entireties before voting to accept or reject the Plan.
9  Applicable voting procedures ("Voting Procedures") are set forth in a separate document which also
10  accompanies this Disclosure Statement. If you hold a claim or interest in a voting class under the
11  Plan, please review the Voting Procedures carefully so that your vote will be counted.

12      OTHER THAN AS SET FORTH IN THE DISCLOSURE STATEMENT, NO
13  REPRESENTATIONS CONCERNING THE DEBTORS, THEIR FINANCIAL CONDITION, OR
14  ANY ASPECT OF THE PLAN ARE AUTHORIZED BY ANY PARTY IN THESE CASES. ANY
15  REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OR
16  REJECTION OF THE PLAN, WHICH ARE OTHER THAN AS CONTAINED IN, OR
17  INCLUDED WITH, THE PLAN OR THIS DISCLOSURE STATEMENT, SHOULD NOT BE
18  RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.

19      THE PROPONENTS ARE SECURED CREDITORS OF THE DEBTORS AND ARE NOT
20  AFFILIATED WITH THE DEBTORS. THEY DO NOT HAVE ACCESS TO THE DEBTORS'
21  EMPLOYEES, ADVISORS, ATTORNEYS OR INTERNAL DOCUMENTS. THEREFORE, THE
22  PLAN AND THIS DISCLOSURE STATEMENT INCLUDE INFORMATION BASED ON THE
23  DEBTORS' STATEMENTS IN PUBLICLY AVAILABLE DOCUMENTS (SUCH AS FILINGS
24  IN THESE CHAPTER 11 CASES). BELOW, THE PROPONENTS HAVE REPEATED OR
25  SUMMARIZED INFORMATION FROM THE DEBTORS' DISCLOSURE STATEMENT,
26  WHICH THE DEBTORS HAVE REQUESTED BE APPROVED BY THE BANKRUPTCY
27  COURT AS CONTAINING ADEQUATE INFORMATION FOR VOTING ON THE DEBTORS'
28

[4] See **Exhibit "2"** – Identification Keys for Debtors' Estates and Secured Claims.

52010-001\DOCS_LA:224408.6    11

1  PROPOSED CHAPTER 11 PLAN. THE PROPONENTS' RELY ON THE INFORMATION

2  CONTAINED IN THE DEBTORS' DISCLOSURE STATEMENT AND HAVE NOT

3  PERFORMED THEIR OWN INDEPENDENT INVESTIGATION OF THE ACCURACY AND

4  COMPLETENESS OF INFORMATION CONTAINED THEREIN. THEREFORE, THE

5  PROPONENTS DO NOT REPRESENT HEREIN THAT ANY OF SUCH INFORMATION IS

6  ACCURATE OR COMPLETE AT THE TIME MADE OR AS OF THE DATE OF THIS

7  DISCLOSURE STATEMENT.

8  THE FINANCIAL INFORMATION CONTAINED HEREIN, UNLESS OTHERWISE

9  INDICATED, IS UNAUDITED. THE PROPONENTS ARE UNABLE TO WARRANT OR

10  REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY

11  INACCURACIES. GREAT EFFORT, HOWEVER, HAS BEEN MADE TO ENSURE THAT ALL

12  SUCH INFORMATION IS PRESENTED FAIRLY. CERTAIN OF THE STATEMENTS

13  CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-

14  LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO

15  ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. ALL

16  HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER

17  FULLY THE RISK FACTORS SET FORTH IN ARTICLE VII OF THIS DISCLOSURE

18  STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

19  WHERE THERE ARE SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS

20  AND OTHER DOCUMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT, SUCH

21  SUMMARIES DO NOT PURPORT TO BE COMPLETE AND DO NOT SUBSTITUTE FOR THE

22  FULL TEXT OF THE APPLICABLE AGREEMENT OR DOCUMENT.

23  THE PROPONENTS BELIEVE THAT THE PLAN REPRESENTS THE BEST POSSIBLE

24  RETURN TO HOLDERS OF CLAIMS AND INTERESTS. THE PROPONENTS BELIEVE THE

25  PLAN WILL SUCCESSFULLY REORGANIZE THE DEBTORS AND THAT CONFIRMATION

26  OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS, THEIR CREDITORS AND

27  EQUITY INTEREST HOLDERS.

28

52010-001\DOCS_LA:224408.6            12

1    THE PROPONENTS STRONGLY URGE YOU TO READ THIS DISCLOSURE

2    STATEMENT AND VOTE IN FAVOR OF THE PLAN.

3        *        *        *

4    **Confirmation Hearing**

5        Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on

6    January 12, 2011 commencing at 9:30 a.m. Pacific Time, before the Bankruptcy Court, the

7    Honorable Victoria Kaufman, Courtroom 1675, 21041 Burbank Blvd., Woodland Hills, California

8    91367.  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without

9    further notice except for the announcement of the adjournment date made at the Confirmation

10   Hearing or at any subsequent adjourned Confirmation Hearing.

11       Any objection to Confirmation must be made in writing and specify in detail the name and

12   address of the objector, all grounds for the objection and the amount of the Claim or number of

13   shares of stock held by the objector.  A list of dispositive plan confirmation issues in bullet point

14   format must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy

15   Court, the Proponents, the Creditors Committee, the Equity Holders Committee and the Debtors on

16   or before November 9, 2010; formal opposition briefs to confirmation of the Plan, together with

17   supporting declarations and expert reports must be filed with the Bankruptcy Court and served so

18   that it is received by the Bankruptcy Court, the Proponents, the Creditors Committee, the Equity

19   Holders Committee and the Debtors on or before December 12, 2010.  Objections to Confirmation

20   of the Plan are governed by Bankruptcy Rule 9014.

21                                         **II.**

22               **PLAN PROPONENTS' BACKGROUND AND PROPOSED MANAGEMENT**

23   A.      **Legendary**

24       Legendary is a private real estate investment fund that owns senior secured real estate

25   collateralized debt obligations of the Debtors valued at approximately $65 million.[5]  These

26   obligations are described in the following proofs of claim filed with the Clerk:

27

28   [5] The Debtors have informally stated that they will dispute that they are indebted to Legendary in this amount and may
contest, among other things, Legendary's interest calculations, attorneys' fees and late charges.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| Claim Number | Case No. | Debtor |
|--------------|----------|--------|
| 5 | 09-13406 | Merco Group, LLC |
| 7 | 09-13399 | MG 4th Street Center |
| 6 | 09-13360 | MM 420 Boyd Street |
| 5 | 09-13400 | MG 425 W. 11th Street |
| 5 | 09-13401 | MG 620 Gladys Avenue |
| 4 | 09-13359 | MM 3rd and Omar Street |
| 3 | 09-13398 | MG 1500 Griffith Avenue |
| 69 | 09-13356 | MMPI |
| 7 | 09-13387 | MMPLP |

Additional details concerning the estimated amounts, as of December 31, 2010, of

Legendary's claims, broken down by debt that will / will not be converted to equity under the Plan,

and EWB's claims can be found in the following table:

| | Legendary Debt Being Converted | | | | | | Legendary Debt NOT Being Converted | | |
|---|---|---|---|---|---|---|---|---|---|
| | 3rd & Omar | 420 Boyd | 1500 Griffith & 4th St | 620 Gladys Ave & 336 W11 | 425 W. 11st | Totals for Converted Debt | Merco Group - Sci-ARC | Merco Group - Sky-ARC | Totals for Non-Converted Debt |
| Principal Balance[1] | $2,559,658 | $5,950,000 | $6,396,500 | $5,380,688 | $5,340,000 | $25,626,846 | $10,108,209 | $15,000,000 | $25,108,209 |
| Pre-Petition Unpaid Interest | $ 5,546 | $ 87,893 | $ 74,626 | $ 104,811 | $ 53,585 | $ 326,462 | $ 202,866 | $ 292,188 | $ 495,054 |
| Pre-Petition Default interest | $ 4,266 | $ 58,674 | $ 62,188 | $ 63,522 | $ 63,042 | $ 251,692 | $ 119,333 | $ 177,083 | $ 296,416 |
| Pre-Petition Late charges | $297,631 | $ 11,872 | $ 4,659 | $ 4,916 | $ 2,132 | $ 321,210 | $ 14,420 | $ 553,248 | $ 567,668 |
| Post-Petition Unpaid Interest | $228,948 | $797,227 | $686,558 | $ 567,214 | $ 405,988 | $ 2,685,936 | $ 1,537,009 | $2,213,750 | $ 3,750,759 |
| Post-Petition Default Interest | $144,149 | $532,194 | $572,130 | $ 343,767 | $ 477,633 | $ 2,069,874 | $ 904,123 | $1,341,665 | $ 2,245,788 |
| Post-Petition Late charges | $ - | $ 47,165 | $328,849 | $ 14,747 | $ 268,173 | $ 658,934 | $ 100,937 | $ 320,109 | $ 421,047 |
| Title Charge | $ - | $ - | $ 1,250 | $ 750 | $ 750 | $ 2,750 | $ 750 | $ 650 | $ 1,400 |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Appraisal | $ - | $ - | $ - | $ 8,000 | $ 9,738 | $ 17,738 | $ - | $ 7,988 | $ 7,988 |
| Legal Fees[2] | $416,979 | $416,979 | $416,979 | $416,979 | $416,979 | $2,084,896 | $416,979 | $416,979 | $833,958 |
| Total Outstanding as of 12/31/10 | $3,657,178 | $7,902,005 | $8,543,738 | $6,905,395 | $7,038,020 | $34,046,336 | $13,404,627 | $20,323,660 | $33,728,287 |

| **EWB Debt Being Converted** | | | |
|---|---|---|---|
| | 2640 Washington | Wall Street | Totals for Legendary Converted Debt |
| Principal Balance[1] | $ 6,066,073 | $ 20,850,859 | $26,916,932 |
| Pre-Petition Unpaid Interest | $ 71,855 | $ 243,009 | $ 314,864 |
| Pre-Petitiion Default interest | $ 11,458.00 | $ 98,462.30 | $ 109,920 |
| Pre-Petition Late charges | $ 14,384 | $ 12,625 | $ 27,009 |
| Post-Petition Unpaid Interest to 12/31/2010[2] | $ 869,470 | $ 1,961,284 | $ 2,830,754 |
| Post-Petition Default Interest | $217,365.00 | $1,867,887.75 | $ 2,085,253 |
| Post-Petition Late charges | $ 50,345 | $ 132,560 | $ 182,905 |
| Appraisal | $ 40,000 | $ 20,000 | $ 60,000 |
| Other Fees | | $ 10,500 | $ 10,500 |
| Insurance Advance | $ 14,515 | | $ 14,515 |
| Legal Fees[2] | $ 228,000 | $ 228,000 | $ 456,000 |
| **Total Outstanding as of 12/31/10** | $ 7,583,464 | $ 25,425,187 | $33,008,651 |

[1] See Exh 6 & Decls in support of 1st day Motions

[2] Estimated fees through Dec 31, 2010 shared equally among loans

Legendary is managed by Legendary Developments, LLC and its principals Surjit P. Soni and Dilip Bhavnani. Legendary Developments, LLC is a real estate investment and development company. Both Legendary and Legendary Developments, LLC are based in Pasadena, California.[6]

On June 30, 2009, Legendary acquired from EWB secured notes under which the following Debtors are (i) obligors on the notes, and/or (ii) owners of real property that is collateral for the notes: (a) Merco Group (for the Sci-Arc Real Property and Sky-Arc Real Property); (b) MG – 1500 Griffith Avenue; (c) MG – 620 Gladys Avenue; (d) MM – 420 Boyd Street; (e) MM – 3rd and Omar

[6] An informational brochure regarding Legendary is attached hereto as **Exhibit "10"**.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Street; (f) MG - 425 W. 11th Street; (g) MM – 336 W. 11th Street; (h) MG – Little J; and (i) MG –

2  4th Street Center.  Legendary also holds Guaranty Claims against MMPI and MMPLP.

3       Legendary is a banking and credit customer of EWB.  Its managing members and some of

4  the members also maintain credit facilities, including purchase money loans, construction loans and

5  home equity loans with EWB.  Managing members, through their development company and other

6  business entities, have purchased real estate backed notes from EWB and EWB has provided

7  purchase money financing for such notes.  The obligations Legendary will be converting to equity

8  were acquired from EWB and are subject to purchase money loans by EWB.  EWB has agreed to a

9  collateral substitution of the pledge and assignments of trust deeds associated with the loans to be

10  converted for pledges of a portion of the shares (sufficient to maintain its equity cushion) that

11  Legendary will receive of the Reorganized entity, if the Plan is confirmed.  The Proponents know of

12  no regulatory oversight implications or impediments arising out of the this Plan.

13       **1.    Surjit P. Soni**

14       Mr. Soni is licensed to practice law in the State of California and is the principal of The Soni

15  Law Firm.  Prior to formation of his law firm, Mr. Soni was a Senior Partner and head of the

16  Litigation Group at the law firm of Sheldon & Mak.  He obtained his Juris Doctor cum laude from

17  the University of Miami School of Law.  He earned his Bachelor's of Science degree from the

18  University of Toronto.  Mr. Soni is a nationally-recognized, well-respected business and intellectual

19  property attorney.  He serves clients in their transactional and litigation needs locally, nationally and

20  internationally.  Mr. Soni also has over a decade of business management and marketing experience,

21  including extensive experience in finance, manufacturing, international trade, marketing in the

22  transportation, fashion and other industries, real estate construction, and development.  As a result of

23  his activities as a real estate investor and advisor over the last 10 years, the Bankruptcy Court

24  permitted him to offer testimony concerning trends in Greater Los Angeles area real estate values.

25  Mr. Soni also is highly skilled at corporate finance, reorganizations, work-outs and strategic business

26  growth planning having assisted his clients for over 20 years in these endeavors.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## 2.    **Dilip K. Bhavnani**

Mr. Bhavnani earned his bachelor's degree in economics from UCLA.  Aside from a variety of real estate investment and development projects, Mr. Bhavnani and his family own several businesses involved in promotional products, telecommunications, travel, food products distribution, leather goods and plastic products manufacture and supply.  Mr. Bhavnani holds the position of Chief Operating Officer for Affinity Business Accessories LLC, Premium Shapes USA, Values4Less.com, Inc, Geo Group Communications Inc, and Salus Creative Inc, and SunMost LLC. Mr. Bhavnani is also the Chief Operating Officer of Sun Coast Merchandise Corp. which was formed in 1943.  The Company's annual revenues were just $2.7 million when Mr. Bhavnani joined and were $24.8 million when he assumed his position as COO.  Under Mr. Bhavnani's management, revenues grew to over $162 million in the U.S. and over $312 million worldwide.  Mr. Bhavnani's sophistication with purchasing, logistics and fulfillment ensure that projects stay on time and on budget.

Mr. Bhavnani and Mr. Soni bring together decades of experience in real estate investment and development.  Together, they have developed over 1 million square feet of commercial, industrial and residential space in the last twenty years.  Mr. Bhavnani and Mr. Soni actively manage and supervise all projects.  Legendary Developments, LLC has grown exponentially since its formation.  In less than two years, Legendary Developments, LLC has placed over $80 million (200,000 square feet) in construction and $60 million (175,000 square feet) in development.

Mr. Bhavnani and Mr. Soni have demonstrated creativity and sophistication in acquiring assets, at value, as well as financing in a "down" economy.  They have developed strong relationships with the financial community and work well with cities and municipal governments. They are respected for their strategic vision and their ability to accomplish their planned objectives to create profitable products.  They have consistently produced products that sell at prices well above the market average.  These results are consistently achieved through strategic acquisitions, high design, quality control, tight management, cost control and product positioning.

**B.    East West Bank**

Along with Legendary, EWB is co-Proponent of the Plan. EWB is a full-service commercial bank serving consumers and businesses throughout California. It is one of the largest independent commercial banks headquartered in California with approximately $20 billion of assets and over 130 locations worldwide, including the U.S. markets of California, New York, Georgia, Massachusetts, Texas and Washington. In Greater China, EWB's presence includes a full service branch in Hong Kong and representative offices in Beijing, Shanghai, Shenzhen and Taipei. Through a wholly-owned subsidiary bank, EWB's presence in Greater China also includes full service branches in Shanghai and Shantou and representative offices in Beijing and Guangzhou. Further information about EWB can be found on its website at www.eastwestbank.com.

On or about November 6, 2009, the California Department of Financial Institutions closed United Commercial Bank ("UCB"), San Francisco California and appointed the Federal Deposit Insurance Corporation ("FDIC") as receiver. The FDIC entered into a purchase and assumption agreement with EWB to assume the deposits of UCB, and acquire certain assets of UCB, including UCB's secured notes owed by the following Debtors: (a) Meruelo Wall Street and (b) 2640 Washington Boulevard. By its acquisition of assets of UCB, EWB also holds a Guaranty Claim against MMPI.

**C.    Asset Management and Property Management**

The Proponents have secured the services of Voit Real Estate Services ("VRES") to provide asset management and property management services for the Debtors' property portfolio. VRES is a full service commercial real estate services firm that provides strategic property solutions scaled to clients' needs. VRES combines its nearly four decades of experience in real estate operations, ownership, investment advisory services, financial analysis, market research, asset management, development, tenant advisory and brokerage services to provide clients with forward looking strategies that create value for their assets.

VRES is privately held, debt-free and has owned, developed and managed over 26 million square feet of commercial real estate, participated in $1.3 billion of construction projects and completed over $32 billion in brokerage transaction volume. VRES offers asset management,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    project management, property and association management, financial analysis, asset valuation,

2    receivership, brokerage, asset, business plan strategies, market research, environmental assessment

3    and development and construction management services.  In unrelated engagements, VRES is

4    currently advising Wells Fargo, GE Finance, Chase Commercial Bank, California Bank & Trust,

5    Lehman Brothers, TriMont, Midland/Trigild, US Bank (including Cal National Bank assets), Zions

6    & Wachovia Bank.

### III.

### DEBTORS' BACKGROUND; STRUCTURE AND PROPERTIES; CASE HISTORY

The Proponents are secured creditors of the Debtors and are not affiliated with the Debtors.
They do not have access to the Debtors' employees, advisors, attorneys or internal documents.
Therefore, the Plan and this Disclosure Statement include information based on the Debtors'
statements in publicly available documents (such as filings in these Chapter 11 Cases).[7]

Below, the Proponents have repeated or summarized information from the Debtors'
Disclosure Statement which the Debtors have requested be approved by the Bankruptcy Court as
containing adequate information for voting on the Debtors' proposed chapter 11 plan.  The
Proponents' rely on the information contained in the Debtors' Disclosure Statement and have not
performed their own independent investigation of the accuracy and completeness of information
contained therein.  Therefore, the Proponents do not represent herein that any of such information is
accurate or complete at the time made or as of the date of this Disclosure Statement.

---

[7] MMPI has filed public reports with the SEC which contain additional information about the Debtors and their historic financial performance. The most recent filings are: 10-K for the year ended December 31, 2009 (filed on June 21, 2010), 10-K for the year ended December 31, 2008 (filed on March 16, 2009), Amended 10-K for the year ended December 31, 2008 (filed on April 30, 2009), 10-Q for the quarter ended March 31, 2009 (filed on September 9, 2009), 10-Q for the quarter ended June 30, 2009 (filed on September 17, 2009) and 10-Q for the quarter ended September 30, 2009 (filed on November 9, 2009). On January 19, 2010, MMPI filed its Certification and Notice of Termination of Registration under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports under Section 13 and 15(d) of the Securities Exchange Act of 1934 and accordingly, the Debtor is no longer required to file public reports with the SEC.  You may obtain copies of these documents from the SEC's website at:
http://www.sec.gov/edgar/searchedgar/companysearch.html

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**A.    Corporate History, Consolidated Operations and Corporate and Capital Structures**

**1.    Corporate History**

MMPI is the parent company of the fifty-three related Debtor entities that, along with MMPI, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 26 and 27, 2009.  MMPI was incorporated in 2006 under the laws of the State of Delaware, and is registered with the California Secretary of State to do business in the State of California.  Each of the other Debtors was formed under either the laws of the State of Delaware or the laws of the State of California.  The Delaware Debtors are registered with the California Secretary of State to do business in the State of California.

As a public company, MMPI has been required to file various reports with the SEC, including among others, quarterly reports as well as annual reports with audited financial statements. These reports have been prepared and filed on a consolidated basis.  Although the Debtors' SEC filings do provide information relating to individual subsidiaries, the filings generally discuss the business as a consolidated enterprise.

**2.    Prepetition Corporate and Capital Structure**

**(a)    MMPI**

MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue Code.  Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately owned by MMPI's directors and executive officers with Richard Meruelo owning the largest amount of shares (approximately 39,911,378).  The other 47.8% of MMPI's stock is publicly owned and, prior to April 2009, was traded on the NASDAQ stock exchange.  The stock is presently trading on the Over The Counter Bulletin Board.

**(b)    MMPI Initial Public Offering**

MMPI was formed on or about July 5, 2006, and MMPLP was formed on or about September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's common stock.  Between January 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000 shares of common stock at $10.00 per share.  MMPI raised approximately $425.7 million, after underwriting discounts but before expenses related to the IPO.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

#### (c)    MMPI Existing Common Stock

The authorized capital stock of MMPI consists of up to 200,000,000 shares of common stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred stock, $.01 par value per share. As of April 23, 2010, there are 87,845,789 shares of Common Stock issued and outstanding held by approximately sixty holders of record. Holders of Common Stock have no right to convert their Common Stock into any other securities. The Common Stock has no preemptive or other subscription rights. There are no redemption or sinking fund provisions applicable to the Common Stock. All outstanding shares of Common Stock are duly authorized, validly issued, fully paid and non-assessable.

#### (d)    MMPI's Equity Incentive Plan

Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive Plan ("LTIP") Units and other awards as part of its employee compensation packages. The LTIP units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be converted into MMPLP's common units and consequently become redeemable by the Holder on a one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of such common stock. MMPI initially reserved 2,277,500 shares of common stock for issuance of awards under the Equity Incentive Plan. As of June 30, 2009, there remain 1,083,334 shares available from the initial reservation.

### 3.    Corporate Structure of the Other Debtors

MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP. The remaining 0.4% limited partnership units are owned by certain members of MMPI's management team who obtained their interests through the LTIP available to certain personnel as part of their compensation packages.

MMPLP owns 100% of the common stock of Meruelo Maddux Construction, Inc. ("MM Construction"), 99% of the membership units in Meruelo Maddux Management, LLC ("MM Management") and 99% of the membership units in Funes Architecture, LLC ("Funes"). The remaining membership units in MM Management and Funes are owned by MM Construction.

1      MMPLP also owns 100% of the membership units in MMP Ventures, LLC ("MMP

2    Ventures"). MMP Ventures, in turn, owns 100% of the stock or membership units in a number of

3    subsidiary corporations and limited liability companies referred to as Property Level Debtors

4    because they are the entities which hold title to the various real properties and real estate projects

5    developed and operated by MMPI through MMPLP.

6    **B.    Description of Properties**

7      Currently, the Debtors own in excess of forty discrete properties consisting in some cases of

8    a number of parcels, some of which generate income and others of which are in various stages of

9    development. With approximately 80 acres of land, the Debtors are among the largest non-

10   government land owners in downtown Los Angeles. Attached hereto as **Exhibit "6"** is a description

11   of the Debtors' properties.

12   **C.    Events Leading to Filing**

13     The Debtors have asserted that prior to the Petition Date, their primary objective was to

14   maximize return on investment through development and redevelopment activities, which activities

15   require significant amounts of capital. The Debtors experienced significant, recurring cash shortfalls

16   from (a) operating activities, (b) recurring investment activities such as carrying costs for interest

17   payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on

18   existing rental properties. Shortfalls in operating capital have been funded by the refinance or sale

19   of real property assets, and the use of the proceeds for operating and reinvestment in the purchase of

20   replacement real property assets.

21     The Debtors have asserted that the economic climate and associated disruption in the debt

22   and equity capital markets shortly before the Petition Date were extremely challenging for them.

23   The Debtors have asserted that during 2008 they took significant steps in an effort to improve their

24   financial position. Among other things, the Debtors sold three rental projects and three development

25   projects for an aggregate sales price of approximately $110.6 million. The Debtors also completed

26   nine acquisitions or conversions of development projects to rental projects, resulting in the

27   availability of 949,905 net rental square footage. The Debtors have asserted that their efforts could

28   not overcome the collapse of credit markets and the American banking system that took place in the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    fall of 2008. On or about October 1, 2008, the Debtors suspended development of twelve

2    construction projects.

3        A number of the Debtors' loans secured by real property matured prior to the Petition Date or

4    were to mature soon thereafter. The Debtors have asserted that they were unable to extend or

5    refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or

6    March 1, 2009, including two secured by the property housing the Debtors' corporate headquarters,

7    and one which is secured by the Union Lofts project owned by MMP 760 S. Hill Street. In total, the

8    Debtors had twelve loans that were set to mature during 2009 with an aggregate principal balance of

9    $170.8 million, in addition to $1.7 million of principal amortization on other long-terms loans.

10        Prior to the Petition Date, two lenders filed lawsuits seeking, among other things, the

11    appointment of a receiver. On or about March 4, 2009, California Bank & Trust filed a complaint

12    against 788 South Alameda and MMPI for, among other things, judicial foreclosure and the

13    appointment of a receiver. In addition, on or about March 17, 2009, Chinatrust Bank filed a

14    complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure

15    and the appointment of a receiver.

16        The Debtors have asserted that during the year prior to the Petition Date they investigated

17    borrowing additional capital in order to continue to fund their development projects and, if

18    necessary, operating expenses. The Debtors have asserted, however, that they were not able to

19    borrow or refinance at conventional or otherwise acceptable rates, in large part, due to the

20    deterioration of the credit markets that appears to have affected all banks and other lenders.

21        The Debtors have asserted that due to the Debtors' inability to obtain additional capital, and

22    the unwillingness of current lenders to extend the terms of maturing loans on acceptable terms, the

23    fifty-four jointly administered MMPI Debtors sought relief under Chapter 11 of the Bankruptcy

24    Code to reorganize their financial affairs and prevent the piecemeal dismemberment of their business

25    to the detriment of their creditors.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**D.    Chapter 11 Events**

**1.    Administrative Orders And Matters**

**(a)    Introduction**

On March 26 and 27, 2009, the Debtors filed their voluntary petitions for relief under
Chapter 11 of the Bankruptcy Code. Shortly after the commencement of the Chapter 11 Cases, the
Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a variety
of matters. The Debtors obtained Orders of the Bankruptcy Court, among other things, (a)
authorizing, on an interim basis, the Debtors' use of cash collateral (see below for more detail), (b)
authorizing the Debtors to employ and compensate legal and financial advisors, (C) authorizing the
Debtors to honor certain obligations to employees and to continue employee benefit plans in effect,
(d) permitting the Debtors, on an interim basis, to continue to utilize their cash management systems,
(e) establishing procedures for the Debtors to ensure continued provision of utility services; (f)
limiting the scope of notice required; (g) extending the time to file schedules and statement of
financial affairs; and (h) directing the joint administration of the Cases of the Debtors.
Subsequently, the Bankruptcy Court established September 24, 2009, as the last day for creditors
and parties in interests to file proofs of Claim and proofs of interest against the Debtors. The
Debtors filed the required monthly operating reports on a timely basis. The Debtors were authorized
and continue to operate their business and manage their properties as debtors in possession pursuant
to Sections 1107 and 1108 of the Bankruptcy Code.

**(b)    The Cash Collateral Motions and Corresponding Orders**

**(1)    MMPI Debtors' Cash Collateral Motions and Orders**

By their first *Motion for Entry of Interim and Final Orders Authorizing Debtors to Use Cash
Collateral* (the "Cash Collateral Motion"), the Debtors sought permission to use the cash collateral
of various lenders. Oppositions were filed by most of the Debtors' lenders. The Bankruptcy Court
entered a series of interim orders authorizing such use and continued to hear testimony and consider
evidence concerning the Debtors' proposed use of cash collateral on a final basis. These hearings
concluded in October 2009. The Bankruptcy Court ruled in the Debtors' favor and entered a final
order authorizing the use of the cash collateral of the following lenders through June 30, 2010:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    BofA, CBT, Berkadia, Cathay, Chinatrust, Legendary, Stanford, UCB (now succeeded by EWB),

2    1248 S. Figueroa and Chamlian. In making that ruling, the Bankruptcy Court determined that the

3    following lenders were entitled to additional adequate protection and are therefore entitled to an

4    adequate protection lien in one or more of the Debtors' unencumbered real properties: Berkadia,

5    CBT, Chinatrust, Legendary with respect to 425 W. 11th Street; 3rd & Omar Street, and 420 Boyd

6    Street, and EWB with respect to 2640 Washington. In addition, the Bankruptcy Court determined

7    that BofA was entitled to additional adequate protection with respect to MM 760 S. Hill Street and

8    was entitled to an adequate protection lien on the properties owned by MG Southpark, junior to

9    BofA's existing senior lien against such properties.

10    As a result of the Cash Collateral determinations made by the Bankruptcy Court, the Debtors

11    filed a motion seeking to designate certain properties that would serve as adequate protection for the

12    Debtors' use of cash collateral. The Debtors sought authority to limit the continuing adequate

13    protection lien to certain identified properties in place of a blanket lien on all of the Debtors'

14    unencumbered properties. The matter has been continued from time to time and remains pending.

15    The Debtors also filed a motion seeking authority to use a portion of certain insurance

16    proceeds resulting from fire damage to one of the Debtors properties which currently secures certain

17    obligations of the Debtors to PNL Pomona. The Bankruptcy Court authorized the Debtors to use a

18    portion of the insurance proceeds to demolish the remaining structure on the property in order to be

19    able to market and sell the property as vacant land. Under the Plan, the Proponents intend to use the

20    remaining insurance proceeds of approximately $1 million to reduce the principal balance owed to

21    PNL Pomona. This repayment will not affect the Plan's feasibility as these were off-balance sheet

22    funds.

23    On March 8, 2010, the Debtors filed their Motion for Order Extending Authority for the Use

24    of Cash Collateral and to Maintain Cash Management System Through June 30, 2010. A hearing on

25    the motion was held on March 29, 2010. On June 30, 2010, the Bankruptcy Court entered its Order

26    Granting Debtors' Motion for Order Extending Authority for the Use of Cash Collateral and to

27    Maintain Cash Management System Through June 30, 2010, on the terms provided in the Order.

28    Subsequently, the Debtors filed a motion requesting that their authority to use cash collateral and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    utilize their cash management system be extended through September 30, 2010. On July 1, 2010,

2    the Bankruptcy Court entered an order granting the motion on an interim basis, and the Debtors'

3    request for such approval on a final basis was resolved on a final basis at a hearing held on August 2,

4    2010.

5          On April 2, 2010, SFCC filed a motion seeking authority to use cash collateral held by

6    Berkadia in certain reserves for the purpose of paying for repairs to the roof of buildings and HVAC

7    equipment located on the property subject to Berkadia's lien.

8                    (c)    **The Debtors' Single Asset Real Estate ("SARE") Motion**

9          The Debtors filed a motion seeking an order determining that none of the fifty-four Debtors

10   are subject to the single asset real estate provisions of Sections 101(51B) and 362(d)(3) of the

11   Bankruptcy Code. Two lenders (BofA and Cathay) filed motions seeking a determination from the

12   Bankruptcy Court that MG Southpark, MMP 760 S. Hill Street and Alameda Produce Market are

13   subject to the SARE provisions of the Bankruptcy Code. The Creditors Committee supported the

14   Debtors' position. Approximately, fourteen oppositions and joinders in opposition were filed by

15   various lenders. In June 2009 the Bankruptcy Court ruled in favor of the Debtors, holding that the

16   Debtors are not subject to the SARE provisions of the Bankruptcy Code. BofA has appealed from

17   the Bankruptcy Court's SARE determination. On or about June 29, 2010, the United States District

18   Court issued its decision on appeal and ruled, among other things, that MG Southpark is not subject

19   to the SARE provisions of the Bankruptcy Code, but that MMP 760 S. Hill Street is subject to such

20   provisions. On July 14, 2010, MMP 760 S. Hill Street appealed the District Court's decision as to

21   MMP 760 S. Hill Street to the United States Court of Appeals for the Ninth Circuit. MMP 760 S.

22   Hill Street does not anticipate that the appeal will be concluded prior to the Effective Date. In the

23   event that the Ninth Circuit were to issue a decision and such decision was not appealed, pursuant to

24   orders of the Bankruptcy Court MMP 760 S. Hill Street would have at least 60 days from the

25   issuance of such final decision, and perhaps longer, to comply with section 362(d)(3) of the Code by

26   commencing periodic payments to Union Lofts in an amount equal to interest at the then applicable

27   nondefault contract rate of interest on the value of BofA's interest in the real estate, or filing "a plan

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   of reorganization that has a reasonable possibility of being confirmed within a reasonable time." In

2   any event, it is impossible to know when a final ruling will be issued by the Ninth Circuit.

3          **(d)    Motions for Relief from Stay**

4          The following motions for relief from stay have been filed by lenders to pursue their state

5   law remedies against various real properties owned by the Debtors:

6                  ▪ PNL moved for relief from stay with respect to the real property owned by MG 2001

7                      - 2021 W. Mission located in Pomona. The Bankruptcy Court ruled in favor of the

8                      Debtors and denied PNL's motion. PNL subsequently filed a second motion for relief

9                      from stay and an evidentiary hearing on that motion is pending;

10                 ▪ BofA moved for relief from stay with respect to real property owned by MMP 760 S.

11                     Hill Street and commonly known as 325 West 8th Street and 760 South Hill Street,

12                     Los Angeles (the Union Lofts). The Bankruptcy Court denied the motion subject to

13                     the Debtor's provision of certain adequate protection to BofA;

14                 ▪ BofA moved for relief from the automatic stay with respect to certain real properties

15                     owned by MG Southpark located in downtown Los Angeles. The Bankruptcy Court

16                     ruled in favor of the Debtors and denied BofA's motion;

17                 ▪ UCB moved for relief from the automatic stay with respect to real property owned by

18                     2640 Washington Boulevard. Pursuant to an agreement between the Debtors and

19                     UCB, the motion was granted for the sole and limited purpose of permitting UCB to

20                     record a notice of default with respect to the real property. The Debtor 2640

21                     Washington agreed to pay, out of cash collateral, the first and second installments of

22                     real property taxes for the 2009 - 2010 fiscal year. UCB's motion was withdrawn in

23                     all other respects;

24                 ▪ Legendary moved for relief from the automatic stay with respect to real property

25                     owned by MM 3rd & Omar Street located in downtown Los Angeles. In the context

26                     of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered

27                     Legendary a replacement lien in postpetition cash collateral, payment of normal and

28                     ordinary expenses to maintain the property and the payment of real property taxes for

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   the 2009 - 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to

2   provide an adequate protection lien in favor of Legendary on one or more of the

3   Debtors' unencumbered properties and authorized Legendary to record a notice of

4   default with respect to the property. In light of the rulings in connection with the

5   Cash Collateral Motion, the Bankruptcy Court denied Legendary's motion, subject to

6   the provision of such adequate protection;

7   ▪ Legendary moved for relief from the automatic stay with respect to real property

8   owned by both MG 1500 Griffith Avenue and MG 4th Street Center and located in

9   downtown Los Angeles. The Bankruptcy Court denied Legendary's motion;

10  ▪ Legendary moved for relief from the automatic stay with respect to real property

11  owned by Merco Group, commonly known as Sci-Arc, and located in downtown Los

12  Angeles. The Bankruptcy Court denied Legendary's motion;

13  ▪ Legendary moved for relief from the automatic stay with respect to real property

14  owned by MM 420 Boyd Street and located in downtown Los Angeles. In the

15  context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors

16  offered Legendary a replacement lien in postpetition cash collateral, payment of

17  normal and ordinary expenses to maintain the property and the payment of real

18  property taxes for the 2009 - 2010 fiscal year. In addition, the Bankruptcy Court

19  required the Debtors to provide an adequate protection lien in favor of Legendary on

20  one or more of the Debtors' unencumbered properties and authorized Legendary to

21  record a notice of default with respect to the property. In light of the rulings in

22  connection with the Cash Collateral Motion, the Bankruptcy Court denied

23  Legendary's motion subject to the provision of such adequate protection;

24  ▪ Legendary moved for relief from the automatic stay with respect to real property

25  owned by Merco Group (Sci-Arc) and MG Little J and located in downtown Los

26  Angeles. The matter has been submitted to the Bankruptcy Court. An order denying

27  the Motion was entered on July 15, 2010;

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2

3

4

- Legendary moved for relief from the automatic stay with respect to real properties owned by MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles. The matter has been submitted to the Bankruptcy Court. An order denying the Motion was entered on July 15, 2010;

5

6

7

8

9

10

11

12

13

14

15

- Legendary moved for relief from the automatic stay with respect to real property owned by MG 425 W. 11th Street and located in downtown Los Angeles. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 - 2010 fiscal year. In addition, the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion for relief from the automatic stay subject to the provision of such adequate protection.

16

17

18

19

- On September 2, 2009, Chamlian moved for relief from the automatic stay with respect to real property owned by MMP 2131 Humboldt Street near downtown Los Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied the Chamlians' motion;

20

21

22

23

24

25

26

27

28

- Chinatrust moved for relief from the automatic stay with respect to real property owned by MG 3185 E. Washington Boulevard, among other things. In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Chinatrust a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 -2010 fiscal year. In addition the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Chinatrust on one or more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  denied Chinatrust's motion for relief from the automatic stay subject to the provision

2  of such adequate protection.

3  ▪ The Stanford Group moved for relief from the automatic stay with respect to the real

4  property owned by 908 8th Street located in downtown Los Angeles. The parties

5  have reached a settlement on the Claim of Stanford Group, which was approved by

6  the Bankruptcy Court. As a result of the settlement, the motion was dismissed.

7  ▪ Legendary filed a second motion for relief from the automatic stay with respect to the

8  real property owned by MM 420 Boyd Street. The Bankruptcy Court denied

9  Legendary's motion.

10  ▪ Legendary filed a second motion for relief from the automatic stay with respect to the

11  real property owned by MM 3rd and Omar. The Bankruptcy Court denied

12  Legendary's motion.

13  ▪ On April 1, 2010, Chamlian filed a second motion for relief from the automatic stay

14  with respect to real property owned by MMP 2131 Humboldt Street. In July 2010,

15  the Bankruptcy Court granted relief from stay effective as of December 1, 2010,

16  provided that a sale of Chamlian's real property collateral may not occur until after

17  March 26, 2011, and absent (a) confirmation of a plan providing for treatment of

18  Chamlian's claim, which treatment will supersede the relief granted by the order, (b)

19  commencement of adequate protection payments to Chamlian at the non-default rate

20  under the note, or (c) further order of the Bankruptcy Court.

21  In addition to the motions filed by the Debtors' lenders, a group consisting of three

22  individuals moved for relief from the automatic stay to seek authority to prosecute a civil action filed

23  by them in Los Angeles Superior Court and to clarify that they have authority to pursue alleged labor

24  Claims against certain current and former employees and board members of MMPI, Alameda

25  Produce Market and 788 South Alameda. A hearing on that motion was held on December 17, 2009.

26  The Bankruptcy Court entered an order granting the motion as to Debtors Alameda Produce and 788

27  S. Alameda but ordered that the movants could not pursue such litigation until June 30, 2010. The

28  motion was denied as to MMPI.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52010-001\DOCS_LA:224408.6                    30

1    Also, in addition to the foregoing motions, in April 2004, the Los Angeles County

2    Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of

3    eminent domain, certain property of the Debtors. In September 2008 the trial court dismissed the

4    action and the MTA appealed. Thereafter, the Debtors filed their chapter 11 petitions and the

5    automatic stay prevented further prosecution of the appeal. The Debtors and the MTA entered into a

6    stipulation to modify the automatic stay to permit the prosecution and defense of the appeal. The

7    order approving the stipulation was entered in August 2009.

8    Also, in a similar action, in February 2010, the City of Pomona filed a motion for relief from

9    the automatic stay in order to allow an eminent domain action in a non-bankruptcy forum to proceed.

10   The Debtors did not oppose the relief sought and the motion was granted.

11   The Debtors filed a motion to determine the amounts owed to the County of Los Angeles on

12   account of real property taxes. The dispute involved the proper amount of taxes owed to the County

13   and the appropriate rates of interest as well as whether certain other claimed amounts are properly

14   included in the claim. The motion was resolved through the Debtors' settlement with the County

15   described in subsection (f) below.

16          (e)     **The Debtors' Compromises With Various Lenders And Disputes With Legendary**

17

18   The Debtors have engaged in settlement discussions with their lenders as to their Claims

19   under Loan Documents and as of the filing of this Disclosure Statement, the Debtors have reached

20   settlements with PCB, Imperial, Murakami, Cathay Bank, the Stanford Group and FNBN. The

21   Bankruptcy Court has approved each settlement and the essential terms of each settlement are

     reflected in the Plan.

22   The Debtors have purported that Legendary's liens with respect to the Merco Group and

23   Little J, which will be preserved under the Plan, may be void or avoidable, respectively. Legendary

24   disagrees.

25          (f)     **The Debtors' Settlement with the County of Los Angeles**

26   The Debtors engaged in extensive settlement discussions with the County of Los Angeles

27   (the "County") as to its Claims. Except as to two Debtors, MG Southpark and MMP 760 S. Hill

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Street, the Bankruptcy Court has approved the Debtors' settlement with the County. As to those two

2    Debtors, their motion for approval of their proposed settlement with the County has been severed

3    and has been stayed by the Bankruptcy Court pending the outcome of a certain adversary proceeding

4    filed by the County.

5    The County's adversary proceeding was filed in response to efforts by Bank of America to,

6    in the Debtors' and the County's view, disregard statements of the Bankruptcy Court with regard to

7    Bank of America's efforts to pay real property taxes prior to the Bankruptcy Court's approval of the

8    Debtors' settlement with the County. The settlement provides that the County will accept payments

9    only from the Debtors through, among other things, the effective date of a plan confirmed by the

10    Bankruptcy Court. On April 9, 2010, Bank of America sought to pay the real property taxes by

11    handing two checks to the County's attorney during a hearing on the Debtors' motion for approval of

12    the settlement. The County's attorney declined to accept the payments at that time. The Bankruptcy

13    Court observed that it had witnessed a tender but no acceptance, and continued the hearing to allow

14    for further briefing on the question of whether the Bankruptcy Court could approve the settlement

15    containing the term by which the County agreed to return such payments. Pending the outcome of

16    the continued hearing, the County's attorney intended to keep the checks in his firm's safe.

17    Thereafter, Bank of America sought admissions from the County that the monthly accrual of

18    penalties had ceased as of April 9, 2010, notwithstanding that the payment had not been accepted on

19    that date. Ultimately, the County filed a complaint with the Bankruptcy Court for declaratory relief,

20    requesting that the Bankruptcy Court declare, again, that there had not been an acceptance as of

21    April 9, 2010, and requesting authority to deposit the two checks with the Bankruptcy Court.

22    Bank of America filed a motion with the District Court requesting that the District Court

23    exercise original jurisdiction over the adversary proceeding, asserting that the District Court was

24    required by law to "withdraw the reference" of the adversary proceeding. After filing its motion,

25    BofA filed a counterclaim for declaratory relief against the County seeking, among other things, a

26    determination that the County was required to accept the payment from Bank of America on April 9,

27    2010, and therefore the County's claims against MG Southpark's and MMP 760 S. Hill Street's

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52010-001\DOCS_LA:224408.6                    32

1    estates have been satisfied. The Debtors and the County opposed Bank of America's motion for

2    withdrawal of the reference, which was granted.

3        The District Court held hearings on September 20, 2010 on the parties' motions for summary

4    judgment. On September 21, 2010, the District Court entered its order granting the motions for

5    summary judgment filed by the County and by MG Southpark and MMP 760 S. Hill Street and

6    denying the motion for summary judgment filed by Bank of America. The District Court also

7    referred the proceeding back to the Bankruptcy Court and the effect of the District Court's ruling on

8    confirmation of the Plan will be determined by the Bankruptcy Court in connection with the request

9    for confirmation of the Plan in MG Southpark's and MMP 760 S. Hill Street's cases.

10         **(g)**    **Unexpired Leases and Executory Contracts**

11        With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired nonresidential

12    lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is the lessee and

13    Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December 1,2000, the

14    successor-in-interest to Evelyn Hammond, is the lessor.

15         **(h)**    **Summary of Claims Process, Bar Date and Claims Filed**

16             **(1)**    **Schedules and Statements of Financial Affairs**

17        On or before June 12, 2009 the fifty-four jointly administered Debtors filed with the

18    Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the

19    "Schedules and Statements") as of their March 26, 2009 or March 27, 2009 Petition Date. The

20    Debtors filed amendments to the Schedules and Statements on August 9, 2010.

21        For financial reporting purposes, MMPI prepares consolidated financial statements that are

22    filed with the SEC and that are audited annually. Unlike these consolidated financial statements, the

23    Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the Debtors'

24    non-audited books and tax records. This means that audited financial statements and supporting

25    schedules have not been prepared for each Debtor.

26             **(2)**    **Claims Bar Date**

27        On July 22, 2009, the Bankruptcy Court entered an order in the case (the "MMPI Bar Date

28    Order") establishing the general deadline for filing proofs of Claim against the fifty-four jointly

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  administered Debtors (the "Bar Date"). The deadline established by the Bankruptcy Court was

2  September 24, 2009.

3      The Bar Date established the deadline for Claims, including Claims of governmental units,

4  but excluding certain other Claims, including Claims based on the rejection of executory contracts

5  and unexpired leases as to which the bar date is the later of : (1) the applicable Bar Date; or (2) the

6  first business day that is at least thirty (30) calendar days after (a) the mailing of notice of the entry

7  of the order first approving the rejection of such contract or lease, (b) the mailing of notice of the

8  entry of an order or judgment avoiding a transfer, or (c) the date any relevant tax Claim first arises.

9  The Debtors provided notice of the Bar Date by mailing a notice of such Bar Date.

10      ### (3)    Proofs of Claim and Other Claims

11      According to the Debtors' records, a total of 415 Claims were filed against the Debtors

12  asserting Claims in the total face amount of approximately $927,761,559.23. Numerous Claims

13  were asserted by various alleged creditors in unliquidated amounts, *i.e.* Claims that did not contain a

14  specific dollar amount. The Debtors believe that certain Claims that have been asserted are without

15  merit and intend to object to all such Claims. Other significant categories of disputed Claims

16  include certain taxing authorities that are requesting payments far in excess of those the Debtors

17  believe to be owed to such authorities.

18      The Debtors filed a motion to determine the amounts owed to the County of Los Angeles on

19  account of real property taxes. The dispute involves the proper amount of taxes owed to the County

20  and the appropriate rates of interest as well as whether certain other claimed amounts are properly

21  included in the claim. The parties reached a settlement of their disputes.

22      ### (i)    East West Bank Lawsuit

23      On September 9, 2010, MMPI issued a press release entitled "East West Bank Hostile

24  Takeover Plan Rebuffed by Bankruptcy Court" (the "Press Release"). After hearings held in the

25  Bankruptcy Court, the Bankruptcy Court required MMPI and Richard Meruelo, Chairman and Chief

26  Executive Officer of MMPI, to retract the Press Release. The Order directing the retraction is

27  included with the solicitation package.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    MMPI issued a press release on September 17, 2010, indicating the intent of MMPI and

2    Richard Meruelo as chief executive officer of MMPI to issue a retraction of the Press Release in the

3    form required and approved by the Bankruptcy Court.  MMPI and Richard Meruelo as chief

4    executive officer of MMPI issued a retraction of the Press Release on September 22, 2010.  MMPI

5    has filed an appeal from the court's Order.

6        On September 22, 2010, East West Bankcorp., Inc. and East West Bank filed a Complaint in

7    the Bankruptcy Court for damages, including punitive damages, based on: (1) Libel per se and (2)

8    Libel (the "Complaint").  A judgment against MMPI would be an administrative claim against the

9    estate and thus could reduce the amount available to pay creditors or the value of shares held by

10   stockholders.  East West Bank maintains that it will seek recovery of damages in a significant

11   amount, plus punitive damages.

12       MMPI and Richard Meruelo dispute the allegations of the Complaint, deny that they have

13   any liability to the plaintiffs, and may assert counterclaims.  MMPI has tendered the claims under the

14   Complaint to its insurers.  It is unknown whether the insurers will assume defense of this action.

15   MMPI may have indemnification or contribution claims against insiders of the company.

16   **2.    The Debtors' Stipulation with the Creditors Committee Regarding Unsecured
        Claims**

17

18       The Debtors entered into a stipulation with the Creditors Committee by which they agreed

19   that to the extent any party files a proof of Claim in any of the Debtors' Chapter 11 Cases prior to

     the Bar Date, such proof of Claim shall be deemed to have been timely filed in the proper Debtor's

20   Chapter 11 Case and against the proper Debtor regardless of the name of the particular Debtor or

21   case number identified in the proof of Claim.  The Stipulation was intended to address the possible

22   confusion among creditors holding claims against one or more of the Debtors where the claimant

23   was not sure of the specific Debtor against whom the claim was held because of the Debtors'

24   consolidated business operations.  The Stipulation provided among other things, that claims that

25   were timely filed would be deemed to have been filed against the proper Debtor regardless of the

26   whether Debtor and/or case number were properly identified in the proof of claim.  The Bankruptcy

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Court approved that stipulation. Berkadia has appealed from the order approving the stipulation and

2  that appeal remains pending before the District Court for the Central District of California.

### (a)  Motion to Deem Claims Filed Against the Wrong Debtor to be Filed Against the Proper Debtor

Pursuant to the terms of the Debtors' Stipulation with the Creditors Committee described above, the Debtors have reviewed certain of the proofs of claim filed before the Bar Date in order to identify claims filed in the wrong case or against the wrong Debtor that may properly be reassigned pursuant to the Order approving the Stipulation. Those determinations were based on the documents attached to the proofs of claim, a review of the appropriate Debtor's records and the Debtors' consultation with members of the Debtors' management familiar with the claims and creditors. On or about April 30, 2010, the Debtors filed their motion asking the Bankruptcy Court to enforce the terms of the earlier Stipulation and Order and to deem the timely filed claims as having been filed against the proper Debtor, regardless of the Debtor's name and/or case number identified on the proof of claim. A hearing on that motion was held on June 11, 2010. That motion has been granted with regard to the majority of the relief sought by the Debtors, and a continued hearing on the balance of the relief sought by the Debtors was held on August 6, 2010 at which time the Motion was granted as modified by the Debtors.

### (b)  Other Administrative Matters

Early in the cases, the Debtors met with and were interviewed by the staff attorney and other representative of the office of the United States Trustee (the "US Trustee"). the Debtors have stated that they have complied with certain requirements promulgated by that office with respect to the filing of monthly operating and cash reports. In May and June, 2009, the Debtors appeared at the Section 341(a) meeting of creditors - known as the initial creditor meeting – in the cases of the fifty-four jointly administered Debtors – to answer questions of creditors and parties in interest. The US Trustee conducted each of the Section 341(a) meetings.

Various professionals have been retained and employed by the Debtors in the Chapter 11 Cases and will be paid pursuant to the terms of the Plan. Danning, Gill, Diamond & Kollitz, LLP has been employed as general reorganization counsel for all of the Debtors in the Chapter 11 Cases.

52010-001\DOCS_LA:224408.6    36

1    The following professionals also have been employed by the Debtors:  FTI Consulting, Inc., as

2    financial advisors ("FTI"), Ernst & Young as independent auditors and tax advisors, DLA Piper LLP

3    (US) as special securities and litigation counsel, and Waldron & Associates, Inc. as real estate

4    appraiser.

5         In accordance with the Bankruptcy Court's order, the Debtors submitted supplemental

6    declarations from certain brokers in connection with representing the Debtors in connection with

7    specific properties to be listed for sale. Specifically, the Debtors have retained (i) The Bradco

8    Companies regarding the listing of 2951 Lenwood Road, Barstow, CA; (ii) DAUM Commercial

9    Real Estate Services regarding the listing of (a) 905 E. 8th Street, Los Angeles, CA, (b) 308-310

10   Omar Street and 452, 464 and 470 E. 3rd Street, Los Angeles, CA, and (c) 400-428 Boyd Street, Los

11   Angeles, CA; and (iii) Cushman and Wakefield of California, Inc. regarding the listing of (a) 1875

12   West Mission Boulevard, Pomona, California; and (b) 2001-2021 West Mission Boulevard, Pomona,

13   California.

14        On April 22, 2009 the US Trustee appointed the Creditors Committee.  The Creditors

15   Committee has also hired or proposed to hire its professionals to be retained in the Chapter 11 Cases.

16   SulmeyerKupetz, APC was employed as general counsel by the Creditors Committee in the Debtors'

17   cases.  The Creditors Committee has filed an application to retain Kibel Green, Inc., as its financial

18   advisor.  The Bankruptcy Court granted this application on April 22, 2010.  In addition, certain real

19   estate brokers have been or will be employed in the Chapter 11 Cases to market and sell certain

20   properties but will be paid out of the proceeds of the sale of the properties as opposed to through the

21   Plan.

22        The Bankruptcy Court granted the Debtors' motion to extend the time during which only the

23   Debtors may file a plan of reorganization and solicit acceptances thereof through September 30,

24   2010, provided that (a) on and after May 18, 2010, the Creditors Committee is authorized to file a

25   plan of reorganization; and (b) as of June 14, 2010, an equity committee appointed in the case, if

26   any, and Charleston Capital Advisors and the Hartland Asset Management Corporation are

27   authorized to file a plan of reorganization.  As of August 2, 2010, Legendary and EWB have been

28   authorized to file a plan of reorganization.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    The Debtors filed their original plan of reorganization and disclosure statement, which

2    disclosure statement was considered by the Bankruptcy Court on January 20, 2010. The Debtors

3    filed their *First Amended Joint Plan of Reorganization and First Amended Joint Disclosure*

4    *Statement* on February 27, 2010. The Bankruptcy Court held hearings on approval of the first

5    amended disclosure statement on March 19 and June 30, 2010. The Bankruptcy Court set a further

6    disclosure statement hearing for June 14, 2010 which was subsequently continued to June 21, 2010,

7    July 21, 2010 and August 6, 2010. On June 10, 2010, the Debtors filed their modified second

8    amended disclosure statement, which was subsequently revised on July 15, 2010 and July 30, 2010.

9    On September 1, 2010, the Debtors filed their third amended disclosure statement and plan.

10    Equity holders Charlestown Capital Advisors LLC and Hartland Asset Management

11    Corporation proposed a chapter 11 plan described in their *Charlestown Capital Advisors, LLC's and*

12    *Hartland Management Corporation's Disclosure Statement Describing Second Amended Joint Plan*

13    *of Reorganization of Meruelo Maddux Properties, Inc., et al.* filed on July 14, 2010 [Docket No.

14    1594]. A comparison of the Debtors', Charlestown's and the Proponents' Plans is set forth below in

15    Article IX.

16    On July 19, 2010, the Office of the U.S. Trustee filed a notice with the Bankruptcy Court

17    that it had appointed the Equity Holders Committee, consisting of Taylor International Fund, Ltd.,

18    David A. Spinney, and Douglas J. McCaslin. On August 2, 2010, the Office of the U.S. Trustee

19    added the Williams & Ribb LLP Profit Sharing Plan, David Ofman, Kapil Tayal and David

20    Pourbaba as additional members of the Equity Holders Committee. The Equity Holders Committee

21    has filed an application to retain Ron Orr & Professionals, Inc. and Rodiger Law Office as its

22    counsel. The Equity Holders Committee also filed an application to employ Jenner & Block as its

23    counsel and Kibel Green as its financial advisor.

24    **3.    Plan Exclusivity**

25    By order entered April 1, 2010, the Bankruptcy Court terminated the Debtors' plan

26    exclusivity as to the Creditors Committee, effective May 18, 2010. Further, by order entered on or

27    about June 11, 2010, the Bankruptcy Court terminated the Debtors' plan exclusivity as to the (yet to

28    be formed) Equity Committee and Charlestown Capital Advisors, LLC and Hartland Asset

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Management Corporation. Finally, pursuant to a motion filed by the Proponents and by order

2   entered on or about August 25, 2010, the Bankruptcy Court terminated the Debtors' plan exclusivity

3   as to the Proponents.

4         The Bankruptcy Court approved the Disclosure Statement relating to the Debtors' Plan and

5   the Disclosure Statement relating to the Charlestown Plan. Finally, by order entered September 22,

6   2010, the Bankruptcy Court approved the Disclosure Statement relating to the Proponents' Plan.

7   The Bankruptcy Court has approved various deadlines and procedures relating to the solicitation of

8   votes on, and confirmation of, the Debtors Plan, the Charlestown Plan and the Plan proposed by the

9   Proponents herein. Those procedures are reflected in the Notice of Procedures served on you

10  concurrently herewith.

11        **4.      Real Property Valuation, Sales And Listings**

12              **(a)      Value of Property Level Debtors Real Property Assets**

13        Attached hereto as **Exhibit "7"** is a schedule of real property owned by each of the Property

14  Level Debtors that owns real property and their estimated values. Please review such Exhibit "7" for

15  the assumptions made and methods used. A brief description of each property is set forth in Section

16  III.B hereof and Exhibit "6".

17              **(b)      Sales and Listings Since the Commencement of the Chapter 11 Cases**

18        Since becoming a public company the Debtors have, among other things:  completed

19  approximately nine acquisitions or conversions of development projects to rental projects;

20  completed, acquired, or placed in service four parcels attached to current rental projects; and

21  completed the sale of three rental projects and three development projects. According to the

22  Debtors, in 2008, they sold more property in downtown Los Angeles than any other landowner.

23  With regard to the six properties that were sold:

24              •    on or about March 31, 2008, the Debtors sold a development project located at 9901

25                   Alameda in south Los Angeles for approximately $31.2 million;

26              •    in a two-step sale culminating in or about August 2008, the Debtors sold a rental

27                   project located at 2000 San Fernando Road just north of downtown Los Angeles for

28                   approximately $35 million;

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1           &bull;  on or about September 12, 2008, the Debtors sold a rental project located at 1800 E.

2           Washington Blvd. in downtown Los Angeles for approximately \$14.2 million;

3           &bull;  on or about November 7, 2008, the Debtors sold a development project located at 816

4           Stanford in downtown Los Angeles for approximately \$1.0 million.

5           &bull;  on or about November 14, 2008, the Debtors sold a rental project referred to as the

6           "Overland Terminal" in downtown Los Angeles for approximately \$19.7 million; and

7           &bull;  on or about November 21, 2008, the Debtors sold a development project located at

8           801 E. 7th Street in downtown Los Angeles for approximately \$9.5 million.

9       Since the commencement of the cases, the Debtors have sold certain real estate assets. The

10 following properties have been sold, pursuant to orders entered by the Bankruptcy Court, since the

11 Petition Date:

12          &bull;  5500 Flotilla Street, Los Angeles, previously owned by MM 5500 Flotilla Street to

13          Camfield Partners, LLC for \$210,000;

14          &bull;  2040 Camfield Avenue, Commerce, previously owned by MG 2040 Camfield

15          Avenue to Camfield Partners, LLC for \$4,790,000;

16          &bull;  146 East Front Street, Covina, previously owned by MG 146 E. Front Street to Vartan

17          and Dzovig Koroghlian for \$1,114,450; and

18          &bull;  500 Mateo Street, Los Angeles, previously owned MM 500 Mateo Street to Mydland

19          Enterprises, LLC for \$1,900,000.

20       In addition, the Debtors have stated that they recently listed the following properties for sale:

21          &bull;  2051 Lenwood Road, Barstow, CA

22          &bull;  905 E. 8th Street, Los Angeles, CA

23          &bull;  308-310 Omar Street and 452, 464 and 470 E. Third Street, Los Angeles, CA

24          &bull;  400-428 Boyd Street, Los Angeles, CA

25          &bull;  1875 West Mission Boulevard, Pomona, CA

26          &bull;  2001-2021 West Mission Boulevard, Pomona, CA.

27       Finally, on April 26, 2010, MM 845 Flower closed the sale of its 34 story luxury residential

28 tower for a purchase price of \$109,500,000.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**5.    Events in the Related Chapter 11 Cases MM 845 S. Flower and Chinatown.**

On September 3, 2009, MM 845 S. Flower and Chinatown each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. While MM 845 S. Flower and Chinatown are affiliates of the MMPI Debtors, these cases are not jointly administered with the cases of the MMPI Debtors.

MM 845 S. Flower owned a 34-story residential tower located at 705 W. 9th Street in the South Park region of downtown Los Angeles (the "Project"). The building is comprised of 214 luxury residential units totaling approximately 254,300 square feet and an approximately 6,800 square foot commercial unit on the ground floor. This building is a first class iconic structure in downtown Los Angeles. Viewed from the street, this curtain wall building is clad with various shades of green glass and has numerous distinctive and attractive architectural features which include external balconies on all four corners of the building, a seventh floor amenity deck with a landscaped garden area and a premium extended balcony and viewing deck located on the ninth floor.

Chinatown owns approximately 5.5 acres of unimproved land at 129 West College Street in downtown Los Angeles ("Chinatown Property"). The Chinatown Property has significant development potential and the current development plan for the property is for a mixed residential and retail use. The Chinatown Property is now unencumbered. The Chinatown Property was appraised at $17,600,000 as of March 2008 based upon about $80 per land square foot.

Prior to September 3, 2009 (the "Flower Petition Date"), and on or about July 31, 2008, MM 845 Flower executed a promissory note (the "Note") in the original principal amount of $84,000,000 in favor of Canpartners Realty Holding Company IV, LLC ("Canyon") in connection with a Loan Agreement dated as of July 31, 2008 (the "Loan Agreement") pursuant to which Canyon made a construction loan of $84,000,000 to MM 845 Flower (the "Loan"). MM 845 Flower's obligations under the Note were secured by a construction deed of trust (the "845 Flower Deed of Trust") in favor of Canyon against the Project. MM 845 Flower also granted Canyon a security interest in various deposit accounts of 845 Flower (the "Accounts Pledge"). In addition, Chinatown granted Canyon a deed of trust (the "Chinatown Deed of Trust") against Chinatown's real property located at

1    129 West College Street, Los Angeles, California (the "Chinatown Property"). MMPI executed both

2    completion and repayment guaranties in favor of Canyon (the "MMPI Guaranties") and MMP

3    Ventures pledged its membership interests in 845 Flower and Chinatown to Canyon (the "Pledge

4    Agreements").[8]

5              (a)    **Important Events in MM 845 S. Flower and Chinatown Cases**

6         At the time the cases were filed, the construction of MM 845 S. Flower Project was close to

7    completion. After commencement of the 845 S. Flower case, MM 845 S. Flower completed

8    construction of the Project, completed the process of entitling the Project as condominiums and

9    developed a program for selling individual condominium units (the "Sale Program"). MM 845 S.

10   Flower filed a motion for authority to engage in the Sale Program. Canyon opposed the motion on

11   among other grounds that the Debtor could not sell units free and clear of its loan. After extensive

12   briefing and several hearings, the Bankruptcy Court denied the motion without prejudice to the

13   Debtor pursuing the Sale Program as part of its Chapter 11 Plan.

14        On November 12, 2009, Canyon filed a Motion for Relief from the Automatic Stay (the

15   "RFS Motion") in the MM 845 S. Flower case seeking relief from the automatic stay to permit it to

16   foreclose on its Deed of Trust against the Project. Canyon asserted that it was entitled to relief from

17   the stay because the Debtor does not have any equity in the Project and according to Canyon, the

18   Debtor cannot cram down a plan on Canyon over its objection. MM 845 S. Flower vigorously

19   disputed each of Canyon's contentions. The initial hearing on the RFS Motion was held on January

20   8, 2010. After additional briefing and a further hearing on February 5, 2010, the Bankruptcy Court

21   continued the RFS Motion to March 12, 2010 for an evidentiary hearing regarding the value of the

22   Project and testimony by the appraisers retained by Canyon and MM 845 S. Flower. The RFS

23   Motion was dismissed due to the settlement discussed below.

24        In addition, on October 19, 2009, Canyon filed an adversary proceeding against MM 845 S.

25   Flower and Chinatown in their respective cases, asserting and seeking a declaration, among other

26   things, that Canyon was not required to release its lien on the Chinatown Property or its security

27

28   [8] The Loan Agreement, the Note, the Deed of Trust, the Accounts Pledge, the MMPI Guaranties, the Chinatown Deed of
     Trust, the Pledge Agreements and all other documents and instruments evidencing or securing the Loan, are referred to
     collectively herein as the "Loan Documents."

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  interest in MMP Ventures' membership interests in Chinatown (the "Chinatown Adversary

2  Proceeding"). MM 845 Flower and Chinatown answered and counterclaimed, contending, among

3  other things, that Canyon is required to release its liens on the Chinatown Property and its security

4  interest in the MMP Ventures membership interests in Chinatown. On November 19, 2009, the

5  Bankruptcy Court entered its Order approving the parties' stipulation to consolidate the two

6  adversary proceedings, deeming the complaint filed in 845 Flower's case (1 :09-ap-01435-KT) as

7  the sole operative complaint.

8      On February 16, 2010 the parties filed cross-motions for summary judgment (Chinatown

9  Adversary Proceeding docket nos. 13 - 19) which were initially set for hearing on March 12, 2010.

10 Those hearings were continued several times and the motions and Chinatown Adversary Proceeding

11 were dismissed due to the settlement discussed below.

### (b)    Sale of the Project and Settlement with Canyon

13     On April 13, 2010, MM 845 S. Flower filed a motion for authority to sell the Project to

14 Watermark Properties, Inc., a California corporation, or its assignee (the "Buyer") for a purchase

15 price of $110,000,000 cash pursuant to the Purchase Agreement, subject to a $500,000 purchase

16 price credit to the Buyer as described below. The hearing on the motion was held on April 19, 2010.

17 The Bankruptcy Court approved the sale by its order entered on April 19, 2010.

18     On April 12, 2010, MM 845 S. Flower, Chinatown, MMPI and MMP Ventures entered into a

19 settlement with Canyon (the "Canyon Settlement Agreement"). Pursuant to the settlement, Canyon

20 agreed to accept $86,521,389 from escrow at closing in satisfaction of its Lien and has agreed to the

21 release of its Lien on the Project, on MM 845 S. Flower's bank accounts and other personal property

22 and on the real property owned by the related debtor Meruelo Chinatown, LLC. The sale closed on

23 April 26, 2010 and Canyon received payment of the settlement amount on that date.

24     The Canyon Settlement Agreement resolves all disputes arising out of or relating to

25 Canyon's claims against the Debtors or arising out of or related to the Loan Documents, the RFS

26 Motion, and the Chinatown Adversary Proceeding.

27     In addition, certain creditors have asserted, or may assert, mechanics liens against the Project

28 (the "Mechanics Lien Creditors"). The sale of the Project combined with the funds in MM 845 S.

1  Flower's construction reserve accounts (which was $7,139,319 as of April 9, 2010) provides more

2  than enough proceeds for payment of all amounts determined to be owing to the Mechanics Lien

3  Creditors. MM 845 S. Flower has objections to certain of these claims and reserves all rights and

4  defenses thereto.  As of the April 30, 2010, the aggregate amount owing to the Mechanics' Lien

5  Creditors was between $4,179,157 and $8,733,944.  Since that date, MM 845 Flower has resolved

6  many of these claims which have been paid from the Remaining Claims Fund as provided below.

7  The Debtors have stated that MM 845 Flower continues to work to resolve the remaining claims.

8          At closing, MM 845 S. Flower established the Remaining Claims Fund as a segregated

9  account at City National Bank to hold funds for payment of the unpaid or disputed Mechanics' Lien

10  Claims and unsecured claims against the Debtor's estate (the "Remaining Claims") as provided in

11  the Canyon Settlement Agreement.  The Remaining Claims Fund was funded in an amount not to

12  exceed $10,636,268, comprised of the maximum amount of all unpaid or disputed Mechanics Lien

13  Claims, $100,000 for payment of unsecured claims, and $1,500,000 as provided in the Canyon

14  Settlement Agreement.  The Remaining Claims Fund was funded with the remaining funds from the

15  Debtor's construction reserve accounts plus proceeds of the Sale sufficient to fully fund the account.

16  The Liens of all creditors of MM 845 S. Flower asserting Liens against the Project, including but not

17  limited to Canyon (pursuant to the Canyon Settlement Agreement) and the Mechanics Lien

18  Creditors, attached to the Remaining Claims Fund.  The Canyon Settlement Agreement also

19  provided for the payment of Canyon's third party fees and expenses arising out of the Remaining

20  Claims from the Remaining Claims Fund.  As a result of receipt of the Settlement Amount, all of

21  Canyon's liens, rights and interest in and to any of the Debtors' assets have been fully released,

22  reconveyed, terminated and discharged, including, without limitation, full reconveyances of the

23  Flower Deed of Trust, the Chinatown Deed of Trust, terminations of any UCC financing statements

24  and account control agreements, releases of any guaranties, assignments and pledges, including

25  MMP Ventures' membership interests in 845 Flower and Chinatown, the MMPI Guaranties and the

26  Accounts Pledge and Pledge Agreements.

27          As a result of the settlement, the Chinatown Adversary Proceeding has been dismissed and

28  Canyon has withdrawn its RFS Motion.  The sale will provide approximately $20 million in sale

1   proceeds to the estate and, after payment of administrative expenses, such funds will be available to

2   pay intercompany claims.  The impact of successful resolution of these cases is that the remaining

3   proceeds from the sale of this Project will be available to the MMPI Debtors at the Effective Date

4   rather than one or more years later.  Further, the Chinatown Property is no longer encumbered and

5   will be available to the Debtors as an unencumbered property.

6        On or about July 7, 2010, MM 845 Flower filed a motion for authority to make an interim

7   distribution or distributions in the aggregate amount of up to $12 million from free and clear cash in

8   MM 845 Flower's estate to MMPLP.

9   **E.      Material Proceedings**

10       There are several different circumstances that may create liability for the Debtors in the

11  future to the extent they are not discharged under the Plan as more fully discussed in Section III.F of

12  this Disclosure Statement.

13  **F.      Potential Government Tax Audits**

14       The Debtors are subject to audit and review by federal and state taxing authorities.  An

15  adverse audit report could result in the Debtors being assessed additional tax liability.  The Debtors

16  have stated that they are not aware of any such pending audits and have filed all of their tax returns.

17       **1.      Indemnification Claims**

18       Certain of the Debtors' contracts contain indemnification provisions that could require the

19  Debtors to make payments for Claims made against customers or employees of the Debtors,

20  including management.  Additionally, the Articles and Bylaws of MMPI provide that MMPI shall

21  indemnify its officers and directors to the fullest extent permitted by law.  Pursuant to its contractual

22  and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of

23  its Board of Directors with respect to costs and expenses that may be incurred by them in

24  conjunction with the performance of their employment or role as a member of the Board of

25  Directors.  These indemnification provisions may result in material liability to MMPI or other of the

26  Debtors.  However, the Debtors assert that they maintain various insurance coverages to reduce the

27  Debtors' exposure.  Also, parties in interest may object to such claims (and they could be discharged

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  under the Plan if such objections are successful) and the Litigation Trust to be established under the

2  Plan may bring claims against officers and directors who have indemnity claims.

3          **2.    Eminent Domain**

4          The Debtors are engaged in two eminent domain actions that may result in cash awards being

5  paid to the respective Debtors. One of these eminent domain proceedings involve Alameda Produce

6  Market. In 2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed an

7  eminent domain action against Alameda Produce Market seeking to take the 1339 E. 7th Street Real

8  Property. Shortly thereafter, the MTA obtained an order for possession of such property and has

9  remained in possession ever since. After lengthy proceedings, the trial court dismissed the action

10  and ordered the MTA to return possession of the property to Alameda Produce Market. The MTA

11  appealed the ruling and the matter is pending before the appellate court. If the trial court ruling is

12  affirmed and not further appealed, the MTA will be required to return possession of the property to

13  Alameda Produce Marked, and Alameda Produce Market may, among other things, be entitled to

14  damages and/or compensation as a result of the MTA's use of the property. A reversal of the trial

15  court's ruling could result in a remand to the trial court for a hearing on the valuation of the property.

16  IN the event the MTA is permitted to proceed with the taking of the property, the MTA would be

17  required to pay just compensation in connection with such taking.

18          Earlier this year, MG - 2001-2021 West Mission Blvd. stipulated to relief from the automatic

19  stay to permit the City of Pomona, acting in concert with Cal-Trans ("City") to proceed with an

20  eminent domain action. The action seeks to take a number of small portions of property owned by

21  MG - 2001-2021 West Mission Blvd. in connection with the 71 Expressway/Mission Boulevard

22  Project. MG - 2001-2021 West Mission Blvd. filed its answer and cross complaint for inverse

23  condemnation. The matter was only recently commenced and may take 18-20 months to be

24  resolved.

25          In addition, in November 2007, the State of California commenced an eminent domain action

26  against Meruelo Baldwin Park in the Los Angeles Superior Court seeking to condemn two small

27  portions of property. The parties reached an agreement which was submitted to the Bankruptcy

28  Court and was approved in early 2010. Generally, the agreement provides that the state will pay

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    MBP approximately $80,000 in exchange for taking a small portion of land in fee absolute and a

2    temporary construction easement in the other small portion. The parties are in the process of

3    finalizing the Agreement and making the above-referenced payment.

4        **3.    Litigation After Lifting of the Automatic Stay**

5        The Debtors are also involved in litigation regarding matters for which the automatic stay

6    had been lifted in the Chapter 11 Case. The Debtors have stated that these litigations are not

7    material.

8                                            **IV.**

9                    **SUMMARY OF LEGENDARY/EWB PLAN**

10        The Proponents intend to financially restructure the Debtors' business to deleverage it and

11   create an operating entity which reliably delivers positive Net Operating Income from stabilized

12   assets. The Proponents intend to grow the reorganized business by employing the skills of its new

13   management to "put to work" currently languishing assets and to create value by development of

14   real estate assets for portfolio enhancement or sale at maximum returns. By making the enterprise

15   bankable, the Proponents will be able to access the financial markets. With low debt ratios and the

16   stellar record and reputation of management, the Proponents except that they will be able to secure

17   necessary financing for construction and for portfolio products.

18        The Plan's foundation is an $70 million recapitalization via a $5 million cash infusion by

19   Legendary, conversion of approximately $65 million of the Proponents' debt to equity.

20   Additionally, Holders of MMPI Existing Common Stock will also be offered the right to invest up to

21   $10 million to purchase up to a total of 2,202,500 additional shares of Reorganized MMPI Common

22   Stock (the Subscription Shares), equal to a 10% stake in Reorganized MMPI. This restructuring will

23   greatly reduce the Reorganized Debtors' debt service load permitting them to meet all of their

24   obligations both in the short term and over the life of the Plan. Legendary's cash contribution

25   combined with the proceeds of the rights offering and the Debtors' cash from operations will provide

26   more than sufficient funds for the payment of all amounts due on or around the Plan's Effective

27   Date.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## A.    Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to a specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class. The treatment of these claims is provided below.

The Claims of Creditors the treatment of which has already been settled and resolved by Order entered by the Bankruptcy Court (including the settled Claims of Cathay, FNBN, Imperial, PCB and Stanford) are not classified, or separately classified under the Plan. The terms and conditions of such Bankruptcy Court-approved settlements are assumed by the relevant Reorganized Debtors and shall be unaltered and unmodified by the terms and conditions of the Plan. The Holders of such Claims are not entitled to vote under the Plan.

### 1.    Administrative Claims

Administrative Claims are claims for costs or expenses of administering the Debtors' Chapter 11 Cases which are allowed under Section 507(a)(2) of the Bankruptcy Code. The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a particular claimant agrees to a different treatment.

#### (a)    General

Subject to the bar date provisions herein and additional requirements for professionals and certain other entities set forth below, the surviving Reorganized Debtor shall pay to each Holder of an Allowed Administrative Claim, on account of its Administrative Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date or as soon as practicable thereafter, unless the Holder agrees or shall have agreed to other treatment of such Claim. Payment on and Administrative Claim which arose in the ordinary course of each Debtor's business, including Ordinary Course Professionals, will be made when such payment would have become due in the ordinary course of each Debtor's business or under the terms of the Claim in the absence of the Chapter 11 Cases.

**(b)**     **Payment of Statutory Fees**

On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the hearing on Confirmation, shall be paid in Cash equal to the amount of such Administrative Claim.

**(c)**     **Bar Date for Administrative Claims**

**(1)**     **General Provisions**

Except as provided below for (i) non-tax liabilities incurred in the ordinary course of business by each Debtor and (ii) Postpetition Tax Claims, requests for payment of Administrative Claims must be Filed and served on counsel for the Reorganized Debtors no later than forty-five (45) days after the Effective Date, or such later date, if any, as the Bankruptcy Court shall order upon application made prior to the end of such 45-day period.  Holders of Administrative Claims (including, without limitation, professionals requesting compensation or reimbursement of expenses and the Holders of any Claims for federal, state or local taxes) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized Debtor or any of their respective properties.

**(2)**     **Professionals**

All professionals or other Persons requesting compensation or reimbursement of expenses pursuant to any of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for services rendered on or before the Effective Date (including, inter alia, any compensation requested by any professional or any other Person for making a substantial contribution in the Reorganization Case)[9] shall File and serve on the Proponents, the Reorganized Debtors, the Equity Holders Committee and the Creditors Committee an application for final allowance of compensation and reimbursement of expenses no later than (i) forty-five (45) days after the Effective Date, or (ii) such later date as the Bankruptcy Court shall order upon application made prior to the end of such 45-day period. Objections to applications of professionals for compensation or reimbursement of expenses must be

---

[9] The Proponents reserve their right to assert a "substantial contribution" claim pursuant to Section 503(b)(3) of the Bankruptcy Code against the Estates for fees and expenses incurred in connection with proposing and obtaining approval of the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Filed and served on the Proponents, the Reorganized Debtors, the Equity Holders Committee, the

2    Creditors Committee and the professionals to whose application the objections are addressed on or

3    before (i) fourteen days after such application is Filed and served or (ii) such later date as the

4    Bankruptcy Court shall order or upon agreement between the Reorganized Debtors and the affected

5    professional.

6        Any professional fees and reimbursements of expenses incurred by the Reorganized Debtors

7    subsequent to the Effective Date may be paid by the Reorganized Debtors without application to or

8    Order of the Bankruptcy Court.

9                        **(3)    Ordinary Course Liabilities**

10        Holders of Administrative Claims based on liabilities incurred post-petition in the ordinary

11    course of the Debtors' businesses, including Ordinary Course Professionals, (other than Claims of

12    governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required to

13    File any request for payment of such Claims.  Such Administrative Claims shall be assumed and

14    paid by such Reorganized Debtor pursuant to the terms and conditions of the particular transaction

15    giving rise to such Administrative Claim, without any further action by the Holders of such Claims.

16                        **(4)    Tax Claims**

17        All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise

18    been previously established, must be Filed on or before the later of (i) forty-five (45) days following

19    the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes for such tax

20    year or period with the applicable governmental unit. Any Holder of any Postpetition Tax Claim that

21    is required to File a request for payment of such taxes and that does not File such a Claim by the

22    applicable bar date shall be forever barred from asserting any such Postpetition Tax Claim against

23    any of the Debtors or Reorganized Debtor, or any of their respective properties, whether any such

24    Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date. The

25    Debtors are paying all Postpetition Tax Claims as they come due; however, certain taxing authorities

26    conduct audits which may result in a postpetition tax liability of which the Debtors are currently

27    unaware. The County of Los Angeles has filed administrative priority claims against MMPI and

28    MMP 12385 San Fernando Road for $229,193 and $6,864 respectively. The Debtors have asserted

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    that these taxes have been paid and, in any event, are resolved pursuant to the terms of the settlement

2    between the Debtors and the County of Los Angeles.

3         Allowed Secured Tax claims will be paid timely in the ordinary course of business with all

4    costs, fees, charges and interest as required by sections 506(b) and 511 of the Bankruptcy Code, if

5    applicable.

6           **(5)    Inter-Debtor Administrative Claims**

7         The Debtors' cash management system provides for funds to flow to and from a cash

8    concentration account maintained by MMPLP. The concentration account is linked to the operating

9    bank accounts of each of the Debtors, which bank accounts are maintained as zero balance accounts.

10   When needed to fund payment on checks issued by a particular affiliate, funds are transferred from

11   the concentration account to the operating account of that affiliate. Excess funds, if any, are invested

12   in interest bearing accounts pending their utilization. The cash management system produces inter-

13   Debtor account receivables and account payables. Transactions occurring after the Petition Date and

14   prior to the Effective Date produce inter-Debtor Administrative Claims owed to MMPLP. MMPLP

15   shall retain such Administrative Claims and all rights, interests, and obligations related thereto,

16   which, post-Effective Date, shall be paid and settled in accordance with the Debtors' ordinary course

17   of business with respect to the settlement and payment of intercompany obligations.

18        **2.    Priority Tax Claims**

19        Priority Tax Claims are certain unsecured income, employment and other taxes described by

20   Bankruptcy Code Section 507(a)(8). The Bankruptcy Code requires that each holder of such a

21   507(a)(8) priority Tax Claim receive the present value of such claim in deferred cash payments, over

22   a period not exceeding five years after the Petition Date. The chart attached as **Exhibit "8"** hereto is

23   the Debtors' Section 507(a)(8) priority Tax Claims (as represented to the Bankruptcy Court by the

24   Debtors in their Disclosure Statement). All Priority Tax Claims will paid in full within a reasonable

25   period of time after the Effective Date (or after a Final Order of the Bankruptcy Court allowing such

26   Claims).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## B.    Classes of Claims, Treatment, Impairment, Voting Status

The categories of Claims and Interests listed in the chart below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests in each of the Estates[10] for all purposes, including voting, confirmation and distribution pursuant to the Plan. On the Effective Date, the Plan pays in full all Allowed Unsecured Claims, including General Unsecured, Priority Tax, and Priority Non-Tax claims.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED? VOTING? | TREATMENT |
|---|---|---|---|
| **Class A-1** in the following cases: 21, 54 | Secured Claim – RoofCorp of CA, Inc. | Unimpaired Not Voting | On the Effective Date, the claim shall be reinstated and the Holder shall retain its lien, if any. |
| **Class A-2** in the following case: 42 | Secured Tax Claims (Other than Los Angeles County) | Unimpaired Not Voting | Common Secured Tax Claim Treatment |
| **Class A-2** in the following cases: 1-9, 17, 19, 23, 31 and 42 | Los Angeles County Secured Tax Claims | Impaired Voting | The treatment of Los Angeles County's Secured Tax Claims shall be consistent in all regards with its Bankruptcy Court-approved settlement. |
| **Class A-3** in the following cases: 16, 26, 32, 33, 39, 40, 43, 49, 50, 53, 54 | Non-Settled Secured Lender Claims (Includes Legendary Secured Claims in Merco Group secured by Sci-Arc Real Property and Sky-Arc Real Property in Case 50) | Impaired Voting | Common Non-Settled Secured Lender Claim Treatment |
| **Class A-3** in the following case: 29 | Grand Avenue Lofts, LLC / CIM Urban RE Fund GP II, LLC Secured Claim | Impaired Voting | Grand Avenue Lofts' ("GAL") Position.  GAL asserts that it does not have a claim that is subject to modification or discharge.  Rather, GAL asserts a current right in the real property that cannot be extinguished through bankruptcy, that when it conveyed property to MM 336 W. 11th Street, it reserved a power of termination, as reflected in the grant deed.  GAL asserts that MM 336 W. 11th Street never had title free and clear of GAL's property right.  GAL asserts that an attempted discharge of Grand Avenue's power of termination would, in effect, be a forced conveyance of a property interest, beyond the scope of a discharge that would ultimately give the estate a property interest it did not have before filing bankruptcy. |

[10] See Exhibit 2 – Key to Debtors' Estates and Secured Claims.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS | DESCRIPTION OF CLASS | IMPAIRED? VOTING? | TREATMENT |
|---|---|---|---|
| | | | **Proponents' Position.** The Plan Proponents believe GAL holds a disputed, unliquidated, and contingent Secured Claim. If it is found that GAL holds a valid covenant running with the underlying land it will "ride through" confirmation of the Plan or GAL shall receive its indubitable equivalent under section 1129(b)(2)(A)(iii) of the Bankruptcy Code; to the extent not, it will be extinguished. Any related breach of contract claim is disputed, unliquidated, and contingent; accordingly, it shall not receive a Distribution under the Plan. |
| **Class A-4** in the following case: 48 | Secured Lender Claims (Legendary Secured Claims – MM Little J) | Unimpaired Not Voting | On the Effective Date, the claim shall be reinstated and the Holder shall retain its lien, if any. |
| **Class A-4** in the following cases: 28, 29, 30, 37, 44, 45, and 46 | Secured Lender Claims (All other Legendary Secured Claims) | Impaired Voting | In exchange for its approximately $33 million in Secured Claims, its release of guaranties against MMPI and MMPLP relating to these Secured Claims, and its $5 million equity contribution, Legendary shall receive between 8,369,500 and 9,565,458 shares of Reorganized MMPI, equal to a stake of between 38% and 43% of Reorganized MMPI, dependent upon the outcome of the Reorganized MMPI rights offering described in the treatment for Class E in case 1 (MMPI). |
| **Class A-4** in the following cases: 41 and 52 | Lender Secured Claims (EWB) | Impaired Voting | In exchange for its approximately $32 million in Secured Claims and its release of guaranties against MMPI relating to these Secured Claims, EWB shall receive between 7,048,000 and 8,054,543 shares of Reorganized MMPI, equal to a stake of between 32% and 37% of Reorganized MMPI, dependent upon the outcome of the Reorganized MMPI rights offering described in the treatment for Class E in case 1 (MMPI). |
| **Class B** in the following cases: 1, 5, 32, 33, 36, 52 | Other Priority Claims (Non-Tax) | Unimpaired Not Voting | Common Other Priority Claims Treatment |
| **Class C-1** in all cases | Unsecured Claims – General | Impaired[11] Voting | Common General Unsecured Claim Treatment |
| **Class C-2** in the following cases: 1, 2 | Unsecured Claims – Guaranty Claims against MMPI or MMPLP *except for* Legendary and EWB Guaranty | Impaired Voting | Common Unsecured Guaranty Claim Treatment |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

[11] The Proponents reserve their right to assert at the Confirmation Hearing that Class C-1 is Unimpaired. The Proponents are soliciting Class C-1 in all cases in the event the Court determines that this class is Impaired under the Plan.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED? VOTING? | TREATMENT |
|---|---|---|---|
| | Claims where underlying secured claim will be converted to equity. These Classes include Legendary's Guaranty Claims relating to Merco Group | | |
| **Class C-2** in the following cases: 1, 2 | Unsecured Claims – Legendary and EWB Guaranty Claims against MMPI or MMPLP (but excluding Legendary's Guarantees relating to Legendary Secured Claims in Merco Group secured by Sci-Arc Real Property and Sky-Arc Real Property in Case 50). | Impaired Voting | Converted to equity of Reorganized MMPI as part of Plan treatment of Legendary Secured Claims in Cases 28, 29, 30, 37, 44, 45, and 46 and EWB Secured Claims in Cases 41 and 52. |
| **Class C-3** in the following cases: 11, 12, 14, 15, 21, 25-28, 30, 32-41, 43, 44, 46, 48, 49 52, 54 | Unsecured Claims – Tenant Security Deposits | Unimpaired Not Voting | Common Tenant Security Deposits Treatment |
| **Class D** in the following cases: 2-7, 9-35, and 37-53 | Intercompany Claims | Unimpaired Not Voting | Common Intercompany Claim Treatment |
| **Class E** in all cases *except* 1 and 2 | Equity Interests in all Cases *except* MMPI and MMPLP | Unimpaired Not Voting | Common Equity Interest Treatment |
| **Class E-1** in case 1 | Equity Interests in MMPI held by Insider Shareholders | Impaired Voting | On the Effective Date, all MMPI Existing Common Stock shall be cancelled. Holders of record as of the Effective Date shall receive one share of Reorganized MMPI Common Stock and one Subscription Right for every 20 shares of MMPI Existing Common Stock they held on the Effective Date. Holders of less than twenty shares of MMPI Existing Common Stock, and excess shares following the 20-to-1 conversion, shall be cashed out at $0.227 per share. Such shares of Reorganized MMPI Common Stock shall in the aggregate total 4,405,000 in number and shall constitute in the aggregate a 20% interest in Reorganized MMPI. The Rights Offering shall comply with all necessary rules to ensure its exemption, under Section 1145 of the Bankruptcy Code, from federal, state and local security registration requirements; otherwise it |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS | DESCRIPTION OF CLASS | IMPAIRED? VOTING? | TREATMENT |
|---|---|---|---|
| | | | shall be made available only to Holders of Existing MMPI Common Stock who are "accredited investors." |
| | | | On a form enclosed with its Ballot, each Insider Shareholder may elect to enter into complete, mutual, general releases with the Reorganized Debtors, including the complete release of the Insider Causes of Action, conditioned upon cancellation and forfeiture of all MMPI Existing Common Stock, LTIP Units, rights under the Rights Offering and other interests in the Debtors held by such electing Insider Shareholder. |
| **Class E-2** in case 1 | Non-Insider Equity Interests in MMPI | Impaired Voting | On the Effective Date, all MMPI Existing Common Stock shall be cancelled. Holders of record as of the Effective Date shall receive one share of Reorganized MMPI Common Stock and one Subscription Right for every 20 shares of MMPI Existing Common Stock they held on the Effective Date. Holders of less than twenty shares of MMPI Existing Common Stock, and excess shares following the 20-to-1 conversion, shall be cashed out at $0.227 per share. Such shares of Reorganized MMPI Common Stock shall in the aggregate, total 4,405,000 in number and shall constitute in the aggregate a 20% interest in Reorganized MMPI. The Rights Offering shall comply with all necessary rules to ensure its exemption, under Section 1145 of the Bankruptcy Code, from federal, state and local security registration requirements; otherwise it shall be made available only to Holders of Existing MMPI Common Stock who are "accredited investors." In the event that one or more members of Class E-1 in Case 1 accept the Insider Shareholder Settlement Offer, the Reorganized MMPI Common Stock and Subscription Rights that would otherwise be distributed to such settling Insider Shareholder shall be distributed, on a Pro Rata basis, to the Holders of MMPI Existing Common Stock as of the Effective Date who are members of Class E-2 in Case 1. |
| | | | On the Effective Date, each of the Debtors will transfer all of its Insider Causes of Action to a Litigation Trust controlled by a Litigation Trustee on behalf of the members of Class E-2 in Case 1 of record as of the Effective Date. However, such Insider Causes of Action may be released pursuant to the treatment for Class E-1. In the event that all members of Class E-1 in |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

| CLASS | DESCRIPTION OF CLASS | IMPAIRED? VOTING? | TREATMENT |
|---|---|---|---|
| | | | Case 1 elect to accept the Insider Shareholder Settlement Offer, the Litigation Trust shall not be formed. |
| **Class E-1** in case 2 | Equity Interests in MMPLP held by MMPI | Unimpaired Not Voting | On the Effective Date, the Equity Interests in MMPLP held by MMPI shall be extinguished by the merger of MMPLP with or into MMPI. The rights of the Holders of such Equity Interests shall be Unimpaired. |
| **Class E-2** in case 2 | LTIP Units in MMPLP | Impaired Voting | On the Effective Date, the Holders of the LTIP Units shall be entitled to receive, at the election of MMPI, either cash or shares of Reorganized MMPI Common Stock with a value equal to the value of the LTIP Units (vested as of the Petition Date) as of the Effective Date. Such value shall be determined either by agreement by and between MMPI and the Holders of the LTIP Units or by the Bankruptcy Court. On a form enclosed with its Ballot, each Insider Shareholder may elect to enter into complete, mutual, general releases with the Reorganized Debtors as of the Effective Date conditioned upon cancellation and forfeiture of all MMPI Existing Common Stock, LTIP Units, rights under the Rights Offering and other interests in the Debtors held by such electing Insider Shareholder. |

1.    **Common Class Treatments for Classified Claims**

The following are Common Class Treatments for the following classes of Claims and Interests: (i) Secured Tax Claims, (ii) Secured Lender Claims, (iii) Other Priority Claims, (iv) Unsecured Tenant Security Deposit Claims, (v) General Unsecured Claims, (vi) Unsecured Guaranty Claims (vii) Intercompany Claims, and (vii) Equity Interests. The Classes of Claims and Interests for each Debtor will either receive the Common Treatment or a treatment specific to a particular Class and Debtor. For each Class and for each Debtor, the Plan will specify whether such class will receive the common treatment set forth herein or another treatment.

The Proponents expressly reserve the right, at any time during the term of the Plan, to refinance the obligations secured by any of their real properties or to sell such any or all of such real

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  properties and satisfy the full amount of the Allowed Secured Claims against such real properties

2  from the proceeds of such refinancing.

3              (a)    **Common Secured Tax Claim Treatment**

4          Except to the extent that the Holder of an Allowed Secured Tax Claim accepts, or has

5  accepted, less favorable treatment, the Holder of an Allowed Secured Tax Claim will receive one of

6  the following treatments:

7          (i) If a Class of Holders of Secured Tax Claims votes to accept the Plan in accordance with

8  Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed Secured Tax Claim in such

9  Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the

10  Effective Date, plus simple interest at 5% per annum for the period from the Petition Date through

11  the date each Allowed Claim is paid; *provided, however*, if a Claim is not Allowed as of the

12  Effective Date but becomes Allowed thereafter interest shall not accrue during the initial 30-day

13  period following the Effective Date but shall resume accruing thereafter.

14          (ii) If a Class of Holders of Secured Tax Claims votes to reject the Plan in accordance with

15  Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed Secured Tax Claim in such

16  Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the

17  Effective Date, plus (x) simple interest at 0.64% (i.e., the Federal Judgment Rate) for the period

18  from the Petition Date through the Effective Date and

19          (y) in the event the Claim is not Allowed as of the Effective Date but becomes Allowed

20  thereafter, simple interest at 5% per annum for the period from the 31st day after the Effective Date

21  through the date the Claim is paid.

22          *Under all circumstances for all purposes*, the foregoing treatment shall not supersede

23  treatment specified in Bankruptcy Court-approved agreements where the Secured Tax Claims have

24  been conditionally resolved pending plan confirmation (e.g., Los Angeles County).  The treatment of

25  those Holders' Secured Tax Claims shall be consistent in all regards with their Bankruptcy Court-

26  approved settlements.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**(b)    Common Secured Lender Claim Treatment**

The Holders shall receive quarterly Cash payments over a period of four years from the Effective Date in an aggregate amount equal to the amount of their Allowed Secured Claims, plus interest from the Effective Date on the unpaid portion of the Allowed Secured Claim, at the rate prescribed below.

Payments shall be made in the amount of the accruing interest, with the principal balance and any unpaid interest due and payable at the Maturity Date. The first installment shall be payable on the thirty-first (31st) day after the Effective Date, or in the event such day is not a Business Day than it shall be payable on the next Business Day. Each installment shall be payable quarterly thereafter in the amount equal to interest on the Allowed Claim at the rate of 5.5% per annum or as otherwise established by the Bankruptcy Court, provided, however, that in the event such Claim is not an allowed Claim at the Effective Date then interest shall be payable on the undisputed portion of such Claim until the Claim is allowed pursuant to a Final Order of the Bankruptcy Court. Once a Claim is an Allowed Claim pursuant to a Final Order, then on the next interest payment date, the Holder shall receive a payment equal to the unpaid interest due and owing on the disputed portion of the Claim from the Effective Date.

The terms and conditions of the agreements or instruments between the Holder and the Debtor shall be restructured and amended as of the Effective Date pursuant to Loan Modification Provisions, the form of which is attached to this Disclosure Statement as **Exhibit "9"**. Except as provided in this section, and notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all valid, enforceable and perfected prepetition liens of the Holder in its Collateral shall survive the Effective Date and continue in accordance with the contractual terms of the underlying agreements with such Holder and/or applicable law until the Holder's Allowed Secured Claim is satisfied pursuant to the Plan; provided however, that the Holder shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so long as the Reorganized Debtor is in compliance with the Plan. Any lien or interest granted to the Holder by the Bankruptcy Court as adequate protection shall be released and extinguished upon confirmation.

1    Holders of settled Secured Claims shall not be entitled to vote on the Plan on account of such

2    claims, as those claims are Unimpaired under the Plan and ride through Confirmation.

3              **(c)      Common Other Priority Claim Treatment**

4    This Class includes Other Priority Claims for an amount entitled to priority under Sections

5    507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, and does not include any

6    Administrative Claim or Tax Claim.  These Other Priority Claims are for accrued wages, salary or

7    commissions, including vacation, severance, and sick leave pay earned by an employee within 180

8    days prior to the Petition Date, to the extent of $10,950 per employee.

9    Except to the extent that (x) the Holder of an Allowed Other Priority Claim accepts, or has

10    accepted, less favorable treatment, or (y) the Allowed Other Priority Claim includes accrued

11    vacation or sick pay and the Holder remains employed with the Reorganized Debtors after the

12    Effective Date, the Holder of an Allowed Other Priority Claim will receive one of the following

13    treatments:

14    (i)  If a Class of Holders of Other Priority Claims votes to accept the Plan in accordance with

15    Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed Other Priority Claim in such

16    Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the

17    Effective Date, plus simple interest at 5% per annum for the period from the Petition Date through

18    the date each Allowed Claim is paid; *provided, however*, if a Claim is not Allowed as of the

19    Effective Date but becomes Allowed thereafter interest shall not accrue during the initial 30-day

20    period following the Effective Date but shall resume accruing thereafter.

21    (ii)  If a Class of Holders of Other Priority Claims votes to reject the Plan in accordance with

22    Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed Other Priority Claim in such

23    Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the

24    Effective Date, plus (x) simple interest at 0.64% (i.e., the Federal Judgment Rate) for the period

25    from the Petition Date through the Effective Date and (y) in the event the Claim is not Allowed as of

26    the Effective Date but becomes Allowed thereafter, simple interest at 5% per annum for the period

27    from the 31st day after the Effective Date through the date the Claim is paid.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1     In the event an Other Priority Claim includes accrued vacation or sick pay and the Holder

2     remains employed with the Reorganized Debtors after the Effective Date, the vacation or sick pay

3     shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time

4     following the Effective Date.

5                         **(d)    Common Tenant Security Deposits Treatment**

6         Unsecured Tenant Security Deposit Claims are those unsecured claims asserted by tenants of

7     the Debtors relating to security deposits made to their respective landlord Debtor. The Allowed

8     Claims of the Holders of such claims shall be Reinstated as of the Effective Date (i.e. such claims

9     shall be unaffected by confirmation of the Plan).

10                        **(e)    Common General Unsecured Claim Treatment**

11        Except to the extent that the Holder of an Allowed General Unsecured Claim accepts, or has

12    accepted, less favorable treatment, the Holder of an Allowed General Unsecured Claim will receive

13    one of the following treatments:

14        (i) If a Class of Holders of General Unsecured Claims votes to accept the Plan in accordance

15    with Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim

16    in such Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the

17    Effective Date, plus simple interest at 5% per annum for the period from the Petition Date through

18    the date each Allowed Claim is paid; *provided, however*, if a Claim is not Allowed as of the

19    Effective Date but becomes Allowed thereafter interest shall not accrue during the initial 30-day

20    period following the Effective Date but shall resume accruing thereafter.

21        (ii) If a Class of Holders of General Unsecured Claims votes to reject the Plan in accordance

22    with Section 1126(c) of the Bankruptcy Code, each Holder of an Allowed General Unsecured Claim

23    in such Class shall receive a cash payment equal to 100% of the amount of its Allowed Claim on the

24    Effective Date, plus (x) simple interest at 0.64% (i.e., the Federal Judgment Rate) for the period

25    from the Petition Date through the Effective Date and (y) in the event the Claim is not Allowed as of

26    the Effective Date but becomes Allowed thereafter, simple interest at 5% per annum for the period

27    from the 31st day after the Effective Date through the date the Claim is paid.

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52010-001\DOCS_LA:224408.6                    60

1    Holders who have agreed to other treatments in court-approved settlements (including, but

2    not limited to, FNBN) shall receive the treatments provided in those settlements notwithstanding the

3    Allowance of some or all of their Claims as General Unsecured Claims.

4    **(f)    Common Unsecured Guaranty Claim Treatment**

5    Claims in this Class consist of Guaranty Claims on obligations for which another one of the

6    Debtors is the principal obligor and for which the principal obligation is provided for under the Plan

7    or under the plan filed by MM 845 S. Flower and Chinatown.

8    Such claims shall be cured and reinstated, provided, however, they shall be amended to

9    conform to the restructuring of the underlying obligation owed to such Holder under the Common

10    Secured Lender Claim Treatment in Section III.B.2(b) of the Plan.

11    The foregoing treatment shall not supersede treatment specified in Bankruptcy Court-

12    approved settlements. Holders of Guaranty Claims who have agreed to a different treatment in a

13    Bankruptcy Court-approved settlement will receive the treatment provided therein.

14    **(g)    Common Intercompany Claim Treatment**

15    The Allowed Claims and the Holders of such claims shall be Unimpaired.

16    **(h)    Common Equity Interest Treatment**

17    The Holders of the Interests in these Classes shall retain their Interests in the Debtor.

18    **C.    Executory Contracts and Leases**

19    The Plan constitutes a motion to assume or reject all executory contracts and nonresidential

20    real property leases, except for those executory contracts and nonresidential real property leases that

21    have already been assumed or rejected pursuant to an earlier Order of the Bankruptcy Court or that

22    are the subject of a motion for such an Order pending as of the Confirmation Hearing. Prior to the

23    Confirmation Hearing, the Proponents will file a schedule of all real property leases and executory

24    contracts to be rejected; any contract or lease not on that schedule shall be deemed assumed by the

25    applicable Debtor as of the Effective Date. Prior to the date of hearing on the Disclosure Statement,

26    the Proponents will file a schedule of all real property leases and executory contracts to be assumed

27    listing the cure amount, if any, under such unexpired lease or executory contract. Unless the non-

28    Debtor party to any such executory contract or unexpired lease to be assumed files and serves

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    counsel for the Proponents an objection to the cure amount specified on that schedule on or before

2    the last date established by the Bankruptcy Court to file and serve objections to confirmation of the

3    Plan, such cure amount shall be forever binding on such non-debtor party to said executory contract

4    or unexpired lease.

5    Except as otherwise agreed by the parties to an executory contract or unexpired lease, each

6    Reorganized Debtor will cure any and all undisputed defaults within thirty days of the Effective Date

7    under any executory contract or unexpired lease assumed pursuant to the Plan and to which it is a

8    party, in accordance with Section 365 of the Bankruptcy Code. All disputed defaults that are

9    required to be cured shall be cured either within thirty days of the entry of a Final Order determining

10    the amount, if any, of such Debtor's or Reorganized Debtor's liability with respect thereto, or as may

11    be agreed otherwise by the parties. The Confirmation Order shall state that all pre-petition contracts

12    and unexpired leases that are listed on the schedule described herein are deemed assumed under the

13    Plan.

14    Any Claim for damages arising from the rejection of an executory contract or unexpired lease

15    must be Filed and served on counsel for the Proponents within thirty (30) days after the order of the

16    Bankruptcy Court approving such rejection becomes a Final Order or be (i) forever barred and

17    unenforceable against any Debtor, its Estate, the Reorganized Debtor and their respective property,

18    and (ii) barred from receiving any distribution under the Plan. All Allowed Claims arising from the

19    rejection of executory contracts or unexpired leases shall be treated as a General Unsecured Claim

20    against the respective Debtor who is a party to such executory contract or unexpired lease.

21    Any election of rights by a lessee under Section 365(h)(1) of the Bankruptcy Code must be

22    Filed and served on counsel for the Proponents within thirty (30) days after the order of the

23    Bankruptcy Court approving such rejection becomes a Final Order or lessee shall be deemed to have

24    waived any and all of its rights under Section 365(h)(1) of the Bankruptcy Code.

25

26

27

28

## V.

## MEANS FOR IMPLEMENTATION OF PLAN

### A.    Debt for Equity Conversion and Cash Infusion

Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Plan will be obtained from the Proponents' infusion of $5 million in cash, the Rights Offering, the Reorganized Debtors' cash balances existing on the Effective Date and, thereafter, from the operations of the Reorganized Debtors' business, the sale or refinancing of assets of the Reorganized Debtors, as deemed necessary and appropriate by the Reorganized Debtors, and from any other lawful source.  The Reorganized Debtors' restructured balance sheet on account of the Proponents' debt conversion will severely reduce the Debtors' secured debt load.

### B.    Sources and Uses of Cash for Effective Date

Attached hereto as **Exhibit "3"** is an analysis that shows the estimated sources and uses of cash with respect to the Plan as of the Effective Date.  The analysis includes the requirement of setting aside adequate reserves to pay in full disputed Claims that will not necessarily be paid on or shortly after the Effective Date.  As more fully disclosed in **Exhibit "3"**, the Proponents believe that the Reorganized Debtors will have more than sufficient cash on hand to adequately pay, or reserve for the payment of all Claims required to be paid under the Plan on the Effective Date or within thirty days thereof even absent any subscriptions pursuant to the Rights Offering.

### C.    Business Plan; Feasibility of Ongoing Operations

Attached hereto as **Exhibit "4"** are Legendary's Projections with respect to the business plan for the Reorganized Debtors and the feasibility of the Reorganized Debtors' restructured obligations under the Plan.  The Projections are based upon historical operating information provided, or disclosed by the Debtors and are premised upon all of the assumptions set forth therein.  In particular, the Proponents have made certain assumptions about rents and operating income; assume the sale of certain properties during the four-year performance period contemplated by the Plan; and anticipate the commencement of certain development activities, all as more fully set forth in the notes and assumptions to the Projections.

1    The Proponents believe that given the conservative assumptions upon which the Projections

2  are based, the Plan is feasible.  In particular, during the four-year period of the Plan, the Reorganized

3  Debtors' debt coverage ratio (calculated on an aggregate basis) grows from 0.62 to 1.36, and the

4  debt ratio (based upon conservative real estate valuations noted in the Projections) falls from 72% to

5  55%.

6    At the end of the four-year period of the Plan, under the Projections, the Reorganized

7  Debtors will have refinanced approximately $205 million of secured mortgage debt.  Based upon

8  conservative operating and asset valuation assumptions, the Reorganized Debtors will have a debt

9  ratio of approximately 55% percent and will be generating sufficient income to establish a debt

10  coverage ratio of approximately 1.36 after refinancing.  The Proponents believe that the projected

11  strength of the Reorganized Debtors' operations and balance sheet will enable them to refinance all

12  of this debt before the fourth anniversary of the Effective Date.

13    The Proponents used the following assumptions in producing their projections.  All property

14  incomes are assumed flat for Year 1 post-confirmation.  Lease-up to 90% occupancy from current

15  occupancy levels is expected to be achieved between Year 2 and the close of Year 4 on a straight

16  line basis.  The Proponents assumed lease-up incentives of a 10% average discount from current

17  lease rates plus non-recognition of lease rental rate growth of 2%, 3% and 3% for Years 2, 3 and 4,

18  respectively.  Tenant improvement allowances are reflected in the "contingency" line item and

19  "capital expenditure reserves" at the consolidated MMPI level.  Legendary has been unable to

20  determine how much capital will need to be expended since the Debtors have refused to allow access

21  to the properties.  It is not possible to determine what tenant improvements will be required at this

22  time.

23    Based upon the Projections, as a result of "lease up" operations to achieve stabilized

24  occupancy by the fourth year, conversion of approximately $65 million in debt to equity and the

25  infusion of $15 million in cash from the Rights Offering and Legendary's equity contribution, the

26  Reorganized Debtors will not need to sell any assets to meet cash flow needs nor to service their

27  operations or debt.  However, the Proponents intend to sell or divest approximately $127 million in

28  assets during the term of the Plan in order to generate sufficient cash and reduce debt by an

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    additional $48.7 million. Sales are staggered to avoid massive value erosion through asset dumping.

2    The following shortfalls must be covered in each year:

3              • Year 1 -- $3,842,000;

4              • Year 2 -- $14,065,000;

5              • Year 3 -- $14,590,000; and

6              • Year 4 -- $13,548,000.

7    The value of assets sold in each year of the Plan is:

8              • Year 1 -- $40,740,000;

9              • Year 2 -- $52,145,000;

10             • Year 3 -- $20,450,000; and

11             • Year 4 -- $13,548,000.

12             As more fully set forth in the Projections, the Proponents have identified a pool of assets that

13   will likely be divested during the term of the Plan in order to provide adequate cash flow to service

14   all of the Reorganized Debtors' obligations.[12] The Proponents believe that some or all of these

15   assets can be sold at an adequate price and within an adequate period of time in order to maximize

16   values and to generate the cash required for the Plan to be feasible.

17             Other significant features of the Plan are as follows:

18             1.    The Proponents allocate $5 million over the term of the Plan for capital

19   improvements *over and above* the $8.2 million assigned for tenant improvements and

20   maintenance/repair by the Debtors' Plan. Despite the substantial improvements the Proponents

21   intend, the budget conservatively does not reflect rent increases based on those improvements.

22             2.    The Proponents set aside $20 million from the Reorganized Debtors' operating

23   budget over the term of the Plan for development activities, beginning in Year 1. The budgets do not

24   reflect any income from development activities which will begin to materialize in Year 4 and

25   thereafter.

26             3.    Of critical importance, the Proponents budget the cost for refinance "as and when"

27   the loans mature or balloon payments are required. By the end of the Plan term, all outstanding debt

28   _____

[12] Attached as page 3 of Exhibit 4 herein is a spreadsheet providing details of anticipated asset sales under the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 | will have been paid from sales proceeds or refinanced with all costs associated therewith accounted

2 | for.

3 |     4.    Positive net operating income is achieved in Year 1 and grown annually.  The

4 | Reorganized Debtors' debt coverage ratio (calculated on an aggregate basis) grows from 0.62 to

5 | 1.36, and the debt ratio falls from 72% to 55% using asset values that are approximately 74% of the

6 | Debtors' estimates as supported by recent appraisals.

7 |     5.    All "lease-up" activities are projected to reach stabilized occupancy by the close of

8 | the four-year Plan term – both lease rate discounts and market rate adjustments are budgeted.

9 |     6.    Property sales are minimal and spread to achieve the highest value from a market

10 | turn-around and to avoid "fire sales" of the properties.  The Plan proposes just $127 million in asset

11 | sales over the four year term but such sales are not necessary to pay debt service or to meet

12 | operational requirements.

13 |     7.    Operating expenses are severely reduced by out-sourcing property management on a

14 | revenue-dependent contract.  Corporate overhead is severely reduced and could be more so,

15 | however, this cannot be determined until the Proponents obtain access to this information.

16 |     8.    The Plan is extremely flexible in that asset sales can be increased if necessary to

17 | overcome unachieved lease-ups or cost reductions; funds set aside for development can be deferred

18 | as can capital expenditure allowances, if necessary; and sales can be increased if profit opportunities

19 | from sales emerge.  Under the Plan, refinancing can be accomplished for assets individually or as

20 | tranches bundled to meet even the most rigorous underwriting criteria to achieve the lowest

21 | borrowing costs.

22 |     9.    Equity in Reorganized MMPI grows by over 30% during the four-year Plan term.

23 | **D.**    **Insider Litigation Trust**

24 |     Unless the Insider Shareholder Settlement Offer is accepted by all members of Class E-1 in

25 | Case 1, as of the Effective Date, the a Litigation Trustee will retain all rights on behalf of a

26 | Litigation Trust to commence, pursue and settle, as appropriate, any and all Insider Causes of Action

27 | assigned to the Litigation Trust in any court or other tribunal, including, without limitation, an

28 | adversary proceeding filed in the Chapter 11 Cases.  The failure to explicitly list any Insider Causes

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    of Action is not intended to limit the rights of the Litigation Trust, through the Litigation Trustee, to

2    pursue any and all Insider Causes of Action, including Insider Causes of Action not so identified

3    herein. Notwithstanding any otherwise applicable principle of law or equity, including, without

4    limitation, any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or

5    any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any Insider

6    Cause of Action in the Plan, the Disclosure Statement, or any other document filed with the

7    Bankruptcy Court will in no manner waive, eliminate, modify, release, or alter the Debtors' or the

8    Litigation Trustee's right to commence, prosecute, defend against, settle, and realize upon any

9    Insider Cause of Action that the Debtors or the Estates have or may have as of the Effective Date.

10    The Litigation Trustee may commence Insider Litigation, prosecute Insider Litigation, recover on

11    account of Insider Causes of Action, and settle Insider Causes of Action assigned to the Litigation

12    Trust in accordance with the best interests, and for the benefit of, the Litigation Trust, subject to the

13    terms of any applicable Litigation Trust Agreement.

14    Unless a Cause of Action against a Person is expressly waived, relinquished, released,

15    compromised in writing, or settled in the Plan or any Final Order, the Debtors and their Estates, for

16    the benefit of beneficiaries of the Litigation Trust in which such Insider Causes of Action shall vest,

17    expressly reserve such Insider Causes of Action for later adjudication (including, without limitation,

18    Insider Causes of Action of which the Debtors, the Equity Holders Committee, the Creditors

19    Committee or any party in interest may presently be unaware, or which may arise or exist by reason

20    of additional facts or circumstances unknown to the Debtors, the Equity Holders Committee, the

21    Creditors Committee or any party in interest at this time, or facts or circumstances which may

22    change or be different from those which the Debtors, the Equity Holders Committee, the Creditors

23    Committee or any party in interest now believe to exist) and, therefore, no preclusion doctrine,

24    including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim

25    preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches will apply to Insider Causes

26    of Action upon, or after, the Confirmation or consummation of the Plan based on their description or

27    lack of identification or description in the Disclosure Statement, the Plan, or the Confirmation Order,

28

1  except where such Insider Causes of Action have been expressly released by virtue of the Plan or

2  other Final Order.

3        As of the Effective Date, subject to any Litigation Trust Agreement, the Litigation Trustee,

4  on behalf of the Litigation Trust, will be authorized to exercise and perform the rights, powers and

5  duties held by the Debtors' Estates under the Insider Causes of Action, including, without limitation,

6  the authority under Section 1123(b)(3) of the Bankruptcy Code to provide for the settlement,

7  adjustment, retention and enforcement of claims and interests of the estate, without the consent or

8  approval of any third party, and without any further order of the Bankruptcy Court, except as

9  otherwise provided in the Plan.

10        Subject to the Litigation Trust Agreement, the Litigation Trustee will make the decision of

11  whether or not to pursue Insider Litigation or otherwise prosecute Insider Causes of Action.  The

12  Litigation Trust shall be initially funded in accordance with the terms of an agreement to be

13  negotiated between Reorganized MMPI and the Equity Holders Committee at such time as is

14  appropriate.

15        Any and all Net Proceeds derived by the Litigation Trust from the prosecution of the Insider

16  Causes of Action shall be distributed on a Pro Rata basis to the Holders of record of MMPI Existing

17  Common Stock as of the Effective Date.

18  **E.    Equity Ownership in Reorganized MMPI and the Litigation Trust**

19        **1.    Issuance of New Common Stock**

20        Under the Plan, as of the Effective Date all outstanding equity securities of MMPI will be

21  cancelled and, on or promptly after the Effective Date, Reorganized MMPI will issue 22,025,000

22  shares of its common stock (the Reorganized MMPI Common Stock), as follows (assuming the

23  Rights Offering is fully subscribed):

24        An aggregate of 15,417,500 shares of New Common Stock, representing 70% of the

25  Reorganized MMPI Common Stock assuming full subscription of the Rights Offering, will be issued

26  to the Proponents in exchange for their Secured Claims in each of the Debtors' cases except Merco

27  Group[13] and for Legendary's equity contribution.  Of such shares, (a) 8,369,500 shares (or 38% of

28

[13] Legendary's Secured Claim in the Merco Group case shall receive the Common Secured Lender Treatment.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  the Reorganized MMPI Common Stock assuming full subscription of the Rights Offering) will be

2  issued to Legendary in exchange for its approximately $33 million in Secured Claims and $5 million

3  equity contribution and (b) 7,048,000 shares (or 32% of the Reorganized MMPI Common Stock

4  assuming full subscription of the Rights Offering) will be issued to EWB in exchange for its

5  approximately $32 million in Secured Claims.

6      An aggregate of 4,405,000 shares of Reorganized MMPI Common Stock, representing 20%

7  of the Reorganized MMPI Common Stock will be issued to the Holders of the MMPI Existing

8  Common Stock in exchange for their shares of MMPI Existing Common Stock.

9      An aggregate of up to 2,202,500 shares of Reorganized MMPI Common Stock, representing

10  10% of the Reorganized MMPI Common Stock, will be issued to Holders of the MMPI Existing

11  Common Stock electing to participate in the Rights Offering, pursuant to which Holders of the

12  MMPI Existing Common Stock will be offered rights to purchase an aggregate of up to 2,202,500

13  shares New Common Stock at the price of $4.54 per share (the "Subscription Price"); in accordance

14  with the Subscription Rights discussed in Section V.E.9, below.

15      The Subscription Rights and the Reorganized MMPI Common Stock constitute "securities"

16  within the definition of Section 2(a)(1) of the Securities Act of 1933, as amended (the "Securities

17  Act") and corresponding definitions under state securities laws and regulations ("Blue Sky Laws").

18  Accordingly, the Subscription Rights and the Reorganized MMPI Common Stock will be subject to

19  registration under the Securities Act and Blue Sky Laws unless an exemption from such registration

20  is available.

21      Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a

22  plan of reorganization from registration under the Securities Act and Blue Sky Laws if three

23  principal requirements are satisfied:

24      (i)     The securities are offered and sold under a plan of reorganization and are securities of

25  the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor

26  to the debtor under the plan;

27      (ii)    The recipients of the securities hold a pre-petition or administrative claim against the

28  debtor or an interest in the debtor; and

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1         (iii)    The securities are issued entirely in exchange for the recipient's claim against or

2    interest in the debtor, or principally in such exchange and partly for cash or property.

3         In addition, Section 1145(a)(2) exempts the offer and sale of any security "through any

4    warrant, option, right to subscribe, or conversion privilege" that is sold in the manner specified in

5    Section 1145(a)(1), and the sale of any security upon the exercise of such a warrant, option, right or

6    privilege.

7         The Proponents believe that the Reorganized MMPI Common Stock will qualify as securities

8    "of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a

9    successor to the debtor under the plan." The Proponents believe that the Reorganized MMPI

10   Common Stock will be issued (a) to the Proponents, principally in exchange for the Proponents'

11   Claims against the Debtors and only partly for an additional cash infusion, (b) to Holders of MMPI

12   Existing Common Stock who do not elect to exercise their Subscription Rights, exclusively in

13   exchange for their MMPI Existing Common Stock (*i.e.*, no part of the consideration received by

14   Reorganized MMPI from such Holders will include any cash), and (c) to Holders of MMPI Existing

15   Common Stock who elect to exercise some or all of their Subscription Rights, principally in

16   exchange for their MMPI Existing Common Stock and only partly for cash.  In the view of the

17   Proponents, the Reorganized MMPI Common Stock to be issued to the Proponents will be issued

18   "principally" in exchange for such shares and only "partly" for cash because the value of the

19   Proponents' Claims, as described more fully in Section IV.B hereof, approximates $65 million,

20   which is an amount that far exceeds the $5 million cash infusion to be made by the Proponents.

21   Furthermore, the Reorganized MMPI Common Stock to be issued to the Holders of shares of MMPI

22   Existing Common Stock who elect to exercise their Subscription Rights will be issued "principally"

23   in exchange for such shares and only "partly" for cash because, even assuming that all such Holders

24   elect to exercise their Subscription Rights, the value of the approximately 88.1 million shares of

25   MMPI Existing Common Stock that would be surrendered in exchange for Reorganized MMPI

26   Common Stock substantially exceeds the maximum aggregate cash subscription price that

27   Reorganized MMPI would receive.  Under the Plan, the Reorganized MMPI Common Stock being

28   issued to the Holder of each 20 shares of MMPI Existing Common Stock has a notional value of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    $4.54 per share (based upon the approximate conversion price being paid by the Proponents with

2    respect to their converted debt obligations). The Holder of each such share of Reorganized MMPI

3    Common Stock is entitled, pursuant to the associated Subscription Right, to purchase an additional

4    number of shares of Reorganized MMPI Common Stock equal to up to 0.95 times the number of

5    shares of Reorganized MMPI Common Stock distributed to such Holder under the Plan. Thus, the

6    Proponents believe that no Holder of MMPI Existing Common Stock as of the Effective Date will be

7    able to subscribe for additional Reorganized MMPI Common Stock with a value in excess of 90% of

8    the nominal value of the shares of MMPI Existing Common Stock held by such Holder as of the

9    Effective Date.

10        In the view of the Proponents, the Subscription Rights constitute "rights to subscribe" to

11   Reorganized MMPI Common Stock (*i.e.*, a security that will be sold in the manner specified in

12   Section 1145(a)(1)), and therefore issuance of the Subscription Rights, together with the

13   Reorganized MMPI Common Stock issuable upon exercise of the Subscription Rights (like all

14   Reorganized MMPI Common Stock issuable pursuant to the Plan) should be exempt from

15   registration under the Securities Act and Blue Sky Laws.

16        Based on the foregoing, the issuance of the Reorganized MMPI Common Stock pursuant to

17   the Plan should satisfy the applicable requirements of Section 1145(a)(1) and Section 1145(a)(2) of

18   the Bankruptcy Code, and should be exempt from registration under the Securities Act and any

19   applicable Blue Sky Law. Accordingly, the Proponents will not file a registration statement under

20   the Securities Act or Blue Sky Laws with respect to the Reorganized MMPI Common Stock or

21   otherwise. Notwithstanding the foregoing, the Proponents have not sought any "no-action" letter by

22   the SEC with respect to any such matters, and therefore no assurance can be given regarding the

23   availability of any exemptions from registration with respect to the Reorganized MMPI Common

24   Stock, any other securities, if any, issued pursuant to the Plan, and the Rights Offering.

25   Nevertheless, the Proponents are aware of a number of published "no-action" letters by the SEC in

26   which staff members of the SEC have indicated that, in reliance on Section 1145, they would not

27   recommend enforcement action against issuers of unregistered securities under factual circumstances

28   that the Proponents consider are similar to those applicable to the Reorganized MMPI. *See,*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    *generally*, Barry's Jewelers, Inc., SEC No-Action Letter, 1998 SEC No-Act. LEXIS 735 (July 20,

2    1998), Zenith Laboratories, Inc., SEC No-Action Letter, 1990 SEC No-Act. LEXIS 37 (January 12,

3    1990), Bennett Petroleum Corporation, SEC No-Action Letter, 1983 SEC No-Act. LEXIS 3102

4    (December 27, 1983), Jet Florida System, Inc., Airport Systems, Inc., SEC No-Action Letter, 1987

5    SEC No-Act. LEXIS 1490 (January 12, 1987).

6    　　　　As noted above, the Proponents believe that Section 1145 will be satisfied, however, if it is

7    not, the Proponents will issue stock via a private placement.  The Debtors contend that the

8    Proponents will be foreclosed from conducting a private placement on the grounds that the

9    Disclosure Statement constitutes a  "general solicitation" while the Proponents disagree.  In the

10    event the Proponents are not able to satisfy Section 1145 and the Debtors are correct, the Proponents

11    will not conduct a private placement.  Rather, Legendary will "back stop" the private placement up

12    to $10 million.

13    　　　**2.**　　　**Interests in the Litigation Trust**

14    　　　　Pursuant to the Plan, on the Effective Date, each of the Debtors will transfer all of its Insider

15    Causes of Action to a Litigation Trust controlled by a Litigation Trustee and the Equity Holders

16    Committee on behalf of present non-Insider MMPI Equity Holders and Reorganized MMPI (the

17    "Litigation Trust Beneficiaries").  As will be set forth in the Litigation Trust Agreement, the

18    Litigation Trust Beneficiaries will have beneficial interests (the "Litigation Trust Interests") in the

19    Litigation Trust.

20    　　　　The Proponents acknowledge that certain beneficial interests in certain types of trusts may be

21    subject to characterization as "securities" within the definition of such term set forth in Section

22    2(a)(1) of the Securities Act, the offer or sale of which may be subject to the registration requirement

23    of Section 5 of the Securities Act.  However, the Proponents do not believe that the Litigation Trust

24    Interests are securities and, even if the Litigation Trust Interests were deemed to be "securities," the

25    Proponents believe that the issuance of the Litigation Trust Interests to holders of Class E Claims

26    exclusively in exchange for their MMPI Existing Common Stock should be exempt under Section

27    1145(a)(1), discussed above.  In a number of published "no-action" letters, the SEC staff has

28    recognized that the securities of business entities that purchase, acquire or succeed to the assets of a

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Chapter 11 debtor in a variety of circumstances can qualify as securities of a "successor under a

2    plan" within the meaning of Section 1145(a)(1). This appears to be the case regardless of whether

3    less than substantially all of the assets are acquired. *See, generally*, Bercor, Inc., SEC No-Action

4    Letter, 1989 SEC No-Act. LEXIS 802 (July 11, 1989), Cyclops Industries, Inc., SEC No-Action

5    Letter, 1988 SEC No-Act. LEXIS 626 (June 2, 1988), and Argo Petroleum Corporation, SEC No-

6    Action Letter, 1987 SEC No-Act. LEXIS 2405 (September 14, 1987). Accordingly, the fact that the

7    Litigation Trust will acquire only certain assets of the Debtors does not seem to be an impediment.

8    Furthermore, the SEC has imposed no requirement that there be only a single successor. *See,*

9    *generally*, Oregon Steel Mills, Inc., SEC No-Action Letter, 1993 SEC No-Act. LEXIS 326

10   (February 26, 1993) and American First Corporation, SEC No-Action Letter, 1989 SEC No-Act.

11   LEXIS 980 (September 14, 1989). Accordingly, the Proponents are not aware of any reason why

12   successor status should be available to both Reorganized MMPI and to the Litigation Trust. Finally,

13   in a number of no-action letters the SEC has recognized that Chapter 11 trusts can qualify as

14   "successors under a plan." Examples include The Marbella Founders Trust, SEC No-Action Letter,

15   1993 SEC No-Act. LEXIS 1252 (December 1, 1993), UNR Industries, Inc., No-Action Letter, 1989

16   SEC No-Act. LEXIS 799 (July 11, 1989), Bedford Computer Corporation, No-Action Letter, 1987

17   SEC No-Act. LEXIS 2580 (October 14, 1987), and LMX Corp, No-Action Letter, 1984 SEC No-

18   Act. LEXIS 2230 (May 15, 1984). The purpose, functions and terms of the Trust, like those of the

19   trusts in these no-action letters, are expressly authorized by the Plan and are in furtherance of the

20   Debtors' reorganization or liquidation under the Plan. Like such trusts, (i) the Litigation Trust

21   Interests are not represented by certificates or, if they are, the certificates bear a legend stating that

22   the certificates are transferable only upon death or by operation of law; (ii) the Litigation Trust will

23   exists only to effect a liquidation and will terminate within a reasonable period of time; and (iii) the

24   Litigation Trust will issue annual unaudited financial information to all beneficiaries.

25        Based on such no-action letters, the Proponents believe that the Litigation Trust Interests may

26   be issued without registration under the Securities Act in reliance upon the exemption provided by

27   Section 1145(a)(1) of the Bankruptcy Code. However, the views of the SEC on the matter have not

28   been sought by the Proponents and, therefore, no assurance can be given regarding this matter.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**3.** **Sales and Transfers of the New Common Stock and Litigation Trust Interests**

    **(a)** **Restrictions Under Operative Agreements/Documents**

   The Litigation Trust Interests will not be certificated and will be subject to certain transfer restrictions as set forth in the Liquidating Trust Agreement ("Trust Interest Ownership Change Restrictions"). Generally, the Litigation Trust Interests cannot be assigned or transferred other than by death, by operation of law or otherwise in compliance with the securities laws (as more specifically set forth in the Litigation Trust Agreement), and will not be represented by certificates.

   Subject to the provisions of the amended and restated articles of incorporation and bylaws of MMPI adopted pursuant to the Plan ("Post-Effective Date MMPI Charter Documents"), except as provided below with respect to persons deemed to be "underwriters," the New Common Stock should otherwise be transferable.

    **(b)** **Restrictions/Exemptions under Applicable Law**

   Generally, as securities issued pursuant to Section 1145(a)(1) of the Bankruptcy Code, the New Common Stock may be sold by the recipient without registration under the Securities Act. Under Section 1145(c) of the Bankruptcy Code, the offer and sale of securities of the kind and in the manner specified in Section 1145(a)(1) is deemed to be a "public offering" and therefore such securities are deemed not be "restricted securities" under applicable securities laws. Furthermore, Section 1145(b)(3) of the Bankruptcy Code confirms, subject to the exceptions set forth below, the "non-underwriter" status of recipients of securities offered or sold in the manner specified in Section 1145(a)(1). (By virtue of such non-underwriter status, such recipients become entitled to sell such securities without registration under the Securities Act in reliance upon the exemption provided by Section 4(1) of such act. The effect of these provisions generally is to make the New Common Stock freely transferable under applicable law, subject any restrictions on transfer that may be imposed by the Post-Effective Date MMPI Charter Documents or state corporation statutes.

   Notwithstanding the foregoing, Section 1145(b)(1) identifies certain categories of persons not entitled to sell securities issued in reliance upon Section 1145, which persons are sometimes referred to as "statutory underwriters." Such categories include:

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    (1)    Persons who purchase a claim against, an interest in, or a claim for administrative

2    expense against the debtor with a view to distributing any security received in exchange for such a

3    claim or interest (sometimes referred to as "accumulators");

4    (2)    Persons who offer to sell securities offered under a plan for the holders of such

5    securities (sometimes referred to as "distributors");

6    (3)    Persons who offer to buy such securities from the holders of such securities, if the

7    offer to buy is (a) with a view to distributing such securities and (b) made under a distribution

8    agreement; and

9    (4)    Persons who are "issuers" with respect to the securities, as the term "issuer" is

10    defined in Section 2(11) of the Securities Act.

11    For purposes of category 4, an "issuer" includes not only the issuer of a security itself but

12    also any person directly or indirectly controlling, controlled by the issuer or any person under direct

13    or indirect common control with the issuer (i.e., an "affiliate"). "Control" under applicable securities

14    laws means the possession, direct or indirect, of the power to direct or to cause the direction of the

15    management and policies of a person, whether through the ownership of voting securities, by

16    contract or otherwise. Whether "control" exists is a question of fact. As an example, an officer or

17    director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be

18    "in control" of such debtor or successor, particularly if the management position or directorship is

19    coupled with ownership of a significant percentage of the reorganized debtor's or its successor's

20    voting securities. For this purpose, ownership of ten percent (10%) or more of the voting securities

21    of a reorganized debtor may be presumed to be a "control person." Finally, the Proponents note that,

22    under applicable SEC rules, a group of separate entities that act in concert with respect to a security

23    may be deemed a single "person" to whom the securities holdings of each group member may be

24    attributed for purposes of determining whether control exists.

25    The Bankruptcy Code definition of "underwriter" is subject to certain exclusions for

26    "ordinary trading transactions" by non-issuers and certain transactions pursuant to an agreement that

27    provides only for the purchase, sale, matching, or combining of fractional interests in securities

28    offered or sold under the plan of reorganization. In addition, certain holders of securities issued

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    pursuant to the Plan may be able to resell pursuant to other exemptions, such as Securities Act Rule

2    144, Securities Act Rule 144A, or the so-called "Section 4(1 ½)" exemption. More specifically,

3    Rule 144 permits the resale of securities subject to applicable volume limitations, notice and manner

4    of sale requirements, and certain other conditions; Rule 144A permits resales to "qualified

5    institutional buyers" subject to certain conditions; and the so-called "Section 4(1 ½)" exemption

6    permits resales in certain private transactions. Notwithstanding the foregoing, there can be no

7    assurance that any such or other exemptions will be available to any particular holder.

8    WHETHER ANY PARTICULAR PERSON WILL FALL WITHIN ANY CATEGORY OF

9    "STATUTORY UNDERWRITER" WITH RESPECT TO ANY SECURITY, IF ANY, TO BE

10    ISSUED PURSUANT TO THE PLAN, OR WHETHER ANY PARTICULAR PERSON WILL BE

11    ABLE TO RESELL SUCH SECURITY DEPENDS UPON VARIOUS FACTS AND

12    CIRCUMSTANCES. GIVEN THE COMPLEXITY AND FACTUAL NATURE OF SUCH

13    ISSUES, THE PROPONENTS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT

14    OF ANY PARTICULAR PERSON TO TRADE IN THE SECURITIES, IF ANY, TO BE

15    DISTRIBUTED PURSUANT TO THE PLAN. FURTHERMORE, THE PROPONENTS HAVE

16    NOT SOUGHT AND DO NOT EXPECT TO RECEIVE ANY NO-ACTION POSITION FROM

17    THE SEC WITH RESPECT TO ANY SECURITIES REGULATORY MATTERS CONCERNING

18    THE PLAN, AND NO ASSURANCE CAN BE GIVEN THAT THE SEC OR "BLUE SKY"

19    SECURITIES REGULATORY AUTHORITIES WILL NOT TAKE A POSITION WITH

20    RESPECT TO SUCH MATTERS THAT IS INCONSISTENT WITH THOSE OF THE

21    PROPONENTS AS DESCRIBED HEREIN. POTENTIAL RECIPIENTS OF THE SECURITIES

22    DISTRIBUTED PURSUANT TO THE PLAN ARE STRONGLY URGED TO CONSULT THEIR

23    OWN COUNSEL WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.

24    **4.    Exchange Act Compliance and Related Consequences Thereof**

25    Section 12(g) of the Securities Exchange Act, as amended (the "Exchange Act") requires any

26    company that has both (A) total assets in excess of $10 million and (B) a class of equity securities

27    held by more than 500 persons as of the end of its fiscal year, to register such class of equity

28    securities. Companies having a class of equity securities registered under Section 12(g) of the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Exchange Act are subject to the periodic reporting and certain other requirements of the Exchange

2    Act.

3           MMPI is subject to the periodic reporting and other requirements of the Exchange Act,

4    including filing annual reports on Form 10-K, quarterly reports on Form 10-Q, and reports of events

5    reportable on Form 8-K. Reorganized MMPI is expected to continue to be subject to all applicable

6    requirements of a reporting company following the Effective Date. As a reporting company under

7    the Exchange Act, Reorganized MMPI will be able to and will endeavor to cause its common stock

8    to be listed on a national securities exchange or a qualifying interdealer quotation system and, as

9    discussed herein, the New Common Stock should be freely sellable and transferable by the holders

10   thereof (subject to the limited exceptions described above). The Proponents believe that

11   Reorganized MMPI's reporting status, and the listing or quotation of its securities, would provide

12   holders of the New Common Stock with a readily available trading market, access to current

13   information regarding the company, and greater liquidity for their securities.

14          In addition, registration of the New Common Stock under the Exchange Act and related

15   actions may have other potential benefits, including (i) Reorganized MMPI may subsequently

16   determine to more appropriately compensate or offer to compensate potential or current executives

17   with more liquid, transferable equity (common stock of Reorganized MMPI), and (ii) the

18   Reorganized Debtors may be able subsequently to facilitate acquisitions and/or other corporate

19   transactions using common stock of Reorganized MMPI in lieu of cash or other forms of

20   consideration.

21          The Proponents acknowledge that certain beneficial interests in certain types of trusts may be

22   deemed to be "equity securities" within the meaning of the Exchange Act. In such event, and if the

23   Litigation Trust were to have both total assets in excess of $10 million and Litigation Trust Interests

24   held by more than 500 holders of record as of the end of any of its fiscal years, then the Litigation

25   Trust could become subject to the registration requirement of Section 12(g) of the Exchange Act.

26   However, the Proponents are aware of a number of published "no-action" letters by the SEC in

27   which the SEC staff has indicated that they would not recommend enforcement action in respect of

28   certain types of Chapter 11 trusts that do not register under the Exchange Act. Examples include

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    Guerdon Real Estate Trust, SEC No-Action Letter, 1989 SEC No-Act. LEXIS 562 ) Mar. 31, 1989),

2    Seiscom Delta, Inc., SEC No-Action Letter, 1987 SEC No-Act. LEXIS 2430 (September 14, 1987).

3    Like the trusts that are the subject of these no-action letters, (i) the Litigation Trust has the purpose

4    of liquidating assets and distributing funds, (ii) the trustee of the Litigation Trust will provide an

5    annual report to beneficiaries containing financial or other information, (iii) the Litigation Trust will

6    have a limited term; and (iv) the Litigation Trust Interests are not represented by certificates or, if

7    they are, the certificates bear a legend stating that the certificates are transferable only upon death or

8    by operation of law.

9               **5.    Certain Transactions by Stockbrokers**

10              Section 1145(a)(4) of the Bankruptcy Code provides that a "stockbroker" that executes a

11   transaction in a security that was issued under Section 1145(a)(1) or (a)(2) within 40 days following

12   the first date on which such security was bona fide offered to the public by the issuer, or by or

13   through an underwriter, has an exemption from the registration requirement of Section 5 of the

14   Securities Act and the comparable requirements of the Blue Sky Laws with respect to such

15   transaction. The exemption is subject to the condition that the stockbroker provides, at or before the

16   time of such transaction, a copy of the Disclosure Statement (and supplements to the Disclosure

17   Statement, if any, if ordered by the Bankruptcy Court). The Proponents note that the exemption is

18   available to persons considered "dealers" under the Securities Act, and believe that the Effective

19   Date will be the date on which the 40-day period will begin.

20              **6.    Listing of Reorganized MMPI Stock**

21              Reorganized MMPI will use commercially reasonable efforts to cause its common stock to

22   be listed on a national securities exchange or a qualifying interdealer quotation system as soon as

23   practicable after the Effective Date, but shall have no liability if it is unable to do so.

24              **7.    Investment Company Act**

25              Because, in the Proponents' view, the assets of the Litigation Trust do not consist securities

26   issued by the Debtors or any other person, and for other reasons, the Proponents do not believe that

27   the Litigation Trust falls within the definition of "investment company" in any manner requiring

28

1 such entity to register under the Investment Company Act of 1940, as amended (the "Investment

2 Company Act").

### 8.    Compliance by the Litigation Trust If Required

4          Notwithstanding the preceding discussion, if the Litigation Trustee determines, with the

5 advice of counsel, that the Litigation Trust is required to comply with the registration and reporting

6 requirements of the Exchange Act or the Investment Company Act, then prior to the registration of

7 the Litigation Trust under the Exchange Act or the Investment Company Act, the Litigation Trustee

8 shall seek to amend the Liquidating Trust Agreement to make such changes as are deemed necessary

9 or appropriate to ensure that the Litigation Trust is not subject to registration or reporting

10 requirements of the Exchange Act or the Investment Company Act, and the Litigation Trust

11 Agreement, as so amended, shall be effective after notice and opportunity for a hearing and the entry

12 of a final order of the Bankruptcy Court.  If the Litigation Trust Agreement, as amended, is not

13 approved by final order of the Bankruptcy Court or the Bankruptcy Court otherwise determines in a

14 final order that registration under one or both of the Exchange Act or Investment Company Act is

15 required, then the Litigation Trustee shall take such actions as may be required to satisfy the

16 registration and reporting requirements of the Exchange Act and/or the Investment Company Act, as

17 applicable.

### 9.    Rights Offering to Holders of MMPI Existing Common Stock.

19          Holders of MMPI Existing Common Stock of record as of the Effective Date shall each

20 receive one (1) share of Reorganized MMPI Common Stock and one Subscription Right for each

21 twenty (20) shares of MMPI Existing Common Stock held by such Holder of record as of the

22 Effective Date.  The Subscription Right shall entitle the Holder thereof to subscribe for the purchase

23 of a number of the Subscription Shares equal to up to 0.95 times the number of shares of

24 Reorganized MMPI Common Stock distributed to such Holder under the Plan, at a purchase price of

25 $4.54 per share, provided such Holder makes a written election to exercise such Subscription Right

26 and timely delivers such written election, together with the purchase price of the Reorganized MMPI

27 Common Stock to be purchased pursuant to the exercise of the Subscription Right, to the Transfer

28 Agent on or before the end of the Subscription Period.  The number of Subscription Shares available

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    to be purchased pursuant to the exercise of the Subscription Rights shall be limited to 2,202,500

2    shares (i.e. shares with an aggregate purchase price of $10 million).  In the event that the Rights

3    Offering is oversubscribed, each holder of a Subscription Right that has been properly and timely

4    exercised shall receive a number of Subscription Shares equal to 2,202,500 (the total number of

5    Subscription Shares available) multiplied by its Subscription Share Pro Rata Allocation.  In the event

6    of such oversubscription, excess subscription funds shall promptly be reimbursed to subscribing

7    parties.

8         The foregoing transaction pursuant to which Holders of MMPI Existing Common Stock may

9    acquire additional MMPI Common Stock is referred to in this Plan as the "Rights Offering."  The

10    Rights Offering is subject to and conditioned upon the confirmation of the Plan for MMPI.  The

11    Rights Offering shall comply with all rules necessary to ensure its exemption, under Section 1145 of

12    the Bankruptcy Code, from federal, state and local security registration requirements or shall be

13    made available only to current equity owners who are "accredited investors."  The form of any

14    subscription agreement relating to the Rights Offering shall be approved by the Bankruptcy Court at

15    Confirmation.

16         NEITHER THIS DISCLOSURE STATEMENT, NOR ANY PORTION THEREOF

17    INCLUDING THIS SECTION, HAS BEEN SUBMITTED FOR APPROVAL UNDER THE

18    SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS.

19    NEITHER THE SEC NOR ANY STATE REGULATORY AUTHORITY HAS PASSED UPON

20    THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THIS

21    SECTION.  CREDITORS AND INTEREST HOLDERS SHOULD CONSULT THEIR OWN

22    LEGAL COUNSEL AND ADVISORS AS TO ANY SECURITIES LAW RELATED MATTERS.

23    **F.**    **Board of Directors and Management of Reorganized MMPI; Compensation; Asset and
24    Property Management**

25        **1.**    **Board Composition**

26         The Board will be comprised of seven directors, as follows: two directors will be designated

27    by Legendary, one will be designated by EWB, one will be designated by the Equity Holders

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Committee and three shall be independently named by the board based upon the Proponents'

2  recommendations.

### 2. Management

4  The Reorganized Debtors will be managed by a team assembled by Legendary

5  Developments, LLC, an affiliate of Legendary. Surjit P. Soni and Dilip Bhavnani will serve as co-

6  CEOs. Mr. Soni and Mr. Bhavnani have agreed to serve for a minimum initial term of five years

7  renewable for two year terms. Mr. Soni and Mr. Bhavnani have worked together for over 15 years

8  on a variety of projects and businesses. They share the position of Managing Member for Legendary

9  Development, LLC and its several subsidiaries, as well as for Legendary.[14] Mr. Soni will also

10  assume the function of general counsel for the Reorganized Debtors. A CFO with public company

11  and real estate experience will be recruited through a search if management cannot secure an

12  agreement to retain the Debtors' current CFO. The Proponents expect to retain select current

13  employees with company history, asset and systems knowledge. However, the Proponents do not

14  believe the size of the corporate staffing maintained by the Debtors is justified and staffing will be

15  appropriately down-sized.

### 3. Compensation

17  A compensation committee of the Board of Directors (the "Compensation Committee") will

18  be responsible for establishing the underlying policies and principles of the Reorganized Debtors'

19  compensation program, as well as determining the compensation of executive officers ("EOs"),

20  subject to approval by the Board of Directors.

21  In assessing the compensation of executives, the Compensation Committee will be expected

22  to utilize strategies intended to attract and retain talented executives, including both new hires and

23  the existing team, in a competitive and dynamic real estate marketplace. A core principle of the

24  compensation program will be to position EOs' cash, including cash bonuses, and equity-based

25  compensation to be within a competitive range (e.g., +/-15%) of the average compensation paid by

26  the 50th to the 75th percentile of certain relevant labor markets for similarly situated positions.

27

28  ---
[14] An informational brochure regarding Legendary is attached hereto as **Exhibit "10"**.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Another principle of the compensation strategy will be to provide a meaningful portion of total
2  compensation via equity-based awards.

3       The Compensation Committee will evaluate EO compensation by reviewing available
4  competitive data representing organizations of varying sizes (measured by market capitalization) and
5  operating strategies. The Compensation Committee will engage compensation consultants to
6  compile data from independent sources.  In making decisions regarding EO compensation, the
7  Compensation Committee will considers recommendations from the CEOs with respect to each of
8  the other EOs.  These recommendations will be based upon the CEOs' analysis of each EO's
9  performance and contributions.  However, the Compensation Committee will have the right to act in
10  its sole and absolute discretion.

11       To remain competitive in the market, the Reorganized Debtors will provide certain benefits
12  and perquisites to its EOs.  These include health, dental, life, disability and long term care insurance,
13  certain club membership dues and contributions to 401(k)/profit sharing and defined benefit plans.

14       **4.    Asset and Property Management**

15       As stated above, the Proponents have secured the services of VRES to provide asset
16  management and property management services for the Debtors' property portfolio.  VRES is a full
17  service commercial real estate services firm that provides strategic property solutions scaled to
18  clients' needs.  VRES combines its nearly four decades of experience in real estate operations,
19  ownership, investment advisory services, financial analysis, market research, asset management,
20  development, tenant advisory and brokerage services to provide clients with forward looking
21  strategies that create value for their assets.

22       VRES is privately held, debt-free and has owned, developed and managed over 26 million
23  square feet of commercial real estate, participated in $1.3 billion of construction projects and
24  completed over $32 billion in brokerage transaction volume.  VRES offers asset management,
25  project management, property and association management, financial analysis, asset valuation,
26  receivership, brokerage, asset, business plan strategies, market research, environmental assessment
27  and development and construction management services.  In unrelated engagements, VRES is
28  currently advising Wells Fargo, GE Finance, Chase Commercial Bank, California Bank & Trust,

Lehman Brothers, TriMont, Midland/Trigild, US Bank (including Cal National Bank assets), Zions & Wachovia Bank.

### G. Revesting of Assets/Discharge/Limited Plan Releases

#### 1. Vesting of Assets

Except as otherwise provided in any provision of the Plan, on the Effective Date, all legal and equitable interests of the Debtors in property of their respective estates shall be vested in such Reorganized Debtors, free and clear of all Claims, Liens, encumbrances and Interests except to the extent and only as is expressly provided for otherwise in the Plan. On the Effective Date, each of the Debtors will transfer all of its Insider Causes of Action to a Litigation Trust controlled by a Litigation Trustee and the Equity Holders Committee on behalf of present non-Insider MMPI Equity Holders and Reorganized MMPI. All settlements reached with Holders of Secured Lender Claims and all other Claims shall be enforced by and against the Reorganized Debtors in the form approved by the Bankruptcy Court.

#### 2. Retained Claims and Defenses and Reservation of Rights

##### (a) No Waiver and Retention of Claims and Defenses

Unless otherwise expressly set forth in the Plan or the Confirmation Order, pursuant to Section 1123(b)(3)(B), all Retained Claims and Defenses of any kind or nature whatsoever against third parties arising before the Effective Date and belonging to the Debtors or their Estates shall become property of the Reorganized Debtors. Notwithstanding any otherwise applicable principle of law or equity, including, without limitation, any principles of judicial estoppel, *res judicata*, collateral estoppel, issue preclusion, or any similar doctrine, the failure to list, disclose, describe, identify, analyze or refer to any such Retained Claims and Defenses in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court will in no manner waive, eliminate, modify, release, or alter the Reorganized Debtors' right to commence, prosecute, defend against, settle, and realize upon any Retained Claims and Defenses that the Debtors or the Estates have or may have as of the Effective Date. Retained Claims and Defenses shall include, without limitation:

- All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 524 and 553 of the Bankruptcy Code against any Creditor regarding the amount of such Holder's Allowed Claim (whether prepetition or postpetition), to enforce the discharge of any Secured Creditors' Claims;

- All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 510, 524, 542 and 553 of the Bankruptcy Code including, without limitation, claims and defenses based on any Creditors' assertion of unreasonable professionals' fees, costs, charges and penalties (whether disguised as interest, or otherwise);

- All avoidance causes of action and objections to Claims under Sections 105, 502, 506, 510, 542 through 551 and 553 of the Bankruptcy Code that belong to the Debtors or to the Estates.

- All claims and defenses related to the recovery of professionals' fees and expenses by the Debtor or Reorganized Debtor from Creditors;

- All Insider Causes of Action, including, but not limited to, claims against the Debtors' Insiders, employees, and/or agents relating to pre-confirmation and/or pre-petition conduct, including without limitation, claims for fraud, breach of fiduciary duty or negligence; and

- All claims and defenses attributable to the filing of personal Chapter 7 or Chapter 11 bankruptcy petitions by an Insider who is a natural person, including without limitation, claims or defenses related to the diminution of security for the Debtors' debts if an Insider obtains a discharge of their personal guaranty obligations.

From and after the Effective Date, the Reorganized Debtors are authorized to assert the Retained Claims and Defenses including, but not limited to, for purposes of objection to the allowance of any Claim. Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any of the Debtors' rights with respect to the Retained Claims and Defenses and Reorganized Debtors shall be entitled to assert the Retained Rights and Defenses as fully as if the Chapter 11 Cases had not been commenced.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### (b)    Unknown Retained Claims and Defenses / No Preclusion

Unless otherwise expressly set forth in the Plan or the Confirmation Order, the reservation of rights and Retained Claims and Defenses set forth above shall include, without limitation, any Retained Claims and Defenses of which the Debtors may presently be unaware, or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances that may change or be different from those the Debtors now believe to exist including, without limitation, claims based on theories of construction defect, breach of warranty, negligence, indemnification and contribution. Therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, waiver, estoppel (judicial, equitable or otherwise), or laches will apply to the Reorganized Debtors with respect to the Retained Claims and Defenses upon or after the Confirmation of the Plan based on the Plan, the Disclosure Statement or the Confirmation Order.

### 3.    Discharge of the Debtors and Injunction

### (a)    Discharge

Except as otherwise provided in the Plan, the Confirmation Order or Section 1141(d)(6) of the Bankruptcy Code: (i) on the Effective Date, each Debtor shall be deemed discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Confirmation Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is allowed pursuant to Section 502 of the Bankruptcy Code or (C) the Holder of a Claim or Interest based on such debt or Interest has accepted the Plan; and (ii) all Persons shall be precluded from asserting against each Reorganized Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date. Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order shall act as a discharge of any and all Claims against and all debts and liabilities of the Debtor, as

1  provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any

2  judgment against each Debtor at any time obtained to the extent that it relates to a Claim discharged.

3                          **(b)    Injunction**

4        All Persons that have held, currently hold or may hold a Claim or other debt or liability or an

5  Interest or other right of an Equity Holder, are permanently enjoined from taking any of the

6  following actions on account of any such Claims, debts or liabilities or terminated Interests or rights

7  discharged pursuant to Section IV.N.1. of the Plan: (a) commencing or continuing in any manner any

8  action or other proceeding against any of the Debtors; (b) enforcing, attaching, collecting or

9  recovering in any manner any judgment, award, decree or order against any of the Debtors; (c)

10  creating, perfecting or enforcing any lien or encumbrance against any of the Debtors; (d) asserting a

11  setoff, right of subrogation or recoupment of any kind against any obligation due to any of the

12  Debtors; and (e) commencing or continuing any action, in any manner, in any place that does not

13  comply with or is inconsistent with the provisions of the Plan.  The injunction described herein does

14  not apply to and shall not enjoin or otherwise prevent the Reorganized Debtors or its representatives

15  from commencing or continuing any action against the Debtors' current or former officers, directors,

16  or employees for claims arising before or after the commencement of the Debtors' bankruptcy cases.

17        Any Person injured by any willful violation of such injunction shall recover actual damages,

18  including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive

19  damages, from the willful violator.

20                          **(c)    No Liability for Solicitation or Participation**

21        As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or

22  rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

23  offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the

24  Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation of

25  any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the

26  Plan or the offer, issuance, sale, or purchase of securities.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### (d)    Limitation of Liability

Neither (a) the Proponents or any of their employees, officers, directors, agents, representatives, affiliates, attorneys or any other professional persons employed by any of them, nor (b) Legendary Developments, LLC or any of its employees, officers, directors, agents, representatives, affiliates, attorneys or any other professional persons employed by it, nor (c) the Equity Holders Committee or any of their respective postpetition members, agents, employees, directors, officers representatives, attorneys or other professional advisors, nor (d) the Creditors Committee or any of their respective postpetition members, agents, employees, directors, officers representatives, attorneys or other professional advisors, in each case, shall have any responsibility, or have or incur any liability, to any Person whatsoever, under any theory of liability (except for any Claim based upon willful misconduct or gross negligence), for any act taken or omission made in good faith directly related to formulating, implementing, confirming, or consummating the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan, provided that nothing in this paragraph shall limit the liability of any Person for breach of any express obligation it has under the terms of the Plan or under any post-petition agreement or other postpetition document entered into by such Person or in accordance with the terms of the Plan or for any breach of a duty of care owed to any other Person occurring after the Effective Date.

### H.    Claims Subject To Objection; Post-Effective Date Claims Objections Process

The Proponents are in the process of determining to which Claims they expect to bring objections. As stated throughout this Disclosure Statement, the Proponents are not affiliated with the Debtors and thus they do not have access to the Debtors' employees, advisors, attorneys or internal documents. Legendary therefore has requested the Debtors' books and records so that Legendary may begin to analyze filed and scheduled Claims. Upon Legendary's receipt of adequate information to assess filed and scheduled Claims, and immediately upon determining which Claims require objection, the Proponents will post a schedule of anticipated objections on the website of the estates' balloting agent, Kurtzman Carson Consultants (KCC). Such information will be viewable by parties in interest free of charge.

1    Except as otherwise provided in the Plan, objections to Claims, including without limitation

2    Administrative Claims (other than objections to Administrative Claims of Professionals), shall be

3    Filed and served upon the Holder of such Claim or Administrative Claim no later than the later of:

4    (a) one hundred eighty (180) days after the Effective Date, (b) one hundred eighty (180) days after a

5    proof of Claim or request for payment of such Claim is Filed, and (c) a deadline set by the

6    Bankruptcy Court after the extension of the one hundred eighty (180)-day deadline; such extension

7    may be granted on an ex parte basis without notice or hearing. After the Confirmation Date, only the

8    Reorganized Debtors or the Litigation Trustee, as the case may be, will have the authority to File

9    objections, settle, compromise, withdraw or litigate to judgment objections to Claims and Interests.

10    From and after the Confirmation Date, the Reorganized Debtors or the Litigation Trustee, as the case

11    may be, may settle or compromise any Disputed Claim or Disputed Interest without approval of the

12    Bankruptcy Court.

13                                            **VI.**

14                                    **CONFIRMATION**

15    At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the

16    requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for

17    confirmation of a Plan are that the Plan is (i) accepted by all impaired Classes of Claims and

18    Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is

19    "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of creditors and

20    stockholders that are impaired under the Plan.

21    **A.    Acceptance**

22    The Classes identified above in Section IV.B are impaired and are entitled to vote to accept

23    or reject the Plan. The Proponents reserve the right to amend the Plan in accordance with the terms

24    of the Plan or seek nonconsensual confirmation of the Plan under Section 1129(b) of the Bankruptcy

25    Code or both with respect to any Class of Claims or Interests that is entitled to vote to accept or

26    reject the Plan, if such Class rejects the Plan.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## B.    Unfair Discrimination and the Fair and Equitable Tests

Section 1129(b) of the Bankruptcy Code provides that a Plan can be confirmed even if it has not been accepted by all impaired Classes as long as at least one impaired Class of Claims has accepted it.  The Bankruptcy Court may confirm the Plan as to one or more Debtors at the request of such Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes in the case of such Debtors as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.  A Plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting Class if the value of the cash and/or securities to be distributed to the nonaccepting Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the nonaccepting Class or is otherwise permitted under the circumstances.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

• Secured Creditors. Either: (i) each impaired secured creditor retains its liens securing its secured Claim and receives on account of its secured Claim deferred cash payments having a present value equal to the amount of its allowed secured Claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

• Unsecured Creditors. Either: (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed Claim; or (ii) the Holders of Claims and interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

• Interests. Either: (i) each Holder of an Interest will receive or retain under the Plan property of a value equal to the greater of the fixed liquidation preference to which such Holder is entitled, or the fixed redemption price to which such Holder is entitled or the value of the interest; or (ii) the Holder of an interest that is junior to the nonaccepting Class will not receive or retain any property under the Plan.

## C.   **Feasibility**

To confirm the Plan, the Bankruptcy Court must find that confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Section 1129(a) of the Bankruptcy Code and is referred to as the "feasibility" requirement.  There are two important aspects of a feasibility analysis.  The first aspect considers whether the Debtors will have sufficient cash on hand on the Effective Date to meet its obligations on such date.  The second aspect of feasibility considers whether the Reorganized Debtors will have enough cash over the life of the Plan to make the required Plan payments.

The Proponents' projections for the Reorganized Debtors are set forth in **Exhibit "4"** hereto. Based upon these projections, the Proponents believe that the Reorganized Debtors will be able to make all payments required pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  The Projections show that the Reorganized Debtors will have sufficient funds to meet this Effective Date payment obligations. The Plan calls for the repayment of non-settled Secured Lender Claims within four years after the Effective Date.  The Secured Claims of the Debtors will be repaid during this time period either from the refinancing of debt or the sale of the Collateral for such debt.  Upon the sale of such Collateral, the proceeds will be used to pay the costs of sale and any Secured Claim that is secured by the Collateral to be sold.  Excess proceeds would be unencumbered funds available for the Reorganized Debtors use in the operation of their businesses or for the payment of claims as determined by the Reorganized Debtors' in the sound exercise of their business judgment.

As stated above, the Proponents are secured creditors of the Debtors and are not affiliated with the Debtors.  They do not have access to the Debtors' employees, advisors, attorneys or internal documents.  Therefore, the Plan and this Disclosure Statement include information based on the Debtors' statements in publicly available documents (such as filings in these Chapter 11 Cases).

Above, the Proponents have repeated or summarized information from the Debtors' Disclosure Statement, which the Debtors have requested be approved by the Bankruptcy Court as containing adequate information for voting on the Debtors' proposed chapter 11 plan.  The Proponents rely on the information contained in the Debtors' Disclosure Statement and have not

performed their own independent investigation of the accuracy and completeness of information

contained therein. Therefore, the Proponents do not represent herein that any of such information is

accurate or complete at the time made or as of the date of this Disclosure Statement.

The Proponents' financial projections for the Reorganized Debtors were prepared by

Legendary based upon certain assumptions that it believes to be reasonable under the circumstances.

Those assumptions considered to be significant are described in **Exhibit "4"** hereto. The

assumptions made in the projections referenced herein and contained in **Exhibit "4"** hereto are, in

part, based on the Debtors' statements in publicly available documents, such as filings in these

Chapter 11 Cases, including (without limitation) the Debtors' Disclosure Statement, which the

Debtors have requested be approved by the Bankruptcy Court as containing adequate information for

voting on the Debtors' proposed chapter 11 plan.

Also, the financial projections have not been examined or compiled by independent

accountants. The Proponents make no representation as to the accuracy of the projections or their

ability to achieve the projected results. Many of the assumptions on which the projections are based

are subject to significant uncertainties. Inevitably, some assumptions will not materialize and

unanticipated events and circumstances may affect the actual financial results. Therefore, the actual

results achieved may vary from the projected results and the variations may be material. All Holders

of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of

the assumptions on which the financial projections are based in connection with their evaluation of

the Plan.

D.    **Best Interests Test**

Even if a plan is accepted by each class of holders of claims and interests, the Bankruptcy

Code requires a bankruptcy court to determine that the plan is in the "best interests" of all holders of

claims and interests that are impaired by the plan and that have not accepted the plan. The "best

interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court

to find either that: (i) all members of an impaired class of claims or interests have accepted the plan

or (ii) the plan will provide a member who has not accepted the plan with a recovery of property of a

value, as of the effective date of the plan, that is not less than the amount that such holder would

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1 recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code. Once the bankruptcy

2 court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must

3 determine the probable distribution to general unsecured creditors and equity security holders from

4 the remaining available proceeds in liquidation. If such probable distribution has a value greater

5 than the distributions to be received by such creditors and equity security holders under a debtor's

6 plan, then such plan is not in the best interests of creditors and equity security holders.

7 To determine what Holders of Claims and Interests in each impaired Class would receive if

8 the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar

9 amount that would be generated from the liquidation of the Debtors' assets and properties in the

10 context of a Chapter 7 liquidation case. The Cash amount that would be available for satisfaction of

11 Claims and Interests would consist of the proceeds resulting from the disposition of the

12 unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by

13 the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be

14 reduced by the costs and expenses of liquidation and by such additional administrative and priority

15 Claims that might result from the termination of the Debtors' business and the use of Chapter 7 for

16 the purposes of liquidation. The Debtors' costs of liquidation under Chapter 7 would include the

17 fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and

18 other professionals that such a trustee might engage. In addition, other Claims that might arise in a

19 liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses

20 incurred by the Debtors during the Cases, such as compensation for attorneys, financial advisors and

21 accountants, would be paid in full from the liquidation proceeds before the balance of those proceeds

22 would be made available to pay general unsecured Claims. Moreover, the costs of liquidation in

23 these cases could be greater due to the fact that there is no guarantee that only one trustee would be

24 appointed for each of the fifty four related cases. If more than one trustee is appointed, the costs of

25 liquidation will be increased as each such trustee will retain its own professionals to assist it with the

26 case. To determine if the Plan is in the best interests of each impaired Class, the present value of the

27 distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties,

28 after subtracting the amounts attributable to the foregoing Claims, must be compared with the

92

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    present value of the property offered to such Classes of Claims under the Plan. After considering the

2    effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to

3    creditors in the Chapter 11 Cases, including: (i) the increased costs and expenses of a liquidation

4    under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to

5    such trustee; (ii) the erosion in value of assets in a Chapter 7 case in the context of the expeditious

6    liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail; and (iii)

7    the substantial increases in Claims that would be satisfied on a priority basis or on parity with

8    creditors in the Chapter 11 Cases, the Debtors have determined that confirmation of the Plan will

9    provide each Holder of an Allowed Claim with a recovery that is not less than the recovery such

10    Holder would receive pursuant to the liquidation of the Debtors under Chapter 7.

11    The Liquidation Analysis for each of the Property Level Debtors, MMPI and MMPLP, is

12    attached hereto as **Exhibit "5"**. The information set forth in **Exhibit "5"** provides a summary of the

13    liquidation values of each of such Debtors' assets, assuming a Chapter 7 liquidation in which a

14    trustee appointed by the Bankruptcy Court would liquidate the assets of the Estates. Reference

15    should be made to the Liquidation Analysis for a complete discussion and presentation of the

16    Liquidation Analysis.

17    Underlying the Liquidation Analysis are a number of estimates and assumptions that,

18    although developed and considered reasonable by the Proponents, are inherently subject to

19    significant economic and competitive uncertainties and contingencies beyond the control of the

20    Proponents. As stated above, the Proponents are secured creditors of the Debtors and are not

21    affiliated with the Debtors. They do not have access to the Debtors' employees, advisors, attorneys

22    or internal documents. Therefore, the assumptions made in the Liquidations Analysis , as referenced

23    herein, and contained in **Exhibit "5"** hereto are, in part, based on the Debtors' statements in publicly

24    available documents, such as filings in these Chapter 11 Cases, including (without limitation) the

25    Debtors' Disclosure Statement, which the Debtors have requested be approved by the Bankruptcy

26    Court as containing adequate information for voting on the Debtors' proposed chapter 11 plan. The

27    Proponents rely on the information contained in the Debtors' Disclosure Statement and have not

28    performed their own independent investigation of the accuracy and completeness of information

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52010-001\DOCS_LA:224408.6

93

1  contained therein. Therefore, the Proponents do not represent herein that any of such information is

2  accurate or complete at the time made or as of the date of this Disclosure Statement.

3      The Liquidation Analysis also is based on assumptions with regard to liquidation decisions

4  that are subject to change. Accordingly, the values reflected might not be realized if the Debtors

5  were, in fact, to undergo such a liquidation. The Chapter 7 liquidation period is assumed to be a

6  period of several years, primarily allowing for the sale of the real property assets of the Debtors.

7                                              **VII.**

8                                        **RISK FACTORS**

9      HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS SHOULD READ AND

10  CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER

11  INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS

12  DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE

13  HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS

14  SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS

15  INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

16  **A.    Certain Bankruptcy Law Considerations**

17          **1.    Risk of Non-Confirmation of the Plan**

18      Although the Debtors believe that the Plan will satisfy all requirements necessary for

19  confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will

20  reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will

21  not be required for confirmation or that such modifications would not necessitate the resolicitation of

22  votes.

23          **2.    Risk of Non-Occurrence of the Effective Date**

24      Although the Debtors believe that the Effective Date will occur soon after the Confirmation

25  Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to

26  the Effective Date set forth in Article VI of the Plan have not occurred or been waived by the

27  Debtors and, therefore, the Effective Date does not occur, upon notification submitted by the

28  Proponents to the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b) no

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    distributions under the Plan shall be made, (c) the Debtors and all Holders of Claims and Interests

2    shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as

3    though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to

4    the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute or

5    be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other

6    person or to prejudice in any manner the rights of the Debtors or any person in any further

7    proceedings involving the Debtors.

8    **B.    Risks To Recovery By Holders Of Claims**

9         **1.    Ability to Service Debt**

10        The Reorganized Debtors' ability to make scheduled payments of principal, to pay the

11   interest on, to refinance its indebtedness will depend on future performance. Future performance is,

12   to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and

13   other factors that are beyond the Reorganized Debtors' control. While no assurance can be provided,

14   based upon the current level of operations and anticipated increases in revenues and cash flow

15   described in the financial projections attached as **Exhibit "4"** hereto, the Proponents believe that

16   cash flow from operations, available cash, debt refinancings and sales and the Reorganized Debtors'

17   ability to sell assets as necessary to fund its operations, of assets will be adequate to fund the Plan

18   and meet the Reorganized Debtors' future liquidity needs.

19        **2.    Risks of Asset Disposition Delays**

20        Under the Plan, the Reorganized Debtors would have an approximately $163 million balloon

21   obligation at the end of the fourth year after the Effective Date.  At that time, they are projected by

22   the Proponents to be holding approximately $332 million in real estate and $44 million in cash,

23   without factoring in returns from development activities.  The balloon obligations would be either

24   refinanced or paid off using cash-on-hand or via asset sales.  The Reorganized Debtors plan to

25   liquidate approximately $77 million of real estate over the four-year period after the Effective Date

26   based on the Debtors' valuation of such real estate (which valuation has not been independently

27   verified by the Proponents).  The Plan, therefore, relies, in part, on generating proceeds from real

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   estate sales to pay Claims in the event operating revenues are insufficient. In the event that sales are

2   delayed due to economic or other constraints, payments may be correspondingly delayed.

3          **3.**      **Projected Financial Information**

4          The financial projections included herein (including in exhibits hereto) are dependent upon

5   the successful implementation of the Plan and the validity of the other assumptions contained

6   therein. All projections, by nature, are forward-looking and contain estimates and assumptions.

7   There can be no assurance that such statements will reflect actual outcomes.  The projections made

8   in this Disclosure Statement (including, without limitation, its exhibits) reflect numerous

9   assumptions, including confirmation and consummation of the Plan in accordance with its terms, the

10  anticipated future performance of the Reorganized Debtor, industry performance, general business

11  and economic conditions and other matters, many of which are beyond the control of the

12  Reorganized Debtor. In addition, unanticipated events and circumstances occurring subsequent to

13  the preparation of the projections may affect the actual financial results of the Reorganized Debtors.

14  Although the Debtors believe that the projections are reasonably attainable, variations between the

15  actual financial results and those projected may occur and may be material.

16         **4.**      **Risks Related to Reorganized MMPI's Common Stock**

17         Although Reorganized MMPI will use commercially reasonable efforts to cause its common

18  stock to be listed on a national securities exchange or a qualifying interdealer quotation system as

19  soon as practicable after the Effective Date, the Proponents make no assurance (i) that such listing

20  will be obtained or (ii) even if Reorganized MMPI's common stock is listed, that liquid trading

21  markets for the common stock will develop.  The liquidity of any market for the common stock will

22  depend on, among other things, the number of holders of the common stock, the Reorganized

23  Debtors' financial performance, and the market for similar securities, none of which can be

24  determined or predicted.  Further, the trading price, if applicable, of the common stock may be

25  depressed following the Effective Date.  Any and all financial projections and information in this

26  Disclosure Statement, based on numerous assumptions, are not intended to represent the potential

27  trading values of any securities issued pursuant to the Plan in public or private markets.  The

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  Proponents cannot make any assurances about the development of an active trading market or, if any

2  market develops, what the liquidity or pricing characteristics of that market will be.

3  **5.    Transfer Restrictions**

4  As discussed herein, the Litigation Trust Interests will be subject to certain Trust Interest

5  Ownership Change Restrictions as set forth in the Litigation Trust Agreement.  Such transfer

6  restrictions may adversely affect the ability of some or all of the holders of the Litigation Trust

7  Interests to dispose of such holdings, such holdings' liquidity and potential values, and the

8  development of any market for the Litigation Trust Interests.  Similarly, as discussed herein, certain

9  holders of Litigation Trust Interests, as well as the Reorganized MMPI common stock, may be

10 restricted in their ability to transfer or sell such holdings under the Securities Act and/or Blue Sky

11 Laws.

12 **6.    Regulatory Related Requirements**

13 Certain of the Reorganized Debtors or their respective successors or representatives may be

14 required to adhere to certain reporting, registration and/or filing requirements under federal and state

15 securities laws and/or other applicable statutes and regulations.  Such requirements may potentially

16 delay the occurrence of the Effective Date and/or the implementation of certain provisions of the

17 Plan, and no assurance can be given that all applicable entities will be able to comply with such

18 requirements.  If the applicable entities cannot comply, they may become subject to liability under

19 securities laws and/or other applicable statutes, including civil fines, sanctions and/or de-listing of

20 their securities.

21 **7.    Removal of Existing Management**

22 Pursuant to the Plan, certain members of existing management will likely be removed or

23 terminated from their existing management positions.  Such removal and replacement of certain

24 employees may cause some disruption to the operations of the Reorganized Debtors.  Further, certain

25 members of existing management contend that such removal or termination will give rise to various

26 severance and related claims against the Reorganized Debtors.  While the Proponents deny that such

27 removal will give rise to any such claims and/or contend that there are counter-claims that more than

28 offset any recovery such executives might be entitled to, the Projections include an estimate for such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    severance costs and expenses (without in any way conceding that such expenses are, or will be

2    payable in connection with confirmation of the Plan).

3        **8.    <u>Additional Claims Associated with the Plan.</u>**

4        In addition to the severance claims addressed above, Richard Meruelo contends that

5    confirmation of the Plan (rather than the Debtors Plan) will result in increased claims against the

6    Reorganized Debtors because Mr. Meruelo has personally guaranteed some of the Debtors'

7    obligations to third parties.  The Proponents believe that this contention is false and none of the

8    Projections herein take account of Mr. Meruelo's assertion.  Specifically, to the extent Mr. Meruelo

9    pays a portion of any such guarantee obligations, under the Bankruptcy Code, his related

10   reimbursement or contribution claim against the Reorganized Debtors is subordinated to recovery in

11   full by the primary creditor.  Further, if Mr. Meruelo did satisfy his guarantee obligations to third

12   parties in full, he would be simply subrogated to their rights against the Reorganized Debtors (i.e.

13   there would merely be a substitution of creditor rather than an increase in the obligations of the

14   Reorganized Debtors).  For all of the foregoing reasons, the Proponents do not believe that

15   confirmation of the Plan would result in additional claims against the Reorganized Debtors arising

16   out of Mr. Meruelo's obligations on guarantees to third party creditors of the Reorganized Debtors.

17       **9.    <u>Risks Associated with East West Bank Litigation</u>**

18       The Proponents believe the defamation claims arising out of the September 9, 2010 Press

19   Release could threaten the feasibility of all three proposed plans of reorganization.  The Proponents

20   believe that the reorganized company under responsible management can control the company's

21   exposure and resolve the dispute.  Prior resolution of this Administrative Claim is not a contingency

22   of the Plan.

23                        **VIII.**

24                **<u>INCOME TAX CONSEQUENCES</u>**

25       A summary description of certain United States federal income tax consequences of the Plan

26   is provided below.  This description is for informational purposes only and, due to a lack of

27   definitive judicial or administrative authority or interpretation, substantial uncertainties exist with

28   respect to various tax consequences of the Plan as discussed herein.  Only the principal United States

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   federal income tax consequences of the Plan to the Debtors and to Holders of Claims who are

2   entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been

3   sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of

4   the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained

5   with respect to any tax consequences of the Plan, and the discussion below is not binding upon the

6   IRS or such other authorities.  No representations are being made regarding the particular tax

7   consequences of the confirmation and consummation of the Plan to the Debtors or any Holders of

8   Claims.   No assurance can be given that the IRS would not assert, or that a court would not sustain,

9   a different position from any discussed herein.

10       The discussion of United States federal income tax consequences below is based on the

11  Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations, judicial

12  authorities, published positions of the IRS and other applicable authorities, all as in effect on the date

13  of this document and all of which are subject to change or differing interpretations (possibly with

14  retroactive effect).

15       The following discussion does not address foreign, state or local tax consequences of the

16  Plan, nor does it purport to address the United States federal income tax consequences of the Plan to

17  special classes of taxpayers (*e.g.*, persons who are related to the Debtors within the meaning of the

18  Tax Code, banks and certain other financial institutions, insurance companies, tax-exempt

19  organizations, governmental entities, persons that are, or hold their Claims through, pass-through

20  entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in

21  securities or foreign currency, employees, Holders of LTIP Units, persons who received their Claims

22  pursuant to the exercise of an employee stock option or otherwise as compensation and persons

23  holding Claims that are a hedge against, or that are hedged against, currency risk or that are part of a

24  straddle, constructive sale or conversion transaction).  Furthermore, the following discussion does

25  not address United States federal taxes other than income taxes.

26       Each Holder is strongly urged to consult its own tax advisor regarding the United States

27  federal, state, and local and any foreign tax consequences of the transactions described herein and in

28  the Plan.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH

2    REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS

3    SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE

4    USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING

5    PENALTIES UNDER THE TAX CODE. ANY TAX ADVICE CONTAINED IN THIS

6    SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE

7    PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY

8    THE SUMMARY.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE

9    TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX

10    ADVISER.

11    **A.    <u>Certain United States Federal Income Tax Consequences To The Debtors</u>**

12         **1.    <u>Net Operating Losses</u>**

13         The Debtors currently have accumulated significant net operating loss ("NOL")

14    carryforwards for federal income tax purposes and expect to incur a substantial additional NOL

15    during their current taxable year. The Debtors' 10K filings with the SEC on June 21, 2010 disclosed

16    NOLs of $70,700,000 for federal income tax purposes and $70,600,000 for state income tax

17    purposes. Moreover, the Proponents also expect that the recent sale in 2010 of the 845 S. Flower

18    property may have generated a loss possibly as great as $40,000,000. Because almost all of the

19    Debtors are limited liability companies, the NOLs generally may be utilized to reduce income taxes

20    that otherwise would be paid by such Debtors. The only Property Level Debtor that is a Subchapter

21    C corporation is Santa Fe Commerce Center. NOLs that may be offset against gains realized by

22    MMPI and its limited liability company subsidiaries may not be available to offset gains realized by

23    Santa Fe Commerce Center.

24         The Debtors' financial statement in their 2009 SEC 10K stated that "We have recorded a

25    valuation allowance for the entire amount of the net deferred tax asset due to the uncertainty

26    surrounding our ability to generate sufficient future taxable income to realize this asset." A

27    "valuation allowance" is an accounting financial reporting provision which is recognized if it is more

28    likely than not that tax savings from net operating losses will not be recognized. Accordingly,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    $91,656,000 was reduced from the Debtors' books in 2009, $18,459,000 in 2008 and $4,796,000 in

2    2007. The Form 10K also discloses that losses from property and equipment costs of $62,016,000 in

3    2009 are not likely to produce a tax benefit. The amount of such NOL carryforwards also remains

4    subject to adjustment by the IRS.

5       As discussed below, the amount of any NOL carryforwards, and possibly certain other tax

6    attributes, will be reduced, and the subsequent utilization of such NOL carryforwards and other tax

7    attributes may be restricted upon the implementation of the Plan if it is determined that there has

8    been a change of ownership resulting from less than 50% of the shares being held by the pre-change

9    owners and holders who exchanged qualified debt for their stock

10       The Plan does not assume the benefit of these NOLs for purposes of meeting obligations

11    under the Plan.

12      **2.**    **Cancellation of Debt**

13       In general, the Tax Code allows a debtor in a bankruptcy case to exclude from income any

14    cancellation of indebtedness income ("CODI") that is realized, but the debtor must reduce certain of

15    its tax attributes - such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets

16    by the amount of the CODI that is excluded from income. CODI is that amount by which the

17    adjusted issue price (including accrued but unpaid interest) of the indebtedness satisfied exceeds the

18    cash and fair market value of the other property issued therefor, subject to certain statutory or

19    judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the

20    cancelled debt would have given rise to a tax deduction). To the extent the amount of excluded

21    CODI exceeds the tax attributes available for reduction, the remaining CODI is simply forgiven.

22    Any reduction in tax attributes does not effectively occur until the first day of the taxable year

23    following the year the CODI occurs. If advantageous, a debtor could elect to reduce the basis of

24    depreciable property prior to any reduction in its loss carryforwards.

25       As a result of the implementation of the Plan, the Debtors expect to realize CODI in an

26    amount that is less than its current year NOL and NOL carryforwards.

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

### 3.    **Substitution of Debt**

The Proponents are secured creditors of operating subsidiaries of limited liability company entities controlled by MMPI and in some cases the Proponents are unsecured creditors of MMPI and MMPLP by virtue of guaranties by MMPI or MMPLP. The Proponents under the Plan will exchange their rights as creditors secured by real estate owned by the subsidiaries for stock of MMPI as described in this Disclosure Statement. The difference between the value of the stock and the amount of the debt satisfied by the stock may be considered CODI which would be taken into account as described above. The claims being exchanged by EWB include debt obligations of approximately $32,000,000. In that exchange, liens on $500,000 in restricted cash, approximately $500,000 in cash collateral adequate protection and real estate valued in excess of $32,000,000 by the Debtor securing payment to EWB will be released by EWB. A similar release of liens in the Legendary exchange will occur. The Proponents believe that the stock will be valued to be the collateralized value of the debt obligations being exchanged and accordingly the value of the stock will be equal to the value of the claims exchanged and no CODI will be created by the exchange.

### 4.    **Limitation on NOL Carryforwards and Other Tax Attributes**

Following the implementation of the Plan, any NOLs and carryforwards and possibly certain other tax attributes of the Debtors, allocable to periods prior to the Effective Date, may be subject to the limitations imposed by Section 382 of the Tax Code if it is determined that a change of ownership has resulted.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions, which are "built-in" (*i.e.*, economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized. It is possible that the issuance of stock pursuant to the Plan may result in an ownership change of the Debtors.

### 5.    General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation would be subject would be equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "longterm tax-exempt rate" in effect for the month in which the ownership change occurs (4.01% for ownership changes occurring in June 2010).

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  However, if the corporation does not continue its historic business or use a significant portion of its assets in a new business for two (2) years after the ownership change, the annual limitation resulting from the ownership change is zero.  The limitation on the use of pre-change losses following an ownership change is in addition to any reduction of tax attributes in connection with the realization of CODI.

In addition, Section 382(g)(4)(D) provides, in effect, that if a 50% or greater shareholder of a loss corporation claims a Section 165(g) worthless stock loss and retains his stock at the end of the year of worthlessness, the Debtors will be treated as having undergone an ownership change. The Proponents are not aware that any significant shareholder has claimed or plans to claim a Section 165(g) worthless stock loss that would trigger the application of Section 382(g)(4)(D) and are not aware of any shareholder which owns 50% or more of the stock of MMPI.

### 6.    Special Bankruptcy Exception

If a corporation experiences an ownership change, there are two exceptions to the general loss limitation rule under Section 382 of the Tax Code.  The first exception generally applies where the stockholders and/or qualified creditors of the debtor retain or receive at least 50% of the vote and value of the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan (the "382(1)(5) Exception").  Under this exception, a debtor's pre-change losses are not limited on an annual basis, but are required to be reduced by the amount of any interest deductions claimed during the three (3) taxable years preceding the date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of the debt converted into stock in the reorganization. Moreover, if this exception applies, any further ownership change of the debtor within a two-year

1   period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent

2   ownership change against future taxable income.

3       It is unclear whether the exchange by the Proponents of their rights as real estate lien secured

4   creditors of the Debtors for stock may constitute a change of ownership for purposes of section 382.

5   Stock which is exchanged for indebtedness which was beneficially held at all times before the

6   exchange by the holder for at least 18 months before the date of filing of the Debtors' cases or which

7   arose in the ordinary course of the trade or business of the Debtors is not counted in determinations

8   of changes of ownership for purposes of section 382. All of the debt being exchanged by Legendary

9   and EWB arose in the ordinary course of the trade or business of the Debtors. All of the obligations

10  of the Debtors being exchanged for stock by Legendary were originated by EWB and EWB's

11  retained interest in those obligations will be released as part of the exchange. The shares received by

12  Legendary in its exchange together with the shares retained by historical shareholders are expected

13  to exceed 50% of the shares thereby preventing, within the meaning of Section 382, a change in

14  ownership.

15      If the 382(1)(5) Exception is not applicable to a debtor in bankruptcy (either because the

16  debtor company does not qualify for it or a debtor company elects not to utilize it), the second

17  exception to the general Section 382 rule (the "382(1)(6) Exception") will generally apply. When

18  the 382(1)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change"

19  generally is permitted to determine the fair market value of its stock after taking into account the

20  increase in value resulting from any surrender or cancellation of creditor's Claims in the bankruptcy.

21  This differs from the ordinary rule that requires the fair market value of a corporation's equity to be

22  determined before the events giving rise to the ownership change.

23      The Proponents continue to analyze the Debtors' NOL issues. The Proponents are uncertain

24  of the extent to which the Debtors will be entitled to the benefit of any NOLs without the annual

25  restrictions established by Section 382. Consequently, Legendary's projections do not take into

26  account any application of any NOLs.

27      The Debtors admit that they do not expect to use any of their accumulated NOLs during the

28  term of the Plan, and their auditors apparently agree. Legendary, however, through the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    recapitalization and improved management, does expect to generate positive cash flow and profits

2    and will be in a position to use the Debtors' accumulated NOLs.  While the Debtors may be

3    restricted in their use of accumulated NOLs as a result of the exchange by the Proponents of debt for

4    stock, it remains unclear whether the Reorganized Debtors will be able to use more than the annual

5    limitation on NOLs pursuant to section 382 whether or not there is a change in ownership.

6         **7.    Merger of MMPLP into MMPI**

7         Pursuant to the Plan, MMPLP will merge into MMPI and, accordingly, will distribute its

8    assets to MMPI in complete liquidation.  In general, a distribution in liquidation of a partner's

9    interests is tax-free to both the partner and the partnership unless Section 737 or 751(b) applies.

10   Section 737 requires a partner to recognize gain (but not loss) upon the partnership's distribution of

11   property to such partner (other than property previously contributed to the partnership by such

12   partner) within seven years of the date on which such partner contributed appreciated property to

13   such partnership.  Section 751(b) generally provides that to the extent that a partner receives a

14   distribution from a partnership (i) Section 751 property (unrealized receivables and inventory items

15   which have appreciated substantially in value) in exchange for relinquishing all or part of its interest

16   in the partnership's non-Section 751 property, or (ii) non-Section 751 property in exchange for

17   relinquishing all or part of its interest in the partnership's Section 751 property, the transaction is

18   recharacterized.  The transaction is treated as (1) a deemed distribution to the partner of an interest in

19   the relinquished property followed by (2) a deemed taxable exchange between the partner and the

20   partnership of the relinquished property in exchange for an interest in the property actually

21   distributed by the partnership to the distributee partner.

22        Section 731 (b) provides that no gain or loss is recognized by a partnership on a distribution

23   of property to a partner.  Section 731 (a) provides for (1) the nonrecognition of gain to the partner

24   except to the extent an amount of money is distributed in excess of the partner's tax basis in their

25   partnership interests, and (2) the nonrecognition of loss unless the distribution consists solely of

26   money, unrealized receivables, and inventory.  Any gain or loss recognized by the partner is

27   generally treated as gain or loss from the sale or exchange of a capital asset (subject to the

28   exceptions above).  Section 732(b) provides that the basis of any distributed property is equal to the

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    partner's tax basis in their partnership interest immediately prior to the distribution, reduced by any

2    cash received. The Proponents do not expect the Debtors to recognize any gain or loss in connection

3    with the liquidation of MMPLP.

4    **8.    Consequences of the Sale and/or Refinance of Assets**

5    Pursuant to the Plan, the Reorganized Debtors will sell some of their assets and refinance

6    other assets as necessary during the term of the Plan to meet their operational needs and payment

7    obligations under the Plan. The sale of real property may cause the Debtors to recognize gain or

8    loss. The gain or loss is measured by the difference between the amount realized (the amount paid by

9    the purchaser) and the adjusted tax basis the Debtors have in the property sold. The amount realized

10    from a sale of real property generally includes the amount of liabilities from which the transferor is

11    discharged as a result of the sale. For purposes of this rule, the sale of real property that secures a

12    nonrecourse liability discharges the transferor from the liability, and the sale of real property that

13    secures a recourse liability discharges the transferor from the liability if another person agrees to pay

14    the liability (whether or not the transferor is in fact released from the liability).

15    Gain or loss recognized from the sale of real property may be characterized as either capital

16    or ordinary. Generally, capital gains and losses are gains or losses from the sale or exchange of a

17    capital asset. A capital asset is any property held by a taxpayer, whether or not connected with a

18    trade or business, but does not include property held by a taxpayer, whether or not connected with a

19    trade or business, but does not include property of a kind which would properly be included in the

20    inventory of the taxpayer if on hand at the close of the taxable year, or property which is held

21    primarily for sale to customers in the ordinary course of its trade or business, or property, used in the

22    taxpayer's trade or business, of a character which is subject to the allowance for depreciation, or real

23    property used in the taxpayer's trade or business.

24    Pursuant to Section 1245, a taxpayer who disposes of Section 1245 property must treat as

25    ordinary income the amount of depreciation recapture computed with respect to that property.

26    Section 1245 property includes limited types of real property which have been depreciable.

27    Depreciation recapture with respect to Section 1245 property is computed by subtracting its adjusted

28    tax basis from the lower of its recomputed basis (adjusted tax basis increased by previous

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1    depreciation deductions allowed) or amount realized. Pursuant to Section 1250, a taxpayer who

2    disposes of Section 1250 property must treat as ordinary income the amount of depreciation

3    recapture computed with respect to that property. Section 1250 property is any real property which

4    has been depreciable and that is not Section 1245 property. Generally, for Section 1250 property for

5    which depreciation deductions are computed using the straight-line method for tax purposes, there is

6    no Section 1250 depreciation recapture.

7        Pursuant to Section 1231, Section 1231 gains and losses are treated as capital gains and

8    losses if the Section 1231 gains for the taxable year exceed the Section 1231 losses for that year. A

9    Section 1231 gain or loss is any recognized gain or loss from a Section 1231 transaction. A sale or

10   exchange of property used in a trade or business is a Section 1231 transaction. Real property is

11   considered to be used in a trade or business if it is held for more than one year and is not property of

12   a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of

13   the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary

14   course of its trade or business.

15       Generally, for tax purposes, a refinancing transaction by itself produces no income or

16   deductions as it involves the tax-free receipt of loan proceeds and the nondeductible repayment of a

17   prior loan, assuming the old debt is satisfied in full.

18   **B.    Consequences To Holders Of Certain Claims**

19       **1.    Consequences to Holders of Allowed General Unsecured Claims**

20       Pursuant to the Plan, a Holder of an Allowed General Unsecured Claim will receive payment

21   in full in cash equal to the full amount of its Allowed Claim on the Effective Date (or after a Final

22   Order of the Bankruptcy Court allowing such Claim).

23       In general, a Holder of an Allowed General Unsecured Claim will recognize gain or loss in

24   an amount equal to the difference between (i) the "amount realized" by the Holder in satisfaction of

25   its Claim (other than any Claim for accrued but unpaid interest) and (ii) the Holder's adjusted tax

26   basis in its Claim (other than any Claim for accrued but unpaid interest). For a discussion of the

27   treatment of any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued

28   Interest" below. The amount realized by a Holder will equal the cash Distribution received by such

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Holder. Such payment should be equal to the amount of the Allowed General Unsecured Claim.

2   Each Holder of a General Unsecured Claim is urged to consult its tax advisor regarding the specific

3   tax consequences to such Holder of the receipt of the Distribution provided by the Plan.

4        Where gain or loss is recognized by a Holder of an Allowed General Unsecured Claim, the

5   character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or

6   loss will be determined by a number of factors, including the tax status of the Holder, whether the

7   Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether

8   the Claim was acquired at a market discount and whether and to what extent the Holder had

9   previously claimed a bad debt deduction.

10       **2.**    **Consequences to Holders of Allowed Secured Claims**

11        Pursuant to the Plan, a Holder of an Allowed Secured Claim that has not settled with the

12   Debtors will receive payment in full in cash over approximately four (4) years (collectively herein

13   referred to as the "Secured Deferred Payment Obligation"). The Holder will receive interest at the

14   rate of 5.5% per annum or the rate otherwise established by the Bankruptcy Court. For federal

15   income tax purposes, the Secured Deferred Payment Obligation should be treated (and the following

16   discussion assumes, would be treated) in a similar fashion to the receipt of an actual note payable

17   after four (4) years as provided in the Plan.

18        In general, a Holder of an Allowed Secured Claim will recognize gain or loss in an amount

19   equal to the difference between (i) the "amount realized" by the Holder in satisfaction of its Claim

20   (other than any Claim for accrued but unpaid interest) and (ii) the Holder's adjusted tax basis in its

21   Claim (other than any Claim for accrued but unpaid interest). For a discussion of the treatment of

22   any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued Interest"

23   below. The amount realized by a Holder will equal the "issue price" of the Secured Deferred

24   Payment Obligation received by such Holder. Such issue price should be equal to the stated

25   principal amount of the Secured Deferred Payment Obligation. Each Holder of a Secured Claim is

26   urged to consult its tax advisor regarding the specific tax consequences to such Holder of the receipt

27   of the Secured Deferred Payment Obligation, including the possible application of (and the ability to

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  elect out of) the "installment method" of reporting any gain that might otherwise be recognized by

2  the Holder upon such receipt.

3       Where gain or loss is recognized by a Holder of an Allowed Secured Claim, the character of

4  such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be

5  determined by a number of factors, including the tax status of the Holder, whether the Claim

6  constitutes a capital asset in the hands of the Holder and how long it has been held, whether the

7  Claim was acquired at a market discount and whether and to what extent the Holder had previously

8  claimed a bad debt deduction.

9  **C.**    **Consequences Of The Issuance Of New Common Stock**

10      Pursuant to the Plan, Holders of MMPI Existing Common Stock will exchange their shares

11  for newly issued shares of the same class and kind, but their proportionate holdings will be diluted

12  by distributions of New Equity to Proponents under the Plan. MMPI will not recognize gain or loss

13  on the receipt of money or other property in exchange for the issuance of its stock pursuant to

14  Section 1032.

15      Equity Holders should not recognize any gain or loss. Each Holder's tax basis in its newly-

16  issued stock will be the same as such Holder's tax basis in the MMPI Existing Common Stock,

17  surrendered in exchange therefor. The holding period for the new stock received should include the

18  holding period in the MMPI Existing Common Stock surrendered.

19  **D.**    **Distribution In Discharge Of Accrued Interest**

20      Pursuant to the Plan, all distributions in respect of an Allowed Claim will be allocated first to

21  any portion of such Claim for accrued interest, with any excess allocated to principal, and then to all

22  other amounts. However, there is no assurance that the IRS will respect such allocation for federal

23  income tax purposes.

24      In general, to the extent that any amount received by a Holder of a debt (whether paid in cash

25  or treated for tax purposes as paid with a note or property) is received in satisfaction of accrued

26  interest during its holding period, such amount will be taxable to the Holder as interest income (if

27  not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a

28  deductible loss to the extent any accrued interest claimed was previously included in its gross

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1  income and is not paid in full. Each Holder of a Claim is urged to consult its tax advisor regarding

2  the allocation of consideration and the deductibility of unpaid interest for tax purposes.

3  **E.    Information Reporting And Backup Withholding**

4        Certain payments, including payments in respect of accrued interest or OID, are generally

5  subject to information reporting by the payer to the IRS.  Moreover, such reportable payments are

6  subject to backup withholding in certain circumstances.  Under the Tax Code's backup withholding

7  rules, a Holder of Claims may be subject to backup withholding at the applicable rate with respect to

8  certain distributions or payments pursuant to the Plan, unless the Holder (a) comes within certain

9  exempt categories (which generally includes corporations) and, when required, demonstrates this

10  fact or (b) provides a correct United States taxpayer identification and certifies under penalty of

11  perjury that the Holder is a U.S. person, the taxpayer identification number is correct and that the

12  Holder is not subject to backup withholding because of a failure to report all dividend and interest

13  income.

14  **F.    Importance Of Obtaining Professional Tax Assistance**

15        THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF

16  CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE

17  FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE

18  DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.

19  THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY

20  DEPENDING ON A TAXPAYER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY,

21  HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE STRONGLY URGED TO CONSULT

22  THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE, LOCAL, AND

23  APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN,

24  INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING

25  REQUIREMENTS.

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

# IX.

## COMPARISON OF PLAN TO OTHER PLANS BEFORE THE COURT

For a comparison of the Plan with the plans of reorganization filed herein by the Debtors and Charlestown Capital Advisors, LLC/Hartland Asset Management Corporation, please see the separate three-page letter included in your solicitation package entitled "Comparison of Plans of Reorganization Presented by Plan Proponents Legendary Investors Group No. 1, LLC and East West Bank."

# X.

## ALTERNATIVES TO PLAN/LIQUIDATION

The Proponents believe that the Plan affords Holders of Claims and Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders. If the Plan is not confirmed, however, the theoretical alternatives include: (a) an alternative plan or plans of reorganization; or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the Bankruptcy Code.

### A.    Alternative Plans of Reorganization

If the Plan is not confirmed, another party in interest in the Chapter 11 Cases could propose a different Plan or Plans.[15]  Such Plans might involve either a reorganization and continuation of the Debtors' business, or a liquidation of their assets or a combination of both. See Article IX above.

### B.    Liquidation Under Chapter 7

A Debtor-by-Debtor and consolidated analysis of the Proponents' projected results of liquidation of the Debtors estates is annexed hereto as **Exhibit "5"**.  Creditors will be paid in full under the Plan and, therefore, their claims will receive treatment that is better than their claims would be treated in a chapter 7 liquidation of one or more of the Debtors, where they would be

---

[15] On the Debtors' motion to extend the time during which only the Debtors may file a plan of reorganization and solicit acceptances thereof, the Court extended the Debtors' exclusivity periods through June 11, 2010, provided that on and after May 18, 2010, the Creditors Committee was authorized to file a plan of reorganization. On the Debtors' subsequent motion to further extend their exclusivity periods, the Court further extended the Debtors' exclusivity periods through September 30, 2010, provided that the exclusivity periods were terminated as to shareholders Charlestown Capital Advisors, LLC and Hartland Asset Management Corporation and the Committee of Equity Holders (if one is appointed), effective June 14, 2010.  On motion of Legendary and EWB, the exclusivity periods were terminated as to Legendary and EWB as of August 2, 2010.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   expected to receive less than payment in full as discussed in **Exhibit "5"**.  Current equity holders

2   will receive 20% of the New Equity to be issued under the Plan and will have the opportunity to

3   acquire up to an additional 10% of New Equity pursuant to the Rights Offering.  Non-Insider

4   Holders of MMPI equity will receive all of the beneficial interests in the Litigation Trust (the

5   projected valuation of each Reorganized Debtor is set forth in **Exhibit "5"**).  In a chapter 7

6   liquidation, existing Equity Holders would be expected to receive nothing.  Existing non-Insider

7   Equity Holders are also, therefore, treated better under the Plan than in a chapter 7 liquidation.

## XI.

## CONCLUSION AND RECOMMENDATIONS

10   The Plan provides for an equitable distribution to creditors and shareholders of the Debtors

11   and preserves the value of the business as a going concern. The Proponents believe that confirmation

12   and implementation of the Plan is preferable to any of the alternatives described above because it

13   will provide the greatest recoveries to Holders of Claims and Interests.  Other alternatives would

14   involve significant delay, uncertainty and substantial additional administrative costs.  FOR THESE

15   REASONS, THE PROPONENTS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE

16   PLAN SO THAT THEY WILL BE RECEIVED NO LATER THAN 4:00 P.M., LOS ANGELES

17   TIME, ON NOVEMBER 17, 2010.  Please vote and return your Ballot(s) to:

**Meruelo Maddux Ballot Processing**
**c/o Kurtzman Carson Consultants**
**2335 Alaska Avenue**
**El Segundo, California 90245**
**Facsimile:  (310) 751-1567**
**E-mail:  kcc_meruelomaddux@kccllc.com**

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1   Dated:   October 14, 2010                    PACHULSKI STANG ZIEHL & JONES LLP

2

3                                        By   /s/ Jeffrey W. Dulberg
                                              Jeremy V. Richards (CA Bar No. 102300)
4                                             Jeffrey W. Dulberg (CA Bar No. 181200)
                                              Counsel for Co-Proponent Legendary
5                                             Investors Group No. 1, LLC

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

52010-001\DOCS_LA:224408.6                    113