CHRISTOPHER E. PRINCE (State Bar No. 183553)
cprince@lesnickprince.com
MATTHEW A. LESNICK (SBN 177594)
matt@lesnickprince.com
ANDREW R. CAHILL (SBN 233798)
acahill@lesnickprince.com
LESNICK PRINCE LLP
185 Pier Avenue, Suite 103
Santa Monica, CA 90405
Telephone: (213) 493-6496
Facsimile:  (213) 493-6596

Attorneys for
Charlestown Capital Advisors, LLC and
Hartland Asset Management Corporation

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:09-bk-13356-KT |
| MERUELO MADDUX PROPERTIES, INC., et al., | Chapter 11 |
| Debtor. | CHARLESTOWN CAPITAL ADVISORS, LLC'S AND HARTLAND ASSET MANAGEMENT CORPORATION'S DISCLOSURE STATEMENT DESCRIBING FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF MERUELO MADDUX PROPERTIES, INC., ET AL. DATED OCTOBER 14, 2010 |
| | Hearing<br>Date:        October 15, 2010<br>Time:       10:30 a.m.<br>Place:      Courtroom 301<br>            21041 Burbank Blvd.<br>            Woodland Hills, CA 91367 |

## Contents

I. INTRODUCTION ...............................................................................................35

    A.    OVERVIEW OF THE CHARLESTOWN PLAN ...............................35

    B.    HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE .............37

    C.    NOTICES ...............................................................................40

II. DEBTORS' BUSINESS AND OPERATIONS PRIOR TO THE FILING ..........................40

    A.    CORPORATE HISTORY OF THE DEBTORS ...............................40

    B.    NATURE OF THE DEBTORS' BUSINESS ...............................41

    C.    Consolidated Operations ...............................................42

    D.    THE DEBTORS' CURRENT BUSINESS STRATEGIES ...............43

    E.    PROPOSED BUSINESS STRATEGY FOR THE REORGANIZED DEBTORS ...............................................................................43

    F.    PREPETITION CAPITAL STRUCTURE OF THE COMPANY ...................44

        1.    MMPI ...............................................................................44

        2.    Corporate Structure of the Other Debtors ...............46

    G.    MATERIAL PROCEEDINGS ...............................................46

        1.    Potential Government Tax Audits ...............................46

        2.    Indemnification Claims ...............................................46

III. EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES ...............................................................................47

IV. CHAPTER 11 EVENTS ...............................................................................49

    A.    ADMINISTRATIVE ORDERS AND MATTERS ...............................49

        1.    Introduction ...............................................................49

        2.    The Cash Collateral Motions and Corresponding Orders ...............49

        3.    The Debtors' Single Asset Real Estate ("SARE") Motion ...............50

        4.    Motions for Relief from Stay ...............................................51

        5.    The Debtors' Compromises With Various Lenders ...............56

        6.    Unexpired Leases and Executory Contracts ...............57

7.    Summary of Claims Process, Bar Date and Claims Filed......................57

8.    Other Administrative Matters................................................................59

B.    REAL PROPERTY VALUATION, SALES AND LISTINGS .........................61

1.    Value of Property Level Debtors Real Property Assets .........................61

2.    Sales and Listings Since the Commencement of the Chapter
11 Cases...............................................................................................61

C.    Events in the Related Chapter 11 Cases MM 845 S. Flower and
Chinatown. ................................................................................................62

1.    Important Events in MM 845 S. Flower and Chinatown cases..............64

2.    Sale of the Project and Settlement with Canyon ...................................65

V. SUMMARY OF THE CHARLESTOWN PLAN.................................................67

1.    Common Class Treatments for Classified Claims .................................67

2.    Summary of Classified Claims and Treatment ......................................72

B.    Treatment for Unclassified Claims ...........................................................93

1.    Unclassified Claims (Applicable to all of the Debtors) .........................93

VI. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............98

VII. MEANS FOR IMPLEMENTATION OF THE CHARLESTOWN PLAN .....................100

A.    OVERVIEW OF PLAN IMPLEMENTATION .................................................100

B.    VESTING OF ASSETS ...............................................................................100

C.    SALE OR REFINANCE OF CERTAIN OF THE ASSETS OF
CERTAIN DEBTORS .................................................................................100

D.    OFFER TO PURCHASE AND SECURED LOAN .......................................100

E.    Certificate of Incorporation and Bylaws; Cancellation Of Certain
MMPI Securities, LTIP Units and Related Agreements ...................................104

F.    Certain Post-Effective Date Securities Issues ................................................105

G.    Merger of MMPLP and MMPI ........................................................................105

H.    Retained Claims And Defenses And Reservation Of Rights ...........................106

I.    NON-BANKRUPTCY LITIGATION .................................................................109

J.    OBJECTIONS TO CLAIMS ............................................................................109

K.    DISBURSING AGENT ....................................................................................110

L.    DISCHARGE OF THE DEBTORS AND INJUNCTION ...............................110

    1.    Discharge ..........................................................................................110

    2.    Injunction ..........................................................................................111

M.    NO LIABILITY FOR SOLICITATION OR PARTICIPATION ....................112

N.    LIMITATION OF LIABILITY ........................................................................112

O.    CERTIFICATE OF INCORPORATION AND CERTIFICATES OF ORGANIZATION .............................................................................................113

P.    OTHER DOCUMENTS AND ACTIONS........................................................113

Q.    CORPORATE ACTION ..................................................................................113

R.    RETIREE BENEFITS ......................................................................................114

S.    THE OFFICIAL COMMITTEES ....................................................................114

VIII. MANAGEMENT OF REORGANIZED DEBTORS .....................................................114

IX. CONFIRMATION AND CONSUMMATION PROCEDURE .........................................115

A.    SOLICITATION OF VOTES ..........................................................................115

B.    THE CONFIRMATION HEARING ...............................................................117

C.    CONFIRMATION ............................................................................................118

    1.    Acceptance ........................................................................................118

    2.    Unfair Discrimination and the Fair and Equitable Tests.....................118

    3.    Feasibility ..........................................................................................119

    4.    Best Interests Test ..............................................................................121

D.    CONSUMMATION..........................................................................................124

X. CONFIRMATION DATE CONDITIONS .........................................................................124

A.    CONDITIONS TO CONFIRMATION The conditions to Confirmation shall be the following: .................................................................124

B.    WAIVER OF CONDITIONS ..........................................................................124

C.    EFFECT OF FAILURE OF CONDITIONS ...................................................125

D.    VACATUR OF CONFIRMATION ORDER ..................................................125

XI. RETENTION OF JURISDICTION ....................................................................................125

XII. PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE
CHARLESTOWN PLAN AND TREATMENT OF DISPUTED,
CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS .................128

A.    VOTING OF CLAIMS AND INTERESTS.......................................128

B.    METHOD OF DISTRIBUTIONS UNDER THE CHARLESTOWN
PLAN ...........................................................................................128

1.    Distributions Under the Charlestown Plan.............................128

2.    Timing and Methods of Distribution......................................129

C.    UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS ...........130

D.    DISPUTED CLAIMS AND ESTIMATIONS ..................................131

1.    Treatment of Disputed Claims ...............................................131

2.    Distribution on Account of Disputed Claims Once They Are
Allowed ...................................................................................132

3.    Allowance of Claims Subject to Bankruptcy Code Section
502(d) ......................................................................................132

E.    SETOFFS .......................................................................................132

XIII. CERTAIN RISK FACTORS TO BE CONSIDERED....................................132

A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS................133

1.    Risk of Non-Confirmation of the Charlestown Plan..............133

2.    Risk of Non-Occurrence of the Effective Date ......................133

B.    RISKS TO RECOVERY BY HOLDERS OF CLAIMS .................134

1.    Ability to Service Debt...........................................................134

2.    Risks of Asset Disposition Delays .........................................134

3.    Projected Financial Information..............................................134

4.    Failure to Meet Projected Occupancy Rates. .........................134

5.    Failure to Obtain Secured Loan of $15 Million. ....................135

6.    Failure to Confirm One or More of the Debtors' Chapter 11
Plans. .......................................................................................135

7.    Change of Management. ..........................................................135

8.    Insider Guaranty Claims..........................................................136

9.    Insider Treatment. ...................................................................136

10.      East West Bank Complaint. ...............................................137

XIV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE
CHARLESTOWN PLAN ...........................................................138

A.      CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES TO THE DEBTORS ........................................139

1.      Net Operating Losses ...............................................139

2.      Cancellation of Debt...............................................140

3.      Merger of MMPLP into MMPI...............................140

4.      Consequences of the Sale and/or Refinance of Assets of the
Debtors ...................................................................141

B.      CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS .........143

1.      Consequences to Holders of Allowed Secured Claims .........143

C.      DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST...................144

D.      INFORMATION REPORTING AND BACKUP WITHHOLDING...............145

E.      IMPORTANCE OF OBTAINING PROFESSIONAL TAX
ASSISTANCE..............................................................................145

XV. MISCELLANEOUS PROVISIONS ......................................................146

A.      EXEMPTION FROM TRANSFER TAXES ....................................146

B.      PAYMENT OF STATUTORY FEES ...........................................146

C.      MODIFICATION OR WITHDRAWAL OF THE CHARLESTOWN
PLAN ......................................................................................146

D.      GOVERNING LAW ..................................................................146

E.      FILING OR EXECUTION OF ADDITIONAL DOCUMENTS .....................147

F.      WITHHOLDING AND REPORTING REQUIREMENTS .............................147

G.      WAIVER OF RULE 7062 OF THE FEDERAL RULES OF
BANKRUPTCY PROCEDURE ........................................................147

H.      HEADINGS ..............................................................................147

I.      EXHIBITS AND SCHEDULES .................................................147

J.      CONFLICT ...............................................................................148

K.      SUCCESSORS AND ASSIGNS .................................................148

L.      SATURDAY, SUNDAY OR LEGAL HOLIDAY........................148

M.    POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS
      OR INTERESTS ................................................................................148

N.    SEVERABILITY OF PLAN PROVISIONS ...................................................148

O.    BALLOTING ......................................................................................149

P.    NO ADMISSIONS OR WAIVER OF OBJECTIONS ....................................149

Q.    SURVIVAL OF SETTLEMENTS.............................................................149

XVI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION   OF
      THE CHARLESTOWN PLAN .................................................................150

A.    ALTERNATIVE PLANS OF REORGANIZATION.......................................150

B.    LIQUIDATION UNDER CHAPTER 7.......................................................150

XVII. CONCLUSION AND RECOMMENDATION................................................151

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## **EXHIBITS**

The Charlestown Plan (Exhibit A);

Order approving the Charlestown Disclosure Statement (Exhibit B);

Chart of the Debtors' Corporate Structure (Exhibit C);

Loan Modification Agreements (Exhibit D);

Projected Financial Information (Exhibit E);

The Debtors' Unexpired Leases and Executory Contracts (Exhibit F);

The Debtors' Liquidation Analysis (Exhibit G);

The Claims and Interests of the Debtors (Exhibit H);

    List of Administrative Expense Claims (Exhibit H. 1)

    List of Class `B" Priority Unsecured Claims (Exhibit H.2);

    List of Class "C" General Unsecured Claims — Tenant Security Deposit Claims
       (Exhibit H.3);

    List of Class "C" General Unsecured Claims -- Convenience Class (Exhibit H.4);

    List of Class "C" General Unsecured Claims (Exhibit H.5);

    List of Class "C" Unsecured Guaranty Claims (Exhibit H.6);

    List of Class "D" Intercompany Claims (Exhibit H.7);

    List of Class "E" Interests (Exhibit H.8);

List of Debtors' Transfers During the 90-Day and One-Year Avoidance Periods (Exhibit I);

Property Valuations and Property Descriptions (Exhibit J); and

Agreement and Plan of Merger (Exhibit K)

# DEFINITIONS

| | |
|---|---|
| 620 S. Gladys Avenue Encumbered Real Property | means the real property located at 620 S. Gladys Avenue, 830-838 6th Street, and 647-649 Ceres Avenue, Los Angeles, California, APNs 5147-030-005, 5147-030-006, 5147-030-007, 5147-030-008, 5147-030-009, 5147-030-037, 5147-030-050, 5147-030-053, 5147-030-054, 5147-030-055, 5147-030-061 and 5147-030-062. |
| 620 S. Gladys Avenue Unencumbered Real Property | means the real property located at 643 and 644 South Gladys Avenue, Los Angeles, California, APNs 5147-030-064 and 5147-029-045. |
| 729 E. Temple Street Real Property | means the real property located at 729 E. Temple Street, 718-736 Jackson Street, and 223 Center Street, Los Angeles, California, APNs 5173-015-006, 5173-014-001 and 5173-014-002. |
| 788 S. Alameda | means 788 South Alameda, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09¬bk-13395. |
| 788 S. Alameda Real Property | means the real property located at 788 South Alameda Street, Los Angeles, California, APN 5166-031-014. |
| 815 E. Temple Street Real Property | means the real property located at 815 E. Temple Street, 210 & 234 Center Street, and 740 Jackson Street, Los Angeles, California, APNs 5173-022-001, 5173-022-002, 5173-022-004, 5173-022-005 and 5173¬015-003. |
| 905 8th Street | means 905 8th Street, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13396. |
| 905 8th Street Real Property | means the real property located at 905 E. 8th Street, Los Angeles, California, APN 5146-029-039. |
| 1119 S. Olive Street Real Property | means the real property located at 1117-1119 S. Olive Street, Los Angeles, California, APNs 5139-020-006 and 5139-020-007. |
| 1124 S. Olive Street Real Property | means the real property located at 1124 S. Olive Street, and 218 W. 11th Street, Los Angeles, California, APNs 5139-019-011 and 5139¬019-015. |

| | |
|---|---|
| 1339 E. 7th Street Real Property | means the real property located at 1339 E. 7th Street, Los Angeles, California, APNs 5147-035-004, 5147-035-005, 5147-035-006. 5147¬035-007 and 5147-035-008. |
| 1248 Figueroa Street | means 1248 Figueroa Street, LLC. |
| 1248 Figueroa Street Collateral | means the MG 2529 Santa Fe Avenue Real Property |
| 1500 Griffith Avenue Real Property | means the real property located at 1467 and 1500 Griffith Avenue and 833 E. 15th Street, Los Angeles, California, APNs 5132-025-018, 5132-026-028 and 5132-026-030. |
| 1510 Griffith Avenue Real Property | means the real property located at 1510 Griffith Avenue, Los Angeles, California, APNs 5132-025-004, 5132-025-006 and 5132-025-017. |
| 2131 Humboldt Encumbered Real Property | means the real property located at 2131 Humboldt Street, Los Angeles, California, APNs 5447-009-018 and 5447-009-019. |
| 2131 Humboldt Unencumbered Real Property | means the real property located at 350-354 N. Avenue 21 Street, Los Angeles, California, APN 5447-009-020, and at 336-346 N. Avenue 21, Los Angeles, California, APNs 5447-009-007, 5447-009-008, and 5447-009-009. |
| 2640 Washington Boulevard | means 2640 Washington Boulevard, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13397. |
| 2640 Washington Boulevard Real Property | means the real property located at 2640 E. Washington Boulevard, Los Angeles, California, APN 5168-017-012. |
| Administrative Claim | means any right to payment constituting a cost or expense of administration of the Chapter 11 Cases of a kind specified under Section 503(b) and entitled to priority under Section 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the estates of the Debtors, any actual and necessary costs and expenses of operating the respective businesses of the Debtors, any indebtedness or obligations incurred or assumed by any of the Debtors in connection with the conduct of their respective businesses, including, without limitation, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under Section 330 or 503 of the Bankruptcy |

| | |
|---|---|
| | Code, and any fees or charges assessed against the estates of the Debtors under Section 1930 of chapter 123 of Title 28 of the United States Code. |
| Alameda Produce Market | means Alameda Produce Market, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13394. |
| Alameda Produce Market Encumbered Real Property | means the real property located at 1312 E. 7th Street, Los Angeles, California, APN 5146-009-003 (the "7th Street Produce Market"), and the property located at 761 Terminal Street, Los Angeles, California, APNs 5146-009-004 and 5146-009-005 ("Alameda Square"). |
| Alameda Produce Market Unencumbered Real Property | means the real property located at 1215 E. 7th Street, Los Angeles, California, APN 5147-034-015. |
| Allowed Claim or Allowed Interest | means a Claim against or Interest in a Debtor to the extent that<br>a.      a proof of the Claim or Interest<br>i.      was timely Filed and served upon a Debtor and no objection to the Claim or Interest is Filed within the time fixed by the Bankruptcy Court for such objections;<br>ii.      is deemed Filed under applicable law (e.g., filed on the Schedules as noncontingent, nondisputed and liquidated) or pursuant to a Final Order of the Bankruptcy Court and no objection to the Claim or Interest is Filed within the time fixed by the Bankruptcy Court for such objections;<br>iii.      is Allowed pursuant to subparagraph b of this definition; or<br>iv.      is Allowed under the Charlestown Plan.<br>b.      If a Debtor or other party in interest files an objection to a proof of Claim or Interest within a time fixed by the Bankruptcy Court, the Claim or Interest shall be Allowed to the extent of<br>i.      any amount of such Claim or Interest to which no party objected; or<br>ii.      any amount otherwise authorized by Final Order or the Charlestown Plan. |
| Allowed Class Claim | means an Allowed Claim in the particular Class described. |
| Allowed Class Interest | means an Allowed Interest in the particular Class described. |

11

| | | |
|---|---|---|
| 1 | Allowed Priority Tax Claim | means a Tax Claim against a Debtor to the extent that |
| 2 | | a.        a proof of the Tax Claim<br>i. was timely Filed and served upon a Debtor |
| 3 | | and no objection to the Tax Claim is Filed within the time fixed by the Bankruptcy Court for such objections; or |
| 4 | | ii.        is deemed Filed under applicable law |
| 5 | | (e.g., filed on the Schedules as noncontingent, nondisputed and liquidated) or pursuant to a Final Order of the Bankruptcy Court and no |
| 6 | | objection to the Tax Claim is Filed within the time fixed by the Bankruptcy Court for such |
| 7 | | objections; or |
| 8 | | iii.        is Allowed pursuant to subparagraph b of this definition; or |
| 9 | | iv.        is Allowed under the Charlestown Plan.<br>b. If a Debtor or other party in interest files an |
| 10 | | objection to a proof of Tax Claim within a time fixed by the Bankruptcy Court, the Tax Claim shall be Allowed to the extent of |
| 11 | | i. any amount of such Tax Claim to which no party objected; or |
| 12 | | ii.        any amount otherwise authorized by Final Order or the Charlestown Plan. |
| 13 | | |
| 14 | APN | means a county assessor's parcel number. |
| 15 | Ballots | means each of the ballot forms distributed with the Disclosure Statement to each Holder of an Impaired Claim or Impaired Interest (other than |
| 16 | | to Holders of Impaired Claims or Impaired Interests deemed to have rejected the |
| 17 | | Charlestown Plan or otherwise not entitled to vote on the Charlestown Plan), upon which is to |
| 18 | | be indicated, among other things, acceptance or rejection of the Charlestown Plan. |
| 19 | | |
| 20 | Balloting Procedures Order | Means the order of the Bankruptcy Court governing the solicitation and tabulation of |
| 21 | | votes from Holders of Impaired Claims and Interests. |
| 22 | | |
| 23 | Bankruptcy Code | means Title 11 of the United States Code, 11 U.S.C. § 101 et seq., as in effect on the date hereof or hereafter amended if such |
| 24 | | amendments are made applicable to the Chapter 11 Cases. |
| 25 | | |
| 26 | Bankruptcy Court | means, (a) the United States Bankruptcy Court for the Central District of California (San Fernando Valley Division), having jurisdiction |
| 27 | | over the Chapter 11 Cases; (b) to the extent there is no reference pursuant to Section 157 of |
| 28 | | |

| | | |
|---|---|---|
| 1 | | Title 28 of the United States Code, the United States District Court for the Central District of California; and (c) any other court having jurisdiction over the Chapter 11 Cases. |
| 2 | | |
| 3 | Bankruptcy Rules | means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under Section 2075 of Title 28 of the United States Code, and local rules of the Bankruptcy Court, as the context may require. |
| 4 | | |
| 5 | | |
| 6 | BofA | means Bank of America, N.A. |
| 7 | BofA Collateral re MMP 760 S. Hill Street | means, collectively, [1] the MMP 760 S. Hill Street Real Property and, [2] approximately $6,560,893 in cash held in BofA account number 1459360078, approximately $200,000 of which the Debtors contend is not BofA collateral. |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | BofA Collateral re MG Southpark | means the MG Southpark Real Property. |
| 12 | Business Day | means any day on which commercial banks are open for business, and not authorized to close, in the City of Los Angeles, California, except any day designated as a legal holiday in Bankruptcy Rule 9006(a). |
| 13 | | |
| 14 | | |
| 15 | Canpartners | means Canpartners Realty Holding Co., IV LLC. |
| 16 | Berkadia | means Berkadia Commercial Mortgage, Inc. (as successor to Capmark Finance, Inc.), special servicer for Wells Fargo Bank, N.A., successor by consolidation to Wells Fargo Bank Minnesota, N.A. as Trustee for the Registered Certificate holders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through Certificates 2002-Cl. |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | Berkadia Collateral | means, collectively, [1] the Santa Fe Commerce Center Real Property and [2] cash deposited by Santa Fe Commerce Center with and held by Berkadia for the benefit of and account of Santa Fe Commerce Center in the approximate amount of $600,000. |
| 22 | | |
| 23 | | |
| 24 | Cash | means legal tender of the United States of America and equivalents thereof. |
| 25 | | |
| 26 | Cash Election Holders | Holders of MMPI Interests who, under the terms of the Charlestown Plan, elect to receive a cash distribution on account of their Interests. |
| 27 | | |
| 28 | | |

| | | |
|---|---|---|
| 1 | Cathay | means Cathay Bank, a California banking corporation. |
| 2 | CBT | means California Bank & Trust. |
| 3 4 5 | CBT Collateral | means, collectively, [1] the 788 S. Alameda Real Property and [2] the cash located in CBT account number 2120351811 in the approximate amount of $7,514. |
| 6 | Chamlian | means, collectively, Vahan Chamlian and Anoush Chamlian. |
| 7 8 | Chamlian Collateral | Chamlian Collateral   means the 2131 Humboldt Encumbered Real Property. |
| 9 | Chapter 11 Cases | means the Chapter 11 cases of the Debtors. |
| 10 11 12 13 | Charlestown Plan | means the coordinated Chapter 11 plan of reorganization as proposed by the Charlestown Proponents as it may be amended or modified, from time to time, together with all addenda, exhibits, schedules, supplements or other attachments, if any. |
| 14 15 16 | Charlestown Proponents | means Charlestown Capital Advisors, LLC and Hartland Asset Management Corporation as proponents of a Chapter 11 plan of reorganization for the Debtors. |
| 17 18 | Chinatown Plan | means any plan of reorganization Confirmed in the Chapter 11 Case of Chinatown. |
| 19 20 | Chinatown | means Meruelo Chinatown, LLC, a California limited liability company, a Debtor in Possession in Chapter 11 Case number 1:09-bk-21622. |
| 21 22 | Chinatrust | means Chinatrust Bank, USA. |
| 23 | Chinatrust Collateral | means the MG 3185 E. Washington Boulevard Encumbered Real Property. |
| 24 | Class | means a class of Claims or Interests designated pursuant to the Charlestown Plan. |
| 25 | Clerk | means the Clerk of the Bankruptcy Court. |
| 26 27 28 | Collateral | means any property or interest in property of a Debtor's Estate subject to a Lien to secure the payment or performance of a Claim as of the Petition Date, which Lien is not subject to |

14

| | | |
|---|---|---|
| 1 | | avoidance under the Bankruptcy Code or applicable non-bankruptcy law or otherwise |
| 2 | | invalid under the Bankruptcy Code or applicable non-bankruptcy law. |
| 3 | Commencement Date | means March 26, 2009 for MMP 12385 San Fernando Road and March 27, 2009 for 788 S. |
| 4 | | Alameda, 905 8th Street, 2640 Washington Boulevard, Alameda Produce Market, MBP, |
| 5 | | Merco Group, Meruelo Farms, Meruelo Wall Street, MG 4th Street Center, MG 146 E. Front |
| 6 | | Street, MG 425 W. 11th Street, MG 620 Gladys Avenue, MG 1211 E. Washington Boulevard, |
| 7 | | MG 1308 S. Orchard, MG 1500 Griffith Avenue, MG 2001-2021 W. Mission |
| 8 | | Boulevard, MG 2040 Camfield Avenue, MG 2529 Santa Fe Avenue, MG 3185 E. |
| 9 | | Washington Boulevard, MG 5707 S. Alameda, MG Ceres Street Produce, MG Little J, MG |
| 10 | | Overland Terminal, MG Southpark, MM 3rd and Omar Street, MM 230 W. Avenue 26, MM |
| 11 | | 336 W. 11th Street, MM 420 Boyd Street, MM 500 Mateo Street, MM 555 Central Avenue, |
| 12 | | MM 817-825 S. Hill Street, MM 915-949 S. Hill Street, MM 1000 E. Cesar Chavez, MM |
| 13 | | 2415 E. Washington Boulevard, MM 5500 Flotilla Street, MM Construction, MM Mission |
| 14 | | Boulevard, MMP 306-330 N. Avenue 21, MMP 760 S. Hill Street, MMP 1009 N. Citrus, MMP |
| 15 | | 1060 N. Vignes, MMP 1919 Vineburn, MMP 2131 Humboldt Street, MMP 2951 Lenwood |
| 16 | | Road, MMPLP, MMP Ventures, National Cold Storage, Santa Fe & Washington Market, Santa |
| 17 | | Fe Commerce Center, and Wall Street Market, the date on which each of the preceding Debtors |
| 18 | | filed their respective petitions for relief commencing the Chapter 11 Cases. |
| 19 | | |
| 20 | Confirmation | means the conclusion of the Confirmation Hearing. |
| 21 | Confirmation Date | means the date on which the Confirmation Order is entered on the Docket. |
| 22 | | |
| 23 | Confirmation Hearing | means the hearing to consider confirmation of the Charlestown Plan pursuant to Section 1128 of the Bankruptcy Code. |
| 24 | | |
| 25 | Confirmation Order | means the order entered by the Bankruptcy Court confirming the Charlestown Plan pursuant to Section 1129 of the Bankruptcy Code. |
| 26 | | |
| 27 | Creditor | has the meaning ascribed to it in Section 101(10) of the Bankruptcy Code. |
| 28 | | |

| | |
|---|---|
| Creditors' Committee | means the official committee of unsecured creditors' appointed in the Chapter 11 Cases of the Debtors by the Office of the United States Trustee, as its composition may be changed from time to time by the addition, resignation and/or removal of its members. |
| Cure Payments | means the distribution of Cash as, and to the extent, required for the cure of any and all leases and executory contracts pursuant to Section 365 of the Bankruptcy Code in connection with any assumed leases and executory contracts. |
| DGCL | means the Delaware General Corporation Law. |
| Debtors | means, collectively, Meruelo Maddux Properties, Inc., a Delaware corporation, and its 53 related jointly administered debtor entities. |
| Debtors in Possession | means the Debtors in their capacities as debtors in possession in the Chapter 11 Cases pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. |
| Disbursing Agent | means the Person responsible for making distributions under the Charlestown Plan, including the Reorganized Debtors, or such Person(s) as the Reorganized Debtors may employ in their sole discretion, to serve as Disbursing Agent. The Disbursing Agent shall be the Chief Accounting Officer of MMPI. |
| Disclosure Statement | means the written disclosure statement, dated as of February 26, 2010, that relates to this Charlestown Plan, as approved by the Bankruptcy Court pursuant to Section 1125 of the Bankruptcy Code, as such disclosure statement may be amended, modified or supplemented from time to time. |
| Disputed | means, with reference to any Claim, or Interest, or any portion thereof, any Claim or Interest proof of which was timely and properly Filed and in either case or in the case of any Administrative Claim, Claim or Interest that is disputed under the Charlestown Plan or as to which the Debtors have interposed a timely objection and/or request for estimation in accordance with Section 502(c) of the Bankruptcy Code and Bankruptcy Rule 3018, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, and any Claim or Interest proof of |

which was required to be Filed by Order of the Bankruptcy Court but as to which a proof of claim or interest was not timely or properly Filed.

**Distribution**  means a distribution to a Holder of an Allowed Claim pursuant to this Charlestown Plan.

**Docket**  means the docket in the Chapter 11 Cases maintained by the Clerk.

**Effective Date**  means the thirtieth day after the Confirmation Order in a form satisfactory to the Charlestown Proponents shall have become a Final Order. If a stay of the Confirmation Order is in effect, the Effective Date shall be extended to the first Business Day on which no such stay is in effect but in no event shall the Effective Date be later than one hundred twenty (120) days after the Confirmation Date; and provided further that the Bankruptcy Court may extend the deadline for the Effective Date to occur following (a) submission of a stipulation signed by the affected parties or (b) notice and hearing on the Charlestown Proponents' motion.

**Estates**  means, collectively, the estates created in each of the Debtors' Chapter 11 Cases under Section 541 of the Bankruptcy Code.

**Federal Judgment Rate**  means the interest rate on federal judgments and is based on the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the first day on which the defendant is liable for interest. The Federal Judgment Rate was 0.64% for the week ended immediately prior to the Petition Date of the Debtors.

**File or Filed**  means filed with the Clerk in the Chapter 11 Cases.

**Final Order**  means an order or judgment of the Bankruptcy Court as entered on the Docket in the Chapter 11 Cases, or other court of competent jurisdiction, the operation or effect of which is not stayed, reversed or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to

| | | |
|---|---|---|
| 1 | | appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending. |
| 2 | | |
| 3 | Flower Plan | means any plan of reorganization Confirmed in the Chapter 11 Case of MM 845 S. Flower. |
| 4 | | |
| 5 | FNBN | means FNBN CML-ComI, LLC. |
| 6 | FNBN Collateral | means the MMP 2951 Lenwood Road Real Property. |
| 7 | GAAP | means Generally Accepted Accounting Principles in the United States of America as in effect on the date of this Charlestown Plan, including those set forth in (i) the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants, (ii) statements and pronouncements of the Financial Accounting Standards Board, (iii) such other statements by such other entity as approved by a significant segment of the accounting profession and (iv) the rules and regulations of the SEC governing the inclusion of financial statements (including pro forma financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act, including opinions and pronouncements in staff accounting bulletins and similar written statements from the accounting staff of the SEC. |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | General Unsecured Claim | means any Claim that is not an Administrative Claim, Priority Claim, Tax Claim, Intercompany Claim, Guaranty Claim or Secured Claim. |
| 18 | | |
| 19 | | |
| 20 | Guaranty Claim | means a Claim against multiple Debtors, whether the Claim is a guarantee, indemnity agreement, claim for obligations for which another Debtor is the primary obligator, joint and several obligations or otherwise. |
| 21 | | |
| 22 | | |
| 23 | Holder | means the holder of a Claim or Interest. |
| 24 | Impaired | means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of Section 1124 of the Bankruptcy Code. |
| 25 | | |
| 26 | Imperial | means Imperial National Bank, a division of City National Bank, a national banking association. |
| 27 | | |
| 28 | | |

| | |
|---|---|
| Inside Equity Interests | means any Interest in MMPI held by a person who is or was an Insider of a Debtor prior to the Effective Date. |
| Insider | has the meaning set forth in Section 101(31) of the Bankruptcy Code. |
| Insider Litigation | means any action or proceeding brought by or on behalf of the Debtors or the Reorganized Debtors against a person who is or was an Insider of the Debtors prior to the Effective Date. |
| Insider Cash Election Holders | Holders Insider Equity Interests who, under the terms of the Charlestown Plan, elect to receive a cash distribution on account of their Interests. |
| Insider Stock Retention Holders | Holders of Insider Equity Interests who, under the terms of the Charlestown Plan, elect to retain their Interests. |
| Instrument | means any share of stock, security, promissory note or other "instrument," within the meaning of that term, as defined in Section 9105(1)(i) of the UCC. |
| Intercompany Claims | means all Claims asserted by any Debtor(s) or MM 845 S. Flower or Chinatown against any other Debtor(s). |
| Interest | has the meaning set forth in Section 101(16) of the Bankruptcy Code for "equity security." |
| Kennedy Funding | means Kennedy Funding, Inc. |
| Kennedy Funding Collateral | means the MM Mission Boulevard Real Property. |
| Legendary | means Legendary Investors Group No. 1, L.L.C. (as successor to East West Bank on certain loans). |
| Lien | has the meaning set forth in Section 101(37) of the Bankruptcy Code. |
| Loan Documents | means, collectively, any and all writings between a Debtor and a Creditor or any other entity, establishing, fixing or describing the terms and conditions of the debtor creditor relationship between such Debtor and the |

| | | |
|---|---|---|
| | | Creditor, regardless of form, title or substance. |
| | Local Bankruptcy Rules | means the local rules of the Bankruptcy Court, as applicable from time to time in the Chapter 11 Cases. |
| | Los Angeles Tax Claim | means the claim of Los Angeles County against a Debtor's estate for real property taxes. |
| | LTIP Units | means all long term incentive plan units in MMPLP. |
| | MBP | means Meruelo Baldwin Park, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13386. |
| | MBP Real Property | means the real property located at 13853, 13822 and 13916 Garvey Avenue, 13904 Corak Street and 3060 Feather Avenue, Baldwin Park, California, APNs 8555-018-002, 8555-018-003, 8555-017-013, 8555¬017-021, and 8555-017-026. |
| | Merco Group | means Merco Group, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13406. |
| | Merco Group Real Property | means the Sci-Arc Real Property and the Sky-Arc Real Property. |
| | Merco Group Personal Property | means the cash in East West Bank account number 80360027 in the approximate amount of $24,898. |
| | Meruelo Farms | means Meruelo Farms, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13358. |
| | Meruelo Wall Street | means Meruelo Wall Street, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13366. |
| | Meruelo Wall Street Real Property | means the real property located at 419 E. 9th Street, Los Angeles, California, APN 5145-011-015. |
| | MG 4th Street Center | means Merco Group — 4th Street Center, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13399. |

| | |
|---|---|
| MG 4th Street Center Real Property | means the real property located at 900, 910 and 926 E. 4th Street and 405-411 S. Hewitt Street, Los Angeles, California, APNs 5163-022¬002, 5163-022-003, 5163-022-001, 5163-022-005, 5163-022-022 and 5163-022-023. |
| MG 146 E. Front Street | means Merco Group — 146 E. Front Street, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13380. |
| MG 425 W. 11th Street | means Merco Group — 425 West 11th Street, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13400. |
| MG 425 W. 11th Street Real Property | means the real property located at 425 W. 11th Street, Los Angeles, California, APNs 5139-008-010 and 5139-008-001. |
| MG 620 Gladys Avenue | means Merco Group — 620 Gladys Avenue, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13401. |
| MG 801 E. 7th Street | means Merco Group — 801 E. 7th Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13378. |
| MG 801 E. 7th Street Real Property | means the real property located at 648 Stanford Avenue, Los Angeles, California, APN 5147-029-030. |
| MG 1211 E. Washington Boulevard | means Merco Group —1211 E. Washington Boulevard, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13382. |
| MG 1211 E. Washington Boulevard Real Property | means the real property located at 1211 and 1225 E. Washington Boulevard, Los Angeles, California, APNs 5131-003-002, 5131-003-010, 5131-003-011, and 5131-003-024. |
| MG 1308 S. Orchard | means Merco Group — 1308 S. Orchard, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13384. |
| MG 1308 S. Orchard Real Property | means the real property located at 1308 S. Orchard, Los Angeles, California, APN 5056-004-007. |
| MG 1500 Griffith Avenue | means Merco Group —1500 Griffith Avenue, LLC, a Delaware limited liability company and |

| | | |
|---|---|---|
| 1 | | a Debtor in Possession in Chapter 11 Case number 1:09-bk-13398. |
| 2 3 4 | MG 2001-2021 W. Mission Boulevard | means Merco Group — 2001-2021 West Mission Boulevard, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13403. |
| 5 6 | MG 2001-2021 W. Mission Boulevard Encumbered Real Property | means the real property located at 1875 West Mission Boulevard, Pomona, California, APN 8707-019-004. |
| 7 8 | MG 2001-2021 W. Mission Boulevard Unencumbered Real Property | means the real property located on W. Mission Boulevard, Pomona, California, APN 8707-019-005. |
| 9 10 | MG 2040 Camfield Avenue | means Merco Group — 2040 Camfield Avenue, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13375. |
| 11 12 13 | MG 2529 Santa Fe Avenue | means Merco Group — 2529 Santa Fe Avenue, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13404. |
| 14 15 | MG 2529 Santa Fe Avenue Real Property | means the real property located at 2529 S. Santa Fe Avenue, Los Angeles, California, APN 6302-008-010, also known as Santa Fe Plaza. |
| 16 17 | MG 3185 E. Washington Boulevard | means Merco Group — 3185 E. Washington Boulevard, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13373. |
| 18 19 | MG 3185 E. Washington Boulevard Encumbered Real Property | means the real property located at 3185 E. Washington Boulevard, Los Angeles, California, APN 5169-020-003. |
| 20 21 | MG 3185 E. Washington Boulevard Unencumbered Real Property | means the real property located at 3185 E. Washington Boulevard, Los Angeles, California, APN 5169-023-022. |
| 22 23 24 | MG 5707 S. Alameda | means Merco Group — 5707 S. Alameda LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13381. |
| 25 26 27 | MG 5707 S. Alameda Real Property | means the real property located at 5701 S. Alameda Street (1862 E. 55th Street) and 5707 to 5715 S. Alameda Street and 5716 Alba Street, Los Angeles, California, APNs 5105-009-002, 5105-009-008, 5105-011-014, and 5105-011-015. |
| 28 | | |

| | | |
|---|---|---|
| 1 | MG Ceres Street Produce | means Merco Group — Ceres Street Produce, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13385. |
| 2 | | |
| 3 | MG Ceres Street Produce Real Property | means the real property located at 758 Ceres Avenue, Los Angeles, California, APNs 5146-003-032, 5146-003-033, 5146-003-034 and 5146-003-035. |
| 4 | | |
| 5 | | |
| 6 | MG Little J | means Merco Group — Little J, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13405. |
| 7 | | |
| 8 | MG Overland Terminal | means Merco Group — Overland Terminal, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13434. |
| 9 | | |
| 10 | | |
| 11 | MG Southpark | means Merco Group — Southpark, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13407. |
| 12 | | |
| 13 | MG Southpark Real Property | means the real property located at numerous street addresses, including 1150 S. Grand Avenue, Los Angeles, California, APNs 5139-019-040, 5139-020-016, 5139-020-022, 5139-020-024, 5139-024-003, 5139-024-014, 5139-024-015, and 5139-024-016. |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | MM 3rd and Omar Street | means Meruelo Maddux — 3rd & Omar Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13359. |
| 18 | | |
| 19 | MM 3rd and Omar Street Real Property | means the real property located at 470 3rd Street, Los Angeles, California, APNs 5147-004-013, 5147-004-016, 5147-004-017 and 5147-004-019. |
| 20 | | |
| 21 | | |
| 22 | MM 230 W. Avenue 26 | means Meruelo Maddux — 230 W. Avenue 26, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13389. |
| 23 | | |
| 24 | MM 230 W. Avenue 26 Real Property | means the real property located at 210-212, and 230 W. Avenue 26, Los Angeles, California, APNs 5205-014-013, 5205-014-017 and 5205-014-018. |
| 25 | | |
| 26 | | |
| 27 | MM 336 W. 11th Street | means Meruelo Maddux — 336 W. 11th Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case |
| 28 | | |

| | |
|---|---|
| 1 | number 1:09-bk-13402. |
| 2 | MM 336 W. 11th Street Real Property — means the real property located at 336 W. 11th Street, Los Angeles, California, APN 5139-020-025. |
| 3 | |
| 4 | MM 420 Boyd Street — means Meruelo Maddux — 420 Boyd Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13360. |
| 5 | |
| 6 | MM 420 Boyd Street Real Property — means the real property located at 420 Boyd Street, Los Angeles, California, APNs 5147-006-001, 5147-006-002, 5147-006-003, and 5147-006-008. |
| 7 | |
| 8 | |
| 9 | MM 500 Mateo Street — means Meruelo Maddux — 500 Mateo Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13361. |
| 10 | |
| 11 | MM 555 Central Avenue — means Meruelo Maddux — 555 Central Avenue, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13439. |
| 12 | |
| 13 | |
| 14 | MM 817-825 S. Hill Street — means Meruelo Maddux — 817-825 S. Hill Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13391. |
| 15 | |
| 16 | MM 817-825 S. Hill Street Real Property — means the real property located at 817 S. Hill Street, 325 S. Hill Street, and 820 S. Olive Street, Los Angeles, California, APNs 5144-018-021, 5144-018-027, 5144-018-028 and 5144-018-032. |
| 17 | |
| 18 | |
| 19 | MM 845 S. Flower — means Meruelo Maddux — 845 S. Flower Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-21621. |
| 20 | |
| 21 | |
| 22 | MM 915-949 S. Hill Street — means Meruelo Maddux — 915-949 S. Hill Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13362. |
| 23 | |
| 24 | MM 915-949 S. Hill Street Real Property — means the real property located at 915-949 S. Hill Street, Los Angeles, California, APNs 5139-004-004, 5139-004-005, 5139-004-006, 5139-004-007, 5139-004-008, 5139-004-009, 5 13 9-004-020 and 5139-004-024. |
| 25 | |
| 26 | |
| 27 | MM 1000 E. Cesar Chavez — means Meruelo Maddux -- 1000 E. Cesar Chavez, LLC, a Delaware limited liability |
| 28 | |

| | |
|---|---|
| | company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13393. |
| MM 1000 E. Cesar Chavez Real Property | means the real property located at 1000, 1016, 1028, and 1030 E. Cesar Chavez, Los Angeles, California, APNs 5410-007-004, 5410-007-022, 5410-007-006, and 5410-007-007. |
| MM 2415 E. Washington Boulevard | means Meruelo Maddux — 2415 E. Washington Blvd., LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13365. |
| MM 2415 E. Washington Boulevard Real Property | means the real property located at 2415 E. Washington Boulevard, Los Angeles, California, APN 5168-009-011. |
| MM 5500 Flotilla Street | means Meruelo Maddux — 5500 Flotilla Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13367. |
| MM Construction | means Meruelo Maddux Construction, Inc., a California corporation, and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13388. |
| MM Management | means Meruelo Maddux Management, LLC, a Delaware limited liability company, and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13390. |
| MM Mission Boulevard | means Meruelo Maddux — Mission Boulevard, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13369. |
| MM Mission Boulevard Real Property | means the real property located at 2001-2021 W. Mission, Pomona, California, APN 8707-019-003. |
| MMP 306-330 N. Avenue 21 | means Meruelo Maddux Properties — 306-330 N. Avenue 21, LLC a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13370. |
| MMP 306-330 N. Avenue 21 Real Property | means the real property located at 306-330 N. Avenue 21, Los Angeles, California, APNs 5447-009-003, 5447-009-004, 5447-009-005 and 5447-009-006. |
| MMP 760 S. Hill Street | means Meruelo Maddux Properties — 760 S. Hill Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13363. |

| | |
|---|---|
| MMP 760 S. Hill Street Real Property | means the real property located at 760 S. Hill Street and 325 W. 8th Street, Los Angeles, California, APNs 5144-014-046 through 5144-014-139. |
| MMP 1009 N. Citrus | means Meruelo Maddux Properties — 1009 North Citrus Avenue, Covina, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13372. |
| MMP 1009 N. Citrus Real Property | means the real property located at 1009 N. Citrus Avenue, Covina, California, APNs 8421-025-017 and 8421-025-020. |
| MMP 1060 N. Vignes | means Meruelo Maddux Properties — 1060 N. Vignes, LLC a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13374. |
| MMP 1060 N. Vignes Real Property | means the real property located at 1060 N. Vignes, Los Angeles, California, APN 5409-014-001. |
| MMP 1919 Vineburn Street | means Meruelo Maddux Properties — 1919 Vineburn Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13364. |
| MMP 1919 Vineburn Street Real Property | means the real property located at 1919 Vineburn, Los Angeles, California, APNs 5215-014-005 and 5215-014-006. |
| MMP 2131 Humboldt Street | means Meruelo Maddux Properties — 2131 Humboldt Street, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13371. |
| MMP 2951 Lenwood Road | means Meruelo Maddux Properties — 2951 Lenwood Road, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13383. |
| MMP 2951 Lenwood Road Real Property | means the real property located at 2951 Lenwood Road, Barstow, California, APNs 0421-313-540000, 0421-313-550000, 0421-313-560000, 0421-313-570000, and 0421-313-580000. |
| MMP 12385 San Fernando Road | means Meruelo Maddux Properties — 12385 San Fernando Road, LLC, a Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13338. |

| | | |
|---|---|---|
| 1 | MMP 12385 San Fernando Road Real Property | means the real property located at 12361 and 12385 San Fernando Road, Sylmar, California, APNs 2611-007-011, 2611-007-020, and 2611-007-021. |
| 2 | | |
| 3 | MMPI | means Meruelo Maddux Properties, Inc., a Delaware corporation, and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13356. |
| 4 | | |
| 5 | | |
| 6 | MMPI Acquisition | Means MMPI Acquisition, LLC, a Delaware LLC |
| 7 | MMPI Existing Common Stock | means all authorized shares of common stock of MMPI existing as of the Petition Date. |
| 8 | MMPLP | means Meruelo Maddux Properties, L.P., a Delaware limited partnership, and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13387. |
| 9 | | |
| 10 | | |
| 11 | MMP Ventures | means MMP Ventures, LLC, a Delaware limited liability company, and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13392. |
| 12 | | |
| 13 | National Cold Storage | means National Cold Storage, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13376. |
| 14 | | |
| 15 | | |
| 16 | Order | means an order or judgment of the Bankruptcy Court as entered on the Docket. |
| 17 | Ordinary Course Professionals | means any attorneys, accountants, and other professionals or professional service providers such as public relations and communications 'consultants, architects, engineers, title companies, surveyors, real estate closing professionals, real estate brokers, environmental consultants, design consultants, information technology consultants, life/safety consultants, property managers, marketing and business consultants utilized by the Debtors in the ordinary course of the Debtors' operation and development of properties and development projects. |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | Other Priority Claim | means any Claim, other than an Administrative Claim or a Tax Claim, entitled to priority in right of payment under Section 507(a) of the Bankruptcy Code. |
| 25 | | |
| 26 | | |
| 27 | Person | means any individual, corporation, general partnership, limited partnership, limited liability partnership, limited liability company, |
| 28 | | |

| | |
|---|---|
| | association, joint stock company, joint venture, government or political subdivision, official committee appointed by the United States Trustee, unofficial committee of creditors or equity holders, or other entity (as defined in the Bankruptcy Code). |
| Petition Date | shall have the same meaning as Commencement Date. |
| PNL Pomona | means PNL Pomona, L.P., a Delaware limited partnership. |
| PNL Pomona Collateral | means, collectively, [1] the MG 2001-2021 W. Mission Boulevard Encumbered Real Property, [2] approximately $946,816 in insurance proceeds received and to be received in connection with property casualties (subject to reductions for Court approved expenditures), and [3] the cash in the amount of $49,508 previously held in an account maintained by PNL for the benefit of MG 2001-2021 W. Mission Boulevard. |
| Postpetition Tax Claims | means Administrative Claims and other Claims by a governmental unit for taxes against any of the Debtor (and for a reasonable rate of interest related to such taxes) for any tax year or period, all or any portion of which occurs or falls within the period from and including the Petition Date through and including the Effective Date. |
| Priority Claim | means an Allowed Claim entitled to priority under Sections 507(a)(3) through 507(a)(7) of the Bankruptcy Code, and includes Priority Tax Claims. |
| Priority Tax Claim | means any unsecured Claim of a governmental unit of the kind specified in Sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| Pro Rata | means, with respect to any Distribution on account of an Allowed Claim or Allowed Interest, a proportionate share, so that the ratio of the consideration distributed on account of an Allowed Claim or Allowed Interest in a Class to the amount of such Allowed Claim or Allowed Interest is the same as the ratio of the amount of the consideration distributed on account of all Allowed Claims or Allowed Interests in such Class to the amount of all |

| | |
|---|---|
| | Allowed Claims or Allowed Interests in such Class. |
| Property Level Debtors | means any Debtor which held title to real property on the Commencement Date. |
| Quarterly Distribution Date | means the 15th of the first full month after the Effective Date and the 15th of every third month thereafter. |
| RULPA | means the Delaware Revised Uniform Limited Partnership Act. |
| Record Date | means the date designated by the Bankruptcy Court set forth in the Disclosure Statement as the date for determining the holders of Claims and Interests entitled to vote to accept or reject the Charlestown Plan. |
| Record Date Holder | means a holder of MMPI Existing Common Stock as of the Record Date. |
| Reinstated | shall have the meaning set forth in Section 1124(2) of the Bankruptcy Code. |
| Reorganized Debtor | means a Debtor or any combination of Debtors, whose Chapter 11 Plan is confirmed or any amended plan or plans of reorganization. |
| Reorganized MMPI | means MMPI from and after the Effective Date of the Charlestown Plan. |
| Retained Claims and Defenses | means all causes of action and claims held by or capable of assertion by the Debtor or its Estate, including, without limitation, all avoidance actions, all Section 510 actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, and whether asserted or assertable, directly or derivatively, that the Debtors or their Estates could assert immediately prior to the Effective Date, but excludes all such causes of action, claims or defenses released, waived or extinguished by the Debtors pursuant to this Charlestown Plan or a Final Order of the Bankruptcy Court. |
| Santa Fe & Washington Market | means Santa Fe & Washington Market, LLC, a |

| | |
|---|---|
| | Delaware limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13379. |
| Santa Fe & Washington Market Encumbered Real Property | means the real property located at 1910-1922 Santa Fe Avenue, Los Angeles, California, APNs 5168-005-004 and 5168-005-010. |
| Santa Fe & Washington Market Unencumbered Real Property | means the real property located at 303 S. Hewitt Street and 2425 E. 12th Street, Los Angeles, California, APNs 5163-012-007, and 5168-003-014. |
| Santa Fe Commerce Center | means Santa Fe Commerce Center, Inc., a California corporation and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13368. |
| Santa Fe Commerce Center Real Property | means the real property located at 2445, 2460 and 2535 E. 12th Street, Los Angeles, California, APNs 5168-003-013, 5168-005-021 and 5168-004-001. |
| Santa Fe Commerce Center Personal Property | means the funds deposited by Santa Fe Commerce Center with Berkadia presently in the approximate amount of $600,000 for and account of the benefit of Santa Fe Commerce Center. |
| Scheduled | means set forth on the Schedules filed by the Debtors in their respective Chapter 11 Cases. |
| Schedules | means the schedules of assets and liabilities filed by any Debtor pursuant to Section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any amendments and modifications thereto through the Confirmation Date. |
| SEC | means the United States Securities and Exchange Commission. |
| Secured Claim | means any Claim secured by Collateral to the extent of the value of such collateral, as determined in accordance with Section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of such setoff. |
| Securities Act | means the Securities Act of 1933, as amended, or any successor statute, and the rules and regulations promulgated thereunder. |

| | | |
|---|---|---|
| 1 | Service Level Debtors | means MMPI, MMPLP, MMP Ventures, MM Construction, and MM Management. |
| 2 3 | Sci-Arc Real Property | means the real property located at 960 E. 3rd Street, Los Angeles, California, APN 5163-016-011, owned by Merco Group. |
| 4 5 6 | Sky Arc Real Property | means the real property located at 950 E. 3rd Street, Los Angeles, California, APNs 5163-016-012, 5163-016-013, 5163-016-014, owned by Merco Group. |
| 7 | Stanford | means The Stanford Group, L.P. |
| 8 | Stanford Collateral | means the 905 8th Street Real Property. |
| 9 10 11 | Stock Retention Holders | Holders of Interests in MMPI who, under the terms of the Charlestown Plan, elect to retain their Interests. |
| 12 | Subscription Agreement | has the meaning ascribed to such term in Section IV.F of this Charlestown Plan. |
| 13 14 15 | Treasury Bills | means the United States Government Securities Treasury Bills with constant maturities as published in the Federal Reserve Statistical Release H. 15 on the first business day of each January, April, July and October. |
| 16 17 | UCB | means United Commercial Bank, a division of East West Bank. |
| 18 19 20 | UCB Collateral re 2640 Washington | means, collectively, [1] the 2640 Washington Boulevard Real Property and [2] the cash in the East West Bank reserve account bearing account number 80365810 in the approximate amount of $9,410. |
| 21 22 23 | UCB Collateral re Meruelo Wall Street | means, collectively, [1] the Meruelo Wall Street Real Property and [2] $480,000 of the $518,825 in the East West Bank / UCB interest reserve account bearing account number 18296574. Other funds in that account are not UCB collateral. |
| 24 25 26 | Unimpaired | means with reference to a Class of Claims or Interests, that the Class is not Impaired. An Unimpaired Class is not entitled to vote on the Charlestown Plan. |
| 27 28 | Voting Agent | means the Person designated by the Bankruptcy Court to receive and tabulate Ballots and take such other actions as specified in the Balloting |

| | | |
|---|---|---|
| 1 | | Procedures Order. |
| 2 | Voting Deadline | means the date on which Ballots must be received by the Voting Agent under the Ballot Procedures Order. |
| 3 | | |
| 4 | Wall Street Market | means Wall Street Market, LLC, a California limited liability company and a Debtor in Possession in Chapter 11 Case number 1:09-bk-13377. |
| 5 | | |

32

**DISCLAIMERS**

On October __, 2010, the Bankruptcy Court entered the Disclosure Statement Order, approving the Charlestown Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Charlestown Plan.

APPROVAL OF THE CHARLESTOWN DISCLOSURE STATEMENT DOES NOT MEAN THE BANKRUPTCY COURT HAS RULED ON THE MERITS OF THE CHARLESTOWN PLAN.  THE BANKRUPTCY COURT HAS NOT CONFIRMED THE CHARLESTOWN PLAN DESCRIBED IN THE CHARLESTOWN DISCLOSURE STATEMENT, AND THE TERMS OF THE CHARLESTOWN PLAN ARE NOT BINDING ON ANYONE.  IF THE BANKRUPTCY COURT CONFIRMS THE CHARLESTOWN PLAN, HOWEVER, THE CHARLESTOWN PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL HOLDERS OF CLAIMS OR INTERESTS IN THOSE CHAPTER 11 CASES WHERE THE PLAN IS CONFIRMED.

THE STATEMENTS CONTAINED IN THE CHARLESTOWN DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THE CHARLESTOWN DISCLOSURE STATEMENT DOES NOT IMPLY THE INFORMATION HAS NOT CHANGED SINCE. HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ THE CHARLESTOWN DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE CHARLESTOWN PLAN, BEFORE VOTING.

THE CHARLESTOWN DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT, AND IT SUMMARIZES THE TERMS OF THE CHARLESTOWN PLAN.  IF THE CHARLESTOWN PLAN AND DISCLOSURE STATEMENT ARE INCONSISTENT, THE CHARLESTOWN PLAN WILL CONTROL. THE CHARLESTOWN DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE CHARLESTOWN PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY

FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE CHARLESTOWN PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS. CERTAIN OF THE STATEMENTS CONTAINED IN THE CHARLESTOWN DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN THE CHARLESTOWN DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE CHARLESTOWN PLAN.

WHERE THERE ARE SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THE CHARLESTOWN DISCLOSURE STATEMENT, SUCH SUMMARIES DO NOT PURPORT TO BE COMPLETE AND DO NOT SUBSTITUTE FOR THE FULL TEXT OF THE APPLICABLE AGREEMENT.

**THE CHARLESTOWN PROPONENTS DO NOT HAVE ACCESS TO THE DEBTORS' EMPLOYEES, ADVISORS, ATTORNEYS OR INTERNAL DOCUMENTS. THEREFORE, THE CHARLESTOWN PLAN AND THE CHARLESTOWN DISCLOSURE STATEMENT INCLUDE INFORMATION BASED ON THE DEBTORS' STATEMENTS IN PUBLICLY AVAILABLE DOCUMENTS (SUCH AS FILINGS IN THESE BANKRUPTCY CASES).  EXCEPT AS SPECIFICALLY PROVIDED, THE CHARLESTOWN PROPONENTS MAKE NO REPRESENTATIONS REGARDING THE ACCURACY OF THE DEBTORS' STATEMENTS.**

# I.

## <u>INTRODUCTION</u>

The Charlestown Proponents are shareholders of MMPI.  The Charlestown Proponents submit the Charlestown Disclosure Statement to provide Holders of Claims against and Interests in MMPI and/or its 53 related debtor entities with adequate information regarding the Charlestown Plan.  The Charlestown Plan is a coordinated plan of reorganization and not a consolidated plan of reorganization.  In other words, except as specifically noted, each of the Debtors will remain a separate entity during and after the Charlestown Plan confirmation process, and the debts and liabilities of each debtor entity will remain attributable to that debtor alone.  Accordingly, the Debtors' Claims and Interests are classified on a Debtor-by-Debtor basis, votes will be tabulated on a Debtor-by-Debtor basis, and the Charlestown Plan will be confirmed on a Debtor-by-Debtor basis.

### A.        OVERVIEW OF THE CHARLESTOWN PLAN

Under the Charlestown Plan, MMPI will receive a $38 million cash infusion from MMPI Acquisition.  The $38 million cash infusion will take the form of $23 million in equity and $15 million in secured debt.  Along with MMPI's existing cash balance, the $38 million cash infusion will enable MMPI to make payments to creditors and shareholders under the terms of the Charlestown Plan.

*Payments to Unsecured Creditors (Non-Insiders)*

Except for Insiders and Holders of Guaranty Claims, general unsecured creditors will be paid in full with interest as soon as the Charlestown Plan becomes effective.

Non-Insider Holders of Unsecured Claims who do not have contracts that entitle them to receive interest will receive payment in full plus interest from the Petition Date at .5% .  Non-Insider Holders of Unsecured Claims who have contracts that entitled them to receive interest will receive payment in full plus interest from the Petition Date at the lesser of (A) 8 percent or (B) 2 percentage points below their contract rate.

*Payments to Secured Creditors (Non-Insiders)*

Under the Charlestown Plan, Holders of Secured Claims will receive monthly interest

1   payments at 5.25% for four years with full payment on the principal balance four years after the

2   Effective Date.  The first six months of interest will be paid in advance on the Effective Date.  This

3   treatment will not apply to Holders of Secured Claims who have agreed to another treatment in

4   Bankruptcy Court-approve settlements with the Debtors.

5       *Distributions to MMPI Shareholders*

6       On the Effective Date, but after the purchase by MMPI Acquisition of 55% of the shares of

7   MMPI Existing Common Stock in accordance with the terms of this Plan, the MMPI Exsiting

8   Common Stock shall undergo a 5 to 1 reverse stock split.  No fractional shares of Reorganized

9   MMPI Common Stock will be permitted.  Accordingly, a Holder that otherwise would receive a

10  fractional share as a result of this reverse stock split will receive $0.35 per share in exchange for

11  such shares that would be represented by such fractional share.

12      Holders of MMPI Existing Interests shall have the option to either (i) exchange their MMPI

13  Existing Common Stock for a cash payment of $0.35 per share of MMPI Existing Common Stock

14  (such Holders, the "Cash Election Holders"), or (ii) to retain their MMPI Existing Common Stock

15  (such Holders, the "Stock Retention Holders"), subject to operation of the Plan.

16      In the event that the Cash Election Holders, together with the Insider Cash Election Holders

17  own less than 55% of the shares of MMPI Existing Common Stock, then the Stock Retention

18  Holders, notwitststanding their election to retain their MMPI Existing Common Stock, will be

19  deemed to have elected, on a pro rata basis together with the Insider Stock Retention Holders, to

20  exchange a sufficient number of shares of MMPI Existing Common Stock such that the total

21  number of shares exchanged for cash (including the shares held by the Cash Election Holders and

22  the Insider Cash Election Holders) equals 55% of the shares of MMPI Existing Common Stock.

23  Such Stock Retention Holders who are deemed to have elected to exchange a pro rata portion of

24  their shares of MMPI Existing Common Stock shll receive a cash payment of $0.35 per share of

25  such stock.

26      In the event that the Cash Election Holders, together with the Insider Cash Election Holders

27  own more than 55% of the shares of MMPI Existing Common Stock, then the Cash Election

28

1   Holders, notwitststanding their election to receive a cash distribution in exchange for their shares,

2   will be deemed to have elected, on a pro rata basis together with the Insider Cash Election Holders,

3   to retain a sufficient number of shares of MMPI Existing Common Stock such that the total number

4   of shares exchanged for cash equals 55% of the shares of MMPI Existing Common Stock.

5        The distribution of shares or cash to Holders of Insider Equity Interests shall be held in

6   reserve for the earlier of (1) five years after the Effective Date; (2) the resolution of any Insider

7   Litigation against that Holder; or (3) upon such earlier time as the Reorganized MMPI decides, in

8   its sole and absolute discretion is appropriate.[1]

9        *Merger of MMPLP and MMPI*

10       On the Effective Date, MMPLP will be merged into MMPI.  MMPI's equity interests in

11   MMPLP will be cancelled.  Holders of LTIP Units shall be entitled to receive, at MMPI's option,

12   either (A) cash; or (B) shares of Reorganized MMPI Common Stock with a value equal to the value

13   of the LTIP Units on the Effective Date.

14       **B.        HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE**

15       This Charlestown Disclosure Statement is part of a package of materials sent to persons

16   from whom votes are being solicited (the "Solicitation Package").  The Solicitation Package

17   includes the Charlestown Disclosure Statement and Charlestown Plan, disclosure statements and

18   plans from other plan proponents, letters from the Official Committee of Unsecured Creditors and

19   the Official Committee of Equity Holders regarding their recommendations, letters from each of the

20   competing plan proponents regarding their views on the various plans, and ballots.  The ballots are

21   the method by which Holders of Allowed Claims and Interests may vote on the Charlestown Plan

22   and other competing plans.

23       Only Holders of Allowed Claims or Interests who are impaired and who will receive a

24   distribution under the Charlestown Plan are entitled to vote to accept or to reject the Charlestown

25

26   _____

[1]  The Bankruptcy Court may determine that this treatment unfairly discriminates against Insider
Holders and, that Insiders Holders are entitled to an immediate distribution.  The Charlestown
27   Proponents will amend the Charlestown Plan in accordance with the Bankruptcy Court's ruling on
this issue.  Accordingly, Insiders may be entitled to the same treatment as Non-Insiders under the
28   Charlestown Plan generally.

Plan. Holders of unimpaired Claims or Interests are deemed to accept the Charlestown Plan and are not entitled to vote. Holders of Claims or Interests who receive nothing are deemed to have rejected the Charlestown Plan and are not entitled to vote.

The following Classes of Claims and Interests are impaired, and Holders of Allowed Claims and Interests in those Classes will receive distributions under the Charlestown Plan. As a result, Holders of Claims and Interests in those Classes are entitled to vote to accept or reject the Charlestown Plan:

Classes 1OA, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1, 28A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 50A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of secured tax Claims against the Debtors);

Classes 21A-2, 28A-2, 29A-2, 29A-3, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 37A-2, 37A-3, 38A-2, 39A-2, 40A-2, 41A-2, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors against each relevant Debtor);

Classes 1C-3, 2C-3, 3C, 4C-2, 5C-2, 6C, 7C, 8C-2, 9C-2, IOC-2, 11C-3, 12C-3, 13C-2, 14C-3, 15C-2, 16C-2, 17C, 18C-2, 19C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3, 27C-3, 28C-3, 29C-2, 30C-3, 31C-2, 32C, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-2, 39C-3, 40C-3, 41C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3, 53C, and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor);[2]

Class 1E (the Class of Non-Insider Interests of MMPI); and

Class 1F (the Class of Insider Interests of MMPI).

The following Classes of the Charlestown Plan are unimpaired. Holders of Claims and Interests in those Classes are not entitled to vote because they are presumed to have accepted the Charlestown Plan:

---

[2] Holders of Claims entitled to receive the Common Unsecured Claim Treatment may be impaired or unimpaired depending on their entitlement to a contractual rate of interest. The Charlestown Proponents do not know which members are impaired and which are unimpaired and, therefore, are soliciting votes from all Holders in these classes.

Classes 1B, 5B, 32B, 33B, 36B and 52B, (consisting of the Priority Unsecured

Benefits Claims of present and former employees of each relevant Debtor);

Classes 11C-1, 12C-1, 14C-1, 15C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1,

32C-1, 33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 41C-1, 43C-3, 44C-3,

46C-1, 48C-3, 49C-3, 52C-1 and 54C-1 (consisting of the unsecured Claims for security deposits of

the Debtors' tenants);

Classes 2D through 7D, 9D-35D, and 37D-53D (consisting of the Intercompany Claims);

Classes 3E through 54E (consisting of the Interests of MMPLP, MMP Ventures, LLC

("MMP Ventures"), Meruelo Maddux Construction, Inc. ("MM Construction") and Meruelo

Maddux Management, LLC ("MM Management")).

The following Class of Interests is being extinguished and, therefore, Holders of Interests in

the Class are deemed to reject the Charlestown Plan and are not entitled to vote:

- Class 2E (Interests in MMPLP).

Under the Bankruptcy Code, a Chapter 11 plan of reorganization may be confirmed if each

Class of Impaired Claims and Interests votes to accept that plan.  Bankruptcy Code Section 1126(c)

defines acceptance by a Class of Claims as acceptance by holders of at least two-thirds in dollar

amount and more than one-half in number of Allowed Claims in that Class who vote.  Under

Bankruptcy Code Section 1126(d), a Class of Interests accepts a plan if, of those Holders voting,

Holders of two-thirds of the Interests (in amount) vote to accept that plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing,

that such acceptance or rejection was not solicited or procured in good faith or in accordance with

the provisions of the Bankruptcy Code.  For a more detailed description of the requirements for

confirmation of the Charlestown Plan, see Article IX of the Charlestown Disclosure Statement.

With respect to each Debtor's Chapter 11 Case, a Class of Claims entitled to vote on the

Charlestown Plan rejects the Charlestown Plan, the Charlestown Proponents reserve the right to

amend the Charlestown Plan or request confirmation of the Charlestown Plan pursuant to Section

1129(b) of the Bankruptcy Code or both.  Section 1129(b) permits the confirmation of a plan of

1  reorganization notwithstanding the non-acceptance of the Charlestown Plan by one or more

2  impaired Classes of Claims or Interests.  Under that Section, a Plan may be confirmed by a

3  Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to

4  each non-accepting Class.  A more detailed description of the requirements for confirmation of a

5  nonconsensual Plan is found later in the Charlestown Disclosure Statement.

6      For each Debtor, in the event at least one Impaired Class of Claims votes to accept the

7  Charlestown Plan (and at least one Impaired Class either votes to reject the Charlestown Plan or is

8  deemed to have rejected the Charlestown Plan), such Debtor shall request the Bankruptcy Court to

9  confirm the Charlestown Plan under the cramdown provisions of Section 1129(b) of the Bankruptcy

10  Code.

11      **C.    NOTICES**

12      All notices, requests and demands hereunder to be effective must be in writing and, unless

13  otherwise expressly provided herein, shall be deemed to have been duly given or made when

14  actually delivered by U.S. Mail addressed as follows:

15

16

17                    COUNSEL TO THE CHARLESTOWN
                    PROPONENTS
                    **Christopher E. Prince**
18                  **Lesnick Prince LLP**
                    185 Pier Avenue, Suite 103
19                  Santa Monica, CA  90405

20

21                    **II.**

22      **DEBTORS' BUSINESS AND OPERATIONS PRIOR TO THE FILING**

23      **A.    CORPORATE HISTORY OF THE DEBTORS**

24      MMPI is the parent company of the fifty-three related Debtor entities that, along with

25  MMPI, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 26

26  and 27, 2009.  The Debtors are listed in Exhibit C to this Charlestown Disclosure Statement.

27      MMPI was incorporated in 2006 under the laws of the State of Delaware and is registered

28

with the California Secretary of State to do business in the State of California.  Each of the other Debtors was formed under either the laws of the State of Delaware or the laws of the State of California.  The Delaware Debtors are registered with the California Secretary of State to do business in the State of California.

### B.    NATURE OF THE DEBTORS' BUSINESS

MMPI, together with its subsidiary operating partnership, MMPLP, and its affiliates and related entities, is a self-managed, full-service real estate company that develops, redevelops, and owns industrial, commercial, and multi-unit residential real properties primarily located in downtown Los Angeles and other areas in southern California.  The Company focuses on unique properties that it believes have an alternate, more profitable use achievable through major renovation, redevelopment, or development. The Company's projects are predominantly located in a densely populated urban, multi-ethnic environment and involve numerous local entitlement, property assemblage, and physical challenges.

The Company is committed to responsible property investing that has economic, environmental, and social benefits.  Its development activities include urban infill projects that are expected to meet the demands of urban communities and that utilize or upgrade existing infrastructure instead of creating new infrastructure.  The Company is known as a "smart growth" developer, and many of the Company's projects are designed to locate businesses, customers, and employees close to each other and close to existing public transit systems.  The Company is also known as an "incubator" of new businesses, and actively seeks development projects in empowerment zones.  The Company is very familiar with the social, cultural, business, and political issues of land development in Southern California, and especially in the Los Angeles area.

The Company's business model anticipates the need for time to develop properties and requires the infusion of funds to pay the costs of such development, including the carrying costs. Many of the Company's properties have gone through the land use process to the point where entitlements have been obtained thus increasing the value substantially, but development has been deferred pending an improvement in the credit markets.  In summary, the Company's business

1  model contemplates and is based upon the purchase, development and resale of properties, pursuant

2  to which the Company turns over such properties in a relatively short period of time, such as a few

3  years instead of decades, and uses the profit from such properties to fund operations of MMPI and

4  all of its other affiliates and the purchase and development of other properties.

5         Currently, the Company owns in excess of forty discrete properties consisting in some cases

6  of a number of parcels, some of which generate income and others of which are in various stages of

7  development.  With approximately 80 acres of land, the Company is believed to be the largest non-

8  government land owner in downtown Los Angeles.

9         **C.      Consolidated Operations**

10        The Debtors consist of a parent company and various levels of subsidiary Debtors, including

11  the Property Level Debtors.  The Company has been, before and after its formation in 2006, and

12  presently continues to be, operated as a consolidated enterprise.  With limited exceptions, revenues

13  for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and

14  the subsidiary Debtors.  Accordingly, there are some Debtors which generate revenues in excess of

15  operating expenses and debt service, but there are some that do not.

16        The Company may purchase and keep properties that are cash flow negative because the

17  Company believes that those properties will, in time, generate a positive return and the enterprise

18  will be significantly more valuable as a result.  The recent unprecedented freezing of credit markets

19  and economic downturn caused the Company to suspend substantially all of its various development

20  projects.

21        Before and after the IPO, the Debtors utilized a concentration account for its cash

22  management.  The cash management system provides for funds to flow to and from a cash

23  concentration account maintained by MMPLP. The concentration account is linked to the operating

24  bank accounts of each of Debtors, which bank accounts are maintained as zero balance accounts.

25  When needed to fund payment on checks issued by a particular affiliate, funds are transferred from

26  the concentration account to the operating account of that affiliate.  Excess funds, if any, are

27  invested in interest bearing accounts pending their utilization.  The Company rarely disrupts this

28

1    flow of funds.

2       As a public company, MMPI has been required to file various reports with the SEC,

3 including among others, quarterly reports as well as annual reports with audited financial

4 statements.  These reports have been prepared and filed on a consolidated basis.  Although the

5 Debtors' SEC filings do provide information relating to individual subsidiaries, the filings generally

6 discuss the business as a consolidated enterprise.  This consolidated reporting is a manifestation of

7 the synergy and economic efficiencies gained through the Company's corporate structure.  The

8 indirect overhead expenses for administrative services provided by certain Debtors may be allocated

9 to other Debtors.  With few exceptions, revenues received from the operation of the Debtors'

10 properties are swept daily into a general operating account, and the Debtors' obligations are paid

11 from such account.

12      **D.**      **THE DEBTORS' CURRENT BUSINESS STRATEGIES**

13       The Company's business is focused on real estate development and redevelopment.  The

14 substantial majority of the Company's properties are not stabilized, i.e., the property is either not a

15 rental property or if a rental property, the property has not reached full occupancy or has not yet

16 been redeveloped to its full income producing level.  The Company's strategy has three primary

17 components: investment, value creation, and operations.  Due to the current economic climate,

18 including the lack of an active credit market, the Company has placed on hold substantially all of its

19 development projects.

20      **E.**      **PROPOSED BUSINESS STRATEGY FOR THE REORGANIZED DEBTORS**

21       Broadly speaking, the Charlestown Proponents feel that MMPI's mix of assets and core of

22 employees is sound.  MMPI's greatest weaknesses are lack of sound strategic direction from the

23 highest levels of executive management, high vacancy rates (relative to its peers) and, most

24 critically, inadequate capitalization.  Without a change in upper management, improved occupancy

25 at MMPI's income-producing properties, and a significant infusion of cash, the Charlestown

26 Proponents believe MMPI cannot survive as a reorganized company.

27       Accordingly, the Charlestown Plan contemplates removal of Richard Meruelo and John

28

1  Maddux from their positions with the Company, renewed focus on leasing income-generating

2  properties, and an infusion of $38 million cash on the Effective Date.  These steps, taken together,

3  will permit the Company to fund operating losses in the near term while moving the Company to

4  profitability in the medium term.  Moreover, it will give the Company breathing room to sell assets

5  in a measured fashion without the need for "fire sale" dispositions of property.

6      Under the Charlestown Plan, with a strengthened balance sheet and stabilizing cash flow,

7  MMPI will re-start pre-development activities.  The Charlestown Proponents' financial projections

8  do not, however, include costs or revenue associated with construction of new development

9  projects.

10     The Charlestown Proponents anticipate that the Reorganized Debtors will use existing

11  vendors, contractors and other service providers to the extent needed to meet the operational needs

12  of the Company.  Similarly, the Charlestown Proponents anticipate that the Reorganized Debtors

13  will retain many of the Debtors' current employees to maintain continuity of management and

14  operations and to preserve institutional knowledge.

15  **F.    PREPETITION CAPITAL STRUCTURE OF THE COMPANY**

16      **1.    MMPI**

17  MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue

18  Code.  Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately

19  owned by MMPI's directors and executive officers with Richard Meruelo owning the largest amount

20  of shares (approximately 39,911,378).  The other 47.8% of MMPI's stock is publicly owned and,

21  prior to April 2009, was traded on the NASDAQ stock exchange.  The stock is presently trading on

22  the Over the Counter Bulletin Board.

23

24      a.    *MMPI Initial Public Offering*

25  MMPI was formed on or about July 5, 2006, and MMPLP was formed on or about

26  September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's common

27  stock.  The formation transaction and the IPO were designed to allow MMPI to acquire and to

28

44

continue the operations of its predecessor entities, pay down existing mortgage debt, pay off the mezzanine loan facility from Ca1PERS, provide capital for future acquisitions, fund future development costs, and establish a capital reserve for general corporate purposes.  Between January 30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000 shares of common stock at $10.00 per share.  MMPI raised approximately $425.7 million, after underwriting discounts but before expenses related to the IPO.  A substantial portion of the proceeds was used to pay off the debt owed to Ca1PERS.  On December 31, 2008, there were approximately 88.1 million shares of common stock outstanding.

### b.    *MMPI Common Stock*

The authorized capital stock of MMPI consists of up to 200,000,000 shares of common stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred stock, $.01 par value per share.  As of April 23, 2010, there were 87,845,789 shares of Common Stock issued and outstanding held by approximately sixty holders of record.  Holders of Common Stock have no right to convert their Common Stock into any other securities.  The Common Stock has no preemptive or other subscription rights.  There are no redemption or sinking fund provisions applicable to the Common Stock.  All outstanding shares of Common Stock are duly authorized, validly issued, fully paid, and nonassessable.

### c.    *MMPI's Equity Incentive Plan*

Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive Plan ("LTIP") Units, and other awards as part of its employee compensation packages.  The LTIP units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be converted into MMPLP's common units and consequently become redeemable by the Holder on a one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of such common stock.  MMPI initially reserved 2,277,500 shares of common stock for issuance of awards

1   under the Equity Incentive Plan.  As of June 30, 2009, there remain 1,083,334 shares available from

2   the initial reservation.

### 2.    Corporate Structure of the Other Debtors

4       MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP.  The

5   remaining 0.4% limited partnership units are owned by certain members of MMPI's management

6   team who obtained their interests through the LTIP available to certain personnel as part of their

7   compensation packages.

8       MMPLP owns 100% of the common stock of MM Construction, 99% of the membership

9   units in MM Management and 99% of the membership units in Funes Architecture, LLC ("Funes").

10  The remaining membership units in MM Management and Funes are owned by MM Construction.

11      MMPLP also owns 100% of the membership units in MMP Ventures.  MMP Ventures, in

12  turn, owns 100% of the stock or membership units in a number of subsidiary corporations and

13  limited liability companies referred to as Property Level Debtors because they are the entities which

14  hold title to the various real properties and real estate projects developed and operated by MMPI

15  through MMPLP.

### G.    MATERIAL PROCEEDINGS

17      There are several different circumstances that may create liability for the Company in the

18  future, to the extent they are not discharged under the Charlestown Plan.

### 1.    Potential Government Tax Audits

20      The Company is subject to audit and review by federal and state taxing authorities.  An

21  adverse audit report could result in the Company being assessed additional tax liability.  The

22  Company is not aware of any such pending audits and has filed all of its tax returns.

### 2.    Indemnification Claims

24      As is necessary and customary in the normal course of business, certain of the Company's

25  contracts contain indemnification provisions that could require the Company to make payments for

26  Claims made against customers or employees of the Company, including management.

27  Additionally, the Articles and Bylaws of MMPI provide that MMPI shall indemnify its officers and

28

directors to the fullest extent permitted by law.  Pursuant to its contractual and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of its Board of Directors with respect to costs and expenses that may be incurred by them in conjunction with the performance of their employment or role as a member of the Board of Directors.  These indemnification provisions may result in material liability to MMPI or other of the Debtors.  However, the Company maintains various insurance coverages to reduce the exposure of the Company.

### III.

### EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

Prior to the Petition Date, the Company experienced significant, recurring cash shortfalls from (a) operating activities, (b) recurring investment activities such as carrying costs for interest payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing rental properties.  Shortfalls in operating capital have been funded by the refinance or sale of real property assets, and the use of the proceeds for operating and reinvestment in the purchase of replacement real property assets.

The economic climate and associated disruption in the debt and equity capital markets shortly before the Petition Date were extremely challenging for the Company.  On or about October 1, 2008, the Company suspended development of twelve construction projects.

A number of the Company's loans secured by real property matured prior to the Petition Date or were to mature soon thereafter.  Among other things, the Company was unable to extend or refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or March 1, 2009, including two secured by the property housing the Company's corporate headquarters, and one which is secured by the Union Lofts project owned by MMP 760 S. Hill Street.  In total, the Company had twelve loans that were set to mature during 2009 with an aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization on other long-terms loans.

In addition, prior to the Petition Date, two lenders filed lawsuits seeking, among other

1   things, the appointment of a receiver.  On or about March 4, 2009, California Bank & Trust filed a

2   complaint against 788 South Alameda and MMPI for, among other things, judicial foreclosure and

3   the appointment of a receiver.  In addition, on or about March 17, 2009, Chinatrust Bank filed a

4   complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure

5   and the appointment of a receiver.

6         Because the Company's Management did not obtain additional capital to fund operating

7   losses and could not negotiate concessions from its secured lenders sufficient to offset the lack of

8   adequate capital, the fifty-four jointly administered MMPI Debtors sought relief under Chapter 11

9   of Bankruptcy Code.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# IV.

## CHAPTER 11 EVENTS

A.    ADMINISTRATIVE ORDERS AND MATTERS

    1.    Introduction

On March 26 and 27, 2009, the Debtors filed their voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Shortly after the commencement of the Chapter 11 Cases, the Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a variety of matters. The Debtors obtained Orders of the Bankruptcy Court, inter alia, (a) authorizing, on an interim basis, the Debtors' use of cash collateral (see below for more detail); (b) authorizing the Debtors to employ and compensate legal and financial advisors; (c) authorizing the Debtors to honor certain obligations to employees and to continue employee benefit plans in effect; (d) permitting the Debtors, on an interim basis, to continue to utilize their cash management systems; (e) establishing procedures for the Debtors to ensure continued provision of utility services; (f) limiting the scope of notice required; (g) extending the time to file schedules and statement of financial affairs; and (h) directing the joint administration of the Cases of the Debtors. Subsequently, the Bankruptcy Court established September 24, 2009 as the last day for creditors and parties in interests to file proofs of Claim and proofs of interest against the Debtors.  The Debtors filed the required monthly operating reports on a timely basis. The Debtors were authorized and continue to operate their business and manage their properties as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

    2.    The Cash Collateral Motions and Corresponding Orders
       a.    *MMPI Debtors' Cash Collateral Motions and Orders*

By their first Motion for Entry of Interim and Final Orders Authorizing Debtors to Use Cash Collateral (the "Cash Collateral Motion") the Debtors sought permission to use the cash collateral of various lenders. Oppositions were filed by most of the Debtors' lenders. The Bankruptcy Court entered a series of interim orders authorizing such use and continued to hear testimony and consider evidence concerning the Debtors' proposed use of cash collateral on a final basis. These hearings

1    concluded in October 2009. The Bankruptcy Court ruled in the Debtors' favor and entered a final

2    order authorizing the use of the cash collateral of the following lenders through March 31, 2010:

3    BofA, CBT, Berkadia, Cathay, Chinatrust, Legendary, Stanford, UCB (now succeeded by East

4    West), and Chamlian. In making that ruling, the Bankruptcy Court determined that the following

5    lenders were entitled to additional adequate protection and are therefore entitled to an adequate

6    protection lien in one or more of the Debtors' unencumbered real properties: Berkadia, CBT,

7    Chinatrust, Legendary with respect to 425 W. 11th Street; 3rd & Omar Street, and 420 Boyd Street,

8    and East West with respect to 2640 Washington.

9            As a result of the Cash Collateral determinations made by the Bankruptcy Court, the Debtors

10   filed a motion seeking to designate certain properties that would serve as adequate protection for the

11   Debtors' use of cash collateral. The Debtors sought authority to limit the continuing adequate

12   protection lien to certain identified properties in place of a blanket lien on all of the Debtors'

13   unencumbered properties. The matter has been continued pending the completion of an appraisal of

14   one of the properties the Debtors propose to include as part of the pool of assets to serve as

15   continuing adequate protection.

16           The Debtors also filed a motion seeking authority to use a portion of certain insurance

17   proceeds resulting from fire damage to one of the Debtors properties which currently secures certain

18   obligations of the Debtors to PNL Pomona. The Court authorized the Debtors to use a portion of the

19   insurance proceeds to demolish the remaining structure on the property in order to be able to market

20   and sell the property as vacant land.

21           On March 8, 2010, the Debtors filed their Motion for Order Extending Authority for the Use

22   of Cash Collateral and to Maintain Cash Management System Through June 30, 2010. A hearing on

23   the motion was held on March 29, 2010. On March 31, 2010, the Court entered its Order Granting

24   Debtors' Motion for Order Extending Authority for the Use of Cash Collateral and to Maintain Cash

25   Management System Through June 30, 2010, on the terms provided in the Order.

26           **3.      The Debtors' Single Asset Real Estate ("SARE") Motion**

27           The Debtors filed a motion seeking an order determining that none of the fifty-four Debtors

28

are subject to the single asset real estate provisions of Sections 101(51B) and 362(d)(3) of the

Bankruptcy Code. Two lenders (BofA and Cathay) filed motions seeking a determination from the

Bankruptcy Court that MG Southpark, MMP 760 S. Hill Street and Alameda Produce Market are

subject to the SARE provisions of the Bankruptcy Code. The Creditors Committee supported the

Debtors' position. Approximately, fourteen oppositions and joinders in opposition were filed by

various lenders. In June 2009 the Bankruptcy Court ruled in favor of the Debtors, and held that the

Debtors are not subject to the SARE provisions of the Bankruptcy Code. BofA has appealed from

the Bankruptcy Court's SARE determination. On or about June 29, 2010, the United States District

Court issued its decision on appeal and ruled, among other things, that MG Southpark is not subject

to the SARE provisions of the Bankruptcy Code, but that MMP 760 S. Hill Street is subject to such

provisions. On July 14, 2010, MMP 760 S. Hill Street appealed the District Court's decision as to

MMP 760 S. Hill Street to the United States Court of Appeals for the Ninth Circuit. MMP 760 S.

Hill Street does not anticipate that the appeal will be concluded prior to the Effective Date. In the

event that the Ninth Circuit were to issue a decision and such decision was not appealed, pursuant to

orders of the Bankruptcy Court MMP 760 S. Hill Street would have at least 60 days from the

issuance of such final decision, and perhaps longer, to comply with section 362(d)(3) of the Code

by commencing periodic payments to Union Lofts in an amount equal to interest at the then

applicable non-default contract rate of interest on the value of BofA's interest in the real estate, or

filing 'a plan of reorganization that has a reasonable possibility of being confirmed within a

reasonable time.' In any event, it is impossible to know when a final ruling will be issued by the

Ninth Circuit.

### 4.    Motions for Relief from Stay

The following motions for relief from stay have been filed by lenders to pursue their state

law remedies against various real properties owned by the Debtors:

PNL moved for relief from stay with respect to the real property owned by MG 2001 —

2021 W. Mission located in Pomona. The Bankruptcy Court ruled in favor of the Debtors and

denied PNL's Motion. PNL has recently filed a second motion for relief from stay. The Bankruptcy

1    Court granted the motion in part and denied the motion in part, generally ruling that PNL will be

2    entitled to record a notice of default and proceed with foreclosure proceedings unless the Debtors

3    commence making monthly adequate protection payments;

4        BofA moved for relief from stay with respect to real property owned by MMP 760 S. Hill

5    Street and commonly known as 325 West 8th Street and 760 South Hill Street, Los Angeles (the

6    Union Lofts). The Bankruptcy Court denied the motion subject to the Debtor's provision of certain

7    adequate protection to BofA;

8        BofA moved for relief from the automatic stay with respect to certain real properties owned

9    by MG Southpark located in downtown Los Angeles. The Bankruptcy Court ruled in favor of the

10    Debtors and denied BofA's motion;

11        UCB moved for relief from the automatic stay with respect to real property owned by 2640

12    Washington Boulevard. Pursuant to an agreement between the Debtors and UCB, the motion was

13    granted for the sole and limited purpose of permitting UCB to record a notice c default with respect

14    to the real property. The Debtor 2640 Washington agreed to pay, out c cash collateral, the first and

15    second installments of real property taxes for the 2009 — 2010 fiscal year. UCB's motion was

16    withdrawn in all other respects;

17        Legendary moved for relief from the automatic stay with respect to real property owned by

18    MM 3rd & Omar Street located in downtown Los Angeles. In the context of the Bankruptcy Court's

19    rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in post-

20    petition cash collateral, payment of normal and ordinary expenses to maintain the property, and the

21    payment of real property taxes for the 2009 — 2010 fiscal year. In addition, the Bankruptcy Court

22    required the Debtors to provide an adequate protection lien in favor of Legendary on one or more of

23    the Debtors' unencumbered properties. In light of the rulings in connection with the Cash Collateral

24    Motion, the Bankruptcy Court denied Legendary's motion, subject to the provision of such adequate

25    protection;

26

27

28

1    Legendary moved for relief from the automatic stay with respect to real property owned by

2    both MG 1500 Griffith Avenue and MG 4th Street Center and located in downtown Los Angeles.

3    The Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion;

4    Legendary moved for relief from the automatic stay with respect to real property owned by

5    Merco Group, commonly known as Sci-Arc, and located in downtown Los Angeles. The

6    Bankruptcy Court denied Legendary's motion;

7    Legendary moved for relief from the automatic stay with respect to real property owned by

8    MM 420 Boyd Street and located in downtown Los Angeles. In the context of the Bankruptcy

9    Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in

10    postpetition cash collateral, payment of normal and ordinary expenses to maintain the property, and

11    the payment of real property taxes for the 2009 — 2010 fiscal year. In addition, the Bankruptcy

12    Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or

13    more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash

14    Collateral Motion, the Bankruptcy Court denied Legendary's motion subject to the provision of such

15    adequate protection;

16    Legendary moved for relief from the automatic stay with respect to real property owned by

17    Merco Group (Sky-Arc) and MG Little J and located in downtown Los Angeles. The Bankruptcy

18    Court denied Legendary's motion;

19    Legendary moved for relief from the automatic stay with respect to real properties owned by

20    MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles. The

21    Bankruptcy Court denied Legendary's motion;

22    Legendary moved for relief from the automatic stay with respect to real property owned by

23    MG 425 W. 11th Street and located in downtown Los Angeles. In the context of the Bankruptcy

24    Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a replacement lien in

25    postpetition cash collateral, payment of normal and ordinary expenses to maintain the property, and

26    the payment of real property taxes for the 2009 — 2010 fiscal year. In addition, the Bankruptcy

27    Court required the Debtors to provide an adequate protection lien in favor of Legendary on one or

28

1    more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash

2    Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Legendary's

3    motion for relief from the automatic stay subject to the provision of such adequate protection;

4          Vahan and Anoush Chamlian moved for relief from the automatic stay with respect to real

5    property owned by MMP 2131 Humboldt Street near downtown Los Angeles. The Bankruptcy

6    Court ruled in favor of the Debtors and denied the Chamlians' motion;

7          Chinatrust moved for relief from the automatic stay with respect to real property owned by

8    MG 3185 E. Washington Boulevard, among other things. In the context of the Bankruptcy Court's

9    rulings on the Cash Collateral Motion, the Debtors offered Chinatrust a replacement lien in

10   postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and

11   the payment of real property taxes for the 2009 — 2010 fiscal year. In addition the Bankruptcy

12   Court required the Debtors to provide an adequate protection lien in favor of Chinatrust on one or

13   more of the Debtors' unencumbered properties. In light of the rulings in connection with the Cash

14   Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Chinatrust's

15   motion for relief from the automatic stay subject to the provision of such adequate protection;

16         The Stanford Group moved for relief from the automatic stay with respect to the real

17   property owned by 908 8th Street located in downtown Los Angeles. The hearing on that motion

18   has been continued from time to time while the parties engage in settlement negotiations. The

19   parties have reached a settlement on the Claim of Stanford Group, and a motion for approval of the

20   settlement has been filed with the Court. The settlement resolves the motion for relief from stay.

21         Legendary filed a second motion for relief from the automatic stay with respect to the real

22   property owned by MM 420 Boyd Street. The Court denied Legendary's motion.

23         Legendary filed a second motion for relief from the automatic stay with respect to the real

24   property owned by MM 3rd and Omar. The Court denied Legendary's motion.

25         Vahan and Anoush Chamlian filed a second motion for relief from the automatic stay with

26   respect to real property owned by MMP 2131 Humboldt Street. The motion is set for hearing in

27   June, 2010.

28

PNL Pomona filed a second motion for relief from the automatic stay with respect to the real property owned by MG 2001-2021 West Mission. The motion is set for hearing in June, 2010.

In addition to the motions filed by the Debtors' lenders, a group consisting of three individuals moved for relief from the automatic stay to seek authority to prosecute a civil action filed by them in Los Angeles Superior Court and to clarify that they have authority to pursue alleged labor Claims against certain current and former employees and board members of MMPI, Alameda Produce Market and 788 South Alameda. A hearing on that motion was held on December 17, 2009. The Court entered an order granting the motion as to Debtors Alameda Produce and 788 S. Alameda but ordered that the movants could not pursue such litigation until June 30, 2010. The motion was denied as to MMPI.

Also, in addition to the foregoing motions, in April 2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of eminent domain, certain property of the Debtors. In September 2008 the trial court dismissed the action and the MTA appealed. Thereafter, the Debtors filed their chapter 11 petitions and the automatic stay prevented further prosecution of the appeal. The Debtors and the MTA entered into a stipulation to modify the automatic stay to permit the prosecution and defense of the appeal. The order approving the stipulation was entered in August 2009. The matter is still pending.

Also, in a similar action, in February 2010, the City of Pomona filed a motion for relief from the automatic stay in order to allow an eminent domain action in a non-bankruptcy forum to proceed. The Debtors did not oppose the relief sought and the motion was granted.

The Debtors filed a motion to determine the amounts owed to the County of Los Angeles on account of real property taxes. The dispute involved the proper amount of taxes owed to the County and the appropriate rates of interest as well as whether certain other claimed amounts are properly included in the claim. The County and Debtors resolved the dispute and entered into an agreement that was approved by the Bankruptcy Court excepting out the Bank of America lender properties. The County filed an Adversary Proceeding with regard to the Bank of America objections to the settlement (among other claims) that Bank of America removed to the District Court. The District

1   Court in September 2010 ruled in favor of the County and Debtors and against Bank of America.

2   The District Court further remanded the Adversary Action to the Bankruptcy Court for further

3   proceedings.  Bank of America has appealed the Ruling of the District Court to the 9th Circuit

4   Court of Appeals.

5              **5.        The Debtors' Compromises With Various Lenders**

6          The Debtors have reached settlements with PCB, Imperial, Murakami, Cathay Bank, the

7   Stanford Group and FNBN. The Bankruptcy Court approved the Debtors' compromise with PCB

8   and the essential terms of that settlement are reflected in the Charlestown Plan, specifically the

9   Charlestown Plan's treatment of PCB's Class 51A-4 Claim in Section III.C.2 of the Charlestown

10  Plan.

11         The Bankruptcy Court approved the settlement with Murakami. The essential terms of that

12  settlement are reflected in the Charlestown Plan, specifically the Charlestown Plan's treatment of

13  Murakami's Class 37A-4 Claim in Section III.B.2 of the Charlestown Plan.

14         The Debtors motion to approve their settlement with Imperial was heard on February 24,

15  2010 and was granted. The essential terms of that settlement are reflected in the Charlestown Plan,

16  specifically, the Charlestown Plan's treatment of Imperial's Claims in Classes 35A-2, 38A-2 and

17  51A-2 in Section III.C. of the Charlestown Plan.

18         The Debtors have reached an agreement in principal with Cathay Bank for the settlement of

19  Cathay Bank's claims. The Debtors filed a motion for approval with the Bankruptcy Court, and the

20  settlement was approved. The essential terms of that settlement are reflected in the Charlestown

21  Plan, specifically the Charlestown Plan's treatment of Cathay Bank's Class 36A-2 and 36A-3 in

22  Section III.C.2 of the Charlestown Plan.

23         The Debtors have reached an agreement with The Stanford Group, L.P. for the settlement of

24  The Stanford Group, L.P.'s claims. The Debtors have filed a motion for approval of the settlement

25  with the Bankruptcy Court, and the settlement was approved. The essential terms of that settlement

26  are reflected in the Charlestown Plan, specifically the Charlestown Plan's treatment of the Stanford

27  Group, L.P.'s Class 34A-2 in Section III.C.2. of the Charlestown Plan.

28

1      The Bankruptcy Court approved the Debtors' settlement with FNBN.  The Charlestown Plan

2   proposes to treat FNBN in accordance with the terms of its settlement, specifically with respect to

3   the treatment of FNBN's secured claim in Class 42A-1 and with respect to FNBN's unsecured

4   claim in Class 1C-3.

5            **6.**     **Unexpired Leases and Executory Contracts**

6      With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired nonresidential

7   lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is the lessee and

8   Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December 1, 2000, the

9   successor-in-interest to Evelyn Hammond, is the lessor.

10           **7.**     **Summary of Claims Process, Bar Date and Claims Filed**
               a.     ***Schedules and Statements of Financial Affairs***

11

12      On or before June 12, 2009 the fifty-four jointly administered Debtors filed with the

13   Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the

14   "Schedules and Statements") as of their March 26, 2009 or March 27, 2009 Petition Date. The

15   Debtors will shortly file amendments to the schedules.

16      For financial reporting purposes, MMPI prepares consolidated financial statements that are

17   filed with the SEC and that are audited annually. Unlike these consolidated financial statements, the

18   Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the Debtors'

19   non-audited books and tax records. This means that audited financial statements and supporting

20   schedules have not been prepared for each Debtor.

21

22              b.     ***Claims Bar Date***

23      On July 22, 2009, the Bankruptcy Court entered an order in the case (the "MMPI Bar Date

24   Order") establishing the general deadline for filing proofs of Claim against the 54 jointly

25   administered Debtors (the "Bar Date"). The deadline established by the Bankruptcy Court was

26   September 24, 2009.

27      The Bar Date established the deadline for Claims, including Claims of governmental units,

28

but excluding certain other Claims, including Claims based on the rejection of executory contracts and unexpired leases as to which the bar date is the later of: (1) the applicable Bar Date; or (2) the first business day that is at least thirty (30) calendar days after (a) the mailing of notice of the entry of the order first approving the rejection of such contract or lease, (b) the mailing of notice of the entry of an order or judgment avoiding a transfer, or (c) the date any relevant tax Claim first arises. The Debtors provided notice of the Bar Date by mailing a notice of such Bar Date.

### c.    *Proofs of Claim and Other Claims*

According to the Debtors' records, a total of 415 Claims were filed against the Debtors asserting Claims in the total face amount of approximately $927,761,559.23. The Claims scheduled by the Debtors and Claims filed by claimants in each Class is summarized in Exhibits "H.2" to "H.8" attached hereto. The amounts listed on those exhibits represent the current state of the Debtors' computation of the Claims filed and scheduled, and do not reflect amounts which have been paid to date or which the Debtors have otherwise resolved through deposit or stipulation.

Numerous Claims were asserted by various alleged creditors in unliquidated amounts, i.e., Claims that did not contain a specific dollar amount. The Debtors believe that certain Claims that have been asserted are without merit and intend to object to all such Claims. Other significant categories of disputed Claims include certain taxing authorities that are requesting payments far in excess of those the Debtors believe to be owed to such authorities.

The Debtors filed a motion to determining the amounts owed to the County of Los Angeles on account of real property taxes. The dispute involves the proper amount of taxes owed to the County and the appropriate rates of interest as well as whether certain other claimed amounts are properly included in the claim. The parties reached a settlement of their disputes and the Debtors' Motion for approval of the settlement is pending.

### d.    *The Debtors' Stipulation with the OCC Regarding Unsecured Claims*

The Debtors entered into a stipulation with the OCC by which they agreed that to the extent

any party files a proof of Claim in any of the Debtors' Chapter 11 Cases prior to the Bar Date, such proof of Claim shall be deemed to have been timely filed in the proper Debtor's Chapter 11 Case and against the proper Debtor regardless of the name of the particular Debtor or case number identified in the proof of Claim. The Stipulation was intended to address the possible confusion among creditors holding claims against one or more of the Debtors where the claimant was not sure of the specific Debtor against whom the claim was held because of the Debtors' consolidated business operations. The Stipulation provided, among other things, that claims that were timely filed would be deemed to have been filed against the proper Debtor regardless of the whether Debtor and/or case number were properly identified in the proof of claim. The Bankruptcy Court approved that stipulation. Berkadia has appealed from the order approving the stipulation and that appeal remains pending before the District Court for the Central District of California.

e.    ***Motion to Deem Claims Filed Against the Wrong Debtor to be Filed Against the Proper Debtor***

Pursuant to the terms of the Debtors' Stipulation with the OCC described above, the Debtors have reviewed certain of the proofs of claim filed before the Bar Date in order to identify claims filed in the wrong case or against the wrong Debtor that may properly be reassigned pursuant to the Order approving the Stipulation. Those determinations were based on the documents attached to the proofs of claim, a review of the appropriate Debtor's records and consultation with members of the Debtors' management familiar with the claims and creditors. On or about April 30, 2010, the Debtors filed their motion asking the Court to enforce the terms of the earlier Stipulation and Order and to deem the timely filed claims as having been filed against the proper Debtor, regardless of the Debtor's name and/or case number identified on the proof of claim. The motion was granted subject to the Debtors giving notice to affected creditors and opportunity for further hearing. Those hearings have concluded, and the Bankruptcy Court has entered an order granting the motion and allocating the claims accordingly.

**8.    Other Administrative Matters**

Early in the cases, the Debtors met with and were interviewed by the staff attorney and other

representative of the Office of the United States Trustee (the "US Trustee"). During the Cases, the Debtors have complied with certain requirements promulgated by that office with respect to the filing of monthly operating and cash reports. In May and June, 2009 the Debtors appeared at the Section 341(a) meeting of creditors - known as the initial creditor meeting - in the cases of the fifty-four jointly administered Debtors to answer questions of creditors and parties in interest. The US Trustee conducted each of the Section 341(a) meetings.

On April 22, 2009 the US Trustee appointed the Committee of Unsecured Creditors in the cases.

Various professionals have been retained and employed in the Chapter 11 Cases and will be paid pursuant to the terms of the Charlestown Plan.  Danning, Gill, Diamond & Kollitz, LLP has been employed as general reorganization counsel for all of the Debtors in the Chapter 11 Cases. The following professionals also have been employed by the Debtors: FTI Consulting, Inc., as financial advisors ("FTI"); Ernst & Young as independent auditors and tax advisors; DLA Piper LLP (US) as special securities and litigation counsel; and Waldron & Associates, Inc., as real estate appraiser. SulmeyerKupetz, APC was employed as general counsel by the Committee. Kibel Green, Inc. was retained as the Committee's financial advisor.

In addition, certain real estate brokers have been or will be employed in the Chapter 11 Cases to market and sell certain properties but will be paid out of the proceeds of the sale of the properties as opposed to through the Charlestown Plan. In accordance with the Bankruptcy Court's order, the Debtors submitted supplemental declarations from certain brokers in connection with representing the Debtors in connection with specific properties to be listed for sale. Specifically, the Debtors have retained (i) The Bradco Companies regarding the listing of 2951 Lenwood Road, Barstow, CA; (ii) DAUM Commercial Real Estate Services regarding the listing of (a) 905 E. 8th Street, Los Angeles, CA, (b) 308-310 Omar Street and 452, 464 and 470 E. 3rd Street, Los Angeles, CA, and (c) 400-428 Boyd Street, Los Angeles, CA; and (iii) Cushman and Wakefield of California, Inc. regarding the listing of (a) 1875 West Mission Boulevard, Pomona, California and (b) 2001-2021 West Mission Boulevard, Pomona, California.

**B.      REAL PROPERTY VALUATION, SALES AND LISTINGS**

**1.      Value of Property Level Debtors Real Property Assets**

Attached hereto as Exhibit J is a schedule of real property owned by each of the Property Level Debtors that owns real property. **The real property values in Exhibit J identified as "MMPI Values" are based on the opinion of Richard Meruelo, not independent appraisals of the properties. The Charlestown Proponents make no representation regarding the validity or accuracy of these values.**

The real property values identified as "Appraised Values" represent values identified in recent appraisals submitted to the Bankruptcy Court by creditors. The appraised values are all lower than Mr. Meruelo's values. If any creditors obtained appraisals that were comparable to or higher than Mr. Meruelo's values, they did not submit those appraisals to the Court. The Charlestown Proponents played no role in selecting or hiring the appraisers and make no representation regarding the validity or accuracy of the values in the appraisals.

**2.      Sales and Listings Since the Commencement of the Chapter 11 Cases**

Since becoming a public company the Company has, among other things: successfully completed approximately nine acquisitions or conversions of development projects to rental projects; successfully completed, acquired, or placed in service four parcels attached to current rental projects; and successfully completed the sale of three rental projects and three development projects. In 2008, the Company sold more property in downtown Los Angeles than any other landowner. With regard to the six properties that were sold:

a.      on or about March 31, 2008, the Company sold a development project located at 9901 Alameda in south Los Angeles for approximately $31.2 million;

b.      in a two-step sale culminating in or about August 2008, the Company sold a rental project located at 2000 San Fernando Road just north of downtown Los Angeles for approximately $35 million;

c.      on or about September 12, 2008, the Company sold a rental project located at 1800 E. Washington Boulevard in downtown Los Angeles for approximately $14.2 million;

1    d.    on or about November 7, 2008, the Company sold a development project located at

2    816 Stanford in downtown Los Angeles for approximately $1.0 million.

3    e.    on or about November 14, 2008, the Company sold a rental project referred to as the

4    "Overland Terminal" in downtown Los Angeles for approximately $19.7 million; and

5    f.    on or about November 21, 2008, the Company sold a development project located at

6    801 E. 7th Street in downtown Los Angeles for approximately $9.5 million.

7    The following properties have been sold, pursuant to orders entered by the Bankruptcy

8    Court, since the Petition Date:

9    5500 Flotilla Street, Los Angeles, previously owned by Debtor Meruelo Maddux — 5500

10    Flotilla Street, LLC ("MM 5500 Flotilla Street") to Camfield Partners, LLC for $210,000;

11    2040 Camfield Avenue, Commerce, previously owned by Debtor Merco Group — 2040

12    Camfield Avenue, LLC ("MG 2040 Camfield Avenue") to Camfield Partners, LLC for $4,790,000;

13    146 East Front Street, Covina, previously owned by Debtor Merco Group — 146 East Front

14    Street, LLC ("MG 146 E. Front Street") to Vartan and Dzovig Koroghlian for $1,114,450; and

15    500 Mateo Street, Los Angeles, previously owned by Debtor Meruelo Maddux — 500

16    Mateo Street, LLC ("MM 500 Mateo Street") to Mydland Enterprises, LLC for $1,900,000.

17    In addition, the Debtors have recently listed the following properties for sale:

18    2951 Lenwood Road, Barstow, CA

19    905 E. 8th Street, Los Angeles, CA

20    308-310 Omar Street and 452, 464 and 470 E. Third Street, Los Angeles, CA

21    400-428 Boyd Street, Los Angeles, CA

22    1875 West Mission Boulevard, Pomona, CA

23    2001-2021 West Mission Boulevard, Pomona, CA.

24    Finally, on April 26, 2010, MM 845 Flower closed the sale of its 34 story luxury residential

25    tower for a purchase price of $109,500,000.

26    **C.    Events in the Related Chapter 11 Cases MM 845 S. Flower and Chinatown.**

27    On September 3, 2009, MM 845 S. Flower and Chinatown each filed voluntary petitions for

28

relief under chapter 11 of the Bankruptcy Code. While MM 845 S. Flower and Chinatown are affiliates of the MMPI Debtors, these cases are not jointly administered with the cases of the MMPI Debtors.

MM 845 S. Flower owned a 34-story residential tower located at 705 W. 9th Street in the South Park region of downtown Los Angeles (the "Project"). The building is comprised of 214 luxury residential units totaling approximately 254,300 square feet and an approximately 6,800 square foot commercial unit on the ground floor. This building is a first class iconic structure in downtown Los Angeles. Viewed from the street, this curtain wall building is clad with various shades of green glass and has numerous distinctive and attractive architectural features which include external balconies on all four corners of the building, a seventh floor amenity deck with a landscaped garden area and a premium extended balcony and viewing deck located on the ninth floor.

Chinatown owns approximately 5.5 acres of unimproved land at 129 West College Street in downtown Los Angeles ("Chinatown Property"). The Chinatown Property has significant development potential and the current development plan for the property is for a mixed residential and retail use. The Chinatown Property is now unencumbered. The Chinatown Property was appraised at $17,600,000 as of March 2008 based upon about $80 per land square foot.

Prior to September 3, 2009 (the "Flower Petition Date"), and on or about July 31, 2008, MM 845 Flower executed a promissory note (the "Note") in the original principal amount of $84,000,000 in favor of Canpartners Realty Holding Company IV, LLC ("Canyon") in connection with a Loan Agreement dated as of July 31, 2008 (the "Loan Agreement") pursuant to which Canyon made a construction loan of $84,000,000 to MM 845 Flower (the "Loan"). MM 845 Flower's obligations under the Note were secured by a construction deed of trust (the "845 Flower Deed of Trust") in favor of Canyon against the Project. MM 845 Flower also granted Canyon a security interest in various deposit accounts of 845 Flower (the "Accounts Pledge"). In addition, Chinatown granted Canyon a deed of trust (the "Chinatown Deed of Trust") against Chinatown's real property located at 129 West College Street, Los Angeles, California (the "Chinatown Property"). Meruelo Maddux

Properties, Inc., ("MMPI") executed both completion and repayment guaranties in favor of Canyon (the "MMPI Guaranties") and MMP Ventures pledged its membership interests in 845 Flower and Chinatown to Canyon (the "Pledge Agreements")[3].

### 1.    Important Events in MM 845 S. Flower and Chinatown cases

At the time the cases were filed, the construction of MM 845 S. Flower Project was close to completion. After commencement of the 845 S. Flower case, MM 845 S. Flower completed construction of the Project, completed the process of entitling the Project as condominiums and developed a program for selling individual condominium units (the "Sale Program"). MM 845 S. Flower filed a motion for authority to engage in the Sale Program. Canyon opposed the motion on among other grounds that the Debtor could not sell units free and clear of its loan. After extensive briefing and several hearings, the Court denied the motion without prejudice to the Debtor pursuing the Sale program as part of its Chapter 11 Plan.

On November 12, 2009, Canyon filed a Motion for Relief from the Automatic Stay (the "RFS Motion") in the MM 845 S. Flower case seeking relief from the automatic stay to permit it to foreclose on its Deed of Trust against the Project. Canyon asserted that it was entitled to relief from the stay because the Debtor does not have any equity in the Project and according to Canyon, the Debtor cannot cram down a plan on Canyon over its objection. MM 845 S. Flower vigorously disputed each of Canyon's contentions. The initial hearing on the RFS Motion was held on January 8, 2010. After additional briefing and a further hearing on February 5, 2010, the Court continued the RFS Motion to March 12, 2010 for an evidentiary hearing regarding the value of the Project and testimony by the appraisers retained by Canyon and MM 845 S. Flower. That evidentiary hearing has been continued to June 7, 2010 but will be taken off calendar due to the settlement discussed below.

In addition, on October 19, 2009, Canyon filed an adversary proceeding against MM 845 S. Flower and Chinatown in their respective cases, asserting and seeking a declaration, among other

---

[3] The Loan Agreement, the Note, the Deed of Trust, the Accounts Pledge, the MMPI Guaranties, the Chinatown Deed of Trust, the Pledge Agreements, and all other documents and instruments evidencing or securing the Loan, are referred to collectively herein as the "Loan Documents"

things, that Canyon was not required to release its lien on the Chinatown Property or its security interest in MMP Ventures' membership interests in Chinatown (the "Chinatown Adversary Proceeding") MM 845 Flower and Chinatown answered and counterclaimed, contending, among other things, that Canyon is required to release its liens on the Chinatown Property and its security interest in the MMP Ventures membership interests in Chinatown. On November 19, 2009, the Bankruptcy Court entered its Order approving the parties' stipulation to consolidate the two adversary proceedings, deeming the complaint filed in 845 Flower's case (1:09-ap-01435-KT) as the sole operative complaint.

On February 16, 2010 the parties filed cross-motions for summary judgment (Chinatown Adversary Proceeding docket nos. 13 19) which were initially set for hearing on March 12, 2010. Those hearings have been continued several times and are currently set for hearing on June 7, 2010 but will be taken off calendar due to the settlement discussed below.

### 2.    Sale of the Project and Settlement with Canyon

On April 13, 2010, MM 845 S. Flower filed a motion for authority to sell the Project to Watermarke Properties, Inc., a California corporation, or its assignee (the "Buyer") for a purchase price of $110,000,000 cash pursuant to the Purchase Agreement, subject to a $500,000 purchase price credit to the Buyer as described below. The hearing on the Motion was held on April 19, 2010. The Court approved the sale by its order entered on April 19, 2010.

On April 12, 2010, MM 845 S. Flower, Chinatown, MMPI and MMP Ventures entered into a settlement with Canyon (the "Canyon Settlement Agreement"). Pursuant to the settlement, Canyon agreed to accept $86,521,389 from escrow at closing in satisfaction of its Lien and has agreed to the release of its Lien on the Project, on MM 845 S. Flower's bank accounts and other personal property and on the real property owned by the related debtor Meruelo Chinatown, LLC. The sale closed on April 26, 2010 and Canyon received payment of the settlement amount on that date.

The Canyon Settlement Agreement resolves all disputes arising out of or relating to Canyon's claims against the Debtors or arising out of or related to the Loan Documents, the RFS Motion, and the Chinatown Adversary Proceeding.

In addition, certain creditors have asserted, or may assert, mechanics liens against the Project (the "Mechanics Lien Creditors"). The sale of the Project combined with the funds in MM 845 S. Flower's construction reserve accounts (which was $7,139,319 as of April 9, 2010) provides more than enough proceeds for payment of all amounts determined to be owing to the Mechanics Lien Creditors. MM 845 S. Flower has objections to certain of these claims and reserves all rights and defenses thereto. As of the date hereof, the aggregate amount owing to the Mechanics' Lien Creditors was between $4,179,157 and $8,733,944. As such claims are resolved, the Mechanics' Lien Claims will be paid from the Remaining Claims Fund as provided below.

At closing, MM 845 S. Flower established the Remaining Claims Fund as a segregated account at City National Bank to hold funds for payment of the unpaid or disputed Mechanics' Lien Claims and unsecured claims against the Debtor's estate (the "Remaining Claims") as provided in the Canyon Settlement Agreement. The Remaining Claims Fund was funded in an amount not to exceed $10,636,268, comprised of the maximum amount of all unpaid or disputed Mechanics Lien Claims, $100,000 for payment of unsecured claims, and $1,500,000 as provided in the Canyon Settlement Agreement. The Remaining Claims Fund was funded with the remaining funds from the Debtor's construction reserve accounts plus proceeds of the Sale sufficient to fully fund the account. The Liens of all creditors of MM 845 S. Flower asserting Liens against the Project, including but not limited to Canyon (pursuant to the Canyon Settlement Agreement) and the Mechanics Lien Creditors, attached to the Remaining Claims Fund. The Canyon Settlement Agreement also provided for the payment of Canyon's third party fees and expenses arising out of the Remaining Claims from the Remaining Claims Fund. As a result of receipt of the Settlement Amount, all of Canyon's liens, rights and interest in and to any of the Debtors' assets have been fully released, reconveyed, terminated and discharged, including, without limitation, full reconveyances of the Flower Deed of Trust, the Chinatown Deed of Trust, terminations of any UCC financing statements and account control agreements, releases of any guaranties, assignments and pledges, including MMP Ventures' membership interests in 845 Flower and Chinatown, the MMPI Guaranties and the Accounts Pledge and Pledge Agreements.

As a result of the settlement, the Chinatown Adversary Proceeding has been dismissed and Canyon has withdrawn its RFS Motion. The sale will provide approximately $20 million in sale proceeds to the estate and, after payment of administrative expenses, such funds will be available to pay intercompany claims. The impact of successful resolution of these cases is that the remaining proceeds from the sale of this Project will be available to the MMPI Debtors at the Effective Date rather than one or more years later. Further, the Chinatown Property is no longer encumbered and will be available to the Company as an unencumbered property.

On or about July 7, 2010, MM 845 S. Flower filed a motion for authority to make an interim distribution or distributions in the aggregate amount of up to $12 million from free and clear cash in MM 845 S. Flower's estate to MMPLP. That motion was granted.

**V.**

**SUMMARY OF THE CHARLESTOWN PLAN**

The Charlestown Plan provides for the treatment and payment of Claims and Interests in the Debtors' bankruptcy cases.  The Charlestown Plan also provides for the payment of unclassified claims, such as administrative expense claims and priority tax claims against each Debtor.  Claims or Interests are classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class, and are classified in another Class or Classes to the extent that any remainder of the Claim or Interest qualifies within the description of such other Class or Classes.

1.    **Common Class Treatments for Classified Claims**

The following are Common Class Treatments for the following classes of Claims and Interests: (i) Secured Tax Claims, (ii) Secured Lender Claims, (iii) Other Priority Claims, (iv) Unsecured Tenant Security Deposit Claims, (v) General Unsecured Claims, (vi) Intercompany Claims, and (vii) Equity Interests. The Classes of Claims and Interests for each Debtor will either receive the Common Treatment or a treatment specific to a particular Class.  For each Class and for each Debtor, the Charlestown Plan will specify whether such class will receive the common treatment set forth herein or another treatment.

1    The Charlestown Proponents expressly reserve the right, at any time during the term of the

2    Charlestown Plan, to refinance the obligations secured by any of their real properties or to sell such

3    any or all of such real properties and satisfy the full amount of the Allowed Secured Claims against

4    such real property(ies) from the proceeds of such refinancing.  The Charlestown Proponents also

5    reserve the right to make full or partial repayment of the debt at any time on or following the

6    Effective Date.

7

8    a.    ***Common Los Angeles County Tax Claim Treatment***

9    Los Angeles County Tax Claims will be paid in accordance with the terms of the

10    Bankruptcy Court-approved settlement between the Debtor and Los Angeles County IF

11    PERMITTED TO DO SO.

12

13    b.    ***Common Secured Lender Claim Treatment***

14    The Holder shall receive deferred Cash payments over a period of four years from the

15    Effective Date in an amount equal to the amount of the Allowed Secured Claim plus interest from

16    the Effective Date on the unpaid portion of the Allowed Secured Claim at the rate prescribed below.

17    Payments shall be made in the amount of the monthly accruing interest with the principal balance

18    and any unpaid interest due and payable four years after the Effective Date.  The monthly

19    installments of interest shall be payable on or before the fifteenth (15th) day of each month, with the

20    first installment due on or before the fifteenth (15th) day of the month following the month in which

21    the Effective Date occurs.  The first six installments, however, will be paid together on the date that

22    the first installment is due.

23    Each installment shall be in the amount equal to interest on the Allowed Secured Claim at

24    the rate of 5.25% per annum or as otherwise established by the Bankruptcy Court, provided,

25    however, that in the event such Claim is not an Allowed Secured Claim at the Effective Date then

26    interest shall be payable on the undisputed portion of such Claim until the Claim is allowed

27    pursuant to a Final Order of the Bankruptcy Court.  Once the Claim is an Allowed Secured Claim

28

1  pursuant to a Final Order, then on the next interest payment date, the Holder shall receive a payment

2  equal to the unpaid interest due and owing on the disputed portion of the Claim from the Effective

3  Date.

4            The terms and conditions of the agreements or instruments between the Holder and the

5  Debtor shall be restructured and amended as of the Effective Date pursuant to a Loan Modification

6  Agreement, the form of which is attached to the Disclosure Statement as Exhibit D.  The Holder and

7  Reorganized Debtor shall, within a reasonable period of time after the Effective Date (or after a

8  Final Order of the Bankruptcy Court allowing the Claim) complete the Loan Modification

9  Agreement consistent with the terms of this Charlestown Plan, and execute and deliver the same to

10  be effective as of the Effective Date.  If there shall be found any error in the Loan Modification

11  Agreement such that it was not completed consistent with the terms of this Charlestown Plan, the

12  Holder and the Reorganized Debtor shall correct and re-execute the Loan Modification Agreement

13  to be consistent with the Charlestown Plan.  Except as provided in this section and the Loan

14  Modification Agreement, and notwithstanding Section 1141(c) or any other provision of the

15  Bankruptcy Code, all valid, enforceable and perfected prepetition liens of the Holder in its

16  Collateral shall survive the Effective Date and continue in accordance with the contractual terms of

17  the underlying agreements with such Holder and/or applicable law until the Holder's Allowed

18  Secured Claim is satisfied pursuant to the Charlestown Plan; provided however, that the Holder

19  shall be prohibited from exercising rights or remedies pursuant to such underlying agreements so

20  long as the Reorganized Debtor is in compliance with the Charlestown Plan.  Any lien or interest

21  granted to the Holder by the Bankruptcy Court as adequate protection shall be released and

22  extinguished upon confirmation.

23
                         a.        ***Common Settled Secured Claim Treatment***
24

25            The foregoing treatment shall not supersede the terms of Bankruptcy Court approved

26  settlements.  Holders of Secured Claims who settled with the Debtors and whose settlements have

27  been approved by the Bankruptcy Court will be paid in accordance with their settlement

28

1    agreements.

2

3                          b.        ***Common Other Priority Claim Treatment***

4            This Class includes Other Priority Claims for an amount entitled to priority under Sections

5    507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, and does not include any

6    Administrative Claim or Tax Claim.  These unsecured Other Priority Claims are for unsecured

7    Claims for accrued employee compensation earned within 180 days prior to the Petition Date, to the

8    extent of $10,950 per employee.

9            Holders of Other Priority Claims will be paid in full on the Effective Date except to the

10   extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim

11   remains employed with the Reorganized Debtors after the Effective Date.  If so, the vacation or sick

12   pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick

13   time following the Effective Date.

14

15                          c.        ***Common Tenant Security Deposits Treatment***

16           The Allowed Claims of the Holders shall be Reinstated as of the Effective Date of the

17   Charlestown Plan.

18

19                          d.        ***Common Unsecured Claim Treatment***

20           The Holders of Allowed General Unsecured Claims shall, on the Effective Date, receive a

21   cash payment equal to the full amount of their Allowed Claim plus interest from the Petition Date to

22   the Effective Date.  Holders entitled to a contractual rate of interest will receive interest at the lesser

23   of: (A) 8 percent; or (B) 2 percentage points below their contractual rate.  These Holders are

24   impaired.

25           Holders without contractual interest rates will be entitled to interest at (.5%).  These Holders

26   are impaired.

27           In the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the

28

1  payment will be due 30 days after the date the Disputed Claim becomes an Allowed Claim.

2  Creditors who have agreed to other treatments in court-approved settlements shall receive

3  the treatments provided in those settlements notwithstanding the Allowance of some or all of their

4  Claims as General Unsecured Claims.

5  The Charlestown Proponents cannot determine at this time which Holders are entitled to

6  contractual rates of interest and which are not.  Accordingly, the Charlestown Proponents will

7  solicit votes from all Holders with General Unsecured Claims.

8

9  e.    ***Common Unsecured Guaranty Claim Treatment***

10  Claims in this Class consist of Guaranty Claims on obligations for which another one of the

11  Debtors is the principal obligor and for which the principal obligation is provided for under this

12  Charlestown Plan or under the plan filed by MM 845 S. Flower and Chinatown.

13  Five years after the Effective Date, the Holder of an Allowed Guaranty Claim in this Class

14  shall receive the full amount of its Claim plus interest at 3% per annum (or such other interest rate

15  as the Bankruptcy Court shall determine is necessary for the Charlestown Plan to comply with

16  Bankruptcy Code Section 1129(b)(2)).  The amount of the Allowed Guaranty Claim shall reflect

17  payments made on the underlying obligation and/or recoveries based on disposal of the collateral.

18  If, for example, the underlying obligation is satisfied, the amount of the Holder's Guaranty Claim

19  shall be zero.  Similarly, if the Collateral securing the underlying obligation is sold at a foreclosure

20  sale for more than the amount owed by the Principal Obligor, the Holder's Guaranty Claim shall

21  also be zero.

22

23  f.    ***Common Treatment for Guaranty Claims held by Settling Guaranty
       Creditors***

24

25  The foregoing treatment shall not supersede treatment specified in Bankruptcy Court-

26  approved settlements.  Holders of Guaranty Claims who have agreed to a different treatment in

27  Bankruptcy Court-approved settlement will receive that treatment.

28

g.     ***Common Intercompany Claim Treatment***

The Holders shall retain such Claims and all rights, interests, and obligations related thereto but, notwithstanding, the Holders consent to the treatment afforded and distributions to be made under this Charlestown Plan to Holders in each class of Allowed Claims.

h.     ***Common Equity Interest Treatment***

The Holders of the Equity Interests in these Classes shall retain their Equity Interests in the Debtor.

**2.      Summary of Classified Claims and Treatment**

The categories of Claims and Interests listed in the chart below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to this Charlestown Plan.  The amounts listed for each Class in the chart below represent the Debtors' estimate of the amount of the Allowable Claims asserted in each Class and contain a brief summary description of the treatment of each class.  This is a summary for information only and does not specify the full terms of the treatment for each class. Such full description is set forth in Article III of the Charlestown Plan. The terms of the Charlestown Plan control over the summary descriptions set forth herein. In addition, the Debtors expressly reserve all of their rights to object to the amount, character and enforceability of any Claim, whether or not listed in the chart below.

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| **1.** | **Meruelo Maddux Properties, Inc.[4]** | | |
| 1A | Secured Claim of Oliver, Sandifer - $436,901 | Unimpaired. | The Class lA Claim is unimpaired and the Holder is not entitled to vote on the Charlestown Plan.  On the Effective Date, the Holder's claim shall be reinstated and the Holder shall retain its attorney's lien, if any. |
| 1B | Priority Benefits Claims - $46,362 | Unimpaired. | Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued |

---

[4] The Debtors are listed in the order of the Service Level Debtors and then the Property Level Debtors.

| Class | Description of Class | Impaired/ Unimpaired | |
|-------|---------------------|----------------------|---|
| | | | vacation or sick pay and the Holder of the Other Priority Claim remains employed with the Reorganized Debtors after the Effective Date.  If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date. |
| 1C-1 | Unsecured Insider Claims | Impaired. | The Holders shall receive the Common General Unsecured Claim Treatment on account of their Allowed Claims except that their distribution will be held by the Reorganized MMPI in reserve for the earlier of (1) five years after the Effective Date; (2) the resolution of any Insider Litigation against that Holder; or (3) upon such earlier time as the Reorganized Debtor decides, in its sole and absolute discretion is appropriate.  Interest will accrue, at an annual rate to be determined by the Bankruptcy Court, on the Allowed amount of the Claims until the distribution is released to the Holder. |
| 1C-2A | Unsecured Guaranty Claims - $102,245,154 | Impaired. | Common Unsecured Guaranty Claim Treatment:  Five years after the Effective Date, the Holder of an Allowed Guaranty Claim in this Class shall receive the full amount of its Claim plus interest at 3% per annum (or such other interest rate as the Bankruptcy Court shall determine is necessary for the Charlestown Plan to comply with Bankruptcy Code Section 1129(b)(2)).  The amount of the Allowed Guaranty Claim shall reflect payments made on the underlying obligation and/or recoveries based on disposal of the collateral. |
| 1C-2B | Settled Unsecured Guaranty Claims - $92,453,017 | Impaired. | Holder's Guaranty Claim shall be consistent in all regards with the Bankruptcy Court-approved settlement. |
| 1C-3 | General Unsecured Claims - $7,668,891 | Impaired. | Common Unsecured Claim Treatment: The Holders of Allowed General Unsecured Claims shall receive a cash payment equal to the full amount of their Allowed Claim on the Effective Date plus interest from the Petition Date to the Effective Date. Holders with contracts that entitle them to interest on their Claims will receive interest at the lesser of: (A) 8%; or (B) 2 percentage points below their contractual rate.  These Holders are impaired. Holders without contractual interest rates will be entitled to interest at .5%.  These |

| Class | Description of Class | Impaired/Unimpaired | |
|---|---|---|---|
| | | | Holders are impaired.<br>In the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the payment will be due 30 days after the date the Disputed Claim becomes an Allowed Claim. |
| 1 E | Non-Insider Equity Interests | Impaired. | On the Effective Date all Holders of MMPI Existing Common Stock shall have the option to either (i) exchange their MMPI Existing Common Stock for a cash payment of $0.35 per share of MMPI Existing Common Stock (such Holders, the "Cash Election Holders"), or (ii) to retain their MMPI Existing Common Stock (such Holders, the "Stock Retention Holders"), subject to operation of the Plan.<br>In the event that the Cash Election Holders, together with the Insider Cash Election Holders (as defined immediately below in the description of treatment for Class 1F) own less than 55% of the shares of MMPI Existing Common Stock, then the Stock Retention Holders, notwitststanding their election to retain their MMPI Existing Common Stock, will be deemed to have elected, on a pro rata basis together with the Insider Stock Retention Holders, to exchange a sufficient number of shares of MMPI Existing Common Stock such that the total number of shares exchanged for cash (including the shares held by the Cash Election Holders and the Insider Cash Election Holders) equals 55% of the shares of MMPI Existing Common Stock.  Such Stock Retention Holders who are deemed to have elected to exchange a pro rata portion of their shares of MMPI Existing Common Stock shall receive a cash payment of $0.35 per share of such stock.<br>In the event that the Cash Election Holders, together with the Insider Cash Election Holders own more than 55% of the shares of MMPI Existing Common Stock, then the Cash Election Holders, notwithstanding their election to receive a cash distribution in exchange for their shares, will be deemed to have elected, on a pro rata basis together with the Insider Cash Election Holders, to retain a sufficient number of shares of MMPI Existing Common Stock such that the total number of shares exchanged for cash equals 55% of the shares of MMPI Existing Common Stock. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | | | The MMPI Existing Common Stock that is retained by Holders in accordance with the foregoing shall be subject to a 5 to 1 reverse stock split.  The MMPI Existing Common Stock that is exchanged for cash shall be transferred to MMPI Acquisition on the Effective Date as described herein at Section VII.E.a. |
| 1F | Insider Equity Interests | Impaired. | On the Effective Date all Holders of Insider Equity Interests shall have the option to either (i) exchange their MMPI Existing Common Stock for a cash payment of $0.35 per share of MMPI Existing Common Stock (such Holders, the "Insider Cash Election Holders"), or (ii) to retain their MMPI Existing Common Stock (such Holders, the "Insider Stock Retention Holders"), subject to operation of the Plan.  In the event that the Insider Cash Election Holders, together with the Cash Election Holders own less than 55% of the shares of MMPI Existing Common Stock, then the Insider Stock Retention Holders, notwitststanding their election to retain their MMPI Existing Common Stock, will be deemed to have elected, on a pro rata basis together with the Stock Retention Holders, to exchange a sufficient number of shares of MMPI Existing Common Stock such that the total number of shares exchanged for cash (including the shares held by the Insider Cash Election Holders and the Cash Election Holders) equals 55% of the shares of MMPI Existing Common Stock.  Such Insider Stock Retention Holders who are deemed to have elected to exchange a pro rata portion of their shares of MMPI Existing Common Stock shall receive a cash payment of $0.35 per share of such stock.<br>  In the event that the Insider Cash Election Holders, together with the Cash Election Holders own more than 55% of the shares of MMPI Existing Common Stock, then the Insider Cash Election Holders, notwitststanding their election to receive a cash distribution in exchange for their shares, will be deemed to have elected, on a pro rata basis together with the Cash Election Holders, to retain a sufficient number of shares of MMPI Existing Common Stock such that the total number of shares exchanged for cash equals 55% |

| Class | Description of Class | Impaired/ Unimpaired | |
|-------|---------------------|----------------------|---|
| | | | of the shares of MMPI Existing Common Stock. The cash to be distributed to or the MMPI Existing Common Stock to by held by Holders of Insider Equity Interests in accordance with this section shall be held in reserve for the earlier of (1) five years after the Effective Date; (2) the resolution of any Insider Litigation against that Holder; or (3) upon such earlier time as the Reorganized MMPI decides, in its sole and absolute discretion is appropriate. The Bankruptcy Court may determine that this treatment unfairly discriminates against Insider Holders and, that Insiders Holders are entitled to an immediate distribution. The Charlestown Proponents will amend the Charlestown Plan in accordance with the Bankruptcy Court's ruling on this issue. Accordingly, Insiders may be entitled to the same treatment as Non-Insiders under the Charlestown Plan generally. The MMPI Existing Common Stock that is allocated to Holders of Insider Equity Interests in accordance with the foregoing shall be subject to a 5 to 1 reverse stock split.  The MMPI Existing Common Stock that is exchanged for cash shall be transferred to MMPI Acquisition as described herein at Section VII.E.a. |
| **2.** | **MMPLP** | | |
| 2C-1 | Unsecured Guaranty Claims - $41,001,926 | Impaired. | Common Unsecured Guaranty Claim Treatment |
| 2C-2 | General Unsecured Claims - $1,869,638[5] | Impaired. | Common Unsecured Claim Treatment. |
| 2D | Intercompany Claims - $452,881,601 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto |
| 2E | Equity Interests of MMPI (99.6%) and Holders of LTIP Units (0.4%) | Impaired. | Interest in MMPLP will be cancelled, and MMPLP will be merged into MMPI. Holders of LTIP Units shall be entitled to receive, at MMPI's option, either (A) cash; or (B) shares of Reorganized MMPI Common Stock with a value equal to the value of the LTIP Units on the Effective Date. |

---

[5]   Berkadia has filed alleged and duplicative unsecured claims for "money had and received, money lent, unjust enrichment, and interference with contract" for $1,443,668.40 (the `Berkadia Unsecured Claim") against 53 of the 54 Debtors. The Debtors will be filing formal objections to the Berkadia Unsecured Claims asserted in the 53 Chapter 11 Cases at the appropriate time. In the table below, the classes of "General Unsecured Claims" for the 53 Debtors separately list the amount of general unsecured claims asserted by claimants, exclusive of the disputed Berkadia Unsecured Claim. Notwithstanding the foregoing, the claim is included in the Class 2C-3.

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| **3.** | **MMP Ventures LLC** | | |
| 3C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment. |
| 3D | Intercompany Claims - $2,509 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 3E | Equity Interests of MMPLP (100%) | Unimpaired. | Holders retain their interests. |
| **4.** | **Meruelo Maddux Construction, Inc.** | | |
| 4C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment. |
| 4D | Intercompany Claims - $10,588 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 4E | Equity Interests of Meruelo Maddux Construction, Inc. | Unimpaired. | Holders retain their interests. |
| **5.** | **Meruelo Maddux Management LLC** | | |
| 5B | Priority Benefits Claims - $151,247 | Unimpaired. | Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim remains employed with the Reorganized Debtors after the Effective Date.  If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date. |
| 5C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment. |
| 5D | Intercompany Claims - $4,296,137 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 5E | Equity Interests of MMPLP (99%) and MMCI (1%) | Unimpaired. | Holders retain their interests |
| **6.** | **Meruelo Maddux – 555 Central Avenue LLC** | | |
| 6C | General Unsecured Claims - $10,102 | Impaired. | Common Unsecured Claim Treatment. |
| 6D | Intercompany Claims - $1,999,388 | Unimpaired. | Creditors retain their claims and all rights, interests an obligations related thereto. |
| 6E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **7.** | **Merco Group – Overland Terminal LLC** | | |
| 7C | General Unsecured Claims - $132,750 | Impaired. | Common Unsecured Claim Treatment. |
| 7D | Intercompany Claims - $1,093,202 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 7E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| **8.** | **National Cold Storage LLC** | | |
| 8C | General Unsecured Claims — $4,545 | Impaired. | Common Unsecured Claim Treatment. |
| 8E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **9.** | **Wall Street Market LLC** | | |
| 9C | General Unsecured Claims - $2,092 | Impaired. | Common Unsecured Claim Treatment |
| 9D | Intercompany Claims - $3,536,086 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 9E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **10.** | **Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina, LLC** | | |
| 10A | Los Angeles County Secured Tax Claim - $118,420 | Impaired. | Common Los Angeles Tax Claim Treatment.  See Plans or full description of treatment. |
| 10C | General Unsecured Claims - $15,357 | Impaired. | Common Unsecured Claim Treatment. |
| 10D | Intercompany Claims - $6,630,774 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 10E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **11.** | **Meruelo Maddux – 230 W. Avenue 26 LLC** | | |
| 11A | Los Angeles County Secured Tax Claim - $163,484 | Impaired. | Common Los Angeles Tax Claim Treatment. See Plan for full description of treatment |
| 11C-1 | Unsecured Claims — Tenant Security Deposits - $24,610 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 11C-2 | General Unsecured Claims - $3,952 | Impaired. | Common Unsecured Claim Treatment. |
| 11D | Intercompany Claims - $6,414,500 | Unimpaired. | Creditors retain their claims and  all rights, interests and obligations related thereto. |
| 11E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **12.** | **Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | |
| 12A | Los Angeles County Secured Tax Claim - $111,937 | Impaired. | Common Los Angeles Tax Claim Treatment. See Plan for full description of treatment. |
| 12C-1 | Unsecured Claims — Tenant Security Deposits - $8,025 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 12C-2 | General Unsecured Claims - $14,882 | Impaired. | Common Unsecured Claim Treatment. |
| 12D | Intercompany Claims - $3,569,603 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 12E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **13.** | **Meruelo Maddux – 817-825 S. Hill Street LLC** | | |
| 13A | Los Angeles County Secured Tax Claim — $350,917 | Impaired. | Common Los Angeles Tax Claim Treatment. See Plan for full |
| 13C | General Unsecured Claims - $1,583 | Impaired. | Common Unsecured Claim Treatment. |
| 13D | Intercompany Claims - $16,377,573 | Unimpaired. | Creditors retain their claims and all rights, interests and obli2:ations related thereto. |
| 13E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **14.** | **Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| 14A | Los Angeles County Secured Tax Claim - $167,582 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 14C-1 | Unsecured Claims — Tenant Security Deposits - $3,100 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 14C-2 | General Unsecured Claims - $10,930 | Impaired. | Common Unsecured Claim Treatment. |
| 14D | 14D   Intercompany Claims - $6,804,902 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 14E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **15.** | **Meruelo Maddux Properties – 1060 N. Vignes LLC** | | |
| 15A | Los Angeles County Secured Tax Claim - $115,121 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 15C | General Unsecured Claims - $71,044 | Impaired. | Common Unsecured Claim Treatment. |
| 15D | Intercompany Claims - $6,549,824 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 15E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **16.** | **Meruelo Maddux – 2415 E. Washington Boulevard LLC** | | |
| 16A | Los Angeles County Secured Tax Claim - $50,897 | Impaired. | Creditor receives Common Secured Tax Claim- Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 16C | General Unsecured Claims - $4,780 | Impaired. | Common Unsecured Claim Treatment. |
| 16D | Intercompany Claims - $2,220,879 | Unimpaired. | Creditors retain their claims and all rights interests and obligations related thereto. |
| 16E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| **17.** | **Meruelo Maddux – 5500 Flotilla Street LLC** | | |
| 17C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment.. |
| 17D | Intercompany Claims - $611,663 | Unimpaired. | Creditors retain their claims and all rights interests and obligations related thereto. |
| 17E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **18.** | **Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |
| 18A | Los Angeles County Secured Tax Claim - $211,338 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 18C | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 18D | Intercompany Claims - $8,997,401 | Unimpaired. | Creditors retain their claims and  all rights, interests and obligations related thereto.. |
| 18E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **19.** | **Merco Group – 146 E. Front Street LLC** | | |
| 19C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment. |
| 19D | Intercompany Claims - $2,243,787 | Unimpaired. | Creditors retain their claims and  all rights, interests and obligations related thereto.. |
| 19E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **20.** | **Merco Group – 801 E. 7th Street LLC** | | |
| 20A | Los Angeles County Secured Tax Claim - $14,177 | Impaired. | Common Los Angeles Tax Claim Treatment.. |
| 20C | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 20D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and  all rights, interests and obligations related thereto.. |
| 20E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **21.** | **Merco Group – 1211 E. Washington Boulevard LLC** | | |
| 21A-1 | Los Angeles County Secured Tax Claim - $245,814 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 21A-2 | RoofCorp of CA, Inc. - $37,500 | Impaired. | Paid in full with 50% of claim paid on Effective Date and 50% of Claim, plus interest from the Effective Date at 3.5% on the 1 st anniversary of the Effective Date. |
| 21C- | Unsecured Claims — | Unimpaired. | Creditors' legal, equitable and contractual |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 1 | Tenant Security Deposits - $42,357 | | rights are Reinstated. |
| 21C-2 | General Unsecured Claims - $31,231 | Impaired. | Common Unsecured Claim Treatment. |
| 21D | Intercompany Claims - $9,122,302 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 21E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holder retains their interests. |
| **22.** | **Merco Group – 1380 S. Orchard LLC** | | |
| 22A | Los Angeles County Secured Tax Claim - $36,714 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 22C | General Unsecured Claims - $4,322 | Impaired. | Common Unsecured Claim Treatment. |
| 22D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 22E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **23.** | **Merco Group – 2040 Camfield Avenue LLC** | | |
| 23C | General Unsecured Claims - $652 | Impaired. | Common Unsecured Claim Treatment.. |
| 23D | Intercompany Claims - $5,163,790 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 23E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **24.** | **Merco Group – Ceres Street Produce LLC** | | |
| 24A | Los Angeles County Secured Tax Claim - $65,342 | Impaired | Common Los Angeles Tax Claim Treatment. |
| 24C | General Unsecured Claims - $2,059 | Impaired. | Common Unsecured Claim Treatment. |
| 24D | Intercompany Claims - $2,772,264 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 24E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **25.** | **Meruelo Baldwin Park LLC** | | |
| 25A | Los Angeles County | Impaired | Common Los Angeles Tax Claim |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | Secured Tax Claim - $201,681 | | Treatment. |
| 25C-1 | Unsecured Claims — Tenant Security Deposits - $3,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 25C-2 | General Unsecured Claims - $4,082 | Impaired. | Common Unsecured Claim Treatment. |
| 25D | Intercompany Claims - $8,847,699 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 25E | Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **26.** | **Santa Fe & Washington Market LLC** | | |
| 26A | Los Angeles County Secured Tax Claim - $45,481 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 26C-1 | Unsecured Claims — Tenant Security Deposits - $27,900 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 26C-2 | General Unsecured Claims - $4,591 | Impaired. | Common Unsecured Claim Treatment. |
| 26D | Intercompany Claims - $4,879,642 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto.. |
| 26E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **27.** | **Merco Group – 5707 S. Alameda LLC** | | |
| 27A | Los Angeles County Secured Tax Claim re $112,423 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 27C-1 | Unsecured Claims — Tenant Security Deposits - $5,794 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 27C-2 | General Unsecured Claims - $16,673 | Impaired. | Common Unsecured Claim Treatment. |
| 27D | Intercompany Claims - $4,859,886 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 27E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **28.** | **Meruelo Maddux – 3rd and Omar Street LLC** | | |
| 28A-1 | Los Angeles County Secured Tax Claim - $125,813 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 28A-2 | Legendary Secured Claim - $2,559,658 | Impaired. | Common Secured Lender Treatment. . |
| 28C-1 | Unsecured Claims — Tenant Security Deposits - $2,600 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 28C- | General Unsecured Claims | Impaired. | Common Unsecured Claim Treatment. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 2 | - $2,772 | | |
| 28D | Intercompany Claims - $3,416,741 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 28E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **29.** | **Meruelo Maddux – 336 W. 11th Street LLC** | | |
| 29A-1 | Los Angeles County Secured Tax Claim - $199,416 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 29A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligations of 620 Gladys Avenue, LLC (see Class 46A-2 below). | Impaired. | Common Secured Lender Treatment. |
| 29A-3 | Grand Avenue Lofts, HOA Secured Claim - $270,000 | Impaired. | Grand Avenue Lofts' ("GAL") Position. GAL asserts that it does not have a claim that is subject to modification or discharge. Rather, GAL asserts a current right in the real property that cannot be extinguished through bankruptcy, that when it conveyed to MM 336 W. 11th Street, it reserved a power of termination, as reflected in the Grant Deed. GAL asserts that MM 336 W. 11th Street never had title free and clear of GAL's property right. GAL asserts that an attempted discharge of GAL's power of termination would, in effect, be a forced conveyance of a property interest, beyond the scope of a discharge that would ultimately give the estate a property interest it did not have before the filing. The Charlestown Proponents currently take no position regarding GAL's rights and reserve the right to argue that GAL's rights may be affected or otherwise restricted by the Charlestown Plan. |
| 29A-4 | Grand Avenue Lofts, LLC / CIM Urban RE Fund GP II, LLC Secured Claim - 0 | Impaired. | Same as 29A-3 immediately above. |
| 29C | General Unsecured Claims - $43,857 | Impaired. | Common Unsecured Claim Treatment. |
| 29D | Intercompany Claims - $10,554,921 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 29E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **30.** | **Meruelo Maddux – 420 Boyd Street LLC** | | |
| 30A-1 | Los Angeles County Secured Tax Claim - | Impaired. | Common Los Angeles Tax Claim Treatment. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | $272,651 | | |
| 30A-2 | Legendary Secured Claim - $5,950,000 | Impaired. | Common Secured Lender Treatment. |
| 30C-1 | Unsecured Claims — Tenant Security Deposits - $21,463 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 30C-2 | General Unsecured Claims - $31,296 | Impaired. | Common Unsecured Claim Treatment. |
| 30D | Intercompany Claims - $2,607,940 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 30E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **31.** | **Meruelo Maddux – 500 Mateo Street LLC** | | |
| 31C | General Unsecured Claims - $1,657 | Impaired. | Common Unsecured Claim Treatment. |
| 31D | Intercompany Claims - $1,968,955 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 31E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **32.** | **Meruelo Maddux Properties – 760 S. Hill Street LLC** | | |
| 32A-1 | Los Angeles County Secured Tax Claim - $256,063 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 32A-2 | Bank of America Secured Claim - $28,108,094 | Impaired. | Common Secured Lender Treatment. |
| 32B | Priority Benefits Claims - $14,223 | Unimpaired. | Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim remains employed with the Reorganized Debtors after the Effective Date. If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date. |
| 32C-1 | Unsecured Claims — Tenant Security Deposits $39,061 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 32C-2 | General Unsecured Claims - $460,061 | Impaired. | Common Unsecured Claim Treatment. |
| 32D | Intercompany Claims - $25,543,339 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 32E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **33.** | **788 S. Alameda LLC** | | |
| 33A-1 | Los Angeles County Secured Tax Claim - | Impaired. | Common Los Angeles Tax Claim Treatment. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | $95,225 | | |
| 33A-2 | California Bank & Trust Secured Claim - $7,153,799 | Impaired. | Common Secured Lender Treatment. |
| 33B | Priority Benefits Claims - $1,382 | Unimpaired. | Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim remains employed with the Reorganized Debtors after the Effective Date.  If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date. |
| 33C-1 | Unsecured Claims — Tenant Security Deposits - $85,000 | Unimpaired. | Creditors retain their claims and  all rights, interests and obligations related thereto. |
| 33C-2 | General Unsecured Claims - $61,022 | Impaired. | Common Unsecured Claim Treatment. |
| 33D | Intercompany Claims - $1,485,597 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 33E | Equity Interests of MMP Ventures (100%) | Unimpaired | Holders retain their interests. |
| **34.** | **905 8th Street LLC** | | |
| 34A-1 | Los Angeles County Secured Tax Claim - $87,293 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 34A-2 | The Stanford Group LP Secured Claim - $1,950,000 | Impaired. | Common Settled Secured Claim Treatment |
| 34C-1 | Unsecured Claims — Tenant Security Deposits - $3,525 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 34C-2 | General Unsecured Claims - $12,849 | Impaired. | Common Unsecured Claim Treatment. |
| 34D | Intercompany Claims - $2,814,172 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 34E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **35.** | **Meruelo Maddux – 914-949 S. Hill Street LLC** | | |
| 35A-1 | Los Angeles County Secured Tax Claim - $307,986 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 35A-2 | Imperial Capital Bank Secured Claim - $9,007,827 | Impaired. | Common Settled Secured Claim Treatment. |
| 35C-1 | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 35C-2 | Tenant Security Deposits - $30,000 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 35D | Intercompany Claims - | Unimpaired. | Creditors retain their claims and all rights, |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | $17,716,678 | | interests and obligations related thereto. |
| 35E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **36.** | **Alameda Produce Market LLC** | | |
| 36A-1-a | Los Angeles County Secured Tax Claim re Alameda Produce Market Encumbered Real Property - $421,457 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 36A-1-b | Los Angeles County Secured Tax Claim re Alameda Produce Market Unencumbered Real Property - $37,263 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 36A-2 | Cathay Bank Secured Claim - $48,815,711 | Impaired. | Common Settled Secured Claim Treatment |
| 36A-3 | Cathay Bank Secured Claim - $9,848,944 | Impaired. | Common Settled Secured Claim Treatment |
| 36B | Priority Benefits Claims - $23,169 | Unimpaired. | Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim remains employed with the Reorganized Debtors after the Effective Date.  If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date. |
| 36C-1 | Unsecured Claims — Tenant Security Deposits - $301,019 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 36C-2 | General Unsecured Claims - $581,888 | Impaired. | Common Unsecured Claim Treatment. |
| 36E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **37.** | **Merco Group – 1500 Griffith Avenue LLC** | | |
| 37A-1-a | Los Angeles County Secured Tax Claim re 1500 Griffith - $109,864 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 37A-1-b | Los Angeles County Secured Tax Claim re 1510 Griffith Avenue - $78,830 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 37A-2 | Legendary Secured Claim - $6,396,500 — joint and several obligation with 4th Street Center, LLC, and also secured by the 4th Street Center Real Property (see Class 44A-2 below). | Impaired. | Common Secured Lender Treatment. |
| 37A- | Murakami Secured Claim - | Impaired. | Common Settled Secured Claim |

| Class | Description of Class | Impaired/ Unimpaired | |
|-------|----------------------|----------------------|---|
| 3 | $2,945,000 | | Treatment. |
| 37C-1 | Unsecured Claims — Tenant Security Deposits - $58,830 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 37C-2 | General Unsecured Claims - $2,452 | Impaired. | Common Unsecured Claim Treatment. |
| 37D | Intercompany Claims - $5,508,367 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 37E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **38.** | **Meruelo Maddux Properties – 1919 Vineburn Street LLC** | | |
| 38A-1 | Los Angeles County Secured Tax Claim - $138,067 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 38A-2 | Imperial Capital Bank Secured Claim - $5,468,543 | Impaired. | Common Settled Secured Claim Treatment. |
| 38C-1 | Unsecured Claims Tenant Security Deposits - $42,210 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 38C-2 | General Unsecured Claims - $2,652 | Impaired. | Common Unsecured Claim Treatment. |
| 38D | Intercompany Claims - $3,035,648 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 38E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **39.** | **Meruelo Maddux Properties – 2131 Humboldt Street LLC** | | |
| 39A-1-a | Los Angeles County Secured Tax Claim Against 2131 Humboldt Encumbered Real Property - $263,168 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 39A-1-b | Los Angeles County Secured Tax Claim Against 2131 Humboldt Unencumbered Real Property - $145,353 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 39A-2 | Chamlian Secured Claim - $7,000,000 | Impaired. | Common Secured Lender Treatment. |
| 39C-1 | Unsecured Claims — Tenant Security Deposits - $10,500 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 39C-2 | General Unsecured Claims - $3,631 | Impaired. | Common Unsecured Claim Treatment. |
| 39D | Intercompany Claims - $13,680,208 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 39E | Equity Interests of MMP | Unimpaired | Holders retain their interests. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | Ventures (100%) | | |
| **40.** | **Merco Group – 2529 Santa Fe Avenue LLC** | | |
| 40A-1 | Los Angeles County Secured Tax Claim - $126,578 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 40A-2 | 1248 S. Figueroa Secured Claim - $3,134,825 | Impaired. | Common Secured Lender Treatment. |
| 40C-1 | Unsecured Claims — Tenant Security Deposits - $15,000 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 40C-2 | General Unsecured Claims - $25,049 | Impaired. | Common Unsecured Claim Treatment. |
| 40D | Intercompany Claims - $3,703,446 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 40E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **41.** | **2640 Washington Boulevard LLC** | | |
| 41A-1 | Los Angeles County Secured Tax Claim - $212,108 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 41A-2 | East West Bank as successor to UCB Secured Claim - $6,066,073 | Impaired. | Common Secured Lender Treatment. |
| 41C-1 | Unsecured Claims — Tenant Security Deposits - $52,150 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 41C-2 | General Unsecured Claims - $19,358 | Impaired. | Common Unsecured Claim Treatment. |
| 41D | Intercompany Claims - $3,920,800 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 41E | Equity Interests of MMP Ventures (100%) | Unimpaired. | |
| **42.** | **Meruelo Maddux Properties – 2951 Lenwood Road LLC** | | |
| 42A-1 | FNBN Secured Claim - $8,983,643 | Impaired. | Common Settled Secured Claim Treatment. |
| 42C | General Unsecured Claims - $6,281,773 | Impaired. | Common Unsecured Claim Treatment. |
| 42D | Intercompany Claims - $6,279,821 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 42E | Equity Interests of MMP Ventures (100%) | Unimpaired | Holders retain their interests. |
| **43.** | **Merco Group – 3185 E. Washington Boulevard LLC** | | |
| 43A-1-a | Los Angeles County Secured Tax Claim re 3185 | Impaired. | Common Los Angeles Tax Claim Treatment. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | E. Washington Boulevard Encumbered Real Property - $191,130 | | |
| 43A-1-b | Los Angeles County Secured Tax Claim re 3185 E. Washington Boulevard Unencumbered Real Property- $969 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 43A-2 | Chinatrust Secured Claim - $9,541,565 | Impaired. | |
| 43C-1 | General Unsecured Claims - $1,702 | Impaired. | Common Unsecured Claim Treatment. |
| 43C-2 | Unsecured Claims — Tenant Security Deposits $250,000 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 43D | Intercompany Claims - $1,938,813 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 43E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **44.** | **Merco Group – 4th Street Center LLC** | | |
| 44A-1 | Los Angeles County Secured Tax Claim - $96,705 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 44A-2 | Legendary Secured Claim - joint and several obligation with 1500 Griffith Avenue, and also secured by 1500 Griffith Avenue (see Class 37A-2 above). | Impaired. | Common Secured Lender Treatment. |
| 44C-1 | General Unsecured Claims - $17,652 | Impaired. | Common Unsecured Claim Treatment. |
| 44C-2 | General Unsecured Claims — Tenant Security Deposits - $4,500 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 44D | Intercompany Claims - $6,840,375 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 44E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **45.** | **Merco Group – 425 W. 11th Street LLC** | | |
| 45A-1 | Los Angeles County Secured Tax Claim - $332,662 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 45A-2 | Legendary Secured Claims - $5,340,000 | Impaired. | Common Secured Lender Treatment. |
| 45C | General Unsecured Claims - $4,266 | Impaired. | Common Unsecured Claim Treatment. |
| 45D | Intercompany Claims - $11,737,757 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 45E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| 46. | Merco Group – 620 Gladys Avenue LLC | | |
| 46A-1-a | Los Angeles County Secured Tax Claim re 620 S. Gladys Avenue Encumbered Real Property - $311,811 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 46A-1-b | Los Angeles County Secured Tax Claim re 620 S. Gladys Avenue Unencumbered Real Property - $113,033 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 46A-2 | Legendary Secured Claim re 620 S. Gladys Avenue - $5,380,688 which is also secured by the MM 336 W. 11th Street Real Property (see Class 29A-4 above). | Impaired. | Common Secured Lender Treatment. |
| 46C | General Unsecured Claims - $1,501 | Impaired. | Common Unsecured Claim Treatment. |
| 46D | Intercompany Claims - $9,788,629 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 46E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| 47. | Merco Group – 2001-2021 W. Mission Boulevard LLC | | |
| 47A-1 | Los Angeles County Secured Tax Claim - $105,146 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 47A-2 | PNL Pomona LP Secured Claim — to be determined | Impaired. | Common Secured Lender Treatment. |
| 47C | General Unsecured Claims - $5,402 | Impaired. | Common Unsecured Claim Treatment. |
| 47D | Intercompany Claims - $12,948,409 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 47E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| 48. | Merco Group – Little J LLC | | |
| 48A-1-a | Los Angeles County Secured Tax Claim re 1119 S. Olive Street - $52,446 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 48A-1-b | Los Angeles County Secured Tax Claim re 1124 S. Olive Street - $64,262 | Unimpaired. | Common Los Angeles Tax Claim Treatment. |
| 48A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligation for payment under a loan made to Merco Group which is also | Impaired. | Common Secured Lender Treatment. |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | secured by the Sky-Arc Real Property (see Class 50A-2 below). | | |
| 48C-2 | General Unsecured Claims - $2,252 | Impaired. | Common Unsecured Claim Treatment. |
| 48C-3 | Tenant Security Deposit Claims - $7,000 | Unimpaired | Creditors' legal equitable and contractual rights are Reinstated. |
| 48D | Intercompany Claims - $8,299,295 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 48D | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **49.** | **Merco Group – Southpark LLC** | | |
| 49A-1 | Los Angeles County Secured Tax Claim - $570,318 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 49A-2 | Bank of America Secured Claim - $20,000,000 | Impaired. | Common Secured Lender Treatment. |
| 49C-1 | General Unsecured Claims - $1,308,981 | Impaired. | Common Unsecured Claim Treatment. |
| 49C-2 | Tenant Security Deposit Claims - $31,000 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 49D | Intercompany Claims - $37,919,096 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 49E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **50.** | **Merco Group LLC** | | |
| 50A-1 | Los Angeles County Secured Tax Claim $380,214 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 50A-2 | Legendary Secured Claim re Sky-Arc Real Property - $15,000,000 which is also secured by the Little J Real Property (see Class 48A-2 above) | Impaired. | Common Secured Lender Treatment. |
| 50A-3 | Legendary Secured Claim re Sci-Arc Real Property - $10,108,209 | Impaired. | Common Secured Lender Treatment. |
| 50C | General Unsecured Claims - $271,104 | Impaired. | Common Unsecured Claim Treatment. |
| 50D | Intercompany Claims - $16,604,526 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 50E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **51.** | **Meruelo Farms LLC** | | |
| 51A-1-a | Los Angeles County Secured Tax Claim re 815 E. Temple Street - $94,319 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 51A- | Los Angeles County | Unimpaired. | Common Los Angeles Tax Claim |

| Class | Description of Class | Impaired/ Unimpaired | |
|-------|---------------------|---------------------|---|
| 1-b | Secured Tax Claim re 729 E. Temple Street - $208,977 | | Treatment. |
| 51A-2 | Imperial Capital Bank Secured Claim - $6,978,349 | Impaired. | Common Settled Secured Claim Treatment. |
| 51A-3 | Pacific Commerce Secured Claim - $3,350,000 | Impaired. | Common Settled Secured Claim Treatment. |
| 51C | General Unsecured Claims - $187,099 | Impaired. | Common Unsecured Claim Treatment. |
| 51D | Intercompany Claims - $9,138,503 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 51E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **52.** | **Meruelo Wall Street LLC** | | |
| 52A-1 | Los Angeles County Secured Tax Claim - $423,210 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 52A-2 | East West Bank as successor to UCB Secured Claim - $20,850,859 | Impaired. | Common Secured Lender Treatment. |
| 52B | Priority Benefits Claims - $9,542 | Impaired. | Holders of Other Priority Claims will be paid in full on the Effective Date except to the extent such Claim includes accrued vacation or sick pay and the Holder of the Other Priority Claim remains employed with the Reorganized Debtors after the Effective Date.  If so, the vacation or sick pay shall be reinstated and the Holder shall be authorized to use such amounts for vacation or sick time following the Effective Date. |
| 52C-1 | Unsecured Claims — Tenant Security Deposits - $297,650 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 52C-2 | General Unsecured Claims - $16,640 | Impaired. | Common Unsecured Claim Treatment. |
| 52D | Intercompany Claims - $3,133,131 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 52E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **53.** | **Meruelo Maddux – Mission Boulevard LLC** | | |
| 53A-1 | Los Angeles County Secured Tax Claim - $290,497 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 53A-2 | Kennedy Funding, Inc. Secured Claim - $8,800,000 | Impaired. | Common Secured Lender Treatment. |
| 53C | General Unsecured Claims - $15,539 | Impaired. | Common Unsecured Claim Treatment. |
| 53D | Intercompany Claims - | Unimpaired. | Creditors retain their claims and all rights, |

| Class | Description of Class | Impaired/ Unimpaired | |
|---|---|---|---|
| | $20,054,067 | | interests and obligations related thereto. |
| 53E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **54.** | **Santa Fe Commerce Center, Inc.** | | |
| 54A-1 | Los Angeles County Secured Tax Claim - $99,452 | Impaired. | Common Los Angeles Tax Claim Treatment. |
| 54A-2 | Berkadia Secured Claim - $10,170,904 | Impaired. | Common Secured Lender Treatment. |
| 54A-3 | RoofCorp of CA, Inc. Secured Claim - $111,377 | Impaired. | Common Secured Lender Treatment. |
| 54C-1 | Unsecured Claims — Tenant Security Deposits - $79,667 | Unimpaired. | Creditors' legal equitable and contractual rights are Reinstated. |
| 54C-2 | General Unsecured Claims - $16,059 | Impaired. | Common Unsecured Claim Treatment. |
| 54E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

## B.    Treatment for Unclassified Claims

### 1.    Unclassified Claims (Applicable to all of the Debtors)

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Charlestown Plan because they are automatically entitled to a specific treatment provided for them in the Bankruptcy Code. As such, the Debtors have not placed the following claims in a class. The treatment of these claims is provided below.

### a.    *Administrative Claims*

Administrative Claims are claims for costs or expenses of administering the Debtors' Chapter 11 Cases which are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy Code requires that all Administrative Claims be paid on the Effective Date of the Charlestown Plan, unless a particular claimant agrees to a different treatment. Section 507(a)(2) Administrative Claims include, but are not limited to, claims arising from the employment of professionals and the costs and the statutory fees of the Bankruptcy Court and the Office of the United States Trustee.

### (1)    __General__

1    Subject to the bar date provisions herein and additional requirements for professionals and

2    certain other entities set forth below, the surviving Reorganized Debtor shall pay to each Holder of

3    an Allowed Administrative Claim, on account of its Administrative Claim and in full satisfaction

4    thereof, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date or

5    as soon as practicable thereafter, unless the Holder agrees or shall have agreed to other treatment of

6    such Claim. Payment on an Administrative Claim which arose in the ordinary course of each

7    Debtor's business, including Ordinary Course Professionals, will be made when such payment

8    would have become due in the ordinary course of each Debtor's business or under the terms of the

9    Claim in the absence of the Chapter 11 Cases.

10                    **(2)      Payment of Statutory Fees**

11    On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930, as

12    determined by the Court at the hearing on Confirmation, shall be paid in Cash equal to the amount

13    of such Administrative Claim.

14                    **(3)      Bar Date for Administrative Claims**

15                    *(a)      General Provisions*

16    Except as provided below for (i) non-tax liabilities incurred in the ordinary course of

17    business by each Debtor and (ii) Postpetition Tax Claims, requests for payment of Administrative

18    Claims must be Filed and served on counsel for the Reorganized Debtor no later than forty-five (45)

19    days after the Effective Date, or such later date, if any, as the Court shall order upon application

20    made prior to the end of such 45-day period. Holders of Administrative Claims (including, without

21    limitation, professionals requesting compensation or reimbursement of expenses and the Holders of

22    any Claims for federal, state or local taxes) that are required to File a request for payment of such

23    Claims and that do not File such requests by the applicable bar date shall be forever barred from

24    asserting such Claims against any of the Debtors or the Reorganized Debtor or any of their

25    respective properties.

26                    *(b)      Professionals*

27    All professionals or other Persons requesting compensation or reimbursement of expenses

28

1    pursuant to any of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for

2    services rendered on or before the Effective Date (including, inter alia, any compensation requested

3    by any professional or any other Person for making a substantial contribution in the Reorganization

4    Case) shall File and serve on the Reorganized Debtor and the Creditors' Committee an application

5    for final allowance of compensation and reimbursement of expenses no later than (i) forty-five (45)

6    days after the Effective Date, or (ii) such later date as the Court shall order upon application made

7    prior to the end of such 45-day period. Objections to applications of professionals for compensation

8    or reimbursement of expenses must be Filed and served on Reorganized Debtor, the Creditors'

9    Committee and the professionals to whose application the objections are addressed on or before (i)

10   fourteen days after such application is Filed and served or (ii) such later date as the Court shall

11   order or upon agreement between the Reorganized Debtor and the affected professional.

12       Any professional fees and reimbursements of expenses incurred by the Reorganized Debtor

13   subsequent to the Effective Date may be paid by the Reorganized Debtor without application to or

14   Order of the Court.

15                           *(c)*       ***Ordinary Course Liabilities***

16       Holders of Administrative Claims based on liabilities incurred post-petition in the ordinary

17   course of the Debtors' businesses, including Ordinary Course Professionals, (other than Claims of

18   governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required

19   to File any request for payment of such Claims. Such Administrative Claims shall be assumed and

20   paid by such Reorganized Debtor pursuant to the terms and conditions of the particular transaction

21   giving rise to such Administrative Claim, without any further action by the Holders of such Claims.

22                           *(d)*       ***Tax Claims***

23       All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise

24   been previously established, must be Filed on or before the later of (i) forty-five (45) days following

25   the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes for such tax

26   year or period with the applicable governmental unit. Any Holder of any Postpetition Tax Claim

27   that is required to File a request for payment of such taxes and that does not File such a Claim by

28

the applicable bar date shall be forever barred from asserting any such Postpetition Tax Claim against any of the Debtors or Reorganized Debtor, or any of their respective properties, whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the Effective Date. The Debtors are paying all Postpetition Tax Claims as they come due; however, certain taxing authorities conduct audits which may result in a postpetition tax liability of which the Debtors are currently unaware.

The San Bernardino County Taxing Authority has asserted a tax claim for the 2010-11 tax year. The Reorganized Debtor will pay such real property taxes in the normal and ordinary course of business together with any and all costs, fees and interest if applicable pursuant to 11 USC Sections 506(b) and 511. Any lien created on account of the unpaid taxes shall remain until paid in full.

### b.    Priority Tax Claims

Priority Tax Claims are certain unsecured income, employment and other taxes described by Bankruptcy Code Section 507(a)(8). The Bankruptcy Code requires that each holder of such a 507(a)(8) priority Tax Claim receive the present value of such claim in deferred cash payments, over a period not exceeding five years after the Petition Date. The following chart lists the Debtors' Section 507(a)(8) priority Tax Claims and their treatment under this Charlestown Plan.

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **1.  Meruelo Maddux Properties, Inc.** | | |
| **Name** – Franchise Tax Board <br> **Type of tax** – Income | $0.00 | See below. |
| **Name** – State of Delaware <br> **Type of tax** –  Franchise | $125,138.00 | See below. |
| **Name** – State Board of Equalization <br> **Type of tax** –  Hazardous Substance Tax | $61,916 | See below |
| **2.  Meruelo Maddux Properties, L.P.** | | |
| Name – Franchise Tax Board <br> Type of tax – Income | $0.00 | See below. |
| **4.  Meruelo Maddux Construction, Inc.** | | |
| Name – Franchise Tax Board <br> **Type of tax** – Income | $0.00 | See below. |
| **10.  Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina** | | |
| Name – Franchise Tax Board <br> **Type of tax** – Income | $0.00 | See below. |

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **11.  Meruelo Maddux – 230 W. Avenue 26 LLC** | | |
| Name: Franchise Tax Board<br>**Type of tax** –  Income | $0.00 | See below. |
| **12.  Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | |
| Name – City of Los Angles<br>**Type of tax** – Business<br>Name – Franchise Tax Board<br>**Type of tax** – Income | $151,232<br><br>$0.00 | See below. |
| **13.  .  Meruelo Maddux  - 817-825 S. Hill Street L** | | |
| Name – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **14.  .  Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| Name - Franchise Tax Board<br>**Type of tax** – Income | 0.00 | See below. |
| **15..  Meruelo Maddux  Properties – 1060 N. Vignes LLC** | | |
| Name - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **17.  Meruelo Maddux  - 5500 Flotilla Street LLC** | | |
| Name - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **18.  Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |
| Name - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **20.  Merco Group – 801 E. 7th StreetLLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **21.  Merco Group – 1211 E. Washington Boulevard LLC** | | |
| | | |
| **28.  Meruelo Maddux 3rd and Omar Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **29.  Meruelo Maddux - 336 W. 11th Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **30.  Meruelo Maddux  -  500 Mateo Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **35.  Meruelo Maddux  -  915-949 S. Hill Street** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **39.  Meruelo Maddux  -  2131 Humboldt Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |

| NAME | AMOUNT OWED | TREATMENT |
|------|-------------|-----------|
| **42. Meruelo Maddux  -  2951 Lenwood Road LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **52. Meruelo Wall Street LLC** | | |
| **Name** - Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **TOTAL** | **$340,475.00** | |

Except as otherwise provided below, or as otherwise agreed to by Reorganized Debtor and the applicable taxing agency, Holders an Allowed Priority Tax Claims shall receive the Common Unsecured Claim Treatment, i.e., payment in full on or before 30 days after the Effective Date.

In the event a Disputed Priority Tax Claim becomes an Allowed Priority Tax Claim after the Effective Date, the payment will be due 30 days after the date the Disputed Claim becomes an Allowed Claim.  Creditors who have agreed to other treatments in court-approved settlements shall receive the treatments provided in those settlements notwithstanding the Allowance of some or all of their Claims

## VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Charlestown Plan constitutes a motion to assume or reject all executory contracts and nonresidential real property leases, except for those executory contracts and nonresidential real property leases that have already been assumed or rejected pursuant to an earlier Order of the Bankruptcy Court or that are the subject of a motion for such an Order pending as of the Confirmation Hearing. Prior to the Charlestown Proponents, the Charlestown Proponents will file a schedule of all real property leases and executory contracts to be rejected; any contract or lease not on that schedule shall be deemed assumed by the applicable Debtor as of the Effective Date.  Prior to the date of hearing on the Charlestown Proponents Disclosure Statement, the Charlestown Proponents will file a schedule of all real property leases and executory contracts to be assumed

---

[6] The Franchise Tax Board has filed claims for franchise taxes for the 2009 year corporate tax fee of $800 in the Debtors' cases scheduled above.  Debtors' records indicate that all such taxes have been paid and, accordingly, the above schedule shows the amount of the such FTB claims to be zero but if it is determined that the FTB has Allowable Claims, the treatment is as provided above.

1    listing the cure amount, if any, under such unexpired lease or executory contract. Unless the non-

2    Debtor party to any such executory contract or unexpired lease to be assumed files and serves on

3    Charlestown Proponents' counsel an objection to the cure amount specified on that schedule on or

4    before the last date established by the Bankruptcy Court to file and serve objections to confirmation

5    of the Charlestown Plan, such cure amount shall be forever binding on such non-debtor party to said

6    executory contract or unexpired lease.

7    Except as otherwise agreed by the parties to an executory contract or unexpired lease, each

8    Reorganized Debtor will cure any and all undisputed defaults within thirty days of the Effective

9    Date under any executory contract or unexpired lease assumed pursuant to the Charlestown Plan

10    and to which it is a party, in accordance with Section 365 of the Bankruptcy Code. All disputed

11    defaults that are required to be cured shall be cured either within thirty days of the entry of a Final

12    Order determining the amount, if any, of such Debtor's or Reorganized Debtor's liability with

13    respect thereto, or as may be agreed otherwise by the parties. The Confirmation Order shall state

14    that all pre-petition contracts and unexpired leases that are listed on the schedule described herein

15    are deemed assumed under the Charlestown Plan.

16    Any Claim for damages arising from the rejection of an executory contract or unexpired

17    lease must be Filed and served on counsel for the Reorganized Debtors within thirty (30) days after

18    the order of the Bankruptcy Court approving such rejection becomes a Final Order or be (i) forever

19    barred and unenforceable against any Debtor, its Estate, the Reorganized Debtor and their

20    respective property, and (ii) barred from receiving any distribution under the Charlestown Plan. All

21    Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be

22    treated as a Class "C" General Unsecured Claim against the respective Debtor who is a party to such

23    executory contract or unexpired lease.

24    Any election of rights by a lessee under Section 365(h)(1) of the Bankruptcy Code must be

25    Filed and served on counsel for the Debtors within thirty (30) days after the order of the Bankruptcy

26    Court approving such rejection becomes a Final Order or lessee shall be deemed to have waived any

27    and all of its rights under Section 365(h)(1).

28

# VII.

## MEANS FOR IMPLEMENTATION OF THE CHARLESTOWN PLAN

### A.    OVERVIEW OF PLAN IMPLEMENTATION

Except as otherwise provided in the Charlestown Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors to make payments pursuant to the Charlestown Plan will be obtained from the Reorganized Debtors' cash balances existing on the Effective Date, from cash generated by the Reorganized Debtors' business post-Effective Date, from the sale or refinancing of assets of the Reorganized Debtors, from the proceeds of the Secured Loan described below, and from any other lawful source.

### B.    VESTING OF ASSETS

Except as otherwise provided in any provision of the Charlestown Plan, on the Effective Date, all legal and equitable interests of the Debtors in property of their respective estates shall be vested in such Reorganized Debtors, free and clear of all Claims, Liens, encumbrances and Interests except to the extent and only as is expressly provided for otherwise in Article III.0 of the Charlestown Plan.

### C.    SALE OR REFINANCE OF CERTAIN OF THE ASSETS OF CERTAIN DEBTORS

As of the Effective Date, the Reorganized Debtors will continue to operate their businesses. In order to meet their operational needs and payment obligations under the Charlestown Plan, the Reorganized Debtors may sell or refinance some of their assets as necessary during the term of the Charlestown Plan. The Reorganized Debtors will determine which assets will be sold or refinanced based on the then existing needs of the business. After the payment of the costs of sale and the satisfaction of any Liens fixed by this Charlestown Plan against the asset, the remaining proceeds will be available for the payment of the costs of operating its business and funding the Reorganized Debtors' obligations under this Charlestown Plan.

### D.    OFFER TO PURCHASE AND SECURED LOAN

a.    *Purchase of Shares*

On the Effective Date, MMPI Acquistion will contribute $23.0 million in cash, and such funds will be used first to purchase 55% of the shares of MMPI Existing Common Stock for $0.35 per share, as such purchase is described above at Sections III.C.1.g and h.  The remainder of such $23 million may be used for any corporate purpose, including making distributions under this Plan.

The current investors in MMPI Acquisition are Charlestown Capital, Hartland Asset Management, and Global Asset Capital.  Global Asset Capital owns 75% of MMPI Acquisition, Charlestown Capital owns 20% of MMPI Acquisition, and Hartland Asset Management owns 5% of MMPI Acquisition.

Charlestown Capital is a private merchant-banking and financial advisory company headquartered in New York. Charlestown Capital has been involved in strategic M & A advisory, restructurings, asset divestitures, partial recapitalizations, and other financings across many sectors. As a merchant bank, Charlestown has committed capital to mid-sized enterprises and financially backed managements during financial restructurings.

Charlestown Capital was founded by Raj Maheshwari in 2005.  Under Mr. Maheshwari's tenure, Charlestown Capital has been a M & A advisor to Esmark, Inc, a $1.3 billion steel company that was sold to OAO Severstal of Russia in August 2008.  Charlestown Capital continues to be a Mergers & Acquisition advisor to The Bouchard Group, the founders of Esmark, Inc. and to their successor companies.  In addition, Charlestown continues to be involved in many other M & A and financial restructuring initiatives.

Charlestown Capital, Raj Maheshwari, and persons or entities affiliated them own a total of 1,712,300 shares in MMPI as follows:

| | |
|---|---|
| Charlestown Jupiter Fund LLC | 1,435,000 |
| Man Mohan and Asha Maheshwari | 155,000 |
| Charlestown Capital Advisors, LLC | 118,000 |
| Raj Maheshwari | 4,300 |

These 1.7 million shares are approximately 2% of the shares in MMPI and approximately 4% of the Non-Insider shares.

1    Hartland Asset Management is a registered investment advisor providing investment

2  management services to institutional investors.  Since its inception in 1995, Hartland has specialized

3  in private investments within the real estate and fixed income asset classes.  Currently, Hartland

4  manages an investment account for investing in real estate owned by tax exempt institutions. It also

5  originates opportunities to invest in renewable energy projects.

6    Lee Smith is President of Hartland Asset Management. Over his career, Mr. Smith has

7  implemented over $500 million worth of investments, mostly, though not exclusively, in real estate.

8  He has written extensively on economic and investment issues.  Before starting Hartland, Mr. Smith

9  served in the Administration of New York Governor Mario M. Cuomo, having been appointed in

10  1983 as the Deputy Commissioner and general counsel of the NYS Labor Department.  In1989 he

11  was named Executive Director of the Governor's Pension Investment Task Force, a 20 member

12  committee of legal and financial experts and pension fund executives, chaired by Ira Millstein, to

13  examine the role of pension funds in economy.  He edited the Task Force's two reports: Our

14  Money's Worth, The Report of the Governor's Task Force on Pension Fund Investment, (New York,

15  l989); Competitive Plus - A Study of Economically Targeted Investments by Pension Funds, (New

16  York, 1990).

17    Hartland Asset Management, Lee Smith and persons or entities affiliated with them own

18  50,500 shares in MMPI.  This represents less than 1% of the outstanding shares in MMPI.

19    Global Asset Capital ("GAC") is a Palo Alto, California-based private equity investment

20  firm with interests in venture capital, structured finance, and real estate.  Founded in 1997, GAC is

21  currently managing over $350MM focused on venture capital, private equity, and real estate. GAC

22  has a successful track record of building businesses in the telecommunications/media/technology

23  and specialty finance/real estate industries.  GAC partners with management teams to build

24  category defining companies that create long-term equity value.  GAC's current real estate portfolio

25  comprises over twenty office and development assets in California.  GAC's financial advisor in real

26  estate matters is Deutsche Bank, and its legal advisor is Morrison & Foerster.

27    In addition to the above investors, MMPI Acquisition is advised by the Multi Capital Group.

28

1  Multi Capital Group is a Real Estate Investment Banking firm, specializing in the full spectrum of

2  real estate financing.  This is the case whether it is the acquisition or refinancing of an office

3  building, shopping center, industrial building, mixed-use, multi-family property or health related

4  facility.  As a part of The Multi Group of Companies, Multi Capital Group has successfully been

5  involved in excess of $6 billion Dollars of real estate transactions.  Over the last decade, Multi

6  Capital has built an array of complementary financial and advisory services. Today, Multi Capital

7  offers, owners, investors and developers comprehensive debt structures, corporate advisory, and

8  construction consulting services, as well access to a wide variety of investment and financial

9  services.

10  On or before the final day of hearings on confirmation of the Charlestown Plan, MMPI

11  Acquisition will make a $4 million deposit into a segregated account.  Upon entry of an order of the

12  Bankruptcy Court confirming the Charlestown Plan, the $4 million deposit amount will become a

13  non-refundable deposit and will constitute the total amount of liquidated damages for MMPI

14  Acquisition's failure to transmit the full purchase price on the Effective Date, unless MMPI's

15  Acquisition's failure to perform is excused.  MMPI Acquisition's obligation to transmit the full

16  purchase price will not be subject to any financing contingency.

17

18  b.  ***Secured Loan***

19  MMPI Acquisition has obtained a commitment for a secured loan in the amount of $15

20  million (the "Secured Loan") for MMPI Acquisition to use in funding the operations and payments

21  under the Charlestown Plan.  The Secured Loan will be made as of the Effective Date and will

22  receive the common secured lender treatment, i.e., it will bear monthly interest at the rate of 5.25%

23  for four years with full payment on the principal balance four years after the Effective Date.  The

24  Secured Loan will be secured by a first priority deed of trust on three of the Debtors' real properties,

25  (i) 1211 East Washington Boulevard, (ii) W. Ave. 26 and (iii) 129 W. College Street owned by

26  related Debtor Chinatown.

27

28

c.   ***Offer to Purchase And Secured Loan Conditioned Upon Confirmation And Effective Date***

The purchase of shares of MMPI Exising Common Stock set forth herein and the Secured Loan are subject to and conditioned upon confirmation of the Charlestown Plan and the occurrence of the Effective Date.

**E.   Certificate of Incorporation and Bylaws; Cancellation Of Certain MMPI Securities, LTIP Units and Related Agreements**

a.   ***Cancellation Of Certain MMPI Securities, LTIP Units and Related Agreements***

At the Effective Date, (i) the LTIP Units; all warrants, options or other rights for the purchase or other acquisition from any Debtor of any MMPI Existing Common Stock or LTIP Units; all securities convertible into or redeemable or exchangeable for any MMPI Existing Common Stock or LTIP Units; and all warrants, rights or options for the purchase or other acquisition from any Debtor of any MMPI Existing Common Stock or LTIP Units or any such warrants, options, other rights or securities, and any interest or participation in any of the foregoing and any other ownership or profit interest or participation in MMPI or MMPLP (other than MMPI Existing Common Stock or to the extent not held directly or indirectly by MMPI) will be cancelled and extinguished, and (ii) the obligations of, Claims against, and/or Interests in MMPI under, relating or pertaining to any agreements (including without limitation, registration rights agreements, merger, contribution and similar agreements and voting, shareholders and similar agreements), indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the MMPI Existing Common Stock and any other instrument or document evidencing or creating ownership interest in MMPI (including without limitation, provisions of the agreement of limited partnership of MMPLP and award agreements relating to the LTIP Units but excluding MMPI Existing Common Stock) will be released and discharged.  For the avoidance of doubt, other than as required to effect the reverse stock split described in Section VII.E.b below, there will be no cancellation of MMPI Existing Common

Stock.

b.    ***Reverse Stock Split***

On the Effective Date, but after the purchase by MMPI Acquisition of 55% of the shares of MMPI Existing Common Stock in accordance with the terms of this Plan, the MMPI Exsiting Common Stock shall undergo a 5 to 1 reverse stock split.  Accordingly, for each 5 shares of MMPI Existing Common Stock held by a Holder after the purchase by MMPI Acquisition described herein, such Holder will hold 1 share of Reorganized MMPI Common Stock.  No fractional shares of Reorganized MMPI Common Stock will be permitted.  In this manner, a Holder that otherwise would receive a fractional share as a result of this reverse stock split will receive $0.35 per share in exchange for such shares that would be represented by such fractional share.

c.    ***Amended and Restated Certificate of Incorporation and Bylaws***

On and after the Effective Date, pursuant to and by virtue of this Charlestown Plan, the certificate of incorporation of the Reorganized MMPI will be amended and restated in a form necessary to effectuate the provisions of the Charlestown Plan until thereafter changed or amended as provided therein or by applicable law.  Similarly, amended and restated bylaws in a form necessary to effectuate the Charlestown Plan will be the bylaws of Reorganized MMPI until thereafter changed or amended as provided therein or by applicable law.

**F.    Certain Post-Effective Date Securities Issues**

The Reorganized Debtor will remain a public company and take steps to rescind its Form 15 and regain reporting status.  Within a reasonable time after the Effective Date, Reorganized MMPI will take all commercially reasonable steps necessary to list the MMPI Existing Common Stock on a public exchange and to remain publicly listed for at least four years.

**G.    Merger of MMPLP and MMPI**

Upon the terms and subject to the conditions set forth in the agreement and plan of merger (the "Merger Agreement"), the form of which is attached hereto as Exhibit K, MMPLP shall be merged with and into MMPI one day after the Effective Date if not earlier accomplished (the

"Merger").  Following the Merger, the separate corporate existence of MMPLP shall cease, and MMPI shall continue as the surviving company and shall succeed to and assume all the rights and obligations of MMPLP.

If not earlier accomplished, as promptly as practicable but at least one day after the Effective Date, the parties shall file with the Secretary of State of the State of Delaware a certificate of merger (the "Certificate of Merger") executed and acknowledged by the parties in accordance with the relevant provisions of the DGCL and the RULPA and, as promptly as practicable on or after the Effective Date, the parties to the Merger shall make all other filings or recordings required by the Court and under the DGCL and the RULPA.  If not earlier accomplished, the Merger shall become effective one day after the Effective Date and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, or at such later date and time as MMPI and MMPLP shall agree and shall specify in the Certificate of Merger.

Once the Merger becomes effective, all the property, rights, privileges, powers, and franchises of MMPLP shall vest in MMPI, and all debts, liabilities, and duties of MMPLP shall become the debts, liabilities and duties of MMPI.

**H.      Retained Claims And Defenses And Reservation Of Rights**
        *a.      No Waiver and Retention of Claims and Defenses*

Unless otherwise expressly set forth in the Charlestown Plan or the Confirmation Order, pursuant to Section 1123(b)(3)(B), all Retained Claims and Defenses of any kind or nature whatsoever against third parties arising before the Effective Date and belonging to the Debtor or the Estate shall become property of the Reorganized Debtor.  Such Retained Claims and Defenses shall include, without limitation:

All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 524 and 553 of the Bankruptcy Code against any Creditor regarding the amount of such Holder's Allowed Claim (whether pre-petition or post-petition), to enforce the discharge of any Secured Creditors' Claims;

All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 510, 524, 542 and 553 of the Bankruptcy Code including, without limitation, claims and defenses based on any Creditors' assertion of unreasonable professionals' fees, costs, charges and penalties (whether disguised as interest, or otherwise); and

All claims and defenses related to the recovery of professionals' fees and expenses by the Debtor or Reorganized Debtor from Creditors.

All claims against the Debtors' Insiders, employees, agents and/or professionals arising out of or relating to pre-confirmation conduct (including pre-petition conduct), including without limitation, claims for fraud, breach of contract, breach of fiduciary duty, negligence, or professional malpractice.

All claims and defenses attributable to the filing of personal Chapter 7 or Chapter 11 bankruptcy petitions by an Insider who is a natural person, including without limitation, claims or defenses related to the diminution of security for the Company's debts if an Insider obtains a discharge of their personal guaranty obligations.

From and after the Effective Date, the Reorganized Debtor is authorized to assert the Retained Claims and Defenses including, but not limited to, for purposes of objection to the allowance of any Claim.  Nothing contained in the Charlestown Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any of the Debtor's rights with respect to the Retained Claims and Defenses and Reorganized Debtor shall be entitled to assert the Retained Rights and Defenses as fully as if the Chapter 11 Case had not been commenced.

b.       *Retention of Avoidance Actions*

Unless otherwise expressly set forth in the Charlestown Plan or the Confirmation Order, from and after the Effective Date, the Reorganized Debtor shall have the right to prosecute any and all avoidance actions, recovery causes of action and objections to Claims under Sections 105, 502,

506, 510, 542 through 551 and 553 of the Bankruptcy Code that belong to the Debtors or to the

Estates, including, without limitation, all avoidance actions related to the transfers listed on Exhibit

"I" attached hereto, as well as potential avoidance actions against Legendary and East West Bank

relating to the withdrawals by East West Bank of $2 million from an account held at East West

Bank a few days before the Debtors' bankruptcy and against Legendary, based on the post petition

recording of documents purporting to re-establish a previously reconveyed Lien against assets of

Debtors, and against PNL for certain involuntary, unauthorized postpetition transfers of funds

belonging to MG 2001-2021 W. Mission.

With regard to actions that may be asserted under section 547 of the Code, a plaintiff must

show that the recipient received more as a result of the transfer than the recipient would receive in a

hypothetical Chapter 7 case.  Under the Charlestown Plan, general unsecured creditors' Allowed

Claims will be paid in full.  As a result, with regard to transfers made during the relevant 90-day or

1-year preference periods to general unsecured creditors, the Reorganized Debtor is unlikely to seek

the avoidance of such transfers.  If the Charlestown Plan is not confirmed, the risk that an avoidance

action may be filed to recover a transfer made during the relevant period may increase. A list of all

of the transfers by the Debtor during the 90-day and 1-year periods is attached as Exhibit "I."

c.    ***Unknown Retained Claims and Defenses / No Preclusion***

Unless otherwise expressly set forth in the Charlestown Plan or the Confirmation Order, the

reservation of rights and Retained Claims and Defenses set forth above shall include, without

limitation, any Retained Claims and Defenses of which the Debtor may presently be unaware, or

which may arise or exist by reason of additional facts or circumstances unknown to the Debtor at

this time or facts or circumstances that may change or be different from those the Debtor now

believes to exist including, without limitation, claims based on theories of construction defect,

breach of warranty, negligence, indemnification and contribution.  Therefore, no preclusion

doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, waiver,

estoppel (judicial, equitable or otherwise), or laches will apply to the Reorganized Debtor with

1   respect to the Retained Claims and Defenses upon or after the Confirmation of the Charlestown

2   Plan based on the Charlestown Plan, the Disclosure Statement or the Confirmation Order.

3       **I.**       **NON-BANKRUPTCY LITIGATION**

4         The Debtors are engaged in litigation proceedings for which relief from stay has been

5   granted.  While the Debtors do not consider any such litigation to be material, there are two eminent

6   domain actions that may result in cash awards being paid to the respective Debtors. In 2004, the Los

7   Angeles County Metropolitan Transportation Authority ("MTA") filed an eminent domain action

8   against Alameda Produce Market seeking to take the 1339 E. 7th Street Real Property.  Shortly

9   thereafter, the MTA obtained an order for possession of such property and have remained in

10  possession ever since.  After lengthy proceedings, the trial court dismissed the action and ordered

11  the MTA to return possession of the property to Alameda Produce Market.  The MTA appealed the

12  ruling and the matter is pending before the appellate court. If the trial court ruling is affirmed and

13  not further appealed, the MTA will be required to return possession of the property to Alameda

14  Produce Market, and Alameda Produce Market may, among other things, be entitled to damages

15  and/or compensation as a result of the MTA's use of the property.  A reversal of the trial court's

16  ruling could result in a remand to the trial court for a hearing on the valuation of the property. In the

17  event the MTA is permitted to proceed with the taking of the property, the MTA would be required

18  to pay just compensation in connection with such taking.

19      **J.**       **OBJECTIONS TO CLAIMS**

20        Except as otherwise provided in the Charlestown Plan, objections to Claims, including

21  without limitation Administrative Claims (other than objections to Administrative Claims of

22  Professionals), shall be Filed and served upon the Holder of such Claim or Administrative Claim no

23  later than the later of: (a) one hundred eighty (180) days after the Effective Date, (b) one hundred

24  eighty (180) days after a proof of Claim or request for payment of such Claim is Filed, and (c) a

25  deadline set by the Bankruptcy Court after the extension of the one hundred eighty (180)-day

26  deadline; such extension may be granted on an ex parte basis without notice or hearing. After the

27  Effective Date, only the Reorganized Debtor will have the authority to File objections, settle,

28

1  compromise, withdraw or litigate to judgment objections to Claims and Interests.  From and after

2  the Confirmation Date, Reorganized Debtor may settle or compromise any Disputed Claim or

3  Disputed Interest without approval of the Bankruptcy Court.  The Reorganized Debtors will file

4  objections to any claim which was scheduled as disputed, contingent or unliquidated and for which

5  no timely proof of claim was filed.

6

7      **K.      DISBURSING AGENT**

8          The Chief Accounting Officer of Reorganized MMPI shall act as the Disbursing Agent for

9  the purpose of making all distributions provided for under the Charlestown Plan.  The Disbursing

10  Agent shall serve without bond, and shall receive no additional compensation for his duties as

11  Disbursing Agent.

12      **L.      DISCHARGE OF THE DEBTORS AND INJUNCTION**

13          **1.      Discharge**

14          Except as otherwise provided in the Charlestown Plan, the Confirmation Order or Section

15  1141 (d)(6) of the Bankruptcy Code: (i) on the Effective Date, each Debtor shall be deemed

16  discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code

17  from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and

18  Interests that arose before the Confirmation Date and all debts of the kind specified in Sections

19  502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not: (A) a proof of Claim or proof of

20  Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the

21  Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is allowed pursuant to

22  Section 502 of the Bankruptcy Code or (C) the Holder of a Claim or Interest based on such debt or

23  Interest has accepted the Charlestown Plan; and (ii) all Persons shall be precluded from asserting

24  against each Reorganized Debtor, its successors, or its assets or properties any other or further

25  Claims or Interests based upon any act or omission, transaction, or other activity of any kind or

26  nature that occurred prior to the Confirmation Date. Except as otherwise provided in the

27  Charlestown Plan or the Confirmation Order, the Confirmation Order shall act as a discharge of any

28

1    and all Claims against and all debts and liabilities of the Debtor, as provided in Sections 524 and

2    1141 of the Bankruptcy Code, and such discharge shall void any judgment against each Debtor at

3    any time obtained to the extent that it relates to a Claim discharged.

### 2.    Injunction

5        All Persons that have held, currently hold or may hold a Claim or other debt or liability or an

6    Interest or other right of an equity security Holder, are permanently enjoined from taking any of the

7    following actions on account of any such Claims, debts or liabilities or terminated Interests or rights

8    discharged pursuant to Section I.1. immediately above: (a) commencing or continuing in any

9    manner any action or other proceeding against any of the Debtors, the Creditors' Committee, or

10   professional persons retained by the Creditors' Committee; (b) enforcing, attaching, collecting or

11   recovering in any manner any judgment, award, decree or order against any of the Debtors, the

12   Creditors' Committee or professional persons retained by the Creditors' Committee; (c) creating,

13   perfecting or enforcing any lien or encumbrance against any of the Debtors, the Creditors'

14   Committee, or professional persons retained by the Creditors' Committee; (d) asserting a setoff,

15   right of subrogation or recoupment of any kind against any obligation due to any of the Debtors, the

16   Creditors' Committee or professional persons retained by the Creditors' Committee; and (e)

17   commencing or continuing any action, in any manner, in any place that does not comply with or is

18   inconsistent with the provisions of the Charlestown Plan.  The injunction described herein does not

19   apply to and shall not enjoin or otherwise prevent the Reorganized Debtor from commencing or

20   continuing any action against the Debtors' current or former officers, directors, or employees for

21   claims arising before or after the commencement of the Debtors' bankruptcy cases.

22       Any Person injured by any willful violation of such injunction shall recover actual damages,

23   including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive

24   damages, from the willful violator.  No Liability for Solicitation or Participation

25       As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or

26   rejections of the Charlestown Plan and/or that participate in the offer, issuance, sale, or purchase of

27   securities offered or sold under the Charlestown Plan, in good faith and in compliance with the

28

1  applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or

2  participation, for violation of any applicable law, rule, or regulation governing the solicitation of

3  acceptances or rejections of the Charlestown Plan or the offer, issuance, sale, or purchase of

4  securities.

5       **M.    NO LIABILITY FOR SOLICITATION OR PARTICIPATION**

6       As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or

7  rejections of the Charlestown Plan and/or that participate in the offer, issuance, sale, or purchase of

8  securities offered or sold under the Charlestown Plan, in good faith and in compliance with the

9  applicable provisions of the Bankruptcy Code, shall not be liable, on account of such solicitation or

10  participation, for violation of any applicable law, rule, or regulation governing the solicitation of

11  acceptances or rejections of the Charlestown Plan or the offer, issuance, sale, or purchase of

12  securities.

13       **N.    LIMITATION OF LIABILITY**

14       Neither (a) the Charlestown Proponents or any of their employees, officers, directors,

15  agents, representatives, affiliates, attorneys or any other professional persons employed by any of

16  them; nor (b) MMPI Acquisition or any of its employees, officers, directors, agents, representatives,

17  affiliates, attorneys or any other professional persons employed by it; nor (c) the Reorganized

18  Debtors or any of its respective members, agents, employees, directors, officers, representatives,

19  attorneys or other professional advisors; nor (d) the Creditors' Committee or any of its respective

20  postpetition members, agents, employees, directors, officers representatives, attorneys or other

21  professional advisors shall have any responsibility, or have or incur any liability, to any Person

22  whatsoever, under any theory of liability (except for any claim based upon willful misconduct or

23  gross negligence), for any act taken or omission made in good faith directly related to formulating,

24  implementing, confirming, or consummating the Charlestown Plan, the Charlestown Disclosure

25  Statement, or any contract, instrument, release, or other agreement or document created in

26  connection with the Charlestown Plan, provided that nothing in this paragraph shall limit the

27  liability of any Person for breach of any express obligation it has under the terms of this

28

1   Charlestown Plan or under any post-petition agreement or other post-petition document entered into

2   by such Person or in accordance with the terms of this Charlestown Plan or for any breach of a duty

3   of care owed to any other Person occurring after the Effective Date.

4         **O.     CERTIFICATE OF INCORPORATION AND CERTIFICATES OF**

5   **ORGANIZATION**

6   On the Effective Date, the Reorganized Debtor, or each of them if there is more than one,

7   shall adopt amended certificates pursuant to applicable non-bankruptcy law and Section

8   1123(a)(5)(I) of the Bankruptcy Code. Each amended certificate will, among other provisions

9   prohibit the issuance of nonvoting equity securities to the extent required by Section 1123 (a)(6) of

10  the Bankruptcy Code and will become effective upon the occurrence of the Effective Date, and shall

11  include such other provisions as determined by the Reorganized Debtors including the elimination

12  of single purpose entity provisions.

13        **P.     OTHER DOCUMENTS AND ACTIONS**

14  The Debtors and the Reorganized Debtor may, and shall, execute such documents and take

15  such other actions as are necessary to effectuate the transactions provided for in the Charlestown

16  Plan.

17        **Q.     CORPORATE ACTION**

18  The adoption of the amended certificates of incorporation, certificates of organization, or

19  certificate of limited partnership, as the case may be, and all other matters under the Charlestown

20  Plan involving the corporate structure of the Reorganized Debtor, shall be deemed to have occurred

21  and be effective on and after the Effective Date without any requirement of further action by the

22  stockholders, directors, managers, members, or limited partners, as the case may be, of each Debtor.

23  Without limiting the foregoing, upon entry of the Confirmation Order by the Clerk, the

24  filing by any of the Reorganized Debtor of the amended certificates shall be authorized and

25  approved in all respects, including amendments to eliminate any special purpose entity provisions.

26  On the Effective Date or as soon thereafter as is practicable, pursuant to applicable law, the bylaws,

27  operating agreements, or partnership agreement, as the case may be, of each Debtor shall be the

28

1    bylaws, operating agreements or partnership agreement of such Reorganized Debtor.

2        **R.    RETIREE BENEFITS**

3        The Debtors do not have any present obligations to pay retiree benefits within the meaning

4    of Section 1129(a)(13).

5        **S.    THE OFFICIAL COMMITTEES**

6        The Creditors' Committee and the Equity Committee shall be dissolved on the Effective

7    Date and the members of such committee shall be released and discharged from all further rights

8    and duties arising from or related to the Chapter 11 Cases.  The professionals retained by such

9    committee and the members thereof shall not be entitled to compensation or reimbursement of

10    expenses incurred for services rendered after the Effective Date (except with regard to seeking

11    allowance of fees incurred prior to the Effective Date).

12                                        **VIII.**

13                        **MANAGEMENT OF REORGANIZED DEBTORS**

14        The Reorganized Debtors will retain professional management to manage the Company.

15    The professional management will be existing MMPI employees, new employees, or outside

16    management companies or some combination of them.  The professional management will be

17    selected in consultation with the Equity Committee.

18        The initial board of directors of Reorganized MMPI will consist of seven directors.  MMPI

19    Acquisition will have the right to appoint four of the seven directors.  The Equity Committee will

20    have the right to appoint three of the seven directors (collectively, the "Equity Committee

21    Directors").  One of the Equity Committee Directors must be approved by MMPI Acquisition.  The

22    Equity Committee Directors must approve Reorganized MMPI's Chief Financial Officer and its

23    independent auditor.  The Equity Committee Directors must approve any related-party transactions

24    involving Reorganized MMPI and MMPI Acquisition or its parents, subsidiaries or other affiliates.

25    The Equity Committee Directors must approve any sale of Reorganized MMPI or substantially all

26    of Reorganized MMPI's assets.  The terms of the directors shall be staggered in accordance with the

27    following provisions, which provisions shall be reflected in Reorganized MMPI's certificate of

28

incorporation: the initial directors shall be divided into three groups, with the first group up for re-election at the first annual meeting of the board containing two of the four directors appointed by MMPI Acquisition, the second group up for re-election one year after the first annual meeting of the board containing the other two directors initially appointed by MMPI Acquisition, and the third group up for re-election two years after the first annual meeting of the board containing the three directors appointed by the Equity Committee.

Insiders of the Charlestown Proponents and Insiders of MMPI Acquisition may serve as non-executive members of the Company's board of directors, but they will not hold operational management positions. The Charlestown Proponents anticipate that the Reorganized Debtors will retain as many of the current employees as practicable for continuity of management and preservation of institutional knowledge. The Charlestown Proponents do not, however, intend to retain Richard Meruelo or John Maddux.

Mr. Meruelo and Mr. Maddux allege that they have valid and enforceable employment agreements. Mr. Meruelo and Mr. Maddux have asserted that the termination of their employment would give rise to claims under those agreements. The Charlestown Proponents believe that any such claims would be limited by Bankruptcy Code Section 502(b)(7) which limits claims for employees for damages resulting from the termination of an employment contract. So limited, the maximum amount of Mr. Meruelo's and Mr. Maddux's claims would be approximately $1.5 million. Mr. Meruelo or Mr. Maddux may disagree with the Charlestown Proponents' interpretation of Section 502(b)(7) and with their calculation of the maximum damages.

## IX.

## CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Charlestown Plan:

### A.    SOLICITATION OF VOTES

In accordance with Sections 1126 and 1129 of the Bankruptcy Code, the following Classes of Claims are impaired, and the Holders of Allowed Claims in each of these Classes are entitled to

vote to accept or reject the Charlestown Plan of this Debtor or Debtors against whom they have a claim:

Classes 10A, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1, 28A-1, 38A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of Secured Tax Claims against the Debtors);

Classes 21A-2, 28A-2, 29A-2, 29A-3, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 37A-2, 37A-3, 37A-4, 38A-2, 39A-2, 40A-2, 41A-2, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors);

Classes 1B, 5B, 32B, 33B, and 36B (consisting of the Priority Unsecured Benefits Claims of present and former employees); and

Classes 1C-3, 2C-3, 3C, 4C-2, 5C-2, 6C, 7C, 8C-2, 9C-2, 10C-2, 11C-3, 12C-3, 15C-2, 16C-2, 17C, 18C-2, 19C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3, 29C-2, 30C-3, 31C-2, 32C, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3, 53C, and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor);

Class 1E (the class of Non-Insider Interests in MMPI); and

Class 1F (the class of Insider Interests in MMPI)

The Class of Interests of MMPLP, Class 2E will not retain or receive any property on account of their Interests as a result of the merger of MMPLP and MMPI immediately following the Effective Date.

The following Classes of the Charlestown Plan are unimpaired. As a result, Holders of Claims and Interests in those Classes are conclusively presumed to have accepted the Charlestown Plan and the solicitation of acceptances with respect to such Classes is not required under Section 1126(f) of the Bankruptcy Code:

1    Classes 11C-1, 12C-1, 14C-1, 15C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1, 32C-1,

2    33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 43C-3, 44C-3, 46C-1, 48C-3, 49C-3,

3    52C-1 and 54C-1 consisting of the unsecured Claims for security deposits of the Debtors' tenants);

4    Classes 3E through 54E (consisting of the Interests of MMPLP, MMP Ventures, MM

5    Construction and MM Management, and the Property Level Debtors).

6    As to the Classes of Claims entitled to vote on a Plan, the Bankruptcy Code defines

7    acceptance of a Plan by a Class of creditors as acceptance by Holders of at least two-thirds in dollar

8    amount and more than one-half in number of the Claims of that Class that have timely voted to

9    accept or reject a Plan. A vote may be disregarded if the Bankruptcy Court determines, after notice

10   and a hearing, that acceptance or rejection was not solicited or procured in good faith or in

11   accordance with the provisions of the Bankruptcy Code.

12   Any creditor in an impaired Class: (i) whose Claim has been listed by the Debtors in the

13   Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as

14   disputed, contingent or unliquidated) or (ii) who filed a proof of Claim on or before the Bar Date or

15   any proof of Claim filed within any other applicable period of limitations or with leave of the

16   Bankruptcy Court, which Claim is not the subject of an objection or request for estimation, is

17   entitled to vote on the Charlestown Plan.

18   **B.    THE CONFIRMATION HEARING**

19   The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation

20   hearing. The Confirmation Hearing in respect of the Charlestown Plan has been scheduled to

21   commence on January 5, 2010, commencing at 9:30 a.m. Pacific Standard Time, before, the

22   Honorable Victoria S. Kaufman of the United States Bankruptcy Court for the Central District of

23   California. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court

24   without further notice except for an announcement of the adjourned date made at the Confirmation

25   Hearing. The Charlestown Plan may be modified by the Debtors pursuant to Section 1127 of the

26   Bankruptcy Code prior to, during or as a result of that hearing, without further notice to parties in

27   interest.

28

Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number of shares of stock held by the objector.  Objections to confirmation of the Charlestown Plan are governed by Bankruptcy Rule 9014.

## C.    CONFIRMATION

At the Confirmation Hearing, the Bankruptcy Court will confirm the Charlestown Plan only if all of the requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation of a Plan are that the Charlestown Plan is (i) accepted by all impaired Classes of Claims and Interests or, if rejected by an impaired Class, that the Charlestown Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of creditors and stockholders that are impaired under the Charlestown Plan.

### 1.    Acceptance

The Classes identified above in Section IX.A are impaired and are entitled to vote to accept or reject the Charlestown Plan.

The Debtors reserve the right to amend the Charlestown Plan in accordance with the terms of the Charlestown Plan or seek nonconsensual confirmation of the Charlestown Plan under Section 1129(b) of the Bankruptcy Code or both with respect to any Class of Claims that is entitled to vote to accept or reject the Charlestown Plan, if such Class rejects the Charlestown Plan.

### 2.    Unfair Discrimination and the Fair and Equitable Tests

Section 1129(b) of the Bankruptcy Code provides that a Plan can be confirmed even if it has not been accepted by all impaired Classes as long as at least one impaired Class of Claims has accepted it.  The Bankruptcy Court may confirm the Charlestown Plan as to one or more Debtors at the request of such Debtors notwithstanding the Charlestown Plan's rejection (or deemed rejection) by impaired Classes in the case of such Debtors as long as the Charlestown Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it. A Plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting Class if the value of the cash and/or securities to be distributed to the nonaccepting Class is equal to, or

otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the nonaccepting Class or is otherwise permitted under the circumstances.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable." The Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

• <u>Secured Creditors</u>. Either: (i) each impaired secured creditor retains its liens securing its secured Claim and receives on account of its secured Claim deferred cash payments having a present value equal to the amount of its allowed secured Claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

<u>Unsecured Creditors</u>. Either: (i) each impaired unsecured creditor receives or retains under the Charlestown Plan property of a value equal to the amount of its allowed Claim; or (ii) the Holders of Claims and interests that are junior to the Claims of the dissenting Class will not receive any property under the Charlestown Plan.

<u>Interests</u>. Either: (i) each holder of an Interests will receive or retain under the Charlestown Plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the nonaccepting Class will not receive or retain any property under the Charlestown Plan.

### 3.    Feasibility

To confirm the Charlestown Plan, the Bankruptcy Code must find that confirmation of the Charlestown Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors. This requirement is imposed by Section 1129(a) of the Bankruptcy Code and is referred to as the "feasibility" requirement.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Reorganized Debtors will have enough cash on hand on the Effective Date of the

1   Charlestown Plan to make the distributions provided under the Charlestown Plan on or near the

2   Effective Date.  The other aspect of feasibility considers whether the Reorganized Debtors will

3   generate enough cash – through operations or asset sales -- to make the future payments

4   contemplated under the Charlestown Plan.  For purposes of determining whether the Charlestown

5   Plan meets the feasibility requirement, the Charlestown Proponents have analyzed the Reorganized

6   Debtors' ability to meet their obligations under the Charlestown Plan.  As part of this analysis, the

7   Charlestown Proponents have prepared projections of the Reorganized Debtors' financial

8   performance for four years following the Effective Date (the "Projection Period").  These

9   projections, and the assumptions on which they are based, are included in the Shareholder

10  Propoenents' Projected Financial Information, annexed hereto as Exhibit "E" and provide a

11  projected Consolidated Statement of Cash Flow for the Reorganized Debtors on a monthly basis for

12  the first two years of the Projection Period and on an annual basis for each of the four years of the

13  Projection Period.  The Projections also provide a projected Cash Flow for each of the Operating

14  Debtors on a monthly basis for the first two years of the Projection Period and on an annual basis

15  for each of the four years of the Projection Period.  Exhibit E also contains a statement of the results

16  of actual operating revenues and expenses for the period April 1, 2009 through March 31, 2010.

17         The pro forma financial information and the projections are based on the assumption that the

18  Charlestown Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the

19  Effective Date under the Charlestown Plan will occur on or about December 31, 2010.  Based upon

20  the Charlestown Proponents Projected Financial Information, the Charlestown Proponents believe

21  that the Reorganized Debtors will be able to make all payments required pursuant to the

22  Charlestown Plan and, therefore, that confirmation of the Charlestown Plan is not likely to be

23  followed by liquidation or the need for further reorganization.  The Projections show that the

24  Reorganized Debtors will have sufficient funds to meet their Effective Date payment obligations.

25  The Charlestown Plan calls for the repayment of the secured claims within 4 years after the

26  Effective Date.  The Secured Claims of the Debtors will be repaid during this time period either

27  from the refinancing of the secured Debt post-Effective Date or the sale of the Collateral for such

28

Debt.  Upon the sale of such Collateral, the proceeds will be used to pay the costs of sale and any secured claim that is secured by the Collateral to be sold.  Excess proceeds would be unencumbered funds available for the Reorganized Debtors use in the operation of their businesses or for the payment of claims as determined by the Reorganized Debtors' in the sound exercise of their business judgment.

The Charlestown Proponents have prepared their financial projections with the assistance of their advisors based upon certain assumptions that they believe to be reasonable under the circumstances.  Those assumptions considered to be significant are described in Exhibit "E" hereto. The financial projections have not been examined or compiled by independent accountants. The Charlestown Proponents make no representation as to the accuracy of the projections or the Reorganized Debtors' ability to achieve the projected results.  Many of the assumptions on which the projections are based are subject to significant uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the Projection Period may vary from the projected results and the variations may be material.  All Holders of Claims and Interests that are entitled to vote to accept or reject the Charlestown Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Charlestown Plan.

### 4.    Best Interests Test

Even if a plan is accepted by each Class of Holders of Claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the Charlestown Plan is in the "best interests" of all Holders of Claims and Interests that are impaired by the Charlestown Plan and that have not accepted the Charlestown Plan.  The "best interests" test, as set forth in Section 1 129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that: (i) all members of an impaired Class of Claims or interests have accepted the Charlestown Plan or (ii) the Charlestown Plan will provide a member who has not accepted the Charlestown Plan with a recovery of property of a value, as of the effective date of the Charlestown Plan, that is not less than the amount that such

1    holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.  Once

2    the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority

3    claimants, it must determine the probable distribution to general unsecured creditors and equity

4    security holders from the remaining available proceeds in liquidation.  If such probable distribution

5    has a value greater than the distributions to be received by such creditors and equity security holders

6    under a debtor's plan, then such plan is not in the best interests of creditors and equity security

7    holders.

8         To determine what Holders of Claims and Interests in each impaired Class would receive if

9    the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar

10   amount that would be generated from the liquidation of the Debtors' assets and properties in the

11   context of a Chapter 7 liquidation case.  The Cash amount that would be available for satisfaction of

12   Claims and Interests would consist of the proceeds resulting from the disposition of the

13   unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by

14   the Debtors at the time of the commencement of the liquidation case.  Such Cash amount would be

15   reduced by the costs and expenses of liquidation and by such additional administrative and priority

16   Claims that might result from the termination of the Debtors' business and the use of Chapter 7 for

17   the purposes of liquidation.

18        The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a trustee

19   in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that

20   such a trustee might engage.  In addition, other Claims that might arise in a liquidation case or result

21   from the pending Chapter 11 Cases, including any unpaid expenses incurred by the Debtors during

22   the Cases, such as compensation for attorneys, financial advisors and accountants, would be paid in

23   full from the liquidation proceeds before the balance of those proceeds would be made available to

24   pay general unsecured Claims.  Moreover, the costs of liquidation in these cases could be greater

25   due to the fact that there is no guarantee that only one trustee would be appointed for each of the 54

26   related cases. If more than one trustee is appointed, the costs of liquidation will be increased as each

27   such trustee will retain its own professionals to assist it with the case.

28

To determine if the Charlestown Plan is in the best interests of each impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and properties, after subtracting the amounts attributable to the foregoing Claims, must be compared with the present value of the property offered to such Classes of Claims under the Charlestown Plan.

After considering the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including: (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a Chapter 7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale" atmosphere that would prevail; and (iii) the substantial increases in Claims that would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Charlestown Proponents have determined that confirmation of the Charlestown Plan will provide each holder of an Allowed Claim with a recovery that is not less than the recovery such holder would receive pursuant to the liquidation of the Debtors under Chapter 7.

The Liquidation Analysis for each of the Property Level Debtors, MMPI and MMPLP, is attached hereto as Exhibit "G."  The information set forth in Exhibit G provides a summary of the liquidation values of each of such Debtors' assets, assuming a Chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Estates. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.  Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic and competitive uncertainties and contingencies.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation.  The Chapter 7 liquidation period is assumed to be a period of several years, primarily allowing for the sale of the real property assets of the Debtors.

**D.      CONSUMMATION**

The Charlestown Plan will be consummated on the Effective Date. The Effective Date of the Charlestown Plan will occur on the first Business Day on which the conditions precedent to the effectiveness of the Charlestown Plan, as set forth in the Charlestown Plan, have been satisfied or waived by the Charlestown Proponents pursuant to the terms of the Charlestown Plan.  For a more detailed discussion of the conditions precedent to the Charlestown Plan and the consequences of the failure to meet such conditions, see Article X of the Charlestown Disclosure Statement. The Charlestown Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

**X.**

**CONFIRMATION DATE CONDITIONS**

**A.      CONDITIONS TO CONFIRMATION The conditions to Confirmation shall be the following:**

(1)      The satisfaction of the requirements of Section 1129 of the Bankruptcy Code;

(2)      The Confirmation Order shall (i) be acceptable in form and substance to the Charlestown Proponents (in their sole and absolute discretion) and (ii) expressly authorize and direct the Debtors to perform the actions that are conditions to the effectiveness of the Charlestown Plan; and

(3)      Each of the events and actions required by the Charlestown Plan to occur or to be taken prior to Confirmation shall have occurred or have been taken, or the Charlestown Proponents or the party whose obligations are conditioned by such occurrences and/or actions, as applicable, shall have waived such occurrences or actions.

**B.      WAIVER OF CONDITIONS**

The Charlestown Proponents may waive any or all of the other conditions set forth in the Charlestown Plan without leave of or order of the Bankruptcy Court and without any formal action. The Charlestown Proponents reserve the right to amend or revoke the Charlestown Plan. Although this Charlestown Plan is styled as a joint Plan, the Charlestown Proponents reserve the right to

1    proceed with Confirmation under this Charlestown Plan for one Debtor, or a combination of

2    Debtors, and not the others.

3        **C.    EFFECT OF FAILURE OF CONDITIONS**

4        In the event that the Effective Date does not occur, upon notification submitted by the

5    Charlestown Proponents to the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b)

6    no distributions under the Charlestown Plan shall be made, (c) the Debtors and all Holders of

7    Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the

8    Confirmation Date as though the Confirmation Date had never occurred, and (d) the Debtors'

9    obligations with respect to the Claims and Interests shall remain unchanged and nothing contained

10    in the Charlestown Plan shall constitute or be deemed a waiver or release of any Claims or Interests

11    by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors

12    or any person in any further proceedings involving the Debtors.

13        **D.    VACATUR OF CONFIRMATION ORDER**

14        If an order denying confirmation of the Charlestown Plan is entered, then the Charlestown

15    Plan shall be null and void in all respects, and nothing contained in the Charlestown Plan shall (a)

16    constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any

17    manner the rights of the Holder of any Claim against, or Interest in, the Debtors; (c) prejudice in

18    any manner any right, remedy, or Claim of the Debtors; or (d) be deemed an admission against

19    interest by the Debtors.

20

21                       **XI.**

22                **<u>RETENTION OF JURISDICTION</u>**

23        Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective

24    Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the

25    Effective Date to the full extent permitted by law, including, without limitation, jurisdiction to:

26        *(a)    Allow, disallow, determine, liquidate, classify, subordinate, estimate or establish*

27            *the priority or secured or unsecured status of any Claim or Interest, including the*

28            *resolution of any request for payment of any Administrative Claim, the resolution*

*of any objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Charlestown Plan;*

(b) *Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Charlestown Plan, for periods ending before the Effective Date;*

(c) *Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which the any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;*

(d) *Ensure that distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Charlestown Plan;*

(e) *Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors, Reorganized Debtor or the Chapter 11 Cases that may be pending on the Effective Date;*

(f) *Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Charlestown Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Charlestown Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;*

(g) *Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Charlestown Plan or the Confirmation Order, including the release and injunction provisions set forth*

*in and contemplated by the Charlestown Plan and the Confirmation Order, or any entity's rights arising under or obligations incurred in connection with the Charlestown Plan or the Confirmation Order;*

(h)  *Subject to any restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Charlestown Plan, modify the Charlestown Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code or modify -the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Charlestown Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Court Order, the Charlestown Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Charlestown Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Charlestown Plan, to the extent authorized by the Bankruptcy Code;*

(i)  *Issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation or enforcement of the Charlestown Plan or the Confirmation Order;*

(j)  *Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;*

**(k)** **Determine any other matters that may arise in connection with or relating to the Charlestown Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Charlestown Plan, the Disclosure Statement or the Confirmation Order, except as otherwise e provided in the Charlestown Plan; and Enter an Order concluding the Chapter 11 Cases.**

The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including without limitation the matters set forth in this Article, this Article shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

**XII.**

**PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE CHARLESTOWN PLAN AND TREATMENT OF DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS AND INTERESTS**

**A.**     **VOTING OF CLAIMS AND INTERESTS**

Each Holder of an Allowed Claim or an Allowed Interest in an Impaired Class of Claims or Interests shall be entitled to vote separately to accept or reject the Charlestown Plan as provided in such order as may be entered by the Bankruptcy Court establishing certain procedures with respect to the solicitation and tabulation of votes to accept or reject the Charlestown Plan, or any other order or orders of the Bankruptcy Court.

**B.**     **METHOD OF DISTRIBUTIONS UNDER THE CHARLESTOWN PLAN**

**1.**     **Distributions Under the Charlestown Plan**

The Chief Accounting Officer of Reorganized MMPI will serve as Disbursing Agent. The Disbursing Agent will make all distributions of cash and securities required to be distributed under the applicable provisions of the Charlestown Plan. The Disbursing Agent may employ or contract

1    with other entities to assist in or make the distributions required by the Charlestown Plan. The

2    Disbursing Agent will serve without bond, and the Disbursing Agent will not receive additional

3    compensation for distribution services rendered pursuant to the Charlestown Plan.

4          Cash payments made pursuant to the Charlestown Plan will be in U.S. dollars by checks

5    drawn on a bank selected by the Reorganized Debtor, or by wire transfer from a bank, at the option

6    of Reorganized Debtor. Cash payments of $1,000,000 or more to be made pursuant to the

7    Charlestown Plan will, to the extent requested in writing no later than five days after the

8    Confirmation Date, be made by wire transfer from a bank. Cash payments to foreign creditors, if

9    any, may be made, at the option of the Reorganized Debtor, in such funds and by such means as are

10   necessary or customary in a particular foreign jurisdiction.

### 2.    Timing and Methods of Distribution
#### a.    *Compliance with Tax Requirements*

13         In connection with the Charlestown Plan, to the extent applicable, the Disbursing Agent

14   must comply with all tax withholding and reporting requirements imposed on it by any

15   governmental unit, and all distributions pursuant to the Charlestown Plan will be subject to such

16   withholding and reporting requirements. The Disbursing Agent will be authorized to take any and

17   all actions that may be necessary or appropriate to comply with such withholding and reporting

18   requirements.

19         Notwithstanding any other provision of the Charlestown Plan: (i) each Holder of an Allowed

20   Claim or Interest that is to receive a distribution of Cash pursuant to the Charlestown Plan will have

21   sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by

22   any governmental unit, including income, withholding and other tax obligations, on account of such

23   distribution; and (ii) no distribution will be made to or on behalf of such Holder pursuant to the

24   Charlestown Plan unless and until such Holder has made arrangements satisfactory to the

25   Disbursing Agent for the payment and satisfaction of such tax obligations. Any Cash to be

26   distributed pursuant to the Charlestown Plan will, pending the implementation of such

27   arrangements, be treated as an undeliverable distribution pursuant to the Charlestown Plan.

28

b.    ***Pro Rata Distributions***

Except where specifically provided otherwise, when the Charlestown Plan provides for Pro Rata distribution, the property to be distributed under the Charlestown Plan shall be divided Pro Rata among the Holders of Allowed Claims or Allowed Interests of the relevant Class.

c.    ***Distributions***

Distributions under the Charlestown Plan shall be made by the Disbursing Agent to the Holders of Allowed Administrative Claims and Allowed Claims at the addresses set forth on the Schedules, unless such addresses are superseded by addresses listed on proofs of Claim or transfers of Claims filed pursuant to Bankruptcy Rule 3001, or at the last known address of such Holders if the Debtors or Reorganized Debtor has been notified in writing of a change of address.

**C.    UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS**

Any Person that is entitled to receive a cash distribution under the Charlestown Plan but that fails to cash a check within 90 days of its issuance shall be entitled to receive a reissued check from the Reorganized Debtor for the amount of the original check, without any interest, if such person requests the Disbursing Agent to reissue such check and provides the Disbursing Agent with such documentation as the Disbursing Agent requests to verify that such Person is entitled to such check, prior to the first anniversary of the Effective Date. If a Person fails to cash a check within 90 days of its issuance and fails to request reissuance of such check prior to the first anniversary of the date on which the check is issued, such Person shall not be entitled to receive any further distribution under this Charlestown Plan. If the distribution to any Holder of an Allowed Claim or Allowed Interest is returned to a Disbursing Agent as undeliverable, no further distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified in writing of such Holder's then-current address. Undeliverable distributions will remain in the possession of the Disbursing Agent pursuant to the Charlestown Plan until such time as a distribution becomes deliverable. Undeliverable cash will be held in trust in segregated bank accounts in the name of the Disbursing

1    Agent for the benefit of the potential claimants of such funds, and will be accounted for separately.

2    The Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with

3    the Reorganized Debtor's investment and deposit guidelines. Any distribution which is not claimed

4    within thirteen months of the Effective Date shall be deemed property of the Reorganized Debtor.

5    **D.     DISPUTED CLAIMS AND ESTIMATIONS**

6    **1.     Treatment of Disputed Claims**

7    Notwithstanding any other provisions of the Charlestown Plan, no payments or distributions

8    will be made on account of any Claim or Interest until such Claim or Interest becomes an Allowed

9    Claim or Allowed Interest. The Reorganized Debtor may, at any time, request that the Bankruptcy

10   Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy

11   Code, irrespective of whether the Reorganized Debtor previously objected to such Claim or whether

12   the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction

13   to estimate any contingent or unliquidated Claim at any time during litigation concerning any

14   objection to the Claim, including during the pendency of any appeal relating to any such objection.

15   If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will

16   constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as

17   determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on

18   such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to

19   any ultimate payment on account of such Claim. All of these Claims objection, estimation and

20   resolution procedures are cumulative and not necessarily exclusive of one another. In addition to

21   seeking estimation of Claims as provided in the Charlestown Plan, the Reorganized Debtor may

22   resolve or adjudicate certain Disputed Claims of Holders in Unimpaired Classes in the manner in

23   which the amount of such Claim and the rights of the Holder of such Claim would have been

24   resolved or adjudicated if the Reorganization Cases had not been commenced, subject to any

25   applicable discharge and limitations on amounts of Claims and remedies available under bankruptcy

26   law. Claims may be subsequently compromised, settled, withdrawn or resolved by the Reorganized

27   Debtor.

28

1      **2.    Distribution on Account of Disputed Claims Once They Are Allowed**

Thirty days after the date a Disputed Claim becomes an Allowed Claim, the Disbursing Agent will make distributions on account of any Disputed Claim or Disputed Interest that has become an Allowed Claim or Allowed Interest during the preceding calendar quarter. Such distributions will be made pursuant to the provisions of the Charlestown Plan governing the applicable Class. Holders of Disputed Claims or Disputed Interests that are ultimately allowed will also be entitled to receive, on the basis of the amount ultimately allowed, matured and payable interest, if any, at the rate provided for the Class to which such Claim belongs.

**3.    Allowance of Claims Subject to Bankruptcy Code Section 502(d)**

Allowance of Claims shall be in all respects subject to the provisions of Section 502(d) of the Bankruptcy Code.

**E.    SETOFFS**

Except with respect to Claims of the Debtors and Reorganized Debtor released pursuant to the Charlestown Plan or any contract, instrument, release, indenture or other agreement or document created in connection with the Charlestown Plan, the Reorganized Debtor may, pursuant to Section 553 of the Bankruptcy Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Charlestown Plan on account of such Claim (before any distribution is made on account of such Claim), the Claims, rights and causes of action of any nature that the Reorganized Debtor may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by Reorganized Debtor of any such Claims, rights and causes of action that the Debtors and the Reorganized Debtor may possess against such Holder.

## XIII.

## <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER

INFORMATION SET FORTH IN THE CHARLESTOWN DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE CHARLESTOWN PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE CHARLESTOWN PLAN AND ITS IMPLEMENTATION.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    Risk of Non-Confirmation of the Charlestown Plan

Although the Charlestown Proponents believe that the Charlestown Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Similarly, there can be no assurance that modifications to the Charlestown Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes.

In addition, the Charlestown Proponents – like any plan proponent in any bankruptcy case – may withdraw or modify their plan at any time before confirmation.  The Charlestown Proponents plan to conduct commercially reasonable due diligence regarding the assets, operations and financial condition of MMPI prior to confirmation.  The Charlestown Proponents may modify or withdraw their plan based on the results of the diligence process.

### 2.    Risk of Non-Occurrence of the Effective Date

Although the Charlestown Proponents believe that the Effective Date will occur 30 days after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date have not occurred or been waived by the Charlestown Proponents within one hundred and twenty (120) days after the Confirmation Date, the Confirmation Order shall be vacated, in which event no distributions under the Charlestown Plan would be made, the Debtors and all Holders of Claims and Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### B.    RISKS TO RECOVERY BY HOLDERS OF CLAIMS

#### 1.    Ability to Service Debt

The Reorganized Debtor's ability to make scheduled payments of principal, to pay the interest on, to refinance its indebtedness will depend on future performance. Future performance is to a certain extent subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond the Reorganized Debtor's control. While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flow described in the financial projections attached as Exhibit E hereto, the Charlestown Proponents believe that cash flow from operations, available cash, debt refinancings and sales and the Reorganized Debtors' ability to sell assets as necessary to fund its operations, of assets will be adequate to fund the Charlestown Plan and meet their future liquidity needs.

#### 2.    Risks of Asset Disposition Delays

The Charlestown Plan relies, in part, on generating proceeds from real estate sales to pay Claims. If sales are delayed due to economic or other factors, the Reorganized Debtors might not be able to meet their obligations under the Charlestown Plan.

#### 3.    Projected Financial Information

The financial projections included as Exhibit E hereto are dependent upon the successful implementation of the Charlestown Plan and the validity of the other assumptions contained therein. These projections reflect numerous assumptions, including confirmation and consummation of the Charlestown Plan in accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry performance, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtor. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the projections may affect the actual financial results of the Reorganized Debtors. Although the Charlestown Proponents believe that the projections are reasonably attainable, variations between the actual financial results and those projected may occur and may be material.

#### 4.    Failure to Meet Projected Occupancy Rates.

1    The Charlestown Plan relies, in part, on increasing revenue through increased leasing

2    activities on those developed properties Reorganized MMPI expects to retain throughout the term of

3    the Charlestown Plan.  If leasing activity falls below the Charlestown Proponents projections, the

4    Reorganized Debtors' revenue would similarly fall below projections.

5    **5.    Failure to Obtain Secured Loan of $15 Million.**

6    The Charlestown Plan is dependent in part on funding through the Secured Loan. There is a

7    risk that the Secured Loan will not be funded. The Charlestown Proponents believe that these risks

8    are minimal because MMPI Acquisition is prepared to fund the Secured Loan subject only to the

9    conduct of commercially reasonable due diligence to be conducted prior to confirmation of the

10   Charlestown Plan

11   **6.    Failure to Confirm One or More of the Debtors' Chapter 11 Plans.**

12   This Charlestown Plan is a joint plan for 54 related debtor entities. The Charlestown

13   Proponents are seeking confirmation of the Charlestown Plan separately for each of the 54 related

14   Chapter 11 Cases.  In one or more of the cases, the Charlestown Plan may not be confirmed. If the

15   Charlestown Plan is not confirmed in one or more of the Debtors' cases, the affected Debtors will

16   re-evaluate their options, including without limitation, an alternative plan of reorganization,

17   conversion of the case to chapter 7 or dismissal of the case.

18   If the Charlestown Plan is confirmed at the parent level (i.e., for MMPI and MMPLP), the

19   Charlestown Proponents believe that failure to confirm the Charlestown Plan for one or more of the

20   Property Level Debtors will not prevent implementing of the Charlestown Plan.  If, however, the

21   Charlestown Plan cannot be confirmed for the majority of Property Level Debtors, implementation

22   of the Charlestown Plan would be threatened.

23   **7.    Change of Management.**

24   The Charlestown Proponents do not intend to retain Richard Meruelo and John Maddux as

25   employees of the Reorganized MMPI.  The loss of Mr. Meruelo and Mr. Maddux will result in the

26   loss of significant institutional knowledge.  The Charlestown Proponents believe that the impact of

27   this loss on the Reorganized MMPI will be minimal because they intend to retain many of MMPI's

28

1    other current employees.

2        It is possible that some or all of the current MMPI employees will decline to continue their

3    employment with Reorganized MMPI.  The potential loss of institutional knowledge from the

4    departure of these MMPI employees could be significant.

5        **8.    Insider Guaranty Claims.**

6        Richard Meruelo and Belinda Meruelo guaranteed certain obligations of the Property Level

7    Debtors in cases where PNL, Berkadia and East West Bank are secured lenders.  Other Insiders

8    guaranteed certain obligations of Property Level Debtors, but those guarantees have since been

9    released by settlement.

10        Insider guarantors may assert claims for indemnification and/or reimbursement.  If the

11    Insider guarantors assert such claims, the Charlestown Proponents believe the impact on

12    Reorganized MMPI is minimal because payments on the guaranties would correspondingly reduce

13    Reorganized MMPI's liability on the underlying obligation.  To the extent no payments are made,

14    the claims will be disallowed under Bankruptcy Code Section 502(e) if the claims are still

15    contingent as of the time for allowance or disallowance.

16        **9.    Insider Treatment.**

17        The Charlestown Plan classifies Insider Claims and Insider MMPI Interests separately from

18    Non-Insider Claims and Non-Insider MMPI Interests and offers them disparate treatment.  The

19    Debtors and certain of the Insiders have objected to the separate classification and the disparate

20    treatment.  If the Bankruptcy Court determines that the Charlestown Plan cannot be confirmed

21    unless Insider Claims and Interests are given equal treatment, the Charlestown Proponents will

22    amend the Charlestown Plan to provide for such equal treatment.

23        If Insider Holders of MMPI Interests elect a stock distribution rather than a cash distribution

24    on account of their Interests, Reorganized MMPI's cash position would be improved by

25    approximately $16 million (as compared to the Projections attached as Exhibit E) .

26        If Insider Holders elect a stock distribution, Insider Holders would own approximately 23%

27    of the stock in Reorganized MMPI.

28

## 10.    East West Bank Complaint.

On September 9, 2010, MMPI issued a press release entitled "East West Bank Hostile Takeover Plan Rebuffed by Bankruptcy Court" (the "Press Release").  After hearings held in the Bankruptcy Court, the Bankruptcy Court required MMPI and Richard Meruelo, Chairman and Chief Executive Officer of MMPI, to retract the Press Release.  The Order directing the retraction is included with the solicitation package.

MMPI issued a press release on September 17, 2010, indicating the intent of MMPI and Richard Meruelo as chief executive officer of MMPI to issue a retraction of the Press Release in the form required and approved by the Bankruptcy Court.  MMPI and Richard Meruelo as chief executive officer of MMPI issued a retraction of the Press Release on September 22, 2010.  MMPI has filed an appeal from the court's Order.

On September 22, 2010, East West Bankcorp., Inc. and East West Bank filed a Complaint in the Bankruptcy Court for damages, including punitive damages, based on: (1) Libel per se and (2) Libel (the "Complaint").  A judgment against MMPI would be an administrative claim against the estate and thus could reduce the amount available to pay creditors or the value of shares held by stockholders.  East West Bank maintains that it will seek recovery of damages in a significant amount, plus punitive damages.

MMPI and Richard Meruelo dispute the allegations of the Complaint, deny that they have any liability to the plaintiffs, and may assert counterclaims.  MMPI has tendered the claims under the Complaint to its insurers.  It is unknown whether the insurers will assume defense of this action.  MMPI may have indemnification or contribution claims against insiders of the company.

The Charlestown Proponents are monitoring the litigation arising from the Complaint and have formed no opinion regarding the merits of the Complaint or the Company's and Mr. Meruelo's potential defenses.  The Charlestown Proponents similarly have no opinion regarding the impact of the Complaint on the Debtors' bankruptcy cases and the plan confirmation process.  Allowance of a significant administrative claim on account of the Complaint could threaten the feasibility of the Charlestown Plan or the willingness of the Charlestown Proponents to proceed with confirmation of

the Charlestown Plan.

## XIV.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE CHARLESTOWN PLAN

A summary description of certain United States federal income tax consequences of the Charlestown Plan is provided below. This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Charlestown Plan as discussed herein. Only the principal United States federal income tax consequences of the Charlestown Plan to the Reorganized Debtors and to holders of Claims who are entitled to vote to accept or reject the Charlestown Plan are described below. No opinion of counsel has been sought or obtained with respect to any tax consequences of the Charlestown Plan. No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Charlestown Plan, and the discussion below is not binding upon the IRS or such other authorities. No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Charlestown Plan to the Debtors or any holders of Claims. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code") Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Charlestown Plan, nor does it purport to address the United States federal income tax consequences of the Charlestown Plan to special classes of taxpayers (e.g., persons who are related to the Debtors within the meaning of the Tax Code, banks and certain other financial institutions, insurance

1    companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims

2    through, pass-through entities, persons whose functional currency is not the United States dollar,

3    foreign persons, dealers in securities or foreign currency, employees, holders of LTIP Units persons

4    who received their Claims pursuant to the exercise of an employee stock option or otherwise as

5    compensation and persons holding Claims that are a hedge against, or that are hedged against,

6    currency risk or that are part of a straddle, constructive sale or conversion transaction). Furthermore,

7    the following discussion does not address United States federal taxes other than income taxes.

8        Each holder is strongly urged to consult its own tax advisor regarding the United States

9    federal, state, and local and any foreign tax consequences of the transactions described herein and in

10    the Charlestown Plan.

11        IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH

12    REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS

13    SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE

14    USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING

15    PENALTIES UNDER THE TAX CODE. ANY TAX ADVICE CONTAINED IN THIS

16    SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE

17    PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY

18    THE SUMMARY EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE

19    TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX

20    ADVISER.

21    **A.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

22    **TO THE DEBTORS**

23        **1.    Net Operating Losses**

24        The Debtors currently have significant net operating loss ("NOL") carryforwards for federal

25    income tax purposes and expect to incur a substantial additional NOL during their current taxable

26    year. The amount of such NOL carryforwards remains subject to adjustment by the IRS.

27        Following the implementation of the Charlestown Plan, any NOLs and carryforwards and

28

possibly certain other tax attributes of the Debtors, allocable to periods prior to the Effective Date, may be subject to the limitations imposed by Section 382 of the Tax Code.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) a special bankruptcy exception, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation. Such limitation also may apply to certain losses or deductions, which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized.

Under the Charlestown Plan, some or all of the existing shares in MMPI may be redeemed for cash.  Accordingly, under the Charlestown Plan, MMPI will undergo an ownership change which may significantly limit the use of the Debtors' NOL carryforwards.

### 2.    Cancellation of Debt

In general, the Tax Code allows a debtor in a bankruptcy case to exclude from income any cancellation of indebtedness income ("CODI") that is realized, but the debtor must reduce certain of its tax attributes - such as NOL carryforwards, current year NOLs, tax credits and tax basis in assets by the amount of the CODI that is excluded from income. CODI is that amount by which the adjusted issue price (including accrued but unpaid interest) of the indebtedness satisfied exceeds the cash and fair market value of the other property issued therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the payment of the cancelled debt would have given rise to a tax deduction). To the extent the amount of excluded CODI exceeds the tax attributes available for reduction, the remaining CODI is simply forgiven. Any reduction in tax attributes does not effectively occur until the first day of the taxable year following the year the CODI occurs. If advantageous, a debtor could elect to reduce the basis of depreciable property prior to any reduction in its loss carryforwards.

### 3.    Merger of MMPLP into MMPI

Pursuant to the Charlestown Plan, MMPLP will merge into MMPI and, accordingly, will distribute its assets to MMPI in complete liquidation. In general, a distribution in liquidation of a partner's interests is tax-free to both the partner and the partnership unless Section 737 or 751(b) applies. Section 737 requires a partner to recognize gain (but not loss) upon the partnership's distribution of property to such partner (other than property previously contributed to the partnership by such partner) within seven (7) years of the date on which such partner contributed appreciated property to such partnership. Section 751(b) generally provides that to the extent that a partner receives a distribution from a partnership (i) Section 751 property (unrealized receivables and inventory items which have appreciated substantially in value) in exchange for relinquishing all or part of its interest in the partnership's non-Section 751 property, or (ii) non-Section 751 property in exchange for relinquishing all or part of its interest in the partnership's Section 751 property, the transaction is recharacterized. The transaction is treated as (1) a deemed distribution to the partner of an interest in the relinquished property followed by (2) a deemed taxable exchange between the partner and the partnership of the relinquished property in exchange for an interest in the property actually distributed by the partnership to the distributee partner.

Section 731(b) provides that no gain or loss is recognized by a partnership on a distribution of property to a partner. Section 731(a) provides for (1) the nonrecognition of gain to the partner except to the extent an amount of money is distributed in excess of the partner's tax basis in their partnership interests, and (2) the nonrecognition of loss unless the distribution consists solely of money, unrealized receivables, and inventory. Any gain or loss recognized by the partner is generally treated as gain or loss from the sale or exchange of a capital asset (subject to the exceptions above). Section 732(b) provides that the basis of any distributed property is equal to the partner's tax basis in their partnership interest immediately prior to the distribution, reduced by any cash received. The Debtors do not expect to recognize any gain or loss in connection with the liquidation of MMPLP.

**4.        Consequences of the Sale and/or Refinance of Assets of the Debtors**

Pursuant to the Charlestown Plan, the Reorganized Debtors will sell some of their assets and

refinance other assets as necessary during the term of the Charlestown Plan to meet their operational needs and payment obligations under the Charlestown Plan. The sale of real property may cause the Debtors to recognize gain or loss. The gain or loss is measured by the difference between the amount realized (the amount paid by the purchaser) and the adjusted tax basis the Debtors have in the property sold. The amount realized from a sale of real property generally includes the amount of liabilities from which the transferor is discharged as a result of the sale. For purposes of this rule, the sale of real property that secures a nonrecourse liability discharges the transferor from the liability, and the sale of real property that secures a recourse liability discharges the transferor from the liability if another person agrees to pay the liability (whether or not the transferor is in fact released from the liability).

Gain or loss recognized from the sale of real property may be characterized as either capital or ordinary. Generally, capital gains and losses are gains or losses from the sale or exchange of a capital asset. A capital asset is any property held by a taxpayer, whether or not connected with a trade or business, but does not include property held by a taxpayer, whether or not connected with a trade or business, but does not include property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property which is held primarily for sale to customers in the ordinary course of its trade or business, or property, used in the taxpayer's trade or business, of a character which is subject to the allowance for depreciation, or real property used in the taxpayer's trade or business.

Pursuant to Section 1245, a taxpayer who disposes of Section 1245 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property. Section 1245 property includes limited types of real property which have been depreciable. Depreciation recapture with respect to Section 1245 property is computed by subtracting its adjusted tax basis from the lower of its recomputed basis (adjusted tax basis increased by previous depreciation deductions allowed) or amount realized. Pursuant to Section 1250, a taxpayer who disposes of Section 1250 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property. Section 1250 property is any real property which

has been depreciable and that is not Section 1245 property. Generally, for Section 1250 property for which depreciation deductions are computed using the straight-line method for tax purposes, there is no Section 1250 depreciation recapture.

Pursuant to Section 1231, Section 1231 gains and losses are treated as capital gains and losses if the Section 1231 gains for the taxable year exceed the Section 1231 losses for that year. A Section 1231 gain or loss is any recognized gain or loss from a Section 1231 transaction. A sale or exchange of property used in a trade or business is a Section 1231 transaction. Real property is considered to be used in a trade or business if it is held for more than one year and is not property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year or property held by the taxpayer primarily for sale to customers in the ordinary course of its trade or business.

Generally, for tax purposes, a refinancing transaction by itself produces no income or deductions as it involves the tax-free receipt of loan proceeds and the nondeductible repayment of a prior loan, assuming the old debt is satisfied in full.

**B.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS**

Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount and whether and to what extent the holder had previously claimed a bad debt deduction.

**1.    Consequences to Holders of Allowed Secured Claims**

Pursuant to the Charlestown Plan, a Holder of an Allowed Secured Claim will receive payment in full in cash over approximately four (4) years (collectively herein referred to as the "Secured Deferred Payment Obligation"). The Holder will also receive interest at the rate of five and one-quarter percent (5.25%) per annum. For federal income tax purposes, the Secured Deferred Payment Obligation should be treated (and the following discussion assumes, would be treated) in a

1    similar fashion to the receipt of an actual note amortizable over four (4) years.

2    In general, a holder of an Allowed Secured Claim will recognize gain or loss in an amount

3    equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim

4    (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its

5    Claim (other than any Claim for accrued but unpaid interest). For a discussion of the treatment of

6    any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued Interest"

7    below. The amount realized by a holder will equal the "issue price" of the Secured Deferred

8    Payment Obligation received by such holder. Such issue price should be equal to the stated

9    principal amount of the Secured Deferred Payment Obligation. Each holder of a Secured Claim is

10   urged to consult its tax advisor regarding the specific tax consequences to such holder of the receipt

11   of the Secured Deferred Payment Obligation, including the possible application of (and the ability

12   to elect out of) the "installment method" of reporting any gain that might otherwise be recognized

13   by the holder upon such receipt.

14   Where gain or loss is recognized by a holder of an Allowed Secured Claim, the character of

15   such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be

16   delimited by a number of factors, including the tax status of the holder, whether the Claim

17   constitutes a capital asset in the hands of the holder and how long it has been held, whether the

18   Claim was acquired at a market discount and whether and to what extent the holder had previously

19   claimed a bad debt deduction.

20   **C.    DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST**

21   Pursuant to the Charlestown Plan, all distributions in respect of an Allowed Claim will be

22   allocated first to any portion of such Claim for accrued interest, with any excess allocated to the

23   principal amount of such Claim to the extent thereof, and then to all other amounts. However, there

24   is no assurance that the IRS will respect such allocation for federal income tax purposes.

25   In general, to the extent that any amount received by a holder of a debt (whether paid in cash

26   or treated for tax purposes as paid with a note) is received in satisfaction of accrued interest during

27   its holding period, such amount will be taxable to the holder as interest income (if not previously

28

1   included in the holder's gross income). Conversely, a holder generally recognizes a deductible loss

2   to the extent any accrued interest claimed was previously included in its gross income and is not

3   paid in full. Each holder of a Claim is urged to consult its tax advisor regarding the allocation of

4   consideration and the deductibility of unpaid interest for tax purposes.

5           **D.        INFORMATION REPORTING AND BACKUP WITHHOLDING**

6           Certain payments, including payments in respect of accrued interest or OID, are generally

7   subject to information reporting by the payer to the IRS. Moreover, such reportable payments are

8   subject to backup withholding in certain circumstances. Under the Tax Code's backup withholding

9   rules, a holder of Claims may be subject to backup withholding at the applicable rate with respect to

10  certain distributions or payments pursuant to the Charlestown Plan, unless the holder (a) comes

11  within certain exempt categories (which generally includes corporations) and, when required,

12  demonstrates this fact or (b) provides a correct United States taxpayer identification and certifies

13  under penalty of perjury that the holder is a U.S. person, the taxpayer identification number is

14  correct and that the holder is not subject to backup withholding because of a failure to report all

15  dividend and interest income.

16          **E.        IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**

17          THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF

18  CERTAIN INCOME TAX CONSEQUENCES OF THE CHARLESTOWN PLAN AND IS NOT A

19  SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE

20  ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX

21  ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY

22  VARY DEPENDING ON A TAXPAYER'S PARTICULAR CIRCUMSTANCES.

23  ACCORDINGLY, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE STRONGLY

24  URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL,

25  STATE, LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX

26  CONSEQUENCES OF THE CHARLESTOWN PLAN, INCLUDING WITH RESPECT TO TAX

27  REPORTING AND RECORD KEEPING REQUIREMENTS.

28

# XV.

## MISCELLANEOUS PROVISIONS

### A.    EXEMPTION FROM TRANSFER TAXES

Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of notes or equity securities under the Charlestown Plan, the creation of any mortgage, deed of trust or other security interest, the making or assignment or any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Charlestown Plan, including, without limitation, any agreements of consolidation, deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Charlestown Plan shall not be subject to any stamp, real estate transfer, mortgage recording, license transfer or other similar tax. For the avoidance of doubt, the transactions contemplated under the Charlestown Plan include, among other things, the transactions and transfers contemplated in Section III of the Charlestown Plan under, in furtherance of, or in connection with the consolidation provided for therein including, without limitation,' the transfer of the Debtors' right, title and interest in property of the Estates to the Reorganized Debtor.

### B.    PAYMENT OF STATUTORY FEES

All fees payable on or before the Effective Date pursuant to Section 1930 of Title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date.

### C.    MODIFICATION OR WITHDRAWAL OF THE CHARLESTOWN PLAN

The Charlestown Proponents reserve the right, in accordance with the Bankruptcy Code, to amend, modify (subject to Court approval), or withdraw the Charlestown Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Charlestown Proponents may amend or modify the Charlestown Plan, or remedy any defect or omission or reconcile any inconsistency in the Charlestown Plan in such a manner as may be necessary to carry out the purpose and intent of the Charlestown Plan.

### D.    GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Charlestown Plan and any agreements, documents and instruments executed in connection with the Charlestown Plan.

### E.    FILING OR EXECUTION OF ADDITIONAL DOCUMENTS

On or before the Effective Date, the Reorganized Debtor shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Charlestown Plan.

### F.    WITHHOLDING AND REPORTING REQUIREMENTS

In connection with the Charlestown Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions there under shall be subject to any such withholding and reporting requirements.

### G.    WAIVER OF RULE 7062 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

The Charlestown Proponents may request that the Confirmation Order include (a) a finding the Rule 62(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7062 of the Federal Rules of Bankruptcy Procedure, shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Charlestown Plan immediately after the entry of the Confirmation Order.

### H.    HEADINGS

Headings used in the Charlestown Plan are for convenience and reference only and shall not constitute a Part of the Charlestown Plan for any purpose.

### I.    EXHIBITS AND SCHEDULES

All Exhibits and Schedules to the Charlestown Plan and Disclosure Statement are incorporated into and constitute a part of the Charlestown Plan as if set forth herein.

**J.     CONFLICT**

The terms of this Charlestown Plan shall govern in the event of any inconsistency with the summaries of the Charlestown Plan set forth in the Disclosure Statement.

**K.     SUCCESSORS AND ASSIGNS**

The rights, benefits and obligations of any Person named or referred to in the Charlestown Plan shall be binding on, and shall inure to the benefit of, any heir, executor, trustee, administrator, successor or assign of such Person.

**L.     SATURDAY, SUNDAY OR LEGAL HOLIDAY**

If any payment or act under the Charlestown Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

**M.     POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS OR INTERESTS**

Notes, bonds, stock certificates and other evidences of Claims against or Interests in the Debtors, and all Instruments of the Debtors (in either case, other than those executed and delivered as contemplated hereby in connection with the consummation of the Charlestown Plan), shall, effective upon the Effective Date, represent only the right to participate in the distributions contemplated by the Charlestown Plan.

**N.     SEVERABILITY OF PLAN PROVISIONS**

If, prior to Confirmation, any term or provision of the Charlestown Plan that does not govern the treatment of Claims or Interests provided for herein or the conditions to the Effective Date is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or

interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Charlestown Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination, and shall provide, that each term and provision of the Charlestown Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

## O.    BALLOTING

Each Holder of Allowed Claim or an Allowed Interest entitled to vote on the Charlestown Plan will receive a ballot. The ballot will contain two boxes, one indicating acceptance of the Charlestown Plan and the other indicating rejection of the Charlestown Plan. Holders of Allowed Claims or Allowed Interests who elect to vote on the Charlestown Plan must mark one or the other box pursuant to the instructions contained on the ballot. Any executed Ballot that does not indicate acceptance or rejection of the Charlestown Plan will be deemed to constitute an acceptance of the Charlestown Plan.

## P.    NO ADMISSIONS OR WAIVER OF OBJECTIONS

Notwithstanding anything herein to the contrary, nothing contained in the Charlestown Plan shall be deemed as an admission by any Charlestown Proponents with respect to any matter set forth herein including, without limitation, liability on any Claim or the propriety of any Claims classification. The Charlestown Proponents are not bound by any statements herein or in the Disclosure Statement as judicial admissions.

## Q.    SURVIVAL OF SETTLEMENTS

All Bankruptcy Court-approved settlements shall survive consummation of the Charlestown Plan, except to the extent that any provision of any such settlement is inconsistent with the Charlestown Plan, in which case the provisions of the Charlestown Plan shall supersede such inconsistent provision of such settlement. Notwithstanding the foregoing, the settlement documents approved by the Bankruptcy Court regarding Imperial, Murakami and PCB, and any other settlement agreement approved prior to the Effective Date that specifically provides that the

1    Charlestown Plan shall not modify the terms of such settlement, shall supersede any inconsistent

2    Plan provisions.

3    **XVI.**

4    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION**

5    **OF THE CHARLESTOWN PLAN**

6    The Charlestown Proponents believe that the Charlestown Plan affords Holders of Claims

7    the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests

8    of such Holders. If the Charlestown Plan is not confirmed, however, the theoretical alternatives

9    include: (a) an alternative plan or plans of reorganization; or (b) liquidation of the Debtors under

10    Chapter 7 or Chapter 11 of the Bankruptcy Code.

11    **A.        ALTERNATIVE PLANS OF REORGANIZATION**

12    The Debtors have proposed a competing plan of reorganization. Their plan contemplates a

13    reorganization and continuation of the Debtors' business.

14    If neither the Debtors' plan, the Charlestown Plan is not confirmed, the Creditors'

15    Committee, or after the expiration of the Debtors' exclusive period in which to propose and solicit a

16    reorganization Plan, any other party in interest in the Chapter 11 Cases, could propose a different

17    Plan or Plans. Such Plans might involve reorganization and continuation of the Debtors' business, or

18    a liquidation of their assets or a combination of both.

19    **B.        LIQUIDATION UNDER CHAPTER 7**

20    If no Plan is confirmed, the Chapter 11 Cases may be converted to individual cases under

21    Chapter 7 of the Bankruptcy Code. Upon conversion, one or more Chapter 7 trustees will be

22    appointed to liquidate the assets of the Debtors. It is impossible to predict precisely how the

23    proceeds of the liquidation would be distributed to the respective Holders of Claims against the

24    Debtors. A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of

25    Holders of Claims and Interests is set forth in Article IX.C. of the Charlestown Disclosure

26    Statement (Best Interests Test / Liquidity Analysis). The Debtors believe that liquidation under

27    Chapter 7 would result in, among other things: (i) decreased distributions to creditors because of

28

1   additional administrative expenses attendant to the appointment of one or more trustee's and the

2   trustee's employment of attorneys and other professionals; (ii) increased expenses and Claims, some

3   of which would be entitled to priority, which would be generated during the liquidation and from

4   the rejection of leases and other executory contracts in connection with a cessation of the Debtors'

5   operations; and (iii) the failure to realize the greater, going concern value of the Debtors' assets.

6          In the opinion of the Charlestown Proponents, the recoveries projected to be available in

7   either a Chapter 7 liquidation are not likely to afford Holders of Claims as great a realization

8   potential as does the Charlestown Plan.

9                                        **XVII.**

10                        **<u>CONCLUSION AND RECOMMENDATION</u>**

11         The Charlestown Plan provides for an equitable distribution to creditors of the Debtors and

12   preserves the value of the business as a going concern. The Charlestown Proponents believe that

13   confirmation and implementation of the Charlestown Plan is preferable to any of the alternatives

14   described above because it will provide the greatest recoveries to Holders of Claims and Interests.

15   For these reasons, the Charlestown Proponents urge you to vote to accept the Charlestown Plan.

16   Dated:  October 14, 2010                     LESNICK PRINCE LLP

17

18                                   By: _____/s/ Christopher E. Prince_____
                                           Christopher E. Prince
19                                            Attorneys for
                                     Charlestown Capital Advisors, LLC
20                                                and
                                     Hartland Asset Management Corporation,
21

22

23

24

25

26

27

28