1  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *JTedford@DGDK.com*
2  ENID COLSON (State Bar No. 189912)
   *EColson@dgdk.com*
3  MICHAEL C. ABEL (State Bar No. 187743)
   *MAbel@DGDK.com*
4  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
5  Los Angeles, California  90067-2904
   Telephone:  (310) 277-0077
6  Facsimile:  (310) 277-5735

7  Attorneys for Meruelo Maddux Properties, Inc., and
   affiliated Debtors and Debtors-in-Possession

8                    **UNITED STATES BANKRUPTCY COURT**

9                     **CENTRAL DISTRICT OF CALIFORNIA**

10                    **SAN FERNANDO VALLEY DIVISION**

11  In re                                ) Case No. 1:09-bk-13356-KT
                                         )
12  MERUELO MADDUX PROPERTIES,           ) Chapter 11 (Jointly Administered)
    INC., et al.,[1]                     )
13                                       ) **FOURTH AMENDED JOINT DISCLOSURE**
                Debtors and Debtors-in-  ) **STATEMENT DESCRIBING FOURTH**
14              Possession.              ) **AMENDED JOINT PLAN OF**
                                         ) **REORGANIZATION OF MERUELO**
15  _____) **MADDUX PROPERTIES, INC., ET AL.**
                                         ) **DATED SEPTEMBER 20, 2010**
16  ☑    Affects all Debtors             )
                                         ) **Disclosure Statement Hearing**
17  ☐    Affects the following Debtor(s): ) Date:      October 6, 2010
                                         ) Time:      1:30 p.m.
18                                       ) Place:     Courtroom 301
                                         )            21041 Burbank Blvd.
19                                       )            Woodland Hills, California
                                         )
20                                       ) **Plan Confirmation Hearing**
                                         ) Date:      _____, 2011
21                                       ) Time:      9:30 a.m._
                                         ) Place:     Courtroom 301
22                                       )            21041 Burbank Blvd.
    _____)            Woodland Hills, California
23

24  _____

25  [1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities.  The affiliated case numbers are as follows:  1:09-bk-13338-KT; 1:09-bk-13358-KT; 1:09-bk-13359-KT; 1:09-bk-13360-KT; 1:09-bk-13361-KT; 1:09-bk-13362-KT; 1:09-bk-13363-KT; 1:09-bk-13364-KT; 1:09-bk-13365-KT; 1:09-bk-13366-KT; 1:09-bk-13367-KT; 1:09-bk-13368-KT; 1:09-bk-13369-KT; 1:09-bk-13370-KT; 1:09-bk-13371-
26  KT; 1:09-bk-13372-KT; 1:09-bk-13373-KT; 1:09-bk-13374-KT; 1:09-bk-13375-KT; 1:09-bk-13376-KT; 1:09-bk-13377-KT; 1:09-bk-13378-KT; 1:09-bk-13379-KT; 1:09-bk-13380-KT; 1:09-bk-13381-KT; 1:09-bk-13382-KT; 1:09-bk-13383-KT; 1:09-bk-13384-KT; 1:09-bk-13385-KT; 1:09-bk-13386-KT; 1:09-bk-13387-KT; 1:09-bk-13388-KT; 1:09-bk-13389-KT; 1:09-bk-13390-KT; 1:09-bk-13392-KT; 1:09-bk-13393-KT; 1:09-bk-13394-
27  KT; 1:09-bk-13395-KT; 1:09-bk-13396-KT; 1:09-bk-13397-KT; 1:09-bk-13398-KT; 1:09-bk-13399-KT; 1:09-bk-13400-KT; 1:09-bk-13401-KT; 1:09-bk-13402-KT; 1:09-bk-13403-KT; 1:09-bk-13404-KT; 1:09-bk-13405-KT; 1:09-bk-13406-KT; 1:09-bk-13407-KT; 1:09-bk-13434-KT; and 1:09-bk-13439-KT.
28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................ 3

    A.    OVERVIEW ............................................................................................. 3

    B.    ADDITIONAL INFORMATION .......................................................... 5

    C.    HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE................... 6

    D.    VOTING PROCEDURES ....................................................................... 9

    E.    CONFIRMATION HEARING................................................................ 10

    F.    NOTICES .................................................................................................. 11

II.    DEBTORS' BUSINESS AND OPERATIONS PRIOR TO THE FILING ...................... 11

    A.    CORPORATE HISTORY OF THE DEBTORS .................................. 11

    B.    NATURE OF THE DEBTORS' BUSINESS........................................ 12

        1.    210 – 212 and 230 West Avenue 26, Los Angeles..................... 14

        2.    306 – 330 North Avenue 21, Los Angeles ................................. 14

        3.    1000 East Cesar Chavez, Los Angeles ....................................... 15

        4.    2415 East Washington Boulevard, Los Angeles ........................ 15

        5.    1211 East Washington Boulevard, Los Angeles ........................ 16

        6.    13853, 13822 and 13916 Garvey Avenue, 13904 Corak Street and 3060 Feather Avenue, Baldwin Park .................................. 16

        7.    1910 - 1922 Santa Fe Avenue, 2425 East 12th Street and 303 South Hewitt, Los Angeles ........................................................ 17

        8.    5701 and 5707 - 5715 South Alameda Street and 5016 Alba Street, Los Angeles .................................................................. 18

        9.    3rd & Omar Street, Los Angeles ............................................... 18

        10.    420 Boyd Street, Los Angeles .................................................. 19

        11.    760 South Hill Street, and 325 West 8th Street, Los Angeles (The Union Lofts) ..................................................................... 19

        12.    788 South Alameda, Los Angeles ............................................. 20

        13.    905 8th Street, Los Angeles...................................................... 20

-i-

## **TABLE OF CONTENTS (cont.)**

**Page**

14.  Alameda Produce Market, Los Angeles (Including Alameda Square and Seventh Street Produce Market) ...............................21

15.  1500 Griffith Avenue, Los Angeles...........................................22

16.  1919 Vineburn Street, Los Angeles..........................................22

17.  2131 Humboldt Street, Los Angeles.........................................23

18.  2529 Santa Fe Avenue, Vernon (Santa Fe Plaza).....................23

19.  2640 East Washington Boulevard, Los Angeles (Washington Produce Market) ...........................................................................24

20.  2951 Lenwood Road, Barstow (Barstow Produce Center)........24

21.  3185 East Washington Boulevard, Los Angeles (Washington Cold Storage)...........................................................................25

22.  620, 643 and 644 South Gladys Avenue, 830 - 838 East 6th Street and 647 - 649 Ceres Avenue, Los Angeles ......................25

23.  2001 - 2021 West Mission Boulevard, Pomona .........................26

24.  1124 South Olive, 1117-1119 South Olive and 218 W. 11th Street, Los Angeles..................................................................26

25.  950 and 960 E. 3rd Street, Los Angeles ....................................27

26.  815 East Temple Street, 210 Center Street and 729 East Temple Street, Los Angeles (Center Village).............................28

27.  833 Wall Street (Wall Street Market), Los Angeles..................28

28.  1875 West Mission Boulevard, Pomona ....................................29

29.  Santa Fe Commerce Center – 2445, 2460 and 2535 East 12th Street, Los Angeles..................................................................29

30.  1009 North Citrus Avenue, Covina (Citrus Gardens) ...............30

31.  817-825 South Hill Street, Los Angeles (Ullman Tower Two).................30

32.  1060 North Vignes, Los Angeles (Vignes Village)....................30

33.  12361 and 12385 San Fernando Road, Sylmar (San Fernando Court)........................................................................................31

34.  801 East 7th Street, Los Angeles ..............................................31

35.  1308 South Orchard, Los Angeles.............................................31

-ii-

1

**TABLE OF CONTENTS (cont.)**

2
**Page**

36.   758 Ceres Avenue, Los Angeles (Ceres Street Produce
      Market) .............................................................................................31

37.   336 West 11th Street, Los Angeles (South Park Towers) ........................32

38.   915-949 South Hill Street, Los Angeles (Ullman Tower One) .................32

39.   900, 910 and 926 East 4th Street and 405 – 411 S. Hewitt
      Street, Los Angeles .......................................................................33

40.   425 West 11th Street, Los Angeles (Desmond Building).........................33

41.   West 11th Street and South Grand Avenue, Los Angeles
      (Southpark Towers, TransAmerica Lofts & Olive Street
      Towers) ...........................................................................................34

C.    CONSOLIDATED OPERATIONS...........................................................34

D.    THE DEBTORS' CURRENT AND ON-GOING BUSINESS
      STRATEGIES ..................................................................................36

      1.    The Debtors' Investment Strategy ...............................................37

      2.    The Debtors' Value Creation Strategies .....................................37

            a.   Focus on the Property Needs of Specific Industries
                 and Premium Space Users. ..............................................37

            b.   Focus on Sub-Markets that are Transitioning from
                 Large to Small Tenants. ...................................................37

            c.   Aggregate Small, Synergistic Tenants............................38

            d.   Focus on Residential Development in Appropriate
                 Locations...........................................................................38

            e.   Coordinate Residential and Industrial Development in
                 Shifting Urban Markets. ...................................................38

            f.   Pursue Opportunities Offered by Governmental
                 Organizations. ...................................................................39

            g.   Aggregate Separate Parcels and Acquire Controlling
                 Locations in Developing Neighborhoods. .......................39

      3.    The Company's Operating Strategies ........................................40

            a.   Efficiently Manage the Development and Operation of
                 the Company's Projects. ...................................................40

            b.   Seek Interim Revenues from Properties. .........................40

-iii-

# TABLE OF CONTENTS (cont.)

**Page**

       c.    Sell or Recapitalize the Company's Projects to Realize Value. ........................................................................... 40

E.    PREPETITION CAPITAL STRUCTURE OF THE COMPANY ...................... 41

    1.    MMPI ................................................................................ 41

        a.    MMPI Initial Public Offering ......................................... 41

        b.    MMPI Common Stock ..................................................... 42

        c.    MMPI's Equity Incentive Plan ....................................... 42

    2.    Corporate Structure of the Other Debtors ................................. 43

F.    MATERIAL PROCEEDINGS .................................................................. 43

    1.    Potential Government Tax Audits ............................................. 43

    2.    Indemnification Claims ........................................................... 43

III.    EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES ......................................................................................................... 44

IV.    CHAPTER 11 EVENTS ..................................................................................... 46

A.    ADMINISTRATIVE ORDERS AND MATTERS ................................. 46

    1.    Introduction ............................................................................. 46

    2.    The Cash Collateral Motions and Corresponding Orders ......... 47

    3.    The Debtors' Single Asset Real Estate ("SARE") Motion ........ 48

    4.    Motions for Relief from Stay ................................................... 49

    5.    The Debtors' Compromises With Various Lenders ................... 54

    6.    The Debtor's Settlement with the County of Los Angeles ......... 55

    7.    East West Bank's Adversary Proceeding Against the Debtors .... 56

    8.    Unexpired Leases and Executory Contracts .............................. 57

    9.    Summary of Claims Process, Bar Date and Claims Filed .......... 57

        a.    Schedules and Statements of Financial Affairs .............. 57

        b.    Claims Bar Date .............................................................. 58

        c.    Proofs of Claim and Other Claims .................................. 58

359261.05 [XP]    25195

## TABLE OF CONTENTS (cont.)

**Page**

         d.    The Debtors' Stipulation with the OCC Regarding Unsecured Claims ............................................................. 59

         e.    Motion to Deem Claims Filed Against the Wrong Debtor to be Filed Against the Proper Debtor ................. 59

     10.    Other Administrative Matters .................................... 60

B.    REAL PROPERTY VALUATION, SALES AND LISTINGS ............................ 62

     1.    Value of Property Level Debtors Real Property Assets ............................ 62

     2.    Mr. Meruelo's Expertise in Valuing the Debtors Properties ....................... 64

     3.    Sales and Listings Since the Commencement of the Chapter 11 Cases ............................................................. 66

C.    EVENTS IN THE RELATED CHAPTER 11 CASES MM 845 S. FLOWER AND CHINATOWN ............................................... 68

     1.    Important Events in MM 845 S. Flower and Chinatown cases ................. 69

     2.    Sale of the Project and Settlement with Canyon ......................... 70

V.    SUMMARY OF THE PLAN ............................................... 72

A.    COMMON CLASS TREATMENTS FOR CLASSIFIED CLAIMS ................... 73

     1.    Common Secured Tax Claim Treatment .................................... 73

     2.    Common Secured Lender Claim Treatment ............................... 74

     3.    Common Other Priority Claim Treatment .................................. 75

     4.    Common Tenant Security Deposits Treatment ............................ 76

     5.    Common Convenience Class Claim Treatment ........................... 76

     6.    Common Unsecured Claim Treatment .................................... 76

     7.    Common Unsecured Guaranty Claim Treatment ....................... 76

     8.    Common Treatment for Guaranty Claims held by Settling Guaranty Creditors ................................................. 78

     9.    Common Intercompany Claim Treatment ................................. 78

     10.    Common Interest Treatment ............................................... 78

B.    SUMMARY OF CLASSIFIED CLAIMS AND TREATMENT ........................ 78

359261.05 [XP]    25195

1

# TABLE OF CONTENTS (cont.)

2
**Page**

3   C.   TREATMENT FOR UNCLASSIFIED CLAIMS.................................113

4        1.   Unclassified Claims (Applicable to all of the Debtors)...........113

5             a.   Administrative Claims...................................114

6             b.   Priority Tax Claims......................................117

7  VI.  TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
8       LEASES.................................................................120

9  VII. MEANS FOR IMPLEMENTATION OF THE PLAN ....................121

      A.   OVERVIEW OF PLAN IMPLEMENTATION....................121
10
      B.   VESTING OF ASSETS...............................................121
11
12    C.   DEBTORS' BUSINESS POST-CONFIRMATION...............121

13    D.   $15 MILLION LOAN TO FUND OPERATIONS AND PLAN
           PAYMENTS..........................................................123
14
      E.   DEBTORS' PERFORMANCE UNDER THE PLAN...............123
15
      F.   CERTIFICATE OF INCORPORATION AND BYLAWS;
16         CANCELLATION OF LTIP UNITS AND RELATED
           AGREEMENTS .....................................................125
17
           1.   Cancellation of LTIP Units and Related Agreements .............125
18
           2.   Amended and Restated Certificate of Incorporation and
19              Bylaws ...........................................................126

20    G.   MERGER OF MMPLP AND MMPI ...............................126

21    H.   RETAINED CLAIMS AND DEFENSES AND RESERVATION OF
           RIGHTS...............................................................127
22
           1.   No Waiver and Retention of Claims and Defenses .................127
23
           2.   Retention of Avoidance Actions...................................128
24
           3.   Unknown Retained Claims and Defenses / No Preclusion.......128
25
      I.   NON-BANKRUPTCY LITIGATION ................................129
26
      J.   OBJECTIONS TO CLAIMS .........................................130
27
           1.   MMPI...............................................................131
28
           2.   MMPLP ...........................................................133

-vi-

1

## **TABLE OF CONTENTS (cont.)**

2                                                                                                          **Page**

3      3.      MM Management ....................................................................... 133

4      4.      MG – Overland Terminal ........................................................... 133

5      5.      National Cold Storage................................................................ 134

6      6.      MMP 306 – 330 N. Avenue 21 .................................................. 134

7      7.      MMP 1060 N. Vignes................................................................. 134

8      8.      MMP 12385 San Fernando Road ............................................... 135

9      9.      MG 1211 E. Washington Boulevard .......................................... 135

10     10.     MG – Ceres Street Produce ....................................................... 135

11     11.     MM 3rd & Omar Street ................................................................ 135

12     12.     MM 336 W. 11th Street .............................................................. 136

13     13.     MM 420 Boyd............................................................................ 136

14     14.     MMP 760 S. Hill Street ............................................................. 136

15     15.     788 S. Alameda.......................................................................... 137

16     16.     Alameda Produce Market .......................................................... 137

17     17.     MG 1500 Griffith Avenue ......................................................... 138

18     18.     MMP 2131 Humboldt Street ...................................................... 138

19     19.     2640 Washington Blvd. .............................................................. 138

20     20.     MG 3185 E. Washington Boulevard .......................................... 139

21     21.     MG 4th Street Center................................................................... 139

22     22.     MG 425 W. 11th Street................................................................ 139

23     23.     MG 620 Gladys Avenue ............................................................. 139

24     24.     MG 2001-2021 W. Mission Boulevard ...................................... 139

25     25.     MG Little J................................................................................. 140

26     26.     MG Southpark ............................................................................ 140

27     27.     Merco Group.............................................................................. 141

28     28.     Meruelo Farms............................................................................ 141

-vii-

359261.05 [XP]    25195

1

# TABLE OF CONTENTS (cont.)

2

**Page**

3        29.    Meruelo Wall Street.................................................................................. 141

4        30.    MM Mission Boulevard............................................................................ 142

5        31.    Santa Fe Commerce Center ..................................................................... 142

6    K.    DISBURSING AGENT.................................................................................... 142

7    L.    DISCHARGE OF THE DEBTORS AND INJUNCTION................................. 142

8        1.    Discharge ................................................................................................. 142

9        2.    Injunction ................................................................................................ 143

10    M.    NO LIABILITY FOR SOLICITATION OR PARTICIPATION ......................... 144

11    N.    LIMITATION OF LIABILITY ........................................................................ 144

12    O.    CERTIFICATE OF INCORPORATION AND CERTIFICATES OF
         ORGANIZATION ............................................................................................ 144
13

14    P.    OTHER DOCUMENTS AND ACTIONS .......................................................... 145

15    Q.    CORPORATE ACTION ................................................................................... 145

16    R.    RETIREE BENEFITS ...................................................................................... 145

17    S.    THE CREDITORS' COMMITTEE AND THE EQUITY
         HOLDERS' COMMITTEE................................................................................ 145

18 VIII.    MANAGEMENT OF REORGANIZED DEBTORS...................................................... 146

19    A.    BOARD OF DIRECTORS AND MANAGEMENT OF THE
         REORGANIZED DEBTORS............................................................................. 146
20

21        1.    Board of Directors .................................................................................. 146

22        2.    Officers & Biographies............................................................................ 147

23            a.    Richard Meruelo .......................................................................... 147

24            b.    John Charles Maddux ................................................................... 147

25            c.    Andrew Murray ............................................................................ 148

26            d.    Lynn Beckemeyer......................................................................... 148

27            e.    Fred Skaggs .................................................................................. 149

28            f.    Miguel E. Echemendia.................................................................. 149

-viii-

# **TABLE OF CONTENTS (cont.)**

**Page**

g.      Todd Nielsen.................................................................149

B.      COMPENSATION OF MMPI EXECUTIVE OFFICERS ..................................150

IX.    CONFIRMATION AND CONSUMMATION PROCEDURE ......................................151

A.      SOLICITATION OF VOTES.................................................................151

B.      THE CONFIRMATION HEARING ..................................................153

C.      CONFIRMATION..........................................................................154

1.      Acceptance....................................................................154

2.      Unfair Discrimination and the Fair and Equitable Tests .........................155

3.      Feasibility .................................................................156

4.      Best Interests Test...........................................................157

D.      CONSUMMATION .......................................................................160

X.     CONFIRMATION DATE CONDITIONS...........................................................160

A.      CONDITIONS TO CONFIRMATION .............................................160

B.      CONDITIONS TO EFFECTIVE DATE ...........................................160

C.      WAIVER OF CONDITIONS .............................................................161

D.      EFFECT OF FAILURE OF CONDITIONS ........................................161

E.      VACATUR OF CONFIRMATION ORDER.......................................161

XI.    RETENTION OF JURISDICTION.....................................................................161

XII.   PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER
       THE PLAN AND TREATMENT OF DISPUTED, CONTINGENT AND
       UNLIQUIDATED CLAIMS AND INTERESTS ............................................164

A.      VOTING OF CLAIMS AND INTERESTS ........................................164

B.      METHOD OF DISTRIBUTIONS UNDER THE PLAN....................164

1.      Distributions Under the Plan ......................................164

2.      Timing and Methods of Distribution .........................165

a.      Compliance with Tax Requirements ............................165

b.      Pro Rata Distributions.................................................165

-ix-

359261.05 [XP]      25195

**TABLE OF CONTENTS (cont.)**

**Page**

           c.    Distributions ................................................................ 165

C.    UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS .............................. 166

D.    DISPUTED CLAIMS, DISPUTED INTERESTS AND
ESTIMATIONS ................................................................................ 166

    1.    Treatment of Disputed Claims or Interests ............................... 166

    2.    Distribution on Account of Disputed Claims or Interests Once
They Are Allowed ................................................................... 167

    3.    Allowance of Claims Subject to Bankruptcy Code Section
502(d) .................................................................................... 167

E.    SETOFFS ......................................................................................... 167

XIII.    CERTAIN RISK FACTORS TO BE CONSIDERED ....................................... 168

A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS .................................. 168

    1.    Risk of Non-Confirmation of the Plan ..................................... 168

    2.    Risk of Non-Occurrence of the Effective Date ......................... 169

B.    RISKS TO RECOVERY BY HOLDERS OF CLAIMS ................................... 169

    1.    Ability to Service Debt ............................................................ 169

    2.    Risks of Asset Disposition Delays ........................................... 169

    3.    Risks Related to Dependence on Key Personnel ...................... 169

    4.    Projected Financial Information ............................................... 170

    5.    Failure to Confirm One or More of the Debtors' Chapter 11
Plans ...................................................................................... 170

    6.    Risk Related to the Litigation Claim Filed by East West
Bankcorp and EWB Against MMPI and Richard Meruelo (the
"EWB Complaint"). ................................................................ 171

XIV.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............... 172

A.    CERTAIN UNITED STATES FEDERAL INCOME TAX
CONSEQUENCES TO THE DEBTORS ........................................... 173

    1.    Net Operating Losses .............................................................. 173

    2.    Cancellation of Debt ............................................................... 174

-x-

# TABLE OF CONTENTS (cont.)

**Page**

|  |  |  |
|---|---|---|
| 3. | Limitation on NOL Carryforwards and Other Tax Attributes | 175 |
| 4. | General Section 382 Limitation | 175 |
| 5. | Special Bankruptcy Exception | 176 |
| 6. | Merger of MMPLP into MMPI | 176 |
| 7. | Consequences of the Sale and/or Refinance of Assets of the Debtors | 177 |

B. CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS ........................... 179

    1. Consequences to Holders of Allowed General Unsecured Claims .................................................................................. 179

    2. Consequences to Holders of Allowed Secured Claims .......................... 180

C. DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST ...................... 181

D. INFORMATION REPORTING AND BACKUP WITHHOLDING ................. 181

E. IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE ............................................................................................ 181

XV. MISCELLANEOUS PROVISIONS ............................................................... 182

A. EXEMPTION FROM TRANSFER TAXES ........................................................ 182

B. PAYMENT OF STATUTORY FEES ................................................................. 182

C. MODIFICATION OR WITHDRAWAL OF THE PLAN .................................. 183

D. GOVERNING LAW ........................................................................................ 183

E. FILING OR EXECUTION OF ADDITIONAL DOCUMENTS ........................ 183

F. WITHHOLDING AND REPORTING REQUIREMENTS ................................ 183

G. WAIVER OF RULE 7062 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE ......................................................................... 183

H. HEADINGS ........................................................................................................ 184

I. EXHIBITS AND SCHEDULES ........................................................................ 184

J. NOTICES ............................................................................................................ 184

K. CONFLICT .......................................................................................................... 184

L. SUCCESSORS AND ASSIGNS ........................................................................ 184

-xi-

1

## TABLE OF CONTENTS (cont.)

2

**Page**

3    M.    SATURDAY, SUNDAY OR LEGAL HOLIDAY ...............................................184

4    N.    POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS
         OR INTERESTS....................................................................................................185
5

6    O.    SEVERABILITY OF PLAN PROVISIONS..........................................................185

     P.    BALLOTING ........................................................................................................185
7

8    Q.    NO ADMISSIONS OR WAIVER OF OBJECTIONS .........................................186

9    R.    SURVIVAL OF SETTLEMENTS ........................................................................186

10   XVI.  ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF
           THE PLAN ...............................................................................................................186

11   A.    ALTERNATIVE PLANS OF REORGANIZATION ...........................................186

12   B.    LIQUIDATION UNDER CHAPTER 7 ...............................................................187

13   XVII. CONCLUSION AND RECOMMENDATION ..............................................................187

14

## EXHIBITS TO THE DISCLOSURE STATEMENT

15   DEFINITION OF TERMS USED IN DISCLOSURE STATEMENT (**EXHIBIT A-1**);

16   THE PLAN (**EXHIBIT A-2**);

17   ORDER OF THE BANKRUPTCY COURT DATED [ ], 2010 (THE "DISCLOSURE
      STATEMENT ORDER") APPROVING THIS DISCLOSURE STATEMENT
18    (**EXHIBIT B**);

19   CHART OF THE DEBTORS' CORPORATE STRUCTURE:  PREPETITION LIST OF THE
      DEBTORS  (**EXHIBIT C**);
20

21   LOAN MODIFICATION AGREEMENTS (**EXHIBIT D**);

22   THE DEBTORS' PROJECTED FINANCIAL INFORMATION (**EXHIBIT E**);

23   THE DEBTORS' UNEXPIRED LEASES AND EXECUTORY CONTRACTS (**EXHIBIT F**);

24   THE DEBTORS' LIQUIDATION ANALYSIS (**EXHIBIT G**);

25   THE CLAIMS AND INTERESTS OF THE DEBTORS (**EXHIBIT H**);

26   LIST OF ADMINISTRATIVE EXPENSE CLAIMS (**EXHIBIT H.1**)

27   LIST OF CLASS "B" PRIORITY UNSECURED CLAIMS (**EXHIBIT H.2**);

28   LIST OF CLASS "C" GENERAL UNSECURED CLAIMS – TENANT SECURITY
      DEPOSIT CLAIMS (**EXHIBIT H.3**);

1

## **TABLE OF CONTENTS (cont.)**

2
                                                                                            **Page**

3

4      LIST OF CLASS "C" GENERAL UNSECURED CLAIMS -- CONVENIENCE CLASS
          (**EXHIBIT H.4**);

5      LIST OF CLASS "C" GENERAL UNSECURED CLAIMS (**EXHIBIT H.5**);

6      LIST OF CLASS "C" UNSECURED GUARANTY CLAIMS (**EXHIBIT H.6**);

7      LIST OF CLASS "D" INTERCOMPANY CLAIMS (**EXHIBIT H.7**);

8      LIST OF CLASS "E" INTERESTS (**EXHIBIT H.8**);

9    LIST OF DEBTORS' TRANSFERS DURING THE 90-DAY AND ONE-YEAR AVOIDANCE
          PERIODS (**EXHIBIT I**);
10
     DEBTORS' PROPERTY VALUATIONS (**EXHIBIT J**); AND
11
     AGREEMENT AND PLAN OF MERGER (**EXHIBIT K**)
12
     ADDENDUM OF HISTORICAL FINANCIAL INFORMATION. [FILED SEPARATELY]
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

359261.05 [XP]      25195

1    THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE

2  AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE

3  DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN

4  IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED

5  SINCE THE DATE HEREOF.  HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS

6  DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO

7  VOTING ON THE PLAN.

8    FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS

9  DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY

10 INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT,

11 THE TERMS OF THE PLAN ARE CONTROLLING.  THIS DISCLOSURE STATEMENT MAY

12 NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO

13 VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL

14 CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE

15 ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER

16 PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL

17 EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

18 CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY

19 NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.

20 THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF

21 ACTUAL OUTCOMES.  ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND

22 CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE XIII OF THIS

23 DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

24    WHERE THERE ARE SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS

25 REFERRED TO IN THIS DISCLOSURE STATEMENT, SUCH SUMMARIES DO NOT

26 PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR

27 ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENT,

28 INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

1  THE DEBTORS BELIEVE THE PLAN WILL ENABLE THEM TO SUCCESSFULLY

2  REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT

3  ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND

4  THEIR CREDITORS.

5  THE DEBTORS URGE ALLOWED CLAIM HOLDERS IN CLASSES OF CLAIMS

6  THAT ARE IMPAIRED AND THAT ARE NOT DEEMED TO HAVE REJECTED THE PLAN

7  TO VOTE TO ACCEPT THE PLAN.

8  **I.**

9  **INTRODUCTION**

10  **A.    OVERVIEW**

11  Meruelo Maddux Properties, Inc., ("MMPI"), and its 53 related debtor entities that filed

12  voluntary bankruptcy petitions at the same time as MMPI (each a "Debtor" and, collectively, the

13  "Debtors" or the "Company") submit this Fourth Amended Disclosure Statement ("Disclosure

14  Statement') pursuant to Section 1125 of Title 11 of the United States Code (the "Bankruptcy

15  Code").  The purpose of this Disclosure Statement is to provide Holders of Claims against and

16  Interests in the Debtors with adequate information to enable them to make informed judgments

17  about the Debtors' Joint Fourth Amended Plan of Reorganization under Chapter 11 of the

18  Bankruptcy Code, dated September 20, 2010, (as the same may be amended, the "Plan"), filed with

19  the United States Bankruptcy Court for the Central District of California – San Fernando Valley

20  Division (the "Bankruptcy Court") before exercising their right to vote to accept or reject the Plan.[2]

21  This Disclosure Statement describes the business background and operating history of the

22  Debtors before the filing of their Chapter 11 Cases.  It also summarizes certain significant events

23  _____

24  [2]      Unless otherwise defined herein, all capitalized terms contained herein have the meanings
ascribed to them in the Definitions to the Disclosure Statement attached hereto as Exhibit "A-1."  A
25  term used, but not defined herein or in the attached Definitions, but defined in the Bankruptcy
Code, has the meaning given to that term in the Bankruptcy Code unless the context of this
26  Disclosure Statement clearly requires otherwise.  References to code sections are references to the
Bankruptcy Code, except as otherwise stated.

27

28

359261.05 [XP]    25195

1  that have taken place during the Chapter 11 Cases and describes the terms of the Plan, which

2  divides creditor Claims and the interests of shareholders into Classes and provides for the

3  satisfaction of allowed Claims and interests.

4       The Plan is a joint Plan and not a consolidated Plan. The Debtors are not seeking

5  substantive consolidation in the Plan.  As a result, the Claims and Interests in each of the Debtors

6  have been classified on a Debtor by Debtor basis.  Votes will be tabulated and acceptances will be

7  determined on a Debtor by Debtor basis.  The Debtors will seek confirmation of the Plan as to each

8  Debtor on an individual basis notwithstanding that the Plan is a joint Plan.  The votes of creditors

9  of one Debtor will not affect or be counted toward acceptance or rejection of a plan for any other

10  Debtor.  The Debtors reserve the right to proceed with Confirmation under the Plan for one Debtor,

11  or a combination of Debtors, and not others.

12       The Plan provides for the payment in full of all Claims.  General Unsecured Claims will be

13  paid within 30 days after the Effective Date of the Plan with interest from the Petition Date at

14  0.64% per annum.  Secured Claims will receive payments of interest at 5% per annum over 5 years

15  if the creditor votes to accept the Plan and 7 years if the creditor votes to reject the Plan.  The

16  principal balance will be due at the end of the 5 or 7 year term as applicable and will be repaid

17  either through the sale of the property securing the claim or the refinancing of the secured debt.

18  Secured Creditors who have entered into Bankruptcy Court approved settlement agreements with

19  the Debtors will be paid in accordance with the terms of the settlement agreements.  MMPI

20  shareholders will retain their shares in MMPI and their rights are not affected by the Plan.  In the

21  alternative, MMPI shareholders have the right to elect to have their shares redeemed for $0.25 for

22  each share of MMPI Existing Common Stock held by the shareholder.  The redemption will occur

23  on or as soon as practicable after the Effective Date.   MMPLP will be merged into MMPI and

24  MMPLP's equity interests will be cancelled.   Payments under the Plan will be funded from the

25  Debtors' operations, existing cash at the Effective Date and the sale and refinance of certain of the

26  Debtors' assets.  In addition, the Debtors have obtained a commitment for a $15 million convertible

27  secured loan to fund their operations and plan payments.  The Loan bears interest at the rate of 5%

28  per annum and is convertible into 30 million shares of MMPI common stock between 4 and 5 years

4

1  after the Loan is funded (at a conversion rate of $.50 per share).  A detailed description of the Plan

2  is set forth in Article V of this Disclosure Statement.

3  Upon Bankruptcy Court approval ("Confirmation") of the Plan, the Plan will be binding

4  upon all creditors and shareholders regardless of whether an individual creditor or shareholder has

5  voted in favor of the Plan.  THE DEBTORS THEREFORE URGE YOU TO READ THIS

6  DISCLOSURE STATEMENT AND THE PLAN CAREFULLY.

7  **B.   ADDITIONAL INFORMATION**

8  MMPI has filed public reports with the Securities and Exchange Commission ("SEC")

9  which contain additional information about the Company and its historic financial performance.

10  The most recent filings are:  10-K for the year ended December 31, 2009 (filed on June 21, 2010),

11  10-K for the year ended December 31, 2008 (filed on March 16, 2009), Amended 10-K for the year

12  ended December 31, 2008 (filed on April 30, 2009), 10-Q for the quarter ended March 31, 2009

13  (filed on September 9, 2009), 10-Q for the quarter ended June 30, 2009 (filed on September 17,

14  2009) and 10-Q for the quarter ended September 30, 2009 (filed on November 9, 2009).  On

15  January 19, 2010, MMPI filed its Certification and Notice of Termination of Registration under

16  Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports under

17  Section 13 and 15(d) of the Securities Exchange Act of 1934 and accordingly, the Debtor is no

18  longer required to file public reports with the SEC.  MMPI is not presently filing reports.  The

19  financial projections do not include the costs of public reporting.

20  You may obtain copies of these documents from:

21  •      The SEC's website at:  *http://www.sec.gov/edgar/searchedgar/companysearch.html;*

22  •      The Company's website (under "Investor Relations") at:

23  *http://www.meruelomaddux.com/noflash/index.php* or

24  •      Kurtzman Carson Consultant's website at: *[to be inserted]*

25  •      By requesting them in writing from:

26              Meruelo Maddux Properties, Inc.
                761 Terminal Street

27              Building 1, 2nd Floor
                Los Angeles, CA 90021

28              Attn:  Mr. Todd Nielsen

5

1    A Ballot for the acceptance or rejection of the Plan is also enclosed with this Disclosure

2  Statement submitted to the Holders of Claims and Interests that are entitled to vote to accept or

3  reject the Plan.

4    On [_____], 2010, after notice and a hearing, the Bankruptcy Court

5  entered the Disclosure Statement Order, approving this Disclosure Statement as containing

6  adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors

7  typical of the Debtors' creditors to make an informed judgment whether to accept or reject the Plan.

8  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE

9  A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS

10  OF THE PLAN.  THE BANKRUPTCY COURT HAS NOT YET CONFIRMED THE PLAN

11  DESCRIBED IN THIS DISCLOSURE STATEMENT.  IN OTHER WORDS, THE TERMS OF

12  THE PLAN ARE NOT YET BINDING ON ANYONE.  HOWEVER, IF THE BANKRUPTCY

13  COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE

14  DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THESE CHAPTER 11

15  CASES.

16    The Court will enter an order that provides the deadlines, procedures and instructions for

17  voting to accept or reject the Plan and for filing objections to confirmation of the Plan, and the

18  applicable standards for tabulating Ballots (the "Procedures Order").  In addition, detailed voting

19  instructions accompany each Ballot.  Each holder of a Claim or Interest entitled to vote on the Plan

20  should read this Disclosure Statement, the Plan, the Disclosure Statement Order, the Procedures

21  Order and the instructions accompanying the Ballot in their entirety before voting on the Plan.

22  These documents contain important information concerning the classification of Claims and

23  Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan

24  may be made except pursuant to Section 1125 of the Bankruptcy Code.

25    **C.    HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE**

26    Pursuant to the provisions of the Bankruptcy Code, only Holders of Allowed Claims or

27  Interests in Classes of Claims or Interests that are impaired and that are not deemed to have rejected

28  the Plan are entitled to vote to accept or reject a proposed Plan.  Classes of Claims or Interests in

359261.05 [XP]    25195

which the Holders of Claims or Interests are unimpaired under a Chapter 11 Plan are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.  Classes of Claims or Interests in which the Holders of Claims or Interests will receive no recovery under a Chapter 11 Plan are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. For a detailed description of the treatment of Claims and Interests under the Plan, see Article V of this Disclosure Statement.

The following Classes are Impaired and, to the extent Claims or Interests in such Classes are Allowed Claims or Interests, the Holders of such Claims or Interests will receive distributions under the Plan.  As a result, Holders of Claims or Interests in those Classes are entitled to vote to accept or reject the Plan:

• Classes 10A, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A, 26A, 27A-1,  28A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1, 39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 50A-1, 51A-1, 52A-1, 53A-1, and 54A-1 (consisting of secured tax Claims against the Debtors);

• Classes 21A-2, 28A-2, 29A-2, 29A-3, 29A-4, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2, 36A-2, 36A-3, 36A-4, 37A-2, 37A-3, 38A-2, 39A-2, 40A-2, 41A-2, 42A-1, 42A-2, 43A-2, 44A-2, 45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and 54A-3 (consisting of the Secured Claims of lenders and other secured creditors against each relevant Debtor);

• Classes 1C-2A, 1C-2B, 1C-3, 2C-2, 2C-3, 3C, 6C, 7C, 8C-2, 9C-2, 10C-2, 11C-3, 12C-3, 13C-2, 14C-3, 15C-2, 16C-2, 18C-2, 20C, 21C-3, 22C, 24C-2, 25C-3, 26C-3,  27C-3, 28C-3, 29C-2, 30C-3, 31C-2, 32C, 32C-3, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3, 40C-3, 41C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3, 53C,  and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor); and

Class 1E (consisting of the Interests in MMPI).

The Plan provides for the merger of MMPLP into MMPI.  The interests of the holders of LTIP units in Class 2E will be cancelled and extinguished at the Effective Date and the remaining

1   interests will be extinguished as a result of the merger of MMPLP and MMPI.  As a result Class 2E

2   is deemed to reject the Plan and is not entitled to vote on the Plan.

3          The following Classes of the Plan are Unimpaired.  As a result, Holders of Claims and

4   Interests in those Classes are conclusively presumed to have accepted the Plan and are not entitled

5   to vote on the Plan:

6          •       Classes 1B, 5B, 32B, 33B, 36B and 52B, (consisting of the Priority Unsecured

7   Benefits Claims of present and former employees of each relevant Debtor);

8          •       Classes 11C-1, 12C-1, 14C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1, 32C-1,

9   33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 41C-1, 43C-3, 44C-3, 46C-1, 48C-3,

10  49C-3, 52C-1 and 54C-1 (consisting of the unsecured Claims for security deposits of the Debtors'

11  tenants);

12         •       Classes 1C-1, 2C-1, 4C-1, 4C-2, 5C-2, 8C-1, 9C-1, 10C-1, 11C-2, 12C-2, 13C-1,

13  14C-2, 15C-1, 16C-1, 17C, 18C-1, 19C-1, 19C-2, 21C-2, 23C, 24C-1, 25C-2, 26C-2, 27C-2, 28C-

14  2, 29C-1, 30C-2, 31C-1, 32C-2, 33C-2, 34C-2, 35C-1, 36C-2, 38C-2, 39C-2, 40C-2, 41C-2, 42C-1,

15  43C-1, 44C-1, 45C-1, 47C-1, 48C-1, 49C-1, 50C-1, 51C-1, 52C-2, and 54C-2 (consisting of the

16  Convenience Claims and other unimpaired general unsecured claims of each relevant Debtor);

17         •       Classes 2D through 7D, 9D-35D, and 37D-53D (consisting of the Intercompany

18  Claims);

19         •       Classes 3E through 54E (consisting of the Interests in the Debtors other than MMPI

20  and MMPLP).

21         As a condition to confirmation for each Debtor's Chapter 11 Case, the Bankruptcy Code

22  requires that each Class of Impaired Claims and Interests vote to accept the Plan, except under

23  certain circumstances.  Section 1126(c) of the Bankruptcy Code defines acceptance of a Plan by a

24  Class of Impaired Claims as acceptance by holders of at least two-thirds in dollar amount and more

25  than one-half in number of Claims in that Class, but for that purpose counts only those who

26  actually vote to accept or to reject the Plan.  Thus, a Class of Claims will have voted to accept its

27  Debtor's Plan only if two-thirds in amount and a majority in number actually voting cast their

28  Ballots in favor of acceptance.  Holders of Claims who fail to vote are not counted as either

accepting or rejecting the Plan.  Thus, acceptance of a Plan by the Impaired Classes of Claims listed above for each Debtor will occur only if at least two-thirds in dollar amount and a majority in number of the Holders of such Claims in each Class that cast their Ballots vote in favor of acceptance.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that such acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  For a more detailed description of the requirements for confirmation of the Plan, see Article IX of this Disclosure Statement.

With respect to each Debtor's Chapter 11 Case, if a Class of Claims or Interests entitled to vote on the Plan rejects the Plan, the relevant Debtor reserves the right to amend the Plan or request confirmation of the Plan pursuant to Section 1129(b) of the Bankruptcy Code or both.  Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of the Plan by one or more impaired Classes of Claims or Interests.  Under that Section, a Plan may be confirmed by a Bankruptcy Court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting Class.  For a more detailed description of the requirements for confirmation of a nonconsensual Plan, see Article IX of this Disclosure Statement.

For each Debtor, in the event at least one Impaired Class of Claims votes to accept the Plan (and at least one Impaired Class either votes to reject the Plan or is deemed to have rejected the Plan), such Debtor shall request the Bankruptcy Court to confirm the Plan under the cramdown provisions of Section 1129(b) of the Bankruptcy Code.

## D.    VOTING PROCEDURES

If you are entitled to vote to accept or reject the Plan, in the Chapter 11 Case in which you have an Allowed Claim or Allowed Interest, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class or against more than one Debtor and you are entitled to vote each of such claims or interests, you will receive separate Ballots for each case in which you are entitled to vote and for each separate Class of Claims or Interests for which you are entitled to vote.  Please vote and return your Ballot(s) to:

9

Meruelo Maddux Ballot Processing
c/o Kurtzman Carson Consultants
2335 Alaska Avenue
El Segundo, CA 90245
Facsimile: (310) 751-1567
EMail: KCC_meruelomaddux@KCCLLC.com

DO NOT RETURN ANY NOTES WITH YOUR BALLOT.  TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 4:00 P.M., LOS ANGELES TIME, ON _____, 2010. ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN SHALL BE DEEMED TO CONSTITUTE AN ACCEPTANCE OF THE PLAN.

Any Claim in an impaired Class as to which an objection or request for estimation is pending or which is scheduled by the relevant Debtor as unliquidated, disputed or contingent and for which no proof of Claim has been filed is not entitled to vote unless the holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please email the Debtors' counsel at:  mmpi@dgdk.com.

**E.     CONFIRMATION HEARING**

Pursuant to Section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on _____, 2011, commencing at 9:30 a.m. Los Angeles Time, before the Bankruptcy Court, the Honorable Victoria S. Kaufman, Presiding, Courtroom 301, 21041 Burbank Blvd., Woodland Hills, California  91367.  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or number of

359261.05 [XP]      25195

1   shares of stock held by the objector.  Any such objection must be filed with the Bankruptcy Court

2   and served so that it is received by the Bankruptcy Court, the Official Committee of Unsecured

3   Creditors (the "Creditors Committee"), the Official Committee of Equity Interest Holders (the

4   "Equity Committee"), and the Debtors on or before _____, 2010.  Objections to

5   confirmation of the Plan are governed by Bankruptcy Rule 9014.

6   **F.     NOTICES**

7           All notices, requests and demands hereunder to be effective must be in writing and unless

8   otherwise expressly provided herein, shall be deemed to have been duly given or made when

9   actually delivered by U.S. Mail or email addressed as follows:

| DEBTORS AND REORGANIZED DEBTORS | COUNSEL TO THE DEBTORS AND REORGANIZED DEBTORS |
|---|---|
| Todd Nielsen, Esq.<br>General Counsel<br>MERUELO MADDUX<br>PROPERTIES, INC.<br>761 Terminal Street<br>Building 1, 2nd Floor<br>Los Angeles, California 90021<br>TNielsen@meruelomaddux.com | John N. Tedford, IV, Esq.<br>DANNING, GILL, DIAMOND &<br>KOLLITZ, LLP<br>2029 Century Park East, Third Floor<br>Los Angeles, California 90067-2904<br>Telephone:  (310) 277-0077<br>Facsimile:  (310) 277-5735<br>E-Mail:  JTedford@dgdk.com |

**II.**

**DEBTORS' BUSINESS AND OPERATIONS PRIOR TO THE FILING**

**A.     CORPORATE HISTORY OF THE DEBTORS**

        MMPI is the parent company of the fifty-three related Debtor entities that, along with

MMPI, filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on March 26

and 27, 2009.  A list of each of the Debtors is attached as part of Exhibit "C."  MMPI was

incorporated in 2006 under the laws of the State of Delaware, and is registered with the California

Secretary of State to do business in the State of California.  Each of the other Debtors was formed

under either the laws of the State of Delaware or the laws of the State of California.  The Delaware

Debtors are registered with the California Secretary of State to do business in the State of

California.

359261.05 [XP]    25195

**B.     NATURE OF THE DEBTORS' BUSINESS**

MMPI, together with its subsidiary operating partnership, MMPLP, and its affiliates and related entities, is a self-managed, full-service real estate company that develops, redevelops and owns industrial, commercial and multi-unit residential real properties primarily located in downtown Los Angeles and other areas in southern California.  The Company focuses on unique properties that it believes have an alternate, more profitable use achievable through major renovation, redevelopment or development.  The Company's projects are predominantly located in a densely populated urban, multi-ethnic environment and involve numerous local entitlement, property assemblage and physical challenges.

The Company is committed to responsible property investing that has economic, environmental and social benefits.  Its development activities include urban infill projects that are expected to meet the demands of urban communities and that utilize or upgrade existing infrastructure instead of creating new infrastructure.  The Company is known as a "smart growth" developer, and many of the Company's projects are designed to locate businesses, customers and employees close to each other and close to existing public transit systems.  The Company is also known as an "incubator" of new businesses, actively seeking development projects in empowerment zones.  The Company is very familiar with the social, cultural, business and political issues of land development in Southern California, and especially the Los Angeles area.

The Debtors were formed to succeed to certain operations of a predecessor group, whose owners were Richard Meruelo, Maria Meruelo and John Charles Maddux.  Through their predecessor business, the Company's principals have been investing in urban real estate since 1972.

The Debtors' current management team is led by Richard Meruelo, who serves as MMPI's Chief Executive Officer and Chairman of MMPI's Board of Directors,  and John Charles Maddux, who serves as MMPI's President and Chief Operating Officer and a member of MMPI's Board of Directors.  Messrs. Meruelo and Maddux both have more than 20 years experience in identifying, acquiring, entitling, financing, developing and redeveloping urban real estate.  They have worked together since 1987.

359261.05 [XP]   25195

1       The Company does not utilize the same business model as typical real estate investment

2  companies, many of which utilize real estate investment trusts ("REITs"), and the Company's

3  business Plan is distinctive among publicly traded companies.  Many public real estate companies

4  focus on properties with stable occupancies at market rents or properties with stable occupancies at

5  below-market rents that may benefit from more efficient management or minor renovations.  In

6  contrast, the Company focuses on urban in-fill development and on finding different, more

7  profitable uses for existing urban properties.  The Company looks for properties that have value

8  intrinsic to the property itself, such as the property's location, whether there is an end user of the

9  property on the horizon who might want to purchase the property, how well the property will fit in

10  with the growth patterns of the area and community in which it is situated, and other factors.  Such

11  properties may have substantial vacancies, unstable occupancies, or require major renovations for a

12  new use.  The Company's business requires local and other special knowledge to identify viable

13  alternative uses for urban property, and presents higher potential returns than the returns that the

14  property owner might otherwise derive.

15       The Company's business model anticipates the need for time to develop properties and

16  requires the infusion of funds to pay the costs of such development, including the carrying costs.

17  To help defray costs during development, properties may be utilized as parking lots or other uses,

18  not because such use generates substantial income but because the land itself is extremely valuable

19  since it can be developed at an appropriate time in the future, and the parking lot revenue provides

20  some interim revenue.  Many of the Company's properties have gone through the land use process

21  to the point where entitlements have been obtained thus increasing the value substantially, but

22  development has been deferred pending an improvement in the credit markets.  In summary, the

23  Company's business model contemplates and is based upon the purchase, development and resale

24  of properties, pursuant to which the Company turns over such properties in a relatively short period

25  of time, such as a few years instead of decades, and uses the profit from such properties to fund

26  operations of MMPI and all of its other affiliates and the purchase and development of other

27  properties.

28

1    Currently, the Company owns in excess of forty discrete properties consisting in some cases

2    of a number of parcels, some of which generate income and others of which are in various stages of

3    development.  With approximately 80 acres of land, the Company is believed to be the largest non-

4    government land owner in downtown Los Angeles.

5    Properties the Debtors currently own include the following:

6    **1.     210 – 212 and 230 West Avenue 26, Los Angeles**

7    The subject property is owned by Meruelo Maddux-230 W. Avenue 26, LLC ("MM 230 W.

8    Avenue 26") and is unencumbered.  The property is located at the corner of Humboldt Street and

9    West Avenue 26 near the Northeast boundary of downtown Los Angeles.  It is comprised of one

10   property totaling approximately 1.8 acres of land which has been improved with a group of multi-

11   tenant industrial buildings consisting of approximately 67,671 net rentable square feet.  As of June

12   30, 2010, the improvements were leased to four tenants occupying approximately 23% of the total

13   rentable area.  Three of the tenants, occupying 71% of the rented space are on month to month

14   tenancies.  The average occupancy for month to month tenants is 34 months. The largest tenant

15   occupies 6.9% of the total area.  The property is currently being utilized as an industrial and

16   distribution space facility.

17   This property is an example of how MMPI services the multitude of business owners and

18   their numerous employees who are involved in the (a) design, (b) production and (c) distribution

19   sectors of the garment industry in downtown Los Angeles.

20   **2.     306 – 330 North Avenue 21, Los Angeles**

21   The subject property is owned by Meruelo Maddux Properties-306-330 N. Avenue 21, LLC

22   ("MMP 306-330 N. Avenue 21") and is unencumbered.  The property is located near the corner of

23   Humboldt Street and North Avenue 21 near the Northeast boundary of downtown Los Angeles.  It

24   is comprised of approximately 1.1 acres which have been improved with industrial buildings

25   consisting of approximately 80,712 net rentable square feet. As of June 30, 2010, the improvements

26   were leased to five tenants occupying approximately 30% of the total rentable area.  All of the

27   tenants are on month to month tenancies.  The average occupancy for month to month tenants is 37

28

14

1  months. The largest tenant occupies 13.4% of the total area.  The property is currently being

2  utilized as an industrial and distribution space facility.

3        This property is an example of how MMPI services the multitude of business owners and

4  their numerous employees who are involved in the (a) design, (b) production and (c) distribution

5  sectors of the garment industry in downtown Los Angeles.

6           **3.    1000 East Cesar Chavez, Los Angeles**

7        The subject property is owned by Meruelo Maddux-1000 E. Cesar Chavez, LLC ("MM

8  1000 E. Cesar Chavez") and is unencumbered. The property is comprised of four separate

9  properties located near the Northeast boundary of downtown Los Angeles. Specifically, properties

10 one and two are located at the corner of East Cesar Chavez Avenue and North Mission Road and

11 properties three and four are located east of the parking lot on East Cesar Chavez Avenue.  The

12 subject property is improved with an industrial building, parking lot, and two single-family

13 residences and totals approximately 1.6 acres consisting of approximately 50,373 net rentable

14 square feet.  As of June 30, 2010, the improvements were leased to seven tenants occupying

15 approximately 17% of the total rentable area.  All of the tenants are on month to month tenancies.

16 The average occupancy for month to month tenants is 42 months. The largest tenant occupies 6.6%

17 of the total area.   The non-residential portion of the property is currently being utilized as an

18 industrial and distribution space facility.

19       This property is home to an assortment of small business owners prevalent in downtown

20 Los Angeles whereby the Company looks to support and incubate their businesses.

21           **4.    2415 East Washington Boulevard, Los Angeles**

22       The subject property is owned by Meruelo Maddux-2415 E. Washington Blvd., LLC ("MM

23 2415 E. Washington Boulevard").  As a result of the Debtors' settlement with Imperial Capital

24 Bank, a division of City National Bank, a national banking association ("Imperial") and

25 Bankruptcy Court approval thereof, the property is encumbered by a lien in favor of Imperial.  The

26 property is located near the corner of South Santa Fe Avenue and East Washington Boulevard,

27 adjacent to Santa Fe Commerce Center, near the Southeast Industrial part of downtown Los

28 Angeles.  It is comprised of one property totaling approximately 0.5 acres which has been

359261.05 [XP]   25195

1   improved with an industrial building consisting of approximately 18,500 net rentable square feet.

2   As of June 30, 2010, the improvements were not leased. The property is currently a multi-tenant

3   industrial space facility.

4        This property is intended to be used by an assortment of small business owners prevalent in

5   downtown Los Angeles whereby the Company looks to support and incubate their businesses.

6        **5.    1211 East Washington Boulevard, Los Angeles**

7        The subject property is owned by Merco Group-1211 E. Washington Boulevard, LLC

8   ("MG 1211 East Washington Boulevard") and is unencumbered.  The property is located at the

9   corner of Washington Boulevard and South Central Avenue just south of the Interstate 10 Freeway

10  in downtown Los Angeles.  It is comprised of three properties totaling approximately 2.0 acres

11  which have been improved with a multi-tenant industrial building and a retail plaza consisting of

12  approximately 113,479 net rentable square feet.  The third property is a parking lot.  As of June 30,

13  2010, the improvements were leased to seven tenants occupying approximately 73.2% of the total

14  rentable area.  Two of the tenants, occupying 46% of the rented space are on month to month

15  tenancies.  The average occupancy for month to month tenants is 38 months. The largest tenant

16  occupies 30.8% of the total area.  The property is currently being utilized primarily as a garment

17  manufacturing space.

18       This property is an example of how MMPI services the multitude of business owners and

19  their numerous employees who are involved in the (a) design, (b) production and (c) distribution

20  sectors of the garment industry in downtown Los Angeles.

21       **6.    13853, 13822 and 13916 Garvey Avenue, 13904 Corak Street and 3060**

22       **Feather Avenue, Baldwin Park**

23       The subject property is owned by Meruelo Baldwin Park, LLC and is unencumbered.  The

24  property is located at the intersection of Francisquito Avenue and the Interstate 10 Freeway in

25  Baldwin Park, California.  It is comprised of approximately 6.3 acres of land and improvements

26  containing approximately 3,878 net rentable square feet which include two single-family

27  residences.  As of June 30, 2010, the improvements were leased to three tenants occupying

28  approximately 100% of the total rentable area. All of the tenants are on month to month tenancies.

1   The average occupancy for month to month tenants is 46 months.  The largest tenant occupies 40.3

2   % of the total building area.  The largest component of this property is unimproved land

3   immediately adjacent to the Interstate 10 Freeway.

4        This property is intended to be a retail development as a compliment to the garment,

5   produce, multi-tenant and residential activities of MMPI.

6        **7.    1910 - 1922 Santa Fe Avenue, 2425 East 12th Street and 303 South**

7            **Hewitt, Los Angeles**

8        The subject property is owned by Santa Fe & Washington Market, LLC ("Santa Fe &

9   Washington Market").  The subject property includes three separate properties of which one is

10  located in the Arts District of downtown Los Angeles at 303 South Hewitt Street and two of which

11  are located adjacent to the Santa Fe Commerce Center at 1910-1922 Santa Fe Avenue and 2425

12  East 12th Street in downtown Los Angeles.  The property located at 303 South Hewitt Street has

13  been improved with a forty-eight unit apartment building.  The two industrial buildings located at

14  1910-1922 Santa Fe Avenue and at 2425 East 12th Street contain approximately 38,490 net

15  rentable square feet in the aggregate.  As of June 30, 2010, the apartment building was leased to

16  forty-one tenants occupying approximately 85.2% of the total rentable area, thirty-nine of which

17  are on month to month tenancies.  The average occupancy for month to month tenants is 41

18  months.  As of June 30, 2010, the two industrial buildings are leased to four tenants, occupying

19  approximately 86.2% of the total rentable area. The largest tenant occupies 36.7% of the total area.

20       Pursuant to a settlement with Imperial, the properties located at 1910-1922 Santa Fe

21  Avenue are encumbered by a lien in favor of Imperial.

22       The property at 1910-1922 Santa Fe Avenue is an example of how MMPI services the

23  multitude of business owners and their numerous employees who are involved in the (a) design, (b)

24  production and (c) distribution sectors of the garment industry in downtown Los Angeles.  The

25  property at 2425 East 12th Street is tenanted by small business owners prevalent in downtown Los

26  Angeles whereby the Company looks to support and be a helping hand in incubating their

27  businesses.  The property at 303 S Hewitt is an example of how the Company focuses its expertise

28  and downtown knowledge base on supplying residential units to individuals.  This effort is geared

17

1  towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of

2  residences.

3    **8.    5701 and 5707 - 5715 South Alameda Street and 5016 Alba Street, Los**

4    **Angeles**

5    The subject property is owned by Merco Group - 5707 S. Alameda, LLC ("MG 5707 S.

6  Alameda") and is unencumbered.  The property is located in a major trucking thoroughfare

7  immediately south of downtown Los Angeles. It is comprised of two separate properties totaling

8  approximately 1.9 acres of which one property has been improved with a multi-tenant industrial

9  building consisting of approximately 55,729 net rentable square feet.   The second property

10 includes an additional non-contiguous land parcel one block away that is utilized as pallet storage.

11 As of June 30, 2010, the improvements were leased to five tenants occupying approximately 50.5%

12 of the total rentable area.  A sixth tenant leases the pallet storage area.  All five of the tenants, are

13 on month to month tenancies.  The average occupancy for month to month tenants is 41 months.

14 The largest tenant occupies 21.9% of the total area.  The property is currently being utilized as a

15 multi-tenant industrial space facility.

16    This property is an example of how MMPI services the multitude of business owners and

17 their numerous employees who are involved in the (a) design, (b) production and (c) distribution

18 sectors of the garment industry in downtown Los Angeles.

19    **9.    3rd & Omar Street, Los Angeles**

20    The subject property is owned by Meruelo Maddux - 3rd & Omar Street, LLC ("MM 3rd &

21 Omar Street") and is encumbered by a lien in favor of Legendary Investors Group No. 1, LLC, as

22 successor to East West Bank ("Legendary").  The property is located at 3rd & Omar Streets near

23 the Little Tokyo area of downtown Los Angeles.  It is comprised of two properties totaling

24 approximately 0.5 acres of which one has been improved with a multi-tenant building consisting of

25 approximately 23,298 net rentable square feet and the other is being utilized as a parking lot. As of

26 June 30, 2010, the improvements were leased to one tenant occupying approximately 10% of the

27 total rentable area.  The tenant is on a month to month tenancy.  The average occupancy for month

28

359261.05 [XP]    25195

1  to month tenants is 37 months.  The ground floor of this property, where the current tenant is

2  located, is currently being utilized as retail/wholesale storefront facility.

3      This property is intended to be used by an assortment of small business owners prevalent in

4  downtown Los Angeles whereby the Company looks to support and incubate their businesses.

5          **10.    420 Boyd Street, Los Angeles**

6      The subject property is owned by Meruelo Maddux - 420 Boyd Street, LLC ("MM 420

7  Boyd Street") and is encumbered by a lien in favor of Legendary.  The property is located at 420

8  Boyd Street near the Little Tokyo area of downtown Los Angeles.  It is comprised of two

9  properties totaling approximately 0.6 acres which have been improved with a multi-tenant building

10  consisting of approximately 47,806 net rentable square feet and a parking lot.  As of June 30, 2010,

11  the improvements were leased to nine tenants occupying approximately 39 % of the total rentable

12  area.  Seven of the tenants, occupying 76% of the rented space are on month to month tenancies.

13  The average occupancy for month to month tenants is 69 months. The largest tenant occupies

14  12.6% of the total area.  The property is currently being utilized as multi-tenant office space, a

15  restaurant facility and a parking lot.

16      This property is intended to be used by an assortment of small business owners prevalent in

17  downtown Los Angeles whereby the Company looks to support and incubate their businesses.

18          **11.    760 South Hill Street, and 325 West 8th Street, Los Angeles (The Union**

19              **Lofts)**

20      The subject property is owned by Meruelo Maddux Properties - 760 South Hill Street, LLC

21  ("MMP 760 S. Hill Street") and is encumbered by a lien in favor of Bank of America, N.A.

22  ("BofA").  The property is located at the corner of West 8th Street and South Hill Street in

23  downtown Los Angeles.  It is comprised of one property totaling approximately 0.3 acres which

24  has been improved with a ninety-two unit condominium building currently in lease-up.  The

25  building is newly restored and converted former bank headquarters originally built in the 1920s

26  consisting of approximately 94,270 net rentable square feet.  Space located on the ground floor is

27  intended for a restaurant tenant.  As of June 30, 2010, the improvements are  leased to seventy-two

28  tenants occupying approximately 61% of the total rentable area.  The residential component,

1    comprised of 81,609 square feet, is 72.4% occupied.  The retail component, comprised of

2    approximately 12,661 square feet, is 0% occupied.

3        This property is an example of how the Company focuses its expertise and downtown

4    knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

5    density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

6        **12.    788 South Alameda, Los Angeles**

7        The subject property is owned by 788 South Alameda, LLC ("788 South Alameda") and is

8    encumbered by a lien in favor of California Bank & Trust.  The property is located at 788 South

9    Alameda Street across the street from Alameda Square in downtown Los Angeles.  It is comprised

10   of one property totaling approximately 2.3 acres which has been improved with a newly

11   constructed modern produce market that is home to numerous small produce tenants consisting of

12   approximately 33,984 net rentable square feet.  As of June 30, 2010, the improvements were leased

13   to twenty-six tenants occupying approximately 81% of the total rentable area.  All of the tenants

14   are on month to month tenancies.  The average occupancy for month to month tenants is 17

15   months. The property is currently being utilized as a small-tenant produce industry space with

16   coolers.

17       This property is an example of the Company's (a) significant expertise and presence and (b)

18   focus on providing tailored solutions for a variety of space needs of the many small businesses in

19   the food and produce distribution industry in downtown Los Angeles.

20       **13.    905 8th Street, Los Angeles**

21       The subject property is owned by 905 8th Street, LLC ("905 8th Street") and is encumbered

22   by a lien in favor of The Stanford Group, L.P. ("Stanford").  The property is located at 905 8th

23   Street in downtown Los Angeles.  It is comprised of one property totaling approximately 0.9 acres

24   which has been improved with a multi-tenant industrial building consisting of approximately

25   28,200 net rentable square feet.  As of June 30, 2010, the improvements were leased to six tenants

26   occupying approximately 20 % of the total rentable area.  All of the tenants are on month to month

27   tenancies.  The average occupancy for month to month tenants is 29 months.

28

1   This property is an example of the Company's (a) significant expertise and presence and (b)

2   focus on providing tailored solutions for a variety of space needs of the many small businesses in

3   the food and produce distribution industry in downtown Los Angeles.

4   **14.   Alameda Produce Market, Los Angeles (Including Alameda Square and**

5   **Seventh Street Produce Market)**

6   The subject property is owned by Alameda Produce Market, LLC ("Alameda Produce

7   Market") and includes (a) four industrial buildings totaling 1,585,816 square feet of net rentable

8   area on approximately 20.2 acres that is home to American Apparel ("Alameda Square"), (b) a

9   multi-tenant produce market known as the Seventh Street Produce Market with 122,120 square feet

10   of net rentable area, (c) an unencumbered parking structure located at 1215 East 7th Street whose

11   use has been donated to the Center City East Association to provide aid to homeless people and (d)

12   an unencumbered parking lot located at 1339 East 7th Street that is subject to an eminent domain

13   proceeding with the MTA.  The Alameda Square and Seventh Street Produce Market properties are

14   subject to a lien in favor of Cathay Bank ("Cathay").

15   In regards to Alameda Square it is 60.9% occupied with eleven tenants and the largest

16   tenant is American Apparel who leases 53.9% of the area.

17   In regards to the Seventh Street Produce Market it is 71.5% leased.  A significant portion of

18   the vacant space is unusable currently and is in the process of being approved to be improved so

19   that it can be leased.

20   Alameda Square has been an example of two characteristics of MMPI's overall operations.

21   First, it serves as an example of how MMPI incubates small business owners in the case of

22   American Apparel that now occupies more than 10 times more space than it initially did and

23   employs approximately 5,000 workers daily at Alameda Square.  Second, it is an example of how

24   the Company services business owners and their numerous employees who are involved in the (a)

25   design, (b) production and (c) distribution sectors of the garment industry in downtown Los

26   Angeles.  Seventh Street Produce Market is an example of the Company's (a) significant expertise

27   and presence and (b) focus on providing tailored solutions for a variety of space needs of the many

28   small businesses in the food and produce distribution industry in downtown Los Angeles.  The

21

portion of the property located at 1339 East 7th Street is currently the subject of litigation between Alameda Produce Market and the Metropolitan Transit Authority ("MTA") which initiated eminent domain proceedings.  The Company asserted that the MTA did not properly pursue such proceedings and the MTA's case was dismissed.  The case has been appealed by the MTA and Alameda Produce Market believes it has claims against the MTA for, among other things, the value of the Company's lost use of the property during the numerous years that the property has been possessed by the MTA.  In the event the MTA is successful in taking the property, the Company will have a Claim against the MTA for the fair value thereof, among other things less amounts previously paid to lenders.

### 15.    1500 Griffith Avenue, Los Angeles

The subject property is owned by Merco Group - 1500 Griffith Avenue, LLC ("MG 1500 Griffith Avenue").  The property is located at the corner of Griffith Avenue and East 16th Street in downtown Los Angeles.  It is comprised of two separate properties totaling approximately 2.0 acres which have been improved with two buildings consisting of approximately 50,058 net rentable square feet.  One property is encumbered by a lien in favor of Yoshiaki & Fumiko Murakami and the other property is encumbered by a lien in favor of Legendary.  As of June 30, 2010, the improvements were leased to three tenants occupying approximately 100% of the total rentable area.  One of the tenants, occupying 12% of the rented space is on a month to month tenancy.  The average occupancy for month to month tenants is 42 months. One lease is subject to renewal in 2011.  The largest tenant occupies 60% of the total area.  The property is currently being utilized as a distribution facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

### 16.    1919 Vineburn Street, Los Angeles

The subject property is owned by Meruelo Maddux Properties - 1919 Vineburn Street, LLC ("MMP 1919 Vineburn Street") and is encumbered by a lien in favor of Imperial.  The property is located at 1919 Vineburn Street just north of downtown Los Angeles.  It is comprised of one

property totaling approximately 5.8 acres which has been improved with a single-tenant distribution building consisting of approximately 122,345 net rentable square feet.  As of June 30, 2010, the improvements were 100% leased to one tenant.  The property is currently being utilized as a single-tenant distribution space facility.

This property is an example of how MMPI services the multitude of business owners and their numerous employees who are involved in the (a) design, (b) production and (c) distribution sectors of the garment industry in downtown Los Angeles.

### 17.    2131 Humboldt Street, Los Angeles

The subject property is owned by Meruelo Maddux Properties - 2131 Humboldt Street, LLC ("MMP 2131 Humboldt Street") and is partially encumbered by a lien in favor of Vahan & Anoush Chamlian ("Chamlian").  The subject property is located at the corner of Interstate 5 Freeway and Humboldt Street near the Northern boundary of downtown Los Angeles.  It is comprised of approximately 6.0 acres which has been partially improved with industrial buildings consisting of approximately 31,319 net rentable square feet.  The largest component of this property is unimproved land, which is encumbered and located at 2131 Humboldt Street and contains approximately 213,801 square feet of land with no improvements.  This portion of the property is used from time to time for film shoots and associated parking.

The unencumbered portion is located at 336-346 and 350-354 North Avenue 21.  It contains approximately 31,319 square feet of space.  As of June 30, 2010, the improvements were leased to one tenant occupying approximately 17% of the total rentable area.  The tenant is on a month to month tenancy.  The average occupancy for month to month tenants is 47 months.  The improved portion of the property is currently being utilized as an industrial and distribution space facility.

This property represents a large scale redevelopment site that could be redeveloped in a variety of ways to satisfy the developing needs of downtown Los Angeles space users both by itself or with other properties located in the same area and owned by other Debtors.

### 18.    2529 Santa Fe Avenue, Vernon (Santa Fe Plaza)

The subject property is owned by Merco Group – 2529 Santa Fe Avenue, LLC ("MG 2529 Santa Fe Avenue") and is encumbered by a lien in favor of 1248 Figueroa Street, LLC ("1248

23

1  Figueroa"). The property is located in Vernon, California totaling approximately 1.3 acres which

2  has been improved with a newly constructed retail plaza that opened in 2009 consisting of

3  approximately 16,000 net rentable square feet. As of June 30, 2010, a portion of the

4  improvements were leased to a restaurant occupying approximately 29.4% of the total rentable area

5  with the lease expiring on April 30, 2013. The property is currently in lease up.

6       This property is an example of the development of urban in-fill property to satisfy the

7  sometimes non-institutional needs of small businesses in downtown Los Angeles.

8       **19.    2640 East Washington Boulevard, Los Angeles (Washington Produce**

9              **Market)**

10      The subject property is owned by 2640 Washington Boulevard, LLC ("2640 Washington

11  Boulevard") and is encumbered by a lien in favor of East West Bank as successor to United

12  Commercial Bank ("UCB"). The property is located at 2640 East Washington Boulevard just

13  south of downtown Los Angeles. It is comprised of one property totaling approximately 2.8 acres

14  which has been improved with a newly constructed modern produce center consisting of

15  approximately 31,876 net rentable square feet. As of June 30, 2010, the improvements were leased

16  to twenty-three tenants occupying approximately 70.4% of the total rentable area. All tenants are

17  on month to month tenancies. The average occupancy for month to month tenants is 20 months.

18  The largest tenant occupies 8.9% of the total area. The property is currently being utilized as a

19  small-tenant produce industry space with coolers.

20      This property is an example of the Company's (a) significant expertise and presence and (b)

21  focus on providing tailored solutions for a variety of space needs of the many small businesses in

22  the food and produce distribution industry in downtown Los Angeles.

23      **20.    2951 Lenwood Road, Barstow (Barstow Produce Center)**

24      The subject property is owned by Meruelo Maddux Properties - 2951 Lenwood Road, LLC

25  ("MMP 2951 Lenwood Road") and is encumbered by a secured lien in favor of FNBN-CMLCOM

26  I, LLC ("FNBN"). The property is located at the intersection of Lenwood Road and the Interstate

27  15 Freeway in Barstow, California. It is comprised of several properties totaling 75.0 acres which

28  has been partially improved with three buildings consisting of approximately 261,750 net rentable

24

1    square feet.   The three buildings are comprised of a single-tenant cross dock building, a truck

2    maintenance building, and a newly constructed multi-tenant cold storage building for produce

3    tenants.  As of June 30, 2010, the improvements were not leased.

4         This property is an example of the Company's (a) significant expertise and presence and (b)

5    focus on providing tailored solutions for a variety of space needs of the many small businesses in

6    the food and produce distribution industry.

7         **21.    3185 East Washington Boulevard, Los Angeles (Washington Cold**

8              **Storage)**

9         The subject property is owned by Merco Group -- 3185 E. Washington Boulevard, LLC

10   ("MG 3185 E. Washington Boulevard").  The property is commonly known as 3185 East

11   Washington Boulevard in downtown Los Angeles.  It is comprised of two parcels.  The main,

12   largest parcel is encumbered by a lien in favor of Chinatrust Bank (U.S.A.) ("Chinatrust"), and

13   totals approximately 2.7 acres which has been improved with a cold storage facility consisting of

14   approximately 59,000 net rentable square feet.  As of June 30, 2010, the improvements were leased

15   to a tenant occupying 100% of the total rentable area.  The property is currently being utilized as a

16   single-tenant cold storage facility.  MG 3185 E. Washington Boulevard also owns a small parcel

17   across Washington Boulevard which is unencumbered.

18        This property is an example of the Company's (a) significant expertise and presence and (b)

19   focus on providing tailored solutions for a variety of space needs of the many small businesses in

20   the food and produce distribution industry in downtown Los Angeles.

21        **22.    620, 643 and 644 South Gladys Avenue, 830 - 838 East 6th Street and**

22              **647 - 649 Ceres Avenue, Los Angeles**

23        The subject property is owned by Merco Group-620 Gladys Avenue, LLC ("MG 620

24   Gladys Avenue") and is partially encumbered by a lien in favor of Legendary.  The property

25   generally is located at the corner of South Gladys Avenue and East 6th Street in the Seafood

26   District of downtown Los Angeles.  The property has been improved with several buildings

27   housing numerous small businesses and an educational/daycare facility. The encumbered portion of

28   the property is located at 620 S. Gladys Avenue, 830 - 838 East 6th Street and 647 - 649 Ceres

1  Avenue. It contains approximately 107,795 square feet of land and improvements totaling

2  approximately 73,253 square feet of space. It is being primarily used as a multi-tenant

3  seafood/produce distribution facility. The unencumbered portion of the property is located at 643

4  and 644 S. Gladys Avenue and contains approximately 17,400 square feet of land and

5  improvements containing approximately 16,535 square feet of space. It is being used as a multi-

6  tenant distribution space facility. As of June 30, 2010, the improvements on the subject property

7  were leased to six tenants occupying approximately 63% of the total rentable area.  Two of the

8  tenants, occupying 46% of the rented space are on month to month tenancies.  The average

9  occupancy for month to month tenants is 27 months. The largest tenant occupies 19.2% of the total

10  area.

11      This property is an example of the Company's (a) significant expertise and presence and (b)

12  focus on providing tailored solutions for a variety of space needs of the many small businesses in

13  the food and produce distribution industry in downtown Los Angeles.

14              **23.    2001 - 2021West Mission Boulevard, Pomona**

15       The subject property is owned by Meruelo Maddux - Mission Boulevard, LLC ("MM

16  Mission Boulevard") and is encumbered by a lien in favor of Kennedy Funding, Inc. ("Kennedy").

17  The property is located adjacent to 1875 West Mission Boulevard in Pomona, California.  It is

18  comprised of one property totaling approximately 14.7 acres which has been improved with a

19  three-story, single-tenant, office building consisting of approximately 242,042 net rentable square

20  feet.   As of June 30, 2010, the improvements were not leased.

21      This property represents a large scale redevelopment site that could be redeveloped in a

22  variety of ways to satisfy the developing needs of Los Angeles space users.

23              **24.    1124 South Olive, 1117-1119 South Olive and 218 W. 11th Street, Los**

24                          **Angeles**

25      The subject property is owned by Merco Group-Little J, LLC ("MG Little J").  It is

26  comprised of three separate properties, located on both sides of the 1100 block of South Olive

27  Street in the South Park area of downtown Los Angeles.  The western portion, which is

28  encumbered by a lien in favor of Legendary, is improved with a building occupied by a restaurant

1  tenant consisting of approximately 11,829 net rentable square feet.   The remaining two properties,

2  which are unimproved and unencumbered, are currently being utilized as parking lots.  As of June

3  30, 2010, the improvements were leased to a restaurant occupying 100% of the total rentable area.

4         As a compliment to the commercial real estate activities of MMPI, the Company also

5  focuses its expertise and downtown knowledge base on supplying residential units to individuals.

6  This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable

7  development of for rent or for sale product.  This property is intended to be redeveloped for such

8  uses.

9         **25.     950 and 960 E. 3rd Street, Los Angeles**

10        The subject property is owned by Merco Group, LLC ("MG") and is encumbered by two

11 liens in favor of Legendary, each on separate parcels.[3]  The two properties are located at the corner

12 of East 3rd Street and South Santa Fe Avenue in the Arts District of downtown Los Angeles.  It is

13 comprised of two separate properties totaling approximately 10.5 acres of which one has been

14 improved with a building occupied by the Southern California Institute of Architecture ("Sci-Arc")

15 consisting of approximately 81,741 net rentable square feet.  The second property consists of

16 unimproved land which is entitled for 635 residential units and a portion of which is currently

17 being partially utilized as parking lot for Sci-Arc student parking.  As of June 30, 2010,  the

18 building was leased to Sci-Arc occupying approximately 100% of the total rentable area.   Sci-Arc

19 exercised its option to extend its lease.  The Debtor and Sci-Arc have entered into an agreement for

20 the purchase by Sci-Arc of the property where the building is located and the parking lot.

21        As a compliment to the commercial real estate activities of MMPI, the Company also

22 focuses its expertise and downtown knowledge base on supplying residential units to individuals.

23 This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable

24 development of for rent or for sale product.  This land portion of this property is intended to be

25 redeveloped for such uses.

26

27 [3]       The Debtors reserve the right to assert that Legendary's lien is void or voidable.

28

359261.05 [XP]    25195

1  **26.    815 East Temple Street, 210 Center Street and 729 East Temple Street,**

2       **Los Angeles (Center Village)**

3       The subject property is owned by Meruelo Farms, LLC ("Meruelo Farms") and is

4  encumbered by liens in favor of Imperial (on 815 East Temple Street) and Pacific Commerce Bank

5  ("PCB"), on 729 East Temple Street.  The property is comprised of multiple properties totaling

6  approximately 5.3 acres of which 815 East Temple Street has been improved by a cold storage and

7  processing facility and 729 East Temple Street has been improved by industrial buildings.  The

8  subject properties consist of approximately 176,628 net rentable square feet.  The unimproved

9  portions of the properties are currently being held as parking lots.  As of June 30, 2010, the

10 improvements at 815 East Temple Street were partly leased to a food processing tenant occupying

11 approximately 14% of the total rentable area.

12      815 East Temple is an example of the Company's (a) significant expertise and presence and

13 (b) focus on providing tailored solutions for a variety of space needs of the many small businesses

14 in the food and produce distribution industry in downtown Los Angeles.  729 East Temple is

15 intended to be a home to a large assortment of small business owners prevalent in downtown Los

16 Angeles whereby the Company looks to support and incubate their businesses.

17      **27.    833 Wall Street (Wall Street Market), Los Angeles**

18      The subject property is owned by Meruelo Wall Street, LLC ("Meruelo Wall Street") and is

19 encumbered by a lien in favor of East West as successor to UCB.  The property is located at the

20 intersection of East 9th Street and Wall Street in the Garment District of downtown Los Angeles.

21 It is comprised of one property totaling approximately 2.1 acres which has been improved with a

22 multi-tenant building consisting of approximately 98,245 net rentable square feet and rooftop

23 parking.  As of June 30, 2010, the improvements were leased to fifty tenants occupying

24 approximately 92% of the total rentable area. All of the tenants are on month to month tenancies.

25 The average occupancy for month to month tenants is 49 months.  The property is currently being

26 utilized as a garment wholesale and retail and office space facility.

27

28

359261.05 [XP]    25195

1      This property is an example of how MMPI services the multitude of business owners and

2  their numerous employees who are involved in the (a) design, (b) production and (c) distribution

3  sectors of the garment industry in downtown Los Angeles.

4        **28.    1875 West Mission Boulevard, Pomona**

5      The subject property is owned by Merco Group – 2001 – 2021 West Mission Boulevard,

6  LLC ("MG 2001 – 2021 West Mission Boulevard") a part of which is encumbered by a lien in

7  favor of PNL Pomona.[4]   The property is located at 1875 West Mission Boulevard in Pomona, CA.

8  It is comprised of two properties totaling approximately 27.7 acres on which is presently located an

9  industrial building consisting of approximately 424,309 net rentable square feet.  As of June 30,

10  2010, the improvements were not leased.

11      This property represents a large scale redevelopment site that could be redeveloped in a

12  variety of ways to satisfy the developing needs of Pomona space users.

13        **29.    Santa Fe Commerce Center – 2445, 2460 and 2535 East 12th Street, Los**

14            **Angeles**

15      The subject property is owned by Santa Fe Commerce Center, Inc. ("Santa Fe Commerce

16  Center") and is encumbered by a lien in favor of Wells Fargo Bank, N.A., successor by

17  consolidation to Wells Fargo Bank Minnesota, National Association as Trustee for the Registered

18  Certificateholders of GMAC Commercial Mortgage Securities, Inc., Mortgage Pass-Through

19  Certificates, Series 2002-C1 ("Wells Fargo").  In this case, Wells Fargo has acted by and through

20  Berkadia Commercial Mortgage, Inc., its Special Servicer, and is referred to hereinafter as

21  "Berkadia."

22      The property is located at 2445, 2460 and 2535 East 12th Street in the Southeast Industrial

23  District of downtown Los Angeles.  It is comprised of one property totaling approximately 6.8

24  acres which has been improved with a three building industrial complex consisting of

25

26  [4]     For purposes of clarification, readers should note that the real property located at 2001-2021

27  W. Mission Boulevard is not owned by MG 2001-2021 West Mission Boulevard but is instead
owned by MM Mission Boulevard, LLC.

28

359261.05 [XP]     25195

1  approximately 244,501 net rentable square feet.  As of June 30, 2010, the improvements were

2  leased to five tenants occupying approximately 82% of the total rentable area.  Three of the tenants,

3  occupying 40% of the rented space, are on month to month tenancies.  The average occupancy for

4  month to month tenants is 89 months. The largest tenant occupies 26.9% of the total area.  The

5  property is currently being utilized as a multi-tenant industrial space facility.

6      This property is an example of how MMPI services the multitude of business owners and

7  their numerous employees who are involved in the (a) design, (b) production and (c) distribution

8  sectors of the garment industry in downtown Los Angeles.

9      **30.    1009 North Citrus Avenue, Covina (Citrus Gardens)**

10      The subject property is owned by Meruelo Maddux Properties - 1009 North Citrus Avenue,

11  Covina, LLC ("MMP 1009 N. Citrus Avenue") and is unencumbered.  The property is located at

12  1009 North Citrus Avenue in Covina, California.  It is comprised of approximately 2.5 acres of

13  land which has been entitled for 52 residential units.  The property is currently vacant.

14      This property is an example of how the Company focuses its expertise and downtown

15  knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

16  density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

17      **31.    817-825 South Hill Street, Los Angeles (Ullman Tower Two)**

18      The subject property is owned by Meruelo Maddux-817-825 S. Hill Street, LLC ("MM

19  817-825 S. Hill Street") and is unencumbered. The property is located at 817-825 South Hill Street

20  in the Historic Core/ Jewelry district of downtown Los Angeles.  It is comprised of one property

21  totaling approximately 1.0 acres of land being utilized as a commercial parking lot facility.

22      While currently being utilized as a parking facility, this property is an example of how the

23  Company focuses its expertise and knowledge base on supplying future residential units to

24  individuals.  This effort is geared towards (a) high density urban in-fill, (b) transit oriented and/or

25  (c) affordable development of residences.

26      **32.    1060 North Vignes, Los Angeles (Vignes Village)**

27      The subject property is owned by Meruelo Maddux Properties-1060 N. Vignes, LLC

28  ("MMP 1060 N. Vignes") and is unencumbered.  The property is located near the corner of North

359261.05 [XP]    25195

1  Vignes Street and North Main Street near Chinatown in downtown Los Angeles.  It is comprised of

2  one property totaling approximately 4.0 acres of land, which is currently unoccupied.  Interim

3  operating revenue is typically generated from parking revenues from film production parking.

4      This property is an example of how the Company focuses its expertise and downtown

5  knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

6  density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

7      **33.    12361 and 12385 San Fernando Road, Sylmar (San Fernando Court)**

8      The subject property is owned by Meruelo Maddux Properties - 12385 San Fernando Road,

9  LLC ("MMP 12385 San Fernando Road") and is unencumbered.  The property is located at 12361

10  and 12385 San Fernando Road in Sylmar, California.  It is comprised of approximately 5.5 acres of

11  land entitled for approximately 247 residential housing units, along with retail and office space.

12      This property is an example of how the Company focuses its expertise and knowledge base

13  on supplying residential units to individuals.  This effort is geared towards (a) high density urban

14  in-fill, (b) transit oriented and/or (c) affordable development of residences.

15      **34.    801 East 7th Street, Los Angeles**

16      Merco Group – 801 E. 7th Street, LLC owns a parking lot located at 648 S. Stamford

17  Avenue in downtown Los Angeles that occupies approximately 0.13 acres and is unencumbered.  It

18  generates no income currently.

19      **35.    1308 South Orchard, Los Angeles**

20      The subject property is owned by Merco Group - 1308 S. Orchard, LLC ("MG 1308 S.

21  Orchard") and is unencumbered. The subject property is located west of downtown Los Angeles.  It

22  is comprised of approximately 0.3 acres of land.

23      **36.    758 Ceres Avenue, Los Angeles (Ceres Street Produce Market)**

24      The subject property is owned by Merco Group - Ceres Street Produce, LLC ("MG Ceres

25  Street Produce") and is unencumbered.  The property is located in the industrial district of

26  downtown Los Angeles.  It is comprised of approximately 0.4 acres of land.

27  This property is intended to be developed based upon the Company's (a) significant expertise and

28

359261.05 [XP]   25195

1  presence and (b) focus on providing tailored solutions for a variety of space needs of the many

2  small businesses in the food and produce distribution industry in downtown Los Angeles.

3  **37.    336 West 11th Street, Los Angeles (South Park Towers)**

4  The subject property is owned by Meruelo Maddux - 336 W. 11th Street, LLC ("MM 336

5  W. 11th Street") and is encumbered by a lien in favor of the County and Legendary.  Grand

6  Avenue Lofts Homeowners Association also asserts a lien against the property.  CIM Urban RE

7  Fund GP II, LLC and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (collectively, "CIM")

8  asserts that this subject property is encumbered by a covenant running with the land for the benefit

9  of CIM based on language included in the grant deed by which MM 336 W. 11th Street acquired

10 the subject property.  CIM asserts that the alleged encumbrance in favor of CIM has priority over

11 any party asserting a lien which arose after the deed was recorded, including the County,

12 Legendary and Grand Avenue Lofts Home Owners Association.   The Debtors dispute the validity

13 of the interests asserted by CIM and the Homeowners Association.

14 The property is located at the corner of West 11th Street and South Olive Street in the South

15 Park area of downtown Los Angeles.  The property is entitled for an 80 unit residential

16 development.  It is comprised of approximately 0.7 acres of land being utilized as a parking lot.

17 This property is an example of how the Company focuses its expertise and downtown

18 knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

19 density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

20 **38.    915-949 South Hill Street, Los Angeles (Ullman Tower One)**

21 The subject property is owned by Meruelo Maddux - 915-949 S. Hill Street, LLC ("MM

22 915-949 S. Hill Street") and is encumbered by a lien in favor of Imperial.  The property is located

23 at 915-949 South Hill Street in the South Park area of downtown Los Angeles.  It is comprised of

24 approximately 1.5 acres of land being utilized as a commercial parking lot.

25 This property is an example of how the Company focuses its expertise and downtown

26 knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

27 density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

28

359261.05 [XP]    25195

1
2

**39.    900, 910 and 926 East 4th Street and 405 – 411 S. Hewitt Street, Los Angeles**

3    The subject property is owned by Merco Group - 4th Street Center, LLC ("MG 4th Street

4  Center") and is encumbered by a lien in favor of Legendary.  The property is located at the corner

5  of South Hewitt Street and East 4th Street in the Arts District of downtown Los Angeles. It is

6  comprised of approximately 1.3 acres which has been improved with two buildings consisting of

7  approximately 14,472 net rentable square feet.  As of June 30, 2010, the improvements were

8  leased to one tenant that occupies 53% of the net rentable area.  The lease for this tenant is subject

9  to renewal in 2011.  The property is a multi-tenant industrial and distribution space facility.

10    This property is intended to be used by an assortment of small business owners prevalent in

11  downtown Los Angeles whereby the Company looks to support and incubate their businesses.

12    **40.    425 West 11th Street, Los Angeles (Desmond Building)**

13    The subject property is owned by Merco Group - 425 West 11th Street, LLC ("MG 425 W.

14  11th Street") and is encumbered by a lien in favor of Legendary.  The subject property consists of

15  two properties located on 11th Street, a few blocks away from the Staples Center and LA Live in

16  the South Park area of downtown Los Angeles.  The two properties total approximately 0.67 acres

17  which has been improved with a multi-story industrial building known as the "Desmond Building"

18  consisting of approximately 78,500 net rentable square feet.  As of June 30, 2010, the

19  improvements were leased to a tenant occupying approximately 20.0% of the total rentable area.

20  The tenant is on a month to month tenancy with the average occupancy of 56 months.  The other

21  property is currently utilized as a parking lot.

22    With regard to the property currently utilized as a parking lot, current plans for

23  development include the building of a new, ground up, 20+ story, 80,000 square foot residential

24  project that will compliment existing nearby residential projects.  The City of Los Angeles issued

25  initial permits for such project.  By obtaining the permit, MG 425 W. 11th Street has the ability to

26  proceed with development of the property at an appropriate time in the future.

27    Both the improved and unimproved parts of this property are intended to be redeveloped

28  based on the Company's focus on supplying residential units to individuals.  This effort is geared

359261.05 [XP]   25195

1  towards (a) high density urban in-fill, (b) transit oriented and/or (c) affordable development of

2  residences.

3       **41.    West 11th Street and South Grand Avenue, Los Angeles (Southpark**

4               **Towers, TransAmerica Lofts & Olive Street Towers)**

5       The subject properties are owned by Merco Group -- Southpark, LLC ("MG Southpark"),

6  and are encumbered by a lien in favor of Bank of America.  The properties are approximately three

7  to four blocks east of the Staples Center and the L.A. Live complex.  One property is located along

8  Pico Boulevard between Olive Street and Hill Street, and consists of four adjacent parcels, part of

9  which is improved with a three-story parking structure and an adjoining one-story brick industrial

10 building.  One and one-half blocks northeast of the first property is another property located at the

11 intersection of 11th Street and South Olive Street, consisting of one parcel.  One full major street

12 west of the first two properties is the third property, located along South Grand Avenue and

13 reaching to the corner of 12th Street and South Olive Street, consisting of three parcels.  There is

14 one tenant in the improvements. Pending development or sale, the properties are leased to a parking

15 operator and utilized as parking lots.

16      This property is an example of how the Company focuses its expertise and downtown

17 knowledge base on supplying residential units to individuals.  This effort is geared towards (a) high

18 density urban in-fill, (b) transit oriented and/or (c) affordable development of residences.

19      **C.    CONSOLIDATED OPERATIONS**

20      The Company's business model and strength is based on the fact that it is a single enterprise

21 with a single management team that manages a portfolio of properties that were assembled and are

22 managed in an efficient and synergistic manner.  In addition, the acquisition and development of a

23 relatively large number of properties in a small geographic area allows for great flexibility in the

24 development of such properties.  Accordingly, the properties together are more valuable than the

25 properties separately because of this synergistic relationship.  For instance, the Company is an

26 incubator for small businesses.  Certain properties in the portfolio are conducive to start-up

27 businesses (e.g., smaller tenant spaces, less expensive costs).  As those start-up businesses grow,

28 the Company has the flexibility to move them to another property to meet the needs of their

34

359261.05 [XP]   25195

growing businesses.  This is particularly true with respect to Alameda Square, Seventh Street Produce Market, 788 Alameda, and 2640 Washington.  Additionally, certain employees of businesses at the larger facilities of Alameda Square or Seventh Street Produce Market learn the business then start their own businesses, often at one of the smaller facilities.  This is also true of the Company's garment tenants.  Urban in-fill development is very different from single-family home-building over large swaths of land.  Urban in-fill development involves many moving parts which may require business relocations amongst various properties.  In the process, the Company is able to improve and update facilities and organize these smaller businesses into a cohesive market that helps improve the business of each.

Although the Debtors formally consist of a parent company and various levels of subsidiary Debtors, including the Property Level Debtors, the Company has been, before and after its formation in 2006, and presently continues to be, effectively operated as a single enterprise.  With limited exceptions, revenues for each of the entities are commingled, and the funds are used to pay the expenses of MMPI and the subsidiary Debtors.  Accordingly, there are some Debtors which generate revenues in excess of operating expenses and debt service, but there are some that do not.  The Company may purchase and keep properties that are cash flow negative because the Company believes that those properties will, in time, generate a positive return and the enterprise will be significantly more valuable as a result.  The recent unprecedented freezing of credit markets and economic downturn caused the Company to suspend substantially all of its various development projects.

Before and after the IPO, like most larger developers, the Debtors utilized a concentration account for its cash management.  The cash management system provides for funds to flow to and from a cash concentration account maintained by MMPLP.  The concentration account is linked to the operating bank accounts of each of Debtors, which bank accounts are maintained as zero balance accounts.  When needed to fund payment on checks issued by a particular affiliate, funds are transferred from the concentration account to the operating account of that affiliate.  Excess funds, if any, are invested in interest bearing accounts pending their utilization.  The Company rarely disrupts this flow of funds.

35

1    As a public company, MMPI has been required to file various reports with the SEC,

2  including among others, quarterly reports as well as annual reports with audited financial

3  statements.  These reports have been prepared and filed on a consolidated basis.  Although the

4  Debtors' SEC filings do provide information relating to individual subsidiaries, the filings

5  generally discuss the business as a consolidated enterprise.  This consolidated reporting is a

6  manifestation of the synergy and economic efficiencies gained through the Company's corporate

7  structure.  The indirect overhead expenses for administrative services provided by certain Debtors

8  may be allocated to other Debtors.  With a few exceptions, revenues received from the operation of

9  the Debtors' properties are swept daily into a general operating account, and the Debtors'

10  obligations are paid from such account.

11    **D.    THE DEBTORS' CURRENT AND ON-GOING BUSINESS STRATEGIES**

12    The Company's business is focused on real estate development and redevelopment.  The

13  substantial majority of the Company's properties are not stabilized, i.e., the property is either not a

14  rental property or if a rental property, the property has not reached full occupancy or has not yet

15  been redeveloped to its full income producing level.  The Company's strategy has three primary

16  components: investment, value creation and operations.  Due to the current economic climate,

17  including the lack of an active credit market, the Company has placed on hold substantially all of

18  its development projects.

19    The Company's intent is to continue to build on (i) its market presence, (ii) its relationships

20  with its tenants, (iii) development and operation experiences and (iv) its desire to provide real

21  estate solutions for a variety of urban space users and urban residents.  The Company has always

22  followed a double bottom line approach to its real estate operations that include both a financial

23  return goal and a goal of providing more to the community it serves and the City of Los Angeles

24  through transit oriented development, "green" or LEED development, and the incubation of small

25  businesses that employ large amounts of employees.  For instance, the Company helped incubate

26  American Apparel from a small startup company to an employer with over 5,000 employees at

27  what is believed to be the largest garment manufacturing facility in the nation.

28    In particular, the Company will continue and expand on the following:

359261.05 [XP]    25195

1
       **1.      The Debtors' Investment Strategy**

2
       The Company invests in sub-markets that are undergoing demographic, structural or

3
economic changes, where a significant portion of the properties and participants are historically of

4
a non-institutional nature, where the buildings are predominantly obsolete or no longer relevant to

5
the submarket's changing profile, where the Company has established strong working relationships

6
with the city planners, community redevelopment agencies and local political organizations and

7
where the existing transportation networks, particularly public transportation systems, are nearby.

8
       **2.      The Debtors' Value Creation Strategies**

9
           *a.      Focus on the Property Needs of Specific Industries and Premium*

10
                     *Space Users.*

11
       The Company seeks to achieve rent premiums by meeting the property needs of "premium

12
space users" such as food processing and food distribution companies whose critical business

13
functions depend on the location, zoning, tenant improvements or utilities of the leased space and

14
whose needs frequently coincide with urban environments. The ability to provide premium space

15
users with facilities and services that maximize their operating profits may allow a landlord to

16
minimize leasing risk and charge rents that, net of costs incurred to provide such facilities and

17
services, exceed rents that could be obtained from tenants that are relatively indifferent to location

18
or amenities. The Company will continue to identify premium space users in the Company's

19
markets and work to understand and fulfill their evolving requirements.

20
           *b.      Focus on Sub-Markets that are Transitioning from Large to Small*

21
                     *Tenants.*

22
       The Company acquires, modernizes and subdivides large, older single-tenant industrial and

23
mixed-use buildings. In many urban markets, large manufacturers and distributors have relocated

24
their businesses, often vacating such buildings for overseas or suburban locations. Taking their

25
place are small emerging businesses and established companies that are de-centralizing their

26
operations. The Company seeks to transform large, single-tenant buildings into workplaces for

27
many small tenants by re-using a large portion of the existing facility and creatively subdividing

28

1  the space at a relatively low cost. This approach should allow the Company to offer competitively-

2  priced space (as compared to rental rates for new buildings) in convenient urban locations.

3          **c.**    *Aggregate Small, Synergistic Tenants.*

4        In urban areas, the non-office tenant base includes many small businesses. Grouping similar

5  businesses together creates a marketplace that offers convenience to product buyers and a steadier

6  stream of prospective customers to the businesses. These advantages may increase tenants'

7  business profits and stability and may justify a rental premium compared to stand-alone locations.

8  The Company seeks sub-markets where there is an active, but unorganized, critical mass of similar

9  businesses that could benefit from aggregation. The Company believes this strategy should allow

10  the Company to generate higher rental income from the Company's small tenants.

11          **d.**    *Focus on Residential Development in Appropriate Locations.*

12        The Company intends to continue to develop urban residential projects on sites the

13  Company owns near transportation infrastructure and demand generators such as office buildings,

14  retail stores, restaurants, and cultural and sports venues.  In the long term, the Company believes

15  demand for residential units in downtown Los Angeles and other urban areas will continue to grow.

16        The Company believes that ultimately their residential projects will offer desirable housing

17  and provide the Company with attractive returns on invested capital.

18          **e.**    *Coordinate Residential and Industrial Development in Shifting*

19                                *Urban Markets.*

20        The Company believes that much of the downtown Los Angeles industrial space is aging or

21  obsolete and not properly serving its industrial users.  The Company seeks properties within

22  historically industrial districts that are located in emerging housing sub-markets. As active

23  developers and operators of industrial/distribution space, the Company believes they have greater

24  ability to acquire such opportunities quickly and at lower industrial/distribution pricing than

25  residential-only developers. The Company also seeks the purchase of industrial/distribution

26  properties in areas near downtown but not in emerging residential markets. The Company sees

27  opportunities to better serve industrial users they displace through residential redevelopment by

28  providing them with more suitable space in commercial projects of the Company in such near

38

1 downtown areas. The Company believes coordinating residential and industrial development in this

2 manner facilitates the Company's land assemblage.

3          **f.        *Pursue Opportunities Offered by Governmental Organizations.***

4          In the State of California, the state government, regional agencies and local community

5 redevelopment agencies created under the California Community Redevelopment Law control a

6 large amount of surplus property in urban areas and have substantial land use discretion. These

7 organizations often must dispose of their surplus property in a manner that encourages socially

8 responsible development. The Company believes that such organizations present some of the more

9 compelling opportunities in California urban areas because of the size or location of the parcels

10 they control or because the acquisition terms for such parcels may be more favorable than typical

11 private seller terms. The Company believes their management's advocacy of socially-minded

12 solutions for urban real estate problems gives the Company a competitive advantage to be selected

13 by these government organizations, thereby creating opportunities to acquire properties at attractive

14 values.

15          **g.        *Aggregate Separate Parcels and Acquire Controlling Locations in***

16                      ***Developing Neighborhoods.***

17          In the Company's markets, large, contiguous development properties are infrequently for

18 sale and, when available, sell for prices that often reflect their potential value. The Company seeks

19 to acquire smaller, separate real estate parcels over time with a view toward aggregating those

20 smaller parcels into one property that can accommodate a larger-scale development project. To

21 acquire the individual parcels and reduce the Company's holding costs, the Company sometimes

22 purchases an option contract or signs a long-term purchase agreement that gives the Company the

23 right to acquire the land at a specific price on or before a specified future date. The Company may

24 also acquire a strategically sized or configured parcel in a city block that would be instrumental in

25 any material redevelopment of the block, thereby deterring any substantial competing development

26 and creating an incentive for owners of adjacent parcels to sell.

27

28

### 3. The Company's Operating Strategies

#### a. *Efficiently Manage the Development and Operation of the Company's Projects.*

The Company employs a mixture of project development management and asset management strategies. First, the Company keeps direct control over critical development functions in which they believe they have valuable expertise and that require significant local knowledge, such as identification and acquisition of projects and land use entitlement. Second, because of the widely varying nature of the Company's projects, the Company generally retains expert third-party general contractors to manage the construction of the Company's projects, and the Company employs in-house project managers to supervise the construction management process closely. Third, once a project is complete, the Company manages its operation and leasing activities, or the Company retains third-party sales companies in the case of for-sale projects. The Company will engage third-party leasing agents when they have superior tenant relationships or knowledge of the sub-markets in which the Company's projects are located.

#### b. *Seek Interim Revenues from Properties.*

The public approval process for certain projects may last two years or longer. During the assemblage or approval process, the Company takes steps to permit the Company to generate interim revenues and allow the Company to terminate leases promptly or relocate tenants when the Company obtains the final assemblage piece or approvals. The Company accomplishes this by converting long-term leases to month-to-month leases and seeking additional interim income from additional sources, such as surface parking or by temporarily licensing space to entertainment companies for on-location filming. In addition, because the Company has a roster of month-to-month tenants who have shown a willingness to relocate at the Company's discretion, the Company has the flexibility to generate interim revenues by relocating tenants from a property commencing redevelopment construction to another property that is not currently being redeveloped.

#### c. *Sell or Recapitalize the Company's Projects to Realize Value.*

The Company has engaged in a business strategy whereby it may dispose of or recapitalize some portion of the Company's projects from time to time once they reach what the Company

40

1  believes to be their maximum near-term value and may redeploy some or all of the Company's

2  equity and profits into other real estate investments that the Company believes have a greater long-

3  term potential for economic appreciation.  In addition, in response to the changing economy and as

4  part of its business strategy to emerge as a reorganized company from Chapter 11, the Company

5  continues to consider multiple scenarios to determine the best use of its real property assets,

6  including but not limited to the sale or refinancing of some portion of its assets to meet its financial

7  obligations under the Plan, to reduce obligations to creditors, to provide capital for its business and

8  to ensure the long-term sustainability of the business.

9         **E.**     **PREPETITION CAPITAL STRUCTURE OF THE COMPANY**

10             **1.**     **MMPI**

11       MMPI is structured as a taxable corporation under Subchapter C of the Internal Revenue

12  Code.  Approximately 52.2% of MMPI's stock (approximately 45,859,606 shares) is privately

13  owned by MMPI's directors and executive officers with Richard Meruelo owning the largest

14  amount of shares (approximately 39,911,378).  The other 47.8% of MMPI's stock is publicly

15  owned and, prior to April 2009, was traded on the NASDAQ stock exchange.  The stock is

16  presently trading on the Over the Counter Bulletin Board.

17            **a.**     ***MMPI Initial Public Offering***

18       Prior to MMPI's formation in 2006, its predecessor business' management team was one of

19  only approximately thirteen designated groups participating in the California Urban Real Estate

20  ("C.U.R.E.") program sponsored by the State of California Public Employee's Retirement System

21  ("CalPERS").  CalPERS provided the predecessor business with capital through the C.U.R.E

22  program in the form of a revolving credit facility in the principal amount of approximately $150

23  million.  The CalPERS credit facility was obtained through a single borrower and the funds were

24  disbursed among the entities collectively comprising the predecessor business.

25       Thereafter, MMPI was formed on or about July 5, 2006, and MMPLP was formed on or

26  about September 12, 2006, in anticipation of an initial public offering (the "IPO") of MMPI's

27  common stock.  The formation transaction and the IPO were designed to allow MMPI to acquire

28  and continue the operations of its predecessor entities, pay down existing mortgage debt, pay off

1   the mezzanine loan facility from CalPERS, provide capital for future acquisitions, fund future

2   development costs, and establish a capital reserve for general corporate purposes.  Between January

3   30, 2007, and February 14, 2007, MMPI consummated its IPO and sold to the public 45,550,000

4   shares of common stock at $10.00 per share.  MMPI raised approximately $425.7 million, after

5   underwriting discounts but before expenses related to the IPO.  A substantial portion of the

6   proceeds was used to pay off the debt owed to CalPERS.  On December 31, 2008, there were

7   approximately 88.1 million shares of common stock outstanding.

8                                    **b.      *MMPI Common Stock***

9          The authorized capital stock of MMPI  consists of up to 200,000,000 shares of common

10  stock, $.01 par value per share (the "Common Stock"), and up to 50,000,000 shares of preferred

11  stock, $.01 par value per share.  As of April 23, 2010, there are 87,845,789 shares of Common

12  Stock issued and outstanding held by approximately sixty holders of record.  Holders of Common

13  Stock have no right to convert their Common Stock into any other securities.  The Common Stock

14  has no preemptive or other subscription rights.  There are no redemption or sinking fund provisions

15  applicable to the Common Stock.  All outstanding shares of Common Stock are duly authorized,

16  validly issued, fully paid and nonassessable.

17                                   **c.      *MMPI's Equity Incentive Plan***

18         Since January 30, 2007, MMPI has maintained an equity incentive Plan (the "Equity

19  Incentive Plan") to provide MMPI with the flexibility to use restricted stock, Long Term Incentive

20  Plan ("LTIP") Units and other awards as part of its employee compensation packages.  The LTIP

21  units are interests in MMPLP that, upon the allocation of profits from MMPLP over time, may be

22  converted into MMPLP's common units and consequently become redeemable by the Holder on a

23  one-for-one basis for cash equal to the value of a share of MMPI's common stock or a share of

24  such common stock.  MMPI initially reserved 2,277,500 shares of common stock for issuance of

25  awards under the Equity Incentive Plan.  As of June 30, 2009, there remain 1,083,334 shares

26  available from the initial reservation.

27

28

## 2. Corporate Structure of the Other Debtors

MMPI is the sole general partner of, and holds a 99.6% ownership interest in, MMPLP. The remaining 0.4% limited partnership units are owned by certain members of MMPI's management team who obtained their interests through the LTIP available to certain personnel as part of their compensation packages.

MMPLP owns 100% of the common stock of Meruelo Maddux Construction, Inc. ("MM Construction"), 99% of the membership units in Meruelo Maddux Management, LLC ("MM Management") and 99% of the membership units in Funes Architecture, LLC ("Funes"). The remaining membership units in MM Management and Funes are owned by MM Construction.

MMPLP also owns 100% of the membership units in MMP Ventures, LLC ("MMP Ventures"). MMP Ventures, in turn, owns 100% of the stock or membership units in a number of subsidiary corporations and limited liability companies referred to as Property Level Debtors because they are the entities which hold title to the various real properties and real estate projects developed and operated by MMPI through MMPLP.

## F. MATERIAL PROCEEDINGS

There are several different circumstances that may create liability for the Company in the future, to the extent they are not discharged under the Plan as more fully discussed in Section VII.J.

### 1. Potential Government Tax Audits

The Company is subject to audit and review by federal and state taxing authorities. An adverse audit report could result in the Company being assessed additional tax liability. The Company is not aware of any such pending audits and has filed all of its tax returns.

### 2. Indemnification Claims

As is necessary and customary in the normal course of business, certain of the Company's contracts contain indemnification provisions that could require the Company to make payments for Claims made against customers or employees of the Company, including management. Additionally, the Articles and Bylaws of MMPI provide that MMPI shall indemnify its officers and directors to the fullest extent permitted by law. Pursuant to its contractual and legal obligations, MMPI agreed on a prepetition basis to indemnify the officers, and members of its Board of

43

359261.05 [XP]    25195

1   Directors with respect to costs and expenses that may be incurred by them in conjunction with the

2   performance of their employment or role as a member of the Board of Directors.  These

3   indemnification provisions may result in material liability to MMPI or other of the Debtors.

4   However,  the Company maintains various insurance coverages to reduce the exposure of the

5   Company.  This potential liability is largely the result of guaranty claims against certain officers of

6   the Debtors in connection with loans of some Debtors and litigation against certain of the officers

7   and directors filed by certain former employees of some of the Debtors.  For example, there are

8   presently two guaranty claims pending against Mr. Meruelo.  Such guarantors have filed claims for

9   indemnification against the Debtors' estates.  However each such claim for the underlying debt will

10  be paid pursuant to the Plan.  Thus, the existence of this litigation does not increase the Debtors'

11  potential liability except with respect to a claim by the officer for attorneys fees incurred in

12  connection with the litigation and amounts, if any, the officer is required to pay above and beyond

13  the amount of the borrower Debtor's restructured  debt to the lender.

14                              **III.**

15          **EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

16          Prior to the Petition Date, the Company's primary objective was to maximize return on

17  investment through development and redevelopment activities, which activities require significant

18  amounts of capital.  The Company experienced significant, recurring cash shortfalls from (a)

19  operating activities, (b) recurring investment activities such as carrying costs for interest payments,

20  real estate taxes and unfunded development expenditures, and (c) capital expenditures on existing

21  rental properties.  Shortfalls in operating capital have been funded by the refinance or sale of real

22  property assets, and the use of the proceeds for operating and reinvestment in the purchase of

23  replacement real property assets.

24          The economic climate and associated disruption in the debt and equity capital markets

25  shortly before the Petition Date were extremely challenging for the Company.  During 2008, the

26  Company took significant steps in an effort to improve its financial position.  Among other things,

27  the Company sold three rental projects and three development projects, for an aggregate sales price

28  of approximately $110.6 million.  The Company also completed nine acquisitions or conversions of

359261.05 [XP]    25195

development projects to rental projects, resulting in the availability of 949,905 net rental square footage.  However, the Company's efforts could not overcome the collapse of credit markets and the American banking system that took place in the fall of 2008.  On or about October 1, 2008, the Company suspended development of twelve construction projects.

A number of the Company's loans secured by real property matured prior to the Petition Date or were to mature soon thereafter.  Among other things, the Company was unable to extend or refinance three loans aggregating $86.9 million that matured on or about February 28, 2009, or March 1, 2009, including two secured by the property housing the Company's corporate headquarters, and one which is secured by the Union Lofts project owned by MMP 760 S. Hill Street.  In total, the Company had twelve loans that were set to mature during 2009 with an aggregate principal balance of $170.8 million, in addition to $1.7 million of principal amortization on other long-terms loans.

In addition, prior to the Petition Date, two lenders filed lawsuits seeking, among other things, the appointment of a receiver.  On or about March 4, 2009, California Bank & Trust filed a complaint against 788 South Alameda and MMPI for, among other things, judicial foreclosure and the appointment of a receiver.  In addition, on or about March 17, 2009, Chinatrust Bank filed a complaint against MG 3185 E. Washington Boulevard for, among other things, judicial foreclosure and the appointment of a receiver.

During the year prior to the Petition Date, the Company tirelessly investigated borrowing additional capital in order to continue to fund its development projects and, if necessary, operating expenses.  However, the Company was not able to borrow or refinance at conventional or otherwise acceptable rates, in large part, due to the deterioration of the credit markets that appears to have affected all banks and other lenders.  Lenders were frequently lending at lower loan-to-value ratios, taking longer to make lending decisions and generally applying more stringent underwriting standards.  During the last few months prior to the Petition Date, a number of lenders demanded exorbitant fees, principal reduction payments and/or other burdensome terms as consideration for their consent to extend the terms of their loans.  However, given that the Company had an approximately $28.0 million annual shortfall in its combined operating and

45

1   development activities, and because of the turmoil in the credit markets especially for development

2   financing, the Company needed significant loan concessions from its lenders to survive.

3          The existence of open credit markets has been important to the Company's business

4   strategy of financing acquisitions and development in the ordinary course of its business.  In

5   addition, an open credit market is important to purchasers of the Company's properties.  The

6   Company's management team anticipates that credit markets will improve in the future in light of,

7   among other things, the hundreds of billions of dollars that have been infused into the banking

8   systems by the federal government.

9          Due to the Company's inability to obtain additional capital, and the unwillingness of current

10  lenders to extend the terms of maturing loans on acceptable terms, the fifty-four jointly

11  administered MMPI Debtors sought relief under Chapter 11 of Bankruptcy Code to reorganize their

12  financial affairs and prevent the piecemeal dismemberment of their business to the detriment of

13  their creditors.

14                                          **IV.**

15                                  **CHAPTER 11 EVENTS**

16  **A.       ADMINISTRATIVE ORDERS AND MATTERS**

17          **1.       Introduction**

18          On March 26 and 27, 2009, the Debtors filed their voluntary petitions for relief under

19  Chapter 11 of the Bankruptcy Code.  Shortly after the commencement of the Chapter 11 Cases, the

20  Bankruptcy Court held several hearings on emergency motions presented by the Debtors on a

21  variety of matters.  The Debtors obtained Orders of the Bankruptcy Court, inter alia, (a)

22  authorizing, on an interim basis, the Debtors' use of cash collateral (see below for more detail), (b)

23  authorizing the Debtors to employ and compensate legal and financial advisors, (c) authorizing the

24  Debtors to honor certain obligations to employees and to continue employee benefit plans in effect,

25  (d)  permitting the Debtors, on an interim basis, to continue to utilize their cash management

26  systems, (e) establishing procedures for the Debtors to ensure continued provision of utility

27  services; (f) limiting the scope of notice required; (g) extending the time to file schedules and

28  statement of financial affairs; and (h) directing the joint administration of the Cases of the Debtors.

359261.05 [XP]    25195

1  Subsequently, the Bankruptcy Court established September 24, 2009, as the last day for creditors

2  and parties in interests to file proofs of Claim and proofs of interest against the Debtors.  The

3  Debtors filed the required monthly operating reports on a timely basis.  The Debtors were

4  authorized and continue to operate their business and manage their properties as debtors in

5  possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

6  **2.      The Cash Collateral Motions and Corresponding Orders**

7          By their first Motion for Entry of Interim and Final Orders Authorizing Debtors to Use

8  Cash Collateral, (the "Cash Collateral Motion") the Debtors sought permission to use the cash

9  collateral of various lenders.  Oppositions were filed by most of the Debtors' lenders.  The

10  Bankruptcy Court entered a series of interim orders authorizing such use and continued to hear

11  testimony and consider evidence concerning the Debtors' proposed use of cash collateral on a final

12  basis.  These hearings concluded in October 2009.  The Bankruptcy Court ruled in the Debtors'

13  favor and entered a final order authorizing the use of the cash collateral of the following lenders

14  through June 30, 2010: BofA, CBT, Berkadia, Cathay, Chinatrust, Legendary, Stanford, UCB (now

15  succeeded by East West), 1248 S. Figueroa and Chamlian.  In making that ruling, the Bankruptcy

16  Court determined that the following lenders were entitled to additional adequate protection and are

17  therefore entitled to an adequate protection lien in one or more of the Debtors' unencumbered real

18  properties:  Berkadia, CBT, Chinatrust, Legendary with respect to 425 W. 11th Street; 3rd & Omar

19  Street, and 420 Boyd Street, and East West with respect to 2640 Washington.  In addition, the

20  Bankruptcy Court determined that BofA was entitled to additional adequate protection with respect

21  to MM 760 S. Hill Street and was entitled to an adequate protection lien on the properties owned

22  by MG Southpark, junior to BofA's existing senior lien against such properties.

23          As a result of the Cash Collateral determinations made by the Bankruptcy Court, the

24  Debtors filed a motion seeking to designate certain properties that would serve as adequate

25  protection for the Debtors' use of cash collateral.  The Debtors sought authority to limit the

26  continuing adequate protection lien to certain identified properties in place of a blanket lien on all

27  of the Debtors' unencumbered properties.  The matter has been continued from time to time and

28  remains pending.

1    The Debtors also filed a motion seeking authority to use a portion of certain insurance

2    proceeds resulting from fire damage to one of the Debtors properties which currently secures

3    certain obligations of the Debtors to PNL Pomona.  The Court authorized the Debtors to use a

4    portion of the insurance proceeds to demolish the remaining structure on the property in order to be

5    able to market and sell the property as vacant land.

6    On March 8, 2010, the Debtors filed their Motion for Order Extending Authority for the

7    Use of Cash Collateral and to Maintain Cash Management System Through June 30, 2010.  A

8    hearing on the motion was held on March 29, 2010.  On June 30, 2010, the Court entered its Order

9    Granting Debtors' Motion for Order Extending Authority for the Use of Cash Collateral and to

10   Maintain Cash Management System Through June 30, 2010, on the terms provided in the Order.

11   Subsequently, the Debtors filed a motion requesting that their authority to use cash collateral and

12   utilize their cash management system be extended through September 30, 2010.  On July 1, 2010,

13   the Court entered an order granting the motion on an interim basis, and the Debtors' request for

14   such approval on a final basis is pending as, among other things, the Bankruptcy Court considers

15   whether the additional adequate protection to be afforded to certain of the secured creditors should

16   include a cash component.

17   On April 2, 2010, SFCC filed a motion seeking authority to use cash collateral held by

18   Berkadia in certain reserves for the purpose of paying for repairs to the roof of buildings and

19   HVAC equipment located on the property subject to Berkadia's lien.  That motion was resolved

20   pursuant to a stipulation between the parties.

21   **3.    The Debtors' Single Asset Real Estate ("SARE") Motion**

22   The Debtors filed a motion seeking an order determining that none of the fifty-four Debtors

23   are subject to the single asset real estate provisions of Sections 101(51B) and 362(d)(3) of the

24   Bankruptcy Code.  Two lenders (BofA and Cathay) filed motions seeking a determination from the

25   Bankruptcy Court that MG Southpark, MMP 760 S. Hill Street and Alameda Produce Market are

26   subject to the SARE provisions of the Bankruptcy Code.  The Creditors Committee supported the

27   Debtors' position.  Approximately, fourteen oppositions and joinders in opposition were filed by

28   various lenders.  In June 2009 the Bankruptcy Court ruled in favor of the Debtors, holding that the

359261.05 [XP]    25195

1  Debtors are not subject to the SARE provisions of the Bankruptcy Code.  BofA has appealed from

2  the Bankruptcy Court's SARE determination.

3          On or about June 29, 2010, the United States District Court issued its decision on appeal

4  and ruled, among other things, that MG Southpark is not subject to the SARE provisions of the

5  Bankruptcy Code, but that MMP 760 S. Hill Street is subject to such provisions.  On July 14, 2010,

6  MMP 760 S. Hill Street appealed the District Court's decision as to MMP 760 S. Hill Street to the

7  United States Court of Appeals for the Ninth Circuit.  MMP 760 S. Hill Street does not anticipate

8  that the appeal will be concluded prior to the Effective Date.  In the event that the Ninth Circuit

9  were to issue a decision and such decision was not appealed, pursuant to orders of the Bankruptcy

10  Court MMP 760 S. Hill Street would have at least 60 days from the issuance of such final decision,

11  and perhaps longer, to comply with section 362(d)(3) of the Code by commencing periodic

12  payments to Union Lofts in an amount equal to interest at the then applicable nondefault contract

13  rate of interest on the value of BofA's interest in the real estate, or filing "a plan of reorganization

14  that has a reasonable possibility of being confirmed within a reasonable time."  In any event, it is

15  impossible to know when a final ruling will be issued by the Ninth Circuit.

16                    **4.      Motions for Relief from Stay**

17          The following motions for relief from stay have been filed by lenders to pursue their state

18  law remedies against various real properties owned by the Debtors:

19  •    PNL moved for relief from stay with respect to the real property owned by MG 2001 –

20          2021 W. Mission located in Pomona.  The Bankruptcy Court ruled in favor of the Debtors

21          and denied PNL's Motion.  PNL subsequently filed a second motion for relief from stay.  In

22          September 2010, the Bankruptcy Court granted relief from stay effective as of December 1,

23          2010, provided that a sale of PNL's real property collateral may not occur until after March

24          26, 2011, and absent (a) confirmation of a plan providing for treatment of PNL's claim,

25          which treatment will supersede the relief granted by the order (b) commencement of

26          adequate protection payments to PNL at the non-default rate under the note, or (c) further

27          order of the Bankruptcy Court.

28

1   • BofA moved for relief from stay with respect to real property owned by MMP 760 S. Hill

2   Street and commonly known as 325 West 8th Street and 760 South Hill Street, Los Angeles

3   (the Union Lofts). The Bankruptcy Court denied the motion subject to the Debtor's

4   provision of certain adequate protection to BofA;

5   • BofA moved for relief from the automatic stay with respect to certain real properties owned

6   by MG Southpark located in downtown Los Angeles. The Bankruptcy Court ruled in favor

7   of the Debtors and denied BofA's motion;

8   • UCB moved for relief from the automatic stay with respect to real property owned by 2640

9   Washington Boulevard. Pursuant to an agreement between the Debtors and UCB, the

10   motion was granted for the sole and limited purpose of permitting UCB to record a notice of

11   default with respect to the real property. The Debtor 2640 Washington agreed to pay, out of

12   cash collateral, the first and second installments of real property taxes for the 2009 – 2010

13   fiscal year. UCB's motion was withdrawn in all other respects;

14   • Legendary moved for relief from the automatic stay with respect to real property owned by

15   MM 3rd & Omar Street located in downtown Los Angeles. In the context of the

16   Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a

17   replacement lien in postpetition cash collateral, payment of normal and ordinary expenses

18   to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal

19   year. In addition, the Bankruptcy Court required the Debtors to provide an adequate

20   protection lien in favor of Legendary on one or more of the Debtors' unencumbered

21   properties and authorized Legendary to record a notice of default with respect to the

22   property. In light of the rulings in connection with the Cash Collateral Motion, the

23   Bankruptcy Court denied Legendary's motion, subject to the provision of such adequate

24   protection;

25   • Legendary moved for relief from the automatic stay with respect to real property owned by

26   both MG 1500 Griffith Avenue and MG 4th Street Center and located in downtown Los

27   Angeles. The Bankruptcy Court ruled in favor of the Debtors and denied Legendary's

28   motion;

359261.05 [XP]   25195

1   • Legendary moved for relief from the automatic stay with respect to real property owned by

2   Merco Group, commonly known as Sci-Arc, and located in downtown Los Angeles.  The

3   Bankruptcy Court denied Legendary's motion;

4   • Legendary moved for relief from the automatic stay with respect to real property owned by

5   MM 420 Boyd Street and located in downtown Los Angeles.  In the context of the

6   Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a

7   replacement lien in postpetition cash collateral, payment of normal and ordinary expenses

8   to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal

9   year.  In addition, the Bankruptcy Court required the Debtors to provide an adequate

10  protection lien in favor of Legendary on one or more of the Debtors' unencumbered

11  properties and authorized Legendary to record a notice of default with respect to the

12  property.  In light of the rulings in connection with the Cash Collateral Motion, the

13  Bankruptcy Court denied Legendary's motion subject to the provision of such adequate

14  protection;

15  • Legendary moved for relief from the automatic stay with respect to real property owned by

16  Merco Group (Sky-Arc) and MG Little J and located in downtown Los Angeles.  The

17  matter has been submitted to the Court.  An order has not yet been issued;

18  • Legendary moved for relief from the automatic stay with respect to real properties owned

19  by MG 620 Gladys and MM 366 West 11th Street and located in downtown Los Angeles.

20  The matter has been submitted to the Court.  An order has not yet been issued;

21  • Legendary moved for relief from the automatic stay with respect to real property owned by

22  MG 425 W. 11th  Street and located in downtown Los Angeles.  In the context of the

23  Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Legendary a

24  replacement lien in postpetition cash collateral, payment of normal and ordinary expenses

25  to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal

26  year.  In addition, the Bankruptcy Court required the Debtors to provide an adequate

27  protection lien in favor of Legendary on one or more of the Debtors' unencumbered

28  properties.  In light of the rulings in connection with the Cash Collateral Motion, the

51

Bankruptcy Court ruled in favor of the Debtors and denied Legendary's motion for relief from the automatic stay subject to the provision of such adequate protection;

- On September 2, 2009, Vahan and Anoush Chamlian moved for relief from the automatic stay with respect to real property owned by MMP 2131 Humboldt Street near downtown Los Angeles.  The Bankruptcy Court ruled in favor of the Debtors and denied the Chamlians' motion;

- Chinatrust moved for relief from the automatic stay with respect to real property owned by MG 3185 E. Washington Boulevard, among other things.  In the context of the Bankruptcy Court's rulings on the Cash Collateral Motion, the Debtors offered Chinatrust a replacement lien in postpetition cash collateral, payment of normal and ordinary expenses to maintain the property and the payment of real property taxes for the 2009 – 2010 fiscal year.  In addition the Bankruptcy Court required the Debtors to provide an adequate protection lien in favor of Chinatrust on one or more of the Debtors' unencumbered properties.  In light of the rulings in connection with the Cash Collateral Motion, the Bankruptcy Court ruled in favor of the Debtors and denied Chinatrust's motion for relief from the automatic stay subject to the provision of such adequate protection;

- The Stanford Group moved for relief from the automatic stay with respect to the real property owned by 908 8th Street located in downtown Los Angeles.  The parties have reached a settlement on the Claim of Stanford Group, which was approved by the Court.  As a result of the settlement, the motion was dismissed.

- Legendary filed a second motion for relief from the automatic stay with respect to the real property owned by MM 420 Boyd Street.  The Court denied Legendary's motion.

- Legendary filed a second motion for relief from the automatic stay with respect to the real property owned by MM 3rd and Omar.  The Court denied Legendary's motion.

- On April 1, 2010 Vahan and Anoush Chamlian filed a second motion for relief from the automatic stay with respect to real property owned by MMP 2131 Humboldt Street.  In July 2010, the Bankruptcy Court granted relief from stay effective as of December 1, 2010, provided that a sale of Chamlian's real property collateral may not occur until after March

52

1    26, 2011, and absent (a) confirmation of a plan providing for treatment of Chamlian's claim,

2    which treatment will supersede the relief granted by the order, (b) commencement of

3    adequate protection payments to Chamlian at the non-default rate under the note, or (c)

4    further order of the Bankruptcy Court.

5         In addition to the motions filed by the Debtors' lenders, a group consisting of three

6    individuals moved for relief from the automatic stay to seek authority to prosecute a civil action

7    filed by them in Los Angeles Superior Court and to clarify that they have authority to pursue

8    alleged labor Claims against certain current and former employees and board members of MMPI,

9    Alameda Produce Market and 788 South Alameda.  A hearing on that motion was held on

10   December 17, 2009.  The Court entered an order granting the motion as to Debtors Alameda

11   Produce and 788 S. Alameda but ordered that the movants could not pursue such litigation until

12   June 30, 2010.  The motion was denied as to MMPI.

13        Also, in addition to the foregoing motions, in April 2004, the Los Angeles County

14   Metropolitan Transportation Authority ("MTA") filed suit seeking to acquire through its power of

15   eminent domain, certain property of the Debtors.  In September 2008 the trial court dismissed the

16   action and the MTA appealed.  Thereafter, the Debtors filed their chapter 11 petitions and the

17   automatic stay prevented further prosecution of the appeal.  The Debtors and the MTA entered into

18   a stipulation to modify the automatic stay to permit the prosecution and defense of the appeal.  The

19   order approving the stipulation was entered in August 2009.  The matter is still pending.

20        Also, in a similar action, in February 2010, the City of Pomona filed a motion for relief

21   from the automatic stay in order to allow an eminent domain action in a non-bankruptcy forum to

22   proceed.  The Debtors did not oppose the relief sought and the motion was granted.

23        The Debtors filed a motion to determine the amounts owed to the County of Los Angeles on

24   account of real property taxes.  The dispute involved the proper amount of taxes owed to the

25   County and the appropriate rates of interest as well as whether certain other claimed amounts are

26   properly included in the claim.  The motion was resolved through the Debtors' settlement with the

27   County described in Section 6 below.

28

53

1              **5.      The Debtors' Compromises With Various Lenders**

2              The Debtors have engaged in extensive settlement discussions with their lenders as to their

3    Claims under Loan Documents and as of the filing of this Disclosure Statement, the Debtors have

4    reached settlements with PCB, Imperial, Murakami, Cathay Bank, the Stanford Group, FNBN and

5    Berkadia.  The Bankruptcy Court approved the Debtors' compromise with PCB and the essential

6    terms of that settlement are reflected in the Plan, specifically the Plan's treatment of PCB's Class

7    51A-4 Claim in Section III.C.2 of the Plan.

8              The Bankruptcy Court approved the settlement with Murikami.  The essential terms of that

9    settlement are reflected in the Plan, specifically the Plan's treatment of Murakami's Class 37A-4

10   Claim in Section III.B.2 of the Plan.

11             The Debtors motion to approve their settlement with Imperial was heard on February 24,

12   2010 and was granted.  The essential terms of that settlement are reflected in the Plan, specifically,

13   the Plan's treatment of Imperial's Claims in Classes 35A-2, 38A-2 and 51A-2 in Section III.C. of

14   the Plan.

15             The Debtors have reached an agreement with Cathay Bank for the settlement of Cathay

16   Bank's claims.  The Bankruptcy Court approved the settlement with Cathay Bank.  The essential

17   terms of that settlement are reflected in the Plan, specifically the Plan's treatment of Cathay Bank's

18   claims in Class 36A-2 and 36A-3 in Section III.C.2 of the Plan.

19             The Debtors have reached an agreement with The Stanford Group, L.P. for the settlement of

20   The Stanford Group, L.P.'s claims.  The Bankruptcy Court approved the settlement with the

21   Stanford Group.  The essential terms of that settlement are reflected in the Plan, specifically the

22   Plan's treatment of the Stanford Group, L.P.'s claims in Class 34A-2 in Section III.C.2. of the Plan.

23             The Debtors have reached an agreement with FNBN for the settlement of FNBN's claims.

24   The Bankruptcy Court approved the settlement with FNBN.  The essential terms of that settlement

25   are reflected in the Plan, specifically the Plan's treatment of FNBN's claims in Classes 1-C3, 42A-1

26   and 42C-2 in Section III.C.2. of the Plan.

27             The Debtors have reached an agreement with Berkadia for the settlement of Berkadia's

28   claims.  A motion to approve the settlement is forthcoming.  The essential terms of the settlement

54

1   of Berkadia's secured claim against Santa Fe Commerce Center are reflected in Section III.C.54.b.

2   of the Plan.

3        **6.**     **The Debtor's Settlement with the County of Los Angeles**

4        The Debtors have engaged in extensive settlement discussions with the County of Los

5   Angeles ("County") as to its Claims.  Except as to two Debtors, MG Southpark and MMP 760 S.

6   Hill Street, the Bankruptcy Court has approved the Debtors' settlement with the County.  As to

7   those two Debtors, their motion for approval of their proposed settlement with the County has been

8   severed and has been stayed by the Bankruptcy Court pending the outcome of a certain adversary

9   proceeding filed by the County.

10       The County's adversary proceeding was filed in response to efforts by Bank of America to,

11   in the Debtors' and the County's view, disregard statements of the Bankruptcy Court with regard to

12   Bank of America's efforts to pay real property taxes prior to the Bankruptcy Court's approval of the

13   Debtors' settlement with the County.  The settlement provides that the County will accept payments

14   only from the Debtors through, among other things, the effective date of a plan confirmed by the

15   Court.  On April 9, 2010, Bank of America sought to pay the real property taxes by handing two

16   checks to the County's attorney during a hearing on the Debtors' motion for approval of the

17   settlement.  The County's attorney declined to accept the payments at that time.  The Bankruptcy

18   Court observed that it had witnessed a tender but no acceptance, and continued the hearing to allow

19   for further briefing on the question of whether the Bankruptcy Court could approve the settlement

20   containing the term by which the County agreed to return such payments.  Pending the outcome of

21   the continued hearing, the County's attorney intended to keep the checks in his firm's safe.

22       Thereafter, Bank of America sought admissions from the County that the monthly accrual

23   of penalties had ceased as of April 9, 2010, notwithstanding that the payment had not been

24   accepted on that date.  Ultimately, the County filed a complaint with the Bankruptcy Court for

25   declaratory relief, requesting that the Bankruptcy Court declare, again, that there had not been an

26   acceptance as of April 9, 2010, and requesting authority to deposit the two checks with the Court.

27       Bank of America filed a motion with the District Court requesting that the District Court

28   exercise original jurisdiction over the adversary proceeding, asserting that the District Court was

359261.05 [XP]   25195

1  required by law to "withdraw the reference" of the adversary proceeding.  After filing its motion,

2  BofA filed a counterclaim for declaratory relief against the County seeking, among other things, a

3  determination that the County was required to accept the payment from Bank of America on April

4  9, 2010, and therefore the County's claims against MG Southpark's and MMP 760 S. Hill Street's

5  estates have been satisfied.  The Debtors and the County opposed Bank of America's motion for

6  withdrawal of the reference, which was granted.

7        The District Court held hearings on September 20, 2010 on the parties' motions for

8  summary judgment.  On September 21, 2010 the District Court entered its order granting the

9  motions for summary judgment filed by the County and by MG Southpark and MMP 760 S. Hill

10 Street and denying the motion for summary judgment filed by Bank of America.  The District

11 Court's order stated, "As the Court has decided there is no preemption, there are no longer any

12 material issues remaining to justify withdrawal.  The Court therefore refers any remaining matters

13 to the Bankruptcy Court."  On September 27, 2010, Bank of America filed a notice of appeal with

14 the District Court, and that appeal has been assigned case number 10-56526.  The Debtors contend

15 that Bank of America's notice of appeal was ineffective because it was not filed with the Court that

16 had jurisdiction over the adversary proceeding at the time the notice of appeal was filed; the

17 Debtors also contend that the District Court's order was interlocutory and therefore not yet properly

18 appealable.  Bank of America may disagree with the Debtors in these regards.  The Debtors

19 contend the effect of the District Court's ruling with regard to confirmation of the Debtors' plan will

20 be determined by the Bankruptcy Court in connection with the Debtors' request for confirmation of

21 its plan in MG Southpark's and MMP 760 S. Hill Street's cases.

22        **7.    East West Bank's Adversary Proceeding Against the Debtors**

23        On September 9, 2010, MMPI issued a press release entitled "East West Bank Hostile

24 Takeover Plan Rebuffed by Bankruptcy Court" (the "Press Release").  After hearings held in the

25 Bankruptcy Court, the Bankruptcy Court required MMPI and Richard Meruelo, Chairman and

26 Chief Executive Officer of MMPI, to retract the Press Release.  The Order directing the retraction

27 is included with the solicitation package.

28

359261.05 [XP]    25195

1   MMPI issued a press release on September 17, 2010, indicating the intent of MMPI and

2   Richard Meruelo as chief executive officer of MMPI to issue a retraction of the Press Release in

3   the form required and approved by the Bankruptcy Court.  MMPI and Richard Meruelo as chief

4   executive officer of MMPI issued a retraction of the Press Release on September 22, 2010.  MMPI

5   has filed an appeal from the court's Order.

6   On September 22, 2010, East West Bankcorp., Inc. and East West Bank filed a Complaint

7   in the Bankruptcy Court for damages, including punitive damages, based on: (1) Libel per se and

8   (2) Libel (the "Complaint").  A judgment against MMPI would be an administrative claim against

9   the estate and thus could reduce the amount available to pay creditors or the value of shares held by

10  stockholders.  East West Bank maintains that it will seek recovery of damages in a significant

11  amount, plus punitive damages.

12  MMPI and Richard Meruelo dispute the allegations of the Complaint, deny that they have

13  any liability to the plaintiffs, and may assert counterclaims.  MMPI has tendered the claims under

14  the Complaint to its insurers.  It is unknown whether the insurers will assume defense of this

15  action.  MMPI may have indemnification or contribution claims against insiders of the company.

16              **8.    Unexpired Leases and Executory Contracts**

17  With the Bankruptcy Court's approval, Meruelo Farms assumed an unexpired

18  nonresidential lease of the parking lot located at 740 E. Temple St., Los Angeles under which it is

19  the lessee and Susan E. Moody, Trustee of the Susan E. Moody Revocable Trust, dated December

20  1, 2000, the successor-in-interest to Evelyn Hammond, is the lessor.

21              **9.    Summary of Claims Process, Bar Date and Claims Filed**

22                  ***a.    Schedules and Statements of Financial Affairs***

23  On or before June 12, 2009 the fifty-four jointly administered Debtors filed with the

24  Bankruptcy Court their schedules of assets and liabilities and a statement of financial affairs (the

25  "Schedules and Statements") as of their March 26, 2009 or March 27, 2009 Petition Date.  The

26  Debtors filed amendments to the schedules on August 9, 2010.

27  For financial reporting purposes, MMPI prepares consolidated financial statements that are

28  filed with the SEC and that are audited annually.  Unlike these consolidated financial statements,

359261.05 [XP]    25195

1  the Schedules and Statements reflect the assets and liabilities of the Debtors on the basis of the

2  Debtors' non-audited books and tax records.  This means that audited financial statements and

3  supporting schedules have not been prepared for each Debtor.

4               **b.      *Claims Bar Date***

5               On July 22, 2009, the Bankruptcy Court entered an order in the case (the "MMPI Bar Date

6  Order") establishing the general deadline for filing proofs of Claim against the 54 jointly

7  administered Debtors (the "Bar Date").  The deadline established by the Bankruptcy Court was

8  September 24, 2009.

9               The Bar Date established the deadline for Claims, including Claims of governmental units,

10 but excluding certain other Claims, including Claims based on the rejection of executory contracts

11 and unexpired leases as to which the bar date is the later of: (1) the applicable Bar Date; or (2) the

12 first business day that is at least thirty (30) calendar days after (a) the mailing of notice of the entry

13 of the order first approving the rejection of such contract or lease, (b) the mailing of notice of the

14 entry of an order or judgment avoiding a transfer, or (c) the date any relevant tax Claim first arises.

15 The Debtors provided notice of the Bar Date by mailing a notice of such Bar Date.

16              **c.      *Proofs of Claim and Other Claims***

17              According to the Debtors' records, a total of 415 Claims were filed against the Debtors

18 asserting Claims in the total face amount of approximately $927,761,559.23.  The Claims

19 scheduled by the Debtors and Claims filed by claimants in each Class is summarized in Exhibits

20 "H.2" to "H.8" attached hereto.  The amounts listed on those exhibits represent the current state of

21 the Debtors' computation of the Claims filed and scheduled, and do not reflect amounts which have

22 been paid to date or which the Debtors have otherwise resolved through deposit or stipulation.

23              Numerous Claims were asserted by various alleged creditors in unliquidated amounts, i.e.

24 Claims that did not contain a specific dollar amount.  The Debtors believe that certain Claims that

25 have been asserted are without merit and intend to object to all such Claims.  Other significant

26 categories of disputed Claims include certain taxing authorities that are requesting payments far in

27 excess of those the Debtors believe to be owed to such authorities.

28

1    The Debtors filed a motion to determining the amounts owed to the County of Los Angeles

2  on account of real property taxes.  The dispute involves the proper amount of taxes owed to the

3  County and the appropriate rates of interest as well as whether certain other claimed amounts are

4  properly included in the claim.  The parties reached a settlement of their disputes and the Debtors'

5  Motion for approval of the settlement is pending.

6           **d.      *The Debtors' Stipulation with the OCC Regarding Unsecured***

7                              ***Claims***

8    The Debtors entered into a stipulation with the OCC by which they agreed that to the extent

9  any party files a proof of Claim in any of the Debtors' Chapter 11 Cases prior to the Bar Date, such

10 proof of Claim shall be deemed to have been timely filed in the proper Debtor's Chapter 11 Case

11 and against the proper Debtor regardless of the name of the particular Debtor or case number

12 identified in the proof of Claim.  The Stipulation was intended to address the possible confusion

13 among creditors holding claims against one or more of the Debtors where the claimant was not sure

14 of the specific Debtor against whom the claim was held because of the Debtors' consolidated

15 business operations.  The Stipulation provided among other things, that claims that were timely

16 filed would be deemed to have been filed against the proper Debtor regardless of the whether

17 Debtor and/or case number were properly identified in the proof of claim.  The Bankruptcy Court

18 approved that stipulation.  Berkadia has appealed from the order approving the stipulation and that

19 appeal remains pending before the District Court for the Central District of California.  Pursuant to

20 the settlement between the Debtors and Berkadia, after Bankruptcy Court approval of the

21 settlement, Berkadia will dismiss its appeal.

22          **e.      *Motion to Deem Claims Filed Against the Wrong Debtor to be***

23                         ***Filed Against the Proper Debtor***

24   Pursuant to the terms of the Debtors' Stipulation with the OCC described above, the

25 Debtors have reviewed certain of the proofs of claim filed before the Bar Date in order to identify

26 claims filed in the wrong case or against the wrong Debtor that may properly be reassigned

27 pursuant to the Order approving the Stipulation.  Those determinations were based on the

28 documents attached to the proofs of claim, a review of the appropriate Debtor's records and

consultation with members of the Debtors' management familiar with the claims and creditors.  On or about April 30, 2010, the Debtors filed their motion asking the Court to enforce the terms of the earlier Stipulation and Order and to deem the timely filed claims as having been filed against the proper Debtor, regardless of the Debtor's name and/or case number identified on the proof of claim.  A hearing on that motion was held on for June 11, 2010.  That motion has been granted with regard to the majority of the relief sought by the Debtors, and a continued hearing on the balance of the relief sought by the Debtors was held on August 6, 2010 at which time the Motion was granted as modified by the Debtors.

### 10.    Other Administrative Matters

Early in the cases, the Debtors met with and were interviewed by the staff attorney and other representative of the Office of the United States Trustee (the "US Trustee").  During the Cases, the Debtors have complied with certain requirements promulgated by that office with respect to the filing of monthly operating and cash reports.  In May and June, 2009 the Debtors appeared at the Section 341(a) meeting of creditors - known as the initial creditor meeting - in the cases of the fifty-four jointly administered Debtors to answer questions of creditors and parties in interest.  The US Trustee conducted each of the Section 341(a) meetings.

On April 22, 2009 the US Trustee appointed the Committee of Unsecured Creditors in the cases.  Shortly thereafter, the Debtors met with the Committee to discuss the Debtors' business and proposed Chapter 11 Plan.  The Debtors and the Committee have been in close communication throughout these cases.

Various professionals have been retained and employed in the Chapter 11 Cases and will be paid pursuant to the terms of the Plan.  Danning, Gill, Diamond & Kollitz, LLP has been employed as general reorganization counsel for all of the Debtors in the Chapter 11 Cases.  The following professionals also have been employed by the Debtors: FTI Consulting, Inc., as financial advisors ("FTI"), Ernst & Young as independent auditors and tax advisors, DLA Piper LLP (US) as special securities and litigation counsel, and Waldron & Associates, Inc. as real estate appraiser. SulmeyerKupetz, APC was employed as general counsel by the Committee in the Debtors' cases.

1    The Committee has filed an application to retain Kibel Green, Inc., as its financial advisor.

2    The Court granted this application on April 22, 2010.  In addition, certain real estate brokers have

3    been or will be employed in the Chapter 11 Cases to market and sell certain properties but will be

4    paid out of the proceeds of the sale of the properties as opposed to through the Plan.  In accordance

5    with the Bankruptcy Court's order, the Debtors submitted supplemental declarations from certain

6    brokers in connection with representing the Debtors in connection with specific properties to be

7    listed for sale.  Specifically, the Debtors have retained (i) The Bradco Companies regarding the

8    listing of 2951 Lenwood Road, Barstow, CA; (ii) DAUM Commercial Real Estate Services

9    regarding the listing of (a) 905 E. 8th Street, Los Angeles, CA, (b) 308-310 Omar Street and 452,

10   464 and 470 E. 3rd Street, Los Angeles, CA, and (c) 400-428 Boyd Street, Los Angeles, CA; and

11   (iii) Cushman and Wakefield of California, Inc. regarding the listing of (a) 1875 West Mission

12   Boulevard, Pomona, California; and (b) 2001-2021 West Mission Boulevard, Pomona, California.

13   The Bankruptcy Court granted the Debtors' motion to extend the time during which only

14   the Debtors may file a plan of reorganization and solicit acceptances thereof through September 30,

15   2010, provided that on and after May 18, 2010, the Committee is authorized to file a plan of

16   reorganization and as of June 14, 2010, an equity committee appointed in the case, if any, and

17   Charleston Capital Advisors and the Hartland Asset Management Corporation are authorized to file

18   a plan of reorganization.  The Debtors filed their original plan of reorganization and disclosure

19   statement, which disclosure statement was considered by the Court on January 20, 2010.  The

20   Debtors filed their First Amended Joint Plan of Reorganization and First Amended Joint Disclosure

21   Statement on February 27, 2010.  The Court held hearings on approval of the First Amended

22   Disclosure Statement on March 19.  The Debtors filed their Second Amended Joint Plan of

23   Reorganization and Second Amended Disclosure Statement on May 1, 2010 and the Court set a

24   further disclosure statement hearing for June 14, 2010 which was subsequently continued to June

25   21, 2010 and then July 21, 2010, July 26, 2010 and July 27, 2010.  On August 6, 2010 the Court

26   approved the Debtors' Second Amended Disclosure Statement (Docket No. 1510).  On September

27   1, 2010 the Debtors filed their Third Amended Disclosure Statement and their Third Amended

28

359261.05 [XP]    25195

1   Joint Plan.  On September 20, 2010 the Debtors filed this Fourth Amended Disclosure Statement

2   and their Fourth Amended Joint Plan of Reorganization.

3          On July 19, 2010 and August 2, 2010, the Office of the U.S. Trustee filed a notice with the

4   Court that it had appointed an equity committee, consisting of Taylor International Fund, Ltd.,

5   David A. Spinney, Douglas J. McCaslin, Kapil Tayal, Williams & Ribb LLP Profit Sharing Plan,

6   David Ofman and David Pourbaba.  The equity committee has filed an application to retain Ron

7   Orr & Professionals, Inc. and Rodiger Law Office as its counsel. The equity committee has filed an

8   application to employ Kibel Green, Inc. as its financial advisor.  A hearing on the application to

9   employ Ron Orr & Professionals, Rodiger Law Office and Kibel Green, Inc. was held on August

10  26, 2010.  The equity committee has also filed an application to employ Jenner & Block as counsel.

11  Their retention was approved subject to certain restrictions as provided in the Court's tentative

12  ruling.

13       **B.      REAL PROPERTY VALUATION, SALES AND LISTINGS**

14                **1.      Value of Property Level Debtors Real Property Assets**

15         Attached hereto as Exhibit J is a schedule of real property owned by each of the Property

16  Level Debtors that owns real property.  The values are based on the opinion of Richard Meruelo

17  who has substantial experience in valuing real property and particular in the downtown Los

18  Angeles area and has been found by the Court to qualify as an expert on such matters.

19         A brief description regarding each property is set forth in Section II.B hereof.  Generally,

20  the values given are those that Mr. Meruelo believes the Debtors could sell the property over a

21  normal period of time.  Mr. Meruelo believes the real estate market, especially downtown, is

22  improving. There is renewed sale activity occurring, whereas, one year ago there

23  were very few sale transactions. The most recent example is the sale of MM 845 S. Flower's

24  property at 705 W. 9th Street, that solicited several offers from investors. Although he believes the

25  price that it was sold for is less than what Mr. Meruelo would have expected if the Company was

26  not in bankruptcy, the sale price achieved was significantly higher than the value expected by many

27  appraisers.

28

359261.05 [XP]    25195

1        There is also a significant difference in the availability of credit to finance real estate.

2    Today, there are several real estate lenders in the market looking to make loans. Although

3    traditional bank financing is still rare; that is primarily because the banks are still struggling to

4    digest bad loans in their portfolios and not that financing real estate is not an opportunity for

5    lending.   However, the non bank lending sources are slowly returning to the market. The most

6    significant lending source that has been absent from the market during the economic downturn, the

7    CMBS securitization market, has now completed several transactions on a nationwide basis. This is

8    truly exceptional because one year ago the supposed experts said this method of real estate

9    financing was gone forever.

10       In total, Mr. Meruelo has more than 20 years of experience in identifying, acquiring,

11   entitling, financing, developing and redeveloping real estate in downtown Los Angeles.  In

12   connection with these activities, he has read and studied hundreds of appraisal reports prepared by

13   M.A.I. and other appraisers for properties located in downtown Los Angeles.  He has attended

14   numerous seminars concerning real estate development, valuation issues, and similar matters.  He

15   is a member, and in some cases an officer, of a number of local civic groups that track local real

16   estate and commercial business conditions in downtown Los Angeles, including the Central City

17   Association, the Central City East Association and the Los Angeles Central Industrial

18   Redevelopment Project.

19       During the course of this case various secured creditors commissioned appraisals which

20   they submitted to the Court in support of motions for relief from the automatic stay or in opposition

21   to the Debtors' motion for authority to use cash collateral.  Naturally, those creditors who submitted

22   appraisals did so because their appraisals reflected opinions of value that were less than Mr.

23   Meruelo's opinions of value; if any creditors obtained appraisals that were comparable to or higher

24   than Mr. Meruelo's values, they did not submit those appraisals to the Court.  In addition, an

25   appraiser appointed by the Court at the request of one creditor has provided six appraisals, some of

26   which concluded that the values of the property appraised was similar to Mr. Meruelo's valuation,

27   and some of which concluded that the values were measurably lower than Mr. Meruelo's valuation.

28   The Debtors believe that reasonable minds can differ with regard to the value of a property, but

359261.05 [XP]   25195

1    that appraisals submitted to the Court have not, on the whole, reflected the true values of the

2    relevant properties.  In fact, a number of appraisals contained estimates of value that are disproved

3    by prices that potential buyers were at the same time offering to the Debtors.

4         The Debtors believe that many of the appraisals, including those submitted by the Court-

5    appointed appraiser, contain significant errors.  Among other things, some appraisals have treated

6    separate parcels which should be appraised separately as a single economic unit, which results in an

7    artificially low estimate of value.  Some appraisals disregard comparable local sales (including

8    some transactions involving subsidiaries of MMPI) in favor of sales in outlying areas where the

9    prices obtained for properties are lower than downtown Los Angeles, and then fail to accurately

10   account for the fact that the property being appraised is in a significantly better locale.  Some

11   appraisals fail to recognize that the downtown real estate market has not been as adversely affected

12   by recent market conditions as outlying areas and put too much emphasis on trends in Riverside

13   and similar areas when estimating a rate of decline in properties downtown.  Some appraisals fail to

14   recognize that certain areas of downtown, such as the South Park area (near the Staples Center and

15   L.A. Live) and areas in Little Tokyo where significant residential and other development is

16   ongoing, are at least stable if not increasing in value.  Also, many of the appraisals of improved

17   properties in downtown failed to recognize that buyers in the downtown market do not utilize

18   capitalization rates (which typically are relied upon by appraisers) in determining the price for

19   which they are willing to purchase property.  Appraisers also appear to still be looking to declines

20   in value from 2007 through 2009 when comparing estimated values today to prices for which

21   properties were sold one year ago, even though the Debtors' experience in selling properties over

22   the last few years is to the contrary.

23           **2.      Mr. Meruelo's Expertise in Valuing the Debtors Properties**

24        There are a number of factors which Mr. Meruelo considers when estimating the value of

25   real property, and the weight he gives to one factor versus another will depend on, among other

26   things, the current condition and use of the property, and the use for which the property is best

27   suited.  One factor he may consider is the replacement cost of the property, which generally looks

28   to how much a buyer would pay for an otherwise equivalent substitute property.  With respect to

1  the Debtors' properties, Mr. Meruelo is familiar with the prices for which the properties were

2  purchased, he is familiar with the prices for which similar properties are being sold (particularly

3  since the Company is often the one selling the properties), he is familiar with the structures on the

4  Debtors' properties, and he has a significant amount of experience in the development of properties

5  and therefore can estimate the expense that would be incurred if someone had to rebuild the

6  structures.

7      Another factor he may consider relates to sale comparisons, which generally looks to the

8  prices for which comparable properties, adjusted for differences in location and such, are being

9  sold.  Such values are often estimated in terms of price per square foot of land and price per square

10  foot of building.  Again, he is familiar with the prices for which similar properties are being sold,

11  both in total and on a square footage basis, especially in the downtown Los Angeles market, often

12  because the Company has sold the comparable properties.  In fact, over the years he has observed

13  that lender appraisals, when identifying comparable sales, often are relying on sales of properties

14  sold by the Company.

15      Another factor he may consider looks to the ability of the property to produce income,

16  typically in the form of rents.  Present value may be estimated based on an evaluation of the

17  anticipated future income stream from the property, and then a capitalization rate is applied in order

18  to estimate the present value of the property.  As noted above, in the performance of his duties as

19  Chairman and Chief Executive Officer of MMPI, Mr. Meruelo regularly speaks with real estate

20  professionals, brokers and others familiar with the downtown Los Angeles real estate market and

21  other markets in which the Company owns real property in order to, among other things, expand

22  his knowledge of the markets, evaluate properties available for sale that the Company may wish to

23  purchase, and keep apprised of trends in values and the capital markets.  He incorporates the

24  information obtained by him during the course of these discussions when he estimates the values of

25  the Debtors' properties.

26      Also, MMPI's management team have met periodically during recent years, particularly in

27  2008 and 2009, to discuss, among other things, real estate trends, growth patterns, market

28  conditions, and particular properties and the factors that contribute to their value.  These meetings

1   have been conducted in order to, among other things, evaluate the prices to pay for the purchase of

2   properties not presently owned by the Company, and prices for which the Company's properties

3   may be sold.  During these meetings, they discuss, among other things, space needs by tenants or

4   end users, the condition and location of the properties, access to the properties and traffic patterns,

5   the income stream, if any, generated by the property, growth patterns, community and area trends,

6   comparable sales, expressions of interest by third parties in purchasing the Company's properties,

7   and statements or expressions of value by commercial real estate brokers.

8                  **3.**       **Sales and Listings Since the Commencement of the Chapter 11 Cases**

9        Since becoming a public company the Company has, among other things:  successfully

10   completed approximately nine acquisitions or conversions of development projects to rental

11   projects; successfully completed, acquired, or placed in service four parcels attached to current

12   rental projects; and successfully completed the sale of three rental projects and three development

13   projects.  In 2008, the Company sold more property in downtown Los Angeles than any other

14   landowner.  With regard to the six properties that were sold:

15        a.       on or about March 31, 2008, the Company sold a development project located at

16   9901 Alameda in south Los Angeles for approximately $31.2 million;

17        b.       in a two-step sale culminating in or about August 2008, the Company sold a rental

18   project located at 2000 San Fernando Road just north of downtown Los Angeles for approximately

19   $35 million;

20        c.       on or about September 12, 2008, the Company sold a rental project located at 1800

21   E. Washington Blvd. in downtown Los Angeles for approximately $14.2 million;

22        d.       on or about November 7, 2008, the Company sold a development project located at

23   816 Stanford in downtown Los Angeles for approximately $1.0 million.

24        e.       on or about November 14, 2008, the Company sold a rental project referred to as the

25   "Overland Terminal" in downtown Los Angeles for approximately $19.7 million; and

26        f.       on or about November 21, 2008, the Company sold a development project located at

27   801 E. 7th Street in downtown Los Angeles for approximately $9.5 million.

28

1      The Company is believed to have sold more properties in downtown Los Angeles than

2  anybody else during the last two years.  Mr. Meruelo was involved in negotiating each of the above

3  sales and other sales on behalf of the Company.  Further, he is the person who ultimately decided

4  the sale price for each of the properties, largely because he is the person at the Company who is the

5  most knowledgeable as to the value of the Company's real estate.  That fact that the Company has

6  engaged in so many recent sales and ongoing development activities is one of the reasons the

7  Debtors believe that he is one of the most qualified persons in Los Angeles to testify as to the value

8  of properties in downtown Los Angeles.

9      Since the commencement of the cases, the Debtors have formulated and implemented a

10  strategy with respect to the Debtors' real estate assets.  As part of this strategy, the Debtors have

11  considered multiple scenarios in the categorization and use of their real estate assets providing for a

12  balance between creditor payment and the creation of an enterprise with the greatest chance of

13  long-term sustainability and success.  The Debtors determined that certain assets should be sold to

14  reduce the immediate obligations to creditors, to provide capital for the business and to ensure the

15  long-term sustainability of the business.

16      The following properties have been sold, pursuant to orders entered by the

17  Bankruptcy Court, since the Petition Date:

18      •    5500 Flotilla Street, Los Angeles, previously owned by Debtor Meruelo Maddux –

19  5500 Flotilla Street, LLC ("MM 5500 Flotilla Street") to Camfield Partners, LLC for $210,000;

20      •    2040 Camfield Avenue, Commerce, previously owned by Debtor Merco Group –

21  2040 Camfield Avenue, LLC ("MG 2040 Camfield Avenue") to Camfield Partners, LLC for

22  $4,790,000;

23      •    146 East Front Street, Covina, previously owned by Debtor Merco Group – 146 East

24  Front Street, LLC ("MG 146 E. Front Street") to Vartan and Dzovig Koroghlian for $1,114,450;

25  and

26      •    500 Mateo Street, Los Angeles, previously owned by Debtor  Meruelo Maddux –

27  500 Mateo Street, LLC ("MM 500 Mateo Street") to Mydland Enterprises, LLC for $1,900,000.

28      In addition, the Debtors have recently listed the following properties for sale:

67

1  • 2951 Lenwood Road, Barstow, CA

2  • 905 E. 8th Street, Los Angeles, CA

3  • 308-310 Omar Street and 452, 464 and 470 E. Third Street, Los Angeles, CA

4  • 400-428 Boyd Street, Los Angeles, CA

5  • 1875 West Mission Boulevard, Pomona, CA

6  • 2001-2021 West Mission Boulevard, Pomona, CA.

7  Finally, on April 26, 2010, MM 845 Flower closed the sale of its 34 story luxury residential

8  tower for a purchase price of $109,500,000.

9  **C.      EVENTS IN THE RELATED CHAPTER 11 CASES MM 845 S. FLOWER**

10  **AND CHINATOWN**

11  On September 3, 2009, MM 845 S. Flower and Chinatown each filed voluntary petitions for

12  relief under chapter 11 of the Bankruptcy Code.  While MM 845 S. Flower and Chinatown are

13  affiliates of the MMPI Debtors, these cases are not jointly administered with the cases of the MMPI

14  Debtors.

15  MM 845 S. Flower owned a 34-story residential tower located at 705 W. 9th Street in the

16  South Park region of downtown Los Angeles (the "Project").  The building is comprised of 214

17  luxury residential units totaling approximately 254,300 square feet and an approximately 6,800

18  square foot commercial unit on the ground floor.  This building is a first class iconic structure in

19  downtown Los Angeles.  Viewed from the street, this curtain wall building is clad with various

20  shades of green glass and has numerous distinctive and attractive architectural features which

21  include external balconies on all four corners of the building, a seventh floor amenity deck with a

22  landscaped garden area and a premium extended balcony and viewing deck located on the ninth

23  floor.

24  Chinatown owns approximately 5.5 acres of unimproved land at 129 West College Street in

25  downtown Los Angeles ("Chinatown Property").  The Chinatown Property has significant

26  development potential and the current development plan for the property is for a mixed residential

27  and retail use.  The Chinatown Property is now unencumbered.  The Chinatown Property was

28  appraised at $17,600,000 as of March 2008 based upon about $80 per land square foot.

1    Prior to September 3, 2009 (the "Flower Petition Date"), and on or about July 31, 2008,

2  MM 845 Flower executed a promissory note (the "Note") in the original principal amount of

3  $84,000,000 in favor of Canpartners Realty Holding Company IV, LLC ("Canyon") in connection

4  with a Loan Agreement dated as of July 31, 2008 (the "Loan Agreement") pursuant to which

5  Canyon made a construction loan of $84,000,000 to MM 845 Flower (the "Loan").  MM 845

6  Flower's obligations under the Note were secured by a construction deed of trust (the "845 Flower

7  Deed of Trust") in favor of Canyon against the Project.  MM 845 Flower also granted Canyon a

8  security interest in various deposit accounts of 845 Flower (the "Accounts Pledge").  In addition,

9  Chinatown granted Canyon a deed of trust (the "Chinatown Deed of Trust") against Chinatown's

10  real property located at 129 West College Street, Los Angeles, California (the "Chinatown

11  Property").  MMPI executed both completion and repayment guaranties in favor of Canyon (the

12  "MMPI Guaranties") and MMP Ventures pledged its membership interests in 845 Flower and

13  Chinatown to Canyon (the "Pledge Agreements[5]") .

### 1.    Important Events in MM 845 S. Flower and Chinatown cases

15    At the time the cases were filed, the construction of MM 845 S. Flower Project was close to

16  completion.  After commencement of the 845 S. Flower case, MM 845 S. Flower completed

17  construction of the Project, completed the process of entitling the Project as condominiums and

18  developed a program for selling individual condominium units (the "Sale Program").  MM 845 S.

19  Flower filed a motion for authority to engage in the Sale Program.  Canyon opposed the motion on

20  among other grounds that the Debtor could not sell units free and clear of its loan.  After extensive

21  briefing and several hearings, the Court denied the motion without prejudice to the Debtor pursuing

22  the Sale program as part of its Chapter 11 Plan.

23    On November 12, 2009, Canyon filed a Motion for Relief from the Automatic Stay (the

24  "RFS Motion") in the MM 845 S. Flower case seeking relief from the automatic stay to permit it to

---

[5]    The Loan Agreement, the Note, the Deed of Trust, the Accounts Pledge, the MMPI
Guaranties, the Chinatown Deed of Trust, the Pledge Agreements and all other documents and
instruments evidencing or securing the Loan, are referred to collectively herein as the "Loan
Documents."

1    foreclose on its Deed of Trust against the Project.  Canyon asserted that it was entitled to relief

2    from the stay because the Debtor does not have any equity in the Project and according to Canyon,

3    the Debtor cannot cram down a plan on Canyon over its objection.  MM 845 S. Flower vigorously

4    disputed each of Canyon's contentions.  The initial hearing on the RFS Motion was held on

5    January 8, 2010.  After additional briefing and a further hearing on February 5, 2010, the Court

6    continued the RFS Motion to March 12, 2010 for an evidentiary hearing regarding the value of the

7    Project and testimony by the appraisers retained by Canyon and MM 845 S. Flower.  The RFS

8    Motion was dismissed due to the settlement discussed below.

9         In addition, on October 19, 2009, Canyon filed an adversary proceeding against MM 845 S.

10   Flower and Chinatown in their respective cases, asserting and seeking a declaration, among other

11   things, that Canyon was not required to release its lien on the Chinatown Property or its security

12   interest in MMP Ventures' membership interests in Chinatown (the "Chinatown Adversary

13   Proceeding") MM 845 Flower and Chinatown answered and counterclaimed, contending, among

14   other things, that Canyon is required to release its liens on the Chinatown Property and its security

15   interest in the MMP Ventures membership interests in Chinatown.  On November 19, 2009, the

16   Bankruptcy Court entered its Order approving the parties' stipulation to consolidate the two

17   adversary proceedings, deeming the complaint filed in 845 Flower's case (1:09-ap-01435-KT) as

18   the sole operative complaint.

19        On February 16, 2010 the parties filed cross-motions for summary judgment (Chinatown

20   Adversary Proceeding docket nos. 13 – 19) which were initially set for hearing on March 12, 2010.

21   Those hearings were continued several times and the motions and the Chinatown Adversary

22   Proceeding were dismissed due to the settlement discussed below.

23              **2.    Sale of the Project and Settlement with Canyon**

24        On April 13, 2010, MM 845 S. Flower filed a motion for authority to sell the Project to

25   Watermarke Properties, Inc., a California corporation, or its assignee (the "Buyer") for a purchase

26   price of $110,000,000 cash pursuant to the Purchase Agreement, subject to a $500,000 purchase

27   price credit to the Buyer as described below.  The hearing on the Motion was held on April 19,

28   2010.  The Court approved the sale by its order entered on April 19, 2010.

1    On April 12, 2010, MM 845 S. Flower, Chinatown, MMPI and MMP Ventures entered into

2    a settlement with Canyon (the "Canyon Settlement Agreement").  Pursuant to the settlement,

3    Canyon agreed to accept $86,521,389 from escrow at closing in satisfaction of its Lien and has

4    agreed to the release of its Lien on the Project, on MM 845 S. Flower's bank accounts and other

5    personal property and on the real property owned by the related debtor Meruelo Chinatown, LLC.

6    The sale closed on April 26, 2010 and Canyon received payment of the settlement amount on that

7    date.

8    The Canyon Settlement Agreement resolves all disputes arising out of or relating to

9    Canyon's claims against the Debtors or arising out of or related to the Loan Documents, the RFS

10   Motion, and the Chinatown Adversary Proceeding.

11   In addition, certain creditors have asserted, or may assert, mechanics liens against the

12   Project (the "Mechanics Lien Creditors").  The sale of the Project combined with the funds in MM

13   845 S. Flower's construction reserve accounts (which was $7,139,319 as of April 9, 2010) provides

14   more than enough proceeds for payment of all amounts determined to be owing to the Mechanics

15   Lien Creditors.  MM 845 S. Flower has objections to certain of these claims and reserves all rights

16   and defenses thereto.  As of April 30, 2010, the aggregate amount owing to the Mechanics' Lien

17   Creditors was between $4,179,157 and $8,733,944.  Since that date, MM 845 S. Flower has

18   resolved many of these claims which have been paid from Remaining Claims Fund as provided

19   below.  MM 845 S. Flower continues to work to resolve the remaining claims.

20   At closing, MM 845 S. Flower established the Remaining Claims Fund as a segregated

21   account at City National Bank to hold funds for payment of the unpaid or disputed Mechanics' Lien

22   Claims and unsecured claims against the Debtor's estate (the "Remaining Claims") as provided in

23   the Canyon Settlement Agreement.   The Remaining Claims Fund was funded in an amount not to

24   exceed $10,636,268, comprised of the maximum amount of all unpaid or disputed Mechanics Lien

25   Claims, $100,000 for payment of unsecured claims, and $1,500,000 as provided in the Canyon

26   Settlement Agreement.  The Remaining Claims Fund was funded with the remaining funds from

27   the Debtor's construction reserve accounts plus proceeds of the Sale sufficient to fully fund the

28   account.  The Liens of all creditors of MM 845 S. Flower asserting Liens against the Project,

71

359261.05 [XP]   25195

1  including but not limited to Canyon (pursuant to the Canyon Settlement Agreement) and the

2  Mechanics Lien Creditors, attached to the Remaining Claims Fund.  The Canyon Settlement

3  Agreement also provided for the payment of Canyon's third party fees and expenses arising out of

4  the Remaining Claims from the Remaining Claims Fund.  As a result of receipt of the Settlement

5  Amount, all of Canyon's liens, rights and interest in and to any of the Debtors' assets have been

6  fully released, reconveyed, terminated and discharged, including, without limitation, full

7  reconveyances of the Flower Deed of Trust, the Chinatown Deed of Trust, terminations of any

8  UCC financing statements and account control agreements, releases of any guaranties, assignments

9  and pledges, including MMP Ventures' membership interests in 845 Flower and Chinatown, the

10  MMPI Guaranties and the Accounts Pledge and Pledge Agreements.

11         As a result of the settlement, the Chinatown Adversary Proceeding has been dismissed and

12  Canyon has withdrawn its RFS Motion.  The sale will provide approximately $20 million in sale

13  proceeds to the estate and, after payment of administrative expenses, such funds will be available to

14  pay intercompany claims.  The impact of successful resolution of these cases is that the remaining

15  proceeds from the sale of this Project will be available to the MMPI Debtors at the Effective Date

16  rather than one or more years later.  Further, the Chinatown Property is no longer encumbered and

17  will be available to the Company as an unencumbered property.

18         On or about July 7, 2010, MM 845 S. Flower filed a motion for authority to make an

19  interim distribution or distributions in the aggregate amount of up to $12 million from free and

20  clear cash in MM 845 S. Flower's estate to MMPLP.  That motion was granted.

21                            **V.**

22                  **SUMMARY OF THE PLAN**

23         The Plan provides for the treatment and payment of Claims against the bankruptcy estates

24  of each of the Debtors.  It also provides for the payment of unclassified claims, such as

25  administrative expense claims and priority tax claims against each Debtor.  Claims or Interests are

26  classified in a particular Class only to the extent that the Claim or Interest qualifies within the

27  description of that Class, and are classified in another Class or Classes to the extent that any

28  remainder of the Claim or Interest qualifies within the description of such other Class or Classes.

359261.05 [XP]    25195

## A. COMMON CLASS TREATMENTS FOR CLASSIFIED CLAIMS

The following are Common Class Treatments for the following classes of Claims and Interests: (i) Secured Tax Claims, (ii) Secured Lender Claims, (iii) Other Priority Claims, (iv) Unsecured Tenant Security Deposit Claims, (v) Convenience Class Claims, (vi) General Unsecured Claims, (vii) Intercompany Claims, and (viii) Interests.  The Classes of Claims and Interests for each Debtor will either receive the Common Treatment or a treatment specific to a particular Class.  For each Class and for each Debtor, the Plan will specify whether such class will receive the common treatment set forth herein or another treatment.

In addition to the specific treatment detailed below, the Debtors expressly reserve the right to abandon any of their real properties pursuant to Section 554 of the Bankruptcy Code prior to the Confirmation Date.  The Debtors also expressly reserve the right, at any time during the term of the Plan, to refinance the obligations secured by any of their real properties and satisfy the full amount of the Allowed Secured Claims against such real property(ies) from the proceeds of such refinancing.  The Debtors also reserve the right subject to Court Approval to sell any of their properties prior to the Effective Date and Reinstate the obligations with respect thereto and pay any such Claims in full under the Plan at the Effective Date.  The Debtors also reserve the right to make full or partial payment of the Debt at any time on or following the Effective Date.

### 1. Common Secured Tax Claim Treatment

Pursuant to, and subject to Court approval of the Debtors' settlement with the County, the Holder shall receive deferred cash payments equal to the Allowed Secured Tax Claims with interest at the rate of 18.00 percent per annum, on the Allowed Secured Tax Claim until paid in full.  Holders of Allowed Secured Tax Claims shall receive deferred cash payments, payable in sixteen (16) equal quarterly installments commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly Distribution Date.  To the extent that the last payment occurs later than March 26, 2013, the County has consented to this Treatment.

The Reorganized Debtor shall have the right to pay the Allowed Secured Tax Claim, or any remaining balance of such Claim, or any portion of such Claim, at any time on or after the Effective Date.

## 2.    Common Secured Lender Claim Treatment

The Holder shall receive deferred Cash payments over a period of either (i) five years from the Effective Date if the Holder votes to accept the Plan or (ii) seven years from the Effective Date if the Holder votes to reject the Plan (the "Maturity Date"), in an aggregate amount equal to the amount of the Allowed Secured Claim, plus interest from the Effective Date on the unpaid portion of the Allowed Secured Claim, at the rate prescribed below.  Payments shall be made in the amount of the monthly accruing interest, with the principal balance and any unpaid interest due and payable at the Maturity Date.  The monthly installments of interest shall be payable on or before the fifteenth (15th) day of each month, with the first installment due on or before the fifteenth (15th) day of the first month following the month the Effective Date occurs.  Each installment shall be in the amount equal to interest on the Allowed Claim at the rate of 5.0% per annum or as otherwise established by the Court, provided, however, that in the event such Claim is not an allowed Claim at the Effective Date then interest shall be payable on the undisputed portion of such Claim until the Claim is allowed pursuant to a Final Order of the Bankruptcy Court.  Once the Claim is an Allowed Claim pursuant to a Final Order, then on the next interest payment date, the Holder shall receive a payment equal to the unpaid interest due and owing on the disputed portion of the Claim from the Effective Date.

The terms and conditions of the agreements or instruments between the Holder and the Debtor shall be restructured and amended as of the Effective Date pursuant to a Loan Modification Agreement the form of which is attached hereto as Exhibit D.  The Holder and Debtor shall, within a reasonable period of time after the Effective Date (or after a Final Order of the Bankruptcy Court allowing the Claim) complete the Loan Modification Agreement consistent with the terms of this Plan, and execute and deliver the same to be effective as of the Effective Date.  If there shall be found any error in the Loan Modification Agreement such that it was not completed consistent with the terms of this Plan, the Holder and the Debtor shall correct and re-execute the Loan Modification Agreement to be consistent with the Plan.  Except as provided in this section and the Loan Modification Agreement, and notwithstanding Section 1141(c) or any other provision of the Bankruptcy Code, all valid, enforceable and perfected prepetition liens of the Holder in its

1  Collateral shall survive the Effective Date and continue in accordance with the contractual terms of

2  the underlying agreements with such Holder and/or applicable law until the Holder's Allowed

3  Secured Claim is satisfied pursuant to this Plan; provided however, that the Holder shall be

4  prohibited from exercising rights or remedies pursuant to such underlying agreements so long as

5  the Reorganized Debtor is in compliance with this Plan.  Any lien or interest granted to the Holder

6  by the Court as adequate protection shall be released and extinguished upon confirmation.

7  **3.      Common Other Priority Claim Treatment**

8          This Class includes Other Priority Claims for an amount entitled to priority under Sections

9  507(a)(4), 507(a)(5), 507(a)(6) or 507(a)(7) of the Bankruptcy Code, and does not include any

10  Administrative Claim or Tax Claim.  These unsecured Other Priority Claims are for unsecured

11  Claims for accrued employee compensation earned within 180 days prior to the Petition Date, to

12  the extent of $10,950 per employee

13          The Bankruptcy Code requires that each Holder of a Priority Claim receive Cash on the

14  Effective Date equal to the amount of the Holder's Allowed Claim.  However, a Class of Priority

15  Claims may vote to accept deferred Cash payments of a value, as of the Effective Date, equal to the

16  allowed amount of such Claims.

17          Unless otherwise agreed to by the parties, each Holder of an Allowed Other Priority Claim

18  will receive an initial payment equal to 50% of the Holder's Allowed Claim and a second payment

19  for the balance of the Holder's Allowed Claim one year after the Effective Date with interest at the

20  rate of 4.0% per annum.  To the extent such claim includes accrued vacation or sick pay such

21  vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated

22  and the holder shall be authorized to use such vacation or sick time following the Effective Date.

23  The initial payment shall occur on or before the later of (i) the Effective Date or (ii) 30 days after

24  the end of the calendar quarter in which the Disputed Claim becomes an Allowed Claim and (iii)

25  the date that such Claim would be paid in accordance with any terms and conditions of any

26  agreements or understandings relating thereto between the applicable Debtor and the Holder of

27  such Claim.

28

359261.05 [XP]    25195

### 4.     Common Tenant Security Deposits Treatment

The Allowed Claims of the Holders shall be reinstated as of the Effective Date of the Plan.

### 5.     Common Convenience Class Claim Treatment

Convenience Classes of General Unsecured Claims against each Debtor includes those Claims the amount of which are equal to or less than $500.  The Holders of such Claims shall receive a single Cash payment equal to the full Allowed amount of the Claim, payable on the later of (i) the Effective Date or as soon as practicable thereafter or (ii) in the case of a Disputed Claim, 30 days after the date an Order allowing such Claim becomes a Final Order, or (iii) 30 days after the contingent claim becomes non-contingent.  No payments shall be made to Holders of contingent Claims until such Claims become non-contingent.

The Holder of any Claim in any Impaired "C" Class may elect to reduce the Allowed amount of its Claim to $500 and be treated as a member of the Convenience Class.

### 6.     Common Unsecured Claim Treatment

The Holders of Allowed General Unsecured Claims shall receive deferred cash payments equal to 100% of the Allowed amount of the Claim plus interest at the rate of 0.64% per annum, from the Petition Date, payable 30 days after the Effective Date or, in the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the payment will be due an payable 30 days after the date an Order allowing such Claim becomes a Final Order.

### 7.     Common Unsecured Guaranty Claim Treatment

Claims in this Class consist of Guaranty Claims on obligations for which another one of the Debtors is the principal obligor (referred to generally in this section as the "Principal Obligor") and for which the principal obligation is provided for under this Plan.

As of the Effective Date, all provisions of all guaranties giving rise to such Guaranty Claims shall be canceled and extinguished, including any and all waivers of suretyship rights and defenses under California Civil Code § 2856, and all Claims arising under such guaranties shall be released except as provided in this Plan.  Guaranty Claims shall be deemed contingent as of the Effective Date and shall be deemed to be guarantees of the amended obligations of the respective Principal Obligors under the Plan.  The Holder of a Guaranty Claim in this Class shall not receive

76

1   any distribution on account of its Guaranty Claim; unless and until the Principal Obligor defaults

2   under the terms of this Plan (e.g., by failing to make a payment of interest and failing to timely cure

3   such default under the surviving terms of the applicable promissory note).  In that event, the Holder

4   of a Guaranty Claim shall be required to proceed, whether by judicial or non-judicial foreclosure,

5   against all real property securing the debt owed by the Principal Obligor to the Holder before

6   seeking payment on account of its Guaranty Claim.  If the Holder forecloses on such real property

7   collateral, the amount of the Holder's Guaranty Claim shall be equal to (1) the amount owed by the

8   Principal Obligor at the time of default, less the price for which the real property collateral was sold

9   at the foreclosure sale (including by credit bid) or the fair market value of such property at the time

10  of the foreclosure sale, whichever is greater.  If the price for which the real property collateral was

11  sold at the foreclosure sale is greater than the amount owed by the Principal Obligor as of the date

12  of default, the amount of the Holder's Guaranty Claim shall be zero and any excess amounts will

13  be distributed to the relevant principal obligor in accordance with applicable law.

14          If the price for which the real property collateral was sold at the foreclosure sale is less than

15  the amount owed by the Principal Obligor as of the date of default, the Holder's resulting Guaranty

16  General Unsecured Claim shall be deemed non-contingent.  Within thirty (30) days after the

17  foreclosure sale, the Holder shall file a motion with the Bankruptcy Court on regular notice to the

18  Debtors seeking entry of an order determining the amount of the Holder's Guaranty Claim as

19  provided herein.  Upon the entry of that order, the Holder's Guaranty Claim shall receive the same

20  treatment as afforded to Claims (i.e., the Holder shall receive deferred cash payments equal to

21  100% of the Allowed amount of the Claim with interest, payable in equal quarterly installments

22  commencing on the first Quarterly Distribution Date and thereafter on each succeeding Quarterly

23  Distribution Date).  In the event that the order is entered after the first Quarterly Distribution Date,

24  the initial payment shall be due and payable on the later of the next Quarterly Distribution Date or

25  thirty (30) days after the date on which the order is entered.

26

27

28

359261.05 [XP]     25195

**8.      Common Treatment for Guaranty Claims held by Settling Guaranty Creditors**

The foregoing treatment shall not apply with regard to guaranties executed by MMPI or other Debtors for the benefit of Cathay, FNBN, Imperial, PCB, or other Holders of Guaranty Claims where, pursuant to settlements approved by the Bankruptcy Court, the guaranties have been confirmed or otherwise continued.  With respect to those guaranties, the treatment of the Holder's Guaranty Claim shall be consistent in all regards with the Bankruptcy Court-approved settlement.

**9.      Common Intercompany Claim Treatment**

The Holders shall retain such Claims and all rights, interests, and obligations related thereto but, notwithstanding, the Holders consent to the treatment afforded and distributions to be made under this Plan to Holders in each class of Allowed Claims.

**10.     Common Interest Treatment**

The Holders of Interests in this Class shall retain their Interests in the Debtor.

**B.      SUMMARY OF CLASSIFIED CLAIMS AND TREATMENT**

The categories of Claims and Interests listed in the chart below classify Claims (except for Administrative Claims and Priority Tax Claims) and Interests for all purposes, including voting, confirmation and distribution pursuant to this Plan.  The amounts listed for each Class in the chart below represent the Debtors' estimate of the amount of the Allowable Claims asserted in each Class and contain a brief summary description of the treatment of each class.  This is a summary for information only and does not specify the full terms of the treatment for each class.  Such full description is set forth in Article III of the Plan.  The terms of the Plan control over the summary descriptions set forth herein.  In addition, the Debtors expressly reserve all of their rights to object to the amount, character and enforceability of any Claim, whether or not listed in the chart below.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| **1.** | **Meruelo Maddux Properties, Inc.[6]** | | |
| 1A | Secured Claim of Oliver, Sandifer - $436,901 | Impaired. | Paid in full. The Holder shall receive deferred cash payments equal to 100% of the Allowed amount of the Claim, payable 30 days after Effective Date.  The Holder shall retain its attorneys' lien on the recoveries in the underlying litigation to which this Holder's lien relates. |
| 1B | Priority Benefits Claims - $46,362 | Unimpaired. | Paid in full.  50% of claim paid on Effective Date and 50% of claim plus interest at 4% per annum paid on 1st anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 1C-1 | General Unsecured Claims – Convenience Class - $429 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date,  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 1C-2A | Unsecured Guaranty Claims - $102,245,154 | Impaired. | Guaranties deemed contingent as of Effective Date and deemed to guaranty amended obligation of Principal Obligor under Plan. Guarantor enjoined from enforcement until default by Principal Obligor on payment obligations under Plan are uncured for 15 days.  Guarantor must  proceed against real property collateral first. Guaranty claim reduced by payments received on principal obligation and the purchase price received at foreclosure sale for collateral or fair market |

---

[6]      The Debtors are listed in the order of the Service Level Debtors and then the Property Level Debtors.

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | value, whichever is greater.  See Common Unsecured Guaranty Claim Treatment and Plan for full description of treatment. |
| 1C-2B | Unsecured Guaranty Claims – Settling Guaranty Creditors - $92,453,017 | Impaired. | The treatment of the Holder's Guaranty Claim shall be consistent in all regards with the Bankruptcy Court-approved settlement. |
| 1C-3 | General Unsecured Claims - $7,093,358 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed; except that FNBN's unsecured claim will be paid pursuant to the Settlement with FNBN.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 1E | Equity Interests | Impaired. | Holders retain their Interests.  In the alternative Holders may elect to have their Interests redeemed for a cash payment of $0.25 per share of Existing MMPI Common Stock payable on or as soon as practicable after the Effective Date. |
| **2.** | **Meruelo Maddux Properties L.P.** | | |
| 2C-1 | General Unsecured Claims – Convenience Class - $2,422 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 2C-2 | Unsecured Guaranty Claims - $41,001,926 | Impaired. | Guaranties deemed contingent as of Effective Date and deemed to guaranty amended obligation of Principal Obligor under Plan. Guarantor enjoined from enforcement until default by Principal Obligor on payment obligations under Plan are uncured for 15 days.  Guarantor must proceed against real property collateral first. Guaranty claim reduced by payments received on principal obligation and the purchase price received at foreclosure sale for collateral or fair market value, whichever is greater.  See Common Unsecured Guaranty Claim Treatment and Plan for |

80

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | full description of treatment. |
| 2C-3 | General Unsecured Claims - $668,935[7] | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 2D | Intercompany Claims - $452,881,601 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 2E | Equity Interests of MMPI (99.6%) and Holders of LTIP Units (4%) | Impaired. | LTIP units cancelled. MMPLP merged into MMPI |
| **3.** | **MMP Ventures LLC** | | |
| 3C | General Unsecured Claims - $629 | Unimpaired. | Paid in full at Effective Date. |
| 3D | Intercompany Claims - $2,509 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 3E | Equity Interests of MMPLP (100%) | Unimpaired. | Holders retain their interests. |
| **4.** | **Meruelo Maddux Construction, Inc.** | | |
| 4C-1 | General Unsecured Claims – Convenience Class - $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 4C-2 | General Unsecured Claims - $629 | Unimpaired. | Paid in full at Effective Date. |
| 4D | Intercompany Claims - $10,588 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 4E | Equity Interests of MMPLP (100%) | Unimpaired. | Holders retain their interests. |
| **5.** | **Meruelo Maddux Management LLC** | | |
| 5B | Priority Benefits Claims - $151,247 | Unimpaired. | Paid in full.  50% paid on Effective date and 50% plus interest at 4% paid on 1st |

---

[7]      Berkadia has filed alleged and duplicative unsecured claims for "money had and received, money lent, unjust enrichment, and interference with contract" for $1,443,668.40 (the "Berkadia Unsecured Claim") against 53 of the 54 Debtors.  The Debtors have entered into a settlement with Berkadia and as part of the Settlement, the Berkadia Unsecured Claims will be withdrawn. In the table below, the classes of "General Unsecured Claims" for the 53 Debtors separately list the amount of general unsecured claims asserted by claimants, exclusive of the disputed Berkadia Unsecured Claim.

81

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 5C – 1 | General Unsecured Claims – Convenience Class - $24 | Unimpaired. | Claims of $500 or Less Paid in Full on Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 5C - 2 | General Unsecured Claims - $629 | Unimpaired. | Paid in full at Effective Date. |
| 5D | Intercompany Claims - $4,296,137 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 5E | Equity Interests of MMPLP (99%) and MMCI (4%) | Unimpaired. | Holders retain their interests. |
| **6.** | **Meruelo Maddux – 555 Central Avenue LLC** | | |
| 6C | General Unsecured Claims - $10,079 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 6D | Intercompany Claims - $1,999,388 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 6E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **7.** | **Merco Group – Overland Terminal LLC** | | |
| 7C | General Unsecured Claims - $132,726 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 7D | Intercompany Claims - $1,093,202 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 7E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **8.** | **National Cold Storage LLC** | | |

82

359261.05 [XP]    25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 8C-1 | General Unsecured Claims – Convenience Class - $212 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 8C-2 | General Unsecured Claims – $4,522 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 8E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **9. Wall Street Market LLC** | | | |
| 9C-1 | General Unsecured Claims – Convenience Class - $1,118 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 9C-2 | General Unsecured Claims - $2,029 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 9D | Intercompany Claims - $3,536,086 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 9E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests |
| **10. Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina, LLC** | | | |
| 10A | Los Angeles County Secured Tax Claim - $127,403 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 10C-1 | General Unsecured Claims – Convenience Class - $525 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 10C-2 | General Unsecured Claims - $15,334 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |

83

359261.05 [XP]   25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 10D | Intercompany Claims - $6,630,774 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 10E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **11.     Meruelo Maddux – 230 W. Avenue 26 LLC** | | | |
| 11A | Los Angeles County Secured Tax Claim - $175,442 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 11C-1 | Unsecured Claims – Tenant Security Deposits - $24,610 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 11C-2 | General Unsecured Claims – Convenience Class - $999 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 11C-3 | General Unsecured Claims - $3,929 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 11D | Intercompany Claims - $6,414,500 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 11E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **12.     Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | | |
| 12A | Los Angeles County Secured Tax Claim - $120,124 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 12C-1 | Unsecured Claims – Tenant Security Deposits - $8,025 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 12C-2 | General Unsecured Claims – Convenience class - $597 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 12C-3 | General Unsecured Claims - $18,858 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim |

84

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Treatment and Plan for full description of treatment. |
| 12D | Intercompany Claims - $3,569,603 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 12E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **13.** | **Meruelo Maddux – 817-825 S. Hill Street LLC** | | |
| 13A | Los Angeles County Secured Tax Claim – $379,123 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 13C-1 | General Unsecured Claims – Convenience Class - $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 13C-2 | General Unsecured Claims - $1,560 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 13D | Intercompany Claims - $16,377,573 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 13E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **14.** | **Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| 14A | Los Angeles County Secured Tax Claim - $179,907 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 14C-1 | Unsecured Claims – Tenant Security Deposits - $3,100 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 14C-2 | General Unsecured Claims – Convenience Class - $705 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 14C-3 | General Unsecured Claims - $10,241 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |

85

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 14D | Intercompany Claims - $6,804,902 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 14E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **15.** | **Meruelo Maddux Properties – 1060 N. Vignes LLC** | | |
| 15A | Los Angeles County Secured Tax Claim - $123,542 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 15C-1 | General Unsecured Claims – Convenience Class - $597 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 15C-2 | General Unsecured Claims - $71,021 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 15D | Intercompany Claims - $6,549,824 | Unimpaired | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 15E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **16.** | **Meruelo Maddux – 2415 E. Washington Boulevard LLC** | | |
| 16A | Los Angeles County Secured Tax Claim - $55,606 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 16C-1 | General Unsecured Claims – Convenience Class - $175 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 16C-2 | General Unsecured Claims - $4,091 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 16D | Intercompany Claims - $2,220,879 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 16E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

359261.05 [XP]   25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| **17.** | **Meruelo Maddux – 5500 Flotilla Street LLC** | | |
| 17C | General Unsecured Claims - $629 | Unimpaired. | Paid in full at Effective Date. |
| 17D | Intercompany Claims - $611,663 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 17E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **18.** | **Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |
| 18A | Los Angeles County Secured Tax Claim - $226,806 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 18C-1 | General Unsecured Claims – Convenience Class - $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 18C-2 | General Unsecured Claims - $2,629 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 18D | Intercompany Claims - $8,997,401 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 18E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **19.** | **Merco Group – 146 E. Front Street LLC** | | |
| 19C-1 | General Unsecured Claims – Convenience Class - $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 19C-2 | General Unsecured Claims - $629 | Unimpaired. | Paid in full on the Effective Date |
| 19D | Intercompany Claims - $2,243,787 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 19E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **20.** | **Merco Group – 801 E. 7th Street LLC** | | |
| 20A | Los Angeles County Secured Tax Claim - $15,205 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full |

87

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | description of treatment. |
| 20C | General Unsecured Claims - $2,629 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 20D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 20E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **21.** | **Merco Group – 1211 E. Washington Boulevard LLC** | | |
| 21A-1 | Los Angeles County Secured Tax Claim - $263,793 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 21A-2 | RoofCorp of CA, Inc. - $37,500 | Impaired. | Paid in full with 50% of claim paid on Effective Date and 50% of Claim, plus interest from the Effective Date at 3.5% on the 1st anniversary of the Effective Date. |
| 21C-1 | Unsecured Claims – Tenant Security Deposits - $42,357 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 21C-2 | General Unsecured Claims – Convenience Class - $260 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 21C-3 | General Unsecured Claims - $33,786 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 21D | Intercompany Claims - $9,122,302 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 21E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **22.** | **Merco Group – 1308 S. Orchard LLC** | | |
| 22A | Los Angeles County Secured Tax Claim - $39,500 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 22C | General Unsecured Claims - $4,299 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 22D | Intercompany Claims - $1,346,512 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 22E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **23.** | **Merco Group – 2040 Camfield Avenue LLC** | | |
| 23C | General Unsecured Claims - $629 | Unimpaired. | Paid in full on the Effective Date. |
| 23D | Intercompany Claims - $5,163,790 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 23E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **24.** | **Merco Group – Ceres Street Produce LLC** | | |
| 24A | Los Angeles County Secured Tax Claim - $70,090 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 24C-1 | General Unsecured Claims – Convenience Class - $121 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 24C-2 | General Unsecured Claims - $2,036 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 24D | Intercompany Claims - $2,772,264 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 24E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **25.** | **Meruelo Baldwin Park LLC** | | |
| 25A | Los Angeles County Secured Tax Claim - $216,638 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |

89

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 25C-1 | Unsecured Claims – Tenant Security Deposits - $3,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 25C-2 | General Unsecured Claims – Convenience Class - $213 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 25C-3 | General Unsecured Claims - $4,059 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 25D | Intercompany Claims - $8,847,699 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 25E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **26.** | **Santa Fe & Washington Market LLC** | | |
| 26A | Los Angeles County Secured Tax Claim - $39,305 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 26C-1 | Unsecured Claims – Tenant Security Deposits - $27,900 | Unimpaired. | Creditors legal, equitable and contractual rights are Reinstated. |
| 26C-2 | General Unsecured Claims – Convenience Class - $251 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 26C-3 | General Unsecured Claims - $4,568 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 26D | Intercompany Claims - $4,879,642 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 26E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **27.** | **Merco Group – 5707 S. Alameda LLC** | | |
| 27A | Los Angeles County Secured Tax Claim - $120,619 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | description of treatment. |
| 27C-1 | Unsecured Claims – Tenant Security Deposits - $5,794 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 27C-2 | General Unsecured Claims – Convenience Class - $718 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 27C-3 | General Unsecured Claims - $16,650 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 27D | Intercompany Claims - $4,859,886 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 27E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **28.      Meruelo Maddux – 3rd and Omar Street LLC** | | | |
| 28A-1 | Los Angeles County Secured Tax Claim - $137,523 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 28A-2 | Legendary Secured Claim - $2,559,658 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan. Creditor retains its Lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 28C-1 | Unsecured Claims – Tenant Security Deposits - $2,600 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 28C-2 | General Unsecured Claims – Convenience Class - $954 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 28C-3 | General Unsecured Claims - $2,749 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective |

359261.05 [XP]    25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 28D | Intercompany Claims - $3,416,741 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 28E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **29.** | **Meruelo Maddux – 336 W. 11th Street LLC** | | |
| 29A-1 | Los Angeles County Secured Tax Claim - $217,986 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 29A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligations of 620 Gladys Avenue, LLC  (see Class 46A-2 below). | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan.  Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 29A-3 | Grand Avenue Lofts, HOA Secured Claim - $270,000 | Impaired | Claim is disputed.  To the extent allowed, Creditor receives Common Secured Lender Treatment except that the Holder shall not be required to enter into the Loan Modification Agreement, but the agreements or instruments between the Holder and the Debtor shall be deemed restructured and amended to provide that the periods within which the Debtor is to perform obligations under such agreements shall be extended to the Maturity Date and the period for accrual of damages or the exercise of rights and remedies against the Debtor, including liquidated damages and reversion rights, are tolled through the Maturity Date. |
| 29A-4 | Grand Avenue Lofts, LLC / | Impaired. | Same as 29A-3 immediately |

359261.05 [XP]    25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | CIM Urban RE Fund GP II, LLC Secured Claim – 0 | | above. |
| 29C-1 | General Unsecured Claims - Convenience Class  $400 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 29C-2 | General Unsecured Claims - $43,834 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 29D | Intercompany Claims - $10,554,921 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 29E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **30.       Meruelo Maddux – 420 Boyd Street LLC** | | | |
| 30A-1 | Los Angeles County Secured Tax Claim - $298,732 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 30A-2 | Legendary Secured Claim - $5,950,000 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan.  Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 30C-1 | Unsecured Claims – Tenant Security Deposits - $21,463 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 30C-2 | General Unsecured Claims – Convenience Class - $1,799 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 30C-3 | General Unsecured Claims - $31,272 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. |

359261.05 [XP]    25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 30D | Intercompany Claims - $2,607,940 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 30E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **31.** | **Meruelo Maddux – 500 Mateo Street LLC** | | |
| 31C-1 | General Unsecured Claims - Convenience Class $255 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 31C-2 | General Unsecured Claims - $1,634 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 31D | Intercompany Claims - $1,968,955 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 31E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **32.** | **Meruelo Maddux Properties – 760 S. Hill Street LLC** | | |
| 32A-1 | Los Angeles County Secured Tax Claim - $281,044 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 32A-2 | Bank of America Secured Claim - $28,108,094 | Impaired. | Creditor receives monthly payments of interest at the "BBA LIBOR Rate" as defined in the Holder's Loan Documents on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment, which is modified as to interest rate as provided above and as provided in the Plan and summarized below.  Debtor shall have a one-time right to sell the BofA |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Collateral re MMP 760 S. Hill Street (excepting the funds held on deposit which are part of such collateral) to a third party on the terms provided in the Plan without triggering an acceleration of the debt or a breach or default under Holder's Loan Documents and without triggering any due on sale clause in the Holder's Loan Documents. |
| 32B | Priority Benefits Claims - $14,223 | Unimpaired. | Paid in full. 50% of claim paid on Effective Date and 50% of claim plus interest at 4.0% per annum paid on 1st anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 32C-1 | Unsecured Claims – Tenant Security Deposits $39,061 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 32C-2 | General Unsecured Claims – Convenience Class - $2,186 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 32C-3 | General Unsecured Claims - $473,167 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 32D | Intercompany Claims - $25,543,339 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 32E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **33.     788 S. Alameda LLC** | | | |
| 33A-1 | Los Angeles County Secured Tax Claim - $104,514 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |

95

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|-------|----------------------|----------------------|-----------|
| 33A-2 | California Bank & Trust Secured Claim - $7,153,799 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 33B | Priority Benefits Claims - $1,382 | Unimpaired. | Paid in full.  50% of claim paid on Effective Date and 50% of claim plus interest at 4% per annum paid on 1st anniversary of Effective Date.  To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 33C-1 | Unsecured Claims – Tenant Security Deposits - $85,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 33C-2 | General Unsecured Claims – Convenience Class - $1,503 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 33C-3 | General Unsecured Claims - $65,876 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 33D | Intercompany Claims - $1,485,597 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 33E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **34.        905 8th Street LLC** | | | |
| 34A-1 | Los Angeles County Secured Tax Claim - $95,421 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with |

96

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | County. See Plan for full description of treatment. |
| 34A-2 | The Stanford Group LP Secured Claim - $1,950,000 | Impaired. | Claim paid pursuant to settlement with Creditor. See Section III.C.34 of Plan for full description of the treatment. |
| 34C-1 | Unsecured Claims – Tenant Security Deposits - $3,525 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 34C-2 | General Unsecured Claims - Convenience Class $300 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 34C-3 | General Unsecured Claims - $13,525 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 34D | Intercompany Claims - $2,814,172 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 34E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **35.** | **Meruelo Maddux – 915-949 S. Hill Street LLC** | | |
| 35A-1 | Los Angeles County Secured Tax Claim - $338,027 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 35A-2 | Imperial Capital Bank Secured Claim - $9,007,827 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.35.b of Plan for full description of treatment. |
| 35C-1 | General Unsecured Claims – Convenience Class - $674 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 35C-2 | General Unsecured Claims - $2,629 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 35C-3 | Unsecured Claims – Tenant Security Deposits - $30,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |

97

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 35D | Intercompany Claims - $17,716,678 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 35E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **36.** | **Alameda Produce Market LLC** | | |
| 36A-1-a | Los Angeles County Secured Tax Claim re Alameda Produce Market Encumbered Real Property - $462,572 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 36A-1-b | Los Angeles County Secured Tax Claim re Alameda Produce Market Unencumbered Real Property - $39,199 | Impaired. | Same as 36A-1-a immediately above. |
| 36A-2 | Cathay Bank Secured Claim - $48,815,711 | Impaired. | Claim paid pursuant to settlement with creditor.  See Section III.C.36 of the Plan for full description of treatment. |
| 36A-3 | Cathay Bank Secured Claim - $9,848,944 | Impaired. | Same as section 36A-2 immediately above. |
| 36A-4 | Secured Claim of Oliver, Sandifer - $436,901 | Impaired. | Paid in full. The Holder shall receive deferred cash payments equal to 100% of the Allowed amount of the Claim, payable 30 days after Effective Date.  The Holder shall retain its attorneys' lien on the recoveries in the underlying litigation to which this Holder's lien relates. |
| 36B | Priority Benefits Claims - $23,169 | Unimpaired. | Paid in full.  50% of claim paid on Effective Date and 50% of claim plus interest at 4% per annum paid on 1st anniversary of Effective Date.  To the extent such claim includes accrued vacation or sick pay such vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 36C-1 | Unsecured Claims – Tenant Security Deposits - $301,019 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 36C-2 | General Unsecured Claims – Convenience Class - | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See |

98

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | $1,650 | | Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 36C-3 | General Unsecured Claims - $696,776 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 36E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **37.       Merco Group – 1500 Griffith Avenue LLC** | | | |
| 37A-1-a | Los Angeles County Secured Tax Claim re 1500 Griffith - $120,576 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 37A-1-b | Los Angeles County Secured Tax Claim re 1510 Griffith Avenue - $86,516 | Impaired. | Same as 37A-1-a immediately above. |
| 37A-2 | Legendary Secured Claim - $6,396,500 – joint and several obligation with 4th Street Center, LLC, and also secured by the 4th Street Center Real Property (see Class 44A-2 below). | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan.  Creditor retains its lien collateral.  See Common Secured Lender Treatment and Plan for full description of treatment. |
| 37A-3 | Murakami Secured Claim - $2,945,000 | Impaired. | Claim paid pursuant to Settlement with Creditor.  See Section III.C.37.c of Plan for full description of treatment. |
| 37C-1 | Unsecured Claims – Tenant Security Deposits - $58,830 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 37C-2 | General Unsecured Claims - $2,429 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 37D | Intercompany Claims - $5,508,367 | Unimpaired. | Creditors retain their claims and all rights, interests and |

359261.05 [XP]    25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | obligations related thereto. |
| 37E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **38.** | **Meruelo Maddux Properties – 1919 Vineburn Street LLC** | | |
| 38A-1 | Los Angeles County Secured Tax Claim - $151,536 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 38A-2 | Imperial Capital Bank Secured Claim - $5,468,543 | Impaired. | Claim paid pursuant to Settlement with Creditor.  See Section III.C.38.b of Plan for full description of treatment. |
| 38C-1 | Unsecured Claims – Tenant Security Deposits - $42,210 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 38C-2 | General Unsecured Claims - Convenience Class $275 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 38C-3 | General Unsecured Claims - $2,629 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 38D | Intercompany Claims - $3,035,648 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 38E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **39.** | **Meruelo Maddux Properties – 2131 Humboldt Street LLC** | | |
| 39A-1-a | Los Angeles County Secured Tax Claim Against 2131 Humboldt Encumbered Real Property - $263,168 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 39A-1-b | Los Angeles County Secured Tax Claim Against 2131 Humboldt Unencumbered Real Property - $145,353 | Impaired. | Same as 39A-1-b immediately above. |
| 39A-2 | Chamlian Secured Claim - $7,000,000 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if |

100

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 39C-1 | Unsecured Claims – Tenant Security Deposits - $10,500 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 39C-2 | General Unsecured Claims – Convenience Class $485 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 39C-3 | General Unsecured Claims - $3,608 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 39D | Intercompany Claims - $13,680,208 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 39E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **40.    Merco Group – 2529 Santa Fe Avenue LLC** | | | |
| 40A-1 | Los Angeles County Secured Tax Claim - $138,336 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 40A-2 | 1248 S. Figueroa Secured Claim - $3,134,825 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan.  Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 40C-1 | Unsecured Claims – Tenant Security Deposits - $15,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 40C-2 | General Unsecured Claims – Convenience Class - $718 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 40C-3 | General Unsecured Claims - $25,026 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 40D | Intercompany Claims - $3,703,446 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 40E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **41.    2640 Washington Boulevard LLC** | | | |
| 41A-1 | Los Angeles County Secured Tax Claim - $231,852 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 41A-2 | East West as successor to UCB Secured Claim - $6,066,073 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 41C-1 | Unsecured Claims – Tenant Security Deposits - $52,150 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 41C-2 | General Unsecured Claims – Convenience Class - $1,262 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 41C-3 | General Unsecured Claims - $23,510 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |

102

| | CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|---|
| | 41D | Intercompany Claims - $3,920,800 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| | 41E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| | **42.** | **Meruelo Maddux Properties – 2951 Lenwood Road LLC** | | |
| | 42A-1 | FNBN Secured Claim - $8,983,643 | Impaired. | Claim paid pursuant to settlement with creditor.  See Section III.C.42 of the Plan for full description of treatment. |
| | 42C-1 | General Unsecured Claims - Convenience Class $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| | 42C-2 | General Unsecured Claims - $6,281,750 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed; provided, however, that the unsecured claim of FNBN will be paid pursuant to the terms of the Settlement between FNBN and MMP 2951 Lenwood Road.  See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| | 42D | Intercompany Claims - $6,179,424 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| | 42E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| | **43.** | **Merco Group – 3185 E. Washington Boulevard LLC** | | |
| | 43A-1-a | Los Angeles County Secured Tax Claim - Encumbered - $209,776 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| | 43-A-1-b | Los Angeles County Secured Tax Claim - Unencumbered - $1,063 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| | 43A-2 | Chinatrust Secured Claim - $9,541,565 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan |

103

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 43C-1 | General Unsecured Claims – Convenience Class - $63 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 43C-2 | General Unsecured Claims - $1,679 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 43C-3 | Unsecured Claims – Tenant Security Deposits - $250,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 43D | Intercompany Claims - $1,938,813 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 43E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **44.     Merco Group – 4th Street Center LLC** | | | |
| 44A-1 | Los Angeles County Secured Tax Claim - $106,132 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 44A-2 | Legendary Secured Claim - joint and several obligation with 1500 Griffith Avenue, and also secured by 1500 Griffith Avenue (see Class 37A-2 above). | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 44C-1 | General Unsecured Claims – Convenience Class - $407 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 44C-2 | General Unsecured Claims - $17,629 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 44C-3 | Unsecured Claims – Tenant Security Deposits - $4,500 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 44D | Intercompany Claims - $6,840,375 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 44E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **45. Merco Group – 425 W. 11th Street LLC** | | | |
| 45A-1 | Los Angeles County Secured Tax Claim - $363,625 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 45A-2 | Legendary Secured Claims - $5,340,000 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Lien on Collateral is extinguished. Creditor receives lien on real property of MMP 1060 N. Vignes. See Plan for full description of treatment. |
| 45C-1 | General Unsecured Claims – Convenience Class - $835 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 45C-2 | General Unsecured Claims - $4,243 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 45D | Intercompany Claims - $11,737,757 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |

105

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 45E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **46.** | **Merco Group – 620 Gladys Avenue LLC** | | |
| 46A-1-a | Los Angeles County Secured Tax Claim re 620 S. Gladys Avenue Encumbered Real Property - $340,820 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 46A-1-b | Los Angeles County Secured Tax Claim re 620 S. Gladys Avenue Unencumbered Real Property - $121,492 | Impaired. | Same as 46A-1-a immediately above. |
| 46A-2 | Legendary Secured Claim re 620 S. Gladys Avenue - $5,380,688 which is also secured by the MM 336 W. 11th Street Real Property (see Class 29A-4 above). | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 46C-1 | Unsecured Claims – Tenant Security Deposits - $22,682 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 46C-2 | General Unsecured Claims - $1,478 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 46D | Intercompany Claims - $9,788,629 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 46E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **47.** | **Merco Group – 2001-2021 W. Mission Boulevard LLC** | | |
| 47A-1 | Los Angeles County Secured Tax Claim - $112,819 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 47A-2 | PNL Pomona LP Secured Claim – $8,462,940 | Impaired. | Creditor receives monthly payments of interest at 5% per |

359261.05 [XP]    25195

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 47C-1 | General Unsecured Claims – Convenience Class - $899 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 47C-2 | General Unsecured Claims - $5,379 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 47D | Intercompany Claims - $12,948,409 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 47E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **48.    Merco Group – Little J LLC** | | | |
| 48A-1-a | Los Angeles County Secured Tax Claim re 1119 S. Olive Street - $57,560 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 48A-1-b | Los Angeles County Secured Tax Claim re 1124 S. Olive Street - $68,960 | Impaired. | Same as 48A-1-a immediately above. |
| 48A-2 | Legendary Secured Claim - a pledge of the Debtor's Real Property to secure the obligation for payment under a loan made to Merco Group (see Class 50A-2 below) which is also secured by the Sky-Arc Real Property (see Class 50A-2 below). | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full |

107

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | description of treatment. |
| 48C-1 | General Unsecured Claims - Convenience Class $400 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 48C-2 | General Unsecured Claims - $2,229 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 48C-3 | Unsecured Claims – Tenant Security Deposits - $7,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 48D | Intercompany Claims - $8,299,295 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 48E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **49.        Merco Group – Southpark LLC** | | | |
| 49A-1 | Los Angeles County Secured Tax Claim - $625,953 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 49A-2 | Bank of America Secured Claim - $20,000,000 | Impaired. | Creditor receives monthly payments of interest at the "Base Rate as defined in Holder's Loan Documents on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 49C-1 | General Unsecured Claims – Convenience Class - $777 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 49C-2 | General Unsecured Claims - $1,038,368 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim |

108

| Class | Description of Class | Impaired / Unimpaired | Treatment |
|---|---|---|---|
| | | | Treatment and Plan for full description of treatment. |
| 49C-3 | Unsecured Claims – Tenant Security Deposits - $31,000 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 49D | Intercompany Claims - $37,919,096 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 49E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **50.** | **Merco Group LLC** | | |
| 50A-1 | Los Angeles County Secured Tax Claim $415,617 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 50A-2 | Legendary Secured Claim re Sky-Arc Real Property - $15,000,000 which is secured by the Little J Real Property (see Class 48A-2 above) | Impaired. | Depending upon outcome of any adversary proceeding regarding the validity and extent of the Creditor's lien on the Sky Arc Real Property, the Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment.<br><br>To the extent the Debtor sells Parcel D of the Sky-Arc Real Property, the Creditor's alleged lien will be released pursuant to the Plan on that Parcel and a pro-rata share of the purchase price will be segregated with the Creditor's lien to attach to such proceeds to the same extent and with the same validity and priority as such Liens had on Parcel D immediately prior to the sale, pending the outcome of any adversary proceeding. |
| 50A-3 | Legendary Secured Claim re Sci-Arc Real Property - $10,108,209 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment.

To the extent the Debtor sells the collateral prior to the Effective Date, the Loan will be Reinstated and the Creditor will be paid in full with interest at the non-default contract rate. To the Extent the collateral is sold after the Effective Date, the Creditor's Lien shall be released and the allowed amount of the Creditor's Claim will be paid in full. |
| 50C-1 | General Unsecured Claims - Convenience Class $350 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 50C-2 | General Unsecured Claims - $629 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 50D | Intercompany Claims - $16,604,526 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 50E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **51.      Meruelo Farms LLC** | | | |
| 51A-1-a | Los Angeles County Secured Tax Claim re 815 E. Temple Street - $103,517 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 51A-1-b | Los Angeles County Secured Tax Claim re 729 E. Temple Street - $228,384 | Impaired. | Same as 51A-1-a immediately above. |

110

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| 51A-2 | Imperial Capital Bank Secured Claim - $6,978,349 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.51.c of Plan for full description of treatment. |
| 51A-3 | Pacific Commerce Secured Claim - $3,350,000 | Impaired. | Claim paid pursuant to Settlement with Creditor. See Section III.C.51.d of Plan for full description of treatment. |
| 51C-1 | General Unsecured Claims – Convenience Class - $92 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date. See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 51C-2 | General Unsecured Claims - $187,076 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 51D | Intercompany Claims - $9,138,503 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 51E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **52.       Meruelo Wall Street LLC** | | | |
| 52A-1 | Los Angeles County Secured Tax Claim - $465,046 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County. See Plan for full description of treatment. |
| 52A-2 | East West as successor to UCB Secured Claim - $20,850,859 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term. Loan documents are modified as provided in the Plan. Creditor retains its lien on its collateral. See Common Secured Lender Treatment and Plan for full description of treatment. |
| 52B | Priority Benefits Claims- $9,542 | Unimpaired | Paid in full. 50% of claim paid on Effective Date and 50% of claim plus interest at 4% per annum paid on 1st anniversary of Effective Date. To the extent such claim includes accrued vacation or sick pay such |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | vacation or sick pay shall not be disbursed in cash but the vacation or sick time shall be reinstated and the holder shall be authorized to use such vacation or sick time following the Effective Date. |
| 52C-1 | Unsecured Claims – Tenant Security Deposits - $297,650 | Unimpaired. | Creditors' legal, equitable and contractual rights are Reinstated. |
| 52C-2 | General Unsecured Claims – Convenience Class - $1,761 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 52C-3 | General Unsecured Claims - $20,873 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 52D | Intercompany Claims - $3,133,131 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 52E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **53.     Meruelo Maddux – Mission Boulevard LLC** | | | |
| 53A-1 | Los Angeles County Secured Tax Claim - $305,815 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 53A-2 | Kennedy Funding, Inc. Secured Claim - $8,800,000 | Impaired. | Creditor receives monthly payments of interest at 5% per annum on Allowed Amount of Claim for 5 years if Creditor accepts Plan or 7 years if Creditor rejects Plan with payment of principal by the end of the 5 or 7 year term.  Loan documents are modified as provided in the Plan. Creditor retaining its lien on its collateral.  See Common Secured Lender Treatment and Plan for full description of treatment. |
| 53C | General Unsecured Claims - $15,515 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. |

| CLASS | DESCRIPTION OF CLASS | IMPAIRED / UNIMPAIRED | TREATMENT |
|---|---|---|---|
| | | | See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 53D | Intercompany Claims - $20,054,067 | Unimpaired. | Creditors retain their claims and all rights, interests and obligations related thereto. |
| 53E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |
| **54.** | **Santa Fe Commerce Center, Inc.** | | |
| 54A-1 | Los Angeles County Secured Tax Claim - $109,152 | Impaired. | Creditor receives Common Secured Tax Claim Treatment pursuant to agreement with County.  See Plan for full description of treatment. |
| 54A-2 | Berkadia Secured Claim - $10,170,904 | Impaired. | Claim paid pursuant to settlement with creditor.  See Section II.C.54 of the Plan for full description of treatment. |
| 54A-3 | RoofCorp of CA, Inc. Secured Claim - $111,377 | Impaired. | Paid in full with 50% of claim paid on Effective Date and 50% of Claim, plus interest from the Effective Date at 3.5% on the 1st anniversary of the Effective Date. |
| 54C-1 | Unsecured Claims – Tenant Security Deposits -$79,667 | Unimpaired | Creditors' legal, equitable and contractual rights are Reinstated. |
| 54C-2 | General Unsecured Claims – Convenience Class - $755 | Unimpaired. | Claims of $500 or Less Paid in Full at Effective Date.  See Common Convenience Class Claim Treatment and Plan for full description of Treatment. |
| 54C-3 | General Unsecured Claims - $15,369 | Impaired. | Paid in full with interest from the Petition Date at 0.64% per annum, 30 days after Effective Date or date claim is allowed. See Common Unsecured Claim Treatment and Plan for full description of treatment. |
| 54E | Equity Interests of MMP Ventures (100%) | Unimpaired. | Holders retain their interests. |

## C.    TREATMENT FOR UNCLASSIFIED CLAIMS

### 1.    Unclassified Claims (Applicable to all of the Debtors)

Certain types of claims are not placed into voting classes; instead they are unclassified.

They are not considered impaired and they do not vote on the Plan because they are automatically

1  entitled to a specific treatment provided for them in the Bankruptcy Code.  As such, the Debtors

2  have not placed the following claims in a class.  The treatment of these claims is provided below.

3                              **a.**     ***Administrative Claims***

4          Administrative Claims are claims for costs or expenses of administering the Debtors'

5  Chapter 11 Cases which are allowed under Bankruptcy Code Section 507(a)(2).  The Bankruptcy

6  Code requires that all Administrative Claims be paid on the Effective Date of the Plan, unless a

7  particular claimant agrees to a different treatment.  The following chart lists the Debtors' Section

8  507(a)(2) Administrative Claims arising from the employment of professionals and the costs and

9  the statutory fees of the Bankruptcy Court and the Office of the United States Trustee and their

10  treatment under this Plan.

| NAME | ESTIMATED AMOUNT OWED[8] | TREATMENT |
|---|---|---|
| DANNING, GILL, DIAMOND & KOLLITZ, LLP – Reorganization Counsel to the Debtors | $516,800 | See below. |
| SULMEYERKUPETZ – Counsel to the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases of the MMPI Debtors | $158,400 | See below. |
| FTI CONSULTING – Financial Advisors to the MMPI Debtors | $161,000 | See below. |
| ERNST & YOUNG LLP – Independent Auditors and Tax Advisors to the MMPI Debtors | $121,000 | See below. |
| DLA PIPER – Special Counsel to the MMPI Debtors | $19,200 | See below. |
| LEWIS LANDAU | To Be Determined | See below. |
| KIBEL GREEN, INC. Financial Advisors to the Official Committee of Unsecured Creditors | $52,800 | See below. |

---

[8]       Stated amounts are estimates based on information available as of September 1, 2010.  Any requests must comply with applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and Local Bankruptcy Rules.

114

| NAME | ESTIMATED AMOUNT OWED[8] | TREATMENT |
|---|---|---|
| KIBEL GREEN, INC. Financial Advisors to the Official Equity Holders Committee | To Be Determined. | |
| RON ORR & PROFESSIONALS, INC.; RODIGER LAW OFFICE And JENNER & BLOCK, LLP - Co-Counsel to the Official Equity Holders Committee | To Be Determined | See below |
| Clerk's Office Fees | To Be Determined | Paid in full on the Effective Date |
| Office of the United States Trustee Fees | To Be Determined | Paid in full on the Effective Date |
| **TOTAL** | **$1,179,200** | |

### (1)    General

Subject to the bar date provisions herein and additional requirements for professionals and certain other entities set forth below, the surviving Reorganized Debtor shall pay to each Holder of an Allowed Administrative Claim, on account of its Administrative Claim and in full satisfaction thereof, Cash equal to the Allowed amount of such Administrative Claim on the Effective Date or as soon as practicable thereafter, unless the Holder agrees or shall have agreed to other treatment of such Claim.  Payment on an Administrative Claim which arose in the ordinary course of each Debtor's business, including Ordinary Course Professionals, will be made when such payment would have become due in the ordinary course of each Debtor's business or under the terms of the Claim in the absence of the Chapter 11 Cases.

### (2)    Payment of Statutory Fees

On or before the Effective Date, all fees payable pursuant to 28 U.S.C. § 1930, as determined by the Court at the hearing on Confirmation, shall be paid in Cash equal to the amount of such Administrative Claim.

### (3)    Bar Date for Administrative Claims

#### (a)    General Provisions

Except as provided below for (i) non-tax liabilities incurred in the ordinary course of business by each Debtor and (ii) Postpetition Tax Claims, requests for payment of Administrative

1  Claims must be Filed and served on counsel for the Reorganized Debtors no later than forty-five

2  (45) days after the Effective Date, or such later date, if any, as the Court shall order upon

3  application made prior to the end of such 45-day period.  Holders of Administrative Claims

4  (including, without limitation, professionals requesting compensation or reimbursement of

5  expenses and the Holders of any Claims for federal, state or local taxes) that are required to File a

6  request for payment of such Claims and that do not File such requests by the applicable bar date

7  shall be forever barred from asserting such Claims against any of the Debtors or the Reorganized

8  Debtors or any of their respective properties.

9              *(b)*      ***Professionals***

10         All professionals or other Persons requesting compensation or reimbursement of expenses

11  pursuant to any of Sections 327, 328, 330, 331, 503(b) and 1103 of the Bankruptcy Code for

12  services rendered on or before the Effective Date (including, inter alia, any compensation requested

13  by any professional or any other Person for making a substantial contribution in the Reorganization

14  Case) shall File and serve on the Reorganized Debtor and the Creditors' Committee and the Equity

15  Committee an application for final allowance of compensation and reimbursement of expenses no

16  later than (i) forty-five (45) days after the Effective Date, or (ii) such later date as the Court shall

17  order upon application made prior to the end of such 45-day period.  Objections to applications of

18  professionals for compensation or reimbursement of expenses must be Filed and served on

19  Reorganized Debtors, the Creditors' Committee, the Equity Committee and the professionals to

20  whose application the objections are addressed on or before (i) fourteen days after such application

21  is Filed and served or (ii) such later date as the Court shall order or upon agreement between the

22  Reorganized Debtors and the affected professional.

23         Any professional fees and reimbursements of expenses incurred by the Reorganized Debtor

24  subsequent to the Effective Date may be paid by the Reorganized Debtor without application to or

25  Order of the Court.

26              *(c)*      ***Ordinary Course Liabilities***

27         Holders of Administrative Claims based on liabilities incurred post-petition in the ordinary

28  course of the Debtors' businesses, including Ordinary Course Professionals, (other than Claims of

359261.05 [XP]   25195

1  governmental units for taxes or Claims and/or penalties related to such taxes) shall not be required

2  to File any request for payment of such Claims.  Such Administrative Claims shall be assumed and

3  paid by such Reorganized Debtor pursuant to the terms and conditions of the particular transaction

4  giving rise to such Administrative Claim, without any further action by the Holders of such Claims.

5  <center>*(d)*     ***Tax Claims***</center>

6  All requests for payment of Postpetition Tax Claims, for which no bar date has otherwise

7  been previously established, must be Filed on or before the later of (i) forty-five (45) days

8  following the Effective Date; and (ii) 120 days following the filing of the tax return for such taxes

9  for such tax year or period with the applicable governmental unit.  Any Holder of any Postpetition

10  Tax Claim that is required to File a request for payment of such taxes and that does not File such a

11  Claim by the applicable bar date shall be forever barred from asserting any such Postpetition Tax

12  Claim against any of the Debtors or Reorganized Debtors, or any of their respective properties,

13  whether any such Postpetition Tax Claim is deemed to arise prior to, on, or subsequent to, the

14  Effective Date.  The Debtors are paying all Postpetition Tax Claims as they come due; however,

15  certain taxing authorities conduct audits which may result in a postpetition tax liability of which the

16  Debtors are currently unaware.

17  <center>**b.**     ***Priority Tax Claims***</center>

18  Priority Tax Claims are certain unsecured income, employment and other taxes described

19  by Bankruptcy Code Section 507(a)(8).  The following chart lists the Debtors' Section 507(a)(8)

20  priority Tax Claims and their treatment under this Plan.

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **1.          Meruelo Maddux Properties Inc.** | | |
| **Name –** IRS<br>**Type of tax –** Income | $304 | See below. |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **Name –** State of Delaware<br>**Type of tax –** Franchise | $125,138 | See below. |
| **2.          Meruelo Maddux Properties L.P.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |

<center>117</center>

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **4.**     **Meruelo Maddux Construction, Inc.** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **10.**     **Meruelo Maddux Properties – 1009 N. Citrus Avenue, Covina** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **11.**     **Meruelo Maddux – 230 W. Avenue 26 LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **12.**     **Meruelo Maddux Properties – 306-330 N. Avenue 21 LLC** | | |
| **Name –** City of Los Angeles<br>**Type of tax -** Business | $151,232 | See below. |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **13.**     **Meruelo Maddux – 817-825 S. Hill Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **14.**     **Meruelo Maddux – 1000 E. Cesar Chavez LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **15.**     **Meruelo Maddux Properties – 1060 N. Vignes LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **Name –** State Board of Equalization<br>**Type of tax –** Hazardous Substance Tax | $61,916 | See below. |
| **17.**     **Meruelo Maddux – 5500 Flotilla Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **18.**     **Meruelo Maddux Properties – 12385 San Fernando Road LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **20.**     **Merco Group – 801 E. 7th Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **21.**     **Merco Group – 1211 E. Washington Boulevard LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **28.**     **Meruelo Maddux – 3rd and Omar Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |

359261.05 [XP]   25195

| NAME | AMOUNT OWED | TREATMENT |
|---|---|---|
| **29.        Meruelo Maddux – 336 W. 11th Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **30.        Meruelo Maddux – 500 Mateo Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **31.        Meruelo Maddux Properties – 760 S. Hill Street LLC** | | |
| **Name** – City of Los Angeles<br>**Type of tax** – Business<br>**Name** – Franchise Tax Board<br>**Type of tax** – Income | $1,885<br><br>$0.00 | See below.<br><br>See below. |
| **35.        Meruelo Maddux – 915-949 S. Hill Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **39.        Meruelo Maddux Properties – 2131 Humboldt Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **42.        Meruelo Maddux Properties – 2951 Lenwood Road LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **52.        Meruelo Wall Street LLC** | | |
| **Name** – Franchise Tax Board<br>**Type of tax** – Income | $0.00 | See below. |
| **TOTAL[9]** | **$340,779** | |

        Except as otherwise agreed to by Reorganized Debtor and the applicable taxing agency, the Reorganized Debtors shall pay such Allowed Priority Tax Claim in full with interest at the rate of 5% per annum accrued from the Petition Date on the latest of  (a) 30 days after the Effective Date, and (b) with respect to a Disputed Priority Tax Claim, 30 days after the date an Order allowing such Priority Tax Claim becomes a Final Order.

---

[9]        The Franchise Tax Board has filed claims for franchise taxes for the 2009 year corporate tax fee of $800 in the Debtors' cases scheduled above.  Debtors' records indicate that all such taxes have been paid and, accordingly, the above schedule shows the amount of the such FTB claims to be zero but if it is determined that the FTB has Allowable Claims, the treatment is as provided above.

119

359261.05 [XP]    25195

# VI.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Plan constitutes a motion to assume or reject all executory contracts and nonresidential real property leases, except for those executory contracts and nonresidential real property leases that have already been assumed or rejected pursuant to an earlier Order of the Bankruptcy Court or that are the subject of a motion for such an Order pending as of the Confirmation Hearing.  Prior to the Confirmation Hearing, the Debtors will file a schedule of all real property leases and executory contracts to be rejected; any contract or lease not on that schedule shall be deemed assumed by the applicable Debtor as of the Effective Date.  Prior to the date of hearing on the Debtors' Disclosure Statement, the Debtors will file a schedule of all real property leases and executory contracts to be assumed listing the cure amount, if any, under such unexpired lease or executory contract.  Unless the non-Debtor party to any such executory contract or unexpired lease to be assumed files and serves on Debtors' counsel an objection to the cure amount specified on that schedule on or before the last date established by the Bankruptcy Court to file and serve objections to confirmation of the Plan, such cure amount shall be forever binding on such non-debtor party to said executory contract or unexpired lease.

Except as otherwise agreed by the parties to an executory contract or unexpired lease, each Reorganized Debtor will cure any and all undisputed defaults within thirty days of the Effective Date under any executory contract or unexpired lease assumed pursuant to the Plan and to which it is a party, in accordance with Section 365 of the Bankruptcy Code.  All disputed defaults that are required to be cured shall be cured either within thirty days of the entry of a Final Order determining the amount, if any, of such Debtor's or Reorganized Debtor's liability with respect thereto, or as may be agreed otherwise by the parties.  The Confirmation Order shall state that all pre-petition contracts and unexpired leases that are listed on the schedule described herein are deemed assumed under the Plan.

Any Claim for damages arising from the rejection of an executory contract or unexpired lease must be Filed and served on counsel for the Debtors within thirty (30) days after the order of the Bankruptcy Court approving such rejection becomes a Final Order or be (i) forever barred and

1  unenforceable against any Debtor, its Estate, the Reorganized Debtor and their respective property,

2  and (ii) barred from receiving any distribution under the Plan.  All Allowed Claims arising from the

3  rejection of executory contracts or unexpired leases shall be treated as a Class "C" General

4  Unsecured Claim against the respective Debtor who is a party to such executory contract or

5  unexpired lease.

6  Any election of rights by a lessee under Section 365(h)(1) of the Bankruptcy Code must be

7  Filed and served on counsel for the Debtors within thirty (30) days after the order of the

8  Bankruptcy Court approving such rejection becomes a Final Order or lessee shall be deemed to

9  have waived any and all of its rights under Section 365(h)(1).

10  **VII.**

11  **MEANS FOR IMPLEMENTATION OF THE PLAN**

12  **A.    OVERVIEW OF PLAN IMPLEMENTATION**

13  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for

14  the Reorganized Debtors to make payments pursuant to the Plan will be obtained from the

15  Reorganized Debtors' cash balances existing on the Effective Date, a $15 million loan to be made

16  to the Debtors on the Effective Date and from the operations of the Reorganized Debtors' business,

17  the sale or refinancing of assets of the Reorganized Debtors, as deemed necessary and appropriate

18  by the Reorganized Debtors and from any other lawful source.

19  **B.    VESTING OF ASSETS**

20  Except as otherwise provided in any provision of the Plan, on the Effective Date, all legal

21  and equitable interests of the Debtors in property of their respective estates shall be vested in such

22  Reorganized Debtors, free and clear of all Claims, Liens, encumbrances and Interests except to the

23  extent and only as is expressly provided for otherwise in Article III.C of the Plan.

24  **C.    DEBTORS' BUSINESS POST-CONFIRMATION**

25  As of the Effective Date, the Reorganized Debtors will continue to operate their businesses.

26  The Debtors future business model and operations will be consistent with its pre-existing business

27  model, adapted to meet the challenges of the new economic climate as more fully discussed below.

28  The Debtors have always operated as an integrated enterprise where the assets are managed to

359261.05 [XP]    25195

bring the greatest value to the enterprise as a whole.  The Company has been, and will continue to be, a self-managed, full-service real estate company focused on industrial, commercial and residential properties primarily in urban markets.  The Company has unique development and management expertise in the types of properties owned by the Debtors.  Its development projects often involve unique local entitlement, property assemblage and physical challenges.  The Company's operating projects frequently require management expertise not usually found in third-party asset or property management companies.  For these reasons, the Company believes that maintaining the current development and management functions of the Company are essential to providing the greatest value to the enterprise.

Two of the primary adaptations in the business model are being driven by constricted credit markets.  First, as credit underwriting has substantially tightened, the Company may be more inclined to dispose of development projects that present longer-term development challenges.  Nevertheless, the Company is likely to retain key strategic development projects, and will maintain a development pipeline that we believe will result in the greatest value to the company in the years to come.  Second, the Company is more likely to redeploy cash into projects that provide for shorter-term realization of investment, whether through the sale of the asset or through increases in operating revenue.  For instance, with respect to projects that were slated for substantial redevelopment, the Company may instead upgrade or rehabilitate existing improvements to provide for more immediate increases in rental income.

The Financial Projections err on the conservative side, and have not assumed any significant improvement in market conditions.  Among other things, the Projections show the earnings potential of the Debtors portfolio generally at current occupancy and rent levels.  Even given these conservative assumptions, the Financial Projections show that the Company will have the ability to meet its obligations under the Plan.  Any future development or leasing activities not forecast in the Financial Projections would be undertaken to bring accretive value to the Company over and above that shown in the Financial Projections.

359261.05 [XP]    25195

**D.    $15 MILLION LOAN TO FUND OPERATIONS AND PLAN PAYMENTS**

The Debtors have obtained a commitment from Watermarke Properties, Inc. (or its designated affiliate) for a $15 million secured loan (the"Loan") for the Debtors use in funding operations and payments under the Plan.  The Loan will be made as of the Effective Date and will bear interest at the rate of 5% per annum.  The Loan will be secured by a first priority deed of trust on two of the Debtors' real properties, (i) 1211 East Washington Boulevard, (ii) 230 W Ave. 26 and (iii) 129 W. College Street owned by related Debtor Chinatown.  The Loan has a maturity date of the fifth anniversary after the date of closing and funding (the "Loan Date").  The principal amount of the Loan is due at the maturity date.  Interest is payable quarterly; however, interest may be paid "in kind" by adding the interest to the principal if approved by the Lender.  The Loan is convertible into 30 million shares of MMPI Existing Common Stock (which amount shall be increased pro rata in the event interest is paid in kind) with the conversion right being exercisable between the fourth anniversary and the fifth anniversary of the Loan Date.  The Loan is subject to finalization of loan documentation.

**E.    DEBTORS' PERFORMANCE UNDER THE PLAN**

As part of their business plan, the Reorganized Debtors intend to sell some of their assets and refinance other assets during the term of the Plan in order to meet their operational needs and fund their payment obligations under the Plan.  The Debtors will determine which assets will be sold or refinanced based on a variety of factors, including the then existing needs of the Debtors, the condition of the real estate and credit markets and opportunities available to the Debtors.

The Debtors' Financial Projections which were prepared with the advice and assistance of the Debtors' financial advisor, show that the Debtors will monetize certain of their assets over the course of the seven year term of the Plan.  These Financial Projections provide a model for the sale of certain of their assets over the term of the Plan and are an example of a sales strategy which, when executed, would provide sufficient funding for the Debtors' obligations under the Plan.  The Financial Projections provide an example of the Debtors' possible sale strategy and do not represent a commitment by the Debtors to sell any given asset at any particular time.  The Debtors may sell a designated asset at a different time than as set forth in the Financial Projections or it may determine

359261.05 [XP]    25195

1   that an asset identified for sale should instead be retained by the Debtors.  As noted above, the

2   Debtors' decision regarding which assets will ultimately be sold will depend on a variety of factors,

3   including the condition of the real estate and credit markets and opportunities available to the

4   Debtors.

5          As stated in the Financial Projections, during the first twelve months of the Plan, the

6   Debtors will have sufficient cash (including cash on hand at the Effective Date and cash flow from

7   the operation of their properties) to fully fund their operations without any asset sales during that

8   time.  Nonetheless, the Debtors intend to sell assets during that time period consistent with their

9   business strategy.  The Debtors have entered into contracts with the Southern California Institute

10  for Architecture ("Sci-Arc") for the sale of the Sci-Arc Property and Parcel D of the Sky-Arc

11  Property from Merco Group, LLC.  Sci-Arc is the tenant of the Sci-Arc Property.  Provided that all

12  due diligence is completed and all contingencies and conditions are met or waived, this sale is

13  projected to close within the first year after the Effective Date.

14         In light of the Debtors' available liquid assets to fund operations, the Debtors project that

15  they will need to meet the following performance benchmarks through (i) the sale of assets, (ii)

16  refinancing of secured debt (iii) cost reductions or increased revenues from operations and

17  increased leasing activity including increased occupancy and rental rates; and (iv) other business

18  generation activities such as proceeds realized from development projects.  To the extent the

19  Debtors exceed a performance benchmark in any one year, this will necessarily reduce the amount

20  needed to meet the performance benchmark for the succeeding year.

| Year 1 | $0.00 |
|--------|-------|
| Year 2 | $ 18,273,000 |
| Year 3 | $ 19,301,000 |
| Year 4 | $ 19,064,000 |
| Year 5 | $ 15,894,000 |
| Year 6 | $ 15,411,000 |
| Year 7 | $ 15,646,000 |

124

359261.05 [XP]    25195

| | |
|---|---|

These amounts represent the projected operating and plan payment shortfalls in those years if there are no assets sales, cost reductions, proceeds from refinancing of debt, increases in operating revenue, including through increased occupancy or rental rates or proceeds generated from development or other activities.  These are the minimum amounts required to maintain positive cash balances and make the payments required under the Plan.

The Debtors believe that, even without significant market improvement, they will be able to satisfy their payment obligations under the Plan because they have sufficient equity in all of their assets in the aggregate to monetize assets and retain substantial value for the enterprise.  The Debtors have unencumbered assets which they value at $105.4 million. The value of the unencumbered assets alone almost equals the total cash needs for the entire 7 year term of the Plan. There is sufficient equity to enable the Debtors to sell assets if necessary to fully meet their financial obligations under the Plan.  Moreover, the Debtors have demonstrated their ability and willingness to sell property in order to meet their obligations.  As discussed at Section IV.C. above, the Debtors sold $110.6 million in property in 2008 and have closed sales of $8.1 million since the commencement of the Chapter 11 Cases.  In addition, in the bankruptcy case of related debtor MM 845 S. Flower, the Company closed a sale on April 26, 2010 of a residential tower in downtown Los Angeles for the net sale price of $109.5 million.  The Debtors have in the past and will continue in the future to seek strategic sales that will benefit the Company.  Based on the Debtors' business plan, the fact that they have substantial equity in their properties and their business expertise, they believe that they will be able to satisfy all payment obligations under the Plan.

**F.     CERTIFICATE OF INCORPORATION AND BYLAWS; CANCELLATION OF LTIP UNITS AND RELATED AGREEMENTS**

**1.     Cancellation of LTIP Units and Related Agreements**

At the Effective Date, other than the MMPI Existing Common Stock, (i) the LTIP Units; all warrants, options or other rights for the purchase or other acquisition from any Debtor of any MMPI Existing Common Stock or LTIP Units; all securities convertible into or redeemable or

359261.05 [XP]   25195

exchangeable for any MMPI Existing Common Stock or LTIP Units; and all warrants, rights or options for the purchase or other acquisition from any Debtor of any MMPI Existing Common Stock or LTIP Units or any such warrants, options, other rights or securities, and any interest or participation in any of the foregoing and any other ownership or profit interest or participation in MMPI or MMPLP (to the extent not held directly or indirectly by MMPI) will be cancelled and extinguished, and (ii) the obligations of, Claims against, and/or Interests in MMPI under, relating or pertaining to any agreements (including without limitation, registration rights agreements, merger, contribution and similar agreements and voting, shareholders and similar agreements), indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the MMPI Existing Common Stock and any other instrument or document evidencing or creating ownership interest in MMPI (including without limitation, provisions of the agreement of limited partnership of MMPLP and award agreements relating to the LTIP Units) will be released and discharged.

### 2.    Amended and Restated Certificate of Incorporation and Bylaws

On and after the Effective Date, pursuant to and by virtue of this Plan, the certificate of incorporation of the Reorganized MMPI will be amended to prohibit the issuance of non-voting equity securities.  Nothing herein shall prevent Reorganized MMPI from adopting a new name.

### G.    MERGER OF MMPLP AND MMPI

Upon the terms and subject to the conditions set forth in the agreement and plan of merger (the "Merger Agreement"), the form of which is attached hereto as Exhibit K, MMPLP shall be merged with and into MMPI one day after the Effective Date if not earlier accomplished (the "Merger").  Following the Merger, the separate corporate existence of MMPLP shall cease, and MMPI shall continue as the surviving company and shall succeed to and assume all the rights and obligations of MMPLP.

If not earlier accomplished, as promptly as practicable on or after the Effective Date, the parties shall file with the Secretary of State of the State of Delaware a certificate of merger (the "Certificate of Merger") executed and acknowledged by the parties in accordance with the relevant provisions of the DGCL and the RULPA and, as promptly as practicable on or after the Effective

359261.05 [XP]    25195

Date, the parties to the Merger shall make all other filings or recordings required by the Court and under the DGCL and the RULPA.  If not earlier accomplished, the Merger shall become effective one day after the Effective Date and the filing of the Certificate of Merger with the Secretary of State of the State of Delaware, or at such later date and time as MMPI and MMPLP shall agree and shall specify in the Certificate of Merger.

Once the Merger becomes effective, all the property, rights, privileges, powers and franchises of MMPLP shall vest in MMPI, and all debts, liabilities and duties of MMPLP shall become the debts, liabilities and duties of MMPI.

**H.    RETAINED CLAIMS AND DEFENSES AND RESERVATION OF RIGHTS**

**1.    No Waiver and Retention of Claims and Defenses**

Unless otherwise expressly set forth in the Plan or the Confirmation Order, pursuant to Section 1123(b)(3)(B), all Retained Claims and Defenses of any kind or nature whatsoever against third parties arising before the Effective Date and belonging to the Debtor or the Estate shall become property of the Reorganized Debtor.  Such Retained Claims and Defenses shall include, without limitation:

All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 524 and 553 of the Bankruptcy Code against any Creditor regarding the amount of such Holder's Allowed Claim (whether prepetition or postpetition), to enforce the discharge of any Secured Creditors' Claims;

All claims and defenses pursuant to applicable non-bankruptcy law and Sections 502, 506, 510, 524, 542 and 553 of the Bankruptcy Code including, without limitation, claims and defenses based on any Creditors' assertion of unreasonable professionals' fees, costs, charges and penalties (whether disguised as interest, or otherwise); and

All claims and defenses related to the recovery of professionals' fees and expenses by the Debtor or Reorganized Debtor from Creditors.

From and after the Effective Date, the Reorganized Debtor is authorized to assert the Retained Claims and Defenses including, but not limited to, for purposes of objection to the allowance of any Claim.  Nothing contained in the Plan or the Confirmation Order shall be deemed

1  to be a waiver or the relinquishment of any of the Debtor's rights with respect to the Retained

2  Claims and Defenses and Reorganized Debtor shall be entitled to assert the Retained Rights and

3  Defenses as fully as if the Chapter 11 Case had not been commenced.

4  **2.    Retention of Avoidance Actions**

5  Unless otherwise expressly set forth in the Plan or the Confirmation Order, from and after

6  the Effective Date, the Reorganized Debtor shall have the right to prosecute any and all avoidance

7  actions, recovery causes of action and objections to Claims under Sections 105, 502, 506, 510, 542

8  through 551 and 553 of the Bankruptcy Code that belong to the Debtors or to the Estates,

9  including, without limitation, all avoidance actions related to the transfers listed on Exhibit "I"

10  attached hereto, as well as potential avoidance actions against Legendary and East West Bank

11  relating to the withdrawals by East West Bank of $2 million from an account held at East West

12  Bank a few days before the Debtors' bankruptcy and against Legendary, based on the post petition

13  recording of documents purporting to re-establish a previously reconveyed Lien against assets of

14  Debtors, and against PNL for certain involuntary, unauthorized postpetition transfers of funds

15  belonging to MG 2001-2021 W. Mission.

16  With regard to actions that may be asserted by the Debtors under section 547 of the Code,

17  the Debtors note that in order to avoid a preferential transfer a debtor must show that the recipient

18  received more as a result of the transfer than the recipient would receive in a hypothetical Chapter 7

19  case.  Provided that the Debtors' proposed plans are confirmed, general unsecured creditors'

20  Allowed Claims will be paid in full.  As a result, with regard to transfers made during the relevant

21  90-day or 1-year preference periods to general unsecured creditors, the Reorganized Debtor is

22  unlikely to seek the avoidance of such transfers.  If the plan is not confirmed, the risk that an

23  avoidance action may be filed to recover a transfer made during the relevant period may increase.

24  A list of all of the transfers by the Debtor during the 90-day and 1-year periods is attached as

25  Exhibit "I."

26  **3.    Unknown Retained Claims and Defenses / No Preclusion**

27  Unless otherwise expressly set forth in the Plan or the Confirmation Order, the reservation

28  of rights and Retained Claims and Defenses set forth above shall include, without limitation, any

128

359261.05 [XP]    25195

1    Retained Claims and Defenses of which the Debtor may presently be unaware, or which may arise

2    or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts

3    or circumstances that may change or be different from those the Debtor now believes to exist

4    including, without limitation, claims based on theories of construction defect, breach of warranty,

5    negligence, indemnification and contribution.  Therefore, no preclusion doctrine, including,

6    without limitation, the doctrines of res judicata, collateral estoppel, waiver, estoppel (judicial,

7    equitable or otherwise), or laches will apply to the Reorganized Debtor with respect to the Retained

8    Claims and Defenses upon or after the Confirmation of the Plan based on the Plan, the Disclosure

9    Statement or the Confirmation Order.

10    **I.**      **NON-BANKRUPTCY LITIGATION**

11           The Debtors are engaged in litigation proceedings for which relief from stay has been

12    granted.  While the Debtors do not consider any such litigation to be material, there are two

13    eminent domain actions that may result in cash awards being paid to the respective Debtors.  In

14    2004, the Los Angeles County Metropolitan Transportation Authority ("MTA") filed an eminent

15    domain action against Alameda Produce Market seeking to take the 1339 E. 7th Street Real

16    Property.  Shortly thereafter, the MTA obtained an order for possession of such property and have

17    remained in possession ever since.  After lengthy proceedings, the trial court dismissed the action

18    and ordered the MTA to return possession of the property to Alameda Produce Market.  The MTA

19    appealed the ruling and the matter is pending before the appellate court.  If the trial court ruling is

20    affirmed and not further appealed, the MTA will be required to return possession of the property to

21    Alameda Produce Market, and Alameda Produce Market may, among other things, be entitled to

22    damages and/or compensation as a result of the MTA's use of the property.  A reversal of the trial

23    court's ruling could result in a remand to the trial court for a hearing on the valuation of the

24    property.  In the event the MTA is permitted to proceed with the taking of the property, the MTA

25    would be required to pay just compensation in connection with such taking.

26           Earlier this year MG - 2001-2021 West Mission Blvd. stipulated to relief from the

27    automatic stay to permit the City of Pomona, acting in concert with Cal-Trans ("City") to proceed

28    with an eminent domain action.  The action seeks to take a number of small portions of property

359261.05 [XP]    25195

1  owned by MG - 2001-2021 West Mission Blvd. in connection with the 71 Expressway/Mission

2  Boulevard Project.  MG - 2001-2021 West Mission Blvd. filed its answer and cross complaint for

3  inverse condemnation.  The matter was only recently commenced and may take 18-20 months to be

4  resolved.

5         In addition, in November 2007, the State of California commenced an eminent domain

6  action against Meruelo Baldwin Park in the Los Angeles Superior Court seeking to condemn two

7  small portions of property.  The parties reached an agreement which was submitted to the

8  Bankruptcy Court and was approved in early 2010.  Generally, the agreement provides that the

9  state will pay MBP approximately $80,000 in exchange for taking a small portion of land in fee

10  absolute and a temporary construction easement in the other small portion.  The parties are in the

11  process of finalizing the Agreement and making the above-referenced payment.

12  **J.    OBJECTIONS TO CLAIMS**

13         Except as otherwise provided in the Plan, objections to Claims, including without limitation

14  Administrative Claims (other than objections to Administrative Claims of Professionals), shall be

15  Filed and served upon the Holder of such Claim or Administrative Claim no later than the later of:

16  (a) one hundred eighty (180) days after the Effective Date, (b) one hundred eighty (180) days after

17  a proof of Claim or request for payment of such Claim is Filed, and (c) a deadline set by the

18  Bankruptcy Court after the extension of the one hundred eighty (180)-day deadline; such extension

19  may be granted on an ex parte basis without notice or hearing.  After the Confirmation Date, only

20  the Reorganized Debtor will have the authority to File objections, settle, compromise, withdraw or

21  litigate to judgment objections to Claims and Interests.  From and after the Confirmation Date,

22  Reorganized Debtor may settle or compromise any Disputed Claim or Disputed Interest without

23  approval of the Bankruptcy Court.  Nothing in this Section VII.L. shall affect the rights of Bank of

24  America with respect to its claims and defenses asserted in connection with the *County of Los*

25  *Angeles Tax Collector v. Bank of America, et al.*, pending before the United States District Court

26  for the Central District of California, case number 2:10-cv-03536-SVW, in which Bank of America

27  is requesting declaratory relief that, *inter alia*, it has a right to pay real property taxes assessed

28  against Bank of America's real property collateral and that the County tax collector must accept

1  checks handed to the County's counsel on or about April 9, 2010. Bank of America asserts that the

2  County's Liens and tax claims have been released as to those properties. The County disagrees and

3  opposes Bank of America's requests.

4       The Debtors will file objections to any claim which was scheduled as disputed, contingent

5  or unliquidated and for which no timely proof of claim was filed. The following list is illustrative,

6  but not exhaustive, and the Debtors expressly reserve the right to object to any claim or interest

7  whether or not identified below.

8       The FTB filed an $800 priority unsecured tax claim against 21 of the Debtors for corporate

9  tax fees. The Debtors believe these tax obligations were satisfied prior to the Petition Date and, if

10  the Debtors cannot resolve the issue consensually with the FTB, the Debtors will object to the

11  FTB's claims.

12       The County of Los Angeles filed proofs of secured claims and alleged administrative claims

13  against all of the Debtors that own real property, and one Debtor that does not, with regard to real

14  property taxes owed. With regard to the base amount of such real property taxes, any disputes are

15  being pursued pursuant to applicable state and local law in the form of tax assessment appeals.

16  Pursuant to the Debtors' settlement with the County, the Debtors' rights with regard to such appeals

17  are preserved. In the event that the Debtors' settlement with the County is not approved, the

18  Debtors may object to portions of the County's claims on various grounds.

19       **1.**    **MMPI**

20       **Grand Avenue Lofts Homeowners Association (POC no. 43)**: Grand Avenue Lofts

21  Homeowners Association ("Grand Ave HOA") filed a secured claim against MMPI for $270,000

22  based on agreements between Grand Ave HOA's predecessor in interest and certain Property Level

23  Debtors. MMPI was not a party to those agreements and MMPI did not pledge any assets in

24  connection with those agreements. Therefore, if the Debtors cannot resolve the issue consensually

25  with Grand Ave HOA, the Debtors will object to this claim.

26       **Aviles Security Patrol (POC no. 19)**: Aviles Security Patrol ("Aviles") filed a priority

27  status unsecured claim for $32,530 against MMPI. As noted above, this claim is also one of the

28  claims which was reassigned from MMPI to the Debtors for whom Aviles provided security

1   services:  2640 Washington, 788 S. Alameda, Alameda Produce Market, MG 2529 Santa Fe, MG

2   Southpark, MM 1000 E. Cesar Chavez, MM 2415 E. Washington Boulevard, MMP 760 S. Hill

3   Street, MMPLP, Meruelo Wall Street and Santa Fe Commerce Center pursuant to the Debtors'

4   Reassignment Motion.  To the extent the Reassignment Motion results in eleven claims each for

5   $32,500 being deemed filed against eleven Debtors, the Debtors will seek disallowance of the

6   amounts in excess of those actually owed by each obligor-Debtor.  The Debtors believe there is no

7   basis for the asserted priority status of this claim and, if the Debtors cannot resolve the issue

8   consensually with Aviles, the Debtors will object to the priority of these claims and ask the Court

9   to allow the claim only as a general unsecured claim.

10        **EDI (MMPI POC nos. 26, 72):**  EDI filed unsecured claims against MMPI for $129,570

11   and $140,881.  The Debtors dispute the amounts asserted by EDI.

12        **Guaranty Claims of CBT, Kennedy, Legendary, UCB:**  Kennedy and UCB each filed a

13   secured guaranty claim against MMPI and Legendary filed seven different secured claims against

14   MMPI.  While MMPI has guaranteed the obligations of certain Property Level Debtors, none of

15   those guaranties is secured and the Debtors will object to the guaranty claims of any lender who

16   asserts it holds a secured guaranty.  Because MMPI's guaranty claims are unsecured, the Debtors

17   do not believe there is any basis for the lenders to include, among other things, postpetition interest,

18   postpetition attorney's fees or any postpetition charges in their unsecured guaranty claims.  CBT,

19   Kennedy, Legendary and UCB appear to include postpetition amounts in their guaranty claims and

20   the Debtors will object to those amounts.  To the extent any amounts claimed by lenders against the

21   Property Level Debtors are disallowed, the Debtors will seek to disallow the same amounts from

22   the lenders' guaranty claims against MMPI.

23        **CIM Urban RE Fund GP II (POC no. 60):**  CIM Urban RE Fund GP II ("CIM") filed a

24   secured claim for an unliquidated amount against MMPI based on agreements between CIM's

25   predecessor in interest and certain Property Level Debtors.  MMPI was not a party to those

26   agreements and MMPI did not pledge any assets in connection with those agreements.  Therefore,

27   if the Debtors cannot resolve the issue consensually with CIM, the Debtors will object to this claim.

28

132

**Geodesign (POC no. 71)**:  Geodesign filed an unsecured claim for $21,715 against MMPI. The Debtors believe the claim is owed by a non-debtor affiliate, not MMPI.  If the Debtors cannot resolve the issue consensually with Geodesign, the Debtors will object to this claim.

**Shareholders' Equity Interests Filed as Claims (POC nos. 1-8, 10-12, 14)**:  Various shareholders of MMPI filed proofs of claims asserting what appear to be equity interests in MMPI. The Debtors have objected to the claims and seek to have them allowed as equity interests.

**Tirso Del Junco (POC no. 77)**:  Dr. Tirso Del Junco filed an unsecured claim for $268,260 against MMPI.  There is no basis for any of the amounts claimed by Dr. Del Junco and, to the extent any obligation is owed to Dr. Del Junco, it is owed by a non-debtor affiliate and not MMPI

**Late Filed Claims:**  RoofCorp filed an unsecured claim for $25,000 on November 4, 2009. As the Bar Date in the Chapter 11 Cases was September 24, 2009, the Debtors will object to this claim as late-filed.

### 2.    MMPLP

**US Bancorp Business Equipment Finance Group (MMPI POC no. 57):**  US Bancorp Business Equipment Finance Group ("US Bancorp") filed a secured claim against MMPI for $8,682 related to an equipment lease for a copier.  Pursuant to the Debtors' Reassignment Motion, the claim is deemed filed against MMPLP.  The Debtors, however, believe the claim is an unsecured claim and if the Debtors are unable to resolve the issue consensually with US Bancorp, the Debtors will object to the secured status of this claim.

### 3.    MM Management

**American Home Assurance (POC no. 3):**  American Home Assurance Company and various other insurance companies filed a single unsecured claim for an unknown amount against MM Management.  The Debtors do not believe that any amount is owing to these companies by any of the Debtors and will object to this claim.

### 4.    MG – Overland Terminal

**Mayer Hoffman McCann P.C. / CBIZ MHM, LLC (POC nos. 1 & 2):**  Mayer Hoffman McCann P.C. and CBIZ MHM, LLC (now Argo Partners) each filed unsecured proofs of claim for $42,228 which appear to be duplicate claims for a single debt.  The Debtors believe only one, but

1    not both, of the claims should be allowed.  If the Debtors are unable to resolve the issue

2    consensually with the two creditors, the Debtors will object to one of these claims as duplicative of

3    the other claim.

4        **Late Filed Claims**:  Capital One Bank filed an unsecured claim for $1,308 against MG

5    Overland Terminal on December 10, 2009.  The claim also appears to have been intended to be

6    filed against an unrelated debtor in an unrelated case.  The Los Angeles Department of Water and

7    Power ("DWP") filed an unsecured claim for $9,646 on January 15, 2010.  As the Bar Date in the

8    Chapter 11 Cases was September 24, 2009, the Debtors will object to these claims as late-filed and

9    will object to the Capital One Bank claim as not being an obligation of any of the MMPI Debtors.

10            **5.    National Cold Storage**

11        **SYM PAC International (POC no. 10):**  SYM PAC International, Inc. filed an unsecured

12   claim for $150,994 against National Cold Storage on November 9, 2009 for alleged damages

13   related to the cold storage of swordfish.  The debtors will object as there is no merit to this claim

14   and as it was not timely filed.

15           **6.    MMP 306 – 330 N. Avenue 21**

16        **City of Los Angeles (POC no. 8):**  The City of Los Angeles filed a priority unsecured tax

17   claim for $151,232 for business taxes.  The Debtors believe that the entire amount claimed is not

18   entitled to priority as a portion of the taxes claimed were assessed more than one year before the

19   Petition Date.  If the Debtors are unable to resolve the issue consensually with the City of Los

20   Angeles, the Debtors will object to the priority status asserted for the entirety of the claim and they

21   will also object to the amount of the claim.

22        **Lexis Nexis:**  Lexis Nexis filed two unsecured proofs of claims for $1,548 and $801 on

23   March 11, 2010 and November 2, 2009 respectively and the Debtors will also object to these

24   untimely claims.

25           **7.    MMP 1060 N. Vignes**

26        **State Board of Equalization (MMPI POC no. 82):**  The SBE filed a priority unsecured

27   tax claim for $61,915 related to a hazardous substance tax.  The claim relates to stockpiled soil on,

28   and contaminated earth affecting, unimproved real property commonly described as 1060 N.

1  Vignes St., Los Angeles, California owned by MMP – 1060 N. Vignes, LLC.  Pursuant to the

2  Debtors' Reassignment Motion, the claim is deemed filed against MMP 1060 N. Vignes.  The

3  Debtors dispute that this claim is entitled to priority status as a tax claim or otherwise.  If the

4  Debtors are unable to resolve the issue consensually with the SBE, the Debtors will object to the

5  priority status of this claim.

6          **8.     MMP 12385 San Fernando Road**

7          **American Home Assurance (POC no. 4):**  American Home Assurance Company and

8  various other insurance companies filed a single unsecured claim for an unknown amount against

9  MMP 12385 San Fernando Road.  The Debtors do not believe that any amount is owing to these

10  companies by any of the Debtors and will object to this claim.

11          **9.     MG 1211 E. Washington Boulevard**

12          **Blake Sign Co. (POC no. 5):**  Blake Sign Company ("Blake") filed an unsecured claim for

13  $1,948 and asserted priority status for $148 of this amount.  The Debtors believe there is no basis

14  for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the

15  issue consensually with Blake, the Debtors will object to the $148 priority portion of this claim and

16  ask the Court to allow the claim only as a general unsecured claim for $1,948.

17          **10.    MG – Ceres Street Produce**

18          **Blake Sign Co. (POC no. 2):**  Blake Sign Company ("Blake") filed an unsecured claim for

19  $1,407 and asserted priority status for $107 of this amount.  The Debtors believe there is no basis

20  for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the

21  issue consensually with Blake, the Debtors will object to the $107 priority portion of this claim and

22  ask the Court to allow the claim only as a general unsecured claim for $1,407.

23          **11.    MM 3rd & Omar Street**

24          **Legendary (POC no. 4):**  The Debtors will object to the amount of Legendary's proof of

25  claim against MM 3rd & Omar, as well as the associated guaranty claims asserted against MMPI

26  and MMPLP, to the extent Legendary seeks amounts which are not allowable under state law,

27  bankruptcy law or both.

28

1

### 12.    MM 336 W. 11th Street

2        **Legendary**:  Although Legendary did not file a proof of claim against MM 336 W. 11th

3   Street, this Debtor pledged its real property in favor of Legendary to secure the obligations of MG

4   620 Gladys.  MM 336 W. 11th Street will be a co-movant with respect to any objections to the

5   Legendary claim filed by MG 620 Gladys.

6        **CIM Urban RE Fund GP II (POC no. 6) and Grand Avenue Lofts, LLC / Grand**

7   **Avenue Lofts LP (POC no. 5)**:  CIM Urban RE Fund GP II ("CIM") and Grand Avenue Lofts,

8   LLC and Grand Avenue Lofts LP each filed a secured claim for an unliquidated amount against

9   MM 336 W. 11th Street based on agreements entered into by MM 336 W. 11th Street, MG Little J

10  and MG Southpark.  The Debtors will object to this claim.

11        **Grand Avenue Lofts Homeowners Association (POC no. 43)**:  Grand Avenue Lofts

12  Homeowners Association ("Grand Ave HOA") filed a secured claim against MMPI for $270,000

13  based on agreements between Grand Ave HOA's predecessor in interest and MM 336 W. 11th

14  Street, MG Little J and MG Southpark. The Debtors will object to this claim.

15

### 13.    MM 420 Boyd

16        **Legendary (POC no. 6)**:  The Debtors will object to the amount of Legendary's proof of

17  claim against MM 420 Boyd, as well as the associated guaranty claims asserted against MMPI and

18  MMPLP, to the extent Legendary seeks amounts which are not allowable under state law,

19  bankruptcy law or both.

20

### 14.    MMP 760 S. Hill Street

21        **BofA**:  The Debtors will object to the amount of BofA's proof of claim against MMP 760 S.

22  Hill Street, as well as the associated guaranty claim asserted against MMPI, to the extent BofA

23  seeks amounts which are not allowable under state law, bankruptcy law or both.

24        **Asha Abdella (MMPI POC no. 18)**:  Asha Abdella filed an unsecured claim for $250,000

25  against MMPI asserting damages for alleged discrimination in housing and employment.  Pursuant

26  to the Debtors' Reassignment Motion, the claim is deemed filed against MMP 760 S. Hill Street

27  and MM Management.  The Debtors also believe there is no basis for Ms. Abdella's claim and will

28  file an objection to the claim.

1    **Fast Taco #3 (MMPI POC no. 32):**  Fast Taco #3 filed an unsecured claim for $300,000

2    against MMPI asserting damages for an alleged breach of a lease termination agreement.  Pursuant

3    to the Debtors' Reassignment Motion, the Debtors believe the claim is deemed filed against MMP

4    760 S. Hill Street and MG Southpark.  The Debtors will object to this claim.

5    **Otis Elevator (MMPI POC no. 24):**  Otis Elevator ("Otis") filed an unsecured claim for

6    $16,611 for repair services related to an elevator in the Union Lofts.  The Debtors believe that any

7    sums owed to Otis were paid in full prior to the Petition Date.  If the Debtors cannot resolve the

8    issue consensually with Otis, they will object to this claim.

9    **The Union Restaurant & Lounge (POC no. 3):**  The Union Restaurant & Lounge

10   ("Union Restaurant") filed an unsecured claim against MMP 760 S. Hill Street for damages in the

11   amount of $247,606 based on alleged breach of lease and defamation.  The Debtors believe there is

12   no basis for Union Restaurant's claim and will file an objection to the claim.

13                    **15.    788 S. Alameda**

14   **CBT:**  The Debtors will object to the amount of CBT's proof of claim against 788 S.

15   Alameda, as well as the associated guaranty claim asserted against MMPI, to the extent CBT seeks

16   amounts which are not allowable under state law, bankruptcy law or both.

17   **Hugo Rodriguez, Natividad Gonzales, Jose Barreto, Roman Rodriguez (POC nos. 2-4,**

18   **6):**  Hugo Rodriguez, Natividad Gonzales, Jose Barreto and Roman Rodriguez (collectively, the

19   "Rodriguez Plaintiffs") filed unsecured claims against 788 S. Alameda for $251,084, $233,554,

20   $233,554 and $238386, respectively, for damages based on alleged wage and hour violations.  Each

21   of the Rodriguez Plaintiffs asserts priority status for their claims.  The Debtors do not believe there

22   is any basis for the claims asserted by the Rodriguez Plaintiffs and further do not believe there is a

23   basis for priority status for any of the amounts asserted and will file objections to these claims.  The

24   Debtor anticipates that liquidation of the alleged claims will take place in the Superior Court.

25                    **16.    Alameda Produce Market**

26   **Hugo Rodriguez, Natividad Gonzales, Jose Barreto, Roman Rodriguez (POC nos. 8-**

27   **10,12):**  The Rodriguez Plaintiffs filed unsecured claims against Alameda Produce Market for

28   $251,084, $233,554, $233,554 and $238,386, respectively, for damages based on alleged wage and

                                        137

1   hour violations.  Each of the Rodriguez Plaintiffs asserts priority status for their claims.  The

2   Debtors do not believe there is any basis for the claims asserted by the Rodriguez Plaintiffs and

3   further do not believe there is a basis for priority status for any of the amounts asserted and will file

4   objections to these claims.

5       **County of Los Angeles, Metropolitan Transportation Authority (POC no. 14):**  The

6   County of Los Angles Metropolitan Transportation Authority ("MTA") filed an unsecured claim

7   against Alameda Produce Market for $8,500,000 related to the pending eminent domain litigation

8   between Alameda Produce Market and MTA.  The Debtors believe that they are owed damages in

9   an amount in excess of $8.5 million.

10                    **17.    MG 1500 Griffith Avenue**

11      **Legendary (POC no. 3):**  The Debtors will object to the amount of Legendary's proof of

12  claim against MG 1500 Griffith and MG 4th Street Center, as well as the associated guaranty claim

13  asserted against MMPI, to the extent Legendary seeks amounts which are not allowable under state

14  law, bankruptcy law or both.

15                    **18.    MMP 2131 Humboldt Street**

16      **Chamlian (POC no. 3):**  The Debtors will object to the amount of the Chamlians' proof of

17  claim against MMP 2131 Humboldt Street to the extent they seek amounts which are not allowable

18  under state law, bankruptcy law or both.

19      **Blake Sign Co. (POC no. 5):**  Blake Sign Company ("Blake") filed an unsecured claim for

20  $975 and asserted priority status for $80 of this amount.  The Debtors believe there is no basis for

21  the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue

22  consensually with Blake, the Debtors will object to the $80 priority portion of this claim and ask

23  the Court to allow the claim only as a general unsecured claim for $975.

24                    **19.    2640 Washington Blvd.**

25      **UCB (POC no. 5):**  The Debtors will object to the amount of UCB's proof of claim against

26  2640 Washington Blvd as well as the associated guaranty claims asserted against MMPI, to the

27  extent it seeks amounts which are not allowable under state law, bankruptcy law or both.

28

138

### 20.    **MG 3185 E. Washington Boulevard**

**Chinatrust (POC no. 3):**  The Debtors will object to the amount of Chinatrust's proof of claim against MG 3185 E. Washington Boulevard to the extent it seeks amounts which are not allowable under state law, bankruptcy law or both.

### 21.    **MG 4th Street Center**

**Legendary (POC no. 11):**  The Debtors will object to the amount of Legendary's proof of claim against MG 4th Street Center and against MG 1500 Griffith, as well as the associated guaranty claims asserted against MMPI, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

### 22.    **MG 425 W. 11th Street**

**Legendary (POC no. 5):**  The Debtors will object to the amount of Legendary's proof of claim against MG 425 W. 11th Street, as well as the associated guaranty claim asserted against MMPI, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

**Blake Sign Co. (POC no. 2):**  Blake Sign Company ("Blake") filed an unsecured claim for $1,300 and asserted priority status for $107 of this amount.  The Debtors believe there is no basis for the asserted priority status of any portion of this claim and, if the Debtors cannot resolve the issue consensually with Blake, the Debtors will object to the $107 priority portion of this claim and ask the Court to allow the claim only as a general unsecured claim for $1300.

### 23.    **MG 620 Gladys Avenue**

**Legendary (POC no. 5):**  The Debtors will object to the amount of Legendary's proof of claim against MG 620 Gladys Avenue and against MM 336 W. 11th Street, as well as the associated guaranty claims asserted against MMPI and MMPLP, to the extent Legendary seeks amounts which are not allowable under state law, bankruptcy law or both.

### 24.    **MG 2001-2021 W. Mission Boulevard**

**PNL:**  Although PNL failed to file a proof of claim against MG 2001-2021 W. Mission Boulevard, the Debtors will object to the amounts in any claim PNL asserts to the extent PNL seeks amounts which are not allowable under state law, bankruptcy law or both.

139

### 25.   MG Little J

**Legendary**:  Although Legendary did not file a proof of claim against MG Little J, this Debtor pledged its real property in favor of Legendary to secure some of the obligations of Merco Group.  MG Little J will be a co-movant with respect to any objections to the Legendary claim filed by Merco Group.

**CIM Urban RE Fund GP II (POC no. 6) and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (POC no. 4)**:  CIM and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP each filed a secured claim for an unliquidated amount against MG Little J based on agreements entered into by MM 336 W. 11th Street, MG Little J and MG Southpark.  The Debtors dispute that any of these creditors hold a claim secured by any of the assets of Little J.  The Debtors will object to this claim.

**Grand Avenue Lofts Homeowners Association (POC no. 3)**:  Grand Ave HOA filed a secured claim against MG Little J for $270,000 based on agreements between Grand Ave HOA's predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark.  The Debtors dispute that Grand Ave HOA's claim is secured by any of the assets of Little J.  The Debtors will object to this claim.

### 26.   MG Southpark

**BofA (POC no. 8)**:  The Debtors will object to the amount of BofA's proof of claim against MG Southpark, as well as the associated guaranty claim asserted against MMPI, to the extent BofA seeks amounts which are not allowable under state law, bankruptcy law or both.

**CIM Urban RE Fund GP II (POC no. 13) and Grand Avenue Lofts, LLC / Grand Avenue Lofts LP (POC no. 7)**:  CIM and Grand Avenue Lofts, LLC and Grand Avenue Lofts LP each filed a secured claim for an unliquidated amount against MG Southpark based on agreements entered into by MM 336 W. 11th Street, MG Little J and MG Southpark.  The Debtors dispute that any of these creditors hold a claim secured by any of the assets of MG Southpark.  The Debtors will object to this claim.

**Grand Avenue Lofts Homeowners Association (POC no. 6)**:  Grand Ave HOA filed a secured claim against MG Southpark for $270,000 based on agreements between Grand Ave

359261.05 [XP]    25195

1   HOA's predecessor in interest and MM 336 W. 11th Street, MG Little J and MG Southpark.  The

2   Debtors dispute that Grand Ave HOA's claim is secured by any of the assets of MG Southpark.

3   The Debtors will object to this claim.

4        **EDI Architecture (POC no. 9; MMPI POC no. 26):**  EDI Architecture ("EDI") filed

5   unsecured claim for $567,524 against MG Southpark.  The Debtors dispute the amounts asserted by

6   EDI.

7        **27.   Merco Group**

8        **Legendary (POC no. 5)**:  The Debtors will object to the amount of Legendary's proof of

9   claim against Merco Group, as well as the associated guaranty claims asserted against MMPI and

10  MMPLP, to the extent Legendary seeks amounts which are not allowable under state law,

11  bankruptcy law or both.  In addition, the Debtors may object to Legendary's asserted secured status

12  with respect to the Sky-Arc Real Property as Legendary's predecessor in interest recorded a full

13  reconveyance of its deed of trust on the Sky-Arc Real Property in 2007.

14       **American Home Assurance (POC no. 6):**  American Home Assurance Company and

15  various other insurance companies filed a single unsecured claim for an unknown amount against

16  Merco Group.  The Debtors do not believe that any amount is owing to these companies by any of

17  the Debtors and will object to this claim**.**

18       **28.   Meruelo Farms**

19       **Woodland Farms (POC no. 9):**  Woodland Farms filed an unsecured claim against

20  Meruelo Farms for $1,991,537 and asserts administrative priority for $1,412,913 based on alleged

21  damages and an alleged breach of a prepetition lease with Meruelo Farms.  The Debtors dispute the

22  amount claimed by Woodland Farms and also dispute that any sums which may be owing to

23  Woodland Farms are entitled to administrative priority.  The Debtors will object to this claim.

24       **29.   Meruelo Wall Street**

25       **UCB:**  The Debtors will object to the amount of UCB's proof of claim against Meruelo

26  Wall Street to the extent UCB seeks amounts which are not allowable under state law, bankruptcy

27  law or both.

28

### 30.    MM Mission Boulevard

**Kennedy**:  The Debtors will object to the amount of Kennedy's proof of claim against MM Mission Boulevard to the extent Kennedy seeks amounts which are not allowable under state law, bankruptcy law or both.

### 31.    Santa Fe Commerce Center

**Berkadia**:  The Debtors will object to the amount of Berkadia's proof of claim against Santa Fe Commerce Center to the extent Berkadia seeks amounts which are not allowable under state law, bankruptcy law or both.

### K.    DISBURSING AGENT

The Chief Accounting Officer of MMPI (currently Fred Skaggs) shall act as the Disbursing Agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without bond, and shall receive no additional compensation for his duties as Disbursing Agent.

### L.    DISCHARGE OF THE DEBTORS AND INJUNCTION

#### 1.    Discharge

Except as otherwise provided in the Plan, the Confirmation Order or Section 1141(d)(6) of the Bankruptcy Code:  (i) on the Effective Date, each Debtor shall be deemed discharged and released to the fullest extent permitted by Section 1141 of the Bankruptcy Code from all Claims and Interests, including, but not limited to, demands, liabilities, Claims and Interests that arose before the Confirmation Date and all debts of the kind specified in Sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not:  (A) a proof of Claim or proof of Interest based on such debt or Interest is Filed or deemed Filed pursuant to Section 501 of the Bankruptcy Code, (B) a Claim or Interest based on such debt or Interest is allowed pursuant to Section 502 of the Bankruptcy Code or (C) the Holder of a Claim or Interest based on such debt or Interest has accepted the Plan; and (ii) all Persons shall be precluded from asserting against each Reorganized Debtor, its successors, or its assets or properties any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date.  Except as otherwise provided in the Plan or the Confirmation Order, the

359261.05 [XP]    25195

1  Confirmation Order shall act as a discharge of any and all Claims against and all debts and

2  liabilities of the Debtor, as provided in Sections 524 and 1141 of the Bankruptcy Code, and such

3  discharge shall void any judgment against each Debtor at any time obtained to the extent that it

4  relates to a Claim discharged.

5  **2.    Injunction**

6  All Persons that have held, currently hold or may hold a Claim or other debt or liability or

7  an Interest or other right of an equity security Holder, are permanently enjoined from taking any of

8  the following actions on account of any such Claims, debts or liabilities or terminated Interests or

9  rights discharged pursuant to Section K.1. immediately above: (a) commencing or continuing in

10  any manner any action or other proceeding against any of the Debtors and the Creditors'

11  Committee, and professional persons retained by the Debtors, the Creditors' Committee, and each

12  of their respective affiliates, current or former officers, directors, agents, employees and

13  representatives; (b) enforcing, attaching, collecting or recovering in any manner any judgment,

14  award, decree or order against any of the Debtors, the Creditors' Committee and professional

15  persons retained by any of the Debtors and Creditors' Committee and each of their respective

16  affiliates, current or former officer, directors, agents, employees and representatives; (c) creating,

17  perfecting or enforcing any lien or encumbrance against any of the Debtors, the Creditors'

18  Committee, and professional persons retained by any of the Debtors and the Creditors' Committee

19  and each of their respective affiliates, current or former officers, directors, agents, employees and

20  representatives; (d) asserting a setoff, right of subrogation or recoupment of any kind against any

21  obligation due to any of the Debtors, the Creditors' Committee and professional persons retained

22  by any of the Debtors and the Creditors' Committee and each of their respective affiliates, current

23  or former officers, directors, agents, employees and representatives; and (e) commencing or

24  continuing any action, in any manner, in any place that does not comply with or is inconsistent with

25  the provisions of the Plan; provided however, the injunction provided herein does not apply to and

26  shall not enjoin or otherwise prevent action against the Debtors' current or former officers,

27  directors, or employees that is not a Discharged Claim under Section K.1. immediately above.

28

1    Any Person injured by any willful violation of such injunction shall recover actual damages,

2    including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive

3    damages, from the willful violator.

4    **M.    NO LIABILITY FOR SOLICITATION OR PARTICIPATION**

5    As specified in Section 1125(e) of the Bankruptcy Code, Persons that solicit acceptances or

6    rejections of the Plan and/or that participate in the offer, issuance, sale, or purchase of securities

7    offered or sold under the Plan, in good faith and in compliance with the applicable provisions of the

8    Bankruptcy Code, shall not be liable, on account of such solicitation or participation, for violation

9    of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of

10    the Plan or the offer, issuance, sale, or purchase of securities.

11    **N.    LIMITATION OF LIABILITY**

12    Neither (a)  any Reorganized Debtor or any of their respective postpetition employees,

13    officers, directors, agents, representatives, affiliates, attorneys or any other professional persons

14    employed by any of them, nor (b) the Creditors' Committee or any of their respective postpetition

15    members, agents, employees, directors, officers representatives, attorneys or other professional

16    advisors, in each case, shall have any responsibility, or have or incur any liability, to any Person

17    whatsoever, under any theory of liability (except for any Claim based upon willful misconduct or

18    gross negligence), for any act taken or omission made in good faith directly related to formulating,

19    implementing, confirming, or consummating the Plan, the Disclosure Statement, or any contract,

20    instrument, release, or other agreement or document created in connection with the Plan, provided

21    that nothing in this paragraph shall limit the liability of any Person for breach of any express

22    obligation it has under the terms of this Plan or under any post-petition agreement or other post-

23    petition document entered into by such Person or in accordance with the terms of this Plan or for

24    any breach of a duty of care owed to any other Person occurring after the Effective Date.

25    **O.    CERTIFICATE OF INCORPORATION AND CERTIFICATES OF**

26    **ORGANIZATION**

27    On the Effective Date, the Reorganized Debtor, or each of them if there is more than one,

28    shall adopt amended certificates pursuant to applicable non-bankruptcy law and Section

1   1123(a)(5)(I) of the Bankruptcy Code.  Each amended certificate will, among other provisions

2   prohibit the issuance of nonvoting equity securities to the extent required by Section 1123(a)(6) of

3   the Bankruptcy Code and will become effective upon the occurrence of the Effective Date, and

4   shall include such other provisions as determined by the Reorganized Debtors including the

5   elimination of single purpose entity provisions.

6        **P.    OTHER DOCUMENTS AND ACTIONS**

7        The Debtors and the Reorganized Debtor may, and shall, execute such documents and take

8   such other actions as are necessary to effectuate the transactions provided for in the Plan.

9        **Q.    CORPORATE ACTION**

10        The adoption of the amended certificates of incorporation, certificates of organization, or

11   certificate of limited partnership, as the case may be, and all other matters under the Plan involving

12   the corporate structure of the Reorganized Debtor, shall be deemed to have occurred and be

13   effective on and after the Effective Date without any requirement of further action by the

14   stockholders, directors, managers, members, or limited partners, as the case may be, of each

15   Debtor.  Without limiting the foregoing, upon entry of the Confirmation Order by the Clerk, the

16   filing by any of the Reorganized Debtor of the amended certificates shall be authorized and

17   approved in all respects, including amendments to eliminate any special purpose entity provisions.

18   On the Effective Date or as soon thereafter as is practicable, pursuant to applicable law, the bylaws,

19   operating agreements, or partnership agreement, as the case may be, of each Debtor shall be the

20   bylaws, operating agreements or partnership agreement of such Reorganized Debtor.

21        **R.    RETIREE BENEFITS**

22        The Debtors do not have any present obligations to pay retiree benefits within the meaning

23   of Section 1129(a)(13).

24        **S.    THE CREDITORS' COMMITTEE AND THE EQUITY HOLDERS'**

25             **COMMITTEE**

26        The Creditors' Committee and the Equity Committee shall be dissolved 60 days after the

27   Effective Date and the members of each such committee shall be released and discharged from all

28   further rights and duties arising from or related to the Chapter 11 Cases.  The professionals retained

145

359261.05 [XP]    25195

by each such committee and the members thereof shall not be entitled to compensation or reimbursement of expenses incurred for services rendered after the Effective Date (except with regard to seeking allowance of fees incurred prior to the Effective Date).

## VIII.

## MANAGEMENT OF REORGANIZED DEBTORS

### A.    BOARD OF DIRECTORS AND MANAGEMENT OF THE REORGANIZED DEBTORS

#### 1.    Board of Directors

The initial board of directors of Reorganized MMPI will consist of seven directors.  Richard Meruelo and John Maddux, or the shareholder entities controlled by them (collectively, the "Founding Shareholders"), will have the right to appoint four of the initial seven directors ("Founding Shareholder Directors").  If a majority (both in number of members and in number of shares held by such members) of the members of the Equity Committee vote to accept the Debtors' Plan and vote their preference among the proposed plans in favor of the Debtors' Plan, then the Equity Committee will have the right to appoint three of the initial seven directors (collectively, the "Equity Committee Directors"), subject to the requirement that the Founding Shareholders approve one of the Equity Committee Directors.  If a majority of the members of the Equity Committee do not so vote, then the remaining three directors will be appointed by the Founding Shareholder Directors.  The Equity Committee Directors, if appointed, must approve Reorganized MMPI's Chief Financial Officer and its outside auditor, the cost of which auditor is within Reorganized MMPI's budget.  The terms of the initial directors shall be staggered in accordance with the following provisions, which provisions shall be reflected in Reorganized MMPI's certificate of incorporation: two of the Founding Shareholder Directors shall be up for re-election at the first annual shareholder meeting (occurring at least one year after the Effective Date), the other two Founding Shareholder Directors shall be up for re-election at the second annual shareholder meeting (occurring at least two years after the Effective Date), and the three Equity Committee Directors, if appointed, or the three remaining directors, shall be up for re-election at the third annual shareholder meeting (occurring at least three years after the Effective Date).  The board of

1   Reorganized MMPI must approve any related-party transactions.  Reorganized MMPI will

2   disseminate to shareholders annual financial statements audited by the outside auditor.  In 2013,

3   Reorganized MMPI will make commercially-reasonable efforts to become a publicly reporting

4   company if the board determines such to be in the best interests of the company.

5                        **2.        Officers & Biographies**

6          Richard Meruelo (Chief Executive Officer), John Charles Maddux (President and Chief

7   Operating Officer), Lynn Beckemeyer (Executive Vice President for Development), Fred Skaggs

8   (Chief Accounting Officer),  Andrew Murray (Chief Financial Officer), Todd Nielsen (General

9   Counsel and Corporate Secretary) and Miguel E. Echemendia (Chief Administrative Officer)  will

10  continue in their current capacities as officers of the Reorganized Debtors.

11                       **a.        Richard Meruelo**

12         Mr. Meruelo serves as the Company's Chief Executive Officer and Chairman of MMPI's

13  Board of Directors. Mr. Meruelo has served as chairman of the Company's predecessor business

14  since 1987. During that time, Mr. Meruelo led the strategic planning for the business while

15  managing project acquisitions, purchase negotiations and related financings totaling nearly $1.2

16  billion. In addition, Mr. Meruelo was responsible for maintaining the predecessor business'

17  relationships with CalPERS and local and state governmental bodies that had land-use jurisdiction

18  over the contributed projects. Mr. Meruelo earned his degree in business administration from the

19  University of Southern California, with an emphasis in finance and real estate. Mr. Meruelo

20  currently serves as a board member for the Central City East Association and the Los Angeles

21  Central Industrial Redevelopment Project.

22                       **b.        John Charles Maddux**

23         Mr. Maddux serves as the Company's President and Chief Operating Officer and as a

24  member of MMPI's Board of Directors. Mr. Maddux has served as president of the Company's

25  predecessor business since 2005. Before joining the predecessor business, Mr. Maddux served as a

26  founder and shareholder of the law firm of Nevers, Palazzo, Maddux & Packard, PLC from 1998 to

27  2005, and practiced law with the firm of O'Melveny & Myers, LLP from 1986 to 1996, where he

28  was a member of the real estate practice group. While at each firm, Mr. Maddux served as the

359261.05 [XP]    25195

1  Company's predecessor's outside legal counsel. Mr. Maddux earned his bachelor's degree in

2  business management—finance from Brigham Young University's Marriott School of

3  Management and his J.D. from Brigham Young University's J. Reuben Clark Law School. His

4  affiliations include the Urban Land Institute, the Building Industry Association, the International

5  Conference of Shopping Centers, the Los Angeles County Bar Association and the California Bar

6  Association, Real Property Section.

7         **c.**   **Andrew Murray**

8       Andrew Murray serves as the Company's Chief Financial Officer.  He oversees the

9  Company's financial reporting, capital markets activities and investor relations.  Mr. Murray joined

10  the Company on May 23, 2008.  Before joining the Company, Mr. Murray had twenty years of

11  experience in financial institutions and real estate investment banking with such firms as Salomon

12  Brothers, Ryan Beck & Co., Sutro & Co., and Friedman, Billings, Ramsey, which is now FBR

13  Capital Markets.  Mr. Murray graduated from the Wharton School of Business in 1989.

14         **d.**   **Lynn Beckemeyer**

15       Mr. Beckemeyer serves as the Company's Executive Vice President for Development and

16  as a member of the Company's Board of Directors. He oversees work relating to planning, design,

17  architecture and entitlement work as well as construction activity. Mr. Beckemeyer has served as

18  the senior vice president of development and construction of the Company's predecessor business

19  since April 2006. Before joining the predecessor business, Mr. Beckemeyer served in various real

20  estate development and management positions with The Walt Disney Company for seven years

21  before becoming vice president of worldwide corporate operations and real estate for Walt Disney

22  from 2001 to 2006. Prior to that, Mr. Beckemeyer managed the development, design and

23  construction of urban projects in the Washington, DC metropolitan area and Dallas, Texas, from

24  1983 to 1994, with 21 International and The Limited, Inc. Mr. Beckemeyer serves as a director of

25  Avalon Entertainment, a private company. A registered architect, Mr. Beckemeyer earned a degree

26  in architecture and construction science at Kansas State University and studied real estate

27  development at Harvard University Graduate School of Design. Mr. Beckemeyer's professional

28

359261.05 [XP]    25195

1   affiliations include the American Institute of Architects, the National Council of Architectural

2   Registration Boards, the National Association of Home Builders and the Urban Land Institute.

3                          **e.     Fred Skaggs**

4         Mr. Skaggs serves as the Company's Chief Accounting Officer.  He is responsible for all

5   accounting activities.  Mr. Skaggs joined the Company's predecessor business as treasurer in

6   September 2005.  Before joining the predecessor business, he served as chief financial officer for

7   Bright Development, a private residential and multifamily developer, where he guided the

8   company's financial and operational performance from 2004 to 2005.  Prior to that, Mr. Skaggs

9   served as the chief financial officer and controller for Shuwa Investments Corporation, a

10  commercial real estate company with $3.2 billion in assets, from 1987 to 2004.  Mr. Skaggs also

11  served as senior internal auditor and chief corporate accountant for the Masco Corporation from

12  1981 to 1987 and with Price Waterhouse from 1979 to 1981.  A certified licensed public

13  accountant, Mr. Skaggs earned his degree in accounting from Brigham Young University's

14  Marriott School of Management with minors in English and Spanish.

15                         **f.     Miguel E. Echemendia**

16        Mr. Echemendia serves as the company's Chief Administrative Officer.  He is responsible

17  for all property management, leasing activities, property specific financing and other general

18  administrative functions.  Mr. Echemendia served as chief operating officer of the predecessor

19  business since July 2000, and has been responsible for strategic planning, acquisitions, finance and

20  management.

21                         **g.     Todd Nielsen**

22        Mr. Nielsen serves as the Company's General Counsel and Corporate Secretary.  He is

23  responsible for all legal issues relating to compliance with SEC regulations, as well as overseeing

24  real estate transactions and other legal matters. Mr. Nielsen has served as the general counsel of the

25  Company's predecessor business since March 2005.  Before joining the predecessor business, Mr.

26  Nielsen served as the predecessor's outside legal counsel with the law firm of Nevers, Palazzo,

27  Maddux & Packard.  Prior to that, Mr. Nielsen practiced law privately including with Brobeck,

28  Phleger & Harrison.  Mr. Nielsen's private practice experience included representation of

1  developers, investors, corporate users and lenders in connection with the acquisition, financing,

2  development, construction, sale and leasing of retail, office, industrial, hotel, and residential

3  projects.  Mr. Nielsen graduated magna cum laude in 1995 from Brigham Young University's J.

4  Reuben Clark Law School, and thereafter served as a law clerk to the Hon. Howard M. Kirshbaum

5  of the Colorado Supreme Court.

6  **B.     COMPENSATION OF MMPI EXECUTIVE OFFICERS**

7         The following table sets forth the compensation paid by MMPI to each of their current

8  executive officers, for services rendered in their respective capacities in 2009.   The executive

9  officers' salaries remained the same in 2010 and will be the same as of the Effective Date.

10

11

| Name | Capacity in Which Served | Compensation |
|---|---|---|
| Richard Meruelo | Chief Executive Officer | $470,350 |
| John Maddux | President and Chief Operating Officer | $472,880 |
| Todd Nielsen | General Counsel and Corporate Secretary | $278,483 |
| Miguel E. Echemendia | Chief Administrative Officer | $278,483 |
| Fred Skaggs | Chief Accounting Officer | $278,115 |
| Lynn Beckemeyer | Executive Vice President for Development | $278,279 |
| Andrew Murray | Chief Financial Officer | $279,630 |

22         John Maddux and Richard Meruelo will continue to receive their car allowances.  The

23  officers will receive reimbursement of expenses pursuant to customary company procedures.

24  Historically, in 2007 and 2008, the Debtors' officers have received cash bonuses.  For 2007 and

25  2008 the Debtors' officers received cash bonuses pursuant to the terms of their employment

26  agreements as follows:

27

28

359261.05 [XP]    25195

| Name | Annual Bonus Amount |
|------|---------------------|
| Richard Meruelo | $225,000 |
| John Charles Maddux | $225,000 |
| Todd Nielsen | $68,750 |
| Andrew Murray | $68,750[10] |
| Miguel E. Echemendia | $68,750 |
| Fred Skaggs | $68,750 |
| Lynn Beckemeyer | $68,750 |

The Debtors did not pay bonuses to the officers in 2009.  The Debtors may pay bonuses to the officers during the Plan term as determined by the Board of Directors, in its discretion.  In addition, pursuant to Employment Agreements between the Company and each of Richard Meruelo, John Maddux and Andrew Murray, Richard Meruelo and John Maddux are entitled to receive annual bonuses in a minimum amount equal to 50% of their base compensation and Andrew Murray is entitled to receive a bonus in a minimum amount equal to 25% of his base compensation.   Such bonuses are payable on December 31 of each year of their term of employment.  Upon assumption of the Employment Agreements, the Debtors will be required to pay the Bonuses due on December 31, 2009, totaling $518,750 and the bonuses due on December 31, 2010 totaling $518,750.

## IX.

## CONFIRMATION AND CONSUMMATION PROCEDURE

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

## A.     SOLICITATION OF VOTES

In accordance with Sections 1126 and 1129 of the Bankruptcy Code, the following Classes of Claims are Impaired, and the Holders of Allowed Claims in each of these Classes are entitled to vote to accept or reject the Plan of this Debtor or Debtors against whom they have a claim:

---

[10]    2008 only

1    •    Classes 10A, 11A, 12A, 13A, 14A, 15A, 16A, 18A, 20A, 21A-1, 22A, 24A, 25A,

2    26A, 27A-1, 28A-1, 38A-1, 29A-1, 30A-1, 32A-1, 33A-1, 34A-1, 35A-1, 36A-1, 37A-1, 38A-1,

3    39A-1, 40A-1, 41A-1, 42A-1, 43A-1, 44A-1, 45A-1, 46A-1, 47A-1, 48A-1, 49A-1, 51A-1, 52A-1,

4    53A-1, and 54A-1 (consisting of Secured Tax Claims against the Debtors);

5    •    Classes 21A-2, 28A-2, 29A-2, 29A-3, 29A-4, 30A-2, 32A-2, 33A-2, 34A-2, 35A-2,

6    36A-2, 36A-3, 36A-4, 37A-2, 37A-3, 37A-4, 38A-2, 39A-2, 40A-2, 41A-2, 42A-1, 43A-2, 44A-2,

7    45A-2, 46A-2, 47A-2, 48A-2, 49A-2, 50A-2, 50A-3, 51A-2, 51A-3, 52A-2, 53A-2, 54A-2, and

8    54A-3 (consisting of the Secured Claims of lenders and other secured creditors);

9    •    Classes 1C-2A, 1C-2B, 1C-3, 2C-2, 2C-3, 3C, 6C, 7C, 8C-2, 9C-2, 10C-2, 11C-3,

10    12C-3, 13C-2, 14C-3, 15C-2, 16C-2, 18C-2, 20C, 21C-3, 22C, 23C, 24C-2, 25C-3, 26C-3,  27C-3,

11    28C-3, 29C-2, 30C-3, 31C-2, 32C, 32C-3, 33C-3, 34C-3, 35C-2, 36C-3, 37C-2, 38C-3, 39C-3,

12    40C-3, 41C-3, 42C-2, 43C-2, 44C-2, 45C-2, 46C-2, 47C-2, 48C-2, 49C-2, 50C-2, 51C-2, 52C-3,

13    53C,  and 54C-3 (consisting of the general unsecured Claims against each relevant Debtor).

14    Class 1E (consisting of the Interests in MMPI).

15    The Plan provides for the merger of MMPLP into MMPI.  The interests of the holders of

16    LTIP units in Class 2E will be cancelled and extinguished at the Effective Date and the remaining

17    interests will be extinguished as a result of the merger of MMPLP and MMPI.  As a result Class 2E

18    is deemed to reject the Plan and is not entitled to vote on the Plan.

19    The following Classes of the Plan are Unimpaired.  As a result, Holders of Claims and

20    Interests in those Classes are conclusively presumed to have accepted the Plan and the solicitation

21    of acceptances with respect to such Classes is not required under Section 1126(f) of the Bankruptcy

22    Code:

23    •    Classes 1B, 5B, 32B, 33B, 36B and 52B, (consisting of the Priority Unsecured

24    Benefits Claims of present and former employees of each relevant Debtor);

25    •    Classes 11C-1, 12C-1, 14C-1, 21C-1, 25C-1, 26C-1, 27C-1, 28C-1, 30C-1, 32C-1,

26    33C-1, 34C-1, 35C-3, 36C-1, 37C-1, 38C-1, 39C-1, 40C-1, 41C-1, 43C-3, 44C-3, 46C-1, 48C-3,

27    49C-3, 52C-1 and 54C-1 (consisting of the unsecured Claims for security deposits of the Debtors'

28    tenants);

152

1    •      Classes 1C-1, 2C-1, 4C-1, 4C-2, 5C-2, 8C-1, 9C-1, 10C-1, 11C-2, 12C-2, 13C-1,

2   14C-2, 15C-1, 16C-1, 17C, 18C-1, 19C-1, 19C-2, 21C-2, 23C, 24C-1, 25C-2, 26C-2, 27C-2, 28C-

3   2, 29C-1, 30C-2, 31C-1, 32C-2, 33C-2, 34C-2, 35C-1, 36C-2, 38C-2, 39C-2, 40C-2, 41C-2, 42C-1,

4   43C-1, 44C-1, 45C-1, 47C-1, 48C-1, 49C-1, 50C-1, 51C-1, 52C-2, and 54C-2 (consisting of the

5   Convenience Claims and other classes of unimpaired general unsecured claims of each relevant

6   Debtor);

7    •      Classes 2D through 7D, 9D-35D, and 37D-53D (consisting of the Intercompany

8   Claims);

9    •      Classes 3E through 54E (consisting of the Interests of the Debtors other than MMPI

10  and MMPLP).

11          As to the Classes of Claims entitled to vote on a Plan, the Bankruptcy Code defines

12  acceptance of a Plan by a Class of creditors as acceptance by Holders of at least two-thirds in dollar

13  amount and more than one-half in number of the Claims of that Class that have timely voted to

14  accept or reject a Plan.  A Class of Interests has accepted the Plan if Holders of such Interests

15  holding at least two-thirds in amount actually voting have voted to accept the Plan.  Holders of

16  Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.  A

17  vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that

18  acceptance or rejection was not solicited or procured in good faith or in accordance with the

19  provisions of the Bankruptcy Code.

20          Any creditor in an impaired Class: (i) whose Claim has been listed by the Debtors in the

21  Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as

22  disputed, contingent or unliquidated) or (ii) who filed a proof of Claim on or before the Bar Date or

23  any proof of Claim filed within any other applicable period of limitations or with leave of the

24  Bankruptcy Court, which Claim is not the subject of an objection or request for estimation, is

25  entitled to vote on the Plan.

26      **B.      THE CONFIRMATION HEARING**

27          The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation

28  hearing.  The Confirmation Hearing in respect of the Plan has been scheduled for January 12, 2011,

153

359261.05 [XP]   25195

1  commencing at 9:30 a.m., Los Angeles Time, before, the Honorable Victoria S. Kaufman of the

2  United States Bankruptcy Court, Courtroom 301, 21041 Burbank Blvd., Woodland Hills,

3  California 91367. The Confirmation Hearing may be adjourned from time to time by the

4  Bankruptcy Court without further notice except for an announcement of the adjourned date made at

5  the Confirmation Hearing. The Plan may be modified by the Debtors pursuant to Section 1127 of

6  the Bankruptcy Code prior to, during or as a result of that hearing, without further notice to parties

7  in interest.

8  Any objection to confirmation must be made in writing and specify in detail the name and

9  address of the objector, all grounds for the objection and the amount of the Claim or number of

10  shares of stock held by the objector. Any such objection must be filed with the Bankruptcy Court

11  and served so that it is received by the Bankruptcy Court, the Committees and the Debtors on or

12  before _____, 2010. Objections to confirmation of the Plan are governed by

13  Bankruptcy Rule 9014.

14  **C.      CONFIRMATION**

15  At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the

16  requirements of Section 1129 of the Bankruptcy Code are met. Among the requirements for

17  confirmation of a Plan are that the Plan is (i) accepted by all impaired Classes of Claims and

18  Interests or, if rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is

19  "fair and equitable" as to such Class, (ii) feasible and (iii) in the "best interests" of creditors and

20  stockholders that are impaired under the Plan.

21  **1.      Acceptance**

22  The Classes identified above in Section IX.A are impaired and are entitled to vote to accept

23  or reject the Plan.

24  The Debtors reserve the right to amend the Plan in accordance with the terms of the Plan or

25  seek nonconsensual confirmation of the Plan under Section 1129(b) of the Bankruptcy Code or

26  both with respect to any Class of Claims or Interests that is entitled to vote to accept or reject the

27  Plan, if such Class rejects the Plan.

28

154

359261.05 [XP]   25195

## 2. Unfair Discrimination and the Fair and Equitable Tests

Section 1129(b) of the Bankruptcy Code provides that a Plan can be confirmed even if it has not been accepted by all impaired Classes as long as at least one impaired Class of Claims has accepted it.  The Bankruptcy Court may confirm the Plan as to one or more Debtors at the request of such Debtors notwithstanding the Plan's rejection (or deemed rejection) by impaired Classes in the case of such Debtors as long as the Plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired Class that has not accepted it.   A Plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting Class if the value of the cash and/or securities to be distributed to the nonaccepting Class is equal to, or otherwise fair when compared to, the value of the distributions to other Classes whose legal rights are the same as those of the nonaccepting Class or is otherwise permitted under the circumstances.

The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

•    Secured Creditors.  Either: (i) each impaired secured creditor retains its liens securing its secured Claim and receives on account of its secured Claim deferred cash payments having a present value equal to the amount of its allowed secured Claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured Claim; or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

•    Unsecured Creditors.  Either: (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed Claim; or (ii) the Holders of Claims and interests that are junior to the Claims of the dissenting Class will not receive any property under the Plan.

•    Interests.  Either: (i) each holder of an Interests will receive or retain under the Plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest;

1  or (ii) the holder of an interest that is junior to the nonaccepting Class will not receive or retain any

2  property under the Plan.

3                            **3.    Feasibility**

4         To confirm the Plan, the Bankruptcy Code must find that confirmation of the Plan is not

5  likely to be followed by liquidation or the need for further financial reorganization of the Debtors.

6  This requirement is imposed by Section 1129(a) of the Bankruptcy Code and is referred to as the

7  "feasibility" requirement.

8         There are at least two important aspects of a feasibility analysis.  The first aspect considers

9  whether the Debtors will have enough cash on hand on the Effective Date of the Plan to pay all the

10  Claims and expenses which are entitled to be paid on such date.

11        The other aspect of feasibility considers whether the Reorganized Debtors will have enough

12  cash over the life of the Plan to make the required Plan payments.  For purposes of determining

13  whether the Plan meets the feasibility requirement, the Debtors have analyzed their ability to meet

14  their obligations under the Plan.  As part of this analysis, the Debtors have prepared projections of

15  their financial performance for seven years following the Effective Date through December 31,

16  2017 (the "Projection Period").  These projections, and the assumptions on which they are based,

17  are included in the Debtors' Projected Financial Information, annexed hereto as Exhibit "E" and

18  provide a projected Consolidated Statement of Cash Flow for the Debtors on a monthly basis for

19  the first two years of the Projection Period and on an annual basis for each of the seven years of the

20  Projection Period.  The Projections also provide a projected Cash Flow for each of the Operating

21  Debtors on a monthly basis for the first two years of the Projection Period and on an annual basis

22  for each of the seven years of the Projection Period.  Exhibit E also contains a statement of the

23  results of actual operating revenues and expenses for the period April 1, 2009 through March 31,

24  2010.

25        The pro forma financial information and the projections are based on the assumption that

26  the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, that the Effective

27  Date under the Plan will occur on or before January 1, 2011.  Based upon the Debtors' Projected

28  Financial Information, the Debtors believe that they will be able to make all payments required

1  pursuant to the Plan and, therefore, that confirmation of the Plan is not likely to be followed by

2  liquidation or the need for further reorganization.  The Projections show that the Debtors will have

3  sufficient funds to meet this Effective Date payment obligation.  The Plan calls for the repayment

4  of the secured claims within 5 years after the Effective Date if the relevant Secured Creditor votes

5  in favor of the Plan and within 7 years after the Effective Date if the relevant Secured Creditor

6  votes against the Plan.  The Secured Claims of the Debtors will be repaid during this time period

7  either from the refinancing of the secured Debt post-Effective Date or the sale of the Collateral for

8  such Debt.  Upon the sale of such Collateral, the proceeds will be used to pay the costs of sale and

9  any secured claim that is secured by the Collateral to be sold.  Excess proceeds would be

10  unencumbered funds available for the Reorganized Debtors use in the operation of their businesses

11  or for the payment of claims as determined by the Reorganized Debtors' in the sound exercise of

12  their business judgment.

13          The Debtors have prepared their financial projections, with the assistance of their advisors

14  based upon certain assumptions that they believe to be reasonable under the circumstances.  Those

15  assumptions considered to be significant are described in Exhibit "E" hereto.   The financial

16  projections have not been examined or compiled by independent accountants.  The Debtors make

17  no representation as to the accuracy of the projections or their ability to achieve the projected

18  results.  Many of the assumptions on which the projections are based are subject to significant

19  uncertainties.  Inevitably, some assumptions will not materialize and unanticipated events and

20  circumstances may affect the actual financial results.  Therefore, the actual results achieved

21  throughout the Projection Period may vary from the projected results and the variations may be

22  material.  All Holders of Claims that are entitled to vote to accept or reject the Plan are urged to

23  examine carefully all of the assumptions on which the financial projections are based in connection

24  with their evaluation of the Plan.

25          **4.      Best Interests Test**

26          Even if a plan is accepted by each Class of Holders of Claims and Interests, the Bankruptcy

27  Code requires a bankruptcy court to determine that the plan is in the "best interests" of all Holders

28  of Claims and Interests that are impaired by the plan and that have not accepted the Plan.  The "best

359261.05 [XP]   25195

interests" test, as set forth in Section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy

Court to find either that: (i) all members of an impaired Class of Claims or interests have accepted

the plan or (ii) the plan will provide a member who has not accepted the plan with a recovery of

property of a value, as of the effective date of the plan, that is not less than the amount that such

holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.  Once

the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority

claimants, it must determine the probable distribution to general unsecured creditors and equity

security holders from the remaining available proceeds in liquidation.  If such probable distribution

has a value greater than the distributions to be received by such creditors and equity security

holders under a debtor's plan, then such plan is not in the best interests of creditors and equity

security holders.

To determine what Holders of Claims and Interests in each impaired Class would receive if

the Debtors were liquidated under Chapter 7, the Bankruptcy Court must determine the dollar

amount that would be generated from the liquidation of the Debtors' assets and properties in the

context of a Chapter 7 liquidation case.  The Cash amount that would be available for satisfaction

of Claims and Interests would consist of the proceeds resulting from the disposition of the

unencumbered assets and properties of the Debtors, augmented by the unencumbered Cash held by

the Debtors at the time of the commencement of the liquidation case.  Such Cash amount would be

reduced by the costs and expenses of liquidation and by such additional administrative and priority

Claims that might result from the termination of the Debtors' business and the use of Chapter 7 for

the purposes of liquidation.

The Debtors' costs of liquidation under Chapter 7 would include the fees payable to a

trustee in bankruptcy, as well as those fees that might be payable to attorneys and other

professionals that such a trustee might engage.  In addition, other Claims that might arise in a

liquidation case or result from the pending Chapter 11 Cases, including any unpaid expenses

incurred by the Debtors during the Cases, such as compensation for attorneys, financial advisors

and accountants, would be paid in full from the liquidation proceeds before the balance of those

proceeds would be made available to pay general unsecured Claims.  Moreover, the costs of

158

1   liquidation in these cases could be greater due to the fact that there is no guarantee that only one

2   trustee would be appointed for each of the 54 related cases.  If more than one trustee is appointed,

3   the costs of liquidation will be increased as each such trustee will retain its own professionals to

4   assist it with the case.

5          To determine if the Plan is in the best interests of each impaired Class, the present value of

6   the distributions from the proceeds of a liquidation of the Debtors' unencumbered assets and

7   properties, after subtracting the amounts attributable to the foregoing Claims, must be compared

8   with the present value of the property offered to such Classes of Claims under the Plan.

9          After considering the effects that a Chapter 7 liquidation would have on the ultimate

10  proceeds available for distribution to creditors in the Chapter 11 Cases, including: (i) the increased

11  costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in

12  bankruptcy and professional advisors to such trustee; (ii) the erosion in value of assets in a Chapter

13  7 case in the context of the expeditious liquidation required under Chapter 7 and the "forced sale"

14  atmosphere that would prevail; and (iii) the substantial increases in Claims that would be satisfied

15  on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors have determined

16  that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is

17  not less than the recovery such holder would receive pursuant to the liquidation of the Debtors

18  under Chapter 7.

19         The Liquidation Analysis for each of the Property Level Debtors, MMPI and MMPLP, is

20  attached hereto as Exhibit "G."  The information set forth in Exhibit G provides a summary of the

21  liquidation values of each of such Debtors' assets, assuming a Chapter 7 liquidation in which a

22  trustee appointed by the Bankruptcy Court would liquidate the assets of the Estates.  Reference

23  should be made to the Liquidation Analysis for a complete discussion and presentation of the

24  Liquidation Analysis.  Underlying the Liquidation Analysis are a number of estimates and

25  assumptions that, although developed and considered reasonable by the Debtors' management, are

26  inherently subject to significant economic and competitive uncertainties and contingencies beyond

27  the control of the Debtors and their management.  The Liquidation Analysis also is based on

28  assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the

359261.05 [XP]    25195

1  values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation.

2  The Chapter 7 liquidation period is assumed to be a period of several years, primarily allowing for

3  the sale of the real property assets of the Debtors.

4        **D.     CONSUMMATION**

5        The Plan will be consummated on the Effective Date.  The Effective Date of the Plan will

6  occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan,

7  as set forth in the Plan, have been satisfied or waived by the Debtors pursuant to the terms of the

8  Plan.  For a more detailed discussion of the conditions precedent to the Plan and the consequences

9  of the failure to meet such conditions, see Article X of this Disclosure Statement.  The Plan is to be

10  implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

11             **X.**

12  **CONFIRMATION DATE CONDITIONS**

13        **A.     CONDITIONS TO CONFIRMATION**

14        The conditions to Confirmation shall be the following:

15        (1)     The satisfaction of the requirements of Section 1129 of the Bankruptcy Code;

16        (2)     The Confirmation Order shall (i) be acceptable in form and substance to the Debtors

17  (in the Debtors' sole and absolute discretion) and (ii) expressly authorize and direct the Debtors to

18  perform the actions that are conditions to the effectiveness of the Plan; and

19        (3)     Each of the events and actions required by the Plan to occur or to be taken prior to

20  Confirmation shall have occurred or have been taken, or the Debtors or the party whose obligations

21  are conditioned by such occurrences and/or actions, as applicable, shall have waived such

22  occurrences or actions.

23        **B.     CONDITIONS TO EFFECTIVE DATE**

24        The Plan shall not become effective unless and until it has been confirmed and the

25  following condition has been satisfied in full or waived by the Debtors:  the Confirmation Order in

26  a form satisfactory to the Debtors shall have become a Final Order.

27

28

**C.    WAIVER OF CONDITIONS**

1

2          The Debtors may waive any or all of the other conditions set forth in the Plan without leave

3   of or order of the Bankruptcy Court and without any formal action.  The Debtors reserve the right

4   to amend or revoke the Plan.  Although this Plan is styled as a joint Plan, the Debtors reserve the

5   right to proceed with Confirmation under this Plan for one Debtor, or a combination of Debtors,

6   and not the others.

7          **D.    EFFECT OF FAILURE OF CONDITIONS**

8          In the event that the Effective Date does not occur, upon notification submitted by the

9   Debtors to the Bankruptcy Court: (a) the Confirmation Order shall be vacated, (b) no distributions

10  under the Plan shall be made, (c) the Debtors and all Holders of Claims and Interests shall be

11  restored to the status quo ante as of the day immediately preceding the Confirmation Date as

12  though the Confirmation Date had never occurred, and (d) the Debtors' obligations with respect to

13  the Claims and Interests shall remain unchanged and nothing contained in the Plan shall constitute

14  or be deemed a waiver or release of any Claims or Interests by or against the Debtors or any other

15  person or to prejudice in any manner the rights of the Debtors or any person in any further

16  proceedings involving the Debtors.

17         **E.    VACATUR OF CONFIRMATION ORDER**

18         If an order denying confirmation of the Plan is entered, then the Plan shall be null and void

19  in all respects, and nothing contained in the Plan shall (a) constitute a waiver or release of any

20  Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Holder of

21  any Claim against, or Interest in, the Debtors; (c) prejudice in any manner any right, remedy or

22  Claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

23                                              **XI.**

24                          **RETENTION OF JURISDICTION**

25         Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective

26  Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the

27  Effective Date to the full extent permitted by law, including, without limitation, jurisdiction to:

28

359261.05 [XP]    25195

(a)     Allow, disallow, determine, liquidate, classify, subordinate, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim, the resolution of any objections to the allowance or priority of Claims or Interests and the resolution of any dispute as to the treatment necessary to reinstate a Claim pursuant to the Plan;

(b)     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending before the Effective Date;

(c)     Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which the any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising there from;

(d)     Ensure that distributions to Holders of Allowed Claims or Allowed Interests are accomplished pursuant to the provisions of the Plan;

(e)     Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtors, Reorganized Debtor or the Chapter 11 Cases that may be pending on the Effective Date;

(f)     Enter such Orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order, except as otherwise provided herein;

(g)     Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan or the Confirmation Order, including the release and injunction provisions set forth in and contemplated by the Plan and the Confirmation Order, or any entity's rights arising under or obligations incurred in connection with the Plan or the Confirmation Order;

(h)     Subject to any restrictions on modifications provided in any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, modify the Plan before or after the Effective Date pursuant to Section 1127 of the Bankruptcy Code or modify

162

1  the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or

2  other agreement or document created in connection with the Plan, the Disclosure Statement or the

3  Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any

4  Bankruptcy Court Order, the Plan, the Disclosure Statement, the Confirmation Order or any

5  contract, instrument, release, indenture or other agreement or document created in connection with

6  the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary

7  or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code;

8      (i)     Issue injunctions, enter and implement other Orders or take such other actions as

9  may be necessary or appropriate to restrain interference by any entity with consummation,

10  implementation or enforcement of the Plan or the Confirmation Order;

11      (j)     Enter and implement such Orders as are necessary or appropriate if the

12  Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

13      (k)     Determine any other matters that may arise in connection with or relating to the

14  Plan, this Disclosure Statement, the Confirmation Order or any contract, instrument, release,

15  indenture or other agreement or document created in connection with the Plan, the Disclosure

16  Statement or the Confirmation Order, except as otherwise provided in the Plan;

17      (l)     Enter an Order concluding the Chapter 11 Cases; and

18      (m)     In the event a Plan is confirmed in the Chapter 11 Case of MG 5707 S. Alameda and

19  / or the Chapter 11 Case of MM 1000 E. Cesar Chavez, prior in time to confirmation of a Plan in

20  the Chapter 11 Case of a Debtor that has pledged an interest in real property to a secured creditor

21  who is a Replacement Lien Property Pool Creditor, the Court shall retain jurisdiction over the real

22  properties owned by MG 5707 S. Alameda and / or MM 1000 E. Cesar Chavez until confirmation

23  of a Plan for each of the Debtors that have pledged an interest in real property to a secured creditor

24  who is a Replacement Lien Property Pool Creditor.

25      The foregoing list is illustrative only and not intended to limit in any way the Bankruptcy

26  Court's exercise of jurisdiction.  If the Bankruptcy Court abstains from exercising jurisdiction or is

27  otherwise without jurisdiction over any matter arising out of the Chapter 11 Cases, including

28  without limitation the matters set forth in this Article, this Article shall have no effect upon and

1  shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent

2  jurisdiction with respect to such matter.

3  <p align="center">**XII.**</p>

4  <p align="center">**PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER**</p>

5  <p align="center">**THE PLAN AND TREATMENT OF DISPUTED, CONTINGENT**</p>

6  <p align="center">**AND UNLIQUIDATED CLAIMS AND INTERESTS**</p>

7  **A.      VOTING OF CLAIMS AND INTERESTS**

8  Each Holder of an Allowed Claim or an Allowed Interest in an Impaired Class of Claims or

9  Interests shall be entitled to vote separately to accept or reject the Plan as provided in such order as

10  may be entered by the Bankruptcy Court establishing certain procedures with respect to the

11  solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the

12  Bankruptcy Court.

13  **B.      METHOD OF DISTRIBUTIONS UNDER THE PLAN**

14  **1.      Distributions Under the Plan**

15  The Chief Accounting Officer of MMPI, currently Fred Skaggs, will serve as Disbursing

16  Agent.  The Disbursing Agent will make all distributions of cash and securities required to be

17  distributed under the applicable provisions of the Plan.  The Disbursing Agent may employ or

18  contract with other entities to assist in or make the distributions required by the Plan.  The

19  Disbursing Agent will serve without bond, and the Disbursing Agent will not receive additional

20  compensation for distribution services rendered pursuant to the Plan.

21  Cash payments made pursuant to the Plan will be in U.S. dollars by checks drawn on a bank

22  selected by the Reorganized Debtor, or by wire transfer from a bank, at the option of Reorganized

23  Debtor.  Cash payments of $1,000,000 or more to be made pursuant to the Plan will, to the extent

24  requested in writing no later than five days after the Confirmation Date, be made by wire transfer

25  from a bank.  Cash payments to foreign creditors, if any, may be made, at the option of the

26  Reorganized Debtor, in such funds and by such means as are necessary or customary in a particular

27  foreign jurisdiction.

28

<p align="center">164</p>

### 2.     Timing and Methods of Distribution

#### a.     *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Disbursing Agent must comply with all tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements.  The Disbursing Agent will be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

Notwithstanding any other provision of the Plan:  (i) each Holder of an Allowed Claim or Interest that is to receive a distribution of Cash pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations, on account of such distribution; and (ii) no distribution will be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements satisfactory to the Disbursing Agent for the payment and satisfaction of such tax obligations.  Any Cash to be distributed pursuant to the Plan will, pending the implementation of such arrangements, be treated as an undeliverable distribution pursuant to the Plan.

#### b.     *Pro Rata Distributions*

When the Plan provides for Pro Rata distribution, the property to be distributed under the Plan shall be divided Pro Rata among the Holders of Allowed Claims or Allowed Interests of the relevant Class.

#### c.     *Distributions*

Distributions under the Plan shall be made by the Disbursing Agent to the Holders of Allowed Administrative Claims, Allowed Claims and Allowed Interests at the addresses set forth on the Schedules, unless such addresses are superseded by addresses listed on proofs of Claim or transfers of Claims filed pursuant to Bankruptcy Rule 3001, or at the last known address of such Holders if the Debtors or Reorganized Debtor has been notified in writing of a change of address.

359261.05 [XP]     25195

**C.     UNDELIVERABLE OR UNCLAIMED DISTRIBUTIONS**

Any Person that is entitled to receive a cash distribution under the Plan but that fails to cash a check within 90 days of its issuance shall be entitled to receive a reissued check from the Reorganized Debtor for the amount of the original check, without any interest, if such person requests the Disbursing Agent to reissue such check and provides the Disbursing Agent with such documentation as the Disbursing Agent requests to verify that such Person is entitled to such check, prior to the first anniversary of the Effective Date.  If a Person fails to cash a check within 90 days of its issuance and fails to request reissuance of such check prior to the first anniversary of the date on which the check is issued, such Person shall not be entitled to receive any further distribution under this Plan.  If the distribution to any Holder of an Allowed Claim or Allowed Interest is returned to a Disbursing Agent as undeliverable, no further distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified in writing of such Holder's then-current address.  Undeliverable distributions will remain in the possession of the Disbursing Agent pursuant to the Plan until such time as a distribution becomes deliverable.  Undeliverable cash will be held in trust in segregated bank accounts in the name of the Disbursing Agent for the benefit of the potential claimants of such funds, and will be accounted for separately.  The Disbursing Agent holding undeliverable cash shall invest such cash in a manner consistent with the Reorganized Debtor's investment and deposit guidelines.  Any distribution which is not claimed within thirteen months of the Effective Date shall be deemed property of the Reorganized Debtor.

**D.     DISPUTED CLAIMS, DISPUTED INTERESTS AND ESTIMATIONS**

**1.     Treatment of Disputed Claims or Interests**

Notwithstanding any other provisions of the Plan, no payments or distributions will be made on account of any Claim or Interest until such Claim or Interest becomes an Allowed Claim or Allowed Interest.  The Reorganized Debtor may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to Section 502(c) of the Bankruptcy Code, irrespective of whether the Reorganized Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any contingent or unliquidated Claim at any time during litigation concerning any

1    objection to the Claim, including during the pendency of any appeal relating to any such objection.

2    If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount will

3    constitute either the Allowed Amount of such Claim or a maximum limitation on such Claim, as

4    determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on

5    such Claim, the Reorganized Debtor may elect to pursue any supplemental proceedings to object to

6    any ultimate payment on account of such Claim.  All of these Claims objection, estimation and

7    resolution procedures are cumulative and not necessarily exclusive of one another.  In addition to

8    seeking estimation of Claims as provided in the Plan, the Reorganized Debtor may resolve or

9    adjudicate certain Disputed Claims of Holders in Unimpaired Classes in the manner in which the

10   amount of such Claim and the rights of the Holder of such Claim would have been resolved or

11   adjudicated if the Reorganization Cases had not been commenced, subject to any applicable

12   discharge and limitations on amounts of Claims and remedies available under bankruptcy law.

13   Claims may be subsequently compromised, settled, withdrawn or resolved by the Reorganized

14   Debtor.

15                    **2.        Distribution on Account of Disputed Claims or Interests Once They Are**

16                           **Allowed**

17            In the event a Disputed Claim becomes an Allowed Claim after the Effective Date, the

18   payment will be due and payable 30 days after the date an Order allowing such Claim becomes a

19   Final Order.  Such distributions will be made pursuant to the provisions of the Plan governing the

20   applicable Class.  Holders of Disputed Claims or Disputed Interests that are ultimately allowed will

21   also be entitled to receive, on the basis of the amount ultimately allowed, matured and payable

22   interest, if any, at the rate provided for the Class to which such Claim belongs.

23                    **3.      Allowance of Claims Subject to Bankruptcy Code Section 502(d)**

24            Allowance of Claims shall be in all respects subject to the provisions of Section 502(d) of

25   the Bankruptcy Code.

26        **E.      SETOFFS**

27            Except with respect to Claims of the Debtors and Reorganized Debtor released pursuant to

28   the Plan or any contract, instrument, release, indenture or other agreement or document created in

359261.05 [XP]     25195

1  connection with the Plan, the Reorganized Debtor may, pursuant to Section 553 of the Bankruptcy

2  Code or applicable nonbankruptcy law, set off against any Allowed Claim and the distributions to

3  be made pursuant to the Plan on account of such Claim (before any distribution is made on account

4  of such Claim), the Claims, rights and causes of action of any nature that the Reorganized Debtor

5  may hold against the Holder of such Allowed Claim; provided, however, that neither the failure to

6  effect such a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by

7  Reorganized Debtor of any such Claims, rights and causes of action that the Debtors and the

8  Reorganized Debtor may possess against such Holder.

9

10                                          **XIII.**

11                   **CERTAIN RISK FACTORS TO BE CONSIDERED**

12        **HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS SHOULD READ**

13  **AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS**

14  **THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND**

15  **THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED**

16  **BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.**

17  **THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS**

18  **CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN**

19  **AND ITS IMPLEMENTATION.**

20        **A.      CERTAIN BANKRUPTCY LAW CONSIDERATIONS**

21                **1.      Risk of Non-Confirmation of the Plan**

22        Although the Debtors believe that the Plan will satisfy all requirements necessary for

23  confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will

24  reach the same conclusion.  Moreover, there can be no assurance that modifications to the Plan will

25  not be required for confirmation or that such modifications would not necessitate the resolicitation

26  of votes.

27

28

### 2.   Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in Article V of the Plan have not occurred or been waived by the Debtors within one hundred and twenty (120) days after the Confirmation Date, the Confirmation Order shall be vacated, in which event no distributions under the Plan would be made, the Debtors and all Holders of Claims and Interests would be restored to the status quo ante as of the day immediately preceding the Confirmation Date and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### B.   RISKS TO RECOVERY BY HOLDERS OF CLAIMS

#### 1.   Ability to Service Debt

The Reorganized Debtor's ability to make scheduled payments of principal, to pay the interest on, to refinance its indebtedness will depend on future performance.  Future performance is, to a certain extent, subject to general economic, financial, competitive, legislative, regulatory and other factors that are beyond the Reorganized Debtor's control.  While no assurance can be provided, based upon the current level of operations and anticipated increases in revenues and cash flow described in the financial projections attached as Exhibit E hereto, the Debtors believe that cash flow from operations, available cash, debt refinancings and sales and the Debtors' ability to sell assets as necessary to fund its operations, of assets will be adequate to fund the Plan and meet their future liquidity needs.

#### 2.   Risks of Asset Disposition Delays

The Plan relies, in part, on generating proceeds from real estate sales to pay Claims in the event operating revenues are insufficient.  In the event that sales are delayed due to economic or other constraints, payments may be correspondingly delayed.

#### 3.   Risks Related to Dependence on Key Personnel

The Debtors success depends to a significant extent on the continued services of their senior management and other members of management.  The Debtors' senior management has extensive

1   expertise in the real estate industry.  The Debtors could be adversely affected if one or more

2   members of its current management were unwilling or unable to continue in their employment.

3   **4.      Projected Financial Information**

4         The financial projections included as Exhibit E hereto are dependent upon the successful

5   implementation of the Plan and the validity of the other assumptions contained therein.  These

6   projections reflect numerous assumptions, including confirmation and consummation of the Plan in

7   accordance with its terms, the anticipated future performance of the Reorganized Debtor, industry

8   performance, general business and economic conditions and other matters, many of which are

9   beyond the control of the Reorganized Debtor.  In addition, unanticipated events and circumstances

10  occurring subsequent to the preparation of the projections may affect the actual financial results of

11  the Reorganized Debtors.  Although the Debtors believe that the projections are reasonably

12  attainable, variations between the actual financial results and those projected may occur and may be

13  material.

14  **5.      Failure to Confirm One or More of the Debtors' Chapter 11 Plans.**

15        This Plan is a joint Plan for 54 related debtor entities.  The Debtors are seeking

16  confirmation of the Plan separately for each of the 54 related Chapter 11 Cases.  It is possible that

17  the Debtors will not be able to achieve confirmation in one or more of the 54 Chapter 11 Cases.

18  Nevertheless, the Debtors believe that they have a strong likelihood of confirming their Cases.  In

19  the event one or more Debtors' Cases are not confirmed, the affected Debtors will re-evaluate their

20  options in light of their inability to confirm the plan, which options would include without

21  limitation, an alternative plan of reorganization, conversion of the case to a chapter 7 case or

22  dismissal of the case.

23        The Debtors believe that their inability to achieve confirmation for one or more of the

24  Chapter 11 Cases will not have a material impact on the Debtors' ability to implement the Plan for

25  the remaining Debtors and make the payments required under the Plan.  The Debtors believe that

26  they have sufficient equity in their properties and sufficient unencumbered assets to monetize

27  additional assets as needed to meet the cash flow needs of the enterprise in the event one or more

28  the Debtors' cases is not confirmed. As an example, the Debtors assert that even in the unlikely

1   event that the cases of each of the eleven Debtors with positive cash flow (i.e., in excess of their

2   respective expenses) were not confirmed, the Debtors would still be able to implement the Plan

3   with respect to the remaining Debtors.  The loss of the revenue from the income producing Debtors

4   would result in a shortfall of approximately $4.2 million per year, or approximately $29.4 million

5   over the term of the Plan.  In that event, the Debtors would be required to monetize additional

6   assets, reduce costs, refinance debt and increase revenues more quickly to meet their cash flow

7   needs.  The Debtors will have sufficient cash on hand following confirmation from, at minimum,

8   the remaining proceeds from the sale of MM 845 S. Flower's Project to fund operations while

9   assets are sold, costs are reduced, refinancing is completed and revenues are increased.  Finally, if

10  one or more non-cash flow producing Debtors are among those that are not confirmed, the failure

11  to achieve confirmation for those Debtors may well have a neutral or non-detrimental effect on the

12  feasibility of the Plan and the Debtors' ability to make payments thereunder.

**6.    Risk Related to the Litigation Claim Filed by East West Bankcorp and
EWB Against MMPI and Richard Meruelo (the "EWB Complaint").**

15          The EWB Complaint seeks recovery of damages and punitive damages from MMPI and its

16  CEO Richard Meruelo allegedly resulting from the issuance of a press release by MMPI on

17  September 9, 2010.  There is a risk that EWB could be successful on its Complaint and obtain an

18  award of damages and punitive damages against MMPI and CEO Richard Meruelo.  Entry of

19  judgment in favor of EWB may have an impact on the Debtors' ability to make payments to

20  creditors under the Plan depending on the magnitude of any such allowed claim. The Debtors do

21  not believe that this risk is significant because the Debtors believe that they have no liability to

22  EWB for the claims asserted in the EWB Complaint.  Further, the Debtors have tendered the claims

23  asserted in the EWB Complaint to their insurers and, to the extent any liability exists, the Debtors

24  believe that any such claim would be covered by insurance.  The Debtors also believe that they

25  may have counter-claims that may offset or eliminate any liability.  The Debtors have informed

26  their proposed lender, Watermarke Properties, Inc. ("Watermarke") of the existence of the EWB

27  Complaint and Watermarke has informed the Debtors that the successful resolution of the EWB

28  Complaint is not a condition to Watermarke proceeding with its proposed loan to the Debtors.

171

# XIV.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

A summary description of certain United States federal income tax consequences of the Plan is provided below.  This description is for informational purposes only and, due to a lack of definitive judicial or administrative authority or interpretation, substantial uncertainties exist with respect to various tax consequences of the Plan as discussed herein.  Only the principal United States federal income tax consequences of the Plan to the Debtors and to holders of Claims who are entitled to vote to accept or reject the Plan are described below.  No opinion of counsel has been sought or obtained with respect to any tax consequences of the Plan.  No rulings or determinations of the Internal Revenue Service (the "IRS") or any other tax authorities have been sought or obtained with respect to any tax consequences of the Plan, and the discussion below is not binding upon the IRS or such other authorities.  No representations are being made regarding the particular tax consequences of the confirmation and consummation of the Plan to the Debtors or any holders of Claims.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein.

The discussion of United States federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code") Treasury Regulations, judicial authorities, published positions of the IRS and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).

The following discussion does not address foreign, state or local tax consequences of the Plan, nor does it purport to address the United States federal income tax consequences of the Plan to special classes of taxpayers (e.g., persons who are related to the Debtors within the meaning of the Tax Code, banks and certain other financial institutions, insurance companies, tax-exempt organizations, governmental entities, persons that are, or hold their Claims through, pass-through entities, persons whose functional currency is not the United States dollar, foreign persons, dealers in securities or foreign currency, employees, holders of LTIP Units persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation and

359261.05 [XP]    25195

1  persons holding Claims that are a hedge against, or that are hedged against, currency risk or that are

2  part of a straddle, constructive sale or conversion transaction).  Furthermore, the following

3  discussion does not address United States federal taxes other than income taxes.

4       Each holder is strongly urged to consult its own tax advisor regarding the United States

5  federal, state, and local and any foreign tax consequences of the transactions described herein and

6  in the Plan.

7       IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH

8  REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS

9  SUMMARY (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO

10  BE USED, AND CANNOT BE USED BY ANY TAXPAYER FOR THE PURPOSE OF

11  AVOIDING PENALTIES UNDER THE TAX CODE. ANY TAX ADVICE CONTAINED IN

12  THIS SUMMARY (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE

13  PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY

14  THE SUMMARY. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE

15  TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX

16  ADVISER.

17  **A.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES**

18  **TO THE DEBTORS**

19       **1.      Net Operating Losses**

20       The Debtors currently have significant net operating loss ("NOL") carryforwards for federal

21  income tax purposes and expect to incur a substantial additional NOL during their current taxable

22  year.  The amount of such NOL carryforwards remains subject to adjustment by the IRS.  As

23  discussed below, the amount of the Debtors' NOL carryforwards, and possibly certain other tax

24  attributes, will be reduced, and the subsequent utilization of such NOL carryforwards and other tax

25  attributes may be restricted upon the implementation of the Plan.  Because almost all of the Debtors

26  are limited liability companies, the NOLs generally may be utilized to reduce income taxes that

27  otherwise would be paid by such Debtors.  The only Property Level Debtor that is a Subchapter C

28  corporation is Santa Fe Commerce Center.  NOLs that may be offset against gains realized by

359261.05 [XP]    25195

1    MMPI and its limited liability company subsidiaries may not be available to offset gains realized

2    by Santa Fe Commerce.

3                              **2.    Cancellation of Debt**

4           In general, the Tax Code allows a debtor in a bankruptcy case to exclude from income any

5    cancellation of indebtedness income ("CODI") that is realized, but the debtor must reduce certain

6    of its tax attributes - such as NOL carryforwards, current year NOLs, tax credits and tax basis in

7    assets by the amount of the CODI that is excluded from income.  CODI is that amount by which

8    the adjusted issue price (including accrued but unpaid interest) of the indebtedness satisfied

9    exceeds the cash and fair market value of the other property issued therefor, subject to certain

10   statutory or judicial exceptions that can apply to limit the amount of CODI (such as where the

11   payment of the cancelled debt would have given rise to a tax deduction).  To the extent the amount

12   of excluded CODI exceeds the tax attributes available for reduction, the remaining CODI is simply

13   forgiven.  Any reduction in tax attributes does not effectively occur until the first day of the taxable

14   year following the year the CODI occurs.  If advantageous, a debtor could elect to reduce the basis

15   of depreciable property prior to any reduction in its loss carryforwards.

16          As a result of the implementation of the Plan, the Debtors expect to realize CODI in an

17   amount that is less than its current year NOL and NOL carryforwards.  Recent legislation allows

18   certain taxpayers that recognize CODI in 2009 or 2010 to elect to include the CODI in taxable

19   income ratably over the five (5) year period beginning in the fourth or fifth tax year, depending on

20   whether the CODI is recognized in 2009 or 2010 (a "CODI Deferral Election").  The deferral ends

21   if the taxpayers liquidates or sells substantially all of its assets.  If this election is available to a

22   debtor in bankruptcy, the debtor may elect to include the CODI in taxable income on a deferred

23   basis rather than excluding the CODI from taxable income and reducing its tax attributes by the

24   amount of the CODI in the year the CODI arises.  The Debtors do not currently expect to make the

25   CODI Deferral Election.

26

27

28

### 3. Limitation on NOL Carryforwards and Other Tax Attributes

Following the implementation of the Plan, any NOLs and carryforwards and possibly certain other tax attributes of the Debtors, allocable to periods prior to the Effective Date, may be subject to the limitations imposed by Section 382 of the Tax Code.

Under Section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception discussed below, the amount of its pre-change losses that may be utilized to offset future taxable income is, in general, subject to an annual limitation.  Such limitation also may apply to certain losses or deductions, which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change that are subsequently recognized.  Since interests in MMPI are unimpaired, there will not be an ownership change.

### 4. General Section 382 Limitation

In general, the amount of the annual limitation to which a corporation would be subject would be equal to the product of (i) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (4% for ownership changes occurring in June 2010).

Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year.  However, if the corporation does not continue its historic business or use a significant portion of its assets in a new business for two (2) years after the ownership change, the annual limitation resulting from the ownership change is zero.  The limitation on the use of pre-change losses following an ownership change is in addition to any reduction of tax attributes in connection with the realization of CODI.

In addition, Section 382(g)(4)(D) provides, in effect, that if a fifty percent (50%) or greater shareholder of a loss corporation claims a Section 165(g) worthless stock loss and retains his stock at the end of the year of worthlessness, the Debtors will be treated as having undergone an ownership change. The Debtors are not aware that any significant shareholder has claimed or plans

to claim a Section 165(g) worthless stock loss that would trigger the application of Section 382(g)(4)(D).

### 5.    Special Bankruptcy Exception

If a corporation experiences an ownership change, there are two exceptions to the general loss limitation rule under Section 382 of the Tax Code.  The first exception generally applies where the stockholders and/or qualified creditors of the debtor retain or receive at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor pursuant to a confirmed bankruptcy plan (the "382(l)(5) Exception").  Under this exception, a debtor's pre-change losses are not limited on an annual basis, but are required to be reduced by the amount of any interest deductions claimed during the three (3) taxable years preceding the date of the reorganization, and during the part of the taxable year prior to and including the reorganization, in respect of the debt converted into stock in the reorganization.  Moreover, if this exception applies, any further ownership change of the debtor within a two-year period will preclude the debtor's utilization of any pre-change losses at the time of the subsequent ownership change against future taxable income.

If the 382(l)(5) Exception is not applicable to a debtor in bankruptcy (either because the debtor company does not qualify for it or a debtor company elects not to utilize it), the second exception to the general Section 382 rule (the "382(l)(6) Exception") will generally apply.  When the 382(l)(6) Exception applies, a corporation in bankruptcy that undergoes an "ownership change" generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditor's Claims in the bankruptcy.  This differs from the ordinary rule that requires the fair market value of a corporation's equity to be determined before the events giving rise to the ownership change.

### 6.    Merger of MMPLP into MMPI

Pursuant to the Plan, MMPLP will merge into MMPI and, accordingly, will distribute its assets to MMPI in complete liquidation.  In general, a distribution in liquidation of a partner's interests is tax-free to both the partner and the partnership unless Section 737 or 751(b) applies.  Section 737 requires a partner to recognize gain (but not loss) upon the partnership's distribution of property to such partner (other than property previously contributed to the partnership by such

176

1  partner) within seven (7) years of the date on which such partner contributed appreciated property

2  to such partnership.  Section 751(b) generally provides that to the extent that a partner receives a

3  distribution from a partnership (i) Section 751 property (unrealized receivables and inventory items

4  which have appreciated substantially in value) in exchange for relinquishing all or part of its

5  interest in the partnership's non-Section 751 property, or (ii) non-Section 751 property in exchange

6  for relinquishing all or part of its interest in the partnership's Section 751 property, the transaction

7  is recharacterized.  The transaction is treated as (1) a deemed distribution to the partner of an

8  interest in the relinquished property followed by (2) a deemed taxable exchange between the

9  partner and the partnership of the relinquished property in exchange for an interest in the property

10 actually distributed by the partnership to the distributee partner.

11      Section 731(b) provides that no gain or loss is recognized by a partnership on a distribution

12 of property to a partner.  Section 731(a) provides for (1) the nonrecognition of gain to the partner

13 except to the extent an amount of money is distributed in excess of the partner's tax basis in their

14 partnership interests, and (2) the nonrecognition of loss unless the distribution consists solely of

15 money, unrealized receivables, and inventory.  Any gain or loss recognized by the partner is

16 generally treated as gain or loss from the sale or exchange of a capital asset (subject to the

17 exceptions above).  Section 732(b) provides that the basis of any distributed property is equal to the

18 partner's tax basis in their partnership interest immediately prior to the distribution, reduced by any

19 cash received.  The Debtors do not expect to recognize any gain or loss in connection with the

20 liquidation of MMPLP.

21      **7.    Consequences of the Sale and/or Refinance of Assets of the Debtors**

22      Pursuant to the Plan, the Reorganized Debtors will sell some of their assets and refinance

23 other assets as necessary during the term of the Plan to meet their operational needs and payment

24 obligations under the Plan.  The sale of real property may cause the Debtors to recognize gain or

25 loss.  The gain or loss is measured by the difference between the amount realized (the amount paid

26 by the purchaser) and the adjusted tax basis the Debtors have in the property sold.  The amount

27 realized from a sale of real property generally includes the amount of liabilities from which the

28 transferor is discharged as a result of the sale.  For purposes of this rule, the sale of real property

359261.05 [XP]     25195

that secures a nonrecourse liability discharges the transferor from the liability, and the sale of real property that secures a recourse liability discharges the transferor from the liability if another person agrees to pay the liability (whether or not the transferor is in fact released from the liability).

Gain or loss recognized from the sale of real property may be characterized as either capital or ordinary.  Generally, capital gains and losses are gains or losses from the sale or exchange of a capital asset.  A capital asset is any property held by a taxpayer, whether or not connected with a trade or business, but does not include property held by a taxpayer, whether or not connected with a trade or business, but does not include property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property which is held primarily for sale to customers in the ordinary course of its trade or business, or property, used in the taxpayer's trade or business, of a character which is subject to the allowance for depreciation, or real property used in the taxpayer's trade or business.

Pursuant to Section 1245, a taxpayer who disposes of Section 1245 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property.  Section 1245 property includes limited types of real property which have been depreciable.  Depreciation recapture with respect to Section 1245 property is computed by subtracting its adjusted tax basis from the lower of its recomputed basis (adjusted tax basis increased by previous depreciation deductions allowed) or amount realized.  Pursuant to Section 1250, a taxpayer who disposes of Section 1250 property must treat as ordinary income the amount of depreciation recapture computed with respect to that property.  Section 1250 property is any real property which has been depreciable and that is not Section 1245 property.  Generally, for Section 1250 property for which depreciation deductions are computed using the straight-line method for tax purposes, there is no Section 1250 depreciation recapture.

Pursuant to Section 1231, Section 1231 gains and losses are treated as capital gains and losses if the Section 1231 gains for the taxable year exceed the Section 1231 losses for that year.  A Section 1231 gain or loss is any recognized gain or loss from a Section 1231 transaction.  A sale or exchange of property used in a trade or business is a Section 1231 transaction.  Real property is considered to be used in a trade or business if it is held for more than one year and is not property

178

1   of a kind which would properly be includible in the inventory of the taxpayer if on hand at the

2   close of the taxable year or property held by the taxpayer primarily for sale to customers in the

3   ordinary course of its trade or business.

4       Generally, for tax purposes, a refinancing transaction by itself produces no income or

5   deductions as it involves the tax-free receipt of loan proceeds and the nondeductible repayment of a

6   prior loan, assuming the old debt is satisfied in full.

7       **B.    CONSEQUENCES TO HOLDERS OF CERTAIN CLAIMS**

8           **1.    Consequences to Holders of Allowed General Unsecured Claims**

9       With respect to the Allowed General Unsecured Claims, pursuant to the Plan, holders will

10  receive one hundred (100%) of their claims thirty (30) days after the Effective Date in full

11  satisfaction of the claim plus interest from the Petition Date (March 27, 2009) at 0.64% per annum.

12      In general, a holder of an Allowed General Unsecured Claim will recognize gain or loss to

13  the extent there is any difference between (i) the "amount realized" by the holder in satisfaction of

14  its Claim (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax

15  basis in its Claim (other than any Claim for accrued but unpaid interest).  For a discussion of the

16  treatment of any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued

17  Interest" below.  The amount realized by a holder receiving a Deferred Payment Obligation will

18  equal the "issue price" of the Deferred Payment Obligation. Such issue price should be equal to the

19  stated principal amount of the Deferred Payment Obligation. Each holder of a General Unsecured

20  Claim is urged to consult its tax advisor regarding the specific tax consequences to such holder of

21  the receipt of the Deferred Payment Obligation, including the possible application of (and ability to

22  elect out of) the "installment method" of reporting any gain that might otherwise be recognized by

23  the holder upon such receipt.

24      Where gain or loss is recognized by a holder of an Allowed General Unsecured Claim, the

25  character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income

26  or loss will be determined by a number of factors, including the tax status of the holder, whether

27  the Claim constitutes a capital asset in the hands of the holder and how long it has been held,

28

179

1  whether the Claim was acquired at a market discount and whether and to what extent the holder

2  had previously claimed a bad debt deduction.

3  **2.    Consequences to Holders of Allowed Secured Claims**

4      Pursuant to the Plan, a holder of an Allowed Secured Claim will receive payment in full in

5  cash over approximately seven (7) years, or over five (5) years if such holder votes in favor of the

6  Plan (collectively herein referred to as the "Secured Deferred Payment Obligation").  In either case,

7  the holder will also receive interest at the rate of five percent (5%) per annum.  For federal income

8  tax purposes, the Secured Deferred Payment Obligation should be treated (and the following

9  discussion assumes, would be treated) in a similar fashion to the receipt of an actual note

10 amortizable over seven (7) years or five (5) years in the case of holders who vote in favor of the

11 Plan.

12     In general, a holder of an Allowed Secured Claim will recognize gain or loss in an amount

13 equal to the difference between (i) the "amount realized" by the holder in satisfaction of its Claim

14 (other than any Claim for accrued but unpaid interest) and (ii) the holder's adjusted tax basis in its

15 Claim (other than any Claim for accrued but unpaid interest).  For a discussion of the treatment of

16 any Claim for accrued but unpaid interest, see "Distribution in Discharge of Accrued Interest"

17 below.  The amount realized by a holder will equal the "issue price" of the Secured Deferred

18 Payment Obligation received by such holder.  Such issue price should be equal to the stated

19 principal amount of the Secured Deferred Payment Obligation. Each holder of a Secured Claim is

20 urged to consult its tax advisor regarding the specific tax consequences to such holder of the receipt

21 of the Secured Deferred Payment Obligation, including the possible application of (and the ability

22 to elect out of) the "installment method" of reporting any gain that might otherwise be recognized

23 by the holder upon such receipt.

24     Where gain or loss is recognized by a holder of an Allowed Secured Claim, the character of

25 such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will

26 be determined by a number of factors, including the tax status of the holder, whether the Claim

27 constitutes a capital asset in the hands of the holder and how long it has been held, whether the

28

359261.05 [XP]    25195

1  Claim was acquired at a market discount and whether and to what extent the holder had previously

2  claimed a bad debt deduction.

3          **C.      DISTRIBUTION IN DISCHARGE OF ACCRUED INTEREST**

4          Pursuant to the Plan, all distributions in respect of an Allowed Claim will be allocated first

5  to any portion of such Claim for accrued interest, with any excess allocated to the principal amount

6  of such Claim to the extent thereof, and then to all other amounts.  However, there is no assurance

7  that the IRS will respect such allocation for federal income tax purposes.

8          In general, to the extent that any amount received by a holder of a debt (whether paid in

9  cash or treated for tax purposes as paid with a note) is received in satisfaction of accrued interest

10 during its holding period, such amount will be taxable to the holder as interest income (if not

11 previously included in the holder's gross income).  Conversely, a holder generally recognizes a

12 deductible loss to the extent any accrued interest claimed was previously included in its gross

13 income and is not paid in full.  Each holder of a Claim is urged to consult its tax advisor regarding

14 the allocation of consideration and the deductibility of unpaid interest for tax purposes.

15         **D.      INFORMATION REPORTING AND BACKUP WITHHOLDING**

16         Certain payments, including payments in respect of accrued interest or OID, are generally

17 subject to information reporting by the payer to the IRS.  Moreover, such reportable payments are

18 subject to backup withholding in certain circumstances.  Under the Tax Code's backup withholding

19 rules, a holder of Claims may be subject to backup withholding at the applicable rate with respect

20 to certain distributions or payments pursuant to the Plan, unless the holder (a) comes within certain

21 exempt categories (which generally includes corporations) and, when required, demonstrates this

22 fact or (b) provides a correct United States taxpayer identification and certifies under penalty of

23 perjury that the holder is a U.S. person, the taxpayer identification number is correct and that the

24 holder is not subject to backup withholding because of a failure to report all dividend and interest

25 income.

26         **E.      IMPORTANCE OF OBTAINING PROFESSIONAL TAX ASSISTANCE**

27         THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF

28 CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE

359261.05 [XP]    25195

1   FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL.  THE ABOVE

2   DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.

3   THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY

4   DEPENDING ON A TAXPAYER'S PARTICULAR CIRCUMSTANCES.  ACCORDINGLY,

5   HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE STRONGLY URGED TO

6   CONSULT THEIR TAX ADVISORS ABOUT THE UNITED STATES FEDERAL, STATE,

7   LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF

8   THE PLAN, INCLUDING WITH RESPECT TO TAX REPORTING AND RECORD KEEPING

9   REQUIREMENTS.

10                                    **XV.**

11                      **MISCELLANEOUS PROVISIONS**

12         **A.      EXEMPTION FROM TRANSFER TAXES**

13         Pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of

14   notes or equity securities under the Plan, the creation of any mortgage, deed of trust or other

15   security interest, the making or assignment or any lease or sublease, or the making or delivery of

16   any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan,

17   including, without limitation, any agreements of consolidation, deeds, bills of sale or assignments

18   executed in connection with any of the transactions contemplated under the Plan shall not be

19   subject to any stamp, real estate transfer, mortgage recording, license transfer or other similar tax.

20   For the avoidance of doubt, the transactions contemplated under the Plan include, among other

21   things, the transactions and transfers contemplated in Section III of the Plan under, in furtherance

22   of, or in connection with the consolidation provided for therein including, without limitation, the

23   transfer of the Debtors' right, title and interest in property of the Estates to the Reorganized Debtor.

24         **B.      PAYMENT OF STATUTORY FEES**

25         All fees payable on or before the Effective Date pursuant to Section 1930 of Title 28 of the

26   United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be

27   paid on or before the Effective Date.

28

                                      182

## C.    MODIFICATION OR WITHDRAWAL OF THE PLAN

The Debtors reserve the right, in accordance with the Bankruptcy Code, to amend, modify (subject to Court approval), or withdraw the Plan prior to the entry of the Confirmation Order. After the entry of the Confirmation Order, the Debtors may amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistency in the Plan in such a manner as may be necessary to carry out the purpose and intent of the Plan.

## D.    GOVERNING LAW

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of California (without reference to the conflicts of laws provisions thereof) shall govern the construction and implementation of the Plan and any agreements, documents and instruments executed in connection with the Plan.

## E.    FILING OR EXECUTION OF ADDITIONAL DOCUMENTS

On or before the Effective Date, the Reorganized Debtor shall file with the Bankruptcy Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

## F.    WITHHOLDING AND REPORTING REQUIREMENTS

In connection with the Plan and all instruments issued in connection therewith and distributions thereon, the Reorganized Debtor shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all distributions there under shall be subject to any such withholding and reporting requirements.

## G.    WAIVER OF RULE 7062 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE

The Debtors may request that the Confirmation Order include (a) a finding the Rule 62(a) of the Federal Rules of Civil Procedure, made applicable by Rule 7062 of the Federal Rules of Bankruptcy Procedure, shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate the Plan immediately after the entry of the Confirmation Order.

359261.05 [XP]    25195

## H.  HEADINGS

Headings used in the Plan are for convenience and reference only and shall not constitute a Part of the Plan for any purpose.

## I.  EXHIBITS AND SCHEDULES

All Exhibits and Schedules to the Plan and Disclosure Statement are incorporated into and constitute a part of the Plan as if set forth herein.

## J.  NOTICES

All notices, requests and demand hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered by U.S. Mail or email addressed as follows:

| REORGANIZED DEBTOR | COUNSEL TO THE DEBTORS AND REORGANIZED DEBTOR |
|---|---|
| Todd Nielsen, Esq.<br>General Counsel<br>MERUELO MADDUX PROPERTIES, INC.<br>761 Terminal Street<br>Building 1, 2nd Floor<br>Los Angeles, California 90021<br>TNielsen@meruelomaddux.com | John N. Tedford, IV , Esq.<br>DANNING, GILL, DIAMOND & KOLLITZ, LLP<br>2029 Century Park East, Third Floor<br>Los Angeles, California 90067-2904<br>JTedford@dgdk.com |

## K.  CONFLICT

The terms of the Plan shall govern in the event of any inconsistency with the summaries of the Plan set forth in this Disclosure Statement.

## L.  SUCCESSORS AND ASSIGNS

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, trustee, administrator, successor or assign of such Person.

## M.  SATURDAY, SUNDAY OR LEGAL HOLIDAY

If any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be

184

1  completed on the next succeeding Business Day, but shall be deemed to have been completed as of

2  the required date.

3  **N.      POST-EFFECTIVE DATE EFFECT OF EVIDENCES OF CLAIMS OR**

4  **INTERESTS**

5       Notes, bonds, stock certificates and other evidences of Claims against or Interests in the

6  Debtors, and all Instruments of the Debtors (in either case, other than those executed and delivered

7  as contemplated hereby in connection with the consummation of the Plan), shall, effective upon the

8  Effective Date, represent only the right to participate in the distributions contemplated by the Plan.

9  **O.      SEVERABILITY OF PLAN PROVISIONS**

10      If, prior to Confirmation, any term or provision of the Plan that does not govern the

11  treatment of Claims or Interests provided for herein or the conditions to the Effective Date is held

12  by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the

13  power to alter and interpret such term or provision to make it valid or enforceable to the maximum

14  extent practicable, consistent with the original purpose of the term or provision held to be invalid,

15  void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

16  Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and

17  provisions of the Plan will remain in full force and effect and will in no way be affected, impaired,

18  or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall

19  constitute a judicial determination, and shall provide, that each term and provision of the Plan, as it

20  may have been altered or interpreted in accordance with the foregoing, is valid and enforceable

21  pursuant to its terms.

22  **P.      BALLOTING**

23      Each Holder of Allowed Claim or an Allowed Interest entitled to vote on the Plan will

24  receive a ballot.  The ballot will contain two boxes, one indicating acceptance of the Plan and the

25  other indicating rejection of the Plan.  Holders of Allowed Claims or Allowed Interests who elect

26  to vote on the Plan must mark one or the other box pursuant to the instructions contained on the

27  ballot.

28

359261.05 [XP]    25195

1    **Q.    NO ADMISSIONS OR WAIVER OF OBJECTIONS**

2    Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be

3    deemed as an admission by any Debtor with respect to any matter set forth herein including,

4    without limitation, liability on any Claim or the propriety of any Claims classification.  The

5    Debtors are not bound by any statements herein or in the Disclosure Statement as judicial

6    admissions.

7    **R.    SURVIVAL OF SETTLEMENTS**

8    All Bankruptcy Court-approved settlements shall survive consummation of the Plan, except

9    to the extent that any provision of any such settlement is inconsistent with the Plan, in which case

10    the provisions of the Plan shall supersede such inconsistent provision of such settlement.

11    Notwithstanding the foregoing, the settlement documents approved by the Bankruptcy Court

12    regarding Imperial, Murakami and PCB, and any other settlement agreement approved prior to the

13    Effective Date that specifically provides that the Plan shall not modify the terms of such settlement,

14    shall supersede any inconsistent Plan provisions.

15    **XVI.**

16    **ALTERNATIVES TO CONFIRMATION AND CONSUMMATION**

17    **OF THE PLAN**

18    The Debtors believe that the Plan affords Holders of Claims and Interests the potential for

19    the greatest realization on the Debtors' assets and, therefore, is in the best interests of such Holders.

20    If the Plan is not confirmed, however, the theoretical alternatives include: (a) an alternative plan or

21    plans of reorganization; or (b) liquidation of the Debtors under Chapter 7 or Chapter 11 of the

22    Bankruptcy Code.

23    **A.    ALTERNATIVE PLANS OF REORGANIZATION**

24    If the Plan is not confirmed, the Debtors, or after the expiration of the Debtors' exclusive

25    period in which to propose and solicit a reorganization Plan, any other party in interest in the

26    Chapter 11 Cases, could propose a different Plan or Plans.  Such Plans might involve either a

27    reorganization and continuation of the Debtors' business, or a liquidation of their assets or a

28    combination of both.

**B.      LIQUIDATION UNDER CHAPTER 7**

1

2        If no Plan is confirmed, the Chapter 11 Cases may be converted to individual cases under

3   Chapter 7 of the Bankruptcy Code.  Upon conversion, one or more Chapter 7 trustees will be

4   appointed to liquidate the assets of the Debtors.  It is impossible to predict precisely how the

5   proceeds of the liquidation would be distributed to the respective Holders of Claims against the

6   Debtors.  A discussion of the effect that a Chapter 7 liquidation would have on the recoveries of

7   Holders of Claims and Interests is set forth in Article IX.C. of this Disclosure Statement (Best

8   Interests Test / Liquidity Analysis).  The Debtors believe that liquidation under Chapter 7 would

9   result in, among other things: (i) decreased distributions to creditors because of additional

10  administrative expenses attendant to the appointment of one or more trustee's and the trustee's

11  employment of attorneys and other professionals; (ii) increased expenses and Claims, some of

12  which would be entitled to priority, which would be generated during the liquidation and from the

13  rejection of leases and other executory contracts in connection with a cessation of the Debtors'

14  operations; and (iii) the failure to realize the greater, going concern value of the Debtors' assets.

15       In the opinion of the Debtors, the recoveries projected to be available in either a Chapter 7

16  liquidation are not likely to afford Holders of Claims as great a realization potential as does the

17  Plan.

**XVII.**

18

**CONCLUSION AND RECOMMENDATION**

19

20       The Plan provides for an equitable distribution to creditors and shareholders of the Debtors

21  and preserves the value of the business as a going concern.  The Debtors believe that confirmation

22  and implementation of the Plan is preferable to any of the alternatives described above because it

23  will provide the greatest recoveries to Holders of Claims and Interests.  Other alternatives would

24  involve significant delay, uncertainty and substantial additional administrative costs.  FOR THESE

25  REASONS, THE DEBTORS URGE YOU TO RETURN YOUR BALLOT ACCEPTING THE

26

27

28

359261.05 [XP]     25195

1  | PLAN SO THAT THEY WILL BE RECEIVED NO LATER THAN 4:00 P.M., LOS ANGELES
2  | TIME, ON NOVEMBER 17, 2010.
3  |
   | Dated: October ____, 2010                    Respectfully Submitted,
4  |
5  |                                              By: _____
6  |                                                  Richard Meruelo
   |                                                  Chief Executive Officer
7  |
8  | COUNSEL FOR NOTICE PURPOSES:
   | DANNING, GILL, DIAMOND & KOLLITZ, LLP
9  |
10 |
   | By: _____
11 |     John N. Tedford, IV
   |     Counsel for Debtors and
12 |     Debtors in Possession
13 |
14 |
...

359261.01 [XP]      25195

| | |
|---|---|
| In re: MERUELO MADDUX PROPERTIES, INC.<br><br>Debtor(s). | CHAPTER: 11<br>CASE NUMBER: 1:09-bk-13356-KT |

NOTE: When using this form to indicate service of a proposed order, DO NOT list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

### PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Danning, Gill, Diamond & Kollitz, LLP, 2029 Century Park East, Third Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document described **FOURTH AMENDED JOINT DISCLOSURE STATEMENT DESCRIBING FOURTH AMENDED JOINT PLAN OF REORGANIZATION OF MERUELO MADDUX PROPERTIES, INC., ET AL. DATED SEPTEMBER 20, 2010** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

### I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF") –
Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On October 14, 2010, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Michael C Abel, mca@dgdk.com (counsel for Debtors)
Robert Abiri    rabiri@abiriszeto.com
Allison R Axenrod    allison@claimsrecoveryllc.com
Peter Bonfante, peterbonfante@bsalawfirm.com
Jennifer L Braun, jennifer.l.braun@usdoj.gov (Office of the U.S. Trustee)
Martin J Brill, mjb@lnbrb.com (counsel for interested party)
George T Busu    george.busu@limruger.com
Andrew W Caine    acaine@pszjw.com
Howard Camhi, hcamhi@ecjlaw.com (counsel for Kennedy Funding Inc.)
Gary O Caris    gcaris@mckennalong.com, pcoates@mckennalong.com
James E Carlberg    jcarlberg@boselaw.com
Sara Chenetz    chenetz@blankrome.com
Jacquelyn H Choi    jchoi@swjlaw.com
Ronald R Cohn, rcohn@horganrosen.com (counsel for Pacific Commerce Bank)
Enid M. Colson, ecm@dgdk.com (counsel for Debtors)
Michaeline H Correa, mcorrea@jonesday.com (counsel for MTA)
Brian L Davidoff, bdavidoff@rutterhobbs.com (counsel for Murakami)
Aaron De Leest, aed@dgdk.com (counsel for Debtors)
Daniel Denny    ddenny@gibsondunn.com
Jeffrey W Dulberg    jdulberg@pszjw.com
Michael G Fletcher, mfletcher@frandzel.com (counsel for Cathay Bank)
Donald L Gaffney, dgaffney@swlaw.com (counsel for Bank of America)
Thomas M Geher, tmg@jmbm.com (counsel for Capmark Finance Inc.)

☒    Service information continued on attached page

359261.05 [XP]    25195

| In re: MERUELO MADDUX PROPERTIES, INC.<br><br>Debtor(s). | CHAPTER: 11<br>CASE NUMBER: 1:09-bk-13356-KT |
|---|---|

Bernard R Given, bgiven@frandzel.com (counsel for Cathay Bank)
Barry S Glaser, bglaser@swjlaw.com (counsel for L.A. County)
Matthew A Gold    courts@argopartners.net
Michael I Gottfried    mgottfried@lgbfirm.com, msaldana@lgbfirm.com
John A Graham    jag@jmbm.com
Ofer M Grossman    omglaw@gmail.com
Jodie M Grotins    jgrotins@mcguirewoods.com
Peter J Gurfein    pgurfein@lgbfirm.com
Cara Hagan, carahagan@haganlaw.org
Asa S Hami, ahami@sulmeyerlaw.com (counsel for Committee)
Brian T Harvey, bharvey@buchalter.com (counsel for California Bank & Trust)
David W Hercher    dave.hercher@millernash.com
William W Huckins    whuckins@allenmatkins.com, clynch@allenmatkins.com
Natasha L Johnson    natasha.johnson@dlapiper.com
Lance M. Jurich, ljurich@loeb.com (counsel for Canpartners)
William H. Kiekhofer    wkiekhofer@mcguirewoods.com (counsel for Esmark)
Andrew F Kim, kim-a@blankrome.com (counsel for Imperial Bank)
Michael S Kogan, mkogan@ecjlaw.com (counsel for Kennedy Funding Inc.)
Tamar Kouyoumjian, tkouyoumjian@sulmeyerlaw.com (counsel for Committee)
Duane Kumagai, dkumagai@rutterhobbs.com (counsel for Murakami)
Lewis R Landau    lew@landaunet.com
Matthew A Lesnick    matt@lesnicklaw.com
David E Leta, dleta@swlaw.com (counsel for FNBN-CMLCON I LLC)
Katherine Lien    katie.lien@sbcglobal.net, katielien@gmail.com
Steven K Linkon, slinkon@rcolegal.com (counsel for Chinatrust Bank)
Robert M Llewellyn    michael.llewellyn@boe.ca.gov
Richard Malatt, rmalatt@gmail.com (counsel for interested party)
Elmer D Martin, elmermartin@msn.com (counsel for United Commercial Bank)
Elissa Miller, emiller@sulmeyerlaw.com (counsel for Committee)
Iain A W Nasatir, inasatir@pszjlaw.com (counsel for East West Bank and Legendary)
Jennifer L Nassiri    jennifer.nassiri@dlapiper.com
Lawrence Peitzman, lpeitzman@pwkllp.com (counsel for interested party)
Eric S Pezold, epezold@swlaw.com (counsel for Bank of America)
Christopher E Prince    cprince@lesnickprince.com
Michael H Raichelson    mhr@cabkattorney.com
Dean G Rallis Jr, drallis@sulmeyerlaw.com (counsel for Committee)
Kurt Ramlo    kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com
Daniel H Reiss    dhr@lnbrb.com
Michael B Reynolds    mreynolds@swlaw.com, kcollins@swlaw.com
Jeremy V Richards    jrichards@pszjlaw.com, bdassa@pszjlaw.com
James S Riley    tgarza@sierrafunds.com
Kirsten A Roe    kroe@wthf.com, dfunsch@wthf.com
Martha E Romero    Romero@mromerolawfirm.com
Victor A Sahn, vsahn@sulmeyerlaw.com (counsel for Committee)
Daniel H Slate, dslate@buchalter.com (counsel for California Bank & Trust)
Surjit P Soni, surj@sonilaw.com (counsel for Legendary)

☒    Service information continued on attached page

359261.05 [XP]    25195

| In re: MERUELO MADDUX PROPERTIES, INC. | CHAPTER: 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-KT |

Bennett L Spiegel    blspiegel@jonesday.com
James Stang, jstang@pszjlaw.com (counsel for East West Bank and Legendary)
Catherine Steege    csteege@jenner.com
Derrick Talerico    dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com
John N Tedford, jtedford@dgdk.com (counsel for Debtors)
Damon Thayer    dthayer@jenner.com
James A Timko    jtimko@allenmatkins.com
Alan G Tippie, atippie@sulmeyerlaw.com (counsel for Committee)
United States Trustee (SV), ustpregion16.wh.ecf@usdoj.gov
Rouben Varozian    rvarozian@bzlegal.com
Jason L Weisberg    jason@gdclawyers.com
William E Winfield    wwinfield@nchc.com
Jasmin Yang    jyang@swlaw.com

II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL (indicate method for each person or entity served):
On, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case
or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States
Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the
judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after
the document is filed.

III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method
for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on October 14, 2010, I
served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing
to such service method), by facsimile transmission and/or email as follows.   Listing the judge here
constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after
the document is filed.

Via EMail
Ron Orr & Professionals, Inc: ronorresq@aol.com (Attorneys for Equity Committee)
Georgiana G. Rodiger: crodiger@rodigerlaw.com (Attorneys for Equity Committee)

Via Personal Delivery
Hon. Kathleen Thompson, U.S. Bankruptcy Court, 21041 Burbank Blvd, Suite 305, Woodland Hills, CA
91367

U.S. Trustee, Attn: Jennifer Braun, 21051 Warner Center Lane, Suite 115, Woodland Hills, CA 91367

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true
and correct.

| October 14, 2010 | Cindy M. Cripe | _Cindy M Cripe_ |
|---|---|---|
| Date | Type Name | Signature |