CHRISTOPHER E. PRINCE (SBN 183553)
cprince@lesnickprince.com
MATTHEW A. LESNICK (SBN 177594)
matt@lesnickprince.com
ANDREW R. CAHILL (SBN 233798)
acahill@lesnickprince.com
Lesnick Prince LLP
185 Pier Avenue, Suite 103
Santa Monica, CA 90405
Telephone: (213) 493-6496
Facsimile:  (213) 493-6596

Attorneys for
Charlestown Capital Advisors, LLC and
Hartland Asset Management Corporation

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:09-bk-13356-KT |
| MERUELO MADDUX PROPERTIES, INC., et al., | Chapter 11 |
| Debtor. | DECLARATION OF EDWARD F. MCGONAGLE IN SUPPORT OF CHARLESTOWN CAPITAL ADVISORS, LLC'S AND HARTLAND ASSET MANAGEMENT CORPORATION'S PROPOSED PLAN OF REORGANIZATION |
| | Confirmation Hearing<br>Date:      January 26, 2010<br>Time:      9:30 a.m.<br>Place:     Courtroom 301<br>              21041 Burbank Blvd.<br>              Woodland Hills, CA 91367 |

I, Edward F. McGonagle, declare as follows:

**1.** I am the Managing Partner of Property Solutions LLC. Property Solutions LLC was retained by Charlestown Capital and Hartland Asset Management ("Charlestown") to provide services in connection with plan confirmation. I am submitting this declaration in support of Charlestown's Fourth Amended Plan of Reorganization (the "Charlestown Plan"). I know the following to be true of my own personal knowledge and, if called upon as a witness, I could and would testify competently thereto.

**2.** Property Solutions LLC was retained by Charlestown for $15,000 per month since August 2010 to provide general financial and real estate advisory services relating to the bankruptcy cases of Meruelo Maddux Properties, Inc. et. al. ("MMPI"). Among the services Property Solutions LLC has provided is to provide advice regarding a proposed business plan for MMPI and to provide an opinion regarding the requirements of 11 U.S.C. Section 1129(a)(11) and 11 U.S.C. Section 1123(a)(5). All of the services provided by Property Solutions LLC to Charlestown were provided by me personally. I have not been retained as an expert witness within the past four years. My biography is attached to this Declaration as Exhibit "A".

**3.** The testimony and opinion in this Declaration are based on: my personal knowledge of each of the properties and the local marketplace; the Monthly Operating Reports submitted to the Court since March, 2009; publicly available and private subscription market and company information sources; and discussions with market participants. In preparing this Declaration and forming my opinions, I have considered the documents and other sources of information listed on Exhibit "B".

**Background Information:**

**4.** MMPI describes itself as a self-managed, full-service real estate company that develops, redevelops and owns commercial and residential properties located in downtown Los Angeles and other densely populated urban areas in California that are undergoing demographic or economic changes. MMPI was formed as a publicly owned company as the result of an initial public offering '(IPO') that raised $455,500,000 in January 2007. The new equity was used

primarily to pay down existing debt, pay IPO transaction costs and to complete the purchases of a number of planned acquisitions. These activities were completed by the end of the 2nd quarter of 2007, when MMPI reported a net Shareholder's Equity of $415,035,377 with cash reserves of $50,290,248. MMPI's balance sheet showed commercial real estate assets with book values totaling $695,273,760 against a combined secured debt of $277,956,798, a debt to book value ratio of approximately 40.0%.

5.        By the 2nd quarter of 2007, MMPI had a total of 67 secured loans. Consistent with many real estate developers who obtain a short term loan with the anticipation of developing or redeveloping the property and immediately refinancing the property with a much higher value loan, the majority of MMPI's loans were relatively short term. Of MMPI's 67 loans, 40 of the loan had a maturity date before December 31, 2008. The short maturity dates eventually proved to be a major problem for MMPI. Financial institutions, facing large pressures with their commercial real estate loan portfolios, became increasingly reluctant to extend short term loans for MMPI, particularly given MMPI's growing operating cash shortfalls, failures to meet development goals and weakened management credibility.

6.        MMPI's IPO business plan filed with the SEC show a development and redevelopment program with a total of 22 projects that were projected to be in development, under construction or completed by the end of 2007. 15 of the projects were industrial /commercial projects with a total of 2,527,743 square feet of space and 7 projects were residential projects with a total of 1,938 residential units. MMPI was incapable of meeting these goals. Of these planned industrial/commercial projects, only 4 were ever completed for a total of 423,693 square feet. All 4 were developed and constructed by a third party contractor with a purchase contract from MMPI. MMPI reneged on the purchase of two of these buildings (323,693 square feet) and purchased two, for a total of 100,000 square feet. Of the planned residential projects, two were completed for a total of 306 residential units.

7.        By the 1st quarter of 2008, MMPI began scaling back real estate development activities in response to a sharply tightening market for development financing and recognition of

3

1   increasingly difficult cash demands.  This trend continued throughout the year, with the exception

2   of the ongoing construction activity at the 717 W. 9th high rise residential project.  By the 4th quarter

3   of 2008, despite the aggressive sale of a number of prime assets, MMPI's available cash reserves

4   had declined to $4.5 million.

5   **8.**      In March, 2009 MMPI filed for Chapter 11 bankruptcy protection.   In his

6   declaration, Richard Meruelo stated "The Company experiences significant recurring cash shortfalls

7   from (a) operating activities, (b) recurring investment activities such as carrying costs for interest

8   payments, real estate taxes and unfunded development expenditures, and (c) capital expenditures on

9   existing rental properties.  The Company needs to generate additional cash of approximately $28.0

10   million annually to fund such shortfalls."

11   **9.**      MMPI has been filing Monthly Operating Reports ("MORs") with the Court since

12   April, 2009.  Since MMPI has identified cash shortfalls as its significant problem, my analysis has

13   focused attention on this issue.  A summary of MMPI's cashflow performance, as detailed in these

14   MORs is as follows:

| | 3rd Quarter 2010 | 2nd Quarter 2010 | 1st Quarter 2010 | 4th Quarter 2009 | 3rd Quarter 2009 | 2nd Quarter 2009 |
|---|---|---|---|---|---|---|
| Total Operating Revenue | 6,043,521 | 5,832,581 | 5,778,388 | 5,987,252 | 5,770,027 | 6,214,068 |
| Total Cash Operating Expenses | (6,127,258) | (5,238,112) | (5,509,482) | (5,790,228) | (5,550,682) | (6,038,265) |
| Net Cash From Operations | (83,737) | 594,469 | 268,906 | 197,024 | 219,345 | 175,803 |
| Interest Expenses | (3,276,073) | (3,778,239) | (4,627,344) | (4,529,865) | (4,533,723) | (4,890,815) |
| Net Operating Cash Flow | (3,359,810) | (3,183,770) | (4,358,438) | (4,332,841) | (4,314,378) | (4,715,012) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Non Operating Income | 9,174 | 10,994 | 13,909 | 13,255 | 12,166 | 15,632 |
| Non-Cash Expenses | (1,442,922) | (1,450,157) | (1,615,192) | (2,046,689) | (2,047,174) | (2,027,367) |
| Legal & Professional | (2,843,659) | (2,266,324) | (1,233,936) | (2,945,311) | (2,144,567) | (476,982) |
| Total Non Operating Cash Flow | (4,277,407) | (3,705,487) | (2,835,219) | (4,978,745) | (4,179,575) | (2,488,717) |
| | | | | | | |
| Net Income | (7,637,217) | (6,889,257) | (7,193,657) | (9,311,586) | (8,493,953) | (7,203,729) |

**10.**            Per MMPI's most recent MOR filing of October 2010, MMPI reports a Post-Petition Profit/(Loss) of ($49,538,758). This number does not include any write downs in asset values.

**General Market Conditions:**

**11.**            Of the 41 properties expected to be in the portfolio on the Effective Date, only 6 are not located in Central Los Angeles. These 6 properties represent approximately 11% of the total portfolio value as seen in the Property Valuation Table. The Charlestown Plan intends to market these properties for sale and does not anticipate leasing any of these properties. As a result, I have not examined the market for leased property in these markets. The general market analysis has been focused on the Central Los Angeles market, primarily industrial /commercial leased and for sale space.

**12.**            Additionally, while I believe that the residential land parcels have significant long term value, my conversations with active financing and development market participants, particularly at Deutsche Bank and Silverpeak Real Estate Partners (formerly called Perimeter Group) reveals a wide range of opinions about the near future availability and likely terms of urban for-profit residential development financing. Given this degree of uncertainty, for the purposes of conservatism, I have assumed that only predevelopment residential development activity that focuses on public entitlements and general design and site layout. Several of these land parcels have been targeted for sale; the remainder are projected to generate no income for this analysis period.

**13.**        According to the National Bureau of Economic Research, the recent economic downturn and recession began in December 2007 and ended in June 2009.  The Los Angeles County Economic Development Corp.'s most recent forecast says that this economy has been slowly recovering since mid-2009 with relatively flat job growth changing to modest job gains starting in 2011.  Local brokers report an uptick in leasing activity as tenants return to the market. Cushman & Wakefield's 3rd quarter market report for the Greater Los Angeles industrial market states 'Although still at a twelve-year historic high, the Greater Los Angeles market has the lowest vacancy rate in the nation and is 540 bps (basis points) lower than the nation's rate of 10.6%.  In terms of economic drivers, the industrial sector's recovery is much stronger than the office sector.'

| Reported Market Vacancy Levels for Industrial/Commercial Property | | |
|---|---|---|
| | Downtown Los Angeles | Entire Los Angeles County |
| Grubb & Ellis (3rd Qtr) | 2.5% | 3.3% |
| Cushman & Wakefield (3rd Qtr) | 2.8% | 5.2% |
| CB Richard Ellis (3rd Qtr) | 2.3% | 3.3% |
| CoStar Market Analytics (3rd Qtr) | 3.2% | 5.1% |
| Reported Meruelo Maddux vacancy rate (per Debtor Disclosure Statement) | 39.2% | 47.2% |

**14.**        However a review of commercial real estate publications and conversations with active market participants at Deutsche Bank and Silverpeak reveals a consensus opinion that commercial bank lending, particularly the smaller regional banks, is likely to remain very modest through the first half of 2011.  This problem is especially acute in the available financing of B-grade non-institutional quality assets, which comprise the great majority of MMPI portfolio.  The level of investor demand for these assets is negatively impacted by the shortage of buyer financing, leaving the market dominated, for the most part, to low or no leverage purchasers.  Fortunately, most of these assets are small and in a market that is dominated by property users who tend to be low or no leverage purchasers rather than typical investors.  However, I believe it will still take a longer period time and result in a slower sale marketing process for assets.

**15.**        On a going forward basis from the Effective Date, I believe that the company has a number of good assets in one of the strongest sub-markets in the United States.  However MMPI faces significant challenges in three major categories

1)      The economy and financial markets are still recovering from the recent recession and credit crisis.  There is a wide range of expert economic opinion regarding the speed and strength of this economic rebound as well as the ability of local commercial banks to resume lending to commercial real estate.

2)   The company still has the same cash shortfall issues from operations that it cited at the time of filing for bankruptcy.  When MMPI cut back development activity, there doesn't appear to have been any effort to significantly reduce overhead expenses (employee numbers are roughly similar to those at the time of the IPO), no significant lowering in other operating expenses and little apparent effort to lease-up the now-available space. This problem has been accelerating on MMPI since there has been limited investment in the upkeep of the properties and large levels of deferred maintenance reduce the lease ability of the properties.

3)   Management reputation and credibility may have been damaged in the past four years to the point where routine leasing, financing, dealings with service providers and project entitlement activities become more difficult, protracted and expensive.

**18)**      The Charlestown Plan has been structured to address these issues while strongly protecting the interests of the relevant stakeholders in these proceedings. The Charlestown Plan has five short term strategic goals.  Work towards these goals will commence at the Effective Date and is anticipated to be completed by the end of 2012 or the first quarter of 2012.  The five strategic goals are:

1) **Lease up vacant space:**  A primary focus will be to invest the effort and money necessary to lease the very high levels of vacant existing commercial space to occupancy levels approaching those levels reported in this marketplace.  Two of the Charlestown Plan's partners and the Real Estate Investment Banking firm serving as advisor were brought into this transaction for their market expertise and significant experience in supervising commercial real estate turnarounds and solving issues with distressed commercial real estate in this marketplace.

2) **Invest in physical building improvements:**  The physical assets of the portfolio have undergone a lengthy period of significant under-investment in the building maintenance and capital improvements necessary to adequately lease the majority of these properties, as well as maintain compliance with current Building & Safety and County Health Department codes.  Approximately $18.4 million is budgeted for these improvements and associated third party leasing costs from the Effective Date through to the end of 2012.

3) **Reposition portfolio through sale of non-core assets:**  The forecast model projects the sale of non-core properties, including properties outside the downtown Los Angeles marketplace. The projected asset sale prices are conservative and lower than those presented by MMPIs in court documents and MMPI's Plan.  Asset dispositions are forecast to be concluded by the end of 2012.

4) **Significantly reduce debt levels:**  The portfolio currently has a high level of secured debt relative to portfolio net operating income.  The Charlestown Proponents will focus on increasing debt service coverage ratios through both increasing per property net operating income as well as actively working to reduce current debt through asset sales, debt refinancing and loan pay downs as needed.  The professional reputations of the market-oriented Charlestown Plan participants are a competitive advantage in attracting replacement financing and potential corporate lines of credit.

5) **Maintain an adequate cash reserve:**  Given the level of uncertainty regarding the strength of the economic recovery and the potential for near future unforeseen economic shocks, an adequate cash reserve will be maintained and grown through the period of this Plan. The Charlestown Plan is bringing in a total of $21 million of new net cash to the company to allow it to ride out the potentially longer time frames that would be the result of an extended credit crisis.  This is particularly important given the recent negative financial news regarding the financial viability of American Apparel, which leases approximately 39% of the portfolio's currently leased space.

**19)**    When these five strategic goals are achieved (estimated as year-end 2012), the remaining current portfolio will consist of nineteen properties. Sixteen of these properties will be income producing properties that have been modernized and will have significantly improved occupancy rates. The positive net income from these properties will be more than adequate to cover pre-development expenses of the remaining developable land parcels as well as prospective shareholder dividends. The remaining three properties (Southpark, 915-949 S. Hill Street and Meruelo Chinatown) have a total of five, prime residential development sites. With the restoration of the company's cash reserves, it is anticipated that pre-development of these sites will be ongoing during the Charlestown Plan period. Taking further advantage of the growing cash reserves, the company will additionally begin exploring new development and acquisition opportunities in its core market area.

**20)**    As an additional measure to increase the viability of the Charlestown Plan in all market circumstances, a very conservative approach has been adapted to estimating the sales proceeds from assets being marketed for sale. As well as lengthening the projected sales marketing timeline, our projected property values have been placed on the lower end of the scale of what might to be achieved in the marketplace. The Property Valuation Table reflects these valuations, which total $419,645,032. When available, credible court submitted appraisals were used to determine the property value. Since these appraisals were submitted by secured creditors looking to establish claims that their loans were under-secured, the appraised values are likely to be on the low end of the valuation scale. 19 of the 41 properties were appraised and represent $298,685,000 in values or 71% of the total portfolio valuation. The remaining properties were valued by calculating the average discount between the Court appraisal values and MMPI assumed values in their projections. These resulting imputed values are a 73.2% discount from MMPI's assumed property valuations. Closing costs are assumed to be a total of 3.0% of the sale price of the asset.

**21)**    Because the Charlestown Proponents' use lower estimated asset values ($141,140,025 lower in total) than MMPIs, projected net sales proceeds under the Charlestown Plan

are lower even when the plan calls for the sale of the same property. To make an "apples to apples" comparison of net sales proceeds, use the following two tables:

To apply MMPI's property values to the Charlestown Plan, **add** the following to the Charlestown Proponents' Annual Sales Proceeds (in thousands):

|  | Annual | Running Total |
|---|---|---|
| Year 1 | 21,726 | 21,726 |
| Year 2 | 16,612 | 38,338 |

To apply the Charlestown Proponents' property values to MMPI's plan, **subtract** the following numbers to Debtor's Annual Sales Proceeds (in thousands):

|  | Annual | Running Total |
|---|---|---|
| Year 1 | 9,180 | 9,180 |
| Year 2 | 19,935 | 29,115 |
| Year 3 | 5,641 | 34,756 |
| Year 4 | 4,908 | 39,664 |
| Year 5 | 5,543 | 45,207 |
| Year 6 | 5,202 | 50,409 |

Accordingly, if MMPI's property values are correct, net sales proceeds under the Charlestown Plan will be approximately $38 million higher than projected. Conversely, if the Charlestown Proponents' property values are correct, net sales proceeds under MMPI's Plan will be approximately $50 million lower than projected. These valuation differences permit the Charlestown Plan a higher level of Plan execution certainty and a greater probability of achieving higher than expected results.

**19)**    To help restore the management reputation and credibility of MMPI, the Charlestown Plan intends to replace Richard Meruelo and John Maddux and bring in new senior management and a new independent Board of Directors.  Additionally, advisors from SilverPeak Real Estate Partners, Multi-Group and Deutsche Bank have made themselves available to lend institutional support and credibility.

**20)**    In the Pre-Effective Date Activity, the unrestricted Cash Balance is stated as of September 1, 2010 and is derived from Debtor's Exhibit F, as were Revenues from Properties Projections.  MMPI's Exhibit F was derived from MMPI's approved 2010 mid-year revised operating budgets.  The budgets are primarily based on MMPI's historical activity with a minimal amount of leasing activity projected for certain properties.  Expenses from Properties:  Projections are taken directly from Debtor's Exhibit F, which were derived from MMPI's approved 2010 mid-year revised operating budgets.  The budgets are primarily based on MMPI's historical activity.  Pre-Effective Date property tax payment projections are taken directly from Debtor's Exhibit F.  Property taxes are assumed to be paid in full in December 2010.  The amount of these payments is taken from MMPI's approved 2010 operating budgets which are based on actual tax bills.

**21)**    To determine 845 Net Sales Proceeds I have used MMPI's net sales proceeds calculations.  While MMPI has already received the majority of the proceeds from the sale, the projections also include additional amounts expected to be received.  The Pre-Effective Date Contingency line item reflects MMPI's capital expenditure forecast for 2010, per MMPI's Exhibit F.  This figure is intended to cover unforeseen capital expenditures as well as costs associated with new leasing should any of MMPIs prove able to lease additional space.  Pre-Effective Date Sales Proceeds reflect the net sales proceeds from MMPI's sale of 2131 Humboldt Street and 306 N. Avenue 21, Los Angeles.  This net proceeds number is from MMPI's filings dated October 12, 2010.

**22)**    Payments on Amended Debt projections are taken directly from Debtor's Exhibit F.  Payments on amended debt are expected to be made pursuant to the respective agreement which have either been approved or are pending court approval.  As amended debt agreements are approved by the court, monthly interest payments resume pursuant to the new terms in the

agreements.  Post-petition interest payments for non-amended loans begin on the Effective Date with interest that accrues up to that point added to the loan balance on the Effective Date.  No interest payments are made prior to Effective Date on account of non-amended loans.

**23)**    Pre-Effective Date Corporate Cost projections are taken directly from Debtor's Exhibit F.  Based on MMPI's 2010 revised budget and current operations assuming no reductions prior to the Effective Date (all Debtor's cost reductions are assumed post-Effective Date). Corporate costs are comprised primarily of payroll and payroll related expenses (taxes, healthcare, insurance, etc.), insurance, professional fees, rent, audit/accounting fees and security.

**24)**    At the Effective Date, a total of $21 million in new net cash will be brought to MMPI.

**25)**    Employment Termination Reserve money has been set aside on the Effective Date for the unlikely event that executive employment agreements are still in effect and severance payments are due.  The Professional Fees Reserve was an estimated amount was provided by MMPI.  Unsecured creditors will receive full payment of their claims within 30 days of the effective date, unless subject to a different arrangement under a court approved settlement.  Unsecured creditors will additionally receive an interest payment equal to an 8.0% annual rate calculated from the Petition Date through to the Effective Date. 50% of priority wage claims provided in Schedule E are paid on the Effective Date.

**Operations Assumptions:**

**26)**    Starting revenue from properties is taken from MMPI's approved 2010 mid-year revised budgets and the September 2010 monthly operating report.  We anticipate leasing currently vacant space, in combination with a capital improvements program, in the majority of the properties to a projected average vacancy rate of 7.5% by the end of 2012.  Rental rate projections were derived from direct, personal market knowledge, asking rental rates for comparable for-lease properties including information from CoStar Realty Information Services, an examination of the monthly operating reports and conversations with local market participants.  No revenue is projected from the following nine properties:

2951 Lenwood Road, Barstow    2001    W.    Mission    Blvd,    MM-Mission    Blvd.,

| | Pomona | Pomona |
|---|---|---|
| 1009 N. Citrus Ave., Covina | 1060 N. Vignes Ave. | Ceres Street Produce |
| 336 W. 11th Street | 1308 S. Orchard Street | Meruelo Chinatown |

Growth in rental rates for 2011-2017 is assumed to be 0%, 1%, 3%, 3%, 3%, 3%, and 3% respectively (2.1% annual average). Given that the local economy and tenant space demand has begun to recover, I believe that these assumptions are conservative.

28) Starting operating expenses from properties is taken from MMPI's approved 2010 mid-year revised budgets and the September 2010 monthly operating report. Corporate expenses are allocated across the portfolio on a per property basis. This allocation was determined by each property's book value (from Debtor's financial filings) as a percentage of the overall portfolio book value. Growth in operating expenses for 2011-2014 is assumed to be 3.0% annually. Property Taxes are paid when due in April and December and are grown at 2.0% annually as set forth in Prop 13A. Pre-petition property taxes are assumed to be paid quarterly at an 18% interest rate from the Effective Date through October 2014 per the Court approved agreement with the County of Los Angeles.

29) A monthly capital improvements program on a per property basis will commence at the Effective Date and continue through to the end of 2012. Growth in capital improvement and tenant improvements expenses is assumed to be 3.0% annually. Routine market level tenant improvements, tied to market level tenant leasing requirements, are assumed on a per property basis and are in addition to the above capital improvements program. While in-house leasing and marketing expenses are included in the corporate costs that are allocated on a per property basis (see above), the forecast model anticipates a level of third party leasing expenses that are projected at 3.0% of new leasing activity and 1.5% of lease renewals.

30) Principal payments occur as assets are sold. Unpaid interest (pre and post-petition) as of the Effective Date is accrued at the default rate and added to the outstanding principal balance at the Effective Date. This does not apply to amended debt. MMPI's records were used to determine how many months of accrued interest are present for each loan. Debt service for amended loans is paid monthly per the amended loan agreements. As applicable, adjustments are

applied to variable interest rates based on projected changes in LIBOR, Prime and Treasury forward curves. Additionally, amended debt on the Imperial Capital loans is tied to 6 month Treasuries which are expected to rise per the forward curve. Debt service for non-amended loans is paid monthly at a fixed rate of 5.25% through the Charlestown Plan period. Please see the Disclosure Statement for further explanation. Debt service for the first six months following the Effective Date will be pre-paid at the time of the first debt service payment.

31)      Corporate costs are comprised primarily of payroll and payroll related expenses (taxes, healthcare, insurance, etc.), insurance, professional fees, rent, audit/accounting fees and security. Included in these expenses are the costs necessary for the Company to remain a publicly traded entity. Corporate costs are estimated at $705,000 per month (in addition to the property management costs embedded in per-property operating expenses). Ongoing Professional Fees are estimated at to $63,000 per month (in addition to the professional fees embedded in corporate costs).

32)      MMPI's Liquidation Analysis has been adopted, for the sake of brevity, by the Charlestown Plan. Given the current level of uncertainty within the commercial real estate financing markets, a mass liquidation of the portfolio would likely require an unreasonably lengthy average property marketing period and result in unjustifiably low property sales prices. This result would significantly shortchange both the secured creditors as well as MMPI's equity holders.

33)      As of the Effective Date, I anticipate that there will be 41 properties in the portfolio. In the context of this declaration, an examination of each individual property would be impractical and unwieldy. The properties in the portfolio have been divided into 6 separate categories.

1) **Stabilized assets that Reorganized MMPI will retain**. Our primary focus with these properties will be to efficiently property manage these assets while maintaining their occupancy levels and a reasonable standard of physical maintenance. Three of the properties are single tenant properties. This category of properties includes:

1500 Griffith Avenue, Los Angeles
3185 E. Washington Blvd., Los Angeles
950 & 960 E. 3rd Street (Sci-Arc), Los Angeles
833 Wall Street (Wall Street Market), Los Angeles

1919 Vineburn Street, Los Angeles
2445 E. 12th St. (Santa Fe Commerce Ctr.) Los Angeles
1910 Santa Fe Ave., 303 S. Hewitt, Los Angeles

2) **Properties requiring leasing attention and moderate physical improvements.**  These are properties that have been under-leased and under-maintained but with adequate property management attention can be turned into profitable properties.  The physical improvements that are required are non-structural and are predominantly tenant-related and/or mechanical equipment related.  Once these properties have been upgraded to a leasable condition they can be leased up at competitive market rates and occupancy rates consistent with market averages. This category of property includes:

910 E. 4th Street (4th Street Center), Los Angeles
620, 644 S. Gladys Ave., Los Angeles
230 W. Ave. 26th, Los Angeles
420 Boyd Street, Los Angeles
3rd & Omar Street, Los Angeles
2415 E. Washington Blvd., Los Angeles

3) **Properties requiring a large amount of physical, structural redevelopment**.  These are large scale properties that will undergo significant levels of capital improvements.  In the case of one of them, the 7th Street Produce Market, many of these capital improvements are requirements based on binding agreements between MMPI and the LA City Attorney's office, the City of Los Angeles Building and Safety Department and the County of Los Angeles Health Department.  In additional to legally required capital improvements, the Charlestown Plan anticipates continuing MMPI's program of modernizing the property and returned units into legally leasable condition. Alameda Square, adjacent to the 7th Street Produce Market, is the largest property in the portfolio and offers the best financial returns for the redevelopment investment.  By returning Building 2 (approximately 400,000 s.f.) into a leasable condition and improving access to the property thru the currently abandoned rear access road that divides Alameda Square from the 7th Street Produce Market as well as moving DWP power placements, the return on investment can outpace the yields on new high rise development with a minimum of market risk.  The final

1    major project if the modernization of 425 W. 11th Street, also known as the Desmond Building.

2    An investment of approximately $2 million in structural upgrades such as renovated elevators

3    and improved electrical and HVAC distribution will result in a very leasable property in an

4    excellent location with strong ground floor retail and upper floor creative office space.

5    4) **Residential land parcels that Reorganized MMPI intends to keep for future development**.

6    The positive net income from the above commercial properties will be more than adequate to

7    cover pre-development expenses of the remaining developable land parcels as well as

8    prospective shareholder dividends.  The remaining three properties (Southpark, 915-949 S. Hill

9    Street and Meruelo Chinatown) have a total of five, prime residential development sites.  With

10   the restoration of the company's cash reserves, it is anticipated that pre-development of these

11   sites will be ongoing during the Charlestown Plan period.  It is likely that one of more of these

12   development parcels may be the basis of a joint venture agreement with a major financing or

13   development resource that is interested in profitably capitalizing on the growing demand for

14   high rise residential housing in downtown Los Angeles.

15   5) **Income properties that Reorganized MMPI intends to sell in the next two years**.  These are

16   properties that either no longer makes economic sense to retain within the portfolio or are being

17   sold for strategic, financial reasons.  Reorganized MMPI intends to limit the amount of capital

18   improvement investment in these properties and aggressively place them on the market as

19   income generating properties that are anticipated to be sold with two years.  This category of

20   property includes:

21              760 S. Hill Street (The Union Lofts), Los Angeles
             729, 815 E. Temple, 210 Center St., Los Angeles

22                    2951 Lenwood Road, Barstow

23                2640 E. Washington Blvd., Los Angeles
             5707-5715 S. Alameda Street, Los Angeles

24                1000 E. Cesar Chavez Blvd., Los Angeles

25         1117-1119 S. OliveStreet  (Little J's), Los Angeles
             2529 Sante Fe Ave. (Santa Fe Plaza), Vernon

26                  788 S. Alameda Street, Los Angeles
                      905 8th Street, Los Angeles

27

28

1    6) **Non-income land parcels that Reorganized MMPI intends to sell in the next two years.**

2    These are properties that are either too small, non-economic or outside our core market area.

3    There will be virtually no capital improvements other than enhancing site security and

4    Reorganized MMPI will aggressively place them on the market with the intention of selling

5    them within two years.  This category of property includes:

6                    2001-2021 W. Mission Blvd., Pomona
                      1875 W. Mission Blvd., Pomona
7                      1009 N. Citrus Avenue, Covina
                       12385 San Fernando Road, Sylmar
8            930 E. 3rd Street (Sky-Arc Land), Los Angeles
9                      13853 Garvey Ave., Baldwin Park
                       801 E. 7th Street, Los Angeles
10                   1060 N. Vignes Street, Los Angeles
                       758 Ceres Ave., Los Angeles
11                     336 W. 11th Street, Los Angeles
12                   817-825 S. Hill Street, Los Angeles
                      1308 S. Orchard Street, Los Angeles
13
14    I declare under penalty of perjury under the laws of the United States of America that the

      foregoing is true and correct and that this declaration was executed on December 3, 2010 in Los
15
      Angeles, California
16

17

18                              _Edward F. McGonagle_
                                   Edward F. McGonagle
19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# A

# Ted McGonagle's Biography

Mr. McGonagle is a real estate professional with considerable direct experience in the development, re-development and asset management of commercial properties and portfolios. His work experience includes management positions with The Pyramid Companies, Lowe Enterprises and Property Solutions. Throughout his career he has been actively involved in over $4 billion in development and asset management projects.

Mr. McGonagle is a Certified Commercial Institute Member (C.C.I.M.), a selected member of Lambda Alpha International (the honorary land economics society) and a licensed California real estate broker. He is a member of the National Association of Real Estate Executives (NACORE), the Building Owners and Managers Association (BOMA), the Institute of Real Estate Management (IREM), the American Real Estate Society and the National Association of Industrial & Office Properties (NAIOP).

Mr. McGonagle is widely recognized for his knowledge of southern California real estate and has been quoted in publications such as the Los Angeles Times, the Downtown News, the Daily News and the Wall Street Journal. He was recently profiled in Realtor Magazine article as a `rising star turnaround artist' and was recently interviewed in the upcoming issue of Commercial Investment Real Estate magazine regarding commercial redevelopment opportunities in Los Angeles.

His education includes a B.A. in economics from Reed College, an Advanced Professional Certificate in Real Estate Investment Analysis from New York University and advanced real estate courses at UCLA.

## The Weitzman Group 1985 – 1987

The Weitzman Group is an appraisal and consulting firm based in New York City. The firm has a nationwide practice that provides property valuation and project feasibility services to a range of institutional investors and developers. Mr. McGonagle was a financial analyst who was actively involved with the analysis and valuation of over one hundred existing properties and the feasibility study of thirty potential development projects.

## The Pyramid Companies 1987 – 1989

A leading developer of major regional shopping malls in New York and New England, Pyramid has developed and operates over thirty major regional malls totaling approximately 45 million square feet of retail space. Mr. McGonagle was the assistant project manager for Palisades Center, a 1.8 million square foot mall development project in West Nyack New York. He subsequently was the project manager for a 180-acre mixed-use redevelopment project adjacent to the Carousel Center mall in Syracuse New York.

## Lowe Enterprises 1989 – 1997

Based in Los Angeles, Lowe Enterprises is a very active commercial and residential developer, asset manager, hotel operator and pension fund advisor. Lowe provides real estate services to institutional investors and major financial

institutions. Mr. McGonagle was a Vice President for commercial development, redevelopment and asset management activities in southern California. Mr. McGonagle's activities included the active management of a broad range of commercial and large-scale residential development and redevelopment projects. Since Lowe was (at the time) the largest property owner in downtown Los Angeles, Mr. McGonagle was very involved in the asset management, repositioning and refinancing of Lowe's downtown holdings.

## Property Solutions L.L.C. 1997 to 2006

Property Solutions L.L.C. is a consulting firm that helps non-institutional owners and users of commercial real estate with property, site location and adaptive reuse challenges. Many of our clients view us as their as-needed corporate real estate department, freeing them from administrative and project management hassles while freeing them to concentrate on their core business activity. Mr. McGonagle is the Managing Principal of the firm and is responsible for conducting active consulting work and supervising ongoing project activities.

## Meruelo Maddux Properties Inc. 2007 to 2009

Property Solutions LLC provided underwriting, advocacy and analysis services to Meruelo Maddux Properties Inc. related to this company's efforts to go public with an initial public offering. At the time of the IPO, Mr. McGonagle agreed to a two year contract as the Chief Investment Officer of this company. At the end of this period, Mr. McGonagle returned to Property Solutions LLC.

## Property Solutions L.L.C. 2009 to Present

# EXHIBIT

# B

**In re Meruelo Maddux Properties, Inc.**

Report of Ted McGonagle re Plan Feasibility and Adequate Means for Implementation
Documents and Other Information Considered

1.  Fourth Amended Disclosure Statement describing the Charlestown's Fourth Amended Chapter 11 Plan of Reorganization.

2.  Charlestown's Fourth Amended Chapter 11 Plan of Reorganization.

3.  Monthly Operating Reports from Debtor submitted to Court from April, 2009 to October, 2010.

4.  Property appraisals submitted to Court in relation to Meruelo Maddux Properties' Chapter 11 bankruptcy proceedings.

5.  CoStar Realty Information Inc.'s Property, Comparables and Analytics subscription services.

6.  Online Directory of Real Estate Financing compiled and offered by Crittenden Research, Inc.

7.  Online Directory of Real Estate Buyers compiled and offered by Crittenden Research, Inc.

8.  Sonnenblick Goldman/Cushman Wakefield Monthly Capital Markets Update

9.  2010 Building Owners and Managers Association Experience Exchange Report

10. Institute of Real Estate Management 2010 Income/Expense Analysis book: Conventional Apartments

11. U.S. Industry & Trade Outlook, 2010; U.S. Department of Commerce

12. BNI Building News 2010 Square Foot CostBook

13. The Bluebook of Cleaning, Reconstruction and Repair Costs, 2010

14. Means Square Foot Costs, 2010 Edition

15. 2010 national Construction Estimator

16. Cushman & Wakefield quarterly MarketBeat reports for Greater Los Angeles

17. CB Richard Ellis quarterly MarketView reports for the Greater Los Angeles market

18. Grubb & Ellis quarterly Industrial Trends report for Los Angeles County

19. Means CostWorks 2010 Construction Costs software and pricing database information

20. Discussions with Charlestown's Principals and counsel regarding the scope of the assignment, background information, documentation and case status.

21. Discussions with executives at SilverPeak Real Estate Partners, Multi Group and Deutsche Bank regarding market financial and sales conditions.

22. Discussions with a wide range of local real estate brokers and active market participants regarding market leasing activity, rates, terms and general sales conditions.

23. Financial projections prepared by the Debtor as exhibits for various amended Disclosure Statements for Chapter 11 proceedings

24. Fourth Amended Disclosure Statement describing the Debtor's Modified Fourth Amended Chapter 11 Plan of Reorganization.

25. Second Amended Disclosure Statement describing the Legendary's Modified Second Amended Chapter 11 Plan of Reorganization.