CHRISTOPHER E. PRINCE (SBN 18353)
   cprince@lesnickprince.com
MATTHEW A. LESNICK (SBN 177594)
   matt@lesnickprince.com
ANDREW R. CAHILL (SBN 233798)
   acahill@lesnickprince.com
LESNICK PRINCE LLP
185 Pier Avenue, Suite 103
Santa Monica, CA  90405
Telephone: (213) 493-6496
Facsimile:  (213) 493-6596

Attorneys for Charlestown Capital Advisors, LLC and
Hartland Asset Management Corporation

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | Case No. 1:09-bk-13356-VK |
| | Chapter 11 |
| MERUELO MADDUX PROPERTIES, INC., et al. | **APPENDIX OF EVIDENCE IN SUPPORT OF OMNIBUS REPLY OF CHARLESTOWN CAPITAL ADVISORS, LLC AND HARTLAND ASSET MANAGEMENT CORPORATION IN SUPPORT OF THEIR PROPOSED PLAN OF REORGANIZATION** |
| Debtor. | |

Date:      January 26, 2011
Time:     9:30 a.m.
Place:     Courtroom 301
           21041 Burbank Blvd.
           Woodland Hills, CA  91367

Charlestown Capital Advisors, LLC and Hartland Asset Management Corporation (together, the "Charlestown Proponents"), proponents of a plan of reorganization of Debtors, respectfully submit following evidence in Support of Their Response to the Debtors' Opposition to the Charlestown Proponents proposed plan of reorganization, and in support of confirmation of the Fourth Amended Chapter 11 Plan of Reorganization proposed by the Charlestown Proponents (the "Charlestown Plan").

1

**Table of Contents**

2

3

| Exhibit | Description |
|---------|-------------|
| A | Email from Philip Payne to John Hansen dated 10/7/10, Bates Stamp PP000001-PP000005 |
| B | Portions of Deposition Transcript of Todd Nielsen |
| C | Portions of the Minutes of the Board of Directors dated August 23, 2010 |
| D | Portions of the Deposition of Richard Meruelo, Day 1 |
| E | Portions of the Deposition of Richard Meruelo, Day 2 Exhibit |
| F | Ballot 275 |
| G | Portions of the Deposition of Fred Skaggs |
| H | Portions of Transcript from December 20, 2010 Hearing |
| I | Portions of Lease Agreement between Merco Group – Little J, LLC and Musica Latina, Inc. dated July 1, 2006 (Bates Stamp MMPI 81463-64, 81484) and Amendment to Lease between Merco Group – Little J, LLC and Musica Latina, Inc. dated February 1, 2009 (Bates Stamp MMPI 81486-87) |

18

19   DATED:  January 14, 2011

20                         LESNICK PRINCE LLP

21

22                         By:___/s/ Christopher E. Prince_____
                                   Christopher E. Prince
23                                 Attorneys   for   Charlestown   Capital
                                   Advisors,   LLC   and   Hartland   Asset
24                                 Management Corporation

25

26

27

28

**EXHIBIT A**

## Joanna Clark

| | |
|---|---|
| **From:** | John Maddux [jmaddux@meruelomaddux.com] |
| **Sent:** | Friday, October 08, 2010 11:32 AM |
| **To:** | 'John Hansen' |
| **Cc:** | Philip Payne |
| **Subject:** | RE: Discussions with Phil |

John and Phil, I will plan on speaking to the two of you at 9 a.m. on Monday the 11th. I can put two additional parties on a call using our phone equipment. If you will let me know the number I should call you at, I will call you both at that time. I met with John Tedford yesterday morning. Among other things, we discussed the issue of retaining EY to do additional audit work relative to Fred's memo. I asked him to put his thoughts in an e-mail. As I continue to review e-mails this morning, I will forward it to you when I get to it. He said he went and looked at the EY engagement and found it to be narrower than he anticipated. He thought that it could be handled by a motion to the court providing that EY would perform audit work requested by the Company's audit committee. Normally, the way these things work is that the party goes to work and then a motion is filed.

John Charles Maddux
President
Meruelo Maddux Properties
761 Terminal Street
Second Floor
Los Angeles, California 90021
Telephone: (213) 291-2800 X 310
Facsimile: (213) 291-2830
e-mail: jmaddux@mmpi.la

---

**From:** John Hansen [mailto:jbhansen_ca@yahoo.com]
**Sent:** Friday, October 08, 2010 8:14 AM
**To:** John Maddux
**Cc:** Philip.Payne@bbrmail.com
**Subject:** Re: Discussions with Phil

How about 9:00 a.m. pacific time?
John can we use a call in conf line?

John B. Hansen
Glenwood Companies
100 West Broadway, Suite 1100
Glendale, CA 91210
Phone: (818) 409-0115 ext. 102
Fax: (818) 409-0904
E-mail: jbhansen@glenwoodgrp.net

---

**From:** John Maddux <jmaddux@meruelomaddux.com>
**To:** "jbhansen_ca@yahoo.com" <jbhansen_ca@yahoo.com>
**Cc:** "Philip.Payne@bbrmail.com" <Philip.Payne@bbrmail.com>
**Sent:** Thu, October 7, 2010 9:25:46 PM
**Subject:** Re: Discussions with Phil



1

CONFIDENTIAL                                                                                          PP000001

I will make time. What time would work for the two of you?

---

**From:** John Hansen
**To:** John Maddux
**Cc:** Philip Payne
**Sent:** Thu Oct 07 18:17:47 2010
**Subject:** Discussions with Phil

Hi John

Here are the emails Phil and I have been exchanging.  Could we have a conference call Monday Morning between you Phil and me?

I think a discussion would be good

John B. Hansen
Glenwood Companies
100 West Broadway, Suite 1100
Glendale, CA 91210
Phone: (818) 409-0115 ext. 102
Fax: (818) 409-0904
E-mail: jbhansen@glenwoodgrp.net


----- Forwarded Message ----
**From:** Philip Payne <Philip.Payne@ginkgomail.com>
**To:** John Hansen <jbhansen_ca@yahoo.com>
**Sent:** Thu, October 7, 2010 6:12:47 PM
**Subject:** Re: MMPI

Yes

Philip S. Payne
CEO
Ginkgo Residential

Sent from my iPhone

On Oct 7, 2010, at 9:11 PM, "John Hansen" <jbhansen_ca@yahoo.com> wrote:

> Hi Phil
>
> Good points.  I will see John Maddux this weekend and maybe on Monday morning we could have a conf call to discuss this between the three of us.   Is it ok with you if I forward this email to John Maddux so he can see the points of our discussion?
>
> Thanks
>
> John B. Hansen
> Glenwood Companies
> 100 West Broadway, Suite 1100
> Glendale, CA 91210
> Phone: (818) 409-0115 ext. 102

2

CONFIDENTIAL

PP000002

Fax: (818) 409-0904
E-mail: jbhansen@glenwoodgrp.net

---

**From:** Philip Payne <Philip.Payne@ginkgomail.com>
**To:** John Hansen <jbhansen_ca@yahoo.com>
**Sent:** Thu, October 7, 2010 9:27:10 AM
**Subject:** Re: MMPI

Obviously, our e-mails crossed in the mail.

I think it is important to keep in mind that Richard created this mess by issuing the press release and by allegedly doing the things in Fred's letter. I do believe it is in the best interest of everyone for the bankruptcy to come to some reasonable conclusion as soon as possible. However, I am having a difficult time seeing how Richard is contributing to this in a positive way. In fact, the press release and Fred's letter are actually hurting us. So, the argument that we cannot do anything with regards to Richard because it might hurt shareholders is not overly compelling to me.

Now to your point one. I agree we should hire EY as soon as possible.

Point 2. It is interesting that one of the major issues at MMPI has been Richard's tendency to do whatever he wants and his significant ownership (in fact, Richard's ownership is a fundamental flaw at MMPI that I should have paid more attention to before joining the board and one that FBR - the original underwriter - should have addressed at the original IPO). Now, he does want he wants, allegedly without proper purpose or authorization, and he ownership is being raised as am impediment to the board doing anything about this. We have a duty to oversee the operations, ethics and compliance of the company. This is not me picking a fight with Richard, this is just about corporate governance and board duties. I am perfectly willing to discuss and do what is in the best interest of the shareholders, but that Richard does not like it is not important to me. I do not like the press release or Fred's letter and I do not see how those are in the shareholders best interest. If the idea is to leave him in place, but severely restrict his authority and ability to act independently Pending completion on EY's investigation, I be willing to agree, but only if Maddux is willing to take responsibility for keeping him under control.

Point 3. This is basically the same issue as 2 above.
Philip S. Payne
CEO
Ginkgo Residential
Sent from my iPhone

On Oct 7, 2010, at 10:33 AM, "John Hansen" <jbhansen_ca@yahoo.com> wrote:

> Hi Phil
>
> I spoke with John Maddux a couple of times and he brought up a couple of good points.

2. Richard stepping aside - John believes, and I think I agree, that if Richard believed it was in the best interest of the company for him to step aside, he would do so voluntarily. However, if he were voted off, and he disagreed with the idea, what would stop him from calling an immediate shareholder vote and voting the directors off and ultimately put himself back in charge? I realize that would be a blessing to us in some regards to be removed as directors, but it wouldn't do much good for the company.

3. Richard's value in Bankruptcy - The approval of the plan calls for Richard to be the key witness in determining the value of the properties. His testimony will be the primary source for information in favor of the company's holdings. If he is removed from his position, either voluntarily or involuntarily, how would that effect his ability to testify and ultimately get the plan approved? Good question. I believe that it is in the best interest of our creditors and equity holders for our plan to be approved, so it raises and interesting quandary.

I asked John if anyone else besides the Equity Comm or Taylor has mentioned the letter from Fred, no one else so far. So the leak is apparently narrow in scope. My thinking about the above issues, balancing the need for Richard to be a central figure in approving the final plan and making sure that the issues in the letter are investigated, would be to have EY investigate the letter and answer the issues. Once we have the information from EY we would be in a better position to determine Richard's position with the company. At that point we decide upon a suspension. Let me know what you think.

I think all of the other proceedures you mentioned above should be put in place.


Thanks

John B. Hansen
Glenwood Companies
100 West Broadway, Suite 1100
Glendale, CA 91210
Phone: (818) 409-0115 ext. 102
Fax: (818) 409-0904
E-mail: jbhansen@glenwoodgrp.net

---

**From:** Philip Payne <Philip.Payne@ginkgomail.com>
**To:** Sullivan Jeff <jeffrey.sullivan@dlapiper.com>
**Cc:** Hansen John <jbhansen_ca@yahoo.com>
**Sent:** Thu, October 7, 2010 5:56:40 AM
**Subject:** MMPI



CONFIDENTIAL

**EXHIBIT B**

```
 1    LOS ANGELES, CALIFORNIA, WEDNESDAY, JANUARY 12, 2011

 2                        2:23 P.M.

 3

 4         MS. RODIGER:  We are just getting ready to

 5    start the deposition and here in the conference room I'm

 6    here Georgiana Rodiger for the creditors' committee.  We

 7    will go around and make appearances.

 8         MS. HAGAN:  Cara Hagan on behalf of PNL.

 9         MS. FREEDMAN:  Susan Freedman on behalf of the

10    County of Los Angeles.

11         MR. KLAUSNER:  Gary Klausner representing the

12    debtors.

13         MS. RODIGER:  And Mr. Nielsen is here also.

14         MR. KLAUSNER:  And I'm also representing

15    Mr. Nielsen for purposes of the deposition.

16         MS. RODIGER:  Thank you.  Okay.  I think we're

17    ready.

18                        EXAMINATION

19    BY MS. RODIGER:

20      Q.  Can you state and spell your name for the

21    record, please.

22      A.  Sure.  Todd Nielsen t-o-d-d, N i-e-l-s-e-n.

23      Q.  Thank you.  Mr. Nielsen have you had your

24    deposition taken in the last five years?

25      A.  Yes.

                                            1
```

```
 1      Q.  How many times?

 2      A.  Twice.

 3      Q.  In what context?

 4      A.  An unlawful detainer action and in a specific

 5    performance action by the company.
```

6      Q.  Were both of those lawsuits involving your

7   employer?

8      A.  Yes.

9      Q.  Okay.  Have you had a chance to meet with an

10  attorney before your deposition today?

11     A.  Briefly.

12     Q.  And you are an attorney; is that right?

13     A.  Yes.

14     Q.  All right.  Do you feel generally comfortable

15  with the deposition process or would you like me to go

16  through all of the general admonitions?

17     A.  You might as well go through it.  I --

18     Q.  Very good.  The deposition process is one where

19  you've been placed under oath by the court reporter and

20  the testimony you give today is the same as it would be

21  in a court of law do you understand that?

22     A.  Yes.

23     Q.  Okay.  Everything that is said in this room

24  will be taken down by the court reporter on your right

25  and put into a booklet form that will later be provided

                                                        2


1   to you to review and sign under penalty of perjury.  Do

2   you understand that?

3      A.  Yes.

4      Q.  Okay.  At the time you have the opportunity to

5   review the booklet, you will be asked to make changes

6   and corrections to the record.  However, you should know

7   that should you make significant changes like a change

8   of a yes to a no, or significant dollar changes, those

9   could be commented upon by any attorney at a future

10  proceeding and could prove embarrassing to you in some

11  way.

17      Q.  Can you tell me when the March 18th -- I'm

18  sorry March 14th, 2008 board minutes were created?

19      A.  Not specifically.  It would have been shortly

20  before, I'm sorry of the March 14th was the date of the,

21  of the board meeting?  So it would have normally been

22  some time between that meeting and the next meeting.

23      Q.  How often are board meetings held?

24      A.  Well, originally board meetings were held

25  regularly on a quarterly basis.  In 2008 there were

                                                    9


 1  probably some additional board meetings in addition to

 2  the quarterly meetings.  In 2009 and 10 there were

 3  substantially more meetings held and not all of them

 4  were regularly scheduled.

 5      Q.  Did you attend the board of directors'

 6  meetings?

 7      A.  Yes.

 8      Q.  All right.  And was it your responsibility as

 9  you understood it for you to take the minutes for the

10  board of directors' meetings?

11      A.  Yes, yes.

12      Q.  And that, has that been true since 2007?

13      A.  Yes.

14      Q.  How quickly after a board meeting did you

15  prepare minutes as a general practice?

16      A.  There would usually be some lag time, depending

17  on -- you know some of them were prepared again in

18  between the time of the last -- of the board meeting in

19  question and the next board meeting, some of them may

20  have been prepared in groups such that they were you

21  know, I prepared multiple meetings -- minutes for

22  multiple meetings at a time.  It varied.

23     Q.  Why did it vary between those two practices?

24     A.  Mostly it was because of the bankruptcy just

25  increased the workload so substantially that it was less

                                                    10


1   practical to get them all done in between each meeting.

2   In addition there were so many more meetings that

3   occurred that it became more difficult to prepare them

4   in between each meeting.

5      Q.  Can you identify for me the time period in

6   which you were preparing minutes between meetings?

7      A.  Generally 2007 and 2008.

8      Q.  When you prepared the board minutes between

9   meetings, did you usually present those minutes to the

10  board for approval at the next meeting?

11     A.  Yes.

12     Q.  Was that something that you usually reflected

13  in the minutes?

14     A.  Yes.

15     Q.  And then for the period after 2008, were board

16  minutes prepared in groups?

17     A.  Yes, 2009-2010 it was more likely in groups.

18     Q.  Do you (comma), can you identify for me what

19  the groups of minutes were for 2009 and 2010 that were

20  prepared after a lag time?

21     A.  I can't off the top of my head.

22     Q.  In the -- in the minutes of, I believe,

23  August 23rd, 2010, the minutes reflect that there was a

24  group of minutes approved at that meeting.  Do you know

25  what group of minutes was approved at that meeting?

                                                    11


1      A.  Those were probably for, I don't know for sure,

2    but they were probably for 2009 and maybe.

3            MR. KLAUSNER:  Todd, let me just remind you not

4    to speculate or guess.

5            THE WITNESS:  Okay.  I don't know for sure.

6    BY MS. RODIGER:

7       Q.  Okay I'm asking for your best estimate.

8       A.  My estimate.

9       Q.  Yes.

10      A.  Would be -- they would probably be for 2009 and

11   probably a part of 2010.

12      Q.  Do you recall how many minutes were approved at

13   that August 23rd board meeting specifically?

14      A.  I don't recall the specifics.

15      Q.  Do you recall the time frame of the minutes

16   that were approved at that August 23rd board meeting?

17      A.  I'm not sure I understand.  Can you --

18      Q.  If it was January 1st 2009 through --

19      A.  I don't remember specifically.

20      Q.  Why -- why was a group of minutes from 2009 and

21   2010 submitted for approval at the August 23rd board

22   meeting?

23      A.  August 23rd of what, what time period?

24      Q.  2010.

25      A.  To update our record of the minutes.

                                        12


1       Q.  So to bring the board approval process of the

2    minutes current?

3       A.  Correct.

4       Q.  Okay.  Can you tell me as to the minutes

5    prepared prior to August 23rd, 2010 which minutes, if

6    any, were prepared by Mr. Sullivan?

7       A.  Not without viewing them.

8     Q.  Is there something in the minutes that would

9  tell you that?

10     A.  I thought that they would have, I thought that

11  they indicated that Mr. Sullivan prepared them, but I

12  don't remember.

13     Q.  Okay.  I think I have a copy?

14     A.  I believe there were minutes in July of 2009

15  because I was on vacation and there may have been --

16  been some others, but that's the one I remember.

17     Q.  And you were anticipating my next question

18  which is was Mr. Sullivan taking minutes because you

19  weren't at those meetings?

20     A.  Correct.

21     Q.  Okay.  Of the minutes that you prepared, how

22  did you record at the meetings what you were going to

23  need for the minutes, handwriting or computer?

24     A.  I took handwritten notes.

25     Q.  And did you ever differ from that practice

                                               13


1  during the time that you were preparing board minutes?

2     A.  No.

3     Q.  So do you somewhere have your handwritten notes

4  that were used in preparing all of the board minutes

5  from 2008 through 2010?

6     A.  No.

7     Q.  What did you do with the handwritten notes?

8     A.  Once, once board minutes are approved then I

9  throw those away.

10     Q.  Okay.  So, so would it be correct to say that

11  there is not to your knowledge a copy of your

12  handwritten notes from any of these board meetings?

13     A.  Correct.

14     Q.  Okay.  And other than your notes taken at the

15  board meetings do you use anything else to prepare board

16  minutes?

17      A.  Such as I'm not sure I understand.

18      Q.  An agenda or other people's notes.

19      A.  No.

20      Q.  Is there usually a board agenda distributed

21  prior to the MMPI board of directors meetings?

22      A.  For regularly scheduled meeting yes there

23  normally would be.  Not necessarily for, for the other

24  meetings, no.

25      Q.  Who prepares that agenda usually?

                                        14


1      A.  It would usually be me or John Maddux.

2      Q.  Do you have copies of the agendas that you have

3  prepared for board of directors meetings since 2008?

4      A.  Yes.

5      Q.  Have those all been produced as part of the

6  board packet materials to your knowledge?

7      A.  I don't believe so.

8      Q.  Where would those agendas be?

9      A.  Those would be in my files.

10      Q.  Okay.  And how about the agendas that

11  Mr. Maddux prepared, do you have copies of those also?

12      A.  I likely have copies.  But I'm not 100 percent

13  sure.

14      Q.  Prior to board meetings have you undertaken to

15  distribute any kinds of materials board packets for

16  board consideration?

17      A.  I, I did not necessarily distribute materials.

18  I may have distributed some of the materials, not

19  necessarily all of them.

20      Q.  That's really where I was going you anticipated

**EXHIBIT C**



**MERUELOMADDUX**
PROPERTIES

## MMPI BOARD OF DIRECTORS' CONFERENCE CALL
## MINUTES
August 23, 2010 4:00 p.m. Pacific Time

Board Participants:    John Hansen
Phil Payne
Richard Meruelo
Richard Polanco
John Maddux
Lynn Beckemeyer
John Hansen
Anthony Williams (joined part way as noted)

Other Participants:    Andrew Murray
Miguel Echemendia
Fred Skaggs
Todd Nielsen
Jeff Sullivan
Tom Califano
Julie Brand
John Tedford
Freddie Reiss
Steve Voskanian

Mr. Maddux introduced Freddie Reiss and Steve Voskanian of FTI Consulting. They will discuss treatments under the company plan.



1



J Anthony Williams

joined the call.

The board asked about the status of negotiations with the creditor committee.

The board discussed how acceptance of the proposal would affect cash at the effective date.

Mr. Meruelo discussed the effect of having multiple plans on negotiations.

Mr. Reiss explained that when there are competing plans, the cost of the plans increases. He indicated that the board should discuss treatment of three key classes: equity, unsecureds, and secureds.

Mr. Reiss expressed his opinion if we were going to make changes that would effect economics, they should be made as soon as possible.

The board discussed the advantages and disadvantages of various treatments of equity. Mr. Reiss explained that the company had originally proposed a cancellation of equity with a $10 million rights offering. The difficulty was making the offering available to all shareholders. Securities counsel believed that it could only be made to accredited investors unless it qualified under Section 1145 of the Bankruptcy Code, and there was concern that 1145 may not apply. This was the purpose of restructuring the treatment to a contribution of $.07 to retain shares and a redemption of $.08 to redeem. It would raise some cash, although not as much as a rights offering, and it would allow a shareholder the option to either stay in or leave. That way, it was at the option of the shareholder, not the company. At the time, $.08 was a premium to the trading price. The stock price had since risen, although the volume appeared to be very low. It appeared Mr. Taylor was a buyer of stock at about $.20. Charlestown is offering $.16 per share but that is still below current market price, although it's possible Mr. Taylor effectively created the market price due to his own buying activity. Mr. Reiss recommended to the board that it unimpair equity, which would provide treatment to equity that was more fair than other plans, and would simplify the confirmation hearings. There would be no dilution or disenfranchisement of equity. Mr. Meruelo agreed with Mr. Reiss. Mr. Maddux also expressed his support for the change in treatment. Mr. Payne asked whether that meant the company was abandoning the rights offering. Mr. Reiss responded that it would reduce the amount of funds being raised, although the $.07 contribution was only projected to raise a few million dollars. ███████████████████████████████
███████████████ The board discussed the likelihood and effects of becoming publicly reporting. ██████████████████████████████████████████████████████████████
████████████████████████████ Mr. Reiss discussed the NOLs and other tax issues related to changes in control that would occur under competing plans. He did not believe the two competing plans adequately analyzed the tax effects.

The board discussed treatment of creditors, specifically: 100% payment within 30 days for unsecureds, and a 5% interest rate for secureds. The board also discussed shortening the secured loan term to 4 or 5 years. Mr. Hansen asked for management's recommendation. Mr. Williams asked what was appropriate for unsecureds. ████████
██████████████████████████ Mr. Maddux indicated that it would require the company to sell assets or raise capital sooner. Mr. Williams expressed his opinion that the question should not merely be who is paying the most, but what is best for the long term prospects of the company. Mr. Meruelo indicated that matching an offer, however, may be necessary to get the vote. Mr. Maddux proposed that the board authorize the company to unimpair equity, provide unsecured treatment of 100% payment at 30 days with 5% post-petition interest, and secureds at 5% interest. Mr. Tedford clarified that it should be authorization only, and not required. Mr. Williams so moved. Mr. Polanco seconded the motion. It was approved 7-0.

3

Mr. Nielsen presented various minutes for approval of the board. Mssrs. Beckemeyer and Maddux provided some revisions. Mr. Payne moved to approve subject to the revisions. Mr. Williams seconded. It was approved 7-0.

Meeting adjourned at 5:15 p.m.

**EXHIBIT D**

1        REPORTER'S NOTE: THIS TRANSCRIPT IS A ROUGH

2 DRAFT TRANSCRIPT ONLY.  THIS REPORTER HAS NEITHER EDITED

3 NOR PROOFREAD THE TEXT, AND IT IS NOT A CITABLE

4 DOCUMENT.

5

6        REPORTER:  DENISE A. ROSS

7

8        THE VIDEOGRAPHER:  Here begins Volume No. 1,

9 Videotape No. 1, in the deposition of Richard Meruelo in

10 the matter of inray Meruelo Maddux Properties

11 Incorporated et al., in the United States District Court

12 for the Central District of California in the

13 San Fernando Valley division.  The case number is 109 B

14 K-13356 can KT.  Today's date is January 11, 2011.  The

15 time on the video monitor is 9:54.

16        The video operator today is Jemal Judkins, a

17 notary public contracted by Merrill Legal Solutions at

18 20750 Ventura Boulevard, Suite 205, Woodland Hills,

19 California.

20        This video deposition is is taking place at

21 1901 Avenue of the Stars in Los Angeles and was noticed

22 by Kenneth Lee of Jenner & Block.  Counsel please voice

23 identify yourselves and state whom you represent.

24        MR. LEE:  Ken Lee from Jenner Block

25 representing the official equity committee.

                                                    1

UNCERTIFIED ROUGH DRAFT ONLY

1        MR. PRINCE:  Christopher prince of Lesnick

2 Prince LLC for Charlestown capital adviser and Hart land

3 asset management corporation.

4        MR. PEZOLD:  Eric Pezold, Snell & Wilner,^ Bank

5 of America.

6        MS. HAGAN:  Cara Hagan for PNL Pomona.

7        MR. GILBERT:  James gill sick sick for County

8 of Los Angeles tax collector.

9        MR. CASTANARES:  Tony Castanares Stutman

10 Treister & Glatt for the debtors.

11        THE VIDEOGRAPHER:  Would all others present on

12 the telephone please represent yourselves -- would --

13 Marc Hankin, Jenner & Block, the Equity Committee.

14        MR. SAHN:  Victor Sahn of /SUL Meyer cupped for

15 the official committee of unsecured creditors.

16        MR. GAFFNEY:  Don Gaffney on behalf of Bank of

17 America.

18        MS. PROUT:  Maita Prout for East West Bank.

19        THE VIDEOGRAPHER:  Would all others present

20 please state your name for the record Andrew Murray

21 Meruelo Maddux Properties Miguel Echemendia

22 Meruelo Maddux Properties John Maddux Meruelo Maddux

23 Properties.

24        THE VIDEOGRAPHER:  The court reporter today is

25 Denise Ross of Merrill Legal Solutions would the

                                        2
            UNCERTIFIED ROUGH DRAFT ONLY


1 reporter please swear in the witness.

2 BY MR. LEE:

3     Q.  Good morning, Mr. Meruelo?

4     A.  Good morning.

5     Q.  You've been deposed previously; right?

6     A.  Yes.

7     Q.  So you're aware that you're under oath and you

8 must testify truthfully as if you were in court; right?

9      A.  Yes.

10      Q.  Throughout this deposition, I will refer to

11 Meruelo Maddux, MMPI or the company and when I do, I'm

12 referring to Meruelo Maddux Properties Incorporated as

13 well as its various subsidiaries and related entities.

14 Do you understand that?

15      A.  I understand what you just said, but there are

16 many entities and there are differences between those

17 entities so please use the the entity names so that I

18 can provide you an accurate answer.

19      Q.  When it's relevant I will refer to the the

20 specific entities but when I refer to MMPI,

21 Meruelo Maddux or the company I'm referring to the entire

22 organization as well as its subsidiaries?

23      A.  Okay.  When I do not understand, I will ask for

24 clarifying --

25      Q.  Sure?

                                                3
                    UNCERTIFIED ROUGH DRAFT ONLY


1      A.  Can you please let me finish.  I will ask you

2 to provide a clarification on what you're asking me so

3 that I do not inadvertently provide you an inaccurate

4 answer.

5      Q.  Absolutely.  If you don't understand any of my

6 questions please let me know and I will restate them or

7 rephrase them.

8          Mr. Meruelo, you graduated from USC in 1986?

9      A.  Sir, is that a question?

10      Q.  Yes.

11      A.  Yes.

12      Q.  And do you have any additional professional

13 designations or certifications?

6 create board minutes because the company had been ordered

7 to produce them?

8     A.  I don't recall ever hearing that.

9     Q.  Your answer is actually a little bit broader

10 than my question so I'll go ahead and broaden it.

11         Did anyone ever tell you that Mr. Nielsen had to

12 write board minutes because other parties in the

13 bankruptcy case had requested them?

14     A.  As I stated before, I don't ever recall hearing

15 that.

16     Q.  Besides the stock that you hold in MMPI, do you

17 own any other stock or other type of equity interest in

18 another company?

19         MR. CASTANARES:  Counsel are you excluding the

20 various companies that he's testified about in response

21 to your questions today and Mr. Lee's questions today or

22 are you looking for publicly traded stock?  Could you

23 narrow your question somewhat.

24         MR. PRINCE:  I'm actually trying to ask a very

25 broad question and funnel from there.

                                        170
                UNCERTIFIED ROUGH DRAFT ONLY


1         MR. CASTANARES:  Okay.

2 BY MR. PRINCE:

3     Q.  I'm sorry just to make one clarification I'm

4 talking about right now not some sort of indefinite time

5 in the past but right now?

6     A.  I own equity interests in other private

7 entities.

8     Q.  The other private entities that you own equity

9 interests in, are these sort of what we've broadly been

10 describing as the affiliated entities or is there

11 something else?

12    A.  Yes.

13    Q.  Good answer.  Let me break that question up.

14 When you're talking about having equity interests in

15 private entities, are you talking about the entities that

16 we've been discussing today already?

17    A.  Yes.

18    Q.  Do you own any equity interest in any other

19 private entity besides the one s that we've been

20 discussing already?

21    A.  No.

22    Q.  Your stock in MMPI, is it pledged as collateral

23 for any debt?

24    A.  Yes.

25    Q.  And what is -- what is the nature of that

                                                    171
                    UNCERTIFIED ROUGH DRAFT ONLY


1 pledge?

2    A.  It's -- it's a pledge ever collateral.  I don't

3 understand your question (of).

4    Q.  Certainly I'm trying to get to the details of

5 it.  To whom is the debt owed?

6    A.  It would be an assignee of key bank.

7    Q.  And do you know who the assignee is?

8    A.  It's generally a related entity to my mother.

9    Q.  An entity affiliated with your mother purchased

10 the loan from key bank?

11    A.  Yes.

12    Q.  And so now the -- do you know the name of that

13 entity?

14    A.  Not off the top of my head.

15    Q.  And so now your stock in MMPI is pledged to

16 secure a loan held by an entity affiliated with your

17 mother; is that right?

18     A.  In layman's terms yes.  There's other quirks

19 but that's generally it.

20     Q.  What is the term of the loan, term being length

21 of time?

22     A.  It's either -- either five, seven or ten years.

23 Some lente period of time.

24     Q.  And is that the remaining term or the whole term

25 (lengthy)?

                                                    172
                    UNCERTIFIED ROUGH DRAFT ONLY


1     A.  I think it's a remaining term.

2     Q.  And what is the -- what are the the payment

3 requirements under the loan?  Are you required to make

4 any payments now?

5     A.  It's on an accrual basis.

6     Q.  I know accrual basis as a tax term.  Do you mean

7 that interest is being added to the balance of the loan

8 and that you're not making any payments?

9     A.  Yes to a certain extent of the payment.

10     Q.  Are you make anything payments?  Let me withdraw

11 that question.  In the last year, have you made any

12 payments?

13     A.  I believe so.

14     Q.  On an interest-only basis -- well, let me just

15 start with the basics.  What is the principal amount of

16 the loan?

17     A.  I don't know as I sit here right now.

18     Q.  Is it more than a million dollars?

19     A.  Yes.

20     Q.  More than $10 million?

21    A.  Yes.

22    Q.  More than $20 million?

23    A.  Yes.

24    Q.  More than $50 million?

25    A.  I don't think so.

173

UNCERTIFIED ROUGH DRAFT ONLY

1    Q.  And what is the interest rate on the loan?

2    A.  I don't remember at this time.

3    Q.  Is it more than two percent?

4    A.  I just don't remember.

5    Q.  More than 10 percent?

6    A.  I'm not going to give you an answer.  I don't

7 want to guess.

8    Q.  Is -- does it incur interest at all?

9    A.  Yes.

10    Q.  How much have is you paid on the loan in the the

11 last year?

12    A.  I don't recall at this time.

13    Q.  Have you -- have you paid more than a million

14 dollars?

15    A.  I don't recall any amount at this time and I

16 don't want to guess.

17    Q.  You have no idea whether you paid more than a

18 million dollars or let's say $10,000?

19    A.  Correct.

20    Q.  Have you -- are you in default on the loan?

21    A.  I don't believe so.

22    Q.  What islet basis for your belief?

23    A.  Nobody is trying to collect.

24    Q.  Before the the entity controlled by your mother

25 purchased the loan, did key bank make any attempt to

174
UNCERTIFIED ROUGH DRAFT ONLY

1 collect on it?

2    A.  I don't believe so.  There was letters that

3 placed it in default, but it was a stock pledge.  They

4 could have sold stock and that never happened.  So I'm

5 not sure how to answer you specifically.

6    Q.  Is your stock pledged as collateral for any

7 other debt other than the one that we've just been

8 discussing?

9    A.  I don't believe so.

10    Q.  Do you have any judgments against you?

11    A.  Yes.

12    Q.  How many?

13    A.  I'm not sure.

14    Q.  More than two?

15    A.  Probably.

16    Q.  More than five?

17    A.  I don't think so.

18    Q.  Do you know what the total amounts of the

19 judgments against you is?

20    A.  You know, I'll give you an estimate.

21 $10 million.

22    Q.  Are your wages being garnished?

23    A.  Yes.

24    Q.  Do you know how much of your wages is being

25 garnished at this time?

175
UNCERTIFIED ROUGH DRAFT ONLY

1    A.  $2,000 a pay period.

2    Q.  What is your pay period?

3      A.  Every two weeks.

4      Q.  Do you know which judgment creditor is

5 garnishing your wages?

6      A.  Yes.

7      Q.  Who is that?

8      A.  Canyon capital.

9      Q.  How long have your wages been garnished?

10      A.  About one year -- approximately.  I'm not -- I

11 don't know the exact date.

12      Q.  Is there any other judgment creditor garnishing

13 your wages?

14      A.  No.

15      Q.  Other than having your wages garnished, are any

16 of your judgment creditors taking other -- any other

17 action to enforce their judgments against you?

18      A.  Not generally.  That doesn't mean that they may

19 not start tomorrow or not.

20         MR. PRINCE:  Counsel because I've sort of said

21 that I would try and stop around this time.  I would

22 actually just ask if we could talk about that e-mail

23 account just generically.  I think you had said you were

24 going to discuss it his personnel e-mail account I'm not

25 going to ask for his password or his e-mail address.

176

UNCERTIFIED ROUGH DRAFT ONLY


1         MR. CASTANARES:  Will you ask him the following

2 question to his knowledge if he's ever used that account

3 for anything to do with MMPI as a foundational question.

4         MR. PRINCE:  I think that question was asked

5 and he said no.  I'll tell you what I want to know and

6 you can discuss it with your client of the I just want

7 to know is it the kind of account like a G mail account

**EXHIBIT E**

1        REPORTER'S NOTE: THIS TRANSCRIPT IS A ROUGH

2 DRAFT TRANSCRIPT ONLY.  THIS REPORTER HAS NEITHER EDITED

3 NOR PROOFREAD THE TEXT, AND IT IS NOT A CITABLE

4 DOCUMENT.

5

6        REPORTER:  DENISE A. ROSS

7

8        THE VIDEOGRAPHER:  Here begins Volume II,

9 Videotape No. 1, in the deposition of Richard Meruelo in

10 the the matter of in ray Meruelo Maddux property s in

11 the United States Bankruptcy Court central district of

12 can California San Fernando Valley division the case

13 number is 109 B K-13356 KT.  Today's date is January 12,

14 2711.  The time on video monitor is 928.

15        The video operator today is Inga Kornev

16 contracted by Merrill Legal Solutions at 20750 Ventura

17 Boulevard, Suite 205, Woodland Hills, California.  This

18 video deposition is taking place at Stutman Treister &

19 Glatt located at 1901 Avenue of the Stars, Los Angeles,

20 California and was noticed by Kenneth Lee of Jenner &

21 Block.  Counsel please voice identify yourself s and

22 state whom you represent and if you're not sitting near

23 a microphone.

24        MR. PRINCE:  /KREUFT merprince of /HRES in this

25 case prince LLP for Charlestown capital adviser ands

                                                    1

                    UNCERTIFIED ROUGH DRAFT ONLY

1 Hart land asset management corporation.

2        MR. LEE:  Ken Lee of Jenner & Block

3 representing the official /WEBGity quest.

4        [!EZ SPEAKER 101]:  County of Los Angeles.

5          MR. PEZOLD:  On behalf of bank of me.  Daniel

6 Meruelo Maddux Miguel Echemendia Meruelo Maddux.

7          MR. CASTANARES:  Tony Castanares Stutman

8 Treister & Glatt for the debtors.

9          MR. PRINCE:  On the telephone could you please

10 identify yourselves mark had /HEUFRPBGin of Jenner &

11 Block representing the equity committee.

12          Asa hammy of sol-Meyer behalf.

13          Cara Hagan an for PNL Pomona.

14          Amand /AO mata Prout for East West Bank.  Mon.

15          MR. PRINCE:  And I believe Ms. Lin are you on

16 the line as well.

17          Yes Monicalin East West Bank.

18          MR. PRINCE:  Is there anyone who has not yet

19 identified themselves?

20          THE VIDEOGRAPHER:  The court reporter today is

21 Denise Ross of Merrill Legal Solutions.  Would the

22 reporter please swear in the witness.

23          MR. LEE:

24 BY MR. PRINCE:

25     Q.  Counsel when we broke yesterday there was some

                                                    2

                    UNCERTIFIED ROUGH DRAFT ONLY


1 discussions about e-mail s and I see from the expression

2 on your face you haven't had a chance to discuss it?

3          MR. CASTANARES:  I haven't discussed it and I

4 have thought about it Chris let me say this it seems to

5 me the issue isn't really domain is proper or not the

6 issue is whether you're entitled to get there or not.

7 If you're entitled to get there then the question about

8 the do mane is proper.  If you're not entitled to get

9 there except to get there improperly.  So I think we

10 should discuss it at that level /KP as a result I didn't

6 payment of the Neufeld Law Group's legal fees by -- by

7 the MMPI estate?

8      A.  I don't remember that.

9      Q.  Were you aware that the United States trustee

10 had made inquiries regarding the payment of the

11 Neufeld Law Group legal fees out of the MMPI estate?

12         MR. CASTANARES:  Assumes facts not in evidence.

13         You may answer.

14         THE WITNESS:  I'd like to answer no; however, I

15 have been in bankruptcy court on a number of times that

16 the U.S. trustee has appeared and stood up and said

17 things.  And I don't know if while I was sitting there

18 she said something and I either missed it or I don't

19 recall.  But my initial answer is no, I don't know.

20     Q.  Separate from something that the U.S. trustee

21 might have said in court that you may not have heard, do

22 you have any other knowledge that the U.S. trustee had

23 inquired about the Neufeld Law Group payments?

24     A.  No.

25     Q.  Are you familiar with the J-Lounge restaurant?

8

UNCERTIFIED ROUGH DRAFT ONLY


1      A.  Yes.

2      Q.  And I apologize I know sometimes my questions

3 seem very basically that I'll know that you'll know about

4 the J-Lounge restaurant.  But as your counsel has

5 objected as to assumes facts not in evidence sometimes I

6 have to lay a foundation for this?

7      A.  Counsel, I like -- you use your time as

8 inefficiently as you can.

9      Q.  MMPI owns the real estate in the building where

10 the J-Lounge --

11         MR. CASTANARES:  Excuse me.  She wants you to

12 move your microphone farther up.

13        THE WITNESS:  It's pretty close to my nose

14 already.

15        MR. CASTANARES:  Thank you.

16        THE VIDEOGRAPHER:  Sorry.

17 BY MR. PRINCE:

18     Q.  MMPI owns the the lounge and the building where

19 the J-Lounge restaurant is is located; right?

20     A.  I need a clarification.  When Mr. Lee referred

21 to MMPI, he included subsidiaries.  I need to know in

22 the answer to this particular question MMPI does not.

23 One of the subsidiaries owns it.  If that's the same to

24 you, then yes.  But I need you to clarify that in going

25 forward.

                                              9

                UNCERTIFIED ROUGH DRAFT ONLY


1     Q.  Understandable.  I think yesterday what I was

2 trying to do when I just say MMPI I mean MMPI or its

3 affiliate s and when I'm trying to refer to MMPI

4 specifically I say MMPI the parent company?

5     A.  However, affiliates means different things

6 possibly to me than to you.  So I -- I call them

7 subsidiaries.  So if you can say MMPI includes it's

8 subsidiaries not affiliate s and the reason I say that

9 is because some nonMMPI entities for various reasons are

10 called affiliates.

11     Q.  Well, in this case, I think since it's a

12 subsidiary we can just agree to disagree on this point.

13 Does an MMPI subsidiary own the land and the building

14 where the J-Lounge restaurant is is located?

15     A.  Yes.

16     Q.  Do you know who owns the the restaurant business

17 itself?

18    A.  The tenant is Musica Latina incorporated.

19    Q.  And do you know who owns Musica Latina

20 incorporated?

21    A.  Sergio Dovarro.

22    Q.  Do you personally have any interest in Musica

23 Latina incorporated?

24    A.  No.

25    Q.  Do you know if anyone other than Mr. Dovarro has

10

UNCERTIFIED ROUGH DRAFT ONLY

1 an interest in Musica Latina?

2    A.  I think his wife but I'm -- the answer is I do

3 not know.

4    Q.  Do you know Mr. Dovarro?

5    A.  Yes.

6    Q.  How long have you known him?

7    A.  20 years.

8    Q.  Where did you meet him?

9    A.  I believe it was through friends at some sort

10 of a USC event.  We are both USC graduates at about the

11 same time.

12    Q.  Did you know him at USC?  I guess what I'm

13 trying to find out is this an alumni event after you left

14 USC or did you meet him during school?

15    A.  Probably after.  I mean I knew -- I knew he

16 existed while -- I'm a couple years older than him and

17 so we weren't on the same track and he was in a

18 different school than I was.  So I knew he was there.  I

19 mean I kind of knew him but I really met him after we

20 both graduated.

21    Q.  Do you know if Mr. Dovarro has purchased

22 unsecured claims in the MMPI bankruptcy cases?

23    A.  I believe entities of his either were

24 considering it or did.

25     Q.  Did you ever discuss that with him?

1     A.  I discussed with him that many of our vendors

2 were calling me to see how -- that they were being

3 contacted about -- from various parties to buy their

4 claims.  And they were being offered fairly low

5 percentages of their claim amount s and that -- that

6 there could be a business in that.  I mean there could

7 be a profit motive.

8          And that he should look into it.

9     Q.  And when did you have that discussion?

10    A.  Probably a year ago.

11    Q.  Do you -- did anyone else -- do you know if

12 anyone else at MMPI discussed this with Mr. Dovarro?

13    A.  I am not sure.

14    Q.  Do you know if outside counsel for MMPI

15 discussed this with Mr. Dovarro?

16         MR. CASTANARES:  I'm going to have to ask this

17 one to go one by one.  The the present -- the present

18 question I'm going to let you answer but I want you to

19 answer is yes or no that is whether you know whether

20 outside counsel your outside counsel discussed it with

21 Mr. Dovarro.  It's not whether Mr. Dovarro discussed it

22 with him it's whether MMPI's outside counsel discussed

23 it with Mr. Dovarro is that right.

24         MR. PRINCE:  That's correct.

25         MR. CASTANARES:  So the question is is whether

1 you know whether that happened or not.  Just answer that

14 no.

15      Q.  In the last four years?

16      A.  Pre and post-IPO, he provided rental services

17 on a building that the the company that -- that MMPI had

18 a ground lease over.

19      Q.  1828 Oak Street?

20      A.  Yes.

21      Q.  Do you know what Mr. Dovarro or his company was

22 paid for the management services?

23      A.  I don't know exactly.  I can give you an

24 approximate amount.  It's 60 or $70,000 annually.

25      Q.  Who set that price?  Who negotiated with

                                              15
                    UNCERTIFIED ROUGH DRAFT ONLY


1 Mr. Dovarro over what he would receive?

2       A.  I did.

3       Q.  Do you know Mr. Carreras?

4       A.  Yes well you have a first name.

5       Q.  This is an accountant for the company?

6       A.  Yes.

7       Q.  What is his first name?

8       A.  Louis.

9       Q.  I wasn't sure whether it would be Luis or Louis

10 so?

11      A.  You're right it is Luis.

12      Q.  How long have you known Mr. Carreras?

13      A.  Since a very early age.

14      Q.  And aside that from work that his accounting

15 firm does for MMPI or its subsidiaries, does

16 Mr. Carreras's firm do any work for you personally?

17      A.  Yes.

18      Q.  What does he do?

19      A.  He prepares tax returns.

20    Q.  How much do you pay him to prepare tax returns

21 for you?

22    A.  I don't recall at this time.

23    Q.  Can you give a ballpark approximation?  Like

24 more than 100,000?

25    A.  I don't think so, but I'm not sure.

16

UNCERTIFIED ROUGH DRAFT ONLY

1    Q.  Does Mr. Carreras do any work for any of your

2 family members or their companies?

3    A.  Is this --

4        (Witness conferring with his counsel. )

5        MR. CASTANARES:  I think -- I can see that

6 there might be some grounds for this inquiry.  It does

7 however begin to go beyond the witness himself into his

8 family.  And it seems to me if the grounds of the

9 inquiry relate to the witness himself I can see much

10 greater breath than for his family but I think the

11 witness is a bit concern of privacy issues of his family

12 so if you care to make some sort of proffer of either or

13 both of the reason for this or to the extent to which

14 you want to go into it the witness and I can consult

15 about the privacy issues.

16        MR. PRINCE:  I think if we can just have a yes

17 or no that's the extent of it.

18        MR. CASTANARES:  I think it's fair enough for

19 him to get a yes or no to that.  He hasn't asked you the

20 identity of the family members or anything just whether

21 or not is it Carreras.

22        THE WITNESS:  Carreras.

23        MR. CASTANARES:  Carreras.  Whether he does any

24 work for anybody in your family other than you I think

25 if you're comfortable answering the question that way

17

UNCERTIFIED ROUGH DRAFT ONLY

1 and if that ends the inquiry that should be a

2 satisfactory result.

3          THE WITNESS:  Yes.

4          MR. PRINCE:  Thank you, Counsel.

5          MR. CASTANARES:  Thank you, Counsel.

6 BY MR. LEE:

7          Q.  You mentioned that you've known him from a very

8 early age.  Are we talking kindergarten early age or do

9 you just mean in high school or something like that

10 (that's Mr. Prince)?

11         A.  We are third or fourth cousins and so when I

12 say an early age, he's older than I am.  I don't

13 remember him until I was probably -- I don't know --

14 ten -- tens year old.  But he probably remembers me

15 earlier than that.  We weren't very close but we knew --

16 you know, we both knew we existed.

17         Q.  Sometimes people mean different things when they

18 say third or fourth cousins.  Do you know if you share a

19 grandparent or a great grandparent or a great great

20 grandparent?

21         A.  Yes.

22         Q.  Which of those?

23         A.  Great grandparent.

24         Q.  And Mr. Garcia's wife I believe you also said is

25 a third or fourth cousin.  Is she any closer in

18

UNCERTIFIED ROUGH DRAFT ONLY

1 relationship to Mr. Carreras?

2          A.  Luis is her uncle.

3     Q.  Do you recall a point where Mr. Carreras was

4  /SEFRBG as a member of the unsecured creditors committee

5  (serving)?

6     A.  Yes.

7     Q.  When he was a member of the committee, did you

8  ever speak to him about the bankruptcy case?

9     A.  I believe I did.

10    Q.  About how many times?

11    A.  I don't recall.  I have pretty regular

12  discussions with him regarding tax issues and tax

13  planning.  Some of those conversations there would be a

14  comment about a bankruptcy issue.  So I just don't

15  recall which ones we did and which ones we didn't.

16    Q.  Did Mr. Carreras ever tell you about the

17  deliberations of the unsecured creditors committee?

18    A.  I mean in general, I think most of his

19  conversations were how much time he was spending on it

20  that he didn't expect the discord amongst the members.

21  The general craziness of it, but not what he said, she

22  said.

23    Q.  Was there a point at which he told you that the

24  unsecured creditors committee was thinking of proposing

25  it's own plan of reorganization?

                                              19

                   UNCERTIFIED ROUGH DRAFT ONLY


1     A.  I -- I had meetings with the committee and

2  their counsel on a number of occasions and the counsel

3  for the committee told me that.

4     Q.  Did Mr. Carreras ever tell you that?

5     A.  I don't recall if he did or not.  I'm certain

6  is I first heard it from Dean Rallis.

7     Q.  Did you ever discuss with Mr. Carreras the need

8  to prevent the unsecured creditors committee from

**EXHIBIT F**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

In re:                                          Case No.: 1:09-bk-13356-KT

MERUELO MADDUX PROPERTIES, INC., et al.,        Chapter 11

                           Debtors.             *BALLOT FOR CREDITOR CLAIMS*

☐ Affects all Debtors
☒ Affects the following Debtor(s):
   Meruelo Maddux Properties L.P.

This ballot is for Persons who hold Claims against the following Debtor Meruelo Maddux Properties
L.P. in each of the Classes set forth below. Please review the Plans and Disclosure Statements before
casting your vote. Please contact your attorney if you have further questions.

Based on either (i) the Debtors' Schedules or (ii) a Proof of Claim you filed in these Bankruptcy Cases,
the Balloting Agent's records indicate that you are the holder of the following Claim:

                 Claim No.      N/A      Amount      $7,040.00

Item 1.    Vote. Indicate your acceptance or rejection of the Plans.

YOU MAY VOTE BY PLACING A CHECK MARK ( √ ) TO ACCEPT OR REJECT ONE, MORE THAN ONE, OR
NONE OF THE PLANS LISTED BELOW.

| Plan | Class Treatment | Accept | Reject |
|------|-----------------|--------|--------|
| Charlestown/Hartland Plan | Class Class C General Unsecured Claims (2C-2) | ☐ | ☑ |
| Legendary/EWB Plan | Class Class C-1 – Unsecured Claims – General (C-1) | ☐ | ☑ |
| Meruelo Maddux Properties, Inc., et al. Plan | Class H.5 Class C Gen'l Unsecureds (2C-3) | ☑ | ☐ |

RECEIVED

NOV 19 2010

Ballot Code 645  KURTZMAN CARSON CONSULTANTS

091335610110218192900513

Received by: Kurtzman Carson Consultants LLC on 11/19/2010 at 10:20:28 AM.

**Item 2.**    **Preference Election.** If you voted to accept more than one of the Plans listed above, please indicate your preference among those Plans you accepted by placing a check mark ( √ ) next to the Plan or Plans you prefer. If you prefer two Plans equally, you may place a check mark next to both of those Plans. If you do not have any preference, you may leave this section blank.

| ☐ Charlestown/Hartland Plan |
| ☐ Legendary/EWB Plan |
| ☐ Meruelo Maddux Properties, Inc., et al. Plan |

**Item 3:**    **Creditor Information and Signature.** By signing this Ballot, the undersigned acknowledges receipt of the Plans and the Disclosure Statements in support thereof.

*Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that I have authority under applicable law to cast this Ballot.*

Name of Creditor: Kieckhafer, Schiffer & Company, LLC
(Print or Type)

Signature: ~~~~~~~~
Print Name: Sergio Docarro

Tax ID Number: 95-2757575

Address:
~~6201 Oak Canyon Drive~~        1100 S. Hope St. #1407
~~Irvine, CA 92618~~            Los Angeles, CA 90015

Date Completed: 11-19-2010

**Item 4.**    **Return Your Ballot.** In order to have your vote count, you must sign and return the Ballot to the Balloting Agent by the Balloting Deadline. You must return this Ballot to the Balloting Agent by mail, hand delivery, overnight courier, facsimile or by email at the following address so that it is received by no later than 4:00 p.m. Pacific time on November 22, 2010 (the "Balloting Deadline"):

Meruelo Maddux Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Ave
El Segundo, CA 90245
Facsimile – 310-751-1557
Email – KCC_MerueloMaddux@kccllc.com
Telephone - 877-565-8219

2

**EXHIBIT G**

1        REPORTER'S NOTE: THIS TRANSCRIPT IS A ROUGH

2 DRAFT TRANSCRIPT ONLY.  THIS REPORTER HAS NEITHER EDITED

3 NOR PROOFREAD THE TEXT, AND IT IS NOT A CITABLE

4 DOCUMENT.

5

6        REPORTER:  DENISE A. ROSS

7

8        THE VIDEOGRAPHER:  Here begins Volume I,

9 Videotape No. 1 in the deposition of Fred Skaggs in the

10 matter of inray Meruelo Maddux Properties in the U.S.

11 bankruptcy court, Central District of California,

12 San Fernando Valley division.  The case number is 109 B

13 K-13356 KT.  Today's date is January 7, 2011.  The time

14 on the video monitor is 9:35 a.m..  the video operator

15 today is James Gabiel a videographer contracted by

16 Merrill Legal Solutions at 20750 Ventura Boulevard,

17 Suite 205, Woodland Hills, California 91364.  This video

18 deposition is taking place at Jenner & Block, 633 West

19 Fifth Street 35th floor Los Angeles California 90071 and

20 was noticed by Kenneth K Lee of Jenner & Block.  Counsel

21 please voice identify yourselves and state whom you

22 represent.

23        MR. LEE:  Ken Lee for the official equity

24 commit.

25        MS. RODIGER:  Georgiana Rodiger co-counsel to

                                                    1
                  UNCERTIFIED ROUGH DRAFT ONLY


1 Mr. Lee for the Official Equity Committee.

2        MR. PRINCE:  Christopher Prince, Lesnick Prince

3 LLC, for Charlestown Captial Advisory LLC and Hartland

4 Asset Management Corporation.

5        MR. GLASER:  Barry Glaser Steckbauer Weinhart

6 Jaffe for the County of Los Angeles.

7          MR. CASTANARES:  Tony Castanares, Stutman

8 Treister & Glatt, for the debtors and the witness.

9          THE VIDEOGRAPHER:  Would counsel on the phone

10 please identify themselves.

11          MR. PEZOLD:  Eric Pezold, Snell & Wilmer, on

12 behalf of Bank of America.

13          MS. HAGAN:  Cara Hagan, Hagan & Associates, on

14 behalf of PNL Pomona.

15          MR. HANKIN:  Marc Hankin, Jenner & Block, for

16 the equity committee.

17          MS. LIN:  Monica Lin, Jung & Yuen, for

18 East West Bank.

19          THE VIDEOGRAPHER:  Would all others parties

20 present please state their names for the record.

21          MR. MURRAY:  Andrew Murray, Meruelo Maddux

22 Properties.

23          MR. MADDUX:  John Maddux, Meruelo Maddux

24 Properties.

25          MR. MERUELO:  Richard from MMPI, Richard

                                              2

               UNCERTIFIED ROUGH DRAFT ONLY


1 Meruelo.

2          THE VIDEOGRAPHER:  The court reporter today is

3 Denise Ross of Merrill Legal Solutions.

4          Would the reporter please swear in the witness.

5

6                    FRED SKAGGS,

7             having been first duly sworn, was

8             examined and testified as follows:

9

10                   EXAMINATION

11 BY MR. LEE:

12     Q.  Good morning, Mr. Skaggs.

13    A.  Good morning.

14    Q.  How are you could go today?

15    A.  Pretty today.

16    Q.  As I mentioned to you before my name is Ken Lee

17 and I represent the Official Equity Committee.  Have you

18 taken a deposition -- have you been deposed before?

19    A.  Yes.

20    Q.  I'll still go over some of the ground rules I'm

21 sure Mr. Castanares has told you before and if you've

22 been deposed before you're familiar with them but just to

23 make sure?

24        MR. LEE:  Can you identify yourself who you

25 just joined the call.

                                              3

            UNCERTIFIED ROUGH DRAFT ONLY


1        Deanerablis from cunt counsel for the

2 committee.

3 BY MR. LEE:

4    Q.  I will be asking you a series of questions

5 today.  If you don't understand one of my questions, just

6 tell me so and I will restate it or rephrase it and it's

7 important that you verbalize your answer.  For example,

8 you say yes instead of nodding or say no instead of

9 shaking your head.  And please wait until I finish

10 stating my question before you answer so that we don't

11 talk past each other.

12        From time to time some of the attorneys here may

13 object to my questions.  You are still obligated to

14 answer the questions unless Mr. Castanares directs you

15 not to answer the question.

16        Throughout the deposition, I will be referring

17 to Meruelo Maddux, MMPI or the company.  When I use those

18 words I'm referring to Meruelo Maddux Properties

19 incorporated or any of its operating subsidiaries or

20 entities.

21        Do you have any questions for me before we

22 begin?

23     A.  I understand.

24        MR. CASTANARES:  Counsel if you want him to

25 refer to a specific operating entity or subsidiary

                                                    4

                UNCERTIFIED ROUGH DRAFT ONLY


1 you'll identify it in your question.

2        MR. LEE:  I will.

3        MR. CASTANARES:  Thank /STPHAOS.

4     Q.  Can you please state your name for the record?

5     A.  Fred Skaggs joining the meeting.

6        MR. LEE:  Whoever just joined, can you identify

7 yourself.

8        It's Brian Fischer, F-I-S-C-H-E-R, Jenner &

9 Block, equity committee.

10        MR. LEE:  Hi, Brian.

11        MS. RODIGER:  Maybe you want to identify for

12 Dean Rallis and Brian Fischer who else is in the room

13 just so that they know.

14        MR. FISCHER:  I don't need that.  I can get

15 that during the break.

16        MR. CASTANARES:  Right.  They can figure it

17 out.  If they wanted to be a little earlier, they would

18 have found out with the rest of us.

19        MR. LEE:  Whoever is on the phone if you guys

20 can be on mute, because sometimes you can hear the

21 background noise, keyboards clicking.  Thanks.

22     Q.  Can you tell me your educational background.

23     A.  I graduated from Brigham Young university with

24 a bachelor of science in accounting.

25     Q.  What year was that?

                                                    5

UNCERTIFIED ROUGH DRAFT ONLY

1    A.  1979.

2    Q.  And who is your current employer?

3    A.  Meruelo Maddux.

4    Q.  And what is your current job title?

5    A.  Currently I'm on paid administrative leave but

6 I'm the chief accounting officer.

7    Q.  How long have you held the job as the chief

8 accounting officer?

9    A.  Since I believe May of 2008.

10   Q.  And prior to May 2008, what position did you

11 hold?

12   A.  I was the chief financial officer.

13   Q.  And how long -- chief financial officer at

14 Meruelo Maddux; right?

15   A.  Yes.

16   Q.  And how long did you hold that position?

17   A.  I believe it was approximately July -- June or

18 July of 2006 to May of 2008.

19   Q.  And prior to that, what position or which

20 employer were you at?

21   A.  I was still with Meruelo Maddux and I believe I

22 was the treasurer was my title.

23   Q.  And how long were you treasurer of

24 Meruelo Maddux?

25   A.  From when I started in September of 2005 until

6

UNCERTIFIED ROUGH DRAFT ONLY

1 June or July of 2006.

2    Q.  And before that time period where were you at?

3    A.  I was with bright development corporation.

4    Q.  And what kind of company is that?

5     A.  It was a residential home builder.  And I was

6 the CFO of that company.

7     Q.  And how long were you CFO at that company?

8     A.  My duration at the company which was about a

9 year and a few months.

10     Q.  And prior to being at Bright, where were you?

11     A.  I was with Shuwa investment corporation.

12        MS. RODIGER:  Can you spell that, please.

13        THE WITNESS:  S-H-U-W-A investment corporation.

14        MS. RODIGER:  Thank you.

15 BY MR. LEE:

16     Q.  And what position did you hold at that company.

17     A.  I was the chief financial officer from about

18 1996 or so.  I'm not -- I don't remember exactly when at

19 this point but probably about 1996 until when I left in

20 2004 or so.

21     Q.  And before 1996 where were you employed?

22     A.  Shuwa investments corporation as the

23 controller.

24     Q.  And how long were you controller?

25     A.  Probably about -- since I started, which was in

                                                    7

             UNCERTIFIED ROUGH DRAFT ONLY



1 1987 until I -- until I left in 2000 -- well until 1996

2 or so.

3     Q.  And in your current job as the chief accounting

4 officer at Meruelo Maddux, can you describe for me your

5 responsibilities?

6     A.  I'm involved in cash management making sure

7 that the controls in the company are in place and are

8 proper.  I do the bankruptcy reports or review the

9 reports and do portions of them -- of the bankruptcy

10 reports but review the reports that are submitted to the

11 court and to -- to various parties.

1 building, I believe, once or maybe twice.  And I didn't

2 get a tour of all the space.

3     Q.  Do you know if Mr. Dovarro managed all the

4 properties at 1828 Oak Street?

5     A.  I don't believe so.

6     Q.  Do you know -- which aspect of 1828 Oak Street

7 did he manage?

8     A.  I think he generally managed or was responsible

9 for renting the space to -- for parties.  So his basic

10 function was to rent the space to -- what I've always

11 termed as "Quinceanera."  They're the 15-year-old, or

12 16, whatever it is -- I think 15-year-old parties.  But

13 it could be any type of party.

14    Q.  And is Mr. Dovarro involved with J-Lounge?

15    A.  Yes.

16    Q.  What is his role at J-Lounge?

17    A.  Well, he's -- he runs the the J restaurant.

18    Q.  Are you aware that the rent for J-Lounge has

19 been reduced?

20    A.  Yes.

21    Q.  Do you know by -- well, first of all, do you

22 know when it was reduced?

23    A.  Well, I remember looking at the /AO autothe

24 accounts receivable balance that shows -- I think there

25 was a retroactive adjustment and that retroactive

                                        214
              UNCERTIFIED ROUGH DRAFT ONLY


1 adjustment was made sometime in 2009, maybe about six,

2 seven months after the bankruptcy filing.

3     Q.  Do you know what the reduction in rent was?

4     A.  In general, yes.

5     Q.  Can you tell me?

6    A.  I think we were at about a little bit north of

7  $40,000 a month that we billed to the restaurant and we

8  reduced it I believe to 25,000.  And I think we gave a

9  month or two of free rent or at least we deferred the

10 payment on a month or two of rent.

11    Q.  Was that -- was that rent abatement unusually

12 large?

13    A.  I really wasn't involved in the -- in the

14 discussion on that; so I can't -- it seemed fairly

15 sizeable to me, but I wasn't involved in the negotiation

16 with that with him.

17        MR. LEE:  I want to introduce as exhibit.

18        THE REPORTER:  H.

19        (Whereupon, Plaintiff's Exhibit # was

20        marked for identification.)

21 BY MR. LEE:

22    Q.  Do you recognize this document?

23    A.  I do.

24    Q.  Did you write this memo?

25    A.  Yes.

                                        215
              UNCERTIFIED ROUGH DRAFT ONLY


1    Q.  Do you know when you wrote this memo?

2    A.  Originally I wrote this memo at the time I was

3  preparing the memo to the audit committee.  But I did it

4  not include it as part of that.

5    Q.  And what was the reason for not including it?

6    A.  It was history.  It was old and the audit memo

7  related to things that are transpiring right now.

8        MR. LEE:  I want to introduce now as

9  Exhibit I --

10        (Whereupon, Plaintiff's Exhibit # was

11        marked for identification.)

12 BY MR. LEE:

**EXHIBIT H**

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4   In Re:                    )   Case No. SV09-13356-KT
                              )
5   MERUELO MADDUX PROPERTIES,  )   Woodland Hills, California
    INC., A DE CORP.,          )   Monday, December 20, 2010
6                              )   2:00 p.m.
            Debtor.            )
7   _____)

8                              MOTION FOR ORDER DENYING
                               CONFIRMATION OF THE
9                              CHARLESTOWN PLAN PURSUANT TO
                               11 U.S.C. SECTION 1129
10
                               CONT'D STATUS CONFERENCE
11                             REGARDING DISCOVERY

12                             CONT'D COUNT OF LOS ANGELES
                               TAX COLLECTOR'S MOTION TO
13                             QUASH BANK OF AMERICA'S
                               SUBPOENA, OR IN THE
14                             ALTERNATIVE, FOR A PROTECTIVE
                               ORDER
15

16

17              TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE VICTORIA KAUFMAN
18           UNITED STATES BANKRUPTCY JUDGE

19

20

21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

*Echo Reporting, Inc.*

ii

```
 1  APPEARANCES:

 2  For the Debtor:                   JOHN N. TEDFORD, IV, ESQ.
                                      JOHN J. BINGHAM, JR., ESQ.
 3                                    Danning, Gill, Diamond
                                        & Kollitz, LLP
 4                                    2029 Century Park East
                                      Third Floor
 5                                    Los Angeles, California 90067
                                      (310) 277-0077
 6
                                      GARY E. KLAUSNER, ESQ.
 7                                    ANTHONY ARNOLD, ESQ.
                                      Stutman, Treister & Glatt
 8                                    1901 Avenue of the Stars
                                      Twelfth Floor
 9                                    Los Angeles, California 90067
                                      (310) 228-5735
10
    For Legendary Group:             JEFFREY W. DULBERG, ESQ.
11                                    Pachulski, Stang, Ziehl
                                        & Jones
12                                    10100 Santa Monica Boulevard
                                      11th Floor
13                                    Los Angeles, California 90067
                                      (310) 277-69120
14
    For the Creditors Committee:     DEAN G. RALLIS, JR., ESQ.
15                                    Sulmeyer, Kupetz
                                      333 South Hope Street
16                                    35th Floor
                                      Los Angeles, California 90071
17                                    (213) 629-4520

18  For Bank of America:             ERIC S. PEZOLD, ESQ.
                                      DON GAFNEY, ESQ.
19                                    Snell & Wilmer
                                      600 Anton Boulevard
20                                    Suite 1400
                                      Costa Mesa, California 92626
21                                    (714) 427-7000

22

23

24

25
```

iii

APPEARANCES:   (Cont'd.)

For County of Los Angeles          BARRY S. GLASER, ESQ.
  Tax Collector:                   Steckbauer, Weinhart & Jaffe,
                                     LLP
                                   333 South Hope Street
                                   30th Floor
                                   Los Angeles, California 90071
                                   (213) 229-2868

For Charlestown:                   CHRISTOPHER E. PRINCE, ESQ.
                                   Lesnick Prince, LLP
                                   185 Pier Avenue, Suite 103
                                   Santa Monica, California
                                   90405
                                   (213) 291-8984

For the Equity Committee:          GEORGIANA RODIGER, ESQ.
                                   MARK HANKIN, ESQ.
                                   Rodiger Law Office
                                   272 South Los Robles Avenue
                                   Pasadena, California 91101
                                   (626) 793-7264

For California Bank & Trust:       DANIEL H. SLATE, ESQ.
                                   Buchalter Nemer
                                   1000 Wilshire Boulevard
                                   Suite 1500
                                   Los Angeles, California 90017
                                   (213) 891-0700

Court Recorder:                    Leslie Schramm
                                   United States Bankruptcy Court
                                   21041 Burbank Boulevard
                                   Woodland Hills, California
                                     91367

Transcriber:                       Jordan R. Keilty
                                   Echo Reporting, Inc.
                                   6336 Greenwich Drive, Suite B
                                   San Diego, California 92122
                                   (858) 453-7590

1 areas of inquiry I would be pursuing, you know, it's not --

2          THE COURT:  So does anybody want to add anything

3 or respond to anything that Mr. Pezold said?

4          MR. GLASER:  No, your Honor.

5          MR. TEDFORD:  Your Honor, I'm happy to answer any

6 questions you may have, but I have nothing further to add.

7          THE COURT:  Okay.  I think we have a situation

8 here where we have an approved settlement agreement between

9 the Debtor and the County of Los Angeles that agreed -- or

10 in which the County agreed to certain plan treatment.  The

11 plan as currently proposed that provides for that treatment

12 for the Debtor and others, I don't think the fact that the

13 County declined to accept other plans without treatment,

14 which is a reduction from what they otherwise would be

15 entitled to, means that they are acting in bad faith, nor do

16 I think that it meets any standard of bad faith as

17 articulated by the Ninth Circuit when a creditor votes in

18 favor of its interest.

19          The fact that there are some cases that talk about

20 artificial impairment in the context of a County does not

21 mean that the person who's being artificially impaired has

22 acted in bad faith, and I don't -- and based on the context

23 that you're discussing, I don't think there are any cases on

24 which a county has been found to be acting in bad faith

25 because it's voting against plans that don't provide it with

37

1 all it's entitled to under state law.

2          So there's no reason to take discovery from the

3 County with respect to its -- whether or not its vote can be

4 counted as being made in bad faith simply because they voted

5 to reject plans that don't provide for the treatment to

6 which they'd otherwise be entitled to under state law and

7 under the Bankruptcy Code, except for the fact that they've

8 reached a settlement agreement.

9          The -- the issue about -- to the extent that

10 anyone wanted to assert that the claim should be designated

11 on the basis that it was solicited before approval of a

12 disclosure statement, there is no need to take discovery

13 from the County on that.  Either that is going to be

14 determined to be an issue as far as designating votes -- and

15 the Court is not deciding that today, and the Court is of

16 the view that Judge Thompson did not decide that either,

17 about the impact of pre-solicitation lockups in the context

18 of whether that vote can be designated, but there does need

19 to be discovery on that.

20          Judge Thompson already went through some of these

21 categories and found them to be burdensome.  It was in a

22 different context.  It was in the context of approval of a

23 settlement agreement as opposed to confirmation of a plan,

24 but there is no reason to take discovery on the proofs of

25 claim that were already filed or the liens of the County.

38

1 So in the sense that it's public knowledge, public

2 documentation, you can get it publically.  So that finding

3 of burdensome this Court feels is the same whether it's in

4 the context of approval of settlement agreement or plan --

5 you know, plan confirmation, which is that there's no reason

6 to take discovery on the proofs of claim filed and on the

7 liens of the County which, you know, are statutory.

8             MR. PEZOLD:  Your Honor --

9             THE COURT:  I'm moving on.

10            The Court -- Judge Thompson already held that

11 there is a settlement privilege.  The issue is whether it's

12 -- you know, whether that privilege -- whether there needs

13 to be discovery to get to another compelling interest.  It's

14 this Judge's view that although the Court in the -- in -- if

15 a motion was brought with respect to taking this kind of

16 discovery from the Debtor may have -- you know, may think

17 about it differently because the Debtor is a proponent.  In

18 the situation where the County is not a proponent, the Court

19 does not believe that that settlement privilege should be

20 outweighed as far as taking discovery from the County

21 because the County is not the proponent.  So its good faith

22 is not part of the test of whether the plan is proposed in

23 good faith.

24            Judge Thompson already allowed the claim for

25 voting purposes.

54

1  the -- this is the -- I mean, this is the Court's --

2         MR. KLAUSNER:  Okay.

3         THE COURT:  The Court was concerned when the

4  motion was presented as they don't have a vote, they don't

5  have an impaired class.  The Court thinks the voting is

6  fluid.  It could change.  The Court isn't willing to make a

7  determination on that basis.

8         MR. KLAUSNER:  Then I shouldn't --

9         THE COURT:  So then we have the issue about

10 insufficient disclosure about feasibility and management and

11 how that was -- and the Court was concerned that not having

12 -- that hiding information about management and funding was

13 -- was hampering the ability to take discovery on those

14 issues by competing plan proponents, and the Court's of the

15 view that having read the opposition filed by Charlestown

16 that at least -- it may not -- I mean, there may be lots of

17 problems with their proposed management and funding, but now

18 you know what they are.  So people can take discovery about

19 them, and it may turn out that when they have a chance to

20 take discovery and when we have a hearing about it, it will

21 demonstrate that their plan is infeasible or that their

22 management has issues.  But at least now you know what their

23 proposal is.

24        MR. KLAUSNER:  All right.  Well --

25        THE COURT:  And the fact that they're -- you know,

55

1 | the fact that they may or may not have improperly approached

2 | Debtor's current management, whatever, that isn't a reason

3 | to deny confirmation of their plan today.

4 |       MR. KLAUSNER:  Here --

5 |       THE COURT:  So --

6 |       MR. KLAUSNER:  Let me --

7 |       THE COURT:  Right.

8 |       MR. KLAUSNER:  Let me respond to that.  I think a

9 | lot of what you say would have merit -- more merit if we

10 | didn't have the Court's order of October 19.  The Court

11 | wanted to avoid a plan free for all and wanted to try to

12 | organize the process in a way that would allow us some

13 | opportunity to get to the January 26 trial date in an

14 | efficient manner.

15 |       So what the Court required everybody to do was to

16 | put on their prima facie case.  This was a -- this is

17 | confirmation by declaration.  We're not going to start a

18 | trial and have a parade of witnesses testifying on all of

19 | these issues.  The idea was that each side was responsible

20 | to demonstrate the confirmability of its plan on December 3.

21 | And, indeed, one of the reasons we were brought into the

22 | case was because there was a huge amount of work that needed

23 | to be done to make those confirmation showings by that

24 | deadline.

25 |       Now, you know, with respect to the Court, I think

56

1  you're ignoring the significance of that order.  There are

2  cases and there are places where people file plans, and it

3  all gets done a week before the confirmation hearing and you

4  start a trial and people bring in their financial sources,

5  and they produce their witnesses on feasibility and

6  management.  That's not the way this was supposed to play

7  out.

8         THE COURT:  Okay.  What don't you have time to do

9  now?  Now you know.  You only just started taking discovery

10 a week ago.  I mean, you know, it's -- I saw this -- and you

11 already took their expert.  So who won't you get to take?  I

12 mean, who now are you not -- who -- how have you been

13 prejudiced?  How has the Debtor been prejudiced by finding

14 out now?

15        MR. KLAUSNER:  Because we're litigating with a

16 party that's failed to meet its --

17        THE COURT:  Well, but it's met it now.  So what --

18        MR. KLAUSNER:  Well, it's not.  I mean, if you

19 look at their materials, it's nothing.  I mean, if you look

20 at what they filed carefully, what -- you have no evidence

21 of financing.  It's nothing.

22        And, by the way, let me deal with an issue just

23 before --

24        THE COURT:  Okay.  Is this because the letter is

25 not dated and --

57

1          MR. KLAUSNER:  No, it's -- the letter is -- first

2   of all ,it's written by a company that's been --

3          THE COURT:  Well, letters of intent are always

4   meaningless in a way.

5          MR. KLAUSNER:  -- that's been suspended.

6          THE COURT:  They're letters of intent, yeah.

7          MR. KLAUSNER:  It's not even qualified to do

8   business here.  The letter itself is not a commitment to do

9   anything.  It's kind of an expression of interest.

10          THE COURT:  Isn't that what letters of intent are?

11          MR. KLAUSNER:  That's -- well, they could be more

12   serious or less serious.  This is not a commitment letter.

13   What we produced, by the way, in terms of Watermark because

14   people have sort of tried to compare the voluminous showing

15   that we produced on December three with the rather paltry

16   showing of Charlestown on December 3.

17          We produced a commitment letter.  We produced it

18   in discovery.  In September we gave a copy of the written

19   commitment letter to both Committees.  It was vetted by

20   their financial advisor.  They actually met with the people

21   from Watermark.  I mean, we demonstrated that we have the

22   financing that we need.

23          What has Charlestown done?  If you believe that

24   the Court order required something -- let's assume for the

25   sake of argument trial started tomorrow.

58

1        THE COURT:  But it doesn't.

2        MR. KLAUSNER:  Well, wait a minute, that it really

3 did.  It really started on December 3.  And let's assume on

4 December 3 you've seen their evidence of financing.  You've

5 seen this letter which is a totally meaningless, non-

6 committal, non-binding letter by a company that's been

7 suspended to do business.  There's a declaration of an

8 individual who claims to have money in various accounts, the

9 total of which doesn't even add up to what they need to

10 close this deal, let alone operate their business.  I mean,

11 if that was the showing before you, you could not make a

12 finding that Charlestown had the cash, the $38,000,000, that

13 they -- they've provided no evidence, by the way, of the

14 $15,000,000 secured loan they need.  They need $23,000,000

15 in equity and $15,000,000 in a secured loan, and even Mr.

16 Villani's inadequate declaration doesn't even address the

17 $15,000,000.  It's not there.  There's no evidence at all of

18 the $15,000,000.  So when the $23,000,000 -- they don't even

19 have the money to do this deal.  So if the trial started

20 today or it started on December 3 and that was the state of

21 the record, could you make a finding that they had the

22 ability to fund $38,000,000 consisting of an equity

23 contribution fo 23 and a secured debt of 15?  You couldn't

24 possibly make that finding.  That's the point.  That's why

25 we were required to file our evidence on December 3, and the

1  you are not.

2          MR. KLAUSNER:  Okay.  At the moment, although
3  counsel may gloss over this, Mr. Villani, who is the only
4  declarant with regard to Global Asset, we now find out
5  spends his time in London.

6          THE COURT:  But that would have been the same
7  whether they disclosed it before or not.  He's in London.
8  So what -- so now he's in London.

9          MR. KLAUSNER:  Well, so far we have not received
10  any information as to when we're going to be able to depose
11  him.  Okay.  Here's the problem.  If on December 3 they had
12  evidence that could support the funding of the plan, this
13  might not be such a critical problem.  However, on December
14  3 they filed nothing.

15          The declaration of Mr. Villani really adds nothing
16  to the equation.  The letter of intent adds nothing to the
17  equation.  He never answered your question about the
18  $15,000,000 because there's no commitment by anybody.
19  There's no -- virtually no discussion of it other than it's
20  contemplated that there's going to be a loan of $15,000,000.

21          THE COURT:  Well, because they're looking for the
22  best source, and they -- and, I mean, the terms are the same
23  as the terms the Debtor got.  So the idea is that it
24  shouldn't be -- I mean, they think they're going to be able
25  to find somebody to loan on the same terms as was gotten by

72

1   the Debtor because it's the same property, but it's the same

2   assets.

3           MR. KLAUSNER:  They filed this plan months ago.

4   They represented to the Court that they were going to come

5   in with $38,000,000.  We're now five weeks from a

6   confirmation trial.  Mr. Villani is unavailable because he's

7   in London.

8           THE COURT:  That doesn't mean he's unavailable.

9   That means he's in London.

10          MR. KLAUSNER:  Well, we've never been given a

11  date.

12          THE COURT:  Well, maybe -- have you asked?

13          MR. KLAUSNER:  Yes.  I've asked repeatedly.  I've

14  asked about four times.

15          THE COURT:  Okay.  When are you going to be able

16  to fit in Mr. Villani who's now the Global Asset declarant?

17          MR. PRINCE:  Yes, your Honor.  As -- again, as you

18  may have noticed, by tomorrow there will have been two

19  depositions of my client and none of anybody else.  I've

20  been making my people available very promptly.  The first

21  two depositions taken in this confirmation trial where the

22  conduct of the Debtor's management was one of the primary

23  issues have been of my clients.

24          THE COURT:  All right.  So what --

25          MR. PRINCE:  And so there's no --

59

1 people who couldn't live up to that obligation are gone.

2            So it isn't about what discovery we need.  We
3 don't need discovery.  They've demonstrated their inability
4 to meet their own plan obligations.  We don't need to do
5 anything more.  I mean, we can chase Mr. Villani to London
6 or wherever he's hiding out, and we can ask him -- you know,
7 we can spend six or seven hours with him, but we don't need
8 to prove any more than Charlestown has proven itself.  The
9 case for denying confirmation of its plan has become
10 stronger by virtue of their filings.  I mean, aside from
11 sort of the -- the suspicious nature of not producing any
12 evidence of their letter of intent until December 16, that
13 in and of itself it's suspicious.  The letter itself is kind
14 of meaningless, but I'm telling you if that was your
15 evidence on -- if that was your evidence at the confirmation
16 trial, you couldn't possibly make the finding that you would
17 need to find feasibility.  And to the extent that they're
18 arguing that they need competent management, they've also
19 failed to provide you with any credible evidence.  Mr.
20 Magonigil is all over the map.  He was working for us last
21 spring.  He was a consultant for the Debtor.  While he's a
22 consultant for the Debtor, Charlestown is using him to help
23 prepare their plan.  I mean, that's evidence that we
24 obtained at Mr. Magonigil's deposition.  He never disclosed
25 that in his declaration.  I mean, his declaration is subject

60

1  to a motion to strike.  He didn't disclose that he's going

2  to be the chief operating officer.  He presented himself as

3  an independent expert.

4          THE COURT:  Maybe he wasn't going to be the chief

5  operating officer then.

6          MR. KLAUSNER:  Maybe he was or wasn't?

7          THE COURT:  Yeah, maybe he wasn't.  Maybe he

8  didn't know.  Maybe they decided no.

9          MR. KLAUSNER:  Well, how does that happen in the

10 real world?  We have somebody who's proposing to take over a

11 multi hundred million dollar business telling us on

12 December --

13         THE COURT:  Well, let's say he did know.  Why does

14 that mean he's not competent management?

15         MR. KLAUSNER:  Well, it means that he was lying in

16 his declaration or at least he was concealing significant

17 facts and expert.  He testified -- his declaration was

18 submitted as an expert, and he --

19         THE COURT:  Well, but Mr. -- one of them -- I

20 can't remember, but one of them has been designated as an

21 expert, one of the Debtor's two principals.

22         MR. KLAUSNER:  That's okay.

23         THE COURT:  Well, so --

24         MR. KLAUSNER:  They --

25         THE COURT:  -- he's an expert, and he's clearly

61

 1  got an interest.  He's a shareholder.  He's a this and that.
 2  I mean, you know --

 3      MR. KLAUSNER:  There's nothing preclusive about
 4  having an interest.  It's just it should be disclosed, and
 5  it wasn't, and Charlestown's slate of officers includes Fred
 6  Skaggs.  Well, Fred Skaggs works or us.  How do they put
 7  him on their slate?  Does that mean that they have, in fact,
 8  an agreement with Mr. Skaggs?  And I'd like Mr. Prince to
 9  answer that question.  If they do, that's a very interesting
10  development in terms of somebody who's in the inner circle
11  of our management, that they would actually go out and
12  engage him to work for a competitor while he's working for
13  us.

14      THE COURT:  Well, what's wrong with that?  Not
15  that it -- I mean, I just don't know.  Why is that a reason
16  to not -- to deny confirmation of their plan today?

17      MR. KLAUSNER:  Well, because I think that what
18  they're going to tell you is that they haven't done that
19  because I think they're going to tell you that they just
20  think he'd be a good candidate and that's why they put him
21  on the list, and I think they've invented that entire list
22  to satisfy an obligation that they never thought they would
23  have, which is to produce the evidence from December 16th
24  that you made them do.  If we had allowed them to proceed
25  under your scenario, none of this -- they would have seen

111

1        I certify that the foregoing is a correct

2  transcript from the electronic sound recording of the

3  proceedings in the above-entitled matter.

4

5  _____     _____

     Transcriber              Date

6

7  FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9  _____

     L. L. Francisco, President

10  Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT I**

**AIR COMMERCIAL REAL ESTATE ASSOCIATION**
## STANDARD INDUSTRIAL/COMMERCIAL SINGLE-TENANT LEASE -- NET
### (DO NOT USE THIS FORM FOR MULTI-TENANT BUILDINGS)

1.    **Basic Provisions ("Basic Provisions").**

   1.1    Parties: This Lease ("Lease"), dated for reference purposes only July 1, 2006
is made by and between Merco Group - Little J, LLC
("Lessor")
and Musica Latina, Inc. (dba J Restaurant)
("Lessee"),
(collectively the "Parties," or individually a "Party").

   1.2    Premises: That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease,
and commonly known as 1117-1119 S. Olive Street
located in the County of Los Angeles , State of California ,
and generally described as (describe briefly the nature of the property and, if applicable, the "Project," if the property is located within a Project)
an approximately 11,829 s.f. multi-level building located on approximately 18,467 s.f. of
land
("Premises"). (See also Paragraph 2)

   1.3    Term: -- years and -- months ("Original Term") commencing January 1, 2007
("Commencement Date") and ending month-to-month ("Expiration Date"). (See also Paragraph 3)

   1.4    Early Possession: July 1, 2006 ("Early Possession Date").
(See also Paragraphs 3.2 and 3.3)

   1.5    Base Rent: $35,487.00 per month ("Base Rent"), payable on the 1st day of
each month commencing January 1, 2007
. (See also Paragraph 4)
   ☐ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.

   1.6    Base Rent and Other Monies Paid Upon Execution:

   (a)    Base Rent: $-- for the period --

   (b)    Security Deposit: $-- ("Security Deposit"). (See also Paragraph 5)

   (c)    Association Fees: $-- for the period --

   (d)    Other: $-- for --

   (e)    Total Due Upon Execution of this Lease: $--

   1.7    Agreed Use: restaurant, lounge and dance floor, with incidental offices and storage
. (See also Paragraph 6)

   1.8    Insuring Party: Lessor is the "Insuring Party" unless otherwise stated herein. (See also Paragraph 8)

   1.9    Real Estate Brokers: (See also Paragraph 15)

   (a) Representation: The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check
applicable boxes):

☐ None represents Lessor exclusively ("Lessor's Broker");
☐ None represents Lessee exclusively ("Lessee's Broker"); or
☐ represents both Lessor and Lessee ("Dual Agency").

   (b) Payment to Brokers: Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Broker the fee agreed to

PAGE 1 OF 23

INITIALS

INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM STN-7-4/01E

MMPI 81463

in their separate written agreement (or if there is no such agreement, the sum of ———————— or ———————— % of the total Base Rent) for the brokerage services rendered by the Brokers.

1.10    Guarantor. The obligations of the Lessee under this Lease are to be guaranteed by – –

_____ ("Guarantor"). (See also Paragraph 37)

1.11    Attachments. Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs 51_____ through 54_____ ;

☐ a plot plan depicting the Premises;

☐ a current set of the Rules and Regulations;

☐ a Work Letter;

☐ other (specify): _____

_____

_____

## 2.    Premises.

2.1    Letting. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. Unless otherwise provided herein, any statement of size set forth in this Lease, or that may have been used in calculating Rent, is an approximation which the Parties agree is reasonable and any payments based thereon are not subject to revision whether or not the actual size is more or less. Note: Lessee is advised to verify the actual size prior to executing this Lease.

2.2    Condition. Lessor shall deliver the Premises to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Premises, other than those constructed by Lessee, shall be in good operating condition on said date and that the structural elements of the roof, bearing walls and foundation of any buildings on the Premises (the "Building") shall be free of material defects. If a non-compliance with said warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Building. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense.

2.3    Compliance. Lessor warrants that the improvements on the Premises comply with The term "Applicable Requirements" mean the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("Applicable Requirements") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 50), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning, are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense. If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("Capital Expenditure"), Lessor and Lessee shall allocate the cost of such work as follows:

(a) Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and an amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days

**PAGE 2 OF 23**

INITIALS _____    INITIALS _____

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION    FORM STN-7-4/01E

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1. SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2. RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES IS LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: Los Angeles | Executed at: Los Angeles |
| On: 11-20-06 | On: 11-10-2006 |
| By LESSOR: | By LESSEE: |
| Merco Group - Little J, LLC | Musica Latina, Inc. |
| By: | By: |
| Name Printed: Miguel E. Echevarria | Name Printed: SERGIO NAVARRO |
| Title: Vice President | Title: President |
| By: | By: |
| Name Printed: | Name Printed: |
| Title: | Title: |
| Address: 761 Terminal St., Bldg. 1, 2nd Floor | Address: 1119 S. Olive Street |
| Los Angeles, CA 90021 | Los Angeles, CA |
| Telephone:(213) 627-5045 | Telephone:(213) 746-7746 |
| Facsimile:(213) 627-5979 | Facsimile:(213) 746-7233 |
| Federal ID No. | Federal ID No. 95-2757521 |

| | |
|---|---|
| BROKER: | BROKER: |
| Attn: | Attn: |
| Title: | Title: |
| Address: | Address: |
| Telephone:(___) | Telephone:(___) |
| Facsimile:(___) | Facsimile:(___) |
| Federal ID No. | Federal ID No. |

PAGE 22 OF 23

INITIALS                                                                 INITIALS

©2001 - AIR COMMERCIAL REAL ESTATE ASSOCIATION
                                        FORM STN-7-4/01E

MMPI 81484

## AMENDMENT TO LEASE

This Amendment to Lease ("Amendment") dated effective as of February 1, 2009 ("Effective Date"), is between Merco Group – Little J, LLC, a California limited liability company ("Lessor"), and Musica Latina, Inc., a California corporation, dba "J Restaurant" ("Lessee"), with reference to the following facts:

A.      Lessor and Lessee entered into that certain Standard Industrial/Commercial Single-Tenant Lease – Net dated as of July 1, 2006, including the Addendum attached thereto, as amended by that certain Letter to Lessee dated January 9, 2008 (as amended, the "Lease"), with respect to the premises commonly known by the street address of 1117-1119 S. Olive Street, Los Angeles, California 90015, and as more particularly described in the Lease. Any capitalized term used but not defined in this Amendment shall have the meaning given to such term in the Lease.

B.      Lessor and Lessee each desire to amend the Lease in accordance with the terms of this Amendment.

NOW THEREFORE, in consideration of the foregoing recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.      Amendment to Base Rent Amount. Effective as of the Effective Date, the Base Rent set forth in Paragraph 1.5 of the Lease shall be reduced to $25,000.00 per month.

2.      Additional Charges.   Effective as of the Effective Date, Lessee's obligation to pay Additional Charges shall be temporarily suspended and Lessee's obligation to pay Additional Charges shall not commence to accrue until Lessee is otherwise notified by Lessor.

3.      Release of Claims. In consideration of Lessor entering into this Amendment, Lessee hereby releases and forever discharges Lessor, its parents, affiliates and subsidiaries, and all of their respective members, shareholders, officers, directors, employees and agents (collectively, the "Released Parties"), from any and all known or unknown claims or liabilities in any way related to the Released Parties, the Lease, or the property subject thereto.

Lessee hereby expressly waives the rights and benefits of California Civil Code §1542, and does so understanding and acknowledging the significance of said express waiver, which provides as follows:

"A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

Lessee's Initials: _____

4.      Other Amendments. Each of the other provisions of the Lease are modified as necessary to reflect the modifications to the Lease contained in this Amendment.

5.      Severability of Provisions.   In the event any one or more of the provisions of this Amendment shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof, and this Amendment shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

MMPI 81486

6.    No Rights to Setoff or Abatement; Entire Agreement. Lessee represents that it has no right to setoff or abatement of rent, nor any defenses against payment of any amounts owed under the Lease. The Lease, as amended by this Amendment, contains the entire agreement of the parties with regard to the transactions contemplated thereby; and supersedes all prior agreements, understandings and negotiations, whether written or oral. Except as amended by this Amendment, the Lease remains unchanged and in full force and effect.

7.    Counterparts; Facsimile Signatures. This Amendment may be executed in counterparts, all of which taken together shall be deemed one original agreement. Signatures transmitted by facsimile shall be deemed delivery of the original signatures, unless otherwise expressly stated in the same facsimile transmission.

LESSOR:
Merco Group – Little J, LLC,
a California limited liability company

By: _____
Name: _____
Title: _____VP_____

LESSEE:
Musica Latina, Inc.,
a California corporation, dba "J Restaurant"

By: _____
Name: _____Sergio Novarro___
Title: _____President_____

MMPI 81487