JOHN N. TEDFORD, IV (State Bar No. 205537)
*JTedford@DGDK.com*
ENID M. COLSON (State Bar No. 189912)
*EColson@DGDK.com*
DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
Los Angeles, California 90067-2904
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

GARY E. KLAUSNER (State Bar No. 69077)
*GKlausner@Stutman.com*
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067-6013
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

Attorneys for Meruelo Maddux Properties, Inc., and
affiliated Debtors and Debtors-in-Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | ) Case No. 1:09-bk-13356-VK |
| MERUELO MADDUX PROPERTIES, INC., et al.,[1] | ) Chapter 11 (Jointly Administered) |
| Debtors and Debtors-in-Possession. | ) **NOTICE OF MOTION AND DEBTORS' MOTION FOR (1) APPROVAL OF SETTLEMENTS WITH EAST WEST BANK AND (2) AUTHORITY TO AMEND DEBTORS' PROPOSED CHAPTER 11 PLAN, AND FOR AUTHORITY FOR EAST WEST BANK TO MODIFY ITS VOTES TO ACCEPT THE DEBTORS' PLAN; AND MEMORANDUM OF POINTS AND AUTHORITIES AND DECLARATION OF JOHN CHARLES MADDUX IN SUPPORT THEREOF** |
| ☑ Affects all Debtors | ) |
| ☐ Affects the following Debtors: | ) Date: January 26, 2011 |
| | ) Time: 3:00 p.m. |
| | ) Place: Courtroom 301 |
| | ) 21041 Burbank Boulevard |
| | ) Woodland Hills, California |

---

[1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities. The affiliated case numbers are as follows: 1:09-bk-13338-VK; 1:09-bk-13358-VK through 1:09-bk-13407-VK; 1:09-bk-13434-VK; and 1:09-bk-13439-VK.

364473.06 [XP]      25195

# <u>TABLE OF CONTENTS</u>

**Page**

I. STATEMENT OF FACTS ......................................................................................... 5

    A.     BANKRUPTCY BACKGROUND ........................................................ 5

    B.     THE DEBTORS' OVERALL BUSINESS MODEL AND APPROACH ................................................................................... 5

    C.     THE DEBTORS' COLLECTIVE ORGANIZATION AND OPERATIONS ....................................................................... 7

    D.     BRIEF DESCRIPTION OF THE AFFECTED DEBTORS' BUSINESS AND PROPERTY ....................................... 7

          1.     MERUELO MADDUX PROPERTIES, INC. ................ 7

          2.     MERUELO WALL STREET, LLC .............................. 7

          3.     2640 WASHINGTON BOULEVARD, LLC ................ 8

    E.     THE DEBTORS' CASH COLLATERAL AND CASH MANAGEMENT MOTIONS ................................................. 9

    F.     PREPETITION CLAIMS ASSERTED BY EWB AGAINST THE DEBTORS .............................................................. 10

    G.     EWB'S ADVERSARY PROCEEDING AGAINST MMPI AND MERUELO ........................................................... 11

    H.     TREATMENT OF EWB'S CLAIMS UNDER THE DEBTORS' CURRENT PLAN .......................................... 11

    I.     EWB'S PROPOSED CHAPTER 11 OF REORGANIZATION ........................... 12

    J.     THE DEBTORS' PROPOSED SETTLEMENTS WITH EWB .......................... 12

    K.     TREATMENT OF BANK OF AMERICA'S SECURED CLAIMS UNDER THE DEBTORS' CURRENT PLAN ................. 17

II. ARGUMENT .......................................................................................................... 18

    A.     THE COURT IS AUTHORIZED TO APPROVE THE SETTLEMENT AGREEMENTS WITH EAST WEST BANK ........................ 18

    B.     THE PROPOSED SETTLEMENTS ARE REASONABLE AND IN THE BEST INTERESTS OF THE ESTATES ........................ 19

    C.     THE SETTLEMENTS AND THE PROPOSED MODIFICATION TO THE TREATMENT OF BANK OF AMERICA'S SECURED CLAIMS WILL RESULT IN ONLY NON-MATERIAL MODIFICATIONS OF THE DEBTORS' PLAN ........................ 24

364473.06 [XP]    25195

# TABLE OF CONTENTS (cont.)

**Page**

    1.    THE PROPOSED MODIFICATIONS OF THE DEBTORS' PLAN COMPLY WITH ALL OF THE MANDATORY PLAN REQUIREMENTS ...................................................................24

    2.    THE PROPOSED MODIFICATIONS ARE NOT MATERIAL, AND CREDITORS AND INTEREST HOLDERS VOTING TO ACCEPT THE PLAN SHOULD BE DEEMED TO ACCEPT THE MODIFIED PLAN .............................26

D.    EWB SHOULD BE AUTHORIZED TO CHANGE ITS VOTES .......................28

E.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE CASH COLLATERAL TO PERFORM FUTURE PAYMENT OBLIGATIONS UNDER THE SETTLEMENTS .................................................28

F.    WAIVER OF THE 14-DAY STAY, IF ANY ......................................................29

III. CONCLUSION.................................................................................................................29

364473.06 [XP]    25195

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re A & C Properties,*
 784 F.2d 1377 (9th Cir. 1986), *cert. denied,*
 479 U.S. 854, 107 S. Ct. 189 (1986)................................................................ 20

*In re American Solar King Corp.,*
 90 B.R. 808 (Bankr. W.D. Tex. 1988)........................................................... 27

*In re Carla Leather, Inc.,*
 44 B.R. 457 (Bankr. S.D.N.Y. 1984)............................................................ 20

*Mt. Vernon Plaza Community Urban Redevelopment Corp.,*
 79 B.R. 305 (Bankr. S.D. Ohio 1987) ...................................................... 27, 28

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.*
 *Anderson,*
 390 U.S. 414(1968)....................................................................................... 19

*United States v. Alaska National Bank (In re Walsh Construction, Inc.),*
 669 F.2d 1325 (9th Cir. 1982) ..................................................................... 20

*In re W. T. Grant & Co.,*
 699 F.2d 599 (2d Cir. 1983) *cert. denied,*
 464 U.S. 822, 104 S. Ct. 89 (1983), *aff'd,* 50 B.R. 764 (S.D.N.Y. 1985) ........................ 20

**Statutes**

11 U.S.C. § 1107.................................................................................................. 6

11 U.S.C. § 1108.................................................................................................. 6

11 U.S.C. § 1122.......................................................................................... 25, 27

11 U.S.C. § 1123.......................................................................................... 25, 27

11 U.S.C. § 1123(a)(1) ...................................................................................... 25

11 U.S.C. § 1123(a)(2) ...................................................................................... 25

11 U.S.C. § 1123(a)(3) .................................................................................. 25, 26

11 U.S.C. § 1123(a)(4) .................................................................................. 25, 26

11 U.S.C. § 1123(a)(5) ...................................................................................... 26

11 U.S.C. § 1123(a)(6) ...................................................................................... 26

11 U.S.C. § 1123(a)(7) ...................................................................................... 26

11 U.S.C. § 1123(a)(8) ...................................................................................... 26

364473.06 [XP]        25195

| | |
|---|---|
| 1 | <div align="center">**TABLE OF AUTHORITIES (cont.)**</div> |
| 2 | <div align="right">**Page**</div> |

3   11 U.S.C. § 1123(b)(1) ............................................................................................ 25

4   11 U.S.C. § 1123(b)(2) ............................................................................................ 25

5   11 U.S.C. § 1123(b)(3) ............................................................................................ 26

6   11 U.S.C. § 1123(b)(4) ............................................................................................ 25

7   11 U.S.C. § 1123(b)(5) ............................................................................................ 26

8   11 U.S.C. § 1125 ...................................................................................................... 27

9   11 U.S.C. § 1127(a) ............................................................................................ 25, 27

10  11 U.S.C. § 1127(c) .................................................................................................. 27

11  11 U.S.C. § 1127(d) ................................................................................................. 27

12  28 U.S.C. § 157 ........................................................................................................ 19

13  28 U.S.C. § 1334 ...................................................................................................... 19

14  **Rules**

15  Fed. R. Bankr. P. 3018(a) ......................................................................................... 29

16  Fed. R. Bankr. P. 3019 ............................................................................................. 27

17  Fed. R. Bankr. P. 3019(a) ......................................................................................... 28

18  Fed. R. Bankr. P. 6004(h) ......................................................................................... 30

19  Fed. R. Bankr. P. 6006(d) ......................................................................................... 30

20  Fed. R. Bankr. P. 9019 ............................................................................................. 19

21  Fed. R. Bankr. P. 9019(a) ......................................................................................... 19

22

23

24

25

26

27

28

364473.06 [XP]    25195

1    **PLEASE TAKE NOTICE** that on **January 26, 2011**, at **3:00 p.m.**, in Courtroom 301 of

2    the United States Bankruptcy Court located at 21041 Burbank Boulevard, Woodland Hills,

3    California, the above-captioned debtors and debtors-in-possession (collectively the "Debtors") will

4    and do hereby move for an order approving three settlements (each a "Settlement" and collectively

5    the "Settlements") with East West Bank ("EWB"), which collectively constitute a global settlement

6    of substantially all of EWB's alleged claims against the Debtors' estates. As they have with prior

7    settlements approved by the Court, the Debtors also request authority to use cash collateral to make

8    payments provided for under the settlements. The Debtors also request authority to modify the

9    Debtors' proposed Chapter 11 plan to incorporate the terms of the Settlements with EWB and to

10   make a minor modification to the treatment of Bank of America's secured claims against Meruelo

11   Maddux Properties – 760 S. Hill Street, LLC ("MMP 760 South Hill"), and Merco Group –

12   Southpark, LLC ("MG Southpark"), and determine that the proposed modification of their plan

13   does not require resolicitation thereof. In addition, in furtherance of the Settlements, the Debtors

14   request that the Court authorize EWB to modify its votes to accept the Debtors' proposed plan.

15          This motion is made on the following grounds: Prior to March 27, 2009 (the "Petition

16   Date"), Debtors Meruelo Wall Street, LLC ("MWS") and 2640 Washington Boulevard, LLC

17   ("2640 Washington"), obtained loans from United Commercial Bank ("UCB"). Each loan was

18   secured by real property owned by the Debtor that was the borrower under the loan. The loan

19   obtained by MWS was guarantied by Richard Meruelo ("Meruelo"). The loan obtained by 2640

20   Washington was guarantied by Meruelo Maddux Properties, Inc. ("MMPI"). In late 2009, UCB's

21   interests in the loans and security interests in the relevant Debtors' properties were assigned to

22   EWB. As a result of these transactions, EWB has, among other things, liens against real properties

23   owned by MWS and 2640 Washington and an unsecured guaranty claim against MMPI's estate.

24          Subject to Court approval, MMPI, MWS and Meruelo, on the one hand, and EWB, on the

25   other hand, have agreed to a settlement of all disputes arising out of or relating to, among other

26   things, EWB's loan to MWS, Meruelo's guaranty, the Debtors' use of cash collateral generated by

27   MWS' property, the Debtors' continued utilization of their existing cash management system, and

28   the treatment of EWB's claim under MWS' Chapter 11 plan (the "MWS Settlement"). The MWS

-2-

1    Settlement is memorialized in the Settlement Agreement attached as Exhibit "1" to the Declaration

2    of John Charles Maddux (the "Maddux Declaration"), and has been approved by MMPI's Board of

3    Directors.

4         Subject to Court approval, MMPI and 2640 Washington, on the one hand, and EWB, on the

5    other hand, have agreed to a settlement of all disputes arising out of or relating to, among other

6    things, EWB's loan to 2640 Washington, the Debtors' use of cash collateral generated by 2640

7    Washington's property, treatment of EWB's claims under 2640 Washington's proposed Chapter 11

8    plan, and EWB's consent to the treatment currently proposed under MMPI's Chapter 11 plan (the

9    "2640 Settlement"). The 2640 Settlement is memorialized in the Settlement Agreement attached as

10   Exhibit "2" to the Maddux Declaration, and has been approved by MMPI's Board of Directors.

11        On or about September 9, 2010, MMPI issued a press release. On or about September 22,

12   2010, EWB filed a libel complaint, thereby initiating an adversary proceeding with this Court.

13   Subject to Court approval, MMPI and Meruelo, on the one hand, and EWB and East West Bancorp,

14   Inc., on the other hand, have agreed to a settlement of this dispute whereby MMPI has agreed to

15   entry of a stipulated judgment for the total sum of one dollar ($1.00) and Meruelo has agreed to

16   execute a letter expressing his appreciation to EWB for those matters set forth in the letter (the

17   "Adversary Settlement"). The Adversary Settlement is memorialized in the Settlement Agreement

18   attached as Exhibit "3" to the Maddux Declaration, and has been approved by MMPI's Board of

19   Directors.

20        The Debtors believe that the Settlements are fair, reasonable and in the best interests of their

21   and other Debtors' estates. Therefore, the Debtors request that the Court approve the Settlements

22   and authorize the use of cash collateral to perform their payment obligations under the Settlements.

23        Approval of the MWS Settlement and the 2640 Settlement will require minor modifications

24   to the Debtors' proposed Chapter 11 plan. The Debtors are requesting that the Court authorize the

25   Debtors to amend their proposed plan and determine that the modification of the Debtors' plan

26   does not require resolicitation thereof. Also, in furtherance of the Settlements, in which EWB has

27   agreed to support the Debtors' proposed plan, pursuant to Federal Rule of Bankruptcy Procedure

28   ///

1   3018(a) the Debtors are requesting that the Court authorize EWB to modify its votes to accept the

2   Debtors' plan.

3          As noted in the Debtors' reply to Bank of America's objection to confirmation of the

4   Debtors' plan, the Debtors have agreed to revise the treatment of Bank of America's secured claims

5   against MMP 760 South Hill and MG Southpark so that the treatment will be the same "Common

6   Secured Lender Treatment" afforded to certain other secured claims.  The Debtors are requesting

7   that the Court authorize them to make this revision and determine that the modification does not

8   require resolicitation of their plan.

9          This Motion is based upon this Notice and Motion, the Memorandum of Points and

10  Authorities, and the Maddux Declaration appended hereto, the separate Request for Judicial Notice

11  filed concurrently herewith, the papers and pleadings on file in this case, and such other evidence

12  as may be presented to the Court.

13         **PLEASE TAKE FURTHER NOTICE** that the Court has scheduled a hearing on this

14  Motion on shortened time and the hearing on this matter will be held on **January 26, 2011, at 3:00**

15  **p.m.  Oppositions, if any, must be in writing, filed with the Court, served on the Debtors'**

16  **counsel, and a hard copy must be delivered to chambers of the Honorable Victoria S.**

17  **Kaufman so that it is received by chambers on or before 10:00 a.m. on January 26, 2011**.  If

18  you do not have any objection to this motion, you need not take any further action.

19

20  Dated: January 24, 2011                   DANNING, GILL, DIAMOND & KOLLITZ, LLP

21

22                                            By: _____
                                                   John N Tedford, IV
23                                                 Attorneys for Meruelo Maddux Properties,
                                                   Inc., and affiliated Debtors and Debtors-in-
24                                                 Possession

25

26

27

28

                                            -4-

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3                                              I.

4                                  STATEMENT OF FACTS

5   A.      BANKRUPTCY BACKGROUND

6          On March 26 and 27, 2009 (the "Petition Date"), Meruelo Maddux Properties, Inc.

7   ("MMPI"), and 53 of MMPI's direct and indirect subsidiaries (collectively the "Debtors") filed

8   voluntary petitions under Chapter 11 of Title 11 of the United States Code (the "Code").  Pursuant

9   to the Court's ruling on March 30, 2009, the 54 cases are being jointly administered under MMPI's

10  case number, 1:09-bk-13356-VK.  The Debtors are operating their business affairs pursuant to the

11  authority granted under §§ 1107 and 1108 of the Code.

12

13  B.      THE DEBTORS' OVERALL BUSINESS MODEL AND APPROACH[2]

14         MMPI, together with MMPLP and its affiliates and related entities (sometimes collectively

15  referred to herein as the "Company") develops, redevelops and owns industrial, commercial and

16  multi-unit residential properties in downtown Los Angeles and other urban markets in southern

17  California.  MMPI was formed in 2006, and one of the reasons for forming MMPI was to hold an

18  initial public offering of stock in order to generate cash to pay off certain then-existing debt and

19  raise funds the Company could use to continue growing through the development of real properties.

20

21         [2] In addition to the declaration appended hereto, this Motion is supported by the Declaration
    of Richard Meruelo filed with the Court on March 27, 2009 (*docket entry no. 10*), and the
22  Supplemental Declaration of Richard Meruelo and the Declaration of Fred Skaggs filed with the
    Court on April 21, 2009 (*docket entry no. 95*).  The declarations were sizeable, particularly with the
23  exhibits.  In connection with a prior matter before the Court, it was suggested by a non-Debtor
    party that, to conserve the environment, the Debtors should not be required to re-file and serve the
24  declarations in connection with each matter where the Debtors rely upon the declarations in support
    of their description of the Debtors' background and operations.  The Debtors request that the Court
25  take judicial notice of the filing of those declarations and treat the declarations as if they were filed
    anew in support of this opposition.  Similarly, the Debtors request that the Court take judicial
26  notice of the filing of Richard Meruelo's declaration in support of confirmation of the Debtors'
    Plan (*docket entry no. 2327*).  The Debtors will make copies of the declarations available on
27  request by electronic mail or regular mail, as appropriate.

28

                                              -5-

1    When MMPI was formed, the Company owned, leased with rights to purchase, and had rights to

2    buy approximately 52 development, redevelopment and stabilized projects.

3        Like its predecessor business, MMPI's focus is on non-stabilized properties and commercial

4    and industrial land which have alternate, more profitable uses achievable through redevelopment or

5    major renovation and ground-up development.  The Company's properties are used for diverse

6    purposes, and include food industry, wholesale markets, small tenant industrial, residential high

7    rise and mixed-use "urban village" properties.  The vast majority of the properties are situated in

8    downtown Los Angeles.  The Company is believed to be the largest non-governmental land owner

9    in downtown Los Angeles, owning or controlling approximately 80 acres of land in downtown Los

10   Angeles at the time that MMPI went public.

11       The Company focuses on urban in-fill development and on finding different, more

12   profitable uses for existing urban properties.  The Company looks for properties that have value

13   intrinsic to the property itself, such as the property's location, whether there is an end user of the

14   property on the horizon who might want to purchase the property, how well the property will fit in

15   with the growth patterns of the area and community in which it is situated, and other factors.

16       The Company's business model anticipates the need for time to develop properties and

17   requires the infusion of funds to pay the costs of such development, including the carrying costs.

18   To help defray costs during development, properties may be utilized as parking lots or other uses,

19   not because such use generates substantial income but because the land itself is extremely valuable

20   since it can be developed at an appropriate time in the future, and the parking lot revenue provides

21   some interim revenue.  Some of the Company's properties have been developed to the point where

22   entitlements have been obtained thus increasing the value substantially, but development has been

23   deferred pending an improvement in the credit markets.  In summary, the Company's business

24   model contemplates and is based upon the purchase, development and resale of properties, pursuant

25   to which the Company turns over such properties in a relatively short period of time, such as a few

26   years instead of decades, and uses the profit from such properties to fund operations of MMPI and

27   all of its other affiliates and the purchase and development of other properties.

28   ///

1  C.      THE DEBTORS' COLLECTIVE ORGANIZATION AND OPERATIONS

2          Although the Debtors and their non-Debtor affiliates consist of a parent company and

3  various levels of subsidiaries, including limited liability companies and other entities which hold

4  title to properties, the Company has been, before and after its formation as a public company, and

5  presently continues to be, effectively operated as a single enterprise. Revenues of the entities are

6  commingled, and the funds are used to pay the expenses of MMPI and the subsidiaries. Some

7  entities generate revenues in excess of operational expenses and debt service, but some do not. The

8  reason that the Company purchases and keeps properties that are cash flow negative is because the

9  Company believes that those properties will, in time, generate a positive return and the enterprise

10  will be significantly more valuable as a result.

11

12  D.      BRIEF DESCRIPTION OF THE AFFECTED DEBTORS' BUSINESS AND PROPERTY

13          1.      MERUELO MADDUX PROPERTIES, INC.

14          One of the Debtors is MMPI, the parent company of the affiliated Debtors. MMPI does not

15  separately own any real property. However, since MMPI was formed in 2006, MMPI has been the

16  guarantor of many of the other Debtors' obligations to secured creditors. With regard to a number

17  of loans obtained by the Debtors prior to MMPI and the formation of the Company, the loans were

18  guarantied by Richard Meruelo and/or others who had a direct ownership interest in the borrower.

19  Subsequent to MMPI's formation, MMPI has been substituted for the individual guarantors with

20  regard to a number of those loans. A more complete description of MMPI's operations is set forth

21  above.

22

23          2.      MERUELO WALL STREET, LLC[3]

24          One of the Debtors is Meruelo Wall Street, LLC ("MWS"), which owns real property (the

25  "MWS Property") encumbered by a deed of trust in favor of United Commercial Bank ("UCB"),

26  _____

27  [3] *See* Meruelo Confirmation Declaration, ¶ 91; Debtors' Disclosure Statement § II(B)(27);
    EWB Disclosure Statement p. 15.

28

-7-

364473.06 [XP]    25195

1  which assigned its beneficial interest in the deed of trust to East West Bank ("EWB") in or about

2  November 2009. The MWS Property is located in the garment district in downtown Los Angeles,

3  at the main intersection of East 9th and Wall Streets, adjacent to the downtown Wholesale Flower

4  Market. The MWS Property is approximately 2.1 acres in size and comprises an entire city block.

5  The MWS Property is improved with a multi-tenant building with approximately 98,245 net

6  rentable square feet, and rooftop parking. Richard Meruelo ("Meruelo") has testified that the value

7  of the MWS Property is no less than $35,352,900.

8      On or about October 14, 2008, UCB made a $21 million loan to MWS (the "MWS Loan").

9  The MWS Loan was secured by, among other things, a deed of trust against MWS Property and a

10  security interest in a certificate of deposit which has a current balance of approximately $521,000.

11  The MWS Loan was guarantied by Meruelo. According to the disclosure statement filed by EWB

12  and Legendary Investors Group No. 1, LLC (the "EWB Disclosure Statement") in support of their

13  joint proposed Chapter 11 plan (the "EWB Plan"), EWB asserts that as of December 31, 2010, the

14  principal amount owed by MWS was $20,850,859, accrued interest was $4,170,643, and estimated

15  legal fees and other charges aggregated $403,685.

16

17      3.   2640 WASHINGTON BOULEVARD, LLC[4]

18      Another one of the Debtors is 2640 Washington Boulevard, LLC ("2640 Washington"),

19  which owns real property (the "2640 Property") encumbered by a deed of trust in favor of UCB,

20  which assigned its beneficial interest in the deed of trust to EWB in or about November 2009. The

21  2640 Property is located just south of downtown Los Angeles and is approximately 2.8 acres in

22  size. The 2640 Property is improved with a newly constructed modern produce center which was

23  developed by the Company to complement the other produce markets owned by the Company,

24  including the Seventh Street Produce Market owned by Alameda Produce Market, LLC, and the

25  ///

26  ——————————————————

27  [4] *See* Meruelo Confirmation Declaration, ¶ 82; Debtors' Disclosure Statement § II(B)(19);
EWB Disclosure Statement p. 15.

28

1  produce market owned by 788 South Alameda, LLC.  Richard Meruelo has testified that the value

2  of the 2640 Property is no less than $7,172,100.

3      On or about November 26, 2007, UCB made a $6.15 million loan to 2640 Washington (the

4  "2640 Loan").  The 2640 Loan was secured by, among other things, a deed of trust against the

5  2640 Property.  The 2640 Loan was guarantied by MMPI.  According to the EWB Disclosure

6  Statement, EWB asserts that as of December 31, 2010, the principal amount owed by 2640

7  Washington was $6,066,073, accrued interest was $1,170,148, and estimated legal fees and other

8  charges aggregated approximately $347,244.

9

10  E.      THE DEBTORS' CASH COLLATERAL AND CASH MANAGEMENT MOTIONS

11      On the Petition Date, the Debtors filed a number of so-called "first day motions," including

12  motions seeking authority to use cash collateral and to utilize their existing cash management

13  system (sometimes referred to together with subsequent motions seeking similar relief as the "Cash

14  Collateral Motion" and the "Cash Management Motion").  The Cash Collateral Motion and the

15  Cash Management Motion were granted on an interim basis.  UCB, among others, opposed the

16  Debtors' motions.  Various hearings, including evidentiary hearings, were held with regard to the

17  Debtors' requests for relief on a final basis.  A stipulation was reached whereby UCB consented to

18  the use of the cash collateral generated by the MWS Property.

19      On or about January 13, 2010, the Court entered its order granting the Cash Collateral

20  Motion and the Cash Management Motion on a final basis through March 31, 2010.  As to the

21  interests of EWB in the 2640 Property, the Court determined that EWB was entitled to the base

22  level of adequate protection proposed by the Debtors plus additional adequate protection in the

23  form of a lien against certain unencumbered properties to be designated as the "Replacement Lien

24  Property Pool."  Pursuant to a subsequent order of the Court, commencing on August 2, 2010,

25  EWB also is entitled to additional adequate protection in the form of cash payments in the amount

26  of $18,000 per month.  Such payments reduce the amount of EWB's adequate protection lien

27  against the Replacement Lien Property Pool.

28  ///

1    The Debtors' authority to use cash collateral has been extended from time to time by the

2    Court. The most recent order was entered on or about September 30, 2010, pursuant to which the

3    Debtors were authorized to use cash collateral generated by the MWS Property and the 2640

4    Property through January 31, 2011. A hearing was held on January 20, 2011, on the Debtors'

5    request to extend such authority and the Debtors' motion was granted through April 30, 2011.

6

7    F.    PREPETITION CLAIMS ASSERTED BY EWB AGAINST THE DEBTORS

8    EWB filed multiple claims against the Debtors' estates, including an unsecured guaranty

9    claim against MMPI. EWB's claims have not been liquidated, and it has been contemplated by the

10    Debtors that the allowed amount of EWB's claims would need to be determined in connection with

11    or after confirmation proceedings. The prepetition claims asserted by EWB against the Debtors are

12    as follows:

13    (1)    EWB's secured claim against MWS' estate. On or about September 23, 2009, UCB

14    filed a proof of claim in MWS' case asserting a secured claim in the amount of $21,391,410.11.

15    The proof of claim was assigned claim number 8 by the Clerk of the Court in MWS' case. The

16    claim was subsequently transferred to EWB. The allowed amount of this claim has not been

17    liquidated.

18    (2)    EWB's general unsecured claim against MWS' estate. On or about September 24,

19    2009, The Surveillance, Protection & Investigations Group, Inc. ("SPI"), filed a proof of claim in

20    MWS' case asserting an unsecured claim in the amount of $7,618.08. The proof of claim was

21    assigned claim number 6 by the Clerk of the Court in MWS' case. The claim was subsequently

22    transferred to EWB. The allowed amount of this claim has not been liquidated.

23    (3)    EWB's secured claim against 2640 Washington's estate. On or about September 23,

24    2009, UCB filed a proof of claim in 2640 Washington's case asserting a secured claim in the

25    amount of $6,325,682.96. The proof of claim was assigned claim number 5 by the Clerk of the

26    Court in 2640 Washington's case. The claim was subsequently transferred to EWB. The allowed

27    amount of this claim has not been liquidated.

28    ///

364473.06 [XP]    25195

1    (4)    EWB's unsecured guaranty claim against MMPI's estate. On or about September

2    23, 2009, UCB filed a proof of claim in MMPI's case asserting an unsecured claim in the amount

3    of $6,325,682.96.  The proof of claim was assigned claim number 48 by the Clerk of the Court in

4    MMPI's case.  The claim was subsequently transferred to EWB.  Pursuant to a stipulation of the

5    parties, the allowed amount of this claim has been liquidated at $6,198,254.97 for voting and plan

6    confirmation purposes only.

7

8    G.    EWB'S ADVERSARY PROCEEDING AGAINST MMPI AND MERUELO

9    On or about September 9, 2010, MMPI issued a press release (the "Press Release").  On or

10   about September 22, 2010, EWB and East West Bancorp, Inc., filed a libel complaint, thereby

11   initiating Adversary Proceeding No. 1:10-ap-01403-VK with this Court (the "Adversary

12   Proceeding").  Discovery in the Adversary Proceeding has not yet commenced and has been stayed.

13

14   H.    TREATMENT OF EWB'S CLAIMS UNDER THE DEBTORS' CURRENT PLAN

15   Under the Debtors' current proposed plan, each of EWB's secured claims is separately

16   classified and EWB will receive the "Common Secured Lender Claim Treatment" for each loan.[5]

17   Generally, since EWB voted against the Debtors' plan, this means that EWB will receive deferred

18   cash payments over a period of seven years commencing on the effective date of the Debtors' plan

19   (the "Effective Date").[6]  During such period EWB will receive monthly interest-only payments on

20   the principal balance of the restructured debt (i.e., the allowed amount of EWB's secured claim as

21   of the Effective Date), with interest accruing at a rate of 5.0% per annum or such other rate as is

22   established by the Court.  EWB will retain its liens against its real property collateral.  The loan

23   documents will be modified pursuant to the Loan Modification Agreement attached as Exhibit "D"

24   to the Debtors' disclosure statement.

25   _____

26   [5] The classes consisting of EWB's secured claims are classes 41A-2 and 52A-2.

27   [6] Debtors' Plan, § III(B)(2)(b).

28

-11-

1  I.    EWB'S PROPOSED CHAPTER 11 OF REORGANIZATION

2         In July 2010, EWB and Legendary Investors Group No. 1, LLC ("Legendary") filed a

3  motion requesting that the Court terminate exclusivity as to them in order to permit them to file a

4  competing Chapter 11 plan.  On or about August 25, 2010, the Court entered an order granting

5  EWB and Legendary's motion.

6         On October 19, 2010, the Court entered an order approving the form of the EWB

7  Disclosure Statement.  Under the EWB Plan, EWB's secured claim against MWS, its secured claim

8  against 2640 Washington, and its unsecured guaranty claim against MMPI would be converted to

9  equity in MMPI.  A hearing on EWB and Legendary's request for confirmation of the EWB Plan is

10  scheduled to commence on January 27, 2011, together with the confirmation hearing on the

11  Debtors' Plan and one other proposed plan.

12

13  J.    THE DEBTORS' PROPOSED SETTLEMENTS WITH EWB

14         Subject to Court approval, the Debtors have agreed to settlements of any and all disputes

15  arising out of or relating to, among other things, EWB's secured claim against MWS' estate

16  EWB's secured claim against 2640 Washington's estate, and EWB's unsecured guaranty claim

17  MMPI's estate (each a "Settlement" and collectively the "Settlements").  The Settlements, which

18  have been approved by MMPI's Board of Directors, are memorialized in the settlement agreements

19  attached as Exhibits "1," "2" and "3" to the Declaration of John Charles Maddux appended hereto

20  (the "Maddux Declaration").

21         Without limiting or altering the terms and detail in the Settlement Agreement attached as

22  Exhibit "1" to the Maddux Declaration, the terms of the Settlement to which MMPI, MWS and

23  Meruelo are all parties is summarized as follows:[7]

24  ///

25  ///

26
    _____

27    [7] In the event that there is any discrepancy between the terms set forth in the settlement
    documents and the terms described below, the terms in the settlement documents will control.

28

-12-

1.     MWS, MMPI and EWB will enter into a separate First Modification and Extension Agreement (the "MWS Loan Modification Agreement") providing, among other things, for the following:

     a.    as of the date on which the Court enters its order approving the settlement (the "Approval Date"), the principal balance of the loan will be $20,850,858.92 (the total amount that was owed as of January 5, 2009);

     b.    the maturity date will be extended from November 5, 2011, to November 1, 2014;

     c.    the non-default interest rate will be a fixed rate of 5.0% per annum (down from the current non-default interest rate of 6.5%), and the default interest rate will be a fixed rate of 8.0% per annum (down from the current default interest rate of 11.5%);[8]

     d.    MWS will make monthly interest-only payments in arrears;

     e.    funds currently being held in a certificate of deposit account, the sum of which is approximately $521,136.19, will be disbursed as follows:  (i) $150,000 of the funds will be disbursed to EWB in full and complete satisfaction of its claim under the MWS Loan for attorneys' fees and costs; and (ii) the remainder of such funds will be disbursed to MWS;

     f.    "Past Due Interest," which is defined as the interest that would accrue on the $20,850,858.92 balance from January 6, 2009, through the Approval Date at a rate of 5.0% per annum, will not be added to the balance of the loan but will be deferred and paid at the new maturity date; and

     g.    the existing guaranty by Meruelo will be terminated and MMPI will be substituted as the guarantor.

2.     EWB will consent to the use of cash collateral for the purposes set forth in the Cash Collateral Motion, for the purpose of making payments provided for in the Settlement and the MWS Loan, as modified, and any other purpose as may be authorized by the Court.

---

[8] The current non-default interest rate under the MWS Loan is the prime rate of interest plus 2.0%, subject to a floor of 6.5%.  The default interest rate is the non-default rate plus 5.0%.

364473.06 [XP]     25195

3.      EWB will consent to the Debtors' continued use of their existing cash management system and the relief sought in the Cash Management Motion. Neither MWS nor any other entity will be required to segregate MWS' cash collateral.

4.      Except with regard to the obligations created under the Settlement and the loan documents, as modified by the MWS Loan Modification Agreement, MWS and EWB will exchange mutual limited releases.

5.      To the extent that any adequate protection liens have arisen or may arise in favor of EWB pursuant to the Court's orders authorizing the use of cash collateral, such liens will be waived, released and discharged.

6.      The treatment afforded to EWB under any plan proposed by MWS will be consistent with, and MWS will not in any way seek to alter, modify or contradict, the terms of the Settlement. Provided that the Debtors' Plan complies with the Settlement, EWB will fully support the Debtors' Plan and EWB will not support or participate in the formulation of any other plan.

7.      As of the Approval Date, relief from stay will be granted in favor of EWB to exercise its remedies against MWS and property of MWS' estate in the event of a default in any obligation for the payment of money to EWB that is not cured within a 30-day cure period as more particularly provided in the settlement agreement. With regard to any other defaults susceptible to being cured but not cured within the 30-day cure period, EWB may seek relief from stay by filing a motion on 14 days' notice.

Without limiting or altering the terms and detail in the Settlement Agreement attached as Exhibit "2" to the Maddux Declaration, the terms of the Settlement to which 2640 Washington and MMPI are both parties is summarized as follows:[9]

1.      2640 Washington and MMPI, on the one hand, and EWB, on the other hand, will enter into a separate First Modification and Extension Agreement (the "2640 Loan Modification Agreement") providing, among other things, for the following:

---

[9] In the event that there is any discrepancy between the terms set forth in the settlement documents and the terms described below, the terms in the settlement documents will control.

-14-

1        a.     as of the Approval Date, the principal balance of the loan will be

2 $6,066,072.72 (the total amount that was owed as of January 5, 2009);

3        b.     the maturity date will be extended from December 5, 2012, to November 1,

4 2014;

5        c.     the non-default interest rate will be a fixed rate of 5.0% per annum (down

6 from the current non-default interest rate of 8.0%), and the default interest rate will be a fixed rate

7 of 8.0% per annum (down from the current default interest rate of 10.0%);[10]

8        d.     2640 Washington will make monthly interest-only payments in arrears;

9        e.     funds currently being held in a segregated EWB account, the sum of which

10 currently is approximately $9,410.05, will be released to EWB and the entirety of such funds will

11 be applied by EWB to attorneys' fees and costs to be reimbursed pursuant to the Settlement;

12        f.     "Past Due Interest," which is defined as the interest that would accrue on the

13 $6,066,072.72 balance from January 6, 2009, through the Approval Date at a rate of 5.0% per

14 annum, will not be added to the balance of the loan but will be deferred and paid at the new

15 maturity date;

16        g.     within five business days of the Approval Date, 2640 Washington will pay

17 EWB the sum of $150,000 (less the amount in the segregated EWB account described above) in

18 full and complete satisfaction of its claim under the 2640 Loan for attorneys' fees and costs; and

19        h.     from the first day after the effective date of 2640 Washington's proposed

20 plan through the date that is 90 days after the effective date, 2640 Washington may elect to have all

21 personal liability under or in connection with the 2640 Loan be fully, finally and completely

22 released by conveying the 2640 Washington Property to a subsidiary or nominee of EWB.

23    2.     EWB will consent to the use of cash collateral for the purposes set forth in the Cash

24 Collateral Motion, for the purpose of making payments provided for in the Settlement and the 2640

25 Loan, as modified, and any other purpose as may be authorized by the Court.

26

---

27 [10] The current non-default interest rate under the 2640 Loan is the prime rate of interest plus 0.5%, subject to a floor of 8.0%. The default interest rate is the non-default rate plus 2.0%.

28

3.    EWB will consent to the Debtors' continued use of their existing cash management system and the relief sought in the Cash Management Motion.  Neither 2640 Washington nor any other entity will be required to segregate 2640 Washington's cash collateral.

4.    Except with regard to the obligations created under the Settlement and the loan documents, as modified by the 2640 Loan Modification Agreement, 2640 Washington and MMPI, on the one hand, and EWB, on the other hand, will exchange mutual limited releases.

5.    To the extent that any adequate protection liens have arisen or may arise in favor of EWB pursuant to the Court's orders authorizing the use of cash collateral, such liens will be waived, released and discharged.

6.    The treatment afforded to EWB under any plan proposed by 2640 Washington will be consistent with, and 2640 Washington will not in any way seek to alter, modify or contradict, the terms of the Settlement.  Provided that the Debtors' Plan complies with the Settlement, EWB will fully support the Debtors' Plan and EWB will not support or participate in the formulation of any other plan.

7.    As of the Approval Date, relief from stay will be granted in favor of EWB to exercise its remedies against 2640 Washington and property of 2640 Washington's estate in the event of a default in any obligation for the payment of money to EWB that is not cured within a 30-day cure period as more particularly provided in the settlement agreement.  With regard to any other defaults susceptible to being cured but not cured within the 30-day cure period, EWB may seek relief from stay by filing a motion on 14 days' notice.

Without limiting or altering the terms and detail in the Settlement Agreement attached as Exhibit "3" to the Maddux Declaration, the terms of the Settlement to which MMPI and Meruelo are both parties is summarized as follows:[11]

1.    In settlement of EWB's alleged claims against MMPI and Meruelo with respect to the Press Release, MMPI, Meruelo, EWB and East West Bancorp, Inc., will stipulate to entry of

---

[11] In the event that there is any discrepancy between the terms set forth in the settlement documents and the terms described below, the terms in the settlement documents will control.

1    judgment in the Adversary Proceeding in the form attached as Exhibit "A" to the Settlement

2    Agreement. Judgment will be entered against MMPI in the total amount of $1.00.

3        2.    Meruelo individually will execute and deliver to EWB a letter expressing his

4    appreciation to EWB for those matters set forth in the letter, and the Adversary Proceeding will be

5    dismissed with prejudice as to Meruelo.

6        3.    MMPI and Meruelo, on the one hand, and EWB and East West Bancorp, Inc., on the

7    other hand, will release each other of all claims relating to the Press Release and the Adversary

8    Proceeding.

9

10    K.    TREATMENT OF BANK OF AMERICA'S SECURED CLAIMS UNDER THE

11        DEBTORS' CURRENT PLAN

12        Bank of America ("BofA") holds secured claims against two of the Debtors:  Meruelo

13    Maddux Properties – 760 S. Hill Street, LLC ("MMP 760 South Hill"); and Merco Group –

14    Southpark, LLC ("MG Southpark").  BofA's secured claim against MMP 760 South Hill's estate

15    constitutes Class 32A-2 under the Debtors' Plan.  The Debtors' Plan provides that such claim will

16    receive the Common Secured Lender Claim Treatment except that (a) the interest rate will be the

17    "BBA LIBOR Rate" as defined in the relevant loan documents, and (b) the Debtor would have the

18    right to sell BofA's real property collateral on terms set forth in the Debtors' Plan.  Essentially, this

19    proposed treatment means that absent a sale of BofA's real property collateral, BofA will receive

20    the Common Secured Lender Claim Treatment with interest accruing at one of the contractual non-

21    default interest rates provided for in the relevant promissory note.

22        BofA's secured claim against MG Southpark's estate constitutes Class 49A-2 under the

23    Debtors' Plan.  The Debtors' Plan provides that such claim will receive the Common Secured

24    Lender Claim Treatment except that the interest rate will be the "Base Rate" as defined in the

25    relevant loan documents.  Again, this proposed treatment means that BofA will receive the

26    Common Secured Lender Claim Treatment with interest accruing at one of the contractual non-

27    default interest rates already provided for in the relevant promissory note.

28    ///

364473.06 [XP]    25195

1    As indicated in the Debtors' recently-filed reply to BofA's objection to confirmation of the

2    Debtors' Plan, the Debtors have agreed to modify the treatment of BofA's secured claims in Class

3    32A-2 and Class 49A-2 such that the applicable interest rate will be the same 5.0% per annum rate

4    afforded to other classes afforded the Common Secured Lender Claim Treatment, and not the lower

5    rates that currently exist under BofA's loan documents.

6

7                                    II.

8                                ARGUMENT

9    A.    THE COURT IS AUTHORIZED TO APPROVE THE SETTLEMENT AGREEMENTS

10          WITH EAST WEST BANK

11    This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, and

12    Federal Rule of Bankruptcy Procedure 9019.  Rule 9019(a) provides,

13                On motion by the trustee and after a hearing on notice to creditors,
                  the debtor . . . and to such other entities as the court may designate,
14                the court may approve a compromise or settlement.

15    The Supreme Court, in *Protective Committee for Independent Stockholders of TMT Trailer*

16    *Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968), held that a bankruptcy court, in considering

17    whether to approve a compromise, should inform itself regarding

18                all facts necessary for an intelligent and objective opinion of the
                  probabilities of ultimate success should the claim be litigated.
19                Further, the judge should form an educated estimate of the
                  complexity, expense, and likely duration of such litigation, the
20                possible difficulties of collecting on any judgment which might be
                  obtained, and all other factors relevant to a full and fair assessment of
21                the wisdom of the proposed compromise.

22    The Ninth Circuit has clarified the inquiry as follows:

23                In determining the fairness, reasonableness and adequacy of a
                  proposed settlement agreement, the court must consider:  (a)
24                probability of success in the litigation; (b) the difficulties, if any, to
                  be encountered in the matter of collection; (c) the complexity of the
25                litigation involved, and the expense, inconvenience and delay
                  necessarily attending it; [and] (d) the paramount interest of the
26                creditors and a proper deference to their reasonable views in the
                  premises.

27

28    ///

                                  -18-

1  *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied*, 479 U.S. 854, 107 S. Ct.

2  189 (1986).

3      A trustee or debtor-in-possession has the burden of persuading the Court that the

4  compromise is fair and equitable and should be approved. *Id.* Although "the creditors' objections

5  to a compromise must be afforded due deference, such objections are not controlling, and while the

6  court must preserve the rights of the creditors, it must also weigh certain factors to determine

7  whether the compromise is in the best interest of the bankrupt estate." *Id.* at 1382 (citations

8  omitted).

9      The bankruptcy court has wide latitude and discretion in evaluating a proposed compromise

10 because the judge is "uniquely situated to consider the equities and reasonableness." *United States*

11 *v. Alaska National Bank (In re Walsh Construction, Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982).

12 The Ninth Circuit has further stated:

13         A compromise agreement allows the trustee and the creditor to avoid
        the expenses and burdens associated with litigating "sharply

14         contested and dubious" claims. [Citation]. The bankruptcy court
        need not conduct an exhaustive investigation into the validity of the

15         asserted claim. [Citation]. It is sufficient that, after apprising itself of
        all facts necessary for an intelligent and objective opinion concerning

16         the claim's validity, the court determines that either (1) the claim has
        a "substantial foundation" and is not "clearly invalid as a matter of

17         law," or (2) the outcome of the claim's litigation is "doubtful."

18 *Id.* at 1328. The court is not "to decide the numerous questions of law and fact raised by

19 [objectors] but rather to canvass the issues and see whether the settlement '*falls below the lowest*

20 *point in the range of reasonableness.*'" *In re Carla Leather, Inc.*, 44 B.R. 457, 465 (Bankr.

21 S.D.N.Y. 1984) (quoting *In re W. T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983) (emphasis

22 added), *cert. denied*, 464 U.S. 822, 104 S. Ct. 89 (1983)), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985).

23

24 B.    THE PROPOSED SETTLEMENTS ARE REASONABLE AND IN THE BEST

25      INTERESTS OF THE ESTATES

26     The proposed Settlements are in the best interests of creditors and other parties in interest.

27 With regard to the MWS Loan, both the Debtors' Plan and the Settlement provide for monthly

28 payments of interest at a fixed rate of 5.0% per annum; however, whereas the plan provides for the

364473.06 [XP]    25195

1   accrual of interest at a fixed rate of 5.0% per annum on the full allowed amount of EWB's secured

2   claim as of the Effective Date, the Settlement provides for interest to accrue at a fixed rate of 5.0%

3   per annum on the loan balance as of January 5, 2009.  Interest on such amount from January 5,

4   2009, to the Approval Date will accrue at the rate of 5.0% per annum, compared to the non-default

5   contract rate of 6.5%, and will be payable at maturity, which has been extended to November 1,

6   2014.  EWB's claim for attorneys' fees will be reduced from approximately $228,000 to $150,000,

7   and EWB will waive late charges which it alleges aggregate approximately $145,185.  EWB will

8   release its security interest in over $500,000 in cash which will be used to pay for the $150,000 in

9   agreed-upon attorneys' fees.  Any objections by EWB to the Debtors' use of cash collateral and

10  utilization of their existing cash management system will be resolved.  In addition, EWB will

11  support MWS' plan provided that it is consistent with the MWS Settlement, thus increasing the

12  likelihood of the Debtors confirming a plan of reorganization that enables the Company to emerge

13  from bankruptcy best prepared and able to handle the opportunities and challenges that it will face

14  in the future.

15          With regard to the 2640 Loan, the terms of the Settlement, and therefore the benefits,

16  generally are the same as those in the Settlement with MWS, except that the non-default rate is

17  being reduced from 8.0% to 5.0%.  Also, EWB will modify its vote in MMPI's case and vote in

18  favor of the Debtors' plan.  In addition, under the 2640 Settlement, 2640 Washington will have the

19  ability to convey the 2640 Property to a subsidiary or nominee of EWB in exchange for a full

20  release of any and all personal liability under the 2640 Loan.  Based on projections attached to the

21  Declaration of Andrew Murray filed in support of confirmation of the Debtors' Plan, the total net

22  operating income less monthly interest payments to be made to EWB result in a net loss in excess

23  of $600,000 through November 2014.  The Settlement affords 2640 Washington the flexibility to

24  decide within 90 days after the Effective Date whether to convey the 2640 Property to a subsidiary

25  or nominee of EWB in exchange for a full release of any and all personal liability under the 2640

26  Loan, and thus eliminate the need to incur such potential losses.

27          With regard to the Adversary Proceeding, EWB initially asserted that as a result of the Press

28  Release it had suffered millions of dollars in damages.  Various parties, including the Official

1    Committee of Equity Security Holders (the "Equity Committee") appointed in this case, attempted

2    to use the Press Release to deny the Debtors the right to send out their Disclosure Statement and

3    solicit votes in favor of their plan. They also sought to use the press release to argue that the

4    Debtors incurred a large administrative claim that made the Debtors' plan not feasible. The Equity

5    Committee sought discovery relating to the Press Release from the Debtors and third parties, and in

6    conjunction with Charlestown Capital Advisors LLC and Hartland Asset Management Corporation

7    (collectively "Charlestown"), the Equity Committee is attempting to use the Press Release as

8    grounds for denying confirmation of the Debtors' plan. The press release has always been a red

9    herring, but one that opposing parties clung to in an effort to derail the Debtors' reorganization

10    efforts. The Settlement, pursuant to which MMPI will pay a total of $1.00 in satisfaction of the

11    alleged claim, clearly is beneficial to the estates and should put to rest baseless allegations by the

12    Equity Committee, Charlestown and others that the Press Release resulted in the Debtors' estates

13    incurring millions of dollars in administrative claims.

14         The proposed Settlements with EWB also are fair and reasonable settlements of issues

15    arising out of or relating to, among other things, EWB's secured claims against MWS and 2640

16    Washington and their estates and property, the treatment of EWB's secured claims under the

17    Debtors' plan, the EWB Plan, the Debtors' authority to use cash collateral generated by the MWS

18    Property and the 2640 Property, the Debtors' authority to utilize their existing cash management

19    system, and various other disputes. The Debtors ceased making payments on account of EWB's

20    loans (except adequate protection payments) in January 2009. Non-default interest on the principal

21    balances are 6.5% per annum for the MWS Loan and 8.0% per annum for the 2640 Loan, and

22    default interest on the principal balance due is an additional 5.0% per annum for the MWS Loan

23    and 2.0% for the 2640 Loan. There are disputes as to certain amounts claimed by EWB and, absent

24    a settlement, the Debtors will be required to object to the allowance of EWB's claims after the

25    Effective Date in order to liquidate the allowed amount of EWB's secured claims. There is always

26    a risk of loss in litigation and both the Debtors and EWB would be required to incur significant

27    time and additional legal expenses litigating these matters. Under the Settlement, the risk of loss is

28    ///

-21-

1    eliminated because, among other things, the Debtors will not need to litigate with EWB regarding

2    the allowed amounts of its claims.

3        The Debtors objected to confirmation of the EWB Plan and EWB objected to confirmation

4    of the Debtors' Plan. The Debtors believe that their objection to confirmation of the EWB Plan

5    demonstrates that the EWB Plan is unconfirmable. The Debtors believe that they will successfully

6    confirm their proposed plan, which was accepted by an overwhelming number of classes of general

7    unsecured claims, a large number of classes of secured claims, and a majority of shareholders who

8    cast votes on the Debtors' Plan. Again, the Debtors recognize that there is a risk of loss and have

9    factored that risk into their determination that the Settlement is in the best interests of the creditors

10    and other parties in interest.

11        EWB previously objected to the Debtors' use of its cash collateral and may allege in the

12    future that it is entitled to additional adequate protection for such future use beyond that which the

13    Court already has afforded. The Debtors believe the likelihood they would successfully oppose

14    such efforts by EWB is good because, among other things, the Debtors believe that EWB is

15    adequately protected by a significant equity cushion in connection with the MWS Loan and, with

16    regard to the 2640 Loan, the Debtors believe that additional adequate protection to be afforded to

17    EWB would be the same or substantially the same as that previously ordered by the Court. Again,

18    however, there is always a risk of loss in litigation and the Debtors have taken the risk into account

19    in determining that the Settlements are in the best interests of the creditors and other parties in

20    interest.

21        With regard to the Adversary Proceeding, the Debtors also believe that they ultimately will

22    be successful in defending against the claims asserted by EWB and East West Bancorp, Inc., with

23    respect to the press release. However, again, the Debtors recognize that there is a risk of loss which

24    supports a settlement of $1.00 on account of such claims.

25        Much of the litigation described above and other pending litigation with respect to which

26    EWB is a party is complex, and litigating such matters undoubtedly will require the Debtors'

27    estates and EWB to incur hundreds of thousands of dollars in additional legal fees. The amount

28    and cost of litigation in the case multiplied drastically in late July and early August 2010 when the

-22-

1   OEC was appointed and when exclusivity was terminated as to EWB and Legendary. According to

2   the EWB Disclosure Statement, EWB (and UCB as EWB's predecessor-in-interest) has incurred

3   approximately $456,000 in attorneys fees in this case through December 31, 2010. If EWB is

4   required to engage in further litigation over confirmation of the Debtors' Plan and the EWB Plan,

5   the amount of legal fees that will be incurred by EWB, and which EWB will likely seek to recover

6   from the Debtors' estates, will continue to climb. Further, assuming that the OEC's legal fees

7   ultimately are allowed, the Debtors' estates will be required to absorb the extravagant amount of

8   attorneys' fees being incurred by the OEC in connection with the litigation being advanced by the

9   OEC on behalf of Charlestown (despite the fact that Charlestown's own proposed plan was rejected

10  by almost all classes of creditors, including all creditor classes in MMPI's case). While withdrawal

11  of the EWB Plan will not eliminate the continued accrual of legal fees in this case, it will help. The

12  cessation of all other litigation by EWB, such as litigation relating to the use of cash collateral, also

13  will reduce the legal fees incurred by the Debtors and others in this case.

14         The Debtors' proposed Settlement also will eliminate the need for the Debtors and others to

15  incur additional legal fees in connection with matters relating to EWB's claims against the Debtors'

16  estates. Among other things, the Debtors will not be required to prosecute objections to proofs of

17  claims filed by EWB in MWS' and 2640 Washington's cases.

18         In the Debtors' business judgment, in view of, among other things, the restructuring of debt,

19  the improvement in cash flow, the reduction in litigation and associated legal fees that will result

20  from the Settlements and the withdrawal of the EWB Plan, and for numerous other reasons

21  including those described herein, the Debtors believe that the Settlement is in the best interests of

22  the Debtors, their estates, their creditors and MMPI's shareholders.

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

-23-

C.    THE SETTLEMENTS AND THE PROPOSED MODIFICATION TO THE TREATMENT OF BANK OF AMERICA'S SECURED CLAIMS WILL RESULT IN ONLY NON-MATERIAL MODIFICATIONS OF THE DEBTORS' PLAN

1.    THE PROPOSED MODIFICATIONS OF THE DEBTORS' PLAN COMPLY WITH ALL OF THE MANDATORY PLAN REQUIREMENTS

Section 1127(a) of the Code provides in pertinent part that:

> The proponent of the plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan . . .

11 U.S.C. § 1127(a).  Approval of the Settlements will require modifications of the Debtors' Plan regarding EWB's secured claims.  In addition, the Debtors have agreed to modify their plan so that the interest rate applicable to the treatment of Classes 32A-2 and 49A-2 is 5.0%.  In lieu of filing a second modified Fourth Amended Plan, redlined copies of pages of the Debtors' Fourth Amended Plan showing the changes that will be appropriate upon approval of the Settlements and approval of the proposed modifications to Classes 32A-2 and 49A-2 are attached as Exhibit "4" hereto.

The proposed modifications to the Debtors' Plan comply with all of the requirements of §§ 1122 and 1123 of the Code:

Sections 1122, 1123(a)(1), (a)(2) & (b)(1), (b)(2), and (b)(4):  The proposed modifications will have no effect on the designation of classes or the designation of which classes are impaired or unimpaired and therefore satisfies Sections 1122 and 1123(a)(1) and (2).  The proposed modifications also do not provide for the assumption and assignment of executory contracts and unexpired leases under the Debtors' Plan, or the sale of property under the Debtors' Plan, and therefore Section 1123(b)(2) and (b)(4) are inapplicable.

Sections 1123(a)(3) & (a)(4):  The proposed modification will affect the treatment of the classes consisting of EWB's secured claims asserted against MWS and 2640 Washington, and BofA's secured claims asserted at MMP 760 South Hill and MG Southpark.  Each of these secured classes contain only a single member and therefore the proposed modification will not affect the

///

-24-

1    classification or treatment of any other creditor or any interest holder.  As such, the proposed

2    modifications satisfy Section 1123(a)(3) and (a)(4).

3        Section 1123(a)(5):  The proposed modifications also have little to no effect on the means

4    for implementing the Debtors' Plan and its feasibility, and improve the overall financial condition

5    of the Company going forward.  Among other things, as described above, the Settlements reduce

6    the amount of EWB's claims against MWS' and 2640 Washington's estates going forward and

7    interest that will accrue under the loans as modified is less than the interest that would accrue under

8    the Debtors' Plan.  In addition, the modification of treatment of BofA's secured claims will not

9    have an impact on the Debtors' projections because the projections inadvertently were based on

10   BofA receiving interest of 5.0% per annum instead of the rates permitted by BofA's existing loan

11   documents.  Based on the foregoing, the proposed modifications will not jeopardize either the

12   feasibility of the Debtors' Plan or the means for implementing the Debtors' Plan and therefore the

13   proposed modifications satisfy § 1123(a)(5).

14       Sections 1123(a)(6), (a)(7), (a)(8) & (b)(3):  The proposed modifications will not have any

15   effect on the existing provisions of the Debtors' Plan which provide for amendments to the

16   Debtors' charters or the selection of officers and directors of the Reorganized Debtors or the

17   retention of claims and causes of action belonging to the Debtors.  Section 1123(a)(8) is

18   inapplicable.

19       Section 1123(b)(5):  The proposed modifications alter the rights of EWB with respect to

20   payment of its secured claims against the Debtors in the sense that EWB will receive distributions

21   in accordance with the terms of the Settlements.  However, in that event EWB has consented to the

22   modified treatment of its claims in the Settlement Agreements.  The proposed modifications also

23   alter the rights of BofA in the sense that the Debtors are now proposing a rate which is higher than

24   that provided for in BofA's existing loan documents.  The modification is beneficial to BofA, and

25   the change is being made pursuant to an agreement between the Debtors and BofA.  The proposed

26   modifications do not alter the rights of any other holders of secured claims.

27   ///

28   ///

1    For the foregoing reasons, the proposed modifications comply with §§ 1122 and 1123 of the

2 Code and do nothing to change the Debtors' Plan's compliance with those provisions. As such, the

3 proposed modifications satisfy the requirements outlined in § 1127(a) and should be approved.

4

5    2.    THE PROPOSED MODIFICATIONS ARE NOT MATERIAL, AND CREDITORS

6        AND INTEREST HOLDERS VOTING TO ACCEPT THE PLAN SHOULD BE

7        DEEMED TO ACCEPT THE MODIFIED PLAN

8    Section 1127(d) of the Bankruptcy Code provides in pertinent part that:

9        Any holder of a claim or interest that has accepted or rejected a plan
        is deemed to have accepted or rejected, as the case may be, such plan
10        as modified, unless, within the time fixed by the court, such holder
        changes such holder's previous acceptance or rejection . . .
11

12 11 U.S.C. § 1127(d).

13    Rule 3019 of the Federal Rules of Bankruptcy Procedure provides that:

14        In a . . . . chapter 11 case, after a plan has been accepted and before
        its confirmation, the proponent may file a modification of the plan. . .
15        . If the court finds after hearing on notice to the trustee, any
        committee appointed under the Code, and any other entity designated
16        by the court that the proposed modification does not adversely
        change the treatment of the claim of any creditor or the interest of
17        any equity security holder who has not accepted in writing the
        modification, it shall be deemed accepted by all creditors and equity
18        security holders who have previously accepted the plan.

19 Fed. R. Bankr. P. 3019.

20    While § 1127(c) requires a proponent of a modification to comply with the disclosure

21 requirements contained in § 1125, modifications to a plan do "not necessarily mandate the

22 preparation of a new disclosure statement and resolicitation of the plan." *In re American Solar*

23 *King Corp.*, 90 B.R. 808, 823 (Bankr. W.D. Tex. 1988). "Further disclosure occurs only when and

24 to the extent that the debtor intends to solicit votes from previously dissenting creditors or when the

25 modification materially and adversely impacts parties who previously voted for the plan." *Id.* "[I]f

26 a modification does not 'materially' impact a claimant's treatment, the change is not adverse and

27 the court may deem that acceptances apply to the amended plan as well." *Id.* at 826. In *Mt. Vernon*

28 *Plaza Community Urban Redevelopment Corp.,* 79 B.R. 305 (Bankr. S.D. Ohio 1987), the plan

-26-

1 | proponents modified their plan to add a new co-proponent, increased the amount of administrative

2 | expenses to be paid upon the sale of certain properties, changed provisions regarding the repayment

3 | of notes held by the debtors and changed provisions regarding the assumption and rejection of

4 | certain agreements. The court determined that:

5 |
> None of the changes negatively affects the repayment of
> creditors, the length of the Plan, or the protected property interests of
> parties in interest.

6 |

7 |
> Taken as a whole, the Court finds that the proposed
> modifications do not adversely change the treatment of the claim of
> any creditor under the Plan. Accordingly, such modifications do not

8 |
> require circulation of a further modified disclosure statement. All
> creditors previously accepting the plan are, therefore, deemed to have

9 |
> accepted the plan as now modified.

10 | *Mt. Vernon* at p. 306.

11 | The proposed modifications to the Debtors' Plan have no substantive effect on the treatment

12 | of claims in any class other than the classes of EWB's and BofA's secured claims. Even if the

13 | modifications to the treatment of EWB's secured claims are considered to be adverse, EWB has

14 | consented to such modification as required by Rule 3019(a). The modification of the treatment of

15 | BofA's secured claims also is being done pursuant to an agreement with BofA, although BofA still

16 | has not accepted the treatment proposed in the Debtors' Plan. The proposed modifications have no

17 | effect on the treatment of secured claims other than EWB's secured claims.

18 | The proposed modifications also have no effect on the treatment of general unsecured

19 | claims because all holders of allowed general unsecured claims still will be paid in full thirty days

20 | after the Effective Date, except convenience class claims which are unimpaired. Since the Debtors'

21 | modification of the Debtors' Plan will have no economic impact on the unsecured claims, general

22 | unsecured creditors would not be apt to reconsider their acceptance of the Debtors' Plan because of

23 | the proposed modifications.

24 | The proposed modifications also have no adverse effect on the treatment of MMPI's equity

25 | interest holders. Shareholders still will effectively be unimpaired under the Debtors' Plan, with the

26 | option to receive $0.25 per share on account of their interests. The modifications incorporating the

27 | terms of the Settlements reduce the amount of the Debtors' secured debt and, as discussed above,

28 | the Settlements (and thus the related modifications to the Debtors' Plan) are in the best interests of

-27-

1  the Debtors and their estates, decrease the overall debt and improve the cash flow of the Company,

2  and increase the likelihood for a successful reorganization for the ultimate benefit of shareholders.

3  While interest payments to be made to BofA at the fixed rate of 5.0% per annum are higher than

4  the current rates proposed in the Debtors' Plan, the Debtors' projections inadvertently utilized the

5  5.0% rate and therefore, in terms of the Debtors' projections, there is no impact on any other party

6  in interest.

7  Based on the foregoing, the proposed modifications should be deemed to be non-material

8  and the Court should deem the proposed modifications to be accepted by EWB (who has consented

9  in writing to the modifications) and by all creditors who voted to accept the Debtors' Plan.

10

11  D.    EWB SHOULD BE AUTHORIZED TO CHANGE ITS VOTES

12  Federal Rule of Bankruptcy Procedure 3018(a) provides, in relevant part, "For cause

13  shown, the court after notice and hearing may permit a creditor or equity security holder to change

14  or withdraw an acceptance or rejection." EWB submitted votes accepting its plan and rejecting the

15  Debtors' Plan. However, under the Settlements, EWB has agreed to support the Debtors' Plan.

16  Accordingly, in furtherance of the Settlements, the Debtors request that the Court authorize EWB

17  to change its votes to accept the Debtors' Plan.

18

19  E.    THE COURT SHOULD AUTHORIZE THE DEBTORS TO USE CASH COLLATERAL

20        TO PERFORM FUTURE PAYMENT OBLIGATIONS UNDER THE SETTLEMENTS

21  In connection with prior motions for approval of settlements, the Debtors sought authority

22  to use cash collateral to make future payments of interest and other payment obligations under the

23  loans, as modified by the settlements. Certain parties objected to the Debtors' use of cash collateral

24  for this purpose. As reflected in the relevant orders, the Court in all cases authorized the Debtors to

25  use cash collateral to make future payments of interest.

26  The segregated funds that will be released to the Debtors under the Settlements will be

27  sufficient to make payments required upon the approval of the Settlements. Excess amounts will

28  be available for use by the Company generally. As with prior settlements, the Debtors require the

1 | use of cash collateral in order to satisfy future payment obligations required under the Settlements

2 | and the loans, as modified by the loan extension agreements, including real property taxes, and the

3 | Debtors request authority to use cash collateral for such purposes.

4 |

5 | F.    WAIVER OF THE 14-DAY STAY, IF ANY

6 |      Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d) provide that certain types of

7 | orders are stayed until the expiration of 14 calendar days after entry of the orders, unless the Court

8 | orders otherwise.  The Debtors do not believe that either rule applies to the Court's order granting

9 | the relief requested herein.  However, out of an abundance of caution, in the event that such rules

10 | do apply, the Debtors request that the Court's order granting this motion provide for a waiver of the

11 | 14-day stay.  Waiver of the 14-day stay is appropriate so that the parties can act in accordance with

12 | the terms of the Settlements immediately and not incur unnecessary costs or delays in connection

13 | with the pending plan confirmation trial.

14 |

15 | III.

16 | CONCLUSION

17 |      For the foregoing reasons, the Debtors request that the Court approve the proposed

18 | Settlements, authorize the Debtors to modify the Debtors' Plan, and determine that the proposed

19 | modification of the Debtors' Plan does not require resolicitation thereof.  The Debtors also request

20 | that the Court authorize EWB to change its votes in order to vote in favor of the Debtors' Plan.

21 | The Debtors also request such further relief as the Court deems just and proper.

22 |

23 | Dated: January 24, 2011          DANNING, GILL, DIAMOND & KOLLITZ, LLP

24 |

25 |      By: _____

26 |      John N Tedford, IV
          Attorneys for Meruelo Maddux Properties,

27 |      Inc., and affiliated Debtors and Debtors-in-
          Possession

28 |

-29-