GARY E. KLAUSNER (State Bar No. 69077)
*GKlausner@Stutman.com*
STEPHAN M. RAY (State Bar No. 89853)
*SRay@Stutman.com*
CAROL CHOW (State Bar No. 169299)
*CChow@Stutman.com*
STUTMAN, TREISTER & GLATT
PROFESSIONAL CORPORATION
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA  90067-6013
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

JOHN N. TEDFORD, IV (State Bar No. 205537)
*JTedford@DGDK.com*
DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
Los Angeles, California  90067-2094
Telephone:  (310) 277-0077
Facsimile:  (310) 277-5735

Special Reorganization Counsel for Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>MERUELO MADDUX PROPERTIES, INC., et al.,[1]<br><br>Debtors and Debtors in Possession<br><br>☒　Affects all Debtors<br>☐　Affects the following Debtor(s): | Case No.: 1:09-bk-13356-VK<br>Chapter 11<br>(Jointly Administered)<br><br>**DEBTORS' OPPOSITION TO EQUITY COMMITTEE'S MOTION *IN LIMINE* FOR ORDER MAKING ADVERSE FACTUAL FINDINGS AND DECLARATION OF CAROL CHOW IN SUPPORT THEREOF**<br><u>Hearing</u><br><br>Date:　February 3, 2011<br>Time:　9:30 a.m.<br>Place:　Courtroom 301 |

---

[1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities.

**TABLE OF CONTENTS**

I.      INTRODUCTION...................................................................................................... 1

II.     STATEMENT OF FACTS ......................................................................................... 5

      A.      THE EQUITY COMMITTEE HAS SUBJECTED THE
             DEBTORS TO GROSSLY BURDENSOME AND OPPRESSIVE
             DISCOVERY.......................................................................................... 5

      B.      THE DEBTORS HAVE RESPONDED TO DISCOVERY IN
             GOOD FAITH NOTWITHSTANDING THE BURDENS
             CREATED BY THE COMPRESSED DISCOVERY AND
             BRIEFING SCHEDULE......................................................................... 7

III.    LEGAL ARGUMENT ............................................................................................. 11

      A.      THE NON-PRIVILEGED DOCUMENTS REGARDING THE
             THREE TRANSACTIONS HAVE ALREADY BEEN
             PRODUCED............................................................................................ 11

            1.      The Non-Privileged Documents Relating To The $1,925,000
                   Cashier's Check To Magnum Properties That Could Be
                   Located Have Already Been Produced. ...................................... 12

            2.      The Non-Privileged Documents Relating To The $100,000
                   Wire Transfer To The Florida Court That Could Be Located
                   Have Already Been Produced. ...................................................... 16

            3.      The Non-Privileged Documents Relating To The $200,000
                   Check Made Payable To Commerce Escrow That Could Be
                   Located Have Already Been Produced. ...................................... 18

      B.      THE MOTION *IN LIMINE* SHOULD BE DENIED BECAUSE
             THE RELIEF REQUESTED IS DIRECTLY CONTRARY TO
             APPLICABLE STATUTES AND CASE LAW. ............................... 20

            1.      The Equity Committee Cannot Circumvent The Due Process
                 Requirements Of The Federal Rules Of Civil Procedure. .......... 20

            2.      The Equity Committee Has Failed To Meet And Confer In
                 Good Faith, A Statutory Prerequisite To Its Motion................... 23

      C.      THE EQUITY COMMITTEE'S MOTION SHOULD BE
             DENIED ON THE GROUNDS THAT THE EQUITY
             COMMITTEE AND ITS AFFILIATED PARTIES HAVE
             FAILED TO RESPOND TO THE DEBTORS' DISCOVERY. ...... 26

IV.     CONCLUSION ....................................................................................................... 29

1

## TABLE OF AUTHORITIES

2

### CASES

3

4

*Ambu, Inc. v. Kohlbrat & Bunz Corp.*,
    2000 U.S. Dist. LEXIS 241 (W.D.N.C. Jan. 5, 2000) ...................................................29

5

6

*Henry v. Gill Industries, Inc.*,
    983 F.2d 943 (9th Cir. 1993) ...................................................22

7

*Las Vegas Hilton v. Sun (In re Sun)*,
    2007 Bankr. LEXIS 3676 (Bankr. C.D. Cal. Oct. 30, 2007) .......................................23

8

9

*Leimbach v. Lane (In re Lane)*,
    302 B.R. 75 (Bankr. D. Idaho 2003)...................................................23

10

11

*National Ass'n of Radiation Survivors v. Turnage*,
    15 F.R.D. 543 (N.D. Cal. 1987)...................................................22

12

13

*Pacific Marine Center, Inc. v. Silva*,
    No. 09-1409, 2010 WL 344833 (E.D. Cal. Sept. 1, 2010) ..........................................22

14

*Professional Seminar Consultants, Inc. v. Sino American Technology Exchange
    Council, Inc.*,
    727 F.2d at 1474 ...................................................20

15

16

*Rainbow Pioneer
    No. 44-18-04 A v. Hawaii-Nevada Investment Corp.*,
    711 F.2d 902 (9th Cir. 1983) ...................................................20

17

18

*In re Rubin*,
    769 F.2d 611 (9th Cir. Cal. 1985)...................................................20, 21

19

20

*Sanchez v. Wash. Mutual Bank (In re Sanchez)*,
    2008 Bankr. LEXIS 4239 (Bankr. E.D. Cal. Sept. 8, 2008).......................................23

21

22

*U.S. v. ACB Sales & Service, Inc.*,
    95 F.R.D. 316 (D. Ariz. 1982) ...................................................22

23

*In Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*,
    982 F.2d 363 (9th Cir. 1992) ...................................................22

24

25

*United States v. Sumitomo Marine & Fire Insurance Co.*,
    617 F.2d at 1367 ...................................................20

26

27

*In re Visioneering Construction*,
    661 F.2d at 119 ...................................................20

28

1

2

## STATUTES

Federal Rule of Civil Procedure 37 ...............................................................20, 21, 25

Federal Rule of Civil Procedure 37(a)(1) ................................................................23

Federal Rule of Civil Procedure 37(a)(2)(A) ..........................................................23

Federal Rule of Civil Procedure 27(a)(2)(B) ..........................................................23

Federal Rule of Civil Procedure 37(b) ....................................................................23

Federal Rule of Civil Procedure 37(b)(2)(A) ..........................................................20

Federal Rule of Civil Procedure 37(d) ...............................................................23. 24

Federal Rule of Civil Procedure 7037 ....................................................................23

Federal Rule of Civil Procedure 37(d)(1)(B)..........................................................24

Fed. R. Bankr. P. 7037 ...............................................................................20, 25

## MISCELLANEOUS

Local Bankruptcy Rule 7026-1(c)(2) ...............................................................23, 24, 25

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The Debtors hereby oppose the Equity Committee's "Motion *in Limine* for Order Making Adverse Factual Findings" filed on January 24, 2011 [Docket No. 2659] (the "Motion"), as follows:

## I.    INTRODUCTION

The Motion alleges that the Debtors failed to produce internal documents and emails with regard to three transactions: (1) a $1,925,000 cashier's check payable to Magnum Properties that was intended to prove that the Debtors had sufficient funds to place a bid on a possible transaction (but was never cashed); (2) a $100,000 wire transfer to a Florida court to bid in a foreclosure auction (which bid was not accepted); and (3) a $200,000 check payable to Commerce Escrow to make a back-up offer on a property (which offer was not accepted).[2]  Based on a purported failure to produce documents regarding these three unconsummated transactions, the Equity Committee asks the Court to impose severe evidentiary sanctions against the Debtors by making adverse factual findings, including a finding that there were no legitimate business purposes for these transactions.  Not only is the Motion procedurally improper, it alleges false facts and seeks relief that is unavailable as a matter of law.  The Motion is entirely without merit and should be denied for the following reasons.

**First**, the Equity Committee's Motion should be rejected outright because it is based on a demonstrably false premise.  The Equity Committee has completely misstated the scope and degree of the Debtors' discovery responses.  The Debtors have in fact produced all non-privileged documents relating to these three transactions that could be located based upon a reasonable search -- including all internal emails and documents that could be located.

**Second**, a review of the documents that have been produced, together with the deposition testimony that has been elicited from at least 10 witnesses during discovery, clearly demonstrates that these transactions were for legitimate business purposes.  The Equity Committee's request that the Court render factual findings that are directly *contrary* to the evidence escapes logic

---

[2]    As set forth below, *none* of these possible purchases were actually consummated, and *all* of the money remained with or was returned to the Debtors.

1

1  and reason.  The Equity Committee is simply trying to prove through discovery sanctions what the

2  actual evidence shows is not true.

3          **Third**, the "death penalty" evidentiary sanctions requested by the Equity Committee

4  are in direct contravention of applicable rules and case law.  The Equity Committee failed to meet

5  and confer with the Debtors on these subjects in good faith.  Moreover, the Equity Committee can

6  not support a claim for extreme evidentiary sanctions when the Debtors have produced all responsive

7  documents that could be located, and when no discovery orders have been entered, much less

8  violated.

9          **Fourth**, the Equity Committee lacks standing to seek any sanctions, given that its

10  own discovery responses are grossly deficient, and its feeble response to the discovery pales in

11  comparison to the massive effort mounted by the Debtors to respond to the waves of discovery that

12  have been propounded against them.

13          To place the Equity Committee's Motion in its proper perspective, the Court should

14  consider the "full picture."  For the past two months, the Debtors have been fully engaged in

15  discovery with respect to three competing plans of reorganization, while concurrently completing

16  extensive briefing and declarations in support of their own plan of reorganization and in opposition

17  to the competing plans.  At the same time, the Debtors have reached landmark settlements with

18  certain major secured creditors (such as Legendary and East West Bank), and negotiated with other

19  parties in an effort to reach settlements.  And of course, the Debtors have been busy running their

20  business.

21          While the Debtors have been diligently pursuing confirmation and a successful

22  conclusion to these cases, the Equity Committee has, on the other hand, been pursuing an entirely

23  different course of action.  The Equity Committee purports to represent "non-insider" shareholders,

24  but in reality, it is dominated by a single person – Stephen S. Taylor – who purchased the Debtors'

25

26

27

28

1    stock at depressed prices post-petition.[3]  Mr. Taylor has exerted his control over the Equity

2    Committee and caused it to partner with Charlestown, which is the proponent of the Charlestown

3    Plan.  To further their agenda, the Equity Committee (in concert with Charlestown and other

4    affiliated parties)[4] have completely hijacked the discovery process and turned it into a war of

5    attrition against the Debtors.  In this regard, the Equity Committee has spared no expense (paid by

6    the Debtors) to examine and reexamine every minute detail, to pursue every possible conspiracy

7    theory, and to send multiple lawyers to attend or listen to nearly every hearing and deposition.

8              Meanwhile, the Debtors have made an extraordinary effort to respond to the

9    discovery propounded to them.  The Debtors have produced *over 85,000 pages of documents* – most

10   of which were produced over a month and a half ago – in response to six (6) rounds of document

11   requests.  The Debtors have taken and/or defended almost 20 depositions in the span of a month.

12   The Debtors have produced for deposition, among others, almost all of their upper management,

13   many of their key employees, an independent director chairing the board's audit committee, their in-

14   house counsel, and their outside counsel.

15             Further, at the request of the Audit Committee of the Debtors' Board of Directors, the

16   Debtors hired Ernst & Young to conduct an independent investigation into alleged accounting issues

17   alluded to in two memos prepared by Fred Skaggs (the "Skaggs Memo").  Ernst & Young has:

18        (a)    Investigated and collected the Debtors' records (including internal
19              emails) with respect to each of the issues discussed in the Skaggs
                Memo, as well as approximately 25 other accounting issues;

20        (b)    Interviewed all of the Debtors' relevant managers and employees
21              and their outside counsel;

22   [3]   Mr. Taylor is the Chairman of the Equity Committee.  Mr. Taylor is also the director of the
     Taylor International Fund, Ltd. (the "Taylor Fund"), a member of the Equity Committee.
23   According to Mr. Taylor, the Taylor Fund paid 13¢ to 15¢ a share for stock in MMPI after the
     petition date.  *See* Taylor Depos., page 11, line 24 to page 12, line 3 [Chow Decl., Ex. M].  The
24   Taylor Fund and Taylor, through his individual IRA, own approximately 12 million shares of
     stock in MMPI (all of which were purchased postpetition).  *Id*., at page 11, lines 20-23.
25   Mr. Taylor also assisted his parents in buying stock in MMPI.  *Id.*, at page 9, line 24 to page 10,
     line 13.
26

27   [4]   The Equity Committee has jointly propounded discovery with other parties, including, *inter alia*,
     Charlestown, Hartland, the Unsecured Creditors Committee, and secured creditor PNL Pomona
28   (the "Affiliated Partes").

(c)    Prepared and produced a full report regarding the results of
Ernst & Young's independent investigation;

(d)    Produced approximately 1,500 pages of relevant documents –
including the Debtors' internal emails – to the Equity Committee
and its Affiliated Parties; and

(e)    Produced their lead forensic accountant, Amy Hawkes, for a full
day's deposition by the Equity Committee and its Affiliated
Parties.

The Debtors will show at trial that the Ernst & Young investigation was thorough and complete.  The Ernst & Young Report was produced to the Equity Committee as soon as it was released, and the documents underlying that report were produced shortly thereafter.  Further, the Debtors followed up the production of the Ernst & Young Report by searching their records again, and producing some additional documents relating to the issues described in the Skaggs Memo.  In addition, two of the Debtors' independent directors sitting on the Audit Committee (Payne and Hansen) produced thousands of pages of additional documents relating to the issues described in the Skaggs Memo.

Against this backdrop, the Equity Committee filed its Motion *in Limine* seeking to sanction the Debtors for purportedly failing to respond to discovery.  There is no legitimate basis for granting the relief requested by the Equity Committee.  The Debtors have already expended tremendous time, effort and resources in responding to the Equity Committee's discovery requests. The Equity Committee has failed to identify any deficiencies in the Debtors' responses that justify any sanctions against the Debtors, much less the extreme sanctions demanded by the Equity Committee.  Further, the Equity Committee's demand for sanctions fails as a matter of law; the Motion does not even satisfy basic statutory requirements governing sanctions.

Given the gross deficiencies that plague every aspect of the Equity Committee's Motion *in Limine*, it is plain to see that the Motion that the Equity Committee has filed is not simply a motion *in limine*, but rather a variation of the Equity Committee's trial brief that the Court specifically instructed it to not file.[5]  The Equity Committee's Motion is therefore objectionable for

---

[5]    During the status conference held on January 20, 2011, the Court made clear to the Equity Committee that the Court did not want a trial brief.

1    the additional reason that it is an improper attempt to circumvent the Court's edict against burdening

2    the Court and the parties with more trial briefs on the merits.

3                              **II.      STATEMENT OF FACTS**

4    **A.      THE EQUITY COMMITTEE HAS SUBJECTED THE DEBTORS TO**
          **GROSSLY BURDENSOME AND OPPRESSIVE DISCOVERY.**
5

6             In the past two months, the Debtors have managed to accomplish a much more

7    ambitious undertaking than was anticipated when the Court established a schedule for briefing and

8    discovery.  The Debtors filed their opening brief in support of the Debtors' Plan, along with

9    hundreds of pages of supporting materials, filed oppositions to the two competing plans, and filed

10   reply briefs and supporting evidence in response to seven (7) sets of oppositions to the Debtors'

11   Plan.  In addition, the Debtors have filed evidentiary objections to opposing declarations, and

12   responded to evidentiary objections asserted against their own declarations.  The Debtors have also

13   successfully negotiated major settlements with Legendary and East West Bank, which will result in

14   the withdrawal of one of the three competing plans.

15            At the same time, the Debtors have had to face an onslaught of discovery propounded

16   by a team of attorneys representing, among others, the Equity Committee, Charlestown, their

17   Affiliated Parties, and Bank of America.  The Equity Committee and other parties have relentlessly

18   pursued discovery with respect to every aspect of the Debtors' business, regardless of whether it is

19   material to the confirmation trial, and regardless of the cost.

20            In response to this avalanche of discovery demands, the Debtors have gathered and

21   produced *over 85,000 pages* of documents in response to 6 rounds of document requests propounded

22   by various parties (which does include the documents produced in connection with the Rule 2004

23   motion filed by the Creditors Committee and joined in by the Equity Committee, which contained

24   over 20 additional categories of document requests), as follows:

25        1.      Debtors have responded to the Equity Committee's
                  November 2, 2010 "Rule 26 Requests" (the "Equity
26                Committee's 1st Set of Requests");

27        2.      Debtors have responded to the Equity Committee's
                  November 5, 2010 Second "Rule 26 Requests" (comprised of
28

1
2
          5 document requests) (the "Equity Committee's 2nd Set of Requests");

3.      Debtors have responded to the November 18, 2010 Joint
3      Rule 34 Document Requests (comprised of <u>41 document
<u>requests</u> propounded on behalf of the Equity Committee and
4      5 of its Affiliated Parties) (the "Equity Committee's 3rd Set of Requests");

5

4.      Debtors have responded to the December 17, 2010 document
6      requests propounded by Bank of America (comprised of
8 document requests);

7

5.      Debtors have responded to the December 28, 2010 document
8      requests propounded by Bank of America (comprised of
17 document requests); and

9

6.      Debtors have responded to the December 29, 2010 document
10     requests propounded by the Equity Committee (comprised of
10 document requests) (the "Equity Committee's 4th Set of
11     Requests").

12 *See* Chow Decl., ¶ 2.

13          Layered on top of the unrelenting waves of document requests and court filings, the

14 Debtors also have participated in almost twenty depositions in the span of about thirty days. A

15 detailed listing of the specific tasks that had to be accomplished in this short time frame is set forth

16 in the Chow Declaration, ¶ 3.

17          In addition to the foregoing, the Equity Committee and others propounded subpoenas

18 to numerous third-parties to further investigate their claims against the Debtors. *See* Chow Decl.,

19 ¶ 4.

20          All of this is on top of the Ernst & Young investigation, which had already examined

21 the five items set forth in the Skaggs Memo plus many others Mr. Skaggs raised during the

22 investigation. That this investigation had been done by an independent and highly respected firm, at

23 a significant cost to the estate, was apparently of no moment to the Equity Committee.

24          In short, the discovery to date has been breathtaking in scope and neck-breaking in

25 speed. The pace of discovery that has been directed against the Debtors has been unrelenting and

26 largely driven by the Equity Committee and its Affiliated Parties. Any consideration of the Equity

27 Committee's Motion *in Limine* must take into consideration the massive amount of discovery, the

28

                

1    Ernst & Young investigation, and plan confirmation litigation that has taken place in a very limited

2    amount of time.

3    **B.    THE DEBTORS HAVE RESPONDED TO DISCOVERY IN GOOD FAITH
         NOTWITHSTANDING THE BURDENS CREATED BY THE COMPRESSED
4        DISCOVERY AND BRIEFING SCHEDULE.**

5            Despite the burden that has collectively been inflicted upon the Debtors by the Equity

6    Committee and other parties, the Debtors have made a good faith effort to produce documents and

7    respond to discovery.

8            In **October 2010**, the Debtors hired Ernst & Young to conduct an <u>independent</u>

9    <u>investigation</u> into alleged accounting issues alluded to in the Skaggs Memo.[6]  A team of 5

10   investigators from Ernst & Young led by Amy Hawkes, conducted an independent review of, among

11   other things, the issues identified in the Skaggs Memo.[7]  Ms. Hawkes has extensive experience in

12   the field of forensic accounting, including prior experiences at Coopers & Lybrand and Navigant

13   Consulting.  Significantly, she served as an accountant in the division of enforcement with the

14   Securities and Exchange Commission for four (4) years,[8] and she has a law degree.[9]  The Ernst &

15   Young investigative team has:

16          (a)    Reviewed and collected the Debtors' records relevant to the
                   Skaggs Memo as well as approximately 25 other accounting issues
17                 (including internal emails);

18          (b)    Interviewed all of the Debtors' relevant managers and employees;

19          (c)    Prepared and produced a full report regarding the results of its
20                 investigation;

21          (d)    Produced approximately 1,500 pages of relevant documents –
                   including the Debtors' internal emails – to the Equity Committee
22                 and its Affiliated Parties; and

23          (e)    Produced their lead forensic accountant, Amy Hawkes, for a full
                   day's deposition by the Equity Committee and its Affiliated
24                 Parties.

25   [6]   Ernst & Young's investigation was interrupted and delayed several times by the Equity
           Committee's objections to employment and numerous other tactical maneuvers.

26   [7]   *See* Hawkes Depos., page 30, lines 21-24 [Chow Decl., Ex. N].

27   [8]   *See* Hawkes Depos., page 12, lines 3-23 and page 14, lines 4-9 [Chow Decl., Ex. N].

28   [9]   *See* Hawkes Depos., page 14, lines 1-3 [Chow Decl., Ex. N].

1   *See* Chow Decl., ¶ 5.

2         On **November 18, 2010**, the Equity Committee and its other Affiliated Parties

3   propounded their Joint Rule 34 Document Requests, which included *41 document requests*.  Certain

4   of the requests related to some of the accounting issues described in the Skaggs Memo.[10]

5         On **December 13, 2010**, the agreed-upon response deadline, the Debtors produced

6   *75,118 pages of documents* in response to the Joint Rule 34 Document Requests.[11]  Among other

7   things, the Debtors produced documents relating to the specific issues described in the Skaggs

8   Memo that were requested by the Equity Committee and its Affiliated Parties.

9         On **December 20, 2010**, Ernst & Young issued its Report on the five items in the

10  Skaggs Memo plus approximately 25 others.  In addition, on **December 23, 2010**, Ernst & Young

11  produced its supporting documentation with regard to the investigation.  The documents were

12  produced to the Equity Committee and their Affiliated Parties.  *See* Chow Decl., ¶ 23.  Given that

13  Ernst & Young had spent a significant amount of time and effort collecting relevant documents from

14  the Debtors, and the Debtors had cooperated in that process, the Debtors relied on the fact that Ernst

15  & Young would produce documents that would also be responsive to the Equity Committee's Joint

16  Rule 34 Requests.  Indeed, Ernst & Young produced approximately 1,500 pages of such documents.

17        On **January 6, 2011**, the Equity Committee deposed Amy Hawkes.  Ms. Hawkes'

18  investigation and her background have been fully reviewed and vetted by all parties in interest,

19  including the Equity Committee.  The Debtors intend to call Ms. Hawkes as a witness at trial, where

20  she will be given the opportunity to describe Ernst & Young's investigation and its conclusions.

21  Many other witnesses were also deposed about these issues, including Messrs. Payne, Meruelo,

22  Maddux, Nielsen, Murray, Echemendia, Garcia and other employees of the Debtors, and several

23  third party witnesses.

24        In addition, the Equity Committee served subpoenas on two independent board

25  members sitting on the Debtors' Audit Committee, Philip S. Payne and John B. Hansen.  On or

26

27  [10]   *See* November 18, 2010 Joint Document Requests [Chow Decl., Ex. D].

28  [11]   *See* Chow Declaration, ¶ 22.

1   about **December 22, 2010**, Mr. Hansen produced over *1,500 pages* of his records regarding, among

2   others, the Skaggs Memo (bates labeled JH 000001-1673).  *See* Chow Decl., ¶ 24.  On or about

3   **January 3, 2011**, Mr. Payne produced approximately *1,200 pages* of documents, which included,

4   among other things, emails relating to the Audit Committee's investigation into the Skaggs Memo

5   and the engagement of Ernst & Young to investigate the issues identified in the Skaggs Memo.  *See*

6   Chow Decl., ¶ 24.

7            On **January 6, 2011**, the Debtors also responded to the Equity Committee's

8   "Rule 26" document requests that were originally propounded on November 5, 2010.[12]  In the

9   Equity Committee's Rule 26 Requests, document request number 1 requested "all Documents

10  concerning the Skaggs Document, including but not limited to all Documents concerning

11  investigation of any Skaggs Document and matters described therein."  In response, the Debtors

12  referred the Equity Committee to the Debtors' prior document production, the Ernst & Young

13  production, the Payne production, and the Hansen production – since the Skaggs related documents

14  had already been produced.[13]  In addition, document request number 5 requested "all Documents

15  concerning any potential, proposed or actual transfer, receipt, deposit, disbursement, purchase, sale

16  or other transaction to, with, or from Merco Group – 2040 Camfield Ave., LLC."  In response, on

17

18   [12]  The Debtors had initially objected to the Equity Committee's Rule 26 requests on numerous
19        grounds, including that Rule 26 does not provide for document requests.  The Court held that the
         Debtors should nonetheless respond to the Rule 26 requests, although no specific order was
20        issued with regard to when the responses would be due.  In any event, on January 6, 2011, the
         Debtors provided responses.

21   [13]  *See* January 6, 2011 Debtors' Response to Rule 26 Requests, page 6 [Chow Decl., Ex. J].  There
22        was no need for the Debtors to re-produce documents that had already been produced.  Indeed,
         the Equity Committee, Charlestown, Hartland, and the Creditors Committee all took the exact
23        same position.  For instance, the Equity Committee stated that it would not produce documents
         that the Debtors already have:  "The Equity Committee objects to the Request to the extent they
24        seek or call for documents . . . already in the Debtors' possession, custody or control . . ."  *See*
         December 9, 2010 Responses and Objections to First Request for Production of Documents by
25        Debtors to Equity Committee, page 2, lines 14-17.  [Chow Decl., Ex. F].  *See also* December 13,
         2010 Charlestown Capital Advisors, LLC's and Hartland Asset Management Corporation's
26        Responses to First Request for Production of Documents by Debtors, page 3, lines 15-18 [Chow
         Decl., Ex. H]; December 16, 2010 Official Committee of Unsecured Creditors' Response to First
27        Request for Production of Documents by Debtors to Creditors Committee, page 3, lines 16-19
28        [Chow Decl., Ex. I].

1    January 6, 2011, the Debtors produced approximately *540 pages* of documents relating to the sale of

2    the 2040 Camfield property (bates labeled MMPI 80894-81433).  *See* Chow Decl., ¶ 25.

3            Discovery cut-off for written discovery was **January 7, 2011**.  On the evening of

4    **January 10, 2011** (3 days *after* the discovery cut-off), counsel for the Equity Committee advised

5    Debtors' counsel for the *first time* in a phone call that it believed that the Debtors' document

6    production was deficient on the grounds that no internal emails had been produced (which was false)

7    and that it intended to file a motion to compel.  When the Debtors' counsel requested clarification as

8    to what specific categories of emails that the Equity Committee wanted (out of the approximately 60

9    document requests that have been propounded), counsel for the Equity Committee *refused* to specify

10   a specific category of documents and claimed deficiencies with respect to the Debtors' response to

11   *all* document requests.  The only possible limitation mentioned by the Equity Committee's counsel

12   was that the Equity Committee might scale back its demands *in its motion to compel*.  *See* Chow

13   Decl., ¶¶ 6-9. (As set forth more fully in Part III.B.2 below, the Equity Committee has refused to

14   meet and confer in good faith.)

15           Notwithstanding the Equity Committee's unreasonable demand for supplemental

16   productions with respect to approximately 60 document requests, the Debtors nonetheless offered to

17   look for additional emails with respect to the issues identified in the Skaggs Memo.[14]  The Debtors

18   have since made a good faith attempt to identify any additional non-privileged emails that have not

19   previously been produced – including emails from Mr. Meruelo and Mr. Skaggs (who, the Equity

20   Committee alleged did not previously search for responsive emails relating to the Skaggs Memo).

21           On **January 12, 2011**, the Debtors produced additional emails relating to, among

22   other things, the Skaggs Memo in general, although none of the new emails specifically related to

23   the three issues that were the subject of the Equity Committee's Motion.  *See* Chow Decl., ¶ 26.

24           On **January 21, 2011**, the Debtors produced additional emails relating to, among

25   other things, the Skaggs Memo in general.  Out of the new emails that could be located, the only

26   emails that specifically related to the three transactions at issue are certain emails from Fred Skaggs

---

27   [14]  *See* January 12, 2011 email from Carol Chow (Stutman) to Brian Fischer (Jenner & Block)

28        [Chow Decl., Ex. B].

1   (MMPI 81767-81783), and an email dated October 13, 2010 from Miami-Dade County Clerk to

2   Richard Meruelo confirming the request for the $100,000 refund for bidder number 20353 (MMPI

3   81784).  These emails have been produced.  *See* Chow Decl., Ex. R.

### III.    LEGAL ARGUMENT

**A.    THE NON-PRIVILEGED DOCUMENTS REGARDING THE THREE
TRANSACTIONS HAVE ALREADY BEEN PRODUCED.**

7           The Equity Committee's request for evidentiary sanctions based on its allegation that

8   the Debtors have failed to produce any internal documents with respect to the three transactions is

9   based upon a demonstrably false premise.

10          As detailed above and demonstrated below, the Debtors have already produced all

11  non-privileged and responsive documents with respect to the three transactions that could be located.

12  In addition, Ernst & Young has thoroughly investigated the issues identified in the Skaggs Memo, at

13  a tremendous cost to the estate.[15]  The Ernst & Young Report was produced to the Equity

14  Committee as soon as it was released, and the documents underlying that report were produced

15  shortly thereafter.  The Debtors understand that the Equity Committee is vigorously objecting to the

16  admission of the Ernst & Young Report on the grounds of hearsay.  It is simply mind boggling that

17  the Equity Committee would try to prevent the Court from considering the Ernst & Young Report,

18  given the history of this case and the shrill and scurrilous nature of the Equity Committee's

19  allegations.  It is clear why the Equity Committee is fighting the admission of the Report – it simply

20  does not like the result of the independent investigation.  The Debtors will respond to that

21  evidentiary argument if and when it is actually raised at trial.[16]  Further, the Debtors followed up the

---

[15]  Ernst & Young charged the estate approximately $150,000 for the investigation and report.  That
does not include the additional costs associated with the discovery that the Equity Committee has
propounded to Ernst & Young and Amy Hawkes.

[16]  The Debtors submit that the Ernst & Young Report is admissible both for purposes of this
Motion and at trial.  As just one example with respect to its admissibility on this Motion, Ernst &
Young was involved in the process of collecting the Debtors' documents and producing them to
the Equity Committee and other parties in interest.  The Equity Committee, however, has
vigorously objected to the admissibility of the Ernst & Young Report, notwithstanding the fact
that it has included it on its list of trial exhibits.  Rather than unilaterally attaching the Ernst &
Young Report in opposition to the Motion, the Debtors offer to provide it should the Court

1    production from Ernst & Young by searching for and producing additional documents relating to the

2    issues described in the Skaggs Memo.  In addition, the Debtors' independent directors sitting on the

3    Audit Committee (Payne and Hansen) produced thousands of pages of additional documents relating

4    to the transactions described in the Skaggs Memo.

5             Further, the Equity Committee and its Affiliated Parties have already conducted

6    extensive and duplicative discovery, including, among other things, deposing Mr. Skaggs and other

7    members of the Debtors' management, deposing one of the audit committee board members, and

8    deposing Amy Hawkes, the forensic accounting partner at Ernst & Young that led the investigation

9    into the Skaggs Memo.

10        **1.    The Non-Privileged Documents Relating To The $1,925,000 Cashier's
              Check To Magnum Properties That Could Be Located Have Already
11            Been Produced.**

12            The first transaction for which the Equity Committee claims that the Debtors have

13    purportedly "denied the Equity Committee the internal documents" is the $1,925,000 Cashier's

14    Check payable to Magnum Properties.  As demonstrated below, the non-privileged and responsive

15    documents regarding this matter have been produced.

16            By way of background, the evidence will show that for some years, Mr. Meruelo had

17    been aware of a nearby downtown property which he thought would be an attractive acquisition if it

18    became available at a favorable price.  He became aware of the fact that the property was

19    encumbered by a note and deed of trust of approximately $3,800,000, and that the note had fully

20    matured.  He thought that if the Debtors could acquire the note at a substantial discount, it might be

21    an avenue to acquire the property, or at worst, reap a substantial profit if the note were paid off.  He

22    decided to see if the Debtors could acquire the note.  The evidence will show that if the negotiations

23    were successful, due diligence and submission to MMPI's Board would ensue.  In consultation with

24    a broker of his acquaintance, Mr. Meraz of Magnum Properties, Mr. Meruelo decided to submit a bid

25    of $1,925,000, a 50% discount on the note.

26    _____

27    determine that it would like to review it at this time.  The Debtors will deal with the Equity
      Committee's objection to admissibility at trial should the Equity Committee continue to press
28    that position.

1    Mr. Meruelo asked an employee of the Debtors, Mr. Echemendia, who in turn asked

2 another employee, Mr. Garcia, to obtain an $1,925,000 cashier's check and send a copy of the check

3 to provide "proof of funds" to qualify the Debtors to timely bid on the note. Unbeknownst to

4 Mr. Meruelo, only John Maddux had authority to authorize a check in that amount. Unfortunately,

5 Mr. Maddux was out of the office, so Mr. Garcia obtained the requested funds by making four

6 separate check requests for smaller amounts under $500,000 (which Mr. Meruelo was authorized to

7 approve), and turned them into one cashier's check in the amount of $1,925,000. After the cashier's

8 check was obtained, a copy of the check was provided to a real estate broker (i.e., the original

9 cashier's check was never given to the broker or any third-party). On that same day, the cashier's

10 check was redeposited into the very same bank account.

11    As demonstrated by the documents that have already been produced – and as will be

12 further established at trial – no funds were misappropriated, nor was there any attempt to

13 misappropriate funds. Indeed, there was never any intention that the funds leave the Company, nor

14 did the funds ever go to a third party. The entire transaction was designed simply to demonstrate

15 that the Debtors had sufficient funds to make a bid, which bid ultimately turned out to be

16 unsuccessful.

17    The Debtors have produced for deposition all of their employees with material

18 knowledge of the transactions identified in this transaction. In addition, they have produced

19 hundreds of pages of documents relating to the Skaggs Memo and this transaction in particular.

20 Although the following is not meant to be a comprehensive listing of all documents that have been

21 produced relative to this transaction, the following demonstrates that the Equity Committee's

22 allegations of non-production are bogus:

23    (1)    An internal email dated August 16, 2010 from Marcial Garcia to

24           Michelle Jeanmarie, which provided (MMPI 73106 [Chow Decl.,

25           Ex. P]):

26           "Michelle, Please prepare a check from: 2040 Camfield
             Properties (East West a/c/ # 80994643) to: CASH (Cashiers
27           Check payable to MAGNUM PROPERTIES).

28           The amount is $1,925,000.00

The G/L code is: Deposit-Purchases.

Please route approval to Richard Meruelo."

(2)    Email notifications sent by the accounting system "ProcessManager" to Fred Skaggs on August 16, 2010 at 9:52 a.m. advising him of the 4 checks issued from the Camfield Account on August 16, 2010 to Magnum Properties regarding "Deposit Purchases." (MMPI 81771-81774 [Chow Decl., Ex. R]).

(3)    A copy of, among other things, the front and back of each of the 4 checks in question dated August 16, 2010 drawn from the account of 2040 Camfield Avenue, LLC (the "Camfield Account") (MMPI 73112 [Chow Decl., Ex. P]).

(4)    A copy of the $1,925,000.00 cashier's check along with a deposit slip dated August 16, 2010 and a notation on the check that stated "not used for its intended purposes" (EY-MERU-RPT-000254 [Chow Decl., Ex. Q]).

(5)    August 19, 2010 email from Fred Skaggs to Fred Skaggs (email to himself) documenting the $1,925,000 transaction. The email provided (MMPI 81781 [Chow Decl., Ex. R]):

> "Steven E. Voskanian, Consultant for FTI, wanted to review our latest cash report. We revised the report and I informed him that we had made a disbursement after preparing the cash report of $1,925,000. After telling this to Steve, I later asked John Maddux if [he] had any more insights. John said he had talked to Richard and Richard said we just gave Maroz a copy of the cashiers check. No money had or would be transferred from any of the accounts of MMPI."

(6)    A long email chain dated August 19, 2010 and August 20, 2010 between Debtors' employees (including Edward Laufer, Michelle Jeanmarie, and Miguel Echemendia) and U.S. Bank regarding

1 establishing the Camfield Account at U.S. Bank (MMPI 73118-

2 73124 [Chow Decl., Ex. P]).

3  (7) A copy of the bank statement for the Camfield Account showing the

4 August 24, 2010 re-deposit of the $1,925,000 check as well as the

5 ending balance of $1,935,000 as of August 31, 2010 (MMPI 73113-

6 114 [Chow Decl., Ex. P]).

7  (8) A copy of a bank statement for the period ending September 30,

8 2010, showing that the Camfield Account at U.S. Bank is a debtor in

9 possession account (EY-MERU-RPT-000240 [Chow Decl., Ex. Q]).

10  (9) A chart entitled "Summary Schedule of Cash," which shows the

11 ending balance for the month of August 2010 for the Camfield

12 Account as $1,935,000 (MMPI 73114 [Chow Decl., Ex. P]).

13  (10) A chart entitled "Bank Reconciliation" which shows that the ending

14 balance as of August 31, 2010 for the Camfield Account was

15 $1,935,000 (MMPI 73115 [Chow Decl., Ex. P]).

16  (11) An excerpt from a chart entitled "Total Disbursements from All

17 Accounts for Current Period," which shows the 4 checks (MMPI

18 73116 [Chow Decl., Ex. P]).

19  (12) The general ledger for the Camfield Account, which shows the

20 4 check amounts, each with the remark "Magnum

21 Properties/RE . . ." (MMPI 73117 [Chow Decl., Ex. P]).

22  (13) Printout from the Debtors' accounting database, "Process Manager,"

23 which shows the accounting details of each of the 4 checks (MMPI

24 73107-110 [Chow Decl., Ex. P]).

25  Thus, the non-privileged documents relating to this particular transaction

26 that could be located have been produced.

27

28

      

**2.      The Non-Privileged Documents Relating To The $100,000 Wire Transfer
To The Florida Court That Could Be Located Have Already Been
Produced.**

The Debtors have also produced the non-privileged documents relating to the

$100,000 wire transfer to the Florida Court.

By way of factual background, the evidence will show that on June 2, 2010,

Mr. Meruelo directed Mr. Echemendia, the debtor's Chief Administrative Officer, to make two wire

transfers to the Florida court clerk: one of $100,000 of the Debtors' money, and the other of $3,000

of Mr. Meruelo's own money.  Mr. Meruelo will testify that he intended to have the corporation bid

on one specific property with MMPI's money, and to use his own funds to bid on other properties

personally.  He told Mr. Echemendia to establish two separate accounts, so that his own funds would

not be commingled with MMPI's, and Mr. Echemendia did exactly that.  The corporate payment of

$100,000 is shown on Ex. I-1 and I-2 of the Skaggs Memo, showing bidder number 20353 on both

documents.  At trial, the Debtors will introduce additional documentary evidence on the identical

forms, showing the deposit of Mr. Meruelo's own $3,000 with a separate bidder number.

Nevertheless, the Florida court clerk mistakenly commingled the two deposits into

one account.  That account was in the Debtors' name alone, and Mr. Meruelo's name does not

appear on it.  The evidence will show that not a penny of the Debtors' money ever left that account,

and that the full $100,000 was returned to the Debtors after the bid was unsuccessful.

As to the intended purpose of this deposit, Mr. Meruelo's testimony will show that he

was aware of a specific property, a single-family home fronting on Ocean Boulevard in Miami

Beach, with a value of at least $3,000,000.  Mr. Meruelo knew of potential buyers for the house

willing to pay roughly $3,250,000 who were not aware of the foreclosure sale.  He saw an

opportunity for MMPI to profit from his knowledge and the potential opportunity to get the property

cheaply at the foreclosure sale, and took the first step toward such a transaction by making MMPI an

eligible bidder with the deposit.  Mr. Meruelo bid $1,000,000 on behalf of MMPI, but the bid was

unsuccessful.  The full $100,000 was subsequently returned to MMPI.

Although the following is not meant to be a comprehensive listing of all documents that have been produced relative to this transaction, the following demonstrates that the Equity Committee's obligations of non-production regarding this matter are bogus:

(1)   Printout from the accounting database showing the $100,000 wire transfer (MMPI 73124) [Chow Decl., Ex. P].

(2)   September 21, 2010 memo from Skaggs to the Audit Committee: "We verified that $100,000 in funds is on deposit with the Miami-Dade County Clerk for the benefit of MMPI in an account in the name of MMPI."[17]

(3)   October 13, 2010 email from Richard Meruelo to Miguel Echemendia and Marcial Garcia forwarding the Florida Court's approval of the refund request for bidder number 20353, <u>which is identified as Meruelo Maddux Properties, Inc.</u> (EY-MERU-RPT 000072-77) [Chow Decl., Ex. Q].

(4)   October 19, 2010 email exchanged between John Bonds and Fred Skaggs regarding approval of transfers over $100,000 (MMPI 81782-83) [Chow Decl., Ex. R].

(5)   "Outgoing Wire Funds Transfer Request" form for the $100,000 wire transfer to "Harvey Ruvin, Clerk of Courts" for bidder number 20353 (EY-MERU-RPT 000067, 71) [Chow Decl., Ex. Q].

(6)   "Wire Transfer Instructions" of Miami-Dade County Clerk of Court, showing the wire transfer of $100,000 for bidder number 20353 (EY-MERU-RPT 000068) [Chow Decl., Ex. Q].

(7)   Excerpt from a chart entitled "Total Disbursements from All Accounts for Current Period" (from Monthly Operating Reports),

---

[17]  *See* September 21, 2010 memorandum from Fred Skaggs to Phil Payne, John Hansen, and Mayor Anthony Williams [Chow Decl., Ex. O].

showing $100,000 disbursement to "Harvey Ruvin, Clerk."  (EY-

MERU-RPT 000070) [Chow Decl., Ex. Q].

(8)    Printout from the accounting database showing the October 19, 2010

$100,000 wire (EY-MERU-RPT 000078) [Chow Decl., Ex. Q].

(9)    Documentation regarding the deposit of $100,000 (EY-MERU-RPT

000087) [Chow Decl., Ex. Q].

(10)    Documentation relating to a separate transfer of $3,000 for bidder

number 16358 (Richard Meruelo) from Mr. Meruelo's personal

account (EY-MERU-RPT 000079-86) [Chow Decl., Ex. Q].

(11)    This transaction was also reported in the Monthly Operating Reports, which

was filed with the Court.[18]

The Equity Committee's claim -- that no internal documents or emails relating to this

transaction have been produced -- is entirely false.  As demonstrated above, the non-privileged

documents relating to this particular transaction that could be located have been produced.

**3.    The Non-Privileged Documents Relating To The $200,000 Check Made
Payable To Commerce Escrow That Could Be Located Have Already
Been Produced.**

The Debtors have also produced the non-privileged documents with regard to the

$200,000 check made payable to Commerce Escrow.  By way of background, Mr. Meruelo learned

that a property in downtown Los Angeles might be available that would make an attractive

acquisition for MMPI.  It had been for sale, and was in escrow to another buyer at a good price, but

Mr. Meruelo heard that the escrow might not close.  Mr. Meruelo decided to make a back-up offer

identical to the existing one, believing that the seller might accept it if the original buyer did not

close.  A collateral benefit of this route was to obtain financial information, *e.g.*, current interest

rates and loan terms, that would assist in the formulation of some of the economic underpinnings of

the Debtors' Plan.

---

[18]    *See* Monthly Operating Report Number 16 (For the Month Ending June 30, 2010), filed on
July 15, 2010, Docket No. 1602-1, page 2 of 32.

1    On August 5, 2010, Mr. Meruelo approved a $200,000 check to Commerce Escrow

2 for the purpose of submitting a back-up offer on that property that was in close proximity to one of

3 the Debtors' properties, the Alameda Produce Market.  However, the escrow with the original buyer

4 closed.  Accordingly, the check was *never cashed*, and was instead returned to the Debtors.  Mr.

5 Skaggs placed a stop payment on the check on September 21, 2010.

6    Although the following is not meant to be a comprehensive listing of all documents

7 that have been produced relative to this transaction, the following demonstrates that the Equity

8 Committee's allegations of non-production in connection with this matter are bogus:

9    (1)    August 5, 2010 invoice from Commerce Escrow Company,

10         documenting an opening deposit in the sum of $200,000 for escrow

11         number 10-55602-DB for Alameda Produce Market.  (EY-MERU-

12         RPT 000256) [Chow Decl., Ex. Q].

13    (2)    Computer printout of Debtors' accounting database showing

14         August 5, 2010 $200,000 deposit with Commerce Escrow for

15         Alameda Produce Market, LLC.  (EY-MERU-RPT 000257) [Chow

16         Decl., Ex. Q].

17    (3)    Voided August 5, 2010 check for $200,000 by Alameda Produce

18         Market, LLC, to Commerce Escrow.  (EY-MERU-RPT 000258)

19         [Chow Decl., Ex. Q].

20    (4)    Computer printout from "ProcessManager" of August 5, 2010

21         $200,000 payment to Commerce Escrow, indicating "Opening

22         Deposit – Escrow # 10-55602-DB."  (EY-MERU-RPT 000259)

23         [Chow Decl., Ex. Q].

24    (5)    General Ledger of Alameda Produce Market, LLC showing August 5,

25         2010 $200,000 for "Opening Deposit – Escrow # 10-55602." (EY-

26         MERU-RPT 000260) [Chow Decl., Ex. Q].

27    (6)    General Ledger of Alameda Produce Market, LLC showing

28         September 22, 2010 reversal of $200,000 for "Opening Deposit –

547827v1                                   19

1    Escrow # 10-55602." (EY-MERU-RPT 000261) [Chow Decl.,

2    Ex. Q].

3        The non-privileged documents relating to this particular transaction that could be

4    located have been produced.

5        The Equity Committee complains that while Mr. Meruelo testified that he provided

6    Commerce Escrow with a written offer, both the Debtors and Commerce Escrow failed to produce a

7    copy of the offer.  The Debtors have not located a copy of the written offer.  To the extent the offer

8    can be located, the Debtors will produce it.  However, the fact that the Debtors did not have a

9    particular document from an *unconsummated* transaction which involved an *un-cashed* check is

10   hardly a basis for issuing harsh evidentiary sanctions.

11   **B.    THE MOTION *IN LIMINE* SHOULD BE DENIED BECAUSE THE RELIEF
12       REQUESTED IS DIRECTLY CONTRARY TO APPLICABLE STATUTES
         AND CASE LAW.**

13       **1.    The Equity Committee Cannot Circumvent The Due Process
14           Requirements Of The Federal Rules Of Civil Procedure.**

15       Leaving aside the falsity of the Equity Committee's factual allegations, its Motion *in*

16   *Limine* must be denied because, based on the applicable Federal Rules of Civil Procedure ("FRCP")

17   and Ninth Circuit law, the Equity Committee is not entitled to seek evidentiary sanctions in the

18   absence of a violation of a discovery order.  There has been no such order, let alone a violation of

19   one.

20       A request for sanctions for failure to make disclosures or to cooperate in discovery is

21   governed by FRCP 37, made applicable to adversary proceedings and contested matters by

22   FRBP 7037.  FRCP 37 provides that if a party "fails to obey an <u>order</u> to provide or permit

23   discovery," then the Court may issue sanctions and direct that "(i) the matters embraced in the order

24   or other designated facts be taken as established for purposes of the action, as the prevailing party

25   claims."  *See* FRCP 37(b)(2)(A) (emphasis added).

26       As the Ninth Circuit has held, FRCP 37 sanctions are "applicable only to cases in

27   which a party has disobeyed a court order."  *In re Rubin*, 769 F.2d 611, 616 (9th Cir. Cal. 1985).  In

28

*Rubin*, the Ninth Circuit reversed a bankruptcy court's order issuing sanctions without first ordering

further production or without first entertaining a motion to compel:

> At no time did the court give any warning; **at no time did it order further production, nor did Creditors ever move to compel further production**.

> A party should be given some indication by the court of how its discovery responses have been deficient. Moreover, it is common practice for trial courts to issue warnings or to make orders of default or dismissal conditional on a party's continued noncompliance with an outstanding order to compel.  In several of our cases, such warnings were an important factor in upholding the use of severe sanctions.  *See, e.g.*, *Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council, Inc.*, 727 F.2d at 1474 (district court entered order to produce or risk having certain facts established); *Rainbow Pioneer No. 44-18-04 A v. Hawaii-Nevada Investment Corp.*, 711 F.2d 902, 904 (9th Cir. 1983) (magistrate's order to respond to interrogatories and produce documents contained warning that failure to comply would result in default); *United States v. Sumitomo Marine & Fire Insurance Co.*, 617 F.2d at 1367 (district court entered order that unless interrogatories were answered by certain date, complaint would be dismissed).

> In *In re Visioneering Construction*, 661 F.2d at 119, a case strongly relied upon by Creditors, the bankruptcy court repeatedly accommodated an alleged debtor in involuntary proceedings before striking its answer as a sanction for discovery abuses.  The court 'bent over backward, including . . . setting over hearings on the motion to enter default to give [the debtor] another chance to comply with discovery orders.' *Id*. at 123.

> In contrast, the bankruptcy court in this case did not have before it any outstanding motions for sanctions or motions to compel when it ordered that Rubin's answer be stricken.  The court did not conditionally order further production nor did it warn Rubin at any time that it was contemplating dismissal.

*In re Rubin*, 769 F.2d 611, 616-617 (9th Cir. 1985) (emphasis added).

Likewise in this case, the Equity Committee has never obtained a discovery order

against the Debtors, nor have the Debtors violated any such orders.  Accordingly, the Equity

Committee is not entitled to seek evidentiary sanctions (let alone the severe ones it is seeking)

because it has failed to satisfy the prerequisites for seeking such types of relief.

1    Notably, in its Motion, the Equity Committee completely ignores FRCP 37, in the

2  naïve hope that the Court would ignore the due process requirements set forth in the FRCP.  The

3  Equity Committee offers <u>no</u> legal authority for the proposition that the Court can simply disregard

4  the procedural due process requirements set forth in FRCP 37.  Instead, the Equity Committee cites

5  to a litany of cases that have no application to the case at hand.

6    For instance, in *In Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp*, 982 F.2d

7  363, 368 (9th Cir. 1992), the plaintiff sued the manufacturer of a space heater that allegedly caused a

8  fire and extensively damaged a yacht.  Prior to filing the suit, the plaintiff had experts examine the

9  heater, and then destroyed the heater.  Because the destruction of evidence was not in dispute, and

10  the destruction precluded the defendant from any opportunity to inspect the evidence, all other

11  evidence that could potentially be considered was rendered unreliable.  *Id*. at 369.[19]  *Unigard* is not

12  applicable; there is no allegation (let alone proof) of spoliation of evidence in the Equity

13  Committee's Motion, and moreover, the Debtors have produced all non-privileged documents that

14  could be located with respect to the three transactions.

15    Other cases relied upon by the Equity Committee involve litigants who did not even

16  bother to respond to discovery.  For instance, in *Henry v. Gill Industries, Inc*., 983 F.2d 943, 947

17  (9th Cir. 1993), the defendant failed to answer interrogatories or submit to a deposition for 8 months

18  and failed to appear at two properly noticed depositions.  Further, the delay caused irreparable

19  prejudice because one of the key witnesses died in the interim.  In *Pacific Marine Center, Inc. v.*

20  *Silva*, No. 09-1409, 2010 WL 344833, at *1-2 (E.D. Cal. Sept. 1, 2010), the plaintiff failed to appear

21  for her deposition (although the Court did not issue sanctions).

22    The Equity Committee's cases are inapposite.  Here, the Debtors not only provided

23  written responses to discovery, they produced all non-privileged documents that could be located

24

25  [19]  Likewise, in *U.S. v. ACB Sales & Service, Inc.*, 95 F.R.D. 316, 318 (D. Ariz. 1982), the Court

26  issued sanctions after the defendant destroyed documents with the intent to suppress the evidence
even though the defendant was on notice that the documents were required by statute to be

27  retained.  In *National Ass'n of Radiation Survivors v. Turnage*, 15 F.R.D. 543, 555 (N.D. Cal.
1987), it was undisputed that the defendant destroyed relevant documents – the defendant's

28  counsel actually conceded the point.

with respect to the three transactions.  Moreover, the Debtors produced for deposition (by the Equity Committee and others) no less than eight of their employees of the Debtors, and several other witnesses testified, including Amy Hawkes (Ernst & Young) and Gaelle Gralnek (outside counsel). The Debtors further provided over a thousand pages of documents produced by Ernst and Young.

In sum, the Equity Committee's Motion fails as a matter of law because it does not comport with FRCP 37.

### 2. The Equity Committee Has Failed To Meet And Confer In Good Faith, A Statutory Prerequisite To Its Motion.

Further, in order to even qualify to seek sanctions under either FRCP 37(b) or FRCP 37(d), the moving party must first meet and confer in good faith.  The Equity Committee has also failed to meet this fundamental prerequisite.

Meet and Confer Requirement under Rule 37(b):  Pursuant to Rule 37(b), the moving party must first obtain a court order mandating responses to the document requests (which, as referenced above, has not been obtained).  In order to obtain such an order, the moving party must include a certification that the movant has "in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." See FRCP 37(a)(1). [20]  Further, Local Bankruptcy Rule 7026-1(c)(2) provides:

> "(2)  Meeting of Counsel.  Prior to the filing of any motion relating to discovery, **counsel for the parties must meet in person or by**

---

[20]  *Sanchez v. Wash. Mutual Bank (In re Sanchez)*, 2008 Bankr. LEXIS 4239, 3-5 (Bankr. E.D. Cal. Sept. 8, 2008) (motion to compel is not facially valid if it does not include a certification that "specifically convey[s] to the court who, where, how, and when the respective parties attempted to personally resolve the discovery dispute…" and… "set[s] forth essential facts sufficient to enable the court to pass a preliminary judgment on the adequacy and sincerity of the good faith conferment between the parties. That is, a certificate must include, *inter alia*, the names of the parties who conferred or attempted to confer, the manner by which they communicated, the dispute at issue, as well as the dates, times, and results of their discussions, if any"); *Las Vegas Hilton v. Sun (In re Sun)*, 2007 Bankr. LEXIS 3676, 10-11 (Bankr. C.D. Cal. Oct. 30, 2007) (issuing sanctions against party filing motion to compel for failure to file stipulation that parties conferred in good faith as required by FRCP 37(a)(2)(A) and the applicable local rules); *Leimbach v. Lane (In re Lane)*, 302 B.R. 75 (Bankr. D. Idaho 2003) (denying motion to compel upon finding failure to file a certification that the parties have unsuccessfully met and conferred in an attempt to resolve a discovery dispute without judicial intervention in accordance with FRCP 37(a)(2)(B), incorporated herein by Fed. R. Bankr. P. 7037).

**telephone in a good faith effort to resolve a discovery dispute**. It is the responsibility of counsel for the moving party to arrange the conference. Unless altered by agreement of the parties or by order of the court for cause shown, **counsel for the opposing party must meet with counsel for the moving party within 7 days of service upon counsel of a letter requesting such meeting and specifying the terms of the discovery order to be sought**."

*See* Local Bankruptcy Rule 7026-1(c)(2) (emphasis added).

    <u>Meet and Confer Requirement under Rule 37(d)</u>:  Likewise, a request for sanctions under Rule 37(d) must be preceded by a meet and confer in a good faith effort to negotiate a compromise.  FRCP 37(d)(1)(B) provides:  "[a] motion for sanctions for failing to answer or respond must include a certification that the movant has in good faith conferred or attempted to confer with the party failing to act in an effort to obtain the answer or response without court action."

    In this instance, the Equity Committee did not even bother to send a meet and confer letter to identify any of the deficiencies set forth in its Motion (as required under Local Bankruptcy Rule 7026-1(c)(2)).  Instead, on January 9, 2011, the Equity Committee sent an email requesting a meet and confer to discuss questions in regard to the Debtors' privilege log.  The Debtors agreed to meet and confer by telephone on January 10, 2011.  However, once the telephonic meet and confer commenced, counsel for the Equity Committee – without advance warning – launched into a wide range of discovery issues, none of which were mentioned in the email.  *See* Chow Decl., ¶ 7.  This was the first time that the Equity Committee informed the Debtors of its belief that the Debtors' document production was deficient because, according to the Equity Committee, internal emails were not produced.  (As set forth above, this assertion is a complete fabrication.)

    When the Debtors' counsel requested clarification as to what specific requests (out of the approximately 60 document requests that have been propounded) the Debtors should address, counsel for the Equity Committee *refused to specify a specific document request and claimed deficiencies with respect to all discovery*.  The only concession made by the Equity Committee's counsel was that the Equity Committee might scale back its demands *in its motion to compel*.  It is hardly a good faith meet and confer if, as the confirming email from Debtors' counsel stated, the demanding party refuses to specify what particular deficiencies need to be addressed:

"... as I stated to you repeatedly on our call, **we would be willing to go back and look for emails with regard to specific document requests, but we simply do not have the time or resources to look for emails with respect to 50-60 document requests at this time, many of which were entirely overbroad, not limited to the relevant time period, and cover entirely irrelevant subject matters. You repeatedly refused to identify for me a discrete list of document requests to follow-up on** and insisted that the demand for internal emails applied to all document requests. Your position is simply untenable, particularly so at this point in the litigation. . . . At the end, you did agree to possibly scale back your document requests *in your motion to compel* -- without providing us with prior notice of your purported compromise and without providing us with an opportunity to respond beforehand. The purported meet and confer is not in good faith when you make an impossible demand that you know we would be forced to reject, just so that you would have an excuse to file a motion to compel."[21]

The Equity Committee has plainly failed to meet and confer *in good faith*. Instead, the Equity Committee insisted on supplemental production with respect to *all* document requests – most of which were hopelessly overbroad and burdensome[22] – so as to make the Debtors' compliance virtually impossible. The Equity Committee's only goal here was to create the illusion of non-compliance and an impasse in order to justify further motion practice – not to resolve any legitimate discovery disputes in good faith. The fact that the Equity Committee then filed the Motion on only three of the transactions in the Skaggs Memo, jettisoning scores of other requests, is proof that the meet and confer was no more than bad faith posturing by the Equity Committee.[23]

---

[21]  *See* January 12, 2011 email from Carol Chow (Stutman) to Brian Fischer (Jenner) [Chow Decl., Ex. B].

[22]  For instance, document request no. 2 (from the Joint Requests) asked for all documents relating to the "fluctuation in expense line items in YOUR Monthly Operating Reports"; document request no. 13 demanded all documents relating to "any pending litigation against YOU"; document request no. 14 demanded all documents relating to "detailed line item budget of current and projected corporate costs for 2010 and 2011"; and document  no. 17 demanded all documents relating to "YOUR tax attributes, assets or liabilities." [Chow Decl., Ex. D]  Notably, the Equity Committee is now criticizing the Debtors for producing thousands of pages of documents that the Equity Committee specifically asked for. For instance, the Equity Committee complains that the Debtors produced thousands of pages of environmental reports (*i.e.*, Phase I and Phase II reports) – yet that was specifically requested in document request no. 39. *Id.*

[23]  Notwithstanding the Equity Committee's refusal to meet and confer in good faith, the Debtors offered to look for additional internal emails with respect to the accounting issued identified in the Skaggs Memo, and then produced the same shortly thereafter.

The Motion in *Limine* should therefore be denied on the grounds that the Equity

Committee failed to comply with FRCP 37, FRBP 7037, and Local Bankruptcy Rule 7026-1(c)(2).

**C.    THE EQUITY COMMITTEE'S MOTION SHOULD BE DENIED ON THE
GROUNDS THAT THE EQUITY COMMITTEE AND ITS AFFILIATED
PARTIES HAVE FAILED TO RESPOND TO THE DEBTORS' DISCOVERY.**

In addition to dealing with all the Equity Committee's monkeyshines as described

above, the Debtors, of course, also had to conduct discovery against the competing plan proponents,

the Equity Committee, and the Creditors Committee.  However, as discussed below, most of those

parties have refused to cooperate with the Debtors' discovery requests, and have provided only

minimal responses.

For instance, Charlestown has inexcusably failed to produce a privilege log.

Charlestown also refused to provide follow-up information as requested by the Debtors.[24]  Global

Asset Capital, the purported money source behind the Charlestown Plan, has failed to produce a

privilege log.[25]

While the Equity Committee has produced a privilege log, it has pretty much asserted

that virtually all of its members' conversations and documents are privileged based on spurious

claims of "joint interest" privileges – a newly imagined privilege that purportedly covers all

communications between those who oppose the Debtors' plan.  The Equity Committee is

withholding approximately 9,700 documents (including emails) from production.[26]

During the deposition of Mr. Taylor (chair of the Equity Committee), the Equity

Committee's counsel asserted a privilege for certain (if not virtually all, since Taylor was instructed

by counsel not to answer) conversations between the Equity Committee and Charlestown.  For

instance:

> "MR. FISCHER:  -- that we – that the Equity Committee believes that
> there is a **common interest during certain periods of time shared
> with other constituencies, including the Charlestown proponents**
> and absolutely there may be emails in which both Raj and Mr. Taylor

---

[24]    *See* Chow Declaration, ¶ 17.

[25]    *See* Chow Declaration, ¶ 18.

[26]    *See* Equity Committee's amended privilege log, dated January 14, 2011 [Chow Decl., Ex. G].

are recipients or one is a sender in which counsel is present, Committee Professionals are present, and accordingly, they've been withheld.  I'm not saying that there absolutely is one. I don't know for a fact."[27]

The Equity Committee further claimed a "rainforest" of privileges that "permeates" everything:

"MR. FISCHER:  Look, I just want to be very clear about something. The issue here is that there's **a rainforest of privilege that this deposition is taking place surrounded by and everything that Charlestown has proposed is under attack by debtors and accordingly, everything that's been discussed related to the Charlestown Plan within something that can be considered a privileged family has privileged legal issues embedded in it permeated – it's permeated with privilege**, and that's the issue here. This is all subject to work product protection, attorney/client privilege protection just by the nature of the bankruptcy proceedings and the fact that the Equity Committee is an entity that owes its existence to the bankruptcy proceedings."[28]

According to the Equity Committee, this amorphous "rainforest" of privileges purports to cover all discussions of any material interest, with apparent disregard of whether an attorney was present or whether the attorney-client or work product privileges would otherwise apply.  For instance, according to the Equity Committee, none of its internal deliberations and strategic decisions are subject to discovery:

MR. FISCHER:  Yeah.  **The position that the Equity Committee takes is that its internal deliberations and its strategic decision making is not the subject of discovery.**[29]

Further, the Equity Committee takes the position that regardless of the laws of evidence and privilege, any information acquired through its professionals is likewise shielded from discovery:

BY MR. CASTAÑARES:  Q Yeah.  What did you find out as part of this broader inquiry about Legendary's capability of performing its obligations under its Plan if its Plan were confirmed?

---

[27]  *See* Taylor Depos., page 96, lines 11-19 (emphasis added) [Chow Decl., Ex. M].

[28]  *See* Taylor Depos., page 155, line 21 to page 156, line 9 (emphasis added) [Chow Decl., Ex. M].

[29]  *See* Taylor Depos., page 217, lines 16-19 (emphasis added) [Chow Decl., Ex. M].

MR. FISCHER:  And I think the issue is that all of the information that Mr. Taylor has has been acquired through **either legal or financial professionals** and it's our position that the matter is therefore not the subject of discovery; so I'm going to instruct him not to answer.[30]

In another example, the Equity Committee's counsel instructed Mr. Taylor not to disclose any discussions where a professional was present (including non-lawyers such as Kibel Green):

"MR. FISCHER:  And also instruct you, Mr. Taylor, and also to the extent that Mr. Skaggs's name came up in any context in any discussion you've ever had with Mr. McGonagle in which the Equity Committee's professionals were a party to the conversation, either in the form of Jenner & Block, Ms. Rodiger, Mr. McGonagle, Mr. Orr, **or Kibel Green, that's privileged**.  You're not to answer the question."[31]

Further, the Equity Committee criticized the Debtors for redacting certain of their board meeting minutes.  Yet when the Equity Committee produced its own minutes, they redacted so much of its board meeting minutes that it was impossible to tell what the context was, let alone substantiate their claim of attorney-client or work product privilege.  *See* Chow Decl., Ex. S.

It is clear that the Equity Committee does not believe that discovery is a two-way street.  While it has clearly stonewalled and thwarted the Debtors' legitimate discovery requests with ridiculous claims of "a rainforest of privileges," it is in no position to complain that the Debtors' much more fulsome discovery is insufficient, let alone sanctionable.

Given the feeble discovery response by the Equity Committee (and its Affiliated Parties), the Equity Committee is hardly in a position to criticize the Debtors' massive effort to respond to discovery, which by all measures far exceeded the weak effort made by the Equity Committee.  Even if the Debtors' response efforts were merely equal to the minimal response level of the Equity Committee, the Equity Committee would still not be entitled to complain.  Even if the Debtors had copied the outlandish positions that the Equity Committee has taken to thwart discovery (which the Debtors did not), it is not bad faith to adopt the same position in a discovery dispute as assumed by the opponent.  As one court has held:

---

[30]    *See* Taylor Depos., page 229, lines 15-23 (emphasis added) [Chow Decl., Ex. M].

[31]    *See* Taylor Depos., page 84, lines 11-18 (emphasis added) [Chow Decl., Ex. M].

"What is good for the goose is good for the gander.  If Defendants were not going to cooperate without a scheduling order, it cannot be said that Plaintiff acted in bad faith by adopting the same position, especially where Plaintiff clearly sought clarification from Defendants on this point."

*See Ambu, Inc. v. Kohlbrat & Bunz Corp.*, 2000 U.S. Dist. LEXIS 241 (W.D.N.C. Jan. 5, 2000).

## IV.    CONCLUSION

The Equity Committee has forced the parties to expend millions of dollars in professional fees chasing after allegations of corporate mismanagement that were purportedly implicated by the Skaggs Memo and investigated by Ernst & Young – the centerpiece of the Equity Committee's and Charlestown's oppositions to the Debtors' Plan.  Now, after all their efforts have failed to yield any evidence that support their unfounded allegations of "self-dealing," they ask the Court to ignore the evidence, ignore the due process requirements set forth in the FRCP, and find that the Debtors and Mr. Meruelo are guilty of the baseless charges that have been leveled against them.  The Equity Committee's ridiculous leaps of logic must be rejected.

For the foregoing reasons, the Debtors respectfully request that the Court deny the Equity Committee's motion *in limine*.

DATED:  January 31, 2011                     Respectfully submitted,


                                              */s/ Carol Chow*
                                             CAROL CHOW
                                             STUTMAN, TREISTER & GLATT
                                             PROFESSIONAL CORPORATION
                                             Special Reorganization Counsel for
                                             Debtors and Debtors in Possession

547827v1                                          29

1

## DECLARATION OF CAROL CHOW

2          I, Carol Chow, declare as follows:

3          1.          I am an attorney duly admitted to practice before this Court.  I am a member

4    of Stutman, Treister & Glatt Professional Corporation ("ST&G"), special reorganization counsel for

5    the debtor in the above-captioned case (the "Debtors").  I have personal knowledge of the statements

6    set forth below except for those facts stated on information and belief and, and as to those facts, I am

7    informed and believe them to be true.  If called upon to do so, I could and would testify competently

8    to the matters stated in this Declaration because I know them of my own personal knowledge.

9    **A.    <u>PROCEDURAL HISTORY</u>**

10          2.          In this contested matter, the Debtors have gathered and produced *over*

11   *85,000 pages* of documents in response to 6 rounds of document requests propounded by various

12   parties, as follows (which include the documents produced in connection with the Rule 2004 motion

13   filed by the Creditors Committee and joined in by the Equity Committee, which contained over 20

14   additional categories of document requests):

15          a.          Debtors have responded to the Equity Committee's
16                      November 2, 2010 "Rule 26 Requests" (the "Equity
                        Committee's 1st Set of Requests");
17
18          b.          Debtors have responded to the Equity Committee's
                        November 5, 2010 Second "Rule 26 Requests" (comprised of 5
                        document requests) (the "Equity Committee's 2nd Set of
19                      Requests");

20          c.          Debtors have responded to the November 18, 2010 Joint
21                      Rule 34 Document Requests (comprised of <u>41 document
                        requests</u> propounded on behalf of the Equity Committee and 5
22                      of its Affiliated Parties) (the "Equity Committee's 3rd Set of
                        Requests");
23
24          d.          Debtors have responded to the December 17, 2010 document
                        requests propounded by Bank of America (comprised of
25                      8 document requests);

26          e.          Debtors have responded to the December 28, 2010 document
27                      requests propounded by Bank of America (comprised of 17
                        document requests); and

28

30

f.    Debtors have responded to the December 29, 2010 document requests propounded by the Equity Committee (comprised of 10 document requests) (the "Equity Committee's 4th Set of Requests").

3.    The Debtors also had to complete extensive briefing with regard to the competing plans and attend/defend approximately twenty (20) depositions in the span of 30 days, including the Christmas and New Year holidays.  Specifically, in the past month and a half, the Debtors completed the following:

| | |
|---|---|
| December 3, 2010 | Debtors filed their Confirmation Brief and the Supporting Declarations of Richard Meruelo, Andrew Murray, and M. Freddie Reiss. |
| December 10, 2010 | Debtors filed the Motion to Disallow the Charlestown Plan (without which Charlestown would have never disclosed critical information that were needed for the Debtors to conduct discovery). |
| December 17, 2010 | Debtors conducted the Deposition of Ted McGonagle (Charlestown). |
| December 20, 2010 | Debtors filed their Reply Pleadings in Support of the Motion to Disallow the Charlestown Plan. |
| December 21, 2010 | Debtors conducted the Deposition of Raj Maheshwari (Charlestown). |
| December 30, 2010 | Debtors filed Oppositions to the Charlestown Plan and the Legendary Plan and the supporting declaration of M. Freddie Reiss. |
| January 4, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Philip S. Payne (Debtors' Director and member of the Audit Committee). |
| January 5, 2011 | Debtors conducted the Deposition of Steve Taylor (Equity Committee). |
| January 5, 2011 | Debtors participated in the Deposition of Richard B. Jennings (Legendary's expert). |
| January 6, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of M. Freddie Reiss (Debtors' expert). |

| | | |
|---|---|---|
| January 6, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Amy Hawkes, the Ernst & Young forensic accountant who led the independent investigation of the Fred Skaggs memo. |
| January 7, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Fred Skaggs. |
| January 8, 2011 | The Debtors conducted the Deposition of Riaz Valani (Global Asset Capital – the apparent financier behind the Charlestown Plan). |
| January 11-12, 2011 | The Equity Committee and its Affiliated Parties conducted the Deposition of Richard Meruelo (Debtors' CEO). |
| January 12, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of John Maddux (Debtors' President). |
| January 12, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Todd Nielsen (Debtors' In-House Counsel). |
| January 13, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Miguel Echemendia (Debtors' Chief Accounting Officer). |
| January 13, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Gaelle Gralnek of Neufeld, Marks, Gralnek & Maker (Outside Counsel for Debtors). |
| January 13, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Marcial Garcia (Debtors' Employee). |
| January 14, 2011 | The Equity Committee and its Affiliated Parties conducted the deposition of Andrew Murray (Debtors' CFO). |
| January 14, 2011 | The Debtors filed nine (9) reply pleadings in response to six (6) sets of objections to the Debtors' plan of reorganization and the supporting declarations of Richard Meruelo, M. Freddie Reiss, and Cynthia C. Marian. |

January 18, 2011    The Debtors conducted the deposition of David
Rifkind (Bank of America's Expert).

January 20, 2011    The Debtors filed their reply to the opposition of
Bank of America and the supporting declaration
of M. Freddie Reiss.

January 21, 2011    The Equity Committee and its Affiliated Parties
plan conducted the deposition of Gary Tenzer.

4.    In addition to the foregoing, the Equity Committee and others propounded subpoenas to numerous third-parties to further investigate the Debtors.

5.    In addition, the Debtors hired Ernst & Young to conduct an <u>independent investigation</u> into the accounting issues identified in the Skaggs Memo.  The Ernst & Young investigative team has:

(a)    Reviewed and collected the Debtors' records relevant to the Skaggs Memo as well as approximately 25 other accounting issues (including internal emails);

(b)    Interviewed all of the Debtors' relevant managers and employees;

(c)    Prepared and produced a full report regarding the results of its investigation;

(d)    Produced approximately 1,500 pages of relevant documents – including the Debtors' internal emails – to the Equity Committee and its Affiliated Parties; and

(e)    Produced their lead forensic accountant, Amy Hawkes, for a full day's deposition by the Equity Committee and its Affiliated Parties.

The Ernst & Young investigation was thorough and complete. The Ernst & Young Report was produced to the Equity Committee as soon as it was released, and the documents underlying that report were produced shortly thereafter.  Further, the Debtors followed up the production of Ernst & Young by searching for and producing additional documents relating to the issues described in the Skaggs Memo.  In addition, the Debtors' directors sitting on the Audit Committee (Payne and Hansen) produced additional documents relating to the transactions described in the Skaggs Memo.

## B.    **PURPORTED MEET AND CONFER**

6.      On January 10, 2011, at 9:45 a.m. (after the discovery cut-off), Brian Fischer (Jenner & Block) sent an email to myself and other attorneys to outline the issues to be discussed during a telephonic meet and confer; the issues related solely to the Debtors' privilege log. Attached hereto as Exhibit "A" is a true and correct copy of the January 10, 2011 email from Mr. Fischer.

7.      On the evening of January 10, 2011, Eric Goldberg and I had a teleconference call with Brian Fischer to meet and confer about the Debtors' privilege log. However, once we got on the call, and without advance warning, Mr. Fischer expanded the call to discuss purported deficiencies with respect to a myriad of the Debtors' discovery responses that went far beyond the privilege log.

8.      One of the overarching complaints that Mr. Fischer had with respect to the Debtors' discovery responses to all outstanding discovery requests was that the Debtors purportedly failed to produce internal emails. This was the first time that this issue had been raised with me. I explained to him the emails were produced by the Debtors, the Debtors' directors, and Ernst & Young (which gathered documents from the Debtors). Further, I asked Mr. Fischer if there was a specific category of emails that he was looking for, since it would be impractical to look again for emails on approximately 60 categories of documents. Mr. Fischer refused to "scale back" his demand for additional documents but would only agree to "scale back" his demands in the motion to compel he was filing. I argued that this was not a legitimate meet and confer if he made a demand for additional documents with respect to 50-60 document requests, when in fact, he was only interested in supplemental productions with respect certain categories of documents. He refused to change his position and maintained that he did not have to scale back his demands and could do so in his motion to compel.

9.      Attached hereto as Exhibit "B" is a true and correct copy of a confirming email I sent to Mr. Fischer on January 12, 2011 with regard to our purported meet and confer. Mr. Fischer responded to my email, a true and correct copy of which is attached hereto as Exhibit "C." Mr. Fischer claimed to refute my email but continued to refuse to disclose precisely which categories of documents he was looking for.

## C.    **DISCOVERY PLEADINGS**

10.    Attached hereto as Exhibit "D" is a true and correct copy of the "Joint Rule 34 Confirmation Document Request to Debtors" which was propounded on November 18, 2010 by, *inter alia*, the Equity Committee.    This set of demands included 41 document requests.

11.    Attached hereto as Exhibit "E" is a true and correct copy of the "Debtors' Response to the Joint Rule 34 Confirmation Document Request to Debtors" dated December 13, 2010.    In addition, on that same date, the Debtors produced 75,118 pages of documents.

12.    Attached hereto as Exhibit "F" is a true and correct copy of the "Responses and Objections to First Request for Production of Documents by Debtors to Equity Committee," dated December 9, 2010, including a privilege log.

13.    Attached hereto as Exhibit "G" is a true and correct copy of an email dated January 14, 2011 from Brian Fischer to myself attaching the Equity Committee's supplemental privilege log.

14.    Attached hereto as Exhibit "H" is a true and correct copy of "Charlestown Capital Advisors, LLC's and Hartland Asset Management Corporation's Responses to First Request for Production of Documents by Debtors," dated December 13, 2010.

15.    Attached hereto as Exhibit "I" is a true and correct copy of "Official Committee of Unsecured Creditors' Response to First Request for Production of Documents by Debtors to Creditors Committee," dated December 16, 2010.

16.    Attached hereto as Exhibit "J" is a true and correct copy of the Debtors' Response to the Rule 26 Document Requests dated January 6, 2011.

17.    During discovery in this contested matter, Charlestown has failed to produce a privilege log.  Charlestown also refused to provide follow-up information as requested by the Debtors, as demonstrated by the meet and confer letters that have been exchanged.  Attached hereto as Exhibit "K" is a true and correct copy a meet and confer letter dated December 21, 2010 from Gary Klausner to Christopher Prince, counsel for Charlestown.  Attached hereto as Exhibit "L" is a true and correct copy a letter dated December 22, 2010 from Christopher Prince, counsel for Charlestown, to Gary Klausner.  In its letter, Charlestown ignored the Debtors' request with regard

to document request no. 16.  Further, while Charlestown agreed to produce certain additional documents, none were ever provided.

18.    Global Asset Capital, the purported money source behind the Charlestown Plan, has failed to produce a privilege log.

### D.    DEPOSITION TRANSCRIPTS

19.    Attached hereto as Exhibit "M" is a true and correct copy of the relevant excerpts from the transcript of the deposition of Steve Taylor conducted on January 5, 2011.

20.    Attached hereto as Exhibit "N" is a true and correct copy of the relevant excerpts from the transcript of the deposition of Amy Hawkes conducted on January 6, 2011.

### E.    DOCUMENT PRODUCTIONS

21.    Attached hereto as Exhibit "O" is a true and correct copy of the September 21, 2010 memorandum from Fred Skaggs to Phil Payne, John Hansen, and Mayor Anthony Williams.

22.    On December 13, 2010, the agreed-upon response deadline, the Debtors produced *75,118 pages of documents* in response to the Joint Rule 34 Document Requests.  Attached hereto as Exhibit "P" is a true and correct copy of certain selected documents produced by the Debtors on December 13, 2010, bates labeled MMPI 73106-73124.

23.    On December 20, 2010, Ernst & Young issued its Report on the five items in the Skaggs Memo plus approximately 25 others.  In addition, on December 23, 2010, Ernst & Young produced its supporting documentation with regard to the investigation.  The documents were produced to the Equity Committee and their Affiliated Parties.  Attached hereto as Exhibit "Q" is a true and correct copy of selected documents produced by Ernst & Young on December 23, 2010, including EY-MERU-RPT 000066-87 and EY-MERU-RPT 000234-263.

24.    The two lead independent board members sitting on the Debtors' Audit Committee are Philip S. Payne and John B. Hansen.  On or about December 22, 2010, Mr. Hansen produced over *1,500 pages* of his records regarding, among others, the Skaggs Memo (bates labeled JH 000001-1673).  On or about January 3, 2011, Mr. Payne produced approximately *1,200 pages* of documents, which included, among other things, emails relating to the Audit Committee's

investigation into the Skaggs Memo and the engagement of Ernst & Young to investigate the issues

identified in the Skaggs Memo.

25.    In the Equity Committee's Rule 26 Requests, document request number 5

requested "all Documents concerning any potential, proposed or actual transfer, receipt, deposit,

disbursement, purchase, sale or other transaction to, with, or from Merco Group – 2040 Camfield

Ave., LLC."  In response, on January 6, 2011, the Debtors produced approximately 540 pages of

documents relating to the sale of the 2040 Camfield property (bates labeled MMPI 80894-81433).

26.    On January 12, 2011, the Debtors made a supplemental document production,

bates labeled MMPI 81505-718. The production included additional emails relating to, among

others, the Skaggs Memo in general, although none of the new emails specifically related to the three

issues that are the subject of the Equity Committee's Motion.

27.    On January 21, 2011, the Debtors made a supplemental document production,

bates labeled MMPI 81767-81844.  A true and correct copy of this supplemental production

(*excluding* the full copy of Ernst & Young Report at 81787-81844) is attached hereto as Exhibit "R."

28.    Attached hereto as Exhibit "S" is a true and correct copy of the August 28,

2010 Board Meeting Minutes of the Equity Committee, bates labeled OEC 0007595-7603, that was

produced by the Equity Committee in this contested matter.

I declare under penalty of perjury that the foregoing is true and correct.  Executed at

Los Angeles, California, on January 31, 2011.


                                        */s/ Carol Chow*_____
                                        CAROL CHOW