1  GARY E. KLAUSNER (State Bar No. 69077)
   STEPHAN M. RAY (State Bar No. 89853)
2  MARINA FINEMAN (State Bar No. 193065)
   ANTHONY ARNOLD (State Bar No. 251973), Members of
3  STUTMAN, TREISTER & GLATT, P.C.
4  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA  90067-6013
5  gklausner@stutman.com, sray@stutman.com,
   mfineman@stutman.com, aarnold@stutman.com
6  Telephone: (310) 228-5600
7  Facsimile: (310) 228-5788

8  Special Reorganization Counsel for Debtors and Debtors in Possession

9  JOHN N. TEDFORD, IV (State Bar No. 205537)
   DANNING GILL, DIAMOND & KOLLITZ, LLP
10 2029 Century Park East, Third Floor
   Los Angeles, CA 90067-2904
11 JTedford@DGDK.com
   Telephone:  (310) 277-0077
12 Facsimile:  (310) 277-5735

13 Reorganization Counsel for Debtors and Debtors in Possession

14              UNITED STATES BANKRUPTCY COURT
                 CENTRAL DISTRICT OF CALIFORNIA
15               SAN FERNANDO VALLEY DIVISION
16

17 In re:                          Case No.: 1:09-bk-13356-VK
                                   Chapter 11 (Jointly Administered)
18 MERUELO MADDUX PROPERTIES,
   INC., et al.,[1]                 **DEBTORS' OPPOSITION TO
19                                 CHARLESTOWN'S REQUEST FOR SANCTIONS
                         Debtor.   AGAINST DEBTORS FOR SPOLIATION OF
20                                 EVIDENCE**

21                                 Date:   February 28, 2011
22                                 Time:   2:00 p.m.
                                   Place:  Courtroom 301
23                                         21041 Burbank Boulevard
                                           Woodland Hills, CA  91367
24

25

26 _____
   [1]   Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by
27      affiliated entities.  The affiliated case numbers are as follows:  1:09-bk-13338-VK; 1:09-bk-13358-VK
        through 1:09-bk-13407-VK; 1:09-bk-13434-VK; and 1:09-bk-13439-VK.
28

548193v.3

# **TABLE OF CONTENTS**

**Page(s)**

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS ................................................................................. 3

    A.      The Facts Demonstrate That The Debtors Acted Reasonably And
Responsibly At All Times........................................................................... 3

        1.      The Notes & Minutes ..................................................... 3

        2.      The OCC's Motion For A Rule 2004 Exam. ........................ 4

        3.      The Debtors' Document Production............................... 5

        4.      The Nielsen Deposition................................................. 6

        5.      The Discovery Motions.................................................. 7

        6.      Charlestown's Request. ................................................ 8

III.    DISCUSSION ................................................................................................... 9

    A.      The Debtors Had No Obligation To Preserve The Notes. ........................ 9

    B.      There Was No Spoliation Or "Culpable Mind." ...................................... 12

    C.      The Notes Are Not Relevant To Any Claim Or Defense. ....................... 16

    D.      The Imposition Of An Adverse Inference Is Not Warranted Here......... 18

IV.     CONCLUSION ............................................................................................... 21

# TABLE OF AUTHORITIES

**CASES**

*Adkins v. Wolever,*
    554 F.3d 650 (6th Cir. 2009) ...................................................12

*Akiona v. United States,*
    938 F.2d 158 (9th Cir. 1991) ..................................................12

*Beaven v. United States DOJ,*
    622 F.3d 540 (6th Cir. 2010) ..................................................12

*Chrysler Realty Co., LLC v. Design Forum Architects, Inc.,*
    2009 U.S. Dist. LEXIS 121411 ( E.D. Mich. Dec. 31, 2009)......................12

*Costobile-Fulginiti v. City of Pa.,*
    719 F. Supp. 2d 521 (E.D. Pa. 2010) ...................................14, 15

*Flottman v. Hickman County,*
    2010 U.S. Dist. LEXIS 110758 (M.D. Tenn. 2010) ...................................13

*Fujitsu Ltd. v. Federal Express Corp.,*
    247 F.3d 423 (2nd Cir. 2001)...............................................9, 13

*Glover v. The BIC Corp.,*
    6 F.3d 1318 (9th Cir. 1993) ...................................................12

*Hechinger Inv. Co. of Del., Inc. v. Univ. Forest Prods., Inc. (In re Hechinger Inv. Co.*
    *of Del., Inc.),*
    489 F.3d 568 (3d Cir. 2007)...........................................19, 20

*Kronisch v. United States,*
    150 F.3d 112, 127 (2d Cir. 1998).............................................17

*Leon v. IDX Sys. Corp.,*
    464 F.3d 951 (9th Cir. 2006) ..................................................13

*In re Napster, Inc. Copyright Litig.,*
    462 F. Supp. 1060 (N.D. Cal. 2006) ...................................8, 12, 18, 19

*National Assoc. of Radiation Survivors v. Turnage,*
    115 F.R.D. 543 (N.D. Cal. 1987).............................................13

*Ogden v. United States,*
    323 F.2d 818 (9th Cir. 1963) ..................................................17

*Otsuka v. Polo Ralph Lauren Corp.,*
    2010 U.S. Dist. LEXIS 12867 (N.D. Cal. Jan. 25, 2010) ......................8, 12

*Ritchie v. United States*,
    451 F.3d 1019 (9th Cir. 2006) ................................................................15

*Schmid v. Milwaukee Elec. Tool Corp.*,
    13 F.3d 76 (3d Cir. 1994) ...............................................................13, 20

*In re Take-Two Interactive Software, Inc.*,
    2009 U.S. Dist. LEXIS 39140 (S.D.N.Y. April 21, 2009) ....................16, 17

*Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*,
    982 F.2d 363 (9th Cir. 1992) .................................................................13

*United States v. $40,955.00 In United States Currency*,
    554 F.3d 752 (9th Cir. 2009) ...................................................................9

*United States v. Benedict*,
    647 F.2d 928 (9th Cir. 1981),
    *cert. denied*, 102 S. Ct. 648 (1981) .........................................................16

*United States v. Kitsap Physicians Serv.*,
    314 F.3d 995 (9th Cir. 2002) ...................................................................9

*United States v. Sarabia*,
    1995 U.S. App. LEXIS 13539 (9th Cir. Ariz. May 31, 1995)....................16

*Wm. T. Thompson Co. v. General Nutrition Corp., Inc.*,
    593 F. Supp. 1443 (C.D. Cal. 1984) ......................................................13

*Zubulake v. UBS Warburg LLC*,
    220 F.R.D. 212 (S.D.N.Y. 2003) ............................................................13

**OTHER AUTHORITIES**

6 C. Hugh Friedman, *California Practice Guide: Corporations* 6:232a (2011) .............................3

*Corporate Secretary's Answer Book*, 8-14................................................................3

*Up-to-the-Minutes: Best Practices for Memorializing Board and Committee
Meetings*, § 7 ........................................................................................3

E. Norman Veasey & Christine T. Di Guglielmo, *The Tensions, Stresses, And
Professional Responsibilities Of The Lawyer For The Corporation*, 62 Business
Lawyer 1, (Nov. 2006)................................................................................3

1    The Debtors file this Opposition to the "Request For Sanctions Against Debtors For

2    Spoliation Of Evidence" [Docket No. 2747] (the "Request") filed by Charlestown Capital Advisors,

3    LLC and Hartland Asset Management Corporation (collectively, "Charlestown").

4

5                                               **I.**

6                                    **INTRODUCTION**

7    Four months ago, in response to discovery requests propounded by the Official

8    Creditors Committee ("OCC"), the Debtors provided to the OCC, the Official Equity Committee

9    ("OEC"), and the OEC's litigation partner, Charlestown, copies of the official minutes ("Minutes") of

10   the meetings of the Debtors' board of directors ("Board") for the period from March of 2008 through

11   September 9, 2010.  Thereafter, nobody – not the OCC, not the OEC, not Charlestown – complained

12   about the adequacy of the production (except to complain about the redaction of certain portions that

13   the Court authorized the Debtors to redact).  Otherwise, nobody sent the Debtors a letter about the

14   production, nobody requested a meet and confer, and nobody filed a motion to compel.

15   More than two months ago, after Judge Thompson in this case ruled on the scope of

16   certain of the OCC's Rule 2004 discovery requests, the Debtors, by email and secure file download,

17   made available to the OCC, OEC and Charlestown, thousands of pages of additional documents that

18   were provided to the members of the Board for Board meetings ("Board Packets").  Again, nobody –

19   not the OCC, not the OEC, not Charlestown – complained about the adequacy of the production of

20   the Board Packets.  Nobody sent the Debtors a letter about the Board Packets, nobody requested a

21   meet and confer, and nobody filed a motion to compel.

22   One month ago, the Debtors made available for deposition their General Counsel, Mr.

23   Todd Nielsen, who was questioned by, among others, counsel for the OEC and Charlestown.  During

24   his deposition, Mr. Nielsen clearly stated that it was his and the Debtors' standard practice to discard

25   his handwritten notes ("Notes") of Board meetings after he had prepared final, formal Minutes from

26   those Notes, and those Minutes had been approved by the Board.  Again, nobody complained about

27   the Notes not being produced (because they had been thrown away after the Minutes were finalized),

28   nobody sent a letter, nobody requested a meet and confer, and nobody filed a motion to compel.

Three and a half weeks ago, on January 20, 2011, as the confirmation trial approached, this Court set January 24, 2011 as the last day for parties to file motions in limine, which were the Court's preferred method for resolving any final discovery issues.  Thereafter, on January 24, Charlestown and its "tag-team" litigation partner, the OEC, filed three discovery motions: one motion to compel from the OEC, and one motion in limine from each of the OEC and Charlestown.[2]  Again, nobody complained about the Notes, the Minutes or the Board Packets.

Two weeks ago, on February 3, 2011, the Court held a hearing on the discovery motions filed by, among others, the OEC and Charlestown.  During that hearing, which lasted approximately three hours, again, neither the OEC nor Charlestown made any mention of any issues relating to the Notes, the Minutes or the Board Packets.  Less than 8 hours later, Charlestown filed the Request, along with an application for OST, so that the Request could be heard on an "emergency" basis.

Pursuant to the Request, Charlestown seeks to have the Court impose by decree what Charlestown is incapable of proving at trial.  Specifically, through the Request, Charlestown is asking the Court to "draw an adverse inference" that the Notes "would have been harmful to Debtors."  According to the Request, the drawing of such an adverse inference (whatever it means) is an appropriate sanction for Mr. Nielsen's act of discarding his Notes after the Board had approved the Minutes for each meeting, which Charlestown, in typically haphazard fashion, calls "spoliation of evidence."

In addition to being untimely, Charlestown's Request is utterly without foundation in fact or law.  This Opposition will show, among other things, that (1) Mr. Nielsen's practice of discarding his Notes once the Minutes had been approved is not only the Debtors' normal policy, but is also the "best practice" recommended for all corporations; (2) the Notes were never the subject of any discovery request or order; (3) Charlestown has failed to satisfy the Ninth Circuit's high standard

---

[2]    One of those three motions, filed by the OEC, was in fact based on exactly the same deposition – Mr. Nielsen's – that forms the basis for Charlestown's Request.  *See* Notice of Motion and Motion To Compel Testimony [Docket No. 2658], filed by the OEC on January 24, 2011.  Yet for some reason, Charlestown waited another ten days to file its own Request.

1   for imposing an adverse inference; and (4) imposing a "spoliation inference" would be inappropriate,

2   and inconsistent with applicable law.

## II.

### STATEMENT OF FACTS

**A.    The Facts Demonstrate That The Debtors Acted Reasonably And Responsibly At All Times.**

**1.    The Notes & Minutes.**

Mr. Nielsen is the Debtors' General Counsel.[3]  His duties include attending meetings of the Board, giving legal advice to the Board, and preparing Minutes that constitute the formal record of such meetings.  Mr. Nielsen's practice, both before and during the Debtors' bankruptcy, was to take handwritten Notes of Board meetings, and then later to prepare formal, typed Minutes of the meetings.[4]

In his deposition, Mr. Nielsen testified clearly that this was his standard practice.  He further testified that, after formal Minutes of a particular meeting had been presented to and approved by the Board, it was his standard practice to throw away his handwritten notes, and place the approved Minutes in the Debtors' files as the official record of a Board meeting.[5]  This practice (discarding notes after formal board minutes are approved) is not only the standard practice for the Debtors, it is also the standard, recommended "best practice" for all corporations.[6]

---

[3]    Transcript of Deposition of Todd Nielsen, January 12, 2011 ("Nielsen Transcript"), a copy of which is attached hereto as Exhibit A, at 13:8-10.

[4]    Nielsen Transcript, Exhibit A, at 19-20; 22-24.

[5]    Nielsen Transcript, Exhibit A, at 19, 25.

[6]    *See, e.g., Corporate Secretary's Answer Book*, 8-14 (Cynthia M. Krus ed., 5th ed. 2011) ("After approval of the minutes, drafts of the minutes of meetings of the board of directors and committees of the board of directors should be discarded in accordance with the company's document retention policy"); 6 C. Hugh Friedman, *California Practice Guide: Corporations* 6:232a (2011) ("As routine 'housekeeping,' retain only the *final* minutes approved by the board. Discard earlier — and possibly *erroneous* — drafts that could be misconstrued") (emphasis added); E. Norman Veasey & Christine T. Di Guglielmo, *The Tensions, Stresses, And Professional Responsibilities Of The Lawyer For The Corporation*, 62 Business Lawyer 1, (Nov. 2006) ("Once the minutes have been finally approved, they become the official record of the meeting. Accordingly, to avoid confusion, preliminary drafts and notes relating to the minutes should not be retained"); *Up-to-the-Minutes: Best Practices for Memorializing Board and Committee Meetings*, § 7 (Dorsey & Whitney LLP, June 2005) ("Notes of individual directors or other meeting attendees should not survive once final minutes have been approved.  The best practice for many companies is

**2.    The OCC's Motion For A Rule 2004 Exam.**

On July 26, 2010, the OCC filed a motion for a Rule 2004 examination of the Debtors [Docket No. 1643] (the "2004 Motion").  Legendary and the OEC promptly filed joinders to the 2004 Motion, while Charlestown filed its joinder several weeks later, on September 1, 2010.  However, no order was ever entered with respect to the 2004 Motion.  At a hearing on August 6, 2010, when the OCC's counsel commented that the 2004 Motion had been filed, and requested that an order be entered, the Court expressed its view that certain of the OCC's requests – including the request for materials provided by MMPI to its Board members, were "onerous," and set a date by which the Debtors would file a motion for protective order.

On August 13, 2010, the Debtors filed their Motion For A Protective Order [Docket No. 1699] ("PO Motion").  Thereafter, the OCC and the OEC filed oppositions to the PO Motion, but Charlestown did not.  Judge Thompson then determined that, with a confirmation hearing approaching, the 2004 Motion should be treated as plan-related discovery.

Over the next few months, Judge Thompson held a series of hearings / status conferences on the 2004 Motion, while the parties Debtors engaged in a "rolling production" of documents requested, and the attempted to resolve various open issues regarding the scope of discovery sought from the Debtors.  The categories of documents that the OCC was seeking to obtain from the Debtors were set forth in the OCC's Amended Exhibit 1 to the 2004 Motion [Docket No. 1648] ("Doc Request").  As these negotiations and status conferences progressed, the OCC filed with the Court a series of three "Status Conference Reports" [Docket Nos. 1839, 1925 and 2049] (collectively, the "Reports").

Each of the Reports showed the status of the discovery and related disputes.  Thus, with respect to each of the 22 categories of documents listed in the Doc Request, the Reports showed

---

either to have only the meeting secretary keep notes or to collect and destroy the notes of meeting participants at the end of the meeting.  Once the minutes have been reviewed and approved by the board or committee, all drafts and notes of the meeting secretary should be destroyed, as well.  Generally, the final minutes (as kept in the official minute book), together with a clean copy of the official board package and any other materials specifically referred to in the minutes, should be the only permanent record maintained by the company.")

1    what had been produced; what had not been produced; what proposals had been exchanged in the

2    meet and confer process; and what other issues remained open.  *See* Docket Nos. 1839, 1925 and

3    2049, each at Exhibit 1 thereto.  Ultimately, although the Court never entered an order on the Rule

4    2004 Motion, the Debtors agreed to produce numerous documents listed in the Doc Request.

5        **3.    The Debtors' Document Production.**

6        Doc Request No. 20 asked for "All Board minutes and resolutions of the Board of any

7    of the Debtors from the date of MMPI's initial public offering to the present."  *See* Doc Request at 9.

8    In satisfaction of Doc Request No. 20, the Debtors ultimately produced their official Minutes for

9    various Board meetings in 2008, 2009 and 2010, all as set forth in the October 22, 2010 Report.  *See*

10   October 22, 2010 Report, Docket No. 2049, at Exhibit 2 thereto, p. 22.  These Minutes totaled about

11   71 pages, and were emailed to Counsel for Charlestown on October 6, 2010.  *See* Exhibit B attached

12   hereto.

13       Doc Request No. 21 (which Judge Thompson described as "onerous,") asked for:

14           *All DOCUMENTS consisting of, relating to and/or evidencing any*
             *presentations made to the Board of any of the DEBTORS, all*
15           *materials, documents and information provided to such Board, any*
             *committee of such Board, or any member of such Board, including, but*
16           *not limited to, such materials, documents and information provided in*
             *connection with any such presentations, any management report,*
17           *financial statement, audit report, investment bank documentation or*
             *report, financial advisor documentation or report, and further*
18           *including, without limitation, all documents and materials prepared by*
             *or on behalf of any such Board member, officer and/or committee*
19           *member of any Board committee.*

20   *See* Doc Request at 9.  Although the October 22, 2010 Report indicates that, as of that date, no

21   documents had been produced in response to Doc Request No. 21, the Debtors subsequently

22   produced several thousand pages of documents responsive to this request.  Specifically, first on

23   November 23, 2010, and then again on December 7, 2010, the Debtors, via email and secure file

24   download, made available to counsel for the OCC, the OCC, and Charlestown copies of what were

25   referred to among the parties as "Board Packets" for various Board meetings.  *See* Exhibit C attached

26   hereto.  The Board Packets were comprised of materials that had been given to the members of the

27   Board for review and discussion at Board meetings, and totaled more than 2,600 pages in all.  While

28   no order was ever entered on the Rule 2004 Motion, Judge Thompson, during the course of the

1   status conferences, ruled that the Debtors' obligation to produce documents in response to Doc

2   Request No. 21 would be limited to the Board Packets.

3            Thus, by December 7, 2010, the Debtors had produced to the OCC, the OEC and

4   Charlestown almost 2,700 pages of documents in response to Doc Requests Nos. 20 and 21,

5   notwithstanding the fact that no order had ever been entered requiring the Debtors to do so.

6   Furthermore, after receiving the Minutes and Board Packets, none of these parties – not the OCC,

7   not the OEC, and not Charlestown – ever (a) wrote to complain about the scope of production on

8   those Requests, (b) asked for a meet and confer regarding those Requests; or (c) filed a motion to

9   compel regarding those Requests.

10           **4.    The Nielsen Deposition**

11           The Debtors produced Mr. Nielsen for deposition on January 12, 2011.  By the time

12  of Mr. Nielsen's deposition, the parties, including Charlestown, had had more than three months to

13  review the Minutes, and more than one month to review the Board Packets.  During his deposition,

14  Mr. Nielsen explained his practice of using his Notes to prepare Minutes, and then discarding the

15  Notes.[7]  Mr. Nielsen also candidly acknowledged that during the course of the bankruptcy, he had

16  fallen far behind in the task of typing up his Notes into formal Minutes.[8]

17           During his deposition, Mr. Nielsen made no attempt to hide or obfuscate the fact that

18  his standard practice, before and during the bankruptcy, was to discard his Notes once the official

19  Minutes had been approved.[9]  In the Request, Charlestown professes to have only learned of this

20  alleged "spoliation" after receiving the transcript of the Nielsen deposition, but conveniently omits a

21  few key facts.  For example, Charlestown's Request neglects to advise the Court that (1) counsel for

22  Charlestown actually appeared at the Nielsen deposition, at which the Notes were discussed in

23  detail; and (2) counsel for Charlestown actually asked Mr. Nielsen approximately 80 questions at the

24  deposition, filling almost 15 pages of transcript.[10]  These facts, together with the facts that

---

[7]   *See*, note 1, *supra.*.

[8]   Nielsen Transcript, Exhibit A at 16:10-25.

[9]   Nielsen Transcript, Exhibit A at 19-20.

[10]  *See* Nielsen Transcript, Exhibit A at 3, 146-161.

1    Charlestown has been conducting this litigation in concert with the OEC, which on January 24, 2011

2    filed a motion to compel with regard to the very same deposition testimony, cast grave doubt on

3    Charlestown's contention that the Request had to be filed as an "emergency" because Charlestown

4    only became "aware" of the alleged "spoliation" after receiving the transcript of the Nielsen

5    deposition in late January, after the motions in limine were filed.  Indeed, the closeness with which

6    the OEC and Charlestown have been working in opposing the Debtors' Plan – to the point of

7    asserting a "joint interest" privilege – makes Charlestown's claim to not have known what transpired

8    in Mr. Nielsen's deposition hard to accept.[11]  Charlestown's Request is simply too late.

9            During his deposition, Mr. Nielsen also explained that his backlog in transforming his

10   Notes into Minutes was due to the increase in his workload resulting from the pendency of the

11   bankruptcy cases.[12]  Despite this delay in preparing some of the Minutes from his Notes, and

12   notwithstanding Charlestown's allegations regarding "creating" minutes that supposedly "didn't

13   exist," there is no evidence that the final Minutes are anything less than accurate records of what

14   took place at each Board meeting.  Indeed, Charlestown's Request neglects to mention the facts that,

15   although Charlestown and the OEC conducted in-tandem discovery of most of the Board members,

16   and received tens of thousands of pages of documents in discovery (including about 2,500 pages

17   from the independent Board members alone), there is no evidence that the Notes contained anything

18   that the Minutes do not, or that the final Minutes are somehow inaccurate records of the Board

19   meetings.

20        **5.    The Discovery Motions.**

21            This Court set January 24, 2011 as the last day for parties to file motions in limine,

22   which were the Court's preferred method for resolving any final discovery issues.  Thereafter, on

23   January 24, Charlestown and the OEC filed three motions: one motion to compel from the OEC

24   _____

[11]    This also highlights the extreme hypocrisy of the positions taken by the OEC and Charlestown.  For
25   example, while Charlestown, in its Request, complains that it is entitled to documents it never even asked
for (the Notes), in addition to the thousands of pages it has already received, Charlestown's partner in
26   litigation, the OEC, openly makes the following statement:  "The position the Equity Committee takes is
that its internal deliberations and strategic decision-making is [sic] not the subject of discovery."
Deposition of Stephen Taylor, 217:16-19.

27   [12]    Nielsen Transcript, Exhibit A, at 16:10-25.

28

1    (which, like Charlestown's Request, is based solely on the Nielsen deposition), and one motion in

2    limine from each of the OEC and Charlestown.  Again, nobody complained about the Notes, the

3    Minutes or the Board Packets.

4              On February 3, 2011, the Court held a hearing on the discovery motions filed by,

5    among others, the OEC and Charlestown.  During that hearing, which lasted approximately three

6    hours, again, neither the OEC nor Charlestown made any mention of any issues relating to the Notes,

7    the Minutes or the Board Packets.  Less than 8 hours later, Charlestown filed the Request, along with

8    an application for OST, so that the Request could be heard on an "emergency" basis.

9         **6.    Charlestown's Request.**

10             In its Request, Charlestown makes a series of unfounded accusations, such as the

11   following:

12        • *"Sometime in 2009, Meruelo Maddux properties, Inc. ("MMPI") stopped
            keeping official minutes of its board of directors meetings."* Request at 1.

13        • *"MMPI's failure to keep contemporaneous minutes of its board meetings is,
            by itself, a gross failure of corporate governance."*  Request at 1.

14        • There was a *"failure to keep board minutes during these critical periods..."*
            Request at 2.

15

16        • *"Nielsen admitted that he wrote the board minutes for 2009 and 2010 long
            after MMPI's being asked to produce those minutes in this case,"* and Nielsen

17          *"created evidence regarding board deliberations"*  Request at 5.

18             As shown above, however, these hysterical accusations are simply not true.  The

19   Debtors <u>always</u> had contemporaneous records of their Board meetings.  These records were first in

20   the form of Mr. Nielsen's Notes, and later were prepared into formal Minutes that were approved by

21   the Board.  Once the Minutes were approved by the Board, the Notes were discarded, an act that,

22   rather than constituting "spoliation of evidence," is the standard "best practice" for corporations, a

23   fact of which Charlestown, in its eagerness to make scurrilous accusations, is blithely unaware.

24             The balance of this Opposition will show that Charlestown's Request for an adverse

25   inference misunderstands the applicable law, as well the foregoing facts.

26

27

28

**III.**

**DISCUSSION**

In the Ninth Circuit, before imposing an adverse inference instruction, a court must find: (1) that the allegedly spoliating party had an obligation to preserve the evidence; (2) that the evidence was spoliated with "a culpable state of mind"; and (3) that the evidence was relevant to the other party's claim, meaning that "a reasonable trier of fact could find that it would support that claim." *Otsuka v. Polo Ralph Lauren Corp.*, 2010 U.S. Dist. LEXIS 12867, *9 (N.D. Cal. Jan. 25, 2010) (citing *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 1060, 1078 (N.D. Cal. 2006)).  Here, Charlestown does not even come close to meeting this high burden; the Request offers only conclusory, and demonstrably false, allegations about the Notes and the Minutes.  The discussion below will show that, contrary to the irresponsible allegations made by Charlestown in the Request, (1) the Debtors had no obligation to preserve the Notes, which were discarded in the ordinary course of business, and were never subject to a discovery request; (2) Mr. Nielsen, rather than having a "culpable state of mind" when he discarded the Notes, simply acted in accordance with his standard practice, which conforms to the recommended "best practices" for all corporations; and (3) the Notes did not contain evidence relevant to any claim that Charlestown asserts.

**A.    The Debtors Had No Obligation To Preserve The Notes.**

Charlestown acknowledges that an obligation to preserve evidence does not even arise unless "the party has notice that the evidence is relevant to litigation or when a party should have known the evidence may be relevant to future litigation."  Request at 12 (citing *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2nd Cir. 2001)).  However, the case law is clear that a "party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business." *United States v. $40,955.00 In United States Currency*, 554 F.3d 752, 758 (9th Cir. 2009); *see also United States v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (affirming district court's finding of no spoliation when potentially relevant documents were destroyed in the defendants' normal course of business).

1    Here, the uncontroverted evidence in Mr. Nielsen's deposition was that it was the

2    normal course of business for the Debtors and Mr. Nielsen to discard his handwritten Notes after he

3    had prepared them into formal Minutes, and the Minutes had been approved by the Board.[13]  Indeed,

4    this was not only the Debtors' standard practice, it is the standard practice recommended for all

5    corporations, including public companies like MMPI.[14]  Thus, contrary to Charlestown's allegations

6    of spoliation, the evidence shows that Mr. Nielsen's treatment of the Notes was consistent with his

7    own and the industry's best practices.

8    Further, the Debtors never had notice that the Notes were relevant to any litigation

9    when they were discarded in the ordinary course.  In the Request, Charlestown attempts to argue that

10   the Notes were required to be produced by Doc Request No. 20 and 21, *see* Request at 10, but that is

11   simply incorrect.  As discussed above, Doc request No. 20 sought the production of: "*All Board*

12   *minutes and resolutions of the Board of any of the Debtors from the date of MMPI's initial public*

13   *offering to the present*."  *See* Doc Request at 9.  The Debtors did in fact produce the Minutes, and

14   resolutions, to the parties on October 6, 2010, as confirmed in the October 22, 2010 Report filed

15   with the Court.

16   Charlestown may attempt to argue that the Notes were required to be produced

17   pursuant to Doc Request No. 20, because they were "drafts" of the Minutes, but that argument fails

18   for at least two reasons.  First, the instructions to the Doc Request are very clear: while "preliminary,

19   intermediate and final drafts" of various items defined as "DOCUMENTS" were requested (for

20   example, on Doc Request Nos. 1, 3-10, and 12-17), they were <u>not</u> requested with regard to Doc

21   Request No. 20, which asked for "minutes and resolutions."  Second, to the extent that Charlestown

22   believes that, notwithstanding the specific language of Doc Request No. 20, the Notes should have

23   been produced in response thereto, it will have to explain why (a) this issue never came up in any of

24   the three Reports filed with the Court; and (b) why it failed to raise this issue at any time since

25

26   _____

27   [13]   Nielsen Transcript, Exhibit A, at 19:19-20:7.

28   [14]   *See* Note 6, *supra.*

1    Charlestown received the Minutes, without Notes, on October 6, 2010, almost <u>four months</u> before it

2    filed the instant Request.

3            Likewise, the Notes were not required to be produced under Doc Request No. 21

4    either.  That Request called for the production of:

5            *All DOCUMENTS consisting of, relating to and/or evidencing any*
        ***presentations made to the Board of any of the DEBTORS***, *all*
6        *materials, documents and information provided to such Board, any*
        *committee of such Board, or any member of such Board, including, but*
7        *not limited to, such **materials, documents and information provided***
        ***in connection with any such presentations***, *any management report,*
8        *financial statement, audit report, investment bank documentation or*
        *report, financial advisor documentation or report, and further*
9        *including, without limitation, **all documents and materials prepared***
        ***by or on behalf of any such Board member, officer and/or committee***
10       ***member of any Board committee***.

11   *See* Doc Request at 9 (emphasis added).  There are at least three reasons why the Notes were not

12   required to be produced pursuant to Doc Request No. 21.

13           First, while not a model of clarity, Doc Request No. 21 centers around documents

14   relating to "*presentations made to the Board of any of the DEBTORS,*" and "*documents and*

15   *materials prepared by or on behalf of any such Board member, officer and/or committee member of*

16   *any Board committee."*  The Notes are not in the former category (they were not part of presentations

17   to the Board), and they are not part of the latter category, because they were prepared by Mr.

18   Nielsen, who is neither a "Board member," nor a "member, officer or committee member" of "any

19   Board committee."

20           Second, during the course of the various hearings and status conferences on the Rule

21   2004 Exam, Judge Thompson ruled that, with respect to Doc Request No. 21, all that the Debtors

22   would be required to produce would be the Board Packets.  It is undisputed that the Board Packets

23   were in fact produced on November 23, 2010 and December 7, 2010, which brings us to the next

24   reason.

25           Third, to the extent there was any dispute about whether the Debtors were required

26   under Doc Request No 21 to produce anything other than the Board Packets, Charlestown could, and

27   should, have raised that issue during the approximately <u>two months</u> before trial that it had the Board

28   Packets.  Again, neither Charlestown, nor its litigation partner, the OEC, ever sent a letter, asked for

1   a meet & confer, or filed a motion to compel or motion in limine on these issues.  The first time

2   Charlestown raised any issue with respect to the Notes was on February 3, 2011 – <u>four months</u> after

3   it received the Minutes, <u>two months</u> after it had the Board packets, <u>three weeks</u> after deposing Mr.

4   Nielsen, <u>one week</u> after the deadline to file discovery motions, and <u>after</u> trial had already

5   commenced.

6          Finally, Charlestown appears to argue in its Request that, regardless of what the

7   actual discovery requests said, there was some overarching requirement for the Debtors to preserve

8   the Notes.  *See, e.g.*, Request at 13 ("Here, the duty to preserve began *at least* at the time the Debtors

9   filed their first plan of reorganization . . . .") (emphasis supplied).  Not surprisingly, Charlestown

10   fails to provide any citation to support this proposition, and indeed there is none.

11          Moreover, Charlestown's argument here proves too much.  If the Debtors had to

12   preserve all Notes once the first plan was filed, even though there was no discovery propounded

13   then, what exactly did the subsequent discovery requests give the Debtors notice of that they had to

14   preserve?  The fact is that even if the Debtors were not permitted to discard the Notes in the ordinary

15   course after the formal Minutes were approved (and they were permitted to do so), once they

16   received the Doc Requests (which specifically did <u>not</u> require the Notes to be produced), they were

17   more than entitled to continue their normal practice of discarding the Notes, in reliance upon the fact

18   that nobody had asked for them.

19          In view of the foregoing, the Debtors had no obligation to preserve the Notes.

20   Accordingly, Charlestown has failed to satisfy the first prong of the *Napster* three-part test for

21   determining whether an adverse inference instruction should be given.

22   **B.**    **There Was No Spoliation Or "Culpable Mind."**

23          The second prong of the *Napster* "adverse inference" test requires that the Court find

24   that "the evidence was spoliated with a culpable mind," *Otsuka* at *9; *Napster*, 462 F. Supp. 2d at

25   1078.  Here, Charlestown's Request fails on two counts.

26          First, there was no real spoliation.  This is not a situation like those in the cases cited

27   in Charlestown's Request, where a defendant destroyed "one of a kind" physical evidence – a video,

28

1    a picture, or faulty heater – without which the plaintiff could not make its case.[15]  Here, all that

2

3    [15]    *See, e.g.*, *Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009) (Plaintiff, a prisoner, sued an officer for assault;
Court remanded for consideration of whether sanctions were appropriate where the defendant prison lost

4    or destroyed pictures and video of the injuries); were lost or destroyed by the prison); *Akiona v. United
States*, 938 F.2d 158 (9th Cir. 1991) (9th Circuit overturned lower court's decision to draw adverse

5    inference in negligence suit against United States government, where United States destroyed records re
defective grenade, on grounds that (a) United States had no notice of claims or reason to preserve the

6    documents, and (b) destruction could have been consistent with the government's document retention
policies and did not indicate bad faith); *Beaven v. United States DOJ*, 622 F.3d 540 (6th Cir. 2010)

7    (plaintiffs alleged defendants violated their privacy rights by disclosing to third parties an employee roster
containing sensitive personal information to be disclosed to improper persons, violating their privacy

8    rights.  During an internal investigation, but prior to plaintiffs' suit, defendants destroyed the documents
outside the ordinary course of business.  The court held that the defendants' spoliation of evidence critical

9    to the contested issues warranted an adverse inference); *Chrysler Realty Co., LLC v. Design Forum
Architects, Inc.*, 2009 U.S. Dist. LEXIS 121411 ( E.D. Mich. Dec. 31, 2009) (Plaintiff alleged a

10   professional negligence claim against an HVAC installer for installing a defective system.  Plaintiff, who
controlled the evidence (the HVAC system), hired someone to remove and destroy the HVAC system

11   without notifying or allowing defendant an opportunity to inspect the systems; court dismissed plaintiff's
claim based upon spoliation); *Flottman v. Hickman County*, 2010 U.S. Dist. LEXIS 110758 (M.D. Tenn.

12   2010) (Plaintiff maintained journal entries detailing defendant's assaults upon her and, while on notice
that the journals were relevant, destroyed certain pages of the journal; court held that the defendant was

13   entitled to an adverse inference instruction because destroyed evidence was highly relevant to defendant's
defenses); *Fujitsu Limited v. Federal Express*, 247 F.3d 423 (2d Cir. 2001) (Plaintiff sued for damage to

14   cargo shipped by FedEx.  Although Plaintiff reported damage immediately, FedEx did not request an
opportunity to inspect the cargo, and Plaintiff then disposed of the cargo.  The court did not impose a

15   spoliation sanction because no evidence existed that plaintiff intended to destroy evidence, and FedEx
failed to timely request an inspection); *Glover v. The BIC Corp.*, 6 F.3d 1318 (9th Cir. 1993) (Plaintiff

16   alleged that a BIC lighter was defective and caused injury.  Defendant alleged that plaintiff's expert
spoliated the lighter before BIC's expert could examine it.  Court held that plaintiff's expert's conduct was

17   "careless," but that his testimony need not be excluded, because defendant BIC was not prevented from
conducting its own examination); *Leon v. IDX Sys. Corp.*, 464 F.3d 951 (9th Cir. 2006) (Employer (IDX)

18   commenced a declaratory relief action against employee (Leon) seeking determination that its termination
of Leon was not retaliatory; Leon counter-sued for retaliatory discharge.  IDX sought Leon's return of an

19   IDX laptop that contained relevant documents and instructed Leon not to delete anything on the laptop,
but Leon intentionally deleted all relevant information.  Court affirmed findings that Leon's spoliation of

20   evidence was willful, because he was specifically on notice of the duty to preserve the information, which
would "likely be at the heart of IDX's defense," and dismissed Leon's claims); *National Assoc. of

21   Radiation Survivors v. Turnage*, 115 F.R.D. 543 (N.D. Cal. 1987) (After receiving document requests
asking for them, defendants destroyed a significant number of documents relevant to plaintiffs' claims

22   regarding radiation exposure; failed to produce other documents; and threatened retaliation against
employees who sought to comply with document request.  Court held that spoliation warranted various

23   monetary and procedural sanctions); *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76 (3d Cir. 1994)
(After plaintiff's expert examined and took apart an allegedly defective saw; defendant alleged spoliation

24   of evidence because it was unable to recreate the condition of the saw in its allegedly defective condition.
Trial court granted summary judgment after striking plaintiff's expert report as sanction for spoliation.

25   Third Circuit reversed on grounds that the expert had not destroyed the allegedly defective product and,
since it was a *design* defect case, defendant's expert did not need to examine the condition of any

26   particular saw); *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363 (9th Cir. 1992)
(Unigard brought subrogation claims against Lakewood, the manufacturer of a heater that Unigard

27   thought responsible for a fire on a boat it insured.  Unigard destroyed the heater and the remains of the
boat before filing suit, and  thereby precluded defendant from inspecting the evidence.  Since Unigard's

28   destruction of the evidence made a full defense impossible, summary judgment against Unigard was

1    happened is that Mr. Nielsen – in accordance with the standard practice for his and other corporate

2    boards – discarded his original handwritten Notes after he had used them to prepare formal Minutes

3    of the Board meetings.  At this point, Charlestown and the OEC have deposed Mr. Nielsen, Mr.

4    Meruelo, Mr. Maddux and Mr. Payne; have obtained tens of thousands of pages of documents from

5    the debtors; and have obtained thousands more pages of documents from the Debtors' two

6    independent directors, Messrs. Payne and Hansen.  And still, there is no evidence in the record, and

7    certainly no evidence in Charlestown's Request, to suggest that the Minutes (which Charlestown has

8    had since October 6, 2010) are anything less than an accurate record of the Board meetings.

9           Second, even if the Court were to find that the preparation of the Notes into Minutes

10    constitutes "spoliation," Charlestown has failed to satisfy its burden to show that Mr. Nielsen's

11    discarding of the Notes was done with a "culpable mind."  *See Costobile-Fulginiti v. City of Pa.*, 719

12    F. Supp. 2d 521, 529 (E.D. Pa. 2010).  To the contrary, the evidence here shows that Mr. Nielsen's

13    actions in discarding the Notes were undertaken, reasonably, without any culpability whatsoever:

14        •  <u>There Was No Notice</u> - As discussed above, the Notes were never the subject
      of discovery, and were not required to be produced pursuant to the Doc

15            Requests.  Accordingly, when he discarded his Notes, Mr. Nielsen had no
      notice that the Notes would be subject to discovery, or were otherwise

16            relevant.

17        •  <u>There Was No Attempt to Hide The Facts</u> – Throughout his deposition, Mr.
      Nielsen was perfectly candid about the fact that he had discarded the Notes,

18            and that it was always his practice to do so. Mr. Nielsen never attempted to
      hide or obfuscate his actions (because they were completely above board).

19

20

appropriate); *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 593 F. Supp. 1443 (C.D. Cal. 1984)

21    (Plaintiff alleged false advertising and illegal restraint of trade claims and propounded discovery upon
defendant GNC, and sought various sales and inventory records that were relevant to plaintiff's claims.

22    GNC destroyed all records relevant to the litigation, even after plaintiff obtained several court orders
requiring GNC to preserve those very records.  Finding that GNC "engaged in a pattern of order

23    violations and discovery abuse, including defiance and indifference to the orders of the court, to their
obligations and duties as litigants, and to the discovery process under the Federal Rules of Civil

24    Procedure," the court entered default in favor of plaintiff); *Zubulake v. UBS Warburg LLC*, 220 F.R.D.
212 (S.D.N.Y. 2003) (Plaintiff sued her former employer for sex discrimination and contended that

25    evidence to prove her case existed in internal UBS emails.  Although UBS instructed its employees to
preserve all information relating to the case, some backup tapes containing potentially relevant evidence

26    were missing and certain emails were either deleted or not saved at all.  Plaintiff sought an adverse
inference instruction that the evidence, if available, would have been favorable to plaintiff and harmful to

27    UBS.  The court denied that request, noting that "the adverse inference instruction is an extreme sanction
and should not be given lightly.").

28

- • **There Was A Reasonable Explanation for the Delay** – Charlestown implies that there was something sinister about Mr. Nielsen having fallen behind in preparing the Board Minutes, and having to prepare several "batches" all at once in August of 2010.  However, Mr. Nielsen previously explained that this was due to the press of more urgent matters relating to the bankruptcy case, such as negotiations with various creditors.  Conspiracy theories aside, Charlestown has simply failed to provide any evidence that the Minutes do not accurately reflect the Board meetings, regardless of when the Minutes were typed up from the Notes.

In its Request, Charlestown fails to meet its burden to establish that any wrongdoing occurred with regard to the Notes.  Indeed, the Request presents no evidence whatsoever with respect to the "culpable mind" prong of *Napster*'s 3-part test.  Rather than being part of some nefarious plot to destroy secret evidence of wrongdoing at the Board level,[16] the evidence shows that Mr. Nielsen's discarding of his Notes after the formal Minutes were approved was the standard practice of the company (and most public companies).

When presented with facts almost identical to those here, courts have found there to be no "culpable mind."  *See, e.g.,  Costobile-Fulginiti v. City of Pa.*, 719 F. Supp. 2d 521, 529 (E.D. Pa. 2010) ("Council's supervisor, Michael Meketon, testified that it was common practice at DHS for a social worker to discard original documents and notes after the information had been copied or typed up and placed in the file.  Meketon likened the original documents to rough or working drafts. We find that this practice, and Council's conduct in following this practice, does not warrant spoliation sanctions.  Plaintiff has not provided any evidence that Council's original handwritten notes or original documents were purposely altered or omitted when transferred from rough draft to final draft form.") (internal citations omitted).

Here, like in *Costobile*, Mr. Nielsen simply discarded his "original documents and notes after the information had been copied or typed up and placed in the file," which practice "does not warrant spoliation sanctions." *Id.*  In view of the foregoing, it is clear that there was no

---

[16]    Charlestown's operative, but implausible, theory of how the plot worked seems to be that (1) the Board engaged in or approved improper transactions during Board meetings; (2) Mr. Nielsen dutifully recorded in his Notes all the details of the improper activity; and (3) Mr. Nielsen then prepared formal Minutes, which omit any reference to the improper things that supposedly took place, and then destroyed the "evidence," in the form of the Notes.  All of which begs the question: If the Board members really were doing something improper, why would they want Mr. Nielsen to take Notes in the first place?

1    spoliation, and that Mr. Nielsen had no "culpable mind" when he discarded his Notes.  Accordingly,

2    Charlestown has failed to satisfy the second prong of the three-part *Napster* test for determining

3    whether an adverse inference instruction should be given.

4    **C.    The Notes Are Not Relevant To Any Claim Or Defense.**

5            The third part of the three-part *Napster* test for determining if an adverse inference

6    instruction should be given is whether the allegedly spoliated evidence is relevant to a claim or

7    defense.  Here, again, although Charlestown clearly has the burden of proof to establish relevance,

8    *Ritchie v. United States*, 451 F.3d 1019, 1024 (9th Cir. 2006), it has failed to carry that burden.

9            In support of its argument that the Notes are relevant, Charlestown offers the

10   following: "reliable evidence of the Company's board meetings are [sic] relevant to these

11   proceedings."  Request at 14.  That may well be true, but it misses the point.  For Charlestown to

12   prevail on its Request for an adverse inference instruction, in addition to satisfying the first two

13   prongs of the test, it must show that <u>the Notes</u> are relevant, *i.e.*, <u>that the Notes are the only reliable</u>

14   <u>evidence of the Board Meetings</u>, and this it cannot do.

15           Charlestown already has the Minutes; it already has almost 3,000 pages of Board

16   Packets; it already participated in the depositions of Mr. Nielsen and three Board members; and it

17   has already received another 2,500 pages of documents from two independent Board members.

18   Thus, not only does Charlestown have all that information, and it has had it for <u>months</u>.  Yet,

19   Charlestown has been unable to come up with any evidence to show that the Minutes that it has, are

20   anything other than exactly what Charlestown says is relevant, *i.e.*, "reliable evidence of the

21   Company's board meetings."  Under these circumstances, Charlestown cannot be found to have

22   satisfied its burden to show that the Notes are relevant; Charlestown's unfounded claims about what

23   it hopes the Notes would have shown are just not sufficient.

24           The Ninth Circuit has clearly held that allegations regarding the value of destroyed

25   evidence cannot be merely speculative.  *See United States v. Benedict*, 647 F.2d 928, 933 (9th Cir.

26   1981) (allegations regarding value of destroyed evidence cannot be merely speculative), *cert. denied*,

27   102 S. Ct. 648 (1981); *United States v. Sarabia*, 1995 U.S. App. LEXIS 13539, 3-5 (9th Cir. Ariz.

28   May 31, 1995) (finding that the lower court did not abuse its discretion in refusing to sanction

1    prosecution for what it found to be negligent destruction of evidence whose value was highly

2    speculative).  Here, Charlestown has offered nothing but rank speculation as to what the Notes

3    would have shown (contrary to all other evidence), and that is insufficient to support an adverse

4    inference.

5        In *In re Take-Two Interactive Software, Inc.*, 2009 U.S. Dist. LEXIS 39140 (S.D.N.Y.

6    April 21, 2009), the United States District Court for the Southern District of New York faced an

7    issue similar to that raised by Charlestown here.  The plaintiffs in *Take-Two* filed a shareholders

8    derivative action against the corporation, which then appointed a special litigation committee

9    ("SLC") to investigate the shareholders' claims, and to make recommendations about whether to

10   pursue them.  The plaintiffs then moved to exclude the SLC's reports from the court's consideration,

11   based on claims of "spoliation of evidence."

12       In particular, the plaintiffs in *Take-Two* based their argument on the undisputed facts

13   that one of the members of the SLC, "Brown," destroyed his secretary's handwritten minutes of SLC

14   meetings, as well a handwritten draft of the SLC's 'Supplemental Report,' and argued that Brown

15   should have known that the materials that had been destroyed would have been discoverable in the

16   litigation.  In denying the plaintiffs' motions, the *Take-Two* court noted that the plaintiffs failed to

17   proffer any evidence suggesting that the destroyed documents contained anything relevant to their

18   claims.  *Id.* at *14 (citing *Kronisch v. United States, 150 F.3d 112, 127 (2d Cir. 1998))* ("no adverse

19   inference where party failed to provide any extrinsic evidence that the subject matter of the lost or

20   destroyed materials would have been unfavorable to the opposing party or would have been relevant

21   to the issues in this lawsuit") (internal citation omitted).  In reaching its conclusion, the *Take-Two*

22   court relied on the following facts: (i) Brown's secretary converted her handwritten notes of SLC

23   meetings into typewritten draft minutes before destroying the handwritten notes, and that this was a

24   regular practice, (ii) there was no allegation that the typewritten minutes were also destroyed,  and

25   (iii) there was nothing in the record that suggested that the handwritten notes contained relevant

26   information.  *Id.* at 13-14.

27       The holding in *Take-Two* is consistent with the Ninth Circuit's holding in *Ogden v.*

28   *United States*, 323 F.2d 818 (9th Cir. 1963).  In *Ogden*, a criminal defendant sought sanctions

1    against the prosecution relating to the destruction of handwritten interview notes taken by the FBI;

2    the notes were destroyed after being reduced to a signed, written record in accordance with the FBI's

3    standard practice.  Relying on established precedent, the Ninth Circuit held that because the contents

4    of the handwritten notes were otherwise available to the defendant in the form of the signed, written

5    statement, and because the destruction of the notes was done in good faith and in accordance with

6    the normal practice of the FBI, there was no basis for the court to impose sanctions.  *Id.* at 821.

7            In the instant case, the bottom line is clear: because the Notes were discarded in the

8    ordinary course of business after the Minutes were approved, and in the absence of any evidence that

9    the Minutes do not accurately reflect the Board deliberations, the Notes are not relevant.  Thus, since

10   Charlestown has failed to meet its burden to prove that the Notes were relevant to any of its claims,

11   Charlestown has failed to satisfy the third prong of *Napster's* three-part test for determining whether

12   an adverse inference instruction should be given.

13

14   **D.    The Imposition Of An Adverse Inference Is Not Warranted Here.**

15           Charlestown's final argument is that it would be "appropriate" for the Court to draw

16   an adverse inference against the Debtors because there was a duty to preserve evidence, and the

17   Debtors supposedly breached that duty willfully.  Request at 15.  As shown above, however, with

18   regard to the Notes at issue, the Debtors were under no such duty.  Accordingly, the Debtors did not

19   breach any duty, and it would not be appropriate to impose any sanctions on the Debtors.

20           Charlestown goes to great lengths to try to compare the situation here to the *Napster*

21   case, where the court imposed an adverse inference after finding that a defendant had deleted emails

22   that were relevant to the litigation.  But even Charlestown knows that this is a huge stretch.  This

23   case is worlds apart from *Napster*.

24           In *Napster*, Hummer invested in Napster after various parties had sued Napster for

25   copyright infringement.  462 F. Supp. 2d at 1064.  On June 1, 2000, Hummer received deposition

26   and document subpoenas asking for, among other things, "all communications regarding Napster."

27   *Ibid.*  On June 3, 2000, Hummer distributed an internal email that was nominally styled as a

28   "litigation hold" notice, but in reality was a thinly-disguised instruction for Hummer's employees to

1    purge their files of anything relating to Napster.  Among other things, the email contained the

2    following "reminder":

3                    *Please also be aware of our e-mail policy. As we have all been*
             *required to surrender Napster e-mails, this should reinforce*
4                    *compliance with our long standing policies.*
             *1. we do not retain e-mails, it is your responsibility to delete your*
5                    *handled e-mails immediately*
             *2. we do not use e-mail to chat about matters related to public*
6                    *companies or matters such as the above*
             *3. we do not retain written copies of e-mails in our files*

7

8    *Ibid.*

9            Hummer initially denied that it had instructed its employees to delete files, and also

10   denied that files had been deleted.  *Id.* at 1065.  However, this was proven false when the plaintiffs,

11   in discovery from third parties, obtained copies of some Napster-related emails to and from

12   Hummer; Hummer then changed its story to say that it had only deleted files in accordance with its

13   document retention policy.  *Id.* at 1066.  Ultimately, the plaintiffs asked the court to impose

14   terminating sanctions against Hummer for its conduct, or alternatively, an adverse interest

15   instruction.  *Id.* at 1070.  The *Napster* court held that an adverse interest was an appropriate sanction,

16   because, once Hummer received the June 1, 2000 subpoena, it had a duty to preserve documents

17   covered by that subpoena, but instead Hummer deleted emails that were clearly subject of the

18   subpoena, and thereby caused prejudice to the plaintiffs.

19           *Napster* is wholly inapposite to the situation here.  <u>First</u>, unlike the case in *Napster*, as

20   discussed above in Section III.A. of this Opposition, the Notes were never the subject of a valid

21   discovery request or Court order.  <u>Second</u>, unlike Hummer in *Napster*, the Debtors never directed

22   their employees to purge their files 48 hours after receiving a discovery request; rather, the Notes

23   were discarded in what the undisputed evidence shows is the ordinary course of business of Mr.

24   Nielsen (and most corporations).  <u>Third</u>, unlike the evidence in *Napster*, which was completely

25   deleted from Hummer's files, here, the Notes were only discarded <u>after</u> Mr. Nielsen transformed

26   them into official Minutes that were approved by the Board <u>and</u> produced in discovery.  <u>Fourth</u>,

27   unlike Hummer, which at first denied it had deleted emails, and initially did not produce the June 3

28   "file purge" instruction email, the Debtors here were completely candid about the Notes, as set forth

1  clearly in Mr. Nielsen's deposition.  Fifth, unlike the plaintiffs in *Napster*, which the court found to

2  have been prejudiced by Hummer's conduct, Charlestown is unable to demonstrate any prejudice

3  whatsoever.

4     The facts here are much more like those in *Hechinger Inv. Co. of Del., Inc. v. Univ.*

5  *Forest Prods., Inc.* (*In re Hechinger Inv. Co. of Del., Inc.*), 489 F.3d 568 (3d Cir. 2007).  In

6  *Hechinger*, UFP, a preference defendant, moved the court for an adverse inference in its favor on the

7  grounds that Hechinger had destroyed certain records that UFP alleged might have assisted UFP in

8  establishing a § 547(c)(1) affirmative defense.  The Hechinger court then summarized the applicable

9  stand for the "spoliation inference" as follows:

10     The "key considerations in determining whether [the 'spoliation
   inference'] is appropriate should be: (1) the degree of fault of the party

11     who altered or destroyed the evidence; (2) the degree of prejudice
   suffered by the opposing party; and (3) whether there is a lesser

12     sanction that will avoid substantial unfairness to the opposing party
   and, where the offending party is seriously at fault, will serve to deter

13     such conduct by others in the future."

14  *Hechinger*, 489 F.3d at 579 (quoting *Schmid v. Milwaukee Electric Tool Corp.*, 13 F.3d 76, 78-79

15  (3d Cir. 1994)).

16     The *Hechinger* court ultimately found that neither of the first two factors applied

17  because "[t]here is no evidence that Hechinger intentionally destroyed documents that it knew would

18  be important or useful to UFP in defending against a preference action.  In fact, there is no evidence

19  that any of the documents destroyed would have been useful to UFP.  There was also no showing

20  that UFP was prejudiced because UFP did not identify any evidence that was destroyed by

21  Hechinger that would have aided UFP.  Any finding that this conduct prejudiced UFP would be

22  purely speculative.  Therefore, the Bankruptcy Court had little basis for granting UFP's spoliation

23  motion and we will not disturb the Court's denial of that motion."  *Hechinger*, 489 F.3d at 579.

24     Like in *Hechinger,* there is no evidence that the Notes would have been useful to

25  Charlestown; there has been no showing that Charlestown has been prejudiced in any way; and any

26  such finding regarding prejudice would be purely speculative.  In addition, unlike the situation in

27  *Hechinger*, where the records destroyed were lost forever, here, although the Notes themselves are

28  gone, their content still exists in the form of the Minutes, and Charlestown has had ample

1    opportunity to take discovery of Mr. Nielsen, the Debtors and independent directors in order  to

2    corroborate the veracity and accuracy of the Minutes.  Yet, even after all this, Charlestown still has

3    produced nothing to show that it has been prejudiced, or that the Notes somehow would have helped

4    it prove any claim.

5
                                                        **IV.**

6
                                                **CONCLUSION**

7

8            For all the foregoing reason, the Debtors respectfully request that the Court (1) deny

9    Charlestown's Request; (2) decline to impose any sanction against the Debtors; (3) find that the loss

10   of the Notes caused no prejudice to Charlestown or any other party; and (4) granting such other

11   relief as the Court deems proper.

12

13
     Dated: February 17, 2011
14                                          Respectfully submitted,

15

16                                          _____/s/ Eric D. Goldberg_____
17                                          GARY E. KLAUSNER, STEPHAN M. RAY,
                                            MARINA FINEMAN, and ANTHONY ARNOLD,
18                                          Members of STUTMAN, TREISTER & GLATT, P.C.

19                                          Special Reorganization Counsel for Debtors and
                                            Debtors in Possession

20

21

22

23

24

25

26

27

28

# _EXHIBIT A_

# In The Matter Of:

*MERUELO MADDUX PROPERTIES, INC.*

_____

*NIELSEN, TODD - Vol. 1*
**January 12, 2011**

_____

**MERRILL CORPORATION**

**LegaLink, Inc.**

20750 Ventura Boulevard
Suite 205
Woodland Hills, CA 91364
Phone: 818.593.2300
Fax: 818.593.2301

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
SAN FERNANDO VALLEY DIVISION

In Re:                    ) CASE NO.
                          ) 1:09-BK-13356-KT
MERUELO MADDUX PROPERTIES,  )
INC., et al.,             )
                          )
Debtors and               )
Debtors-in-Possession.    )
_____ )
Affects All Debtors       )
_____ )


DEPOSITION OF TODD NIELSEN
TAKEN ON
WEDNESDAY, JANUARY 12, 2011


Reported by:  NIKKI ROY
CSR No. 3052

**Page 1**

---

1       Deposition of TODD NIELSEN, taken on behalf of the
2   Official Equity Committee, at 1901 Avenue of the Stars,
3   Suite 1200, Los Angeles, California, on Wednesday,
4   January 12, 2011, at 9:54 a.m., before Nikki Roy, CSR
5   No. 3052.
6
7
8   APPEARANCES:
9
10  FOR THE OFFICIAL EQUITY COMMITTEE:
11      RODIGER LAW OFFICES
        BY:  GEORGIANA RODIGER, ESQ.
12      272 Los Robles Avenue
        Pasadena, California 91101-2872
13      (626) 793-7264
14
15  FOR MERUELO MADDUX PROPERTIES, INC., AND THE WITNESS:
16      LAW OFFICES STUTMAN TREISTER & GLATT
        BY:  GARY KLAUSNER, ESQ.
17      1901 Avenue of the Stars
        Suite 1200
18      Los Angeles, California 90067-6013
        (310) 228-5755
19
20
21
22
23
24
25

**Page 2**

---

1   APPEARANCES (CONTINUED):
2
3   FOR THE COUNTY OF LOS ANGELES:
4       STECKBAUER WEINHART JAFFE, LLP
        BY:  SUSAN FELDMAN, ESQ.
5       333 South Hope Street
        36th Floor
6       Los Angeles, California 90071
        (213) 229-2868
7
8
        FOR THE CREDITORS COMMITTEE:
9
        SULMEYER KUPETZ
10      BY:  ASA HAMI, ESQ.
        333 South Hope Street
11      35th Floor
        Los Angeles, California 90071
12      (213) 626-2311
        (Via teleconference)
13
14
15      FOR BANK OF AMERICA:
16      SNELL & WILMER LLP
        BY:  DONALD L. GAFFNEY, ESQ.
17      400 East Van Buren Street
        Phoenix, Arizona 85004-2202
18      (602) 382-6000
        (Via teleconference)
19
20  FOR CHARLESTOWN CAPITAL ADVISORY LLC and HARTLAND ASSET
    MANAGEMENT CORPORATION:
21
        LESNICK PRINCE LLP
22      BY:  CHRIS PRINCE, ESQ.
        185 Pier Avenue
23      Suite 103
        Santa Monica, California 90405
24      (310) 396-0960
25

**Page 3**

---

1   APPEARANCES OF COUNSEL (CONTINUED):
2
3   FOR PNL POMONA:
4       HAGAN & ASSOCIATES
        BY:  CARA HAGAN, ESQ.
5       110 East Wilshire Avenue
        Suite 405
6       Fullerton, California 92832-1956
        (714) 526-3377
7
8
    ALSO PRESENT:
9
        RICHARD MERUELO
10      MIGUEL ECHEMENDIA
        JOHN TEDFORD, (Telephonically)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 4**

I N D E X

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| TODD NIELSEN | | |
| | MS. RODIGER | 7 |
| | MR. GAFFNEY | 96 |
| | MR. PRINCE | 146 |
| | MS. HAGAN | 161 |

E X H I B I T S

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit AA | Privilege Log with attachments, 21 pages | 68 |
| Exhibit AB | Privilege Log with attachments, 3 pages | 70 |

QUESTIONS INSTRUCTED NOT TO ANSWER
(None)

INFORMATION REQUESTED
(None)

Page 5

LOS ANGELES, CALIFORNIA, WEDNESDAY, JANUARY 12, 2011
2:23 P.M.

MS. RODIGER:  We are just getting ready to start the deposition, and here in the conference room I'm here, Georgiana Rodiger for the creditors' committee.  We will go around and make appearances.

MS. HAGAN:  Cara Hagan on behalf of PNL.

MS. FREEDMAN:  Susan Freedman on behalf of the County of Los Angeles.

MR. KLAUSNER:  Gary Klausner representing the debtors.

MS. RODIGER:  And Mr. Nielsen is here also.

MR. KLAUSNER:  And I'm also representing Mr. Nielsen for purposes of the deposition.

MS. RODIGER:  Thank you.  Okay.  I think we're ready.

TODD NIELSEN
called as a deponent and sworn in by the deposition officer, was examined and testified as follows:

Page 6

EXAMINATION
BY MS. RODIGER:
    Q.  Can you state and spell your name for the record, please.
    A.  Sure.  Todd Nielsen, T-o-d-d, N-i-e-l-s-e-n.
    Q.  Thank you.  Mr. Nielsen, have you had your deposition taken in the last five years?
    A.  Yes.
    Q.  How many times?
    A.  Twice.
    Q.  In what context?
    A.  An unlawful detainer action and in a specific performance action by the company.
    Q.  Were both of those lawsuits involving your employer?
    A.  Yes.
    Q.  Okay.  Have you had a chance to meet with an attorney before your deposition today?
    A.  Briefly.
    Q.  And -- and you are an attorney; is that right?
    A.  Yes.
    Q.  All right.  Do you feel generally comfortable with the deposition process or would you like me to go through all of the general admonitions?
    A.  You might as well go through it.  I --

Page 7

    Q.  Very good.  The deposition process is one where you've been placed under oath by the court reporter, and the testimony you give today is the same as it would be in a court of law.
        Do you understand that?
    A.  Yes.
    Q.  Okay.  Everything that is said in this room will be taken down by the court reporter on your right and put into a booklet form that will later be provided to you to review under -- and sign under penalty of perjury.
        Do you understand that?
    A.  Yes.
    Q.  Okay.  At the time you have the opportunity to review the booklet, you will be able to make changes and corrections to the record.  However, you should know that should you make significant changes like a change of a yes to a no, or significant dollar changes, those could be commented upon by any attorney at a future proceeding and could prove embarrassing to you in some way.
        Do you understand that?
    A.  Yes.
    Q.  Okay.  For that reason, it's very important we get the best record we can right from the outset.  And

Page 8

2 (Pages 5 to 8)

**Page 9**

1  part of the rules for that is, since the court reporter
2  can only take down one person speaking at a time, you
3  and I and all the other attorneys should try to make
4  sure that I complete my question before you start an
5  answer and vice versa.
6       Do you understand that?
7  A. Yes.
8  Q. Okay. Also your attorney and any other
9  attorney here has the opportunity to object if they need
10  to do so, and should an attorney start objecting, I
11  would ask that you hold your answer until everyone has
12  had a chance to state whatever they want to put on the
13  record.
14       Do you understand that?
15  A. Yes.
16  Q. Okay. In addition, your attorney may at some
17  point ask -- instruct you not to answer. If he does
18  that, I will ask you if you're following his
19  instructions and we'll make a record on that, but that's
20  another reason it's really important to give
21  Mr. Klausner a chance to say whatever he'd like to say
22  before you speak.
23  A. Okay.
24  Q. Okay. In your testimony today I am looking for
25  your best memory or recollection. I am asking -- I will

**Page 10**

1  be asking you for estimates, but I do not want you to
2  speculate. The difference between an estimate and a
3  speculation would be if I asked you to estimate the
4  change in your pocket, you probably would have some
5  factual basis for making an estimate. If I asked you to
6  state the change in my purse, that would undoubtedly be
7  a guess.
8       Do you understand the difference?
9  A. Yes.
10  Q. Okay. And if I ask you for an estimate, it may
11  be an estimate in terms of years or in terms of amount
12  or in terms of dates. And whatever your best estimate
13  is, is all I'm entitled to. But if you're guessing,
14  please say so and both Mr. Klausner and I will say
15  please don't guess or speculate. Okay?
16  A. Okay.
17  Q. All right. Have you any health condition that
18  precludes you from being able to give your best
19  testimony today?
20  A. No.
21  Q. Okay. Have you consumed any kind of a
22  substance or medication that might impact your ability
23  to testify today?
24  A. No.
25  Q. All right. Do you have any questions about the

**Page 11**

1  deposition process that I haven't answered for you?
2  A. No.
3  Q. Okay. Have you reviewed any documents in
4  preparation for your deposition today?
5  A. No.
6  Q. As I --
7       MR. KLAUSNER: Excuse me. Could we go off the
8  record just for a minute?
9       MS. RODIGER: Sure.
10       MR. KLAUSNER: Okay.
11       (Off-the-record discussion was held.)
12  BY MS. RODIGER:
13  Q. Let me clarify that I understand that you're an
14  attorney; is that right?
15  A. Yeah.
16  Q. Yes. And so while we were just off the record,
17  we were discussing the fact that we may get into areas
18  of inquiry that could possibly invade an attorney-client
19  privilege. I -- I want to state up front that to the
20  extent that I am asking any question that invades an
21  attorney-client privilege, please feel free to consult
22  with your attorney or let me know that because I do
23  understand that attorney-client privileges exist and I
24  don't want to invade them unintentionally. I'm not
25  trying to get that kind of testimony from you.

**Page 12**

1       That said, Mr. Klausner has something to say
2  which I agree with, I think?
3       MR. KLAUSNER: Yeah, I suggested that -- that
4  we clarify at the beginning and we stipulate at the
5  beginning of this deposition that there's nothing that
6  Mr. Nielsen will say today which will be used or deemed
7  or interpreted as any waiver of any applicable privilege
8  including the attorney-client privilege or work-product
9  privilege. And if he should answer a question that
10  would arguably be governed by those privileges, his
11  answer will not be considered or deemed or used to -- as
12  a basis for an argument that any privilege has been
13  waived.
14       Is that acceptable, Counsel?
15       MS. RODIGER: That's acceptable to me.
16       MS. HAGAN: Acceptable.
17       MS. FREEDMAN: Acceptable.
18       MS. RODIGER: Okay.
19       MR. KLAUSNER: And, Mr. Gaffney, is that okay
20  with you? Are you on mute, Don?
21       MS. RODIGER: Anyone on the phone so
22  stipulating?
23       MR. GAFFNEY: Don Gaffney. I was on mute.
24       MR. KLAUSNER: Are you okay with the
25  stipulation?

3 (Pages 9 to 12)

1        MR. GAFFNEY:  Yes.
2        MR. KLAUSNER:  Thank you.
3        MS. RODIGER:  And the creditors' committee
4    counsel?
5        MR. HAMI:  Yes, that's fine.  Mr. Asa Hami.
6        MR. KLAUSNER:  Thank you.
7        MS. RODIGER:  Very good.
8        Q.  Mr. Nielsen, what is your current position at
9    MMPI?
10       A.  General counsel of the company.
11       Q.  How long have you had that position?
12       A.  Since 2005, so about five-and-a-half years.
13       Q.  How long have you been with MMPI?
14       A.  Well, MMPI has existed since the beginning of
15   2007, so -- so since January of 2007.
16       Q.  How long have you been employed by MMPI or its
17   predecessor entity?
18       A.  Five-and-a-half years.
19       Q.  So since 2005?
20       A.  Correct.
21       Q.  In this case there have been board minutes
22   produced.
23       Are you aware of that?
24       A.  Yes.
25       Q.  Did you prepare those board minutes that were

**Page 13**

1    produced in this case?
2        A.  Most of them.
3        Q.  Can you identify for me by dates which ones you
4    did produce and which ones you did not?
5        A.  I produced all of them except for, I believe
6    there are one or two that were produced by Jeff Sullivan
7    of DLA Piper.
8        Q.  Who is --
9        A.  I don't remember the specific dates, so it's
10   easier to define what I didn't prepare rather than what
11   I did.
12       Q.  All right.
13       A.  So there -- there were one or two, two board
14   minutes that were prepared by Mr. Sullivan.
15       Q.  When I ask you if you prepared them, I'm asking
16   if you actually drafted them.
17       Do you understand that?
18       A.  Yes.
19       Q.  And -- and with the exception of what was
20   produced by Mr. Sullivan, did you actually draft the
21   board minutes that were produced?
22       A.  Yes.
23       Q.  Can you tell me during what period of time you
24   prepared those draft -- those board minutes?
25       A.  Well, since the -- since the inception of the

**Page 14**

1    company until -- until present.  When I say "the
2    company," I guess that would be since 2007 to the
3    present.
4        Q.  The earliest board minutes, I believe, that
5    were produced in this case are dated March 14th, 2008.
6        Is that consistent with your memory?
7        A.  I believe so.
8        Q.  Can you tell me when the March 18th -- I'm
9    sorry -- March 14th, 2008 board minutes were created?
10       A.  Not specifically.  It would have been shortly
11   before -- I'm sorry.  March 14th was the date of the --
12   of the board meeting?  So it -- it would have normally
13   been some time between that meeting and the next
14   meeting.
15       Q.  How often are board meetings held?
16       A.  Well, originally board meetings were held
17   regularly on a quarterly basis.  In 2008 there were
18   probably some additional board meetings in addition to
19   the quarterly meetings.  In 2009 and '10 there were
20   substantially more meetings held and not all of them
21   were regularly scheduled.
22       THE DEPOSITION OFFICER:  Not all of them
23   were...
24       THE WITNESS:  Regularly scheduled.
25   BY MS. RODIGER:

**Page 15**

1        Q.  Did you attend the board of directors'
2    meetings?
3        A.  Yes.
4        Q.  All right.  And was it your responsibility as
5    you understood it for you to take the minutes for the
6    board of directors' meetings?
7        A.  Yes, yes.
8        Q.  And that -- has that been true since 2007?
9        A.  Yes.
10       Q.  How quickly after a board meeting did you
11   prepare minutes as a general practice?
12       A.  There would usually be some lag time, depending
13   on -- you know, some of them were prepared, again, in
14   between the time of the last -- of the board meeting in
15   question and the next board meeting; some of them may
16   have been prepared in groups such that they were -- you
17   know, I prepared multiple meetings for -- minutes for
18   multiple meetings at a time.  It varied.
19       Q.  Why did it vary between those two practices?
20       A.  Mostly it was because of the bankruptcy just
21   increased the workload so substantially that it was less
22   practical to get them all done in between each meeting.
23   In addition, there were so many more meetings that
24   occurred that it became more difficult to prepare them
25   in between each meeting.

**Page 16**

**4 (Pages 13 to 16)**

Q. Can you identify for me the time period in
which you were preparing minutes between meetings?
   A. Generally 2007 and 2008.
   Q. When you prepared the board minutes between
meetings, did you usually present those minutes to the
board for approval at the next meeting?
   A. Yes.
   Q. Was that something that you usually reflected
in the minutes?
   A. Yes.
   Q. And then for the period after 2008, were board
minutes prepared in groups?
   A. Yes, 2009-2010 it was more likely in groups.
   Q. Do you -- can you identify for me what the
groups of minutes were for 2009 and 2010 that were
prepared after a lag time?
   A. I can't off the top of my head.
   Q. In the -- in the minutes of, I believe,
August 23rd, 2010, the minutes reflect that there was a
group of minutes approved at that meeting.
      Do you know what group of minutes was approved
at that meeting?
   A. Those were probably for -- I don't know for
sure, but they were probably for 2009 and maybe --
      MR. KLAUSNER: Todd, let me just remind you not

to speculate or guess.
      THE WITNESS: Okay. I don't know for sure.
BY MS. RODIGER:
   Q. Okay. I'm asking for your best estimate. Can you --
   A. My estimate?
   Q. Yes.
   A. Would be for -- they were probably for 2009 and
maybe even a part of 2010.
   Q. Do you recall how many minutes were approved at
that August 23rd board meeting specifically?
   A. I don't recall the specifics.
   Q. Do you recall the time frame of the minutes
that were approved at that August 23rd board meeting?
   A. I'm not sure I understand. Can you --
   Q. If it was January 1st, 2009 through --
   A. I -- I don't remember specifically.
   Q. Why -- why was a group of minutes from 2009 and
2010 submitted for approval at the August 23rd board
meeting?
   A. August 23rd of what -- what time period?
   Q. 2010.
   A. To -- to update our record of the minutes.
   Q. So to bring the board approval process of
the -- of the minutes current?
   A. Correct.

Q. Okay. Can you tell me as to the minutes
prepared prior to August 23rd, 2010 which minutes, if
any, were prepared by Mr. Sullivan?
   A. Not without viewing them.
   Q. Is there something in the minutes that would
tell you that?
   A. I thought that they would have -- I thought
that they indicated that Mr. Sullivan prepared them, but
I -- I don't remember.
   Q. Okay. I think I have a copy.
   A. I believe there were minutes in July of 2009
because I was on vacation. And there -- there may have
been -- been some others, but that's the one I -- I
remember.
   Q. And you were anticipating my next question
which is, was Mr. Sullivan taking minutes because you
weren't at those meetings?
   A. Correct.
   Q. Okay. Of the minutes that you prepared, how
did you record at the meetings what you were going to
need for the minutes, handwriting or computer?
   A. I took handwritten notes.
   Q. And did you ever differ from that practice
during the time that you were preparing board minutes?
   A. No.

Q. So do you somewhere have your handwritten notes
that were used in preparing all of the board minutes
from 2008 through 2010?
   A. No.
   Q. What did you do with the handwritten notes?
   A. Once -- once board minutes are approved, then
I -- I throw those away.
   Q. Okay. So -- so would it be correct to say that
there is not to your knowledge a copy of your
handwritten notes from any of these board meetings?
   A. Correct.
   Q. Okay. And other than your notes taken at the
board meetings, do you use anything else to prepare
board minutes?
   A. Such as -- I'm not sure I understand.
   Q. An agenda or other people's notes?
   A. No.
   Q. Is -- is there usually a board agenda
distributed prior to the MMPI board of directors
meetings?
   A. For a regularly scheduled meeting, yes, there
normally would be. Not necessarily for -- for the other
meetings, though.
   Q. Who prepares that agenda usually?
   A. It would usually be me or John Maddux.

1     Q. Do you have copies of the agendas that you have
2  prepared for board of directors meetings since 2008?
3     A. Yes.
4     Q. Have those all been produced as part of the
5  board packet materials to your knowledge?
6     A. I don't believe so.
7     Q. Where would those agendas be?
8     A. Those would be in my files.
9     Q. Okay. And how about the agendas that
10  Mr. Maddux prepared, do you have copies of those also?
11     A. I likely have copies. I -- but I'm -- I'm not
12  100 percent sure.
13     Q. Prior to board meetings, have you undertaken to
14  distribute any kinds of materials, board packets for
15  board consideration?
16     A. I -- did not necessarily distribute
17  materials. I may have distributed some of the
18  materials, not necessarily all of them.
19     Q. That's really where I was going. You
20  anticipated me again. I was trying to find out if
21  that's something you would have done or somebody else on
22  the board would have done as a general practice.
23     A. There was not a single person who distributed
24  materials.
25     Q. What kind of materials might you have

1  distributed, categorically, not specifically,
2  Mr. Klausner.
3     A. Usually, you know, documents of a legal nature.
4     Q. Anything else?
5     A. Resolutions, for instance. Any agreements that
6  might -- might be approved. Usually those things that
7  were -- were -- where we were seeking board approval of
8  the specific document.
9     Q. Have you produced, pursuant to the board packet
10  production in this case, copies of everything that you
11  produced for the board of directors to the best of your
12  knowledge?
13     A. To the best of my knowledge.
14     Q. Okay. On the 2009-2010 minutes that were
15  prepared sometime after those meetings occurred, did you
16  deviate from your normal practice of using your
17  handwritten notes to prepare those minutes?
18     A. No.
19     Q. Were those minutes prepared after the equity
20  committee and creditor committee request for production
21  of documents in this case?
22     A. I don't remember.
23     Q. Okay. Do you know what period of time prior to
24  the August 23rd meeting when they were approved was
25  dedicated to your preparing those minutes?

1     A. Can you say that again?
2     Q. Yes. Can you recall what period of time prior
3  to the August 23rd, 2010 meeting where they were
4  approved you dedicated to preparing those minutes, two
5  weeks, three weeks?
6     A. Like how long it took me?
7     Q. Exactly. Better question.
8     A. I -- I -- I would have a hard time estimating
9  that. They were prepared over various periods of time.
10  You know, several hours over several -- over a number of
11  days. I mean, it would depend on how much time I had
12  any particular day to -- to devote to that. So it may
13  be that I worked one hour one day and then three hours
14  on -- on another day.
15     Q. Do you --
16     A. And it may have been more than two days. I
17  mean, I don't -- I don't remember specifically.
18     Q. Do you recall when you started preparing those
19  minutes that were approved at the August 23rd, 2010
20  meeting?
21     A. Well, I probably started preparing some of them
22  in 2009 and didn't get them completed. And I would have
23  started preparing some of them in 2010 and would have
24  completed the package, so to speak.
25     Q. When you say you "probably started preparing

1  some in 2009," as you're sitting here today, do you have
2  a memory that you did that?
3     A. Yes.
4     Q. And as to the minutes that you prepared in
5  2009, is there a reason why they were not submitted to
6  the board for approval till August 23rd, 2010?
7     A. Because I didn't complete them.
8     Q. So as to minutes as to any particular board
9  meeting, they were not completed until prior to the
10  August 23rd meeting?
11     A. Correct.
12     Q. Okay. So what portions of the minutes for --
13  for 2009 would you have prepared in 2009?
14     A. I don't -- I don't remember.
15     Q. Where did you prepare minutes, in your office?
16     A. Yes.
17     Q. And were they prepared on a laptop or on a
18  computer?
19     A. Computer.
20     Q. Have you used the same computer for all minutes
21  since 2008?
22     A. I don't think so. I think my computer was
23  upgraded at some point.
24     Q. Do you have any estimate of when that upgrade
25  occurred?

| | |
|---|---|
| 1    A. I don't remember. | 1    A. I don't remember. |

1    A. I don't remember.
2    Q. Other than your prior computer and your current
3  computer in your office, to your knowledge, did you use
4  any other computers to prepare minutes?
5    A. No, no.
6    Q. Okay. Have you -- have you retained hard
7  copies of all of the board minutes that you prepared in
8  this case?
9    A. Yes.
10    Q. Okay. And -- and are those in your office?
11    A. No.
12    Q. Where are they?
13    A. Of the -- of the minutes?
14    Q. Yes.
15    A. I believe some are in my office and some may be
16  either in the file room or in my secretary's office.
17    Q. What would be the difference between the
18  minutes in your office versus those in the file room and
19  those in your secretary's office?
20    A. Well, it would -- in connection with producing
21  the documents, I -- I would pull minutes from -- you
22  know, from a file, and I think I still have some in my
23  office and haven't put them back. Some I have put back
24  and some might still be in my secretary's office.
25    Q. And how about those in the file room, are those
**Page 25**

1  older minutes?
2    A. Yeah, normally.
3    Q. I was guessing, but --
4    A. Yeah.
5    Q. Okay. When you prepare board minutes, do you
6  prepare a certain part of the board minutes first before
7  other parts?
8    A. I usually do it sequentially as it appears on
9  the paper.
10    Q. So --
11    A. So I start with the heading and then I indicate
12  attendance and then I go through, you know, the order of
13  the -- you know, the order in which the speakers spoke.
14    Q. The order of business at the meeting?
15    A. Correct.
16    Q. All right. So when you say that you partially
17  prepared -- or I'm sorry -- started preparing some of
18  the 2009 minutes in 2009, what portion of the minutes
19  did you prepare in 2009?
20    A. Well, I would have had the heading and the
21  participants and part of the -- you know, the
22  presentations, but I -- I wouldn't have completed all of
23  it.
24    Q. What part of the presentations would you not
25  have prepared?
**Page 26**

1    A. I don't remember.
2    Q. There -- is there any categorical explanation
3  for the parts that were -- that's a bad question. I
4  strike that question.
5      Is there any description of the kinds of
6  information in board minutes from 2009 that you did not
7  prepare in 2009?
8    A. I'm not sure I understand that.
9    Q. Understanding that you said that you start with
10  the heading and then the participants and then go
11  through the order of business at the board meetings, for
12  the 2009 minutes, which you started preparing in 2009 --
13    A. Uh-huh.
14    Q. -- but did not complete until around
15  August 23rd, 2010, can you recall as you're sitting here
16  what kind of information didn't get inserted until 2010
17  in those minutes?
18    A. Well, wherever I stopped in my preparation,
19  whatever came after that wouldn't have been in -- in it.
20  It was based on my time availability. So I may have not
21  completed minutes and then come back to them at some
22  later time to complete the -- the remainder of the
23  meeting minutes.
24    Q. So your -- your preparation of the minutes
25  would have been chronological in terms of what
**Page 27**

1  occurred --
2    A. Correct.
3    Q. -- in order at the board meetings?
4    A. Correct.
5    Q. All right. So then for the 2009 minutes that
6  you started preparing, was there any full set of minutes
7  from 2009 meetings that you prepared and completed in
8  2009?
9    A. It's possible. I don't remember.
10    Q. Okay. I don't want -- that's all I'm
11  entitled --
12    A. I don't -- I don't remember.
13    Q. Perfect. And I don't want to interrupt your
14  answer, so to the extent that I start speaking before
15  you finish, I apologize. And --
16    A. It's okay.
17    Q. -- I'll stop if I'm aware I'm doing that. I
18  don't want to speak over you.
19      From the board minutes that have been produced
20  in this case, it appears that the first board meeting in
21  2009 was February 10th.
22      Is that consistent with your memory?
23    A. February 10th of?
24    Q. 2009.
25    A. And the question is?
**Page 28**

**7 (Pages 25 to 28)**

1      Q.  The first board meeting in the year 2009.
2      A.  I believe there may have been other board
3  meetings prior to that, but not meetings at which
4  minutes were taken or that I took notes of or that I was
5  in attendance.
6      Q.  Would there have been any minutes created for
7  any meetings in 2009 prior to the February 10th, 2009
8  meeting?
9      A.  No.
10     Q.  Were there board of directors meetings held in
11  2009 where minutes were not taken?
12     A.  Yes.
13     Q.  What kind of meetings were those?
14     A.  Conference calls.
15     Q.  Were those conference calls actual board
16  meetings?
17     A.  I don't know.
18     Q.  What distinguished a conference call board
19  meeting from the regular meetings that had minutes?
20     A.  Well, in terms of minutes, if I was present, I
21  would have taken notes and prepared.  There may have
22  been meetings, and whether there was a quorum present or
23  not, I don't know.  But there may have -- there were
24  meetings where I was not invited or was not --
25     Q.  Present?

                                              Page 29

1      A.  -- asked to attend.
2      Q.  Okay.  If you were not asked to attend a board
3  meeting, do you have an understanding of who was
4  responsible for taking minutes?
5      A.  No.
6      Q.  When Mr. Sullivan took minutes because you were
7  going to be absent, did you ask him to take minutes in
8  your absence?
9      A.  Yes.
10     Q.  Do you, as you're sitting here, know of anyone
11  else besides Mr. Sullivan and yourself who prepared
12  board minutes for the MMPI board of directors?
13     A.  I don't think so.  I don't remember.  I -- I
14  don't believe so.
15     Q.  In response to the production request for board
16  minutes in this case, were you responsible for pulling
17  together those documents for production?
18     A.  Yes.
19     Q.  And what steps did you take to compile those
20  documents?
21     A.  Well, I went to the file and searched for --
22  for the relevant minutes.  I looked back at -- tried to
23  determine whether there were any that I had missed based
24  on, you know, dates of -- of calls or meetings and then
25  would -- if I -- if I had missed some minutes somewhere,

                                              Page 30

1  would have sought those minutes.
2      Q.  Okay.  Starting with the first thing you said,
3  what file did you go to to search for relevant minutes?
4      A.  Well, I have a file with respect to Meruelo
5  Maddux Properties, general matters and board meetings,
6  so I would have gone to that file.
7      Q.  Is that a file that you keep in your office?
8      A.  No.
9      Q.  Where do you keep that file?
10     A.  Again, I -- it's partially kept in the file
11  room and partially kept in my secretary's office,
12  depending on dates.
13     Q.  So is -- are those the two locations where you
14  look to find minutes?
15     A.  Yes.
16     Q.  And what did you do in the second step to try
17  to determine if you had missed any?
18     A.  Well, I -- I just went through what I had and
19  determined whether that covered the various meetings
20  that I attended.
21     Q.  What record do you have of the meeting dates, a
22  calendar?
23     A.  I -- I may have looked back at -- at my
24  calendar.  I may have looked at different sources.
25     Q.  Like what?

                                              Page 31

1      A.  I may have talked to my secretary.
2      Q.  When -- when you say "may have," are you -- are
3  you --
4      A.  I think I did ask her about whether we held a
5  meeting on -- on certain days.
6      Q.  Does your secretary keep a master calendar for
7  you?
8      A.  I wouldn't call it a master calendar.  She --
9  she keeps an Outlook calendar for me.
10     Q.  Do you keep your own calendar also?
11     A.  Not -- no.
12     Q.  So other than talking to your secretary about
13  board meeting dates, what else did you do to determine
14  the dates of the board meetings?
15     A.  I think that was it.
16     Q.  Did you look at the agendas that you had?
17     A.  I don't remember.
18     Q.  And at the time that you searched for the
19  relevant minutes and tried to determine if there were
20  any that you had missed, did you find that there were
21  any board minutes that had not been completed as of that
22  date?
23     A.  As of what date?
24     Q.  When you did your search.
25     A.  For the document production?

                                              Page 32

Merrill Corporation - Los Angeles

800-826-0277                                    www.merrillcorp.com/law

**Page 33**

1    Q. Yes.

2    A. I -- I don't remember.

3    Q. Do you have a memory --

4    A. I don't.

5    Q. I'm sorry?

6    A. I don't remember the date. I don't remember

7  the dates when I was preparing -- preparing them versus

8  the dates when I was producing them.

9    Q. Do you have a memory of whether you were

10  preparing board minutes after you did this search to

11  pull them together for production?

12    A. I don't remember but it is possible.

13    Q. Are you responsible for retaining books and

14  records for MMPI?

15    A. Some books and records.

16    Q. Are you responsible for keeping board minute

17  records?

18    A. Yes.

19    Q. Anyone else besides you responsible for that?

20    A. No.

21    Q. Do you have a board minute book, a binder that

22  you keep board minutes in?

23    A. For some.

24    Q. And -- and which "some"?

25    A. Well, the 2007, 2008 were better organized.

**Page 34**

1    Q. So are 2007, two -- two -- 2008 board minutes

2  in some kind of a book?

3    A. Yes.

4    Q. Where is that book?

5    A. Again, either -- either in the file room or in

6  my secretary's office.

7    Q. As you're sitting here today, do you have an

8  image in your mind of --

9    A. No.

10    Q. -- where it is? Okay.

11    A. No.

12    Q. And the 2009, 2010 board minutes, is it correct

13  that they are not in some kind of a book?

14    A. Correct.

15    Q. Are they in some kind of a file?

16    A. I think they may be in different locations.

17    Q. So they may not all be together at this point?

18    A. Correct.

19    Q. But if you were going to put your hands on

20  them, is it correct that you believe they would be

21  either in your office, your secretary's office or the

22  file room?

23    A. Yes.

24    Q. Is there anywhere else that you think that they

25  might be?

**Page 35**

1    A. I don't believe so.

2    Q. All right. You testified earlier that there

3  may have been minutes -- I'm sorry. Let me start again.

4    You testified earlier that there may have been

5  board of directors' calls prior to February 10th, 2009

6  in 2009 for which minutes weren't created?

7    A. Correct.

8    Q. Do you, as you're sitting here today, have a

9  specific memory of any of those calls?

10    A. Yes.

11    Q. What -- what's your memory about that?

12    A. There were some calls I remember in January of

13  2009. Again, I think that they were more informal. I

14  don't know whether a quorum was present. I don't -- I

15  was not part of them, so I don't even know who might

16  have attended.

17    Q. How do you know that those calls occurred?

18    A. I don't remember.

19    Q. Do you have an understanding of who

20  participated in those calls?

21    A. No.

22    Q. Do you have an estimate of how many calls

23  occurred in January 2009 among the board of directors of

24  MMPI?

25    A. No.

**Page 36**

1    Q. Would -- could you estimate the numbers between

2  one and five?

3    A. Yeah, I do. It would be within one and five.

4    Q. All right. Okay. And do you have an

5  understanding of whether the board actually convened on

6  any conference calls in early 2009 when you weren't on

7  the call?

8    A. I don't know.

9    Q. Do you have an understanding of whether the

10  board took any actions or -- or votes when you weren't

11  on the call?

12    A. I'm not aware of any. I -- I don't know for

13  sure, but I -- I believe I would have been advised

14  and -- and I was not. So I don't believe there were.

15    Q. Who would you have looked to to advise you if

16  some kind of action item occurred on one of those calls?

17    A. John Maddux.

18    Q. Going back to 2008, as you're sitting here

19  today, do you have any understanding of whether the

20  board of directors had conference calls in which you did

21  not participate or take minutes in 2008?

22    A. It's possible, but I don't remember.

23    Q. Okay. And same question for 2009. Looking at

24  the entire year, do you have an estimate of how many

25  conference calls the board of directors may have had for

**9 (Pages 33 to 36)**

1  which you did not --
2      A.  All of 2009?
3      Q.  Yeah, if you can.
4      A.  I don't remember.  It -- it was -- it would
5  have been less than ten, but I -- I don't have a
6  specific number or better estimate.
7      Q.  Who would have records of those calls,
8  Mr. Maddux?
9      A.  I don't know.
10     Q.  If you were to go to someone to ask what
11 happened on those calls today, who would you go to?
12     A.  I -- I don't know who I would go to.
13     Q.  Okay.  All right.  And then going to 2010, were
14 there conference calls among the board members, to your
15 knowledge, that you were not a participant in and did
16 not take minutes for?
17     A.  I don't have a specific recollection of any,
18 but it is possible.
19     Q.  Do you have any reason to think that there were
20 board of directors' conference calls in 2010 prior to
21 September 9th, 2010 which is the last board minutes I
22 have, for which minutes were not taken?
23     A.  Can you -- can you say that again?
24     Q.  Yes.  Do you have any reason to believe that
25 there were conference calls among the board of directors

**Page 37**

1  in 2010 prior to September 9th, 2010 for which minutes
2  were not taken?
3      A.  I do not remember any for 2010.
4      Q.  And for the period between September 9th, 2010
5  and the present, have there been board of directors
6  meetings at MMPI?
7      A.  Yes.
8      Q.  Have there been minutes prepared on those board
9  of directors meetings?
10     A.  No.
11     Q.  Approximately how many board of directors
12 meetings have there been since September 9th, 2010?
13     A.  This is an estimate, right?
14     Q.  Yes, it is.
15        MR. KLAUSNER:  Well, but don't -- don't go
16 overboard.  I mean, if you can -- if you don't know, you
17 don't know.
18        THE WITNESS:  A handful.  I -- four, five.
19 BY MS. RODIGER:
20     Q.  I understand it's an estimate.  Thank you for
21 saying that.
22        Were you a participant in the four or five
23 approximately board meetings since September 9th, 2010?
24     A.  Yes.
25     Q.  Did you take notes for those board meetings?

**Page 38**

1      A.  Yes.
2      Q.  But formal minutes have not been prepared?
3      A.  Correct.
4      Q.  Okay.  And where would your handwritten notes
5  for those meetings be?
6      A.  In my office.
7      Q.  In a particular location in his -- in your
8  office?
9      A.  No.
10     Q.  Is there a reason that board of directors
11 minutes for the meetings since September 9th, 2010 have
12 not been finalized?
13     A.  Just time availability.
14     Q.  Has anyone from the board of directors asked
15 that the minutes be prepared for review within 30 days
16 or 90 days of a board meeting?
17     A.  No.
18     Q.  When you prepare board of directors meetings
19 minutes for MMPI, who do you distribute them to?
20     A.  The board.
21     Q.  Anybody else?
22     A.  No.
23     Q.  How do you distribute them to the board?
24     A.  Probably by e-mail.  I -- I have distributed
25 some by e-mail.

**Page 39**

1      Q.  Is there any other method you use for
2  distribution?
3      A.  It is possible that I may provide them by hand
4  if they are, you know, in person.
5      Q.  When board of directors minutes are voted upon
6  by the board of directors, do you prepare a motion or
7  resolution for approval?
8      A.  No.
9      Q.  Do you note in your -- in your notes who brings
10 the motion to approve the minutes?
11     A.  Sometimes.  I think there are times when I
12 don't know who brought the motion, just that a motion
13 was brought, but I will often note who -- who brings the
14 motion.
15     Q.  Do you -- strike that.
16        Are your board of directors meetings generally
17 telephonic or in person?
18     A.  During bankruptcy they've generally been
19 telephonic.
20     Q.  Would that be why you wouldn't necessarily know
21 who made the motion, because it's a voice on the phone?
22     A.  That may be one reason.  I -- I -- it may be
23 that I simply didn't note who made it.
24     Q.  In your notes?
25     A.  Correct.

**Page 40**

**10 (Pages 37 to 40)**

Q. Okay. Do you in your notes reflect what the
vote is on approval of the minutes?
A. Yes.
Q. Do you note in your notes the dates of the
minutes that are submitted for approval?
A. Can you say that again?
Q. Do -- do your notes reflect the dates of the
minutes that are submitted for approval at any board
meeting?
A. I don't -- I don't remember.
Q. Okay. So for instance, the August 23rd meeting
notes that you prepared, would they have reflected which
minutes were submitted for approval at that meeting?
A. I don't remember.
Q. But would it be correct to say that when you
prepared the August 23rd minutes, your handwritten notes
were then disposed of?
A. Correct.
Q. Do you -- do you as you're sitting here have
any knowledge of any handwritten notes for any of the
prepared meetings that you retained?
A. No.
Q. Do you know of anywhere else other than in your
handwritten notes that information on who voted or who
moved for approval of the minutes might be reflected?

**Page 41**

Q. I believe some of the board members are
attorneys; is that correct?
A. Yeah, I -- I did not include any board members.
Q. Okay. And I can see it would be easier to look
for what an attorney --
Are you on break?
(Whereupon at 3:16 p.m. Mr. Meruelo
and Mr. Echemendia entered the deposition
proceedings.)
MS. RODIGER: Oh, okay.
MR. MERUELO: We were getting bored over there.
MS. RODIGER: Oh, well, welcome.
MS. HAGAN: It's much more exciting over here.
MS. RODIGER: Mr. Meruelo and Mr. Echemendia
just entered the room.
Q. As -- I can see how it would be easier to
identify an attorney as a speaker as communicating
something within an attorney-client privilege.
What criteria did you use in determining
whether something spoken to an attorney was an
attorney-client privileged communication?
A. Well, if it was a communication to which an
attorney responded.
Q. Okay. Okay. Because clearly in the board
meetings there were attorneys present at the time. So

**Page 43**

A. No.
Q. Are you also responsible for the redactions to
the board minutes that were produced?
A. Yes.
Q. Did you actually yourself do these redactions?
A. Yes.
Q. Can you tell me what criteria you used for
doing the redactions?
A. Yes. I looked at anything that was
attorney-client privileged or anything that was
confidential settlement communication or -- regarding
confidential settlement negotiations.
Q. How did you -- what did you look for to find
something that was attorney-client privileged?
A. Usually based on the speaker or who was being
spoken to.
Q. So who would you look for as a speaker to find
an attorney-client communication?
A. Me, Jeff Sullivan, bankruptcy counsel.
Q. As in outside bankruptcy counsel?
A. Correct.
Q. Okay. Anyone else?
A. I don't remember.
Q. How about --
A. It's possible.

**Page 42**

just the presence of an attorney was not used in your
criteria?
A. Correct.
Q. And -- and were you looking for communications
that were specifically legal-advice-oriented or
settlement-oriented?
A. Well, the settlement negotiations was a
separate category, not necessarily part of the
attorney-client privileged category.
Q. Okay.
A. And so -- can you say the question again?
Q. All right. So let's put the settlement
negotiations into a separate category and just talk
about the attorney-client communications.
Can you tell me if attorney-client
communications as you identified them related -- what
categories of information they related to; litigation,
pending litigation, for instance, or management
decisions or bankruptcy proceedings? Do you have --
A. It wouldn't have included management decisions.
It would have included presentations by counsel, it
would have included responses by counsel to questions,
it would have included counsel provided to the board.
Q. Okay. And when you say "counsel," are you
including both outside counsel for MMPI and --

**Page 44**

**11 (Pages 41 to 44)**

| | |
|---|---|
| 1   A. Yes. | 1     MR. KLAUSNER:  And there was one other. |
| 2   Q. -- yourself? | 2     MS. RODIGER:  John Tedford. |
| 3   A. Sorry. | 3     MR. TEDFORD:  I'm here. |
| 4     MR. KLAUSNER:  Let her finish the question. | 4     MS. RODIGER:  Hi, John. |
| 5   BY MS. RODIGER: | 5   Q. Mr. Nielsen, for purposes of the redactions in |
| 6   Q. Okay.  And -- all right.  Let's talk inside | 6   the board minutes, were the outside counsel coming to |
| 7   counsel for MMPI. | 7   make presentations to the board to your understanding? |
| 8       Who are the inside counsel for MMPI? | 8   A. Yes.  Some, yes. |
| 9   A. Me. | 9   Q. Is that generally what was redacted in these |
| 10   Q. Anyone else working with you? | 10   board minutes, other than -- |
| 11   A. I don't -- I don't believe so.  I do have -- | 11   A. Yes. |
| 12   there is one other attorney in our office, but I don't | 12   Q. -- some of the -- |
| 13   believe he ever attended the meetings. | 13       Okay.  And the presentations that were being |
| 14       MR. KLAUSNER:  We're losing our audience. | 14   made to the board, did they relate to the pending |
| 15       MS. RODIGER:  Wasn't interesting? | 15   bankruptcy or pending litigation? |
| 16       MR. MERUELO:  It's an indication -- | 16   A. Yes. |
| 17       MR. ECHEMENDIA:  I defer to his comments. | 17   Q. Anything else that you can think of as you're |
| 18   BY MS. RODIGER: | 18   sitting here? |
| 19   Q. And the outside counsel who might have been | 19   A. Jeff -- Jeff Sullivan is counsel to the |
| 20   making presentations to the board that's reflected in | 20   company, so it may have been on topics other than |
| 21   these minutes, are -- are they the outside counsel who | 21   bankruptcy. |
| 22   are identified as being present? | 22   Q. What kinds of categories of legal advice would |
| 23   A. Yes. | 23   Mr. Sullivan have been providing at board meetings? |
| 24   Q. What kind of role did you have as MMPI's | 24       MR. KLAUSNER:  It's -- it's okay to answer if |
| 25   internal counsel of overseeing the work of outside | 25   you can answer without disclosing actual attorney-client |
| **Page 45** | **Page 47** |

| | |
|---|---|
| 1   counsel for MMPI? | 1   communications.  If you can't, then I'll instruct you |
| 2   A. Well, I manage outside counsel. | 2   not to answer. |
| 3   Q. Is that part of your job description? | 3       THE WITNESS:  Only general subjects. |
| 4   A. Yes. | 4   BY MS. RODIGER: |
| 5   Q. What do you do in managing outside counsel? | 5   Q. That's what I'm asking for. |
| 6   A. That's a very broad question. | 6   A. Corporate securities reporting-type issues. |
| 7   Q. Uh-huh. | 7   Q. Anything else? |
| 8   A. I'm not -- I'm not sure I -- I coordinate with | 8   A. I don't remember. |
| 9   counsel in terms of upcoming dates and events and needs, | 9   Q. As counsel to the company, what are the areas |
| 10   coordinate on strategy, I counsel with them, I give them | 10   that Jeff Sullivan is responsible for advising the |
| 11   direction in terms of what to do on behalf of the | 11   company on? |
| 12   company. | 12   A. Corporate and securities matters. |
| 13       MS. RODIGER:  Okay.  Since Mr. Meruelo has made | 13   Q. "Corporate and security matters," is that what |
| 14   us aware that they're on break, can we take a | 14   you said? |
| 15   five-minute break so I can just speak to them? | 15   A. Yeah. |
| 16       MR. KLAUSNER:  Yeah, we should mute the call. | 16   Q. What are you -- what falls under the heading of |
| 17   Why don't we -- do you want it to say 3:30? | 17   corporate matters? |
| 18       MS. RODIGER:  Okay.  I'm muting the call. | 18   A. Governance.  You know, I can't think -- I can't |
| 19       MR. GAFFNEY:  Thank you. | 19   think off the top of my head what other... |
| 20       (Recess from 3:22 p.m. to 3:35 p.m.) | 20   Q. As you're sitting here today, do you have any |
| 21       MR. KLAUSNER:  Okay.  We're back.  Do we still | 21   memory of Jeff Sullivan giving legal advice to the board |
| 22   have Don? | 22   of directors on subjects other than corporate matters or |
| 23       MR. GAFFNEY:  Yes. | 23   securities reporting issues? |
| 24       MR. KLAUSNER:  Asa? | 24   A. I don't remember. |
| 25       MR. HAMI:  Yes. | 25   Q. How often do you interact with Mr. Sullivan? |
| **Page 46** | **Page 48** |

1    A.  There's not a specific regular interaction.  It
2  may be frequently or it may be infrequently.
3    Q.  In the last two weeks, how often have you
4  spoken with Mr. Sullivan?
5    A.  I don't believe I've spoken with him.
6    Q.  Is Mr. Sullivan usually present at board
7  meetings or no?
8    A.  He's usually in attendance, but not
9  necessarily.
10    Q.  Oh, okay.  So is he usually in attendance as a
11  presenter or as an attendee?
12    A.  Both.
13    Q.  Is Mr. Sullivan invited to board meetings
14  regardless of whether he's making a presentation?
15    A.  Yes.
16    Q.  On the few instances where he's prepared
17  minutes instead of you, did you collect his minutes for
18  production in this case?
19    A.  Yes.
20    Q.  Does he, when he produces minutes, provide
21  those to you before dissemination?
22    A.  Yes.
23    Q.  As to the matters that are redacted in the
24  board of directors minutes, are there any votes that
25  were redacted?

                                        **Page 49**

1    A.  No.
2    Q.  Any action items that were voted upon and
3  approved?
4    A.  No.
5    Q.  Are there any resolutions that were not
6  provided on the basis of privilege or settlement?
7    A.  I don't believe so.
8    Q.  In the August 23rd minutes, it reflects that
9  revisions were made at the time of the vote.
10      Do you recall that happening?
11    A.  Revisions to what?
12    Q.  Minutes.
13    A.  I don't remember.
14    Q.  It states:
15        Mr. Nielsen presented various minutes
16      for approval of the board.  Messrs.
17      Beckemeyer and Maddux provided some
18      revisions.  Mr. Payne, P-a-y-n-e, moved to
19      approve subject to the revisions,
20      Mr. Williams seconded.  It was approved
21      7/0.
22      Do you recall revisions being made to minutes
23  at board meetings?
24    A.  Yes.
25    Q.  What did you do when revisions were made at

                                        **Page 50**

1  board meetings?
2    A.  I would revise the board minutes.
3    Q.  Did you reflect on the board minutes as revised
4  that they were revised minutes?
5    A.  I don't think that's correct.  They're not
6  revised minutes.
7    Q.  Okay.  How did you reflect the revisions that
8  were made at the meetings?
9    A.  I did not.  I don't understand the question.
10    Q.  When revisions were made at meetings, did you
11  enter whatever changes needed to be made to the proposed
12  minutes on some kind of a redline draft?
13    A.  No.
14    Q.  What record do you have of what the revisions
15  were that were made at meetings prior to a vote?
16    A.  I don't -- I -- I'm not sure.
17    Q.  Did you retain copies of the proposed minutes
18  that were submitted to the board before revisions were
19  made?
20    A.  I believe so.
21    Q.  Did you produce those as part of the board
22  minutes that were produced?
23    A.  No -- or I may have.  I -- I don't know.
24    Q.  If -- if I represent to you that there aren't
25  minutes -- more than one set of minutes for a particular

                                        **Page 51**

1  date of a board meeting, would that help you in deciding
2  whether you provided --
3    A.  That would suggest I did not.
4    Q.  Okay.  Where would the draft minutes or
5  proposed minutes prepared for the board be?
6    A.  I don't know.
7    Q.  Would they be in your office?
8    A.  I -- I don't know.
9    Q.  When you pulled together the board packet
10  materials for production, did you pull together board of
11  directors minutes that had been submitted to the board
12  for votes?
13    A.  I don't believe so.
14    Q.  Would the draft minutes as unrevised be still
15  on your computer system?
16    A.  I don't know.  I don't know.
17    Q.  When you revised minutes pursuant to
18  instructions from the board of directors, did you create
19  a new document with the revisions?
20    A.  I don't remember.  It's possible.
21    Q.  Where would you look to find that out?
22    A.  I would probably look in my e-mails.
23    Q.  Is that because the proposed minutes would have
24  likely been e-mailed to everyone prior to the meeting?
25    A.  Yes.

                                        **Page 52**

                              **13 (Pages 49 to 52)**

Q. And then after minutes are approved, do you
submit finalized meetings to --
A. No.
Q. -- sorry -- minutes to everyone?
A. No.
Q. No. So you would look in your e-mails so that
you could find the proposed minutes and compare them
with -- with your final set of minutes?
A. Correct.
Q. Okay.
A. If I understood the question.
MR. KLAUSNER: Well -- and -- and if you don't
understand, feel free to tell counsel.
THE WITNESS: Maybe -- maybe say it again,
then.
BY MS. RODIGER:
Q. Why would you look at your e-mails?
A. To see what I sent out. I -- I would -- I
don't remember the revisions being significant, so I
would have typed them into the minutes. And whether I
saved it as a new version or not, I don't remember.
Q. When you attended MMPI board meetings, did you
attend all of the meetings or just part usually?
A. It would depend. When you say -- ask the
question again.

Page 53

Q. When you attended MMPI board of directors
meetings, were you present for the entirety of the
meeting usually?
A. No.
Q. What -- what parts of the meeting would you be
present for?
A. Well, I would be present -- there -- there were
usually -- there may have been a separate what we would
call an executive session of independent directors,
which I would not have attended.
Q. Who attends the executive sessions?
A. Independent directors.
Q. And who would that be in 2010?
A. Phil Payne, John Hansen, Anthony Williams and
Richard Planco.
Q. Who calls those meetings?
A. They're not called. They simply follow -- if
the independent directors desire, they simply follow
after the regular meeting.
Q. And that was my next question. So these
executive sessions, if they occur, generally occur after
the board meeting?
A. Correct.
Q. Do they ever occur before the board meeting?
A. Not that I'm aware of.

Page 54

Q. Is the board meeting usually adjourned before
the independent board member executive sessions occur?
A. Yes.
Q. So when you say you're not present necessarily
for the entire time, you're referring only to the
executive sessions that occur after the board meeting's
been adjourned?
A. Correct.
Q. Is -- does anybody take minutes for the
executive sessions?
A. Not that I'm aware of.
Q. Okay.
A. Let -- let me clarify. I don't know that those
are technically part of the board meeting or not.
Q. Okay. Other than the executive sessions of the
independent directors, are you generally a participant
in the entire board of directors meetings?
A. Yes. Clarify the word "participant."
Q. Present.
A. Yes.
Q. Okay. So as a matter of custom and practice,
you are usually present when they start through the time
that they adjourn?
A. Correct.
Q. All right. Does Mr. Sullivan also take notes,

Page 55

to your knowledge, at the board of directors meetings?
A. I don't believe so.
Q. Does anyone else besides you take notes that
you're aware of?
A. Not that I'm aware of.
Q. Did you prepare the privilege log that was
produced on the board minutes?
A. No.
Q. Do you know who did?
A. Yes.
Q. Who?
A. Bankruptcy counsel.
Q. Who?
A. The Danning Gill firm.
Q. Mr. Tedford?
A. I don't know.
Q. Did you review the privilege log before it was
produced?
A. No.
Q. How did you define the settlement privilege
that you used for redactions?
A. If it related to settlement discussions with
another party in the -- in the bankruptcy.
Q. So any -- any portion of the board minutes that
related to a potential settlement discussion was

Page 56

14 (Pages 53 to 56)

| | |
|---|---|
| 1   redacted? | 1   A. Legal-type documents. |
| 2   A. Yes. | 2   Q. Such as contracts? |
| 3   Q. Was -- and -- and were those indicated on the | 3   A. Contracts. |
| 4   privileged log, if you know, as a CSD? | 4   Q. Correspondence? |
| 5   THE DEPOSITION OFFICER: CSD? | 5   A. Yes and no. Some correspondence. |
| 6   MS. RODIGER: CSD. | 6   Q. What kinds of correspondence do you retain? |
| 7   THE WITNESS: I -- I -- without seeing the log, | 7   A. Correspondence with other -- other parties to |
| 8   I can't be -- I can't determine that. | 8   contracts usually. |
| 9   BY MS. RODIGER: | 9   Q. When you say "other parties," you mean third |
| 10   Q. I'm going to hand you a copy of the | 10   parties? |
| 11   October 8th, 2010 -- what I'm representing to be the | 11   A. Correct. |
| 12   two -- the privilege log that was produced. | 12   Q. Okay. What kinds of correspondence do you not |
| 13   If you could look at that and see the two | 13   retain? |
| 14   categories of withholdings. One is AC and one is CSD, I | 14   A. Accounting correspondence. |
| 15   believe. | 15   Q. What is "accounting correspondence"? |
| 16   A. Yes. So yes, that would represent the | 16   A. Lender statements. |
| 17   confidential settlement discussions. | 17   Q. Is there someone else at MMPI responsible for |
| 18   Q. Are there any grounds other than | 18   retaining those? |
| 19   attorney-client privileged or confidential settlement | 19   A. I don't know if there's one or more people. |
| 20   discussions on which documents were redacted or | 20   Q. Do you have an understanding that anyone else |
| 21   withheld? | 21   at MMPI retains those kinds of documents? |
| 22   A. I don't believe so. | 22   A. Yes, I believe so. |
| 23   Q. Okay. As one of the people responsible for | 23   Q. What other kinds of documents do you retain? |
| 24   document retention at MMPI, what do you do to make sure | 24   A. Entity formation documents. I can't really |
| 25   that documents are retained, at least post-bankruptcy? | 25   think of the -- the range of -- of types. |
| **Page 57** | **Page 59** |

| | |
|---|---|
| 1   A. Well, I will put them in a file or otherwise | 1   Q. When -- |
| 2   retain them. | 2   A. Litigation documents. |
| 3   Q. Okay. Are you -- do you also provide | 3   Q. Okay. When we talk about your -- your personal |
| 4   instructions to the company on document retention | 4   document retention practices, are you talking about |
| 5   post-bankruptcy? | 5   retention in hard copy or retention in electronic form? |
| 6   A. I have not. | 6   A. I'm -- can you ask the question again? |
| 7   Q. Okay. So for you, your document production -- | 7   Q. When you're retaining certain kinds of |
| 8   A. I believe that's probably attorney-client | 8   documents, the ones which you've described, do you |
| 9   privileged, but... | 9   retain them in a hard copy in files or in an electronic |
| 10   Q. Well, I'm not asking what you advised them, I'm | 10   form? |
| 11   just asking -- | 11   A. Hard copy. |
| 12   A. Okay. | 12   Q. Do you also retain documents in electronic |
| 13   Q. -- if you advised them. Do you know if | 13   form? |
| 14   somebody else has provided any kind of document | 14   A. Not generally. |
| 15   retention instructions to the company? | 15   Q. Do you take any steps to preserve -- |
| 16   A. I don't know. | 16   A. Let -- let me clarify that. |
| 17   Q. But you have not done so? | 17   Q. Yeah. |
| 18   A. I have not. | 18   A. I think that we have prepared electronic. In |
| 19   Q. So when you were talking about your | 19   connection with production, I think we have provided |
| 20   responsibility for retaining board minutes, you were | 20   things in electronic form. So we would continue to have |
| 21   speaking specifically to what your understanding is as | 21   those in electronic form. |
| 22   to your obligation? | 22   Q. So -- |
| 23   A. Correct. | 23   A. For instance, loan documents. |
| 24   Q. Okay. And what other kinds of documents are | 24   Q. That were produced via a CD? |
| 25   you responsible for retaining as far as you know? | 25   A. Correct. |
| **Page 58** | **Page 60** |

**15 (Pages 57 to 60)**

Q. Okay. Are documents at MMPI retained in a -- in a master system, a linked system?

A. I don't understand.

Q. Linked -- linked. What is MMPI's backup practice?

A. Of hard copies?

Q. Of what's on its electronic systems.

A. I believe there is a backup system. I don't know what that is.

Q. Do you know how often it's backed up?

A. I don't.

Q. Do you know where it's backed up to?

A. I don't.

Q. Who is in charge of that?

A. Probably John Maddux.

Q. Why do you think John Maddux is in charge of that?

A. He's in charge of everything.

Q. So if he's not, he should know who's doing it?

A. Correct.

Q. Okay. Have you ever asked to retrieve anything through the backup system?

A. No.

Q. Do you have a backup system on your computer in your office?

**Page 61**

A. No.

Q. No independent backup system?

A. No.

Q. Do you ever back anything up onto CDs?

A. No. Again, other than documents that are produced to other parties.

Q. Thank you. I understand that.
And you said that your computer was replaced at some point between 2007 and the present time?

A. Correct.

Q. Can you tell me when that was?

A. I don't remember.

Q. Was that a company-wide replacement of the computers?

A. No.

Q. Your computer just became old and crippled or something?

A. Mine was older than -- than others and was running slow.

Q. Are you linked with the other computers at MMPI?

A. You'll have to define what you mean, "linked."

Q. Can you access documents created by other people at MMPI?

A. Some.

**Page 62**

Q. What is your e-mail address?

A. tnielsen, n-i-e-l-s-e-n, @meruelomaddux.com.

Q. Does anyone besides you have the ability to send e-mails addressed from tnielsen@meruelomaddux.com?

A. My secretary may.

Q. Do you?

A. It may be noted, though. I don't -- I don't remember.

Q. Do you use a password to get on the system?

A. Yes.

Q. Does she have your password?

A. No.

Q. Have you given your password to anyone else?

A. From time to time.

Q. Who have you given your password to?

A. Our IT administrator.

Q. Who else?

A. That's it.

Q. Do you have any reason to believe that anyone has sent e-mails using your e-mail address other than you?

A. I have no reason to believe that.

Q. Okay.

A. Well, again, except my secretary. I think she has some delegated authority to -- to access e-mail.

**Page 63**

Q. When she sends an e-mail, does it appear with her e-mail address as secretary --

A. I don't remember -- I don't -- I don't remember that.

Q. Do you, as you're sitting here today, have any reason to believe that she can sign on and write something that is shown as being written by you only?

A. I don't know.

Q. Do you have any reason to think she can?

A. No.

THE DEPOSITION OFFICER: She can?

THE WITNESS: Can.

MS. RODIGER: She can.

Q. Do you have any reason to think she can?

A. No.

Q. The document retention system that you use, do you use a shredder for any kinds of documents?

A. No.

Q. When you dispose of documents, how do you -- do you just throw them in a trash can?

A. Generally. I guess I have used a shredder on a very rare occasion. It's not my practice, though.

Q. Is there a shredding routine at MMPI when documents that are to be shredded are all put out for shredding at once?

**Page 64**

16 (Pages 61 to 64)

| | |
|---|---|
| 1    A. I'm not aware of any. | 1   down the page -- |
| 2    Q. The handwritten notes that you use for the | 2    A. Yes. |
| 3   board minutes, were those just disposed of in a trash | 3    Q. -- is redacted material. |
| 4   can? | 4    A. Right. |
| 5    A. Yes. | 5    Q. Looking at this, can you tell me if you |
| 6    Q. Now I would like to ask you about the press | 6   performed those redactions? |
| 7   release documents. | 7    A. Yes, I did. |
| 8    A. Okay. | 8    Q. Okay. How about the next page? There's more |
| 9    Q. Okay. Who searched and compiled the production | 9   redacted material. |
| 10   on the press release documents for MMPI? | 10    Did you do those? |
| 11    A. I did. | 11    A. Yes. |
| 12    Q. What did you do to search for those? | 12    Q. All right. How about the next page? There's |
| 13    A. I searched my e-mails and I asked others in the | 13   more redactions. |
| 14   company to do the same. | 14    Did you do those? |
| 15    Q. Who did you ask? | 15    A. Yes. |
| 16    A. Andrew Murray, John Maddux, Richard Meruelo. I | 16    Q. Can you tell me why those redactions were made? |
| 17   can't remember if there were others. | 17    A. On the basis of attorney-client privilege. |
| 18    Q. All right. Did they provide you with documents | 18    Q. It appears that the areas that are redacted |
| 19   in response to your request? | 19   were a communication from you; is that correct? |
| 20    A. I believe Andrew Murray may have. | 20    A. Correct. |
| 21    Q. Do you recall if what you produced was | 21    Q. And were you providing legal advice in these |
| 22   documents from Mr. Murray as well as documents you had? | 22   e-mails? |
| 23    A. I don't remember. I believe everything on my | 23    A. Yes. |
| 24   system was a duplicate of what anyone else had, so I may | 24    Q. Was there any reason other than the providing |
| 25   have only produced it as it was printed off from my | 25   of legal advice which to your knowledge was used for |
| **Page 65** | **Page 67** |

| | |
|---|---|
| 1   system. I don't remember if I might have produced | 1   redactions? |
| 2   anything independent of that. | 2    A. Not that I'm aware of. Maybe attorney-work |
| 3    Q. Did you perform any redactions on the documents | 3   product. |
| 4   that were produced? | 4    Q. I believe you have the first privileged log |
| 5    A. I must have. | 5   there; is that correct? |
| 6    Q. Let me give you a copy of an e-mail | 6    A. Yes. |
| 7   communication that I received -- I'll represent that I | 7    Q. And that's the one dated October 14th; is that |
| 8   received from Mr. Tedford which is dated October 14th -- | 8   correct? |
| 9   is that correct -- on the front page or did I give you | 9    A. Yes. |
| 10   the wrong one? | 10    Q. I see "AC" and "/AW." Does that mean |
| 11    A. October 14th. | 11   attorney-client and attorney work product? |
| 12    Q. Yes. Okay. And the production that's attached | 12    A. Correct. |
| 13   to it and the privilege log. I think if you look at the | 13    Q. And you didn't prepare this document; is that |
| 14   product -- produced documents attached, there are | 14   right? |
| 15   redactions. | 15    A. I did not. |
| 16    A. Okay. | 16    MS. RODIGER: And then there was a subsequent |
| 17    Q. And looking at, for instance, the e-mail of | 17   privileged log. I'm going to have that marked as |
| 18   September 9th, 2010, at 9:32 a.m. -- | 18   Exhibit AA, I guess. |
| 19    A. September 9th when? | 19    (The document referred to was marked by |
| 20    Q. 2010 at 9:32 a.m. It's four pages from the | 20    the CSR as Deposition Exhibit AA for |
| 21   back. | 21    identification and attached to the |
| 22    A. 9:40? | 22    deposition transcript hereto.) |
| 23    Q. 32 a.m. | 23   BY MS. RODIGER: |
| 24    A. Okay. | 24    Q. Everything that I just handed you before I |
| 25    Q. You'll see that under your name about halfway | 25   confuse you. |
| **Page 66** | **Page 68** |

**17 (Pages 65 to 68)**

| | |
|---|---|
| 1    A. Okay. | 1    Q. Okay. As you're sitting here today, do you |
| 2    Q. You can just give it to the court reporter. | 2    have a memory of when you first read this e-mail and the |
| 3    Thank you. | 3    attachment to it which is the next page? |
| 4       I'm handing you another document. Sorry. I | 4    A. I -- I don't know if I read this e-mail. |
| 5    didn't give you the cover, the transmittal, which is a | 5    Q. All right. Let's go to -- |
| 6    three-page document dated October 20th. The first page | 6    A. Sorry. Go ahead. |
| 7    is a transmittal -- I represent it's a transmittal from | 7    Q. I didn't mean to cut you off. |
| 8    Mr. Tedford to me with an updated privileged log and the | 8       Did you want to say something more? |
| 9    press release documents. | 9       MR. KLAUSNER: You -- you answered the |
| 10      Have you seen that document before? | 10   question. |
| 11   A. I don't remember. | 11      THE WITNESS: Yeah. |
| 12   Q. Okay. And my question was related to the | 12      MS. RODIGER: He did. If he wanted to say |
| 13   updated privilege log, not to Mr. Tedford's e-mail. | 13   something more, I just cut him off. |
| 14   A. "Updated privileged log" I'm not sure is an | 14   Q. Okay. Turning to the next page, it appears to |
| 15   accurate way to describe it. | 15   be an e-mail from Mr. Meruelo on which you're copied, |
| 16   Q. Have you seen the -- | 16   sent at 5:28 p.m. with an attached second version of a |
| 17   A. I think it's a privileged log to additional | 17   press release document. |
| 18   documents that were supplemented. | 18      Do you recall whether you read this at or about |
| 19   Q. Okay. Have you seen the October 20th | 19   5:28 p.m.? |
| 20   privileged log that I just handed you previously? | 20   A. I don't know. |
| 21   A. I don't remember. | 21   Q. All right. Turning to the next page, it |
| 22   Q. Did you prepare that? | 22   appears to be an e-mail from Mr. Murray on which you |
| 23   A. No. | 23   were copied, sent at 7:00 o'clock p.m. on September 8th, |
| 24   Q. Going back to Exhibit AA -- you can hand that | 24   2010, with an attached page. |
| 25   to the court reporter. | 25      Do you know if you read this on or about 7:00 |
| **Page 69** | **Page 71** |

| | |
|---|---|
| 1       MR. KLAUSNER: Did you want to mark that? | 1    o'clock p.m. on September 8th, 2010? |
| 2       MS. RODIGER: Yes. Let's mark it AB. | 2    A. Again, I don't remember when I might have read |
| 3       (The document referred to was marked by | 3    it. |
| 4       the CSR as Deposition Exhibit AB for | 4    Q. The next page is an e-mail from Mr. Bustamante, |
| 5       identification and attached to the | 5    B-u-s-t-a-m-a-n-t-e, on which you were copied, sent at |
| 6       deposition transcript hereto.) | 6    approximately 7:38 on September 8th, 2010. It's a |
| 7    BY MS. RODIGER: | 7    two-page document with attachment that is a one-page |
| 8    Q. On Exhibit AA, if you look at the first page | 8    document. |
| 9    after Mr. Tedford's communication, which appears to be | 9       Do you recall -- well, after the third page |
| 10   an e-mail from Mr. Meruelo on which you're copied, dated | 10   appears to be a response from you at 7:28:52. |
| 11   September 8th, 2010, at 5:04 p.m. -- | 11   A. No. |
| 12   A. I'm not sure we're looking at the same page. | 12      MR. KLAUSNER: What was the question? |
| 13   You said the second page? | 13   BY MS. RODIGER: |
| 14   Q. Yes, I -- I think the -- oh, I'm sorry. After | 14   Q. Well, I -- I -- so as not to confuse him, I |
| 15   the privileged log. | 15   wanted to show him the first e-mail, which has your |
| 16   A. After the privileged log, okay. | 16   address and a date and time on it, because my question |
| 17   Q. Yes. Did you receive this e-mail in the normal | 17   is, do you know when you first read Mr. Bustamante's |
| 18   course of business? | 18   e-mail? |
| 19   A. I don't know what you mean by "normal course of | 19   A. Not until the following day. |
| 20   business." | 20   Q. The -- it appears on this page, which is |
| 21   Q. Did you receive this e-mail on or about 5:04 | 21   redacted, that you sent a response on or about 7:28:52 |
| 22   p.m. on your computer? | 22   p.m. on September 8th, 2010. |
| 23   A. On -- on the computer. | 23      MR. KLAUSNER: What time is that? |
| 24   Q. Did you read it? | 24      THE WITNESS: Where are you referring to? |
| 25   A. Probably not at that time. | 25      MS. RODIGER: 7, dot, dot, 28, dot, dot, 52 |
| **Page 70** | **Page 72** |

**18 (Pages 69 to 72)**

Page 73

```
 1    p.m.  It's -- it's right after -- three pages after the
 2    document we were just looking at.
 3         MR. KLAUSNER:  Is Counsel referring to an
 4    e-mail from Michael Bustamante to Todd Nielsen
 5    September 8, 7:39 p.m.?
 6    BY MS. RODIGER:
 7         Q.  The one I'm looking at says 7:28:52.
 8         A.  Okay.  That's what we were looking at.
 9         Q.  Oh, I'm sorry.  Yes.  Mr. Bustamante's is 7:39.
10    Your response seemed to be...
11         A.  Again, you're saying it's a response.  It's not
12    my response to him.
13         Q.  Just for purposes of identification, I was just
14    trying to show you the page.
15         A.  Okay.
16         Q.  Okay.
17         MR. KLAUSNER:  We have in front of us the page
18    that you mentioned.
19         MS. RODIGER:  Thank you.
20         Q.  Can you tell me if what appears beneath your
21    name on this page is something that was sent by you?
22         A.  Yes.
23         Q.  And it appears to be time-dated prior to what
24    Mr. Bustamante sent you; is that right?
25         A.  Correct.
```

Page 74

```
 1         Q.  Okay.  Did the material that's redacted relate
 2    to the press release that Mr. Bustamante's writing
 3    about?
 4         A.  No.
 5         Q.  To your knowledge, did you have the press
 6    release e-mails in your hand when you -- or on your
 7    computer before you wrote whatever's redacted here?
 8         A.  What press release e-mails?
 9         Q.  The ones we just went through.
10         A.  Specific ones.
11         Q.  The ones we just reviewed.
12         A.  You went through three.
13         Q.  That have been produced.
14         MR. KLAUSNER:  Do you understand the question?
15         THE WITNESS:  No.
16    BY MS. RODIGER:
17         Q.  The information that's redacted on the page
18    that we've all now found --
19         A.  Yes.
20         Q.  -- did it relate to the press release?
21         A.  Yes.
22         Q.  Okay.  At the time that you wrote whatever's
23    been redacted here, had you seen any of the e-mails that
24    are produced before this e-mail in this production?
25         A.  Yes.
```

Page 75

```
 1         Q.  Which ones had you seen?
 2         A.  I had seen the e-mail from Richard Meruelo.
 3         Q.  Sent at 5:04 p.m.?
 4         A.  Sent at 5:28.
 5         Q.  Oh, all right.  And you know that because it's
 6    after the redacted material that's reflected on the
 7    e-mail train?
 8         A.  Correct.
 9         Q.  Okay.  Then if you go back another two pages or
10    so --
11         A.  Back which way?  Forward?
12         Q.  Towards the back, the end.  Chronologically
13    we're going back in time --
14         A.  Oh.
15         Q.  -- to an e-mail from Todd Nielsen dated
16    September 9th, the next day, at 9:32 in the morning.
17         A.  No, we're going forward in time.
18         Q.  I'm sorry.  From Michael Bustamante to you at
19    that time.
20         MR. KLAUSNER:  Is it an e-mail from Michael
21    Bustamante dated September 9 at 9:41?
22         MS. RODIGER:  9:32.  So go forward.  It's right
23    before the 9:41 one.
24         THE WITNESS:  Right here, right here.  Okay.
25    What was the question?
```

Page 76

```
 1    BY MS. RODIGER:
 2         Q.  All right.  It appears that there's a redacted
 3    area here --
 4         A.  Correct.
 5         Q.  -- that was authored by you again?
 6         A.  Correct.
 7         Q.  All right.  And this was -- it appears that it
 8    was sent at 7:28 p.m. on September 8th, 2010?
 9         A.  Correct.
10         Q.  And from the -- the width of the redaction, it
11    looks like it might be different from the prior redacted
12    material, but it's not clear.
13         Do you know?
14         A.  It was not different.  It's the same thing.
15         Q.  Okay.  Thank you.  And then if you go back two
16    pages, there's another redacted area from you with
17    respect -- in response -- prior to -- sorry --
18    Mr. Bustamante's 9:41 a.m. e-mail.  And this does look
19    like it's the same redacted material.
20         Is -- is it?
21         A.  Yes.
22         Q.  Okay.  So we have three redactions of the same
23    content that was e-mailed by you; is that right?
24         A.  Correct.
25         Q.  And then in the up -- strike that.
```

19 (Pages 73 to 76)

| | |
|---|---|
| 1     In the subsequent privileged log that was<br>2 served October 20th, we were advised that there were not<br>3 any other nonprivileged documents on the press release.<br>4     Did you attempt to compile whatever documents<br>5 would have been responsive to the ten -- to the -- to<br>6 the remainder of the production on the press release?<br>7    A. Yes.<br>8    Q. Okay. And were you unable to find any<br>9 documents that did not fall within a privilege --<br>10 asserted on the privileged log?<br>11    A. Correct.<br>12    Q. The -- as you understand it, the<br>13 attorney-client privilege that was asserted for anything<br>14 post-September 9th, what was the basis for that?<br>15    A. Attorney-client privileged and attorney work<br>16 product.<br>17    Q. And -- and what was the category of<br>18 attorney-client kinds of communications that made those<br>19 documents privileged? Were they --<br>20    A. Communications with bankruptcy counsel<br>21 generally.<br>22    Q. About the press release?<br>23    A. Correct.<br>24    Q. Okay. Did it apply to just bankruptcy counsel<br>25 and to internal counsel as well?<br>           **Page 77** | 1    Q. Okay. So then moving to what you were just<br>2 talking about, what kind of documentation are you<br>3 responsible for preparing for financial statements?<br>4    A. Leases and other contracts that -- loan<br>5 documents, other documents whether, you know, related to<br>6 company receivables or payables as it relates to<br>7 agreements.<br>8    Q. And the documents that you were just<br>9 describing, are those documents that you've actually<br>10 created or you're talking about providing copies of<br>11 whatever the controlling documents are that the --<br>12    A. Both.<br>13    Q. Okay. You may have negotiated them or prepared<br>14 them?<br>15    A. Correct.<br>16    Q. Okay. Do you have any responsibility for<br>17 internal controls at MMPI on expenditures?<br>18    A. Yes.<br>19    Q. What is your responsibility?<br>20    A. I approve legal expenses.<br>21    Q. And are those external counsel legal expenses?<br>22    A. Correct.<br>23    Q. Anything else that you approve?<br>24    A. Yes.<br>25    Q. What?<br>           **Page 79** |
| 1    A. I don't remember. I would need to look at the<br>2 privileged log.<br>3    Q. Please -- please do.<br>4    (Document reviewed by witness.)<br>5    THE WITNESS: It appears to include with either<br>6 outside or inside counsel.<br>7 BY MS. RODIGER:<br>8    Q. So those were the criteria you used?<br>9    A. Yes.<br>10    Q. Okay. Do you have a role in -- and you can set<br>11 those aside.<br>12    Do you have a role in internal controls at<br>13 MMPI?<br>14    A. Depends on what you mean by "a role."<br>15    Q. A responsibility.<br>16    A. Yes, I have some responsibility.<br>17    Q. What is your responsibility?<br>18    A. To provide documentation for purposes -- for<br>19 purposes of financial document preparation or financial<br>20 statement preparation that fall within my purview.<br>21    Q. Okay. Let me divide this into two areas, then<br>22    Do you have a responsibility with respect to<br>23 the implementation of internal controls over finances at<br>24 MMPI?<br>25    A. No.<br>           **Page 78** | 1    A. I can't think of what it might be. An example<br>2 may be corporate maintenance fees, registered agent<br>3 fees.<br>4    Q. So you're talking about fees that relate to<br>5 maintaining current filings with the Secretary of State<br>6 or any governing agencies that need to be paid?<br>7    A. Correct.<br>8    Q. Okay. Any other kinds of documents -- sorry --<br>9 or reports you have a responsibility for approving for<br>10 payment, invoicing?<br>11    A. Not that I -- I can't think -- I can't think,<br>12 but I'm not sure.<br>13    Q. What is the process by which you approve<br>14 external attorney expenses?<br>15    A. We have a process manager.<br>16    Q. You're talking about a system?<br>17    A. An electronic system, and I approve it<br>18 electronically.<br>19    Q. So you receive some kind of notification<br>20 through the process manager system?<br>21    A. Correct.<br>22    Q. And when you open it, you get a check box that<br>23 says approve or not approve?<br>24    A. Correct.<br>25    Q. And attached to that check box is the<br>           **Page 80** |

**20 (Pages 77 to 80)**

| | |
|---|---|
| 1 supporting documentation for the expense that's been | 1 review that form.  I know what it is, so I generally |
| 2 submitted? | 2 will approve that. |
| 3    A.  To the -- yes, to the extent there is | 3    Q.  Just because you know what the form is and the |
| 4 supporting documentation, it would be attached. | 4 amount's minimal? |
| 5    Q.  Okay.  So if -- if an external firm submitted | 5    A.  Correct. |
| 6 an invoice to MMPI for -- then it would be your job to | 6    Q.  Okay.  Who are the outside attorney firms that |
| 7 approve it? | 7 you reviewed in 2010? |
| 8    A.  Correct. | 8    A.  Danning Gill, DLA Piper, Oliver Sandifer, |
| 9    Q.  And so if you got an approval form, would that | 9 Neufeld, Fred Szkolnik. |
| 10 invoice be attached to it? | 10    Q.  How do you spell that last name? |
| 11    A.  Yes. | 11    A.  I don't know how. |
| 12    Q.  Yes.  Generally? | 12    Q.  Okay. |
| 13    A.  Generally. | 13    A.  It's a very difficult spelling. |
| 14    Q.  Okay.  And would -- would that be the first | 14    Q.  Okay. |
| 15 time you would have seen the invoice or would you have | 15    A.  Cox Castle, Stutman Treister. |
| 16 already reviewed it? | 16    Q.  Good.  Mr. Klausner can stop looking worried. |
| 17    A.  It's likely the first time I would have seen | 17    THE DEPOSITION OFFICER:  Can stop... |
| 18 it. | 18    MS. RODIGER:  Looking worried. |
| 19    Q.  Who -- | 19    THE WITNESS:  Yours. |
| 20    A.  Not necessarily. | 20 BY MS. RODIGER: |
| 21    Q.  Okay.  Who scans it into the system, if you | 21    Q.  Oh, good.  Thank you. |
| 22 know? | 22    A.  Ron Orr. |
| 23    A.  I don't know. | 23    THE DEPOSITION OFFICER:  Ron Orr? |
| 24    Q.  What do you do when you open that little box in | 24    THE WITNESS:  Ron Orr, Jenner & Block, Sulmeyer |
| 25 the supporting documentation usually? | 25 Kupetz.  And I'm sure I'm missing somebody. |
| **Page 81** | **Page 83** |

| | |
|---|---|
| 1    A.  What -- what do you mean? | 1    MS. HAGAN:  Everybody but me. |
| 2    Q.  Do you at that point review the invoice and | 2    THE WITNESS:  Everybody but Cara. |
| 3 then approve or not approve? | 3 BY MS. RODIGER: |
| 4    A.  Yes. | 4    Q.  In addition to outside attorney invoices, do |
| 5    Q.  Does anyone else at MMPI have the approval | 5 you have responsibility for reviewing professional fees |
| 6 power over outside lawyer fees? | 6 of financial institutions? |
| 7    A.  Yes. | 7    A.  Of -- of who? |
| 8    Q.  Who? | 8    Q.  Financial institutions, say, retained by the |
| 9    A.  Well, it depends on the amounts.  It's likely | 9 equity committee like KGI.  Is that something you look |
| 10 John Maddux. | 10 at or no? |
| 11    Q.  What is the cap on your authority? | 11    A.  I -- yes, I do approve those. |
| 12    A.  I believe it's 100,000. | 12    Q.  And do you also review and approve the FTI |
| 13    Q.  And do you know what the limits are on | 13 invoices? |
| 14 Mr. Maddux's authority? | 14    A.  Yes. |
| 15    A.  I don't. | 15    Q.  Anyone else in that kind of category that you |
| 16    Q.  On something over $100,000, do you generally | 16 can think of? |
| 17 review it first before it goes to Mr. Maddux? | 17    A.  Probably.  I can't remember. |
| 18    A.  Oh, yes. | 18    Q.  All right.  Let's go back to the outside |
| 19    Q.  So would it be correct to say that you review | 19 attorney firms that you mentioned. |
| 20 all outside attorney invoices? | 20    The Danning Gill firm represents MMPI in this |
| 21    A.  Most. | 21 bankruptcy case; is that right? |
| 22    Q.  Who don't you review? | 22    A.  Correct. |
| 23    A.  There's no one in particular I don't review. | 23    Q.  Okay.  And DLA Piper, what's your understanding |
| 24 And it's not necessarily -- for instance, you know, a | 24 of what they are represented to do for debtors? |
| 25 $25 statement of information fee, I wouldn't necessarily | 25    A.  Corporate and securities and litigation. |
| **Page 82** | **Page 84** |

**21 (Pages 81 to 84)**

TODD NIELESEN 02/11/2011

| | |
|---|---|
| 1   Q. For MMPI and the affiliated debtors? | 1   Q. But not always? |
| 2   A. Correct. | 2   A. Not always. |
| 3   Q. Okay. Who's your primary contact at DLA Piper? | 3   Q. When do you sign the retainer agreements? |
| 4   A. Rob Odson and Jeff Sullivan. | 4   A. There's no specific -- there's no specific -- |
| 5      Odson, O-d-s-o-n, I believe. | 5   Q. Procedure? |
| 6   Q. What work does Oliver Sandifer do for MMPI? | 6   A. -- procedure for that. |
| 7   A. Eminent domain. | 7   Q. Who -- who else can sign the retainer |
| 8   Q. Does Mr. Sandifer have a firm name? | 8  agreements? |
| 9   A. It's a Ms. Sandifer and -- | 9   A. John Maddux and Richard Meruelo. |
| 10   Q. Oh, I'm sorry. | 10   Q. Is there any criteria that determines when |
| 11   A. -- that's -- that's the first two names on the | 11  you're going to approve a retainer versus Mr. Maddux or |
| 12  firm, Oliver Sandifer something. | 12  Mr. Meruelo? |
| 13   Q. Okay. What -- | 13   A. Well, you switched. Approve or -- or signed? |
| 14   A. Oliver is a last name. | 14  What do you mean? |
| 15   Q. I understand that. | 15   Q. All right. Let's start with sign. |
| 16   A. Of the firm, yeah. | 16   A. No, there's none. |
| 17      MS. RODIGER: Did somebody join or drop off? | 17   Q. Okay. How about approve? |
| 18  Oh, well. | 18   A. I generally approve retainer agreements. |
| 19      MS. HAGAN: Drop off. | 19   Q. And you generally have copies of them? |
| 20  BY MS. RODIGER: | 20   A. Yes. |
| 21   Q. What work -- what did -- work did the Neufeld | 21   Q. Have you -- strike that. |
| 22  firm do for MMPI? | 22      How does the retaining of new outside counsel |
| 23   A. Litigation and research. | 23  usually come to your attention? Do you generate it or |
| 24   Q. Who is your primary contact at the Neufeld | 24  someone talks to you in the company about the need for |
| 25  firm? | 25  outside counsel? |
| **Page 85** | **Page 87** |

| | |
|---|---|
| 1   A. Tim Neufeld and Gaelle Gralnek. | 1   A. Both. |
| 2   Q. How about Fred Szkolnik? | 2   Q. I should have asked you. Do you also approve |
| 3   A. Unlawful detainer. | 3  or review the EY expenditures, Ernst & Young? |
| 4   Q. For MMPI and other debtors? | 4   A. No. |
| 5   A. Correct. | 5   Q. Once you approve a legal expenditure, who |
| 6   Q. Okay. And how about Cox Castle? | 6  issues the check? |
| 7   A. General real estate work and litigation. | 7   A. Accounting issues the check. |
| 8   Q. And the Stutman Treister firm? | 8   Q. Do you have a role in that process? |
| 9   A. Bankruptcy counsel. | 9   A. No. |
| 10   Q. Are those all of the outside counsel for MMPI | 10   Q. Once you have approved an invoice, is your role |
| 11  that you can think of? | 11  finished? |
| 12   A. There's -- there's one other. Landegger, | 12   A. Yes. |
| 13  L-a-n-d-e-g-g-e-r, I believe. | 13   Q. Other than the documents that you've described |
| 14   Q. What do they do? | 14  dealing with legal expenses, financial, billings and |
| 15   A. Employment. | 15  corporate maintenance issues, sitting here today, is |
| 16   Q. As general counsel for MMPI, do you have | 16  there anything else that you have approval power over |
| 17  responsibility for the retainer agreements with these | 17  that you can think of? |
| 18  different firms? | 18   A. I don't remember. |
| 19   A. Yes. | 19   Q. Do you want a minute to think about that? |
| 20   Q. Do you define the scope of work and sign the | 20   A. I won't remember in a minute. |
| 21  retainer agreements? | 21   Q. Is there a time of the month when you usually |
| 22   A. I do not have the retainer agreements for every | 22  get these approval contacts from the process manager |
| 23  matter. | 23  system? |
| 24   Q. Do you sign the retainer agreements for MMPI? | 24   A. No. |
| 25   A. I may. | 25   Q. Any time -- |
| **Page 86** | **Page 88** |

**22 (Pages 85 to 88)**

1   A.  No.
2   Q.  -- that could happen?
3   A.  Yes.
4   Q.  Do you review financial reports for approval
5   generated by MMPI?
6   A.  What do you mean by "financial reports"?
7   Q.  Any kind of financial statement, accounts
8   receivable, accounts payable do you have approval
9   authority over?
10   A.  Not those types of...
11   Q.  Do you have responsibility for certifying the
12   correctness of any of the information in those kinds of
13   documents?
14   A.  No.
15   Q.  Have you generated any declaration that's been
16   filed in the bankruptcy proceeding?
17   A.  I don't remember.
18   Q.  Okay.  Do you have the ability to access the
19   Yardi system?
20   A.  No.
21   Q.  Do you have the ability to access the DOS
22   system at MMPI?
23   A.  I don't know what that is.
24   Q.  Are -- are you aware of Mr. Meruelo's family
25   properties or his private properties being accounted for

Page 89

1   litigation do you provide to Ernst & Young?
2   A.  What litigation is occurring, what liabilities
3   are being alleged.  That's mostly what they're looking
4   for.
5   Q.  Do -- does the litigation that you keep track
6   of for MMPI relate solely to lawsuits brought against or
7   for the debtor entities?
8   A.  Yes.
9   Q.  Do you also keep track of litigation that does
10   not specifically relate to the debtor entities?
11   A.  No.
12   Q.  Do you keep track of any litigation --
13   A.  Let me --
14   Q.  Yes?
15   A.  -- correct that.
16   Q.  Yes.
17   A.  I have worked on litigation for a nondebtor
18   entity, Meruelo Maddux Ponte Vista.
19   Q.  What was the nature of that litigation?
20   A.  Eminent domain and related.
21   Q.  Why did you work on that?
22   A.  It was litigation that predated the IPO and
23   that I was familiar with and the board authorized me to
24   continue to manage it.
25   Q.  Did you get compensated directly from the

Page 91

1   on the DOS system?
2   A.  I don't.
3   Q.  You don't -- you're not aware?
4   A.  I'm not aware.
5   Q.  Other than the process manager system, do you
6   have access to any other kind of accounting system at
7   MMPI?
8   A.  No.
9   Q.  What is your interaction with Ernst & Young, if
10   any?
11   A.  In what -- in what setting?
12   Q.  Do you have interaction with Ernst & Young?
13   A.  Some.
14   Q.  Okay.  I'm speaking generally about Ernst &
15   Young's financial services to MMPI and not the Skaggs
16   special --
17   A.  Okay.
18   Q.  -- assignment.  What -- what interaction do you
19   have with Ernst & Young in its general retention?
20   A.  I generally discuss litigation, outstanding
21   litigation with them.  I will also assist in sending out
22   audit request letters to outside law firms.
23   Q.  Anything else?
24   A.  Not that I can think of.
25   Q.  What kinds of information on outstanding

Page 90

1   entity involved for your oversight on that case?
2   A.  Not me personally.
3   Q.  All right.  Let me flip the question.
4       Was your oversight of that matter as authorized
5   by the board something you were compensated for as
6   general counsel for MMPI?
7   A.  That I was compensated for personally?
8   Q.  No.  Through -- through your employment as
9   general counsel for MMPI.
10       MR. KLAUSNER:  Objection; vague.
11   BY MS. RODIGER:
12   Q.  I'm -- I'm asking if the oversight of that
13   litigation was something you did in your role as general
14   counsel for MMPI.
15   A.  Yes.
16   Q.  Have you worked on any other litigation for
17   nondebtor entities since this bankruptcy's been filed?
18   A.  Well, when you refer to "nondebtor entities,"
19   there are other predecessor entities which are not in
20   bankruptcy for which I performed services prior to the
21   IPO.
22       Can you rephrase the question?
23   Q.  Yes.  I'm only asking for the period since this
24   bankruptcy's been filed.
25   A.  Oh, okay.

Page 92

23 (Pages 89 to 92)

| | |
|---|---|
| 1    Q.  Have you worked on any litigation for any of | 1    Q.  Both individually? |
| 2  the nondebtor entities? | 2    A.  Yes. |
| 3    A.  I have consulted with other counsel regarding | 3    Q.  What is the amount of that guarantee? |
| 4  litigation that affects the company but may not | 4    A.  I don't -- |
| 5  necessarily be -- to which the company is a party. | 5    Q.  Or those guarantees? |
| 6    Q.  What litigations are those? | 6    A.  I don't remember. |
| 7    A.  Guarantee litigation on company debts. | 7    Q.  And who is the guarantor on the PNL Pomona |
| 8    Q.  What litigations are they? | 8  litigation? |
| 9    A.  Berkadia, Wells Fargo, Imperial, PNL.  I'm sure | 9    A.  I think we covered that. |
| 10  there's others.  I can't -- I'm not -- I can't think of | 10    Q.  On PNL Pomona litigation? |
| 11  it right now. | 11    A.  I think we covered that. |
| 12    Q.  Who is the guarantor in the Berkadia litigation | 12    Q.  I'm sorry.  I thought I asked you about |
| 13  you're talking about? | 13  Berkadia, Wells Fargo, and Imperial, and now I was going |
| 14    A.  Richard Meruelo. | 14  to PNL Pomona. |
| 15    Q.  Individually? | 15    A.  Then I mistook.  I -- I think I gave a wrong |
| 16    A.  Correct. | 16  answer, then. |
| 17    Q.  Anyone else? | 17    Q.  Okay. |
| 18    A.  No. | 18    A.  Maybe when you said Wells Fargo, I was thinking |
| 19    Q.  What's the amount of the guarantee? | 19  PNL.  Berkadia and Wells Fargo are the same lender. |
| 20    A.  I don't know. | 20  That was Richard Meruelo. |
| 21    Q.  Can you estimate? | 21    Q.  Okay. |
| 22    A.  No. | 22    A.  Imperial is Richard Meruelo and John Maddux. |
| 23    Q.  All right.  Who's the guarantor on the Wells | 23  PNL is -- is Belinda Meruelo and the Estate of Homer |
| 24  Fargo litigation you're talking about? | 24  Meruelo. |
| 25    A.  I believe it's the Estate of Homer Meruelo and | 25    Q.  And do you know the amount of that guarantee? |
| **Page 93** | **Page 95** |

| | |
|---|---|
| 1  Belinda Meruelo. | 1    A.  No. |
| 2    Q.  Who is Homer Meruelo? | 2        MR. GAFFNEY:  This is Don Gaffney.  I apologize |
| 3    A.  I'm -- I'm not certain of that.  I -- I believe | 3  for interrupting, but I -- at 6:00 p.m., my time, I have |
| 4  that's correct. | 4  to go on a conference call because I'm on the memorial |
| 5        MR. KLAUSNER:  Don't -- don't guess or | 5  committee over here in Arizona for -- |
| 6  speculate. | 6        THE DEPOSITION OFFICER:  I need the -- |
| 7  BY MS. RODIGER: | 7        MR. GAFFNEY:  -- the Federal Bar Association. |
| 8    Q.  To the best of your recollection at the moment | 8        THE DEPOSITION OFFICER:  I'm sorry.  I could |
| 9  is all I'm asking for.  And please qualify it if you | 9  not -- |
| 10  don't have a clear recollection.  That's fine. | 10        I'm sorry, Counsel.  This is Nikki, the |
| 11    A.  You can't really estimate names, so I guess | 11  reporter.  You said, I have to go on a conference call |
| 12  I -- I'm not -- I'm not 100 percent certain on that. | 12  because I'm on the... |
| 13    Q.  Who is Homer Meruelo?  Who was Homer Meruelo? | 13        MR. GAFFNEY:  Board for the Federal Bar |
| 14    A.  That was Richard Meruelo's father. | 14  Association Memorial for the judge -- our judge who was |
| 15    Q.  And who is Belinda Meruelo? | 15  killed over here. |
| 16    A.  His mother. | 16        I was wondering if you would allow me just to |
| 17    Q.  Are those the only guarantors that you can | 17  ask a couple of questions so I can get off the phone. |
| 18  recall as the possible guarantors as you're sitting | 18        MS. RODIGER:  Absolutely.  Thank you, sir. |
| 19  here? | 19        MR. GAFFNEY:  I appreciate -- I appreciate it. |
| 20    A.  That's all I recall right now. | 20        MS. RODIGER:  Let me know your time press. |
| 21    Q.  Do you recall the amount of that guarantee? | 21 |
| 22    A.  I do not. | 22        EXAMINATION |
| 23    Q.  Who's the guarantor on the Imperial litigation? | 23  BY MR. GAFFNEY: |
| 24    A.  Richard Meruelo and I believe John Maddux | 24    Q.  Sir, I apologize for interrupting.  My name is |
| 25  was -- was on one loan. | 25  Donald Gaffney.  I'm an attorney for Bank of America in |
| **Page 94** | **Page 96** |

| | |
|---|---|
| 1 these proceedings. I just have a very few questions. | 1     A. I may have been. |
| 2     In going through the descriptions of the | 2     Q. Do you know who in the LA County board would |
| 3 various professionals that oversee, are you ever | 3 have received or reviewed any of the settlement |
| 4 involved with any invoices regarding any of the lobbying | 4 proposals? |
| 5 activities of any of the MMPI-related companies? | 5     MS. FREEDMAN: I'm going -- this is Susan |
| 6     A. No. | 6 Freedman, I'm here on behalf of LA County. And I think |
| 7     Q. Do you know who handles that? | 7 these discussions and this information is subject to the |
| 8     A. I do not. | 8 settlement privilege and I'm going to object, and I'm |
| 9     Q. Have you ever been involved in any way | 9 going to ask Mr. Klausner to ask his client to not |
| 10 regarding the political contributions or campaign | 10 respond to this. |
| 11 contributions that have been made by the MMPI or its | 11     MR. GAFFNEY: You can't instruct somebody |
| 12 related companies? | 12 else's client. |
| 13     MR. KLAUSNER: Object; it assumes facts not in | 13     MS. FREEDMAN: I'm asking Mr. Klausner to ask |
| 14 evidence. | 14 his client. |
| 15 BY MR. GAFFNEY: | 15     MR. KLAUSNER: Hang on. I want to take a look |
| 16     Q. You can answer the question. | 16 at the question. |
| 17     A. I don't -- I don't remember. | 17     THE DEPOSITION OFFICER: I'm sorry? |
| 18     Q. Do you know who handles those contributions? | 18     MS. FREEDMAN: Hang on, he wanted to take a |
| 19     A. I do not. | 19 look at the question. |
| 20     Q. Do you know the total amount that -- oh, strike | 20     MR. KLAUSNER: Yeah, my understanding is the |
| 21 that. | 21 bankruptcy court has ruled that the subject matter of |
| 22     Who handles within the company the -- the | 22 the settlement of the tax claims between the county and |
| 23 Staple Center box log? | 23 the debtors is a matter of -- is subject to a settlement |
| 24     A. I don't know what a box log is. | 24 privilege. And for that reason, it's not appropriate to |
| 25     Q. Are you familiar at all with the laws regarding | 25 go into it at this deposition, so I'll instruct the |
| **Page 97** | **Page 99** |
| 1 the entertainment of political figures? | 1 witness not to answer. |
| 2     A. Superficially familiar with it. | 2     MR. GAFFNEY: Okay. |
| 3     Q. Are you familiar at all with the -- with laws, | 3     Q. Let me for the record to the witness, are you |
| 4 regulations that might affect the use of a convention | 4 going to follow the instruction of Mr. Klausner not to |
| 5 center or athletic center box for business purposes? | 5 answer my question? |
| 6     A. No. | 6     A. I will. |
| 7     Q. All right. Do you know anyone in -- within the | 7     MR. GAFFNEY: All right. Just for the record, |
| 8 company who is responsible for handling the affairs | 8 it would be our intent to raise before the court the |
| 9 regarding the Staple Center box owned -- owned or leased | 9 fact that the activities of Dr. Guerra and his company, |
| 10 by MMPI? | 10 including activities with LA County, have not been |
| 11     A. I don't. | 11 disclosed to anyone in this case and ask Mr. Klausner |
| 12     Q. Have you in any way been involved in | 12 whether he's willing to reconsider his instruction? |
| 13 negotiations or meetings with LA County or any of its | 13     MR. KLAUSNER: We're going to take a break for |
| 14 representatives? | 14 a second. Yeah, we're going to go off record for a |
| 15     A. Yes. | 15 minute and we'll be back. |
| 16     Q. And who did you meet with? | 16     MR. GAFFNEY: Thank you. I'm under -- I'm |
| 17     A. I don't know that I met -- you said have I been | 17 under some time pressure. If you could get back |
| 18 in any way involved. I didn't say I met with anybody. | 18 quickly. |
| 19     Q. Would you please describe generally what your | 19     MR. KLAUSNER: We will do the best we can. |
| 20 involvement was. | 20     MR. GAFFNEY: Thank you, sir. |
| 21     A. Documentation. | 21     MR. KLAUSNER: We are going to put you on mute |
| 22     Q. Is that purely in the form of settlement? | 22 for a minute. |
| 23     A. Correct. | 23     (Recess from 4:54 p.m. to 4:56 p.m.) |
| 24     Q. Were you involved in any way regarding the | 24     MR. KLAUSNER: Yeah. We are back on the |
| 25 proposals for settlement? | 25 record. |
| **Page 98** | **Page 100** |

25 (Pages 97 to 100)

1        I want to remind everyone that we are reserving
2   and preserving all of our privileges, attorney-client
3   privilege and settlement communication privilege and any
4   other privilege which we're entitled.  That having been
5   said, though, I will permit the witness -- I'll withdraw
6   my instruction, permit the witness to answer the
7   question.  I think the last question pending, we'll have
8   to go back to it.  I can't see it on my screen.
9        MR. GAFFNEY:  Why don't we have her read it
10  back.
11       MR. KLAUSNER:  Uh-huh.
12       (The record was read as follows:
13       Q   Do you know who in the LA County
14       board would have received or reviewed any
15       of the settlement proposals?)
16       THE WITNESS:  I do not know.
17       MR. GAFFNEY:  Okay.  Those are my questions at
18  this time.  Counsel, thank you very -- all the Counsel,
19  thank you for your consideration.
20       MR. KLAUSNER:  You're welcome.  Take care.
21       (Off-the-record discussion was held.)
22       MR. KLAUSNER:  I was going to suggest this
23  might be a good time to take a break anyway.
24       THE DEPOSITION OFFICER:  Off the record.
25       MR. KLAUSNER:  Yeah, we're off the record.

Page 101

1   Sorry.
2        (Recess from 4:58 p.m. to 5:17 p.m.)
3              EXAMINATION
4   BY MS. RODIGER:
5        Q.  Okay.  Back on the record.  Mr. Nielsen, you
6   identified four different litigations that you have
7   consulted with other counsel on in which none of the
8   debtor entities are parties; is that right?
9        A.  No, that's not right.
10       Q.  Okay.  Are any of the debtor entities
11  partners -- named in the Berkadia litigation?
12       A.  No.
13       Q.  In the Wells Fargo litigation?
14       A.  It's the same thing.
15       Q.  Okay.  I got it now.  All right.  The Imperial
16  litigation?
17       A.  I don't remember.
18       Q.  PNL Pomona?
19       A.  Yes.
20       Q.  Who's named?
21       A.  Well, they were named.  Merco
22  Group 2001, dash, 2021, West Mission Boulevard, LLC.
23       THE DEPOSITION OFFICER:  I'm sorry.  Merco...
24       THE WITNESS:  Merco Group 2001, dash, 2021,
25  West Mission Boulevard, LLC.

Page 102

1        Q.  When was the Merco Group named in the PNL
2   litigation?
3        A.  During the bankruptcy.
4        Q.  They're in this pending case bankruptcy?
5        A.  Correct.
6        Q.  All right.  And are they still currently
7   parties to the PNL Pomona litigation?
8        A.  I think they're no longer.
9        Q.  When did they cease to be a named party in the
10  PNL Pomona litigation?
11       A.  I don't -- I don't remember.
12       Q.  How long ago approximately?
13       A.  I don't remember.
14       Q.  Before the bankruptcy was filed?
15       A.  No.  I think it was after the bankruptcy was
16  filed.
17       Q.  Okay.  But you don't have any estimate of when
18  they were dismissed?
19       A.  I don't.
20       Q.  Have you continued to expend time on the PNL
21  Pomona litigation since the debtor entity affiliate was
22  dismissed?
23       A.  Yes, I have consulted with counsel after the --
24  after the dismissal.

Page 103

1        Q.  How actively are you involved in that
2   litigation?
3        A.  Very limited.  They also include a judicial
4   foreclosure account against a debtor asset, so dismissal
5   of the party itself wasn't enough, so I -- I've also
6   continued consulting with counsel on that case.
7        Q.  Who -- who is the counsel you've consulted with
8   on PNL Pomona?
9        A.  The Neufeld firm.
10       Q.  And they are representing Belinda Meruelo and
11  the Estate of Homer Meruelo?
12       A.  Correct.
13       Q.  Who at the Neufeld firm?
14       A.  Gaelle Gralnek.
15       THE DEPOSITION OFFICER:  Spell her last name.
16       THE WITNESS:  G-r-a-l-n-e-k?  I'm not positive.
17  BY MS. RODIGER:
18       Q.  Who is the firm that you have consulted with on
19  the Imperial case?
20       A.  I think that was Neufeld as well.
21       Q.  Same attorney?
22       A.  I don't remember.  Yes, Gaelle Gralnek.
23  Maybe -- maybe Neufeld.
24       Q.  Maybe the named partner, Mr. Neufeld?
25       A.  Maybe.

Page 104

26 (Pages 101 to 104)

| | |
|---|---|
| 1    Q. Okay. And who is the law firm that you have<br>2 consulted with on the Berkadia/Wells Fargo litigation?<br>3    A. Same.<br>4    Q. The Neufeld firm?<br>5    A. Correct.<br>6    Q. Who represented the debtor affiliate entity,<br>7 Merco Group in the PNL Pomona litigation?<br>8    A. Can you repeat that?<br>9    Q. Who was the attorneys or firm that represented<br>10 the debtor affiliated party, Merco Group in the PNL<br>11 Pomona litigation?<br>12    A. Neufeld.<br>13    Q. So Neufeld was representing the Merco Group<br>14 also?<br>15    A. Yes.<br>16    Q. What litigation since the bankruptcy has the<br>17 Neufeld firm handled for MMPI or its affiliates?<br>18    A. Since the bankruptcy?<br>19    Q. Yes.<br>20    A. They performed some services on behalf of the<br>21 company in the 845 Flower --<br>22    Q. What -- what --<br>23    A. -- matter.<br>24    Q. -- services? On litigation?<br>25    A. Mechanics lien issues.<br><div align="right">**Page 105**</div> | 1    A. Well, they represented the company in<br>2 connection with the Berkadia litigation, the PNL<br>3 litigation and the other litigation I mentioned.<br>4    Q. Imperial?<br>5    A. Imperial.<br>6    Q. Okay. My question was, are the -- is the<br>7 Neufeld firm currently representing MMPI in any pending<br>8 litigation?<br>9    A. Well, again, depends on what you mean by<br>10 "representing." As a named party, no. In terms of<br>11 representation on a more general basis, I would say yes.<br>12    Q. When was the last time that the Neufeld firm<br>13 represented MMPI as a named party in any pending<br>14 litigation?<br>15    A. PNL.<br>16    Q. And you don't recall -- and that was the Merco<br>17 Group?<br>18    A. Correct.<br>19    Q. And you don't recall how long ago that<br>20 representation ended as a named party?<br>21    A. I don't.<br>22    (Whereupon a conference was<br>23    held off the record between<br>24    the deponent and Mr. Klausner.)<br>25    THE WITNESS: Yeah, I mean, 845 Flower -- I<br><div align="right">**Page 107**</div> |
| 1    Q. Okay. Anything else you can think of?<br>2    A. They've assisted us in settlements with various<br>3 other parties. I -- I can't think of right now with<br>4 who.<br>5    Q. You stated that the Neufeld firm has provided<br>6 MMPI with litigation and research legal services; is<br>7 that right?<br>8    A. General research, right.<br>9    Q. Are they under a general ongoing retainer to<br>10 MMPI?<br>11    A. Yeah, I mean, they -- depends on what you mean<br>12 by a "general ongoing retainer." I guess the answer is<br>13 yes.<br>14    MR. KLAUSNER: Well, you know what, let's have<br>15 her --<br>16    MS. RODIGER: Let me be clear --<br>17    MR. KLAUSNER: -- let's have her define what<br>18 she's talking about.<br>19 BY MS. RODIGER:<br>20    Q. Let me be clear.<br>21    A. Okay.<br>22    Q. Are they representing MMPI currently in any<br>23 litigation, the Neufeld firm?<br>24    A. Yes.<br>25    Q. What litigation?<br><div align="right">**Page 106**</div> | 1 guess it depends on what you mean -- I don't know if<br>2 that's -- I don't think there's current representation,<br>3 though.<br>4    MR. KLAUSNER: Okay.<br>5 BY MS. RODIGER:<br>6    Q. Does -- did something just refresh your<br>7 recollection on the last time that the Neufeld firm<br>8 represented MMPI or any of the affiliate debtors as a<br>9 named party in any pending litigation?<br>10    A. Well, it continues to represent the company in<br>11 connection with settlement discussions --<br>12    Q. Which was not my question.<br>13    A. -- not necessarily as a named party in the<br>14 litigation.<br>15    Q. Yeah, which was my question.<br>16    A. Okay.<br>17    Q. I'm -- I'm asking about --<br>18    A. PNL.<br>19    Q. -- yeah, litigation representation. And the<br>20 last time was PNL that you can recall, and you don't<br>21 know how long ago the affiliate entity was dismissed<br>22 from that lawsuit; is that right?<br>23    A. Correct.<br>24    Q. Okay. In the documents produced by Ernst &<br>25 Young in this case, there are multiple invoices from the<br><div align="right">**Page 108**</div> |

<div align="right">27 (Pages 105 to 108)</div>

**Page 109**

1  Neufeld law firm. Have you had a chance to look at the
2  E&Y production in this case?
3      A. No.
4      Q. One of the documents is a June 15th e-mail from
5  Mr. Meruelo to the -- regarding the Neufeld law firm
6  asking for payment of $100,000 to the Neufeld Law Group
7  for legal services from 845 Flower, LLC.
8          Are you familiar with that payment?
9      A. Yes.
10     Q. What was that payment for?
11     A. I don't understand your question in terms of --
12  as far as who's -- I -- I don't understand the question.
13     Q. What kinds of legal services was the Neufeld
14  firm providing to MMPI relating to 845 Flower, LLC for
15  $100,000?
16     A. Mechanics lien issues.
17     Q. Was the mechanics lien litigation?
18     A. No, it was -- no, because it was in bankruptcy,
19  so it was just claims.
20     Q. What were the amount of the claims?
21     A. Well, pre- -- pre-bankruptcy was also
22  litigation, so yes. Post-bankruptcy it was claims
23  within the bankruptcy.
24     Q. So these were creditor claims?
25     A. Correct.

**Page 110**

1      Q. In the bankruptcy matter?
2      A. Correct.
3      Q. And the Neufeld Law Group was representing MMPI
4  or its affiliates in advising on handling those claims?
5      A. Correct.
6      Q. And was the $100,000 incurred in representing
7  MMPI or its affiliates on 845 Flower, LLC?
8      A. No.
9      Q. Okay. What was the $100,000 incurred on by the
10  Neufeld law firm -- Law Group?
11     A. I think the question makes assumptions that
12  aren't true.
13     Q. Okay. Did you authorize the $100,000
14  expenditure to the Neufeld Law Group for legal services
15  from 845 Flower, LLC?
16     A. Depends on what you mean by "expenditure."
17     Q. The payment.
18     A. The payment of the 100,000?
19     Q. Yeah.
20     A. No.
21     Q. Is that unusual that you didn't authorize the
22  payment of the Neufeld law firm --
23     A. Well --
24     Q. -- invoice for legal services?
25     A. Again, you're making assumptions that aren't

**Page 111**

1  quite accurate.
2          MR. KLAUSNER: You don't have to re-form her
3  question.
4  BY MS. RODIGER:
5      Q. Do you know what the $100,000 was paid to the
6  Neufeld Law Group for?
7      A. As a retainer.
8      Q. As a retainer on what?
9      A. For -- for -- I -- I don't know that.
10     Q. Is $100,000 an unusually large retainer for the
11  Neufeld Law Group?
12     A. I -- I don't know that I would characterize it
13  as unusually large.
14     Q. What kind of representation was the Neufeld Law
15  Group doing for which the debtors paid a $100,000
16  retainer?
17     A. I don't know that -- I don't know.
18     Q. What kind of legal services was the Neufeld Law
19  Group performing relating to 845 Flower, LLC?
20     A. Mechanics liens issues.
21     Q. What was the total charges that the Neufeld law
22  firm made on the 845 Flower, LLC representation?
23     A. I don't -- I don't know.
24     Q. Are you familiar with an additional payment to
25  the Neufeld law firm of $30,000 in a retainer?

**Page 112**

1      A. Yes.
2      Q. What was that for?
3      A. For ongoing services performed on behalf of the
4  debtor.
5      Q. What kind of services?
6      A. Consultation, negotiation of settlements,
7  representation, legal matters, general research, things
8  like that.
9      Q. Was the $30,000 paid to the Neufeld law firm a
10  retainer?
11     A. Yes.
12     Q. Was the $30,000 retainer paid on a specific
13  representation?
14     A. No.
15     Q. Was it applied to multiple invoices?
16     A. Yes.
17     Q. Do you know which matters the 30,000 was
18  applied to?
19     A. I don't -- I don't know.
20     Q. The -- how recently did the Neufeld Law Group
21  handle any matters relating to 845 Flower?
22     A. Beginning of 2010.
23     Q. Was -- was the last time that they represented
24  any of the debtors relating to 845 Flower beginning of
25  2010?

**28 (Pages 109 to 112)**

1    A. I don't remember.
2    Q. Okay. You dealt with Ms. Gralnek,
3 G-r-a-l-e-n-k (sic), on 845 Flower; is that right?
4    A. I don't remember. I don't remember.
5    Q. What is the Wells Fargo versus Richard Meruelo
6 Sante Fe commerce litigation? Is that the Wells Fargo
7 litigation you referenced earlier?
8    A. Correct.
9    Q. And in that case, the Neufeld law firm
10 represents Mr. Meruelo individually?
11    A. Correct.
12    Q. Did MMPI pay any of those invoices incurred --
13    A. No.
14    Q. No?
15    A. No.
16    Q. Not to your knowledge?
17    A. Not to my knowledge.
18    Q. Did you approve any payment of invoices for
19 legal services provided to Richard Meruelo by the
20 Neufeld law firm in the Wells Fargo matter?
21    A. There were -- I -- I don't remember.
22    Q. Would you have approved any payment of the
23 legal services --
24    A. I may have.
25       MR. KLAUSNER: Let -- let her finish --

**Page 113**

1       THE WITNESS: I'm sorry.
2       MR. KLAUSNER: Let her finish the question. It
3 sounds like she's asking you a hypothetical.
4       THE WITNESS: Okay.
5 BY MS. RODIGER:
6    Q. Well, the question before that was, did you
7 authorize any of the payments for legal services
8 provided to Richard Meruelo in the Wells Fargo matter by
9 MMPI?
10    A. Not for Richard Meruelo.
11    Q. So to your knowledge, MMPI or its affiliate
12 debtor entities did not pay for any of Mr. Meruelo's
13 litigation expenses in the Wells Fargo case?
14    A. Correct.
15    Q. And did the Neufeld law firm also represent
16 Mr. Meruelo in a matter adverse to Dorothy Goulden,
17 G-o-u-l-d-e-n, regarding the Wall Street Market?
18    A. I believe they represented Mr. Meruelo and the
19 company.
20    Q. Was the company a named party in that case?
21    A. Yes.
22    Q. Did MMPI pay any of Mr. Meruelo's individual
23 legal services as incurred with the Neufeld law firm in
24 that matter?
25       THE DEPOSITION OFFICER: I'm sorry. The last

**Page 114**

1 part of the question? Incurred with...
2 BY MS. RODIGER:
3    Q. -- with the Neufeld law firm in that case?
4    A. I believe upon settlement we paid the legal
5 fees for that case. I don't know if they related to
6 representation of Mr. Meruelo or for the company. I
7 think they were representing the company throughout the
8 case.
9    Q. Did the company -- did -- which company, MMPI?
10    A. No. It was, I think, Wall Street Market,
11 LLC --
12    Q. Yes.
13    A. -- I believe was the name of the entity.
14    Q. And the Neufeld Law Group represented both Wall
15 Street Market and Mr. Meruelo in that case?
16    A. Correct.
17    Q. Did you on behalf of Wall Street Market waive
18 any conflicts with respect to representation of two
19 parties in that case?
20    A. I don't remember.
21    Q. But it's correct that to your knowledge, Wall
22 Street Market and/or any of the debtor entities, none of
23 them paid any of Mr. Meruelo's individual law fees --
24 attorney's fees to the Neufeld Law Group in that case;
25 is that right?

**Page 115**

1    A. I believe the company paid the fees of that
2 case. I'm not aware of an allocation between Meruelo
3 or -- or the company.
4    Q. Why would the company pay for Mr. Meruelo's
5 attorney fees?
6    A. I -- I don't think the company necessarily did.
7 I don't know that -- the Neufeld firm represented the
8 company and Mr. Meruelo together, but I don't know if --
9 again, there was no separate allocation of fees and so
10 the company paid -- paid for that litigation.
11    Q. Did you authorize that?
12    A. Yes.
13    Q. Why would you authorize the debtor companies to
14 pay for Richard Meruelo's attorney's fees in that case?
15       MR. KLAUSNER: Assumes facts -- objection;
16 assumes facts not in evidence.
17       THE WITNESS: I don't think they did.
18 BY MS. RODIGER:
19    Q. Why did you not require the Neufeld Law Group
20 to allocate expenses as between the debtor entity and
21 Mr. Meruelo in that case?
22    A. Because the debtor was the primary party, and
23 I'm not aware of what, if any, role Richard Meruelo
24 played in that -- that litigation --
25    Q. Did you --

**Page 116**

**29 (Pages 113 to 116)**

1    A. -- other than being named.
2    Q. Did you ask the Neufeld law firm what
3  percentage of their time and expenditures was expended
4  on behalf of Wall Street Market as opposed to
5  Mr. Meruelo individually?
6    A. No.
7    Q. You didn't care?
8    A. I didn't -- I didn't think it was a significant
9  issue.
10    Q. How many cases has that been true in with the
11  Neufeld Law Group?
12    MR. KLAUSNER: Objection; vague.
13    THE WITNESS: I don't know what you're asking.
14  BY MS. RODIGER:
15    Q. Can you give me an estimate of how many cases
16  the Neufeld Law Group has been paid by debtor or debtor
17  entity, affiliated entity for representation where they
18  also individually represented Mr. Meruelo?
19    A. Well, Goulden. I can't think of -- I can't
20  think of any others.
21    Q. Imperial?
22    A. Yes, Imperial.
23    Q. Wells Fargo?
24    A. No.
25    Q. Was the Neufeld law firm representing

1    Q. And was any portion of the $30,000 retainer
2  paid for services being rendered to Mr. Meruelo
3  individually or his family members?
4    A. Again, I think some of that was applied to the
5  Goulden. I don't -- but I don't attribute that to their
6  representation of Mr. Meruelo. I -- I don't know if
7  there may have been others. If we paid others, I did
8  not attribute those fees to their representation of
9  Mr. Meruelo.
10    Q. When you say you don't "attribute" it, does
11  that mean that you received confirmation from the
12  Neufeld Law Group that none of the fees were being
13  charged to the debtor entities were, in fact, incurred
14  in representing Mr. Meruelo individually?
15    A. I -- I did not ask for verification from them.
16    Q. Is that an assumption on your part, then?
17    A. Yes.
18    Q. What's the basis of the assumption?
19    A. With respect to Goulden?
20    Q. With respect to any case in which the debtor
21  entities have either paid the Neufeld Law Group or been
22  asked to pay the Neufeld Law Group where they also
23  represented Mr. Meruelo and/or members of his family.
24    A. What is the basis -- can you read the question
25  again?

1  Mr. Meruelo in the Wells Fargo litigation?
2    A. Yeah.
3    Q. But you're certain that MMPI did not pay for
4  any legal services provided by the Neufeld Law Group to
5  Richard Meruelo individually in that case?
6    A. I don't believe any fees have been paid.
7    Q. Oh, so your answer is that none of the legal
8  fees have been paid so far?
9    A. Correct.
10    Q. Okay. Did you in that case request any kind of
11  allocation by the Neufeld Law Group for its legal
12  services as between the debtor entity and Richard
13  Meruelo?
14    A. No.
15    Q. Have you ever asked anyone from the Neufeld Law
16  Group to allocate their legal charges as between debtor
17  entities and Mr. Meruelo and/or members of his family?
18    A. No.
19    Q. Was any portion of the $100,000 paid as a
20  retainer, paid to cover Mr. Meruelo's or his family's
21  legal expenses with the Neufeld Law Group?
22    A. No.
23    Q. You're certain of that?
24    A. Well, I -- no, I don't think we -- no, I don't
25  think we paid fees for -- for them individually.

1    MR. KLAUSNER: Uh-huh.
2  BY MS. RODIGER:
3    Q. I'll state -- restate it.
4    What is the basis of your assumption that none
5  of the debtor entities have been -- have paid for or
6  been asked to pay for services rendered by the Neufeld
7  Law Group to Mr. Meruelo and/or members of his family?
8    A. Based on what I feel is attributable.
9    Q. What's that mean?
10    A. Well, if fees were incurred that, you know,
11  I -- I think that a portion of them are attributable
12  to -- to the company and so we would have paid fees for
13  that.
14    Q. Okay. You review each of the Neufeld Law
15  Group's invoices; is that right?
16    A. You haven't asked me about a specific invoice.
17  I don't think I can answer that.
18    Q. Are there any Neufeld Law Group invoices that
19  you did not review? I thought you represented -- I --
20    A. Which have been paid or not paid or --
21    Q. That's not part of my question.
22    A. I --
23    MR. KLAUSNER: Well, I'll object; vague.
24  Witness is having trouble with it.
25  ///

BY MS. RODIGER:

Q. Have you reviewed all of the Neufeld Law Group invoices that have been submitted to MMPI?

A. No.

Q. Which ones don't you review?

A. The ones that have not been paid.

Q. Okay. So all of those that have been paid, you have reviewed?

A. I don't -- I don't remember.

Q. Who else would review and approve Neufeld Law Group invoices besides yourself?

A. I'm not aware of anyone else.

Q. In the Neufeld Law Group invoices that you reviewed, did you look to see what percentage of the time expended was being charged to the debtor entities as opposed to the individuals being represented by the Neufeld Law Group?

A. Can you repeat that?

Q. If, for instance, the Neufeld Law Group invoiced for research, did you satisfy yourself in some fashion that that research was performed for MMPI as opposed to for Richard Meruelo or members of his family?

A. Yes, I likely would have.

Q. How do you do that?

A. Based on what I understood the work to be for.

**Page 121**

Q. How -- how did you confirm it or was it an assumption again?

A. Well, I may have looked at time entries or it may have been based on my -- my memory.

Q. Was there any time that you asked the Neufeld Law Group to tell you what their time breakdown was in -- in legal fees incurred for Richard Meruelo on any matter?

A. No.

Q. Was there any time that you asked them for a breakdown on legal fees incurred for members of Mr. Meruelo's family on any matter?

A. No.

Q. Did you personally ever confer with any member of the Neufeld Law Group about their legal strategy for Richard Meruelo or members of his family?

A. Yes.

Q. Did you have authority from those individuals to do that?

A. I was representing the company in conferring on strategy. I don't know whether I had authority or not.

Q. Did you give direction to the Neufeld law firm in representing Richard Meruelo or members of his family?

A. I think that the question -- can -- can you

**Page 122**

repeat the question?

I would not say I gave direction, but I would consult with them in connection with their representation.

Q. Did you expend a certain percentage of your time as the general counsel of MMPI advising the Neufeld Law Group on how to represent Richard Meruelo or members of his family?

A. Not on how to represent, no.

Q. Did you expend a certain amount of your time as general counsel for MMPI consulting with the Neufeld Law Group on how to represent Richard Meruelo or members of his family?

A. If that's the same question, no.

Q. What did you talk to them about with respect to Richard Meruelo and members of his family's representation?

A. How the litigation would affect the company, how it related to the bankruptcy; what claims the company had with respect to claims being made in that litigation; defenses that the litigation -- that the company had with respect to those claims and that -- as a -- as an extension that the guarantor would have; activities that the company undertook with respect to that -- those loans; information that the company had

**Page 123**

with respect to those loans; various claims that the company may have made in the past against that lender; historical information that would affect claims or defense in that case.

There's a lot of -- it was impossible in many cases to separate company interest from -- from guarantor interest.

Q. Okay. Well, in the Berkadia/Wells Fargo case, the Imperial case and the PNL Pomona case where you continued to consult with the Neufeld Law Group after there were not any named debtor entities in those cases, what were you talking to the Neufeld Law Group about?

A. Settlement as well as what I just described to you in the -- in my answer to the past question.

Q. Settlement of who?

A. In the bankruptcy.

Q. So your discussion with the Neufeld law firm -- Law Group in those matters related only to settlement of bankruptcy claims against the debtor entities?

A. And all the other things I mentioned in my previous answer.

Q. Related only to debtor entity potential liability?

MR. KLAUSNER: Are you now -- objection; you're mischaracterizing his prior statement.

**Page 124**

**31 (Pages 121 to 124)**

1     THE WITNESS:  I think you're mischaracterizing
2  my prior --
3  BY MS. RODIGER:
4     Q.  Okay.
5     A.  -- answer.
6     Q.  All right.  In the PNL Pomona case, Merco
7  Group -- your testimony is you can't remember when Merco
8  Group was dismissed out; is that right?
9     A.  I don't...
10    Q.  Did you engage in any discussions with PNL --
11 I'm sorry.  Strike that.
12    Did you discuss with the Neufeld Law Group any
13 settlement strategy in the PNL Pomona case?
14    A.  Yes.
15    Q.  And did you do that after Merco Group was
16 dismissed out of the case?
17    A.  Yes.
18    Q.  Who were you discussing having a settlement
19 for?
20    A.  A global settlement for the company and -- and
21 guarantors.
22    Q.  So you were negotiating for the guarantors as
23 well?
24    A.  No.
25    Q.  Okay.  Who was representing the guarantors?

**Page 125**

1     A.  Neufeld.
2     Q.  And the guarantors were the only named parties
3  remaining in the case?
4     A.  Well, the property was still named in the case.
5  It's not a party, but it is a -- I don't know what the
6  right term is.  It's still subject or purportedly
7  subject to the jurisdiction of that court.  So I
8  represented the interests of the company in connection
9  with that litigation.
10    MS. RODIGER:  Okay.  Move to strike as
11 nonresponsive.
12    Q.  I haven't asked you that question.
13    The CA Auto Mart case that was handled by the
14 Neufeld Law Group, were any of the debtor parties named
15 parties in that?
16    A.  I don't know what the CA Auto Mart case is.
17    Q.  Do you recall having telephone conversations
18 with the Neufeld Law Group regarding a cross-complaint
19 in the CA Auto Mart case?
20    A.  I don't know what the CA Auto Mart case is.
21    Q.  Mr. Sohigian, S-o-h-i-g-i-a-n?
22    A.  I don't recognize --
23    MR. KLAUSNER:  Is that a question?
24    THE WITNESS:  -- that name.
25 BY MS. RODIGER:

**Page 126**

1     Q.  Yes, I'm asking if you recognize the matter
2  with the -- that -- the addition of that name.
3     A.  I don't recognize that name.
4     Q.  Do you recall doing a mediation before Judge
5  Sohigian in or about August of 2010?
6     A.  No.
7     Q.  Okay.  How about the East-West/Meruelo Wall
8  Street loan, dash, Richard Meruelo, were any of the
9  debtor entity parties in that case?
10    A.  I don't think so.
11    Q.  Did you review the Neufeld Law Group invoices
12 on that matter?
13    A.  No, I don't believe so.  No.
14    Q.  Did you provide copies of the Neufeld Law Group
15 invoices you reviewed to Ernst & Young?
16    A.  No.
17    Q.  Did you ask the Neufeld Law Group to provide
18 copies to Ernst & Young?
19    A.  No.
20    Q.  Do you know how Ernst & Young got copies of the
21 Neufeld Law Group invoices?
22    A.  I believe they may have requested information.
23    Q.  Do you remember having discussions on the
24 matter of Richard Meruelo versus East-West/Meruelo Wall
25 Street loan in or about August 2010?

**Page 127**

1     A.  With -- with who?
2     Q.  The Neufeld Law Group.
3     A.  Yes, it's possible.  I don't remember.
4     Q.  Were you involved in drafting the debtor's plan
5  of reorganization?
6     A.  Yes.
7     Q.  Were you involved in the revisions to the plans
8  of reorganization?
9     A.  Yes.
10    Q.  What was your role?
11    A.  Review and comment.
12    Q.  Okay.  Did you do any of the initial drafting?
13    A.  When you mean drafting -- I don't know what you
14 mean by "drafting."  Typing?
15    Q.  Writing, typing --
16    A.  No.
17    Q.  -- creating?
18    A.  No.
19    Q.  Okay.  Were you involved in determinations of
20 valuations of equity for purposes of the plans of
21 reorganization?
22    A.  I'm not aware of -- no, no.
23    Q.  Did you help set pricing for equity shares in
24 any of the plans?
25    A.  I don't remember.

**Page 128**

**32 (Pages 125 to 128)**

Page 129

1    Q. Have you written any declarations for MMPI
2  management in this case without their input?
3    A. Without whose input?
4    Q. Whoever the declarant was.
5    MR. KLAUSNER:  Do you understand the question?
6    THE WITNESS:  No.
7  BY MS. RODIGER:
8    Q. Okay.
9    A. I have not -- I don't know.  I don't understand
10  the question.
11    Q. Have you written any declaration for any
12  individual in this case other than yourself?
13    A. I don't know what you mean by "written."
14    Q. Created, typed.
15    A. No.
16    Q. What do you mean by "written"?
17    A. Whatever your question is.  I guess I'm asking
18  you to clarify what you mean by "written."
19    Q. Have you dictated any declaration for any other
20  individual?
21    A. No.
22    Q. Have you handwritten a declaration for any
23  other individual?
24    A. No.
25    Q. How many court hearings have you been to in

Page 130

1  these cases?
2    A. I don't know.
3    Q. Can you estimate?
4    A. Twenty.
5    Q. Can you tell me generally why you've been at
6  court hearings in these cases?
7    A. Yes.  To provide -- do my duties to the
8  company.
9    Q. Did someone ask you to go to the meetings -- I
10  mean, to the court hearings?
11    A. No.
12    Q. So you decided whether you would go or not?
13    A. Yes.
14    Q. Did -- did the board ask you to go to court
15  hearings?
16    A. No.
17    Q. Do you have interaction with Mr. Bond, John
18  Bond?
19    A. No.
20    THE DEPOSITION OFFICER:  B-o-n-d.
21    MS. RODIGER:  B-o-n-d.
22    Q. What do you know about the $100,000 in MMPI
23  funds that were transferred to a Florida court along
24  with $3,000 of Mr. Meruelo's personal funds in June
25  2010?

Page 131

1    A. I know that a transfer was made to a court in
2  connection with an auction, and I know that those funds
3  were wired back to the company.
4    Q. Did you authorize that expenditure before it
5  happened?
6    A. No.
7    Q. Do you know of any MMPI litigation that was
8  pending in a Florida court at the time?
9    A. No.
10    Q. Do you know what the payment was for?
11    A. It was not a payment.
12    Q. Do you know what the expenditure was for?
13    A. I don't think it -- I'm not sure -- it was a
14  deposit in a -- in an auction, so I'm not even sure if
15  it's proper to characterize it as an expenditure.
16    Q. Do you know what the deposit was for?
17    A. An auction.
18    Q. On?
19    A. Property.
20    Q. Where?
21    A. In Florida.
22    Q. Does MMPI purchase properties in Florida?
23    A. It can, sure.
24    Q. Has MMPI ever purchased property in Florida?
25    A. No.

Page 132

1    Q. Are MMPI's real estate purchases limited to
2  Southern California?
3    A. No.
4    Q. What exception do you know of?
5    A. We've looked at purchases in other locations
6  besides Southern California.
7    Q. What property outside of Southern California
8  has MMPI ever purchased?
9    A. I didn't say "purchased."  I -- we've looked at
10  purchases.
11    Q. Has MMPI ever purchased a property outside of
12  Southern California that you know of?
13    A. Depends on what you mean by "MMPI."  I don't
14  know if that would include predecessor entities or not.
15  It is possible that predecessor entities may have.  I --
16  I don't know.
17    Q. I -- I'm not asking you to speculate.  I'm
18  asking of your knowledge.
19    A. Has MMPI -- MMPI has never purchased any
20  property.
21    Q. Have -- has MMPI or any of the affiliated
22  debtor entities acquired property outside of Southern
23  California to your knowledge?
24    A. Not to my knowledge.
25    Q. Do you know if the deposit sent to a Florida

33 (Pages 129 to 132)

1　court was made on MMPI business?
2　　A.　I understand that it was made on MMPI business,
3　yes.
4　　Q.　What's the basis of that understanding?
5　　A.　Based on my review of documents indicating that
6　it was held in the name of MMPI.
7　　Q.　Was -- was that review done after the payment
8　was made --
9　　A.　Yes.
10　　Q.　-- or deposit was made?
11　　A.　Yes.
12　　Q.　Did you perform any review prior to the deposit
13　being --
14　　A.　No.
15　　Q.　-- made?
16　　A.　No.
17　　Q.　Okay.　And your understanding was the money was
18　returned to MMPI; is that right?
19　　A.　Yes.
20　　Q.　Okay.　And what is -- what do you know about
21　the $1.925 million cashier's check that was issued in or
22　about August 2010?
23　　A.　Well, based on my review of documents, I know
24　that cashier's checks were issued.　I know that
25　cashier's checks were redeposited.　That's all -- that's

**Page 133**

1　all I know.
2　　Q.　Were you involved in approving that
3　expenditure?
4　　A.　No.
5　　Q.　Did you perform your review prior to the
6　cashier's check being issued?
7　　A.　No.
8　　Q.　Do you know why four checks were issued for the
9　$1.925 million?
10　　A.　My understanding is that it was to provide
11　proof of immediately available funds.
12　　Q.　Do you know why four checks were needed to do
13　that?
14　　A.　I don't.
15　　Q.　Did breaking down the $1.925 million into four
16　checks circumvent internal controls at MMPI?
17　　A.　I don't know.
18　　Q.　Is MMPI in the business of buying notes?
19　　A.　Yes, it could be.
20　　Q.　Is it your understanding that MMPI has bought
21　notes in the past?
22　　A.　No.
23　　Q.　Is it your understanding that the $1.925
24　million was intended for the possible purchase of a
25　note?

**Page 134**

1　　A.　That is my understanding.
2　　Q.　To your knowledge, has MMPI ever before issued
3　a cashier's check it did not intend to expend?
4　　A.　I -- I --
5　　MR. KLAUSNER:　Assumes not -- facts not in
6　evidence.
7　BY MS. RODIGER:
8　　Q.　Okay.　I'll back up.
9　　Do you have an understanding of whether or not
10　MMPI intended to expend the 1.925 reflected in the
11　cashier's check to Magnum Properties?
12　　A.　Based on my review of documents, I believe
13　there was no intent to expend that money.
14　　Q.　Do you have an understanding of whether or not
15　MMPI intended to photocopy that cashier's check and then
16　return the funds to its own accounts?
17　　A.　Based on my review of documents, that -- my
18　understanding is that was the intent.
19　　Q.　Has MMPI to your knowledge ever before issued a
20　cashier's check it did not intend to expend?
21　　A.　It's possible.　I don't know.
22　　Q.　Just asking your knowledge.
23　　A.　I don't know.
24　　Q.　So you don't know of that occurring previously?
25　　A.　I don't know.　Yeah, I don't know.

**Page 135**

1　　Q.　Okay.　And, to your knowledge, has MMPI ever
2　before issued a cashier's check solely in order to take
3　a photocopy?
4　　A.　I don't know.
5　　Q.　To your knowledge, has MMPI ever before issued
6　a cashier's check it did not intend to deliver to the
7　payee?
8　　MR. KLAUSNER:　I'm going to object.　It's
9　vague.
10　　THE WITNESS:　Based on my review of documents,
11　I under -- I understand that the cashier's checks you're
12　asking about were issued with the intent that they never
13　be delivered.
14　BY MS. RODIGER:
15　　Q.　Okay.　Do you know why the funds, when returned
16　to the debtor accounts, were deposited in a
17　nondebtor-in-possession account?
18　　A.　That's not true.
19　　Q.　Do you have an understanding of whether any of
20　these funds were deposited in a nondebtor-in-possession
21　account?
22　　A.　Yes.
23　　Q.　What's your understanding?
24　　A.　When the funds were redeposited, they were
25　deposited in a debtor-in-possession account.

**Page 136**

**34 (Pages 133 to 136)**

| | |
|---|---|
| 1    Q. Do you have any knowledge of any funds being<br>2 deposited in a nondebtor-in-possession account since<br>3 this bankruptcy occurred?<br>4    A. I understand that has occurred.<br>5    Q. In what instance.<br>6    A. In this instance.<br>7    Q. Okay. Have you --<br>8    A. Many --<br>9    Q. Sorry.<br>10    A. Well, that after it had been deposited into a<br>11 debtor-in-possession account at East-West Bank, that it<br>12 was then transferred to an account at US Bank which was<br>13 not a debtor-in-possession account.<br>14    Q. Is it your understanding that the account at<br>15 US Bank was formed after the bankruptcy was filed?<br>16    A. Yes.<br>17    Q. Do you have an understanding of why the US Bank<br>18 account is not a debtor-in-possession account?<br>19    A. Yes.<br>20    Q. What's your understanding?<br>21    A. That it was inadvertently not set up as a<br>22 debtor-in-possession account.<br>23    Q. Are you aware of any -- strike that.<br>24      Do you know who set up that account?<br>25    A. Someone at the bank, I assume.<br><div align="right">**Page 137**</div> | 1    A. I don't know.<br>2    Q. Who authorized opening that account?<br>3    A. Miguel Echemendia.<br>4    Q. What is your knowledge regarding whether or not<br>5 Mr. Meruelo owes MMPI substantial sums for management<br>6 services rendered by MMPI to Mr. Meruelo's personal<br>7 properties?<br>8    A. My knowledge is that the company has an account<br>9 receivable that shows that he -- that would indicate<br>10 that he owes money to the company.<br>11    Q. Do you know how much that is?<br>12    A. I know our statement of account is about<br>13 200,000.<br>14    Q. To your knowledge, were those sums incurred by<br>15 the company in providing management services to<br>16 Mr. Meruelo's personal properties?<br>17    A. I don't know.<br>18    Q. To your knowledge, has Mr. Meruelo<br>19 post-bankruptcy used any MMPI assets or employees for<br>20 his own personal properties?<br>21    A. Yes.<br>22    Q. And what examples come to mind?<br>23    A. Mr. Horrigan provided --<br>24    Q. Who is the issuer.<br>25    A. H-o-r-r --<br><div align="right">**Page 139**</div> |
| 1    Q. No, I'm sorry. At MMPI or the debtor<br>2 affiliate. Do you know who set up that account?<br>3    A. Can you repeat the question?<br>4    Q. Yes. Do you know who at MMPI or the affiliated<br>5 debtor entities established the nondebtor-in-possession<br>6 account?<br>7    A. I don't think -- that's a vague question. I<br>8 don't -- I don't understand it.<br>9    Q. Who opened it, the account?<br>10      MR. KLAUSNER: Who opened what? I'm sorry.<br>11      THE WITNESS: The bank opened it.<br>12 BY MS. RODIGER:<br>13    Q. For whom?<br>14      MR. KLAUSNER: Objection; vague.<br>15      THE WITNESS: For the accountholder.<br>16 BY MS. RODIGER:<br>17    Q. And who was that?<br>18    A. I don't know. I understand it was Canfield,<br>19 one of the Canfield entities.<br>20    Q. And do you know who the person was that opened<br>21 that account at US Bank?<br>22    A. I don't.<br>23    Q. Did your review of documents tell you that?<br>24    A. Who at the bank opened it?<br>25    Q. No.<br><div align="right">**Page 138**</div> | 1    Q. -i-g-a-n.<br>2    A. -- i-g-a-n, provided construction services,<br>3 construction management services with respect to a home<br>4 of Mr. Meruelo's parents. Actually, that's probably not<br>5 responsive to your question because you asked for<br>6 Mr. Meruelo.<br>7      Employees also provide management services for<br>8 various properties owned by Richard Meruelo or his<br>9 parents.<br>10    Q. How long has that been going on?<br>11    A. Since the IPO.<br>12    Q. Is that still going on currently?<br>13    A. Yes.<br>14    Q. What is Mr. Meruelo charged for that?<br>15    A. I don't know the current charge of that.<br>16    Q. Do you know what he's been charged at any point<br>17 in time since the IPO?<br>18    A. Yes. At the time of the IPO, he was to pay<br>19 $150,000 in management fees. There are adjustments that<br>20 get made to that.<br>21    Q. Has Mr. Meruelo, to your knowledge, paid any of<br>22 those management fees?<br>23    A. Yes. To my understanding he has, yes.<br>24    Q. Do you know how much he's paid?<br>25    A. I don't.<br><div align="right">**Page 140**</div> |

<div align="right">**35 (Pages 137 to 140)**</div>

| | |
|---|---|
| 1　Q.　And to your knowledge, has Mr. Meruelo's | 1　A.　I don't know. |
| 2　parents paid any management fees to MMPI? | 2　Q.　To your knowledge, did the Whittier home |
| 3　A.　I'm not aware that the charge is to the | 3　ever -- was it ever titled to any of the debtor |
| 4　parents.  I think the charge is to -- to Mr. Meruelo. | 4　entities? |
| 5　Q.　Even with respect to properties belonging to | 5　A.　Not that I'm aware of. |
| 6　his parents that have been managed by MMPI? | 6　Q.　Do you know of any reason why MMPI would have |
| 7　A.　Yes. | 7　signed a contract with any of the subcontractors on the |
| 8　Q.　And Mr. Horrigan who you mentioned provided | 8　Whittier home? |
| 9　construction management services. | 9　A.　No. |
| 10　　Are you referring to the home in Whittier that | 10　Q.　Do you know if MMPI has preserved its computer |
| 11　was owned by the Meruelos -- Mr. Meruelo's parents? | 11　records since the bankruptcy was filed? |
| 12　A.　Correct. | 12　A.　I believe so. |
| 13　Q.　Do you know of any construction management | 13　Q.　What's the basis of that understanding? |
| 14　services Mr. Horrigan provided on any other property? | 14　A.　I'm not aware of any -- any nonpreservation of |
| 15　A.　Sure. | 15　those. |
| 16　Q.　I'm sorry.  On any other property belonging to | 16　Q.　Okay.  Do you have any experience buying or |
| 17　Mr. Meruelo's parents. | 17　selling real estate in the Los Angeles market? |
| 18　A.　I'm not aware, but it's possible for the -- for | 18　A.　Yes. |
| 19　the managed property that he's provided services. | 19　Q.　What's your -- commercial real estate? |
| 20　Q.　Just asking for your knowledge.  I don't -- I | 20　A.　Yes. |
| 21　don't want you to speculate. | 21　Q.　What's your experience -- or are you licensed? |
| 22　A.　I'm not aware. | 22　A.　As -- as representation of Mr. Meruelo or the |
| 23　Q.　Okay. | 23　company or -- or, you know, MMPI or its affiliates, |
| 24　A.　I'm not aware. | 24　yeah, I -- I've been part -- |
| 25　Q.　To your knowledge, has Mr. Horrigan provided | 25　Q.　As an attorney? |
| Page 141 | Page 143 |
| 1　construction management services on any real property | 1　A.　Yes, as an attorney. |
| 2　personally owned by Mr. Meruelo? | 2　Q.　Okay.  Are -- are you a real estate broker? |
| 3　A.　I'm not aware. | 3　A.　I'm am not an active real estate broker. |
| 4　Q.　How long did Mr. Horrigan provide services with | 4　Q.　Are you an inactive -- |
| 5　respect to the Whittier home? | 5　A.　I had been at one point. |
| 6　A.　I don't know. | 6　Q.　Okay.  And -- and where were you a real estate |
| 7　Q.　Were you aware that he was doing it at the time | 7　broker for?  In California? |
| 8　he was doing it? | 8　A.　California. |
| 9　A.　Yes. | 9　Q.　When were you a real estate broker? |
| 10　Q.　Do you know for what period of time he did it? | 10　A.　Back in 2 -- 2006. |
| 11　A.　I don't know. | 11　Q.　For how long? |
| 12　Q.　Did John Durham -- is that -- | 12　A.　I don't remember. |
| 13　A.　Durham (phonetic distinction). | 13　Q.　You don't know? |
| 14　Q.　Durham.  Thank you. | 14　A.　Yeah, I don't. |
| 15　　Did John Durham also to your knowledge provide | 15　Q.　A year? |
| 16　services on behalf of MMPI on the home in Whittier? | 16　A.　Probably. |
| 17　A.　He may have.  I don't know. | 17　Q.　Did you during that time negotiate any |
| 18　Q.　What's your understanding of what Mr. Horrigan | 18　commercial real estate transactions in Los Angeles? |
| 19　did on the property in Whittier? | 19　A.　No -- well, yeah, yeah, as counsel. |
| 20　A.　Construction management. | 20　Q.　As a broker? |
| 21　Q.　To your knowledge, did Mr. Horrigan operate out | 21　A.　No. |
| 22　of that Whittier home site for a period of time? | 22　Q.　Okay.  And do you -- you are an attorney, |
| 23　A.　I believe so. | 23　that's right? |
| 24　Q.　Did he act as the general supervisor on that | 24　A.　Yes. |
| 25　job? | 25　Q.　And where are you admitted to practice? |
| Page 142 | Page 144 |

36 (Pages 141 to 144)

1    A. In California.
2    Q. Anywhere else?
3    A. No.
4    Q. All right. To your knowledge, are there any
5  executed documents with Watermark that are post the
6  letter of commitment?
7    A. That are what?
8    Q. Post its letter of commitment.
9    A. Can you say it again?
10    Q. Are you aware of any finalized loan
11  documentation with Watermark executed after the letter
12  of commitment?
13    A. After. Okay. No.
14    Q. Have you read the Skaggs document?
15    A. If you're referring to the September --
16    Q. 20th?
17    A. -- 20th, yes.
18    Q. Did you read it prior to -- when did you read
19  it?
20    A. It would have been a day or two after it was
21  sent.
22    Q. After it was sent to the audit committee?
23    A. Yeah, sent to me, right.
24    Q. Okay. You didn't see it prior to the time it
25  went to the audit committee?

**Page 145**

1    A. No.
2    Q. Did you talk to Ernst & Young about the Skaggs
3  document?
4    A. Yes.
5    Q. And investigation --
6    A. Yes.
7    Q. -- by Ernst & Young?
8       How much time did you expend talking to Ernst &
9  Young?
10    A. I don't remember.
11    Q. How many times did you talk to them?
12    A. Probably three, four.
13    Q. Telephonically or in person?
14    A. Both.
15    Q. Who did you talk to?
16    A. Amy Hawkes.
17    Q. Anyone else?
18    A. Not that I remember.
19    MS. RODIGER: I'll pass. Thank you.
20
21       EXAMINATION
22  BY MR. PRINCE:
23    Q. Are you familiar with the unsigned, undated
24  letter that was sent -- accompanied the Skaggs letter
25  when it was turned over to the parties in the bankruptcy

**Page 146**

1  case?
2    A. Help me. Oh, when it was -- yes, yes, yes.
3    Q. Do you know who wrote that?
4    A. Yes.
5    Q. Who?
6    A. I did.
7    Q. Did you have assistance from anyone in writing
8  it?
9    A. Depends on what you mean by "assistance." Yes.
10    Q. Who?
11    A. Bankruptcy counsel.
12    Q. Specifically who?
13    A. John Tedford.
14    Q. Was anyone from the Stutman firm involved in
15  the preparation of that letter?
16    A. I don't remember.
17    Q. Did you send it to anyone from the Stutman firm
18  before it was circulated?
19    A. I don't remember.
20    Q. When you say that you were assisted by
21  Mr. Tedford, did he see a draft first and comment on it?
22    A. I don't think I can answer that without
23  disclosing attorney-client privilege.
24    Q. I'm not asking for what his comments are, I'm
25  just asking you did he see a draft?

**Page 147**

1    MR. GREGORY: I'm going to instruct him not to
2  answer. We'll pick this up at a break. Why don't you
3  keep going.
4    MR. PRINCE: That's fine.
5    Q. Were you aware that -- I'll call -- if I call
6  them Berkadia instead of Wells Fargo, blah, blah, blah,
7  blah, will you understand what I'm talking about?
8    A. Yes, yes.
9    Q. All right. Were you aware that Berkadia filed
10  an objection to the $30,000 payment to the Neufeld Law
11  Group?
12    A. Yes.
13    Q. And when did you become aware of that?
14    A. I don't remember.
15    Q. Do you have a sense that it was shortly after
16  the objection was filed?
17    A. No.
18    Q. Was it closer to the time of the Skaggs --
19  September 20th Skaggs letter came out?
20    A. No.
21    Q. Is there any other kind of time anchor that we
22  could come up with to give you an idea?
23    A. I can't think of one.
24    Q. Okay. Do you know if it was before or after
25  the $100,000 was given to the Neufeld Law Group?

**Page 148**

**37 (Pages 145 to 148)**

TODD NIELSEN - 02/12/2011

1     A. I don't know.
2     Q. Do you have an understanding of whether the
3  company is authorized to give retainers to attorneys in
4  its bankruptcy cases?
5     A. I don't.
6     Q. You don't have any understanding one way or the
7  other?
8     A. No.
9     Q. You're aware that there was $100,000 that was
10  transferred from the 845 Flower entity to the Neufeld
11  Law Group?
12     A. Yes.
13     Q. And you're aware that was in June of 2010?
14     A. Approximately.
15     Q. Did you approve that transfer at the time?
16     A. No.
17     Q. Did you approve the $30,000 transfer?
18     A. Yes.
19     Q. In the company, who normally approves payments
20  to law firms?
21     A. Payments on invoices I would normally pay.
22  Retainers could be me or -- or Richard Meruelo or John
23  Maddux.
24     Q. There's no -- is there a specific normal
25  procedure for who approves it?

Page 149

1     Q. And did you approve the initial application?
2     A. I don't remember that.
3     Q. Did you approve the reversal?
4     A. Yes.
5     Q. And when was it reversed?
6     A. I don't -- I don't remember.
7     Q. Are you aware that Mr. Meruelo had submitted a
8  declaration in the bankruptcy case in connection with
9  his request for approval of an indemnity agreement
10  between him and the company with respect to Berkadia?
11     A. Yes.
12     Q. Did you review that declaration before it was
13  filed?
14     A. I don't remember.
15     Q. Have you ever reviewed it?
16     A. I don't know.
17     Q. Do you know the contents of it?
18     A. I -- I don't remember.
19     Q. Were you present in court when the matter was
20  discussed, were you present in court at any of the
21  hearings on it?
22     A. Yes.
23     Q. Do you recall in either the declaration or in
24  court --
25     THE DEPOSITION OFFICER: I'm sorry?

Page 151

1     A. No.
2     Q. When did you become aware that the $100,000 had
3  been paid to the Neufeld Law Group?
4     A. I don't remember.
5     Q. Was that $100,000 payment, in fact, a retainer?
6     A. That's my understanding.
7     Q. Were you involved in allocating a portion of
8  the $100,000 to various matters?
9     A. Yes.
10     Q. Were you aware that the allocation occurred
11  before the check cleared on the payment?
12     A. No.
13     Q. Do you have any sense of how long before or
14  after the payment was made that the allocation was made?
15     A. I don't.
16     Q. Is it your understanding that at one point,
17  $42,966.47 of the $100,000 was applied to a Berkadia
18  matter?
19     MR. KLAUSNER: What was that number again,
20  Counsel?
21  BY MR. PRINCE:
22     Q. $42,966.47.
23     A. I believe it may -- yes, it may have been
24  applied to the Berkadia matter at one point and then
25  reversed.

Page 150

1  BY MR. PRINCE:
2     Q. Do you recall in either the declaration or in
3  court statements that no amount of the Berkadia fees had
4  been paid?
5     A. Yes.
6     Q. And do you believe that to be a complete and
7  accurate statement?
8     A. Yes.
9     Q. And is the basis of your belief that you had
10  previously reallocated the fees to another matter?
11     A. Yes.
12     Q. Did you -- are you aware of at any time the
13  company -- anyone at the company disclosing to the
14  bankruptcy court that the money had been paid, but then
15  it had later been reallocated?
16     A. I don't know.
17     Q. Are you aware of that fact ever being
18  communicated to the United States Trustee's Office?
19     A. I don't know.
20     Q. Are you aware of that ever being communicated
21  to any of the parties in the case?
22     A. I don't know.
23     Q. On what basis did you approve the reallocation?
24     A. I'm not sure I understand the question.
25     Q. Was there any reason why you would reallocate

Page 152

38 (Pages 149 to 152)

1    the 42,000 approximately -- actually, I guess closer to
2    43,000 that had been applied to Berkadia invoices to
3    other invoices?
4       A. I'm not sure I --
5       THE DEPOSITION OFFICER: I'm sorry. And --
6    applied to Berkadia and -- if you could speak up.
7       MR. PRINCE: Long day.
8       Q. To other invoices?
9       A. If I can answer that without attorney --
10   disclosing attorney-client privilege.
11      MR. KLAUSNER: Then don't.
12   BY MR. PRINCE:
13      Q. Was the basis for your reallocation discussions
14   with counsel?
15      It's a yes-or-no question. I'm not asking for
16   the communication.
17      MR. KLAUSNER: If you can't answer that
18   question without divulging attorney-client
19   communications, then I'm instructing you not to answer.
20      THE WITNESS: It may have been.
21   BY MR. PRINCE:
22      Q. Do you have any accounting reason for having
23   done the reallocation separate from legal advice?
24      A. I don't know what you mean by "accounting
25   reason."

**Page 153**

1      Q. Are you familiar with the concept of
2   accounting?
3      A. The concept generally, yes.
4      Q. Have you worked with accountants in the past?
5      A. To some degree.
6      Q. Do you understand that when payments are made
7   and reflected on the company's books, that those should
8   reflect the basis of the transaction?
9      A. I don't know exactly what you mean "that those
10   should reflect the basis for the transaction."
11      Q. Do you understand that when the company has a
12   payment reflected on its books --
13      A. Uh-huh.
14      Q. -- that payment should accurately reflect what
15   happened?
16      A. Yes.
17      Q. Do you understand that the purpose of that is
18   so that the company can keep accurate accounts?
19      A. Yes.
20      Q. Did you reallocate the 43 -- approximately
21   $43,000 from Berkadia to PNL to correct any inaccuracy
22   on the company's books?
23      A. Not that I'm aware of.
24      Q. Did you -- did you reallocate the payment from
25   Berkadia to the PNL Pomona matter because of discussion

**Page 154**

1   with the Neufeld Law Group?
2      A. I don't remember.
3      Q. Other than counsel for the company -- first of
4   all, did you discuss the reallocation of the forty --
5   approximately $43,000 from the Berkadia matter to the
6   PNL Pomona matter with outside counsel before you did
7   it?
8      MR. KLAUSNER: Objection. You're asking for --
9   objecting; I'm instructing you not to answer.
10   Attorney-client communication.
11      MR. PRINCE: The fact of him discussing it
12   without regard to the contents of the communication,
13   you're taking the position that that's privileged?
14      MR. KLAUSNER: I'm taking the position that the
15   question you're asking calls for revealing
16   attorney-client communications and it's therefore
17   subject to protection.
18      MR. PRINCE: Can we just agree that when you
19   instruct him he's accepting the instruction?
20      MR. KLAUSNER: Yes.
21   BY MR. PRINCE:
22      Q. Other than possibly counsel, did you discuss it
23   with anyone else before you did -- before you did the
24   reallocation?
25      A. I don't think I can answer that without

**Page 155**

1   disclosing attorney-client privilege.
2      Q. Did you discuss it with anyone other than
3   counsel outside of the presence of outside counsel?
4      A. I'm counsel too.
5      Q. Were -- was it your understanding that when you
6   were discussing the reallocation, you were providing
7   legal advice to whoever you discussed it with?
8      A. I suppose it could be characterized as that,
9   yes.
10      Q. Why did you reallocate the approximately 43,000
11   from the Berkadia matter to the PNL Pomona matter?
12      MR. KLAUSNER: I'm going to instruct the
13   witness to -- not to answer if answering the question
14   would require him to divulge any attorney-client
15   communication.
16   BY MR. PRINCE:
17      Q. Can you answer it?
18      A. No.
19      MR. PRINCE: Okay. I -- I'm just going to lay
20   the record here that if Mr. Nielsen was discussing this
21   before it happened and then he went ahead and did it,
22   that even to the extent that it involved what would
23   otherwise be attorney-client communication, I think it
24   would be subject to the crime fraud exception to the
25   attorney-client privilege and therefore would not be

**Page 156**

**39 (Pages 153 to 156)**

**Page 157**

1  privileged.  I'm not going to get into a debate with you
2  about it, I'm just laying the foundation that's the
3  basis for my belief.
4      Will you reconsider your instruction?
5      MR. KLAUSNER:  I -- I'll reconsider your
6  instruction the next time we take a break.
7  BY MR. PRINCE:
8      Q.  Okay.  Aside from something that could be
9  attorney-client communication, did you have any other
10  reason for reallocating the $43,000?
11     A.  No, I -- no.
12     Q.  And I apologize because we -- I -- I got a
13  little lost in some of it.
14     Did -- did you speak to -- did you answer the
15  question as to whether you spoke with the Neufeld Law
16  Group or was that a part of the instruction not to
17  answer?
18     MR. KLAUSNER:  I think he answered that
19  question.
20     MR. PRINCE:  I can't remember the answer.  What
21  was it?
22     MR. KLAUSNER:  Let's go back.
23     THE WITNESS:  I don't think I did answer that
24  question.
25     MS. RODIGER:  There was an instruction not to

**Page 158**

1  answer.
2      MR. PRINCE:  May I ask the reporter to find
3  that portion and read it to us.
4      (The record was read as follows:
5      Q   Did you reallocate the payment from
6      Berkadia to the PNL Pomona matter because
7      of discussion with the Neufeld Law Group?
8      A   I don't remember.)
9      MR. PRINCE:  Why don't we -- I just have a
10  couple more questions.
11     Q.  The PNL Pomona matter, is it your understanding
12  that that was a matter in which the Neufeld Law Group
13  represented the company?
14     A.  Yes.
15     Q.  And what --
16     MR. KLAUSNER:  Counsel, you -- do you know that
17  this subject matter was dealt with by Ms. Rodiger?
18     MR. PRINCE:  Right.  I'm actually focusing
19  specifically on the time it was reallocated and I didn't
20  hear Ms. Rodiger cover that.  But --
21     MS. RODIGER:  And I'll summarize that during
22  the break for him.
23     MR. PRINCE:  Feel free to -- I am not trying to
24  replow the same ground, so feel free to let me know.
25     Q.  At the time that you reallocated it, was that

**Page 159**

1  your understanding that the Neufeld Law Group
2  represented the company in connection with PNL Pomona?
3      A.  Yes.
4      Q.  Does the company have an engagement letter with
5  the Neufeld Law Group?
6      A.  No.
7      Q.  Was there a conflict waiver with respect to the
8  engagement?
9      A.  I'm not aware of a written one.
10     Q.  Are you aware of an oral one?
11     A.  I may have discussed that with them.
12     Q.  Is there any agreement between the company and
13  Mr. Meruelo about how payments would be allocated?
14     A.  No.
15     Q.  At the time of the reallocation, was it your
16  understanding that the Neufeld Law Group represented the
17  company in connection with the Berkadia matter?
18     A.  Yes.
19     Q.  What is the basis for that understanding?
20     A.  Well, we engaged in settlement discussions with
21  Berkadia, and I believe that the Neufeld Law Group
22  represented both the company and Richard Meruelo.
23     Q.  And you believe that based on what?
24     A.  Based on the fact that I asked them to.
25     Q.  You personally asked the Neufeld Law Group

**Page 160**

1  to --
2      A.  Yes.
3      Q.  -- represent the company in connection with the
4  Berkadia matter?
5      A.  Yes.
6      Q.  And did you -- is there an engagement letter
7  for that?
8      A.  No.
9      Q.  Is there a conflict waiver for that?
10     A.  Not a written one that I'm aware of.
11     Q.  When the conflict became an actual conflict and
12  the company was negotiating with Mr. Meruelo about the
13  indemnification, did Neufeld Law Group withdraw?
14     A.  I disagree with -- your question assumes a fact
15  I disagree with.
16     Q.  You -- you do not believe that the claim by
17  Mr. Meruelo against the company for indemnity in
18  connection with that litigation created an actual
19  conflict between him and the company?
20     A.  No.
21     MR. PRINCE:  Maybe we can take the break and
22  you can discuss with him the other matter.
23     MR. KLAUSNER:  How long do you want?
24     MR. PRINCE:  Five -- however long you need.
25     MR. KLAUSNER:  Can we go off the record for a

**40 (Pages 157 to 160)**

1 minute?
2     MR. PRINCE: Off the record.
3     (Recess from 6:41 p.m. to 6:51 p.m.)
4     MR. KLAUSNER: Okay. So -- all right. We're
5 back -- yeah, we're back on the record.
6     Counsel, I can -- if you want me to respond to
7 the issue that we took under advisement when we took our
8 break --
9     Is that a yes or a no?
10     MR. PRINCE: Other than I assume that the
11 answer is going to be you thought about it and are not
12 reconsidering.
13     MR. KLAUSNER: Yeah, you're correct.
14     MR. PRINCE: Okay.
15     MR. KLAUSNER: You're prescient.
16     MR. PRINCE: I've been told that many times.
17 I -- I have nothing further.
18     MR. KLAUSNER: Okay. Ms. Hagan, do you have
19 any questions?
20     MS. HAGAN: Just briefly.
21
22          EXAMINATION
23 BY MS. HAGAN:
24     Q. Mr. Nielsen, were you involved with the -- PNL
25 Pomona property in particular I'm discussing. Were you

Page 161

1 involved with the negotiation for the reinstatement
2 agreement?
3     A. Yes.
4     THE DEPOSITION OFFICER: Were you involved in
5 the...
6     MS. HAGAN: -- negotiation related to the
7 reinstatement agreement.
8     THE DEPOSITION OFFICER: And the answer?
9     THE WITNESS: Yes.
10 BY MS. HAGAN:
11     Q. And did you speak with Belinda Meruelo
12 regarding that reinstatement agreement?
13     A. I don't remember.
14     Q. Do you know how Ms. Meruelo's signature was
15 obtained?
16     A. I assume from Richard Meruelo.
17     Q. Is that something that would normally happen,
18 Richard would take it to his mother to have it signed?
19     A. Right.
20     Q. Did you have any discussion with her about the
21 terms of the reinstatement?
22     A. I don't -- I don't know he -- no, I don't -- I
23 can't remember.
24     Q. Which of the company entities do you believe is
25 involved in the PNL Pomona guarantee litigation?

Page 162

1     A. Merco Group 2001-2021, West Mission Boulevard,
2 LLC.
3     Q. And who's the guarantor?
4     A. I don't remember. I thought -- I thought it
5 was Belinda and the Estate of Homer.
6     Q. Do you believe that Richard Meruelo is one of
7 the guarantors to that?
8     A. I don't think so.
9     MS. HAGAN: That's all I have. Thank you.
10     MR. KLAUSNER: Thank you.
11     MS. FREEDMAN: I have nothing.
12     MR. KLAUSNER: Anyone on the phone with
13 anything?
14     MR. TEDFORD: No.
15     MR. KLAUSNER: Tedford didn't have anything.
16     Asa, do you have anything?
17     MR. HAMI: No, I don't.
18     MR. KLAUSNER: The deposition's concluded.
19     MS. RODIGER: Is --
20     MR. KLAUSNER: Those of you on the phone, any
21 reason why we can't disconnect?
22     MS. RODIGER: Unless you want their stipulation
23 to the Prince stipulation.
24     MR. TEDFORD: I'm sorry. What was the
25 question?

Page 163

1     MR. KLAUSNER: Well, we have -- we have a
2 customary stipulation that we've been doing at the end
3 of these depositions to relieve the court reporter of
4 her responsibility to keep track of the transcript.
5     Chris, do you want to articulate the
6 stipulation you've been entering into in these
7 depositions?
8     MR. PRINCE: I'm not sure that I can except in
9 the most general terms which is, we are relieving the
10 reporter of obligations under the code.
11     A rough transcript may be used, but other
12 parties have the opportunity to comment. I believe that
13 the witness has ten days from receipt to review and
14 sign.
15     If it has not been reviewed and signed, a
16 copy -- unsigned copy may be used as a signed original
17 would be -- and there may be some other provisions, but
18 it was at the end of another deposition, and it's been
19 circulated many, many times, so --
20     MS. RODIGER: And we incorporate it by
21 reference.
22     MR. KLAUSNER: Okay.
23     MS. RODIGER: Usually.
24     MR. KLAUSNER: That's fine.
25     MS. RODIGER: I so stipulate.

Page 164

41 (Pages 161 to 164)

TODD NIELSEN

1    MR. KLAUSNER:  Agreed.
2    MS. HAGAN:  So stipulated.
3    MS. FREEDMAN:  Agreed.
4    MR. PRINCE:  Off.
5    MR. KLAUSNER:  Okay.  We're off record and
6    hanging up.
7    MR. PRINCE:  Copy, not rough.
8    MS. RODIGER:  Rough copy.  Rough and copy.
9    MR. KLAUSNER:  We'll take a rough and a copy.
10   (Previous stipulation incorporated by
11   reference:
12        "Mr. Prince:  Go back on the record.
13        "Counsel and I have discussed the
14   disposition of the transcript.  We've
15   agreed that the witness would have
16   10 days from receipt to review and
17   make any corrections.
18        "In the meantime, before an official
19   transcript has arrived, parties can use an
20   unofficial version for any purpose which an
21   official version would be used, but the parties
22   all reserve the right to comment that it's not
23   official until it's had an opportunity to be
24   reviewed or changed.
25        "After that 10 days has expired, if the

Page 165

1    transcript is not signed, the unsigned version
2    can be used for any purpose that a signed
3    version would be.  And the reporter is relieved
4    of all obligations under the code, (and that
5    would apply to this deposition, the prior
6    deposition of Mr. McGonagle and any deposition
7    in which the witness is either a Charleston or
8    Hartland witness or the debtor's witness.)
9        "Mr. Castanares:  And it can signed under
10   penalty of perjury:
11        "Mr. Prince:  Yes.
12        "Mr. Castanares:  Okay.  I think we're
13   concluded.)
14        (Whereupon, at the hour of
15        7:03 p.m., the proceedings
16        were concluded.)
17              -oOo-
18
19
20
21
22
23
24
25

Page 166

1    STATE OF CALIFORNIA        )
                                ) ss.
2    COUNTY OF LOS ANGELES      )
3
4
5        WITNESS'S DECLARATION
6
7
8        I, certify under penalty of perjury that
9    the foregoing is true and correct.
10
11       Executed at _____, on
12   _____, 2011, at _____,
13   California.
14
15
16
        _____
17           TODD NIELSEN
18
19
20
21
22
23
24
25

Page 167

1    STATE OF CALIFORNIA        )
                                ) ss.
2    COUNTY OF LOS ANGELES      )
3
4        I, NIKKI ROY, Certified Shorthand Reporter,
5    certificate number 3052, for the State of California,
6    hereby certify:
7        The foregoing proceedings were taken before me at
8    the time and place therein set forth, at which time the
9    deponent was placed under oath by me;
10       The testimony of the deponent and all objections at
11   the time of the examination were recorded
12   stenographically by me and were thereafter transcribed;
13       The foregoing transcript is a true and correct
14   transcript of my shorthand notes so taken;
15       I further certify that I am neither counsel for nor
16   related to any party to said action nor in any way
17   interested in the outcome thereof.
18       In witness whereof I have hereunto subscribed my
19   name this 18th day of January, 2011.
20
21       _____
22
23
24
25

Page 168

42 (Pages 165 to 168)

Case 1:09-bk-13356-VK    Doc 2808   Filed 02/17/11   Entered 02/17/11 17:46:41    Desc
TODD NIELSEN 02/11/2011
Main Document    Page 70 of 96

Page 169

**A**

**aa** 5:9 68:18,20
  69:24 70:8
**ab** 5:10 70:2,4
**ability** 10:22 63:3
  89:18,21
**able** 8:15 10:18
**absence** 30:8
**absent** 30:7
**absolutely** 96:18
**ac** 57:14 68:10
**acceptable** 12:14,15
  12:16,17
**accepting** 155:19
**access** 62:23 63:25
  89:18,21 90:6
**accompanied**
  146:24
**account** 104:4
  136:17,21,25 137:2
  137:11,12,13,14,18
  137:18,22,24 138:2
  138:6,9,21 139:2,8
  139:12
**accountants** 154:4
**accounted** 89:25
**accountholder**
  138:15
**accounting** 59:14,15
  88:7 90:6 153:22
  153:24 154:2
**accounts** 89:7,8
  135:16 136:16
  154:18
**accurate** 69:15
  111:1 152:7 154:18
**accurately** 154:14
**acquired** 132:22
**act** 142:24
**action** 7:12,13 36:16
  50:2 168:16
**actions** 36:10
**active** 144:3
**actively** 104:1
**activities** 97:5 100:9
  100:10 123:24
**actual** 29:15 47:25
  160:11,18
**addition** 9:16 15:18
  16:23 84:4 127:2
**additional** 15:18
  69:17 111:24
**address** 63:1,20
  64:2 72:16
**addressed** 63:4

**adjourn** 55:23
**adjourned** 55:1,7
**adjustments** 140:19
**administrator** 63:16
**admitted** 144:25
**admonitions** 7:24
**adverse** 114:16
**advice** 47:22 48:21
  67:21,25 153:23
  156:7
**advise** 36:15
**advised** 36:13 58:10
  58:13 77:2
**advisement** 161:7
**advising** 48:10 110:4
  123:6
**advisory** 3:20
**affairs** 98:8
**affect** 98:4 123:18
  124:3
**affiliate** 103:22
  105:6 108:8,21
  114:11 138:2
**affiliated** 85:1
  105:10 117:17
  132:21 138:4
**affiliates** 105:17
  110:4,7 143:23
**agencies** 80:6
**agenda** 20:16,18,24
**agendas** 21:1,7,9
  32:16
**agent** 80:2
**ago** 103:13 107:19
  108:21
**agree** 12:2 155:18
**agreed** 165:1,3,15
**agreement** 151:9
  159:12 162:2,7,12
**agreements** 22:5
  79:7 86:17,21,22
  86:24 87:3,8,18
**ahead** 71:6 156:21
**al** 1:6
**alleged** 91:3
**allocate** 116:20
  118:16
**allocated** 159:13
**allocating** 150:7
**allocation** 116:2,9
  118:11 150:10,14
**allow** 96:16
**america** 3:14 96:25
**amount** 10:11 93:19
  94:21 95:3,25

97:20 109:20
  123:10 152:3
**amounts** 82:9 83:4
**amy** 146:16
**anchor** 148:21
**andrew** 65:16,20
**angeles** 2:3,18 3:3,6
  3:11 6:1,10 143:17
  144:18 167:2 168:2
**answer** 5:14 9:5,11
  9:17 12:9,11 28:14
  47:24,25 48:2
  95:16 97:16 100:1
  100:5 101:6 106:12
  118:7 120:17
  124:14,21 125:5
  147:22 148:2 153:9
  153:17,19 155:9,25
  156:13,17 157:14
  157:17,20,23 158:1
  161:11 162:8
**answered** 11:1 71:9
  157:18
**answering** 156:13
**anthony** 54:14
**anticipated** 21:20
**anticipating** 19:15
**anybody** 39:21 55:9
  98:18
**anyway** 101:23
**apologize** 28:15
  96:2,24 157:12
**appear** 64:1
**appearances** 2:8 3:1
  4:1 6:7
**appears** 26:8 28:20
  67:18 70:9 71:14
  71:22 72:10,20
  73:20,23 76:2,7
  78:5
**applicable** 12:7
**application** 151:1
**applied** 112:15,18
  119:4 150:17,24
  153:2,6
**apply** 77:24 166:5
**appreciate** 96:19,19
**appropriate** 99:24
**approval** 17:6 18:18
  18:23 22:7 24:6
  40:7 41:2,5,8,13,25
  50:16 81:9 82:5
  88:16,22 89:4,8
  151:9
**approve** 40:10 50:19

79:20,23 80:13,17
  80:23,23 81:7 82:3
  82:3 83:2 84:11,12
  87:11,13,17,18
  88:2,5 113:18
  121:10 149:15,17
  151:1,3 152:23
**approved** 17:20,21
  18:9,13 20:6 22:6
  22:24 23:4,19 50:3
  50:20 53:1 88:10
  113:22
**approves** 149:19,25
**approving** 80:9
  134:2
**approximately**
  38:11,23 72:6
  103:13 149:14
  153:1 154:20 155:5
  156:10
**area** 76:3,16
**areas** 11:17 48:9
  67:18 78:21
**arent** 51:24 110:12
  110:25
**arguably** 12:10
**argument** 12:12
**arizona** 3:17 96:5
**arrived** 165:19
**articulate** 164:5
**asa** 3:10 13:5 46:24
  163:16
**aside** 78:11 157:8
**asked** 10:3,5 30:1,2
  39:14 61:21 65:13
  88:2 95:12 118:15
  119:22 120:6,16
  122:5,10 126:12
  140:5 159:24,25
**asking** 9:25 10:1
  11:20 14:15 18:4
  48:5 58:10,11
  92:12,23 94:9
  99:13 108:17 109:6
  114:3 117:13 127:1
  129:17 132:17,18
  135:22 136:12
  141:20 147:24,25
  153:15 155:8,15
**asserted** 77:10,13
**asset** 3:20 104:4
**assets** 139:19
**assignment** 90:18
**assist** 90:21
**assistance** 147:7,9

**assisted** 106:2
  147:20
**associates** 4:4
**association** 96:7,14
**assume** 137:25
  161:10 162:16
**assumes** 97:13
  116:15,16 135:5
  160:14
**assumption** 119:16
  119:18 120:4 122:2
**assumptions** 110:11
  110:25
**athletic** 98:5
**attached** 66:12,14
  68:21 70:5 71:16
  71:24 80:25 81:4
  81:10
**attachment** 71:3
  72:7
**attachments** 5:9,10
**attempt** 77:4
**attend** 16:1 30:1,2
  53:23
**attendance** 26:12
  29:5 49:8,10
**attended** 31:20
  35:16 45:13 53:22
  54:1,10
**attendee** 49:11
**attends** 54:11
**attention** 87:23
**attorney** 7:18,20
  8:19 9:8,9,10,16
  11:14,22 43:5,17
  43:20,23 44:1
  45:12 68:11 77:15
  80:14 82:20 83:6
  84:4,19 96:25
  104:21 116:5
  143:25 144:1,22
  153:9
**attorneyclient**
  11:18,21,23 12:8
  42:10,14,18 43:18
  43:21 44:9,14,15
  47:25 57:19 58:8
  67:17 68:11 77:13
  77:15,18 101:2
  147:23 153:10,18
  155:10,16 156:1,14
  156:23,25 157:9
**attorneys** 9:3 43:2
  43:25 105:9 115:24
  116:14 149:3

Case 1:09-bk-13356-VK    Doc 2808    Filed 02/17/11    Entered 02/17/11 17:46:41    Desc
TODD NIELSEN - 02/11/2011
Main Document    Page 71 of 96

Page 170

**attorneywork** 68:2
**attributable** 120:8
  120:11
**attribute** 119:5,8,10
**auction** 131:2,14,17
**audience** 45:14
**audit** 90:22 145:22
  145:25
**august** 17:19 18:10
  18:13,18,20 19:2
  22:24 23:3,19 24:6
  24:10 27:15 41:11
  41:16 50:8 127:5
  127:25 133:22
**authored** 76:5
**authority** 63:25
  82:11,14 89:9
  122:18,21
**authorize** 110:13,21
  114:7 116:11,13
  131:4
**authorized** 91:23
  92:4 139:2 149:3
**auto** 126:13,16,19,20
**availability** 27:20
  39:13
**available** 134:11
**avenue** 2:2,12,17
  3:22 4:5
**aw** 68:10
**aware** 13:23 28:17
  36:12 46:14 54:25
  55:11 56:4,5 65:1
  68:2 89:24 90:3,4
  116:2,23 121:12
  128:22 137:23
  141:3,18,22,24
  142:3,7 143:5,14
  145:10 148:5,9,13
  149:9,13 150:2,10
  151:7 152:12,17,20
  154:23 159:9,10
  160:10

**B**

**back** 25:23,23 27:21
  30:22 31:23 36:18
  46:21 62:4 66:21
  69:24 75:9,11,12
  75:13 76:15 84:18
  100:15,17,24 101:8
  101:10 102:5 131:3
  135:8 144:10
  157:22 161:5,5
  165:12

**backed** 61:10,12
**backup** 61:4,8,22,24
  62:2
**bad** 27:3
**bank** 3:14 96:25
  137:11,12,15,17,25
  138:11,21,24
**bankruptcy** 1:1
  16:20 40:18 42:19
  42:20 44:19 47:15
  47:21 56:12,23
  77:20,24 84:21
  86:9 89:16 92:20
  99:21 103:4,5,15
  103:16 105:16,18
  109:18,23 110:1
  123:19 124:16,19
  137:3,15 143:11
  146:25 147:11
  149:4 151:8 152:14
**bankruptcys** 92:17
  92:24
**bar** 96:7,13
**based** 27:20 30:23
  42:15 120:8 121:25
  122:4 133:5,23
  135:12,17 136:10
  159:23,24
**basis** 10:5 12:12
  15:17 50:6 67:17
  77:14 107:11
  119:18,24 120:4
  133:4 143:13 152:9
  152:23 153:13
  154:8,10 157:3
  159:19
**beckemeyer** 50:17
**beginning** 12:4,5
  13:14 112:22,24
**behalf** 2:1 6:8,9
  46:11 99:6 105:20
  112:3 115:17 117:4
  142:16
**belief** 152:9 157:3
**believe** 14:5 15:4,7
  17:18 19:11 21:6
  25:15 29:2 30:14
  34:20 35:1 36:13
  36:14 37:24 43:1
  45:11,13 49:5 50:7
  51:20 52:13 56:2
  57:15,22 58:8
  59:22 61:8 63:19
  63:22 64:6 65:20
  65:23 68:4 82:12

  85:5 86:13 93:25
  94:3,24 114:18
  115:4,13 116:1
  118:6 127:13,22
  135:12 142:23
  143:12 150:23
  152:6 159:21,23
  163:6 164:12
**belinda** 94:1,15
  95:23 104:10
  162:11 163:5
**belonging** 141:5,16
**beneath** 73:20
**berkadia** 93:9,12
  95:13,19 102:11
  105:2 107:2 124:8
  148:6,9 150:17,24
  151:10 152:3 153:2
  153:6 154:21,25
  155:5 156:11 158:6
  159:17,21 160:4
**best** 8:25 9:25 10:12
  10:18 18:4 22:11
  22:13 94:8 100:19
**better** 23:7 33:25
  37:6
**billings** 88:14
**binder** 33:21
**blah** 148:6,6,6,7
**block** 83:24
**board** 13:21,25
  14:13,21,24 15:4,9
  15:12,15,16,18
  16:1,6,10,14,15
  17:4,6,11 18:10,13
  18:18,23 19:24
  20:2,6,10,13,14,18
  20:19 21:2,5,13,14
  21:15,22 22:7,9,11
  24:6,8 25:7 26:5,6
  27:6,11 28:3,19,20
  29:1,2,10,15,18
  30:2,12,12,15 31:5
  32:13,14,21 33:10
  33:16,21,22 34:1
  34:12 35:5,23 36:5
  36:10,20,25 37:14
  37:20,21,25 38:5,8
  38:11,23,25 39:10
  39:14,16,18,20,23
  40:5,6,16 41:8 42:3
  43:1,3,24 44:23
  45:20 47:6,7,10,14
  47:23 48:21 49:6

  49:13,24 50:16,23
  51:1,2,3,18,21 52:1
  52:5,9,10,11,18
  53:22 54:1,22,24
  55:1,2,6,14,17 56:1
  56:7,24 58:20 65:3
  91:23 92:5 96:13
  99:2 101:14 130:14
**bond** 130:17,18,20
  130:21
**book** 33:21 34:2,4,13
**booklet** 8:9,15
**books** 33:13,15
  154:7,12,22
**bored** 43:11
**bought** 134:20
**boulevard** 102:22,25
  163:1
**box** 80:22,25 81:24
  97:23,24 98:5,9
**break** 43:6 46:14,15
  100:13 101:23
  148:2 157:6 158:22
  160:21 161:8
**breakdown** 122:6,11
**breaking** 134:15
**briefly** 7:19 161:20
**bring** 18:23
**brings** 40:9,13
**broad** 46:6
**broker** 144:2,3,7,9
  144:20
**brought** 40:12,13
  91:6
**buren** 3:16
**business** 26:14
  27:11 70:18,20
  98:5 133:1,2
  134:18
**bustamante** 72:4,5
  73:4,24 75:18,21
**bustamantes** 72:17
  73:9 74:2 76:18
**buying** 134:18
  143:16

**C**

**ca** 126:13,16,19,20
**calendar** 31:22,24
  32:6,8,9,10
**california** 1:2 2:3,12
  2:18 3:6,11,23 4:6
  6:1 132:2,6,7,12,23
  144:7,8 145:1
  167:1,13 168:1,5

**call** 29:18 32:8 36:7
  36:11 46:16,18
  54:9 96:4,11 148:5
  148:5
**called** 6:20 54:17
**calls** 29:14,15 30:24
  35:5,9,12,17,20,22
  36:6,16,20,25 37:7
  37:11,14,20,25
  54:16 155:15
**campaign** 97:10
**canfield** 138:18,19
**cant** 17:17 48:1,18
  48:18 57:8,8 59:24
  65:17 80:1,11,11
  84:17 93:10,10
  94:11 99:11 101:8
  106:3 117:19,19
  125:7 148:23
  153:17 157:20
  162:23 163:21
**cap** 82:11
**capital** 3:20
**cara** 4:4 6:8 84:2
**care** 101:20 117:7
**case** 1:5 13:21 14:1
  15:5 22:10,21 25:8
  28:20 30:16 49:18
  84:21 92:1 100:11
  103:5 104:6,19
  108:25 109:2 113:9
  114:13,20 115:3,5
  115:8,15,19,24
  116:2,14,21 118:5
  118:10 119:20
  124:4,8,9,9 125:6
  125:13,16 126:3,4
  126:13,16,19,20
  127:9 129:2,12
  147:1 151:8 152:21
**cases** 117:10,15
  124:6,11 130:1,6
  149:4
**cashiers** 133:21,24
  133:25 134:6 135:3
  135:11,15,20 136:2
  136:6,11
**castanares** 166:9,12
**castle** 83:15 86:6
**categorical** 27:2
**categorically** 22:1
**categories** 44:17
  47:22 57:14
**category** 44:8,9,13
  77:17 84:15

Case 1:09-bk-13356-VK    Doc 2808    Filed 02/17/11    Entered 02/17/11 17:46:41    Desc
TODD NIELSEN - 2/11/2011
Main Document    Page 72 of 96

Page 171

cd 60:24
cds 62:4
cease 103:10
center 97:23 98:5,5
98:9
central 1:2
certain 26:6 32:5
60:7 94:3,12 118:3
118:23 123:5,10
certificate 168:5
certified 168:4
certify 167:8 168:6
168:15
certifying 89:11
chance 7:17 9:12,21
109:1
change 8:17 10:4,6
changed 165:24
changes 8:15,17,18
51:11
characterize 111:12
131:15
characterized 156:8
charge 61:14,16,18
140:15 141:3,4
charged 119:13
121:15 140:14,16
charges 111:21
118:16
charleston 166:7
charlestown 3:20
check 80:22,25 88:6
88:7 133:21 134:6
135:3,11,15,20
136:2,6 150:11
checks 133:24,25
134:8,12,16 136:11
chris 3:22 164:5
chronological 27:25
chronologically
75:12
circulated 147:18
164:19
circumvent 134:16
claim 160:16
claims 99:22 109:19
109:20,22,24 110:4
123:19,20,22 124:1
124:3,19
clarify 11:13 12:4
55:13,18 60:16
129:18
clear 76:12 94:10
106:16,20
cleared 150:11

clearly 43:24
client 99:9,12,14
closer 148:18 153:1
code 164:10 166:4
collect 49:17
com 63:2,4
come 27:21 87:23
139:22 148:22
comfortable 7:22
coming 47:6
comment 128:11
147:21 164:12
165:22
commented 8:19
comments 45:17
147:24
commerce 113:6
commercial 143:19
144:18
commitment 145:6
145:8,12
committee 2:2,10
3:8 6:7 13:3 22:20
22:20 84:9 96:5
145:22,25
communicated
152:18,20
communicating
43:17
communication
42:11,18 43:21,22
66:7 67:19 70:9
101:3 153:16
155:10,12 156:15
156:23 157:9
communications
44:4,14,16 48:1
77:18,20 153:19
155:16
companies 97:5,12
116:13
company 7:13 13:10
15:1,2 46:12 47:20
48:9,11 58:4,15
65:14 79:6 87:24
93:4,5,7 97:22 98:8
100:9 105:21 107:1
108:10 114:19,20
115:6,7,9,9 116:1,3
116:4,6,8,10
120:12 122:20
123:18,20,22,24,25
124:2,6 125:20
126:8 130:8 131:3
139:8,10,15 143:23

149:3,19 151:10
152:13,13 154:11
154:18 155:3
158:13 159:2,4,12
159:17,22 160:3,12
160:17,19 162:24
companys 154:7,22
companywide 62:13
compare 53:7
compensated 91:25
92:5,7
compile 30:19 77:4
compiled 65:9
complete 9:4 24:7
27:14,22 152:6
completed 23:22,24
24:9 26:22 27:21
28:7 32:21
computer 19:21
24:18,19,20,22
25:2,3 52:15 61:24
62:8,16 70:22,23
74:7 143:10
computers 25:4
62:14,20
concept 154:1,3
concluded 163:18
166:13,16
condition 10:17
confer 122:14
conference 6:5
29:14,15,18 36:6
36:20,25 37:14,20
37:25 96:4,11
107:22
conferring 122:20
confidential 42:11
42:12 57:17,19
confirm 122:1
confirmation 119:11
conflict 159:7 160:9
160:11,11,19
conflicts 115:18
confuse 68:25 72:14
connection 25:20
60:19 107:2 108:11
123:3 126:8 131:2
151:8 159:2,17
160:3,18
consideration 21:15
101:19
considered 12:11
consistent 15:6
28:22
construction 140:2

140:3 141:9,13
142:1,20
consult 11:21 123:3
124:10
consultation 112:6
consulted 93:3
102:7 103:24 104:7
104:18 105:2
consulting 104:6
123:11
consumed 10:21
contact 85:3,24
contacts 88:22
content 76:23
contents 151:17
155:12
context 7:11
continue 60:20
91:24
continued 3:1 4:1
103:21 104:6
124:10
continues 108:10
contract 143:7
contracts 59:2,3,8
79:4
contributions 97:10
97:11,18
controlling 79:11
controls 78:12,23
79:17 134:16
convened 36:5
convention 98:4
conversations
126:17
coordinate 46:8,10
copied 70:10 71:15
71:23 72:5
copies 21:1,10,11
22:10 25:7 51:17
61:6 79:10 87:19
127:14,18,20
copy 19:10 20:9
57:10 60:5,9,11
66:6 164:16,16
165:7,8,8,9
corporate 48:6,12
48:13,17,22 80:2
84:25 88:15
corporation 3:20
correct 13:20 18:25
19:18 20:8,11
24:11 26:15 28:2,4
34:12,14,18,20
35:7 39:3 40:25

41:15,18 42:21
43:2 44:3 51:5
53:9 54:23 55:8,24
58:23 59:11 60:25
61:20 62:10 66:9
67:19,20 68:5,8,12
73:25 75:8 76:4,6,9
76:24 77:11,23
79:15,22 80:7,21
80:24 81:8 82:19
83:5 84:22 85:2
86:5 91:15 93:16
94:4 98:23 103:6
104:12 105:5
107:18 108:23
109:25 110:2,5
113:8,11 114:14
115:16,21 118:9
141:12 154:21
161:13 167:9
168:13
corrections 8:16
165:17
correctness 89:12
correspondence
59:4,5,6,7,12,14,15
counsel 4:1 12:14
13:4,10 42:19,20
44:21,22,23,24,25
45:7,8,19,21,25
46:1,2,5,9,10 47:6
47:19 48:9 53:13
56:12 73:3 77:20
77:24,25 78:6
79:21 86:9,10,16
87:22,25 92:6,9,14
93:3 96:10 101:18
101:18 102:7
103:24 104:6,7
123:6,11 144:19
147:11 150:20
153:14 155:3,6,22
156:3,3,4 158:16
161:6 165:13
168:15
county 3:3 6:10
98:13 99:2,6,22
100:10 101:13
167:2 168:2
couple 96:17 158:10
course 70:18,19
court 1:1 8:2,4,8 9:1
69:2,25 99:21
100:8 126:7 129:25
130:6,10,14,23

131:1,8 133:1
151:19,20,24 152:3
152:14 164:3
**cover** 69:5 118:20
158:20
**covered** 31:19 95:9
95:11
**cox** 83:15 86:6
**create** 52:18
**created** 15:9 29:6
35:6 62:23 79:10
129:14 160:18
**creating** 128:17
**creditor** 22:20
109:24
**creditors** 3:8 6:6
13:3
**crime** 156:24
**crippled** 62:16
**criteria** 42:7 43:19
44:2 78:8 87:10
**crosscomplaint**
126:18
**csd** 57:4,5,6,14
**csr** 1:25 2:4 68:20
70:4
**current** 13:8 18:24
25:2 80:5 108:2
140:15
**currently** 103:7
106:22 107:7
140:12
**custom** 55:21
**customary** 164:2
**cut** 71:7,13

_____

**D**

**danning** 56:14 83:8
84:20
**dash** 102:22,24
127:8
**date** 15:11 32:22,23
33:6 52:1 72:16
**dated** 15:5 66:8 68:7
69:6 70:10 75:15
75:21
**dates** 10:12 14:3,9
30:24 31:12,21
32:13,14 33:7,8
41:4,7 46:9
**day** 23:12,13,14
72:19 75:16 145:20
153:7 168:19
**days** 23:11,16 32:5
39:15,16 164:13

165:16,25
**dealing** 88:14
**dealt** 113:2 158:17
**debate** 157:1
**debtor** 91:7,10 102:8
102:10 103:22
104:4 105:6,10
112:4 114:12
115:22 116:13,20
116:22 117:16,16
118:12,16 119:13
119:20 120:5
121:15 124:11,19
124:22 126:14
127:9 132:22
136:16 138:1,5
143:3
**debtorinpossession**
136:25 137:11,13
137:18,22
**debtors** 1:8,10 6:12
84:24 85:1 86:4
99:23 108:8 111:15
112:24 128:4 166:8
**debtorsinpossess...**
1:8
**debts** 93:7
**decided** 130:12
**deciding** 52:1
**decisions** 44:19,20
**declarant** 129:4
**declaration** 89:15
129:11,19,22 151:8
151:12,23 152:2
167:5
**declarations** 129:1
**dedicated** 22:25
23:4
**deemed** 12:6,11
**defense** 124:4
**defenses** 123:21
**defer** 45:17
**define** 14:10 56:20
62:22 86:20 106:17
**degree** 154:5
**delegated** 63:25
**deliver** 136:6
**delivered** 136:13
**depend** 23:11 53:24
**depending** 16:12
31:12
**depends** 78:14 82:9
106:11 107:9 108:1
110:16 132:13
147:9

**deponent** 6:20
107:24 168:9,10
**deposit** 131:14,16
132:25 133:10,12
**deposited** 136:16,20
136:25 137:2,10
**deposition** 1:14 2:1
6:5,15,21 7:7,18,23
8:1 11:1,4 12:5
15:22 43:8 57:5
64:11 68:20,22
70:4,6 83:17,23
96:6,8 99:17,25
101:24 102:23
104:15 114:25
130:20 151:25
153:5 162:4,8
164:18 166:5,6,6
**depositions** 163:18
164:3,7
**describe** 69:15
98:19
**described** 60:8
88:13 124:13
**describing** 79:9
**description** 5:8 27:5
46:3
**descriptions** 97:2
**desire** 54:18
**detainer** 7:12 86:3
**determinations**
128:19
**determine** 30:23
31:17 32:13,19
57:8
**determined** 31:19
**determines** 87:10
**determining** 43:19
**deviate** 22:16
**devote** 23:12
**dictated** 129:19
**didnt** 14:10 23:22
24:7 27:16 40:23
68:13 69:5 71:7
98:18 110:21 117:7
117:8,8 132:9
145:24 158:19
163:15
**differ** 19:23
**difference** 10:2,8
25:17
**different** 31:24
34:16 76:11,14
86:18 102:6
**difficult** 16:24 83:13

**direction** 46:11
122:22 123:2
**directly** 91:25
**directors** 16:1,6
20:19 21:2 22:11
29:10 30:12 35:5
35:23 36:20,25
37:20,25 38:5,9,11
39:10,14,18 40:5,6
40:16 48:22 49:24
52:11,18 54:1,9,12
54:18 55:16,17
56:1
**disagree** 160:14,15
**disclosed** 100:11
**disclosing** 47:25
147:23 152:13
153:10 156:1
**disconnect** 163:21
**discuss** 90:20 125:12
155:4,22 156:2
160:22
**discussed** 151:20
156:7 159:11
165:13
**discussing** 11:17
125:18 155:11
156:6,20 161:25
**discussion** 11:11
56:25 101:21
124:17 154:25
158:7 162:20
**discussions** 56:22
57:17,20 99:7
108:11 125:10
127:23 153:13
159:20
**dismissal** 103:25
104:4
**dismissed** 103:19,23
108:21 125:8,16
**dispose** 64:19
**disposed** 41:17 65:3
**disposition** 165:14
**dissemination** 49:21
**distinction** 142:13
**distinguished** 29:18
**distribute** 21:14,16
39:19,23
**distributed** 20:19
21:17,23 22:1
39:24
**distribution** 40:2
**district** 1:2
**divide** 78:21

**division** 1:3
**divulge** 156:14
**divulging** 153:18
**dla** 14:7 83:8 84:23
85:3
**document** 22:8
32:25 52:19 57:24
58:4,7,14 60:4
64:16 68:13,19
69:4,6,10 70:3
71:17 72:7,8 73:2
78:4,19 145:14
146:3
**documentation**
78:18 79:2 81:1,4
81:25 98:21 145:11
**documents** 11:3
22:3,21 25:21
30:17,20 57:20,25
58:24 59:1,21,23
59:24 60:2,8,12,23
61:1 62:5,23 64:17
64:19,24 65:7,10
65:18,22,22 66:3
66:14 69:9,18 77:3
77:4,9,19 79:5,5,8
79:9,11 80:8 88:13
89:13 108:24 109:4
133:5,23 135:12,17
136:10 138:23
145:5
**doing** 28:17 42:8
61:19 111:15 127:4
142:7,8 164:2
**dollar** 8:18
**domain** 85:7 91:20
**don** 12:20,23 46:22
96:2
**donald** 3:16 96:25
**dont** 10:15 11:24
14:9 17:23 18:2,11
18:16 19:9 21:6
22:22 23:17,17
24:14,14,22 25:1
27:1 28:9,10,12,12
28:13,18 29:17,23
30:13,13,14 32:17
33:2,4,6,6,12 35:1
35:14,14,15,18
36:8,12,14,22 37:4
37:5,9,12,17 38:15
38:15,16,17 40:12
41:10,10,14 42:23
45:11,11,12 46:17
48:8,24 49:5 50:7

Case 1:09-bk-13356-VK   Doc 2808   Filed 02/17/11   Entered 02/17/11 17:46:41   Desc
TODD NIELESEN 02/11/2011
Main Document    Page 74 of 96

Page 173

50:13 51:5,9,16,23
52:6,8,13,16,16,20
53:12,19,21 55:13
56:2,16 57:22
58:16 59:19 61:3,8
61:11,13 62:12
63:7,7 64:3,3,3,8
65:23 66:1 69:11
69:21 70:19 71:4
71:20 72:2 78:1
81:23 82:15,22,23
83:11 88:18 89:17
89:23 90:2,3 93:20
94:5,5,10 95:4,6
97:17,17,24 98:11
98:17 101:9 102:17
103:12,12,14,18,20
104:22 107:16,19
107:21 108:1,2,20
109:11,12 111:2,9
111:12,17,17,23,23
112:19,19 113:1,4
113:4,21 115:5,20
116:6,7,8,17
117:13 118:6,24,24
119:5,5,6,10
120:17 121:5,9,9
122:21 125:9 126:5
126:16,20,22 127:3
127:10,13 128:3,13
128:25 129:9,9,13
130:2 131:13
132:13,16 134:14
134:17 135:21,23
135:24,25,25 136:4
138:7,8,8,18,22
139:1,17 140:15,25
141:20,21 142:6,11
142:17 143:1
144:12,13,14
146:10 147:16,19
147:22 148:2,14
149:1,5,6 150:4,15
151:2,6,6,14,16,18
152:16,19,22
153:11,24 154:9
155:2,25 157:23
158:8,9 162:13,22
162:22,22 163:4,8
163:17
**dorothy** 114:16
**dos** 89:21 90:1
**dot** 72:25,25,25,25
**dr** 100:9
**draft** 14:20,24 51:12

52:4,14 147:21,25
**drafted** 14:16
**drafting** 128:4,12,13
128:14
**drop** 85:17,19
**duplicate** 65:24
**durham** 142:12,13
142:14,15
**duties** 130:7

_____

**E**

**earlier** 35:2,4 113:7
**earliest** 15:4
**early** 36:6
**easier** 14:10 43:4,16
**east** 3:16 4:5
**eastwest** 127:7,24
137:11
**echemendia** 4:10
43:8,14 45:17
139:3
**either** 25:16 34:5,5
34:21 78:5 119:21
151:23 152:2 166:7
**electronic** 60:5,9,12
60:18,20,21 61:7
80:17
**electronically** 80:18
**elses** 99:12
**email** 39:24,25 63:1
63:20,25 64:1,2
66:6,17 69:13
70:10,17,21 71:2,4
71:15,22 72:4,15
72:18 73:4 74:24
75:2,7,15,20 76:18
109:4
**emailed** 52:24 76:23
**emails** 52:22 53:6,17
63:4,20 65:13
67:22 74:6,8,23
**embarrassing** 8:20
**eminent** 85:7 91:20
**employed** 13:16
**employees** 139:19
140:7
**employer** 7:15
**employment** 86:15
92:8
**ended** 107:20
**engage** 125:10
**engaged** 159:20
**engagement** 159:4
159:8 160:6
**enter** 51:11

**entered** 43:8,15
**entering** 164:6
**entertainment** 98:1
**entire** 36:24 55:5,17
**entirety** 54:2
**entities** 91:7,10
92:17,18,19 93:2
102:8,10 114:12
115:22 118:17
119:13,21 120:5
121:15 124:11,19
132:14,15,22 138:5
138:19 143:4
162:24
**entitled** 10:13 28:11
101:4
**entity** 13:17 59:24
91:18 92:1 103:22
105:6 108:21
115:13 116:20
117:17,17 118:12
124:22 127:9
149:10
**entries** 122:3
**equity** 2:2,10 22:19
84:9 128:20,23
**ernst** 88:3 90:9,12
90:14,19 91:1
108:24 127:15,18
127:20 146:2,7,8
**esq** 2:11,16 3:4,10
3:16,22 4:4
**established** 138:5
**estate** 86:7 93:25
95:23 104:11 132:1
143:17,19 144:2,3
144:6,9,18 163:5
**estimate** 10:2,3,5,10
10:11,12 18:4,5
24:24 35:22 36:1
36:24 37:6 38:13
38:20 93:21 94:11
103:18 117:15
130:3
**estimates** 10:1
**estimating** 23:8
**et** 1:6
**events** 46:9
**everybody** 84:1,2
**evidence** 97:14
116:16 135:6
**exactly** 23:7 154:9
**examination** 5:2 7:1
96:22 102:3 146:21
161:22 168:11

**examined** 6:21
**example** 80:1
**examples** 139:22
**exception** 14:19
132:4 156:24
**exciting** 43:13
**excuse** 11:7
**executed** 145:5,11
167:11
**executive** 54:9,11
54:21 55:2,6,10,15
**exhibit** 5:9,10 68:18
68:20 69:24 70:4,8
**exist** 11:23
**existed** 13:14
**expend** 103:21
123:5,10 135:3,10
135:13,20 146:8
**expended** 117:3
121:15
**expenditure** 88:5
110:14,16 131:4,12
131:15 134:3
**expenditures** 79:17
88:3 117:3
**expense** 81:1
**expenses** 79:20,21
80:14 88:14 114:13
116:20 118:21
**experience** 143:16
143:21
**expired** 165:25
**explanation** 27:2
**extension** 123:23
**extent** 11:20 28:14
81:3 156:22
**external** 79:21 80:14
81:5
**ey** 88:3

_____

**F**

**fact** 11:17 100:9
119:13 150:5
152:17 155:11
159:24 160:14
**facts** 97:13 116:15
116:16 135:5
**factual** 10:5
**fall** 77:9 78:20
**falls** 48:16
**familiar** 91:23 97:25
98:2,3 109:8
111:24 146:23
154:1
**family** 89:24 118:17

119:3,23 120:7
121:22 122:12,16
122:24 123:8,13
**familys** 118:20
123:16
**far** 58:25 109:12
118:8
**fargo** 93:9,24 95:13
95:18,19 102:13
105:2 113:5,6,20
114:8,13 117:23
118:1 124:8 148:6
**fashion** 121:21
**father** 94:14
**fe** 113:6
**february** 28:21,23
29:7 35:5
**federal** 96:7,13
**fee** 82:25
**feel** 7:22 11:21 53:13
120:8 158:23,24
**fees** 80:2,3,4 82:6
84:5 115:5,23,24
116:1,5,9,14 118:6
118:8,25 119:8,12
120:10,12 122:7,11
140:19,22 141:2
152:3,10
**feldman** 3:4
**fernando** 1:3
**figures** 98:1
**file** 25:16,18,22,25
30:21 31:3,4,6,7,9
31:10 34:5,15,22
58:1
**filed** 89:16 92:17,24
103:15,17 137:15
143:11 148:9,16
151:13
**files** 21:8 60:9
**filings** 80:5
**final** 53:8
**finalized** 39:12 53:2
145:10
**finances** 78:23
**financial** 78:19,19
79:3 84:6,8 88:14
89:4,6,7 90:15
**find** 21:20 31:14
32:20 42:13,17
52:21 53:7 77:8
158:2
**fine** 13:5 94:10
148:4 164:24
**finish** 28:15 45:4

113:25 114:2
**finished** 88:11
**firm** 56:14 81:5
84:20 85:8,12,16
85:22,25 86:8
104:9,13,18 105:1
105:4,9,17 106:5
106:23 107:7,12
108:7 109:1,5,14
110:10,22 111:22
111:25 112:9 113:9
113:20 114:15,23
115:3 116:7 117:2
117:25 122:22
124:17 147:14,17
**firms** 83:6 84:19
86:18 90:22 149:20
**first** 26:6 28:20 29:1
31:2 68:4 69:6
70:8 71:2 72:15,17
81:14,17 82:17
85:11 147:21 155:3
**five** 7:7 36:2,3 38:18
38:22 160:24
**fiveandahalf** 13:12
13:18
**fiveminute** 46:15
**flip** 92:3
**floor** 3:5,11
**florida** 130:23 131:8
131:21,22,24
132:25
**flower** 105:21
107:25 109:7,14
110:7,15 111:19,22
112:21,24 113:3
149:10
**focusing** 158:18
**follow** 54:17,18
100:4
**following** 9:18 72:19
**follows** 6:22 101:12
158:4
**foreclosure** 104:4
**foregoing** 167:9
168:7,13
**form** 8:9 60:5,10,13
60:20,21 81:9 83:1
83:3 98:22
**formal** 39:2
**formation** 59:24
**formed** 137:15
**forth** 168:8
**forty** 155:4
**forward** 75:11,17,22

**found** 74:18
**foundation** 157:2
**four** 38:18,22 66:20
102:6 134:8,12,15
146:12
**frame** 18:12
**fraud** 156:24
**fred** 83:9 86:2
**free** 11:21 53:13
158:23,24
**freedman** 6:9,9
12:17 99:5,6,13,18
163:11 165:3
**frequently** 49:2
**front** 11:19 66:9
73:17
**fti** 84:12
**full** 28:6
**fullerton** 4:6
**funds** 130:23,24
131:2 134:11
135:16 136:15,20
136:24 137:1
**further** 161:17
168:15
**future** 8:19

**G**

**gaelle** 86:1 104:14
104:22
**gaffney** 3:16 5:4
12:19,23,23 13:1
46:19,23 96:2,2,7
96:13,19,23,25
97:15 99:11 100:2
100:7,16,20 101:9
101:17
**gary** 2:16 6:11
**general** 7:24 13:10
16:11 21:22 31:5
48:3 86:7,16 90:19
92:6,9,13 106:8,9
106:12 107:11
112:7 123:6,11
142:24 164:9
**generally** 7:22 17:3
40:16,18 47:9
54:21 55:16 60:14
64:21 77:21 81:12
81:13 82:16 83:1
87:18,19 90:14,20
98:19 130:5 154:3
**generate** 87:23
**generated** 89:5,15
**georgiana** 2:11 6:6

**getting** 6:4 43:11
**gill** 56:14 83:8 84:20
**give** 8:3 9:20 10:18
46:10 66:6,9 69:2,5
117:15 122:22
148:22 149:3
**given** 63:13,15
148:25
**giving** 48:21
**glatt** 2:16
**global** 125:20
**go** 6:7 7:23,25 11:7
26:12 27:10 31:3
37:10,11,12 38:15
71:5,6 75:9,22
76:15 84:18 96:4
96:11 99:25 100:14
101:8 130:9,12,14
157:22 160:25
165:12
**goes** 82:17
**going** 19:20 21:19
30:7 34:19 36:18
37:13 57:10 68:17
69:24 75:13,17
87:11 95:13 97:2
99:5,8,9 100:4,13
100:14,21 101:22
136:8 140:10,12
148:1,3 156:12,19
157:1 161:11
**good** 8:1 13:7 83:16
83:21 101:23
**goulden** 114:16,17
117:19 119:5,19
**governance** 48:18
**governed** 12:10
**governing** 80:6
**gralenk** 113:3
**gralnek** 86:1 104:14
104:16,22 113:2
**gregory** 148:1
**ground** 158:24
**grounds** 57:18
**group** 17:20,21
18:17 102:22,24
103:2 105:7,10,13
107:17 109:6 110:3
110:10,14 111:6,11
111:15,19 112:20
115:14,24 116:19
117:11,16 118:4,11
118:16,21 119:12
119:21,22 120:7,18
121:2,11,13,17,19

122:6,15 123:7,12
124:10,12,18 125:7
125:8,12,15 126:14
126:18 127:11,14
127:17,21 128:2
148:11,25 149:11
150:3 155:1 157:16
158:7,12 159:1,5
159:16,21,25
160:13 163:1
**groups** 16:16 17:12
17:13,15 120:15
**guarantee** 93:7,19
94:21 95:3,25
162:25
**guarantees** 95:5
**guarantor** 93:12,23
94:23 95:7 123:23
124:7 163:3
**guarantors** 94:17,18
125:21,22,25 126:2
163:7
**guerra** 100:9
**guess** 10:7,15 15:2
18:1 64:21 68:18
94:5,11 106:12
108:1 129:17 153:1
**guessing** 10:13 26:3

**H**

**hagan** 4:4,4 5:5 6:8
6:8 12:16 43:13
84:1 85:19 161:18
161:20,23 162:6,10
163:9 165:2
**halfway** 66:25
**hami** 3:10 13:5,5
46:25 163:17
**hand** 40:3 57:10
69:24 74:6
**handed** 68:24 69:20
**handful** 38:18
**handing** 69:4
**handle** 112:21
**handled** 105:17
126:13
**handles** 97:7,18,22
**handling** 98:8 110:4
**hands** 34:19
**handwriting** 19:21
**handwritten** 19:22
20:1,5,10 22:17
39:4 41:16,20,24
65:2 129:22
**hang** 99:15,18

**hanging** 165:6
**hansen** 54:14
**happen** 89:2 162:17
**happened** 37:11
131:5 154:15
156:21
**happening** 50:10
**hard** 23:8 25:6 60:5
60:9,11 61:6
**hartland** 3:20 166:8
**havent** 11:1 25:23
120:16 126:12
**hawkes** 146:16
**head** 17:17 48:19
**heading** 26:11,20
27:10 48:16
**health** 10:17
**hear** 158:20
**hearings** 129:25
130:6,10,15 151:21
**hed** 9:21
**held** 11:11 15:15,16
15:20 29:10 32:4
101:21 107:23
133:6
**help** 52:1 128:23
147:2
**hereto** 68:22 70:6
**hereunto** 168:18
**hes** 49:8,14,16 61:18
61:19 100:12
140:16,24 141:19
155:19
**hi** 47:4
**historical** 124:3
**hold** 9:11
**home** 140:3 141:10
142:5,16,22 143:2
143:8
**homer** 93:25 94:2,13
94:13 95:23 104:11
163:5
**hope** 3:5,10
**horr** 139:25
**horrigan** 139:23
141:8,14,25 142:4
142:18,21
**hour** 23:13 166:14
**hours** 23:10,13
**hypothetical** 114:3

**I**

**idea** 148:22
**identification** 68:21
70:5 73:13

Case 1:09-bk-13356-VK   Doc 2808   Filed 02/17/11   Entered 02/17/11 17:46:41   Desc
TODD NIELSEN - 02/11/2011
Main Document    Page 76 of 96

Page 175

**identified** 44:16
  45:22 102:6
**identify** 14:3 17:1,14
  43:17
**igan** 140:1,2
**ill** 28:17 48:1 66:7
  99:25 101:5 120:3
  120:23 135:8
  146:19 148:5 157:5
  158:21
**im** 6:6,14 10:13
  11:24 14:15 15:8
  15:11 18:4,14
  20:15 21:11,11
  26:17 27:8 28:10
  28:17,17 33:5 35:3
  36:12 46:8,8,18
  47:3 48:5 51:16
  54:25 55:11 56:5
  57:10,11 58:10,10
  60:6 65:1 68:2,17
  69:4,14 70:12,14
  73:7,9 75:18 80:12
  83:25,25 85:10
  90:4,14 92:12,12
  92:23 93:9,10 94:3
  94:3,9,12,12 95:12
  96:4,8,10,12,25
  99:5,6,8,8,13,17
  100:16,16 102:23
  104:16 108:17,17
  114:1,25 116:2,23
  121:12 125:11
  127:1 128:22
  129:17 131:13,14
  132:17,17 136:8
  138:1,10 141:3,16
  141:18,22,24 142:3
  143:5,14 144:3
  147:24,24 148:1,7
  151:25 152:24
  153:4,5,15,19
  154:23 155:9,14
  156:4,12,19 157:1
  157:2 158:18 159:9
  160:10 161:25
  163:24 164:8
**image** 34:8
**immediately** 134:11
**impact** 10:22
**imperial** 93:9 94:23
  95:13,22 102:15
  104:19 107:4,5
  117:21,22 124:9
**implementation**

78:23
**important** 8:24 9:20
**impossible** 124:5
**inaccuracy** 154:21
**inactive** 144:4
**inadvertently**
  137:21
**inception** 14:25
**include** 43:3 78:5
  104:3 132:14
**included** 44:20,21
  44:22,23
**including** 12:8 44:25
  100:10
**incorporate** 164:20
**incorporated** 165:10
**increased** 16:21
**incurred** 110:6,9
  113:12 114:23
  115:1 119:13
  120:10 122:7,11
  139:14
**indemnification**
  160:13
**indemnity** 151:9
  160:17
**independent** 54:9
  54:12,18 55:2,16
  62:2 66:2
**indicate** 26:11 139:9
**indicated** 19:8 57:3
**indicating** 133:5
**indication** 45:16
**individual** 114:22
  115:23 129:12,20
  129:23
**individually** 93:15
  95:1 113:10 117:5
  117:18 118:5,25
  119:3,14
**individuals** 121:16
  122:18
**informal** 35:13
**information** 5:17
  27:6,16 41:24
  44:17 74:17 82:25
  89:12 90:25 99:7
  123:25 124:3
  127:22
**infrequently** 49:2
**initial** 128:12 151:1
**input** 129:2,3
**inquiry** 11:18
**inserted** 27:16
**inside** 45:6,8 78:6

**instance** 22:5 41:11
  44:18 60:23 66:17
  82:24 121:19 137:5
  137:6
**instances** 49:16
**institutions** 84:6,8
**instruct** 9:17 48:1
  99:11,25 148:1
  155:19 156:12
**instructed** 5:14
**instructing** 153:19
  155:9
**instruction** 100:4,12
  101:6 155:19 157:4
  157:6,16,25
**instructions** 9:19
  52:18 58:4,15
**intend** 135:3,20
  136:6
**intended** 134:24
  135:10,15
**intent** 100:8 135:13
  135:18 136:12
**interact** 48:25
**interaction** 49:1
  90:9,12,18 130:17
**interest** 124:6,7
**interested** 168:17
**interesting** 45:15
**interests** 126:8
**internal** 45:25 77:25
  78:12,23 79:17
  134:16
**interpreted** 12:7
**interrupt** 28:13
**interrupting** 96:3,24
**invade** 11:18,24
**invades** 11:20
**investigation** 146:5
**invited** 29:24 49:13
**invoice** 81:6,10,15
  82:2 88:10 110:24
  120:16
**invoiced** 121:20
**invoices** 82:20 84:4
  84:13 97:4 108:25
  112:15 113:12,18
  120:15,18 121:3,11
  121:13 127:11,15
  127:21 149:21
  153:2,3,8
**invoicing** 80:10
**involved** 92:1 97:4,9
  98:12,18,24 104:1
  128:4,7,19 134:2

147:14 150:7
  156:22 161:24
  162:1,4,25
**involvement** 98:20
**involving** 7:14
**ipo** 91:22 92:21
  140:11,17,18
**issue** 117:9 161:7
**issued** 133:21,24
  134:6,8 135:2,19
  136:2,5,12
**issuer** 139:24
**issues** 48:6,23 88:6
  88:7,15 105:25
  109:16 111:20
**item** 36:16
**items** 50:2
**ive** 49:5 104:5
  143:24 161:16

———————
J
**jaffe** 3:4
**january** 1:16 2:4 6:1
  13:15 18:15 35:12
  35:23 168:19
**jeff** 14:6 42:19 47:19
  47:19 48:10,21
  85:4
**jenner** 83:24
**job** 46:3 81:6 142:25
**john** 4:10 20:25
  36:17 47:2,4 54:14
  61:15,16 65:16
  82:10 87:9 94:24
  95:22 130:17
  142:12,15 147:13
  149:22
**join** 85:17
**judge** 96:14,14
  127:4
**judicial** 104:3
**july** 19:11
**june** 109:4 130:24
  149:13
**jurisdiction** 126:7

———————
K
**keep** 31:7,9 32:6,10
  33:22 91:5,9,12
  148:3 154:18 164:4
**keeping** 33:16
**keeps** 32:9
**kept** 31:10,11
**kgi** 84:9
**killed** 96:15

**kind** 10:21 11:25
  21:25 27:16 29:13
  34:2,13,15 36:16
  45:24 51:12 58:14
  79:2 80:19 84:15
  89:7 90:6 111:14
  111:18 112:5
  118:10 148:21
**kinds** 21:14 27:5
  47:22 58:24 59:6
  59:12,21,23 60:7
  64:17 77:18 80:8
  89:12 90:25 109:13
**klausner** 2:16 6:11
  6:11,14 9:21 10:14
  11:7,10 12:1,3,19
  12:24 13:2,6 17:25
  22:2 38:15 45:4,14
  46:16,21,24 47:1
  47:24 53:12 70:1
  71:9 72:12,23 73:3
  73:17 74:14 75:20
  83:16 92:10 94:5
  97:13 99:9,13,15
  99:20 100:4,11,13
  100:19,21,24
  101:11,20,22,25
  106:14,17 107:24
  108:4 111:2 113:25
  114:2 116:15
  117:12 120:1,23
  124:24 126:23
  129:5 135:5 136:8
  138:10,14 150:19
  153:11,17 155:8,14
  155:20 156:12
  157:5,18,22 158:16
  160:23,25 161:4,13
  161:15,18 163:10
  163:12,15,18,20
  164:1,22,24 165:1
  165:5,9
**know** 8:16 11:22
  16:13,17 17:21,23
  18:2 22:3,23 23:10
  25:22 26:12,13,21
  29:17,23 30:10,24
  35:14,15,17 36:8
  36:12 37:9,12
  38:16,17 40:4,12
  40:20 41:23 48:18
  51:23 52:6,8,16,16
  55:13 56:9,16 57:4
  58:13,16,25 59:19
  61:9,10,12,19 64:8

Case 1:09-bk-13356-VK   Doc 2808   Filed 02/17/11   Entered 02/17/11 17:46:41   Desc
TODD NIELSEN - 02/12/2011
Main Document     Page 77 of 96

Page 176

70:19 71:4,20,25
72:17 75:5 76:13
79:5 81:22,23
82:13,24 83:1,3,11
89:23 93:20 95:25
96:20 97:7,18,20
97:24 98:7,17 99:2
101:13,16 106:14
108:1,21 111:5,9
111:12,17,17,23
112:17,19 115:5
116:7,8 117:13
119:6 120:10
122:21 126:5,16,20
127:20 128:13
129:9,13 130:2,22
131:1,2,7,10,12,16
132:4,12,14,16,25
133:20,23,24 134:1
134:8,12,17 135:21
135:23,24,25,25
136:4,15 137:24
138:2,4,18,20
139:1,11,12,17
140:15,16,24
141:13 142:6,10,11
142:17 143:1,6,10
143:23 144:13
147:3 148:24 149:1
151:16,17 152:16
152:19,22 153:24
154:9 158:16,24
162:14,22
**knowledge** 20:9
21:5 22:12,13 25:3
37:15 41:20 56:1
67:25 74:5 113:16
113:17 114:11
115:21 132:18,23
132:24 135:2,19,22
136:1,5 137:1
139:4,8,14,18
140:21 141:1,20,25
142:15,21 143:2
145:4
**kupetz** 3:9 83:25

**L**

**la** 98:13 99:2,6
100:10 101:13
**lag** 16:12 17:16
**landegger** 86:12,13
**laptop** 24:17
**large** 111:10,13
**law** 2:11,16 8:4

90:22 105:1 109:1
109:5,6 110:3,10
110:10,14,22 111:6
111:11,14,18,21,25
112:9,20 113:9,20
114:15,23 115:3,14
115:23,24 116:19
117:2,11,16,25
118:4,11,15,21
119:12,21,22 120:7
120:14,18 121:2,10
121:13,17,19 122:6
122:15,22 123:7,11
124:10,12,17,18
125:12 126:14,18
127:11,14,17,21
128:2 148:10,25
149:11,20 150:3
155:1 157:15 158:7
158:12 159:1,5,16
159:25 160:13
**laws** 97:25 98:3
**lawsuit** 108:22
**lawsuits** 7:14 91:6
**lawyer** 82:6
**lay** 156:19
**laying** 157:2
**leased** 98:9
**leases** 79:4
**legal** 22:3 47:22
48:21 67:21,25
79:20,21 88:5,14
106:6 109:7,13
110:14,24 111:18
112:7 113:19,23
114:7,23 115:4
118:4,7,11,16,21
122:7,11,15 153:23
156:7
**legaladviceorient...**
44:5
**legaltype** 59:1
**lender** 59:16 95:19
124:2
**lesnick** 3:21
**letter** 145:6,8,11
146:24,24 147:15
148:19 159:4 160:6
**letters** 90:22
**liabilities** 91:2
**liability** 124:23
**licensed** 143:21
**lien** 105:25 109:16
109:17
**liens** 111:20

**limited** 104:3 132:1
**limits** 82:13
**linked** 61:2,4,4
62:20,22
**litigation** 44:17,18
47:15 60:2 84:25
85:23 86:7 90:20
90:21 91:1,2,5,9,12
91:17,19,22 92:13
92:16 93:1,4,7,12
93:24 94:23 95:8
95:10 102:11,13,16
103:3,8,11,22
104:2 105:2,7,11
105:16,24 106:6,23
106:25 107:2,3,3,8
107:14 108:9,14,19
109:17,22 113:6,7
114:13 116:10,24
118:1 123:18,21,21
126:9 131:7 160:18
162:25
**litigations** 93:6,8
102:6
**little** 81:24 157:13
**llc** 3:20 102:22,25
109:7,14 110:7,15
111:19,22 115:11
163:2
**llp** 3:4,15,21
**loan** 60:23 79:4
94:25 127:8,25
145:10
**loans** 123:25 124:1
**lobbying** 97:4
**location** 39:7
**locations** 31:13
34:16 132:5
**log** 5:9,10 56:6,17
57:4,7,12 66:13
68:4,17 69:8,13,14
69:17,20 70:15,16
77:1,10 78:2 97:23
97:24
**long** 13:11,13,16
23:6 103:13 107:19
108:21 140:10
142:4 144:11
150:13 153:7
160:23,24
**longer** 103:9
**look** 31:14 32:16
42:13,17 43:4
52:21,22 53:6,17
57:13 66:13 70:8

76:18 78:1 84:9
99:15,19 109:1
121:14
**looked** 30:22 31:23
31:24 36:15 42:9
122:3 132:5,9
**looking** 9:24 36:23
44:4 66:17 67:5
70:12 73:2,7,8
83:16,18 91:3
**looks** 76:11
**los** 2:3,12,18 3:3,6
3:11 6:1,10 143:17
144:18 167:2 168:2
**losing** 45:14
**lost** 157:13
**lot** 124:5

**M**

**maddux** 1:6 2:15
20:25 21:10 31:5
36:17 37:8 50:17
61:15,16 65:16
82:10,17 87:9,11
91:18 94:24 95:22
149:23
**madduxs** 82:14
**magnum** 135:11
**maintaining** 80:5
**maintenance** 80:2
88:15
**making** 10:5 45:20
49:14 110:25
**manage** 46:2 91:24
**managed** 141:6,19
**management** 3:20
44:18,20 129:2
139:5,15 140:3,7
140:19,22 141:2,9
141:13 142:1,20
**manager** 80:15,20
88:22 90:5
**managing** 46:5
**march** 15:5,8,9,11
**mark** 70:1,2
**marked** 68:17,19
70:3
**market** 114:17
115:10,15,17,22
117:4 143:17
**mart** 126:13,16,19
126:20
**master** 32:6,8 61:2
**material** 67:3,9 74:1
75:6 76:12,19

**materials** 21:5,14,17
21:18,24,25 52:10
**matter** 55:21 86:23
92:4 99:21,23
105:23 110:1
113:20 114:8,16,24
122:8,12 127:1,12
127:24 150:18,24
151:19 152:10
154:25 155:5,6
156:11,11 158:6,11
158:12,17 159:17
160:4,22
**matters** 31:5 48:12
48:13,17,22 49:23
112:7,17,21 124:18
150:8
**mcgonagle** 166:6
**mean** 23:11,17 38:16
59:9 62:22 68:10
70:19 71:7 78:14
82:1 87:14 89:6
106:11,11 107:9,25
108:1 110:16
119:11 120:9
128:13,14 129:13
129:16,18 130:10
132:13 147:9
153:24 154:9
**mechanics** 105:25
109:16,17 111:20
**mediation** 127:4
**medication** 10:22
**meet** 7:17 98:16
**meeting** 15:12,13,14
16:10,14,15,22,25
17:6,20,22 18:10
18:13,19 20:21
22:24 23:3,20 24:9
24:10 26:14 27:23
28:20 29:1,8,19
30:3 31:21 32:5,13
39:16 41:9,11,13
52:1,24 54:3,5,19
54:22,24 55:1,14
**meetings** 15:15,16
15:18,19,20 16:2,6
16:17,18,23 17:2,5
19:17,20 20:10,13
20:20,23 21:2,13
22:15 27:11 28:3,7
29:3,3,7,10,13,16
29:19,22,24 30:24
31:5,19 32:14 38:6
38:9,12,23,25 39:5

39:11,18 40:16
41:21 43:25 45:13
47:23 49:7,13
50:23 51:1,8,10,15
53:2,22,23 54:2,16
55:6,17 56:1 98:13
130:9
**member** 55:2 122:14
**members** 37:14 43:1
43:3 118:17 119:3
119:23 120:7
121:22 122:11,16
122:23 123:7,12,16
**memorial** 96:4,14
**memory** 9:25 15:6
24:2 28:22 33:3,9
35:9,11 48:21 71:2
122:4
**mentioned** 73:18
84:19 107:3 124:20
141:8
**merco** 102:21,23,24
103:2 105:7,10,13
107:16 125:6,7,15
163:1
**meruelo** 1:6 2:15
4:9 31:4 43:7,11,14
45:16 46:13 65:16
70:10 71:15 75:2
87:9,12 91:18
93:14,25 94:1,2,13
94:13,15,24 95:20
95:22,23,24 104:10
104:11 109:5 113:5
113:10,19 114:8,10
114:16,18 115:6,15
116:2,8,21,23
117:5,18 118:1,5
118:13,17 119:2,6
119:9,14,23 120:7
121:22 122:7,16,23
123:7,12,16 127:7
127:8,24,24 139:5
139:18 140:6,8,14
140:21 141:4 142:2
143:22 149:22
151:7 159:13,22
160:12,17 162:11
162:16 163:6
**meruelomaddux**
63:2,4
**meruelos** 89:24
94:14 114:12,22
115:23 116:4,14
118:20 122:12

130:24 139:6,16
140:4 141:1,11,11
141:17 162:14
**messrs** 50:16
**met** 98:17,18
**method** 40:1
**michael** 73:4 75:18
75:20
**miguel** 4:10 139:3
**million** 133:21 134:9
134:15,24
**mind** 34:8 139:22
**mine** 62:18
**minimal** 83:4
**minute** 11:8 33:16
33:21 88:19,20
100:15,22 161:1
**minutes** 13:21,25
14:14,21,24 15:4,9
16:5,11,17 17:2,4,5
17:9,12,15,18,19
17:20,21 18:9,12
18:17,22,24 19:1,2
19:5,11,16,19,21
19:24 20:2,6,14
22:14,17,19,25
23:4,19 24:4,8,12
24:15,20 25:4,7,13
25:18,21 26:1,5,6
26:18,18 27:6,12
27:17,21,23,24
28:5,6,19 29:4,6,11
29:19,20 30:4,6,7
30:12,16,22,25
31:1,3,14 32:19,21
33:10,22 34:1,12
35:3,6 36:21 37:16
37:21,22 38:1,8
39:2,11,15,19 40:5
40:10 41:2,5,8,13
41:16,25 42:3
45:21 47:6,10
49:17,17,20,24
50:8,12,15,22 51:2
51:3,4,6,12,17,22
51:25,25 52:4,5,11
52:14,17,23 53:1,4
53:7,8,20 55:9 56:7
56:24 58:20 65:3
**mischaracterizing**
124:25 125:1
**missed** 30:23,25
31:17 32:20
**missing** 83:25
**mission** 102:22,25

163:1
**mistook** 95:15
**mmpi** 13:9,13,14,16
20:19 30:12 33:14
35:24 38:6 39:19
44:25 45:7,8 46:1
53:22 54:1 57:24
59:17,21 61:1
62:21,24 64:23
65:10 78:13,24
79:17 81:6 82:5
84:20 85:1,6,22
86:4,10,16,24 89:5
89:22 90:7,15 91:6
92:6,9,14 97:11
98:10 105:17 106:6
106:10,22 107:7,13
108:8 109:14 110:3
110:7 113:12 114:9
114:11,22 115:9
118:3 121:3,21
123:6,11 129:1
130:22 131:7,22,24
132:8,11,13,19,19
132:21 133:1,2,6
133:18 134:16,18
134:20 135:2,10,15
135:19 136:1,5
138:1,4 139:5,6,19
141:2,6 142:16
143:6,10,23
**mmpirelated** 97:5
**mmpis** 45:24 61:4
132:1
**moment** 94:8
**money** 133:17
135:13 139:10
152:14
**monica** 3:23
**month** 88:21
**morning** 75:16
**mother** 94:16
162:18
**motion** 40:6,10,12
40:12,14,21
**move** 126:10
**moved** 41:25 50:18
**moving** 79:1
**multiple** 16:17,18
108:25 112:15
**murray** 65:16,20,22
71:22
**mute** 12:20,23 46:16
100:21
**muting** 46:18

**N**

**name** 7:3 66:25
73:21 83:10 85:8
85:14 96:24 104:15
115:13 126:24
127:2,3 133:6
168:19
**named** 102:11,20,21
103:2,10 104:24
107:10,13,20 108:9
108:13 114:20
117:1 124:11 126:2
126:4,14
**names** 85:11 94:11
**nature** 22:3 91:19
**necessarily** 20:22
21:16,18 40:20
44:8 49:9 55:4
81:20 82:24,25
93:5 108:13 116:6
**need** 9:9 19:21 78:1
80:6 87:24 96:6
160:24
**needed** 51:11
134:12
**needs** 46:9
**negotiate** 144:17
**negotiated** 79:13
**negotiating** 125:22
160:12
**negotiation** 112:6
162:1,6
**negotiations** 42:12
44:7,13 98:13
**neither** 168:15
**neufeld** 83:9 85:21
85:24 86:1 104:9
104:13,20,23,24
105:4,12,13,17
106:5,23 107:7,12
108:7 109:1,5,6,13
110:3,10,14,22
111:6,11,14,18,21
111:25 112:9,20
113:9,20 114:15,23
115:3,14,24 116:7
116:19 117:2,11,16
117:25 118:4,11,15
118:21 119:12,21
119:22 120:6,14,18
121:2,10,13,17,19
122:5,15,22 123:6
123:11 124:10,12
124:17 125:12
126:1,14,18 127:11

127:14,17,21 128:2
148:10,25 149:10
150:3 155:1 157:15
158:7,12 159:1,5
159:16,21,25
160:13
**never** 132:19 136:12
**new** 52:19 53:21
87:22
**nielsen** 1:14 2:1 5:3
6:13,15,19 7:5,5,6
12:6 13:8 47:5
50:15 63:2 73:4
75:15 102:5 156:20
161:24 167:17
**nikki** 1:24 2:4 96:10
168:4
**nondebtor** 91:17
92:17,18 93:2
**nondebtorinposs...**
136:17,20 137:2
138:5
**nonpreservation**
143:14
**nonprivileged** 77:3
**nonresponsive**
126:11
**normal** 22:16 70:17
70:19 149:24
**normally** 15:12
20:22 26:2 149:19
149:21 162:17
**note** 40:9,13,23 41:4
134:25
**noted** 63:7
**notes** 19:22 20:1,5
20:10,12,16 22:17
29:4,21 38:25 39:4
40:9,24 41:1,4,7,12
41:16,20,24 55:25
56:3 65:2 134:18
134:21 168:14
**notification** 80:19
**number** 5:8 23:10
37:6 150:19 168:5
**numbers** 36:1

**O**

**o0o** 166:17
**oath** 8:2 168:9
**object** 9:9 97:13
99:8 120:23 136:8
**objecting** 9:10 155:9
**objection** 92:10
116:15 117:12

124:24 138:14
148:10,16 155:8
**objections** 168:10
**obligation** 58:22
**obligations** 164:10
166:4
**obtained** 162:15
**occasion** 64:22
**occur** 54:21,21,24
55:2,6
**occurred** 16:24
22:15 24:25 28:1
35:17,23 36:16
137:3,4 150:10
**occurring** 91:2
135:24
**oclock** 71:23 72:1
**october** 57:11 66:8
66:11 68:7 69:6,19
77:2
**odson** 85:4,5,5
**office** 24:15 25:3,10
25:15,16,18,19,23
25:24 31:7,11 34:6
34:21,21 39:6,8
45:12 52:7 61:25
152:18
**officer** 6:21 15:22
57:5 64:11 83:17
83:23 96:6,8 99:17
101:24 102:23
104:15 114:25
130:20 151:25
153:5 162:4,8
**offices** 2:11,16
**official** 2:2,10
165:18,21,23
**offtherecord** 11:11
101:21
**oh** 43:10,12 49:10
70:14 73:9 75:5,14
82:18 83:21 85:10
85:18 92:25 97:20
118:7 147:2
**okay** 6:16 7:17 8:7
8:14,24 9:8,16,23
9:24 10:10,15,16
10:21 11:3,10
12:18,19,24 18:2,4
19:1,10,19 20:8,12
21:9 22:14,23
24:12 25:6,10 26:5
28:10,16 30:2 31:2
34:10 36:4,23
37:13 39:4 41:1,11

42:22 43:4,10,24
43:24 44:10,24
45:6 46:13,18,21
47:13,24 49:10
51:7 52:4 53:10
55:12,15,21 57:23
58:3,7,12,24 59:12
60:3 61:1,21 63:23
65:8,9 66:12,16,24
67:8 69:1,12,19
70:16 71:1,14 73:8
73:15,16 74:1,22
75:9,24 76:15,22
77:8,24 78:10,21
79:1,13,16 80:8
81:5,14,21 83:6,12
83:14 84:23 85:3
85:13 86:6 87:17
89:18 90:14,17
92:25 95:17,21
100:2 101:17 102:5
102:10,15 103:18
105:1 106:1,21
107:6 108:4,16,24
110:9,13 113:2
114:4 118:10
120:14 121:7 124:8
125:4,25 126:10
127:7 128:12,19
129:8 133:17,20
135:8 136:1,15
137:7 141:23
143:16 144:2,6,22
145:13,24 148:24
156:19 157:8 161:4
161:14,18 164:22
165:5 166:12
**old** 62:16
**older** 26:1 62:18
**oliver** 83:8 85:6,12
85:14
**once** 20:6,6 64:25
88:5,10
**onepage** 72:7
**ones** 14:3,4 60:8
74:9,10,11 75:1
121:5,6
**ongoing** 106:9,12
112:3
**open** 80:22 81:24
**opened** 138:9,10,11
138:20,24
**opening** 139:2
**operate** 142:21
**opportunity** 8:14

9:9 164:12 165:23
**opposed** 117:4
121:16,22
**oral** 159:10
**order** 26:12,13,14
27:11 28:3 136:2
**organized** 33:25
**original** 164:16
**originally** 15:16
**orr** 83:22,23,24
**outcome** 168:17
**outlook** 32:9
**outset** 8:25
**outside** 42:20 44:25
45:19,21,25 46:2,5
47:6 78:6 82:6,20
83:6 84:4,18 86:10
87:22,25 90:22
132:7,11,22 155:6
156:3,3
**outstanding** 90:20
90:25
**overboard** 38:16
**oversee** 97:3
**overseeing** 45:25
**oversight** 92:1,4,12
**owes** 139:5,10
**owned** 98:9,9 140:8
141:11 142:2

_____

**P**
**package** 23:24
**packet** 21:5 22:9
52:9
**packets** 21:14
**page** 5:2,8 66:9 67:1
67:8,12 69:6 70:8
70:12,13 71:3,14
71:21,24 72:4,9,20
73:14,17,21 74:17
**pages** 5:9,11 66:20
73:1 75:9 76:16
**paid** 80:6 111:5,15
112:9,12 115:4,23
116:1,10,10 117:16
118:6,8,19,20,25
119:2,7,21 120:5
120:12,20,20 121:6
121:7 140:21,24
141:2 150:3 152:4
152:14
**paper** 26:9
**parents** 140:4,9
141:2,4,6,11,17
**part** 9:1 18:8 21:4

26:6,21,24 35:15
44:8 46:3 51:21
53:23 55:14 115:1
119:16 120:21
143:24 157:16
**partially** 26:16 31:10
31:11
**participant** 37:15
38:22 55:16,18
**participants** 26:21
27:10
**participate** 36:21
**participated** 35:20
**particular** 23:12
24:8 39:7 51:25
82:23 161:25
**parties** 59:7,9,10
62:6 102:8 103:8
106:3 115:19 126:2
126:14,15 127:9
146:25 152:21
164:12 165:19,21
**partner** 104:24
**partners** 102:11
**parts** 26:7 27:3 54:5
**party** 56:23 93:5
103:10 104:5
105:10 107:10,13
107:20 108:9,13
114:20 116:22
126:5 168:16
**pasadena** 2:12
**pass** 146:19
**password** 63:9,11
63:13,15
**pay** 113:12 114:12
114:22 116:4,14
118:3 119:22 120:6
140:18 149:21
**payable** 89:8
**payables** 79:6
**payee** 136:7
**payment** 80:10
109:6,8,10 110:17
110:18,22 111:24
113:18,22 131:10
131:11 133:7
148:10 150:5,11,14
154:12,14,24 158:5
**payments** 114:7
149:19,21 154:6
159:13
**payne** 50:18,18
54:14
**penalty** 8:10 166:10

167:8
**pending** 44:18 47:14
47:15 101:7 103:5
107:7,13 108:9
131:8
**people** 57:23 59:19
62:24
**peoples** 20:16
**percent** 21:12 94:12
**percentage** 117:3
121:14 123:5
**perfect** 28:13
**perform** 66:3 133:12
134:5
**performance** 7:13
**performed** 67:6
92:20 105:20 112:3
121:21
**performing** 111:19
**period** 14:23 17:1,11
18:20 22:23 23:2
38:4 92:23 142:10
142:22
**periods** 23:9
**perjury** 8:11 166:10
167:8
**permit** 101:5,6
**person** 9:2 21:23
40:4,17 138:20
146:13
**personal** 60:3
130:24 139:6,16,20
**personally** 92:2,7
122:14 142:2
159:25
**phil** 54:14
**phoenix** 3:17
**phone** 12:21 40:21
96:17 163:12,20
**phonetic** 142:13
**photocopy** 135:15
136:3
**pick** 148:2
**pier** 3:22
**piper** 14:7 83:8
84:23 85:3
**place** 168:8
**placed** 8:2 168:9
**plan** 128:4
**planco** 54:15
**plans** 128:7,20,24
**played** 116:24
**please** 7:4 10:14,15
11:21 78:3,3 94:9
98:19

Case 1:09-bk-13356-VK    Doc 2808    Filed 02/17/11    Entered 02/17/11 17:46:41    Desc
TODD NIELESEN    02/12/11
Main Document    Page 80 of 96

Page 179

**pnl** 4:3 6:8 93:9 95:7 95:10,14,19,23 102:18 103:2,8,11 103:21 104:8 105:7 105:10 107:2,15 108:18,20 124:9 125:6,10,13 154:21 154:25 155:6 156:11 158:6,11 159:2 161:24 162:25
**pocket** 10:4
**point** 9:17 24:23 34:17 62:9 82:2 140:16 144:5 150:16,24
**political** 97:10 98:1
**pomona** 4:3 95:7,10 95:14 102:18 103:8 103:11,22 104:8 105:7,11 124:9 125:6,13 154:25 155:6 156:11 158:6 158:11 159:2 161:25 162:25
**ponte** 91:18
**portion** 26:18 56:24 118:19 119:1 120:11 150:7 158:3
**portions** 24:12
**position** 13:8,11 155:13,14
**positive** 104:16
**possible** 28:9 33:12 36:22 37:18 40:3 42:25 52:20 94:18 128:3 132:15 134:24 135:21 141:18
**possibly** 11:18 155:22
**post** 145:5,8
**postbankruptcy** 57:25 58:5 109:22 139:19
**postseptember** 77:14
**potential** 56:25 124:22
**power** 82:6 88:16
**practical** 16:22
**practice** 16:11 19:23 21:22 22:16 55:21 61:5 64:22 144:25
**practices** 16:19 60:4

**pre** 109:21
**prebankruptcy** 109:21
**precludes** 10:18
**predated** 91:22
**predecessor** 13:17 92:19 132:14,15
**preparation** 11:4 27:18,24 78:19,20 147:15
**prepare** 13:25 14:10 16:11,24 20:13 22:17 24:15 25:4 26:5,6,19 27:7 39:18 40:6 56:6 68:13 69:22
**prepared** 14:14,15 14:24 16:13,16,17 17:4,12,16 19:2,3,8 19:19 21:2,10 22:15,19 23:9 24:4 24:13,17 25:7 26:17,25 28:7 29:21 30:11 38:8 39:2,15 41:12,16 41:21 49:16 52:5 60:18 79:13
**prepares** 20:24
**preparing** 17:2 19:24 20:2 22:25 23:4,18,21,23,25 26:17 27:12 28:6 33:7,7,10 79:3
**prescient** 161:15
**presence** 44:1 156:3
**present** 4:8 15:1,3 17:5 29:20,22,25 35:14 38:5 43:25 45:22 49:6 54:2,6,7 55:4,19,22 62:9 151:19,20
**presentation** 49:14
**presentations** 26:22 26:24 44:21 45:20 47:7,13
**presented** 50:15
**presenter** 49:11
**preserve** 60:15
**preserved** 143:10
**preserving** 101:2
**press** 65:6,10 69:9 71:17 74:2,5,8,20 77:3,6,22 96:20
**pressure** 100:17
**previous** 124:21

165:10
**previously** 69:20 135:24 152:10
**pricing** 128:23
**primary** 85:3,24 116:22
**prince** 3:21,22 5:5 146:22 148:4 150:21 152:1 153:7 153:12,21 155:11 155:18,21 156:16 156:19 157:7,20 158:2,9,18,23 160:21,24 161:2,10 161:14,16 163:23 164:8 165:4,7,12 166:11
**printed** 65:25
**prior** 19:2 20:19 21:13 22:23 23:2 24:9 25:2 29:3,7 35:5 37:20 38:1 51:15 52:24 73:23 76:11,17 92:20 124:25 125:2 133:12 134:5 145:18,24 166:5
**private** 89:25
**privilege** 5:9,10 11:19,21 12:7,8,9 12:12 43:18 50:6 56:6,17,20 57:12 66:13 67:17 69:13 77:9,13 99:8,24 101:3,3,4 147:23 153:10 156:1,25
**privileged** 42:10,14 43:21 44:9 57:4,19 58:9 68:4,17 69:8 69:14,17,20 70:15 70:16 77:1,10,15 77:19 78:2 155:13 157:1
**privileges** 11:23 12:10 101:2
**probably** 10:4 15:18 17:23,24 18:7 23:21,25 39:24 52:22 58:8 61:15 70:25 84:17 140:4 144:16 146:12
**procedure** 87:5,6 149:25
**proceeding** 8:20 89:16

**proceedings** 43:9 44:19 97:1 166:15 168:7
**process** 7:23 8:1 11:1 18:23 80:13 80:15,20 88:8,22 90:5
**produce** 14:4 51:21
**produced** 13:22 14:1 14:5,6,20,21 15:5 21:4 22:9,11 28:19 42:3 51:22 56:7,18 57:12 60:24 62:6 65:21,25 66:1,4,14 74:13,24 108:24
**produces** 49:20
**producing** 25:20 33:8
**product** 66:14 68:3 68:11 77:16
**production** 22:10,20 30:15,17 32:25 33:11 49:18 52:10 58:7 60:19 65:9 66:12 74:24 77:6 109:2
**professional** 84:5
**professionals** 97:3
**proof** 134:11
**proper** 131:15
**properties** 1:6 2:15 31:5 89:25,25 131:22 135:11 139:7,16,20 140:8 141:5
**property** 126:4 131:19,24 132:7,11 132:20,22 141:14 141:16,19 142:1,19 161:25
**proposals** 98:25 99:4 101:15
**proposed** 51:11,17 52:5,23 53:7
**protection** 155:17
**prove** 8:20
**provide** 40:3 49:20 58:3 65:18 78:18 91:1 127:14,17 130:7 134:10 140:7 142:4,15
**provided** 8:9 44:23 50:6,17 52:2 58:14 60:19 106:5 113:19 114:8 118:4 139:23

140:2 141:8,14,19 141:25
**providing** 47:23 67:21,24 79:10 109:14 139:15 156:6
**provisions** 164:17
**pull** 25:21 33:11 52:10
**pulled** 52:9
**pulling** 30:16
**purchase** 131:22 134:24
**purchased** 131:24 132:8,9,11,19
**purchases** 132:1,5 132:10
**purely** 98:22
**purportedly** 126:6
**purpose** 154:17 165:20 166:2
**purposes** 6:15 47:5 73:13 78:18,19 98:5 128:20
**purse** 10:6
**pursuant** 22:9 52:17
**purview** 78:20
**put** 8:9 9:12 25:23 25:23 34:19 44:12 58:1 64:24 100:21

**Q**

**qualify** 94:9
**quarterly** 15:17,19
**question** 9:4 11:20 12:9 16:15 19:15 23:7 27:3,4 28:25 36:23 44:11 45:4 46:6 51:9 53:11,25 54:20 60:6 69:12 71:10 72:12,16 74:14 75:25 92:3 92:22 97:16 99:16 99:19 100:5 101:7 101:7 107:6 108:12 108:15 109:11,12 110:11 111:3 114:2 114:6 115:1 119:24 120:21 122:25 123:1,14 124:14 126:12,23 129:5,10 129:17 138:3,7 140:5 152:24 153:15,18 155:15 156:13 157:15,19

Case 1:09-bk-13356-VK    Doc 2808    Filed 02/17/11    Entered 02/17/11 17:46:41    Desc
TODD NIELESEN    02/12/11
Main Document    Page 81 of 96

Page 180

157:24 160:14
163:25
**questions** 5:14
10:25 44:22 96:17
97:1 101:17 158:10
161:19
**quickly** 16:10 100:18
**quite** 111:1
**quorum** 29:22 35:14

**R**

**raise** 100:8
**range** 59:25
**rare** 64:22
**read** 70:24 71:2,4,18
71:25 72:2,17
101:9,12 119:24
145:14,18,18 158:3
158:4
**ready** 6:4,17
**real** 86:7 132:1
142:1 143:17,19
144:2,3,6,9,18
**reallocate** 152:25
154:20,24 156:10
158:5
**reallocated** 152:10
152:15 158:19,25
**reallocating** 157:10
**reallocation** 152:23
153:13,23 155:4,24
156:6 159:15
**really** 9:20 21:19
59:24 94:11
**reason** 8:24 9:20
24:5 37:19,24
39:10 40:22 63:19
63:22 64:6,9,14
67:24 99:24 143:6
152:25 153:22,25
157:10 163:21
**recall** 18:9,11,12
23:2,18 27:15
50:10,22 65:21
71:18 72:9 94:18
94:20,21 107:16,19
108:20 126:17
127:4 151:23 152:2
**receipt** 164:13
165:16
**receivable** 89:8
139:9
**receivables** 79:6
**receive** 70:17,21
80:19

**received** 66:7,8 99:3
101:14 119:11
**recess** 46:20 100:23
102:2 161:3
**recognize** 126:22
127:1,3
**recollection** 9:25
37:17 94:8,10
108:7
**reconsider** 100:12
157:4,5
**reconsidering**
161:12
**record** 7:4 8:16,25
9:13,19 11:8,16
18:22 19:20 31:21
51:14 100:3,7,14
100:25 101:12,24
101:25 102:5
107:23 156:20
158:4 160:25 161:2
161:5 165:5,12
**recorded** 168:11
**records** 33:14,15,17
37:7 143:11
**redacted** 47:9 49:23
49:25 57:1,20 67:3
67:9,18 72:21 74:1
74:7,17,23 75:6
76:2,11,16,19
**redaction** 76:10
**redactions** 42:2,5,8
47:5 56:21 66:3,15
67:6,13,16 68:1
76:22
**redeposited** 133:25
136:24
**redline** 51:12
**refer** 92:18
**reference** 164:21
165:11
**referenced** 113:7
**referred** 68:19 70:3
**referring** 55:5 72:24
73:3 141:10 145:15
**reflect** 17:19 41:1,7
51:3,7 154:8,10,14
**reflected** 31:8 41:12
41:25 45:20 75:6
135:10 154:7,12
**reflects** 50:8
**reform** 111:2
**refresh** 108:6
**regard** 155:12
**regarding** 42:11

93:3 97:4,10,25
98:9,24 109:5
114:17 126:18
139:4 162:12
**regardless** 49:14
**registered** 80:2
**regular** 29:19 49:1
54:19
**regularly** 15:17,21
15:24 20:21
**regulations** 98:4
**reinstatement**
162:1,7,12,21
**relate** 47:14 74:1,20
80:4 91:6,10
**related** 44:16,17
56:22,25 69:12
79:5 91:20 97:12
115:5 123:19
124:18,22 162:6
168:16
**relates** 79:6
**relating** 109:14
111:19 112:21,24
**release** 65:7,10 69:9
71:17 74:2,6,8,20
77:3,6,22
**relevant** 30:22 31:3
32:19
**relieve** 164:3
**relieved** 166:3
**relieving** 164:9
**remainder** 27:22
77:6
**remaining** 126:3
**remember** 14:9
18:16 19:9,14
22:22 23:17 24:14
25:1 27:1 28:9,12
30:13 32:17 33:2,6
33:6,12 35:12,18
36:22 37:4 38:3
41:10,14 42:23
48:8,24 50:13
52:20 53:19,21
62:12 63:8 64:3,3
65:17,23 66:1
69:11,21 72:2 78:1
84:17 88:18,20
89:17 95:6 97:17
102:17 103:12,14
104:22 113:1,4,4
113:21 115:20
121:9 125:7 127:23
128:3,25 144:12

146:10,18 147:16
147:19 148:14
150:4 151:2,6,14
151:18 155:2
157:20 158:8
162:13,23 163:4
**remind** 17:25 101:1
**rendered** 119:2
120:6 139:6
**reorganization**
128:5,8,21
**repeat** 105:8 121:18
123:1 138:3
**rephrase** 92:22
**replaced** 62:8
**replacement** 62:13
**replow** 158:24
**reported** 1:24
**reporter** 8:2,8 9:1
69:2,25 96:11
158:2 164:3,10
166:3 168:4
**reporting** 48:23
**reportingtype** 48:6
**reports** 80:9 89:4,6
**represent** 51:24
57:16 66:7 69:7
108:10 114:15
123:7,9,12 160:3
**representation**
107:11,20 108:2,19
111:14,22 112:7,13
115:6,18 117:17
119:6,8 123:4,17
143:22
**representatives**
98:14
**represented** 84:24
105:6,9 107:1,13
108:8 112:23
114:18 115:14
116:7 117:18
119:23 120:19
121:16 126:8
158:13 159:2,16,22
**representing** 6:11
6:14 57:11 104:10
105:13 106:22
107:7,10 110:3,6
115:7 117:25
119:14 122:20,23
125:25
**represents** 84:20
113:10
**request** 22:20 30:15

65:19 90:22 118:10
151:9
**requested** 5:17
127:22
**require** 116:19
156:14
**research** 85:23
106:6,8 112:7
121:20,21
**reserve** 165:22
**reserving** 101:1
**resolution** 40:7
**resolutions** 22:5
50:5
**respect** 31:4 76:17
78:22 115:18
119:19,20 123:15
123:20,22,24 124:1
140:3 141:5 142:5
151:10 159:7
**respond** 99:10 161:6
**responded** 43:23
**response** 30:15
65:19 72:10,21
73:10,11,12 76:17
**responses** 44:22
**responsibility** 16:4
58:20 78:15,16,17
78:22 79:16,19
80:9 84:5 86:17
89:11 164:4
**responsible** 30:4,16
33:13,16,19 42:2
48:10 57:23 58:25
59:17 79:3 98:8
**responsive** 77:5
140:5
**restate** 120:3
**retain** 51:17 58:2
59:6,13,23 60:9,12
**retained** 25:6 41:21
57:25 61:1 84:8
**retainer** 86:17,21,22
86:24 87:3,7,11,18
106:9,12 111:7,8
111:10,16,25
112:10,12 118:20
119:1 150:5
**retainers** 149:3,22
**retaining** 33:13
58:20,25 59:18
60:7 87:22
**retains** 59:21
**retention** 57:24 58:4
58:15 60:4,5,5

64:16 90:19
**retrieve** 61:21
**return** 135:16
**returned** 133:18
136:15
**revealing** 155:15
**reversal** 151:3
**reversed** 150:25
151:5
**review** 8:10,15
39:15 56:17 82:2
82:17,19,22,23
83:1 84:12 88:3
89:4 120:14,19
121:5,10 127:11
128:11 133:5,7,12
133:23 134:5
135:12,17 136:10
138:23 151:12
164:13 165:16
**reviewed** 11:3 74:11
78:4 81:16 83:7
99:3 101:14 121:2
121:8,14 127:15
151:15 164:15
165:24
**reviewing** 84:5
**revise** 51:2
**revised** 51:3,4,6
52:17
**revisions** 50:9,11,18
50:19,22,25 51:7
51:10,14,18 52:19
53:19 128:7
**richard** 4:9 54:15
65:16 75:2 87:9
93:14 94:14,24
95:20,22 113:5,19
114:8,10 116:14,23
118:5,12 121:22
122:7,16,23 123:7
123:12,16 127:8,24
140:8 149:22
159:22 162:16,18
163:6
**right** 7:20,22 8:8,25
10:17,25 11:14
14:12 16:4 26:16
28:5 35:2 36:4
37:13 38:13 44:12
45:6 55:25 65:18
67:4,12 68:14 71:5
71:21 73:1,24 75:5
75:22,24,24 76:2,7
76:23 84:18,21

87:15 92:3 93:11
93:23 94:20 98:7
100:7 102:8,9,15
103:7 106:3,7,8
108:22 113:3
115:25 120:15
125:6,8 126:6
133:18 144:23
145:4,23 148:9
158:18 161:4
162:19 165:22
**rob** 85:4
**robles** 2:12
**rodiger** 2:11,11 5:4
6:4,6,13,16 7:2
11:9,12 12:15,18
12:21 13:3,7 15:25
18:3 38:19 43:10
43:12,14 45:5,15
45:18 46:13,18
47:2,4 48:4 53:16
57:6,9 64:13 68:16
68:23 70:2,7 71:12
72:13,25 73:6,19
74:16 75:22 76:1
78:7 83:18,20 84:3
85:17,20 92:11
94:7 96:18,20
102:4 103:1 104:17
106:16,19 108:5
111:4 114:5 115:2
116:18 117:14
120:2 121:1 125:3
126:10,25 129:7
130:21 135:7
136:14 138:12,16
146:19 157:25
158:17,20,21
163:19,22 164:20
164:23,25 165:8
**role** 45:24 78:10,12
78:14 88:8,10
92:13 116:23
128:10
**ron** 83:22,23,24
**room** 6:5 8:7 25:16
25:18,25 31:11
34:5,22 43:15
**rough** 164:11 165:7
165:8,8,9
**routine** 64:23
**roy** 1:24 2:4 168:4
**ruled** 99:21
**rules** 9:1
**running** 62:19

**S**

**san** 1:3
**sandifer** 83:8 85:6,8
85:9,12
**santa** 3:23
**sante** 113:6
**satisfy** 121:20
**saved** 53:21
**saying** 38:21 73:11
**says** 73:7 80:23
**scans** 81:21
**scheduled** 15:21,24
20:21
**scope** 86:20
**screen** 101:8
**search** 31:3 32:24
33:10 65:12
**searched** 30:21
32:18 65:9,13
**second** 31:16 70:13
71:16 100:14
**seconded** 50:20
**secretary** 32:1,6,12
63:5,24 64:2 80:5
**secretarys** 25:16,19
25:24 31:11 34:6
34:21
**securities** 48:6,12
48:23 84:25
**security** 48:13
**see** 43:4,16 53:18
57:13 66:25 68:10
101:8 121:14
145:24 147:21,25
**seeing** 57:7
**seeking** 22:7
**seen** 69:10,16,19
74:23 75:1,2 81:15
81:17
**selling** 143:17
**send** 63:4 147:17
**sending** 90:21
**sends** 64:1
**sense** 148:15 150:13
**sent** 53:18 63:20
71:16,23 72:5,21
73:21,24 75:3,4
76:8 132:25 145:21
145:22,23 146:24
**separate** 44:8,13
54:8 116:9 124:6
153:23
**september** 37:21
38:1,4,12,23 39:11
66:18,19 70:11

71:23 72:1,6,22
73:5 75:16,21 76:8
145:15 148:19
**sequentially** 26:8
**served** 77:2
**services** 90:15 92:20
105:20,24 106:6
109:7,13 110:14,24
111:18 112:3,5
113:19,23 114:7,23
118:4,12 119:2
120:6 139:6,15
140:2,3,7 141:9,14
141:19 142:1,4,16
**session** 54:9
**sessions** 54:11,21
55:2,6,10,15
**set** 28:6 51:25 53:8
78:10 128:23
137:21,24 138:2
168:8
**setting** 90:11
**settlement** 42:11,12
44:7,12 50:6 56:20
56:22,25 57:17,19
98:22,25 99:3,8,22
99:23 101:3,15
108:11 115:4
124:13,15,18
125:13,18,20
159:20
**settlementoriented**
44:6
**settlements** 106:2
112:6
**shares** 128:23
**shes** 106:18 114:3
**shorthand** 168:4,14
**shortly** 15:10 148:15
**show** 72:15 73:14
**shown** 64:7
**shows** 139:9
**shredded** 64:24
**shredder** 64:17,21
**shredding** 64:23,25
**sic** 113:3
**sign** 8:10 64:6 86:20
86:24 87:3,7,15
164:14
**signature** 162:14
**signed** 87:13 143:7
162:18 164:15,16
166:1,2,9
**significant** 8:17,18
53:19 117:8

**simply** 40:23 54:17
54:18
**single** 21:23
**sir** 96:18,24 100:20
**site** 142:22
**sitting** 24:1 27:15
30:10 34:7 35:8
36:18 41:19 47:18
48:20 64:5 71:1
88:15 94:18
**skaggs** 90:15 145:14
146:2,24 148:18,19
**slow** 62:19
**snell** 3:15
**sohigian** 126:21,21
127:5
**solely** 91:6 136:2
**somebody** 21:21
58:14 83:25 85:17
99:11
**sorry** 15:9,11 26:17
33:5 35:3 45:3
53:4 69:4 70:14
71:6 73:9 75:18
76:17 80:8 85:10
95:12 96:8,10
99:17 102:1,23
114:1,25 125:11
137:9 138:1,10
141:16 151:25
153:5 163:24
**sought** 31:1
**sounds** 114:3
**sources** 31:24
**south** 3:5,10
**southern** 132:2,6,7
132:12,22
**speak** 9:22 23:24
28:18 46:15 153:6
157:14 162:11
**speaker** 42:15,17
43:17
**speakers** 26:13
**speaking** 9:2 28:14
58:21 90:14
**special** 90:16
**specific** 7:12 14:9
22:8 35:9 37:6,17
49:1 74:10 87:4,4
112:12 120:16
149:24
**specifically** 15:10
18:10,16 22:1
23:17 44:5 58:21
91:10 147:12

Case 1:09-bk-13356-VK   Doc 2808   Filed 02/17/11   Entered 02/17/11 17:46:41   Desc
TODD NIELSEN - 02/11/2011
Main Document    Page 83 of 96

Page 182

158:19
**specifics** 18:11
**speculate** 10:2,15
18:1 94:6 132:17
141:21
**speculation** 10:3
**spell** 7:3 83:10
104:15
**spelling** 83:13
**spoke** 26:13 157:15
**spoken** 42:16 43:20
49:4,5
**ss** 167:1 168:1
**staple** 97:23 98:9
**stars** 2:2,17
**start** 6:5 9:4,10
26:11 27:9 28:14
35:3 55:22 87:15
**started** 23:18,21,23
23:25 26:17 27:12
28:6
**starting** 31:2
**state** 7:3 9:12 10:6
11:19 80:5 120:3
167:1 168:1,5
**stated** 106:5
**statement** 78:20
82:25 89:7 124:25
139:12 152:7
**statements** 59:16
79:3 152:3
**states** 1:1 50:14
152:18
**steckbauer** 3:4
**stenographically**
168:12
**step** 31:16
**steps** 30:19 60:15
**stipulate** 12:4
164:25
**stipulated** 165:2
**stipulating** 12:22
**stipulation** 12:25
163:22,23 164:2,6
165:10
**stop** 28:17 83:16,17
**stopped** 27:18
**strategy** 46:10
122:15,21 125:13
**street** 3:5,10,16
114:17 115:10,15
115:17,22 117:4
127:8,25
**strike** 27:4 40:15
76:25 87:21 97:20

125:11 126:10
137:23
**stutman** 2:16 83:15
86:8 147:14,17
**subcontractors**
143:7
**subject** 50:19 99:7
99:21,23 126:6,7
155:17 156:24
158:17
**subjects** 48:3,22
**submit** 53:2
**submitted** 18:18
24:5 41:5,8,13
51:18 52:11 81:2,5
121:3 151:7
**subscribed** 168:18
**subsequent** 68:16
77:1
**substance** 10:22
**substantial** 139:5
**substantially** 15:20
16:21
**suggest** 52:3 101:22
**suggested** 12:3
**suite** 2:3,17 3:23 4:5
**sullivan** 14:6,14,20
19:3,8,16 30:6,11
42:19 47:19,23
48:10,21,25 49:4,6
49:13 55:25 85:4
**sulmeyer** 3:9 83:24
**summarize** 158:21
**sums** 139:5,14
**superficially** 98:2
**supervisor** 142:24
**supplemented**
69:18
**supporting** 81:1,4
81:25
**suppose** 156:8
**sure** 7:5 9:4 11:9
17:24 18:2,14
20:15 21:12 27:8
36:13 46:8 51:16
57:24 69:14 70:12
80:12 83:25 93:9
131:13,14,23
141:15 152:24
153:4 164:8
**susan** 3:4 6:9 99:5
**switched** 87:13
**sworn** 6:20
**system** 52:15 61:2,2
61:8,22,24 62:2

63:9 64:16 65:24
66:1 80:16,17,20
81:21 88:23 89:19
89:22 90:1,5,6
**systems** 61:7
**szkolnik** 83:9 86:2

**T**

**take** 9:2 16:5 30:7
30:19 36:21 37:16
38:25 46:14 55:9
55:25 56:3 60:15
99:15,18 100:13
101:20,23 136:2
157:6 160:21
162:18 165:9
**taken** 1:15 2:1 7:7
8:8 20:12 29:4,11
29:21 37:22 38:2
168:7,14
**talk** 44:13 45:6 60:3
123:15 146:2,11,15
**talked** 32:1
**talking** 32:12 58:19
60:4 79:2,10 80:4
80:16 93:13,24
106:18 124:12
146:8 148:7
**talks** 87:24
**tax** 99:22
**technically** 55:14
**tedford** 4:10 47:2,3
56:15 66:8 69:8
147:13,21 163:14
163:15,24
**tedfords** 69:13 70:9
**teleconference** 3:12
3:18
**telephone** 126:17
**telephonic** 40:17,19
**telephonically** 4:10
146:13
**tell** 14:23 15:8 19:1
19:6 42:7 44:15
53:13 62:11 67:5
67:16 73:20 122:6
130:5 138:23
**ten** 37:5 77:5 164:13
**term** 126:6
**terms** 10:11,11,12
27:25 29:20 46:9
46:11 107:10
109:11 162:21
164:9
**testified** 6:22 35:2,4

**testify** 10:23
**testimony** 8:3 9:24
10:19 11:25 125:7
168:10
**thank** 6:16 7:6 13:2
13:6 38:20 46:19
62:7 69:3 73:19
76:15 83:21 96:18
100:16,20 101:18
101:19 142:14
146:19 163:9,10
**thats** 9:19 12:15
13:5 19:13 21:19
21:21 27:3 28:10
45:20 46:6 48:5
51:5 58:8 63:18
66:12 68:7 73:8
74:1,17 75:6 81:1
85:11,11 89:15
91:3 94:4,10,20
102:9 108:2 120:21
123:14 133:25,25
136:18 138:7 140:4
144:23 148:4 150:6
155:13 157:2 163:9
164:24
**thereof** 168:17
**theres** 12:5 49:1
59:19 67:8,12 76:2
76:16 82:23 86:12
86:12 87:4,4,16
93:10 108:2 124:5
149:24
**theyre** 46:14 51:5
54:17 91:3 103:5,9
**theyve** 40:18 106:2
**thing** 31:2 76:14
102:14
**things** 22:6 60:20
112:7 124:20
**think** 6:16 12:2
19:10 24:22,22
25:22 30:13 32:4
32:15 34:16,24
35:13 37:19 40:11
47:17 48:18,19
51:5 59:25 60:18
60:19 61:16 63:24
64:9,14 66:13
69:17 70:14 80:1
80:11,11 84:16
86:11 88:17,19
90:24 93:10 95:9
95:11,15 99:6
101:7 103:9,16

104:20 106:1,3
108:2 110:11 115:7
115:10 116:6,17
117:8,19,20 118:24
118:25 119:4
120:11,17 122:25
125:1 127:10
131:13 138:7 141:4
147:22 148:23
155:25 156:23
157:18,23 163:8
166:12
**thinking** 95:18
**third** 59:9 72:9
**thought** 19:7,7
95:12 120:19
161:11 163:4,4
**three** 23:5,13 73:1
74:12 76:22 146:12
**threepage** 69:6
**throw** 20:7 64:20
**till** 24:6
**tim** 86:1
**time** 8:14 9:2 14:23
15:13 16:12,14,18
17:1,16 18:12,20
19:24 22:23 23:2,8
23:9,11 27:20,22
32:18 39:13 43:25
50:9 55:5,22 62:9
63:14,14 70:25
72:16,23 74:22
75:13,17,19 81:15
81:17 88:21,25
96:3,20 100:17
101:18,23 103:21
107:12 108:7,20
112:23 117:3
121:15 122:3,5,6
122:10 123:6,10
131:8 140:17,18
142:7,10,22 144:17
145:24 146:8
148:18,21 149:15
152:12 157:6
158:19,25 159:15
168:8,8,11
**timedated** 73:23
**times** 7:9 40:11
146:11 161:16
164:19
**titled** 143:3
**tnielsen** 63:2,4
**today** 7:18 8:3 9:24
10:19,23 11:4 12:6

Case 1:09-bk-13356-VK    Doc 2808    Filed 02/17/11    Entered 02/17/11 17:46:41    Desc
TODD NIELSEN 02/12/2011
Main Document    Page 84 of 96

Page 183

24:1 34:7 35:8
36:19 37:11 48:20
64:5 71:1 88:15
**todd** 1:14 2:1 5:3
6:19 7:5,5 17:25
73:4 75:15 167:17
**told** 161:16
**top** 17:17 48:19
**topics** 47:20
**total** 97:20 111:21
**track** 91:5,9,12
164:4
**train** 75:7
**transaction** 154:8
154:10
**transactions** 144:18
**transcribed** 168:12
**transcript** 68:22
70:6 164:4,11
165:14,19 166:1
168:13,14
**transfer** 131:1
149:15,17
**transferred** 130:23
137:12 149:10
**transmittal** 69:5,7,7
**trash** 64:20 65:3
**treister** 2:16 83:15
86:8
**tried** 30:22 32:19
**trouble** 120:24
**true** 16:8 110:12
117:10 136:18
167:9 168:13
**trustees** 152:18
**try** 9:3 31:16
**trying** 11:25 21:20
73:14 158:23
**turned** 146:25
**turning** 71:14,21
**twenty** 130:4
**twice** 7:10
**two** 14:6,13,13 16:19
23:4,16 31:13 34:1
34:1 49:3 57:12,13
75:9 76:15 78:21
85:11 115:18
145:20
**twopage** 72:7
**typed** 53:20 129:14
**types** 59:25 89:10
**typing** 128:14,15

**U**

**uhhuh** 27:13 46:7

101:11 120:1
154:13
**unable** 77:8
**undated** 146:23
**understand** 8:5,12
8:22 9:6,14 10:8
11:13,23 14:17
18:14 20:15 27:8
38:20 51:9 53:13
61:3 62:7 74:14
77:12 85:15 109:11
109:12 129:5,9
133:2 136:11 137:4
138:8,18 148:7
152:24 154:6,11,17
**understanding** 27:9
30:3 35:19 36:5,9
36:19 47:7 58:21
59:20 84:23 99:20
133:4,17 134:10,20
134:23 135:1,9,14
135:18 136:19,23
137:14,17,20
140:23 142:18
143:13 149:2,6
150:6,16 156:5
158:11 159:1,16,19
**understood** 16:5
53:11 121:25
**undertaken** 21:13
**undertook** 123:24
**undoubtedly** 10:6
**unintentionally**
11:24
**united** 1:1 152:18
**unlawful** 7:12 86:3
**unofficial** 165:20
**unrevised** 52:14
**unsigned** 146:23
164:16 166:1
**unusual** 110:21
**unusually** 111:10,13
**upcoming** 46:9
**update** 18:22
**updated** 69:8,13,14
**upgrade** 24:24
**upgraded** 24:23
**use** 20:13 25:3 40:1
43:19 63:9 64:16
64:17 65:2 98:4
165:19
**usually** 16:12 17:5,8
20:18,24,25 22:3,6
26:8 42:15 49:6,8
49:10 53:23 54:3,8

55:1,22 59:8 81:25
87:23 88:21 164:23

**V**

**vacation** 19:12
**vague** 92:10 117:12
120:23 136:9 138:7
138:14
**valley** 1:3
**valuations** 128:20
**van** 3:16
**varied** 16:18
**various** 23:9 31:19
50:15 97:3 106:2
124:1 140:8 150:8
**vary** 16:19
**verification** 119:15
**versa** 9:5
**version** 53:21 71:16
165:20,21 166:1,3
**versus** 25:18 33:7
87:11 113:5 127:24
**vice** 9:5
**viewing** 19:4
**vista** 91:18
**voice** 40:21
**vote** 41:2 50:9 51:15
**voted** 40:5 41:24
50:2
**votes** 36:10 49:24
52:12

**W**

**waive** 115:17
**waived** 12:13
**waiver** 12:7 159:7
160:9
**wall** 114:17 115:10
115:14,17,21 117:4
127:7,24
**want** 9:12 10:1
11:19,24 28:10,13
28:18 46:17 70:1
71:8 88:19 99:15
101:1 141:21
160:23 161:6
163:22 164:5
**wanted** 71:12 72:15
99:18
**wasnt** 45:15 104:5
**watermark** 145:5,11
**way** 8:21 69:15
75:11 97:9 98:12
98:18,24 149:6
168:16

**wednesday** 1:16 2:3
6:1
**weeks** 23:5,5 49:3
**weinhart** 3:4
**welcome** 43:12
101:20
**wells** 93:9,23 95:13
95:18,19 102:13
105:2 113:5,6,20
114:8,13 117:23
118:1 124:8 148:6
**went** 30:21 31:18
74:9,12 145:25
156:21
**west** 102:22,25
163:1
**weve** 74:18 132:5,9
164:2 165:14
**whatevers** 74:7,22
**whats** 35:11 61:7
84:23 93:19 119:18
120:9 133:4 136:23
137:20 142:18
143:13,19,21
**whereof** 168:18
**whittier** 141:10
142:5,16,19,22
143:2,8
**whos** 61:19 85:3
93:23 94:23 102:20
109:12 163:3
**width** 76:10
**williams** 50:20 54:14
**willing** 100:12
**wilmer** 3:15
**wilshire** 4:5
**wired** 131:3
**withdraw** 101:5
160:13
**withheld** 57:21
**withholdings** 57:14
**witness** 2:15 5:2
15:24 18:2 38:18
48:3 53:14 57:7
64:12 71:11 72:24
74:15 75:24 78:4,5
83:19,24 84:2
100:1,3 101:5,6,16
102:24 104:16
107:25 114:1,4
116:17 117:13
120:24 125:1
126:24 129:6
136:10 138:11,15
153:20 156:13

157:23 162:9
164:13 165:15
166:7,8,8 168:18
**witness** 167:5
**wondering** 96:16
**wont** 88:20
**word** 55:18
**work** 45:25 68:11
77:15 85:6,21,21
86:7,20 91:21
121:25
**worked** 23:13 91:17
92:16 93:1 154:4
**working** 45:10
**workload** 71:10
**workproduct** 12:8
**worried** 83:16,18
**wouldnt** 26:22 27:19
32:8 40:20 44:20
82:25
**write** 64:6
**writing** 74:2 128:15
147:7
**written** 64:7 129:1
129:11,13,16,18
159:9 160:10
**wrong** 66:10 95:15
**wrote** 74:7,22 147:3

**X**

**Y**

**yardi** 89:19
**yeah** 11:15 12:3 26:2
26:4 36:3 37:3
43:3 46:16 48:15
60:17 71:11 85:16
99:20 100:14,24
101:25 106:11
107:25 108:15,19
110:19 118:2
135:25 143:24
144:14,19,19
145:23 161:5,13
**year** 29:1 36:24
144:15
**years** 7:7 10:11
13:12,18
**yesorno** 153:15
**youll** 62:22 66:25
**young** 88:3 90:9,12
90:19 91:1 108:25
127:15,18,20 146:2
146:7,9
**youngs** 90:15

**youre** 9:18 10:13
  11:13 24:1 27:15
  30:10 34:7 35:8
  36:18 41:19 47:17
  48:20 55:4,5 56:4
  60:7 64:5 70:10
  71:1,15 73:11
  79:10 80:4,16
  87:11 90:3 93:13
  93:24 94:18 101:20
  110:25 117:13
  118:3,23 124:24
  125:1 136:11
  145:15 149:9,13
  155:8,13,15 161:13
  161:15
**youve** 8:2 60:8 79:9
  88:13 104:7 130:5
  164:6

_____
**Z**
_____

_____
**0**
_____
**0** 50:21
**00** 71:23,25 96:3
**000** 82:12,16 109:6
  109:15 110:6,9,13
  110:18 111:5,10,15
  111:25 112:9,12,17
  118:19 119:1
  130:22,24 139:13
  140:19 148:10,25
  149:9,17 150:2,5,8
  150:17 153:1,2
  154:21 155:5
  156:10 157:10
**03** 166:15
**04** 70:11,21 75:3
**09bk13356kt** 1:5

_____
**1**
_____
**1** 1:5 133:21 134:9
  134:15,23 135:10
**10** 15:19 165:16,25
**100** 21:12 82:12,16
  94:12 109:6,15
  110:6,9,13,18
  111:5,10,15 118:19
  130:22 148:25
  149:9 150:2,5,8,17
**103** 3:23
**10th** 28:21,23 29:7
  35:5
**110** 4:5
**12** 1:16 2:4 6:1

**1200** 2:3,17
**146** 5:5
**14th** 15:5,9,11 66:8
  66:11 68:7
**150** 140:19
**15th** 109:4
**16** 43:7
**161** 5:5
**17** 102:2
**185** 3:22
**18th** 15:8 168:19
**1901** 2:2,17
**1st** 18:15

_____
**2**
_____
**2** 6:2 144:10
**200** 139:13
**2001** 102:22,24
**20012021** 163:1
**2005** 13:12,19
**2006** 144:10
**2007** 13:15,15 15:2
  16:8 17:3 33:25
  34:1 62:9
**2008** 15:5,9,17 17:3
  17:11 20:3 21:2
  24:21 33:25 34:1
  36:18,21
**2009** 15:19 17:15,24
  18:7,15,17 19:11
  23:22 24:1,5,13,13
  26:18,18,19 27:6,7
  27:12,12 28:5,7,8
  28:21,24 29:1,7,7
  29:11 34:12 35:5,6
  35:13,23 36:6,23
  37:2
**20092010** 17:13
  22:14
**2010** 17:15,19 18:8
  18:18,21 19:2 20:3
  23:3,19,23 24:6
  27:15,16 34:12
  37:13,20,21 38:1,1
  38:3,4,12,23 39:11
  54:13 57:11 66:18
  66:20 70:11 71:24
  72:1,6,22 76:8 83:7
  112:22,25 127:5,25
  130:25 133:22
  149:13
**2011** 1:16 2:4 6:1
  167:12 168:19
**2021** 102:22,24
**20th** 69:6,19 77:2

  145:16,17 148:19
**21** 5:9
**213** 3:6,12
**22** 46:20
**2285755** 2:18
**2292868** 3:6
**23** 6:2
**23rd** 17:19 18:10,13
  18:18,20 19:2
  22:24 23:3,19 24:6
  24:10 27:15 41:11
  41:16 50:8
**25** 82:25
**272** 2:12
**28** 71:16,19 72:10,21
  72:25 73:7 75:4
  76:8

_____
**3**
_____
**3** 5:11 43:7 46:17,20
  46:20 130:24
**30** 39:15 46:17
  111:25 112:9,12,17
  119:1 148:10
  149:17
**3052** 1:25 2:5 168:5
**310** 2:18 3:24
**32** 66:18,20,23 75:16
  75:22
**333** 3:5,10
**35** 46:20
**35th** 3:11
**36th** 3:5
**38** 72:6
**3826000** 3:17
**39** 73:5,9
**3960960** 3:24

_____
**4**
_____
**4** 100:23,23 102:2
**40** 66:22
**400** 3:16
**405** 4:5
**41** 75:21,23 76:18
  161:3
**42** 150:17,22 153:1
**43** 153:2 154:20,21
  155:5 156:10
  157:10
**47** 150:17,22

_____
**5**
_____
**5** 70:11,21 71:16,19
  75:3,4 102:2
**51** 161:3

**52** 72:10,21,25 73:7
**5263377** 4:6
**54** 2:4 100:23
**56** 100:23
**58** 102:2

_____
**6**
_____
**6** 96:3 161:3,3
**602** 3:17
**626** 2:13
**6262311** 3:12
**68** 5:9

_____
**7**
_____
**7** 5:4 50:21 71:23,25
  72:6,10,21,25 73:5
  73:7,9 76:8 166:15
**70** 5:10
**714** 4:6
**7937264** 2:13

_____
**8**
_____
**8** 73:5
**845** 105:21 107:25
  109:7,14 110:7,15
  111:19,22 112:21
  112:24 113:3
  149:10
**850042202** 3:17
**8th** 57:11 70:11
  71:23 72:1,6,22
  76:8

_____
**9**
_____
**9** 2:4 66:18,20,22
  75:16,21,21,22,23
  76:18
**90** 39:16
**900676013** 2:18
**90071** 3:6,11
**90405** 3:23
**911012872** 2:12
**925** 133:21 134:9,15
  134:23 135:10
**928321956** 4:6
**96** 5:4
**966** 150:17,22
**9th** 37:21 38:1,4,12
  38:23 39:11 66:18
  66:19 75:16 77:14

# _EXHIBIT B_

**Goldberg, Eric D.**

| | |
|---|---|
| **From:** | John N. Tedford, IV [JTedford@dgdk.com] |
| **Sent:** | Wednesday, October 06, 2010 1:08 AM |
| **To:** | Christopher E. Prince |
| **Subject:** | RE: MMPI: board minutes |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| **Attachments:** | Minutes batch 1.pdf; Minutes batch 2.pdf; Minutes batch 3.pdf |

Chris -- Here you go.

---

**From:** Christopher E. Prince [mailto:cprince@lesnickprince.com]
**Sent:** Monday, October 04, 2010 4:43 PM
**To:** John N. Tedford, IV
**Subject:** MMPI: board minutes

John:

Just a reminder that I would like a copy of all board minutes produced to the committees and Legendary.

Chris

**lesnick prince** LLP
**Christopher E. Prince**
**Lesnick Prince LLP**
185 Pier Avenue, Suite 103
Santa Monica, CA  90405
direct        213.291.8984
facsimile    310.396.0963
www.lesnickprince.com

# EXHIBIT C

## Goldberg, Eric D.

**Subject:** FW: MMPI: Board
    materials

**From:** John N. Tedford, IV
**Sent:** Tuesday, November 23, 2010 6:27 PM
**To:** 'Hankin, Marc B.'; 'ronorresq@aol.com'; 'crodiger@rodigerlaw.com'; 'Rallis Jr, Dean G.';
'Jeremy Richards'; 'Christopher E. Prince'
**Cc:** 'tnielsen@meruelomaddux.com'; 'gklausner@stutman.com'; 'SRay@Stutman.com';
'CChow@Stutman.com'
**Subject:** MMPI: Board materials

Counsel:

A few minutes ago MMPI provided a link for downloading board materials.  I believe that Cristy and
Chris were left off the initial distribution list, but I think they can obtain the documents by clicking on
the link below (if you try and are unsuccessful, please let me know).  These documents are being
produced in connection with the OCC's Rule 2004 motion, and therefore are subject to the same
confidentiality restrictions imposed by the Court with regard to board minutes and other materials
that have been produced.

John

---

**From:** Jose Solis (via Thru) [mailto:jsolis@meruelomaddux.com]
**Sent:** Tuesday, November 23, 2010 6:15 PM
**Cc:** John N. Tedford, IV
**Subject:** Board Materials

## Thru. Secure Message                        Thru Tracking: T478-009-

www.thruinc.com

---

Access Secured Files Here - *Expires Tuesday 11/30/2010 7:59 AM (UTC)*
**From:**         jsolis@meruelomaddux.com
**To:**         MHankin@jenner.com, ronorresq@aol.com, drallis@sulmeyerlaw.com,
jrichards@pszjlaw.com
**Cc:**         JTedford@dgdk.com, tnielsen@mmpi.la
Reply To All

---

If this email has been converted to text format and the link does not work, please copy and
paste the following URL into your browser address field:

https://meruelomaddux.thruinc.net/ExDn.aspx?id=009V9FNXJKK

This email contains information that may be confidential or privileged and may constitute inside information. The contents
of this email are intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to
read, disclose, distribute or otherwise use this transmission. If you have received this email in error, please notify the
sender immediately and delete the transmission. Delivery of this message is not intended to waive any applicable
privileges.

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document described as **DEBTORS' OPPOSITION TO CHARLESTOWN'S REQUEST FOR SANCTIONS AGAINST DEBTORS FOR SPOLIATION OF EVIDENCE** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _**February 17, 2011**_, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Michael C Abel on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
mca@dgdk.com

Robert Abiri on behalf of Interested Party Courtesy NEF
rabiri@abiriszeto.com

Allison R Axenrod on behalf of Creditor Claims Recovery Group LLC
allison@claimsrecoveryllc.com

Christopher J Bagnaschi on behalf of Defendant Richard Meruelo
cb@cjblaw.com

John J Bingham on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
jbingham@dgdk.com

William C Bollard on behalf of Creditor Victory Outreach La Puente, Inc.
eal@jbblaw.com, kmg@jbblaw.com;dritchie@jbblaw.com;william@jbblaw.com

Peter Bonfante on behalf of Interested Party Courtesy NEF
peterbonfante@bsalawfirm.com

Julia W Brand on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
JBrand@bhfs.com

Jennifer L Braun on behalf of U.S. Trustee United States Trustee (SV)
jennifer.l.braun@usdoj.gov

Martin J Brill on behalf of Interested Party Courtesy NEF
mjb@lnbrb.com

Andrew W Caine on behalf of Creditor Legendary Investors Group No. 1, LLC
acaine@pszyjw.com

Howard Camhi on behalf of Creditor Kennedy Funding, Inc.
hcamhi@ecjlaw.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
548292v1

**F 9013-3.1.PROOF.SERVICE**

Gary O Caris on behalf of Interested Party EDI Architecture
gcaris@mckennalong.com, pcoates@mckennalong.com

James E Carlberg on behalf of Creditor Woodland Farms, Inc.
jcarlberg@boselaw.com

Sara Chenetz on behalf of Creditor Imperial Capital Bank
chenetz@blankrome.com, chang@blankrome.com

Jacquelyn H Choi on behalf of Interested Party Courtesy NEF
jchoi@swjlaw.com

Carol Chow on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
CChow@Stutman.com

Cynthia M Cohen on behalf of Interested Party Courtesy NEF
cynthiacohen@paulhastings.com

Ronald R Cohn on behalf of Creditor Pacific Commerce Bank
rcohn@horganrosen.com

Enid M Colson on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
emc@dgdk.com, ecolson@dgdk.com

Michaeline H Correa on behalf of Interested Party Los Angeles County Metropolitan Transportation Authority
mcorrea@jonesday.com

Emily R Culler on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
eculler@stutman.com

Ana Damonte on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank Minnesota, National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc., etc
ana.damonte@pillsburylaw.com

Brian L Davidoff on behalf of Creditor Yoshiake Murakami
bdavidoff@rutterhobbs.com, calendar@rutterhobbs.com;jreinglass@rutterhobbs.com

Susan S Davis on behalf of Creditor Cox, Castle & Nicholson LLP
sdavis@coxcastle.com

Aaron De Leest on behalf of Debtor Merco Group - 2040 Camfield Avenue, LLC, a DE LLC
aed@dgdk.com

Daniel Denny on behalf of Interested Party Courtesy NEF
ddenny@gibsondunn.com

Jeffrey W Dulberg on behalf of Creditor Legendary Investors Group No. 1, LLC
jdulberg@pszjlaw.com

Marina Fineman on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
mfineman@stutman.com

Michael G Fletcher on behalf of Creditor Cathay Bank
mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com

Barry V Freeman on behalf of Interested Party Courtesy NEF

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
548292v1

**F 9013-3.1.PROOF.SERVICE**

bvf@jmbm.com, bvf@jmbm.com

Donald L Gaffney on behalf of Creditor BANK OF AMERICA
dgaffney@swlaw.com

Thomas M Geher on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank
Minnesota, National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage
Securities, Inc., etc
tmg@jmbm.com

Bernard R Given on behalf of Creditor Cathay Bank
bgiven@frandzel.com, efiling@frandzel.com;shom@frandzel.com;bgiven@frandzel.com

Barry S Glaser on behalf of Creditor County of Los Angeles Tax Collector
bglaser@swjlaw.com

Gabriel I Glazer on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
gglazer@stutman.com

Matthew A Gold on behalf of Creditor Argo Partners
courts@argopartners.net

Michael J Gomez on behalf of Creditor Cathay Bank
mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com

Michael I Gottfried on behalf of Interested Party Courtesy NEF
mgottfried@lgbfirm.com, msaldana@lgbfirm.com

John A Graham on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank Minnesota,
National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc.
jag@jmbm.com

Ofer M Grossman on behalf of Interested Party Courtesy NEF
omglaw@gmail.com

Jodie M Grotins on behalf of Interested Party Courtesy NEF
jgrotins@mcguirewoods.com

Peter J Gurfein on behalf of Creditor CIM Urban RE Fund GP II, LLC, as Successor in Interest to Grand Avenue Lofts, LP
pgurfein@lgbfirm.com

Cara J Hagan on behalf of Creditor PNL Pomona, L.P.
carahagan@haganlaw.org

Asa S Hami on behalf of Creditor Committee Creditors Committee
ahami@sulmeyerlaw.com

Brian T Harvey on behalf of Creditor California Bank & Trust
bharvey@buchalter.com, IFS_filing@buchalter.com

Robert A Hessling on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
rhessling@dgdk.com

William W Huckins on behalf of Interested Party Courtesy NEF
whuckins@allenmatkins.com, clynch@allenmatkins.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
548292v1

**F 9013-3.1.PROOF.SERVICE**

Lance N Jurich on behalf of Creditor CanPartners Realty Holding Company IV, LLC
ljurich@loeb.com, kpresson@loeb.com

William H. Kiekhofer on behalf of Creditor Esmark, Inc.
wkiekhofer@mcguirewoods.com

Andrew F Kim on behalf of Creditor Imperial Capital Bank
kim-a@blankrome.com

Michael S Kogan on behalf of Creditor Kennedy Funding, Inc.
mkogan@ecjlaw.com

Tamar Kouyoumjian on behalf of Creditor Committee Creditors Committee
tkouyoumjian@sulmeyerlaw.com, kfox@sulmeyerlaw.com

Lewis R Landau on behalf of Creditor Committee Creditors Committee
lew@landaunet.com

Leib M Lerner on behalf of Auditor Ernst & Young LLP
leib.lerner@alston.com

Matthew A Lesnick on behalf of Stockholder Charlestown Capital Advisors, LLC
matt@lesnicklaw.com

David E Leta on behalf of Creditor FNBN-CMLCOM I LLC
dleta@swlaw.com, wsmart@swlaw.com

Katherine Lien on behalf of Interested Party Courtesy NEF
katie.lien@sbcglobal.net, katielien@gmail.com

Steven K Linkon on behalf of Creditor Chinatrust Bank (USA)
slinkon@rcolegal.com

Robert M Llewellyn on behalf of Creditor California State Board Of Equalization
michael.llewellyn@boe.ca.gov

Richard Malatt on behalf of Interested Party Courtesy NEF
rmalatt@gmail.com

Elmer D Martin on behalf of Creditor East West Bank
elmermartin@gmail.com

Elissa Miller on behalf of Interested Party Courtesy NEF
emiller@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com

Avi Muhtar on behalf of Creditor Committee Official Committee of Unsecured Creditors
amuhtar@sulmeyerlaw.com

Iain A W Nasatir on behalf of Attorney Pachulski Stang Ziehl & Jones LLP
inasatir@pszjlaw.com, jwashington@pszjlaw.com

Jeffrey P Nolan on behalf of Creditor Legendary Investors Group No. 1, LLC
jnolan@pszjlaw.com

Henry H Oh on behalf of Defendant Meruelo Maddux Properties Inc a DE Corp
henry.oh@dlapiper.com, janet.curley@dlapiper.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
548292v1

**F 9013-3.1.PROOF.SERVICE**

Lawrence Peitzman on behalf of Interested Party Courtesy NEF
lpeitzman@pwkllp.com

Eric S Pezold on behalf of Creditor BANK OF AMERICA
epezold@swlaw.com, dwlewis@swlaw.com

Christopher E Prince on behalf of Stockholder Charlestown Capital Advisors, LLC
cprince@lesnickprince.com

Michael H Raichelson on behalf of Creditor Stanford Group LP
mhr@cabkattorney.com

Dean G Rallis Jr on behalf of Attorney SulmeyerKupetz, a Professional Corporation
drallis@sulmeyerlaw.com

Kurt Ramlo on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com

Craig M Rankin - DECEASED - on behalf of Interested Party Courtesy NEF
cmr@lnbrb.com

Daniel H Reiss on behalf of Interested Party Richard Meruelo
dhr@lnbrb.com

Michael B Reynolds on behalf of Creditor FNBN-CMLCON I LLC
mreynolds@swlaw.com, kcollins@swlaw.com

Jeremy V Richards on behalf of Creditor East West Bank
jrichards@pszjlaw.com, bdassa@pszjlaw.com

James S Riley on behalf of Creditor Sierra Liquidity Fund, LLC
tgarza@sierrafunds.com

Martha E Romero on behalf of Creditor San Bernardino County Tax Collector
Romero@mromerolawfirm.com

Victor A Sahn on behalf of Creditor Committee Creditors Committee
vsahn@sulmeyerlaw.com

Steven J Schwartz on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
sschwartz@dgdk.com

Kenneth J Shaffer on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
jshaffer@stutman.com

Zev Shechtman on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
zshechtman@dgdk.com, danninggill@gmail.com

David B Shemano on behalf of Interested Party Courtesy NEF
dshemano@pwkllp.com

Jeffrey S Shinbrot on behalf of Creditor The Union Restaurant and Lounge, LLC
jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com

Stephen Shiu on behalf of Creditor FNBN-CMLCOM I LLC

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*
548292v1

**F 9013-3.1.PROOF.SERVICE**

sshiu@swlaw.com

Lori Sinanyan on behalf of Interested Party Los Angeles County Metropolitan Transportation Authority
lsinanyan@jonesday.com

Daniel H Slate on behalf of Creditor California Bank & Trust
dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com

Surjit P Soni on behalf of Creditor Legendary Investors Group No. 1, LLC
surjit@sonilaw.com, teresa@sonilaw.com

Bennett L Spiegel on behalf of Plaintiff East West Bancorp, Inc.
blspiegel@jonesday.com

Tracie L Spies on behalf of Creditor PNL Pomona, L.P.
tracie@haganlaw.org

James Stang on behalf of Creditor East West Bank
jstang@pszjlaw.com

Catherine Steege on behalf of Creditor Committee Official Committee of Equity Holders
csteege@jenner.com

Derrick Talerico on behalf of Creditor CanPartners Realty Holding Company IV, LLC
dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

John N Tedford on behalf of Attorney Danning Gill Diamond & Kollitz LLP
jtedford@dgdk.com, DanningGill@Gmail.com

Damon Thayer on behalf of Interested Party Courtesy NEF
dthayer@jenner.com

James A Timko on behalf of Interested Party Courtesy NEF
jtimko@allenmatkins.com

Alan G Tippie on behalf of Interested Party Courtesy NEF
atippie@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com;kfox@sulmeyerlaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Rouben Varozian on behalf of Creditor Vahan Chamlian
rvarozian@bzlegal.com

Jason L Weisberg on behalf of Creditor Roofcorp of CA Inc
jason@gdclawyers.com

William E Winfield on behalf of Creditor Committee Creditors Committee
wwinfield@nchc.com

Jasmin Yang on behalf of Creditor BANK OF AMERICA
jyang@swlaw.com

Aleksandra Zimonjic on behalf of Creditor CIM Urban RE Fund GP II, LLC, as Successor in Interest to Grand Avenue
Lofts, LP
azimonjic@lgbfirm.com, kmoss@lgbfirm.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

☐ Service information continued on attached page

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ***Fill in Date Document is Filed,*** I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***February 17, 2011,*** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

**Via Personal Delivery**
Hon. Victoria Kaufman, U.S. Bankruptcy Court, 21041 Burbank Blvd., Suite 354, Woodland Hills, CA  91367

**Via Email:**
Ronald S. Orr:  ronorresq@aol.com (Attorneys for Equity Committee)
Georgiana G. Rodiger:  crodiger@rodigerlaw.com (Attorneys for Equity Committee)

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 17, 2011 | Joanne B. Stern | */s/ Joanne B. Stern* |
| --- | --- | --- |
| *Date* | *Type Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.