GARY E. KLAUSNER (State Bar No. 69077)
STEPHAN M. RAY (State Bar No. 89853)
GABRIEL I. GLAZER (State Bar No. 246384)
STUTMAN, TREISTER & GLATT, P.C.
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067-6013
gklausner@stutman.com, sray@stutman.com, gglazer@stutman.com
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

Special Reorganization Counsel for Debtors and Debtors in Possession

JOHN N. TEDFORD, IV (State Bar No. 205537)
DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
Los Angeles, CA 90067-2904
JTedford@DGDK.com
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Reorganization Counsel for Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>MERUELO MADDUX PROPERTIES, INC., et al.,[1]<br><br>Debtor.<br><br>☒ Affects all Debtors<br>☐ Affects the following Debtor(s): | Case No.: 1:09-bk-13356-VK<br>Chapter 11 (Jointly Administered)<br><br>**DEBTORS' REPLY BRIEF REGARDING THE APPLICATION OF BANKRUPTCY CODE SECTION 1129(c)**<br><br><u>**Hearing Date**</u><br>Date:  February 28, 2011<br>Time:  2:00 p.m.<br>Place:  Courtroom 301<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA 91367 |

---

[1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities (the "Cases"). The affiliated case numbers are as follows: 1:09-bk-13338-VK; 1:09-bk-13358-VK through 1:09-bk-13407-VK; 1:09-bk-13434-VK; and 1:09-bk-13439-VK.

# **TABLE OF CONTENTS**

**Page(s)**

I.   PRELIMINARY STATEMENT .................................................................................. 1

II.   STATEMENT OF FACTS ........................................................................................ 3

    A.   The Undisputed Voting Results. ................................................................... 3

        1.   Creditors Voted to Reject the Charlestown Plan............................ 4

        2.   Shareholders Voted to Reject the Charlestown Plan....................... 5

    B.   Creditor and Shareholder Support For the Debtors' Plan Is Evident Both
       From the Voting Results and Pleadings Filed With the Court................................ 6

    C.   The Voting Summaries Generated By Both Charlestown and the OEC
       are Materially Misleading and Dishonest. ................................................. 7

III.   ARGUMENT ........................................................................................................ 8

    A.   The Expressed Preferences of Creditors and Shareholders Are the
       Primary Consideration Under Section 1129(c)........................................... 8

    B.   Where The Preferences of Creditors and Shareholders Are Ambiguous,
       Courts May Consider Additional Factors Under Section 1129(c)...................... 10

    C.   No Basis Exists To Ignore The Expressed Preferences Of "Insider"
       Creditors and Shareholders Under Section 1129(c).................................... 12

    D.   Charlestown Cannot Change The Expressed Preferences Of Creditors................ 14

    E.   Charlestown Cannot Change The Expressed Preferences Of
       Shareholders.......................................................................................... 18

    F.   Even if the Court Were to Consider Additional Factors Under Section
       1129(c), a Trial on the Charlestown Plan Would Be Unnecessary...................... 18

        1.   The Debtors' Plan Seeks To Keep The Interests Of Shareholders
           Intact, While The Charlestown Plan Forces A Liquidation Of
           Those Interests. .......................................................................... 18

        2.   The Debtors' Plan Offers Better Treatment To Creditors And
           Shareholders Than The Charlestown Plan.................................... 19

        3.   The Debtors' Plan Is More Feasible Than The Charlestown
           Plan. ........................................................................................... 20

    G.   A Trial On The Charlestown Plan Would Be Detrimental To The
       Estates. .................................................................................................. 21

IV.   CONCLUSION...................................................................................................... 22

# TABLE OF AUTHORITIES

**CASES**

*In re Applegate Property, Ltd.*,
  133 B.R. 827 (Bankr. W.D. Tex. 1991) .................................................................13, 14

*In re Asarco LLC*,
  420 B.R. 314 (S.D. Tex. 2009) ...........................................................................10, 11

*Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel Assocs.)*,
  165 B.R. 470 (B.A.P. 9th Cir. 1994)..........................................................................10

*In re Coram Healthcare Corp.*,
  315 B.R. 321 (Bankr. D. Del. 2004) .........................................................................10

*In re Greate Bay Hotel & Casino, Inc.*,
  251 B.R. at 245 (Bankr. D.N.J. 2000)........................................................9, 10, 16, 17

*In re Heritage Org., L.L.C.*,
  376 B.R. 783 (Bankr. N.D. Tex. 2007).......................................................................15

*In re Holley Garden Aparts., Ltd.*,
  238 B.R. 488 (Bankr. M.D. Fla. 1999) ..................................................................11, 12

*In re Hotel Assocs. of Tucson*,
  165 B.R. 470 (9th Cir. B.A.P. 1994)..........................................................................15

*In re Internet Navigator*,
  289 B.R. 128 (Bankr. N.D. Iowa 2003) ......................................................................13

*In re L & J Anaheim Assocs.*,
  995 F.2d 940 (9th Cir. 1993) ....................................................................................15

*In re La Guardia Assocs., L.P.*,
  2006 Bankr. LEXIS 4735 (Bankr. E.D. Penn. Sept. 13, 2006)...........................13, 14

*In re Oaks Partners, Ltd.*,
  141 B.R. 453 (Bankr. N.D. Ga. 1992) .......................................................................18

*In re Orchards Village Inv., LLC*,
  2010 Bankr. LEXIS 48 (Bankr. D. Or. 2010).........................................................9, 18

*In re River Valley Fitness One Ltd. P'ship*,
  2003 Bankr. LEXIS 125 (Bankr. D.N.H. Sep. 19, 2003) ...........................................10

*In re River Village Assocs.*,
  181 B.R. 795 (E.D. Pa. 1995) ...................................................................................11

*In re TCI 2 Holdings, LLC*,
    428 B.R. 117 (Bankr. D.N.J. 2010) ..................................................................9

*In re Treasure Bay Corp.*,
    212 B.R. 520 (Bankr. S.D. Miss. 1997) .........................................................10

*In re Turner Eng'g, Inc.*,
    109 B.R. 956 (Bankr. D. Mont. 1989) ...........................................................10

*In re Valley View Shopping Ctr., L.P.*,
    260 B.R. 10 (Bankr. D. Kan. 2001) ...............................................................19

**STATUTES**

11 U.S.C. § 101(2) ...........................................................................................5

11 U.S.C. § 101(31) .........................................................................................5

11 U.S.C. § 1125(b) .......................................................................................16

11 U.S.C. § 1129(a) ...................................................................2, 7, 12, 18, 21

11 U.S.C. § 1129(b) .......................................................................................19

11 U.S.C. § 1129(c) ................................................................................. *passim*

1    Meruelo Maddux Properties, Inc. ("MMPI") and 53 affiliated entities, the debtors and

2    debtors in possession (collectively the "Debtors") in the above captioned Cases,[2] hereby submit this

3    omnibus reply to the briefs filed by Charlestown [Docket No. 2796], the Official Equity Committee

4    (the "OEC") [Docket No. 2794], and the Official Committee of Unsecured Creditors (the "OCC"

5    and, together with Charlestown and the OEC, the "Charlestown Proponents") [Docket No. 2791],

6    and in support of its opening brief discussing the application of Bankruptcy Code section 1129(c) to

7    the Debtors' Plan and the Charlestown Plan (the "Debtors' Brief").

8    ## I.        PRELIMINARY STATEMENT

9    There is no question that the vast majority of all Classes of claims and equity interests

10    voted to accept the Debtors' Plan and to reject the Charlestown Plan.  Charlestown originally

11    solicited votes on its plan from 133 Classes of claims; it was rejected by 129 of those Classes.

12    Charlestown also solicited votes on two Classes of equity interests at the MMPI level; its plan was

13    rejected by the largest Class of the two.  Obviously realizing that those rejections constitute a death

14    knell for the Charlestown Plan, Charlestown is now seeking to re-engineer the actual voting,

15    portraying rejections and non-votes as acceptances of, and preferences for, the Charlestown Plan.

16    In their respective briefs, Charlestown and the OEC make various representations

17    regarding creditor and shareholder preferences that find no support in the record.  Charlestown, for

18    example, opens its brief with the patently false representation that its plan is supported by "nearly all

19    non-Insider parties with a genuine stake in the outcome of these confirmation hearings."

20    Charlestown Brief, at p. 1.  Charlestown reaches this erroneous conclusion by completely excluding

21    the votes and preferences of: (1) 10 out of 17 total secured creditors, because those creditors reached

22    a consensual resolution of the treatment of their claims with the Debtors; (2) all general unsecured

23    creditors; and (3) the majority of all shareholders.  In other words, if Charlestown ignores the votes

24    of every Class that voted to reject its plan, and focuses only on the handful of creditors and

25    shareholders that support it, the Charlestown Plan was a wild success!  The OEC takes the same

26    approach in its brief, although it goes one step further by misrepresenting that certain creditors that

---

27    [2]    All capitalized terms not defined herein shall have the meanings ascribed to them in the "Debtors' Brief In
28    Response To The Court's Tentative Ruling On Bankruptcy Code Section 1129(c)" [Docket No. 2793].

1    voted to reject the Charlestown Plan (like Oliver, Sandifer & Murphy) actually accepted it, and by

2    completely ignoring the votes of other creditors (like Pacific Commerce) altogether.

3                Charlestown's re-shuffling of the votes turns the plan solicitation process into a farce.

4    It unwinds the expressed preferences of creditors by artificially, and impermissibly, manufacturing

5    false "acceptances" of its plan.  Charlestown is doing this not only to pretend that its plan received

6    the acceptances necessary for purposes of sections 1129(a)(8) and 1129(a)(10),[3] but also to portray

7    the actual voting results less dismally for the purposes of section 1129(c).  Charlestown rejects the

8    voting process mandated under the Bankruptcy Code and advocates a result contrary to the

9    expressed will of the very creditors and shareholders whose preferences are paramount to the Court's

10   analysis under section 1129(c).

11               Though the briefs filed by the Charlestown Proponents attempt to steer the Court's

12   attention away from the fact that stakeholders' preferences are determinative in these Cases, none of

13   the case law relied upon in those briefs supports any further consideration of the Charlestown Plan

14   beyond comparing the voting results.  Indeed, the case law demonstrates that courts uniformly select

15   plans that are unambiguously supported by both creditors and shareholders when called upon to

16   consider section 1129(c).

17               In those instances where the preferences of creditors and shareholders are not as one-

18   sided as they are here, some courts consider other factors that also weigh in favor of the Debtors'

19   Plan.  The Court need not conduct a trial on the Charlestown Plan in order to reach these

20   conclusions.[4]  As just one example, there can be no legitimate dispute that the Debtors' Plan provides

21   better treatment to *all* shareholders, because it leaves their interests intact; while the Charlestown

22   Plan would force the liquidation of a majority of outstanding shares in MMPI at a price that 95% of

23   shareholders are unwilling to accept, merely because it is favored by a small group of speculators.

24

25   [3]  Among many other fatal deficiencies, the Charlestown Plan does not have an accepting impaired Class of
         Creditors at the MMPI level, as required by section 1129(a)(10).

26   [4]  Notably, the OEC concedes this point in the Introduction to its brief.  *See* OEC Brief, at 1 (stating that if
27       the Court could determine that the Debtors' Plan best satisfies the dictates of Bankruptcy Code section
         1129(c) without holding a hearing on the Charlestown Plan, "there would be no benefit to continuing the
28       confirmation hearing to consider the Charlestown Plan.").

1       The OCC's position in support of the Charlestown Plan is inexplicable.  Almost every

2   Class of unsecured creditors has voted to accept the Debtors' Plan and to reject the Charlestown

3   Plan.  Even Charlestown admits this.  If the Debtors' Plan is confirmed, the OCC's constituency will

4   be paid in full, with interest, in short order.  If, instead, the Court allows a trial with respect to the

5   Charlestown Plan, confirmation of either plan will be delayed for months, and millions of dollars in

6   additional professional fees will be incurred.  Despite having taken the position in the past that the

7   paramount goal of the OCC is to see unsecured creditors paid in full as soon as possible, the OCC is

8   inexplicably asking this Court to delay confirmation of the Debtors' Plan for months, at great cost

9   and detriment to the estates.  Yet, unsecured creditors would receive no benefit for forcing this

10  unnecessarily expensive and laborious process.  The OCC and its lawyers are clearly out of touch

11  with both the interests and wishes of the constituency they purport to represent.

12      Parties entitled to vote have submitted their ballots and the Debtors' Plan is the clear

13  preference in these Cases.  The estates do not have unlimited resources with which to entertain a

14  competing plan that has received little support from creditors and shareholders, especially where a

15  trial on the Charlestown Plan would not alter the result under section 1129(c).  The Court should,

16  therefore, confirm the Debtors' Plan without holding a wasteful and costly trial on the Charlestown

17  Plan.

18  **II.      STATEMENT OF FACTS**

19  **A.      The Undisputed Voting Results.**

20      As set forth in the Original Ballot Analysis prepared by KCC, the Debtors' Plan was

21  accepted by the vast majority of all voting creditor Classes and by the only Class of equity interests.

22  Due to recent settlements,[5] support for the Debtors' Plan has grown even larger since the Original

23  Ballot Analysis.  No party seriously disputes that the Debtors' Plan has received tremendous support

---

[5]  As explained in the Debtors' Brief, approximately 93% of all voting creditor Classes support the Debtors' Plan, including 93% of all Classes of secured claims and 94% of all Classes of general unsecured claims. Of the 54 Debtors for which the Debtors' Plan has been proposed, the Debtors' Plan has been accepted by all Classes with respect to 46 Debtors and, therefore, does not need to be crammed down in any of those 46 Cases.

from both creditors and shareholders.[6]  In contrast, the Charlestown Plan is preferred by only a small handful of individual creditors and shareholders, as detailed below.

**1.    Creditors Voted to Reject the Charlestown Plan.**

As reflected in the Original Ballot Analysis, only 4 Classes of claims, out of a total of 133 voting Classes, voted to accept the Charlestown Plan.  All other creditor Classes, totaling 129 in all, voted to reject the Charlestown Plan.  Only 1 Class of general unsecured claims, out of a total of 54 voting Classes, voted to accept the Charlestown Plan; the rest rejected it.  These numbers reflect the official tally of all timely-filed votes compiled by KCC, a neutral third-party agent appointed by the Court.

Following KCC's production of the Original Ballot Analysis, the following events occurred, or are believed to have occurred:

1.    The Court approved a settlement between the Debtors and Legendary, which resulted in Legendary's withdrawal of all of its claims against the Debtors.  As a result, Legendary's votes are no longer being counted for or against either plan.  The votes cast by the County in those Cases affected by the settlement with Legendary are also no longer being counted for or against either plan.

2.    The Court approved a settlement between the Debtors and EWB.  As a result of that agreement, EWB, which had previously rejected the Debtors' Plan, now supports it.

3.    The Debtors agreed to terms with CB&T, and CB&T, which had previously rejected the Debtors' Plan, will now support it upon modification pursuant to the parties' agreement.

4.    Charlestown alleges that it has come to terms with both CB&T and PNL, and according to Charlestown those entities will support the Charlestown Plan upon modification pursuant to the parties' agreement.

5.    The Court vacated the Debtors' settlement agreement with Cathay Bank.  Cathay Bank originally voted to accept the Debtors' Plan, but did not vote on the Charlestown Plan.  Cathay Bank has recently openly affirmed its support for the Debtors' Plan and opposed the Charlestown Plan.

Notably, none of these events have had a material positive impact on the overall

---

[6]  Rather, as discussed below, Charlestown, the OEC, and the OCC attempt to minimize the importance of the overwhelming support shown for the Debtors' Plan by claiming that Charlestown can manipulate the record to render the voting results, and the expressed preferences of stakeholders, meaningless.  Not only is most of what Charlestown proposes to do impermissible or demonstrably false, but Charlestown's arguments ignore the clear statutory language of section 1129(c).

voting results with respect to the Charlestown Plan.  Charlestown's agreements with CB&T and PNL would, at most, result in its plan being supported by two additional Classes of claims,[7] bringing the total number of Classes supporting that plan to a meager 6 out of 113 Classes.

*At no time since the Original Ballot Analysis has any Class of claims, other than CB&T and PNL, expressed any additional support for the Charlestown Plan.*  Contrary to the statements made by Charlestown and the OEC, none of the County, Oliver Sandifer & Murphy, or any Class of general unsecured claims (other than the lone Class 49C-2), has *ever* voted to accept the Charlestown Plan.  Thus, notwithstanding the contrived and fundamentally false voting summaries contained in the briefs submitted by Charlestown and the OEC, the fact remains that the Charlestown Plan was rejected by nearly all Classes of creditors entitled to vote in these Cases.

**2.    Shareholders Voted to Reject the Charlestown Plan.**

Just as the Charlestown Plan is only supported by a small handful of creditors, it is supported by a small minority of shareholders.  Charlestown solicited votes on its plan from all MMPI shareholders: 66% of voting shares rejected the Charlestown Plan; just 34% approved it.  Charlestown and its affiliates own more than 1.7 million shares in MMPI.  Stephen Taylor, the Chairman of the OEC, along with two other OEC members that invested through Mr. Taylor's funds, their relatives and affiliates (collectively, the "Postpetition Investors"), collectively control at least 18 million shares in MMPI.[8]  The Postpetition Investors purchased the vast majority of their interests in MMPI postpetition for less than 15 cents per share.[9]  Taken together, Charlestown and the Postpetition Investors, a group consisting of 4 parties and their affiliates, control more than 78% of what they call "non-insider" shares that voted for the Charlestown Plan.[10]

---

[7]    If anything, Cathay Bank's likel.

[8]    *See, e.g.,* "Debtors' Reply to Objections Filed By Charlestown, [etc.]" [Docket No. 2585].  Mr. Taylor alone controls at least 13.2 million shares.  Collectively, the Postpetition Investors own more than 20% of MMPI's stock and may be treated as "insiders" of the Debtors under the Bankruptcy Code.  *See* 11 U.S.C. §§ 101(31), 101(2).

[9]    These shareholders also purchased their interests knowing that the Debtors' founders were majority shareholders, that minority shareholders did not have the right to appoint a member to the Board of Directors, and, in most cases, at a time when MMPI stock was not traded on an exchange.

[10]    A total of approximately 75 million shares were voted on the Charlestown Plan.  Approximately 49.4 million shares were voted to reject that plan; just 25.3 million voted to accept it.  Collectively,

With the exception of Charlestown, and just 3 members of the OEC (who have made a deal with Charlestown and have been directing the OEC's staunch support for the Charlestown Plan), only 7% of all voting shares were voted to accept the Charlestown Plan.[11]  Shareholders as a whole flatly rejected Charlestown's Plan two-to-one, and Charlestown will have to cram down its plan on its largest class of shareholders.

By contrast, the Debtors' Plan was accepted by over 70% of all voting shareholders, even when counting late-filed votes against the Debtors' Plan.  Unlike the Charlestown Plan, the Debtors' Plan is consensual as to the entire Class of equity interests and does not need to be crammed down on shareholders.[12]

**B.      Creditor and Shareholder Support For the Debtors' Plan Is Evident Both From the Voting Results and Pleadings Filed With the Court.**

The Debtors' Plan has been accepted by approximately 93% of all voting Classes of claims across all Debtors and by the only Class of equity interests.  No Class rejected the Debtors' Plan in at least 46 Cases, and it will not be necessary to cram the Plan down on any Class in those Cases.

Out of 61 secured Classes across all Debtors, 57 Classes (representing secured claims totaling more than $154 million) support the Debtors' Plan.  The Debtors' Plan will need to be crammed down over the objection of just 3 individual secured creditors: Bank of America (as to two properties), PNL, and Chinatrust.  Significantly, the Debtors have been able to reach consensual resolutions of the claims held by, or otherwise received accepting votes from, all of their other secured creditors, who support the Debtors' Plan.

---

Charlestown and the Postpetition Investors control approximately 20 million shares that voted in favor of the Charlestown Plan.

[11]  Excluding Charlestown and the Postpetition Investors, just 5.5 million shares, out of a total of approximately 75 million voting shares, were voted to accept the Charlestown Plan.  A similar number of so-called non-insider shares, approximately 4.3 million, were voted to reject the Charlestown Plan.  *See* Affidavit of David Hartie [Docket No. 2321].

[12]  In Exhibit "A" to Charlestown's brief, Charlestown claims that the class of MMPI's shareholders voted to reject the Debtors' Plan after accounting for certain late-filed votes.  Charlestown Brief, Exhibit "A", n. 4.  Noticeably, Charlestown provides no mathematical basis for this conclusion.  In fact, even when those votes are included, approximately 71% of all shares voted to accept the Debtors' Plan and the Class of equity security holders has accepted the Debtors' Plan.

Secured creditors have also ardently supported and expressed a preference for the Debtors' Plan outside of the voting process. Cathay Bank, the Debtors' largest secured creditor, has expressed its support for the Debtors' Plan and opposes the Charlestown Plan.[13] Similarly, the County supports the Debtors' Plan and opposes the Charlestown Plan. *See* Docket No. 2807 (stating that "[t]he County unequivocally prefers and supports the Debtors' Plan and believes the Court should consider this preference in any analysis under section 1129 (c).").

General unsecured creditors expressed an almost unanimous preference for the Debtors' Plan, with 45 out of 48 Classes voting to accept the Debtors' Plan, and 53 out of 54 Classes voting to reject the Debtors' Plan. None of these Classes have since expressed any desire to change their votes.[14] While the OCC appears to support confirmation of the Charlestown Plan, it is clearly out of touch with its constituency. In addition to the overwhelming acceptance of the Debtors' Plan by Classes of general unsecured creditors detailed above, 5 out of 7 individual members of the OCC voted to accept the Debtors' Plan and 3 of those individuals voted to reject the Charlestown Plan.

## C.    The Voting Summaries Generated By Both Charlestown and the OEC are Materially Misleading and Dishonest.

In a blatant attempt to mislead the Court, Charlestown and the OEC each describe the voting results as favoring confirmation of the Charlestown Plan. These descriptions deliberately misrepresent the actual voting results as compiled by a neutral third party, and are based upon Charlestown's fanciful view that the Court should completely ignore the votes and preferences of the majority of all secured creditors, all general unsecured creditors, and the majority of all shareholders. Among other things, Charlestown and the OEC depict the dozens of secured claims held by the County, and that held by Oliver, Sandifer & Miller, as well as all rejecting unsecured Classes, as if

---

[13]   *See, e.g.,* "Declaration of Gregory Badura In Support of Omnibus Objection . . .", par. 24-25 [Docket No. 2731-2] (explaining that Cathay continues to approve of its treatment under the Debtors' Plan, but that Charlestown would be required to treat Cathay "as a fully secured creditor" under its plan, and "would have to pay Cathay on the effective date of its plan the full amount of the accrued and unpaid interest" on Cathay's $53 million loan, which totals more than $10 million).

[14]   Furthermore, as explained in the Debtors' Brief, MMPI's Board of Directors, including 4 outside directors, met with securities counsel and advisors to discuss the competing plans, and after comparing those plans "line by line," the Board concluded that the Debtors' Plan "is the Plan that we think has the best chance of getting people something close to their value." *See* Debtors' Brief, § III.E.

1   they were voted in favor of the Charlestown Plan, when those creditors actually oppose that plan.[15]

2   If the Court would only look past all of the rejections to its own plan, and disregard all of the

3   acceptances of the Debtors' Plan, Charlestown contends, it will find that the Charlestown Plan is

4   actually preferred by "nearly all non-Insider parties."  Try as they might, Charlestown and the OEC

5   cannot ignore or unilaterally alter the expressed preferences of creditors and shareholders, which the

6   Debtors have accurately summarized above and in the Debtors' Brief.

7                                  **III.   ARGUMENT**

8   **A.   The Expressed Preferences of Creditors and Shareholders Are the Primary
         Consideration Under Section 1129(c).**

9

10                  In the face of clear evidence that creditors and shareholders have, in fact, expressed a

11   near-unanimous preference for the Debtors' Plan, the troika of Charlestown, the OEC, and the OCC

12   have taken a seemingly coordinated, yet unsupportable, approach in an effort to marginalize and

13   bypass the voting results.  Their arguments that the Court should ignore the actual preferences of

14   stakeholders contradict the clear language of section 1129(c), as well as the case law.[16]

15                  From the clear text of the statute, section 1129(c) states that the court "shall consider

16   the preferences of creditors and equity security holders in determining which plan to confirm."

17   11 U.S.C. § 1129(c).  Nothing in the statute or the legislative history even hints that the Court's

18   inquiry should be limited to the identities or status of particular creditors or shareholders.  For

19   example, unlike section 1129(a)(10), section 1129(c) does not instruct the Court to consider

20   preferences, "without including any acceptance of the plan by any insider."  *See* 11 U.S.C. §

21   1129(a)(10) (requiring the acceptance of a plan by an impaired class of claims, excluding the votes

22   of insiders).  Moreover, nothing in section 1129(c) requires the Court to ignore the preferences of

23   [15]   The OEC also ignores the votes of some creditors, like Pacific Commerce, altogether, and fails to
24          recognize that CB&T supports the Debtors' Plan.  These "oversights" conveniently allow the OEC to
          represent that Charlestown's Plan received more support than it actually did.

25   [16]   Notwithstanding the Court's directive for the parties to assume that both plans meet the requirements for
26          confirmation for purposes of these briefs, Charlestown and the OEC each used a significant portion of
          their respective briefs to recycle numerous arguments that they have made repeatedly in opposition to
27          confirmation of the Debtors' Plan.  As the Debtors have explained in their own confirmation briefs,
          Charlestown's and the OEC's tired attacks on the Debtors' management are not supported by any
28          evidence; their attempt to repackage those arguments as being relevant to the Court's consideration under
          section 1129(c) is disingenuous.

1    creditors that are unimpaired under a plan, particularly where the votes of those creditors were

2    originally solicited by Charlestown, and unimpairment is now being used as a tool to circumvent the

3    overwhelming rejection of the Charlestown Plan by creditors.  Nor is there any statutory mandate or

4    case authority that requires courts to ignore the votes of creditors simply because they have entered

5    into settlements concerning their plan treatment.[17]

6              Eager to avoid any focus on the actual preferences of creditors and shareholders,

7    Charlestown and the OEC cite a number of cases in which courts considered factors in addition to

8    such preferences under section 1129(c).  Notably, neither Charlestown nor the OEC discuss the

9    actual facts or results of these cases, opting instead for generalities.  Why?  Because once one digs

10   beneath the "sound bites" offered by the OEC and Charlestown, one finds that these cases actually

11   support the Debtors.

12             For example, the court in *In re TCI 2 Holdings, LLC*, 428 B.R. 117 (Bankr. D.N.J.

13   2010), applied section 1129(c) to two competing plans in a large case with various creditor interests.

14   The court explained that "**[t]he most significant element in choosing between two confirmable**

15   **plans is the statutory direction to the court to 'consider the preferences of creditors and equity**

16   **security holders in determining which plan to confirm.'  The preference of creditors is**

17   **reflected in the voting results**."  *Id.* at 183-84 (emphasis added) (quoting 11 U.S.C. § 1129(c) and

18   citing *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 245 (Bankr. D.N.J. 2000)).  Thus, although

19   the court considered the fact that one plan proposed in that case provided better treatment to

20   creditors and the other was more feasible, ultimately the court's decision to confirm the debtor's plan

21   was based upon the fact that "an overwhelmingly number of creditors voted in favor of the

22   AHC/Debtor Plan and against the Beal/Icahn Plan."  *Id.* at 184.

23             The court's holding in *TCI 2 Holdings, LLC*, is entirely consistent with the clear

24   language of section 1129(c), as well as every case interpreting that section where the preferences of

25   stakeholders were manifest in the voting results.  *See, e.g., In re Orchards Village Inv., LLC*, 2010

26

27   [17]  Of course, Charlestown and the OEC simultaneously argue that the Court should ignore the votes of
         settling creditors that support the Debtors' Plan, while upholding the terms of Charlestown's own
28       settlements with Bank of America and PNL.

1   Bankr. LEXIS 48, *62 (Bankr. D. Or. 2010) ("Based on the clear terms of § 1129(c), . . . primary

2   consideration [is given] to the preferences of creditors and equity holders."); *In re River Valley*

3   *Fitness One Ltd. P'ship*, 2003 Bankr. LEXIS 125 *9 (Bankr. D.N.H. Sep. 19, 2003) (confirming

4   debtor's plan, which was accepted by 25 out of 30 creditors, over competing plan that was rejected

5   by the general unsecured class); *In re Turner Eng'g, Inc.*, 109 B.R. 956, 961 (Bankr. D. Mont. 1989)

6   (confirming plan accepted by 31 creditors over competing plan accepted by 14 creditors); *In re*

7   *Treasure Bay Corp.*, 212 B.R. 520, 548 (Bankr. S.D. Miss. 1997) (holding debtors' plan preferable to

8   competing plan, because creditors "voted overwhelmingly in favor of the debtors' plan", which was

9   accepted by 11 out of 12 voting classes, while the competing plan was rejected by all but 2 out of 16

10  impaired classes); *In re Coram Healthcare Corp.*, 315 B.R. 321 (Bankr. D. Del. 2004) (confirming

11  trustee's plan because it was heavily favored by creditors, even though shareholders preferred the

12  competing plan); *cf. Connecticut Gen. Life Ins. Co. v. Hotel Assocs. (In re Hotel Assocs.)*, 165 B.R.

13  470, 477 (B.A.P. 9th Cir. 1994) (remanding case and directing the bankruptcy court to "consider the

14  preferences of creditors and equity security holders in determining which plan to confirm").

**B.    Where The Preferences of Creditors and Shareholders Are Ambiguous, Courts
        May Consider Additional Factors Under Section 1129(c).**

17          It is only where creditor and shareholder preferences are either ambiguous or mixed

18  that courts have given meaningful weight to any other factor.  Indeed, it is not surprising that neither

19  the OEC nor Charlestown has cited a single reported case confirming a competing plan over one

20  preferred by both creditors and shareholders.  Why?  Because no such cases exist.

21          For example, in *In re Greate Bay Hotel & Casino, Inc.*, the votes of creditors on two

22  competing plans were mixed.  251 B.R. at 246 (explaining that "the voting results . . . may be

23  interpreted to favor each proponent in various ways").  Thus, in that instance the court considered

24  (1) the type of plan proposed (*i.e.*, a plan of reorganization versus a liquidating plan), (2) the

25  treatment of creditors and shareholders, and (3) the feasibility of the competing plans, in order to

26  determine which of the plans to confirm.

27          Similarly, in *In re Asarco LLC*, 420 B.R. 314, 337 (S.D. Tex. 2009), another case

28  cited by Charlestown and the OEC, the court considered these factors after concluding that creditors'

preferences were unclear.  Notably, however, the court in *Asarco* recognized that shareholders, which had proposed and supported a plan through the debtor's parent company and owner, received better treatment under the parent's plan than under the debtor's plan.  *Id.* at 338.  Specifically, the parent's plan allowed shareholders to retain their interests in, and control over the debtor, while the debtor's plan proposed to bring in a new owner that could have left existing shareholders with no value.  *Id.*  Significantly, the court did not discount the preferences of shareholders in *Asarco*, even though they had proposed the parent's plan in an effort to retain their interests and ownership over the debtor.  Rather, the court confirmed the parent's plan *precisely because* it was preferred by equity holders and provided them better treatment than the debtor's competing plan.

*In re Holley Garden Apts., Ltd.*, 238 B.R. 488, 495 (Bankr. M.D. Fla. 1999), a case relied upon heavily by Charlestown, also supports the Debtors' analysis under section 1129(c).  The court in that case found that both the plan proposed by the debtor and the one proposed by the debtor's secured creditor (Condor) were confirmable.  *Id.*  The court considered which plan to confirm by applying the four-factor test described above, but never once cited to the actual language of section 1129(c), or its directive for the court to consider the preferences of creditors and shareholders.  Still, the facts of that case made the application of section 1129(c) relatively easy.

First, the court found that the debtor's plan was preferable, because it was a plan of reorganization, while Condor's plan was a liquidating plan and provided for the debtor's property to be turned over to Condor.  *Id.* at 495.

Second, the court found that the debtor's plan was preferable, because it provided better treatment to creditors *and left equity interests intact*.  *Id.*  Condor's plan provided considerably worse treatment to creditors and would have extinguished equity interests.  *Id.* at 495-96.  Although the Court found that Condor's plan was more feasible than the debtor's plan, the debtor's plan was also found to be feasible.  *Id.*

Third, the court considered the preferences of creditors and shareholders.  Shareholders obviously favored the debtor's plan.  With respect to creditors, a total of 17 unsecured creditor claims were voted on the plans.  In addition to its own claim, Condor purchased 12 other claims and, therefore, controlled the class.  *See id.* at 492.  The court recognized that the votes

1    submitted by Condor for claims it purchased postpetition in order to sway the vote could not form a

2    credible basis upon which to find a creditor preference for its plan.

3              Thus, *Holley Garden* actually supports confirmation of the Debtors' Plan.  As

4    discussed in section III.F. below, the Debtors' Plan is the only plan that: (1) is a true reorganization

5    plan, (2) leaves shareholders' interests intact, and (3) is preferred by both shareholders and creditors.

6    Moreover, the Debtors have not purchased any claims or interests in MMPI postpetition and have

7    not attempted to artificially swing the voting results either for purposes of section 1129(a) or section

8    1129(c).  Additionally, like Condor's preferences in *Holley Garden,* the minority shareholders'

9    desires are not aligned with the preferences of equity as a whole in these Cases.

10             In sum, none of the cases cited by Charlestown or the OEC has confirmed a

11   competing plan on the losing end of such a lopsided vote.

12   **C.    No Basis Exists To Ignore The Expressed Preferences Of "Insider" Creditors
13             and Shareholders Under Section 1129(c).**

14             Although Charlestown improperly cites *Holley Garden* for the untenable position that

15   the votes of "insider" shareholders should be disregarded, no legal basis exists for the Court to

16   ignore the preferences of the Debtors' majority owners.  Indeed, the court in *Holley Garden* found

17   that the debtor's plan was preferable in that case precisely because it left the owners' equity interests

18   intact, whereas the competing plan would have extinguished those interests.  The court did not

19   disregard the voting preferences of equity holders merely because they were "insiders" of the debtor.

20   Moreover, the court's statement that "[t]he votes of unrelated creditors are an important

21   consideration, despite the overwhelming votes of related creditors in favor of their own plan," was

22   clearly based on the unique facts of that case, where the majority of claims were purchased

23   postpetition by Condor in order to control the vote.  *Id.* (citing *In re River Village Assocs.*, 181 B.R.

24   795, 807 (E.D. Pa. 1995).  Charlestown's wild extension of *Holley Garden* is not supported by the

25   facts of that case, the language of the statute, or any case law.[18]

[18]    In fact, the only case cited by the court in support of that statement also directly contradicts Charlestown's
26   position.  In *In re River Village Associates*, the debtor's secured creditor (GECC) proposed a plan that
27   unimpaired every class other than its own, such that all of those classes "were deemed to have accepted
     the GECC plan *without voting.*"  *In re River Village Associates*, 181 B.R. at 806 (emphasis added).  The
28   debtor proposed its own plan, which had the support of "all of the tenants who chose to vote . . ., but . . .

1    Each of the Charlestown Proponents also cite *In re La Guardia Assocs., L.P.*, 2006

2    Bankr. LEXIS 4735, *75 (Bankr. E.D. Penn. Sept. 13, 2006) and/or *In re Applegate Property, Ltd.*,

3    133 B.R. 827 (Bankr. W.D. Tex. 1991), in arguing that the votes of "insiders" must be ignored under

4    section 1129(c).  These arguments reflect a grave misrepresentation of those cases and the law.

5    The court in *La Guardia Associates* considered which of two competing plans to

6    confirm under section 1129(c).  The debtors in that case had coordinated with a third party to

7    purchase a number of claims postpetition, in order to swing the votes in its favor.  *Id.*  The court

8    began its inquiry by stating "[a]s the statute plainly states, it is the interests of creditors and equity

9    security holders which are the Court's paramount concern." *Id.*  The court then noted that "the

10    practice of buying claims may sometimes subvert that policy," and quoted at length from the

11    *Applegate Property* opinion, which explained:

12    When the debtor, in the context of competing plans, buys up blocking
claims in an important "swing class" consisting of such independent
13    third parties (whether directly or indirectly, as here), it is effectively
stacking the deck on the Section 1129(c) issue, undercutting the ability
14    of the court to properly "consider the preferences of creditors" as
directed by the statute.
15

16    *Id.* (quoting *In re Applegate Property, Ltd.*, 133 B.R. 827).

17    As discussed above, neither the Debtors, nor any of their principals have purchased

18    claims or interests postpetition in order to swing a class vote, or to prejudice the Court's inquiry

19

20    the GECC vote in the unsecured and secured creditor classes resulted in a rejection of the Debtor's plan
by those creditor classes." *Id.*  The court confirmed the GECC plan over the debtor's plan,
21    notwithstanding the fact that GECC, the plan proponent, controlled the creditor classes and that unrelated
creditors voted in favor of the debtor's plan. *Id.*  In light of the ambiguity surrounding the voting
22    outcome, however, the court's decision turned primarily on the fact that GECC's plan provided "superior
treatment [to] all creditors and possibly even the Debtor's interest holders" and was "far more feasible
23    than the Debtor's plan." *Id.* at 807.  Thus, *In re River Village Associates* does not support Charlestown's
argument that the preferences of insiders are to be ignored for purposes of section 1129(c) and any
24    suggestion to the contrary is unfounded.

25    *In re Internet Navigator*, 289 B.R. 128 (Bankr. N.D. Iowa 2003), a case cited by Charlestown, is similar.
The debtor in that case proposed a plan that provided less than full payment to creditors, with payments
26    over 5 years.  The debtor's plan was supported by 2 creditors, but was rejected by OLS, the debtor's
largest creditor and the proponent of a competing plan.  The court found that the preferences of creditors
27    in that case were "skewed" by the fact that OLS controlled the majority of the vote.  Additionally, the
plan proposed by OLS would pay all creditors in full, immediately, and was found to be more feasible and
28    to provide better treatment to creditors.  For these reasons, the court confirmed the OLS plan.  This case
cannot be compared to the present Cases, in which creditors would be paid in full under both plans.

1  under section 1129(c).  Charlestown and the OEC merely assert (without providing any support) that

2  the Court should ignore the votes of the Debtors' founders because they are insiders of the Debtors.

3  Why?  Because otherwise Charlestown would be forced to admit that the majority of shareholders

4  flatly rejected its plan.

5         The Debtors' founders and officers acquired their interests in MMPI years ago, at the

6  time MMPI became a publicly traded company.  As holders of MMPI common stock, the Debtors'

7  officers possess the same legal rights under state law as every other shareholder.  The mere fact that

8  a shareholder is also an officer of a company does not provide any legal basis to strip such holders of

9  their interests, or to discount their preferences in bankruptcy.  Tellingly, none of the Charlestown

10  Proponents cite any authority to support a finding to the contrary.  Ironically, the Postpetition

11  Investors purchased the majority of their interests *postpetition* and have engaged in precisely the

12  conduct that the courts in *La Guardia Associates* and *Applegate Property* warned of.  If anything,

13  those cases suggest that the preferences of the Postpetition Investors should be ignored for purposes

14  of section 1129(c), because most of their shares were purchased postpetition.

15         In sum, neither the plain language of section 1129(c), nor any case cited to the Court,

16  supports the nullification of the preferences of "insider" shareholders under section 1129(c).

17  Moreover, to do so here would be grossly inequitable.  The "insider" shareholders that Charlestown

18  seeks to disenfranchise founded, and invested tens of millions of dollars into the Debtors' businesses

19  prepetition.  Meanwhile, the handful of shareholders supporting the Charlestown Plan bought their

20  interests postpetition, for pennies per share.  No legal or equitable basis exists for elevating the

21  preferences of these few post-bankruptcy speculators over those held by shareholders as a whole.

22  **D.     Charlestown Cannot Change The Expressed Preferences Of Creditors.**

23         The Charlestown Proponents do not dispute the fact that creditors voted to accept the

24  Debtors' Plan and to reject the Charlestown Plan.  Rather, Charlestown and the OEC argue that the

25  Court should ignore those votes because (1) *Charlestown* believes that its plan offers creditors

26  treatment that is similar to that provided by the Debtors' Plan, even though almost every Class of

27  claims voted to reject the treatment provided by the Charlestown Plan, (2) most rejecting Classes

28  could be "unimpaired," and their voting preferences, therefore, belatedly discarded, and (3)

1    Charlestown claims it can step into the Debtors' shoes with respect to certain settlement agreements,

2    such as one with the County, and thereby assume the benefit of creditor votes to accept the Debtors'

3    Plan. Even if some legal basis existed to support any of these arguments, and there is not, they do

4    nothing to change the known *preferences* of creditors. As recently expressed by the County in a

5    joinder to the Debtors' Brief, Charlestown has no right to tell creditors what their preferences are,

6    especially where the creditors have voted and clearly expressed contrary preferences. *See* Docket

7    No. 2807 (stating that "Section 1129(c) requires the Court to consider the preferences of creditors.

8    The County unequivocally prefers and supports the Debtors' Plan and believes the Court should

9    consider this preference in any analysis under section 1129(c).").

10          The Bankruptcy Code provides a process for plans to be proposed and for interested

11   parties to vote in accordance with their preferences. The arguments of Charlestown and the OEC

12   reduce the plan solicitation process to a complete sham. Charlestown solicited votes on its plan for

13   133 Classes of claims and all shareholders. Charlestown and the OEC are obviously dissatisfied

14   with the voting results (rejections from 129 Classes of claims and 66% of equity). But

15   dissatisfaction with those actual results does not give Charlestown the right to ignore the votes or to

16   focus the Court's attention only on the few individual creditors and shareholders that prefer its plan.

17          Charlestown and the OEC argue that they can change the fact that approximately 95%

18   of all voting Classes of claims rejected the Charlestown Plan. They also argue that creditors'

19   preferences cannot reasonably be inferred from the voting results, because Charlestown will

20   "nullify" those votes by unimpairing them.[19] These arguments miss the point. As explained above,

21   Congress did not instruct courts to ignore the votes of unimpaired classes, or to simply count the

22   number of classes a plan proponent can unimpair after those classes voted to reject a plan. It also did

23   not instruct courts to disregard the expressed preferences of creditors where the treatment under

24   competing plans appears similar. It is for creditors and shareholders to decide for themselves

25   through the voting process which plan they prefer. Congress has instructed that these preferences be

---

[19]   The OEC's attempt to minimize the importance of the votes of Classes of general unsecured creditors by
       arguing that the Debtors "artificially impaired" those Classes is legally untenable. Courts in the Ninth
       Circuit have rejected the notion of artificial impairment. *See In re Hotel Assocs. of Tucson*, 165 B.R. 470,
       475 (9th Cir. B.A.P. 1994) (citing *In re L & J Anaheim Associates*, 995 F.2d 940, 942 (9th Cir. 1993)).

1    respected, not disregarded.

2              Further, the fact that the Debtors reached consensual settlement agreements with the

3    majority of their secured creditors (both before *and after* Charlestown's Plan was proposed), and that

4    those creditors voted to accept the Debtors' Plan, does not provide a basis for the Court to disregard

5    their preferences.  These creditors negotiated at arms-length and came to terms with *the Debtors*

6    with respect to the treatment of their claims, because, *inter alia,* they have confidence in the Debtors'

7    ability to repay their debts and to protect their collateral.  Nearly all of these creditors also voted to

8    reject the Charlestown Plan because, among other reasons, they have no faith in Charlestown's

9    ability to manage the Debtors' valuable assets.[20]  Charlestown cannot dismiss the fact that a majority

10    of secured creditors do not want to deal with Charlestown in the future, simply because Charlestown

11    believes that its plan provides similar treatment.

12              To support its position that creditors voting in accordance with what Charlestown

13    calls "lock-up" agreements should not be counted for purposes of section 1129(c), Charlestown cites

14    only a law review article discussing two unreported Delaware cases that interpreted section 1125(b)

15    and the *Greate Bay Hotel & Casino* case.  Charlestown Brief, at 13-14.  The law review article cited

16    by Charlestown is irrelevant in that it does not even discuss section 1129(c), and the unreported

17    decisions discussed therein have been criticized by courts and commentators as reading section

18    1125(b) too narrowly, and discouraging negotiations between debtors and creditors.  *See, e.g., In re*

19    *Heritage Org., L.L.C.*, 376 B.R. 783, 792 (Bankr. N.D. Tex. 2007).[21]

20

21    [20]   *See generally* "Declaration of Gregory Badura In Support of Omnibus Objection . . .", par. 4, 15 [Docket
       No. 2731-2] (explaining that "factors in loan underwriting include knowing who the borrower is, who is
22      in management control of the borrower, and who is in control of the collateral, and having confidence in
       those individuals."); *see also* County's Joinder in support of the Debtors' Brief [Docket No. 2807]
23      (explaining that the County supports and prefers the Debtors' Plan and objects to Charlestown's attempt to
       assume the benefit of the County's settlement agreement under the Charlestown Plan).

24    [21]   Interpreting the term "solicitation" narrowly for purposes of section 1125(b), that court upheld the terms
       of a postpetition settlement and noted:
25
              courts considering whether or not settlement discussions between debtors (or trustees)
26            and creditors have crossed the line from negotiation to solicitation have carefully
              preserved the right to negotiate and have not found impermissible solicitation where it
27            was clear that arm's length negotiations, in fact, had occurred, even where the creditor
              agreed to support the debtor's plan . . . as consideration for the agreed treatment of the
28            creditor's claim under the debtor's to-be-filed plan.

1    Further, Charlestown's quote from the *Greate Bay* case comes in the context of the

2    court's consideration of the preferences of a class that had voted to accept one plan over another by a

3    slim margin (55%). *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. at 246. In determining

4    whether the "preference" of that class was persuasive for purposes of section 1129(c), the court

5    mentioned that one of the members of the class was bound to accept the plan and, without citing any

6    authority, stated that the creditor's vote "did not necessarily reflect on which plan provides better

7    treatment for the creditors." *Id.* The circumstances in that case are a far cry from those here. The

8    votes in *Greate Bay* were almost equally divided between two plans, whereas the votes here are one-

9    sided in favor of the Debtors' Plan. Moreover, where a secured creditor occupies a class by itself,

10    the Court cannot assume that its vote reflects anything other than its preference for one plan over

11    another.

12    At most, Charlestown has reached settlement agreements with just 3 secured creditors

13    (Bank of America, PNL and CB&T), one of which has also settled with the Debtors.[22] Only one

14    other secured creditor (Kennedy Funding) actually voted to accept Charlestown's Plan; that creditor

15    also voted to accept the Debtors' Plan. In sum, Bank of America and PNL are the only secured

16    creditors that support the Charlestown Plan and do not support the Debtors' Plan. By contrast, 12 out

17    of 17 individual secured creditors support only the Debtors' Plan. Together with Kennedy Funding

18    and CB&T, 14 out of 17 secured creditors voted to accept the Debtors' Plan. There can be no doubt

19    that the vast majority of secured creditors prefer the Debtors' Plan.

20    Similarly, Charlestown and the OEC argue that the expressed preferences of general

21    unsecured creditors should be ignored because Charlestown can simply unimpair those Classes, and

22    thereby generate "deemed acceptances" of its plan. These creditors have already voted, however,

23    and they voted to reject the Charlestown Plan. Nothing in section 1129(c) restricts "creditors" to

24    ─────────────

25    *Id.* (quoting Robert J. Keach, A Hole in the Glove: Why 'Negotiation' Should Trump 'Solicitation', 22-5 ABIJ 22 (June 2003).

26    [22]    Notably, the Debtors do not argue that the Court should ignore the preferences of those creditors; for example, that Bank of America supports Charlestown's Plan is indicative of the preference of that one

27    creditor. However, there is no basis to give weight to the preferences of Bank of America and PNL, the only secured creditors that voted to accept the Charlestown Plan and to reject the Debtors' Plan, while

28    ignoring the preferences of the vast majority of secured creditors that voted in favor of the Debtors' Plan.

1  those in impaired classes.  Moreover, until Charlestown discovered that nearly all of those voting

2  creditors opposed its plan, the Classes were impaired.  As the OEC recognizes in its brief, the

3  unimpairment of general unsecured creditors will not result in "any material difference change in

4  the[ir] treatment" under the Charlestown Plan.  OEC Brief, at 3, lines 24-25.  That Charlestown may

5  try to unimpair those Classes in order to force deemed acceptances of its plan for purposes of section

6  1129(a) does not change the fact that those creditors already rejected the Charlestown Plan when it

7  provided substantially the same treatment.  The preference of unsecured creditors is known and it is

8  that preference that is relevant to the Court's inquiry under section 1129(c).

9  **E.      Charlestown Cannot Change The Expressed Preferences Of Shareholders.**

10            No party denies the fact that 66% of all voting shareholders rejected the Charlestown

11  Plan.  Instead, Charlestown and the OEC argue that the Court should disregard the votes of

12  "insiders" for purposes of section 1129(c).  This is another way of Charlestown saying that only the

13  votes it likes should count.  As set forth in section III.C., above, no authority supports this position.

14  Inasmuch as shareholders have clearly voted to accept the Debtors' Plan and to reject the

15  Charlestown Plan, the Court should uphold those preferences under section 1129(c).

16  **F.      Even if the Court Were to Consider Additional Factors Under Section 1129(c), a
17           Trial on the Charlestown Plan Would Be Unnecessary.**

18            Although it is unnecessary to look beyond the voting results, even if the Court were to

19  consider additional factors for purposes of its section 1129(c) analysis, it can do so by considering

20  the evidence presently before the Court.  As set forth below, the evidence plainly demonstrates that

21  each of the factors considered under section 1129(c) favor confirmation of the Debtors' Plan.

22           **1.      The Debtors' Plan Seeks To Keep The Interests Of Shareholders Intact,
23                    While The Charlestown Plan Forces A Liquidation Of Those Interests.**

24            Courts have consistently found that, for purposes of section 1129(c), a reorganization

25  plan is preferable to a liquidating plan.  *See, e.g., In re Orchards Village Investments, LLC*, 2010

26  Bankr. LEXIS 48, *21 (Bankr. D. Or. 2010) ("The courts have stated in numerous contexts that

27  reorganization is preferable to liquidation and the philosophy of the Bankruptcy Code is to preserve

28  economic units.") (quoting *In re Oaks Partners, Ltd.*, 141 B.R. 453, 465 (Bankr. N.D. Ga. 1992)).

As the court in *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 41 (Bankr. D. Kan. 2001), explained: "Although not the exclusive factor in determining which competing plan to confirm, the type of plan is a key component.  A reorganization plan is usually preferable to a liquidation plan.  The policy of Chapter 11 is to successfully rehabilitate the debtor."  The court in *Valley View* confirmed a plan of reorganization proposed by the debtor, which allowed equity security holders to keep their interests, over a competing plan of liquidation that would have resulted "in a devastating tax obligation to the equity security holders."  *Id.* at 40-41.

Unlike the Debtors' Plan, the Charlestown Plan essentially forces the liquidation of the majority of shares in MMPI against the will of that majority.  Thus, the Charlestown Plan is, in substance, a plan to involuntarily liquidate most of the interests of existing shareholders for the benefit of a new unwanted investor.[23]  Much like the case in *Valley View*, the Charlestown Plan would be "devastating" to existing equity holders by divesting them of their interests, while the Debtors' Plan would leave those holders' interests intact.  This factor, therefore, weighs decidedly in favor of confirmation of the Debtors' Plan.

## 2.      The Debtors' Plan Offers Better Treatment To Creditors And Shareholders Than The Charlestown Plan.

As explained in the Debtors' Brief, the Debtors' Plan offers better treatment to shareholders than does the Charlestown Plan.[24]  Charlestown and the OEC argue that Charlestown's Plan actually provides better treatment to shareholders, even though they do not dispute that the Charlestown Plan will force shareholders to sell a majority of their interests against their will, at a price that 95% of them have already rejected.  Contrary to the picture painted by Charlestown, the forced liquidation of stock at 35¢ per share under its plan does not provide better treatment than the Debtors' Plan, which allows all shareholders to retain their interests, but gave shareholders the *option*

---

[23]    Indeed, as pointed out in prior pleadings, cramming down shareholders and forcing them to sell their stock at 35¢ is neither fair nor equitable under section 1129(b).  *See, e.g.,* Debtors' Opposition to the Charlestown Plan [Docket No. 2525].

[24]    As described in the Debtors' Brief, the Debtors' Plan also offers better treatment to creditors.  Though facially Charlestown proposes similar treatment to creditors under its plan, creditors voted for the Debtors' Plan because they have confidence in the Debtors' ability to pay their debts and to manage creditors' collateral following confirmation.

to *voluntarily* redeem their shares for 25¢ per share.  Relatively few shareholders elected to sell their shares under either plan; the difference between the plans is that Charlestown *requires* shareholders to part with a majority of their holdings against their will.

The OEC admits in its brief that the Postpetition Investors' staunch support of the Charlestown Plan is driven by a common desire to create a public market for their MMPI stock, which they hope would allow those investors to unload their holdings at a profit.  *See* OEC Brief, p. 9.[25]  In order to facilitate this goal, they have made a deal with Charlestown, pursuant to which Mr. Taylor would become a member of the Board.  Any benefit obtained by these "non-insider" speculator shareholders, through increased control over the Board or the possibility of selling their holdings on a public exchange, is far outweighed by the harm to all existing shareholders by the forfeiture of their interests under the Charlestown Plan.  Thus, that plan provides objectively worse treatment for existing shareholders as a whole.

### 3.    The Debtors' Plan Is More Feasible Than The Charlestown Plan.

As set forth in the Debtors' Brief, the Debtors have presented undisputed evidence that their plan is feasible.  Evidence has also been presented from which the Court may find that the Charlestown Plan is not feasible.  The Court has asked the parties to assume that both plans meet all requirements for confirmation, however, and for purposes of this brief the Debtors will not address this factor.[26]  What is clear, however, is that the Court need not determine whether the Charlestown Plan is just as feasible as the Debtors' Plan or less so for purposes of its analysis under section 1129(c).  At most, a trial on the Charlestown Plan might reveal that the Charlestown Plan is also

[25]    The OEC neglects to mention that MMPI stock has been actively traded postpetition, even though MMPI is no longer listed on a public exchange.  In fact, the Postpetition Investors purchased the majority of their holdings *after* MMPI was de-listed from a public exchange.

[26]    Charlestown's argument that its plan is more feasible than the Debtors' ignores the Court's directive and is false, in any event.  Among other things, Charlestown argues that: (1) the Debtors will receive an additional $6 million under its plan, but ignores the fact that those amounts would be more than consumed by additional obligations owing to the County and other parties on the Effective Date, (2) its plan preserves claims against insiders, but fails to state that any such claims would also be preserved under the Debtors' Plan and that no evidence of such claims exists in any event, (3) Charlestown will engage "professional" and "independent" management, but Charlestown has failed to produce any material information regarding the qualifications of its alleged management team, and (4) its projections are more feasible than the Debtors', but fails to disclose that its plan assumes an unrealistic timetable for the sale of properties.  Charlestown's unfounded allegations are, therefore, unhelpful to the Court's inquiry under section 1129(c).

feasible – it would not weigh in favor of confirming the Charlestown Plan.

**G.    A Trial On The Charlestown Plan Would Be Detrimental To The Estates.**

In its brief, the OCC, which was formed to represent the interests of the Debtors' unsecured creditors, argues that the Court should conduct a trial on the Charlestown Plan, rather than terminate further proceedings on the Charlestown Plan if the Court finds that the Debtors' Plan is confirmable.  The OCC does not argue that unsecured creditors prefer the Charlestown Plan because, in fact, 53 out of 54 Classes of unsecured creditors voted to reject that plan.  The OCC also does not argue that unsecured creditors would receive better treatment under the Charlestown Plan because, as all parties agree, unsecured creditors would receive substantially the same treatment under both plans.  The OCC's support of Charlestown shows a reckless disregard for the expressed will and interests of its own constituency, and a careless indifference for the massive delay and expense that would accompany a trial on the Charlestown Plan.  One wonders how the OCC justifies this position when: (1) its constituency overwhelmingly voted against the Charlestown Plan, and (2) holding a trial on the Charlestown Plan would delay the full payment to unsecured creditors without providing any countervailing benefit.

Among other things, confirmation of the Charlestown Plan would require the Court to resolve disputes concerning the following:

- Charlestown's failure to satisfy the requirements of section 1129(a)(10);
- Charlestown's need to cram its plan down on nearly every Class of claims, as well as a Class of equity interests, over multiple objections;
- Charlestown's alleged ability to benefit from various settlement agreements between the Debtors and third parties, over those parties' objections;
- Charlestown's inability to fund its statutory obligations to the County and other creditors;
- A lack of evidence supporting Charlestown's ability to fund its plan;
- A lack of evidence supporting Charlestown's ability to manage and operate the Debtors' businesses;
- A lack of evidence supporting Charlestown's valuation of the Debtors' equity, and the forced liquidation of the majority of interests at less than fair value; and

- The Charlestown Plan's failure to satisfy a number of additional requirements for confirmation under sections 1129(a) and (b), as more fully set forth in the Debtors' Opposition to the Charlestown Plan.[27]

Any trial on these issues would undoubtedly take months and deprive the estates of millions of dollars.  Yet, in the end, unsecured creditors would not receive any additional benefit under the Charlestown Plan.

### IV.    CONCLUSION

For all the reasons set forth above and in the Debtors' Brief, no reason exists to ignore the expressed preferences of creditors and shareholders in these Cases.  Taking those preferences into consideration, as the Court is required to do under section 1129(c), the Charlestown Plan could not be confirmed over the Debtors' Plan.

Dated:  February 22, 2011                    Respectfully submitted,


                                             */s/ Gabriel Glazer*
                                             GARY E. KLAUSNER, STEPHAN M. RAY, and
                                             GABRIEL GLAZER
                                             Members of STUTMAN, TREISTER & GLATT, P.C.
                                             Special Reorganization Counsel for Debtors and
                                             Debtors in Possession

---

[27]    *See* [Docket No. 2523].

| In re:  MERUELO MADDUX PROPERTIES, INC. | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1901 Avenue of the Stars, 12th Floor, Los Angeles, CA  90067.

A true and correct copy of the following document described as; "**DEBTORS' REPLY BRIEF REGARDING THE APPLICATION OF BANKRUPTCY CODE SECTION 1129(c)**" will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")</u>** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **February 22, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Michael C Abel on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
mca@dgdk.com

Robert Abiri on behalf of Interested Party Courtesy NEF
rabiri@abiriszeto.com

Allison R Axenrod on behalf of Creditor Claims Recovery Group LLC
allison@claimsrecoveryllc.com

Christopher J Bagnaschi on behalf of Defendant Richard Meruelo
cb@cjblaw.com

John J Bingham on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
jbingham@dgdk.com

William C Bollard on behalf of Creditor Victory Outreach La Puente, Inc.
eal@jbblaw.com, kmg@jbblaw.com;dritchie@jbblaw.com;william@jbblaw.com

Peter Bonfante on behalf of Interested Party Courtesy NEF
peterbonfante@bsalawfirm.com

Julia W Brand on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
JBrand@bhfs.com

Jennifer L Braun on behalf of U.S. Trustee United States Trustee (SV)
jennifer.l.braun@usdoj.gov

Martin J Brill on behalf of Interested Party Courtesy NEF
mjb@lnbrb.com

Andrew W Caine on behalf of Creditor Legendary Investors Group No. 1, LLC
acaine@pszyjw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                     **F 9013-3.1.PROOF.SERVICE**

548351v1

| In re:  MERUELO MADDUX PROPERTIES, INC. | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Howard Camhi on behalf of Creditor Kennedy Funding, Inc.
hcamhi@ecjlaw.com

Gary O Caris on behalf of Interested Party EDI Architecture
gcaris@mckennalong.com, pcoates@mckennalong.com

James E Carlberg on behalf of Creditor Woodland Farms, Inc.
jcarlberg@boselaw.com

Sara Chenetz on behalf of Creditor Imperial Capital Bank
chenetz@blankrome.com, chang@blankrome.com

Jacquelyn H Choi on behalf of Interested Party Courtesy NEF
jchoi@swjlaw.com

Carol Chow on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
CChow@Stutman.com

Cynthia M Cohen on behalf of Interested Party Courtesy NEF
cynthiacohen@paulhastings.com

Ronald R Cohn on behalf of Creditor Pacific Commerce Bank
rcohn@horganrosen.com

Enid M Colson on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
emc@dgdk.com, ecolson@dgdk.com

Michaeline H Correa on behalf of Interested Party Los Angeles County Metropolitan Transportation Authority
mcorrea@jonesday.com

Emily R Culler on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
eculler@stutman.com

Ana Damonte on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank Minnesota,
National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc., etc
ana.damonte@pillsburylaw.com

Brian L Davidoff on behalf of Creditor Yoshiake Murakami
bdavidoff@rutterhobbs.com, calendar@rutterhobbs.com;jreinglass@rutterhobbs.com

Susan S Davis on behalf of Creditor Cox, Castle & Nicholson LLP
sdavis@coxcastle.com

Aaron De Leest on behalf of Debtor Merco Group - 2040 Camfield Avenue, LLC, a DE LLC
aed@dgdk.com

Daniel Denny on behalf of Interested Party Courtesy NEF
ddenny@gibsondunn.com

Jeffrey W Dulberg on behalf of Creditor Legendary Investors Group No. 1, LLC
jdulberg@pszjlaw.com

Marina Fineman on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
mfineman@stutman.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                    **F 9013-3.1.PROOF.SERVICE**

548351v1

| In re:  MERUELO MADDUX PROPERTIES, INC. | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Michael G Fletcher on behalf of Creditor Cathay Bank
mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com
Barry V Freeman on behalf of Interested Party Courtesy NEF
bvf@jmbm.com, bvf@jmbm.com

Donald L Gaffney on behalf of Creditor BANK OF AMERICA
dgaffney@swlaw.com

Thomas M Geher on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank
Minnesota, National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage
Securities, Inc., etc
tmg@jmbm.com

Bernard R Given on behalf of Creditor Cathay Bank
bgiven@frandzel.com, efiling@frandzel.com;shom@frandzel.com;bgiven@frandzel.com

Barry S Glaser on behalf of Creditor County of Los Angeles Tax Collector
bglaser@swjlaw.com

Gabriel I Glazer on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
gglazer@stutman.com

Matthew A Gold on behalf of Creditor Argo Partners
courts@argopartners.net

Eric D Goldberg on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
egoldberg@stutman.com

Michael J Gomez on behalf of Creditor Cathay Bank
mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com

Michael I Gottfried on behalf of Interested Party Courtesy NEF
mgottfried@lgbfirm.com, msaldana@lgbfirm.com

John A Graham on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank Minnesota,
National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc.
jag@jmbm.com

Ofer M Grossman on behalf of Interested Party Courtesy NEF
omglaw@gmail.com

Jodie M Grotins on behalf of Interested Party Courtesy NEF
jgrotins@mcguirewoods.com

Peter J Gurfein on behalf of Creditor CIM Urban RE Fund GP II, LLC, as Successor in Interest to Grand Avenue Lofts, LP
pgurfein@lgbfirm.com

Cara J Hagan on behalf of Creditor PNL Pomona, L.P.
carahagan@haganlaw.org

Asa S Hami on behalf of Creditor Committee Creditors Committee
ahami@sulmeyerlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                          **F 9013-3.1.PROOF.SERVICE**

548351v1

| In re:  MERUELO MADDUX PROPERTIES, INC. | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Brian T Harvey on behalf of Creditor California Bank & Trust
bharvey@buchalter.com, IFS_filing@buchalter.com

Robert A Hessling on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
rhessling@dgdk.com

William W Huckins on behalf of Interested Party Courtesy NEF
whuckins@allenmatkins.com, clynch@allenmatkins.com

Lance N Jurich on behalf of Creditor CanPartners Realty Holding Company IV, LLC
ljurich@loeb.com, kpresson@loeb.com

William H. Kiekhofer on behalf of Creditor Esmark, Inc.
wkiekhofer@mcguirewoods.com

Andrew F Kim on behalf of Creditor Imperial Capital Bank
kim-a@blankrome.com

Michael S Kogan on behalf of Creditor Kennedy Funding, Inc.
mkogan@ecjlaw.com

Tamar Kouyoumjian on behalf of Creditor Committee Creditors Committee
tkouyoumjian@sulmeyerlaw.com, kfox@sulmeyerlaw.com

Lewis R Landau on behalf of Creditor Committee Creditors Committee
lew@landaunet.com

Leib M Lerner on behalf of Auditor Ernst & Young LLP
leib.lerner@alston.com

Matthew A Lesnick on behalf of Stockholder Charlestown Capital Advisors, LLC
matt@lesnicklaw.com

David E Leta on behalf of Creditor FNBN-CMLCOM I LLC
dleta@swlaw.com, wsmart@swlaw.com

Katherine Lien on behalf of Interested Party Courtesy NEF
katie.lien@sbcglobal.net, katielien@gmail.com

Steven K Linkon on behalf of Creditor Chinatrust Bank (USA)
slinkon@rcolegal.com

Robert M Llewellyn on behalf of Creditor California State Board Of Equalization
michael.llewellyn@boe.ca.gov

Richard Malatt on behalf of Interested Party Courtesy NEF
rmalatt@gmail.com

Elmer D Martin on behalf of Creditor East West Bank
elmermartin@gmail.com

Elissa Miller on behalf of Interested Party Courtesy NEF
emiller@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                 **F 9013-3.1.PROOF.SERVICE**

548351v1

| In re:  MERUELO MADDUX PROPERTIES, INC. | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Avi Muhtar on behalf of Creditor Committee Official Committee of Unsecured Creditors
amuhtar@sulmeyerlaw.com

Iain A W Nasatir on behalf of Attorney Pachulski Stang Ziehl & Jones LLP
inasatir@pszjlaw.com, jwashington@pszjlaw.com

Jeffrey P Nolan on behalf of Creditor Legendary Investors Group No. 1, LLC
jnolan@pszjlaw.com

Henry H Oh on behalf of Defendant Meruelo Maddux Properties Inc a DE Corp
henry.oh@dlapiper.com, janet.curley@dlapiper.com

Lawrence Peitzman on behalf of Interested Party Courtesy NEF
lpeitzman@pwkllp.com

Eric S Pezold on behalf of Creditor BANK OF AMERICA
epezold@swlaw.com, dwlewis@swlaw.com

Christopher E Prince on behalf of Stockholder Charlestown Capital Advisors, LLC
cprince@lesnickprince.com

Michael H Raichelson on behalf of Creditor Stanford Group LP
mhr@cabkattorney.com

Dean G Rallis Jr on behalf of Attorney SulmeyerKupetz, a Professional Corporation
drallis@sulmeyerlaw.com

Kurt Ramlo on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com

Craig M Rankin - DECEASED - on behalf of Interested Party Courtesy NEF
cmr@lnbrb.com

Daniel H Reiss on behalf of Interested Party Richard Meruelo
dhr@lnbrb.com

Michael B Reynolds on behalf of Creditor FNBN-CMLCON I LLC
mreynolds@swlaw.com, kcollins@swlaw.com

Jeremy V Richards on behalf of Creditor East West Bank
jrichards@pszjlaw.com, bdassa@pszjlaw.com

James S Riley on behalf of Creditor Sierra Liquidity Fund, LLC
tgarza@sierrafunds.com

Martha E Romero on behalf of Creditor San Bernardino County Tax Collector
Romero@mromerolawfirm.com

Victor A Sahn on behalf of Creditor Committee Creditors Committee
vsahn@sulmeyerlaw.com

Steven J Schwartz on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
sschwartz@dgdk.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                **F 9013-3.1.PROOF.SERVICE**

548351v1

| In re:  MERUELO MADDUX PROPERTIES, INC. | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Kenneth J Shaffer on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
jshaffer@stutman.com

Zev Shechtman on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
zshechtman@dgdk.com, danninggill@gmail.com

David B Shemano on behalf of Interested Party Courtesy NEF
dshemano@pwkllp.com

Jeffrey S Shinbrot on behalf of Creditor The Union Restaurant and Lounge, LLC
jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com

Stephen Shiu on behalf of Creditor FNBN-CMLCOM I LLC
sshiu@swlaw.com

Lori Sinanyan on behalf of Interested Party Los Angeles County Metropolitan Transportation Authority
lsinanyan@jonesday.com

Daniel H Slate on behalf of Creditor California Bank & Trust
dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com

Surjit P Soni on behalf of Creditor Legendary Investors Group No. 1, LLC
surjit@sonilaw.com, teresa@sonilaw.com

Bennett L Spiegel on behalf of Plaintiff East West Bancorp, Inc.
blspiegel@jonesday.com

Tracie L Spies on behalf of Creditor PNL Pomona, L.P.
tracie@haganlaw.org

James Stang on behalf of Creditor East West Bank
jstang@pszjlaw.com

Catherine Steege on behalf of Creditor Committee Official Committee of Equity Holders
csteege@jenner.com

Derrick Talerico on behalf of Creditor CanPartners Realty Holding Company IV, LLC
dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

John N Tedford on behalf of Attorney Danning Gill Diamond & Kollitz LLP
jtedford@dgdk.com, DanningGill@Gmail.com

Damon Thayer on behalf of Interested Party Courtesy NEF
dthayer@jenner.com

James A Timko on behalf of Interested Party Courtesy NEF
jtimko@allenmatkins.com

Alan G Tippie on behalf of Interested Party Courtesy NEF
atippie@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com;kfox@sulmeyerlaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                      **F 9013-3.1.PROOF.SERVICE**

548351v1

| In re:  MERUELO MADDUX PROPERTIES, INC. | CHAPTER  11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Rouben Varozian on behalf of Creditor Vahan Chamlian
rvarozian@bzlegal.com

Jason L Weisberg on behalf of Creditor Roofcorp of CA Inc
jason@gdclawyers.com

William E Winfield on behalf of Creditor Committee Creditors Committee
wwinfield@nchc.com

Jasmin Yang on behalf of Creditor BANK OF AMERICA
jyang@swlaw.com

Aleksandra Zimonjic on behalf of Creditor CIM Urban RE Fund GP II, LLC, as Successor in Interest to Grand Avenue
Lofts, LP
azimonjic@lgbfirm.com, kmoss@lgbfirm.com

**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On **February 22, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**Via U.S. Mail**

Honorable Victoria S. Kaufman, U.S. Bankruptcy Court, Courtroom 301, 21041 Burbank Blvd. Woodland Hills, California 91367

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 22, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**Via Email**

Ronald S. Orr:  ronorresq@aol.com (Attorneys for Equity Committee)
Georgiana G. Rodiger:  crodiger@rodigerlaw.com (Attorneys for Equity Committee)

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| February 22, 2011 | Debra G. Ige | */s/ Debra G. Ige* |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                    **F 9013-3.1.PROOF.SERVICE**

548351v1