PETER C. ANDERSON
UNITED STATES TRUSTEE
JENNIFER L. BRAUN (State Bar No. 130932)
ASSISTANT UNITED STATES TRUSTEE
DARE LAW (State Bar No. 155714)
HATTY YIP (State Bar No. 246487)
TRIAL ATTORNEY
OFFICE OF THE UNITED STATES TRUSTEE
21051 Warner Center Lane, Suite 115
Woodland Hills, CA 91367
Telephone No. (818) 716-8800
Facsimile No.  (818) 716-1576
*Email:* dare.law@usdoj.gov

# UNITED STATES BANKRUPTCY COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>**MERUELO MADDUX PROPERTIES, INC., a DE Corp.,**<br><br>　　　　　　　Debtor(s). | Case Number 1:09-bk-13356-VK<br><br>Chapter 11<br><br>**REPORT OF UNITED STATES TRUSTEE RE: ORDER REFERRING CONCERNS RAISED BY MEMBERS OF THE OFFICIAL COMMITTEE OF EQUITY HOLDERS TO THE OFFICE OF THE UNITED STATES TRUSTEE**<br><br>[NO HEARING SET] |

**TO THE HONORABLE VICTORIA S. KAUFMAN, UNITED STATES BANKRUPTCY JUDGE, AND THE PARTIES IN INTEREST:**

The United States Trustee for the Central District of California hereby submits this Report (the "Report") in response to the Court's Order Referring Concerns Raised by Members of the Official Committee of Equity Holders to the Office of the United States Trustee.

This Report is based upon the review of available documentation and the deposition testimony under oath of all six current members of the Official Committee of Equity Holders ("OEC") appointed by the United States Trustee. It addresses the issues raised in the Williams & Ribb Employee Profit Sharing Plan's Response Regarding Court's Tentative Ruling regarding Section 1129(c) ("Response") and the Statement Regarding Williams & Ribb Employee Profit

-1-

Sharing Plan's Response Regarding Court's Tentative Ruling Regarding Section 1129(c) ("OEC Statement").

## I.  INTRODUCTION

The debtor, Meruelo Maddux Properties Inc., a DE Corp. ("Debtor" or "MMPI"), filed a bankruptcy petition under chapter 11 on March 27, 2009. On July 19, 2010, the Office of the United States Trustee ("U.S. Trustee") filed an Appointment and Notice of Appointment of Official Committee of Equity Holders ("Appointment"), appointing the following three members to an official equity committee: (1) Taylor International Fund, Ltd.; (2) Douglas J. McCaslin; and (3) David A. Spinney. On July 20, 2010, the U.S. Trustee filed a Status Report re United States Trustee's Appointment of Official Committee of Equity Holders, stating that the U.S. Trustee was gathering information and planning to supplement the membership of the OEC. On August 2, 2010, the U.S. Trustee filed an Amended Appointment and Notice of Appointment of Official Committee of Equity Holders, thereby appointing four additional members: (4) Williams & Ribb LLP Profit Sharing Plan ("Williams & Ribb"), (5) David Ofman, (6) Kapil Tayal, and (7) David Pourbaba. David Pourbaba has since voluntary resigned from the OEC, leaving a total of six members. Stephen S. Taylor, as representative of Taylor International Fund, Ltd., is the Chairman of the OEC.

On March 1, 2011, Williams & Ribb filed its Response, raising its concerns regarding the following issues: (1) the legal expenses incurred in this case, (2) a possible relationship between OEC counsel Ron Orr and Georgiana ("Cristy") Rodiger and former judge Kathleen Thompson and its impact on the proceedings, (3) a possible relationship between Taylor International Fund, Ltd. and other OEC members and its effects on the OEC, (4) the attendance of Taylor International Fund, Ltd. employees at OEC meetings; and (5) the possible relationship between Taylor International Fund, Ltd. and Charlestown Capital Advisors, LLC ("Charlestown"). On March 4, 2011, the OEC filed its OEC Statement in response. After a hearing on March 7, 2011, on March 8, 2011, the Court issued an Order Referring Concerns Raised by Members of the Official Committee of Equity Holders to the Office of the United States Trustee (the "Order"), directing the U.S. Trustee to address the issues raised in the Response and OEC Statement and to file a report by April 8, 2011.

//

## II. U.S. TRUSTEE'S INVESTIGATION AND ANALYSIS PROCEDURE

The U.S. Trustee reviewed the Response and the OEC Statement, including the exhibits thereto. The U.S. Trustee then conducted an informational meeting with Chris Kappos III and John D. Williams, representatives from Williams & Ribb. From March 24, 2011 through March 29, 2011, the U.S. Trustee took the depositions of all six members of the OEC, specifically David Ofman,[1] Stephen S. Taylor of Taylor International Fund, Ltd.,[2] Kapil Tayal,[3] David A. Spinney,[4] Douglas J. McCaslin,[5] and Chris Kappos III of Williams & Ribb.[6] The U.S. Trustee also obtained and reviewed

---

[1] A true and correct copy of relevant portions of the Transcript of March 24, 2011 United States Trustee Deposition of David Ofman, In re: Meruelo Maddux Properties, Inc., 1:09-bk-13356-VK, (hereinafter "Ofman Deposition") is attached hereto as Exhibit "1". The complete certified copy of the Ofman Deposition will be lodged separately with the Court.

[2] A true and correct copy of relevant portions of the Transcript of March 24, 2011 United States Trustee Deposition of Stephen S. Taylor, In re: Meruelo Maddux Properties, Inc., 1:09-bk-13356-VK (hereinafter "Taylor Deposition") is attached hereto as Exhibit "2". The complete certified copy of the Taylor Deposition will be lodged separately with the Court.

[3] A true and correct copy of relevant portions of the Transcript of March 25, 2011 United States Trustee Deposition of Kapil Tayal, In re: Meruelo Maddux Properties, Inc., 1:09-bk-13356-VK, (hereinafter "Tayal Deposition") is attached hereto as Exhibit "3". The complete certified copy of the Tayal Deposition will be lodged separately with the Court.

[4] A true and correct copy of relevant portions of the Transcript of March 25, 2011 United States Trustee Deposition of David Spinney, In re: Meruelo Maddux Properties, Inc., 1:09-bk-13356-VK, (hereinafter "Spinney Deposition") is attached hereto as Exhibit "4". The complete certified copy of the Spinney Deposition will be lodged separately with the Court.

[5] A true and correct copy of relevant portions of the rough draft Transcript of March 29, 2011 United States Trustee Deposition of Douglas McCaslin, In re: Meruelo Maddux Properties, Inc., 1:09-bk-13356-VK, (hereinafter "McCaslin Deposition") is attached hereto as Exhibit "5".
Due to the time constraints in the preparation and filing of this Report, the U.S. Trustee has not yet obtained a certified transcript of the McCaslin Deposition, and therefore has instead cited and attached a copy of the draft provided by the court reporter. When the U.S. Trustee receives the certified copy of the McCaslin Deposition transcript, the U.S. Trustee will lodge that certified transcript with this Court. At that time, the U.S. Trustee will file a Notice of Lodging of Transcript, and if the Court so requests, will also file an amended Report to correct any page citations to comport with the certified transcript.

[6] A true and correct copy of relevant portions of the rough draft Transcript of March 29, 2011 United States Trustee Deposition of Chris Kappos III, In re: Meruelo Maddux Properties, Inc., 1:09-bk-13356-VK, (hereinafter "Kappos Deposition") is attached hereto as Exhibit "6".

copies of minutes of various OEC Meetings and the Bylaws of the Official Committee of Equity Holders of Meruelo Maddux Properties, Inc., *et. al.* ("Bylaws").[7]

This Report is based on the information gathered from the informal meeting with Mr. Kappos and Mr. Williams, OEC members' testimony under oath, documents obtained from the Court's docket, and documents produced by OEC's counsel.

### III. THE U.S. TRUSTEE'S FINDINGS

Pursuant to 11 U.S.C. § 1102(a), the United States Trustee may appoint committees of creditors or of equity security holders as the United States Trustee deems appropriate. This office also monitors committee conduct, and the United States Trustee may exercise his discretion to modify committee membership by adding, substituting, or removing committee members. Accordingly, although this Court *sua sponte*, one day after the March 7, 2011 hearing for which the Response was filed, issued its Order referring the committee members' concerns to this office, the Office of the United States Trustee independently would have investigated those issues, as committee composition lies within the central purview and discretion of the United States Trustee.

#### A. Issues Relating to the OEC's Fiduciary Duties

##### 1. Relationships between OEC Members and Taylor International Fund, Ltd.

The testimony of OEC members David A. Spinney, David Ofman, and Steve Taylor showed that these three members have known each other for over twenty years and previously worked

---

Due to the time constraints in the preparation and filing of this Report, the U.S. Trustee has not yet obtained a certified transcript of the Kappos Deposition, and therefore has instead cited and attached a copy of the draft provided by the court reporter. When the U.S. Trustee receives the certified copy of the Kappos Deposition transcript, the U.S. Trustee will lodge that certified transcript with this Court. At that time, the U.S. Trustee will file a Notice of Lodging of Transcript, and if the Court so requests, will also file an amended Report to correct any page citations to comport with the certified transcript.

[7] A true and correct copy of the Bylaws, obtained from the Court's docket as part of the OEC Statement, is attached hereto as Exhibit "7".

-4-

UST 000004

together at the Chicago Board Options Exchange.[8] None of the other OEC members appear to have known each other prior to the formation of the OEC.

Steve Taylor also introduced David A. Spinney and David Ofman to MMPI stock.[9] Steve Taylor and David Ofman have previously invested together, and David Ofman is an investor in Taylor Fund LP, which is a feeder fund to Taylor International Fund, Ltd.[10] Nonetheless, David Ofman testified that he conducted his own due diligence and research before investing in MMPI.[11] Mr. Ofman also testified under oath that he does not have any voting agreements with other members of the OEC,[12] and that he has no knowledge that any other OEC members have any voting agreements among themselves.[13]

David Spinney and Steve Taylor also have invested together in the past, and David Spinney is also an investor in Taylor Fund LP.[14] David A. Spinney testified under oath that Steve Taylor does not tell him he should buy a certain stock, but instead will mention a stock to him and tell him to look into it.[15] Mr. Spinney also testified under oath that he has no voting agreement with other OEC members to vote a certain way.[16]

Chris Kappos III testified that because of the relationship between David Spinney, Steve Taylor, and David Ofman, he did not "think that [the OEC] had a fair and balanced outlook with

---

[8] See Exhibit "2", Taylor Deposition at 10-11, 14-15; Exhibit "4", Spinney Deposition at 10-11, 15-16; and Exhibit "1", Ofman Deposition at 8-9, 29.

[9] See Exhibit "2", Taylor Deposition at 12; Exhibit "4", Spinney Deposition at 10; and Exhibit "1", Ofman Deposition at 8.

[10] See Exhibit "1", Ofman Deposition at 10-12; and Exhibit "2", Taylor Deposition at 14-15, 22-26.

[11] See Exhibit "1", Ofman Deposition at 13-14.

[12] See Exhibit "1", Ofman Deposition at 27.

[13] See Exhibit "1", Ofman Deposition at 27.

[14] See Exhibit "2", Taylor Deposition at 10-12.

[15] See Exhibit "4", Spinney Deposition at 13-15.

[16] See Exhibit "1", Ofman Deposition at 33-34.

UST 000005

respect to the alternative plans."[17] Mr. Kappos explained that "if it has been established that Mr. David Ofman and Mr. David Spinney are investors in Taylor International Fund, Ltd., it's reasonable to believe that they would support the manager–the managing director, the general partner of Taylor International Fund, Ltd."[18] When asked whether he believed that Steve Taylor, David Spinney and David Ofman were not acting as fiduciaries, Mr. Kappos testified, "We were uncertain and concerned."[19] However, Mr. Kappos also testified that he did not believe that the prior relationships of these members affected their ability to analyze a proposed plan of reorganization.[20] While he stated that it was his belief that Mr. Ofman and Mr. Spinney voted in sync with Mr. Taylor at all times,[21] he also testified that the voting order was rotated and that Steve Taylor frequently did not vote first.[22] Douglas McCaslin also testified that the voting order was rotated, and he believed that Steve Taylor often voted last.[23] Multiple members testified that prior to the meetings they did not know what items would be voted on at those meetings.[24]

The testimony of the OEC members and the documents reviewed adduced no evidence that David A. Spinney, David Ofman, and Steve Taylor concealed their relationship or voted as a block in breach their fiduciary duties as members of the OEC. The U.S. Trustee's review of the completed solicitation forms, that the OEC members submitted to the U.S. Trustee when they sought to participate on an equity committee in this case, showed that none of the members failed to disclose any information or relationships that they were asked to disclose. While that form asked if the equity holder had any relationships with MMPI or its insiders, it did not ask for information about any

---

[17]*See* Exhibit "6", Kappos Deposition at 23

[18]*See* Exhibit "6", Kappos Deposition at 41.

[19]*See* Exhibit "6", Kappos Deposition at 71.

[20]*See* Exhibit "6", Kappos Deposition at 23-24.

[21]*See* Exhibit "6", Kappos Deposition at 43.

[22]*See* Exhibit "6", Kappos Deposition at 42-43.

[23]*See* Exhibit "5", McCaslin Deposition at 59-60.

[24]*See* Exhibit "1", Ofman Deposition at 20; Exhibit "4", Spinney Deposition at 19-20.

UST 000006

relationships with other equity holders of MMPI. There is no evidence to show that Mr. Spinney or Mr. Ofman based their votes on the vote of Taylor International Fund, Ltd., that any members of the OEC are voting as a unit, or that any members of the OEC have any kind of voting agreement.

        2.        **Relationship between Taylor International Fund, Ltd. and Charlestown**

Steve Taylor testified that on behalf of the OEC, he negotiated with representatives of Charlestown and visited the Charlestown office.[25] Mr. Taylor also testified that he discussed the possibility of an equity committee plan and the active involvement of Taylor International Fund, Ltd. in OEC meetings, but that if "those discussions move past a potential and theoretical point that it would involve us resigning our position from the committee, our meaning Taylor International Fund position."[26] When asked, "Were these discussions with Charlestown?," Mr. Taylor testified "No."[27] When asked "Other than the Taylor funds not being cashed out, was there any discussion with Charlestown about infusing additional capital to help fund the 35 cent buy out?," Mr. Taylor responded: "I can't recall a specific discussion of an investment from our fund to increase that 35 cent..."[28] When further asked: "Do you have any reason to believe that when Charlestown was making this representation to the court and testimony that in their minds they were including moneys that may have been offered by any of the Taylor funds?", Steve Taylor replied: "I hope not. I wasn't aware of that. You know, to the extent that any investment from our fund I'd have to know about it and you know we already have a pretty substantial investment in MMPI. And you know we didn't commit to, you know, X million of dollars, anything like that."[29] Moreover, when asked: "when you were in discussions with Charlestown about any possible role for the Taylor funds, did you share that information at or close to the time that it was happening with the other fund–with the other equity committee members," Steve Taylor stated: "I believe so. I mean, there is certainly...no desire to keep

---

[25] *See* Exhibit "2", Taylor Deposition at 52-57.

[26] *See* Exhibit "2", Taylor Deposition at 56-57.

[27] *See* Exhibit "2", Taylor Deposition at 57.

[28] *See* Exhibit "2", Taylor Deposition at 58.

[29] *See* Exhibit "2", Taylor Deposition at 59.

anything concealed or hidden...any discussions that I would have with Raj [of Charlestown] or Legendary or anyone, I've always tried to share them as quickly and as fully as I possibly can with the full committee."[30]

Mr. Kappos testified that Steve Taylor made a statement regarding potential financial interest in a plan proponent, other than holding stock in MMPI:

    A.    [Chris Kappos, III] I have knowledge of a statement that Mr. Taylor made that he has never denied.
    Q.    [Dare Law] What is that statement?
    A.    [Chris Kappos, III] That he was in discussions with Raj at Charlestown for his fund to participate and/or be the backstop.
...
    A.    [Chris Kappos, III] So they were, at some point, discussing the opportunity, which apparently involved Mr. Taylor and Taylor International Fund, Limited.
...
    Q.    [Dare Law] What is your understanding of what that participation or backstop would be?
    A.    [Chris Kappos, III] I was not part of the discussions, so I have nothing other than the fact he made a statement that he and his fund had had discussions with Raj to participate.
...
    Q.    [Dare Law]...Do you have a belief that Mr. Taylor, himself, or his fund would, in fact, back the Charlestown plan?
    A.    [Chris Kappos, III] Mr. Taylor, in his initial e-mail to us, indicated his ability to raise capital when he thought an initial plan of reorganization could be. He opined on the value. He opined on what he believed the Charlestown and Legendary plans provided for. He suggested during subsequent committee meetings, and inquired of counsel in a what-if fashion, such as, "What if my fund submitted a plan?...[31]

Questions were also asked about Chris Kappos III's knowledge of financial backers for the Charlestown plan:

    Q.    [Cristy Rodiger] Did Mr. Taylor ever tell you that he individually, or Taylor International Fund had, in fact, made any kind of commitment to be a backer for the Charlestown plan?
    A.    [Chris Kappos, III] No.
    Q.    [Cristy Rodiger] Did anyone else ever tell you that Mr. Taylor or Taylor International Fund had entered into an agreement to be one of the financial backers for Charlestown?
    A.    [Chris Kappos, III] As a committee, in our due diligence process, we were unable, prior to the October 13, 2010, endorsement of Charlestown, to determine who was a financial backer and whether or not they had a financial backer.
    Q.    [Cristy Rodiger] So you didn't know?
    A.    [Chris Kappos, III] No.

---

[30] *See* Exhibit "2", Taylor Deposition at 59-60.

[31] *See* Exhibit "6", Kappos Deposition at 122-126.

-8-

|   |   |   |
|---|---|---|
| | ... | |
| A. | | [Chris Kappos, III] They had discussions that he would potentially back the Charlestown plan. |
| Q. | | [Cristy Rodiger] So, Mr. Taylor's statement to you was acknowledging that the potential was being considered and there had been discussions; is that right? |
| A. | | [Cris Kappos, III] Yes. |
| Q. | | [Cristy Rodiger] He never told you that they had entered into any agreement to do that; is that right? |
| A. | | [Chris Kappos, III] He did not. |
| Q. | | [Cristy Rodiger] Did Mr. Taylor tell you this was a secret, something you were not supposed to tell anyone else? It was on the down low? He was trying to hide something from anybody? |
| A. | | [Chris Kappos III] No. But I found it unusual that he would make the statement.[32] |

Mr. Kappos also testified that discussions about Taylor International Fund, Ltd. putting together a plan of reorganization was discussed in a formal OEC meeting with OEC professionals present.[33]

Thus, while Taylor International Fund, Ltd. appears to have considered possibly proposing or providing financial support for a plan of reorganization, the testimony also shows that Taylor International Fund, Ltd. did not provide such support and that the OEC members were aware of such discussions.

### 3. OEC Meetings

Multiple members of the OEC, including Chris Kappos III, testified that everyone was allowed or given an opportunity to speak at the OEC's meetings.[34] Members of the OEC testified that they received agendas prior to the meetings and minutes were kept.[35] Accordingly, the U.S. Trustee found no evidence that any member of the OEC was restrained from participation at meetings.

The Response also raised concerns with respect to the attendance at OEC meetings by employees of Taylor Asset Management. The U.S. Trustee found that employees of Taylor Asset

---

[32] See Exhibit "6", Kappos Deposition at 134-136.

[33] See Exhibit "6", Kappos Deposition at 140.

[34] See Exhibit "6", Kappos Deposition at 81; Exhibit "3", Tayal Deposition at 11; Exhibit "1", Ofman Deposition at 31; Exhibit "4", Spinney Deposition at 25-26; and Exhibit "5", McCaslin Deposition at 16-17.

[35] See Exhibit "1", Ofman Deposition at 20, 22, Exhibit "2", Taylor Deposition at 38; Exhibit "3", Tayal Deposition at 9-10; and Exhibit "5", McCaslin Deposition at 15.

-9-

Management, which manages Taylor International Fund, Ltd. (Taylor International Fund, Ltd. has no employees but is managed by Taylor Asset Management),[36] did participate in at least some of the OEC meetings by being present on telephone calls, and were on e-mail correspondence in relation to OEC matters. Multiple OEC members testified that they were aware of the presence of Taylor Asset Management employees, including Bob Kirkland, Ellis Kitsemble, and Christopher Stiner, in at least some of the OEC meetings.[37] OEC members also testified that they knew that certain Taylor Asset Management employees were receiving email correspondences relating to OEC matters.[38] Steve Taylor testified that Taylor Asset Management employees were on the OEC meeting calls because "to the extent I felt that it was good to have their eyes and ears there in case I maybe missed something."[39] Steve Taylor, Douglas McCaslin, and Chris Kappos, III, testified that to the extent they knew any of those individuals were participating in the OEC conference calls, there were no objections to Taylor Asset Management employees being on the OEC meeting calls.[40] Douglas McCaslin also testified that the employees of Taylor Asset Management "provided resources to us at no cost" and "they were very, very helpful to the committee."[41]

Pursuant to the Bylaws of the OEC, under the subsection entitled Membership, "B. Any member of the Committee may designate a representative and alternative representatives to attend Committee meetings, provided that such representative and alternate is an employee of, or attorney, or attorney in fact, for the equity holder and that such designation is made to the Chairperson prior to the relevant meeting..." Under the subsection entitled Meetings, subsection F states: "Due to the

---

[36] See Exhibit "2", Taylor Deposition at 25-26, 39-43.

[37] See Exhibit "3", Tayal Deposition at 11-12, 25; and Exhibit "5," McCaslin Deposition at 19-22.

[38] See Exhibit "3", Tayal Deposition at 11-12; Exhibit "4", Spinney Deposition at 49-50; and Exhibit "5", McCaslin Deposition at 19-20.

[39] See Exhibit "2", Taylor Deposition at 41.

[40] See Exhibit "2", Taylor Deposition at 41, 47; Exhibit "5", McCaslin Deposition at 22; and Exhibit "6", Kappos Deposition at 56.

[41] See Exhibit "5", McCaslin Deposition at 36.

-10-

potentially sensitive, non-public nature of the subjects that may be discussed by the Committee and the possibility that public disclosure of such information could have a detrimental effect upon the Debtors, the estates or all of the equity holders in these cases, meetings of the Committee will not be open to persons other than members of the Committee, *ex officio* members, their designated representatives or alternates and designated counsel, and professionals employed by the Committee...." Therefore, the testimony showed that there was full knowledge by the OEC members of these representatives' participation, and the Bylaws do not require removal from the OEC.

### 4.    Other Fiduciary Duty Issues

In the course of the investigation, the U.S. Trustee found that an OEC member sold MMPI shares after becoming a member of the OEC. Chris Kappos III testified that after the formation of the OEC, acting as the agent for Williams & Ribb, he sold shares of MMPI stock.[42] Specifically, Mr. Kappos testified that Williams & Ribb sold 300,000 shares of MMPI, and his parents' living trust sold 8,000 shares of MMPI, around February 2011, after the OEC was formed:

> "Q.   [Dare Law] Since the time the application was submitted for the Office of the U.S. Trustee, have you traded in any MMPI shares?
> A.   [Chris Kappos, III] Myself, personally, no.
> Q.   [Dare Law] And what about for the profit sharing?
> A.   [Chris Kappos, III] Yes.
> Q.   [Dare Law] Was it buy or sell?
> A.   [Chris Kappos, III] Sell.
> Q.   [Dare Law] When did the profit sharing sell some shares?
> A.   [Chris Kappos, III] Early February 2011.
> Q.   [Dare Law] And how many shares did it sell?
> A.   [Chris Kappos, III] I believe, 300,000 shares.
> ...
> Q.   [Dare Law] And then, for your parents' living trust, have they bought or sold after the equity committee was formed?
> A.   [Chris Kappos, III] I believe they have sold approximately 8,000 shares."[43]

Mr. Kappos also testified that he discussed with his father the sale of the MMPI shares prior to the sale.[44]

---

[42]*See* Exhibit "6", Kappos Deposition at 97.

[43]*See* Exhibit "6", Kappos Deposition at 12-13.

[44]*See* Exhibit "6", Kappos Deposition at 121-122.

Mr. Kappos also testified that he recalled discussions in OEC meetings about the importance of members of the OEC not trading in OEC stock while they are sitting on the OEC.[45] However, Mr. Kappos testified that he did not believe Williams & Ribb was "trading" MMPI shares:

> "Q. [Cristy Rodiger] Did that not convince you that Williams and Ribb should not be trading in MMPI stock while it was on the OEC?"
> A. [Chris Kappos, III] I think that your definition of trading should be clarified. I do not believe that Williams and Ribb profit sharing plans was trading in the shares. I also believe that the counsel to the committee cautioned us to not be using non-public information with respect to any shares acquired or sold in MMPI.
> Q. [Cristy Rodiger] Do you recall the counsel for the committee advising that while you were sitting in a position where you were obtaining insider information, that the sitting members of the committee should not buy or sell MMPI stock?"
> A. [Chris Kappos, III] I do not recall that, specifically buy or sell.
> Q. [Cristy Rodiger] And in your mind, trading is different from buy or sell how?
> A. [Chris Kappos, III] Trading would reflect where we are both acquiring and selling shares with respect to the small price appreciation. So it's such that, whether or not the shares were, you know, at 8 cents, 12 cents, and during that whole period of time, you would be both acquiring and selling the shares, I think would have been a better description, in my mind, as to what trading would mean.
> Q. [Cristy Rodiger] So as you're sitting here today, do you have any recollection of the attorneys for the OEC telling the OEC members, if you're going to sit on this commitee, do not buy or sell MMPI shares?
> A. [Chris Kappos, III] I do not believe, or recall that that was stated whatsoever."[46]

Mr. Kappos testified that he discussed his father's investment in MMPI at an OEC meeting: "I believe that I invoked his name during the committee dialogue. There were, I believe, in the Charlestown plan, provisions in the initial plan–the final plan, that would restrict additional investment to accredited investors. It was a topic of discussion. I invoked his name, that I thought it was patently unfair that my dad would not meet the criteria for accredited investors. And so, yes, I did discuss my father with regard to his ownership in MMPI."[47]

Subsection A of the OEC Bylaws, under "Confidentiality and Trading in Claims," states: "Members of this Committee may from time to time receive confidential, proprietary, or insider information. The improper use of that information may constitute a violation of federal or state securities laws or a breach of the Committee member's fiduciary duties towards equity holders.

---

[45] *See* Exhibit "6", Kappos Deposition at 98.

[46] *See* Exhibit "6", Kappos Deposition at 98-99.

[47] *See* Exhibit "6", Kappos Deposition at 121-122.

-12-

1  Each member agrees to adopt appropriate internal security measures to safeguard the
2  confidentiality of information that each member receives as a member of the Committee."
3  　　　　In addition, Mr. Kappos testified that beginning around November 2010, Williams & Ribb
4  stopped attending OEC meetings.[48] However, he also testified that he continued to receive OEC
5  meeting minutes and that he looked at the minutes even though he was no longer participating in
6  the OEC meetings.[49] When asked "When do you think Williams and Ribb will decide whether or
7  not it intends to participate in equity committee meetings again?," Mr. Kappos responded: "We're
8  unsure. Not determined."[50] Mr. Kappos also testified that Williams & Ribb did not provide
9  documents in response to discovery requests served by MMPI to OEC members.[51]
10 　　　　Accordingly, the evidence reflected trading of MMPI shares post-formation of the OEC by
11 Williams & Ribb, the failure to participate in OEC meetings, and the failure to produce documents
12 in response to discovery requests.
13 　　　**B.    OEC Counsel**
14 　　　　　　**1.    Relationship of OEC Counsel with Judge Thompson**
15 　　　With respect to allegations of a potential relationship between OEC counsel, in particular
16 Ron Orr and Georgiana Cristy Rodgier, and the former judge in this case, U.S. Bankruptcy Judge
17 Kathleen Thompson, the U.S. Trustee reviewed the Declarations of Ron Orr and Georgiana C.
18 Rodiger attached to the OEC Statement. The U.S. Trustee also questioned Mr. Kappos about the
19 concerns raised by Williams & Ribb and any impact of any prior relationship between or among
20 Mr. Orr, Ms. Rodiger, and the Honorable Kathleen Thompson.[52] The testimony did not reflect any
21 evidence of misconduct or conflict of interest relating to any prior relationship between Ron Orr,
22 Christy Rodiger, and Judge Thompson.

---

[48] *See* Exhibit "6", Kappos Deposition at 88.

[49] *See* Exhibit "6", Kappos Deposition at 88-89.

[50] *See* Exhibit "6", Kappos Deposition at 107.

[51] *See* Exhibit "6", Kappos Deposition at 85-86.

[52] *See* Exhibit "6", Kappos Deposition at 36-40.

UST 000013

### 2. Attorneys' Fees

The U.S. Trustee also questioned the OEC members regarding the hiring of OEC counsel.[53] Douglas McCaslin testified that other attorneys and firms were considered for the position at the time Ron Orr was hired.[54] Both Douglas McCaslin and Kapil Tayal testified that they felt that the OEC required the services of three different firms for different purposes.[55]

Whether or not the fees charged by OEC counsel have been reasonable and necessary, or rather have been excessive, can be reviewed and determined at the time that counsel's fee applications are heard. As the fees charged by OEC counsel, as well as the other professionals in this case, are subject to review pursuant to 11 U.S.C. § 330, the U.S. Trustee reserves his right to review and object to any and all professional fees.

## IV. CONCLUSION

This Report summarizes the investigation conducted by the U.S. Trustee in response to the Order. The transcripts of the depositions of the OEC members will be lodged with the Court, for the Court's and the parties' convenience. Based on the U.S. Trustee's investigation and concurrently with the filing of this Report, the U.S. Trustee will reconstitute the membership of the OEC by removing Williams & Ribb from the OEC.

Dated: April 8, 2011

PETER C. ANDERSON
United States Trustee

By: *[signature]*
DARE LAW
HATTY YIP
Attorneys for the United States Trustee

---

[53] *See* Exhibit "5", McCaslin Deposition at 29-30.

[54] *See* Exhibit "5", McCaslin Deposition at 30.

[55] *See* Exhibit "3", Tayal Deposition at 23; and Exhibit "5", McCaslin 21-22.

-14-

UST 000014