JENNER & BLOCK LLP
Kenneth K. Lee  (Cal. Bar No. 264296)
633 West 5th Street, Suite 3500
Los Angeles, CA 90071-2054
Telephone:  213-239-5100
Facsimile:  213-239-5199
klee@jenner.com

JENNER & BLOCK LLP
Marc B. Hankin  (admitted *pro hac vice*)
919 Third Avenue, 37th Floor
New York, NY 10022-3908
Telephone:  212-891-1600
Facsimile:  212-891-1699
mhankin@jenner.com

RON ORR & PROFESSIONALS, INC.
Ronald S. Orr (Cal. Bar No. 54257)
578 Washington Blvd., #389
Marina Del Rey, CA  90292
Telephone:  310-301-4849
Facsimile:  310-301-6549
ronorresq@aol.com

RODIGER LAW OFFICE
Georgiana G. Rodiger, (Cal. Bar No. 94416)
272 South Los Robles Avenue
Pasadena, California  91101
Telephone:  626-793-7264
Facsimile:  626-793-7592
crodiger@rodigerlaw.com

Attorneys for Equity Committee

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SAN FERNANDO VALLEY DIVISION**

| | |
|---|---|
| IN RE:<br><br>**MERUELO MADDUX PROPERTIES, INC.,**<br>**et al.**[1]<br><br>**Debtors and Debtors-in-Possession.**<br><br>**Affects all debtors**<br><br>. | CASE NO. 09-bk-13356-VK<br><br>Chapter 11<br><br>**EQUITY COMMITTEE'S LIMITED OBJECTION TO DEBTORS' EFFECTIVE DATE LOAN DOCUMENTS**<br><br>Date:     May 9, 2011<br>Time:    2:00 p.m.<br>Place:    Courtroom 301<br>             21041 Burbank Boulevard<br>             Woodland Hills, CA 91367 |

---

[1]   This case is jointly administered with chapter 11 cases filed with the Court by numerous affiliated entities. The Debtors and debtors-in-possession and their respective tax identification numbers are identified in the *Order Directing The Joint Administration Of Related Cases* entered by the Court on April 7, 2009 (docket entry no. 30).

The Official Committee of Equity Holders (the "Equity Committee") submits this limited objection to the Notice Of Submission Of Debtors' Effective Date Loan Documents (docket entry no. 3063, and the documents attached thereto, the "Watermarke Loan Documents") and states as follows:

### LIMITED OBJECTION

The Equity Committee, throughout the course of these cases, has not objected to any of the Debtors' proposed business transactions with third parties where (i) such transactions were negotiated at arm's length, (ii) such transactions did not inappropriately entrench existing management and (iii) the material terms of such transactions were appropriately disclosed to the Court and interested parties. Accordingly, the Equity Committee does not object to the terms of the Watermarke Loan Documents to the extent that such terms were previously disclosed by the Debtors, whether in their plan of reorganization, Richard Meruelo's supplemental declaration, dated January 6, 2011 (docket entry no. 2544, the "Meruelo Declaration"), or in the term sheet for the Watermarke loan attached to such declaration (the "Watermarke Loan Term Sheet").[2]

As this Court is well aware, the Equity Committee has objected to the Debtors' Plan and is supporting the competing Charlestown Plan. That the Equity Committee is not objecting to the previously disclosed terms of the Watermarke Loan Documents is entirely consistent with the Equity Committee's understanding that courts, in determining the appropriateness of a proposed transaction, consider whether the transaction was entered into by unrelated parties as the result of an arm's length negotiation. In fact, the treatment of MMPI shareholders under the Charlestown Plan is the result of such a negotiation between the plan proponents and the Equity Committee, and courts have repeatedly held that the best determination of an asset's value (for example, the common stock of MMPI under a plan of reorganization) is that determined by unrelated parties pursuant to arm's-length negotiations. *See In re Two S Corp.*, 875 F.2d 240, 244 (9th Cir. 1989) (the value of an asset is the price that a disinterested third-party would pay for that asset in an arm's-length negotiation); *In re 3dfx Interactive, Inc.*, 389 B.R. 842, 887 (Bankr. N.D. Cal. 2008) (commenting that the price paid after an arm's-length negotiation was a better gauge of asset's value than expert opinion); *In re*

---

[2] The Meruelo Declaration and the Watermarke Term Sheet are attached to the Declaration of Michael J. Kelly at Exhibit 1.

Main Document    Page 3 of 7

*Kenner*, 265 B.R. 224, 233 (Bankr. E.D. Cal. 2001) (holding that when evaluating whether an estate received reasonably equivalent value, the essence of the test is whether "the transaction carries the earmarks of an arms length bargain"); *In re McElroy*, 210 B.R. 833, 835 (Bankr. D.Or. 1997) (fair market value is the "cash price that a willing buyer would pay a willing seller in an arms-length transaction, free of any compulsion or duress").

The Equity Committee presumes, for purposes of this Limited Objection, that the Watermarke Loan Documents were the result of arm's-length negotiations between the Debtors and Watermarke Properties, Inc. (together with any affiliate that would make the Watermarke Loan, "Watermarke") that took place after the Watermarke Loan Term Sheet was filed with this Court in January. One apparent outcome of those negotiations was that Watermarke will require MMPI and each owner of the properties that would secure the $15 million convertible loan to execute an "Environmental Certificate and Indemnity Agreement" in the form attached as Exhibit D to the Watermarke Loan Documents (the "Environmental Indemnity Agreement"). The Environmental Indemnity Agreement provides, in pertinent part, for MMPI and each property owner to indemnify Watermarke for any loss or liability arising from any hazardous substance law with respect to the premises, and any liability "which may be incurred by the or asserted against the Watermarke lender directly or indirectly resulting from the presence of a hazardous substance on the premises, whether or not caused by in whole or in part by the negligent acts or omissions of the lender or individuals or entities acting as the agents or employees of the lender." Environmental Indemnity Agreement at 4.[3]

Most importantly, such indemnity obligations expressly survive the Watermarke lender foreclosing on the property: "The indemnity contained in this Agreement … shall survive the foreclosure, release or reconveyance of the Deed of Trust, whether by payment of the Debt (as defined in the Deed of Trust) or any deed-in-lieu of foreclosure of the Premises." *Id*. at 8. In this manner, Watermarke negotiated for the ability to assert an indemnity claim against MMPI and each (prior) property owner, even after having taken ownership through a foreclosure proceeding.

---

[3] Such agreement makes clear that the indemnity does not apply where the liability arises due to the gross negligence or intentional misconduct of Watermarke or its employees, agents or contractors. Environmental Indemnity Agreement at 4.

Equity Committee's Limited Objection To Debtors' Effective Date Loan Documents

There is just one problem with this indemnification obligation. It was never disclosed in any of the descriptions of the material terms of the Watermarke loan. Such indemnification obligation was not set forth in any of the several filed versions of the Debtors' Plan, the Meruelo Declaration or the Watermarke Loan Term Sheet. This indemnification is not simply a standard provision that necessarily attends a loan secured by real property; it is a material economic term that apparently resulted from negotiations between the Debtors and Watermarke.

As a result of the Debtors' decision to only disclose this material term at the last possible minute, and long after the evidentiary record on confirmation has been closed, the Equity Committee and other parties in interest have been prevented from addressing this issue during the course of the confirmation trial. While the Debtors may assert that the Equity Committee had access to the Debtors' environmental reports, the important fact is that the Equity Committee had absolutely no opportunity to address how such potential obligation to Watermarke impacts the Debtors' Plan, including the feasibility of such plan. The Equity Committee had no way of knowing that Watermarke had determined that the risk of an environmental liability was so significant as to merit a separate indemnification claim against MMPI and the property owner that would expressly survive foreclosure.[4]

In similar fashion, the form of Secured Convertible Promissory Note (the "Note") includes a material term that was not previously disclosed. In the term sheet attached to the Meruelo Declaration, the parties expressly agreed that "Borrower shall have the right to substitute collateral in the event Borrower elects to sell one of [sic] more portions of the collateral. The Loan documents shall specify the criteria for substituting collateral." Watermarke Loan Term Sheet at ¶ 9. The Note, however, does not restrict the substitution of collateral to a sale of one of the properties that secures the note. Note at 2. Instead, substitution may occur "upon written request by the Company" to the Watermarke lender. *Id.* There is no requirement that the property be sold, and the Note does not provide for any restriction on the Debtors' selection of the property that will be substituted as

---

[4] Such provision must be distinguished from an environmental indemnity on a pre-petition secured loan. As noted herein, the key issue is not that it was Watermarke's business judgment to obtain such an indemnity, but that the Debtors failed to disclose such obligation in a timely manner.

collateral, so long as the new collateral meets the technical "Substitution Conditions" set forth in the Note.

While there may be a rational business reason for this provision to be included in the Note, that is not the issue. In each of the Debtors' Plan, the Meruelo Declaration and the Watermarke Loan Term Sheet, the three properties that were to secure the $15 million Note were expressly identified. (Plan at IV.E; Meruelo Declaration at ¶ 6; Watermarke Loan Term Sheet at ¶ 8.) Under the form of proposed Note, it is impossible to know which properties would eventually become subject to the Watermarke Lender's security interest (even if the initial three properties are not sold), and how such security interest in the replacement collateral (which security interest would extend to income produced by the property) would impact the Debtors going forward. Again, the Debtors' late disclosure of this material term has prevented the Equity Committee and other parties in interest from considering this issue during the confirmation hearing -- even though the Watermarke Term Sheet was filed with this Court on January 6, 2011.

This is not the first time that the Debtors have failed to timely disclose material information to this Court and parties in interest. Without recounting each instance, it is useful to recall that the Debtors did not timely disclose (i) that they had not created Board minutes during the prior 18-month period while advising this Court that producing Board minutes would be burdensome; (ii) the "poison pill" embedded in separate settlements with Cathay Bank and East West Bank that would have allowed the lenders to declare an event of default and accelerate all amounts owing in the event a competing plan were confirmed, and (iii) that Mr. Meruelo currently has $5 million of outstanding personal judgments lodged against him, and that his wages are being garnished by one of his personal creditors. Time and again, the Debtors have consistently waited until the last possible moment to disclose material information to this Court and the parties in interest in these cases.

Such disclosure failures should be considered in light of the fact that the Debtors' Plan, unlike the Charlestown Plan, does not provide for the reorganized Debtors to file financial statements with the Securities and Exchange Commission (the "SEC") after their emergence from chapter 11. Accordingly, they would not be subject to regulation or oversight by the SEC or be governed by the various laws, such as important provisions of the Sarbanes-Oxley Act, that apply to publicly

4

reporting companies. In light of the Debtors' conduct during the course of these cases, it is not surprising that they have made this decision.

Given that the record on the confirmation hearing is closed, the Equity Committee respectfully submits that the Debtors should not be permitted (in the event that their plan is confirmed) to enter into the Watermarke Loan Documents to the extent such documents include the material terms described herein that were not previously disclosed by the Debtors. Such a remedy would not necessarily render the Debtors' Plan unconfirmable, as this Court could permit the Debtors a reasonable opportunity to determine if the Watermarke lender were willing to provide the loan on the terms previously disclosed. Viewed in the context of the Debtors' course of conduct to date, and specifically with respect to this proposed transaction, the Debtors cannot reasonably assert that such a remedy would be inappropriate or unjust, as they had every opportunity to negotiate the precise terms of the loan documents with Watermarke after the Watermarke Loan Term Sheet was filed with this Court in January of this year, and to make any necessary conforming disclosures in a timely manner.

Dated: May 6, 2011                           **JENNER & BLOCK LLP**

                                             By    */s/ Marc B. Hankin*
                                                   Kenneth K. Lee  (Cal. Bar No. 264296)
                                                   Marc B. Hankin  (admitted *pro hac vice*)
                                                   Attorneys for Equity Committee

# **DECLARATION OF MICHAEL J. KELLY**

STATE OF ILLINOIS           )
                            )  SS:
COUNTY OF COOK              )

Michael J. Kelly, being duly sworn, deposes and says:

1. I am an associate of the firm of Jenner & Block LLP. I am an attorney duly licensed in and am a member in good standing of the bar for the State of Illinois and am admitted to practice before the United States District Court for the Northern District of Illinois and am admitted *pro hac vice* to practice before this Court. I submit this Declaration in support of the Equity Committee's Limited Objection To Debtors' Effective Date Loan Documents.

2. Attached hereto as Exhibit 1 is a true and accurate copy of the Supplemental Declaration of Richard Meruelo in Support of "Fourth Amended Joint Plan of Reorganization of Meruelo Maddux Properties, Inc., et al., Dated September 20, 2010" (docket entry no. 2544).

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct.

Executed on May 6, 2011, in Chicago, Illinois.

                                      */s/ Michael J. Kelly*
                                         Michael J. Kelly