1  JOHN N. TEDFORD, IV (State Bar No. 205537)
   *JTedford@DGDK.com*
2  ENID M. COLSON (State Bar No. 189912)
   *EColson@DGDK.com*
3  DANNING, GILL, DIAMOND & KOLLITZ, LLP
   2029 Century Park East, Third Floor
4  Los Angeles, California  90067-2904
   Telephone:  (310) 277-0077
5  Facsimile:  (310) 277-5735

6  GARY E. KLAUSNER (State Bar No. 69077)
   *GKlausner@Stutman.com*
7  STUTMAN, TREISTER & GLATT
   PROFESSIONAL CORPORATION
8  1901 Avenue of the Stars, 12th Floor
   Los Angeles, CA  90067-6013
9  Telephone:  (310) 228-5600
   Facsimile:  (310) 228-5788
10
   Attorneys for Meruelo Maddux Properties, Inc., and
11 affiliated Debtors and Debtors-in-Possession

12                UNITED STATES BANKRUPTCY COURT
13                CENTRAL DISTRICT OF CALIFORNIA
14                SAN FERNANDO VALLEY DIVISION
15
   In re                              )  Case No. 1:09-bk-13356-VK
16                                     )
   MERUELO MADDUX PROPERTIES,          )  Chapter 11 (Jointly Administered)
17 INC., et al.,[1]                    )
                                       )  **DEBTORS' REPLY IN SUPPORT OF**
18         Debtors and Debtors-in-     )  **MOTION FOR ESTIMATION OF**
                Possession.            )  **CONTINGENT AND UNLIQUIDATED**
19                                     )  **CLAIM OF THE LOS ANGELES COUNTY**
   _____     )  **METROPOLITAN TRANSPORTATION**
20 ☐   Affects all Debtors             )  **AUTHORITY FOR NON-VOTING PLAN**
                                       )  **CONFIRMATION PURPOSES ONLY; AND**
21 ☑   Affects the following Debtors:  )  **DECLARATION OF RICHARD MERUELO**
                                       )  **AND REQUEST FOR JUDICIAL NOTICE IN**
22 Alameda Produce Market, LLC         )  **SUPPORT THEREOF**
   (1:09-bk-13394-VK)                  )
23                                     )  Date:    May 17, 2011
                                       )  Time:    2:30 p.m.
24                                     )  Place:   Courtroom 301
                                       )           21041 Burbank Boulevard
25                                     )           Woodland Hills, California
                                       )
26 _____     )

27  _____
        [1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated
28  entities.  The affiliated case numbers are as follows:  1:09-bk-13338-VK; 1:09-bk-13358-VK through 1:09-bk-13407-VK; 1:09-bk-
    13434-VK; and 1:09-bk-13439-VK.

   369321.05 [XP]    25195

1    Debtor and debtor-in-possession Alameda Produce Market, LLC ("Alameda Produce"),

2  replies to the opposition (the "Opposition") (*docket entry no. 3075*) of the Los Angeles County

3  Metropolitan Transportation Authority (the "MTA") to Alameda Produce's *Motion for Estimation*

4  *of Contingent and Unliquidated Claim of the Los Angeles County Metropolitan Transportation*

5  *Authority for Non-Voting Plan Confirmation Purposes Only* (the "Motion") (*docket entry no. 3015*)

6  as follows:[2]

7

8                                              I.

9                                      INTRODUCTION

10    1.    In the MTA Action,[3] the MTA prevailed before the Court of Appeal and the appeal

11  currently is pending before the Supreme Court.  If the MTA prevails on appeal,[4] the MTA will not

12  be entitled to the return of the Withdrawn Funds and the matter will be remanded to the Superior

13  Court for further proceedings.

14    2.    It is not practicable to try to map out all of the ways that the MTA Action may

15  conclude if the Supreme Court rules in favor of Alameda Produce.  There are some scenarios in

16  which the MTA again prevails on appeal, in which cases it will be entitled to the Subject Property

17  and will not be entitled to the return of the Withdrawn Funds.  However, it is almost certain that

18  even if the MTA is entitled to some recovery or offset against Alameda Produce, a final ruling in

19  favor of the MTA on that issue will not be made by the state court for years.

20    3.    Alameda Produce believes that at the end of the day it will have a substantial claim

21  against the MTA even if Alameda Produce is held responsible for reimbursing all or part of the

22

23    [2] Alameda Produce requested, and graciously the MTA agreed to and the Court approved an
24  extension of time for Alameda Produce to file its reply.  Accordingly, this reply is timely filed and
    served by no later than 2:00 p.m. on May 11, 2011.

25    [3] Capitalized terms have the same meaning as ascribed to them in the Motion.

26    [4] Charlestown recently cited an article reporting that from April 1996 through March 2004,
27  the Supreme Court issued 634 published opinions affirming or reversing rulings of the California
    courts of appeal, and in 45.9% of the cases the appellate court was affirmed.

28

369321.05 [XP]    25195

1   Withdrawn Funds. Alameda Produce has not engaged in the time consuming and costly process of

2   estimating all the various components of its damages. However, with Alameda Produce expressly

3   reserving all rights and remedies, the Court should consider the following: In mid-2004, in

4   connection with the MTA Action, Alameda Produce obtained a conservative "minimal market

5   value" appraisal of the Subject Property.[5] Mr. David A. Zoraster of CB Richard Ellis, Inc.,

6   estimated that the value of the Subject Property as of June 15, 2004, was worth at least as much or

7   more than $9.7 million.[6] A general rule of thumb is that annual ground rents in downtown Los

8   Angeles are typically 10% of the value of the property. Using the minimal market value from mid-

9   June 2004, a ground lease of the Subject Property could be estimated at $970,000 per year. The

10  MTA has been in possession of the Subject Property since November 2004. As a result, a quick

11  and dirty estimate of the amount of rent that the MTA would have had to pay Alameda Produce

12  over the last 6½ years is approximately $6,305,000. Even if Alameda Produce's damages were

13  determined in accordance with this simple calculation[7] and judgment was entered today, rather than

14  years from now, the amount owed by the MTA to Alameda Produce would exceed the Withdrawn

15  Funds.

16      4.      Under the circumstances, the Court has the authority to and should estimate the

17  MTA Contingent Claim at zero dollars for non-voting plan confirmation purposes only, with the

18  Court's findings having no preclusive effect upon the ultimate disposition of the MTA's alleged

19  claim.

20  ///

21  ///

---

[5] A copy of the appraisal is included in Exhibit "6" to the Request for Judicial Notice.

[6] This is the amount for which Charlestown has agreed to surrender the Subject Property and abandon the appeal.

[7] Alameda Produce must stress again that Alameda Produce does not necessarily believe that the appropriate measure of damages in this complicated case is the rent that the MTA would have been required to pay during the time that it possesses the Subject Property. This example is provided merely to show the even the most basic calculation of potential damages is in excess of $6.19 million. All of Alameda Produce's rights and remedies are expressly reserved.

- 3 -

369321.05 [XP]    25195

II.

BRIEF BACKGROUND

5.    In April 2004, the MTA filed the MTA Action.  The MTA initially deposited $6.3 million with the Superior Court as "probable compensation" for the taking.  *See* CCP § 1255.010.

6.    In June 2004, Alameda Produce filed a motion requesting that the Superior Court increase the amount of the deposit to $9.7 million, with final compensation still to be determined at trial.[8]  *See* CCP § 1255.030 (redetermination of amount deposited).  Alameda Produce submitted an very basic appraisal from an appraiser at CB Richard Ellis retained "to provide a minimal market value – an estimate that the property must be worth at least as much or more."[9]  According to that appraisal, as of June 15, 2004, the Subject Property had a value of at least $9.7 million.  In October 2004, the Superior Court ordered the MTA to increase its deposit to $8.5 million, without prejudice to Alameda Produce establishing a higher valuation at trial.

7.    Alameda Produce believes that the value of the Subject Property was significantly more than $9.7 million.  Furthermore, that appraisal did not attempt to quantify "severance damages" that Alameda Produce is claiming, which in basic terms are the damages suffered by Alameda Produce and the remainder of its property as a result of severing the Subject Property from the remainder of the property owned by Alameda Produce.  In the event that the MTA prevails on appeal, Alameda Produce expects to present evidence to the Superior Court proving that it is entitled to just compensation for the real property itself in excess of $9.7 million, plus many millions of dollars in severance damages that have been caused by the MTA's taking of the Subject Property.[10]

---

[8] A copy of Alameda Produce's motion is attached as Exhibit "6" to the Request for Judicial Notice appended hereto.  A copy of the appraisal was attached to that motion.

[9] The appraisal also stated, "This is a limited appraisal in that the value conclusion is on a not less than, or minimal basis; and in that no analysis of highest and best use was made."

[10] No estimate or appraisal of severance damages has been made to date because the MTA Action has not proceeded beyond the right to take issues/trial.  The grounds for severance damages are substantially the same as the basis for damages caused by dispossession of the Subject Property and Alameda Produce anticipates that the severance damages will be substantial.

369321.05 [XP]    25195

8.    Three entities with liens against the Subject Property applied to withdraw part of the $6.3 million deposit. The MTA entered into a stipulation *with the lienholders* and, for reasons that have never been explained, did not require the lienholders to file an undertaking.[11] The MTA then compounded this problem by failing to negotiate with Alameda Produce in good faith. As a result of Justice Zebrowski's and Superior Court Judge Dunn's findings that the MTA failed to negotiate with Alameda Produce in good faith, the Superior Court entered its order of permanent dismissal in September 2008.[12]

9.    In October 2010, the Court of Appeal reversed. In December 2010, the Supreme Court granted Alameda Produce's petition for review. The issue being litigated in the Supreme Court is whether Alameda Produce is deemed to have waived its right to object to the MTA's taking of the Subject Property. *See* CCP § 1255.260. The appeal is fully briefed, oral argument has not yet been set, and a decision is not expected for many months.

10.    If the MTA prevails on appeal, the case will be remanded to the Superior Court. Alameda Produce and the MTA will engage in discovery regarding, among other things, the value of the Subject Property and "severance damages" recoverable by Alameda Produce. A trial will be held regarding the amount of compensation that must be paid by the MTA. Alameda Produce believes that at the end of this process the amount that the MTA will be required to pay will be substantially more than the $8.5 million previously deposited with the Superior Court.

11.    If Alameda Produce prevails in the Supreme Court, the MTA Action could go in a number of directions. In footnote 14 of the Opposition, the MTA states that if the Supreme Court affirms the dismissal, the MTA anticipates continued litigation before the Court of Appeal. If the MTA is correct, that phase of the appeal would take at least a number of months, and whether the Court of Appeal's decision would result in a further appeal or further litigation before the Superior

---

[11] DCA Decision, page 4. The operative text of the stipulation is contained in footnote 5 of the DCA Decision, commencing on page 4.

[12] A copy of the Superior Court's order was attached as Exhibit "2" to the Request for Judicial Notice appended to the Motion.

1   Court is speculative. If the MTA Action is returned to the Court of Appeal instead of the Superior

2   Court, the MTA likely would again argue that its "resolution of necessity" did not actually require

3   the negotiation of mutually agreeable parking, and therefore the dismissal order should be reversed

4   (in which case the MTA again would not be entitled to a return of the Withdrawn Funds).[13] If the

5   MTA loses all of its arguments on appeal, and even if the MTA is entitled to assert a claim against

6   Alameda Produce, the claim must be fully litigated before the Superior Court and offset against

7   Alameda Produce's substantial claims against the MTA.

8          12.    In the Opposition the MTA actually does not disclose what the MTA *really* intends

9   to do if the appellate courts affirm the Superior Court's dismissal of the MTA Action:  the MTA is

10  going to adopt another "resolution of necessity" and file a second eminent domain action.  The

11  Subject Property was chosen by the MTA because it is across the street from another MTA facility,

12  and the MTA intends to pursue ownership of the Subject Property even if the current MTA Action

13  is dismissed.  In the second eminent domain proceeding, the MTA will need to deposit "probable

14  compensation" with the Superior Court and Alameda Produce expects the MTA to petition the

15  Superior Court to credit the Withdrawn Funds against the amount the MTA must deposit in the

16  second proceeding.  Alameda Produce has not evaluated the likelihood that the MTA would be

17  allowed such a credit, but expects the MTA to make such a request.  If the request is granted,

18  nobody will be required to return the Withdrawn Funds to the MTA.[14]

19  ///

20  ///

21

22  [13] *See* Court of Appeal Decision, page 10 (describing issues raised by the MTA on appeal).
    The MTA presented three primary issues, including whether the resolution of necessity adopted by
23  the MTA had not required the negotiation of mutually agreeable parking.  The MTA also presented
    two alternative issues to be addressed if the MTA did not prevail on the first three.  One of the two
24  alternative issues was whether its surrender of the Subject Property should have been contingent on
    a repayment of the Withdrawn Funds.  The Court of Appeal may never reach the last issue which is
25  one upon which the MTA's alleged claim in this proceeding is based, and Alameda Produce does
    not believe that the last issue is properly before the Court of Appeal to begin with.

26  [14] Even if the MTA's request for a credit were denied, Alameda Produce could pay any
    judgment in favor of the MTA in the first eminent domain proceeding from funds received in the
27  second eminent domain proceeding.

28
                                          - 6 -

III.

## THE DEBTORS' PLAN PROVIDES FOR PAYMENT OF

## THE MTA'S CLAIM IN THE UNLIKELY EVENT THAT

## IT BECOMES AN ALLOWED CLAIM

13.    The MTA incorrectly alleges in the Opposition that the Debtors' plan provides no means for payment of the MTA Contingent Claim. The crux of the MTA's argument appears to be that because the Debtors' projections do not expressly show a payment being made to the MTA at some point in the future, the plan does not "provide for" the MTA's claim. To the contrary, it would not have been proper for the projections to have included a payment that neither the MTA nor the Debtors believe will ever be made. Moreover, as shown by the evidence presented to the Court in connection with confirmation, and as the Debtors' counsel stated at closing arguments, even if a judgment in some undetermined amount is entered at some undetermined time in the future in favor of the MTA, any judgment could be satisfied from, among other things, sales proceeds or other revenues generated by the other Debtors. In objecting to the Debtors' plan, and now to the Motion, the MTA fails to take into account the flexibility and resources that are and will be available to Alameda Produce under the Debtors' plan. The MTA also fails to consider that, under the hypothetical it has presented, the cloud on title to the Subject Property will be lifted. Even if one ignores resources available from the other Debtors, one cannot ignore the fact that Alameda Produce will have another asset which may serve as collateral if Alameda Produce is required to obtain a loan in order to pay the MTA.[15]

///

///

///

---

[15] The evidence submitted to the Court in connection with confirmation also showed that Alameda Produce owns an unencumbered property located at 1215 East 7th Street, Los Angeles, California. The use of that property is being donated to the Central City East Association for their service vehicles and to provide aid to homeless people by storing their belongings. Declaration of Richard Meruelo filed on December 3, 2010 (*docket entry no. 2327*), ¶ 63.

IV.

THE COURT HAS THE AUTHORITY TO ESTIMATE

THE MTA'S CLAIM AT ZERO

14.    As addressed in the Motion, an estimation motion is not required for the Court to consider the value (or lack thereof) of the MTA's alleged claim for purposes of making a finding under § 1129(a)(11). *See In re Harbin*, 486 F.3d 510 (9th Cir. 2007); *In re Pizza of Hawaii, Inc.*, 40 B.R. 1014 (D. Haw. 1984); *In re Dennis Ponte, Inc.*, 61 B.R. 296, 300 (B.A.P. 9th Cir. 1986) (when a claimant asserting an unliquidated or contingent claim challenges the feasibility of a plan, the court need only "consider[] the potential claim . . . during the confirmation process sufficiently for the purpose of evaluating its impact on feasibility"). However, because the MTA contended that the Court must accept its claim at face value, and because the Court inquired as to whether Alameda Produce had filed a motion to estimate the MTA Contingent Claim, the Debtors filed the Motion in the event the Court is of the view that one is required.

15.    The Court has the legal authority to estimate the MTA's claim at zero for the purpose of evaluating feasibility of the Debtors' Plan. The MTA contends otherwise, citing *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 415, 422 (Bankr. S.D.N.Y. 2003), for the proposition that "estimation 'raises risks of denial of due process, and Bankruptcy Courts need to be sensitive to this concern.'" In *Adelphia*, an administrative claimant objected to confirmation of the proposed plan and the debtor filed a motion to estimate the alleged claim for both feasibility and allowance purposes. Sensitive to the claimant's due process rights, the bankruptcy court did not estimate the claim for allowance purposes for due process reasons. However, the bankruptcy court *did* estimate the claim for plan feasibility purposes because estimation of the claim for such a limited purpose, where the court's findings would "not have any preclusive effect upon the ultimate disposition of [the] claim," was proper. *Adelphia*, 341 B.R. at 418 (quoting *In re Ralph Lauren Womenswear*, 197 B.R. 771, 775 (Bankr. S.D.N.Y. 1996)). As a result, the MTA's assertion that estimating its claim at zero for the purpose of evaluating feasibility of the Debtors' Plan would be improper is contradicted by the legal authority upon which it relies.

///

- 8 -

16.    As stated in *Adelphia*, the purpose of § 1129(a)(11)

is to protect creditors against unrealistic plans that have little or no chance of success. As stated by the Ninth Circuit:

> The purpose of section 1129(a)(11) [of the Bankruptcy Code] is to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.

*Pizza of Haw., Inc. v. Shakey's, Inc.* (*In re Pizza of Haw., Inc.*), 761 F.2d 1374, 1382 (9th Cir. 1985) (*quoting 5 Collier on Bankruptcy* ¶ 1129.02, at 1129–36.11 (15th ed. 1984)).  However, **just as speculative prospects of success cannot sustain feasibility, speculative prospects of failure cannot defeat feasibility**.  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds. *See In re U.S. Truck Co., Inc.*, 47 B.R. 932, 944 (E.D.Mich.1985).  Nor need success be guaranteed. *See Kane [v. Johns-Manville Corp.]*, 843 F.2d [636] at 650 [(2d Cir. 1988)].

In making determinations as to feasibility, however, a bankruptcy court does not need to know to a certainty, or even a substantial probability, that the plan will succeed.  All it needs to know is that the plan has a reasonable likelihood of success. *See Kane v. Johns–Manville Corp.*, 843 F.2d 636, 650 (2d Cir. 1988) (the feasibility standard is whether the plan offers a reasonable assurance of success). *In re Texaco Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) (Schwartzberg, J.) ("All that is required is that there be reasonable assurance of commercial viability"); *In re Johns–Manville Corp.*, 68 B.R. 618, 635 (Bankr. S.D.N.Y. 1986) (Lifland, C.J.) ("The plan proponent is not required to guarantee the ultimate success of the reorganized company") (citations omitted); *In re Prudential Energy Co.*, 58 B.R. 857, 862 (Bankr. S.D.N.Y. 1986) (Buschman, J.) ("Guaranteed success in the stiff winds of commerce without the protection of the Code is not the standard under § 1129(a)(11).  Most debtors emerge from reorganization with a significant handicap.  But a plan based on impractical or visionary expectations cannot be confirmed").

* * * * *

In that connection, it has been repeatedly held, including in cases at the Circuit Court of Appeals level, that when estimating claims, Bankruptcy Courts may use whatever method is best suited to the contingencies of the case, so long as the procedure is consistent with the fundamental policy of Chapter 11 that a reorganization "must be accomplished quickly and efficiently." *Bittner v. Borne Chemical Co.*, 691 F.2d at 135–37; *see also, e.g., In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir.1984), citing 3 *Collier on Bankruptcy* ¶ 502.03, at 502–77 (15th ed.1983).  Bankruptcy Courts have employed a wide variety of methods to estimate claims, including summary trial, *In re Baldwin–United Corp.*, 55 B.R. 885, 899 (Bankr. S.D. Ohio 1985), a full-blown evidentiary hearing, *In re Nova Real Estate Inv. Trust*, 23 B.R. 62, 65 (Bankr.E.D.Va.1982),

369321.05 [XP]    25195

1    and a review of pleadings and briefs followed by oral argument of
     counsel, *In re Lane*, 68 B.R. 609, 613 (Bankr. D. Haw.1986).  In so
2    doing, courts specifically have recognized that it is often
     "inappropriate to hold time-consuming proceedings which would
3    defeat the very purpose of 11 U.S.C. § 502(c)(1) to avoid undue
     delay."  *In re Windsor Plumbing Supply Co.*, 170 B.R. 503, 520
4    (Bankr.E.D.N.Y.1994).

5    *Adelphia*, 341 B.R. at 421-23 (emphasis added).  Accordingly, *Adelphia* supports the Debtors'

6    position that the Court has the authority to estimate the MTA's claim at zero for the purpose of

7    assisting the Court in evaluating whether the Debtors' Plan is feasible, without forcing the parties

8    to engage in discovery and evidentiary hearings.

9

10                                              V.

11        THE MTA CONTINGENT CLAIM SHOULD BE ESTIMATED AT

12        ZERO FOR THE LIMITED PURPOSE DESCRIBED IN THE MOTION

13        17.    Contrary to the MTA's suggestion, Alameda Produce is not requesting that the

14   Court estimate the MTA Contingent Claim at zero solely because the MTA believes it will prevail

15   on appeal.  Alameda Produce is requesting that the Court estimate the MTA Contingent Claim at

16   zero "[i]n light of the fact that all parties believe that nothing ever will need to be paid by Alameda

17   Produce to the MTA, the fact that the MTA's assertion of a claim is not supported by the state law,

18   the Superior Court's order, admissions by the MTA in its Supreme Court brief, and the MTA's

19   actions in the Namco case, and the substantial uncertainty as to when the MTA Contingent Claim

20   would be resolved."[16]  The MTA cannot dispute that both the MTA and Alameda Produce believe

21   that nothing likely will need to be paid by Alameda Produce to the MTA.  The MTA does not

22   dispute that the Superior Court declined to condition dismissal of the MTA Action on Alameda

23   Produce returning the deposit.  The MTA cannot dispute that if the Superior Court is affirmed on

24   appeal the MTA will need to pursue other remedies.  The MTA does not dispute that the MTA is

25   ///

26

27        [16] Motion, page 15, lines 2-7.

28

                                           - 10 -

369321.05 [XP]     25195

1 | pursuing or will pursue the exact same claims against the lienholders.[17]  The MTA also does not

2 | dispute that there is substantial uncertainty as to how long it will be before the MTA Contingent

3 | Claim can be resolved.  The only things the MTA actually disputes is whether it admitted in its

4 | Supreme Court brief that it must seek recovery from the lienholders, whether CCP § 1255.280(a)

5 | applies, and whether Alameda Produce's claims against the MTA exceed the MTA Contingent

6 | Claim.

7 |

8 | A.    THE MTA ADMITS THAT IF ALAMEDA PRODUCE'S INTERPRETATION OF CCP

9 |        § 1255.260 IS ACCEPTED AND THE DISMISSAL IS AFFIRMED, THE MTA WILL BE

10 |       REQUIRED TO PURSUE THE LIENHOLDERS

11 |       18.    Contrary to the MTA's Opposition, the MTA admitted on page 45 of its Supreme

12 | Court brief that, if the Superior Court's dismissal is upheld, the MTA will be required to return the

13 | Subject Property to Alameda Produce and seek the return of the Withdrawn Funds from the entities

14 | who actually withdrew the funds.  This statement is consistent with the general theme of the

15 | MTA's argument on appeal, which is that the Court should adopt the MTA's interpretation of CCP

16 | § 1255.260[18] because, otherwise, Alameda Produce allegedly receive a windfall.  In an effort

17 | to generate sympathy, the MTA has told the Supreme Court that if it accepts Alameda Produce's

18 | interpretation of CCP § 1255.260, the MTA will be forced to pursue the three lienholders from

19 | whom it may or may not recover.

20 | ///

21 |

---

22 |        [17] Contrary to the MTA's suggestion, Alameda Produce does not contend that the MTA
23 | waived or released its alleged claims against Alameda Produce's estate by filing a proof of claim in
     | the Namco case.  The point is that the MTA is aware of the fact that its primary remedy is against
24 | the applicants who withdrew the Withdrawn Funds, and has acted consistent with that knowledge.

25 |        [18] "If any portion of the money deposited . . . is withdrawn, the receipt of any such money
     | shall constitute a waiver by operation of law of all claim and defenses *in favor of the persons*
26 | *receiving such payment* except a claim for greater compensation." CCP § 1255.260 (emphasis
     | added).  The issue before the Supreme Court is whether Alameda Produce's claims and defenses
27 | have been waived because part of the deposit was withdrawn by lienholders who received the
     | Withdrawn Funds.

28 |

- 11 -

369321.05 [XP]    25195

1    19.   Having made that plea to the Supreme Court one day before closing arguments and

2  the same day on which the MTA filed its unauthorized supplemental objection to confirmation of

3  the Debtors' plan,[19] the MTA tries to retreat from its admission by claiming that it has been taken

4  out of context.  To the contrary, the context is clear that the MTA was arguing that if Alameda

5  Produce's interpretation of CCP § 1255.260 is adopted, and the appellate court rules in favor of

6  Alameda Produce, the MTA will have to seek to recover the Withdrawn Funds from the parties

7  who withdrew the funds, including two that the MTA states are in bankruptcy (Namco) or

8  receivership (California National Bank).  There is no other way to interpret the MTA's statement

9  on page 45 and at no point in its Supreme Court brief did the MTA state that it would be entitled to

10  recover the Withdrawn Funds from Alameda Produce.

11

12  B.   THE MTA ADMITS THAT IT IS NOT ENTITLED TO RECOVER FROM ALAMEDA

13     PRODUCE PURSUANT TO CCP § 1255.280(a)

14    20.   With regard to CCP § 1255.280(a), Alameda Produce and the MTA again reach the

15  same conclusion, but from different directions.  In Alameda Produce's view, CCP § 1255.280(a)

16  would require the MTA to seek recovery from the lienholders who withdrew the Withdrawn Funds,

17  not from Alameda Produce.  In the MTA's view, CCP § 1255.280(a) does not apply at all.[20]  Under

18  ///

19  ///

20  ///

21  ///

22

23    [19] The MTA's complaint regarding the timing of the Motion rings hollow considering that
24  the MTA filed an unauthorized supplemental objection to confirmation of the Debtors' plan at 6:01
   p.m. the day before closing arguments.  Rather than request another continuance in order to address
25  arguments made in the supplemental objection and risk delaying the confirmation proceedings, the
   Debtors proceeded with closing arguments.

26    [20] The MTA claims that CCP § 1255.280 "typically applies only where the court enters a
27  valuation judgment with respect to property."  There is no such limitation in the statute, and the
   context in which CCP § 1255.280 appears in the code does not support the MTA's position.

28

- 12 -

1   either party's interpretation, the MTA is not entitled to seek recovery from Alameda Produce under

2   CCP § 1255.280(a).[21]

3

4   C.    THE MTA HAS NOT OFFERED ANY AUTHORITY TO SHOW THAT IT HAS VALID

5         CLAIMS AGAINST ALAMEDA PRODUCE

6         21.    The burden of proof in the claim estimation process is the same as that for

7   objections to claims. *In re Frascella Enterprises, Inc.*, 360 B.R. 435, 458–59 (Bankr. E.D. Pa.

8   2007) (burden of proof in estimation proceeding should be consistent with the burdens of proof in

9   claim litigation). Generally, an objecting party has the burden of going forward to negate the *prima*

10  *facie* validity afforded to a properly filed proof of claim. *Lundell v. Anchor Constr. Specialists (In*

11  *re Lundell)*, 223 F.3d 1035, 1039 (9th Cir. 2000). However, the ultimate burden of persuasion

12  remains at all times upon the claimant. *Id.* Therefore, where an objecting party provides argument

13  or evidence negating the prima facie validity of a proof of claim, the burden reverts to the claimant

14  to prove the validity of the claim by a preponderance of the evidence. *Id.*

15        22.    The MTA did not identify in its proof of claim or its confirmation objection any

16  legal grounds upon which the MTA Contingent Claim was based, and merely alleged that Alameda

17  Produce would be required to return $8.5 million to the MTA.[22] In the Opposition, the MTA for

18  the first time asserts that the grounds for its alleged claim consist of equitable actions and remedies,

19  "including restitution, unjust enrichment, and constructive trust."[23] The MTA provides no legal

20  _____

21  [21] The MTA claims, citing only to its own Supreme Court brief, that if CCP § 1255.280(a)
    applies Alameda Produce would be required to return the deposit because it allegedly participated

22  in the withdrawals and received the benefit of the Withdrawn Funds. The MTA did not make this
    argument to the Supreme Court; indeed, the MTA's Table of Authorities reflects that the MTA did

23  not even cite to CCP § 1255.280. Also, it stands to reason that if the Supreme Court agrees with
    Alameda Produce's interpretation of CCP § 1255.260 (providing for waiver of claims and defenses

24  by person receiving withdrawn funds) it would similarly interpret CCP § 1255.280 (providing that
    amounts withdrawn by a party in excess of the amount to which the party is entitled must be paid to

25  the party entitled thereto).

26  [22] A copy of the proof of claim was attached as Exhibit "1" to the Request for Judicial
    Notice appended to the Motion.

27  [23] Objection, page 15, line 21-23.

28

- 13 -

1  analysis whatsoever with respect to these newly alleged claims, and therefore has not attempted to

2  demonstrate the likelihood that the MTA would succeed. The MTA's reference to having a claim

3  for constructive trust suggests that the MTA has not actually evaluated the legal basis for its alleged

4  claims since a constructive trust is a remedy, not a claim. *See PCO, Inc. v. Christensen, Miller,*

5  *Fink, Jacobs, Glaser, Weil & Shapiro, LLP*, 150 Cal. App. 4th 384, 398 (2007).[24] In any event, the

6  MTA has not provided any legal analysis to show that (a) if Alameda Produce prevails on appeal,

7  and (b) if the MTA fails or refuses to collect the Withdrawn Funds or a portion thereof from the

8  lienholders,[25] and (c) if the MTA sues Alameda Produce, there is a likelihood that the MTA will

9  prevail in that action.

10

11  D.     ALAMEDA PRODUCE'S CLAIMS AGAINST THE MTA OFFSET ANY AMOUNT

12         ALAMEDA PRODUCE OTHERWISE WOULD OWE TO THE MTA

13         23.     Alameda Produce will have sizeable claims against the MTA as a result of the fact

14  that, for the last 6½ years, the MTA has occupied the Subject Property. The Company acquired the

15  Property so that it could build a parking structure to service its tenants at Alameda Square. As a

16  result of Alameda Produce's inability to use the Subject Property during this time, damages have

17  accrued – and are continuing to accrue on a daily basis. As a matter of law, if Alameda Produce is

18  successful on appeal, Alameda Produce will be entitled to recover all damages, broadly construed,

19  from the MTA. *See* CCP §§ 1268.610 and 1268.620.

20         24.     Even if the MTA ultimately is successful in establishing that Alameda Produce must

21  reimburse the MTA for the Withdrawn Funds, it is extremely likely that the amount of damages the

22  MTA will owe to Alameda Produce will exceed the Withdrawn Funds. At the start of this reply,

23

24     [24] It appears that the MTA believes that it may be entitled to a novel remedy in which
    Alameda Produce holds the Subject Property in constructive trust for the benefit of the MTA. A
25  constructive trust requires that there be a *res*. It is unclear what *res* the MTA believes exists other
    than the Subject Property.
26

27     [25] While criticizing Alameda Produce, the MTA makes no effort to quantify how much the
    MTA may recover from the lienholders.
28

- 14 -

369321.05 [XP]     25195

1    expressly reserving all rights and claims, Alameda Produce showed that even under a most basic of

2    formulations the amount owed by the MTA *as of today* would exceed $6.3 million. The Superior

3    Court's determination of all of the damages to which Alameda Produce is entitled will occur after

4    many months of discovery and trial. To provide the Court a flavor of the many things that parties

5    and the Court will need to take into consideration, and again reserving any and all rights and claims

6    of Alameda Produce against the MTA, attached hereto is a supplemental Declaration of Richard

7    Meruelo with additional background regarding the Subject Property, Alameda Produce's intended

8    use of the Subject Property, and some of the damages that may be recovered from the MTA. The

9    parties justifiably have not embarked on the extensive and time consuming discovery necessary to

10    litigate Alameda Produce's claims against the MTA. Further, the total amount of damages likely

11    will be dependent on the ultimate outcome of the MTA Action and any subsequent eminent domain

12    proceedings, which may not be known for years. In any event, Alameda Produce believes that the

13    total amount of damages that are and will be recoverable from the MTA is substantial, and well in

14    excess of $6.3 million.

15       25.    If the MTA believed it was important to conduct discovery regarding feasibility of

16    the Debtors' plan or the Debtors' view that Alameda Produce's claim against the MTA exceeds any

17    claim that may be allowed in favor of the MTA, it had the opportunity to conduct such discovery

18    last December and January. The Debtors' position that Alameda Produce's claim against the MTA

19    exceeds $6.3 million is nothing new.[26] Nevertheless, the MTA complains that the Debtors filed a

20    simple declaration to that effect. The MTA's claim that it should be entitled to conduct discovery

21    and hold evidentiary hearings regarding a claim that the MTA does not even believe will ever need

22    to be paid should be rejected.

---

24    [26] If nothing else, the MTA was or should have been aware of the Debtors' position
because, in the Debtors' disclosure statement, the Debtors identified the MTA Contingent Claim as
25    disputed and stated that Alameda Produce's claims against the MTA exceeded the $8.5 million
claimed by the MTA. Disclosure Statement, page 138, lines 5-9 ("The [MTA] filed an unsecured
26    claim against Alameda Produce Market for $8,500,000 related to the pending eminent domain
litigation between Alameda Produce Market and the MTA. The Debtors believe that they are owed
27    damages in an amount in excess of $8.5 million.). The disclosure statement also referenced the
Debtors' claims against the MTA on pages 21-22 and page 129.

- 15 -

1

VI.

2

VARIOUS ALLEGATIONS IN THE OPPOSITION ARE CONTRADICTED

3

BY EVIDENCE IN THE SUPERIOR COURT TRIAL RECORD

4        26.    At the same time that the MTA contests the admissibility of Richard Meruelo's

5    declaration and complains that the declaration is "self-serving," the MTA presents the Court with

6    factual allegations supported solely by the MTA's own self-serving appellate brief. As stated in the

7    Motion, "Alameda Produce does not agree with much of the MTA's brief, including recitations of

8    certain facts which are contrary to evidence in the record and, in some instances, are contrary to the

9    Court of Appeal's decision."[27] Many inaccurate allegations in the MTA's Supreme Court brief are

10    repeated in the Opposition. Alameda Produce does not believe there is a need to address inaccurate

11    alleged facts in the Opposition, and generally does not do so in this reply.

12        27.    However, there was no "collusion" or "scheme" between Alameda Produce and the

13    lienholders to "extract" funds from the MTA. The allegation that California National Bank, which

14    had a deed of trust even before the MTA adopted its resolution of necessity, engaged in collusion is

15    preposterous. VCC Alameda, LLC, which the MTA falsely claims to be affiliated with Richard

16    Meruelo, legitimately sold the Subject Property to Alameda Produce subject to seller financing.[28]

17    Namco, an entity not affiliated with the Debtors, extended Alameda Produce a line of credit which

18    was secured by the Subject Property and which the MTA admits was not even close to being fully

19    drawn against.[29] These were legitimate non-affiliated lenders which held legitimate liens against

20    the Subject Property, which filed applications for withdrawal on their own behalf, and with which

21    the MTA stipulated to withdrawal of most of the Withdrawn Funds without protecting itself. The

22

23        [27] Motion, page 13, footnote 29.

24        [28] A non-Debtor affiliate of Alameda Produce, Alameda North Parking, Inc., was leasing
the Subject Property subject to a lease with an option to purchase. The sale transaction ultimately
25    was accomplished by Alameda Produce instead of Alameda North Parking.

26        [29] The MTA alleges that Alameda Produce verified Namco's statement that it was owed
$2.25 million when the debt owed at the time was only $355,264. The MTA ignores the Court of
27    Appeal's decision, which explains that the Subject Property was pledged as additional collateral for
an affiliated entity's note. DCA Decision, page 6, n.7.

28

- 16 -

1  MTA's inflammatory allegations are nothing more than an attempt to deflect the focus from itself

2  for its own refusal to negotiate in good faith when ordered to do so by the Superior Court.[30]

3

4                                          VII.

5                                      CONCLUSION

6       28.    Alameda Produce does not criticize the MTA for filing a proof of claim against

7  Alameda Produce's estate to protect its interests in the unlikely event that, years from now, after

8  the conclusion of litigation in the Superior Court, the Court of Appeal and the Supreme Court, the

9  MTA ends up with an Allowed Claim against Alameda Produce's estate.  However, when a claim

10  is so speculative and dependent on so many pieces falling into place, and when the claimant itself

11  does not believe that the debtor actually will be required to pay the claim, it is appropriate to value

12  the claim at zero for purposes of evaluating whether confirmation of the debtor's plan is likely to

13  be followed by liquidation or the need for further reorganization.  That is especially true here with

14  respect to the MTA Contingent Claim where, among other things, the MTA has simply alleged that

15  it would have a claim but has not offered any legal analysis to support its assertions, and there can

16  be no legitimate dispute that Alameda Produce has sizeable claims against the MTA which would

17  offset any claims that the MTA may assert.  Accordingly, for the reasons stated in the Motion and

18  this reply, Alameda Produce requests that the Court estimate the MTA Contingent Claim at zero

19  dollars for non-voting plan confirmation purposes only.

20

21  Dated: May 11, 2011                    DANNING, GILL, DIAMOND & KOLLITZ, LLP

22

23                                  By:  _____
                                         John N Tedford, IV
24                                       Attorneys for Debtor and Debtor-in-
                                         Possession Alameda Produce Market, LLC
25

26      [30] The MTA also disregards the fact that even though the MTA commenced an eminent
    domain proceeding, Alameda Produce was (and still is) the owner of the Subject Property, and had
27  (and still has) every right to encumber the Subject Property for any reason.

28
                                          - 17 -

369321.05 [XP]    25195

## DECLARATION OF RICHARD MERUELO

I, Richard Meruelo, declare and state as follows:

1.     I am the Chief Executive Officer and Chairman of the Board of Directors of Meruelo Maddux Properties, Inc. ("MMPI").

2.     I have personal knowledge of the facts stated herein, and if called as a witness, I could and would competently testify thereto.

3.     On March 27, 2009 (the "Petition Date"), Alameda Produce Market, LLC ("Alameda Produce"), filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code.

4.     Alameda Produce, as successor-in-interest to Alameda Produce Market, Inc., owns, among other things, real property located in downtown Los Angeles and commonly known as 1339 East 7th Street, Los Angeles, California (the "Subject Property").

5.     The Subject Property is located across the street from MMPI's corporate offices and is part of the complex generally referred to as "Alameda Square." The Subject Property also is located adjacent to a facility operated by the Los Angeles County Metropolitan Transportation Authority (the "MTA"). In or about April 2004, the MTA filed an eminent domain complaint (the "MTA Action") in the Los Angeles Superior Court (the "Superior Court") against the Subject Property. In or about November 2004, the MTA took possession of the Subject Property. Since the MTA took possession of the Subject Property, Alameda Produce has not been in possession of or had the use of the Subject Property.

6.     In the event that Alameda Produce prevails in the MTA Action whereby the MTA is required to return the Subject Property to Alameda Produce, Alameda Produce will be entitled to damages resulting from the MTA's interim taking. There are many components to those damages which would be the subject of further litigation, and this declaration does not purport to discuss all of those components or all of the damages resulting therefrom. Without limiting our rights to determine the appropriate amount of damages, one component of damages may be measured by determining the ground rents that the MTA would be required to pay to use the Subject Property

- 18 -

1  during the last six-plus years. It is my understanding that the MTA believes that the Subject

2  Property has a value of at least $9.7 million. I believe that the value of the Subject Property was

3  significantly more than $9.7 million. A customary method of determining an annual ground rent is

4  10% of the property value. Based on this method and the MTA valuation, the MTA would have

5  been required to pay at least $6.8 million in ground rents over a seven year period.

6        7.        This does not include various other components of damages that Alameda Produce

7  suffered by not having use of the Subject Property during the past seven years. For instance,

8  American Apparel, who is the major tenant at Alameda Square, did not renew its lease because of

9  uncertainty regarding parking, and as a result our lender, Cathay Bank, would not extend the term

10  of our loans of approximately $60 million. This resulted in Alameda Produce and its affiliates

11  filing its bankruptcy petitions for relief in March 2009. Furthermore, we intended to build a multi-

12  level parking structure on the Subject Property which included an overhead bridge connecting the

13  parking structure to buildings located on Alameda Square, including where American Apparel is a

14  tenant. The parking structure would have served a number of purposes. Among other things, it

15  would have allowed us to provide additional parking to American Apparel and its employees.

16  After the MTA took possession of the Subject Property, we were required to dedicate a substantial

17  amount of additional land at Alameda Square to parking. At the time, we were leasing part of that

18  land to third parties who parked trucks and other vehicles on the premises. When the MTA took

19  possession of the Subject Property, we were required to terminate leases with third parties so that

20  the land previously used by them could be used by American Apparel. As a direct result of the

21  MTA's actions we have been deprived of additional revenues from such sources.

22        8.        Building a parking structure on the Subject Property also would have significantly

23  improved the marketability of the buildings at Alameda Square to companies interested in leasing

24  space, or to any entities interested in purchasing Alameda Square. Building a parking structure on

25  the Subject Property not only would have allowed us to receive additional revenues in leasing

26  parking areas at Alameda Square to third parties, it would have increased the revenues generated by

27  our ability to lease vacant building space at Alameda Square. It also would have freed up land at

28  Alameda Square for development that is now required to be devoted to parking. Overall, building a

- 19 -

1  parking structure on the Subject Property would have increased the value of the Alameda Square

2  property.

3      9.      After the MTA filed the MTA Action, we negotiated with the MTA in an effort to

4  agree to a joint use of the Subject Property. In fact, the MTA's Board of Directors had directed the

5  MTA's staff to negotiate regarding joint uses of the Subject Property. We made proposals to the

6  MTA and provided the MTA with designs for multi-level parking structures that would satisfy the

7  MTA's need for parking as well as provide Alameda Produce with additional parking space for

8  American Apparel or other tenants at Alameda Square. The MTA basically took the position that if

9  at least 100 of its buses could not be parked on the ground floor, then the idea of providing parking

10  for employees of the adjacent businesses must be totally abandoned. The Court-appointed referee

11  overseeing the negotiations determined that the MTA was not negotiating in good faith and

12  reported to the Superior Court accordingly.

13      10.      In the MTA Action, we submitted an appraisal to the Superior Court which was

14  designed to provide the Court with a conservative estimate of the Subject Property's market value.

15  The appraiser opined that, at a minimum, the Subject Property had a market value of $9.7 million.

16  I believe that the value of the Subject Property was significantly more than $9.7 million. If the

17  MTA prevails on appeal, we expect to present evidence to the Superior Court proving that Alameda

18  Produce is entitled to compensation for the real property itself in excess of $9.7 million, plus many

19  millions of dollars in severance damages that have been caused by the MTA's taking of the Subject

20  Property.

21      11.      The MTA's representatives, including Roger Moliere, who I understand to be the

22  MTA's director of real estate development, told me that they intend to pursue ownership of the

23  Subject Property even if the current MTA Action is dismissed. Because the Subject Property is

24  adjacent to an existing MTA facility and because the MTA has been using the Subject Property for

25  seven years, I believe it is likely that the MTA would adopt another resolution of necessity and file

26  a second eminent domain action in order to take the Subject Property.

27      12.      I believe that if Alameda Produce prevails on appeal, the MTA will be required to

28  return possession of the Subject Property to Alameda Produce and compensate Alameda Produce

- 20 -

369321.05 [XP]      25195

1 | for, among other things, damages to Alameda Produce caused by the dispossession of the Subject

2 | Property. I anticipate that these damages will include, but will not be limited to, ground rents and

3 | other lost revenues that Alameda Produce would have received, including, without limitation,

4 | revenues it would have received had it not been required to terminate leases with entities who were

5 | leasing land at Alameda Square, lost revenues that Alameda Produce would have received from

6 | American Apparel and other tenants at Alameda Square if Alameda Produce had built a parking

7 | structure on the Subject Property, lost revenues that Alameda Produce would have received if the

8 | parking structure included commercial space such as restaurant or other space that could have been

9 | utilized by companies catering to employees of surrounding businesses such as tenants at American

10 | Apparel, and damages caused due to the fact that Alameda Produce was unable to further develop

11 | Alameda Square since available land needed to be devoted to parking.

12 |        13.    I believe that damages Alameda Produce will be able to recover from the MTA will

13 | include the increase in costs borne by Alameda Produce as a result of the delay in construction of

14 | the parking structure. If we had been able to commence building the parking structure in or about

15 | 2004 or 2005, the cost of construction would have been less. In addition, at the time the MTA filed

16 | the MTA Action there was a financing program which was available for a limited period of time

17 | and which I believe was available to us on very favorable terms. We submitted an application but

18 | lost out on the opportunity because of the MTA Action and the unwillingness of the MTA to agree

19 | with us regarding a mutually beneficial use of the Subject Property. Obtaining funding now on the

20 | terms that were available to us at the time will be more difficult. I understand that the increase the

21 | costs of construction, including financing costs, constitutes damages recoverable from the MTA. I

22 | believe that the MTA could have mitigated some of these damages if it had been more committed

23 | to trying to negotiate adequate, mutually agreeable parking for the MTA's buses and employees of

24 | American Apparel.

25 |        14.    Alameda Produce also has incurred significant expenses litigating with the MTA

26 | over the last seven years, particularly with respect to the MTA's alleged right to take the Subject

27 | Property. Alameda Produce incurred significant attorneys' fees litigating the MTA's right to take

28 | the Subject Property, including fees incurred in connection with Superior Court, Court of Appeal

- 21 -

1    and now Supreme Court litigation. Attorneys' fees also were incurred when we were negotiating

2    with the MTA. I estimate that there were five to ten mediation sessions and Alameda Produce's

3    attorneys also engaged in negotiations outside of mediation. After the Superior Court dismissed

4    the MTA Action, Alameda Produce incurred attorneys' fees as a result of post-dismissal motions

5    filed by the MTA with the Superior Court, and then more attorneys' fees in connection with the

6    MTA's appeal to the Court of Appeal and Alameda Produce's appeal to the Supreme Court. We

7    will incur more appellate fees if the Supreme Court chooses to remand to the Court of Appeal for

8    further proceedings prior to final resolution of the appeal. In addition to attorneys' fees, Alameda

9    Produce also has incurred other expenses such as appraisal fees and similar expenses. Also, if we

10   are required to litigate with the MTA regarding the damages to which Alameda Produce is entitled,

11   Alameda Produce will be forced to incur a significant amount of attorneys' fees, expert witness

12   fees, appraisal fees, among other things, in connection with such litigation.

13          15.    The amount of damages to which Alameda Produce will be entitled has not been

14   litigated before the Superior Court. No discovery on the issue has been conducted, and because of

15   the Superior Court's order dismissing the MTA Action and the subsequent stay pending appeal, we

16   have not engaged in the time consuming and costly process of litigating the amount of damages to

17   be paid by the MTA. The total amount of damages recoverable likely will not be known for years,

18   and is increasing with time. Based upon my knowledge of the Subject Property and the other

19   properties owned by Alameda Produce, including the development and leasing potential of such

20   properties, my knowledge of properties located in the vicinity of Alameda Square, my experience

21   with sales and leasing of real property in downtown Los Angeles generally and the area in which

22   the Subject Property is located in particular, I believe that the amount of damages to which

23   Alameda Produce will be entitled substantially exceeds $6.3 million.

24          16.    Neither I nor any entity owned or controlled by me is affiliated with California

25   National Bank ("Cal National"), VCC Alameda, LLC ("VCC Alameda"), or Namco Capital Group,

26   ///

27   ///

28   ///

- 22 -

369321.05 [XP]        25195

1 | Inc. ("Namco").  Alameda Produce did not "collude" or "scheme" with any of the lenders to

2 | "extract" funds from the MTA.

3 |

4 |     I declare under penalty of perjury under the laws of the United States of America that the

5 | foregoing is true and correct.

6 |     Executed on May __, 2011, at Los Angeles, California.

7 |

8 |                     SIGNATURE TO FOLLOW
                        RICHARD MERUELO

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

369321.05 [XP]    25195

1

2

### REQUEST FOR JUDICIAL NOTICE

3      Debtor and debtor-in-possession Alameda Produce Market, LLC ("Alameda Produce"),

4 hereby requests that the Court take judicial notice of the following:

5      1.      On or about June 30, 2004, defendant Alameda Produce Market, Inc., filed its

6 *Notice and Motion for Increase of Deposit of Probable Just Compensation* in *Los Angeles County*

7 *Metropolitan Transportation Authority v. VCC Alameda, LLC, et al.*, Los Angeles Superior Court

8 case number BC313010.  A true and correct copy of the motion is attached as Exhibit "6" hereto.

9      2.      On or about October 14, 2010, Meruelo Maddux Properties, Inc., and its affiliated

10 debtors and debtors-in-possession filed their *Fourth Amended Joint Disclosure Statement*

11 *Describing Fourth Amended Joint Plan of Reorganization of Meruelo Maddux Properties, Inc., et*

12 *al., Dated September 20, 2010* (the "Disclosure Statement") (*docket entry no. 1954*).  True and

13 correct copies of the cover page and pages 21, 22, 129 and 138 of the Disclosure Statement are

14 attached as Exhibit "7" hereto.

15

16 Dated: May 11, 2011              DANNING, GILL, DIAMOND & KOLLITZ, LLP

17

18                           By:  _____
                                  John N Tedford, IV
19                                Attorneys for Debtor and Debtor-in-
                                  Possession Alameda Produce Market, LLC
20

21

22

23

24

25

26

27

28

- 24 -

# EXHIBIT 6

1 | Connie Cooke Sandifer, State Bar Number 80627
Cynthia C. Miller, State Bar Number 185206
2 | OLIVER, VOSE, SANDIFER, MURPHY & LEE
281 S. Figueroa Street, 2nd Floor
3 | Los Angeles, CA  90012-2501
Telephone: (213) 621-2000
4 | Facsimile: (213) 621-2211

5 | Attorneys for Defendant
Alameda Produce Market, Inc.

6

**CONFORMED COPY**
OF ORIGINAL FILED
Los Angeles Superior Court

**JUN 3 0 2004**

John A. Clarke, Executive Officer/Clerk
By_____, Deputy
**J. SUNGA**

7

8 | SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

9

10

| | |
|---|---|
| 11   LOS ANGELES COUNTY METROPOLITAN TRANSPORTATION AUTHORITY, | NO. BC 313010 |
| 12            Plaintiff, | NOTICE AND MOTION FOR INCREASE OF DEPOSIT OF PROBABLE JUST COMPENSATION; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF CYNTHIA C. MILLER IN SUPPORT THEREOF |
| 13       vs. | |
| 14   VCC ALAMEDA, LLC, a California Limited Liability Company, ALAMEDA NORTH PARKING, INC.; LOS ANGELES COUNTY TAX COLLECTOR; BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION; CHICAGO TITLE COMPANY, a California corporation,; CALIFORNIA NATIONAL BANK, a National Banking Association; CITY OF LOS ANGELES, (ADMINISTRATIVE SERVICES DIVISION); DOE 1 through DOE 100; and ALL PERSONS UNKNOWN CLAIMING AN INTEREST IN THE PROPERTY TO BE CONDEMNED HEREIN | (LACMTA Parcel Number Division 1 - Bus Operating Division 7th & Alameda Street) |
| 15 | |
| 16 | |
| 17 | Assigned for Pretrial Matters to Department 59, Commissioner Mitchell |
| 18 | |
| 19 | |
| 20 | DATE:     July 21, 2004 |
| 21 | TIME:     10:00 a.m. |
|  | DEPT:     59 |
| 22 | |
| 23            Defendants. | |
| 24 | |

25 | PLEASE TAKE NOTICE that on July 21, 2004 at 8:30 a.m. in

26 | Department 59 of the above-entitled Court located at 111 N. Hill

27 | Street , Los Angeles, California, defendant Alameda Produce Market,

28 | Inc., will move the Court to increase the amount of the deposit

-1-

1  pursuant to Code of Civil Procedure Section 1255.030.  This motion

2  is made on the ground that the amount deposited is inadequate

3  because it is based upon an appraisal that is dated far enough in

4  advance of the date of value herein that it does not reflect the

5  probable just compensation to be paid in this case.  Thus, although

6  a deposit has been made in this case, it is not reflective of the

7  probable amount of compensation which will be paid for the Subject

8  Property in this proceeding.  This motion is based on this notice,

9  the motion filed herewith, the memorandum of points and authorities

10  attached hereto, the attached declaration of Cynthia Miller in

11  support hereof, and the pleadings and papers on file in this action

12  and such further oral and documentary evidence presented at the

13  time of hearing on this motion.

14  DATED: June 30, 2004        OLIVER, VOSE, SANDIFER, MURPHY & LEE

15

16                              By: _Cynthia C. Miller_____

17                                  Connie Cooke Sandifer
                                    Cynthia C. Miller
18                                  Attorneys for Defendant
                                    Alameda Produce Market, Inc.

19

20

21

22

23

24

25

26

27

28

OLIVER, VOSE, SANDIFER, MURPHY & LEE
A PROFESSIONAL CORPORATION
281 S. FIGUEROA STREET, SECOND FLOOR
LOS ANGELES, CA 90012-2501
TELEPHONE: (213) 621-2000
TELECOPIER: (213) 621-2211

-2-

121099                      MOTION TO INCREASE DEPOSIT

OLIVER, VOSE, SANDIFER, MURPHY & LEE
A PROFESSIONAL CORPORATION
281 S. FIGUEROA STREET, SECOND FLOOR
LOS ANGELES, CA 90012-2501
TELEPHONE: (213) 621-2000
TELECOPIER: (213) 621-2211

1

<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

2

I.    <u>INTRODUCTION</u>

3

Plaintiff, the Los Angeles County Metropolitan

4

Transportation Authority ("MTA"), filed this eminent domain

5

action on April 1, 2004 to acquire the real property located at

6

the intersection of Alameda Street and 7th Street, in the City of

7

Los Angeles, ("Subject Property").   The Subject Property is owned

8

by Alameda Produce Market, Inc.

9

On April 1, 2004, plaintiff MTA obtained a 90 day Order of

10

Immediate Possession based upon its deposit of $6,300,000.00 as

11

the probable amount of compensation for the taking of the Subject

12

Property.   The Summary of Just Compensation upon which said Order

13

for Immediate Possession was issued was based upon an appraisal

14

prepared by for Plaintiff MTA on October 6, 2003.

15

Defendant Alameda Produce Market, Inc., has obtained a

16

current appraisal of the Subject Property in the amount of

17

$9,700,000. Defendant seeks an Order from this Court increasing

18

the amount of funds deposited as probable compensation to

19

$9,700,000 on this basis of its updated appraisal.

20

<u>ARGUMENT</u>

21

1.    **WHERE THE AMOUNT OF PROBABLE COMPENSATION EXCEEDS THE
AMOUNT DEPOSITED, THE COURT IS REQUIRED TO ORDER
PLAINTIFF TO INCREASE THE DEPOSIT.**

22

23

Where the initial deposit of compensation is inadequate and

24

does not represent the probable amount of compensation, the Court

25

is directed to order plaintiff to increase the deposit

26

accordingly prior to taking possession of the property.   Code of

27

Civil Procedure Section 1255.030 states in part:

28

\

OLIVER, VOSE, SANDIFER, MURPHY & LEE
A PROFESSIONAL CORPORATION
281 S. FIGUEROA STREET, SECOND FLOOR
LOS ANGELES, CA 90012-2501
TELEPHONE: (213) 621-2000
TELECOPIER: (213) 621-2211

1   "(a) At any time after a deposit has been made

2   pursuant to this article, the court shall, upon motion

3   of the plaintiff or of any party having an interest in

4   the property for which the deposit was made, determine

5   or redetermine whether the amount deposited is the

6   probable amount of compensation that will be awarded in

7   the proceeding.

8       (b) If the plaintiff has not taken possession of

9   the property and the court determines that the probable

10  amount of compensation exceeds the amount deposited,

11  the court may order the plaintiff to increase the

12  deposit or may deny the plaintiff possession of the

13  property until the amount deposited has been increased

14  to the amount specified in the order.

15      (c) If the plaintiff has taken possession of the

16  property and the court determines that the probable

17  amount of compensation exceeds the amount deposited,

18  the court shall order the amount deposited to be

19  increased to the amount determined to be the probable

20  amount of compensation."

21  At the time of filing this action, plaintiff deposited

22  $6,300,000.00 for the probable just compensation.  This initial

23  deposit has since been withdrawn and/or reserved for lienholders

24  on the property.  There is however, not a sufficient amount on

25  deposit to reflect the probable just compensation as of the

26  earliest possible date of value in this case.  Accordingly, this

27  court should order the deposit of the difference between the

28  original deposit and the appraisal amount submitted by Alameda

-4-

1  Produce Market, Inc.

2      2.   DEFENDANT ALAMEDA PRODUCE MARKET, INC. IS ENTITLED TO

3  HAVE THE PROBABLE COMPENSATION FOR ITS PROPERTY DEPOSITED AS

4  A PREREQUISITE TO PLAINTIFF'S PREJUDGMENT POSSESSION.

5      Believing the deposit appraisal figure to be outdated

6  (especially in light of the fact that the summary of fair market

7  value accompanying plaintiff's Application for Prejudgment

8  Possession does not reference the sales dates of the transactions

9  on which it relies), defendant Alameda Produce Market, Inc.,

10 obtained a minimal value summary report from David A. Zoraster,

11 MAI, of CB Richard Ellis.  Mr. Zoraster's appraisal report

12 incorporates sales transactions, which by virtue of their

13 proximity to the date of value, could not have been included in

14 plaintiff MTA's deposit appraisal. A true and correct copy of Mr.

15 Zoraster's appraisal report attached hereto as Exhibit "A".

16     The Zoraster appraisal report concludes that the minimum

17 value of the real property owned by defendant Alameda Produce

18 Market, Inc., is the amount of $9,700,000.  Insofar as the

19 current deposit for the probable amount of compensation is only

20 $6,300,000, the Court should increase the deposit required by

21 plaintiff MTA, which is a prerequisite to prejudgment possession,

22 to $9,700,000.

23     3.   CONCLUSION.

24     The Court should find that plaintiff is required to deposit

25 the probable just compensation to be awarded herein prior to

26 taking prejudgment possession of the Subject Property.  Since the

27 deposit made by plaintiff MTA is lower than the indicated value

28                                    \

OLIVER, VOSE, SANDIFER, MURPHY & LEE
A PROFESSIONAL CORPORATION
281 S. FIGUEROA STREET, SECOND FLOOR
LOS ANGELES, CA 90012-2501
TELEPHONE: (213) 621-2000
TELECOPIER: (213) 621-2211

-5-

121099                          MOTION TO INCREASE DEPOSIT

1  of the just compensation which is probable herein, this Court

2  should order that plaintiff increase its deposit a total of

3  $9,700,000.00.

4  DATED: June 30, 2004            OLIVER, VOSE, SANDIFER, MURPHY & LEE

5

6                                  By: _Cynthia C. Miller_____

7                                      Connie Cooke Sandifer
                                        Cynthia C. Miller
8                                      Attorneys for Defendant
                                        Alameda Produce Market, Inc.

9

10

11

12

OLIVER, VOSE, SANDIFER, MURPHY & LEE
A PROFESSIONAL CORPORATION
281 S. FIGUEROA STREET, SECOND FLOOR
LOS ANGELES, CA 90012-2501
TELEPHONE: (213) 621-2000
TELECOPIER: (213) 621-2211

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-6-

OLIVER, VOSE, SANDIFER, MURPHY & LEE
A PROFESSIONAL CORPORATION
281 S. FIGUEROA STREET, SECOND FLOOR
LOS ANGELES, CA 90012-2501
TELEPHONE: (213) 621-2000
TELECOPIER: (213) 621-2211

1            <u>DECLARATION OF CYNTHIA C. MILLER</u>

2      I, Cynthia C. Miller, declare that if called as a witness, I

3 would competently testify under oath to the following facts:

4      1.    I am a licensed attorney and an associate with the firm

5 of Oliver, Vose, Sandifer, Murphy & Lee, attorneys for defendant

6 Alameda Produce Market, Inc., in this matter. This eminent

7 domain action was filed on April 1, 2004, for the taking of the

8 real property located at the corner of Alameda Street and 7th

9 Street in the City of Los Angeles ("Subject Propert"). The

10 Subject Property was owned by Alameda Produce Market, Inc.

11      2.    On or about April 1, 2004, the plaintiff Los Angeles

12 County Metropolitan Transportation Authority ("MTA") deposited

13 the sum of $6,300,000 as probable just compensation for the

14 Subject Property.

15      3.    At the time, it made the initial deposit of probable

16 compensation, plaintiff MTA deposited $6,300,000.00 based upon an

17 October 2003 appraisal summary.

18      4.    I am informed and believe that the total amount of

19 $6,300,000.00 has been withdrawn from the court and/or

20 specifically left on deposit for defendants City of Los Angeles

21 and County of Los Angeles.

22      5.    Attached to this motion as Exhibit "A" is the appraisal

23 report prepared by David A. Zoraster, MAI, of CB Richard Ellis.

24 This appraisal report states that the minimum current value of

25 the Subject Property is $9,700,000.

26                   \

27                   \

28                   \

121099              MOTION TO INCREASE DEPOSIT

1          I declare under penalty of perjury that the foregoing is

2    true and correct and that this declaration is executed on June

3    30, 2004, at Los Angeles, California.

4

5                                    _____
                                     Cynthia C. Miller
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OLIVER, VOSE, SANDIFER, MURPHY & LEE
A PROFESSIONAL CORPORATION
281 S. FIGUEROA STREET, SECOND FLOOR
LOS ANGELES, CA 90012-2501
TELEPHONE: (213) 621-2000
TELECOPIER: (213) 621-2211

-8-

121099                          MOTION TO INCREASE DEPOSIT