1  GARY E. KLAUSNER (State Bar No. 69077)
2  MARINA FINEMAN (State Bar No. 193065)
   GABRIEL I. GLAZER (State Bar No. 246384), Members of
3  STUTMAN, TREISTER & GLATT, P.C.
   1901 Avenue of the Stars, 12th Floor
4  Los Angeles, CA  90067-6013
   gklausner@stutman.com
5  mfineman@stutman.com
   gglazer@stutman.com
6  Telephone: (310) 228-5600
7  Facsimile: (310) 228-5788

8  Special Reorganization Counsel for Debtors and Debtors in Possession

9  JOHN N. TEDFORD, IV (State Bar No. 205537)
   DANNING GILL, DIAMOND & KOLLITZ, LLP
10 2029 Century Park East, Third Floor
   Los Angeles, CA 90067-2904
11 JTedford@DGDK.com
   Telephone:  (310) 277-0077
12 Facsimile:  (310) 277-5735

13 Reorganization Counsel for Debtors and Debtors in Possession

14                    UNITED STATES BANKRUPTCY COURT
                      CENTRAL DISTRICT OF CALIFORNIA
15                     SAN FERNANDO VALLEY DIVISION

16

17 In re:                                Case No.: 1:09-bk-13356-VK
                                         Chapter 11 (Jointly Administered)
18 MERUELO MADDUX PROPERTIES,
   INC., et al.,[1]                      NOTICE OF MOTION AND MOTION FOR
19                                       ORDER:  (1) STRIKING EVIDENCE
                            Debtor.      IMPROPERLY RECEIVED AFTER THE CLOSE
20                                       OF TRIAL THROUGH JUDICIAL NOTICE, AND
                                         (2) RECONSIDERING PLAN CONFIRMATION
21 ☒   Affects all Debtors              RULING, OR, IN THE ALTERNATIVE, (3)
   ☐   Affects the following Debtor(s): SCHEDULING A HEARING TO CONSIDER
22                                       FAIR VALUE
23
                                         HEARING [SUBJECT TO APPLICATION FOR
24                                       ORDER SHORTENING TIME]

25

26

27 ─────────────────
   [1]  Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities. The
28      affiliated case numbers are as follows:  1:09-bk-13338-VK; 1:09-bk-13358-VK through 1:09-bk-13407-VK; 1:09-bk-13434-VK;
        and 1:09-bk-13439-VK.

550890v5

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT....................................................2

II.    BACKGROUND FACTS .................................................................................6

III.    ARGUMENT. ..............................................................................................10

    A.    Evidence of the Trading Price of MMPI's Stock On May 18, 2011 Must Be
Stricken From the Record................................................................................10

        1.    Post-Trial Judicial Notice Is Improper Where It Results In Unfairness
or Prejudice.........................................................................................10

        2.    The Strict Requirements of Federal Rule of Evidence 201 Were Not Met...12

    B.    The "Pink Sheet" Trading Price of MMPI's Stock On One Random Day Is a
Completely Invalid Measure of Value and In No Way Reflects the True Value
of the Reorganized Entity Or of Its Stock.............................................................13

    C.    The Charlestown Plan Cannot Be Confirmed In the Absence of Sufficient
Evidence As to the Fair Value of the Shares of Class 1F.................................17

        a.    The Watermarke Conversion Option Has No Relationship To Current
Stock Value..........................................................................................18

        b.    The Cash Out Option Has No Relationship to Current Stock Value..........19

        c.    The Members Of Class 1F Are Not Willing Sellers..............................19

        d.    There is No "Estoppel".............................................................20

    D.    If the Court Intends to Consider Evidence Outside the Record The Court
Should, At The Very Least, Schedule An Evidentiary Hearing To Consider
The Issue of Fair Value...................................................................................21

IV.    CONCLUSION.............................................................................................22

# TABLE OF AUTHORITIES

## CASES

Asarco LLC v. Americans Mining Corp.,
    396 B.R. 278 ................................................................................................. 17

Case v. Los Angeles Lumber Products Co.,
    308 U.S. 106 ................................................................................................. 14

Colonial Leasing Company of New England, Inc. v. Logistics Control Group International,
    762 F.2d, 454 ............................................................................................. 4, 11

Consolidated Rock Products Co. v. Du Bois,
    312 U.S. 510 ................................................................................................. 15

First Avenue West Building, LLC v. James (In re Onecast Media),
    439 F.3d 558 ................................................................................................. 22

Group One, Ltd. v. Hallmark Cards, Inc.,
    407 F.3d 1297 ................................................................................................. 10

In re Minnelusa Co.,
    176 B.R. 954 ................................................................................................. 17

In re Mirant Corp.,
    334 B.R. 800 ............................................................................................. 13, 15

In re Missouri Pac. R. Co.,
    39 F.Supp. 436 ................................................................................................. 15

Nantucket Investors II v. California Federal Bank (In re Indian Palms Assocs.), 61
    F.3d 197 ................................................................................................. 10

New Hampshire v. Maine,
    532 U.S. 742 ................................................................................................. 20

In re New York, New Haven & Hartford R.R. Co.,
    4 B.R. 758 ................................................................................................. 15

Protective Committee For Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,
    390 U.S. 414 ................................................................................................. *Passim*

Sanchez v. Johnson,
    301 F.Supp.2d 1060 (N.D. Cal. 2004), aff'd, 416 F.3d 1051 ......................... 22

Sch. District No. 1J v. ACandS, Inc.,
    5 F.3d 1255 ................................................................................................. 22

In re Snider Farms, Inc.,
    83 B.R. 977 ................................................................................................. 11

U.S. Bank National Associate v. Wilmington Trust Co. (In re Spansion, Inc.),
    426 B.R. 114 ................................................................................................. 15

TABLE OF AUTHORITIES (Continued)

United States v. Jones,
29 F.3d 1549 ...................................................................................................12

United States v. Ritchie,
342 F.3d 903 ...................................................................................................13

**FEDERAL STATUTES**

11 U.S.C. § 1129 ...............................................................................................11

11 U.S.C. § 1129(b)...................................................................................*Passim*

**RULES**

F.R.C.P. 59(e) ...................................................................................................22

Fed. R. Evid. Rule 201 ................................................................................*Passim*

Fed. R. Evid. Rule 201(b).............................................................................10, 12

Fed. R. Evid. Rule 201(e)..................................................................................12

Fed. R. Bankr. P. 9017: ......................................................................................1

Fed. R. Bankr. P. 9023........................................................................................1, 22

**OTHER AUTHORITIES**

J. Weinstein & H. Berger, Weinstein's Evidence,
§ 201 (1975).....................................................................................................12

550890v5

**PLEASE TAKE NOTICE** that the Debtors and Debtors in Possession in the above captioned chapter 11 cases, through their undersigned counsel, hereby move (the "Motion") the Court for the entry of orders, pursuant to Federal Rule of Civil Procedure 59(e), made applicable here by Federal Rule of Bankruptcy Procedure 9023, and Federal Rule of Evidence 201, made applicable here by Federal Rule of Bankruptcy Procedure 9017:  (1) Striking from the record any evidence of the stock trading price of MMPI's shares on May 18, 2011, and (2) Denying confirmation of the Charlestown Plan or, in the alternative, (3) if the Court intends to consider evidence outside the record at trial the Court should, at the very least, schedule a properly noticed evidentiary hearing to consider the fair value issue.

**PLEASE TAKE FURTHER NOTICE** that, by separate application, the Debtors have sought to have this Motion considered on shortened notice.  Upon the Court's disposition of the application to shorten time, the Debtors shall provide separate notice of the hearing to interested parties.

The Motion is based on and supported by this Notice, the attached Memorandum of Points and Authorities, the record in this case, and any other evidence properly before the Court prior to or at the hearing on the Motion.

**WHEREFORE**, the Debtors respectfully request that the Court enter an Order: (1) Striking from the record any evidence of the stock trading price of MMPI's shares on May 18, 2011, and (2) Denying confirmation of the Charlestown Plan or, in the alternative, (3) if the Court intends to consider evidence outside the record at trial the Court should, at the very least, schedule a properly noticed evidentiary hearing to consider the fair value issue.

Dated:  May 27, 2011

/s/ Gabriel I. Glazer
GARY E. KLAUSNER,
MARINA FINEMAN, and
GABRIEL I. GLAZER, Members of
STUTMAN, TREISTER & GLATT, P.C.

Special Reorganization Counsel for Debtors

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On the morning of May 19, 2011, this Court issued a tentative ruling (the "Tentative Ruling") in which the Court addressed, for the very first time, a fundamental issue pertaining to the confirmability of the Charlestown Plan. That issue was, and is, whether Charlestown had demonstrated that the 35 cent per share price at which the Debtors' shareholders would be forced to sell up to 55 percent of their shares under the Charlestown Plan - and over their objection - satisfied the "fair and equitable" requirement for confirming a plan over a dissenting vote of a class of shareholders under Bankruptcy Code section 1129(b).

After having analyzed the law, in its Tentative Ruling the Court rejected Charlestown's contention that the Court could find the Charlestown Plan to be fair and equitable solely by virtue of the fact that no class of creditors or equity holders junior to that of the dissenting shareholder class would receive or retain any property under the Charlestown Plan. Under Charlestown's theory, it could have "crammed down" its Plan on dissenting shareholders by giving them a peppercorn, a penny or, indeed, nothing at all, as long as no junior class of equity received anything, and regardless of the actual value of the stock. Consistent with prior case law, the Court in its Tentative Ruling properly concluded instead that where, as here, a chapter 11 debtor is solvent, the members of a dissenting class of shareholders have a legal right to receive fair value for their equity.

Following that critical legal determination, the Court in its Tentative Ruling then explained the process by which it determined the "fair value" of the dissenters' shares. In so doing, the Court had to overcome a nearly empty evidentiary record on this point in Charlestown's case. Although Charlestown indisputably has the burden of proof on all requirements for confirmation of its Plan, including establishing that it is "fair and equitable" to the dissenting class of shareholders, and despite the fact that Charlestown had failed to provide any expert or other probative testimony of

1    equity value,[2] the Court found the fair value of the stock to be 45 cents per share, based solely upon

2    the Court's review of publicly available information concerning the closing price of the stock on

3    May 18, 2011, the day before the Tentative Ruling was issued.

4           Thus, after the close of evidence, and without any prior notice to the Debtors (or other

5    interested parties) that it would do so, the Court relied on evidence that no one had ever attempted to

6    introduce during the trial, and that was not part of the evidentiary record before it.  In doing so, the

7    Court essentially tried to fill an evidentiary gap regarding a key issue on which Charlestown had the

8    burden of proof, *i.e.*, establishing that its plan is fair and equitable to every dissenting class, as

9    required by Bankruptcy Code section 1129(b).  Moreover, in so doing, the Court did not address

10   distortions that could (and did) result from the thinly-traded nature of the Debtors' stock, or the fact

11   that the existence of confirmation proceedings in which shareholders faced an attempt to cram down

12   a plan that would have paid them only 35 cents per share may have depressed the trading price of the

13   stock, so that the trading price did not reflect the intrinsic economic value of the stock.  The Court's

14   Tentative Ruling, which was rendered on May 19, 2011, was the first time that the Court had made

15   any ruling, preliminary or otherwise, on the issue of the fair value of the stock.

16          As will be demonstrated below, this process was manifestly incorrect, <u>as a matter of

17   law</u>, for two independent reasons:

18          1.    The Bankruptcy Court does not have the authority, without any prior notice or

19   an opportunity for interested parties to be heard, two months following the conclusion of trial, to

20   obtain new evidence to satisfy an evidentiary burden that a plan proponent failed to meet during

21   trial; and

22          2.    The closing price of MMPI's stock on one particular day, during which only

23   approximately one-quarter of one percent of the outstanding shares were traded, was not a valid

24   basis for determining fair value for purposes of a cramdown analysis in this case.

---

[2]    In fact, as will be discussed *infra* in Part II hereof, the only evidence of value in the record on this point was the Declaration of M. Freddie Reiss, dated December 30, 2010, Trial Exhibit 85, in which Mr. Reiss demonstrated that, based upon <u>Charlestown's</u> projected net equity, as set forth in its Disclosure Statement, the reorganized debtor would have a net equity of approximately $107 million, which was equal to over $1.20 per share, and that based on the Debtor's projected net equity, the reorganized debtor would have a net equity of approximately $263 million, worth $3.00 per share.

1    The Debtors respectfully submit that the Court erred in a manner similar to what

2   occurred in the case of *Colonial Leasing Company of New England, Inc. v. Logistics Control Group*

3   *International*, 762 F.2d, 454 (5th Cir. 1985). In that case, the Fifth Circuit Court of Appeals reversed

4   a fraudulent transfer judgment against a defendant, because the trial court had taken judicial notice

5   of a fact after the conclusion of trial, and relied on that judicially-noticed fact to find that the plaintiff

6   had established a *prima facie* case, which the plaintiff had otherwise failed to establish during trial.

7   Similar to the situation here, in *Colonial Leasing* the defendant had chosen not to present evidence at

8   trial on that factual issue, justifiably relying on the plaintiff's failure to have met its affirmative

9   burden of proof. The Court of Appeals held that by taking judicial notice after the trial had ended,

10  and thereby denying the defendant an opportunity to present evidence on the issue at trial, the trial

11  court had prejudiced the defendant such that a new trial was required.[3]

12    Here, once the Court rejected Charlestown's legal theory regarding the equity

13  cramdown, *i.e.*, that Charlestown did not have to provide fair value to the dissenting shareholders,

14  the Court should have found that Charlestown had failed to meet its evidentiary burden on one of the

15  key elements of its case in chief. Had Charlestown or the Court raised the issue of the stock's

16  trading value as evidence of fair value prior to or during the course of trial, the Debtors could have

17  presented evidence and argument addressing that issue.

18    As the Court itself appeared to acknowledge during the course of argument at the

19  May 19 Status Conference, the use of the MMPI stock's closing price, on one day during which only

20  a miniscule percentage of the Debtors' outstanding stock actually traded, as a proxy for the fair value

21  of reorganized MMPI's stock for cram-down purposes, is a fundamentally unsound method of

22  valuation. Among other things: (1) the stock was being traded by a small minority of shareholders

23  (23,000 shares out of a total of 88 million) which, under most circumstances, would not be

24  considered a "market", let alone an efficient one; and (2) more importantly, the stock was trading

25  under circumstances that would obviously depress trading prices: (a) the Debtors are operating in a

26  chapter 11 case, and, therefore, anyone purchasing the stock was taking the risk that no plan would

27

28

[3]   Here, since the taking of judicial notice worked to Charlestown's advantage, the remedy of a new
trial for Charlestown would not be warranted.

1  be confirmed and the Debtors would eventually be liquidated, and (b) the stock was trading at a time

2  when there was a pending plan under which shareholders would be forced to sell up to 55 percent of

3  their shares for 35 cents per share – a risk factor that obviously would have influenced a buyer's

4  willingness to pay a particular price.

5      Under these circumstances, the use of the May 18 closing price was a manifest error

6  of law. The Supreme Court has expressly rejected valuation methods that, like the method applied

7  by the Court here, are linked to a debtor's present status in bankruptcy. *See Protective Comm. For*

8  *Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 441-54 (1968). The *TMT*

9  *Trailer* decision makes clear that plan confirmation orders will be overturned where those orders rest

10  on an improper valuation of the debtor's stock. *See id.* at 453-54. The Court's application of a

11  legally improper valuation standard risks an outcome in which "the rights of the stockholders [are]

12  relinquished by default." *Id.* at 450.

13      As will be demonstrated below, the Debtors are entitled to an order:

14      (1)  Striking from the record any evidence of the stock trading price of MMPI's

15         shares on May 18, 2011; and

16      (2)  Denying confirmation of the Charlestown Plan; or, in the alternative,

17      (3)  If the Court intends to consider evidence outside the record at trial, the Court

18         should, at the very least, schedule a properly noticed evidentiary hearing to

19         consider the fair value issue.

20      The Debtors understand the importance of resolving plan issues in a timely fashion.

21  However, as the Supreme Court admonished decades ago in reversing confirmation of a plan that

22  failed to provide "fair and equitable" treatment to equity holders, "[t]he need for expedition . . . is not

23  a justification for abandoning proper standards." *TMT Trailer, infra* at 450. Simply put, exigencies

24  are not a justification to jettison basic rules of evidence, burden of proof and due process in order to

25  allow a plan proponent, who failed to meet its burden of proof, to force dissenting shareholders to

26  sell their shares for the proponent's sole benefit and at a price rejected by an overwhelming majority

27  of shareholders.

28      The particular issue before the Court was, and is, fundamental to the interests of the

550890v5

1 | Debtors, its creditors, employees, as well as its equity holders who comprise the constituencies that

2 | the Debtors, as debtors in possession, have a responsibility to protect. This important issue should

3 | be resolved in a manner consistent with due process, applicable substantive law, and proper rules of

4 | procedure, evidence, and burden of proof. The Court's May 19, 2011 ruling, if allowed to stand,

5 | could have profoundly adverse and potentially irreparable consequences. Accordingly, the Court

6 | should grant the Motion, strike the improperly introduced evidence, and revisit its ruling that the

7 | Charlestown Plan would be confirmed.

## II.

## **BACKGROUND FACTS**

10 |       Pursuant to this Court's order of October 18, 2010, plan proponents were required to

11 | file, on December 3, 2010, confirmation briefs and evidence in support of their respective plans. On

12 | December 3, 2010, Charlestown filed a confirmation brief; however, contrary to the Court's prior

13 | order, Charlestown failed to provide by that date any evidence to prove that its plan was fair and

14 | equitable to dissenting shareholders. Moreover, the only argument contained in Charlestown's

15 | confirmation brief that its Plan could be confirmed over the dissent of a class of shareholders was

16 | that, because no class junior to shareholders would retain any property, Charlestown was under no

17 | obligation to provide any value to dissenting shareholders. Charlestown Confirmation Brief, at 19

18 | [Docket No. 2333].

19 |       On December 30, 2010, in compliance with this Court's order of October 19, 2010,

20 | the Debtors filed objections to the Charlestown Plan. In support of their Objections, the Debtors

21 | submitted the "Declaration of M. Freddie Reiss In Support Of Debtors' Opposition To Confirmation

22 | Of The Charlestown Plan And The Legendary/EWB Plan" (Docket No. 2525) (the "Reiss

23 | Declaration")[4]. In the Reiss Declaration, M. Freddie Reiss, a member of FTI Consulting, the

24 | financial advisor engaged by the Debtors, analyzed the proposal contained in the Charlestown Plan

25 | for its acquisition of 55% of the outstanding shares of the Debtors' stock at a per share price of 35

26 | cents.

27

28

---

[4]   The Reiss Declaration was admitted into evidence at trial as Exhibit 85. A copy of the Reiss Declaration is attached hereto as Exhibit "A".

1    Attached to the Reiss Declaration as Exhibit "A" was a chart prepared by FTI

2    entitled: "Analysis of Implied Effective Date Evaluations, Meruelo Maddux Properties, Inc." This

3    chart contained a comparison of the net equity value attributed to the reorganized debtors by each of

4    Charlestown, the Debtors and Legendary/EWB, another plan proponent whose plan was

5    subsequently withdrawn. These net equity values were based upon valuations made by each of the

6    plan proponents. Thus, Mr. Reiss' opinion concerning the net equity value pertaining to the

7    Charlestown Plan was based upon <u>Charlestown's own valuations of the Debtors' assets and liabilities</u>

8    <u>as of the effective date of its proposed plan</u>. The Reiss Declaration, which was never contested on

9    this point, demonstrated that, based upon Charlestown's own valuations, the value of the net equity

10   as of the effective date of Charlestown's plan would be approximately $107 million and under the

11   Debtors' Plan would be at least $263 million. Divided among the Debtors' 88 million shares,

12   Charlestown's own projected net equity would result in a per share value of in excess of $1.20, or

13   more than <u>three times</u> what Charlestown proposed to pay for those exact same shares and the

14   Debtors' net equity would have a per share value of nearly $3.00.

15        In his Declaration analyzing the 35 cent per share price proposed by Charlestown,

16   Mr. Reiss stated, *inter alia*, as follows:

17        Furthermore, the proponents of the Charlestown Plan themselves have
18        reported a net equity value of the company of approximately $107
         million per the balance sheet contained in their own financial
19        projections. . . .

20        Based upon my analysis of the Competing Plans, I am of the opinion
         that neither of the Competing Plans [referring to the Charlestown Plan
21        and the Legendary/EWB Plan] provides fair value to MMPI
         shareholders based on the net equity of the Reorganized Debtors and
22        each is extremely and unfairly dilutive as to existing MMPI
         shareholders. . . . .[5]

23        On January 14, 2011, Charlestown filed a reply brief in response to the Debtors'

24   objection to confirmation of the Charlestown Plan. In response to the Debtors' argument that the

25   Charlestown Plan did not provide fair and equitable treatment to dissenting shareholders,

26   Charlestown argued that 35 cents per share constituted fair value because that price had been

27   _____

28   [5]   Reiss Declaration at 4:1-5; 10:18-21.

1    negotiated with certain "non-insider shareholders." *See* Charlestown Reply, at 30 [Docket No.

2    2586]. Charlestown failed to produce any declaration supporting this statement in its brief or any

3    other *evidence* that 35 cents represented the fair value of the stock.

4              The confirmation trial of Charlestown's Plan took place during the period between

5    March 25 and March 29, 2011. At trial, Charlestown presented two witnesses; Riaz Valani, who

6    testified concerning the proposed funding for the Charlestown Plan, and Edward McGonagle, who

7    testified primarily, about Charlestown's projections and business plan. Although Charlestown had,

8    on the eve of trial, announced its intention to call Steven Taylor, the Chairman of the Official Equity

9    Committee, and Martin Caverly, the person that Charlestown identified as the Reorganized Debtors'

10   proposed interim Chief Executive Officer, neither Mr. Taylor nor Mr. Caverly was permitted to

11   testify.[6] Charlestown also called Mr. Reiss as an adverse witness, and questioned Mr. Reiss in

12   connection with the Reiss Declaration. Mr. Reiss' trial testimony was entirely consistent with that of

13   his Declaration, in that he analyzed the reorganized debtors' equity and share values based on the

14   balance sheet attached to Charlestown's Disclosure Statement.

15             Indeed, Charlestown has ignored its own evidence of the stock's value contained in

16   the Disclosure Statement approved by this Court and submitted to all voting creditors and

17   shareholders. The balance sheet set forth in Charlestown's Disclosure Statement represented that the

18   reorganized debtor would have a net equity value of $107 million – a figure that equates to over

19   $1.20 per share. At $1.20 per share, Charlestown effectively acknowledged that the true value of the

20   MMPI stock was more than three times what dissenting shareholders would be forced to accept if the

21   Charlestown Plan were confirmed. As calculated by Mr. Reiss, based upon Charlestown's projected

22   net equity of $107 million, Charlestown's 35 cents per share price would constitute a 61% discount

23   from the balance sheet value of each share. Even using the $.45 per share figure the Court applied in

24

25

---

26   [6]  Following the end of the trial, Charlestown submitted various exhibits, including excerpts from
     Mr. Taylor's deposition. These excerpts include Mr. Taylor's references to discussions between the
27   Equity Committee and Charlestown. As will be demonstrated infra, these discussions have no relevance
     to a determination of the fair value of the stock which the majority shareholders would be forced to sell
28   under the Charlestown Plan.

1    its Tentative Ruling, the Charlestown Plan would force dissenting shareholders to accept a price that

2    is a fraction of what Charlestown acknowledges to be the fair value of the stock.

3           Furthermore, if the Debtors' post-effective date balance sheet were used, the

4    discrepancy between the Charlestown Plan's purchase price and actual value is far greater. The

5    Debtors' projected post-effective date balance sheet, also part of Exhibit "A" to the Reiss

6    Declaration, projects a net equity value of at least $263 million, or $2.99 per share.  At a purchase

7    price of 35 cents per share, the Charlestown Plan proponents would be acquiring the Debtors' stock

8    at an 85% discount.

9           Thus, at the close of trial, the *only* evidence in the record as to the fair value of the

10   Debtors' stock was: (i) that contained in the balance sheet attached to the Debtors' Disclosure

11   Statement, (ii) that contained in the balance sheet attached to Charlestown's Disclosure Statement,

12   and (iii) the discussion of those competing values contained in the Reiss Declaration.

13          As shown in the table below, based upon the evidence actually in the record as of the

14   close of trial, and assuming the Charlestown Plan was otherwise confirmable, the Court could

15   confirm the Charlestown Plan over the objection of the Class 1F shareholders *only* if those

16   shareholders were given value ranging from $1.20 per share, at a minimum, to $2.99 per share:

17
18
19

| | Estimated Net Equity As Of Effective Date | Price Per Share As Of Effective Date | 35 Cents Per Share As % of Estimated Equity |
|---|---|---|---|
| Charlestown's Balance Sheet | $107 million | **$1.20** | 29% |
| Debtors' Balance Sheet | $263 million | **$2.99** | 12% |

20
21
22

23          Charlestown's proposal to pay just 35 cents per share was rightfully rejected by

24   shareholders and the Court, as that amount reflects just 29% of Charlestown's own estimate of the

25   stock's actual value.  Unfortunately, the Court's decision to apply the stock trading price as of May

26   18, 2011, information taken from outside the record, as an estimate of fair value did not accurately

27   reflect the actual fair value of the stock according to either party's estimates.

28

# III.

## ARGUMENT

**A.    Evidence of the Trading Price of MMPI's Stock On May 18, 2011 Must Be Stricken From the Record.**

As described above, as of the close of trial, Charlestown had failed to produce any evidence that 35 cents per share constituted fair value – an issue that was critical to Charlestown's efforts to confirm its Plan over the rejecting vote of Class 1F, and as to which Charlestown had the burden of proof.  Nonetheless, the Court determined, *sua sponte,* and with no prior notice to the parties, that the closing price of MMPI stock as of the day before the May 19 hearing was a fact of which it could take judicial notice under Rule 201 of the Federal Rules of Evidence, and one that could then be incorporated into the record to satisfy Charlestown's evidentiary burden.  As set forth below, the Federal Rules of Evidence do not permit the Court to take judicial notice of the MMPI stock's May 18 closing price in order to satisfy Charlestown's burden of establishing that its Plan provides fair and equitable treatment to Class 1F.  Accordingly, evidence of the May 18, 2011 stock trading price must be stricken from the record.

### 1.    Post-Trial Judicial Notice Is Improper Where It Results In Unfairness or Prejudice.

Rule 201 permits a court to take judicial notice of certain facts that are not subject to reasonable dispute.  Fed. R. Evid. Rule 201(b).  However, even where judicial notice might otherwise be appropriate, courts recognize that "there are circumstances under which it is improper for the district court to take judicial notice after the verdict, such as where unfairness results." *Group One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1306 (Fed. Cir. 2005) (citing *Colonial Leasing Co. of New England, Inc. v. Logistics Control Group Int'l*, 762 F.2d 454, 461 (5th Cir. 1985) (*"Colonial Leasing"*); *see also Nantucket Investors II v. California Fed. Bank (In re Indian Palms Assocs.)*, 61 F.3d 197, 205 (3d Cir. 1995) (explaining that judicial notice of undisputed facts may be taken, "as long as it is not unfair to a party to do so").

In *Colonial Leasing*, the Fifth Circuit Court of Appeals reversed a judgment against a defendant in a fraudulent transfer case, because the trial court had taken judicial notice of a fact <u>after</u>

1    the conclusion of trial, and relied on that judicially-noticed fact to find that the plaintiff had

2    established a *prima facie* case, which the plaintiff had failed to establish <u>during</u> trial.  At trial, the

3    defendant had chosen not to present evidence on that factual issue (involving the status of a state

4    court judgment, which was disputed at trial), relying on the plaintiff's failure to have met its

5    affirmative burden of proof.  The Court of Appeals held that by taking judicial notice of the state

6    court judgment after the trial had ended, and thereby denying the defendant an opportunity to present

7    evidence on the issue at trial, the trial court had prejudiced the defendant.  *Id.* at 461.[7]

8              *Colonial Leasing* is strikingly similar to the facts in this case, and requires that the

9    evidence of MMPI's stock closing price be stricken, and the Court's decision be reconsidered.  Just

10   as in *Colonial Leasing*, at trial the Debtors and other opponents of the Charlestown Plan justifiably

11   relied on Charlestown's failure to satisfy its evidentiary burden at the time of trial.  The Court's

12   determination to go outside the evidentiary record in order to solve this problem for Charlestown,

13   two months after the conclusion of trial, was improper.  Moreover, by doing so, the Debtors and

14   other interested parties were denied a reasonable opportunity to present evidence and further expert

15   testimony to rebut the validity of the stock trading price as a measure of fair value at trial.[8]

16             Furthermore, by virtue of Charlestown's failure to present evidence at trial

17   establishing that the Charlestown Plan's 35 cent per share forced sale price constituted fair value for

18   the dissenting class of shareholders, the Debtors did not need to present any rebuttal evidence of

---

[7]   The court explained:

> When Logistics declined to produce evidence, it relied on Colonial's failure
> to establish its prima facie case.  When the district court subsequently took
> notice of the only fact necessary to complete Colonial's prima facie proof,
> Logistics was deprived of the opportunity to adduce evidence on a critical
> fact placed in issue by the court's action, taking place as it did after the jury
> was discharged.  While we do not hold that taking judicial notice after trial is
> always improper, in the circumstances of this case it is not supportable.

[8]   Courts following *Colonial Leasing* have emphasized how "procedural fairness demands an opportunity to
      be heard on the propriety of taking judicial notice" and, consistent with learned treatises, have noted how
      counsel may "petition for rehearing" in response to a court taking judicial notice without indicating that it
      planned to do so.  *See, e.g., In re Snider Farms, Inc.*, 83 B.R. 977, 997-99 (Bankr. N.D. Ind. 1988) (citing
      1 J. Weinstein & H. Berger, *Weinstein's Evidence*, § 201 (1975) and providing the parties with time in
      which they could "object to any matters which the Court took judicial notice of in this opinion").

1  value, in addition to the Reiss Declaration, which had been timely filed on December 30, 2010, in

2  support of the Debtors' objection to the Charlestown Plan. There was no need for the Debtors to

3  present evidence that the one-day trading price for a tiny fraction of the stock of a company traded

4  only on the pink sheets, and that did not reflect any control premium, was not probative evidence of

5  the post effective date value of a controlling interest in the Debtors, because not even Charlestown

6  tried to introduce such evidence to meet its burden of proof on the issue. The Debtors were justified

7  in proceeding in this fashion because Charlestown had the burden of proof in establishing that its

8  plan was fair and equitable to the dissenting class of shareholders, and presented no competent

9  evidence on this point. Indeed, at no time during trial did Charlestown ever suggest that the "pink

10  sheet" stock price on any particular day was a proper method of valuing the Debtors' stock. Had

11  Charlestown or the Court raised the issue of the stock's trading price prior to or during the course of

12  trial, the Debtors would have been prepared to address that issue.

13      **2.**     **The Strict Requirements of Federal
Rule of Evidence 201 Were Not Met.**

14

15      Rule 201(b) is clear that a court may only take judicial notice of facts that are not

16  subject to reasonable dispute. *See* Fed. R. Evid. Rule 201(b). This narrow standard is required,

17  because "the effect of taking judicial notice under Rule 201 is to preclude a party from introducing

18  contrary evidence and, in effect, directing a verdict against him as to the fact noticed." *United States*

19  *v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (quoting Wright & Graham, Federal Practice &

20  Procedure: Evidence § 5104 at 485).

21      Moreover, even where a fact may be the proper subject of judicial notice, Rule 201

22  provides that courts must allow parties to be heard with respect to the propriety of any judicial

23  notice. Fed. R. Evid. 201(e) ("[a] party is entitled upon timely request to an opportunity to be heard

24  as to the propriety of taking judicial notice and the tenor of the matter noticed. In the absence of

25  prior notification, the request may be made after judicial notice has been taken"); *see also United*

26  *States v. Ritchie*, 342 F.3d 903, 908-909 (9th Cir. 2003) (explaining that, even if certain facts were

27  properly the subject of judicial notice, opposing party "should have been given some opportunity to

28  respond to the propriety of taking judicial notice of the facts alleged therein").

1    Here, none of the parties opposing Charlestown's Plan were given timely notice and

2    an opportunity to be heard <u>before</u> the Court took judicial notice of MMPI's May 18, 2011 stock

3    closing price, for the purpose of determining fair value.  As set forth below, the closing price of

4    MMPI stock on May 18, 2011 does not accurately reflect the value of the Reorganized Debtors or

5    the fair value of the interests held by Class 1F.  The reasons outlined below describing the Debtors'

6    objection to the probative value of such information as evidence of equity value are valid, reasonable

7    and supported by decades of case law.  There is an abundance of case law supporting the position

8    that stock value is not a reliable or admissible form of evidence of a chapter 11 debtor's equity value.

9    *See, e.g., In re Mirant Corp.*, 334 B.R. 800, 822 (Bankr. N.D. Tex. 2005).  Furthermore, the present

10    status of this case makes MMPI's current stock price completely unreliable as an indicator of the

11    Debtors' actual post confirmation equity value.  *See* section B, *infra.*

12    In sum, the Court's post-trial use of the May 18, 2011 stock trading price was legally

13    impermissible.

14    **B.    The "Pink Sheet" Trading Price of MMPI's Stock On One Random Day Is a
15          Completely Invalid Measure of Value and In No Way Reflects the True Value
              of the Reorganized Entity Or of Its Stock.**

16

17    The only expert testimony pertaining to the value of the Reorganized Debtors, or of

18    the MMPI stock, was the evidence submitted by the Debtors in the form of the Reiss Declaration of

19    December 30, 2010.  In his Declaration, Mr. Reiss concludes, ***based on Charlestown's own***

20    ***projected post-confirmation balance sheet***, that the Reorganized Debtors will have a balance sheet

21    value of approximately $107 million, which equates to a per share price of approximately $1.20.  As

22    set forth in the Reiss Declaration, the Debtors' own balance sheet valued the Debtors' equity at over

23    $263 million, equating to a per share value price of approximately $3.00.  See Part II hereof.  There

24    was no competent evidence presented during trial on the subject of reorganization value or share

25    value other than the respective post effective date balance sheets of Charlestown and the Debtors.

26    Thus, as opposed to the unreliable "pink sheet" trading price, Charlestown has actually supplied the

27    Court with its own evidence that discredits its 35 cents proposed purchase price.  Assuming

28

1    Charlestown truthfully represented its projected post-effective date balance sheet, which shows a net

2    equity of $107 million, the balance sheet value of each share is $1.20.

3          Whether the Charlestown Plan provides fair and equitable treatment to dissenting

4    shareholders in this case turns on whether those shareholders will receive fair value in exchange for

5    their interests under that Plan. See 11 U.S.C. § 1129(b); *see also* Tentative Ruling ("the Court must

6    find that the treatment of class 1F is permissible under § 1129(b). If it is not, the Charlestown

7    Proponents cannot confirm their plan over the rejection of class 1F."). "Where a plan is not fair and

8    equitable as a matter of law it cannot be approved by the court." *Case v. Los Angeles Lumber Prods.*

9    *Co.*, 308 U.S. 106, 114 (1939).

10          The Court's decision to rely upon "pink sheet" trading prices as of a single day –

11    May 18, 2011 – when the closing price obviously reflected the fact that MMPI was in bankruptcy,

12    and had not been reorganized – suffers from precisely the flaw that prompted the Supreme Court to

13    reverse plan confirmation in *Protective Committee for Independent Stockholders of TMT Trailer*

14    *Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). In *TMT Trailer*, the lower court approved a

15    reorganization plan that wiped out shareholders' stock based upon that court's conclusion that the

16    plan was "fair and equitable" vis-à-vis the shareholders due to the debtor's insolvency. In reaching

17    its conclusion, the trial court based its solvency valuation upon the debtor's status *as an entity in*

18    *bankruptcy*, and "steadfastly refused to consider the value of the company once it was out of the

19    reorganization proceedings." *Id.* at 444. Rather, the lower court simply grounded its valuation

20    analysis on the fact that the debtor was "an organization that is in" bankruptcy proceedings, and thus

21    should be valued "as it now exists to determine what should be done in these proceedings." *See id.*

22    at 449-50.

23          Reversing this ruling on appeal, the Supreme Court held that "[s]ince the

24    determination of insolvency was not made in accordance with the proper standards of valuation,

25    neither the approval nor the confirmation of the plan can stand." *Id.* at 441. In reaching this

26    conclusion, the Court used language that is equally applicable and instructive here:

27            One can easily sympathize with the desire of a court to terminate bankruptcy
        reorganization proceedings, for they are frequently protracted. ***The need for***

28

1    ***expedition, however, is not a justification for abandoning proper standards***. It is
also easy to share the court's concern that creditors receive their money as promptly
2    as possible. However, the right of stockholders to participate at all hung on the result
of the valuation proceedings; sedulously eliminating all inquiry into the future may,
3    in this context, have caused the rights of the stockholders to have been relinquished
by default.
4

5    *Id.* at 450 (emphasis added). Thus, rather than permitting valuation based upon the entity's present

6    status as a debtor in bankruptcy, the Court ruled that a determination of valuation would require

7    further evidence about the debtor's value as a going concern *once the bankruptcy proceedings were*

8    *concluded. See id.* at 453-54; *accord Consolidated Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526

9    (1941) (Douglas, *J.*).

10         Here, the Court's use of "pink sheet" trading prices of the stock of a chapter 11 debtor

11    as a valuation metric – and the sole one at that – suffers from the same problem as the discredited

12    analysis of the lower court in *TMT Trailer*: those prices necessarily reflect the status of MMPI as a

13    debtor in bankruptcy and include risk discounts due to that status. *See, e.g., In re New York, New*

14    *Haven & Hartford R.R. Co.*, 4 B.R. 758, 791-92 (D. Conn. 1980) (observing that "[t]he stigma of

15    bankruptcy alone is a factor that will seriously depress the market value of a company's securities"

16    and rejecting "a wooden application of the market price methodology" on the grounds that it resulted

17    in undervaluation and thereby "would deprive the Income Bondholders of a position of equity,

18    rightfully theirs, in the reorganized New Haven").[9]

19         Accordingly, it was manifest error for the Court to rely upon the current "pink sheets"

20    price as evidence establishing the fair value of the dissenters' forfeited stock. Just as in *TMT*

21    *Trailer*, "[e]valuations of evidence reached by the accurate application of erroneous legal standards

22

23    [9]  *See also In re Missouri Pac. R. Co.*, 39 F. Supp. 436, 446 (D. Mo. 1941) (rejecting use of "market"
valuation of securities because the debtors' stay in bankruptcy "would necessarily result in a serious
24    depression in the market value of its securities," including because "investors do not know whether the
proposed plan or any other plan will be approved and confirmed, or if so, when such a result may be
25    accomplished"); *In re Mirant Corp.*, 334 B.R. 800, 822 n.71 (Bankr. N.D. Tex. 2005) ("It is not
appropriate to value securities of a reorganized debtor based on what the market would pay since the
26    'taint' of bankruptcy will cause the market to undervalue the securities and future earning capacity of the
Debtor." (citation and quotation marks omitted)); *cf. U.S. Bank Nat'l Assoc. v. Wilmington Trust Co. (In
27    re Spansion, Inc.)*, 426 B.R. 114, 130 (Bankr. D. Del. 2010) (dismissing argument that value can be
determined by referring to an active "market for buying claims," and concluding that "value must be
28    determined by relying on the expert opinions in the record").

1  are erroneous evaluations," and a more searching inquiry would be required to determine whether

2  the Charlestown Plan is actually "fair and equitable" vis-à-vis the class of shareholders who voted to

3  reject it.  *See* 390 U.S. at 444-45.  Because the Charlestown Plan proponents never made that

4  showing, they failed to meet their affirmative burden under Bankruptcy Code section 1129(b) and

5  confirmation of their plan must be denied.

6          As the Court itself appeared to acknowledge during the course of argument, the use of

7  one-day's closing stock price as a proxy for the value of the reorganized debtor's equity is an

8  unreliable methodology that has no support in the case law.  In part, the Court stated:

9           I think you're right . . . I mean, I'm not really an expert on stock
            valuation. You know, we thought - the Court thought when we read
10          the opinion, oh, well, maybe we'll just look at the current stock trading
            price just like we looked at the current interest rate. You know, but
11          maybe that isn't the right way to do it. Like you said, ***it's only one day
            and -- and there is a plan on the table to force people to sell half for
12          .35 cent. So -- and it really wasn't -- it wasn't brought up at the trial,
            and it really probably isn't fair to pick one day***, . . . [and] in a solvent
13          estate case that you - that fair and equitable requires not just no one
            junior getting anything but ***that they get the value which is in the first
14          clause***

15  May 19, 2011 Hearing Transcript, at 49 (emphasis added).[10]  Later during the hearing, the Court

16  recognized that "***45¢ does seem like an arbitrary number***." *Id.* at 94.

17          Indeed, the May 18, 2011 closing price did not accurately reflect the fair value of the

18  shareholders' interests for the following reasons, among others:

19          (1) the stock was being traded by a small minority of shareholders (23,000 shares out

20  of a total of 88 million), or less than .03% of the outstanding shares on an "over-the-counter" basis,

21  which does not constitute a "market";

22          (2) the stock was trading under circumstances that would obviously depress trading

23  prices:  (a) the Debtors are operating in a chapter 11 case with the risk that they will never emerge

24  from bankruptcy and, therefore, anyone purchasing the stock was taking the risk that no plan would

25  be confirmed and the Debtors would eventually be liquidated, and (b) the stock was trading at a time

26  when there was a pending plan under which shareholders would be required to sell up to 55 percent

27
28

[10]  Copies of the relevant pages of the Transcript are attached hereto as Exhibit "B".  A copy of the
      complete transcript will be filed separately.

1   of their shares for 35 cents – a risk factor that obviously would have influenced a buyer's willingness

2   to pay more than that sum; and

3          (3) the value of the small portion of shares traded on May 18 does not include the

4   additional "control premium" that would be reflected in a proper valuation of a controlling interest.

5   *See, e.g., Asarco LLC v. Americans Mining Corp.*, 396 B.R. 278, 354 (S.D. Tex. 2008) (noting how a

6   control premium was a necessary addition to "the stock price valuation" of an entity for purposes of

7   ascertaining its actual fair value); *In re Minnelusa Co.*, 176 B.R. 954, 956 (Bankr. M.D. Fla. 1994)

8   (describing discount that would be reflected in value of minority shares "because the minority

9   shareholder cannot control the management of the corporation").

10          Thus, the May 18, 2011 closing price of a tiny fraction of the shares of a thinly-traded

11   stock of a chapter 11 debtor traded only on the pink sheets is not probative of, and certainly does not

12   accurately reflect, the fair value of a controlling interest in MMPI's equity for purposes of

13   determining fair and equitable treatment under the Bankruptcy Code.

14   **C.**    **The Charlestown Plan Cannot Be Confirmed In the Absence of Sufficient Evidence As
15   to the Fair Value of the Shares of Class 1F.**

16          The United States Supreme Court has long recognized that "[m]atters not in the

17   record and not properly the subject of judicial notice cannot form the basis of judicial confirmation

18   of a plan of reorganization." *TMT Trailer*, 390 U.S. at 440.

19          Whether for tactical reasons or through inadvertence, Charlestown failed to produce

20   evidence of the 35 cents per share forced sale price under the Charlestown Plan. This evidentiary

21   failure cannot be rectified by having the Court take judicial notice of one day's trading price of

22   MMPI stock, and so the record remains devoid of reliable evidence concerning the fair value of the

23   shares held by Class 1F shareholders, who are being forced to sell those shares under the

24   Charlestown Plan for 35 cents per share. As a result, there is no evidence from which this Court can

25   properly determine that the treatment provided under the Charlestown Plan to Class 1F shareholders

26   is fair and equitable. Because it is Charlestown's burden to establish that its Plan is fair and

27   equitable to dissenting shareholders, and because it failed to carry that burden, the Charlestown Plan

28   cannot be confirmed.

1    During a portion of the argument, various supporters of the Charlestown Plan

2  attempted to convince the Court to stick with its original Tentative Ruling, and argued that the state

3  of the record was adequate to support confirmation without any need for further evidence or to

4  provide any interested party the opportunity to challenge the evidence identified by the court for the

5  first time on May 19.  The Court appeared to be persuaded by this hue and cry, but the underlying

6  arguments simply lack substance and are a smokescreen for the empty evidentiary record that

7  confronts this Court.

8

**a.   The Watermarke Conversion Option Has
No Relationship To Current Stock Value.**

9

10    At the May 19 status conference, the argument was made that because the $15 million

11  loan from Watermarke Properties, Inc. ("Watermarke") to be made under the Debtors' Plan contains

12  a conversion feature, under which Watermarke, at its option, <u>after four years</u>, could convert its $15

13  million debt to equity, at a conversion price of $.50 a share, that <u>potential</u> <u>future</u> price constitutes a

14  measure of the <u>current</u> value of the Debtors' stock.  That argument fails because: (i) Watermarke's

15  conversion right is for far less than 55% of the Debtors' shares, and (ii) the conversion will not come

16  about, if at all, for a period of at least <u>four years</u> after the Effective Date. The conversion price may

17  or may not be the same, higher or lower than stock value as of that date. Standing by itself, this

18  conversion price is not evidence of any particular value of the Class 1F shareholders' stock as of the

19  effective date of Charlestown's Plan.

20    The additional argument that the conversion right constitutes a "dilution" of existing

21  share ownership is irrelevant to the issue of fair value and ignores the fact that the Debtors' Plan,

22  unlike Charlestown's, is not being crammed down on equity.  Moreover, on a fully converted basis,

23  the conversion shares (30 million) would represent 25% of the shares outstanding following

24  conversion (88 million current shares plus 30 million conversion shares). In contrast, the

25  Charlestown Plan imposes a forced dilution of 55% (rather than 25%). The choice is between

26  (a) having someone acquire <u>**25%**</u> of the shares (which does not include control) in four years at 50

27  cents, with a concomitant elimination of $15 million of debt from the Debtors' books, versus

28  (b) having someone acquire <u>**55%**</u> of the shares (a controlling interest) for 35 cents <u>today</u>.  On this

550890v5

1  record, there is no basis for concluding anything other than that the Charlestown Plan is far more

2  dilutive than the Watermarke potential conversion. Without expert testimony on the point, the

3  Debtors respectfully submit that the Court cannot properly make any other finding.

**b.    The Cash Out Option Has No Relationship
to Current Stock Value.**

6  Another argument that surfaced during the May 19 status conference was that because

7  the Debtors' Plan had offered an option to shareholders to sell their stock on the Effective Date for

8  25 cents per share, that should be considered a measure of the value of the Class 1F shares on the

9  effective date of Charlestown's Plan. This is not correct; the Debtors never presented the 25 cent

10 option as being equivalent to the value of their equity interests. That option was presented simply to

11 give shareholders the opportunity to consensually cash out if they no longer wanted to be part of the

12 reorganized entity; the $.25 per share figure was, in effect, a floor, or minimum. Under this theory,

13 an offer to buy the shares for a penny that was not accepted would mean that the shares were worth a

14 penny; that cannot be right.

**c.    The Members Of Class 1F Are Not "Willing Sellers".**

16 Finally, it was argued that the 35 cent per share price should be considered fair value

17 because it was the product of "arms length negotiations" between "willing buyers and willing

18 sellers"--members of the Equity Committee and Charlestown. The problem with this argument is

19 twofold. First, there was no trial testimony concerning who negotiated, over what period of time, the

20 parameters of the discussions, any of the terms and conditions that were considered in the

21 negotiations, or how the 35 cent figure was arrived at.

22 Second, and even more fundamental to this point, is the undisputed fact that the

23 Equity Committee had no authority, and no right, to negotiate a sale price for anybody other than the

24 outside minority shareholders whom the Committee acknowledges it was only formed to represent.

25 One cannot reasonably suggest that a group of people who represent a particular constituency

26 (outside minority shareholders) have the right to negotiate for the pricing of the sale of the

27 controlling interest in a company held by people who are not part of their constituency and who, in

28 fact, were separately classified under the Charlestown Plan. No one has ever contended that the

1  inside shareholders were part of any such confidential negotiations between the Equity Committee

2  and Charlestown, nor were they provided information as to those negotiations when it was sought

3  during discovery.  Clearly, the price negotiated by the Committee does not represent a price that the

4  majority of shareholders who have rejected the Charlestown Plan were "willing" to accept.  In

5  addition, as noted above, whatever value these individuals may attribute to their shares will

6  inevitably be discounted due to the fact that such shares lack the "control premium" associated with

7  the much larger blocks of shares held by the dissenting class of insider shareholders.

8  **d.      There is No "Estoppel".**

9         Based on comments made by Charlestown's counsel during the May 19, 2011 status

10  conference, the Debtors anticipate that Charlestown, or other parties, may argue that the Debtors

11  should be "estopped" from challenging the valuation based on the May 18, 2011 stock trading price

12  because, in connection with a previously-filed and subsequently withdrawn plan of reorganization, in

13  June 2010, the Debtors used the stock trading price as a rationale for the proposed treatment of

14  shareholders.  This argument, if made, should be rejected.

15         To begin with, the principle of judicial estoppel requires that a court act in reliance on

16  a position taken by a party during the course of litigation.  *See New Hampshire v. Maine*, 532 U.S.

17  742 (2001) (estoppel requires that court accepted party's earlier position).  Here, there was no

18  judicial reliance and, indeed, no judicial action was taken with respect to the prior plan.  On a more

19  substantive level, comparing the treatment of shareholders under the Charlestown plan with the

20  proposed treatment under the Debtors' previously-filed plan is akin to comparing apples to

21  dinosaurs.  First, in the previously-filed plan, the Debtors provided an <u>option</u> to existing

22  shareholders; they could either retain their stock in the reorganized debtor by paying 7 cents a share,

23  or they could elect to sell for 8 cents per share.  The Debtors explained in their proposed disclosure

24  statement for that plan that the purchase/sale prices were based on the average trading price of the

25  Debtors' stock over a period of approximately 5 months preceding the filing of that plan.

26         Second, unlike the Charlestown Plan, there was an "escape valve" for anyone who

27  believed that the trading price did not reflect the true value of the stock - they could buy in at less

28  than the proposed sale price, thus availing themselves of an option not available to shareholders

1   under the Charlestown Plan. This is a critical distinction because the Debtors' Plan avoided the risk

2   that shareholders could be forced to sell at an artificially depressed market price. Third, there was

3   no "control premium" required to be considered in connection with the Debtors' prior plan. Thus,

4   there are significant distinctions between the Debtors' prior reference to trading price, and any use of

5   the stock trading price to determine whether the Charlestown Plan was fair and equitable.

6           Significantly, Charlestown itself has never contended that the stock trading price was

7   evidence of fair value and, therefore, the issue was never presented to the Court during the

8   Charlestown trial. Had Charlestown done what it was obligated to do – submit evidence in support

9   of plan confirmation prior to or even during the trial – and, had Charlestown's evidence consisted of

10  stock trading prices, the Debtors would have confronted that evidence during the trial.

11  Charlestown's failure to produce evidence should not be obfuscated by the completely unavailing

12  and irrelevant "estoppel" theory. Ultimately, this Court must determine whether the Charlestown

13  Plan is fair and equitable to the dissenting class of shareholders. Charlestown had an obligation to

14  present evidence at trial and it failed to do so, based on its erroneous contention that shareholders

15  who ere being forced to sell their stock were not entitled to the fair value of that stock.

16          Finally, if estoppel were to be used against any party, it should properly be used

17  against Charlestown. Charlestown filed a Disclosure Statement, which was approved by order of

18  this Court, which represents that the post-effective date reorganized debtor will have a net equity of

19  $107 million -- $1.20 per share. Charlestown's unsupported 35 cents purchase price is less than one-

20  third of its own projected balance sheet value.

21  **D.      If the Court Intends to Consider Evidence Outside the Record The Court Should, At
22          The Very Least, Schedule An Evidentiary Hearing To Consider The Issue of Fair
            Value.**

23          It appears from the Court's Tentative Ruling that the Court believed it was necessary

24  to go outside the trial record to determine the fair value of stock which the class of dissenting

25  shareholders would be forced to sell pursuant to the Charlestown Plan. Implicit in that decision is

26  the conclusion that the evidentiary record was insufficient. While the Debtors agree that the record

27  that existed at the conclusion of trial was insufficient for the Court to find that the Charlestown Plan

28

1  was fair and equitable to the dissenting class of shareholders, or, at the very least that the evidence

2  demonstrated a per share value of between $1.07 and $2.99 per share; and while fully reserving their

3  rights in that regard, if the Court believes that it is appropriate and necessary to consider evidence

4  that was not presented at trial, then such additional evidence should be considered in the context of

5  an evidentiary hearing when parties can present expert testimony and other evidence concerning the

6  value of the reorganized entity and the value of a controlling interest in its stock—at which hearing

7  the burden of confirmation of the Charlestown Plan should remain squarely on its proponents.

8                                          **IV.**

9                                    <u>**CONCLUSION**</u>

10             The Debtors recognize that these cases need to be resolved in a timely fashion.

11  However, those needs should not override the due process rights of the Debtors and other interested

12  parties to be heard in connection with this Court's post-trial determination of fair value before

13  valuable equity interests are involuntarily stripped from them.

14             Based on the foregoing, the Debtors respectfully request that the Court enter an

15  Order: (1) striking from the record any evidence of the stock trading price of MMPI's shares on

16  May 18, 2011, and (2) denying confirmation of the Charlestown Plan or, in the alternative, (3) if the

17

18

19

20

21

22

23

24

25

26

27

28

1  Court intends to consider evidence outside the record at trial the Court should, at the very least,

2  schedule a properly noticed evidentiary hearing to consider the fair value issue.[11]

3

4  Dated:  May 27, 2011                              /s/ Gabriel I. Glazer
                                                     GARY E. KLAUSNER,
5                                                    MARINA FINEMAN, and
                                                     GABRIEL I. GLAZER, Members of
6                                                    STUTMAN, TREISTER & GLATT, P.C.

7
                                                     Special Reorganization Counsel for Debtors
8

9

10

11

12

13

14

15

16

17

18

19

20

---

21  [11]  Although no final order has been entered, the instant motion requests that the Court reconsider its oral
     ruling at the May 19, 2011 hearing. *See First Ave. West Bldg., LLC v. James (In re Onecast Media)*, 439
22   F.3d 558, 561-562 (9th Cir. 2006) (holding that bankruptcy court committed clear error in denying
     motion for reconsideration of an oral ruling).  Reconsideration requests are typically brought under
23   Federal Rule of Civil Procedure 59(e), made applicable here by Federal Rule of Bankruptcy Procedure
     9023, and are "appropriate if the [lower] court (1) is presented with newly discovered evidence, (2)
24   committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change
     in controlling law." *Sch. Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).  The application
25   of these factors "is a matter of discretion" for the Court based upon the unique matter now before it.  *See,*
     *e.g., Sanchez v. Johnson*, 301 F. Supp. 2d 1060, 1061-62 (N.D. Cal. 2004), *aff'd*, 416 F.3d 1051 (9th Cir.
26   2005).  For the many reasons outlined herein, the Court's admission of the "pink sheets" trading price to
     the record and subsequent reliance upon that price as a proper valuation metric constituted both clear legal
27   error and a manifestly unjust ruling under the circumstances.  Accordingly, the standards permitting the
     Court to reconsider this improper ruling – and its resulting decision to confirm the Charlestown Plan – are
28   easily satisfied here.

550890v5                                      23

# EXHIBIT "A"

GARY E. KLAUSNER (State Bar No. 69077)
STEPHAN M. RAY (State Bar No. 89853)
MARINA FINEMAN (State Bar No. 193065)
ANTHONY ARNOLD (State Bar No. 251973)
STUTMAN, TREISTER & GLATT PC
1901 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067-6013
gklausner@stutman.com, sray@stutman.com, mfineman@stutman.com, aarnold@stutman.com
Telephone: (310) 228-5600
Facsimile: (310) 228-5788

Special Reorganization Counsel for Debtors

JOHN N. TEDFORD, IV (State Bar No. 205537)
DANNING GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
Los Angeles, CA 90067-2904
JTedford@DGDK.com
Telephone: (310) 277-0077
Facsimile: (310) 277-5735

Reorganization Counsel for Debtors

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re: | Case No.: 1:09-bk-13356-VK |
| | Chapter 11 (Jointly Administered) |
| MERUELO MADDUX PROPERTIES, INC., et al., [1] | **DECLARATION OF M. FREDDIE REISS IN SUPPORT OF DEBTORS' OPPOSITION TO CONFIRMATION OF THE CHARLESTOWN PLAN AND THE LEGENDARY/EWB PLAN** |
| Debtor. | |
| ☒  Affects all Debtors | **Plan Confirmation Hearing** |
| ☐  Affects the following Debtor(s): | Date:  January 26, 2011 |
| | Time:  9:30 a.m. |
| | Place:  Courtroom 301 |
| | 21041 Burbank Boulevard |
| | Woodland Hills, CA  91367 |

---

[1] Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities. The affiliated case numbers are as follows: 1:09-bk-13338-VK; 1:09-bk-13358-VK through 1:09-bk-13407-VK; 1:09-bk-13434-VK; and 1:09-bk-13439-VK.

546911v3

1

1       I, M. Freddie Reiss, declare:

2       1.    I am over the age of 18 years. I have personal knowledge of all of the facts set

3  forth below, and, if called as a witness, could testify to them competently.

4       2.    I am a senior managing director in the Corporate Finance practice at FTI

5  Consulting, Inc. ("FTI") and the national leader of FTI's company-side practice. FTI is acting as

6  financial advisor to Meruelo Maddux Properties, Inc. and its affiliates ("MMPI" or the "Debtors") in

7  the above-captioned chapter 11 cases.

8       3.    On December 3, 2010, I filed a declaration (the "December 3 Declaration")

9  and expert report (the "Expert Report") in support of confirmation of the Debtors' "Fourth Amended

10  Joint Plan of Reorganization of Meruelo Maddux Properties, Inc., *et al.* Dated September 20, 2010"

11  (the "Debtors' Plan").

12       4.    I submit this "Declaration Of M. Freddie Reiss In Support Of Debtors'

13  Opposition To Confirmation Of The Charlestown Plan And The Legendary/East West Bank Plan"

14  (this "Declaration") in support the Debtors' opposition to the confirmation of the Fourth Amended

15  Charlestown Plan of Reorganization (the "Charlestown Plan") and to the confirmation of Legendary

16  Investors Group, No. 1, LLC's and East West Bank's Modified Second Amended Chapter 11 Plan

17  Dated September 3, 2010 (the "Legendary/EWB Plan" and, together with the Charlestown Plan, the

18  "Competing Plans").

19       5.    This Declaration is based upon work performed to date. In addition, I have

20  reviewed the Competing Plans and the pleadings submitted to date in support of confirmation of the

21  Competing Plans. Additional work will be performed before the plan confirmation hearing

22  scheduled to commence on January 26, 2011. I reserve the right to supplement this Declaration, the

23  December 3 Declaration and the Expert Report should I receive or find additional documents or

24  information or complete additional analysis. I further reserve the right to present rebuttal testimony

25  should that be necessary. This Declaration has been prepared solely in connection with the above-

26  referenced case and is intended for no other use.

27

28

1      A.   **Summary of Conclusions**

2      6.   This Declaration contains two principal conclusions with respect to each of

3 the Competing Plans, which together support a finding that neither of the Competing Plans is

4 confirmable: (1) neither of the Competing Plans provides fair value to MMPI shareholders based on

5 the net equity value of the Reorganized Debtors and the proposed dilution to existing MMPI

6 shareholders; and, (2) neither of the Competing Plans is feasible as various assumptions underlying

7 the financial projections for each of the Competing Plans are unreasonable.

8      B.   **Equity Valuations**

9         i.   **Charlestown Plan**

10      7.   The proponents of the Charlestown Plan – Charlestown Capital Advisors,

11 LLC, Hartland Asset Management Corporation and Global Asset Capital -- contemplate investing

12 approximately $23 million of equity in the Reorganized Debtors, through a newly formed entity

13 called MMPI Acquisition ("MMPIA"). It is my understanding that sufficient evidence of the sources

14 of such equity investment has yet to be provided. The plan proponents would receive a 55%

15 ownership stake in the Reorganized Debtors for their $23 million investment while existing

16 shareholders will be diluted to a 45% ownership stake. When factoring in the cash shareholders will

17 receive for redemption of their existing shares (approximately $17 million), shareholder value will

18 be diluted by 35%. Shareholders do not have the option to retain an ownership percentage higher

19 than 45% or be cashed out for an ownership percentage less than 45%. Shareholders will be forced

20 to redeem shares for $0.35. The Charlestown Plan does not address how this pricing was

21 determined.

22      8.   The Debtors estimate that the net equity value of the company will be

23 approximately $278.4 million on the Effective Date. As illustrated in the Analysis of Implied

24 Effective Date Equity Valuations (the "Valuation Analysis"), which is attached hereto as Exhibit

25 "A", the Charlestown Plan proponents' investment of $23 million for a 55% ownership stake implies

26 an estimated net equity value of the Reorganized Debtors of only $41.8 million ($23 million divided

27 by 55%). This equates to a discount of nearly $236.6 million (or 85%) from the Debtors' $278.4

28 million estimated net equity value of the Reorganized Debtors. As a result, it is my opinion that

1    such an investment does not constitute fair value with respect to existing shareholders. Furthermore,

2    the proponents of the Charlestown Plan themselves have reported a net equity value of the company

3    of approximately $107.2 million per the balance sheet contained in their own financial projections.

4    The benefit to the Charlestown Plan proponents equates to a reduction of approximately $65.4

5    million (or 61%) from their own stated net equity value of the Reorganized Debtors.

6              ii.     **Legendary/EWB Plan**

7          9.     The Legendary/EWB Plan contemplates investing approximately $15 million

8    of equity in the Reorganized Debtors. This assumes that the $10 million rights offering provided for

9    under the Legendary/EWB Plan is fully back stopped by Legendary. It is my understanding that

10    sufficient evidence of this commitment has yet to be provided. Under the Legendary/EWB Plan, the

11    proponents would receive an 80% ownership stake in the Reorganized Debtors for their $15 million

12    investment while existing shareholders will be diluted to a 20% ownership stake. As a result,

13    shareholder value will be diluted by 64%. This takes into account Legendary's investment of $15

14    million and a debt to equity conversion of approximately $59.5 million. Shareholders do not have

15    the option to redeem shares for cash and have no other option.

16         10.     The Debtors estimate that the net equity value of the company will be

17    approximately $278.4 million on the Effective Date. As illustrated in the Valuation Analysis, the

18    Legendary/EWB Plan proponents' investment of $74.5 million for an 80% ownership stake implies

19    an estimated net equity value of only $93.1 million ($74.5 million divided by 80%). This equates to

20    a discount of nearly $185.3 million (or 66.6%) from the Debtor's estimated net equity value of the

21    Reorganized Debtors. In my opinion, such an investment does not constitute fair value to existing

22    shareholders. Furthermore, the Legendary/EWB Plan proponents have reported a net equity value of

23    the company of approximately $134.5 million per the balance sheet contained in Legendary's/EWB's

24    own financial projections. The benefit to the Legendary/EWB Plan proponents equates to a

25    reduction of approximately $41.4 million (or 30.8%) from their own stated net equity value of the

26    Reorganized Debtors.

27

28

Case 1:09-bk-13356-VK   Doc 2525   Filed 12/30/10   Entered 12/30/10 20:41:28   Desc
Main Document      Page 5 of 12

C.      **Feasibility Issues**

i.      **Charlestown Plan**

(a)      **Effective Date Assumptions**

11.      $15 million in new debt proceeds is assumed under the Charlestown Plan, however no sufficient evidence of this commitment has been provided to date. Without this source of cash, I do not believe that the Charlestown Plan would be feasible because Effective Date cash would decrease to approximately $12 million. This would allow for only 6 months of funding for operations under the Charlestown Plan (assuming all other Effective Date assumptions are valid).

12.      $23 million in new equity capital is assumed under the Charlestown Plan, however, I understand that no sufficient evidence of this commitment has been provided to date. Without this capital, I do not believe that the Plan would be feasible because Effective Date cash would be decrease to approximately $4 million. This would allow for only 2 months of funding for operations under the Plan (assuming all other Effective Date assumptions are valid). See analysis exhibits.

13.      The Charlestown Plan assumes the agreement reached with the Los Angeles County Tax Collector (the "County") with respect to prepetition property taxes is assumable and transferable. Without assumption of this agreement, and with the payment of the County's claims on or about the Effective Date, the Charlestown Plan would have approximately $9 million less cash on the Effective Date.

14.      The Charlestown Plan assumes that the agreement reached with FNBN with respect to their unsecured debt is assumable and transferable. Without assumption of this agreement, and with the payment of FNBN's pre-settlement claim on or about the Effective Date, the Plan would have approximately $3 million less cash on the Effective Date.

15.      Should Charlestown's assumptions set forth in paragraphs 13-15 fail, the Reorganized Debtors would only have $15 million of cash on the Effective date, enough to operate for less than 9 months and inadequate to fund front loaded leasing costs. This figure also assumes a successful raise of new debt and equity capital. Without these funds, the Charlestown Plan would have negative cash on the Effective Date.

5

546911v3

28

**(b)    Operating Assumptions**

16.    The Charlestown Plan is highly reliant on remarkably speculative and aggressive leasing targets and assumptions. I am informed and believe that the proponents of the Charlestown Plan have no experience leasing, managing or selling properties in the downtown Los Angeles industrial market.

17.    The Charlestown Plan assumes that certain operating properties are leased to a "stabilized" occupancy of 92.5% in less than 2 years during what is expected to be a continued depressed and soft leasing market. Several third party research reports forecast negative absorption in both 2011 and 2012 and average market occupancy rates less than what the Charlestown Plan discloses.

18.    Aggressive leasing objectives usually require significant tenant concessions in the form of free rent, tenant improvement allowances and reduced rental rates. The Charlestown Plan provides for no free rent which is not commonplace in the market nor does it provide for reduced rental rates. Several third party research reports forecast negative rent growth in the near term.

19.    Despite providing an allowance for tenant improvements, I believe that the amounts projected on a per square foot basis under the Charlestown Plan are far below what it would take to bring the vacant spaces to leasable condition. The Debtors estimate that at least $9 million of additional capital expenditures will be necessary to achieve the forecasted leasing targets. Additionally, the Charlestown Plan does not adequately disclose how the tenant improvement costs were formulated. In my opinion, the source and methodology applied in determining these costs should be disclosed in order to properly evaluate the feasibility of these projections.

20.    The Charlestown Plan does not disclose expected rental rates by property. Extrapolated rental rates projected in the Charlestown Plan are significantly higher than both in-place rents and market rents. I believe that this clearly demonstrates the Charlestown Plan proponents' lack of knowledge and expertise of the market. Rental rates appear to be higher than those that are currently in-place, severely impacting cash if they are not achieved. In my opinion,

6

EXHIBIT A

29

1    this is simply not feasible, let alone logical. The source of the projected rental rates should be

2    disclosed in order to properly evaluate feasibility.

3        21.    The Charlestown Plan does not disclose the strategy or business plan for

4    achieving leasing objectives.

5        22.    Cash balances are highly sensitive to projected rental rates, vacancy rates and

6    capital expenditures. Should the Charlestown Plan's highly aggressive and speculative leasing goals

7    and capital costs be off target and/or not met on their projected schedule they may experience

8    recurring cash shortfalls according to Charlestown's own projections.

9        23.    Despite the aggressive leasing forecasts and targets, the Charlestown Plan

10   does not project increases in operating expenses. This is highly unusual. The vast majority of the

11   leases are gross indicating the landlord pays for operating expense, not the tenant. Increases in

12   physical occupancy of properties results in increased operating expenses. In my opinion, this

13   demonstrates that the Charlestown Plan proponents have not done adequate research and lack the

14   fundamental knowledge of the properties and their underlying leases.

15       24.    The Charlestown Plan makes no mention or outlines any proposed strategy for

16   achieving the proposed leasing goals. In my opinion, the lack of a descriptive business plan coupled

17   with the fact that the plan proponent has no idea who will run this large real estate company

18   seriously compromises their ability to execute their plan as proposed.

19       25.    The Charlestown Plan continues to keep the enterprise operating as a public

20   company; however does not maintain adequate costs to cover public reporting obligations

21              (c)    **Sales Assumptions**

22       26.    I believe that the Charlestown Plan projects to dispose of an unrealistic

23   amount of property in merely 2 years. Projected sales consist of 12 properties in the 1st year and an

24   additional 10 properties in the 2nd year. This equates to approximately 3 properties per quarter. In

25   my opinion, it is unlikely that the proponents of the Charlestown Plan have the resources to

26   effectively market and sell such a large number of properties in such a short period of time.

27       27.    Given the relatively small geographic area in which the properties are located,

28   placing so many properties on the market for sale is the equivalent of a orderly liquidation.

7

546911v3

1　Liquidating properties in this niche market will allow buyers to seek opportunistic purchases, drop

2　rents and devalue surrounding properties, including those properties remaining in the plan

3　proponent' portfolio.

4　　　　28.　The Charlestown Plan discloses the sale of non-core properties but in reality

5　disposes of core properties as well.

6　　　　ii.　　**Legendary/EWB Plan**

7　　　　　　(a)　**Effective Date Assumptions**

8　　　　29.　$10 million in new equity capital obtained through a rights offering is

9　assumed under the Legendary/EWB Plan, however the success of such a rights offering appears to

10　be highly speculative. Without a successful offering, the proponents of the Legendary/EWB Plan

11　would be required to fund the amount of the deficiency.

12　　　　30.　An infusion of at least $5 million in new equity capital from the

13　Legendary/EWB Plan proponents is assumed; I am informed and believe that no sufficient evidence

14　of this commitment has been provided to date. Without this capital, the Legendary/EWB Plan's

15　feasibility would be jeopardized, especially if the rights offering is not successful.

16　　　　31.　The Legendary/EWB Plan assumes the deal reached with the County with

17　respect to prepetition property taxes is transferable; however it assumes the incorrect amount of pre-

18　petition property taxes payable on the Effective Date. The amount is understated by $3.5 million,

19　per the actual agreement with the County.

20　　　　32.　The Legendary/EWB Plan assumes the agreement reached with FNBN with

21　respect to their unsecured debt is assumable and transferable. Without assumption of this agreement,

22　and with the payment of FNBN's pre-settlement claim, the Plan would have approximately $3

23　million less cash on the Effective Date.

24　　　　33.　Should Legendary's/EWB's assumptions set forth in paragraphs 31-32 fail, the

25　Reorganized Debtors would only have $9 million of cash on the Effective Date, enough to operate

26　for less than 4 months and inadequate to fund front loaded leasing costs. This assumes a

27　contribution of the full $15 million of required capital. Without these funds, the Legendary/EWB

28　Plan would have negative cash on the Effective Date.

8

546911v3

**(b)    Operating Assumptions**

34.    I believe that the Legendary/EWB Plan is reliant on speculative leasing targets and assumptions for several properties, not just Union Lofts and Alameda. I am informed and believe that the proponents of the Legendary/EWB Plan have no experience leasing, managing or selling properties in the downtown Los Angeles industrial market.

35.    The Legendary/EWB Plan assumes that properties are leased to a "stabilized" occupancy during what is expected to be a continued depressed and soft leasing market. Several third party research reports forecast negative absorption in both 2011 and 2012. Furthermore, the Plan does not define "stabilized" occupancy, a key component of determining feasibility.

36.    Leasing in soft market conditions requires significant tenant concessions in the form of free rent, tenant improvement allowances and reduced rental rates. The Legendary/EWB Plan provides for only one-half month of free rent which is not consistent with the market nor does it provide for reduced rental rates. Several third party research reports forecast negative rent growth in the near term.

37.    The Legendary/EWB Plan does not disclose expected rental rates or their source by property. This is a key component of determining feasibility.

38.    The Legendary/EWB Plan does not disclose necessary tenant improvements or their source by property. This is a key component of determining feasibility.

**(c)    Sales Assumptions**

39.    The Legendary/EWB Plan identifies 905 8th St. as having a value of $2 million, but assumes that it can sell for $3 million.

**(d)    Additional Assumptions**

40.    The forecasts underlying the Legendary/EWB Plan do not assume any changes to floating rates of interest associated with settled debt. Forward curve projections indicate rising benchmarks.

41.    The Legendary/EWB Plan continues to keep the enterprise operating as a public company; however it projects massive reductions in corporate overhead. Corporate costs are expected to be reduced to a mere $5 million, a decrease of nearly $3.2 million or 40%. In my

9

1   opinion, this is simply not realistic given the minimum amount of costs associated with maintaining

2   a public company and operating per the Legendary/EWB Plan.

3           42.    Since no properties are projected to sell until December 31, 2011, the cash

4   balance in 2011 is projected to drop to less than $3.2 million and negative $7.3 million using the

5   correct amounts for prepetition property taxes and unsecured claims. As a result, I believe that the

6   Legendary/EWB Plan is simply not feasible as $3.2 million will only provide for less than 2 months

7   of capital.

8           43.    The Legendary/EWB Plan does not include a 24 month consolidated

9   projection which is included in both the Debtors' Plan and Charlestown Plan. This exhibit is an

10  important component in determining the feasibility of the Legendary/EWB Plan.

11          44.    I believe that the Legendary/EWB Plan's forecast model incorrectly includes

12  Contingency and Corporate G&A costs in its calculation of Net Operating Income. While this

13  number does not impact the projected cash balances, its miscalculation should call in to question

14  whether the proponents of the Legendary/EWB Plan posses the necessary industry knowledge

15  required to run a large real estate company. NOI is a simple calculation that is easily understood by

16  those with even limited experience in the industry.

17      **D.      Conclusion**

18          45.    Based on my analysis of the Competing Plans, I am of the opinion that neither

19  of the Competing Plans provides fair value to MMPI shareholders based on the net equity value of

20  the Reorganized Debtors and each is extremely and unfairly dilutive as to existing MMPI

21  shareholders. I am of the opinion that neither of the Competing Plans is feasible due to the

22  unreasonable assumptions underlying the financial projections under each of the Competing Plans.

23          I declare under penalty of perjury under the laws of the United States of America that

24  the foregoing is true and correct.

25          Executed at Los Angeles, California, on December 30, 2010.

26

27                                              M. Freddie Reiss

28

# Exhibit A

**Analysis of Implied Effective Date Equity Valuations**
*Meruelo Maddux Properties, Inc.*

**Comparison to Debtor**

| Charlestown | ED Equity (millions) |
|---|---|
| Debtor Equity (Default Rates) | $    263.4 |
| Debtor Equity (Contract Rates) | 278.4 |
| Charlestown Implied | 41.8 |
| Discount to Debtor $ [1] | 236.6 |
| Discount to Debtor % | 85.0% |

[1] At contract rates

**Comparison to Debtor**

| Legendary | ED Equity (millions) |
|---|---|
| Debtor Equity (Default Rates) | $    263.4 |
| Debtor Equity (Contract Rates) | 278.4 |
| Legendary Implied | 93.1 |
| Discount to Debtor $ [1] | 185.3 |
| Discount to Debtor % | 66.6% |

[1] At contract rates

**Comparison to Balance Sheet**

| Charlestown | ED Equity (millions) |
|---|---|
| Charlestown Equity per B/S | 107.2 |
| Charlestown Implied | 41.8 |
| Discount Benefiting Investor $ | 65.4 |
| Discount Benefiting Investor % | 61.0% |

**Comparison to Balance Sheet**

| Legendary | ED Equity (millions) |
|---|---|
| Legendary Equity per B/S | 134.5 |
| Legendary Implied | 93.1 |
| Discount Benefiting Investor $ | 41.4 |
| Discount Benefiting Investor % | 30.8% |

| | |
|---|---|
| Equity Infusion | 23.0 |
| Ownership Stake | 55.0% |
| Implied Equity Valuation | 41.8 |
| Per Balance Sheet | 107.2 |

Debt to Equity Conversion Values (Using Contract Rates)

| | |
|---|---|
| 3rd and Omar | 2.9 |
| 336 W 11th St | - |
| 420 Boyd | 6.8 |
| 1500 Griffith | 7.1 |
| 4th St Center | - |
| 425 W 11th | 5.8 |
| 620 Gladys | 6.3 |
| 2640 Washington | 7.0 |
| Meruelo Wall St. | 23.5 |
| **Total** | 59.5 |

| | |
|---|---|
| Equity Infusion | 15.0 |
| Ownership Stake | 80.0% |
| Implied Equity Valuation | 93.1 |
| Per Balance Sheet | 134.5 |

DRAFT - Subject to Change          PRIVILEDGED AND CONFIDENTIAL

Exhibit A - Page 11

# EXHIBIT "B"

49

1  you -- look, if you owned -- if you were going to buy a home

2  and --

3          THE COURT:  No, I understand that.

4          MR. KLAUSNER:  -- and there's an --

5          THE COURT:  I think you're right.

6          MR. KLAUSNER:  Okay.

7          THE COURT:  I mean, I'm not really an expert on

8  stock valuation.  You know, we thought -- the Court thought

9  when we read the opinion, oh, well, maybe we'll just look at

10 the current stock trading price just like we looked at the

11 current interest rate.

12          You know, but maybe that isn't the right way to do

13 it.  Like you said, it's only one day and -- and there is a

14 plan on the table to force people to sell half for .35 cent.

15 So -- and it really wasn't -- it wasn't brought up at the

16 trial, and it really probably isn't fair to pick one day,

17 although it's the most recent day.  And even though it's

18 publically available information and as -- as the right

19 amount, assuming that the Court's -- you know, because

20 assuming that the Court is right that you -- in a solvent

21 estate case that you -- that fair and equitable requires not

22 just no one junior getting anything but that they get the

23 value which is in the first clause, although you kind of

24 wonder then why is there a second clause, but --

25          MR. KLAUSNER:  That has to be.

*Echo Reporting, Inc.*

93

1 getting anything.  And that's not in the statute, and it

2 does seem like I guess I can see support for the .50 cents.

3 I guess the Debtor agreed to have Watermark dilution at .50

4 cents.  So, I mean, I guess we can say .50 cents is an

5 appropriate number.  That's a number that they agreed to and

6 that Watermark's -- because aren't they selling their stock

7 for .50 cents if Watermark --

8             MR. KLAUSNER:  Your Honor, the way it works --

9             MR. PRINCE:  Excuse me, Mr. Klausner.  I --

10            MR. KLAUSNER:  But why --

11            MR. PRINCE:  It's the Court's question.

12            MR. KLAUSNER:  She --

13            THE COURT:  Okay.  Mr. Prince you can speak.

14            MR. PRINCE:  Thank you.  I thought you were

15 asking --

16            THE COURT:  Not that you're willing to go up to

17 .50 cents.  I just -- and I thought, well, maybe what we

18 could do is because it's not even -- I mean, there isn't a

19 lot of cases on this issue.  You know, maybe we could put it

20 in a reserve and then if people appeal it, the money would

21 be there.  I -- you know, because I -- an appellate court

22 could say, you know, leave the statute the way it is.  There

23 are cases -- the same case that says you look at the value

24 where the Court went -- I did -- you know, the case -- the

25 Court -- and other courts have said, listen, it's or, you

*Echo Reporting, Inc.*

94

1 know, no one junior.  But then they go to the -- they go to

2 the process of valuation because even going through the

3 process of valuation, the plan that's at issue satisfies the

4 test.  So that's the other thing I'm thinking, well, maybe

5 if we put the money aside, not the whole amount but the

6 amount that's --

7          MR. PRINCE:  Your Honor --

8          THE COURT:  -- because .45 cents does seem like an

9 arbitrary number.

10          MR. PRINCE:  Your Honor, there's two issues on --

11          THE COURT:  -- have a chance to deal with it

12 and --

13          MR. PRINCE:  There are two issues I think, your

14 Honor, that your Honor has raised.  One is I believe the

15 evidence on the record estops the Debtor from making this

16 argument.  They have testified that they proposed plans

17 using stock market prices as their basis, and they had a

18 fiduciary duty to the shareholders when they proposed those

19 plans.  Either they are admitting now a breach of fiduciary

20 duty under Delaware law or they are estopped from arguing

21 that you cannot use the stock market price.

22          On top of that, your Honor, the Watermark deal --

23 and Mr. Reise, I walked -- I made him get out a calculator,

24 and I made him do those numbers on the stand because this

25 has been a preposterous argument that the Debtor has been

*Echo Reporting, Inc.*

| In re: MERUELO MADDUX PROPERTIES, INC. | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 1901 Avenue of the Stars, 12th Floor, Los Angeles, CA  90067.

A true and correct copy of the following document described as:  **"NOTICE OF MOTION AND MOTION FOR ORDER: (1) STRIKING EVIDENCE IMPROPERLY RECEIVED AFTER THE CLOSE OF TRIAL THROUGH JUDICIAL NOTICE, AND (2) RECONSIDERING PLAN CONFIRMATION RULING, OR, IN THE ALTERNATIVE, (3) SCHEDULING A HEARING TO CONSIDER FAIR VALUE"** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document.  On **May 27, 2011**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Michael C Abel on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
mcabel@mac.com

Robert Abiri on behalf of Interested Party Courtesy NEF
rabiri@abiriszeto.com

Allison R Axenrod on behalf of Creditor Claims Recovery Group LLC
allison@claimsrecoveryllc.com

Christopher J Bagnaschi on behalf of Defendant Richard Meruelo
cb@cjblaw.com

John J Bingham on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
jbingham@dgdk.com

William C Bollard on behalf of Creditor Victory Outreach La Puente, Inc.
eal@jbblaw.com, kmg@jbblaw.com;william@jbblaw.com

Peter Bonfante on behalf of Interested Party Courtesy NEF
peterbonfante@bsalawfirm.com

Erin N Brady on behalf of Interested Party Los Angeles County Metropolitan Transportation Authority
enbrady@jonesday.com

Julia W Brand on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
JBrand@bhfs.com, jjung@bhfs.com;pherron@bhfs.com

Jennifer L Braun on behalf of U.S. Trustee United States Trustee (SV)
jennifer.l.braun@usdoj.gov

Martin J Brill on behalf of Interested Party Courtesy NEF
mjb@lnbrb.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

| In re: MERUELO MADDUX PROPERTIES, INC. | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Andrew W Caine on behalf of Creditor Legendary Investors Group No. 1, LLC
acaine@pszyjw.com

Howard Camhi on behalf of Creditor Kennedy Funding, Inc.
hcamhi@ecjlaw.com

Gary O Caris on behalf of Interested Party EDI Architecture
gcaris@mckennalong.com, pcoates@mckennalong.com

James E Carlberg on behalf of Creditor Woodland Farms, Inc.
jcarlberg@boselaw.com

Sara Chenetz on behalf of Creditor Imperial Capital Bank
chenetz@blankrome.com, chang@blankrome.com

Jacquelyn H Choi on behalf of Interested Party Courtesy NEF
jchoi@swjlaw.com

Carol Chow on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
CChow@Stutman.com

Cynthia M Cohen on behalf of Interested Party Courtesy NEF
cynthiacohen@paulhastings.com

Ronald R Cohn on behalf of Creditor Pacific Commerce Bank
rcohn@horganrosen.com

Enid M Colson on behalf of Debtor 2640 Washington Boulevard, LLC, a CA LLC
emc@dgdk.com, ecolson@dgdk.com

Michaeline H Correa on behalf of Interested Party Los Angeles County Metropolitan Transportation Authority
mcorrea@jonesday.com

Emily R Culler on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
eculler@stutman.com

Ana Damonte on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank Minnesota,
National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc., etc
ana.damonte@pillsburylaw.com

Brian L Davidoff on behalf of Creditor Yoshiake Murakami
bdavidoff@rutterhobbs.com, calendar@rutterhobbs.com;jreinglass@rutterhobbs.com

Susan S Davis on behalf of Creditor Cox, Castle & Nicholson LLP
sdavis@coxcastle.com

Aaron De Leest on behalf of Debtor Merco Group - 2040 Camfield Avenue, LLC, a DE LLC
aed@dgdk.com

Daniel Denny on behalf of Interested Party Courtesy NEF
ddenny@gibsondunn.com

Jeffrey W Dulberg on behalf of Creditor Legendary Investors Group No. 1, LLC
jdulberg@pszjlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_August 2010_                                                    **F 9013-3.1.PROOF.SERVICE**

551535v1

| In re: MERUELO MADDUX PROPERTIES, INC. | CHAPTER 11 |
| | |
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Marina Fineman on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
mfineman@stutman.com

Michael G Fletcher on behalf of Creditor Cathay Bank
mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com

Barry V Freeman on behalf of Interested Party Courtesy NEF
bvf@jmbm.com, bvf@jmbm.com

Donald L Gaffney on behalf of Creditor BANK OF AMERICA
dgaffney@swlaw.com

Thomas M Geher on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank
Minnesota, National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage
Securities, Inc., etc
tmg@jmbm.com

Bernard R Given on behalf of Creditor Cathay Bank
bgiven@frandzel.com, efiling@frandzel.com;shom@frandzel.com;bgiven@frandzel.com

Barry S Glaser on behalf of Creditor County of Los Angeles Tax Collector
bglaser@swjlaw.com

Gabriel I Glazer on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
gglazer@stutman.com

Matthew A Gold on behalf of Creditor Argo Partners
courts@argopartners.net

Eric D Goldberg on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
egoldberg@stutman.com

Michael J Gomez on behalf of Creditor Cathay Bank
mgomez@frandzel.com, efiling@frandzel.com;sking@frandzel.com

Michael I Gottfried on behalf of Interested Party Courtesy NEF
mgottfried@lgbfirm.com, msaldana@lgbfirm.com;ncereseto@lgbfirm.com

John A Graham on behalf of Creditor Wells Fargo Bank, N.A. successor by consolidation to Wells Fargo Bank Minnesota,
National Association as Trustee for the Registered Certificateholders of GMAC Commercial Mortgage Securities, Inc.
jag@jmbm.com

Ofer M Grossman on behalf of Interested Party Courtesy NEF
omglaw@gmail.com

Jodie M Grotins on behalf of Interested Party Courtesy NEF
jgrotins@mcguirewoods.com

Peter J Gurfein on behalf of Creditor CIM Urban RE Fund GP II, LLC, as Successor in Interest to Grand Avenue Lofts, LP
pgurfein@lgbfirm.com, cscott@LGBFirm.com

Cara J Hagan on behalf of Creditor PNL Pomona, L.P.
carahagan@haganlaw.org

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                          F 9013-3.1.PROOF.SERVICE

551535v1

| In re: MERUELO MADDUX PROPERTIES, INC. | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Asa S Hami on behalf of Creditor Committee Creditors Committee
ahami@sulmeyerlaw.com

Brian T Harvey on behalf of Creditor California Bank & Trust
bharvey@buchalter.com, IFS_filing@buchalter.com

Robert A Hessling on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
rhessling@dgdk.com

William W Huckins on behalf of Interested Party Courtesy NEF
whuckins@allenmatkins.com, clynch@allenmatkins.com

Lance N Jurich on behalf of Creditor CanPartners Realty Holding Company IV, LLC
ljurich@loeb.com, kpresson@loeb.com

William H. Kiekhofer on behalf of Creditor Esmark, Inc.
wkiekhofer@mcguirewoods.com

Andrew F Kim on behalf of Creditor Imperial Capital Bank
akim@mrllp.com

Michael S Kogan on behalf of Creditor Kennedy Funding, Inc.
mkogan@ecjlaw.com

Tamar Kouyoumjian on behalf of Creditor Committee Creditors Committee
tkouyoumjian@sulmeyerlaw.com, kfox@sulmeyerlaw.com

Lewis R Landau on behalf of Creditor Committee Creditors Committee
lew@landaunet.com

Dare Law on behalf of U.S. Trustee United States Trustee (SV)
dare.law@usdoj.gov

Leib M Lerner on behalf of Auditor Ernst & Young LLP
leib.lerner@alston.com

Matthew A Lesnick on behalf of Stockholder Charlestown Capital Advisors, LLC
matt@lesnicklaw.com

David E Leta on behalf of Creditor FNBN-CMLCOM I LLC
dleta@swlaw.com, wsmart@swlaw.com

Katherine Lien on behalf of Interested Party Courtesy NEF
katie.lien@sbcglobal.net, katielien@gmail.com

Steven K Linkon on behalf of Creditor Chinatrust Bank (USA)
slinkon@rcolegal.com

Robert M Llewellyn on behalf of Creditor California State Board Of Equalization
michael.llewellyn@boe.ca.gov

Richard Malatt on behalf of Interested Party Courtesy NEF
rmalatt@gmail.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

_August 2010_                                                    **F 9013-3.1.PROOF.SERVICE**

551535v1

| | |
|---|---|
| In re: MERUELO MADDUX PROPERTIES, INC. | CHAPTER 11 |
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Elmer D Martin on behalf of Creditor East West Bank
elmermartin@gmail.com

Elissa Miller on behalf of Interested Party Courtesy NEF
emiller@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com

Avi Muhtar on behalf of Creditor Committee Official Committee of Unsecured Creditors
amuhtar@sulmeyerlaw.com

Iain A W Nasatir on behalf of Attorney Pachulski Stang Ziehl & Jones LLP
inasatir@pszjlaw.com, jwashington@pszjlaw.com

Jeffrey P Nolan on behalf of Creditor Legendary Investors Group No. 1, LLC
jnolan@pszjlaw.com

Henry H Oh on behalf of Defendant Meruelo Maddux Properties Inc a DE Corp
henry.oh@dlapiper.com, janet.curley@dlapiper.com

Lawrence Peitzman on behalf of Interested Party Courtesy NEF
lpeitzman@pwkllp.com

Eric S Pezold on behalf of Creditor BANK OF AMERICA
epezold@swlaw.com, dwlewis@swlaw.com

Christopher E Prince on behalf of Stockholder Charlestown Capital Advisors, LLC
cprince@lesnickprince.com

Michael H Raichelson on behalf of Creditor Stanford Group LP
mhr@cabkattorney.com

Dean G Rallis Jr on behalf of Attorney SulmeyerKupetz, a Professional Corporation
drallis@sulmeyerlaw.com

Kurt Ramlo on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
kurt.ramlo@dlapiper.com, evelyn.rodriguez@dlapiper.com

Craig M Rankin - DECEASED - on behalf of Interested Party Courtesy NEF
cmr@lnbrb.com

Daniel H Reiss on behalf of Interested Party Richard Meruelo
dhr@lnbyb.com

Michael B Reynolds on behalf of Creditor FNBN-CMLCON I LLC
mreynolds@swlaw.com, kcollins@swlaw.com

Jeremy V Richards on behalf of Creditor East West Bank
jrichards@pszjlaw.com, bdassa@pszjlaw.com

James S Riley on behalf of Creditor Sierra Liquidity Fund, LLC
tgarza@sierrafunds.com

Martha E Romero on behalf of Creditor San Bernardino County Tax Collector
Romero@mromerolawfirm.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                **F 9013-3.1.PROOF.SERVICE**

551535v1

| In re: MERUELO MADDUX PROPERTIES, INC.<br><br>Debtor(s). | CHAPTER 11<br><br>CASE NUMBER: 1:09-bk-13356-VK |
|---|---|

Victor A Sahn on behalf of Creditor Committee Creditors Committee
vsahn@sulmeyerlaw.com

Steven J Schwartz on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
sschwartz@dgdk.com

Kenneth J Shaffer on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
jshaffer@stutman.com

Zev Shechtman on behalf of Debtor In Possession Meruelo Maddux Properties Inc a DE Corp
zshechtman@dgdk.com, danninggill@gmail.com

David B Shemano on behalf of Interested Party Courtesy NEF
dshemano@pwkllp.com

Jeffrey S Shinbrot on behalf of Creditor The Union Restaurant and Lounge, LLC
jeffrey@shinbrotfirm.com, sandra@shinbrotfirm.com

Stephen Shiu on behalf of Creditor FNBN-CMLCOM I LLC
sshiu@swlaw.com

Lori Sinanyan on behalf of Interested Party Los Angeles County Metropolitan Transportation Authority
lsinanyan@jonesday.com

Daniel H Slate on behalf of Creditor California Bank & Trust
dslate@buchalter.com, rreeder@buchalter.com;ifs_filing@buchalter.com

Surjit P Soni on behalf of Creditor Legendary Investors Group No. 1, LLC
surjit@sonilaw.com, gayane@sonilaw.com

Bennett L Spiegel on behalf of Plaintiff East West Bancorp, Inc.
blspiegel@jonesday.com

Tracie L Spies on behalf of Creditor PNL Pomona, L.P.
tracie@haganlaw.org

James Stang on behalf of Creditor East West Bank
jstang@pszjlaw.com

Catherine Steege on behalf of Creditor Committee Official Committee of Equity Holders
csteege@jenner.com

Derrick Talerico on behalf of Creditor CanPartners Realty Holding Company IV, LLC
dtalerico@loeb.com, kpresson@loeb.com;ljurich@loeb.com

John N Tedford on behalf of Attorney Danning Gill Diamond & Kollitz LLP
jtedford@dgdk.com, DanningGill@Gmail.com

Damon Thayer on behalf of Interested Party Courtesy NEF
dthayer@jenner.com

James A Timko on behalf of Interested Party Courtesy NEF
jtimko@allenmatkins.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*

**F 9013-3.1.PROOF.SERVICE**

551535v1

| In re: MERUELO MADDUX PROPERTIES, INC. | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 1:09-bk-13356-VK |

Alan G Tippie on behalf of Interested Party Courtesy NEF
atippie@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com;kfox@sulmeyerlaw.com

United States Trustee (SV)
ustpregion16.wh.ecf@usdoj.gov

Rouben Varozian on behalf of Creditor Vahan Chamlian
rvarozian@bzlegal.com

Jason L Weisberg on behalf of Creditor Roofcorp of CA Inc
jason@gdclawyers.com

William E Winfield on behalf of Creditor Committee Creditors Committee
wwinfield@nchc.com

Jasmin Yang on behalf of Creditor BANK OF AMERICA
jyang@swlaw.com

Aleksandra Zimonjic on behalf of Creditor CIM Urban RE Fund GP II, LLC, as Successor in Interest to Grand Avenue Lofts, LP
azimonjic@lgbfirm.com, kmoss@lgbfirm.com;cscott@lgbfirm.com


**II.   SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On **May 27, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. *Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.*

**Via U.S. Mail**

Honorable Victoria S. Kaufman, U.S. Bankruptcy Court, Courtroom 301, 21041 Burbank Blvd. Woodland Hills, CA 91367

**III.   SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **May 27, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. *Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.*

**Via Email**

Ronald S. Orr:  ronaldorresq@gmail.com (Attorneys for Equity Committee)
Georgiana G. Rodiger:  crodiger@rodigerlaw.com (Attorneys for Equity Committee)


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| May 27, 2011 | Debra G. Ige | /s/ Debra G. Ige |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                           **F 9013-3.1.PROOF.SERVICE**

551535v1