1  GARY E. KLAUSNER (State Bar No. 69077)
   MARINA FINEMAN (State Bar No. 193065)
2  GABRIEL I. GLAZER (State Bar No. 246384), Members of
3  STUTMAN, TREISTER & GLATT, P.C.
   1901 Avenue of the Stars, 12th Floor
4  Los Angeles, CA  90067-6013
   gklausner@stutman.com
5  mfineman@stutman.com
   gglazer@stutman.com
6  Telephone: (310) 228-5600
7  Facsimile: (310) 228-5788

8  Special Reorganization Counsel for Debtors and Debtors in Possession

9  JOHN N. TEDFORD, IV (State Bar No. 205537)
   DANNING GILL, DIAMOND & KOLLITZ, LLP
10 2029 Century Park East, Third Floor
   Los Angeles, CA 90067-2904
11 JTedford@DGDK.com
   Telephone:  (310) 277-0077
12 Facsimile:  (310) 277-5735

13 Reorganization Counsel for Debtors and Debtors in Possession

14             UNITED STATES BANKRUPTCY COURT
               CENTRAL DISTRICT OF CALIFORNIA
15              SAN FERNANDO VALLEY DIVISION

16

17 In re:                              Case No.: 1:09-bk-13356-VK
                                       Chapter 11 (Jointly Administered)
18 MERUELO MADDUX PROPERTIES,
   INC., et al.,[1]                    **NOTICE OF FILING OF MAY 19, 2011
19                                      HEARING TRANSCRIPT**
20                          Debtor.
                                       **NO HEARING REQUIRED**
21 ☒    Affects all Debtors
22 ☐    Affects the following Debtor(s):

23

24

25

26

27 [1]  Pursuant to an order of the Court, this case is being jointly administered with 53 chapter 11 cases filed by affiliated entities. The
        affiliated case numbers are as follows:  1:09-bk-13338-VK; 1:09-bk-13358-VK through 1:09-bk-13407-VK; 1:09-bk-13434-VK;
28      and 1:09-bk-13439-VK.

551536v1

1    **PLEASE TAKE NOTICE** that the Debtors and Debtors in Possession in the above

2    captioned chapter 11 cases, hereby attach, as Exhibit "1", a true and complete copy of the

3    transcript of the status conference hearing held on May 19, 2011 at 3:00 p.m. by the Bankruptcy

4    Court in the above captioned matter.

5

6

7    Dated:  May 27, 2011                     /s/ Gabriel I. Glazer
                                              GARY E. KLAUSNER,
8                                             MARINA FINEMAN, and
                                              GABRIEL I. GLAZER, Members of
9                                             STUTMAN, TREISTER & GLATT, P.C.

10                                            Special Reorganization Counsel for Debtors

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

1     UNITED STATES BANKRUPTCY COURT

2     CENTRAL DISTRICT OF CALIFORNIA

3       --oOo--

4 In Re:       )  Case No. SV09-13356-KT
             )
5 MERUELO MADDUX PROPERTIES, )  Woodland Hills, California
 INC., A DE CORP.,    )  Thursday, May 19, 2011
6          )  3:00 p.m.
     Debtor.    )
7 _____)

8          CONT'D MOTION FOR AUTHORITY TO
          FURTHER MODIFY THE CHARLESTOWN
9          PLAN AND TO APPROVE CHANGE OF
          VOTES OF CATHAY BANK AND MS.
10         KEARNY CT 1 LLC AS SUCCESSOR
          TO CHINA TRUST BANK, USA
11

12         CONT'D CHAPTER 11 STATUS
          CONFERENCE

13         SECOND INTERIM APPLICATION FOR
          APPROVAL AND PAYMENT OF
14         INTERIM COMPENSATION AND
          REIMBURSEMENT OF EXPENSES BY
15         DANNING, GILL, DIAMOND &
          KOLLITZ, LLP, AS GENERAL
16         COUNSEL TO DEBTORS AND DEBTORS
          IN POSSESSION
17

18         SECOND INTERIM APPLICATION FOR
          APPROVAL AND PAYMENT OF
19         INTERIM COMPENSATION AND
          REIMBURSEMENT OF EXPENSES BY
20         COX, CASTLE & NICHOLSON, LLP,
          AS SPECIAL REAL ESTATE COUNSEL
21         TO DEBTOR AND DEBTOR IN
          POSSESSION

22

23

24 Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Echo Reporting, Inc.*

EXHIBIT 1

ii

1

       FIRST INTERIM APPLICATION FOR
       APPROVAL AND PAYMENT OF

2

       INTERIM COMPENSATION AND
       REIMBURSEMENT OF EXPENSES BY

3

       SEBOLD & CO AS LITIGATION
       CONSULTANT FOR DEBTOR AND

4

       DEBTOR IN POSSESSION

5

       TRANSCRIPT OF PROCEEDINGS
   BEFORE THE HONORABLE VICTORIA KAUFMAN

6

     UNITED STATES BANKRUPTCY JUDGE

7

8

APPEARANCES:

For the Debtors:             GARY E. KLAUSNER, ESQ.

9

                          Stutman, Treister & Glatt
                          1901 Avenue of the Stars

10

                          Twelfth Floor
                          Los Angeles, California 90067

11

                          (310) 228-5695

12

For the Official Equity    RONALD S. ORR, ESQ.
  Committee:             Ronn Orr & Professionals, Inc.

13

                          578 Washington Boulevard
                          Suite 389

14

                          Marina Del Rey, California
                            90292

15

                          (310) 301-4849

16

For the Creditors Committee:  DEAN G. RALLIS, JR., ESQ.
                          Sulmeyer Kupetz

17

                          333 South Hope Street
                          35th Floor

18

                          Los Angeles, California 90071
                          (213) 617-5222

19

For Legendary:             JEREMY RICHARDS, ESQ.

20

                          Pachulski, Stang, Ziehl
                            & Jones

21

                          10100 Santa Monica Boulevard
                          11th Floor

22

                          Los Angeles, California 90067
                          (310) 277-6910

23

24

25

*Echo Reporting, Inc.*

EXHIBIT 1

3

iii

1  APPEARANCES: (Cont'd.)

2  For Bank of America:              DONALD GAFFNEY, ESQ.
                                     Snell & Wilmer
3                                    600 Anton Boulevard
                                     Suite 1400
4                                    Costa Mesa, California 92626
                                     (714) 427-7000
5
   For PNL:                          CARA HAGAN, ESQ.
6                                    Hagan and Associates
                                     110 East Wilshire Boulevard
7                                    Fullerton, California
                                     (714) 526-3377
8
   For Legendary Investors:          CHRISTOPHER E. PRINCE, ESQ.
9                                    Lesnick Prince, LLP
                                     185 Pier Avenue, Suite 103
10                                   Santa Monica, California 90405
                                     (213) 291-8984
11
   For Global Asset Capital:         CYNTHIA M. COHEN, ESQ.
12                                   Paul Hastings, Janofsky
                                         & Walker, LLP
13                                   515 South Flower Street
                                     25th Floor
14                                   Los Angeles, California 90071
                                     (213) 683-6275
15
   For John Maddux:                  DAVID SHEMANO, ESQ.
16                                   Peitzman, Weg & Kempinsky, LLP
                                     2029 Century Park East
17                                   Suite 3100
                                     Los Angeles, California 90067
18                                   (310) 552-3100

19 For Cathay Bank:                  MIKE FLETCHER, ESQ.

20 Court Recorder:                   Patty Garcia
                                     United States Bankruptcy Court
21                                   21041 Burbank Boulevard
                                     Woodland Hills, California
22                                       91367

23

24

25

*Echo Reporting, Inc.*

EXHIBIT 1                                                      4



iv

1  Transcriber:              Jordan R. Keilty
                             Echo Reporting, Inc.
2                            6336 Greenwich Drive, Suite B
                             San Diego, California 92122
3                            (858) 453-7590
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

*Echo Reporting, Inc.*

EXHIBIT 1                                                    5

1

1   WOODLAND HILLS, CALIFORNIA THURSDAY, MAY 19, 2011 3:00 P.M.

2   _____--oOo--

3        (Call to order of the Court.)

4        THE COURT:  On the 3:00 o'clock calendar we have

5   Meruelo Maddux Properties, motion for authority to modify

6   the Charlestown plan and a continued Chapter 11 status

7   conference.

8        MS. COHEN:  Good afternoon, your Honor.  Cynthia

9   Cohen, Paul, Hastings, Janofsky, and Walker, on behalf of

10  Global Asset Capital, GAC Real Estate Partners, specially

11  appearing for Charlestown and Heartland.

12       We've read your Honor's tentative, and I have

13  written authority to increase the payment as required to

14  that class to .45 cents a share.

15       THE COURT:  Thank you.  All right.

16       So do either of you want to talk about the motion

17  to modify the plan?

18       MR. KLAUSNER:  Do you want a discussion on the

19  tentative now or --

20       THE COURT:  No.  I want to go forward with the

21  motion to modify the plan.

22       MR. KLAUSNER:  That's fine.  Thank you.

23       MR. PRINCE:  Your Honor, I have essentially

24  nothing further to add other than we've filed our chart

25  regarding feasibility showing that substantial cash as I --

*Echo Reporting, Inc.*

EXHIBIT 1                                        6

2

1   I could go through the Debtor's reply to our chart, but in

2   terms of feasibility, in terms of motion to modify, it

3   actually -- their conclusion is that we had more cash than

4   we concluded.  So I don't think that their chart

5   demonstrates infeasibility of our plan.

6          So unless your Honor has any questions for me with

7   regard to the motion to modify, I think it's been briefed

8   and argued, and we're ready to submit.

9          MR. KLAUSNER:  Unless you had any further issues

10  that you wanted us to address, your Honor.

11         THE COURT:  Okay.  So the Court's going to grant

12  the motion to modify.

13         MR. PRINCE:  Thank you, your Honor.  We'll submit

14  an order.

15         THE COURT:  So then the Court -- the Court had

16  evaluated some of the things that Mr. Klausner raised at the

17  last status conference about issues with the Charlestown

18  plan.  He raised -- I mean, among the other issues, of

19  course, they've also argued about feasibility, which was

20  covered in also the opposition to the motion to modify the

21  plan or the second modification to the fourth amended plan

22  of Charlestown was the issue about forced sale of the equity

23  and management.

24         The Court has put some thought into both of those

25  issues.  With respect to the forced sale to equity, the

*Echo Reporting, Inc.*

EXHIBIT 1                                          7

3

1 Court had looked at the cases that had been cited by the

2 parties about the situation where we have a solvent estate

3 and what 1129(b)(2)(c) requires, and had -- and it has a

4 tentative about that which people can discuss, and when we

5 get down to it, we can read it in unless it's changed.

6        And then Mr. Klausner also raised the issue about

7 management, and the Court looked at cases that had been

8 cited by Charlestown in its reply and the objection to --

9 objection to confirmation, and the Court's of the view that

10 the management has been disclosed, and the case law is it

11 doesn't have to be disclosed necessarily in the disclosure

12 statement and that, although people had an opportunity to

13 cross examine any witnesses, including the proposed

14 management and they did so with Mr. McGonagle, they didn't

15 cross examine the -- Mr. Kaverly and his -- the Court's

16 looked at his credentials as outlined in the attachment to

17 the declaration of Raj -- is it Maheshwari?

18        MS. COHEN:  Maheshwari.

19        THE COURT:  -- that was filed on December 16th.

20 It looks like he has sufficient credentials.  People have

21 voted in favor of that plan, you know, enough where it could

22 be confirmed.  So the Court doesn't believe that the

23 management poses a problem to confirmation of that plan.

24        So -- and that plan is -- represents a largely

25 consensual plan at this time in comparison to the --

*Echo Reporting, Inc.*

EXHIBIT 1                                                          8

4

1 assuming that the other plan, both plans were confirmable,

2 that the -- what I'll refer to as the Charlestown plan

3 represents a plan that's been results of consensus.  The

4 Court wouldn't have to cram down any insecured creditors

5 except for one, but that's secured in -- which case is that?

6          MS. COHEN:  I think it's 48, your Honor.

7          THE COURT:  Forty-eight?

8          MS. COHEN:  I think.  It's my vague recollection

9 that it's 48.

10          THE COURT:  It's 40.

11          MS. COHEN:  Sorry, your Honor.

12          THE COURT:  40(a)(2), but that creditor didn't

13 object to confirmation, and they're getting the common

14 secured creditor treatment that was included in the Debtor's

15 plan and also incorporated in the Charlestown plan.  It

16 seems like that would meet the standards for being fair and

17 equitable and not -- in order for the Court to confirm that.

18          So, as opposed to the Court having to force the

19 plan onto Bank of America and two classes, P and L Pomona

20 and China Trust, in addition to foreseeing -- you know,

21 well, of course, they've objected to the plan, although the

22 Court had ruled that their estimated claim was zero, but, I

23 mean, they don't agree.  And who else?  Oh, Grandview Lofts,

24 it resolves the Grandview Lofts.  It really resolves three

25 cases as has come to be clear in the objections to the

*Echo Reporting, Inc.*

EXHIBIT 1                                                    9

5

1  motion to modify the Charlestown plan.

2         And in looking at 1129(c), the Court is to

3  consider the preferences of equity holders and also

4  creditors as well as things such as feasibility, which plan

5  seems more feasible.  There certainly appears to be

6  sufficient cash in the Charlestown plan to pay equity to the

7  cram down class, .45 cents a share, which was the market

8  trading value as of yesterday.  There's been significant

9  trading in those shares on the over-the-counter market.

10  Even one of the committee members on the equity committee

11  was trading in shares before he -- well, maybe he still is

12  but was then removed.

13         So the Court is ready to hear argument, will be

14  prepared to confirm the Charlestown plan today.

15         MS. COHEN:  Your Honor, we'll submit on the

16  Court's --

17         THE COURT:  Okay.

18         MS. COHEN:  -- statements.

19         THE COURT:  Oh, oh, one other thing.  The Court's

20  going to require that the insider class get paid the same

21  time as the other class, without the 90-day delay.

22         MS. COHEN:  Okay.

23         MR. PRINCE:  Understood, your Honor.

24         THE COURT:  If people want to go after them

25  because they think that they breached their duties, then

*Echo Reporting, Inc.*

EXHIBIT 1                                              10

6

1 | they can do that, but that isn't going to be to hold up

2 | their payment on their stock.

3 |       MS. COHEN:  We said we would do that if that's

4 | what the Court would require.

5 |       THE COURT:  Right.  I checked with them yesterday,

6 | and that's what it says, and that's what the Court's going

7 | to require, assuming no plan is confirmed.

8 |       MR. KLAUSNER:  Your Honor, Gary Klausner for the

9 | Debtor.  I'd like to react to your comments and probably go

10 | a little bit beyond that, since it seems like we're arguing

11 | sort of the ultimate issue today.

12 |       First of all, on the issue of management, the

13 | burden of proof is on the plan proponent, and I think you've

14 | heard maybe 12 days of testimony concerning the importance

15 | of competent and capable management who have the experience

16 | to be able to operate this kind of business.  You heard an

17 | extensive amount of testimony from Mr. Meruelo himself, from

18 | Mr. Maddux.  You heard from Mr. Payne, all of whom I think

19 | were consistent in explaining the uniqueness of this

20 | business, the uniqueness of its business model and its

21 | business plan and how the Debtor's management is

22 | particularly suited to be able to operate this business.

23 |       You've heard no such evidence from Charlestown

24 | concerning its proposed slate of management.  Mr. Kaverly

25 | never testified.  Yes, we could have cross examined him, but

*Echo Reporting, Inc.*

EXHIBIT 1

7

1  he didn't take the stand.  He didn't submit a declaration.

2       So on the one hand you have Mr. Meruelo and Mr.

3  Maddux who've spent 20 years building this company,

4  contributing substantial value through their own knowledge

5  and experience, their understanding of the market, this

6  market, their understanding of the community, their

7  understanding of the laws, regulations, political

8  environment, their knowledge of the tenants, their knowledge

9  of the properties, their ability to have created this

10 business and to have navigated it through two years of a

11 bankruptcy proceeding to a point where the company is

12 prepared to emerge extremely healthy, all as a result of

13 their efforts.

14      In contrast, Charlestown did not provide you with

15 anything other than a one-page resume of Mr. Kaverly.  We

16 don't know if Mr. Kaverly has ever set foot in the business.

17 We don't know if he's ever looked at the business plan.  We

18 don't know if he has any ability to execute that plan.  We

19 don't know if he has any understanding of how this business

20 operates, what its assets are, who its tenants are, what its

21 business plan is, whether he even agrees with the business

22 plan or has any ability to implement it or to operate this

23 company or has any of the administrative skills or

24 managerial skills necessary to do it.

25      So what you would be doing is you would be taking

*Echo Reporting, Inc.*

EXHIBIT 1

12

8

1  a slate of people who have successfully operated this

2  business, putting them in a position where it has well over

3  $100,000,000 of equity, negotiated, consensual resolutions

4  with substantially all but a handful of its creditors and is

5  prepared to pay the other ones in full, pay everybody in

6  full, restore ownership to equity, without taking anything

7  away from them.  And, instead, we would drop ship Martin

8  Kaverly into this business, about whom you know virtually

9  nothing.

10        THE COURT:  But it's not just Martin Kaverly,

11 right?  It's a whole team.  It's Mr. McGonagle, who worked

12 for MMPI, and Mr. Skaggs -- who I believe --

13        MR. KLAUSNER:  Well, Mr. --

14        THE COURT:  -- reason to believe that he would

15 accept the position.  He had been CFO of MMPI.  So there's

16 on mention of CEO's are not -- are usually -- you know, it's

17 like, you know, you can't think of the president by himself.

18 I mean, it's a whole team, and as long as they are qualified

19 managers and as long as they have a suitable team behind

20 them, they'll be --

21        MR. KLAUSNER:  I --

22        THE COURT:  -- fine.  I don't think there's any

23 evidence that he's not fine.

24        MR. KLAUSNER:  That's not our burden.  The burden

25 is on them.  Mr. McGonagle has never run this company.  He's

EXHIBIT 1

9

1 never had a managerial position.  He was somebody whose role
2 was to interface with shareholders.  He assisted the company
3 in their road show that led to the company going public.  He
4 -- his role was a stockholder relations officer.  He didn't
5 manage this business.  He didn't administer it.  He didn't
6 operate it.  There's nothing to suggest and there was no
7 evidence to suggest that he will be a capable manager.
8        We don't know if Mr. Skaggs is going to be working
9 or not.  There's no evidence from which you can make that
10 conclusion.  The only thing you have evidence of is that
11 when Mr. Maheshwari put Mr. Skaggs' name on his declaration,
12 no one had talked to Mr. Skaggs.  They could have just as
13 easily put Warren Buffet's name down.  But just because Mr.
14 Skaggs worked for this company doesn't mean he's going to go
15 to work for Charlestown.  It's an assumption without any
16 evidence.
17        So we have an entire management team that you've
18 heard from over the course of a lengthy trial who will be
19 dispossessed and in substitution we had people who are
20 virtual strangers to this company and to this business.
21        Okay.  Let me move to -- let me move to the issue
22 of the treatment of shareholders.  It appears that the Court
23 agrees with the proposition that for fair and equitable
24 purposes in a case in which there is equity, shareholders
25 must be given value.  That is the only thing that makes

*Echo Reporting, Inc.*

EXHIBIT 1                                    14

10

1  sense.  So I -- it appears the Court has accepted that

2  proposition.

3         Then the question becomes are they getting fair

4  value, are they being treated fairly and equitably.  And

5  let's just to set the stage, these are people who have

6  invested their money in the company, and when you're dealing

7  with the principals, Mr. Meruelo and Maddux, you're dealing

8  with people who invested millions of dollars of their own

9  money in this company and years of their lives, and this

10 plan, the Charlestown plan proposes to dispossess them of 55

11 percent of what they own.  It's taking their property away

12 from them.

13        And in the first instance, you have to ask the

14 question of why are we doing that?  Is that necessary for

15 the company to reorganize?  There's no evidence that anybody

16 has presented that suggests that selling off 55 percent of

17 their stock in order to allow third parties to acquire

18 ownership is essential to any reorganization.

19        The Debtor's plan is entirely confirmable.  It's

20 entirely feasible.  The funding for the plan is in place.

21 Substantially all the creditors have consented.  A handful

22 have held out.  It's not -- it -- it's not appropriate I

23 think to be rewarding Charlestown simply because they made

24 deals with people that we refused to deal with or we

25 wouldn't make the same deals that they made.

11

1        The reason is they aren't good business deals.

2 They are very destructive to shareholder values.  Just by

3 way of example, the Cathay settlement will cost the Debtor

4 under the Charlestown plan $6,000,000 more than will be paid

5 under the Debtor's plan.  There's no good reason to make

6 that deal other than Charlestown knew that they had to come

7 into court and tell you that they had the consent of Cathay.

8        So basically they sold out equity.  They paid --

9 they're paying an additional $6,000,000 to make a deal.

10 They made a deal with Grand Avenue Lofts.  All this was

11 pointed out the other day by Mr. Tedford that they actually

12 proposed to put a -- to -- on the one hand, their plan

13 proposes to sell a piece of property in a year from which

14 they are going to derive $2.8 million of cash flow that they

15 need, but at the same time, they've agreed with Grand Lofts

16 to put a parking structure on that property.

17        The deals that they've made with the other

18 creditors will cost this estate multimillions of dollars by

19 virtue of the fact that they made these deals out of

20 desperation.  There's no reason to be rewarding Charlestown

21 for doing that.  The --

22        THE COURT:  Just to mention on Grand Avenue Lofts,

23 the Debtor said they can confirm their plan without even

24 having a deal with Grand Avenue, without any -- even

25 confirming a plan with Grand Avenue Lofts.  So, clearly,

*Echo Reporting, Inc.*

EXHIBIT 1                                    16

12

1 even in the Debtor's claim, Grand Avenue Lofts -- I mean,

2 otherwise, they wouldn't have said they could confirm the

3 other 53 plans.

4       So to the extent that -- you know, I don't think

5 that -- if the Debtor basically has acknowledged that we

6 don't need Grand Avenue Lofts to confirm the plans --

7       MR. KLAUSNER:  Right.  And the plan --

8       THE COURT:  Although, I don't know if that's

9 really true, but that's been the Debtor's position, and the

10 Debtor hasn't -- we haven't resolved the issues by Grand

11 Avenue Lofts.  The Court isn't ready right now to say that

12 the Debtor's plan regarding Grand Avenue Lofts could be

13 confirmed because there's a pending objection on Grand

14 Avenue Lofts which the Court has to resolve.

15       So -- so I just --

16       MR. KLAUSNER:  My -- the point I'm making is --

17       THE COURT:  Not to mention that Grand Avenue Lofts

18 can hold up confirmation of the Charlestown plan since the

19 Debtors have said that it isn't -- shouldn't hold up

20 confirmation of their other 53 plans.

21       MR. KLAUSNER:  I don't disagree with that.  The

22 point I'm making, your Honor, is that making deals is not an

23 end in itself.  The deal making is certainly encouraged in

24 the bankruptcy process, but what is ultimately encouraged

25 and what the process is designed to achieve is

*Echo Reporting, Inc.*

EXHIBIT 1

13

1  rehabilitation of a company so that it can emerge from

2  bankruptcy healthy, so that creditors can be paid and equity

3  can be protected.  That's the goal.

4          Making a deal with a creditor to secure a consent

5  which costs the company millions of dollars more than is

6  necessary, simply to get a consent, isn't to be rewarded.

7  The Debtor's plan pays creditors in full.  The Debtor's plan

8  doesn't take away ownership from the people who own this

9  company.  That's the fundamental difference between those

10 two plans.

11         The fact that you had to fix cram down interest

12 rates for Bank of America and PNL and China Trust, that's

13 not a reason not to confirm the Debtor's plan.  That doesn't

14 mean the Debtor's plan is not confirmable.  The Debtor has

15 achieved enormous success in getting other creditors to

16 consent to its plan.  The fact that we've had four people in

17 the courtroom fighting with us ignores the fact that

18 substantially all, hundreds of millions of dollars of

19 creditors have consented to the Debtor's plan.  The Debtor

20 has achieved -- and Charlestown has taken advantage of those

21 settlements.  They didn't make those settlements.  We did.

22         So we have a plan that pays every creditor in

23 full.

24         THE COURT:  But when we did them, didn't we do it

25 for creditors?  Wasn't that the point, to do it -- I mean,

EXHIBIT 1                                        18

14

1   are you saying that their plan doesn't rehabilitate the

2   estate?

3           MR. KLAUSNER:  Well, the --

4           THE COURT:  I mean, obviously it costs more to

5   reach consensus because you have to get somebody to cut a

6   deal with you.  That doesn't mean -- I mean, otherwise, why

7   cut any deals at all?  You can always do great by, you know,

8   just cram it down on everybody, and they probably won't get

9   what they want, but that isn't what the Bankruptcy Code is

10  designed to do.

11          MR. KLAUSNER:  Nor is it designed -- but here is

12  what it's not designed for.  You have a Debtor that has

13  restructured its relationship with an enormous amount of

14  creditors and is prepared to emerge healthy, where creditor

15  -- where shareholder interests are preserved.

16          Why would anybody -- why would a court prefer a

17  Charlestown plan?  Why is that necessary?  Why -- what are

18  we -- what goal and objective of Chapter 11 are we achieving

19  under the Charlestown plan?  We have third parties who would

20  like to acquire ownership of this company.  Why?  Because

21  it's very valuable.  Why is it valuable?  Because the

22  management of this company has made it valuable.  They

23  succeeded in the worst real estate market in the last 50

24  years.  They've created --

25          THE COURT:  I like how they don't take any credit

*Echo Reporting, Inc.*

EXHIBIT 1

19

15

1  -- I mean, it's not their fault that it filed, but the fact

2  that now the market is rebounding is totally to their

3  credit?  I mean, you know, I -- it's like when things are

4  bad, it's market forces, but when things are good, it's

5  because they're stars.  I mean, it's just -- I mean, the

6  bottom line is these are people who decided to do an IPO,

7  who decided to get in all this cash, who then filed

8  bankruptcy shortly thereafter, allegedly not their fault,

9  and now are taking all the credit for the fact that things

10 are getting better when they wouldn't take any of the blame

11 for the fact that the market turned.

12        MR. KLAUSNER:  Well, the market --

13        THE COURT:  And now, not only did they do an IPO

14 which then brought in all the shareholders, right, but

15 exclusivity was terminated after a long time, right, to

16 allow competing plans.  So what -- your position makes me

17 say there shouldn't be allowed -- I shouldn't allow

18 competing plans, because that means we're taking out the

19 management, that that's, you know, what Judge Thompson

20 decided when --

21        MR. KLAUSNER:  Well --

22        THE COURT:  -- were going to consider other

23 management because existing management was not doing what it

24 needed to do to get to the finishing line.  That's why

25 exclusivity was terminated.

*Echo Reporting, Inc.*

EXHIBIT 1

20

16

1        So the bottom line is once it's -- you know, once

2   they decided to raise money in IPO and taking all these

3   other people's money and, two, once they got to the point

4   where even in their bankruptcy the Court terminated

5   exclusivity because there was a showing that they weren't

6   apparently negotiating in good faith, you know, and then

7   maybe they got religion, but, you know what, I just -- this

8   argument that they should be able to stay in place no matter

9   what, you know, and beat any other plan because they're the

10  insiders just as -- I just don't agree.

11        MR. KLAUSNER:  Well, your Honor, I think --

12        THE COURT:  Just because they're the ones who were

13  there originally.

14        MR. KLAUSNER:  Well, they weren't just there

15  originally.  I mean, these are people who have invested

16  millions of dollars of their own money, and I think you have

17  to differentiate between --

18        THE COURT:  Well, they're going to get a big chunk

19  of that.  They're going to get the current trading value of

20  cash.

21        MR. KLAUSNER:  I'll get to that.

22        THE COURT:  And they're going to get -- you know,

23  and they're going to keep the other almost half.  They're

24  not being forced to sell the whole thing.  You know, if

25  they're so talented, I mean, they'll land on their feet.

EXHIBIT 1

17

1  They'll be fine.  They're still going to be able to buy and

2  sell stock in real estate.  They can take all their money

3  from the stock, which is like what, a couple of million

4  dollars, and do something with it.  They're going to keep

5  their knowledge about the market.  They're the ones who

6  decided to go public.  They're the ones who ran the company

7  to the point where exclusivity was terminated.

8          There are just consequences to what they've done.

9  They've made choices, and this is a consequence of their

10 choices.

11         MR. KLAUSNER:  I don't think that the fact that

12 exclusivity was terminated and the fact that an alternative

13 plan was proposed means that people who own something should

14 be penalized.

15         THE COURT:  They're not being penalized.

16         MR. KLAUSNER:  This is not about penalizing

17 management.  This is about doing what's in the best

18 interests of this estate for all constituencies, including

19 shareholders.  And the threshold question that you have to

20 consider, if you find the Charlestown plan confirmable --

21 and I'm going to get to that.  I haven't dealt with your

22 tentative yet, but the threshold question you have to

23 consider is why is it in the interests of the estate to

24 allow a third party to come in and acquire ownership of the

25 company?  This is not a situation where that is a --

*Echo Reporting, Inc.*

EXHIBIT 1

22

18

1 nobody's demonstrated the need for either the additional

2 money because substantially all the money that Charlestown's

3 putting in is going to buy stock, and nobody's suggested --

4         THE COURT:  That's not all the money.

5         MR. KLAUSNER:  There'll be some extra money.

6 Nobody has suggested that the Debtor's plan cannot be

7 effectuated or implemented successfully without additional

8 money.  There was no feasibility challenge to this plan.

9 Our plan is a feasible plan, and it pays everybody in full.

10 The essential difference in these plans is what happens to

11 ownership.

12         Forget management for a moment because -- forget

13 whether Mr. Meruelo gets to go to the office and run this

14 business just for the moment.  You're in a position where

15 you're being asked to allow third parties to use the

16 bankruptcy process to acquire control of a company, and the

17 question is why were we doing that.  Is that what the

18 bankruptcy process is for?  The bankruptcy process is to

19 rehabilitate a business, protect the constituencies.

20         This plan does that.  Shareholders keep their

21 value.  They keep the value of their stock.  Why is that a

22 bad thing?  For what reason are we forcing shareholders who

23 have rejected this plan, why are we forcing them to sell

24 their stock?  For whose benefit?  For Raj Maheshwari?  For

25 Charlestown?  For GAC?  For Mt. Keller?  Why are we doing

*Echo Reporting, Inc.*

EXHIBIT 1

23

19

1 that?

2        It's not necessary for reorganization.  It's not

3 part of the process.  Are we just doing it because we're mad

4 at these people because they wasted some time in Chapter 11

5 or because they did a public offering and then the market

6 turned on them and they had to resort to bankruptcy?  What

7 have they sun in the bankruptcy?  They've sold property

8 successfully.  They've negotiated cash collateral

9 stipulations which have kept them in business.  They have

10 avoided relief from stay.  There were huge battles in this

11 case for the first year where everybody was coming into this

12 case, telling the Court the company's insolvent, there's

13 nothing here, it should be liquidated, it should be

14 converted.  They avoided that.  They protected the interests

15 of creditors, and they protected the interests of

16 shareholders.

17        They filed this plan back in October.  The process

18 of getting this plan confirmed and the fact it's taken six

19 months is not their fault.  It's -- the problem is, of

20 course, with a competing plan.  The people behind the

21 competing plan decided that this wasn't -- this case wasn't

22 going to be about the economics, it was going to be about

23 destroying and maligning the people who own and run this

24 company.

25        So they spent three months trying to convince you

*Echo Reporting, Inc.*

EXHIBIT 1

24

20

1 that these people were dishonest, corrupt, committed all

2 sorts of crimes and misdemeanors, and at the end of the day,

3 at least it was my sense, having heard some of your

4 comments, that you had concluded that you weren't convinced

5 that management needed to be replaced.

6         Now, maybe I read you wrong, but I had never heard

7 you make a finding or suggest or make a tentative that you

8 thought that the problem with this company was that

9 management had to go and the only way they would go is if we

10 could get another person to control ownership.

11         So, assuming that we don't need to change

12 ownership in order to get new management -- and I can't

13 imagine that this Court is actually -- would actually

14 believe that Mr. Kaverly would come in here and do a better

15 job than Mr. Meruelo.  There's just no possibility that you

16 could make that -- reach that conclusion based on what

17 you've heard in court.

18         So there's no -- if we're not throwing out

19 management because that's the only way -- I mean, if we're

20 not changing ownership because that's the only way we can

21 get rid of management because we don't need to get rid of

22 management, if the Debtor has filed a plan which has been

23 mostly consensual -- you just haven't heard from the people

24 that have consented because they didn't need to be here.

25 You've only heard the tirade from people who, you know,

*Echo Reporting, Inc.*

EXHIBIT 1

25

21

1  haven't agreed and with whom we haven't been able to reach

2  agreement because the Debtor doesn't want to make deals that

3  it doesn't that it doesn't think are in the interests of the

4  company.

5        So at the end of the day, the Debtor's plan gets

6  everybody paid, and it protects shareholders, and now what

7  you're going to be asked to do is to take people who own a

8  company, and it's not just Mr. Meruelo and Mr. Maddux.

9  Other people --

10        THE COURT:  Non-insider shareholders don't think

11  they're being protected.  Non-insider shareholders don't

12  think they're being protected.  This is about two kinds of

13  shareholders.  It's about non-insider shareholders and

14  insider shareholders with different views.

15        MR. KLAUSNER:  Okay.

16        THE COURT:  So what you're saying is we should

17  ignore the non-insider shareholders because they're not

18  currently managing the company.  Well, that's why they want

19  change.

20        MR. KLAUSNER:  Well, the --

21        THE COURT:  So -- and they want a publically

22  reporting company which is a company they want to have seats

23  on the board, which they won't get.  They want to have --

24  these are the things that they want.  This is why they voted

25  for this other plan.

*Echo Reporting, Inc.*

EXHIBIT 1

26

22

1          So the thing is that we have to -- somebody -- and

2     there's always some -- someone has -- someone will win and

3     someone will not.  We've got two competing plans that are

4     both -- assuming that they're both confirmable, and the

5     Court's already ruled that the Charlestown plan is

6     confirmable, so, you know, why should we just go with the

7     people who are currently in power and not the people who

8     don't like those people --

9          MR. KLAUSNER:  Because those --

10         THE COURT:   -- and you want them changed and you

11    don't believe that they're doing a good job or at least as

12    good of a job as a replacement group would?

13         MR. KLAUSNER:  Because you have no evidence to

14    base that on.

15         THE COURT:  We have voting.  This is why we do

16    voting.

17         MR. KLAUSNER:  And the voting was overwhelmingly

18    against the Charlestown plan.

19         THE COURT:  Because the majority of the stock is

20    held by insiders.

21         MR. KLAUSNER:  So what?  They're the right -- so

22    for --

23         THE COURT:  I mean, obviously, they're not going

24    to vote for the Charlestown plan.  I mean, you know --

25         MR. KLAUSNER:  Well, that's the point.  So you

EXHIBIT 1

27

23

1 just said we have voting.  Well, the people who bought this

2 stock, the minority shareholders bought a minority interest.

3 They didn't buy control of the company.  They bought it

4 during the --

5          THE COURT:  Because that wasn't the -- they

6 couldn't buy it.

7          MR. KLAUSNER:  But they made their choice.  They

8 bought --

9          THE COURT:  Well, now they're making a choice to

10 get rid of the current majority and put in new people.

11          MR. KLAUSNER:  That isn't their option.

12          THE COURT:  Really?

13          MR. KLAUSNER:  That's your choice, and you have to

14 decide if that's warranted.  You have to decide if there is

15 a legitimate need to throw out management.  The fact that

16 minority shareholders who bought in in a distressed

17 situation for pennies on the dollar, most of which was in --

18 in a Chapter 1 case where they had no board seat, they had

19 no representation, they weren't in control -- this is what

20 they bought into.  They were speculators.

21          And this isn't even so much about -- and so we're

22 going to take their desire, having sort of thrown -- having

23 invested in a distressed company in Chapter 11, we're -- and

24 owning a minority interest, you're going to decide that

25 their desire for new management in the form of Mr. Kaverly

24

1  justifies forcing owners of a business to have to sell their

2  stock at a price that they don't want to sell, regardless of

3  the fact that it won't make a difference in terms of paying

4  creditors, just because the minority shareholders decided

5  that they don't want management, and that's not what

6  bankruptcy is for.  If they don't like that, your Honor,

7  they've got remedies in other courts.  They've got plenty of

8  remedies under corporate law.  If they don't like the way a

9  business is --

10         THE COURT:  Well, why do they get a vote at all?

11  Why do we even look at their votes?  Why should we just --

12  why do we even bother to take votes?  If the majority gets

13  to decide, then why do we -- I mean, what's the point?

14         MR. KLAUSNER:  Well, I don't know that --

15         THE COURT:  They don't count because they're

16  minority, right?  Why should we even look at their voting?

17         MR. KLAUSNER:  There's no -- your Honor, the --

18         THE COURT:  Why shouldn't we just have veto?

19         MR. KLAUSNER:  There's no rule of nature that says

20  that the minority, meaning the non-insiders, are all going

21  to vote one way and the majority will vote another.  It just

22  so happens that this is a plan that the minority happens to

23  be supporting because they have a unique interest that isn't

24  reflective of shareholders in general.  They do not

25  represent anybody other than themselves.  They negotiated a

*Echo Reporting, Inc.*

EXHIBIT 1

25

1  deal which benefits them for their own particular interests.

2  If you buy stock at .11 cents and you can sell it at .35

3  cents, maybe you don't care what happens to the rest because

4  you're playing with the house's money.

5        How can you -- so if you're suggesting as a matter

6  of bankruptcy law the majority of the constituency has voted

7  against the plan but, nevertheless, because the minority

8  would prefer it, that's the one we should confirm?

9        THE COURT:  That's not the only point.

10        MR. KLAUSNER:  Well, they --

11        THE COURT:  There's a whole lot of things we have

12  to go through in 1129 and a whole -- you know, there's a lot

13  to get to the confirmation.

14        MR. KLAUSNER:  Yes, but --

15        THE COURT:  You know, so they had to jump through

16  a lot of hoops and not just that.

17        MR. KLAUSNER:  But the Debtor's plan leaves equity

18  in place, and it leaves the ownership interest of the

19  minority shareholders in place.  And the purpose of

20  bankruptcy is not to resolve the minority shareholders'

21  concerns about how a company is being run.

22        THE COURT:  You know, in most cases equity gets

23  wiped out all together.

24        MR. KLAUSNER:  And there's no value.  Here there's

25  enormous --

*Echo Reporting, Inc.*

EXHIBIT 1

30

26

1          THE COURT:  All right.  So, I mean, if bankruptcy

2 was all about keeping people where they are, then equity

3 wouldn't get wiped out whenever.

4          MR. KLAUSNER:  Yes, that --

5          THE COURT:  More than a majority of the time.

6 It's not about just keeping equity in place.

7          MR. KLAUSNER:  When --

8          THE COURT:  Clearly not.

9          MR. KLAUSNER:  When equity is in the money, they

10 are a constituency that is entitled to be protected, and the

11 value of their interest has to be protected.  Sure, they get

12 wiped out.  The absolute priority rule requires that they

13 get wiped out.  If you have creditors that have an insolvent

14 business, the value of the company goes to the creditors.

15 If there's equity -- and there's a huge amount of equity in

16 this case -- if there's equity, equity is entitled to it.  I

17 mean, how can a Bankruptcy Court tell somebody "We're going

18 to take your property away?"  I mean, on what basis, for

19 what reason, for what goal?  What rehabilitative goal is

20 served by forcing shareholders to sell their stock in an

21 environment and for a price that they don't want to sell it

22 for?  Why?  There's -- if the creditors are getting paid and

23 the equity is being preserved, then why would we want to

24 seriously consider a plan that puts that ownership interest

25 in the hands of third parties just because they want to buy

*Echo Reporting, Inc.*

EXHIBIT 1                                                    31

27

1  it?  What's the justification for that?

2          Let me turn to your tentative.  If we start with

3  the proposition that where there is equity value, equity has

4  to be protected and that ownership interests of shareholders

5  cannot be wiped out or reduced unless they're given fair

6  value -- let's start with that as a proposition, which seems

7  to me it has to be the case.

8          Up to that point we agree with your decision.  We

9  submit that at that point in your decision, the correct

10 conclusion would have been to deny confirmation to

11 Charlestown, and the reason is that it was their burden to

12 demonstrate to you that their plan was fair and equitable.

13         Now, here's sort of the -- here's the progression

14 of the evidence on that issue.  On December 3, plan

15 proponents were obligated to present evidence in support of

16 their plans.  As we know, Charlestown presented no evidence

17 on December 3 in support of its plan, certainly no evidence

18 to support that their plan was fair and equitable to

19 shareholders.

20         We filed a plan objection on December 30, which

21 was the date that the plan objections were due.  We provided

22 in support of our plan objection Mr. Reise's declaration in

23 which mr. Reise opined that based upon the balance sheet of

24 the enterprise of the reorganized Debtor, based upon the

25 balance sheet of both Charlestown and the Debtor, that .35

EXHIBIT 1

28

1  cents was not a fair price.  Under the Charlestown analysis,

2  there was over $100,000,000 of equity.  Given the fact that

3  there's 90,000,000 shares outstanding, on a per share price,

4  it's over a dollar a share.

5          The Debtor's balance sheet showed over

6  $200,000,000 of equity.  So on a balance sheet basis, the

7  per share value was over two dollars.

8          Charlestown never filed anything in response to

9  that.

10          THE COURT:  That's not true.  They assert -- they

11  filed a reply to the opposition to confirmation, and they

12  asserted that they were paying fair value because they had

13  the Equity Committee that represented non-insider

14  shareholders had agreed -- have negotiated for .35 cents,

15  and that -- you know, and that we -- and we had the class --

16  shareholders agree to sell at .35 cents.  So their view was

17  .35 cents was fair value.  They didn't not respond at all.

18  They didn't agree with Mr. Reise' opinion that the value was

19  represented by -- in a way that he -- and he said and they

20  cited in their reply the Prince case and some other cases

21  that talk about how you value stock.  How do you value

22  stock?  And the Prince case specifically talks about that

23  the value of stock should not be up to experts because it's

24  too amorphous.  Fair value is what people will buy and sell

25  stuff for.

*Echo Reporting, Inc.*

EXHIBIT 1                                                    33

29

1          In fact, this is something that Mr. Meruelo has

2   discussed in connection with valuing property in this case,

3   real property.  "Oh, don't listen to the appraisers.  They

4   don't really know, those experts.  You know, he knows

5   because he buys and sells stuff."  Well, what better way to

6   determine the value of stock than what people are buying and

7   selling it for every day?

8          MR. KLAUSNER:  Well --

9          THE COURT:  Every day on over-the-counter market.

10          MR. KLAUSNER:  Well, you've sort of touched on two

11  things.

12          THE COURT:  Okay.

13          MR. KLAUSNER:  First of all --

14          THE COURT:  As opposed to some experts, you know.

15          MR. KLAUSNER:  Number one, there's no trial

16  testimony on the issue of negotiations.  That may have been

17  in the brief, but you didn't hear any evidence.

18          THE COURT:  We didn't have any direct evidence in

19  trial other than the fact that the Debtor wanted to have

20  direct evidence on management because that had been raised

21  as a potential evidence.  Direct evidence wasn't supposed to

22  be given at trial.  Direct evidence is supposed to be in

23  declarations and --

24          MR. KLAUSNER:  And there was no evidence by

25  Charlestown to support its value.  There was none.  There

*Echo Reporting, Inc.*

EXHIBIT 1                                    34

30

1  was no declaration submitted.

2      THE COURT:  We know that people -- we know non-

3  insiders have voted to accept that plan.  We have evidence

4  of that.  We have evidence of people voting to accept a plan

5  in which they're forced to sell half their stock maybe, I

6  mean, depending on what happened with people consenting, for

7  .35 cents.

8      MR. KLAUSNER:  We also have evidence that 70

9  percent voted against it.  I mean, at what -- if -- if value

10 is determined by what a willing buyer and a willing seller

11 will agree to in an arm's-length deal, then the only

12 evidence you have is that this price has been resoundingly

13 rejected.  If you want to look at the voting as evidence of

14 what people were willing to agree to, there's no question

15 that people rejected this.  Ninety-five percent of the

16 people who voted and who were given an opportunity to elect

17 to take .35 cents rejected that.

18     THE COURT:  Because maybe they didn't want to sell

19 all of their stock.  Maybe under the plan they were only

20 going to sell half.

21     MR. KLAUSNER:  Well, I can't get into their head,

22 but if you're suggesting that the vote of a small minority

23 of shareholders somehow establishes the value of the

24 company's --

25     THE COURT:  I'm just saying that Charlestown

*Echo Reporting, Inc.*

EXHIBIT 1

35

31

1  didn't say any -- I'm just saying your position that they

2  said nothing about Mr. Reise' opinion is not an accurate --

3          MR. KLAUSNER:  It is accurate.

4          THE COURT:  No, it's --

5          MR. KLAUSNER:  They --

6          THE COURT:  They did say something.  They did say

7  something.  They said that their belief is it's based on

8  what it's worth based on what a willing buyer and seller

9  will exchange for.  That was the --

10         MR. KLAUSNER:  Let's talk about the difference

11 between what's in arguments and briefs.

12         THE COURT:  Okay.

13         MR. KLAUSNER:  And what's evidence.  Okay.

14 Evidence is declarations, trial testimony.  There aren't --

15 there was no trial testimony.  There was no evidence of any

16 of this.  It's all argument.  There was no evidence.

17         Now, they have a burden to prove that they're

18 providing fair value.  That's their burden, not our burden

19 to overcome it, although we did submit evidence.  It's the

20 only evidence in this record of the value of the stock.  Mr.

21 Reise' declaration, he was cross examined at trial, and --

22 at the trial of the Charlestown plan.  They called him as a

23 witness.  They cross examined him.  They didn't establish

24 much, but they cross examined him on the subject of his

25 declaration.

*Echo Reporting, Inc.*

EXHIBIT 1                                        36

32

1           They offered no evidence.  There's no declaration.

2   There was no witness.  There was nobody who testified to you

3   as to what that stock is worth.  There's nothing.  So on

4   what basis can the Court find that there is fair value?

5           Now, at no time -- interestingly, let's talk about

6   the stock price.  At no time did Charlestown present to you

7   any evidence of stock trading price.  That's not in the

8   record.  They didn't tell you what it was trading at in

9   December, January, February, March, April.  Where is there

10  evidence of stock value?  And had they proposed to provide

11  that evidence, you know, had they told us that that was the

12  basis for it or had they submitted a declaration, we would

13  have been prepared to deal with it at trial.

14          We didn't have to deal with it at trial because

15  they didn't put on any evidence.  We made a decision at the

16  conclusion of their evidence not to present an opposition

17  case.  If you'll recall, we said we're not going to.  We'll

18  go right to closing argument.  That was a decision based on

19  what they failed to do at trial.

20          They can't have it both ways.  They can't tee off

21  a .35 cent sale price, not produce any evidence that

22  supports it.  Indeed, the only evidence in the record is Mr.

23  Reise' declaration.  Their trial ends.  They don't deal with

24  the subject, and two months later, you decide -- and,

25  indeed, their position in their brief was we don't have to

*Echo Reporting, Inc.*

EXHIBIT 1                                37

33

1  do anything because under -- one of their positions was

2  under 1129(b)(2)(c)(ii), there's no junior class getting

3  anything, so it doesn't matter.

4        So they're wrong, number one.  That's clearly

5  wrong.  I mean, you can't take the position that where you

6  have equity value somehow you can just disregard that, you

7  know, equity value and give shareholders zero in theory or

8  dollar.

9        So they were wrong on the principal.  They chose

10 not to support their case.  They could have produced expert

11 testimony.  They could have presented evidence of stock

12 trading.  We would have responded to it.  We would have

13 explained why trading for this company at this time in the

14 market isn't really reflective of value.  And there's a good

15 reason for that.  I mean, there's an obvious reason for it.

16       If you have a plan pending that proposes to pay

17 creditors -- shareholders .35 cent for the stock, who's

18 going to pay more for that?  Who's going to go out and buy

19 the stock for more than .35 --

20       THE COURT:  People are because it's trading at

21 .45.

22       MR. KLAUSNER:  Yeah, and some people are making

23 how many, 22 -- you cited 22,000 shares out of 90,000,000.

24       THE COURT:  That's just one day.

25       MR. KLAUSNER:  But why would --

*Echo Reporting, Inc.*

EXHIBIT 1                                        38

34

1          THE COURT:  Mr. Whatever --

2          MR. KLAUSNER:  I mean, how --

3          THE COURT:   -- the guy on the Committee sold

4  something like 800,000 shares on February 11th.

5          MR. KLAUSNER:  Well --

6          THE COURT:  It was 800 -- it was a lot.

7          MR. KLAUSNER:  Okay.  I would approach this the

8  following way.  We had a trial.  They failed to provide

9  evidence on an issue on which they had a burden of proof.

10  We -- we had a right to confront their evidence, and we

11  would not.  Because they provided no evidence on the

12  subject, there was no need for us to do anything other than

13  have Mr. Reise' declaration in the record.

14          You concluded that they needed to provide value.

15  You determined that you could find value by looking at the

16  stock trading.  That's incorrect, for two reasons.  First of

17  all, as a matter of process, we should be given the

18  opportunity to demonstrate why the stock price is not valid.

19  It is not a valid measure of the value of the stock of this

20  company, and we would have had they relied on -- had that

21  been their position and had they presented evidence on the

22  subject and put in stock values, we would have provided

23  evidence demonstrating that (a) it's not a reliable factor

24  --  for a company like this in bankruptcy with a .35 cent

25  plan pending, it is not a reliable measure of value, and we

*Echo Reporting, Inc.*

EXHIBIT 1                                        39

35

1  would have provided our own expert testimony on how you

2  would need to value this company.

3          We made the decision not to address that issue

4  because they chose not to provide evidence.  If it's your

5  view that two months after the trial you can look to

6  trading, our position would be that it is -- it's not valid

7  evidence of value.  If you want to now say that Charlestown

8  can prove value by looking at stock value, we -- it's a

9  matter of process.  We have to have the right to respond to

10 that.  We didn't do it because it wasn't on the table.  We

11 didn't have to respond to every theory of value.  We had to

12 respond to the evidence that they presented.

13         Their theory -- you look at the enterprise value

14 or you could look at the projected earnings or you could

15 look at the business plan.  I mean, there are all sorts of

16 ways that you could try to value this company.  They didn't

17 do it.  It wasn't our job to do that for them.  You're doing

18 their job.  You know, you're -- you're filling a gap that --

19 for which they had a burden of proof.  If you're going to do

20 that, if you're now going to suggest that after -- two

21 months after the end of a trial, you're going to look at

22 trading and conclude that that's a fair measure of value, we

23 have to be given an opportunity to respond to that, because

24 if that had been the issue at trial, we would have, and it's

25 fundamentally unfair not making that -- where they chose not

*Echo Reporting, Inc.*

EXHIBIT 1

40

36

1   to present evidence for you in effect to provide the

2   evidence for them and then for us not even be given an

3   opportunity to respond to it, and there are any number of

4   reasons why the trading price of that stock is not

5   reflective of fair value, not the least of which is you have

6   a .35 cent plan on the table, which isn't reflective of the

7   value of the stock post-confirmation.  It's just impossible

8   to connect those two dots because the market would obviously

9   reflect the fact that there's an enormous risk to

10  shareholders who would purchase stock knowing that a plan

11  could be confirmed that would require half of their stock to

12  be sold for .35 cents.

13          Now, I'm not going to testify as an expert.  What

14  I'm suggesting to you is we have a right to have an expert

15  and we have a right to have the Court educated on how stock

16  of this company should be valued because once you accept the

17  proposition that shareholders are entitled to value, then we

18  have to conduct a real proceeding to determine what that

19  value is.

20          Now, my view is we shouldn't even go there because

21  you should have concluded that once you found that

22  shareholders were entitled to the value of their stock, at

23  that point you could and we think you should have said "I

24  sat through a trial.  Charlestown did not present evidence.

25  Maybe they had arguments and briefs, but they didn't present

*Echo Reporting, Inc.*

EXHIBIT 1

41

37

1  evidence.  They had a chance to do it.  It's too bad.

2  They're done."

3          You've sort of gone in the other direction and

4  said, "Well, they didn't present evidence, and they didn't

5  -- they certainly didn't present any stock issue.  They

6  didn't present any evidence on the balance sheet, but you

7  said, "Okay.  I'll fill in the gap.  I'm going to look at

8  the trading, and I'm picking a day.  Maybe it's

9  representative, maybe it isn't.  We don't really know.  It's

10  .45 cents.  That's fair value."

11          With all due respect, your Honor, that's wrong,

12  for two reasons.  One, it's not fair value.  There's a

13  minimum amount of stock that's being traded.  This is a --

14  clearly a -- you're talking about 23,000 shares out of

15  90,000,000.  That's like one quarter of one percent.  You're

16  picking a day, I mean, when courts tend to look at trading

17  on a public exchange and, you know, this is not the New York

18  Stock Exchange.  This is over the counter.  They tend to

19  look at it over a period of time.

20          But, more importantly, there's no evidence from

21  any expert who will tell you that the proper way to value

22  the stock in this company is to look at the trading volume

23  of one day for a company that's in a bankruptcy case where

24  they come to a plan under which shareholders will lose half

25  their stock at .35 cents.  That's the subject of expert

*Echo Reporting, Inc.*

EXHIBIT 1                                                42

38

1 testimony.

2          So with all respect to the Court -- and I

3 appreciate the fact that, you know, you have worked

4 enormously hard to get control of this case and to

5 understand the complexities of it and to deal with an

6 enormous amount of lawyers who have raised any number of

7 issues, and I have enormous respect for what you've done.

8 However, the last part of that decision I believe and I

9 submit to you was improper, that once you got to the point

10 where you determine that shareholders were entitled to the

11 value of their stock, I think the appropriate result would

12 have been to say "I've looked at the evidence, and you

13 didn't prove it to me."

14          If, however, your view is that we should be

15 allowing Charlestown the benefit of providing evidence of

16 stock price, we ought to be given the opportunity to

17 demonstrate to you through appropriate expert testimony why

18 stock price for this company at this time is not an

19 appropriate measure of value.

20          So, with all due respect, I don't believe that you

21 can confirm the Charlestown plan and make a proper finding

22 under 1129(b) based on the record in this case, and I think

23 it would be phenomenally unfair to the people who own the

24 stock of this company, and regardless of how you feel about

25 them as individuals or managers, the people who have bought

*Echo Reporting, Inc.*

EXHIBIT 1

43

39

1 and paid for and invested in stock who own something --

2       THE COURT:  The Court does not have any negative

3 feeling about them.

4       MR. KLAUSNER:  Okay.  Well --

5       THE COURT:  I mean, it has nothing to do with, you

6 know --

7       MR. KLAUSNER:  Well, and --

8       THE COURT:  -- them -- it's not like -- when I say

9 consequences, I don't mean like they're being penalized.  No

10 one's being penalized.  It's not meant to be a -- it's just

11 -- it's just we make decisions and things happen based on

12 the decisions we make.  It doesn't necessarily have to be

13 seen as a penalty.  It's just --

14       MR. KLAUSNER:  Well, the decision that was made

15 back in September was to file a plan, but --

16       THE COURT:  So, I mean, it's just that obviously

17 other -- there are people who -- there's two competing

18 plans, and there are some people that prefer other

19 management.  I mean, many people -- I mean, enough people

20 where --

21       MR. KLAUSNER:  When you say enough people, what

22 you're talking about is --

23       THE COURT:  Non-insiders and other creditors.

24       MR. KLAUSNER:  What about the -- the enormous

25 number of creditors that have supported our plan?  Are you

*Echo Reporting, Inc.*

EXHIBIT 1

44

40

1  counting them?  Are you considering --

2         THE COURT:  Yes, because that's the same treatment

3  in both plans.

4         MR. KLAUSNER:  But they voted for our plan.

5         THE COURT:  Because at that time those were the

6  only people they had to negotiate with.  They had to

7  negotiate with the existing management.  There was no

8  opportunity for competing plans at that time.

9         MR. KLAUSNER:  But I don't --

10        THE COURT:  And management did the best they could

11 to tie them up.

12        MR. KLAUSNER:  I don't know what more the company

13 could do other than get the case --

14        THE COURT:  I just want to make the point that

15 it's not about the Court trying to penalize anyone or, you

16 know, it's nothing like that.

17        MR. KLAUSNER:  That's fine.

18        THE COURT:  It's just there's two plans.  We have

19 to pick one, and we've got to move on.

20        MR. KLAUSNER:  The one that is --

21        THE COURT:  And meet the requirements --

22        MR. KLAUSNER:  I agree with that.

23        THE COURT:  -- and move on.

24        MR. KLAUSNER:  Well, I don't disagree that we move

25 on, but we need to move on correctly.

*Echo Reporting, Inc.*

EXHIBIT 1

45

41

1         THE COURT:  Okay.

2         MR. KLAUSNER:  And you do have two plans, and the

3 two plans are creditor neutral.  The fact that there are a

4 handful of creditors with whom we could not agree is not a

5 compelling factor in a case where so many creditors have

6 voted for our plan.  An overwhelming majority of creditors

7 have supported this plan, in dollar amount, in class, in

8 amount of claims, in number.

9         There's been an enormous amount of creditor

10 support for this plan.  It was our client that made the deal

11 with accounting?  It was our client that made the deal with

12 Legendary.  You know, we're the ones who accomplished an

13 enormous amount of the --

14        THE COURT:  Because there was nobody else who

15 could do it then.  I mean, you had to do it.  That was your

16 fiduciary obligation, and they were the only ones who could

17 do it because they were the Debtor in Possession.

18        MR. KLAUSNER:  Well --

19        THE COURT:  No one else could come in -- I mean,

20 it wasn't like the committees could come in and start

21 cutting deals with people.  You know, I mean, it's just --

22        MR. KLAUSNER:  The point is you --

23        THE COURT:  That was their job.  Their job was to

24 cut deals with people and to reach resolution.

25        MR. KLAUSNER:  Which they did, successfully, and

EXHIBIT 1                                        46

42

1  they're -- there is now a plan and there has been since

2  October which pays creditors in full and leaves equity in

3  place, and you have to choose that plan over a plan that

4  destroys equity value.

5          THE COURT:  I have a question about -- when we get

6  a chance, I want to compare the feasibility of the two plans

7  with the cash flows.

8          MR. KLAUSNER:  Okay.

9          THE COURT:  Okay.

10          MR. KLAUSNER:  You do have to choose between two

11  plans, and the question is why are you choosing or why would

12  you choose a plan that destroys the value of somebody's

13  stock ownership against their will.  Why would you do that?

14  And your -- if your answer is because there are a number of

15  people who voted for it, great, but there are just as many

16  -- there are multiples of people and shares who voted

17  against that.

18          So if you just want to count votes, that doesn't

19  work.  Now, do we need to remove these people to make the

20  company better?  There's no proof of that, and there's

21  certainly no proof that it's necessary, and there's

22  completely no proof that Mr. Kaverly is somehow going to do

23  a better job than the people who have been running this

24  company.

25          So other than to benefit the minority shareholders

43

1  who are minority shareholders who've bought into a situation

2  knowing exactly what they were getting and other than

3  benefitting GAC and Charlestown who get promotional fees and

4  brokerage commissions for putting this deal together --

5          THE COURT:  Where is the evidence of that, by the

6  way?

7          MR. KLAUSNER:  In the letter of intent that was

8  filed on march 25.  So that there's -- the -- the letter of

9  intent which was filed with this Court on the eve of the

10  Charlestown trial which, by the way, is the only evidence we

11  have.  We haven't seen any operating agreement, which is

12  another problem we can get to.  But the letter of intent

13  delineated, you know, how we're going to divide up a number

14  of pies here and the plan proponent gets a stake of -- gets

15  a piece of stock.  Plus they get fees for having put this

16  deal together.  I mean, that's why Charlestown was in this

17  from day one.  They never had any of their own money in the

18  deal.  They -- when Charlestown filed this plan, they had no

19  money and no resources, and they were looking for funding

20  sources.

21          Indeed, what was told to you or what was told to

22  the Court back in October when they filed their disclosure

23  statement was a lie.  You know, what they said was MMPI is

24  going to put $23,000,000 into this business as equity and

25  MMPI has obtained or Charlestown has obtained a commitment

*Echo Reporting, Inc.*

EXHIBIT 1                                    48

44

1 for $15,000,000 secured loan, not true.  MMPI had no money.

2 It had no funding whatsoever, and there was no loan.  I

3 mean, we found out later that they were looking very hard.

4 And, as you'll recall, we had Mr. Valani who came to a

5 deposition on January 8, and he talked about how he had some

6 people and they were looking at the deal and they were

7 considering what to do and then two months went by and

8 nothing happened, and all the sudden Mt. Cabot appears.

9        So Charlestown has never put any money in this

10 deal.  They're just getting money out of putting the pieces

11 together.  So that's what you're accomplishing.  You know,

12 you're allowing a third party with no stake in this, with no

13 skin in the game so to speak, to come into a bankruptcy

14 proceeding with a valuable company in play and acquiring --

15 and putting a bunch of pieces together so that third parties

16 can acquire ownership and for whose benefit are we doing

17 this?  That's what I'm trying to figure out.  We're not

18 doing it for the benefit of creditors.  They're getting

19 paid.

20        THE COURT:  It's not what the Court's allowing.

21 It's what the Code allows, just like the Code allows

22 creditors to be crammed down against their will.  They don't

23 like it.  It isn't the Court that does that.  It's the Code

24 that does that.  The Code allows the majority of the

25 shareholders to be sold.  It's not the Court.  The Code

*Echo Reporting, Inc.*

EXHIBIT 1

45

1   enables that.  So, you know, sometimes, I mean, a lot of

2   people aren't happy.  I mean, the Code allows people to --

3   you know, to pay adequate protection which is less than the

4   interest rate on the loan.  I mean, there's a lot of things

5   the Code provides for that are not to people's liking, but

6   that doesn't mean that you don't do it.  So I just --

7           MR. KLAUSNER:  Okay.  Well --

8           THE COURT:  So if you want to argue about it and

9   say -- I mean, you could say the Code doesn't allow for

10  that, but I don't see that the Code says that.

11          MR. KLAUSNER:  Well, I --

12          THE COURT:  You just can't allow a minority -- you

13  can't allow the company to be sold out from within the

14  control of the majority shareholders.

15          MR. KLAUSNER:  Well, what's interesting is if --

16  first of all, there is nothing in the Code that says that --

17          THE COURT:  It's not precluded.  It doesn't say

18  you shall not allow majority shareholders to be sold out

19  against their will.

20          MR. KLAUSNER:  You're right.  It doesn't say that,

21  but there's nothing specifically that also says that a court

22  is empowered to order shareholders to sell their stock, but

23  let me give you a different sort of hypothetical here.

24          You know, what if instead of buying stock, MMPIA,

25  which was the plan acquirer -- and MMPIA proposed to

*Echo Reporting, Inc.*

EXHIBIT 1

50

46

1    purchase 55 percent of the assets of the company and they

2    proposed to purchase 55 percent of the assets for

3    $23,000,000.  And what if the evidence was that the assets

4    of the company were worth $100,000,000 and that 55 percent

5    of the assets was worth $55,000,000 and they were

6    underpaying.

7            It's unlikely that the Court would approve that

8    transaction.  So there's no reason why equity shouldn't be

9    protected from being forced to sell their ownership interest

10   in a company any more than they would be forced to let

11   somebody buy the assets of that company for a price that is

12   an unfair price.  There's no reorganization goal that's met

13   by doing that.  There's no reorganization need to do that.

14           The Bankruptcy Code and cases protect equity.

15   They -- they -- the Supreme Court in the La Salle case

16   requires a fair value analysis if somebody's going to come

17   in and invest and acquire the ownership of a company.

18   Creditors aren't allowed to get over .100 cents if there's

19   more value that would otherwise go to equity.

20           So there's no question that the Bankruptcy Code

21   and the case law protects the interests of equity, and

22   that's your role.  And if a plan proponent comes into court,

23   which they have a right to do, and they want to acquire a

24   business, they can bid for the assets.

25           What they're really doing here is they want to bid

*Echo Reporting, Inc.*

EXHIBIT 1

51

47

1  for the stock against people who don't want to sell to them.

2  I don't know if it's that obvious that the Bankruptcy Court

3  allows that to happen in a case where equity is in the

4  money, but it would seem to me that if the Court can permit

5  that to happen, even if you can, you've got to conduct

6  proceedings to determine what the value of the company is

7  and come to a determination as to whether or not the

8  shareholders are being paid fairly.

9          That hasn't happened here.  It hasn't happened

10  because Charlestown chose not to present evidence, and the

11  fact that the Court two months after the trial looks at what

12  the trading number is is not a substitute for a properly

13  conducted hearing on the issue of value.  This company

14  should be valued, and the Court can then make a

15  determination as to what the fair price is, and I -- and

16  that's really the way this process should have worked except

17  Charlestown chose to ignore the problem, and maybe they were

18  relying too heavily on the Code section and they thought

19  that as long as there was no junior interest getting

20  anything, that they really didn't need to meet that burden.

21          But that's -- this is an extraordinarily

22  fundamental moment in this case.  And, again, with ultimate

23  respect to the Court, I think you moved the ball down the

24  field too quickly because I think that once you concluded

25  that the shareholders were entitled to that value, you had

*Echo Reporting, Inc.*

EXHIBIT 1

52

48

1  to determine what -- whether there was sufficient evidence

2  to form -- for you to make a finding of value.

3        The real evidence in this case was Mr. Reise'

4  unchallenged declaration, and that testimony demonstrated

5  that the value was at least $100,000,000 according to

6  Charlestown's own numbers.

7        Now, if you accept the Debtor's numbers -- and

8  throughout the case you seem to have been receptive to Mr.

9  Meruelo's values -- if you accept the Debtor's numbers, it's

10 $200,000,000 of value.

11        THE COURT:  All right.  The Court discounted its

12 values as a cram down except for one situation.

13        MR. KLAUSNER:  Okay.

14        THE COURT:  I mean, we just didn't take --

15        MR. KLAUSNER:  But even if --

16        THE COURT:  -- his number.

17        MR. KLAUSNER:  Even --

18        THE COURT:  And Judge Thompson never just took his

19 numbers.

20        MR. KLAUSNER:  Even if you take Charlestown's own

21 values, there's over $100,000,000 of value here, and to

22 superimpose on that the trading price of 23,000 shares of

23 stock when there's a pending plan that would impose a

24 $35,000 forced sale price which obviously has to have an

25 effect on the value somebody is going to pay -- I mean, if

EXHIBIT 1

53

49

1 you -- look, if you owned -- if you were going to buy a home

2 and --

3          THE COURT:  No, I understand that.

4          MR. KLAUSNER:  -- and there's an --

5          THE COURT:  I think you're right.

6          MR. KLAUSNER:  Okay.

7          THE COURT:  I mean, I'm not really an expert on

8 stock valuation.  You know, we thought -- the Court thought

9 when we read the opinion, oh, well, maybe we'll just look at

10 the current stock trading price just like we looked at the

11 current interest rate.

12          You know, but maybe that isn't the right way to do

13 it.  Like you said, it's only one day and -- and there is a

14 plan on the table to force people to sell half for .35 cent.

15 So -- and it really wasn't -- it wasn't brought up at the

16 trial, and it really probably isn't fair to pick one day,

17 although it's the most recent day.  And even though it's

18 publically available information and as -- as the right

19 amount, assuming that the Court's -- you know, because

20 assuming that the Court is right that you -- in a solvent

21 estate case that you -- that fair and equitable requires not

22 just no one junior getting anything but that they get the

23 value which is in the first clause, although you kind of

24 wonder then why is there a second clause, but --

25          MR. KLAUSNER:  That has to be.

*Echo Reporting, Inc.*

EXHIBIT 1                                                    54

50

1          THE COURT:  But it's because I don't think it --

2          MR. KLAUSNER:  If you had -- let's assume this

3   company had no assets other than $100,000,000 in cash.  And

4   let's say that it had an extra $50,000 and it had $50,000 of

5   creditors.

6          So the Debtor files a plan, and the Debtor's plan

7   is we'll take the $50,000.  We'll pay the creditors, and

8   shareholders will keep their ownership interest.  Yet

9   another plan filed.  The other plan says we'll take the

10  $50,000.  We'll pay the creditors, and we'll give you

11  another $100,000 to acquire the ownership of the company.

12  And, by the way, because there's no junior interest getting

13  and receiving anything, we can cram that down, even if 80

14  percent of the shareholders vote against it.

15         Of course you couldn't confirm that kind of a

16  plan.  So, I mean, at the very least, it -- once you've

17  reached that conclusion, which we think it's the correct

18  conclusion -- we have to have the right process to determine

19  the value of this company, and my first position would be

20  that was Charlestown's burden that they didn't reach.

21         THE COURT:  Okay.  Do you have anything new

22  because I think we're now recycling stuff we've already

23  talked about, and we have -- it's 4:20, and we cannot stay

24  after 5:30 today.

25         MR. KLAUSNER:  I'm happy to take a break here.

*Echo Reporting, Inc.*

EXHIBIT 1                                                    55

51

1           THE COURT:  Okay.

2           MR. KLAUSNER:  Do you want to take a break break

3   or just --

4           THE COURT:  Well, I mean, I'd like to have new

5   people.

6           MR. KLAUSNER:  Okay.

7           THE COURT:  I mean, unless you have anything that

8   we haven't already covered.

9           MR. KLAUSNER:  No.  Actually, what I --

10          THE COURT:  So on this issue.

11          MR. KLAUSNER:  No.  I'm happy to take a break.

12  I'm not -- probably not the only one who's going to argue on

13  this issue, but I'm happy to sit down for a moment.

14          THE COURT:  Okay.

15          MS. COHEN:  Your Honor, I have one question.

16          THE COURT:  Well, I think what --

17          MS. COHEN:  I see Mr. Shemano, and that's what

18  precipitates my question.  We just sat here for about an

19  hour and 10 minutes listening to Mr. Klausner present an

20  argument for the benefit of equity, not for the benefit of

21  the estate.  With the exception of the commentary,

22  unjustified, about Mr. Kaverly and Mr. McGonagle, his entire

23  focus is what should be paid to equity.

24          Do we have to hear Mr. Shemano, who actually

25  represents a shareholder, come up and give the same

*Echo Reporting, Inc.*

EXHIBIT 1                                    56

52

1 argument?  I didn't -- I was tempted to object to Mr.

2 Klausner even speaking on the subject because he represents

3 the estate, not equity, or should represent the estate.  But

4 I was mindful of the Court's admonition to me when I

5 interrupted him in his closing argument for having

6 improperly referred to things that weren't in the record.

7         But I don't think it's appropriate, your Honor, to

8 have Mr. Klausner do Mr. Shemano's job for him and then come

9 up and have Mr. Shemano do the job too.

10        MR. SHEMANO:  Your Honor, I will be brief.

11        THE COURT:  All right.

12        MR. SHEMANO:  David Shemano of Peitzman, Weg and

13 Kempinsky on behalf of John Maddux, who is a shareholder and

14 an insider shareholder in the context of this plan.  On

15 behalf of Mr. Maddux, we joined in the Debtor's objection to

16 confirmation of the Charlestown plan on the 1129(b) issue,

17 and I just want to add one issue regarding the valuation of

18 the stock.

19        In addition to everything else Mr. Klausner said,

20 what this is about is control over the Debtor, a fight about

21 control.  If you simply look at 23,000 shares being traded

22 by essentially minority shareholders who have no control

23 interest in the company  and to compare that to the value of

24 that stock when you've got control of the company, which the

25 insiders do at this point, is apples and oranges.  You

*Echo Reporting, Inc.*

EXHIBIT 1                                                            57

53

1   cannot -- there's a control premium to this company, and

2   that's really what this dispute is all about.  So you simply

3   can't look at the market value of the non-insider shares as

4   to value of the insider shares.  They're the ones who are

5   distinguishing the two.  They separately classified them.

6   They want to distinguish them.  They want to say that the

7   non-insider shares should be treated differently than the

8   insider shares.

9         Well, if they really take that position, the

10  insider shares which control -- have the control are

11  extremely valuable, and that is what this case is entirely

12  about is who gets to control those shares.  So it's simply

13  looking at the market in one given day for those 23,000.

14  It's not reflective of what the value of my client owns and

15  which would be forced to be taken from him if the

16  Charlestown plan is confirmed, if chosen by the Court under

17  1129(c).

18        We briefly addressed the 1129(c) argument, your

19  Honor, because it really ties into everything that's been

20  going on here, and that is -- let's take a step back and

21  understand what is exactly happening.  We engage in a

22  hostile takeover of a company by Charlestown, okay, it's a

23  hostile takeover.  They could not accomplish this under

24  state law.  You can't compel shareholders to sell by fair

25  market value or otherwise.  There's simply no vehicle to do

EXHIBIT 1

58

54

1 that.  You can't do that.  They're in Bankruptcy Court, and

2 the Court asked can you -- suggests you can compel

3 shareholders to sell, majority shareholders to sell.

4         And I don't dispute, your Honor, that in certain

5 circumstances you can, but we're in a situation where

6 Chapter 11 worked as it was supposed to work.  The insiders,

7 management, the Debtor in Possession, filed a Chapter 1 case

8 and through a lot of effort, hard work, and starts and stops

9 reached a point where they proposed a confirmable plan, pays

10 all creditors, equity retains it --

11         THE COURT:  After exclusivity was terminated.

12         MR. SHEMANO:  That's correct, your Honor.

13         THE COURT:  And there was some pressure on them to

14 come --

15         MR. SHEMANO:  That's correct.  I'm not disputing

16 that.  That's correct.  But when you ask the question under

17 what circumstance should a majority shareholder be required

18 to sell out its stock, this is not the circumstance.  This

19 is not -- if the shareholder, if the equity did not propose

20 a confirmable plan that pays all creditors in full, I think

21 the Court would be absolutely right.  You could confirm a

22 plan in which equity was wiped out, but that's not the

23 situation.

24         This is simply about the choice between the

25 equity.  All right.  We're only looking at equity.  And when

*Echo Reporting, Inc.*

EXHIBIT 1                                    59

55

1  you -- and when that situation is we can't look at insiders,

2  non-insiders, equity is always involved in insiders, just by

3  definition.  Okay.

4          We're talking about what do the insiders prefer,

5  what do the equity prefer, and here you have the

6  overwhelming amount of shareholders who want to retain their

7  stock in a case where they're proposing to pay everybody

8  .100 cents.  To force them to sell under that circumstance

9  to outsiders, with no interest in this company other than to

10  leverage the situation and take control of the company at a

11  discount, all right, then I don't think the Bankruptcy Code

12  contemplates that anyway.  The Bankruptcy Code is designed

13  to encourage companies in trouble to go into Chapter 11,

14  negotiate, and work their way out.

15          If you, say, set a precedent here where a company

16  successfully does that, they go in, they negotiate,

17  everybody's paid in full, but you tell them at the

18  confirmation hearing they're going to have to sell out to an

19  outsider, for no benefit to any creditor in this case, I

20  think you are establishing a precedent that goes directly

21  contrary to what is contemplated by the Bankruptcy Code and

22  where Debtor in Possession stays in control and has the

23  ability to negotiate and exit if it proposes a confirmable

24  plan.

25          So, again, your Honor, I don't dispute that under

EXHIBIT 1

60

56

1  certain circumstances when the Debtor and the insiders don't

2  do what they're supposed to do at the end of the day, yes,

3  you can sell them out.  But at the end of the day, they

4  accomplished what Chapter 11 meant them to do, and if

5  there's no creditor that is being prejudiced by the Debtor's

6  plan, the fact that there is a plan that basically provides

7  creditors the exact same return but the only effect is to

8  change control among the equity, I don't believe the Court

9  -- that under 1129(c) the Court can make that decision in

10 good faith under the Code.

11          Thank you, your Honor.

12          MS. COHEN:  Your Honor, I don't need a break, and

13 I'll be very brief.  So if you'd like to just go on, that's

14 fine.  If your Honor wants a break, I'm happy to take one.

15          THE COURT:  Let's take a five-minute break.

16          MS. COHEN:  That's fine, your Honor.

17     (Proceedings recessed briefly.)

18          THE COURT:  Please be seated.

19          MS. COHEN:  Your Honor asked a question or said

20 you wanted to get to something about cash flow and

21 comparative feasibility of the plans, and so I thought I

22 would refer initially to try and show your Honor where to

23 find that, and that is if you look at the Charlestown

24 proponent's statement re cash at or near the effective date

25 which was filed yesterday at 4:40, in addition to the

*Echo Reporting, Inc.*

EXHIBIT 1                                                61